ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
S. CLINTON WOODS
Deputy Attorney General
State Bar No. 246054
  455 Golden Gate Ave, Suite 11000
  San Francisco, CA  94102
  Telephone: (415) 510-3807
  Fax: (415) 703-5480
  E-mail:  Clint.Woods@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Acting Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW JONES, *et al*.,** | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **DECLARATION OF S. CLINTON WOODS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al*.,** | Dept:          5B |
| | Judge:        The Honorable  M. James Lorenz and Magistrate Judge Alison H. Goddard |
| Defendants. | Action Filed:     July 1, 2019 |

I, S. Clinton Woods, hereby declare as follows:

1.     I am a Deputy Attorney General with the California Department of Justice and serve as counsel in this action for Defendants Attorney General Rob Bonta, in his official capacity, and Allison Mendoza, in her official capacity as Acting Director of the Department of Justice Bureau of Firearms.   I make this

1

declaration in support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction or, Alternatively, Motion for Summary Judgment.  I have personal, first-hand knowledge of the matters set forth below and, if called as a witness, I could and would testify competently thereto.

2.   Attached hereto as **Exhibit 1** is a true and correct copy of a survey of historical laws, rules, and regulations from the Founding Era to the 1930s that relate to age restrictions on ownership, use, purchasing, possession, and/or handling of weapons including but not limited to pistols and other firearms.  This survey was compiled from various sources provided by Defendants' experts as well as independent research by the Department of Justice.  This survey is compiled only to assist the Court and is not intended to be a comprehensive list of all laws, rules, or regulations which may be relevant to the historical inquiry.  Defendants expressly reserve the right to supplement this survey as further laws, rules, and regulations are uncovered.

3.   Attached hereto as **Exhibit 2** is a true and correct copy of a survey of historical laws, rules, and regulations from the Founding Era to 1899 that relate to restrictions on the use, possession, or storage of gunpowder, as well as firearm proving requirements.  This survey was compiled from various sources provided by Defendants' experts as well as independent research by the Department of Justice.  This survey is compiled only to assist the Court and is not intended to be a comprehensive list of all laws, rules, or regulations which may be relevant to the historical inquiry.  Defendants expressly reserve the right to supplement this survey as further laws, rules, and regulations are uncovered.

4.   Attached hereto as **Exhibit 3** is a true and correct copy of a survey of historical laws, rules, and regulations from the Pre-Founding Era to 1888 that relate to restrictions on who may carry weapons and/or the use, possession, carrying, or selling of dangerous weapons.  This survey was compiled from various sources provided by Defendants' experts as well as independent research by the Department

2

of Justice.  This survey is compiled only to assist the Court and is not intended to be a comprehensive list of all laws, rules, or regulations which may be relevant to the historical inquiry.  Defendants expressly reserve the right to supplement this survey as further laws, rules, and regulations are uncovered.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of a survey of historical laws, rules, and regulations from 1889 to the 1930s that relate to restrictions on who may carry weapons and/or the use, possession, carrying, or selling of dangerous weapons.  This survey was compiled from various sources provided by Defendants' experts as well as independent research by the Department of Justice.  This survey is compiled only to assist the Court and is not intended to be a comprehensive list of all laws, rules, or regulations which may be relevant to the historical inquiry.  Defendants expressly reserve the right to supplement this survey as further laws, rules, and regulations are uncovered.

6.     Attached hereto as **Exhibit 5** is a true and correct excerpted copy of Defendants' Disclosure of Expert Witnesses dated June 1, 2021, and the attached Expert Report of Professor Laurence Steinberg, Ph.D, dated May 24, 2021, which was exchanged with Plaintiffs' counsel in June 2021, but has not previously been submitted to the Court in this matter.

7.     Attached hereto as **Exhibit 6** is a true and correct copy of the Declaration of Saul Cornell In Support of State Defendants' Supplemental Brief, submitted in the matter of *B&L Productions, Inc. d/b/a Crossroads of the West v. Gavin Newsom* No. 8:22-cv-01518-JWH (C.D. Cal.), dated February 15, 2023 and filed via ECF on February 24, 2023.

8.     Attached hereto as **Exhibit 7** are true and correct copies of website printouts showing available and upcoming hunter education courses within 200 miles and 75 miles of San Diego County zip codes 92117 and 92113 (both traditional in-person classes and hybrid online and follow-up classes), that were obtained from the search the California Department of Fish and Wildlife's hunter

education course "Upcoming Events" page at https://register-ed.com/programs/california/161 on February 2, 2023.

9.     Attached hereto as **Exhibit 8** is a true and correct copy of a website printout reflecting an online and follow-up hunter education course scheduled with Instructor David Bogan for February 19, 2023 in Temecula, CA.

10.     Attached hereto as **Exhibit 9** is true and correct copy of the current schedule of the California Department of Fish and Wildlife's California hunting license and tag fees, obtained on March 15, 2023 from https://wildlife.ca.gov/Licensing/Hunting.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of Cal. Dept. Fish & Wildlife, Hunting License: Number Issued (2010s), available at https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59821&inline.

12.      Attached hereto as **Exhibit 11** is a true and correct copy of Cal. Dept. Fish & Wildlife, Hunting License: Number Issued (2020s), available at https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=178041&inline.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of records of the August 13, 2013 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 683, 2013-2014 Reg. Sess. (Cal. 2013).

14.     Attached hereto as **Exhibit 13** is a true and correct copy of the August 20, 2018 California Assembly Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018).

145  Attached hereto as **Exhibit 14** is a true and correct copy of the August 28, 2018 California Senate Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018).

16.     Attached hereto as **Exhibit 15** is a true and correct copy of the September 6, 2019 California Assembly Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019).

4

1    16.   Attached hereto as **Exhibit 16** is a true and correct copy of the September

2    13, 2019 California Senate Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg.

3    Sess. (Cal. 2019).

7    I declare under penalty of perjury under the laws of the State of California

8    that the foregoing is true and correct and that this declaration was executed on

10   March 16, 2023, in San Francisco, California.

_____

S. Clinton Woods

14   SA2019103398

5

# TABLE OF CONTENTS

| Exhibit | Description | Pages |
|---|---|---|
| 1. | Table - Defendants' Survey of Relevant Statutes Concerning Age Restrictions | 1-64 |
| 2. | Survey of Gunpowder Laws | 65-79 |
| 3. | Survey of Dangerous Weapons Regulations | 80-130 |
| 4. | Survey of Dangerous Weapon Regulations | 131-165 |
| 5. | Expert Report of Professor Laurence Steinberg, Ph. D | 166-256 |
| 6. | Declaration of Saul Cornell | 257-307 |
| 7. | Hunter Education Courses | 308-315 |
| 8. | Educational Courses in Temecula, CA | 316-319 |
| 9. | Hunting Licenses and Tag Fees | 320-329 |
| 10. | Hunting Licenses 2019 | 330-332 |
| 11. | Hunting Licenses 2020-2022 | 333-336 |
| 12. | Assembly Public Safety- Hearing Report 8/13/13 | 337-343 |
| 13. | Assembly Floor Analysis 8/20/18 | 344-347 |
| 14. | Senate Floor Analyses 8/28/18 | 348-354 |
| 15. | Assembly Floor Analysis 9/6/19 | 355-358 |
| 16. | Senate Floor Analyses 9/6/19 | 359-370 |

Declaration of S. Clinton Woods  (3:19-cv-01226-L-AHG)

# EXHIBIT 1

**Table - Defendants' Survey of
Relevant Statutes Concerning Age
Restrictions**

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)[1,]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| 1 | 1655 | Massachusetts - Harvard | A Copy of the Laws of Harvard College, 1655, at 10. | ""noe students shall be suffered to have a gun in his or theire champers or studies, or keeping for theire use any where else in the town." | Prohibition against keeping guns on campus for any student. |
| 2 | 1763 | New York – City of New York | Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 11, Image 12 (1763) available at The Making of Modern Law: Primary Sources. 1763.<br><br>Ordinances of the City of New York, § VI | "And be it further ordained by the authority aforesaid, That if any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings, current money of New York; and on refusal to pay the same, shall be committed to the House of Correction, at the discretion of the Mayor, recorder or aldermen, or any one of them before whom such offender shall be convicted, there to remain committed, not exceeding Twenty days; unless such forfeiture as aforesaid, be sooner paid with the lawful fees of commitment; one half | Prohibition against firing guns, rockets, or other firecrackers in any public area for children, youths, apprentices, or servants. |

[1] Laws such as this which were based on race, nationality, or enslaved status were enacted before ratification of the Thirteenth and Fourteenth Amendments, are morally repugnant, and would obviously be unconstitutional today.  They are provided only as evidence of a regulatory tradition that the courts have already recognized.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2150-2151 (2022) (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | thereof to the informer with costs, and the other half to the church wardens of this City, for the use of the poor thereof." | |
| 3 | Revolution Era | Massachusetts - Harvard | 31 Publications of The Colonial Society of Massachusetts: Collections 338, 358 (1935). | XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls, Yard or near the College, he shall be fined not exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence | Prohibition against keeping guns, pistols, or gunpowder on campus for any student. |
| 4 | 1776 | New Hampshire | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | "And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . ." | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 5 | 1785 | Delaware | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | "[E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian | Militia law requiring parents to supply arms for militia-eligible minors in their households. |

2

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | respectively be provided with a musket or firelock . . .." | |
| 6 | 1792 | New Hampshire | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792). | "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements." | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 7 | 1793 | Massachusetts | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | "[A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . ." | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 8 | 1793 | Pennsylvania | Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania) | "I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia. . . . II. And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years. And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable | Militia law exempting minors from having to purchase weapons. |

3

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
| | | | | consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states." | |
| 9 | 1793 | Rhode Island – Rhode Island College | Laws of Rhode Island College (1793) at 13. | Prohibited guns on campus under pain of expulsion. | Prohibition against keeping guns or gunpowder on campus for any student. |
| 10 | 1795 | Connecticut - Yale College | The Laws of Yale-College, in New-Haven, in Connecticut, Enacted by the President and Fellows, the Sixth Day of October, A.D. 1795 p.26 (1800). | Prohibited students from possessing any guns or powder. | Prohibition against keeping guns or gunpowder on campus for any student. |
| 11 | 1797 | Vermont | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 12 | 1803 | New York – City of New York | Edward Livingston, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty of the City of New-York, in Common- | "Whereas the firing of guns and the practice of fowling in the public streets and in the roads or highways in the vicinity of this city, are frequently productive of accidents and dangerous consequences are always to be apprehended therefrom: Be it therefore ordained by the Mayor, | Prohibition against discharging firearms within the City, and providing that if the offender is a minor, apprentice, servant, or slave, the fine shall be recoverable |

4

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City Page 83-84, Image 84-85 (1803) available at The Making of Modern Law: Primary Sources. 1803.<br><br>Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1. | Aldermen, and Commonality of the City of New York, in the Common Council convened, That no person shall hereafter be permitted to fire or discharge any gun, pistol, fowling piece, or fire-arm, at any place on the island of New York, within the distance of four miles from the City Hall, under the penalty of five dollars upon each offender, to be recovered with costs. And if the person so offending shall be a minor, apprentice, servant or slave, the said fine shall be recoverable form his father, mother, master or mistress, together with costs. Provided always, that nothing contained in this ordinance shall be constructed to extend to the reviews or exercises of any military company, or of the State Prison Guards" | from their parent, master, or mistress. |
| 13 | 1806 | Delaware | Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816) | Exempting all minors enrolled in the militia from acquiring weapons. | Militia law exempting minors from requirement to purchase weapons. |
| 14 | 1810 | Georgia – University of Georgia | *The Minutes of the Senate Academicus* 1799–1842, University of Georgia Libraries (1976). See https://dlg.usg.edu/record/guan_ua0148_ua0148-002-004-001#text | "no student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever." | Prohibition against keeping guns, pistols, or other dangerous weapons on campus. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| 15 | 1810 | Massachusetts | An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176. | "[A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act . . . ." | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 16 | 1812 | Delaware | Act of Feb. 4, 1812, 195 Del. Laws 522 (1812)<br><br>An Act to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes. | SEC. 1. Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met, That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State, or within the limits thereof; of where the limits cannot be ascertained, within one quarter of a mile of the center of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.<br><br>SEC. 2. And be it enacted by the authority aforesaid, That if any free white person or persons, or the child or children of any such person or persons, shall fire or discharge any gun, ordnance, | Prohibiting firings of guns and pistols, and assessing fines against parents for breaches by minors and apprentices |

6

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of the State. | |
| 17 | 1817 | South Carolina | Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 61-61, Image 61-62 (1823) available at The Making of Modern Law: Primary Sources. 1817.<br><br>[Ordinances of the Town of Columbia, An Ordinance for Prohibiting the Firing of | "Whereas the practice of firing small arms within the town of Columbia is extremely dangerous to the lives; as well as the property of the inhabitants thereof, and ought to be strictly prohibited: Be it ordained by the Intendent and Municipal Wardens of the towns aforesaid, in council assembled, and it is hereby ordained by the authority of the same, That hereafter it shall not be lawful for any person to fire or discharge any gun, pistol or other small arms within the limits bounded by Henderson, Blossom, Lincoln and Upper streets; and if any person shall wantonly, knowingly, and willfully fire or discharge any gun, pistol, or other small arms within the said limits, such person shall forfeit and pay to the use of the town aforesaid, a sum not exceeding five dollars, for each and every | Prohibiting discharging of firearms within the town limits, and providing that offenses by minors who may not have property to be levied may have their weapons seized. |

7

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Guns in the Town of Columbia (1817)] | such offence, to be sued for and recovered according to law. And whereas, offences of this kind may be committed by minors or other disorderly persons, who have no ostensible property whereof the said penalty can be levied. Be it therefore ordained by the authority aforesaid, That any gun, pistol or other small arms, fired or discharged by any such person in breach of this ordinance, shall be liable for the payment of the penalty or penalties aforesaid; and it shall be lawful for the intendant, either of the Wardens or constables, who shall see such person offending against this ordinance, to seize and take into possession the gun or pistol, or other small arms so fired or discharged, and despite the same with the Intendant or either of the Wardens; and if the person charged with the said offense, and convicted thereof, shall not within ten days after conviction pay the penalty incurred and the costs of prosecution, the same shall be sold to discharge the said penalty and costs:" | |
| 18 | 1820 | New Hampshire | An Act for the forming, arranging and regulating the militia, § 46, 2 New Hampshire Laws Enacted Since June 1, 1815, 80 (1824). | [A]ll parents, masters, and guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act . . . . | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 19 | 1821 | New Jersey | An Act to exempt minors from Militia Duty in time of peace, in Josiah Harrison, Ed., *A Compilation Of The* | "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and | Exempting people under the age of 21 years from militia duty in times of peace. |

8

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | *Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820* 266 (1833). | they are hereby, exempt from militia duty in time of peace." | |
| 20 | 1824 | Virginia – University of Virginia | University of Virginia Board of Visitors Minutes (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/ | "No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school." | Prohibition against keeping or using weapons or arms of any kind on campus. |
| 21 | 1825 | Missouri | An Act to organize, govern and discipline the Militia, ch. I, § 24, in 1825 Mo. Laws 533, 554. | [A]ll parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act. | Militia law requiring parents to supply arms for militia-eligible minors in their households. |
| 22 | 1835 | Connecticut – City of New London | The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources.  1835 | "Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court | Prohibiting firings of guns and pistols, and assessing fines against parents, guardians, and masters for breaches by minors and apprentices. |

9

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city." | |
| 23 | 1838 | North Carolina – University of North Carolina | Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina 15 (1838). | "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane." | Prohibition against keeping firearms, gunpowder, other dangerous weapons or dogs on campus. |
| 24 | 1844 | Ohio | Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 | Requiring males between the ages of 21 and 45 to be enrolled in the militia. | Militia law exempting males under the age of 21 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 25 | 1853 | Kentucky | Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws, in Force, and Applicable to the City of Louisville, Ky. Prepared and Digested, under an Order from the General Council of Said City by Oliver H. Strattan and John M. Vaughan, City Clerks, which Includes the State Constitution and City Charter, with Notes of Reference Page 175, Image 176 (1857) available at The Making of Modern Law: Primary Sources.  1853 | "No. 68. An Ordinance as to Retailing Gun Powder. No person shall retail gunpowder to minors under fifteen years of age, or free colored persons, without authority from his parent or guardian, or to slaves without authority from his master. Any person doing so in either case, shall be fined twenty dollars." | Prohibition against selling gunpowder to people under the age of fifteen years without permission from their parent, or slaves without authority from their master, or to free people of color. |
| 26 | 1856 | Alabama | 1856 Ala. Acts 17, To Amend the Criminal Law, §1. (855 Ala. Laws 17 | "That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars." | Prohibition against selling, giving, or lending male minors dangerous weapons. |
| 27 | 1856 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled | "Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be | Prohibition against selling, loaning, or giving any pistol or other dangerous weapon to a minor. |

11

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-'71 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.  1856<br><br>Offences Against Public Policy and Economy. § 4864. | fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court." | |
| 28 | 1858 | Tennessee | The Code of Tennessee Enacted by the General Assembly of 1857-8, 871 (Return J. Meigs & William F. Cooper eds. 1858). Chapter 9, Article II, Selling Liquors or Weapons to Minors or Slaves. Page 871. 1858. | "Any person who sells, loans, or gives to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in travelling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court." | Prohibition against selling, loaning, or giving any pistol or other dangerous weapon to any person under the age of 21 years.  See *Warwick v. Cooper*, 37 Tenn. 659, 660–61 (1858) (describing "an infant under the age of twenty-one") |
| 29 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend an Act Entitled "An Act to Reduce to One of the Several Acts in Relation to the Town of Harrodsburg," § 23. | "If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie-knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars." | Prohibition against selling, giving, or loaning deadly weapons to minors, slaves, or free people of color. |

12

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 30 | 1859 | New York – City of New York | D. T. Valentine, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York: Revised A. D. 1859 Adopted by the Common Council Page 235, Image 243 (1859) available at The Making of Modern Law: Primary Sources. 1859.  Ordinances of the City of New York. Firing of Fire-Arms, Cannons and Fireworks. § 6. | "No tavern-keeper, keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises, nor shall suffer or permit any pistol gallery, erected in his or her house, or upon his or her premises, to be used for the purpose of practicing with any pistol gun, fowling-piece or other fire-arms, upon the first day of the week, called Sunday, under the penalty of fifty dollars for each offense, to be sued for and recovered from the person keeping such public house, tavern, public garden, pistol gallery, place of resort or premises; and also the further penalty of fifty dollars for each offense, to be sued for and recovered from the person firing off or practicing with a pistol, gun, fowling-piece, or other fire-arms; and in case of such person so offending shall be an apprentice, such penalty shall be sued for and recovered from the master of such apprentice, or in case such person so offending shall be a minor and not an apprentice, the same shall be sued for and recovered from the father of, or in case of the death of the father, then from the mother or guardian of such minor." | Prohibition against allowing the discharging of weapons on Sundays, and providing that if the person discharging the weapon is a minor, the penalty shall be recovered from the father, mother, or guardian. |
| 31 | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature | "§ 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any | Prohibition against allowing minors to visit or use shooting galleries without the consent of their parent or guardian. |

13

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
|  |  |  | Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863.<br><br>[Ordinances of the City of Memphis, Shooting Galleries, § 1.] | person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor |  |

14

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday." | |
| 32 | 1864 | Pennsylvania | Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 | Requiring males between the ages of 21 and 45 to be enrolled in the militia | Militia law exempting males under the age of 21 years. |
| 33 | 1866 | Alabama | George Washington Stone, The Penal Code of Alabama, Montgomery, 1866 Page 63, Image 63 (1866) available at The Making of Modern Law: Primary Sources. 1866. Miscellaneous Offenses § 204. | "Selling or giving fire-arms to minor. – Any person who sells, gives, or lends to any boy under eighteen years of age, any pistol, or bowie-knife, or other knife of like kind or description, must, on conviction, be fined not less than fifty, nor more than five hundred dollars." | Prohibition against selling, giving, or lending male minors dangerous weapons |
| 34 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.  1867 | "Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court." | Prohibition against selling, loaning, or giving pistols or other dangerous weapons to minors. |

15

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. | | |
| 35 | 1868 | Oregon | 1868 Or. Laws 18-19, An Act to Protect the Owners of Firearms, §§ 1-2. | "Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore . . . § 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: either or any one of the following-named guns, and one revolving pistol: a rifle, shot-gun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon. § 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state." | Allowing white male citizens over the age of 16 years to carry certain firearms for his own use and defense. Providing exceptions to this right in order to keep the peace or defend the state. |
| 36 | 1869 | Virginia – Town of Lexington | The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources.  1869 | "If any person sell, barter, give or furnish, or cause to be sold, bartered, given or furnished to any minor under sixteen years of age, cigarettes, or pistols, or dirks, or bowie knives, having good cause to believe him or her to be a minor under | Prohibition against selling, bartering, giving, or furnishing pistols, other dangerous weapons, or cigarettes, to any person under the age of 16 years. |

16

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Ordinances of the town of Lexington. Of Concealed Weapons and Cigarettes. § 2. | sixteen years of age, shall be fined not less than ten dollars nor more than one hundred dollars." | |
| 37 | 1871 | Connecticut | Henry Dutton, A Revision of Swift's Digest of the Laws of Connecticut. Also, Practice, Forms and Precedents, in Connecticut Page 564, Image 565 (Vol 1, 1871) available at The Making of Modern Law: Primary Sources. 1871 | Of Trespass on the Case. A person, before he trusts a gun with an incautious person, is bound to render it perfectly innoxious. Where the defendant negligently and imprudently entrusted a loaded gun to a young mulatto girl, who discharged it against the son of the plaintiff, and severely wounded him by which the plaintiff lost his service and was put to great expense for his cure, the defendant was subjected to 100 pounds damages. | Assessing damages for lending weapons to youths. |
| 38 | 1873 | Illinois – City of Chicago | Proceedings of the Common Council of the City of Chicago Page 140, Image 185 (Vol. 5, 1874) available at The Making of Modern Law: Primary Sources.  1873<br><br>Ordinances of Chicago: An Ordinance Prohibiting the Sale to or Furnishing Minors with Firearms. § 1 | "That no person within said city shall sell to or in any manner furnish any minor with any gun, pistol, revolver, or other firearms; and any person offending against this ordinance shall on conviction be fined in a sum not less than twenty-five dollars nor more than one hundred dollars for each offense." | Prohibition against sending any gun, pistol, revolver, or other firearms to minors. |
| 39 | 1875 | Indiana | Edwin Augustine Davis, LL.B., The Statutes of the State of Indiana: Containing the Revised Statutes of 1852, with the Amendments | "§ 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly | Prohibition against selling, bartering, or giving deadly weapons to people under the age of 21 years. |

17

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Thereto, and the Subsequent Legislation, 246with Notes and References to Judicial Decisions. Second Edition Vol. 2 Page 482, Image 493 (1877) available at The Making of Modern Law: Primary Sources.  1875.  An Act to prohibit the sale, gift or bartering of deadly weapons or ammunition therefor, to minors. | weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars." | |
| 40 | 1876 | Alabama | Wade Keyes, The Code of Alabama, 1876: with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources. 1877 Offenses Against Public Health, etc. § 4230 (3751) | "Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor than five hundred dollars." | Prohibition against selling, giving, or lending a boy under 18 dangerous weapons |
| 41 | 1876 | Georgia | 1876 Ga. Laws 112. | "Section I. That from an after the passage of this Act it shall not be lawful for any person or persons | Prohibition against selling, giving, lending, or |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane. Any person found guilty of a violation of this Act shall be guilty of a misdemeanor, and punished as prescribed in section 4310 of the Code of 1873: Provided, that nothing herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property. Sec. II. Repeals conflicting laws." | furnishing weapons to minors. |
| 42 | 1878 | Mississippi | 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3. | "§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned | Prohibition against selling pistols, other deadly weapons, or ammunition to minors or intoxicated people. |

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | to hard labor under the direction of the board of supervisors or of the court." | |
| 43 | 1878 | Wisconsin | Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 847, Image 889 (1883) available at The Making of Modern Law: Primary Sources. 1882 | "Offenses Against Lives and Persons of Individuals. §4397a. (1) It shall be unlawful for any person to sell or use, or have in his possession, for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy fire-arm. (2) Any person violating any of the provisions of this act, on conviction thereof, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars, or by both fine and imprisonment, in the discretion of the court. § 4397b. (1) It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. (2) It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any minor in this state." | Prohibition against selling, using, or possessing toy pistols or toy firearms. Prohibition against selling, giving, or furnishing firearms to minors. Prohibition against possession of firearms by minors. |
| 44 | 1880 | Mississippi | Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, | "§ 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to be a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor | Prohibition against selling pistols, other deadly weapons, or ammunition, to any minor or intoxicated person. Imputing responsibility to fathers who allow people under the age of 16 years to carry concealed weapons. |

20

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
|  |  |  | Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. 1880. Carrying Concealed Weapons. | under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided." | Prohibiting weapons at schools and universities. |
| 45 | 1881 | Connecticut – City of New Haven | Charter of the City of New Haven Page 142-143, Image 241-242 (1881) available at The Making of Modern Law: Primary Sources. 1881 | "No person shall sell to any child under the age of sixteen years, without the written consent of the parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of cartridge, or of any fulminate" | Prohibiting the selling of ammunition or firearms to children under 16. |

21

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 46 | 1881 | Delaware | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.  1881<br><br>An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons. 16 Del. Laws 716 (1881) | "That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers. § 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court." | Prohibition against selling deadly weapons to minors. |
| 47 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the | "§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than | Prohibition against selling deadly weapons to minors. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548. | an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers." | |
| 48 | 1881 | Florida | 1881 Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to. | § 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such minor, or the person having charge to such minor, and it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any person or persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife. § 2. Any person or persons so offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months. | Prohibition against selling, hiring, bartering, lending, or giving weapons to people under the age of 16 years. |
| 49 | 1881 | Indiana | The Revised Statutes of the State of Indiana, the | "1986. It shall be unlawful for any person to sell, barter or give to any other person under the age of | Prohibition against selling, bartering, or giving deadly |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | Revision of 1881 and All General Laws Enacted to that Revision (1888) Section 1986-87, Furnishing Deadly Weapon to Minor. 1881 | twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol. 1987. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars." | weapons to people under the age of 21 years. |
| 50 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources. 1881 <br><br> An Act to prohibit the carrying of concealed weapons by minors. See also NEV. REV. STAT. § 4864 (1885). | "Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment." | Prohibition against carrying of concealed weapons for any person under the age of 21 years. |
| 51 | 1881 | Pennsylvania | Act of June 10, 1881, § 1 | makes any person, "who shall knowingly and willfully sell or cause to be sold, to any person | Prohibition against selling any cannon, revolver, pistol |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, … shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars." | or any deadly weapon to any person under the age of 16 years. |
| 52 | 1882 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. 1881. Deadly Weapons: Selling or Giving to Minor. § 54b. | "Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200)." | Prohibition on selling, giving, loaning, hiring, bartering or offering deadly weapons to minors, with exceptions for parents, guardians, or employers of those minors. |
| 53 | 1882 | Maryland | 1882 Md. Laws 656 | "Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any | Prohibition on selling, giving, or bartering firearms (other than shotguns or fowling pieces and rifles) to any person under 21 years of age. |

25

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur." | |
| 54 | 1882 | Massachusetts | Report of Commissioners on Revision of Ordinances Page 141, Image 146 (1882) available at The Making of Modern Law: Primary Sources. 1882<br><br>Of Explosive Compounds. Penalty for selling guns, pistols, cartridges, etc., to children. § 1 | "Whoever sells to a child under the age of sixteen years, without the written consent of its parent or guardian, any cartridge or fixed ammunition of which any fulminate is a component part, or a gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate, shall be liable to a penalty of not less than five nor more than fifty dollars." | Prohibition against selling cartridges, ammunition, or firearms to any person under the age of 16 years without parental consent. |
| 55 | 1882 | West Virginia | 1882 W. Va. Acts 421–22 | "If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two | Prohibition against selling, furnishing, or giving any pistol or other dangerous weapons to persons under the age of 21 years. |

26

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | | hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again." | |
| 56 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 106, §§ 1-2. | "§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any | Prohibition against selling, trading, or giving deadly weapons or toy pistols to minors or people of unsound mind. |

27

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | court of competent jurisdiction shall be fined not less than one nore more than ten dollars." | |
| 57 | 1883 | Michigan | 1883 Mich. Pub. Acts 144, An Act To Prevent The Sale And Use Of Toy Pistols, § 1. | That no person shall sell, give, or furnish to any child under the age of thirteen years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same. | Prohibition against the selling, giving, or finishing any pistol, gun, or toy pistol to any person under the age of 13 years. |
| 58 | 1883 | Missouri | MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879).<br><br>1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1. | "If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, | Prohibition on selling, delivering, loaning, or bartering any deadly weapon to a minor. |

28

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment." | |
| 59 | 1883 | New Hampshire | William Martin Chase, The Public Statutes of the State of New Hampshire, To which are Prefixed the Constitutions of the United States and State of New Hampshire with a Glossary and Digested Index Page 713, Image 732 (1891) available at The Making of Modern Law: Primary Sources. 1883<br><br>Offenses Against Minors. § 4. | "If any person shall have in his possession a toy pistol, toy revolver, or other toy firearms, for the explosion of percussion caps or blank cartridges, with intent to sell the same, or shall sell, or offer to sell or to give away the same, he shall be fined not more than fifty dollars; and he shall be liable for all damages resulting from the use of the toy pistol, revolver, or other firearms by him sold or given away, to be recovered in an action on the case." | Prohibition against toy pistols, revolvers, or devices for the explosion of caps or blanks by minors. |
| 60 | 1883 | Ohio | 1883 Ohio Laws 222, An Act to Prohibit the Sale of Toy Pistols in the State of Ohio, § 1. | "That it shall be unlawful for any firm, company or person in the state of Ohio, to sell or exhibit for sale any pistol manufactured out of any metallic or hard substance, commonly known as the "toy pistol"; to a minor under the age of fourteen years; any firm company or person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten nor more than fifty dollars, or be imprisoned not less than ten days nor more than twenty days, or both, and shall be liable to a | Prohibition against selling or exhibiting toy pistols to any person under the age of 14 years. |

29

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
|     |                   |              |          | civil action in damages ot any person injured by such sale." |  |
| 61 | 1883 | Pennsylvania | John Purdon, A Digest of the Laws of Pennsylvania: From the Year One Thousand Seven Hundred to the Sixth Day of July, One Thousand Eight Hundred and Eighty-Three.11th Edition Page 423-424, Image 472-473 (Vol. 1, 1885) available at The Making of Modern Law: Primary Sources. 1883 Crimes, Carrying and Sale of Explosives, § 113. | "Any person who shall knowingly and willfully sell or cause to be sold to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell, or cause to be sold, to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell, or cause to be sold to any such minor, any cartridge, gunpowder or other dangerous and explosive substance, shall in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars." | Prohibition against selling or causing to be sold any cannon, revolver, pistol or other deadly weapon, or imitation or toy weapons, to any person under the age of 16 years. |
| 62 | 1883 | Rhode Island | 1883 R.I. Pub. Laws 157, An Act In Amendment Of And in Addition To Chapter 92 Of The Public Statutes "Of Fire-arms and Fire-works", § 1 | "§ 1. No person shall sell to any child under the age of fifteen years, without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate." | Prohibition against selling any firearm, cartridge, ammunition, or explosive to any person under the age of 15 years. |
| 63 | 1883 | Washington | Edward D. McLaughlin, The Revised Statutes and Codes | "Sale of Toy Pistols to Children, It shall be unlawful for any person or persons to sell or offer | Prohibition against selling, furnishing, or giving any |

30

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | of the State of Washington Page 1042, Image 1094 (1896) available at The Making of Modern Law: Primary Sources. 1883 | for sale, any toy pistols within this state, and every person who shall sell, give, furnish, or cause to be furnished to any person under the age of sixteen years, any pistol, toy pistol or other pocket weapon, in which explosives may be used, shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than five, nor more than twenty-five dollars." | pistol, toy pistol, or any pocket weapon to any person under the age of 16 years. |
| 64 | 1883 | Wisconsin | 1883 Wis. Sess. Laws 290 | "Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100)." | Prohibition against possession of pistols or revolvers by minors. |
| 65 | 1884 | Iowa | 1884 Iowa Acts 86. | "Section 1. That it shall be unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor. Sec. 2. Any violation of this act shall be punishable by a fine of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county | Prohibition against selling, presenting, or giving a pistol, revolver, or toy pistol to a minor. |

31

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | jail of not less than ten nor more than thirty days. Sec. 3. This act being deemed of immediate importance shall be in full force and take effect from and after its publication in the Iowa State Leader and Iowa State Register, newspapers published at Des Moines, Iowa." | |
| 66 | 1884 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884 Carrying, Using, Etc., Certain Weapons, § 410. | "A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand – club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section." | Prohibition against unlicensed carrying of deadly weapons for people under the age of 18 years. |
| 67 | 1885 | Massachusetts - City of Boston | The Revised Ordinances of 1885, of the City of Boston, | "No person shall sell to any child under the age of sixteen years without the written consent of a | Prohibition against selling any gun, pistol, cartridge, or ammunition to any person |

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. 1884"<br><br>Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. | parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder." | under the age of 16 years without written permission from parent or guardian. |
| 68 | 1885 | New Jersey | 1885 N.J. Laws 52, An Amendment to an Act to Prevent Vending, Using, or Exploding of Guns, Pistols, Toy Pistols, or Other Fire-Arms to or by Persons under the Age of Fifteen Years in this State, ch. 44, § 2. | "That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol, or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school." | Prohibition against selling, hiring or loaning any firearms or toy pistols to any person under the age of fifteen years, except in the presence of his father or guardian or for school military drills. |

33

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 69 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885<br><br>An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. | "No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof." | Prohibition against firearm possession for anyone under the age of 18 years. Prohibition against selling or giving any firearm to people under 18 years. |
| 70 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes | "No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty | Prohibition on minors attending shooting or pistol galleries. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887.<br><br>Ordinances, City of Council Bluffs, Shooting Gallery, § 5. | dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter." | |
| 71 | 1887 | Kansas – City of Manhattan | Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the Council Page 49-50, Image 51-52 (1887) available at The Making of Modern Law: Primary Sources. 1887<br><br>Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health and Safety, Toy Pistols, §13. | Any person who shall give, trade, loan or otherwise furnish any pistol, revolver, or toy pistol by which cartridges or caps may be exploded, or any dirk, bowie-knife sling shot or toy known as "rubber sling shot" or other dangerous weapon, to any minor or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before the Police Judge be fined not less than five nor more than one hundred dollars. § 14. Having Possession of the Same. Any minor who shall have in his possession any pistol, revolver, or toy pistol by which cartridges may be exploded or any dirk, bowie knife, brass knuckles, slung shot or toy known as "rubber sling shot" or other dangerous weapons shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than one nor more than ten dollars. | Prohibition against giving, trading, loaning, or furnishing a pistol, revolver, toy pistol, or other deadly weapons or toy weapons to minors or people of unsound mind. |

35

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 72 | 1887 | Missouri – City of St. Louis | Chester H. Krum, Reviser, The Revised Ordinance City of St. Louis. No. 17188. Approved April 7, 1893 Page 885, Image 894 (1895) available at The Making of Modern Law: Primary Sources. 1887<br><br>Ordinances of the City of St. Louis. Minors – Conditions of Sale to, of Ammunition. – | "No person shall sell to any child under the age of sixteen years, without the written consent of the parents or guardian of such child, any cartridge of fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate." | Prohibition on the selling of guns, pistols, ammunition, or any component part thereof to any person under the age of 16 years. |
| 73 | 1890 | Louisiana | 1890 La. Acts 39, An Act Making it a Misdemeanor for Any Person to Sell, Give or Lease, to Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons, Intended to be Carried or Used as a Concealed Weapon, § 1. | ". . . [I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon which may be carried concealed to any person under the age of twenty-one years." | Prohibition against selling, leasing, or giving a dangerous weapon to people under the age of 21 years. |
| 74 | 1890 | Oklahoma [Territory] | 1890 Okla. Laws 495, art. 47 | "Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. | Prohibition against selling or giving any firearms or deadly weapons to minors. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br><br>Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article." | |
| 75 | 1890 | Wyoming [Territory] | 1890 Wyo. Terr. Sess. Laws 140. Josiah A. Van Orsdel, Attorney General, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1253, Image 1253 (1899) available at The Making of Modern Law: Primary Sources. | "Furnishing Deadly Weapons to Minor. § 5052. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars." | Prohibition against selling, bartering, or giving pistols or other deadly weapons to people under the age of 21 years. |

37

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 1890 | | |
| 76 | 1891 | West Virginia | See *State v. Workman*, 14 L.R.A. 600 (1891): John Augustus Warth, The Code of West Virginia. Containing the Constitution and Naturalization of the United States – the Constitution of the State – the Code, as Amended by Legislation to and Including the Year 1891 and Marginal Notes to all Prior Laws and Applicable Decisions, with an Appendix, Containing all the Statutes of the State in Force, of a General and Prospective Nature, not Enacted or Inserted in the Several Chapters of the Code Page 915-916, Image 920-921 (1891) available at The Making of Modern Law: Primary Sources. 1891 | "Offenses Against the Peace, § 7. If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again." | Prohibition against selling or furnishing pistols or other deadly weapons to any person under the age of 21 years. |
| 77 | 1892 | District of Columbia | Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or | "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person | Prohibition against selling, hiring, lending, or giving any dangerous weapon to those under the age of 21. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|
| | | | dangerous weapons within the District of Columbia, and for other purposes. | any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles. … SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months." | |
| 78 | 1892 | Maine – City of Portland | Seth L. Haarrabee, The Charter and Ordinances of the City of Portland , Me.Page 136, Image 150 (1892) available at The Making of Modern Law: Primary Sources. 1892 Nuisances. Sale of blank cartridges and pistols prohibited. § 4. | No person shall sell to any child under the age of sixteen years, without the written consent of a parent or guardian of such child, any blank cartridge, or any pistol, or mechanical contrivance specially arranged or designed for the explosion of the same and any person violating the provisions of this ordinance shall be liable to a penalty of not less than fifty, and not exceeding one hundred dollars, to be recovered on complaint to the use of the City of Portland. | Prohibition against giving pistols or blank cartridges to people under the age of 16 years old without written consent of parent or guardian. |

39

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
| 79 | 1893 | Louisiana – City of New Orleans | John Q. Flynn Flynn's Digest of the City Ordinances, Together with the Constitutional Provisions, Acts of the General Assembly, and Decisions of the Courts Relative to the Government of the City of New Orleans Page 545, Image 617 (1896) available at The Making of Modern Law: Primary Sources. 1893<br><br>Ordinances of the City of New Orleans. Offences, Misdemeanors and Nuisances. § 1342. | "It shall be unlawful for any one to sell, or lease, or give through himself or any other person, any pistol, dirk, bowieknife, toy pistol for which cartridges are used, or any other dangerous weapon which may be carried concealed, to any person under the age of eighteen years. § 1343. That any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor and shall be liable to a fine not exceeding twenty-five dollars or imprisonment for a period not exceeding thirty days, or both, at the discretion of the Recorder having jurisdiction." | Prohibition against selling, leasing, or giving any dangerous weapon to any person under the age of 18 years. |
| 80 | 1893 | North Carolina | 1893 N.C. Sess. Laws 468–69 | Section 1: That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot. Sec. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offense shall be fined or imprisoned, one or both, in the discretion of the court. | Prohibition against selling, offering, or giving pistols or any deadly weapons to a minor. |

40

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 81 | 1895 | Nebraska – City of Lincoln | 1895 Neb. Laws 237-38, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXVI, §§ 2, 5. | "§ 2. No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy gun, or other toy arm or arms, or sling shot, out of which any leaden or other dangerous missiles may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars, and stand committed until such fine and costs are paid and secured." | Prohibition against selling, loaning, or furnishing any firearm to minors. Prohibition against a parent or guardian permitting any minor to have a firearm, toy pistol, or sling shot. |
| 82 | 1896 | California – City of Fresno | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. 1896. Misdemeanors. Section 53. | No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor." | Prohibition against pawnbrokers selling, hiring, or loaning firearms or other dangerous weapons to minors. |
| 83 | 1897 | Iowa | Annotated Code of the State of Iowa Containing All the Laws of a General Nature Enacted by The Twenty-Sixth General Assembly at the Extra Session, Which | "Selling Firearms to Minors. No person shall knowingly sell, present or give any pistol, revolver or toy pistol to any minor. Any violation of this section shall be punished by a fine of not less than twenty-five nor more than one hundred dollars, or | Prohibition against selling, presenting, or giving any pistol, revolver, or toy pistol to minors. |

41

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | Adjourned July 2, 1897 Page 1955, Image 787 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1897. § 5004. | by imprisonment in the county jail not less than ten nor more than thirty days." | |
| 84 | 1897 | Texas | 1897 Tex. Gen. Laws 221-22, An Act to Prevent the Barter, Sale and Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . . , ch. 155, § 1. | "That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is committed." | Prohibition against selling, giving, bartering, or giving pistols or other dangerous weapons to any minor without the consent of the parent or guardian. |
| 85 | 1900 | New York | 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1. | "Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slungshot, billy, sand-club or metal knuckles, or who, in any city or incorporated village in this state, without the written consent of | Prohibition against selling or giving firearms or dangerous weapons to people under the age of 18 years. Prohibition against selling or giving air guns or spring guns to anyone under the age of 12 years. Prohibition against |

42

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | the police magistrate, sells or gives any pistol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under the age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor." | selling or giving any toy pistols which use blanks to any person under the age of 16 years. |
| 86 | 1902 | Virginia | 1902-1904 Va. Acts 261, An Act to Prevent the Sale or Gift of Toy Firearms to Persons Under Twelve Years of Age, and to Provide a Penalty Therefor, ch. 186, §§ 1-2. 1903 | "1. Be it enacted by the general assembly of Virginia, That it shall be unlawful for any person, firm, corporation, or association, to sell, barter, exchange, furnish, or dispose of by purchase, gift, or in any other manner, any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosive discharge blank or ball charges, to any person under the age of twelve years. Any firm, corporation, or association violating the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than fifty dollars nor more than one hundred dollars, or confined in jail for a period not less than thirty, nor more than ninety days, either or both. 2. Each sale of any of the articles hereinbefore specified to any person under the age mentioned shall constitute a separate offense, and any person over the age of twelve | Prohibition on selling, bartering, exchanging, furnishing, gifting, or giving any toy pistol, rifle, or other toy operable firearm to any person under the age of 12 years old. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | years who shall purchase, accept, or in any manner acquire any of the toy articles of the kind hereinbefore enumerated for any person under the age of twelve years, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than two hundred dollars, or confined in jail for a period not less than thirty days nor more than six months, either or both." | |
| 87 | 1903 | New Jersey | 1903 N.J. Laws 337-38, An Act to Amend an Act Entitled "An Act for the Punishment of Crimes," ch. 169, § 1. | "It shall not be lawful to sell, barter, exchange, hire or loan to any person under the age of fifteen years, any gun, pistol, toy pistol, or other firearms, or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other firearms, nor for any person under the age of fifteen years to carry, fire or use a gun, pistol, toy pistol or other firearms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school; it shall be the duty of all persons selling, hiring, bartering or exchanging pistols, revolvers, guns or other firearms, to keep and maintain a book of registry of the same, in which said book of registry shall be entered the number of the article sold, if any, the name of the maker, together with such other means of identification as may be obtainable concerning the same, and also the name and address of the person to whom such | Prohibition against selling, hiring or loaning any firearms or toy pistols to any person under the age of fifteen years, except in the presence of his father or guardian or for school military drills. |

44

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | pistol, revolver, gun or other firearm is sold, bartered, exchanged or hired[.]" | |
| 88 | 1903 | Oregon | 1903 Or. Laws 309-10, An Act to Regulate and Prohibit the Sale, Barter, Exchange, or Gift of Explosives, Firearms or Other Articles of a Like Kind, to Children Under the Age of Fourteen Years, and to Punish the Violation of the Provisions of this Act. §§ 1-2. | "§ 1. It shall be unlawful to sell, exchange, barter, or give to any child, under the age of fourteen years, any explosive article or substance, other than an ordinary firecracker, containing ten grains of gunpowder; or to sell, exchange, barter, or give to any such child any firearms, or other device of a like kind, ordinarily used or ordinarily capable of being used in discharging gunpowder in a greater quantity than ten grains; and it is herby made unlawful in any event to sell, exchange, barter, or give to any child, under the age of fourteen years, any instrument or apparatus, the chief utility of which consists in the fact that it is used, or is ordinarily capable of being used, as an article or device to increase the force or intensity of such explosive, or to direct or control the discharge of any such explosive. § 2. Any person violating the provisions of this act shall be guilty of a misdemeanor." | Prohibition against selling, exchanging, bartering, or giving any explosive article or substance containing more than ten grains of gunpowder to any person under the age of 14 years. |
| 89 | 1903 | South Dakota | 1903 S.D. Sess. Laws 168-69, Prohibiting the Use of Fire Arms by Persons under Fifteen Years of Age, ch. 144, §§ 1-3. | §1. It shall be unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other fire arms except with the consent and knowledge of their parents or guardians. § 2. It shall be unlawful for any parent or guardian, having the legal charge or control of any minor under the age of fifteen years, to allow or permit such minor to use or carry while loaded | Prohibition against carrying firearms for any person under the age of 15 years, except with consent and knowledge of parents. Imputing liability to parents who allow people under the age of 15 years to carry |

45

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
| | | | | any of the arms mentioned in section one of this act within the platted portion or within the distance of one mile of the platted portion of any city, town or village. § 3. Any person or persons violating the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not exceeding Fifty Dollars. | firearms within the platted portion of a municipality. |
| 90 | 1904 | Maryland – Garrett County | 1904 Md. Laws 295, An Act to Prohibit all Persons Under Fifteen Years of Age from Carrying or Having in Their Possession Firearms of any Description Within the Limits of Garrett County, ch. 177, §§ 1-2 | "§ 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for all persons under the age of fifteen years to carry or have in his or her possession any shot gun, rifle, revolver or other firearm of any description within the limits of Garrett County. § 2. And be it enacted, That any person convicted of violating this Act before any court of competent jurisdiction shall be fined not less than five dollars nor more than twenty dollars, or be imprisoned in the county jail for not less than ten nor more than thirty days for each and every offense." | Prohibition against possession of firearms for people under the age of 15 years. |
| 91 | 1905 | Indiana | 1905 Ind. Acts 688, Weapon— Furnishing to Minor, § 450. | "It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed guilty of | Prohibition against selling, bartering, or giving deadly weapons to people under the age of 21 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
| | | | | a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars." | |
| 92 | 1905 | Utah | 1905 Utah Laws 60, An Act to Prohibit the Sale of Firearms to Minors and the Carrying of Firearms by Minors, and Prescribing Penalties for Violation Thereof, ch. 52, §§ 1-2. | "§ 1. Selling or giving firearms to minors under fourteen. Any person who sells, gives or disposes of, or offers to sell, give or dispose of any pistol, gun, target gun, or other firearm, to any person under the age of fourteen years, is guilty of a misdemeanor. § 2. Minor under fourteen must not carry firearms. Any person under the ager of fourteen years who shall carry, or have in his possession, any pistol, gun, target gun or other firearm, unless accompanied by a parent or guardian, shall be guilty of a misdemeanor." | Prohibition against selling, giving, or offering any pistol or firearm to any person under the age of 14 years. Prohibition against carrying or possession of firearms for any person under the age of 14 years. |
| 93 | 1908 | Maryland – Catonsville, Baltimore County | 1908 Md. Laws 397, § 31. | "It shall be unlawful for any person under the age of twenty-one years to fire a gun, cat rifle, pistol, or any explosive instrument of metal, within one mile in any direction of the Library Hall in Catonsville, Baltimore county; and any person under said age of twenty-one years, violating this section, shall upon conviction before the Circuit Court, or any justice of the peace for said county, be fined a sum not less than one dollar nor more than ten dollars, or be imprisoned in the county jail for not less than five days nor more than thirty days, or be both fined and imprisoned, in the discretion of the court or the justice of the peace." | Prohibition against firing weapons within a mile of a Library Hall for anyone under the age of 21 years. |
| 94 | 1909 | Idaho | 1909 Id. Sess. Laws 6, An Act To Regulate the Use and | "If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, | Prohibition on selling, delivering, loaning, |

47

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1. | or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property." | bartering, or giving any dangerous weapon to a person under the age of 16, or intoxicated persons. |
| 95 | 1909 | Massachusetts | 1909 Mass. Acts 148, An Act to Prohibit the Sale of Air Guns to Certain Minors | "Section ninety-two of chapter one hundred and two of the Revised Laws is hereby amended by inserting after the word "firearms", in the second line, the words — air guns, — so as to read as follows: Section 92. Whoever sells or furnishes to a minor under the age of fifteen years any firearms, air guns or other dangerous weapon shall be punished by a fine of not less than ten nor more than fifty dollars for each offence; but instructors and teachers may furnish military weapons to pupils for instruction and drill." | Prohibition against selling or furnishing firearms, air guns, or other dangerous weapons to people under the age of 15 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 96 | 1909 | Washington | 1909 Wash. Sess. Laws 984, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 8, § 308. | "Use of Firearms by Minor. No minor under the age of fourteen years shall handle or have in his possession or under his control, except while accompanied by or under his control, except while accompanied by or under the immediate charge of his parent or guardian, any firearm of any kind for hunting or target practice or for other purposes. Every person violating any of the foregoing provisions, or aiding or knowingly permitting any such minor to violate the same, shall be guilty of a misdemeanor." | Prohibition against the unsupervised use, possession, or handling of firearms by any person under the age of 14 years. |
| 97 | 1911 | Delaware | Vol. 26 Del. Laws 28, 28- 29 (1911). Section 3. | "It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person." | Prohibition against selling deadly weapons to minors or intoxicated persons. |
| 98 | 1911 | Illinois – Cook County | Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6. | "It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar" | Prohibition against issuing firearms permits to minors. |
| 99 | 1911 | New York | 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale | "Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person | Felony prohibition against carrying or possessing blunt force weapons or dangerous |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | and Carrying of Dangerous Weapons. ch. 195, §1. | who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony." | knives.  Felony prohibition against carrying concealed weapons for any person under the age of 16 years. Misdemeanor prohibition against carrying or possessing blunt force weapons or dangerous knives for any person under the age of 16 years. |
| 100 | 1911 | New York | 1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1. | Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to | Prohibition against manufacturing carrying or possessing blunt force weapons or dangerous knives, or for selling, loaning, offering, or leasing any gun, firearm, or toy pistol to any person under the age of 16 years. |

50

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor. | |
| 101 | 1912 | Vermont | 1912 Vt. Acts and Resolves 306, An Act . . . Relating to Firearms, §§ 1-2. | § 1. A person, other than a parent or guardian, who sells or furnishes to a minor under the age of sixteen years a firearm or other dangerous weapon, shall be fined not more than fifty dollars nor less than ten dollars. This section shall not apply to an instructor or teacher who furnishes military weapons to pupils for instruction and drill. § 2. A child under the age of sixteen years who, without the consent of his parent or guardian, has in his possession or control a pistol or revolver constructed or designed for the use of gunpowder or other explosive substance with leaden ball or shot shall be fined not more than twenty dollars. | Prohibition on selling or furnishing firearms to any person under the age of 16 years, with exceptions for parents and instructors. |
| 102 | 1913 | North Carolina | 1913 N.C. Sess. Laws 57, Pub. Laws, An Act to Prevent the Use of Firearms by Children, ch. 32 § 1. | "That any person being the parent or guardian of, or standing in loco parentis to, any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever, any gun, pistol, or other dangerous firearm, whether such firearm be | Prohibition against permitting any person under the age of 12 years to possess or gain custody of firearms of any kind, and imputing liability on the parent or guardian. |

51

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-----|-----|-----|-----|-----|
| | | | | loaded or unloaded, or any other person, who shall knowingly furnish such child any such firearm, shall be guilty of a misdemeanor, and upon conviction shall be fined not exceeding fifty dollars, or imprisoned not exceeding thirty days." | |
| 103 | 1913 | Ohio | 1913 Ohio Laws 906, An Act: A Bill to Amend and Supplement [Certain] Sections . . . and to Repeal [Certain] Sections of the General Code; Relating to Children and to Females under Twenty-One Years of Age and to Organizations which Include within Their Objects Matters Relating to Children, ch. 11, §§ 12966-67. | "§ 12966. Whoever sells or exhibits for sale, to a minor under sixteen years of age, a pistol manufactured of a metallic or hard substance, commonly known as a "toy pistol" or air gun, or any form of explosive gun ,shall be fined not less than ten dollars nor more than fifty dollars or imprisoned not less than ten days nor more than twenty days, or both, and be liable in damages to any person injured by such sale. § 12967. Whoever sells, barters, furnishes or gives to a minor under the age of seventeen years, an air-gun, musket, rifle, shotgun, revolver, pistol, or other fire-arm, or ammunition therefor, or, being the owner or having charge or control thereof, knowingly permits it to be used by a minor under such age, shall be fined not more than one hundred dollars or imprisoned in jail not more than thirty days, or both." | Prohibition against selling or exhibiting for sale toy pistols or air guns to any person under the age of 16 years. Prohibition against selling, bartering, furnishing, or giving air guns, musket, rifles, shotguns, revolvers, pistols or other firearms or ammunition to any person under the age of 17 years. |
| 104 | 1914 | Illinois – City of Chicago | Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, IMage 458-459 (Vol. 7, 1916) available at The Making of | "It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the | Prohibition on issuing concealed weapons permits to minors. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Modern Law: Primary Sources.  1914<br><br>Ordinance of May 25, 1914, § 4a. | purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar." | |
| 105 | 1914 | New Jersey | 1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt | "No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any | Prohibition against giving hunting licenses to anyone under the age of 14 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | and Pursue Wild Animals and Fowl," ch. 43, § 1. | applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws." | |
| 106 | 1917 | Illinois – City of Chicago | Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917 | It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar. | Prohibition against issuing weapons permits to minors. |
| 107 | 1917 | Missouri – City of Joplin | Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. 1917 | "If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, | Prohibition against selling, delivering, loaning, or bartering deadly weapons to any minor without the consent of their parent or guardian. |

54

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | | exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state." | |
| 108 | 1917 | Oregon | 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 10. | "Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment." | Prohibition against selling, offering, or giving a pistol, revolver, or other concealable firearm to any person under the age of 21 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 109 | 1918 | Delaware | 1918–1919 Del. Laws 484, Minors Under Fifteen Not to Use Gun Unless Accompanied by an Adult, § 2382 A. Sec. 25 A. 1918 | "It shall be unlawful for any minor under fifteen years of age to hunt game birds or game animals anywhere in this state with a rifle or shotgun of any kind unless accompanied by an adult lawfully hunting." | Prohibition against any minor under 15 from using a rifle or shotgun to hunt unless accompanied by an adult. |
| 110 | 1919 | Delaware | Vol. 30 Del. Laws 55, 55-56 (1919). Section 222. | "It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person." | Prohibition against selling deadly weapons to minors or intoxicated persons. |
| 111 | 1920 | Georgia | 1920 Ga. Laws 134, § 2. 1910.  See *Spires v. Goldberg*, 26 Ga. App. 530 (1921) | Forbids the sale of pistols to minors and makes the violations of the statute a misdemeanor. | Prohibition against the sale of pistols to minors and makes the violations of the statute a misdemeanor. |
| 112 | 1922 | Massachusetts | 1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130)<br><br>§ 8 (amending § 130). | "Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill." | Prohibition against the sale of firearms or other dangerous weapons or ammunition to people under the age of fifteen years or unnaturalized foreign born people, with the exception that instructors and teachers may furnish military weapons to students for the purposes of instruction and drill. |

56

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 113 | 1923 | North Dakota | 1923 N.D. Laws 381, Pistols and Revolvers, ch. 266, § 9. | "Sec. 9. Selling to Minors. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined not less than $100, nor more than $1,000, or be imprisoned not less than three months, nor more than one year, or both." | Prohibition against selling, bartering, hiring, lending, or giving any pistol or revolver to any person under the age of 18 years. |
| 114 | 1923 | South Carolina | 1923 S.C. Acts 221 | "If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days." | Prohibition against selling, giving, or offering any pistol or other dangerous weapons to a minor, and providing that a parent or guardian of a minor under the age of 12 years who possesses such items is guilty of a misdemeanor. |
| 115 | 1925 | Indiana | 1925 Ind. Acts 496, ch. 207, An Act to Regulate and Control the Possession, Sale, and Use of Pistols and Revolvers in the State of Indiana | "Sec 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars, or be | Prohibition on selling, bartering, hiring, lending, or giving pistols or revolvers to people under the age of 21 years. |

57

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | imprisoned for not more than three months, or both, except for uses as hereinbefore provided." | |
| 116 | 1925 | West Virginia | 1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. | "Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and | Prohibition against unlicensed carry of pistols or other dangerous weapons, and restricting the issuance of such licenses to persons over the age of 21 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
|     |                   |              |          | girls, respectively, of the state. … Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner." |  |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 117 | 1927 | Hawai'i [Territory] | 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), § 8. | "Section 8. Selling to minors. No person shall sell, barter, hire, lend, or give any pistol or revolver to any person under the age of eighteen years." | Prohibition against selling, bartering, hiring, lending, or giving pistols to people under the age of 18 years. |
| 118 | 1929 | Indiana | 1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1. | "Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . ." | Designating people who commit crimes with a pistol who are over 16 as having committed a felony. |
| 119 | 1932 | District of Columbia | Washington D.C. 47 Stat. 650, 651-652 (1932) | "SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, | Prohibition against selling to people under the age of 18 years. |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | CARRYING CONCEALED WEAPONS | except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.<br><br>…<br>SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years." | |
| 120 | 1933 | Hawai'i [Territory] | 1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4. | "§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his | Directing the sheriff to issue firearms permits to people over the age of 21 years, and permits for shotguns for people over the age of 16 years. |

61

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Concerning Age Restrictions (Founding Era – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|
|     |                   |              |          | place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship." |  |

62

# EXHIBIT 2

**Chart on Gunpowder Laws**

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | **Founding Era and Pre-Civil War** | | |
| 1. | 1757-68 | Maryland | *Md. Acts 53, An Act Prohibiting All Trade With The Indians, For The Time Therin Mentioned, § 3*[1] | That it shall not be lawful for any person or persons within this Province, to sell or give to any Indian Woman or Child, any gunpowder, shot, or lead, whatsoever, nor to any Indian Man within this province, more than the quantity of one pound of gunpowder and six pounds of shot or lead, at any one time, and not those, or lesser quantities of powder or lead oftener than once in Six months, under the Penalty of Five Pounds Current Money for every pound of gunpowder. | Gunpowder |

---

[1] Laws such as this which were based on race, nationality, or enslaved status were enacted before ratification of the Thirteenth and Fourteenth Amendments, are morally repugnant, and would obviously be unconstitutional today. They are provided only as evidence of a regulatory tradition that the courts have already recognized. The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2150-2151 (2022) (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)). Reference to a particular historical analogue does not endorse the analogue's *application* in the past. Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right. *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.")

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|----|-------------------|--------------|----------|--------------------------|------------------------|
| 2. | 1775 | New Hampshire | *8 Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution from 1776-1783 at 15-16 (Nathaniel Bouton ed. 1874), Jan. 12, 1775.* | Requiring each firearm sold in the colony to possess certain specifications and pass inspection involving the safe firing of the gun | Firearm proving |
| 3. | 1775 | Maryland | *Resolution of the Maryland Council of Safety, August 19, 1775* | Approving purchase of muskets with detailed manufacturing specifications and requiring that they be proved before purchase | Firearm proving |
| 4. | 1775 | Pennsylvania | *Resolution of the Pennsylvania Committee on Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383* | Requiring that all muskets be "proved" prior to purchase | Firearm proving |
| 5. | 1776 | New Jersey | *"Act for the Inspection of Gunpowder", 1776-1777, N.J. Laws 6, ch. 6* | Required the inspection of gunpowder prior to sale, and appointed state inspectors to "mark" lots that passed inspection. | Gunpowder |

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|----|-------------------|--------------|----------|--------------------------|------------------------|
| 6. | 1776 | Rhode Island | *"An Act for the Inspection of Gunpowder Manufactured Within This State" 1776 R.I. Public Laws 25 (Oct. Session)* | Requiring that before gunpowder could be sold it needed to pass inspection or adhere to certain safety standards | Gunpowder |
| 7. | 1776 | Continental Army | E. Wayne Carp's To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775-1783 (1984) at 66-67 | George Washington ordered all Continental Army firearms stamped with an insignia: "U.S.XIII." in order to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals | Firearm proving |
| 8. | 1780 | Continental Army | *Letter from George Washington to Henry Knox (Nov. 30, 1780), in The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, ed.)* | "I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing." | Firearm proving |

3

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 9. | 1783 | Massachusetts – City of Boston | 1783 Mass. Acts 37, § 2 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder. Punishable by forfeiture and sale at public auction. | Gunpowder |
| 10. | 1784 | New York – City of New York City | 1784 Laws of N.Y. 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers. Punishable by forfeiture and fine. | Gunpowder |

4

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|----|-------------------|--------------|----------|---------------------------|------------------------|
| 11. | 1794 | Pennsylvania | *Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337* | Whereas gun-powder imported from abroad, and manufactured within this state, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use : and whereas the modes herefore rules to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch pall, by which it is conceived that the force of gunpowder may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition. | Gunpowder |
| 12. | 1805 | Massachusetts | *1804 Mass. Acts. 111, ch. 81, An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth.* | To prevent harm to residents from the sale of unsafe firearms.  The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. If the firearm passed inspection, | Firearm proving |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. | |
| 13. | 1811 | New Hampshire | *N.H. Laws 74, An Act To Regulate The Keeping And Selling, And Transporting Of Gunpowder, chap. 61, § 5* | That if any person or persons shall sell or offer for sale by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending shall forfeit and pay for each and every offense a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid. | Gunpowder |
| 14. | 1811 | New Jersey | *N.J. Laws 300, An Act To Regulate Gun Powder Manufactories And Magazines Within This State* | No person or persons whatsoever shall be permitted within this state to erect or establish or cause to be erected or established any manufactory which shall be actually employed in manufacturing gun powder either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house. | Gunpowder |
| 15. | 1814 | Massachusetts | *1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The* | § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according | Firearm proving |

6

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | *Proof Of Fire Arms, Manufactured Within This Commonwealth,"* ch. 192, | to the provisions of an act . . . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according to the provisions of the first section of the act.") | |
| 16. | 1820 | New Hampshire | *N.H. Laws 274, An Act To Provide For The Appointment Of Inspectors And Regulating The Manufacture Of Gunpowder, chap XXV, §§ 1-9* | The Governor is herby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state § 2. And be it further enacted that from and after the first day of July next, all gunpowder which shall be manufactured within this estate shall be composed of the following proportions and quality of materials. . . § 3. It shall be the duty of each of said inspectors to inspect examine and prove all gunpowder which after the first day of July shall not be deposited at any public powder magazine, or manufactory of this state. . . § 4: No gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four inch howitzer and elevated so as to form an | Gunpowder |

7

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | angle of forty five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy five yards at the lease. § 5: When ever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure ill manufactured or deficient gunpowder. § 6. If any person shall knowingly sell any condemned gunpowder  . . . every such person, so offending , shall forfeit and pay not less than two hundred dollars nor more than five hundred dollars. . . § 7. Each inspector . . . be shown to the faithful and impartial discharge of the duties of his office, and each inspector one cent for each pound  gunpowder, by him examined inspected and proved § 8. That if any manufacturer of gunpowder meant to be sold inspected . . . shall forfeit . . . not less than two dollars . . . § That if any person with within this state . . shall knowingly . . . shall forfeit not less than 5 dollars nor more than 500 dollars. | |
| 17. | 1821 | Maine | 1821 Laws of the State of Maine 685- | Required the governor to appoint inspectors of firearms who would then | Firearm Proving |

8

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|----|----|----|----|----|----|
| | | | 86, vol. 2, § 3, An Act to Provide for the Proof of Fire Arms. | ensure that firearms met certain safety standards and stamped prior to their sale. | |
| 18. | 1836 | Connecticut – Cities of Hartford, New Haven, New London, Norwich, and Middletown | Acts 105 (Reg. Sess.) An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20 | Relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities. | Gunpowder |
| 19. | 1845 | Iowa | *Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12* | They shall have power from time to time to make and publish all such laws and ordinances as to them shall seem necessary to provide for the safety, preserve health, promote the prosperity and improve the morals, order, comfort and convenience of said city, and the inhabitants thereof, to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gunpowder within the city. | Gunpowder |

9

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 20. | 1847 | Indiana | *Ind. Acts 93, An Act To Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, And To Amend the Same, chap 61, § 8, pt. 4* | To regulate and license, or provide by ordinance for regulating and licensing for the keepers of gunpowder and other explosive compounds. | Gunpowder |
| 21. | 1849 | Ohio | *Ohio Laws 408, An Act To Incorporate The Town Of Ripley In The County Of Brown, § 4* | That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein. | Gunpowder |
| 22. | 1851 | Illinois – City of Chicago | Ordinances of the City of Chicago, Ill., ch. 16, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities. Punishable by a fine of $25 per offense. | Gunpowder |
| 23. | 1858 | Minnesota – City of St. Paul | Ordinances of the City of St. Paul, Minn., ch. 21, § 1 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities. Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time. Punishable by a fine not to exceed $50 per offense. | Gunpowder |
| 24. | 1859 | Massachusetts | 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December | Renewing and updating firearm proving and gunpowder safety inspection laws | Firearm proving |

10

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| No | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873) | | |
| 25. | 1865 | Vermont | *Vt. Acts & Resolves 213, An Act To Amend An Act Entitled "An Act To Incorporate The Village Of Rutland,:" Approved November 15, 1847, § 10* | …and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and said fire-wardens may , if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same. | Gunpowder |
| 26. | 1867-68 | Tennessee | *Tenn. Pub. Acts 26, An Act To Amend The Charter Of The City Of Memphis, And For Other Purposes, pt. 20* | To provide for the prevention and extinguishment of fires . . . to regulate and prevent carrying on manufactures dangerous in causing or producing fire . . . | Gunpowder |

11

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| | | Reconstruction Era and Post-14th Amendment to 1899 | | | |
|---|---|---|---|---|---|
| | **Year of Enactment** | **Jurisdiction** | **Citation** | **Description of Regulation** | **Subject of Regulation** |
| 27. | 1866 | New Jersey | *1886 N.J. Laws 358, An Act To Regulate The Manufacture And Storage Of Gun Powder, Dynamite And Other Explosive, § 1* | No person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder, blasting powder, dualin, dynamite, forcite, giant powder, nitro-glycerine, or any powder or materials of which nitro-glycerine is an essential ingredient or forms a component part, or any other explosive within the distance of one thousand feet from any public road… | Gunpowder |
| 28. | 1869 | Nebraska | *Neb. Laws 53, An Act To Incorporate Cities Of The First Class In The State Of Nebraska, § 47* | The City Council shall have power to license all . . . vendors of gunpowder | Gunpowder |
| 29. | 1871 | Maine | The Revised Statutes of the State of Maine, Passed January 25, 1871 326 (1871) | Renewing and updating firearm proving and gunpowder safety inspection laws | Firearm proving |
| 30. | 1874 | Kentucky | *Ky. Acts 327, An Act to Revise and Amend* | To prohibit the manufacture of gunpowder or other explosive, dangerous or noxious compounds or | Gunpowder |

12

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| | | | | | |
|---|---|---|---|---|---|
| | | | *the Charter of the City of Newport, § 6* | substances in said city, and to regulate their sale and storage by license. | |
| 31. | 1883 | California | *Cal. Stat. 156, § 153* | The Municipal Council shall provide by ordinance for the payment into a "Fireman's Charitable Fun" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; slao all fines collected in the police court for violations of fire ordinances. | Gunpowder |
| 32. | 1885 | Rhode Island | *R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1* | Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitro-glycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years. | Gunpowder |
| 33. | 1889 | Ohio | *Ohio Laws 164, An Act To Amend Section 2669 Of The Revised Statutes, As* | The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of | Gunpowder |

13

| | | | | | |
|---|---|---|---|---|---|
| | | | *Amended April 22, 1885, § 2669* | horses and other animals on the highways or public grounds of the corporation, vendors of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable… | |
| 34. | 1890 | Oklahoma | *Okla. Sess. Laws 447, Crime and Punishment, § 24* | Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by and ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter. | Gunpowder |
| 35. | 1890 | Oklahoma | *Okla. Sess. Laws 474, Crime and Punishment, § 4* | Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village, is guilty of a misdemeanor. | Gunpowder |
| 36. | 1891 | New Hampshire | *N.H. Laws 332, Safe-keeping Of* | If any person shall carry from town to town, or from place to place, any gunpowder  for the purpose of | Gunpowder |

14

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Survey of Relevant Historical Analogues Regarding Gunpowder and Proving (Founding Era – 1899)**

| | | | | | |
|---|---|---|---|---|---|
| | | | *Gunpowder And Other Explosives, § 7* | peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars. | |
| 37. | 1895 | Nebraska | *Neb. Laws 233, Statutes Relating To The government Of The City Of Lincoln, § 17* | No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound. | Gunpowder |
| 38. | 1899 | Tennessee | *Tenn. Pub. Acts 327, An Act To Repeal The Charter Of The Town Of Waverly, In Humphreys county, And to Incorporate Said Town And Define Its Rights, Powers, etc., § 10* | To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols. | Gunpowder |

Ex. 2
079

# EXHIBIT 3

**Chart on Dangerous Weapons
Regulations**

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)[1]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 1. | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay |
| 2. | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay |
| 3. | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake.  Exempted subjects living within 12 miles of the Scottish border.  Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow |
| 4. | 1606 | England | 4 Jac. I, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon |
| 5. | 1664 | New York | The Colonial Laws of New York from the Year 1664 to the Revolution . . ., at 687 (1894) | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the presence and at the direction of their Master or Mistress. | Gun; Pistol; Sword; Club; Other kind of weapon |
| 6. | 1686 | New Jersey | The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881) (1686) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons.  Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons |

[1] Laws such as this which were based on race, nationality, or enslaved status were enacted before ratification of the Thirteenth and Fourteenth Amendments, are morally repugnant, and would obviously be unconstitutional today.  They are provided only as evidence of a regulatory tradition that the courts have already recognized.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2150-2151 (2022) (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.")

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 7. | 1750 | Massachusetts | 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling.  Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon |
| 8. | 1786 | Massachusetts | An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon |
| 9. | 1788 | Ohio [Territory] | 1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . ., ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary.  Punishable by imprisonment for up to 40 years. | Any dangerous weapon |
| 10. | 1792 | Virginia | Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force . . . ., at 187 (1803), §§ 8-9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition |
| 11. | 1797 | Delaware | Del. Laws 104, An Act for the Trial of Negroes, ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons |
| 12. | 1798 | Kentucky | 1798 Ky. Acts 106 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; |

2

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Club; Other weapon |
| 13. | 1799 | Mississippi [Territory] | 1799 Miss. Laws 113, A Law for The Regulation of Slaves | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition |
| 14. | 1799 | New Jersey | Charles Nettleton, Laws of the State of New-Jersey, at 474 (1821), [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon |
| 15. | 1801 | Tennessee | 1801 Tenn. Act 260-61 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Dirk; Large knife; Pistol; Other dangerous weapon |
| 16. | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon |
| 17. | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition |
| 18. | 1805 | Alabama | 1805 Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act | "And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools | Gun Powder Shot |

3

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|-----|-----|-----|-----|
| | | | respecting Slaves. – Passed March 6, 1805: Sec. 4. | given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves." | Club Other Weapon Ammunition |
| 19. | 1811 | Maryland | The Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments, at 465 (1811) | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon |

4

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 20. | 1813 | Louisiana | 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 | Prohibited the carrying of any concealed weapon, including a dirk, dagger, knife, pistol, or any other deadly weapon. | Dirk; Dagger; Knife; Pistol; Other deadly weapon |
| 21. | 1816 | Georgia | Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions, at 599 (1821), Offences Against the Public Peace, (1816) § 19 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon |

5

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 22. | 1818 | Missouri [Territory] | Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates, at 374 (1818), Slaves, § 3 | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and from possessing a gun or ammunition. | Gun; Powder; Shot; Club; Other weapon; Ammunition |
| 23. | 1835 | Arkansas [Territory] | Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon |
| 24. | 1836 | Massachusetts | Mass. Rev. Stat., ch. 134, § 16 (1836) | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon |
| 25. | 1837 | Alabama | 1837 Ala. Acts 7, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife |
| 26. | 1837 | Arkansas | Josiah Gould, A Digest of the Statutes of Arkansas Embracing All Laws of a General and Permanent Character in Force the Close of the Session of the | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane |

6

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | General Assembly of 1856 380 381–82 (1837) | | |
| 27. | 1837 | Georgia | Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears.  Exempted "such pistols as are known as horseman's pistols" from these restrictions.  Punishable by a fine of up to $100-500 for the first offense and $500-1,000 for subsequent offenses. | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear |
| 28. | 1837 | Mississippi | 1837 Miss. L. 291-92 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense.  Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; Bowie knife; Sword; Sword cane; Other deadly weapon |
| 29. | 1837 | Mississippi | 1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5. | That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so | Rifle Shotgun Sword Sword cane Pistol Dirk Bowie Knife Other deadly weapons Dueling |

7

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | killing the other may also be prosecuted and convicted as in other cases of murder. | |
| 30. | 1837 | Mississippi – Town of Sharon | 1837 Miss. L. 294 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol |
| 31. | 1837 | Tennessee | 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon. Punishable by fine of $200-500 and imprisonment for 3-6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon |
| 32. | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick. Punishable by fine of $100-500 and imprisonment for $1-6 months. | Bowie knife; Arkansas toothpick |
| 33. | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies. Punishable by imprisonment for 3-15 years. | Bowie knife; Arkansas toothpick; Any knife or weapon that resembles a bowie knife |
| 34. | 1838 | Tennessee | Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-38, at 200-01, ch. 137 | Prohibited the sale or transfer of any Bowie knife or knives, Arkansas toothpicks, or "any knife or weapon that shall in form shape or size resemble a Bowie knife or any Arkansas toothpick." | Bowie knife; Arkansas toothpick; Any similar knife |
| 35. | 1838 | Virginia | Acts of the General Assembly of Virginia, Passed at the Session of | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon |

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 1838, at 76-77, ch. 101 (1838) | | |
| 36. | 1839 | Alabama | 1839 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50-100 and imprisonment not to exceed 3 months. | Knife; Deadly weapon |
| 37. | 1839 | Florida [Territory] | John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840, at 423 (1839), An Act to Prevent any Person in this Territory from Carrying Arms Secretly | Prohibited the concealed carrying of "any dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine of $50-500 or imprisonment for 1-6 months. | Dirk; Pistol; Other arm or weapon |
| 38. | 1839 | Mississippi – Town of Emery | 1839 Miss. L. 385, ch. 168 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol |
| 39. | 1840 | Mississippi – Town of Hernando | 1840 Miss. L. 181, ch. 111 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol |
| 40. | 1841 | Alabama | 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50-100. | Knife; Pistol; Air gun; Other deadly weapon |
| 41. | 1841 | Maine | 1841 Me. Laws 709, ch. 169, § 16. | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Upon complaint of any person, the person intending to carry | Dirk; Dagger; Sword; Pistol; |

9

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | such weapons may be required to find sureties for keeping the peace for up to six months. | Other offensive and dangerous weapon |
| 42. | 1841 | Mississippi | 1841 Miss. 52, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife |
| 43. | 1842 | Louisiana | Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842) | Prohibited the carrying of " any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20-50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon |
| 44. | 1845 | Illinois | Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A.D. 1844-45: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force , at 176 (1845), Criminal Jurisprudence, § 139 | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon |
| 45. | 1846 | North Carolina | 1846 N.C. L., ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
| | | | | | Firearms; Other deadly weapons of offense |
| 46. | 1847 | Maine | The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix, at 709 (1847), Justices of the Peace, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon |
| 47. | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive weapon with the intent to assault another person.. Punished by fine of up to $100 and imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon |
| 48. | 1850 | Mississippi | 1850 Miss. 43, ch. 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife |
| 49. | 1851 | Alabama | 1851-52 Ala. 3, ch. 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol |
| 50. | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop of Philadelphia, to Convey Certain Real Estate in the Borough of York, and a Supplement to the Charter of Said Borough, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon. Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon |

11

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 51. | 1852 | Hawai'i [Independent] | 1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons Dangerous or Unusual Weapons \| Hawaii \| 1852 | "§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate." | Bowie Knife Sword Cane Pistol Air Gun Slungshot Other deadly weapons |
| 52. | 1852 | New Mexico [Territory] | 1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1. | That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days. | Pistols Daggers Knives Other deadly weapons |
| 53. | 1853 | California | S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53, § 127 | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault.  Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon |
| 54. | 1853 | New Mexico [Territory] | 1853 N.M. Laws 406, An Act Prohibiting the Carrying of Weapons | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas | Pistol; Bowie knife; Cuchillo de cinto (belt buckle |

12

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Concealed or Otherwise, § 25 | toothpick, Spanish dagger, slungshot, or any other deadly weapon. | knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon |
| 55. | 1854 | Mississippi | 1854 Miss. 50, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, Arkansas toothpick, sword cane, and dueling or pocket pistol. | Bowie knife; Arkansas toothpick; Sword cane; Dueling or pocket pistol |
| 56. | 1854 | Washington [Territory] | 1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon |
| 57. | 1855 | California | 1855 Cal. L. 152-53, ch. 127 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to the decedent's family for liquidated damages. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon |
| 58. | 1855 | Indiana | 1855 Ind. Acts 153, An Act to Provide for the Punishment of Persons Interfering with Trains or Railroads, ch. 79, § 1 | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person. Exempted any person who was a "traveler." Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword cane; Other dangerous or deadly weapon |
| 59. | 1855 | Louisiana | 1855 La. L. 148, ch. 120 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." | Pistol; Bowie knife; Dirk; Other dangerous weapon |

13

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 60. | 1856 | Mississippi | 1856-1857 Miss. L. 36, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Dirk knife; Sword cane |
| 61. | 1856 | Tennessee | 1855-56 Tenn. L. 92, ch. 81 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor.  Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife |
| 62. | 1856 | Texas | Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger |
| 63. | 1858 | District of Columbia | 1 William B. Webb The Laws of the Corporation of the of Washington Digested and Arranged under Appropriate in Accordance with a Joint Resolution of the City 418 (1868), Act of Nov. 18, 1858. | It shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as dagger, pistol, bowie knife, dirk knife, or dirk, colt, slungshot, or brass or other metal knuckles within the City of Washington; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapon shall forfeit and pay upon such conviction not less than twenty dollars nor more than fifty dollars; which fines shall be prosecuted and recovered in the same manner as other penalties and forfeitures accruing to the city are sued for and recovered: Provided, That the Police officers when on duty shall be exempt from such penalties and forfeitures. | Dagger Pistol Bowie Knife Dirk Knife Colt Slungshot Metal Knuckles Other dangerous or concealed weapons |
| 64. | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, An Act to Adopt and Establish a Criminal code for the Territory of Nebraska, § 135 | Prohibited the carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to assault a person.   Punishable by fine up to $100. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon |

14

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 65. | 1859 | Indiana | 1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor. § 1. | Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars. | Dirk<br>Pistol<br>Bowie Knife<br>Dagger<br>Sword cane<br>Other dangerous or concealed weapons. |
| 66. | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slungshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro." Punishable by fine of $50. | Pistol;<br>Dirk;<br>Bowie knife;<br>Brass knuckles;<br>Slungshot;<br>Colt;<br>Cane-gun;<br>Other deadly weapon |
| 67. | 1859 | New Mexico [Territory] | 1859 N.M. Laws 94, § 1-2. | "That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the | Pistol;<br>Bowie knife;<br>Cuchillo de cinto (belt buckle knife);<br>Arkansas toothpick;<br>Spanish dagger;<br>Slungshot;<br>Other deadly weapon |

15

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| | | | | discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause." | |
| 68. | 1859 | Ohio | 1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon |
| 69. | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon |
| 70. | 1860 | Georgia | 1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1. | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Gun; Pistol; Bowie knife; Slungshot; Sword cane; Other weapon |
| 71. | 1861 | California | William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of such weapon in a fight. Punishable by a fine of $100-500 or imprisonment for 1-6 months. | Dirk; Bowie knife; Sword; Sword cane; Pistol; |

16

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., at 334 (1861) | | Gun; Other deadly weapon |
| 72. | 1861 | Nevada [Territory] | 1861 Nev. L. 61 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon |
| 73. | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, dagger, or other deadly weapon.  Punished by fine of $5-35. | Pistol; Bowie knife; Dagger; Other deadly weapon |

17

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 74. | 1863 | Kansas – City of Leavenworth | C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix, at 45 (1863), An Ordinance Relating to Misdemeanors, § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon |
| 75. | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 190 (1863), Offences Affecting Public Safety: Carrying Concealed Weapons, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10-50. | Pistol; Bowie knife; Dirk; Other deadly weapon |
| 76. | 1864 | Arizona [Territory] | Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of | That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution. | Dirk Knife Bowie Knife Pistol Gun |

18

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Modern Law: Primary Sources, 1867. <br><br> An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. | | |
| 77. | 1864 | California | Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United | Prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30-90 days or fine of $20-200. | Dirk; <br> Pistol; <br> Sword cane; <br> Slungshot; <br> Other deadly or dangerous weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | States Naturalization Laws, with Notes of California Decisions Thereon, at 261, § 1 (1868) | | |
| 78. | 1864 | Montana [Territory] | 1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1 | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory.  Punishable by fine of $25-100. | Pistol; Bowie knife; Dagger; Other deadly weapon |
| 79. | 1866 | Kansas – City of Lawrence | Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863. Nuisances, § 10 | Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section. | Pistol Bowie Knife Concealed carry Other deadly weapon. |
| 80. | 1866 | New York | Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection | Prohibited using, attempting to use, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun.  Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun |

20

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1 | | |
| 81. | 1866 | North Carolina | 1866 N.C. L. ch. 21, at 33-34, § 11 | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; Dirk cane; Rifle cane |
| 82. | 1867 | Alabama | 1867 Ala. Rev. Code 169 | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description." Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife |
| 83. | 1867 | Alaska [Territory] | Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906. | That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the | Revolver Pistol Firearm Dirk Dagger Slungshot |

21

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | use of which injury could be inflicted upon the person or property of any other person. | Metal knuckles Other weapons |
| 84. | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory.  Punishable by fine of $5-35.  Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon |
| 85. | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, dirk, sword cane, Spanish stiletto, belt or pocket pistol, or other knife or weapon. Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon |
| 86. | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State. Selling Liquors or Weapons to Minors, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon |

22

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 87. | 1867 | Virginia – Town of Lexington | Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867. | "Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty." | Pistol<br>Dirk<br>Bowie Knife<br>Razor<br>Slungshot<br>Concealed weapons |
| 88. | 1868 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1) | Prohibited the carrying of any rifle or "shot-gun walking cane." Punishable by fine of $500-1000 and imprisonment of no less than 2 years. | Rifle;<br>Shotgun walking cane |
| 89. | 1868 | Florida | Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892), at 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles. Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot;<br>Metallic knuckles |
| 90. | 1868 | Florida | 1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace. Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot;<br>Metallic knuckles;<br>Billy;<br>Firearms;<br>Other dangerous weapon |
| 91. | 1868 | Florida | James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, at 403 (1881), Offences Against | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Dirk;<br>Pistol;<br>Other arm or weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Public Peace, § 13 (Fla. Act of Aug. 6, 1868, ch. 1637) | | |
| 92. | 1868 | Kansas | The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868. Crimes and Punishments, § 282 | Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court. | Pistol Bowie Knife Dirk Other deadly weapon Prohibition against confederates carrying |
| 93. | 1869 | Tennessee | 1869-70 Tenn. L. 23-24, ch. 22 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" |
| 94. | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 95. | 1870 | Georgia | 1870 Ga. L. 421, ch. 285 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters. | Dirk; Bowie knife; Pistol; Revolver; Any kind of deadly weapon |
| 96. | 1870 | Louisiana | 1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . ., § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon |
| 97. | 1870 | New York | "The Man Trap," The Buffalo Commercial, Nov. 1, 1870 | Referenced prohibition on the use of "infernal machines." | Trap gun; Infernal machine |
| 98. | 1870 | West Virginia | 1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7. | If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine. | Pistol Dirk Bowie Knife Concealed Carry Other dangerous weapons. |
| 99. | 1871 | Arkansas – City of Little Rock | George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City 230-31 (1871) | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25-500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; Colt; Metal knuckles |
| 100 | 1871 | District of Columbia | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 1871-1872, Part II, 33 (1872) (Dist. of Col., An Act to Prevent the Carrying of Concealed Weapons, 1871, ch. XXV) | or other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20-50. | Dirk; Razor; Sword-cane; Slungshot; Metal knuckles |
| 101 | 1871 | Mississippi | 1871 Miss. L. 819-20, ch. 33 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane |
| 102 | 1871 | Missouri – City of St. Louis | Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City, at 491-92 (1871), Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10. | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor. Punishable by fine of $10-500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon |
| 103 | 1871 | Tennessee | James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (Nashville, 1871) | Prohibited the carrying of a pistol, dirk, Bowie knife, Arkansas tooth pick, or other weapon in the shape of those weapons, to an election site. Punishable by fine of minimum $50 and imprisonment at the discretion of the court. | Pistol; Dirk; Bowie knife; Arkansas toothpick |
| 104 | 1871 | Texas | 1871 Tex. Laws 25, An Act to Regulate the | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, | Pistol; Dirk; |

26

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Keeping and Bearing of Deadly Weapons. § 1 | Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense.  Punishable by fine of $20-100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other kind of knife used for offense or defense |
| 105 | 1871 | Texas | Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879). Art. 163. | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day.  Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or other kind of knife used for offense or defense.  Punishable by fine and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; Other dangerous weapon; Other knife used for offense or defense |
| 106 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, An Act to Add an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon. Punishable by a fine of $3-10. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Razor; Brass; Metal knuckles; Other deadly weapon |
| 107 | 1872 | Nebraska – City of Nebraska | Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, at 36 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy slungshot, brass or other | Musket; Rifle; Shot gun; Pistol; |

27

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1 | metallic knuckles, or any other dangerous or deadly weapons. | Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or deadly weapons |
| 108 | 1872 | Wisconsin | 1872 Wis. Sess. Laws 17, ch. 7, § 1, An Act to prohibit and prevent the carrying of concealed weapons. | "SECTION 1. If any person shall go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slung-shot, brass knuckles, or other offensive and dangerous weapon, he shall, on conviction thereof, be adjudged guilty of a misdemeanor, and shall be punished by imprisonment in the state prison for a term of not more than two years, or by imprisonment in the county jail of the proper county not more than twelve months, or by fine not exceeding five hundred dollars, together with the costs of prosecution, or by both said fine and costs and either of said imprisonments; and he may also be required to find sureties for keeping the peace and against the further violation of this act for a term not exceeding two years: provided, that so going armed shall not be deemed a violation of this act whenever it shall be made to appear that such person had reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, or to any person under his immediate care or custody, or entitled to his protection or assistance, or if it be made to appear that his possession of such weapon was for a temporary purpose, and with harmless intent." | Dirk Dagger Sword Pistol Revolver Slung shot Brass Knuckles Concealed carry Other dangerous weapons |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 109 | 1873 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4110 (Act of Apr. 8, 1873, p. 130) | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20-200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot |
| 110 | 1873 | Georgia | R. H. Clark, The Code of the State of Georgia (1873) § 4528 | Prohibited the carrying of any dirk, Bowie knife, pistol, or other deadly weapon to a court, election site, precinct, place of worship, or other public gathering site. Punishable by fine of $20-50 or imprisonment for 10-20 days. | Dirk; Bowie knife; Pistol; Any kind of deadly weapon |
| 111 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2, as codified in Mass. Gen. Stat., ch. 164 (1873) § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested pursuant to a warrant or while committing a crime. Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon |
| 112 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2 as codified in Mass. Gen. Stat., ch. 164 (1873) § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles. Punishable by fine up to $50 or imprisonment up to 6 months. | Slungshot; Metallic knuckles |
| 113 | 1873 | Nevada | Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive, at 563 (Vol. 1, 1873), Of Crimes and Punishments, §§ 35-36 | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small sword, backsword, or other dangerous weapon. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other dangerous weapon |
| 114 | 1873 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon |

29

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Tennessee, With Notes and References, Including Acts of Session of 1870-1871, at 125 (Vol. 2, 1873), Offences Against Public Policy and Economy, § 4864 | | |
| 115 | 1874 | Alabama | 1874 Ala. L. 41, ch. 1 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk |
| 116 | 1874 | Illinois | Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-72 and 1873-74, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874, at 360 (1874), Disorderly Conduct: Disturbing the Peace, § 56 | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron knuckles, or other deadly weapon while disturbing the peace.  Punishable by fine up to $100. | Pistol; Knife; Slungshot; Other deadly weapon |
| 117 | 1874 | New Jersey – City of Jersey City | Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto, at 41 (1874), An Ordinance to Prevent the | Prohibited the carrying of a concealed slungshot, billy, sandclub or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, including a sword in a cane, or air-gun.  punishable by confiscation of the weapon and a fine of up to $20. Exempted policemen of Jersey City. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon; Sword cane; Air gun |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: §§ 1-2 | | |
| 118 | 1874 | Virginia | 1874 Va. L. 239, ch. 239 | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk |
| 119 | 1875 | Alabama | 1875-1876 Ala. L. 82, ch. 1 | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk |
| 120 | 1875 | Alabama | 1875-1876 Ala. L. 46, ch. 2 | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives |
| 121 | 1875 | Arkansas | Act of Feb. 16, 1875, 1874-75 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25-100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles |
| 122 | 1875 | Idaho [Territory] | Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875), § 133. | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; Pistol; Knife; Dirk; |

31

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Bludgeon; Other offensive weapon |
| 123 | 1875 | Indiana | 1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon.  Punishable by fine of $1-500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon |
| 124 | 1876 | Alabama | 1876-77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey.  Punishable by a fine of $50-300 and imprisonment or hard labor for no more than 6 months. | Bowie knife; Pistol; Air gun; Other similar weapon |
| 125 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon |
| 126 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128 | Prohibited the transfer of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane |
| 127 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly weapon without written permission from the Captain of Police. Exempted peace officers. | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; Dirk; Dagger; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments, at 64 (1876), Misdemeanors, § 39 | | Other dangerous or deadly weapon |
| 128 | 1876 | Wyoming [Territory] | Wyo. Comp. Laws (1876) ch. 35, § 127, as codified in Wyo. Rev. Stat., Crimes (1887), Having possession of offensive weapons, § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon |
| 129 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife |
| 130 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon, unless the person was threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50-300 and imprisonment of not more than 6 months. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon |
| 131 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, at 100, § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon.  Punishable by a fine of $5-50. | Pistol; Bowie knife; Dagger; Other deadly weapon |
| 132 | 1877 | New Jersey | Mercer Beasley, Revision of the Statutes of New | Prohibited The carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with | Pistol; Hanger; |

33

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| | | | Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871, at 304 (1877), An Act Concerning Disorderly Persons, § 2 | intent to assault any person." Punishable as a "disorderly person." | Cutlass; Bludgeon; Other offensive weapon |
| 133 | 1877 | South Dakota [Territory] | S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon |
| 134 | 1877 | Utah – City of Provo [Territory] | Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-07 (1877) (Provo, Utah). § 182: | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; Dagger; Other dangerous or deadly weapon |
| 135 | 1878 | Alabama – City of Uniontown | 1878 Ala. L. 437, ch. 314 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk |
| 136 | 1878 | California – City of Los Angeles | William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878 Ordinances of the City of Los Angeles, § 36. | In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said | Dirk Pistol Sword-in-a-cane Slungshot Other deadly weapons |

34

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
| | | | | corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately. | |
| 137 | 1878 | Mississippi | 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon.  Excepted travels other than "a tramp." Punishable by fine of $5-100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon |
| 138 | 1879 | Alabama – City of Montgomery | J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama] (1879), § 428 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon.  Punishable by a fine of $1-100. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon |
| 139 | 1879 | Idaho – City of Boise [Territory] | Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894, at 118-19 (1894), Carrying Concealed Weapons, § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slungshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey.  Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slungshot; Metallic knuckles; Other dangerous or deadly weapons |
| 140 | 1879 | Kansas – City of Salina | Revised Ordinances of the City of Salina, Together with the Act Governing Cities of the Second Class: Also a Complete List of the Officers of Salina During its Organization as a Town and City of the | That it shall be unlawful for any person to carry on or about his person any pistol, bowie knife, dirk, or other deadly or dangerous weapon, anywhere within the limits of the city of Salina, save and except as hereinafter provided. § 2. This ordinance shall not apply to cases when any person carrying any weapon above mentioned is engaged in the pursuit of any lawful business, calling or employment and the | Pistol Bowie Knife Dirk Other deadly or dangerous weapons. |

35

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Second and Third Class Page 99, Image 100 (1879) available at The Making of Modern Law: Primary Sources. 1879 Ordinances of the City of Salina, An Ordinance Relating to the Carrying of Deadly Weapons, § 1. | circumstances in which such person is placed at the time aforesaid, are such as to justify a prudent man in carrying such weapon, for the defense of his person, property or family, nor to cases where any person shall carry such weapon openly in his hands, for the purpose of sale, barter, or for repairing the same, or for use in any lawful occupation requiring the use of the same. § 3. Any person violating any of the provisions of this ordinance shall, upon 31 conviction thereof before the police court, be fined in any sum not less that twentyfive nor more than one hundred dollars | |
| 141 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorizes the passage of laws restricting the carrying of concealed weapons. | Concealed weapons |
| 142 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon. Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other dangerous weapon |
| 143 | 1879 | North Carolina | North Carolina: N.C. Sess. Laws (1879), ch. 127, as codified in North Carolina Code, Crim. Code, ch. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal knuckles, razor, or other deadly weapon.  Exemption for carrying on the owner's premises.  Punishable by fine or imprisonment at the discretion of the court. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon |
| 144 | 1879 | Texas | 1879 Tex. Crim. Stat. tit. IX, Ch. 4 | "If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, | Pistol Dirk |

36

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried." Exemptions for militia members. Also prohibited carrying in a church, religious assembly, schools, and other sensitive spaces | Dagger Slungshot Sword Cane Bowie Knife Brass Knuckles Other dangerous weapons. |
| 145 | 1880 | Ohio | Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880, at 1633 (Vol. 2, 1879), Offences Against Public Peace, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon.  Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon |
| 146 | 1880 | South Carolina | 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894), § 129 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon.  Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon |
| 147 | 1881 | Alabama | 1880-1881 Ala. L. 38-39, ch. 44 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, or firearm of "any other kind or description," or air gun. Punishable by fine of $50-300 and imprisonment of not more than 6 months.  Further provided that fines collected under the statute would be monetary and not in-kind payments. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 148 | 1881 | Arkansas | 1881 Ark. Acts 191, ch. 96, § 1-2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol |
| 149 | 1881 | Colorado | Colo. Rev. Stat 1774, § 248 (1881) | Prohibited the concealed carrying of any firearms, any pistol, revolver, Bowie knife, dagger, slingshot, brass knuckles, or other deadly weapon, unless authorized by chief of police. | Pistol; Revolver; Bowie knife; Dagger; Slingshot; Metal knuckles; Other deadly weapon |
| 150 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors. Punishable by a fine of $25-200 or imprisonment for 10-30 days. | Deadly weapon |
| 151 | 1881 | Illinois | Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code 73 (1885), ch. 38, Possession or sale forbidden, § 1 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon. Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon |
| 152 | 1881 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25-200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon |

38

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882, at 375 (1882), Deadly Weapons: Selling or Giving to Minor, § 54b. | | |
| 153 | 1881 | Indiana | The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1, at 366 (1881), Crimes, § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle.  Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance |
| 154 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon.  Punishable by fine of $20-200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon |
| 155 | 1881 | New York | George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January | Prohibited using, attempting to use, or concealing a slungshot, billy, sandclub or metal knuckles, and any dirk.  Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 1, 1881, Arranged Alphabetically According to Subjects, at 321 (Vol. 1, 1881), Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9 | | |
| 156 | 1881 | Tennessee – City of Nashville | William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, at 340-41 (1881), Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; Other deadly weapon |
| 157 | 1881 | Washington [Territory] | 1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929 | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon |
| 158 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine; Other combustible; Concealed deadly weapon; Gun; Pistol; Firearm |

40

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 159 | 1881 | Washington [Territory] | William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897, at 1956 (Vol. 2, 1897) | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror.  Punishable by fine up to $25. | Dangerous weapon |
| 160 | 1882 | Georgia | 1882-83 Gal. L. 48-49, ch. 94 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense." | Pistol; Dirk; Sword cane; speak Bowie knife; Other kind of knife |
| 161 | 1882 | Georgia | 1882-83 Ga. L. 37, ch. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife |
| 162 | 1882 | Iowa – City of Sioux City | S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa, at 62 (1882), Ordinances of the City of Sioux City, Iowa, § 4. | Prohibited the carrying a concealed pistol, revolver, slungshot, cross-knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Pistol; Revolver; Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon |
| 163 | 1882 | West Virginia | 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor. | Pistol; Dirk; Bowie knife; Razor; Slungshot; |

41

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|
|  |  |  |  | Punishable by fine of $25-200 and imprisonment of 1-12 months. | Billy; Metal knuckles; Other dangerous or deadly weapon |
| 164 | 1883 | Illinois – City of Danville | Revised Ordinances of the City of Danville [Illinois], at 66 (1883), Ordinances of the City of Danville. Concealed Weapons, § 22. | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon.  Also prohibited displaying the weapon in a threatening or boisterous manner.  Punishable by fine of $1-100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon |
| 165 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading Or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, §§ 1-2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind.  Also prohibited the possession of such weapons by any minor.  Punishable by fine of $5-100.  Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon.  Punishable by fine of $1-10. | Pistol; Revolver; Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons |
| 166 | 1883 | Missouri | 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated.  Punishable by fine of $25-200 and/or by imprisonment up to 6 months. | Fire arms; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG

**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 167 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb |
| 168 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon |
| 169 | 1884 | Georgia | 1884-85 Ga. L. 23, ch. 52 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife |
| 170 | 1884 | Maine | The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884, at 928, (1884), Prevention of Crimes, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon |
| 171 | 1884 | Minnesota – City of Saint Paul | W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Ordinances of the Common Council; Revised to December 1, 1884, at 289 (1884), Concealed Weapons – License, § 1 | | Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon |
| 172 | 1884 | Tennessee | Tenn. Pub. Acts (1879), ch. 186, as codified in Tenn. Code (1884) | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; Spanish stiletto; Pistol; Revolver |
| 173 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1 | Prohibited the setting of any spring gun trap. Punishable by a fine of $50-500 and liability for twice the amount of any damage resulting from the trap. | Spring gun |
| 174 | 1884 | Wyoming [Territory] | 1884 Wyo. Sess. Laws, ch. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983 | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slungshot or other deadly weapon. Punishable by fine of $10-100 or imprisonment up to 6 months. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon |
| 175 | 1885 | Montana [Territory] | 1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight. Punishable by fine of $10-100 and/or imprisonment for 1-3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon |
| 176 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous | Slungshot; Billy; Sandclub; |

44

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| | | | Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410 | knife. Punishable as a felony, and as a misdemeanor if a minor. | Metal knuckles; Dagger; Dirk; Dangerous knife |
| 177 | 1885 | New York – City of Syracuse | Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, at 215 (1885), [Offenses Against the Public Peace and Quiet,] § 7 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon. Punishable by a fine of $25-100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon |
| 178 | 1885 | Oregon | 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury. Punishable by a fine of $10-200 or imprisonment for 5-100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles |
| 179 | 1886 | Colorado – City of Denver | Isham White, The Laws and Ordinances of the City of Denver, Colorado, at 369, § 10 (1886) | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace. Punishable by a fine of $25-300. | Slungshot; Colt; Metal knuckles |
| 180 | 1886 | Georgia | 1886 Ga. L. 17, ch. 54 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and "pistol or revolver cartridges." | Pistol; Revolver; Dirk; |

45

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Bowie knife; Pistol or revolver cartridges |
| 181 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day. Punishable by a fine of $10-50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon |
| 182 | 1886 | Maryland – County of Calvert | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State, at 468-69 (Vol. 1, 1888), Concealed Weapons, § 30 | Prohibited the carrying of a concealed pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon. Punishable by fine of up to $500 or imprisonment of up to 6 months. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon |
| 183 | 1886 | Maryland | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the | Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of | Gun; Pistol; Dirk; Bowie Knife Billy Sand club Bludgeon Other dangerous or deadly weapons. |

46

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. Carrying Weapons \| Maryland \| 1886 Concealed Weapons, § 30. | injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction. | |
| 184 | 1887 | Alabama | 1886 Ala. L. 36, ch. 4 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk |
| 185 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa, at 206-07 (1887), Carrying Concealed Weapons Prohibited, § 105 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon |
| 186 | 1887 | Kansas – City of Independence | O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council, at 162 (1887), Weapons, § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner.  Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon.  Punishable by fine of $5-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 187 | 1887 | Michigan | 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument |
| 188 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, Criminal Laws, § 174 | Prohibited the carrying of a any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon |
| 189 | 1887 | New Mexico [Territory] | An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887) | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk |
| 190 | 1887 | Virginia | The Code of Virginia: With the Declaration of Independence and the Constitution of the United | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind. Punishable by fine of $20-100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; |

48

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | States; and the Constitution of Virginia, at 897 (1887), Offences Against the Peace, § 3780 | | Slungshot; Any weapon of the like kind |
| 191 | 1888 | Maryland – County of Kent | John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein, at 1457 (Vol. 2, 1888), Election Districts– Fences, § 99 | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon. Punishable by a fine of $5-20. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon |
| 192 | 1888 | Florida | Fla. Act of Aug. 6, 1888, ch. 1637, subch. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace. Punishable by imprisonment up to 1 year and a fine up to $50. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon |
| 193 | 1888 | Georgia | 1888 Ga. L. 22, ch. 123 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges |
| 194 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slungshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly. Punishable by fine of $5-25, and confiscation of the weapon. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Metal knuckles; Razor; Other deadly weapon |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Therein, at 522-23 (Vol. 1, 1888), City of Baltimore, § 742 | | |
| 195 | 1888 | Minnesota | George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 | Prohibited manufacturing, selling, giving, or disposing of a slungshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent.  Also prohibited carrying a concealed slungshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon. | Slungshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon |
| 196 | 1888 | Utah – City of Salt Lake City [Territory] | Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14 | Prohibited carrying a slingshot or any concealed deadly weapon without permission of the mayor. Punishable by fine up to $50. | Slingshot; Deadly weapon |

# EXHIBIT 4

**Chart of Dangerous Weapon Regulations**

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)[1,]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 197 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16, § 1 | Prohibited carrying of any pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any knife manufactured to offensive or defensive purposes.  Punishable by a fine of $25-100 and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass knuckles; Bowie knife; Other offensive or defensive knife |
| 198 | 1889 | Idaho [Territory] | The Act of the Territory of Idaho approved February 4, 1889 (Sess. Laws 1889, p. 27) | Prohibited private persons from carrying "deadly weapons" within any city, town or village. | Deadly weapons |
| 199 | 1889 | Pennsylvania – City of Johnstown | Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, | Prohibited the concealed carrying of any pistol, razor, dirk, Bowie knife, blackjack, handy billy, or other deadly weapon.  Punishable by fine of $5-50. | Pistol; Razor; Dirk; Bowie knife; Blackjack; Billy; Other deadly weapon |

[1] Laws such as this which were based on race, nationality, or enslaved status were enacted before ratification of the Thirteenth and Fourteenth Amendments, are morally repugnant, and would obviously be unconstitutional today.  They are provided only as evidence of a regulatory tradition that the courts have already recognized.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2150-2151 (2022) (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.")

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Rules of Select and Common Councils and Joint Sessions, at 86 (1897), An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12 | | |
| 200 | 1890 | Connecticut – City of New Haven | Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City, at 164, § 192 (1890) | Prohibited the concealed carrying of any metal knuckles, pistol, slungshot, stiletto, or similar weapons, absent written permission of the mayor or superintendent of police.  Punishable by a fine of $5-50. | Metal knuckles; Slungshot; Stiletto |
| 201 | 1890 | Georgia | 1890 Ga. L. 38, ch. 131 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges |
| 202 | 1890 | Louisiana | 890 La. L. 39, ch. 46 | Prohibiting the transfer of any pistol, dirk, Bowie knife, or "any other dangerous weapon, which may be carried concealed on a person to any person under the age of 21. | Pistol; Dirk; Bowie knife; Other dangerous weapon |
| 203 | 1890 | Maryland – City of Baltimore | John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, sandclub, metal knuckles, razor or any other dangerous or deadly weapon, or who openly carries with the intent to injure a person.  Punishable by fine of up to $500 and imprisonment up to 6 months. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Sandclub; |

2

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-92, and of 1892-1893, up to the Summer Recess of 1893, at 297-98 (1893), Ordinances of Baltimore, § 742A | | Metal knuckles; Razor; Other dangerous or deadly weapon |
| 204 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon.  Punishable by fine up to $100. | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon |
| 205 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife | Pistol; Revolver; Colt; Billy; |

3

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG

**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------------------|--------------|----------|--------------------------|----------------------|
| | | | of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10. | resembling a Bowie knife, or any other dangerous or deadly weapon.  Punishable by fine up to $100. | Slungshot; Metal knuckles; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon |
| 206 | 1890 | Oklahoma [Territory] | 1890 Okla. Laws 495, art. 47, §§ 1, 2, 10; Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory), at 495-96 (1891) | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or any other knife or instrument manufactured or sold solely for defense.  Also prohibited the carrying of any pistol, revolver, Bowie knife, dirk knife, loaded cane, billy, metal knuckles, or "any other offensive or defense weapon."  Punishable by a fine of $50-500 and imprisonment for 3-12 months. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Other knife; Loaded cane; Billy; Other offensive or defensive weapon |
| 207 | 1890 | Oklahoma [Territory] | 1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19 | Prohibited the manufacture, sale, giving, or disposing of any instrument or weapon usually known as a slungshot, and prohibited the carrying any slungshot or similar weapon. | Slungshot |
| 208 | 1890 | Oklahoma – Town of Checotah [Territory] | General Laws Relating to Incorporated Towns of Indian Territory, at 37 (1890), Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3 | Prohibited the carrying of any pistol; dirk; butcher knife; Bowie knife; sword; spear-cane, metal knuckles, razor, slungshot, sandbag, or a switchblade. | Pistol; Dirk; Butcher knife; Sword; Spear cane; Metal knuckles; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| | | | | | Razor; Slungshot; Sandbag; Switchblade |
| 209 | 1891 | Michigan | 1891 Mich. Pub. Acts 409, Police Department, pt 15 | Prohibited the carrying of a concealed pistol, revolver, Bowie knife, dirk, slungshot, billie, sandbag, false knuckles, or other dangerous weapon. Also prohibited lurking or being concealed with the intent to injure a person or property, or threatening to beat or kill a person or property. Punishable by fine up to $100 and the costs of prosecution, and in default of payment, imprisonment. | Pistol; Revolver; Bowie; Dirk; Slungshot; Billy; Sandbag; False knuckles; Other dangerous weapon |
| 210 | 1891 | West Virginia | 1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling such a weapon to a minor. Punishable by fine of $25-200 and imprisonment for 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon |
| 211 | 1892 | Alabama | 1892 Ala. L. 183, ch. 95 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives, and clarified that cartridges that can be used in a pistol shall be deemed pistol cartridges. | Pistol; Pistol cartridges; Bowie knife; Dirk |
| 212 | 1892 | District of Columbia | Washington D.C. 27 Stat. 116 (1892) CHAP. 159.– An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes. | "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives | Concealed carry Daggers Air guns Pistols Bowie Knives Dirk Knives Dirks |

5

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles." | Blackjacks<br>Razors<br>Sword canes<br>Slungshot<br>Metal Knuckes |
| 213 | 1892 | Georgia | 1892 Ga. L. 25, ch. 133 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and metal knuckles. | Pistol;<br>Revolver;<br>Dirk;<br>Bowie knife;<br>Pistol or revolver cartridges;<br>Metal knuckles |
| 214 | 1892 | Vermont | No. 85.—An Act Against Carrying Concealed Weapons, Ch. 85, p. 95. 1892. | "Section 1. A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.<br>Sec. 2. A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly" | Firearm<br>Dirk<br>Bowie Knife<br>Dagger<br>Other deadly weapons. |
| 215 | 1892 | Washington – City of Tacoma | Albert R. Heilig, Ordinances of the City of Tacoma, Washington, at 333-34 (1892) | Prohibited the carrying of a concealed a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, slingshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person. | Revolver;<br>Pistol;<br>Knife;<br>Dirk;<br>Dagger;<br>Slingshot;<br>Metal knuckles;<br>Instrument that causes injury |
| 216 | 1893 | Arizona [Territory] | 1893 Ariz. Sess. Laws 3, § 1 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of | Pistol;<br>Other firearm;<br>Dirk; |

6

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | knife, except a pocket knife not manufactured for offensive or defensive use). | Dagger; Slungshot; Sword-cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) |
| 217 | 1893 | Delaware | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix, at 987 (1893), An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1 | Prohibited the concealed carrying of deadly weapons or selling deadly weapons other than an ordinary pocket knife, and prohibited discharging any firearm in any public road.  Punishable by fine of $25-100 or by imprisonment for 10-30 days. | Deadly weapon |

7

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 218 | 1893 | North Carolina | 1893 N.C. L. 468-69, ch. 514 | Prohibiting the transfer of any pistol, pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane, or slingshot to a minor. | Pistol;<br>Pistol cartridge;<br>Metal knuckles;<br>Bowie knife;<br>Dirk;<br>Loaded cane;<br>Slingshot |
| 219 | 1893 | Rhode Island | 1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slingshot, pistol, or firearm of any description. | Dirk;<br>Bowie knife;<br>Butcher knife;<br>Dagger;<br>Razor;<br>Sword Cane;<br>Air gun;<br>Billy;<br>Metal knuckles;<br>Slingshot;<br>Pistol;<br>Other firearm |
| 220 | 1893 | Tennessee – City of Nashville | Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises, at 364-65 (1893), Ordinances of the City of Nashville, § 738 | Prohibited the carrying of a pistol, Bowie knife, dirk knife, slingshot, brass knucks, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol;<br>Bowie knife;<br>Dirk;<br>Slingshot;<br>Brass knuckles;<br>Other deadly weapon |
| 221 | 1893 | Wyoming – City of Rawlins | A. McMicken, City Attorney, The Revised Ordinances of the City of | Prohibited a person from possessing or carrying a pistol, revolver, knife, slingshot, bludgeon or other | Pistol;<br>Revolver;<br>Knife; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
| | | | Rawlins, Carbon County, Wyoming, at 131-32 (1893), Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1 | lethal weapon.  Punishable by fine up to $100 or imprisonment up to 30 days. | Slungshot; Bludgeon; Other lethal weapon |
| 222 | 1895 | North Dakota | 1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13 | Prohibited the carrying of any slungshot or similar weapon, and the concealed carrying of any firearm or any "sharp or dangerous weapon." | Slungshot; Firearm; Sharp or dangerous weapon |
| 223 | 1895 | North Dakota | The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto, at 1259 (1895) | Prohibited the setting of any spring or trap gun. | Trap gun |
| 224 | 1895 | Vermont – City of Barre | Ordinances of the City of Barre, Vermont, ch. 16, § 18 (1895) | Prohibited discharging a gun, pistol, or other loaded firearm, firecracker, serpent, or other explosive, unless on a person's own property or with the permission of the property owner.  Also prohibited making a bonfire in the street except with city council permission and the carrying of concealed steel or brass knuckles, a pistol, slungshot, stiletto, or weapon of similar character. | Steel or brass knuckles; Pistol; Slungshot; Stiletto; Weapon of similar character; Gun; Loaded firearm; Firecracker; Serpent |
| 225 | 1896 | California – City of Fresno | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896, at 37, § 53 (1896) | Prohibited the transfer to any minor under the age of 18 any gun, pistol or other firearm, dirk, Bowie knife, powder, shot, bullets, or any combustible or dangerous material, absent written consent of parent or guardian. | Gun; Pistol; Dirk; Bowie knife; Powder; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Shot; Bullets |
| 226 | 1896 | California – City of Fresno | L. W. Moultrie, Charter and Ordinances of the City of Fresno, at 30, § 8 (1896) | Prohibited the concealed carrying of any pistol or firearm, slungshot, dirk, Bowie knife, or other deadly weapon, absent written permission. | Pistol; Firearm; Slungshot; Dirk; Bowie knife; Other deadly weapon |
| 227 | 1896 | Mississippi | 1896 Miss. L. 109-10, ch. 104 | Prohibited the carrying of a concealed Bowie knife, dirk, butcher knife, pistol, brass or metallic knuckles, slingshot, sword, or other deadly weapon "of like kind or description." | Bowie knife; Dirk; Butcher knife; Pistol; Metal Knuckles; Slingshot; Sword; Other deadly weapon of like kind |
| 228 | 1896 | Rhode Island | General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State, at 1010-11 (1896), Offences Against Public Policy, §§ 23, 24, 26 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slungshot, pistol, or firearm of any description.  Exempted officers or watchmen whose duties required them to make arrests or guard prisoners or property. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword cane; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm |
| 229 | 1896 | Washington – City of Spokane | Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances | Prohibited the carrying of a concealed revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the | Revolver; Pistol; Other firearms; Knife; |

10

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896, at 309-10 (1896), Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1 | use of which injury could be inflicted upon the person or property. punishable by fine of $25-100, cost of prosecution, and imprisonment until fines/costs are paid. | Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury |
| 230 | 1897 | Alabama | William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, § 27 (1897) | Tax of $300 on the sale of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridge; Bowie knife; Dirk |
| 231 | 1897 | Missouri – City of Saint Joseph | William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged, at 508 (1897), Concealed Weapons – Carrying of, § 7 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, Bowie knife, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. | Pistol; Revolver,; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Razor; Bowie knife; Any knife resembling a bowie knife; Other dangerous or deadly weapon |
| 232 | 1897 | Texas | 1897 Tex. Gen. Laws 221, An Act to Prevent the Barter, Sale And Gift of Any | Prohibited the selling or giving to a minor a pistol, dirk, dagger, slungshot, sword cane, spear or knuckles made of any metal or hard substance, | Pistol; Dirk; Dagger; |

11

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| | | | Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal Or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . ., ch. 155 | Bowie knife or any other knife manufactured or sold for the purpose of offense or defense without the consent of their parent or guardian. Punishable by fine of $25-200 and/or imprisonment for 10-30 days. | Slungshot; Sword cane; Spear; Knuckles; Bowie knife; Any other knife used for offense or defense |
| 233 | 1897 | Washington | Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897, at 1956-57 (Vol. 2, 1897), Carrying Concealed Weapons, § 7084 | Prohibited the carrying of a concealed revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person. Punishable by fine of $25-100 and/or imprisonment for 30 days. | Revolver; Pistol; Other fire-arms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury |
| 234 | 1898 | Georgia | 1898 Ga. L. 60, ch. 103 | Prohibited the concealed carry of any pistol, dirk, sword cane, spear, Bowie knife, other kind of knife "manufactured and sold for purpose of offense and defense," and any "kind of metal knucks." | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear; Metal knuckles |
| 235 | 1898 | Oregon – City of Oregon City | The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order, 259 (1898), An Ordinance Providing for the Punishment of Disorderly | Prohibited the carrying of any slingshot, billy, dirk, pistol, or "any concealed deadly weapon," and the discharge of any firearm, air gun, sparrow gun, flipper, or bean shooter, unless in self-defense. | Slingshot; Billy; Dirk; Pistol; Concealed deadly weapon; Firearm; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG

**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
| | | | Persons, and Keepers and Owners of Disorderly Houses, § 2 | | Air gun; Sparrow gun; Flipper; Bean shooter |
| 236 | 1899 | Alaska | Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905, at App. A, p. 139 (30 Stat. L. 1253 (1899)); 1896-99 Alaska Sess. Laws 1270, ch. 6, § 117 | Prohibited concealed carrying in any manner any revolver, pistol, other firearm, knife (other than an "ordinary pocket knife"), dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury to a person or property. | Pistol; Revolver; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles; Other instrument |
| 237 | 1899 | Nebraska – City of Fairfield | Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899), Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1 | Prohibited the carrying of a concealed pistol, revolver, dirk, Bowie knife, billy, slingshot, metal knuckles, or other dangerous or deadly weapons. Punishable by forfeiture and "shall be so adjudged." | Pistol; Revolver; Dirk; Bowie knife; Billy; Slingshot; Metal knuckles; Other dangerous or deadly weapons |
| 238 | 1899 | Texas – City of San Antonio | Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, at 220 (1899), Ordinances of the City of | Prohibited drawing in a threatening manner a pistol, gun, knife, sword cane, club or any other instrument or weapon that may cause death. | Pistol; Gun; Knife; Sword cane; Club; Any other instrument or weapon that causes death |

13

***Jones v. Bonta***, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | San Antonio, Ordinances, ch. 22, § 4 | | |
| 239 | 1900 | Iowa – City of Des Moines | William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa, at 89-90,  (1900), Ordinances City of Des Moines, Weapons, Concealed, § 209 | Prohibited the carrying of a concealed pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon |
| 240 | 1900 | New York | 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1 | Prohibited manufacturing or selling a slungshot, billy, sandclub or metal knuckles, and prohibited selling a firearm to a minor in any city or incorporated village without written consent of police magistrate.  Exempted any officer of the United States or peace officer when necessary and proper to discharge official duties. | Slungshot; Billy; Sandclub; Metal knuckles; Pistol; Other firearm |
| 241 | 1901 | Arizona [Territory] | 1901 Ariz. 1251-53, §§ 381, 385, 390 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use).  Exempted peace officers in discharge of official duties.  Punishable by a fine of $25-100 and forfeiture of the weapon. | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) |
| 242 | 1901 | Utah | 1901 Utah Laws 97-98, An Act Defining an Infernal | Prohibited the construction and possession of any "infernal machine," defined as a device with a | Infernal machine |

14

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3 | loaded firearm that is capable of igniting when moved, handled, or opened. | |
| 243 | 1903 | Oklahoma [Territory] | Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or other kind of knife manufactured for defense. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword Cane; Spear; Metal knuckles; Other knife |
| 244 | 1903 | South Dakota | S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471 | Prohibited the carrying of a concealed slungshot, firearm, or sharp or dangerous weapon. | Slungshot; Firearm; Sharp or dangerous weapon |
| 245 | 1905 | Indiana | 1905 Ind. Acts 677, Public Conveyance—Attacking, § 410 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol or other weapon, or throwing a stone, stick, club or any other substance at a vehicle.  Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other weapon; Stone; stick; Club; Any other substance |
| 246 | 1905 | New Jersey | 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1 | Prohibited the carrying of a concealed revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor.  Punishable by fine up to $200 and/or imprisonment with hard labor up to 2 years. | Revolver; Pistol; Other deadly; offensive or dangerous weapon or firearm or any stiletto; |

15

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
| | | | | | Dagger; razor |
| 247 | 1908 | Rhode Island | 1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws, § 23 | Prohibited the carrying of any dirk, dagger, razor, sword cane, Bowie knife, butcher knife, air-gun, billy, metal knuckles, slungshot, pistol, other firearm.  Exempted officers or watchmen. | Dirk; Dagger; Razor; Sword cane; Bowie knife; Butcher knife; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm. |
| 248 | 1909 | Idaho | 1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1 | Prohibited the carrying a concealed dirk, Bowie knife, dagger, slungshot, pistol, revolver, gun, or any other deadly or dangerous weapon in any public setting. | Dirk; Bowie knife; Dagger; Slungshot; Pistol; Revolver; Other deadly or dangerous weapon |
| 249 | 1909 | South Dakota | 1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game | Prohibited the setting or possession of any "set gun." | Set gun |

16

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|--------------------------|------------------------|
|  |  |  | Warden and Defining His Duties, ch. 240, §§ 21-22 |  |  |
| 250 | 1909 | Washington | 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3 | Prohibited the setting of any trap, spring pistol, rifle, or other deadly weapon.  Punishable by imprisonment for up to 1 year or a fine of up to $1,000.  Further punishable by imprisonment for up to 20 years for non-fatal or fatal injuries resulting from the trap or | Trap gun |
| 251 | 1911 | New York | 1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1 | Prohibited the manufacture, sale, giving, or disposing of any weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, and the offering, sale, loaning, leasing, or giving of any gun, revolver, pistol, air gun, or spring-gun to a person under the age of 16. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Gun; Revolver; Pistol; Air gun; Spring gun |
| 252 | 1911 | New York | 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, or bludgeon, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instrument or weapon" with intent to use the weapon unlawfully against another. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; |

17

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG

**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Stiletto; Other dangerous or deadly weapon |
| 253 | 1912 | Vermont | 1912 Vt. Acts and Resolves 261 | Prohibited the setting of any spring gun. Punishable by a fine of $50-500 and liability for twice the amount of damage resulting from the trap. | Spring gun |
| 254 | 1913 | Florida | 1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8 | Prohibited hunting wild game with automatic guns. | Machine guns |
| 255 | 1913 | Hawaii [Territory] | 1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons, § 3089. | Prohibited the carrying a Bowie knife, sword cane, pistol, air-gun, slungshot, or other deadly weapon. Punishable by fine of $10-250 or imprisonment for 3-12 months, unless good cause can be shown for carrying the weapon. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon |
| 256 | 1913 | Iowa | 1913 Iowa Acts 307, ch. 297, §§ 1, 2 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sandbag, skull cracker, slungshot, or other offensive and dangerous weapons or instruments.  Also prohibited the selling, keeping for sale, offering for sale, loaning, or giving away any dirk, dagger, stiletto, metallic knuckles, sandbag, or "skull cracker."  Exempted the selling or keeping for sale of "hunting and fishing knives." | Dirk; Dagger; Sword; Pistol; Revolver; Stiletto; Metallic knuckles; Picket; Billy; Sand bag; Skull cracker; Slungshot; Other offensive and dangerous weapons or instruments |
| 257 | 1913 | New York | 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, | Prohibited the carrying or possession of any weapon of the kind commonly known as a | Blackjack; Slungshot; |

18

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Carrying and Use of Dangerous Weapons Carrying Weapons, Dangerous or Unusual Weapons, § 1 | blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb, or bombshell, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instruments or weapon." | Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Bomb; Bombshell; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon |
| 258 | 1915 | New Hampshire | 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18 | Prohibited the setting of a spring gun.  Punished by a fine of $50-500. | Spring gun |
| 259 | 1915 | North Dakota | 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5 | Prohibited the concealed carrying of any instrument or weapon usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, or any sharp or dangerous weapon, any gun, revolver, pistol, or "other dangerous fire arm," nitroglycerin, dynamite, or any other dangerous or violent explosive. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Any sharp or dangerous weapon; Any Gun; Revolver; Pistol; Dangerous firearm; Explosive |

19

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 260 | 1917 | California | 1917 Cal. Stat. 221, § 1 | Prohibited the manufacture, leasing, keeping for sale, offering, giving, or disposing of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dirk, or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dirk; Dagger |
| 261 | 1917 | California | 1917 Cal. Stat. 221, § 2 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb, or bombshells, and the carrying of any dirk or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Bomb; Bombshells; Dirk; Dagger |
| 262 | 1917 | California | 1917 Cal. Stat. 221, § 5 | Prohibited the use, or carrying or possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or other "dangerous or deadly instrument or weapon." | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Loaded pistol; Revolver; Other firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; |

20

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Metal knuckles; Bomb; Bombshell; Other deadly or dangerous weapon |
| 263 | 1917 | Missouri – City of Joplin | Joplin Code of 1917, Art. 67, § 1201. | Prohibited the carrying of a concealed firearm, Bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slungshot, or other similar deadly weapons in a church, school, election site, court, or other public setting. Also prohibits using the weapon in a threatening manner, using while intoxicated, or selling to a minor. | Firearms; Bowie knife; Spring-back knife; Razor; Knuckle; Billy; Sword cane; Dirk; Dagger; Slungshot; Other deadly weapons |
| 264 | 1917 | North Carolina – Harnett County | 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1 | Prohibited killing quail with a gun that shoots over two times before reloading. | Gun that shoots over two times before reloading (machine gun) |
| 265 | 1917 | Oregon | 1917 Or. Sess. Laws 804-08, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing | Prohibited the attempted use, or the carry and possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or any other "dangerous or deadly weapon." Punishable by a fine of $50-500 or imprisonment for 1-6 months. | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Pistol; Revolver; Other Firearm; Blackjack; Slungshot; Billy; Sandclub; |

21

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | penalties for violation of the provisions of this Act, § 7 | | Sandbag; Metal knuckles; Bomb; Bombshell; Other dangerous or deadly weapon |
| 266 | 1923 | California | 1923 Cal. Stat. 695, § 1 | Prohibited the manufacture, importation, keeping for sale, offering or exposing for sale, giving, lending, or possession of any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, and the concealed carrying of any dirk or dagger. Punishable by imprisonment for 1-5 years. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Dirk; Dagger |
| 267 | 1923 | Missouri | 1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17 | Prohibited the carrying, while a passenger or operating a moving vehicle, of a revolver, gun or other firearm, or explosive, any Bowie knife, or other knife having a blade of more than two and one-half inches in length, any slingshot, brass knucks, billy, club or other dangerous weapon. Punishable by imprisonment of minimum 2 years. | Revolver; Gun; Explosive; Bowie knife; Other knife having a blade of more than two and one-half inches in length; Slingshot; Metal knuckles; Billy; Club; Other dangerous weapon |
| 268 | 1923 | South Carolina | 1923 S.C. Acts 221 | Prohibited the selling or giving to a minor a pistol or pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane or slingshot.  Also prohibited a parent from giving such a weapon to their child under 12 years old.  Punishable by fine up to $50 or imprisonment up to 30 days. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot |

22

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 269 | 1923 | Vermont | 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1 | Prohibited using, carrying, or possessing a machine gun or automatic rifle while hunting. | Machine gun; Automatic rifle |
| 270 | 1925 | Oregon | 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2 | Prohibited the setting of any loaded spring gun. Punishable by a fine of $100-500 or imprisonment for 30 days to 6 months. Exception for setting of trap gun to destroy burrowing rodents. | Spring gun; Set gun |
| 271 | 1925 | West Virginia | 1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7(a) | Prohibited unlicensed carrying of a pistol, dirk, Bowie knife, slungshot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Punishable by imprisonment for 6-12 months for the first offense, and for 1-5 years for subsequent offenses, and in either case, a fine of $50-200. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon |
| 272 | 1925 | West Virginia | 1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b | Prohibited publicly displaying for rent or sale any revolver, pistol, dirk, Bowie knife, slungshot, other dangerous weapon, machine gun, submachine gun, or high powered rifle. Requires dealers to keep a register. Prohibited selling, renting, giving, or lending any of these weapons to an unnaturalized person. | Revolver; Pistol; Dirk; Bowie knife; Slungshot; Machine gun; Other dangerous weapon; Submachine gun; High powered rifle |

23

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 273 | 1925 | West Virginia | 1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b | Prohibited carrying, transporting, or possessing a machine gun, submachine gun, or high powered rifle except on their own premises and with a permit. Also provides guidelines for such a permit. | Machine gun; Submachine gun; High powered rifle |
| 274 | 1927 | California | 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1 2 | Prohibited a person, firm, or corporation possessing a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun |
| 275 | 1927 | Indiana | 1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of | Prohibited owning or possessing a machine gun or bomb in an automobile. Punishable by imprisonment for 1-5 years. | Machine gun; Bomb |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Machine Guns or Bombs—Penalty, ch. 156, § 1 | | |
| 276 | 1927 | Indiana | 1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2 | Prohibited discharging a machine gun or bomb. Punishable by imprisonment for 2-10 years. | Machine gun; Bomb |
| 277 | 1927 | Iowa | 927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1 2 | Prohibited possession of a machine gun. | Machine gun |
| 278 | 1927 | Maryland | 1927 Md. Laws 156, § 388-B | Prohibited possession of liquor in an automobile that also carries a gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon. | Gun; Pistol; Revolver; Machine gun; Other dangerous or deadly weapon |
| 279 | 1927 | Massachusetts | 1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 | Prohibited the carrying of a pistol, revolver, machine gun, stiletto, dagger, dirk knife, slungshot, metallic knuckles, or sawed off shotgun, billy, or dangerous weapon if arrested upon a warrant for an alleged crime.  Punishable by imprisonment of 6 months to 2.5 years. | Pistol; Revolver; Machine gun; Stiletto; Dagger; Dirk; Slungshot; Metallic knuckles; Sawed-off shotgun; Billy; Dangerous weapon |
| 280 | 1927 | Massachusetts | 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123) | Prohibited selling, renting, or leasing a pistol, revolver, or machine gun to a person without a license to possess the same. | Pistol; Revolver; Machine gun |

25

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 281 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, bludgeon.  Punishable by fineup to $1,000 or imprisonment. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub; Bludgeon |
| 282 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. Punishable by fine of $1,000 and/or imprisonment up to 5 years. | Machine gun; Silencer |
| 283 | 1927 | New Jersey | 1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1 | Prohibited a pawnbroker from selling or possessing for sale, loan, or to give away a machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Punishable as a high misdemeanor. | Machine gun; Automatic rifle; Revolver; Pistol; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive |

26

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 284 | 1927 | New Jersey | 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | Prohibited selling, giving, loaning, delivering or furnishing, or possessing a machine gun or automatic rifle to another person without a license. | Machine gun; Automatic rifle |
| 285 | 1927 | Rhode Island | 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun. | Pistol; Machine gun |
| 286 | 1927 | Rhode Island | 1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8. | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun or silencer. | Pistol; Machine gun; Silencer |
| 287 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3 | Prohibited a person who has previously been convicted of a violent crime from owning, carrying, or possessing any firearm (including machine gun or pistol). | Machine gun; Pistol |
| 288 | 1929 | Indiana | 1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch. 55, § 1 | Prohibited being armed with a pistol, revolver, rifle shotgun, machine gun, or any other firearm or dangerous weapon while committing or attempting to commit a crime of rape, robbery, bank robbery, or larceny. Punishable by imprisonment for 10-20 years, in addition to the punishment for the original crime. | Pistol; Revolver; Rifle; Shotgun; Machine gun; Dangerous or deadly weapon |
| 289 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, sandbag, bludgeon, or any gas ejecting device. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub, |

27

**Jones v. Bonta**, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | | Sandbag, Bludgeon, Gas ejecting device |
| 290 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. | Machine gun; Silencer |
| 291 | 1929 | Missouri | 1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2 | Prohibited selling, delivering, transporting, and possessing a machine gun. Punishable by imprisonment of 2-30 years and/or fine up to $5,000. | Machine gun |
| 292 | 1929 | Nebraska | 1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2 | Prohibited selling or otherwise disposing of a machine gun. Punishable by fine of $1,000-$10,000. Also Prohibited transporting or possessing a machine gun. Punishable by imprisonment for 1-10 years. | Machine gun |
| 293 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 4 | Prohibited selling, giving, transferring, or possessing a machine gun. Punishable by fine up to $1,000 and imprisonment by separate or solitary confinement at labor up to 5 years. Also Prohibited using a machine gun during an attempted crime. | Machine gun |

28

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|------|------|------|------|------|
| | | | | Punishable by separate and solitary confinement at labor for up to 10 years. | |
| 294 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns, § 3 | Prohibited being armed with a machine gun while committing a crime. Punishable by imprisonment with solitary confinement up to 10 years. | Machine gun |
| 295 | 1929 | Wisconsin | 1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1 | Prohibited owning, using, or possession a machine gun. Punishable by imprisonment of 1-15 years. | Machine gun |
| 296 | 1931 | Delaware | 1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1 | Prohibited a person from possessing a machine gun. Punishable by fine and/or imprisonment. | Machine gun |
| 297 | 1931 | Illinois | 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | Prohibited selling, loaning, or giving away, purchasing, possessing, carrying, or transporting any machine gun. | Machine gun |
| 298 | 1931 | Illinois | 1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7 | Prohibited being armed with a machine gun while committing arson, assault, burglary, kidnapping, larceny, rioting, or robbery. Punishable by imprisonment for 5 years to life. | Machine gun |

29

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|-----|-------------------|--------------|----------|---------------------------|------------------------|
| 299 | 1931 | Michigan | 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun |
| 300 | 1931 | New York | 1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1 | Prohibited using an imitation pistol and carrying or possessing a black-jack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or ay other dangerous or deadly weapon. | Imitation pistol; Blackjack; Slungshot; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Machine gun; Sawed-off shot gun; Other dangerous or deadly weapon |
| 301 | 1931 | North Dakota | 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2 | Prohibited selling, giving, loaning, furnishing, or delivering a machine gun, submachine gun, automatic rifle, or bomb (without a license). Punishable by imprisonment up to 10 years and/or fine up to $3,000. | Machine gun; Submachine gun; Automatic rifle; Bomb |
| 302 | 1932 | District of Columbia | District of Columbia 1932: 1932, Public-No. 275-72D Congress, ch. 465 | Prohibited being armed with or having readily available any pistol or other firearm while committing a violent crime. In addition to being punished for the crime, will also be punished with imprisonment (various terms depending on the number of previous convictions).  Additionally, Prohibited people convicted of violent crimes from owning or possessing a pistol. Prohibited carrying | Pistol; Deadly or dangerous weapon |

30

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | | a concealed deadly or dangerous weapon. Regulates the sale and transfer of pistols. | |
| 303 | 1932 | Louisiana | 1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1 2 | Prohibited selling, loaning, giving, purchasing, possession, carrying, or transporting a machine gun. | Machine gun |
| 304 | 1933 | California | 1933 Cal. Stat. 1169 | Prohibited a person, firm, or corporation from selling, possessing or transporting a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun |
| 305 | 1933 | Florida | 1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1 | Prohibited throwing a bomb or shooting a machine gun across or along a street or highway, any public park or place where people assemble with the intent to do bodily harm. Punishable by death. | Bomb; Machine gun |
| 306 | 1933 | Hawaii | 1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2 | Prohibited a person, firm, or corporation from owning, possessing, selling, or transporting a machine gun, shell cartridge, or bomb containing or capable of emitting tear gas or other noxious gas. | Machine gun; Shell cartridge; Bomb |
| 307 | 1933 | Kansas | 1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Unlawful in Certain Cases, Providing for Search, | Prohibited possession of a machine rifle, machine gun, or submachine gun. | Machine gun |

31

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1 3 | | |
| 308 | 1933 | Minnesota | 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3 | Prohibited owning, controlling, using, possessing, selling, or transporting a machine gun. | Machine gun |
| 309 | 1933 | New York | 1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3 | Prohibited selling, giving, disposing of, transporting, or possessing a machine gun or submachine gun to a person guilty of a felony. | Machine gun |
| 310 | 1933 | Ohio | 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1 | Prohibited owning, possessing, and transporting a machine gun, light machine gun, or submachine gun without a permit. Punishable by imprisonment of 1-10 years. | Machine gun; Light machine gun; Submachine gun |
| 311 | 1933 | Oregon | 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4 | Prohibited possession of a machine gun. Also Prohibited carrying a concealed machine gun, pistol, revolver, or other firearm. | Machine gun; Pistol; Revolver; Other firearm |
| 312 | 1933 | Oregon | 1933 Or. Laws 488, An Act to Amend Sections 72-201, | Prohibited a unnaturalized person and person convicted of a felony against another person or the | Pistol; Revolver; |

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| | | | 72-202, 72-207, Oregon Code 1930, § 2 | government from owning or possessing a pistol, revolver, other firearm, or machine gun. Punishable by imprisonment for 1-5 years. | Other firearm; Machine gun |
| 313 | 1933 | South Dakota | 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 | Prohibited possession of a machine gun during a violent crime. Punishable by imprisonment up to 15 years. Prohibited using a machine gun offensively or aggressively; punishable by imprisonment up to 15 years. Requires manufacturers to keep a register of machine guns and for owners to converted their machine guns to pistols to register the weapon. | Machine gun |
| 314 | 1933 | Texas | 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6 | Prohibited possession of a machine gun; punishable by imprisonment up to 10 years. Prohibited selling, leasing, giving, bartering, exchanging, or trading a machine gun; punishable by imprisonment for 2 months to 10 years. | Machine gun |
| 315 | 1933 | Washington | 1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5 | Prohibited manufacturing, owning, buying, selling, loaning, furnishing, transporting, or possessing a machine gun. | Machine gun |
| 316 | 1934 | New Jersey | 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5 | Declares a person who possesses a machine gun or submachine gun a "gangster" and therefore, enemy of the state.  Also declares a person who carries a deadly weapon without a permit a "gangster." If convicted a "gangster," punishable by fine up to $10,000 and/or imprisonment up to 20 years. | Machine gun; Submachine gun; Deadly weapon |

33

*Jones v. Bonta*, No. 3:19-cv-01226-L-AHG
**Defendants' Survey of Relevant Statutes Regarding Dangerous Weapons (1889 – 1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|---|
| 317 | 1934 | South Carolina | 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6 | Prohibited transporting, possessing, selling, renting, or giving a firearm or machine gun. Punishable by fine up to $1,000 and imprisonment with solitary confinement up to 20 years. | Firearm; Machine gun |
| 318 | 1934 | Virginia | 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 | Prohibited possession or use of a machine gun during a violent crime; punishable by death or imprisonment for a minimum of 20 years. Prohibited unlawful possession or use of a machine gun for offensive or aggressive purposes; punishable by imprisonment for a minimum of 10 years. Requires manufacturers to keep a register of machine guns. | Machine gun |
| 319 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01-164.06 | Prohibited using or possessing a machine gun during an attempted violent crime; punishable by imprisonment of minimum 20 years. Prohibited use of a machine gun for offensive or aggressive purposes; punishable by imprisonment of minimum 10 years. | Machine gun |
| 320 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1 | Prohibited selling, possessing, using, or transporting a machine gun, automatic firearm, bomb, hand grenade, projectile, shell, or other container that can contain tear or other gas. Punishable by imprisonment for 1-3 years. | Machine gun; Automatic firearm; Bomb; Hand grenade; Projectile; Shell; Other container that can contain gas |

34

# EXHIBIT 5

**Defendants Disclosure of Expert
Witnesses**

1   ROB BONTA
    Attorney General of California
2   MARK BECKINGTON
    Supervising Deputy Attorney General
3   JOHN D. ECHEVERRIA
    Deputy Attorney General
4   JENNIFER E. ROSENBERG
    Deputy Attorney General
5   State Bar No. 275496
      300 South Spring Street, Suite 1702
6     Los Angeles, CA  90013
      Telephone:  (213) 269-6617
7     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
9   *State of California, and Luis Lopez, in his*
    *official capacity as Director of the*
10  *Department of Justice Bureau of Firearms*

11          IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  | **MATTHEW JONES, *et al.*,** | 3:19-cv-01226-L-AHG |
    |---|---|
15  | | |
    | Plaintiffs, | **DEFENDANTS' DISCLOSURE OF EXPERT WITNESSES** |
16  | | |
17  | **v.** | **[Fed. R. Civ. P. 26(a)(2)]** |
18  | **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,** | Dept:      5B |
19  | | Judge:    The Honorable  M. James Lorenz and Magistrate Judge Alison H. Goddard |
20  | Defendants. | |

21

22

23

24

25

26

27

28

In accordance with Federal Rule of Civil Procedure 26(a)(2) and this Court's Order Granting Joint Motion for Modification of Scheduling Order in Light of Ninth Circuit Order (ECF No. 80), Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Luis Lopez, in his official capacity as Director of the Department of Justice Bureau of Firearms,[1] hereby disclose the following expert witnesses upon whose testimony they intend to rely at trial:

**Saul Cornell, Professor, Paul and Diane Guenther Chair in American History, Fordham University, 441 East Fordham Road, Bronx, NY 10458, (718) 817-3935.** Professor Cornell will provide expert opinion regarding the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of, and access to, firearms to individuals below the age of 21. A copy of Professor Cornell's expert report in this matter is attached hereto as Exhibit 1. Professor Cornell's rates for services performed in the above-entitled case include an hourly rate of $500 per hour for reviewing materials, participating in meetings, and preparing reports, $750 per hour for depositions and court appearances, and an additional $100 per hour for travel time.

**John J. Donohue, Professor, C. Wendell and Edith M. Carlsmith Professor of Law, Stanford Law School, 559 Nathan Abbott Way, Stanford, CA 94305, (650) 721-6339.** Professor Donohue will provide expert opinion regarding the public-safety risks of firearm possession and use by 18-20 year olds and the effectiveness of California's gun-safety laws in restricting firearm

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Bonta is automatically substituted as a defendant in this matter in place of his predecessors, former Acting Attorney General Matthew Rodriquez and former Attorney General Xavier Becerra, and Director Luis Lopez is automatically substituted as a defendant in this matter in place of his predecessor, former Acting Director Brent E. Orick.

1

1    possession and use by at-risk individuals.  A copy of Professor Donohue's expert

2    report in this matter is attached hereto as Exhibit 2.  Professor Donohue's rates for

3    services performed in the above-entitled case include an hourly rate of $650 per

4    hour for reviewing materials, participating in meetings, and preparing reports, $850

5    per hour for depositions, and $650 per hour for trial.

6

7    **Laurence Steinberg, Developmental Psychologist, 1921 Pine Street,**

8    **Philadelphia, PA 19103, (215) 204-8321.**  Dr. Steinberg will provide expert

9    opinion regarding the neurobiological and psychological development of

10   adolescents aged 18-20, the ways in which neurobiological immaturity of this age

11   group impacts behavior, and the implications of these factors on the potential

12   efficacy of California's restrictions on firearms access for individuals under the age

13   of 21.  A copy of Dr. Steinberg's expert report in this matter is attached hereto as

14   Exhibit 3.  Professor Steinberg's rates for services performed in the above-entitled

15   case include an hourly rate of $500 per hour for reviewing materials, participating

16   in meetings, and preparing reports, and $500 per hour for depositions and court

17   appearances.  These rates also apply to travel time.

18       The information required under Federal Rule of Civil Procedure 26(a)(2)(B) is

19   provided in each expert witness's respective expert report.  Defendants reserve the

20   right to designate additional expert witnesses for rebuttal as provided in the Court's

21   Order Granting Joint Motion for Modification of Scheduling Order in Light of

22   Ninth Circuit Order (ECF No. 80).

23       The expert witnesses disclosed herein shall be contacted only through

24   Defendants' counsel.

25

26

27

28

1  Dated:  June 2, 2021                          Respectfully Submitted,

2                                               ROB BONTA
                                                Attorney General of California
3                                               MARK BECKINGTON
                                                Supervising Deputy Attorney General
4                                               JOHN D. ECHEVERRIA
                                                Deputy Attorney General
5

6

7                                                _/s/ Jennifer E. Rosenberg_____
                                                JENNIFER E. ROSENBERG
8                                               Deputy Attorney General
                                                *Attorneys for Defendants Rob Bonta,*
9                                               *in his official capacity as Attorney*
                                                *General of the State of California,*
10                                              *and Luis Lopez, in his official*
                                                *capacity as Director of*
11                                              *the Department of Justice Bureau of*
                                                *Firearms*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

1   ROB BONTA
    Attorney General of California
2   MARK BECKINGTON
    Supervising Deputy Attorney General
3   JOHN D. ECHEVERRIA
    Deputy Attorney General
4   JENNIFER E. ROSENBERG
    Deputy Attorney General
5   State Bar No. 275496
      300 South Spring Street, Suite 1702
6     Los Angeles, CA  90013
      Telephone:  (213) 269-6617
7     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
8   *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
9   *State of California, and Luis Lopez, in his*
    *official capacity as Director of the*
10  *Department of Justice Bureau of Firearms*

11                IN THE UNITED STATES DISTRICT COURT

12              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  | **MATTHEW JONES, *et al.*,** | 3:19-cv-01226-L-AHG |
    | --- | --- |
15  | Plaintiffs, | **EXPERT REPORT OF** |
16  | | **PROFESSOR LAURENCE** |
    | | **STEINBERG** |
17  | **v.** | |
    | | Dept:        5B |
18  | **ROB BONTA, in his official capacity** | Judge:       The Honorable  M. James |
    | **as Attorney General of the State of** | Lorenz and Magistrate |
19  | **California, *et al.*,** | Judge Alison H. Goddard |
20  | Defendants. | |

21

22

23

24

25

26

27

28

## BACKGROUND AND QUALIFICATIONS

1.      I hold the degrees of A.B. in Psychology from Vassar College (Poughkeepsie, New York) and Ph.D. in Human Development and Family Studies from Cornell University (Ithaca, New York).

2.      I am a developmental psychologist specializing in adolescence, broadly defined as the second decade of life. Throughout this document, "adolescence" refers to the period of development from age 10 to age 20, which is the age range generally accepted within the scientific community.[1] Adolescence can be further divided into three phases: early adolescence (10 through 13), middle adolescence (14 through 17), and late adolescence (18 through 20).[2]

3.      I received my Ph.D. in 1977 and have been continuously engaged in research on adolescent development since that time. I am the author or co-author of approximately 450 scientific articles and 17 books on young people. Prior to my faculty appointment at Temple University, where I have been since 1988, I was on the faculty at the University of Wisconsin—Madison (1983-1988) and the University of California, Irvine (1977-1983). From 1997-2007, I directed the John D. and Catherine T. MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice, a national multidisciplinary initiative on the implications of research on adolescent development for policy and practice concerning the treatment of juveniles in the legal system. I also have been a member of the MacArthur Foundation Research Network on Law and

---

[1] Steinberg, L. (2019). *Adolescence* (12th edition). New York: McGraw-Hill.

[2] Key terms appear in ***bold italic*** type and are defined in a Glossary of Key Terms that follows the body of the report. (Further, where this report references an age range, such as "from age 10 to age 20," "10 through 13," or "between the ages of 18 and 20," I intend the age range to include both the lower age number and the higher age number. For example, "between the ages of 18 and 20" includes the ages of 18, 19, and 20.

1

Neuroscience, a national initiative examining the ways in which neuroscientific research may inform and improve legal policy and practice.

4.      Since 1997, my colleagues and I have been studying whether, to what extent, and in what respects adolescents and adults differ in ways that affect their behavior and may inform decisions about the treatment of young people under the law.

5.      I have conducted extensive research on decision making, risk-taking, and judgment in adolescence and young adulthood (where young adulthood encompasses the ages of 18-20), including several large-scale studies of age differences in judgment and decision making between ages 10 and 30, in both American and international samples.[3]

6.      My research on adolescent development is widely cited. A 2020 publication in the journal PLoS Bio reported an analysis of the publications of close to 7 million scientists with at least five citations over the period from 1996-2019,

---

[3] Duell, N., Steinberg, L., Icenogle, G., Chein, J., Chaudary, N., Di Giunta, L., . . . Chang, L. (2018). Age patterns in risk taking around the world. *Journal of Youth and Adolescence*, *47,* 1052-1072; Icenogle, G., Steinberg, L., Duell, N., Chein, J., Chang, L., Chaudary, N., . . . Bacchini, D. (2019). Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational sample. *Law and Human Behavior, 43*, 69-85; Steinberg, L., Albert, D., Cauffman, E., Banich, M., Graham, S., & Woolard, J. (2008). Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. *Developmental Psychology*, *44*, 1764-1778; Steinberg, L., Graham, S., O'Brien, L., Woolard, J., Cauffman, E., & Banich, M. (2009). Age differences in future orientation and delay discounting. *Child Development*, *80*, 28-44; Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop". *American Psychologist*, *64*, 583-594; Steinberg, L., Icenogle, G., Shulman, E., Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. (2018). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science*, *21*, 1-13.

2

using SCOPUS, the largest scientific citation database.[4] Each scientist was categorized into one of 22 major fields (e.g., "Psychology and Cognitive Science") and two of 176 subfields (e.g., "Developmental and Child Psychology"). According to this analysis, I fall within the top .01% of all scientists in the world, across all fields, in citations. I am the 20th most frequently cited psychologist in the world and the fourth most frequently cited developmental psychologist. According to Google Scholar, my scientific papers have been cited well over 100,000 times.[5]

7.     I am on the faculty at Temple University, in Philadelphia, Pennsylvania, USA, where I am a Distinguished University Professor and the Laura H. Carnell Professor of Psychology. I am a Fellow of the American Psychological Association (APA), the Association for Psychological Science, and the American Academy of Arts and Sciences, and a member of the Society for Research in Child Development and the Society for Research on Adolescence. I was President of the Division of Developmental Psychology of the APA and President of the Society for Research on Adolescence. I was also a member of the National Academies' Board on Children, Youth, and Families and chaired the National Academies' Committee on the Science of Adolescence, during which time I oversaw the creation of a comprehensive report on adolescent risk-taking.[6]

8.     I have been qualified as an expert witness in state courts in Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Indiana, Kentucky, Massachusetts, Missouri, Nevada, Ohio,

---

[4] Ioannidis, J.P.A., Boyack K.W. & Baas, J. (2020). Updated science-wide author databases of standardized citation indicators. *PLoS Bio, 18*, e3000918.

[5] Data from Google Scholar, accessed on February 18, 2021, at https://scholar.google.com/citations?hl=en&user=EIO0arEAAAAJ&view_op=list_works&sortby=pubdate.

[6] Steinberg, L. (Chair), with members of the Committee on the Science of Adolescence of the Institute of Medicine and the National Research Council. (2011). *The science of adolescent risk-taking*. Washington: National Academies Press.

3

1  Oregon, Pennsylvania, and Wisconsin, as well as the U.S. District Courts for the

2  Southern District of New York, the Eastern District of New York, and the District of

3  Connecticut. I have also been deposed as an expert witness in cases in California,

4  Colorado, Florida, Oregon, North Carolina, Pennsylvania, Rhode Island, and

5  Wisconsin; in U.S. District Courts for the Eastern District of Michigan, the Western

6  District of Washington, and the District of Colorado; and in the Military Court of

7  Commission Review in Guantanamo Bay, Cuba. In addition, I was the lead

8  scientific consultant for the APA when the Association filed amicus curiae briefs in

9  *Miller v. Alabama*, 567 U.S. 460 (2012); *Graham v. Florida*, 560 U.S. 48 (2011);

10  and *Roper v. Simmons*, 543 U.S. 551 (2005). One of my articles, "Less Guilty by

11  Reason of Adolescence," (co-authored with Elizabeth Scott),[7] was cited in the

12  Court's majority opinions in *Roper* and *Miller*, as was the APA amicus brief that I

13  helped draft.

14       9.    A copy of my curriculum vitae is attached as Exhibit A.

15  **REFERRAL QUESTION**

16       10.    Ms. Jennifer Rosenberg, Deputy Attorney General of the State of

17  California, requested that I describe and analyze the current research concerning

18  ***neurobiological*** and psychological development during late adolescence (i.e.,

19  among individuals between the ages of 18-20), the ways in which neurobiological

20  immaturity impacts behavior and ***psychosocial*** development during this period, and

21  the basis for and evolution of the understanding of ongoing behavioral development

22  during these late adolescent years. I was also asked to provide an opinion about the

23  implications these scientific facts have for the potential success of recently enacted

24  regulations in California that limit the sale and transfer by federally licensed

25  firearms dealers of certain firearms to individuals under age 21 to reduce gun

26  

27       [7] Steinberg, L., & Scott, E. (2003). Less guilty by reason of adolescence:
Developmental immaturity, diminished responsibility, and the juvenile death

28  penalty. *American Psychologist*, *58*, 1009-1018.

4

violence, including suicides, homicides, mass shootings, and other gun-related altercations between late adolescents and other persons. I have been compensated at the rate of $500 per hour for my preparation of this report. My compensation is not contingent on the outcome of the case.

**OVERVIEW OF OPINIONS**

11.     Over the past two decades, considerable scientific evidence has accumulated demonstrating that, compared to adults, adolescents—including late adolescents—are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations. These characteristics of adolescents are now viewed as normative, driven by processes of brain maturation that are not under the control of young people, and typical of normally developing individuals ages 10 through 20 years old.

12.     In several landmark cases decided between 2005 and 2016, the U.S. Supreme Court drew on this scientific evidence to conclude that the psychological and neurobiological immaturity of adolescents, relative to adults, warrants the differential treatment of young people under U.S. criminal law.[8]

13.     In the past ten years, additional scientific evidence has accrued indicating that many aspects of psychological and neurobiological immaturity characteristic of early adolescents and middle adolescents are also characteristic of late adolescents (i.e., between ages 18 and 20).

---

[8] Steinberg, L. (2013). The influence of neuroscience on U.S. Supreme Court decisions involving adolescents' criminal culpability. *Nature Reviews Neuroscience, 14,* 513-518 (referring to *Roper*, 543 U.S. 551; *Graham*, 560 U.S. 48; and *Miller*, 567 U.S. 460).

5

14.     Although late adolescents are in some ways similar to individuals in their mid-20s, in other ways, and under certain circumstances, they are more like individuals in early and middle adolescence in terms of their behavior, psychological functioning, and brain development. Developmental science therefore does not support the bright-line boundary that is often observed under the law wherein 18-year-olds are categorically deemed to be adults.[9] More specifically, in this declaration I explain that under emotionally arousing conditions, decision making and judgment in late adolescence often resembles those characteristics of middle adolescence (i.e., between ages 14 and 17) rather than that of adults in their mid-20s.

15.     Therefore, in many respects and for certain legal purposes, a chronological age boundary drawn at 21 rather than 18 is more consistent with the scientific community's contemporary understanding of adolescent brain and psychological development.[10] These legal purposes include limiting the circumstances under which firearms may be sold or transferred to adolescents between the ages of 18-20. It is my opinion that imposing additional restrictions on the sale or transfer of firearms to young adults aged 18-20 beyond those applicable to adult purchasers is appropriate, especially where more powerful and more destructive weapons are concerned.

## OPINIONS

## I.     BRAIN DEVELOPMENT CONTINUES BEYOND THE TEEN YEARS

16.     For most of the 20th century, scientists believed that brain maturation ended sometime during late childhood, a conclusion based on the observation that

---

[9] Scott, E., Bonnie, R. & Steinberg, L. (2016). Young adulthood as a transitional legal category: Science, social change, and justice policy. *Fordham Law Review*, *85*, 641-666.

[10] Steinberg, L., & Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. *Annual Review of Developmental Psychology*, *1*, 21-40.

the brain reached its adult size and volume by age 10. This conclusion began to be challenged in the late 1990s, as a result of research that examined the brain's internal anatomy as well as patterns of brain activity, rather than focusing solely on the brain's external appearance.[11]

17.    The advent of *functional Magnetic Resonance Imaging (fMRI)* permitted scientists and researchers to actually observe the brains of living individuals and examine their responses to various stimuli and activities. The results of this examination demonstrated that key brain systems and structures, especially those involved in *self-regulation* (i.e., exercising control over one's emotions, impulses, and actions) and *higher-order cognition* (e.g., advanced thinking abilities, including thinking ahead, planning, accurately perceiving risk, and making reasoned decisions), continue to mature throughout adolescence until at least the age of 21.[12]

18.    Further study of brain maturation conducted during the past decade has revealed that several aspects of brain development affecting judgment and decision-making are not only ongoing during early and middle adolescence, but continue at least until age 21. As more research confirming this conclusion accumulated, by 2015 the notion that brain maturation continues into late adolescence became widely accepted among neuroscientists.[13]  This contemporary view of brain

---

[11] Gogtay, N., et al. (2004). Dynamic mapping of human cortical development during childhood through early adulthood. *Proceedings of the National Academies of Sciences*, *101*, 8174–8179; Giedd, J., Blumenthal, J., Jeffries, N., Castellanos, F., Liu, H., Zijdenbos, A., . . . Rapoport, J. (1999). Brain development during childhood and adolescence: a longitudinal MRI study. *Nature Neuroscience*. 2, 861–863; Sowell, E., Thompson, P., Leonard, C., Welcome, S., Kan, E., & Toga, A. (2004). Longitudinal mapping of cortical thickness and brain growth in normal children. *Journal of Neuroscience*, *24*, 8223–8231.

[12] Casey, B. J., Tottenham, N., Liston, C., & Durston, S. (2005). Imaging the developing brain: What have we learned about cognitive development? *Trends in Cognitive Science, 9,* 104–110.

[13] Dosenbach, N., et al. (2011). Prediction of individual brain maturity using

development as ongoing at least until age 21 stands in marked contrast to the view held by scientists as recently as 15 years ago. We now know that, in many respects, individuals between 18 and 20 are more neurobiologically similar to younger teenagers than had previously been thought. These areas include deficiencies in self control under conditions of emotional arousal, and a strong interest in sensation seeking, discussed below in paragraphs 20-24.

## II.   PSYCHOLOGICAL IMMATURITY IN ADOLESCENCE

19.   Like research on brain development, research on cognitive, emotional, and social development during adolescence conducted during the past 15 years also has led scientists to revise the field's understanding of this age period. Conclusions drawn from this psychological research parallel those drawn from recent studies of brain development and indicate that individuals in their late teens and early 20s are less mature than their older counterparts in several important and legally-relevant

fMRI. *Science*, *329*, 1358–1361; Fair, D., et al. (2009). Functional brain networks develop from a "local to distributed" organization. *PLoS Computational Biology*, *5*, 1–14; Hedman A., van Haren N., Schnack H., Kahn R., & Hulshoff Pol, H. (2012). Human brain changes across the life span: A review of 56 longtitudinal magnetic resonance imaging studies. *Human Brain Mapping, 33*, 1987-2002; Pfefferbaum, A., Rohlfing, T., Rosenbloom, M., Chu, W., & Colrain, I. (2013). Variation in longitudinal trajectories of regional brain volumes of healthy men and women (ages 10 to 85 years) measured with atlas-based parcellation of MRI. *NeuroImage, 65*, 176-193; Simmonds, D., Hallquist, M., Asato, M., & Luna, B. (2014). Developmental stages and sex differences of white matter and behavioral development through adolescence: A longitudinal diffusion tensor imaging (DTI) study. *NeuroImage*, *92*, 356-368. Somerville, L., Jones, R., & Casey, B.J. (2010). A time of change: behavioral and neural correlates of adolescent sensitivity to appetitive and aversive environmental cues. *Brain & Cognition, 72*, 124-133; Tamnes, C., Herting, M., Goddings, A., Meuwese, R., Blakemore, S., Dahl, R., . . . Mills, K. (2017). Development of the cerebral cortex across adolescence: A multisample study of inter-related longitudinal changes in cortical volume, surface area, and thickness. *Journal of Neuroscience, 37*, 3402-3412; Whitaker, K., Vértes, P., Romero-Garcia, R., Váša, F., Moutoussis, M., Prabhu, G., . . . Bullmore E. (2016). Adolescence is associated with genomically patterned consolidation of the hubs of the human brain connectome. PNAS, 113, 9105-9110.

8

ways.[14] The results of these psychological studies, including many that have been conducted by myself and my American and international collaborators, have been found not only in the United States, but around the world.[15]

20.     First, adolescents and people in their early 20s are more likely than older individuals to engage in what psychologists call "sensation-seeking": the pursuit of arousing, rewarding, exciting, or novel experiences.[16] As a consequence of this, young people are more apt to focus on the potential rewards of a given decision than on the potential costs, including the risks to self and others as well as the potential negative consequences of the decision, including potential

---

[14] Scott, E., Bonnie, R. & Steinberg, L. (2016). Young adulthood as a transitional legal category, *Fordham Law Rev*iew, *85*, 641-666 and Steinberg, L. (2014). *Age of opportunity: Lessons from the new science of adolescence*. New York: Houghton Mifflin, Harcourt.

[15] This conclusion and those referenced in footnotes 15-22 and 25 come from a study my collaborators and I conducted of more than 900 American individuals between the ages of 10 and 30 from five U.S. cities, as well as an international study of more than 5,500 individuals between the ages of 10 and 30 from 11 countries, in which participants completed a computerized test battery and many standardized personality questionnaires assessing such characteristics as sensation seeking, impulsivity, reward sensitivity, susceptibility to peer influence, and risk taking. For study details, see Duell, N., Steinberg, L., Icenogle, G., Chein, J., Chaudary, N., Di Giunta, L., . . . Chang, L. (2018). Age patterns in risk taking around the world. *Journal of Youth and Adolescence*, *47,* 1052-1072; Steinberg, L. (2009). Should the science of adolescent brain development inform public policy? *American Psychologist*, *64*, 739-750; Steinberg, L., Icenogle, G., Shulman, E., Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. (2018). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science*, *21*, 1-13.

[16] Steinberg, L., Albert, D., Cauffman, E., Banich, M., Graham, S., & Woolard, J. (2008). Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. *Developmental Psychology*, *44*, 1764-1778 and Steinberg, L., Icenogle, G., Shulman, E., Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. (2018). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science*, *21*, 1-13.

9

punishment.[17] Other studies have shown that heightened risk-taking among adolescents is due to the greater attention they pay to the potential rewards of a risky choice relative to the potential costs.[18] This tendency is especially pronounced among individuals between the ages of 18 and 21, as evidenced by studies of age differences in risk-taking on experimental gambling tasks that identify the extent to which participants' decisions are more influenced by what they can win versus what they can lose,[19] as well as participants' reports of involvement in both health-related risk-taking (e.g., smoking, drinking while driving, having unprotected sex) and antisocial risk-taking (e.g., fighting, stealing, vandalizing), in which respondents answer a series of questions concerning the relative benefits and costs of various types of risky activity.[20]

21.     Second, adolescents and individuals in their early 20s are less able than older individuals to control their impulses and consider the future consequences of their actions and decisions. In general, adolescents are more short-sighted and less able and less likely to plan ahead than adults. They are less likely than adults to foresee the possible outcomes of their actions and regulate their behavior accordingly.[21] Importantly, significant gains in impulse control continue to

[17] Cauffman, E., Shulman, E., Steinberg, L., Claus, E., Banich, M., Graham, S., & Woolard, J. (2010). Age differences in affective decision making as indexed by performance on the Iowa Gambling Task. *Developmental Psychology*, *46*, 193-207.

[18] For a review, see Shulman, E., Smith, A., Silva, K., Icenogle, G., Duell, N., Chein, J., & Steinberg, L. (2016). The dual systems model: Review, reappraisal, and reaffirmation. *Developmental Cognitive Neuroscience, 17*, 103-117.

[19] This literature is summarized in Cauffman, E., Shulman, E., Steinberg, L., Claus, E., Banich, M., Graham, S., & Woolard, J. (2010). Age differences in affective decision making as indexed by performance on the Iowa Gambling Task. *Developmental Psychology*, *46*, 193-207.

[20] Steinberg, L. (2009). Should the science of adolescent brain development inform public policy? *American Psychologist*, *64*, 739-750.

[21] Grisso, T., Steinberg, L., Woolard, J., Cauffman, E., Scott, E., Graham, S., Lexcen, F., Reppucci, N., & Schwartz, R. (2003). Juveniles' competence to stand

occur beyond age 18 and into the early 20s. This has been shown in studies using experimental tests of impulsivity and delay of gratification, as well as questionnaires assessing these same variables.[22]

22.     Third, basic cognitive abilities, including memory and logical reasoning, mature before the development of emotional maturity, including the ability to exercise self-control, rein in *sensation seeking*, properly consider the risks and rewards of alternative courses of action, and resist coercive pressure from others. Thus, a young person who demonstrates advanced cognitive abilities, such as those necessary to succeed in many high school or college classes,  may nonetheless be socially and emotionally immature.[23]

23.     As a consequence of this gap between intellectual and emotional maturity, the tendencies of adolescents and people in their early 20s, relative to individuals in their mid- or late 20s, to be more focused on rewards, more impulsive, and more myopic are exacerbated when adolescents are making decisions in situations that are emotionally arousing, including those that generate

trial: A comparison of adolescents' and adults' capacities as trial defendants. *Law and Human Behavior*, *27*, 333-363.

[22] Steinberg, L., Graham, S., O'Brien, L., Woolard, J., Cauffman, E., & Banich, M. (2009). Age differences in future orientation and delay discounting. *Child Development*, *80*, 28-44; Steinberg, L., Albert, D., Cauffman, E., Banich, M., Graham, S., & Woolard, J. (2008) Age differences in sensation seeking and impulsivity as indexed by behavior and self-report: Evidence for a dual systems model. *Developmental Psychology*, *44*, 1764-1778; Steinberg, L., Icenogle, G., Shulman, E., Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. (2018). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science*, *21*, 1-13.

[23] Icenogle, G., Steinberg, L., Duell, N., Chein, J., Chang, L., Chaudary, N., . . . Bacchini, D. (2019). Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational sample. *Law and Human Behavior, 43*, 69-85; Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop". *American Psychologist*, *64*, 583-594.

negative emotions, such as fear, threat, anger, or anxiety.[24]  Psychologists

distinguish between "***cold cognition***" (i.e., thinking that is exercised under calm or

non-arousing circumstances) and "***hot cognition***" (i.e., thinking that is exercised

under circumstances that are emotionally arousing or stressful, including, for

example, negative emotions such as fear, anger, or perceived threat, as well as

positive emotions, such as exuberance or exhilaration). Adolescents' deficiencies in

judgment and self-control, relative to adults, are greater under "hot" circumstances

in which emotions are aroused than they are under calmer, "cold" circumstances.

This includes late adolescents between the ages of 18 and 20.[25]

24.     The combination of heightened attentiveness to rewards and still-

maturing impulse control makes middle and late adolescence a time of greater risk-

taking than any other stage of development. This has been demonstrated both in

studies of risk-taking in psychological experiments (when other factors, such as

_____

[24] Dreyfuss, M., Caudle, K., Drysdale, A., Johnston, N., Cohen, A., Somerville, L., . . . Casey, B. J. (2014). Teens impulsively react rather than retreat from threat. *Developmental Neuroscience, 36,* 220-227; Heller, A., & Casey, B.J., (2016). The neurodynamics of emotion: Delineating typical and atypical emotional processes during adolescence. Developmental Science, 19, 3-18; Lau, J., Britton, J., Nelson, E., Angold, A., Ernst, M., Goldwin, M., . . . Pine, D. (2011). Distinct neural signatures of threat learning in adolescents and adults. *Proceedings of the National Academy of Sciences,108*, 4500-4505; Somerville, L.,  Jones, R., &  Casey, B.J. (2010). A time of change: Behavioral and neural correlates of adolescent sensitivity to appetitive and aversive environmental cues. *Brain and Cognition, 72*, 124-133.

[25] Cohen, A., Breiner, K., Steinberg, L., Bonnie, R., Scott, E., Taylor-Thompson, K., . . . Casey, B.J. (2016). When is an adolescent an adult? Assessing cognitive control in emotional and non-emotional contexts. *Psychological Science*, *4*, 549-562; Steinberg, L. (2014). *Age of opportunity: Lessons From the New Science of Adolescence*. New York: Houghton Mifflin Harcourt; Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop". *American Psychologist*, *64*, 583-594; Steinberg, L., & Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. *Annual Review of Developmental Psychology*, *1*, 21-40.

outside influences, can be controlled) and in the analysis of data on risky behavior in the real world.[26]

25.     In recent experimental studies of risk-taking, the peak age for risky decision-making has been determined to be in the late teens and early 20s.[27]  This age trend is consistent with epidemiological data on age trends in risky behavior, which show peaks in risk-taking, or in the adverse outcomes of risk-taking, in the late teens and early 20s across a wide range of phenomena, including arrests for violent and non-violent crime, driver deaths, unintended pregnancy, and binge drinking.[28]  The sorts of risk-taking that peak in the late teens and early 20s are generally those that occur under "hot" circumstances, such as those listed in the previous sentence.

26.     Four forms of risk-taking that peak in the late teens and early 20s are particularly relevant in the context of discussions concerning the regulation of sales of firearms to individuals between the ages of 18 and 20. First, according to recent data from the United States Federal Bureau of Investigation (FBI) on arrest rates as a function of age, arrests for violent crime increase between 10 and 19 years, peak in the late teens and early 20s, and decline thereafter, most dramatically after 25.[29]

---

[26] Duell, N., Steinberg, L., Icenogle, G., Chein, J., Chaudary, N., Di Giunta, L., . . . Chang, L. (2018). Age patterns in risk taking around the world. *Journal of Youth and Adolescence*, *47*, 1052-1072.

[27] Braams, B., van Duijvenvoorde, A., Peper, J., & Crone, E. (2015). Longitudinal changes in adolescent risk-taking: A comprehensive study of neural responses to rewards, pubertal development and risk taking behavior. *Journal of Neuroscience, 35*, 7226-7238; Shulman, E., & Cauffman, E. (2014). Deciding in the dark: Age differences in intuitive risk judgment. *Developmental Psychology, 50,* 167-177.

[28] Willoughby, T., Good, M., Adachi, P., Hamza, C., & Tavernier, R. (2013). Examining the link between adolescent brain development and risk taking from a social-developmental perspective. *Brain and Cognition*, *83*, 315-323.

[29] U.S. Department of Justice. (2020). *Crime in the United States*, 2019.

13

Second, according to data from the National Institute of Mental Health,[30] as well as epidemiological studies, suicidal ideation and attempted suicide are higher during late adolescence and young adulthood than any other period of life.[31] Firearms were used in more than half of all suicide attempts.[32] Third, numerous studies have documented that rates of deliberate self-injury, which, even if not fatal, may have very serious consequences, also peak in middle and late adolescence.[33] Finally, binge drinking is more frequent during the late teens and early 20s than at any other age.[34] This is significant, because there is a strong association between binge drinking and violence.[35] Intoxication is a particularly significant contributing factor to homicide and physical assault at all ages, especially in incidents involving personal confrontations, and even more so in those involving firearms.[36] Thus, there

---

[30] NIMH. (2021). Suicide. Accessed on February 17, 2021 at (https://www.nimh.nih.gov/health/statistics/suicide.shtml#part_155143).

[31] Nock, M., Borges, G., Bromet, E., Cha, C., Kessler, R., & Lee. S. (2008). Suicide and suicidal behavior. *Epidemiologic Reviews, 30*, 133-154.

[32] NIMH. (2021). Suicide. Accessed on February 17, 2021 at (https://www.nimh.nih.gov/health/statistics/suicide.shtml#part_155143).

[33] Jacobson, C., & Gould, M. (2007). Epidemiology and phenomenology of non-suicidal self-injurious behavior among adolescents: A critical review of the literature. *Archives of Suicide Research, 11*, 129-147; Nock, M. (2010). Self-injury. *Annual Review of Clinical Psychology, 6*, 339-363; Rodham, K., & Hawton, K. (2009). *Epidemiology and phenomenology of nonsuicidal self-injury.* In M. K. Nock (Ed.), *Understanding nonsuicidal self-injury: Origins, assessment, and treatment* (p. 37–62). Washington: American Psychological Association.

[34] Patrick, M., Terry-McElrath, Y,, Lanza, S., Jager, J., Schulenberg, J., & O'Malley, P. (2019), Shifting age of peak binge drinking prevalence: Historical changes in normative trajectories among young adults aged 18 to 30. *Alcoholism: Clinical and Experimental Research, 43*, 287-298.

[35] Brewer, R., & Swahn, M. (2005). Binge drinking and violence. *JAMA, 294*, 616-619; Macdonald S., Cherpitel, C., Borges, G., DeSouza, A., Giesbrecht, N., & Stockwell, T. (2005). The criteria for causation of alcohol in violent injuries based on emergency room data from six countries. *Addictive Behavior, 30*, 103-113.

[36] Branas, C., Han, S., & Wiebe, D. (2016). Alcohol use and firearm

---

14

is good reason to place limits on the sale of firearms to individuals who are between 18 and 20, as they are members of an age group that is especially at risk for violence, suicide, nonsuicidal self-injury, and excessive drinking. Such restrictions are likely to reduce various forms of firearms violence, including suicide, non-fatal self-injury, homicide, non-fatal firearms violence, and other gun-related crimes.

### III. NEUROSCIENTIFIC EXPLANATIONS OF ADOLESCENT IMMATURITY

27.     Research by many scientists, including myself, has shown that the main underlying cause of psychological immaturity during adolescence and the early 20s is the different timetables along which two important brain systems develop during this period, sometimes referred to as a "maturational imbalance."[37] The system that is responsible for the increase in sensation-seeking and reward-seeking that takes place in adolescence, which is localized mainly in the brain's limbic system, undergoes dramatic changes very early in adolescence, around the time of puberty. Attentiveness to rewards remains high through the late teen years and into the early 20s. But the system that is responsible for self-control, regulating impulses, thinking ahead, evaluating the rewards and costs of a risky act, and

---

violence, *Epidemiologic Reviews*, *38*, 32–45; Felson, R. B., & Staff, J. (2010). The effects of alcohol intoxication on violent versus other offending. *Criminal Justice and Behavior*, *37*, 1343-1360; Wintemute G., Wright M., Castillo-Carniglia A., Shev, A., & Cerdá, M. (2018). Firearms, alcohol and crime: Convictions for driving under the influence (DUI) and other alcohol-related crimes and risk for future criminal activity among authorised purchasers of handguns. *Injury Prevention, 24,* 68-72.

[37] Casey, B. J., Jones, R., Levita, L., Libby, V., Pattwell, S., Riberry, E., . . . Somerville, L. (2010). The storm and stress of adolescence: Insights from human imaging and mouse genetics. *Developmental Psychobiology*, *52*, 225-235; Shulman, E., Smith, A., Silva, K., Icenogle, G., Duell, N., Chein, J., & Steinberg, L. (2016). The dual systems model: Review, reappraisal, and reaffirmation. *Developmental Cognitive Neuroscience, 17*, 103-117.

15

resisting peer pressure, which is localized mainly in the prefrontal cortex, is still undergoing significant maturation well into the mid-20s.[38]

28.  Thus, during middle and late adolescence there is an imbalance between the reward system and the self-control system that inclines adolescents toward sensation-seeking and impulsivity. As this "maturational imbalance" diminishes, during the mid-20s, there are improvements in such capacities as impulse control, resistance to peer pressure, planning, and thinking ahead. In our studies, we find a decline in impulsivity, susceptibility to peer pressure, planning ahead, and delay of gratification as measured both on experimental tasks and questionnaires.[39]

29.  Studies of structural and functional development of the brain are consistent with this view. Specifically, research on neurobiological development shows continued maturation into the early or even mid-20s of brain regions and systems that govern various aspects of self-regulation and higher-order cognitive function. These developments involve structural (i.e., in the brain's anatomy) and functional (i.e., in the brain's activity) changes in the ***prefrontal*** and ***parietal*** cortices, as well as improved structural and functional ***connectivity*** between the limbic system and the prefrontal cortex. The structural changes are primarily the result of two processes: ***synaptic pruning*** (the elimination of unnecessary

---

[38] Shulman, E., Harden, K., Chein, J., & Steinberg, L. (2015). Sex differences in the developmental trajectories of impulse control and sensation-seeking from early adolescence to early adulthood. *Journal of Youth and Adolescence*, *44*, 1-17; Steinberg, L. (2008). A social neuroscience perspective on adolescent risk-taking. D*evelopmental Review*, *28*, 78-106; Van Leijenhorst, L., Moor, B. G., Op de Macks, Z. A., Rombouts, S. A. R. B., Westenberg, P. M., & Crone, E. A. (2010). Adolescent risky decisionmaking: Neurocognitive development of reward and control regions. *NeuroImage, 51*, 345–355.

[39] Albert, D., & Steinberg, L. (2011). Judgment and decision making in adolescence. *Journal of Research on Adolescence*, *21*, 211-224; Blakemore, S-J., & T. Robbins, T. (2012). Decision-making in the adolescent brain. *Nature Neuroscience*, *15*, 1184-1191.

connections between neurons, which allows the brain to transmit information more efficiently), and ***myelination*** (the growth of sheaths of myelin around neuronal connections, which functions as a form of insulation that allows the brain to transmit information more quickly).

30.     Although the process of synaptic pruning is largely finished by age 16, myelination continues into the late teens and throughout the 20s.[40] Thus, although the structural development of the prefrontal cortex is largely complete by the end of middle adolescence, the maturation of connections between this region and regions that govern self-regulation and the brain's emotional centers, facilitated by the continued myelination of these connections, continues into late adolescence (at least through age 20) and may not be complete until the mid-20s.[41] As a consequence, late adolescents often have difficulty controlling their impulses, especially in emotionally arousing situations.

31.     Recent studies that my colleagues and I conducted of middle adolescents, late adolescents, and individuals in their mid-20s illustrate this point. We assessed individuals' impulse control and brain activity while experimentally manipulating their emotional state. We compared performance on a standard test of impulse control as well as brain activity when individuals were emotionally aroused versus when they were not. In order to induce arousal, participants were told that, at

_____

[40] For reviews of changes in brain structure and function during adolescence and young adulthood, see Blakemore, S-J. (2012). Imaging brain development: The adolescent brain. *Neuroimage, 61*, 397-406; Engle, R. (2013). The teen brain. *Current Directions in Psychological Science, 22 (2)* (whole issue); and Luciana, M. (Ed.) (2010). Adolescent brain development: Current themes and future directions. *Brain and Cognition, 72* (2), whole issue; and Spear, L., & Silveri, M. (2016). Special issue on the adolescent brain. *Neuroscience and Biobehavioral Reviews, 70* (whole issue).

[41] Khundrakpam, B, Lewis, J., Zhao, L., Chouinard-Decorte, F., & Evans, A. (2016). Brain connectivity in normally developing children and adolescents. *NeuroImage, 134*, 192-203.

17

any moment, they might hear a very loud, aversive sound (which the researchers had demonstrated at the beginning of the experiment). Under conditions during which individuals were not emotionally aroused, individuals between 18 and 21 exhibited impulse control and patterns of brain activity comparable to those in their mid-20s. But under emotionally arousing conditions, 18- to 21-year-olds demonstrated levels of impulsive behavior and patterns of brain activity that were comparable to those in their mid-teens.[42] In other words, under emotionally arousing circumstances, the brain of an 18- to 21-year-old functions in ways that are similar to that of a 16- or 17-year old.

## IV.   PLAINTIFFS' OBJECTIONS TO THE USE OF DEVELOPMENTAL SCIENCE IN DETERMINING CHRONOLOGICAL AGE BOUNDARIES

32.    Plaintiffs have dismissed the significance of findings from studies of age differences between adolescents and adults on the grounds that such findings are generalizations derived from studies of group averages.[43]  Although within any given chronological age group there is variability among individuals of the same age with regard to their capabilities and behavioral tendencies, countless state and federal statutes use chronological age boundaries to distinguish between groups of individuals with respect to their treatment under the law, including determinations about eligibility to apply for a driver license, vote, enter into contracts, and purchase alcohol or tobacco.[44]  Such bright-line boundaries are appropriate when

---

[42] Cohen, et al. (2016). When is an adolescent an adult? Assessing cognitive control in emotional and non-emotional contexts. *Psychological Science*, *4*, 549-562; Rudolph, M., Miranda-Dominguez, O., Cohen, A., Breiner, K., Steinberg, L., . . . Fair, D. (2017). At risk of being risky: The relationship between "brain age" under emotional states and risk preference. *Developmental Cognitive Neuroscience*, *24*, 93-106.

[43] Plaintiffs' Objections to Defendants' Evidence in Support of Opposition to Motion for Preliminary Injunction. January 24, 2020, p. 2, paragraph 4.

[44] Steinberg, L., & Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. *Annual Review of Developmental*

18

individual assessments of maturity would be unduly burdensome, logistically difficult, inefficient, or unreliable. Thus, while it is true that studies comparing the behavioral and psychological characteristics of late adolescents with those of individuals who are 21 and older rely on  group averages, it is my opinion that the findings of this research[45] can usefully inform policy decisions about where to best draw chronological age boundaries for purposes of age-based laws, and how best to align these boundaries with scientific understanding of the development of specific capacities and capabilities.[46]

33.    Plaintiffs in this matter have argued that existing chronological age boundaries established for one purpose should automatically determine the age boundary used for other purposes. However, it is commonplace in the United States to draw different chronological age boundaries for different purposes when different boundaries are warranted.[47] In general, although the presumptive age of majority in the United States is 18, this boundary is frequently adjusted downward (e.g., for purposes of the age of eligibility for driver licensing, which is 16 in most states) or upward (e.g., for purposes of setting a minimum age for the purchase of alcoholic beverages, with is federally mandated to be 21).

34.    Generally speaking, departures from the presumptive age of majority are followed when lawmakers determine that such deviations are in the best interests of young people, society, or both.[48] For example, the driver licensing age is lower than 18 because in previous generations many individuals who were 16 were no longer enrolled in school and had jobs that necessitated driving, either to

---

*Psychology*, *1*, 21-40.

[45] See footnotes 14-19, 22.

[46] Hamilton, V. (2016). Adulthood in law and culture. *Tulane Law Review*, *91*, 55-97.

[47] Steinberg, L., & Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. Annual Review of Developmental Psychology, 1, 21-40.

[48] Id.

1  commute to work or to carry out job responsibilities, which may have been

2  necessary for their (or their family's) financial well-being; although this rationale is

3  not as compelling today as it was in the mid-twentieth century, it is still believed the

4  benefits of permitting people under 18 to drive (e.g., not burdening their parents

5  with having to shuttle their high school aged children to school, extracurricular

6  activities, or social events) are thought to outweigh the costs of allowing them to do

7  so, even though research shows that they are less skilled behind the wheel and more

8  likely to be involved in motor vehicle crashes than are drivers older than 18.

9      35.    In contrast, the minimum purchase age for alcohol and marijuana

10  (where legal), and increasingly, tobacco, is older than 18 because using these

11  substances may adversely affect young people and endanger others, and it is

12  thought that the public health costs of underage substance use clearly outweigh

13  whatever benefits or perceived benefits that young people may accord to such use.[49]

14      36.    The potential costs to society of permitting firearm dealers to transfer

15  certain firearms to members of the general public under the age of 21, without any

16  additional restrictions than those imposed on transfers to adults 21 and over, very

17  likely outweigh whatever benefits are conferred to them by firearm ownership,

18  given that people younger than 21 are relatively more impulsive, more likely to

19  focus on the potential rewards of a risky decision than attend to the potential risks,

20  and more likely to commit violent crimes, as this report attests.[50]

21      37.    Plaintiffs have argued that individuals under 21 years old who are

22  serving in the military are permitted to use the sorts of firearms that the extant

23  matter concerns. This observation, while potentially true, is irrelevant to whether

24  the sale of these firearms to civilians between 18 and 20 years old should be

25  regulated under the law. Individuals who enlist in the military are required to

26

27  [49] Id.

28  [50] Id.

undergo extensive instruction by their superiors over a period of more than a month in the use of firearms during basic training.[51]  Enlistees' progress in firearms training is carefully monitored and tested, and demonstrating mastery of weapons use is required for successful completion of basic training. Such intensive training is not required of civilians who purchase firearms.

## CONCLUSION

38.     Extensive studies demonstrate that important neurobiological development is ongoing throughout the teenage years and continues into the early 20s. As a result of neurobiological immaturity, young people, even those past the most common age of majority (18), continue to demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, making decisions independently from their peers, and resisting the coercive influence of others. Many of the same immaturities that characterize the brains of individuals younger than 18 are characteristic of the brains of individuals between 18 and 21, and perhaps even into the mid-20s, particularly with respect to the exercise of mature self control. Deficiencies in self control are likely to interfere with safe firearm useage.

39.     Recent discoveries in psychological science and in brain science should ask us to rethink how we view people in late adolescence and young adulthood in terms of their treatment under the law. Certainly, there is no scientific evidence to suggest that a meaningful psychological or neurobiological distinction

---

[51] See, for example, *U.S. Air Force Basic Military Training* (https://www.airforce.com/pdf/USC91019023_BMT_Schedule.pdf?_ga=368081862.1613592674), accessed on February 18, 2021; *Army Basic Training: What to Expect* (https://www.militaryonesource.mil/military-life-cycle/new-to-the-military/military-career/army-basic-training-and-officer-candidate-school-what-to-expect/), accessed on February 18, 2021; *U.S. Marines: Recruit Training* (https://www.marines.com/become-a-marine/process-to-join/recruit-training.html), accessed on February 18, 2021.

can be drawn between individuals who are nearly 18 years old and those who are at least 18 but not yet 21 in situations that are characterized by "hot cognition."[52] The fact that 18-20-year-olds are still developing and may act with the immaturity of those less than 18 under certain conditions supports using age limitations such as the one at issue in this case to address gun violence perpetrated by this age group.

40.     Accordingly, it is my professional opinion, based on the scientific evidence reviewed herein, that the limitations on firearm sales and transfers to individuals under 21 required under California Penal Code § 27510 are both appropriate and necessary to promote public safety.


I declare under penalty of perjury that the foregoing is true and correct. Executed on May 24, 2021 at Philadelphia, Pennsylvania.


Laurence Steinberg, Ph.D.

---

[52] Steinberg, L., & Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. *Annual Review of Developmental Psychology*, *1*, 21-40.

22

# GLOSSARY OF KEY TERMS

| | |
|---|---|
| *Early adolescence:* | Ages 10, 11, 12, and 13. |
| *Middle adolescence:* | Ages 14, 15, 16, and 17. |
| *Late adolescence:* | Ages 18, 19, and 20. |
| *Neurobiological:* | Referring to the brain's anatomy or functioning. |
| *Psychosocial:* | Referring to emotional and social development (in contrast to cognitive, or intellectual, development). |
| *Functional Magnetic Resonance Imaging (fMRI):* | A brain imaging method that permits researchers to identify activity in specific brain regions while the individual whose brain is being imaged is engaged in a task chosen by the researcher, such as one requiring impulse control. |
| *Self-regulation:* | Exercising control over one's feelings, impulses, and actions, so as to modulate one's emotions, contain one's thoughts, or restrain one's behavior. |
| *Higher-order cognition:* | Sophisticated thinking skills that are used when one is engaged in such things as planning ahead, exercising logical reasoning, weighing the risks and rewards of a potential decision, or systematically evaluating a complicated situation. |
| *Structural brain development:* | Physical changes in the brain's anatomy, which mainly occur prenatally and during infancy, childhood, and adolescence, and generally result in improvements in the speed and efficiency of information processing and the more effective coordination of activity across brain regions. |
| *Functional brain development:* | Systematic changes in the brain's patterns of activity, which mainly occur prenatally and during infancy, childhood, and adolescence, and that are most commonly identified through functional Magnetic Resonance Imaging (fMRI). |
| | Synaptic pruning: A key aspect of structural brain development, wherein unnecessary connections between brain cells are eliminated, thereby improving the brain's efficiency. Synaptic pruning occurs prenatally and during infancy, childhood, and adolescence, and is largely complete by adulthood. |
| *Myelination:* | A key aspect of structural brain development, wherein biological connections between brain cells become sheathed in a white fatty substance called myelin, which improves connectivity between brain regions, thereby increasing the speed of information processing. Myelination begins prenatally and occurs throughout life. |

23

# EXHIBIT A

*Curriculum Vitae*

**Laurence Steinberg**

Department of Psychology
Temple University
Philadelphia, PA  19122
(215) 204-7321 (voice)
(215) 204-5539 (fax)
laurence.steinberg@temple.edu
Website

## PRESENT POSITIONS

Distinguished University Professor, Temple University (1999-)
Laura H. Carnell Professor of Psychology, Temple University (1998-)
Professor of Psychology, Temple University (1988-)

## EDUCATION

The Johns Hopkins University, Baltimore, Maryland (1970-71)
Vassar College, Poughkeepsie, New York (1971-74)
        A.B. in Psychology
Cornell University, Ithaca, New York (1974-77)
        Ph.D. in Human Development and Family Studies

## PREVIOUS POSITIONS

Director, John D. and Catherine T. MacArthur Foundation Research Network on Adolescent
        Development and Juvenile Justice (1997-2007)
Director of Graduate Studies, Department of Psychology, Temple University (1994-1999, 2001-2007)
Director, Division of Developmental Psychology, Department of Psychology, Temple University (1991-
        94)
Professor of Child and Family Studies, University of Wisconsin--Madison (1983-89)
Faculty Associate, National Center on Effective Secondary Schools, School of Education, University of
        Wisconsin--Madison (1985-89)
Associate Professor of Social Ecology, University of California, Irvine (1982-83)
Faculty Associate, Public Policy Research Organization, University of California, Irvine (1979-83)
Associate Director for Undergraduate Studies, Program in Social Ecology, University of California,
        Irvine (1981-82)
Assistant Professor of Social Ecology, University of California, Irvine (1977-82)
Lecturer in Human Development and Family Studies, Cornell University (1976-77)

Vitae created 6/2/2021

**PRIOR TESTIMONY (PREVIOUS 4 YEARS)**

State of Arkansas v. McGehee, 2017, Grady, Arkansas. Provided expert testimony before the Arkansas State Board of Parole at a clemency hearing for an inmate on death row, who had been 20 at the time of his capital offense. Testimony concerned the psychological and neurobiological immaturity of 20-year-olds.

State of Delaware v. Carr, 2017, Wilmington, DE.  Provided expert testimony in family court on behalf of a 16-year-old who was charged with criminally negligent homicide. Testimony concerned juveniles' ability to perceive and understand risk.

Commonwealth of Kentucky v. Diaz, 2017, Lexington, Kentucky. Provided expert testimony at an evidentiary hearing on behalf of a 20-year-old defendant charged with murder, with regard to a motion filed by the defendant to declare the Kentucky death penalty statue unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony concerned the psychological and neurobiological immaturity of 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

Cruz v. U.S., 2017. Provided expert testimony at an evidentiary hearing in U. S. District Court (District of Connecticut) on behalf of a defendant who had been sentenced to mandatory LWOP when he was 18 years and 20 weeks old, with regard to a motion filed by the defendant contending that the sentence was in violation of the Eighth Amendment. Testimony concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Miller v. Alabama to individuals under 21.

Commonwealth of Pennsylvania v. Manuel Ortiz, 2017, Lancaster, PA. Provided expert testimony at a resentencing hearing in the Court of Common Pleas on behalf of a defendant who had been convicted of murder and sentenced to life without the possibility of parole when he was 16 years old. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Florida v. Quintin Vicks, 2018, Miami, Florida. Retained by counsel for the defendant. Provided testimony at a sentencing hearing concerning the possible imposition of a sentence of life without the possibility of parole in a case in which a defendant aged 18 years and 11 weeks old was charged with felony murder.

State of Nevada v. Jeremy Strohmeyer, 2018, Las Vegas, Nevada. Retained by counsel for the defendant. Provided testimony at a postconviction relief hearing concerning the possible resentencing of a defendant who at age 18 and 7 months pled guilty to the charges of murder, kidnapping, substantial bodily harm of a minor, and sexual assault of as minor and sentenced to life without the possibility of parole.

State of Florida v. Andre Delancy, 2018, Ft. Lauderdale, Florida. Retained by counsel for the defendant. Provided testimony in a death penalty hearing in a case in which a defendant aged 19 had been convicted

3

of murder. Testimony concerned the psychological and neurobiological immaturity of 19-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

State of Florida v. Stephen Cobourn, 2018, Fort Lauderdale, Florida (by videoconference). Retained by counsel for the defendant. Testified at a resenting hearing for a 55-year-old man who had been convicted of homicide and sentenced to life without the possibility of parole at the age of 17.

State of Arizona v. Shavonte Beasley, 2018, Phoenix, Arizona. Retained by counsel for the defendant, who had been charged with murder, with regard to a motion filed by the defendant to declare the Arizona death penalty statue unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony at this evidentiary hearing concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

Commonwealth of Kentucky v. Lawy Thomas, 2018, Hopkinsville, Kentucky. Retained by counsel for defendant, who had been sentenced to life after the imposition of a "hammer clause" in response to his failure to appear at a final sentencing hearing; the agreed-upon sentence as a result of a plea agreement had been for 20 years. Defendant was 17 at the time of his offense and 19 at the time the hammer clause was imposed. Testimony concerned the psychological and neurobiological immaturity of adolescents, especially with regard to their ability to understand and abide by a hammer clause.

State of Arkansas v. Terry Carroll, 2018, Little Rock, Arkansas (by videoconference). Provided expert testimony at a resentencing hearing on behalf of a defendant who had been convicted of murder and sentenced to life without the possibility of parole when he was 16 years old. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Alabama v. Kenney Loggins, 2018, Birmingham, Alabama. Provided expert testimony at a resentencing hearing on behalf of a defendant who had been convicted of murder and sentenced to life without the possibility of parole when he was 17 years old. Testimony concerned the psychological and neurobiological immaturity of 17-year-olds and the role of such immaturity in mitigating culpability.

State of Missouri v. Sammie Taylor, 2018, St. Louis. Provided expert testimony at a resentencing hearing on behalf of a defendant who had been convicted of murder and sentenced to life without the possibility of parole when he was 17 years old. Testimony concerned the psychological and neurobiological immaturity of 17-year-olds and the role of such immaturity in mitigating culpability.

State of Missouri v. Deion Martin, 2018, New Madrid, Missouri. Provided expert testimony at a bench trial on behalf of a 21-year-old defendant who had been charged with first degree murder, robbery, and armed criminal action when he was 18 years old. Testimony concerned the psychological and neurobiological immaturity of 18-year-olds and the role of such immaturity in mitigating culpability.

State of Nevada v. Casey Sandoval, 2018, Las Vegas, Nevada (by videoconference). Provided expert testimony at a jury trial on behalf of a 19-year-old defendant who had been charged with first degree murder and tampering with evidence when he was 16 years old. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Indiana v. Marcus Dansby, 2018, Fort Wayne, Indiana. Retained by counsel for the defendant, who had been charged with murder, with regard to a motion filed by the defendant to declare the Indiana

death penalty statue unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony at this evidentiary hearing concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

State of Missouri v. Hardy Bivens, 2019, St. Louis. Provided expert testimony at a resentencing hearing on behalf of a defendant who had been convicted of murder and sentenced to life without the possibility of parole when he was 16 years old. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Colorado v. Marco Garcia-Bravo, 2019, Colorado Springs, Colorado. Provided expert testimony at an evidentiary hearing with regard to a motion filed by the defendant to declare the Colorado death penalty statute unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

People v. Ike Souzer, 2019, Orange County, California. Provided testimony in juvenile court on behalf of a defendant charged with first degree murder for a offense that allegedly occurred when he was 13-years-old. Testimony concerned psychological and brain development in early adolescence.

State of Alaska v. Erik Almandinger, 2019, Palmer, Alaska (telephonic). Provided expert testimony at a sentencing hearing on behalf of a defendant who had been convicted of first degree murder when he was 16 years old. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Florida v. Marquis Thomas, 2019, Ft. Lauderdale, Florida (telephonic). Provided expert testimony at a hearing in response to a motion for a downward departure in sentencing for an 18-year-old defendant who had been charged with several violent felonies at the age of 17. Testimony concerned the psychological and neurobiological immaturity of adolescents and the role of such immaturity in mitigating culpability.

State of Missouri v. William Gebhart, 2019, St. Louis. Provided expert testimony at a resentencing hearing on behalf of a defendant who had been convicted of murder and sentenced to 50 years without the possibility of parole when he was 17 years old. Testimony concerned the psychological and neurobiological immaturity of 17-year-olds and the role of such immaturity in mitigating culpability.

State of Florida v. Karari Ritchie, 2019, Fort Lauderdale, Florida. Retained by counsel for the defendant. Provided testimony in a death penalty hearing in a case in which a defendant aged 20 had been convicted of murder. Testimony concerned the psychological and neurobiological immaturity of 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

Guzek v. Kelly, 2019, Salem, Oregon. Provided expert testimony at an evidentiary hearing with regard to a motion filed by the defendant to declare the Colorado death penalty statute unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

State of Florida v. David Weintraub, 2019, Ft. Lauderdale, Florida. Retained by counsel for the defendant. Provided testimony in a death penalty hearing in a case in which a defendant aged 19 had been convicted

5

of murder. Testimony concerned the psychological and neurobiological immaturity of 19-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

State of Colorado v. Maya McKinney, 2019, Castle Rock, Colorado. Retained by counsel for the defendant. Provided testimony in a reverse transfer hearing in a case involving a 16-year-old charged with first degree murder. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Arkansas v. Tacori Mackrel, 2020, Conway, Arkansas (by videoconference). Provided expert testimony at an evidentiary hearing with regard to a motion filed by the defendant to declare the Arkansas death penalty statute unconstitutional on the grounds that it permits capital punishment for individuals under the age of 21. Testimony concerned the psychological and neurobiological immaturity of 18- to 20-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

Commonwealth of Massachusetts v. Jason Robinson, 2020, Boston, Massachusetts (by videoconference). Retained by counsel for the defendant. Provided testimony in an evidentiary hearing in a case in which a defendant aged 19 had been convicted of murder. Testimony concerned the psychological and neurobiological immaturity of 19-year-olds and the logic of extending the U.S.S.C. decision in Miller v. Alabama to individuals under 21.

Commonwealth of Massachusetts v. Monserrate Valentin, 2021, Salem, Massachusetts (by telephone). Provided testimony in a sentencing hearing involving a 16-year-old who had been convicted of vehicular manslaughter. Testimony concerned the psychological and neurobiological immaturity of 16-year-olds and the role of such immaturity in mitigating culpability.

State of Ohio v. Damantae Graham, 2021, Ravenna, Ohio (by videoconference). Provided testimony in a resentencing hearing in a case involving a 23-year-old whose death sentence for a murder committed when he was 19 years old had been vacated by the Ohio Supreme Court. Testimony concerned the psychological and neurobiological immaturity of 19-year-olds and the logic of extending the U.S.S.C. decision in Roper v. Simmons to individuals under 21.

Sifuentes v. American Cyanamid et al.; Owens v. American Cyanamid et al.; Burton v. American Cyanamid et al. Deposed in 2017 in Philadelphia. Retained by counsel for the defendants. Cases involved allegation by plaintiff that lead paint exposure caused by products possibly manufactured by defendants contributed to a variety of problems borne by the plaintiffs. These individual cases were joined for purposes of my deposition.

State of Florida v. Quintin Vicks. Deposed in 2018 in Laguna Beach, California by videoconference (attorneys were in Miami). Retained by counsel for the defendant. The case involved the possible

imposition of a sentence of life without the possibility of parole in a case in which a defendant aged 18 years and 11 weeks old was charged with felony murder.

State of Florida v. Andre Delancy. Deposed in 2018 in Philadelphia by videoconference (attorneys were in Fort Lauderdale). Retained by counsel for the defendant. Deposition taken prior to testimony in a death penalty hearing in a case in which a defendant aged 19 had been convicted of murder.

State of Florida v. Karari Ritchie. Deposed in 2019 in Philadelphia by telephone (attorneys were in Fort Lauderdale). Retained by counsel for the defendant. Deposition taken prior to testimony in a death penalty hearing in a case in which a defendant aged 20 had been convicted of murder.

John Doe et al., v. Michigan Department of Corrections, et al. Deposed in 2019 in Philadelphia. Retained by counsel for plaintiffs. Deposition in connection with a class action filed in the U.S. District Court (Eastern District of Michigan) on behalf of children confined in adult prisons operated by the defendants. Deposition concerned state of scientific knowledge concerning adolescent psychological and brain development with specific reference to differences between adolescents and adults as well as among adolescents of different ages.

State of Florida v. Jacob Brighton. Deposed in 2020 in Laguna Beach, California by videoconference (attorneys were in Ft. Pierce, Florida). Deposition taken prior to testimony in a resentencing hearing in a case in which a defendant aged 17 had been convicted of murder and sentenced to life without parole.

State of North Carolina v. JUUL Labs. Deposed in 2021 in Philadelphia by videoconference (attorneys were in Washington, DC and Raleigh, North Carolina). Retained for counsel for the defendant. Case involved allegation by plaintiff that defendant had intentionally marketed its e-cigarette products to underage youth and had failed to prevent underage use of its products.

## HONORS AND AWARDS

Phi Beta Kappa and Graduation with Honors and Distinction in Psychology, Vassar College (1974)
National Science Foundation Graduate Award, Honorable Mention (1975)
Cornell University Fellowship (1976-1977)
Aspen Institute for Humanistic Studies, Participant, Forum on the First Twenty Years of Life (1982)
Command Performance (Student Initiated Teaching Award), University of California, Irvine (1983)
Faculty Scholar, William T. Grant Foundation, Program in the Mental Health of Children (1983-1988)
Fellow, American Psychological Association, Division 7 (Developmental Psychology) (elected 1987)
Faculty Excellence Award, University of Wisconsin School of Family Resources and Consumer Sciences
      Alumni Association (1988)
Highest Impact Authors in Psychology, 1986-1990, Institute for Scientific Information (1992)
Great Teacher Award, Temple University (1994)
Scientific Core Group Member, John D. and Catherine T. MacArthur Foundation Research Network on
      Psychopathology and Development (1994-2000)
Anathan Family Foundation Visiting Professorship, Western Psychiatric Institute and Clinic, University
      of Pittsburgh Medical Center (November, 1995)
Top Developmental Psychology Authors in Productivity and Impact, *Developmental Review* (1995)
Editor's Choice for non-fiction, *Booklist* (for *Beyond the Classroom*) (1996)
President, Society for Research on Adolescence (1998-2000)
Visiting Scholar, Institute of Child Development, University of Minnesota (April, 1998)
Laura H. Carnell Professor of Psychology, Temple University (1998-)

Gallagher Lecturer, Society for Adolescent Medicine (1999)
Distinguished University Professor, Temple University (1999-)
Visiting Professor of Adolescent Medicine, Morristown Memorial Hospital (December, 1999)
John P. Hill Memorial Award for Outstanding Contributions to the Study of Adolescence, Society for
        Research on Adolescence (2000)
Highly Cited Researcher, Institute for Scientific Information (2001)
Paul W. Eberman Faculty Research Award, Temple University (2003)
Urie Bronfenbrenner Award for Lifetime Contribution to Developmental Psychology in the Service of
        Science and Society, American Psychological Association (2003)
Distinguished Scientist Lecturer, American Psychological Association (2005)
President, Division of Developmental Psychology, American Psychological Association (2007-2008)
Presidential Citation, American Psychological Association (2008)
Fellow, Association for Psychological Science (elected 2008)
Award for Distinguished Contributions to Research in Public Policy, American Psychological
        Association (2009) (citation and biosketch in *American Psychologist*, 2009, *November*, 737-739).
Inaugural Laureate, Klaus J. Jacobs Research Prize for Productive Youth Development (2009)
Stauffer Award for Outstanding Faculty Service, Temple University Alumni Association (2010)
Social Policy Book Award, Society for Research on Adolescence (for *Rethinking Juvenile Justice*) (2010)
Member, John D. and Catherine T. MacArthur Foundation Research Network on Law and Neuroscience
        (2011-2016)
Harrington Distinguished Visiting Professor, Baldwin-Wallace College (2011)
Henry and Bryna David Lectureship, National Academy of Sciences, Washington (2011)
National Associate, National Research Council, The National Academies (elected 2011)
Fellow, American Academy of Arts and Sciences (elected 2013)
Highly Cited Researcher, Institute for Scientific Information (2013)
Highly Cited Researcher, Thomson Reuters (2014)
Elizabeth Hurlock Beckman Award (2014)
Listed in *The World's Most Influential Scientific Minds*, Thomson Reuters (2015)
Outstanding Contribution Award, American Society of Criminology, Division of Developmental and
        Life-Course Criminology (for Sweeten, G., Piquero, A., & Steinberg, L. (2013). Age and the
        explanation of crime, revisited. *Journal of Youth and Adolescence*, *42*, 921-938) (2015)
Highly Cited Researcher, Thomson Reuters (2015)
Highly Cited Researcher, Thomson Reuters (2016)
Highly Cited Researcher, Thomson Reuters (2017)
Highly Cited Researcher, Clarivate (2018)
Highly Cited Researcher, Clarivate (2019)


## SELECTED RECENT PROFESSIONAL ACTIVITIES

Board of Directors, Juvenile Law Center, Philadelphia (2003-2010)
Board on Children, Youth, and Families, The National Academies (2005-2008)
Research Advisory Panel, The National Campaign to Prevent Teen and Unintended Pregnancy (2007-
        2009)
Chair, Committee on the Science of Adolescence, The National Academies (2008-2012)
Lead scientific consultant, Amicus curiae brief filed by the American Psychological Association in U.S.
        Supreme Court cases, *Roper v. Simmons* (2004), *Sullivan v. State of Florida* (2009) *and Graham
        v. State of Florida* (2009), *Miller v. Alabama (2012)*, *Jackson v. Hobbs (2012)*.
Faculty Affiliate, University of Chicago Crime Lab (2010-)

8

Advisory Board, The University of Virginia Center to Promote Effective Youth Development (2011-)
Member, MacArthur Foundation Research Network on Law and Neuroscience (2011-2016)
Advisory Board, Duke University Center for the Study of Adolescent Risk and Resilience (2013-)
External Advisory Board, Adolescent Brain Cognitive Development (ABCD) Study, National Institutes of Health (2015-)
Council of Distinguished Scientists, National Commission on Social, Emotional, & Academic Development, The Aspen Institute (2016-2019)
Scientific Advisory Committee, Center on the Developing Adolescent, University of California, Berkeley (2017-)

## BOOKS AND EDITED VOLUMES (PREVIOUS 10 YEARS)

Steinberg, L. (2023). *Adolescence* (13th edition). New York: McGraw-Hill.
Steinberg, L. (2020). *Adolescence* (12th edition). New York: McGraw-Hill.
Steinberg, L. (2017). *Adolescence* (11th edition). New York: McGraw-Hill.
Steinberg, L. (2014). *Age of opportunity: Lessons from the new science of adolescence*. New York: Eamon Dolan/Houghton Mifflin Harcourt. (Audio edition: Brilliance Audio, 2014; paperback edition: New York: Eamon Dolan/Mariner Books, 2015; Chinese (complex) edition, Taipei: CommonWealth Magazine Co., 2015; Chinese (simple) edition, Beijing: China Youth Press, 2016; Italian edition, Torino: Codice, 2015; Japanese edition, Tokyo: Nikkei Business Press, 2015; Korean edition, Goyang: Provence Press, 2022; Russian edition, Moscow: Mann, Ivanov, and Ferber, 2017; Turkish edition, Ankara: Imge, 2017).
Steinberg, L. (2014). *Adolescence* (10th edition). New York: McGraw-Hill.
Steinberg, L. (2011). *You and your adolescent: The essential guide for ages 10 to 25*. New York: Simon & Schuster. (Chinese (simplified) edition, Beijing: PTPress, 2018; Turkish edition, Ankara: Imge, 2018).
Steinberg, L. (2011). *Adolescence* (9th edition). New York: McGraw-Hill.
Steinberg, L., Bornstein, M., Vandell, D., & Rook, K. (2011). *Lifespan development*. Belmont, CA: Wadsworth.
Steinberg, L., Vandell, D., & Bornstein, M. (2011). *Development*: *Infancy through adolescence*. Belmont, CA: Wadsworth. (Korean edition: Seoul: Cengage Learning Korea, 2012).
Steinberg, L. (Chair). (2011). *The science of adolescent risk-taking*. (Washington: National Academies Press), with members of the Committee on the Science of Adolescence of the Institute of Medicine and the National Research Council.

## RESEARCH ARTICLES (PREVIOUS 10 YEARS) (*denotes former or current trainee)

In Press

*Cauffman, E., Beardslee, J., Fine, A., Frick, P., & Steinberg, L. (in press). The impact of initial processing decision on youth five years after first arrest. *Development and Psychopathology*.
Fine, A., Amemiya, J., Frick, P., Steinberg, L., & *Cauffman, E. (in press). Perceptions of police from ages 13 to 22 among justice-involved Black, Latino, and White males. *Law & Human Behavior.*

Kan, E., Knowles, A., Peniche, M., Frick, P., Steinberg, L., & *Cauffman, E. (in press). Neighborhood disorder and risk-taking among justice-involved youth: The mediating role of life expectancy. *Journal of Research on Adolescence*. Online ahead of print. 10.1111/jora.12596

Kitzmiller, M.K., Cavanagh, C., Frick, P., Steinberg, L., & *Cauffman, E. (in press). Parental incarceration and the mental health of juvenile offenders: The moderating role of neighborhood disorder. *Psychology, Public Policy, and Law*. Online ahead of print. 10.1037/law0000274

Knowles, A., Rowan, Z., Steinberg, L., Frick, P., & *Cauffman, E. (in press). Evading detection during adolescence: The role of criminal capital and psychosocial factors. *Justice Quarterly*. 38, 249-275.

Lansford, J. E., Rothenberg, W. A., Riley, J., Uribe Tirado, L. M., Yotanyamaneewong, S., Alampay, L. P., . . . Steinberg, L. (in press). Longitudinal trajectories of four domains of parenting in relation to adolescent age and puberty in nine countries. *Child Development*. Online ahead of print. 10.1111/cdev.13526

Padgaonkar, N., Baker, A., Dapretto, M., Galván, A., Frick, P., Steinberg, L., & *Cauffman, E. (in press). Exploring disproportionate minority contact in the juvenile justice system over the year following first arrest. *Journal of Research on Adolescence*. Online ahead of print. 10.1111/jora.12599

Pastorelli, C., Zuffianò, A.,  Lansford, J., Thartori, E., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Gurdal, S., Liu, Q., Long, Q., Oburu, P., Skinner, A., Sobring, E., Steinberg, L., . . . Bacchini, D. (in press). Positive youth development: Parental warmth, values, and prosocial behavior in 11 cultural groups. *Journal of Youth Development*.

*Shulman, E., Beardslee, J., Fine, A., Frick, P., Steinberg, L., & *Cauffman, E. (in press). Exposure to gun violence: Associations with anxiety, depressive symptoms, and aggression among male juvenile offenders. *Journal of Clinical Child and Adolescent Psychology*.

Simmons, C., Kan, E., Simpkins, S., Datta, S., Steinberg, L., Frick, P., & *Cauffman, E. (in press). Assessing the association between participation in extracurricular activities and delinquent behavior among justice-involved young men. *Journal of Research on Adolescence*. Online ahead of print. 10.1111/jora.12600

Lansford, J. E., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K. A., Malone, P., Oburu P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Bornstein, M. H. (2021). International collaboration in the study of positive youth development. In N. Wiium & R. Dimitrova (Eds.), *Handbook of positive youth development: Advancing research, policy and practice in global contexts*. New York: Springer.

Lansford, J. E., Rothenberg, W. A., Tapanya, S., Uribe Tirado, L. M., Yotanyamaneewong, S., Alampay, L. P., . . . Steinberg, L. (2021). Achieving the sustainable development goals: Evidence from the longitudinal Parenting Across Cultures project. In P. Banati (Ed.), *Sustainable human development: Evidence from longitudinal studies in childhood and adolescence*. Bristol, UK: Bristol University Press.

Robertson, E., Frick, P., Ray, J., Thornton, L., Wall Myers, T., Steinberg, L., & *Cauffman, E.. (2021). Do callous-unemotional traits moderate the effects of the juvenile justice system on later offending behavior? *Journal of Child Psychology and Psychiatry, 62*, 212-222.

Rothenberg, W.A., Zietz,S., Lansford, J., Bornstein, M., Deater-Deckard, K., Dodge, K., . . . Steinberg, L. (2021). Four domains of parenting in three ethnic groups in the United States. In J. Lansford, W.A. Rothenberg, & M. Bornstein (Eds.), *Parenting across cultures from childhood to adolescence: Development in Nine Countries* (pp. 193-226). New York: Routledge.

*Albert, W., Hanson, J., Skinner, A., Dodge, K., Steinberg, L., Deater-Deckard, K. . . . Lansford, J. (2020). Individual differences in executive function partially explain the socioeconomic gradient in middle-school academic achievement. *Developmental Science*, *5*, e12937.

Chen, D., Strang, J., Kobuck, V., Rosenthal, S., Wallen, K., Waber, D., Steinberg, L., . . . Garafalo, R. (2020) Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health*, *5*, 246-257.

Di Giunta, L., Rothenberg, W.A., Lunetti. C. Lansford, J., Pastorelli, C., Eisenberg, N., Thartori, E., Basili, E., Favini, A., Al-Hassan, S.,  Yotanyamaneewong, S., Alampay, L., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L . . . Tirado, L. (2020). Longitudinal associations between mothers' and fathers' anger/irritability expressiveness, harsh parenting, and adolescents' socioemotional functioning in nine countries. *Developmental Psychology*, *56*, 458–474.

*Duell, N., & Steinberg, L. (2020). Differential correlates of positive and negative risk taking in adolescence. *Journal of Youth and Adolescence*, *49*, 1162-1178.

Kan E., Beardslee J., Frick P., Steinberg, L., & *Cauffman, E. (2020). Marijuana use among justice-involved youth after California state-wide legalization, 2015-2018. *American Journal of Public Health*, *110*, 1386-1392.

Kapetanovic, S., Rothenberg, W. A., Lansford, J. E., Bornstein, M. H., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Gurdal, S., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Bacchini, D. (2020). Cross-cultural examination of links between parent-adolescent communication and adolescent psychological problems in 12 cultural groups. *Journal of Youth and Adolescence*, *49*, 1225-1244.

Knowles, A., Rinehart, J., Steinberg, L., Frick, P., & *Cauffman, E. (2020). Risky sexual behavior among arrested adolescent males: The role of future expectations and impulse control. *Journal of Research on Adolescence, 30*, 562-579.

Lansford, J. E., Zietz, S., Bornstein, M. H., Deater-Deckard, K., Di Giunta, L., Dodge, K. A., Gurdal, S., Liu, Q., Long, Q., Malone, P. S., Oburu, P., Pastorelli, C., Skinner, A. T., Sorbring, E., Steinberg, L., . . . Chang, L. (2020). Opportunities and peer support for aggression and delinquency during adolescence in nine countries. *New Directions for Child and Adolescent Development*, *2020*, 73-88.

Matlasz, T., Frick, P., Robertson, E., Ray, J., Thornton, L., Wall Myers, T., Steinberg, L., & *Cauffman, E. (2020). Does self-report of aggression after first arrest predict future offending and do the forms and functions of aggression matter? *Psychological Assessment*; 32, 265-276

Robertson, E., Frick, P., Walker, T., Kemp, E., Ray, J., Thornton, L., Wall Myers, T., Steinberg, L., & *Cauffman, E. (2020). Callous-unemotional traits and risk of gun carrying and use during crime. *American Journal of Psychiatry*, *177*, 827-833.

Rothenberg, W. A., Lansford, J., Alampay, L., Al-Hassan, S., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Yotanyamaneewong, S. (2020). Examining effects of mother and father warmth and control on child externalizing and internalizing problems from age 8 to 13 in nine countries. *Development and Psychopathology*, *32*, 1113-1137.

Rothenberg, W. A., Lansford, J., Al-Hassan, S., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Alampay, L. P. (2020). Examining effects of parent warmth and control on internalizing behavior clusters from age 8 to 12 in 12 cultural groups in nine countries. *Journal of Child Psychology and Psychiatry*, *61*, 436-446.

Rothenberg, W. A., Lansford, J., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Al-Hassan, S. (2020). Cross-cultural effects of parent warmth and control on aggression and rule-breaking from ages 8-13. *Aggressive Behavior, 46*, 327-340.

Rothenberg, W. A., Lansford, J., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Bacchini, D. (2020). Effects of parental warmth and behavioral control on adolescent externalizing and internalizing trajectories across cultures. *Journal of Research on Adolescence*, *30*, 835-855.

Rothenberg, W. A., Lansford, J., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Bornstein, M. (2020). Examining the internalizing pathway to substance use frequency in 10 cultural groups. *Addictive Behaviors, 102,* 106214.

Schenck-Fontaine, A., Lansford, J., Skinner, A., Deater-Deckard, K., Di Giunta, L., Dodge, K., Oburu, P., Pastorelli, C., Sorbring, E., Steinberg, L., . . . Chang, L. (2020). Associations between perceived material deprivation, parents' discipline practices, and children's behavior problems: An international perspective. *Child Development*, *91*, 307-326.

*Silva, K., Chein, J., & Steinberg, L. (2020). The influence of romantic partners on male risk taking. *Journal of Social and Personal Relationships, 37*, 1405-1415.

Simmons, C., Fine, A., Knowles, A., Frick, P., Steinberg, L., & *Cauffman, E. (2020). The relation between callous-unemotional traits, psychosocial maturity, and delinquent behavior among justice-involved youth. *Child Development*, *91*, e120-e133.

Walker, T., Robertson, E., Frick, P., Ray, J., Thornton, L., Myers, T., Steinberg, L., & *Cauffman, E. (2020). Relationships among callous-unemotional traits, future orientation, optimism, and self-esteem in justice involved adolescents. *Journal of Child and Family Studies*, *29*, 2434-2442.

Beardslee, J., Miltimore, S., Fine, A., Frick, P., Steinberg, L., & *Cauffman, E. (2019). Under the radar or under arrest: How does adolescent boys' first contact with the juvenile justice system affect later offending? *Law and Human Behavior*, *43*, 342-357.

Chang, L., Lu, H., Lansford, J. E., Bornstein, M. H., Steinberg, L., Chen, B., . . . Yotanyamaneewong, S. (2019). External environment and internal state in relation to life history behavioral profiles of adolescents in nine countries. *Proceedings of the Royal Society B: Biological Sciences*, *286*, 20192097

Chang, L., Lu, H., Lansford, J., Skinner, A., Bornstein, M., Steinberg, L. . . . Topanya, S. (2019). Environmental harshness and unpredictability, life history, and social and academic behavior of adolescents in nine countries. *Developmental Psychology*, *55*, 890-903.

Deater-Deckard, K., Godwin, J., Lansford, J., Tirado, L., Yotanyamaneewong, S., Alampay, L. P., Al-Hassan, S., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., & Tapanya, S. (2019). Chaos, danger, and maternal parenting in families: Links with adolescent adjustment in low- and middle-income countries. *Developmental Science*, *22*, e12855.

*Duell, N., & Steinberg, L. (2019). Positive risk taking in adolescence. *Child Development Perspectives*, *13*, 48-52.

*Icenogle, G., Steinberg, L., *Duell, N., Chein, J., Chang, L., Chaudary, N., . . . Bacchini, D. (2019). Adolescents' cognitive capacity reaches adult levels prior to their psychosocial maturity: Evidence for a "maturity gap" in a multinational sample. *Law and Human Behavior*, *43*, 69-85.

Lansford, J. E., Malone, P. S., Tapanya, S., Uribe Tirado, L. M., Zelli, A., Alampay, L. P., . . . Steinberg, L. (2019). Household income predicts trajectories of child internalizing and externalizing behavior in high-, middle-, and low-income countries. *International Journal of Behavioral Development*, *43*, 74-79.

Li, M., Lauharatanahirun, N., Steinberg, L., King-Casas, B., Kim-Spoon, J., & Deater-Deckard, K. (2019). Longitudinal link between trait motivation and risk-taking behaviors via neural risk processing. *Developmental Cognitive Neuroscience, 40*, 100725.

*Palitz, S., Rifkin, L., Norris, L., Knepley, M., Fleischer, N., Steinberg, L., & Kendall, P. (2019). But what will the results be?: Learning to tolerate uncertainty is associated with treatment-produced gains. *Journal of Anxiety Disorders, 68*, 102146.

Ray, J., Frick, P., Thornton, L., Meyers, T., Steinberg, L., & *Cauffman, E. (2019). Estimating and predicting the course of callous-unemotional traits in first-time adolescent offenders. *Developmental Psychology, 55*, 1709-1719.

Scott, E., & Steinberg, L. (2019). In defense of developmental science in juvenile sentencing: A response to Christopher Berk. *Law and Social Inquiry, 44*, 780-786.

*Sherman, L., Rosenbaum, G., *Smith, A., Botdorf, M., Fettich, K., Patrianakos, J., McCloskey, M., Steinberg, L., & Chein, J. (2019). The interactive effects of peers and alcohol on functional brain connectivity in young adults. *Neuroimage, 197*, 264-272.

Simmons, C., Rowan, Z., Knowles, A., Steinberg, L., Frick, P., & *Cauffman, E. (2019). A life history approach to understanding juvenile offending and aggression. *Aggression and Violent Behavior, 49*, 101317 (published online only).

Skinner, A., Lansford, J., Bornstein, M., Deater-Deckard, K., Dodge, K., Malone, P., & Steinberg, L. (2019). Education and parenting in the United States. In E. Sorbring & J. Lansford (Eds.) *School systems, parent behavior, and academic achievement: An international perspective*, pp. 123-138. New York: Springer.

Steinberg, L. (2019). Raging hormones. In R. Sternberg (Ed.), *My biggest research mistake: Adventures and misadventures in psychological research*, pp. 66-69. Sage: Thousand Oaks, CA.

Steinberg, L., & *Icenogle, G. (2019). Using developmental science to distinguish adolescents and adults under the law. *Annual Review of Developmental Psychology, 1*, 21-40

Thornton, L., Frick, P., Ray, J., Meyers, T., Steinberg, L., & *Cauffman, E. (2019). Risky sex, drugs, sensation seeking, and callous-unemotional traits in justice-involved adolescent males. *Journal of Clinical Child and Adolescent Psychology, 48*, 68-79.

Walsh, H., Meyers, T., Ray, J., Frick, P., Thornton, L., Steinberg, L., & *Cauffman, E. (2019). Perceptions of police-juvenile contact predicts self-reported offending in adolescent males. *Psychology, Crime, and Law, 25*, 963-976.

*Ammerman, B., Steinberg, L., & McCloskey, M. (2018). Risk-taking behavior and suicidality: The unique role of adolescent drug use. *Journal of Clinical Child and Adolescent Psychology, 47*, 131-141.

*Breiner, K., Li, A.., Cohen, A., Steinberg, L., Bonnie, R., Taylor-Thompson, K., . . . Galvan, A. (2018).  Combined effects of peer presence, social cues and rewards on cognitive control in adolescents.  *Developmental Psychobiology, 60*, 292-302.

Bersani, B., Fine, A., *Cauffman, E., Steinberg, L., Frick, P., & Piquero, A. (2018). Investigating the offending histories of undocumented immigrants. *Migration Letters, 15*, 147-156.

Deater-Deckard, K., Godwin, J., Lansford, J., Bacchini, D., Bombi, A., Bornstein. M., Chang, L., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L. . . Al-Hassan, S. (2018). Within- and between-person and group variance in behavior and beliefs. *Journal of Adolescence, 62*, 207-217.

*Duell, N., *Icenogle, G., Chein, K., Steinberg, L., Banich, M., . . . Chaudhary, N. (2018). A cross-sectional examination of response inhibition and working memory on the Stroop task *Cognitive Development, 47*, 19-31.

*Duell, N., Steinberg, L., *Icenogle, G., Chein, J., Chaudhary, N., Di Giunta, L., . . . Chang, L. (2018). Age patterns in risk taking across the world. *Journal of Youth and Adolescence, 47*, 1052-1072. [Correction published February 28, 2019].

Fine, A., Simmons, C., Miltimore, S., Frick, P., Steinberg, L., & *Cauffman, E. (2018). The school experiences of male adolescent offenders: Implications for academic performance and recidivism. *Crime & Delinquency, 64*, 1326-1350.

13

Harden, K.P., Mann, F., Grozinger, A., Patterson, M., Steinberg, L., Tackett, J., & Tucker-Drob, E. (2018). Developmental differences in reward sensitivity and sensation seeking in adolescence: Testing sex-specific associations with gonadal hormones and pubertal development. *Journal of Personality and Social Psychology: Personality Processes and Individual Differences, 115*, 151-178.

Lansford, J., Godwin, J., Al-Hassan, S., Bacchini, D., Bornstein, M. H., Chang, L., Chen, X., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Zelli, A. (2018). Longitudinal associations between parenting and youth adjustment in twelve cultural groups: Cultural normativeness of parenting as a moderator. *Developmental Psychology, 54*, 362-377.

Lansford, J., Godwin, J., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Bacchini, D. (2018). Parenting, culture, and the development of externalizing behaviors from age seven to 14 in nine countries. *Development and Psychopathology*, 30, 1937-1958.

Lansford, J., Rothenberg, W. A., Jensen, T., Lippold, M., Bacchini, D., Bornstein, M., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Al-Hassan, S. (2018). Bidirectional relations between parenting and behavior problems from age 8 to 13 in nine countries. *Journal of Research on Adolescence*, *28*, 571-590.

Last, B., Lawson, G., *Breiner, K., Steinberg, L., & Farah, M. (2018). Childhood socioeconomic status and executive function in childhood and beyond. *PLoS One, 24*, e0202964.

Mahler, A., Fine, A., Frick, P., Steinberg, L., & *Cauffman, E. (2018). Expecting the unexpected? Expectations for future success among adolescent first-time offenders. *Child Development, 89*, 535-551.

Robertson, E., Frick, Ray, J., Thornton, L., Meyers, T., P., Steinberg, L., & *Cauffman, E. (2018). The associations among callous-unemotional traits, worry, and aggression in justice involved adolescent boys. *Clinical Psychological Science, 6,* 671-684.

Rosenbaum, G., Venkatraman, V., Steinberg, L., & Chein, J. (2018). The influences of described and experienced information on adolescent risky decision making. *Developmental Review*, *47*, 23-43.

Scott, E., *Duell, N., & Steinberg, L. (2018). Brain development, social context, and justice policy. *Washington University Journal of Law and Policy*, *57*, 13-74.

*Sherman, L., Steinberg, L., & Chein, J. (2018). Connecting brain responsivity and real-world risk taking: Strengths and limitations of current methodological approaches. *Developmental Cognitive Neuroscience*, *33*, 27-41.

Simmons, C., Steinberg, L., Frick, P., & *Cauffman, E. (2018). The differential influence of absent and harsh fathers on juvenile delinquency. *Journal of Adolescence*, *62*, 9-17.

*Smith, A., Rosenbaum, G., Botdorf, M., Steinberg, L., & Chein, J. (2018). Peers influence adolescent reward processing, but not response inhibition. *Cognitive, Affective, and Behavioral Neuroscience*, *18*, 284-295.

Steinberg, L. (2018). Regulating our enthusiasm for self-regulation interventions. (Editorial). *JAMA Pediatrics*, *172*, 520-522.

Steinberg, L.,*Icenogle, G., *Shulman, E., *Breiner, K., Chein, J., Bacchini, D., . . . Takash, H. (2018). Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation. *Developmental Science*, *21*, 1-13.

Thomas, A., Ozbardakci, N., Fine, A., Steinberg, L., Frick, P., & *Cauffman, E. (2018). Effects of physical and emotional maternal hostility on adolescents' depression and reoffending. *Journal of Research on Adolescence*, *28*, 427-437.

•

Wall Myers, T., Salcedo, Frick, P., Ray, J., Thornton, L., Steinberg, L., & *Cauffman, E. (2018). Understanding the link between exposure to violence and aggression in justice-involved adolescents. *Development and Psychopathology, 30*, 593-603.

Bornstein, M. H., Putnick, D. L., Lansford, J. E., Al-Hassan, S. M., Bacchini, D., Bombi, A. S., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Skinner, A., Sorbring, E., Steinberg, L., . . . Alampay, L. P. (2017). "Mixed blessings": Religiousness, parenting, and child adjustment in global perspective. *Journal of Child Psychology and Psychiatry, 58*, 880-892.

Botdorf, M., Rosenbaum, G., Patrianakos, J., Steinberg, L., & Chein, J. (2017). Adolescent risk-taking is predicted by individual differences in cognitive control over emotional, but not non-emotional, response conflict. *Cognition and Emotion, 31*, 972-979.

Daryanani, I., Hamilton, J., MacArthur, B., Steinberg, L., Abramson, L., & Alloy, L. (2017). Cognitive vulnerabilities to depression for adolescents in single-mother and two-parent families. *Journal of Youth and Adolescence, 46*, 213-227.

Fine, A., Cavanagh, C., Donley, S., Frick, P., Steinberg, L., & *Cauffman, E. (2017). Is the effect of justice system attitudes on recidivism stable after youths' first arrest? Race and legal socialization among first-time youth offenders. *Law and Human Behavior, 41*, 146-158.

Fine, A., Cavanagh, C., Frick, P., Steinberg, L., & *Cauffman, E. (2017). Can probation officers identify remorse among male adolescent offenders? *Psychological Assessment, 29*, 754-761

Fine, A., Donley, S., Cavanagh, C., Miltimore, S., Steinberg, L., Frick, P., & *Cauffman, E. (2017). And justice for all: Determinants and effects of probation officers' processing decisions regarding first-time juvenile offenders. *Psychology, Public Policy, and Law, 23*, 105-117.

Fine, A., Mahler, A., Steinberg, L., Frick, P., & *Cauffman, E. (2017). Individual in context: The role of impulse control on the association between the home, school, and neighborhood developmental contexts and adolescent delinquency. *Journal of Youth and Adolescence, 46*, 1488-1502.

Harden, K., Krestch, N., Mann, F., Herzhoff, Tackett, J., Steinberg, L., & Tucker-Drob, E. (2017). Beyond dual systems: Four heritable dimensions underlie behavioral and self-report measures of self-control in adolescence. *Developmental Cognitive Neuroscience*, 25, 221-234.

*Icenogle, G., Steinberg, L., Olino, T., *Shulman, E., Chein, J., Alampay, L., . . .Tirado, L. (2017). Puberty predicts approach but not avoidance on the Iowa Gambling Task in a multinational sample. *Child Development, 88*, 1598-1614.

Lansford, J., Al-Hassan, S., Bacchini, D., Bornstein, M., Chang, L., Chen, B., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Skinner, A., Pastorelli, C., Sorbring, E., Steinberg, L., . . . Zelli, A. (2017). Parenting and positive adjustment for adolescents in nine countries. In R. Dimitrova (Ed.), *Well-being of youth and emerging adults across cultures*, pp. 235-248. New York: Springer.

Lansford, J. E., Godwin, J., Bornstein, M. H., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Skinner, A., Pastorelli, C., Sorbring, E., Steinberg, L., . . . Bacchini, D. (2017). Reward sensitivity, impulse control, and social cognition as mediators of the link between childhood family adversity and externalizing behavior in eight countries. *Development and Psychopathology, 29,* 1675-1688.

Mahler A., Simmons, C., Frick, P., Steinberg, L., & *Cauffman, E. (2017). Aspirations, expectations and delinquency: The moderating effect of impulse control. *Journal of Youth and Adolescence, 46*, 1503-1514.

Ray, J., Frick, P., Thornton, L., Wall, T., Steinberg, L., & *Cauffman, E. (2017). Callous-unemotional traits predict self-reported offending in adolescent boys: The mediating role of delinquent peers and the moderating role of parenting practices. *Developmental Psychology, 53*, 319-328.

Rhodes, E., Devlin, K., Steinberg, L., & Giovannetti, T. (2017). Grit in adolescence is protective of late-life cognition: Non-cognitive factors and cognitive reserve. *Journal of Aging, Neuropsychology, and Cognition*, *24*, 321-332.

Rosenbaum, G., Botdorf, M., Patrianakos, J., Steinberg, L., & Chein, J. (2017). Working memory training in adolescents decreases laboratory risk taking in the presence of peers. *Journal of Cognitive Enhancement*, *1*, 513-525.

Rudolph, M., Miranda-Dominguez, O., Cohen, A., *Breiner, K., Steinberg, L., . . . Fair, D. (2017). At risk of being risky: The relationship between "brain age" under emotional states and risk preference. *Developmental Cognitive Neuroscience*, *24*, 93-106.

*Shulman, E., *Monahan, K., & Steinberg, L. (2017). Severe violence during adolescence and early adulthood and its relation to anticipated rewards and costs. *Child Development*, *88*, 16-26.

*Silva, K., Patrianakos, J., Chein, J., & Steinberg, L. (2017). Joint effects of peer pressure and fatigue on risk and reward processing in adolescence. *Journal of Youth and Adolescence*, *46*, 1878-1890.

Skinner, A. T., Sorbring, E., Gurdal, S., Lansford, J. E., Bornstein, M. H., Chang, L., Deater-Deckard, K., Di Giunta, L., Dodge, K., Malone, P., Oburu, P., Pastorelli, C., Sorbring, E., Steinberg, L., . . . Bombi, A. S. (2017). Cross-national collaboration in the study of parenting and child adjustment. In G. Egloff (Ed.), *Child-rearing: Practices, attitudes and cultural differences*, pp. 1-19. Hauppauge, NY: Nova Science Publishers.

Steinberg, L. (2017). Adolescent brain science and juvenile justice policymaking. *Psychology, Public Policy, and Law*, *23*, 410-420.

Cohen, A., *Breiner, K., Steinberg, L., Bonnie, R., Scott, E., Taylor-Thompson, K., . . . Casey, B.J. (2016). When is an adolescent an adult? Assessing cognitive control in emotional and non-emotional contexts. *Psychological Science*, *4*, 549-562. (Corrigendum. *Psychological Science, 28*, 399-402.)

*Duell, N., *Icenogle, G., & Steinberg, L. (2016). Adolescent decision making and risk taking. In L. Balter & C. Tamis-Lemonda (Eds.), *Child psychology: A handbook of contemporary issues* (pp. 263-284). New York: Routledge.

*Duell, N., Steinberg, L., Chein, J., Al-Hassan, S., Bacchini, D., Chang, L., . . . Alampay, L. (2016). Interaction of reward seeking and self-regulation in the prediction of risk taking: A cross-national test of the dual systems model. *Developmental Psychology*, *52*, 1593-1605.

Fanti, K., Kimonis, E., Hadjicharalambous, M., & Steinberg, L. (2016). Do neurocognitive deficits in decision making differentiate conduct disorder subtypes? *European Child & Adolescent Psychiatry*, *25*, 989-996.

Fine, A., Cavanagh, C., Donley, S., Steinberg, L., Frick, P., & *Cauffman, E. (2016). The role of peer arrests in the development of youths' attitudes towards the justice system. *Law and Human Behavior, 40*, 211-218.

Fine, A., Steinberg, L., Frick, P., & *Cauffman, E. (2016). Self-control assessments and implications for predicting adolescent offending. *Journal of Youth and Adolescence*, *45*, 701-712.

Kern, M., Benson, L., Larson, E., Bevans, K., Forrest, C., & Steinberg, L. (2016). The Anatomy of Developmental Predictors Of Healthy Lives Study (TADPOHLS). *Journal of Applied Developmental Psychology, 20*, 135-145.

Kern, M., Benson, L., Steinberg, E.,* & Steinberg, L. (2016). The EPOCH measure of adolescent well-being. *Psychological Assessment*, *5*, 586-597.

Kim-Spoon, J., Kahn, R., Deater-Deckard, K., Chiu, P., Steinberg, L., & King-Casas, B. (2016). Risky decision making in a laboratory driving task is associated with health risk behaviors during late adolescence but not adulthood. *International Journal of Behavioral Development*, *40*, 58-63.

Lansford, J., Bornstein, M., Deater-Deckard, K., Dodge, K., Al-Hassan, S., Bacchini, D., . . . Zelli, A. (2016). How international research on parenting advances understanding of child development. *Child Development Perspectives*, *10*, 202-207.

*Monahan, K., Guyer, A., *Silk, J., Fitzwater, T., & Steinberg, L. (2016). Integration of developmental neuroscience and contextual approaches to the study of adolescent psychopathology. In D. Cicchetti (Ed.), *Developmental psychopathology* (3rd ed., pp. 720-765). New York: Wiley.

Ray, J., Frick, P., Thornton, L., Steinberg, L., & *Cauffman, E. (2016). Impulse control and callous-unemotional traits distinguish patterns of delinquency and substance use in justice involved adolescents: Examining the moderating role of neighborhood context. *Journal of Abnormal Child Psychology, 44*, 599-611.

Ray, J., Frick, P., Thornton, L., Steinberg, L., & *Cauffman, E. (2016). Positive and negative item wording and its influence on the assessment of callous-unemotional traits. *Psychological Assessment,* 28, 394-404.

Scott, E., Grisso, T., Levick, M., & Steinberg, L. (2016). Juvenile sentencing reform in a constitutional framework. *Temple Law Review*, *88*, 675-715.

Scott, E., Bonnie, R., & Steinberg, L. (2016). Young adulthood as a transitional legal category: Science, social change, and justice policy. *Fordham Law Review*, *85*, 641-666.

*Shulman, E., Harden, K., Chein, J., & Steinberg, L. (2016). The development of impulse control and sensation-seeking in adolescence: Independent or interdependent processes? *Journal of Research on Adolescence*, *26*, 37-44.

*Shulman, E., *Smith, A., *Silva, K., *Icenogle, G., *Duell, N., Chein, J., & Steinberg, L. (2016). The dual systems model: Review, reappraisal, and reaffirmation. *Developmental Cognitive Neuroscience, 17*, 103-117.

*Shulman, E., & Steinberg, L. (2016). Human development and juvenile justice. In K. Heilbrun, D. DeMatteo, & N. Goldstein (Eds.), *APA handbook of psychology and juvenile justice* (pp. 69-90). Washington: APA Books.

*Silva, K., Chein, J., & Steinberg, L. (2016). Adolescents in peer groups make more prudent decisions when a slightly older adult is present. *Psychological Science*, *27*, 322-330.

*Silva, K., Shulman, E., Chein, J., & Steinberg, L. (2016). Peers increase late adolescents' exploratory behavior and sensitivity to positive and negative feedback. *Journal of Research on Adolescence*, *26*, 696-705.

Steinberg, L. (2016). Commentary on Special Issue on the Adolescent Brain: Redefining adolescence. *Neuroscience and Biobehavioral Reviews*, *70*, 343-346.

*Cauffman, E., *Shulman, E.,  Bechtold, J., & Steinberg, L. (2015). Children and the law. In R. M. Lerner (Series Ed.) & M. Bornstein & T. Leventhal (Vol. Eds.), *Handbook of child psychology and developmental science* (7th ed.). *Volume 4: Ecological settings and processes in developmental systems* (pp. 616-653). New York: Wiley.

Duckworth, A., & Steinberg, L. (2015). Unpacking self-control. *Child Development Perspectives*, *9*, 32-37.

*Monahan, K., Steinberg, L., & Piquero, A. (2015). Juvenile justice policy and practice: A developmental perspective. *Crime and Justice, 44*, 577-619.

*Shulman, E., Harden, K., Chein, J., & Steinberg, L. (2015). Sex differences in the developmental trajectories of impulse control and sensation-seeking from early adolescence to early adulthood. *Journal of Youth and Adolescence*, *44*, 1-17.

Smith, A.,* Steinberg, L., Strang, N.,* & Chein, J. (2015). Age differences in the impact of peers on adolescents' and adults' neural response to reward. *Developmental Cognitive Neuroscience*, *11*, 75-82.

Steinberg, L. (2015). The neural underpinnings of adolescent risk-taking: The roles of reward-seeking, impulse control and peers. In G. Oettingen & P. Gollwitzer (Eds.), *Self regulation in adolescence*. (pp. 173-192). New York: Cambridge University Press.

Steinberg, L. (2015). How to improve the health of American adolescents. *Perspectives on Psychological Science*, *10*, 711-715.

17

Steinberg, L., *Cauffman, E., & *Monahan, K. (2015). Psychosocial maturity and desistance from crime in a sample of serious juvenile offenders. *Juvenile Justice Bulletin, March,* 1-12.

Steinberg, L., & Chein, J. (2015). Multiple accounts of adolescent impulsivity. *PNAS*, *112*, 8807-8808.

Thornton, L., Frick, P., *Shulman, E., Ray, J., Steinberg, L., & *Cauffman, E. (2015). Callous-unemotional traits and adolescents' role in group crime. *Law and Human Behavior*, *39*, 368-377.

*Dmitrieva, J., Gibson, L., Steinberg, L., Piquero, A., & Fagan, J. (2014). Predictors and consequences of gang membership: comparing gang members, gang leaders, and non-gang-affiliated adjudicated youth. *Journal of Research on Adolescence*, *24*, 220-234.

Hampton, A., Drabick, D., & Steinberg, L. (2014). Does IQ moderate the relation between psychopathy and juvenile offending? *Law and Human Behavior*, *38*, 23-33.

Harden, K., Kretsch, N., Steinberg, L., & Tucker-Drob, E. (2014). Genetically distinct facets of risky decision-making in adolescents: Integrating behavioral and self-report measures. *Behavior Genetics, 44*, 661-662. (Abstract only).

Jones, O., Bonnie, R., Casey, B.J., Davis, A., Faigman, D., Hoffman, M., Montague, R., Morse, S., Raichle, M., Richeson, J., Scott, E., Steinberg, L., Taylor-Thompson, K., Wagner, A., & Yaffee, G. (2014). Law and Neuroscience: Recommendations submitted to the President's Bioethics Commission. *Journal of Law and the Biosciences*, *1*, 222-236.

Logue, S., Chein, J., Gould, T., Holliday, E., & Steinberg, L. (2014). Adolescent mice, unlike adults, consume more alcohol in the presence of peers than alone. *Developmental Science, 17*, 79-85.

Peterman, J., Labelle, D., & Steinberg, L. (2014). Devoutly anxious: The relationship between anxiety and religiosity in adolescence. *Psychology of Religion and Spirituality*, *6*, 113-122.

*Shulman, E., Steinberg, L., & Piquero, A. (2014). A mistaken account of the age-crime curve: Response to Males and Brown (2013). *Journal of Adolescent Research, 29,* 25-34.

*Smith, A., Chein, J., & Steinberg, L. (2014). Peers increase adolescent risk taking even when the probabilities of negative outcomes are known. *Developmental Psychology*, *50*, 1564-1568.

*Smith, A., Steinberg, L., & Chein, J. (2014). The role of the anterior insula in adolescent decision making. *Developmental Neuroscience*, *36*, 196-209.

Steinberg, L. (2014). Using scientific research to transform juvenile justice policy and practice: A modest success story and some suggestions for the next four decades. In H. Yoshikawa, L. Forcier, & K. McCartney (Eds.), *Improving the odds for America's children: Future directions for policy and practice* (pp. 174-178). Cambridge: Harvard Education Press.

Steinberg, L. (2014). How should the science of adolescent brain development inform legal policy? In J. Bhabha (Ed.), *Human rights and adolescence*. (pp. 59-76). Philadelphia: University of Pennsylvania Press.

Steinberg, L. (2014). Should the science of adolescent brain development inform public policy? *Court Review*, *50*, 70-77.

*Weigard, A., Chein, J., *Albert, D., *Smith, A., & Steinberg, L. (2014). Effects of anonymous peer observation on adolescents' preference for immediate rewards. *Developmental Science*, *17*, 71-78.

*Albert, D., Chein, J., & Steinberg, L. (2013). The teenage brain: Peer influences on adolescent decision-making. *Current Directions in Psychological Science*, *22*, 114-120.

*Monahan, K., Steinberg, L., & *Cauffman, E. (2013). Age differences in the impact of employment on antisocial behavior. *Child Development*, *84*, 791-801.

*Monahan, K., Steinberg, L., *Cauffman, E., & Mulvey, E. (2013). Psychosocial (im)maturity from adolescence to early adulthood: Distinguishing between adolescence-limited and persistent antisocial behavior. *Development and Psychopathology*, 25, 1093–1105.

Shapero, B., & Steinberg, L. (2013). Emotional reactivity and exposure to household stress in childhood predict psychological problems in adolescence. *Journal of Youth and Adolescence*, *42*, 1573-1582.

*Shulman, E., Steinberg, L., & Piquero, A. (2013). The age-crime curve in adolescence and early adulthood is not due to age differences in economic status. *Journal of Youth and Adolescence*, *42*, 848-860.

*Smith, A., Chein, J., & Steinberg, L. (2013). Impact of socio-emotional context, brain development, and pubertal maturation on adolescent decision-making. *Hormones and Behavior*, *64*, 323-332.

Steinberg, L. (2013). Does recent research on adolescent brain development inform the mature minor doctrine? *Journal of Medicine and Philosophy*, *38*, 256-267.

Steinberg, L. (2013). The influence of neuroscience on U.S. Supreme Court decisions involving adolescents' criminal culpability. *Nature Reviews Neuroscience*, *14,* 513-518.

*Strang, N., Chein, J., & Steinberg, L. (2013). The value of the dual systems model of adolescent risk-taking. *Frontiers in Human Neuroscience*. 7, 223.

Sweeten, G., Piquero, A., & Steinberg, L. (2013). Age and the explanation of crime, revisited. *Journal of Youth and Adolescence*, *42,* 921-938.

Bornstein, M. H., Jager, J., & Steinberg, L. (2012). Adolescents, parents, friends/peers: A relationships model. In I. Weiner (Ed.), *Handbook of psychology* (2nd ed.), R. M. Lerner, M. A. Easterbrooks, & J. Mistry (Eds.), Volume 6. *Developmental Psychology* (pp. 657-745). New York: Wiley.

*Cauffman, E., & Steinberg, L. (2012). Emerging findings from research on adolescent development and juvenile justice. *Victims and Offenders*, *7*, 428-449.

*Dmitrieva, J., *Monahan, K., *Cauffman, E., & Steinberg, L. (2012). Arrested development: The effects of incarceration on the development of psychosocial maturity. *Development and Psychopathology*, *24*, 1073-1090.

*Morris, A., Cui, L., & Steinberg, L. (2012). Parenting research and themes: What we've learned, and where to go next. In R. Larzelere, A. Morris, & A. Harrist (Eds.), Authoritative parenting: Synthesizing nurturance and discipline for optimal child development. (pp. 35-58). Washington, D.C: American Psychological Association.

Steinberg, L. (2012). Should the science of adolescent brain development inform public policy? *Issues in Science and Technology, Spring*, 67-78.

*Albert, D., & Steinberg, L. (2011). Judgment and decision making in adolescence. *Journal of Research on Adolescence*, *21*, 211-224.

*Albert, D., & Steinberg, L. (2011). Age differences in strategic planning as indexed by the Tower of London. *Child Development*, *82*, 1501-1517.

Albert, D.,* & Steinberg, L. (2011). Peer influences on adolescent risk behavior. In M. Bardo, D. Fishbein, & R. Milich (Eds.), *Inhibitory control and drug abuse prevention: From research to translation*. (Part 3, pp. 211-226). New York: Springer.

Burchinal, M., McCartney, K., Steinberg, L., Crosnoe, R., Friedman, S., & McLoyd, V. (2011). Examining the black-white achievement gap using the NICHD study of early child care and youth development. *Child Development*, *82*, 1404-1420.

Chein, J., *Albert, D., O'Brien, L.,* Uckert, K.,* & Steinberg, L. (2011). Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry. *Developmental Science*, *14*, F1–F10.

*Chung, H., Mulvey, E., & Steinberg, L. (2011). Understanding the school outcomes of juvenile offenders: An exploration of neighborhood influences and motivational resources. *Journal of Youth and Adolescence, 40*, 1025-1038.

Drabick, D., & Steinberg, L. (2011). Developmental psychopathology. In B. Brown and M. Prinstein (Eds.). *Encyclopedia of adolescence* (Vol. 3, pp. 136-142). San Diego: Academic Press.

Goldweber, A., *Cauffman, E., *Dmitrieva, J., Piquero, A., & Steinberg, L. (2011). The development of criminal style in adolescence and young adulthood: Separating the lemmings from the loners. *Journal of Youth and Adolescence*, *40*, 332–346.

*Lee, J., Steinberg, L., Piquero, A., & Knight, G. (2011). Identity-linked perceptions of the police among African American juvenile offenders: A developmental perspective. *Journal of Youth and Adolescence*, *40*, 23-37.

Lerner, R., Boyd, M., Kiely, M., Napolitano, C., Schmid, K., and Steinberg, L. (2011). The history of the study of adolescence. In B. Brown and M. Prinstein (Eds.). *Encyclopedia of adolescence* (Vol. 1). Pp. 169-176. San Diego: Academic Press.

Maslowsky, J., Buvinger, E., Keating, D., Steinberg, L. & *Cauffman, E. (2011). Cost-benefit analysis mediation of the relationship between sensation seeking and risk behavior. *Personality and Individual Differences*, 51, 802-806.

*Monahan, K., Lee, J.,* & Steinberg, L. (2011). Revisiting the negative impact of part-time work on adolescent adjustment: Distinguishing between selection and socialization using propensity score matching. *Child Development*, *82*, 96-112.

*Monahan, K., & Steinberg, L. (2011). Accentuation of individual differences in social competence from early childhood to mid-adolescence. *Journal of Research on Adolescence*, *21*, 576-585.

*Morris, A., *Silk, J., *Morris, M., Steinberg, L., Aucoin, K., & Keyes, A. (2011). The influence of mother–child emotion regulation strategies on children's expression of anger and sadness. *Developmental Psychology*, 47, 213-225.

*O'Brien, L., *Albert, D., Chein, J., & Steinberg, L. (2011). Adolescents prefer more immediate rewards when in the presence of their peers. *Journal of Research on Adolescence*, *21*, 747-753.

Steinberg, L. (2011). Parenting the adolescent. In M. Fisher, E. Alderman, R. Kreipe, & W. Rosenfeld (Eds.). *Textbook of adolescent health care*. Elk Grove, IL: American Academy of Pediatrics.

Steinberg, L. (2011). Adolescent risk-taking: A social neuroscience perspective. In E. Amsel & J. Smetana (Eds.), *Adolescent vulnerabilities and opportunities: Constructivist developmental perspectives* (pp. 41-64). New York: Cambridge University Press.

Steinberg, L. (2011). Adolescents' risky driving in context. *Journal of Adolescent Health, 49*, 557-558.

Steinberg, L., & Collins, W.A. (2011). Adolescent psychosocial development and behavior. In M. Fisher, E. Alderman, R. Kreipe, & W. Rosenfeld (Eds.). *Textbook of adolescent health care* (pp. 39-44). Elk Grove, IL: American Academy of Pediatrics.

Steinberg, L., & *Monahan, K. (2011). Adolescents' exposure to sexy media does not hasten the initiation of sexual intercourse. *Developmental Psychology*, 47, 562-576.

Steinberg, L., & *Monahan, K. (2011). Premature dissemination of advice undermines our credibility as scientists: Response to Brown (2011) and to Collins, Martino, and Elliot (2011). *Developmental Psychology*, *47*, 582-584.

*Williams, L., & Steinberg, L. (2011). Reciprocal relations between parenting and adjustment in a sample of juvenile offenders. *Child Development*, *82*, 633-645.

**ESSAYS, EDITORIALS, AND BOOK REVIEWS (PREVIOUS 10 YEARS)**

Steinberg, L. (2020, June 16). Expecting students to play it safe if colleges reopen is a fantasy. *The New York Times*, p. A31.

Cauffman, E., & Steinberg, L. (2020, April 8). Release nonviolent juvenile offenders from custody to protect them from COVID-19. *Los Angeles Times*. https://www.latimes.com/socal/daily-pilot/opinion/story/2020-04-08/commentary-release-nonviolent-juvenile-offenders-from-custody-to-protect-them-from-covid-19

Hirsh-Pasek, K., & Steinberg, L. (2018, November 21). Beyond the midterms: Helping students overcome the impact of No Child Left Behind. Education Plus Development Blog, The Brookings Institution. https://www.brookings.edu/blog/education-plus-development/2018/11/21/beyond-the-midterms-helping-students-overcome-the-impact-of-no-

child-left-behind/#disqus_thread

Steinberg, L. (2018, September 18). Letter to the editor (Re: Accuser Goes Public, in Risk to Kavanaugh). *The New York Times,* p. A22.

Steinberg, L. (2018, March 5). When can you buy a gun, vote, or be sentenced to death? Science suggests US should revise legal age limits. *The Conversation.* https://theconversation.com/when-can-you-buy-a-gun-vote-or-be-sentenced-to-death-science-suggests-us-should-revise-legal-age-limits-92328

Steinberg, L. (2018, March 4). Why we should lower the voting age to 16. *The New York Times Sunday Review*, p. 6.

Casey, BJ, Bonnie, R., Davis, A., Faigman, D., Hoffman, M., Jones, O., Montague, R., Morse, S., Raichle, M., Richeson, J., Scott, E., Steinberg, L., Taylor-Thompson, K., & Wagner, A. (2017). *How should justice policy treat young offenders*? Nashville: MacArthur Foundation Research Network on Law and Neuroscience (Vanderbilt Law Research Paper No. 17-9; U of Penn Law School, Public Law Research Paper No. 17-17).

Steinberg, L., Grisso, T., Scott, E., & Bonnie, R. (2016, May 1). Don't treat young adults as teenagers. *The New York Times, Sunday Review*, p. 10.

Scott, E., Grisso, T., Levick, M., & Steinberg, L. (2015). *The Supreme Court and the transformation of juvenile sentencing*. Chicago: John D. and Catherine T. MacArthur Foundation.

Steinberg, L. (2015). Self-control: A driver of student achievement. *Educational Leadership*, *73*, 28-32.

Steinberg, L. (2015, March 31). Dzhokhar Tsarnaev, adolescent or adult? *The Boston Globe*, p. A13.

Steinberg, L. (2015, February 16). Failings of American high schools. *Teachers College Record*. Online, http://www.tcrecord.org/content.asp?contentid=17864

Steinberg, L. (2015, Spring). New foundations of adolescent learning. *Independent School*, 94-99.

Steinberg, L. (2015, February 10). Should the legal drinking age be lowered? Opinion piece for "Room for Debate," *The New York Times*. http://www.nytimes.com/roomfordebate/2015/02/10/you-must-be-21-to-drink?rref=homepage

Steinberg, L. (2014, November 4). A 16-year-old is as good as an 18-year-old -- or a 40-year-old --at voting. *Los Angeles Times*. http://www.latimes.com/opinion/op-ed/la-oe-steinberg-lower-voting-age-20141104-story.html (reprinted in the *Philadelphia Inquirer* as "It's time to allow 16-year-olds to vote" on November 9, 2014).

Steinberg, L. (2014, October 31). Injuries. Stress. Divided attention. Are coaches damaging our kids? *TIME*. http://time.com/3551269/injuries-stress-divided-attention-are-coaches-damaging-our-kids/

Steinberg, L. (2014, October 11). Thinking outside the box. *New Scientist*, 30-31.

Steinberg, L. (2014, September 22). Obesity, early puberty and why we should be concerned. Opinion piece for CNN.com. http://www.cnn.com/2014/09/22/opinion/steinberg-obesity-puberty/index.html

Steinberg, L. (2014, September 21). The case for delayed adulthood. *The New York Times*, *Sunday Review,* p. 12.

Steinberg, L. (2014, September 17). Is character education the answer? *Education Gadfly,* http://edexcellence.net/articles/is-character-education-the-answer

Steinberg, L. (2014, September 14). Some millennials are this trapped: Income inequality, obesity, and the neuroscience of adolescence. *Salon.* http://www.salon.com/2014/09/14/some_millennials_are_this_trapped_income_inequality_obesity_and_the_neuroscience_of_adolescence/#comments

Steinberg, L. (2014, July 5). Letter to the editor (Re: Rape on Campus, and the Law). *The New York Times,* p. A18.

Steinberg, L. (2014, April 27). Friends can be dangerous. *The New York Times, Sunday Review*, p. 12.

Steinberg, L. (2014, March 11). Justice system is failing young black men. Opinion piece for cnn.com. http://www.cnn.com/2014/03/11/opinion/steinberg-black-youth-prison/

21

Steinberg, L. (2014, February 11). What's holding back American teenagers? *Slate*.
http://www.slate.com/articles/life/education/2014/02/high_school_in_america_a_complete_disast
er.html

Steinberg, L. (2014, January 27). Beyond early childhood education. Letter to the editor (Re: It Takes a
Generation). *The New York Times*.

Steinberg, L. (2013, September 28). Violence in the media. Letter to the editor. (Re: Does Media
Violence Lead to the Real Thing?). *The New York Times, Sunday Dialogue*.

Steinberg, L. (2013). The importance of serendipity. In J. Brooks-Gunn, R. Lerner, A. Petersen, & R.
Silbereisen (Eds.) *The developmental science of adolescence: History through autobiography*. Pp.
494-501. New York: Psychology Press.

Steinberg, L. (2012, June 5). Seeing juveniles' maturity, and immaturity. Opinion piece for "Room for
Debate," *The New York Times*. http://www.nytimes.com/roomfordebate/2012/06/05/when-to-
punish-a-young-offender-and-when-to-rehabilitate/sentences-should-acknowledge-juveniles-
maturity-and-immaturity

Steinberg, L. (2012, May 29). What the brain says about maturity. Opinion piece for "Room for Debate,"
*The New York Times*. http://www.nytimes.com/roomfordebate/2012/05/28/do-we-need-to-
redefine-adulthood/adulthood-what-the-brain-says-about-maturity

Steinberg, L. (2012, March 19). "Don't put juveniles in jail for life." Opinion piece for cnn.com.
http://www.cnn.com/2012/03/19/opinion/steinberg-juvenile-crime/index.html?hpt=hp_bn6

Steinberg, L. (2012, February 6). Letter to the editor (Re: Hysterical Teenage Girls). *The New York Times*,
p. A22.

Steinberg, L. (November 1, 2011). Moshman on adolescent and teen brains: Some valid points, but wrong
in several respects. *Human Development*.

Steinberg, L. (April 18, 2011). "Raise age to buy cigarettes to 21." Opinion piece for cnn.com. Reprinted
in Hill, M. (Ed.). *Teen rights and freedoms: Tobacco and smoking*. Farmington Hills, MI: Gale
Group. http://edition.cnn.com/2011/OPINION/04/18/steinberg.smoking.teens/?hpt=C2

Steinberg, L. (2011). Demystifying the adolescent brain. *Educational Leadership*, *68*, 42-46.

Steinberg, L. (February 25, 2011). "Brain Development Science Sheds Light on Teen Driving."
http://www.autoobserver.com/2011/02/brain-development-science-sheds-light-on-teen-
driving.html

Steinberg, L. (February 14, 2011). "Talk to Your Teen About Sex."
http://www.psychologytoday.com/blog/you-and-your-adolescent/201102/talking-your-teen-
about-sex

Steinberg, L. (February 3, 2011). "How Peers Affect the Teenage Brain."
http://www.psychologytoday.com/blog/you-and-your-adolescent/201102/how-peers-affect-the-
teenage-brain

Steinberg, L. (February 3, 2011). "Learning from the Tragedy in Tampa."
http://www.psychologytoday.com/blog/you-and-your-adolescent/201102/learning-the-tragedy-in-
tampa

Steinberg, L. (2011, January 30). "Parent rage toward teens is not rare." Invited opinion piece for
cnn.com.
(http://www.cnn.com/2011/OPINION/01/30/steinberg.adolescent.violence/index.html?iref=allsea
rch).

Steinberg, L. (January 18, 2011). "Another Take on Tiger Mothering."
http://www.psychologytoday.com/blog/you-and-your-adolescent/201101/another-take-tiger-
mothering

22

## RESEARCH GRANTS, AWARDS, AND CONTRACTS

**National Institute of Justice**
Elizabeth Cauffman (PI), "Delinquency and Crime From Adolescence Through Young Adulthood: The
    Crossroads Study"
(2020-2023) ($999,918)                                          (Role: Co-Principal Investigator)

**William T. Grant Foundation**
Elizabeth Cauffman (PI), "Crossroads: Reducing Inequality and Promoting Positive Youth Development
    by Understanding Juvenile Justice Processing"
(2018-2021) ($598,937)                                          (Role: Co-Principal Investigator)

**National Institute of Child Health and Human Development**
Jennifer Lansford (PI), "Childhood Risk Factors and Young Adult Competence"
(2017-2022) ($4,290,686)                                        (Role: Co-Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg  (PI), "At the Boundary of Adolescence and Adulthood: The Next Generation of
    Neuroscience, Juvenile, and Criminal Justice Reform Conference"
(2017-2019) ($172,500)                                          (Role: Principal Investigator)

**National Institute of Mental Health**
Thomas Olino (PI), "Developmental Changes in Reward Responsivity:  Associations with Depression
    Risk Markers"
(2016-2021) ($3,211,838)                                        (Role: Co-Investigator)

**John D. and Catherine T. MacArthur Foundation**
Elizabeth Cauffman (PI), "Crossroads: The Impact of Formal vs. Informal Justice System Processing on
    Juveniles' Desistance from Crime"
(2016-2021) ($1,000,000)                                        (Role: Co-Principal Investigator)

**Department of Defense, U.S. Army Medical Research and Materiel Command**
Laurence Steinberg (PI), "Group Influences on Young Adult Warfighters' Risk-Taking"
(2012-2016) ($529,000)                                          (Role: Principal Investigator)

**National Institute of Child Health and Human Development**
Jennifer Lansford (PI), "Parenting, Adolescent Self-Regulation, and Risk Taking Across Cultures"
(2012-2017) ($4,891,112)                                        (Role: Co-Investigator)

**National Institute on Alcohol Abuse and Alcoholism**
Kathryn Harden (PI), "Genetic Influences on Adolescent Decision-Making and Alcohol Use"
(2012-2015) ($418,381)                                          (Role: Co-Investigator)

**National Institute on Drug Abuse**
Jason Chein (PI), "Improving Adolescent Decision Making Through Cognitive Control Training"
(2012-2015) ($420,750)                                          (Role: Co-Investigator)

**MacArthur Foundation Research Network on Law and Neuroscience**
BJ Casey (PI), "Neural and Behavioral Correlates of Age Differences in Psychological Capacities
     Relevant to Judgments of Criminal Responsibility"
(2011-2016) ($561,250)                             (Role: Co-Principal Investigator)

**Pennsylvania Department of Health (Health Research Formula Fund Grant)**
Laurence Steinberg (PI), "Social Influences on Alcohol Consumption in Adolescent Versus Adult Mice"
(2011-2012) ($25,000)                               (Role: Principal Investigator)

**Robert Wood Johnson Foundation (via subcontract from University of Pennsylvania)**
Laurence Steinberg (PI), "Correlates and Consequences of Positive Health in Adolescence"
(2011-2013) ($231,000)                             (Role: Principal Investigator)

**National Institute on Alcohol Abuse and Alcoholism**
Jason Chein (PI), "Combined Effects of Alcohol and Peer Context on Behavior and Neural Correlates of
     Risk-Taking"
(2011-2016) ($1,719,935)                           (Role: Co-Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Models for Change Research Initiative, Phase V"
(2010-2019) ($3,000,000)                           (Role: Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Elizabeth Cauffman (PI), "Crossroads: Formal versus Informal Processing in the Juvenile Justice System"
(2010-2013) ($500,000)                             (Role:  Co-Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Models for Change Research Initiative, Phase IV"
(2009-2016) ($500,000)                             (Role: Principal Investigator)

**Jacobs Foundation**
Klaus J. Jacobs Research Prize in Productive Youth Development
(2009) (1,000,000 Swiss Francs; approximately $1,000,000)     (Role: Inaugural Prize Recipient)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Models for Change Research Initiative, Phase III"
(2008-2021) ($745,539)                             (Role: Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "Pathways to Desistance: A Prospective Study of Serious Adolescent Offenders,
     Renewal Proposal"
(2008-2009) ($600,000)                             (Role:  Co-Principal Investigator)

**National Institute of Justice, U.S. Department of Justice**
Edward Mulvey (PI), "Pathways to Desistance"
(2008-2010) ($995,707)                             (Role:  Co-Principal Investigator)

24

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Models for Change Research Initiative, Phase II"
(2007-2021) ($2,692,789)                                  (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Models for Change Research Initiative"
(2007-2016) ($600,000)                                  (Role: Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "Pathways to Desistance: A Prospective Study of Serious Adolescent Offenders"
(2007-2009) ($130,000)                                  (Role:  Co-Principal Investigator)

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "Pathways to Desistance: A Prospective Study of Serious Adolescent Offenders"
(2007-2008) ($149,268)                                  (Role:  Co-Principal Investigator)

**National Institute of Drug Abuse**
Laurence Steinberg (PI), "Peer Effects on Neural and Behavioral Markers of Risk-Taking"
(2006-2011) ($999,315)                                  (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Continuation of the Pathways to Desistance Study: Renewal Proposal"
(2006-2017) ($1,558,662)                                  (Role: Principal Investigator)

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders"
(2006-2007) ($148,163)                                  (Role: Co-Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2006-2008) ($1,498,131)                                  (Role: Co-Principal Investigator)

**National Institute of Drug Abuse**
Edward Mulvey (PI), "Pathways to Desistance from Substance Use Problems and Crime"
(2005-2010) ($4,732,905)                                  (Role: Co-Principal Investigator)

**National Institute of Child Health and Human Development**
Laurence Steinberg (PI), "NICHD Study of Early Child Care and Youth Development, Phase IV"
(2005-2009) ($1,354,701)                                  (Role: Principal Investigator)

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders in Philadelphia"
(2005-2006) ($149,370)                                  (Role: Co-Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2005-2006) ($1,499,817)                                  (Role: Co-Principal Investigator)

25

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders in Philadelphia"
(2004-2005) ($149,122)                              (Role: Co-Principal Investigator)

**National Institute of Mental Health**
Nathan Fox (PI), "The Effects of Early Temperament on Social Behavior in Adolescence"
(2004-2007) ($1,053,624)                          (Role: Co-Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2004) ($1,450,000)                               (Role: Co-Principal Investigator)

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders in Philadelphia"
(2003-2004) ($149,975)                            (Role: Co-Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2003) ($1,700,000)                               (Role: Co-Principal Investigator)

**Pennsylvania Council on Crime and Delinquency**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders in Philadelphia"
(2002-2003) ($149,659)                            (Role: Co-Principal Investigator)

**National Institute of Mental Health**
Ronald Dahl (PI), "Affect Regulation and Adolescent Brain Maturation"
(2002-2006) ($1,488,333)                          (Role: Co-Investigator)

**William T. Grant Foundation**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders"
(2002-2005) ($350,000)                            (Role: Co-Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Research Network on Adolescent Development and Juvenile Justice"
(2002-2016) ($5,600,000)                          (Role: Principal Investigator)

**William Penn Foundation**
Laurence Steinberg (PI), "A Prospective Study of Serious Juvenile Offenders in Philadelphia"
(2002-2005) ($601,928)                            (Role: Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2001-2002) ($1,700,000)                          (Role: Co-Principal Investigator)

**Robert Wood Johnson Foundation**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders"
(2001-2004) ($742,505)                            (Role: Co-Principal Investigator)

**William T. Grant Foundation**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders"
(2001-2004) ($742,505)                                    (Role: Co-Principal Investigator)

**Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2000-2001) ($1,700,000)                                  (Role: Co-Principal Investigator

**National Institute of Justice, U.S. Department of Justice**
Edward Mulvey (PI), "A Prospective Study of Serious Adolescent Offenders, Renewal Proposal"
(2000) ($1,700,000)                                       (Role: Co-Principal Investigator)

**Open Society Institute, The Soros Foundations**
Laurence Steinberg (PI), "The Competence of Adolescents as Trial Defendants"
(1999-2002) ($225,000)                                    (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Research Network on Adolescent Development and Juvenile Justice"
(1999-2001) ($4,080,000)                                  (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Development of Assessment Modules for Middle Childhood, Extension and
       Supplement,"
(1999-2000) ($25,696)                                     (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Assessment of Life Stress in Children and Adolescents: Development of the
       PACE/LEDS"
(1999) ($53,000)                                          (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Research Network on Adolescent Development and Juvenile Justice,
       Supplement"
(1998) ($175,000)                                         (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Assessment of Life Stress in Children and Adolescents: Development of the
       PACE/LEDS"
(1998) ($36,819)                                          (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Development of a Context Module for Middle Childhood, Supplement"
(1998) ($24,780)                                          (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Assessment of Life Stress in Children and Adolescents"
(1997-1998) ($74,100)                                     (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Development of a Context Module for Middle Childhood"
(1997-1998) ($101,600)                                    (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Research Program on Adolescent Development and Juvenile Justice"
(1997-1998) ($1,250,000)                                 (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI) "Child and Adolescent Life Events Development"
(1996-1997) ($64,830)                                      (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Development of a Context Module"
(1996-1997) ($89,600)                                      (Role: Principal Investigator)

**John D. and Catherine T. MacArthur Foundation**
Laurence Steinberg (PI), "Adolescent Development and Juvenile Justice: Planning Grant"
(1996) ($60,000)                                             (Role: Principal Investigator)

**MacArthur Foundation Research Network on Psychopathology and Development**
Laurence Steinberg (PI), "Adolescent LEDS Collaborative Project"
(1995-1996) ($10,770)                                      (Role: Principal Investigator)

**MacArthur Foundation Research Networks on Successful Pathways Through Middle Childhood
   and on Psychopathology and Development**
Laurence Steinberg (PI), "Establishment of a Joint Task Force on Family Processes"
(1995-1996) ($114,644)                                    (Role: Principal Investigator)

**William T. Grant Foundation**
Laurence Steinberg (PI), "Family, Peer, and Community Influences on Psychological Adjustment in Late
   Adolescence"
(1991-1995) ($298,783)                                    (Role: Principal Investigator)

**Temple University Biomedical Research Fund**
Laurence Steinberg (PI), "Parenting Practices Related to Aggressive and Nonaggressive Rule-Breaking
   Behavior in Adolescence"
(1990) ($1,400)                                              (Role: Principal Investigator)

**The Lilly Endowment**
Laurence Steinberg (PI), "Family, Peer, and Community Influences on Adolescent Achievement"
(1990-1993) ($246,610)                                    (Role: Principal Investigator)

**Temple University Research Incentive Fund**
Robert Fauber (PI), "Adolescent Autonomy and Parenting Style"
(1989-1990) ($3,500)                                       (Role: Co-Principal Investigator)

**Graduate School Research Committee, University of Wisconsin--Madison**
B. Bradford Brown (PI), "Ethnographic Study of Three High Schools"

28

(1988-1990) ($23,713) (Role: Co-Principal Investigator)

**National Center on Effective Secondary Schools, U.S. Department of Education**
B. Bradford Brown (PI), "Noninstructional Influences on Academic Achievement"
(1988-1990) ($660,000) (Role: Co-Principal Investigator)

**William T. Grant Foundation**
Laurence Steinberg (PI) "Adolescent Autonomy and Family Relations"
(1987-1988) ($9,336) (Role: Principal Investigator)

**National Center on Effective Secondary Schools, U.S. Department of Education**
B. Bradford Brown (PI), "Noninstructional Influences on Academic Achievement"
(1987-1988) ($51,539) (Role: Co-Principal Investigator)

**Graduate School Research Committee, University of Wisconsin**
Laurence Steinberg (PI), "Family Transitions During Adolescence,"
(1986-1987) ($11,586) (Role: Principal Investigator)

**National Center on Effective Secondary Schools, U.S. Department of Education**
Laurence Steinberg (PI), "Student Achievement and Responsibility"
(1985-1986) ($17,000) (Role: Principal Investigator)

**Graduate School Research Committee, University of Wisconsin**
Laurence Steinberg (PI), "Changes in Family Relations During Adolescence"
(1984-1985) ($11,337) (Role: Principal Investigator)

**William T. Grant Foundation**
Laurence Steinberg (PI) "Faculty Scholars Award"
(1983-1988) ($161,250) (Role: Principal Investigator)

**University of California Focused Research Program**
Ellen Greenberger (PI) "Early Work Experience and Adolescent Stress"
(1979-1982) ($9,652) (Role: Co-Principal Investigator)

**The Ford Foundation**
Ellen Greenberger (PI), "Early Adolescents at Work: Dissemination of Findings to National and
       International Policy-Makers"
(1979-1982) ($25,000) (Role: Co-Principal Investigator)

**The Spencer Foundation**
Ellen Greenberger (PI), "Early Adolescents at Work: Effects of Part-Time Employment on Family
       Relations, Peer Relations, and Psychosocial Development"
(1979-1982) ($29,400) (Role: Co-Principal Investigator)

**National Institute of Education**
Ellen Greenberger (PI), "Early Adolescents at Work: Costs and Benefits to Learning and Social
       Development"
(1979-1981) ($122,313) (Role: Co-Principal Investigator)

29

**National Institute of Education**
Ellen Greenberger (PI), "Early Adolescents at Work: Effects of Part-Time Employment on Literacy and
    Maturity"
(1978-1979) ($100,499)                (Role: Co-Principal Investigator)

**Committee on Instructional Development, University of California**
Laurence Steinberg (PI), "Development of Instructional Materials for 'Human Development over the Life
    Cycle'"
(1978) ($2,492)                (Role: Principal Investigator)

**College of Human Ecology, Cornell University**
Laurence Steinberg (PI), "A Longitudinal Study of Physical Growth, Intellectual Growth, and Family
    Interaction in Early Adolescence"
(1977) ($509)                (Role: Principal Investigator)

**PRESENTATIONS**

**Keynotes, Plenary Addresses, and Named Lectures**

Texas Judicial Commission on Mental Health, Judicial Summit on Mental Health, Virtual Conference, November 2020.

New York State Association of Independent Schools, Admissions and Placement Directors Conference, New Paltz, New York, April 2019.

MAPP Summit, University of Pennsylvania, Philadelphia, October, 2018.

National Alliance of Sentencing Advocate and Mitigation Specialists, Philadelphia, April, 2018.

Taipei American School, Taipei, November, 2017.

Lindsay Dryden Speaker, The Odyssey School, Stevenson, MD, November, 2016.

Gray Matters Summit, Confederation of Oregon School Administrators, Eugene, August, 2016.

Claritycon2016, Clarity Child Guidance Center, San Antonio, June, 2016.

Pearl Leibovitch Clinical Day, Agence Ometz, Montreal, Many, 2016.

Betty and Bernard S. Shapiro Family Endowment Lecture, Agence Ometz, Montreal, May, 2016.

37th Annual Conference of Agencies and Organizations Serving Troubled Youth, Snowbird, Utah, May, 2016.

SPEAK, San Francisco, April, 2016.

Science of Hope, Foundation for Healthy Generations, Seattle, April, 2016.

Teachers College, Columbia University, November, 2015.

Learning & the Brain Society, Boston, November, 2015.

Genoa Science Festival, Genoa, October, 2015.

Lois Bloom Lecture, Child Study Center, Pennsylvania State University, September, 2015.

World Congress on Community Corrections, Los Angeles, July, 2015.

Spiker Memorial Lecture, Department of Psychology, University of Iowa, April, 2015.

34th Annual School Psychology Conference, Temple University, March, 2015.

Catholic Partnership Schools Education Summit, Mt. Laurel, New Jersey, March, 2015.

University of Chicago Crime Lab, January, 2015.

Models for Change Ninth Annual Working Conference, Washington, December, 2014.

Families First Fathers Breakfast, Boston, October, 2014.

Juvenile Defender Leadership Summit, Louisville, October, 2014.

American Academy of Psychiatry and the Law, Chicago, October, 2014.

FLUX (International Congress for Integrative Developmental Cognitive Neuroscience), Los Angeles, September, 2014.

European Association for Research on Adolescence, Izmir, Turkey, September, 2014.

National Council of Family and Juvenile Court Judges, Chicago, July, 2014.

National Center for Mental Health and Juvenile Justice, Washington, May, 2014.

Grimes Lecture, Department of Psychology, LaSalle University, March, 2014.

Society for Research on Adolescence, Austin, March, 2014.

Birch Lecture, International Neuropsychological Society, Seattle, February, 2014.

Boyd McCandless Lecture in Developmental Psychology, Department of Psychology, Emory University, October, 2013.

P. Browning Hoffman Memorial Lecture in Law and Psychiatry, University of Virginia School of Law, October, 2013.

2013 Youth Services Conference, Wisconsin Department of Children and Families, Wisconsin Dells, WI, October, 2013.

Models for Change National Court Leadership Symposium, Washington, October, 2013.

Society for Research in Psychopathology, Oakland, September, 2013.

Sulzberger Colloquium, Center for Child and Family Policy, Duke University, September, 2013.
Sulzberger Distinguished Lecture, Center for Child and Family Policy, Duke University, September, 2013.
Teenwise Minnesota, St. Paul, Minnesota, May, 2013.
Teaching Institute, Society for Research in Child Development, Seattle, April, 2013.
Allen L. Edwards Psychology Lecture Series, University of Washington, February, 2013.
Adolescent Brain Development and Trauma: Moving from Theory to Action, Casey Family Programs, Philadelphia, October, 2012.
American Psychological Association, Orlando, August, 2012.
Henry and Bryna David Lecture, National Academy of Sciences, Washington, November, 2011.
Cognitive Development Society, Philadelphia, October 15, 2011.
Harrington Distinguished Visiting Professor Lecture, Department of Psychology, Baldwin-Wallace College, October, 2011.
Breiland Lecture, University of Illinois School of Social Work, September, 2011.
Gatlinburg Conference on Research and Theory in Intellectual and Developmental Disabilities, San Antonio, 2011.
Joint Meeting on Adolescent Treatment Effectiveness, Baltimore, December, 2010.
Woodrow Wilson School of Public and International Affairs, Princeton University, December, 2010.
Phillips Andover Academy, November, 2010.
Third Annual El Paso County Mental Health Law Conference, El Paso, October, 2010.
Mercyhurst Criminal Justice Conference, Erie, PA, October, 2010.
Alaska Addictions Professional Association, Anchorage, May, 2010.
Cherlin Memorial Lecture, Department of Psychology, Yale University, October, 2009.
Award address for Distinguished Contributions to Research in Public Policy, American Psychological Association, Toronto, August, 2009.
MacArthur Foundation Models for Change Annual Meeting, Washington, December, 2008.
Presidential address, Division of Developmental Psychology, American Psychological Association, Boston, August, 2008.
Minnesota Association for Children's Mental Health, Duluth, Minnesota, April, 2008.
Jean Piaget Society, Quebec City, June, 2008.
Justin Wise Polier Colloquium, Citizen's Committee for Children, New York, April, 2007.
APA Distinguished Scientist Lecture, Rocky Mountain Psychological Association, Phoenix, April, 2005.
Joint Meeting on Adolescent Treatment Effectiveness, Washington, April, 2007.
Barbara Lemann Memorial Lecture, Tulane University Health Science Center, March, 2005.
Russell Barkley Lecture, Department of Psychiatry, University of Massachusetts Medical School, November, 2006.
Master Lecture, XVIII Congresso di Psicologia dello Sviluppo, Sciacca, Italy, September, 2004.
National Family & Parenting Institute, London, April, 2002.
University of Virginia Institute of Law, Psychiatry and Public Policy, Richmond, March, 2002.
Presidential address, Society for Research on Adolescence, Chicago, March, 2000.
Konopka Lecture, University of Minnesota, February, 2000.
Parent Education Institute, University of Minnesota, St. Paul, June, 2001.
Children, Youth and Families at Risk Program Initiative, Cooperative Extension Service, U.S. Department of Agriculture, San Diego, March, 2001.
Cummins Endowment for Adolescent Medicine Lecture, Morristown Memorial Hospital, Morristown, NJ, December, 1999.
Gallagher Lecture, Society for Adolescent Medicine, Los Angeles, March, 1999.
Colorado Principals' Center Winter Institute, Denver, February, 1997.
Golden Apple Foundation Annual Dutch Koldyke Forum, Chicago, October, 1996.

Anathan Foundation Lecture, Western Psychiatric Institute and Clinic, University of Pittsburgh Medical
    Center, September, 1995.
Goucher College Educational Conference, March, 1994.
Matthew Vassar Lecture, Vassar College, New York, September, 1996.
European Association for Research on Adolescence, Liège, Belgium, May, 1996.
Delaware Association of School Administrators, Dover, January, 1991.
Grantmakers for Children and Youth, San Francisco, November, 1987.
Empire State Organization of Youth Employment Services, Syracuse, June, 1987.
Vermont Association for Middle Level Education, Burlington, November, 1985.


## Invited Talks

Chief Probation Officers of California, Sacramento, January, 2021.
Texas Judicial Commission on Mental Health, Austin, November, 2020.
Family Action Network, Chicago, October, 2020
Chief Probation Officers of California, Sacramento, August, 2020.
Lena Pope, Fort Worth, October, 2019
Learning & the Brain, New York, May, 2019.
Flintridge Preparatory School, La Canada, California, April, 2019.
Washington State House of Representatives Committee on Public Safety, Seattle, November, 2018.
Neuroscience School of Advanced Studies, Venice, Italy, September, 2018.
WGBH Innovation IdeaLab, Boston, November, 2017.
Montclair Kimberly Academy, Montclair, NJ, November, 2017.
Center for Neuroscience and Society, University of Pennsylvania, October, 2017.
World Bank and Brazilian Ministry of Education, Brasilia, September, 2017.
Princeton HealthCare System, Princeton, NJ, August, 2017.
OECD, Conference on The Future of Education and Skills, Lisbon, May, 2017.
Child Mind Institute, New York, April, 2017.
Federal Reserve System, Washington, March, 2017.
Miss Edgar's and Miss Cramp's School, Westmount, Quebec, March, 2017.
Aspen Institute Society of Fellows, Aspen, August, 2016.
Aspen Ideas Festival, June, 2016.
The Ford Foundation, June, 2016.
Bermuda Sloop Foundation, Hamilton, Bermuda, June, 2016.
Trinity School and Dalton School, New York, April, 2016.
Clinton Global Initiative Winter Meeting, New York, February, 2016.
St. Clements School, Toronto, February, 2016.
Hinsdale School District, Hinsdale, IL, January, 2016.
DuPage County Health Department, Wheaton, IL, January, 2016.
Glenbard Parent Series, Glen Ellyn, IL, January, 2016.
National Governors Association, Center for Best Practices, Washington, December, 2015.
Jacobs Foundation, Zurich, December, 2015.
Seven College Conference, Smith College, December, 2015.
The Shipley School, Bryn Mawr, PA, November, 2015.
Center for Law, Brain, and Behavior, Harvard Law School, November, 2015.
Temple Law Review Symposium, Temple University, October, 2015.
Philadelphia Family Court Judges, September, 2015.
Neshaminy School District, Langhorne, PA, September, 2015.

33

Aspen Ideas Festival, Aspen, July, 2015.
The Philadelphia School, Philadelphia, May, 2015.
Woodrow Wilson School, Princeton University, April, 2015.
Vera Institute of Justice, Congressional Briefing, Washington, February, 2015
Glenbard Parent Series, Glen Ellyn, IL, November, 2014.
Family Action Network, Northfield, IL, November, 2014.
Family Action Network, Evanston, November, 2014.
School of Education, University of California, Irvine, October, 2014.
College of Health and Behavioral Sciences, Chapman University, October, 2014.
The Pacific Club, Newport Beach, October, 2014.
Free Library of Philadelphia, September, 2014.
Town Hall, Seattle, September, 2014.
Education/Psychology Library, University of California, Berkeley, September, 2014.
Graduate School of Education, Harvard University, September, 2014.
Teachers College, Columbia University, September, 2014.
Masters in Applied Positive Psychology Program, University of Pennsylvania, September, 2014.
Conference on the Third Decade of Life, Volkswagen Foundation, Hannover, Germany, June, 2014.
Workshop on Development of Recommendations for the Assessment of Adolescents' Competence in
    Clinical Care. World Health Organization, Brocher Foundation, Geneva, June, 2014.
Conference on Preventing and Responding to Prescription Drug Abuse on Campus, Temple University,
    June, 2014.
Hamilton Project Forum, National Press Club, Washington, May, 2014.
Institute of Medicine, Committee on the Health Implications of Raising the Minimum Age for Purchasing
    Tobacco Products, April, 2014.
Advocates for Children of New Jersey, East Windsor, New Jersey, March, 2014.
Camden County Council on Alcoholism and Drug Abuse, Camden, December, 2013.
Talks to Teachers, University of Pennsylvania, November, 2013.
Preconference on evolutionary psychology, Society for Research in Child Development, Seattle, April,
    2013.
Colloquium on Law, Neuroscience, and Criminal Justice, Stanford Law School, March, 2013.
Casey Family Foundation Board of Trustees, Seattle, February, 2013.
National Scientific Council on the Developing Child, Washington, December, 2012.
MacArthur Foundation Models for Change National Conference, Washington, December, 2012.
Lower Merion School District, Ardmore, Pennsylvania, November, 2012.
Cuidad de Las Ideas, Puebla, Mexico, November, 2012.
Calleva Research Centre, Magdelan College, University of Oxford, October, 2012.
Germantown Academy, Philadelphia, October, 2012.
Conference on Promoting Positive Development in the Third Decade of Life, Center for the Advanced
    Study in the Behavioral Sciences, Stanford University, June, 2012.
University of Minnesota Extension, St. Paul, April, 2012.
Population Research Center, Columbia University, April, 2012.
New York State Judicial Institute, White Plains, NY, December, 2011.
Parents Translational Research Center, University of Pennsylvania, October, 2011.
Advocates for Children of New Jersey, East Windsor, New Jersey, April, 2011.
Jacobs Foundation Conference, Marbach, Germany, April, 2011.
Raymond and Beverly Sackler U.S.A.-U.K. Scientific Forum, The National Academy of Sciences/The
    Royal Society, Irvine, CA, March, 2011.
Jacobs Foundation, Zurich, December, 2010.
Citizens for Juvenile Justice Leadership, Boston, December, 2010.

Parents of Students of Phillips Academy, Andover, MA, November, 2010.
National Institute of Child Health and Human Development, Rockville, MD, July, 2010.
German Psychological Association, Dornburg, Germany, June, 2010.
Corporate Alliance for Drug Education, Philadelphia, June, 2010.
Association for Psychological Science, Boston, May, 2010.
Alaska Addictions Professional Association, Anchorage, May, 2010.
State of Alaska Division of Juvenile Justice, Anchorage, May, 2010.
University of Chicago School of Law, April, 2010.
Bloomberg School of Public Health, The Johns Hopkins University, October, 2009.
New York City Bar Association, New York, May, 2009.
Learning and the Brain Society, Washington, May, 2009.
U.S. House of Representatives Education and Labor Committee, Washington, April, 2009.
University of North Carolina at Greensboro, January, 2009.
Woodrow Wilson School of Public and International Affairs, Princeton University, November, 2008.
The World Bank, Washington, November, 2008.
Pennsylvania Senate Judiciary Committee, Harrisburg, September, 2008.
Jacobs Foundation Forum on Youth, Berlin, July, 2008.
Newkirk Center for Science and Society and the Center for Psychology and Law, University of
     California, Irvine, May, 2008.
Minnesota Association for Children's Mental Health, Duluth, April, 2008.
National Institute on the Teaching of Psychology (NITOP), St. Pete Beach, Florida, January, 2008.
U.S. Food and Drug Administration, Washington, December, 2007.
Norfolk Academy, Norfolk, Virginia, November, 2007.
APA Grand Challenges Summit, Baltimore, October, 2007.
Wisconsin Family Impact Seminar, Madison, October, 2007.
CAB Health and Recovery Services, Salem State College, Salem, Massachusetts, October, 2007.
National Governors' Association Service Policy Advisors' Retreat, New Orleans, June, 2007.
Coalition for Juvenile Justice, Washington, June, 2007.
United States Senate Judiciary Committee, June, 2007.
Leiden University, The Netherlands, May, 2007.
National Conference of State Legislatures Spring Forum, Washington, April, 2007.
Philadelphia Prison Society and the Institute for Violence Research and Prevention, Philadelphia, April,
     2007.
Carrier Clinic, Bridgewater, New Jersey, March, 2007.
City and Juvenile Judges Association, New Orleans, January, 2007.
Grantmakers for Children, Youth, and Families, Los Angeles, September, 2006.
NIH conference on Reward Neurocircuitry in Adolescent Development and Decision Making, Bethesda,
     January, 2006.
Governor's Commission on College and Career Success, Harrisburg, November, 2005.
Grantmakers for Children and Youth, Denver, September, 2005.
National Institute of Justice, Washington, July, 2005.
Subcommittee on Select Education, U.S. House of Representatives Committee on Education and the
     Workforce, July, 2005.
Young Presidents' Organization Southern 7 Chapter, Greenbrier, West Virginia, June, 2005.
American Psychological Society, Los Angeles, May, 2005.
Rock Island/Milan School District, Rock Island, Illinois, April, 2005.
Chapin Hall, University of Chicago, November, 2004.
Fred Friendly Seminar on Juvenile Justice (produced for PBS). Filmed in Berkeley, California, October,
     2004.

Fall Mental Health Forum, Riverbend Foundation, Florence, Alabama, October, 2004.
Illinois State Legislature Taskforce on Trying Juveniles as Adults, Chicago, October, 2004.
International Society for Addiction Medicine, Helsinki, June, 2004.
Young Presidents' Organization Philadelphia Forum, May, 2004.
Ohio Juvenile Defenders' Summit, Dayton, Ohio, April, 2004.
Young Presidents' Organization Philadelphia Forum, March, 2004.
Young Presidents' Organization South America University, Rio de Janeiro, Brazil, January, 2004.
New York Academy of Sciences, New York, September, 2003.
National Consortium on Violence Research (NCOVR) Summer Workshop, San Juan, June, 2003.
Urban Institute, San Francisco, May, 2003.
Pennsylvania House of Representatives, Committees on Health and Human Services and Children and
        Youth, April, 2003.
Young Presidents' Organization Philadelphia Forum, 2003.
Master Lecture, Society for Research in Child Development, Tampa, Florida, April, 2003.
National Conference of Juvenile and Family Court Judges, Philadelphia, March, 2003.
Council of Juvenile Corrections Administrators, Charlotte, January, 2003.
Annie E. Casey Foundation Roundtable on Family Strengthening Youth Development, Baltimore,
        December, 2002.
Florida Conference of Circuit Judges, Amelia Island, Florida, December, 2002.
University Extension, Iowa State University, October, 2002.
Iowa State University, October, 2002.
Young Presidents' Organization Prague University, Prague, October, 2002.
Institute for Adolescent Risk Communication, University of Pennsylvania, June, 2002.
Adolescent Health Institute, University of New Hampshire Cooperative Extension, Lake Winnipesaukee,
        New Hampshire, June, 2002.
National Consortium on Violence Research (NCOVR) Summer Workshop, St. Augustine, Florida, June,
        2002.
White House Conference on Character and Community, June, 2002.
Brookings Institution, Washington, May, 2002.
Practical Parenting Partnerships, Lake Osage, Missouri, April, 2002.
European Association for Research on Adolescence Summer School, Puidoux-Chexbres, Switzerland,
        July, 2001.
Young Presidents' Organization Venice University, Venice, Italy, June, 2001.
National Institute of Justice, Washington, March, 2001.
Casey Journalism Conference, College Park, Maryland, June, 2000.
Brookings Institution, Washington, May, 2000.
White House Conference on Teenagers, May, 2000.
Congressional Research Briefing, Joint Center for Poverty Research, Washington, January, 2000.
Bill and Melinda Gates Foundation and the Daniel J. Evans Graduate School of Public Affairs of the
        University of Washington, Kirkland, Washington, December, 1999.
Rochester Child Health Congress, University of Rochester Medical Center, October, 1999.
National Association of Secondary School Principals, Hershey, PA, October, 1999.
U.S. House of Representatives Bi-Partisan Working Group on Youth Violence, September, 1999.
National Research Council, Committee on Law and Justice, May, 1999.
EdSource Conference on Public Schools, Irvine and San Ramon California, March, 1999.
National Conference on Juvenile Justice, Minneapolis, March, 1999.
Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, March, 1999.
Center for Children, Families, and the Law, University of Virginia, November, 1998.
Robert Wood Johnson Foundation, Annapolis, November, 1998.

American Bar Association Criminal Justice Standards Task Force on Juveniles in the Adult Criminal
        System, Washington, October, 1998.
Family Resource Network of the School District of Philadelphia, September, 1998.
Arkansas Governor's Working Group on Juvenile Violence, Little Rock, August, 1998.
Arkansas Public Defenders Commission, Little Rock, August, 1998.
Senate of Pennsylvania Committee on Education, June, 1998.
Corrections Program Office, U.S. Department of Justice, Houston, May, 1998.
National Institute of Drug Abuse, Rockville, November, 1997.
Teachers College, Columbia University, July, 1997.
Vice President and Mrs. Gore's "Family Re-Union" conference on Families and Learning, Nashville,
        June, 1997.
The Communitarian Network, Washington, June, 1997.
Brookings Institution, Washington, May, 1997.
Fourth Annual Invitational Public Schools Conference, Temple University, May, 1997.
National Urban League, National Press Club, Washington, February, 1997.
Chester County Intermediate Unit, Exton, Pennsylvania, December, 1996.
Alliance for Education, Worcester, Massachusetts, December, 1996.
Center for School Study Councils, University of Pennsylvania, December, 1996.
Pennsylvania State Board of Education, Philadelphia, November, 1996.
National Academy of Sciences, Commission on Behavioral and Social Sciences and Education,
        September, 1996.
Central New York State Psychological Association, Syracuse, October, 1995.
Vassar College, September, 1995.
Penn State University, Delaware County Campus, April, 1994.
Center for Substance Abuse Prevention, School of Medicine, University of Maryland, Baltimore,
        November, 1993.
New Jersey Public Health Association, Jamesburg, New Jersey, October, 1993.
Josselyn Center for Mental Health, Northfield, IL, October, 1993.
Rochester Symposium on Developmental Psychology, University of Rochester, October, 1993.
Urie Bronfenbrenner Symposium, Cornell University, September, 1993.
Social Science Research Council, New York, May, 1992.
Pennsylvania Family Policy Seminar, Harrisburg, April, 1992.
National Commission on Children, St. Paul, October, 1990.
Division of Developmental Psychology, American Psychological Association, Boston, August, 1990.
Council on Foundations, Toronto, April, 1989.
National Council for Families and Television, Studio City, California, December, 1988.
Carnegie Council on Adolescent Development, Washington, September, 1988.
Puget Sound Community Colleges, Seattle, September, 1987.
Temple University Medical School, November, 1986.
Pennsylvania Juvenile Court Judges Seminar, National Center for Juvenile Justice, Hershey,
        Pennsylvania, October, 1986.
National Invitational Conference on the Health Futures of Adolescents, Daytona Beach, April, 1986.
Social Science Research Council, Santa Barbara, December, 1983.
House Subcommittee on Labor Standards, United States House of Representatives, Washington (co-
        authored testimony presented by E. Greenberger).
Aspen Institute for Humanistic Studies, July, 1982.
National Center for Vocational Education, Ohio State University, May, 1980.
National Institute of Education, Washington, March, 1979.
Foundation for Child Development, Palo Alto, California, November, 1978.

**COLLOQUIA**

John Jay College of Criminal Justice, April, 2017.
Department of Psychiatry, University of Pennsylvania, Philadelphia, November, 2015.
Institute of Human Development and Social Change and Department of Applied Psychology, New York University, March, 2015.
Center for Psychology and Law, University of California, Irvine, March, 2014.
University of Virginia Center to Promote Effective Youth Development, October, 2013.
Department of Psychology, UCLA, April, 2013.
Committee on Education and Center for Human Potential and Public Policy, University of Chicago, April, 2013.
Program in Law, Psychology, and Human Development, Cornell University, November, 2012.
Consortium on Law and Values, University of Minnesota School of Law, November, 2012.
Department of Pediatrics, Cooper Medical School of Rowan University, October, 2012.
University of Texas, Dallas, October, 2012.
Institute of Cognitive Science, Colorado University, September, 2012.
Department of Education, University of California, Irvine, March, 2012.
Institute of Human Development and Behavior Change Research Network, University of California, Berkeley, March, 2012.
Neuroscience and Public Policy Seminar Series, University of Wisconsin, Madison, November, 2011.
Department of Psychology, University of California, Davis, October, 2011.
Department of Applied Psychology, New York University, October, 2011.
Department of Psychology, Baldwin-Wallace College, October, 2011.
NY/NJ Developmental Colloquium Series, New York University, September, 2011.
Mercyhurst College, October, 2010.
Center for Neuroscience and Society and Department of Psychology, University of Pennsylvania, October, 2010.
Center for the Humanities at Temple, Temple University, September, 2010.
Institute for the Study of Child Development, Robert Wood Johnson Medical School, April, 2010.
Carolina Consortium on Human Development, Chapel Hill, March, 2010.
Harris School of Public Policy Studies, University of Chicago, February, 2010.
Department of Psychology & Neuroscience, Duke University, October, 2009.
Curry School of Education, University of Virginia, September, 2009.
Department of Psychology and Center for Drug Abuse Research Translation, University of Kentucky, April, 2009.
Sackler Institute for Developmental Psychobiology, Weill Medical College of Cornell University, March, 2009.
Department of Psychology, UCLA, May, 2008.
Columbia Law School, November, 2007.
Department of Society, Human Development, and Health, Harvard School of Public Health, January, 2007.
Woodrow Wilson School of Public and International Affairs and the Center for Research on Child Wellbeing, Princeton University, December, 2006.
Child and Family Research Section, NICHD, November, 2006.
Department of Psychology, Drexel University, May, 2006.
Graduate School of Social Work and Social Research, Bryn Mawr College, November, 2005.
Bloomburg School of Public Health, The Johns Hopkins University, July, 2005.
School of Education, Western Illinois University, April, 2005.
Department of Child Psychiatry, Tulane University School of Medicine, March, 2005.

38

Department of Human Development and Family Studies, University of Wisconsin, Madison, December, 2004.

University of Virginia School of Law, November, 2004.

Department of Psychology, Ursinus College, November, 2004.

Villanova University School of Law, February, 2004.

Cornell University, November, 2003.

Department of Mental Health, Bloomberg School of Public Health, The Johns Hopkins University, March, 2003.

Child Study Center, New York University School of Medicine, January, 2003.

School of Social Ecology, University of California, Irvine, April, 2002.

Departments of Psychology, Education, and Urban Studies, Vassar College, October, 2001.

Bush Center in Child Development and Social Policy, Yale University, October, 2001.

Irving B. Harris School of Public Policy, University of Chicago, June, 2001.

Center for Mental Health Services Research and Department of Law and Psychiatry, University of Massachusetts Medical School, May, 2000.

Department of Psychology, University of Delaware, October, 1999.

Institute of Child Development, University of Minnesota, April, 1998.

Department of Psychology and Human Development, Bryn Mawr College, November, 1997.

Center for Research on Young Children and Families, Teachers College, Columbia University, June, 1997.

Graduate School of Education, Harvard University, March, 1997.

Florida Atlantic University, January, 1997.

Graduate School of Education, University of Pennsylvania, December, 1995.

Department of Psychology, New York University, September, 1994.

Memorial Sloan-Kettering Cancer Center, New York, May, 1994.

Department of Educational Psychology, University of Illinois, April, 1994.

Department of Adolescent Medicine, Children's Hospital of Philadelphia, February, 1994.

Center for Family Research, University of Georgia, January, 1994.

Department of Sociology, The Johns Hopkins University, December, 1993.

Department of Human Development and Family Studies, Penn State University, April, 1992.

Department of Child and Family Development, University of North Carolina at Greensboro, February, 1992.

Institute of Child Development, Department of Pediatrics, Robert Wood Johnson Medical School, December, 1991.

Department of Individual and Family Studies, University of Delaware, October, 1990.

Russell Sage Foundation, New York, June, 1989.

Institute of Child Development, Department of Pediatrics, Robert Wood Johnson Medical School, October, 1988.

Department of Psychiatry, Michael Reese Hospital and the Committee on Human Development, University of Chicago, May, 1988.

Department of Psychology, Stanford University, January, 1988.

Stanford Center for the Study of Families, Children, and Youth, January, 1988.

Department of Psychology, Southern Illinois University at Edwardsville, January, 1988.

Department of Human Development and Family Studies, Cornell University, December, 1985.

College of Human Development, Pennsylvania State University, November, 1981.

Bush Foundation Program in Child Development and Social Policy, UCLA, September, 1981.

**CONFERENCE PRESENTATIONS**

Breiner, K., Icenogle, G., Duell, N., Skinner, A., Lansford, J., Di Giunta, L., . . . Steinberg, L. (April, 2021). Resistance to peer influence and risk taking: A cross-cultural and longitudinal examination. Paper presented as a part of a symposium entitled "Parental and Peer Influences on Adolescent Risk Taking" at the Society for Research on Child Development (Virtual Meeting).

Campbell, C., Skinner, A.,  Lansford, J., Deater-Deckard, K., Di Giunta, L., Dodge, K., . . . Chang, L. (April, 2021). Parallel growth of children's internalizing behaviors predicted by positive parenting behaviors. Poster presented at the Society for Research in Child Development (Virtual Meeting)..

Skinner, A., Godwin, J., Alampay, L., Lansford, J., Bacchini, D., Bornstein, M., . . . Yotanyamaneewong, S. (April, 2021). Parenting during adolescence as a moderator of links between COVID-19 disruption and reported changes in parents' and young adults' adjustment in five countries. Paper presented as a part of a symposium entitled "Family Adjustment During the Global Outbreak of COVID-19: A Longitudinal and International Perspective" at the Society for Research on Child Development (Virtual Meeting).

Beardslee, J., Kan, E., Frick, P., Steinberg, L. & Cauffman, E. (March, 2020). Age specific predictors of gun- and nongun-related offended during adolescence and the transition to adulthood. Paper accepted for presentation as a part of a symposium entitled "Risk Factors for Gun Carrying During Adolescence" at the Society for Research on Adolescence, San Diego.

Peniche, M., Beardslee, J., Simmons, C., Kan, E., Frick, P., Steinberg, L., & Cauffman, E. (March, 2020). One and done: What predicts who re-offends and who desists after their first arrest? Poster accepted for presentation at the Society for Research on Adolescence, San Diego.

Simmons, C., Frick, P., Steinberg, L., & Cauffman, E. (March, 2020). Age related associations between callous-unemotional traits, impulsivity, and delinquent behavior impacts of race, socioeconomic status, and age on substance use. Paper accepted for presentation as a part of a symposium entitled "Exploring the Cognitive and Psychosocial Correlates of Delinquent Behavior among At-Risk Youth" at the Society for Research on Adolescence, San Diego.

Kan, E., Simmons, C., Frick, P., Steinberg, L., & Cauffman, E. (March, 2020). Impacts of race, socioeconomic status, and age on substance use. Paper accepted for presentation as a part of a symposium entitled "Substance Use Among Justice-Involved Youth: Impacts of Demographic Factors, Victimization, and Justice System Involvement" at the Society for Research on Adolescence, San Diego.

Simmons, C., Kan, E., Steinberg, L., Frick, P., & Cauffman, E. (March, 2020). Examining the influence of justice system involvement on substance use in justice-involved youth. Paper accepted for presentation as a part of a symposium entitled "Substance Use Among Justice-Involved Youth: Impacts of Demographic Factors, Victimization, and Justice System Involvement" at the Society for Research on Adolescence, San Diego.

Kan, E., Fine, A., Beardslee, J., Frick, P., Steinberg, L., & Cauffman, E. (March, 2020). The first cut is the deepest: How does first juvenile justice contact impact substance abuse? Poster presented at the American Psychology-Law Society, New Orleans.

Kemp, E., Frick, P., Robertson, E., Ray, J., Thornton, L., Meyers, T., Steinberg, L., & Cauffman, E. (March, 2020). Clinical cutoff scores for the inventory of callous-unemotional traits (ICU) predict higher rates of juvenile delinquency. Poster presented at the American Psychology-Law Society, New Orleans.

Knowles, A., Frick, P., Steinberg, L., & Cauffman, E. (March, 2020). Examining the relation between estimated life expectancy and delinquency across development. Poster presented at the American Psychology-Law Society, New Orleans.

Simmons, C., Knowles, A., Brown, C., Steinberg, L., Frick, P., & Cauffman, E. (March, 2020). The psychological consequences of contact with the justice system. Poster presented at the American Psychology-Law Society, New Orleans.

Walker, T., Robertson, E., Frick, P., Ray, J., Thornton, L., Steinberg, L., & Cauffman, E. (March, 2020). Individual and environmental influence on attributions for blame for delinquency in young adults. Poster presented at the American Psychology-Law Society, New Orleans.

Icenogle, G., Simmons, C., & Steinberg, L. (August, 2019). Developmental trajectories of executive functions in seven countries. Poster presented at FLUX, New York.

Kemp, E.C., Robertson, E.L., Walker, T.M., Frick, P.J., Ray, J.V., Thornton, L.C., Myers, T.D.W., Steinberg, L., & Cauffman, E. (May, 2019). Associations between callous-unemotional traits and gun use in a longitudinal study of justice-involved youth. Poster presented at the Society for the Scientific Study of Psychopathy, Las Vegas.

Robertson, E., et al. (May, 2019). The reciprocal role of victimization, externalizing, and internalizing: A window into the etiological pathways of callous-unemotional variants. Poster presented at the Society for the Scientific Study of Psychopathy, Las Vegas.

Walker, T., et al. (May, 2019). Disentangling the relation between future orientation and callous-unemotional traits in the prediction of offending in justice-uninvolved youth. Poster presented at the Society for the Scientific Study of Psychopathy, Las Vegas.

Alampay, L., et al. (March, 2019). Change in caregivers' attitudes and use of corporal punishment following a legal ban in Kenya. Paper presented as part of a symposium entitled "Cross-Cultural Perspectives on Parenting and Children's Socioemotional Functioning and Academic Achievement" at the Society for Research in Child Development, Baltimore.

Al-Hassan, S., et al. (March, 2019). Parents' behavior and academic achievement in nine countries. Paper presented as part of a symposium entitled "Cross-Cultural Perspectives on Parenting and Children's Socioemotional Functioning and Academic Achievement" at the Society for Research in Child Development, Baltimore.

Di Guinta, L., et al. (March, 2019). Family irritability expressiveness, harsh parenting, and adolescents' socioemotional functioning in nine countries. Paper presented as part of a symposium entitled "Cross-Cultural Perspectives on Parenting and Children's Socioemotional Functioning and Academic Achievement" at the Society for Research in Child Development, Baltimore.

Duell, N., Chein, J., Olino, T., & Steinberg, L. (March, 2019). Teens take good risks, too: An exploratory study of positive risk taking in adolescence. Paper presented as part of a symposium entitled "Beyond Sex, Drugs, and Rock n' Roll: The Adaptive Functions of Adolescent Risk-Taking" at the Society for Research in Child Development, Baltimore.

El Mallah, S., et al. (March, 2019). Early adolescent temperament and indicators of positive youth development: a cross-cultural comparison. Paper presented as part of a symposium entitled "Development in Context: Cultural Influences from Infancy to Adolescence" at the Society for Research in Child Development, Baltimore.

Gliozzo, G., Di Guinta, L., Duell, N., Steinberg, L., Fiasconaro, I., Iselin, A., . . . Bacchini, D. (March, 2019). Cross-cultural links among executive functions, emotionality, emotion regulation, and effortful control in preadolescence. Poster presented at the Society for Research in Child Development, Baltimore.

Knowles, A., et al. (March, 2019). Sexual behavior among justice-involved youth: Links to positive youth development. Paper presented as part of a symposium entitled "Focus on the Positives: Examining Positive Developmental Outcomes Within At-Risk Populations" at the Society for Research in Child Development, Baltimore.

Skinner, A., et al. (March, 2019). The moderating role of mothers' endorsement of corporal punishment and child adjustment in eight countries. Paper presented as part of a symposium entitled "Cross-Cultural Perspectives on Parenting and Children's Socioemotional Functioning and Academic Achievement" at the Society for Research in Child Development, Baltimore.

Rowan, Z., Alaniz, S., Beardslee, J., Datta, S., Shulman, E., Cauffman, E., Frick, P., & Steinberg, L. (March, 2019).  Offending like there is no tomorrow. Paper presented at a symposium entitled "Crime and Its Consequences" the American Psychology-Law Society, Portland.

Knowles, A., Rowan, Z., Frick, P., Steinberg, L., & Cauffman, E. (March, 2019). Evading detection during adolescence. Paper presented at a symposium entitled "Crime and Its Consequences" the American Psychology-Law Society, Portland.

Kitzmiller, M., Cavanagh, C., Cauffman, E., Frick, P., & Steinberg, L. (November, 2018). Ecological considerations for juvenile mental health: Neighborhood environment and family criminality. Paper presented as part of a symposium entitled "Challenges to Developmental and Psychological Determinants of Crime" at the American Society for Criminology, Atlanta.

Dairywala, K., Shulman, E., & Steinberg, L. (April, 2018). Do age-related patterns in risk taking differ based on socioeconomic status? A Multi-National, Cross-Sectional Analysis. Poster presented at the Society for Research on Adolescence, Minneapolis.

Duell, N., Icenogle, G., & Steinberg, L. (April, 2018). Age patterns in risk taking around the world. Poster presented at the Society for Research on Adolescence, Minneapolis.

Albert, D., Skinner, A., Hanson, J., Lansford, J., Steinberg, L., & Dodge, K. (April, 2018). Individual differences in executive function partially explain the socioeconomic gradient in middle-school academic proficiency. Poster presented at the Society for Research on Adolescence, Minneapolis.

Fine, A., Frick, P., Steinberg, L., & Cauffman, E. (April, 2018). Reducing delinquency through monitoring justice-system-involved male adolescents: Whose monitoring matters? Paper presented as part of symposium entitled "Youth at the Nexus of Juvenile Justice and Education" at the Society for Research on Adolescence, Minneapolis.

Matlasz, T., Robertson, E., Frick, P., Meyers, T., Ray, J., Thornton, L., . . . Cauffman, E. (March, 2018). Predicting later offending from self-reports of aggression. Poster presented at the American Psychology-Law Society, Memphis.

Poor, A., Walker, T., Robertson, E.,  Frick, P., Myers, T., Ray, J., . . . Cauffman, E. (March, 2018). The associations between callous-unemotional traits, beliefs about the future, and offending in justice-involved adolescent boys. Poster presented at the American Psychology-Law Society, Memphis.

Schumann, R., Lieblich, S., Jadhav, T., Barnes, K., Silva, K., & Steinberg, L. (May, 2017). Sensation-seeking, but not impulsivity, is significantly predictive of infidelity in a relationship. Poster presented at the Association for Psychological Science, Boston.

Beyer, A., Robertson, E., Frick, P., Myers, T.,  Ray, J., Thornton, L., Steinberg, L., & Cauffman, E. (May, 2017). Primary and secondary variants of callous-unemotional traits: Relations with type and severity of aggression. Poster presented at the Association for Psychological Science, Boston.

Robertson, E., Frick, P., Ray, J., Thornton, L., Myers, T., Steinberg, L., & Cauffman, E. (May, 2017).  Differences in type, severity, and method of assessing violence between primary and secondary variants of CU traits in justice-involved adolescent males. Paper presented as a part of a symposium entitled "Building a Better Understanding of CU Variant in Youth," at the Society for the Scientific Study of Psychopathology, Antwerp, Belgium.

Icenogle, G., & Steinberg, L. (April, 2017). Age patterns of resistance to peer influence in a multinational sample. Poster presented at the Society for Research on Child Development, Austin.

Lansford, J., Deater-Deckard, K., Godwin, J., Di Giunta, L., Dodge, K., Malone, P., . . . Chen, B. (April, 2017).  Household chaos, neighborhood danger, and parenting in ten countries. Paper presented as a part of a symposium entitled "Bringing Order to Chaos: The Role of Household Chaos in Parenting" at the Society for Research on Child Development, Austin.

Lansford, J., Godwin, J., Al-Hassan, S., Bacchini, D. Bombi, A., Bornstein, M., . . . Zelli, A. (April, 2017). Family- and culture-level predictors of youth adjustment in nine countries. Paper presented as a part of a symposium entitled "Positive Adaptation of Children and Adolescents with Different Cultural Background in a Global Perspective," at the Society for Research on Child Development, Austin.

Fine, A., Mahler, A., Steinberg, L., Frick, P., & Cauffman, E. (April, 2017). The role of individual differences on the association between contexts and adolescent delinquency. Paper presented as a part of a symposium entitled "The Family Context and Youth Antisocial Behavior," at the Society for Research on Child Development, Austin.

Frick, P., Ray, J., Thornton, L., Wall, T., Steinberg, L., & Cauffman, E. (November, 2016). The effect of juvenile justice-related factors on trajectories of callous-unemotional traits. Paper presented as a part of a symposium entitled "The Importance of Environmental Influences for Youth with Juvenile Psychopathy" at the American Criminological Society, New Orleans.

Icenogle, G., Fettich, K., Steinberg, L., Breiner, K., Galvan, A., & Chein, J. (September, 2016). Cortical thickness of prefrontal regions is related to sensation seeking in adults but not adolescents. Poster presented at the 4th Annual FLUX Congress, St Louis.

Rosenbaum, G., Botdorf, M., Smith, A., Fettich, K., Patrianakos, J., Strang, N., . . . Chein, J. (September, 2016). The behavioral and neural influences of alcohol and social context on risky choice. Poster presented at the 4th Annual FLUX Congress, St Louis.

Breiner, K., Li, A., Cohen, A., Steinberg, L., Bonnie, R., Scott, E., . . . Galvan. A. (September, 2016). The "triple threat": Influence of peers, excitement, and reward on cognitive control capacity in adolescents. Poster presented at the 4th Annual FLUX Congress, St Louis.

Silva, K., Patrianakos, J., Chein, J., & Steinberg, L. (May, 2016). Cognitive fatigue increases late adolescents' risk-taking and reward-seeking behavior without affecting ability to learn from negative consequences. Poster presented at the Association for Psychological Science, Chicago.

Silva, K., Chein, J., & Steinberg, L. (April, 2016). Improving young soldiers' decision-making by changing the age mix of combat squads. Poster presented at the Society for Research on Adolescence, Baltimore.

Duell, N., Silva, K., Icenogle, G., Banich, M., Chein, J., & Steinberg, L. (April, 2016). Influence of working memory on Stroop performance: A developmental examination. Poster presented at the Society for Research on Adolescence, Baltimore.

Silva, K., Shulman, E., Chein, J., & Steinberg, L. (April, 2016). Peers increase adolescents' exploratory behavior and sensitivity to positive and negative feedback. Poster presented at the Society for Research on Adolescence, Baltimore.

Simmons, C., Cavanagh, C., Cauffman, E., Frick, P., & Steinberg, L. (April, 2016). The influence of father-child relationship quality on delinquency. Poster presented at the Society for Research on Adolescence, Baltimore.

Cauffman, E., Cavanagh, C., Simmons, C., Frick, P., & Steinberg, L. (April, 2016). Substance use among first time juvenile offenders. Paper presented as a part of a symposium entitled "Substance Use, Violence, and Health During Adolescence and the Transition to Adulthood," at the Society for Research on Adolescence, Baltimore.

Mahler, A., Cauffman, E., Frick, P., & Steinberg, L. (April, 2016). Expectations for future success among adolescent first-time offenders. Paper presented as a part of a symposium entitled "Expectations for the Future and Adolescent Adjustment," at the Society for Research on Adolescence, Baltimore.

Fine, A., Cavanagh, C., Donley, S., Steinberg, L., Frick, P., & Cauffman, E. (April, 2016). The role of peer arrests on the development of youths' attitudes towards the justice system. Paper presented as a part of a symposium entitled "Exploring Mechanisms of Legal Socialization During Adolescence," at the Society for Research on Adolescence, Baltimore.

Duell, N., Icenogle, G., Chein, J., & Steinberg, L. (April, 2016). A cross-cultural examination of the dual systems model of adolescent risk taking. Paper presented as a part of a symposium entitled "Advances in the Dual Systems Model of Adolescent Risk Taking," at the Society for Research on Adolescence, Baltimore.

Participant, "Current State of Affairs on Adolescent Risk-taking Research." Panel discussion at the Society for Research on Adolescence, Baltimore.

Wall, T., Salcedo, A., Frick, P., Ray, J., Thornton, L., Steinberg, L., & Cauffman, E. (March, 2016). Understanding the link between exposure to violence and aggression in justice-involved adolescents. Paper presented at the annual meeting of the American Psychology-Law Society, Atlanta.

Cohen, A., Breiner, K., Dellarco, D., Heller, A., Pedersen, G., Rudolph, M., . . . Casey, BJ. (September, 2015). When does an adolescent become an adult: The influence of emotion on the development of cognitive control. Paper presented at the 3rd Annual FLUX Congress, Leiden, The Netherlands.

Clark, J., Frick, P., Thornton, L., Ray, J., Steinberg, L., & Cauffman, E. (June, 2015). Parenting and conduct problems in first time male offender juveniles with callous-unemotional traits. Poster presented at the Society for the Scientific Study of Psychopathy, Chicago.

Thornton, L., Frick, P., Ray, J., Steinberg, L., & Cauffman, E. (June, 2015). Sex, drugs, and callous-unemotional traits in a sample of juvenile justice-involved males. Poster presented at the Society for the Scientific Study of Psychopathy, Chicago.

Silva, K., Shulman, L., Chein, J., & Steinberg, L. (May, 2015). Peers increase adolescents' exploratory behavior and sensitivity to positive and negative feedback. Poster presented at the Association for Psychological Science, New York.

Cohen, A., Breiner, K. Dellarco, D., Heller, A., Rudolph, M., Pedersen, G. . . .Casey, B.J. (April, 2015). Young adults act like adolescents under transient negative and sustained positive emotion. Poster presented at the Social and Affective Neuroscience Society, Boston.

Smith, A., Steinberg, L., & Chein, J. (March, 2015). Age-related changes in cortical thickness of the anterior insula. Poster presented at the Society for Research in Child Development, Philadelphia.

Shulman, E., & Steinberg, L. (March, 2015). Is there really anything wrong with today's twentysomethings? Poster presented at the Society for Research in Child Development, Philadelphia.

Rosenbaum, G., Botdorf, M., Steinberg, L., & Chein, J. (March, 2015). Working memory training in adolescents decreases laboratory risk taking in the presence of peers. Poster presented at the Society for Research in Child Development, Philadelphia.

Icenogle, G., & Steinberg, L. (March, 2015). Adolescent decision making: Pubertal status and age differentially predict behavior on the Iowa gambling task. Poster presented at the Society for Research in Child Development, Philadelphia.

Botdorf, M., Rosenbaum, G., Patrianakos, J., Steinberg, L., & Chein, J. (March, 2015). Gender differences in adolescent cognitive control in the face of emotional, but not non-emotional, stimuli. Poster presented at the Society for Research in Child Development, Philadelphia.

Duell, N., & Steinberg, L. (March, 2015). Predictors and benefits of school engagement in adolescent offenders. Poster presented at the Society for Research in Child Development, Philadelphia.

Smith, A., Steinberg, L., & Chein, J. (March, 2015). Increased engagement of reward-processing regions during peer observation reflects higher rates of risk-taking behaviors. Paper at a symposium entitled, "Peer Influence and Risky Decision-Making: Insight from Neuroimaging," Society for Research in Child Development, Philadelphia.

Fine, A., Cauffman, E., & Steinberg, L. (March, 2015). Impulsivity assessments and implications for predicting adolescent offending. Paper presented as a part of a symposium entitled "Development as Process: Delinquency, Substance Use, and Risk Taking During Adolescence," Society for Research in Child Development, Philadelphia.

Steinberg, L., & Breiner, K. (March, 2015). Is the increase in reward-seeking during adolescence universal? Paper presented as a part of a symposium entitled "Sensation Seeking Across Adolescence and Young Adulthood: National and Historical Variation in its Level, Growth, and Correlates," Society for Research in Child Development, Philadelphia.

Cauffman, E., Donley, S., Bechtold, J., & Steinberg, L. (November, 2014). Sensation seeking among at-risk adolescents: Findings from the Crossroads study. Paper presented at the annual meeting of the American Society of Criminology, San Francisco.

Ray, J., Frick, P., Thornton, L., Cauffman, E., & Steinberg, L. (November, 2014). Dispositional factors distinguish latent classes of delinquency and substance use: The moderating role of neighborhood context. Paper presented at the annual meeting of the American Society of Criminology, San Francisco.

Bruett, L., Drabick, D.A.G., Steinberg, L., Ridenour, T., Reynolds, M., & Tarter, R.E. (November, 2014). Prospective transactional influences of maternal psychological control, child emotion dysregulation, and child internalizing symptoms. Poster presented at the annual meeting of the Association for Behavioral and Cognitive Therapies, Philadelphia, PA.

Shulman, E., Bechtold, J., Cauffman, E., & Steinberg, L. (May, 2014). Partners in crime: Co-offending in adolescence and early adulthood. Paper presented at the annual meeting of the Life History Research Society, Pittsburgh.

Shulman, E., Monahan, K., & Steinberg, L. (March, 2014). Perceived risks and rewards of crime in adolescence and early adulthood. Paper presented as a part of a symposium entitled "Digging Deeper into Adolescent Risk-Taking: Individual and Contextual Factors," Society for Research on Adolescence, Austin.

Dmitrieva, J., Gibson, L., Steinberg, L., & Piquero, A. (March, 2014). Predictors and consequences of gang membership: Comparing gang members, gang leaders, and non-gang-affiliated adjudicated youth. Paper presented as a part of a symposium entitled "New Research on Risks, Correlates, and Consequences of Gang-Involvement for Adolescents," Society for Research on Adolescence, Austin.

Koski, J., Smith, A., Chein, J., Steinberg, L., & Olson, I. (March, 2014). The influence of social status on peer influence and risky decisions. Poster presented at the Society for Research on Adolescence, Austin.

Hamilton, J., Shulman, E., & Steinberg, L. (March, 2014). Psychosocial maturity as a mechanism linking childhood peer victimization and risky behavior in adolescence. Poster presented at the Society for Research on Adolescence, Austin.

Seltzer, M., Steinberg, L., & Alloy, L. (March, 2014). Adolescent racial identity: A person-focused analysis of the relationship between stressors and internalizing symptoms. Paper presented at the Anxiety and Depression Association of America, Chicago.

Potter, C., Steinberg, L., & Harden, P. (November, 2013). "Hooking up" in high school: Implications for future relationship satisfaction and depressive symptoms. Poster presented at the Association for Behavioral and Cognitive Therapies, Nashville.

Discussant, "Reforming Juvenile Justice: A Developmental Approach, a New Report from the National Research Council." (November, 2013). Association for Public Policy Analysis and Management, Washington.

Chein, J., Logue, S., Gould, T., Smith, A., & Steinberg, L. (September, 2013). Peer influences on approach and consummatory behavior during adolescence: Evidence from humans and mice. Paper presented at the 1st Annual FLUX Congress, Pittsburgh.

Smith, A., Chein, J., & Steinberg, L. (September, 2013). Peer influence on the receipt of reward during adolescence. Paper presented at the 1st Annual FLUX Congress, Pittsburgh.

Thornton, L., Ray, J., Frick, P., Kahn, R., Cauffman, E., & Steinberg, L. (June, 2013). The role of callous-unemotional traits in processing decision for first-time offenders. Poster presented at the Society for the Scientific Study of Psychopathy, Washington.

Discussant, "Examining Peer Influences on Adolescent Health Risk Behaviors: Behavioral Neuroscience, Genetic, and Socio-Contextual Perspectives." (April, 2013). Society for Research in Child Development, Seattle.

Discussant, "When is Adolescent Decision-Making Risky and Why? Evidence from Behavioral and Neuroimaging Studies." (April, 2013). Society for Research in Child Development, Seattle.

Cauffman, E., Cavanagh, C., & Steinberg, L. (April, 2013). Family matters: Taking stock of school discipline and arrest. Paper presented as a part of a symposium entitled "The School-to-Prison Pipeline: Pathways Between School, Arrest, and Detention," Society for Research in Child Development, Seattle.

Benson, L., Kern, M., Steinberg, E., & Steinberg, L. (April, 2013). An integrative approach to studying positive psychological and physical health from adolescence into adulthood. Poster presented at the Society for Research in Child Development, Seattle.

Bodie, J., Drabick, D., & Steinberg, L. (April, 2013). Risk for antisocial behavior among adolescents and young adults: The mediating role of psychosocial maturity. Poster presented at the Society for Research in Child Development, Seattle.

Weigard, A., Chein, J., Albert, D., Smith, A., & Steinberg, L. (April, 2013). Effects of peer presence on delay discounting in late adolescents: replication using an anonymous peer paradigm. Poster presented at the Society for Research in Child Development, Seattle.

Shields, B., Drabick, D., & Steinberg, L. (April, 2013). Impact of anxiety symptoms on the relation between deviant peer behavior and alcohol use among adolescent offenders. Poster presented at the Society for Research in Child Development, Seattle.

Chair, Paper session entitled "Paper Session: Individual and Contextual Predictors of Adolescent and Early Adulthood Risk Behaviors" (April, 2013). Society for Research in Child Development, Seattle.

Hampton, A., Drabick, D., & Steinberg, L. (April, 2013). Psychopathy and intelligence: Predictors of juvenile aggressive and income offending during a three-year follow-up period. Paper presented at the Society for Research in Child Development, Seattle.

Thornton, L., Frick, P., Ray, J., Cauffman, E., & Steinberg, L. (March, 2013). Adolescents with callous unemotional traits and their roles in group crime and non-detected offending. Paper presented at the American Psychology-Law Society, Portland, Oregon.

Ray, J., Frick, P., Thornton, L., Cauffman, E., & Steinberg, L. (March, 2013). Callous-unemotional traits distinguish subgroups of offenders among a sample of justice involved males: A latent class analysis. Paper presented at the American Psychology-Law Society, Portland, Oregon.

Cavanagh, C., Cauffman, E., Frick, P., & Steinberg, L. (March, 2013). Like mother, like son: Attitudes and antisocial behavior. Paper presented at the American Psychology-Law Society, Portland, Oregon.

Thomas, A., Cauffman, E., Frick, P., & Steinberg, L. (March, 2013). Effects of probation officer monitoring on juvenile offending: Influence of justice system attitudes. Paper presented at the American Psychology-Law Society, Portland, Oregon.

Smith, A., Chein, J., & Steinberg, L. (October, 2012). Peer influences on the integration of reward valuation and impulse control processes during adolescence. Poster presented at the Society for Neuroscience, New Orleans.

Invited participant, Symposium entitled "Adolescent Culpability and the Supreme Court—Challenges to the Use of Social Science in Advocacy" (August, 2012). American Psychological Association, Orlando.

Albert, D., Chein, J., Smith, A., Uckert, K., & Steinberg, L. (March, 2012). The future is now: Differences between adolescents and adults in neural and behavioral markers of intertemporal choice evaluation. Poster presented at the Cognitive Neuroscience Society, Chicago.

Smith, A., Chein, J., Weigard, A., & Steinberg, L. (March, 2012). Influence of peers on the calculation of risk in a probabilistic gambling task. Paper presented as a part of a symposium entitled "Factors Affecting Susceptibility to Peer Influence on Risky Behavior: The Role of Puberty, Situational Context, and Parenting," Society for Research on Adolescence, Vancouver.

Monahan, K., Cauffman, E., Steinberg, L., & Mulvey, E. (March, 2012). Patterns of antisocial behavior from adolescence to early adulthood: The development of psychosocial maturity. Paper presented as a part of a symposium entitled "Pulling Themselves Up or Getting Dragged Down: Diverse Pathways in Adolescent Risk-Taking," Society for Research on Adolescence, Vancouver.

Steinberg, L. (March, 2012). Toward a positive psychology of adolescence. Paper presented as a part of a symposium entitled "Positive Adolescent Health," Society for Research on Adolescence, Vancouver.

Steinberg, E., Kern, M., & Steinberg, L. (March, 2012). Positive psychological well-being as a predictor of adolescents' physical health. Paper presented as a part of a symposium entitled "Positive Adolescent Health," Society for Research on Adolescence, Vancouver.

Kretsch, N., Polk, R., Harden, K.P., & Steinberg, L. (March, 2012). Peer influence on risky decision-making: The role of pubertal status. Poster presented at the Society for Research on Adolescence, Vancouver.

Wurster, T., & Steinberg, L. (March, 2012). Gender differences and predictors of romantic conflict in adolescent relationships. Poster presented at the Society for Research on Adolescence, Vancouver.

Discussant, "Should I Stay or Should I Go? Social Influences on Risk-Taking in Adolescence and Early Adulthood at Neural and Behavioral Levels." (March, 2012). Society for Research on Adolescence, Vancouver.

Morrison, A., Heimberg, R., & Steinberg, L. (November, 2011). Voluntary attentional control moderates the development of anxiety in youth. Paper presented at the Association for Behavioral and Cognitive Therapies, Toronto.

Smith, A., Chein, J., & Steinberg, L. (November, 2011). Developmental differences in reward processing in the presence of peers. Paper presented at the Society for Neuroscience, Washington.

Monahan, K., Cauffman, E., & Steinberg, L. (April, 2011). Developmental differences in impulse control and antisocial behavior from adolescence to early adulthood. Paper presented as part of a symposium entitled "Individual Differences in Change in Impulsivity-Like Constructs from Childhood into Adolescence: Associations with Risky Behaviors," Society for Research in Child Development, Montreal.

Albert, D., Chein, J., Uckert, K., O'Brien, L., & Steinberg, L. (April, 2011). Task-dependent differences in the influence of peers on adolescent decision-making and reward processing. Paper presented as part of a symposium entitled "Self-Regulation During Adolescence: Neurobiological Mechanisms and Clinical Implications," Society for Research in Child Development, Montreal.

Keating, D., Houts, R., Morrison, F., & Steinberg, L. (April, 2011). Executive functioning and cognitive outcomes during adolescence. Paper presented as part of a symposium entitled "Executive Functioning, Psychosocial Development, and Adolescent Risk-Taking," Society for Research in Child Development, Montreal.

Albert, D., & Steinberg, L. (May, 2010). Resistance to peer influence moderates pathways from parental monitoring to early adolescent risk behavior. Paper presented as a part of a symposium entitled "Adolescents at Risk: Examining Variables that Predict Sex, Drug Use, and Self-Injury," Association for Psychological Science, Boston.

Boessen, A., Hipp, J., Cauffman, E., Fagan, J., & Steinberg, L. Youth transition and neighborhood effects: Residential instability among serious adolescent offenders. (November, 2009). Paper presented as a part of a symposium entitled "Linking the Micro to the Macro for Understanding Patterns of Crime," American Society for Criminology, Philadelphia.

Maslowsky, J., Buvinger, E., Keating, D., & Steinberg, L. (March, 2010). Cost/benefit analysis mediation of the relationship between sensation seeking and risk behavior. Paper presented as part of a symposium titled "Why Do Risk Behaviors Increase During Adolescence? New Studies on Individual and Developmental Mechanisms," Society for Research on Adolescence, Philadelphia.

Keating, D., Houts, E., Steinberg, L., & Morrison, F. (March, 2010). Executive function and adolescent risk behavior in a national sample. Paper presented as part of a symposium titled "Why Do Risk Behaviors Increase During Adolescence? New Studies on Individual and Developmental Mechanisms," Society for Research on Adolescence, Philadelphia.

Discussant, "Why Do Risk Behaviors Increase During Adolescence? New Studies on Individual and Developmental Mechanisms." (March, 2010). Society for Research on Adolescence, Philadelphia.

Chair, "Using Propensity Score Matching to Control for Selection Effects in Research on Extracurriculars, Employment, and Media Exposure" (March, 2010). Society for Research on Adolescence, Philadelphia.

Steinberg, L. (March, 2010). Does Exposure to Sexy Media Lead Adolescents to Have Sex? A Reanalysis and a New Conclusion. Paper presented as part of a symposium titled "Using Propensity Score Matching to Control for Selection Effects in Research on Extracurriculars, Employment, and Media Exposure," Society for Research on Adolescence, Philadelphia.

Hodgdon, H., & Steinberg, L. (March, 2010). The impact of emotional maltreatment on aggression in a sample of serious juvenile offenders. Poster presented at the Society for Research on Adolescence, Philadelphia.

O'Brien, L., & Steinberg, L. (March, 2010). Peer influence on delay discounting. Poster presented at the Society for Research on Adolescence, Philadelphia.

Discussant, "Family and Peer Relations in Adolescence: Insights from Developmental Social Neuroscience." (March, 2010). Society for Research on Adolescence, Philadelphia,

Chung, H., Mulvey, E., & Steinberg, L. (March, 2010). Neighborhood context and depressive symptoms: A focus on serious juvenile offenders. Paper presented as a part of a symposium titled "Neighborhood Influences on Adolescent Mental Health and Behavior: A Dynamic, Process-Oriented Perspective," Society for Research on Adolescence, Philadelphia, March, 2010.

Cauffman, E., Boessen, A., Hipp, J., Fagan, J., & Steinberg, L. (March, 2010). The Impact of Residential Instability on Juvenile Offending. Paper presented as a part of a symposium titled "Neighborhood Influences on Adolescent Mental Health and Behavior: A Dynamic, Process-Oriented Perspective," Society for Research on Adolescence, Philadelphia, March, 2010.

Albert, D., Steinberg, L., & Banich, M. (March, 2010). Age differences in strategic planning as indexed by the Tower of London. Paper presented as part of a symposium titled "Immature, Impetuous, and Imprisoned: Examining the Relation Between Psychosocial Capacities and Antisocial Tendencies," Society for Research on Adolescence, Philadelphia.

Monahan, K., Steinberg, L., & Cauffman, E. (March, 2009). Age differences in peer selection, peer socialization, and offending: The role of resistance to peer influence. Paper presented at the American Psychology-Law Society, San Antonio.

Hodgdon, H., & Steinberg, L. (April, 2009). The impact of child maltreatment and emotional regulation on mental health in a sample of juvenile offenders. Paper presented as part of a symposium entitled "Risk Factors for Antisocial Behavior: Gender Differences and Similarities," Society for Research in Child Development, Denver.

Chein, J., DiSorbo, A., Albert, D., O'Brien, L., Eagan, D., & Steinberg, L. (April, 2009). Neural markers of peer influence on adolescent risk taking. Paper presented as part of a symposium entitled "Neuroimaging Peer Relations in Adolescence: fMRI Studies of Peer Influence, Peer Evaluation, and Social Exclusion," Society for Research in Child Development, Denver.

Chair, organizer, and discussant, "Neuroimaging Peer Relations in Adolescence: fMRI Studies of Peer Influence, Peer Evaluation, and Social Exclusion." (April, 2009). Society for Research in Child Development, Denver.

Dmitrieva, J., & Steinberg, L. (April, 2009). Services that work: In search of juvenile justice programs that reduce recidivism. Paper presented as part of a symposium entitled "Improving Functioning of Incarcerated Adolescents: Effectiveness of Formal and Informal Interventions," Society for Research in Child Development, Denver.

Steinberg, L., & Burchinal, M. (April, 2009). What matters most? Differential impact of early child care versus early parenting on adolescent functioning. Paper presented as part of a symposium entitled "Effects of Early Childcare and Parenting in Adolescence: New Results of The NICHD Study of Early Child Care and Youth Development," Society for Research in Child Development, Denver.

Vandell, D., Belsky, J., Burchinal, M., & Steinberg, L. (April, 2009). The NICHD Early Child Care Research Network Do Effects of Early Child Care Extend to Age 15 Years? Results from the NICHD Study of Early Child Care. Paper presented as part of a symposium entitled "Effects of Early Childcare and Parenting in Adolescence: New Results of The NICHD Study of Early Child Care and Youth Development," Society for Research in Child Development, Denver.

Booth-LaForce, C., Roisman, G., Susman, E., Barnett-Walker, K., Owen, M., Belsky, J., Bradley, R., Houts, R., Steinberg, L., & The NICHD Early Child Care Research Network. (April, 2009). Early parenting and child-care antecedents of awakening cortisol levels in adolescence. Paper presented as part of a symposium entitled "Effects of Early Childcare and Parenting in Adolescence: New Results of The NICHD Study of Early Child Care and Youth Development," Society for Research in Child Development, Denver.

Belsky, J., Steinberg, L., Houts, R., & Halpern-Felsher, B. (April, 2009). The development of reproductive strategy in females: Harsh maternal control, early menarche, increased sexual risk taking. Paper presented as part of a symposium entitled "The Belsky, Steinberg, and Draper Evolutionary Theory of Socialization: Prospects and Pitfalls," Society for Research in Child Development, Denver.

Albert, D., O'Brien, L., DiSorbo, A., Uckert, K., Eagan, D., Chein, J., & Steinberg, L. (April, 2009). Peer influences on risk taking in young adulthood. Poster presented at the Society for Research in Child Development, Denver.

O'Brien, L., & Steinberg, L. (April, 2009). Predicting externalizing behavior across middle childhood: The role of planning. Poster presented at the Society for Research in Child Development, Denver.

Steinberg, L. (April, 2009). A social neuroscience perspective on adolescent risk-taking. Paper presented as part of a symposium entitled "Current Theories of Adolescent Risk Taking," Society for Research in Child Development, Denver.

Burchinal, M., McCartney, K., & Steinberg, L. (April, 2009). Examining the black-white achievement gap among low-income children in the NICHD Study of Early Child Care. Paper presented as part of a symposium entitled "Early Achievement Disparities by Race/Ethnicity and Social Class: Strengthening our Understanding of Process," Society for Research in Child Development, Denver.

DiSorbo, A., Albert, D., O'Brien, L., Steinberg, L., & Chein, J. (November, 2008). Adolescent risk-taking: Socio-emotional neural system vulnerability to peer influence. Poster presented at the Society for Neuroscience, Washington.

Chassin, L., Dmitrieva, J., Knight, G., Modecki, K., Cauffman, E., Steinberg, L., & Losoya, S. (July, 2008). Does adolescent alcohol and marijuana use suppress the development of psychosocial maturity? Paper presented as a part of a workshop entitled "Alcohol Use and Problems over Time: Latent Growth Curve Models in Alcohol Research," Research Society on Alcoholism, Washington.

Dmitrieva, J., Farruggia, S., Cauffman, E., & Steinberg, L. (March, 2008). A VIP in need is a VIP indeed: The role of very important caring adults in adjustment of juvenile offenders. Paper presented as part of a symposium entitled "Important Non-Parental Adults in the Lives of High-Risk Youth," Society for Research on Adolescence, Chicago.

Panelist, "SRA from Birth to Maturity: A Roundtable on the First 22 Years." (March, 2008). Society for Research on Adolescence, Chicago,

Monahan, K., Steinberg, L., Mulvey, E., & Cauffman, E. (March, 2008). Trajectories of offending among serious adolescent offenders. Paper presented as part of a symposium entitled "Trajectories of Problem Behavior from Adolescence Through Adulthood: Evidence From the U.S., New Zealand, and Puerto Rico," Society for Research on Adolescence, Chicago.

Monahan, K., & Steinberg, L. (March, 2008). The impact of residential transition on antisocial behavior during adolescence. Poster presented at the Society for Research on Adolescence, Chicago.

Dmitrieva, J., Steinberg, L., & Cauffman, E. (March, 2008). Arrested development: The effects of incarceration experiences on adolescents' development of psychosocial maturity. Paper presented as part of a symposium entitled "Contact with the Juvenile Justice System and Adolescent Psychosocial Adjustment," Society for Research on Adolescence, Chicago.

Chair, organizer, and discussant, "Neural Underpinnings of Psychosocial Maturity: Cross-National Findings from Three Studies." (March, 2008). Society for Research on Adolescence, Chicago.

Cauffman, E., Shulman, E., Claus, E., Banich, M., Graham, S., Woolard, J., & Steinberg, L. (March, 2008). Responding to reward versus punishment: How adolescents differ from adults in performance on the Iowa Gambling Task. Paper presented as part of a symposium entitled "Neural Underpinnings of Psychosocial Maturity: Cross-National Findings from Three Studies," Society for Research on Adolescence, Chicago.

Rankin, L., & Steinberg, L. (March, 2008). Does parenting have enduring effects on patterns of competency and adjustment among serious juvenile offenders? Poster presented at the Society for Research on Adolescence, Chicago.

Dmitrieva, J., & Steinberg, L. (March, 2008). Adolescent offenders' sense of self-worth: Exaggerated for leaders but low for followers. Poster presented at the Society for Research on Adolescence, Chicago.

Discussant, "The Brain Bases of Executive Control and Reward Processing in Adolescence" (March, 2008). Society for Research on Adolescence, Chicago.

Albert, D., Woolard, J., & Steinberg, L. (March, 2008). The development of strategic planning: Age differences on the Tower of London. Poster presented at the Society for Research on Adolescence, Chicago.

Maslowsky, J., Keating, D., Banich, M., Cauffman, E., Steinberg, L., & Woolard, J. (March, 2008). Reasoned versus reactive risk taking: Unique contributions of impulsivity and risk assessment to adolescent risk behavior. Poster presented at the Society for Research on Adolescence, Chicago.

Sood, E., & Steinberg, L. (August, 2007). The role of potential protective factors for substance use among early- and non-early-maturing girls. Poster presented at the American Psychological Association, San Francisco.

Monahan, K., O'Brien, L., Steinberg, L., & Dmitrieva, J. (May, 2007). Impulsivity, anxiety, and offending: the role of context. Paper presented as a part of a symposium entitled "Interaction Effects of Personality Traits and Context on Problem Behaviors: Early Childhood Through Adolescence," American Psychological Society, Washington.

Monahan, K., Steinberg, L., & Cauffman, E. (March, 2007). Peer groups and deviant behavior: the role of friendship quality and resistance to peer influence. Paper presented as part of a symposium entitled "Peer Relations of Aggressive and Delinquent Youth," Society for Research in Child Development, Boston.

Goldweber, A., Cauffman, E., Piquero, A., & Steinberg, L. (March, 2007). Peer relationships and offending: what distinguishes group from solo offenders? Paper presented as part of a symposium entitled "Peer Relations of Aggressive and Delinquent Youth," Society for Research in Child Development, Boston.

Bubier, J., & Steinberg, L. (March, 2007). Psychological adjustment among adolescents: does having friends outside of school make things better or worse? Poster presented at the Society for Research in Child Development, Boston.

Lee, J., & Steinberg, L. (March, 2007). Ethnic identity and attitudes towards the police among African American juvenile offenders. Poster presented at the Society for Research in Child Development, Boston.

Monahan, K., & Steinberg, L. (March, 2007). Gainful activity and adolescent offending: The role of employment and school attendance. Paper presented as a part of a symposium entitled "An Evaluation of Biological and Environmental Influences on Trajectories of Externalizing Behaviors Across the Lifespan," Society for Research in Child Development, Boston.

Hodgdon, H., & Steinberg, L. (March, 2007). The impact of childhood maltreatment on adolescent psychological functioning and the effects of peer support. Poster presented at the Society for Research in Child Development, Boston.

Belsky, J., Steinberg, L., Houts, R., Friedman, S., DeHart, G., Cauffman, E., et al., (March, 2007). Rearing antecedents of pubertal timing. Paper presented as a part of a symposium entitled "Gene X Environment Interaction and Differential Susceptibility: Promising Avenues for the Study of Child Development," Society for Research in Child Development, Boston.

Blatt-Eisengart, I. & Steinberg, L. (November, 2006). Sex differences in the longitudinal relations among risk and protective factors and adolescent antisocial behavior. Poster presented at the Association for Cognitive and Behavioral Therapies, Chicago.

Steinberg, L. (August, 2006). How developmental science informs decisions about juvenile justice policy and practice. Paper presented as a part of an invited symposium entitled "Developmental Science: An Interdisciplinary Approach to Understanding Development," American Psychological Association, New Orleans.

Testa, C., & Steinberg, L. (August, 2006). Depression and health risk-taking during adolescence. Poster presented at the American Psychological Association, New Orleans.

Keyser, J., & Steinberg, L. (August, 2006). Impact of ethnicity, socio-economic status, sexual attraction, and family structure on dieting among adolescent girls. Poster presented at the American Psychological Association, New Orleans.

Chair, "The MacArthur Juvenile Capacity Study: A New Approach to the Study of Adolescent Cognitive Development." (March, 2006). Society for Research on Adolescence, San Francisco.

Steinberg, L. (March, 2006). A new approach to the study of adolescent cognitive development. Paper presented as part of a symposium entitled "The MacArthur Juvenile Capacity Study: A New Approach to the Study of Adolescent Cognitive Development," Society for Research on Adolescence, San Francisco.

Graham, S., & Steinberg, L. (March, 2006). Age differences in future orientation. Paper presented as part of a symposium entitled "The MacArthur Juvenile Capacity Study: A New Approach to the Study of Adolescent Cognitive Development," Society for Research on Adolescence, San Francisco.

Discussant, "Transactional Relations between Adolescents and Parents: Who Influences Whom?" (March, 2006). Society for Research on Adolescence, San Francisco.

Discussant, "Parent-Adolescent Relations and Adolescent Internalizing and Externalizing Behaviors." (Match, 2006). Society for Research on Adolescence, San Francisco.

Von Bank, H., Brown, B., & Steinberg, L. (March, 2006). Does awareness of peer crowd affiliation affect self-concept and well-being? a longitudinal, symbolic interactionist study. Paper presented as part of a symposium entitled "Peer Groups, Crowds, and the Social Network: The Longitudinal Study of Adolescent Peer Relationships," Society for Research on Adolescence, San Francisco.

Testa, C., & Steinberg, L. (March, 2006). Overweight adolescents' struggle to lose: outcomes of dieting and exercise. Poster presented at the Society for Research on Adolescence, San Francisco.

Wilson, K., Lee, J., & Steinberg, L. (March, 2006). Adolescent sexual activity: links between relational context and depression. Poster presented at the Society for Research on Adolescence, San Francisco, March, 2006.

Wilson, K., Steinberg, L., & Alloy, L. (March, 2006). A test of the hopelessness theory of depression in adolescence. Poster presented at the Society for Research on Adolescence, San Francisco.

Blatt-Eisengart, I., Drabick, D., & Steinberg, L. (March, 2006). Sex differences in the longitudinal relations among family risk factors and preadolescent externalizing symptoms. Poster presented at the Society for Research on Adolescence, San Francisco.

Piquero, A., Fagan, J., Mulvey, E., Steinberg, L., & Odgers, C. (November, 2005). Developmental Trajectories of legal socialization among serious adolescent offenders. Paper presented as a part of a symposium entitled "Legitimacy, Procedural Justice, and Compliance," American Society of Criminology, Toronto.

Steinberg, L. (August, 2005). Between and rock and a soft place: Developmental research and the child advocacy process. Paper presented as a part of a symposium entitled "Psychology and Children: Translating Research into Better Policy and Services," American Psychological Association, Washington.

Discussant, "The Unintended Consequences of Social Policy on Youth Development." (April, 2005). Society for Research in Child Development, Atlanta,

Discussant, "Environmental Chaos and Children's Development: Expanding the Boundaries of Chaos." (April, 2005). Society for Research in Child Development, Atlanta.

Chung, H., Little, M., & Steinberg, L. (November, 2004). The transition to adulthood for juvenile offenders: A developmental perspective. Paper presented as part of symposium entitled "On Your Own Without a Net: The Transition to Adulthood for Youth Involved in the Justice System," American Criminological Society, Nashville.

Piquero, A., Cauffman, E., Mulvey, E., & Steinberg, L. (November, 2004). Predicting disposition among serious juvenile offenders: Who gets locked up? Paper presented as part of symposium entitled "New Findings from the Pathways to Desistance Study," American Criminological Society, Nashville.

Gardner, M., Steinberg, L., & Garrett, R. (April, 2004). Risk-Taking Across Three Age Groups: The Role of Susceptibility to Peer Influence. Poster presented at the Conference on Human Development, Washington.

Cauffman, E., Schubert, C., & Steinberg, L. (March, 2004). Romantic relationships among serious adolescent offenders: Gender similarities and differences. Paper presented as a part of a symposium entitled "Improving Our Understanding of Female Offending," American Psychology-Law Society, Scottsdale, Arizona.

Cauffman, E., Piquero, A., Mulvey, E., & Steinberg, L. (March, 2004). Predicting disposition among serious juvenile offenders: Who gets locked up? Paper presented as a part of a symposium entitled "Sanctions and Services for Serious Juvenile Offenders: Findings from the Pathways to Desistance Study," American Psychology-Law Society, Scottsdale, Arizona.

Participant, invited conversation hour, "Human Subjects Issues in Research with Adolescents," Society for Research on Adolescence, Baltimore, March, 2004.

Chair and organizer, "Predictors of Re-Offending in a Sample of Serious Juvenile Offenders," (March, 2004). Society for Research on Adolescence, Baltimore.

Cauffman, E., & Steinberg, L. (March, 2004). Psychosocial maturity and recidivism among adolescent offenders. Paper presented as a part of a symposium entitled "Predictors of Re-Offending in a Sample of Serious Juvenile Offenders," Society for Research on Adolescence, Baltimore.

Steinberg, L., & Chung, H. (April, 2003). Variations in patterns of offending: The impact of family and neighborhood. Paper presented as part of a symposium entitled "The Psychological Development of Serious Juvenile Offenders: The MacArthur Study of Pathways to Desistance," Society for Research in Child Development, Tampa, Florida.

Discussant, "Adolescent Decision Making and Drug Abuse." (April, 2003). Society for Research in Child Development, Tampa, Florida.

Steinberg, L. (November, 2002). Familial and neighborhood correlates of serious juvenile offending. Paper presented as a part of a symposium entitled "Serious Juvenile Offending," American Society of Criminology, Chicago.

Chair, "Juveniles' Competence to Stand Trial: The MacArthur Study." (August, 2002). American Psychological Association, Chicago.

Steinberg, L. (August, 2002). Age differences in capacities underlying competence to stand trial. Paper presented as part of a symposium entitled "Juveniles' Competence to Stand Trial: The MacArthur Study," American Psychological Association, Chicago.

Chair, "Adolescents' Competence to Stand Trial as Adults: The MacArthur Juvenile Competence Study." Society for Research on Adolescence, New Orleans, April, 2002.

Steinberg, L. (April, 2002). Age differences in capacities underlying competence to stand trial. Paper presented as part of a symposium entitled "Juveniles' Competence to Stand Trial," Society for Research on Adolescence, New Orleans.

Discussant, "Emotion Regulation in Adolescence." (April, 2002). Society for Research on Adolescence, New Orleans.

Invited presenter, symposium entitled "What is the Meaning of Good Science in the Field of Adolescent Development?" (April, 2002). Society for Research on Adolescence, New Orleans.

Steinberg, L. (March, 2002). Age differences in capacities underlying competence to stand trial. Paper presented as part of a symposium entitled "Juveniles' Competence to Stand Trial," American Psychology and Law Society, Austin, Texas.

Steinberg, L. (March, 2002). The juvenile psychopath: Fads, fictions, and facts. Paper presented as part of a symposium entitled "Recent Research and Legal Developments on Juvenile Psychopathy," American Psychology and Law Society, Austin, Texas.

Discussant, symposium entitled "Gender, Mental Disorder, and Juvenile Justice." (November, 2001). American Society of Criminology, Atlanta.

Chair, "A New Framework for Studying Adolescent Development and Psychopathology." (April, 2001). Society for Research in Child Development, Minneapolis.

Discussant, "Pathways to Parental Knowledge: Monitoring Research in the 21st Century." (April, 2001). Society for Research in Child Development, Minneapolis.

Discussant, "The Impact of Exposure to Community Violence On Children and Youth: Fact or Fluke." (April, 2001). Society for Research in Child Development, Minneapolis.

Discussant, "Assessment of Psychopathy Among Adolescents and Adults: Developmental and Legal Implications." (November, 2000). American Criminological Society, San Francisco.

Steinberg, L., & Cauffman, E. (March, 2000). A developmental perspective on the commission, investigation, and judgment of adolescent crime. Paper presented as a part of a symposium entitled, "Justice for Juveniles: Factors Relating to the Commission, the Investigation, and the Judgment of Adolescent Crime," American Psychology and Law Society, New Orleans.

Discussant, "Autonomy during Adolescence: Developmental Processes in Diverse Contexts." (March, 2000). Society for Research on Adolescence, Chicago.

Organizer and chair, "Lethal Violence in American Schools: Rhetoric, Reality, and Rational Responses." (November, 1999). American Society of Criminology, Toronto.

Steinberg, L., & Cauffman, E. (November, 1999). A developmental perspective on school violence. Paper presented as a part of an invited symposium entitled "Lethal Violence in American Schools: Rhetoric, Reality, and Rational Responses," American Society of Criminology, Toronto.

Steinberg, L. (July, 1999). A developmental perspective on the transfer of adolescents to adult court. Paper presented as a part of an invited symposium entitled "Separating the Men from the Boys: Thresholds for Criminal Punishment of Adolescent Offenders," American Psychology and Law Society and the European Psychology and Law Society, Dublin.

Discussant, "Methodological Challenges in Research with Racial and Ethnic Minority Populations: The Unspoken Issues." (April, 1999). Society for Research in Child Development, Albuquerque.

Steinberg, L. (April, 1999). Should juvenile offenders be tried as adults? A developmental perspective on changing legal policies. Paper presented as a part of an invited symposium entitled "The Changing Landscape for Children: Important Issues as We Enter the Millennium," Society for Research in Child Development, Albuquerque.

Chair and organizer, "Should Violent Juvenile Offenders Be Tried as Adults?" (February, 1998). Society for Research on Adolescence, San Diego.

Steinberg, L., Avenevoli, S., & Hecker, T. (March, 1998). Developmental perspectives on waiver of adolescents to adult court. Paper presented as part of an invited symposium entitled, "Should Violent Juvenile Offenders Be Tried as Adults?" Society for Research on Adolescence, San Diego.

Invited participant, "Healthy Sexuality in Adolescence." (February, 1998). Society for Research on Adolescence, San Diego.

Discussant, "Adolescence and the Law: Developmental Perspectives." (April, 1997). Society for Research on Child Development, Washington,

Discussant, "Children's Perspectives on the Family System." (April, 1997). Society for Research on Child Development, Washington.

Steinberg, L. & Avenevoli, S. (June, 1996). Disengagement from school and problem behavior in adolescence: A developmental-contextual analysis of the influences of family and part-time work. Conference on New Perspectives on Adolescent Risk Behavior, UCLA, Los Angeles.

Steinberg, L., and Greene, M. (March, 1996). Is 'Americanization' bad for adolescents' achievement and mental health? Paper presented as a part of a symposium on "The Development of Immigrant Adolescents," Society for Research on Adolescence, Boston.

Invited participant, "Conceptual and Methodological Issues in Research on Parenting." (March, 1996). Society for Research on Adolescence, Boston, March, 1996.

Steinberg, L., & Cauffman, E. (September, 1995). Adolescent development and adolescent decision-making. Temple University Law School Conference on Children's Rights, Philadelphia.

Discussant, "Developmental Processes: Similar or Different Across Ethnic and Racial Groups?" (March, 1995). Society for Research in Child Development, Indianapolis.

Cauffman, E., & Steinberg, L. (March, 1995). Moderating effects of neighborhood parenting on family socialization processes. Paper presented as part of a symposium entitled "Community Effects on Adolescent Development: New Approaches to the Study of Neighborhoods and Their Impact," Society for Research in Child Development, Indianapolis.

Chair and organizer, "Community Effects on Adolescent Development: New Approaches to the Study of Neighborhoods and Their Impact." (March, 1995). Society for Research in Child Development, Indianapolis.

Fletcher, A., & Steinberg, L. (February, 1994). Generational status and country of origin as influences on the psychological adjustment of Asian-American adolescents. Paper presented as part of a symposium entitled "Psychosocial Adjustment of Asian-American Adolescents," Society for Research on Adolescence, San Diego.

Participant, "Roundtable Discussion on Parent-Peer Linkages in Adolescence." (February, 1994). Society for Research on Adolescence, San Diego.

Participant, "Roundtable Discussion on Adolescent Sexuality." (February, 1994). Society for Research on Adolescence, San Diego.

Lamborn, S., Steinberg, L., Darling, N., Mounts, N., & Dornbusch, S. (April, 1993). Adolescents' perceptions of parenting styles: Short-term longitudinal implications for adjustment. Paper presented at the American Educational Research Association, Atlanta.

Steinberg, L., Fletcher, A., & Darling, N. (March, 1993). Influence of parental authoritativeness in the adolescent's peer network on adolescent misconduct. Paper presented as a part of a symposium entitled "Interactive Influences of Parents and Peers on Adolescent Misbehavior," Society for Research in Child Development, New Orleans.

Darling, N., Steinberg, L., & Gringlas, M. (March, 1993). Community integration and value consensus as forces for adolescent socialization: A Test of the Coleman and Hoffer hypothesis. Paper presented as a part of a symposium entitled "Community and Neighborhood Influences on Adolescent Behavior," Society for Research in Child Development, New Orleans.

Fletcher, A., Darling, N., & Steinberg, L. (May, 1992). Parenting practices as moderators of peer influence on adolescent deviance. Paper presented at the Society for Life History Research, Philadelphia.

Discussant, PRIDE Conference on the Impact of Social Context on Early Adolescent Trajectories (October, 1992). Pennsylvania State University, University Park, PA.

Discussant, "Psychosocial Antecedents of the Timing of Puberty." (March, 1992). Society for Research on Adolescence, Washington.

Steinberg, L., & Lamborn, S. (March, 1992). Autonomy redux: Adolescent adjustment as a joint function of emotional autonomy and relationship security. Paper presented as a part of a symposium entitled "Adolescent Autonomy: Is It All It's Cracked Up to Be?" Society for Research on Adolescence, Washington.

Steinberg, L., & Weinmann, L. (July, 1991). Adolescent adjustment as a function of timing of parental divorce and remarriage. Paper presented as a part of a symposium entitled "Adolescents and Divorce: International Perspectives from Longitudinal Research," International Society for the Study of Behavioural Development, Minneapolis.

Steinberg, L., & Darling, N. (May, 1991). The broader context of social influence in adolescence. Paper presented at an international conference on "The Development of Motivational Systems in Adolescence: Interindividual Differences and Contextual Factors in Interaction," German Research Foundation and the University of Geissen, Schloss Rauischholzhausen, Germany.

Steinberg, L., Mounts, N., Lamborn, S., & Brown, B. (April, 1991). Authoritative parenting and adolescent adjustment across varied ecological niches. Paper presented as a part of a symposium entitled "Authoritative Parenting and Adolescent Adjustment," Society for Research in Child Development, Seattle.

Mounts, N., Brown, B., Lamborn, S., & Steinberg, L. (April, 1991). Parenting style and crowd membership: Contributions to adolescent development. Paper presented as a part of a symposium entitled "From Family to Peer: Family Influences on Peer Relations from Early Childhood through Adolescence," Society for Research in Child Development, Seattle.

Chair and organizer, "Social Influences on Maturational Timing." (March, 1990). Society for Research on Adolescence, Atlanta.

Belsky, J., & Steinberg, L. (March, 1990). Toward a biosocial theory of pubertal timing. Paper presented as part of a symposium entitled "Social Influences on Maturational Timing," Society for Research on Adolescence, Atlanta.

Dornbusch, S., Steinberg, L., & Ritter, P. (March, 1990). Ethnic differences in beliefs about the value of school success: An empirical assessment of Ogbu's hypothesis. Paper presented as part of a symposium entitled "Ethnic Variations in Adolescent Experience," Society for Research on Adolescence, Atlanta.

Brown, B., Steinberg, L., Mounts, N., & Philipp, M. (March, 1990). The comparative influence of peers and parents on high school achievement: Ethnic differences. Paper presented as part of a symposium entitled "Ethnic Variations in Adolescent Experience," Society for Research on Adolescence, Atlanta.

Bogenschneider, K., & Steinberg, L. (August, 1989). Maternal employment and adolescent achievement: A process model. Paper presented as a part of a symposium entitled "Maternal Employment and Child Outcomes: New Perspectives on 'Process' Issues," American Psychological Association, New Orleans.

Speaker, John P. Hill Memorial Symposium. (April, 1989). Society for Research in Child Development, Kansas City.

Mounts, N., Lamborn, S., & Steinberg, L. (April, 1989). Relations between family process and school achievement in different ethnic contexts. Paper presented as a part of a symposium entitled "Ethnic Comparisons of Parent and Peer Influences on Adolescent Development," Society for Research in Child Development, Kansas City.

Steinberg, L. (March, 1989). Parenting adolescent achievers: When families make a difference (and when they don't). Paper presented as a part of a symposium entitled "The Ecology of Student Achievement in High Schools: Noninstructional Influences," American Educational Research Association, San Francisco.

Steinberg, L., & Brown, B. (March, 1989). Beyond the classroom: Family and peer influences on high school achievement. Invited paper presented to the Families as Educators special interest group, American Educational Research Association, San Francisco.

Lamborn, S., Brown, B., & Steinberg, L. (March, 1989). The social contexts of adolescence: Influences on student engagement. Paper presented as a part of a symposium entitled "Student Engagement in High Schools," American Educational Research Association, San Francisco.

Discussant, "Hormone Contributions to Adolescent Behavior." (March, 1988). Society for Research on Adolescence, Alexandria, Virginia,

Steinberg, L., & Elmen, J. (March, 1988). Authoritative parenting and school success. Paper presented as a part of a symposium entitled "Noninstructional Influences on Adolescents' School Achievement: An Ecological Approach," Society for Research on Adolescence, Alexandria, Virginia.

Elmen, J., & Steinberg, L. (March, 1988). Achievement orientation in early adolescence: Social correlates and developmental patterns. Paper presented at the Society for Research on Adolescence, Alexandria, Virginia.

Steinberg, L. (November, 1987). Reciprocal relation between marital happiness and child development among midlife parents of teenagers. Paper presented as a part of a symposium entitled "Marriage, Parenting, and Child Development: Reciprocal Relationships," National Council on Family Relations, Atlanta.

Steinberg, L. (April, 1987). Pubertal status, hormonal levels, and family relations: The distancing hypothesis. Paper presented as a part of a symposium entitled "Hormone Status at Puberty: Consequences for Adolescents and Their Families," Society for Research in Child Development, Baltimore.

Steinberg, L. (April, 1987). Emotional autonomy, parental permissiveness, and adolescents' susceptibility to antisocial peer pressure. Paper presented as a part of a symposium entitled "Family and Peer Influences on Adolescent Problem Behavior," Society for Research in Child Development, Baltimore.

Steinberg, L. (March, 1986). Recent research in adolescent development. Invited workshop, Society for Adolescent Medicine, Boston.

Silverberg, S., & Steinberg, L. (March, 1986). Adolescent individuation and adult identity. Paper presented at the Society for Research on Adolescence, Madison, Wisconsin.

Steinberg, L., & Silverberg, S. (August, 1985). Emotional autonomy during early adolescence. Paper presented as a part of a symposium entitled "Family Factors in Adolescent Development: Recent Research," American Psychological Association, Los Angeles.

Steinberg, L., & Greenberger, E. (July, 1985). The changing ecology of adolescent development. Invited presentation as a part of a symposium entitled "Adolescent Development in Context," International Society for the Study of Behavioural Development, Tours, France.

Co-organizer, "Youth Employment and Unemployment." (July, 1985). International Society for the Study of Behavioural Development, Tours, France,

Steinberg, L. (April, 1985). Emotional autonomy in early adolescence. Paper presented as a part of a symposium entitled "Parent-Child Relations in the Transition to Adolescence: Family Adaptations to Developmental Change," Society for Research in Child Development, Toronto.

Steinberg, L. (March, 1985). The ABCs of transformations in family relations at adolescence: Changes in affect, behavior, and cognition. Paper presented at the Third Biennial Conference on Adolescence Research, Tucson.

Greenberger, E., & Steinberg, L. (August, 1981). Part-time employment of youth during high school. Paper presented as a part of a symposium entitled "Youth and Work in Cross-Cultural Perspective," American Anthropological Association, Los Angeles.

Greenberger, E., & Steinberg, L. (August, 1981). The workplace as a context for the socialization of youth. Paper presented at the annual meeting of the American Psychological Association, Los Angeles.

Chair, "Working: Effects of Early Work Experience on Adolescent Development." (April, 1981). Society for Research in Child Development, Boston.

Steinberg, L., Catalano, R., & Dooley, D. (April, 1981). Economic antecedents of child maltreatment. Paper presented at the Society for Research in Child Development, Boston.

Steinberg, L., & Greenberger, E. (April, 1981). Is work experience valuable? Some unanswered questions. Paper presented as a part of a symposium entitled "Evaluating School-to-Work Transition Models," American Educational Research Association, Los Angeles.

Steinberg, L., Greenberger, E., & Garduque, L. (August, 1980). Adolescent learning and intellectual development: The contribution of work. Paper presented at the American Psychological Association, Montreal.

Greenberger, E., Steinberg, L., & Vaux, A. (April, 1980). Adolescents in the workplace: Effects of part-time employment on family and peer relations. Paper presented at the Western Psychological Association, Honolulu.

Steinberg, L., Greenberger, E., & Garduque, L. (April, 1980). Part-time employment during adolescence: Costs and benefits to schooling and learning. Paper presented at the Western Psychological Association, Honolulu.

Discussant, "Symposium on Maternal Stress" (April, 1980). Western Psychological Association, Honolulu.

Steinberg, L., & Greenberger, E. (June, 1979). Continuities and discontinuities in occupational development: The nature and effects of early adolescent work. Paper presented at the International Society for the Study of Behavioural Development, Lund, Sweden.

Steinberg, L., & Greenberger, E. (April, 1979). Part-time employment during high school: Some costs and benefits to schooling and learning. Paper presented as a part of a symposium entitled "*Youth: Transition to Adulthood* Reconsidered: The Place of Work in the Education of Adolescents," at the American Educational Research Association, Boston.

Steinberg, L. (April, 1979). Changes in family relations at puberty. Paper presented as a part of a symposium entitled "Psychological Correlates of Pubertal Changes," Society for Research in Child Development, San Francisco.

Steinberg, L., & Green, C. (April, 1979). How parents may mediate the effects of day care. Paper presented at the Society for Research in Child Development, San Francisco.

Steinberg, L. (March, 1978). Changes in family relationships at adolescence: A developmental perspective. Paper presented at the Arizona Symposium on Families and Adolescents, Tucson.

Steinberg, L. (August, 1977). Research in the ecology of adolescent development: A longitudinal study of the impact of physical maturation on changes in the family system in early adolescence. Paper presented at the Foundation for Child Development conference on Research Perspectives in the Ecology of Human Development, Ithaca, New York.

Steinberg, L., & Hill, J. (April, 1977). Family interaction in early adolescence. Paper presented at the Society for Research in Child Development, New Orleans.

Gubman, E., & Steinberg, L. (March, 1976). Regarding research: Ask any grandmother. Paper presented at the Groves Conference on Marriage and the Family, Kansas City, Missouri.


**TEACHING**

Undergraduate and Graduate Courses Taught

*Cornell University* (1976-77)
Adolescence and Adulthood
Adolescence in Modern Society

*University of California, Irvine* (1977-83)
Introduction to Human Behavior
Human Development Over the Life-Cycle
Abnormal Behavior
Adolescent Development
Perspectives on Child Rearing
Seminar in Human Development (Graduate)

*University of Wisconsin--Madison* (1983-88)
Development from Middle Childhood to Late Adulthood
Adolescent Development in Social Context
Adolescence, Family, and Work (Graduate)
Adolescence and the Family (Graduate)
The Family at Mid-Life (Graduate)
Interdisciplinary Perspectives on Adolescent Development (Graduate)

*Temple University* (1988-)
Introduction to Psychology (Developmental Psychology Unit)
Developmental Research Methods
Adolescent Development

Capstone Course in Psychology
Core Course in Developmental Psychology (Graduate)
Developmental Research Methods (Graduate)
Seminar in Socioemotional Development (Graduate)
Seminar in Adolescent Development (Graduate)
Seminar in Developmental Psychopathology (Graduate)
Seminar on Neuroscience and the Law (Graduate)


## SELECTED UNIVERSITY SERVICE

*University of California, Irvine*
Committee on Courses (1982-83)

*University of Wisconsin--Madison* (1983-88)
Executive Committee, Institute on Aging (1983-86)
University Senate (1984-86)
Chancellor's Search Committee for Dean of the School of Family Resources and Consumer Sciences
     (1984-85)
Vice-Chancellor's Committee to Review Child and Family Studies Doctoral Program (1985-86)
Graduate School Research Committee (1986-88)

*Temple University* (1988-)
Invited Participant, Faculty Senate Forum on the Future of Temple University (1991)
College of Arts and Sciences Committee on Interdisciplinary Activities (1991-92)
Director, Division of Developmental Psychology, Department of Psychology (1991-94)
Chair, Personnel Committee, Department of Psychology (1992-93, 1995-96, 2005-06, 2009-10)
Awards Committee, College of Arts and Sciences (1993-96) (Chair, 1994-95)
Provost's Committee on Strategic Planning for Girard College (1994)
Executive Committee, College of Arts and Sciences (1994-96)
Chair, Graduate Board, Department of Psychology (1994-99, 2001-07)
Great Teachers Award Committee (1995-97)
Graduate Committee, College of Arts and Sciences (1996-97)
Provost's Academic Planning Priorities Committee (1996-97)
University Affirmative Action Committee (1997-99)
Presentation of Camille Cosby for honorary degree at commencement (1997)
Commencement Address, President's Scholars Commencement (1998)
Exceptional Salary Adjustment Award Committee (1999-)
Commencement Marshal (1999-2002)
Research Policies Advisory Committee, College of Liberal Arts (2001)
Symposium Planning Committee, Center for Public Policy (2001)
Search Committee for Vice-President for Research and Dean of the Graduate School (2001-02)
Internal Research Advisory Committee of the Vice-Provost for Research (2001-04)
Co-Chair, Million Dollar Club (2004-05)
Graduate Committee, College of Liberal Arts (2005-06)
Search Committee for Vice President for Research and Strategic Planning (2007)
Budget Priorities Committee, College of Liberal Arts (2008-2011)
Chair, Provost's Research Review Committee (2009-10)

59

Search Committee for Senior Vice-Provost for Research Administration and Graduate Education (2009-10)

Ad hoc Committee on Graduate Education, College of Liberal Arts (2015)

Provost's Committee on a Smoke-Free Campus (2017-18)

Search Committee for Professor of Interdisciplinary Knowledge, College of Liberal Arts (2019)

## <u>DECLARATION OF SERVICE BY E-MAIL</u>

Case Name:   ***Jones, Matthew, et al. v. Rob Bonta, et al.***
Case No.:    **3:19-cv-01226-L-AHG**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.

On June 2, 2021, I served the document listed below by transmitting a true copy via electronic mail addressed as follows:

John W. Dillon, Esq.                    **E-mail Address**:
DILLON LAW GROUP APC                    JDillon@Dillonlawgp.com
2647 Gateway Road, Suite 105 No. 255
Carlsbad, CA  92009

- **DEFENDANTS' DISCLOSURE OF EXPERT WITNESSES**
  - **Exhibit 1:  EXPERT REPORT OF PROFESSOR SAUL CORNELL**
  - **Exhibit 2:  EXPERT REPORT OF PROFESSOR JOHN J. DONOHUE**
  - **Exhibit 3:  EXPERT REPORT OF PROFESSOR LAURENCE STEINBERG**

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on June 2, 2021, at Los Angeles, California.

| Jennifer E. Rosenberg | |
| --- | --- |
| Declarant | |

SA2019103398

# EXHIBIT 6

**Declaration of Saul Cornell**

1   Rᴏʙ Bᴏɴᴛᴀ
   Attorney General of California
2   R. Mᴀᴛᴛʜᴇᴡ Wɪsᴇ
   Supervising Deputy Attorney General
3   Nɪᴄᴏʟᴇ J. Kᴀᴜ
   Deputy Attorney General
4   State Bar No. 292620
    300 South Spring Street, Suite 1702
5    Los Angeles, CA 90013-1230
    Telephone: (213) 269-6220
6    Fax: (916) 731-2125
    E-mail: Nicole.Kau@doj.ca.gov
7   *Attorneys for Defendants Governor Gavin Newsom,*
   *Attorney General Rob Bonta, Secretary Karen Ross,*
8   *and 32nd District Agricultural Association*

9

| **B&L PRODUCTIONS, INC., d/b/a CROSSROADS OF THE WEST, et al.,** | 8:22-cv-01518 JWH (JDEx) |
|---|---|
| | **DECLARATION OF SAUL CORNELL IN SUPPORT OF STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF** |
| Plaintiffs, | |
| v. | Date:       April 6, 2023 |
| **GAVIN NEWSOM, et al.,** | Time:      9:00 a.m. |
| | Courtroom:  9D |
| Defendants. | Judge:    The Honorable John W. Holcomb |
| | Action Filed: August 12, 2022 |

17      I, Saul Cornell, declare under the penalty of perjury that the following is true

18 and correct:

19      1.     I have been asked by the Office of the Attorney General for the State

20 of California to provide an expert opinion on the history of firearms regulation in

21 the Anglo-American legal tradition, with a particular focus on how the Founding

22 era understood the right to bear arms, as well as the understanding of the right to

23 bear arms held at the time of the ratification of the Fourteenth Amendment to the

24 United States Constitution. In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen,*

25 the U.S. Supreme Court underscored that text, history, and tradition are the

26 foundation of modern Second Amendment jurisprudence. This modality of

27 constitutional analysis requires that courts analyze history and evaluate the

28 connections between modern gun laws and earlier approaches to firearms regulation

1    in the American past.  This declaration explores these issues in some detail.  Finally,

2    I have been asked to evaluate the statutes at issue in this case, particularly regarding

3    its connection to the tradition of firearms regulation in American legal history.

4          2.     This declaration is based on my own personal knowledge and

5    experience, and if I am called to testify as a witness, I could and would testify

6    competently to the truth of the matters discussed in this declaration.

7                      **BACKGROUND AND QUALIFICATIONS**

8          3.     I am the Paul and Diane Guenther Chair in American History at

9    Fordham University.  The Guenther Chair is one of three endowed chairs in the

10   history department at Fordham and the only one in American history.  In addition to

11   teaching constitutional history at Fordham University to undergraduates and

12   graduate students, I teach constitutional law at Fordham Law School.  I have been a

13   Senior Visiting research scholar on the faculty of Yale Law School, the University

14   of Connecticut Law School, and Benjamin Cardozo Law School.  I have given

15   invited lectures, presented papers at faculty workshops, and participated in

16   conferences on the topic of the Second Amendment and the history of gun

17   regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

18   Law School, the University of Pennsylvania Law School, Columbia Law School,

19   Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

20   Leiden University, and McGill University.[1]

21         4.     My writings on the Second Amendment and gun regulation have been

22   widely cited by state and federal courts, including the majority and dissenting

23   opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law

24   reviews and top peer-reviewed legal history journals.  I authored the chapter on the

25   right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-

26   _____
     [1] For a full *curriculum vitae* listing relevant invited and scholarly
27   presentations, *see* Exhibit 1.

     [2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).
28

authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); and *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.).

## RETENTION AND COMPENSATION

5.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.     The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

---

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

# SUMMARY OF OPINIONS

7.     Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

4

1   no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading

2   source of early American views about English law, opined that the common law

3   "hath ever had a special care and regard for the conservation of the peace; for peace

4   is the very end and foundation of civil society."[8]

5       9.    In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of

6   Blackstone's authority as a guide to how early Americans understood their

7   inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous

8   terms that there was a "well established historical tradition of prohibiting the

9   carrying of dangerous and unusual weapons."[9]  The dominant understanding of

10  the Second Amendment and its state constitutional analogues at the time of their

11  adoption in the Founding period forged an indissoluble link between the right to

12  keep and bear arms with the goal of preserving the peace.[10]

13      10.    The right of the people to pass laws to promote public health and

14  safety is one of the most fundamental right in the pantheon of American rights. The

---

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S. 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

idea of popular sovereignty, a core belief of the Founding generation, included a right of legislatures to enact laws to promote the common good.  Although modern lawyers and jurists are accustomed to thinking of this concept under the rubric of state police power, the Founding generation viewed it as a right, not a power.[11]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[12]  Pennsylvania's Constitution framed this estimable right succinctly: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."  "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[13]  Included in this right was the most basic right of all: the right of the people to regulate their own internal police.  Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence.  The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

11.    In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased.  Indeed, the individual states

---

[11] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[12] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[13] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

exercised their police powers to address longstanding issues and novel problems created by firearms in American society. Over the eighteenth and nineteenth centuries, American regulation increased as states grappled with advances in firearm technology and changes in American society. Regulation touched every aspect of guns from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons might be carried in public.

## I. THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER*

12. The United States Supreme Court's decisions in *Heller*, *McDonald*,[14] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[15] Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, respond to societal ills created by those changes.[16]

---

[14] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[15] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[16] *See* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

13.     Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[17]  The Court acknowledged that when novel problems created by firearms are at issue, "a more nuanced approach" is appropriate.[18]  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

14.     In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[19]  Indeed, such research is still ongoing: new materials continue to emerge; and since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[20]

15.     As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights.[21]  Although "free-standing balancing" by judges is precluded by *Heller*, the plain meaning of the Second Amendment's text recognizes a role for regulation explicitly and further asserts that actions inimical to a free state fall

---

[17] *Bruen*, 142 S. Ct. 2111, 2133.

[18] *Id.* at 2132.

[19] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[20] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[21] *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635.

outside of the scope of the right instantiated in the text.[22]  The Second Amendment

states:  "A well regulated Militia, being necessary to the security of a free State, the

right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

amend. II.  Thus, from its outset, the Second Amendment recognizes both the right

to keep and bear arms and the right of the people to regulate arms to promote the

goals of preserving a free state.  Although rights and regulation are often cast as

antithetical in the modern gun debate, the Founding generation saw the two goals as

complimentary.  Comparing the language of the Constitution's first two

amendments and their different structures and word choice makes this point crystal

clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard

American English in the Founding era, to "abridge" meant to "reduce."  Thus, the

First Amendment prohibits a diminishment of the rights it protects.  The Second

Amendment's language employs a very different term, requiring that the right to

bear arms not be "infringed."[23]  In Founding-era American English, the word

"infringement" meant to "violate" or "destroy."  In short, when read with the

Founding era's interpretive assumptions and legal definitions in mind, the two

Amendments set up radically different frameworks for evaluating the rights they

enshrined in constitutional text.  Members of the Founding generation would have

understood that the legislature could regulate the *conduct* protected by the Second

Amendment and comparable state arms bearing provisions as long as such

regulations did not destroy the underlying *right*.  An exclusive focus on rights and a

---

[22]  *Heller*, 554 U.S. at 635.

[23]  The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

9

disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

16. John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty. Regulation was the indispensable correlate of rights in Founding era constitutionalism.[24]

17. Burn's conception of the close connection between liberty and regulation was widely shared by others in the Anglo-American world. Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[25] And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[26] Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[27] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[28] And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[29]

---

[24] *Liberty,* A NEW LAW DICTIONARY (1792); *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[25] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[26] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[27] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[28] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[29] *Abridge, Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

18.     For the framers, ratifiers, and other relevant legal actors in the
Founding era, regulation, including robust laws, was not understood to be an
"infringement" of the right to bear arms, but rather the necessary foundation for the
proper exercise of that right as required by the concept of ordered liberty.[30]  As one
patriotic revolutionary era orator observed, almost a decade after the adoption of the
Constitution:  "True liberty consists, not in having *no government*, not in a
*destitution of all law*, but in our having an equal voice in the formation and
execution of the laws, according as they effect [*sic*] our persons and property."[31]
By allowing individuals to participate in politics and enact laws aimed at promoting
the health, safety, and well-being of the people, liberty flourished.[32]

19.     The key insight derived from taking the Founding era conception of
rights seriously and applying the original understanding of the Founding era's
conception of liberty is the recognition that regulation and liberty are both hard
wired into the Amendment's text.  The inclusion of rights guarantees in
constitutional texts was not meant to place them beyond the scope of legislative
control.  "The point of retaining natural rights," originalist scholar Jud Campbell

---

[30] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[31] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[32] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

1    reminds us "was not to make certain aspects of natural liberty immune from

2    governmental regulation.  Rather, retained natural rights were aspects of natural

3    liberty that could be restricted only with just cause and only with consent of the

4    body politic."[33]  Rather than limit rights, regulation was the essential means of

5    preserving rights, including self-defense.[34]  In fact, without robust regulation of

6    arms, it would have been impossible to implement the Second Amendment and its

7    state analogues.  Mustering the militia required keeping track of who had weapons

8    and included the authority to inspect those weapons and fine individuals who failed

9    to store them safely and keep them in good working order.[35]  The individual states

10   also imposed loyalty oaths, disarming those who refused to take such oaths.  No

11   state imposed a similar oath as pre-requisite to the exercise of First Amendment-

12   type liberties.  Thus, some forms of prior restraint, impermissible in the case of

13   expressive freedoms protected by the First Amendment or comparable state

14   provisions, were understood by the Founding generation to be perfectly consistent

15   with the constitutional right to keep and bear arms.[36]

16   _____

[33] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L.
REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half
Cocked: The Persistence of Anachronism and Presentism in the Academic Debate
Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206
(2016) *s* (noting that the Second Amendment was not understood in terms of the
simple dichotomies that have shaped modern debate over the right to bear arms).

[34] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15
GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-
shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the
inclusion of the Second Amendment in the Bill of Rights placed certain forms of
regulation out of bounds totally anachronistic.  This claim has no foundation in
Founding-era constitutional thought, but reflects the contentious modern debate
between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's
debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND
THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021),
https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf
[https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of
What?*, 132 HARV. L. REV. 120, 123 (2019).

[35] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE
RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[36] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the
Second Amendment, and the Problem of History in Contemporary Constitutional*

20.     In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  The proper metric for deciding if such laws were constitutional was and remains the same today: whether a regulation infringes on the right protected by the Second Amendment.[37]

## II.  FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

21.     Guns have been regulated from the dawn of American history.[38]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[39]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[40]

22.     The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace and the right of self-defense existed within this larger framework.[41]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never

_____

*Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[37] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[38] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[39] *Id.*

[40] Ruben & Miller, *supra* note 19, at 1.

[41] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

13

understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[42]  In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[43]

23.    *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[44]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[45]

24.    Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem.  In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[46]

25.    The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early

---

[42] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[43] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[44] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[45] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[46] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

14

American gun policy and relate it to early American gun culture.[47]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth.  It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment.  The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society.  Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[48]  Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[49]

---

[47] It is important to recognize that there were profound regional differences in early America.  *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[48] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[49] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

26.     Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[50]  Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[51]

Figure 1



Figure 2.3   Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

_____

[50] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[51] Sweeney, *supra* note 48.

27.     As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary weapon of choice for those with evil intent during this period.[52]   The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that these types of firearms were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

28.     In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America.

29.     The Founding generation faced a different, but no less serious problem:  American reluctance to purchase the type of weapons needed to effectively arm their militias. Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by eighteenth-century military tactics.  A gun had to be able to receive a bayonet and serve as a bludgeon if necessary.  The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but these weapons were not well suited to eighteenth-century ground wars.  When the U.S. government surveyed the state of the militia's preparedness shortly after President Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[53]

---

[52] HAAG, *supra* note 44.
[53] Sweeney, *supra* note 48.

30.     As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced.[54]  The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies.

31.     In short, the market for firearms in early America shared very few features with the contemporary world of firearms commerce.  Gun shows, gun supermarkets, and internet sales are just a few of the many ways Americans acquire firearms today.  Although estimates vary, there are now more guns than people in contemporary America.  Today's Americans are awash in sea of guns and have a myriad of choices when they wish to acquire a firearm.  Early America firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.  Local gun smiths, not big box stores such as Walmart, were responsible for selling firearms.  Most sellers and buyers of firearms in early America were members of the same community and needed to maintain an ongoing relationship with their local gun smith to keep their guns in good working order.  These informal ties of kin and community that defined the close-knit communities of early America meant that individuals were effectively vetted and monitored by their neighbors in ways that share little with the largely anonymous world of modern firearms commerce.  In addition, early American firearms, in contrast with modern weapons, needed frequent repair, so much so that many gunsmiths devoted most of their time to repair, not the manufacture or assembly of arms.[55]

---

[54] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[55] Scott Paul Gordon, *The Ambitions of William Henry*, 136 *Pennsylvania Magazine of History and Biography* 253 (2012).  Pennsylvania was one of the main regions of early American gunsmithing, M.L. Brown, *Firearms in Colonial America: The Impact on History and Technology*, 1492-1792 (1980).

18

32.     Although much of the supervision of this market was achieved through these informal means, governments in early America also regulated the sale of firearms and ammunition in multiple ways.

33.     One form of government regulation of the early American firearms industry was through laws providing for the inspection of weapons.[56]  The danger posed by defective or poorly manufactured arms could be catastrophic.  A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.  Indeed, without such regulation, the industry may not have survived.

34.     Other laws targeted arms and ammunition trafficking.  For example, Connecticut prohibited the sale of ammunition by its residents outside the colony.[57]  Similarly, states regulated the sale of arms by taxation and permit schemes.[58]

35.     Gunpowder was extensively regulated, from manufacture to sale, transportation, and storage.  New Hampshire, for example, enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[59]  The purpose of this law and other similar laws was to promote public safety.

---

[56] *See, e.g.*, 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[57] 1 Trumbull, *Public Records of the Colony of Connecticut*, 79 (December 1, 1642), 138-139 (April 19, 1646), 145-146 (October 30, 1646).

[58] *See, e.g.*, An Act Entitled Revenue, 1858 N.C. Sess. Laws 34, chap. 25, § 27, pt. 15; An Act to Tax Guns and Pistols in the County of Washington, 1867 Miss. Laws 327, § 1.

[59] 1825 N.H. Laws 74, ch. 61, § 5.

36.     Examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include:

- An Act to Incorporate and Establish the City of Dubuque, 1845 Iowa Laws 119, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

- An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder); and

- An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").

37.     Early American governments also regulated where shooting galleries could be located—again, for the purpose of promoting public safety.  For example, governments required licenses to open shooting galleries and oftentimes set explicit limits on locations.   Historical examples include:

- Burlington, Iowa, in 1841, requiring an application for erecting a shooting battery.  *Ordinances of the City of Burlington, with Head Notes and an Analytic Index*, § 1 (1841), at 149-150 (Chas. Ben. Darwin, Thompson & Co. Printers, 1856) (listing other conditions);

- The East Feliciana Parish, Louisiana, in 1847, forbidding "shooting of guns, pistols, or any other fire arms within the limits of the town of

20

Clinton . . . ." *Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish*, sec. 1. (September session, 1847), at 80 (John C. White, Whig Office, September 1, 1848);

- Rhode Island, in 1851, forbidding any pistol or rifle gallery in the "compact part of the town of Newport . . . ." 1851 R.I. Pub. Laws 9, An Act in Amendment of an Act Entitled an Act Relating to Theatrical Exhibitions and Places of Amusement, §§ 1-2, in *The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State*, chp. 80, section 2 (January Session 1857), at 204-205 (Samuel Ames, Chairman, Sayles, Miller and Simons 1857) (same).

- San Francisco, California in 1853, requiring a license to keep a pistol or rifle shooting gallery. *Ordinances and Joint Resolutions of the City of San Francisco: Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council 220,* Ordinance No. 498, section 13 (December 29, 1853), at 220 (Monson & Valentine 1854).

- Memphis, Tennessee, in 1863 requiring a license to set up a pistol gallery, and prohibited such galleries "in the first story of any building in [the] city[.]" *Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page*, Chp. 5, Art. VI., at 147-148  (October 7, 1863) (WM. H. Bridges, Argus Book and Job Office 1863) (among other requirements); and

- New Orleans, Louisiana, in 1870, prohibiting "any pistol or shooting
  gallery within the limits of the city of New Orleans without having first
  obtained the consent of" residents and common council. *The Laws and
  General Ordinances of the City of New Orleans: Together with the Acts of
  the Legislature, Decisions of the Supreme Court, and Constitutional
  Provisions Relating to the City Government: Revised and Digested,
  Pursuant to an Order of the Common Council*, Section 1, art. 636 (5), at
  257 (Henry Jefferson Leovy, Simmons & Co. New Ed. 1870).

38.    The calculus of individual self-defense changed dramatically in the
decades following the adoption of the Second Amendment.[60]  The early decades of
the nineteenth century witnessed a revolution in the production and marketing of
guns.[61]  The same technological changes and economic forces that made wooden
clocks and other consumer goods such as Currier and Ives prints common items in
many homes also transformed American gun culture.[62]  These same changes also
made handguns and a gruesome assortment of deadly knives, including the dreaded
Bowie knife, more common.  The culmination of this gradual evolution in both
firearms and ammunition technology was the development of Samuel Colt's pistols
around the time of the Mexican-American War.[63]  Economic transformation was
accompanied by a host of profound social changes that gave rise to America's first
gun violence crisis.  As cheaper, more dependable, and easily concealable handguns
proliferated in large numbers, Americans, particularly southerners, began sporting

---

[60] Cornell, *supra* note 3, at 745.
[61] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American
Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).
[62] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW
AMERICAN HISTORY (Eric Foner ed., 1990).
[63] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st
ed. 1996).

22

1   them with alarming regularity.  The change in behavior was most noticeable in the

2   case of handguns.[64]

3       39.   The response of states to the emergence of new firearms that

4   threatened the peace was more regulation.  When faced with changes in technology

5   and consumer behavior, as well as novel threats to public safety, the individual

6   states enacted laws to address these problems.  In every instance apart from a few

7   outlier cases in the Slave South, courts upheld such limits on the unfettered exercise

8   a right to keep and bear arms.  The primary limit identified by courts in evaluating

9   such laws was the threshold question about infringement:  whether the law negated

10  the ability to act in self-defense.[65]  In keeping with the clear imperative hard-wired

11  into the Second Amendment, states singled out weapons that posed a particular

12  danger for regulation or prohibition.  Responding in this fashion was entirely

13  consistent with Founding-era conceptions of ordered liberty and the Second

14  Amendment.

15  **III.  RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO
16        REGULATE FIREARMS (1863-1877)**

17      40.   Founding-era constitutions treated the right of the people to regulate

18  their internal police separately from the equally important right of the people to

19  bear arms.  These two rights were separate in the Founding era but were mutually

20  reinforcing:  both rights were exercised in a manner that furthered the goal of

21  ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation

22  of the connection between these two formerly distinct rights, fusing the two

23  together as one single constitutional principle.  This change reflected two profound

24  transformations in American politics and law between 1776 and 1868.  First, the

25  judicial concept of police power gradually usurped the older notion of a police right

26  ───────────────
    [64] Cornell, *supra* note 9, at 716.

27  [65] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell,
    *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law
28  in Context*, 125 YALE L.J. F. 121, 128 (2015).

grounded in the idea of popular sovereignty. As a result, state constitutions no longer included positive affirmations of a police right. Secondly, the constitutional "mischief to be remedied" had changed as well.[66] Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[67]

41. The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[68] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as

---

[66] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61. The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822). For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[67] *See McDonald*, 561 U.S. at 767–68

[68] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

24

1   the Legislature may prescribe."[69]  Nor was Texas an outlier in this regard.  Sixteen

2   state constitutions adopted during this period employed similarly expansive

3   language.[70]  Millions of Americans living in the newly organized western states and

4   newly reconstructed states of the former confederacy adopted constitutional

5   provisions that reflected this new formulation of the right to bear arms.  Thus,

6   millions of Americans were living under constitutional regimes that acknowledged

7   that the individual states' police power authority over firearms was at its apogee

8   when regulating guns.[71]

9          42.     This expansion of regulation was entirely consistent with the

10   Fourteenth Amendment's emphasis on the protection of rights and the need to

11   regulate conduct that threatened the hard-won freedoms of recently free people of

12   the South and their Republican allies.  The goals of Reconstruction were therefore

13   intimately tied to the passage and enforcement of racially neutral gun regulations.[72]

14          43.     Reconstruction ushered in profound changes in American law, but it

15   did not fundamentally alter the antebellum legal view that a states' police powers

16   were rooted in the people's right to make laws to protect the peace and promote

17   public safety.  Nor did Reconstruction challenge the notion that these powers were

18   at their zenith when dealing with guns and gun powder.  In fact, the Republicans

19   who wrote the Fourteenth Amendment were among the most ardent champions of

20   an expansive view of state police power.  As heirs to the antebellum Whig vision of

21          [69] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional
22   provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The
     people have the right to bear arms for their security and defense; but the legislature
23   shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6
     ("[T]he people have the right to bear arms for their security and defense, but the
24   legislature may regulate the exercise of this right by law.").

          [70] Cornell, *supra* note 68, at 75–76.
25
          [71] *Id.*
26
          [72] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND
27   RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas,
     *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L.
28   REV. 2603 (2022).

a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[73]

44.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not cede their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[74]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [75]

45.     It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent

---

[73] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[74] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[75] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

from antebellum levels.[76]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[77]

46.     Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[78]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[79]

47.     In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety.  Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[80]  The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction.  The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican controlled state legislatures

---

[76] *See* Spitzer, *supra* note 38, at 59–61 tbl. 1.

[77] *Id.*

[78] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[79] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[80] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[81]

48.     The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.  American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

49.     Laws aimed at limiting arms in important public venues where people gathered were also enacted by Reconstruction-era governments to preserve the peace and enable civil society to flourish.[82]  Some examples include laws banning firearms in churches, schools, and other public places in which people gathered in significant numbers.[83]  Such laws were rooted in practices dating back centuries. Indeed, the Statute of Northampton (1328) prohibited guns in fairs and markets— places where people gathered in large numbers to engage in commerce,

---

[81] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[82] *See, e.g.*, 1890 Okla. Laws 495, art. 47, sec. 7 ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.")

[83] For a good illustration of the colonial policy, see An Act for the Better Security of the Inhabitants by Obliging the Male White Persons to Carry Fire Arms to Places of Public Worship, 1770, reprinted in GEORGIA COLONIAL LAWS 471 (1932).  For a good example of the restrictive approach taken during Reconstruction, see J. Hockaday, REVISED STATUTES OF THE STATE OF MISSOURI (1879) at 224.

1 entertainment, and politics. Americans in the Founding era copied elements of this

2 ancient law and included these prohibitions in laws enacted after the American

3 Revolution.[84]

4     50. One location that required additional regulation was public parks. The

5 creation of large urban public parks in the 1850s posed new challenges for

6 preserving the peace and public safety. Statutes prohibited possession of arms in

7 these important public spaces in major urban areas of every region of the nation.[85]

8     51. The federal government also passed laws limiting firearms in its parks.

9 Such regulations are especially important because federal lands were indisputably

10 governed by the Second Amendment, irrespective of the incorporation doctrine.[86]

11 The Secretary of the Interior underscored the danger posed by firearms in parks

12 when he wrote that, in Yellowstone, an "[a]bsolute prohibition of firearms in the

13 park is recommended.[87]

---

[84] Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.), *reprinted in* 1 THE STATUTES OF THE REALM 258 (London, John Raithby ed., 1235–1377). On the importance of the Statute of Northampton to maintain the peace, see generally A.J. Musson, *Sub-Keepers and Constables: The Role of Local Officials in Keeping the Peace in Fourteenth-century England*, 117 ENG. HIST. REV. 1 (2002). On the continuities between this feature of English law and early American gun laws, see Cornell, supra note 43.

[85] *San Francisco Municipal Reports*, 499 (1874); *Law and Ordinances Governing the Village of Hyde Park* (1875); *The Municipal Code of Chicago*, 391 (1881); *Ordinances of the City of Boulder* 157 (1899); *The Revised Ordinances of the City of Danville* (1883); *A Digest of the Laws and Ordinances of the City of Philadelphia from the Year 1701 to the 21 Day of June, 1887*, at 513 (1887); The Revised Municipal Code of Ohio, 196 (1899); *Report of the Board of Park Commissioners of the City of Rochester, N.Y.: 1888 to 1898*, 98 (1898); *The Municipal Code of the City of Spokane, Washington: Comprising the Ordinances of the City ... Revised to October 22, 1896*, 316 (1896); *Proceedings of the Common Council of the City of Saint Paul* 133 (1892); *Annual Report of the Park Commissioners of the City of Lynn for the Year Ending 1893*, at 45 (1893); *Charter and Ordinances of the City of New Haven: Together with Legislative Acts Affecting Said City* 293 (1898); *A Digest of the Acts of Assembly Relating to and the General Ordinances of the City Pittsburgh* 496 (1897).

[86] Report of the Department of the Interior ... [with Accompanying Documents] 499 (1899); Report of the Secretary of the Interior for the Fiscal Year, 125 (1900).

[87] *The Abridgment: Containing Messages of the President of the United States to the Two Houses of Congress with Reports of Departments and Selections*

## IV. *Bruen*'s Framework and the Scope of Permissible Regulation

52.     The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[88]

53.     Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[89] States and localities have regulated arms and ammunition since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[90] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

54.     Sales of weapons have been subject to regulation since before the Founding. In addition, carrying of weapons in sensitive places, including places where large gatherings occur, has been regulated by localities, states, and the federal government over the course of American history.

---

*from Accompanying Papers* 618 (1893).

[88] Spitzer, *supra* note 38.

[89] *Id.*

[90] Gary Gerstle, *Liberty and Coercion: The Paradox of American Government, from the Founding to the Present* (Princeton Univ. Press, 2015).

1   Executed on February 15, 2023 at Redding, CT.

2                               *Saul Cornell*

3                     _____

4                               Saul Cornell

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

# EXHIBIT A

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 <u>Choice</u> Outstanding Academic Book

| **Book Publications** |
|---|

<u>The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution</u>
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

<u>The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller</u>
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

<u>Visions of America: A History of the United States</u> [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

<u>"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control</u> (Oxford University Press, 2006) (paperback edition  2008)

<u>Whose Right to Bear Arms Did the Second Amendment Protect?</u>  (Bedford/St. Martins Press, 2000) (Paperback 2000)

<u>The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828</u>  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, <u>Retrieving the American Past:  Documents and Essays on American History</u>, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  <u>University  of California, Davis Law Review</u>  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 <u>Yale Law & Policy Review Inter Alia</u> 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  <u>University of California, Davis Law Review Online</u> (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 <u>Fordham Law Review</u>  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 <u>Law and Contemporary Problems</u> (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." <u>Law and History Review</u> 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in <u>Firearms and Freedom: The Second Amendment in the Twenty-First Century</u> Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 <u>Law and Contemporary Problems</u> (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 <u>Northwestern Journal of Criminal Law</u>  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism,"  <u>Wisconsin Law Review Forward</u>  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  <u>American</u> <u>Journal of Legal History</u> 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," <u>Yale Law Journal  Forum</u>  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" <u>Fordham Law Review</u> *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," <u>The Oxford Handbook of the US Constitution</u>,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" <u>Constitutional Commentary</u> 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  <u>Fordham Law Review</u> 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  <u>Fordham Urban Law Journal</u> 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" <u>William & Mary  Quarterly</u> 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" <u>William & Mary Quarterly</u> 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," <u>Yale Journal of Law and the Humanities</u> 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," <u>Northwestern University Law Review</u> 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095-1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed: The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment,"
Haber/Edelman Lecture: University of Vermont, Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium,
 November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate," Guns
 in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth
 Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series: "Guns in the United States," University of Connecticut (2016) "How does the
 Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History,"
 Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties: From Standing Armies to
 the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the
 Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom: A Short Cultural History of the Second Amendment,"
 Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell
 College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists"
 Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture,
 Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria: Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke: The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting, Cambridge, England (2016)

"Second Amendment Historicism and Philosophy" The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America: Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists: The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History," American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment" Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy, Albany Law School ( 2007)

"*District of Columbia* v. *Heller* and the Problem of Originalism," University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate," American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation, NRA/ GMU Student's For the Second Amendment Symposium (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History," Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?" University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and Early American History," SHEAR Brown University (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate," Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C. (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control: Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms: The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You: Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
     SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal,* March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network,* January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44 (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts:

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## **State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]
Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]
Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
Amicus Brief, Young v. State of Hawaii N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, Flanagan vs. Becerra, Central District of California Case (2018) [2nd Amendment]
Amicus Brief, Gill v. Whitford (US Supreme Court, 2017) [Partisan Gerrymandering]
Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## **Law Review Symposia Organized**

### **Second Amendment:**

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).
"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev*. 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev*. 2545 (2022).

### **New Originalism:**

"The New Originalism" 82 *Fordham L. Rev*. 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev*. 915 (2015).

# CERTIFICATE OF SERVICE

Case
Name: **B&L Productions, Inc., et al. v.
Gavin Newsom, et al.**

No.   **8:22-cv-01518 JWH (JDEx)**

I hereby certify that on <u>February 24, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF SAUL CORNELL IN SUPPORT OF STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 24, 2023</u>, at Los Angeles, California.

| Carol Chow | */s/Carol Chow* |
|:---:|:---:|
| Declarant | Signature |

SA2022303648

| From: | cacd_ecfmail@cacd.uscourts.gov |
|---|---|
| To: | ecfnef@cacd.uscourts.gov |
| Subject: | Activity in Case 8:22-cv-01518-JWH-JDE B & L Productions, Inc. et al v. Gavin Newsom et al Response in Opposition to Motion |
| Date: | Friday, February 24, 2023 3:34:10 PM |

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Notice of Electronic Filing

The following transaction was entered by Kau, Nicole on 2/24/2023 at 3:33 PM PST and filed on 2/24/2023

| | |
|---|---|
| **Case Name:** | B & L Productions, Inc. et al v. Gavin Newsom et al |
| **Case Number:** | 8:22-cv-01518-JWH-JDE |
| **Filer:** | 32nd District Agricultural Association |
| | Gavin Newsom |
| | Karen Ross |
| | Does |
| | Rob Bonta |

**Document Number:** 31

**Docket Text:**
**OPPOSITION to NOTICE OF MOTION AND MOTION for Preliminary Injunction re the enforcement of California Penal Code sections 27573 and 27575 during the pendency of this action [21] filed by Defendants 32nd District Agricultural Association, Rob Bonta, Does, Gavin Newsom, Karen Ross. (Attachments: # (1) Declaration, # (2) Declaration)(Kau, Nicole)**


**8:22-cv-01518-JWH-JDE Notice has been electronically mailed to:**

Anna M Barvir     abarvir@michellawyers.com, cmichel@michellawyers.com, lpalmerin@michellawyers.com

Carl Dawson Michel     cmichel@michellawyers.com, ccastron@michellawyers.com, hvillegas@michellawyers.com, lpalmerin@michellawyers.com

Donald E J Kilmer , Jr    don@dklawoffice.com

Nicole Juliet Kau     nicole.kau@doj.ca.gov, carol.chow@doj.ca.gov

Tiffany Dawn Cheuvront     tcheuvront@michellawyers.com

**8:22-cv-01518-JWH-JDE Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\STATE DEFENDANTS SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/24/2023] [FileNumber=35407954-0
] [2a2c240c2fec98f468ee0acd4b33bceadc78349871abb652bf07206222fea9efaca
93f86e546256d75ba190df0ba24def150a2131a13c705c8075c2fcf89611e]]
**Document description:**Declaration
**Original filename:**C:\fakepath\DEC OF PATRICK J. CHARLES ISO STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/24/2023] [FileNumber=35407954-1
] [56178df3a93f0c20ba45dbbb0c3390ea719c3845ef50fb0caf6a40bd7c1529cae09
c7a9993af73dc7be55eff0ae288263818ab57cfdc442faf9acb9860d402ce]]
**Document description:**Declaration
**Original filename:**C:\fakepath\DEC OF SAUL CORNELL ISO STATE DEFENDANTS' SECOND SUPPLEMENTAL BRIEF.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/24/2023] [FileNumber=35407954-2
] [1cf4a6696cd26191b8b96167143a8f841e205dcd97eeeb87e561f3a0dbfdb1bb587
1abf601d2e92d5df38581bc414d675c8bef3052d4d75597fc8ab290f0548d]]

# EXHIBIT 7

**Hunter Education Courses**

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)

# Upcoming Events

## Find events near you

ZIP code

**92117**

Miles away

within 200 miles

or remove location

**FEBRUARY 2023**

FEB
**16**
THU

### Online Course and Follow-Up Class (/events/view/186991)

**Registration Open**    13 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**    Midway City, CA 92655
Thursday, February 16, 2023    4:30pm - 8:30pm

**DISTANCE**
**79 mi**

FEB
**19**
SUN

### Online Course and Follow-Up Class (/events/view/194285)

**Registration Open**    10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**    Temecula, CA 92028
Sunday, February 19, 2023    9:00am - 1:00pm

**DISTANCE**
**48 mi**

FEB
**19**
SUN

### Online Course and Follow-Up Class (/events/view/194286)

**Registration Open**    10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**    Temecula, CA 92028
Sunday, February 19, 2023    3:00pm - 7:00pm

**DISTANCE**
**48 mi**

Help

<table>
<tr><td>FEB<br>**25**<br>SAT</td><td></td></tr>
</table>

**FEB 25 SAT**

## Online Course and Follow-Up Class (/events/view/194009)

**Registration Open**   15 of 15 seats remaining

**LOCATION & SCHEDULE**
**Blue Collar Firearms**   Colton, CA 92324
Saturday, February 25, 2023   8:00am - 12:15pm

**DISTANCE**
**85 mi**

---

**MARCH 2023**

**MAR 5 SUN**

## Online Course and Follow-Up Class (/events/view/194290)

**Registration Open**   10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**   Temecula, CA 92028
Sunday, March 5, 2023   8:30am - 12:30pm

**DISTANCE**
**48 mi**

---

**MAR 5 SUN**

## Online Course and Follow-Up Class (/events/view/194295)

**Registration Open**   10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**   Temecula, CA 92028
Sunday, March 5, 2023   1:30pm - 5:30pm

**DISTANCE**
**48 mi**

---

**MAR 16 THU**

## Online Course and Follow-Up Class (/events/view/186989)

**Registration Open**   18 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**   Midway City, CA 92655
Thursday, March 16, 2023   4:30pm - 8:30pm

**DISTANCE**
**79 mi**

---

**MAR 19 SUN**

## Online Course and Follow-Up Class (/events/view/194297)

**Registration Open**   10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**   Temecula, CA 92028
Sunday, March 19, 2023   8:30am - 12:30pm

**DISTANCE**
**48 mi**

Help

<table>
<tr><td>MAR<br>**19**<br>SUN</td><td>

### Online Course and Follow-Up Class (/events/view/194298)

**Registration Open**   10 of 10 seats remaining

**LOCATION & SCHEDULE**
**The Hunter Instructor - Temecula**   Temecula, CA 92028
Sunday, March 19, 2023   1:30pm - 5:30pm

**DISTANCE**
**48 mi**
</td></tr>
</table>

<table>
<tr><td>MAR<br>**25**<br>SAT</td><td>

### Online Course and Follow-Up Class (/events/view/194010)

**Registration Open**   15 of 15 seats remaining

**LOCATION & SCHEDULE**
**Blue Collar Firearms**   Colton, CA 92324
Saturday, March 25, 2023   8:00am - 12:30pm

**DISTANCE**
**85 mi**
</td></tr>
</table>

| ← Previous | 1 | 2 (/programs/california/161/page:2?zip=92117&distance=200) |

Next → (/programs/california/161/page:2?zip=92117&distance=200)
RSS (https://www.register-ed.com/programs/schedule/page:1/limit:200.rss?zip=92117&distance=200)
Last → (/programs/california/161/page:2?zip=92117&distance=200)

Help

Active Programs (/programs/california)     Update registration (/users/login)     Cancel registration (/users/login)

# Upcoming Events

## Find events near you

ZIP code

**92117**

Miles away

within 200 miles

or remove location

**APRIL 2023**

<table>
<tr>
<td>
APR<br>
**22**<br>
SAT
</td>
<td>

### Online Course and Follow-Up Class (/events/view/194011)

**Registration Open**    15 of 15 seats remaining

**LOCATION & SCHEDULE**
**Blue Collar Firearms**    Colton, CA 92324
Saturday, April 22, 2023    8:00am - 12:30pm

**DISTANCE**
**85 mi**

</td>
</tr>
</table>

← First (/programs/california/161?zip=92117&distance=200&_=1676073655064)

← Previous (/programs/california/161?zip=92117&distance=200&_=1676073655064)

RSS (https://www.register-ed.com/programs/schedule/page:1/limit:200.rss?zip=92117&distance=200)

1 (/programs/california/161?zip=92117&distance=200&_=1676073655064)    2    Next →

Help

Active Programs (/programs/california)

Update registration (/users/login)   Cancel registration (/users/login)

# Upcoming Events

### Find events near you

ZIP code

**92113**

Miles away

within 50 miles

or remove location

**MARCH 2023**

MAR
**11**
SAT

### Traditional Hunter Education (/events/view/191009)

**Registration Open**   37 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, March 11, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**

**APRIL 2023**

APR
**8**
SAT

### Traditional Hunter Education (/events/view/191010)

**Registration Open**   43 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, April 8, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**

**MAY 2023**

MAY
**13**
SAT

### Traditional Hunter Education (/events/view/191011)

**Registration Open**   50 of 50 seats remaining

**LOCATION & SCHEDULE**

Help

Escondido Fish & Game    Escondido, CA 92027
Saturday, May 13, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**

---

**JULY 2023**

<table>
<tr><td>JUL<br>**8**<br>SAT</td><td>

## Traditional Hunter Education (/events/view/191012)

**Registration Open**   50 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, July 8, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**
</td></tr>
</table>

---

**AUGUST 2023**

<table>
<tr><td>AUG<br>**12**<br>SAT</td><td>

## Traditional Hunter Education (/events/view/191013)

**Registration Open**   48 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, August 12, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**
</td></tr>
</table>

---

**OCTOBER 2023**

<table>
<tr><td>OCT<br>**14**<br>SAT</td><td>

## Traditional Hunter Education (/events/view/191014)

**Registration Open**   50 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, October 14, 2023   7:30am - 5:00pm

**DISTANCE**
**34 mi**
</td></tr>
</table>

---

**NOVEMBER 2023**

<table>
<tr><td>NOV<br>**11**<br>SAT</td><td>

## Traditional Hunter Education (/events/view/191015)

**Registration Open**   50 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game**   Escondido, CA 92027
Saturday, November 11, 2023   7:30am - 5:00pm
</td></tr>
</table>

Help

**DISTANCE**
**34 mi**

RSS (https://www.registe -ed com/programs  chedule page:1/limit:200.   ?zip=92113&distance=50)

Help

# EXHIBIT 8

**Educational Courses in Temecula, CA**

Update registration (/users/login)     Cancel registration (/users/login)

Upcoming Events (/programs/california/161-online-course-and-follow-up-class)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

You're registering for:

# Online Course and Follow-Up Class

**Registration Open**   10 of 10 seats remaining

Register Now (/events/register/194286)

**LOCATION & SCHEDULE**

# Meeting on:

Sunday, February 19, 2023            3:00pm - 7:00pm

# Located at:

**The Hunter Instructor - Temecula**
41835 Camino de la Torre
Temecula, CA 92028
Get directions (https://maps.google.com?sensor=false&zoom=12&q=41835+Camino+de+la+Torre%2C+Temecula+CA)

---

**About the Event**
This is the follow-up course in relation to the on-line Hunter Education Course. This is NOT and instructional course, but rather a review and exam course.

ALL students are required to have completed the on-line course before attending this session and should be prepared to pass the exam upon their arrival.

While anyone may attend the course, it is strongly recommended that students ages 10 and under attend a tradition Hunter Education course.

**About the Location**
This is the follow up course to the hybrid on line Hunter Education Course. This is a 3 hour review and safe gun handing demonstration only course and 1 hour exam

---

**DETAILS**

# Requirements

**Important** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you have previously held a CDFW license (i.e. Fishing), your GO ID is printed on the license above your name.** Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

All students must download, print, and sign a Student Consent Form (https://s3.amazonaws.com/register-ed.com/uploads/et_20170109_002052728_1508446753.pdf). Students **17 years of age and younger** mus signed by a parent or guardian. **The signed form must be brought to class.**

Help

Access is permitted to the 4 hour follow-up class only after a student has completed the written Home Study or On-line component of the class. In order to be certified the student must attend the entire review class. Students will need to show safe handling of firearms and pass the Hunter Education test with a score of 80% or better. There is no minimum age to attend California Hunter Education.

**Special Accommodations** If you require special assistance or accommodations, please see the form, Reasonable Accommodation: Request for Services (https://s3.amazonaws.com/register-ed.com/uploads/et_20160502_002052728_1304264900.pdf). If you have any questions, please contact the instructor or regional director directly.

## Cancellation Policies
You must cancel your registration before Saturday, February 18, 2023, at 3:00pm CST.

## Organized by:
**David M Bogan**
Instructor Mobile Phone: 951-536-0171
Send a message



## ABOUT THE PROGRAM
## Overview

This is a 2 component course. Students must complete an Online Course prior to attending a Follow-Up Class. The Follow-Up is a review only of what the student has learned online.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

The on-line course in itself will not get you a valid hunter education certificate. Once you have completed one of the on-line courses, you will still need to attend a 4 hour follow-up class with a certified Hunter Education Instructor. Young children may find the course demanding, due to the limited interaction with an instructor. Please contact the Instructor directly for help deciding whether your child is old enough. The course is available by request in hardcopy form for individuals without computer or internet access.

Help

Register Now (/events/registe

# EXHIBIT 9

**Hunting Licenses and Tag Fees**

# Hunting Licenses and Tags

| Items & Fees | Tag Reporting | Reduced-Fee | Forms |
|---|---|---|---|

| FAQs | Exchanges, Returns, Preference Points | |
|---|---|---|

## License Items and Fees

**Purchase these items ONLINE or at any CDFW License Sales Office or License Agent.**

*Valid JULY 1, 2022 through JUNE 30, 2023*

Fish and Game Code Section 70 defines "Resident" as any person who has resided continuously in the State of California for six months or more immediately prior to the date of their application for a license or permit, any person on active military duty with the Armed Forces of the United States or auxiliary branch thereof, or any person enrolled in the Job Corps established pursuant to Section 2883 of Title 29 of the United States Code.

Fish and Game Code Section 86 defines "Take" as hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture or kill.

License fees include a 3% nonrefundable application fee, not to exceed $7.50 per item.

Licenses issued from license agents include a 5% nonrefundable license agent handling fee.

## Hunting Licenses

| Title | Fee | Description |
|---|---|---|
| Resident Hunting License | $54.00 | Required for any resident 16 years of age or older who takes birds or mammals. |

| Title | Fee | Description |
|---|---|---|
| Nonresident Hunting License | $188.74 | Required for any nonresident 16 years of age or older who takes birds or mammals. |
| Junior Hunting License | $14.30 | Required for any resident or nonresident less than 16 years of age who takes birds or mammals. To qualify, hunter must be less than 16 years of age at the beginning of the license year (July 1). |
| One-Day Nonresident Hunting License | $25.92 | **IMPORTANT!** This license is only available for nonresidents taking resident and migratory game birds on Licensed Game Bird Clubs (Upland Game Bird Validation is also required) or Licensed Domesticated Migratory Game Bird Shooting Areas (Federal Duck Stamp and California Duck Validation are also required). |
| Two-Day Nonresident Hunting License | $54.00 | Allows a nonresident 16 years of age or older to take resident and migratory game birds, resident small game mammals, nongame mammals and furbearers for two consecutive days. Additional validations and tags may be required for certain species. IMPORTANT! This license is NOT valid for deer, bear, elk, pronghorn antelope, bighorn sheep, or pig. |
| Disabled Veteran Reduced Fee Hunting License | $8.24 at CDFW Offices $8.64 from License Agents | Available for any resident or nonresident honorably discharged disabled veteran with a 50 percent or greater service-connected disability. After you prequalify for your first Disabled Veteran Reduced Fee Hunting License, you can purchase a disabled veteran license anywhere licenses are sold. Disabled Veteran Reduced Fee Hunting License |
| Recovering Service Member Reduced-Fee | $8.24 at CDFW Offices | Available to any recovering service member. A recovering service member is defined as a member of the armed forces, including a member of the National Guard or a Reserve, who is undergoing medical |

Ex. 9
Page 322

| Title | Fee | Description |
|---|---|---|
| Hunting License | $8.64 from License Agents | treatment, recuperation or therapy and is in an outpatient status while recovering from a serious injury or illness related to the member's military service. After you prequalify for your Recovering Service Member Reduced-Fee Hunting License, you can purchase a recovering service member hunting license anywhere licenses are sold.<br><br>Recovering Service Member Reduced-Fee Hunting License |
| Duplicate Hunting License | $11.88 | Available Online, at any CDFW License Sales Offices and License Agents. |

## Big Game Tag Drawing Applications

**More information about Applying for the Big Game Tag Drawing**

| Title | Fee | Description |
|---|---|---|
| Resident First-Deer Tag or First-Deer Tag Drawing Application | $35.38 | Hunters may obtain two deer tags per license year. Applicants for deer tags must be age 12 as of July 1, of the current license year or at the time of purchase if purchasing after July 1. A First-Deer Tag Drawing Application or First-Deer Tag must be purchased before or at the same time as a Second-Deer Tag Drawing Application (junior hunters only) or Second-Deer Tag. See the Big Game Hunting Digest for more information. |
| Resident Second-Deer Tag or Second-Deer Tag Drawing Application | $44.28 | |
| Nonresident First-Deer Tag or First-Deer Tag | $317.00 | |

Ex. 9
Page 323

| Title | Fee | Description |
|---|---|---|
| Drawing Application | | |

# Big Game Tags

| Title | Fee | Description |
|---|---|---|
| Bear Tag | $28.34 Resident Junior<br>$52.41 Resident<br>$334.05 Nonresident | Resident and nonresident licensed hunters age 12 or older as of July 1 of the current license year, may purchase. One bear tag per license year. |
| Elk Tag | $23.50 Resident Junior<br>$512.05 Resident<br>$1,568.05 Nonresident | Resident and nonresident licensed hunters age 12 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Elk Tag Drawing Application per license year. |
| Pronghorn Antelope Tag | $23.50 Resident Junior<br>$172.29 Resident<br>$527.50 Nonresident | Resident and nonresident licensed hunters, age 12 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Pronghorn Tag Drawing Application per license year. |
| Bighorn Sheep Tag | $468.75 Resident<br>$1,736.75 Nonresident | Resident and nonresident licensed hunters, age 16 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Bighorn Sheep Tag Drawing Application per license year. Hunters can not apply as a party. Applicants can not apply if they have previously been issued a California Bighorn Sheep Tag through the Big Game Drawing. |
| Wild Pig Tag | $25.92 Resident<br>$86.97 Nonresident | Resident and nonresident licensed hunters, 12 years of age or older at the time of |

Ex. 9
Page 324

| Title | Fee | Description |
|---|---|---|
| | | application, may purchase an unlimited number of Wild Pig Tags. Tags are nonrefundable and nontransferable. |

## Bird Hunting Validations

| Title | Fee | Description |
|---|---|---|
| California Duck Validation | $34.56 | Required for any person taking waterfowl, excluding juniors hunting under the authority of a Junior Hunting License. |
| Upland Game Bird Validations | $21.60 | Required for any person taking upland game bird species, excluding juniors hunting under the authority of a Junior Hunting License. |
| Federal Duck Stamp | $25.00 | Required for any person hunting waterfowl. Hunters under the age of 16 are exempt from the Federal Duck Stamp requirement. Federal Duck Stamps are not sold at CDFW offices. Federal Duck Stamps can be purchased at many post offices and some license agents. More information about the Federal Duck Stamp (USFWS)⬀. |
| Harvest Information Program (HIP) Validation | NO FEE | Required for any person hunting ducks, dove, gallinules, geese, band-tailed pigeon, black brant, coots, and snipe. This validation is free to hunters who complete the Harvest Information Program (HIP) Survey. The validation is available where hunting licenses are sold. The HIP Validation is imprinted on your hunting license document when you answer the HIP Survey questions. If you hunt migratory game birds, verify that a HIP Validation has been printed on your hunting license. The HIP Survey provides wildlife biologists with data needed to make wildlife management decisions and formulate hunting seasons. More information about HIP⬀ |

# Passes for State-Operated Hunting Areas

| Title | Fee | Description |
| --- | --- | --- |
| Type A One-Day Pass | $24.33 | Allows a licensed hunter to hunt on a Type A State-operated Wildlife Area for one day if space is available. Junior hunters are exempt from permit requirements. |
| Type A Two-Day Pass | $39.14 | Allows a licensed hunter to hunt on a Type A State-operated Wildlife Area. This pass may be used as follows: 1) by one person for any two authorized shoot days; or 2) by two persons on any one authorized shoot day. Junior hunters are exempt from pass requirements. |
| Type A Season Pass | $183.34 | Allows a licensed hunter unlimited season access to Type A and Type B State-operated Wildlife Areas for one person if space is available. Junior hunters are exempt from permit requirements. |
| Type B Season Pass | $61.56 | Allows a licensed hunter unlimited season access to Type B State-operated Wildlife Areas for one person if space is available. Junior hunters are exempt from pass requirements. |

# Reservation Applications for State-Operated Hunting Areas

| Title | Fee | Description |
| --- | --- | --- |
| Reservation Application | $1.34 per application | Allows a licensed hunter to apply for reservation drawings to hunt on State-operated Wildlife Areas. |

# Lifetime Hunting Licenses

| Title | 2023 Fee | Description |
|---|---|---|
| Ages 0-9 | $644.50 | Available to any resident showing proof of completion of hunter education training. Lifetime hunting licensees receive an annual hunting license each year for life. Lifetime Hunting Packages must first be purchased from a CDFW License Sales Office. See Lifetime License application and information for more detail. |
| Ages 10-39 | $1,054.25 | |
| Ages 40-61 | $949.75 | |
| Ages 62+ | $644.50 | |
| Lifetime Bird Hunting Privilege Package | $374.25 | Lifetime licensees who purchase the Lifetime Bird Hunting Privilege Package receive Upland Game Bird and California Duck Validations each year for life. |
| Lifetime Big Game Hunting Privilege Package | $784.50 | Lifetime licensees who purchase the Big Game Hunting Privilege Package receive a One-Deer Tag Application and five Wild Pig Tags each year for life. |

## Permits for Hunters with Disabilities

| Title | Fee | Description |
|---|---|---|
| Mobility Impaired Disabled Persons Motor Vehicle Hunting License Application | NO FEE | Available to any resident or nonresident for mobility impaired disabled hunter who must use a motor vehicle to pursue game. A person must be either permanently or fully confined to a wheel chair, a single or double amputee above the knee or double amputee below the knee or depend upon the aid of a walker, crutches, etc. to walk. Certification from the hunter's physician is required. The license is only available from the CDFW's License and Revenue Branch. <br><br> Mobility Impaired Disabled Persons Motor Vehicle Hunting License (PDF Form). |

| Title | Fee | Description |
|-------|-----|-------------|
| Visually Disabled Muzzleloader Scope Permit | NO FEE | Available to any resident or nonresident visually impaired hunter having a permanent loss, significant limitation, or diagnosed disease or disorder, which substantially impairs the vision of a hunter, preventing the hunter from viewing and aligning the sights of a muzzle-loading rifle with the target in order to hunt deer. A visually disabled hunter may use a scope of no more than one power while hunting under the conditions of a muzzle-loading deer hunt tag. Certification from the hunter's physician or optometrist is required annually, except if the physician or optometrist indicated on the initial application that the hunter's disability is permanent the hunter will be able to provide a copy of their previously issued Visually Disabled Muzzleloader Scope Permit to renew the permit. The permit is only available from the CDFW's License and Revenue Branch.<br><br>Visually Disabled Muzzleloader Scope Permit Application (PDF Form). |
| Disabled Archer Permit | NO FEE | Available to any resident or nonresident hunter's having permanent loss, significant limitation, or diagnosed disease or disorder, which substantially impairs one or both upper extremities preventing a hunter to draw and hold a bow in a firing position. Allows the hunter to hunt with a crossbow or other device to draw and hold a bow in a firing position under the conditions of an archery tag or during archery season. Certification from the hunter's physician is required annually, except if the physician indicated on the initial application that the hunter's disability is permanent the hunter will be able to provide a copy of their previously issued Disabled Archer Permit to renew the permit. The permit is only available from the CDFW's License and Revenue Branch.<br><br>Disabled Archer Permit Application (PDF Form). |

# Duplicate Fees

| Title | Fee | Description |
| --- | --- | --- |
| Duplicate Hunting License | $11.88 | Replaces a lost or stolen hunting license. |
| Duplicate Hunting Validation | $3.24 | (California Duck Validation and Upland Game Bird Validation) Replaces lost or stolen hunting validations. |
| Duplicate Big Game Tag | $11.33 | Replaces lost or stolen big game tags. Available only at CDFW license sales offices. Duplicate Big Game Tag Affidavit (PDF Form) |
| Duplicate Hunter Education Certificate | $7.56 | Replaces a lost or stolen Hunter Education Certificate. |

# Related Information

- Available Deer Tags (PDF)⧉
- Big Game Tags and Drawings
- Collectible Stamps
- General Hunting Information
- Hunter Education Requirements
- Hunting Regulations
- Licensed Game Bird Clubs (PDF)⧉
- Search For a Licensed Guide (Fishing and Hunting)
- Waterfowl Hunting Reservations
- Certificate of Nonreceipt / CNR (PDF)⧉

Ex. 9
Page 329

# EXHIBIT 10

**Hunting Licenses 2019**



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting
Items Reported by License Year
**AS OF 10/31/2021**

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | 251,572 | 246,701 | 248,262 | 251,046 | 248,473 | 238,655 | 238,495 | 233,531 | 229,320 | 219,076 |
| Lifetime Hunting | 4,987 | 4,676 | 4,858 | 4,942 | 5,203 | 5,277 | 5,585 | 5,845 | 6,042 | 6,262 |
| Junior Hunting (Annual) | 20,520 | 20,553 | 20,505 | 20,959 | 19,818 | 25,878 | 23,770 | 22,301 | 21,123 | 19,936 |
| Lifetime Junior Hunting | 691 | 649 | 739 | 769 | 855 | 1,107 | 1,144 | 1,180 | 854 | 1,238 |
| Disabled Veteran Hunting | 2,019 | 2,370 | 2,734 | 3,124 | 3,527 | 3,827 | 4,099 | 4,325 | 4,609 | 4,713 |
| Recovering Service Member | 0 | 0 | 4 | 7 | 12 | 7 | 7 | 6 | 3 | 3 |
| Non-Resident Hunting (Annual) | 3,711 | 3,915 | 3,965 | 3,736 | 3,707 | 3,720 | 3,768 | 3,923 | 3,893 | 3,813 |
| Non-Resident 1-Day Hunting | 565 | 171 | 144 | 236 | 253 | 246 | 224 | 279 | 244 | 278 |
| Non-Resident 2-Day Hunting | 3,164 | 3,231 | 3,007 | 3,022 | 2,911 | 3,033 | 2,907 | 3,271 | 3,188 | 2,997 |
| *Sub Total - Hunting Licenses* | *287,229* | *282,266* | *284,218* | *287,841* | *284,759* | *281,750* | *279,999* | *274,661* | *269,276* | *258,316* |
| Resident First Deer Tag | 139,283 | 140,633 | 139,895 | 143,697 | 143,126 | 143,047 | 142,022 | 142,021 | 139,763 | 137,839 |
| Non-Resident First Deer Tag | 978 | 975 | 974 | 942 | 962 | 997 | 1,078 | 1,122 | 1,157 | 1,233 |
| Resident Second Deer Tag | 40,600 | 38,933 | 38,639 | 40,172 | 38,649 | 40,490 | 41,498 | 42,312 | 39,791 | 40,927 |
| Non-Resident Second Deer Tag | 64 | 54 | 50 | 56 | 55 | 56 | 65 | 57 | 67 | 71 |
| Lifetime Deer Tag | 2,160 | 1,916 | 2,028 | 2,043 | 2,117 | 2,233 | 2,317 | 2,408 | 2,511 | 2,583 |
| Duplicate/Exchange Deer Tag | 566 | 215 | 240 | 191 | 222 | 238 | 153 | 165 | 141 | 154 |
| *Sub Total - Deer Tags* | *183,651* | *182,726* | *181,826* | *187,101* | *185,131* | *187,061* | *187,133* | *188,085* | *183,430* | *182,807* |
| Resident Pronghorn Antelope Tag | 231 | 240 | 240 | 198 | 197 | 252 | 270 | 241 | 245 | 227 |
| Resident Pronghorn Antelope Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 16 |
| Non-Resident Pronghorn Antelope Tag | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Resident Bighorn Sheep Tag | 21 | 25 | 23 | 18 | 12 | 11 | 18 | 18 | 17 | 25 |
| Non-Resident Bighorn Sheep Tag | 1 | 2 | 3 | 4 | 2 | 1 | 0 | 0 | 1 | 3 |
| Resident Elk Tag | 415 | 421 | 439 | 409 | 352 | 381 | 313 | 322 | 348 | 332 |
| Resident Elk Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 24 |
| Non-Resident Elk Tag | 7 | 5 | 3 | 4 | 5 | 3 | 2 | 4 | 5 | 3 |
| *Sub Total - Antelope, Bighorn Sheep, Elk Tags* | *675* | *694* | *709* | *633* | *569* | *649* | *604* | *586* | *617* | *631* |
| Resident Antelope Tag Drawing Application | N/A | 22,715 | 23,039 | 21,929 | 22,636 | 24,018 | 24,599 | 26,223 | 26,618 | 26,652 |
| Non-Resident Antelope Tag Drawing Application | N/A | 282 | 301 | 307 | 351 | 400 | 435 | 496 | 519 | 547 |
| Resident Bighorn Sheep Tag Drawing Application | N/A | 12,179 | 12,756 | 12,329 | 12,706 | 13,521 | 14,103 | 15,443 | 16,111 | 16,350 |
| Non-Resident Bighorn Sheep Tag Drawing Application | N/A | 668 | 682 | 688 | 725 | 776 | 795 | 850 | 898 | 919 |
| Resident Elk Tag Drawing Application | N/A | 31,602 | 32,194 | 31,369 | 32,493 | 34,938 | 35,570 | 38,449 | 39,011 | 38,795 |
| Non-Resident Elk Tag Drawing Application | N/A | 474 | 489 | 517 | 573 | 620 | 699 | 775 | 820 | 877 |
| Elk, Antelope, Sheep Tag Return Processing Fee | 11 | 3 | 24 | 7 | 24 | 6 | 8 | 42 | 16 | 15 |
| Elk, Antelope, Sheep Drawing Applications | 61,034 | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above |
| *Sub Total - Antelope, Bighorn Sheep, Elk Draw* | *61,045* | *67,923* | *69,485* | *67,146* | *69,508* | *74,279* | *76,209* | *82,278* | *83,993* | *84,155* |
| Fundraising Deer Tag Random Drawing | N/A | 15,516 | 18,054 | 17,984 | 17,720 | 22,359 | 23,575 | 24,362 | 22,295 | 22,249 |
| Fundraising Bighorn Sheep Tag Random Drawing | N/A | N/A | 16,488 | 12,585 | 0 | 0 | 10,451 | 12,306 | 11,924 | 9,299 |
| Fundraising Antelope Tag Random Drawing | N/A | N/A | 6,548 | 6,335 | 5,927 | 7,988 | 8,840 | 9,129 | 8,503 | 8,787 |
| Fundraising Elk Tag Random Drawing | N/A | 12,020 | 13,695 | 13,110 | 14,152 | 17,232 | 18,033 | 16,243 | 21,410 | 19,726 |



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year

**AS OF 10/31/2021**

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Sub Total - Fundraising Drawing* | *0* | *27,536* | *54,786* | *50,014* | *37,799* | *47,579* | *60,899* | *62,040* | *64,132* | *60,061* |
| Resident Bear Tags | 24,576 | 24,954 | 24,625 | 23,328 | 26,481 | 27,483 | 27,172 | 27,752 | 27,809 | 26,428 |
| Resident Bear Tags (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1,226 |
| Non-Resident Bear Tags | 268 | 237 | 247 | 69 | 95 | 98 | 81 | 94 | 95 | 101 |
| *Sub Total - Bear* | *24,844* | *25,191* | *24,872* | *23,397* | *26,576* | *27,581* | *27,253* | *27,846* | *27,904* | *27,755* |
| Resident Wild Pig Tag | 48,125 | 49,461 | 50,956 | 51,986 | 49,076 | 44,082 | 42,942 | 41,433 | 39,549 | 38,539 |
| Non-Resident Wild Pig Tag | 1,218 | 1,016 | 1,197 | 1,192 | 1,085 | 1,051 | 1,041 | 866 | 902 | 825 |
| Lifetime Wild Pig Tags | 11,225 | 7,759 | 8,196 | 8,269 | 8,127 | 8,297 | 8,273 | 8,280 | 8,052 | 8,134 |
| *Sub Total - Wild Pig Tags* | *60,568* | *58,236* | *60,349* | *61,447* | *58,288* | *53,430* | *52,256* | *50,579* | *48,503* | *47,498* |
| Bobcat Hunting Tags** | 3,684 | 4,593 | 12,461 | 12,632 | 12,538 | 11,650 | 11,323 | 11,988 | 12,067 | 10,661 |
| Bobcat Shipping Tags | 1,078 | 1,525 | 1,577 | 1,483 | 804 | N/A | N/A | N/A | N/A | N/A |
| *Sub Total - Bobcat Tags* | *4,762* | *6,118* | *14,038* | *14,115* | *13,342* | *11,650* | *11,323* | *11,988* | *12,067* | *10,661* |
| Duck Validation | 67,551 | 67,637 | 68,806 | 68,095 | 67,929 | 66,603 | 66,570 | 64,531 | 63,855 | 61,794 |
| Collector Duck Stamp | 59 | 419 | 261 | 681 | 464 | 434 | 337 | 327 | 348 | 296 |
| Lifetime Duck Validation | 2,625 | 2,237 | 2,198 | 2,240 | 2,320 | 2,406 | 2,484 | 2,580 | 2,603 | 2,685 |
| Waterfowl Reservation Application | 740,522 | 759,168 | 833,433 | 876,700 | 860,488 | 1,006,387 | 1,037,814 | 1,026,383 | 1,012,301 | 982,488 |
| 1-Day Type A Wildlife Area Permit | 36,004 | 13,473 | 11,710 | 10,324 | 10,697 | 10,576 | 8,594 | 9,593 | 9,490 | 8,803 |
| 2-Day Type A Wildlife Area Pass | 3,071 | 13,184 | 14,771 | 15,300 | 17,898 | 17,803 | 14,467 | 15,171 | 14,660 | 14,217 |
| Type A Wildlife Area Season Pass | 3,822 | 5,404 | 5,476 | 5,411 | 4,413 | 4,553 | 5,210 | 4,941 | 4,827 | 4,963 |
| Type B Wildlife Area Season Pass | 785 | 958 | 962 | 778 | 576 | 611 | 746 | 797 | 752 | 751 |
| Upland Game Bird Validation | 175,505 | 173,373 | 173,590 | 175,616 | 171,121 | 160,541 | 158,646 | 156,449 | 154,656 | 145,085 |
| Collector Upland Game Bird Stamp | 30 | 130 | 87 | 165 | 133 | 183 | 149 | 107 | 82 | 95 |
| Lifetime Upland Game Bird Validation | 2,649 | 2,278 | 2,404 | 2,491 | 2,589 | 2,627 | 2,788 | 2,890 | 2,938 | 3,028 |
| Harvest Information Program Validation | 22,467 | 174,251 | 184,441 | 183,293 | 165,209 | 174,169 | 148,831 | 160,290 | 156,546 | 146,325 |
| *Sub Total - Game Bird Hunting* | *1,055,090* | *1,212,512* | *1,298,139* | *1,341,094* | *1,303,837* | *1,446,893* | *1,446,636* | *1,444,059* | *1,423,058* | *1,370,530* |
| Lifetime Hunting Package - Age 0 to 9 | 115 | 132 | 161 | 149 | 156 | 156 | 135 | 151 | 162 | 181 |
| Lifetime Hunting Package - Age 10 to 39 | 158 | 186 | 151 | 160 | 194 | 168 | 211 | 189 | 202 | 191 |
| Lifetime Hunting Package - Age 40 to 61 | 103 | 89 | 99 | 90 | 110 | 101 | 109 | 127 | 120 | 111 |
| Lifetime Hunting Package - Age 62 and Over | 40 | 50 | 44 | 47 | 53 | 51 | 36 | 61 | 52 | 54 |
| Lifetime Hunting Privilege Package - Big Game | 155 | 144 | 147 | 163 | 150 | 151 | 153 | 175 | 181 | 187 |
| Lifetime Hunting Privilege Package - Game Bird | 162 | 202 | 172 | 176 | 183 | 156 | 190 | 201 | 191 | 191 |
| *Sub Total - Lifetime Packages* | *733* | *803* | *774* | *785* | *846* | *783* | *834* | *904* | *908* | *915* |
| **TOTAL HUNTING** | **1,678,597** | **1,864,005** | **1,989,196** | **2,033,573** | **1,980,655** | **2,131,655** | **2,143,146** | **2,143,026** | **2,113,888** | **2,043,329** |

*****Lifetime License** statistics reflect the sale of lifetime packages since the implementation of the Automated License Data System in 2010.

****** Bobcat Hunting Tags** issued prior to 2012 were sold as a set of 5 tags. 2012 and after tags were sold individually.

# EXHIBIT 11

**Hunting Licenses 2020-2022**



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2023**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | 247,185 | 231,047 | 216,684 | - | - | - | - | - | - | - |
| Lifetime Hunting | 6,924 | 7,066 | 7,271 | - | - | - | - | - | - | - |
| Junior Hunting (Annual) | 19,132 | 16,977 | 14,596 | - | - | - | - | - | - | - |
| Lifetime Junior Hunting | 1,053 | 1,098 | 1,022 | - | - | - | - | - | - | - |
| Disabled Veteran Hunting | 5,084 | 5,004 | 4,779 | - | - | - | - | - | - | - |
| Recovering Service Member | 6 | 3 | 2 | - | - | - | - | - | - | - |
| Non-Resident Hunting (Annual) | 3,907 | 4,374 | 4,117 | - | - | - | - | - | - | - |
| Non-Resident 1-Day Hunting | 342 | 385 | 236 | - | - | - | - | - | - | - |
| Non-Resident 2-Day Hunting | 2,643 | 2,887 | 2,266 | - | - | - | - | - | - | - |
| *Sub Total - Hunting Licenses* | *286,276* | *268,841* | *250,973* | - | - | - | - | - | - | - |
| Resident First Deer Tag | 143,891 | 141,555 | 138,910 | - | - | - | - | - | - | - |
| Non-Resident First Deer Tag | 1,292 | 1,442 | 1,581 | - | - | - | - | - | - | - |
| Resident Second Deer Tag | 43,806 | 43,810 | 44,908 | - | - | - | - | - | - | - |
| Non-Resident Second Deer Tag | 62 | 94 | 115 | - | - | - | - | - | - | - |
| Lifetime Deer Tag | 2,722 | 2,811 | 2,921 | - | - | - | - | - | - | - |
| Duplicate/Exchange Deer Tag | 86 | 122 | 129 | - | - | - | - | - | - | - |
| *Sub Total - Deer Tags* | *191,859* | *189,834* | *188,564* | - | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag | 195 | 129 | 183 | - | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag (Junior) | 15 | 15 | 15 | - | - | - | - | - | - | - |
| Non-Resident Pronghorn Antelope Tag | 1 | 1 | 1 | - | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag | 25 | 26 | 26 | - | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag | 2 | 3 | 3 | - | - | - | - | - | - | - |
| Resident Elk Tag | 255 | 217 | 308 | - | - | - | - | - | - | - |
| Resident Elk Tag (Junior) | 12 | 16 | 14 | - | - | - | - | - | - | - |
| Non-Resident Elk Tag | 2 | 2 | 2 | - | - | - | - | - | - | - |
| *Sub Total - Antelope, Bighorn Sheep, Elk Tags* | *507* | *409* | *552* | - | - | - | - | - | - | - |
| Resident Antelope Tag Drawing Application | 29,841 | 29,854 | 30,391 | - | - | - | - | - | - | - |
| Non-Resident Antelope Tag Drawing Application | 656 | 729 | 830 | - | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag Drawing Application | 18,652 | 18,672 | 19,107 | - | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag Drawing Application | 1,015 | 1,084 | 1,186 | - | - | - | - | - | - | - |



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2023**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Elk Tag Drawing Application | 44,273 | 44,503 | 44,364 | - | - | - | - | - | - | - |
| Non-Resident Elk Tag Drawing Application | 998 | 1,092 | 1,247 | - | - | - | - | - | - | - |
| Elk, Antelope, Bighorn Sheep Tag Return Fee | 97 | 142 | 25 | - | - | - | - | - | - | - |
| *Sub Total - Antelope, Bighorn Sheep, Elk Drawing* | *95,532* | *96,076* | *97,150* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| Fundraising Deer Tag Random Drawing | 27,473 | 61,753 | 0 | - | - | - | - | - | - | - |
| Fundraising Bighorn Sheep Tag Random Drawing | 16,557 | 15,643 | 0 | - | - | - | - | - | - | - |
| Fundraising Antelope Tag Random Drawing | 10,011 | 9,210 | 0 | - | - | - | - | - | - | - |
| Fundraising Elk Tag Random Drawing | 20,906 | 23,333 | 0 | - | - | - | - | - | - | - |
| *Sub Total - Fundraising Drawing* | *74,947* | *109,939* | *0* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| Resident Bear Tags | 28,521 | 29,539 | 31,230 | - | - | - | - | - | - | - |
| Resident Bear Tags (Junior) | 1,729 | 1,758 | 1,799 | - | - | - | - | - | - | - |
| Non-Resident Bear Tags | 138 | 150 | 221 | - | - | - | - | - | - | - |
| *Sub Total – Bear Tags* | *30,388* | *31,447* | *33,250* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| Resident Wild Pig Tag | 44,624 | 41,107 | 32,177 | - | - | - | - | - | - | - |
| Non-Resident Wild Pig Tag | 1,000 | 941 | 545 | - | - | - | - | - | - | - |
| Lifetime Wild Pig Tags | 8,299 | 8,436 | 8,174 | - | - | - | - | - | - | - |
| *Sub Total - Wild Pig Tags* | *53,923* | *50,484* | *40,896* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| Duck Validation | 69,631 | 66,686 | 61,757 | - | - | - | - | - | - | - |
| Collector Duck Stamp | 279 | 315 | 40 | - | - | - | - | - | - | - |
| Lifetime Duck Validation | 2,864 | 2,933 | 2,992 | - | - | - | - | - | - | - |
| Waterfowl Reservation Application | 1,238,138 | 1,240,782 | 1,065,148 | - | - | - | - | - | - | - |
| 1-Day Type A Wildlife Area Permit | 10,102 | 9,756 | 9,940 | - | - | - | - | - | - | - |
| 2-Day Type A Wildlife Area Pass | 19,040 | 13,784 | 13,330 | - | - | - | - | - | - | - |
| Type A Wildlife Area Season Pass | 5,804 | 5,925 | 5,195 | - | - | - | - | - | - | - |
| Type B Wildlife Area Season Pass | 930 | 678 | 633 | - | - | - | - | - | - | - |
| Upland Game Bird Validation | 162,911 | 151,574 | 132,812 | - | - | - | - | - | - | - |
| Collector Upland Game Bird Stamp | 77 | 98 | 27 | - | - | - | - | - | - | - |
| Lifetime Upland Game Bird Validation | 3,216 | 3,295 | 3,386 | - | - | - | - | - | - | - |
| Harvest Information Program Validation | 156,879 | 143,894 | 131,232 | - | - | - | - | - | - | - |
| *Sub Total - Game Bird Hunting* | *1,669,871* | *1,639,720* | *1,426,492* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2023**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Lifetime Hunting Package - Age 0 to 9 | 258 | 226 | 215 | 9 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 10 to 39 | 190 | 227 | 206 | 10 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 40 to 61 | 143 | 169 | 150 | 9 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 62 and Over | 49 | 59 | 65 | 2 | - | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Big Game | 228 | 223 | 225 | 10 | - | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Game Bird | 254 | 278 | 291 | 11 | - | - | - | - | - | - |
| *Sub Total – Lifetime Packages* | *1,122* | *1,182* | *1,152* | *51* | - | - | - | - | - | - |
| **TOTAL HUNTING** | **2,404,425** | **2,387,932** | **2,039,029** | **51** | - | - | - | - | - | - |

# EXHIBIT 12

**Assembly Public Safety**

Date of Hearing:  August  13, 2013
Counsel:          Shaun Naidu

ASSEMBLY  COMMITTEE  ON PUBLIC SAFETY
Tom Ammiano,  Chair

SB 683 (Block) – As Amended:  August  7, 2013

SUMMARY:  Extends  the safety  certificate  requirement  for handguns  to all firearms  and requires  the performance  of a safe handling  demonstration  to receive  a long gun.  Specifically, this bill:

1)  Starting  January 1, 2015, extends  the safety  certificate  requirement  for handguns  to all firearms  and makes conforming  changes.

2)  Requires  long-gun  recipients,  except as specified,  to perform a safe handling  demonstration before receiving  that firearm  from a licensed firearm  dealer.  Requires  the Department  of Justice  (DOJ) to adopt regulations  by January 1, 2015 establishing  a long-gun  safe-handling demonstration  that includes,  at a minimum,  loading  and unloading  the long gun.

3)  Exempts  individuals  with valid current-season  hunting  licenses,  or valid hunting  licenses from the hunting  season immediately  preceding  the calendar  year, from the firearm  safety certificate  requirement  when acquiring  a firearm  other than handguns.  This exemption  is in addition  to the current  list of exemptions  to the handgun  safety certificate  requirements.

4)  Exempts  individuals  with unexpired  handgun  safety certificates  from the firearm  safety certificate  requirement  when acquiring  only handguns.

EXISTING LAW:

1)  Prohibits  a dealer, except as specified,  from delivering  a handgun  unless the person receiving the handgun  presents  to the dealer a valid handgun  safety certificate.  (Penal Code Section 26840.)

2)  Punishes  as a misdemeanor  any person who purchases  or receives  any handgun,  except as specified,  without  a valid handgun  safety certificate  or any person who sells, delivers, loans, or transfers  any handgun,  except as specified,  to a person who does not have a valid handgun safety certificate.  (Penal Code Section 31615.)

3)  Requires  the safety  certificate  applicant  to complete  and pass a written test prescribed  by DOJ and administered  by a DOJ-certified  instructor.  The test must cover, but is not limited to, the following:

a)  The laws applicable  to carrying  and handling  firearms,  particularly  handguns;

b)  The responsibilities  of ownership  of firearms,  particularly  handguns;

   c)  Current law as it relates to the sale and transfer of firearms laws;

   d)  Current law as it relates to the permissible use of lethal force;

   e)  What constitutes safe firearm storage;

   f)  Risks associated with bringing handguns into the home; and,

   g)  Prevention strategies to address issues associated with bringing firearms into the home. (Penal Code Section 31640.)

4) Authorizes a certified instructor who administers the handgun safety test to charge a fee of $25, $15 of which is to be paid to DOJ to cover DOJ's cost in carrying out and enforcing provisions relating to the handgun safety certificate and other specified provisions of law. (Penal Code Section 31650.)

5) Provides that DOJ shall develop handgun safety certificates, which expire 5 years after the date of issue, to be issued by DOJ-certified instructors to those persons who have complied with specified requirements. A handgun safety certificate shall include, but not be limited to, the following information:

   a)  A unique handgun safety certificate identification number;

   b)  The holder's full name;

   c)  The holder's date of birth;

   d)  The holder's driver's license or identification number;

   e)  The holder's signature;

   f)  The signature of the issuing instructor; and,

   g)  The date of issuance. (Penal Code Section 31655.)

6) Exempts the following persons from the handgun safety certificate requirement:

   a)  Any active or honorably-retired peace officer, as defined;

   b)  Any active or honorably-retired deferral officer or law enforcement agent;

   c)  Any reserve peace officer, as defined;

   d)  Any person who has successfully completed the specified peace officer training course;

   e)  A licensed firearms dealer, as specified;

   f)  A federally-licensed collector, as specified;

g) A person to whom a firearm is being returned, where the person receiving the firearm is the owner of the firearm;

h) A family member of a peace officer killed in the line who is obtaining the firearm of the slain officer;

i) Any individual who has a valid concealed weapons permit, who is authorized to carry a loaded firearm, or who is the holder of a special weapons permit, as specified;

j) An active or honorably-retired member of the United States Armed Forces, the National Guard, the Air National Guard, or the other active reserve components of the United States. (Penal Code Section 31700(a).)

FISCAL EFFECT:   Unknown

COMMENTS:

1) Author's Statement:   According to the author, "SB 683 is about education and preventing unintended injuries. Currently anyone age 18 or older can buy a long gun without having to show that he or she understands how to safely use and properly store it in the home. Long guns can be just as dangerous as hand guns. And long gun laws are just as complicated as hand gun laws. So it makes sense to establish similar requirements to buy a long gun as those required to purchase a hand gun.

"The purpose of the current Handgun Safety Certificate is to ensure that persons who buy a handgun have a basic familiarity with the firearm and are aware of the laws that govern gun ownership. This bill expands this program by establishing the Firearm Safety Certificate which seeks to generate more responsible, law-abiding gun owners by requiring every purchaser to take a written objective test that covers California laws applicable to the handling of both hand guns and long guns, the responsibilities of firearm ownership, the private transfer of firearms, and safe firearm storage."

2) Safety Certificate Background:   Beginning in 1993, possession of a handgun safety certificate was required to transfer firearms. The Department of Justice was required to create the requisite process to obtain a handgun safety certificate. Exemptions were provided for specified classes of persons who did not need to either successfully take the course or challenge the course with a specified exam.

Senate Bill 52 (Scott), Chapter 942, Statutes of 2001, repealed the basic firearms safety certificate scheme and replaced it with the more stringent handgun safety certificate scheme. SB 52 provided that, effective January 1, 2003, no person may purchase, transfer, receive, or sell a handgun without a Handgun Safety Certificate (HSC).

This bill would extend what currently is a requirement for handgun buyers to learn basic safety and laws regarding handguns to instead include this requirement to buyers of all firearms. The subjects covered would be:

a) The laws applicable to carrying and handling firearms;

b)  The responsibilities of ownership of firearms;

c)  Current law as it relates to the sale and transfer of firearms;

d)  Current law as it relates to the permissible use of lethal force;

e)  What constitutes safe firearm storage;

f)  Risks associated with bringing a firearm into the home; and,

g)  Prevention strategies to address issues associated with bringing firearms into the home.

3)  <u>Hunting License v. Firearm Safety Certificate</u>:  California requires any person hunting, pursuing, catching, capturing, killing, or attempting any of these actions on, birds or mammals to have a hunting license issued by this state.  (Fish and Game Code (FGC) Sections 86 and 1054.2.)  In order to obtain a California hunting license, the state "requires all first time resident hunters, regardless of age, to complete hunter education training or pass a comprehensive equivalency test before purchasing a hunting license."  (California Department of Fish and Wildlife, *California Hunter Education Program* <http://www.dfg.ca.gov/huntered/>  [as of Aug. 7, 2013]; FGC Sections 1053.5 and 3050.) Consequently, "[e]ach year approximately 30,000 students complete the state's ten-hour minimum hunter education course."  (California Department of Fish and Wildlife, *California Hunter Education Program*, supra.)  A hunting license generally is valid for one year from July 1 to June 30.  (FGC Section 3037.)  Additionally, California allows the issuance of a lifetime hunting license for state residents of any age.  (FGC Section 3031.2.)

Topics covered by the hunting education course generally are Introduction to Hunter Education, Hunting Safety, Hunter Responsibility, Outdoor Safety, Wildlife Conservation, and Hunting Opportunities.  (See, e.g., International Hunter Education Association, *Introduction to Hunter Education* <http://homestudy.ihea.com/>  [as of Aug. 7, 2013].)  The amount of firearm safety information included in the hunting education course is more extensive than that in the safety certificate education component prompting the exemption in this bill from the safety certificate requirement for those in possession of a hunting license. An argument, however, can be made that while the hunting education requirement is more intensive and extensive, it does not cover all aspects included by the safety certificate education component (such as the applicable laws regarding the sale and transfer of firearms and persons ineligible to possess firearms) which would be useful to all firearm owners.

4)  <u>Loaning of Long Guns</u>:  Under existing law, there is an exception for a minor possessing a handgun safety certificate when a handgun is temporarily loaned for the purpose of the minor engaging in lawful, recreational sport (such as competitive shooting) or other specified activities.  (Penal Code Section 31810.)  As argued in its opposition letter, the California Waterfowl Association notes that this bill "is impractical in cases where firearms need to be temporarily loaned to others, particularly youth, for hunting or other recreational shooting purposes while participants are in the field or at a shooting range.  In such cases, it would not likely be possible for someone to obtain a safety certificate in a timely manner."  As this bill does not create a loan-to-minors exception to the firearm safety certificate, the author may wish to address the inconsistency that this bill will create between long guns and handguns.

5) <u>Argument in Support</u>:  According to the <u>Law Center to Prevent Gun Violence</u>, "SB 683 would require *every* firearm purchaser to have a valid Firearm Safety Certificate before buying a weapon, regardless of whether the firearm to be acquired is a handgun or a long gun.  This expansion reflects the prominent role that long guns (rifles and shotguns) play in our gun violence epidemic.  For example, of the 26,682 crime guns entered into the state's Automated Firearm System (AFS) database in 2009, 11,500 were long guns.  Moreover, requiring long gun owners to obtain a Firearm Safety Certificate will help ensure that all gun owners know how to handle their weapons safely and understand their responsibilities under California law.

"Expanding the certificate requirement to apply to all firearm buyers is a reasonable method of making sure that gun owners are informed about basic principles of gun safety and California law while imposing only a minimal burden upon them."

6) <u>Argument in Opposition</u>:  According to the <u>California Association of Federal Firearms Licensees</u>, "This measure would make the qualification test for a '*firearm* safety certificate' unnecessarily difficult as it will require detailed knowledge of the many firearm types that a purchaser doesn't – and may never – own.

"Handgun purchasers seeking to exercise Second Amendment rights acknowledged by the U.S. Supreme County in *D.C., et al. v. Heller*, 128 S.Ct. 2783 (2008), would no longer just need to know the details of handguns.  Under SB 683, they would also need to learn, know, and pass a test on the intricacies of firearm categories like rifles, shotguns, other long guns, and firearms Federally [sic] classified as Any Other Weapons, each having myriad action types such as lever, pump, semi-automatic, single-shot, and others – this despite the fact that they may never chose to own any of them."

7) <u>Prior Legislation</u>:

   a) AB 35 (Shelley), Chapter 940, Statutes of 2001, required any person who wants to purchase or otherwise transfer a handgun, except as specified, to obtain a handgun safety certificate.  Enactment of AB 35 was contingent upon the enactment of SB 52, with the bill that was chaptered last establishing the handgun safety certificate scheme.

   b) SB 52 (Scott), Chapter 942, Statutes of 2001, required any person who wants to purchase or otherwise transfer a handgun, except as specified, to obtain a handgun safety certificate.  Enactment of SB 52 was contingent upon the enactment of AB 35, with the bill that was chaptered last establishing the handgun safety certificate scheme.

<u>REGISTERED SUPPORT / OPPOSITION</u>:

<u>Support</u>

Courage Campaign (Sponsor)
American Academy of Pediatrics, California
American Association of University Women, Santa Barbara-Goleta Valley Branch
Anti-Defamation League
Auburn Area Democratic Club
Bend the Arc: Jewish Partnership for Justice

Brady Campaign to Prevent Gun Violence, California Chapter
Brady Campaign to Prevent Gun Violence, Orange County Chapter
California Church IMPACT
California Medical Association
City of Santa Monica
Clergy & Laity United for Economic Justice
Coalition Against Gun Violence, A Santa Barbara County Coalition
Coalition to Stop Gun Violence
CREDO Action
Diablo Valley Democratic Club
Doctors for America
Jewish Public Affairs Committee of California
Laguna Woods Democratic Club
Law Center to Prevent Gun Violence
League of Women Voters of California
Los Angeles Mayor Antonio Villaraigosa (former)
Nevada County Democratic Women's Club
PICO California
Santa Barbara Rape Crisis Center
Tri-Cities Democratic Forum
Women Against Gun Violence
Women For: Orange County
Violence Prevention Coalition of Greater Los Angeles
Violence Prevention Coalition of Orange County
Youth ALIVE!

Eleven private individuals

Opposition

California Association of Federal Firearms Licensees
California Rifle and Pistol Association, Inc.
California Waterfowl Association

Analysis Prepared by:   Shaun Naidu / PUB. S. / (916) 319-3744

# EXHIBIT 13

**Assembly Floor Analysis 8/20/18**

**SB 1100**
Page 1

SENATE THIRD READING
SB 1100 (Portantino)
As Amended  June 28, 2018
Majority  vote

SENATE VOTE:  24-10

| Committee | Votes | Ayes | Noes |
|---|---|---|---|
| **Public Safety** | 5-2 | Jones-Sawyer,  Carrillo,  Kamlager-Dove,  Quirk,  Santiago | Lackey,  Kiley |
| **Appropriations** | 12-5 | Gonzalez Fletcher,  Bloom,  Bonta, Calderon,  Carrillo,  Chau, Eggman,  Friedman,  Eduardo Garcia, Nazarian,  Quirk, Reyes | Bigelow,  Brough,  Fong,  Gallagher,  Obernolte |

**SUMMARY**:  Increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.  Specifically,  **this bill**:

1) Exempts  the sale of a firearm,  that is not a handgun,  to the following  persons that are 18 years of age or older:

   a) A person who possesses a valid,  unexpired  hunting  license  issued by the Department  of Fish  and Wildlife;

   b) An active peace officer,  who is authorized  to carry a firearm  in the course and scope of his or her employment;

   c) An active  federal officer,  or law enforcement  agent, who is authorized  to carry a firearm in the course and scope of his or her employment;

   d) A reserve peace officer,  who is authorized  to carry a firearm  in the course and scope of his or her employment;  and,

   e) An active member of the United States Armed Forces, the National Guard, the Air national Guard,  or the active  reserve components  of the United States, where the individuals  in these organizations  are properly  identified.  Proper identification  includes the Armed Forces Identification  Card or other written  documentation  certifying  that the individual  is an active or honorably  retired  member.

   f) A person who provides proper identification  that that he or she is an honorably discharged  member of the United States Armed Forces, the National Guard, the Air National Guard,  or the active  reserve components  of the United  States. For the purposes of this exemption  proper identification  includes  an Armed Forces Identification  or other written  documentation  certifying  that he person is an honorably  discharged  member.

2) Makes conforming  changes to the age requirements  for an application  for the granting  of serial number by DOJ to persons wishing to manufacture  or assemble a firearm.

**EXISTING LAW**:

1) Prohibits  the sale or transfer of a handgun,  except as specifically  exempted,  to any person below the age of 21 years.

2) Prohibits  any person from making  an application  to purchase  more than one handgun  within any 30-day period.

3) Exempts  from the above 30-day prohibition  any of the following:

   a) Any law enforcement  agency;

   b) Any agency duly authorized  to perform  law enforcement  duties;

   c) Any state or local correctional  facility;

   d) Any private  security  company  licensed  to do business  in California;

   e) Any person who is a peace officer,  as specified,  and is authorized  to carry a firearm  in the course and scope of employment;

   f) Any motion  picture,  television,  video production  company  or entertainment  or theatrical company  whose production  by its nature involves  a firearm;

   g) Any authorized  representative  of a law enforcement  agency,  or a federally  licensed firearms  importer  or manufacturer;

   h) Any private  party transaction  conducted  through  a licensed  firearms  dealer;

   i) Any person who is a licensed  collector  and has a current certificate  of eligibility  issued by the Department  of Justice  (DOJ);

   j) The exchange,  replacement,  or return of a handgun  to a licensed  dealer within  the 30-day period;  and,

   k) A community  college  that is certified  by the Commission  on Peace Officer  Standards and Training  (POST) to present  law enforcement  academy  basic course or other commission-certified  training.

4) Prohibits  a handgun  from being  delivered  when a licensed  firearms  dealer is notified  by the DOJ that within  the preceding  30-day period the purchaser  has made another  application  to purchase  a handgun  and the purchase  was not exempted,  as specified.

5) Provides  that the penalties  for making  more than one application  to purchase  a handgun within  any 30-day period is as follows:

   a) A first violation  is an infraction  punishable  by a fine of $50;

   b) A second violation  is an infraction  punishable  by a fine of $100; and,

   c) A third violation  is a misdemeanor.

**FISCAL EFFECT**:  According to the Assembly Appropriations Committee:

1) General Fund costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the Department of Justice (DOJ) to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**COMMENTS**:  According to the author, "Raising the age limit to 21 years of age to purchase a firearm and having the one gun a month law apply to all firearms insures we as Californians are taking proper steps toward public safety.  While Washington continues to be unable to pass prudent gun legislation it is imperative that California steps up.  Young people across America are demanding that legislators respond to the crisis of gun violence on campuses.  As a dad and a legislator I am determined to build on their leadership and help California act appropriately."

Please see the policy committee analysis for a full discussion of this bill.

**Analysis Prepared by**: Gregory Pagan / PUB. S. / (916) 319-3744                 FN: 0004093

# EXHIBIT 14

**Senate Floor Analyses 8/28/18**

**SENATE RULES COMMITTEE**                                    SB 1100
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:    SB 1100
Author:     Portantino (D), et al.
Amended:    8/23/18
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 4/17/18
AYES:  Skinner, Bradford, Jackson, Mitchell, Wiener
NOES:  Anderson, Stone

SENATE APPROPRIATIONS COMMITTEE: 5-1, 5/25/18
AYES:  Lara, Beall, Bradford, Hill, Wiener
NOES:  Nielsen
NO VOTE RECORDED:  Bates

SENATE FLOOR: 24-10, 5/29/18
AYES:  Allen, Atkins, Beall, De León, Dodd, Galgiani, Glazer, Hernandez,
  Hertzberg, Hill, Hueso, Jackson, Lara, Leyva, McGuire, Mitchell, Monning,
  Pan, Portantino, Roth, Skinner, Stern, Wieckowski, Wiener
NOES:  Anderson, Bates, Fuller, Gaines, Moorlach, Morrell, Nielsen, Stone,
  Vidak, Wilk
NO VOTE RECORDED:  Berryhill, Bradford, Cannella, Newman, Nguyen

ASSEMBLY FLOOR: 47-30, 8/28/18 - See last page for vote

---

**SUBJECT:**  Firearms:  transfers

**SOURCE:**  Author

---

**DIGEST:**  This bill increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.

*Assembly Amendments* add additional exemptions including sale and control by specified members of the military and active peace officers.

**ANALYSIS:**

Existing law:

1) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years.

2) Prohibits any person from making an application to purchase more than one handgun within any 30-day period.

3) Exempts from the above 30-day prohibition any of the following:

   a) Any law enforcement agency;

   b) Any agency duly authorized to perform law enforcement duties;

   c) Any state or local correctional facility;

   d) Any private security company licensed to do business in California;

   e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

   f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

   g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

   h) Any private party transaction conducted through a licensed firearms dealer;

   i) Any person who is a licensed collector and has a current certificate of eligibility issued by the Department of Justice (DOJ);

   j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

   k) A community college that is certified by the Commission on Peace Officer Standards and Training to present law enforcement academy basic course or other commission- certified training.

4) Prohibits a handgun from being delivered when a licensed firearms dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a handgun and the purchase was not exempted, as specified.

5) Provides that the penalties for making more than one application to purchase a handgun within any 30-day period is as follows:

   a) A first violation is an infraction punishable by a fine of $50;

   b) A second violation is an infraction punishable by a fine of $100; and,

   c) A third violation is a misdemeanor.

This bill:

1) Exempts the sale of a firearm, that is not a handgun, to the following persons that are 18 years of age or older:

   a) A person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   c) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

   d) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   e) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the individuals in these organizations are properly identified. Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member; and,

   f) A person who provides proper identification that that he or she is an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States. For the purposes of this exemption proper identification includes an Armed Forces Identification or other written documentation certifying that he person is an honorably discharged member.

2) Makes conforming changes to the age requirements for an application for the granting of serial number by the DOJ to persons wishing to manufacture or assemble a firearm.

**Background**

This bill increases the minimum age from 18 to 21 years for a person to purchase all firearms in California. The age restriction also impacts the ability to transfer a weapon. Under current law a person must be 21 years of age to purchase a handgun, and this bill applies those same rules to the purchase and transfer of all firearms (including long guns). This bill creates an exception to this rule when the purchaser or transferee has a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

On February 14, 2018 Nikolas Cruz shot and killed 17 people and wounded an additional 17 people at Marjory Stoneman Douglas High School in Parkland, Florida. The perpetrator was 19-years old at the time of the incident, and he used assault rifles. Following the incident Florida passed legislation to increase the minimum age for buying rifles to 21-years. The National Rifle Association challenged the law and filed a lawsuit in the United States District court for the Northern District of Florida alleging that the ban on gun sales to people under 21 years of age is unconstitutional because it violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution because 18-year-olds are classified as adults.

**FISCAL EFFECT:** Appropriation: No   Fiscal Com.: Yes   Local: Yes

According to the Assembly Appropriations Committee:

1) GF costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the DOJ to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**SUPPORT:** (Verified 8/27/18)

California Chapters of the Brady Campaign to Prevent Gun Violence
City of Santa Monica
Giffords Law Center to Prevent Gun Violence

**OPPOSITION:** (Verified   8/27/18)

California Sportsman's Lobby
Firearms Policy Coalition
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International

**ARGUMENTS IN SUPPORT:** According to the California Chapters of the Brady Campaign to Prevent Gun Violence:

> Existing law prohibits the sale or transfer of a handgun to any person below the age of 21 years. SB 1100 will similarly prohibit, with exceptions, the sale or transfer of a long gun by a licensed firearm dealer to a person under age of 21. Additionally, the bill will require those who manufacture or assemble a long gun to be at least 21 years old in order to obtain a serial number for the firearm and register it with the California Department of Justice. These provisions makes sense as those under age 21 are disproportionally linked to crime. In 2015, 23.4 percent of those arrested for murder and non-negligent manslaughter in the U.S. were under 21 and 26.5 percent of those arrested for "weapons carrying, possession, etc." were under age 21. Individuals age 18 to 20 compromise only 4% of the population but commit 17% of gun homicides.

> Maturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds. This is recognized in other areas – those under age 21 cannot buy alcohol, rent a car, or purchase a handgun – and the same age restriction should apply to long guns.

**ARGUMENTS IN OPPOSITION:** According to the Outdoor Sportsmen's Coalition of California:

> SB 1100 would needlessly raise the age for purchasing a rifle or shotgun from 18 to 21onth.

> Rather than raise the minimum age for lawful individuals to purchase a rifle or shotgun, or limit such purchases to one firearm per month, experience with mass homicides and other crimes involving firearms has clearly shown that the focus should be on preventing criminals and individuals suffering from mental illness from acquiring firearms, not on those who are not a part of the problem.

> Persons who have an intent to commit such crimes, or other illegal acts involving the use of a firearm, will always be able to obtain firearms through unlawful sources without going through a licensed firearms dealer.

The restrictions proposed in SB 1100 will not prevent it.

ASSEMBLY FLOOR: 47-30, 8/28/18
AYES: Aguiar-Curry, Baker, Berman, Bloom, Bonta, Burke, Calderon, Carrillo, Chau, Chiu, Chu, Eggman, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Gloria, Gonzalez Fletcher, Grayson, Holden, Irwin, Jones-Sawyer, Kalra, Kamlager-Dove, Levine, Limón, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Nazarian, O'Donnell, Quirk, Quirk-Silva, Reyes, Rivas, Rubio, Santiago, Mark Stone, Thurmond, Ting, Weber, Wood, Rendon
NOES: Acosta, Travis Allen, Arambula, Bigelow, Brough, Caballero, Cervantes, Chávez, Chen, Choi, Cooley, Cunningham, Dahle, Flora, Fong, Frazier, Gallagher, Gray, Harper, Kiley, Lackey, Mathis, Mayes, Melendez, Obernolte, Patterson, Salas, Steinorth, Voepel, Waldron
NO VOTE RECORDED: Cooper, Daly, Rodriguez


Prepared by: Gabe Caswell / PUB. S. /
8/28/18 21:35:58

**** **END** ****

# EXHIBIT 15

**Assembly Floor Analysis 9/6/19**

SENATE THIRD READING
SB 61 (Portantino)
As Amended  September 6, 2019
Majority vote

## SUMMARY:

Prohibits the sale of a semiautomatic centerfire rifle to any person under 21 years of age, and prohibits a person from making an application to purchase more than one semiautomatic centerfire rifle in any 30-day period, except as specified.

**Major Provisions**

1) Prohibits a person from making an application to purchase more than one centerfire automatic rifle within any 30-day period and makes conforming changes to the existing prohibition against the purchase of more than one handgun in any 30-day period.

2) Adds the following entities to the existing exemption to the 30-day prohibition relating to sale of handguns:

   a) The purchase of a firearm other than a handgun by a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) The acquisition of a firearm, other than a handgun, at an auction or similar event conducted by a nonprofit public benefit, or mutual benefit corporation to fund the activities of that corporation or local chapter of that corporation; and,

   c) Clarifies that for the purpose of the above exemption, the frame or receiver of a firearm is a handgun, unless the application to purchase and delivered to the recipient is equipped with, is attached to, or is currently accompanied by, a barrel of 16 inches or greater in length.

3) Provides that a licensed firearms dealer shall not sell, supply, deliver, or give possession of a firearm to any person under 21 years of age. This provision shall not apply to or affect the sale of a firearm that is not a handgun or a semiautomatic centerfire rifle to a person 18 years of age or older that possesses a valid unexpired hunting license issued by the Department of Fish and Wildlife, or is an honorably discharged member of the United States military.

4) States that the provisions of this bill are severable.

## COMMENTS:

**According to the Author:**

"More and more shootings are occurring with long guns so it is important that we treat the laws of both handguns and long guns the same. The law that passed last year requiring no one under the age of 21 to purchase a firearm has exemptions that we are strengthening and tightening when it comes to the purchase of semi-automatic center fire rifle by requiring the person to obtain a CEO with the [Department of Justtice] as well."

**Arguments in Support:**

According to the Ventura County Board of Supervisors, "As you know, Ventura County was the site of the November 2018 shooting at the Borderline bar, which tragically resulted in 12 deaths. This mass shooting has left our community shattered and in search of ways to prevent similar tragedies. We appreciate the Legislature's multi-¬- pronged effort to advance legislation in 2019 that reduces the likelihood that persons who pose a threat to themselves or others are restricted from possessing firearms. As a general policy, the County of Ventura supports legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides.

"We believe SB 61 would be part of the solution in reducing gun violence. It would make long guns generally subject to the same purchasing restrictions as handguns. Limitations imposed on the purchase of handguns were enacted 20 years ago (AB 202, 1999). That legislation was intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market. SB 61 would apply the law enacted under AB 202 to long guns, as specified. It would, however, include several narrow exceptions."

**Arguments in Opposition:**

According to the California Rifle and Pistol Association "SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

"SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

"You and your proponents argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

"Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first

firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase."

"Both California and Federal law already address your concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ."

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

2) Sales tax revenue loss (General Fund (GF)) likely in the hundreds of thousands of dollars annually due to the limitation on the number of centerfire semiautomatic rifles that may be purchased in a 30-day period.

3) One-time costs (GF/Dealer Record of Sale Account) of less than $100,000 to the DOJ for limited term information technology staff and equipment to update systems to track centerfire semiautomatic rifles to ensure only one purchase within a 30-day period.

## VOTES:

**SENATE FLOOR: 27-10-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Chang, Grove, Jones, Moorlach, Morrell, Nielsen, Stone, Wilk
**ABS, ABST OR NV:** Roth

**ASM PUBLIC SAFETY: 5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Quirk, Santiago, Wicks
**NO:** Lackey, Mathis
**ABS, ABST OR NV:** Kamlager-Dove

**ASM APPROPRIATIONS: 13-5-0**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Maienschein, Petrie-Norris, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte

## UPDATED:

VERSION: September 6, 2019

CONSULTANT: Gregory Pagan (Counsel) / PUB. S. / (916) 319-3744          FN: 0002053

# EXHIBIT 16

**Senate Floor Analyses 9/6/19**

**SENATE RULES COMMITTEE**                                    SB 61
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

UNFINISHED BUSINESS

---

Bill No:    SB 61
Author:     Portantino (D), et al.
Amended:    9/6/19
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE: 5-2, 4/2/19
AYES: Skinner, Bradford, Jackson, Mitchell, Wiener
NOES: Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE: 4-2, 5/16/19
AYES: Portantino, Bradford, Hill, Wieckowski
NOES: Bates, Jones

SENATE FLOOR: 27-10, 5/22/19
AYES: Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo,
  Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire,
  Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg,
  Wieckowski, Wiener
NOES: Bates, Borgeas, Chang, Grove, Jones, Moorlach, Morrell, Nielsen, Stone,
  Wilk
NO VOTE RECORDED: Roth

ASSEMBLY FLOOR: 46-17, 9/13/19
(ROLL CALL NOT AVAILABLE)

---

**SUBJECT:**  Firearms:  transfers

**SOURCE:**   Author

---

**DIGEST:**  This bill prohibits the sale of a semiautomatic centerfire rifle to any
person under 21 years of age, and prohibits a person from making an application to
purchase more than one semiautomatic centerfire rifle in any 30-day period, except
as specified.

*Assembly Amendments* (1) limit the purchase limitations to one gun a month for semiautomatic centerfire rifles, in addition to handguns which are limited under existing law; (2) remove the language defining frames or receivers as firearms under specified scenarios; and (3) add double-jointing language to prevent chaptering issues with SB 172 (Portantino) and AB 645 (Irwin).

## ANALYSIS:

Existing law:

1) Prohibits a person from making more than one application to purchase a handgun within any 30-day period. (Pen. Code § 27535.)

2) Prohibits a firearms dealer from delivering a handgun to a person whenever the dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a handgun that does not fall within an exception to the 30-day prohibition. A violation of that delivery prohibition by the dealer is a crime. (Pen. Code § 27540.)

3) Exempts the following from the one handgun a month prohibition: (Pen. Code, § 27535, subd. (b).)

   a) Any law enforcement agency.

   b) Any agency duly authorized to perform law enforcement duties.

   c) Any state or local correctional facility.

   d) Any private security company licensed to do business in California.

   e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

   f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.

   g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

j) The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

k) The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

l) The return of any handgun to its owner.

m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

This bill:

1) Extends the prohibition on purchasing more than one handgun a month to also include semiautomatic centerfire rifles.

2) Exempts the following from the one gun a month prohibition: (Pen. Code, § 27535, subd. (b).)

a) Any law enforcement agency.

b) Any agency duly authorized to perform law enforcement duties.

c) Any state or local correctional facility.

d) Any private security company licensed to do business in California.

e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves

the use of a firearm.

g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

j) The exchange of a handgun or semiautomatic centerfire rifle where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

k) The replacement of a handgun or semiautomatic centerfire rifle when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

l) The return of any handgun or semiautomatic centerfire rifle to its owner.

m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training,

3) Specifies that specified licensees shall not sell, supply, deliver, or give possession or control of a semiautomatic centerfire rifle to any person who is under 21 years of age, with specified exemptions.

## Background

*One Gun a Month.* According to the Senate Public Safety Committee analysis of AB 202 (Knox, 1999), which created the one-handgun-a-month law in California:

> The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely

traveled  to Virginia  to purchase quantities  of weapons to take back for illegal  sale in other states. Purchases of more than one handgun per 30-day period in Virginia  is allowed  upon completion of an "enhanced" background check when  the purchase is for lawful business or personal use, for purposes of collectors, bulk sales and purchases from estates, to replace a lost or stolen weapon, and similar situations.

Supporters of limits  on purchases of handguns assume that the Virginia  limits  and the limits  in this bill  would only affect a very small proportion of legitimate  handgun purchasers. A family  of two adults could still  purchase 24 handguns a year under the provisions of both this bill  and the Virginia  law.

Virginia  repealed this law in 2012.  But, according to the Law Center to Prevent Gun Violence:

Virginia's  one-gun-a-month  law – which was in effect from 1993 to 2012 and prohibited the purchase of more than one handgun per person in any 30-day period – significantly  reduced the number of crime guns traced to Virginia  dealers. Virginia  initially  adopted its law after the state became recognized as a primary  source of crime guns recovered in states in the northeastern U.S. After the law's adoption, the odds of tracing a gun originally  acquired in the Southeast to a Virginia  gun dealer (as opposed to a dealer in a different southeastern state) dropped by:

- 71% for guns recovered in New York;
- 72% for guns recovered in Massachusetts; and
- 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/ [footnotes omitted].)

Other states that have limits  on the number of firearms  that can be sold in one month include:

- California:  California  law prohibits any person from purchasing more than one handgun within  any 30-day period. In addition, a licensed  firearms  dealer may

not deliver a handgun to any person following notification from the California Department of Justice that the purchaser has applied to acquire a handgun within the preceding 30-day period. Finally, firearms dealers must conspicuously post in their licensed premises a warning, in block letters at least one inch in height, notifying purchasers of these restrictions.

- District of Columbia: A person may not register more than one handgun in the District during any 30-day period. Since every handgun must be registered, this amounts to a purchase and sale limitation of one handgun per 30-day period.

- Maryland: Maryland prohibits any person from purchasing more than one handgun or assault weapon within a 30-day period. Under limited circumstances, a person may be approved by the Secretary of the Maryland State Police to purchase multiple handguns or assault weapons in a 30-day period. Maryland also penalizes any dealer or other seller who knowingly participates in an illegal purchase of a handgun or assault weapon.

- New Jersey: New Jersey prohibits licensed firearms dealers from knowingly delivering more than one handgun to any person within any 30-day period. With limited exceptions, no person may purchase more than one handgun within any 30-day period. New Jersey requires a handgun purchaser to obtain a separate permit for each handgun purchased, and present the permit to the seller. The seller must keep a copy of each permit presented.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/[footnotes omitted].)

*AB 1674 (Santiago, 2015): Veto Message.* The Governor stated in his veto message of Senate Bill 1674, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period:

> This bill generally prohibits the purchase of more than one firearm within any 30-day period. It should be noted that California already bans the purchase of more than one handgun per month.

> While well-intentioned, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need.

Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed.

*SB 1177 (Portantino, 2018): Veto Message.*  The Governor stated in his veto message of Senate Bill 1177, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period, with the same exemptions included in this bill:

This bill prohibits any person from purchasing more than one long-gun per month.

I vetoed a substantially similar bill in 2016, and my views have not changed.

**FISCAL EFFECT:**  Appropriation:  No    Fiscal Com.:   Yes    Local:  Yes

According to the Assembly Appropriations Committee:

- DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

- Sales tax revenue loss (GF) likely in the hundreds of thousands of dollars to low millions of dollars annually due to the limitation on the number of firearms that may be purchased in a 30-day period.

- One-time costs (GF/Dealer Record of Sale Account) of $281,000 to the DOJ for limited term information technology staff and equipment to update systems to track both handguns and long guns to ensure only one purchase within a 30-day period.

**SUPPORT:** (Verified  9/12/19)

Bay Area Student Activists
Brady California United Against Gun Violence
Coalition Against Gun Violence
Giffords Law Center to Prevent Gun Violence
Los Angeles City Attorney
Los Angeles County Board of Supervisors

**OPPOSITION:** (Verified  9/12/19)

California  Rifle  and  Pistol  Association
California  Sportsman's  Lobby
Gun Owners of California
National  Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
Safari Club International  Foundation

**ARGUMENTS IN SUPPORT:**  According to Brady California  United  Against
Gun Violence:

> In 1999,  legislation  (AB 202) was enacted that limits  purchases of
> handguns from licensed firearms  dealers in California to no more than
> one per person per 30-day period. The purpose of the bill was to curb
> the illegal  flow of handguns by taking the profit out of selling  guns
> from bulk purchases on the black market. SB 61 applies existing law
> under AB 202 to long guns, including  rifles, shotguns, and lower
> receivers.

> Under SB 61, firearms (handguns *and* long guns) will  not be delivered
> whenever the dealer is notified by the Department of Justice that
> within  the preceding 30-day period, the purchaser had made another
> application  to purchase a firearm.  Private party transactions will
> continue to be exempt. Additionally,  rifle and shotgun (but not lower
> receiver) purchasers with a valid hunting  license issued by the
> Department of Fish and Wildlife  and the acquisition of a rifle  or
> shotgun at an auction or similar  event conducted by a nonprofit will
> be exempt.

> It stands to reason that a person buying large quantities of guns at one
> time  may be acting as a straw purchaser or gun trafficker.  Moreover,
> firearms  acquired this way are frequently used in crime. In fact, an
> ATF study of tracing data demonstrated that 22% of all handguns
> recovered in crime in 1999 were originally  purchased as part of a
> multiple  sale. A similar  study found that 20% of all handguns
> recovered in crime in 2000 were originally  purchased as part of a
> multiple  sale. Additionally,  a University  of Pennsylvania  report found
> that a quarter of all guns used in crime were purchased as part of a
> multiple-gun  sale and that guns purchased in bulk were up to 64%

more likely to be used for illegal purposes than guns purchased individually.

Since 1999, Californians have typically purchased more long guns than handguns every year. Currently, these long guns include high powered featureless weapons with exchangeable magazines that enable rapid reload and lower receivers, which can be assembled into illegal military-style weapons. Limiting multiple-gun sales within a short period of time for such weapons, which are more lethal than handguns, is clearly in the interest of public safety.

The Department of Justice began to retain records of long gun purchases on January 1, 2014. An analysis of the transaction data from the period January 2014 through June 2015 shows that 81.9% of long guns were sold as a single long gun purchase within a 30-day period. *Clearly, the vast majority of long gun purchasers will not be impacted by SB 61.* However, at the opposite end of the spectrum, an individual purchased 177 long guns in two transactions within a one month period (April 2014). Furthermore, sales to single individuals ranging from 5 to 54 long guns per month occurred on 1,787 occasions, totaling 12,090 guns. Department data also shows that when multiple long guns are transferred in a sale, it is more than twice as likely that lower receivers are included. The largest bulk sale of long guns in one month to an individual (177 long guns) was composed *entirely* of lower receivers, which can be built into illegal assault weapons and sold on the black market.

Brady California believes that handguns and long guns should generally be subject to the same laws. Preventing the flow of illegal guns is important to public safety regardless of whether the firearm is a handgun or a long gun. Limiting firearms sales to one gun per 30-day period is a recognized strategy to reduce gun trafficking and keep firearms out of dangerous hands. Brady California thanks you for introducing SB 61.

**ARGUMENTS IN OPPOSITION:** According to California Rifle and Pistol Association:

SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California

businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife.  The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

The author and proponents have argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month.  For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive.  Each transaction requiring a trip to the licensed dealer.

Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase.

Both California and Federal law already address the author's concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ.

SB 61, does allow for numerous exemptions to the restriction which do not apply to the general public, though well intended by the author will create a nightmare DOJ and law enforcement to implement and enforce. Additionally, the author has argued this bill is necessary because the vast majority of firearms recovered from APPS seizures are long guns. However, data from the Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF, clearly shows the vast majority of firearms recovered by law enforcement are handguns, which are already subject to the 30-day restriction, illustrating the restrictions ineffectiveness at reducing crime.

The author and proponents have tried three previous versions of this bill in the last three years. All vetoed by Governor Brown; 2016: AB 1674, 2017: SB 497 and in 2018: SB 1177. In his 2018 veto statement the Governor stated: "I am returning SB 1177 without my signature. This bill prohibits any person from purchasing more than one long-gun per month. I vetoed a substantially similar bill in 2016, and my views have not changed", in his 2016 veto statement Governor Brown said in part; " while well-intended, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need. Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed".

Prepared by:  Gabe Caswell / PUB. S. /
9/13/19 19:33:29

**** **END** ****