1   ROB BONTA
    Attorney General of California
2   MARK BECKINGTON
    Supervising Deputy Attorney General
3   S. CLINTON WOODS
    Deputy Attorney General
4   STEPHANIE ALBRECHT
    Deputy Attorney General
5   JENNIFER E. ROSENBERG
    Deputy Attorney General
6   State Bar No. 275496
7     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013
8     Telephone: (213) 269-6617
      Fax: (916) 731-2124
9     E-mail:  Jennifer.Rosenberg@doj.ca.gov
10  *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
11  *State of California, and Allison Mendoza, in*
    *her official capacity as Acting Director of the*
12  *Department of Justice Bureau of Firearms*

13              IN THE UNITED STATES DISTRICT COURT

14          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

15

16

17

18

| | |
|---|---|
| **MATTHEW JONES**, *et al.*, | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **DECLARATION OF RANDOLPH ROTH** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California**, *et al.*, | Dept:     5B<br>Judge:    The Honorable M. James Lorenz and Magistrate Judge Alison H. Goddard |
| Defendants. | Action Filed:    July 1, 2019 |

# DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.     I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University. I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.     I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

3.     I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History.  I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4.     I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

2010 Allan Sharlin Memorial Book Award from the Social Science History
Association for outstanding books in social science history.[2]  *American Homicide*
was also named one of the Outstanding Academic Books of 2010 by *Choice*, and
the outstanding book of 2009 by *reason.com*.  The book is an interregional,
internationally comparative study of homicide in the United States from colonial
times to the present.  I am a Fellow of the American Association for the
Advancement of Science, and I have served as a member of the National Academy
of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the
Editorial Board of the *American Historical Review*, the most influential journal in
the discipline. And in 2022 I received the inaugural Distinguished Scholar Award
from the Historical Criminology Division of the American Society of Criminology.

   5.   I am the principal investigator on the National Homicide Data
Improvement Project, a project funded by the National Science Foundation (SES-
1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and
the Harry Frank Guggenheim Foundation to improve the quality of homicide data
in the United States from 1959 to the present.  The pilot project on Ohio has drawn
on a wide range of sources in its effort to create a comprehensive database on
homicides (including narratives of each incident) based on the mortality statistics of
the Ohio Department of Health, the confidential compressed mortality files of the
National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports,
death certificates, coroner's reports, the homicide case files of Cincinnati,
Cleveland, and Columbus, obituaries, and newspaper accounts.

   6.   I have published numerous essays on the history of violence and the
use of firearms in the United States, including a) "Guns, Gun Culture, and
Homicide: The Relationship between Firearms, the Uses of Firearms, and

---

   [2] See Social Science History Association, Allan Sharlin Memorial Book
Award, https://ssha.org/awards/sharlin_award/.

Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States).

7.    I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration draws are available through the Historical Violence Database.  The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present.  The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98 (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).

The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[3]

8.    My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence. I hasten to add that the insights that my colleagues and I have gained as social

_____

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism. Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right. That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

9.    I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.C.); *State of Vermont v. Max B. Misch*; *National Association for Gun Rights and Capen v. Campbell*, No. 22-cv-11431-FDS (D.MA.); *National Association for Gun Rights, and Susan Karen Goldman v. City of Highland Park, Illinois*, No. 1:22-cv-04774 (N.D. Ill. Eastern Division); *Association Of New Jersey Rifle and Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7:-22-cv-04360 (D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Federation, et al. v. Brown and Roseblum*, No. 2:22-cv-01815-IM (D.OR.); *National Association for Gun Rights v. Brown*, No 22-cv-00404-DKW-RT (D.HI.); *National Association for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D.CT.); *Steven Rupp et al. and California Rifle and Pistol Association v. Bonta*, No. 8:17-cv-00746-JLS-JDE (CA. Central District Western Division); and *Harrell v. Raoul*, No. 23-141-SPM (S.D. Ill.).

# OPINIONS

## I.  SUMMARY OF OPINIONS

10.    I have been asked by the California Department of Justice to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

11.    For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers— coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our failure at nation-

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that

building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.    Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

13.    My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing

persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder; and 6) the problem of modern youth gun violence that emerged in the mid-1960s and that has intensified since 2015.

## II.   GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.   Homicide and Firearms in the Colonial Era (1688-1763)

14.   In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

15.    Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.  Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8]  Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.  In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution.  The rates in the Chesapeake were likewise low, at 8 per million per

---

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

year for European Americans and 4 to 5 per million for African Americans.[10]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

16.    Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The

---

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

[12] Ibid., 117.

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

17.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

[23] Ibid.

[24] Ibid.  Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

18.    When colonists anticipated violence or during times of political instability, gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[28]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a modest impact on homicide rates among colonists.

**B.    The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

19.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and

---

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[29] Ibid., 118-119.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

could thus threaten the security of the government and the safety of citizens.[30]  The

threats that such citizens posed to public safety could be checked in most instances

by ordinary criminal statutes, drawn largely from British common law.  But at

times those threats could be checked only by statutes that placed limits on basic

rights.[31]

---

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was

20.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood

_____

adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

out, at 6 per 100,000 adults per year.[34]  And the proportion of domestic and
nondomestic homicides committed with firearms was correspondingly low—
between 0 and 10 percent—because people once again generally refrained, as they
had from the Glorious Revolution through the French and Indian War, from going
about armed, except to hunt, control vermin, or serve in the militia.[35]

21.     The keys to these low homicide rates and low rates of gun violence in
New England, the Mid-Atlantic states, and the settled Midwest were successful
nation-building and the degree to which the promise of the democratic revolution
was realized.  Political stability returned, as did faith in government and a strong
sense of patriotic fellow feeling, as the franchise was extended and political
participation increased.[36]  And self-employment—the bedrock of citizenship, self-
respect, and respect from others—was widespread.  By 1815, roughly 80 percent of
women and men owned their own homes and shops or farms by their mid-thirties;
and those who did not were often white-collar professionals who also received
respect from their peers.[37]  African Americans still faced discrimination and limits
on their basic rights in most Northern states.  But despite these barriers, most
African Americans in the North were optimistic, after slavery was abolished in the

---

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

North, about earning their own living and forming their own churches and

voluntary organizations.[38]

22.    That is why there was little interest among public officials in the North

in restricting the use of firearms during the Early National period, except in duels.

They took a strong stand against dueling in the wake of Alexander Hamilton's

death, because of the threat the practice posed for the nation's democratic polity

and the lives of public men: editors, attorneys, military officers, and politicians.[39]

23.    Laws restricting the everyday use of firearms did appear, however, in

the early national period in a number of slave states,[40] where violence among

citizens increased after the Revolution to extremely high levels.  Revolutionary

ideas and aspirations wreaked havoc on the status hierarchy of the slave South,

where homicide rates ranged from 8 to 28 per 100,000 adults per year.[41]  Poor and

middle-class whites were increasingly frustrated by their inability to rise in a

---

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

1  society that remained class-bound and hierarchical.[42]  Prominent whites were

2  subjected to the rough and tumble of partisan politics and their position in society

3  was threatened by people from lower social positions.[43]  African Americans

4  despaired over the failure of the abolition movement in the South, and whites were

5  more fearful than ever of African American rebellion.[44]  As a result, impatience

6  with restraint and sensitivity to insult were more intense in the slave South, and

7  during this period the region saw a dramatic increase in the number of deadly

8  quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to

9  frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever

10  Southerners settled in the early national period.[46]  During the Early National period,

11  the proportion of homicides committed with firearms went up accordingly, to a

12  third or two-fifths, as Southerners armed themselves in anticipation of trouble, or

13  set out to cause trouble.[47]

14      24.    Citizens and public officials in these states recognized that concealable

15  weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an

16  alarming proportion of the era's murders and serious assaults.[48]  They were used to

17  ambush both ordinary citizens and political rivals, to bully or intimidate law-

---

18      [42] Ibid., 182.

19      [43] Ibid.

20      [44] Ibid.

21      [45] Ibid., 182, 199-203.

22      [46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in
Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope
Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard
University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and
Behavior in the Old South* (New York: Oxford University Press, 1982).

26      [47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51
through 57.

27      [48] Roth, *American Homicide*, 218.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[50] These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

25.    The pistols of the early national period represented a technological advance.  Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51]  The new types of knives

---

[49] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

26.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[53]

---

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws.  Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols.  See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-

27.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

### C.    Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.     By the early twentieth century, every state either banned concealed

---

results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

firearms or placed severe restrictions on their possession.[55]  They did so in response
to two developments: the nationwide surge in homicide rates, from the North and
South to the Trans-Mississippi West; and the invention of new firearms, especially
the revolver, which enabled the firing of multiple rounds in succession without
reloading and made the homicide problem worse.  Between the mid-nineteenth and
the early twentieth century homicide rates fell in nearly every Western nation.[56]
But in the late 1840s and 1850s those rates exploded across the United States and
spiked even higher during the Civil War and Reconstruction, not only in the South
and the Southwest, where rates had already risen in the early national period, but in
the North.  Rates that had ranged in the North in the 1830s and early 1840s from a
low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in
New York City, rose to between 2 and 33 per 100,000 in the northern countryside
and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the
plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000,
and rates soared even higher in rural Louisiana to 90 per 100,000 and in mountain
communities in Georgia and Missouri from less than 5 per 100,000 adults per year
to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per
year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in
South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in

---

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan,
*Frontier Law and Order*, 17-22.  These sources identify laws that either banned
concealed firearms or placed severe restrictions on their possession in every state
except Vermont.  However, Vermont also had such a law by the early twentieth
century.  *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th
Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A
person who shall carry a dangerous or deadly weapon, openly or concealed, with
the intent or avowed purpose of injuring a fellow man, shall, upon conviction
thereof, be punished by a fine not exceeding two hundred dollars, or by
imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

23

1    Kansas. Americans, especially men, were more willing to kill friends,

2    acquaintances, and strangers. And so, the United States became—and remains

3    today—by far the most murderous affluent society in the world.[57]

4         29.    The increase occurred because America's heretofore largely successful

5    effort at nation-building failed at mid-century.[58] As the country struggled through

6    the wrenching and divisive changes of the mid-nineteenth century—the crises over

7    slavery and immigration, the decline in self-employment, and rise of industrialized

8    cities—the patriotic faith in government that most Americans felt so strongly after

9    the Revolution was undermined by anger and distrust.[59] Disillusioned by the course

10    the nation was taking, people felt increasingly alienated from both their government

11    and their neighbors.[60] They were losing the sense that they were participating in a

12    great adventure with their fellow Americans.[61] Instead, they were competing in a

13    cutthroat economy and a combative political system against millions of strangers

14    whose interests and values were antithetical to their own.[62] And most ominously,

15    law and order broke down in the wake of the hostile military occupation of the

16    Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

17

18       [57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and

19   Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195

20   (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

21       [58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory,

22   Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

23       [59] Roth, *American Homicide*, 299-302, 384-385. See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

24       [60] Roth, *American Homicide*, 300.

25       [61] Ibid.

26       [62] Ibid.

27       [63] Ibid., 299-302, 332, 337, 354.

28

30.     The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64]  Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.  Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their

---

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

32.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers.  It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68] And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;

---

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[69] Ibid., 38-57.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

That no injury is caused to the arm or ammunition by allowing it to
remain charged any length of time.[70]

33.    Smith and Wesson had created a near-perfect murder weapon.  It was
lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to
use at any time.[71]  Its only drawbacks were its small caliber and low muzzle
velocity, which limited its ability to stop an armed or aggressive adversary on the
first shot, and the difficulty and danger of reloading.  The reloading problem was
remedied by Colt's development in 1889 of the first double-action commercial
revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an
ejector to push out spent cartridges.[72]

34.    These new weapons were not the primary cause of the surge in
violence that occurred in the United States from the Mexican War through
Reconstruction.  But they did contribute to the later stages of the crisis, as they
superseded knives and black powder handguns as the primary weapons used in
interpersonal assaults, not only because of their greater lethality, but because they
were used in novel ways.[73]  Easily concealed, they became the weapons of choice
for men who stalked and ambushed estranged spouses or romantic partners, for
suspects who killed sheriffs, constables, or police officers, and for self-styled

---

[70] Ibid., 39.

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media,
2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa
Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that
"Americans used the new firearms in ways they could never use muzzle-loading
guns [. . .] The ownership of modern breech-loading [firearms] made the homicide
rate worse in the United States than it would have been otherwise because it
facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis
added).

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states.  In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.  Homicide rates whipsawed, however, in the South.  They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75]  Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[76]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers— reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[77]  And that is why every state in the Union restricted the right to carrying certain concealable weapons.

35.    It is important to note that state legislators experimented with various

[74] Ibid., 124-125.

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

[76] Ibid., 125.

[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[79] and it followed in 1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly weapons, including pistols, that were not designed for hunting or militia service.[80]

---

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."  An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or

---

1

_____

2  about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot,
3  sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife
   manufactured or sold for the purposes of offense or defense, unless he has
4  reasonable grounds for fearing an unlawful attack on his person, and that such
   ground of attack shall be immediate and pressing; or unless having or carrying the
5  same on or about his person for the lawful defense of the State, as a militiaman in
6  actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor,
   and, on conviction thereof shall, for the first offense, be punished by fine of not less
7  than twenty-five nor more than one hundred dollars, and shall forfeit to the county
8  the weapon or weapons so found on or about his person; and for every subsequent
   offense may, in addition to such fine and forfeiture, be imprisoned in the county jail
9  for a term not exceeding sixty days; and in every case of fine under this section the
10 fines imposed and collected shall go into the treasury of the county in which they
   may have been imposed; provided that this section shall not be so construed as to
11 prohibit any person from keeping or bearing arms on his or her own premises, or at
12 his or her own place of business, nor to prohibit sheriffs or other revenue officers,
   and other civil officers, from keeping or bearing arms while engaged in the
13 discharge of their official duties, nor to prohibit persons traveling in the State from
14 keeping or carrying arms with their baggage; provided, further, that members of the
   Legislature shall not be included under the term "civil officers" as used in this act.'
15 An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg.
16 Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads,
   'If any person shall go into any church or religious assembly, any school room, or
17 other place where persons are assembled for amusement or for educational or
18 scientific purposes, or into any circus, show, or public exhibition of any kind, or
   into a ball room, social party, or social gathering, or to any election precinct on the
19 day or days of any election, where any portion of the people of this State are
20 collected to vote at any election, or to any other place where people may be
   assembled to muster, or to perform any other public duty, (except as may be
21 required or permitted by law,) or to any other public assembly, and shall have or
22 carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword
   cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured
23 and sold for the purposes of offense and defense, unless an officer of the peace, he
24 shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first
   offense, be punished by fine of not less than fifty, nor more than five hundred
25 dollars, and shall forfeit to the county the weapon or weapons so found on his
26 person; and for every subsequent offense may, in addition to such fine and
   forfeiture, be imprisoned in the county jail for a term not more than ninety days.'
27 Id. § 3."  The law did not apply, however, 'to a person's home or business, and
28

1    These laws were enforced with little or no racial bias until the 1890s, when white

2    supremacists disfranchised African Americans, legalized segregation, and took firm

3    control of the courts and law enforcement.[81]

4        36.    Many states accompanied or followed these broadly applicable carry

5    regulations with restrictions on sales and transfers of these types of concealable

6    arms to minors.  For example, Texas took steps in 1897 to prohibit the selling or

7    gift of these same types of small, concealable weapons to minors. "That if any

8    person in this State shall knowingly sell, give or barter, or cause to be sold, given or

9    bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or

10   knuckles made of any metal or hard substance, bowie knife or any other knife

11   manufactured or sold for the purpose of offense or defense, without the written

12   consent of the parent or guardian of such minor, or of someone standing in lieu

13   thereof, he shall be punished by fine of not less then twenty-five nor more than two

14   hundred dollars, or by imprisonment in the county jail not less than ten nor more

15   than thirty days, or by both such fine and imprisonment. And during the time of

16   such imprisonment such offender may be put to work upon any public work in the

17   _____

18   there were exemptions for "peace officers" as well as travelers; lawmakers and
     jurists spent considerable time fleshing out who qualified under these exemptions,
19   and how to allow those fearing an imminent attack to carry these weapons in public
     spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just
20   pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . .
     gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun,
21   pistol . . . .'"

22       See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas:
23   Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D.
     dissertation: Texas Christian University, 2019), 72-83, 124-163
24   (https://repository.tcu.edu/handle/116099117/26778).

25       [81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study
26   draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases,
     of which 1,885 left a record of final adjudication.  See also Rivas, "Deadly Weapon
27   Laws of Texas," 164-195.

28

1    county in which such offense is committed."[82]

2          37.     Tennessee and Arkansas went farther than Texas to stem the tide of

3    post-Civil War interpersonal violence. In 1871, Tennessee flatly prohibited the

4    carrying of pocket pistols and revolvers, openly or concealed, except for the large

5    army and navy pistols commonly carried by members of the military, which could

6

7

8

9

10

11

12

13

14

---

[82] 1897 Tex. Gen. Laws 221-22, An Act to Prevent the Barter, Sale and Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . . , ch. 155, § 1. (https://firearmslaw.duke.edu/laws/1897-tex-gen-laws-221-22-an-act-to-prevent-the-barter-sale-and-gift-of-any-pistol-dirk-dagger-slung-shot-sword-cane-spear-or-knuckles-made-of-any-metal-or-hard-substance-to-any-minor-without/). Other examples abound. For example, as early as 1856, Tennessee passed a similar law against selling, loaning, or given any minor a concealable weapon, including a pistol: "Offences Against Public Policy and Economy. § 4864. Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court." Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-'71 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. (https://firearmslaw.duke.edu/laws/seymour-dwight-thompson-a-compilation-of-the-statute-laws-of-the-state-of-tennessee-of-a-general-and-permanent-nature-compiled-on-the-basis-of-the-code-of-tennessee-with-notes-and-references-incl-2/).

be carried openly, but not concealed.[83]  Arkansas followed suit in 1881.[84]

Tennessee's law withstood a court challenge, and Arkansas's was never

challenged.[85]  And both states moved to prevent the sale or transfer of pocket

pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or

offer to sell, or bring into the State for the purpose of selling, giving away, or

otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of

pistol, except army or navy pistols."[86]  Arkansas passed a similar prohibition in

1881, but went even further by prohibiting the sale of pistol cartridges as well:

"Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any

manner furnish to any person any dirk or bowie knife, or a sword or a spear in a

---

[83] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[84] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[85] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022) (https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/).

[86] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are
used in the army or navy of the United States, and known as the navy pistol, or any
kind of cartridge for any pistol, or any person who shall keep such arms or
cartridges for sale, shall be guilty of a misdemeanor."[87]

38.    California's legislature, recognizing that the homicide rate had reached
catastrophic levels (over 65 per 100,000 adults per year),[88] banned concealed
weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have
> been more deaths occasioned by sudden assaults with weapons
> previously concealed about the person of the assailant or assailed, than
> by all other acts of violence which figure on the criminal calendar….
> For many sessions prior to the last, ineffectual efforts were made to
> enact some statute which would effectually prohibit this practice of
> carrying concealed weapons.  A radical change of public sentiment
> demanded it, but the desired law was not passed until the last
> Legislature, by a handsome majority.[89]

39.    But the legislature repealed the law in 1870, as public sentiment
veered back toward the belief that the effort to make California less violent was
hopeless, and that the only protection law-abiding citizens could hope for was to
arm themselves.  And the legislature once again had the enthusiastic support of the

---

[87] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[88] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On
violence in California and across the Far West, see Roth, Maltz, and Eckberg,
"Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide,
Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona
Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California*
(Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity
Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton,
2016); and Roth, *American Homicide*, 354.

[89] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's
Concealed Weapon Permit Law," Social Science Research Network, posted August
12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[90]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[91]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[92]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[93]

40.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[94]

The burden of proof remained with the person who carried the concealed weapon.

---

[90] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[91] Ibid., 11.

[92] Ibid., 11-13.

[93] Ibid., 13-15.

[94] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

41.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

### III.   ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

42.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[95]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly, like the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and boys, killing five and

---

[95] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996). On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

wounding six.[96]  But from the 1830s into the early twentieth century, mass killings
were common.

43.     Examples include Nat Turner's rebellion in Southampton County,
Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen
Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in
1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist
Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and
the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.
Because these mass killings were almost always spontaneous and loosely
organized, they were difficult for government to prevent.  Worse, in some incidents,
such as the Haun's Mill Massacre, state and local governments were complicit; and
in others, state and local governments turned a blind eye to the slaughter, as was the
case in the murder of Chinese farm workers in Chico, California, in 1877.[97]

---

[96] For examples of massacres of unarmed Native Americans, see the murder
in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain
Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96
pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob
Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual
Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644
(https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For
examples of political conflict among colonists that led to mass killings, see the
confrontation in 1655 at Severn River in Maryland between opposed factions in the
English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood,
New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at
Cloud's Creek, South Carolina, by Tory partisans under the leadership of William
Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South
Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's
Children: The Bosket Family and the American Tradition of Violence* (New York:
Vintage, 2008), 5-6.

[97] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton
County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall
Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford
University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's*

44.    The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[98]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[99] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens

_Fierce Rebellion_ (New York: Harper and Row, 1975); Stephen C. LeSueur, _The 1838 Mormon War in Missouri_ (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney_, The Mormon War: Zion and the Missouri Extermination Order of 1838_ (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, _Frontier Violence: Another Look_ (New York: Oxford University Press, 1974), 93-95; Faragher, _Eternity Street_, 463-480; and Sucheng Chan, _The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910_ (Berkeley: University of California Press, 1986), 372.

[98] Alan Trelease, _White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction_ (New York: Harper and Row, 1975).

[99] Dennis C. Rousey, _Policing the Southern City: New Orleans, 1805-1889_ (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, _The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction_ (New York: Oxford University Press, 2008); and Gilles Vandal, _Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884_ (Columbus: Ohio State University Press, 2000), 67-109.

1 were murdered in the Tulsa Race Massacre in Oklahoma.[100]

2 **IV.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM**
3 **MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE**
**PRESENT**

4
5      45.     The character of mass murder began to change in the late nineteenth

6 and early twentieth century with the invention and commercial availability of new

7 technologies that gave individuals or small groups of people the power to kill large

8 numbers of people in a short amount of time.  These technologies proved useful to

9 criminal gangs, anarchists, and factions of the labor movement intent on killing

10 adversaries, public officials, and law enforcement officers.  The technologies that

11 were most widely used by criminals and terrorists were dynamite, invented by

12 Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by

13 General John T. Thompson, who improved upon a pioneering German design.

14      46.     The advantage of dynamite over nitroglycerin and other explosives

15 used in mining and construction was its power and its stability, which made

16 accidental explosions rare.  The advantages of submachine guns over existing

17 machine guns as weapons of war were that they were light enough to be carried and

18 operated by a single individual, and they were capable of firing .45 caliber bullets

19 from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725

20 rounds per minute.[101]

21 _____

22      [100] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race
Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott
23 Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge:
Louisiana State University Press, 1982); and Tim Madigan, *The Burning:
24 Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas
Dunne Books / St. Martin's Press, 2001).
25

26      [101] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New
York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's
27 Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

28

47. Criminals and terrorists quickly discovered how accessible and useful these new technologies were. They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive. They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 10- or 30-round magazine for as little as $10).[102] That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers. Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[103] Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety. Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day

---

[102] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today. See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022. The prices of 10- and 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[103] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6. Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker. See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

Massacre and the Kansas City Massacre.[104]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[105]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[106]

48.    Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[107] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of

---

[104] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[105] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[106] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[107] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[108] The Gun Control Act of 1968 and the Omnibus Crime Control and Safe Streets Act of 1968 placed additional restrictions on the sale and transfer of firearms, including placing age-related restrictions on the sale or transfer of long guns and handguns to juveniles and those under the age of 21.[109] The Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[110]

49.    Since 1970, public officials have continued to reserve the right to

---

[108] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

[109] The Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, added a provision prohibiting federally licensed firearms dealers from selling or transferring handguns or handgun ammunition to anyone under the age of 21, and the Gun Control Act of 1968, Pub. L. No. 90-618, added a provision to federal law prohibiting federally licensed firearms dealers from selling or transferring any firearms, including long guns, to anyone under the age of 18; those provisions are enshrined in 18 U.S.C. § 922(b)(1). In addition, the Youth Handgun Safety Act of 1994 strengthened restrictions on handgun use by those under 18 by adding a prohibition on possession of handguns by those under the age of 18; that provision is enshrined in18 U.S. Code § 922(x). See 18 U.S.C. § 922(x) (prohibiting people under 18 years of age from possessing handguns or handgun ammunition with certain exceptions for employment, target practice, education, possession with written permission of a parent or guardian, and a handgun possessed while defending the home of the juvenile or a home in which they are an invited guest).

[110] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[111]  And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks.  It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[112]

50.    In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons.  These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or their allies during the

---

[111] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007.  Accessed August 31, 2022.

[112] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[113]  The
signature military firearm of that era—the M-16 rifle with a 30-round magazine and
a muzzle velocity of over 3,000 feet per second[114]—was capable of firing 750 to
900 rounds per minute when set on fully automatic.[115]  But the M-16 was used more
often in combat—and more accurately, effectively, and sustainably as a weapon for
inflicting mass casualties—when set on semiautomatic, which was standard
military procedure.  That is why the U.S. Army defines "rapid fire" as 45 rounds
per minute (the rate of fire of an M-16 when set on semiautomatic), not 750 to
900.[116]  And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which
replaced the "fully automatic" switch with a three-round burst (but otherwise the
same weapon as the M-16)—an alteration that slows the potential rate of fire,
conserves ammunition, and improves accuracy.[117] The civilian version of the M-
16—the ArmaLite AR-15, a semiautomatic centerfire rifle—has approximately the
same muzzle velocity as the M-16 (3,300 feet per second) and the same rate of fire
as the M-16 on semiautomatic: 45 rounds per minute.[118]

---

[113] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov
Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986).

[114] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[115] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate
Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg,
Pennsylvania: Stackpole Books, 1984)

[116] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24
(Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC
3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May
2016).  Available at the Army Publishing Directorate Site
(https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-
22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[117] See military-today.com (http://www.military-
today.com/firearms/m16.htm), accessed October 4, 2022.

[118] Ezell, *The Great Rifle Controversy*, 177-192.

51.     The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological advances have increased the speed at which semiautomatic handguns can be fired.  An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[119] And they are affordable.  A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[120]

52.     It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles that arrived on the domestic market in the 1970s and 1980s, including their use with large capacity magazines.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[121]

53.     Manufacturers soon discovered ways to increase the rate of fire of

---

[119] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM."  YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[120] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and buymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[121] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[122]

54.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[123]

---

[122] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[123] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

55.   The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings. The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966  through July 2022 (see Figure 1, below).

Figure 1 (Data from the database of the Violence Project)

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have on average been as deadly as mass shootings with fully automatic weapons.

56.   And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

1

Figure 2 (Data from the database of the Violence Project)

| | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

57.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  With extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30 percent versus 12 percent of incidents.

58.    The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[124]  The Violence Project, which has compiled data

---

[124] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

on mass shootings from 1966 into 2022, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  Other authorities have adopted similar definitions of "mass shootings" and "mass murder."  For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers."[125]  Federal legislation enacted in 2013 authorized the U.S. Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[126]

59.    What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time—generally because of their race, ethnicity, or faith.

-----

table in this declaration, unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed,  887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis.

[125] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005) (https://www.fbi.gov/stats-services/publications/serial-murder#two), accessed January 3, 2023.

[126] 28 U.S.C. § 530C(b)(1)(M).

60.     Today, thanks especially to extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people. And because of these modern technologies, which were developed for warfare, angry, alienated, or emotionally immature individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause.  For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves.  And since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

## V.   YOUTH VIOLENCE IN THE LATE TWENTIETH AND EARLY TWENTY-FIRST CENTURY

61.     The age restrictions in the national Gun Control Act of 1968 and the and the Omnibus Crime Control and Safe Streets Act of 1968, as well as those in California's 2019 firearms laws, represent responses—as have all historic restrictions on the use, possession, and ownership of weapons, including firearms—to real changes in the character and incidence of violence in the United States.  If we look, for instance, at homicide rates in the United State by the age of victims, indexed for comparative purposes to the rates in 1959—the low point in rates over the past century—we can see that rates went up and down in synchrony for all age groups from 1928 (when reliable national statistics were first available from the mortality statistics of the Bureau of the Census) through the early 1960s.[127] Youth

---

[127] Bureau of the Census, *Mortality Statistics, 1900-1936* (Washington, D. C.: Government Printing Office, 1906-1938); Bureau of the Census, *Vital Statistics of the United States* (Washington, D.C.: Government Printing Office, 1937-1967); and Centers for Disease Control and Prevention, *CDC Wonder: Compressed Mortality,*

violence was not a distinct problem during that timeframe.



62.    But this same data shows that since the mid-1960s, homicide rates for young Americans have diverged from the rates for Americans ages 25 and older, and have increased substantially, especially for youths ages 15 to 19: from 3.5 per 100,000 per year in the 1950s to a peak of 20.5 per 100,000 in 1993. The rate for youths ages 15 to 19 fell in the late 1990s, but they have since rebounded to 12.8 per 100,000: nearly four times the rate of the 1950s and early 1960s.

63.    The reasons for the increase in violence among young Americans, including the increase since 2015, which has also increased among young children, ages 10 to 14, and young adults, ages 20 to 24, are many. It has affected young people of all races and ethnicities, in both urban and rural America, especially where young people face poverty and other disadvantages. Scholars agree,

_Underlying Cause of Death, and Multiple Cause of Death_, 1968-2021 (https://wonder.cdc.gov/).

however, that the interplay between gang culture, social media, and firearms is at the root of today's high rate of youth violence.[128]

64.    Youths, including those in the 18-20-year-old age range, have also been involved in mass shootings in recent decades, especially in schools. Kathleen Newman, who studied school shooters in *Rampage*, found that the fundamental problem has been the way in which students who contemplate mass murder perceive themselves as *marginal*, even if they have not been bullied or abused by their classmates.[129] They feel *socially isolated*: a feeling that can be all the more intense, according to Newman, in close knit rural or suburban communities, where it can be difficult for people to find peers who share their feelings or interests. Newman grants that psychosocial problems can "magnify" the students' feelings of marginality and isolation. But what moves school shooters to action are *cultural scripts* that are readily available in the media, especially social media. The scripts offer alienated individuals a way to "solve" their problems and assert their masculinity through mass violence. And once they embrace those scripts, the pressure to act grows more and more intense, especially if they share their plans with a confidante or on social media. Incentives to act also increase, according to Newman, because mass violence offers isolated young males a way to send a message, assert their masculinity, gain fame, and attack the adult power structure and adolescent social hierarchy that they feel has betrayed them.

65.    Newman offers an excellent list of warning signs that students and teachers should look for. But none of the students who Newman studied were on the verge of expulsion, imprisonment, or compulsory commitment to a mental

---

[128] For an excellent introduction to the contemporary problem of youth violence, see Forrest Stuart, *Ballad of the Bullet: Gangs, Drill Music, and the Power of Online Infamy* (Princeton: Princeton University Press, 2020).

[129] Katherine S. Newman, *Rampage: The Social Roots of School Shootings* (New York: Perseus, 2004), especially at pages 229–70. And see also Dave Cullen, Columbine (New York: Twelve, 2009).

institution. They could not have been taken out of school or forced into treatment. And what distinguished them was not their feelings (which most adolescents experience at one time or another), but the *extremity* of their feelings. That is why most would-be school shooters, like most adult mass killers, fly under the radar. They are hard to distinguish from their peers. However, Newman does cite one more important precursor of mass murders in schools that does distinguish some young men: access to a firearm.

66.     It is impossible in our free society to ensure that every young person feels loved, respected, and successful, especially because so many youths in our society whom we might consider successful do not feel that way, because their ambitions are unrealistic. It is also impossible to prevent young people from resenting others who are successful and from blaming others for their personal failures. And it is impossible to force young people to learn from failures so they can do better in the future, or come to grips with personal losses or setbacks, which is hard even for adults. Young people, because of their emotional immaturity and inexperience, often have difficulty seeing a brighter future when things appear to go wrong.

67.     That is why many citizens, criminologists, and policymakers seek to limit access to technologies that give angry, alienated, emotionally immature youths the power to kill. Accidental deaths have declined dramatically in the United States since 1950, but the primary cause has not been changes in personal behavior. It has been bans on unsafe products, such as dangerous toys or cars not equipped with air bags and seat belts.[130]

---

[130] See, for example, John C. Burnham, "Why Did the Infants and Toddlers Die? Shifts in Americans' Ideas of Responsibility for Accidents—From Blaming Mom to Engineering," *Journal of Social History* 29 (1995): 817-837; Burnham, *Accident Prone: A History of Technology, Psychology, and Misfits of the Machine Age* (Chicago: University of Chicago Press, 2009); and Patricia G. Schnitzer, M.

68.     Voters and legislators who support age limits on access to certain classes of firearms have never sought to disarm young people.  They have sought to keep unsafe arms posing the most significant risk to the public—in this case, firearms designed for the sole purpose of killing and wounding the maximum number of people possible in the shortest amount of time—out of the hands of unsupervised children and youths.  These types of safety measures are appropriate in addressing premeditated crimes, like mass shootings and gang killings, by reducing the accessibility and ease of acquiring those dangerous arms without supervision.

69.     My colleagues and I are still hard at work trying to understand the causes and cures for the spate of gun violence that has erupted since 2015, especially among young people. See, for example, the research agendas of the twelve experts interviewed on behalf of the Harry Frank Guggenheim Foundation by Greg Berman.[131] One of the key questions is how best to get guns off the streets and out of the hands of young people, especially those who are affiliated with urban streets gangs or the rural drug trade. The causes of the surge in violence are many, but the ready availability of firearms is a cause upon which scholars agree.

**CONCLUSION**

70.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed

Denise Dowd, Robin L. Kruse, and Barbara A. Morrongiello, "Supervision and Risk of Unintentional Injury in Young Children," *Injury Prevention* 21 (2015): e63-e70.

[131] Greg Berman, *Behind the Rise in Gun Violence in New York and Other American Cities* (New York: Harry Frank Guggenheim Foundation, 2022).

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder. Legislators are not required to pass such laws, of course, but historically, they have always retained the ability to do so. There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations. And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century. Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 8, 2023, at Dublin, Ohio.

_Randolph Roth_

—————————————————

Randolph Roth

Declaration of Randolph Roth (3:19-cv-01226-L-AHG)

# EXHIBIT A

**Roth Curriculum Vitae 2023**

Randolph Roth                                                    Page 1

Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                      Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                 (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

## Table of Contents

**Personal**                                                   2

Education                                                      2
Academic Positions                                            2
Honorary Positions                                            2
Professional Honors and Awards for Scholarship                2
Professional Honors and Awards for Teaching                   3
Grants                                                        3

**Bibliography and Research**                                 4-17

**Teaching**                                                  18-20

**Service**                                                   21-26

Randolph Roth                                                    Page 2

**Personal**

    Marital Status:        Married        Allison Sweeney
    Children:            Alexander

**Education**

    1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire?
    Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis
    and Howard R. Lamar, advisors)

    1973, B.A., with honors and distinction, in History, Stanford University (thesis,
    "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl
    Degler and Barton Bernstein, advisors)

**Academic Positions**

    1985-present, The Ohio State University: College of Arts and Sciences
    Distinguished Professor of History and Sociology
    1978-1985, Grinnell College: Assistant Professor of History
    1978, University of Vermont: Instructor in History
    1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

    2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

    2022, Distinguished Scholar Award, Division of Historical Criminology,
    American Society of Criminology

    2013-2016, Member, Roundtable on Crime Trends in America, National Research
    Council, National Academy of Sciences

    2012, Fellow, American Association for the Advancement of Science

    2011, Michael J. Hindelang Award, American Society of Criminology, for the
    outstanding contribution to criminology over the previous three years

    2010, Allan Sharlin Memorial Award, Social Science History Association,

Randolph Roth                                                                Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding
senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

Randolph Roth                                                              Page 4

   1992, Fellow, Workshop on the Rhetoric of Social History, University of
   Iowa

   1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

   1987, National Endowment for the Humanities, Summer Stipend

   1983, Research Fellowship for Recent Recipients of the Ph.D., American Council
   of Learned Societies

   1981, Fred Harris Daniels Fellowship, American Antiquarian Society


**Bibliography and Research**


**Books**

   *American Homicide* (an interregional study of violent crime and violent death in
   America from colonial times to the present). The Belknap Press of Harvard
   University Press (2009), 655 pp.

   *The Democratic Dilemma:  Religion, Reform, and the Social Order in the
   Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press
   (1987), 399 pp.


**Edited Volumes**

   Co-founder and co-director, Historical Violence Database (on-line database on
   violent crime, violent death, and collective violence).  Web address:
   www.sociology.ohio-state.edu/cjrc/hvd

   American Homicide Supplementary Volume (on-line supplement to *American
   Homicide*, including detailed appendices on methods, supplemental tables, graphs,
   and statistical analyses), approx. 750 pp. Web address:
   http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

   "Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with
   Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

Randolph Roth                                                              Page 5

"The Opioid Epidemic and Homicide in the United States," co-authored with
Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and
Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with
Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic
Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and
Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and
Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in
Contemporary Debates on the Second Amendment* (Washington, D.C.:
Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections*
44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing."
*Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United
States? Variation across Time and Space as the Keys to Understanding Homicide
and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and
Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get
Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in
Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers
on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical
Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American
Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in
Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender,
Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The
Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online:
Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence

Randolph Roth                                                                    Page 6

in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon,
Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by
the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim
Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary
History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide,"
*Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is
Empirically, Mathematically, and Theoretically Sound," *Crime, History, and
Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology*
(2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth,
Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods*
(2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the
History of Violent Crime and Violent Death." *Historical Methods*. Randolph
Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb
Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical
Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?"
*Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and
John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities
of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds.,
*Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about
Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social
Science History* (2002) 26: 699-708.

Randolph Roth                                                                                    Page 7

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central

Randolph Roth                                                                Page 8

Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods*
(1986) 19: 103-117.


**Public History Essays**

"Can Faith Change the World?  Religion and Society in Vermont's Age of
Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont
History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of
the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.


**Works in Progress**

*Child Murder in America*. An interregional study of murders of and by children
from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of
Speaking for Nature" (essay in manuscript)


**Editorial Boards**

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*


**Invited Lectures**

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States,"
Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary
Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime
Historians Symposium, Leeds University, Great Britain, Scheduled for September

Randolph Roth                                                           Page 9

2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

Randolph Roth                                                              Page 10

"Quantitative Analysis of the History of Crime and Violence: Achievements and
Prospects," Keynote Address, Conference on "Making Sense of Violence,"
University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,
and the Social Sciences in the Study of Violence." Conference on Emerging
Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May
25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,
and the Social Sciences in the Study of Violence." Presidential Plenary Address,
Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal
Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern
College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the
"From Borderland to Backcountry Conference: Frontier Communities in
Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar
on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15,
2007

 "American Homicide: Its History," Ohio State University at Newark, Nov. 6,
2007

 "American Homicide: A Political Hypothesis" and "The Case for Social Science
History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early
American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the
Historical Approaches in the Social Sciences series, State University of New York
at Binghamton, Oct. 12, 2006

 "The History of American Homicide," Winter College, Ohio State University,
Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group,

Randolph Roth                                                    Page 11

Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western
Democracies?  A Political and Psychological Hypothesis," Center for Historical
Research and Documentation on War and Contemporary Societies, Belgian
Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social
Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family,"
Plenary Session, Society of Historians of the Early American Republic, July 22,
2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of
Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History,
Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University,
February, 2003

"American Homicide," School of Law, Northwestern University, September,
2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of
History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University,
November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional
History of Homicide in America," and "The Historical Database Project on Crime
and Violence in America," two lectures presented at the Charles Warren Center,
Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation
to the Early American History Seminar, University of Pennsylvania, October,

Randolph Roth                                                          Page 12

1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in
Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the
Center for Research on Vermont, the University of Vermont, and the Vermont
Council on the Humanities.  The presentation was televised in Vermont.  It also
made the evening news in Burlington and an AP wire story on my presentation
was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States,
1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior
Springs, Missouri, and Social Science History Association, November 17, 2022,
Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the
United States, 1959-Present." Social Science History Association, November 23,
2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of
Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania
Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in
the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society
of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and
Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6,
2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of
Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American
Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social
Behavior," American Historical Association, New York City, January 4, 2015

Randolph Roth                                                                Page 13

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports,"

Randolph Roth                                                                    Page 14

Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April
12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the
Presidential Panel on "History in the Social Science History of Association:
Disciplinary Developments," Social Science History Association, Chicago, Nov.
15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of
Non-Emergency Medicine," Social Science History Association, Chicago, Nov.
15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities
Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-
Century West Was Violent."  Social Science History Association convention in
Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the
History of Violent Crime and Violent Death."  Social Science History Association
convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had
Enough Money to Study It Properly? Possibilities for Collaborative Research
Projects," Social Science History Association, Portland, Oregon, November 3-6,
2005

**Reviews**

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of
Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American
Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*.
(Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at
the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Randolph Roth                                                      Page 15

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Randolph Roth                                                              Page 16

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic:  Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness:  Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Randolph Roth                                                          Page 17

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture*
(Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South*
(International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early
Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of
Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis,
exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                                    Page 18

**Teaching**

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| | |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

**Publications on Teaching**

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

**Ph.D Students Supervised**

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Randolph Roth                                                              Page 19

University fellowship for senior graduate students. Assistant Professor of History,
University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in
Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History,
University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in
Western Virginia, 1844-1865," December 2011. Former Assistant Professor of
History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil
Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in
Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education
and the Defining of the Midwest," January 1999. Professor of History, Reinhardt
College. Author of *Cultivating Regionalism: Higher Education and the Making of
the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent
scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in
Popular Culture, 1765-1820," May 1995. Professor of Social and International
Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-
1850," November 1993. Professor of History, Union College


**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do
Americans Commit Suicide More Often during Economic Crises?" (Anticipated
2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated
2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020).
Prospective applicant to graduate school in history.

Randolph Roth                                                                                    Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities,
Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017).
Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points,
New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at
the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in
Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West
Virginia's Multiracial Community" (2010). Ph.D. candidate in early American
history at the College of William and Mary. Recipient of the first Annual Prize at
Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                                 Page 21

## Service

### Service in Professional Organizations

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                          Page 22

      1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

      American Historical Review
      Journal of American History
      William and Mary Quarterly
      Journal of the Early Republic
      Social Science History
      Journal of Interdisciplinary History
      Historical Methods
      Journal of Women's History
      Journal of the Family
      Crime, History, and Societies
      European Journal of Criminology
      American Journal of Sociology
      Sociological Quarterly
      Criminology
      Criminal Justice Review
      Journal of Criminal Law and Criminology
      Law and Social Inquiry
      Homicide Studies
      International Criminal Justice Review
      International Journal of Law, Crime, and Justice
      Law and Society Review
      City and Community
      Eras Review
      Western Historical Quarterly
      Canadian Journal of Sociology
      Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

      American Historical Association
      Organization of American Historians
      Social Science History Association
      European Social Science History Association
      American Society of Criminology
      Homicide Studies Working Group
      American Association for the Advancement of Science

**Service at Ohio State University**

Randolph Roth                                                        Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and
Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of
Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of
Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior
Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

Randolph Roth                                                                                    Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer
Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin:
advises City Council on all matters concerning utilities, policing, transportation,
parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of
Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at
the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit
Badge Counselor / Eagle Scout Association / Philmont Staff Association /
Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge
Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee
for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic
association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                                    Page 25

    1988-present, President / Vice President / Trustee, East Dublin Civic Association

    1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

## Outreach / Media Appearances

    Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

    B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

    Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

    Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

    Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

    "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

    "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

    "Mass Murder in American History," CSpan-3, April 2, 2017

    All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

    Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

    Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

    Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

    "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

Randolph Roth                                                            Page 26

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-
22-2009%205-2010.pdf and
http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of
2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and
WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL,
Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio,
KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009;
The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury,
Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC,
Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in
Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on
March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with
Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9,
2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012;
and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012;
*American Homicide* was the subject of an editorial by op-ed writer Gregory
Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010
**(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-
2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*,
Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine*
in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the
*Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the
*Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*,
the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los
Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher
Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's
work in a Sunday edition