1  ROB BONTA
   Attorney General of California
2  MARK BECKINGTON
   Supervising Deputy Attorney General
3  S. CLINTON WOODS
   Deputy Attorney General
4  STEPHANIE ALBRECHT
   Deputy Attorney General
5  JENNIFER E. ROSENBERG
   Deputy Attorney General
6  State Bar No. 275496
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone: (213) 269-6617
8    Fax: (916) 731-2124
     E-mail:  Jennifer.Rosenberg@doj.ca.gov
9  *Attorneys for Defendants Rob Bonta, in his*
   *official capacity as Attorney General of the*
10 *State of California, and Allison Mendoza, in*
   *her official capacity as Acting Director of the*
11 *Department of Justice Bureau of Firearms*

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16

17 **MATTHEW JONES, *et al.*,**                  3:19-cv-01226-L-AHG

                                    Plaintiffs,   **DECLARATION OF PROFESSOR**
18                                                **SAUL CORNELL**

19        **v.**                                  Dept:       5B
                                                  Judge:      The Honorable  M. James
20 **ROB BONTA, in his official capacity**                    Lorenz and Magistrate
   **as Attorney General of the State of**                    Judge Alison H. Goddard
21 **California, *et al.*,**                       Action Filed:      July 1, 2019

22                                    Defendants.

23

24

25

26

27

28

                                    1

## BACKGROUND AND QUALIFICATIONS

1.      I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City.  I have a master's degree in History and a Ph.D. in History, both from the University of Pennsylvania. In addition to teaching constitutional history at Fordham College, I teach seminars in constitutional law at Fordham Law School. I have been a Senior Visiting Research Scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  Prior to my time at Fordham University, I was a Professor of History at The Ohio State University, the Thomas Jefferson Chair at the University of Leiden in the Netherlands, and an Assistant Professor in the Departments of History at The Ohio State University and the College of William & Mary.  A copy of my complete curriculum vitae (CV) is attached to this declaration as Exhibit A.

2.      My scholarship on the Second Amendment and the history of firearms regulation has been widely cited by state and federal courts.[1]  I have published two dozen articles on this topic that have appeared in leading law reviews and top peer-reviewed legal history journals.[2]  I authored the chapter on the right to bear arms in the Oxford Handbook of the U.S. Constitution and co-authored the chapter in *The Cambridge History of Law in America* on the Founding Era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]

---

[1] For a complete list of court citations, see my CV attached as Exhibit A.

[2] Particularly relevant publications include Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). A full list of relevant publications is also included in my CV.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber

1        3.    I have given numerous invited lectures, presented papers at faculty

2    workshops, and participated in conferences on the Second Amendment and the

3    history of firearms regulation at Yale Law School, Harvard Law School, Stanford

4    Law School, UCLA Law School, the University of Pennsylvania Law School,

5    Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson

6    College, Cambridge, Leiden University, and McGill University.

7        4.    I have also provided expert witness testimony in both state and federal

8    courts in firearms-related matters, including *Rocky Mountain Gun Owners v.*

9    *Hickenlooper*, No. 2013-CV-33879 (D. Col.); *Chambers v. City of Boulder*, No.

10   2018-CV-30581 (D. Col.), *Zeleny v. Newsom*, No. 17-cv-07357-RS (TSH) (N.D.

11   Cal.), *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, No. 3:19-cv-

12   01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v.*

13   *Harrington,* No. 21-cv-1348 (D. Minn.); *Renna v. Bonta*, No. 20-cv-2190 (S.D.

14   Cal.); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal.); *Rupp v. Bonta*,

15   No. 8:17-cv-746-JLS-JDE (C.D. Cal.); *B&L Productions, Inc. v. Newsom,* No. 21-

16   cv-1718-AJB-DDL (S.D. Cal.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D.

17   Mass.); *NAGR v. Lamont*, No. 3:22-cv-0118 (D. Conn.).

18       5.    A list of my publications and other cases in which I have testified as an

19   expert witness is also included in the CV I attach as Exhibit A to this declaration.

20       6.    I am being compensated for services performed in the above-entitled

21   case at an hourly rate of $500 for reviewing materials, participating in meetings,

22   and preparing reports, $750 for depositions and court appearances, and

23   compensation for travel expenses.  My compensation is not in any way dependent

24   on the outcome of this or any related proceeding, or on the substance of my

25   opinion.

26

27   eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the*
     *Early Federal System*, in 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544
28   (Christopher Tomlins & Michael Grossberg eds., 2008).

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

# SUMMARY OF CONCLUSIONS

7.      The State of California has asked me to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of and access to firearms of those below the age of twenty-one, including those old enough to participate in the militias.  In the body of my declaration below, I provide evidence and reasoning for the following opinions:

8.      In their pleadings and preliminary injunction briefing, Plaintiffs assert an uncontroversial fact about the history of the militia in the eighteenth century and much of the nineteenth century: governments compelled some minors to serve in the militia and participate in related community-based forms of law enforcement. But the fact that government forced individuals to participate in the militia does not demonstrate the existence of a constitutional right to keep, bear, or acquire firearms for those under the age of 21.  Rather, this fact shows that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.  Imposing a legal obligation on individuals does not establish that a right existed; here it demonstrates that the opposite was the case.  Failure to comply with this legal obligation resulted in punishment.  Militia laws gave government broad power over minors, but they did not confer an individual rights claim that minors might make against government regulation.  Contrary to Plaintiffs' core contention, in Anglo-American constitutional theory rights and obligations are correlatives, not synonyms.  The existence of a right imposes an obligation on government to respect a right.  Militia laws did the opposite: they imposed on an obligation on individuals.[4]

---

[4] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. See, e.g., Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984); Leif Wenar, *Rights*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

9.      During the Revolutionary and Founding eras (1776–1799), minors or "infants" (those below the age of twenty-one, which was the age of legal majority at the time) were not independent legal actors claiming the full panoply of rights, including the right to keep and bear arms.  This was so even though militia laws obligated some minors to join the militia and perform related activities, including participating in peacekeeping as mandated by the common law and statutes of the era.  Revolutionary-era and later Founding-era militia statutes requiring militia service and the bearing of arms by those under the age of twenty-one created legal obligations or duties that governments enforced by fines and possible imprisonment, but they did not articulate any individual rights for infants under the age of twenty-one to purchase, receive transfer, or bear arms outside of these situations.

10.     The decision to impose duties upon members of a particular age group, those 18-20, to serve in the militia was a policy choice made by states and the federal government; it did not assert a fixed constitutional principle.  There was no constitutional requirement for this subset of the population to serve in the militia.  Individual states and the federal government decided which members of the population ought to serve in the militia based on the needs of public defense.  And these requirements were adjusted over time to the changing needs of the individual states and the federal government.

11.     State police power is central to the scheme of ordered liberty in American law.[5]  This bedrock fact of Anglo-American law was true in the Founding era and remains true today; the police power is inalienable, and no aspect

_____

[5] On Founding era conceptions of liberty, JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty." See *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

1    of the police power is more well established in American law than the laws aimed

2    at protecting minors from harm.  The scope of state police power is greatest when

3    protecting the health and safety of minors. Given these facts, it is not surprising that

4    there is a long history of state regulations targeting minors and guns.

5        12.    The regulation of gun powder and firearms has always been

6    understood to be a core feature of the state's considerable police powers to promote

7    public health and safety, from the Founding era to the present.

8        13.    The flexibility inherent in the police power was widely acknowledged

9    by leading jurists in the antebellum era.  Esteemed judges, including Chief Justice

10   John Marshall and the distinguished Massachusetts jurist Lemuel Shaw expressly

11   acknowledged this indisputable fact about American law.  Indeed, the antebellum

12   firearms cases cited in *Heller* embraced this conception of the police power and its

13   relevance to adjudicating laws governing firearms.[6]

14       14.    There is no expiration date on government's police power authority to

15   regulate firearms, a fact underscored by the increase in the intensity of regulation at

16   multiple moments in American history after the adoption of the Second

17   Amendment.  During the Jacksonian era (1820-1840) and Reconstruction (1863-

18   1878) states responded to new challenges by expanding the scope of government

19   regulation.  Courts upheld virtually all regulations adopted during these periods.

20       15.    Post-Civil War regulation intensified to respond to new and

21   unprecedented problems created by firearms in an increasingly urban and modern

22   society that lacked the community-based forms of peacekeeping and law

23   enforcement typical of pre-industrial and pre-modern societies.  The increasingly

24

25

---

26   [6] Cf. *State v. Reid*, 1 Ala. 612 (1840) adjudicated the scope of the right to
     keep and bear arms with the classic Marshall and Taney Court police power
27   framework, *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct
     the removal of gunpowder is a branch of the police power"); *Thurlow v.*
28   *Massachusetts*, 46 U.S. 504 (1847) (License Cases).

complicated nature of American law led to new models of regulation, including more laws governing minors and their access to weapons.

16.     States and localities made expanded use of the authority they had held since the Founding to adopt new administrative mechanisms, including permitting and licensing schemes, to address the continuing problems posed by firearms.  As had been the case in the Founding era, regulation and rights continued to be seen as inextricably linked with one another.

17.     The trajectory of gun regulation continued into the next century.  The most significant change in government regulation in the twentieth century was the expansion of federal regulation of inter-state commerce during the New Deal.  This power enabled the federal government to enact a range of laws about the sale and transfer of firearms and further limited the ability of minors to access guns.

18.     Across the broad arc of American history, from the Founding Era and through the modern day, governments have regulated firearms.  Regulations limiting firearms ownership and possession for those under the age of 21 are longstanding and firmly rooted in the American historical and legal tradition.  For most of the nation's history the law has never considered minors fully independent legal actors who possessed the same rights as adults. Given this irrefutable fact, state limits on the ability of minors to acquire and use firearms is indisputably consistent with the original public understanding of the Second Amendment right.

19.     Counsel for Defendants provided me with the operative complaint in this matter, the briefs the parties filed in support of and in opposition to Plaintiffs' motion for preliminary injunction, and the 2019 expert declaration of David Hardy and associated exhibits filed with Plaintiffs' 2019 motion for preliminary injunction.[7]  Counsel also provided me with the briefs and record in the Ninth

---

[7] Declaration of David Hardy and related exhibits submitted in support of Plaintiffs' motion for preliminary injunction (ECF Nos. 21-11, 21-12, 21-13, & 21-14) (hereinafter "Hardy Decl."),

Circuit appeal of this Court's denial of Plaintiffs' motion for preliminary injunction. Otherwise, my declaration is based on my independent research. In my declaration, I cite to the scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions.

## OPINIONS

## INTRODUCTION

20.    The proper starting point for any analysis of Founding era law, particularly questions about rights begins with common law. American law, particularly the law governing the family, derived from English common law. Many aspects of the common law were transformed by the American Revolution. The break with England led the individual states to Americanize the common law to reflect the republican character of American constitutionalism. Still, despite the important breaks from English law there were also important continuities that endured. A central principle inherited from this common law tradition was the legal distinction between adults and "infants." There was no legal category of "young adult" under English common law or the American law of domestic relations. Those between the ages of eighteen and twenty (and indeed all under the age of 21) were considered "minors" or "infants" from the time of the nation's founding up through the latter half of the twentieth century.[8] The proper historical framing of the issue before the Court thus should be: "Did the Second Amendment recognize a right of infants, meaning those under 21, to keep and bear arms?" The answer to that question is simple: no.

21.    This declaration explains the historical interpretive methodology and sources necessary to understand the meaning of the right to keep and bear arms in

---

[8] Note these two terms, "infant" and "minor," are used interchangeably throughout this declaration. On the role of common law in shaping American law's treatment of those below the age of majority, see T. E. James, *The Age of Majority*, 4 AM. J. LEGAL Hist. 22 (1960); Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55 (2016).

the United States and American firearms regulation, and focuses additional attention on the way state, federal, and even local law regulated minors and arms. The scope of materials examined is extensive, in both chronological and substantive scope; it includes a wide variety of legal texts, from statutes, regulations, and case law to popular legal guidebooks and commentary from legal scholars.

22.     The ability to regulate firearms and gun powder is central to the conception of ordered liberty that defined American law from its earliest days. Based on a careful review of the materials consulted in this declaration, I conclude that infants could not assert a constitutional right to purchase or own a gun outside of the context of participation in a militia in the Founding era, or, indeed, for most of American history.  The historical record demonstrates that infants were typically only entrusted with firearms when under the supervision of a parent or a guardian, or when serving in militias or other community-based peace keeping activities such as the hue and cry.

23.     Reviewing the arguments Plaintiffs have made thus far in the case, including the declaration of David Hardy, I conclude that there is no evidence to support the claim that infants under the age of 21 had a constitutional right to keep and bear arms in the Founding era.  The fact that early American militia laws imposed onerous duties upon able-bodied males under 21—the legal age of majority at the time—to serve in militias does not demonstrate the existence of a robust or unfettered right to purchase, receive transfer of, keep, or bear arms. Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors entirely within their parents, guardians, or masters.  Thus, when properly contextualized, the available historical evidence supports just the opposite conclusion from that posed by Plaintiffs: at the time of the Founding, and in the periods that followed, minors had no constitutional right to purchase, receive transfer of, keep, or bear arms.  It is indisputable that many states chose as a matter

9

1    of policy to require infants to participate in the militia and other law enforcement

2    activities, but this did not evidence a constitutional right.

3         24.    Nonetheless, given the centrality of militia laws to Plaintiffs'

4    erroneous argument about the historical Second Amendment rights of minors, this

5    declaration explores the nature of such laws in considerable detail.  It also offers

6    several important but neglected contexts for understanding the history in which the

7    militia laws were passed and implemented.  Early American militia statutes

8    reflected the importance of the militia in early America and the persistent problem

9    states and the federal government faced in properly arming the militia.  Minors did

10   not arm themselves; they depended on parents and guardians to outfit them with the

11   necessary arms, and in some instances depended on the state to provide arms. These

12   arms were provided so that minors required to serve in the militia would be able to

13   meet their legal obligations as defined by early American militia statutes.  This fact

14   not only reflected the legal status of infants it also reflected the economic realities

15   of life in early America where few ordinary families could afford to purchase

16   multiple firearms and most families desired guns useful for life in agrarian society,

17   not the heavy military weapons needed for eighteenth century ground warfare.

18        25.    This declaration then surveys the considerable authority states and

19   localities have historically exercised under their police power to regulate the ability

20   of minors to acquire or use dangerous weapons.  The exercise of that power was not

21   static, but proved extremely flexible, allowing states and localities to craft new laws

22   to address the shifting threats to public safety posed by the proliferation of weapons

23   and other changes in society, including the increasing availability of deadly

24   weapons occasioned by the rise of the market economy and other changes in society

25   such as urbanization.  Finally, the declaration takes note of the development of

26   modern federal firearms regulation.  Firearms law's complexity has increased as

27   society has become more complex, and modern government and the administrative

28   state that emerged after the Civil War have grown to deal with these changes.  This

1  process began at the end of the nineteenth century and the pace of this

2  transformation quickened in the twentieth century.  The use of permit schemes,

3  fees, and taxes were among the new legal tools used after the Civil War to achieve

4  the goals of regulating arms to further the goals of ordered liberty.[9]

5  #### I.  MATERIALS REVIEWED AND METHODOLOGIES USED

6  26.    My evaluation of these legal historical materials draws on the most

7  recent scholarship on the Second Amendment and the right to bear arms, as well as

8  the existing case law, including *New York State Rifle & Pistol Association v. Bruen*,

9  142 S. Ct. 2111 (2022).  I employ the accepted historical and legal methodologies

10  for interpreting legal sources from the Founding era and later periods of American

11  history, including the era of the Fourteenth Amendment's adoption and

12  implementation.  This declaration analyzes the public meaning of the Second

13  Amendment, the Fourteenth Amendment, the various state constitutional provisions

14  on the right to keep and bear arms, state statutes, local ordinances, court decisions,

15  and popular and learned legal commentaries.[10]  The goal of surveying such a wide

16  range of sources is to ascertain the various public understandings of how these

17  different legal and constitutional texts were interpreted when the Bill of Rights was

18

19

20  ─────────────────

   [9]There is a rich literature on the growth of the modern administrative state
21  and regulation, Morton Keller, REGULATING A NEW SOCIETY PUBLIC
   POLICY AND SOCIAL CHANGE IN AMERICA, 1900–1933 (1996) at 160-162;
22  Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301
   (2015). Firearms regulation mirrored other forms of regulation and took advantage
23  of these new methods and institutions.

24  [10] For a discussion of the minimum standard for undergraduate history
   majors, see MARY LYNN RAMPOLLA, A POCKET GUIDE TO WRITING IN HISTORY 18
25  (8th ed., 2015); MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE
   SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 128 (2001). On the methods
26  of professional legal history, see THE OXFORD HANDBOOK OF LEGAL HISTORY
   (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). On the methods of
27  originalism, see Keith E. Whittington, *Originalism: A Critical Introduction*, 82
   FORDHAM L. REV. 375 (2013).

28

ratified, when individual laws and ordinances were enacted, and when the
Fourteenth Amendment was adopted and interpreted by Courts.[11]

27.     Historical inquiries by courts must be supplemented by careful
examination of the relevant scholarship and evidence if they are to avoid the
dangers of "law office history."[12]  Modern legal history—the methodology I use in
this declaration—approaches the past with a more holistic model of meaning,
recognizing that legal meanings, including those relevant to understanding the
history of the Second Amendment, the various state constitutional arms-bearing
provisions, and gun regulation, must be rigorously contextualized.[13]  This approach
requires analyzing more than traditional legal texts to understand the social,
cultural, and intellectual contexts that shaped the law.  Any effort to understand the
Second Amendment and the history of gun regulation must canvass a variety of
historical topics, including such diverse and distinctive sub-fields as legal history,
social history, cultural history, economic history, and military history.  The eminent
English legal historian Frederic Maitland was one of the first modern scholars to
recognize that true historical inquiry, particularly the history of the law, requires
unraveling multiple webs of meaning.  As Maitland sagely noted: "such is the unity
of all history that anyone who endeavors to tell a piece of it must feel that his first
sentence tears a seamless web."[14]

28.     As *Bruen* makes clear one must recognize that the Founding era
confronted different problems than modern Americans now face.  Technological

---

[11] J.H. HEXTER, REAPPRAISALS IN HISTORY 194–45 (1961).

[12] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT.
REV. 119, 122 n.13 (1965).

[13] The best illustration of this method in practice is the three volume
*Cambridge History of Law in America. See* THE CAMBRIDGE HISTORY OF LAW IN
AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[14] Frederic William Maitland, *A Prologue to a History of English Law*, 14 L.
QUARTERLY REV. 13 (1898).  For a more recent exploration of Maitland's idea of
the web of meaning, see Jonathan Gienapp, *Historicism and Holism: Failures of
Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

and social change eased some problems, but exacerbated other on-going problems and created new unprecedented challenges to the states and localities.  Fortunately, the emergence of the Marshall Court's flexible police power framework for evaluating gun powder and firearms regulation proved more than adequate to facing these diverse challenges.

29.     In *District of Columbia v. Heller*, the Supreme Court directed courts and litigants to look to history in evaluating the scope of permissible regulation under the Second Amendment.[15]  At the time *Heller* was decided, there was relatively little scholarship on the history of gun regulation, but in the years since the decision was published, a burgeoning body of scholarship has uncovered a previously unknown and little studied history of arms regulation in the Anglo-American legal tradition.[16]  My declaration draws on this important body of new scholarship and the breadth of digital sources now available to scholars in order to understand and contextualize the rights implicated—and not implicated—in this case.

30.     *Heller* did not undertake the arduous and laborious task of doing the historical research necessary to understand the full scope of the legal tradition of arms regulation. Rather, it left this project to lower courts and future scholars. Justice Scalia's characterization of the limits of *Heller's* foray into history in the majority opinion is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should

---

[15] *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[16] Cornell & DeDino, *supra* note 2; Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 *Law and Contemporary Problems* 55, 60 (2017). For an effort to synthesize the new scholarship on regulation and apply it using *Heller's* framework, see JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* (2018).

be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[17]

31.    Moreover, in *Heller*, Justice Scalia's majority opinion noted that "constitutional rights are enshrined with the scope they were thought to have when the people adopted them."[18]  *Heller* also made clear that the right to keep and bear arms was not absolute:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the nineteenth-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.[19]

32.    *Heller* identified an illustrative set of examples of "presumptively lawful regulations."[20]  This list was not exhaustive, but only a sketch of the many ways guns and gunpowder have been regulated by government, a legacy that is deeply anchored in text, history, and tradition.[21]  Thus, *Heller* directed courts to look at the Founding era, antebellum America, and Reconstruction when examining the scope of the right.[22]

33.    In *McDonald v. City of Chicago*, this analysis was refined in Justice Alito's majority opinion.  In addition to discussions of the Founding period, he

---

[17]*Heller*, 554 U.S. at 626–27.

[18] *Id.* at 684.

[19] *Id.* at 626.

[20] *Id.* at 627 n.26.

[21] *Id.* at 626.

[22] On the notion of constitutional modalities, and the relevance of the categories of history, text, and tradition, see P. BOBBITT, CONSTITUTIONAL INTERPRETATION (1991). Of course, other scholars may have different terminology for these modes of analysis, but these jurisprudential categories largely overlap these six forms. *E.g.* Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189 (1987); Robert Post, *Theories of Constitutional Interpretation*, in LAW AND THE ORDER OF CULTURE 13–41 (R. Post ed., 1991).

included references to the modern Supreme Court's substantive due process

jurisprudence and its focus on the central role of historical tradition in

understanding the scope of cherished rights in the American legal tradition:

> In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan* [v. *Louisiana,* 391 U. S. 145,149 (1968)], or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg,* 521 U.S. 702, 721 (1997).[23]

34.    Finally, the case law *Heller* probed from antebellum America analyzed

the permissible scope of firearms regulation in terms of the police power. The

history of arms regulation therefore requires an understanding of the police power

and its role in firearms regulation over the long arc of American history.

35.    The deeply polarized nature of the modern debate over the role of guns

in American society has created its own unique problems for courts seeking to

understand the mutually entwinned history of gun rights and gun regulation. Much

of the "scholarship" published on this topic, particularly materials in student edited

law journals, is marred by errors, anachronisms, and ideological special pleading.

One consequence of this fact is that any claim or citation made in the existing law

review literature must be scrutinized for historical accuracy and potential

ideological bias. Typically, in less contentious and ideologically charged sub-fields

of the law, one can spot-check citations in the "scholarly" literature and largely

trust that historical claims are generally accurate, but this is not always true in the

field of Second Amendment scholarship. Law review articles are typically not peer

reviewed, although some top journals have incorporated some aspects of outside

review in their publication decisions. Although peer review is not perfect it does

offer one means to verify claims and evidence. Much of the scholarship in the field

of Second Amendment writing is more ideological than scholarly in nature and

---

[23] *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010).

1  therefore has exploited the absence of peer review to advance questionable

2  historical claims. Vetting the various claims and checking sources in this field,

3  including close review of primary sources or secondary sources that may be out of

4  print or inaccessible, is therefore essential and further increases the amount of time

5  needed to conduct reliable historical research.[24]

6      36.    In *Bruen*, Justice Kavanaugh reiterated *Heller's* invocation of

7  Blackstone's authority as a guide to how early Americans understood their

8  inheritance from England.  Specifically, Justice Kavanaugh stated in unambiguous

9  terms that there was a "well established historical tradition of prohibiting the

10  carrying of dangerous and unusual weapons."[25]  The dominant understanding of the

11  Second Amendment and its state constitutional analogues at the time of their

12  adoption in the Founding period forged an indissoluble link between the right to

13  keep and bear arms with the goal of preserving the peace.[26]

14  _____

15  [24]  For a discussion of this problem in the context of the Second Amendment and the rights and obligations of militia participation, see  Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. INTER ALIA 1 (2021)

17  [25] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). It seems probable that the  phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. Rev. 687 (2016). Read with this in mind the term would be best rendered as "unusually dangerous."

23  [26]  On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569

28

37.    More recently in *Bruen*, the court elaborated the nature of the historical inquiry needed to evaluate the constitutionality of permissible regulation under the Second Amendment.[27] *Bruen's* methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[28] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[29]

38.    Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[30] Nor were guns the primary weapon of choice for those with evil intent during this period.[31] Finally, although there were events where masses of people shot others, there were no mass shootings in the modern sense. Firearms technology in the eighteenth century precluded the possibility of mass shootings.

---

(2017).

[27] Cornell, *supra* note 2, at 21.

[28] Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[29] Richard Slotkin, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); Joan Burbick, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[30] Randolph Roth, AMERICAN HOMICIDE 56, 315 (2009).

[31] Haag, *supra* note 28.

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

39.     The chief problem the Founding generation faced regarding firearms seems almost hard to imagine given the proliferation of weapons in modern America. In contrast to modern America, gun owners in the Founding era were reluctant to purchase the type of weapons needed to effectively arm the state militias.  This problem became clear during the American Revolution and persisted long after American Independence.  When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[32]

40.     Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.  Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[33]  Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity, at least in terms of militia weapons, have limited value in illuminating the challenges Americans face today.

---

[32]Kevin Sweeney,  *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019)

[33] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

41.    Moreover, the Supreme Court has made clear that a literal approach to history, simply canvassing the laws on the book from the Founding era is not sufficient to understand the scope of permissible regulation.  Indeed, Justice Thomas clearly stated in *Bruen* that history neither imposes "a regulatory straightjacket nor a regulatory blank check."[34]  The Court acknowledged that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen* differentiates between cases in which contested regulations are responses to long-standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

## II. The Legal Status of Infants Under the Common Law: The Founding Era and Beyond

42.    The first step in evaluating the status of Second Amendment rights for those aged 18–20 and other minors in the Founding era is to consider the common law's treatment of the legal capacities and rights of persons under the age of legal majority at that time.  Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[35]  This legal fact did not change until the latter half of the twentieth century.[36]  Across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision.  Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly

---

[34] *Bruen*, 142 S. Ct. 2111

[35] Zephaniah Swift, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).

[36] Hamilton, *supra* note 8 at 57-8.

anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

43.     Under English common law, individuals under the legal age of majority, twenty-one, were entirely subsumed under the authority of their parents (usually their fathers) or guardians.  The power of fathers or guardian under this system of patriarchy exceeded the power of the monarch over his subjects.  For example, for minors there was no right of petition or other rights enjoyed by English subjects and later by American citizens.[37]  Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment.  There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).[38]

44.     Although Mr. Hardy discusses the rights of "young adults" in his declaration, that term did not exist in the founding era and is a modern invention.[39] Individuals below the legal age of majority, twenty-one, were "infants" in the eyes of the law at the time of the nation's founding and of the Second Amendment's adoption.[40]  An infant was legally "disabled" in the eyes of the law.  Rather than

---

[37] Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 Yale L.J. 142 (1986).

[38] John E.B. Myers, *A Short History of Child Protection in America*, 42 Fam. L.Q. 449 (2008); Elizabeth Pleck, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (1987).

[39] Hardy Decl., at ¶¶ 7, 8, 12, 15, 18, 22, 28, 30.  On the emergence of the category of young adult in modern legal theory, see Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016).

[40] Swift, *supra* note 35; T. E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22 (1960).

analogize infants to citizens, Founding Era law analogized minors to married women under coverture, madmen, and "idiots."[41]

45.    American law at the time of the Second Amendment's enactment did not treat infants—even those infants who may have been obliged to serve in militias or participate in enforcing the peace by participating in community actions such as a hue and cry—as autonomous legal actors with an individual right to keep and bear arms outside the context of and separate from any duties imposed upon them.[42]  In short, Plaintiffs' argument and Mr. Hardy's contention that anyone under 21 could have maintained a Second Amendment claim (under either the Federal bill of rights or comparable state arms bearing provisions) is both historically unfounded and inconsistent with the actual legal status of those under 21 at the time of the Second Amendment's adoption.

46.    Mr. Hardy's declaration thus reflects a fundamental flaw: it rests on an ahistorical treatment of those under the age of 21 that ignores the legal history of Anglo-American domestic relations governing infants and their parents or guardians.[43]  Mr. Hardy also fails to acknowledge that—as was true of *femme*

---

[41] Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016). *Cf.* discussion *infra* pp.19-22.

[42] *See* Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016); John Bouvier, 1 *Institutes of American Law* 148 (1858) ("The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights.").

[43] *See* Hardy Decl., Ex. 17 (David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 530 (2019)).  Mr. Hardy's argument appears to rest on the authority of writings by other gun rights activists, not historical experts on the legal history of childhood *See id.*  But as noted above, the Kopel and Greenlee article's references to the "Rights of Young Adults," as well as its content, are premised on the same anachronistic

*covert*, a status that treated women as "disabled in the Law" in the eighteenth century—those under 21 were also legally "disabled" in the eyes of the law.[44]

47.     Under the doctrine of coverture, a married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[45]  Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[46]

48.     Indeed, an influential eighteenth-century English treatise on the law of domestic relations noted that the comparison between a femme covert and minors was frequently made by writers on the law: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[47]  Given the irrefutable fact that minors were legally "disabled" in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is erroneous.

---

understanding of the legal status of infants in Anglo-American law as the one presented in Mr. Hardy's declaration.  Kopel and Greenlee also apparently share (or perhaps supply) Mr. Hardy's confusion about the legal relationship between rights and duties, and therefore their ahistorical claims are not probative in this matter.

[44] Anonymous, BARON AND FEME: A TREATISE OF LAW AND EQUITY, CONCERNING HUSBANDS AND WIVES 8 (1738).

[45] J.H.BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed. 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate,* 26 YALE JOURNAL OF LAW AND FEMINISM 165,167 (2014).

[46] 1 William Blackstone, COMMENTARIES *442.

[47] Anon., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

49.     The American Revolution set in motion a process of change that republicanized the rights of minors by giving society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.[48]  This change did not endow minors with full legal rights under the law, but it did diminish the near absolute power that fathers (or parents more generally) and guardians had over minors living under their authority.

50.     The subject of minors' legal status was explored at considerable length by Zephaniah Swift, an esteemed Connecticut jurist in the Founding era, and author of one of the first legal treatises published after the adoption of the Second Amendment.  Swift captured the central legal fact governing persons below the age of majority at the time of the Founding: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—minors." Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[49]  During the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts.  This new supervisory role narrowed the range of contractual freedom of minors acting without consent.  Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[50]

---

[48] Jeffrey Shulman, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014).

[49] Swift, *supra* note 35.

[50] Holly Brewer, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

51.    The influential early nineteenth century legal author and jurist James Kent discussed the legal status of minors in 1836 in his influential Commentaries on American law: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[51]  When some radical Jacksonian Democrats suggested that the age of majority for voting ought to be lowered for those who had served in the militia, leading Federalists in the New York state constitutional convention mocked them.  Federalist Elisha Williams, a delegate from Columbia County, wondered if his Democratic opponents wished to enfranchise "brave infants" by giving them the right to vote.[52]  Extending full rights to minors was literally treated as a joke by Federalists sitting in the constitutional convention.  John Bouvier, author of the first American law dictionary, shared Swift and Kent's views, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[53]  Bouvier's statement captures the widespread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full panoply of rights under American law.[54]

52.    It is impossible to understand the legal conception of "infant" without recognizing the patriarchal nature of English common law and its early American

---

[51] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

[52] Corinne T. Field, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.

[53] John Bouvier, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[54] Field, *supra* note 52.

variants.[55]  Johns Hopkins historian Toby Ditz summarizes the centrality of the

legal concept of patriarchy to family law and governance in the Founding Era:

> Historians have begun to use the concept "household patriarchy" to
> describe community organization in eighteenth century America.
> Household patriarchy refers to both internal and external aspects of
> domestic organization. It describes authority relations in which heads,
> and not others within households, have the formal right to make final
> decisions about internal matters. Patriarchal household heads speak for
> their dependents in dealings with the larger world. The civic status of
> household dependents is an indirect or secondary one; the community
> reaches them primarily through the actions and voices of the heads.[56]

53.    Individuals below the age of legal majority served in the militia and

participated in community-based efforts to keep the peace (such as the "hue and

cry"), but these public safety duties were undertaken in a supervised setting under

color of law.[57]  David Hardy's declaration in support of the preliminary injunction

at ¶ 33 ignores the most basic facts about Founding era domestic law and common

law understandings of the status of minors as dependent, not independent actors.  In

essence, Hardy approaches the past backwards, starting with the status of minors in

contemporary law and applying this conception to the Founding era.  This approach

is profoundly anachronistic and precluded by *Bruen's* text, history, and tradition

framework.[58]

---

[55] The absorption of the common law in America and the development of
different variants of common law in the colonies and states has generated a rich
scholarly literature, for a useful overview, see Lauren Benton & Kathryn
Walker, *Law for the Empire: The Common Law in Colonial America and the
Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[56] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal
Households in Connecticut, 1750-1820*, 47 WILLIAM & MARY Q. 235, 236 (1990).

[57] The Statute of Winchester, adopted in 1284 in the Reign of Edward I,
required male members of the community between 15 and 40 to join the "hue" and
"cry" and participate in community law enforcement, see 1 STATUTES OF THE
REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the
nineteenth century, community-based law enforcement, including the "hue" and
"cry" were the only means to deal with most forms of ordinary crime. See
LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[58] David Hardy and related exhibits submitted in support of Plaintiffs' motion
for preliminary injunction (ECF Nos. 21-11, 21-12, 21-13, & 21-14) (hereinafter
"Hardy Decl.").

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

54.    Moreover, Mr. Hardy fails to acknowledge that some militia statutes explicitly required parental consent for those under 21 to serve.  Additionally, some states chose to exclude those under the age of consent from the obligation to acquire firearms. [59]  Hardy's ahistorical analysis fails to reckon with one of the most important early American cases on the scope of government regulation of infants.  Perhaps the best account of the status of minors and participation in public defense may be found in an opinion authored by Justice Story while riding circuit.  The case tested the legality of a minor's enlistment in the navy and the authority of Congress to override common law parental authority to facilitate the ability of Congress to support and maintain a navy.  "The right of parents, in relation to the custody and services of their children, whatever they may," he wrote "are rights depending upon the mere municipal rules of the state, and may be enlarged, restrained, and limited as the wisdom or policy of the times may dictate."[60]  As Story makes clear, the rights of minors, unlike the rights of adults, were entirely within the scope of legislative control.  Mr. Hardy also opines that, based on his review of state and federal militia laws, "not only were 18-to-20-year-olds able to freely purchase and acquire firearms, they were also required to possess them."[61]  But this conclusion suffers from the same flawed, a confused tautological analysis conflating rights with responsibilities.  The fact that those who served in militias were required by militia statutes in some cases to appear at muster with, and use, their own arms does not mean that those under 21 had freestanding rights to purchase firearms for individual use outside the service context.  Mr. Hardy does

---

[59] See, e.g., Hardy Decl., Ex. 17 at 0415-0416 (collecting New Jersey statutes); id. at 0429 (collecting New Hampshire statutes); id. at 0435-0436 (collecting Pennsylvania statutes).

[60] UNITED STATES V. BAINBRIDGE 1 Mason, 71; 2 Wheeler, Cr. Cas. 521.

[61] Hardy Decl. at ¶ 26.

not identify a single statute establishing such a right.[62]  As Story's analysis makes

clear such a right would have to be recognized by statute to enjoy legal cognizance.

55.    Another problematic element of Mr. Hardy's analysis stems from his

failure to acknowledge over a third of state militia statutes in the Founding Era

required parents or guardians to provide firearms to militia members under the age

of 21 who were under their charge—even though sources upon which he bases his

declaration explicitly identify such statutory provisions.[63]

56.    Finally, Hardy's myopic focus on militia statues blinds him to other

important sources for understanding the status of minors at the Founding. The case

of minor's participation in community-based forms of law enforcement is

illustrative of the limited legal status infants enjoyed at the time of the Founding.[64]

The circumstances under which an infant could participate in community forms of

keeping the peace were defined by the patriarchal structure of local communities

and the peacekeeping mechanism instantiated by law.  As Princeton historian Laura

Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept
> was based in a long-standing, highly gendered construction of
> government authority, which subordinated everyone to a sovereign body,
> just as all individual dependents were subordinated to specific male heads
> of household. [65]

---

[62] *Id.* at Exhs 3-14.

[63] *See, e.g.,* Hardy Decl., Ex. 17, at 0392 & n.56; *id.* at 0429-0431 & nn.429,
440, 459; *id.* at 0433 & nn.472, 477, 482.

[64] The Statute of Winchester, adopted in 1284 in the Reign of Edward I,
required male members of the community between 15 and 40 to join the "hue" and
"cry" and participate in community law enforcement, see 1 STATUTES OF THE
REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the
nineteenth century, community-based law enforcement, including the "hue" and
"cry" were the only means to deal with most forms of ordinary crime. See
LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[65] Laura F. Edwards, *The Peace: The Meaning and Production of Law in the
Post-Revolutionary United States*, 1 UC IRVINE L. REV. 565, 570 (2011).

57.     Plaintiffs' argument therefore ignores contrary evidence regarding the legal status of minors that renders his claims historically untenable.[66]  A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, captured the dominant view of legal authorities in the Founding era when it described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[67]  The author of this popular legal guide, John Fauchereaud Grimké, was among the state's most distinguished and influential jurists.  The fact that he included infants old enough to participate in the militia and local law enforcement were placed in the same legal category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire arms at the time of the Founding.[68]  Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, or that such individuals could act without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes and ignorance of Founding Era domestic law.[69]

58.     Hardy's analysis completely disregards the social and economic realities of domestic life at the Founding, particularly the way economic realities

---

[66] Hardy Decl. at ¶ 33.

[67] JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Grimké was one of the state's most eminent lawyers and became one of its most influential jurists.  For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

[68] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[69] During the era of the Second Amendment the federal government and the states struggled to arm the militia with the right type of weapons, see Sweeney, *supra* note 32.

28

shaped family formation in this period. Male minors under 21 living under the authority of their fathers faced significant hurdles in establishing their own independent households. The laws governing settlement and residency for Massachusetts are revealing in this regard: they imposed an age requirement of twenty-one, as well as a variety of different wealth requirements, to establish residency in the commonwealth.[70] Moreover, acquiring the necessary economic resources to establish independence was increasingly difficult during the era of the American Revolution. Indeed, most adult men in Concord, the town virtually synonymous with the Minuteman ideal of a well-regulated militia, were forced by economic necessity to postpone establishing their own independent households until their mid-twenties, a decision necessitated by the difficulty of acquiring enough land to establish an independent farmstead. Although these persons were no longer minors in the eyes of the law after turning 21, in virtually every other respect they remained under the patriarchal authority of their fathers as a practical matter in most respects until they could leave home.[71]

59.    One final body of evidence raises further doubts about the claim that Founding Era Americans believed that young men below the age of majority could be trusted with firearms without proper supervision, or that they had unfettered rights to keep, bear, and acquire them: the stringent rules prohibiting firearms ownership and use enacted by colleges in the Revolutionary era. College was one of the very few circumstances where minors lived outside of their parents' or a

---

[70] Persons residing outside of properly governed household, i.e., a home headed by a white male patriarch could be banished from early New England towns, a process known as "warning out," see Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-Century Massachusetts*, 62 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: LAW IN COLONIA MASSACHUSETTS 1630–1800 152, 190 (1984).

[71] Robert A. Gross, THE MINUTEMEN AND THEIR WORLD (1976); Mary Babson Fuhrer, *The Revolutionary Worlds of Lexington and Concord Compared* 85 NEW ENGLAND Q. 78 (2012).

1  guardians' direct authority.  As a matter of law, minors attending college traded

2  strict parental authority for an equally restrictive rule of *in loco parentis*.[72]

3      60.    Harvard's campus rules adopted in the era of the American Revolution

4  prohibited guns on campus:

> XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in
> the College, without Leave of the President—nor shall he go a gunning,
> fishing, or seating over deep Waters, without Leave from the President,
> or one of the Tutors or Professors, under the Penalty of one shilling for
> either of the Offences aforesaid—and if any Scholar shall fire a Gun, or
> Pistol, within the College Walls, Yard or near the College, he shall be
> fined not exceeding two shillings & six pence, or be admonished,
> degraded, or rusticated according to the Aggravation of the Offence. [73]

5

6

7

8

9

10      61.    Although Harvard was a private entity, its role in early Massachusetts

11  society straddled the public and private spheres.[74]  Other colleges in the Founding

12  Era adopted similar restrictions as Harvard.  Yale College prohibited students from

13  possessing any guns or gun powder.[75]  Two years after the adoption of the Second

14  Amendment, Rhode Island College, the forerunner of Brown University, adopted

15  its own stringent ban on guns on campus that not only fined students for possession

16  of firearms, but threatened potential expulsion as well.[76]

17

18      [72] Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform,* 44 VAND. L. REV.1135 (1991).

19      [73] 31 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: COLLECTIONS 338, 358 (1935).

20      [74] Thus, the Massachusetts Constitution of 1780 instructed the citizenry "to
21  cherish the interests of literature and the sciences, and all seminaries of them:
especially the university at Cambridge. MASS. CONST. ch. V, § 1. Laws of the
Commonwealth of Massachusetts from November 28, 1780 to February 28,1807,
22  with the Constitutions of the United States of America, and of the Commonwealth,
1780-1807) at 580. Harvard students and faculty were exempted from militia
23  obligations but during the American Revolution Harvard College did create a
militia company. *see* Conrad E. Wright, *Creating a Fellowship of Educated Men:*
24  *Forming Gentleman at Pre-Revolutionary Harvard, in* YARDS AND GATES: GENDER
IN HARVARD AND RADCLIFFE HISTORY 17–38 (Laurel Ulrich ed., 2004).

25      [75] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED
BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 p.26
26  (1800).

27      [76] Laws of Rhode Island College (1793) at 13.

28

62.   The University of Georgia, one of the nation's oldest public
institutions of higher education, also forbade guns on campus.  The rule was
emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk[,]
sword cane or any other offensive weapon in College or elsewhere, neither shall
they or either of them be allowed to be possessed of the same out of the college in
any case whatsoever."[77]  A similar law governed students at the University of North
Carolina, another public university founded in the same period. The university
prohibition was total: "No Student shall keep a dog, or firearms, or gunpowder. He
shall not carry, keep, or own at the College, a sword, dirk, sword-cane." [78]  College
regulations from this era only underscore the fact that legal and social norms
governing American society in the era of the Second Amendment's ratification do
not offer any support for the view that unsupervised minors were to be trusted with
free access to firearms.  Quite the opposite was the case: there was almost universal
acceptance that guns in the hands of minors required adult supervision and
extensive training.

63.   The figure of Thomas Jefferson looms large in modern discussions
about the meaning of the Second Amendment.[79]  Although Jefferson was among
the Founding generation's most ardent defenders of an expansive vision of the right
to keep and bear arms, even he took a dim view of allowing guns at the University
of Virginia, the institution he helped found.  Jefferson and his good friend James

[77] *The Minutes of the Senate Academicus* 1799–1842, University of Georgia
Libraries (1976),
https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf.

[78] Acts of the General Assembly and Ordinances of the Trustees, for the
Organization and Government of the University of North-Carolina 15 (1838).

[79] David Thomas Konig, *Thomas Jefferson's Armed Citizenry and the
Republican Militia*, 1 Alb. Gov't L. Rev. 250 (2008).

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

Madison, the primary architect of the Second Amendment, attended the meeting in

which this sweeping prohibition of firearms on campus was adopted:

> No Student shall, within the precincts of the University, introduce, keep
> or use any spirituous or vinous liquors, keep or use weapons or arms of
> any kind, or gunpowder, keep a servant, horse or dog, appear in school
> with a stick, or any weapon, nor, while in school."[80]

64.    The rules and regulations of American colleges in the era of the

Second Amendment further support the conclusion that for individuals below the

age of majority, there was no unfettered right to purchase, keep, or bear arms.

Rather, access to, and the ability to keep or bear, weapons occurred in supervised

situations where minors were under the direction of those who enjoyed legal

authority over them: fathers, guardians, constables, justices of the peace, or militia

officers.

65.    Much of the confusion over the scope of Second Amendment rights

and minors stems from a presentist set of assumptions antithetical to the originalist

foundations of recent jurisprudence in this area.  Plaintiffs have cast the issue of

minors and guns in terms of the anachronistic claims about the rights of "young

adults."[81]  There was no legal category of "young adult" in the Founding era.  Nor

did such a category emerge in the century following the adoption of the Second

Amendment.  In fact, the idea of a "young adult" is a very recent development in

---

[80] UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/..

[81] See Hardy Decl., at 11 ¶¶ 22, 24, 13 ¶ 28. *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 422 (4th Cir.), as amended (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied sub nom.* The majority opinion in *Hirschfeld* relied on a flawed analysis offered by two gun rights activists, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S.ILL.U.L.J.495, 530 (2019).  The title of this article's references to the "Rights of Young Adults" demonstrates that the argument made by Kopel, Greenlee, and Hardy is premised on an anachronistic understanding of the legal status of infants and general lack of familiarity with the social and legal history of the family in Anglo-American law during the colonial periods and after American Independence.

American society and law.[82]  Although modern law, including the Warren's court's landmark decision in *Tinker v. Des Moines* have created a robust set of First Amendment rights for minors, there was no similar right in existence at the time of the framing and adoption of the Second Amendment.[83]  Indeed, in his concurrence in *Morse v. Frederick*, Justice Thomas noted that *Tinker* had no basis in the original meaning of the Constitution and was an example of the Warren court's living constitutionalism approach.[84]  Given these facts, any reliance on *Tinker's* holding is inconsistent with *Bruen's* text, history, and tradition framework, and sheds little light on the issue of minors and the right to bear arms at the Founding.

66.    The suggestion that infants must have had Second Amendment rights in the Founding because they would have presumably had First Amendment rights is equally anachronistic.  Infants would have had no legal standing nor any justiciable claim assertable based on either the First Amendment claims or Second Amendment in any court in American in 1791.

67.    Prominent legal controversies over the fate of Shaker children in the early Republic establish this point forcefully.  Two of the most notorious early nineteenth century legal custody battles involved the Shakers, a utopian religious sect that practiced a form of Christian communism and rejected the traditional model of the nuclear family.[85]  Although the Shakers were the beneficiaries of ideas of religious toleration for free exercise in the early Republic, they were viewed with deep suspicion by most Americans.  Given these facts it is not surprising that parental conflicts over children entering Shaker communities would spark

---

[82] On the emergence of the category of young adult in contemporary legal theory, *see* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016). *Id*.

[83] *Id*.

[84] *Morse v. Frederick*, 551 US 393, 416-419 (2007) (J. Thomas, concurring)

[85] For a concise summary of Shaker history and belief, *see* Robert S. Fogarty, *Religious Inventions in America: New Religious Movements* 22 OAH MAGAZINE OF HISTORY 19 (2008).

controversy and widespread public interest.  Minors taken into Shaker communities were entirely under the authority of the male head of household who alone made the decision that children would join the Shaker community.  Minors opposed to such a decision would have had no independent claim of religious freedom or autonomy until they reached the age of legal majority to reject their father's decisions.  Infants' religious choices were entirely controlled by parents or guardians.[86]

68.    The absence of any constitutional claim on behalf of minors involved in these controversies meant that the issues they posed were resolved by legislatures, not courts.  Each of these celebrated cases involved fathers who joined the Shaker community and took their children with them against the wishes of their mother.  In each case, distraught mothers had no course of action in court but had to appeal to the legislatures for a resolution.  The idea of challenging the patriarchal authority of fathers over their charges was a judicial non-starter.  Neither wives nor children had any legal standing to challenge the authority fathers had over the religious life of minors within their household.  Nor could wives avail themselves of a divorce as a means to reassert some control over their offspring given the stringent laws governing this legal option.  Although divorce, a legal tactic that would have restored their control over their children, would have allowed them to remove the children from the Shaker community, the grounds for obtaining one were exceedingly narrow in antebellum America.  The primary grounds, adultery was especially ineffective in cases involving the Shakers because the sect was celibate.  Thus, both aggrieved mothers in Shaker religious custody disputes were forced to petition their legislatures for statutes permitting them to divorce.[87]  In

---

[86] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750–1820,* 47 Wm. & Mary Q. 235, 236 (1990).

[87] On the limited grounds for divorce in pre-Civil War America, *see* Elizabeth B. Clark, *Matrimonial Bonds: Slavery and Divorce in Nineteenth-*

1   each instance, the legislature expressed reluctance to intervene in the decisions of a

2   father regarding the religion of a minor in his care.  This was the only religious

3   freedom claim the law recognized as legally relevant.  Legislators waxed eloquently

4   about the need to protect religious freedom, but in contrast to our modern post-

5   *Tinker* view of the matter, the only relevant rights at issue rights remained tied to

6   the patriarchal authority of the Shaker fathers, not the religious beliefs of mothers

7   or children.  The orthodox view of free exercise of religion at this moment in

8   American history favored the rights of the fathers, minors had no standing or claim

9   to challenge that authority.  Ultimately, one of the mothers seeking custody of her

10  offspring was able to obtain a divorce, but the grounds for the divorce was

11  abandonment, not an assertion of religious freedom.[88]  In short, not only were

12  "Second Amendment" freedoms not available to minors in the Founding era, but

13  neither were the core "First Amendment" freedom of religious liberty so esteemed

14  by modern Americans.[89]  As was true for wives under the doctrine of coverture,

15  _____

16  *Century America*, 8 LAW & HIST. REV. 25 (1990); Norma Basch, FRAMING
    AMERICAN DIVORCE: FROM THE REVOLUTIONARY GENERATION TO THE VICTORIANS
    168–72 (1999); Naomi Cahn, *Faithless Wives and Lazy Husbands: Gender Norms

17  in Nineteenth Century Divorce Law,* 2002 U. ILL. L. REV. 651 (2002). For a useful
    discussion of the issues raised in one of these two  Shaker custody disputes, *see*

18  Janet Sarbanes, *Domestic Broils: Shakers, Antebellum Marriage, and the
    Narratives of Mary and Joseph Dyer* 29 LEGACY: A JOURNAL OF AMERICAN

19  WOMEN WRITERS 329 (2012).

20      [88] Richard D. Brown, SELF-EVIDENT TRUTHS: CONTESTING EQUAL RIGHTS
    FROM THE REVOLUTION TO THE CIVIL WAR 113 (2017) discusses the limited nature

21  of the rights of wives and minors and offers a brief overview of the Shaker custody
    disputes the illustrate the ongoing power of patriarchal authority in the early

22  republic.  The distinguished jurist James Kent endorsed the patriarchal
    understanding of religious liberty at issue in the case, see  Ilyon Woo, THE GREAT

23  DIVORCE: A NINETEENTH-CENTURY MOTHER'S EXTRAORDINARY
    FIGHT AGAINST HER HUSBAND, THE SHAKERS, AND HER TIMES ( 2010)

24  at 249-250.

25      [89] Provisions of the Bill of Rights were not applicable to the states until the
    adoption of the Fourteenth Amendment, but many states had provisions in their

26  own constitutions protecting the free exercise of religion and the right to bear arms.
    Minors would have been unable to effectuate claims of religious freedom by either

27  invoking federal protections or analogous protections under state constitutional law
    because they were legally subsumed under the legal identity of their parents or

28

early American law treated minors as legally disabled and entirely under the

authority of the patriarchal power of male head of households or other guardians.[90]

### III.    PROTECTING ORDERED LIBERTY IN AMERICA: EARLY AMERICAN MILITIA LAWS IN HISTORICAL CONTEXT

69.    It is true that colonial militias and the militias created by the first states

included white males between the ages of eighteen and twenty, and sometimes

younger, in their ranks.  By including some older infants in the militia ranks, the

statutes creating and regulating these militias and the concomitant duties they

imposed implemented policy goals aimed at arming and expanding the ranks of

able-bodied militiamen, but they did not embody or establish a constitutional right

that might be claimed by minors outside of this very narrow context defined by the

relevant statutes.  Nor did these statutes alter the legal age of majority; they simply

implemented a policy goal of the states, and later the federal government.

70.    Although states chose to include minors for policy reasons, the

composition of the militia was always dictated by strategic imperatives. States were

at liberty to expand or contract the legal definitions of the militia to further their

goals of public defense.  If a state felt it was necessary to exclude minors because of

the economic burden it placed on families or because younger Americans were

---

guardians, typically men.

[90] The legislatures' resolution of these cases followed the same logic that shaped the Massachusetts Supreme Court in *Martin v. Commonwealth*, 1 Mass. (1 Will.) 260 (1805). In that case the state's highest court ruled that a woman's estate was not legally forfeited because she fled America with her loyalist husband during the American Revolution. Applying the doctrine of coverture, the court ruled that a married women had no independent will so the decision to flee America was her husband's alone, effectively absolving the wife of any legal liability under the confiscation statute. Although her husband's property was legally confiscated by the state, any property she owned prior to her marriage was exempt and passed on to her heirs, see Linda K. Kerber, *The Paradox of Women's Citizenship in the Early Republic: The Case of Martin vs. Massachusetts*, 1805, 97 AM. HIST. REV. 349 (1992).

viewed as less effective soldiers, there was nothing to prevent a legislature from implementing such changes.

71.    Federalist Thomas Fitzsimons, a member of both the Constitutional Convention and the first Congress that drafted the Second Amendment, captured the view of many in the Founding era when he expressed concerns about imposing overly burdensome requirements of militia service on the nation.  Commenting during the debate over the first militia act, Fitzsimons remined members of Congress that "subjecting the whole body of the people to be drawn out four or five times a year was a great and unnecessary tax on the community."[91]

72.    States had plenary authority to alter the age requirement for participation in the militia.  New Jersey changed the legal definition of the militia in 1821: "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace."[92] Kansas excluded minors by framing its constitutional provision on the militia as follows: "The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[93]  Examples such as these two only underscore Justice Story's observation in *Bainbridge* that the legal status of minors was entirely within the purview of the individual states.  The authority of the federal government to alter the composition of the militia was plenary.

73.    The ideal of a broadly inclusive vision of the militia, at least as far as white males were concerned, was venerated in public orations, pamphlets, and

---

[91] ANNALS OF CONGRESS, House of Representatives, 1st Congress, 3rd Session  (1790) at 1852.

[92] An Act to exempt minors from Militia Duty in time of peace, in Josiah Harrison, Ed., *A Compilation Of The Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820* 266 (1833). By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of satire and ridicule, see David Tatham, *David Claypoole Johnston's Militia Muster*, 19 *AMERICAN ART JOURNAL* 4 (1987).

[93] Kan. Const. of 1859, art. 8, § 1.

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

newspaper essays, but political rhetoric, law, and social reality seldom lined up
neatly with one another.[94]  Instead of mandating a universal and broadly inclusive
militia in the text of the Constitution, the Framers wisely chose to give Congress
the power and flexibility to define the composition of the militia.  There was no
textual mandate in the Constitution that compelled future generations to include
minors if such a policy was deemed to be undesirable by Congress.  If a particular
future Congress believed that society and public defense meant that minors' labor
were needed elsewhere or if it concluded that minors were not well suited to the
military tasks required for national defense, there was no legal ground for minors to
claim a right to participate in the militia or acquire the weapons needed for militia
service.  The same constitutional principle defined the right embodied in the text of
the Second Amendment.  An early draft of the text of the amendment defined the
militia as composed of the "body of the people," but this language was struck out to
allow future legislatures greater flexibility in creating an effective militia.[95]  Thus,
as a matter of constitutional law the composition of the militia was left to Congress
to determine as it saw fit.  Moreover, although the Constitution includes ages
requirements for several offices listed in its text, it conspicuously omits any age
parameters for members of the militia.

74.  It is important to recognize that the legacy of the militia in the
American Revolution was mixed.  Among the Federalist Founders, including

---

[94] *See* Bernard Bailyn, THE IDEOLOGICAL ORIGINS OF THE AMERICAN
REVOLUTION (1967); J. G. A. Pocock, THE MACHIAVELLIAN MOMENT: FLORENTINE
POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION (1975); Lawrence
Delbert Cress, CITIZENS IN ARMS: THE ARMY AND MILITIA IN AMERICAN SOCIETY
TO THE WAR OF 1812 (1982); Noah Shusterman, IN ARMED CITIZENS: THE ROAD
FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

[95] Jack N. Rakove, *The Second Amendment: The Highest State of
Originalism*, 76 CHI.-KENT L. REV. 103, 108, 120-125 (2000) (notes the
significance of this tension between American political rhetoric and constitutional
law in the Founding Era). On the distinction between legal meaning and ordinary
public meaning in originalist theory, see William Baude & Stephen E. Sachs,
*Grounding Originalism*, 113 NW.U.L.REV. 1455 (2019).

1   Washington and Hamilton, there was a widely shared belief that America's heavy

2   dependence on the militia had been a strategic mistake, one that had severely

3   hampered the struggle for independence.[96]  George Washington's private

4   correspondences contain withering comments about the inadequacy of the militia,

5   and the necessity of creating an effective standing army.  He wrote home the

6   following observations: "I assured [Congress] that the longer they delayed raising a

7   standing army, the more difficult and chargeable would they find it to get one, and

8   that, at the same time that the militia would answer no valuable purpose."  The

9   performance of the militia led Washington to lament that "the conduct of the

10  militia, whose behavior and want of discipline has done great injury to the other

11  troops, who never had officers, except in a few instances, [are not] worth the bread

12  they eat."[97]  When Congress finally debated the structure of the militia in the First

13  Congress, there were deep divisions over the organization and structure of the

14  militia. Many—particularly those who had served with Washington in the

15  Continental Army—recognized that the militia, including the Revolutionary-era

16  militia, was never, as some pamphleteers and newspaper essayists proclaimed, an

17  effective fighting force that included the whole body of the people in arms.  Those

18  most familiar with the militia's performance during the Revolution thus feared

19  placing the future security of the nation in the hands of a militia.  Many in the First

20  Congress, a body dominated by Federalists, shared Washington's concerns and

21  doubted the wisdom of continuing to conceive of the militia in the expansive terms

22

23  [96] On the importance of distinguishing between Federalist and Anti-Federalist
    views of the militia, see Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING
24  FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 69 (2008); at 41-70.

25  [97] *From George Washington to Lund Washington, 30 September 1776*, NAT'L
    ARCHIVES, https://founders.archives.gov/documents/Washington/03-06-02-0341.
26  On the relationship between the militia's performance in the Revolution and the
    constitutional debates over the Second Amendment, see Don Higginbotham,
27  *The Federalized Militia Debate: A Neglected Aspect of Second Amendment
    Scholarship,* 55 WM. & MARY Q. 39-58 (1998)

28

that republican theory demanded—a body of independent yeoman drawn from the ranks of the able-bodied white men of the nation organized by law.  Despite a close vote on the issue in Congress, the first federal militia act rejected calls to create an elite, select militia.[98]  Instead, it carried forward the model of earlier colonial laws and defined membership in the militia broadly, and much to the chagrin of former Anti-Federalists, it did little to guarantee that such a militia would be properly armed.[99]  The debates over the future of the militia in Congress reveal a tension between the ideals espoused in popular rhetoric and the reasoned consideration of America's military leaders.  More germane to contemporary Second Amendment jurisprudence, the exact nature of the militia's composition was left by the Constitution to the political branches to decide.

75.    The notion that the composition of the militia, including the participation of minors, was hard wired into our constitutional order at the Founding is simply mistaken.  The militia was always shaped by political and military imperatives not determined by fixed constitutional principles.  The size of the militia, its composition, and the rules for its training are not constitutionally mandated, but have varied across American history, a fact that continues to this day.[100]

76.    The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation and imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[101]  American citizens did not decide

---

[98] Cornell, *supra* note 96.

[99] *Id.*

[100] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

[101] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo.

which weapons to bring to muster, legislative bodies did.  Failure to acquire the

officially prescribed type of weaponry could result in fines and other

punishments.[102]  As far as the militia was concerned, all guns were not created

equal in the eyes of the law. Government policy was designed to force Americans,

in some cases minors under 21, to acquire the type of weapons the government

deemed essential for a well-regulated militia.[103]

77.    Militia laws were often among the longest statutes written by early

American legislative bodies.[104]  These laws not only prescribed the types of

armaments needed to participate in the militia; they also described the range of

penalties for those who did not acquire or maintain the weapons in good working

order.[105]  Tennessee's enforcement mechanism involved the institution of the court

martial:

> The commissioned and staff officers of the infantry are hereby required
> to meet at the place holding their battalion musters at eleven o'clock on
> the day preceding said muster armed with a rifle, musket, or shot gun and
> dressed in the uniform prescribed by law, for the purpose of being trained
> at regimental drills and the commanding or senior officer, present shall
> call, or cause the roll to be called, and make a return of all delinquents to
> the next regimental or battalion court martial.
>
> § 3. The regimental courts martial shall have power to fine delinquents,
> field or staff officers, and it shall be the duty of the commanding or

Laws 360 (condensing the several Militia laws into a single act).

[102] For a sampling of Founding-era militia statutes, see Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county) [

[103] Sweeney, *supra* note 32.

[104] An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27-42 (1776).

[105] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2-3.

senior officer present at any regimental or battalion or drill muster to make a return of all such delinquents.

78.    The fact that failure to adequately arm and maintain the prescribed type of weapons required of militia men resulted in harsh penalties and possible court martial further undermines claims that one can interpret early American militia laws as evidence of a broad and relatively unfettered right to keep and bear arms for minors.

79.    Militia statutes also prescribed penalties and punishments for failing to report to muster properly armed and for misuse of weapons once an individual appeared at muster.[106]  A 1794 Rhode Island statute adopted a few years after the Second Amendment was framed is illustrative of the punishments that could be meted out:

> That every non-commissioned officer or private who shall neglect to appear at the regimental Rendezvous, shall forfeit the sum of Six Shillings and for every day he shall neglect to appear at the company parade, he shall forfeit Four Shillings and Sixpence. And if he shall not be armed and equipped according to other said Act of congress, when so appearing, without sufficient excuse, he shall, for appearing without a gun, forfeit one shilling and sixpence; without bayonet and belt six pence; without a Bayonet and Belt, Sixpence; without a Cartouch-Box and Cartridges.[107]

80.    Once they had mustered, members of the militia were subject to the full rigors of military discipline and punishment.[108]  Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as

---

[106] Act effective May 5th, 1794, 1794 R.I. Pub. Laws 14, 21, (organizing the militia of the state); Act of Dec. 28, 1792, 1795 N.H. Laws 525 (adding to a prior act regulating the state militia).Act of 1799, § 4, 1799 Conn. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

[107] Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21.

[108] *Houston v. Moore*, 18 U.S. 1 (1820).

whipping.[109]  During this era, the goal of achieving good military discipline

justified a range of discipline and punishment for failure to comply with mandatory

duties that is hard to reconcile with the idea that these laws offer evidence of a right

that might be asserted against government, as I discuss next.

81.    Finally, the law did not treat all privately owned weapons in the same

manner.  Militia weapons, including the privately owned weapons used by many to

meet this legal obligation, enjoyed a special constitutional status, and were

exempted from a variety of civil processes.  Rather than erect a barrier against

government intrusion into the most private sphere of American life, militia statutes

did the opposite: they gave government sweeping powers over the lives and

property of those required to serve in the militia.  Weapons purchased for militia

service were subject to government inspection.  Indeed, although militia weapons

were typically privately owned, they were among the most heavily regulated forms

of private property in early American law.[110]

## IV.    DUTIES, NOT RIGHTS: UNDERSTANDING THE LEGAL SIGNIFICANCE OF AND NEED FOR EARLY AMERICAN MILITIA LAWS

82.    Importantly, interpreting early American militia laws requires reading

these statutes as Founding era Americans would have understood them.  These laws

imposed a legal obligation on Americans; they did not create or assert a right

against government regulation.  Indeed, these laws were a highly intrusive form of

government regulation.  Militia statutes gave government broad authority to compel

individuals to engage in specified actions or face punishment, as just discussed.[111]

Thus, when these laws are understood within their historical context, they

---

[109]Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55, 2 Stat. 705 (1812) (Prohibiting whipping a common form of punishment used by the military in the eighteenth century).

[110] Cornell & DeDino, *supra* note 2, at 508-10.

[111] *Id.*

1   demonstrate that those serving in the militia, including minors, did not have a

2   freestanding and robust right to acquire, keep, and bear whatever arms they desired

3   for whatever purpose.  Rather, these laws compelled individuals to purchase or

4   bring to muster the specific type of weapons the government wished them to use.

5       83.    The responsibility for acquiring weapons generally fell on those who

6   were legally responsible for minors, not the minors themselves.  Early American

7   militia statutes did not penalize minors for failing to obtain the required arms

8   necessary to participate in the militia.  Instead, parents and guardians were singled

9   out as the persons responsible for acquiring militia weapons for their minor children

10   or charges under the age of 21.  For example, New Hampshire's 1792 militia law

11   was explicit that parents and guardians had a legal obligation and suffered the

12   penalties for failing to acquire the necessary weapons for militia participation:

13   "That such of the infantry as are under the care of parents, masters or guardians,

14   shall be furnished by them with such arms and accoutrements."[112]  As Table One

15   makes clear, by the time of Jefferson's presidency (1801-1809) nearly a third of the

16   states expressly tasked parents and guardians, not infants, with supplying the

17   necessary arms needed for militia service.  And five more states followed with

18   similar laws quickly thereafter.

19       84.    Given the limited ability of minors to make contracts, fines levied for

20   failure to comply with militia requirements would have been assessed against the

21   legally responsible adult in charge of the minor's household.[113]

22       ///

23       ///

24

25

26   [112] An Act for Forming and Regulating the Militia Within This State, and For
Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792);  see
also, An Act for regulating, governing, and training the Militia of this

27   Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176.

28   [113] Swift, *supra* note 35, at 213, 217.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table One: Founding Era Laws Requiring**

**Parents to Supply Militia Arms for Minors in their Household**

| State | Year | Source | Statutory Text |
|---|---|---|---|
| New Hampshire | 1776 | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . . |
| Delaware | 1785 | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | [E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . . |
| Massachusetts | 1793 | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | [A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . . |

45

| | | | | |
|---|---|---|---|---|
| New Hampshire | 1792 | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792). | That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements. |
| Vermont | 1797 | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131-32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . |
| North Carolina | 1806 | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346–47 (1883). | And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipment's above mentioned . . . |
| Massachusetts | 1810 | An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176. | [A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act . . . . |
| New Hampshire | 1820 | An Act for the forming, arranging and regulating the militia, § 46, 2 New Hampshire Laws Enacted Since June 1, 1815, 80 (1824). | [A]ll parents, masters, and guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act . . . . |
| Maine | 1821 | An Act to organize, govern, and discipline the Militia of this State, ch. CLXIV, § 34, 1821 Me. Laws 548, 570. | [A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act . . . . |

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

| Missouri | 1825 | An Act to organize, govern and discipline the Militia, ch. I, § 24, in 1825 Mo. Laws 533, 554. | [A]ll parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act. |
|---|---|---|---|

85.    Thus, the claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms makes neither legal nor historical sense.  This claim rests almost entirely on an ahistorical and anachronistic misreading of the original meaning of early militia statutes and a failure to acknowledge the common law status of minors as dependent, not independent legal actors.[114]

86.    Pennsylvania's 1793 revision of the state's militia statute further reveals how much power the state had over militia members and the process by which they acquired weapons.  In 1793, shortly after Congress adopted the first ten Amendments during the First Congress, Pennsylvania enacted the following act modifying the nature of its militia law by exempting minors from having to purchase weapons:

I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia. . . .

II. And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years. And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude,

---

[114] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states. [115]

This Pennsylvania statute illustrates that there was no fixed constitutional requirement that minors participate in the militia nor was it a constitutional requirement that they acquire specific weapons.  These legal obligations were entirely within the legislature's purview to define and decisions about the composition of the militia were always driven by the policy choice that individual states and the federal government made in response to the need to promote public defense, as discussed above.[116]  States routinely exercised their broad authority to include or exclude any group from militia service. [117]  A state could also choose to exempt minors from the requirement to purchase weapons if such a policy was necessary.  Students at Harvard were exempt from militia service, a policy choice that was well within the power of the state to pursue.[118]  There was no legal or constitutional requirement that the militia include any minors if excluding them served the constitutional needs of maintaining a well-regulated militia.

     87.     Militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted. The labor of sons was vital to the survival and prosperity of family farms in a pre-industrial

---

[115] Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania).

[116] Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 (only requiring those between the ages of twenty-one and forty-five to be enrolled in the militia); Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 (same).

[117] Delaware adopted a similar provision to Pennsylvania in 1806, exempting minors enrolled in the militia from acquiring weapons, Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816). In 1829 New Jersey exempted all militia-eligible minors from participation during peace time, Act of Nov. 6, 1829, 1829 N.J. Laws 3.

[118] The Perpetual Laws of the Commonwealth of Massachusetts from the Establishment of Its Constitution to the First Session of the General Court, A.D. 1788. (1788) at 314.

largely agrarian economy.  Outside the slave South, the value of this type of labor
was essential for those engaged in farming.  In other sectors of the economy,
apprentices were indispensable to artisan modes of production.  Given the strong
economic pressures on small farm owners and artisans in a pre-industrial society,
market forces could easily have led families to oppose allowing sons to join the
militia voluntarily.[119]  Thus, at the time of the Second Amendment's enactment
these legal and social facts meant that it was necessary for governments to enact
laws requiring able-bodied minors under 21 to participate.  Without such laws, it is
likely that few minors would have been enrolled in the militia because of the
opposition of those who needed their labor, *i.e.*, parents, guardians, and masters.
The individual states and federal government needed the power, which they
exercised, to coerce individuals to participate in the militia, even if such
participation posed an economic hardship to individuals, their families, or legal
guardians.  And the states flexed that power by threatening punishment: Delaware's
1776 militia law, for example, expressly recognized this problem and included a
provision that levied a fine on any "Masters, Guardians, and Parents" who
"restrained" militia-eligible minors from enrolling.[120]

　　　　88.　　Rather than provide historical proof that infants under 21 had
expansive rights and strong legal claims against government interference with the
right to keep and bear arms, the various militia laws and common law constraints
on infants in fact demonstrate something very different: the broad powers states had
to impose obligations and regulate minors when it came to weapons.

---

[119] Gross, *supra* note 71.

[120] Delaware, An Act establishing a Militia in this State. Law and Statutes, 4
(1776).

## V. THE ECONOMICS OF EARLY AMERICAN FIREARMS: THE PROBLEM OF ARMING THE MILITIA

89.    Militia statutes in the Revolutionary era and early Republic grappled with another problem that America faced for much of its early history as a nation: how to arm Americans with the military-quality weapons essential for a well-regulated militia.  Americans at the time of the Second Amendment's adoption were far better armed than any people in the English-speaking world in the eighteenth century and early nineteenth century.  But early American governments faced a persistent problem: the arms citizens preferred were not the heavy military-quality muskets needed for militia service.  Instead, most Americans owned or wanted light hunting muskets or fowling pieces— these firearms, most useful on a farm, were not the standard weapons of the eighteenth-century militia and not the ones required by the various state militia statutes.  Bayonets were of little use to farmers but could mean the difference between life and death on an eighteenth-century battlefield.  Similarly, a sturdy Brown Bess musket could double as blunt instrument in fierce hand to hand combat, but few if any farmers bludgeoned a turkey to death to put food on the table.

90.     Guns in early America were essential tools in an agrarian society and American consumer preferences reflected this basic fact.[121]  Lighter weapons better suited to hunting and ridding fields of pests were the weapons Americans wanted and acquired.  Nobody needed a bayonet to feed themselves or their family.

91.    Ground warfare in the Founding era involved close combat; a soldier had to be able to attach a bayonet to a musket and his weapon had to be sturdy enough to function as a bludgeon if needed.[122]  The light muskets and fowling

---

[121] Sweeney, *supra* note 32.

[122] Jeremy Black, A MILITARY REVOLUTION? MILITARY CHANGE AND EUROPEAN SOCIETY, 1550-1800 (1991); Wayne E. Lee, *Early American Ways of War: A New Reconnaissance, 1600-1815* 44 HIST. J. 269 (2001); Stephen Conway, *The British Army, "Military Europe," and the American War of Independence* 67 WM. & MARY Q. 69 (2010).

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

pieces that Americans found most useful on their farms were therefore of limited
value to the militia, where life and death hinged on the ability to defend oneself
quickly after firing a round.  Reloading a musket took time and in that time a
soldier was exceedingly vulnerable if they lacked the necessary tools for hand-to-
hand combat in close quarters fighting.[123]

92.    Given these facts about early American gun culture and gun
manufacturing the nation faced a persistent problem in arming the militia, it was
exceedingly difficult to get the right types of weapons into the hands of the militia.
Thus, acquiring the right type of arms remained a persistent problem for states and
the federal government in the era of the Second Amendment's adoption.[124]  The
problem was most severe in the Slave South where the militia formed the core of
the slave patrols that hunted runaway slaves and served as a deterrent against slave
rebellion.  In fact, fully half of Americans in this region of the nation lived in a
household in which a military-grade musket was not available for those required to
participate in the militia.  And despite persistent efforts by both the states and the
federal government to enact laws forcing households to purchase muskets and other
military-quality weapons, Americans continued to prefer weapons better suited to
the realities of living in an agrarian society: guns which were more useful for
putting food on the table.[125]

93.    The economic burden of the militia on American families was another
fact that shaped government policy.  Thomas Fitzsimons' comments during the
debate over the militia act during the First Congress captures the reality that the
requirement that militia men purchase their arms was in reality a burdensome tax on
Americans.[126]  During this debate, Congress seriously considered abandoning the

---

[123] *Id.*

[124] Kevin M. Sweeney, and Saul Cornell, *All Guns Are Not Created Equal,*
CHRON. HIGHER EDUC., February 1, 2013.

[125] *Id.*

[126] 1 ANNALS OF CONG. 3 (1790–91).

1  idea of a broadly inclusive militia in favor of a smaller, more select, better trained,

2  and better equipped force, but ultimately this proposal failed.  Instead, Congress

3  settled on a compromise: the first federal militia act carried forward a broadly

4  inclusive idea of a militia but did not take the necessary action to properly arm and

5  equip the militia, leaving this task to the individual states.[127]

6      94.    The fact that Plaintiffs' expert, Mr. Hardy, was unable to find any

7  modern-style gun control laws restricting minors from this period is

8  unremarkable.[128]  The Founding era did not have a modern-style gun violence

9  problem to address.[129]  Moreover, the economics of gun production meant that few

10  households apart from the wealthiest owned multiple weapons. [130]  Finally, the

11  structure of early American society meant that minors were seldom allowed access

12  to guns outside of some supervised context.  Thus, the relative scarcity of laws

13  limiting minors from acquiring weapons in the Founding era reflects nothing more

14  than the basic economics and practical realities of gun ownership and military

15  policy in the era.  It has nothing to do with the existence of an unfettered underlying

16  constitutional right for those under 21 to acquire and use weapons.  Finally, the

17  entire thrust of early American gun policy was driven by the urgent need to arm

18  militias with the necessary weapons for ground warfare.  Given that there were

19  generally too few muskets in the hands of militia members to arm them properly in

20  the Founding Era, there was no reason to limit access to such weapons.

21      **VI.    THE POLICE POWER AND FIREARMS REGULATION**

22      95.    The power to regulate firearms and gunpowder has always been

23  central to the police power and historically was shared by both states and local

24  ────────────────
[127] H. R. Uviller & William G. Merkel, *The Second Amendment in Context:*
25  *The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

[128] Hardy Decl., at 16, ¶ 35.
26  [129] Roth, *supra* note 30,  180-249

27  [130] Sweeney, *supra* note 32.

28

municipalities.[131]   The federal government enjoyed a limited police power that governed federal land, buildings, and the territories.

96.    Firearms case law, including those cases cited by *Heller*, recognizes the broad scope of power to regulate arms inherent to state police power.[132]   One of those cases, *State v. Reid*, offers a clear statement of the centrality of the police power to arms regulation.[133]   The *Reid* Court observed that the state's concealed carry prohibition was not only a legitimate exercise of police power authority, it was at the very core of this power: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[134]   Understanding historical state regulation of minors and firearms therefore necessitates a close examination of the history of the police power.

97.    The legal concept of "police"—the power of the people, acting through government, to enact and enforce laws to protect public health, safety and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[135]   By the era of the American Revolution, the concept had become foundational in Anglo-American law.[136]   References to the regulation of internal police were included in early state constitutions drafted after

---

[131] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[132] *See Heller*, 554 U.S. at 629.

[133] *State v. Reid*, 1 Ala. 612 (1840).

[134] *Id.*, at 616.

[135] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

[136] Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007); Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

the American Revolution.[137]  Founding era documents often described this as a

right, a natural outgrowth of theories of popular sovereignty.  By the Antebellum

era, the Founding era concept of a "police right" had been transformed in the

modern judicial concept of the "police power," and had been further refined by

jurists and legal theorists.

98.    The application of the police power to firearms and ammunition

gained a firm grounding in American jurisprudence when Chief Justice John

Marshall employed it in the context of state regulation of gun powder in *Brown v.*

*Maryland*.[138]  Another influential jurist exploring the scope of the police power was

Massachusetts state court Judge Lemuel Shaw.  His opinion in *Commonwealth v.*

*Alger* became a foundational text for lawyers, judges, and legislators looking for

guidance on the meaning and scope of this power.  Shaw described the police

power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same.
>
> It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder . . . .[139]

99.    By the eve of the Civil War, a strong consensus in American law had

emerged on the broad scope of the police power.  This vision of the police power

---

[137] See, e.g., MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

[138] *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*, 46 U.S. 504 (1847) (License Cases).

[139] *Commonwealth v. Alger*, 61 Mass. 53 (1851). For another good discussion of how state jurisprudence treated the concept, see *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

1  was articulated forcefully by the Supreme Court in the License Cases when Justice

2  McClean wrote that the police power:

3      is not susceptible of an exact limitation but must be exercised under the
       changing exigencies of society. In the progress of population, of wealth,
4      and of civilization, new and vicious indulgences spring up, which require
       restraints that can only be imposed by new legislative power. When this
5      power shall be exerted, how far it shall be carried, and where it shall
       cease, must mainly depend upon the evil to be remedied.[140]

6

7      100.   Rather than view it as a fixed body of power, most judges in the pre-

8  Civil War period viewed it as a reservoir from which the people could draw

9  authority to enact laws necessary to promote the public health, welfare, and

10  morality of society.[141]  The scope of this power in relationship to guns and gun

11  powder was considerable.  Few if any Americans alive in 1791 could have

12  imagined federal courts using the Second Amendment to limit state police power

13  authority in this area of the law.  Indeed, if such an idea had been suggested in 1788

14  it would have undermined ratification of the Constitution and there would be no

15  Second Amendment today to enforce.

16          **A.  The Police Power and Regulation of Minors' Access to
                Arms, 1776-1900**
17

18      101.   Police power regulations also impacted minors' relationship to arms

19  and gun powder.  As was true for other applications of the police power, the

20  enactment of specific laws aimed at minors depended on the practical and public

21  perceptions of the need for government regulation in a particular area.

22      102.   Gun violence was not a pressing issue of public concern at the time

23  that the Second Amendment was enacted.  Firearms in the eighteenth century were

24  not ideally suited for individual self-defense outside the home against unexpected

25  threats or for committing crimes.  Flintlocks and muzzle loading weapons took too

26

27      [140] *Thurlow v. Massachusetts*, 46 U.S. 504, 592 (1847) (License Cases).
       [141] *Id.*
28

1  long to load and were too inaccurate to make them effective instruments of anti-
2  social violence or criminal activity.  Given these facts, there was little need for
3  modern style gun control laws because gun violence was not a serious problem.
4  Government arms policy at the time of the Second Amendment was driven by a
5  different problem: too few military guns in the hands of members of the militia.
6  Arms policy was not designed to restrict access to weapons.  Public policy, both at
7  the state and federal level, aimed to encourage the ownership of military quality
8  weapons needed for militia service and regulation was designed to further this
9  objective.[142]

10     103.   Modern-style arms control measures targeting weapons better suited
11  for crime and inter-personal violence, and not especially useful for militia service,
12  did not emerge in American law until technological changes and economic
13  efficiencies made more accurate and more easily concealable weapons widely
14  available in the early nineteenth century.  Relatively cheap and reliable handguns
15  become common for the first time in American history in the early decades of the
16  nineteenth century.[143]

17     104.   The market revolution of the Jacksonian period (1828-1854)
18  transformed American life, making a host of consumer goods—from wooden
19  clocks to firearms—widely available for the first time.  The impact of these
20  interconnected set of changes in production, consumption, and technology
21  transformed gun culture by making a variety of weapons, including pistols, more
22  common and more reliable.[144]  At the time of the Second Amendment's ratification,

23

24     [142] Randolph Roth, *Why Guns Are and Are Not the Problem: The
    Relationship between Guns and Homicide in American History, in* A RIGHT TO
25  BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON
    THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).
26     [143] *Id.*
27     [144] *Id.*

28

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

90% of the guns owned by Americans were long guns.[145]  In response to the perception that these guns posed a particular danger, states began passing laws to deal with the negative consequences of these weapons, including new limits on public carry.[146]

105.    By the time of the Civil War many states had enacted a variety of laws to deal with the problem of gun violence, including the special dangers firearms posed to minors.  In 1856, for example, Alabama adopted a provision focusing on the specific problem posed by the sale of pistols and other concealable weapons to minors and imposed a substantial financial penalty:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[147]

106.    Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[148]  Kentucky also enacted a similar law, but carved out an exception if a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[149]

107.    The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color is itself instructive.

---

[145] Sweeney, *supra* note 32.

[146] Cornell, *supra* note 2. For a good example, see Of Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[147] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

[148] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

[149] 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

As historian Randolph Roth's work demonstrates, the Slave South was the most

violent region of the nation in the period before the Civil War.  Although some laws

enacted in this period and in this region were driven by racial animus, other laws,

including laws targeting minors were not.  Laws prohibiting concealed carry were

one type of racially neutral modern style gun control regulation.  Southern States

also took the lead in enacting gun-control-type measures, including laws aimed at

preventing minors from acquiring and using dangerous weapons.[150]

108.   Police power regulations were also adopted by cities and towns to

regulate arms.  In 1803, New York City singled out guardians for punishment for

firearms infractions committed by minors under their charge.[151]  In 1817,

Columbia, South Carolina enacted a law that allowed for the seizure of weapons

used by minors within the city limits.[152] And in 1857, the city of Louisville,

Kentucky passed an ordinance stating that "[n]o person shall retail gunpowder to

[150] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. F. 121 (2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On southern homicide rates, Roth, *supra* note 30, 180-249

[151] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

[152] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

minors" but included an exception for those who had "authority from his parent or guardian."[153]

109.   Post-Civil War America carried forward this antebellum tradition of robust regulation of firearms.  Many of the new constitutions adopted after the Civil War in Southern states and newly admitted Western states, expressly asserted that the right to keep and bear arms did not preclude robust legislative power to regulate, making explicit a point that the pre-Civil War case law had firmly established.  It is worth comparing Iowa's formulation, among the most robust of the new post-Civil War provisions, with Pennsylvania's 1776 arms-bearing provision, the first one adopted after American Independence.

- Pennsylvania 1776: "That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power." [154]

- Iowa 1889: "The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."[155]

Utah emulated Iowa by including a similar statement about the power of the legislature to regulate the right:

Utah 1895: "The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law."[156]

---

[153] No. 68. An Ordinance as to Retailing Gun Powder, in Oliver H. Strattan, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY 175 (1857).]

[154] PA. DECLARATION OF RIGHTS,  1776 cl. XIII

[155] IDAHO CONST. OF 1889, ART. I, § 11.

[156] UTAH CONST.  of 1895 art. I, § 6

The language employed by Iowa, Utah, and other states focused on the right of the people to regulate and was consistent with the well-established view of the scope of the police power.[157]  The new language's formulation of the right to keep and bear arms included in these constitutions underscored the breadth of the state's police power authority in arms regulation.  Further, at the Utah constitutional convention, there was a vigorous debate over a proposal to change the age at which individuals could be compelled to participate in the militia from eighteen to twenty-one.  Although there was some disagreement over the wisdom of changing the policy, there was little disagreement that if such a policy was desirable, the state had ample authority to make the change.  The contours of this debate make clear that the there was no constitutional necessity compelling states to either require or prohibit minors from participating in the militia.  The decision remained one that was dictated by military necessity, not constitutional imperative.[158]

110.   The broad latitude to regulate arms was acknowledged by the major constitutional commentators of the period as well.  John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[159]

111.   The Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[160]

_____

[157] See Exhibit C to this declaration.  See also Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*  55 U.C DAVIS. L. REV 65, 75-77 (2021).

[158] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake City ... (1898) at 815-819.

[159] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3 d., (1899) at 4.

[160] For a more detailed discussion, see Laura F. Edwards *The Reconstruction*

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

1    Among the most pressing concerns of Republicans in the era of the Fourteenth

2    Amendment's adoption (1868) was the problem of protecting the lives and rights of

3    African Americans in the South, including their right to keep and bear arms.[161]

4    Support for this goal did not mean that Republicans opposed strong gun

5    regulations.[162]  Quite the opposite was the case across the South.  In fact, rather

6    than mark a retreat from robust gun regulation, Reconstruction marked an

7    intensification of efforts to regulate firearms—a development spurred in part by the

8    rise of paramilitary groups, such as the Ku Klux Klan, and their violence against

9    newly free persons and Republicans.[163]

10         112.   The robust regulation of firearms during Reconstruction, including

11   regulations on sale or access to firearms for those under the age of majority, was

12   not a novel application of the police power, but simply an example of the flexibility

13   inherent in this legal concept.  Exercises of the police power were seen as consistent

14   with the scope of the Second Amendment's reach as it had been understood at the

15   Founding and as it was understood at the time. The author of Section One of the

16   Fourteenth Amendment, John Bingham, expressly affirmed the states' ability to

17   promote public safety and welfare during the public campaign to ratify the

18   amendment, assuring Ohioans in Cincinnati that the states would continue to be

19

20   *of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41
     J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with
21   the meaning of the Amendment, see WILLIAM E. NELSON, THE FOURTEENTH
     AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).
22
         [161] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and*
23   *Fractal Originalism*, 127 HARVARD L. REV. FORUM 238 (2014).

24       [162] RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES:
     REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003).

25       [163] Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and*
     *Gun Regulation in the Reconstruction South,* 17 STAN. L. & POL'Y REV. 615 (2006).
26   One of the most horrifying examples was the Colfax massacre, See Leeanna Keith,
     THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR,
27   AND THE DEATH OF RECONSTRUCTION (2008).

28

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

responsible for all issues of "local administration and personal security."[164]  As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[165]

113.   The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[166]  Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained twenty-one during this period).[167] The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[168] Some of these laws targeted children younger than sixteen, but others singled out anyone below the age of twenty-one.  For example, Indiana's state law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors":

> Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to under the age of twenty-one years,

[164] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence. *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[165] Michael Les Benedict. *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

[166] Cornell and Florence, *supra* note 164.

[167] On the growing perception of the threat guns posed to minors in the post-Civil War era, see Jennifer Carlson  and Jessica Cobb,  *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017).

[168] Misdemeanors. Section 53., *in* L. W. MOULTRIE, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly
weapon that can be worn, or carried, concealed upon or about the person,
or to sell, barter, or give to any person, under the age of twenty-one
years, any cartridges manufactured and designed for use in a pistol. § 2.
Be it further enacted, that any person who shall violate any of the
provisions of the foregoing section shall be deemed guilty of a
misdemeanor, and upon conviction thereof, shall be fined in any sum not
less than five dollars, nor more than fifty dollars.[169]

114.   Wisconsin adopted a statute that prohibited minors from going armed
or acquiring pistols and revolvers:

SECTION 1: It shall be unlawful for any minor, within this state, to
go armed with any pistol or revolver, and it shall be the duty of all
sheriffs, constables, or other public police officers, to take
from any minor, any pistol or revolver, found in his possession.

SECTION 2: It shall be unlawful for any dealer in pistols or
revolvers, or any other person, to sell, loan, or give any pistol or revolver
to any minor in this state.[170]

115.   Henry Campbell Black, the author of Black's *Law Dictionary* and a
leading post-Civil War legal authority, described the police power as "inalienable"
and echoed the view of a long line of jurists who noted that the scope of the power
was not easily defined, and that determination of its limits was best left to courts on
a case-by-case basis.[171]  Christopher G. Tiedeman, a conservative critic of the
police power, nonetheless acknowledged the scope of its legitimate purview:
"police power of the State extends to the protection of the lives, limbs, health,
comfort and quiet of all persons, and the protection of all property within the
State."[172]

---

[169] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.

[170] 1883 Wis. Sess. Laws 290.

[171] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[172] Christopher G. Tiedeman, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

116.   This principle is evident in an 1883 Missouri statute that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes."  In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor.

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.[173]

117.   A Kansas statute prohibited selling, trading, giving, loaning pistols or revolvers to minors:

> Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[174]

118.   The language of a Louisiana law was even more comprehensive:

> "That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife any person under the age of twenty-one years.[175]

---

[173] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[174] 1883 Kan. Sess. Laws 159, § 1.

[175] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

64

119.   A Nevada law focused on the danger posed by minors carrying guns in public:

> Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[176]

120.   In his review of the history of gun regulation, political scientist Robert Spitzer concluded that laws limiting the ability of minors to obtain and use arms without appropriate supervision were among the most common firearms regulations in the post-Civil War period.  After surveying hundreds of laws in the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors— minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s."[177]  In fact, he concluded that restrictions on minors' access and use of arms were more common than limits on felons.[178]

121.   In addition to vigorous state level regulation described above, many states and localities also enacted robust laws addressing the potential problem firearms posed to public safety by implementing tax or permit schemes that took advantage of the expansion of the size of state and local governments during the post-Civil War era.  States and localities used these new administrative tools to address a variety of different problems created by firearms.  An Evanston, Illinois law handled the danger posed by permissive public carry with a permit law:

> It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead,

---

[176] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885, INCLUSIVE. 1077  (David E. Baily and John D. Hammond, 1885).

[177] Spitzer, *supra* note 16 at 60.

[178] *Id.,* at 60.

brass or other metal, or bowie knife, dirk, dagger, or any other dangerous
or deadly weapon. . . § 537. The Mayor may grant to so many and such
persons as he may think proper, licenses to carry concealed weapons, and
may revoke any and all such licenses at his pleasure. § 538. Applications
for such licenses shall be made to the city clerk, and when granted, the
applicant therefor shall pay to the said clerk, for the use of the city, the
sum of two dollars. § 539. Every such license shall state the name, age
and occupation and residence of the person to whom it is granted.[179]

The state of Florida dealt with the danger posed by repeating rifles in a similar

fashion:

In each and every county of this State, it shall be unlawful to carry or
own a Winchester or other repeating rifle or without taking out a license
from the county commissioner of the respective counties, before such
persons shall be at liberty to carry around with him on his person and in
his manual possession such Winchester rifle or other repeating rifle. § 2.
The County Commissioners of the respective counties in this State may
grant such licenses at any regular or special meeting. § 3. The person
taking out such license shall give a bond running to the Governor of the
State in the sum of one hundred dollars, conditioned on the proper and
legitimate use of the gun with sureties to be approved by the county
commissioners, and at the same time there shall by kept by the County
Commissioners granting the same a record of the name of the person
taking out such license, the name of the make of the firearm so licensed
to be carried and the caliber and number of the same.[180]

Mississippi opted for a tax to achieve the same goals as Evanston and Florida:

[A] tax of not less than five dollars or more than fifteen dollars shall be
levied and assessed annually by the board of Police of Washington
county upon every gun and pistol which may be in the possession of any
person in said county, which tax shall be payable at any time on demand,
by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to
forthwith distrain and seize such gun or pistol.[181]

122.   The new tools of the administrative state, including permit schemes

and taxes, were employed to help states and localities implement the regulations

---

[179] Concealed Weapons, §531131-132, George W. Hess, REVISED
ORDINANCES OF THE CITY OF EVANSTON: ALSO SPECIAL LAWS AND ORDINANCES OF
GENERAL INTEREST (1893).

[180] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch.
4147, § 1-4.

[181] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County
Of Washington, ch. 249, § 1.

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

they believed necessary to advance the goals of promoting public health and safety.[182]

123.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms was not a novel application of the police power, but an expansion and continuation of antebellum practices.  Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.  American states had regulated arms since the dawn of the Republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

### B. Increased Lethality and Ease of Use

124.    One important change relevant to understanding firearms regulation in the Reconstruction era derives from changes in firearms technology, specifically the increased lethality of modern weapons.  The change in firearms technology between the era of the Second Amendment and Fourteenth Amendment was profound.  Firearms became more deadly, lighter, easier to use, more accurate, and required far less training to be effective than did the muskets of the eighteenth century.  Although comparisons of weapons from different eras is inherently subjective, one effort to compile a comparative lethality index for military weapons is instructive.  Military historian and defense analyst Trevor DuPuy's theoretical lethality index captures the exponential growth in the lethality of firearms between the era of the Second Amendment and the Fourteenth.  Of course, the lethality index, an intellectual construct developed to compare weapons on the battlefield offers an imperfect gauge for the increased lethality of modern weapons in a

---

[182] On the transformation of American law and the rise of the modern regulatory state, see Herbert Hovenkamp, *Appraising the Progressive State*, 102 IOWA L. REV. 1063, 1068-75 (2017), William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081-83 (1994), and Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301, 304-05 (2015).

civilian context.  An attack on a school with an eighteenth-century musket could

easily result in no casualties given the difficulty of using such weapons and the

likelihood of misfiring.  The attack on Sandy Hook Elementary School and the

scores of mass shootings in recent years would have been impossible using

common eighteenth-century firearms.  The improvements associated with weapons

in the Civil War era were significant, but they pale in comparison to the carnage

that that modern semi-automatic weapons can inflict in densely populated areas and

sensitive places.  Thus, Depuy's innovative and useful scale, designed for

battlefield comparisons invariably understates the increase in the level of

destruction today's weapons can inflict upon a civilian population.[183]

### Dupuy's Theoretical Lethality Index[74]

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

125.   Another important insight derived from Dupuy's work concerns the

increased lethality of guns in the late nineteenth century.  The expansion of gun

laws after the Civil War, in part, reflects the improvements in firearms lethality and

their wider availability to the civilian population.  The ease of use of these weapons

[183] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality* 55 U.C DAVIS. L. REV 2495, 2509 (2022).

compared to earlier firearms also increased their popularity.  The rise of easily concealed weapons, especially pocket pistols, contributed to rising urban crime and violence.  In response to these developments states and localities enacted laws to regulate the baneful consequences of arms proliferation as they had done time and again in the decades following the adoption of the Second Amendment and its state analogs.[184]

### C. Minors and Guns in Age of Increased Access and Lethality:  The Police Power at its Apogee

126.    The proliferation of weapons in the post-Civil War era, particularly weapons capable of easy concealment generated a new problem for American states and localities: the ease of access to firearms for minors.  The data in Figure 3 shows that concern over the threat that firearms posed to young Americans intensified during Reconstruction and reach its apex in 1890. [185]

**Figure 3**



---

[184] *Supra* note 129.

[185]  Figure 3 adapted from data presented in Carlson and Cobb, *supra* note 167.)

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

127.   This humorous cartoon from the popular magazine Puck captures the
underlying concerns evidenced in the quantitative data in the graph above.  The title
of the cartoon, "A Dangerous American Institution: The Free and Untrammeled
Revolver" takes a dim view of the proliferation of pistols and the lack of more
comprehensive gun regulations.[186]  In particular, the images displayed in the upper
right corner and lower left highlight the dangers posed by the possession of guns by
children and college boys.  When read together the quantitative evidence in the
graph and the qualitative evidence in the political cartoon underscore the fact that
during Reconstruction Americans became increasingly worried that minors' easy
access to firearms was a serious problem requiring government action.



A DANGEROUS AMERICAN INSTITUTION—THE FREE AND UNTRAMMELED REVOLVER.

128.   In response to this perception of a new threat to children posed by the
increased lethality and ease of use of firearms, the number of firearms laws limiting
minors' access increased dramatically in the post-Civil War America.  In his review
of the history of gun regulation during this period, political scientist Robert Spitzer

---

[186] PUCK, December 14, 1881

1  concluded that laws limiting the ability of minors to obtain and use arms without

2  appropriate supervision were among the most common firearms regulations in the

3  post-Civil War period.  After surveying dozens of laws across the nineteenth

4  century, Spitzer concluded that "numerous laws restricting gun access by minors—

5  minimum ownership ages ranged from twelve to twenty-one—arose in the late

6  1800s."  In fact, his evidence shows that restrictions on minors were more common

7  than limits on felons. [187]  The statutes reflected in Exhibit B to this declaration

8  confirms Spitzer's conclusions.

9       129.   In contrast to regulations of the general population, the scope of

10  legitimate regulation of arms and children was not constrained by any Second

11  Amendment concerns.  Lewis Hochheimer, one of the leading authorities on

12  domestic law in this period made this point abundantly clear.[188]  He noted that the

13  regulation of firearms was an area of the law in which the police power was at its

14  greatest reach. Infants, he conceded, were not entirely beyond the protection of the

15  Bill of Rights in the era of the Fourteenth Amendment, but Hochheimer was quick

16  to point out that the need to protect those below the age of majority meant some

17  regulations that were impermissible if applied to adults were perfectly legal when

18  regulating infants, including general prohibitions on the sale or possession of arms

19  to minors. [189]  In this instance, the broad power to protect the welfare of minors

20  gave government extraordinary latitude in regulating their conduct.[190]  In fact,

---

[187]  Spitzer, *supra* note 16 at 55, 60.

[188]  The Albany Law Journal's review of Hochheimer's book on infants praised the work for its exhaustive treatment of the subject, noting  that it offered a "convenient and comprehensive summary" of  the rights, remedies, and procedures available to infants, parents, guardians and courts in this area of the law, see *Hochheimer on Custody of Infants,* 36 THE ALBANY LAW JOURNAL: A MONTHLY RECORD OF THE LAW AND THE LAWYERS 380 (1888).

[189]  Lewis Hochheimer, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3ed., (1899) at 4.

[190]  *Id.*

Hochheimer noted that the scope of state regulatory authority was at its zenith when regulating arms and minors.

### D. The Modern Era of Gun Regulation, 1900-1930

130.    With the dawn of a new century, changes in technology, consumer behavior, and society once again created a novel gun violence problem requiring state action, particularly in the case of firearms and minors. [191]  The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia.  In place of the traditional civic republican model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National Guard system was created.  The new militia would be professionalized and—most importantly—controlled more tightly by the federal government. [192]

131.    The militia was divided into the organized militia, the National Guard, and a more amorphous, unorganized Militia. In an influential article published in the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer in the Office of the Judge Advocate General, reviewed the legal changes that facilitated this transformation.  One key development was the change in the policy preferences of the individual states.  One change in particular he noted was the decision of multiple states to change their laws about minors and the militia.  The most significant trend was the increasingly popularity of laws that required parental permission for minors to participate in the militia.  Among the states enacting such laws were Connecticut, Idaho, Louisiana, Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South Dakota, Texas, Oregon, and West Virginia.  The decisions of these states to follow this path only underscores a fact

---

[191] Ernst Freund, The Police Power, Public Policy and Constitutional Rights, 194, 246–47 (1904); Spitzer, *supra* note 16 at 60.

[192] For a discussion of how the modern national guard replaced the ideals at the core of the Founding Era militia, see Richard R. Uviller R & William Merkel, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND AMENDMENT FELL SILENT (2002).

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

that the previous history had made clear: there was no set age requirement for the militia hardwired into the American constitutional system.  States were perfectly at liberty to raise, lower, or prohibit the participation of minors as they deemed necessary.  Defining who would participate in the militia remained a policy choice; there was no constitutional necessity to include minors.[193]

132.   The pace and scope of gun regulation outside of militia regulation also quickened in the twentieth century. New laws were introduced to address novel problems created by advances in firearms technologies, rising levels of gun crime and perceptions of gun violence, including its increased threats to minors.[194] Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.

133.   Prohibitions on machine guns and some semi-automatic weapons illustrated the far-reaching scope of such laws.[195]  Repeating rifles became more common in the late nineteenth century, but fully automatic and semi-automatic weapons did not achieve sufficient market penetration to pose a serious problem until the early decades of the next century.  As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the Antebellum era, the concern over more powerful "gangster weapons" did not emerge until the public discerned a negative impact of these weapons and the people themselves, acting in conformity with the ideals of popular sovereignty, prompted their legislatures to act.  The passage of new regulations often trailed

---

[193] S. T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J. 471, 476 (1917).

[194] On changes in technology and perceptions of crime and gun regulation, Spitzer, *supra* note 16 at 60.  On the perception of growing threats to minors, see Carlson and Cobb *supra* note 167.

[195] Spitzer, *supra* note 16 at 60.

1  technological developments because legislation was only necessary once new

2  weapons became popular enough to cause a problem that required government

3  action.  This pattern repeated itself in the case of rapid-fire and high-capacity

4  weapons, including semi-automatic and fully automatic guns.  As these weapons

5  proliferated and undermined public safety, new laws were crafted to mitigate their

6  harms.[196]

7      134.   Nothing better illustrates this dynamic than the popular concerns about

8  "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a

9  machine gun that was popularly associated with the Saint Valentine's Day

10 Massacre and criminals such as Machine Gun Kelly.[197]   Spitzer's overview of the

11 history of firearms regulation underscores this point:

12      So, for example, fully automatic weapons, most famously the Tommy
        gun,    became available for civilian purchase after World War I. But it
13      was only when ownership spread in the civilian population in the mid-to-
        late 1920s, and the gun became a preferred weapon for gangsters, that
14      states moved to restrict them. The lesson of gun regulation history here is
        that new technologies bred new laws when circumstances warranted.
15

16     135.   Such laws targeting fully automatic and semi-automatic rapid-fire

17 weapons were a classic example of the flexibility of the police power.  Michigan's

18 law is illustrative of these laws:

19      It shall be unlawful within this state to manufacture, sell, offer for sale or
        possess any machine gun or firearm which can be fired more than sixteen
20      (16) times without reloading or any muffler, silencer, or device for
        deadening or muffling the sound of a discharged firearm. [198]
21

22     136.   Silencers posed another problem that prompted new regulations.

23 Minnesota's law banning silencers was typical of these statutes:

24 _____

25 [196] *Id.*

26 [197] On the history of gun regulation up to and including the act,
   see ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA (2001).

27 [198] *Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, §
   16751:*

28

§ 1 Use of silencers prohibited. No person shall within the state of Minnesota sell or offer or expose for sale, or have in possession for use upon or in connection with any rifle, shot-gun, revolver, or other firearm or have in possession for purposes of sale any silencer for a shotgun, revolver, rifle or other fire-arm. [199]

Other states, including New York and Connecticut, passed permit laws.[200]

137.    Unsurprisingly, the proliferation of new weapons impacted the calculus of public policy decisions about the scope of regulation or arms necessary for minors.  By the early 1930s, the number of laws limiting minors' ability to acquire and use weapons increased by 50 percent as compared to the late nineteenth century.[201]

138.    Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[202]  An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons prohibiting the sale, barter, or gift to persons:

under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[203]

---

[199] Minn. Laws 55, An Act to Prevent the Sale, Offering or Exposing for Sale or Having in Possession for the Use or for Purpose of Sale within this State, of Silencer for Shot-gun, Revolver, Rifle or Other Firearm, Defining a Silencer and Providing Penalties for Violation, Ch. 64, §§ 1-4 (1913).

[200] N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. Ch. 195, § 2 (1911); Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, Ch. 252, § 3 (1923).

[201] Spitzer, *supra* note 16 at 60.

[202] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

[203] Weapon— Furnishing to Minor, § 450, 1905 Ind. Acts 688 (1905).

139.   In his classic treatise *The Police Power* (1904), the distinguished legal scholar Ernst Freund noted that the scope of the police power in relation to minors was extensive, and he singled out limits on access to firearms as an illustration of this power.[204]   And in *Glenn v. State* (1911), the Georgia Court of Appeals observed that "the police power of the states makes a special charge of minors."[205]

140.   In fact, the police power's scope was at its greatest when the health and safety of minors was at issue, a fact evident in this 1917 Oregon law:

> Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment.[206]

141.   Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns.  For example, the city of Chicago forbade issuing firearms permits to all minors:

> It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.[207]

142.   The city of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors.  The law equated minors with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy access to guns.

---

[204] Freund, *supra* note 191 at 187, 247.

[205] 10 Ga.App. 128 72 S.E. 927 (1911).

[206] 1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms.

[207] Cook County Ordinance chap. 53 of Chicago Code of 1911: § 6.

1

2

3

4

5

6

7

8

9

10

11

If any person shall carry concealed upon or about his person a dangerous
or deadly weapon of any kind or description, or shall go into any church
or place where people have assembled for religious worship, or into any
school room or place where people are assembled for educational,
political, literary or social purposes, or to any election precinct on any
election day, or into any court room during the sitting of court, or into
any other public assemblage of persons met for any lawful purpose other
than for militia drill, or meetings called under militia law of this state,
having upon or about his person, concealed or exposed, any kind of
firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword
cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall,
in the presence of one or more persons, exhibit any such weapon in a
rude, angry or threatening manner, or shall have any such weapons in his
possession when intoxicated, or directly or indirectly shall sell or deliver,
loan or barter, to any minor any such weapon, without the consent of the
parent or guardian of such minor, he shall be deemed guilty of a
misdemeanor. Provided, that nothing contained in this section shall apply
to legally qualified sheriffs, police officers, and other persons whose
bona fide duty is to execute process, civil or criminal, make arrests, or aid
in conserving the public peace, nor to persons traveling in a continuous
journey peaceably through this state.[208]

12

13

14

15

16

17

18

19

  143. Harkening back to traditional parental authority, some jurisdictions
allowed an exception for guns used while under the supervision of a parent.  For
example, a 1903 South Dakota law made it "unlawful for any person under the age
of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other
firearms except with the consent and knowledge of their parents or guardians."[209]
But these exceptions only underscored the fact that minors were not viewed as
completely responsible citizens, or fully independent legal actors who could claim
Second Amendment rights on their own.

20

21

**E. Firearms Regulation: A Pervasive Feature in American
Law (1934-2021)**

22

23

  144. The very first issue of the Duke law journal, *Law and Contemporary
Problems* (published in 1934), focused on federal involvement in the prevention of

24

25

26

  [208] Joplin Code of 1917, Art. 67, § 1201, Brandishing, Carrying
Weapons,  Possession by, Use of, and Sales to Minors and Others Deemed
Irresponsible.

27

  [209] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

28

crime and included a comprehensive review of firearms regulation in America.  It
explained that the most common forms of regulation were restrictions on public
carry, restrictions on the purchase of arms (including purchase by minors, who still
included those aged 18–20 at that time), and prohibitions on dangerous or unusual
weapons. [210]  The essay also noted that the use of license or permit requirements for
purchase of a firearm expanded in the post-Civil War era and became a standard
feature of gun regulation in the twentieth century. [211]  Indeed, by 1938, a
comprehensive review of firearms regulation concluded that most states had either
banned the public carry of concealed weapons or adopted a restrictive permitting
scheme resembling New York's Sullivan Law.[212]  Localities, especially large urban
areas, in the final decades of the nineteenth century and the early decades of the
next century increased the level of regulation of arms, including limits on minors.
Another wide-ranging legal survey of firearms regulation published in 1950 found
little had changed in the ensuing decades between the publication of the two
comprehensive reviews discussed above and post War World Two-era gun
regulation.[213]

145.   One of the most significant developments in gun regulation in the
twentieth century was the growth of federal firearms regulation, beginning with the
New Deal.  As with the state measures addressed above, the threat posed by
organized crime and the proliferation of dangerous "gangster weapons," most
notably the machine gun, increased public enthusiasm for additional gun control
measures.  Repeated popular demands for some type of federal involvement finally
bore fruit in 1934, when Congress enacted the first comprehensive federal firearms

---

[210] John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400
(1934).

[211] *Id.*

[212] Sam B. Warner, *Uniform Pistol Act,* 29 AM. INST. CRIM. L. &
CRIMINOLOGY 529 (1938).

[213] F.J.K., *Restrictions on the Right to Bear Arms: State and Federal
Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

law.  In contrast to traditional state police power driven legislation, federal

regulation of firearms after the New Deal necessarily focused on interstate

commerce.  The National Firearms Act of 1934 regulated firearms dealers and

imposed a series of taxes on classes of weapons, including machine guns.  The Act

sought to limit access to the class of weapons, which was closely identified with

criminal behavior.[214]

146.    Later in the twentieth century, popular concern over crime and civil

unrest led to the passage of the federal Gun Control Act of 1968.[215]  In addition to

revising the federal licensing scheme for the manufacture, importation, and sale of

firearms, the Act prohibited a variety of persons from purchasing handguns,

including minors, who continued to be defined as those below the age of twenty-

one.  In addition, federal licensees were prohibited from selling firearms to out-of-

state residents, minors, felons, persons under indictment for felonies, fugitives, and

certain other categories of persons.[216]

147.    The Firearm Owners' Protection Act of 1986 loosened some

restrictions on ammunition and prohibited the creation of a federal firearms

registry, but it added additional categories of persons who were barred from

possessing firearms, including illegal aliens, dishonorably discharged members of

the armed forces, and U.S. citizens who renounced their citizenship.[217]  The Brady

Handgun Violence Protection Act of 1993 (Brady Act) created a background check

system for the purchase of firearms from federally licensed dealers.[218]  Notably,

---

[214] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236
(codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of
June 30, 1938, 15 U.S.C. §§ 901–09.

[215] William J. Vizzard, *The Gun Control Act of 1968*, 18 St. Louis Univ.
Pub. L. Rev. 79 (1999).

[216] 18 U.S.C. § 922(b)(1) and d 922(c).

[217] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat.
449 (1986).

[218] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103-159,

1  neither the 1986 nor the 1993 federal legislative amendments lowered the age for

2  sale of handguns to those under 21, even after the Twenty-Sixth Amendment was

3  adopted and ratified in 1971, setting the voting age at 18.

4      148.   The next major turning point in the debate over firearms regulation

5  focused on "assault weapons," and was closely connected to the rise of mass

6  shootings.[219]  California led the way with its ban on assault weapons enacted after

7  the Stockton School Massacre in 1989.[220]  Currently, eight states have passed

8  similar laws.[221]

9      149.   Current efforts to improve the effectiveness of firearms regulation

10  include additional regulation focused on limiting the access to firearms by those

11  under the age of 21, on top of those regulations already imposed by the Gun

12  Control Act of 1968.  *Heller'*s non-exhaustive recitation of examples of

13  presumptively lawful and longstanding regulations expressly referenced laws

14  prohibiting felons and the mentally ill from acquiring firearms—and the bulk of

15  those laws also limited minors' access to firearms beginning in the early twentieth

16  century.[222]

17      150.   The scope of the police power regarding firearms and gunpowder has

18  been among the most expansive in any area of the law.  In the case of minors, the

19  legitimate reach of the police is at its peak.  More recently, the United States Court

20  _____

110 Stat. 3009 (1993).

21     [219] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault

22  Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass
Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*

23  68 EMORY L.J. 1043 (2020).

   [220] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

24     [221] Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault

25  Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020).

   [222] Thomas M. Cooley, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS

26  WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN
UNION 29 (1st ed. 1868), concluded that laws preventing felons from acquiring

27  firearms were justified on grounds too obvious to elaborate.

28

of Appeals for the Fifth Circuit observed that "[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms."[223]  Federal courts have concluded that laws restricting minors' access to firearms are deeply rooted in American history and tradition.[224]

## CONCLUSIONS

151.   A review of the historical record, in context, reveals that "infants"— individuals below the legal age of majority, which has been 21 for the most of American history—have never had an unfettered constitutional right to keep, bear, and acquire arms.  This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history.  For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties and supervised by militia officers.

152.   Those under the age of 21 never enjoyed an autonomous individual right to purchase, acquire, own, or use firearms for most of American legal history. In fact, for most of American history, the law did not consider such minors as fully autonomous legal individuals in any meaningful sense.  The legal status of infants under American law in the Founding era was an inheritance from English common law.  This bedrock principle of Anglo-American law was unaltered by the American Revolution, the adoption of the Constitution, or the addition of amendments, including the Second Amendment and the Fourteenth Amendment. Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire

---

[223] *Glenn v. State*, 72 S.E. 927 (Ga. Ct. App. 1911); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012).

[224] *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012).

1    arms rests on a serious misunderstanding of a core principle of Anglo-American

2    law regarding the status of those below the age of legal majority.  In fact, the

3    concept of "young adult" invoked by Plaintiffs is a recent development in American

4    culture and has no grounding in earlier Anglo-American law—and thus it has no

5    bearing on assessing the scope of the Second Amendment right as it was originally

6    understood at the time of its ratification and in the ensuing years.

7        153.   Plaintiffs' core historical argument, that in the Founding era

8    governments compelled some minors under 21 to serve in the militia and participate

9    in related community-based forms of law enforcement, is not in dispute.  But the

10   existence of such duties does not provide any concomitant evidence of the existence

11   of a constitutional right to keep, bear, or acquire firearms for those under the age of

12   21.  Rather, it demonstrates that governments have imposed a constitutional duty

13   and obligation upon generations of Americans, including some minors, to

14   contribute to public defense.

15       154.   Failure to meet this legal obligation could result in a variety of

16   punishments.  In several states, the law expressly punished parents or guardians if

17   they failed to acquire the necessary arms required by law to allow their minor

18   children to participate in the militia. In those states in which such a provision was

19   not included in law, the common law would have governed, and legal proceedings

20   against insufficiently armed minors would have typically targeted parents or

21   guardians.  Plaintiffs' argument not only confuses rights with obligations, but it

22   conflates specific public policy choices made by states and the federal government

23   about the composition of the militia with fixed constitutional principles about the

24   role of the military in the American constitutional scheme of government and the

25   scope of individual rights.  There is no textual foundation for these claims.  State

26   and local governments were free to expand or contract the age restrictions on

27   participation in the militia in response to the needs of public defense and safety.

28   When it proved advantageous to include males below 21 in the militia,

governments adopted regulations to achieve that policy goal.  If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

155.   The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers.  The scope of state police power is greatest when protecting the health and safety of minors.  Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns.  Public perception that minors were especially at risk to harm from firearms intensified in the post-Civil War era.  Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions.  In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition.

156.   Research into the history of firearms regulation is ongoing. New examples of regulation continue to be uncovered, spurred by the urgency created by *Bruen* and subsequent litigation.  Further research and analysis is necessary to examine the broader framework of regulations of minors under the age of 21 that will inform the questions presented in this case under *Bruen's* new historical analytical framework.  In particular, additional research is necessary so that an analysis of the analogues to modern gun laws are properly contextualized.  This may include further examination of the roles, duties, and responsibilities of minors and their parents in relation to militia service, as well as further examination of other aspects of the historical context in which minors under the age of 21 were placed at the Founding and following the adoption of the Fourteenth Amendment.  Additional review of city ordinances, school rules, and the archival materials un-digitized would be useful to uncover further insights about this vital context.

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.

3            Executed on March 15,  2023, at  Redding, CT.

4

5                                                    *Saul Cornell*

6                                            _____

7                                                    Saul Cornell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

| Exhibit | Description | Pages |
|---------|-------------|-------|
| **A** | Cornell Curriculum Vitae | 1-16 |
| **B** | Table – Gun / Weapon Restrictions for Minors | 17-32 |
| **C** | Table – Post-Civil State Constitutional Arms Bearing Provisions about Regulations | 33-35 |

Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

# EXHIBIT A

**Cornell Curriculum Vitae**

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
New Histories of American Law, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version  of the Past  Will the Supreme  Court Choose in NYSRPA  v. Bruen?," 49 Hastings Constitutional  Law Quarterly (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"  55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the  Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause  Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed: The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:  The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment,"
Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium,
November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns
in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth
Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the
Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History,"
Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to
the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the
Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment,"
Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell
College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists"
Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture,
Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early
    American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of
    Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University,
    (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead
    Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson
    Inaugural Lecture, University of Leiden, Netherlands, (1995)

## Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional
    Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History,
    Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment
    Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of
    Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies
    Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British
    Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring
    Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center,
    Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?"
    Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego
    (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional
    Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania
    Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

| **Interviews, Editorials, Essays, Podcasts:** |
|---|

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"* Salon October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## **State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, Young v. State of Hawaii  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, Flanagan vs. Becerra, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, Gill v. Whitford (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]
Amicus Brief, *Silvera* v.*Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]
Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]
Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## Law Review Symposia Organized

### Second Amendment:
 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).
"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:
"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# EXHIBIT B

**Gun/ Weapon Restrictions for Minors**

**EXHIBIT B**

**GUN/WEAPONS RESTRICTIONS FOR MINORS**

| State | Year | Law | Source |
|---|---|---|---|
| AL | 1856 | To Amend the Criminal Law, §1.That anyone who shall sell or give or lend, to any male minor, a  bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air  gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars. | Acts 17 |
| AL | 1866 | Miscellaneous Offenses § 204. Selling or giving fire-arms to minor. – Any person who sells,  gives, or lends to any boy under eighteen years of age, any pistol, or bowie-knife, or other knife of like kind or description, must, on conviction, be fined not less than fifty, nor more than five hundred dollars. | George Washington Stone, The Penal Code  of Alabama,  Montgomery, 1866 Page 63, (1866) |
| AL | 1876 | Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie  knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy  under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description,  must on conviction, be fined not less than fifty, nor more than five hundred dollars. | Wade Keyes, The Code of Alabama, 1876 : with References to the  Decisions of the Supreme Court of the State upon the Construction of the  Statutes; and in Which the General and Permanent Acts of the Session of  1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources. 1877 |
| CA | 1896 | Misdemeanors. Section 53. No junk-shop keeper or pawnbroker shall hire, loan or deliver to  any  minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot,  bullets or any weapon, or any combustible or dangerous material, without the written consent of  the parent or guardian of such minor. | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno,  1896 Page 37(1896) |
| CT | 1835 | A By Law in relation to the Firing of Guns and Pistols, within the limits of the city of New-London,  and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city. | The By-Laws of the City of New London, with the Statute Laws of the State  of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855)  available at The Making of Modern Law: Primary Sources. 1835 Chapter 26. |
| CT | 1871 | Of Trespass on the Case. A person, before he trusts a gun with an incautious person, is bound  to render it perfectly innoxious. Where the defendant negligently and imprudently entrusted a  loaded gun to a young mulatto girl, who discharged it against the son of the plaintiff, and  severely wounded him by which the plaintiff lost his service and was put to great expense for his cure, the defendant was subjected to 100 pounds damages. | Henry Dutton, A Revision of Swift's Digest of the Laws of Connecticut. Also,  Practice, Forms and Precedents, in Connecticut Page 564, (Vol 1, 1871) |
| CT | 1881 | Charter of the City of New Haven. Trade. § 18. No person shall sell to any child under the age  of sixteen years, without the written consent of the parent or guardian of such child, any  cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or  other mechanical contrivance arranged for the explosion of cartridge, or of any fulminate. | Charter of the City of New Haven Page 142-143, (1881) |
| D.C. | 1892 | CHAP. 159.--An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles. SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offence, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition. SEC. 3. That for the second violation of the provisions of either of the two preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years. SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case. | Washington D.C. 27 Stat. 116 (1892) |

| | | | |
|---|---|---|---|
| | | SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine.  Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.<br>SEC. 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed. | |
| D.C. | 1932 | CARRYING CONCEALED WEAPONS<br>SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or<br>dangerous weapon.<br>EXCEPTIONS<br>SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.<br>ISSUE OF LICENSES TO CARRY<br>SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.<br>SELLING TO MINORS AND OTHERS<br>SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years. | Washington D.C. 47 Stat. 650, 651-652 (1932) |

| DE | 1812 | An Act to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes.<br><br>SEC. 1. Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met, That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State, or within the limits thereof; of where the limits cannot be ascertained, within one quarter of a mile of the center of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.<br><br>SEC. 2. And be it enacted by the authority aforesaid, That if any free white person or persons, or the child or children of any such person or persons, shall fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of the State.<br>SEC. 3. And be it enacted by the authority aforesaid, That if any free negro or mulatto, or the child or children of any such free negro or mulatto, or any manumitted negro or mulatto, or any servant or servants, slave or slaves, apprentice or apprentices, of any person or persons whatsoever, shall fire or discharge any gun, ordnance, musket, fusee, fowling-piece or pistol, within the limits herein before described, and be thereof convicted by the view of any one justice of the peace, or on the oath or affirmation of one or more credible witnesses, every person so offending, shall forfeit and pay any sum, not exceeding five dollars: Provided nevertheless, That in all and every case where the money is not immediately paid on such conviction, into the hands of the justice before whom such conviction is had, it shall and may be lawful, and the said justice is hereby directed and commanded to commit such person or persons to the fail of his county, there to remain, until the forfeitures and costs are paid.<br>SEC. 4. And be it enacted by the authority aforesaid, That all fines and forfeitures incurred under this law, shall be paid over for the use of the poor of the county where the offence shall have been committed.<br>SEC. 5. Provided nevertheless, and be it enacted by the authority aforesaid, That nothing in this act shall extend, or be construed to prevent any such firing, on any day or days of public rejoicing, or where it is authorized by any law of this State, or where it shall be deemed by the justice before whom the information is lodged, that the necessity of the case required the same. | Act of Feb. 4, 1812, 195 Del. Laws 522 (1812) |
| DE | 1881 | An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.  That if any person shall carry concealed a deadly weapon upon or about his person other than  an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an  ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-  five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor  more than thirty days, or both at the discretion of the court: Provided, that the provisions of this  section shall not apply to the carrying of the usual weapons by policemen and other peace  officers. § 2. That if any person shall, except in lawful self-defense discharge any firearm in any  public road in this State, shall be deemed guilty of a misdemeanor and upon conviction thereof  shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one  month, or both at the discretion of the court. 16 Del. Laws 716 (1881). | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two.  As They Have Since Been Amended, Together with the Additional Laws  of a Public and General Nature, Which Have Been Enacted Since the  Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our  Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added  the Constitutions of the United States and of this State, the Declaration of  Independence, and Appendix Page 987, (1893) |
| DE | 1881 | An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.<br>That if any person shall carry concealed a deadly weapon upon or about his person other than  an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an  ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-  five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor  more than thirty days, or both at the discretion of the court: Provided, that the provisions of this  section shall not apply to the carrying of the usual weapons by policemen and peace officers. | Del. Laws 987 |
| DE | 1918 | Minors Under Fifteen Not to Use Gun Unless Accompanied by an Adult, § 2382 A. Sec. 25 A.  1918 It shall be unlawful for any minor under fifteen years of age to hunt game birds or game  animals anywhere in this state with a rifle or shotgun of any kind unless accompanied by an  adult lawfully hunting. | 1918–1919 Del. Laws 484 |
| DE | 1919 | It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers  of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver  or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for  the defense of one's person.<br><br>It shall be the duty of any person or persons, firm, company or corporation desiring to engage in  the business aforesaid, to keep and maintain in his place of business at all times a book which  shall be furnished him by the Clerk of the Peace of the County wherein he does business, in  which said book lie shall enter the date of the sale, the name and address of the person  purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the  color of the person so purchasing the same, and the apparent age of the purchaser, and the  names and addresses of at least two freeholders resident in the County wherein the sale is  made, who shall positively identify the purchaser before the sale can be made; Provided, that  no clerk, employee or other person associated with the seller shall act as one of the identifying  freeholders. This book shall at all times be open for inspection by any Judge, Justice of the  Peace, Police Officer, Constable, or other Peace Officer of this State. | Vol. 30 Del. Laws 55, 55-56 (1919)  Section 222. |

| | | | |
|---|---|---|---|
| FL | 1881 | Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to<br>§ 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor  under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary  pocket-knife, or a gun or rifle used for hunting,  without the permission of the parent of such  minor, or the person having charge to such minor, and it shall be unlawful for any person or  persons to sell, hire, barter, lend or give to any person or persons of unsound mind any  dangerous weapon, other than an ordinary pocket-knife.<br>§ 2. Any person or persons so  offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined  not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months. | Fla. Laws 87 |
| GA | 1876 | Section I. That from an after the passage of this Act it shall not be lawful for any person or  persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife  or sword cane. Any person found guilty of a violation of this Act shall be guilty of a  misdemeanor, and punished as prescribed in section 4310 of the Code of 1873: Provided, that  nothing herein contained shall be construed as forbidding the furnishing of such weapons under  circumstances justifying their use in defending life, limb or property. Sec. II. Repeals conflicting laws. | Ga. Laws 112. |
| GA | 1920 | Laws 134, § 2. 1910 (forbids the sale of pistols to minors and makes the violations of the statute a misdemeanor). See Spires v. Goldberg, 26 Ga. App. 530 (1921). | Ga. Laws 134, § 2. 1910 |
| HI | 1927 | Section 8. Selling to minors. No person shall sell, barter, hire, lend, or give any pistol or  revolver to any person under the age of eighteen years. | Haw. Sess. Laws 209-217 , AN ACT Regulating the Sale, Transfer and  Possession of Certain Firearms and Ammunitions, and Amending Sections  2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), § 8. |
| HI | 1933 | § 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon be delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both. | Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and  Possession of Firearms and Ammunition, § 4. |
| IA | 1884 | Section 1. That it shall be unlawful for any person to knowingly sell, present or give any pistol,  revolver or toy pistol to any minor. Sec. 2. Any violation of this act shall be punishable by a fine  of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county  jail of not less than ten nor more than thirty days. Sec. 3. This act being deemed of immediate  importance shall be in full force and take effect from and after its publication in the Iowa State  Leader and Iowa State Register, newspapers published at Des Moines, Iowa. | Iowa Acts 86. |
| IA | 1887 | Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part  in carrying on any pistol gallery or shooting gallery without license therefor from said city, and  the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6.  No  licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or  shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or  remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter. | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council  Bluffs, and Containing the Statutes Applicable to Cities of the First-Class,  Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887)  available At The Making of Modern Law: Primary Sources. |
| IA | 1987 | § 5004. Selling Firearms to Minors. No person shall knowingly sell, present or give any pistol,  revolver or toy pistol to any minor. Any violation of this section shall be punished by a fine of not  less than twenty-five nor more than one hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days. | Annotated Code of the State of Iowa Containing All the Laws of a General  Nature Enacted by The Twenty-Sixth General Assembly at the Extra  Session, Which Adjourned July 2, 1897 Page 1955, Image 787 (Vol. 1, 1897) available At The Making of Modern Law: Primary Sources. |

| ID | 1909 | An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1. If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property. | Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1. |
|---|---|---|---|
| IL | 1873 | Ordinances of Chicago: An Ordinance Prohibiting the Sale to or Furnishing Minors with Firearms. § 1. That no person within said city shall sell to or in any manner furnish any minor with any gun, pistol, revolver, or other firearms; and any person offending against this ordinance shall on conviction be fined in a sum not less than twenty-five dollars nor more than one hundred dollars for each offense. | Proceedings of the Common Council of the City of Chicago Page 140, Image 185 (Vol. 5, 1874) available at The Making of Modern Law: Primary Sources. |
| IL | 1882 | Deadly Weapons: Selling or Giving to Minor. § 54b. Whoever, not being the father, guardian, or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200). | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. |
| IL | 1914 | Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense. | Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, IMage 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. |
| IL | 1917 | It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of police to grant such permit upon the payment of a fee of one dollar. | Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). |
| IN | 1875 | An Act to prohibit the sale, gift or bartering of deadly weapons or ammunition therefor, to minors. § 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, That any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars. | Edwin Augustine Davis, LL.B., The Statutes of the State of Indiana: Containing the Revised Statutes of 1852, with the Amendments Thereto, and the Subsequent Legislation, 246with Notes and References to Judicial Decisions. Second Edition Vol. 2 Page 482, Image 493 (1877) available at The Making of Modern Law: Primary Sources. |
| IN | 1905 | It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars. | Ind. Acts 688, Weapon— Furnishing to Minor, § 450. |
| IN | 1925 | Sec 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars, or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided. | Ind. Acts 496, ch. 207, An Act to Regulate and Control the Possession, Sale, and Use of Pistols and Revolvers in the State of Indiana |
| IN | 1929 | Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting to commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not more than twenty years.… | Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1. |
| IN | 1986 | It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol. 1987. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor more than fifty dollars. | The Revised Statutes of the State of Indiana, the Revision of 1881 and All General Laws Enacted to that Revision (1888) Section 1986-87, Furnishing Deadly Weapon to Minor. 1881 - 1986. |

| | | | |
|---|---|---|---|
| KS | 1883 | Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nor more than ten dollars. | Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, ch. 106, §§ 1-2. § 1. |
| KS | 1887 | Any person who shall give, trade, loan or otherwise furnish any pistol, revolver, or toy pistol by which cartridges or caps may be exploded, or any dirk, bowie-knife sling shot or toy known as "rubber sling shot" or other dangerous weapon, to any minor or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before the Police Judge be fined not less than five nor more than one hundred dollars. § 14. Having Possession of the Same. Any minor who shall have in his possession any pistol, revolver, or toy pistol by which cartridges may be exploded or any dirk, bowie knife, brass knuckles, slung shot or toy known as "rubber sling shot" or other dangerous weapons shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than one nor more than ten dollars. | Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the Council Page 49-50, Image 51-52 (1887) available at The Making of Modern Law: Primary Sources. 1887 Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health and Safety, Toy Pistols, §13. |
| KY | 1853 | No. 68. An Ordinance as to Retailing Gun Powder. No person shall retail gunpowder to minors under fifteen years of age, or free colored persons, without authority from his parent or guardian, or to slaves without authority from his master. Any person doing so in either case, shall be fined twenty dollars. | Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws, in Force, and Applicable to the City of Louisville, Ky. Prepared and Digested, under an Order from the General Council of Said City by Oliver H. Strattan and John M. Vaughan, City Clerks, which Includes the State Constitution and City Charter, with Notes of Reference Page 175, Image 176 (1857) available at The Making of Modern Law: Primary Sources. |
| KY | 1859 | If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie- knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars. | Ky. Acts 245, An Act to Amend an Act Entitled "An Act to Reduce to One of the Several Acts in Relation to the Town of Harrodsburg," § 23. |
| KY | 1860 | If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie- knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars. | Ky. Acts 245, AN ACT to amend an act, entitled "An act to reduce into one the several acts in relation to the town of Harrodsburg, Ch. 33, § 23. |
| LA | 1890 | . . . [I]t shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon which may be carried concealed to any person under the age of twenty-one years. | La. Acts 39, An Act Making it a Misdemeanor for Any Person to Sell, Give or Lease, to Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons, Intended to be Carried or Used as a Concealed Weapon, § 1. |
| LA | 1893 | Ordinances of the City of New Orleans. Offences, Misdemeanors and Nuisances. § 1342. It shall be unlawful for any one to sell, or lease, or give through himself or any other person, any pistol, dirk, bowieknife, toy pistol for which cartridges are used, or any other dangerous weapon which may be carried concealed, to any person under the age of eighteen years. § 1343. That any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor and shall be liable to a fine not exceeding twenty-five dollars or imprisonment for a period not exceeding thirty days, or both, at the discretion of the Recorder having jurisdiction. | John Q. Flynn Flynn's Digest of the City Ordinances, Together with the Constitutional Provisions, Acts of the General Assembly, and Decisions of the Courts Relative to the Government of the City of New Orleans Page 545, Image 617 (1896) available at The Making of Modern Law: Primary Sources. |
| MA | 1882 | Of Explosive Compounds. Penalty for selling guns, pistols, cartridges, etc., to children. § 1. Whoever sells to a child under the age of sixteen years, without the written consent of its parent or guardian, any cartridge or fixed ammunition of which any fulminate is a component part, or a gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate, shall be liable to a penalty of not less than five nor more than fifty dollars. | Report of Commissioners on Revision of Ordinances Page 141, Image 146 (1882) available at The Making of Modern Law: Primary Sources |
| MA | 1884 | Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder. | The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. |
| MA | 1909 | Section ninety-two of chapter one hundred and two of the Revised Laws is hereby amended by inserting after the word "firearms", in the second line, the words — air guns, — so as to read as follows: Section 92. Whoever sells or furnishes to a minor under the age of fifteen years any firearms, air guns or other dangerous weapon shall be punished by a fine of not less than ten nor more than fifty dollars for each offence; but instructors and teachers may furnish military weapons to pupils for instruction and drill. | Acts 148, An Act to Prohibit the Sale of Air Guns to Certain Minors |
| MA | 1922 | Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill. | Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130) § 8 (amending § 130). |
| MD | 1882 | Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur. | Md. Laws 656 |
| MD | 1904 | § 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for all persons under the age of fifteen years to carry or have in his or her possession any shot gun, rifle, revolver or other firearm of any description within the limits of Garrett County. § 2. And be it enacted, That any person convicted of violating this Act before any court of competent jurisdiction shall be fined not less than five dollars nor more than twenty dollars, or be imprisoned in the county jail for not less than ten nor more than thirty days for each and every offense. | Md. Laws 295, An Act to Prohibit all Persons Under Fifteen Years of Age from Carrying or Having in Their Possession Firearms of any Description Within the Limits of Garrett County, ch. 177, §§ 1-2 |

| | | | |
|---|---|---|---|
| MD | 1908 | It shall be unlawful for any person under the age of twenty-one years to fire a gun, cat rifle, pistol, or any explosive instrument of metal, within one mile in any direction of the Library Hall in Catonsville, Baltimore county; and any person under said age of twenty-one years, violating this section, shall upon conviction before the Circuit Court, or any justice of the peace for said county, be fined a sum not less than one dollar nor more than ten dollars, or be imprisoned in the county jail for not less than five days nor more than thirty days, or be both fined and imprisoned, in the discretion of the court or the justice of the peace. | Md. Laws 397, § 31. |
| ME | 1892 | Nuisances. Sale of blank cartridges and pistols prohibited. § 4. No person shall sell to any child under the age of sixteen years, without the written consent of a parent or guardian of such child, any blank cartridge, or any pistol, or mechanical contrivance specially arranged or designed for the explosion of the same and any person violating the provisions of this ordinance shall be liable to a penalty of not less than fifty, and not exceeding one hundred dollars, to be recovered on complaint to the use the City of Portland. | Seth L. Haarrabee, The Charter and Ordinances of the City of Portland , Me.Page 136, Image 150 (1892) available at The Making of Modern Law: Primary Sources. |
| MI | 1883 | That no person shall sell, give, or furnish to any child under the age of thirteen years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same. | Mich. Pub. Acts 144, An Act To Prevent The Sale And Use Of Toy Pistols, § 1. |
| MO | 1883 | If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment. | MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879). 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1. |
| MO | 1887 | Ordinances of the City of St. Louis. Minors – Conditions of Sale to, of, Ammunition. – No person shall sell to any child under the age of sixteen years, without the written consent of the parents or guardian of such child, any cartridge of fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. | Chester H. Krum, Reviser, The Revised Ordinance City of St. Louis. No. 17188. Approved April 7, 1893 Page 885, Image 894 (1895) available at The Making of Modern Law: Primary Sources. |
| MO | 1917 | If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state. | Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. |
| MS | 1878 | § 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court. | Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3. |
| MS | 1880 | Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge, and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided. | Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. |
| NC | 1893 | Section 1: That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot. Sec. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offense shall be fined or imprisoned, one or both, in the discretion of the court. | N.C. Sess. Laws 468-69. |

| NC | 1913 | That any person being the parent or guardian of, or standing in loco parentis to, any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever, any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any other person, who shall knowingly furnish such child any such firearm, shall be guilty of a misdemeanor, and upon conviction shall be fined not exceeding fifty dollars, or imprisoned not exceeding thirty days. | N.C. Sess. Laws 57, Pub. Laws, An Act to Prevent the Use of Firearms by Children, ch. 32 § 1. |
|---|---|---|---|
| ND | 1923 | Sec. 9. Selling to Minors. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined not less than $100, nor more than $1,000, or be imprisoned not less than three months, nor more than one year, or both. | N.D. Laws 381, Pistols and Revolvers, ch. 266, § 9. |
| NE | 1895 | § 2. No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy gun, or other toy arm or arms, or sling shot, or any such minor and other dangerous missiles may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars, and stand committed until such fine and costs are paid and secured. | Neb. Laws 237-38, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXVI, §§ 2, 5. |
| NH | 1883 | Offenses Against Minors. § 4. If any person shall have in his possession a toy pistol, toy revolver, or other toy firearms, for the explosion of percussion caps or blank cartridges, with intent to sell the same, or shall sell, or offer to sell or to give away the same, he shall be fined not more than fifty dollars; and he shall be liable for all damages resulting from the use of the toy pistol, revolver, or other firearms by him sold or given away, to be recovered in an action on the case. | William Martin Chase, The Public Statutes of the State of New Hampshire, To which are Prefixed the Constitutions of the United States and State of New Hampshire with a Glossary and Digested Index Page 713, Image 732 (1891) available at The Making of Modern Law: Primary Sources. |
| NJ | 1885 | That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol, or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school. | N.J. Laws 52, An Amendment to an Act to Prevent Vending, Using, or Exploding of Guns, Pistols, Toy Pistols, or Other Fire-Arms to or by Persons under the Age of Fifteen Years in this State, ch. 44, § 2. |
| NJ | 1903 | It shall not be lawful to sell, barter, exchange, hire or loan to any person under the age of fifteen years, any gun, pistol, toy pistol, or other firearms, or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other firearms, nor for any person under the age of fifteen years to carry, fire or use a gun, pistol, toy pistol or other firearms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school; it shall be the duty of all persons selling, hiring, bartering or exchanging pistols, revolvers, guns or other firearms, to keep and maintain a book of registry of the same, in which said book of registry shall be entered the number of the article sold, if any, the name of the maker, together with such other means of identification as may be obtainable concerning the same, and also the name and address of the person to whom such pistol, revolver, gun or other firearm is sold, bartered, exchanged or hired[.] | N.J. Laws 337-38, An Act to Amend an Act Entitled "An Act for the Punishment of Crimes," ch. 169, § 1. |
| NJ | 1914 | No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds, wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws. | N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1. |
| NV | 1881 | An Act to prohibit the carrying of concealed weapons by minors. § 1. Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment. See also NEV. REV. STAT. § 4864 (1885). | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1085 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1763 | Ordinances of the City of New York, § VI. And be it further ordained by the authority aforesaid, That if any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings, current money of New York; and on refusal to pay the same, shall be committed to the House of Correction, at the discretion of the Mayor, recorder or aldermen, or any one of them before whom such offender shall be convicted, there to remain committed, not exceeding Twenty days; unless such forfeiture as aforesaid, be sooner paid with the lawful fees of commitment; one half thereof to the informer with costs, and the other half to the church wardens of this City, for the use of the proof thereof. | Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 11, Image 12 (1763) available at The Making of Modern Law: Primary Sources. |
| NY | 1803 | Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1. Whereas the firing of guns and the practice of fowling in the public streets and in the roads or highways in the vicinity of this city, are frequently productive of accidents and dangerous consequences are always to be apprehended therefrom: Be it therefore ordained by the Mayor, Aldermen, and Commonalty of the City of New York, in the Common Council convened, That no person shall hereafter be permitted to fire or discharge any gun, pistol, fowling piece, or fire-arm, at any place on the island of New York, within the distance of four miles from the City Hall, under the penalty of five dollars upon each offender, to be recovered with costs. And if the person so offending shall be a minor, apprentice, servant or slave, the said fine shall be recoverable form his father, mother, master or mistress, together with costs. Provided always, that nothing contained in this ordinance shall be constructed to extend to the reviews or exercises of any military company, or of the State Prison Guards. | Edward Livingston, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City Page 83-84, Image 84-85 (1803) available at The Making of Modern Law: Primary Sources. |

| | | | |
|---|---|---|---|
| NY | 1859 | Ordinances of the City of New York. Firing of Fire-Arms, Cannons and Fireworks. § 6. No tavern- keeper keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises, nor shall suffer or permit any pistol gallery, erected in his or her house, or upon his or her premises, to be used for the purpose of practicing with any pistol gun, fowling-piece or other fire-arms, upon the first day of the week, called Sunday, under the penalty of fifty dollars for each offense, to be sued for and recovered from the person keeping such public house, tavern, public garden, pistol gallery, place of resort or premises; and also the further penalty of fifty dollars for each offense, to be sued for and recovered from the person firing off or practicing with a pistol, gun, fowling-piece, or other fire-arms; and in case of such person so offending shall be an apprentice, such penalty shall be sued for and recovered from the master of such apprentice, or in case such person so offending shall be a minor and not an apprentice, the same shall be sued for from the father of, or in case of the death of the father, then from the mother or guardian of such minor. | D. T. Valentine, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York: Revised A. D. 1859 Adopted by the Common Council Page 235, Image 243 (1859) available at The Making of Modern Law: Primary Sources. |
| NY | 1884 | Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent to so use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699  (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1885 | Making Selling, Etc., Dangerous Weapons, § 409. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of, any instrument or  weapon of the kind usually known as slung-shot, billy, sand club or metal knuckles, or who, in any city in this state, without the written consent of a police magistrate, sells or gives any pistol  or other fire-arm to any person under the age of eighteen years is guilty of a misdemeanor. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page  172, image 699 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1885 | An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page  298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1900 | Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slungshot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pistol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor. | N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1. |
| NY | 1911 | Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: §  1897. Carrying and use of dangerous weapons. A person who attempts to use against another,  or who carries, or possesses any instrument or weapon of the kind commonly known as a  blackjack, slungshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to  use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife,  razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any  person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, loan,  lease or give to him, shall be guilty of a misdemeanor ....................................................................Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this  state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued  to him by a police magistrate of such city or village, or by a justice of the peace of such town, or  in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony. | N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale  and Carrying of Dangerous Weapons. ch. 195, §1. |
| NY | 1911 | Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor. | N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1. |

| | | | |
|---|---|---|---|
| OH | 1883 | That it shall be unlawful for any firm, company or person in the state of Ohio, to sell or exhibit for sale any pistol manufactured out of any metallic or hard substance, commonly known as the "toy pistol"; to a minor under the age of fourteen years; any firm company or person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten nor more than fifty dollars, or be imprisoned not less than ten days nor more than twenty days, or both, and shall be liable to a civil action in damages at any person injured by such sale. | Ohio Laws 222, An Act to Prohibit the Sale of Toy Pistols in the State of Ohio, § 1. |
| OH | 1913 | § 12966. Whoever sells or exhibits for sale, to a minor under sixteen years of age, a pistol manufactured of a metallic or hard substance, commonly known as a "toy pistol" or air gun, or any form of explosive gun ,shall be fined not less than ten dollars nor more than fifty dollars or imprisoned not less than ten days nor more than twenty days, or both, and be liable in damages to any person injured by such sale. § 12967. Whoever sells, barters, furnishes or gives to a minor under the age of seventeen years, an air-gun, musket, rifle, shotgun, revolver, pistol, or other fire-arm, or ammunition therefor, or, being the owner or having charge or control thereof, knowingly permits it to be used by a minor under such age, shall be fined not more than one hundred dollars or imprisoned in jail not more than thirty days, or both. | Ohio Laws 906, An Act: A Bill to Amend and Supplement [Certain] Sections . . . and to Repeal [Certain] Sections of the General Code; Relating to Children and to Females under Twenty-One Years of Age and to Organizations which Include within Their Objects Matters Relating to Children, ch. 11, §§ 12966-67. |
| OK | 1890 | Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.<br>Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.<br>Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.<br>Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.<br>Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.<br>. . .<br>Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.<br>Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.<br>Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise. | Okla. Laws 495, art. 47. |
| OK | 1891 | Concealed Weapons. (2434) § 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in section one and two of this article (§ 1 …pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided) (§ 2…pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided). | Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources. |
| OR | 1868 | Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore . . . § 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: either or any one of the following-named guns, and one revolving pistol: a rifle, shot-gun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon. § 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state. | Or. Laws 18-19, An Act to Protect the Owners of Firearms, §§ 1-2. |
| OR | 1903 | § 1. It shall be unlawful to sell, exchange, barter, or give to any child, under the age of fourteen years, any explosive article or substance, other than an ordinary firecracker, containing ten grains of gunpowder; or to sell, exchange, barter, or give to any such child any firearms, or other device of a like kind, ordinarily used or ordinarily capable of being used in discharging gunpowder in a greater quantity than ten grains; and it is herby made unlawful in any event to sell, exchange, barter, or give to any child, under the age of fourteen years, any instrument or apparatus, the chief utility of which consists in the fact that it is used, or is ordinarily capable of being used, as an article or device to increase the force or intensity of such explosive, or to direct or control the discharge of any such explosive. § 2. Any person violating the provisions of | Or. Laws 309-10, An Act to Regulate and Prohibit the Sale, Barter, Exchange, or Gift of Explosives, Firearms or Other Articles of a Like Kind, to Children Under the Age of Fourteen Years, and to Punish the Violation of the Provisions of this Act. §§ 1-2. |
| OR | 1917 | Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment. | Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 10. |
| PA | 1881 | makes any person, "who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, … shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars." | Act of June 10, 1881, § 1 |

| PA | 1883 | Crimes, Carrying and Sale of Explosives, § 113. Any person who shall knowingly and willfully sell or cause to be sold to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell, or cause to be sold, to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell, or cause to be sold to any such minor, any cartridge, gunpowder or other dangerous and explosive substance, shall in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars. | John Purdon, A Digest of the Laws of Pennsylvania: From the Year One Thousand Seven Hundred to the Sixth Day of July, One Thousand Eight Hundred and Eighty-Three. 11th Edition Page 423-424, Image 472-473  (Vol. 1, 1885) available at The Making of Modern Law: Primary Sources. |
|---|---|---|---|
| RI | 1883 | § 1. No person shall sell to any child under the age of fifteen years, without the written consent  of a parent  or guardian  of such child, any cartridge or fixed ammunition of which any fulminate  is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate. | R.I. Pub. Laws 157, An Act In Amendment Of And in Addition To Chapter  92 Of The Public Statutes "Of Fire-arms and Fire-works", § 1 |
| RI | 1883 | Firearms and Fire-works. § 7. No person shall sell to any child under the age of fifteen years,  without the written consent of a parent or guardian of such child, any cartridge or fixed  ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical  contrivance arranged for the explosion of such cartridge or of any fulminate. § 8. Every person  violating the provisions of the foregoing section shall be fined not less than ten dollars nor more  than twenty dollars for each offence. | General Laws of the State of Rhode Island and Providence Plantations to  Which are Prefixed the Constitutions of the United States and of the State  Page 372, Image 388 (1896) available at The Making of Modern Law:  Primary Sources. |
| SC | 1817 | [Ordinances of the Town of Columbia, An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817). Whereas the practice of firing small arms within the town of Columbia is extremely dangerous to the lives; as well as the property of the inhabitants thereof, and ought to be strictly prohibited: Be it ordained by the Intendent and Municipal Wardens of the towns aforesaid, in council assembled, and it is hereby ordained by the authority of the same, That hereafter it shall not be lawful for any person to fire or discharge any gun, pistol or other small arms within the limits bounded by Henderson, Blossom, Lincoln and Upper streets; and if any person shall wantonly, knowingly, and willfully fire or discharge any gun, pistol, or other small arms within the said limits, such person shall forfeit and pay to the use of the town aforesaid, a sum not exceeding five dollars, for each and every such offence, to be sued for and recovered according to law. And whereas, offences of this kind may be committed by minors or other disorderly persons, who have no ostensible property whereof the said penalty can be levied. Be it therefore ordained by the authority aforesaid, That any gun, pistol or other small arms, fired or discharged by any such person in breach of this ordinance, shall be liable for the payment of the penalty or penalties aforesaid; and it shall be lawful for the intendant, either of the Wardens or constables, who shall see such person offending against this ordinance, to seize and take into possession the gun or pistol, or other small arms so fired or discharged, and despite the same with the Intendant or either of the Wardens; and if the person charged with the said offense, and convicted thereof, shall not within ten days after conviction pay the penalty incurred and the costs of prosecution, the same shall be sold to discharge the said penalty and costs: Provided nevertheless, That nothing in this ordinance contained shall extend to prohibit or restrain the usual exercises or duties of the military on muster or parade days, or in performance of patrol or other duties enjoined by law, or to prohibit or restrain any of the inhabitants of said town from shooting any mad dog, or any other dangerous animal found within the same, or from firing guns on the fourth of July, Christmas and New-Years days, or on any other day of general rejoicing of said town.] | Ordinances, of the Town of Columbia, (S. C.) Passed Since the  Incorporation of Said Town: To Which are Prefixed, the Acts of the General  Assembly, for Incorporating the Said Town, and Others in Relation Thereto  Page 61-61, Image 61-62 (1823) available at The Making of Modern Law:  Primary Sources. |
| SC | 1923 | If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, or of attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days. | S.C. Acts 221 |
| SD | 1903 | §1. It shall be unlawful for any person under the age of fifteen years to carry, use or discharge  any rifle, shot gun, revolver or other fire arms except with the consent and knowledge of their  parents or guardians. § 2. It shall be unlawful for any parent or guardian, having the legal  charge or control of any minor under the age of fifteen years, to allow or permit such minor to  use or carry while loaded any of the arms mentioned in section one of this act within the platted  portion or within the distance of one mile of the platted portion of any city, town or village. § 3.   Any person or persons violating the provisions of this act shall be deemed guilty of a  misdemeanor and upon conviction thereof shall be fined in a sum not exceeding Fifty Dollars. | S.D. Sess. Laws 168-69, Prohibiting the Use of Fire Arms by Persons  under Fifteen Years of Age, ch. 144, §§ 1-3. |
| TN | 1856 | Offences Against Public Policy and Economy. § 4864. Any person who sells, loans, or gives, to  any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous  weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a  misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the  county jail at the discretion of the court. | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State  of Tennessee, of a General and Permanent Nature, Compiled on the Basis  of the Code of Tennessee, With Notes and References, Including Acts of  Session of 1870-'71 Page 125, Image 794 (Vol. 2, 1873) available at The  Making of Modern Law: Primary Sources. |

| TN | 1863 | [Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4. Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.] | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. |
| TN | 1876 | Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court. | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. |
| TX | 1897 | That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is committed. | Tex. Gen. Laws 221-22, An Act to Prevent the Barter, Sale and Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . . , ch. 155, § 1. |
| UT | 1905 | § 1. Selling or giving firearms to minors under fourteen. Any person who sells, gives or disposes of, or offers to sell, give or dispose of any pistol, gun, target gun, or other firearm, to any person under the age of fourteen years, is guilty of a misdemeanor. § 2. Minor under fourteen must not carry firearms. Any person under the age of fourteen years who shall carry, or have in his possession, any pistol, gun, target gun or other firearm, unless accompanied by a parent or guardian, shall be guilty of a misdemeanor. | Utah Laws 60, An Act to Prohibit the Sale of Firearms to Minors and the Carrying of Firearms by Minors, and Prescribing Penalties for Violation Thereof, ch. 52, §§ 1-2. |
| VA | 1869 | Ordinances of the town of Lexington. Of Concealed Weapons and Cigarettes. § 2. If any person sell, barter, give or furnish, or cause to be sold, bartered, given or furnished to any minor under sixteen years of age, cigarettes, or pistols, or dirks, or bowie knives, having good cause to believe him or her to be a minor under sixteen years of age, shall be fined not less than twenty-five dollars nor more than one hundred dollars. | The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources. |
| VA | 1903 | 1. Be it enacted by the general assembly of Virginia, That it shall be unlawful for any person, firm, corporation, or association, to sell, barter, exchange, furnish, or dispose of by purchase, gift, or in any other manner, any toy gun, pistol, rifle, or other toy firearm, if the same shall, by means of powder or other explosive discharge blank or ball charges, to any person under the age of twelve years. Any firm, corporation, or association violating the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than fifty dollars nor more than one hundred dollars, or confined in jail for a period not less than thirty, nor more than ninety days, either or both. 2. Each sale of any of the articles hereinbefore specified to any person under the age mentioned shall constitute a separate offense, and any person over the age of twelve years who shall purchase, accept, or in any manner acquire any of the toy articles of the kind hereinbefore enumerated for any person under the age of twelve years, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred dollars nor more than two hundred dollars, or confined in jail for a period not less than thirty days nor more than six months, either or both. | 1902-1904 Va. Acts 261, An Act to Prevent the Sale or Gift of Toy Firearms to Persons Under Twelve Years of Age, and to Provide a Penalty Therefor, ch. 186, §§ 1-2. |
| VT | 1912 | § 1. A person, other than a parent or guardian, who sells or furnishes to a minor under the age of sixteen years a firearm or other dangerous weapon, shall be fined not more than fifty dollars nor less than ten dollars. This section shall not apply to an instructor or teacher who furnishes military weapons to pupils for instruction and drill. § 2. A child under the age of sixteen years who, without the consent of his parent or guardian, has in his possession or control a pistol or revolver constructed or designed for the use of gunpowder or other explosive substance with leaden ball or shot shall be fined not more than twenty dollars. | Vt. Acts and Resolves 306, An Act . . . Relating to Firearms, §§ 1-2. |
| WA | 1883 | Sale of Toy Pistols to Children, It shall be unlawful for any person or persons to sell or offer for sale, any toy pistols within this state, and every person who shall sell, give, furnish, or cause to be furnished to any person under the age of sixteen years, any pistol, toy pistol or other pocket weapon, in which explosives may be used, shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined in any sum not less than five, nor more than twenty-five dollars. | Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 1042, Image 1094 (1896) available at The Making of Modern Law: Primary Sources. |
| WA | 1909 | Use of Firearms by Minor. No minor under the age of fourteen years shall handle or have in his possession or under his control, except while accompanied by or under his control, except while accompanied by or under the immediate charge of his parent or guardian, any firearm of any kind for hunting or target practice or for other purposes. Every person violating any of the foregoing provisions, or aiding or knowingly permitting any such minor to violate the same, shall be guilty of a misdemeanor. | 1909 Wash. Sess. Laws 984, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 8, § 308. |

| WI | 1882 | Offenses Against Lives and Persons of Individuals. §4397a. (1) It shall be unlawful for any person to sell or use, or have in his possession, for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy fire-arm. (2) Any person violating any of the provisions of this act, on conviction thereof, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars, or by both fine and imprisonment, in the discretion of the court. § 4397b. (1) It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. (2) It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any minor in this state. | Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 847, Image 889 (1883) available at The Making of Modern Law: Primary Sources. |
|---|---|---|---|
| WI | 1883 | Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100). | Wis. Sess. Laws 290 |
| WV | 1882 | (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character" "to a per-son whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years"). | W. Va. Acts 421 |
| WV | 1891 | Offenses Against the Peace, § 7. If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife. | See State v. Workman, 14 L.R.A. 600 (1891): John Augustus Warth, The Code of West Virginia. Containing the Constitution and Naturalization of the United States – the Constitution of the State – the Code, as Amended by Legislation to and Including the Year 1891 and Marginal Notes to all Prior Laws and Applicable Decisions, with an Appendix, Containing all the Statutes of the State in Force, of a General and Prospective Nature, not Enacted or Inserted in the Several Chapters of the Code Page 915-916, Image 920-921 (1891) available at The Making of Modern Law: Primary Sources. |

| WV | 1925 | Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That said applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and necessity for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, with security to be approved by the secretary of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy to carry | W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. |



weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

| WY | 1890 | Furnishing Deadly Weapons to Minor. § 5052. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of sixteen years any cartridges manufactured and designed for use in a pistol; and any person who shall violate any of the provisions of this section shall be fined in any sum not more than fifty dollars. | 1890 Wyo. Terr. Sess. Laws 140. Josiah A. Van Orsdel, Attorney General, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules of the Supreme Court Page 1253, Image 1253 (1899) available at The Making of Modern Law: Primary Sources. |

# EXHIBIT C

**Post-Civil War State Constitutional
Arms Bearing Provisions about
Regulations**

**Table One.**
**Post-Civil War State Constitutional Arms Bearing**
**Provisions about Regulation**
(S. Cornell, *UC Davis Law Review Online,* Vol. 55, Sept. 2021)

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |

| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
|------|-------|------|
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |
| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |