ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
S. CLINTON WOODS
Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
State Bar No. 275496
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6617
  Fax: (916) 731-2124
  E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his
official capacity as Attorney General of the
State of California, and Allison Mendoza, in
her official capacity as Acting Director of the
Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW JONES, *et al.*,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,**<br><br>Defendants. | 3:19-cv-01226-L-AHG<br><br>**DECLARATION OF LOUIS KLAREVAS**<br><br>Dept: 5B<br>Judge: The Honorable M. James Lorenz and Magistrate Judge Alison H. Goddard<br><br>Action Filed: July 1, 2019 |

## <u>DECLARATION OF LOUIS KLAREVAS</u>

I, Louis Klarevas, declare:

1.     I am a security policy analyst and, currently, Research Professor at Teachers College, Columbia University, in New York.  I am also the author of the book *Rampage Nation*, one of the most comprehensive studies on gun massacres in the United States.[1]

2.     I have been asked by the Office of the Attorney General for the State of California to prepare an expert declaration addressing the relationship between mass shooting violence and shooter age.  I have also been asked to review and prepare rebuttals to the declarations submitted by Plaintiffs' experts John Lott and Thomas B. Marvell.

3.     I am being compensated at a rate of $480/hour for my work on this declaration, $600/hour for any testimony (including deposition testimony) in connection with this matter, and $120/hour for travel required to provide testimony.

4.     This expert declaration is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## PROFESSIONAL QUALIFICATIONS

5.     I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  My current research examines the nexus between American public safety and gun violence, including serving as an investigator in a study funded by the National Institutes of Health that is focused on reducing intentional shootings at elementary and secondary schools.

6.     During the course of my nearly 25-year career as an academic, I have served on the faculties of George Washington University, the City University of

---

[1] Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016).

New York, New York University, and the University of Massachusetts. I have also
served as Defense Analysis Research Fellow at the London School of Economics
and Political Science and as United States Senior Fulbright Scholar in Security
Studies at the University of Macedonia.

7.   In addition to having made well over 100 media and public-speaking
appearances, I am the author or co-author of more than 20 scholarly articles and
over 70 commentary pieces. In 2019, my peer-reviewed article on the effectiveness
of restrictions on large-capacity magazines (LCMs) in reducing high-fatality mass
shootings resulting in six or more victims killed was published in the *American
Journal of Public Health*.[2] This study found that jurisdictions with LCM bans
experienced substantially lower gun massacre incidence and fatality rates when
compared to jurisdictions not subject to similar bans. Despite being over 3 years
old now, this study continues to be one of the highest impact studies in all of
academia. It was recently referred to as "the perfect gun policy study," in part due
to the study's "robustness and quality."[3]

---

[2] Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on
High-Fatality Mass Shootings*, 109 American Journal of Public Health 1754 (2019),
*available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311
(last accessed December 27, 2022).

[3] Lori Ann Post and Maryann Mason, *The Perfect Gun Policy Study in a Not
So Perfect Storm*, 112 American Journal of Public Health 1707 (2022), *available at*
https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2022.307120 (last
accessed December 27, 2022). According to Post and Mason, "Klarevas et al.
employed a sophisticated modeling and research design that was more rigorous than
designs used in observational studies. Also, they illustrated the analytic steps they
took to rule out alternative interpretations and triangulate their findings, for
example examining both state bans and federal bans. They helped build the
foundation for future studies while overcoming the limitations of previous
research." *Ibid.*

8. In the past four years (since January 1, 2019), I have been deposed, testified in court, or testified by declaration in the following cases (all in federal court), listed alphabetically by state:

**California – Central District**
*Rupp v. Bonta*                                                      8:17-cv-00746-JLS-JDE
**California – Southern District**
*Duncan v. Bonta*                                                    17-cv-1017-BEN-JLB
*Jones v. Bonta (present case)*                                      19-cv-01226-L-AHG
*Miller v. Bonta*                                                    3:19-cv-1537-BEN-JBS
*Nguyen v. Bonta*                                                    3:20-cv-02470-WQH-MDD
**Connecticut**
*National Ass'n. for Gun Rights v. Lamont*                           3:22-cv-01118-JBA
**Hawaii**
*National Ass'n for Gun Rights v. Lopez*                             1:22-cv-404-DKW-RT
**Illinois – Northern District**
*Viramontes v. Cook County*                                          1:21-cv-04595
*National Ass'n. for Gun Rights v. Highland Park*                    22-cv-04774
*Herrera v. Raoul*                                                   1:23-cv-00532
**Illinois – Southern District**
*Harrel v. Raoul*[*]                                                 23-cv-141-SPM
*Langley v. Kelly*[*]                                                23-cv-192-SPM
*Barnett v. Raoul*[*]                                                23-cv-209-SPM
*Federal Firearms Licensees of Illinois v. Pritzker*[*]             23-cv-215-SPM
**Massachusetts**
*National Ass'n for Gun Rights v. Campbell*                          1:22-cv-11431-FDS
**Oregon**
*Oregon Firearms Federation v. Kotek*[†]                             2:22-cv-01815-IM
*Fitz v. Rosenblum*[†]                                               3:22-cv-01859-IM
*Eyre v. Rosenblum*[†]                                               3:22-cv-01862-IM
*Azzopardi v. Rosenblum*[†]                                          3:22-cv-01869-IM
**Washington – Eastern District**
*Brumback v. Ferguson*                                               1:22-cv-03093-MKD

[*]Non-Consolidated Cases on the Same Briefing Schedule

[†]Consolidated Cases

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

9.     In 2021, I was retained by the Government of Canada in the following cases which involved challenges to Canada's regulation of certain categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated court proceeding involving all six cases in the Federal Court of Canada.

10.     A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

## OPINIONS

11.     It is my professional opinion, based on my review and analysis of mass shooting data, that (1) double-digit-fatality mass shootings are post-World War II phenomena, usually involving long guns, particularly semi-automatic centerfire rifles; (2) mass shootings are a growing threat to American public safety; (3) as a percentage of the U.S. population, 18-20 year-olds are over-represented in mass shooting violence; and (4) 18-20-year old mass shooters have a preference for long guns, especially semi-automatic centerfire rifles, which tend to be legally owned by the shooters or their family members.  Based on these findings, it is my opinion that firearm purchasing restrictions on 18-20-year-olds have the potential to reduce mass shooting violence.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

## I.    DOUBLE-DIGIT-FATALITY MASS SHOOTINGS ARE POST-WORLD WAR II PHENOMENA, USUALLY INVOLVING LONG GUNS, PARTICULARLY SEMI-AUTOMATIC CENTERFIRE RIFLES

12.    An examination of the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed in the United States since 1776 (Table 1 and Figure 1) uncovered several informative findings.[4]  In terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948.  The first known mass shooting resulting in 10 or more deaths occurred in 1949.  In other words, for 70% of its 247-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities, making such acts of gun violence a relatively modern phenomena in American history.[5]

13.    After the first such incident in 1949, 17 years passed until a similar mass shooting occurred in 1966.  The third such mass shooting then occurred 9 years later, in 1975.  And the fourth such incident occurred 7 years after, in 1982.  Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era.  Furthermore, these first few double-digit-fatality incidents occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 1 and Figure 1).

---

[4] I searched for firearm-related "murders," using variations of the term, setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, *available at* https://www.newspaperarchive.com (last accessed October 2, 2022).  The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607.  Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[5] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68% of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

**Table 1.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022[6]**

| | Date | Location | Deaths | Involved Long Gun | Involved Semi-Auto Centerfire Rifle | Involved 18-20-Year-Old Shooter |
|---|---|---|---|---|---|---|
| 1 | 9/6/1949 | Camden, NE | 13 | N | N | N |
| 2 | 8/1/1966 | Austin, TX | 14 | Y | Y | N |
| 3 | 3/30/1975 | Hamilton, OH | 11 | N | N | N |
| 4 | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y | N |
| 5 | 2/18/1983 | Seattle, WA | 13 | N | N | Y |
| 6 | 4/15/1984 | Brooklyn, NY | 10 | N | N | N |
| 7 | 7/18/1984 | San Ysidro, CA | 21 | Y | N | N |
| 8 | 8/20/1986 | Edmond, OK | 14 | N | N | N |
| 9 | 10/16/1991 | Killeen, TX | 23 | N | N | N |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | N | N |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y | N |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | N | N |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | N | N |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y | N |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | Y | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y | N |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y | N |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y | N |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y | N |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y | Y |
| 23 | 5/18/2018 | Santa Fe, TX | 10 | Y | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y | N |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | N | N |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | N | N |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y | N |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y | N |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y | Y |

[6] Death tolls do not include the perpetrators.

**Figure 1.  Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022[7]**



14.     The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events took place in a span of just five years (Table 1 and Figure 1).  But this cluster of incidents was followed by a 20-year period in which only 2 double-digit-fatality mass shootings occurred (Figure 1).  This period of time from 1987-2007 correlates with three important federal firearms measures: the 1986 Firearm Owners Protection Act, the 1989 C.F.R. "sporting use" importation restrictions, and the 1994 Federal Assault Weapons Ban.

15.     It is well-documented in the academic literature that, after the Federal Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[8]  Mass shootings that resulted in 10 or more deaths were no

---

[7] Figure 1 is reproduced in larger form as **Exhibit B** of this declaration.

[8] *See*, for example, Louis Klarevas, *supra* note 1; Louis Klarevas, et al., *supra* note 2; Charles DiMaggio, et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019), *available at* https://journals.lww.com/jtrauma/Abstract/2019/01000/Changes_in_US_mass_shooting_deaths_associated_with.2.aspx (last accessed March 15, 2023); Lori Post, et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and Surveillance (2021), *available at* (continued…)

1   exception, following the same pattern.  In the 56 years from 1949 through 2004,

2   there were a total of 10 mass shootings resulting in double-digit fatalities (a

3   frequency rate of one incident every 5.6 years).  In the 18 years since 2004, there

4   have been 20 double-digit-fatality mass shootings (a frequency rate of one incident

5   every 0.9 years).  In other words, the frequency rate has increased over six-fold

6   since the Federal Assault Weapons Ban expired (Table 1 and Figure 1).

7        16.    Out of the mass shootings resulting in 10 or more deaths, 63% (19 out

8   of 30 incidents) involved long guns, with 84% of these incidents (16 out of 19

9   incidents) involving semi-automatic centerfire rifles (Table 1).  Of particular

10  relevance to the present case, 6 out of the 30 double-digit-fatality mass shootings in

11  American history were perpetrated by a shooter who was 18-20-years-old at the

12  time of the attack.  In other words, while historically accounting for approximately

13  4% of the post-World War II population in the United States, 18-20-year-olds have

14  been involved in perpetrating 20% of the mass shootings resulting in 10 or more

15  deaths—a roughly five-fold over-representation (Table 1).[9]  Similarly, the double-

16  digit-fatality mass shootings that involved perpetrators between the ages of 18 and

17  20 also account for 19% of all deaths resulting from such extreme acts of gun

18  violence (101 out of 538 total deaths)—again a nearly five-fold over-representation

19  given that this age group has only represented approximately 4% of the population

20

21  _____

22  https://publichealth.jmir.org/2021/4/e26042 (last accessed March 15, 2023); and

23  Philip J. Cook and John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 JAMA, September 27, 2022, *available at*

24  https://jamanetwork.com/journals/jama/article-abstract/2796675 (last accessed
    March 15, 2023).

25       [9] According to census data from 1950, 1960, 1970, 1980, 1990, 2000, 2010,

26  and 2020, 18-20-year-olds accounted for a mean average of 4.3% of the U.S.
    population in the post-World War II (up to the present era).  Singe-year-of-age

27  population data is published by the U.S. Census Bureau every decade, *available at*

28  https://www.census.gov/library/publications.html (last accessed March 13, 2023).

of the United States in the post-World War II era (Table 1).  This indicates that this age group is particularly capable of inflicting mass-casualty carnage with firearms.

## II.    MASS SHOOTINGS ARE A GROWING THREAT TO AMERICAN PUBLIC SAFETY

17.    Examining mass-casualty acts of violence in the United States in the last 25 years points to two disturbing patterns.[10]  First, as demonstrated in Table 2, the deadliest individual acts of intentional criminal violence in the United States since the coordinated terrorist attack of September 11, 2001, have all been mass shootings.  Second, as displayed in Figures 2-3, the problem of mass public shooting violence is on the rise.  To put the increase since 1998 into perspective, in the last 25 years, the average population of the United States increased approximately 17%.[11]  However, when the number of people killed in mass public shootings from 1998-2002 is compared to the number killed in such incidents from

---

[10] Because Plaintiffs' expert John Lott begins his analysis of mass shootings with calendar year 1998, for purposes of consistency (and to avoid any confusion), the analyses in Sections II-IV of this declaration also use data from 1998 onward. Moreover, similar to Lott, all analyses herein use a data set of mass public shootings maintained by Lott's organization, the Crime Prevention Research Center (CPRC).  For purposes of this declaration, mass public shootings are defined as incidents, within a 24-hour period, resulting in 4 or more people shot to death, not including the perpetrator(s), in a public location as part of an attack that is not undertaken in relation to an underlying crime.  This definition is consistent with the definition of mass public shootings used by Lott.  However, unlike Lott (whose declaration was executed on September 15, 2019, and not subsequently updated), I extend the analyses in this declaration through the end of 2022.  The CPRC data set on mass public shootings since 1998 is accessible from the organization's website, *available at* https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx (last accessed March 13, 2023).

[11] The increase was calculated using the total annual populations from 1998-2002 and comparing it to the total annual populations from 2018-2022.  The increase between these two five-year time periods is 17.2%.  Annual population estimates are from the U.S. Census Bureau, *available at* https://www.census.gov/programs-surveys/popest/data/data-sets.html (last accessed March 13, 2023).

2018-2022, it reflects an increase of 222%.  In other words, the rise in mass shooting violence has far outpaced the rise in national population—by a factor of 13.  The obvious takeaway from these patterns and trends is that mass shootings pose a significant—and growing—threat to American public safety.

**Table 2.  The Deadliest Acts of Intentional Criminal Violence in the U.S. since the Coordinated Terrorist Attack of September 11, 2001[12]**

|   | Deaths | Date | Location | Type of Violence |
|---|---|---|---|---|
| 1 | 60 | October 1, 2017 | Las Vegas, NV | Mass Shooting |
| 2 | 49 | June 12, 2016 | Orlando, FL | Mass Shooting |
| 3 | 32 | April 16, 2007 | Blacksburg, VA | Mass Shooting |
| 4 | 27 | December 14, 2012 | Newtown, CT | Mass Shooting |
| 5 | 25 | November 5, 2017 | Sutherland Springs, TX | Mass Shooting |
| 6 | 23 | August 3, 2019 | El Paso, TX | Mass Shooting |
| 7 | 21 | May 24, 2022 | Uvalde, TX | Mass Shooting |

**Figure 2.  Annual Number of Mass Public Shooting Incidents, 1998-2022[13]**



[12] Source: CPRC, https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx (last accessed March 13, 2023).  Erroneous fatality counts have been corrected.

[13] Source: CPRC, https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx (last accessed March 13, 2023).  Erroneous fatality counts have been corrected.

**Figure 3.  Annual Number of Mass Public Shooting Deaths, 1998-2022[14]**



## III.  AS A PERCENTAGE OF THE U.S. POPULATION, 18-20-YEAR-OLDS ARE OVER-REPRESENTED IN MASS SHOOTING VIOLENCE

18.     As noted above in Section I, the 18-20 age demographic only accounts for about 4% of the U.S. population.  However, it accounts for a far larger percentage of double-digit-fatality mass shooting incidents and deaths.  The same holds for mass public shootings perpetrated in the United States in the last quarter century.  As shown in Tables 3 and 4 below, in contrast to the comparator groups of 11-17-year-old mass public shooters as well as 21-66-year-old mass public shooters, 18-20-year-old mass public shooters are drastically over-represented, and substantially more so than older mass public shooters, who are also over-represented.[15]  (In contrast, 11-17-year-olds are under-represented.)  This holds whether the metric is the share of mass public shootings that they commit or the share of mass public shooting deaths attributable to their attacks.  The share of

___

[14] Source: CPRC, https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx (last accessed March 13, 2023).  Erroneous fatality counts have been corrected.

[15] The age parameters for the two comparator groups were determined by the youngest and oldest mass public shooter in the CPRC data set (1998-2022), respectively, 11 and 66 years of age.

1   18-20-year-old mass public shooters is 150% larger than the share of the population
2   for that age demographic. Similarly, the share of deaths attributable to 18-20-year-
3   old mass public shooters is 238% larger than the share of the population for that age
4   demographic. Furthermore, the average death toll per mass public shooting for
5   attacks perpetrated by 18-20-year-olds (11.4 deaths on average) is 107% larger than
6   the average death toll per incident associated with 11-17-year-olds (5.5 deaths on
7   average) and 37% larger than the average death toll per incident associated with 21-
8   66-year-olds (8.3 deaths on average).[16] These patterns clearly demonstrate that age
9   is an important factor in terms of the incidence and lethality of mass public
10  shootings.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[16] The average death toll per mass public shooting for attacks perpetrated by 21-66-year-olds (8.3 deaths on average) is 51% larger than the average death toll per incident associated with 11-17-year-olds (5.5 deaths on average).

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

# Table 3.  Mass Public Shooters by Age Group, 1998-2022[17]

### Table 3a.  Mass Public Shooters Aged 11-17

| | Year | Month | Day | State | City | Deaths | Age of Shooter |
|---|---|---|---|---|---|---|---|
| 1 | 1998 | 3 | 24 | Arkansas | Jonesboro | 2.5 | 11 |
| 2 | 1998 | 3 | 24 | Arkansas | Jonesboro | 2.5 | 13 |
| 3 | 2014 | 10 | 24 | Washington | Marysville | 4 | 15 |
| 4 | 2021 | 11 | 30 | Michigan | Oxford | 4 | 15 |
| 5 | 2005 | 3 | 21 | Minnesota | Red Lake | 9 | 16 |
| 6 | 2018 | 5 | 18 | Texas | Santa Fe | 10 | 17 |
| 7 | 1999 | 4 | 20 | Colorado | Columbine | 6.5 | 17 |
| | | | | | Total Deaths | 38.5 | |
| | | | | | Average Deaths Per Incident | 5.5 | |

### Table 3b.  Mass Public Shooters Aged 18-20

| | Year | Month | Day | State | City | Deaths | Age of Shooter |
|---|---|---|---|---|---|---|---|
| 1 | 1999 | 4 | 20 | Colorado | Columbine | 6.5 | 18 |
| 2 | 2007 | 2 | 12 | Utah | Salt Lake City | 5 | 18 |
| 3 | 2022 | 5 | 14 | New York | Buffalo | 10 | 18 |
| 4 | 2022 | 5 | 24 | Texas | Uvalde | 21 | 18 |
| 5 | 2007 | 12 | 5 | Nebraska | Omaha | 8 | 19 |
| 6 | 2018 | 2 | 14 | Florida | Parkland | 17 | 19 |
| 7 | 2021 | 4 | 15 | Indiana | Indianapolis | 8 | 19 |
| 8 | 2007 | 10 | 7 | Wisconsin | Crandon | 6 | 20 |
| 9 | 2012 | 12 | 14 | Connecticut | Newtown | 27 | 20 |
| 10 | 2016 | 9 | 23 | Washington | Burlington | 5 | 20 |
| | | | | | Total Deaths | 113.5 | |
| | | | | | Average Deaths Per Incident | 11.4 | |

[17] Source: CPRC, https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx.

Note: The age parameters for the two comparator groups were determined by the youngest and oldest mass public shooter in the CPRC data set (1998-2022), respectively, 11 and 66 years of age.  For purposes of calculating the average deaths per incident for each age grouping, deaths were equally divided between the shooters in the three incidents that involved two perpetrators (Jonesboro 1998, Columbine 1999, and San Bernadino 2015).  Two revisions were made to the original data: (1) misspellings, erroneous locations, and erroneous death tolls were corrected; and (2) an incident that occurred in Puerto Rico was removed.

**Table 3c.  Mass Public Shooters Aged 21-66**

| | Year | Month | Day | State | City | Deaths | Age of Shooter |
|---|---|---|---|---|---|---|---|
| 1 | 2004 | 7 | 2 | Kansas | Kansas City | 5 | 21 |
| 2 | 2015 | 6 | 17 | South Carolina | Charleston | 9 | 21 |
| 3 | 2019 | 1 | 23 | Florida | Sebring | 5 | 21 |
| 4 | 2019 | 8 | 3 | Texas | El Paso | 23 | 21 |
| 5 | 2021 | 3 | 16 | Georgia | Atlanta | 8 | 21 |
| 6 | 2021 | 3 | 22 | Colorado | Boulder | 10 | 21 |
| 7 | 2022 | 7 | 4 | Illinois | Highland Park | 7 | 21 |
| 8 | 2011 | 1 | 8 | Arizona | Tucson | 6 | 22 |
| 9 | 2021 | 10 | 21 | Washington | Tacoma | 4 | 22 |
| 10 | 2022 | 11 | 19 | Colorado | Colorado Springs | 5 | 22 |
| 11 | 1999 | 6 | 3 | Nevada | Las Vegas | 4 | 23 |
| 12 | 2003 | 2 | 25 | Alabama | Huntsville | 4 | 23 |
| 13 | 2007 | 4 | 16 | Virginia | Blacksburg | 32 | 23 |
| 14 | 2012 | 7 | 20 | Colorado | Aurora | 12 | 24 |
| 15 | 2015 | 7 | 16 | Tennessee | Chattanooga | 5 | 24 |
| 16 | 2019 | 8 | 4 | Ohio | Dayton | 9 | 24 |
| 17 | 2004 | 12 | 8 | Ohio | Columbus | 4 | 25 |
| 18 | 2006 | 5 | 21 | Louisiana | Baton Rouge | 5 | 25 |
| 19 | 2008 | 6 | 25 | Kentucky | Henderson | 5 | 25 |
| 20 | 2016 | 7 | 7 | Texas | Dallas | 5 | 25 |
| 21 | 2015 | 10 | 1 | Oregon | Roseburg | 9 | 26 |
| 22 | 2017 | 1 | 6 | Florida | Fort Lauderdale | 5 | 26 |
| 23 | 2017 | 11 | 5 | Texas | Sutherland Springs | 25 | 26 |
| 24 | 2008 | 2 | 14 | Illinois | DeKalb | 5 | 27 |
| 25 | 2006 | 3 | 24 | Washington | Seattle | 6 | 28 |
| 26 | 2018 | 1 | 28 | Pennsylvania | Melcroft | 4 | 28 |
| 27 | 2018 | 11 | 7 | California | Thousand Oaks | 12 | 28 |
| 28 | 2015 | 12 | 2 | California | San Bernardino | 7 | 28 |
| 29 | 2015 | 12 | 2 | California | San Bernardino | 7 | 29 |
| 30 | 2016 | 6 | 12 | Florida | Orlando | 49 | 29 |
| 31 | 2018 | 4 | 22 | Tennessee | Antioch | 4 | 29 |
| 32 | 2008 | 3 | 18 | California | Santa Maria | 4 | 31 |
| 33 | 2020 | 3 | 15 | Missouri | Springfield | 4 | 31 |
| 34 | 2022 | 11 | 22 | Virginia | Chesapeake | 6 | 31 |
| 35 | 2011 | 9 | 6 | Nevada | Carson City | 4 | 32 |
| 36 | 2006 | 10 | 2 | Pennsylvania | Nickel Mines | 5 | 33 |
| 37 | 2010 | 8 | 3 | Connecticut | Manchester | 8 | 34 |
| 38 | 2013 | 9 | 16 | District of Columbia | Washington | 12 | 34 |
| 39 | 1998 | 3 | 7 | Connecticut | Newington | 4 | 35 |
| 40 | 1999 | 12 | 30 | Florida | Tampa | 5 | 36 |

14

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 41 | 2003 | 8 | 27 | Illinois | Chicago | 6 | 36 |
| 42 | 2004 | 11 | 21 | Wisconsin | Birchwood | 6 | 36 |
| 43 | 2012 | 9 | 27 | Minnesota | Minneapolis | 6 | 36 |
| 44 | 2009 | 11 | 29 | Washington | Parkland | 4 | 37 |
| 45 | 2010 | 6 | 6 | Florida | Hialeah | 4 | 37 |
| 46 | 2018 | 6 | 28 | Maryland | Annapolis | 5 | 38 |
| 47 | 2021 | 9 | 12 | Minnesota | St. Paul | 4 | 38 |
| 48 | 2009 | 11 | 5 | Texas | Fort Hood | 13 | 39 |
| 49 | 2022 | 2 | 28 | California | Arden-Arcade | 4 | 39 |
| 50 | 1999 | 11 | 2 | Hawaii | Honolulu | 7 | 40 |
| 51 | 2012 | 5 | 30 | Washington | Seattle | 5 | 40 |
| 52 | 2012 | 8 | 5 | Wisconsin | Oak Creek | 6 | 40 |
| 53 | 2019 | 5 | 31 | Virginia | Virginia Beach | 12 | 40 |
| 54 | 2009 | 4 | 3 | New York | Binghamton | 13 | 41 |
| 55 | 2011 | 10 | 12 | California | Seal Beach | 8 | 41 |
| 56 | 2000 | 12 | 26 | Massachusetts | Wakefield | 7 | 42 |
| 57 | 2012 | 4 | 2 | California | Oakland | 7 | 43 |
| 58 | 1999 | 7 | 29 | Georgia | Atlanta | 9 | 44 |
| 59 | 2006 | 1 | 30 | California | Goleta | 7 | 44 |
| 60 | 2014 | 2 | 20 | California | Alturas | 4 | 44 |
| 61 | 2021 | 3 | 31 | California | Orange | 4 | 44 |
| 62 | 2005 | 3 | 12 | Wisconsin | Brookfield | 7 | 45 |
| 63 | 2009 | 3 | 29 | North Carolina | Carthage | 8 | 45 |
| 64 | 2016 | 2 | 20 | Michigan | Kalamazoo | 6 | 45 |
| 65 | 2017 | 6 | 5 | Florida | Orlando | 5 | 45 |
| 66 | 2019 | 2 | 15 | Illinois | Aurora | 5 | 45 |
| 67 | 2022 | 6 | 1 | Oklahoma | Tulsa | 4 | 45 |
| 68 | 2018 | 10 | 27 | Pennsylvania | Pittsburgh | 11 | 46 |
| 69 | 1999 | 9 | 15 | Texas | Fort Worth | 7 | 47 |
| 70 | 2003 | 7 | 8 | Mississippi | Meridian | 6 | 48 |
| 71 | 2020 | 2 | 26 | Wisconsin | Milwaukee | 5 | 51 |
| 72 | 2008 | 2 | 7 | Missouri | Kirkwood | 6 | 52 |
| 73 | 2003 | 10 | 24 | Idaho | Oldtown | 4 | 53 |
| 74 | 2002 | 3 | 22 | Indiana | South Bend | 4 | 54 |
| 75 | 2021 | 5 | 26 | California | San Jose | 9 | 57 |
| 76 | 2012 | 2 | 20 | Georgia | Norcross | 4 | 59 |
| 77 | 2017 | 10 | 1 | Nevada | Las Vegas | 60 | 64 |
| 78 | 2001 | 2 | 5 | Illinois | Melrose Park | 4 | 66 |
| | | | | | Total Deaths | 650 | |
| | | | | | Average Deaths Per Incident | 8.3 | |

15

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

**Table 4.  Share of Mass Public Shooting Perpetrators and Deaths Attributable to Mass Public Shooting Perpetrators, Sorted by Age Groups and Compared to Share of Population for Age Groups, 1998–2022[18]**

| | Share of U.S. Population (2000-2020) | Share of Mass Public Shooting Perpetrators | Percentage Differential Given Share of Population | Share of Mass Public Shooting Deaths | Percentage Differential Given Share of Population |
|---|---|---|---|---|---|
| 11-17 | 9.6% | 7.4% | -23% | 4.8% | -50% |
| 18-20 | 4.2% | 10.5% | +150% | 14.2% | +238% |
| 21-66 | 59.6% | 82.1% | +38% | 81.0% | +36% |

## IV.  18-20-YEAR-OLD MASS SHOOTERS HAVE A PREFERENCE FOR LONG GUNS, ESPECIALLY SEMI-AUTOMATIC CENTERFIRE RIFLES, WHICH TEND TO BE LEGALLY OWNED BY THE SHOOTERS OR THEIR FAMILY MEMBERS

19.     As discussed above in Section III, the 18-20 age demographic perpetrates mass public shootings at a rate that is disproportionately larger than the rates associated with the 11-17-year-old and 21-66-year-old comparator groups. Moreover, as shown in Table 5 below, 18-20-year-old mass public shooters display a preference for long guns, particularly semiautomatic, centerfire rifles—the category of long guns regulated under SB 61.  In fact, every mass public shooting perpetrated by an 18-20-year-old involved a long gun.

20.     As shown in Table 5 below, of the 10 individuals aged 18-20 who perpetrated a mass public shooting in the last 25 years, only two purchased a firearm in violation of aged-based purchasing restrictions, and those purchases were

---

[18] Source: Data on mass public shooting perpetrators, incidents, and deaths are drawn from Table 3.  Data on U.S. population are drawn from U.S. Census Bureau, Population and Housing Unit Estimates, *available at* https://www.census.gov/programs-surveys/popest.html.

Note: The age parameters for the two comparator groups were determined by the youngest and oldest mass public shooter in the CPRC data set (1998-2022), respectively, 11 and 66 years of age.  People under age 11 and over age 66 are excluded from the share of U.S. population percentages.  Minus signs ( - ) represent a percentage decrease.  Plus signs ( + ) represent a percentage increase.

made when the gunmen were 17 years old.[19]  The remaining 8 mass public shooters legally purchased their firearms, took their firearms from home, or used a firearm provided by their employer.  Since 1998, there are no examples of a mass public shooter, aged 18-20 at the time that they acquired their firearm(s), purchasing said firearm(s) in violation of state age restrictions.  That mass public shooters of this age demographic generally do not purchase their firearms in violation of age restrictions on 18-20-year-olds is *prima facie* evidence that they do not resort to underground markets to acquire weapons.  In turn, it appears that aged-based purchase laws have the potential to effectively restrict specific firearms in the numerous jurisdictions where they are in force.

21.    All of the above suggest that firearm purchasing restrictions on 18-20-year-olds have the potential to reduce mass shooting violence.

_____

[19] In both incidents—the 1999 Columbine high school massacre in Colorado and the 2007 Trolley Square Mall rampage in Utah—the law failed to prevent the illegal purchases, but it did allow authorities to prosecute the individuals who sold the firearms in violation of state law.  *See* Julie Cart, *Man Pleads Guilty to Selling Gun to Columbine Killers*, Los Angeles Times, August 19, 1999, *available at* https://www.latimes.com/archives/la-xpm-1999-aug-19-mn-1611-story.html (last accessed March 15, 2023); *Man Pleads Guilty to 2 Felony Charges for Helping Columbine Shooters Get Gun*, Los Angeles Times, May 9, 2000, *available at* https://www.latimes.com/archives/la-xpm-2000-may-09-mn-28068-story.html (last accessed March 15, 2023); Russ Rizzo, *A Guilty Plea in the Trolley Gun Deal*, Salt Lake Tribune, October 26, 2007, *available at* https://archive.sltrib.com/article.php?id=7285671&itype=NGPSID (last accessed March 15, 2023; Nate Carlisle, Trolley Square: Gun Seller Sorry, But Shooting Deaths "Not My Fault," *Salt Lake Tribune*, January 25, 2008, *available at* https://archive.sltrib.com/article.php?id=8073128&itype=NGPSID (last accessed March 15, 2023); *Man Linked to Mall Shootings Handgun Going to Prison*, KSL, May 22, 2008, *available at* https://www.ksl.com/article/3363775/man-linked-to-mall-shootings-handgun-going-to-prison (last accessed March 15, 2023).

**Table 5.  Mass Public Shooters Aged 18-20, 1998–2022[20]**

| | Date | Location | Age of Shooter | Type of Guns Used | Semi-Auto Center-Fire Rifle(s) Used | State Restricted 18-20-Year-Olds from Buying Type of Gun(s) Used at Time of Shooting | How Guns Were Acquired |
|---|---|---|---|---|---|---|---|
| 1 | 4/20/1999 | Columbine, CO | 18 | HG/LG | Yes | No | Illegally Purchased* |
| 2 | 2/12/2007 | Salt Lake City, UT | 18 | HG/LG | No | No | Illegally Purchased* |
| 3 | 10/7/2007 | Crandon, WI | 20 | LG | Yes | No | Provided by Employer |
| 4 | 12/5/2007 | Omaha, NE | 19 | LG | Yes | No | Taken from Home |
| 5 | 12/14/2012 | Newtown, CT | 20 | LG | Yes | No | Taken from Home |
| 6 | 9/23/2016 | Burlington, WA | 20 | LG | No | No | Taken from Home |
| 7 | 2/14/2018 | Parkland, FL | 19 | LG | Yes | No | Legally Purchased |
| 8 | 4/15/2021 | Indianapolis, IN | 19 | LG | Yes | No | Legally Purchased |
| 9 | 5/14/2022 | Buffalo, NY | 18 | LG | Yes | No | Legally Purchased |
| 10 | 5/24/2022 | Uvalde, TX | 18 | LG | Yes | No | Legally Purchased |

Note: HG = Handgun.  LG = Long Gun.

* One of the firearms purchased by Columbine High School shooter Eric Harris was an assault pistol (category: handgun).  Similarly, one the firearms purchased by Trolley Square Mall shooter Sulejman Talovic was a revolver (category: handgun). Both handguns were purchased in private transactions (i.e., not involving a federally-licensed firearms dealer) when Harris and Talovic were 17 years of age. At the time, both Colorado and Utah restricted the sale of handguns to individuals under the age of 18, making the sale of each handgun illegal under state law. However, neither Colorado nor Utah restricted private sales of handguns to individuals 18 years of age or older.  For this reason, the Columbine and Trolley Square incidents are still coded as illegal purchases even though Colorado and Utah are both states that do not restrict firearm sales to individuals ages 18 to 20.

---

[20] Source: CPRC, https://crimeresearch.org/wp-content/uploads/2023/01/Mass-Public-Shootings_Jan.-1-1998-to-Jan.26-2023.xlsx.

## V.    REBUTTAL TO DECLARATION OF JOHN LOTT

22.    In his expert declaration, which is devoted primarily to addressing mass shootings, John Lott (hereinafter "Lott") concludes that "no credible evidence exists to support the proposition that raising the age to purchase or acquire a firearm will make *any difference* in curtailing such mass shootings."[21]  Lott bases this conclusion on four claims: (1) "criminals do not buy their firearms legally"; (2) "even if all sources for obtaining firearms were closed off to people 18-20 years of age, it is unlikely that such laws would stop the vast majority of criminals in that age group from acquiring guns"; (3) "age is not a significant factor in mass public shootings"; and (4) "comparisons to crime statistics are skewed."[22]  Lott also devotes several pages discussing what he refers to as "unsupported justifications for the age-based gun ban."[23]  Each of these topics will be addressed in turn.[24]

23.    I should note at the outset that Lott has been accused of violating academic integrity standards by engaging in "research fraud."[25]  He also has a long history of employing questionable and faulty practices to advance arguments against firearms regulations, resulting in accusations that his gun violence research

---

[21] Declaration of John Lott in Support of Plaintiffs' Motion for Preliminary Injunction, *Jones v. Bonta*, Case No. 19-cv-01226-L-AHG (S.D. Cal. Nov. 11, 2019), ECF No. 21-17 (hereinafter "Lott Declaration"), at 3 (emphasis added).

[22] *Ibid.* at 3-10.

[23] *Ibid.* at 10-15.

[24] Throughout his declaration, Lott expresses a variety of personal opinions, including his views on constitutional law.  For purposes of this declaration, I will limit my rebuttal to Lott's empirical claims and evaluate the mass public shootings considered by Lott and compiled by his organization, the Crime Prevention Research Center.  For reasons unknown, Lott limits his analysis to mass public shootings since 1998.  As such, my rebuttal analysis of empirical data uses the same starting date: 1998.

[25] Jon Wiener, Historians in Trouble: Plagiarism, Fraud, and Politics in the Ivory Tower (2007) (relevant chapter attached as **Exhibit C**).

is "junk science."[26]  Lott's declaration in the present case suffers from similar problems.

24.     To begin with, Lott's claim that shooters do not purchase their firearms legally is patently false.  The 2016 U.S. Bureau of Justice Statistics Survey of Prison Inmates (SPI) that Lott cites in his declaration indicates that some perpetrators of crime do indeed acquire their firearms through legal means, including retail purchases.[27]  But, more to the point, the 2016 SPI does not disaggregate how prisoners of different age groups obtained their firearms.  The only age-based finding that the 2016 SPI reported was that the 18-24 age demographic (which includes the 18-20-year-old demographic that is of interest in the present case), when compared to older age groups, was the age group most likely to possess a firearm during the commission of their crimes.[28]  Moreover, this whole line of reasoning is undermined by the fact that the vast majority of mass shooters acquire their firearms legally—a fact which Lott acknowledged in his deposition in *Miller v. Bonta*.[29]

25.     Next, Lott asserts that "even if all sources for obtaining firearms were closed off to people 18-20 years of age, it is unlikely that such laws would stop

---

[26] Evan DeFilippis & Devin Hughes, *Shooting Down the Gun Lobby's Favorite 'Academic': A Lott of Lies*, Armed with Reason, Dec. 1, 2014, *available at* http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lott-of-lies (last accessed March 15, 2023); Piers Morgan, *Lawyer Alan Dershowitz on the Research of Author John Lott Jr.: 'Junk Science … Paid for by the National Rifle Association'*, CNN.com, July 24, 2012, *available at* http://piersmorgan.blogs.cnn.com/2012/07/24/lawyer-alan-dershowitz-on-the-research-of-author-john-lott-jr-junk-sciencepaid-for-by-the-national-rifle-association (last accessed March 15, 2023).

[27] *See* Lott's references to and reproductions of the 2016 U.S. Bureau of Justice Statistics survey.  *See* Lott Declaration, *supra* note 21, at 3-4, Ex. 2.

[28] *Ibid.*, Ex. 2 at 131.

[29] Transcript of Deposition of John R. Lott, Jr., *Miller v. Bonta*, Case No. 19-CV-1537-BEN-JLB (S.D. Cal. Jan. 22, 2021), at 215-16.

criminals in that age group from acquiring guns."[30]  In support of this claim, Lott references the murder rate in Mexico, which is completely irrelevant to assessing the effect of age restrictions on firearm crimes, especially mass shootings, in the United States.[31]  Lott offers no evidence related to gun crimes in the United States perpetrated by 18-20-year-olds, and more specifically to mass shootings in the United States perpetrated by 18-20-year-olds, to support his assertion.  In essence, Lott's claim is unsubstantiated and, as such, it is nothing more than speculation.[32]

26.  Lott also asserts that "age is not a significant factor in mass public shootings."[33]  Specifically, he notes that "of all mass public shootings over the past 21 years, the average age of the shooters is approximately 33.5 years."[34]  He adds, "Thirty-three (33) years of age is also the median age for shooters; therefore, more than half the shooters were over the age of 30."[35]  Based on the mean and median ages of mass public shooters, Lott concludes that "age is not determinative."[36]  This statement raises the question: of what exactly is age not determinative?  If Lott is claiming that most mass shootings are *not* committed by shooters aged 18-20, that

---

[30] Lott Declaration, *supra* note 21, at 4.  Lott writes that if "all sources were closed off," 18-20-year-olds would still find a way to obtain firearms.  *Ibid.*  This is logically impossible.  I assume Lott meant to argue that if all *legal* sources were closed off, 18-20-year-olds would still find a way to obtain firearms.  I respond to his claim with this assumption in mind.

[31] *Ibid.* at 4-5.

[32] As discussed above in Section IV, there is evidence that runs counter to this argument.

[33] Lott Declaration, *supra* note 21, at 5.

[34] *Ibid.*

[35] *Ibid.*  Lott fails to mention that, according to his own data set, the mode (or most frequently occurring) age for mass public shooters is 21.  *See* Table 3 for Lott's list of mass public shootings that have been perpetrated in the U.S. since January 1, 1998.

[36] Lott Declaration, *supra* note 21, at 5.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

is not in dispute—and I am aware of no scholar or analyst who has ever advanced the argument that, in absolute terms, the majority of mass shooters are between 18 and 20 years of age. If that is what Lott means by "age is not determinative," then his argument is a straw man argument. Regardless, at no point in his discussion of age groups in this section of his declaration does Lott provide a breakdown that distinguishes 18-20-year-old mass shooters from other mass shooters.[37]

27.    When Lott does review empirical evidence specific to acts of violence committed by the 18-20-year-old age demographic that is the focal point of the present case, he writes:

> [W]hile persons 18-to-20 commit murders at a higher rate comparatively, the same can be said of persons 21-to-25, who commit murders at a higher rate than people in the 26-30 age range. Persons 36-45 commit crimes at a considerably higher rate than those 46-50…. The same is true for persons 51-55, who commit crimes at a higher rate than do persons over 56. Same for persons 61-to-65—they commit crimes at a higher rate than do persons over 65. Similar findings were made by other researchers.[38]

This is arguably one of the strongest acknowledgements *in support of* California's position that legal restrictions on firearm purchases by 18-20-year-old individuals safeguard the public.

28.    As Lott also acknowledges in his demonstration regarding the race of mass public shooters, an appropriate and useful way to document the propensity of a demographic group to commit violence is to compare the share of violent crimes committed by the subject group to the share of the population for which it

---

[37] In his section on age as a factor in mass public shootings, Lott asserts that he is defining mass public shootings based on "the traditional FBI definition." *Ibid.* at 5, note 3. It is worth noting that there is no official FBI definition of mass shootings or mass public shootings, nor has there ever been one.

[38] *Ibid.* at 7.

accounts.[39]  This methodology allows for valuable comparisons to the remainder of the population.  Nevertheless, despite having access to data on the age of mass public shooting perpetrators, Lott only reports the share of mass shooters by race in relation to the racial distribution of the U.S. population.[40]  Given that this case concerns age-based restrictions, it is important to report the share of mass shootings perpetrated by 18-20-year-olds, in relation to their share of the U.S. population.  As documented in Section III, when such an analysis is performed, it shows that, in relation to their share of the population, 18-20-year-olds are substantially over-represented in mass shooting violence.

29.    Lott also advances several additional arguments in his declaration under an umbrella section titled "Unsupported Justifications for the Age-Based Gun

---

[39] *Ibid.* at 7-9.  Interestingly, Lott concludes that "the claim that [mass public] shooters are overwhelmingly white is misleading."  *Ibid.* at 7.  He reaches this conclusion because his data demonstrate, "[w]hile white males (*excluding those from Middle Eastern descent*) make up the majority of mass public shoot[ers], that is 6.4% below their share of the U.S. population."  *Ibid.* (emphasis added).  However, according to the U.S. Census Bureau, the racial composition of the U.S. population breaks down into five categories: White, Black or African American, American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander.  "Middle Eastern descent" is not a separate racial category.  The U.S. Census Bureau defines a White person as "a person having origins in any of the original peoples of Europe, the Middle East, or North Africa."  *See* U.S. Census Bureau, About the Topic of Race, *available at* https://www.census.gov/topics/population/race/about.html  (last accessed March 13, 2023).  If the data on the racial composition of mass public shooters that Lott presents in his declaration are recalculated so that people of "Middle Eastern descent" are counted as Whites, it results in a finding that White shooters are slightly over-represented in terms of the racial demographics of mass public shooters.  Lott Declaration, *supra* note 21, at 9.

[40] In his declaration, Lott provides a link to a blog post that he authored.  *Ibid.* at 8, note 8.  That blog post contains a link to the data set maintained by Lott's organization, the CPRC, on mass public shootings perpetrated in the U.S. since 1998.  Each of the incidents in that data set are coded for the age of each shooter.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

1  Ban."[41]  Some of his arguments are strictly legal conclusions, which I will not

2  address.  But three of his arguments are empirical ones, which warrant discussion.

3      30.    First, Lott asserts that "California's age-based gun ban will not result

4  in less crime."[42]  However, he offers no direct evidence in support of this assertion.

5  In indirect support of this assertion about age-based restrictions, Lott advances the

6  claim that "every place that has banned guns (either all guns or all handguns) has

7  seen murder rates go up."[43]  To begin with, there are numerous peer-reviewed

8  studies that counter this claim, including studies of places that Lott himself cites in

9  his declaration (e.g., Washington D.C.).[44]  In addition, and more to the point,

10  outright weapons bans are not the same as age-based restrictions on purchases and

11  transfers.  This apples-to-oranges comparison is tantamount to a red herring logical

12  fallacy.

13      31.    Second, in an effort to counter the argument that 18-20-year-olds

14  exhibit disproportionately higher "impulsive or reckless behavior," in comparison

15  to individuals older in age, Lott recommends an examination of the behavior of 18-

16  20-year-old concealed-carry permit holders.[45]  In particular, Lott discusses three

17  _____

18      [41] *Ibid.* at 10-15.

18      [42] *Ibid.* at 11.

19      [43] *Ibid.*

20      [44] Colin Loftin et al., *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 New Eng. J. Med. 1615 (1991), *available at* https://www.nejm.org/doi/full/10.1056/NEJM199112053252305 (last accessed March 15, 2023); David T. Johnson, *The Vanishing Killer: Japan's Postwar Homicide Decline*, 9 Soc. Sci. Japan J. 73 (2006), *available at* https://www.jstor.org/stable/30209794 (last accessed March 15, 2023); Simon Chapman et al. *Association Between Gun Law Reforms and Intentional Firearm Deaths in Australia, 1979-2013*, 316 JAMA 291 (2016), *available at* https://jamanetwork.com/journals/jama/fullarticle/2530362 (last accessed March 15, 2023).

28      [45] Lott Declaration, *supra* note 21, at 12.

states: Michigan, Nevada, and Texas.[46]  However, Lott sources and provides raw data only from Texas, emphasizing data for calendar year 2018.[47]  An examination of this data points to a disturbing trend that directly undermines Lott's argument. In 2018, 18-20-year-old concealed-carry permit holders in Texas had their permits revoked at a rate that was nearly 4.5 times the rate at which this age group was issued concealed-carry permits.[48]

32.    Third, Lott asserts, "Supporters of California's age-based gun ban have stated that mass public shootings carried out at schools are generally committed by people 'under 21'"—a purported claim that he dismisses as "misleading and inaccurate."[49]  In support of his position, Lott argues:

> Of the 74 people who have committed mass public shootings since 1998, 10 were under the age of 21.  Five were under 18, making them too young to purchase a gun under already existing law.  Further, even in the five cases where raising the age limit could conceivably have made an impact, it is likely that the shooters would have illegally obtained the firearm like so many other attackers do.[50]

Lott is again comparing apples to oranges.  The claim he was attempting to challenge was specific to mass public shootings *at K-12 schools*.  But the block quote above—which, notably, undercounts the number of mass public shooters

---

[46] *Ibid.* at 12-14.

[47] *Ibid.* Ex. 7.  In his review of 2018 data from Texas, Lott incorrectly observes that "0.015%" of concealed-carry permits held by 18-20-year-olds were revoked that year.  Actually, 1.6% of concealed-carry permits held by 18-20-year-olds were revoked by the state of Texas in 2018.  *Ibid.* at 12-13, Ex. 7.

[48] *Ibid.*, Ex. 7.  According to Texas statistics for 2018, 18-20-year-olds accounted for nine one-hundredths of all concealed-carry permits issued, but they accounted for forty one-hundredths of all concealed-carry permits revoked.  That is a difference of 4.44 times.  *Ibid.*

[49] *Ibid.* at 11.

[50] *Ibid.*

under the age of 21 in his own data set—addresses *all mass public shootings*.[51] Furthermore, as discussed above in Section III and displayed in Tables 3 and 4, Lott's own data show that mass shooters 18-20 years of age, as a group, are disproportionately over-represented in terms of their demographical share of the U.S. population, meaning that, on average, they are more likely to commit a mass public shooting and more likely to kill more victims than the comparator groups of mass public shooters aged 11-17 and 21-66.

33. When Lott does turn to school shootings, he writes, "Additionally, if one separates out school shootings, there were eight K-12 mass public shootings where at least four people were killed, but only three of those involved killers between the ages of 18 and 20 (Columbine, 1999; Newtown, 2012; and Parkland, 2018)."[52]  Again, Lott actually provides empirical support for California's position, because his data show that 38% of all mass public shootings at K-12 schools involved 18-20-year-old shooters.  In fact, updating Lott's data through 2022, which includes the massacre at Robb Elementary School in Uvalde, Texas, shows that 40% of all mass public shootings at K-12 schools were perpetrated by an age demographic that makes up approximately 4% of the entire U.S. population—a ten-fold difference.[53]

34. Finally, Lott's supposition that "it is likely that the shooters would have illegally obtained the firearm" if they could not legally obtain a firearm due to

---

[51] Lott's own updated data reflect that, from 1998 through 2022, ten—not five—mass public shooters were aged 18-20.  *See* Table 3.

[52] Lott Declaration, *supra* note 21, at 11.

[53] Lott also argues, "There was one of these [K-12 school shootings] on average every 2.7 years, and before this period, they were much rarer."  *Ibid.*  This too is a misplaced argument.  Legislatures typically address high-impact, low-frequency events, ranging from terrorist attacks to building collapses.  Whether rare or not, mass shootings, including those at K-12 schools, are extreme acts of violence that are often addressed as a threat to public safety.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

an age restriction is pure speculation, offered with no empirical foundation.[54]

Indeed, as shown in Table 5 above, of the 10 mass public shooters aged 18-20, only two purchased a firearm in violation of aged-based purchasing restrictions, and those purchases were made when the gunmen were 17 years old. The remaining 8 mass public shooters legally purchased their firearms, took their firearms from home, or used a firearm provided by their employer. Moreover, in the last 25 years, there are no examples of a mass public shooter, aged 18-20 at the time that they acquired their firearm(s), purchasing said firearm(s) in violation of state age restrictions.

## VI. REBUTTAL TO DECLARATION OF THOMAS B. MARVELL

35.     In his expert declaration, Thomas Marvell (hereinafter "Marvell") concludes that "[t]he impact of increasing [the] minimum age to purchase a firearm from 18 to 21 is difficult to determine because *very few states have made such a change*."[55] In reviewing Marvell's declaration, it is hard not to find this assertion perplexing. After all, 18 states plus the District of Columbia—which together account for 36% of all states and 46% of the total current U.S. population—presently have laws that impose restrictions on individuals 18 to 20 years of age who might seek to purchase firearms.[56] The suggestion that "very few states have

---

[54] *Ibid.*

[55] Declaration of Thomas B. Marvell in Support of Plaintiffs' Motion for Preliminary Injunction, *Jones v. Bonta*, Case No. 19-cv-01226-L-AHG (S.D. Cal. Nov. 11, 2019), ECF No. 21-5 (hereinafter "Marvell Declaration"), at 3 (emphasis added).

[56] The states that currently restrict certain firearm purchases by individuals aged 18-20 are: California, Connecticut, Delaware, Florida, Hawaii, Illinois, Iowa, Maryland, Massachusetts, Nebraska, New Jersey, New Mexico, New York, Ohio, Rhode Island, Vermont, Washington, and Wyoming, as well as the District of Columbia. Of these 19 jurisdictions, California, Delaware, Florida, Hawaii, Illinois, New York, Rhode Island, and Vermont restrict both handgun and long gun (continued…)

made such a change" does not seem to be reflective of the legal reality in the United States.

36.     Regardless, Marvell was able to offer his views on the issue, including reviewing studies on aged-based restrictions on firearm purchases.  Specifically, Marvell opined on (1) the nature of time-series-cross-sectional (TSCS) research design; (2) the literature on the relationship between minimum-age firearm restrictions and fatal gun violence (i.e., homicide, suicide, and unintentional death); and (3) the literature on the relationship between minimum-age firearm restrictions and mass shootings.  I address each of these three topics in turn.

37.     While TSCS and similar panel data methodologies are commonly employed to assess the effect of laws, it is worth noting that there are numerous methodologies employed in the social sciences and in the medical/public health fields which are also valuable in informing policy makers as to the impact of laws on behavioral outcomes (e.g., acts of gun violence).  In fact, Marvell concedes this in his declaration when he observes that some of the studies of Gary Kleck do not employ TSCS design.[57]  Just because a study does not employ TSCS design should not be a basis for discounting the usefulness of that study.  Indeed, as discussed

---

purchases.  While Washington does not restrict all long gun purchases, it does restrict the purchase of semiautomatic assault rifles in addition to handguns.  The other 10 jurisdictions restrict only handgun purchases.  *See* Giffords Law Center to Prevent Gun Violence, *Minimum Age To Purchase & Possess*, *available at* https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/minimum-age (last accessed March 15, 2023).  According to 2022 U.S. Census estimates, the 19 jurisdictions have a combined estimated population of 151,844,088.  The entire population of the U.S. (the 50 states plus the District of Columbia) is estimated to be 333,287,557.  As such, the 18 states plus the District of Columbia account for 46% of the entire U.S. population (151,844,088 ÷ 333,287,557 = 0.4556).  U.S. Census Bureau, State Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html (last accessed March 15, 2023).

[57] Marvell Declaration, *supra* note 55, at 2, 4-5.

above, analyses employing other methodologies can be valuable in understanding the relationship between laws and gun violence, including mass shootings.

38.    Marvell devotes most of his declaration to reviewing studies that address the relationship between minimum-age firearm restrictions and fatal gun violence.  He concludes that "there is *no* evidence that gun laws banning the purchase or possession of firearms based on age restrictions have the intended effect of reducing gun homicides and suicides."[58]  This is patently false.  There are studies that have found that age restrictions on firearm purchases have reduced some forms of gun violence and injury, particularly those acts committed by individuals under 21 years of age.  In fact, Marvell cites several of these studies in his declaration.[59]

39.    For instance, the 2015 Gius study found that "[y]outh suicide and unintentional death rates have declined dramatically since the early 1980s [and] the most significant declines came after 1994, the year when the Federal minimum age law took effect," setting 21 as the minimum age to purchase a handgun from a federally-licensed firearms dealer.[60]  Gius concluded that "Federal minimum age requirements reduce both suicides and unintentional deaths."[61]  Similarly, the 2011 Rodriguez Andres and Hempstead study found that "a ban on purchases by minors affects suicides particularly among younger males."[62]  And the 2004 Webster et al. study found that "[s]tate laws raising the minimum legal purchase age to 21 years were associated with a 9.0% decline in rates of firearm suicides among youth aged

---

[58] *Ibid.* at 2 (emphasis added).

[59] *See* the references to and reproductions of Gius 2015, Rodriguez Andres and Hempstead 2011, and Webster et al. 2004.  *Ibid.* at 5-7, Exs. 4, 5, 7.

[60] *Ibid.*, Ex. 4 at 55.

[61] *Ibid.*, Ex. 4 at 56.

[62] *Ibid.*, Ex. 5 at 64.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

18 through 20 years."[63]  All three peer-reviewed studies offer evidence that age-based restrictions on firearm purchases are associated with reduced suicides and unintentional deaths, including among the specific age demographic at issue in this case: 18-20-year-olds.

40.     Marvell attempts to dismiss studies that provide empirical support for California's position on methodological grounds.  As an example, Marvell explains in his declaration that statistical significance entails having a p-value that is less than or equal to .05.[64]  But Marvell then discounts the relevant finding of the Webster et al. study cited in the previous paragraph because it is "barely significant (at the .04 level, just below the .05 level that indicates significance)."[65]  First, despite setting the bar for statistical significance at the .05 level, Marvell "moves the goalposts" on this study published in the prestigious peer-reviewed Journal of the American Medical Association (JAMA) in an effort to undermine its findings (which are directly relevant to the present case).  To put what Marvell is asserting in perspective, it is akin to telling a student who earned an A+ because she scored a grade of 95—which is the minimum required score for an A+ grade—that she is not really an A+ student because 95 is just barely an A+.  Either a finding is statistically significant or it is not.  And the finding reported by Webster and his colleagues is statistically significant according to the .05 standard utilized by Marvell.  Second, not every scholar sets the significance bar at the .05 level.  Some studies, such as the Rodriguez Andres and Hempstead study, also report "marginal significance," using a p-value that is less than or equal to .10.[66]  At a minimum, this practice of using a broader standard merits acknowledgement.

---

[63] *Ibid.*, Ex. 7 at 81.

[64] *Ibid.* at 3.

[65] *Ibid.* at 7.

[66] *Ibid.*, Ex. 5.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

41.    Marvell's review of the literature on the relationship between minimum-age firearm restrictions and fatal gun violence is also plagued by a failure to provide his criteria for how he identified what he refers to as "the pertinent publications" on the topic.[67]  Generally, when reviewing relevant literature, scholars either cover the entire literature or, alternatively, they exclude certain studies based on a failure to meet specific inclusionary criteria.[68]  Marvell does neither.  As such, he has failed to review several studies of direct relevance to this case on the relationship between minimum-age firearm restrictions and gun violence, some of which lend support to California's position.[69]  This raises important methodological questions about the reliability of his review of the literature.

---

[67] *Ibid.* at 2.

[68] *See*, for example, the 2020 RAND study cited by Marvell.  *Ibid.* at 8, Ex. 10.  RAND identifies and applies specific criteria for determining which studies to include in its review.

[69] *See* Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. Pub. Health e49 (2015), *available at* https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2015.302703 (last accessed March 15, 2023); Stephanie R. Morain & Cassandra K. Crifasi, *Time to Pull the Trigger? Examining the Ethical Permissibility of Minimum Age Restrictions for Gun Ownership and Use*, 118 Preventive Medicine 205 (2019), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0091743518303487 (last accessed March 15, 2023); Caitlin A. Moe et al., *Association of Minimum Age Laws for Handgun Purchase and Possession with Homicides Perpetrated by Young Adults Aged 18 to 20 Years*, 174 JAMA Pediatrics 1056 (2020), *available at* https://jamanetwork.com/journals/jamapediatrics/article-abstract/2770131 (last accessed March 15, 2023); Paul S. Nestadt et al., *Prevalence of Long Gun Use in Maryland Firearm Suicides*, 7 Injury Epidemiology 4 (2020), *available at* https://injepijournal.biomedcentral.com/track/pdf/10.1186/s40621-019-0230-y.pdf (last accessed March 15, 2023); Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ m2436 (2020), *available at* https://www.bmj.com/content/bmj/370/bmj.m2436.full.pdf (last accessed March 15, 2023).

42.     Turning to the reduction of mass shooting violence, which is one of the primary legislative intents of the law being challenged, Marvell argues that "[m]ass shootings…are not common enough, in my opinion, to obtain useful research results concerning whether they are affected by age limits."[70]  He then adds that his opinion "is supported by" a 2019 working paper by Luca et al.[71]  Specifically, Marvell writes, "Luca et al. (2019) opine that mass shootings are not frequent enough to estimate the effects of gun policy on gun deaths."[72]  Marvell appears to have misunderstood the argument advanced by Luca and his colleagues.  Their point addresses the limitations involved in "using mass shootings as an *instrumental variable* to further study the impact of gun laws on gun deaths."[73]  An instrumental variable is a third variable that helps explain a correlation between a treatment and an outcome through its relationship to the treatment under study.  In the quote above taken directly from the Luca et al. paper, the treatment is represented by gun laws and the outcome is represented by gun deaths.  According to Luca et al., using mass shootings as instrumental variables to understand *gun deaths in general* is of limited benefit.

---

[70] Marvell Declaration, *supra* note 55, at 9.  For more information on the California Legislature's intent to reduce mass shooting violence through restrictions on the purchase of firearms by 18-20-year-olds, *see* the legislative histories of Senate Bills 1100 (2018) and 61 (2019).  *See* Cal. Legis. Info., Bill Analysis of SB 1100, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100 (last accessed March 15, 2023); Cal. Legis. Info., Bill Analysis of SB 61, *available at* https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61 (last accessed March 15, 2023).

[71] Marvell Declaration, *supra* note 55, at 9.

[72] *Ibid.* at 9.

[73] *Ibid.*, Ex. 11 at 354 (emphasis added).

43.    Marvell, on the other hand, appears to be arguing something different. He suggests that "[m]ass shootings…are not common enough…to obtain useful research results concerning whether *they* [i.e., mass shooting incidents] are affected by age limits."[74]  In other words, according to Marvell, mass shootings happen too infrequently to test whether age-based restrictions on firearm purchases reduce the *incidence* of mass shootings (as opposed to gun deaths in general).  Interestingly, the Luca et al. study that Marvell cites indicates that states that imposed firearm purchase restrictions on 18-20-year-olds appear to have experienced fewer mass shooting incidents than states that only imposed firearm purchase restrictions on individuals 17 years old or younger.[75]  While Luca et al. did not find this association to be statistically significant, it was nevertheless detected, leaving open the possibility that, with more comprehensive and more reliable data, our understanding of this relationship might be improved.[76]

---

[74] *Ibid.* at 9 (emphasis added).

[75] *Ibid.*, Ex. 11 at 381.

[76] One shortcoming with the Luca et al. study is that it relied heavily on FBI Supplementary Homicide Reports ("SHR") and the now discontinued Stanford Geospatial Center database on Mass Shootings in America for data during the period under study (1989-2014).  *Ibid.*, Ex. 11 at 337-338.  SHR data is notoriously flawed, with only about 60% of SHR mass murder data considered to be accurate. Paul Overberg et al., *USA Today Research Reveals Flaws in Mass-Killing Data*, USA Today, Dec. 3, 2013, *available at* https://www.usatoday.com/story/news/nation/2013/12/03/fbi-mass-killing-data-inaccurate/3666953 (last accessed March 15, 2023); Klarevas, Rampage Nation, *supra* note 1 at 66.  In addition, the Stanford data was skewed, missing many incidents that occurred between 1966-2010, in comparison to its far more comprehensive collection of incidents from 2011-2016.  Moreover, while the Luca et al. working paper was made publicly available in 2019, for reasons unknown, it only examined mass shootings that occurred between 1989 and 2014.  Had it covered incidents prior to 1989 and subsequent to 2014, it would have had a broader data set.

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

44.     Marvell seems to be setting up an argument that mass shootings are too infrequent and result in relatively few fatalities.  In fact, in the last paragraph of his declaration, Marvell states that mass shootings, as defined by the FBI, result in "fewer than 100" deaths annually.[77]  Therefore, Marvell appears to be implying that mass shootings need not be a policy priority.[78]  Clearly, such an argument reflects a personal opinion as opposed to a scholarly finding.  Nevertheless, suggestions like this evoke the words of Professor Nate Holdren, who reminds us that a "person of conscience" should avoid using "a ruler to argue that what they see before them is in fact a short and not a tall stack of corpses."[79]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 15, 2023, at Nassau County, New York.



Louis Klarevas

---

[77] Marvell Declaration, *supra* note 55, at 9.  Another problem with Marvell's declaration is that he maintains, like Lott does, that there is an official FBI definition of mass shootings.  He writes, "For clarity, I'm using the same definition of "mass shooting" as used in Luca, et al. (2019), *which also closely matches the one used by the Federal Bureau of Investigation.*"  *Ibid.* (emphasis added).  As noted in Section V, there is no official FBI definition of mass shootings, nor has there ever been one.

[78] As noted above, *supra* note 53, Lott makes a similar argument.

[79] Nate Holdren, *Pandemic Nihilism, Social Murder, and the Banality of Evil*, Bill of Health (Harvard Law School Blog), September 19, 2022, *available at* https://blog.petrieflom.law.harvard.edu/2022/09/19/pandemic-nihilism-social-murder-and-the-banality-of-evil (last accessed March 15, 2023).

Declaration of Louis Klarevas (3:19-cv-01226-L-AHG)

1

# TABLE OF CONTENTS

2

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Louis Klarevas Curriculum Vitae | 1-21 |
| B | Figure 1, Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022 | 22-23 |
| C | Excerpt, Jon Wiener, Historians in Trouble: Plagiarism, Fraud, and Politics in the Ivory Tower (2007) | 24-36 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

# Louis J. Klarevas
**Email: ljk2149@tc.columbia.edu**

**Education**

Ph.D.   International Relations, 1999
School of International Service
American University
Washington, DC

B.A.   Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

**Author**

*Rampage Nation: Securing America from Mass Shootings*

**Current Positions**

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia
University, New York, NY, 2019-Present

**Professional Experience**

*Academic Experience (Presented in Academic Years)*

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston,
Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies,
University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs,
New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York,
NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Exhibit A
Page 2

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

_Professional Experience (Presented in Calendar Years)_

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

Exhibit A
Page 4

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey,*" *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

## Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

Exhibit A Page 6

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

6

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007


**Commentaries Written for _The Huffington Post_ – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

Exhibit A
Page 8

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009


**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011


**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)


**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Preventive Medicine*

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

14

**Service to University, Profession, and Community**

Participant, Minnesota Chiefs of Police Association, Survey of Measures to Reduce Gun Violence, 2023

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

16

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

**Expert Witness Service**

Expert for State of Hawaii, *National Association for Gun Rights, et al. v. Shikada*, United States District Court for the District of Hawaii, Case Number 22-cv-00404-DKW-RT, Honolulu, HI, 2023-

Expert for State of Hawaii, *Abbott v. Lopez*, United States District Court for the District of Hawaii, Case Number 20-cv-00360-RT, Honolulu, HI, 2023-

Expert for State of Illinois, *Harrel v. Raoul*, United States District Court for Southern District of Illinois, Case Number 23-cv-141-SPM, East St. Louis, IL, 2023-

Expert for State of Illinois, *Langley v. Kelly*, United States District Court for Southern District of Illinois, Case Number 23-cv-192-NJR, East St. Louis, IL, 2023-

Expert for State of Illinois, *Barnett v. Raoul*, United States District Court for Southern District of Illinois, Case Number 23-cv-209-RJD, Benton, IL, 2023-

Expert for State of Illinois, *Federal Firearms Licensees of Illinois v. Pritzker*, United States District Court for Southern District of Illinois, Case Number 23-cv-215-NJR, East St. Louis, IL, 2023-

Expert for State of Illinois, *Herrera v. Raoul*, United States District Court for Northern District of Illinois, Case Number 23-cv-532, Chicago, IL, 2023-

Expert for State of Oregon, *Oregon Firearms Federation, Inc., et al. v. Kotek, et al.*, United States District Court for the District of Oregon, Case Number 22-cv-01815-IM, Portland, OR, 2023-

Expert for State of Oregon, *Fitz, et al. v. Rosenblum, et al.*, United States District Court for the District of Oregon, Case Number 22-cv-01859-IM, Portland, OR, 2023-

Expert for State of Oregon, *Eyre, et al. v. Rosenblum, et al.*, United States District Court for the District of Oregon, Case Number 22-cv-01862-IM, Portland, OR, 2023-

Expert for State of Oregon, *Azzopardi, et al. v. Rosenblum, et al.*, United States District Court for the District of Oregon, Case Number 22-cv-01869-IM, Portland, OR, 2023-

Expert for State of Connecticut, *National Association for Gun Rights, et al. v. Lamont, et al.*, United States District Court for the District of Connecticut, Case Number 22-cv-01118-JBA, Hartford, CT, 2023-

Expert for State of Massachusetts, *National Association for Gun Rights and Capen v. Campbell*, United States District Court for the District of Massachusetts, Case Number 22-cv-11431-FDS, Boston, MA, 2023-

Expert for City of Highland Park, Illinois, *National Association for Gun Rights and Goldman v. Highland Park*, United States District Court for Northern District of Illinois, Case Number 22-cv-04774, Chicago, IL, 2022-

Expert for State of Colorado, *Gates, et al. v. Polis*, United States District Court for District of Colorado, 22-cv-01866-NYW-SKC, Denver, CO, 2022-

Expert for State of Washington, *Brumback and Gimme Guns v. Ferguson, et al.*, United States District Court for Eastern District of Washington, Case Number 22-cv-03093-MKD, Yakima, WA, 2022-

Expert for State of Washington, *Sullivan, et al. v. Ferguson, et al.*, United States District Court for Western District of Washington, Case Number, 22-cv-05403-DGE, Seattle, WA, 2022-

Expert for State of California, *Rupp v. Bonta*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2022-

Expert for County of Cook, Illinois, *Viramontes v. County of Cook, IL,* United States District Court for Northern District of Illinois, Case Number 21-cv-04595, Chicago, IL, 2022-

Expert for Government of Canada, *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20, 2021-

Expert for Government of Canada, *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20, 2021-

Expert for Government of Canada, *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20, 2021-

Expert for Government of Canada, *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20, 2021-

Expert for Government of Canada, *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20, 2021-

18

Expert for Government of Canada, *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20, 2021-

Expert for State of California, *Nguyen v. Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v. Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-2019

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Branas and Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

Exhibit A
Page 21

# EXHIBIT B



Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)

# EXHIBIT C

**Exhibit C**
**Page** 24

Also by Jon Wiener

*Gimme Some Truth: The John Lennon FBI Files*
*Come Together: John Lennon in His Time*
*Professors, Politics, and Pop*
*Social Origins of the New South*

# Historians in Trouble

## Plagiarism, Fraud, and Politics
in the Ivory Tower

JON WIENER



**THE NEW PRESS**

NEW YORK
LONDON

Exhibit C
Page 25

© 2005 by Jon Wiener
All rights reserved.
No part of this book may be reproduced, in any form, without
written permission from the publisher.

Requests for permission to reproduce selections from this book should be
mailed to: Permissions Department, The New Press, 120 Wall Street,
31st floor, New York, NY 10005.

Originally published in the United States
by The New Press, New York, 2005
This edition published by The New Press, 2007
Distributed by Two Rivers Distribution

ISBN 978-1-59558-852-4 (ebook)

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA

Wiener, Jon.
  Historians in trouble : plagiarism, fraud, and politics in the ivory tower / Jon Wiener.
    p. cm.
  Includes bibliographical references and index.
  ISBN 978-1-56584-884-9 (hc)
  ISBN 978-1-59558-159-4 (pbk)
    1. Historians–United States–Biography. 2. Historians–Press coverage–United
  States–Case studies. 3. Professional ethics–United States–Case studies. 4. Mass
  media–Political aspects–United States–History–20th century. 5. Power (Social
  sciences)–United States–Case studies. 6. Historiography–Political aspects–United
  States–History–20th century. 7. Plagiarism–United States–History–20th century. 8.
  Fraud–United States–History–20th century. 9. United States–Historiography. I.
  Title.

E175.45.W54 2005
302.23–dc22                                              2004050431

The New Press publishes books that promote and enrich public discussion and
understanding of the issues vital to our democracy and to a more equitable world.
These books are made possible by the enthusiasm of our readers; the support of a
committed group of donors, large and small; the collaboration of our many partners in
the independent media and the not-for-profit sector; booksellers, who often hand-sell
New Press books; librarians; and above all by our authors.

www.thenewpress.com

*Composition by Westchester Book Composition*

Printed in the United States of America

# Contents

Acknowledgments    vii

Introduction: Historians in Trouble    1

I.  Presidential Nominees    11

1.  Feminism and Harassment: Elizabeth Fox-Genovese
    Goes to Court    13

2.  The Alger Hiss Case, the Archives, and
    Allen Weinstein    31

3.  Facing Black Students at Harvard:
    Stephan Thernstrom Takes a Stand    58

II.  Targeted by the Right    71

4.  *Arming America* and "Academic Fraud"    73

5.  David Abraham and the Nazis    94

6.  Mike Davis and Power in Los Angeles    106

III.  Misconduct Without Media Spectacle    117

7.  The Denmark Vesey "Trial Record":
    A New Verdict    119

8.  John Lott, Gun Rights, and Research Fraud    136

Exhibit C
Page 26

# 8

# *John Lott, Gun Rights, and Research Fraud*

*T*he book has been called "the bible of the gun lobby": *More Guns, Less Crime* by John R. Lott Jr., published in 1998 by the prestigious University of Chicago Press. It has sold 100,000 copies and presents what purports to be statistical evidence showing that states that permit citizens to carry guns have lower crime rates. The book has been the key document in persuading states to pass what are called "concealed carry" gun laws—laws requiring authorities to issue a permit to carry concealed weapons to any qualified applicant who requests one. Thirty-five states have done so—most recently Minnesota, where Lott's arguments provided key ammunition for Republican gun advocates.[1] "Were Lott to be discredited," Chris Mooney wrote in *Mother Jones,* "an entire branch of pro-gun advocacy could lose its chief social scientific basis."[2]

Gun control advocates had presented strong evidence that most guns in the home are used on family members rather than intruders; Lott needed to refute that argument. His case rests entirely on statistics, and at the beginning of the book, Lott gives readers one of his strongest statistics: "98 per cent of the time that people use guns defensively, they merely have to brandish a weapon to break off an attack."[3] You didn't have to shoot a gun to fend off a criminal; merely displaying it did the trick. That 98 percent was an astounding figure—and one that now seems fraudulent. Yet the mainstream media, which showed so much dedication to charges that Michael Bellesiles's research was fraudulent, showed almost no interest in similar charges against Lott.

The first edition of the Lott book, published in May 1998, gave the vaguest possible source for the 98 percent figure: "national surveys."[4] Lott had given a more specific source in a *Wall Street Journal* opinion piece published in July 1997: "Other research shows that guns clearly deter criminals. Polls by the *Los Angeles Times,* Gallup and Peter Hart Research Associates show that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98 per cent of the cases, such polls show, people simply brandish the weapon to stop an attack." That was untrue—none of those polls showed what he claimed they did. But he repeated that statement in op-ed pieces published in the *Chicago Tribune,* the *Los Angeles Times,* the *Chicago Sun-Times,* the *Dallas Morning News,* and in testimony before the House Judiciary Committee.[5]

Then critics began to question Lott's figure. In the lead was Otis Dudley Duncan, a retired sociologist at the University of California,

Exhibit C
Page 27

Santa Barbara, who first raised questions in the January 2000 issue of *The Criminologist*.[6] In response to the critics, when the second edition of Lott's book was published later in 2000, Lott cited a completely different and new source: "a national survey I conducted."[7] For three years before this, Lott had never mentioned a national survey he conducted—he had always said the 98 percent figure came from other people's surveys.

At this point, James Lindgren, the Northwestern University law professor who had done an immense amount of work checking Bellesiles's footnotes, decided to take up the issue after reading critiques from Duncan and Tim Lambert, director of the Program in Computer Science at the University of New South Wales (who now maintains a website devoted to the Lott case).[8] When Lindgren asked Lott about the national survey Lott claimed to have done, Lott told him that he lost all the data—on 2,424 people—in a computer crash.[9]

Lindgren saw this claim for what it was: "all evidence of a study with 2,400 respondents does not just disappear when a computer crashes," he wrote on his website in September 2001.

Having done one large survey (about half the size of John Lott's) and several smaller surveys, I can attest that it is an enormous undertaking. Typically, there is funding, employees who did the survey, financial records on the employees, financial records on the mailing or telephoning, the survey instrument, completed surveys or tally sheets, a list of everyone in the sample, records on who responded and who declined to participate, and so on. While not all of these things might be preserved in every study, some of them would usually be retained or recoverable. Just to get a representative list of the US public would take consultation with an experienced sampler and probably the purchase of an expensive sample. As far as I know, there was no cheap commercial list of almost every person or household in the United States from which to draw a good sample.[10]

But John Lott had none of this: no funding, no records of employees or phone calls, no tally sheets, no consultants, nothing. He told Lindgren the phone calls had been made by undergraduate volunteers who he had not paid. He said he couldn't remember the names of any of them. He said he had no phone records because the student volunteers called from their own phones. He said he reimbursed them out of his own pocket for the phone calls they made, but kept no record of his expenses. He didn't have a copy of his survey instrument and didn't remember the wording of the questions. As for the sample, he told Lindgren he drew it off a CD-ROM, but he didn't have the CD-ROM and didn't remember where he got it.

In a last-ditch attempt to come up with evidence that the survey had indeed been conducted, Lindgren suggested e-mailing all former students who might have worked on it—students at the University of Chicago in the classes of 1997 and 1998—to see if any remembered it, because "getting 2,424 respondents with refusals and callbacks would have required thousands and thousands of phone calls. Students would have had to spend many hours calling, which they and their friends would well remember." But Lott objected to this effort, Lindgren wrote, raising "serious questions about how complete

Exhibit C
Page 28

the University's alumni records are." At that point Lindgren stopped, explaining that "my part in this affair is essentially done."[11]

Lott did provide one piece of direct evidence that he did the national survey—one person who said he had been telephoned as part of it. That person is David M. Gross, a Minnesota attorney who is also a former board member of the National Rifle Association and founding director of the Minnesota Gun Owners Civil Rights Association.[12] It seems extremely unlikely, to put it charitably, that he would turn up in a random sample of a few thousand people out of the 300 million Americans.

The conclusion seemed obvious: Lott had never done the national survey. He was lying.[13]


You might think that research fraud in the bible of gun rights owners would be a big story in the American media. But, in fact, it got almost no play. Lott did get fifteen minutes of fame in the mainstream media; however, that coverage focused not on his fraudulent statistics, but rather on the amusing story of his fictional web persona. The story was told beautifully by Richard Morin of the *Washington Post*:

> Mary Rosh thinks the world of John R. Lott Jr., the controversial American Enterprise Institute scholar whose book *More Guns, Less Crime* caused such a stir a few years ago.
>
> In postings on Web sites in this country and abroad, Rosh has tirelessly defended Lott against his harshest critics. He is a meticulous researcher, she's repeatedly told those who say otherwise. He's not driven by the ideology of the left or the

right. Rosh has even summoned memories of the classes she took from Lott a decade ago to illustrate Lott's probity and academic gifts.

> "I have to say that he was the best professor I ever had," Rosh gushed in one Internet posting.
>
> Indeed, Mary Rosh and John Lott agree about nearly everything.
>
> Well they should, because Mary Rosh is John Lott.[14]

Lott quickly admitted he was guilty.

What's significant here is that the *Washington Post* coverage focused not on scandal around the fraudulent statistic that opens the influential book, but rather on the humorous story of the professor with the "cyber sock puppet." The report ran not as a news story about fraudulent gun research or a book story about a dishonest author, but rather in the *Post*'s "Style" section.

Even the *Chronicle of Higher Education* story on Lott was headlined "Scholar's most vigorous defender turns out to be himself, pseudonymously." The story surfaced in the *New York Times* in a cartoon in the *Book Review,* where Mark Alan Stamaty made fun of both Lott and Michael Bellesiles, starting with three panels where Bellesiles says (in Stamaty's words), "the data that backs up my thesis was destroyed in an office flood! HONEST!" This panel was followed by a slightly smaller one devoted to John Lott saying about his data "I had it in my computer, but my computer crashed and I lost it. HONEST!" Then came three more panels on Lott's "Mary Rosh" story.[15] That cartoon in the *Book Review* was the only coverage that Lott's research fraud received in the *New York Times.* (There

Exhibit C
Page 29

were a few exceptions elsewhere in the media, which deserve credit: Timothy Noah writing in *Slate,* Ron Grossman in the *Chicago Tribune,* and especially Chris Mooney in *Mother Jones*).[16]

Lott defended himself in a letter published by the *Washington Post* in March 2003, where he said he was responding to an article that "questioned the existence of a 1997 survey that was used" in his book. Of course, he could have put it more directly, and without the passive voice: he could have written, "Critics questioned the existence of a 1997 survey I claim to have conducted." In his letter, he minimized the problem: "My discussion of the survey actually involved only one number in one sentence." Here "the survey" seems to exist. But "the bottom line is that I lost data for most of my various research projects, as well as the files for my book 'More Guns, Less Crime,' in a computer crash in July 1997."[17] There's a significant omission here: Lott does not say he lost the data for the 1997 survey he claims to have conducted—only that he lost the data for "most" of his research. And of course the critics by this time had been asking not only for the data, but the sample, the survey instrument, the names of the people who made the calls, the financial records of the project, the tally sheets, etc.—questions Lott knew well.

The letter continued, "With the help of other scholars . . . the massive data sets using county and state level crime data were reconstructed." However, that wasn't the data cited in the 1997 survey. The data whose existence was questioned by critics purported to describe a national telephone survey of gun brandishing, not crime data from counties and states.

"Academics have confirmed my hard-disk crash," he wrote in his letter to the *Washington Post*. But no one said he lied about a computer crash; they said he lied about having conducted a massive national telephone survey. The same unnamed "academics" are also described as having "confirmed . . . discussions that I had back in 1996 and 1997 regarding the survey." But when Duncan and Lambert examined these claims, they found that, while a couple of colleagues remembered discussing surveys in general with him, they did not recall discussing in 1997 a survey that Lott told them he himself was conducting. For example one of Lott's co-authors declared, "John told me that he had conducted a survey in 1997"—but significantly, that's not the same as "John told me in 1997 that he was conducting a survey."[18]

"There is also verification by a participant in the survey," Lott wrote. But this "participant" was that Minnesota attorney, the founding director of the Minnesota Gun Owners Civil Rights Association who claimed that, out of 300 million Americans, he received a random call from Lott's researchers.

Lott then declared in his letter to the *Post,* "I redid the survey last year and obtained similar results." However, doing a new survey does not establish that he told the truth when he wrote that he had conducted the "old" survey.

He wrote in the *Post,* "This data set and all the other data used in my new book, 'The Bias against Guns,' have also been made available to anyone who requests them at www.johnlott.org." At that website, he refers to "my two surveys" and repeats—twice—that "unfortunately the original 1997 sample was lost in a computer hard

Exhibit C
Page 30

disk crash."[19] So the data is not available at the website, as promised in the *Post.* Thus, even in Lott's most recent work, he continues to make fraudulent claims about a survey he says he conducted.

On his website, he claims he never attributed the 98 percent figure to polls conducted by others—an attribution cited by his critics as evidence that he never conducted a survey himself. Here's what he wrote in several op-eds: "Polls by the *Los Angeles Times,* Gallup and Peter Hart Research Associates show that there are at least 760,000, and possibly as many as 3.6 million, defensive uses of guns per year. In 98 percent of the cases, such polls show, people simply brandish the weapon to stop an attack." At his website, he declares that the phrase "such polls" was "merely referring back to this type of polls and not those specific polls."[20] Of course, if there were other such polls, which showed what he claimed they did, then he should have named and cited those. You could call this discussion of the phrase "such polls" a misunderstanding of the English language, or you could call it a pathetic attempt at deception.

Lott continues to come up with arguments and defenses similar to this—when Chris Mooney interviewed him for *Mother Jones* for a September 2003 piece, Lott sent a blizzard of charts, tables, and e-mails with ever-shifting data sets and increasingly convoluted arguments.

Lott and his defenders argue that the 98 percent figure is not crucial to the argument in *More Guns, Less Crime*; it's true that the book contains many other more relevant statistics. Harvard economist David Hemenway explained what's wrong with that argument: one must have "faith in Lott's integrity" in order to accept the other statistical arguments he makes.[21]

What about the more relevant statistics supporting Lott's argument in *More Guns, Less Crime*? Lott had presented what he said was data on gun ownership and crime from all 3,054 U.S. counties from 1977 to 1992, which he said proved that the states with "concealed carry" laws had significantly lower rates of violent crime, especially rape and murder. Concealed handguns, Lott wrote, were "the most cost-effective method of reducing crime thus far analyzed by economists."[22] But two scholars writing in the *Journal of Legal Studies* conclude that small changes in Lott's data and statistical methodology produced drastically different results. In particular, if Florida was removed from the analysis, the evidence that concealed weapons reduced murder and rape disappeared completely.[23]

New research suggests Lott's thesis in *More Guns, Less Crime* is wrong: "concealed carry" laws do not reduce crime. The most important work on the topic appeared in the *Stanford Law Review,* which drew on more years of data and a slightly different methodology. The authors, Ian Ayres of the Yale Law School and John Donohue of Stanford Law School, concluded, "No longer can any plausible case be made on statistical grounds that shall-issue laws are likely to reduce crime for all or even most states." They found, on the contrary, that "concealed carry" laws might cause crime to increase.[24]

Unlike Bellesiles, Lott is not subject to academic sanction for research fraud because he does not currently hold an academic position. Indeed his academic career suggests that scholars don't consider his work to merit an academic position. He has held positions briefly at more than half a dozen universities, none of which decided to keep him. The pattern of his career is revealing: after

Exhibit C
Page 31

earning a Ph.D. in economics at UCLA, he started out with a series of "visiting assistant professor" jobs at Texas A&M (1984–86), Rice, and UCLA's School of Management. Then he got a tenure track assistant professorship at the Wharton School at Penn, where he spent four years (1991–95) but failed to get tenure. He then went back to being a visiting assistant professor, this time at the University of Chicago business school (1994–95). At this point, it had been nine years since he started in his first academic job, which meant he should have qualified for a tenured position somewhere. But he didn't. Instead, he was rescued by the Olin Foundation, the right-wing organization that has funded dozens of conservative ideologues on college campuses,[25] and which gave him a four-year law and economics fellowship at the University of Chicago law school, where he wrote *More Guns, Less Crime*. That got him a position at Yale law school—not as a faculty member but as something called "senior research scholar." But things didn't pan out at Yale, and he ended up at the American Enterprise Institute in Washington D.C.[26]

The key fact for our purposes is that the mainstream media ignored what should have been a major story about research fraud in the bible of gun rights. A search of the Nexis database for "Lott" and "fraud" turns up a total of three articles that mention the fact that Lott has been accused of fraud: the *Chicago Tribune,* the *Chronicle of Higher Education,* and the *Washington Monthly*. (To that list should be added Timothy Noah in *Slate*.) Notably missing: the *New York Times,* the *Washington Post,* and the many newspapers that published

Lott's op-eds with the fraudulent claims: the *Wall Street Journal,* the *Los Angeles Times,* the *Chicago Sun-Times,* and the *Dallas Morning News,* among others.

In contrast, Nexis lists sixty-one news articles that link "Michael Bellesiles" and "fraud."[27]

The University of Chicago Press website continues to feature the Lott book prominently, with glorious blurbs from Milton Friedman, the *Wall Street Journal,* and *Business Week*; the press website contains no hint that the key statistic on page three of the book has been shown to be fraudulent.[28] In contrast, Vintage decided not to publish a second corrected edition of Bellesiles's book.

Lott is not a historian; he was trained as an economist. But because problems in his work have been compared so often with that of Bellesiles, it's appropriate to include his work here. Lott is defended by some of the same people who attacked Bellesiles, and he's been described by others as "the Bellesiles of the right."[29] Several writers have argued Lott and Bellesiles committed the same offense—research fraud. They make the same argument about Lott's missing study of gun brandishing and Bellesiles's flawed Table 1 about guns in probate records: since each author got one key piece of research wrong, how can we trust the rest of his work?

But the cases are different. There is no credible evidence that Lott ever did the national survey he claims to have done. In contrast, Bellesiles did research on the guns listed in probate records; where his figures were disputed, he returned to the archives in question, and in the second edition of his book, published a revised version of the flawed table; he also posted disputed probate documents on his website so that interested people can examine them.

Exhibit C
Page 32

Lott's website, in contrast, continues to make the claims shown to have been fraudulent.

What then explains the difference between the media treatment of Bellesiles and Lott? And what explains the fate of each? The charges in both cases were equally serious. The venues in which the debates took place were equally scholarly. The defense offered by Bellesiles was considerably more substantive and convincing than Lott's. The one great difference between the two cases is in the actions of the gun lobby. They mounted a massive campaign to destroy Bellesiles: to pressure Emory University to fire him, to demand that his publisher withdraw the book, and to insist that Columbia University withdraw the Bancroft Prize. But with Lott, the gun control lobby didn't mount any public campaign, didn't exert any pressure, didn't make any demands—didn't even demand that the newspapers that published Lott's fraudulent claims publish corrections. And no newspaper ever published a correction. Lott's critics were limited to scholars and journalists who restricted their efforts to the world of scholarly journals and a few news outlets like *Mother Jones* and *Slate.* Gun control advocates remained polite and reasonable, while the gun lobby shouted its demands.[30]

# IV

# Other Media Spectacles

Exhibit C
Page 33

12. Ibid., 933.

13. Ibid., 934.

14. Pearson, "Trials and Errors," 139.

15. Johnson, "Denmark Vesey," 956, quoting Lionel H. Kennedy and Thomas Parker, eds., *An Official Report of the Trials of Sundry Negroes, Charged with an Attempt to Raise an Insurrection in the State of South Carolina: Preceded by an Introduction and Narrative; and, in an Appendix, A Report of the Trials of Four White Persons on Indictments for Attempting to Excite the Slaves to Insurrection* (Charleston, 1822), 17.

16. Johnson, "Denmark Vesey," 933, 938, 956.

17. Ibid., 938, quoting Thomas Bennett, Jr., Message No. 2 to the Senate and House of Representatives of the State of South Carolina, November 28, 1822, Governor's Messages, 1328, General Assembly Papers, South Carolina Department of Archives and History.

18. Johnson, "Denmark Vesey," 936, quoting "Melancholy Effect of Popular Excitement," *Charleston Courier,* June 21, 1822.

19. Johnson, "Denmark Vesey," 936, quoting "Communication," *Charleston Courier,* June 29, 1822.

20. Johnson, "Denmark Vesey," 939.

21. Lou Morano, "The Slave Uprising That Wasn't," *United Press International,* November 7, 2001. Read online via Lexis-Nexis, March 2004.

22. William Johnson to Thomas Jefferson, August 11, 1823, in *South Carolina Historical and Genealogical Magazine* 1 (July 1900), 212, quoted in Robert L. Paquette, "Jacobins of the Low Country: The Vesey Plot on Trial," *William and Mary Quarterly* 59:1 (January 2002), 186.

23. Johnson, "Denmark Vesey," 971.

24. Douglas R. Egerton, "Forgetting Denmark Vesey; Or, Oliver Stone Meets Richard Wade," *William and Mary Quarterly* 59:1 (January 2002), 143–52; David Robertson, "Inconsistent Contextualism: The Hermeneutics of Michael Johnson," *William and Mary Quarterly* 59:1 (January 2002), 153–58; Edward Pearson, "Trials and Errors: Denmark Vesey and His Historians," *William and Mary Quarterly* 59:1 (January 2002), 137–42. For these historians' previous work on Vesey, see Douglas R. Egerton, *He Shall Go Out Free: The Lives of Denmark Vesey* (Madison, Wisconsin: Madison House, 1999); David Robertson, *Denmark Vesey* (New York: Alfred A. Knopf, 1999); Pearson, ed., *Designs against Charleston.* Pearson followed his apology with an argument that "even though my transcription of the trial document is inaccurate, the accompanying analysis . . . stands, I believe, as a sound piece of scholarship." Pearson, "Trials and

Errors," 139. Robert L. Paquette, "Jacobins of the Lowcountry: The Vesey Plot on Trial," *William and Mary Quarterly* 59:1 (January 2002), 185–92.

25. Winthrop Jordan, "The Charleston Hurricane of 1822; Or, the Law's Rampage," *William and Mary Quarterly* 59:1 (January 2002), 175, 178.

26. Philip D. Morgan, "Conspiracy Scares," *William and Mary Quarterly* 59:1 (January 2002), 160, 166.

27. Drew Gilpin Faust, telephone interview with author, February 2002.

28. James Sidbury, "Plausible Stories and Varnished Truths," *William and Mary Quarterly* 59:1 (January 2002), 179.

29. Peter Wood, telephone interview with author, February 2002.

30. Michael Johnson, telephone interview with author, February 2002.

31. Jason Hardin, "Experts on Vesey Still Agree to Disagree," *Charleston Post and Courier,* March 25, 2001, B1.

32. Jacqueline Jones, Peter H. Wood, Elaine Tyler May, Thomas Borstelmann, and Vicki L. Ruiz, *Created Equal: A Social and Political History of the United States* (New York: Longman, 2003), 379.

33. Dinitia Smith, "Challenging the History of a Slave Conspiracy," *New York Times,* February 23, 2002, B11. Also, I published an article about it: Jon Wiener, "Denmark Vesey: A New Verdict," *The Nation,* March 11, 2002, 21–24.

34. Joanne Meyerowitz, editor of the *JAH,* e-mail to author, June 27, 2003; "Historical Notes and Notions," *Journal of Southern History* 69:4 (November 2003), 1017; John Bowles, editor of the *JSH,* e-mail to author, June 27, 2003. The reviewer, Barbara Bellows, had not published any reconsideration in the *JSH* as of the February 2004 issue.

35. Edward Pearson, e-mail to author, March 10, 2004.

## 8. John Lott, Gun Rights, and Research Fraud

1. Bob von Sternberg, "Tough to Gauge: Concealed-Carry's Goal Is Less Crime, but There's No Consensus on Effect," *Minneapolis Star Tribune,* April 25, 2003, 1.

2. The report of 100,000 copies appears in Chris Mooney, "Double Barreled Double Standards," *Mother Jones,* September–October 2003, www.motherjones.com/news/feature/2003/10/we_590_01.html (accessed February 2, 2004). For a list of the states with "concealed carry" gun laws, see the website with the enthusiastic name "Packing.org": www.packing.org/state/report_basic.jsp?search=shall_issue (accessed March 17, 2004).

Exhibit C
Page 34

3. John R. Lott Jr., *More Guns, Less Crime* (Chicago: University of Chicago Press, 1998), 3.

4. Ibid.

5. John R. Lott Jr., "Childproof Gun Locks: Bound to Misfire," *Wall Street Journal,* July 16, 1997, A22; Lott, "Childproof Gun Locks: Bound to Misfire," *Chicago Tribune,* August 6, 1998; Lott, "Unraveling Some Brady Law Falsehoods," *Los Angeles Times,* July 2, 1997; Lott, "Packing Protection," Letters, *Chicago Sun-Times,* April 30, 1997, 52; Interview with Lott, *Dallas Morning News,* May 31, 1998; Lott, "Gun Regulations Can Cost Lives," Testimony before the House Judiciary Committee, May 27, 1999, www.house.gov/judiciary/lott.pdf (accessed March 17, 2004). See also "Statements by John R. Lott Jr. on Defensive Gun Brandishing," http://cgi.cse.unsw.edu.au/~lambert/cgi-bin/blog/guns/files/lottbrandish.html (accessed March 17, 2004).

6. Otis Dudley Duncan, "Gun Use Surveys: In Numbers We Trust?" *Criminologist* 25:1 (January/February 2000), 1–7, http://cgi.cse.unsw.edu.au/~lambert/cgi-bin/blog/guns/files/duncan1.html, cited by Lindgren, www.cse.unsw.edu.au/~lambert/guns/lindgren.html (both accessed March 26, 2004).

7. John R. Lott Jr., *More Guns, Less Crime,* 2nd ed. (Chicago: University of Chicago Press, 2000), 3.

8. Tim Lambert: http://cgi.cse.unsw.edu.au/~lambert/cgi-bin/blog/ (accessed March 17, 2004).

9. Lindgren, "Comments on Questions About John R. Lott's Claims Regarding a 1997 Survey," http://.cse.unsw.edu.au/~lambert/guns/lindgren.html (accessed March 17, 2004).

10. Ibid.

11. Ibid.

12. Timothy Noah, "The Bellesiles of the Right? Another Firearms Scholar Whose Dog Ate His Data," *Slate.com,* February 3, 2003, http://slate.msn.com/id/2078084/ (accessed March 20, 2004).

13. That was what Tim Lambert suggested: Lambert, "Cramer's Defense of Lott," October 24, 2003, at Lambert's blog: http://cgi.cse.unsw.edu.au/~lambert/cgi-bin/blog/2003/10 (accessed March 27, 2004).

14. Richard Morin, "Scholar Invents Fan to Answer His Critics," *Washington Post,* February 1, 2003, C1.

15. Mark Stamaty, "BOOX: Pity the Poor Gun," *New York Times Book Review,* March 2, 2003, 31. The image can be found at www.nytimes.com/

imagepages/2003/03/02/books/20030302stamaty.html (accessed February 3, 2004).

16. David Glenn, "Scholar's Most Vigorous Defender Turns Out to be Himself, Psuedonymously," *Chronicle of Higher Education,* February 14, 2003, 18; Noah, "The Belllesiles of the Right?"; Ron Grossman, "Another Misfire in the Academic Shootout on Guns," *Chicago Tribune,* February 14, 2003, C1; Mooney, "Double Barreled Double Standards."

17. Lott, letter to the editor, *Washington Post,* March 22, 2003, A15. Lott was repying to a brief item that contained one sentence reporting that he denied "faking evidence": Claudia Deane and Richard Morin, "A Fabricated Fan and Many Doubts," *Washington Post,* February 11, 2003, A19.

18. The statement was made by David Mustard to Lindgren, reported at www.cse.unsw.edu.au/~lambert/guns/lindgren.html (accessed January 31, 2004).

19. www.johnlott.org, see "General Discussion of the 1997 and 2002 Surveys," notes 14 and 15.

20. Lott, untitled statement, www.johnlott.org/files/GenDisc97_02surveys.html (accessed January 29, 2004).

21. David Hemenway, review of *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong,* by John Lott Jr., at Harvard School of Public Health website, www.hsph.harvard.edu/faculty/ Hemenway/book.html (accessed February 2, 2004).

22. John R. Lott Jr. and David B Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *Journal of Legal Studies* 26 (1997), 65.

23. The evidence, originally critiqued in Dan Black and Daniel Nagin, "Do Right-to-Carry Laws Deter Violent Crime?" *Journal of Legal Studies* 27:1 (1998), 209–19, is summarized in Mooney, "Double Barreled Double Standards."

24. Ian Ayres and John J. Donohue III, "Shooting Down the 'More Guns, Less Crime' Hypothesis," *Stanford Law Review* 55:4 (April 2003), 1371–98. See also John J. Donohue III, "The Impact of Concealed Carry Laws," in Jens Ludwig and Philip J. Cook, eds., *Evaluating Gun Policy: Effects on Crime and Violence* (Washington: Brookings Institution, 2003), www.brookings.edu/dybdocroot/press/books/chapter_1/evaluatinggunpolicy.pdf (accessed February 3, 2004). Lott of course defended his work with a variety of complicated but unsuccessful arguments, which are reviewed in Mooney, "Double Barreled Double Standards."

Exhibit C
Page 35

25. See Jon Wiener, "Dollars for Neocon Scholars: The Olin Money Tree," *The Nation*, January 1, 1990, 12–14.

26. For Lott's webpage at the American Enterprise Institute, see www.aei.org/scholars/scholarID.38/scholar.asp (accessed February 3, 2004).

27. Nexis search conducted January 27, 2004.

28. The same problem is evident in the work of James Lindgren, the Northwestern law professor who worked on both the Bellesiles and the Lott cases. The differences in his efforts in the two cases are striking. He published 122 pages on the Bellesiles case in two journal articles with a total of 436 footnotes. He gave more than a dozen public lectures on the Bellesiles case at universities and law schools including Yale, Columbia, Chicago, Berkeley, William and Mary, and Penn. He contacted reviewers of the Bellesiles book and repeatedly urged them to publish reconsiderations. (See chapter 4)

  He didn't do any of this with his work documenting Lott's deception. It was not published anywhere, and it's not even posted on his website—where his Bellesiles materials are still proudly reproduced. Indeed the only place readers can find Lindgren's work on the Lott case is the website of Tim Lambert at the University of New South Wales. There Lindgren can be found stating "I have no research interests in this subfield and no ideas for further efforts to get to the bottom of this inquiry. . . . This project detracts from my other scholarly efforts"—and declaring he was not going to do any more on it. Compare www.law.nwu.edu/faculty/fulltime/Lindgren/Lindgren.html with www.cse.unsw.edu.au/~lambert/guns/lindgren.html (both accessed January 31, 2004), and see Lindgren, "Personal Note, January 17, 2003," www.cse.unsw.edu.au/~lambert/guns/lindgren.html (accessed January 31, 2004).

29. Clayton Cramer, who devoted immense energies to attacking Bellesiles, defends Lott: *Mother Jones* on the Lott Controversy," undated, at Cramer's blog, http://claytoncramer.com/weblog/2003_10_12_archive.html#10660567959 6614813 (accessed March 27, 2004). For a critique see Lambert, "Cramer's Defense of Lott." See also Noah, "The Bellesiles of the Right?"

30. For some recent examples of Lott's continuing work, see his characteristic piece "Baghdad's Murder Rate Irresponsibly Distorted," *Investor's Business Daily*, December 12, 2003, A14; also "The Spin on Gun Control," *Washington Times*, November 14, 2003, A23; and the most surprising venue, "Many Experts Agree: Concealed Guns Cut Crime," *Madison Capital Times*, September 8, 2003, 9A.

## 9. The "Porn Professor": Dino Cinel, Sexual Abuse, and the Catholic Church

1. Portions of this chapter originally published as "Sex, Lies and Tenure: The Porn Prof on Trial," *The Nation*, November 8, 1993, 524–28.

2. Robert V. Wolf, "Professor Teaches the History He Has Lived," *Staten Island Advance*, February 25, 1991, B1; "CSI Welcomes Distinguished Professor," *Staten Island Advance*, April 8, 1991, A6. Cinel's qualifications seemed impressive: his book, *From Italy to San Francisco* (Stanford University Press, 1982) won the Merle Curti Award in Social History for 1984, and he gave the opening address at the 1989 American Italian Historical Association conference in San Francisco for an exhibit titled "Shattering the Stereotype." The book was later shown to be based on fraudulent research: Sebastian Fichera, "The Disturbing Case of Dino Cinel," *History News Network*, April 28, 2003, http://hnn.us/articles/1420.html (accessed March 13, 2004).

3. Brian Larkin, "CSI Prof Admits Sex Scandals," *Staten Island Advance*, May 16, 1991, A1.

4. Ibid.; Steve Cannizaro, "Cinel's Lawsuit Updated," *New Orleans Times-Picayune*, April 15, 1992, B4.

5. Brian Larkin, "CUNY Acting on Sex Prof," *Staten Island Advance*, January 14, 1992, A1.

6. Brian Larkin, "Judge Cans CSI Prof's Porn Charges," *Staten Island Advance*, January 11, 1992, A1.

7. Brian Larkin, "CSI Prof Admits Sex Scandal," *Staten Island Advance*, May 16, 1991, A1; the "spectre of McCarthyism" was argued by CUNY history professor Sandi Cooper, interview with author, October 1993.

8. Nick Russo, telephone interview with author, October 1993.

9. "General University Policy Regarding Academic Appointees: Faculty Conduct and Administration of Discipline, Including the Faculty Code of Conduct," *University of California Academic Personnel Manual* (rev. September 1, 1988), 12.

10. Leslie Bennetts, "Unholy Alliances," *Vanity Fair*, December 1991, 224; Jason Berry, *Lead Us Not into Temptation: Catholic Priests and the Sexual Abuse of Children* (New York: Doubleday, 1992), 296–97.

11. Berry, *Lead Us Not into Temptation*, 294.

12. Ray Bigelow, telephone interview with author, October 1993; Richard Angelico, telephone interview with author, October 1993.

13. Ernst Benjamin, telephone interview with author, October 1993.

14. Richard Gid Powers, telephone interview with author, October 1993.

Exhibit C
Page 36