ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
S. CLINTON WOODS
Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
State Bar No. 275496
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6617
  Fax: (916) 731-2124
  E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his
official capacity as Attorney General of the
State of California, and Allison Mendoza, in
her official capacity as Acting Director of the
Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW JONES, *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,**<br><br>Defendants. | 3:19-cv-01226-L-AHG<br><br>**DECLARATION OF BRENNAN RIVAS**<br><br>Dept:        5B<br>Judge:      The Honorable M. James Lorenz and Magistrate Judge Alison H. Goddard<br>Action Filed:      July 1, 2019 |

1

## DECLARATION OF BRENNAN RIVAS

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

1.    I have been retained by the State of California to provide expert opinion and testimony regarding historical regulations that prohibited the possession, carrying, and sale of certain weapons.  I am being compensated at a rate of $130 per hour.

2.    I have evaluated laws restricting the carrying, use, and sale of certain weapons, particularly those associated with urgent societal problems of the nineteenth century; I have also studied the purposes and justifications of these laws, and the ways in which their authors and enforcers understood them to coexist with a right to bear arms as elaborated in the Second Amendment and state analogues.

## BACKGROUND AND QUALIFICATIONS

3.    I hold a Ph.D. in history from Texas Christian University, awarded in 2019.  My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*.

4.    I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.

5.    I have provided expert analysis and expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 17-1017-BEN-JLB (S.D. Cal.); *Angelo v. District of Columbia*, No. 1:22-cv-02256-RC (D. D.C.); *Christian v. Nigrelli*, No. 22-cv-00695 (JLS) (W.D. N.Y.); *Frey v. Nigrelli*,

No. 21 Civ. 5334 (NSR) (S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-5403 (W.D. Wash.); *Siegel v. Platkin*, No. 22-CV-7463 (RMB) (AMD) (D. N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Ore.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.).

6.      A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

## OPINIONS

I.   SUMMARY OF OPINIONS

7.      As discussed in this declaration, changing economic and social conditions within the nineteenth-century United States led to Americans' first gun crisis.  Listening to their constituents, lawmakers responded by enacting restrictions that promised to reduce the number of needless deaths attributable to the habitual carrying and easy availability of concealable weapons.  Importantly, these restrictions did not flatly ban the carry or possession of all arms, and instead targeted only those groups of people and weapons that posed significant risk to public safety at that time.

8.      The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more and better scholarship on the subject.  For this declaration, I relied upon research and knowledge that I have gained over several years of work on this subject.  This includes the reading and consultation of numerous scholarly monographs, journal articles, and law articles.  I have also consulted several digitized newspaper databases, including: Chronicling America, America's Historical Newspapers, Newspapers.com, Newsbank Newspapers, Newspaper Archive, and Nineteenth Century U.S. Newspapers.  I have also accessed various primary sources—such as books, news articles, statutes, and case law—through digital databases like Hein Online, HathiTrust, Archive.org, and

ProQuest databases. I have also consulted the Duke Repository of Historical Gun Laws, hosted by the Center for Firearms Law at Duke University Law School. This database is an exceedingly important resource for researchers working on topics pertaining to gun regulation. Despite being one of the most comprehensive databases on this subject, scholars still find historical statutes and ordinances that are not included within it—an apt illustration of the fact that there is no *complete* or *comprehensive* database of all historical gun and weapon laws.

9.    My research, which represents some of the most in-depth work on nineteenth-century weapon regulation, shows that there are historical firearm laws similar and analogous to California's age-based restrictions on firearms sales and transfers. The historical context of these analogous laws demonstrates that, just as today, an increased lethality of firearms (driven in part by technological innovation) resulted in severe social consequences which Americans addressed through an array of state and local weapon regulations. By the turn of the twentieth century, more than twenty states prohibited the sale, gift, or transfer of certain types of weapons to persons under a state-specified minimum age (which was usually twenty-one years). These deadly weapons were often defined by law in state penal/criminal codes and were pooled together in a category specifically because they were not considered to be militia weapons, and were therefore subject to strict state regulation in the name of public safety; in fact, Americans of the nineteenth century associated deadly weapons and the carrying of them with crime, recklessness, and an insufficient regard for the value of human life. The response of Americans to gun violence and needless shooting deaths today in the form of weapon regulations, including age-based sales restrictions, is similar to the national response to a comparable problem in the nineteenth century.

10.    California's exceptions from its age-based regulation for persons between the ages of 18 and 20 who possess a hunting license (which may only be procured by undergoing firearms safety training encompassed within a required

hunter education course), or if said persons are active members of the armed forces, National Guard, Air National Guard, or active reserves, or active or reserve peace officers, or federal officers or law enforcement agents authorized to carry firearms in the course and scope of employment, are fully in line with the understanding of weapon regulation by Americans of the nineteenth century.

## II.    HISTORICAL CONTEXT OF NINETEENTH-CENTURY WEAPON REGULATIONS

11.    In order to make sense of the types of weapon regulations enacted between 1800 and 1900—including age-based sales restrictions—it is crucial to have an understanding of the socio-political context of the time.  Nineteenth-century Americans did not debate, pass, and enforce weapon laws in a vacuum any more than we do today—just as for us, their views on how and to what degree they should regulate weapons were formed in response to the violence and loss of life they saw around them.

12.    Rates of homicide and interpersonal violence have fluctuated throughout American history, in large part as a result of socio-political factors. Scholarship on the subject shows that when Americans feel a stronger sense of confidence in their governing institutions and a deeper commitment to one another as fellow Americans, rates of violence tend to be lower.  On the other hand, when people lack faith in their institutions and view their fellow Americans with suspicion, rates of violence generally rise.[1]  The United States has always been a diverse place, which means that regional (and sometimes local) factors have shaped people's perceptions of their political leaders, their governing institutions, and their neighbors.  This process was complicated in the nineteenth century by the dramatic growth of the United States in terms of its geographic size and population.

---

[1] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 17-26.

13.     Violence and homicide in the United States have historically been varied according to region (North, South, and West) over time.  As a general rule, the South was a more violent place than the North between 1800 and 1900, though northern areas experienced increases in violence and homicide around midcentury and near the turn of the twentieth century.[2]  Violence in the West was was also significant, particularly in the southwest where so many new Anglo-American residents came from southern roots.[3]  Still, the violence was to some degree location-specific, with boomtowns and mining camps experiencing much more bloodshed than the newly established market towns attracting middle class residents and featuring more balanced gender ratios.[4]

14.     One pattern that emerged was for states and municipalities to enact new weapon-related statutes at times when the regional homicide levels were on the rise.[5]  For instance the older public carry laws from the nineteenth century were enacted in southern areas, especially along what had been the southwestern border between the United States and Spanish-controlled territories (along the Ohio and Mississippi Rivers).[6]  Taxes upon the ownership of bowie knives also appear to

---

[2] Roth *American Homicide*, 183-198, 297-326, 386-388, 411-434.

[3] Roth, *American Homicide*, 354-356, 374-384.

[4] The extent and severity of violence in the trans-Mississippi West is a subject of much debate among historians. But scholarship has shown that towns with middle-class residents, more balanced gender ratios, and a greater confidence in local institutions were less likely to experience the kind of severe violence stereotypically associated with the American West. See Robert R. Dykstra, *The Cattle Towns* (New York: Knopf, 1968); Mark R. Ellis, *Law and Order in Buffalo Bill's Country: Legal Culture and Community on the Great Plains, 1867-1910* (Lincoln: University of Nebraska Press, 2007).

[5] It is important to point out that nineteenth-century *new enactments* did not necessarily represent a jurisdiction's *first effort* at regulating weapons. Common law custom had largely prohibited the carrying of weapons in public spaces, and some eighteenth-century jurisdictions added that law to their statute books.

[6] For example, see 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 ("That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine…"); 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in

6

1    have originated in the southern states.[7] But as violence and homicide increased in

2    northern areas beginning in the 1840s, new enactments came from northern

3    jurisdictions as well.[8]  Western and Plains communities that had enacted weapon

4    regulations tended to experience a greater degree of peace and consequently lower

5    levels of violence and homicide.[9]  In other words, nineteenth-century Americans

6    from across the country responded to rising levels of violence and crime by

7    regulating weapons.

8         15.    The kinds of violence that American communities confronted explain

9    why weapon regulations took the approaches they did.  A particularly noteworthy

10   problem in the region between the Appalachian Mountains and the Mississippi

11   River Valley was lawlessness and violence in the riverside communities that

12   _____

13   Certain Cases, ch. 89, § 1 ("any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey… .").

14       [7] For example, see 1850 NC, ch. 121; 1856 NC, ch. 34; 1866 NC ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting the Civil War. 1861 Miss. Ch. 125.

17       [8] New enactments during the 1840s regarding public carry and taxation (some of which are municipal ordinances) came from the states: *public carry*, Maine, Alabama, Louisiana, Michigan, Virginia, Wisconsin, California, and Florida; *registration/taxation*, Iowa (Burlington) and Mississippi. In the 1850s: *public carry*, Massachusetts, Pennsylvania, Minnesota, Delaware, New Mexico, Oregon, Wisconsin, Kansas, Ohio, Indiana, Kentucky, New York (Central Park) and Washington, D.C.; *registration/taxation*, Rhode Island (Newport), California (San Francisco), North Carolina, Alabama, Louisiana. See Duke Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository/search-the-repository/. I selected "carry" and "registration/taxation" categories and listed the states with new enactments during each decade of the antebellum nineteenth century. The number of such enactments grew over the decades, and ceased to be exclusively southern beginning in the 1820s (2 of 3 total states), and by the 1850s, northern/midwestern states accounted for 9 of 15 jurisdictions, western ones accounting for 4, and southern ones (including Washington, D. C.) accounting for 4.

25       [9] Richard White, *It's Your Misfortune and None of My Own: A New History of the American West* (Norman: University of Oklahoma Press, 1991), 332. ("Those towns such as the cattle towns that disarmed young men lowered rates of personal violence considerably. Those towns…that not disarm men tended to bury significantly more of them. Society as a whole was able to control personal violence when the community desired to do so.").

7

facilitated transportation.  The Ohio, Missouri, and Mississippi Rivers (and their tributaries) formed the backbone of western transportation in the antebellum nineteenth century, so riverside communities grew around the economy of river transportation.  The boatman who staffed the flatboats and keelboats that conducted the western river trade prior to the 1840s tended to be be illiterate, hard-drinking, and rowdy, and it was not uncommon for them to settle disputes violently.  At each river town, they had opportunities to exchange goods at the local market and enjoy some entertainment in the form of gambling, drinking, and prostitution.  Flatboats and keelboats would have had a musket or rifle aboard for protecting the workers and produce from thieves or river pirates, and boatmen themselves also carried weapons.  It is likely that large knives were a favorite among them because knives functioned in both dry and wet conditions and (unlike the single-shot pistols of the day) did not need to be reloaded.[10]  Fights and fatalities occurred frequently, and boatmen often escaped justice by returning to the river.  This coming and going of rough men had negative effects upon riverside communities, and states deeply engaged in western riverboat traffic were some of the first to enact public carry regulations in the nineteenth century.[11]

16.    Steamboats became an industry standard in the 1840s, dramatically reducing upriver travel times and reshaping the economy of western river transportation.  Passenger traffic rose, professionalism grew among riverboat workers, and some of the more seedy attributes of the trade declined.[12] But by that

---

[10] Depictions of flatboat and keelboat operators reprinted in secondary sources sometimes show them with firearms such as rifles and muskets. See Michael Allen, *Western Rivermen, 1763-1861: Ohio and Mississippi Boatmen and the Myth of the Alligator Horse* (Baton Rouge: Louisiana State University Press, 1990), illustrations following p. 113. Revolvers were neither common nor affordable in the pre-steamboat era.  See Section II.A, *infra*.  Accounts of boatmen's violence refer to their using fists, clubs, and weapons such as knives and pistols. See Allen, *Western Rivermen*, 123-126; Bonnie Stepenhoff, *Working the Mississippi: Two Centuries of Life on the River* (Columbia: University of Missouri Press, 2015), 54-57.
[11] These included: Tennessee (1801), Kentucky (1813), Louisiana (1813), and Indiana (1820).  Tenn. 1801 ch. 22 § 6; Ind. 1819 ch. 39; see also fn.6, *supra*.
[12] Allen, *Western Rivermen*, 3-5.

time, regulation of weapons through public carry and other methods had already taken root; the public carry laws already in force would have prohibited most people from carrying knives and pistols aboard steamboats, along wharves, and in riverside communities.  The flatboat era ended in the 1840s, but its effects upon trans-Appalachian weapon regulation remained.

17.    Violence and homicide were certainly not problems exclusive to riverside areas.  The individualistic, aggressive attitude of boatmen infiltrated beyond the rivers themselves.  In one instance, an Ohio newspaper editor attributed a young man's murder conviction to his falling in with the riverside crowd. "But he followed the river, and associated with men who drank, until he became a hard drinker, then followed the carrying of deadly weapons, and the conversations about trials of strength between fancy men in which deadly weapons were used and displayed, until he imbibed the idea that an insult or injury had to be atoned for alone by an appeal to physical force or the use of weapons."[13]  The negative influence of boatmen and river life more generally has been noted by historians, and the significant socio-economic importance of riverside cities like St. Louis, Memphis, Natchez, New Orleans, and others made events in even their surrounding areas significant to a state more broadly.[14]

18.    Within the trans-Appalachian West more generally, the sparse population and weak reach of government institutions had a notable effect. In 1803,

_____

[13] "The Murder Case, *The Democratic Sentinel* (Cadiz, Ohio), February 23, 1853, 4; reprinted from *Steubenville Union*, February 21, 1853.  See https://chroniclingamerica.loc.gov/lccn/sn85025647/1853-02-23/ed-1/seq-3/. See also "Manners of the West," *Logansport Canal Telegraph* (Logansport, Indiana) February 18, 1837, 4; reprinted from the *Boston Atlas* (Boston, Massachusetts) ("I am sorry to find that the habit of carrying concealed weapons is very prevalent here and in other places on the river.").

[14] Other scholars who note the influence of boatmen include: Swanne Bennett and William B. Worthen, *Arkansas Made: A Survey of the Decorative, Mechanical, and Fine Arts Produced in Arkansas through 1950*, 2 vols. (Fayetteville: University of Arkansas Press, 2021), 267. Roth, *American Homicide*, 219; On the tendency among easterners to perceive Americans as becoming increasingly uncivilized as they moved west, see Gordon S. Wood, *Empire of Liberty: A History of the Early Republic, 1789-1815* (New York: Oxford University Press, 2009), 395-396.

the Louisiana Purchase added 830,000 square miles and tens of thousands of people to the country, feeding the appetite of a citizenry that was, by and large, dedicated to a "manifest destiny" of spreading their values across the continent of North America. Overland travel was arduous and time-consuming, and it posed dangers in the form of thieves and predatory animals. The Natchez Trace Road connecting the bustling Natchez, Mississippi on the Mississippi River to Nashville, Tennessee was notoriously dangerous and filled with questionable characters.[15] Riverside communities like Natchez were often isolated from larger cities and state capitals. Decentralization was most notable in the South, where socio-political life revolved around the large plantations rather than cities with burgeoning industrial centers (as in the North).[16]

19. In 1848, the Mexican Cession added 525,000 square miles and tens of thousands more people to the United States, effectively repeating the logistical and governmental challenges posed by surveying and settling the Louisiana Purchase. The imposing environment of the Mountain West added yet new difficulties to that process. As a result, governing institutions in western zones were frequently stretched quite thin. A state or territorial capital might be several days' journey away from home. This "backcountry" or "frontier"[17] environment existed for much of the nineteenth century, albeit in different areas at different times. Between 1800

_____

[15] Daniel Walker Howe, *What Hath God Wrought? The Transformation of America, 1815-1848* (New York: Oxford University Press, 2007), 127.

[16] Wood, *Empire of Liberty*, 364-365.

[17] The use of the term "frontier" has become somewhat controversial among historians because of its lack of specificity and association with tropes and stereotypes that justify "American exceptionalism." I am using the term here to refer to areas with low population density, limited access to governing institutions, and greater exposure to American Indians. This description can apply to the colonial "backcountry" of the eighteenth century as much as the Old Southwest of Arkansas, Louisiana, and Missouri, and the Mountain West of the nineteenth century. For a useful resource on the conflict surrounding terms like "frontier" among historians of the American West, see Stephen Aron, "Frontiers, Borderlands, Wests," in *American History Now*, eds. Eric Foner and Lisa McGirr (Philadelphia: Temple University Press, 2011), 261-284.

10

and 1900, it first applied to portions of the trans-Appalachian West and then to the trans-Mississippi West.

20.    Access to local government could also be problematic.  County seats were not only the location of county and district courts, but the sites of electoral activity and the only place where official business involving debts and land conveyances could be transacted.  A visit to the county seat for such purposes often required overnight travel.  District judges, who heard the most important civil and criminal cases, generally rode a circuit and visited the seats of the several counties within their jurisdiction only a few times per year.  In between sessions, the people involved in these cases had to wait.  Relative isolation from county and state governments meant that precinct-level officials, like constables, deputies, magistrates, or justices of the peace wielded significant power and influence by being the first point of contact between the people and the representative governments which they relied upon to protect the peace and ensure order.

21.    A perennial problem in these nineteenth-century frontier contexts was the "ruffian" bent on imposing his will through force or intimidation.[18]  Ruffians were men who engaged in unforgivably brutal behavior, often with knives or pistols concealed in their pockets.[19]  Unlike the ten-pound, five-foot-long (or longer)

---

[18] "Ruffianism" in the context of the nineteenth century has become almost synonymous with the "border ruffians" fighting one another over the question of whether to allow slavery in Kansas during the Bloody Kansas conflict of the late 1850s. Many pro-slavery ruffians from Missouri, like those associated with William Quantrill, engaged in small-scale guerrilla conflicts during the Civil War. Some of these continued lives of crime even after 1865, such as Jesse James and other members of the James-Younger Gang. Part of the myth of the American West and the romanticization of the western gunslinger has been built upon "westernizing" these figures by associating them with the Mountain West and the "wild west" when they were really border ruffians shaped by the Kansas-Nebraska conflict. See Matthew Christopher Hulbert, *The Ghosts of Guerrilla Memory: How Civil War Bushwhackers Became Gunslingers in the American West* (Athens: University of Georgia Press, 2016).

[19] For example, see "The 'Science of Defence,'" *Public Ledger* (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); "The Ruffian Foote," *Barre Patriot* (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); "Shocking

11

firearms that were necessary for life in these small, rural communities, fighting knives and pocket pistols could be easily hidden within a pocket or beneath a coat. Men feeling empowered by their secret weapons could risk violent aggression. As a result, southern and southwestern governments became the first to enact new statutes in the early 1800s that discouraged the carrying, possession, or use of deadly weapons posing significant risks to safety.[20]

22. The greater degree of violence and danger to the public in the South and frontier areas had a direct impact upon weapon regulation. Americans living there responded to the problem by enacting regulations, not advocating a state of perpetual armed preparedness. Some gun-related statutes prohibited anyone from furnishing weapons to enslaved persons[21] and Native Americans.[22] White

---

Outrage," *The Miners' Express* (Dubuque, Iowa) September 24, 1851, 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). See https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/

[20] See fn. 8, *supra*.

[21] Slave Code provisions in the American colonies and Founding era tended to penalize the possession of weapons by enslaved men and women, but over time statutes penalized the furnishing of weapons to them by free persons without the consent of a master. See 1835 Tenn. Ch. 58 §1. ("Any free person who, without the consent of the owner, shall sell, loan or give to any slave, any gun, pistol, sword, or dirk, shall be guilty of a misdemeanor, and shall, on conviction by presentment or indictment, be fined not less than fifty dollars, and imprisoned not less than ten days,"). In Texas, the 1840 Slave Code and its amendments in 1850 and 1856 prohibited possession by slaves, but another amendment in 1863 specifically penalized providing or selling weapons to them. See Tex. 1863 ch. 15. (" If any person shall sell, give, or loan, to a slave or slaves, a gun, pistol, sword, bowie knife or dagger, or any gun-powder or percussion caps, without the written consent of his or her master, mistress or overseer, he or she shall be confined at hard labor in the Penitentiary not less than two nor more than five years,").

[22] Colonial and later state and federal governments across what is now the United States heavily regulated the Indian trade because it was one of the most lucrative and important economic enterprises in the colonial, revolutionary, and early republic periods. Native groups certainly acquired firearms, usually through regulated trade encounters overseen by government officials and undertaken by licensed traders. Laws prohibiting the sale of firearms, ammunition, or gunpowder to American Indians were designed to penalize the smugglers who engaged in unlicensed trade outside the regulatory guidelines put in place by colonial, state, and the federal government. See Angela Riley, "Indians and Guns," *Georgetown Law Journal* 100, no. 5 (June 2012); David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America* (Cambridge: Harvard University Press, 2016). Colonial statutes from the seventeenth and eighteenth centuries on this subject were ubiquitous; see Duke Repository of Historical Gun Laws, "Felons, Foreigners and Others Deemed Dangerous By the State, see

---

Americans viewed members of these racial groups with suspicion, if not outright disgust, and did not consider them to be members of the body politic included within the phrase "we, the people." The idea is repugnant to us today and its inclusion within this declaration by no means excuses race-based discrimination or minimizes the problematic relationship between race and guns in American history; but these laws do show a history of governments addressing the perceived dangers posed by the trade in firearms, and a willingness to take action to prevent dealers from selling firearms and other weapons to people whose interests threatened the safety of white (albeit racist) communities.

23.    Moreover, race-based sales regulations were not the only regulatory approaches in use in the nineteenth century. Public carry laws and taxation requirements, designed as they were to be enforced upon white Americans, also grew in number. Age-based restrictions formed yet another strategy that was on the rise, and by the early nineteenth century, it was not uncommon for colleges to prohibit students from carrying deadly weapons on their persons or keeping them within their residences.[23] By the Civil War era, when revolvers and bowie knives were much more readily available, southern states were also the first to enact age-based sales restrictions.[24]

24.    Even though frontier areas and the slaveholding South were more violent places than the North and Midwest, a rising level of violence and crime

https://firearmslaw.duke.edu/repository/search-results/?_sft_subjects=felons-foreigners-and-others-deemed-dangerous-by-the-state. For a nineteenth-century example, see Mo. 1844 ch. 80 §4. ("No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person,").

[23] For example, see The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6-7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[24] See Section III, *infra*.

13

proved to be a problem of national proportions. Northern states were relatively *less* violent than southern ones, but they were not free of all violence and crime. Ruffianism was present in northern life as well, and in the 1850s became associated with the gang-like activities of nativist political factions.[25]  Urban violence associated with nativist unrest was attributed to devotees of anti-Catholicism, each one of which was expected "to arm himself with bowie knife, and revolver or other deadly weapons, and follow their leaders even to the shedding of blood."[26]  When rates of violence rose in northern communities after 1840, residents reacted in much the same way as their southern counterparts had—by enacting regulations designed to discourage the possession, carrying, and use of deadly weapons.[27]

25.    Northern and midwestern states also pursued college rules and age-based sales restrictions.  Harvard College had declared in 1655 that "noe students shall be suffered to have a gun in his or theire champers or studies, or keeping for theire use any where else in the town."[28]  Dickinson College in Pennsylvania put a similar measure in place in 1830, as did Illinois College in 1850.[29] And by the 1880s, age-based restrictions had become a regulatory strategy with nationwide appeal.[30]

---

[25] Mark E. Neely, "Apotheosis of a Ruffian: The Murder of Bill Pool and American Political Culture," in *New Directions in Mid-Nineteenth-Century American Political History*, eds. Gary W. Gallagher and Rachel A. Shelden (Charlottesville: University of Virginia Press, YEAR), 36-63.
[26] "An Exposition of the Principles and Power of the Know Nothing Order of Connecticut," *Cadiz Democratic Sentinel* (Cadiz, Ohio) July 11, 1855, 1; reprinted from the *Hartford Times* (Hartford, Connecticut).  See https://chroniclingamerica.loc.gov/lccn/sn84028794/1855-07-11/ed-1/seq-1/
[27] See fn. 8, *supra*.
[28] A Copy of the Laws of Harvard College, 1655, at 10.
[29] The statutes of Dickinson College, as revised and adopted by the Board of Trustees, April 16, 1830, 22-23; Laws of Illinois College, 1850, in Transactions of the Illinois State Historical Society for the Year 1906, at 245.
[30] See Section III, *infra*.

**A.    Brief History of the Colt Revolver and the Spread of Handgun Violence in the Ninteeth Century**

26.    Prior to the mid-nineteenth century, revolvers were not widely available in the United States.  Pistols that were available were muzzle-loading, single shot firearms that ranged in size from heavy, high-caliber "horse" pistols designed for cavalry use to small "pocket" pistols designed to be concealed in everyday clothing.[31]  The multi-shot revolvers prior to the advent of the revolver are now known as "pepperbox" pistols, but they were not widely available and were treated as curiosities.[32]

27.    The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century.  That was the year that Samuel Colt patented his first revolver design.  It took a number of years, but eventually the revolver overtook dirks and bowie knives as the weapon considered most problematic in American communities.

28.    The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need

---

[31] Blair, *Pollard's History*, 104, 116-119; ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire," pp.117).

[32] Advertisements for multi-barreled pocket pistols can be found in historical newspapers, though the advertisement of them points toward them as rarities and curiosities. See *The Madisonian* (Washington, D.C.), December 22, 1838, 1. This particular example emphasizes their use for travelers, a category of gun-carriers that was generally exempted from public carry regulations during the nineteenth century. The term "pepper-box" is not used.  See https://chroniclingamerica.loc.gov/lccn/sn82015015/1838-12-22/ed-1/seq-1/. An exploration of digitized newspaper databases showed that "pepperbox," "pepper-box," "pepper box," and plural permutations of these terms were not used to describe firearms; rather, they described a box for keeping pepper, which was a kitchen-related item. The primary definition for "pepperbox" in the *Oxford English Dictionary* is: "A small box with a (usually domed) perforated lid, used for sprinkling pepper on food; a pepper pot." According to *OED*, another term for pepper-box pistols was "Allen pistol," which also does not appear to be in common use in nineteenth-century America.

15

to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[33]  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

29. Colt's patent was in force from 1836 to 1857, and during that twenty-year timeframe he tried to win government contracts that would make his invention profitable. His first company, Patent Arms Manufacturing Company, was not a financial success and ceased production in 1842.  The US-Mexican War gave Colt his first military contract, breathing life back into his invention.  He subsequently established Colt's Patent Fire Arms Manufacturing Company, which became a highly successful enterprise for more than a century.  Colt lobbied Congress for a patent extension, citing his inability to capitalize on the initial twenty-year term; but the effort failed, and in 1857 other manufacturers rushed into the market. Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

30. Even though Samuel Colt's company had received a government contract in the 1840s to deliver "horse" pistols, the turning point for the company in terms of government patronage came with the outbreak of the Civil War.  Southern states ordered as many revolvers as they could in the lead-up to Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose

---

[33] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

1  orders for pistols like Colt's revolver skyrocketed during the course of the Civil

2  War.[34]  Wartime production by Colt, in addition to the new entrants into the market

3  (like Smith & Wesson), created an unprecedented infrastructure to manufacture

4  staggeringly large quantities of pistols.  As production capacity increased and the

5  U.S. military demobilized, more of these weapons became available to and

6  affordable for American consumers; by the 1870s, the net result was more and

7  cheaper pistols spread throughout the country[35], introducing the United States to its

8  first experience with rampant gun violence.

9       31.  Colt (and subsequent manufacturers after 1857) produced pistols that

10  fell into the historical categories that ran the gamut from large "horse" pistols to

11  concealable "pocket" pistols.  The first pocket pistol produced by Colt was released

12  in 1848 and was a 0.31-caliber, five-shot revolver.[36]  After the Civil War, military

13  purchases slowed, which led gun manufacturers to pivot toward civilian sales. They

14  marketed pocket pistols heavily.  The explosion in production of pocket pistols was

15  all the more pronounced by the entry of imitation brands that used lower quality

16  metals with less sophisticated workmanship to sell pocket pistols at much lower

17  prices than the competition.[37] These cheap revolvers could be had for a few dollars,

18  with used ones selling for even less.

19  _____

     [34] On the life of Samuel Colt and the history of his firearm manufacturing
20  companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that
     Changed America* (New York: Scribner, 2020).
21       [35] Colt's Army revolvers cost about $20 at the time of the Civil War, but
     subsequent entrants into the market sold small pocket pistols for as little as a couple
22  of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-
     367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the
     catalog but retailed elsewhere for something closer to $18 (see pp. 367).
23  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered
     for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online,
24  see https://bit.ly/3VeUhHo.
     [36] Haven and Belden, *Colt Revolver*, 63-73.
25       [37] On size, variability, and manufacture of Colt pistols, see Jim
26  Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New
     York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93
27  (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official
     History of Colt Firearms from 1836 to the Present* 173 (New York: Simon &
28  Schuster, 1979).

Declaration of Brennan Rivas  (3:19-cv-01226-L-AHG)

32.     The technological improvement and proliferation of revolvers in the mid-nineteenth century had a dramatic impact upon the United States.  This was a time period in which Americans were diverging from other Western countries in regard to rates of violence and homicide.  Distrust in governing institutions, the crisis over slavery and emancipation, and economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.[38]  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the North remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s, northern homicide rates began ratcheting upward yet again.[39]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined. City governments enacted new criminal ordinances and increased funding for police, strongly suggesting that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.

33.     In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence suffered primarily by Black Americans and their political allies.  The disruption of war, occupation, and frequent changes in

---

[38] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).
[39] *Ibid.*

state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process.  As a result, rates of violence and homicide remained quite high in the southern states across the nineteenth century.[40]  The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American communities rendered the interpersonal conflicts that erupted as a result of urbanization, Reconstruction, economic hardship, and social dislocation all the more deadly.

34.    The entry of revolvers into American shops, homes, and communities exacerbated this larger problem of violence by rendering armed encounters even more deadly than they had been before.  To kill someone with a revolver, an assailant had the benefit of six tries and only had to make a slight motion with the pointer finger—unlike bowie knives and dirks that required attackers to come close to their victims and physically get blood on their hands.

### B.    Americans Defined and Regulated "Deadly Weapons"

35.    As Americans faced rising rates of violence and crime in conjunction with the country's  first gun crisis, they (through their lawmakers and judges) defined a series of so-called "deadly weapons" that were subject to stringent regulation.  These regulations took different forms, one of which included age-based sales restrictions.

36.    "Deadly weapons" were those associated with crime in contradistinction to those necessary for communal policing, militia service, and hunting.[41]  In the nineteenth-century United States, particularly the rural,

---

[40] Roth, *American Homicide*, 411-434.

[41] For an insightful explication of nineteenth-century views on the needfulness of deadly weapons for routine policing, see "Deadly Weapons: Who Has and Who Has Not a Right to Carry Them in Public—A Pernicious Habit that Should be Interdicted," *Public Ledger* (Memphis, Tennessee) September 20, 1876, 3. Quoting the grand jury charge of Judge Logwood: "It has been the custom among some of the officers…to habitually wear pistols, and they claim that they have the right under the statutes to do so…" but "the word 'process' [as used in the exception] does not contemplate a warrant, writ subpoena or other paper in a civil

agricultural areas in which most Americans lived, hunting knives, rifles, muskets,

and shotguns were ubiquitous.  Men used these firearms for militia service and for

the occasions when they were required to participate in local policing efforts

through the *posse comitatus*; they would have much more frequently used such

weapons for hunting—be it killing predatory animals, driving birds away from their

crops, or hunting for meat.  For men under the age of legal majority, training in

firearms for such purposes was a domestic matter learned at the feet of older men,

particularly fathers, male relatives, or legal guardians.[42]  The custom of male heads

of households acting as a buffer between their dependents and the law, a

fundamental feature of patriarchalism, did not disappear at the Founding or even at

the turn of the nineteenth century.  Farm workers, ranch hands, and other adult men

had their access to weapons and role in communal policing efforts mediated by

heads of households (who were typically their employers and landlords as well).

For instance, the cattlemen who owned ranches and employed cowboys could

prohibit them from keeping and carrying pistols while working for the ranch or

living within its confines.[43]

    37.    The firearms appropriate for militia use, communal policing, and

hunting were altogether different from the "deadly weapons" which Americans

---

case, which does not direct the officer to take possession of the body of the person; nor does it include any paper or document in a criminal case, except such as commands an arrest." See https://chroniclingamerica.loc.gov/lccn/sn85033673/1876-09-20/ed-1/seq-3/

[42] Plaintiff's expert David Hardy cites statements made by Thomas Jefferson and members of the Founding generation relating to the "training up" in arms of American youth.  Declaration of David Hardy in Support of Plaintiffs' Motion for Preliminary Injunction at ¶¶ 30-31.  Indeed such training occurred, but within the contexts of regulated, supervised militia activity or within the closed domestic sphere of the family.

[43] Jaqueline M. Moore, *Cow Boys and Cattle Men: Class and Masculinities on the Texas Frontier, 1865-1900* (New York: NYU Press, 2010), 84-85, 187-188.  Such a living and working environment did not prohibit cowboys and ranchhands from *purchasing* pistols, but recognition of the extent of patriarchal social relations in the United States through at least the turn of the twentieth century adds an important layer of nuance to any discussion of the access of legal minors and others "disabled" by law to deadly weapons.

deemed a threat to public safety and therefore subjected to strict regulation. Deadly weapons were those carried and used by ruffians, burglars, and assassins, by those ready to settle personal difficulties with blood rather than by reason and law. Many states went so far as to list and define them by statute or code. The other feature which they had in common was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.

38.    In Tennessee (1801), state lawmakers identified a list of weapons subject to public carry restrictions: "any dirk, large knife, pistol or any other dangerous weapon."[44] By the late 1830s when the phrase "bowie knife" came into common use in conjunction with increased violence, state descriptions of deadly weapons tended to absorb it as well. An 1838 Tennessee statute specifically prohibited the wearing of "any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick."[45]

39.    Large knives, and particularly "bowie knives," were associated with ruffianism and brutality. The moniker came from a man named Jim Bowie who used a large knife of unique design during a duel-turned-brawl in 1827. When Bowie died at the Alamo, his name and his knife returned to the public eye. News articles about the history of the knife and its use in needless killings started appearing, and the phrase quickly made its way into regulatory measures pertaining to deadly weapons.[46]

---

[44] Tenn. 1801 ch. 22 § 6.
[45] Tenn. 1838 ch. 137.
[46] Laws of this nature existed in numerous states during the antebellum nineteenth century, including Florida, which clearly distinguished between fighting knives and pocket knives, criminalizing carry of the former but not the latter. See 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife…."). See also 1838 Vir., ch. 101 (criminalizing carry of "any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue…"); 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or

40.    The term "pistol" continued to be used and became a useful catch-all word to include hand-held firearms whether they were muzzle-loading or revolvers of either the large "army" and "horse" variety or a "pocket" size. At times, lawmakers specifically restricted the presence of smaller-model pistols, especially pocket pistols.[47]

41.    Pocket pistols (whether revolvers or single-shot models) were almost universally condemned by Americans because they were weapons associated with crime, assassinations, and a reckless disregard for human life. Between 1865 and 1912, three presidents were assassinated by men concealing pistols, and one more survived an attempt.[48]  Even though carrying concealed weapons might have been a tempting response in light of criminal activity, people at the time understood that it posed too great a danger to the wider public.  In 1872, an editorialist wrote that, despite the dangers of dark New York City streets, "these would be still further increased were the habit of carrying a pocket-pistol to be recognized and universal defense against assault" because "the vague apprehension of attack from everybody could only result in the sacrifice of some innocent lives, without in the slightest

---

any other deadly weapon, pistol or any species of fire arms, or air gun…"); 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon…"); 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons…"); 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane…"); 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,"); Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon…"); Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger, sword, pistol, or other offensive and dangerous weapon…"). This is not an exhaustive list.

[47] For example, see Ark. 1881 ch. 96 § 3 (a misdemeanor to "sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person…any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale…"). The mid-sized "belt" or "navy" pistols were sometimes also restricted.

[48] Presidents assassinated by gunfire from pistols were: Abraham Lincoln (1865); James A. Garfield (1881); and William McKinley (1901). In 1912, Theodore Roosevelt survived being shot by a pistol in an attempted assassination.

22

degree repressing the roughs."[49]  Another writer lamented the invention of a new pocket pistol by the Colt Firearms Company in 1870, saying "We do not know that it is any particular benefit to mankind," and that "it might save a good many lives if there were nothing to shoot with smaller or quicker of discharge than the ancient blunderbuss."[50]  Accidental shootings also made headlines, such as the "distressing accident…by the careless and reckless use of a pocket pistol, which resulted in the shooting and death of [a seven-year-old girl]."[51]

42.    Deadly weapons were understood by Americans and defined by law in contradistinction to militia and hunting weapons.  Judges deciding appellate cases that considered the constitutionality of weapon regulations hinged their decions upon this very distinction. A judge in Arkansas stated that "It is manifest from the language of the [Second Amendment], and from the expressions of these learned commentators, that the arms which it guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well regulated militia, and such as are necessary and suitable to a free people, to enable them to resist oppression, prevent usurpation, repel invasion, etc."[52]  A Tennessee judge, in deciding that a state public carry law was overly broad, reasoned that:

---

[49] No Title, *New York Times* (New York, New York) June 13, 1872, 4. The passage is worth quoting in full: "Strongly impressed, as every citizen must be, with the dangers of New-York streets after nightfall, it is pretty obvious that these would be still further increased were the habit of carrying a pocket-pistol to be recognized and universal defense against assault. Nothing is so much to be avoided as panic in a matter like this, since the vague apprehension of attack from everybody could only result in the sacrifice of some innocent lives, without in the slightest degree repressing the roughs."

[50] No Title, *New York Tribune* (New York, New York) April 7, 1870, 4.

[51] "Another Victim of Careless Shooting," *Cincinnati Daily Gazette* (Cincinnati, Ohio) January 9, 1874, 1. "A distressing accident occurred here this morning, by the careless and reckless use of a pocket pistol, which resulted in the shooting and death of a daughter of Wm. Richter. Mr. Ricther's son, a boy about twelve years old, has been in the habit of carrying a small single barreled pocket pistol, and this morning, while he was yet in bed, his brother, a lad nine years old, took it from his vest and snapped it three times at the head of his sister, a little girl seven years of age. The fourth time he snapped the pistol the cartridge exploded and lodged the ball in the his sister's temple, from the effects of which she died in about four hours."

[52] *Fife v. State*, 31 Ark. 455 (1876).

"We know there is a pistol of that name [revolver] which is not adapted to the equipment of the soldier, yet we also know that the pistol known as the repeater is a soldier's weapon—skill in the use of which will add to the efficiency of the soldier. If such is the character of the weapon here designated, then the prohibition of the statute is too broad to be allowed to stand, consistently with the views herein expressed."[53]

43.    When legal minors participating in militia service arrived for muster or other activities, they were not interacting with the knives, pistols, and other instruments labeled "deadly weapons."  Their arms were those appropriate for civilized warfare, which was almost exclusively muskets, rifles, and their related accessories (like bayonets, flint, powder, etc.).[54]  The revolvers and other pistols appropriate for militia use were the larger, higher-caliber "horse" and "army" pistols designed to be carried into mounted combat or by officers.  Nineteenth-century judges deciding cases after the advent of the revolver and its acceptance by the US military (both of which occurred during the Civil War era) recognized the distinction between pistols used in civilized warfare and those used for criminal activity; they consequently insisted on Second Amendment protections for "horse" and "army" pistols like those in use by certain classes of American military forces.[55]  That protection did not extend to weapons considered to be the "deadly weapons" of the time, like pocket pistols and bowie knives.

---

[53] *Andrews v. State*, 50 Tenn. 165 (1871).
[54] See especially the returns of militia companies and inventories of militia weapons in Robert H. Churchill, "Gun Ownership in Early America: A Survey of Manuscript Militia Returns," *The William and Mary Quarterly* 60, no. 3 (July 2003), 615-642. Militia returns were responses to requests for information from superior officers and civil authorities; they addressed issues such as elections of officers, availability of provisions, lists of militiamen fit for duty, and military readiness (reflected by "the size and armament of specific military units,"). See Churchill, "Gun Ownership in Early America," 615-616.
[55] Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts Blog* (Duke University Law School, Center for Firearms Law, Jan. 2022).  See https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/

24

## III.  AGE-BASED RESTRICTIONS UPON THE SALE OF DEADLY WEAPONS IN THE NINETEENTH CENTURY

44.     Deadly weapons were defined by law and denounced by the public, which subjected them to regulation by representative governments.  These regulations took various forms, like public carry laws, taxation, and sales restrictions.  Sales restrictions ranged from the levying of occupation taxes and licensing requirements upon dealers in weapons to banning the sale of certain weapons.

45.     Between 1850 and 1900, at least twenty-four states and territories enacted age-based weapon restrictions.  Two of those criminalized the carrying of deadly weapons by minors.[56]  But the standard approach was for states to assess fines and other penalties upon the dealers who provided weapons to underage buyers.[57] Unlawful sales, gifts, or transfers of deadly weapons to minors were misdemeanors punishable by a fine (most of them ranging from $25 to $200). Some jurisdictions provided for jail time in lieu of or in addition to the fine.

---

[56] Ariz. 1883 ch. 36 §3 p. 66 "An Act Supplemental to and amendatory of an Act entitled 'An Act to prevent the improper use of deadly weapons, and the indiscriminate use of firearms in the towns and villages of the Territory," (Sec. 3: "Any person in this Territory over the age of ten and under the age of seventeen years, having or carrying, concealed or unconcealed,…shall, upon conviction thereof…be fined in any sum not more than fifty dollars, or be imprisoned in the County Jail not more than one month, or be punished by both such fine and imprisonment, in the discretion of the Court trying the case."); Nev. 1885 ch. 51 p. 51. ("Every person under the age of twenty-one (21) years who shall wear or carry…concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.").
[57] Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 §2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" §2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 §7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,' "; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 §3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 §97 p. 140; N. C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

25

46.    Some states provided exceptions for minors subject to supervision or control by more senior figures.  Illinois, Texas, and Missouri, for instance, barred selling or giving a whole host of deadly weapons to minors without the permission of a parent or guardian.[58]  This entailed the presence of such a guardian or his agent at the place of purchase, or his written consent.[59]

47.    There were also some additional exceptions to states' age-based restrictions.  Maryland excepted hunting firearms from its age restriction, stating that no one, "be he or she licensed dealer or not," was permitted to "sell, barter or give away any firearm whatsoever or other deadly weapons, except shot gun, fowling pieces, and rifles, to any person who is a minor under the age of twenty-one years."[60]  Tennessee lawmakers added a proviso saying "this act shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting."[61]  In Georgia, the prohibition against selling, giving, lending, or furnishing deadly weapons to minors contained a proviso asserting that "nothing

---

[58] Ill. 1881 "Criminal Code" §2 p. 73 ("Whoever, not being the father, guardian or employer of the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person…"); Tex. 1897 ch. 154 p. 221 ("…if any person in this State shall knowingly sell, give, or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof…") (of note, this regulation was one chapter away from a law preventing billiard owners from allowing minors inside without parental consent, indicating these laws were part of a broader effort to protect public safety by regulating the behavior of minors); MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,' " ("If any person…shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon [any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon], without the consent of the parent or guardian of such minor…").

[59] *Ibid.*

[60] Mary. 1882 ch. 424 p. 656.

[61] Tenn. 1856 ch. 81 p. 92 §2.

herein contained shall be construed as forbidding the furnishing of such weapons under circumstances justifying their use in defending life, limb or property."[62]

48.    These nineteenth century requirements placed upon dealers could be substantial.  As they do in many states today, lawmakers expected dealers to use their personal knowledge to refuse to sell to minors, and to carry out sales based upon their own evaluation of the prospective customer.  West Virginia prohibited the sale of deadly weapons to minors, and in doing so charged dealers with not selling to "a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years."[63] Virginia's statute prohibited selling, bartering, giving, or furnishing cigarettes and deadly weapons when "having good cause to believe him or her to be a minor under sixteen years of age."[64]  Illinois required a registration of all weapon sales in the state and even provided data categories that had to be reported, including the "Age of purchaser."[65] The flip-side to this coin was that the statutes provided some protection to dealers who chose not to go through with a sale based upon their evaluations of would-be gun-buyers.

49.    Some states prohibited the sale of weapons to minors in conjunction with other groups deemed untrustworthy at the time. In Kentucky, for example,  the age restriction enacted in 1859 for the town of Harrodsburg went hand-in-hand with restrictions in place against enslaved persons and free Blacks.[66]  And in Kansas, age restrictions imposed in 1883 coincided with restrictions against persons "of notoriously unsound mind"; this Kansas statute criminalized such sales by vendors

---

[62] Geo. 1876 ch. 128 p. 112.
[63] W. V. 1882 ch. 135 §7 p. 421.
[64] Va. 1890 ch. 152 p. 118.
[65] Ill. 1881 "Criminal Code" §3 p. 73. Other headings were "No. of weapon.," "To whom sold or given," "Kind and description of weapon," "For what purpose purchased or obtained," and "Price of weapon."
[66] Kent. 1859 ch. 33 p. 241.

27

1    and also imposed fines upon minors found to be in possession of concealable

2    arms.[67]

3            50.     Sales restrictions like these should be evaluated in light of the relative

4    availability of deadly weapons to prospective buyers under the specified age.

5    Industrialization was rapidly increasing the manufacturing capacity of companies

6    that produced weapons.  Railroads were rapidly decreasing the cost of transporting

7    these mass-produced weapons to customers across the country. The advertising,

8    sales, and distribution networks taking shape were effectively making these

9    products more easily accessible to customers than they had ever been before. The

10   catalog companies advertised pistols and knives, and they could deliver them

11   nationwide at very low prices.  Firearm companies distributed catalogs,

12   advertisement books, and other literature to their network of affiliated dealers,

13   which broadened the shopping options of Americans looking to buy new pistols—

14   in other words, they were no longer confined to what a local dealer had in stock or

15   was able to acquire in the nearest city.  Age-based sales restrictions (as well as

16   other regulatory approaches) increased in number as the nineteenth century wore on

17   because systemic economic conditions were making deadly weapons an

18   increasingly serious problem for American communities.  When the situation called

19   for regulatory intervention to satisfy voters and promote public safety, lawmakers

20   and judges responded accordingly.

21

22

23            [67] Kan. 1883 ch. 105 p. 159 ("§ 1. Any person who shall sell, trade, give, loan
or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps
24   may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other
dangerous weapons to any minor, or to any person of notoriously unsound mind,
25   shall be deemed guilty of a misdemeanor, and shall, upon conviction before any
court of competent jurisdiction, be fined not less than five nor more than one
26   hundred dollars. § 2. Any minor who shall have in his possession any pistol,
revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-
27   knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty
of a misdemeanor, and upon conviction before any court of competent jurisdiction
28   shall be fined not less than one nore more than ten dollars.").

## IV. ADDITIONAL TIME NEEDED FOR FURTHER STUDY OF AGE-BASED WEAPON REGULATIONS

51.    As with any historical research project, my work in this area is still ongoing.  It is important that researchers, historians, and other experts gather as many age-based historical statutes and regulations as possible, but even that task remains incomplete. Experts' reports and declarations have identified many of these laws, but each found at least one example that was not on the other's list. When I began this research, I located two more relevant historical statutes that had not been identified in previous experts' reports.  More time would allow the parties and their experts to put together a more comprehensive list of statutes and regulations and draw more meaningful conclusions from their provisions.  It would also enable us to better identify which of these historical provisions were amended, when, and why.  This work can be time-consuming, especially since it requires the researcher to compare statutory text with its adaptation into a penal code.  It would also permit us to supplement our knowledge of state- and federal-level statutes with additional information drawn from more difficult to research sources, including local ordinances, prosecutorial records, and other sources such as historical newspapers and publications.  Gathering this important social and political context for age-based sales restrictions through additional primary sources beyond statute books, criminal codes, and session laws takes time.  Between 1800 and 1900, at least twenty-four states and territories had enacted such restrictions; it is important to look nationwide for news articles, editorials, and other primary sources that help us understand why Americans pursued this regulatory strategy and how it fit into their understanding of Second Amendment and state analogue rights.

1

**CONCLUSION**

2        52.     As discussed in this declaration, the historical record shows that

3    American states and municipalities frequently regulated the access of legal minors

4    to firearms and other weapons.  Most of these regulations targeted a class of

5    concealable pistols, knives, and other implements that were associated with

6    disorder and needless violence—brought together under the label "deadly

7    weapons."  By the year 1900, at least twenty-four states and territories had enacted

8    statutes prohibiting legal minors from purchasing deadly weapons, and an unknown

9    number of municipalities had enacted similar or overlapping ordinances as well. By

10    far most of these established a minimum age of twenty-one years. Nineteenth-

11    century restrictions placed a burden upon licensed dealers, and sometimes forbade

12    any adult save a parent or guardian from providing, giving, or furnishing prohibited

13    weapons to legal minors. In this way, the historical analogues were more far-

14    reaching than the California law at issue in this case.  Importantly, California's age-

15    based sales restriction includes exemptions for 18-to-20-year-olds that align with

16    the historical record, particularly those that apply to law enforcement, active

17    members of the armed forces or reserves, and those who undergo the necessary

18    training to obtain a hunting license.

19        53.     Age-based sales restrictions enacted between 1800 and 1900 were part

20    of a response by the American people to rising rates of violence, homicide, and

21    crime associated with the proliferation of deadly weapons.  Improved technology

22    increased the lethality of firearms while also making them easier to manufacture,

23    advertise, and distribute nationwide.  People living then, much as we do now,

24    lamented the needless loss of life that came as a result of armed encounters. In

25    addition to public carry restrictions, taxes, and other regulatory measures, American

26    governments (state and local) pursued policies that would keep deadly weapons out

27    of the hands of legal minors.  These laws do not appear to have received much

28

criticism, and few were challenged in court.[68]  More time is needed to gather the additional primary source material (from newspapers, appellate cases, legislative records, etc.) necessary to understand the development, enforcement, and amendment of these laws over time.


    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on March 15, 2023, at Fort Worth, Texas.


*Brennan Rivas*
Brennan Rivas

SA2019103398
43611659.docx

---

[68] For the rare example when one such regulation was challenged, consider *State v. Callicutt*, 69 Tenn. 714, 714 (1878), which rejected a challenge to Tennessee's statutue that barred selling, loaning, or even giving handguns or other arms to minors.

# EXHIBIT A

**Rivas Curriculum Vitae**

# Brennan Gardner Rivas
Curriculum Vitae · March 2023

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
      University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
      2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
      Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
      the Lone Star State, 1836-1930"
      Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
      Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
      1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
      on the Place of Guns in American Law and Society* (New York: Oxford University Press,
      forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
      (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
      Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
      Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
      Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
      *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
      by History Blog* (Jun 2022)

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West
Status: Research and writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
    ~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, No. 22-cv-01499-RGA, D. Del.

## Professional Memberships

Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

## Languages

Spanish (Proficient)
Latin (Proficient)