1   ROB BONTA
    Attorney General of California
2   ANYA BINSACCA
    Supervising Deputy Attorney General
3   TODD GRABARSKY
    STEPHANIE ALBRECHT
4   CAROLYN DOWNS
    Deputy Attorneys General
5   JENNIFER E. ROSENBERG
    Deputy Attorney General
6   State Bar No. 275496
      300 South Spring Street, Suite 1702
7     Los Angeles, CA  90013
      Telephone:  (213) 269-6617
8     Fax:  (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
9   *Attorneys for Defendants Rob Bonta, in*
    *his official capacity as Attorney General of*
10  *the State of California, and Allison Mendoza,*
    *in her official capacity as Director of*
11  *the Department of Justice Bureau of*
    *Firearms*

12

### IN THE UNITED STATES DISTRICT COURT

13

### FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

| | |
|---|---|
| 16  **JOSE CHAVEZ; *et al.*,** | 3:19-cv-01226-L-AHG |
| 17                        Plaintiffs, | **DEFENDANTS' MEMORANDUM** |
| | **OF POINTS AND AUTHORITIES** |
| 18        **v.** | **IN SUPPORT OF MOTION FOR** |
| | **SUMMARY JUDGMENT** |
| 19 | |
| 20  **ROB BONTA, in his official capacity** | Date:          May 13, 2024 |
| **as Attorney General of the State of** | Time:          10:30 a.m. |
| **California; *et al.*,** | Dept:          5B |
| 21 | Judge:        The Honorable M. James |
| 22                        Defendants. | Lorenz and Magistrate |
| | Judge Allison H. Goddard |
| 23 | Action |
| | Filed:          July 1, 2019 |
| 24 | |
| 25 | Third Amended Complaint Filed: |
| | March 22, 2023 |
| 26 | ***NO ORAL ARGUMENT PURSUANT*** |
| 27 | ***TO LOCAL RULE UNLESS*** |
| | ***ORDERED BY THE COURT*** |
| 28 | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.    Statutory Background ............................................................... 3

    A.    Senate Bills 1100 and 61 Restrict Commercial Sales and Transfers of Semiautomatic Centerfire Rifles and Other Long Guns to Certain 18-20-Year-Olds ................................. 3

    B.    People Aged 18-20 May Possess, Use, and Acquire Arms, Including Semiautomatic Centerfire Rifles, in California .......... 4

II.    Procedural History ................................................................... 5

LEGAL STANDARD ......................................................................................... 6

ARGUMENT ....................................................................................................... 6

I.    Section 27510 Regulates Individuals and Conduct Outside the Second Amendment's Scope .................................................. 7

    A.    Plaintiffs Cannot Establish That 18-20-Year-Olds Are Part of "the People" Protected by the Second Amendment ...... 8

    B.    Section 27510 Is a Presumptively Lawful Regulation of Commercial Firearms Transactions That Does Not Bar Keeping or Bearing Arms ............................................................ 10

    C.    The Hunting License Exemption Is an Objective Licensing Regime That Does Not Impinge On the Right to Keep or Bear Arms ................................................................ 11

II.    Section 27510's Age Limit Provisions Are Consistent with the Nation's Historical Tradition of Firearm Regulation ........................ 13

    A.    This Case Implicates a "More Nuanced" Analogical Approach ............................................................................... 14

    B.    The Challenged Age Restrictions on Sales and Transfers Are Relevantly Similar to Historical Analogues ...................... 17

        1.    Historical Age Restrictions Are Directly Analogous ..... 17

        2.    Campus Firearm Regulations Confirm the Original Public Understanding of the Second Amendment's Scope ................................................................ 20

        3.    Public Discourse and Case Law Confirm That Age-Based Limitations Were Publicly Understood Not to Offend the Second Amendment ................................. 20

        4.    Commercial Regulations from Colonial Times Through Reconstruction Provide Relevant Historical Support ............................................................ 22

i

**TABLE OF CONTENTS**
**(continued)**

Page

C.      The Surveyed Historical Analogues Are Relevantly
Similar...................................................................................... 24

CONCLUSION..................................................................................... 25

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

# TABLE OF AUTHORITIES

**Page**

CASES

*Coleman v. State*
  32 Ala. 581 (1858) ........................................................................ 22

*Def. Distributed v. Bonta*
  2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...................................... 7

*District of Columbia v. Heller*
  554 U.S. 570 (2008) .............................................................. *passim*

*Ezell v. City of Chicago*
  651 F.3d 684 (7th Cir. 2011) ........................................................ 17

*Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*
  No. 3:22-CV-410, 2023 WL 5617899 (E.D. Va. Aug. 30, 2023) ..................... 14

*Frlekin v. Apple, Inc.*
  979 F.3d 639 (9th Cir. 2020) ......................................................... 6

*Jones v. Bonta*
  34 F.4th 704 (9th Cir. 2022) ............................................... 1, 5, 13

*Lara v. Comm'r Pa. State Police*
  91 F.4th 122 (3d Cir. 2024) ......................................................... 14

*McDonald v. City of Chicago, Ill.*
  561 U.S. 742 (2010) ............................................................. 6, 7

*Nat'l Rifle Assn. of Am., Inc. v. BATFE*
  700 F.3d 185 (5th Cir. 2012) .......................................... 8, 14, 17, 21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
  597 U.S. 1 (2022) (*Bruen*) .................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*
  No. 23-1072, ___ F. 4th ___, 2024 WL 980633 (1st Cir. Mar. 7,
  2024) ............................................................................ 16

*Or. Firearms Fed'n, Inc. v. Brown*
  644 F. Supp. 3d 782 (D. Or. 2022) ............................................. 13, 16

iii

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Parman v. Lemmon*

4

119 Kan. 323 (1925) ................................................................. 22

5

*Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*

6

647 F. Supp. 3d 508 (W.D. La. 2022) .................................... 14

7

*State v. Allen*

94 Ind. 441 (1884) ................................................................. 22

8

9

*State v. Callicutt*

69 Tenn. 714 (1878) ............................................................... 21

10

*State v. Quail*

11

28 Del. 310 (Del. Gen. Sess. 1914) ...................................... 22

12

*Tankersly v. Commonwealth*

13

9 S.W. 702 (Ky. 1888) ........................................................... 22

14

*Teixeira v. County of Alameda*

15

873 F.3d 670 (9th Cir. 2017) (en banc) ........................... 7, 24

16

*United States v. Alaniz*

17

69 F.4th 1124 (9th Cir. 2023) .......................................... 7, 15

18

*United States v. Rene E.*

19

583 F.3d 8 (1st Cir. 2009) ..................................................... 18

20

*Worth v. Harrington*

666 F. Supp. 3d 902 (D. Minn. 2023) ................................... 14

21

22

**STATUTES**

23

18 U.S.C.

24

§ 922(b)(1) ................................................................................ 7

25

§ 922(c)(1) ................................................................................ 7

26

Cal. Fam. Code § 850 ................................................................. 5

27

28

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

Cal. Penal Code

§ 27880 ................................................................................................. 5

§ 16720 ................................................................................................. 4

§ 16865 ................................................................................................. 1

§ 16960(g) .......................................................................................... 1, 4

§ 16990(g) .......................................................................................... 1, 4

§ 16990(h) .......................................................................................... 1, 4

§ 26150(a)(2) ........................................................................................ 4

§ 26155(a)(2) ........................................................................................ 4

§ 26170(a)(2) ........................................................................................ 4

§ 27505(a) ............................................................................................ 7

§ 27510(b) ....................................................................................... 4, 25

§ 27510(b)(1) ........................................................................................ 1

§ 27510(b)(2) ........................................................................................ 1

§ 27510(b)(3) ........................................................................................ 4

§ 27545 ................................................................................................. 3

§ 27875(a) .......................................................................................... 1, 4

§ 27885 ................................................................................................. 5

§ 27910 ................................................................................................. 5

§ 27920 ................................................................................................. 1

§ 27920(a) ............................................................................................ 4

§ 27950 ................................................................................................. 5

## TABLE OF AUTHORITIES
### (continued)

**Page**

§ 28050 ...................................................................................................... 3

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. II..........................................................................2, 7

**OTHER AUTHORITIES**

1 William Blackstone, Commentaries On the Laws of England 451
(1st ed. 1765) .......................................................................................8

Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the
Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867 (1994) ................. 10

Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making
of the Constitution* (1997)................................................................... 10

James Kent, 2 *Commentaries on American Law* 259 (3d ed. 1836) ....................... 9

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second
Amendment Adjudication*, 133 Yale L.J. 99 (2023) ........................................ 16

Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc. Pol'y &
L. 613 (2007) .......................................................................................8

*Letter from John Adams to James Sullivan* (26 May 1776) (on file with
the National Archives)........................................................................9

Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A
Visual Examination of the Deadly Damage* (Wash. Post, Mar. 27,
2023).................................................................................................. 16

Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the
Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003).............................................. 10

Patrick J. Charles, *Armed in America: A History of Gun Rights from
Colonial Militias to Concealed Carry* (2019)............................................. 21

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed.
1883).................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page**

William J. Novak, *The People's Welfare: Law and Regulation in*
    *Nineteenth Century America* (Univ. of North Carolina Press 1996) ................. 22

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

**INTRODUCTION**

"[A]s a group," 18-20-year-olds are responsible for "unusually high rates of homicide and other violent crimes according to both national and California data," and they are "much more likely than other age groups to commit these crimes with guns." (Donohue Rpt. ¶ 13; *see also id.* ¶¶ 14-45.)[1]  In addition, 18-20-year-olds have committed several of the deadliest mass shootings in U.S. history, almost invariably with semiautomatic weapons, including the shootings at Sandy Hook Elementary (26 killed), Marjory Stoneman Douglas High (17 killed), and Robb Elementary (21 killed), among others.  (*Id.* ¶ 40.)

The California Legislature amended California Penal Code section 27510 to reduce firearms violence and mass shootings by 18-20-year-olds.  Section 27510 now generally prohibits federally licensed firearms dealers from selling or transferring certain firearms, including semiautomatic centerfire rifles and other long guns, to individuals under the age of 21.[2]  At the same time, California's statutory scheme provides several ways that 18-20-year-olds may obtain firearms. For instance, 18-20-year-olds may acquire firearms from immediate family members "by gift, bequest, [or] intestate succession," Cal. Penal Code § 27875(a), or through a spouse, *id.* §§ 16960(g), 16990(g) & (h), 27920.  Licensed dealers may also sell or transfer long guns that are not semiautomatic centerfire rifles to 18-20-year-olds if they take a hunter education course and secure a hunting license, or are part of law enforcement or the military.  Cal. Penal Code §§ 27510(b)(1) & (2).

Plaintiffs seek an order permanently enjoining Section 27510's age restrictions

---

[1] Copies of Defendants' disclosed expert reports in this matter are attached to the Declaration of Jennifer E. Rosenberg filed concurrently herewith.  They are referenced throughout this brief by the name of each expert (e.g. "Donohue Rpt.").

[2] California defines a "long gun" as "any firearm that is not a handgun or a machinegun."  Cal. Penal Code § 16865.  Long guns include rifles and shotguns. "A semiautomatic rifle fires a single bullet each time the trigger is pulled and does not require the user to manually cycle between shots.  And a centerfire rifle uses centerfire ammunition, in which the primer that ignites the powder is in the center of the bullet, rather than at the rim." *Jones v. Bonta*, 34 F.4th 704, 711 n.4 (9th Cir. 2022), *opinion vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

1

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

on the ground that they violate Plaintiffs' Second Amendment right to keep and bear arms.  This Court previously denied Plaintiffs' motion for a preliminary injunction applying the text-and-history standard for evaluating Second Amendment claims set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (*Bruen*).  The Court should again uphold Section 27510's age limitations, and enter judgment for Defendants.

**First,** Plaintiffs cannot meet their threshold burden to show that 18-20-year-olds are among "the people" to whom the Second Amendment accords a right, or that Section 27510's commercial restrictions prevent them from "keep[ing]" or "bear[ing]" any "Arms" for lawful purposes.  U.S. Const. amend. II; *Bruen*, 597 U.S. at 31-33.  For nearly two centuries after the Founding, 18-20-year-olds were considered minors, and were not accorded the full suite of constitutional rights.  Early Americans would not have understood them to be part of "the people" to whom the Amendment refers.  Further, Section 27510 is a presumptively lawful regulation of commercial firearms transactions that does not implicate the plain text of the Amendment.  And Section 27510's hunting license exemption does not implicate Second Amendment protections because it is an objective licensing regime, akin to the shall-issue licensing regimes sanctioned by the Supreme Court in *Bruen*.  *See Bruen*, 597 U.S. at 38 n.9.

**Second,** even if Plaintiffs could show that Section 27510's age limitations implicate presumptively protected conduct, the historical record establishes that governments have traditionally exercised broad discretion to regulate access to weapons for individuals under the age of 21 in order to protect the public safety.  Thus, the challenged age limitations are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.[3]

---

[3] A survey of relevant laws, ordinances, and authorities categorized among five charts of historical laws is included in the concurrently filed Declaration of Todd Grabarsky.  Bracketed numbers in this brief (e.g., **[4]**) refer to the numbers assigned to the laws and authorities listed in the five charts of historical laws.  For

2

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

# BACKGROUND

## I.   STATUTORY BACKGROUND

### A.   Senate Bills 1100 and 61 Restrict Commercial Sales and Transfers of Semiautomatic Centerfire Rifles and Other Long Guns to Certain 18-20-Year-Olds

Under California law, all commercial sales and most transfers of firearms—including long guns, semiautomatic centerfire rifles, and handguns—must occur through a federally licensed firearms dealer (also known as a "federal firearms licensee" or "FFL").  Cal. Penal Code §§ 27545, 28050.

In 2018, in the wake of the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, the California Legislature enacted Senate Bill 1100 to raise the minimum age for sale or transfer of long guns through FFLs from 18 to 21, bringing the age limit in line with the existing age limit for sales and transfers of handguns.  (*See* Albrecht Decl., Ex. 28 at DX 203; *see also* Albrecht Decl., Exs. 21-27.)  Following SB 1100's amendments, California Penal Code Section 27510 prohibited FFLs from selling or otherwise transferring any firearm to any person under the age of 21, with several important exemptions where the purchaser or transferee has been subject to safe firearms training and supervision:  18-20-year-olds could obtain any kind of long gun from FFLs, including semiautomatic centerfire rifles, after securing a hunting license issued by the California Department of Fish and Wildlife (the "hunting license exemption"), if they were part of law enforcement or the military, or had been honorably discharged from the military.  (*Id.*, Ex. 28 at DX 202.)

In 2019, a 19-year-old opened fire in a synagogue in a suburb of San Diego with a semiautomatic centerfire rifle he had purchased using Section 27510's hunting license exemption.  In response, the California Legislature passed Senate Bill 61, which tightened restrictions on the sale of semiautomatic centerfire rifles.

the Court's convenience, the Grabarsky Declaration also includes as exhibits copies of a selection of laws and authorities referenced in the charts.

3

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

(Albrecht Decl., Exs. 35-36, at DX 243, 247.)  Under SB 61's amendments to Section 27510, a FFL may no longer sell or transfer semiautomatic centerfire rifles to any person under the age of 21, unless that person is an active duty member of law enforcement, or an active or reserve member of the military.  *See* Cal. Penal Code § 27510(b)(3).  Thus, following SB 61's amendments to Section 27510, FFLs may no longer sell or transfer semiautomatic centerfire rifles to 18-20-year-olds under the hunting license exemption or the exemption for honorably discharged members of the military.  *Id.* § 27510(b)(1)-(2).  All exemptions continue to authorize FFLs to sell or transfer long guns that are not semiautomatic centerfire rifles to qualifying 18-20-year-olds.  *Id.* § 27510(b).

Section 27510, as amended, regulates only sales and transfers of certain arms by FFLs; it imposes no penalties on purchasers or transferees aged 18-20.[4]

## B.   People Aged 18-20 May Possess, Use, and Acquire Arms, Including Semiautomatic Centerfire Rifles, in California

As this Court concluded in its December 8 Order, "Section 27510 is not a firearms ban, including [with respect to] semiautomatic centerfire rifles, for individuals between 18 and 20 years of age."  (ECF 127 ("Order") at 11.)  Beyond the avenues provided for procuring firearms through FFLs set out in Section 27510, 18-20-year-olds may receive gifts, bequests, transfers, and loans of firearms—of both handguns and long guns (including semiautomatic centerfire rifles)—without having to go through a FFL as intermediary.  They may:  acquire a firearm from immediate family members "by gift, bequest, intestate succession, or other means from one individual to another," Cal. Penal Code § 27875(a); s*ee also id.* § 16720 (defining "immediate family member"), or "take title or possession of a firearm by operation of law," as, for example, between spouses (or as a surviving spouse), *id.*

---

[4] Effective January 1, 2024, California law restricts issuance of permits to carry concealable weapons such as handguns to individuals under the age of 21. Cal. Penal Code §§ 26150(a)(2), 26155(a)(2), 26170(a)(2) (as amended by Stats. 2023, Ch. 249, Secs. 10, 11, & 14).  Plaintiffs do not challenge these provisions, and they have expressly disclaimed any challenge to Section 27510's restrictions on sales and transfers of handguns.  Third Amended Complaint ("TAC") ¶ 34 n.2.

4

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

§§ 16960(g), 16990(g) & (h), 27920(a); Cal. Fam. Code §850 (defining transmutation of property between spouses).  They can also lawfully borrow a firearm from a family member, Cal. Penal Code § 27880, or from any person over 18 years of age, so long as that person is at all times present, *id.* § 27885.  Finally, they can rent a firearm "for the purposes of shooting at targets" at a target facility, *id.* § 27910, or rent a firearm other than a handgun for purposes of hunting if they have a hunting license, *id.* § 27950.  None of these provisions is subject to Section 27510's limits.

## II.  PROCEDURAL HISTORY

Plaintiffs filed their initial complaint challenging SB 1100's amendments to Section 27510 on July 1, 2019.  (ECF 1.)  After amending their complaint to challenge SB 61's amendments (ECF 20), Plaintiffs filed a motion for a preliminary injunction (ECF 21), which this Court denied in November 2020 (ECF 66).

The Ninth Circuit affirmed the denial of that preliminary injunction in part and reversed in part.  *Jones*, 34 F.4th 704.  In the interim, the parties agreed to stay litigation, and after the Supreme Court's disposition of *Bruen*, the Ninth Circuit vacated its opinion and remanded for further proceedings.  *Jones*, 47 F.4th 1124.  On remand, this Court concluded "that *Bruen* represents a change in the legal framework this Court applied when deciding Plaintiffs' preliminary injunction motion," denied Plaintiffs' 2019 motion as moot, and allowed Plaintiffs to file a renewed preliminary injunction motion.  (ECF 100.)[5]  The Court issued a new scheduling order providing the parties with the opportunity to submit new expert reports addressing issues relevant under *Bruen*, and to complete fact discovery.

---

[5] Plaintiffs also filed their TAC in March 2023 adding individual plaintiffs Jose Chavez and Andrew Morris, and voluntarily dismissed the previous individual named plaintiffs, who had all aged out of Section 27510's limits while the appeal was pending.  (ECF 108 & 114.)  New individual plaintiff Jose Chavez turned 21 in September 2023, and is no longer subject to Section 27510's restrictions.  (Chavez Dep. 20:11-16 [Albrecht Decl., Ex. 57].)  Mr. Chavez's claim is therefore moot.

The TAC's Prayer for Relief requests a declaration that Section 27510 is unconstitutional both facially and as applied, but Plaintiffs have made no argument supporting an as-applied challenge at any point in this litigation.

5

1   (ECF 105.)  The parties completed fact discovery, and Defendants served expert

2   reports in September 2023.  Plaintiffs chose not to designate experts.

3       Last December, this Court denied Plaintiffs' renewed motion for a preliminary

4   injunction.  (ECF 127.)  The Court concluded that plaintiffs had no likelihood of

5   success on the merits because Defendants had "identified well-established and

6   representative historical analogues" that were relevantly similar to Section 27510.

7   Order at 15, 20.

8                           **LEGAL STANDARD**

9       "[S]ummary judgment is appropriate when there is no genuine dispute as to

10  any material fact and the movant is entitled to judgment as a matter of law."

11  *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (citation omitted).

12                              **ARGUMENT**

13      The Second Amendment right is "not unlimited[,]" and individuals may not

14  "keep and carry any weapon whatsoever in any manner whatsoever and for

15  whatever purpose."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  In

16  *Bruen*, the Supreme Court announced a new standard for adjudicating Second

17  Amendment claims "centered on constitutional text and history."  597 U.S. at 22.

18  Under this text-and-history approach, courts must first determine whether the

19  amendment's "plain text covers an individual's conduct."  *Id.* at 24.  If it does, "the

20  Constitution presumptively protects that conduct," and "[t]he government must then

21  justify its regulation by demonstrating that it is consistent with the Nation's

22  historical tradition of firearm regulation."  *Id.*

23      The Second Amendment is not a "regulatory straightjacket."  *Id.* at 30.  The

24  text-and-history standard does not prevent states from "experiment[ing] with

25  reasonable firearms regulations" to address threats to the public.  *McDonald v. City*

26  *of Chicago, Ill.*, 561 U.S. 742, 785 (2010) (plurality opinion).  "[L]ongstanding

27  regulatory measures [such] as 'prohibitions on the possession of firearms by felons

28  and the mentally ill,'" or "'laws imposing conditions and qualifications on the

6

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

commercial sale of arms,'" remain available.  *Id.*, at 786 (quoting *Heller*, 554 U.S. at 626-27); *accord Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (reiterating that nothing in *Bruen* "should be taken to cast doubt on [such laws]").  Justice Alito's concurring opinion in *Bruen* confirmed that the Court's opinion "decides nothing about . . . the requirements that must be met to buy a gun" and "does not expand the categories of people who may lawfully possess a gun," and noted that federal law generally "bars the sale of a handgun to anyone under the age of 21, [18 U.S.C.] §§ 922(b)(1), (c)(1)."  597 U.S. at 72-73 (Alito, J. concurring).

## I.   SECTION 27510 REGULATES INDIVIDUALS AND CONDUCT OUTSIDE THE SECOND AMENDMENT'S SCOPE

*Bruen*'s first step requires a determination whether "the 'proposed course of conduct' falls within the Second Amendment"—*i.e.*, whether the regulation at issue prevents any "people" whose rights the Second Amendment protects from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes.  U.S. Const. amend. II; *Bruen*, 597 U.S. at 31-33; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).  Under *Bruen*'s standard, a party challenging a law under the Second Amendment bears this threshold burden.  *See* 597 U.S. at 33-34; *see also Def. Distributed v. Bonta*, 2022 WL 15524977, at *4-5 (C.D. Cal. Oct. 21, 2022), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022).

It is beyond quarrel that legislatures may set *some* age limits on access to firearms.  Plaintiffs appear to acknowledge as much by challenging only the age limitations in Section 27510, rather than California's broader scheme.  They do not challenge California's prohibition on FFLs selling or transferring handguns to people under the age of 21.  *Id.* §§ 27505(a), 27510(a), 27510; *see also* TAC ¶ 34 n.2.  And Plaintiffs have never claimed that individuals under the age of 18 have a right to keep, bear, or acquire firearms.

"Whatever the scope of th[e] right [to acquire firearms]," *Teixeira v. County of Alameda*, 873 F.3d 670, 679-80 (9th Cir. 2017) (en banc), the Second Amendment

7

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

does not encompass Plaintiffs' proposed course of conduct here—an unfettered right for anyone younger than 21 to acquire *any particular weapon* from *any particular source* without the imposition of *any conditions* of sale or transfer.

### A. Plaintiffs Cannot Establish That 18-20-Year-Olds Are Part of "the People" Protected by the Second Amendment

Plaintiffs cannot meet their threshold burden to show that 18-20-year-olds are among "the people" to whom the Second Amendment accords a right to keep and bear arms.  In *Bruen*, the Supreme Court described the Second Amendment right as belonging to "ordinary, law-abiding, adult citizens."  *Bruen*, 597 U.S. at 31-32.  And in *Heller*, the Supreme Court described "the people" whose rights the Second Amendment protects as those who are "members of the political community."  *Heller*, 554 U.S. at 580.  Yet since the Founding, 18-20-year-olds were considered neither "adults" capable of responsible decision-making, nor members of the political community of the United States.

For most of U.S. history, persons younger than 21 were considered minors or "infants."  *See Nat'l Rifle Assn. of Am., Inc. v. BATFE*, 700 F.3d 185, 201 (5th Cir. 2012) (*BATFE*), *abrogated on other grounds by Bruen*, 597 U.S. 1; 1 William Blackstone, Commentaries On the Laws of England 451 (1st ed. 1765) ("So that full age in male or female, is twenty one years, . . . who till that time is an infant, and so styled in law."); *see also* Cornell Rpt. ¶¶ 10, 21; Brewer Rpt. ¶¶ 12-19.  Until 1969—more than a century after the Fourteenth Amendment's ratification— the age of majority for unmarried men was 21 in every state.  *See* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc. Pol'y & L. 613, 681-86 (2007).

This legal distinction between "adults" and "infants" or minors was a "central principle inherited from th[e English] common law tradition" (Cornell Rpt. ¶ 21), in which the patriarchal structure meant that "individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents . . . or guardians" (*id.* ¶ 42).  Indeed, infants under the age of 21 were considered "legally

8

'disabled'" under the law, similar to married women and the mentally unsound. (*Id.* ¶¶ 44, 47-48 [discussing eighteenth century scholarly commentary]; *id.* ¶¶ 41-65.)[6]

"Regulations establishing 21 years as the age of majority during this period were premised on the understanding that those below that age were mentally immature and not yet capable of responsible self-governance." (Brewer Rpt. ¶ 13.) A respected Founding era jurist explained that "[t]he necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years." 2 James Kent, *Commentaries on American Law* 259 (3d ed. 1836). John Adams mused that "[c]hildren" under 21 lack "[j]udgment or [w]ill of their own" and are not "fit to be trusted by the [p]ublic." *See Letter from John Adams to James Sullivan* (26 May 1776) (on file with the National Archives).[7]

Importantly, at the time the Second Amendment was ratified, 18-20-year-olds were not considered "part of the political community possessing political rights." (Brewer Rpt. ¶ 47; *id.* ¶¶ 13, 48-51.) Legislators at the Founding and beyond set 21 as the lower age limit for the exercise of many rights and activities, including: marriage without parental consent, *see, e.g.*, 4 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 153 (James T. Mitchell & Henry Flanders eds., 1897); becoming a naturalized citizen, Act of Mar. 26, 1790, ch. IV, 1 Stat. 103, 104 (repealed 1795); Act of Jan. 29, 1795, ch. XX, 1 Stat. 414, 415; petitioning the government, *see* Cornell Rpt. ¶ 42; forming enforceable contracts for nearly

---

[6] The status of 18-20-year-olds as "infants" was "fixed according to many common law treatises widely used in the colonies and in the New Republic, from Sir Edward Coke's *Institutes of the Laws of England* (1628) to William Blackstone's *Commentaries on the Laws of England* (1765-1769)"; by "guides for justices and for legal proceedings published in the colonies and states"; by "colonial and early national statutes"; and in "colonial court records," which evidenced the fact that infants required others to "act for them in almost all legal matters." (Brewer Rpt. ¶ 9; *accord id.* ¶¶ 12-20 [analyzing these sources]; Cornell ¶¶ 44-55.)

[7] For this reason, any public safety duties in which minors engaged, such as the "hue and cry," "were undertaken in a supervised setting under the authority of parents, guardians, or other [authorized] adults . . . ." (Cornell Rpt. ¶ 56.)

9

anything beyond "necessaries" (which included food, clothes, and lodging, but not firearms), *see* Brewer Rpt. ¶¶ 13-20, 37-38; and serving on juries, *see* Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994).

Perhaps most relevant here, the Founders denied those under 21 the right to vote—thus excluding them from "membership in the polity."  Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 301 (1997).  "While the Constitution left the determination of voting eligibility up to individual states, no state permitted minors to vote.  That right was restricted in the 1790s to only those over the age of 21, and primarily to property holders."  (Brewer Rpt. ¶ 47.)  That exclusion continued until passage of the Twenty-Sixth Amendment in 1971.  *See* Pamela S. Karlan, *Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L. Rev. 1345, 1358-59 (2003).

The Second Amendment right is no exception to this history.  Even before the Founding, 18-20-year-olds' "legal status . . . would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision."  (Cornell Rpt. ¶ 41; *see also id.* ¶¶ 10, 21, 24, 41-71, 82, 166-67.)

### B. Section 27510 Is a Presumptively Lawful Regulation of Commercial Firearms Transactions That Does Not Bar Keeping or Bearing Arms

Even if Plaintiffs are assumed to be among "the people" entitled to Second Amendment rights, Section 27510 imposes presumptively lawful "conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-627; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (reiterating that nothing in *Bruen* "should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms").  "Section 27510 regulates commercial firearms transactions based on age by limiting" the circumstances under which FFLs may sell or transfer firearms to 18-20-year-olds, "rather than

10

prohibiting the access of individuals 18 to 20 years of age to certain firearms offered by FFLs."  Order at 11.  It "does not interfere with intrafamily transfers, loans of firearms from family or any supervising individual over 18, or commercial loans for specific purposes such as target practice and hunting."  *Id.*  And as this Court previously concluded, under the hunting license, honorably discharged military, and active police and military exemptions, "FFLs *can* sell, supply, deliver, or give possession or control of [certain] firearms" to 18-20-year-olds who have received firearm safety training.  Order at 10-12.

The availability of alternative means for 18-20-year-olds to acquire firearms— including long guns, semiautomatic centerfire rifles, and even handguns, whether through Section 27510's exemptions or non-FFL acquisition, *see supra* Background § I(B)—undermines any possible claim that Section 27510's limitations infringe a protected course of conduct.  Plaintiffs have never identified even a single individual who *could not* acquire a firearm through one of the avenues left open by Section 27510.  Individual plaintiffs Chavez and Morris both testified that they have been loaned firearms by parents or friends, or used their parents' or friends' firearms under their supervision.  (*See* Chavez Dep. 79:11-80:17; Morris Dep. 60:25-61:3, 71:6-10, 72:24-73 [Albrecht Decl., Exs. 56 & 57.].)  And both testified that they would refuse to accept a gifted firearm even if given the option.  (Chavez Dep. 83:8-85:19; Morris Dep. 77:23-80:15 [Albrecht Decl., Exs. 56 & 57.].)

### C.   The Hunting License Exemption Is an Objective Licensing Regime That Does Not Impinge On the Right to Keep or Bear Arms

Section 27510 also allows 18-20-year-olds to purchase long guns from FFLs, if they procure a hunting license after taking a hunter education course covering firearm safety training topics.  This kind of objective licensing requirement mirrors the licensing regimes sanctioned by the Supreme Court in *Bruen*.

Licensing regimes based on objective and definite criteria remain valid under *Bruen* because—absent "abusive" scenarios such as those involving "lengthy wait

11

1   times in processing license applications or exorbitant fees"—they do not "prevent

2   'law-abiding, responsible citizens' from exercising their Second Amendment

3   right . . . ." *Bruen*, 597 U.S. at 38 n.9.  Both the majority opinion and Justice

4   Kavanaugh's concurring opinion approved of states continuing to require that a

5   public-carry license applicant first pass a background check and a firearm safety

6   course, reasoning that such licensing regimes "are designed to ensure only that

7   those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible

8   citizens.'"  *Id.* (stating that "nothing in our analysis should be interpreted to suggest

9   the unconstitutionality of the 43 States' 'shall-issue' licensing regimes" or other

10  licensing requirements that are "'narrow, objective, and definite'"); *see also id.* at

11  80 (Kavanaugh, J., concurring) (approving of shall-issue licensing regimes that

12  require "training in firearms handling").

13      The hunting license and education requirements, which "do not grant open-

14  ended discretion to licensing officials and do not require some showing of need

15  apart from self-defense," *id.* (Kavanaugh, J., concurring), are similarly narrow,

16  objective, and definite.  To obtain a license, applicants must complete an official

17  hunter education course.  (Albrecht Decl., Ex. 11 at DX 92.)  They may opt to take

18  a traditional course (ten hours of in-classroom instruction) or a four-hour online

19  course and a four-hour, in-person follow-up course.  (*See id.*, Exs. 12 at DX 97, 13

20  at DX 104.)  Among other topics, the course covers "firearms safety and handling"

21  and first aid.  (*See id.*, Ex. 11, DX 93-94.)  Students learn how to safely handle,

22  load, unload, store, carry, and fire various types of firearms.  (*Id.*, Exs. 1 at DX 10-

23  19 [Hunter Education Course Instructor Manual], 17 at DX 129-30, 60 at DX 1352-

24  62 [detailed topic listing; Study Guide for Hunting Education].)[8]

25      At the conclusion of either course, applicants must pass a test covering

26  objective safe firearms use and other hunting and safety topics, and complete a safe

27  _____

28      [8] Courses are subject to a modest fee—$24.95 for the online component, and in-person traditional and follow-up courses may be provided free or at a similarly modest cost.  (*Id.*, Exs. 4 at DX 61, 5 at DX 65, 17 at DX 129, 18 at DX 145.)

12

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

1    gun handling demonstration for the instructor.  (*Id.*, Exs. 1 at DX 5-6 [Hunter Ed.

2    Course Instructor's Manual], 17 at DX 129.)  Applicants who successfully

3    complete the course are eligible to purchase an annual hunting license for

4    approximately $59.  (*Id.*, Ex. 6 at DX 68.)

5         Plaintiffs thus cannot argue that the hunting license exemption requirements

6    prevent them or any other 18-20-year-old Californian from exercising rights

7    protected by the Second Amendment.  The Ninth Circuit, in its now-vacated panel

8    decision, agreed with this Court that the hunting license exemption does not

9    "prevent young adults from having firearms or from using them in any particular

10   way."  *Jones*, 34 F.4th at 724.  Further, individual plaintiffs Chavez and Morris

11   have each acknowledged that they would be able to purchase firearms by taking a

12   hunter education course and buying a hunting license, but that they had chosen not

13   to do so.  (Chavez Dep. 137:5-138:6; Morris Dep. 109:17-111:5, 110:10-24

14   [admitting that he "cho[se] not to take an available avenue to purchase a firearm"]

15   [Albrecht Decl., Exs. 56 & 57].)  Moreover, both Mr. Chavez and Mr. Morris

16   agreed that the course topics are relevant to safe and responsible firearms use, and

17   that free hunter education courses were available close to their residences.  (Chavez

18   Dep. 117:4-124:14, 133:4-23, 134:10-20, 160:17-161:18; Morris Dep. 98:9-105:16,

19   106:25-107:4, 112:20-113:15, 114:7-16 [Albrecht Decl., Exs. 56 & 57.]).

20        Section 27510's hunting license provision thus does not implicate conduct

21   protected by the Second Amendment.  *See Or. Firearms Fed'n, Inc. v. Brown*, 644

22   F. Supp. 3d 782, 806-07 (D. Or. 2022) (holding permit-to-purchase scheme did not

23   implicate Second Amendment because it tracked regimes approved in *Bruen*),

24   *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022).

**II.    SECTION 27510'S AGE LIMIT PROVISIONS ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION**

Even if Plaintiffs could show that Section 27510's age limitations implicate

the plain text of the Second Amendment, the record demonstrates that the

13

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

challenged provisions are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see* Order at 20.  Courts have long held that setting age limits for sale or transfer of firearms to those under the age of 21 "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety," where members of those groups are considered "untrustworthy" or "irresponsible." *BATFE*, 700 F.3d at 200, 203, 206.

Defendants have identified hundreds of laws, ordinances, and regulations from before the Founding through the end of the nineteenth century demonstrating that governments have traditionally exercised broad discretion to regulate access to and handling of firearms for people under the age of 21 in order to protect the public safety, and to regulate the commercial sale of firearms and other products more broadly to secure public health and safety.  This record amply supports upholding Section 27510's age restrictions as a matter of law.  *See Reese v. Bureau of Alcohol Tobacco Firearms & Explosives*, 647 F. Supp. 3d 508, 524 (W.D. La. 2022) (upholding federal statute setting 21 as the lower age limit for sales of handguns through FFLs where "nineteenth century laws restricting access to firearms by those under the age of 21" were comparable in scope and justification).[9]

### A.   This Case Implicates a "More Nuanced" Analogical Approach

As a preliminary matter, although a standard analogical analysis supports Section 27510, its support in history is especially sound under the "more nuanced" approach that is warranted here.  *Bruen*, 597 U.S. at 27-28.  When a challenged law addresses either "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" is warranted because "[t]he regulatory

---

[9] Several courts have reached a contrary conclusion, but Defendants disagree with their legal reasoning and historical analysis.  Most of these cases are currently pending appellate review.  *See, e.g., Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024), *pet. for reh'g filed* Feb. 15, 2024; *Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-CV-410, 2023 WL 5617899 (E.D. Va. Aug. 30, 2023), *appeal docketed sub nom. McCoy v. ATF*, No. 23-2275 (4th Cir. Oct. 17, 2023); *Worth v. Harrington*, 666 F. Supp. 3d 902 (D. Minn. 2023), *appeal docketed, sub nom. Worth v. Jacobson*, No. 23-2248 (8th Cir. May 22, 2023).

14

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

1    challenges" of today would not be "the same as those that preoccupied the Founders

2    in 1791 or the Reconstruction generation in 1868." *Id.* at 27.  Governments

3    generally regulate problems as they arise, and thus prior generations cannot be

4    expected to have addressed concerns that were not prevalent at the time.  (*See*

5    Spitzer Rpt. ¶¶ 72-75 [describing increased regulation as technology develops and

6    crime rates rise]; *accord* Cornell Rpt. ¶¶ 17, 39, 140-42.)  Because this case

7    implicates both dramatic technological change and unprecedented societal concerns

8    for public safety, a "more nuanced" approach is warranted.  *Cf. Alaniz*, 69 F.4th at

9    1130 (concluding that a broader range of analogues are relevant when addressing a

10   regulation aimed at a "largely modern crime").

11       "[T]he Founding era did not have a modern-style gun violence problem to

12   address."  (Cornell Rpt. ¶ 100.)  "Firearms in the eighteenth century were not

13   ideally suited for" self-defense or committing crimes, as colonial and Founding era

14   weapons "took too long to load and were too inaccurate" for use as effective tools

15   of social violence or other crimes.  (*Id.* ¶ 110.)  The market revolution of the

16   Jacksonian period (1828-1854) led to radical advancements in firearms technology

17   and wide availability of cheaper, deadlier, concealable firearms—which in turn

18   spurred the proliferation of gun violence more generally, followed quickly by

19   increased gun violence among minors under the age of 21.  (*See, e.g.*, *id.* ¶¶ 111-

20   112, 124-142; Roth Rpt. ¶¶ 26-27, 29.)  "The level of post-Civil War [firearm]

21   regulation intensified to respond to new and unprecedented problems created by

22   firearms in an increasingly urban and modern society that lacked the community-

23   based forms of peacekeeping and law enforcement typical of pre-industrial and pre-

24   modern societies."  (Cornell Rpt. ¶ 17; *accord id.* ¶ 113.)

25       In addition, "mass shootings[] are a recent phenomenon, caused by changes in

26   technology that emerged in the late nineteenth through the late twentieth century."

27   (Roth Rpt. ¶ 72; *id.* ¶¶ 44–62.)  "The threat to public safety and law enforcement

28   posed by semiautomatic rifles—with or without dangerous modifications—is a

15

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

modern phenomenon that has a direct correlation with mass murder and mass shootings." (*Id.* ¶ 57.) "The danger these firearms pose is intrinsically different from past weaponry," leading to "dramatically increased" numbers of people "killed or wounded in mass shootings . . . ." (*Id.* ¶ 57 & Fig. 1; *see also* Cornell Rpt. ¶¶ 139-40; *Or. Firearms*, 644 F. Supp. 3d at 803 ("[S]emi-automatic weapons did not become 'feasible and available' until the . . . twentieth century[.]").)[10] And as multiple courts have observed, "'[a]t the Founding, there was no comparable problem of gun violence in schools.'" *Ocean State Tactical, LLC v. Rhode Island*, No. 23-1072, ___ F. 4th ___, 2024 WL 980633, at *3 (1st Cir. Mar. 7, 2024) (applying more nuanced approach to large capacity magazine ban) (quoting *Or. Firearms*, 644 F. Supp. 3d at 803); *accord* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 155-56 (2023) (detailing sharp rise in school shootings from "eleven shootings a decade ago" to "ninety-three shootings during the 2020-2021 school year").

These public safety concerns are particularly pronounced where 18-20-year-olds are involved. Scholars have observed that social isolation and "cultural scripts" often received through modern social media are catalysts of firearm violence for this age group. (Roth Rpt. ¶¶ 65-66.) The statistics bear this out: 18-20-year-olds account for a homicide arrest-rate per 100,000 people that is *four times* higher than the overall homicide arrest rate in California. (Donohue Rpt. ¶ 21.) "[W]hile historically accounting for approximately 4% of the post-World War II population in the United States, 18-20-year-olds have been involved in perpetrating 20% of the mass shootings resulting in 10 or more deaths . . . ." (Klarevas Rpt. ¶ 17.) Further, "18-20-year-old mass public shooters display a preference for long

---

[10] For a visual modeling of the lethality of semiautomatic centerfire rifles such as the AR-15, including modeling of wounds inflicted during the Parkland, Florida mass shooting and Sandy Hook Elementary School shooting in Newtown, Connecticut, see Nick Kirkpatrick et al., *What Does an AR-15 Do to a Human Body? A Visual Examination of the Deadly Damage* (Wash. Post, Mar. 27, 2023), *available at* https://tinyurl.com/4vfz4y4b.

16

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

guns, particularly semiautomatic, centerfire rifles—the category of long guns regulated under SB 61." (*Id.* ¶ 20; *see also* Donohue Rpt. ¶¶ 26-27, 40.)

### B. The Challenged Age Restrictions on Sales and Transfers Are Relevantly Similar to Historical Analogues

#### 1. Historical Age Restrictions Are Directly Analogous

The historical record is replete with analogous age restrictions throughout the nineteenth century, and particularly in the time surrounding the Civil War. (*See* Grabarsky Decl., Chart A.) As concealable weapons such as pistols, dirks, daggers, and other arms became more widely available in the early and mid-nineteenth century, interpersonal violence rose, and "states began passing laws to deal with the negative consequences of these weapons," including restrictions on sales, loans, and public carry. (Cornell Rpt. ¶¶ 109-116.)[11] As firearms became more technologically advanced, restrictions on access and use by minors swiftly followed—and mirrored—these broader restrictions on the general population. Before the end of the nineteenth century, at least "nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms." *BATFE*, 700 F.3d at 202 & n.14; *see also* Cornell Rpt. ¶¶ 109-118; Spitzer Rpt. ¶¶ 16-25 & Exs. I & J; Rivas Rpt. ¶¶ 38-49 & Exs. 32-53; Roth Rpt. ¶¶ 38-43. These historical precursors imposed comparable burdens to Section 27510 and were justified by similar public safety concerns.[12]

---

[11] Hundreds of similar laws prohibiting the sale, loan, possession, or public carry of concealable firearms and small knives—by the general population or categories of persons deemed untrustworthy, dangerous, or irresponsible—appear in Chart D in the Grabarsky Declaration **[205-524]**. (*See also* Spitzer Rpt. ¶¶ 56-57 & Ex. C.) These laws are predecessors to nineteenth-century age limits laws and stretch back to colonial and even medieval times.

[12] Nineteenth century regulations bear particular importance, because as noted in *Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment. 597 U.S. at 37-38; *see also Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood *when the Fourteenth Amendment was ratified*." (emphasis added)).

17

1    For instance, over a decade before the Fourteenth Amendment's ratification,

2    Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife,

3    or knife, or instrument of the like kind or description, . . . or air gun, or pistol." Act

4    of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, **[2]**; Cornell Rpt. ¶ 113.  Tennessee

5    followed suit with laws in 1856 and 1858 prohibiting selling, loaning, giving, or

6    delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, [or]

7    hunter's knife," with exceptions in 1856 for sales, loans, and gifts to minors for the

8    purpose of hunting, and in 1858 for "a gun for hunting or weapon for defence in

9    traveling."  1856 Tenn. Acts 92, ch. 81, § 2 **[3]**; Tenn. Code § 4864 (1858), **[4]**; *see*

10   *also* Rivas Rpt. ¶ 50 & Ex. 35; Cornell Rpt. ¶ 114.  And in 1859, Kentucky passed

11   a law prohibiting anyone other than parents or guardians from selling, giving, or

12   loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or

13   other deadly weapon" to minors.  1859 Ky. Acts 245, § 23, **[5]**; Cornell Rpt. ¶ 115.

14   In each of these states, the age of majority was 21 at the time **[2-5]**.

15   Similar state laws proliferated during Reconstruction and the remainder of the

16   nineteenth century.  (*See* Grabarsky Decl., Chart A, (regarding minors under 21 **[2-**

17   **6, 9, 11-14, 16, 18-20, 22-23, 25, 29, 35, 36, 38, 41, 44-46, 48, 50]**)).[13]  Often, these

18   prohibitions expressly targeted handguns and other handheld weapons, and some

19   criminalized "mere possession."  *United States v. Rene E.*, 583 F.3d 8, 14 (1st Cir.

20   2009).[14]  For example, Maryland made it "unlawful" for anyone "to sell, barter, or

21   give away any firearm whatsoever or other deadly weapon, except for shot guns,

22   fowling pieces and rifles to any person who is a minor under the age of twenty-one

23   _____
   Nonetheless, the Court need not resolve the question of "whether courts should
24   primarily rely on the prevailing understanding of an individual right when the
   Fourteenth Amendment was ratified in 1868 when defining its scope," or 1791,
25   when the Second Amendment was ratified, *Bruen*, 597 U.S. at 37-38.  As discussed
   above, Americans in both time periods regarded 18-20-year-olds as having "no
26   independent political and legal capacity." (*See* Brewer Rpt. ¶ 13; *supra*, § I(A).)
        [13] (*See also id.* (regarding minors generally **[8, 11, 27, 30]**); regarding
27   younger minors **[7, 10, 15, 17, 21, 24, 26, 28, 31-34, 37, 39-40, 43, 47, 49]**).)
        [14] *See also* Cornell Rpt. ¶¶ 125-133 & Exs. B & D; Spitzer Rpt. ¶¶ 16-25 &
28   Exs. I & J (identifying forty-five local ordinances and state statutes imposing an age
   limit of 21 on possession, use, sale, or transfer from 1700s-early 1900s).

18

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

years." 1882 Md. Laws 656, ch. 424, p. 656 **[23]**.  Notably, these laws were often

more burdensome to 18-to-20-year-olds' ability to keep, bear, or acquire arms than

Section 27510.  Many entirely prohibited selling, giving, or loaning handguns and

other concealable deadly weapons to 18-to-20-year-olds.  Others were not blanket

prohibitions, but provided only narrow exceptions that allowed parents or guardians

to provide arms to minors, or to consent to sales or loans.  *See, e.g.*, 1883 Wis. Sess.

Laws 290 (covering "pistol[s]" and "revolver[s]"), **[35]**; Act of Apr. 16, 1881, § 2,

1881 Ill. Laws 73 (covering "pistol[s], revolver[s], derringer[s], bowie knife[s],

dirk[s] or other deadly weapon[s] of like character," but permitting fathers,

guardians, and employers to sell, lend, or give such weapons to minors), **[18]**;

Spitzer Rpt. ¶¶ 20, 22.[15]  Section 27510 falls well within the boundaries set by

historical tradition:  Unlike many of these Reconstruction-era predecessors, it even

leaves open avenues for 18-to-20-year-olds to acquire handguns, that

"quintessential self-defense weapon." *Heller*, 554 U.S. at 629.[16]  These historical

laws confirm that, like the Founders, Americans living in the early and mid-

nineteenth centuries would not have regarded Section 27510's age restrictions as

violating the Second Amendment.[17]

---

[15] These laws often "prohibited the sale of weapons to minors in conjunction with other groups deemed untrustworthy at the time," such as those of unsound mind (Rivas Rpt. ¶ 45 & Exs. 44, 56), servants, the intoxicated, and others with limited rights (Spitzer Rpt. ¶ 20 & Ex. J; *see also* **[4, 5, 12, 14, 17, 27, 29, 35, 47]**.)

[16] For further discussion of exemptions included in Reconstruction-era laws that are similar to those in Section 27510, *see, e.g.*, Rivas Rpt. ¶¶ 9, 42-43, 65.

[17] In addition, local city and town ordinances imposed various restrictions on minors starting in colonial times; these ran the gamut from laws prohibiting and criminalizing sales or loans of concealable firearms and knives to minors and other categories of legally disabled persons, with or without parental or guardian consent, **[86, 93]**, to laws prohibiting even parents and guardians from giving toy guns or other small arms to their charges **[99]**.  The earliest age-based firearm laws appeared in local ordinances, beginning with a New York City ordinance enacted in 1763 penalizing minors who discharged weapons in public places.  (Spitzer Rpt. ¶ 17; **[80]**.)  Numerous city ordinances followed in the early 1800s through the Antebellum and Civil War periods, including some of the first age-based sales restrictions.  (*See* Grabarsky Decl., Chart A **[80-89]**.)  These "early laws applying to cities and towns both reflected and presaged the effort to keep dangerous weapons out of the hands of minors in populated areas."  (Spitzer Rpt. ¶¶ 17 & Exs. I & J.)

19

### 2.   Campus Firearm Regulations Confirm the Original Public Understanding of the Second Amendment's Scope

Throughout history, public and private educational institutions alike have prohibited students from possessing firearms on college and university campuses, where students were subject to the authority and supervision of college officials acting *in loco parentis*.  (*See* Cornell Rpt. ¶¶ 66-71; Spitzer Rpt. ¶¶ 26-35 & Ex. K; Brewer Rpt. ¶ 39.)  These regulations provide additional historical precursors to Section 27510.  For example, at the beginning of the nineteenth century, the University of Georgia prohibited students from keeping "any gun, pistol, Dagger" or "any other offensive weapon in College or elsewhere," meaning that students could not possess such weapons even while they were away from campus.  (Cornell Rpt. ¶ 69, **[117]**.)  And both Harvard (in the Founding era) and Bowdoin College (in 1812) forbade students going "gunning" without permission of faculty members.  (Cornell Rpt. ¶ 67; **[108, 120]**.)  The historical record reveals that at least twelve public universities and nearly fifty private colleges and universities imposed some firearm restrictions upon their students.  (*See* Grabarsky Decl., Chart B **[107-170]**.)  These college students were generally aged 18-22.  (Spitzer Rpt. ¶ 31.)

These regulations "further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms.  Rather, access to . . . weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them:  fathers, guardians, constables, justices of the peace, or militia officers."  (Cornell Rpt. ¶ 71; *accord* Spitzer Rpt. ¶¶ 26-35, 80 & Ex. K; Rivas Rpt. ¶¶ 42-43.)

### 3.   Public Discourse and Case Law Confirm That Age-Based Limitations Were Publicly Understood Not to Offend the Second Amendment

The conclusion that restrictions on 18-20-year-olds' access to firearms "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 597 U.S. at 19, finds further support from Reconstruction Era

20

newspapers.  Based on such sources of public discourse, historians have confirmed that the public did not understand the right to keep and bear arms to protect the rights of 18-to-20-year-olds to purchase such weapons.  In fact, "lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of firearm-related injuries at the hands of minors[.]" Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019); *id.* at 156 & n.212 (cataloguing media accounts of firearm violence by minors in late nineteenth century, as well as public sentiment); *see also* Cornell Rpt. ¶ 141; Rivas Rpt. ¶ 38 & Exs. 71-77.

Legal commentators also approved of such regulations.  A treatise cited with approval in *Heller*, 554 U.S. at 616, included among permissible exercises of police power "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

In *Bruen*, the Supreme Court "recognize[d] that 'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'"  597 U.S. at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)).  The historical record reveals few challenges to age-based firearm restrictions, and suggests that state courts "maintained that age-based restrictions on the purchase of firearms— including restrictions on the ability of persons under 21 to purchase firearms— comported with the Second Amendment guarantee."  *BATFE*, 700 F.3d at 202-03. Indeed, from the Founding until shortly before *Bruen*, only one plaintiff is known to have challenged the constitutionality of age-based restrictions on firearms access. And in that case, the Supreme Court of Tennessee held that Section 4864 of Tennessee's Code, which then prohibited "the sale, gift, or loan of a pistol or other like dangerous weapon to a minor," was "not only constitutional . . . but wise and salutary in all its provisions."  *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878).

21

Additional case law confirms that individuals were prosecuted and convicted under statutes penalizing the sale of firearms to minors throughout the Reconstruction era and early twentieth century; Defendants are unaware, however, of any cases involving a constitutional challenge to those statutes.  *See Parman v. Lemmon*, 119 Kan. 323 (1925); *State v. Quail*, 28 Del. 310 (Del. Gen. Sess. 1914); *Tankersly v. Commonwealth*, 9 S.W. 702, 702 (Ky. 1888); *State v. Allen*, 94 Ind. 441 (1884); *Coleman v. State*, 32 Ala. 581 (1858); *see also* Rivas Rpt. ¶¶ 46-47.

### 4.   Commercial Regulations from Colonial Times Through Reconstruction Provide Relevant Historical Support

Section 27510 is also part of a "long tradition of regulating the commercial sale of products"—including firearms and ammunition—"to advance the goals of a well-regulated society including 'public safety, morals, health, and welfare.'"  Order at 19.  "[T]he early nineteenth century was home to a deluge of formal economic regulations and vigorous defenses of the power of the state over trade and commerce."  William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth Century America* 87 (Univ. of North Carolina Press 1996).  "[E]arly Americans understood the economy as simply another part of their well-regulated society, intertwined with public safety, morals, health, and welfare and subject to the same kinds of legal controls."  *Id.* at 84.  Consistent with these principles, "[n]early all state legislatures in the early nineteenth century passed laws directing 'trades to be conducted, and wares and goods to be fabricated, and put up for market in a certain manner.'"  *Id.* at 88 (citing Nathan Dane, *A General Abridgment and Digest of American Law* (1823)).[18]

---

[18] For example, between 1780 and 1835, Massachusetts passed regulations that closely specified and controlled the way numerous products were manufactured and sold, including gunpowder and firearms.  *See* Novak, *supra*, at 88 (citing Stearns and Metcalf, *The General Laws of Massachusetts, 1780-1835* (1823-1836), and listing a total of forty-nine regulated products, from boards and shingles to beef and pork).  Ohio, Maryland, South Carolina, and Michigan enacted similar schemes.  *Id.*  Aside from product and inspection laws, nineteenth-century legislators also used licensing "to regulate and control a host of economic activities, trades, callings, and professions" for "the public good[.]"  *Id.* at 90.  Alabama, for

22

1      Firearms and ammunition were no exception; they have been regulated "since

2    the dawn of the republic." (Cornell Rpt. ¶ 137.)  It was well understood in the

3    Antebellum and Reconstruction eras that state and local governments possessed the

4    inherent police power "to enact laws necessary to promote the public health,

5    welfare, and morality of society." (*Id.* ¶ 108; *accord id.* ¶¶ 14-20, 102-137.)  No

6    fewer than sixteen state constitutions adopted during the Reconstruction era

7    "expressly asserted that the right to keep and bear arms did not preclude robust

8    legislative power to regulate, making explicit a point that the pre-Civil War case

9    law had firmly established." (*Id.* ¶ 119 & Ex. C.)

10     For example, gunpowder—which was inherently dangerous and manufactured

11   by a rapidly growing industry—was highly regulated in early America to promote

12   public safety. *See generally* Novak, *supra*, at 60-67.  Colonies, states, and localities

13   regularly enacted laws regulating gunpowder, including prohibitions on where and

14   to whom one could sell it, and permit requirements for gunpowder sales. (*See*

15   Grabarsky Decl., Chart E [**525-551**].)  The Court has already deemed these

16   regulations "relevant historic support for the regulation of commercial firearms

17   sales enacted in Section 27510." Order at 19.

18     Similarly, in the mid-nineteenth century, as firearms became more common,

19   state and local governments began to regulate shooting galleries (akin to shooting

20   ranges) to protect the public from danger.  Such regulations required licensure to

21   open a shooting gallery, and often set limitations on the location of galleries.[19]

22   Relevant here, ordinances from the late nineteenth century imposed restrictions

23   _____

24   example, required licenses for over thirty businesses, including firearms dealers.
     *Id.* at 91 (citing *Alabama Acts of the General Assembly* 329-35 (1868)).
        [19] *E.g.*, *Digest of the Laws and Ordinances of the Parish of East Feliciana,*
25   *Adopted by the Police Jury of the Parish*, § 1. (Sept. Sess., 1847), at 80 (John C.
     White, Whig Office, Sept. 1, 1848); 1851 R.I. Pub. Laws 9, An Act in Amendment
26   of an Act Entitled an Act Relating to Theatrical Exhibitions and Places of
     Amusement, §§ 1-2, in *The Revised Statutes of the State of Rhode Island and*
27   *Providence Plantations: To Which are Prefixed, The Constitutions of the United*
     *States and of the State*, ch. 80, § 2 (Jan. Sess. 1857), at 204-05 (Samuel Ames,
28   Chairman, Sayles, Miller and Simons 1857).

23

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)

prohibiting personnel from allowing minors to shoot in the galleries, subject in at least one case to an exception with written consent of a guardian **[88, 94]**.

Thus, from the Founding era through the nineteenth century, state and local governments fully exercised their police powers to enact commercial firearm regulations based on the needs at the time.  (Cornell Rpt. ¶¶ 14-20, 102-142, 171; *see also Teixeira*, 873 F.3d at 685 ("[C]olonial governments substantially controlled the firearms trade," including "provid[ing] and stor[ing] guns, [and] control[ing] the conditions of trade[.]").)  Those laws fit into a broader tradition of regulating commercial sales of a host of products more generally for purposes of protecting the public health and safety.  The commercial restrictions challenged here fit well within this historical tradition.

**C.   The Surveyed Historical Analogues Are Relevantly Similar**

As this Court previously concluded, "[t]he stated objective of SB 1100 and SB 61, which were incorporated into Section 27510, was to increase public safety by limiting access to certain firearms by 18-to 20-year-old individuals" and providing adequate firearms safety training and supervision.  Order at 11-12.  The Legislature was concerned both with the proliferation of mass shootings with semiautomatic centerfire rifles, *see supra* Background § I(A); Argument § II(A), and the fact that individuals under the age of 21 "are disproportionally linked to crime," comprising at that time "only 4% of the population but commit[ting] 17% of gun homicides" (*see* Albrecht Decl., Ex. 28 at DX 204.).  The Legislature considered that 18-20-year-olds may engage in "impulsive or reckless behavior," and that their maturity levels could necessitate additional regulation to promote safety.  (*Id.*)

Empirical data regarding brain development through the mid-20s substantiate the Legislature's concern:  "As a result of neurobiological immaturity" and the still-developing pre-frontal cortex, "adolescents [including those under 21] demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, and resisting the coercive influence of others," especially in

24

1  emotionally charged situations.  (Cauffman Rpt. ¶¶ 10, 20-29.)  Such

2  "[d]eficiencies in self-control are likely to interfere with safe firearm usage."  (*Id.*

3  ¶ 39.)

4      The historical record described above demonstrates that although they did not

5  yet have the benefit of neuroscientific evidence, nineteenth century legislators,

6  commentators, and the American public all shared California's current concerns

7  about the maturity and responsibility of those under the age of 21, and addressed

8  those concerns by "curtail[ing]" the group's "access to firearms."  Order at 20.

9      And as described in the preceding sections, *see supra* Argument II(B), Section

10  27510 is no more restrictive than its historical predecessors, and parallel in many

11  respects:  Section 27510 limits only the circumstances in which 18-to-20-year-olds

12  may be sold or receive transfer of a firearm through a FFL, leaving alternative

13  methods to acquire a firearm.  It addresses public safety and reduces intentional and

14  accidental gun violence by, among other things, imposing supervised training

15  requirements for firearm acquisition, *accord* Order at 12, 20, and placing more

16  restrictions on particular weapons, such as semiautomatic centerfire rifles, that pose

17  significant risk to the public in the hands of people of this age group, Cal. Penal

18  Code § 27510(b).  Nineteenth century legislatures made similarly calibrated

19  choices.  (*See* Spitzer Rpt. ¶¶ 22-23 [explaining that age limits "varied depending

20  on the nature of the restriction," with "higher age limits on the age for carrying

21  concealable weapons," which were considered more dangerous at the time, and

22  "lower age limits for those allowed to hunt" or have "less lethal" toy arms].)

23                          **CONCLUSION**

24      Defendants request that the Court enter summary judgment in their favor.

25

26

27

28

1

2  Dated:  March 15, 2024                    Respectfully submitted,

3                                            ROB BONTA
                                             Attorney General of California
4                                            ANYA BINSACCA
                                             Supervising Deputy Attorney General
5                                            TODD GRABARSKY
                                             STEPHANIE ALBRECHT
6                                            CAROLYN DOWNS
                                             Deputy Attorneys General

7
                                             /s/ Jennifer E. Rosenberg
8                                            JENNIFER E. ROSENBERG
                                             Deputy Attorney General
9                                            Attorneys for Defendants Rob Bonta,
                                             in his official capacity as Attorney
10                                           General of the State of California,
                                             and Allison Mendoza, in her official
11                                           capacity as Director of the
                                             Department of Justice Bureau of
12                                           Firearms

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Memorandum of Ps & As ISO Motion for Summary Judgment (3:19-cv-01226-L-AHG)