# EXHIBIT 2

**Expert Report and Declaration of Professor Saul Cornell**

1   ROB BONTA
    Attorney General of California
2   MARK BECKINGTON
    Supervising Deputy Attorney General
3   TODD GRABARSKY
    Deputy Attorney General
4   STEPHANIE ALBRECHT
    Deputy Attorney General
5   JENNIFER E. ROSENBERG
    Deputy Attorney General
6   State Bar No. 275496
      300 South Spring Street, Suite 1702
7     Los Angeles, CA  90013
      Telephone: (213) 269-6617
8     Fax: (916) 731-2124
      E-mail:  Jennifer.Rosenberg@doj.ca.gov
9   *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
10  *State of California, and Allison Mendoza, in*
    *her official capacity as Director of the*
11  *Department of Justice Bureau of Firearms*

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16

| | |
|---|---|
| **JOSE CHAVEZ, *et al.*,** | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **EXPERT REPORT AND DECLARATION OF PROFESSOR SAUL CORNELL** |
| **v.** | |
| | Dept:          5B |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,** | Judge:        The Honorable  M. James Lorenz and Magistrate Judge Alison H. Goddard |
| Defendants. | Action Filed:      July 1, 2019 |

23

24

25

26

27

28

# TABLE OF CONTENTS

Expert Report and Declaration of Professor Saul Cornell ........................................ 1

Background and Qualifications ........................................................... 1

Retention and Compensation ........................................................... 3

Basis for Opinion and Materials Considered........................................... 3

Summary of Opinions .................................................................. 4

Opinions ............................................................................ 10

    I.      Introduction ................................................................ 10

    II.     Methodology and Context................................................ 14

    III.   Legal Status and Rights of Those Under 21 in a Patriarchal Society: The Original Understanding at the Founding and Beyond .................................................................... 20

    IV.   Protecting Ordered Liberty in America: Early American Militia Laws in Historical Context ................................................ 35

    V.     Duties, Not Rights: Understanding the Legal Significance of and Need for Early American Militia Laws ............................... 42

    VI.   The Economics of Early American Firearms: The Problem of Arming the Militia ...................................................... 50

    VII.  The Police Power and Regulation of Minors and Arms .................... 53

         A.    Growing Need for Regulation in the Nineteenth Century........ 56

         B.    Guns in the Age of Increased Lethality and Ease of Use......... 69

         C.    A New Era of Gun Regulation (1900-1930) ........................... 72

         D.    Firearms Regulation: A Pervasive Feature in American Law (1934-2021) ...................................................... 78

Conclusions........................................................................... 82

Table of Exhibits...................................................................... 86

**EXPERT REPORT AND DECLARATION OF PROFESSOR SAUL CORNELL**

I, Saul Cornell, declare that the following is true and correct:

The State of California has asked me to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of and access to firearms of those below the age of 21, including those old enough to participate in the militias. My report below explores these issues in detail.

This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration

**BACKGROUND AND QUALIFICATIONS**

1.      I am the Paul and Diane Guenther Chair in American History at Fordham University in New York City. I have a master's degree in History and a Ph.D. in History, both from the University of Pennsylvania. In addition to teaching constitutional history at Fordham College, I teach seminars in constitutional law at Fordham Law School. I have been a Senior Visiting Research Scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. Prior to my time at Fordham University, I was a Professor of History at The Ohio State University, the Thomas Jefferson Chair at the University of Leiden in the Netherlands, and an Assistant Professor in the Departments of History at The Ohio State University and the College of William and Mary. A copy of my complete curriculum vitae (CV) is attached to this declaration as Exhibit A.

2.      My scholarship on the Second Amendment and the history of firearms regulation has been widely cited by state and federal courts.[1] I have published two

_____

[1] For a complete list of court citations, see my CV attached as Exhibit A to

dozen articles on this topic that have appeared in leading law reviews and top peer-reviewed legal history journals.[2]  I authored the chapter on the right to bear arms in the Oxford Handbook of the U.S. Constitution and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]

3.      I have given numerous invited lectures, presented papers at faculty workshops, and participated in conferences on the Second Amendment and the history of firearms regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

4.      In addition to having provided expert testimony earlier in this matter, I have also provided expert witness testimony in both state and federal courts in firearms-related matters, including *Rocky Mountain Gun Owners v. Hickenlooper*, No. 2013-CV-33879 (D. Col.); *Chambers v. City of Boulder*, No. 2018-CV-30581 (D. Col.), *Zeleny v. Newsom*, No. 17-cv-07357-RS (TSH) (N.D. Cal.), *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D.

_____

this report.

[2] Particularly relevant publications include Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). A full list of relevant publications is also included in my CV.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, in 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal.); *Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-746-JLS-JDE (C.D. Cal.); *B&L Productions, Inc. v. Newsom,* No. 21-cv-1718-AJB-DDL (S.D. Cal.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Nat'l. Assoc. for Gun Rights, et al. v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *Nat'l. Assoc. for Gun Rights v. Lopez*, No. 1:22-cv-404 (D. Haw.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.).

5.      A list of my publications and other cases in which I have testified as an expert witness is also included in the CV I attach as Exhibit A to this declaration.

## RETENTION AND COMPENSATION

6.      I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports, $750 for depositions and court appearances, and compensation for travel expenses.  My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

7.      Counsel for Defendants provided me with the operative complaint in this matter, the briefs the parties filed in support of and in opposition to Plaintiffs' two motions for preliminary injunction, and the 2019 expert declaration of David Hardy and associated exhibits filed with Plaintiffs' 2019 motion for preliminary injunction.[4]  Counsel also provided me with the briefs and record in the Ninth Circuit appeal of this Court's denial of Plaintiffs' motion for preliminary injunction.

---

[4] Declaration of David Hardy and related exhibits submitted in support of Plaintiffs' motion for preliminary injunction (ECF Nos. 21-11, 21-12, 21-13, & 21-14) (hereinafter "Hardy Decl."),

Otherwise, my report is based on my independent research.  In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions. The materials cited in this report are a subset of the relevant materials I have consulted to understand the contours of American constitutional history that are relevant to understanding the historical issues posed by this case.

## SUMMARY OF OPINIONS

8.      In the body of my report and declaration below, I provide evidence and reasoning for the following opinions:

9.      In their pleadings and preliminary injunction briefing, Plaintiffs assert an uncontroversial fact about the history of the militia in the eighteenth century and much of the nineteenth century: governments compelled some minors to serve in the militia and participate in related community-based forms of law enforcement. But the fact that government forced individuals to participate in the militia does not demonstrate the existence of a constitutional right to keep, bear, or acquire firearms for those under the age of 21.  Rather, this fact shows that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.  Imposing a legal obligation on individuals does not establish that a right existed; it demonstrates that the opposite was the case.  Failure to comply with this legal obligation resulted in punishment.  Militia laws gave governments broad power over minors, but they did not confer an individual rights claim that minors might make against government regulation.  In the Anglo-American constitutional tradition, rights and duties are correlates, not synonyms.[5]  Militia laws imposed an obligation on individuals, not a right.

---

[5] Ori Herstein, "*Legal Rights*," THE STANFORD ENCYCLOPEDIA OF

10.     During the Revolutionary and Founding eras (1776–1799), minors or "infants" (those below the age of 21, which was the age of legal majority at the time) were not independent legal actors claiming the full panoply of rights, including the right to keep and bear arms.  This was so even though militia laws obligated some minors to join the militia and perform related activities, including participating in peacekeeping as mandated by the common law and statutes of the era.  Revolutionary-era and later Founding-era militia statutes requiring militia service and the bearing of arms by those under the age of 21 created legal obligations or duties that governments enforced by fines and possible imprisonment, but they did not articulate any individual rights for infants under the age of twenty-one to purchase, receive transfer, or bear arms outside of these situations.

11.     The decision to impose duties upon members of a particular age group, those 18-20, to serve in the militia was a policy choice made by states and the federal government; it did not assert a fixed constitutional principle.  This fact is clear from the plain text of the Second Amendment, which originally defined the militia as "composed of the body of the people."  As the debates of the First Congress make clear, Congress chose to do this so that it would retain plenary authority to decide the composition of the militia and alter it to meet the demands of the nation's defense requirements.[6]  There was no constitutional requirement that any subset of the population serve in the militia. And these requirements were

_____

PHILOSOPHY (Spring 2023 Edition), Edward N. Zalta & Uri Nodelman (eds.), https://plato.stanford.edu/archives/spr2023/entries/legal-rights/.

[6] SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2008).

1  adjusted over time to the changing needs of the individual states and the federal
2  government.

3      12.    Firearms regulation is a core component of state police power, which
4  is central to the scheme of ordered liberty in American law.[7]  Moreover, the scope
5  of state police power is greatest when protecting the health and safety of minors.
6  Given these facts, it is not surprising that there is a long history of state regulations
7  targeting minors and guns. The case law the Supreme Court probed in *District of*
8  *Columbia v. Heller*, 554 U.S. 570 (2008) from antebellum America analyzed the
9  permissible scope of firearms regulation in terms of state police power.[8]  The
10 history of arms regulation therefore requires an understanding of the police power
11 and its role in firearms regulation over the long arc of American history.

12     13.    In *Heller*, Justice Scalia's majority opinion noted that "constitutional
13 rights are enshrined with the scope they were thought to have when the people
14 adopted them."[9] The same holds true for the police power, which is not simply
15 inalienable, but was understood in the Founding era to be a right of the people to
16 regulate their own internal police.  Thus, Justice Scalia's observation holds true for

---

[7] On Founding era conceptions of liberty, JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

[8] Cf. *State v. Reid*, 1 Ala. 612 (1840) (adjudicating the scope of the right to keep and bear arms with the classic Marshall and Taney Court police power framework); *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*, 46 U.S. 504 (1847) (License Cases).

[9] *Id.* at 684.

both the right to bear arms and the right to regulate them consistent with the legitimate scope of the police power.

14.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by states, local municipalities, and the federal government on federal land and buildings.[10] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered their Anti-Federalist opponents strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[11]

15.     The slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[12]

16.     The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v.*

---

[10] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[11] SAUL CORNELL, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA 1788-1828 (1999).

[12] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/; The Taney Court period covered the years 1836-1864, https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

7

*Maryland.*[13] Nor was Justice Marshall unique in highlighting the centrality of this idea to American law.[14] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety.[15] Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era, elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered

[13] *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*, 46 U.S. 504 (1847) (License Cases)).

[14] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries on American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[15] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904); WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[16]

17.     During the Jacksonian era (1820-1840) and Reconstruction (1863-1878), states responded to new challenges by expanding the scope of government regulation.  Indeed, the period after the Civil War, including the period after the adoption of the Fourteenth Amendment (1868), did nothing to diminish the centrality of police power analysis to judicial resolution of questions about the scope of regulation. As had been true in pre-Civil War America, the states' interests in preserving the peace and in protecting minors gave them broad authority to regulate arms. The level of post-Civil War regulation intensified to respond to new and unprecedented problems created by firearms in an increasingly urban and modern society that lacked the community-based forms of peacekeeping and law enforcement typical of pre-industrial and pre-modern societies.  The increasingly complicated nature of American law led to new models of regulation, including more laws governing minors and their access to weapons.

18.     States and localities made expanded use of the authority they had held since the Founding to regulate firearms.  They adopted new administrative mechanisms, including permitting and licensing schemes, to address the continuing problems posed by firearms.  Regulation and rights continued to be seen as inextricably linked with one another.

19.     The trajectory of gun regulation continued into the next century. The most significant change in government regulation in the twentieth century was the expansion of federal regulation of inter-state commerce during the New Deal. This

---

[16] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

1  power enabled the federal government to enact a range of laws about the sale and
2  transfer of firearms and further limited the ability of minors to access guns.

3       20.     Across the broad arc of American history, from the Founding era and
4  through the modern day, governments have regulated firearms. Regulations limiting
5  firearms ownership and possession for those under the age of 21 are longstanding
6  and firmly rooted in the American historical and legal tradition.  American law has
7  never considered minors fully independent legal actors who possessed the same
8  rights as adults. Given this irrefutable fact, state limits on the ability of minors to
9  acquire and use firearms is indisputably consistent with the original public
10  understanding of the Second Amendment right and its various state analogs.

## OPINIONS

### I. INTRODUCTION

13       21.     American law, particularly the law governing the family, derived from
14  English common law.  A central principle inherited from this common law tradition
15  was the legal distinction between adults and "infants"; there was no legal category
16  of "young adult" under English common law or the American law of domestic
17  relations.  Those between the ages of eighteen and twenty (and indeed all under the
18  age of 21) were considered "minors" or "infants" from the time of the nation's
19  founding up through the latter half of the twentieth century.[17]  The proper historical
20  framing of the issue before the Court thus should be: "Did the Second Amendment
21  recognize a right of infants, meaning those under 21, to keep and bear arms?"  The
22  answer to that question is simple: no.

---

25  [17] Note these two terms, "infant" and "minor," are used interchangeably
26  throughout this report. On the role of common law in shaping American law's
   treatment of those below the age of majority, *see* T. E. James, *The Age of Majority*,
27  4 AM. J. LEGAL HIST. 22 (1960); Vivian E. Hamilton, *Adulthood in Law and
   Culture*, 91 TUL .L. REV. 55 (2016).

22.     This report explains the interpretive methodology and sources necessary to understand the history of the right to keep and bear arms in the United States and American firearms regulation, and focuses additional attention on the way state, federal, and even local law regulated minors and arms.  The scope of materials I examined is extensive, in both chronological and substantive scope; it includes a wide variety of legal texts, from statutes, regulations, and case law to popular legal guidebooks and commentary from legal scholars.

23.     The ability to regulate firearms and gun powder is central to the conception of ordered liberty that defined American law from its earliest days. Based on a careful review of the materials I consulted in drafting this report, I conclude that infants could not assert an independent right to purchase or own a gun outside of the context of participation in a militia in the Founding era, or, indeed, for most of American history.  The historical record demonstrates that infants were typically only entrusted with firearms when under the supervision of a parent or a guardian, or when serving in militias or other community-based peacekeeping activities such as the hue and cry.

24.     Reviewing the arguments Plaintiffs have made thus far in the case, including the declaration of David Hardy submitted in support of Plaintiffs' motion for preliminary injunction, I conclude that there is no evidence to support the claim that infants under the age of 21 had a constitutional right to keep and bear arms in the Founding era.  Infants had a duty to serve in the militia and had to acquire the required weapons, but this did not endow them with a free-standing rights claim that could be asserted against state police power.  Such an idea would have been incomprehensible to the Founding generation.

25.     Early American militia laws imposed duties upon able-bodied males under 21, the legal age of majority at the time.  This does not demonstrate the existence of a robust or unfettered right to purchase, receive transfer of, keep, or bear arms. Under common law, and under later statutory revisions of the common

1   law, minors enjoyed few rights that could be asserted in court; the law subsumed

2   the legal identity of minors entirely within the legal authority of parents, guardians,

3   or masters. Thus, when properly contextualized, the available historical evidence

4   supports just the opposite conclusion from that urged by Plaintiffs: at the time of

5   the Founding, and in the periods that followed, minors had no constitutional right to

6   purchase, receive transfer of, keep, or bear arms.  Many states chose as a matter of

7   policy to require infants to participate in the militia and other law enforcement

8   activities, but this did not create or evince the existence of any constitutional right.

9        26.    Nonetheless, given the centrality of militia laws to Plaintiffs'

10  erroneous argument about the historical Second Amendment rights of minors, this

11  report explores the nature of such laws in considerable detail. It also offers several

12  important but neglected contexts for understanding the history in which the militia

13  laws were passed and implemented.  Early American militia statutes reflected the

14  importance of the militia in early America and the persistent problem states and the

15  federal government faced in properly arming the militia. Minors did not arm

16  themselves; they depended on parents and guardians to outfit them with the

17  necessary arms, and in some instances depended on the state to provide arms. These

18  arms were provided so that minors required to serve in the militia would be able to

19  meet their legal obligations as defined by early American militia statutes.  This fact

20  not only reflected the legal status of minors; it also reflected general problems

21  governments faced arming the militia at the time of the Second Amendment in light

22  of the economic realities of life in early America, where few ordinary families

23  could afford to purchase multiple firearms and most families desired guns useful for

24  life in agrarian society, not the heavy military weapons needed for eighteenth

25

26

27

28

century ground warfare.  Given this context, Plaintiffs' claim is entirely without historical merit.[18]

27.   My report surveys the considerable authority states and localities have historically exercised under their police power to regulate the ability of minors to acquire or use dangerous weapons. The exercise of that power was not static, but proved extremely flexible, allowing states and localities to craft new laws to address the shifting threats to public safety posed by the proliferation of weapons and other changes in society, including the increasing availability of deadly weapons to minors occasioned by the rise of the market economy and other changes in society such as urbanization.  Finally, the report takes note of the development of modern federal firearms regulation. Firearms laws' complexity has increased as society has become more complex, and modern government and the administrative state have grown to deal with these changes. This process began at the end of the nineteenth century and the pace of this transformation quickened in the twentieth century. The use of permit schemes, fees, and taxes were among the new legal tools used after the Civil War to achieve the goals of regulating arms to further the goals of ordered liberty.[19]

---

[18]  Plaintiffs' argument rests on a series of myths about American history that have little connection to the historical reality that the Supreme Court made foundational in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  See RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006); PAMELA HAAG, GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[19]  There is a rich literature on the growth of the modern administrative state and regulation, MORTON KELLER, REGULATING A NEW SOCIETY PUBLIC POLICY AND SOCIAL CHANGE IN AMERICA, 1900–1933 (1996) at 160-162; Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301 (2015).  Firearms regulation mirrored other forms of regulation and took advantage of these new methods and institutions.

1    **II.   Methodology and Context**

2         28.    My evaluation of legal historical materials draws on the most recent

3    scholarship on the Second Amendment and the right to bear arms, as well as the

4    existing case law, including *New York State Rifle & Pistol Association v. Bruen*,

5    142 S. Ct. 2111 (2022). I employ the accepted historical and legal methodologies

6    used by legal and constitutional historians for interpreting legal sources from the

7    Founding era and later periods of American history, including the era of the

8    Fourteenth Amendment's adoption and implementation. This report analyzes the

9    public meaning of the Second Amendment, the Fourteenth Amendment, the various

10    state constitutional provisions on the right to keep and bear arms, state statutes,

11    local ordinances, court decisions, and popular and learned legal commentaries.[20]

12    The goal of surveying such a wide range of sources is to ascertain the various

13    public understandings of how these different legal and constitutional texts were

14    interpreted when the Bill of Rights was ratified, when individual laws and

15    ordinances were enacted, and when the Fourteenth Amendment was adopted and

16    interpreted by courts.[21]

17         29.    Historical inquiries by courts must be supplemented by careful

18    examination of the relevant scholarship and evidence if they are to avoid the

19    dangers of "law office history."[22]  Modern legal history—the methodology I use in

20

21        [20] For a discussion of the minimum standard for undergraduate history

   majors, *see* Mary Lynn Rampolla, A Pocket Guide to Writing in History 18

22    (8th ed., 2015); Martha Howell & Walter Prevenier, From Reliable

   Sources: An Introduction to Historical Methods 128 (2001). On the methods

23    of professional legal history, *see* The Oxford Handbook of Legal History

   (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). On the methods of

24    originalism, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82

25    Fordham L. Rev. 375 (2013).

26        [21] J.H. Hexter, Reappraisals in History 194–45 (1961).

27        [22] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 Sup. Ct.

28

this declaration—approaches the past with a more holistic model of meaning, recognizing that legal meanings, including those relevant to understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, must be rigorously contextualized.[23]  This approach requires analyzing more than traditional legal texts to understand the social, cultural, and intellectual contexts that shaped the law.  Any effort to understand the Second Amendment and the history of gun regulation must canvass a variety of historical topics, including such diverse and distinctive sub-fields as legal history, social history, cultural history, economic history, and military history.

30.    In addition to providing essential context for understanding legal texts, this type of broad historical inquiry is essential to understand the limits of various types of historical sources typically used by courts.  In particular, "silences" in the historical record may tell us more about the way records have been kept or lost, and may not speak directly to issues such as the enforcement of various laws.

31.    In *District of Columbia v. Heller*, and more recently in *Bruen*, the Supreme Court directed courts and litigants to look to history when evaluating the scope of permissible regulation under the Second Amendment.[24] At the time that *Heller* was decided, there was relatively little scholarship on the history of gun regulation, but in the 15 years since *Heller* was published, a burgeoning body of scholarship has uncovered a previously hidden history of arms regulation in the

---

REV. 119, 122 n.13 (1965).

[23] The best illustration of this method in practice is the three volume *Cambridge History of Law in America*. *See* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

[24] *See generally Bruen*, 142 S. Ct. 2111; *see Heller*, 554 U.S. 570; *see also* Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

Anglo-American legal tradition.[25] My report draws on this important body of new scholarship and the breadth of digital sources now available to scholars in order to understand and contextualize the rights implicated—and not implicated—in this case.

32. *Heller* did not undertake the arduous and laborious task of doing the historical research necessary to understand the full scope of the legal tradition of arms regulation. Rather, it left this project to lower courts and future scholars. Justice Scalia's characterization of the limits of *Heller*'s foray into history in the majority opinion is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[26]

33. *Heller* also made clear that the right to keep and bear arms was not absolute:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the nineteenth-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.[27]

---

[25] Cornell & DeDino, *supra* note 2; Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017). For an effort to synthesize the new scholarship on regulation and apply it using *Heller's* framework, *see* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* (2018).

[26] *See Heller*, 554 U.S. at 626–27.

[27] *Id.* at 626.

34.     *Heller* identified an illustrative set of examples of "presumptively lawful regulations."[28] This list was not exhaustive, but only a sketch of the many ways guns and gunpowder have been regulated by government, a legacy that is deeply anchored in text, history, and tradition.[29]  Thus, *Heller* directed courts to look at the Founding era, antebellum America, and Reconstruction when examining the scope of the right.[30]

35.     In *McDonald v. City of Chicago*, this analysis was refined in Justice Alito's majority opinion.  In addition to discussions of the Founding period, he included references to the modern Supreme Court's substantive due process jurisprudence and its focus on the central role of historical tradition in understanding the scope of cherished rights in the American legal tradition:

> In answering that question, as just explained, we must decide whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty, *Duncan* [v. *Louisiana*, 391 U. S. 145,149 (1968)], or as we have said in a related context, whether this right is "deeply rooted in this Nation's history and tradition," *Washington* v. *Glucksberg*, 521 U.S. 702, 721 (1997).[31]

36.     In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their

---

[28] *Id.* at 627 n.26.

[29] *Id.* at 626.

[30] On the notion of constitutional modalities, and the relevance of the categories of history, text, and tradition, see P. BOBBITT, CONSTITUTIONAL INTERPRETATION (1991). Of course, other scholars may have different terminology for these modes of analysis, but these jurisprudential categories largely overlap these six forms. *E.g.*, Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189 (1987); Robert Post, *Theories of Constitutional Interpretation*, in LAW AND THE ORDER OF CULTURE 13–41 (R. Post ed., 1991).

[31] *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010).

17

inheritance from England.  Specifically, Justice Kavanaugh reiterated in

unambiguous terms *Heller*'s conclusion that there was a "well established historical

tradition of prohibiting the carrying of dangerous and unusual weapons," as well as

access to arms for certain persons such as felons and the mentally ill, and of

imposing laws placing "conditions and qualifications on the commercial sale of

arms."[32]  The dominant understanding of the Second Amendment and its state

constitutional analogues at the time of their adoption in the Founding period and at

the time of the Fourteenth Amendment's adoption forged an indissoluble link

between the right to keep and bear arms with the goal of preserving the peace.[33]

37.     Although it is hard for many modern Americans to grasp, there was no

comparable societal ill to the modern gun violence problem for Americans to solve

in the era of the Second Amendment.  A combination of factors, including the

nature of firearms technology and the realities of living life in small, face-to-face,

and mostly homogenous rural communities that typified many parts of early

America, militated against the development of such a problem.  In contrast to

modern America, homicide was not the problem that government firearm policy

needed to address at the time of the Second Amendment.[34]  Nor were guns the

---

[32] *See Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., concurring) (citing *Heller*, 554 U.S. at 626−27 & n.26).

[33] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, *see Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[34] RANDOLPH ROTH, AMERICAN HOMICIDE, 56, 315 (2009).

primary weapon of choice for those with evil intent during this period.[35]  Finally, although there were events where masses of people shot others, there were no mass shootings in the modern sense.  Firearms technology in the eighteenth century precluded the possibility of mass shootings.

38.     The chief problem the Founding generation faced regarding firearms seems almost hard to imagine given the proliferation of weapons in modern America. In contrast to modern America, gun owners in the Founding era were reluctant to purchase the type of weapons needed to effectively arm the state militias.  This problem became clear during the American Revolution and persisted long after American Independence.  When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[36]

39.     Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.  Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of

---

[35] Haag, *supra* note 18.

[36] Kevin Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019)

firearms whose lethality would have been almost unimaginable to the Founding generation.[37]  Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity, at least in terms of militia weapons, have limited value in illuminating the challenges Americans face today.

40.     Moreover, the Supreme Court has made clear that a literal approach to history, simply canvassing the laws on the book from the Founding era, is not sufficient to understand the scope of permissible regulation.  Indeed, Justice Thomas clearly stated in *Bruen* that history neither imposes "a regulatory straightjacket nor a regulatory blank check."  The Court acknowledged that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[38]  *Bruen* differentiates between cases in which contested regulations are responses to long-standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

### III.   LEGAL STATUS AND RIGHTS OF THOSE UNDER 21 IN A PATRIARCHAL SOCIETY:  THE ORIGINAL UNDERSTANDING AT THE FOUNDING AND BEYOND

41.     The first step in evaluating the status of Second Amendment rights for those aged 18–20 and other minors in the Founding era is to consider the common law treatment of the legal capacities and rights of persons under the age of legal majority at that time.  Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[39]  This legal fact did not change until the latter

---

[37] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[38] *Bruen*, 142 S. Ct. at 2132-33.

[39] ZEPHANIAH SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF

half of the twentieth century.[40]  In fact, across this broad swath of American legal history, infants' or minors' legal status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

42.     It is impossible to understand the legal conception of "infant" without recognizing the patriarchal nature of English common law and its early American variants.[41] Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians. The power of fathers or guardians under this system of patriarchy exceeded the power of the monarch over his subjects. For example, for minors, there was no right of petition or other rights enjoyed by English subjects and later by American citizens.[42] Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment. There was no recourse to legal redress for such minors against their parents or

---

CONNECTICUT 213 (1795).

[40] Hamilton, *supra* note 17 at 57-58.

[41] The absorption of the common law in America and the development of different variants of common law in the colonies and states has generated a rich scholarly literature, for a useful overview, *see* Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[42] Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142 (1986).

guardians (provided the punishment was deemed necessary and not excessively cruel).[43]

43.     Johns Hopkins historian Toby Ditz summarizes the centrality of the legal concept of patriarchy to family law and governance in the Founding Era:

> Historians have begun to use the concept "household patriarchy" to describe community organization in eighteenth century America. Household patriarchy refers to both internal and external aspects of domestic organization. It describes authority relations in which heads, and not others within households, have the formal right to make final decisions about internal matters. Patriarchal household heads speak for their dependents in dealings with the larger world. The civic status of household dependents is an indirect or secondary one; the community reaches them primarily through the actions and voices of the heads.[44]

44.     Although Mr. Hardy discusses the rights of "young adults" in his declaration in support of Plaintiffs' motion for preliminary injunction,[45] the term "young adult" is profoundly anachronistic; there was no legal category of "young adult" in the Founding era. Nor did such a category emerge in the next century following the adoption of the Second Amendment. In fact, the idea of a "young adult" is a very recent development in American society and law.[46]  Individuals below the legal age of majority, twenty-one, were considered "infants" in the eyes

---

[43] John E.B. Myers, *A Short History of Child Protection in America,* 42 FAM. L.Q. 449 (2008); ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (1987).

[44] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820,* 47 WILLIAM & MARY Q. 235, 236 (1990).

[45] Hardy Decl., at ¶¶ 7, 8, 12, 15, 18, 22, 28, 30.

[46] On the emergence of the category of young adult in modern legal theory, *see* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016).

of the law at the time of the nation's founding and of the Second Amendment's adoption.[47] An infant was legally "disabled" in the eyes of the law. Rather than analogize infants to citizens who enjoyed the full panoply of rights, Founding Era law analogized minors to individuals who were legally disabled under the law: married women under coverture, madmen, and "idiots."[48]

45.    American law at the time of the Second Amendment's enactment did not treat infants—even those infants who may have been obliged to serve in militias or participate in enforcing the peace by participating in community actions such as a hue and cry—as autonomous legal actors with an individual right to keep and bear arms outside the context of and separate from any duties imposed upon them.[49] In short, Plaintiffs' argument and Mr. Hardy's contention that anyone under 21 could have maintained a Second Amendment claim (under either the Federal bill of rights or comparable state arms bearing provisions) is both historically unfounded and inconsistent with the actual legal status of those under 21 at the time of the Second Amendment's adoption.

46.    Mr. Hardy's declaration and Plaintiffs' theory thus reflect a fundamental flaw: they rest on an ahistorical treatment of those under the age of 21 that ignores the legal history of Anglo-American domestic relations governing infants and their parents or guardians.[50]

---

[47] Swift, *supra* note 39; T. E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22 (1960).

[48] *Supra* note 17.

[49] *See* JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1858) ("The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights.").

[50] *See* Hardy Decl., Ex. 17 (David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 530 (2019)). Mr. Hardy's argument appears to rest on the authority of writings by other gun rights

47.     In many respects, the situation of minors under 21 resembled that of married women under coverture. Under the doctrine of coverture, a married woman ceased to exist as a legal entity and her entire legal persona was subsumed within her husband's authority.[51] Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[52]

48.     Indeed, an influential eighteenth-century English treatise on the law of domestic relations noted that the comparison between a femme covert and minors was frequently made by writers on the law: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[53] Given the irrefutable fact that minors were legally "disabled" in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is erroneous.

---

activists, not historical experts on the legal history of childhood *see id.*  But as noted above, the Kopel and Greenlee article's references to the "Rights of Young Adults," as well as its content, are premised on the same anachronistic understanding of the legal status of infants in Anglo-American law as the one presented in Mr. Hardy's declaration. Kopel and Greenlee also apparently share (or perhaps supply) Mr. Hardy's confusion about the legal relationship between rights and duties, and therefore their ahistorical claims are not probative in this matter.

[51] J.H. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed., 2002); Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate*, 26 YALE JOURNAL OF LAW AND FEMINISM 165,167 (2014).

[52] 1 WILLIAM BLACKSTONE, COMMENTARIES, *442.

[53] ANON., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

49.     The American Revolution set in motion a process of change that republicanized the rights of minors by giving society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.[54] This change did not endow minors with full legal rights under the law, but it did diminish the near absolute power that fathers (or parents more generally) and guardians had over minors living under their authority.

50.     The subject of minors' legal status was explored at considerable length by Zephaniah Swift, an esteemed Connecticut jurist in the Founding era, and author of one of the first legal treatises published after the adoption of the Constitution. Swift outlined the central legal fact governing persons below the age of majority at the time of the Founding: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—minors." Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[55] During the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts. This new supervisory role narrowed the range of contractual freedom of minors acting without consent. Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the American Republic.[56]

51.     The influential early nineteenth century legal author and jurist James Kent discussed the legal status of minors in 1836 in his influential Commentaries

---

[54] JEFFREY SHULMAN, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014).

[55] Swift, *supra* note 39.

[56] HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

on American law: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."[57] When some radical Jacksonian Democrats suggested that the age of majority for voting ought to be lowered for those who had served in the militia, leading Federalists in the New York state constitutional convention mocked them. Federalist Elisha Williams, a delegate from Columbia County, wondered if his democratic opponents wished to enfranchise "brave infants" by giving them the right to vote.[58] Extending full rights to minors was literally treated as a joke by Federalists sitting in the constitutional convention.

52.　　John Bouvier, author of the first American law dictionary, shared the views of Swift and Kent, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[59] Bouvier's statement captures the widespread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full panoply of rights under American law.[60]

53.　　Contemporary law, including attitudes towards the rights of minors, are a product of the Warren Court's rights revolution, including the landmark

---

[57] JAMES KENT, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

[58] CORINNE T. FIELD, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.

[59] JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1858).

[60] Field, *supra* note 58.

decision of *Tinker v. Des Moines*.[61]  But the argument that minors enjoy broad rights claims, although true in modern law, was simply not true in the Founding era. Indeed, Justice Thomas' originalist critique of *Tinker* correctly notes that minors enjoyed few rights in the Founding era.[62]

54.    One of the most illuminating discussions of this issue occurred in an obscure case adjudicated by Justice Joseph Story while he rode circuit in the early nineteenth century. Justice Story was among the most influential early American jurist of the Marshall Court era and his conception of the status of minors offers a useful guide to modern jurists seeking to understand the original meaning of the Second Amendment.[63] In *U.S. v. Bainbridge*, Justice Story opined that the rights of parents and minors were entirely within the purview of "mere municipal rules of the state, and may be enlarged, restrained, and limited as the wisdom or policy of the times may dictate." Moreover, he expressly noted that when it came to the rights of minors the state's power to define the age of majority was plenary:

> Can there be a doubt, that the state legislature can, by a new statute, declare a minor to be of full age, and capable of acting for himself at fourteen, instead of twenty-one years of age? Can it not emancipate the child altogether from the control of its parents? It has already, in the case of paupers, taken the custody from the parents, and enabled the overseers of the poor to bind out the children as apprentices, or servants, during their minority, without consulting the wishes of the parents.[64]

---

[61] *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503 (1969); Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. 1, 22 (2021). On *Tinker*'s significance in modern constitutional law, *see* Symposium, *Constitutional Law: The Constitution Inside the Schoolhouse Gate—Students' Rights Thirty Years After Tinker v. Des Moines School District*, 48 DRAKE L. REV. 433 (2000).

[62] *Morse v. Frederick*, 551 U.S. 393, 418-19 (2007) (Thomas, J., dissenting).

[63] *U S v. Bainbridge*, 1 Mason 71 (1816).

[64] *Id.* at 79, 81.

27

55.     While many modern Americans might recoil at the harshness of the Story's judgment and its disparagement of the rights of minors, his views reflected uncontroversial assumptions at the time that this case was decided. Patriarchalism, not egalitarianism, was the legal norm during the Founding era.

56.     At the Founding and for much of the next century, individuals below the age of legal majority served in the militia and participated in community-based efforts to keep the peace (such as the "hue and cry"), but these public safety duties were undertaken in a supervised setting under the authority of parents, guardians, or other adults authorized under the color of law.[65]  The circumstances under which an infant could participate in community forms of keeping the peace were defined by the patriarchal structure of local communities and the peacekeeping mechanism instantiated by law.  As Princeton historian Laura Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept was based in a long-standing, highly gendered construction of government authority, which subordinated everyone to a sovereign body, just as all individual dependents were subordinated to specific male heads of household. [66]

57.     David Hardy's declaration in support of the preliminary injunction at ¶ 33 ignores the most basic facts about Founding era domestic law and common law understandings of the status of minors as dependent, not independent actors.  In essence, Hardy approaches the past backwards, starting with the status of minors in

---

[65] The Statute of Winchester, adopted in 1284 in the Reign of Edward I, required male members of the community between 15 and 40 to join the "hue" and "cry" and participate in community law enforcement, *see* 1 STATUTES OF THE REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue" and "cry" were the only means to deal with most forms of ordinary crime. *See* LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[66] Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-Revolutionary United States*, 1 UC IRVINE L. REV. 565, 570 (2011).

1   contemporary law and applying this conception to the Founding era.  This approach

2   is profoundly anachronistic and precluded by *Bruen's* text, history, and tradition

3   framework.[67]

4      58.    Moreover, Mr. Hardy fails to acknowledge that some militia statutes

5   explicitly required parental consent for those under 21 to serve.  Additionally, some

6   states chose to exclude those under the age of consent from the obligation to

7   acquire firearms.[68] Mr. Hardy's ahistorical analysis fails to reckon with one of the

8   most important early American cases on the scope of government regulation of

9   infants.  As Justice Story made clear in *Bainbridge*, the rights of minors, unlike the

10  rights of adults, were entirely within the scope of legislative control.[69]

11     59.    Mr. Hardy also opines that, based on his review of state and federal

12  militia laws, "not only were 18-to-20-year-olds able to freely purchase and acquire

13  firearms, they were also required to possess them."[70]  But this conclusion suffers

14  from the same flawed, a confused tautological analysis conflating rights with

15  responsibilities.  The fact that those who served in militias were required by militia

16  statutes in some cases to appear at muster with, and use, their own arms does not

17  mean that those under 21 had freestanding rights to purchase firearms for individual

18  use outside the service context.  Mr. Hardy does not identify a single statute

19  establishing such a right, but relies on his mistaken view that militia service-

20

21     [67] David Hardy and related exhibits submitted in support of Plaintiffs' motion
22  for preliminary injunction (ECF Nos. 21-11, 21-12, 21-13, & 21-14) (hereinafter
23  "Hardy Decl.").

24     [68] *See, e.g.,* Hardy Decl., Ex. 17 at 0415-0416 (collecting New Jersey
     statutes); *id*. at 0429 (collecting New Hampshire statutes); *id*. at 0435-0436
25  (collecting Pennsylvania statutes).

26     [69] *Bainbridge*, 1 Mason at 79, 81; 2 Wheeler, Cr. Cas. 521.

27     [70] Hardy Decl. at ¶ 26.

28

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

imposing obligations are examples of rights claims.[71]  As Justice Story's analysis makes clear, minors had no such claims.  Indeed, Justice Story made clear that the only rights minors might claim are those that were expressly created by statute and positive law.

60.    Another problematic element of Mr. Hardy's analysis stems from his failure to acknowledge over a third of state militia statutes in the Founding Era required parents or guardians to provide firearms to militia members under the age of 21 who were under their charge. Rather than address this inconsistency, Hardy simply ignores it.[72]

61.    Finally, Hardy's myopic focus on militia statutes blinds him to other important sources for understanding the status of minors at the Founding. The case of minor's participation in community-based forms of law enforcement is illustrative of the limited legal status infants enjoyed at the time of the Founding.[73] Although minors participated in such activities, they were supervised by adults. The examples of community-based law enforcement were also shaped by patriarchy. The involvement of minors in such activities was, as Professor Edwards notes, embedded in the patriarchal structure of local communities.[74]

---

[71] *Id.* at Exhs 3-14.

[72] *See, e.g.*, Hardy Decl., Ex. 17, at 0392 & n.56; *id.* at 0429-0431 & nn.429, 440, 459; *id.* at 0433 & nn.472, 477, 482.

[73] The Statute of Winchester, adopted in 1284 in the Reign of Edward I, required male members of the community between 15 and 40 to join the "hue" and "cry" and participate in community law enforcement, see 1 STATUTES OF THE REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue" and "cry" were the only means to deal with most forms of ordinary crime. *See* LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

[74] Edwards, *The Peace*, *supra* note 66.

62.     A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, captured the dominant view of the Founding era when it described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[75]  The author of this popular legal guide, John Fauchereaud Grimké, was among the state's most distinguished and influential jurists.  The fact that he included infants old enough to participate in the militia and local law enforcement in the same legal category as those the law considered to be incapable of asserting their legal will independently only underscores the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire arms at the time of the Founding.[76]

63.     Plaintiffs' argument therefore ignores a large body of contrary evidence regarding the legal status of minors that renders his claims historically untenable.[77]

64.     It is also important to understand the social history of the Founding era, particularly the way economic and social realities shaped family formation in this period.  Male minors under 21 living under the authority of their fathers faced significant hurdles in establishing their own independent households.  The laws governing settlement and residency for Massachusetts are revealing in this regard:

---

[75] JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Grimké was one of the state's most eminent lawyers and became one of its most influential jurists.  For biographical background on his life, *see* Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

[76] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, *see* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

[77] Hardy Decl. at ¶ 33.

they imposed an age requirement of 21, as well as a variety of different wealth requirements, to establish residency in the commonwealth.[78]  Moreover, acquiring the necessary economic resources to establish independence was increasingly difficult during the era of the American Revolution.  Indeed, most adult men in Concord, the town virtually synonymous with the Minuteman ideal of a well-regulated militia, were forced by economic necessity to postpone establishing their own independent households until their mid-twenties, a decision necessitated by the difficulty of acquiring enough land to establish an independent farmstead. Although these persons were no longer minors in the eyes of the law after turning 21, in virtually every other respect they remained under the patriarchal authority of their fathers as a practical matter in most respects until they could leave home.[79]

65.     Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, or that such individuals could act without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes and ignorance of Founding Era domestic law and the realities of living in a pre-industrial, rural patriarchal society.

66.     One final body of evidence raises further doubts about the claim that Founding era Americans believed that young men below the age of majority could

---

[78] Persons residing outside of a properly governed household, i.e., a home headed by a white male patriarch, could be banished from early New England towns, a process known as "warning out."  *See* Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-Century Massachusetts*, 62 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: LAW IN COLONIA MASSACHUSETTS 1630–1800 152, 190 (1984).

[79] ROBERT A. GROSS, THE MINUTEMEN AND THEIR WORLD (1976); Mary Babson Fuhrer, *The Revolutionary Worlds of Lexington and Concord Compared,* 85 NEW ENGLAND Q. 78 (2012).

be trusted with firearms without proper supervision, or that they had unfettered rights to keep, bear, and acquire them: the stringent rules prohibiting firearms ownership and use enacted by colleges in the Revolutionary era. College was one of the very few circumstances where minors lived outside of their parents' or a guardians' direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of *in loco parentis*.[80]

67.    Harvard's campus rules adopted in the era of the American Revolution prohibited guns on campus:

> XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls, Yard or near the College, he shall be fined not exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence. [81]

68.    Although Harvard was a private entity, its role in early Massachusetts society straddled the public and private spheres.[82]  Other colleges in the Founding Era adopted similar restrictions as Harvard.  Yale College prohibited students from

---

[80] Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform,* 44 VAND. L. REV. 1135 (1991).

[81] 31 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: COLLECTIONS 338, 358 (1935).

[82] Thus, the Massachusetts Constitution of 1780 instructed the citizenry "to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge. MASS. CONST. ch. V, § 1. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28,1807, with the Constitutions of the United States of America, and of the Commonwealth, 1780-1807) at 580. Harvard students and faculty were exempted from militia obligations but during the American Revolution Harvard College did create a militia company, *see* Conrad E. Wright, *Creating a Fellowship of Educated Men: Forming Gentleman at Pre-Revolutionary Harvard*, *in* YARDS AND GATES: GENDER IN HARVARD AND RADCLIFFE HISTORY 17–38 (Laurel Ulrich ed., 2004).

possessing any guns or gun powder.[83]  Two years after the adoption of the Second Amendment, Rhode Island College, the forerunner of Brown University, adopted its own stringent ban on guns on campus that not only fined students for possession of firearms, but threatened potential expulsion as well.[84]

69.     The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus.  The rule was emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[85] A similar law governed students at the University of North Carolina, another public university founded in the same period. The university prohibition was total: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane." [86]  College regulations from this era further demonstrate the fact that norms governing American society in the era of the Second Amendment's ratification do not offer support for the view that unsupervised minors were to be trusted with free access to firearms.

---

[83] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 p.26 (1800).

[84] Laws of Rhode Island College (1793) at 13.

[85] THE MINUTES OF THE SENATE ACADEMICUS 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976).

[86] ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

70.     The figure of Thomas Jefferson looms large in modern discussions about the meaning of the Second Amendment.[87] Although Jefferson was among the Founding generation's most ardent defenders of an expansive vision of the right to keep and bear arms, even he took a dim view of allowing guns at the University of Virginia, the institution he helped found. The rules at Mr. Jefferson's university were exceedingly strict on this point:

> No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school.[88]

71.     The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms. Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers.

## IV. PROTECTING ORDERED LIBERTY IN AMERICA: EARLY AMERICAN MILITIA LAWS IN HISTORICAL CONTEXT

72.     Plaintiffs build their case around an uncontroversial fact: colonial militias and the militias created by the first states often included white males between the ages of 18 and 20, and sometimes younger, in their ranks. By including some older infants in the militia ranks, the statutes creating and regulating these

---

[87] David Thomas Konig, *Thomas Jefferson's Armed Citizenry and the Republican Militia*, 1 ALB. GOV'T L. REV. 250 (2008).

[88] UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/. Jefferson and his good friend James Madison, the primary architect of the Second Amendment, attended the meeting in which this policy was adopted.

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

militias and the concomitant duties they imposed implemented policy goals aimed at arming and expanding the ranks of able-bodied militiamen, but they did not embody or establish a constitutional right that might be claimed by minors outside of this very narrow context defined by the relevant statutes. Nor did these statutes alter the legal age of majority; they simply implemented a policy goal of the states, and later the federal government.

73.     Although many states chose to include minors for policy reasons, the composition of the militia was always dictated by strategic imperatives. States were at liberty to expand or contract the legal definitions of the militia to further their goals of public defense. If a state felt it was necessary to exclude minors because of the economic burden it placed on families or because younger Americans were viewed as less effective soldiers, there was nothing to prevent a legislature from implementing such changes.

74.     For example, New Jersey changed the legal definition of the militia in 1821: "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace."[89] As another example, Kansas excluded minors by framing its constitutional provision on the militia as follows: "The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[90] As had been true from the earliest periods of American history, the composition of the militia

---

[89] An Act to exempt minors from Militia Duty in time of peace, in JOSIAH HARRISON, ED., A COMPILATION OF THE PUBLIC LAWS OF THE STATE OF NEW-JERSEY PASSED SINCE THE REVISION IN THE YEAR 1820, 266 (1833). By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of satire and ridicule. *See* David, Tatham, *David Claypoole Johnston's Militia Muster*, 19 AMERICAN ART JOURNAL 4 (1987).

[90] Kan. Const. of 1859, art. 8, § 1.

1 was determined by military needs. There was no fixed constitutional requirement
2 that any sub-group within the population serve.

3      75.      Understanding original meaning requires distinguishing between
4 political rhetoric and legal realities in the Founding era.[91] The ideal of a broadly
5 inclusive vision of the militia, at least as far as white males were concerned, was
6 venerated in public orations, pamphlets, and newspaper essays, but a close look at
7 the statutes enacted by various states and the federal government in the decades
8 after the adoption of the Second Amendment reveals a different legal reality.[92]

9      76.      Instead of mandating a universal and broadly inclusive militia in the
10 text of the Constitution, the Framers chose to give Congress plenary power to
11 define the composition of the militia. There was no textual mandate in the
12 Constitution that compelled future Congresses to include minors in the militia if
13 such a policy was deemed to be undesirable.  If a particular future Congress
14 believed that minors' labor was needed elsewhere, or if it concluded that minors
15 were not well suited to the military tasks required for national defense, there was no
16 legal ground for minors to claim a right to participate in the militia or acquire the
17 weapons needed for militia service. The same constitutional principle defined the
18 right embodied in the text of the Second Amendment.  An early draft of the text of
19 the amendment defined the militia as composed of the "body of the people," but
20 this language was struck out to allow future legislatures greater flexibility in

---

[91] Saul Cornell, *Reading the Constitution, 1787-91: History, Originalism, and Constitutional Meaning*, 37 LAW & HIST. REV. 821 (2019).

[92] *See* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (1967); J. G. A. POCOCK, THE MACHIAVELLIAN MOMENT: FLORENTINE POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION (1975); LAWRENCE DELBERT CRESS, CITIZENS IN ARMS: THE ARMY AND MILITIA IN AMERICAN SOCIETY TO THE WAR OF 1812 (1982); NOAH SHUSTERMAN, ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

1  creating an effective militia.[93]  Thus, as a matter of constitutional law, the

2  composition of the militia was left to Congress to determine as it saw fit.

3       77.    Nor is it surprising that those most familiar with American military

4  matters in the era of the Second Amendment, including virtually all the Federalist

5  Founders, believed that America's heavy dependence on the militia had been a

6  strategic mistake in the American Revolution, one that had severely hampered the

7  struggle for independence.[94] George Washington's private correspondences contain

8  withering comments about the inadequacy of the militia, and the necessity of

9  creating an effective standing army. He wrote home the following observations: "I

10  assured [Congress] that the longer they delayed raising a standing army, the more

11  difficult and chargeable would they find it to get one, and that, at the same time that

12  the militia would answer no valuable purpose."  The performance of the militia led

13  Washington to lament that "the conduct of the militia, whose behavior and want of

14  discipline has done great injury to the other troops, who never had officers, except

15  in a few instances, worth the bread they eat."[95]

16       78.    When Congress finally debated the structure of the militia in the First

17  Congress, there were deep divisions over the organization and structure of the

18  militia. Many—particularly those who had served with Washington in the

19  _____

20  [93] Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV. 103, 108, 120-125 (2000) (noting the

21  significance of this tension between American political rhetoric and constitutional

22  law in the Founding era). On the distinction between legal meaning and ordinary

   public meaning in originalist theory, *see* William Baude & Stephen E. Sachs,

23  *Grounding Originalism*, 113 NW. U. L. REV. 1455 (2019).

24  [94] On the importance of distinguishing between Federalist and Anti-Federalist

25  views of the militia, *see* CORNELL, A WELL REGULATED MILITIA, *supra* note 6, at 41-70.

26  [95] From George Washington to Lund Washington, 30 September 1776,

27  NAT'L ARCHIVES, https://founders.archives.gov/documents/Washington/03-06-02-

28  0341.

Continental Army—recognized that the militia, including the Revolutionary-era militia, was never, as some pamphleteers and newspaper essayists proclaimed, an effective fighting force that included the whole body of the people in arms.  Those most familiar with the militia's performance during the Revolution, Federalists, thus feared placing the future security of the nation in the hands of a militia.  Many in the First Congress, including the many Federalists serving, shared Washington's concerns and doubted the wisdom of continuing to conceive of the militia in the expansive terms that republican theory demanded—a body of independent yeoman drawn from the ranks of the able-bodied white men of the nation.  Despite a close vote on the issue in Congress, the first federal militia act, passed in 1792, rejected calls to create an elite, select militia, and instead carried forward the model of earlier colonial laws and defined membership in the militia broadly, but did little to guarantee that such a militia would be properly armed.[96]  The debates over the future of the militia in Congress reveal a tension between the ideals espoused in popular rhetoric and the reasoned consideration of America's military leaders.

79.    The notion that the composition of the militia, including the participation of minors, was hardwired into our constitutional order at the Founding is simply mistaken, both as a historical matter and as a constitutional matter.  The composition of the militia was always shaped by political and military imperatives, not determined by fixed constitutional principles.  The size of the militia, its composition, and the rules for its training are not constitutionally fixed, but have varied across American history.[97]

---

[96]The Militia Act of 1792 established a "Uniform Militia throughout the United States" to "more effectually... provide for the National Defence." Act of May 8, 1792, 1 Stat. 271.

[97] *Id.*

80.     The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation and imposed fines on those who failed to show up to mandatory musters properly armed.[98]  American citizens did not decide for themselves which weapons to bring to muster.  Failure to acquire the officially mandated type of weaponry could result in fines and other punishments.[99]  As far as the militia was concerned, all guns were not created equal in the eyes of the law.  Government policy was designed to force Americans, in some cases minors under 21, to acquire the type of weapons the government deemed essential for a well-regulated militia.[100]

81.     Militia laws were often among the longest statutes written by early American legislative bodies.[101]  These laws not only prescribed the types of armaments needed to participate in the militia; they also described the range of penalties for those who did not acquire or maintain the weapons in good working order.  Tennessee's enforcement mechanism involved the institution of the court martial:

---

[98] Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

[99] For a sampling of Founding-era militia statutes, see Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county).

[100] Sweeney, *Firearms Ownership and Militias*, *supra* note 36.

[101] *E.g.*, An Act for Formulating and Regulating the Militia, New Hampshire Session Laws 27-42 (1776).

40

1
2
3
4

> The commissioned and staff officers of the infantry are hereby required to meet at the place holding their battalion musters at eleven o'clock on the day preceding said muster armed with a rifle, musket, or shot gun and dressed in the uniform prescribed by law, for the purpose of being trained at regimental drills and the commanding or senior officer, present shall call, or cause the roll to be called, and make a return of all delinquents to the next regimental or battalion court martial.

5
6
7

> § 3. The regimental courts martial shall have power to fine delinquents, field or staff officers, and it shall be the duty of the commanding or senior officer present at any regimental or battalion or drill muster to make a return of all such delinquents. [102]

8
9
10
11
12
13
14
15
16

82.    Militia weapons, including the privately owned weapons used by many to meet this legal obligation, enjoyed a special constitutional status, and were exempted from a variety of civil processes.  But these laws did not erect a barrier against government intrusion into the most private sphere of American life—the home.  In fact, militia statutes achieved the opposite goal: they gave government sweeping powers over Americans and their guns. Weapons used for militia service were subject to government inspection.  Indeed, although militia weapons were typically privately owned, they were among the most heavily regulated forms of private property in early American law.[103]

17
18
19
20

83.    Militia statutes also prescribed penalties and punishments for failing to report to muster properly armed and for misuse of weapons once an individual appeared at muster.[104] A 1794 Rhode Island statute adopted a few years after the Second Amendment is illustrative of the punishments that could be meted out:

21
22
23
24
25
26
27
28

---

[102] 1821 Tenn. Pub. Acts 63, An Act To Amend The Militia Laws Of This State, chap. 55, §§ 2-3.

[103] Cornell & DeDino, *supra* note 2, at 508-10.

[104] Act effective May 5th, 1794, 1794 R.I. Pub. Laws 14, 21 (organizing the militia of the state); Act of Dec. 28, 1792, 1795 N.H. Laws 525 (adding to a prior act regulating the state militia); Act of 1799, § 4, 1799 Conn. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

> That every non-commissioned officer or private who shall neglect to appear at the regimental Rendezvous, shall forfeit the sum of Six Shillings and for every day he shall neglect to appear at the company parade, he shall forfeit Four Shillings and Sixpence. And if he shall not be armed and equipped according to other said Act of congress, when so appearing, without sufficient excuse, he shall, for appearing without a gun, forfeit one shilling and sixpence; without bayonet and belt six pence; without a Bayonet and Belt, Sixpence; without a Cartouch-Box and Cartridges.[105]

Once they had mustered, members of the militia were subject to military discipline and punishment.[106] Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as whipping.[107] During this era, military discipline was exceedingly harsh. Punishment for failure to comply with mandatory *duties* further renders claims that these laws offer evidence of a *right* problematic.

## V.  DUTIES, NOT RIGHTS: UNDERSTANDING THE LEGAL SIGNIFICANCE OF AND NEED FOR EARLY AMERICAN MILITIA LAWS

84.     Interpreting early American militia laws requires reading these statutes as Founding era Americans would have understood them. These laws imposed a legal *obligation* on Americans; they did not create or assert a *right* against government regulation. Indeed, these laws were a highly intrusive form of government regulation.[108] Militia statutes gave governments broad authority to compel individuals to engage in specified actions or face punishment, as just

---

[105] Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21.

[106] *Houston v. Moore*, 18 U.S. 1 (1820).

[107] Laws to authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (Prohibiting whipping a common form of punishment used by the military in the eighteenth century).

[108] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. *See*, *e.g.*, Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984); Leif Wenar, *Rights*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

discussed.[109] Thus, when these laws are understood within their historical context, they demonstrate that those serving in the militia, including minors, did not have a freestanding and robust right to acquire, keep, and bear whatever arms they desired for whatever purpose.  Rather, these laws compelled individuals to purchase or bring to muster the specific type of weapons the government wished them to use in their obligatory militia service.  Thus, Plaintiffs' claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms rests almost entirely on an ahistorical and anachronistic misreading of these documents.[110]

85.    The responsibility for acquiring weapons generally fell on those who were legally responsible for minors, not the minors themselves.  Early American militia statutes typically did not penalize minors for failing to obtain the required arms necessary to participate in the militia.  Instead, *parents* and *guardians* were singled out as the persons responsible for acquiring militia weapons for their minor children or charges under the age of 21.  For example, New Hampshire's 1792 militia law was explicit that parents and guardians had a legal obligation and suffered the penalties for failing to acquire the necessary weapons for militia participation: "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements."[111] Indeed, as Table A below makes clear, by the time of Jefferson's presidency (1801-1809), nearly a third of the states expressly tasked parents and guardians, not

---

[109] Cornell & DeDino, *supra* note 2, at 508-10.

[110] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[111] An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792);  *see also*, An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176.

infants, with supplying the necessary arms needed for militia service.  And five more states followed with similar laws quickly thereafter.

86.    Further, imposing mandatory service upon minors under 21 in the militias was a matter of necessity.  Militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted.  The labor of sons was vital to the survival and prosperity of family farms. Apprentices were essential to artisan modes of production.  Given the strong economic pressures on small farm owners and artisans in a pre-industrial society, market forces could easily have led families to oppose allowing sons to join the militia voluntarily.[112]  Thus, at the time of the Second Amendment's enactment, these legal and social facts meant that it was necessary for the states to enact laws requiring able-bodied minors under 21 to participate.  Without such laws, it is likely that few minors would have been enrolled in the militia because of the opposition of those who needed their labor, i.e., parents, guardians, and masters.  The individual states and federal government had the power to, and did, coerce individuals to participate in the militia, even if such participation posed an economic hardship to individuals, their families, or legal guardians.

87.    The states flexed that coercive power by threatening punishment.  For example, Delaware's 1776 militia law, expressly recognized this problem and included a provision that levied a fine on any "Masters, Guardians, and Parents" who "restrained" militia-eligible minors from enrolling.[113]

88.    Rather than provide historical proof that infants under 21 had expansive rights and strong legal claims against government interference with

---

[112] Gross, *supra* note 79.

[113] Delaware, An Act establishing a Militia in this State. Law and Statutes, 4 (1776).

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

access to firearms the various militia laws testify to government's authority over guns and members of the militia.

89.     It is particularly revealing to note how states responded to the first federal militia act passed in 1792. Many revised their own militia regulations, making these early laws an especially important reflection of how the Second Amendment applied—or did not apply—to minors. A general pattern emerges from these early laws enacted in the wake of the adoption of the Second Amendment. They offer strong proof that young men, who were still treated as infants in the eyes of the law, were not fully independent legal actors who might claim all the rights due citizens.

90.     For example, Connecticut's militia law, adopted in October, 1792, described in considerable detail what weapons were required by statute to meet the obligation to participate, but it also listed the penalties and punishments for failing to appear at muster properly armed and accoutered.[114]  Under that statute, appearing at muster without proper armaments rendered one "delinquent" and a fine was levied against the individual if he was "upwards of twenty-one years of age." [115] Similar to the New Hampshire law described above, if the man was under that age, however, it was the responsibility of the "parent, master or guardian" to supply the weapons and to bear the costs of any fines for his failure to appear or to perform his duty.[116]  The Connecticut militia statute unambiguously stated that the ultimate legal responsibility for acquiring armaments needed by minors serving in the militia rested with parents, guardians, or masters, not the "infants" under their charge.[117]

---

[114] Acts and Laws of the State of Connecticut, in America 298–314 (1796).

[115] *Id.* at 308.

[116] *Id.*

[117] *See* Delaware. Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One

45

Delaware's militia law of 1792 also exempted young men under age 21 from having to supply their own weapons.[118]

91.    Even when such obligations were not expressly included by statute, the common law definition of infants and the limited ability of minors to make contracts meant that any legal proceeding that would attempt to prosecute or penalize minors for failure to enroll, appear at muster, or provide their own weapons would have to proceed against the legally responsible adult in charge of the minor's household.[119]

**Table A: Founding Era Laws Requiring
Parents to Supply Militia Arms for Minors in their Household**

| State | Year | Source | Statutory Text |
| --- | --- | --- | --- |

Thousand Seven Hundred and Ninety-Seven 1134 (1797); The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, A.D. 1798 172-194 (1799); The Laws of the State of New Hampshire, the Constitution of the State of New Hampshire, and the Constitution of the United States 415-430 (1797); Laws of the State of New Jersey, Revised and Published Under the Authority of the Legislature of William Paterson 436-48 (1799); Laws of the State of New-York (1802); James; Martin Iredell, Francois-Xavier. Public Acts of the General Assembly of North-Carolina (1804); Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798 (1798-1813). Georgia and South Carolina also treated minors differently than adults by expressly making masters responsible for arming their apprentices. *See* A Digest of the Laws of the State of Georgia 458-467 (1800); A Digest of the Laws of the State of Georgia 458-467 (1800); Acts and Resolutions of the General Assembly of the General Assembly of the State of South-Carolina 50-51 (Dec. 1792).

[118] Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August, One Thousand Seven Hundred and Ninety-Seven 1134 (1797).

[119] Swift, *supra* note 39, at 213, 217 (explaining the limited rights of minors in the Anglo-American legal tradition).

46

| New Hampshire | 1776 | An Act For forming and regulating the Militia within the State of New Hampshire, in New-England, and for repealing all the Laws heretofore made for that Purpose, Acts & Laws of the Colony of N.H., 39 (1776). | And be it further Enacted by the Authority aforesaid, That each and every Officer and private Soldier of said Militia, not under the control of Parents, Masters, or Guardians, and being of sufficient Ability therefore, in the Judgment of the Select-men of the Town wherein he has his usual place of Abode, shall equip himself and be constantly provided with a good Fire Arm . . . . |
|---|---|---|---|
| Delaware | 1785 | An Act for establishing a Militia, § 7, 2 Military Obligation: The American Tradition 13 (1947). | [E]very apprentice, or other person of the age of eighteen and under twenty-one years, who hath an estate of the value of eighty pounds, or whose parent shall pay six pounds annually towards the public taxes, shall by his parent or guardian respectively be provided with a musket or firelock . . . . |
| Massachusetts | 1793 | An Act for regulating and governing the Militia of the Commonwealth of Massachusetts, Massachusetts Acts and Laws, May Session, ch. 1, § XIX (1793). | [A]ll parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipment's aforementioned . . . . |
| New Hampshire | 1792 | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792). | That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements. |
| Vermont | 1797 | An Act, for regulating and governing the militia of this State, ch. LXXXI, No. 1, § 15, 2 Laws Of The State Of Vermont Digested And Compiled 122, 131- 32 (1808). | And all parents, masters or guardians, shall furnish those of the said militia who shall be under their care and command, with the arms and equipment's above mentioned . . . . |

47

| North Carolina | 1806 | 2 William T. Dortch, John Manning, John S. Henderson, The Code Of North Carolina § 3168, at 346–47 (1883). | And all parents and masters shall furnish those of the militia, who shall be under their care or command, with the arms and equipment's above mentioned . . . |
|---|---|---|---|
| Massachusetts | 1810 | An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176. | [A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively with the arms and equipments, required by this act . . . . |
| New Hampshire | 1820 | An Act for the forming, arranging and regulating the militia, § 46, 2 New Hampshire Laws Enacted Since June 1, 1815, 80 (1824). | [A]ll parents, masters, and guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms and equipments required by this act . . . . |
| Maine | 1821 | An Act to organize, govern, and discipline the Militia of this State, ch. CLXIV, § 34, 1821 Me. Laws 548, 570. | [A]ll parents, masters or guardians, shall furnish all minors enrolled in the militia, who shall be under their care respectively, with the arms, and equipments, required by this Act . . . . |
| Missouri | 1825 | An Act to organize, govern and discipline the Militia, ch. I, § 24, in 1825 Mo. Laws 533, 554. | [A]ll parents, masters and guardians, shall furnish all minors, enrolled in the militia, who shall be under their care, respectively, with the arms and equipments required by this act. |

92.    Pennsylvania's 1793 revision of the state's militia statute further reveals how much power the state had over militia members and the process by which they acquired weapons. In 1793, shortly after Congress adopted the first ten Amendments during the First Congress, Pennsylvania enacted the following act modifying the nature of its militia law by exempting minors from having to purchase weapons:

I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this

48

commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia. . . .

II. And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years. And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states. [120]

93.     This Pennsylvania statute illustrates that there was no fixed requirement that minors participate in the militia, nor that they acquire specific weapons.  Both of these legal obligations were dictated by the policy choice that individual states and the federal government made in response to the need to promote public defense, as discussed above.[121]  Many states exempted students from militia service, and individual states were free to exempt any other sub-category of minors, or all minors if they wished, if such a policy furthered the goal of strengthening the militia or any other relevant state goal.[122]  A state could choose to exempt minors from the requirement to purchase weapons if such a policy was expedient, or exclude them from the militia entirely.  There was no legal or

---

[120] Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania).

[121] Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 (only requiring those between the ages of twenty-one and forty-five to be enrolled in the militia); Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 (same).

[122] Delaware adopted a similar provision to Pennsylvania in 1806, exempting minors enrolled in the militia from acquiring weapons, Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816). In 1829 New Jersey exempted all militia-eligible minors from participation during peace time, Act of Nov. 6, 1829, 1829 N.J. Laws 3.

constitutional requirement that militia include any minors if excluding them served the constitutional needs of maintaining a well-regulated militia.

94.     Pennsylvania's law contains language exempting "all men under the age of twenty-one years" from "furnishing the necessary arms" and from "militia duties." Young men were not expected to supply their own "arms and equipment's."[123] Moreover, given the relative scarcity of militia arms available for civilians, many young men would have had to turn to their local town government or the state to supply them with weapons. Misuse of these government arms also carried stiff penalties. The law provided that any weapons supplied by the state "shall remain the property of the town at the expense of which they shall be provided."[124]

95.     There was thus a broad consensus, built on the recognition of the common constraints on minors and the economic realities of gun ownership, that most minors would not be able to purchase and maintain a military-quality musket without some type of assistance from parents, guardians, or towns.

96.     Rather than provide historical proof that infants under 21 had expansive rights and strong legal claims against government interference with the right to keep and bear arms, the various militia laws and common law constraints on infants in fact demonstrate something very different: the broad powers states had to impose obligations and regulate minors when it came to weapons.

## VI.   THE ECONOMICS OF EARLY AMERICAN FIREARMS: THE PROBLEM OF ARMING THE MILITIA

97.     Militia statutes in the Revolutionary era and early Republic grappled with another problem that America faced for much of its early history as a nation:

---

[123] The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, A.D. 1798 172-194, 181 (1799).

[124] *Id.*

how to arm Americans with the military-quality weapons essential for a well-regulated militia. Americans at the time of the adoption of the Second Amendment were far better armed than any people in the English-speaking world in the eighteenth century and early nineteenth century. But early American governments faced a persistent problem: the arms citizens preferred were not the heavy military-quality muskets needed for militia service. Instead, most Americans owned or wanted light hunting muskets or fowling pieces—firearms, most useful on a farm, that were not the standard weapons of the eighteenth-century militia and not the ones required by the various state militia statutes. Guns in early America were essential tools in an agrarian society and American consumer preferences reflected this basic fact.[125]

98.    Ground warfare in the Founding era involved close combat; a soldier had to be able to attach a bayonet to a musket and his weapon had to be sturdy enough to function as a bludgeon if needed.[126] The light muskets and fowling pieces that Americans found most useful on their farms were therefore of limited value to the militia.

99.    Thus, acquiring the right type of arms remained a persistent problem for states and the federal government in the era of the Second Amendment's adoption.[127]  In fact, fully half of Americans lived in a household in which a military-grade musket was not available for those required to participate in the

---

[125] Sweeney, *Firearms Ownership and Militias*, *supra* note 36.

[126] JEREMY BLACK, A MILITARY REVOLUTION? MILITARY CHANGE AND EUROPEAN SOCIETY, 1550-1800 (1991); Wayne E. Lee, *Early American Ways of War: A New Reconnaissance, 1600-1815* 44 HIST. J. 269 (2001); Stephen Conway, *The British Army, "Military Europe," and the American War of Independence*, 67 WM. & MARY Q. 69 (2010).

[127] Kevin M. Sweeney, and Saul Cornell, *All Guns Are Not Created Equal*, CHRON. HIGHER EDUC., January 28, 2013.

militia.  And despite persistent efforts by both the states and the federal government to enact laws forcing households to purchase muskets and other military-quality weapons, Americans continued to prefer weapons better suited to the realities of living in an agrarian society: guns which were more useful for putting food on the table.[128]

100.   The fact that Plaintiffs' expert, Mr. Hardy, was unable to find any modern-style gun control laws restricting minors from this period is unremarkable.[129]  The Founding era did not have a modern-style gun violence problem to address.[130]  Moreover, the economics of gun production meant that few households apart from the wealthiest owned multiple weapons.[131]  Finally, the structure of early American society meant that minors were seldom allowed access to guns outside of some supervised context.  Thus, the relative scarcity of laws limiting minors from acquiring weapons in the Founding era reflects nothing more than the basic economics and practical realities of gun ownership and military policy in the era.  It has nothing to do with the existence of an unfettered underlying constitutional right for those under 21 to acquire and use weapons.

101.   The economic burden of the militia on American families was another fact that shaped government policy.  This concern was voiced forcefully during the debate over the first militia Act in Congress.  Thomas Fitzsimmons, a Federalist representative from Pennsylvania expressed his concern that militia service—including the requirement that militia men purchase their own arms—was in reality a burdensome tax on Americans, and that it would prove to be an undue burden for

---

[128] *Id.*

[129] Hardy Decl., at 16, ¶ 35.

[130] Roth, AMERICAN HOMICIDE, *supra* note 34, at 180-249.

[131] Sweeney, *Firearms Ownership and Militias*, *supra* note 36.

most families.[132]  During this debate, Congress seriously considered abandoning the idea of a broadly inclusive militia in favor of a smaller, more select, better trained, and better equipped force, but ultimately this proposal failed.  Instead, Congress settled on a compromise: the first federal militia act carried forward a broadly inclusive idea of a militia, but did not take the necessary action to properly arm and equip the militia.[133]

## VII. THE POLICE POWER AND REGULATION OF MINORS AND ARMS

102.    The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states and local municipalities.[134] The federal government enjoyed a limited police power that governed federal land, buildings, and the territories.

103.    Firearms case law, including those cases cited by *Heller*, recognizes the broad scope of power to regulate arms inherent to state police power.[135]  One of those cases, *State v. Reid*, offers a clear statement of the centrality of the police power to arms regulation.[136] The *Reid* Court observed that the state's concealed carry prohibition was not only a legitimate exercise of police power authority, it was at the very core of this power: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of

---

[132] 1 ANNALS OF CONG. 3 (1790–91).

[133] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

[134] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[135] *See Heller*, 554 U.S. at 629.

[136] *State v. Reid*, 1 Ala. 612 (1840).

public morals."[137] Understanding historical state regulation of minors and firearms therefore necessitates a close examination of the history of the police power.

104.   The legal concept of "police"—the power of the people, acting through government, to enact and enforce laws to protect public health, safety and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[138]  By the era of the American Revolution, the concept had become foundational in Anglo-American law.[139]  References to the regulation of internal police were included in early state constitutions drafted after the American Revolution.[140]  Founding era documents often described this as a right, a natural outgrowth of theories of popular sovereignty.  By the Antebellum era, the Founding era concept of a "police right" had been transformed in the modern judicial concept of the "police power," and had been further refined by jurists and legal theorists.

105.   The application of the police power to firearms and ammunition gained a firm grounding in American jurisprudence when Chief Justice John Marshall employed it in the context of state regulation of gun powder in *Brown v. Maryland*.[141]

---

[137] *Id.*, at 616.

[138] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

[139] Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745 (2007); Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[140] *See, e.g.*, MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

[141] *Brown v. Maryland*, 25 U.S. 419, 442–43 (1827) ("The power to direct the

1      106.   Another influential jurist exploring the scope of the police power was

2   Massachusetts state court Judge Lemuel Shaw.  His opinion in *Commonwealth v.*

3   *Alger* became a foundational text for lawyers, judges, and legislators looking for

4   guidance on the meaning and scope of this power.  Shaw described the police

5   power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain
> and establish all manner of wholesome and reasonable laws, statutes and
> ordinances, either with penalties or without, not repugnant to the
> constitution, as they shall judge to be for the good and welfare of the
> commonwealth, and of the subjects of the same.
>
> It is much easier to perceive and realize the existence and sources of this
> power, than to mark its boundaries, or prescribe limits to its exercise.
> There are many cases in which such a power is exercised by all well-
> ordered governments, and where its fitness is so obvious, that all well
> regulated minds will regard it as reasonable. Such are the laws to prohibit
> the use of warehouses for the storage of gunpowder . . . .[142]

13      107.   By the eve of the Civil War, a strong consensus in American law had

14   emerged on the broad scope of the police power.  This vision of the police power

15   was articulated forcefully by the Supreme Court in the License Cases when Justice

16   McClean wrote that the police power:

> is not susceptible of an exact limitation but must be exercised under the
> changing exigencies of society. In the progress of population, of wealth,
> and of civilization, new and vicious indulgences spring up, which require
> restraints that can only be imposed by new legislative power. When this
> power shall be exerted, how far it shall be carried, and where it shall
> cease, must mainly depend upon the evil to be remedied.[143]

_____

removal of gunpowder is a branch of the police power"); *Thurlow v. Massachusetts*,
46 U.S. 504 (1847) (License Cases).

[142] *Commonwealth v. Alger*, 61 Mass. 53 (1851). For another good discussion
of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140,
149 (1855).

[143] *Thurlow v. Massachusetts*, 46 U.S. at 592.

55

108.   Rather than view it as a fixed body of power, most judges in the pre-Civil War period viewed it as a reservoir from which the people could draw authority to enact laws necessary to promote the public health, welfare, and morality of society.[144]  The scope of this power in relationship to guns and gun powder was considerable.  Few if any Americans alive in 1791 could have imagined federal courts using the Second Amendment to limit state police power authority in this area of the law.  Indeed, if such an idea had been suggested in 1788 it would have undermined ratification of the Constitution and there would be no Second Amendment today to enforce.

**A.   Growing Need for Regulation in the Nineteenth Century**

109.   Police power regulations also impacted minors' relationship to arms and gun powder.  As was true for other applications of the police power, the enactment of specific laws aimed at minors depended on the practical and public perceptions of the need for government regulation in a particular area, which culminated in the rise of regulation as minors and the general public gained easier access to firearms.

110.   Gun violence was not a pressing issue of public concern at the time that the Second Amendment was enacted.  Firearms in the eighteenth century were not ideally suited for individual self-defense outside the home against unexpected threats or for committing crimes.  Flintlocks and muzzle loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity.  Given these facts, there was little need for modern style gun control laws because gun violence was not a serious problem.  As discussed above, government arms policy at the time of the Second Amendment's adoption was driven by a different problem: too few military guns in the hands of

---

[144] *Id.*

56

1  members of the militia.  Public policy, both at the state and federal level, aimed to

2  encourage the ownership of military quality weapons needed for militia service and

3  regulation was designed to further this objective.[145]

4      111.   Modern-style arms control measures targeting weapons better suited

5  for crime and inter-personal violence, and not especially useful for militia service,

6  did not emerge in American law until technological changes and economic

7  efficiencies made more accurate and more easily concealable weapons widely

8  available in the early nineteenth century.  Relatively cheap and reliable handguns

9  become common for the first time in American history in the early decades of the

10  nineteenth century.[146]

11      112.   The market revolution of the Jacksonian period (1828-1854)

12  transformed American life, making a host of consumer goods—from wooden

13  clocks to firearms—widely available for the first time.  The impact of these

14  interconnected set of changes in production, consumption, and technology

15  transformed gun culture by making a variety of weapons, including pistols, more

16  common and more reliable.[147] At the time of the Second Amendment's ratification,

17  90% of the guns owned by Americans were long guns.[148]  In response to the

18  perception that these guns posed a particular danger, states began passing laws to

19  deal with the negative consequences of these weapons, including new limits on

20  public carry.[149]

---

21      [145] Randolph Roth, *Why Guns Are and Are Not the Problem: The*

22  *Relationship between Guns and Homicide in American History*, *in* A RIGHT TO

23  BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON

    THE SECOND AMENDMENT 113, 117 (Jennifer Tucker et al. eds., 2019).

24      [146] *Id.*

25      [147] *Id.*

26      [148] Sweeney, *Firearms Ownership and Militias*, *supra* note 36.

27      [149] Cornell, *supra* note 2. For a good example, *see* Of Miscellaneous

28

113.   By the time of the Civil War, many states had enacted a variety of laws to deal with the problem of gun violence, including the special dangers firearms posed to minors.  In 1856, for example, Alabama adopted a provision focusing on the specific problem posed by the sale of pistols and other concealable weapons to minors and imposed a substantial financial penalty:

> That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[150]

114.   Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[151]

115.   Kentucky also enacted a similar law, but carved out an exception if a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[152]

116.   As historian Randolph Roth's work demonstrates, the South was the most violent region of the nation in the period before the Civil War.  Southern States took the lead in enacting gun-control-type measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[153]

---

Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[150] Act of February 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

[151] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

[152] 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

[153] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. 121 (2015), http://www.yalelawjournal.org/forum/firearm-regionalism-and-public-carry. On

117.   Police power regulations were also adopted by cities and towns to regulate arms.  In 1803, New York City singled out guardians for punishment for firearms infractions committed by minors under their charge.[154]  In 1817, Columbia, South Carolina enacted a law that allowed for the seizure of weapons used by minors within the city limits.[155]  And in 1857, the city of Louisville, Kentucky passed an ordinance stating that "[n]o person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[156]

118.   Post-Civil War America carried forward this antebellum tradition of robust regulation of firearms, adapting police power doctrine to the changed circumstances presented by the Reconstruction era.  It would be impossible to

southern homicide rates, Roth, AMERICAN HOMICIDE, *supra* note 34, 180-249

[154] Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, EDWARD LIVINGSTON, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803).

[155] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1, EDWARD LIVINGSTON, LAWS AND ORDINANCES, ORDAINED AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84 (1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50 (1857).

[156] No. 68. An Ordinance as to Retailing Gun Powder, in OLIVER H. STRATTAN, A COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO THE CITY OF LOUISVILLE, KY. 175 (1857).]

59

overstate the role that police power jurisprudence had on thinking about the regulation of arms in this period. Judges, state legislators, and local governments all drew on this legal tradition to adjudicate rights claims and the demands of preserving the peace and protecting liberty.

119.   The most dramatic example of this transformation was the rewriting of state constitution arms-bearing provisions.  Many of the new constitutions adopted after the Civil War in Southern states and newly admitted Western states, expressly asserted that the right to keep and bear arms did not preclude robust legislative power to regulate, making explicit a point that the pre-Civil War case law had firmly established.  It is worth comparing Iowa's formulation, among the most robust of the new post-Civil War provisions, with Pennsylvania's 1776 arms-bearing provision, the first one adopted after American Independence:

- Pennsylvania 1776: "That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power." [157]

- Iowa 1889: "The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."[158]

120.   Utah emulated Iowa by including a similar statement about the power of the legislature to regulate the right:

Utah 1895: "The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law."[159]

---

[157] PA. DECLARATION OF RIGHTS, 1776 cl. XIII.

[158] IDAHO CONST. OF 1889, art. I, § 11.

[159] UTAH CONST. OF 1895 art. I, § 6.

121.   The language employed by Iowa, Utah, and other states focused on the right to regulate and was consistent with the well-established view of the scope of the police power.[160] The new language's formulation of the right to keep and bear arms included in these constitutions underscored the breadth of the state's police power authority in arms regulation.  Further, at the Utah constitutional convention, there was a vigorous debate over a proposal to change the age at which individuals could be compelled to participate in the militia from eighteen to twenty-one. Although there was some disagreement over the wisdom of changing the policy, there was little disagreement that if such a policy was desirable, the state had ample authority to make the change.  The contours of this debate make clear that the there was no constitutional necessity compelling states to either require or prohibit minors from participating in the militia. The decision remained one that was dictated by military necessity, not constitutional imperative.[161]

122.   The broad latitude to regulate arms was acknowledged by the major constitutional commentators of the period as well.  John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[162]

---

[160] *See* Exhibit C to this declaration for other such provisions (Table 2 – Post Civil War Constitutional Arms Bearing Provisions about Regulations).

[161] OFFICIAL REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION ASSEMBLED AT SALT LAKE CITY ... (1898) at 815-819.

[162] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3d., (1899) at 4.

123.   The Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[163] Among the most pressing concerns of Republicans in the era of the Fourteenth Amendment's adoption (1868) was the problem of protecting the lives and rights of African Americans in the South, including their right to keep and bear arms.[164] Support for this goal did not mean that Republicans opposed strong gun regulations.[165]  Quite the opposite was the case across the South.  In fact, rather than mark a retreat from robust gun regulation, Reconstruction marked an intensification of efforts to regulate firearms—a development spurred in part by the rise of paramilitary groups, such as the Ku Klux Klan, and their violence against newly free persons and Republicans.[166]

124.   The robust regulation of firearms during Reconstruction, including regulations on sale or access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept.  Exercises of the police power were seen as consistent with the scope of the Second Amendment's reach as it had been understood at the

---

[163] For a more detailed discussion, see Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[164] Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARVARD L. REV. FORUM 238 (2014).

[165] RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003).

[166] Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South,* 17 STAN. L. & POL'Y REV. 615 (2006). One of the most horrifying examples was the Colfax massacre.  *See* LEEANNA KEITH, THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK POWER, WHITE TERROR, AND THE DEATH OF RECONSTRUCTION (2008).

Founding and as it was understood at the time.  The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the states' ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[167] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[168]

125.   The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[169]  Individual states and localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained twenty-one during this period).[170] Some of these laws targeted children younger than sixteen, but others singled out anyone below the age of twenty-one.  For example, Indiana's state law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors":

---

[167] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043. 1058 (2010).

[168] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

[169] Cornell and Florence, *supra* note 167.

[170] On the growing perception of the threat guns posed to minors in the post-Civil War era, *see* Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings Involving Children*, 98 SOCIAL SCIENCE QUARTERLY 397 (2017).

Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, that any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.[171]

126.   Wisconsin adopted a statute that prohibited minors from going armed or acquiring pistols and revolvers:

SECTION 1: It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.

SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state.[172]

127.   Henry Campbell Black, the author of Black's *Law Dictionary* and a leading post-Civil War legal authority, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined, and that determination of its limits was best left to courts on a case-by-case basis.[173]   Christopher G. Tiedeman, a conservative critic of the police power, nonetheless acknowledged the scope of its legitimate purview: "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[174]

---

[171] Act of Feb. 27, 1875, ch. 40; 1975 Ind. Acts 59.

[172] 1883 Wis. Sess. Laws 290.

[173] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[174] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149–50 (1854)).

64

128. This principle is evident in an 1883 Missouri statute that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes." In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor:

> If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.[175]

129. A Kansas statute prohibited selling, trading, giving, loaning pistols or revolvers to minors:

> Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.[176]

130. The language of a Louisiana law was even more comprehensive:

---

[175] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[176] 1883 Kan. Sess. Laws 159, § 1.

1
2

That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife any person under the age of twenty-one years.[177]

3
4

131.   A Nevada law focused on the danger posed by minors carrying guns in public:

5
6
7
8
9

Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment.[178]

10
11
12
13
14
15
16
17
18
19
20
21

132.   In his review of the history of gun regulation, political scientist Robert Spitzer concluded that laws limiting the ability of minors to obtain and use arms without appropriate supervision were among the most common firearms regulations in the post-Civil War period.  After surveying hundreds of laws in the nineteenth century, Spitzer concluded that "numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s."[179]  In fact, he concluded that restrictions on minors' access and use of arms were more common than limits on felons.[180]  The statutes reflected in Exhibits B (Table 1 – Gun/Weapon Restrictions for Minors) and D (Tables 3c and 3d, in Table 3 – Chronological Overview of State Laws Limiting Minors' Access to Firearms) to this declaration confirm Spitzer's conclusions.

22
23
24
25
26
27
28

---

[177] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.

[178] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881), The General Statutes Of The State Of Nevada. In Force From 1861 To 1885, Inclusive. 1077 (David E. Baily and John D. Hammond, 1885).

[179] Spitzer, *supra* note 25, at 60.

[180] *Id.,* at 60.

66

133.   Lewis Hochheimer, one of the leading authorities on domestic law in this period made this point abundantly clear.[181]  He noted that the regulation of firearms was an area of the law in which the police power was at its greatest reach. Infants, he conceded, were not entirely beyond the protection of the Bill of Rights, but Hochheimer was quick to point out that the need to protect those below the age of majority meant some regulations that were impermissible if applied to adults were perfectly legal when regulating infants, including general prohibitions on the sale or possession of arms to minors.[182]  In this instance, the broad power to protect the welfare of minors gave government extraordinary latitude in regulating their conduct.[183] In fact, Hochheimer noted that the scope of state regulatory authority was at its zenith when regulating arms and minors.

134.   In addition to vigorous state level regulation described above, many states and localities also enacted robust laws addressing the potential problem firearms posed to public safety by implementing tax or permit schemes that took advantage of the expansion of the size of state and local governments during the post-Civil War era. States and localities used these new administrative tools to

---

[181]  The Albany Law Journal's review of Hochheimer's book on infants praised the work for its exhaustive treatment of the subject, noting that it offered a "convenient and comprehensive summary" of the rights, remedies, and procedures available to infants, parents, guardians and courts in this area of the law. *See* Hochheimer, on *Custody of Infants*, 36 THE ALBANY LAW JOURNAL: A MONTHLY RECORD OF THE LAW AND THE LAWYERS 380 (1888). A brief review in the Harvard Law Review also praised the book for its careful "exposition of a small, but important topic in the law." *See* Review of *The Law Relating to the Custody of Infants*, by L. Hochheimer, 13 HARVARD L. REV. 420 (1900).

[182] LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3d ed., (1899) at 4.

[183] *Id.*

---

address a variety of different problems created by firearms. An Evanston, Illinois law handled the danger posed by permissive public carry with a permit law:

> It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.[184]

135.   The state of Florida dealt with the danger posed by repeating rifles in a similar fashion:

> In each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without taking out a license from the county commissioner of the respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners, and at the same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the make of the firearm so licensed to be carried and the caliber and number of the same.[185]

Mississippi opted for a tax to achieve the same goals as Evanston and Florida:

> [A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be in the possession of any person in said county, which tax shall be payable at any time on demand,

---

[184] Concealed Weapons, §531131-132, GEORGE W. HESS, REVISED ORDINANCES OF THE CITY OF EVANSTON: ALSO SPECIAL LAWS AND ORDINANCES OF GENERAL INTEREST (1893).

[185] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, § 1-4.

by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol.[186]

136.   The new tools of the administrative state, including permit schemes and taxes, were employed to help states and localities implement the regulations they believed necessary to advance the goals of promoting public health and safety.[187]

137.   The laws enacted during Reconstruction underscore the fact that robust regulation of firearms, including explicit restrictions on providing firearms to minors, was not a novel application of the police power, but an expansion and continuation of antebellum practices.  Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic, and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## B.   Guns in the Age of Increased Lethality and Ease of Use

138.   One important change relevant to understanding firearms regulation in the Reconstruction era and beyond derives from changes in firearms technology, specifically the increased lethality of modern weapons.  The change in firearms technology between the era of the Second Amendment and Fourteenth Amendment was profound.  Firearms became more deadly, lighter, easier to use, more accurate,

---

[186] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.

[187] On the transformation of American law and the rise of the modern regulatory state, *see* Herbert Hovenkamp, *Appraising the Progressive State*, 102 IOWA L. REV. 1063, 1068-75 (2017), William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081-83 (1994); and Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301, 304-05 (2015).

1  and required far less training to be effective than did the muskets of the eighteenth

2  century.

3      139.   Although comparisons of weapons from different eras is inherently

4  subjective, one effort to compile a comparative lethality index for military weapons

5  is instructive.  Military historian and defense analyst Trevor Dupuy's theoretical

6  lethality index captures the exponential growth in the lethality of firearms between

7  the era of the Second Amendment and the Fourteenth.  Of course, the lethality

8  index, an intellectual construct developed to compare weapons on the battlefield

9  offers an imperfect gauge for the increased lethality of modern weapons in a

10  civilian context.  An attack on a school with an eighteenth-century musket could

11  easily result in no casualties given the difficulty of using such weapons and the

12  likelihood of misfiring.  The attack on Sandy Hook Elementary School and the

13  scores of mass shootings in recent years would have been impossible using

14  common eighteenth-century firearms.  The improvements associated with weapons

15  in the Civil War era were significant, but they pale in comparison to the carnage

16  that modern semi-automatic weapons can inflict in densely populated areas and

17  sensitive places. Thus, Dupuy's innovative and useful scale, designed for battlefield

18  comparisons, understates the increase in the level of destruction today's weapons

19  can inflict upon a civilian population.[188]

20

Dupuy's Theoretical Lethality Index[74]

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

27      [188] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality*,

28  55 U.C DAVIS. L. REV. 2495, 2509 (2022).

1    140.   Another important insight derived from Dupuy's work concerns the

2    increased lethality of guns in the late nineteenth century.  The expansion of gun

3    laws after the Civil War, in part, reflects the improvements in firearms lethality and

4    their wider availability to the civilian population.  The ease of use of these weapons

5    compared to earlier firearms also increased their popularity.  The rise of easily

6    concealed weapons, especially pocket pistols, contributed to rising urban crime and

7    violence.  In response to these developments, states and localities enacted laws to

8    regulate the baneful consequences of arms proliferation as they had done time and

9    again in the decades following the adoption of the Second Amendment and its state

10   analogs.[189]

11   141.   The proliferation of weapons in the post-Civil War era—particularly

12   weapons capable of easy concealment—generated a new problem for American

13   states and localities: the ease of access to firearms for minors.  The data in Figure 1

14   below shows that concern over the threat that firearms posed to young Americans

15   intensified during Reconstruction and reach its apex in 1890.[190]

16

17

18

19

20

21

22

23

24

25

---

26   [189] *See Heller*, 554 U.S. at 627 n.26.

27   [190]  Figure 1 is adapted from data presented in Carlson and Cobb, *supra* note

28   170.)

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

**Figure 1**



Number of Articles Citing Accidental Shootings of Children by Decade

142.    This perception of a new threat to children posed by the increased lethality, availability, and ease of use of firearms, spurred the expansion of regulation to address the negative social consequences of this expansion in civilian arms.  The fact that the number of firearms laws limiting minors' access increased dramatically in the post-Civil War America was a response to changed circumstances.

## C.    A New Era of Gun Regulation (1900-1930)

143.    With the dawn of a new century, changes in technology, consumer behavior, and society once again created a novel gun violence problem requiring state action.[191]

144.    The Dick Act of 1903 and the National Defense Act of 1916 transformed the organization of the militia. In place of the traditional civic republican model of the militia favored by the Founding generation—one that was suffused with traditional Whig fears of powerful standing armies—a new National

---

[191] Freund, *supra* note 15 at 246–47 (1904); Spitzer, *supra* note 25, at 60.

1  Guard system was created.  The new militia would be professionalized and—most

2  importantly—controlled more tightly by the federal government.[192]

3      145.   The militia was divided into the organized militia, the National Guard,

4  and a more amorphous, unorganized Militia.  In an influential article published in

5  the *Yale Law Journal* in 1917, Brigadier General Samuel T. Ansell, a senior officer

6  in the Office of the Judge Advocate General, reviewed the legal changes that

7  facilitated this transformation.  One key development was the change in the policy

8  preferences of the individual states; multiple states decided to change their laws

9  about minors and the militia.  The most significant trend was the increasing

10  popularity of laws that required parental permission for minors to participate in the

11  militia.  Among the states enacting such laws were Connecticut, Idaho, Louisiana,

12  Illinois, Maryland, Nebraska, North Carolina, New Hampshire, New York, South

13  Dakota, Texas, Oregon, and West Virginia. [193]  The decisions of these states to

14  follow this path only underscores a fact that the previous history had made clear:

15  there was no set age requirement for the militia hardwired into the American

16  constitutional system.  States were perfectly at liberty to raise, lower, or prohibit the

17  participation of minors as they deemed necessary.  Defining who would participate

18  in the militia remained a policy choice; there was no constitutional necessity to

19  include minors.

20      146.   The pace and scope of gun regulation outside of militia regulation also

21  quickened in the twentieth century.  New laws were introduced to address novel

22

23      [192] For a discussion of how the modern national guard replaced the ideals at

24  the core of the Founding Era militia, *see* RICHARD R. UVILLER R & WILLIAM

25  MERKEL, THE MILITIA AND THE RIGHT TO ARMS: OR, HOW THE SECOND
   AMENDMENT FELL SILENT (2002).

26      [193] S.T. Ansell, *Legal and Historical Aspects of the Militia*, 26, YALE L.J.

27  471, 476 (1917).

28

problems created by advances in firearms technologies, rising levels of gun crime and perceptions of gun violence, including its increased threats to minors.[194] Although the right to keep and bear arms continued to be a venerated constitutional value, states and localities vigorously exercised their police power authority to address new problems created by changes in technology and behavior.[195]

147.   Prohibitions on machine guns and some semi-automatic weapons illustrated the far-reaching scope of such laws.[196]  Repeating rifles, were oddities in the Founding era and only became commercially viable to produce in the late nineteenth century, but fully automatic and semi-automatic weapons did not achieve sufficient market penetration to pose a serious problem until the early decades of the next century.[197]  As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the Antebellum era, the concern over more powerful "gangster weapons" did not emerge until the public discerned a negative impact of these weapons and the people themselves, acting in conformity with the ideals of popular sovereignty, prompted their legislatures to act.  The passage of new regulations often trailed technological developments because legislation was only necessary once new weapons became popular enough to cause a problem that required government action.  This pattern repeated itself in the case of rapid-fire and high-capacity weapons, including semi-automatic and

---

[194] On changes in technology and perceptions of crime and gun regulation, *see* Spitzer, *supra* note 25, at 60.  On the perception of growing threats to minors, *see* Carlson and Cobb, *supra* note 170.

[195] Freund, *supra* note 15.

[196] Spitzer, *supra* note 25, at 60.

[197] Brian Delay, *The Myth of  Continuity in American Gun Cultur*e (forthcoming, AMERICAN HISTORICAL REVIEW), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4546050

1  fully automatic guns.  As these weapons proliferated and undermined public safety,

2  new laws were crafted to mitigate their harms.[198]

3       148.  Nothing better illustrates this dynamic than the popular concerns about

4  "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a

5  machine gun that was popularly associated with the Saint Valentine's Day

6  Massacre and criminals such as Machine Gun Kelly.[199] Political scientist Robert

7  Spitzer's overview of the history of firearms regulation underscores this point:

8       So, for example, fully automatic weapons, most famously the Tommy
     gun, became available for civilian purchase after World War I. But it was
9       only when ownership spread in the civilian population in the mid-to-late
     1920s, and the gun became a preferred weapon for gangsters, that states
10      moved to restrict them. The lesson of gun regulation history here is that
     new technologies bred new laws when circumstances warranted.[200]
11

12      149.  Such laws targeting fully automatic and semi-automatic rapid-fire

13  weapons were a classic example of the flexibility of the police power.  Michigan's

14  law is illustrative of these laws:

15      It shall be unlawful within this state to manufacture, sell, offer for sale or
     possess any machine gun or firearm which can be fired more than sixteen
16      (16) times without reloading or any muffler, silencer, or device for
     deadening or muffling the sound of a discharged firearm.[201]
17

18      150.  Silencers posed another problem that prompted new regulations.

19  Minnesota's law banning silencers was typical of these statutes:

20      § 1 Use of silencers prohibited. No person shall within the state of
     Minnesota sell or offer or expose for sale, or have in possession for use
21      upon or in connection with any rifle, shot-gun, revolver, or other firearm

22

23  ―――――――――――――

     [198] Spitzer, *supra* note 25, at 60.
24
     [199] On the history of gun regulation up to and including the act,
25  *see* ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA (2001).

26      [200] Spitzer, *supra* note 25, at 68.

27      [201] Michigan Acts of 1929, Pub. No. 206, § 3, Comp. Laws 1929, § 16751.

28

or have in possession for purposes of sale any silencer for a shotgun, revolver, rifle or other fire-arm.[202]

151.   Other states, including New York and Connecticut, passed permit laws.[203]

152.   Unsurprisingly, the proliferation of new weapons spurred more states to regulate the possession of arms by minors.  By the early 1930s, the number of laws limiting minors' ability to acquire and use weapons increased by 50 percent as compared to the late nineteenth century.[204]

153.   Addressing sales and private transfers, Oregon made it "unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years."[205]  An Indiana law took a similarly broad approach to limiting minors' access to dangerous weapons, prohibiting the sale, barter, or gift to persons

> under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person, or to sell, barter or give to any person under the age of twenty-one years any cartridges manufactured and designed to be used in a pistol or revolver.[206]

---

[202] 1913 Minn. Laws 55, An Act to Prevent the Sale, Offering or Exposing for Sale or Having in Possession for the Use or for Purpose of Sale within this State, of Silencer for Shot-gun, Revolver, Rifle or Other Firearm, Defining a Silencer and Providing Penalties for Violation, Ch. 64, §§ 1-4 (1913).

[203] N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. Ch. 195, § 2 (1911); Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, Ch. 252, § 3 (1923).

[204] Spitzer, *supra* note 25, at 60.

[205] Act of Feb. 21, 1917, ch. 377, § 10, 1917 Or. Laws 804, 808.

[206] 1905 Ind. Acts 688, Weapon—Furnishing to Minor, § 450.

154.   Localities also exercised their ample police power authority to pass laws aimed at limiting the access of minors to guns.  For example, the city of Chicago forbade issuing firearms permits to all minors:

> It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.[207]

155.   The city of Joplin, Missouri banned weapons in places that minors frequented, and prohibited the sale, loan, or gift firearms to minors. The law equated minors with intoxicated persons, and the statute characterized prohibited persons as "irresponsible," thus textually underscoring the danger of allowing minors easy access to guns:

> If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.[208]

---

[207] Cook County, Ill, Ordinance chap. 53 of Chicago Code of 1911: § 6.

[208] JOPLIN, MO., CODE art. 67, § 1201 (1917), Brandishing, Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible.

156.   Harkening back to traditional parental authority, some jurisdictions allowed an exception for guns used while under the supervision of a parent.  For example, a 1903 South Dakota law made it "unlawful for any person under the age of fifteen years to carry, use or discharge any rifle, shot gun, revolver or other firearms except with the consent and knowledge of their parents or guardians."[209] But these exceptions only underscored the fact that minors were not viewed as completely responsible citizens, or fully independent legal actors who could claim Second Amendment rights on their own.

### D.   Firearms Regulation: A Pervasive Feature in American Law (1934-2021)

157.   The very first issue of the Duke Law Journal, *Law and Contemporary Problems* (published in 1934), focused on federal involvement in the prevention of crime and included a comprehensive review of firearms regulation in America.  It explained that the most common forms of regulation were restrictions on public carry, restrictions on the purchase of arms (including purchase by minors, who still included those aged 18–20 at that time), and prohibitions on dangerous or unusual weapons. [210]  The essay also noted that the use of license or permit requirements for purchase of a firearm expanded in the post-Civil War era and became a standard feature of gun regulation in the twentieth century. [211] Indeed, by 1938, a comprehensive review of firearms regulation concluded that most states had either banned the public carry of concealed weapons or adopted a restrictive permitting scheme resembling New York's Sullivan Law.[212]  Localities, especially large urban

---

[209] Act of Mar. 10, 1903, 1903 S.D. Sess. Laws ch. 144, §§ 1–3, 168, 168–69.

[210] John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400 (1934).

[211] *Id.*

[212] Sam B. Warner, *Uniform Pistol Act*, 29 AM. INST. CRIM. L. &

1 areas, in the final decades of the nineteenth century and the early decades of the

2 next century increased the level of regulation of arms, including limits on minors.

3 Another wide-ranging legal survey of firearms regulation published in 1950 found

4 little had changed in the ensuing decades.[213]

5      158.   One of the most significant developments in gun regulation in the

6 twentieth century was the growth of federal firearms regulation, beginning with the

7 New Deal.  As with the state measures addressed above, the threat posed by

8 organized crime and the proliferation of dangerous "gangster weapons," most

9 notably the machine gun, increased public enthusiasm for additional gun control

10 measures.  Repeated popular demands for some type of federal involvement finally

11 bore fruit in 1934, when Congress enacted the first comprehensive federal firearms

12 law.  In contrast to traditional state police power driven legislation, federal

13 regulation of firearms after the New Deal necessarily focused on interstate

14 commerce.  The National Firearms Act of 1934 regulated firearms dealers and

15 imposed a series of taxes on classes of weapons, including machine guns.  The Act

16 sought to limit access to the class of weapons, which was closely identified with

17 criminal behavior.[214]

18      159.   Later in the twentieth century, popular concern over crime and civil

19 unrest led to the passage of the federal Gun Control Act of 1968.[215]  In addition to

20 revising the federal licensing scheme for the manufacture, importation, and sale of

21 _____

CRIMINOLOGY 529 (1938).

22     [213] F.J.K., *Restrictions on the Right to Bear Arms: State and Federal*

23 *Firearms Legislation*, 98 U. PA. L. REV. 905 (1950).

24     [214] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236

25 (codified as amended at I.R.C. §§ 5801–5872 (2012); The Federal Firearms Act of June 30, 1938, 15 U.S.C. §§ 901–09.

26     [215] William J. Vizzard, *The Gun Control Act of 1968*, 18 ST. LOUIS UNIV.

27 PUB. L. REV. 79 (1999).

28

firearms, the Act prohibited a variety of persons from purchasing handguns, including minors, who continued to be defined as those below the age of twenty-one.  In addition, federal licensees were prohibited from selling firearms to out-of-state residents, minors, felons, persons under indictment for felonies, fugitives, and certain other categories of persons.[216]

160.   The Firearm Owners' Protection Act of 1986 loosened some restrictions on ammunition and prohibited the creation of a federal firearms registry, but it added additional categories of persons who were barred from possessing firearms, including undocumented immigrants, dishonorably discharged members of the armed forces, and U.S. citizens who renounced their citizenship.[217] The Brady Handgun Violence Protection Act of 1993 (Brady Act) created a background check system for the purchase of firearms from federally licensed dealers.[218]  Notably, neither the 1986 nor the 1993 federal legislative amendments lowered the age for sale of handguns to those under 21, even after the Twenty-Sixth Amendment was adopted and ratified in 1971, setting the voting age at 18.

161.   The next major turning point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings.[219]  California led the way with its ban on assault weapons enacted after

[216] 18 U.S.C. § 922(b)-(d).

[217] Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 (1986).

[218] Brady Handgun Violence Protection Act of 1993, Pub. L. No. 103-159, 110 Stat. 3009 (1993).

[219] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al, *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).

1   the Stockton School Massacre in 1989.[220]  Currently, ten states have passed similar

2   laws.[221]

3       162.   Current efforts to improve the effectiveness of firearms regulation

4   include additional regulation focused on limiting the access to firearms by those

5   under the age of 21, on top of those regulations already imposed by the Gun

6   Control Act of 1968.  The evidence discussed here and listed in Exhibits B (Table

7   1) and D (Table 3a, 3b, 3c and 3d) shows the longstanding nature of restrictions on

8   minors' ability to acquire and use firearms.[222]

9       163.   *Heller*'s non-exhaustive recitation of examples of presumptively

10  lawful and longstanding regulations expressly referenced laws prohibiting felons

11  and the mentally ill from acquiring firearms—and the bulk of those laws also

12  limited minors' access to firearms beginning in the early twentieth century.[223]

13      164.   In fact, nearly 75% of the states have had some form of age-based

14  restriction on firearms acquisition and use for more than a century.[224]  Of the states

15  with prohibitions in place for over a century, 80% of these limited access to

16  firearms for those below the legal age of majority, 21.[225]

17

18  ──────────────

    [220] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.

19  [221] Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault
20  Weapons, Magazines, and Silencers*, 83 LAW & CONTEMP. PROBS. 231 (2020);
    Shawna Chen, *Ten States with Laws Restricting Assault Weapons*,
21  https://www.axios.com/2023/01/12/assault-weapons-ban-states-illinois/.

22  [222] Exhibits B (Table 1) and D (Tables 3a, 3b, 3c, and 3d).

23  [223] THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS
    WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN
24  UNION 29 (1st ed. 1868), concluded that laws preventing felons from acquiring
25  firearms were justified on grounds too obvious to elaborate.

26  [224] Exhibits B (Table 1) and D (Tables 3c and 3d).

27  [225] *Id.*

28

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

165.   The scope of the police power regarding firearms and gunpowder has been among the most expansive in any area of the law.  Historically, in the case of minors under the age of 21, the legitimate reach of the police has been at its peak. For more than a century, state and federal judges have recognized that minors are among the categories of persons whose access to guns may be carefully regulated.[226]

## CONCLUSIONS

166.   A review of the historical record, in context, reveals that "infants"— individuals below the legal age of majority, which has been 21 for the most of American history—have never had an unfettered constitutional right to keep, bear, and acquire arms. This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history.  For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties and supervised by militia officers.

167.   Those under the age of 21 never enjoyed an autonomous individual right to purchase, acquire, own, or use firearms for most of American legal history. In fact, for most of American history, the law did not consider such minors as fully autonomous legal individuals in any meaningful sense.  The legal status of infants under American law in the Founding era was an inheritance from English common law.  This bedrock principle of Anglo-American law was unaltered by the American Revolution, the adoption of the Constitution, or the addition of amendments, including the Second Amendment and the Fourteenth Amendment.

---

[226] *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 202 n.16 (5th Cir. 2012) ("[f]rom the mid-19th century through the early 20th century, twenty-one other States imposed age qualifications on the purchase or use of certain firearms").

Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority. In fact, the concept of "young adult" invoked by Plaintiffs is a recent development in American culture and has no grounding in earlier Anglo-American law—and thus it has no bearing on assessing the scope of the Second Amendment right as it was originally understood at the time of its ratification and in the ensuing years.

168. As Plaintiffs note, in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related community-based forms of law enforcement. But the existence of such *duties* does not provide any concomitant evidence of the existence of a *constitutional right* to keep, bear, or acquire firearms for those under the age of 21. Rather, it demonstrates that governments have imposed a duty and obligation upon generations of Americans, including some minors, to contribute to public defense.

169. Failure to meet this legal obligation could result in a variety of punishments. In several states, the law expressly punished parents or guardians if they failed to acquire the necessary arms required by law to allow their minor children to participate in the militia. In those states in which such a provision was not included in law, the common law would have governed, and legal proceedings against insufficiently armed minors would have typically targeted parents or guardians.

170. Plaintiffs' argument not only confuses rights with obligations; it conflates specific public policy choices made by states and the federal government about the composition of the militia with fixed principles about the role of the military in the American constitutional scheme of government and the scope of individual constitutional rights. State and local governments were historically free to expand or contract the age restrictions on participation in the militia in response

to the needs of public defense and safety.  When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal.  If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

171.   The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers.  And the scope of state police power is greatest when protecting the health and safety of minors.  Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns.  Most states have had laws regulating arms, including regulations of minors, for more than a century.  Many of these laws date to the era of the Fourteenth Amendment and regulate the conduct of those under 21.

172.   Public perception that minors were especially at risk for harm from firearms intensified in the post-Civil War era.  Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions.  In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition.

1    I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3    Executed on September 11, 2023, at Bologna, Italy.

4

5                   *Saul Cornell*

6                _____

7                     Saul Cornell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

**TABLE OF EXHIBITS**

| Exhibit | Description | Pages |
|---------|-------------|-------|
| **A** | Cornell Curriculum Vitae 2023 | 1-18 |
| **B** | Table 1 – Gun/Weapon Restrictions for Minors | 19-34 |
| **C** | Table 2 – Post-Civil War State Constitutional Arms Bearing Provisions about Regulations | 35-37 |
| **D** | Table 3 – Chronological Overview of State Laws Limiting Minors' Access to Firearms (Including Tables 3a, 3b, 3c, and 3d) | 38-45 |

Expert Report and Declaration of Professor Saul Cornell  (3:19-cv-01226-L-AHG)

# EXHIBIT A

**Cornell Curriculum Vitae**

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✱ Bronx, NY 10458 ✱ 203 826-6608 (c) ✱ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

Exhibit A
Page 0002

| **Prizes and Awards** |
|---|

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

| **Book Publications** |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

 "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and *C*ontemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The  1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism,"  Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal 56 (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," Stanford Law and Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," Fordham Law Review 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u>New York in the Age</u> <u>of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## **Book Reviews:**

- <u>Journal of American History</u>
- <u>William and Mary Quarterly</u>
- <u>American Studies</u> <u>Journal of the Early Republic</u>
- <u>Pennsylvania Magazine of History and Biography</u>
- <u>American Quarterly</u>
- <u>American Journal of Legal History</u>
- <u>Law and History Review</u>

## **Journal Manuscript Referee:**

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review
- Stanford Law Review
- Yale Law Journal

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## **Federal Courts:**

United States of America,  v. Graylan Steve Johnson,United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

United States v. Posey, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

United States v. Combs, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

United States v. Barber, United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

Range v. Att'y Gen. United States, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

Antonyuk v. Hochul, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

United States v. Bullock, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

United States of Am. v. Riley, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

United States v. Coombes, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) .

United States v. Medrano, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

United States v. Coleman, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

United States v. Goins, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

Reese v. Bureau of Alcohol Tobacco Firearms & Explosives, United States District Court, W.D. Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

## State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022)  [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief*, Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief*, Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]


### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).


### **Law Review Symposia Organized**

### Second Amendment:

"The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).

"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).

"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev*. 292 (2008).

"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev*. 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev*. 721 (2013).

"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev*. 915 (2015).

# EXHIBIT B

**Table 1 --**
**Gun/Weapon Restrictions for Minors**

**EXHIBIT B**

**TABLE 1 -- GUN/WEAPONS RESTRICTIONS FOR MINORS**

| State | Year | Law | Source |
|---|---|---|---|
| AL | 1856 | To Amend the Criminal Law, §1.That anyone who shall sell or give or lend, to any male minor, a  bowie  knife, or knife or instrument of the like kind or description, by whatever name called, or air  gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars. | Acts 17 |
| AL | 1866 | Miscellaneous Offenses § 204. Selling or giving fire-arms to minor. – Any person who sells,  gives, or lends to any boy under eighteen years of age, any pistol, or bowie-knife, or other knife of like kind or description, must, on conviction, be fined not less than fifty, nor more than five hundred dollars. | George Washington Stone, The Penal Code  of Alabama,  Montgomery, 1866 Page 63, (1866) |
| AL | 1876 | Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie  knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy  under eighteen years of age, pistol, or bowie knife, or other knife of like kind or description,  must on conviction, be fined not less than fifty, nor more than five hundred dollars. | Wade Keyes, The Code of Alabama, 1876 : with References to the  Decisions of the Supreme Court of the State upon the Construction of the  Statutes; and in Which the General and Permanent Acts of the Session of  1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources. 1877 |
| CA | 1896 | Misdemeanors. Section 53. No junk-shop keeper or pawnbroker shall hire, loan or deliver to  any  minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot,  bullets or any weapon, or any combustible or dangerous material, without the written consent of  the parent or guardian of such minor. | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno,  1896 Page 37(1896) |
| CT | 1835 | A By Law in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city. | The By-Laws of the City of New London, with the Statute Laws of the State  of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855)  available at The Making of Modern Law: Primary Sources. 1835 Chapter 26. |
| CT | 1871 | Of Trespass on the Case. A person, before he trusts a gun with an incautious person, is bound  to render it perfectly innoxious. Where the defendant negligently and imprudently entrusted a  loaded gun to a young mulatto girl, who discharged it against the son of the plaintiff, and  severely wounded him by which the plaintiff lost his service and had to pay great expense for his cure, the defendant was subjected to 100 pounds damages. | Henry Dutton, A Revision of Swift's Digest of the Laws of Connecticut. Also, Practice, Forms and Precedents, in Connecticut Page 564, (Vol 1, 1871) |
| CT | 1881 | Charter of the City of New Haven. Trade. § 18. No person shall sell to any child under the age  of sixteen years, without the written consent of the parent or guardian of such child, any  cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol or  other mechanical contrivance arranged for the explosion of cartridge, or of any fulminate. | Charter of the City of New Haven Page 142-143, (1881) |
| D.C. | 1892 | CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles. SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or-second sections of this act shall be so construed as to apply to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition. SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years. SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case. | Washington D.C. 27 Stat. 116 (1892) |

| | | | |
|---|---|---|---|
| | | SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine.  Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.<br>SEC. 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed. | |
| D.C. | 1932 | CARRYING CONCEALED WEAPONS<br>SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or<br>dangerous weapon.<br>EXCEPTIONS<br>SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.<br>ISSUE OF LICENSES TO CARRY<br>SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.<br>SELLING TO MINORS AND OTHERS<br>SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years. | Washington D.C. 47 Stat. 650, 651-652 (1932) |

| DE | 1812 | An Act to prevent the discharging of fire-arms within the towns and villages, and other public places within this State, and for other purposes.<br><br>SEC. 1. Be it enacted by the Senate and House of Representatives of the State of Delaware, in General Assembly met, That from and after the first day of June next, if any person or persons shall presume to fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any of the towns or villages of this State, or within the limits thereof; of where the limits cannot be ascertained, within one quarter of a mile of the center of such town or village, shall fire or discharge any gun, ordnance, musket, fowling piece, fusee or pistol, within or on any of the greens, streets, alleys or lanes of any of the towns and villages within this State, whereon any buildings are or shall be erected, or within one hundred yards of any mill-dam, over or across where any of the main public or State roads may go or pass; every person or persons so offending, shall be fined or punished as hereinafter directed.<br><br>SEC. 2. And be it enacted by the authority aforesaid, That if any free white person or persons, or the child or children of any such person or persons, shall fire or discharge any gun, ordnance, musket, fowling-piece, fusee or pistol, within any, or at any of the places or limits aforesaid, every such person or persons, or the child or children of every such person or persons, shall forfeit and pay for every such offence, any sum, not exceeding five dollars, to be recovered from the person or persons, or from the parent of such child or children, before any justice of the peace of this State, on his own view, or on the oath or affirmation of any one or more credible witnesses, to be recovered as debts under forty shillings are recoverable by the laws of the State.<br>SEC. 3. And be it enacted by the authority aforesaid, That if any free negro or mulatto, or the child or children of any such free negro or mulatto, or any manumitted negro or mulatto, or any servant or servants, slave or slaves, apprentice or apprentices, of any person or persons whatsoever, shall fire or discharge any gun, ordnance, musket, fusee, fowling-piece or pistol, within the limits herein before described, and be thereof convicted by the view of any one justice of the peace, or on the oath or affirmation of one or more credible witnesses, every person so offending, shall forfeit and pay any sum, not exceeding five dollars: Provided nevertheless, That in all and every case where the money is not immediately paid on such conviction, into the hands of the justice before whom such conviction is had, it shall and may be lawful, and the said justice is hereby directed and commanded to commit such person or persons to the fail of his county, there to remain, until the forfeitures and costs are paid.<br>SEC. 4. And be it enacted by the authority aforesaid, That all fines and forfeitures incurred under this law, shall be paid over for the use of the poor of the county where the offence shall have been committed.<br>SEC. 5. Provided nevertheless, and be it enacted by the authority aforesaid, That nothing in this act shall extend, or be construed to prevent any such firing, on any day or days of public rejoicing, or where it is authorized by any law of this State, or where it shall be deemed by the justice before whom the information is lodged, that the necessity of the case required the same. | Act of Feb. 4, 1812, 195 Del. Laws 522 (1812) |
| DE | 1881 | An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.  That if any person shall carry concealed a deadly weapon upon or about his person other than  an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an  ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-  five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor  more than thirty days, or both at the discretion of the court: Provided, that the provisions of this  section shall not apply to the carrying of the usual weapons by policemen and other peace  officers. § 2. That if any person shall, except in lawful self-defense discharge any firearm in any  public road in this State, shall be deemed guilty of a misdemeanor and upon conviction thereof  shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one  month, or both at the discretion of the court. 16 Del. Laws 716 (1881). | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two.  As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the  Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our  Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added  the Constitutions of the United States and of this State, the Declaration of  Independence, and Appendix Page 987, (1893) |
| DE | 1881 | An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.<br>That if any person shall carry concealed a deadly weapon upon or about his person other than  an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an  ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-  five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor  more than thirty days, or both at the discretion of the court: Provided, that the provisions of this  section shall not apply to the carrying of the usual weapons by policemen and peace officers. | Del. Laws 987 |
| DE | 1918 | Minors Under Fifteen Not to Use Gun Unless Accompanied by an Adult, § 2382 A. Sec. 25 A.  1918 It shall be unlawful for any minor under fifteen years of age to hunt game birds or game  animals anywhere in this state with a rifle or shotgun of any kind unless accompanied by an  adult lawfully hunting. | 1918–1919 Del. Laws 484 |
| DE | 1919 | It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers  of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver  or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the  defense of one's person.<br><br>It shall be the duty of any person or persons, firm, company or corporation desiring to engage in  the business aforesaid, to keep and maintain in his place of business at all times a book which  shall be furnished him by the Clerk of the Peace of the County wherein he does business, in  which said book lie shall enter the date of the sale, the name and address of the person  purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the  color of these pistols on purchasing the same, and the apparent age of the purchaser, and the  names and addresses of at least two freeholders resident in the County wherein the sale is  made, who shall positively identify the purchaser before the sale can be made; Provided, that  no clerk, employee or other person associated with the seller shall act as one of the identifying  freeholders. This book shall at all times be open for inspection by any Judge, Justice of the  Peace, Police Officer, Constable, or other Peace Officer of this State. | Vol. 30 Del. Laws 55, 55-56 (1919) Section 222. |

| | | | |
|---|---|---|---|
| FL | 1881 | Fla. Laws 87, An Act to Prevent the Selling, Hiring, Bartering, Lending or Giving to § 1. it shall be unlawful for any person or persons to sell, hire, barter, lend or give to any minor  under sixteen years of age any pistol, dirk or other arm or weapon, other than an ordinary  pocket-knife, or a gun or rifle used for hunting, without the permission of the parent of such  minor, or the person having charge to such minor, and it shall be unlawful for any person or  persons to sell, hire, barter, lend or give to any person or persons of unsound mind any  dangerous weapon, other than an ordinary pocket-knife. § 2. Any person or persons so  offending shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined  not less than twenty nor more than fifty dollars, or imprisoned in the county jail not more than three months. | Fla. Laws 87 |
| GA | 1876 | Section I. That from an after the passage of this Act it shall not be lawful for any person or  persons knowingly to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife  or sword cane. Any person found guilty of a violation of this Act shall be guilty of a  misdemeanor, and punished as prescribed in section 4310 of the Code of 1873: Provided, that  nothing herein contained shall be construed as forbidding the furnishing of such weapons under   circumstances justifying their use in defending life, limb or property. Sec. II. Repeals conflicting laws. | Ga. Laws 112. |
| GA | 1920 | Laws 134, § 2. 1910 (forbids the sale of pistols to minors and makes the violations of the statute  a misdemeanor). See Spires v. Goldberg, 26 Ga. App. 530 (1921). | Ga. Laws 134, § 2. 1910 |
| HI | 1927 | Section 8. Selling to minors. No person shall sell, barter, hire, lend, or give any pistol or  revolver to any person under the age of eighteen years. | Haw. Sess. Laws 209-217 , AN ACT Regulating the Sale, Transfer and  Possession of Certain Firearms and Ammunitions, and Amending Sections  2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the  Revised Laws of Hawaii 1925 (the "Small Arms Act"),  § 8. |
| HI | 1933 | § 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon he delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to he delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both. | Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and  Possession of Firearms and Ammunition, § 4. |
| IA | 1884 | Section 1. That it shall be unlawful for any person to knowingly sell, present or give any pistol,  revolver or toy pistol to any minor. Sec. 2. Any violation of this act shall be punishable by a fine  of not less than twenty-five nor more than one hundred dollars or by imprisonment in the county  jail of not less than ten nor more than thirty days. Sec. 3. This act being deemed of immediate  importance shall be in full force and take effect from and after its publication in the Iowa State  Leader and Iowa State Register, newspapers published at Des Moines, Iowa. | Iowa Acts 86. |
| IA | 1887 | Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part  in carrying on any pistol gallery or shooting gallery without license therefor from said city, and  the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6.  No   licenseer or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or  shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or  remain in about the same to play thereat, under penalty of the same fine and forfeiture as set  forth in section 2 of this chapter. | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council  Bluffs, and Containing the Statutes Applicable to Cities of the First-Class,  Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887)  available At The Making of Modern Law: Primary Sources. |
| IA | 1987 | § 5004. Selling Firearms to Minors. No person shall knowingly sell, present or give any pistol,  revolver or toy pistol to any minor. Any violation of this section shall be punished by a fine of not  less than twenty-five nor more than one hundred dollars, or by imprisonment in the county jail  not less than ten nor more than thirty days. | Annotated Code of the State of Iowa Containing All the Laws of a General  Nature Enacted by The Twenty-Sixth General Assembly at the Extra  Session, Which Adjourned July 2, 1897 Page 1955, Image 787 (Vol. 1,  1897) available At The Making of Modern Law: Primary Sources. |

| ID | 1909 | An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the  Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a  Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.<br>If any person . . . or shall have or carry any such weapon upon or about his person when  intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or  deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon,  without the consent of the parent or guardian of such minor, he shall upon conviction, be  punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred  dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20)  nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it  shall be a good defense to the charge of carrying such concealed weapons if the defendant  shall show that he has been threatened with great bodily harm or had good reason to carry the<br>same in the necessary defense of his person, family home or property. | Id. Sess. Laws 6, An Act to Regulate the Use and Carrying of Concealed  Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to  Minors Under the Age of Sixteen Years to Provide a Penalty for the  Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1. |
|---|---|---|---|
| IL. | 1873 | Ordinances of Chicago: An Ordinance Prohibiting the Sale or Furnishing Minors with  Firearms. § 1. That no person within said city shall sell to or in any manner furnish any minor  with any gun, pistol, revolver, or other firearms; and any person offending against this  ordinance shall on conviction be fined in a sum not less than twenty-five dollars nor more than  one hundred dollars for each offense. | Proceedings of the Common Council of the City of Chicago Page 140,  Image 185 (Vol. 5, 1874) available at The Making of Modern Law: Primary  Sources. |
| IL. | 1882 | Deadly Weapons: Selling or Giving to Minor. § 54b. Whoever, not being the father, guardian, or  employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or  shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver,  derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted  upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than  twenty-five dollars ($25), nor more than two hundred ($200). | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the  State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All  Amendments Thereto, Together with the General Acts of 1875, 1877, 1879,   1881 and 1882, Being All the General Statutes of the State, in Force on the   First Day of December, 1882 Page 375, Image 392 (1882) available at The  Making of Modern Law: Primary Sources. |
| IL. | 1914 | Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell,   barter or give away to any person within the City of Chicago, any pistol, revolver, derringer,  bowie knife, dirk or other weapon of like character which can be concealed on the person,  except to licensed dealers and to persons who have secured a permit for the purchase of such  articles from the general superintendent of police as hereinafter required; provided, this section  shall not apply to sales made of such articles which are delivered or furnished outside the City  of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer,  bowie knife, dirk or other weapon of like character, which can be concealed on the person,  without first securing from the General Superintendent of Police a permit so to do. Before any   such permit is granted, an application in writing shall be made therefor, setting forth in such   application the name, address, age, height, weight, complexion, nationality and other elements of   identification, of the person desiring such permit, and the applicant shall present such  evidence of good character as the General Superintendent of Police in his discretion may  require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to<br>(a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall  be satisfied that the applicant is a person of good moral character, it shall be the duty of the   General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar.<br>§ 8. Any person, firm or corporation violating any of the provisions of this ordinance, shall be  fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for  each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall  be deemed a separate offense. | Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants   from May 1, 1915, to June 30, 1916 Page 458-459, IMage 458-459 (Vol. 7,   1916) available at The Making of Modern Law: Primary Sources. |
| IL. | 1917 | It shall be the duty of the general superintendent of police to refuse such permit to (a) all  persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be  satisfied that the applicant is a person of good moral character, it shall be the duty of the  general superintendent of police to grant such permit upon the payment of a fee of one dollar. | Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278,   Chicago, Ill, 1917). |
| IN | 1875 | An Act to prohibit the sale, gift or bartering of deadly weapons or ammunition therefor, to  minors. § 1. Be it enacted by the General Assembly of the State of Indiana, That it shall be  unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one   years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be  worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person,  under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol.  § 2. Be it further enacted, That any person who shall violate any of the provisions of the  foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall  be fined in any sum not less than five dollars, nor more than fifty dollars. | Edwin Augustine Davis, LL.B., The Statutes of the State of Indiana:  Containing the Revised Statutes of 1852, with the Amendments Thereto,   and the Subsequent Legislation, 246with Notes and References to Judicial  Decisions. Second Edition Vol. 2 Page 482, Image 493 (1877) available at   The Making of Modern Law: Primary Sources. |
| IN | 1905 | It shall be unlawful for any person to sell, barter or give to any other person under the age of   twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that  can be worn or carried concealed upon or about the person, or to sell, barter or give to any  person under the age of twenty-one years any cartridges manufactured and designed to be  used in a pistol or revolver. Any person who shall violate any of the provisions of this section  shall be deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five<br>dollars nor more than fifty dollars. | Ind. Acts 688, Weapon— Furnishing to Minor, § 450. |
| IN | 1925 | Sec 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or  give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed  guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred  dollars, or be imprisoned for not more than three months, or both, except for uses as  hereinebefore provided. | Ind. Acts 496, ch. 207, An Act to Regulate and Control the Possession,  Sale, and Use of Pistols and Revolvers in the State of Indiana |
| IN | 1929 | Be it enacted by the general assembly of the State of Indiana, That any person who being over   sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank  robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun,  machine gun or any other firearm or any dangerous or deadly weapon, or while any other  person present and aiding or assisting in committing or attempting to commit either of said  crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the  crimes above named and upon conviction shall be imprisoned for a determinate period of not  more than twenty years…. | Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit   Crime While Armed with Deadly Weapon, ch.55, § 1. |
| IN | 1986 | It shall be unlawful for any person to sell, barter or give to any other person under the age of   twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that  can be worn or carried concealed upon or about the person, or to sell, barter or give to any  person under the age of twenty-one years any cartridges manufactured and designed to be  used in a pistol. 1987. Any person who shall violate any of the provisions of this section shall be   deemed guilty of a misdemeanor, and, on conviction hall be fined not less than five dollars nor<br>more than fifty dollars. | The Revised Statutes of the State of Indiana, the Revision of 1881 and All  General Laws Enacted to that Revision (1888) Section 1986-87, Furnishing  Deadly Weapon to Minor. 1881 - 1986. |

| | | | |
|---|---|---|---|
| KS | 1883 | Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol,  by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung  shot, or other dangerous weapon to any minor, or to any person of notoriously unsound mind,  shall be deemed guilty of a misdemeanor, and shall, upon conviction before any court of  competent jurisdiction, be fined not less than five nor more than one hundred dollars. § 2. Any  minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges  may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous  weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of  competent jurisdiction shall be fined not less than ten  dollars. | Kan. Sess. Laws 159, An Act to Prevent Selling, Trading or Giving Deadly  Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor,  ch. 106, §§ 1-2.  § 1. |
| KS | 1887 | Any person who shall give, trade, loan or otherwise furnish any pistol, revolver, or toy pistol by  which cartridges or caps may be exploded, or any dirk, bowie-knife sling shot or toy known as  "rubber sling  shot" or other dangerous weapon, to any minor or to any person of notoriously  unsound mind, shall be  deemed guilty of a misdemeanor, and shall upon conviction before the  Police Judge be fined not less  than five nor more than one hundred dollars. § 14. Having  Possession of the Same. Any minor who shall  have in his possession any pistol, revolver, or toy  pistol by which cartridges may be exploded or any  dirk, bowie knife, brass knuckles, sling shot  or toy known as "rubber sling shot" or other dangerous  weapons shall be deemed guilty of a  misdemeanor and upon conviction shall be fined not less than one  nor more than ten dollars. | Sam Kimble Revised Ordinances of the City of Manhattan and Rules of the  Council Page 49-50, Image 51-52 (1887) available at The Making of  Modern Law: Primary Sources. 1887  Ordinances of Manhattan, KS; Offenses Against the Public Peace, Health  and Safety, Toy Pistols, §13. |
| KY | 1853 | No. 68. An Ordinance as to Retailing Gun Powder. No person shall retail gunpowder to minors  under fifteen years of age, or free colored persons, without authority from his parent or  guardian, or to slaves without authority from his master. Any person doing so in either case,  shall be fined twenty dollars. | Oliver H. Strattan, City Clerk A Collection of the State and Municipal Laws,  in Force, and Applicable to the City of Louisville, Ky. Prepared and  Digested, under an Order from the General Council of Said City by Oliver  H. Strattan and John M. Vaughan, City Clerks, which Includes the State  Constitution and City Charter, with Notes of Reference Page 175, Image  176 (1857) available at The Making of Modern Law: Primary Sources. |
| KY | 1859 | If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie-  knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried  concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars. | Ky. Acts 245, An Act to Amend an Act Entitled "An Act to Reduce to One of  the Several Acts in Relation to the Town of Harrodsburg," § 23. |
| KY | 1860 | If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-  knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried  concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars. | Ky. Acts 245, AN ACT to amend an act, entitled "An act to reduce into one  the several acts in relation to the town of Harrodsburg, Ch. 33, § 23. |
| LA | 1890 | . . . [I]t shall be unlawful, for any person to sell, or lease or give through himself or any other  person, any pistol, dirk, bowie-knife or any other dangerous weapon which may be carried  concealed to any person under the age of twenty-one years. | La. Acts 39, An Act Making it a Misdemeanor for Any Person to Sell, Give  or Lease, to Any Minor, Any Pistol, Bowie-Knife, Dirk or Any Weapons,  Intended to be Carried or Used as a Concealed Weapon, § 1. |
| LA | 1893 | Ordinances of the City of New Orleans. Offences, Misdemeanors and Nuisances. § 1342. It  shall be unlawful for any one to sell, or lease, or give through himself or any other person, any  pistol, dirk, bowieknife, toy pistol for which cartridges are used, or any other dangerous weapon  which may be carried concealed, to any person under the age of eighteen years. § 1343. That  any person violating the provisions of this ordinance shall be deemed guilty of a misdemeanor  and shall be liable to a fine not exceeding twenty-five dollars or imprisonment for a period not  exceeding thirty days, or both, at the discretion of the Recorder having jurisdiction. | John Q. Flynn Flynn's Digest of the City Ordinances, Together with the  Constitutional Provisions, Acts of the General Assembly, and Decisions of  the Courts Relative to the Government of the City of New Orleans Page  545, Image 617 (1896) available at The Making of Modern Law: Primary  Sources. |
| MA | 1882 | Of Explosive Compounds. Penalty for selling guns, pistols, cartridges, etc., to children. § 1.  Whoever sells to a child under the age of sixteen years, without the written consent of its parent  or guardian, any cartridge or fixed ammunition of which any fulminate is a component part, or a  gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge or of  any fulminate, shall be liable to a penalty of not less than five nor more than fifty dollars. | Report of Commissioners on Revision of Ordinances Page 141, Image 146  (1882) available at The Making of Modern Law: Primary Sources |
| MA | 1884 | Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall  sell to any child under the age of sixteen years without the written consent of a parent or  guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component  part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such  cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of  which the only component parts are chlorate of potash and sulphide of antimony, nor to any  appliance for exploding the same. The provisions of this section shall be inserted in every  license granted for the sale of gunpowder. | The Revised Ordinances of 1885, of the City of Boston, as Passed and  Approved December 14, 1885. (With Amendments Thereto, Passed and  Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added  the Revised Standing Regulations of the Board of Aldermen. 9th Rev.  Page 172, Image 182 (1886) available at The Making of Modern Law:  Primary Sources. |
| MA | 1909 | Section ninety-two of chapter one hundred and two of the Revised Laws is hereby amended by  inserting after the word "firearms", in the second line, the words — air guns, — so as to read as  follows: Section 92. Whoever sells or furnishes to a minor under the age of fifteen years any  firearms, air guns or other dangerous weapon shall be punished by a fine of not less than ten  nor more than fifty dollars for each offence; but instructors and teachers may furnish military  weapons to pupils for instruction and drill. | Acts 148, An Act to Prohibit the Sale of Air Guns to Certain Minors |
| MA | 1922 | Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign  born person who has who has not a permit to carry firearms under section one hundred and  thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be  punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers  may furnish military weapons to pupils for instruction and drill. | Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch.  485, § 8 (amending § 130)  § 8 (amending § 130). |
| MD | 1882 | Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any  person or persons within the State of Maryland to manufacture or sell, barter or give away the  cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for  any person, be he or she licensed dealer or not, to sell, barter or give away any firearm  whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person  who is a minor under the age of twenty-one years. Any person or persons violating any of the  provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than  two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and  cost, be committed to jail and confined therein until such fine and costs are paid, or for the  period of sixty days, whichever shall first occur. | Md. Laws 656 |
| MD | 1904 | § 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for all persons  under the age of fifteen years to carry or have in his or her possession any shot gun, rifle,  revolver or other firearm of any description within the limits of Garrett County. § 2. And be it  enacted, That any person convicted of violating this Act before any court of competent  jurisdiction shall be fined not less than five dollars nor more than twenty dollars, or be  imprisoned in the county jail for not less than ten nor more than thirty days for each and every  offense. | Md. Laws 295, An Act to Prohibit all Persons Under Fifteen Years of Age  from Carrying or Having in Their Possession Firearms of any Description  Within the Limits of Garrett County, ch. 177, §§ 1-2 |

| | | | |
|---|---|---|---|
| MD | 1908 | It shall be unlawful for any person under the age of twenty-one years to fire a gun, cat rifle, pistol, or any explosive instrument of metal, within one mile in any direction of the Library Hall in Catonsville, Baltimore county; and any person under said age of twenty-one years, violating this section, shall upon conviction before the Circuit Court, or any justice of the peace for said county, be fined a sum not less than one dollar nor more than ten dollars, or be imprisoned in the county jail for not less than five days nor more than thirty days, or be both fined and imprisoned, in the discretion of the court or the justice of the peace. | Md. Laws 397, § 31. |
| ME | 1892 | Nuisances. Sale of blank cartridges and pistols prohibited. § 4. No person shall sell to any child under the age of sixteen years, without the written consent of a parent or guardian of such child, any blank cartridge, or any pistol, or mechanical contrivance specially arranged or designed for the explosion of the same and any person violating the provisions of this ordinance shall be liable to a penalty of not less than fifty, and not exceeding one hundred dollars, to be recovered on complaint to the use the City of Portland. | Seth L. Haarrabee, The Charter and Ordinances of the City of Portland , Me.Page 136, Image 150 (1892) available at The Making of Modern Law: Primary Sources. |
| MI | 1883 | That no person shall sell, give, or furnish to any child under the age of thirteen years, any cartridge of any form or material, or any pistol, gun, or other mechanical contrivance, specially arranged or designated for the explosion of the same. | Mich. Pub. Acts 144, An Act To Prevent The Sale And Use Of Toy Pistols, § 1. |
| MO | 1883 | If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment. | MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879). 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1. |
| MO | 1887 | Ordinances of the City of St. Louis. Minors – Conditions of Sale to, of, Ammunition. – No person shall sell to any child under the age of sixteen years, without the written consent of the parents or guardian of such child, any cartridge of fixed ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. | Chester H. Krum, Reviser, The Revised Ordinance City of St. Louis. No. 17188. Approved April 7, 1893 Page 885, Image 894 (1895) available at The Making of Modern Law: Primary Sources. |
| MO | 1917 | If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state. | Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. |
| MS | 1878 | § 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court. | Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3. |
| MS | 1880 | Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided. | Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. |
| NC | 1893 | Section 1: That it shall be unlawful for any person, corporation or firm knowingly to sell or offer for sale, give in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling shot. Sec. 2. That any person, corporation or firm violating this act shall be guilty of a misdemeanor, and upon conviction for each and every offense shall be fined or imprisoned, one or both, in the discretion of the court. | N.C. Sess. Laws 468–69. |

| | | | |
|---|---|---|---|
| NC | 1913 | That any person being the parent or guardian of, or standing in loco parentis to, any child under the age of twelve years who shall knowlingly permit such child to have the possession or custody of, or use in any manner whatever, any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any other person, who shall knowingly furnish such child any such firearm, shall be guilty of a misdemeanor, and upon conviction shall be fined not exceeding fifty dollars, or imprisoned not exceeding thirty days. | N.C. Sess. Laws 57, Pub. Laws, An Act to Prevent the Use of Firearms by Children, ch. 32 § 1. |
| ND | 1923 | Sec. 9. Selling to Minors. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of eighteen years any pistol or revolver shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be fined not less than $100, nor more than $1,000, or be imprisoned not less than three months, nor more than one year, or both. | N.D. Laws 381, Pistols and Revolvers, ch. 266, § 9. |
| NE | 1895 | § 2. No person shall sell, loan, or furnish, to any minor, any gun, fowling-piece, or other fire-arm, within the limits of the city, under penalty of a fine of fifty dollars for each offense. § 5. It shall be unlawful for any parent, guardian, or other person having the care and custody of any minor, to purchase for or give to any such minor or knowingly to permit any minor to have any toy pistol, toy gun, or other toy arm or arms, or sling shot, out of which any leaden or other dangerous missiles may be discharged. Any such person so offending shall, upon conviction thereof, be fined in any amount not exceeding twenty dollars, and stand committed until such fine and costs are paid and secured. | Neb. Laws 237-38, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XXVI, §§ 2, 5. |
| NH | 1883 | Offenses Against Minors. § 4. If any person shall have in his possession a toy pistol, toy revolver, or other toy firearms, for the explosion of percussion caps or blank cartridges, with intent to sell the same, or shall sell, or offer to sell or to give away the same, he shall be fined not more than fifty dollars; and he shall be liable for all damages resulting from the use of the toy pistol, revolver, or other firearms by him sold or given away, to be recovered in an action on the case. | William Martin Chase, The Public Statutes of the State of New Hampshire, To which are Prefixed the Constitutions of the United States and State of New Hampshire with a Glossary and Digested Index Page 713, Image 732 (1891) available at The Making of Modern Law: Primary Sources. |
| NJ | 1885 | That it shall not be lawful to sell, hire or loan to any person under the age of fifteen years any gun, pistol, toy pistol, or other fire-arms; or for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other fire-arms; nor for any person under the age of fifteen years to carry, fire or use any gun, pistol, toy pistol or other fire-arms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school. | N.J. Laws 52, An Amendment to an Act to Prevent Vending, Using, or Exploding of Guns, Pistols, Toy Pistols, or Other Fire-Arms to or by Persons under the Age of Fifteen Years in this State, ch. 44, § 2. |
| NJ | 1903 | It shall not be lawful to sell, barter, exchange, hire or loan to any person under the age of fifteen years, any gun, pistol, toy pistol, or other firearms, nor for any person under the age of fifteen years to purchase, barter or exchange any gun, pistol, toy pistol or other firearms, nor for any person under the age of fifteen years to carry, fire or use a gun, pistol, toy pistol or other firearms, except in the presence of his father or guardian, or for the purpose of military drill in accordance with the rules of a school; it shall be the duty of all persons selling, hiring, bartering or exchanging pistols, revolvers, guns or other firearms, to keep and maintain a book of registry of the same, in which said book of registry shall be entered the number of the article sold, if any, the name of the maker, together with such other means of identification as may be obtainable concerning the same, and also the name and address of the person to whom such pistol, revolver, gun or other firearm is sold, bartered, exchanged or hired[.] | N.J. Laws 337-38, An Act to Amend an Act Entitled "An Act for the Punishment of Crimes," ch. 169, § 1. |
| NJ | 1914 | No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds, wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws. | N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1. |
| NV | 1881 | An Act to prohibit the carrying of concealed weapons by minors. § 1. Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment. See also NEV. REV. STAT. § 4864 (1885). | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1763 | Ordinances of the City of New York, § VI. And be it further ordained by the authority aforesaid, That if any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings, current money of New York; and on refusal to pay the same, shall be committed to the House of Correction, at the discretion of the Mayor, recorder or aldermen, or any one of them before whom such offender shall be convicted, there to remain committed, not exceeding Twenty days; unless such forfeiture as aforesaid, be sooner paid with the lawful fees of commitment; one half thereof to the informer with costs, and the other half to the church wardens of this City, for the use of the proof thereof. | Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City Page 11, Image 12 (1763) available at The Making of Modern Law: Primary Sources. |
| NY | 1803 | Ordinances of the City of New York, To Prevent the Firing of guns in the City of New York, § 1. Whereas the firing of guns and the practice of fowling in the public streets and in the roads or highways in the vicinity of this city, are frequently productive of accidents and dangerous consequences are always to be apprehended therefrom: Be it therefore ordained by the Mayor, Aldermen, and Commonalty of the City of New York, in the Common Council convened, That no person shall hereafter be permitted to fire or discharge any gun, pistol, fowling piece, or fire-arm, at any place on the island of New York, within the distance of four miles from the City Hall, under the penalty of five dollars upon each offender, to be recovered with costs. And if the person so offending shall be a minor, apprentice, servant or slave, the said fine shall be recoverable form his father, mother, master or mistress, together with costs. Provided always, that nothing contained in this ordinance shall be constructed to extend to the reviews or exercises of any military company, or of the State Prison Guards. | Edward Livingston, Laws and Ordinances, Ordained and Established by the Mayor, Aldermen, and Commonalty of the City of New-York, in Common-Council Convened, for the Good Rule and Government of the Inhabitants and Residents of Said City Page 83-84, Image 84-85 (1803) available at The Making of Modern Law: Primary Sources. |

| NY | 1859 | Ordinances of the City of New York. Firing of Fire-Arms, Cannons and Fireworks. § 6. No tavern- keeper keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises, nor shall suffer or permit any pistol gallery, erected in his or her house, or upon his or her premises, to be used for the purpose of practicing with any pistol gun, fowling-piece or other fire-arms, upon the first day of the week, called Sunday, under the penalty of fifty dollars for each offense, to be sued for and recovered from the person keeping such public house, tavern, public garden, pistol gallery, place of resort or premises; and also the further penalty of fifty dollars for each offense, to be sued for and recovered from the person firing off or practicing with a pistol, gun, fowling-piece, or other fire-arms; and in case of such person so offending shall be an apprentice, such penalty shall be sued for and recovered from the master of such apprentice, or in case such person so offending shall be a minor and not an apprentice, the same shall be sued for and recovered from the father of, or in case of the death of the father, then from the mother or guardian of such minor. | D. T. Valentine, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York: Revised A. D. 1859 Adopted by the Common Council Page 235, Image 243 (1859) available at The Making of Modern Law:  Primary Sources. |
|----|------|---|---|
| NY | 1884 | Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent to so use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1885 | Making Selling, Etc., Dangerous Weapons, § 409. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of, any instrument or weapon of the kind usually known as slung-shot, billy, sand club or metal knuckles, or who, in any city in this state, without the written consent of a police magistrate, sells or gives any pistol or other fire-arm to any person under the age of eighteen years is guilty of a misdemeanor. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 172, image 699 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1885 | An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof. | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. |
| NY | 1900 | Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slungshot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor. | N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1. |
| NY | 1911 | Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, loan, lease or give to him, shall be guilty of a misdemeanor ...................................................................................Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony. | N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1. |
| NY | 1911 | Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years is guilty of a misdemeanor. | N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1. |

| | | | |
|---|---|---|---|
| OH | 1883 | That it shall be unlawful for any firm, company or person in the state of Ohio, to sell or exhibit for sale any pistol manufactured out of any metallic or hard substance, commonly known as the "toy pistol"; to a minor under the age of fourteen years; any firm company or person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than ten nor more than fifty dollars, or be imprisoned not less than ten days nor more than twenty days, or both, and shall be liable to a civil action in damages at any person injured by such sale. | Ohio Laws 222, An Act to Prohibit the Sale of Toy Pistols in the State of Ohio, § 1. |
| OH | 1913 | § 12966. Whoever sells or exhibits for sale, to a minor under sixteen years of age, a pistol manufactured of a metallic or hard substance, commonly known as a "toy pistol" or air pistol, or any form of explosive gun , shall be fined not less than ten dollars nor more than fifty dollars or imprisoned not less than ten days nor more than twenty days, or both, and be liable in damages to any person injured by such sale. § 12967. Whoever sells, barters, furnishes or gives to a minor under the age of seventeen years, an air-gun, musket, rifle, shotgun, revolver, pistol, or other fire-arm, or ammunition therefor, or, being the owner or having charge or control thereof, knowingly permits it to be used by a minor under such age, shall be fined not more than one hundred dollars or imprisoned in jail not more than thirty days, or both. | Ohio Laws 906, An Act: A Bill to Amend and Supplement [Certain] Sections . . . and to Repeal [Certain] Sections of the General Code; Relating to Children and to Females under Twenty-One Years of Age and to Organizations which Include within Their Objects Matters Relating to Children, ch. 11, §§ 12966-67. |
| OK | 1890 | Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article. Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise. . . . Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise. | Okla. Laws 495, art. 47. |
| OK | 1891 | Concealed Weapons. (2434) § 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in section one and two of this article (§ 1…pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided) (§ 2…pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided). | Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources. |
| OR | 1868 | Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore . . . § 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: either or any one of the following-named guns, and one revolving pistol: a rifle, shot-gun (double or single barrel), yager, or musket; the same to be exempt from execution, in all cases, under the laws of Oregon. § 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state. | Or. Laws 18-19, An Act to Protect the Owners of Firearms, §§ 1-2. |
| OR | 1903 | § 1. It shall be unlawful to sell, exchange, barter, or give to any child, under the age of fourteen years, any explosive article or substance, other than an ordinary firecracker, containing ten grains of gunpowder; or to sell, exchange, barter, or give to any such child any firearms, or other device of a like kind, ordinarily used or ordinarily capable of being used in discharging gunpowder in a greater quantity than ten grains; and it is herby made unlawful in any event to sell, exchange, barter, or give to any child, under the age of fourteen years, any instrument or apparatus, the chief utility of which consists in the fact that it is used, or is ordinarily capable of being used, as an article or device to increase the force or intensity of such explosive, or to direct or control the discharge of any such explosive. § 2. Any person violating the provisions of | Or. Laws 309-10, An Act to Regulate and Prohibit the Sale, Barter, Exchange, or Gift of Explosives, Firearms or Other Articles of a Like Kind, to Children Under the Age of Fourteen Years, and to Punish the Violation of the Provisions of this Act. §§ 1-2. |
| OR | 1917 | Section 10. It shall be unlawful for any person, firm or corporation to sell, offer for sale, give or dispose of any pistol, revolver or other firearm of a size which may be concealed upon the person, to any minor under the age of twenty-one years. A violation of this section is a misdemeanor and punishable by imprisonment in the county jail for a period not exceeding six months, or by a fine not exceeding Five Hundred Dollars, or both such fine and imprisonment. | Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 10. |
| PA | 1881 | makes any person, "who shall knowingly and willfully sell or cause to be sold, to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, … shall, in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars." | Act of June 10, 1881, § 1 |

| | | | |
|---|---|---|---|
| PA | 1883 | Crimes, Carrying and Sale of Explosives, § 113. Any person who shall knowingly and willfully sell or cause to be sold to any person under sixteen years of age, any cannon, revolver, pistol or other such deadly weapon, or who shall knowingly and willfully sell, or cause to be sold, to any such minor, any imitation or toy cannon, revolver or pistol so made, constructed or arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged, and thereby become a dangerous or deadly weapon, or who shall knowingly and willfully sell, or cause to be sold to any such minor, any cartridge, gunpowder or other dangerous and explosive substance, shall in every such case, be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine not exceeding three hundred dollars. | John Purdon, A Digest of the Laws of Pennsylvania: From the Year One Thousand Seven Hundred to the Sixth Day of July, One Thousand Eight Hundred and Eighty-Three.11th Edition Page 423-424, Image 472-473  (Vol. 1, 1885) available at The Making of Modern Law: Primary Sources. |
| RI | 1883 | § 1. No person shall sell to any child under the age of fifteen years, without the written consent  of a parent  or guardian  of such child, any cartridge  or fixed  ammunition  of which  any fulminate   is  a component part, or any gun, pistol or other mechanical contrivance arranged for the explosion of such cartridge or of any fulminate. | R.I. Pub. Laws 157, An Act In Amendment Of And in Addition To Chapter  92 Of The Public Statutes "Of Fire-arms and Fire-works", § 1 |
| RI | 1883 | Firearms and Fire-works. § 7. No person shall sell to any child under the age of fifteen years,   without the written consent of a parent or guardian of such child, any cartridge or fixed  ammunition of which any fulminate is a component part, or any gun, pistol or other mechanical  contrivance arranged for the explosion of such cartridge or of any fulminate. § 8. Every person  violating the provisions of the foregoing section shall be fined not less than ten dollars nor more than twenty dollars for each offence. | General Laws of the State of Rhode Island and Providence Plantations to  Which are Prefixed the Constitutions of the United States and of the State  Page 372, Image 388 (1896) available at The Making of Modern Law:  Primary Sources. |
| SC | 1817 | [Ordinances of the Town of Columbia, An Ordinance For Prohibiting the Firing of Guns in the Town of Columbia (1817). Whereas the practice of firing small arms within the town of Columbia is extremely dangerous to the lives; as well as the property of the inhabitants thereof, and ought to be strictly prohibited: Be it ordained by the Intendent and Municipal Wardens of the towns aforesaid, in council assembled, and it is hereby ordained by the authority of the same, That hereafter it shall not be lawful for any person to fire or discharge any gun, pistol or other small arms within the limits bounded by Henderson, Blossom, Lincoln and Upper streets; and if any person shall wantonly, knowingly, and willfully fire or discharge any gun, pistol, or other small arms within the said limits, such person shall forfeit and pay to the use of the town aforesaid, a sum not exceeding five dollars, for each and every such offence, to be sued for and recovered according to law. And whereas, offences of this kind may be committed by minors or other disorderly persons, who have no ostensible property whereof the said penalty can be levied. Be it therefore ordained by the authority aforesaid, That any gun, pistol or other small arms, fired or discharged by any such person in breach of this ordinance, shall be liable for the payment of the penalty or penalties aforesaid; and it shall be lawful for the intendant, either of the Wardens or constables, who shall see such person offending against this ordinance, to seize and take into possession the gun or pistol, or other small arms so fired or discharged, and despite the same with the Intendant or either of the Wardens; and if the person charged with the said offense, and convicted thereof, shall not within ten days after conviction pay the penalty incurred and the costs of prosecution, the same shall be sold to discharge the said penalty and costs: Provided nevertheless, That nothing in this ordinance contained shall extend to prohibit or restrain the usual exercises or duties of the military on muster or parade days, or in performance of patrol or other duties enjoined by law, or to prohibit or restrain any of the inhabitants of said town from shooting any mad dog, or any other dangerous animal found within the same, or from firing guns on the fourth of July, Christmas and New-Years days, or on any other day of general rejoicing of said town.] | Ordinances, of the Town of Columbia, (S. C.) Passed Since the  Incorporation of Said Town: To Which are Prefixed, the Acts of the General  Assembly, for Incorporating the Said Town, and Others in Relation Thereto  Page 61-61, Image 61-62 (1823) available at The Making of Modern Law:  Primary Sources. |
| SC | 1923 | If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days. | S.C. Acts 221 |
| SD | 1903 | §1. It shall be unlawful for any person under the age of fifteen years to carry, use or discharge  any rifle, shot gun, revolver or other fire arms except with the consent and knowledge of their  parents or guardians. § 2. It shall be unlawful for any parent or guardian, having the legal  charge or control of any minor under the age of fifteen years, to allow or permit such minor to  use or carry while loaded any of the arms mentioned in section one of this act within the platted  portion or within the distance of one mile of the platted portion of any city, town or village. § 3.  Any person or persons violating the provisions of this act shall be deemed guilty of a  misdemeanor and upon conviction thereof shall be fined in a sum not exceeding Fifty Dollars. | S.D. Sess. Laws 168-69, Prohibiting the Use of Fire Arms by Persons  under Fifteen Years of Age, ch. 144, §§ 1-3. |
| TN | 1856 | Offences Against Public Policy and Economy. § 4864. Any person who sells, loans, or gives, to  any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous  weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a  misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court. | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State  of Tennessee, of a General and Permanent Nature, Compiled on the Basis  of the Code of Tennessee, With Notes and References, Including Acts of  Session of 1870-'71 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. |

| | | | |
|---|---|---|---|
| TN | 1863 | [Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4. Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.] | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City,  with an Appendix Page 148-149, Image 149-150 (1863) available at The  Making of Modern Law: Primary Sources. |
| TN | 1876 | Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who  sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife,  or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty  of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court. | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50  (1867) available at The Making of Modern Law: Primary Sources. |
| TX | 1897 | That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment. And during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is committed. | Tex. Gen. Laws 221-22, An Act to Prevent the Barter, Sale and Gift of Any Pistol, Dirk, Dagger, Slung Shot, Spear or Knuckles Made of Any Metal or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . . , ch. 155, § 1. |
| UT | 1905 | § 1. Selling or giving firearms to minors under fourteen. Any person who sells, gives or disposes  of, or offers to sell, give or dispose of any pistol, gun, target gun, or other firearm, to any minor  under fourteen years of age, is guilty of a misdemeanor. § 2. Minor under fourteen must not  carry firearms. Any person under the age of fourteen years who shall carry, or have in his  possession, any pistol, gun, target gun or other firearm, unless accompanied by a parent or guardian, shall be guilty of a misdemeanor. | Utah Laws 60, An Act to Prohibit the Sale of Firearms to Minors and the  Carrying of Firearms by Minors, and Prescribing Penalties for Violation  Thereof, ch. 52, §§ 1-2. |
| VA | 1869 | Ordinances of the town of Lexington. Of Concealed Weapons and Cigarettes. § 2. If any person  sell, barter, give or furnish, or cause to be sold, bartered, given or furnished to any minor under  sixteen years of age, cigarettes, or pistols, or dirks, or bowie knives, having good cause to  believe him or her to be a minor under sixteen years of age, shall be fined not less than  ten dollars nor more than one hundred dollars. | The Charter and General Ordinances of the Town of Lexington, Virginia  Page 87, Image 107 (1892) available at The Making of Modern Law:  Primary Sources. |
| VA | 1903 | 1. Be it enacted by the general assembly of Virginia, That it shall be unlawful for any person, firm, corporation, or association, to sell, barter, exchange, furnish, or dispose of by purchase,  gift, or in any other manner, any toy gun, pistol, rifle, or other toy firearm, if the same shall, by  means of powder or other explosive discharge blank or ball charges, to any person under the  age of twelve years. Any firm, corporation, or association violating the provisions of this act  shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less  than fifty dollars nor more than one hundred dollars, or confined in jail for a period not less than  thirty, nor more than ninety days, either or both. 2. Each sale of any of the articles hereinbefore  specified to any person under the age mentioned shall constitute a separate offense, and any  person over the age of twelve years who shall purchase, accept, or in any manner acquire any  of the toy articles of the kind hereinbefore enumerated for any person under the age of twelve  years, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined  not less than one hundred dollars nor more than two hundred dollars, or confined in jail for a  period not less than thirty days nor more than six months, either or both. | 1902-1904 Va. Acts 261, An Act to Prevent the Sale or Gift of Toy Firearms  to Persons Under Twelve Years of Age, and to Provide a Penalty Therefor,  ch. 186, §§ 1-2. |
| VT | 1912 | § 1. A person, other than a parent or guardian, who sells or furnishes to a minor under the age  of sixteen years a firearm or other dangerous weapon, shall be fined not more than fifty dollars  nor less than ten dollars. This section shall not apply to an instructor or teacher who furnishes  military weapons to pupils for instruction and drill. § 2. A child under the age of sixteen years  who, without the consent of his parent or guardian, has in his possession or control a pistol or  revolver constructed or designed for the use of gunpowder or other explosive substance with  leaden ball or shot shall be fined not more than twenty dollars. | Vt. Acts and Resolves 306, An Act . . . Relating to Firearms, §§ 1-2. |
| WA | 1883 | Sale of Toy Pistols to Children, It shall be unlawful for any person or persons to sell or offer for  sale, any toy pistols within this state, and every person who shall sell, give, furnish, or cause to  be furnished to any person under the age of sixteen years, any pistol, toy pistol or other pocket  weapon, in which explosives may be used, shall be deemed guilty of a misdemeanor, and upon  conviction, shall be fined in any sum not less than five, nor more than twenty-five dollars. | Edward D. McLaughlin, The Revised Statutes and Codes of the State of Washington Page 1042, Image 1094 (1896) available at The Making of  Modern Law: Primary Sources. |
| WA | 1909 | Use of Firearms by Minor. No minor under the age of fourteen years shall handle or have in his  possession or under his control, except while accompanied by or under his control, except while  accompanied by or under the immediate charge of his parent or guardian, any firearm of any  kind for hunting or target practice or for other purposes. Every person violating any of the  foregoing provisions, or aiding or knowingly permitting any such minor to violate the same, shall  be guilty of a misdemeanor. | 1909 Wash. Sess. Laws 984, An Act Relating to Crimes and Punishments  and the Rights and Custody of Persons Accused or Convicted of Crime,  and Repealing Certain Acts, ch. 249, ch. 8, § 308. |

| WI | 1882 | Offenses Against Lives and Persons of Individuals. §4397a. (1) It shall be unlawful for any person to sell or use, or have in his possession, for the purpose of exposing for sale or use, any toy pistol, toy revolver, or other toy fire-arm. (2) Any person violating any of the provisions of this act, on conviction thereof, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars, or by both fine and imprisonment, in the discretion of the court. § 4397b. (1) It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor any pistol or revolver, found in his possession. (2) It shall be unlawful for any dealer in pistols or revolvers, or any other person to sell, loan or give any pistol or revolver to any minor in this state. | Supplement to the Revised Statutes of the State of Wisconsin, 1878,  Containing the General Laws from 1879 to 1883, with the Revisers' Notes  to the Statutes of 1878 and Notes to Cases Construing and Applying These  and Similar Statutes by the Supreme Court of Wisconsin and the Courts of  Other States Page 847, Image 889 (1883) available at The Making of  Modern Law: Primary Sources. |
|---|---|---|---|
| WI | 1883 | Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or  revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take  from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for  any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or  revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of  intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this  act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100). | Wis. Sess. Laws 290 |
| WV | 1882 | (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie  knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly  weapon of like kind or character" "to a per-son whom he knows, or has reason, from his  appearance or otherwise, to believe to be under the age of twenty-one years"). | W. Va. Acts 421 |
| WV | 1891 | Offenses Against the Peace, § 7. If a person carry about his person any revolver or other pistol, dirk,  bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly  weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five  nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than  one nor more than twelve months; and if any person shall sell or furnish any such weapon as is  hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to  believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but  nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his  dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of  purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it  repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or  bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable  citizen, of good character and standing in the community in which he lives, and at the time he was found  with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and  did believe that he was in danger of death or great bodily harm at the hands of another person, and that he  was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him  not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged  with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife. | See State v. Workman, 14 L.R.A. 600 (1891): John Augustus Warth, The  Code of West Virginia. Containing the Constitution and Naturalization of  the United States – the Constitution of the State – the Code, as Amended  by Legislation to and Including the Year 1891 and Marginal Notes to all  Prior Laws and Applicable Decisions, with an Appendix, Containing all the  Statutes of the State in Force, of a General and Prospective Nature, not  Enacted or Inserted in the Several Chapters of the Code Page 915-916,  Image 920-921 (1891) available at The Making of Modern Law: Primary  Sources. |

| WV | 1925 | Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That said applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons temporarily for the purpose of executing a process, and a sheriff in such cases may authorize a deputy to carry | W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7,  pt. a. |

| | | | |
|---|---|---|---|
| | | weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee. | |
| WY | 1890 | Furnishing Deadly Weapons to Minor. § 5052. It shall be unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie knife,  slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or  about the person, or to sell, barter or give to any person under the age of sixteen years any  cartridges manufactured and designed for use in a pistol; and any person who shall violate any  of the provisions of this section shall be fined in any sum not more than fifty dollars. | 1890 Wyo. Terr. Sess. Laws 140. Josiah A. Van Orsdel, Attorney General, Revised Statutes of Wyoming, in Force December 1, 1899 Including the Magna Charta, Declaration of Independence, Articles of Confederation, Organic Act of Territory of Wyoming, Act of Admission of the State of Wyoming, Constitution of the United States and of Wyoming, and the Rules  of the Supreme Court Page 1253, Image 1253 (1899) available at The Making of Modern Law: Primary Sources. |

# EXHIBIT C

**Table 2 --**
**Post-Civil War State Constitutional**
**Arms Bearing Provisions About**
**Regulations**

Exhibit C
Page 035

**Table 2**
**Post-Civil War State Constitutional Arms Bearing**
**Provisions About Regulation**
(S. Cornell, *UC Davis Law Review Online,* Vol. 55, Sept. 2021)

| Date | State | Provision |
|------|-------|-----------|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |

Exhibit C
Page 036

| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |
| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |
| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

Exhibit C
Page 037

# EXHIBIT D

**Table 3 -- Chronological Overview of State Laws Limiting
Minors' Access to Firearms**

**Table 3:  Chronological Overview of State Laws Limiting Minors' Access to Firearms**

| Table 3a.  States with Firearms Laws Limiting Minors' Access Enacted Between 1946-1970 (50-75 Years) | | |
|---|---|---|
| State | Year | Provision |
| Ohio | 1943 | Act of May 4, 1943, no. 125, § 1, 1943 Ohio Laws 143, 143–144 (making it unlawful to sell firearms or air-guns to minors under seventeen). |
| Arizona | 1953 | Act of Apr. 1, 1953, ch. 117, § 1, 1953 Ariz. Sess. Laws 236, 236 (making it unlawful to give firearms, ammunition, or toy pistols to minors under eighteen). |
| California | 1953 | The Dangerous Weapons' Control Law, ch. 1, § 12072, 1952 Cal. Stat. 653, 658 (1952) (making it unlawful for any minor under eighteen to own or possess firearms). |
| Rhode Island | 1959 | Act of May 18, 1959, ch. 75, §§ 11-47-30, 11-47-31, 1959 R.I. Laws 259, 272 (making it unlawful to sell firearms to any minors under fifteen). |

| Table 3b.  States with Firearms Laws Limiting Minors Access Enacted Between 1921-1945 (75-100 Years) | | |
|---|---|---|
| State | Year | Provision |
| Connecticut | 1923 | Act of June 2, 1923, ch. 252, § 8, 1923 Conn. Acts 3707, 3709 (making it unlawful to sell, barter, hire, lend, give, or deliver any pistol or revolver to any minor under eighteen). |
| New Hampshire | 1923 | Act of May 4th, 1923, ch. 118, § 7, 1923 N.H. Laws 138, 139 (making it unlawful |

| | | |
|---|---|---|
| | | to sell, barter, hire, lend or give a pistol or revolver to any minor under twenty-one). |
| North Dakota | 1923 | Act of Mar. 7, 1923, ch. 266, § 9, 1923 N.D. Laws 379, 381 (making it unlawful to sell, barter, hire, lend, or give a pistol or revolver to a minor under eighteen). |
| South Carolina | 1923 | Act of Mar. 27, 1923, no. 148, § 19, 1923 S.C. Acts 207, 221 (making it unlawful for a child under twelve to use any gun, pistol, or other dangerous firearm). |
| Hawaii | 1927 | Small Arms Act, § 8, 1927 Haw. Sess. Laws 209, 211 (1927) (making it unlawful to sell, barter, hire, lend, or give any pistol or revolver to any person under eighteen). |
| Michigan | 1927 | Act of June 2, 1927, no. 372, §2, 1927 Mich. Pub. Acts 887, 887–88 (making it unlawful to obtain a pistol license under the age of nineteen). |

| Table 3c.  States with Firearms Laws Limiting Minors Access Enacted Between 1891-1920 (Over 100 Years) | | |
|---|---|---|
| State | Year | Provision |
| North Carolina | 1893 | Act of Mar. 6th, 1893, ch. 514, § 1, 1893 N.C. Sess. Laws 468, 468–69 (making it unlawful to sell, give, or in any way dispose of a pistol or pistol cartridge to any minor). |
| Nebraska | 1895 | Ordinance of August 26, 1895, art. XXVI, § 2, 1895 Neb. Laws Relating to the City of Lincoln 237, 237 (making it unlawful to sell, loan, or furnish any gun, fowling-piece, or other firearm to a minor). |
| Texas | 1897 | Act of May 14, 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221, 221–22 (making it unlawful to sell, give, or barter any pistol or other dangerous weapon to a minor |

| | | without the written consent of their parent or guardian). |
|---|---|---|
| New York | 1900 | Act of Mar. 23, 1900, ch. 222, § 1, 1900 N.Y. Laws 458, 458–59 (making it unlawful to sell any pistol or other firearm to a person under eighteen). |
| Virginia | 1902 | Act of Apr. 30, 1903, ch. 186, § 1–2, 1902–1904 Va. Acts 261, 261 (making it unlawful to provide any toy gun, pistol, rifle, or other toy firearm to a person under twelve). |
| New Jersey | 1903 | Act of June 14, 1903, ch. 169, § 1, 1903 N.J. Laws 337, 337-38 (making it unlawful to sell, barter, exchange, hire, or loan any gun, pistol, toy pistol, or other firearm to a person under fifteen). |
| South Dakota | 1903 | Act of Mar. 10, 1903, ch. 144, §§ 1–2, 1903 S.D. Sess. Laws 168, 168–69 (making it unlawful for persons under fifteen to use firearms). |
| Utah | 1905 | Act of Mar. 9, 1905, ch. 52, §§ 1–2, 1905 Utah Laws 60, 60 (making it unlawful to sell or give firearms to minors under fourteen). |
| Montana | 1907 | Act of Mar. 6, 1907, ch. 111, § 1, 1907 Mont. Laws 282, 282–83 (1907) (making it unlawful for anyone to permit a minor child under fourteen to carry or use any firearms). |
| Idaho | 1909 | Act of Feb. 17th, 1909, § 1, 1909 Id. Sess. Laws 6, 6 (making it unlawful to sell deadly weapons to minors under the age of sixteen). |
| Maine | 1909 | Act of Mar. 29, 1909, ch. 166, § 2, 1909 Me. Laws 169, 169 (making it unlawful to give, furnish, or sell any dangerous weapon or firearms, with certain situational exceptions, to a child). |

| | | |
|---|---|---|
| Massachusetts | 1909 | Act of Mar. 19, 1909, ch. 199, 1909 Mass. Acts 148 (making it unlawful to sell any firearms, air guns, or other dangerous weapons to a minor under fifteen). |
| Washington | 1909 | Act of Mar. 22, 1909, ch. 249, § 308, 1909 Wash. Sess. Laws 890, 984 (making it unlawful for any minor under fourteen to handle or possess a firearm). |
| Vermont | 1912 | Act of Dec. 4, 1912, no. 229, §§ 1–2, 1912 Vt. Acts and Resolves 306, 306 (making it unlawful for anyone other than a parent or guardian to sell or furnish a firearm or other dangerous weapon to a minor under the age of sixteen). |
| Oregon | 1917 | Act of Feb. 21, 1917, Ch. 377, § 10, 1917 Or. Sess. Laws 804, 808 (making it unlawful to sell, give, or dispose of any pistol, revolver, or other firearm of a size which could be concealed to a minor under twenty-one). |

| Table 3d.  States with Firearms Laws Limiting Minors enacted between 1851-1890 (Over 130 Years) | | |
|---|---|---|
| State | Year | Provision |
| Alabama | 1856 | Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17 (making it unlawful to sell, give, or lend an air gun or pistol to a male minor). |
| Tennessee | 1856 | Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92, 92 (making it unlawful to sell, loan, or give to any minor a pistol). |
| Kentucky | 1860 | Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 (making it unlawful for anyone other than a parent or guardian to sell, give, or loan any pistol or other deadly weapon which can be conceal carried to a minor). |

| | | |
|---|---|---|
| Indiana | 1875 | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| Georgia | 1876 | Act of Feb. 17, 1876, no. 128, § 1, 1876 Ga. Laws 112, 112 (making it unlawful to sell, give, lend, or furnish any pistol or other deadly weapons to a minor). |
| Mississippi | 1878 | Act of Feb. 28, 1878, ch. 66, §§ 2, 1878 Miss. Laws 175, 175 (making it unlawful to sell a pistol or other similarly deadly weapon to a minor). |
| Delaware | 1881 | Act of Apr. 8, 1881, ch. 548, § 1, 1881 Del. Laws 716 (making it unlawful to sell a deadly weapon to a minor). |
| Florida | 1881 | Act of Feb. 4, 1881, ch. 3285, §§ 1–2, 1881 Fla. Laws 87, 87 (making it unlawful to sell, hire, barter, lend, or give a pistol or other arm or weapon, with certain exceptions, to minors under sixteen). |
| Illinois | 1881 | Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73 (making it unlawful for any person other than a parent, guardian, or employer to sell, give, loan, hire, or barter a pistol, revolver, or other deadly weapon to a minor). |
| Pennsylvania | 1881 | Act of June 10, 1881, no. 124, § 1, 1881 Pa. Laws 111, 111–12 (making it unlawful to sell a revolver, pistol, or other deadly weapon, to a person under sixteen). |
| Maryland | 1882 | Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656 (making it unlawful to sell, barter, or give away any firearm or other deadly weapons, with some exceptions, to a minor under the age of twenty-one). |
| West Virginia | 1882 | Act of Mar. 24, 1882, ch. 135, § 7, 1882 W. Va. Acts 421, 421–22 (making it |

| | | |
|---|---|---|
| | | unlawful to furnish a revolver, pistol, or other dangerous and deadly weapon, to a person under twenty-one). |
| Kansas | 1883 | Act of Mar. 1, 1883, ch. 105, §§ 1–2, 1883 Kan. Sess. Laws 159, 159 (making it unlawful to furnish a pistol, revolver, toy pistol, or other dangerous weapon to a minor, and making it unlawful for any minor to possess such weapons). |
| Missouri | 1883 | Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76, 76 (making it unlawful to sell, deliver, loan, or barter a firearm or other deadly weapon to a minor without their parents' or guardians' consent). |
| Wisconsin | 1883 | Act of Apr. 3, 1883, ch. 329, §§ 1–2, 1883 Wis. Laws 290, 290 (making it unlawful for any person to sell, loan, or give a pistol or revolver to a minor, and making it unlawful for any minor to go armed with any pistol or revolver). |
| Iowa | 1884 | Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86 (1884) (making it unlawful to sell, present, or give any pistol, revolver, or toy pistol to a minor). |
| Nevada | 1885 | Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51, 51 (making it unlawful for any person under twenty-one to wear or carry any concealed pistol or other dangerous or deadly weapon). |
| Louisiana | 1890 | Act of July 1, 1890, § 1, 1890 La. Acts 39, 39 (making it a misdemeanor to sell, lease, or give any pistol or other dangerous weapon to any person under twenty-one). |
| Oklahoma | 1890 | Penal Code of the Territory of Oklahoma, ch. 25, art. 47, § 3, 1890 Okla. Laws 495, 495 (making it unlawful to sell or give to any minor one of the designated arms or weapons provided in the article). |

| | | |
|---|---|---|
| Wyoming | 1890 | Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |