# EXHIBIT 6

**Expert Report and Declaration of Professor Holly Brewer**

**Vol. 2 of 2**

# EXHIBIT M



DATE DOWNLOADED: Fri Mar  3 14:23:25 2023
SOURCE: Content Downloaded from HeinOnline

Citations:

Bluebook 21st ed.
Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798 (1798-1813).

ALWD 7th ed.
. Public Ls of the State of Rhode-Isl& & Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798 (1798-1813).

APA 7th ed.
(1798-1813). Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798. Newport, Printed by H. & O. Farnsworth, printers to the Hon. General Assembly.

Chicago 17th ed.
Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798. Newport, Printed by H. & O. Farnsworth, printers to the Hon. General Assembly.

McGill Guide 9th ed.
Public Ls of the State of Rhode-Isl& & Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798 (Newport: Printed by H. & O. Farnsworth, printers to the Hon. General Assembly., 1798-1813)

AGLC 4th ed.
Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798 (Printed by H. & O. Farnsworth, printers to the Hon. General Assembly., 1798-1813

MLA 9th ed.
Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798. Newport, Printed by H. & O. Farnsworth, printers to the Hon. General Assembly. HeinOnline.

OSCOLA 4th ed.
Public Laws of the State of Rhode-Island and Providence Plantations Passed since the Session of the General Assembly in January, A.D. 1798. Newport, Printed by H. & O. Farnsworth, printers to the Hon. General Assembly.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and Conditions of the license agreement available at
 https://heinonline.org/HOL/License
-- The search text of this PDF is generated from  uncorrected OCR text.

ſhall operate as an extinguiſhment or deter-
mination of ſuch woman's power and authori-
ty : And the Court of Probate ſhall thereup-
on grant adminiſtration upon the unadminiſ-
tered part of the eſtate, to ſuch huſband, or to
any other ſuitable perſon or perſons.

Sec. 2. *And be it further enacted,* That
the adminiſtrator or adminiſtrators, ſo ap-
pointed, ſhall and may proſecute or defend
any ſuit or ſuits which may have been com-
menced by or againſt the firſt executrix or ad-
miniſtratrix, in the ſame manner, and to the
ſame purpoſe and effect, as ſhe might have
proſecuted or defended the ſame if her truſt
had continued.

*who may proſecute ſuits, &c.*

---

*An Act to organize the Militia of this State.*

WHEREAS by the Conſtitution of the U-
nited States, the Congreſs have power to
provide for organizing, arming and diſci-
plining the militia, and for governing ſuch
part of them as may be employed in the
ſervice of the United States ; reſerving to
the States reſpectively the appointment of
the officers, and the authority of training
the militia according to the diſcipline pre-
ſcribed by Congreſs : And whereas the
Congreſs did, on the eighth day of May,
A. D. 1792, paſs an act, entitled, " An
Act more effectually to provide for the na-
tional defence, by eſtabliſhing an uniform
militia throughout the United States ;"
which Act is in the words following, to wit :

*Preamble.*

" *An Act more effectually to provide for the na-
tional Defence, by eſtabliſhing an uniform Mi-
litia throughout the United States.*

*Act of Con-
greſs.*

.1.     BE it enacted by the Senate and
House of Representatives of the
United States of America, in Congreſs aſſembled,
That

*Who ſhall be
enrolled.*

54                        *Militia.*

That each and every free able-bodied white male citizen of the respective States, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years, (except as is herein after excepted) shall severally and respectively be enrolled in the militia, by the Captain or Commanding officer of the company within whose bounds such citizen shall reside, and that within twelve months after the passing of this act. And it shall at all times hereafter be the duty of every such Captain or Commanding officer of a company, to enroll every such citizen as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years, or being of the age of eighteen years and under the age of forty-five years, (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrollment, by a proper non-commissioned officer of the company, by whom such notice may be proved; that every citizen so enrolled and notified shall, within six months thereafter, provide himself **How to be equipped.** with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except that when called out on company days to exercise only, he may appear without a knapsack.

*Militia.*                                    55

fack. That the commiffioned officers fhall feverally be armed with a fword or hanger and efpontoon, and that from and after five years from the paffing of this act, all mufkets for arming the militia, as herein required, fhall be of bores fufficient for balls of the eighteenth part of a pound. And every citizen fo enrolled, and providing himfelf with arms, ammunition and accoutrements required as aforefaid, fhall hold the fame exempted from all fuits, diftreffes, executions or fales, for debt, or for the payment of taxes.

2. *And be it further enacted,* That the Vice-Prefident of the United States ; the officers, judicial and executive, of the government of the United States ; the members of both Houfes of Congrefs, and their refpective officers ; all cuftom-houfe officers, with their clerks ; all poft-officers and ftage-drivers, who are employed in the care and conveyance of the mail of the poft-office of the United States ; all ferry-men employed at any ferry on the poft-road ; all infpectors of exports ; all pilots ; all mariners actually employed in the fea fervice of any citizen or merchant within the United States, and all perfons who now are or may hereafter be exempted by the laws of the refpective States, fhall be and are hereby exempted from militia duty, notwithftanding their being above the age of eighteen, and under the age of forty-five years.

3. *And be it further enacted,* That within one year after paffing of this act, the militia of the refpective States fhall be arranged into divifions, brigades, regiments, battalions and companies, as the Legiflature of each State fhall direct ; and each divifion, brigade and

*Exemptions.*

*Militia how to be divided.*

and regiment, shall be numbered at the formation thereof, and a record made of such numbers in the Adjutant-General's office in the State; and when in the field, or in service in the State, each division, brigade and regiment, shall respectively take rank according to their numbers, reckoning the first or lowest number highest in rank. That if the same be convenient, each brigade shall consist of four regiments; each regiment of two battalions; each battalion of five companies; and each company of sixty-four privates. That the said militia shall be officered by the respective States as follows: To each division, one Major-General, and two Aids-de-camps, with the rank of Major; to each brigade, one Brigadier-General, with one Brigade Inspector, to serve also as Brigade-Major, with the rank of a Major; to each regiment, one Lieutenant-Colonel Commandant; and to each battalion, one Major; to each company, one Captain, one Lieutenant, one Ensign, four Sergeants, four Corporals, one Drummer, and one Fifer or Bugler. That there shall be a regimental staff, to consist of one Adjutant, and one Quarter-Master, to rank as Lieutenants; one Paymaster, one Surgeon, and one Surgeon's Mate; one Sergeant-Major, one Drum-Major, and one Fife-Major.

*and officered.*

4. *And be it further enacted,* That out of the militia enrolled, as is herein directed, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall at least be one company of artillery, and one troop of horse: There shall be to each company of artillery, one Captain, two Lieutenants, four Sergeants, four Corporals, six

*Companies of Grenadiers, &c. to be formed, &c.*

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14116   Page 8 of 199

fix Gunners, fix Bombardiers, one Drummer, and one Fifer. The officers to be armed with a fword or hanger, a fufee, bayonet and belt, with a cartridge-box, to contain twelve cartridges ; and each private or matrofs fhall furnifh himfelf with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided. There fhall be to each troop of horfe, one Captain, two Lieutenants, one Cornet, four Sergeants, four Corporals, one Saddler, one Farrier, and one Trumpeter. The commiffioned officers to furnifh themfelves with good horfes of at leaft fourteen hands and an half high, and to be armed with a fword and pair of piftols, the holfters of which to be covered with bearfkin caps. Each dragoon to furnifh himfelf with a ferviceable horfe, at leaft fourteen hands and an half high, a good faddle, bridle, mail-pillion and valife, holfters, and a breaft-plate and crupper, a pair of boots and fpurs, a pair of piftols, a fabre, and a cartouch-box, to contain twelve cartridges for piftols : That each company of artillery, and troop of horfe, fhall be formed of volunteers from the brigade, at the difcretion of the Commander in Chief of the State, not exceeding one company of each to a regiment, nor more in number than one eleventh part of the infantry, and fhall be uniformly clothed in regimentals, to be furnifhed at their own expenfe ; the colour and fafhion to be determined by the Brigadier commanding the brigade to which they belong.

    5. *And be it further enacted*, That each battalion and regiment fhall be provided with the State and regimental colours by the field officers, and each company with a drum and fife,

Colours, &c. to be provided.

fife, or bugle-horn, by the commiffioned officers of the company, in fuch manner as the Legiflature of the refpective States fhall direct.

**Adjutant-General, his duty.**

6. *And be it further enacted,* That there fhall be an Adjutant-General appointed in each State, whofe duty it fhall be to diftribute all orders from the Commander in Chief of the State to the feveral corps ; to attend all public reviews, when the Commander in Chief of the State fhall review the militia, or any part thereof ; to obey all orders from him relative to carrying into execution and perfecting the fyftem of military difcipline eftablifhed by this act ; to furnifh blank forms of different returns that may be required, and to explain the principles on which they fhould be made ; to receive from the feveral officers of the different corps throughout the State returns of the militia under their command, reporting the actual fituation of their arms, accoutrements and ammunition, their delinquencies, and every other thing, which relates to the general advancement of good order and difcipline : All which the feveral officers of the divifions, brigades, regiments and battalions, are hereby required to make in the ufual manner, fo that the faid Adjutant-General may be duly furnifhed therewith ; from all which returns he fhall make proper abftracts, and lay the fame annually before the Commander in Chief of the State.

**Rules of difcipline.**

7. *And be it further enacted,* That the rules of difcipline, approved and eftablifhed by Congrefs, in their refolutions of the twenty-ninth of March, one thoufand feven hundred and feventy-nine, fhall be the rules of difcipline to be obferved by the militia throughtout

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14118   Page 10 of 199

throughout the United States, except such de-
viations from the said rules as may be ren-
dered neceffary by the requifitions of this act,
or fome other unavoidable circumstances.
It fhall be the duty of the Commanding of-
ficer, at every mufter, whether by battalion,
regiment or fingle company, to caufe the
militia to be exercifed and trained agreeably
to the faid rules of difcipline.

8. *And be it further enacted,* That all
commiffioned officers fhall take rank accord-
ing to the date of their commiffions; and
when two of the fame grade bear an equal
date, then the rank to be determined by lot,
to be drawn by them before the Command-
ing officer of the brigade, regiment, battalion,
company or detachment.

9. *And be it further enacted,* That if
any perfon, whether officer or foldier, belong-
ing to the militia of any State, and called out
into the fervice of the United States, be
wounded or difabled while in actual fervice,
he fhall be taken care of and provided for at
the public expenfe.

10. *And be it further enacted,* That it
fhall be the duty of the Brigade Infpector to
attend the regimental and battalion meetings
of the militia, compofing their feveral brig-
ades, during the time of their being under
arms; to infpect their arms, ammunition
and accoutrements; fuperintend their exer-
cife and manœuvres, and introduce the fyf-
tem of military difcipline before defcribed
throughout the brigade, agreeable to law,
and fuch orders as they fhall, from time to
time, receive from the Commander in Chief
of the State; to make returns to the Adju-
tant-General of the State, at leaft once in eve-

I                    ry

*Marginal notes:*
Rank.
Difabled fol-
diers.
Brigade In-
fpector, his du-
ty.

ry year, of the militia of tne brigade to which he belongs, reporting therein the actual situation of the arms, accoutrements and ammunition of the several corps, and every other thing which in his judgment may relate to their government, and the general advancement of good order, and military discipline; and the Adjutant-General shall make a return of all the militia of the State to the Commander in Chief of the said State, and a duplicate of the same to the President of the United States.

**Independent companies.**    And whereas sundry corps of artillery, cavalry and infantry, now exist in several of the said States, which by the laws, customs or usages thereof, have not been incorporated with, or subject to, the general regulations of the militia :

11. *Be it further enacted*, That such corps retain their accustomed privileges, subject nevertheless to all other duties required by this act, in like manner with the other militia."

And whereas the reservations contained in the said Constitution, relative to the militia of the States respectively, render it necessary that provision should be made in the premises by the Legislature of this State :

**Militia divided into brigades.**    Section 1. *Be it therefore enacted by this General Assembly, and by the authority thereof it is enacted,* That the whole militia of this State shall be arranged into one division; that the said division shall consist of four brigades ; that the militia in the counties of Newport and Bristol shall form the first brigade ; the militia in the county of Providence the second brigade ; the militia in the county of Washington the third brigade ; and the militia

militia in the county of Kent the fourth brigade : That the brigade in the counties of Newport and Briftol fhall confift of three regiments ; the brigade in the county of Providence, of fix regiments ; the brigade in the county of Wafhington, of three regiments ; and the brigade in the county of Kent, of two regiments : And that each regiment, whofe numbers, in the opinion of the field officers, will admit of it, fhall be divided into two battalions.

Sec. 2. *And be it further enacted,* That the regiments aforefaid be conftituted as follows, to wit : That the towns of Newport, Portfmouth, New-Shoreham, Jameftown and Middletown, conftitute the firft regiment ; the towns of Providence and North-Providence, the fecond regiment ; the towns of Wefterly, Charleftown and Hopkinton, conftitute the third regiment ; the towns of Briftol, Warren and Barrington, the fourth regiment ; the towns of Warwick and Eaft-Greenwich, the fifth regiment ; the towns of Smithfield and Cumberland, the fixth regiment ; the town of Scituate, the feventh regiment ; the towns of North-Kingftown and Exeter, the eighth regiment ; the towns of Weft-Greenwich and Coventry, the ninth regiment ; the towns of Tiverton and Little-Compton, the tenth regiment ; the towns of South-Kingftown and Richmond, the eleventh regiment ; the town of Glocefter, the twelfth regiment ; the town of Fofter, the thirteenth regiment ; and the towns of Cranfton and Johnfton, the fourteenth regiment.

*Regiments conftituted.*

Sec. 3. *And be it further enacted,* That there be four companies of militia in the town of Newport, five in the town of Providence,

*Companies conftituted.*

dence, two in the town of Portfmouth, three in the town of Warwick, four in the town of Wefterly, one in the town of New-Shoreham, four in the town of North-Kingftown, four in the town of South-Kingftown, two in the town of Eaft-Greenwich, one in the town of Jameftown, four in the town of Smithfield, four in the town of Scituate, fix in the town of Glocefter, two in the town of Charleftown, three in the town of Weft-Greenwich, four in the town of Coventry, three in the town of Exeter, one in the town of Middletown, one in the town of Briftol, three in the town of Tiverton, two in the town of Little-Compton, two in the town of Warren, three in the town of Cumberland, two in the town of Richmond, three in the town of Cranfton, four in the town of Hopkinton, two in the town of Johnfton, two in the town of North-Providence, one in the town of Barrington, and four in the town of

**Militia how officered.**

Fofter : And that the aforefaid divifion, brigades, regiments, battalions and companies, be officered agreeably to the above recited act of Congrefs, and that the officers be engaged according to Law.

**Permanent exemptions.**

Sec. 4. *And be it further enacted,* That in addition to the perfons exempted from military duty by the act of Congrefs herein before recited, there fhall be and hereby are exempted from fuch duty, the following perfons, to wit : All perfons who have holden the offices of Governor or Lieutenant-Governor ; all perfons who fuftained any military commiffion or commiffions previous to the laft day of February, A. D. 1796, and took their engagement thereupon according to law ; all perfons who after the faid laft day of February, A. D. 1796, fhall have holden, or

fhall

shall hold, any military commission or commissions for the space of five years successively, and shall have taken, or shall take, their engagements thereupon according to law; and all persons who, after the said last day of February, A. D. 1796, shall have holden, or shall hold any military commission or commissions, and shall have taken, or shall take, their engagements thereupon according to law, and shall have been, or shall be, therefrom suspended or left out by any election of the General Assembly. *Provided neverthe-* Proviso. *less,* that any person who shall claim an exemption on account of his having held any military commission or commissions as aforesaid, shall exhibit to the commanding officer of the company within which he shall reside, if required by said commanding officer, his original commission or commissions, by virtue of which he shall claim such exemption, and the original certificate or certificates of his having taken his engagement or engagements thereupon; and shall also, if required, deliver to and leave with the said commanding officer, a copy of each of them, which copies the said commanding officer shall deliver to his successor in office.

Sec. 5. *And be it further enacted,* That Temporary persons of the following description, so long exemptions. as they shall continue of said description, shall be and hereby are exempted from military duty, to wit : The members of both Houses of the Legislature, the Justices and Clerks of the Supreme Judicial Court, the Justices and Clerks of the Courts of Common Pleas, the Secretary, the Attorney-General, the General-Treasurer, the High-Sheriff of each county, Justices of the Peace, one Ferryman

at

at each stated ferry, who usually attends the
same; one Miller at each grist-mill, who usu-
ally attends the same, every settled or ordain-
ed Minister of the Gospel, the President, Pro-
fessors, Tutors, Students and Steward of
Rhode-Island College; Town-Council men,
Town-Treasurers, Town-Clerks, Town-Ser-
geants, practising Physicians, Surgeons, Apo-
thecaries, Preceptors and Ushers of Acade-
mies and Schools, Engine-men, and every
member of a chartered independent military
body, who shall deliver, once for all, a certi-
ficate from the commanding officer of said
body, that he is a member of such body, and
completely equipped according to law, and
the rules and regulations of said body.

**Notice to be given of leaving a charter-company.**

Sec. 6. *And be it further enacted,* That
whenever any member of any such chartered
independent military body shall cease, other-
wise than by death or removal out of the State,
to be a member thereof, it shall be the duty of
the commanding officer of such body, forth-
with to give notice thereof to the command-
ing officer of the militia company, within the
bounds of which the said member shall then
reside.

**Returns.**

Sec. 8. *And be it further enacted,* That
it shall be the duty of the commanding officer
of every company to make a return of the
same to the Commandants of their respective
regiments, who shall make returns of their
respective regiments to the Brigadier-Gene-
rals: And where said companies are not res-
pectively attached to any regiment or brigade,
returns shall be made to the Adjutant-Gene-
ral. And it shall be the duty of the Brigade-
Major of such brigade, to form a brigade re-
turn, and transmit the same to the Adjutant-
General

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14124   Page 16 of 199

General, who ſhall, from the ſeveral returns thus made, form a general return, and preſent the ſame to his Excellency the Commander in Chief of the State, and a copy thereof to the Major-General ; and tranſmit another duplicate thereof to the Preſident of the United States ; and that the general return aforeſaid, and the copies thereof, be made, preſented and tranſmitted as aforeſaid, on or before the firſt day of January, annually.

Sec. 9. *And be it further enacted,* That on the firſt Monday in September in every year, the militia of this State ſhall meet by companies, for the purpoſe of training, diſciplining and improving them in martial exerciſe ; and in the month of September, in every year, in regiment or battalion ; and that the places of rendezvouzing by companies, be appointed by the commanding officers of the reſpective companies ; the places of regimental or battalion rendezvous, by the Commandants of the regiments reſpectively ; and the days of regimental or battalion rendezvous, ſhall be appointed by the reſpective Brigadiers.

*Times &c. of training.*

Sec. 10. *And be it further enacted,* That it ſhall be the duty of the Brigade-Major of each brigade, to furniſh a copy of all orders for muſter, to the Commandants of regiments within each reſpective brigade ; and of the Adjutant of each regiment, to furniſh a copy of all orders for muſter from the Commandants thereof, to the commanding officers of the reſpective companies.

*Orders for muſtering, by whom to be furniſhed.*

Sec. 11. *And be it further enacted,* That whenever the commanding officer of any company ſhall receive orders from his Brigadier, or

*Companies how to be warned.*

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14125   Page 17 of 199

or the Commandant of his regiment, he shall issue his warrant, with a list of the men of his company, for the assembling of his company, at least ten days before the time appointed for muster, directed to one or more non-commissioned officer or officers, private or privates, by him specially appointed, requiring him or them to warn the men of said company, either in general or in districts, to be by him assigned, to assemble, at the time and place appointed therein, equipped according to law. And the warning officer aforesaid shall warn the men as aforesaid either by personal notice, or by leaving notice in writing at their usual places of abode, six days before, and shall return his warrant with the name of every man so warned, to the said commanding officer, one day before the day of assembling, as aforesaid.

Sec. 12. *And be it further enacted,* That the commanding officers of the several companies of militia shall take post according to the dates of their respective commissions, and that their companies shall take post with them in the same station when on parade; and all independent companies which shall belong to any regiment of militia, shall take post according to the date of their respective charters, and shall be commanded by their own officers.

Post of Captains and companies.

Sec. 13. *And be it further enacted,* That when the militia, or any part of them, shall be assembled together for review or training, it shall be in the power of the commanding officer present, to punish all disorders, or breaches of military order and discipline, whether in non-commissioned officers or privates, by immediately putting the offender under

Commanding officer may punish for disorderly behaviour, &c.

under guard, for a space of time not exceeding twelve hours, or by fining him, not exceeding six dollars, at the discretion of the said commanding officer; which fine shall be certified, by the officer inflicting the same, to some one Justice of the Peace, and collected, paid over and appropriated, in the manner prescribed by the fifteenth section of this act. And if any commissioned officer shall behave in a disorderly or insolent manner, when the militia, or any part of them, shall be assembled as aforesaid, the said officer shall be liable to be arrested and tried for such behaviour by a Court-Martial, and if found guilty, shall be broken.

Sec. 14. *And be it further enacted,* That every non-commissioned officer or private, who shall neglect to appear (being first legally warned) at the regimental or battalion rendezvous, shall forfeit one dollar fifty cents for every day of such neglect; and every one who shall neglect to appear (being first legally warned) at the company parade, shall forfeit one dollar for every day of such neglect; and if he shall not be armed and equipped according to the said act of Congress, when so appearing, in case he shall have resided in this State six months, and shall not, within ten days after such rendezvous or parade, produce to the commanding officer of his company a certificate from the Clerk of the Town-Council of the town, that he had been adjudged by said Town-Council unable to arm and equip himself, he shall, for appearing at the regimental or battalion rendezvous without a gun, forfeit one dollar; without a bayonet and belt, twenty-five cents; without a cartouch-box, twenty-five cents; without a

*Fines for non-appearance at the rendezvous.*

*For not being equipped.*

K flints

flints, five cents; and without priming-wire and brush, five cents: And for appearing at the company parade without a gun, he shall forfeit seventy-five cents; without a bayonet and belt, twenty-five cents; without a cartouch-box, ten cents; without flints, five cents; and without priming-wire and brush, five cents.

**Fines how collected.**

Sec. 15. *And be it further enacted,* That at the expiration of ten days, and within fifteen days, after such rendezvous or parade, the commanding officer of such company shall deliver to some one Justice of the Peace, residing in the same town, a copy of his warrant and of the return of the warning officer thereon, together with a list of the delinquents, in not appearing at the rendezvous or parade as aforesaid, and of the delinquents in not being equipped in the articles enumerated in the preceding section of this act, and of the articles of equipment aforesaid in which they shall have been deficient, and of such offenders as he shall fine, or shall incur a fine, by virtue of the provisions of the thirteenth or eighteenth section of this act, who shall not have paid their fines to said commanding officer, or shall not have rendered to him a satisfactory excuse for their delinquencies; and the said Justice of the Peace shall, within ten days after he shall have received such copy and list from such commanding officer, issue his warrant against each of such delinquents or offenders, directed to the Town-Sergeant or either of the Constables of said town, requiring them to levy of the goods and chattels of such delinquent or offender the fine or fines aforesaid, together with twenty-five cents for said warrant, and all the said Justice's proceedings thereon, and such

such fees as are allowed by law for serving the same; and for want of such goods or chattels to be found, to commit the body of such delinquent or offender to gaol, and to return the said warrant in twenty days from the date thereof. And in case such delinquent or offender shall be within age, and live with his father, mother or guardian, or shall be an apprentice or indented servant, the said Town-Sergeant or Constable shall be required by said warrant to levy the same upon the goods and chattels of said father, mother, guardian, master or mistress, as the case may be; and the said Town-Sergeant or Constable shall be allowed, for serving said warrant, the same fees as are allowed by law for serving an execution. And if said warrant shall be returned *non est inventus*, the said Justice is hereby authorized to issue an *alias* warrant at any time after. And the money so levied, and the money paid as a commutation hereafter mentioned, shall be paid to the said Captain or commanding officer of the company, at the return of said warrants, to be appropriated to pay the expense of warning said company, and that of music (provided the expense of music shall not exceed per day two dollars to the Drummer and two dollars to the Fifer) and to purchase colours; and the residue thereof, if any, shall be paid to the Town-Councils of the several towns, to be by them appropriated to the arming and equipping of those who are not able to arm and equip themselves. And it shall be the duty of the Town-Councils of the respective towns, annually, to call on the commanding officers of the several companies in their towns respectively, to render to said Councils their accounts of the

*How appropriated.*

*Commanding officers to account with the Town-Councils.*

the fines by them received by virtue of this act, and to pay the balance thereof remaining in their hands, if any, to the said Councils, who are hereby authorized to adjust the same accounts; and in case of the refusal of any commanding officer to render his account, or pay the balance remaining in his hands, if any, the said Town-Council shall have a right to sue for and recover the same; and if the said commanding officer shall refuse to render his account as aforesaid, and an action shall thereupon be commenced against him by the said Town-Council, he shall be obliged to pay the costs of such suit, whether he had any money remaining in his hands as aforesaid or

*Warning officer's fees.* not. And the commanding officer of the company shall allow a sum, not exceeding the rate of one dollar per day, to the warning officer aforesaid, for each and every day that he shall or ought to be employed in warning said company, to be judged of by the commanding officer aforesaid.

Sec. 16. *Provided nevertheless, and be it* *Delinquents excused by paying the commutation.* *further enacted,* That the said Captain or commanding officer shall excuse from the payment of his fine, for one year, any of the delinquents aforesaid, provided such delinquent shall annually produce to said Captain or commanding officer, a certificate of his belonging to the society of Friends, from the Clerk of said society, and pay two dollars and fifty cents as an annual commutation, or annually produce a certificate, from any Judge or Justice of the Peace, that such delinquent hath made oath or affirmation before said Judge or Justice, that he is conscientiously scrupulous against bearing arms, and shall pay two dollars and fifty cents as an annual commutation.

Sec.

## *Militia.* 71

Sec. 17. *And be it further enacted,* That every non-commissioned officer or private, who shall neglect or refuse to warn the men of his company, when thereto required, as provided in the eleventh section of this act, without sufficient excuse, shall forfeit the sum of ten dollars, to be levied and collected after the day appointed for rendezvous or parade, in the manner prescribed for the collection of fines by the fifteenth section of this act.

*Penalty for neglecting to warn the company.*

Sec. 18. *And be it further enacted,* That every commissioned officer, who shall neglect or refuse to appear on parade with his company, when duly notified, and not having sufficient excuse, shall be tried by a Court-Martial; and if found guilty, shall be broken and reduced to the ranks.

*Officers neglecting to parade to be tried.*

Sec. 19. *And be it further enacted,* That every regimental Court-Martial shall consist of at least five commissioned officers, one whereof at least being a Captain, and shall be appointed by the commanding officer of the regiment, who is empowered to confirm, mitigate or disapprove, any sentence by them given. And that every General Court-Martial shall consist of at least thirteen commissioned officers one whereof to be a General or field officer, and none under the grade of a Captain, to be appointed by the Major-General, or in his absence by the next officer present in command, who is empowered to confirm, mitigate or disapprove, any sentence by them given.

*Regimental Court-Martial.*

*General Court Martial.*

Sec. 20. *And be it further enacted,* That the divisions of companies as now existing in the several towns, be continued, subject however to such alterations as their present numbers or future increase or diminution may, in the judgment of the field-officers of the regiments respectively, or any two of them, to which

*Divisions of companies.*

72                                    *Militia.*

which they belong, from time to time, render necessary or expedient.

**Militia subject to the articles of war.**   Sec. 21. *And be it further enacted,* That whenever the military force of this State, or any part thereof, shall be called into actual service, it shall be subject to the articles of war, prescribed by Congress for the government of the troops of the United States.

**Commissary-General &c. to be appointed.**   Sec. 22. *And be it further enacted,* That in addition to the officers to be appointed pursuant to the afore recited act of Congress, there be also appointed for the militia of this State, one Director and Purveyor-General of the military hospital, one Quartermaster-General, one Commissary-General, with the power of substitution as occasion may require, and that the Adjutant-General shall have the rank of Lieutenant-Colonel Commandant.

**Officers to be annually appointed.**   Sec. 23. *And be it further enacted,* That all officers of the militia, deriving their appointments from the General Assembly, shall hold their respective offices for and during the term of one year from the time of their respective appointments, except in case of resignation, or being removed by the Legislature, or broken by a sentence of a Court-Martial. And all resignations shall be approved **Resignations to be approved of, &c.** of and certified as follows : the resignation of a Brigadier-General shall be approved of by the Major-General ; the resignation of a field-officer shall be approved of by the Brigadier-General of the brigade to which such field-officer shall belong, and the resignation of a Captain or subaltern officer shall be approved of by the commanding officer of the regiment to which such Captain or subaltern officer shall belong : and the Major-General, the Brigadier-General, or commanding officer of a regiment, who shall approve of any resignation as aforesaid, shall certify the same to the Commander in Chief, who shall have power

power to allow or disallow thereof, at his discretion; and no officer shall be considered as having resigned his commission, unless the same shall have been approved of and certified as aforesaid, and allowed of by the Commander in Chief.

Sec. 24. *And be it further enacted,* That the militia of New-Shoreham and Jamestown shall not be obliged to rendezvous in battalion or regiment, but in company only; and then the militia of New-Shoreham on the Island of Block-Island, and the militia of Jamestown on the Island of Connanicutt.

> Militia of Jamestown, &c. to rendezvous in company.

Sec. 25. *And be it further enacted,* That whenever it shall happen that any Surveyor of the highways shall have warned the men of his district to work on the highways on the same day that is or shall be assigned for training, pursuant to this act, the said warning to work upon the highways shall be considered as superseded.

> Warned to train and work on highways same day, &c.

Sec. 26. *And be it further enacted,* That this act shall be read, once in every year, at a company training of every company of militia in this State.

> This act to be read once in every year.

Sec. 27. *And be it further enacted,* That this act shall take effect from and after the thirtieth day of April next, and that the act heretofore passed, entitled " An Act to organize the militia of this State," be and the same is hereby repealed from and after the said thirtieth day of April.

> When to take effect.

> Former act repealed.

*An Act in Amendment of an Act, entitled " An Act relating to Bail on mesne Process in civil Actions, and for the Relief of poor Prisoners for Debt."*

BE it enacted by the General Assembly, and by the authority thereof it is enacted, That the creditor or creditors, at whose suit any poor

> Poor prisoners for debt to be maintained by the creditors.

# EXHIBIT N

# A C T S

### A N D

# RESOLUTIONS,

### O F   T H E

## G E N E R A L   A S S E M B L Y

### O F   T H E   STATE   O F

# S O U T H - C A R O L I N A.

### P A S S E D   I N   DECEMBER, 1792.





Brewer Exs. Page 317

C H A R L E S T O N:   *M.DCC.XCIII.*

( 50 )

**All the male inhabitants refiding within two miles of Jeffery's creek, liable to work on faid creek.**

*And be it further enacted by the authority aforesaid,* That all the male inhabitants refiding within t\ J miles of Jeffery's creek, liable to do public work do and they are hereby made liable to improve the navigation of faid creek from its confluence with Peedee as far up faid creek as the Cheraw diftrict line.

**Preamble.**

AND WHEREAS, it is expedient and neceffary to continue the acts for the regulation of the militia of this ftate, until the legiflature can arrange the militia agreeable to the act of the United States in Congrefs, ratified the        day of May, one thoufand feven hundred and ninety two,

**Claufe to continue in force certain acts refpecting the regulation of the militia.**

*Be it enacted by the authority aforesaid,* That the act of the general affembly, entitled "an act for the regulation of the militia of this ftate, paffed the twenty fixth day of March one thoufand feven hundred and eighty-four," and the act entitled, " An Act to amend and more effectually put in force for the time therein limited, the act entitled " An Act for the regulation of the militia of this ftate, paffed the twenty-fixth day of March, one thoufand feven hundred and eighty-four, ratified the twentieth day of December, one thoufand feven hundred and ninety-one, be, and are hereby declared to be continued in full force and operation, until this ftate fhall make permanent arrangement for the regulation of the militia, agreeable to the faid act of the United States in Congrefs.

**Indians, moors, mulattoes, &c. obliged ferve in the militia.**

*And be it enacted by the authority aforesaid,* That all free negroes and Indians, nations of Indians in amity with the ftate excepted, moors, mulattoes and muftizoes, between the ages of eighteen and forty five, fhall be obliged to ferve in the faid militia as pioneers in the feveral regimental beats in which they refide, and upon neglect or refufal to attend when fummoned on duty, they and every of them fhall be liable to like penalties and forfeitures as privates in the fame regiment or company are made liable by law.

**Preamble.**

*And whereas,* the raifing and equipping uniform companies of horfe, artillery and infantry in the feveral regiments of militia of this ftate, may be greatly conducive to the public fervice and fafety,

**The commanding officer of any regiment may give leave to equip fo many corps of horfe, &c. as they may think advifeable.**

*Be it therefore enacted,* That it fhall and may be lawful for the colonel, lieutenant colonel or commanding officer of any regiment, to give leave to equip fuch and fo many corps of horfe, artillery and infantry as they may think advifeable, provided fuch horfe and artillery do not exceed the ratio or proportion directed to be obferved by the faid act of Congrefs between the corps of horfe and artillery, with refpect to the number of rank and file in the regiment.

**The officers and privates of uniformed corps, liable to the fame fines and forfeitures of the companies, &c.**

*And be it enacted by the authority aforesaid,* That the officers and privates in any company of artillery, infantry or cavalry, raifed and uniformed in any militia regiment of this ftate by permiffion of his excellency the governor, or any colonel, lieutenant colonel, or commanding officer of any regiment, or to be hereafter raifed, fhall be refpectively liable to all the fines and forfeitures impofed by law on the officers or privates in any regimental or company beat, and that when any perfon now actually enrolled or that fhall hereafter be enrolled in any fuch company fhall be defirous to quit the fame, he fhall

shall be obliged to give at least thirty days notice of such intention, and shall be obliged also to enroll himself in the company beat in which he resides, and produce a certificate thereof from the captain or officer commanding such beat, before he shall be permitted to leave the uniform company or corps to which he belonged, or be excused from duty therein.

*And whereas*, The safety of the city of Charleston requires the calling forth at certain times and seasons, one or more companies of the militia of the said city : *Be it therefore enacted*, That it shall and may be lawful for the governor or commander in chief, for the time being, or the commanding officer of the Charleston regiment, for the time being, to call forth when necessary, such and so many companies or detachments of companies, to mount guard in the said city as to them respectively shall appear necessary and proper: Provided, That no guard shall be obliged to continue on duty at any one except in case of actual alarm, more than twenty-four hours on one guard, and all persons duly summoned to turn out on any such guard, who shall not obey or who shall leave his guard or otherwise misbehave, shall be liable to pay the same fines and forfeitures, as such persons would be obliged to pay for default of duty or misbehaviour, at any general or regimental muster by virtue of any law of this state.

*Preamble.*

*Companies or detachments of companies liable to mount guard, &c.*

*Proviso.*

*In the Senate House, this twenty-first day of December, in the year of our Lord one thousand seven hundred and ninety-two, and in the seventeenth year of the American Independence.*

**DAVID RAMSAY,** *President of the Senate.*

**JACOB READ,** *Speaker of the House of Representatives.*

## An ACT *for relieving and exempting John Wells from banishment.*

WHEREAS John Wells by his humble petition to the legislature of this state, hath prayed to be relieved and exempted from the pains and penalties of the act of confiscation and banishment.

*Preamble.*

*Be it therefore enacted by the honorable the senate and house of representatives now met and sitting in general assembly, and by the authority of the same,* That the said John Wells shall be, and is hereby relieved and exempted from banishment, and is and shall be permitted to return to and remain in this state, any law to the contrary thereof in any wise notwithstanding.

*John Wells exempted from banishment.*

*In the Senate House, the twenty-first day of December, in the year of our Lord one thousand seven hundred and ninety-two, and in the seventeenth year of the Independence of the United States of America.*

**DAVID RAMSAY,** *President of the Senate.*

**JACOB READ,** *Speaker of the House of Representatives.*

Brewer Exs. Page 319

An

THE

# MILITIA SYSTEM

OF

# SOUTH-CAROLINA,

BEING

# A Digest

OF THE

## ACTS OF CONGRESS CONCERNING THE MILITIA,
### LIKEWISE OF THE MILITIA LAWS OF THIS STATE,

WITH

## AN APPENDIX,

**Containing the Statutes at large relating to the Militia, from the 8th May, 1792, to the 17th December, 1834, inclusive; with the Judicial Decisions thereon.**

ALSO,

## The Patrol and Quarantine Laws,

THE

### CONSTITUTION OF THIS STATE AND OF THE UNITED STATES.

Prepared and Published under the authority of the Act of the 19th December, 1833, entitled, *"An Act to provide for the Military organization of the State."*



## By BENJAMIN ELLIOTT,

AND

## MARTIN STROBEL.



CHARLESTON:
PRINTED BY A. E. MILLER,
No. 4 Broad-street.
1835.

Brewer Ex. Page 320
Digitized by Google

DIGEST.                                                      v

of exempts in the 46th Sec. of the Act of S. C. of See Appendix,
19th Dec. 1833.                                               page 149.

### APOTHECARY–GENERAL.

**Apothecary-General.**

The Governor appoints one Apothecary-General with the rank of Major.

**Duties.**

He is (under the direction of the Physician and Surgeon General,) to receive medicine and surgical instruments from the Commissary-General, and to distribute them as may be necessary.

To obey the orders of the Physician and Surgeon-General.

Governor's regulations under the Act of 20th May, 1816. See Appendix, page 163.

### APPEAL.

All disputes relating to the liability of persons to bear arms shall be determined by the Commanding Officer of the company, with the right of appeal to the Commanding Officer of the Regiment by any one who may think himself aggrieved by any such determination.

Act of So. Ca. 10th May, 1794, §. 10. See Appendix, page 21.

Every non-commissioned officer or private, conceiving himself aggrieved by the sentence of a Court Martial, may appeal from the same within fifteen days after notification of being fined, to the field officers of the Regiment, the decision of a majority of whom is decisive. (Prohibitions may be granted against the illegal proceedings of a Court Martial.)

Act of So. Ca. 19th Dec. 1809, § 5. See Appendix, page 69.

**How appeals are to be made.**

No appeal will be considered, unless the appellant accompanies his appeal by an affidavit that he could not attend the Court Martial that fined him, and that he does not appeal for the purpose of delay.

Act of So. Ca. 16th Dec. 1815, § 3. See Appendix, page 86.

For appeals in cases of contested elections of Field Officers—(see ELECTIONS.)

### APPRENTICES.

**Subject to militia duty.**

All White Apprentices, or men servants, shall be furnished by those under whose control they are, with proper arms and accoutrements, and shall be required by them to attend all musters and trainings. For all pecuniary penalties for neglect of duty, the master or the employer shall be liable. But the master shall be entitled to two weeks additional service for every fine which he shall have paid for his apprentice or servant's neglect of, or misconduct at musters and military exercises; and should he injure, destroy, or make away with the arms and accoutrements, he shall make full satisfaction to his master.

Act of So. Ca. 10th May, 1794, §. 15th. See Appendix, page 23.

**Master liable for defalcation of Apprentice.**

Brewer Exs. Page 321

Digitized by Google

vi

# DIGEST.

The master is responsible to the State that his apprentice, or white male servant, shall be always prepared for military service, and that he punctually perform this duty.

*Act of So. Ca. 10th May 794, § 14 See Appendix, page 23.*

## ARMS AND ACCOUTREMENTS.

**Every militia man to arm and equip himself.**

Every citizen duly enrolled in the militia, is required *to arm and equip himself.*

If belonging to the Infantry, he shall procure at his own expense, (unless an apprentice or servant,) a good musket or firelock, with bayonet or belt—two spare flints—a knapsack—a pouch or cartouch box, to contain not less than twenty-four cartridges, with a proper quantity of powder, and ball to suit the bore of his firelock. The bore of the musket should be eighteen balls to the pound—or he may supply himself with a good rifle, knapsack, shot pouch, powder horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder.

*Act of Congress May 8th, 1792, § 1. See Appendix, page 2.*

**Rifleman.**

He must appear thus equipped when summoned for duty, except on days of mere exercise, when the knapsack may be omitted.

**Officers.**

The Commissioned Officers shall be armed with a sword or hanger, and an espontoon.

*Ibid, § 4. See Appendix, page 3.*

**Artillery.**

The Officers of Artillery shall supply themselves with a sword or hanger, a fusee, bayonet and belt, and cartridge box with twelve cartridges.

**Cavalry.**

Each Officer of Cavalry is required to furnish himself with a good horse, at least fourteen and a half hands high, with a sword and pair of pistols, the holsters of which must be covered with bearskin caps.

*ibid.*

Each Dragoon is required to furnish himself with a serviceable horse, at least fourteen and a half hands high, a good saddle, bridle, mail-pillion and valise, holsters and a breast plate and crupper, a pair of boots and spurs, a pair of pistols, a sabre, and a cartouch box to contain twelve cartridges.

*Ibid.*

The arms, horses and accoutrements of the militia are exempt from executions for debts or taxes.

*Ibid. § 1. Ap. p. 2.*

**Apprentice and Servants.**

All white apprentices, or white servants, are to be armed and equipped by their masters and employers, who are liable if their apprentices or servants are not suitably provided.

*Act of So. Ca. May 10th, 1794. See Appendix, page 23.*

**Fines.**

Every militia man not appearing armed and equipped according to law, to forfeit a sum not exceeding five shillings, or the sum of 2s. 4d. for each article deficient.

*Act of So. Ca. May 10th, 1794, § 15. See Appendix, page 26.*

# DIGEST.

Instead of the fines heretofore imposed for not providing arms as above, it is provided by the 43d Section of the Act of 19th Dec. 1833, that any non-commissioned officer or private, who shall appear without a good gun at a muster, shall be fined one dollar, unless he declare upon oath that he is unable to purchase one.   This provision is supposed to apply only to the Beat Companies.

*Act of So. Ca. 19th Dec. 1833, § 43. See Appendix, page 149.*

**Supply of arms from the U. States.**

By an act of Congress, passed in 1808, the sum of two hundred thousand dollars is annually appropriated to provide arms for the whole militia of the Union.   These are distributed among the States in the proportion of their effective militia, and are to be distributed by each State under such regulations as its Legislature shall deem most expedient.

*Act of Congress, April 23d, 1808, § 1. See Appendix, page 10. Act of Congress, April 29th, 1816, § 1. See Appendix, page 12.*

This annual appropriation of $200,000 is to be diverted to no other purpose, nor transferred to any other branch of expenditure.

**Supply of arms by the State, $2,500 annually.**

The Legislature of South Carolina have made an annual appropriation of two thousand five hundred dollars, to be expended by the Governor for arms of all descriptions.   These, with the supply from Congress, are *to be distributed* among the militia from time to time, on such terms and conditions, and in such quantity as the Executive shall prescribe.

*Act of So. Ca. 19th Dec. 1833, § 7. See Appendix, page 153½.*

**Arsenals always to have 10,000 muskets, &c.**

It is also required that there shall always be in the arsenals ten thousand muskets and rifles, four thousand pistols, and two thousand swords, with adequate munitions and accoutrements.   These arms are to be in the best order, and always ready for immediate use, and *not liable to distribution*, except in cases of emergency.

*Act of So. Ca. 19th Dec. 1833 § 1. See Appendix, page 153.*

**Appropriation $50,000.**

To effect this purpose, fifty thousand dollars have been appropriated, which are to be expended from time to time, at the discretion of the executive, in amounts not to exceed $10,000 annually, unless in his opinion a larger annual expenditure should become necessary to the safety of the State.

*§ 2, ibid.*

## ARSENALS AND MAGAZINES.

**Two Arsenals and Magazines, one in Columbia.**

There are now but two Arsenals and Magazines in South-Carolina, one located at Charleston, and the other in Columbia.   The Executive has been authorized to have a suitable Arsenal prepared in the upper part of the old Jail at Columbia, and a Magazine to be built in or near the said town.   Three thousand dollars were appropriated for these objects, and two thousand for all arrangements that may be

*Act of So. Ca. Dec. 19th, 1833, § 3. See Appendix, page 153.*

Digitized by Google

viii                          DIGEST.

**Keeper's Salary.**

necessary for their security.   The Arsenal Keeper, who is also Powder Receiver, is appointed by the Governor, and receives a salary of four hundred dollars, and gives bond in $10,000.

*Act of So. Ca. 20th Dec. 1832. § 4.*

**Charleston.**

**Powder Receiver.**

**Salary.**

The Arsenal of Charleston is in the Citadel, and the Captain of the Citadel and Magazine Guard is also Powder Receiver.   The Arsenal keeper is appointed by the Governor, receives a salary of seven hundred dollars, and gives bond for good conduct in ten thousand dollars.

*See Appendix, page 136.*

*Act of So. Ca. 19th Dec. 1833. § 5.*

**Arms ready for service.**

**Appropriation.**

In the two Arsenals together there are to be always kept on hand, fit for immediate service, at least ten thousand muskets and rifles—two thousand swords, and four thousand pistols, with an adequate quantity of accoutrements and other munitions of war.   Fifty thousand dollars appropriated for the above purpose.

*See Ap. p. 153½. Act of So. Ca. 19th Dec. 1833. § 1.*

*See Appendix, p. 153.*

**Governor authorized to remove Military Stores.**

The Governor has authority to cause the arms and military stores to be temporarily removed to any place of safe deposit.

*Act of So. Ca. 24th Sep. 1813. § 17.*

He may provide Guards for the Arsenals—appoint and remove Arsenal Keepers, take bonds of them, and is required to examine the Arsenals, or cause them to be frequently examined.

*§ 18. See Appendix, page 77.*

**Deposit of Arms.**

He is also to specify what proportion of the public arms and ammunition is to be deposited in the Arsenal and Magazine in Columbia, and what in those of Charleston.

*Act of So. Ca. 19th Dec. 1833. § 3.*

*See Appendix, page 153.*

**Brigade-Quarter-Master to report.**

The Brigade-Quarter-Masters within the limits of whose Brigade Arsenals are or shall hereafter be established, are required to visit and inspect the same at least once in every year, and report to the Quarter-Master-General thereon.

*Act of So. Ca. 16th Dec. 1815. § 15.*

*See Appendix, page 90.*

Arsenal and Magazine in Charleston to be protected by a Citadel and Magazine Guard, which Guard, including workmen, artificers and labourers not to exceed sixty—in addition to their other duties, they are to take charge of the Citadel in Charleston for its protection and that of the arms of the State, under such regulations as the Governor may prescribe.   They are exclusively under his orders, and he has the power to appoint and remove Officers, and make such rules for their government as he may think proper, not inconsistent with law.   They are liable to perform under his orders all the duties of Militiamen or Volunteers.   The Officers and Privates liable to be tried by Courts Martial composed of Officers of the Guard or Militia, and subject to the same penalties and regulations as the Militia are when

*Act of So. Ca. 20th Dec. 1832. § 1.*

*See Appendix, page 13.*

ix

called into actual service under like circumstances. They consist of a Captain, who is also Powder Receiver, and a first and second Lieutenant. The compensation of this Guard is fixed by the Governor, but the pay of the Officers not to exceed that of the United States' Officers of like grades. *Act of So. Ca, 20th Dec. 1832. § 4. See Ap. p. 136.*

**Appropriation.** An appropriation is made to enable the Governor to make arrangements for the security and protection of the Arsenal and Magazine in Columbia. (For this purpose a Guard has been established there jointly with the Town Council of that place.) *Act of So. Ca. 19th Dec. 1833. § 6. See Appendix, page 153½.*

## ARTILLERY.

**One Company to each Division at least.** There shall be at least one Company of Artillery to each Division. Not to exceed one Company to a Regiment nor more in number than one-eleventh part of the Infantry; to be uniformed at their own expense, the uniform to be determined on by their Brigadier. Captains of Artillery shall be attached to the Infantry Battalions in which they reside, and shall rise in the same with other Officers. Members of the Artillery throughout the State, subject to the same laws, rules and orders as the Infantry. *Act of Congress, 8th May, 1792, § 4. See Ap. p. 3. Act of So. Ca. 16th Dec 1797. § 10. See Ap. p. 46. § 12 See Ap. p. 47.*

**Uniform.**

**Officers.** Officers of a Company of Artillery to consist of one Captain, one first, one second and one third Lieutenant. *Act of So Ca. 19th Dec. 1820. § 1. See Ap. p. 105.*

**Number of men.** Officers commanding Brigades to permit Companies of Artillery to be raised to consist of thirty effective men in complete uniform, if reduced below twenty-four men in uniform and not recruited within six months, after notice given, to be dissolved, provided that no Beat Company shall be reduced below forty men by the formation of any Volunteer Company—and provided also, that no greater portion of Artillery shall be raised than is authorized by law. *Act of So. Ca. 16th Dec. 1815. § 10. See Ap. p. 88.*

**Beat Companies not to be reduced.**

One Company of Artillery and no more may be attached to each Regiment. *Act of So. Ca. 19th Dec. 1833. § 13.*

**Allowance.** Each Company of Artillery to be furnished with powder and ball for the usual parades from the State Magazines, and to be allowed annually fifty dollars for their expenses. *See Ap. p.144. Act of So. Ca. 19th Dec. 1833, § 54. See Ap. p 152.*

Artillery, Charleston—(SEE CHARLESTON.)
See also Collection and Collector of Fines.
Artillery, Beaufort—SEE BEAUFORT ARTILLERY.)

## BEATS. *Act of So. Ca. 19th Dec. 1833. § 4 and 13. See Ap. pages 140 and 144.*

**Beats.** There shall be four Beat Companies in each Battalion as nearly equal as may be, and two Battal-

Digitized by Google

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14143   Page 35 of 199

# ACTS

## OF THE

## LEGISLATURE

### OF

# SOUTH-CAROLINA.

## *IN RELATION TO THE MILITIA,*

### FROM THE 10th MAY, 1794, TO 19th DECEM. 1833, INCLUSIVE.

#### EMBRACING ALSO,

## THE PATROL LAWS;

##### TO WHICH ARE ADDED,

##### *The Constitution of this State and of the United States.*

----

**N. B.** For the sake of *reference*, it has been deemed advisable to publish a collection of all the Acts of the Legislature, not omitting such as may have been in whole, or part repealed. The DIGEST, arranged in alphabetical order, will, in general, afford sufficient information for all practical purposes. But, to enable those who may be disposed to test the accuracy of the Digest, or to form their own opinions on questions which may arise under the Militia Laws, we have published the Acts entire, to which, for the same reasons, have been annexed the Constitution of this State and of the United States. Such a collection has been long wanted, and we doubt not will be found useful. We have commenced with the Act of 10th May, 1794, because all acts prior to that date were repealed *by that act, which is the foundation of our present system.*

----

An Act to organize the Militia throughout the State of South-Carolina, in conformity with the Act of Congress. Passed May 10, 1794.

Whereas, it is necessary to organize the militia of this state in conformity with the act of Congress in that case made and provided:

*Be it therefore enacted by the honorable the Senate and House of Representatives now met and sitting in General Assembly, and by the authority of the same,* That from and immediately after the passing of this act, the whole of this state shall be divided

The state divided into divisions and brigades.

**18**                           MILITIA LAWS.

into two divisions,* and to each division there shall be a major-general; one of which divisions shall comprehend the districts of Charleston, Georgetown, Beaufort, Cheraw, Camden and Orangeburgh, except the Dutch Fork between Saluda and Broad Rivers; and the other shall comprehend and include the districts of Ninety-six, including the Dutch Fork between Saluda and Broad Rivers, Washington and Pinckney; and in the first division there shall be five brigades, one for Charleston district, except Colleton county regiment; one for Beaufort and Orangeburgh, including Colleton county regiment; one for Georgetown, one for Cheraw, and one for Camden district; in the second division there shall be four brigades, one for Abbeville and Edgefield counties, one for Laurens and Newberry counties, including the Dutch Fork, one for Washington District, and one for Pinckney district; and that as soon as the Governor or Commander-in-chief of this state shall be informed of the organization and arrangement of the militia regiments of this state, agreeable to the provisions made by this act, he be, and is hereby authorized and required to issue his proclamation, notifying the same, from and immediately after which the militia commissions of all such persons as shall not be re-elected and confirmed in the rank and grade they may hold under the laws of this state, shall be vacated; but that every person who shall be re-elected and confirmed in such commission as he holds in the militia of this state, shall retain such commission, and take rank from the date thereof.

*Officers re-elected to retain their commissions.*

Sec. 2. *And be it further enacted by the authority aforesaid,* That the legislature, on the first organization of the militia of this state, under this act, shall choose by ballot the major-generals, brigadier-generals and adjutant-general; which adjutant-general shall be of the rank of lieutenant-colonel.†

*Major-generals &c. to be elected by the legislature.*

Sec. 3. *And be it further enacted by the authority aforesaid,* That as soon as the several brigadier-generals are notified by the governor, of their election, they shall proceed to divide their respective brigades into regiments, and that after they have made such division, they shall appoint five fit and proper persons in each regiment; whose duty it shall be to divide the respective regiments into battalions and companies, as nearly as conveniently may be, conformably to the act of congress.‡

*Brigades to be divided into regiments, battalions, and companies.*

Sec. 4. *And be it further enacted by the authority aforesaid,* That as soon as the respective regiments, battalions and companies, are marked off and designated, the brigadier-general of

*Lieutenant-colonel and 2 majors to be elected.*

* Altered by Act of 21st December, 1814, sec. 1, into 5 divisions, and 10 brigades.

† Adjutant-general's commission limited to four years, by Act of 19th Dec. 1833, sec. 2.

‡ See Act 19th Dec. 1795, sec. 1, how to proceed where parties are not satisfied with the division made under this act. For the general regulations on the subject of inequalities of beats and regiments, see Act 20th Dec. 1832, sec. 1.

each district respectively, shall direct a regimental muster, as well of those men liable to do duty in time of alarm as at common musters, to be held (giving at least fifteen days notice thereof) at the most central part of the regimental district, for the election of a lieutenant-colonel and two majors, and shall appoint proper persons to open and hold a poll from the hours of nine o'clock in the morning to five o'clock in the afternoon, for the election of the said officers respectively ; and that the persons having the greatest number of votes for lieutenant-colonel, shall be commissioned as lieutenant-colonel, and the persons having the greatest number of votes as majors, shall be commissioned as majors of the respective regiments and battalions ; and that the said brigadier-general shall appoint proper persons in each company, who shall, within five days after the said election of field officers, hold an election for a captain, lieutenant and ensign in each company, in manner aforesaid ; and the persons having the greatest number of votes in each company, shall be commissioned as officers thereof, or retain their former commissions, as the case may be, according to the grade to which they shall be severally elected. *Provided always nevertheless*, That whereever there shall be any company of artillery, cavalry or infantry, associated, uniformed and in commission, which, on the twentieth day of June next, shall consist of at least forty effective rank and file, it shall be lawful for such company to meet and vote for their officers ; and the persons duly elected by a majority of votes, shall retain their commissions, or be commissioned by the governor, as the case may be, to such grade as they shall be respectively elected to. And that all other officers of the Charleston regiment, as well field as battalion officers, shall be elected by the regiment at large ; and no person shall be considered as elected, who shall not have a majority of the votes of the persons voting : *Provided also*, That the men composing the uniform companies, shall not be entitled to vote for the captains, lieutenants and ensigns of the other companies, to be elected by virtue of this act.

*Company officers to be elected.*

*Uniform corps of forty men to elect their officers.*

Sec. 5. *And be it further enacted, by the authority aforesaid*, That in case of any contested election, the validity of the same, (in the election of field officers,) shall be referred to the brigadier-general of the brigade, who shall call to his assistance two field officers of some other regiment of his brigade, not interested in the event of the dispute :[*] and in the election of captains, lieutenants and ensigns, shall be referred to the field officers of the regiment to which they belong ; and all elections of officers made in pursuance of this act, shall be returned, on oath, by the managers, to the governor.

*Contested elections, to whom to be referred.*

---

[*] If the party is dissatisfied with the decision of the brigadier and field officers, he may appeal to the major-general and a board of field officers. Act 19th Dec. 1795, sec. 2.

**How to proceed where the person elected brigadier-general resides out of the state.**

Sec. 6. *And be it further enacted by the authority aforesaid,* That if any person who shall be elected a brigadier-general by virtue of this act, shall be without the limits of the state, it shall be the duty of the major-general of the division to do and perform the duties enjoined on the said brigadier-general ; and in case of his sickness or inability to attend, it shall be lawful for the governor or commander-in-chief for the time being, to commission :, under his hand and seal, some fit and proper person to execute the duties imposed by this act, so far as regards the division of the brigades and election of officers.

**All officers to reside within their commands, except in Charleston.**

Sec. 7, *And be it further enacted, &c.* That all the officers who shall be appointed by virtue of this act, shall reside within their respective commands ; and on their removal therefrom, their commissions shall be vacated :* *Provided,* That the restrictions as to residence, shall not extend to the officers of the Charleston† regiment or regiments, but that a residence within the city shall be sufficient. That the major-generals shall have the right to appoint their respective aids-de-camp, and that the brigadiers shall have the right to appoint their respective aids-de-camp, who shall have the rank of captain ; and they shall also have the right to appoint their respective brigade inspectors,‡ who shall be approved of by the major-generals of the division ; that the regimental staff shall be appointed by the lieutenant-colonels respectively, and be approved of by the brigadier ; and that all officers so to be nominated and appointed as aforesaid, shall be commissioned by the governor, who shall be authorized to appoint all other officers ;§ and that in case of vacancy by death, resignation or otherwise, the brigadiers shall rise in their respective divisions, the lieutenant-colonels commandant, in their respective brigades, the majors in their respective regiments, the captains in their respective battalions, and the subalterns in their respective companies by seniority of commission.

**General officers to appoint their aids-de-camp and brigade inspectors**

**Staff officers to be appointed by the colonels**

**Pay of brigade inspectors.**

Sec. 8. *And be it further enacted by the authority aforesaid,* That each brigade inspector shall receive for his pay fifty pounds per annum, exclusive of the pay he may be entitled to receive when called into actual service.||

**Captains to appoint sergeants and corporals.**

**Companies, places of rendezvous and times of muster**

Sec. 9. *And be it further enacted by the authority aforesaid,* That all sergeants and corporals shall be appointed by the captains of the different companies ; and that each and every company created by virtue of this act, shall have a place of rendezvous, at which they shall respectively assemble once in every two months, except in Charleston, Georgetown and Camden,

---

* See A. A. 17th Dec. 1831, where dividing line passes through a town or village.

† Extended to Georgetown.   A. A. 16th Dec. 1797, sec. 14.

‡ This officer also made brigade major by act of Congress, 8th May, 1792

§ Rest of this clause repealed by A. A. 19th Dec, 1816, sec. 1.

|| Repealed by 13th sec. of the Appropriation Act of 1815.

Brewer Exs. Page 329
Digitized by Google

## MILITIA LAWS. 21

where they shall assemble once a month* by companies, for the purpose of training, disciplining and improving in martial exercise, and shall not be kept at the place of exercise more than one day at a time ; and that each battalion shall be obliged to rendezvous in like manner for the same purpose, not oftener than twice a year, either in battalion or regiment, in such place as the brigadier shall think proper, and shall not be kept at the place of exercise more than one day at a time.

Sec: 10. *And be it further enacted, &c.* That every captain or commanding officer of a company, shall also enrol every citizen who shall from time to time arrive at the age of eighteen years, or come to reside within his beat, and without delay notify such enrolment to such citizen so enrolled, by some non-commissioned officer of the company, who shall be a competent witness to prove such notice; that all disputes that may happen with respect to the age or ability of any person to bear arms, shall be determined by the captain or commanding officer of the company, with a right of appeal by the person who may conceive himself aggrieved, or by any other person belonging to the company, to the lieutenant-colonel or commanding officer of the regiment. *[margin: Persons to be enrolled at the age of 18.]*

Sec. 11. †*And be it further enacted by the authority aforesaid,* That the commander-in-chief for the time being may, in case of invasion or other emergency, when he shall judge it necessary, order out any proportion of the militia of the state, to march to any part thereof, and continue as long as he may think it necessary ; and likewise may, in consequence of an application from the executive of any of the United States, on an invasion, or an apprehension of an invasion of such state, at his discretion, order any number of the militia, not exceeding one third part thereof, to such state : *Provided,* That they be not compelled to continue on duty out of this state more than two months at any one time ; that whilst in actual service in consequence of being so called out, they shall receive the same pay and rations, and be subject to the same rules and regulations as the troops of the United States of America : *Provided,* That upon any transgression or offence of a militia man, whether officer or private, against the rules and regulations of the federal army, the cause shall be tried and determined by a court martial of the militia of this state, and that it shall be in the power of the governor, or in case of his absence, of the commanding officer of the militia of this state, to mitigate, suspend or pardon any punishment to which any militia man be sentenced by a general court martial. *[margin: Marching out of the state in cases of emergency. / Pay when in service.]*

Sec. 12. *And be it further enacted, &c.* That it shall and may be lawful to and for any major-general, or brigadier-general, or commanding officer of a brigade, or lieutenant-colonel commandant, or commanding officer of a regiment, when, and as often as any invasion may happen, to order out the militia under their *[margin: Militia to be called out, in cases of invasion.]*

---

* Altered to six times in the year by A. A. 19th Dec. 1833, sec. 19.
† This Section altered by A. A. 24th Sept. 1813, sec. 1.

Brewer Exs. Page 330
Digitized by Google

respective commands, for the defence of this State, giving notice of such invasion, and every circumstance attending the same, as early as possible to their immediate commanding officer, by whom such information shall be transmitted to the governor or commander-in-chief by express, the expense of which shall be immediately paid; and that in case of insurrections, the commanding officer of the regiment or battalion within the limits of which any such insurrection may happen, shall immediately assemble his regiment or battalion under arms, and having transmitted information thereof to the commanding officer of the brigade, and to the major-general of the division, and to the governor, or commander-in-chief, shall proceed to take such measures to suppress such insurrection as to any three of the judges or justices of the county or district in which such insurrection shall happen, shall appear most proper and effectual; and if any person be wounded or disabled while in actual service in opposing any invasion or insurrection, or in suppressing the same, he shall be taken care of and provided for at the public expense, without regard to the rank such person may hold.

*And whereas,* It is proper to ascertain the compensation which shall be allowed to the militia when they may hereafter be called out into actual service by order of the executive authority of the state:

Sec. 13. *Be it further enacted by the authority aforesaid,* That in future, when the militia of this state, or any part thereof, shall be called out into service within this state, by the authority of the laws thereof, each commissioned officer shall be entitled to, and shall receive the same pay and rations as are allowed to the officers of the same rank of the federal army by the laws of the United States; that the pay of a sergeant, drum-major, and fife-major, in lieu of all other demands, shall be eight dollars per month; and the pay of a corporal, bugler, trumpeter, drummer and fifer, in lieu of all other demands, shall be seven dollars per month; and the pay of a private, in lieu of all other demands, shall be six dollars and a half per month, besides rations; to be provided for in the tax bill of the year in which the service shall be performed.*

Sec. 14. *And be it further enacted, &c.* That the brigade inspectors, whenever required by the brigadier-general of the brigade, shall make a return of the militia of the brigade to which he belongs, to the said brigadier-general; and the brigadier-general shall, whenever required by the major-general of the division to which he belongs, make a return of the militia of their respective brigades to the said major-general; and the major-generals shall, whenever required by the governor or commander-in-chief, make a return of the militia of their respective divisions to the said governor or commander-in-chief.

Pay of the militia when called ent into service

Return to be made when required.

---

*The A. A. 24th September, 1813, sec. 5, makes the pay, &c. the same as allowed U. S. troops.

Sec. 15. *And be it further enacted, &c.* That every master or other person who hath the power over, government or command of any white apprentice or man servant, shall, at his or their own proper costs and charges, furnish and provide every such apprentice or man servant liable to do militia duty, during his servitude, with the arms and accoutrements directed by the aforesaid act of congress; and every master or other person as aforesaid, shall constantly keep such arms and accoutrements as aforesaid for every such apprentice or servant, and shall compel him or them, so completely armed and accoutred as aforesaid, to attend all musters, trainings and exercises directed by this act; and in case such apprentice or servant shall not appear, or his arms and accoutrements shall be found deficient, the master or other person as aforesaid, having the government of such apprentice or servant, shall, on default made in any of the premises, be subject to the same forfeitures and penalties as are inflicted on other persons made liable by this act to appear and bear arms at exercises, musters and trainings: *Provided always,* That if any such servant as aforesaid, who shall be duly furnished and provided as is before directed, and shall be sent to muster by the master or other person, under whose government such servant shall be, shall, of his own accord, and contrary to the will and without the consent of the master, or such other person as aforesaid, neglect to appear at any muster, training or exercise appointed by this act, the master or other person, under whose government such servant may be, shall be liable to the penalty by this act inflicted for the default of such servant; and every such servant so offending, shall be obliged to serve his master two weeks for every penalty so paid by his said master or other person; and if any person shall embezzle, sell or make away with the arms so to be provided for him, he shall be liable to make his master, or other person under whose government he may be, full satisfaction.

*White apprentices and male servants to attend musters.*

Sec. 16. *And be it further enacted, &c.* That no civil officer whatsoever, shall on any pretence, execute any process,[*] (unless for treason, felony, or breach of the peace) on any person whatsoever, at any muster or other time, when such person shall be obliged to bear arms in pursuance of the directions of this act; nor in going to, or returning from any muster or place of rendezvous, or within twenty-four hours after such person shall be discharged from appearing in the regiment, company or troop to which he shall belong, under the penalty of five pounds sterling;

*No civil process to be executed on persons attending musters.*

[*] Under our act, avoiding the service of all process served on any person at any muster, or other time, when such person shall be obliged to bear arms in the militia, or in going to or returning from any muster or place of rendezvous, or within twenty-four hours after such person being discharged from such service, includes as well *bail* writs as any other process.—*Gregg v. Summers,* 1 *M'Cord,* 461.

A writ may be lawfully served, whilst the defendant is attending a militia muster, by leaving a copy at his residence. The act of 1794 was intended to prohibit *personal* service of process only.—*Hunter v. Hunter,* 1 *Bailey.* 646.

MILITIA LAWS,

and the service of any such process shall be void to all intents and purposes whatsoever; and all arms and accoutrements which, by this act, are required to be provided, also the troop-horse of each trooper duly entered and registered with the captain of the troop, so long as said trooper shall continue in the troop, shall not be liable to be seized, distrained or taken in execution for any cause, matter or thing whatsoever. And in case any person shall seize, levy or distrain upon any such arms, accoutrements, or horse, every such person shall forfeit the sum of ten pounds sterling money, to be recovered in any court of record in this state.

**Fines for not attending musters.**
Sec. 17. *And be it further enacted by the authority aforesaid,* That every lieutenant-colonel, who shall wilfully neglect to turn out at a regimental muster, shall be fined in a sum not exceeding ten pounds, and also a sum not exceeding five per cent. on the amount of his last general tax; and that every major who shall wilfully neglect to turn out at a regimental or battalion muster, shall be fined in a sum not exceeding eight pounds, and also a sum not exceeding five per cent. on the amount of his last general tax. That every captain who shall wilfully neglect to turn out at a regimental or battalion muster, shall be fined in a sum not exceeding six pounds, and also a sum not exceeding five per cent. on the amount of his last general tax. That every subaltern officer who shall wilfully neglect to turn out at a regimental or battalion muster, shall be fined in a sum not exceeding four pounds, and also a sum not exceeding five per cent. on the amount of his last general tax; and that every non-commissioned officer and private, who shall wilfully neglect to turn out at a regimental or battalion muster, shall be fined in a sum not exceeding fourteen shillings, and also a sum not exceeding five per cent. on the amount of his last general tax. That every captain who shall wilfully neglect to turn out at an ordinary muster, shall be fined in a sum not exceeding thirty shillings, and also a sum not exceeding two and one half per cent. on the amount of his last general tax. That every subaltern officer who shall wilfully neglect to turn out at an ordinary muster, shall be fined in any sum not exceeding one pound, and also a sum not exceeding two and one half per cent. on the amount of his last general tax; and that every non-commissioned officer and private, who shall wilfully neglect to turn out at an ordinary muster, shall be fined in any sum not exceeding seven shillings, and also a sum not exceeding two and one half per cent. on the amount of his last general tax.[*]

**Fines for disobedience of orders.**
Sec. 18. *And be it enacted by the authority aforesaid,* That every non-commissioned officer and private, who shall neglect or refuse to obey the order of his superior officer, while under arms, shall forfeit a sum not exceeding one pound for every such of-

---

[*] This section is altered by A. A. 17th December, 1808, sec. 4. Also by A. A. 19th December, 1833.

Digitized by Google

## MILITIA LAWS.

tence, and if any such non-commissioned officer or private, enrolled to serve in either of the companies of artillery, infantry or cavalry, shall refuse or neglect to perform such military duty or exercise as he shall be required to perform, or shall depart from his colours or guard, without the permission of his superior officer as aforesaid, he shall forfeit a sum not exceeding one pound; and for the non-payment thereof, the offender shall be committed by warrant from the captain or commanding officer of the troop or company then present, to which such offender doth belong, or under whose command he may be, to the next gaol, there to be confined until the fines as aforesaid, together with the gaoler's fees, are paid; and the respective sheriffs of the city, and respective districts and counties of this state, are hereby empowered and required to receive the body or bodies of such offender or offenders as shall be brought to them by virtue of a warrant or warrants under the hand and seal of such officer as aforesaid, and him or them to keep in safe custody until such fines as are, mentioned in such warrant, together with the gaoler's fees as aforesaid, shall be paid; and the sheriffs and gaolers respectively, shall be allowed the same fees as are allowed in other cases: *Provided always,* That the person so confined, shall, at the end of five days, or any shorter time, for which they may have been committed, be released, on their swearing that they are unable to pay the fines and fees herein before directed to be paid.[*]

Sec. 19. *And be it further enacted by the authority aforesaid,* That the military uniform of this state shall be as follows, that is to say: General officers, dark blue coats with buff coloured facings, linings, collars and cuffs, gold epaulets and yellow buttons, with buff coloured under clothes. Regimental officers of infantry, dark blue coats, with such coloured linings, facings, collars and cuffs, epaulets and buttons, as shall be determined on by the major-general of each division.[†] Military uniform of this state.

Sec. 20. *And be it further enacted, &c.* That all fines which shall be imposed in any regiment, corps, company or troop, shall be paid into the hands of the pay-master, or person acting as such, of such regiment, corps, company or troop, and be paid and appropriated by warrant under the hands of a major part of the field officers, or commanding officer of the corps, or captain or commanding officer of the company or troop, as the case may be, for the purpose of providing colours, drums, bugles, fifes and trumpets, for their respective battalions, corps, companies and troops, and carrying expresses relative to military matters, and for the purchasing and providing arms and accoutrements for such of the men of the respective battalions, corps, companies and troops as are or shall be unable to furnish and provide themselves therewith; and that it shall be the duty of the pay-master, or person acting Appropriation of fines.

---

[*] Altered by A. A. 19th Dec. 1794, sec. 7.
[†] Altered by A. A. 13th Dec. 1815, sec. 7. Also by A. A. 19th Dec. 1833, sec. 47.

Brewer Exs. Page 334
Digitized by Google

MILITIA LAWS.

as such, of each respective battalion, corps, company or troop, once in every year, to render an account to the brigadier or the officer commanding the brigade, of all his receipts and expenditures in pursuance of this act.*

**Arms and accoutrements.**

Sec. 21. *And be it further enacted by the authority aforesaid,* That every free white man of this state, liable to bear arms in any of the regiments, corps, companies or troops in this state, who shall appear at any regimental or battalion muster, or at any company muster, ordered in pursuance of this act, not provided, accoutred and armed according to the act of congress, entitled, "An act more effectually to provide for the national defence, by establishing an uniform militia throughout the United States," passed the 24th October, 1791, shall forfeit and pay for each any every such default, a sum not exceeding five shillings, or the sum of two shillings and four pence for each article of arms or accoutrements required by the last mentioned act ;† that all fines shall be inflicted on non-commissioned officers and privates by the judgment of the majority of the commissioned officers of the company in which the offender is enrolled ;‡ That a major-general shall be tried by a major-general to preside, and four brigadier-generals ; but if the attendance of a major-general cannot conveniently be procured,

**Court martial.** then by five brigadier-generals, and in such case the eldest of such brigadiers to preside ; that a brigadier-general shall be tried by one or more brigadier-generals, and by four field officers ; that a lieutenant-colonel shall be tried by an officer, not under the rank of a lieutenant-colonel, and four field officers ; that a major shall be tried by an officer not under the rank of a field officer, and four officers not under the rank of captain ;§ that all non-commissioned officers and privates be tried by not less than three commissioned officers.|| Each member of a court martial is hereby enjoined to take the following oath or affirmation : "I do swear, (or affirm, as the case may be) that I will not divulge the sentence of the court, until the same shall be approved of or disapproved ; neither will I, upon any account, or at any time whatsoever, disclose or discover the vote or opinion of any particular member of the court martial, unless required to give evidence thereof by a court of justice in a due course of law. So help me God."¶—And any member of the court is authorized to tender the above oath to the other members. The governor or commander-in-chief shall appoint courts martial on general offi-

---

* Altered by A. A. 19th Dec. 1833.

† Altered by A. A. 19th Dec. 1833, sec. 43.

‡ Altered by A. A. 16th Dec. 1815, sec. 2. Also by A. A. 19th Dec. 1833, sec. 30

§ Altered as to battalion court martial, by A. A. 19th Dec. 1816, sec. 9. See also A. A. 19th Dec. 1833, sec. 30.

|| Altered by A. A. 19th Dec. 1833, sec. 30.

¶ For additional Oath, see A. A. 16th Dec. 1813, sec. 1.

Brewer Exs. Page 339
Digitized by Google

cers ; the major-generals shall appoint division courts martial in their respective divisions ; the brigadier-generals shall appoint brigade courts martial in their respective brigades ; the lieutenant colonels shall appoint regimental courts martial in their respective regiments ; and the majors, battalion courts martial in their respective battalions.* And no sentence of a court martial shall be put in force without the same be approved by the officers appointing the same, or by the commanding officers respectively for the time being.

Sec. 22. *And be it further enacted by the authority aforesaid,* That if the conduct of any officer should be represented to the governor or commander-in-chief, or to either of the major-generals of the division, brigadier-general of the brigade, or commanding officer of the detachment, to be so unmilitary and unbecoming an officer, as to deserve being cashiered, it shall be lawful for the governor or commander-in-chief, major-general of the division, brigadier-general of the brigade, or commanding officer of the detachment, as the case may be, to order a court of enquiry, and if on such court of enquiry, it shall appear that there is foundation for the charge, to have a court martial held, who shall make such order in the business as they shall think consistent with military rule : *Provided nevertheless,* That such court of enquiry shall never consist of less than three officers, one of whom at least shall be of the rank of the person accused.

*Court of Enquiry.*

Sec. 23. *And be it further enacted by the authority aforesaid,*† That persons of the following professions and descriptions shall be excused from militia duty, except in times of invasion or alarm, to wit : the lieutenant-governor for the time being, the members of both branches of the legislature, and their officers, the judges, commissioners, registers and clerks of the several superior courts of law and equity, and county courts ; the commissioners of the treasury and their clerks, the secretary of this state and his deputies, the attorney-general, the three circuit solicitors, the surveyor-general and his deputy, residing either in Charleston or Columbia ; the ordinaries and registers of the several districts, the sheriffs and gaol keepers in the several counties and districts, all continental officers who were deranged, or who served to the end of the war ; all regular clergymen of any sect or denomination, all persons holding any office or commission under the United States, all acting magistrates, all regular bred practising physicians and surgeons, all school masters, who shall have under their tuition not less than fifteen scholars ; all students at school or at college, the intendant and wardens of Charleston and Camden, their treasurers, and the officers of their courts ; all branch pilots for the several ports, one white man to each established ferry or toll-bridge, one white man to each wa-

*Persons excused from doing duty.*

---

\* Altered by A. A. 19th Dec. 1833, sec. 30.

‡ This section altered by A. A. 19th Dec. 1833, sec. 46.

Brewer Exs. Page 336

Digitized by Google

ter grist mill, wind mill, fulling mill or oil mill, three white men, to each forge, and five to each furnace erected or to be erected at any iron mine or mines in this state, who shall constantly reside and work at the same; and all persons under the age of eighteen and above the age of forty-five years; and all militia officers who have held their commissions for seven years.

Sec. 24. *Whereas* a doubt has arisen, whether aliens and other transient persons, who have resided, or may reside in this state for a considerable length of time, and enjoy the benefit and advantage resulting from the organization of the militia of this state, are liable to perform militia duty: And whereas it is but just and reasonable that those whose property is secured by the care and watchfulness of the community in which they reside, should contribute to its protection:

*Aliens or transient persons liable to do militia duty.*

*Be it enacted by the authority aforesaid,* That all free white aliens,* or transient persons, above the age of eighteen and under the age of forty-five years, who have resided, or hereafter shall or may reside in this State for the term of six months, shall immediately thereafter be, and are hereby declared to be subject and liable to do and perform all patrol and militia duty which shall or may be required by the commanding officer of the beat or district in which such alien or transient person shall reside, and be subject and liable to all pains and penalties inflicted by this act; any law, usage or custom to the contrary thereof in any wise notwithstanding: *Provided always,* That nothing contained in this act, shall be construed to extend to or affect in any way or manner the natural born citizen of any state or potentate, who shall be actually engaged in war with the United States, or to compel such alien or transient person to serve on patrol or militia duty out of the particular district of the regiment to which he shall or may be attached, nor to natural born and bona fide French citizens, (not being citizens of the United States) who are by treaty exempt from all personal service.†

Sec. 25. *And be it further enacted by the authority aforesaid,* That if the governor or commander-in-chief for the time being, receive advice from any person or persons in authority in this state, or other creditable person or persons in foreign parts, or if he shall receive any information, upon oath, from any credible person or persons within this state, that any foreign enemy or armed force intend suddenly to invade the state; or if any dangerous insurrection or rebellion be actually raised within this state, which cannot be suppressed by one single company, the governor or commander-in-chief for the time being, may raise and assemble such and as many of the divisions, brigades, battalions, regi-

*Militia to be called out in case of invasion or insurrection, and alarm to be made and published.*

---

* The A. A. 1794, requiring aliens to do militia and patrol duty, is neither against the constitution, nor against the laws of nations.—*Ansley v. Timmons,* 3 *M'Cord,* 329.

† This treaty has expired—French aliens are therefore liable, like others, to do militia duty.

ments, troops and companies, by this act directed to be formed, as he shall think sufficient and able to suppress and repel such invasion, rebellion, or insurrection as may happen; and for the more effectual execution thereof, he may make and publish, or cause to be made and published, an alarm throughout the whole state, by firing six guns, two at a time, at three minutes distance; or by sending orders and expresses to the general officers, field officers, and other officers of the militia, to raise their several and respective divisions, brigades, regiments, troops, companies, or such part of them as shall be ordered and directed to march and rendezvous at such proper time and places within the state, as the governor or commander-in-chief for the time being shall think fit; and the said alarms shall be carried on throughout the whole state, by all the commissioned officers of the militia, by firing three small arms at convenient intervals, from place to place, and by speedily raising their several corps, and taking all other proper and effectual measures, to give notice of the motion of the enemy, and forwarding with the utmost expedition, all necessary information to the governor or commander-in-chief, and by putting in execution all such orders as they shall receive from their superior officers.

Sec. 26. *And be it further enacted by the authority aforesaid,* That on the sight of the enemy, or on information of an enemy appearing, or mischief done by an enemy from any white man of credit, who hath seen the same, of the credit of which informer the officer to which information is given, shall be a judge, an alarm shall be made by any commissioned officer, by firing three small arms; and every alarm shall be carried on by all persons hearing or having knowledge of the same, by firing three small arms distinctly as usual; and the said officer who fired the alarm, shall assemble the corps of which he is an officer, by beat of drum, or by ordering them to warn their next neighbours, or otherwise, till the corps can be got together; and the commanding officer of the said corps, shall, with all convenient speed, dispatch two expresses, one to the governor or commander-in-chief, and the other to the next field officer of the regiment to which the said corps belong, with an account of the cause of alarm so made; upon which notice the said field officer shall dispatch two expresses, with an account of the same, one to the brigadier of the brigade, and the other to the major-general of the division; the field officer who shall receive the information as aforesaid, shall have power to assemble any number of men of the battalion or regiment, as the case may be, to which he belongs, to march to the assistance of any of the inhabitants of the state who are in danger.

*On sight or information of an enemy, alarm to be made with small arms.*

Sec. 27. *And be it further enacted by the authority aforesaid,* That if any person liable to bear arms, shall, in time of such alarm, neglect or refuse to use his utmost endeavours to convey and communicate the said alarm or notice of the enemy's approach, every such person shall forfeit and pay a sum not exceed-

*Penalty for refusing or neglecting to give information of the approach of an enemy.*

Brewer Exs. Page 338

Digitized by Google

30            MILITIA LAWS.

ing fifty pounds sterling; and in case any such person, after he hath notice of an alarm, does not forthwith repair, completely armed and accoutred as aforesaid, with all convenient speed, to the place where the regiment, troop or company to which he shall belong, shall be appointed to rendezvous, every such person shall forfeit a sum not exceeding twenty pounds sterling money; and in case the company or troop to which such person shall belong, shall actually engage and fight with the enemy before such person shall appear in the said regiment, troop or company, in every such case, the person not appearing as aforesaid, shall forfeit a sum not exceeding forty pounds sterling money.

*Officers may assemble any number of their corps, to suppress the attempts of an enemy.*

Sec. 28. *And be it further enacted by the authority aforesaid,* That every commissioned officer in the militia, has power, when occasion shall require, to assemble, arm and raise any number of men belonging to their respective corps; and if need be, to give notice and call to their aid the officers and men of any adjacent corps, to disperse, suppress, kill, destroy, apprehend, take or subdue any pirate, sea rover, Indian, or other enemy, who shall, in a hostile manner, hurt or attempt to hurt, any of the inhabitants of this state in their persons or possessions, or any company of slaves who shall be met together, or who shall be lurking in any

*Penalty in case of neglect*

suspected place where they may do mischief; or who shall have absented themselves from the service of their owners; and in case any person liable to bear arms, shall on such occasion, neglect or refuse to appear, upon notice given by any commissioned officer of the troop or corps to which such person belong, or appearing, shall not attend and obey the said officer, he shall, for every such neglect or refusal, forfeit the sum of two pounds sterling.

*In case of invasion, &c. part of every company shall remain in the respective parishes or divisions to which they belong, & be formed into patrols, &c.*

Sec. 29. *And be it further enacted by the authority aforesaid,* That in times of invasion or insurrection, when it shall be found necessary to march the several regiments, troops or companies, or any of them, out of their proper parishes, counties or districts, one fourth part at least of every company in this state, shall stay, and remain in the respective parishes and divisions to which they belong, and shall be formed into patrols under the command of such officer as the commissioned officers of the companies shall direct and appoint, under whose command respectively, they shall continue until the rest of the company shall return to their habitations, and shall be discharged from bearing arms; and the patrol so formed shall be obliged to be on constant duty, and to ride and patrol, and guard the plantations, and keep the slaves within their several parishes and division in good order, aud shall place proper guards, watches and centinels, at proper and convenient places, to give notice of danger, or for the more speedy conveying

*Penalty in case of neglect*

advice and intelligence to the governor or commander-in-chief, or any army raised and assembled by his command; and in case any person or persons obliged to serve in such patrols, shall refuse or neglect to ride patrol, or to watch, stand centinel, or to keep guard, or shall refuse to obey the lawful commands of any person appointed to command such patrol, every person so offen-

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14157   Page 49 of 199

ding shall forfeit any sum not exceeding fifteen pounds sterling money.

Sec. 30. *And be it further enacted by the authority aforesaid,* That in time of invasion, rebellion, or insurrection, when any person shall receive orders to march out of their parish, county, district or division, the captain or other commanding officer, who shall be present, shall cause the names of all the persons who are entered, enlisted and enrolled in the muster roll of such company, (officers excepted) to be written down on small scrolls of paper, which shall be folded up and put into a hat, and shall be shaken together, and the clerk or sergeant of the said company shall draw out of the hat the names of so many persons as will not exceed three fourth parts of the said company ; and the persons whose names shall be so drawn, shall be obliged to march according to such orders as shall be given by the governor or commander-in-chief, and the rest whose names shall be left in the hat, shall stay in their respective parishes or divisions, and shall do the duty of the patrol as before directed ; but no officer of any company shall be excused from marching with the company for which he is appointed, unless by particular orders from the governor or commander-in-chief ; and in that case such officer so directed to stay, shall be commanding officer of that part of the company left for the patrol duty. If any person whose name is drawn as aforesaid, and is thereby obliged to march out of his parish or division, can provide an able bodied man, (to be approved by the majority of the officers of the company to which such person belongs) completely armed and furnished according to the directions of this act, every such person shall be permitted and at liberty so to do ; and upon producing and sending out such able bodied man in his stead, he shall be excused from going out or marching in person ; but nevertheless he shall be obliged to do patrol duty in his district ; and in case of disobedience, neglect or refusal to ride in such patrol, he shall be liable to all the pains, penalties and forfeitures inflicted by this act.

Sec. 31. *And be it enacted by the authority aforesaid,* That in time of an alarm, occasioned by any insurrection, rebellion, or invasion, all field officers, and captains of every company, are empowered, by themselves or their warrants to any inferior officer or soldier, to impress any arms, ammunition, provisions, horses, waggons, carts, boats, canoes, pettiaugers and vessels, with their furniture, or whatever other thing they shall want or have need of for the service of this state : *Provided,* all such things so impressed, be by the said officers brought before three or more indifferent persons, being free holders, to be appraised and valued before they be disposed of for the public service ; and such valuation and appraisement being made, the officer shall give a receipt for the same if he conveniently can ; and the officer is to cause his clerk to enter the same in a book to be kept for that purpose ; and the said appraisers shall ascertain any loss or damage that

*Marginal notes:*

Manner of ascertaining those men who shall leave their respective parishes.

No officer shall be excused, unless by particular orders.

Substitutes allowed.

In case of invasion, &c. arms, &c. to be impressed.

Appraisement to be made of things impressed.

may happen to the thing so impressed, or allow a competent **hire** for the same when returned to the owner, as the case shall require, and shall give such appraisement, under their hands, to the owner, directed to the public treasurers, who are to lay the same before the legislature ; and the commanding officer, or captain of each company, after such alarm shall be over, and before such company shall be discharged, is to order so many men as he shall think fit, to carry the several things by him impressed, to the respective owners, who, upon re-delivery of the same, shall give a receipt. The officer is likewise empowered to draw on the public treasury for so much money as he shall think fit the carriage of the several things deserves.

**Things impressed to be kept an account of.**
Sec. 32. *And be it further enacted by the authority aforesaid,* That the commanding officer, or commander of each company shall lodge in some convenient and secure place for the public use, all the provisions and ammunition impressed by him or by virtue of his warrant, that shall remain unexpended after an alarm, and must keep a particular account thereof.

**Free persons of color liable to do duty as fatigue men and pioneers.**
Sec. 33. *And be it further enacted by the authority aforesaid,* That all free negroes and Indians, (nations of Indians in amity with the state excepted) Moors, Mulatoes, and Mustizoes, between the ages of eighteen and forty-five, shall be obliged to serve in the said militia as fatigue men and pioneers* in the several regimental beats in which they reside ; and upon neglect or refusal to attend when summoned on duty, they and every one of them shall be liable to the like penalties and forfeitures as privates in the same regiment or company are made liable by law.

**Members of uniform companies subject to all fines, &c. imposed by law and must give thirty days notice of their intention to leave their companies.**
Sec. 34. *And be it further enacted by the authority aforesaid,* That the officers and privates in any company of artillery, infantry or cavalry, raised and uniformed in any militia regiment of this state, by permission of his excellency the governor, or any lieutenant-colonel, or commanding officer of any regiment, or to be hereafter raised, shall be respectively liable to all the fines and forfeitures imposed by law on the officers or privates in any regimental or company beat, and that when any person now actually enrolled, or that shall hereafter be enrolled in any such company, shall be desirous to quit the same, he shall be obliged to give at least thirty days† notice of such intention, and shall be obliged also to enrol himself in the company beat in which he resides, or in some other company of artillery, infantry or cavalry of the regiment to which he belongs, and produce a certificate thereof from the captain or officer commanding such beat or company, before he shall be permitted to leave the uniform company or corps to which he belonged, or be excused from duty therein.‡

---

* Repealed as to their acting as pioneers by A. A. 20th Dec. 1823, sec. 13.
† Altered to six months by A. A. 20th Dec. 1800, sec. 3.
‡ See A. A. 17 Dec. 1808, sec. 14, for the penalty where persons remove from their company or beat to any other part of the State, without enrolling himself in some company or beat in the place to which he removed.

Digitized by Google

Sec. 35. And whereas, the safety of the city of Charleston requires the safety forth at certain times and seasons, one or more companies of the militia of the said city:

*Be it therefore enacted by the authority aforesaid,* That it shall and may be lawful for the governor, or commander-in-chief, **Companies** for the time being, or the major-general of the division, or briga- **may be sum-** dier of the brigade in which Charleston is comprehended, or the **moned to** commanding officer of the Charleston regiment for the time being, **mount guard.** to call forth, when necessary, such and so many companies, or detachments of companies, to mount guard in the said city, as to them shall respectively appear necessary and proper: *Provided,* that no guard shall be obliged to continue on duty at any one time, except in case of actual alarm, more than twenty-four hours on one guard; and every person duly summoned to turn out on any such guard, who shall not obey, or who shall leave his guard, or otherwise misbehave, shall be liable to pay the same fines and forfeitures as such person would be obliged to pay for default of duty by non-attendance or misbehaviour, at any battalion or regimental muster by virtue of this act.

Sec. 36. *And be it further enacted by the authority aforesaid,* **Officers to be** That every commissioned officer, who, at the original organiza- **furnished with** tion of the militia, agreeable to this act, shall be appointed in **this act, the act** pursuance of the same, and accepts his commission, shall be **of congress,** furnished, at the expense of this state, with a copy of this law, **tary discipline,** the act of congress to provide for the national defence, and es- **and the articles** tablishing an uniform militia throughout the United States, Ba- **of war.** ron Steuben's military discipline, and the articles of war, all bound together in a small convenient pocket volume; and that the senior major-general, elected in pursuance of this act, is hereby authorized and empowered to contract for procuring the same on the best and cheapest terms.*

Sec. 37. *And be it further enacted by the authority aforesaid,* That if any person or persons whosover, shall be sued, implead- **Persons sued** ed, molested or prosecuted, for any matter, cause or thing, done **on account of** or executed, or cause to be done or executed, by virtue of or in **this act, may** pursuance of this act, and all and every person or persons who **eral issue.** shall or may, by the command, or in aid or assistance of any person who shall do or execute, or cause to be done or executed, any matter or thing by virtue of or in pursuance of the direction of this act, shall and may plead the general issue, and give this act and the special matter in evidence; and in case the plaintiff shall suffer a discontinuance, enter a *noli prosequi,* suffer a nonsuit, or if a verdict or judgment shall pass against him, he shall pay to every defendant that shall be acquitted, or for whom judgment shall pass, his full double costs of suit.

Sec. 38. *And be it further enacted by the authority aforesaid,* **Former militia** That all laws heretofore enacted in this state respecting the mili- **laws repealed.**

---

* Obsolete—A new system of tactics adopted by A. A. 20th Dec. 1832, **sec.** 13.

Digitized by Google

tia, shall be, and the same are hereby repealed, except such laws or parts of laws as respect the Charleston battalion of artillery.*

*In the Senate House, the tenth day of May, in the year of our Lord one thousand seven hundred and ninety-four, and in the eighteenth year of the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*

JACOB READ, *Speaker of the House of Representatives.*

---

An Act for establishing the annual salaries of the powder inspectors and arsenal keepers for Charleston and Ninety-Six districts, within this state, and for limiting the duration of their offices to the term of four years.†

<div style="float:left">Passed 10th<br>May, 1794.</div>

Whereas, it is right and necessary to ascertain the salaries of the powder inspectors and arsenal keepers in Charleston and at Abbeville, in the district of Ninety-six in future, the same being now vacant:

Sec. 1. *Be it therefore enacted by the honorable the Senate and House of Representatives, now met and sitting in General Assembly,*

<div style="float:left">Salaries fixed.</div>

*and by the authority of the same,* That from and after the passing of this act, the annual salary of the powder inspector† and arsenal keeper in Charleston shall be fifty pounds sterling, and the annual salary of the arsenal keeper at Abbeville, in the district of Ninety-six, shall be thirty pounds sterling, any law, usage or custom to the contrary thereof in any wise notwithstanding.

And in order that the public may be from time to time duly informed of the state of the magazine stores to be deposited at Abbeville court-house, in the said district of Ninety-six:

Sec. 2. *Be it enacted by the authority aforesaid,* That the members of the senate and house of representatives, that shall

<div style="float:left">Commissioners appointed to examine the state of the magazines.</div>

from time to time represent Abbeville county aforesaid, shall be commissioners to examine and inspect the state of the magazines and quantity of arms, powder and other stores that may be deposited in the store and magazines at Abbeville court-house aforesaid ; and that they shall, from time to time when required, make report to his excellency the governor, of the state and condition of the said arms, powder and stores, and also annually to the legislature at their November session.‡

And to prevent abuses:

<div style="float:left">Office not to be administered by deputy.</div>

Sec. 3. *Be it further enacted by the authority aforesaid,* That no person who may be appointed to the office of powder inspec-

---

* The exemption of the Charleston battalion of Artillery repealed by A. A. 16th Dec. 1816, sec. 12.

† See A. A. 19th Dec. 1833, sec. 3, 4, 5. 6. where this act is superseded.

‡ Arsenal abolished—A. A. 19th Dec. 1833.

Brewer Exs. Page 343

tor and arsenal store keeper at any magazine of this state, shall be permitted to administer the said office by deputy, unless in case of sickness.

Sec. 4. *And be it further enacted by the authority aforesaid,* That no person who shall be elected to the office of powder receiver and arsenal store keeper for Charleston or Abbeville, shall continue in office for a longer time than four years, without he shall be re-elected to the same by the legislature.

*Term of office limited.*

Sec. 5. *And be it further enacted by the authority aforesaid,* That the powder inspector and arsenal keeper for Charleston district, shall, before he enters on the duties of his office under this act, give security to the satisfaction of the governor, in the sum of five hundred pounds; and the powder inspector and arsenal keeper for Abbeville, in the district of Ninety-six, shall, in like manner give security to the satisfaction of a majority of the judges of the county court of Abbeville county, in the sum of two hundred and fifty pounds, for the faithful performance of the duties of their offices respectively.

*Security required.*

*In the Senate House, the tenth day of May, in the year of our Lord one thousand seven hundred and ninety-four, and in the eighteenth year of the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*
JACOB READ, *Speaker of the House of Representatives.*

---

An additional act to an act entitled "An act to organize the militia throughout the state of South-Carolina, in comformity with the act of Congress."

Whereas the law of congress, entitled " an act more effectually to provide for the national defence, by establishing an uniform militia throughout the United States, directs, that each division, brigade and regiment in each State, shall be numbered at the formation thereof, and a record made of such numbers in the adjutant-general's office in the State; and when in the field, or in service in the state, each division, brigade and regiment, shall respectively take rank, according to their numbers, reckoning the first or lowest number highest in rank.   And whereas it is necessary to fix the rank of officers, who were elected to the same grade, by the legislature at their last session, or by the people since that period :

*Passed 19th Dec. 1794.*

Sec. 1. *Be it therefore enacted by the honorable the senate and house of representatives, now met and sitting in general assembly, and by the authority of the same,* That the rank of the divisions, brigades and regiments, shall be determined by lot in the following manner, that is to say : That a joint committee of both houses shall forthwith cause the words eastern division, and the words western division, to be respectively written on two pieces of paper, which shall be folded up and put into a hat, and they

*Rank of divisions and brigades to be ascertained by lot.*

shall then cause a child under ten years of age to draw out in their presence one of the said lots, and that which shall be so drawn, shall be the first division of this state, and the remaining lot shall be the second division. And if the eastern division shall be the first drawn, then the brigades and regiments in that division shall have the lowest numbers and the highest rank; and the brigades and regiments in the western division, the highest numbers and lowest rank. And if the western division be first drawn, then the brigades and regiments in that division shall have the lowest numbers and highest rank; and the brigades and regiments in the eastern division the highest numbers and lowest rank. That then the committee shall cause the numbers of the brigades in each division, to be determined in a similar manner by lot; that is to say, if the eastern division shall be the first drawn, they shall cause the words Charleston brigade, Georgetown brigade, Cheraw brigade, Camden brigade, and Beaufort and Orangeburgh brigade, to be written on five lots, and to be folded up and put into a hat; and they shall then cause a child under ten years of age to draw, in their presence, the said lots, one by one, from the hat; and the brigade first drawn, shall be numbered the first brigade; the brigade second drawn, shall be numbered the second brigade; the brigade third drawn, shall be numbered the third brigade; the brigade fourth drawn, shall be numbered the fourth brigade; and the brigade fifth drawn, shall be numbered the fifth brigade. And then they shall cause the words, Edgefield and Abbeville brigade, Laurens and Newberry brigade, Washington brigade, and Pinckney brigade, to be written on four lots, and the same shall be folded up and put into a hat, and they shall then cause a child under ten years of age, to draw in their presence, the lots, one by one, from the hat; and the brigade first drawn, shall be numbered the sixth brigade; the brigade second drawn, shall be numbered the seventh brigade; the brigade third drawn, shall be numbered the eighth brigade; and the brigade fourth drawn, shall be numbered the ninth brigade. And if the western division shall be first drawn, they shall cause the words Edgefield and Abbeville brigade, Laurens and Newberry brigade, Washington brigade, and Pinckney brigade, to be written upon four lots, which shall be folded up and put into a hat; and they shall then cause a child under ten years of age to draw, in their presence, the lots, one by one, from the hat; and the brigade first drawn, shall be numbered the first brigade; and the brigade second drawn, shall be numbered the second brigade; the brigade third drawn, shall be numbered the third brigade; and the brigade fourth drawn, shall be numbered the fourth brigade. And then they shall cause the words Charleston brigade, Georgetown brigade, Cheraw brigade, Camden brigade, and Beaufort and Orangeburgh brigade, to be written on five lots, and the same shall be folded up, and put into a hat; and they shall then cause a child under ten years of age to draw, in their presence, the lots, one by one, from the hat;

Brewer Exs. Page 345
Digitized by Google

## MILITIA LAWS. 37

and the brigade first drawn, shall be numbered the fifth brigade; the brigade second drawn, shall be numbered the sixth brigade; the brigade third drawn, shall be numbered the seventh brigade; the brigade fourth drawn, shall be numbered the eighth brigade; and the brigade fifth drawn, shall be numbered the ninth brigade. That then the committee shall in like manner, by lots drawn in their presence, proceed to number the regiments; taking care so to conduct the drawing, that the lowest number of the respective regiments, be given to the lowest number of the respective brigades; and that the brigades highest in number, have the regiments highest in number; and that the rank of the battalions, in their respective regiments, be always determined by the seniority of their respective majors.*

Sec. 2. *And be it further enacted by the authority aforesaid,* That all the officers who were elected by the legislature, at their last session, or by the people since, shall take rank in the following manner, that is to say: If the eastern division shall be the first drawn, all the officers of equal grade and date of commission in that division, shall take rank of all the officers of similar grade and date of commission in the western division; and if the western shall be the first drawn, all the officers of equal grade, and date of commission in that division, shall take rank of all the officers of similar grade and date of commission in the eastern division; and all the officers of equal grade and date of commission, of the brigades lowest in number, shall take rank of all the officers of equal grade and date of commission in the brigades higher in number, in the division to which it belongs; and all the officers of equal grade and date of commission, in the regiments lowest in number, shall take rank of all the officers of equal grade and date of commission in the regiments highest in number, in their respective brigades. And all the officers of equal grade and date of commission in their respective regiments, shall determine their rank in their regiment, by lot, drawn in the presence of the lieutenant-colonel, or commanding officer of the regiment; or where the lieutenant-colonel is dead, and the rank has not been determined between the majors, in the presence of some person to be appointed by the brigadier-general, or in his absence, by the major-general: *Provided always,* That nothing in this act shall be construed to extend to deprive officers who have been elected to the same grade they held before, from retaining and taking rank agreeable to their old commissions, or to determine the rank of officers in any regiment, where they have already drawn for it.†

*Rank of regimental officers to be ascertained by lot.*

Sec. 3. *And be it further enacted by the authority aforesaid,* That when the commission of ensign is vacant in any company, the men liable to do duty in that company, as well in time

*Ensigns how to be elected.*

---

\* See Act 21st Dec. 1814, sec. 2, dividing the state into five divisions and ten brigades, and the manner of deciding rank.

† See A. A. 19th Dec. 1807, sec. 2, for determing commissions of equal grade, by lot.

Brewer Exs. Page 346
Digitized by Google

of alarm as at common musters, shall elect by ballot a fit person to fill the vacancy; and the lieutenant-colonel or commanding officer, shall order such election, giving notice on one muster day, in writing; which shall be publicly declared and made known to the company, by the officer commanding the same, and shall be fixed up in some public place upon the muster ground, that the election will be held at the ensuing muster; and the captain or commanding officer of the company shall manage the election.*

Sec. 4. *And be it further enacted by the authority aforesaid,* That if any person liable to do duty at common musters, shall be appointed a sergeant, and refuse to do duty as such, he shall be fined in the sum of four pounds; but no person shall be obliged to act as sergeant more than one year at a time.

*Sergeants refusing to do duty to be fined.*

Sec. 5. *And be it further enacted by the authority aforesaid,* That the governor, the major-generals and brigadier-generals, respectively, as occasion may require, shall be authorized to appoint one or two extra aids-de-camp, who shall not be entitled to any other rank or pay than what they are entitled to in the line.†

*Governor, major-generals & brigadier-generals to appoint extra aids-de-camp.*

Sec. 6. *And be it further enacted by the authority aforesaid,* That each commanding officer of a corps, when on duty or parade, shall have full power and authority to ascertain and fix certain necessary limits and bounds to their respective parades and places of exercise,‡ (no road in which people usually travel, or more than one half the width of any street, to be included) within which no spectator shall have a right to enter, without liberty from the said commanding officer; and in case any person shall so intrude within the lines of the parade or place of exercise, after being once forbidden, he shall be liable to be confined under guard during the time of exercise, at the discretion of the commanding officer.

*Parade limits to be ascertained.*

Sec. 7. *And be it further enacted by the authority aforesaid.* That every fine imposed by this act, or the act, entitled " An act to organize the militia throughout the state of South-Carolina, in conformity with the act of Congress," or by any future act, shall be recovered in the following manner,§ that is to say : the officer

*Fines, how to be recovered.*

---

* See Act 19th Dec. 1816, sec. 2 & 6.

† Altered by Act 13th Dec. 1815, sec. 3.

‡ A militia officer has the right to make use of uninclosed land, as a muster ground, until the owner object to it; and where an uninclosed field has for many years been used for that purpose without objection. the officer may, as an incident to its use, remove all obstructions to the exercise and drill of the troops under his command, unless *forbidden* by the proprietor to do so. The colonel of a regiment of militia, preparatory to a review, caused a number of old field pine saplings to be cut and removed from a piece of uninclosed land, which had for a long time been used as the regimental muster ground. *Held* that the cutting down and removing the saplings, was an incident to the use of the land as a muster ground; and that the proprietor, not having given previous notice that he objected either to the use or the incident, could not afterwards maintain trespass against the colonel.—*Law v. Nettles,* 2 *Bailey,* 447.

§ Altered by A. A. 19th Dec. 1833, sec. 32.

Brewer Exs. Page 347

Digitized by Google

who presided at the court-martial, when any such fine or fines shall be imposed, (excepting fines incurred for misconduct while under arms, which shall be recovered as is directed by said act) shall issue his warrant, under his hand and seal, directed to some sergeant belonging to the brigade, regiment, battalion, company or troop, to which the offender, according to his rank, may immediately belong, or for want of such sergeant, to such other person as may be appointed by the commanding officer of the regiment, and shall mention therein the amount of the fine or forfeiture, or fines or forfeitures incurred, and for what default or misconduct, and by what court-martial the same was or were imposed, and shall thereby command such sergeant or other person to take the body of the defaulter or offender to the nearest gaol, there to be confined until such fine or forfeiture, or fines or forfeitures, together with the gaoler's and sergeant's fees, shall be paid; and every such sergeant, or other person, shall be obliged to execute such warrant, according to the tenor or purport thereof; and all district sheriffs and gaolers, county sheriffs and gaolers, and city sheriffs and gaolers, in this state, are hereby empowered and required to receive the body of any such defaulter or offender, who may be brought to either of them, under any such warrant, and to keep him in safe custody, until the amount specified in the warrant, together with the gaoler's and sergeant's fees, shall be paid; and the sheriffs and gaolers shall be allowed the same fees, in such cases, as are allowed in other cases of commitments, and the sergeant shall be allowed the same fees as constables have for serving summonses, and for commitments for the same amount, or for levying an execution for the same amount:* *Provided always*, That the person so committed, shall, at the end of a certain time, to be computed at the rate of one day for every three shillings and six pence he may be condemned to pay, be released, upon swearing that he is unable to pay the amount for which he may be committed, and the fees herein before directed to be paid: *And provided also*, That no person shall be taken up on any such warrant or execution, if he will immediately pay the amount he is liable for, and the fees due, or produce to the officer sufficient property of his own, to satisfy the same; which, if he shall produce, the officer shall take and dispose of, at public sale, in the same manner as constables make their sales under execution; and after paying the fine or fines due, and the fees that have accrued, he shall return the surplus, if any there be, of the proceeds of the sale, to the said defaulter or offender.†

Sec. 8. *And be it further enacted by the authority aforesaid,* That every officer in the militia shall, within six months after the ratification of this act, or after he shall be elected or appointed, take the following oath, or affirmation, before some justice of the

Officers to take an oath of fidelity.

---

* See A. A. 24th Sept. 1813, sec. 12, 13, 14.
†Altered by A. A. 24th Sept. 1813, sec. 12, and A. A. 19th Dec. 1833 sec. 32.

peace, who shall certify the same on the back of his commission :
" I, A. B. do solemnly swear, (or affirm, as the case may be) that
I will support and maintain, to the utmost of my ability, the laws
and constitution of this state and of the United States." And
every officer neglecting so to do, shall vacate his commission.

*In the Senate House, the nineteenth day of December, in the year of our Lord
one thousand seven hundred and ninety-four, and in the nineteenth year of
the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*
JACOB READ, *Speaker of the House of Representatives.*

### *In the House of Representatives, Dec.* 17, 1794.

The joint committee of both houses, appointed by the legisla-
ture, for ascertaining the number and rank of the divisions, bri-
gades and regiments, and also the rank of officers of similar grade
and dates of commissions throughout the state, having proceeded
to the business which they had in charge, as the law directs, re-
ported as follows :

FIRST DIVISION, WESTERN DIVISION.
SECOND DIVISION, EASTERN DIVISION.

## *FIRST DIVISION.*

First brigade, Edgefield and Abbeville.
Second brigade, Newberry and Laurens.
Third brigade, Pinckney.
Fourth brigade, Washington.

## *SECOND DIVISION.*

Fifth brigade, Beaufort and Orangeburgh.
Sixth brigade, Georgetown.
Seventh brigade, Charleston.
Eighth Brigade, Camden.
Ninth brigade, Cheraw.

## *FIRST DIVISION.*

### BRIGADE NO. I.

First regiment, Norwood's.
Second regiment, John Martin's.
Third regiment, Calhoun's.
Fourth regiment, Mey's.
Fifth regiment, Carter's.

### BRIGADE NO. II.

Sixth regiment, Upper regiment of Newberry county.
Seventh regiment, Enoree regiment.
Eighth regiment, Lower regiment of Newberry county.
Ninth regiment, Saluda regiment.

### BRIGADE NO. III.

Tenth regiment, Trimmer's.
Eleventh regiment, Mills's.

Twelfth regiment, Love's.
Thirteenth regiment, Brandon's.
Fourteenth regiment, Thomas Moore's.

### BRIGADE NO. IV.

Fifteenth regiment, Allston's.
Sixteenth regiment, Eliab Moore's.
Seventeenth regiment, Wood's,
Eighteenth regiment, William Martin's.
Nineteenth regiment, Clarke's.

## SECOND DIVISION.

### BRIGADE NO. V.

Twentieth regiment, M'Pherson's.
Twenty-first regiment, Rumph's.
Twenty-second regiment, Sabb's.
Twenty-third regiment, Brown's.
Twenty-fourth regiment, Fishburne's.

### BRIGADE NO. VI.

Twenty-fifth regiment, Conway's.
Twenty-sixth regiment, Postell's.
Twenty-seventh regiment, Baxter's.

### BRIGADE NO. VII.

Twenty-eighth regiment, Lee's.
Twenty-ninth regiment, Read's.
Thirtieth regiment, Vanderhorst's.
Thirty-first regiment, Glaze's.

### BRIGADE NO. VIII.

Thirty-second regiment, M'Cawley's.
Thirty-third regiment, Goodwyn's.
Thirty-fourth regiment, Dunlap's.
Thirty-fifth regiment, Cantey's.
Thirty-sixth regiment, Pierson's.

### BRIGADE NO. IX.

Thirty-seventh regiment, Evans's.
Thirty-eighth regiment, Ellison's.
Thirty-ninth regiment, Spencer's.

*Ordered*, That the report be recorded in the Secretary's offices in Charleston and Columbia; and that the report be printed as an appendix to an additional act to the act, entitled, "An act to organize the militia throughout the state of South-Carolina, in conformity with the act of congress."

*By order of the House,*

JOHN SANDFORD DART, C. H.

*In the Senate, Dec.* 19, 1794.

*Resolved*, That this House do concur with the House of Representatives in the foregoing report.

*By order of the Senate.*

FELIX WARLEY, C. S.

Brewer Exs. Page 350

Digitized by Google

**6**

An additional Act to the act, entitled, "An act to organize the militia throughout the State of South-Carolina, in conformity with the act of congress," and for other purposes therein mentioned.

**Passed 19th Dec. 1795.**

*Be it enacted by the honorable the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same,* That in all cases where any of the regiments, or any of the battalions and companies, belonging to any of the regiments of this state, shall or may be aggrieved and injured by the division or divisions made by the different commissioners appointed by the several brigadier-generals, for the purpose of dividing the regiments belonging to their respective brigades, into battalions and companies, pursuant to the militia act of this state, passed on the tenth day of May, seventeen hundred and ninety-four; the regiments, or any of the battalions or companies belonging to the said regiments, so aggrieved and injured, shall make their application for redress to the brigadier-general of the brigade, to which the said regiment or regiments belong, who shall appoint two field officers of the brigade, who are not involved in the dispute, or interested in the decision of the same, who are hereby empowered and directed, should it appear to them fit and expedient, to make, direct and order any arrangement or division of the said regiments, or any of the battalions or companies belonging thereto, as to them shall appear to the advantage of the same : *Provided,* however, that such arrangement or division be, as nearly as conveniently may be, in conformity to the act of congress, passed on the eighth day of May, seventeen hundred and ninety-two.

**Field officers to give relief, where regiments, battalions or companies, are injured by divisions.**

Sec. 2. *And be it further enacted by the authority aforesaid,* That in all cases of contested elections for field officers, where either of the candidates think themselves aggrieved by the determination of the brigadier-general and field officers, who have decided or shall decide on the election, such candidate may appeal from such decision, to the major-general of the division to which he belongs ; and the said major-general, together with a board of general and field officers, to be appointed by the said major-general, and to consist of the said major-general, and not less than one brigadier-general and three field officers, shall examine into the merits of the said election, and shall decide thereon ; and such decision shall be final and conclusive ; and the person in whose favor they shall decide, shall be commissioned by the governor.

**In cases of contested elections appeal to be made.**

Sec. 3. *And whereas,* many of the officers in the militia have, through inadvertence, neglected to take the oath or affirmation prescribed by the act, passed on the nineteenth day of December, seventeen hundred and ninety-four :

*Be it further enacted by the authority aforesaid,* That a further time of six months be allowed them to take the said oath or affirmation, before some justice of the peace, who shall certify the same on the back of his commission ; and every officer who

**Militia officers allowed a further time to qualify.**

Digitized by Google

shall neglect so to do, within the time above limited, shall vacate his commission; but provided he takes the said oath within the said term, he shall retain his commission; any thing in the said act contained to the contrary thereof in any wise notwithstanding.[*]

Sec. 4. *And whereas*, it has been represented to the legislature that the duty of adjutant-general is very aborious, and attended with considerable expense:

*Be it therefore enacted by the authority aforesaid*, That the salary of the said officer shall be, in future, one thousand dollars per annum:[†] *Provided* he shall attend the different regimental reviews throughout the state, once in every year.

<div style="float:right">Salary of the adjutant-general.</div>

Sec. 5. *And whereas*, it is of great importance to the country, that encouragement should be given to the company for opening the Santee canal:

*Be it therefore enacted by the authority aforesaid*, That the overseers, toll-receivers, lock-keepers, and white labourers,[‡] employed or to be employed by the said company, be exempt from doing militia duty at any time hereafter, except in times of alarm.

<div style="float:right">Persons employed at the Santee Canal, excused from militia duty.</div>

Sec. 6. *And be it further enacted by the authority aforesaid*, That so much of this act as relates to the office, salary and duties of the adjutant-general, shall continue in force for and during the term of three years, and from thence to the end of the next session of the legislature thereafter, and no longer.[§]

<div style="float:right">Adjutant-general's salary for 3 years.</div>

*In the Senate House, the nineteenth day of December, in the year of our Lord one thousand seven hundred and ninety-five, and in the twentieth year of the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*
ROBERT BARNWELL, *Speaker of the House of Representatives.*

---

An Act to prolong the time for certain officers of the militia to take the oath or affirmation prescribed by law.[‖]

<div style="float:right">Passed 20th Dec. 1796.</div>

Sec. 1. *Whereas* many officers of the militia have, through inadvertence, neglected to take the oath or affirmation prescribed by the act, entitled, " An additional act to the act, entitled, an act to organize the militia throughout the state of South-Carolina, passed on the nineteenth day of December, in the year of our Lord one thousand seven hundred and ninety-four, in conformity with the act of congress:"

---

[*] Extended to six months further by A. A. 20th Dec. 1796, sec. 1

[†] Now fifteen hundred dollars, by A. A. 19th Dec. 1833, sec. 2.

[‡] Re-enacted except as to white labourers, by A.A. 19th Dec. 1833, sec. 46.

[§] Now limited to four years by A. A. 19th Dec. 1833, sec. 2.

[‖] Expired.

Digitized by Google

*Be it therefore enacted by the honorable the Senate and House of Representatives, now met und sitting in General Assembly, and by the authority of the same,* That a further time of six months be allowed the said officers to take the said oath or affirmation, before some justice of the peace, who shall certify the same on the back of their commissions; and that the said officers, thus taking the said oath or affirmation, shall be still qualified to hold their said commissions, any thing in the aforesaid act, passed the nineteenth day of December, in the year of our Lord one thousand seven hundred and ninety four, to the contrary thereof notwithstanding: *Provided nevertheless,* That if the said officers do not, within the said time, take the said oath or affirmation, at the expiration of the same, their commissions shall be vacated.

Sec. 1. *And be it enacted by the authority aforesaid,* That any officer or officers taking the oath or affirmation within the time above mentioned, shall receive commissions of the same date, and shall be entitled to the same grade as if he or they had taken the said oath or affirmation when first elected.

*In the Senate House, the twentieth day of December, in the year of our Lord one thousand seven hundred and ninety-six, and in the twenty-first year of the Independence of the United States of America.*

**DAVID RAMSAY,** *President of the Senate.*
**ROBERT BARNWELL,** *Seaker of the House of Representatives.*

---

An Act concerning the Cavalry and Artillery of this State, and for other purposes therein mentioned.

*Passed 16th Dec. 1797.*

Sec. 1. *Be it enacted by the honorable the Senate and House of Representatives, now met and sitting in General Assembly, and by the authority of the same,* That the cavalry of this state shall be arranged into squadrons and regiments, as follows: The several troops now raised, and hereafter to be raised, in the brigade number one, (no. 1,) shall form one regiment; the several troops now raised, or hereafter to be raised, in the brigade number two, (no. 2,) shall form one regiment; the several troops now raised, and hereafter to be raised, in the brigade number three, (no. 3,) shall form one regiment; the several troops now raised, and hereafter to be raised, in the brigade number four, (no. 4,) shall form one regiment; the several troops now raised, and hereafter to be raised, in the brigade number five, (no. 5,) shall form one regiment; the several troops now raised, and hereafter to be raised, in the brigade number six, (no. 6,) shall form one regiment or squadron; the several troops now raised, and hereafter to be raised, in the brigade number seven, (no. 7,) shall form one regiment; the several troops now raised, and hereafter to be raised, in the brigade number eight, (no. 8,) shall form one regiment; the several troops now raised, and hereafter to be

*Cavalry of the state to be in squadrons and regiments.*

## MILITIA LAWS.                                    45

raised, in the brigade number nine, (no. 9,) shall form one regiment or squadron. *Provided*, That no regiment shall consist of more than six troops, nor less than four ; nor each troop of more than sixty-four rank and file.

Sec. 2. *And be it further enacted by the authority aforesaid*, That the brigadier-general of each of the aforesaid brigades, shall be, and he is hereby authorized and empowered, whenever the regiment of horse in his brigade is not complete, to fill up the same, if he shall see fit, by authorizing proper persons to raise the necessary number of troops ; and also by empowering the captains of the respective troops in his regiment, to enrol men, who are not obliged to do militia duty, but who would be willing to enrol themselves in such troops, and to turn out with them, properly uniformed and accoutred, when called into actual service ; and the said brigadiers shall distribute the troops in their respective regiments, into squadrons. *(marginal: Brigadiers to fill up regiments of horse and how.)*

Sec. 3. *And be it further enacted by the authority aforesaid*, That to each of the aforesaid squadrons, there shall be one major ; and each of the aforementioned regiments shall be commanded by one lieutenant-colonel ; and the governor and commander-in-chief shall be, and he is hereby authorized to commission, in common form, the eldest captain of horse in each brigade, as lieutenant-colonel in each brigade ; and the second and third in seniority, as majors of the first and second squadrons, in each regiment respectively ; and if any case should occur, in which the captains' commissions bear even date, the preference shall be decided by lot, in presence of the brigade major, who shall make a return thereof to the adjutant-general :  And the rank of the several lieutenant-colonels shall also be determined by lot, to be drawn in the following manner :  The adjutant-general shall write the names of the respective regiments on slips of paper, and having intermixed them well, shall, in presence of the governor or commander-in-chief, draw forth their names, singly ; and each of the aforesaid lieutenant-colonels shall take rank in the order in which his name is drawn ; and the adjutant-general shall make out two lists of the said officers, according to their respective ranks, and transmit one of the said lists to the secretary's office in Charleston, and the other to the secretary's office in Columbia, there to be recorded. *Provided*, That nothing herein contained, shall be so construed as to give rise to any captain or commander of a troop, who has neglected, for six months previous to the passing of this act, to muster his troop. *(marginal: Each squadron to have a major and each regiment a lieutenant-colonel. Officers to be appointed, and their rank determined. Where to be recorded.)*

Sec. 4. *And be it enacted by the authority aforesaid*, That all those of the militia, who have heretofore enrolled themselves in any troop or company of cavalry, may remain with their troop or company ; and that hereafter, all volunteers for the corps of cavalry, shall be limited to their respective brigades, except otherwise ordered by the commander-in-chief. *(marginal: Persons formerly enrolled, to remain,)*

Sec. 5. *And be it further enacted*, That whenever any of the cavalry, or any part thereof, shall be called into the actual service

Digitized by Google

of this state, it shall be the duty of the brigade-inspector to call to

**When in actual service, horses to be appraised**

his assistance, two of the freeholders of the county where each horseman may reside, who, together with the said brigade-inspector, shall, on oath, appraise the horse of each horseman, immediately before the time of going into such service, and enter such appraisement in a book, to be kept by the said brigade-inspector for that purpose; and the said cavalry shall receive the same indemnification, and no other, for loss of horses or otherwise, under the same regulations and restrictions, as are or may be established in like cases, in the militia in the service of the United States, by the laws thereof, for the time being.

**Troops to meet how often.**

Sec. 6. *And be it further enacted*, That the cavalry shall meet in troop, at least six times in each year, and at such places as the commanding officer of each troop shall direct.

**Uniform and discipline.**

Sec. 7. *And be it enacted*, That the brigadier in each brigade, be, and he is hereby authorized to direct the mode of uniform for the cavalry of his brigade; and the adjutant-general shall prescribe the form of discipline to be used and adopted by them.*

**Regiment of artillery formed.**

Sec. 8. *And be it further enacted*, That the company of artillery attached to the twenty-eighth regiment, the company attached to the twenty-ninth regiment, and the company† attached to the thirtieth regiment of infantry, shall form one battalion; and the said battalion, together with the Charleston battalion of artillery, shall form one regiment.

**How to be officered.**

Sec. 9. *And be it further enacted*, That the said regiment of artillery shall be commanded by a lieutenant-colonel; and each of the said battalions by a major; and the governor or commander-in-chief, shall be, and he is hereby authorized to commission, in common form, the first officer in rank in the said regiment, as lieutenant-colonel thereof; and the second and third, in seniority, as majors of the battalions, who shall take rank according to the dates of their commissions.‡

**Other artillery to remain as before.**

Sec. 10. *And be it further enacted*, That throughout the other parts of the state, the captains of artillery shall be attached to the battalions in which they reside, respectively; and rise in the same with the other officers, according to the dates of their commissions.§

**Officers how to rank and rise.**

Sec. 11. *And be it further enacted*, That the said lieutenant-colonel of cavalry, and lieutenant-colonel of artillery, shall take rank and promotion, together with and in the same manner as the other lieutenant-colonels of this state. *Provided nevertheless*, That no officer to be appointed by virtue of this act, shall take rank and precedence over any officer of infantry of the militia of this state, of the same grade, except by seniority of commission.

---

* Altered by Act 17th Dec. 1808, sec. 1.

† Altered—see A. A. 19th Dec. 1807.

‡ Re-organized by A. A. 19th Dec. 1833, sec. 17.

§ Now elected according to the 3rd clause of the 2d sec. of A. A. 19th Dec. 1816.

Brewer Exs. Page 355

Digitized by Google

Sec. 12. *And be it further enacted*, That the officers and men *To be subject* of the cavalry and artillery, throughout this state, shall be subject *to general rules* to the same laws, rules and orders, as the officers and men of the infantry of this state are or shall be subject to: *Provided always nevertheless*, That nothing contained in this act, shall be construed to affect the rights and privileges of the ancient battalion of artillery in Charleston, as secured to them by their charter, or by any other law or regulation.*

Sec. 13. *And be it enacted by the authority aforesaid*, That Artillery in the three companies of artillery in brigadier-general Winn's bri- gen. Winn's gade, shall also form one battalion ; and the eldest captain in the brigade. said battalion shall be commissioned major thereof.†

Sec. 14. *And be it enacted by the authority aforesaid*, That the officers commanding in the different company beats, in the Officers in town of Georgetown, be, and the same are hereby authorized to Georgetown. hold their respective commissions, although not resident in the beats aforesaid: *Provided*, That the said residence be in his battalion.

Sec. 15. *And whereas*, it has been inconvenient, and sometimes oppressive, to issue warrants, in the first instance, against the body of defaulters, and other persons, subjected to the fines by the militia law : For remedy whereof,

*Be it enacted by the authority aforesaid*, That the officer to Warrants for whom the power is given of issuing warrants against the body of fines, &c. how defaulters, and other persons liable to fines, shall, in the first in- to be issued & stance, issue his warrant against the goods and chattels of such executed. person ; and the sergeant or other person to whom such warrant shall be directed, is hereby authorized and required to seize the property of the person against whom the warrant shall be issued, and sell the same, after having advertised it in some public place in the regimental or company district, to which the said person may belong, at least five days previous to the sale ; and if the person to whom the said warrant shall be directed, shall make a return that he cannot find any goods and chattels to be levied on, then the officer who issued the first warrant, is hereby authorized and required to issue a warrant against the body of the person, in lieu of that which was issued against his goods and chattels.‡

Sec. 16. *And be it further enacted by the authority aforesaid*, Governor to is- That the governor and commander-in-chief for the time being, sue blank com- be, and he is hereby authorized to issue blank commissions to the missions. lieutenant-colonels of the respective regiments ; and the lieutenant-colonels of the respective regiments shall, from time to time, as vacancies may occur in their said regiments, fill up and issue commissions, and make return thereof to the brigadier.§

---

* Now placed upon the same footing with every other militia company and battalion in the State. A. A. 16th Dec. 1815, sec. 12.

† Repealed by A. A. Dec. 1818, sec. 3.

‡ Altered by A. A. 24th Sept. 1813, sec. 12.

§ Altered by A. A. 19th Dec. 1833.
Brewer Exs. Page 356 Digitized by Google

48                                    MILITIA LAWS.

**Turning out of the militia.**     Sec. 17. *And be it further enacted by the authority aforesaid,* That the militia of Charleston and Georgetown shall be, and they are hereby exempted from turning out on company parade, oftener than once in every two months; and the commanding officer in each regiment throughout the state, shall be authorized, if he see fit, to exempt his men from turning out on parade in the months of July, August and September : *Provided* they turn out not less than six times in the year.[*]

*In the Senate House, the sixteenth day of December, in the year of our Lord one thousand seven hundred and ninety-seven, and in the twenty second year of the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*
ROBERT BARNWELL, *Speaker of the House of Representatives.*

---

#### An Act to amend the law respecting Quarantines.

**Passed 16th Dec. 1797.**     Sec. 1. *Be it enacted by the honorable the Senate and House of Representatives, now met and sitting in general assembly, and by the authority of the same,* That upon all occasions, when the governor or commander-in-chief of this state may deem it necessary, he shall have a right, and he is hereby required, at the expense of the state, to hire and employ boats and small craft; and a sufficient number of able men, well armed, to be stationed wherever he may think fit, and to act under his directions, in order to enforce obedience to the laws of this state, requiring the performance of quarantine ; and also to arm such men, if requisite, with any fire arms belonging to this state.

*In the Senate House, the sixteenth day of December, in the year of our Lord one thousand seven hundred and ninety-seven, and in the twenty-second year of the Independence of the United States of America.*

DAVID RAMSAY, *President of the Senate.*
ROBERT BARNWELL, *Speaker of the House of Representatives.*

---

#### An Act respecting Slaves, Free Negroes, Mulattoes and Mustizoes, for enforcing the more punctual performance of Patrol duty, and to impose certain restrictions on the emancipation of slaves.

**Passed 20th Dec. 1800.**     Sec. 1. Whereas the laws heretofore enacted for the government of slaves, free negroes, mulattoes and mustizoes, have been found insufficient for the keeping them in due subordination :

*Be it therefore enacted by the honorable the Senate and House of Representatives of the state of South-Carolina, now met and*

---

[*] See A. A. 19th Dec. 1833, sec. 19.

Brewer Exs. Page 357

Digitized by Google

# EXHIBIT O

THE

# Statutes at Large;

BEING

## A COLLECTION

OF ALL THE

# LAWS OF VIRGINIA,

FROM THE

## FIRST SESSION OF THE LEGISLATURE,

IN THE YEAR 1619.

---

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY
OF VIRGINIA, PASSED ON THE FIF'T ! DAY OF FEBRUARY,
ONE THOUSAND EIGHT HUNDRED AND EIGHT.

---

### VOLUME XIII.

---

## By WILLIAM WALLER HENING.

---

" The *Laws* of a country are necessarily connected with every thing belonging
to the people of it: so that a thorough knowledge of *them*, and of their pro-
gress would inform us of every thing that was most useful to be known about
them; and one of the greatest imperfections of historians in general, is owing
to their ignorance of law."

*Priestley's Lect. on Hist. vol.* 1, *pa.* 149.

---

## PHILADELPHIA:

PUBLISHED FOR THE EDITOR, BY THOMAS DESILVER, No. 253,
MARKET STREET.

*William Brown, Printer.*

1823.

Brewer Exs. Page 359
Digitized by Google

340

*after the passing thereof.*

═══

# CHAP. IV.

## *An act for regulating the militia of this Commonwealth.*

### (Passed December the 22d, 1792.)

Preamble.

SECT. 1. WHEREAS the Congress of the United States did at their last session pass an act, intituled, " An act more effectually to provide for the national defence, by establishing an uniform militia throughout the United States ;" and it is expedient for this legislature to carry the same into effect, so far as it respects this state:

Arrangement of the militia in brigades and divisions;
(a) See also the 16 § of the 1 Chap. of the acts of 93.

SECT. 2. (a) *Be it therefore enacted,* That the counties of Accomack, Northampton, Princess-Anne, and Norfolk, shall compose one brigade; the counties of Nansemond, Isle of Wight, Southampton, Surry, Sussex, and Prince-George, one brigade; the counties of Elizabeth City, Warwick, York, James City, Charles City, New-Kent, Henrico, and Hanover, one brigade; the counties of Gloucester, Mathews, Middlesex, Essex, King William, King and Queen, Lancaster, Northumberland, Richmond, and Westmoreland, one brigade: and the said brigades shall compose one division. That the counties of Loudoun and Fairfax shall compose one brigade; the counties of Fauquier, Prince William, Stafford, and King George, one brigade; the counties of Culpeper, Orange, Spotsylvania, and Caroline, one brigade; the counties of Louisa, Goochland, Fluvanna, Albemarle, and Amherst, one brigade: and the said brigades shall compose another division. The counties of Frederick and Berkeley, shall compose one brigade; the counties of Rockingham, Au-

Digitized by Google

gusta, and Shenandoah, one brigade; the counties of Wythe, Russel, Washington, Lee, Grayson, and Montgomery, one brigade; the counties of Botetourt, Rockbridge, Greenbrier, Bath, and Kanawha, one brigade; the counties of Hampshire, Hardy, Pendleton, Randolph, Harrison, Monongalia, and Ohio, one brigade; and the said brigades shall compose another division.   The counties of Henry, Patrick, Franklin, Campbell, and Bedford, shall compose one brigade; the counties of Pittsylvania, Halifax, Charlotte, and Prince Edward, one brigade; the counties of Dinwiddie, Greensville, Brunswick, Lunenburg, and Mecklenburg, one brigade; the counties of Chesterfield, Amelia, Nottoway, Powhatan, Cumberland, and Buckingham, one brigade; and the said brigades shall compose another division.

SECT. 3. *And be it further enacted*, That the counties In regiments of Berkeley, Culpeper, Loudoun, and Frederick, shall and battalions. compose two regiments, and four battalions each; that the counties of Middlesex and Essex, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of King & Queen and King William, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of Northumberland and Lancaster, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of Richmond and Westmoreland, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of Powhatan and Cumberland, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of Harrison and Randolph, shall each compose one battalion, which two battalions shall compose one regiment; that the counties of Russell and Lee, shall each compose one battalion, which two battalions shall compose one regiment; and the counties of Charles City and New-Kent, shall compose each one battalion, which two battalions shall constitute one regiment; the counties of Elizabeth City and Warwick, one battalion, and the counties of York and James City, one battalion, which two battalions shall compose one regiment; and each of the other counties in this Commonwealth, and also the city of Richmond, and borough of Norfolk, shall compose each one regiment and two battalions.

SECT. 4. *And be it further enacted*, That the General Officers, how

*to be appoint-ed.* Assembly shall by joint ballot of both houses, appoint an adjutant-general for the militia of this state, and also a major-general to each division, and a brigadier-general to each brigade; which major-generals and brigadiers, shall reside within the limits of their respective commands. Each major-general shall appoint his own aids de camp, and each brigadier-general his own brigade inspector, who shall also reside within the limits of their respective divisions and brigades.

*Officers to be recommended by grades.* Sect. 5. *And be it enacted*, That the courts of the several counties and corporations, shall from the field and other officers who at present hold commissions in the militia of the respective counties and corporations, proceed to recommend to the executive, the officers necessary to complete the regiments and battalions and companies, pursuant to this act, by grades and seniority; and the persons so recommended, shall be commissioned by the governor, agreeable to the constitution of this state.

*Officers not recommended by the county courts to become supernumeraries.* Sect. VI. All persons holding commissions under the late militia laws of this state, and who shall not be recommended by their respective courts, shall be considered as supernumerary officers, and may be recommended by the respective county and corporation courts to supply vacancies hereafter happening in the officers of the militia.

*Commissioned officers to meet twice in every year to be trained.* Sect. 7. And whereas it will be productive of considerable advantages to the disciplining the militia, to have frequent meetings of the commissioned officers of the several regiments and battalions: *Be it enacted*, That the commissioned officers of the several regiments and battalions shall meet twice in every year, for the purpose of being trained and instructed by the brigade inspector. The days and places of meeting to be fixed on by the commanding officer of the brigade to which the regiments and battalions belong. The officers thus assembled, shall each continue two days and no longer, for every time they shall be called out. Every officer failing to attend such meeting on being summoned (not having a reasonable excuse, to be adjudged of by a court-martial) shall forfeit and pay five dollars, to be appropriated as the other fines are by this act directed.

*Divisions, brigades and regiments to be numbered and* Sect. 8. It shall be the duty of the executive to number by ballot the several divisions, brigades and regiments, and cause the same to be registered in the office

of the adjutant-general; and every commission hereafter registered in issued by the executive, shall express the number of the division, brigade or regiment respectively, to which the person to whom the same is directed shall belong.

*the adjutant-general's office.*

SECT. 9. *And be it further enacted,* That the commanding officers of regiments, battalions, and companies, to be appointed and commissioned by virtue of this act, shall meet at their respective courthouses on some day in the month of March or April next, to be appointed by the commanding officers of regiments, then and there to divide their respective counties into districts for the purpose of forming the regiments, battalions, and companies, by this act established; which districts so laid off shall be designated by certain lines and bounds to be established by them, and recorded by the clerks of the courts-martial respectively, herein-after to be appointed.

*Counties to be divided into districts for forming regiments, battalions and companies.*

SECT. 10. *And be it further enacted,* That it shall be the duty of the commanding officers of each company so inrolled, to proceed forthwith to divide his company into divisions by ballot from one to ten, for the purpose of a regular rotine of duty when called into actual service, and shall return a roster of each division and its number in rotation, within fifteen days, to the commanding officer of his battalion, who shall forthwith transmit the same to the commanding officer of the regiment, who shall order the same to be recorded by the clerk of the court-martial.   The same regulations shall be observed by every commanding officer of a company, battalion, and regiment on the subsequent inrollment of any person therein, unless such person shall produce a certificate of his having been before draughted for the above purpose, in which case he shall be inrolled accordingly.

*Companies to be divided into divisions.*

SECT. 11. *And be it further enacted,* That the members of the council of state; judges of the superior courts; speakers and clerks of both houses of the General Assembly; the clerks of the superior and inferior courts; the attorney-general; the treasurer and his clerks; the auditor of public accounts and his clerks; clerks of the council of state; the register of the land-office and his clerks; all inspectors of tobacco; all professors and tutors and students at the college of William & Mary, and other public seminaries of learning; all ministers of the gospel licensed to preach according to the rules of their sect, who shall have previously taken before the court of their county an oath of fidelity to the Commonwealth;

*Persons exempted from militia duty.*

keepers of the public, district, and county jails, and of the public hospital; millers; and all quakers and menonists religiously scrupulous of bearing arms, and having a certificate from their respective societies, according to the rules thereof, of their being members of such society, shall be, and they are hereby exempted from the duties required by this act.

SECT. 12. And whereas it will be of great utility and advantage in establishing a well disciplined militia, to annex to each battalion a light company to be formed of young men from eighteen to twenty-five years of age, whose activity and domestic circumstances will admit of a frequency of training, not practicable or convenient for . the militia in general, and returning to the main body on their arrival at the latter period, will be constantly giving thereto a military pride and experience, from which the best of consequences will result.

**A company of grenadiers, light infantry, or riflemen, to be annexed to each battalion.** SECT. 13. *Be it enacted*, That the governor with the advice of council, shall issue commissions for a captain, lieutenant and ensign to each battalion out of the present commissioned officers therein; and the said companies shall be distinguished by the denomination of grenadiers, light-infantry or riflemen, at the discretion of the commanding officer of the battalion. Every person belonging to the said light companies, shall wear while on duty, such caps and uniforms as the executive shall direct, to be purchased by the commanding officer of the battalion, out of the monies arising on delinquents. The captain thereof shall after qualifying as is directed for other officers, proceed to enlist by voluntary enlistments in his company, a sufficient number of young men as before described. And as the men of such light company shall from time to time arrive at the age of twenty-five years, the captain shall make report thereof to the commanding officer of the battalion, who shall order them to be inrolled in the company, whose districts they may respectively live in, and deficiencies shall be supplied by new enlistments, and the said companies shall in all respects be subject to the same regulations and orders as the rest of the militia.

**A company of cavalry and a company of artillery, to be annexed to each division.** SECT. 14. *And be it further enacted*, That the governor with the advice of council, shall and he is hereby empowered, to appoint and commission at their own discretion, at least one captain and two lieutenants in each division, who are hereby authorised and empowered to

enlist by voluntary enlistment, and in such proportion to each officer respectively so appointed as the executive shall direct, a company, to be denominated the company of artillery. In like manner commissions shall issue for at least one captain, two lieutenants, and one cornet, who shall also by voluntary enlistments, and in the same proportions to their respective ranks, enlist a company, to be denominated the company of cavalry. *Provided*, that the number of companies of artillery and of cavalry, shall not exceed one for each brigade. Proviso.

SECT. 15. *And be it further enacted*, That each and every officer appointed and commissioned by virtue of this act, shall previous to their entering on the execution of their respective offices, take the following oath:—" I " — do swear that I will be faithful and true to the " Commonwealth of Virginia, of which I profess myself " to be a citizen, and that I will faithfully and justly ex-" ecute the office of a                in the " regiment of the              militia of Virginia, accord-" ing to the best of my skill and judgment: So help me " God." Oaths of Officers.

SECT. 16. The adjutant-general shall have full power and authority to convene the brigade majors and inspectors, at such times and places as the good of the service may require, and he shall think proper, and generally to establish such rules and regulations for conducting the business of his department, as he may think expedient and necessary. Any brigade major or inspector, failing to attend such meeting, when duly notified thereof, not having a reasonable excuse for such failure, shall forfeit and pay fifty dollars, to be appropriated as the other fines are directed by this act. Adjutant-general may convene brigade-majors, and inspectors.

SECT. 17. There shall be a private muster of each company of grenadiers, light-infantry, riflemen, artillery, and cavalry, once in every two months, except in the months of December, January and February, in every year, and every other company, formed by virtue of this act, once in three months, (except as before is herein excepted) to be appointed by the commanding officer thereof, at or as near as may be to the centre of his company district. There shall be a muster of each battalion in the month of May, in every year, to be appointed by the commanding officers of the regiments to which such battalions respectively belong, at, or as near as may be to Musters of the companies ; Of the battalions ;

VOL. XIII.—X x

**346**                      **LAWS OF VIRGINIA.**

Of the regiments ;

the centre of the battalion, and a muster of each regiment in the month of October in every year, to be appointed by the brigadier general or commanding officer of the brigade, to which such regiment belongs, at, or as near as may be, to the centre of the regimental district ; which said company, battalion, and regimental musters shall continue one day each, and no longer.   Of the times and places of the said musters the brigadier generals or commanding officers of brigades for the time being, shall

Notices of them, by whom and how to be given.

cause notice to be given to the commanding officers of regiments; the commanding officers of regiments shall give notice of the regimental and battalion musters to the commanding officers of battalions; the commanding officers of battalions shall give notice of the regimental and battalion musters, to the captains or commanding officers of the companies; and the captains or commanding officers of companies shall give notice of the regimental battalion and private musters, to every person of their respective companies; and to that end the commanding officers of companies shall have power to order so many of their serjeants as they shall think fit to give such notice, which may be done by personal summons by the said commanding officer, or serjeant so ordered, or by either of them leaving notice in writing at the usual place of abode of the person so to be notified.   The notice to be given by the commanding officers of brigades, regiments and battalions, shall be in writing delivered in person, or left at the usual place of abode of each person to be notified, either by such commanding officers themselves, or by such officer or officers of their respective commands, as they may think fit to order.   The said notices shall be given by the commanding officers of the brigade to the commanding officers of regiments, at least thirty days; by the commanding officers of regiments to the commanding officers of battalions, at least fifteen days; by the commanding officers of battalions to the commanding officers of companies, at least ten days; and by the commanding officers of companies to each person in their companies at least five days before such regimental, battalion, or private musters, (as the case may

Penalties on officers, and serjeants failing to give the notices;

be) shall be appointed to be had.   Any officer ordered as aforesaid to give such notices, and failing therein, shall for every offence forfeit and pay twenty dollars: And every serjeant so failing shall forfeit and pay three dollars for every such failure, to be recovered as other fines

hereafter to be established.  Every officer and soldier shall appear at his respective muster field on the day appointed by eleven o'clock in the forenoon.  At every muster, each captain or commanding officer of a company shall call his roll, examine every person belonging thereto, and note down all delinquencies occurring therein, and make return thereof at the next regimental or battalion muster to the commanding officer of his battalion, including those which may occur on that day. And every commanding officer of a battalion, shall at their regimental or battalion musters (as the case may be) in like manner call his roll, examine and note down all delinquencies in his battalion, and make return thereof, together with those reported from commanding officers of companies, to the commanding officer of the regiment to which he belongs, on the day next succeeding such regimental or battalion musters, (as the case may be) who shall lay the whole before the court hereafter appointed to take cognizance of, and determine on them; *Provided*, that the commanding officer of a battalion shall not be obliged to extend his roll call, or individual examination, beyond the officers, unless he shall observe some apparent necessity therefor; and to each of the said returns shall be annexed the following certificate, to wit: " I            do certify that the returns " hereunto annexed, contain all the delinquencies which " have occurred in my company since my last return, " having examined the same as the law directs."  And to the battalion returns shall be added, " and that the " reports which accompany them, are all which have " been made by the commanding officers of battalions."

*Rolls to be called, and delinquencies noted.*

*Form of return of delinquencies.*

SECT. 18.  Every captain or commanding officer of a company, shall within ten days after every regimental and battalion muster, make up and report to the commanding officer of his battalion, a return of his company, in such manner and form as shall be furnished by the proper officer from time to time.  It shall be the duty of the commanding officers of battalions to make like returns to the commanding officers of regiments in ten days after such regimental or battalion musters, who shall cause the adjutant of his regiment to make like returns thereof to their respective brigade inspectors within thirty days thereafter.

*Returns of companies;*

*Of battalions;*

*Of regiments;*

SECT. 19.  Each captain or commanding officer of a company, shall appoint to his company four serjeants,

*Drummer and fifer to be appointed to*

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14185   Page 77 of 199

each company.

four corporals, a drummer and fifer, to be approved of by the commanding officer of his battalion, and all vacancies, which may thereafter happen, shall be filled up by appointments in like manner.

The officer next in rank to take command, in the absence of his superior.

SECT. 20. In all cases of death, absence or resignation, of any lieutenant colonel commandant, major, or captain, the next officer in rank in his respective command, shall be considered as the commanding officer during such vacancy, and liable to perform the duties required by this act, and for neglect therein, shall incur the penalties annexed thereto.

Militia to be exercised.

SECT. 21. It shall be the duty of every commander of a regiment, battalion, or company, at every of their respective musters, to cause the militia to be exercised and trained agreeable to the mode of discipline prescribed by Congress, under pain of being arrested and tried for breach of their duty, and for this purpose the said officers are hereby authorised to order the most expert and fit officer in their respective commands, to perform that duty.

Officers to be furnished with printed copies of the rules of discipline.

SECT. 22. And to the end that a general knowledge of the rules of discipline established by Congress in their resolution of the twenty-ninth day of March, one thousand seven hundred and seventy-nine, may be diffused, the executive is hereby authorised and required, to procure and have a sufficient number of copies of the said rules printed and bound in boards, to afford to every commissioned officer of the militia, one ; and to cause them to be delivered to the commanding officers of brigades, to be by them duly distributed without delay; and upon the death, resignation, or removal of any officer, as aforesaid, the plan delivered him shall revert to the public, and the commanding officer of the battalion in which such vacancy shall occur, shall deliver the same to a new appointed officer, who may not have received one, and for defraying the necessary expense thereof, the executive shall draw on the contingent fund.

Officers may be arrested for misbehaviour.

SECT. 23. Any officer who shall be guilty of disobedience, or other misbehaviour when on duty, or shall at any time be guilty of any conduct unbecoming the character of an officer, shall be put under arrest by his commanding officer, and tried as hereafter shall be directed.

Non-commissioned officers and soldiers may be confined or bound

SECT. 24. If any non-commissioned officer, or soldier, shall behave himself disobediently or mutinously, when on duty, or before any court, or board directed by this act to be held, the commanding officer, court, or board,

may confine him for the day, or cause him to be bound neck and heels for any time not exceeding five minutes.

SECT. 25. If any bystander shall interrupt, molest, or insult any officer or soldier while on duty at any muster, or shall be guilty of like conduct before any court or board as aforesaid, the commanding officer, or such court or board, may cause him to be confined for the day.

SECT. 26. The commanding officers of regiments shall cause to be purchased, out of the money arising from the fines, a set of colours for his regiment, and also a set of colours for each battalion in his regiment. He shall also procure in like manner, for each company in his regiment, a drum and fife, or bugle-horn, and on the colours and drums shall be marked the number of the regiment and battalion, together with the name of the county to which they belong.

SECT. 27. *And be it further enacted,* That the governor, with the advice of council, be authorised and empowered, on any invasion or insurrection, or probable prospect thereof, to call forth such a number of militia, and from such counties as they may deem proper; and for the accommodation, equipment, and support of the militia, so at any time to be called forth, the governor, with the advice aforesaid, may appoint such quarter-masters, commissaries, and other staff, as to them shall seem proper, and to fix their pay and allowances, and shall also take such measures for procuring, transporting, and issuing all stores which may be necessary, as to them shall seem best. Orders for the militia to be called forth, as aforesaid, shall be sent to the commanding officers of brigades, with a notification of the place or places of rendezvous, who shall immediately take measures for detaching the same, with the necessary number, and ranks of officers by detail and rotation of duty.

SECT. 28. The lieutenant colonel commandant, or commanding officers of regiments from which such detachments are drawn, shall cause to be procured by impressment or otherwise, for each company, a waggon, team, and driver, six axes, and six camp-kettles, or pots of convenient size, all which shall be delivered to the commanding officer of the company, who shall be accountable for returning the same when his tour is over, and the articles aforesaid shall be returned to the owners, who shall be allowed for the use of the same, whatever shall be adjudged by the court herein-after appointed for

*Sidenotes:*
neck and heels for disobedience or mutiny.
Bystanders may be confined for molesting any officer or soldier on duty.
Colours to be procured;
Drums and fifes, or bugle horns.
Militia to be called forth in case of invasion or insurrection.
Each company to be furnished with a waggon, team, &c. by impressment or otherwise.

Digitized by Google

350                          LAWS OF VIRGINIA.

<div style="float:left; width:25%">

Articles impressed to be valued,



and the owners paid therefor if lost;


Officers answerable to the public, if lost through neglect.






Executive to appoint officers when necessary.







Commanding officer in a county may order out militia in invasions or insurrections.











Militia in service to be governed by the articles of war of the United States.

</div>

enquiring into delinquencies: And to the end that if any article impressed be lost, the owner may be paid for the same, the lieutenant colonel commandant, or commanding officer, shall cause all property by him impressed by virtue of this act, to be valued by two or more freeholders on oath, before the same shall be sent away; and upon proof being made of any article being lost, the valuation thereof shall be allowed, without any allowance for the use, and the said allowance shall be certified to the auditor of public accounts. The said court shall make enquiry into the cause of such loss, and if it shall appear that the said loss was occasioned by the misconduct or inattention of any officer, the lieutenant colonel commandant, or commanding officer, is hereby authorised and required to prosecute a suit against such officer for the recovery of damages for the use of the Commonwealth.

SECT. 29. If it shall appear to the executive, upon calling forth the militia as aforesaid, that the necessary number and ranks of officers will not attend the detachments for officering them at the places of rendezvous, the governor, with the advice of council, is hereby authorised to appoint such officers as may be necessary from the counties called upon, as they may think proper, to join the detachment so raised.

SECT. 30. If a sudden invasion shall be made into any county in this Commonwealth, or in case of an insurrection in any county, the commanding officer in such county is hereby authorised and required, to order out the whole or such part of his militia as he may think necessary, and in such manner as he may think best, for repelling or suppressing such insurrection, and shall call on the commanding officers of regiments in the adjacent counties, for such aid as he may think necessary, who shall forthwith in like manner furnish the same; and for assembling the militia required upon such occasions, or by orders of the executive, the same measures shall be taken to summon them as is directed in the case of musters.

SECT. 31. Whenever any militia shall be called forth into actual service as aforesaid, they shall be governed by the articles of war which govern the troops of the United States. And courts-martial shall be held as are therein directed, to be composed of militia officers only, for the trial of any person in the militia; but to the cashiering of any officer, or capital punishment of any person, the approbation of the executive shall be necessary;

and when any militia shall be in actual service, they shall be allowed the same pay and rations as are allow- **Their pay and** ed by the Congress of the United States to the troops in **rations ;** the service of the United States.

SECT. 32. *And be it further enacted,* That the com- **Patrollers to** manding officer of every battalion of militia, shall from **be appointed ;** time to time, as he shall deem it necessary, appoint an officer, and so many men of the militia as to him shall seem necessary, not exceeding four, once in every month, or oftener if thereto required by such officer, to patrole and visit all negro quarters and other places suspected of **Their duty ;** entertaining unlawful assemblies of slaves, servants, or other disorderly persons, as aforesaid, unlawfully assembled, or any others strolling about from one plantation to another, without a pass from his or her master, mistress, or owner, and carry them before the next justice of the peace, who, if he shall see cause, is hereby required to order every such slave, servant, stroller, or other disorderly person as aforesaid, to receive any number of lashes, not exceeding twenty, on his or her bare back ; and in case one company of patrollers shall not be sufficient, more companies may in like manner be ordered for the same service. And after every patrole, the officer of every party shall return to the captain of the company to which he belongs, a report in writing upon oath (which oath such captain is hereby empowered to administer) of the names of those of his party who were upon duty, and of the proceedings of such patrole; and such captain shall once in every month deliver such patrole *re-* turns to the commanding officer of his battalion, by whom they shall be certified and laid before the next court-martial; and if they shall adjudge the patrollers to have performed their duty according to law, the said court shall certify the same to the county court, who are thereupon empowered and required to levy fifty cents for every twelve hours each of them shall so patrole; and **Their pay ;** every commanding officer failing to appoint patrollers according to the directions of this act, shall forfeit and pay thirty dollars; and every person appointed to patrole, failing to do his duty, shall forfeit and pay three dollars for **Penalty for** every such failure; which fines, shall be laid, collected, **failing to do** accounted for, and appropriated as is herein directed for **their duty ;** laying, accounting for, and appropriating the several fines and penalties by this act directed.

Digitized by Google

Courts-martial to be held for the trial of officers;

SECT. 33. *And whereas* it is necessary that certain tribunals be instituted for the trial of offences as they are to be viewed in a military light, as well as for enquiring into delinquencies and assessing fines thereon: *Be it therefore enacted*, That the governor shall have power to arrest the major generals and all other officers for any misconduct whatever, and upon trial and conviction, may censure or cashier them; a lieutenant colonel commandant

Officers, by whom to be arrested.

may arrest any officer under his command, and report him to the governor for trial, or at the option of such lieutenant colonel commandant, a general court-martial, to consist of thirteen officers, may by his order be held within the limits of his regimental district, for trial of such as shall be under the rank of a field officer. The president of the said court shall be a field officer, and six at least of the members shall be captains, and where there is not a sufficient number of officers in any regiment to constitute a court where the arrest is made, the commanding officer of the regiment may call upon the commanding officer of any adjacent regiment, to order as many officers from such regiment as will be sufficient to make a court, and such court may, on conviction, censure or cashier any officer so tried, and their sentence

Appeals may be made from the sentence of a court-martial to the executive;

shall be final; saving to such officer an appeal to the executive, if he shall think proper, in which case the commanding officer shall furnish him with a copy of the proceedings of the said court. Any non-commissioned officer, or soldier, offending, shall be tried by a like general court martial, and may, on conviction, be censured or fined at the discretion of the court. For obtaining the

Evidence, how to be procured.

necessary evidence for the trials aforesaid, the governor or the commanding officer of the regiment (as the case may be) shall issue his summons, and any person so summoned failing to attend, shall forfeit and pay, upon a summons from the governor, thirty dollars, and upon a summons from the commanding officer of a regiment, fifteen dollars; to be reported by the commanding officer, amongst other delinquencies, to the court aforesaid.

Courts for assessment of fines, when and where to be held;

SECT. 34. *And be it further enacted*, That the commanding officers of regiments shall, on some day in the months of May and October, not exceeding fifteen, nor less than ten days after their regimental and battalion musters, order the commanding officers of battalions and of companies, to meet at the places where their last battalion musters respectively were held, a majority of

whom shall form a court of enquiry and assessment of
fines, and it shall be the duty of the lieutenant colonel
commandant to preside at such boards, and in case of his
absence by sickness or otherwise, the next officer in rank
shall preside.  The said court shall take the following
oath, to be administered by the senior officer present, and
afterwards by any other officer of the said board to him,
to wit: " I                     do swear, that I will truly
" and faithfully, enquire into all delinquencies which ap-
" pear on the returns to be laid before me, and will assess
" the fines thereon as shall seem just, without favor, par-
" tiality, or affection; So help me GOD."  The lieu-
tenant colonel commandant shall then lay before the said
court all delinquencies, as directed by this act, where-
upon they shall proceed to hear and determine on them.

SECT. 35.  All fines to be assessed by virtue of this act, *Fines to be*
shall be collected by the sheriff of the county, upon a *collected by*
list thereof certified by the clerk of the said court, and *the sheriffs;*
delivered to the sheriff, on or before the first day of Ja-
nuary, in every year, who shall give his receipt therefor,
and account for the same to the lieutenant colonel com-
mandant, or his successor, and be allowed the same com-
missions as for other public monies, on or before the first
day of November in the same year; and on failure, the
commanding officer, or his successor, shall, on ten days
previous notice, obtain judgment for the same in the
county or corporation court with costs; and should any
person so charged with fines, fail to make payment on or *by distress,*
before the first day of May, in any year, the sheriff is *when neces-*
hereby authorised to make distress and sale therefor, in *sary;*
the same manner as is directed in the collection of the
taxes.

SECT. 36.  The commanding officer of every regiment *Officers to*
shall on or before the thirty-first day of December, in *render ac-*
every year, render to the executive an account upon oath *counts of fines*
of all monies which have come into his hands by virtue *received.*
of his office, and of his disbursements; and if there shall
remain any money in his hands, the same shall be paid
into the treasury in aid of the contingent fund.

SECT. 37.  And for enforcing obedience to this act, *Be* *Fines to be*
*it enacted*, That the following forfeitures and penalties *paid for de-*
shall be incurred for delinquencies, viz.  By a lieutenant- *linquencies;*
colonel commandant, or commanding officer of a regi- *By a com-*
ment, for failing to take any oath, to summon any court *manding offi-*
or board, to attend any court or board, to transmit any *cer of a regi-* *ment;*

VOL. XIII.—Y y  .

recommendation of an officer or officers to the governor, to deliver any commission or commissions, to appoint a regimental or battalion muster, to report delinquencies, to make returns of his regiment as by this act directed, shall for each and every such offence or neglect, forfeit and pay seventy dollars; failing to send into actual service any militia legally called for, or to turn out his militia upon any invasion or insurrection of his county, two hundred dollars. By a major for failing to take any oath, to attend any court or board, to give notice of any regimental or battalion muster, to examine his battalion, to report delinquencies, or to make any return as directed by this act, he shall forfeit and pay for each and every offence or neglect, thirty dollars; failing to call forth from his battalion with due dispatch, any detachment of men and officers, as shall be required from time to time by the commanding officer, or any call from the governor, invasion of or insurrection in his county, or requisition from any neighbouring county, eighty dollars.   By a captain for failing to take an oath, to attend any court, to inroll his company, to appoint private musters, to give notice of a regimental or battalion muster, to attend any muster armed, to call his roll, examine his company and report delinquencies, to make any return as directed by this act, he shall forfeit and pay for each and every such offence and neglect, twenty dollars; failing to call forth such officers and men as shall from time to time be legally called from his company, upon any call from the governor, invasion of, or insurrection in the county, or requisition from an adjacent county, or failing on any such occasion to repair to the place of rendezvous, he shall forfeit and pay forty dollars.   By a subaltern officer for failing to take any oath, to attend any court, or muster armed as directed, for each and every such offence he shall forfeit and pay ten dollars; failing to repair to the place of rendezvous, armed as required, when ordered upon any call from the governor, invasion of, or insurrection in the county, or requisition from a neighbouring county, he shall forfeit and pay twenty dollars: And moreover the said officers, for any of the said offences, shall be liable to be arrested and tried for the same as military offenders. By a non-commissioned officer or soldier, for failing to attend at any muster, armed and equipped as directed by law, fifty cents; failing to repair to his rendezvous when ordered, upon any call from the governor, invasion of, or

*By a major;*

*By a captain;*

*By a subaltern;*

*By a non-commissioned officer or private.*

insurrection in the county, or requisition from a neighbouring county, he shall forfeit and pay ten dollars.

SECT. 38. All arms, ammunition, and equipments of the militia, shall be exempted from executions and distresses at all times, and their persons from arrests in civil cases, while going to, continuing at, or returning from musters, and while in actual service.

*Arms, &c. of militia exempted from executions, distresses, &c. and their persons from arrests, at musters and in service.*

SECT. 39. The commanding officers of regiments shall on the day of his regimental muster first to be held under this act, his muster being over, order the majors and captains of his regiment to assemble at some convenient place, at or near the muster-ground, and then and there appoint by ballot a clerk and provost martial, who shall attend the courts or boards herein before directed to be held; such clerk shall keep a fair record of the proceedings of such courts or boards, as also of the roster returned by the several captains or commanding officers of companies for regular rotine of duty, and all other duties required by this act; and together with the provost martial, receive such allowance, to be paid out of the fines arising from delinquencies, as the court or board shall think reasonable.

SECT. 40. The militia of the city of Williamsburg, city of Richmond, and borough of Norfolk, shall have their officers appointed, and be under the same rules and regulations as the different counties.

*Richmond, Williamsburg, and Norfolk militia to be under the like regulations as the militia of the counties.*

SECT. 41. The commanding officers of regiments are hereby empowered to receive the commission of any officer in his regiment, who may think proper to resign, and shall notify such resignation to the next succeeding court, in order that such vacancy may be supplied.

SECT. 42. Any court martial may for good cause shewn, remit any fines imposed by a former court martial, provided that not more than two courts martial shall have intervened between such imposition and application for remission.

*Courts martial may remit fines;*

SECT. 43. Courts martial may exempt any militia man from duty on account of bodily infirmity, and may again direct such persons to be inrolled when able to do duty.

*And exempt persons from militia duty for bodily infirmities.*

SECT. 44. For the trial and punishment of the adjutant general, major generals, and brigadier generals, *Be it enacted,* That any major general or brigadier general offending under this act, shall be arrested and tried in the following manner, viz. A major general shall be arrested by the commander in chief of the state upon any

*Courts martial for the trial of general officers.*

## LAWS OF VIRGINIA.

misconduct of his own knowledge, or upon complaint lodged in writing by any commissioned officer, who shall thereupon order a general court martial, to consist if convenient of the remaining major generals, the brigadier generals of the division, over which such major general is appointed, or as many of them as can conveniently attend, and as many lieutenant colonel commandants and majors, as shall make up the number of thirteen in the whole, who shall constitute a court martial for the trial of such offenders. Any brigadier general may in like manner be arrested for any offence committed under this act, by the commander in chief of the state, or by the major general of the division to which he belongs, and tried by a court martial, to consist of one major general, and not more than four brigadiers, and as many lieutenant colonel commandants, majors, and captains, as will be sufficient to constitute a court, to consist of thirteen members in the whole, which courts shall proceed to hear and determine all such offences, and give judgment according to the right of the case, to be approved or disapproved by the commanding officer of the state.

*By whom they may be arrested.*

SECT. 45. *And be it further enacted,* That the adjutant general shall be allowed four hundred dollars per year; and that each brigade inspector shall be allowed one hundred and fifty dollars per year, for the duties herein required of them, to be paid by the treasurer, on warrant from the auditor, who is hereby authorised and required to grant the same quarter yearly, on proper application being made.

*Salaries of the adjutant general and brigade inspectors.*

SECT. 46. This act shall commence and be in force from and after the passing thereof.

THE

# Statutes at Large;

### BEING

## A COLLECTION

#### OF ALL THE

# LAWS OF VIRGINIA,

#### FROM THE

### FIRST SESSION OF THE LEGISLATURE,

#### IN THE YEAR 1619.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY
OF VIRGINIA, PASSED ON THE FIFTH DAY OF FEBRUARY,
ONE THOUSAND EIGHT HUNDRED AND EIGHT.

### VOLUME XII.

## By WILLIAM WALLER HENING.

"The *Laws* of a country are necessarily connected with every thing be-
longing to the people of it: so that a thorough knowledge of *them*, and
of their progress would inform us of every thing that was most use-
ful to be known about them; and one of the greatest imperfections
of historians in general, is owing to their ignorance of law "
PRIESTLEY'S LECT. ON HIST. VOL. I. pa. 149.

### RICHMOND:

*PRINTED FOR THE EDITOR,*

By GEORGE COCHRAN.

::::::::::::

1823.

Checked
by 1913

Digitized by Google

AT A

# GENERAL ASSEMBLY

### BEGUN AND HELD

At the Public Buildings in the City of Richmond, on Monday the seventeenth day of October in the year of our Lord one thousand seven hundred and eighty-five, and in the tenth year of the commonwealth.*

Patrick Henry, esq. governor.

## CHAP. I.

*An act to amend and reduce into one act, the several laws for regulating and disciplining the militia, and guarding against invasions and insurrections.*

1. WHEREAS the defence and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty, and the different laws heretofore enacted being found inadequate to such purposes, and in order that the same may be formed into one plain and regular system;

Preamble.

---

\* From the adoption of the constitution, until the present session, there had never been less than two sessions of the General Assembly, in each year, sometimes more, according to the exigenies of the government. By an act of May 1784, chap. XX. (See Vol. 11, p. 387) the meeting of the General assembly was fixed for the third Monday in October, annually.—Ever since that period, the sessions have been annual, except, in a few instances, when the assembly has been convened, for special purposes, under the tenth article of the constitution.

VOL. XII. 								B

**Officers displaced by a former act restored.**

II. *Be it enacted by the General Assembly,* That the officers of the militia who were displaced and removed from office, by virtue of an act " For amending the several laws for regulating and disciplining the militia, and guarding against invasions and insurrections," are hereby reinstated, and shall take precedence of rank agreeable to the dates of the commissions they severally held prior to the passing of the said act; and vacancies supplied by appointment of the governor, with the advice of the privy council, or recommendation from the respective county courts.

**Vacancies how supplied**

**Militia men & exempts described.**

III. *And be it further enacted,* That all free male persons between the ages of eighteen and fifty years, except the members of the council of state, members of the American congress, judges of the superior courts, speakers of the two houses of assembly, treasurer, attorney-general, auditors and their clerks, solicitor-general and his clerks, clerks of the council of state, and treasury, register of the land-office, his deputy and clerks, custom-house officers, all inspectors of tobacco, all professors, and tutors at the University of William and Mary, and other public seminaries of learning, all ministers of the Gospel, licensed to preach according to the rules of their sect, who shall have previously taken before the court of their county, an oath of fidelity to the commonwealth, post-masters, keepers of the public gaol and public hospital, millers, persons concerned at iron or lead works, or persons solely employed in repairing or manufacturing fire-arms, all of whom are exempted from the obligations of this act, shall be inrolled or formed into companies, of three serjeants, three corporals, a drummer and fifer, and not less than forty, nor more than sixty-five, rank and file; and these companies shall again be formed into regiments of not more than one thousand, nor less than five hundred men, if there be so many in the county.   Each company shall be commanded by a captain, lieutenant, and an ensign; each regiment by a colonel, lieutenant-colonel, and major; and the whole by a county-lieutenant.   These officers shall be resident within their county; and before they enter on the execution of their respective offices, shall take the following oath: " I do swear that I will be faithful and true to the commonwealth of Virginia, of which I profess myself to be a citizen; and that I will faithfully and justly execute the

**Companies how to be formed.**

**Militia how to be officered.**

**Officers' oath.**

office of a                , in the militia of the county of                , according to the best of my skill and judgment. So help me God." There shall be a private muster of every company once in two months, except December and January, at such convenient time and place as the captain or next commanding officer shall appoint: a muster of each regiment on some day in the month of March or April, in every year, to be appointed by the commanding officer thereof, at a convenient place near the centre of the regiment; and a general muster of the whole on some day in the month of October or November, in every year, to be appointed by the county-lieutenant, or commanding officer, at a convenient place near the centre of the county: For the times and places of the said musters, the county-lieutenant or commanding officer for the time being, shall give notice to the commanding officers of regiments; for the general muster, the commanding officers of regiments shall give notice to the commanding officers of their respective companies of such general muster and of his regimental muster; and the commanding officers of companies shall give notice of the general, regimental, and private musters, to every person of their respective companies, and to that end the commanding officers of companies shall have power to order so many of their serjeants as they shall think fit, to give such notice, which may be done by personal summons by the said commanding officer, or serjeant so ordered, or by either of them, leaving notice in writing at the usual place of abode of the person to be summoned: The notices to be given by the commanding officer of the county, and commanding officers of regiments, shall be in writing, delivered in person, or left at the usual place of abode of each person, to be notified either by such commanding officers themselves, or by such officer or officers of their respective commands as they may think fit to order; the said notices shall be given by the commanding officer of the county, to the commanding officers of regiments at least thirty days; by the commanding officers of regiments at least fifteen days; and by the commanding officers of companies at least five days, before such general, regimental, or private musters (as the case may be) shall be appointed to be had. Any officer ordered as aforesaid to give such notices, failing therein, shall for every offence for-

*Marginal notes:*

Private muster.

Regimental muster.

General muster.

Notices of musters how and when to be given.

Penalties on failure to give notice.

Digitized by Google

feit and pay five pounds; and every serjeant so failing shall forfeit and pay one pound for every such failure; to be recovered as other fines hereafter to be established.

*Equipments of officers & soldiers.*

Every officer and soldier shall appear at his respective muster-field on the day appointed, by eleven o'clock in the forenoon, armed, equipped, and accoutred, as follows: The county-lieutenants, colonels, lieutenant-colonels, and majors, with a sword, the captains, lieutenants and ensigns, with a sword and espontoon, every non-commissioned officer end private with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel, with a good bayonet and iron ramrod well fitted thereto, a cartridge box properly made, to contain and secure twenty cartridges fitted to his musket, a good knapsack and canteen, and moreover, each non-commissioned officer and private shall have at every muster one pound of good powder, and four pounds of lead, including twenty blind cartridges; and each serjeant shall have a pair of moulds fit to cast balls for their respective companies, to be purchased by the commanding officer out of the monies arising on delinquencies.

*Exception as to those beyond the Blue Ridge.*

*Provided*, That the militia of the counties westward of the Blue Ridge, and the counties below adjoining thereto, shall not be obliged to be armed with muskets, but may have good rifles with proper accoutrements, in lieu thereof. And every of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for by his commanding officer. If any private shall make it appear to the satisfaction of the court hereafter to be appointed for trying delinquencies

*Poor privates how to be armed.*

under this act that he is so poor that he cannot purchase the arms herein required, such court shall cause them to be purchased out of the money arising from delinquents. The arms so purchased, shall by the commanding officer of the county, be delivered to the captain of the company to which such poor private may belong, who shall deliver such arms to the private, but they shall continue the property of the county; and if

*Penalty on him for selling, &c. his arms.*

any private shall sell or conceal the same, the seller, concealer, and purchaser, shall each forfeit and pay four pounds, to be recovered by the commanding officer in any court of record, on ten days notice. ☐ And on the death, disability, or exemption of such poor pri-

vate, or his removal out of the county, such arms shall be delivered to the commanding officer of the company, who shall make report thereof to the next court to be held, as aforesaid, and deliver the same to such other poor private, as they shall direct.    And if any poor private shall remove out of the county, and carry such arms with him, he shall incur the same penalty as if he had sold them.    And if any person concerned in selling, purchasing, concealing or removing such arms, shall be prosecuted for the penalty, and upon conviction, shall fail to make instant payment, or give security to pay the same in such time as the court shall deem reasonable, he shall suffer such punishment as the court before whom the recovery shall be made may think fit. And the lieutenant or commanding officer for the time being, of any county, may recover any arms so sold, concealed, or removed, by action or petition, in detinue or trover, with costs.    And to the end that such arms may be known, the commanding officer shall cause to be stamped or engraved on them, the name of the county, together with the number of the regiment to which they may belong.    At every muster, each captain or commanding officer of a company, shall call his roll, examine every person belonging thereto, and note down all delinquencies occurring therein, and make return thereof at the next regimental or general muster, to the colonel or commanding officer of his regiment, including those which may occur on that day.    Every colonel or commanding officer of a regiment, shall in like manner call his roll, examine and note down all delinquencies in his regiment, and make return thereof, together with those reported from commanding officers of companies, to the county lieutenant or commanding officer, within ten days after every general and regimental muster, who shall lay the whole, together with the delinquencies occurring to him on the like examination, before the court hereafter appointed to take cognizance of and determine on them; provided that the commanding officer of a county, or of a regiment, shall not be obliged to extend their roll calls, or individual examinations, beyond the officers, unless they observe some apparent necessity therefor.    And to each of the said returns shall be annexed the following certificate, to wit:  "I ———— do certify that the returns hereunto annexed, contain all delinquencies which have occurred

*Duty of officers at muster.*

14                LAWS OF VIRGINIA,

in the militia of my county, the ———— regiment, or ———— company of ———— regiment (as the case may be) since the last return, having examined the same as the law directs;" and to the county and regimental return shall be added "And that the reports which accompany them are all which have been made by the commanding officers of regiments or companies (as the case may be.")

**Duty of captains as to returns.** Every captain or commanding officer of a company shall, within ten days after every regimental and general muster, make up and report to the commanding officer of his regiment, a return of his company, including all arms, ammunition, and accoutrements, by this act directed, distinguishing effective and good, from non-effective and bad, noting therein such as have died, removed, been exempted, or added, and all persons within the bounds of his company not on his roll, who ought to be inrolled.

**Of the commanding officer of a regiment.** The commanding officer of each regiment shall, within fifteen days after every general muster, make the like return to the commanding officer of the county,

**Of a county.** who shall, within forty days thereafter, make the like return of the whole of his militia to the governor.

**Captains duty as to enrollments.** Each captain or commanding officer of a company, shall, within ten days after receiving his commission and qualifying, as aforesaid, inroll all persons within his district, directed by this act to be inrolled, and shall

**As to appointments.** appoint to his company, three serjeants, three corporals, a drummer and fifer, to be approved by the commanding officer of his regiment, and all vacancies which may thereafter happen, shall be filled up by appointments in like manner.

**Next officers duty on vacancy.** In all cases of death, absence, or resignation of any county-lieutenant, colonel, or captain, the next officer in rank in his respective command shall be considered as the commanding officer during the vacancy, and liable to perform the duties required by this act, and for neglect therein, shall incur the penalties annexed thereto.

**Establishment of a light company.** And whereas, it will be of great utility and advantage in establishing a well disciplined militia, to annex to each regiment a light company to be formed of young men, from eighteen to twenty-five years old, whose activity and domestic circumstances will admit of a frequency of training, and strictness of discipline, not practicable for the militia in general, and returning to the main body, on their arrival at the latter period, will be constantly giv-

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14201   Page 93 of 199

ing thereto a military pride and experience, from which the best of consequences will result:

IV. *Be it therefore enacted,* That the governer, with the advice of council, shall issue commissions for a captain, lieutenant, and ensign to each regiment, in the same manner as is herein directed in this act; and the said companies shall be distinguished by the following words, " *Light Company of*————*Regiment of*———— *Militia,*" filling up the blanks with the number of the regiment and name of the county. Every person belonging to the said light companies, shall wear while on duty, such caps and uniforms as the executive shall direct, to be purchased by the commanding officer of the county, out of the monies arising on delinquents. The captain thereof shall, after qualifying as is directed for other officers, proceed to enlist by voluntary enlistments, in his company, a sufficient number of young men, as before described, and shall have a private muster twice in every three months. And as the men of such light company shall from time to time arrive at the age of twenty-five years, the captain shall make report thereof to the county-lieutenant, who shall order them to be enrolled in the company whose districts they may respectively live in; and deficiencies shall be supplied by new enlistments. And the said companies shall in all respects be subject to the same regulations and orders as the rest of the militia.

V. *And be it further enacted,* That the plan of major-general Baron Steuben, established in congress by their act bearing date the twenty ninth day of March, one thousand seven hundred and seventy-nine, for forming and disciplining the troops of the United States, shall be the guide for the militia of this commonwealth. It shall be the duty of every commander of a county, regiment, and company, at every of their respective musters, to cause the militia to be exercised and trained agreeable to the said plan, under pain of being arrested and tried for breach of their duty; and for this purpose, the said officers are hereby authorized to order the most expert and fit officer in their respective companies, to perform that duty. And to the end, that a general knowledge thereof may be diffused, the executive is hereby authorized and required, to have a sufficient number of copies of the said plan printed and bound in boards, to afford to every commissioned offi-

*[marginal notes:]*

Steuben's discipline adopted.

Captains duty in training.

Steuben to be delivered to each commissioned officer

cer of the militia, one, and to deliver them to the commanders of counties to be by them distributed; and upon the death, resignation, or removal of any officer, the plan delivered him shall revert to the public; and the commanding officer for the time being, shall deliver the same to a new appointed officer who may not have received one; and for defraying the expence of so doing, shall draw on the contingent fund.

**Time for procuring arms.**

VI. *And be it further enacted,* That two years after the commencement of this act, shall be allowed for providing the arms and accoutrements herein directed; but in the mean time, the militia shall appear at musters with, and keep by them, the best arms and accoutrements they can get. Any officer who shall be guilty

**Officer when to be arrested.**

of disobedience, or other misbehaviour when on duty, or shall at any time be guilty of any conduct unbecoming the character of an officer, shall be put under an arrest by his commanding officer, and tried as hereafter shall be directed. If any non-commissioned officer

**Non-commissioned officer and soldier how to be punished.**

or soldier shall behave himself disobediently or mutinously when on duty, on, or before any court or board directed by this act to be held, the commanding officer, court, or board, may either confine him for the day, or cause him to be bound neck and heels for any time not exceeding five minutes. If any byestander shall

**By-stander how to be punished.**

interrupt, molest, or insult any officer or soldier while on duty at any muster, or shall be guilty of the like conduct before any court or board, as aforesaid, the commanding officer, or such court or board may cause him to be confined for the day. The lieutenant or

**Colours, &c. how to be procured.**

commanding officer of a county, shall cause to be purchased, out of the money arising from the fines, for every regiment in his county, the usual sets of colours, with such devices thereon as the executive shall direct; also a drum and fife for each company; and on the colours and drum shall be marked, the name of the county, with the number of the regiment and company to which they belong.

And whereas it is necessary that adequate powers be

**Executive empowered to call forth the militia.**

vested in the executive for calling forth the militia and resources of the state, in cases of invasion or insurrection, or upon any probable prospect of such invasion or insurrection:

**When.**

VII. *Be it further enacted,* That the governor with the advice of the council, be authorized and empowered,

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14203   Page 95 of 199

on any such invasion or insurrection, or probable prospect thereof, to call forth such a number of militia and, from such counties, as they may deem proper.    And for the accommodation, equipment, and support of the forces, so at any time to be called forth, the governor, with the advice aforesaid, may appoint such quartermasters, commissaries, and other staff, as to them shall seem proper, and to fix their pay and allowances, and shall also take such measures for procuring, transporting, and issuing all stores which may be necessary, as to them shall seem best.    Orders for the militia to be called forth, as aforesaid, shall be sent to the county lieutenant or commanding officer, with a notification of the place or places of rendezvous, who shall immediately take measures for detaching the same, with the necessary number and ranks of officers by detail and rotation of duty.  If such detachment shall amount to one-third of a regiment, he shall send one field officer with it; if two-thirds of a regiment, two field officers; and if more than two-thirds, three field officers.  The county lieutenant or commanding officer shall cause to be procured by impressment or otherwise, for each company, a waggon, team, and driver, six axes, and six camp-kettles or pots of convenient size, all which shall be delivered to the commanding officer of the company, who shall be accountable for returning the same when his tour is over: and the articles aforesaid shall be returned to the owners, who shall be allowed for the use of the same whatever may be adjudged by the court hereinafter appointed for enquiring into delinquencies.    And to the end, that if any article impressed, be lost, the owner may be paid for the same, the county lieutenant or commanding officer shall cause all property by him impressed by virtue of this act, to be valued by two or more disinterested freeholders, on oath, before the same shall be sent away: and upon proof being made to the said court of any article being lost, the valuation thereof shall be allowed, without any allowance for the use, and the said allowance shall be certified to the auditors of public accounts. The said court shall make enquiry into the cause of such loss, and if it shall appear that the said loss was occasioned by the misconduct or inattention of any officer, the county lieutenant or commanding officer is hereby authorized to prosecute a suit against such of-

*To appoint staff.*

*How to call forth.*

*County-lieutenant's duty in sending officers.*

*In impressments.*

*Hire to be paid for impressed articles.*

*Lost articles how to be paid for.*

Vol. XII.                    C

Digitized by Google

18                           LAWS OF VIRGINIA,

ficer for the recovery of damages for the use of the commonwealth. If it shall appear to the executive, upon calling forth the militia, as aforesaid, that the necessary number and ranks of officers will not attend the detachments for regimenting and officering them at the places of rendezvous, the governor, with advice of the council, is hereby authorized to appoint such field officers as may be necessary, from the counties called upon, as they may think proper, to join the forces so raised; and the senior officer shall arrange and command the whole, and appoint the usual regimental staff.

*Executive when to appoint field officers.*

And if a general officer, or officers, shall, in the opinion of the executive, be necessary, either on account of the number of troops or importance of the service, the governor, with advice of the council, shall appoint and commission, one or more brigadiers general, for the then existing occasion, who are hereby authorized to appoint, each, an aid-de-camp, brigade major, and brigade quarter-master.

*When to appoint a brigadier.*

If a sudden invasion shall be made into any county in this commonwealth, or in case of an insurrection in any county, the county lieutenant is hereby authorized and required to order out the whole, or such part of his militia as he may think necessary, and in such manner as he may think best for repelling or suppressing such invasion or insurrection; and shall call on the lieutenants or commanding officers of the adjacent counties, for such aid as he may think necessary, who shall forthwith in like manner furnish the same.

*County lieutenant's duty on invasion & insurrection.*

And for assembling the militia required upon such occasions, or by orders of the executive, the same measures shall be taken to summon them, as is directed in the case of musters. Whenever any militia shall be called forth into actual service, as aforesaid, they shall be governed by the articles of war which were last in force in the continental army during the last war; and courts-martial shall be held as are therein directed; but to the cashiering of any officer, or capital punishment of any person, the approbation of the executive shall be necessary.

*Militia in actual service, how to be governed.*

And whenever any militia shall be in actual service, they shall be allowed pay and rations, as follows, to commence from the time of rendezvousing in their counties, and to end, on being discharged, to wit: A brigadier general, one hundred dollars per month, and twelve rations of provisions and five rations of forage for himself and family, per day; an aid-

*Pay and rations of militia.*

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14205   Page 97 of 199

de-camp, thirty dollars per month; a colonel, seventy five dollars per-month, and six rations of provisions and two rations of forage, per day; a brigade major, thirty dollars per month, four rations of provisions and two rations of forage, per day; a brigade quarter-master, thirty dollars per month, and three rations of provisions and one ration of forage per day; a lieu-tenant colonel, sixty dollars per month, and five ra-tions of provisions and two rations of forage per day; a major, fifty dollars per month, and four rations of provisions and two rations of forage, per day; a cap-tain, forty dollars per month, and three rations of pro-visions, per day; a lieutenant, twenty-seven dollars and two-thirds per month, and two rations of provisions, per day; an ensign, twenty dollars per month, and two rations of provisions, per day; a surgeon, sixty dollars per month, and three rations of provisions and two ra-tions of forage, per day; a quarter-master, twenty dol-lars per month, and two rations of provisions and one ration of forage, per day; a pay-master, forty dollars per month, and two rations of provisions and one ra-tion of forage, per day; an adjutant, twenty-four dol-lars per month, and two rations of provisions and one ration of forage, per day; a quarter-master serjeant, eight dollars per month, and one ration per day; a ser-jeant, eight dollars per month, and one ration per day; a corporal, seven dollars per month, and one ration per day; a private, five dollars and one half dollar per month, and one ration per day.   And should any of the staff be of the line, the allowances herein given shall include what they may receive in the line.   A ration of provisions shall consist of one pound of fresh beef or pork, or three quarters of a pound of salt pork, one pound of wheat bread or flour, or one pound and a quarter of corn meal, one gill of rum, when to be had, and one quart of salt, one quart of vinegar, two pounds of soap, and one pound of candles, to every hundred rations; but in case salt meat be issued, the salt to be withheld; and a ration of forage, of ten quarts of corn or oats, and fourteen pounds of hay or fodder.   And moreover, every militia-man, upon his discharge from actual service, shall be entitled to and receive one day's pay for each twenty miles such place of discharge shall be distant from his place of abode.   And should the executive at any time find it expedient to retain the

whole or any part of the rations of provisions or forage herein allowed to officers, and to allow a composition in money, they are hereby empowered to do so.

**Patrollers.**

VIII. *And be it further enacted,* That the commanding officer of the militia in every county, shall from time to time, as he shall deem it necessary, appoint an officer, and so many men of the militia as to him shall appear necessary, not exceeding four, once in every month, or oftener, if thereto required by such officer, to patrole and visit all negro quarters and other places suspected of entertaining unlawful assemblies of slaves, servants, or other disorderly persons, as aforesaid, unlawfully assembled, or any others strolling about from one plantation to another, without a pass from his or her master, mistress, or owner, and carry them before the next justice of the peace, who, if he shall see cause, is to order every such slave, servant, stroller, or other disorderly person, as aforesaid, to receive any number of lashes, not exceeding twenty, on his or her back; and in case one company of patrollers shall not be sufficient, to order more companies for the same service. And after every patrole, the officer of each party shall return to the captain of the company to which he belongs, a report in writing upon oath (which oath such captain is hereby empowered to administer) of the names of those of his party who were upon duty, and of the proceedings in such patrole; and such captain shall once in every month deliver such patrole-returns to the commanding officer of the militia, by whom they shall be certified and delivered to the next court-martial; and if they shall adjudge the patrollers to have performed their duty according to law, the chief officers shall certify the same to the county court, who are thereupon empowered and required to levy twenty pounds of tobacco, or three shillings for every twelve hours each of them shall so patrole. And every commanding officer failing to appoint patrollers according to the directions of this act, shall forfeit and pay ten pounds; and every person appointed to patrole, failing to do his duty, shall forfeit and pay twenty shillings for every such failure; which fines shall be laid, collected, accounted for, and appropriated, as is

**Courts for trying officers**

tain tribunals, be described and instituted for the trial herein directed, for laying, accounting for, and appropriating the several fines and penalties by this act directed. And whereas it is necessary that cer-

Digitized by Google

of offences, as they are to be viewed in a military light, as well as for enquiring into delinquencies and assessing fines thereon.

IX. *Be it therefore enacted,* That the governor, with the advice of council, shall have power to arrest the county-lieutenant, or commanding officer of a county, and all other officers, for any misconduct whatever, and upon trial and conviction, may censure or cashier them. All officers under the county-lieutenant, or commanding officer of a county, may also be arrested by such commanding officer, and reported to the governor for trial, or at the option of such commanding officer, a general court-martial, to consist of thirteen officers, may, by his order, be held in the county for trial of such as shall be under the rank of a field-officer. The president of the said court shall be a field-officer, and six at least of the members shall be captains; and where there is not a sufficient number of officers in any county to constitute a court, where the arrest is made, the commanding officer of such county may call upon as many officers from the adjacent counties as will be sufficient to make up a court, and such court may, on conviction, censure or cashier any officer so tried, and their sentence shall be final; saving to such officer an appeal to the executive if he shall think proper, in which case the commanding officer shall furnish him with a copy of the proceedings of the said court. Any non-commissioned officer or soldier offending, shall be tried by a like general court-martial, and may, on conviction, be censured or fined, at the discretion of the court. For obtaining the necessary evidence for the trials aforesaid, the governor, or commanding officer of the county (as the case may be) shall issue his summons, and any person so summoned, failing to attend, shall forfeit and pay, upon a summons from the governor, ten pounds, and upon a summons of the commander of a county, five pounds; to be reported by the commanding officer amongst other delinquencies, to the court aforesaid.

X. *And be it further enacted,* That the commander of a county shall, on some day in the months of May and November (his general muster being over) summon all his field-officers and captains, a majority of whom, one being a field-officer, shall form a court of enquiry and assessment of fines. The said court shall take the following oath, to be administered by any one

*Governors power over county lieutenant.*

*County-lieutenants power over officers.*

*Courts martial how to be constituted.*

*Court of enquiry and assessment of fines, how to be constituted.*

of the field-officers to the other members, and afterwards by any one of them to him, to wit: "I ——— do swear that I will truly and faithfully enquire into all delinquences which appear on the returns to be laid before me, and will assess the fines thereon as shall seem just, without favour, partiality, or affection. So help me God."— The county lieutenant shall then lay before the said court, all the delinquencies as directed by this act, whereupon they shall proceed to hear and determine

*Fines, how to be collected;* on them. All fines to be assessed by virtue of this act, shall be collected by the sheriff of the county, upon a list thereof certified by the commanding officer, and delivered to the sheriff on or before the first day of Janu-

*how to be accounted for.* ary, in every year, who shall account for the same to the county-lieutenant or his successor, in the manner directed, and be allowed the same commission as for other public monies, on or before the first day of November in the same year, and on failure, the commanding officer, or his successor, shall, on ten days previous notice, obtain judgment for the same in the county

*When distrained for.* court, with costs. And should any person so charged with fines, fail to make payment on or before the first day of May, in any year, the sheriff is hereby authorized to make distress and sale therefor, in the same manner as is directed in the collection of the taxes.—

*When accounted for with the executive.* The commanding officer of every county shall, on or before the thirty-first day of December, in every year, render to the executive an account upon oath, of all monies which have come into his hands by virtue of his office, and of his disbursements; and if there shall remain any money in his hands, the same shall be paid into the treasury, in aid of the contingent fund. And for enforcing obedience to this act,

*Forfeitures and delinquencies.* XI. *Be it enacted,* That the following forfeitures and penalties shall be incurred for delinquencies, viz. By the county-lieutenant or commanding officer of a coun-

*County lieutenant.* ty, for failing to take any oath, to summon any court or board, to attend any court or board, to transmit any recommendation of an officer or officers to the governor, to deliver any commission or commissions, to appoint a general muster, to attend such muster armed as required, to report delinquencies, to make a general return of his militia to the governor, as is directed by this act, shall for each and every such offence or neglect, forfeit and pay twenty pounds; failing to send into actual service any militia called for by the

Case 3:19-cv-01226-L-AHG   Document 134-7   Filed 03/15/24   PageID.14209   Page 101 of 199

governor, or to turn out his militia upon an invasion or insurrection of his county, fifty pounds: By a colonel, for failing to take any oath, to attend any court or board, to appoint a regimental muster, or give notice of any general muster, to examine his regiment, to report delinquencies, or to make any return, as directed by this act, he shall forfeit and pay for each and every offence or neglect, ten pounds; failing to call forth from his regiment, with due dispatch, any detachment of men and officers, armed and equipped, as shall from time to time be required by the commanding officer on any call from the governor, invasion of, or insurrection in his county, or requisition of any neighbouring county, twenty-five pounds: Lieutenant-colonel or major, for failing to take any oath, to attend any court or board, to attend any muster armed as is herein directed, they shall respectively for each and every such offence or neglect, forfeit and pay eight pounds; failing to repair to their rendezvous when summoned upon any call of the governor, invasion of, or insurrection in the county, or requisition of the commander of a neighbouring county, they shall each forfeit and pay sixteen pounds: By a captain, for failing to take an oath, to attend any court, to inroll his company, to appoint private musters, to give notice of a general or regimental muster, to attend any muster armed, to call his roll, examine his company, and report delinquencies, to make any return, as directed by this act, he shall forfeit and pay for each and every such offence and neglect, six pounds; failing to call forth such officers and men, as the commanding officer from time to time shall order from his company, upon any call from the governor, invasion of, or insurrection in the county, or requisition from an adjacent county, or failing on any such occasion to repair to the place of rendezvous, he shall forfeit and pay twelve pounds: By a subaltern officer, for failing to take any oath, to attend any court or muster, armed as directed, for each of the said offences he shall forfeit and pay three pounds; failing to repair to the place of rendezvous, armed as required, when ordered upon any call from the governor, invasion of, or insurrection in the county, or requisition from a neighbouring county, he shall forfeit and pay six pounds: And moreover, the said officers for any of the said offences, shall be liable to be arrested and

*Colonel.*

*Captain.*

*Subaltern.*

**24** · **LAWS OF VIRGINIA,**

Non commissioned officers and soldiers.

tried for the same as military offenders: By a non-commissioned officer or soldier, for failing to attend at any muster with the arms, ammunition and equipments, as directed by this act, he shall forfeit and pay ten shillings; failing to repair to his rendezvous when ordered upon any call from the governor, invasion of, or insurrection in the county, or requisition from a neighbouring county, he shall forfeit and pay two pounds.

Arms exempted from execution; & men when from arrest.

All arms, ammunition, and equipments, of the militia, shall be exempted from executions and distresses at all times, and their persons from arrests in civil cases, while going to, continuing at, or returning from musters, and while in actual service. Each court or board,

Officers of court.

by this act directed to be held, are empowered to appoint a clerk and provost-martial; such clerk shall keep a fair record of their proceedings, and together with the said provost-martial, receive such allowance, to be paid out of the fines arising from delinquencies,

Lost arms, when to be paid for.

as the said court or board shall think reasonable. No arms or accoutrements, which may hereafter be lost in service, shall be paid for by the public, unless the loser shall be killed, wounded, or otherwise incapacitated in the opinion of a court-martial, from preserving his arms. The militia of the city of Williamsburg and

Williamsburg and Norfolk.

borough of Norfolk, shall have their officers appointed and be under the same rules and regulations as the different counties.

Resignation of officers.

XII. *And be it further enacted,* That the county-lieutenant or commanding officer of each county, is hereby empowered to receive the commission of any captain, or other inferior officer in his county, who may think proper to resign, and shall notify such resignation to the next succeeding court, in order that such vacancies may be then supplied: *Provided,* That nothing herein contained shall be construed or taken to deprive the people called quakers or memonists, of any privilege granted them by any former law. *Provided also,* That the governor, with advice of the council, is hereby empowered to suspend the operation of this act in the counties on the western waters, so long as they may think proper.

Quakers and menonists.

Power to suspend.

Repealing clause.

XIII. All and every act and acts heretofore made for regulating and disciplining the militia, and guarding against invasions and insurrections, shall be, and the same are hereby repealed.

Digitized by Google

# EXHIBIT P

## APPENDIX

### LEGAL TREATISES USED BY AMERICANS
### BEFORE THE NINETEENTH CENTURY



Most judges in colonial America, particularly local, received no formal train-
ing and relied on legal manuals and practical experience to learn the law. Al-
though we cannot hear the proceedings inside a seventeenth- or eighteenth-
century courtroom, the manuals and their contents are a critical, albeit
imperfect, means of decoding the extant court records. What assumptions
did they have? After working extensively with many local court records and
before I discovered these treatises, I remember wishing desperately that I
could talk to a judge who lived then. If I could just ask a few questions. . . . In
discovering and reading these legal guides, I have felt that I could. Those
strange terms, the code words, the abbreviations, the writs—all became much
clearer with the aid of these treatises. These seemingly magical treatises,
however, varied in their opinions and conclusions. It is thus important to
have a rough map of their usage.

The manuals that judges used varied over time and by colony. For the early
seventeenth century there was only a handful of such guides available, and
choices were limited. In 1647, the General Court of Massachusetts requested
copies of the following legal books, "to the end we may have the better light
for making and proceeding about laws, that there shalbe these books follow-
ing procured for the use of the Courte from time to time." Aside from a
dictionary and a manual of forms, Sir Edward Coke (spelled here "Cooke")
and Michael Dalton are the only two writers mentioned.

Two of Sir Edward Cooke upon Littleton;
Two of the Books of Entryes;
Two of Sir Edward Cooke upon Magna Charta;
Two of the Newe Tearmes of the Lawe;
Two Daltons Justice of Peace;
Two of Sir Edward Cooks Reports.[1]

1. Cited by Edwin Powers, *Crime and Punishment in Early Massachusetts, 1620–1692:
A Documentary History* (Boston, 1966), 433. The four volumes of Coke's *Institutes*
were published between 1628 and 1644, and Dalton's *Countrey Justice* was published in

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

"Cooke upon Littleton" is volume I of the *Institutes;* "Cooke upon Magna Charta" is volume II. The court might well not have known yet about the last two volumes, which had only just appeared. Coke also published a book of "Entryes," a manual of printed forms, so that might have been his as well. The court thus relied on Coke especially, and to a lesser degree on Dalton. Some judges in Massachusetts also came with prior judicial experience, such as John Winthrop, who had been a justice of the peace in England (and had also served as a member of Parliament with Coke).

We have fewer clues about very early Virginia, partly because most of the general court records burned during the Civil War. Clearly, Virginia was following English laws and procedures to some degree. As shown in Chapter 6, a servant who killed his master was convicted of petit treason. The court confiscated objects that caused a person's death as deodand, following English norms. It did so without passing a comprehensive criminal code to cover these matters, relying, apparently, on Virginia's general charters of 1606 and 1621. "Wee requier the said gennerall Assembly, as also the said Counsell of State to imitate and followe the policy of the forme of goverment, Lawes Custome manners of loyall and other administracion of Justice used in the Realme of England." Some judges probably came to Virginia with some formal training. Otherwise, they probably relied on the handful of books they could get, many of them in law French (such as John Perkins's *Profitable Booke . . . Treating of the Lawes of Englande* and various guides for justices of the peace, such as William Lambarde's *Eirenarcha* or William Stanford's *Les plees del coron*). So much is guesswork, but they had few such treatises to choose from. A Virginia law of 1666 recommended Michael Dalton's *Countrey Justice* or similar, unnamed English guides for local justices of the peace in an act for "the better conformity of the proceedings of the courts of this country."[2]

No laws recommended specific manuals for justices of the peace or other judges in Pennsylvania. However, in 1722 in Philadelphia, *Conductor Generalis* was published, a blending of English guides for justices of the peace, which relied heavily on Dalton's *Countrey Justice* as well as William Nelson's

---

1618. There were few "Books of Entryes" published in England before 1650. The most likely candidate for this list was also written by Coke: *A Booke of Entries: Containing Perfect and Approved Presidents of Counts . . .* (London, 1614). Another collection of forms was William Rastell, *A Colleccion of Entrees of Declaracions, Barres, Replicacions, Rejoinders . . .* (London, 1566).

2. Susan Myra Kingsbury, ed., *The Records of the Virginia Company of London* (Washington, D.C., 1906–1935), III, 484; William Waller Hening, ed., *The Statutes at Large: Being a Collection of All the Laws of Virginia . . .* (rpt. Charlottesville, Va., 1969), I, 69, 112, II, 246.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, Omohundro
Institute of Early American History & Culture, 2005. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=
Created from umdcp on 2023-07-20 15:10:57.

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

*Office and Authority of a Justice of Peace. Conductor Generalis* was reprinted in 1749 and 1750 in the same form, and a new version, influenced by Richard Burn's English *Justice of the Peace, and Parish Officer,* appeared in 1743.[3]

Other colonies published their own guides as well. A short handbook for constables, *The Constables Pocket-Book* (1710), appeared in Massachusetts as well as a summary of Massachusetts laws, *The County and Town Officer* (1768), but no full guide to justices of the peace appeared there until *An Abridgment of Burn's Justice of the Peace,* a modification of the most popular English guide, in 1773. The first guide written by a colonial justice appeared in Virginia in 1736, George Webb's *Office and Authority of a Justice of Peace,* followed by a similarly titled treatise by Richard Starke in 1774.[4]

Wealthy Virginians, especially, sent their sons to England to learn the law formally at the Inns of Court. William Fitzhugh, who played an important role in crafting the Virginia law code of 1705, read deeply in older, pre-Coke common law and continually cited sources in law French and Latin. He claimed that the common law was "only to be learned out of ancient authors (for out of the old fields must come the new corn) contrary to the opinion of the generality of our judges and practicers of the law here." He also cited Coke frequently. His contemporaries probably used more of the guides in English (Coke and Dalton are the most notable), which were more accessible.[5]

Beyond legal treatises actually printed in the colonies or those specifically recommended, the contents of lawyers' libraries during the eighteenth century are helpful in determining usage. Herbert A. Johnson examined twenty-two libraries of the most prominent men. (Normal justices of the peace did not own such extensive collections but were likely to own the most popular

3. *Conductor Generalis; or, The Office, Duty, and Authority of Justices of the Peace . . .* (Philadelphia, 1722); Richard Burn, *The Justice of the Peace, and Parish Officer,* 4 vols. (London, 1743). (P. B., *Conductor Generalis; or, A Guide for Justices of the Peace . . .* [New York, 1711], is markedly different from the Philadelphia, 1722, volume.)

4. N[icholas] B[oone], *The Constables Pocket-Book; or, A Dialogue between an Old Constable and a New . . .* (Boston, 1710) (reprinted in 1727); *The County and Town Officer; or, An Abridgment of the Laws of the Province of the Massachusetts-Bay, relative to County and Town Officers* (Boston, 1768); *An Abridgment of Burn's Justice of the Peace and Parish Officer . . .* (Boston, 1773); George Webb, *Office and Authority of a Justice of Peace, and Also the Duty of Sheriffs . . .* (Williamsburg, Va., 1736); Richard Starke, *Office and Authority of a Justice of Peace, Explained and Digested . . .* (Williamsburg, Va., 1774).

A good, although incomplete, guide to the publication of legal books in America until 1801 is Eldon Revare James, "A List of Legal Treatises Printed in the British Colonies and the American States before 1801," in Morton Carlisle Campbell et al., *Harvard Legal Essays . . .* (Cambridge, Mass., 1934), 159–211.

5. Richard Beale Davis, ed., *William Fitzhugh and His Chesapeake World, 1676–1701: The Fitzhugh Letters and Other Documents* (Chapel Hill, N.C., 1963), 26.

*Legal Treatises before the Nineteenth Century* | 371

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, Omohundro
Institute of Early American History & Culture, 2005. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=
Created from umdcp on 2023-07-20 15:10:57.

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

and readable of these guides.) Volumes published late in the eighteenth century, of course, could not have appeared in the libraries of men who died before they were published. From those libraries, the following stand out in their popularity.[6]

William Blackstone's *Commentaries on the Laws of England* (1765–1769) appeared in the libraries of eight of ten lawyers who lived past the date of its publication. Reprinted in Philadelphia in 1772 from the first London edition, this first American edition contains a list of more than six hundred "subscribers." By the 1790s, Blackstone's influence was unparalleled in political as well as legal circles: his name was mentioned more than any other in political pamphlets and newspapers of the 1790s.[7]

The most popular guide for justices of the peace in those libraries was *Officium Clerici Pacis* (nine libraries). Since this was only partly a guide for justices of the peace and was in Latin (except for introduction partly in English), it was probably less popular among the less prominent justices and those not formally trained. The next most popular guide for justices of the peace among these libraries was Richard Burn's *Justice of the Peace* (six), followed by Dalton's *Countrey Justice* (four), still used more than a century after its initial publication. The most popular abridgments of the law were Knightley D'Anvers, *A General Abridgment of the Common Law* (twelve), and Matthew Bacon, *A New Abridgment of the Law* (nine). (The first American edition of Bacon, which included American precedents, would be published

6. Herbert A. Johnson, *Imported Eighteenth-Century Law Treatises in American Libraries, 1700–1799* (Knoxville, Tenn., 1978). The law libraries that Johnson examined belonged to the following twenty-two men.

Connecticut: John McClellan (1767–1858).

Massachusetts: John Adams (1735–1826), Francis Dana (1743–1811), Robert Treat Paine (1731–1814), Theophilus Parsons (1750–1813).

New York: James Alexander (1691–1756), John Jay (1745–1829), Joseph Murray (ca. 1694–1757), William Smith, Sr. (1697–1769).

Pennsylvania: Ralph Assheton (1695–1746), Benjamin Chew (1722–1810), John Guest (ca. 1650–1707), James Logan (1671–1751), Jasper Yeates (1745–1817).

South Carolina: James Grindlay (d. 1765), Peter Leigh (d. 1759), Benet Oldham (d. 1768).

Virginia: William Byrd II (1674–1744), Robert "King" Carter (1663–1732), Thomas Jefferson (1743–1826), John Mercer (1704–1768), St. George Tucker (1752–1827).

7. William Blackstone, *Commentaries on the Laws of England* (Philadelphia, 1771–1772). The list of subscribers includes their addresses and professions. The list reveals that Blackstone was popular in all the colonies and with many men besides lawyers. And see Donald S. Lutz, "The Relative Influence of European Writers on Late Eigtheenth-Century American Political Thought," *American Political Science Review,* LXXIII (1984), 189–197.

372 | *Appendix*

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

in Philadelphia in 1813.) The most popular commentaries and institutes besides Blackstone were Thomas Wood, *An Institute of the Laws of England* (eight), Christopher Saint-German, *Doctor and Student* (seven), and Matthew Hale, *History of the Common Law* (six).[8]

Criminal law formed its own particular genre. Matthew Hale's *History of Pleas of the Crown* and William Hawkins's *Treatise of the Pleas of the Crown* (which drew on Hale: apparently Hawkins was familiar with Hale's manuscript) were the most popular in that field, both appearing in eleven libraries. The most popular treatises on procedure and evidence were Giles Duncombe, *Tryals per Pais* (nine); Francis Buller, *Introduction to the Law relative to Trials at Nisi Prius* (seven), Geoffrey Gilbert, *The Law of Evidence* (five); and Michael Dalton, *Officium Vicecomitum* (five). (The volumes by Buller and Gilbert were also published in New York and Philadelphia, respectively, in 1788.)[9]

*Coke upon Littleton* (volume I of his *Institutes*) was the single most common treatise on land law, appearing in eleven libraries. With regard to natural law, Samuel von Pufendorf, *Law of Nature and Nations,* appeared in ten libraries (in French only in one of them). A volume relating to children, *The Infants Lawyer,* appeared in three libraries.[10]

These clues were supplemented by the cases themselves. Higher court decisions, especially, cited the authorities whose precedents they were following. Tracking down those authorities was revealing. They cited English

8. J. W., *Officium Clerici Pacis: A Book of Indictments, Informations, Appeals, and Inquisitions* . . . (London, 1675) (chiefly forms rather than procedures, so not as helpful for understanding policy as Burn and others); Burn, *The Justice of the Peace;* Michael Dalton, *The Countrey Justice* . . . (London, 1618); Knightley D'Anvers, *A General Abridgment of the Common Law,* 3 vols. (London, 1705–1737); [Matthew Bacon], *A New Abridgment of the Law,* 5 vols. (London, 1736–1766); Thomas Wood, *An Institute of the Laws of England* . . . (London, 1720); [Christopher Saint-German], *The Dialogue in English, betweene a Doctor of Divinity, and a Student in the Laws of England* (London, 1638); [Matthew Hale], *The History of the Common Law of England* (London, 1713).

9. Sir Matthew Hale, *Historia Placitorum Coronae: The History of Pleas of the Crown* . . . , 2 vols. (London, 1736); William Hawkins, *A Treatise of the Pleas of the Crown* . . . , 2 vols. (London, 1716–1721); Giles Duncombe, *Tryals per Pais; or, The Law of England concerning Juries by Nisi Prius* . . . (London, 1702); Francis Buller, *An Introduction to the Law relative to Trials at Nisi Prius* (Dublin, 1768); [Geoffrey] Gilbert, *The Law of Evidence,* 5th ed. (Philadelphia, 1788); Michael Dalton, *Officium Vicecomitum: The Office and Authority of Sheriffs* . . . (London, 1700).

10. Samuel von Pufendorf, *Of the Law of Nature and Nations,* trans. Basil Kennett and William Percivale (Oxford, 1703); *The Infants Lawyer; or, The Law (Both Ancient and Modern) Relating to Infants, Setting Forth Their Priviledges, Their Several Ages for Divers Purposes* . . . (London, 1697).

*Legal Treatises before the Nineteenth Century* | 373

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, Omohundro
Institute of Early American History & Culture, 2005. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=
Created from umdcp on 2023-07-20 15:10:57.

cases, starting with Coke's *Reports.* Judges also cited English precedent in the Virginia General Court during the early eighteenth century (in crafting their own reports in the 1730s—the only records we have left), and the Massachusetts Superior Court during the mid-eighteenth century frequently cited English cases. Americans began to publish their own reports generally after the Revolution, which also cited authorities, both legal treatises and cases, many of them English.[11]

More local, informal manuals for justices of the peace appeared after the Revolution. The most important of these for Virginia was William Waller Hening's *New Virginia Justice,* which first appeared in 1795 and went through numerous editions in the early nineteenth century. Samuel Freeman's *Massachusetts Justice,* which appeared in Boston in 1795, relied much more on just Massachusetts law, and less on English precedent and the common law, than such guides as Webb's or Hening's in Virginia or *Conductor Generalis* in Pennsylvania. A new version of *Conductor Generalis,* "revised and adapted to the United States of America," compiled by James Parker, appeared in Philadelphia in 1792 and was reprinted in 1793.[12]

As a partial consequence of the Revolution, several comprehensive American treatises would appear in the nineteenth century, all of them much indebted to Blackstone: in particular, St. George Tucker's Virginia version of *Blackstone's Commentaries* (1803); Tapping Reeve, *The Law of Baron and Femme* (1816); and James Kent, *Commentaries on American Law* (1826–1830). The influence of Blackstone can be seen in Kent's nickname, the "American Blackstone."[13]

11. R. T. Barton, ed., *Virginia Colonial Decisions: The Reports by Sir John Randolph and by Edward Barradall of Decisions of the General Court of Virginia, 1728–1741,* 2 vols. (Boston, 1909); Josiah Quincy, Jr., comp., *Reports of Cases Argued and Judged in the Superior Court of Judicature of the Province of Massachusetts Bay, between 1761 and 1772,* ed. Samuel M. Quincy (Boston, 1865). Both contain the earliest reports of American cases. For a complete list of reports of mostly early-nineteenth-century decisions in the supreme courts of each state, see John William Wallace, *The Reporters: Arranged and Characterized with Incidental Remarks,* 4th ed. (Boston, 1882).

12. William Waller Hening, *The New Virginia Justice, Comprising the Office and Authority of a Justice of the Peace* . . . (Richmond, Va., 1795); Samuel Freeman, ed., *The Massachusetts Justice: Being a Collection of the Laws of the Commonwealth of Massachusetts, relative to the Power and Duty of Justices of the Peace* . . . (Boston, 1795); James Parker, comp., *The Conductor Generalis* . . . (Philadelphia, 1792). Freeman also wrote *Town Officer,* published in Portland in 1791 and reprinted in Boston in 1793 and 1794. Also, in 1794, a slim volume that contained almost only forms appeared: Collinson Read, *Precedents in the Office of a Justice of Peace* . . . (Philadelphia, 1794).

13. Tapping Reeve, *The Law of Baron and Femme* . . . (New Haven, Conn., 1816); James

374 | *Appendix*

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, Omohundro
    Institute of Early American History & Culture, 2005. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=
Created from umdcp on 2023-07-20 15:10:57.

What emerged from all this was that the single most popular law books from the seventeenth century were Coke's and Dalton's. Indeed, Coke's *Institutes* remained the most popular guide to the common law until the publication of Blackstone's *Commentaries* in the 1760s. Jefferson, for example, learned the law by poring, painfully, over Coke's *Institutes* (a task I understand only too well). Hale's guides, though written in the late seventeenth century, were widely published, used, and cited only in the eighteenth. Blackstone, like Coke, became an immediate authority and was widely read. Above all, what became clear, however, is that Blackstone and later legal commentators relied mostly on Coke and Hale. Evidence law as it developed in the eighteenth century (as discussed in Chapter 5, on witnesses) owed a great debt to Hale in particular.

These guides and reports were indispensable to my study. Many seventeenth- and eighteenth-century legal terms are either no longer used or have changed in meaning; thus it was not enough to have studied modern law. Only with the aid of these treatises is it possible to crack the codes, and the silences, of early American law.

—————

Kent, *Commentaries on American Law,* 4 vols. (New York, 1826–1830); St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia,* 5 vols. (Philadelphia, 1803). Also, there were less detailed, more general publications, such as James Wilson, *An Introductory Lecture to a Course of Law Lectures* (Philadelphia, 1791).

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, Omohundro
    Institute of Early American History & Culture, 2005. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=
Created from umdcp on 2023-07-20 15:10:57.

*This page intentionally left blank*

Copyright © 2005. Omohundro Institute of Early American History & Culture. All rights reserved.

# EXHIBIT Q

CHAPTER I

## CHILDREN, INHERITED POWER,
## AND PATRIARCHAL IDEOLOGY

*"By this means it comes to pass that many a child, by*
*succeeding a king, hath the right of a father over many a grey-headed*
*multitude, and hath the title of* pater patriae.*"*
*Sir Robert Filmer,* Patriarcha *(1680)*

*" 'Tis not to be imagined, that a company of men*
*should so far degenerate from their own nature,*
*which is reason, to give up themselves and their posterity,*
*with all their concernments in the world, to depend*
*upon the will of a child."*
*Algernon Sidney,* Discourses concerning Government
*([1681–1683], 1698)*



After his election to the House of Burgesses for Elizabeth City, Virginia, "Mr."
Willis Wilson, eighteen years old, traveled to Jamestown to attend the session
of April 1692. The voters had chosen him to hold his father's former seat, but
the Committee of Elections and Privileges objected. After some debate, the
full house refused to accept him as a burgess, he "appearing to this house to
be under the Age of one and Twenty years." Elizabeth City then held another
vote, electing William Armistead in Willis's place. A year later, when the
governor dissolved the Burgesses and called for a new election, the voters
again returned Willis. Now Captain Willis Wilson (an appointed militia of-
ficer), he was still only nineteen. This time the Burgesses accepted him
without comment. Indeed, the fuss over his first election was unprecedented.
In 1688 Daniel Parke was elected for James City (replacing his father-in-law,
Philip Ludwell, whom the governor had promoted to the Council). At eigh-
teen, Parke was the same age Wilson would be in 1692, but no burgess
challenged his right to sit. In 1699 the Burgesses went further than simply
rejecting a particular member on the basis of his age. They passed a law
making the elections of all those under age twenty-one void. Anyone could
challenge such an election, whether inside or outside the House.[1]

1. H. R. McIlwaine, ed., *Journals of the House of Burgesses of Virginia, 1659/60–1693*
(Richmond, Va., 1914), 381–382, 394, 412. Wilson was born in 1673, according to his

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Concern about electing persons under age twenty-one did not arise from local Virginia politics. Virginia's 1699 law mirrored one passed by Parliament in 1696. The concerns were transatlantic and deeply rooted in the ideological arguments that underlay England's two seventeenth-century revolutions. The challenge to Wilson was a symptom of a much larger contest over the basis of authority in England and its colonies during the seventeenth and eighteenth centuries. To challenge Wilson was to raise questions about birthright and the transmission of authority from father to son (explicit in this case). The roots of this challenge to birthright reached into the Reformation. The Reformation, however, had more than one impact on the debates about authority in England and its colonies: it could also encourage, ironically, blind obedience. These countervailing pressures fed a struggle over legitimate authority in England and America during the seventeenth and eighteenth centuries.[2]

In early-seventeenth-century England, authority was perceived to originate in three ways: by election, by succession, or by conquest. Arguments for authority by conquest had few strong adherents: conquest set a dangerous precedent, and morally it had weak persuasive force. Although some political power in England was determined by election, Parliament being the most notable example, much power—much authority—was determined by succession, by inheritance, by birth. The source of authority shaped the degree to which obedience could be justified. "Tyrants and wicked governours may be remooved by the whole state, as Athens and Rome were delivered from their cruell governours: but this must be understood of such kingdomes where the kingdome goeth by election; as in Polonia, and Venice: for from whom kings receive their authoritie, by them they may be constrained to keepe within their bounds: but where kingdomes goe by succession, the reason is otherwise." By this logic, subjects could not replace their ruler in kingdoms where the monarch inherited his crown, such as England.[3]

The Reformation challenged the norm of birthright by emphasizing the responsibility to choose religious membership, which implied that political identity might also be chosen (the subject of the next chapter). At the same time, it provided a way to strengthen obedience to authority: Reformation

———

gravestone in St. John's churchyard in Hampton, Virginia. Given that the new year had begun a week before the 1692 session started, he almost certainly was eighteen. For Parke, see 297 (Apr. 28, 1688), and below.

2. 7 and 8 Will. II, c. 25, s. 7; William Waller Hening, ed., *The Statutes at Large: Being a Collection of All the Laws of Virginia . . .* (rpt. Charlottesville, Va., 1969), III, 174–175 (1699).

3. Andrew Willet, *An Harmonie upon the First Booke of Samuel . . .* (Cambridge, 1607), 294–295.

18 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Copyright © 2007. University of North Carolina Press. All rights reserved.

theology emphasized the authority of fathers especially. Equating the authority of kings with that of fathers could provide a basis for absolute authority. Only in the face of challenges to the norm of authority by birthright in the wake of the Reformation did political authority become so closely aligned with fatherly authority.

Equating the authority of a king or pope with that of a father was not completely new to the Reformation. Elements of this kind of patriarchal thinking existed within medieval Catholic theology, though it was invoked more to justify the spiritual power of the pope and his ministers than the temporal power of kings. The title "Pope" derived from a Greek word for "father." The laity addressed priests, bishops, and other Catholic Church authorities as "father." The description of the king as a temporal "father" of his people was a direct analogy to the spiritual "father" God and his spiritual earthly representatives in the church. This analogy strengthened the church's authority.[4]

Medieval principles of political authority, however, did not rest on this analogy. Instead, the main justifications for the power of the monarch rested on his divine sanction (as conveyed by a pope) and on the principle that the king owned all of the land of the country and thus had dominion over it and all those who lived upon it. The king's "dominium" gave him lordship, both of the land and the people. His authority was conveyed (as was obligation) by birth. A child should be baptized a member of the church just as the child was born a member of the kingdom—if the parents were Christians and subjects. While political authority descended via primogeniture, obligation was inherited by all children from their parents. Everyone was born to a particular status in a hierarchy such that Christ's kingdom on earth was an imperfect parallel of the hierarchies in heaven.[5]

The central analogy that equated a king's authority with that of a father became more important in the wake of the Reformation as a result of its new emphasis on the Ten Commandments, particularly the fifth. Medieval theology emphasized the seven deadly sins, which did not contain the same injunctions about authority as the Ten Commandments. (Although Aquinas and a few other medieval theologians supported teaching the Ten Commandments to parishioners, their influence was limited.) Notably, Jean Bodin, the

4. Ernst H. Kantorowicz, *The King's Two Bodies: A Study in Mediaeval Political Theology* (Princeton, N.J., 1957), 8, 18–19. *Pappas* is "father" in Greek. In Old English, "pope" was *papa,* as it still is in Italian. See *Oxford English Dictionary,* s.v. "papa."

5. This sketch simplifies a complex debate. On this topic, see Francis Oakley, "Christian Obedience and Authority, 1520–1550," 159–192, J. H. Burns, "Scholasticism: Survival and Revival," 132–155, esp. 140–146, both in Burns, ed., *The Cambridge History of Political Thought, 1450–1700* (Cambridge, 1991); Ewart Lewis, *Medieval Political Ideas* (London, 1954), chaps. 2, 3, 88–92.

*Children, Inherited Power, & Patriarchal Ideology* | 19

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the English Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

originator of patriarchal political theory in sixteenth-century France, who strongly influenced English political theorists such as Robert Filmer, was one of the early promulgators of the Ten Commandments.[6]

The Reformation in England introduced a national program of religious instruction that taught that obedience to superiors was divinely enjoined, a duty parallel to and part of obedience to parents, one of the Ten Commandments given by God himself. While the fifth commandment in the Bible itself only instructs readers, "Honour thy father and mother," every Tudor and Stuart rendition of it linked obedience to parents with obedience to political authority. The standard catechism (from the Anglican prayer book of 1549) instructed children and adults to recite their duties toward others: "To love, honour, and succour my father and mother. To honour and obey the kyng and his ministers. To submite my selfe to all my governours, teachers, spirituall pastours and maisters. To ordre my selfe lowly and reverentelye to all my betters."[7] The basic catechism that all Anglicans memorized, therefore, equated parental power with legitimate government, and all children were supposed to be catechized. A law passed in Virginia in 1632, for example, required every minister to instruct the children of his parish every Sunday. The same law required the children, in turn, to memorize the commandments, and their parents, masters, and mistresses to send them to church "upon pain of censure by the county court." Similar laws existed in England. Literally millions of copies of catechisms would be published there over the next two centuries. Other catechisms, similar in form, remained in manuscript and were taught and repeated orally. This spiritual "milk for babes," as some of the catechisms were called, formed one of the first conscious ways by which children learned norms of obedience to authority. English popular culture was thus shaping political ideology via religion. This political ideology, which

6. John Bossy, "Moral Arithmetic: Seven Sins into Ten Commandments," in Edmund Leites, ed., *Conscience and Casuistry in Early Modern Europe* (Cambridge, 1988), 214–234.

7. [Thomas Cramner], *Boke of Common Prayer, and Administracion of the Sacramentes and Other Rites and Ceremonies in the Churche of Englande* (London, 1649), reprinted in F. E. Brightman, ed., *The English Rite . . .*, 2d ed. (London, 1921), II, 784–785. (The 1652 and later official versions are similar.) After 1661, apparently in an attempt partially to accommodate Dissenters, the phrase "his ministers" was changed to "and all that are put in authority under him." Brightman collates the texts of 1549, 1552, 1604, and 1661. Before 1549 the laity was expected to have only a "general familiarity" with the Decalogue. See Margaret Aston, *England's Iconoclasts* (Oxford, 1988), 344–354, as cited by Ian Green, *The Christian's ABC: Catechisms and Catechizing in England, c. 1530–1740* (Oxford, 1996), 13–20, 422; and Bossy, "Moral Arithmetic," in Leites, ed., *Conscience and Casuistry,* 214–234. The prayer book catechism of 1549 was the first official English catechism.

20 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
   North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

would be labeled "patriarchal," pervaded English religious instruction of the late sixteenth and early seventeenth centuries.[8]

These catechisms contained not only the Decalogue but also the other fundamentals of Christian belief that their hundreds of authors held to be most important. Particularly, they all addressed church membership and how one might obtain salvation. These discussions, in which baptism played a central part, also raised questions about authority, in some cases asserting a different type of authority, one based on consent. The awesome publishing record of these texts shows the significance of these issues and illustrates the close connection between religious and political ideology in England during this period, reinforced by the explicit connection between church and state. The primers both emerged from and gave rise to a body of political ideology and to more systematic thinkers, who would in turn change the shape of the debate. The religious turmoil spawned by the Reformation would fundamentally test ideas about authority: Should children obey parents? Servants obey masters? Subjects obey kings? How much obedience should inferiors give to their superiors?

Thus, largely because it was so central to Anglican indoctrination about authority, and certainly also because it fitted so easily with the English allocation of power, the political ideology dominant during the founding of the first English colonies in the early seventeenth century was patriarchalism. This theory combined claims for monarchical and religious authority in order to emphasize how the status to which one was born determined one's place in society. Patriarchal theory compared the king's power over his people to a father's power over his children. "The king towards his people is rightly compared to a father of children, and the people must behave dutifully towards their king," wrote the future James I in 1598 in *The True Lawe of Free Monarchies,* his major work on political principles. The people do not consent to the king's government. Rather, the king's right is based only on his being "their heritable overlord, and so by birth . . . comes to his crown . . . [as] the nearest and lawful heir" of the previous monarch. No matter how "wicked"

8. Hening, ed., *Statutes at Large,* I, 181–182 (1632); Sadie Bell, *The Church, the State, and Education in Virginia* (1930; rpt. New York, 1969), 99; Green, *Christian's ABC,* chaps. 3, 4. Green counts 1,043 discrete versions of the catechism published between the 1530s and the end of the 1730s. Many of these went through numerous editions. Each edition was of 1,250–1,500 copies before 1620, and 2,000 or so copies by the 1630s. The official versions of catechisms alone (usually modifications of the prayer book) were published at a rate of 20,000–100,000 per decade between the 1560s and 1630s. William Perkins's unofficial work, to use another example, went through at least thirty editions between 1592 and 1642. See Green, *Christian's ABC,* 45–67.

*Children, Inherited Power, & Patriarchal Ideology* | 21

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

any king's actions, he was king by the will of God, and it should be left to God to judge his actions, not to the people.[9]

These three elements—the equation of the king's authority with paternal power, the transference of that right via inheritance (primogeniture), and the appointment by God's will (so that the king should be accountable to God alone)—were central to this system of thought. Both a father's power and a king's power arose from birth: the king gained his right by inheritance through primogeniture, the father through progeniture. Originally, according to this theory, monarchical right had been paternal, but then the father bequeathed the power to rule over his children to his eldest son; all his other children inherited the duty of obedience. After many generations, the kin connections became invisible. To neither father nor king could a child consent; a child's allegiance was due from birth. As Sir Robert Filmer wrote:

> It is true, all kings be not the natural parents of their subjects, yet they all either are, or are to be reputed as the next heirs to those progenitors who were at first the natural parents of the whole people, and in their right succeed to the exercise of supreme jurisdiction. And such heirs are not only lords of their own children, but also of their brethren, and all others that were subject to their fathers. . . . By this means it comes to pass that many a child, by succeeding a king, hath the right of a father over many a grey-headed multitude, and hath the title of *pater patriae*.

But there was a built-in contradiction within this theory: while patriarchal power relied on the principle of paternal authority, it was really about lordship. It gave the king or lord primary authority over lesser men's children.[10]

Patriarchal ideas were espoused by James I and his son Charles I, by most Anglican ministers both explicitly and through the catechisms that were the staple of their religious instruction, and by members of the nobility such as Filmer. Two ministers who wrote formal treatises were Robert Sibthorp, vicar of Brackley, and Roger Maynwaring, royal chaplain, both in the 1620s. Filmer, who would become the main formal exponent of these theories by the 1640s, when he published several concisely argued pamphlets, emphasized, like Sibthorp and Maynwaring, the absolute power that these principles granted to the king. His absolutism was part of a broad move by the

9. James I, *The True Lawe of Free Monarchies* . . . (Edinburgh, 1598), rpt. in. David Wootton, ed., *Divine Right and Democracy: An Anthology of Political Writing in Stuart England* (Harmondsworth, 1986), 99, 105.

10. Robert Filmer, *Patriarcha; or, The Natural Power of Kings* (London, 1680), in Johann P. Sommerville, ed., *Patriarcha and Other Writings* (Cambridge, 1991), 12.

22 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Stuarts and Royalists to justify increasing the powers of the monarch. Indeed, in his efforts to grant absolute power to the king, Filmer gave more power to fathers than the laws then granted them, as Filmer's critics pointed out. Both the responsibilities and the privileges of the king were the same as those of a "political father." "If we compare the natural duties of a father with those of a king, we find them to be all one. . . . As the father over one family, so the king, as father over many families, extends his care to preserve, feed, clothe, instruct, and defend the whole commonwealth."[11]

Primogeniture formed the basis for status relationships in both ideology and practice during this period. Primogeniture dictated that property, authority, and status descend from father to the "nearest and lawful heir," usually to the eldest son or, in the absence of a son, to the daughter(s). Primogeniture was the primary means of gaining landed property and an aristocratic or even monarchical title—and thus political power. Between the thirteenth century and 1540, most aristocratic titles and landed property descended via primogeniture in England, and after that date, with slight disruption, both continued to descend so until the early twentieth century.[12]

Filmer acknowledged the ultimate irony of this equation between obedience to fathers and that due kings whose authority derived from primogeni-

11. J. P. Sommerville, *Politics and Ideology in England, 1603–1640* (London, 1986), 29–34, 127–131; Filmer, *Patriarcha,* in Sommerville, ed., *Patriarcha,* 12. This was Filmer's main treatise, written in the 1630s and 1640s but not published until after his death in 1653. His ideas circulated earlier (usually anonymously) in various forms: *Of the Blasphemie against the Holy Ghost . . .* (London, 1647); *The Free-holder's Grand Inquest . . .* (London, 1648); *The Anarchy of a Limited or Mixed Monarchy . . .* (London, 1648); *The Necessity of the Absolute Power of All Kings . . .* (London, 1648); *Observations concerning the Originall of Government* (London, 1652); *Observations upon Aristotles Politiques touching Forms of Government,* including his *Directions for Obedience to Governours in Dangerous and Doubtfull Times* (London, 1652). In 1679 all of these works then published, with the exception of his *Necessity of the Absolute Power of Kings,* were reprinted. In 1680, the last was republished as *The Power of Kings.*

12. Frederick Pollock and Frederic William Maitland, *The History of English Law before the Time of Edward I,* 2d ed. (Cambridge, 1968), II, 363. Although some titles could be "bought" from the king initially (technically, they could be granted by the king in exchange for numerous favors in recognition of somehow noble "blood"), they then descended via primogeniture. James I and Charles II, especially, dramatically expanded the number of members of the House of Lords during the seventeenth century, as a way of consolidating their influence and money. See J. V. Beckett and Clyve Jones, "Introduction: The Peerage and the House of Lords in the Seventeenth and Eighteenth Centuries," in Jones, ed., *A Pillar of the Constitution: The House of Lords in British Politics, 1603–1784* (London, 1989), 1–19.

Copyright © 2007. University of North Carolina Press. All rights reserved.

*Children, Inherited Power, & Patriarchal Ideology* | 23

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

ture: primogeniture could produce "fathers of their country"—kings—who were children. Power could thus be granted to the very young. "It comes to pass that many a child, by succeeding a king, hath the right of a father over many a grey-headed multitude, and hath the title of *pater patriae* [father of the country]." Patriarchalism thus did not justify the power of older people, but justified inherited authority. A son who was young could, and often did, inherit a kingdom with the power to rule over many older subjects. Filmer's philosophy was echoed in English law and practice through the eighteenth century. According to the legal treatises of Sir Matthew Hale, writing in the late seventeenth century, and even of William Blackstone, writing in the mid-eighteenth, the king could never be limited in his legal capacities, even when nine months old. "The king in his politic capacity is always of full age." The king was always king, and his power came regardless of his age, though he could seek the advice of councillors or a protector. Filmer offered an argument based on status. The king gained his position through primogeniture, not by demonstration of his abilities or his judgment.[13]

Shakespeare's *Richard III* (1597) described the fears and hopes of the populace about young kings. Three citizens discuss Edward V's recent accession to power at age twelve:

> *Third Citizen:* Woe to that land that's govern'd by a child.
> *Second Citizen:* In him there is a hope of government
>    Which, in his nonage, council under him,
>    And, in his full and ripen'd years, himself,
>    No doubt, shall then, and till then, govern well.
> *First Citizen:* So stood the state when Henry the Sixth
>    was crown'd in Paris but at nine months old.
> *Third Citizen:* Stood the state so? no, no, good friends, God wot;
>    For then this land was famously enrich'd
>    With politic grave counsel; then the king
>    Had virtuous uncles to protect his grace.

(2.3.11–21)

13. Filmer, *Patriarcha,* in Sommerville, ed., *Patriarcha,* 10; Matthew Hale, *The Pre-rogatives of the King* (1640s–1660s?), ed. D. E. C. Yale, Selden Society, Publications, XCII (London, 1976), 93, 99. Also see William Blackstone, *Commentaries on the Laws of England* (Oxford, 1765–1769), I, 241. Blackstone wrote, "Neither can the king in judgment of law, as king, ever be a minor or under age." Kantorowicz, in *The King's Two Bodies,* traces the origins of this idea of the king's authority regardless of his age to the Tudor period (one would assume to the reign of Edward VI, who inherited the throne at nine, or even to Henry VIII, inheriting the throne at seventeen). Yet young kings clearly had significant power earlier.

24 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Although Third Citizen casts doubt on the ability of the new king to reign wisely, by referring to Solomon's injunction, "Woe to the land that's govern'd by a child," the others reassure him, at least temporarily, by arguing that the young king, with good counsel, "shall then, and till then, govern well."[14] Third Citizen's reminder that the person who would provide counsel for the new king, Edward V, would be his uncle the duke of Gloucester, however, leaves the citizens worried. In Shakespeare's play, the citizens had cause to be concerned: Gloucester would murder his nephew Edward and ascend to the throne himself as Richard III. Although this passage warns that evil men like Richard III can gain positions of power by usurping control over a child and then murdering him, it confirms the ability of children to inherit and to rule. It also gives a sense of the frequency with which it happened.

That young kings often came to power would have been acknowledged in England and America. For example, the commonplace book of a young law student, Henry Wells, from Worcester, Massachusetts, about 1770, listed all the kings and queens of England, their years of birth, and their years of accession. He listed ten kings of England who were under the age of twenty-one when they ascended the throne.[15]

Although the young king usually had a protector or councillors, they were technically only councillors: Shakespeare, for example, referred to "council under him" guiding the young king. Edward VI's "protector," his maternal uncle the duke of Somerset, was imprisoned in 1549 for acting without Edward's authority when Edward had been eleven. As Edward expressed it in his own words, Somerset's crime was "following his own opinion, and doing it all by his own authority, etc." instead of Edward's. The king himself was the one who had the honor, who participated in the ceremonies and rituals of power and made the formal decisions. Henry VI inherited the throne at the age of nine months, as Shakespeare acknowledged. At the age of only one year Henry VI was appearing at public functions and took his place in Parlia-

14. This is almost a direct quote from Eccl. 10:16. Algernon Sidney also quoted this passage, citing Solomon, as "Woe unto the kingdom whose king is a child." *Discourses concerning Government* (1698), ed. Thomas G. West (Indianapolis, Ind., 1990), 119.

15. Kings under twenty-one from the commonplace book of Henry Wells, Worcester, Mass., ca. 1770, Harvard Law Library, MS 5250.

|   | King | Age | Accession |   | King | Age | Accession |
|---|------|-----|-----------|---|------|-----|-----------|
| 1 | Henry II | 20 | 1154 | 6 | Edward IV | 19 | 1460 |
| 2 | Henry III | 9 | 1216 | 7 | Edward V | 12 | 1483 |
| 3 | Edward III | 15 | 1327 | 8 | Henry VIII | 17 | 1509 |
| 4 | Richard II | 11 | 1377 | 9 | Edward VI | 9 | 1546 |
| 5 | Henry VI | 1 | 1422 | 10 | Charles II | 18 | 1648 |

*Children, Inherited Power, & Patriarchal Ideology* | 25

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

ment. He was knighted in May 1426 at age four and crowned in November 1429 when only seven. He was also heir to the monarchy of France and was crowned there in December 1431 at the age of ten.[16]

Young children among the nobility often inherited property and power as well, partly because of shorter life spans. One study of fifteenth-century England found that 50 percent of sons inherited their titles and property from their fathers when they were twenty or younger. Although many young nobles had guardians to manage their lands, like the councillors to the king, these guardians had limited authority over the land and the person of the heir. These boys (and sometimes girls) would inherit their title immediately. Of the many thousands of nobility who inherited their titles while very young, two poets illustrate the policy: John Wilmot, the second earl of Rochester, succeeded to his father's earldom at the age of ten in 1658; and George Gordon, sixth Lord Byron, inherited his granduncle's title at age ten in 1798. The accession to a title made such boys eligible for a seat in the House of Lords if the title bore that privilege and the king issued a writ calling them to attend. Indeed, at least before the English Civil War, it was routine to call both the lord *and* his eldest son who would inherit the title to the House of Lords, a practice that would have made for many youthful members.[17]

Inheriting land could also make boys eligible to stand for the House of Commons, including many future peers whose fathers were still alive. While one had to have inherited a title (for the House of Lords) or fulfilled a property qualification (for the House of Commons), one's age was largely irrelevant. Indeed, many teenagers were elected to the Commons in the seventeenth century. Between 1660 and 1690 alone, forty-three boys under age twenty-one gained seats in the Commons. Christopher Monck, for example, won the by-election for Devon at age thirteen in 1667. He was immediately assigned

16. W. K. Jordan, ed., *The Chronicle and Political Papers of King Edward VI* (Ithaca, N.Y., 1966), as cited by Jennifer Loach, *Edward VI,* ed. George Bernard and Penry Williams (New Haven, Conn., 1999), 91. Edward VI participated in political decisions and left many political writings in his own hand from his reign, between his ascension to the throne at age nine and his death at fifteen.

17. Joel T. Rosenthal, *Patriarchy and Families of Privilege in Fifteenth-Century England* (Philadelphia, 1991), 38, and table, 34. His study of inheritance of titles was based on postmortem "inquisitions" in Yorkshire, Nottinghamshire, Lancashire and chancery court records for the region. Girls also inherited property and titles, but only if they had no brothers. On serving in the Lords, see Elizabeth Read Foster, *The House of Lords, 1603–1649: Structure, Procedure, and the Nature of Its Business* (Chapel Hill, N.C., 1983), 13, 15. In some cases minor sons were not called, and the issue was clearly disputed, even during the early seventeenth century.

26 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

to committees and at the age of fourteen gave a critical floor speech in which he argued for the impeachment of the first earl of Clarendon. The voters of Monmouth chose Charles Somerset for their representative in 1677, when he was only sixteen. Ralph Grey became a member for Berwick upon Tweed at age seventeen in 1679, and Peter Legh for the "family borough" in 1685 at age fifteen. This pattern was not new to the seventeenth century: in 1572 the borough of Wigan elected Richard Molyneux II to Parliament when he was only twelve years old.[18]

The election of these young men reflected their status. Christopher Monck, for example, was also the earl of Torrington and at age sixteen succeeded his father as duke of Albemarle. He had entered Gray's Inn to study the law at age eight, was appointed captain of His Majesty's Foot Guards at age twelve and commissioner for assessment at Devon at age thirteen, was made knight of the Garter at age sixteen, and married the daughter of the duke of Newcastle, Elizabeth Cavendish (heir to twenty thousand pounds), in the same year. Charles Somerset, Lord Herbert of Raglan, was the godson of Charles II. Of the forty-three teenagers elected to Parliament between 1660 and 1690, twenty-four, or more than half, were the sons of peers. The election of these young men to Parliament was consistent with patriarchal theory; their election rested on their birth status.[19]

Their election reflected not only their own but also their families' influence over the voters in those boroughs in a period when all votes were viva voce, when particular families controlled even who stood for elections. Some of those many sons who inherited properties and titles at young ages were chosen to run for Parliament in order to retain control over the seats their fathers had held. They were either the prominent landowners in their borough or chosen by that landowner. Indeed, the election of teenagers seemed most frequent in cases of patronage, where noble families or powerful political appointees had control over who would stand for election. In 1621, for example, Thomas Wriothesley, the fifteen-year-old son of the earl of Southampton, was elected from Callington, in Cornwall, by the patronage of the earl of Pembroke. Even after the passage of the 1696 law that prohibited "infants under 21" from standing for a seat in Parliament, some constituen-

18. 7 and 8 Will. III, c. 25, An Act for the Further Regulating Elections. The 1696 law did not apply to the House of Lords. See Basil Duke Henning, ed., *The House of Commons, 1660–1690* (London, 1983), I, 1–3, II, 443–444, 533, 727–728, III, 73–74, 453–454. Also see Keith Thomas, "Age and Authority in Early Modern England," British Academy, *Proceedings,* LXII (1976), 213.

19. Henning, ed., *House of Commons, 1660–1690,* I, 2.

*Children, Inherited Power, & Patriarchal Ideology* | 27

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

cies continued to elect teenagers (particularly constituencies dominated by powerful families).[20]

Virginians followed the English model of sometimes electing elite young members to its lower house on the basis of their status. Thus, Daniel Parke's election to the House of Burgesses in April 1688 at the age of eighteen reflected his connections. Daniel was the only son of a wealthy and prominent father of the same name, who had also served as a burgess and had died when Daniel was only nine or ten in 1679. At age fifteen, in 1685, Daniel married Jane Ludwell, who possessed, according to a contemporary account, a "great fortune." Philip Ludwell, her father, was Daniel's guardian and had married the widow of Governor Berkeley, in whose mansion at Green Spring she had grown up. Philip Ludwell was extremely powerful in Virginia politics during the 1680s; it was he, in fact, who apparently helped to secure Daniel's election in 1688. Both Daniel Parke and Willis Wilson thus fit the picture of teenage males elected to Parliament during the seventeenth century: significant wealth, high status, powerful patron, previous membership of father, often early inheritance.[21]

Many appointed offices could also be held by children, as is clear in the case of Christopher Monck, above, who became an army captain at age twelve and a commissioner for assessment at age thirteen. The official rule was that one should be at least eleven to be appointed to positions at court or a ministry. Military officers were supposed to be at least sixteen after 1677 for the navy and after 1711 for the army, but younger officers were appointed throughout the eighteenth century. Other offices, such as justice of the peace, king's attorney, or sheriff, had no age limitations. Sir John Randolph, for example, was appointed king's attorney in the county courts of Charles City, Henrico, and Prince George in Virginia at age eighteen. Children could inherit offices such as "Steward, or Ward of the Fleet," through the nineteenth century in England.[22]

20. John K. Gruenfelder, *Influence in Early Stuart Elections, 1604–1640* (Columbus, Ohio, 1981), 129; Thomas, "Age and Authority," British Academy, *Proceedings,* LXII (1976), 231.

21. Edward W. Greenfield, "Some New Aspects of the Life of Daniel Parke," *VMHB,* LIV (1946), 306–315. The fragmentary nature of birth dates for Virginians during this period means that we will never know the precise number of burgesses who were teenagers. Edward Digges, who was elected to the House of Burgesses in 1734, might have been under twenty-one, since his father was born in 1692 (forty-two years earlier). But his date of birth cannot be determined.

22. On appointive offices, see, for example, Hening, ed., *Statutes at Large,* III, 250–251 (1705), where the law prevents blacks and Indians from holding office and requires a three-year residency in a county but says nothing about age. Also see *The Infants Lawyer;*

28 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

That young men exercised power illuminates the irony within patriarchal ideology wherein children were the model of obedience and subordination: as Filmer noted, many a young man ruled over a "grey-headed multitude." In part this apparent contradiction arose because patriarchal theory was a sixteenth- and seventeenth-century patchwork, put together in response to the challenge of the Reformation in order to rationalize an earlier system. This irony would help spawn the debates over the theory and practice of hereditary status. Patriarchal theory saw children's obedience as a filial duty that did not end with age; it did not differentiate between children and adults. This duty might end with the father's death—with succession and inheritance— but, for most of society, it did not. Younger siblings were supposed to owe the obedience they owed to their father to his replacement, their eldest male sibling. Subjects of a king owed their allegiance to his heir. Therefore, although parent-child relations were at the core of patriarchal theory, it was not really about children: the purpose of this ideology was to reify status relationships.

One of the most repeated arguments against primogeniture as a rule for the allocation of property and power was the fact that children, sometimes infants of a year or two, might come to positions of great power. The possibility that the king could be a child enabled a sharp critique of inherited right as justified by patriarchal ideology. In the 1680s Sidney, for example, condemned the rules of primogeniture, since they made "women and children . . . patriarchs; and the next in blood, without any regard to age, sex, or other qualities of the mind or body, . . . the fathers of as many nations as fall under their power. We are not to examine whether he or she be young or old, virtuous or vicious, sober minded or stark mad; the right and power is the same in all." One hundred years later, Thomas Paine condemned hereditary government because it "puts children over men, and the conceits of nonage over wisdom and experience." The brunt of their criticism centered on the figure of the child king (partly since monarchy was purely hereditary and the institution remained unreformed).[23]

_____

*or, The Law (Both Ancient and Modern) Relating to Infants* (London, 1697), 15: "He at 11 years of age may be Grantee of an Office . . . and as an Infant may have an Office by Discent as to be Steward, or Warden of the *Fleet*, etc., so he may by grant." On Randolph, see *Dictionary of American Biography*, s.v. "Randolph, Sir John." On naval and army commissions, see Eric Robson, "Purchase and Promotion in the British Army in the Eighteenth Century," *History*, XXXVI (1951), 69–70; Charles M. Clode, *The Military Forces of the Crown* (London, 1869), I, 383, II, 91, 609–610; Thomas, "Age and Authority," British Academy, *Proceedings*, LXII (1976), 213 n. 5.

23. Sidney, *Discourses concerning Government*, ed. West, 6; Thomas Paine, *The Rights of Man* (1791–1792), rpt. in Michael Foot and Isaac Kramnick, eds., *Thomas Paine Reader* (Harmandsworth, 1987), 274. Also see, for example, *Common Sense* (1776), rpt. in

*Children, Inherited Power, & Patriarchal Ideology* | 29

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

The arguments against "Beard-less Politicians" appeared first and most strongly among the Puritans, in both England and New England. In 1621 they introduced legislation to bar those under twenty-one from Parliament, but the bill did not pass the Commons. The fragmentary notes on the debate say simply, "Mr. Weston Moved to have added to the bill [on reforming elections] that no man may be chosen under xxi yeares of Age, that he may not dispose of the Countryes estate before he can dispose of his owne." Puritans in Massachusetts passed the first such legislation in 1641, limiting both the ability to vote and to be elected to "Freemen" to the age of "twenty and one years." During the Interregnum in 1653, the Barebones Parliament, under the influence of Oliver Cromwell and largely Puritan, required that members of Parliament be twenty-one. With the restoration of Charles II, a newly elected, pro-Royalist Parliament repealed this exclusion, as it did all of the Interregnum legislation.[24]

Likewise, Virginia followed England's pattern nearly exactly during the Interregnum. With Puritans temporarily in control in Virginia (by aid of Commonwealth warships and commissioners and enforced loyalty oaths to the new "common wealth"), the Virginia assembly passed the same law, virtually word for word, in 1655. The English law reads: "That the persons who shall be elected to serve in Parliament shall be such (and no other than such) as are persons of known Integrity, fearing God, and of Good Conversation, and being of the Age of twenty-one years." The Virginia law: "That the persons who shall be elected to serve in the Assembly shall be such and no other then such as are persons of knowne integrity and of good conversation and of the age of one and twenty yeares." These issues of integrity and "good conversation" were Puritan, and Virginia was simply copying this Rump Parliament legislation. As in England, a restored, Royalist Virginia assembly "utterly abrogated and repealed" this law as one of the "alterations of the lawes" during the "late unhappy distractions" that encouraged "deviations from his majesties obedience." That Virginians repealed this law is

_____

*Thomas Paine Reader,* 77: "Another evil which attends hereditary succession is, that the throne is subject to be possessed by a minor at any age."

24. Wallace Notestein, Frances Helen Relf, and Hartley Simpson, eds., *Commons Debates, 1621* (New Haven, Conn., 1935), II, 460, IV, 446, V, 221, VI, 205. Edward Coke, among others, clearly supported this bill reforming elections, which was offered again, with even less support, in 1626. See William B. Bidwell and Maija Jansson, eds., *Proceedings in Parliament, 1626* (New Haven, Conn., 1992), II, 25. On the Puritan legislation, see entries under "Age" and "Elections" (esp. item 4) in *The Laws and Liberties of Massachusetts* (San Marino, Calif., 1998) (facsimile of Cambridge, Mass., 1648), 1–21. On the Barebones Parliament, see C. H. Firth and R. S. Rait, eds., *Acts and Ordinances of the Interregnum, 1642–1660* (London, 1911), II, 817 (Dec. 16, 1653).

30 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

almost more interesting than the English repeal at the Restoration. In England, Parliament repealed all laws passed during the Commonwealth, whereas in Virginia the assembly did so only selectively: in Virginia, therefore, repealing this guideline for electing burgesses was a conscious, judicious action.[25]

Between the Civil War and the Glorious Revolution, age became more of a republican or Whig issue and less associated with Puritans or Dissenters. During the reign of Charles II, the election of minors was controversial partly because Sir Edward Coke had tried to effect the reform (which he had supported as a member of Parliament in 1621) via common law fiat in the fourth volume of his *Institutes of the Laws of England.* The pamphlet wars of the 1680s and the Glorious Revolution of 1688 led to substantial reforms in age restrictions on who could serve in both houses of Parliament. After 1685, members of the House of Lords who were under age twenty-one were supposed to hold only observation privileges, not voting rights (they could attend but could not speak). And after 1696 the election of minors to the House of Commons was officially void.[26]

25. On the control of Puritans in Virginia and loyalty oaths to the Commonwealth, see Thomas J. Wertenbaker, *Virginia under the Stuarts, 1607–1668* (Princeton, N.J., 1914), 103; Hening, ed., *Statutes at Large,* I, 363–364, 371 (1652). For the laws themselves, see Firth and Rait, eds., *Acts and Ordinances of the Interregnum,* II, 817 (Dec. 16, 1653); Hening, *Statutes at Large,* I, 411–412 (March 1655). For the repeal of the laws with the Restoration in Virginia, see Hening, ed., *Statutes at Large,* II, iii–iv: "These revised laws were compiled from those previously enacted, with such alterations as rendered them consistent with the monarchical government then re-established." For the texts of the laws, see II, 41–43, 82. Virginia's 1653 law requiring burgesses to be twenty-one appeared only in manuscript. Because the House of Burgesses published all laws in force, that 1653 law was one of those repealed.

26. On Coke, see Chapter 7. For the 1685 standing order in the House of Lords, see John Hatsell, *Precedents of Proceedings in the House of Commons* (London, 1796), II, 11. Because the right to sit in the House of Lords depended on the king's pleasure (on his issuing a writ calling for their attendance), in some individual cases before 1685 it is clear that young lords were not called to attend the House of Lords until they were over twenty-one. The issue was contested especially after 1660 (and the restoration of the House of Lords itself, along with the monarchy). Indeed, the fact that this reform precedes the Glorious Revolution, that it came in the midst of the turmoil of the 1680s, indicates the contention surrounding it. Especially in the period before the Civil War, the House of Lords seems to have been more like a privy council to the monarch, who called those with whom he (or she) wanted to consult (Foster, *The House of Lords, 1603–1649,* 13–16). Charles II issued writs for minors to attend the House of Lords at least twice in 1667 (the earls of Mulgrave and Rochester, both nineteen or twenty), cases that we know about because the House of Lords took it upon itself to refuse them admission,

*Children, Inherited Power, & Patriarchal Ideology* | 31

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

These reforms during Cromwell's reign and just before and after the Glorious Revolution were passed in the face of a flood of pamphlets that argued for even higher age limitations than twenty-one on those who could be elected. Harrington suggested thirty in *Oceana* (1656). Gerrard Winstanley, a Leveller pamphleteer, suggested forty as the minimum age of service for high public office. The Parliamentarian William Prynne, who argued so fiercely against the corruption of the English bishops and against Archbishop Laud in particular in the 1630s and 1640s that he had his ears cut off twice (first the ears and then the stumps) and his face branded, wrote a pamphlet entitled *Minors No Senators* in 1646.[27]

The Royalist Arise Evans, in *A Rule From Heaven* (1659), urged that both king and members of Parliament should be over fifty, apparently not understanding that this reform was incompatible with succession by primogeniture. (By this rule, kings could not die until at least age seventy, presuming that they had fathered a living child in their teens.) It was rarer for Royalists to take this stand, but not exceptional: James I had urged, in a royal proclamation, that electors not choose "young and inexperienced men" for the Commons, and sometimes refused to issue writs to younger men to serve in the Lords. Both men illustrate how this issue could partially cut across political camps.[28]

Henry Care, a popular and persuasive Whig pamphleteer in the critical decade of the Glorious Revolution, argued that maturity was necessary for elected members of Parliament. His *English Liberties; or, The Freeborn Subject's Inheritance,* published in 1680 and reprinted many times in England and North America, fulminated against the practice of electing "young Green Persons." Minors, he claimed, did not have reason and could more easily be corrupted.

> Be resolved (against all Temptations) to choose *no minors:* What, will you be content with *sucking Statesmen?* and *Beard-less Politicians? . . .* then expect, for well you deserve to be lasht with *Scorpions:* Can you Judge them fit to dispose of your Liberties, Lives Estates and Religion, who cannot legally dispose of their own Estates or themselves? What security can they give you, that they will not give away *yours and you,* whose Bond in the eye

———

apparently afraid that admitting them would compromise its integrity. Andrew Swatland, *The House of Lords in the Reign of Charles II* (Cambridge, 1996), 33–34.

27. George H. Sabine, ed., *The Works of Gerrard Winstanley* (Ithaca, N.Y., 1941), 515, 543, 551, 577, 596, and cited by Thomas, "Age and Authority," British Academy, *Proceedings,* LXII (1976), 229.

28. James F. Larkin and Paul L. Hughes, *Stuart Royal Proclamations* (Oxford, 1973–), I, 494.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

of the Law will not be taken for 40 s[hillings]? but sure your own experi-
ence of what such *young Green persons* have been and done in former
Parliaments, hath I hope learned you sufficient wisdom, not to chuse the
like again.[29]

Do not elect minors, because they cannot make wise decisions. In making
this argument, Care exaggerated the legal disqualifications of those under
twenty-one.

William Penn played an important role in these debates, publishing pam-
phlets that urged electors to choose representatives carefully, appealing to
their reason and conscience. He made the governorship of Pennsylvania
inheritable via primogeniture. He did, however, set up provisions in case the
governor were under twenty-one that provided real power to a regent, signifi-
cantly beyond that given a protector of a king. So, although Penn did not
abandon the idea of inherited right based on primogeniture, he did respond
to one of the chief objections to it.[30]

England's monarchy, meanwhile, remained unreformed. Influential Whig
political writers of the early eighteenth century, even after the reforms in the
Lords and the Commons, continued to express alarm at the idea of young
kings in power—the last and most problematic of the three main arenas of
formal political power in early-eighteenth-century England where a child
could rule. Thomas Gordon and John Trenchard, in their popular *Cato's
Letters,* argued that a king who was a child was a horrifying proposition: by
definition he would be inexperienced, unlearned, and probably amoral. They
described a young king who refused to obey his "governor," or tutor. They
argued that, if a king gained power while young, it would be difficult for him
to be properly instructed in right or wrong, as children needed to be in-
structed. For Gordon and Trenchard, unrestrained power in a prince's hands
would corrupt his character and lead him to tyranny.

I have been told of a Prince, who, while yet under age, being reproved by
his Governor for doing things ill or indecent, used to answer *Je suis Roy, I
am King;* as if this Quality had altered the Nature of Things, and he himself
had been better than other Men, while he acted worse. . . . What then,
Sir? . . . By Nature you are no better than your people.[31]

29. [Henry Care], *English Liberties; or, The Free-born Subject's Inheritance* . . . [London,
1680?], 103.

30. Staughton George, Benjamin M. Nead, and Thomas McCamant, comps., *Charter
to William Penn, and the Laws of the Province of Pennsylvania* . . . (Harrisburg, Pa.,
1879), 98.

31. [John Trenchard and Thomas Gordon], *Cato's Letters; or, Essays on Liberty, Civil and*

*Children, Inherited Power, & Patriarchal Ideology* | 33

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the English Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Here Gordon and Trenchard sought to undermine the argument based on status. A king was no better than his people. While young and untaught, he should not have too much power to act "ill or indecent." A king who had not learned reason needed a governor and not unlicensed political authority. But no laws appeared in eighteenth-century England, during its long period of peace and stability, to limit the authority of young kings (perhaps because none in fact ascended the throne).

After the American Revolution, reformers introduced much higher age restrictions for elected office than had existed in England or in any of its colonies. The American Constitution imposed even higher age qualifications than twenty-one: twenty-five for serving in the House of Representatives, thirty for the Senate, thirty-five for the presidency. These restrictions did not come without debate. Notes taken by James Madison give insight into the controversy over age restrictions at the Constitutional Convention. Generally, the delegates agreed that the opinions of even a twenty-one-year-old "were too crude and erroneous to merit an influence on public measures" and that a young man should be better educated via experience before he should be able to obtain a position of such importance. The dominant view was summarized by George Mason of Virginia:

> Col. [George] Mason: . . . thought it absurd that a man to day should not be permitted by the law to make a bargain for himself, and tomorrow should be authorized to manage the affairs of a great nation. . . . He would if interrogated be obliged to declare that his political opinions at the age of 21. were too crude and erroneous to merit an influence on public measures. It had been said that Congress had proved a good school for our young men. It might be so for any thing he knew but if it were, he chose that they should bear the expence of their own education.[32]

Mason almost echoed Henry Care: if one cannot make "bargains," that is, personal contracts, one should not be able to hold elected office and consent to political contracts. Both Care and Mason exaggerated children's legal disabilities to make their point. In fact, children could make a variety of legal contracts, although this right too was changing during the eighteenth

_____

*Religious, and Other Important Subjects,* 3d ed. (London, 1733), II, 89. Also see Daniel Defoe, *Six Distinguishing Characters of a Parliament-Man* (London, 1700), one of which characteristics, he argued, should be advanced age.

32. Wilbourn E. Benton, ed., *1787: Drafting the U.S. Constitution* (College Station, Tex., 1986), I, 242. Mason's and Wilson's remarks are taken from James Madison's notes.

34 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Copyright © 2007. University of North Carolina Press. All rights reserved.

century, as the following chapters will trace. Indeed, Mason probably read Care's *English Liberties*. Mason, like Care, used the question of children's legal abilities to underline a point about education and understanding. Even at twenty-one, claimed Mason, a person is likely to hold "crude and erroneous" ideas.

James Wilson of Philadelphia responded to Mason by arguing that reason did not necessarily correlate with age. Yet both agreed that certain qualifications were necessary.

> Mr. Wilson was against abridging the rights of election in any shape. It was the same thing whether this were done by disqualifying the objects of choice, or the persons chusing. . . . There was no more reason for incapacitating *youth* than *age,* where the requisite qualifications were found. Many instances might be mentioned of signal services rendered in high stations to the public before the age of 25; The present Mr. Pitt and Lord Bolingbroke were striking instances.

Wilson thus argued against having an age qualification, implying that age did not determine wisdom, but his ideas were overruled in the final debate.

The *Federalist Papers* themselves did not comment explicitly on this debate, but James Madison supported the essence of Mason's speech. In Federalist No. 62, on the Senate, Madison wrote:

> The qualifications proposed for senators . . . consist in a more advanced age, and a longer period of citizenship. . . . The propriety of these distinctions is explained by the nature of the senatorial trust; which requiring greater extent of information and stability of character, requires at the same time that the senator should have reached a period in life most likely to supply these advantages.

Madison did not describe those under thirty as having "erroneous" ideas, as did Mason. But his linking of "advanced age" with "extent of information and stability of character" shows that he thought that age would bring broad experiences and greater control over passions. Indeed, Madison elaborated on this point in Federalist No. 63. Still referring explicitly to the purpose of the Senate and the qualifications of the senators, he asked: "[When the people go astray] how salutary will be the interference of some temperate and respectable body of citizens, in order to check the misguided career, and suspend the blow meditated by the people against themselves, until reason, justice and truth can regain their authority over the public mind." In the Virginia ratifying convention (1788), the delegates agreed to such age limitations for elected office: "We find no qualifications required except those of

*Children, Inherited Power, & Patriarchal Ideology* | 35

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

age and residence, which create a certainty of their judgment being matured, and of being attached to their state."[33]

The American Constitution not only attacked primogeniture indirectly by limiting the ages of those who could hold national office; it disallowed all hereditary offices. All political offices must thereafter be appointive or elective. This might seem to be a minor, or even an obvious stance, given that America had no hereditary aristocracy, no titled nobility. Of course, it did have some nobility before the Revolution—major propertyholders such as Lords Baltimore and Fairfax, Penn, and others who had titles in England. But the property of most of these titled, major landholders was confiscated on the grounds of treason (loyalty to England) during the Revolution itself. So almost no one with an English title retained land in America.[34]

But could not some new titles have been created as a reward for service or based on wealth, as Napoleon would do after the French Revolution? (Napoleon even created "senatoriates," an imperial nobility inspired by ancient Rome.) Hereditary titles could also have become a reward (or source of income and loyalty), following the practice of James I and Charles II in England during the previous century. The English system of government, upon which the Constitutional Convention was modeling its own, had two preserves where power was based on inherited right: the monarchy and the House of Lords. And in some areas of the country, particularly Virginia, South Carolina, and New York, a substantial inherited quasi aristocracy with vast estates (upheld by primogeniture) had been growing and developing. These landowners could have served as the basis of a new aristocracy had the members of the convention and the populace who were to approve the Constitution been so inclined. In a letter to her husband in 1774 Abigail Adams wrote of the elite in Virginia: "Are not the Gentery Lords and the common people vassals?" Or what about commencing a hereditary aristocracy with those who had been officers in the Continental army? (The Society of the Cincinnati, which was meeting at the same time as the convention in Philadelphia, proposed to limit its membership to this group and its descendants via primogeniture.) These persons could have formed the Senate. Of course, the founding fathers did none of these things. The Constitutional Convention rejected all proposals to endow inherited right with continued legitimacy. What was it in the ideas about

33. Jacob E. Cooke, ed., *The Federalist* (Middletown, Conn., 1961), 415, 425; George Nicholas, as quoted in David Robinson, comp., *Debates and Other Proceedings of the Convention of Virginia . . .* (1788), 2d ed. (Richmond, Va., 1805), 18.

34. Fairfax was one of the few who did not lose his claim, in his case, to the Northern Neck in Virginia. His case was disputed, however, for years after the Revolution and finally resolved only by the Supreme Court in 1816.

36 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Copyright © 2007. University of North Carolina Press. All rights reserved.

political legitimacy that dominated the Revolution, that existed among the founding fathers who were members of the elite themselves, that caused them to make such a break with the English past?[35]

Indeed, the Revolution was a more successful echo of the English Civil War of more than a century before, at least of the radical, heady period of the late 1640s: demolishing the monarchy and the House of Lords, enshrining the House of Commons, celebrating the idea that government should be based on the consent of the governed. The differences between the two, certainly in context, are more striking than their similarities. Yet what eerie parallels, at least in initial ideological approach! And why did the one collapse inward upon itself, becoming, in the end, its own antithesis, with a new hereditary monarchy in the person of Oliver Cromwell and no true consent? Cromwell's son Richard then proved no fit king—or protector—and Charles II was restored to the throne. The American Revolutionaries had the benefit of hindsight. But what strains and patterns of thinking, ideologically, connected the two revolutions? Why did Puritans play such an important role in these reforms in the seventeenth century? And why did many Americans come to be attached to the same ideas?

In the years after the Revolution, the Americans challenged inherited right with one further reform, which the English did not implement until the twentieth century, a reform that also measured the limits of their radicalism. They abolished entail, the legal system that enforced primogeniture and governed the transfer of most estates (and titles in England). Even reformers during the English Civil War had not abolished entail, although the Interregnum commission on legal reform of 1652–1653 questioned it.[36]

35. Beckett and Jones, "The Peerage and the House of Lords," in Jones, ed., *A Pillar of the Constitution,* 4–7; Louis Bergeron, *France under Napoleon,* trans. R. R. Palmer (Princeton, N.J., 1981), 62–70; Martyn Lyons, *Napoleon Bonaparte and the Legacy of the French Revolution* (New York, 1994), esp. 173; Georges Lefebvre, *Napoleon: From 18 Brumaire to Tilsit, 1799–1807,* trans. Henry F. Stockhold (New York, 1969), 184; L. H. Butterfield, Marc Friedlaender, and Mary-Jo Kline, eds., *The Book of Abigail and John: Selected Letters of the Adams Family, 1762–1784* (Cambridge, Mass., 1975), 112, 120.

36. Mary Cotterell, "Interregnum Law Reform: The Hale Commission of 1652," *English Historical Review,* LXXXIII (1968), 696–697, 701; Donald Veall, *The Popular Movement for Law Reform, 1640–1660* (Oxford, 1970); Firth and Rait, eds., *Acts and Ordinances of the Interregnum,* II, 587; Stuart E. Prall, *The Agitation for Law Reform during the Puritan Revolution, 1640–1660* (The Hague, 1966), 61–62; Joan Thirsk, "The European Debate on Customs of Inheritance, 1500–1700," in Jack Goody, Joan Thirsk, and E. P. Thompson, eds., *Family and Inheritance: Rural Society in Western Europe, 1200–1800* (Cambridge, 1976), 190. Objections stemmed not only from concerns about equality but from fraud in conveyances.

*Children, Inherited Power, & Patriarchal Ideology* | 37

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
    North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Entail, seen by eighteenth-century lawyers as feudal rules for the inheritance of power that enforced primogeniture, was much more common in colonial Anglo-America, especially in the South, than most historians have assumed. It had a powerful grip on a large portion of the land in tidewater Virginia. Entail, in lay terms, was a process by which some ancestor wrote in a will, "I leave this to my son and to *the heirs of his body* after him." This coded legal passage then prohibited the man who inherited the property from choosing to whom the property would descend: it automatically followed general rules of primogeniture and went to his eldest son or, if he had no son, to his daughters; if he had no daughter, to his brother; and on and on forever. (The property could descend to daughters, so long as the entail did not specify male heirs.) Primogeniture also described the system of inheritance in Virginia, throughout much of the South, and in England where a person who possessed nonentailed real property died intestate. Primogeniture and entail were part of English common law.[37]

Dissenter colonies, including Massachusetts and Pennsylvania, provided less legal support for entail, especially during the seventeenth century, and testators in these colonies invoked it less frequently. Massachusetts and most New England colonies had never used primogeniture to govern intestates, and entail was uncommon from the seventeenth century. Pennsylvania, although it allowed entail, probably never had a high proportion of testators who used it: fewer than 4 percent of Bucks County wills made between 1685 and 1756, for example, contained entail provisions. Even allowing that the 4 percent is an undercount and that over the eighty-year period from 1685 to 1765 (assuming four generations) 15 percent of property might have been entailed, entail was used much less frequently than in Virginia, where in the tidewater about three-quarters of all property was entailed by the time of the Revolution. When a landowner died intestate, Massachusetts divided the property among the male children but gave a double share to the eldest. Here, as in many instances that affected the legal status of children, the Dissenter colonies took a different path than both England and the southern colonies. Seventeenth-century and early-eighteenth-century fathers in Massachusetts and Pennsylvania had greater testamentary power than fathers in Virginia who possessed entailed property, and thus more real power over their children, at least before the Revolution.[38]

37. Holly Brewer, "Entailing Aristocracy in Colonial Virginia: 'Ancient Feudal Restraints' and Revolutionary Reform," *William and Mary Quarterly*, 3d Ser., LIV (1997), 307–346.

38. See Carole Shammas, Marylynn Salmon, and Michael Dahlin, *Inheritance in America: From Colonial Times to the Present* (New Brunswick, N.J., 1987), 34, and esp.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Those American states that had followed primogeniture and entail reacted against it years after the Revolution, for a variety of reasons, but especially because it had been the central pillar of birthright and aristocracy. They no longer felt that inherited right should be the reason for one brother's having power over his siblings, they accepted at least in part the arguments about equality, and they wanted to control children longer and to prevent them from gaining power while young. For example, the changes Jefferson proposed and Virginia legislators accepted abolished both systems (entail and general primogeniture). Estates were to be divided among all children (females as well as males) when a propertyholder died intestate. A testator had discretion over the disposal of his or her estate and the education of the children. This change generally increased the father's power over his children, since women rarely owned property separately when married, and even as widows often did not have more than a "life interest" in an estate (that is, they had no power over to whom the estate would go). Jefferson described a father's lack of beneficiary control under entail as a problem in the preamble to his bill to abolish it. Entail did "injury to the morals of youth, by rendering them independent of and disobedient to their parents." Jefferson regarded these reforms as the cornerstones of "the foundation . . . for a government truly Republican." They were doubly so: not only did they increase equality of opportunity for the younger generation, but they increased fathers' powers over their children by increasing paternal control over inheritance. Most of all, however, they challenged the power of a hereditary aristocracy. They shifted power, inasmuch as it was associated with land ownership itself, away from inherited right. They did not do so completely, however. Jefferson, like most post-Revolutionary leaders, did not seek to redistribute property among *all* people: the reforms still left the property with the family.[39]

_____

table 32-3. Massachusetts, Connecticut, New Hampshire, Rhode Island, Pennsylvania, and Delaware all gave the eldest son a double share of the estate relative to the other sons in the absence of a will. New York, New Jersey, Maryland, Virginia, and North and South Carolina gave all real estate to the eldest son, although personal estate was usually subject to a more equitable division. For an excellent study of the practical effects of paternal control over wills and the power it gave to fathers over their children in Massachusetts, see Philip J. Greven, Jr., *Four Generations: Population, Land, and Family in Colonial Andover, Massachusetts* (Ithaca, N.Y., 1970).

39. Hening, ed., *Statutes at Large*, IX, 226. See bills 20 and 21 of the revisal of the laws, in Julian Boyd et al., eds., *The Papers of Thomas Jefferson* (Princeton, N.J., 1950–), II, 391–392, 394. Also see bill 60, where it is directed that "any father, even if he be not twenty one years old, may, by deed, or last will and testament, either of them being executed in presence of two creditable witnesses, grant or devise the custody and tuition of his child, which had never been married, although it be not born during any part of the infancy of

*Children, Inherited Power, & Patriarchal Ideology* | 39

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

One last issue, a critical one, is who could vote. Most scholars who have examined suffrage have simply assumed that children could not.[40] Yet all evidence indicates that, if they met the requirements (usually property ownership), they could vote by age twelve. To acknowledge their votes is to chart a sea change in what it means to vote. Whether one was a "freeholder" or "freeman" might allow one to vote (although precise rules varied by borough). The terms could refer to males as young as twelve and did not explicitly refer to those over twenty-one, since most guardianships of land ended at age fourteen before the early eighteenth century. (Elite guardianships of land, those in knight's service, lasted longer.) Peter Legh, for example, discussed above, born in 1669, was made a freeman of Preston in 1682 (at age twelve) and a freeman of Liverpool in 1686 (at age sixteen), the year after he was elected to Parliament. During the Middle Ages, the laws rarely excluded children on the basis of age. When they did so, the ages were much lower, and different boroughs varied in what age or competency was relevant to legal maturity. Instead of age, the main qualifications rested on property ownership.[41]

―――――

such child, to whomsoever he will" (II, 485). Jefferson, "Autobiography," in Andrew A. Lipscomb, ed., *The Writings of Thomas Jefferson,* I (Washington, D.C., 1903), 73.

40. Inattention to age-based restrictions on suffrage is surprising, since so many historians have written about suffrage. Yet scholars have paid little attention to changes in age qualifications. When they have noticed age-based changes, they have explained them away, much as did William Blackstone in his contemporary discussion of eighteenth-century English voting requirements. Blackstone acknowledged that Parliament passed the first law that explicitly prohibited those under twenty-one from voting in 1696, yet in his effort to make the common law seem consistent he made no attempt to discover prior practice and implied that the 1696 law had ratified earlier policy. Albert Edward McKinley's classic study of suffrage noted that the first age restrictions on suffrage in Virginia appeared in 1699, but he misrepresented the text of the law when he claimed that it showed that such restrictions on those under twenty-one had existed earlier. John K. Gruenfelder's study of English elections has pointed simply to "confusion . . . over just who could vote" even within boroughs. See Blackstone, *Commentaries,* I, 157–158; McKinley, *The Suffrage Franchise in the Thirteen English Colonies in America* (Philadelphia, 1905), 35. The text of the 1699 law, however, merely introduces the requirement without much explanation. Gruenfelder, *Influence in Early Stuart Elections,* 13; Derek Hirst, *The Representative of the People? Voters and Voting in England under the Early Stuarts* (Cambridge, 1975), 29–40, 43, 104, 113, 115–116.

41. On the variations in medieval competency, see Mary Bateson, ed., *Borough Customs,* II, Selden Society, Publications, XXI (London, 1906), esp. 157–160. "Full age" requirements ranged from being able to tell a good penny from a bad, to measuring cloth or counting money. Age requirements ranged from twelve upward for a variety of types of legal activities, with variations between boroughs. On Peter Legh, see Henning, ed., *House of Commons,* II, 727.

Copyright © 2007. University of North Carolina Press. All rights reserved.

40 | *Children, Inherited Power, & Patriarchal Ideology*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

The basic requirement for voting in England during the seventeenth century was an annual income of at least forty shillings, although different counties and boroughs in England displayed dramatic variation in their suffrage requirements. In some, suffrage rights were inherited and belonged to a "self-perpetuating oligarchy." John Cannon describes four classes of voting requirements for boroughs: freeholder boroughs, scot and lot boroughs, burgage boroughs, and corporation boroughs. Freeholder boroughs set requirements that related to the value of the property, and scot and lot boroughs related suffrage to the payment of taxes. The last two both made suffrage hereditary: burgage boroughs attached suffrage to a particular piece of property, whereas in the corporation boroughs suffrage rights were personally inherited. Voting rights, in short, were usually attached to property ownership, not to age; they seemed to follow the same pattern of inherited right as, for example, the House of Lords, although they were obviously far less exclusive.[42]

The same law of 1696 that excluded them from serving in Parliament also barred those under twenty-one from voting for members. Before 1696, there was no requirement that electors be over twenty-one. During the Leveller debates in the 1640s at the end of the Civil War, John Wildman had demanded that those who elected the members of the House of Commons should be "all the free-born at the age of twenty-one years and upwards." Virginia followed England in 1699, in an act that used almost exactly the same language as its English counterpart: both acts not only excluded those under twenty-one from the suffrage and from elective office, but they also tried to limit corruption in voting, for instance, by excluding the treating of voters with food and drink before elections as an unjust form of influence. These were parallel attempts to limit the role of influence in elections, whether via children or drunk adults.[43]

Massachusetts and Pennsylvania introduced age qualifications for voting earlier than England or Virginia: Massachusetts in 1634 at twenty years, but raised to twenty-one in 1641 and to twenty-four for non–church members in 1664, and Pennsylvania at twenty-one in its "Laws Agreed upon in England,"

42. R. K. Webb, *Modern England: From the Eighteenth Century to the Present,* 2d ed. (New York, 1980), 52. On borough and county variations, see Mark A. Kishlansky, *Parliamentary Selection: Social and Political Choice in Early Modern England* (Cambridge, 1986), 13, 15, 19; John Cannon, *Parliamentary Reform: 1640–1832* (Cambridge, 1973), 29.

43. John Wildman, "The Case of the Army Truly Stated" (1647), in A. S. P. Woodhouse, ed., *Puritanism and Liberty: Being the Army Debates (1647–9)* . . . (Chicago, 1951), 433; 7 and 8 Will. III, c. 25. For Virginia, see McKinley, *The Suffrage Franchise,* 35; Hening, ed., *Statutes at Large,* III, 172–175.

*Children, Inherited Power, & Patriarchal Ideology* | 41

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

written in 1682.[44] Massachusetts permitted non–church members to vote only after intense pressure from Charles II, and then attached this higher age (and a higher property requirement). William Penn's "Frame of Government" was directly indebted to the controversies of the early 1680s. Algernon Sidney helped to draft it, and Penn himself was the author of two political tracts on the rights and responsibilities of electors, published in 1679 and 1687. In one, *England's Great Interest in the Choice of This New Parliament* (1689), he encouraged the electors to choose only *"Sincere Protestants."* Those who were not *"Sincere Protestants"* would support the *"Papal Interest,* which indeed is a Combination against good *Sense, Reason* and *Conscience,* and to introduce a blind Obedience without (if not against) Conviction. And that Principle which introduces Implicit Faith and Blind Obedience in *Religion,* will also introduce Implicit Faith and Blind Obedience in *Government."* Penn's equation of *"good Sense, Reason,* and *Conscience"* with the responsibilities of electors and his condemnation of blind obedience in religion, which leads to passive assent to government, illuminate the connection between Dissenters and consensual politics. The ties between Sidney and Penn as well as Penn's own expressions in these political tracts are consistent with Penn's introduction of age requirements.[45]

A century later, the argument that children should not vote was central to the broader debate about suffrage. In the constitutional debates over suffrage qualifications, Gouverneur Morris of Pennsylvania reflected on why the

44. McKinley, *The Suffrage Franchise,* 309, 277; George, Nead, and McCamant, comps., *Charter to William Penn, and the Laws of the Province of Pennsylvania,* 102, par. 34, "Qualifications of electors"; Nathaniel B. Shurtleff, ed., *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston, 1853–1854), I, 115. The age of electors was raised to twenty-one in Massachusetts in 1641; see *The General Laws and Liberties of the Massachusetts Colony* (Cambridge, Mass., 1672), 1. On pressure from Charles I, see Perry Miller, *The New England Mind: From Colony to Province* (Cambridge, Mass., 1953), 127. Even in New England, consensus was not necessarily reached at once on this issue. John Demos notes that, in the early years of Plymouth Colony, freemanship might well have come "before the age of twenty-one" and gives an example of a "puzzling" notation in the colony records from 1667. Demos, *A Little Commonwealth: Family Life in Plymouth Colony* (New York, 1970), 148.

45. On Sidney's contribution to William Penn's "Frame of Government," see Alan Craig Houston, *Algernon Sidney and the Republican Heritage in England and America* (Princeton, N.J., 1991), 232–233; Peter Karsten, "Who Was 'Colonel Sidney'?: A Note on the Meaning of the October 13, 1681, Penn-Sidney Letter," *Pennsylvania Magazine of History and Biography,* XCI (1967), 193–198. The tracts published by William Penn were *England's Great Interest in the Choice of This New Parliament, Dedicated to All Her Freeholders and Electors* [London, 1679] and *Advice to Freeholders and Other Electors of Members to Serve in Parliament . . .* (London, 1687). The quote is from *England's Great Interest,* 4.

42 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

states prevented children from voting in order to make larger arguments about other groups. "Children do not vote. Why? Because they want prudence, because they have no will of their own. The ignorant and the dependent can be as little trusted with the public interest." Morris was here using the exclusion of children from the suffrage as a basis for excluding others. Yet he was also making a larger, very strong argument that children could not consent, that their consent was in fact irrelevant, since "they have no will of their own" and were dependent. This argument makes some sense in a world where all votes were oral, before observers who would include one's father, landlord, or employer. John Adams made exactly the same argument in a letter arguing for the denial of the vote to all who were dependent, particularly poor men. "Children . . . have as good Judgment, and as independent Minds as those Men who are wholly destitute of Property." Children, like poor men and women, servants, and slaves, were dependent on those who fed, clothed, and employed them. Thus, for Adams, their votes could be swayed. He thought them incapable of making independent, rational decisions and of voting.[46]

Indeed, although all states settled on the age of twenty-one as appropriate for voting privileges, this settlement was not a given. George Mason, during the Virginia constitutional convention in 1776, had proposed that the suffrage be limited to those over twenty-four with property or to the fathers of three or more children. Also in 1776, Major John Cartwright, a radical in England, proposed lowering the voting age there to eighteen, when "a man is a sufficient judge between palpable right and wrong," and suggested that militia rolls then could be used as voting lists.[47]

Adams's and Morris's justification for excluding those "wholly destitute of property" from the vote was the strongest justification of property qualifications for suffrage, which reflected the ambiguities in republican political theory, the tension between equality and dependence. It described poor adult males as "dependent" and compared them explicitly to children. The arguments comparing poor men to children thrived in the late seventeenth and

46. Benton, ed., *1787: Drafting the U.S. Constitution,* I, 228, 229 (also see Hamilton's *Federalist* no. 79: "A power over a man's subsistence amounts to a power over his will" [Cooke, ed., *Federalist,* 531]); Adams to James Sullivan, May 26, 1776, in Robert J. Taylor et al., eds., *Papers of John Adams* (Cambridge, Mass., 1977–), IV, 208–213.

47. Julian A. C. Chandler, *The History of Suffrage in Virginia* (Baltimore, 1901), 16; John Cartwright, *The Legislative Rights of the Commonalty Vindicated; or, Take Your Choice! . . .* , 2d ed. (London, 1777), 147–148, cited in Thomas, "Age and Authority," British Academy, *Proceedings,* LXII (1976), 232. Thomas sees Cartwright as exceptional. Thomas, however, did not notice the debate over age-based suffrage qualifications described above.

*Children, Inherited Power, & Patriarchal Ideology* | 43

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

early eighteenth centuries, an outgrowth of the same political theories that led to the introduction of age requirements and provided the justification for the American Revolution. This description of those without property as without "good judgment" enabled older status codes to be justified in new ways.

But these new connections were fragile. Outside of justification for the authority over children, consent-based political theory had a powerful egalitarian message that undermined the older status-based distinctions. Breaking the connection between the "dependence" of those who did not own property and their inability to make "good judgments" and have "independent minds" meant allowing them citizenship rights. Property requirements were removed in Pennsylvania during the Revolution, but not in Massachusetts until 1821 and not in Virginia until 1850. Thus, as the many refused to accept the fragile connection between property, independence, and reason during the late eighteenth and early nineteenth centuries (and the secret ballot gave them more independence), ancient property restrictions on the franchise disappeared. Yet even as poor men ceased to be compared to children, other groups, such as women, native Americans, and African Americans, became more likely to be compared to children in their ability to make informed and independent judgments.[48]

The transition from primogeniture and patronage to consent as the fundamental principle underlying legitimate authority is clear. But why exclude children so pointedly? Focusing on children illuminates the meaning of consent and the contest over that meaning. It casts in sharp relief the emergence and construction of that body of ideas clustered around equality and consent. Indeed, in arguing for government based on consent versus government based on inherited right, children were at the center of the controversy.

48. Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (New York, 2000). There is a well-established literature on property qualifications for voting in the various states. See, among others, J. R. Pole, *Political Representation in England and the Origins of the American Republic* (Berkeley, Calif., 1971); Donald S. Lutz, *Popular Consent and Popular Control: Whig Political Theory in the Early State Constitutions* (Baton Rouge, La., 1980); Willi Paul Adams, *The First American Constitutions: Republican Ideology and the Making of the State Constitutions in the Revolutionary Era,* trans. Rita Kimber and Robert Kimber (Chapel Hill, N.C., 1980); McKinley, *The Suffrage Franchise;* Chandler, *The History of Suffrage in Virginia;* Chilton Williamson, *American Suffrage: From Property to Democracy, 1760–1860* (Princeton, N.J., 1960); Marchette Chute, *The First Liberty: A History of the Right to Vote in America, 1619–1850* (New York, 1969); Rosemarie Zagarri, *The Politics of Size: Representation in the United States, 1776–1850* (Ithaca, N.Y., 1987); John Phillip Reid, *The Concept of Representation in the Age of the American Revolution* (Chicago, 1989).

44 | *Children, Inherited Power, & Patriarchal Ideology*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:57:39.

# EXHIBIT R

## CHAPTER 7

### THE EMERGENCE OF PARENTAL CUSTODY

CHILDREN AND CONSENT TO CONTRACTS

FOR LAND, GOODS, AND LABOR

*"And an infant of the age of four years may make a will, and it*
*shall be good for all his goods and chattels."*
*John Perkins,* Treatise of the Laws of England on
the Various Branches of Conveyancing *(circa 1540)*

*"Our children be not* in potestate parentum, *as the children*
*of the Romans were: but as soone as they be* puberes,
*which we call the age of discretion, before that time nature*
*doth tell they be but as it were* partes parentum. *That which*
*is theirs they may give or sell, and purchase to themselves other*
*lands and other moveables the father having nothing to doe*
*therewith. And therefore* emancipatio *is clean superfluous,*
*we knowe not what it is."*
*Sir Thomas Smith,* De Republica Anglorum *(1583)*



In February 1752, the churchwardens of Frederick Parish, in Virginia, bound
four white children whose father had died into apprenticeships: Jonathan
Rose (age thirteen), Hannah Rose (nine), Abigail Rose (five), and Isaac Rose
(one). Likewise, they bound John Smith (three) and his sister Eleanor (six) in
August 1752 (both also white) to learn the "skills" of "husbandry" and spin-
ning and sewing, respectively. Only the mother of the Rose children lived;
both parents of John and Eleanor Smith were alive but poor. The records of
colonial Virginia are full of such apprenticeships for white children, which
almost always split families apart and were done without concern for the
consent of either the parents or the child. These cases show little concern for
parental "custody" as we would think of it. Note also that the children were
not "adopted" or in "foster care" or orphanages, but bound to labor for others
until they reached age eighteen (for girls) and twenty-one (for boys). "Family"
and parental custody had very different meanings in the common law prior to
the late eighteenth century. It was not simply that poverty could abrogate
parents' or even the child's rights, but that family had a legal meaning that
was interwoven with rank in society. This was a society where the rights of

Copyright © 2007. University of North Carolina Press. All rights reserved.

masters trumped those of parents, and it grew out of much older feudal norms preserved in the law books that the Virginians brought with them. Indeed, the binding of these white children, even though it was for a limited time, parallels the sale of black children who were enslaved, a practice occurring at the same time in the same county. While there were some differences in future opportunities for these black enslaved children from those for white ones, both practices shared common origins and principles.[1]

Custody as a principle of law as we know it today did not exist four centuries ago in England or America. Parents had some authority over their children, and it became, increasingly, the subject of important public debates. The legal principles that parents or others are "responsible" for their children if they are hurt (explored above in discussing criminal intent) or that parents should legally make decisions for them were simply not there. Parents often influenced their children's decisions, of course: that is partly what this chapter is about. But most law books said nothing about custody. The only place that the term appeared in the law was with respect to guardians, but guardians existed only for heirs. Likewise, their powers, which varied depending on the nature of the guardianship, were very different from guardians' powers today. Masters' or lords' rights, on the other hand, though not called custodial, were firmly established. Parental custody, in short, was not much of a legal issue—except in the case of heirs. Even then it was different.

It was different in part because birth status was in many ways more important to the law than consent in the sixteenth century. To the extent that consent was important, children's consent was in many cases valid. The rights of "lords" predominated except when a child was an heir. Yet these legal principles have been difficult for scholars to imagine because our modern legal norms are so powerful. Writing in nineteenth-century England, Sir Henry Maine noted that the shift that characterized the transition away from feudalism toward a "modern" social order was one from status to contract: formerly one's position and legal rights were associated with one's status, but they began to be based on the rules of contract instead. Despite this immense shift in norms, he saw children's legal abilities as outside this shift. Children cannot make contracts (and always could not), he contended, because they

1. Frederick County Order Books, IV, 117, 264, at Library of Virginia, Richmond (hereafter FCV OB; and Minute Books, MB). John K. Nelson, *"A Blessed Company": Parishes, Parsons, and Parishioners in Anglican Virginia, 1690–1776* (Chapel Hill, N.C., 2002), chap. 8, counted 7,470 such bindings in his survey through some of the surviving records of thirty-one Virginia counties. Virtually all of them were white children. On the absence of adoption in early America, see Yasuhide Kawashima, "Adoption in Early America," *Journal of Family Law,* XX (1981–1982), 677–696.

*Children and Consent to Contracts* | 231

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Brewer Exs. Page 434

cannot exercise judgment. "The great majority of Jurists," he asserted, "are constant to the principle that [children and the insane] are subject to extrinsic control on the single ground that they do not possess the faculty of forming a judgment on their own interests; in other words, that they are wanting in the first essential of an engagement by Contract." Although Maine noted that consent had become more important than status, he did not address what the earlier period had meant for children: he assumed (as have most scholars), in fact, that fathers had had extensive and unlimited power. But neither the principle that children should be "subject to extrinsic control" because they cannot form judgments of their own interests nor the principle that fathers had extensive and unlimited powers over their children existed within the early law. Nor did "contract law" yet exist as a unified body of thought. To tell the story of children's ability to make and unmake contracts (and of granting parents the ability to act on their behalf) is to tell the story of contract law itself. It is about how meaningful, legitimate, and reliable consent became central principles of the common law.[2]

In the late sixteenth century, most children had no "custodian," whether guardian, master, or parent. Parents normally had no custodial power. Masters obtained their authority by contract. Only guardians had what they called custodial power, and that usually ended at age fourteen. Children were "responsible" for themselves in the sense that they could form many valid contracts—influence from their "friends" (parents or others) was common, but parents did not legally make the decision. In some cases children were allowed to annul their contracts, but not in others. By the early nineteenth century, in England and the various states examined here, virtually all children had custodians to make decisons for them during a custody that usually ended at a standard age of twenty-one. This period demarcates many significant changes, the most important being the emergence of parental custody as we know it, in the wake of challenges to birth status and a decline in children's ability to form all types of contracts, even for labor. Its roots were in changing ideas about what constitutes meaningful consent, which were coupled with an emphasis on parental authority as most "natural."

### Custody in the Late Sixteenth and Early Seventeenth Centuries

The term "guardian" evokes images of a standard idea of minority, with consonant privileges and restrictions. However, guardianship was actually suprisingly different in the sixteenth and early seventeenth centuries. The

2. Henry Sumner Maine, *Ancient Law: Its Connection with the Early History of Society and Its Relation to Modern Ideas* (1861), new ed. (London, 1930), 180–181.

232 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

most important single fact is this: only heirs had guardians; indeed, mostly only heirs of land had guardians. In a society where inheritance of land was governed usually by primogeniture, then, only a small minority of orphans had guardians.

A father or mother could be guardian to the heir (assuming the heir inherited land from a more distant relative). But normally the idea of custody did not even apply to the rights of parents but concerned only the rights of this small group of guardians. Such a thing as a "guardian for nurture" did exist but was relatively unimportant. That the law books say almost nothing about it is perhaps the most important point. Today such guardians, including parents, are responsible for the nurture and care of a child and make decisions on their behalf. Then, most children had no such person, and such a person was not perceived as legally necessary. Young children were viewed as needing care and nurture, but not as belonging to a parent, who made decisions for them. And the sense of adult responsibility was much less.

Those who were heirs of land did get guardians. But the role varied dramatically, depending on the way the land was held. And here the reader must absorb some strange terms, because they formed the very core of the land law during this period: knight's service, copyhold, and socage. Land could be held in a variety of ways. If one held an estate in "knight's service" (virtually all of the land that Henry VIII acquired from the monasteries was sold with this restraint on it), then the understanding was that one owned the land in exchange for serving as a knight for the king (or any lesser lord if one held the land directly of him) when he so commanded. If one was unable to serve (as with a male under twenty-one), then the king reclaimed that land until one was able. For boys who married, who sought knighthood, or who literally bought their own wardships from the king or queen, wardship ended earlier. For girls it ended earlier still: it never started if they were fourteen when they inherited the land; if under fourteen, it ended when they married or at sixteen. The presumption was that they would marry a knight to serve the king.[3]

But the twist here is that guardianship in knight's service actually comprised three components: guardianship of the land; guardianship of the body of the ward; and, as an extension of the guardianship of the body, some

3. Sue Sheridan Walker, "Proof of Age of Feudal Heirs in Medieval England," *Mediaeval Studies,* XXXV (1973), 306–323; Edward Britton, *The Community of the Vill: A Study in the History of the Family and Village Life in Fourteenth-Century England* (Toronto, 1977), 46–47; Joel Hurstfield, *The Queen's Wards: Wardship and Marriage under Elizabeth I* (London, 1958), 137, 166. For an example of full age, see Marian K. Dale, ed., "Court Roll of Chalgrave Manor, 1278–1313," *Bedfordshire Historical Record Society,* XXVIII (1950), 46. For estimate of Charles I's income from the court of wards, see Christopher Hill, *Intellectual Origins of the English Revolution Revisited* (Oxford, 1997), 321.

*Children and Consent to Contracts* | 233

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

influence over the ward's marriage. A guardian in knight's service could (and often did) sell the rights separately. Under knight's service the king or queen (or sometimes a lesser lord) was entitled to all of the profits from the estate (out of which he or she remitted a small amount to maintain the child in question). The lords of manors exercised similar control over the bodies and lands of heirs of those who held copyhold land from them (who were their tenants). In other words, the land returned, temporarily, to the lord. This practice can be seen as a kind of tax. Indeed, by one estimate, this type of guardianship—and the sales of the profits of wards' lands and bodies—had brought Charles I more revenue than the rents from all of his crown lands (which he owned directly).[4]

The most common type of guardianship, however, was of wards who held land in "socage" (that is, freehold). In this case, the heir would automatically be given a guardian of his or her body and land until reaching the age of fourteen. This guardian would not be a lord or king; instead, the guardian had to be the closest relative of the child to whom the property could not descend. Elaborate descriptions explained who this person had to be. When the property was inherited via the father, for example, the guardian would be the mother if she lived, her eldest brother if she did not, and so on. A father could be guardian in socage if, for example, his son inherited land from a maternal grandfather. Guardians in socage, unlike guardians in knight's service, did not keep the profits of the estate. Instead, they had to make a careful accounting to the ward when the ward reached fourteen. Neither did such guardians get to arrange or encourage a ward's marriage. The guardian's rights, in other words, were relatively limited. After the heir reached fourteen, he could "oust the Guardian . . . and occupy the Land himself if he will" and could choose a guardian (and rechoose), if he wished.[5]

4. Hill, *Intellectual Origins of the English Revolution Revisited,* 321.

5. Edward Coke, *The First Part of the Institutes of the Laws of England . . . ,* 11th ed. (London, 1719), 79a, 88a–90b (hereafter referred to as *Coke upon Littleton*); Coke, *The Complete Copyholder . . .* (1641), 35 (hereafter referred to as *Complete Copyholder*), in *Coke upon Littleton.* "The next Friend unto the Heir, to whom the Inheritance cannot descend, shall have the Ward of the Heir's Body, and of his Land until the Age of fourteen." (Coke is here commenting upon Littleton's treatise of almost two hundred years earlier.) The 11th edition of 1719 is virtually identical to the 2d edition of 1629 in text (unlike editions of Blackstone, which were continually updated).

When a parent had wardship of the heir, Coke called this "guardianship by natural law": *"Legitimus jure naturae,* as where the Father or the Mother hath the Wardship of their Heir apparent." *Complete Copyholder,* 35.

For examples of fourteen (or reaching fifteen) as the key age, see Walker, "Proof of Age of Feudal Heirs," *Mediaeval Studies,* XXXV (1973), 313, 317.

234 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Although there were ten different types of guardianship in England by the sixteenth century, most of them corresponded to one or the other of these two main types. In almost all cases, guardians existed only for those "orphans" (usually fatherless children) who inherited landed property.[6]

The one unusual type was set up for heirs of merchants in London. London was allowed a special exemption (and had to pay for it) to disbar any lord from claiming wardship over a child, even if the lord might otherwise have rights by the way the heir owned land. Instead, the court of orphans took the goods and lands of such an heir and set up an elaborate system of paying interest on the money, one from which city officials seemed to make a tidy profit. It was unusual in several respects, most importantly in that it assigned guardians for heirs of goods. Also, because the custom of London divided (of necessity) a father's estate in goods among his children and his wife (one-third to be divided among his children, one-third to his wife, one-third to be disposed of by testament), more of his children would be his heirs than was the norm elsewhere, where primogeniture tended to govern the distribution of land. Still, only the most elite orphans got guardians. The average estate in the London Court of Orphans in the year 1662–1663, for example, totaled more than £1,665. The children in question had guardians of their body (usually their mother, if she were alive) as well as for their estate and were wards until they reached twenty-one.[7]

In none of these cases could the father (or mother if she owned land) determine the custody of the child. According to Coke in 1628 (who was clearly trying to modify the system to give fathers more power), a father could designate custody of the land past his heir's age of fourteen. Likewise, if they wanted (presumably in order to make a more secure rental or sale), heirs in socage could choose someone to be guardian for their land after they reached the age of fourteen. But such heirs did not need a guardian for their land. And no one could have custody of the body of an heir in socage after the heir had reached age fourteen.[8]

6. On other types of wardship, and the rights granted by them, see, generally, Stephen Edward Jess, "Orphanage in Tudor-Stuart England: The Law and the Practice, 1509–1660" (Ph.D. diss., University of Nebraska, 1974), esp. 98–101. On guardianship in socage, see 34–35. Also see Frederick Pollock and Frederic William Maitland, *History of English Law before the Time of Edward I,* 2d ed. (1898; Cambridge, 1968), II, 443–444.

7. Charles Carlton, *The Court of Orphans* (Bristol, 1974), 46–47; Barbara Hanawalt, *Growing up in Medieval London: The Experience of Childhood in History* (New York, 1993), 51, 202–203.

8. See Coke, *Complete Copyholder,* 34. If a father appoints a guardian, "and withal committeth the Care of his Child's Body and Disposition of his Substance unto some friend . . . until he accomplish the full age of fourteen years; and then immediately he

*Children and Consent to Contracts* | 235

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Although parents were allowed a few privileges over their children, these privileges were not central to the law and were of short duration. Parents could punish their children "in reasonable and moderate manner only" according to Michael Dalton's 1618 *Countrey Justice.* Although Dalton allowed that "Assaults and Batteries be for the most part contrary to the peace of the realm," parents and masters were allowed this privilege on the grounds that they had "a natural authoritie" over their children "within age." But it seemed to end at fourteen. "Guardianship by nurture" (the only type of guardianship that at all approximates our own), the guardianship of parents that assumes they will nurture their child, ended at fourteen, according to Coke. (And Coke, as will be shown below, was trying to strengthen ideas about parental custody.) Sir Thomas Littleton himself, upon whom Coke was commenting, said nothing about "guardian per cause de nurture" when he wrote in the fifteenth century: it was present only in Coke's commentary. Most law books of this period, although they dealt extensively with land law, conveyancing law, criminal law, and the powers of guardians over wards, said virtually nothing about the powers of parents.[9]

So what happened to the majority of orphans? Who had "custody" of them? Someone must, one assumes, have cared for them as a guardian would today. Not quite. Status runs through the answer to this question as it runs through the law during this entire period. The law did not care about children's welfare, but about their land and money. Children in elite and middling families whose father had died usually lived with their mother. No great effort was made to provide legal guardians, although a father could, particularly if he left his child a landed legacy. If he did, the wardship of the body ended by fourteen. But formally assigning a guardian did not seem to be necessary. The executor of the estate, often the mother, would typically handle the payments due out of it, to be paid at the appropriate times. If the mother was also dead, then the children might live with a relative or godparent who would care for them. For middling or poorer children, the death of a father could bring significant economic distress, not only because the father's trade

———

shall be out of Ward for his Body, but his goods may be kept longer; for as for them they shall remain in the Trustees Hands so many Years as the Testator appointed by his last Will and Testmament: For tho' it be not in the Father's Power to restrain the Liberty of his Child's Body longer than to the age of fourteen, yet the disposing of his Goods he may commit to any for as long Time as himself shall think expedient." This does not apply to land held in knight's service or copyhold, when the father cannot appoint any guardian, for land or body, since the lord's rights are superior to his.

9. Michael Dalton, *The Countrey Justice* (1618; rpt. Amsterdam, 1975), 149; Coke, *Coke upon Littleton,* 89a. Also see Coke, *Complete Copyholder,* 34; and *Ratcliffe's Case,* in George Wilson, ed., *The Reports of Sir Edward Coke . . .* (London, 1777), 5 Co. 37, II, 37–42.

236 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

or labor had provided the money to support the family but because the inheritance practices often left all the children but the heir with no claim to the land. Their mother might be able to support the other children out of her dower right or jointure, were she still alive. The father's goods, after his widow's one-third, were also usually apportioned between the children, with a double share to the eldest son, but the goods represented only a portion of the family's former estate. The smaller the family estate, the more likely such children would fall on the poor relief system: they might go begging; they might be forced to work. Thus the majority of orphans did not get guardians; if they got anything legally constituted, they got masters. And those masters, like the lords in knight's service, had real power over them.

### Children's Consent to Contracts in the
### Late Sixteenth and Early Seventeenth Centuries

The late eighteenth and early nineteenth centuries have been called the period of the "rise of contract." Only then did ideas about contracts become central to the law and receive their own legal treatises. But changes in contract law were happening during the earlier two centuries as well and are intertwined with the struggles over justice and power that followed the Reformation. These legal transformations originated with lawyers and judges directly involved in the religious and political debates over consent that convulsed England in the seventeenth century. In many cases, these men sought to bring changes via judicial fiat—which disguised the change—even in the face of unsuccessful legislative reform. In other cases, they sought and achieved open legislative reform.[10]

But whether open or not, these common lawyers changed the grounds for making legal contracts to exclude force, influence, *and children* as part of a general effort to create a unified law about valid consent. They sought one rule that applied to all types of promises, vows, and agreements, including the ability to vote; they sought to unify a mishmash of varying norms for consent into one consistent principle that determined when consent was valid and binding across all kinds of contracts, whether for goods, land, labor, marriage, or power. Only when the transitions in all these categories are placed side by side does their full scope become clear. For men such as Edward Coke in the early seventeenth century or Gouverneur Morris at the United States Constitutional Convention, the logic of the law should be consistent about the ability to consent.

While some common law reforms about children's consent preceded other

10. P. S. Atiyah, *The Rise and Fall of Freedom of Contract* (Oxford, 1979).

*Children and Consent to Contracts* | 237

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

statutory reforms (such as those about suffrage), they seem to have done so in part because the judges could manipulate certain parts of the common law more easily in response to their principle of justice. Common law reformers used the law to influence the larger ideological debate over political power: who should have power, and why? Coke, as we shall see, overreached himself—to adjudicate about the sources of political power—and failed. He did shape, however, reforms in areas perceived to be more purely "common law." Coke and others did not see these changes in contractual ability simply as useful tools for reforming political power: they consciously sought to systematize, to unify, to justify a whole new system of thought that made consent central. At the same time, that system excluded some from the right to consent based on a logic of inability: those persons became subject to custody.

In the early sixteenth century very different guidelines circumscribed the ability to contract. Although the age of twenty-one in some cases defined "minority," it did so only loosely as an outside delimiter, and only within the common law. Because the jurisdiction of the common law was much narrower, many contracts, including wills and marriages, were governed by ecclesiastical courts, for which the age of full majority was fourteen for boys and twelve for girls. The key issue here is *not* that the ages of twenty-one or fourteen or twelve existed as reference points, but that the meaning of those boundaries shifted. Depending on the nature of the legal contract, the consent of those under age twenty-one was often revocable at their own desire before they turned of age; in many other cases children under that age entered binding contracts. The one area where the contractual ability of children seemed to change least was in their ability to sell, rent, or make a testament of land. But even there the illusion of similarity masks real differences over what would make a valid contract.

Contracts were not as central to law in the Middle Ages; the word, in fact, hardly existed. What we would call contracts of course existed; they were called deeds (*faits* in the law French) or indentures or feoffments (wills) or vows (for marriage, to become a monk or nun, and so forth).[11] But no unified law governed these various agreements. The modern conception of a contract as a legally binding agreement only when a person was qualified to enter such an engagement, wherein the promise itself made the covenant binding,

11. Sir Thomas Littleton died in 1481. His treatise was first published in 1481 or 1482 (A. W. B. Simpson, ed., *Biographical Dictionary of the Common Law* [London, 1984], 316). His treatise did not use the word *contract*. Coke uses it in his commentaries on Littleton to refer, for example, to a deed to rent land from one person to another, but only rarely, and it was clearly not the best legal term (47b, 162b).

238 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

existed in the Middle Ages in very different and less generalizable forms. Certain legal rules did govern exchange relationships. However, these rules paid less attention to age or maturity. Very young children consented to valid contracts of different types; they placed their marks at the bottom of indentures for apprenticeship and on wills and on deeds for goods and land, and they repeated after the minister in marriage ceremonies. In a few cases their consent was void, but usually their consent was either voidable (at their own discretion) or binding, depending on the age of the child and the type of contract.

Fulfilling the formalities made a deed good. All deeds and indentures for land, the most important category, needed to be formally rendered on paper; the law recognized no other surface, because other surfaces that people might write on, such as wood, were more likely to deteriorate. To be valid, such contracts had also to be accompanied by the seals of those who agreed to the covenant and had to be written with specific words. At least two copies had to be made, one for each party who agreed.[12]

Coercion to obtain the consent of the seller or the buyer did not make a deed void so long as these formalities were met. When he wrote his legal treatise on "conveyancing" sometime before his death in 1545, John Perkins generalized about deeds and wills to transfer land. If properly performed, in the sense that they are written and sealed, such agreements are voidable, but still valid, even when made under duress. "All Feoffments, Leases, gifts or grants, made by duresse are voidable; and not void"; they can be voided by "the parties themselves, by their heires, and by those who have their estates." In other words: if someone forces me to sign a deed to sell or rent him land, it is valid unless and until I or my heirs or my guardian protests it formally. This may sound like a trivial distinction, but consider its implications: only a limited number of people could actually void such agreements. And agreements had to be actively avoided. Force, in short, was given, not full legitimacy, but a measure of it.[13]

The strongest constraints on the contractual power of children were with respect to their selling land. Even here, however, they had considerable dis-

12. All examples of indentures and deeds given by Littleton (pre-1481) concern land. See *Coke upon Littleton,* 143b, 229a–230b. These requirements are in Littleton. Coke defines *fait* as "a deed, and signifieth in the Common Law, an Instrument consisting of three things, viz. Writing, Sealing and Delivery, comprehending a Bargain or Contract between Party and Party, Man or Woman" (172a–172b).

13. John Perkins, *A Profitable Book . . . Treating of the Lawes of England* (London, 1642), par. 16. (Different editions of Perkins I checked contain text with the same meaning but have different titles and appear in three languages, Latin, law French, and English.) Perkins's book was also called by such names as *On Conveyancing.*

*Children and Consent to Contracts* | 239

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

cretion, and the rules varied by locality. According to the mainstream common and canon law of the sixteenth century, children could not make wills to give away land until age twenty-one, but they could rent or sell it by deed (so long as they did not violate other encumbrances on the estate). Although they could avoid those deeds at any time before age twenty-one, their heirs could not. In many localities this guideline varied such that at age fifteen a child's devise of land was binding and unavoidable.[14]

Buying land was easier than selling it and was admissible even for Coke. "An infant or minor (whom we call any that is under the Age of 21 years) hath without Consent of any other, capacity to purchase, for it is intended for his Benefit, and at his full Age, he may either agree to it, and perfect it, or without any Cause to be alledged, waive or disagree to the purchase." Littleton as well as Coke discussed this issue under the category of joint heirs to land, where the land was divided among all the children while some were younger than twenty-one. The voidability clause provided an avenue for the child to disagree later if the partition were unfair.[15]

Most other contracts did not have to be as formal as those for land. Apprenticeships and other labor contracts usually required formal deeds. But most personal items (goods and chattels) required no formal indenture to exchange them. Although some exchanges of goods used formal deeds when they were for the future, many transactions for goods were completed at one time, as on a market day, and did not require a deed. Other types of contracts, such as marriage, accepted oral promises rather than written ones. Although narrow rules circumscribed their validity as well, they were different rules. Wills fell in between the two categories; they could be oral or written.[16]

The law distinguished between children's abilities to buy and to sell goods and chattels. All of their immediate exchange for goods or chattels was binding; it was done. But if a child wanted to be obliged to pay in the future (important, since a child might not have immediate control of lands or money

14. Ibid., par. 504: "But if there be a Custome, that all lands and tenements within such a precinct etc. are devisable by all manner of persons, which are of the age of 15 years, or above such age. A devise made of lands or tenements by one of such age is good."

Perkins was cited by William Blackstone as unusual in allowing a four-year-old to make a will by the late-eighteenth century. See Blackstone, *Commentaries on the Laws of England* (1765–1769; rpt. Chicago, 1979), II, 497 (chap. 32) (the reference remained in editions published through 1778, that is, until Blackstone's death in 1780).

15. *Coke upon Littleton*, 2b, 171b.

16. A. W. B. Simpson, *A History of the Common Law of Contract: The Rise of the Action of Assumpsit* (Oxford, 1975), 23–25, 35–36, 199–207; Henry Swinburne, *A Briefe Treatise of Testaments and Last Wils . . .* (1635; rpt. Amsterdam, 1979), part 1, 5, 43.

240 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

but would inherit later), then the agreement could in some cases be voided. In many other cases, it could not. The ability to purchase by bond (or formal agreement to pay in the future) was binding so long as one "needed" the item one bought: "If an infant at the years of discretion make a bond for his necessary meat and drink, or for his necessary apparel, or his schooling, he shall not avoid the same." Usually only the child could avoid the promise, and only within a narrow window. When exchange was immediate or for necessities, it was presumed binding on the grounds that children often had to provide their own necessities, especially if older than fourteen.[17]

Sales by infants gave them greater possibilities to avoid the exchange, but they were still good, so long as the "infant" gave "delivery of his own hand," that is, freely. Force to extract a sale from a child would void it completely. A child under the age of twenty-one had to give a horse freely when asked in order to confirm its sale by deed, for example. Such exchanges "are voidable by himself, and his heirs, and by those which shall have his estate." In other words the child, his heirs, or the guardian of his land (or the executor of the estate, if the land was still in the executor's hands) could void the sale of goods. Most conveyances by children were voidable, although their validity varied widely by the nature of the contract—for what, for when (present or future), via what medium (oral or written), and the age and sex of the child.

Testaments by children to give away their goods, money, and chattels, however, were binding once the child died. Children of four or older could make wills for their goods and their chattels, according to Perkins, one of the most widely read treatise writers on conveyancing; Henry Swinburne, another, later, judge, stated that the minimum age to write such a will should be fourteen for boys and twelve for girls. The City of London had its own rules. There, children under twenty-one could not make valid wills, whether for land or for goods and chattels. But, outside London, it appears that very young children, even under puberty, might make binding wills.[18]

17. Perkins, *Treating of the Lawes of England,* pars. 13, 14; 16 (on force); 503, 504 (on testaments); 13, 14, 19 (on voidability).

18. Carlton, *Court of Orphans,* 62. "And an infant of the age of foure yeares may make a will, and it shall be good for all his goods and chattells" (Perkins, *Treating of the Lawes of England,* par. 503). The same age of *four* appears in the editions of 1565 (in law French), 1642, and 1757; 1565: "enfant del age de iiii ans poit faire testament e serra bon" (fol. 97). Also see Swinburne, *Treatise of Testaments and Last Wils,* part 2, 61–62. Note that this concerns only testaments for goods, not lands: "A boye cannot make his Testament before hee have accomplished the age of 14. yeares, nor a wench before she have accomplished the age of 12. yeares. In so much that if before these foresaid yeares they were of that ripenesse of wit, that they were *doli capaces,* capable of deceit, or able to discerne betwixt good and evill, and betwixt truth and falshood; yet could they not make

*Children and Consent to Contracts* | 241

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

According to Sir Thomas Smith, who summarized English law in 1583 and compared it to Roman law, English children could and did exchange goods and lands even when their fathers were alive. He argued that, unlike Roman law, English law recognized no age of emancipation.

> Our children be not *in potestate parentum,* as the children of the Romans were: but as soone as they be *puberes,* which we call the age of discretion, before that time nature doth tell they be but as it were *partes parentum.* That which is theirs they may give or sell, and purchase to themselves other lands and other moveables the father having nothing to doe therewith. And therefore *emancipatio* is clean superfluous, we knowe not what it is.[19]

Although children before puberty did not seem to have the same liberties to "give and sell, and purchase" as those past puberty, the very fact that puberty rather than intellectual capabilities provided the only partial guideline is important. Smith's statement, that *"emancipatio* is clean superfluous, we knowe not what it is,"* provides a distinct contrast to later policy, which did set an age of emancipation, at an age well beyond puberty. Infants could possess land as well as exchange it; they did not need to be represented in court by anyone, but appeared in their own right. Far from having to sue by representation of their guardian, they could actually sue their own guardian. They were responsible for their actions. "Any speculative objection that there may be against the attribution to infants of an *animus possidendi* [a will to possess], runs counter to English habits."[20]

Their ability to bind themselves by their own consent is clearest with respect to their ability to bind themselves, their own bodies, in labor contracts. The primary sovereignty over their own selves was within their own discretion. Yet others were expected to have influence over them: force and

_____

any Testament, nor dispose of their goods." "Howbeit a boye after the age of 14. yeares, and a wench after the age of 12. yeares, may make a Testament and dispose of their goods and cattels, and that *not onely without the authoritie or consent of their Curator or guardian, but also without the authoritie and consent of the father,* if hee or shee have any goods of his or her owne" (my emphasis).

19. Thomas Smith, *De Republica Anglorum: A Discourse on the Commonwealth of England* (1583), ed. L. Alston (1906; rpt. New York, 1979), book 3, chap. 7, 128–129.

20. Pollock and Maitland, *History of English Law,* II, 440. They did find one situation where "minors" had particular privileges: "During infancy the possessory status quo is to be maintained." In other words, the young heir's or heiress's lands could not be taken to pay debts, and a lease could not be broken by others until he or she had emerged from guardianship.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

persuasion did not make their contracts void. In sixteenth-century England, children were allowed to contract directly with a master in order to bind themselves into an apprenticeship. All contracts signed by apprentices, even under the age of seven, were declared valid and enforceable by law in 1563 "as amply and largely to every intent as if the same Apprentice were of full Age at the time of the making of such Indentures."[21]

Even then some judges questioned whether those under twenty-one could be bound by their mark and seal on an apprenticeship contract, but any question was resolved firmly in favor of their ability to consent and become permanently bound. The above law was passed "because ther hath bene and ys some Question and Scruple moved, wether any person being within [the age] of one and twentye yeres . . . shoulde bee bounden accepted and taken as an Apprentyce." It should replace "any lawe, usage or Custome to the contrary" and applied to all apprenticeship and labor contracts (except those of London and Norwich) and was repeated in legal guides over the next two centuries.[22]

Coercing the child's own consent to a labor contract was acceptable, so long as a justice approved. "Yf the said person refuse to bee bounde as an Apprentice, to commit him unto Warde [prison], *there to remayne untill he be contented and will bee bounden to serve as an Apprentise* should serve" at least seven years or up to age twenty-four. Thus children under age twenty-one could be committed to prison until they agreed to be bound as apprentices. This law is remarkable for the very ease in which it wrapped these assumptions: no question was raised about parental consent; the force used was made legal (although otherwise it might be questionable).[23]

While age shaped the length of service and whether one got paid, it was rank, and rank alone, that determined whether one could be forced to sign a labor contract. Others (men between twelve and sixty and unmarried women between twelve and forty) could also be forced by threat of prison to sign labor agreements, but only for a year or less. Here was an almost universal category, with married women alone exempted, but one other major exemption existed: no person could be forced to labor who had "an Auncestour whose Heire Apparant he [or she] ys" or who had more than ten pounds worth of property. If one did inherit, one's labor contract was void, whether that con-

21. 5 Eliz. I, c. 4, sect. 35. I have modernized the spelling slightly.

22. For example, see Thomas Wood, *An Institute of the Laws of England . . .* , 6th ed. (London, 1738), 13. "An apprentice shall be bound by his indenture notwithstanding his Nonage."

23. 5 Eliz. I, cc. 4, 17, 28, 29.

*Children and Consent to Contracts* | 243

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

tract was for a year or an apprenticeship. As these extensive status exemptions make clear, one's status as poor legitimated coercion to obtain consent. Heirs, on the other hand, were exempt from forced service.[24]

The length of service might seem to define a kind of childhood. Children under twenty-one could be bound apprentices to husbandry "as the parties can agree" until age twenty-four or to skilled trades for seven years.[25] Does this mean that the law sought to control youth under twenty-four, particularly poor youth? Obviously, yes. But why? The answer is not simply that it assumed them not to be adults. On some deep level their status in age interacted with their status in rank. Perhaps young people of the lower orders needed longer coercion to adjust themselves to their rank. In other words: it was a process of forcing them to accept their place in society, of restraining them from theft and vagrancy, at the same time as it provided some nurture and skills. The phrase "as the parties can agree" reveals much and little: how much agreement was sought? How much choice would the young person really have? The law itself both proffered choice and—in allowing imprisonment for as long as necessary to get the child to agree—took it away. Its implementation could have varied dramatically by region and by the justice of the peace or churchwarden who oversaw each contract. We cannot recover the negotiations that lay behind these formal contracts.

This law sought the child's consent, as mediated by justices of the peace, and parents were left out of the equation altogether. Parents might well have influenced their children's choices, either through affection or money (better trades, especially, required a fee to the master). But their influence was indirect and reflected the money, connections, and persuasion at their disposal. Indeed, the many variations on this law, commonly known as the Poor Law, or Statute of Artificers, which was repeated in various forms by statutes and legal manuals in England and its colonies over three centuries, rarely mentioned parental consent for a child's apprenticeship, as we shall see. Parents had no formal claim even to keep their children with them, let alone control their labor, except, of course, in the case of heirs.

Putting this all together reveals a startling picture. The idea of parental custody was not important to the law (nor, at best, even carefully consid-

24. Ibid., cc. 2–5, esp. 4.
25. "No person shall by force or color of this [statute] bee bounden to enter into any Apprenticeshippe other then suche as bee under the age of one and twentye yeres" (5 Eliz. I, c. 4). Adults could also be forced to work, but only for periods of up to one year. Paul Slack, *Poverty and Policy in Stuart England* (London, 1988); A. L. Beier, *Masterless Men: The Vagrancy Problem in England, 1560–1640* (London, 1985), chaps. 2–4; Paul Griffiths, *Youth and Authority: Formative Experiences in England, 1560–1640* (Oxford, 1996), esp. chap. 7.

244 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

ered, certainly not recognizable). The closest one comes is a quote such as Sir Thomas Smith's that assumes that children before puberty (presumably twelve for girls and fourteen for boys) were "partes" of their parents. Most of those with dead fathers or mothers did not have guardians. Of those who did, the purpose of guardianship differed substantially. Guardians in knight's service were frequently called simply the heir's "lord" (not the guardian). This relationship, in particular, bespeaks a feudal obligation. And so it was called when it was abolished in the seventeenth century. Most guardianships over the bodies of heirs ended by fourteen. Many guardianships of land would have ended soon afterward, depending on a variety of factors. Some guardianships, especially in knight's service, lasted until twenty-one. In the latter case in particular, the ward was not held to "own" the land at that time (the ownership was suspended until the boy could become a knight in the king's service). So we cannot think about this type of guardianship as being justified on the grounds that the heir was not properly able to manage the land, nor was such an explanation offered.

In sum, children had the greatest possibilities of voiding their contracts when they were wealthier and the contracts were over land. In no case was the contract of a child actually void except if a good (such as a horse) were taken by force, or for a will over land. In a society that placed many other constraints on the ability to alienate land from the family (the presumption was that one would allow one's heir to have the land), the fact that land transactions, particularly involving the transfer of family land, were the most sharply constrained is hardly surprising. The laws and customs aimed to keep land within the family; it was critical to the family status. Those who owned copyhold land could neither sell it nor will it. Those who owned entailed land could only rent it (though legal maneuvers to get around this were already being tried in the late sixteenth and early seventeenth centuries). Those most elite members of society who were wards in knight's service took longer to obtain control over their land. But does this mean that they thought of children under twenty-one as minors? In some ways, clearly. Yet that boundary meant something different when their deeds, even over land, were only voidable. They could and did contract in many cases, even with this most sovereign good in this society, land.

Children were more strongly bound by contracts if they were buying instead of selling or if granting their own labor. Who benefited from these rules? Not most parents, certainly. The obvious answer is that these rules were skewed in favor of those with privilege. These were rules that allowed masters to obtain servants who might be coerced into labor. But they cushioned elite families from losing their land especially. They were rules that allowed wealthy young men who would inherit in the future to pledge part of

*Children and Consent to Contracts* | 245

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

their future inheritance (which they knew they would inherit in many cases, especially if the land were entailed) for goods. They gave them power and access earlier. But they also protected their future estates.

So was this "free consent"? Hardly. One needed money or land or the expectation thereof in order to buy and sell. The more wealth and influence, the greater the credit that might be extended. The contracts of wealthy heirs, even still, were often avoidable by themselves and sometimes by others; the contracts of poor children, however, over the main commodity they had—their own labor—were not avoidable, and force and influence were acceptable, explicitly so, in their forming of that contract. Real choice was skewed sharply by rank.

Throughout this period, poor parents did not even have the right or obligation to nurture their children, though actual practice clearly depended on the administration of poor laws in particular regions. The poor laws offered a mixed set of payments to some of the poor, and forced labor for others. Each locality was to be responsible for its own poor (determined largely by whether they were born there or had established residency). By the early seventeenth century, children under age seven had the same residency as their parents: over that age, however, they should be sent to the locality of their birth. The poor law in operation thus presumed that poor parents and their children should stay in the same parish only until the child was seven. And it did not give such parents control over their children's labor. What changed was the effort to obtain the child's own consent: it vanished. During the same period, while children began to be settled in the same parish as their parents until they reached age fourteen, this increasing sense of custody for poor parents was undercut by allowing children to be bound at ever younger ages.[26]

### Shifting Ideas about Contracts and Custody: The Role of Coke

Sir Edward Coke made at least three alterations in these earlier patterns, which are actually fairly obvious given that he was commenting, in the first volume of his *Institutes of the Laws of England,* on a law book written almost

26. William Lambarde, *Eirenarcha; or, Of the Office of the Justices of Peace* (1581; rpt. Amsterdam, 1970), 370; Wood, *Institute of the Laws,* 52. A directive from Chief Justice John Popham issued at the beginning of the seventeenth century stated that all vagrants over seven were to be whipped and sent to their own proper place of settlement (determined by a complicated equation of place of birth and last residence), whereas those under that age could be sent with their parents, to their parents' place of settlement. "Place of settlement" determined the parish responsible for their welfare. Ivy Pinchbeck and Margaret Hewitt, *Children in English Society,* I, *From Tudor Times to the Eighteenth Century* (London, 1969), 100–101.

246 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

two centuries earlier. His treatise contains, throughout, Littleton's original *Tenures* in law French, Coke's translation of Littleton, and then Coke's commentary thereon. His alterations might seem minor, yet he made consistent changes that tended toward (1) universalizing a law of contracts, (2) making minority more of a consistent boundary, and (3) giving fathers especially, and parents generally, more custodial power.

With regard to guardians, for example, Coke tried to make the age of twenty-one much more of a fixed boundary for ending males' wardship in knight's service. Coke's translation of Littleton reads: "And also if such Heir be not married at the Time of the Death of his Ancestor, then the Lord shall have the Wardship and Marriage of him." The clear implication of Littleton was that marriage ended wardship of the body. Practice in the late sixteenth century in the Elizabethan court of wards was to end both the wardship of the land and the body at the ward's marriage, whether male or female. While Coke admitted that marriage ended wardship for females for both their land and their body and of the body for males, he claimed that the male heir's land should be retained by the guardian until he reached age twenty-one: "The Guardian shall have the Custody of the Land until the Heir come to his full Age of one and twenty Years." He urged a similar change for another exemption that had allowed males to end wardships early when the land was entailed (so it could not be sold) or when the heir had to provide dowers and provision for siblings. According to Coke, current practice was that the lord would have wardship of one-third of the lands and of the body of the ward until twenty-one: "But now in all these cases the Heir shall be in Ward for his Body, and a third Part of the land." Before then, when the male or female heirs were married at the death of the ancestor, the land was entailed, or they had to provide for younger siblings, they did not usually enter wardship for their land or body. Partly under Coke's influence, wardships for both land and body began to continue longer. Given that child marriages were possible during this period and some parents encouraged their children who would inherit land in knight's service to marry (or entailed their land) so as to avoid wardship altogether, Coke's statements encouraged a significant change, toward not ending this type of guardianship for boys until age twenty-one.[27]

Coke urged a similar reform, subtly, for guardianship in socage. Littleton had stated unequivocally: "And when the Heir cometh to the Age of 14 Years compleat, he may enter and oust the Guardian in Socage, and occupy the Land himself if he will." While Coke acknowledged this passage, he emphasized (as Littleton did not) that, after the age of fourteen, heirs in socage could

27. Hurstfield, *The Queen's Wards,* 137, 166 (for earlier policy); *Coke upon Littleton,* 74b, 78a–79a.

*Children and Consent to Contracts* | 247

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

choose a guardian until they reached age twenty-one. He also argued that the owner of socage land could designate a guardian by will for his child, for his body up to fourteen only but longer for his land. Neither of these changes was entirely of Coke's doing. He could not completely reform the common law in one breath; he had to pay attention to precedent. But he could interpret precedent in such a way as to open paths and magnify inconsistencies. In doing so he provided direction for others to follow.[28]

With regard to contracts for goods, the changes that Coke made were very smooth. Littleton's treatise was only about land law. Coke's translation of Littleton's comments about an infant's ability to sell land was very close to the original: "For if before such Age [of twenty-one] any Deed [fait] or Feoffment, Grant, Release, Confirmation, Obligations, or other Writing be made by any of them etc. . . . all serve for nothing ["tout serve pur nient"], and may be avoided ["et poit este avoyde"]." But, whereas Littleton specifically limited the application to land, Coke broadened the application of this sentence considerably—to all goods and chattels—in his commentaries. "The Law hath provided for the Safety of a Man's or Woman's Estate, that before their Age of twenty-one Years they cannot bind themselves by any Deed, or alien any Land, *Goods or Chattels.*" Coke likewise shifted the implication of this sentence, from voidable "may be avoided" to read "cannot bind." He acknowledged in his commentaries on this section that Littleton had meant only that the deed would be voidable. And he acknowledged that children could be bound by their contracts for necessities. But he made it seem as though these were exceptions to a general rule about their inability to bind themselves. He thus changed the presumption of the law.[29]

"They cannot alien any Land, Goods, or Chattels" was a very strong statement, differing considerably from the earlier lawyers. Whereas Littleton was considering only land, Coke interpreted it as applying to everything. Yet as Henry Swinburne and John Perkins made clear (as discussed above), very different rules had applied to other types of contracts.[30] Littleton gave exam-

28. *Coke upon Littleton,* 78b, 88a, 89a; Coke, *Complete Copyholder,* 34–35.

29. *Coke upon Littleton,* 171b, 172a–b, emphasis added. Coke writes that some exceptions to this rule exist: "An Infant may bind himself to pay for his necessary Meat, Drink, Apparel, necessary Physick, and such other Necesssaries, and likewise for his good Teaching or Instruction, whereby he may profit himself afterwards: But if he bind himself in an Obligation or other Writing, with a Penalty for the Payment of any of these, that Obligation shall not bind him . . . and generally whatsoever an Infant is bound to do by Law, the same shall bind him."

30. Ibid., 172a–b. But note at the end of this that Littleton writes that those under twenty-one should not be jurors for an "enquest" (Littleton seems to have meant by this a civil jury considering land issues).

248 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the English Revolution in Authority, University of
   North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

ples elsewhere in his treatise of infants' deeds to rent land (part of a complex example relating to various levels of renting—if an infant rents to one person, who rents it to another, can recovery be had by the infant?). "If I being within Age, let land to another for Term of 20 years, and after he grant the land to another for Term of ten years, so he granteth but Parcel of his term: In this case when I am of full Age . . . if I confirm his Estate, then this confirmation is good." Coke's comment on this was simply, "That the Lease of an Infant in this Case is not void but voidable." He had to acknowledge it because it was part of Littleton's treatise, even though it did not fit the shape of the presumptions he was urging elsewhere.[31]

One last example should provide proof of Coke's general mission to provide an older and consistent age of majority: his claim in volume IV of his *Institutes* that those under twenty-one could not be elected as a "Knight, Citizen, or Burgesse of Parliament." "One under the age of 21 years is not eligible [for election to the House of Commons], neither can any Lord of Parliament sit there [in the House of Lords] untill he be of the full age of 21 years." Volume IV was published after Coke's death, during the Interregnum. Unless someone altered his manuscript (possible but unlikely), Coke was consciously trying to change the law. Consider only this: in the Parliament of 1621, Coke supported a bill to reform the voting laws. This bill sought to set the qualifications for those elected to the House of Commons: one should have at least six months' residency in the place electing him; one should not treat or influence the voters ("verball sollicitacion to be restrayned aswell as sollicitacion by Letters"); and one should be at least twenty-one years old ("None to be chosen Under age as Unfitt to be trusted to make Lawes for other mens estates that are not trusted with their owne"). He was present at the debate on this bill and tried to get it passed, urging that it not be bogged down with extra requirements when someone proposed adding a property qualification. But the bill did not even make it out of the Commons. Coke knew it did not pass; such a law did not pass until after the Glorious Revolution. Many teenage members of Parliament were elected before and afterward—and were present at that Parliament. So why, then, did he try to make the law seem different from what it actually was? His was a startling attempt at judicial fiat, which, given the popularity of his *Institutes* over the next two centuries, probably had real influence.[32]

31. Ibid., 308b.

32. Edw[ard] Coke, *The Fourth Part of the Institutes of the Laws of England: Concerning the Jurisdiction of Courts* (London, 1644), 46–47; Wallace Notestein, Frances Helen Relf, and Hartley Simpson, eds., *Commons Debates, 1621* (New Haven, Conn., 1935), IV, 446 (Nov. 28, 1621). Puritans made another attempt to exclude those under twenty-one from

*Children and Consent to Contracts* | 249

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

## The Gradual Process of Change in Ideas about Custody

Coke died in 1634. As judge and member of Parliament, he was part of a broader mission of Puritan reform that would help to transform custody and minority. The very idea of guardianship would change in 1645. In the midst of the Interregnum, the House of Commons abolished guardianship in knight's service and all the courts and procedures associated with it. In 1660, Charles II was required to ratify this abolition as a condition for assuming his throne. Only then did the terms of all guardianship change substantially. By the law of 1660, fathers, and fathers alone, were granted the right to designate who would be guardians of all their children, of both their lands and bodies, up to the age of twenty-one.[33]

This law marked a pivotal transition in legal norms about guardianship and custody. It universalized guardianship, making all children potential wards, and gave fathers significant power over their children. In the process, it extended the length of wardship in all cases to as late as twenty-one. At the same time, it denied that power to social superiors. Thereafter, a father's rights to determine the "custody" of his children would be legally paramount. It replaced a lord's power with a father's, created a kind of equality among adult men and gave them superiority over their children (and, by implication, over women, by not giving them that power over their children). Establishing the father's right to designate a guardian for all of his children until age twenty-one extended the institution of guardianship to cover most fatherless children, lengthened the span during which most guardianships lasted, gave fathers more power, and set a more uniform principle of custody.

This statute, thereafter referred to as the "abolition of feudal tenures," could just as easily be called "establishment of paternal custody" or, to use Blackstone's words of a century later, creation of the "empire of the father." The reason this statute was a critical negotiating point for restoring monarchy was that it cut through the monarchs' and lords' powers and elevated

Copyright © 2007. University of North Carolina Press. All rights reserved.

_____

election to the House of Commons in 1626. See William B. Bidwell and Maija Jansson, eds., *Proceedings in Parliament, 1626* (New Haven, Conn., 1991–1992), II, 25 (Feb. 13, 1626).

33. 12 Car. II, c. 24, esp. par. 8. "Where any person hath or shall have any Child or Children under the age of twenty one yeares and not married at the time of his death that it shall and may be lawfull to and for the Father of such child or children . . . [by deed or will] to dispose of the custody and tuition of such children or children for and dureing such time as he or they shall respectively remaine under the age of twenty one yeares or any lesser time." Hill, *Intellectual Origins,* calls this law "one of the unspoken conditions of the restoration" (321).

250 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

the authority of the father. Income from lordships had supplied Charles I's main source of income prior to the Civil War. In getting rid of that income, it also undercut some key feudal principles of obligation, substituting a lord's might for a father's and setting a limit to that authority of twenty-one. Yet in creating that boundary, it made that age a much more important distinction. Indeed, age became more important than rank.

Yet the issues raised by this pivotal law were far from resolved. During the late seventeenth century, for example, it was debated whether heirs who held land in socage needed a guardian after they reached age fourteen, the earlier limit. *The Infants Lawyer* (1697) still said that all guardians in socage had authority only until the heir reached age fourteen. However, it then noted that, after the 1660 law, fathers had the power to grant the custody of their children to any person until the child reached age twenty-one.[34]

Because land in the colonies was held in socage before 1660 and the new law, the duties of most guardians, assigned according to socage rules, officially ended when the ward reached the age of fourteen.[35] But not in Massachusetts. In 1641, as war began to convulse England, the Massachusetts colony for the first time circulated its own body of laws. The first section of the Massachusetts Body of Liberties established a man's right to keep his family with him: "No man shall be deprived of his wife or children." This clause was listed with his rights to his goods and estate, his life, and his honor. Only a man's violation of a law duly passed by a popularly elected General Court and well publicized could take these privileges away from him. Although it does not say "have power over them," it does imply that in part (it is unclear whether the children or wife may leave of their own accord). The law contradicts the Statute of Artificers, at least insofar as it had allowed children to bind themselves to others without their father's consent. Still, it permitted children to be removed from their parents if the parents were not educating them properly. The Body of Liberties prohibited wardships and other feudal impositions. Instead, it gave the following guidelines for orphans: "No Orphan dureing their minoritie which was not committed to tuition or service by their parents in their life time, shall afterwards be absolutely disposed of by any kindred, freind, Executor, Towneship, or Church, nor by themselves without the consent of some Court." While this did not privilege fathers over mothers, it did imply that such orphans should be committed to someone's custody during their minority, which Nathaniel Ward, the author of the Mas-

34. *The Infants Lawyer; or, The Law (Both Ancient and Modern) Relating to Infants, Setting Forth Their Priviledges, Their Several Ages for Divers Purposes* . . . (London, 1697), 46–47.

35. Hurstfield, *The Queen's Wards,* 23.

*Children and Consent to Contracts* | 251

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

sachusetts Body of Liberties, defined elsewhere as twenty-one. They were not permitted to choose their own guardian until age fourteen: others chose for them. It also universalized the application of rules for all orphans, not only heirs. (The category of heirs would have been broadened regardless, because estates were to be divided among the children and wife, rather than going to the elder son, with the wife having only a temporary dower right.) It thereby established a firm minority during which consent was inappropriate. The Body of Liberties also stated clearly that the age of twenty-one would be the "age of discretion for passing away lands or such kinde of herediments, or for giveing, of votes, verdicts or Sentence in any Civill Courts or causes." It did permit children under twenty-one to alienate land if, and only if, that conveyance were ratified directly by the General Court.[36]

Although Massachusetts law allowed fathers to assign custody of their children (both their body and lands) up to twenty-one, not all fathers in Massachusetts actually did so. Nor, indeed, did all Virginia fathers after 1660. (In the absence of their own law, Virginians followed the 1660 English law, as put forth in legal guides that they used such as the *Infants Lawyer*.) As examples from both Massachusetts and Virginia illustrate, fathers during the seventeenth and early eighteenth centuries who designated when their children should control their land gave a variety of ages for inheritance (when they said anything), often younger than twenty-one and as young as fifteen. These included ages of fifteen, sixteen, and seventeen. Suits from the Virginia General Court during the early eighteenth century (over issues unrelated to guardianships) show sixteen- and seventeen-year-olds managing estates without guardians.[37]

36. Edwin Powers, *Crime and Punishment in Early Massachusetts, 1620–1692: A Documentary History* (Boston, 1966), 533, 534, 539, 542–543 (sections 1, 10, 11, 14, 53, 81–84).

37. John Demos, *A Little Commonwealth: Family Life in Plymouth Colony* (New York, 1970), 149. Demos noted that, while many Puritan wills specified that sons should have the land at twenty-one, all other wills designated younger ages. The 1647 will of Alexander Winchester designated that his children should have the land when they arrived at fifteen years. Also see Darrett B. Rutman and Anita H. Rutman, " 'Now-Wives and Sons-in-Law': Parental Death in a Seventeenth-Century Virginia County," in Thad W. Tate and David L. Ammerman, eds., *The Chesapeake in the Seventeenth Century: Essays on Anglo-American Society* (Chapel Hill, N.C., 1979), 153–182: "John Sumner, for example, in 1703, specified that his son of sixteen was of age to dispose of his estate with the advice of designated executors, while Thomas Norman, in 1727, declared it to be his will that his seventeen-year-old son Robert 'Act and do for himself' " (170).

On suits from Virginia General Court: *Case Int. Hallows and Manly* (1722), B26–B27, where a will made in 1687 by a widow named Restitute Whiston Manly specified that her three children should inherit when they turned sixteen: they in fact did so. In another case, Daniel McCarty left his estate to his three sons and appointed executors in trust for

Copyright © 2007. University of North Carolina Press. All rights reserved.

252 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Critical to understanding custody is the practice of naming heirs as executors. If the legal guides are any gauge, it was normal for heirs and heiresses to be executors, regardless of their age. The acts of executors, even over land, were binding if they had reached age seventeen. Executors could, however, be much younger. Swinburne's 1635 *Testaments and Last Wils* held that it was even lawful to make "the childe in the mothers wombe, and unborne at the death of the Testator" an "Executor." So, too, "if the Infant be so yong that he hath no discretion," he still could be executor. But, in these cases, an "Administrator" would then manage the estate "for the childes behoofe, until he be able to execute the same himselfe," until the child was seventeen years old (or even younger). Some protections were prescribed. A younger child acting as executor was not permitted to forgive debts without payment. Making a very young child an executor seemed to put the estate into a holding pattern that did not give the administrator much real power. The administrator "cannot sell or alienate any of the goods of the deceased, unlesse it be upon necessitie, as for the payment of the deceaseds debts, or that the goods would otherwise perish: nor let a lease for a longer term than whilest the Executor shall be in minority."[38]

At his death in 1690, for example, John Carter (Jr.) left his only child, a daughter named Elizabeth, as his main heir and "executrix." She was under fourteen, for the will stated that when she "arrives to 14 yrs. age" she was supposed to be able to choose whether she wanted to live in Virginia or England; if she stayed in Virginia, she could choose whether she wanted to live with her grandmother, mother, or a Mr. Morris. She was to be given, at that point, some of the money from her inheritance for her own use. Carter did not mention any "guardian" or "administrator." He appointed four people, Elizabeth's grandmother and mother, his brother Robert, and Mr. Morris, as "overseers" of his will. Her mother would be her guardian under the rules about socage land until Elizabeth reached fourteen. Although Elizabeth did not receive all of her estate at fourteen, she would by seventeen, as executrix. In her case, most of her estate was in money (which her father could designate control over longer), not land: her grandfather John Carter had entailed his land in tail male, so she could not inherit it (her uncle Robert, later known

―――

the estate until the eldest son turned seventeen, when by the common law he could become full executor of the estate (*McCarty ag't McCarty Extors* [1733], B34–35). R. T. Barton, ed., *Virginia Colonial Decisions: The Reports by Sir John Randolph and by Sir Edward Barradall of Decisions of the General Court of Virginia, 1728–1741* (Boston, Mass., 1909).

38. Swinburne, *Testaments and Last Wils,* part 5, p. 6. Swinburne cites *Coke upon Littleton* and Coke's argument in Russel's case as important authorities in this section. So these rules about executorships already bear Coke's stamp.

*Children and Consent to Contracts* | 253

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

as King Carter, did). (Within four years Elizabeth married and then died. Her husband, Julian LLoyd, appeared in court to request that he assume her resposibilities as executor in March 1693/4.) Many testators in Virginia were leaving their heirs as executors of their estates during this period instead of appointing guardians, even when their heirs were under twenty-one. This practice needs to be central to our understanding of custody in the seventeenth and eighteenth centuries.[39]

By the mid-eighteenth century, both Pennsylvania and Virginia seemed to follow common law guidelines that formed the new, post-Cokean variant on socage guardianship: a guardian is appointed (following the rules about next of kin who cannot inherit), and at fourteen the children can choose their own guardian until the age of twenty-one. Only heirs had guardians, but in Pennsylvania this was a broader category than in Virginia, because the rules of inheritance differed. In cases of intestacy the difference is most clear: Pennsylvania gave one-third of real and personal property to the wife (as dower) and divided the remainder among the children, with a double share for the eldest son. In Virginia, the eldest son would receive all of the land and slaves (with the wife's having a use right to one-third) and only goods would be divided among the wife (one-third) and the children, in which case, despite receiving all of his father's land, the eldest son also got an equal share. But personal goods (especially once debts were subtracted) did not usually amount to enough to educate and feed a child for long. Younger siblings in Virginia, therefore, might be bound out, a pattern that was rarer in Pennsylvania except when the bindings were "real," that is, of boys at fourteen to learn a skilled trade. In this sense Virginia was more similar to England.

It had become more common, by the mid-eighteenth century, for orphans to have guardians until age twenty-one and for fathers to assign guardians. Even then it was unclear whether fathers could assign guardians for the entire period—to do so was relatively uncommon in Virginia and Pennsylvania. In one Pennsylvania orphan's court case from the 1750s, for example, the guardian appointed by the court tried to bind Samuel Sharp into an apprenticeship, whereupon someone produced the will of Samuel's father, who had chosen a different guardian for him. When Samuel reached age

39. On Carter: "Will of John Carter [Jr.] of Corotoman, 1690," *Virginia Magazine of History and Biography,* XVII (1909), 217–218. On the entailing of this property, see Holly Brewer, "Entailing Aristocracy in Colonial Virginia: 'Ancient Feudal Restraints' and Revolutionary Reform," *William and Mary Quarterly,* 3d Ser., LIV (1997), 322–323 n. 49. For Elizabeth's husband's appearance, see "Abstracts from Records of Richmond County, Virginia," *William and Mary College Quarterly Historical Magazine,* 1st Ser., XVII (1908–1909), 73–74.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
   North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

fourteen soon afterward, he proceeded to choose his own guardian (neither his father's choice nor the court's), who did not seek to bind Samuel into an apprenticeship (via the court's authority). The lesson here is that, after fourteen, Samuel's choice of guardian trumped his father's but that before fourteen Samuel's choice did not matter, whether to guardian or master. If his father had not named a guardian, Samuel would have been locked into a labor contract not of his choice until age twenty-one. The middle- and late-eighteenth-century court records of Virginia and Pennsylvania are full of orphan heirs choosing their guardians at age fourteen.[40]

Virginia's laws from the very beginning followed those of England more closely on questions of custody. Acknowledging that "for the most part the parents, either through fond indulgence or perverse obstinacy, are most averse and unwilling to parte with theire children," Virginia's first version of the poor law in 1646 confirmed the "great wisdome [of the English statutes] . . . for the better educateing of youth in honest and profitable trades and manufactures, as also to avoyd sloath and idelnesse wherewith such young children are easily corrupted." It thereby specifically dismissed parental custody (the contrast to Massachusetts laws of the same era is especially striking). When Virginia in 1730 finally passed its own version of England's guardianship law of 1660, giving fathers the power to determine the custody of the children up to the age of twenty-one, it made clear that this should not interfere with apprenticeship: "Provided, That this act shall not extend to discharge any apprentice from his apprenticeship."[41]

Justices of the peace could bind at their own "discretion" all children whose parents' "poverty extends not to give them breeding"—a flexible and broad category. In the eighteenth century, Virginia seemed to bind more children and at younger ages than Massachusetts and Pennsylvania. One study of county records from eighteenth-century Virginia has counted 7,470 children (mostly white) bound out. My own examination of the records of Frederick

40. In Virginia, the orphan's court records are mixed in with those of the quarterly courts; see FCV OB, MB. For Pennsylvania, see Dorothy B. Lapp and Frances B. Dunlap, comps., *Records of Orphan's Court for Chester County, Pennsylvania, 1747–1761* (Danboro, Pa., 1975), 14 (Mar. 15, 1747/8), 39 (Dec. 20, 1748), 52 (Sept. 19, 1749). Lois Green Carr has a rich analysis of the orphan's court in late-seventeenth-century Maryland, which followed a similar practice: guardians could be appointed until age fourteen; after that age the youth could choose. "The Development of the Maryland Orphans' Court, 1654–1715," in Aubrey C. Land, Lois Green Carr, and Edward C. Papenfuse, eds., *Law, Society, and Politics in Early Maryland* (Baltimore, 1977), 41–62.

41. William Waller Hening, ed., *The Statutes at Large: Being a Collection of All the Laws of Virginia* . . . (rpt. Charlottesville, Va., 1969), I, 336, IV, 285–286.

*Children and Consent to Contracts* | 255

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
   North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

County in the 1750s estimates that fully 7.3 percent (161) of the children (virtually all white) in that decade alone were bound by the churchwardens.[42]

Those same records reveal a great deal about what happened to those whose fathers had died. In the decade 1751–1760, more orphans (those whose fathers had died but whose mothers usually lived) were given masters than guardians. While only fifty-seven had guardians (assigned or chosen), seventy-four were bound by the churchwardens. Whether because fathers were splitting inheritances more evenly or because different poor law policies tended to support mothers with young children, fewer orphans, proportionately, were bound out in Massachusetts and Pennsylvania. Indeed, the Frederick County churchwardens bound children—orphans, children of simply poor parents, and illegitimate children—in the 1750s at an average age of 7.9: this was the welfare policy for children, which did not value keeping such families together.[43]

Can Virginia's policies about fatherless and poor children be understood as the traditional policy about poor parents' custody of their children? To some great degree, yes, although it is likely that fewer young children, proportionately, were bound in England. The average age of binding undoubtedly varied by parish and over time. The frequent disputes about proper settlements for children and their parents in England show that the traditional pattern sometimes did provide for families with very young children, perhaps under seven. Yet the Elizabethan poor laws had no lower age limit for binding children, suggesting that in England itself some children were bound at extremely young ages.[44]

Indeed, the attempt to keep young children with their parents may well

42. Hening, ed., *Statutes at Large,* I, 336 (October 1646); Nelson , *"A Blessed Company,"* chap. 8.

43. FCB OB, 1751–1760 (IV–IX). While 74 "orphans" were bound and 46 were "bastards," only 41 were simply "poor," indicating that their father lived. So only one-fourth of those bound (41 of 161) had a father.

44. 39 Eliz. I, cc. 3–4 (1597/8); 43 Eliz. I, cc. 1, 2 (1601). Although most early modern English poor-apprenticeship records "do not include the ages" of those bound, some tentative estimates have been made. Ann Kussmaul, *Servants in Husbandry in Early Modern England* (Cambridge, 1981), 14. See Paul Slack, *The English Poor Law, 1531–1782* (Cambridge, 1995), 19, 31–32; and, especially, Ilana Krausman Ben-Amos, *Adolescence and Youth in Early Modern England* (New Haven, Conn., 1994), 260 n. 125, where she estimates from a sample of ninety-five Southampton records for the seventeenth century that only 20 percent were younger than ten. K. D. M. Snell has some interesting observations about apprenticeship in *Annals of the Labouring Poor: Social Change and Agrarian England, 1660–1900* (Cambridge, 1985) 287–289, and table for 1609–1708. Also see O. J. Dunlop and Richard Denman, *English Apprenticeship and Child Labor: A History* (New York, 1912).

256 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

explain the frequency of families' being "warned out" of Massachusetts and
(to a lesser degree) Pennsylvania communities in the 1750s, a practice not
used much in Virginia. If Massachusetts tended to support families with
young children with monetary payments in order to allow them to stay to-
gether, having a new poor family in the community would be an expensive
proposition. If, on the other hand, Virginia did not—and instead bound out
the children of the family and left the parents free to work unencumbered by
the care of their children—then the poor family cost it nothing (and in fact
just meant extra laborers). The average age at binding was critical to the cost
each community would pay in poor relief.[45]

This contrast also puts Massachusetts's notorious auctions of the poor in
a new light. What the auctions did was see who would accept the lowest
amount for caring for a family or individual within their own home or for
renting a house for them. While an auction does seem embarrassing, in
practice it allowed the family to remain together; the lowest bidder for indi-
vidual children was often a relative. No such practices existed in Virginia, and
transfer payments of that sort were very rare. Instead, Virginia bound chil-
dren individually into apprenticeships (thus separating them from the par-

45. The literature on "warning out" in New England, particularly, is extensive. The
Plymouth General Sessions records (David Thomas Konig, *Plymouth Court Records,
1686–1859* [Wilmington, Del., 1979]) are full of instances of the warning out of families,
as too is the "Goshen Township Book" of Chester County, Pennsylvania (Pennsylvania
Historical Society), for example. The "Quarter Sessions Dockets and Indictments" for
Chester County also contains numerous disputes over the "proper residency" of pauper
families (and of individuals within them). In virtually all cases, the townships did not
want the families and sought to make them go back to their "legal place of settlement."
On Massachusetts, see, especially, Ruth Wallis Herndon, *Unwelcome Americans: Living
on the Margin in Early New England* (Philadelphia, 2001), which focuses on warning out.
On Pennsylvania see Duane Eugene Ball, "Dynamics of Population and Wealth in
Eighteenth-Century Chester County, Pennsylvania," *Journal of Interdisciplinary History,*
IV (1975–1976), 621–644; Lucy Simler, "The Township: The Community of the Rural
Pennsylvanian," *Pennsylvania Magazine of History and Biography,* CVI (1982), 60.

Similar directives to those of Chief Justice Popham from the early seventeenth cen-
tury appeared in many later legal treatises, beginning to specify age fourteen instead of
seven. According to *Conductor Generalis; or, The Office, Duty, and Authority of Justices of the
Peace* (Philadelphia, 1722), 219, those over fourteen should be sent to their place of legal
settlement, and those under fourteen to their parents. This clearly derived from an older
policy that punished those over fourteen for "begging or wandering." Lambarde, *Eiren-
archa,* 192, 244. Also see Pinchbeck and Hewitt, *Children in English Society,* I, 97.

On the later period, see John R. Sutton, *Stubborn Children: Controlling Delinquency in
the United States, 1640–1981* (Berkeley, Calif., 1988), 69–71; Allen Steinberg, *The Trans-
formation of Criminal Justice: Philadelphia, 1800–1880* (Chapel Hill, N.C., 1989), 179–180.

*Children and Consent to Contracts* | 257

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

ents as well as siblings); the children's future labor would pay for their present keep. Although Massachusetts occasionally bound children separately to labor (as did Pennsylvania), reading through these three sets of records reveals clear differences.[46]

Already, by the 1750s, Massachusetts and, to a lesser degree, Pennsylvania had altered practices so as to give more weight to keeping children, especially those below puberty, with their parents: in Massachusetts by giving fathers more power in wills (to designate guardians rather than follow the socage laws), in both Massachusetts and Pennsylvania by splitting up inheritances such that more children were heirs and had some money to live on in case of their parents' death, and by administering the poor law differently so as to keep young children with their mothers.

How much real control did these various custodians have or even want? In gauging control, the question of acceptable punishment is critical. This was partly due to the crowning of custody at that point, and partly due to religious ideology (and beliefs about children's sinfulness). Parents and masters both had more power over the bodies of children than did guardians (with the possible exception of the guardians in knight's service and the variant of copyhold guardians, both of whom were considered "lords"). Both parents and masters, according to guidelines for justices of the peace, had the right to "chastise" their children and servants without being charged with assault;

46. See, for example, Charles H. Bricknell's typescript, "Records of the Town of Plympton," book 2 (vol. I, 1731/2–1781; II, 1781–1802), Widener Library, Harvard University, Cambridge, Mass. Many families were supported intact via levies voted by the town. See, for example, Oct. 24, 1781: "Voted and raised 25 pounds in hard money to supply Noah Eaten's wife and family and for clothing for the poor of said town." A more exhaustive search through the various Massachusetts records that were kept and survive indifferently would surely have yielded more information, but the impression is rather strong: the rate of children bound was lower in Massachusetts, and they tended to be older (that is, teenagers). Herndon, *Unwelcome Americans,* chap. 1, gives several examples of children bound very young (at age three or four).

Nelson, in *"A Blessed Company,"* counted apprenticeships and examined the vestry records for other counties in Virginia and reinforces the findings. Only rarely did the vestry support families. It supported only those incapable of work (for example, under about age two to four), and virtually no individual children longer than four years. The norm seemed to be two to three years, and most of these were illegitimate children whose mother or father had paid a fine, which paid for their first two to three years of support and did not go to the natural parents (at least in the 1760s). See the "Vestry Book for Frederick Parish," MS, Library of Virginia; Wilmer L. Hall, ed., *The Vestry Book of the Upper Parish, Nansemond County, Virginia, 1743–1793* (Richmond, Va., 1949), 48–49, 56–57, 86–91, for example.

258 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
   North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

guardians did not have that right. The rights of parents to discipline their children (and the duty of children to obey their parents) were made explicit by laws in Massachusetts and New York (which would later become part of Pennsylvania's laws): teenage children who "smited" their parents could be put to death. Penn's charter (and later laws) modified this rule such that children who "assault or menace" their parents could be committed to a house of correction (original charter) or put in prison for six months at hard labor (law of 1700). Dalton's *Countrey Justice,* popular in all colonies, instructed that parents might chastise their children and that masters might punish their servants "in a reasonable and moderate manner only."[47]

Similar injuctions appeared in Pennsylvania's guide of 1722, *Conductor Generalis.* It is no assault "where men have a natural power over others . . . as parents have over their children 'till they come of age, for till then they may chastise them for offences without a breach of the peace." George Webb's Virginia manual of 1736, *Office and Authority of a Justice of Peace,* repeated these clauses. Neither, however, contained the clause limiting parental punishments to what was "reasonable and moderate." If a child died as a result of being "chastised" by a master or parent, these guides did not deem the action homicide, but only "chance-medley" or accident. Later guides, such as Blackstone's *Commentaries on the Laws of England* of 1765 and Hening's *Virginia Justice* of 1825, reinserted the clause about reasonable and moderate punishment. Parental punishment seemed to be actually increasing over time, a movement linked to evangelical Christianity. Historians who have examined diaries over this entire period reveal that discipline was harshest in evangelical families in the early nineteenth century.[48]

47. Dalton, *The Countrey Justice,* 149. On the "stubborn child law" in Massachusetts, see Sutton, *Stubborn Children,* 16. The duke of York (the future James II) signed the first law that gave public authorities in the future Pennsylvania the power to punish children over sixteen who had been disobedient to their parents. Staughton George, Benjamin McNead, and Thomas McCamant, comps., *Charter to William Penn, and the Laws of the Province of Pennsylvania . . .* (Harrisburg, Pa., 1879), 19–20, 113; James T. Mitchell and Henry Flanders, comps., *The Statutes at Large of Pennsylvania from 1682 to 1801* (Harrisburg, Pa., 1896–1911), II, 13. There is no evidence that any child was actually executed as a result of the stubborn-child laws. On the circulation of legal texts in early America, see Appendix.

48. *Conductor Generalis,* 18, 131, 161–162; George Webb, *The Office and Authority of a Justice of Peace . . .* (Williamsburg, Va., 1736), 27; Blackstone, *Commentaries,* I, 440. See, especially, Linda A. Pollock, *Forgotten Children: Parent-Child Relations from 1500 to 1900* (Cambridge, 1983), 269. Although Philip J. Greven, Jr., ignores the time dimension in his analysis, his main examples of harsh evangelical discipline are from the early nineteenth century (for example, Francis Wayland, p. 39) (*The Protestant Temperament: Pat-*

*Children and Consent to Contracts* | 259

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

The clause about "reasonable and moderate" is actually important, because the issue of parental power to punish harshly and to kill their children was part of the debate about absolute power for monarchs. If a monarch's power paralleled a father's, the reason this was contested sharply in the various political treatises of the seventeenth century is obvious. Can a king execute his subjects who break a law? It could be used to separate the two powers (kings can kill, fathers not)—or to highlight the authority of both (kings and fathers can kill).

One significant difference separated the privileges of parents and guardians from those of masters: children could legally leave a parent; they could choose a new guardian, at least if over fourteen (in the places where socage law was followed); they could not leave a master. Having a guardian and having a master or a parent were not, of course, exclusive categories. During the earlier period, a child could not have both a guardian and a master. (The Elizabethan Statute of Artificers released a child from an apprenticeship contract if the child became an heir or heiress.) The powers of parents, guardians, and masters were different on other levels as well. Heirs over fourteen could not only choose their guardian, but they could rechoose as often as they liked and even sue their guardian for damages (via, by the late eighteenth century, a "next friend"). Poorer orphans, by contrast, were assigned to a master. And that assignation was almost irrevocable (barring the death of the master or gross cruelty). Masters not only had privileges to chastise a child, but their provision of necessities was much less closely overseen by the courts. Guardians had to post a bond for their management of the estate and their treatment of their ward and were supervised by special orphan's courts; their provision for their wards was supposed to be proportional to the profits from the wards' estate and suitable to "their station in life." But the majority of children, even many orphans, still formally had neither master nor guardian.

Overall, the clearest transition in the law of custody during the eighteenth century was that parental custody (as opposed to custody of masters or guardians) became more idealized and strengthened, over a minority that stretched to twenty-one. Blackstone's *Commentaries on the Laws of England* was the first to lay out a theory of parental custody in a comprehensive form as something

_____

*terns of Child-Rearing, Religious Experience, and the Self in Early America* [New York, 1977]). On this issue also see Greven, "The Self Shaped and Mis-shaped: The Protestant Temperament Reconsidered," in Ronald Hoffman, Mechal Sobel, and Fredrika J. Teute, eds., *Through a Glass Darkly: Reflections on Personal Identity in Early America* (Chapel Hill, N.C., 1997), 348–369.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

within the common law. Yet his citations, aside from Coke, a few later court decisions, and seventeenth- and eighteenth-century statutes, were to Roman civil law and to such natural law philosophers as Samuel von Pufendorf and Hugo Grotius. He even cited Montesquieu. He maintained that parents owe their legitimate children three things: "their maintenance, their protection, and their education."

> The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation, says Puffendorf, laid on them not only by nature herself, but by their own proper act, in bringing them into the world. . . . By begetting them therefore they have entered into a voluntary obligation, to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect *right* of receiving maintenance from their parents. And the president Montesquieu has a very just observation upon this head: that the establishment of marriage in all civilized states is built on this natural obligation of the father to provide for his children; for that ascertains and makes known the person who is bound to fulfil this obligation.[49]

Blackstone thus appealed to natural law principles that make a father's obligation to take care of his legitimate children the fulfillment of a contractual agreement on his part (both his marriage and his "begetting" them indicate his assent to the contract).

But Blackstone supported the poor laws, which removed poor children from their parents, on the grounds that those children thereby got a better education, suitable to their "several stations" (that is, to their status). He claimed the poor laws removed only children past "the age of nurture." While he argued that parents should have to educate their children, he admitted that this duty was not generally part of the laws of England at that time: "Their [the laws'] defects in this particular cannot be denied." Blackstone sought to shape the law into what it should be—in terms of his principles of justice—by appealing to natural law and political philosophy, particularly to ideas about consent.[50]

Although he acknowledged that Coke had allowed "guardianship by nurture" to last only until fourteen, he interpreted the 1660 law (12 Car. II, c. 24) as granting fathers power over their children until twenty-one.

> The legal power of a father (for a mother, as such, is entitled to no power, but only to reverence and respect) the power of a father, I say, over the

49. Blackstone, *Commentaries,* I, 435.
50. Ibid., 439.

*Children and Consent to Contracts* | 261

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

persons of his children ceases at the age of twenty one: for they are then enfranchised by arriving at years of discretion, or that point which the law has established . . . when the empire of the father, or other guardian, gives place to the empire of reason. Yet, till that age arrives, this empire of the father continues even after his death; for he may by his will appoint a guardian to his children.

What is so marvelous about this passage is the way that he both appealed to natural law ideas and to past authority without acknowledging the historical groundings of that past authority: the law of 1660 is made to affirm "The empire of the father [which] continues even after his death"—as if the father's ability to appoint a guardian for his children until they reach twenty-one was buried in time immemorial. In trying to give sense to the law, he reified fathers' power and made it timeless. He did not even bother to explain, by natural law principles or otherwise, why a mother has no "legal power," though the sense of his earlier argument would seem to grant it to her. His language makes the point unmistakably: A child goes from "the empire of the father" to "the empire of reason."[51]

By the time he compiled his influential *Commentaries on American Law* (1826–1830), James Kent had naturalized parental custody, particularly paternal custody, even further. He associated it with twenty-one unequivocally—like Blackstone, making it seem a permanent part of the common law. In one place Kent even neglected to mention that the statute he referred to was passed in 1660 (after the colonies were settled, which usually meant that it would not apply to them, at least according to post-Revolutionary approaches to this question). He too interpreted this statute to mean that fathers had guardianship and control over their children until twenty-one. He also increased their powers. The language and the natural law theory supporting his arguments make his writing almost poetic.

The duties that reciprocally result from this connexion [of parent and child], are prescribed, as well by those feelings of parental love and filial reverence which Providence has implanted in the human breast, as by the positive precepts of religion, and of our municipal law.

A father's house is always open to his children. The best feelings of our nature establish and consecrate this asylum. Under the thousand pains and perils of human life, the home of the parents is to the children a sure refuge from evil, and a consolation in distress. In the intenseness, the lively

51. Ibid., 441, 450.

262 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

touches, and unsubdued nature of parental affection, we discern the wisdom and goodness of the great Author of our being, and Father of mercies.

He called parents "the natural guardians" of children.[52]

Kent claimed that fathers are "entitled to the custody of the persons, and to the value of the services and labour of his children, during their minority" as though this right had always been true (though he admits that even Blackstone had said that fathers were due the labor of their children only while they lived with him). Blackstone's comment was in passing, relating directly to the father's then support. It was not a clear concept in the common law before Blackstone, although children who lived with their parents were expected to labor with the family. In broadening the application this way and in attaching it firmly to minority and twenty-one, Kent thereby expanded "the empire of the father" considerably. Yet in doing so he built not only on Blackstone but on post-Revolutionary American precedents set in Massachusetts and New Hampshire.[53]

Even in the new Republic, however, the empire of the father had limits; the empire of the mother, if such an expression can be used, even more. Poverty, in short, continued to allow the removal of children from their parents, even in the 1810s; poor fathers and mothers often lost their children to apprenticeships at very young ages. The records of Chester County, Pennsylvania, and of Frederick County, Virginia, are full of such bindings, often when both parents lived. Still, the majority of those bound were the fatherless. While the average age increased to over eleven years in Frederick County, apparently as a result of efforts to keep such families together (via such policies as soldiers' pensions and enforcing paternal maintenance of illegitimate children), the practice was still common. But the ratio of those assigned guardians as opposed to those bound shifted dramatically in Virginia: many more orphans were allowed to stay with their mothers in the 1810s.[54]

But the real limits were for black parents, particularly black parents who were enslaved. There, sixteenth-century rules about children's status and masters' rights remained anywhere that slavery continued, with *masters,* not parents, having custody. In South Carolina in 1809, the court ruled that

52. James Kent, *Commentaries on American Law* (New York, 1826–1830), II, 159–163; Blackstone, *Commentaries,* I, 441.

53. Kent, *Commentaries,* II, 163. Kent cites *Day v Everett* in 7 *Massachusetts Reports* 145, and *Gale v Parrott* in 1 *New Hampshire Rep.* 28.

54. For evidence on changing attitudes about pensions and child support, see Holly Brewer, "Constructing Consent: How Children's Status in Political Theory Shaped Public Policy in Virginia, Pennsylvania, and Massachusetts before and after the Revolution" (Ph.D. diss., University of California, Los Angeles, 1994), chap. 6.

*Children and Consent to Contracts* | 263

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

children of enslaved mothers were also slaves of the person who owned their mother at the time of their birth. The enslaved had as much right to their children as did cattle: "The young of slaves . . . stand on the same footing as other animals." They thus effectively closed the door to fraternal equality among white and black fathers—by comparing the rights of enslaved fathers to those of animals. Free black children in Virginia, meanwhile, were much more likely than free white children to be bound out by the overseers of the poor, sometimes in the face of a protracted struggle with those children's mother or father, a struggle clear in the court records. This binding out was undoubtedly due, in part, to their poverty, which in Virginia clearly negated parental custody (and to the fact that more black children might have lacked legal fathers, either because such fathers were enslaved or white and could not have legally married a black mother, even had they wanted to). In Pennsylvania, the plan for gradually abolishing slavery by definition split black parents from their children. If they had any children before they reached the age of twenty-eight and their freedom, those children would in turn have to stay with the master until their own age of twenty-eight. At the very least, we can say that the black family was not protected in the same way as the white, although policies varied by state.[55]

## Children's Contracts Made Void:
### Fathers (or Others) Contract on Their Behalf

Early- and middle-eighteenth-century lawyers consolidated Coke's synthesis but moved gradually toward a position that children could not make contracts

55. *M'Vaughyter's Administrators v John Elder*, in Joseph Brevard, *Reports of Judicial Decisions in the State of South Carolina . . . 1793 to 1816* (Charleston, S.C., 1857), II, 12 (2 Brevard 313). Also see Margaret A. Burnham, "An Impossible Marriage: Slave Law and Family Law," *Law and Inequality Journal,* V (1987), 187. In Frederick County in the 1810s, 37 black children were bound, compared to 187 white children, but the white population was much higher. By my calculations, based on the censuses for 1810 and 1820, 28.4 percent of all free black boys were bound in that decade, compared to 6.4 percent of black females, and only 6.1 percent and 1.5 percent of white males and females, respectively. See Brewer, "Constructing Consent," chap. 6, esp. 385–386, 394. Ira Berlin, *Many Thousands Gone: The First Two Centuries of Slavery in North America* (Cambridge, Mass., 1998), 232–233, has examples of masters of these children controlling the parents as well, owing to the parents' desire to be near their children; thus parents consented to long-term labor contracts.

On Pennsylvania's gradual abolition of slavery and the semislave status of those born to slave parents after 1780, see Gary B. Nash and Jean R. Soderlund, *Freedom by Degrees: Emancipation in Pennsylvania and Its Aftermath* (New York, 1991).

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

at all, particularly over land. During the early eighteenth century, legal treatises such as Thomas Wood's *Institute of the Laws of England,* popular in the colonies, followed Coke in distinguishing between the ability to buy and the ability to sell land, but they hardened the earlier distinctions. On the one hand, Wood claimed that "at Twenty-one [a man] may alien his Lands, Goods and Chattels, but not before," and designated the same for women. On the same page, however, Wood cited the passage from Coke that allowed an infant to purchase "without consent of any other, for it is intended for his benefit."[56]

In practice, a Virginia court case of 1731 offered conflicting precedents about whether the deed of someone under the age of twenty-one should be binding, but finally ruled that it should. One justice cited a recent English court decision to the effect that "the Deeds of Infants have only the form but not the Operation of Deeds." The Virginia General Court ultimately decided, however, that an eighteen-year-old's deed of slaves to his half brother was not voidable, since Virginia law allowed an eighteen-year-old to make a will over land. Slaves (like land) were legally real estate, and he had made a will on the same day that he made the deed. Several Massachusetts local court decisions from the mid-eighteenth century also held, like some English decisions, that those under age twenty-one could simply not form valid contracts over land. Thus Virginia held on longer to the older norms.[57]

In the longer term, this movement toward the absolute invalidity of an infant's deed for land extended into the idea that infants should not be held liable for failing to uphold their side of a contract over goods, even when other persons had performed their part. This stance made contracts with minors a considerable risk. Those under age twenty-one had been allowed at their own discretion to evade contracts they perceived to be detrimental to them, but they were liable to return the goods they had purchased (or the money they had received) and liable for damages. Gradually, legal authorities began to argue that persons under twenty-one should be unable to make any contracts for land or purchases, and that anyone who formed such a contract with a minor deserved to be burdened with the liability if the minor did not fulfill the bargain.

56. Wood, *Institute of the Laws of England,* 12.

57. *Waughop v Tate and Ux'r,* in R. T. Barton, ed., *Virginia Colonial Decisions,* R76–R77. For Massachusetts, see William E. Nelson, *Americanization of the Common Law: The Impact of Legal Change on Massachusetts Society, 1760–1830,* (Cambridge, Mass., 1981), 199 n. 47, 245 n. 249. The law in Massachusetts seemed to go back and forth, in that some early-nineteenth-century Massachusetts local court decisions held that such contracts were only voidable.

*Children and Consent to Contracts* | 265

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Most agreed, throughout this entire period (1550–1830), that children had to be responsible for contracts for their "necessities," but children began to be excluded from even this contract by some judges and legal treatise writers, particularly American authorities, by the early nineteenth century. As the vagueness of the term implies, "necessities" could mean both everything and nothing, depending on the judge and the jury. But, over time, the term began to include less. Coke included as necessities "Meat, Drinke, Apparel, necessary Physicke, and such other Necessaries, and likewise . . . good Teaching or Instruction." Seventy years later, the *Infants Lawyer* shortened the list, but kept it substantially the same: "diet, apparel, Learning, and necessary Physick." A popular early-nineteenth-century English legal guide illustrated the ways in which the term "necessaries" could be stretched. In a widely reported 1793 English decision, for example, Chief Justice Lloyd Kenyon ruled, "A captain in the army, being under age, is liable to pay for a livery ordered for his servant, as necessaries, but not for cockades ordered for the soldiers of his company." Kenyon's was a broad definition of necessities, reflecting the responsible positions that elite young men often still held in late-eighteenth-century England.[58]

But, increasingly, nineteenth-century American decisions began to view necessaries in very narrow terms. The most important change about these contracts for necessities was expressed by James Kent in his 1827 *Commentaries*. When discussing necessities, Kent redefined the entire basis of the question. It was not whether the infant should be liable for necessities, but whether the father was liable for the contracts that the infant formed for necessities. Kent held that, except in extreme cases, the father was not. Only if a child was not living with its father or guardian could the father or guardian be held liable for necessities. "If the infant lives with his father or guardian, and their care and protection are duly exercised, he cannot bind him[s]elf even for necessaries." Otherwise, the law assumed that the father provided them. Kent's standing on this reveals the development of both custody law and contract law. The assumption of the law had shifted to deny the identity of a child altogether, up to age twenty-one: society should see the child only as part of a family, with a father at its head. A child could not contract by himself or herself: the father had to contract on the child's behalf.[59]

For children's contracts beyond necessities, the biggest question during

58. *Infants Lawyer,* 119; *Coke upon Littleton,* 172a; Samuel Comyn, *A Treatise of the Law relative to Contracts and Agreements Not under Seal: With Cases and Decisions Thereon in the Action of Assumpsit* (London, 1807), I, 155.

59. Kent, *Commentaries,* II, 196, especially, and also generally his whole section "Of Infants," II, 191–200.

266 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

the seventeenth and eighteenth centuries was about liability where an infant took possession of goods and then could not return them and refused to pay for them. If a child ate the food, rented the house, or damaged the horse, should the child be responsible for paying the costs as promised? Should the minor be able to keep goods not paid for? *The Infants Lawyer* (1697) debated this question at length, acknowledging that judges had offered arguments on both sides. On the one hand, some lawyers thought that an infant should be responsible for the return of goods if he or she decided to void the contract. If the child could not return the goods, then he or she was responsible for the damage caused. "It was the opinion of some, that an Infant is chargable for a Tort; and therefore Trover and Conversion being a Tort, an Infant is chargable with it, and that therefore Trover lies against him, and he cannot plead *diens age* [within age]." Other lawyers distinguished between violent actions ("vi et armis") and "such torts which concern Contract, Lending, Finding and Conversion, the Original cause whereof is not *Vi et armis,* or such as found in Deceipt." If the damage arose only from a violation of contract, then "no action lies" against the minor. The author of *The Infants Lawyer* finished this analysis with two cases that showed that infants were unquestionably responsible for the payment of rent, even though leases arose from a contractual arrangement. He concluded that infants should generally be held responsible for damages, even if they arose simply over a contract. The *Infants Lawyer* was in this sense typical. It was generally agreed during the early eighteenth century that infants should be liable in cases where they intentionally caused damage or acted deceitfully, such that they, for example, sought to sell goods not their own or pretended that they were of age.[60]

By the early nineteenth century, children had largely lost this liability. The denial of any liability, even in cases of fraud and damage, undermined children's ability to make contracts, since enforcement, even when the other party had fulfilled its part of the bargain, became impossible. Samuel Comyn's popular *Treatise of the Law relative to Contracts and Agreements* (1807) began by stating, "All contracts with infants, except for necessaries, are either void or voidable: the reason of which is, the indulgence the law has thought fit to give infants, who are supposed to want judgment and discretion in their contracts

60. *Infants Lawyer,* 68–70. In the early eighteenth century, children were clearly supposed to be held liable for damage they committed, including damage that resulted from a violation of a contract. William Hawkins, *A Summary of the Crown-Law . . .* (London, 1728), wrote, "Want of reason shall not screen a defendant in any civil action, from satisfying the actual damage" (I, 2). Wood agreed: "Yet if an Infant or Non Compos commit a Trespass against the Person or Possession of another, he must answer for the damage in a Civil Action" (*Institute of the Laws,* 340). Also see the *Infants Lawyer,* 67–68.

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

and transactions with others, and the care it takes of them in preventing them from being imposed upon or overreached by persons of more years and experience." Comyn added the "void" to where only "voidable" had been for Littleton and Perkins in the sixteenth century—an important distinction—and offered an elaborate justification for why children should not be able to make such contracts. "Lord Kenyon [chief justice] said, 'Nothing is clearer in the law than that an infant cannot contract a debt except for necessaries.'" He gave examples of judges who ruled that "the law will not allow an infant to trade," and "that if one deliver goods to an infant on a contract knowing him to be an infant, the infant shall not be charged for them in trover and conversion; for by that means all infants in England would be ruined." He thought that those under age twenty-one would make such disadvantageous contracts, because of their youth, that, if held liable for their performance as were adults, such infants' fortunes "would be ruined." Comyn also emphasized an earlier decision by Lord Chief Justice John Kelyng (1666), who had argued that a judgment against a minor for three hundred pounds damages (resulting from a broken mortgage contract) undercut the major basic principles of contract law. In appeal Comyn urged that the judgment against a minor should be stayed (suspended): "The judgment will stay [not go into effect] for ever, else the whole foundation of the common law will be shaken." For Kelyng in 1666, the issue had to do with the particular issue of an infant's deciding to void a land sale (even though he had lied about his age). For Comyn, the idea that a child could not make a valid contract had become a universal principle, regardless of the type of contract—he did not even mention that it was a mortgage. Comyn argued that "the whole foundation of the common law" rested on the principle of competency.[61]

While judges in England were beginning to adhere to a strict denial of liability for children who made contracts, judges in the United States continued to offer a range of opinions about whether infants were liable for costs when they broke a contract. When were their contracts binding? After he had surveyed the situation in 1827, Kent admitted that he saw "much contradiction and confusion." Kent himself could not help repeating that confusion and offering contradictory advice. After giving the above judgment about

61. Comyn, *Contracts and Agreements,* I, 149, 151, 157; *Manby v Scott,* I Sid. 129. The Kelyng case is *Johnson v Pye,* I Keb. 905. Children may still make contracts to purchase goods or services or to buy or sell land in many states. Their contract, however, is voidable at their own wish any time before they reach the age of majority (usually twenty-one). A modern legal scholar therefore advises that, practically speaking, children do not have this right, and property left to them should be managed by a trust or a guardian and not by the child. Robert Mnookin, *Child, Family, and State: Problems and Materials on Children and the Law* (Boston, 1978), 217, 681.

268 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

children's contracts for necessities, Kent also cited Joseph Story, whose opinion he clearly regarded highly, as giving the argument some precision: any contract that went against the interest of the child should be void; if for the child's benefit, it should be good; and, if unclear, it should be voidable at the child's own discretion (and none other's). The decentered nature of American decisions probably accounted, at least in part, for the contradictory judgments.[62]

American state superior court decisions reflect the extensive uses to which contracts were put by the early nineteenth century. These decisions varied by state and by type of contract as well as by the behavior of the child. For example, some judges held that a negotiable note executed by an infant was void from the beginning, whereas other judges held that it was only voidable.[63] With regard to the key questions of liability, the general opinion of American judges began to adhere to the English consensus that the minor should not have to be responsible for returning money received for an item even after rescinding the contract (and receiving the item back). Infants could also not even be liable for contracts they had purposely violated. In a New Jersey case of 1818, for example, two infants "wilfully" broke a riding chair they had borrowed by using it on a rough road and a long journey very different from the road and journey they had promised to take. Despite this intentional violation of the contract, Justice Samuel Southard concluded, "That infants are not liable upon contracts, is too well established to admit of argument." The intentional part could also be difficult to prove, for, if an infant could be said to have altered an agreement based merely on insufficient knowledge of the situation, then a suit for recovery of damages could not be won.[64]

62. Kent, *Commentaries,* II, 191, 193.

63. *The American Digest: A Complete Digest of All Reported American Cases from the Earliest Times to 1896,* Century Edition (St. Paul, Minn., 1897–1904), XX, 1136. "Void" decisions were made in Kentucky in 1809, *Beeler v Young,* 4 Ky. (1 Bibb) 519; New Hampshire in 1831, *Wentworth v Wentworth,* 5 N.H. 410; New Jersey in 1818, *Fenton v White,* 4 N.J.L. (1 Southard) 100; and Tennessee in 1834, *McMinn v Richmonds,* 14 Tenn. (6 Yer.) 9. Decisions that said an infant's note was not void were made in Kentucky in 1842, *Best v Givens and Wood,* 42 Ky. (2 B. Mon.) 72; Massachusetts in 1840, *Reed v Batchelder,* 42 Mass. (1 Met.) 559; and New York in 1837, *Everson v Carpenter,* 17 Wend. (N.Y.) 419. The second batch actually overlapped in the same states as the first batch, but appeared slightly later: the absolute "void" nature of infants' contracts appears to have had fewer adherents by the mid-nineteenth century. Most decisions were that the minors could avoid these contracts without liability.

64. *Abraham and Jacob Schenk v Stephen Strong,* 4 N.J.L. (1 Southard) 97–98 (February 1818).

*Children and Consent to Contracts* | 269

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Brewer, Exs. Page 472

Even this limited liability, however, began to be questioned during the late eighteenth and early nineteenth centuries. The process of change can be seen in one exemplary case from Connecticut, where a lower court held to the older norm and the supreme court to the newer. *Brown v Dunham* (1791) turned on whether a minor under age twenty-one could be liable for a contract if he pretended to be of age. A lower court ruled that his contract of sale should be upheld on the grounds that the "defendant had the appearance of a man of full age and was allowed by his father to trade." The Connecticut Supreme Court judges overturned that decision, calling that decision a "manifest error," since the "defendant being a minor under the care of his parent, was incapable of making a contract, except for necessaries, therefore could not be guilty of a fraud in contracting."[65]

One notable exception, albeit limited, was made by the United States Supreme Court in 1810, which overturned a circuit court decision. In *Vasse v Smith,* the Court decided that nineteen-year-old Joseph Smith was liable for the goods of another that he had engaged to sell by contract. He had agreed to sell them in Alexandria, Virginia, but instead shipped them to the West Indies. Unfortunately, the ship sank before the goods arrived. Afterward, Smith pleaded that he was not responsible for the loss, because he was an infant when he entered the contract. Chief Justice John Marshall ruled that he was liable, since he had intentionally violated the original contract.[66]

Within the debates several general points of consistency emerge. First, most contracts with infants went from voidable to void. Second, by the nineteenth century, whoever entered into a contract with an infant could lose substantial amounts of money—amounts not at risk earlier because the infant then would have been liable for damages. Third, those cases where contracts with infants had been binding, especially for necessities, became, for the majority of judges, either void or voidable. The assumption of the

65. *Brown v Dunham,* in Jesse Root, *Reports of Cases Adjudged in the Superior Court and Supreme Court of Errors [1789–1793]* (Hartford, Conn., 1798), I, 272–273. Also see a similar case, where the supreme court overturned a lower court's judgment, in the same volume, *Geer v Hovy,* I, 179. This issue continued to be debated during the nineteenth century. See *American Digest,* XXVII, 1186: "An infant is answerable for falsely representing himself to be of full age, and thereby inducing a person to sell him goods on credit" (citation to *Fitts v Hall,* 9 N.H. 441 [1838]).

66. *Vasse v Smith,* 10 U.S. (6 Cranch) 226. Chief Justice Marshall ruled that Smith should be liable in this case because he had committed "not an act of omission but of commission." In other words, Smith did not just fail to sell the goods but actively chose to take a different course in sending the flour to the West Indies. If the former, he would not have been liable. This opinion differed from the English decisions.

270 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

law was that someone else, usually the father, was always supposed to act on their behalf; the consent of the infants themselves became almost irrelevant. When necessities were permitted, what they included varied by judge and by state but became increasingly narrow. They could include a primary education but not a college education; clothes, if not extravagant and if the parents (or others) did not already buy them sufficient clothes.

Thus, what had earlier been a limited application of voidability, meant to apply mostly as a safety clause that assumed that children made contracts, was applied much more broadly by the early nineteenth century, such that it became almost impossible for children to form any contracts. At a time when contracts were more important for the basic transactions of society, contracts directly with infants themselves became much riskier for those who made them. Court decisions usually favored infants in questions of liability, with the argument that they should be able to receive back exactly what they had sold but did not have to return (especially in the same form) the goods or money they had received. This high risk made infants effectively unable to form contracts.

## Labor Contracts

The evidence from the shipping records and a few contracts in the colonies confirms that many children were consenting to their own labor contracts in the seventeenth century. In 1634 a "servant" in Plymouth Colony agreed to serve a master for twelve years, until he turned twenty-three, so he was eleven when he bound himself. In Middlesex, England, in 1683–1684, children as young as eleven were putting their mark to such contracts. In a few cases where children were very young, a parent signed the contract instead of or in addition to the child. In Massachusetts in the 1660s, a father bound his daughter for more than fourteen years of labor (she was probably three). In 1701 in Virginia, six-year-old Elizabeth Bartlett's contract was signed only by her mother and her new master. Is this failure to consider her consent part of a transition to parental consent? Or due to her very young age? Regardless, it seems that, during the late seventeenth century, the contracts of even those under fourteen were still valid but becoming less necessary and that parental consent was allowed in some cases instead.[67]

67. Lawrence William Towner, "A Good Master Well Served: a Social History of Servitude in Massachusetts 1620–1750" (Ph.D. diss., Northwestern University, 1955), 69. Unfortunately for my study, Towner's extensive survey of servants and apprenticeship was not concerned generally with questions of consent. On Middlesex, see

*Children and Consent to Contracts* | 271

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

By the early seventeenth century, poor children no longer had to be co-
erced into consenting to labor contracts; instead, the laws simply allowed
justices of the peace or churchwardens to bind them. But children could still
bind themselves. This change can be glimpsed in the first shipments of
children to Virginia, shipments that mark the beginning of indentured servi-
tude itself.

Between 1617 and 1622, the City of London sent three boats of children to
the colony of Virginia, accompanied by agreements with the Virginia Com-
pany about their term of service. These children were all poor "vagrants,"
mostly boys, ranging in age from eight to sixteen. One was Nicholas Granger,
who arrived at the age of nine in 1619 and was one of the few to survive his
apprenticeship. When asking for a second batch, the Virginia General Court
requested that all children be over age twelve. Some scheduled to be sent in
the second batch were "obstinate" about not wanting to go to Virginia. The
City of London, it turned out, needed the children's consent to convey them
to Virginia. In order to force the children (who refused to agree), they had to
obtain the special permission of the Privy Council, which granted the request
for two reasons: the transportation would be to the youths' benefit (on the
grounds that they would obtain land when their service finished), and these
children were rogues and vagabonds.[68] James I described them as "divers idle
young people." Because these children had "noe employmente" and were
seen to have no legitimate means of supporting themselves, they were forced
to enter these labor contracts—in this case, across the ocean. In effect, in the
eyes of both English and colonial authorities, their poverty invalidated the
need for their consent (even coerced); their consent was obviated both legally
and sometimes illegally but with the complicity of English authorities.[69]

Copyright © 2007. University of North Carolina Press. All rights reserved.

David W. Galenson, *White Servitude in Colonial America: An Economic Analysis* (Cam-
bridge, 1981), 76.

The Massachusetts contract is cited by Towner, "A Good Master Well Served," app. A,
377. Virginia: York County Records Project, Colonial Williamsburg Foundation, Wil-
liamsburg, Va. (hereafter cited as YCRP), citing York County, Deeds, Orders, and Wills
(11) 528 (DOW).

68. Robert C. Johnson, "The Transportation of Vagrant Children from London to
Virginia, 1618–1622," in Howard S. Reinmuth, Jr., ed., *Early Stuart Studies: Essays in
Honor of David Harris Willson* (Minneapolis, Minn., 1970), 137–151, esp. 144, 148; Grace
Abbott, ed., *The Child and the State . . . : Select Documents* (Chicago, 1938), I, 196, citing
*The Records of the Virginia Company of London;* Abbot Emerson Smith, *Colonists in
Bondage: White Servitude and Convict Labor in America, 1607–1776* (Chapel Hill, N.C.,
1947), 147–151. The Virginia court's request is reprinted in Abbott, *The Child and the
State,* I, 195–198. See also Pinchbeck and Hewitt, *Children in English Society,* I, 106.

69. Pinchbeck and Hewitt, *Children in English Society,* I, 106. For other, similar

272 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Clearly, however, not enough "servants" could be obtained legally with the aid of local authorities, whether City of London officials or parish officers in charge of the poor laws. But English authorities did for most of the century turn a blind eye to a thriving trade in what came to be called, by midcentury, "kidnapping." Thousands of people, both children and adults, were kidnapped, or assaulted and put on board ships without their consent, to be sent to the colonies and sold as servants during the seventeenth century. English court records are full of complaints: such theft of persons was technically illegal but was only lightly punished with a small fine, obtainable only when an individual brought suit and, usually, captured the kidnapper as well. A variety of statutes sought to prevent kidnapping by securing the consent of all immigrants, especially young ones. Barbados required in 1661 no one should transport any "servants, under the age of fourteen years unless they can produce a good Certificate, or an Indenture, or Writing from the principal person of the Parish, wherein the child last lived, that it was done with their consent, or at the request of the parents of such child." For violating this, they were to be imprisoned and forced to return the child at their cost. Massachusetts and Pennsylvania heard a few petitions from such kidnapped children and sometimes released them.[70]

Seventeenth-century Virginians, however, condoned the practice, passing laws about how long such "servants" who arrived without contracts should serve—laws that, with every iteration, increased the length of service. The first law, passed in 1643, stated that "such servants as shall be imported haveing no indentures or covenants either men or women if they be above twenty year old to serve fowre year, if they shall be above twelve and under twenty to serve five years, And if under twelve to serve seaven years." By 1666, those over age nineteen had to serve for five years (one more year), and those under that age had to serve until they reached age twenty-four. For those "under twelve," who had to serve seven years by the 1643 act, the 1666 act meant an additional six or more years of service. A twelve-year-old, meanwhile, who had to serve only until seventeen in 1643, by 1666 had to serve until twenty-four. Virginia judges assessed their ages. So, in 1679, "James Browne a servant coming in without indentures consigned by Mr. William Smith of London to Captain Francis Page . . . is adjudged eleven years of age and is ord. to serve according to act," which meant thirteen years. By forcing such persons to labor for long terms without contracts, Virginians were condoning kidnap-

---

examples, see James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill, N.C., 1994), 62–65, 253–255.

70. Richard B. Morris, *Government and Labor in Early America* (New York, 1946), 340–345; Richard Hall, ed., *Acts, Passed in the Island of Barbados . . .* (London, 1764), 35.

*Children and Consent to Contracts* | 273

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

ping of English subjects, adults as well as children, and completely ignoring whether those persons had consented to that labor. (The similarities to the capture and sale of Africans in Virginia are striking.)[71]

To prevent such practices, English courts set up some policies to ensure that those taking ship for the New World had chosen to go, but they were weakly enforced. The first prosecution of kidnapping began during the Civil War, amid heightened tensions between Parliament and the king. In 1643 Elizabeth Hamlyn was committed to Newgate Prison, where she was whipped, "for taking diverse little children in the street and selling them to be carried to Virginia." In 1645, Parliament enacted an ordinance that those who "in a most barbarous and wicked Manner steal away many little children" should be pursued and publicly punished. Even so, when four-year-old Richard Harnold, heir to eight hundred pounds a year, was stolen and sent to Virginia in 1657, the courts were more concerned than over most poor children. With the Restoration, the penalties were relaxed considerably, despite the institution of a formal registry of all outgoing passengers and sending "Searchers," or English officials, to visit servant ships before they left to determine whether emigrants were on them against their will. If the children "had been properly signed on," that is, if they had consented to go, then "the parents could not distress [the] ship owners," but must let them go to the colonies.[72]

Enforcement of the antikidnapping laws gained some teeth in the 1680s, but kidnapping was still fairly widespread and only lightly punished through the first half of the eighteenth century. In 1682, Charles II ordered that persons over twenty-one should bind themselves as servants in the presence of a justice of the peace and that those under twenty-one could bind themselves only with the additional consent of parents or masters. If under fourteen, such parents or masters had to be present at the making of the new contract. Although renewed under James II, this order was only sporadically enforced. In 1717, in response especially to pressure from merchants, who feared being sued by irate masters deprived of apprentices or by wives deserted by husbands, Parliament issued its first proclamation on the subject, albeit with lower ages than Charles II's original order. Those over fifteen had to give assent in person to a magistrate, which would be irrevocable; those under that age apparently had to have their parents present as well. Frequent evasion of these acts was still occurring in the eighteenth century, however.

71. Hening, ed., *Statutes at Large,* I, 257 (1643), 441–442 (1658), II, 113–114 (1662), 240 (1666); YCRP citing DOW (6) 112 (Aug. 24, 1679). Many other such cases appear.

72. Peter Wilson Coldham, "The 'Spiriting' of London Children to Virginia, 1648–1685," *VMHB,* LXXXIII (1975), 280–287, esp. 281, 286; Morris, *Government and Labor,* 342, 344; Smith, *Colonists in Bondage,* 73.

274 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

That children were still coming into Virginia without indentures in 1705 is evidenced by an act of that year concerning tithables.[73]

A pamphlet published in London in 1715 announced that two kidnappers had been discovered, caught, and were awaiting trial—caught only through the endeavors of bereaved parents. The two kidnapping ship captains, Azariah Daniel and Edward Harrison, preferred boys between the ages of ten and twelve. Two boys of "about the age of twelve," kidnapped by Daniel, had been found "bound in a garret." Meanwhile, the others he had kidnapped had already been placed aboard ships. The father who had tracked down the other captain, Harrison, had found him too late: Harrison had put his son on a frigate that had already departed for Barbados. Harrison admitted to putting "above 150 more aboard several other ships in the said river bound to his Majestys Plantations." In other locales, such as Aberdeen, Scotland, in the 1740s, the judges colluded with those who captured boys under fourteen, in particular giving them false contracts that stated that parent and child consented.[74]

By the eighteenth century, the colonies had begun to follow very different policies toward young servants and apprentices in response to increasing emphasis on contracts themselves and growing doubts about the ability of children to make contracts. Apprenticeship contracts from Virginia and Pennsylvania during the eighteenth and early nineteenth centuries demonstrate that Pennsylvanians put a higher value on the consent of the child (of whatever age) as well as of the child's parent. Not only were Virginia's children much more likely to be bound by overseers of the poor on the basis of poverty (in which case their consent was considered irrelevant), but children were much less likely to sign other labor contracts in Virginia. In only two contracts in the 1750s did a boy explicitly sign his own indenture; in later contracts, children of both sexes were bound only by their parents, and their consent was not an issue.[75]

73. Morris, *Government and Labor,* 340. Although the contracts were identical in other respects for persons of all ages, the contracts of servants under twenty-one were more likely to include training in a trade or education. Galenson, *White Servitude,* 200–203.

74. Hening, ed., *Statutes at Large,* III, 259; *The Grand Kidnapper at Last Taken . . .* (London, [1715]), British Library; Peter Wilson Coldham, *Emigrants in Chains: A Social History of Forced Migration to the Americas . . .* (Baltimore, 1992), chap. 7.

75. Indenture of Thomas Pollard, dated June 14, 1751, age seventeen; no parents, guardians, or others signed. Indenture of John Tucker, dated July 20, 1753, age unspecified; both he and his mother signed (Lancaster County, Va., Apprenticeship Records, Library of Virginia). Apprenticeship contracts were not formally kept, so it is difficult to provide a comprehensive sample.

*Children and Consent to Contracts* | 275

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

In Pennsylvania, on the other hand, children usually signed their contracts, regardless of their age. In all of the cases where children were under fourteen, a parent or other family member signed the contract as well. In one case, two-year-old Phebe Stuart's mark appeared next to her name at the bottom of the contract. In two others, a four-year-old and a five-year-old signed their own contracts. Nine-, ten-, and twelve-year-olds also signed their own apprenticeship contracts. Even the wording of the contracts in Virginia and Pennsylvania was different. In nearly all the Pennsylvania contracts, the words "doth voluntarily, of his [or her] own free will and accord, put himself apprentice to . . ." appeared, even in the apprenticeship contract of four-year-old David Wilson, for example: "This indenture witnesseth that David Wilson . . . by and with the approbation of his father James Wilson . . . hath put himself and by these presents doth thereby put, place, and bind out himself." In Virginia, however, the wording appeared differently. Instead of the consent of the child, the contract laid stress on the consent of a parent, either the father or the mother, to binding the child. "Nicholas Hardin . . . hath of his own free will put and by these presents doth bind his son Henry Hardin apprentice." Still, these seem to have been a minority of contracts: most were made by the churchwardens or overseers of the poor.[76]

Thus, two different types of contracts had emerged: the older contract, which involved the consent of the parties involved, and that between the vestrymen of the parish and the master, which could bind the poor against their will. The one involved the direct consent of the child to labor, and the other avoided the child's consent—just as it avoided the consent of adults—on the basis of poverty. The nature and use of both types of contracts would change over time. With respect to both, there was an increasing consensus, as with contracts for goods, lands, and marriage, that young children should not have to be bound by their own contracts but that others could bind them during their minority. The minimum age to form a binding labor contract inched upward during the seventeenth and nineteenth centuries, with different colonies/states following different rules. Most labor contracts involv-

76. Contract of Phebe Stuart, dated Oct. 15, 1811, Apprenticeship Records (AR), Chester County Historical Society, Chester, Pa. (CCHS); David Wilson (age four), dated June 27, 1818, AR, CCHS; James Keegan (age five), dated Dec. 19, 1748, record 32020, CCHS; Hannah Field (age twelve), dated June 27, 1811, record 32812, CCHS; Lydia Morton (age nine), dated June 24, 1822, AR, CCHS; Johnson Walters (age ten), July 10, 1814, AR, CCHS; Benjamin Webb (age ten), Aug. 3, 1775, AR, CCHS; Indenture of Henry Hardin (aged eleven), dated Jan. 20, 1787, FCV, AR.

For an earlier contract, see that of Robert Wilson (1732), "With the advice and consent of his mother and father in law Joseph Stringer and Mary String . . . of his own free and voluntary will and accord put and bind himself . . ." (AR, CCHS).

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

ing children were apprenticeships where the child learned a skill and was taught to read, write, and cipher. Therefore, if the contract was voidable at the child's wish, as became the rule by the late eighteenth century, then masters or mistresses would be less willing to invest in the child in the early years as their part of the contract. This voidability without liability thus effectively limited the opportunities for children to make their own contracts. The growing legal consensus that these contracts could be void at the request of the child encouraged the use of parents as coguarantors or even as sole guarantors as well as the apprenticeship of children by the vestry or county courts. Children's own consent became irrelevant. The question became who should consent for them: Parents? Guardians? State authorities?[77]

By the early ninteenth century, as part of a broad strengthening of notions of custody, parents began to be given a property right in their children and in some states could even sell their children's labor. Several cases illustrate the developing tensions over children's consent in Pennsylvania. In 1748, two guardians petitioned the Pennsylvania court, praying the court to allow them to bind two orphan boys. "Rich Richard and David Richard, two of the children of the deceased being minor yet being obstinately inclined, refuse to be bound to trades pursuant to the direction of their late father's will or to follow any other employment whatsoever, which in the method they are in must inevitably end in their ruin." The guardians promised to bind them only to such masters as the boys "may judge proper or convenient to them," but could not legally do so without a court order authorizing them to bind the orphans. There is no record of their age, yet they were both called "minors." In 1753, another case reinforced the principle that a boy's consent was normal and accepted for a labor contract. Seventeen-year-old Thomas Ralph petitioned the court that he should be released from the indenture he had signed two years previously with one Arthur Kennedy in Ireland, who used "many persuasions and fair promises, to entice your petitioner to leave his parents, and go to Pennsylvania." He was only fifteen years old at that time, and his parents "knew nothing of the agreement." He also noted that the master to whom Kennedy had sold him had forced him to sign a new indenture with more time on it. The court ignored the issue of parental consent but responded to the claim about a coerced second contract and made him serve his master only until the time first set. Clearly, the court thought that a fifteen-

77. On changes in labor law generally during this period, see Robert J. Steinfeld, *The Invention of Free Labor: The Employment Relation in English and American Law and Culture, 1350–1870* (Chapel Hill, N.C., 1991); Christopher L. Tomlins, *Law, Labor, and Ideology in the Early American Republic* (Cambridge, 1993); Karen Orren, *Belated Feudalism: Labor, the Law, and Liberal Development in the United States* (Cambridge, 1991).

*Children and Consent to Contracts* | 277

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
    North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

year-old did not need the consent of his parents in order to enter a binding agreement. In 1811 Elizabeth Rope petitioned the court to dissolve her apprenticeship on the grounds that she was bound to learn housewifery by a man who claimed to be but was not her guardian, at age fifteen, without her consent. Her new master and mistress beat her severely. Although the outcome of the case is not known (it might have been resolved out of court), the question of valid consent (including her own) was central to the petition. In these cases Pennsylvania norms tended to privilege the consent of the child.[78]

In Virginia in 1789, however, a boy was released from his contract—despite the fact that his master had paid for his passage from Ireland—on the grounds that his parents had not consented. Eighteen-year-old Humphrey Murphy petitioned the court to be set free from his apprenticeship because he had signed his own indenture when about age thirteen in 1784 in Ireland, without his father's consent. The court, after examining his indenture with his own mark at the bottom, as well as that of Timothy Parker, to whom he had originally indented himself, released him from his service on the grounds that he had made the contract "when a minor and uncapable of entering into any transaction obligatory." Murphy's master, who had bought his indenture, apparently astounded at the verdict, appealed to the Frederick District Court, where the lower court's judgment was upheld. Thus the labor contracts of those under fourteen, at least, were held to be invalid in Virginia in 1789. Indeed, the court's blanket use of the term "minor" indicates that, had he been any age under twenty-one when he signed the contract, he could also have voided it at his wish.[79]

By the early nineteenth century in most states the decision rendered by the Virginia court had come to be typical. A Massachusetts statute of 1794 held that parental consent was necessary to the labor contracts of all those under age twenty-one (as well as the consent of the child if over fourteen). If the father was not living or if the child was illegitimate, the mother could bind the child. If children had no parent, then their "legal guardian" could bind them. If they also had no guardian, then they could request to be bound by the town selectmen if over age fourteen. In other words, some adult always had to consent for them; if they were under fourteen, then that adult would provide the sole authorization. In some states, in fact, it became normal for a father to have the right to the labor of his children, including any wage or profits a child might earn. Two contracts from Connecticut in 1815 show fathers bind-

78. Chester County, Pennsylvania, Quarter Session Indictments, May 1753, petition of Thomas Ralph; November 1811, complaint and petition of Elizabeth Rope.

79. *Murphy v Magill,* FCV Ended Cases, June 1789. Also see FCV MB, 1786–1790, June 1789, 281–282.

278 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

ing out several of their children to the Slater Cotton Mill and having the right
to their wages, although one father agreed to give his two oldest sons one-half
their wages. The contracts do not specify ages, but the newly accepted rule
was that fathers had the right to their children's labor until the child reached
twenty-one, following Blackstone (discussed above). That this right was be-
coming clearer in the common law is shown by Kent's dictum about the
property rights of fathers in their children.[80]

The best illustration of Pennsylvania's exceptional stand—even better than
the very young children's signatures on labor contracts—is the 1793 Pennsyl-
vania Supreme Court decision of *Respublica v Catharine Keppele.* In this case
Peter Dehaven bound his ward Benjamin Hannis, age ten, to Catharine
Keppele for five years, for which Keppele paid Dehaven. The judges released
Benjamin and maintained that guardians could not bind their wards as ser-
vants—and that even parents could not bind their children as servants. Al-
though they granted that "a parent may have a right to the personal service of
his child," they held that "no parent can make his child the servant to an-
other," since such a contract "cannot be for [the child's] benefit." They im-
plied that the child must always consent as well and specified that the "per-
sonal service" of a child could not translate into selling the child's service. The
justices in Pennsylvania thus set a completely different precedent at this
juncture, separating their policy decisively from that of Massachusetts and
Virginia, who were wrestling with the same questions.[81]

Over three centuries a broad change occurred in the ability of children to
consent to their own labor contracts. Whereas in the Elizabethan period the
labor contracts of children under seven were held to be valid, and unavoidable
even at the child's own request, by the late eighteenth century the courts were
beginning to rule (and the laws to state explicitly) that a father, mother,
guardian, or the overseers of the poor should make that contract for them.
Contracts signed only by minors became seen as not binding on them. This
change did not happen overnight, but began in the seventeenth century with
the change in the poor law itself.

80. *The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4,*
*1835 . . .* (Boston, 1836), 494; Slater Company Records, University of Connecticut Li-
brary, record nos. p2243 (March 1815), p2245 (May 1815) (thanks to David Zonderman
for this reference). On the Virginia decision, see generally the *American Digest,* XXVII,
1120–1122. There seems to be little dispute on this issue in the nineteenth century.
None of the state cases that upheld minors' rights to dissolve their labor contracts in the
nineteenth century appeared in Pennsylvania.

81. *Respublica v Catharine Keppele,* Pa. (1 Yeates 233–237) (1793); Kent, *Commentaries,*
II, 163.

*Children and Consent to Contracts* | 279

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

The process of change on the individual level can be seen in the notes made in the margins of the practice book of a man who would later become a Massachusetts Supreme Court justice. Young Theophilus Parsons, when first learning the law in 1775, copied out a form (or precedent) against an apprentice for an action of covenant broken, for which the injured master could obtain damages. After copying out the routine form, which served as the basic pattern for masters' seeking damages, however, he wrote in the margin: "Quere whether this action his [against] the [person] who was a minor when he sealed the deed?" In other words, Parsons questioned whether the master had the right to damages from his former apprentice. If not, of course, any apprentice could annul a contract he had signed at his own discretion. These are the questions that haunted all of contract law as it began to cohere into a unified body of thought in the eighteenth century. Under what circumstances could a minor's contract be valid and enforceable? If a father consents for his children in the political arena, because his children cannot sufficiently exercise their understanding (as the republican political theorists had argued), should he not consent on their behalf to other contracts as well?[82]

In England the law of contract, as we now know it, was influenced profoundly by seventeenth- and eighteenth-century natural law and political theory, and gained the central place in the common law it now occupies only in the late eighteenth and early nineteenth centuries. The first treatise that elaborated the centrality of a law of contract in its own right was John Joseph Powell's *Essay upon the Law of Contracts and Agreements* (1790).[83]

Both the "rise of contract" in the law and the rise of democratic-republican political ideas and institutions relied on consent, whether to political or legal contracts. Both also relied on the development of a concept of meaningful, uncoerced, and uninfluenced consent. Children, especially young children, can be both coerced and influenced. Legal contracts thus began increasingly to require the "full development" or "maturity" of the understanding; they also changed substantially in their attitude toward coercion and in their requirements for formality.

These ideas about contracts were expressed variously by New England

82. Theophilus Parsons, "Precedents book of the Massachusetts Law, 1775," MS, Harvard University Law Library, Cambridge, Mass. Also see Nelson, *Americanization of the Common Law,* 199 n. 47, for examples in late-eighteenth-century Massachusetts where the contracts of apprentices were held to be invalid on the grounds that the parent or guardian had failed to sign the indenture. Fathers were also granted the right to their children's wages in several decisions.

83. Atiyah, *Freedom of Contract,* 102–103.

280 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Puritans, by the English Puritans under Cromwell, by the supporters of the Glorious Revolution such as Locke and Algernon Sidney, and they were embodied in much of what we have come to call the Enlightenment. They thus show the connections between these earlier religious and political ideas and democratic-republican thought. They would transform not only the basis of political power but the basis of personal power explicitly, by writing new statutes and, implicitly, by rewriting the common law.

Real similarities exist between ideas about custody and consent embodied in Locke's *Two Treatises of Government* and the common law as codified by Blackstone and treatise writers who followed him. In "The Second Treatise" Locke distinguished adults who could reason and form political contracts from the children who could not. "Their Parents have a sort of Rule and Jurisdiction over them . . . [though] but a temporary one." Parents must "govern the Actions of their yet ignorant Nonage, till Reason shall take its place." Although Blackstone (and other common lawyers after him such as Kent) implied that fathers, in particular, had a property right in their children, Locke did not. In a weird way, then, the common law, in retaining allegiance to the property rights of lords and masters in their villeins and servants, was transferring those rights to parents (and the obligations to children). This comparison drew on the logic of Locke and other natural law theorists to some degree but carried the implications of those arguments significantly further. Locke had been careful to distinguish the limits of parents' power over their children "to the Childrens good," limits that carefully exclude a property right of fathers or mothers in their children.[84]

That important technicality aside, it is clear that contract law as it formed in the eighteenth and nineteenth centuries drank deep from the philosophical debates about justice and political power. Consider Blackstone's comments about custody: The power of the father "ceases at the age of twenty one . . . when the empire of the father, or other guardian, gives place to the empire of reason." Only when they have reached the empire of reason can they consent to any contract: they are then enfranchised.[85]

Blackstone gave more power to the father (as opposed to the mother) than did Locke, but both used the same justification: the father's provision of nurture and support justified his power. Yet that logic was subject to an internal critique that would surface in custody disputes of the late eighteenth and early nineteenth centuries: perhaps the mother, not the father, provided the most nurture. Custody disputes between parents would become more

84. John Locke, *Two Treatises of Government,* ed. Peter Laslett (Cambridge, 1988), 304, 306, 309 ("Second Treatise," chap. 6, pars. 55, 58, 63).

85. Blackstone, *Commentaries,* I, 441.

*Children and Consent to Contracts* | 281

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

important as divorce was legalized in the wake of the Revolution, but they also need to be seen in the context of (1) the waning power of the "lord," as embedded, in part, in the removal of the old guardianship rules and (2) the increasing importance of custody itself as "children" became defined as needing someone else to make decisions for them.

Even as paternal power strengthened, challenges to it also arose. The questions increasingly became, Who would act in the children's best interest? Who could act for them? William Murray, Lord Mansfield (chief justice of England, 1756–1788), challenged the emerging emphasis on paternal custody in two key rulings in 1763 and 1764, one of which gave a daughter (who had been apprenticed into prostitution) freedom from her father's custody and set her "at liberty to go where she will" (she was eighteen). In the second, more important case, Mansfield held that, while "the natural right [to custody] is with the father," if the father is a bankrupt, for example, or mistreats the child, then he voids his right to custody. "The court," he held, "will do what shall appear best for the child." A parent's love for the child began to enter into the legal debate as part of this question of best interests. In 1827 Kent, for example, invoked the "unsubdued nature of parental affection" in justifying the custody and responsiblities of parents.[86]

Joseph Story, an associate justice on the United States Supreme Court (1812–1845), voiced a critique of the emerging common law doctrine of paternal custody that would have broad impact, in his important treatise *Commentaries on Equity Jurisprudence* in 1836. He drew on equity court (or Chancery) decisions in England, which provided alternatives to common law verdicts. It was in the equity courts (which influenced decisions in the United States, partly via Story's treatise) that limits on paternal custody developed furthest through the doctrine of "parens patriae" (that the state is the ultimate parent). He searched in vain for any precedents in those courts prior to 1690 concerning parental custody (for reasons that the reader of this chapter will understand). Based on these later decisions, he contended that a father is entrusted with the custody of his children solely on the grounds that "he will best execute the trust reposed in him" for their care. A father's "corruption," "gross ill-treatment or cruelty," or even his "irreligion" might "deprive him of the custody of his children." By the mid-nineteenth century, with the argument that the mother provided better nurture than the father, some judges began to hold that she should be given custody in case of separation or divorce. Other judges emphasized the "natural right" of the father to his

86. The key Mansfield cases are *Rex v Deleval,* 97 Eng. Rep. 913 (3 Burr 1434) (1763) (*The English Reports* [Edinburgh, London, 1900–1932]) and *Blissets Case,* 98 Eng. Rep. 899 (Lofft 748) (1774); Kent, *Commentaries,* II, 159–164.

282 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

child. These varying viewpoints circumscribed the nineteenth-century debate about the rights and powers of fathers.[87]

Comyn's popular 1807 treatise on contract law ascribed the reason for the changes to "the care [the law] takes of [children] in preventing them from being imposed upon or overreached by persons of more years and experience." Yet these changes did not simply "protect" children—they protected the very principle of legitimate consent. The phrase "imposed upon" implies illegitimate influence. Hobbes had allowed influence and force to be natural in forming all contracts. Children gave "implied" consent to their father's authority. Locke's distinction between children and adults allowed adults to consent explicitly. While Blackstone allowed for implied consent, he was also very concerned with separating children from adults in their ability to contract. In that sense, Blackstone based his synthesis of the common law not only on contracts and consent but allied himself more closely with Locke than Hobbes. Indeed, only when force and illegitimate influence are excluded does "consent" to government become something we recognize as democratic.[88]

The early-nineteenth-century treatises on the law of contract acknowledged that, practically speaking, these restrictions on liability, these "protections," actually disabled minors from making contracts.

> Miserable must the condition of minors be; excluded from the society and commerce of the world; deprived of necessaries, education, employment, and many advantages, if they could do no binding acts. Great inconvenience must arise to others, if they were bound by no act. The law therefore, at the same time that it protects their imbecility and indiscretion from injury through their own imprudence, enables them to do binding acts for their own benefit, and without prejudice to themselves, for the benefit of others.[89]

87. Joseph Story, *Commentaries on Equity Jurisprudence, as Administered in England and America* (Boston, 1836), II, 572–585, esp. 575–576, 579–580; Michael Grossberg, *A Judgment for Solomon: The D'Hauteville Case and Legal Experience in Antebellum America* (New York, 1996), 52–55, 150, 159–167. Note that in *Blissets Case* of 1774 (cited above), Mansfield's innovative decision was influenced by what he called the "late remarkable cause of *Giffard and Giffard* before the Lord Chancellor," which was, of course, an equity case.

88. Comyn, *Contracts and Agreements,* 154. Children may still make contracts to purchase goods or services or to buy or sell land in many states. Their contract, however, is voidable at their own wish any time before they reach the age of majority (usually twenty-one). A modern legal scholar therefore advises that, practically speaking, children do not have this right, and property left to them should be managed by a trust or a guardian and not by the child. Mnookin, *Child, Family, and State,* 217, 681.

89. Comyn, *Contracts and Agreements,* I, 154.

*Children and Consent to Contracts* | 283

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
    North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

They understood, in other words, that only the binding nature of contracts for necessities allowed minors, practically, to make those contracts. Thus by excluding those under twenty-one from making contracts even for necessities, as many judges began to do, the judges knew they were banishing them from "the society and commerce of the world" and from a legal identity of their own.

What makes a valid contract or what constitutes consent was being debated both inside and outside the law over these two centuries. While Edward Coke helped make these connections about an age of consent to contracts in the early seventeenth century, William Blackstone played a more important role in the late eighteenth century. His contribution was not so much in what he said about children and contracts, but in the ways that he made explicit the connections between political contracts and legal ones. Blackstone adapted the common law to highlight the centrality of contract. He openly incorporated republican political theory, especially the emphasis on consent and contract, into his synthesis of the "common law." Yet he left openings that could permit coercive or illegitimate authority. For Blackstone, even if a person did not specifically agree, that person "hath virtually agreed" to the "general contract" of society or, as he states later, to the "implied original contract to submit to the rules of the community, whereof we are members." As the American Revolutionaries would confirm, "virtual" consent and "implied" contracts are a tricky business. It was exactly on these grounds that many pamphleteers in the decades leading up to the Revolution debated the colonists' obligation to pay the various taxes imposed by Parliament: Did the colonists consent "virtually" to Parliament via others' votes on their behalf? Or did all who paid taxes need to vote explicitly? Blacksone's position on children—that they are, in essence, unable to consent—helped to shape the debate.[90]

The implicit answer of Blackstone for who represented those, like children, who did not vote (the vast majority of the population in England when Blackstone wrote in the 1760s) was fathers or masters, because they possessed a kind of "property" or custody in them. Coke, Blackstone, and, of course, Kent would help shape ideas about custody, the importance of which went hand in hand with the decline in children's ability to contract. Children

90. Blackstone, *Commentaries,* III, 158, 159; Blackstone refers to Locke, and his influence is evident, throughout his treatise. See, for example, I, 7, or I, 122. "Blackstone [was] an important propagator of social contractarianism in the Locke tradition. If anybody was needed to convert Locke's ideas into an influential tool for lawyers—and perhaps none was needed, for every educated lawyer must have read Locke—this part was played by Blackstone." Atiyah, *Freedom of Contract,* 59, 215–216.

284 | *Children and Consent to Contracts*

Copyright © 2007. University of North Carolina Press. All rights reserved.

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
    North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

began to be seen, especially in America after the Revolution, increasingly as the "property" of parents (or others in the absence of parents). "The child hath no property in his father or guardian; as they have in him, for the sake of giving him education and nurture." By this principle, according to Blackstone, a father could sue another for damages for the lost labor of his child if that child were injured, but a child could not sue if his father were injured, because he had no right to his father's labor. Likewise, Blackstone used the word "property" in justifying a man's recovering his wife, child, or servant from anyone who "wrongfully detain[ed]" them. Like his "property in goods or chattels personal," he could recapture them as long as doing so did not involve a serious breach of the peace. Kent went further in certain respects by challenging even the right of children to form binding contracts for necessities on the grounds that their fathers would provide for them.[91]

Although Blackstone paid more attention to contracts than those who preceded him, he separated his discussion of contracts into separate categories with different rules, unlike later legal treatises.[92] By the early nineteenth century, however, the same rules began to apply to all contracts. Assumpsit actions, for example, were contract suits based only on the oral promises between two partners but unaccompanied by any corroborating actions. In this sense, as we shall fully understand only after the next chapter, contracts for property were influenced by ideas about vows, particularly vows of marriage. The biggest change, however, occurred with respect to the adjudication of contracts: judges began to focus increasingly on the intent of the parties contracting. Did they understand what they did? We can see that shift fully only by focusing on the capacity of children.[93]

Without question, these changes in the ability to make legal contracts had other consequences. They probably aided the growth of capitalism, for example. Yet a simple argument that these changes were driven by the needs of capitalism for reliable contracts does not explain the nature of the changes, the fierceness of the debates, and the sometimes anticapitalist positions taken in deference to the logic of competency. The arguments used to revise the legal rules grew out of and in turn grew into the ideological debates over who could consent. But these changes were also tied into religious ideas and debates, especially under the unifying influence of the common law. As

91. Blackstone, *Commentaries,* III, 4 (citing Coke, *Insititutes,* III, 134), 143.

92. Atiyah, *Freedom of Contract,* 102–103, referring to Blackstone, *Commentaries,* II, chap. 30, III, chap. 9. Also see Atiyah, 215–216.

93. Atiyah, *Freedom of Contract,* 139; Nelson, *Americanization of the Common Law,* esp. 136–144; Morton Horwitz, *The Transformation of American Law, 1780–1860* (New York, 1977), esp. 160–210.

Brewer, Holly. By Birth or Consent : Children, Law, and the American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

Copyright © 2007. University of North Carolina Press. All rights reserved.

contracts formerly under the control of the ecclesiastical courts, such as marriage vows and wills, became part of the common law, some of their rules began to apply to other types of contracts, such as those making any type of verbal commitment (regardless of whether it was written on paper and regardless of whether it bore the proper seals) binding.

But the meaning of religious vows was also changing, partly in response to the Reformation and partly in response to the same arguments that were reshaping the idea of consent within the common law. Consider *Cases of Conscience,* by William Perkins, the Puritan scholar so influential on New England ministers and many others. In 1606 he meditated on promises: when are they binding?

> [A vow] must be *voluntarie,* and *free.* And that it may be so, three things are necessarily required. First, that it be made in Judgement, that is, with reason and deliberation. Next, that it be done with consent of will. And thirdly, with libertie of Conscience.
>
> Hence it appeares, that the Vowes of children, mad-men, and fooles, or such as are taken upon rashnes, or constraint . . . are all utterly unlawfull.[94]

For Perkins, only reason created the conscience that could be bound. Promises should be good only when made voluntarily and freely by those who fully understand the nature of their commitment and who are not under the "government of a superiour." Perkins represented one edge of a debate about the meaning of consent. His position differed dramatically from the ecclesiastical and the common law at that point (in allowing a father to void a vow made without his consent, or in their emphasis on free will, or calling the vow of a child "utterly unlawfull"). What is most important about his meditations on vows is how much they represented what the law of contract would become. They were also important for what he left unsaid: Who is a child and when does childhood end? What constitutes reason? Much remained, in 1608, still to be debated.

Although the shift in children's ability to form contracts did not happen suddenly with the American Revolution, the intellectual roots behind these shifts are the same as those behind the Revolution. The epistemological debates of the seventeenth and eighteenth centuries were not merely abstract theorizing about religious faith, human potential, and the laws of nature. They were central to Lockean and republican political ideology. Although earlier Christian authors such as Aquinas had introduced the concept of an "age of reason" and classical authors such as Aristotle had similar concepts,

Copyright © 2007. University of North Carolina Press. All rights reserved.

94. W[illiam] Perkins, *The Whole Treatise of the Cases of Conscience* . . . (Cambridge, 1606), 406–407, book II, chap. 14.

286 | *Children and Consent to Contracts*

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.

seventeenth-century Continental natural law theorists and English Dissenters and revolutionaries of the seventeenth century, upon whom Blackstone and other legal reformers drew, developed this concept, granting it much greater definition and weight. The separate status of childhood is in many respects a consequence of this emphasis on an age of reason, a distinction that became critical to the political legitimacy of government based upon consent.

Martha Minow summarizes the chasm that characterizes the division in modern law between "persons who are mentally competent and persons who are not."

> The competent have responsibilities and rights; the incompetent have disabilities and, perhaps, protections. The competent can advance claims based on principles of autonomy; the incompetent are subject to restraints that enforce relationships of dependence. These "two tracks" of legal treatment reflect the traditional Western idea that responsibility follows only from voluntary, knowing, and intelligent choice. Mental competence signifies the ability to appreciate the consequences of one's actions, to protect oneself from manipulation and coercion, and to understand and engage in transactions of property and commerce.[95]

While Minow, speaking from the perspective of today, can write of the "traditional Western idea that responsibility follows only from voluntary, knowing, and intelligent choice," we have seen that such sharp distinctions were not traditional in the eighteenth century. These distinctions developed only gradually as a consequence of the law's focus on "voluntary, knowing, and intelligent choice" and were deeply intertwined with the body of ideas that would come to be called democratic.

95. Martha Minow, *Making All the Difference: Inclusion, Exclusion, and American Law* (Ithaca, N.Y., 1990), 126.

Copyright © 2007. University of North Carolina Press. All rights reserved.

*Children and Consent to Contracts* | 287

Brewer, Holly. By Birth or Consent : Children, Law, and the Anglo-American Revolution in Authority, University of
North Carolina Press, 2007. ProQuest Ebook Central, http://ebookcentral.proquest.com/lib/umdcp/detail.action?docID=4321931.
Created from umdcp on 2023-03-14 14:56:27.