# EXHIBIT 7

**Expert Report and Declaration of Professor John J. Donohue**

1   ROB BONTA
    Attorney General of California
2   MARK BECKINGTON
    Supervising Deputy Attorney General
3   TODD GRABARSKY
    Deputy Attorney General
4   STEPHANIE ALBRECHT
    Deputy Attorney General
5   JENNIFER E. ROSENBERG
    Deputy Attorney General
6   State Bar No. 275496
     300 South Spring Street, Suite 1702
7    Los Angeles, CA 90013
     Telephone: (213) 269-6617
8    Fax: (916) 731-2124
     E-mail: Jennifer.Rosenberg@doj.ca.gov
9   *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
10  *State of California, and Allison Mendoza, in*
    *her official capacity as Director of the*
11  *Department of Justice Bureau of Firearms*

12

IN THE UNITED STATES DISTRICT COURT

13

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

| | |
|---|---|
| 16 **JOSE CHAVEZ, *et al.*,** | 3:19-cv-01226-L-AHG |
| 17 Plaintiffs, | **EXPERT REPORT AND DECLARATION OF** |
| 18 **v.** | **PROFESSOR JOHN J. DONOHUE** |
| 19 | Dept: 5B |
| 20 **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,** | Judge: The Honorable M. James Lorenz and Magistrate Judge Alison H. Goddard |
| 21 | Action Filed: July 1, 2019 |
| 22 Defendants. | |

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Background and Qualifications ....................................................................... 1

Retention and Compensation ......................................................................... 4

Basis for Opinion and Materials Considered ................................................ 4

Opinions ......................................................................................................... 4

    I.     Summary of Opinions .......................................................... 4

    II.    18-20-Year-Olds Commit Disproprotionately Higher Rates of Homicide and Other Violent Crime ...................................... 6

    III.   Section 27510's Limitations are Further Justified by the Increasing Risk of and Substantial Harm From Mass Shootings by 18-20-Year-Olds ............................................. 14

         A.    The 18-20 Age Group Is Among the Most Dangerous for Mass Shootings ............................... 14

         B.    The Problem of Mass Shootings Will Continue to Get Worse Without Effective Legislative Solutions ...................... 22

         C.    The Victims of Mass Shootings Are Far More Numerous Than Reflected in the Number of Deaths ................................ 30

    IV.   California's Age Restriction Can Also Help Reduce the Rising Youth Suicide Rate .............................................................. 33

         A.    The Increased Risk of Suicide Among Young Adults Is Elevated by Access to Firearms ................................ 33

         B.    The Most Directly Relevant and Methodologically Sound Study Finds that Age Restrictions on Firearm Purchases Reduced Suicides for 18-20-Year-Olds ................................... 36

         C.    A Number of Other Studies Have Found that Age Restriction Laws and Other Policies to Keep Guns from this Age Cohort Effectively Reduce Suicides ......................... 39

    V.    Neurobiological and Behavioral Factors of the 18-20-Year-Old Age Group Increase the Risks of Gun Violence ............................... 46

         A.    The Observed Pattern of Young Adult Violence Is Consistent with the Neurobiological Development of 18-20-Year-Olds ............................................................... 47

i

**TABLE OF CONTENTS**
(continued)

Page

B.    The 18-20-Year-Old Cohort Is Susceptible to Heavy Alcohol Use, Which Has an Established Link to Violence that Can Only Be Exacerbated by Access to Firearms ............. 49

VI.    California's Gun Safety Regulations Have Helped the State to More Effectively Address Firearm Homicide and Overall Violence Relative to Other States ......................................... 51

VII.    The Claims by Plaintiffs' Declarants in Support of the Motion for Preliminary Injunction are Devoid of Merit ................................. 53

A.    John Lott and Thomas Marvell Rely on Studies with Limited Empirical Value in this Case ...................................... 56

B.    Plaintiffs' Experts Rely on Studies Plagued by Practical and Methodological Shortcomings That Further Undermine Their Value in this Litigation Concerning SB 1100 and SB 61 ........................................................................ 57

C.    The First Study on which Marvell Relies Embodies the Type of Econometric and Interpretive Errors that Lead to Erroneous Conclusions about the Impact of Firearm Regulations ......................................................................... 58

D.    Lott's Declaration is Marred By Numerous Factual and Interpretive Errors that Undermine His Claims ...................... 61

E.    More Semi-Automatic Rifles in the Hands of 18-20-Year-Olds Will Lead to Increased Social Harms ............................. 64

Conclusion ...................................................................................................... 68

Table of Exhibits ............................................................................................ 71

# EXPERT REPORT AND DECLARATION OF JOHN J. DONOHUE

I, John J. Donohue, declare that the following is true and correct:

The State of California has asked me to provide an expert opinion in the above-captioned matter. My declaration and report below presents and explicates that opinion in detail. This report and declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this report and declaration.

## BACKGROUND AND QUALIFICATIONS

1.      I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. A copy of my complete curriculum vitae (CV) is attached as **Exhibit A**.

2.      After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), and Renmin University (Beijing).

3.      At Stanford, I regularly teach a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, St. Gallen University School of Law in Switzerland, and the Universidad del Rosario in Bogota, Colombia.

4.      Since gun crime is such an important aspect of overall American crime, my courses evaluate both the nature of gun regulation in the United States and the impact of gun regulation on crime. This topic is an important part of my research, about which I have published extensively (as reflected in my CV). I have

1

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1   also consistently taught courses on law and statistics for over two decades.

2        5.     I am a Research Associate of the National Bureau of Economic

3   Research, and a member of the American Academy of Arts and Sciences. I was a

4   Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01 and

5   served as the co-editor (handling empirical articles) of the American Law and

6   Economics Review for six years. I have also served as the President of the

7   American Law and Economics Association and as Co-President of the Society of

8   Empirical Legal Studies.

9        6.     From 2011-2018, I served on the Committee on Law and Justice of the

10  National Research Council (NRC), which "reviews, synthesizes, and proposes

11  research related to crime, law enforcement, and the administration of justice, and

12  provides an intellectual resource for federal agencies and private groups."[1]

13       7.     I have submitted expert declarations, expert reports, and/or provided

14  expert testimony in the following 23 cases: 1) *Fyock v. City of Sunnyvale*, Case No.

15  C-13-5807-RMW, United States District Court (N.D. Cal.), January 2014; 2)

16  *Herrera v. San Francisc*o, Case No. CV 13-5351 WHA, United States District

17  Court (N.D. Cal.), January 2014; 3) *Tardy v. O'Malley*, Case No. 1:13-cv-02841-

18  CCB, United States District Court (D. Maryland), February 2014; 4) *Association of*

19  *New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, Case No. 3:18-cv-10507-PGS-

20  LHG, United States District Court (D.N.J.), August 2018; 5) *Flanagan v. Becerra*,

21  Case No. 2:16-cv-06164-JAK-AS, United States District Court (C.D. Cal.); 6)

22  *Duncan v. Becerra*, Case No. 17-cv-1017-BEN-JLB, United States District Court

23  (S.D. Cal.), on June 4, 2017, and a supplemental declaration in *Duncan* (now

24  *Duncan v. Bonta*) on November 8, 2022; 7) *Wiese v. Becerra*, Case No. 2:17-cv-

25  00903-WBS-KJN, United States District Court (E.D. Cal.), on June 16, 2017, and a

26

27             [1] *See* National Academies, Committee on Law and Justice,
     https://www.nationalacademies.org/claj/committee-on-law-and-justice, for more

28  information about the NRC.

2

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

supplemental declaration in *Wiese* (now *Wiese v. Bonta*) on May 1, 2023; 8) *Rupp v. Becerra*, Case No. 8:17-cv-00746-JLS-JDE, United States District Court (C.D. Cal.), October 25, 2018 and November 21, 2018, and on January 6, 2023 in *Rupp v. Bonta*; 9) *Vermont Federation of Sportsmen's Clubs v. Birmingham*, Case No. 224-4-18 Wncv (Vermont Superior Court, Washington Unit) in October 2018; 10) *State ex rel. Schmitt v. Choi*, No. 16BA-CV03144, Circuit Court of Boone County, State of Missouri, in August 2019; 11) *Miller v. Becerra*, Case No. 19-cv-1537-BEN-JLB, United States District Court (S.D. Cal.), on January 23, 2020 and October 22, 2020, and on October 13, 2022 in *Miller v. Bonta*; 12) *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.) in July 2020 and April 2021; 13) *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County, State of Colorado, in September 2020; 14) *Caldwell v. City of San Francisco*, Case No. 12-cv-1892 DMR, United States District Court (Northern District of California, Oakland Division), December 9, 2020; 15) *Jones v. Bonta*, Case No. 3:19-cv-01226-L-AHG, United States District Court (S.D. Cal.), on June 2, 2021 and March 16, 2023; 16) *Worth v. Harrington,* a lawsuit in the District of Minnesota (Case No. 21-cv-1348), on January 24, 2022 and March 28, 2022; 17) *Meyer v. Raoul*, a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY), on May 31, 2022; 18) *Viramontes v. County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595), on September 14, 2022; 19) *State of Vermont v. Misch*, Criminal Division, Docket No. 173-2-19 Bncr, on January 6, 2023; 20) *NAGR v. Lamont*, a lawsuit in the U.S. District Court for the District of Connecticut, Case No. 3:22-cv-01118, on January 26, 2023; 21) *NAGR v. Campbell*, a lawsuit in the U.S. District Court for the District of Massachusetts, Civil Action No. 1:22-cv-11431-FDS, on January 26, 2023; 22) *Herrera v. Raoul, et al.*, No. 23 CV 0532, in the U.S. District Court for the Northern District of Illinois, Eastern Division, on February 27, 2023; and 23) LaFave v. County of

3

1   Fairfax, Circuit Court of Fairfax County, Virginia, No. 21021 01569 in August
2   2023.

3       8.      I was the main author of the Brief of Amici Curiae Social Scientists
4   and Public Health Researchers in Support of Respondents, which was submitted to
5   the United States Supreme Court on September 21, 2021 in *New York State Rifle &*
6   *Pistol Association v. Bruen*, Case No. 20-843.

7       9.      In preparing this declaration, I reviewed the preliminary injunction
8   briefing and declarations filed in 2019 and 2023, as well as the scientific literature
9   and relevant crime and arrest data cited herein.

10                      **RETENTION AND COMPENSATION**

11      10.     I am being compensated for services performed in the above-entitled
12  case I am being compensated at a rate of $850/hour.  My compensation is not in any
13  way dependent on the outcome of this or any related proceeding, or on the
14  substance of my opinion.

15          **BASIS FOR OPINION AND MATERIALS CONSIDERED**

16      11.     Counsel for Defendants provided me with the operative complaint in
17  this matter, the briefs the parties filed in support of and in opposition to Plaintiffs'
18  motion for preliminary injunction, and other briefings and evidence in this matter.
19  Counsel also provided me with the briefs and record in the Ninth Circuit appeal of
20  this Court's denial of Plaintiffs' motion for preliminary injunction. Otherwise, my
21  report is based on my independent research.

22      12.     In my report, I cite to a variety of scholarly articles, laws, cases,
23  popular and learned commentaries, and various other related materials on which I
24  based my opinions.

25                                **OPINIONS**

26  **I.   SUMMARY OF OPINIONS**

27      13.     Individuals between the ages of 18-20, as a group, exhibit unusually
28  high rates of homicide and other violent crimes according to both national and

4

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

California data. Moreover, this age group is much more likely than other age groups to commit these crimes with guns. Both of these factors suggest that efforts to limit the access to guns of 18-20-year-olds will benefit the public by lowering rates of gun homicide and firearm-inflicted injuries. Indeed, the data indicate that the 18-20-year-old cohort commits murder at a higher rates than any other three-year age group (see Figures 1-4, below).

14.    The group of 18-20-year-olds also has a high rate of perpetrating public mass shootings, which is a growing problem in the United States and imposes significant societal costs far beyond the numbers of dead and wounded. Given the current dangers of mass shootings, the highly elevated murder rates in the 18-20 age group provide ample justification for the age-based firearm restrictions of California law.

15.    Public mass shootings with at least four deaths committed by 18-20-year-olds from 1982 to the present have ended in the death of the shooter in 70 percent of the cases. Specifically, of these public mass shootings, 50 percent ended by suicide and 20 percent ended when the shooter was killed by police.

16.    Apart from posing a threat to others, adolescents and young adults, including 18-20-year-olds, are also prone to harming themselves.  Suicide rates, and particularly firearm suicide rates, among 18-20-year-olds have risen sharply in recent years, and increased gun access correlates strongly with increases in suicide levels generally.

17.    Careful studies using micro-level data have shown that restricting access to firearms for individuals who have an elevated risk of engaging in violent crime reduces their future levels of violence by about 20 percent. One would expect that similar benefits would be generated by restricting access to firearms by the high-risk group of 18-20-year-olds. California's continuing efforts to promote gun safety have helped to move it from a state with a considerably higher rate of firearm and overall homicide (and firearm assault) than the rest of the country in 2005 to

having a considerably lower rate of firearm and overall homicide at the end of our data period in 2021—see Figure 14. These improvements have saved hundreds, if not thousands, of lives, and also prevented thousands of non-lethal shootings in California.

18.     The scientific literature on the neurobiological development of late adolescents is consistent with the patterns discussed above of the higher rates of firearm violence in the 18-20-year-old age group. The higher rates of impulsivity, mental illness, and drug and alcohol use in this age group are all factors that elevate risk-taking and undermine caution and reflection in ways that promote violence, accidents, and suicides, all of which the scientific literature has clearly demonstrated become more serious with the ready availability of firearms.

19.     The claims by Plaintiffs and their declarants Thomas Marvell and John Lott that little is to be gained from the challenged firearm restrictions are not based on valid studies of similar regulations undertaken in a state like California that has universal background checks and higher levels of gun safety enforcement measures than most other jurisdictions. The best, most-relevant, and methodologically sound empirical evidence supports the view that restricting gun access to the high-risk 18-20-year-old cohort will save lives and reduce injuries inflicted by firearms.

## II.    18-20-YEAR-OLDS COMMIT DISPROPORTIONATELY HIGHER RATES OF HOMICIDE AND OTHER VIOLENT CRIME

20.     One of the most strikingly consistent facts of crime over time, both in California and the United States, is that 18-20-year-olds commit homicide at disproportionately high rates. Therefore, legislative efforts to reduce homicides, such as Section 27510, appropriately focus on this age group and are likely to generate beneficial results.

21.     To highlight this enduring feature of homicide, Figures 1 and 2 below depict per capita murder arrests in California by age in 2014 and 2020, respectively. Both figures confirm that if one wanted to target safety measures at the age group at

6

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

highest risk for committing homicide, one would focus on those aged 18-20. No other three-year age group above or below age 21 is as homicidal as 18-20-year-olds. Note that the homicide rate for California in 2014 was 4.4 per 100,000,[2] while the homicide rate for 19-year-olds that year was more than four times as high. Therefore, the restriction at issue in this case appropriately limits firearm access to the age group carrying the greatest homicide risk.

**Figure 1**

The Three-Year Age Group that Commits the Most Homicides is 18-20-Year-Olds
(Compared to any such group above or below age 21)
California Arrest Data for 2014



Source: Author's calculations based on data supplied by the FBI.

22.     Figure 2 below presents California murder arrest data for 2020, which again highlights the uniquely high homicide rate of 18-20-year-olds. I examined the FBI's murder arrest data for California by age group from 1980-2020. Over this 41-

---

[2] Cal. Dep't of Justice, "Homicide in California, 2014" at 1, *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/homicide/homicide14-full-report.pdf.

year period, the age group with the highest homicide rates in California in a given year was always either 18- or 19-year-olds, with only one exception: in 2019, 21 was the most homicidal age and 20-year-olds were second.

**Figure 2**

The Three-Year Age Group that Commits the Most Homicides is 18-20-Year-Olds
California Arrest Data for 2020



Source: Author's calculations based on data supplied by the FBI.[3]

---

[3] U.S. Fed. Bureau of Investigation, Uniform Crime Reporting Program Arrest Master File (Data Set), Sept. 26, 2022, *available at* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/downloads (accessed on Mar. 14, 2023); National Center for Health Statistics, Vintage 2020 Postcensal Series (Data Set), Sept. 22, 2021, cited in Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System, Mortalitiy 1999-2020 on CDC Wonder Online Database, *available at* http://wonder.cdc.gov/mcd-icd10.html.

1

2      23.      Figure 3 provides a breakdown of murder arrests by age for the most

3  recent data available: Crime in California and Homicide in California data for

4  2022.[4]  While this California data is only provided with an 18-19 breakdown

5  (instead of the preferred 18-20 breakdown shown in Figure 2), it underscores once

6  again that the familiar pattern for murder in California is that the rate tends to peak

7  in the 18-20 age category and trend down from there.

8                                      **Figure 3**

9      The Three-Year Age Group that Commits the Most Homicides is 18-20-Year-Olds
10                          California Arrest Data for 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27



28
_____
[4] State of California – Department of Justice – Office of the Attorney
General, "Crime Data," https://oag.ca.gov/crime.

24.     The unusually high homicide rate of 18-20-year-olds depicted for California in Figures 1-3 is also seen in national arrest data from the FBI.[5] Table 38 of the FBI report on Crime in the United States shows that in 2019 (the last year this Table was released), the single most homicidal age group in the nation was age 19—which is exactly what we see for California in Figure 1 for 2014, Figure 2 for 2020, and Figure 3 for 2022. FBI Table 38 also shows that the two age groups with the second and third highest number of arrests for murder in 2019 are 18- and 20-year-olds. National FBI crime data for 2017 and 2018 shows exactly the same pattern of homicide arrests for those years as well.[6] Overall, the 2019 murder arrest rate for 18-20-year-olds for the nation was 14 percent *higher* than that of 21-year-olds. In other words, if one wants to reduce homicidal violence in a targeted fashion, one should focus on age groups that exhibit the highest rates of homicide—namely, 18-20-year-olds—as California has done.[7]

25.     In the United States, most murders are committed with firearms.  In 2010, the percentage of murders committed with firearms in California was almost identical to the rest of the country:  68.7 percent vs. 68.1 percent.  However, as a result of California's gun safety measures, over the next decade, California had only half the increase in the share of murders committed with firearms as the rest of the U.S. Specifically, according to CDC data, by 2021, 75 percent of murders were committed with firearms in California, while 81 percent of murders were committed with firearms in the rest of the U.S.

---

[5] U.S. Fed. Bureau of Investigation, Uniform Crime Reports, 2019 (2021), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38, attached hereto as **Exhibit B**.

[6] U.S. Fed. Bureau of Investigation, Uniform Crime Reports, 2017 (2019), *available at* https://bit.ly/3u1j573, and Uniform Crime Reports, 2018 (2020), https://bit.ly/3x2oYmv.

[7] It should also be noted that the FBI violent crimes data for the nation from 2017-2019 (*see supra*, notes 5 and 6) also confirms that 18-20-year-olds consistently have the highest rates of rape and robbery, as well as homicide.

10

26.     Furthermore, the 18-20-year-old cohort has not only established an enduring pattern of elevated risk for homicide, but it has long been recognized as the most likely to use firearms to commit homicides and other violent crimes. Specifically, a 1999 joint report of the Department of the Treasury and Department of Justice ("Joint Report") found that:

> Among murderers, 18 to 20-year-olds were more likely to use a firearm than adults 21 and over. More specifically, in 1997, 74 percent of the homicides committed by 18 to 20-year-old offenders involved firearms. In contrast, only 61 percent of homicides committed by offenders 21 or over involved firearms. (Table 1).… Similarly, in non-lethal crimes, including assault, rape, and robbery, 18 to 20-year-old offenders were more likely to use guns than both younger and older offender age groups. For non-lethal crimes of violence from 1992 to 1997, in cases where the weapon and age of offender were identified, 15 percent of 18 to 20-year-old offenders used a firearm, in contrast to 10 percent of adult offenders, and 5 percent of offenders 17 and under. (Table 2).[8]

27.     Figure 4 below reproduces a chart from the 1999 Joint Report showing that the 18-20-year-old cohort dominates in the commission of gun homicides. The Joint Report also noted on the basis of crime gun trace data that this cohort uses both handguns and long guns in committing violent crime with guns. Overall, 15 percent of the trace data across 27 cities involved long guns, but in some cities, that percentage was more than twice as high.[9] According to the data, the cohort of 18-20-year-olds is the most homicidal age group, and its members use guns to commit murder and other non-lethal crimes at a substantially higher rate than other age groups. Thus, targeting effective gun safety measures at this group is likely to generate crime reduction benefits for all violent crime.

---

[8] Dep't of the Treasury & Dep't of Justice, Gun Crime in the Age Group 18–20 (1999), *available at* https://bit.ly/3hBjp9R.

[9] *Id.* at Table 3.  Three of the 27 cities were from California:  Los Angeles, Inglewood, and Salinas.

**Figure 4**



*Department of the Treasury*                                    *Department of Justice*

## Gun Homicide Offenders by Age Group

Source: Table from Report of the Department of the Treasury and Department of Justice.[10]

28.    The Joint Report also mentioned an additional benefit from restricting access to firearms by those who are younger than 21 years old:

> The significant role that 18 to 20-year-olds have in gun crime and violence in our Nation demands that we make changes in the legal regulation of their access to guns. A further benefit to restricting possession of firearms by 18 to 20-year-olds will be to decrease the likelihood that younger family members, friends, and classmates will be able to obtain guns illegally.[11]

---

[10] *See supra*, note 8.

[11] *Id.* at 2. Studies of high school students show that a non-trivial number will gain access to guns within the household, and that such youth reporting gun possession have the strongest associations with poor mental health as well as alcohol and drug use overall. Kelly V. Ruggles & Sonali Rajan, *Gun Possession Among American Youth: A Discovery-Based Approach to Understand Gun Violence*, PLoS One (2014), *available at* https://bit.ly/3yxKf9d.

12

29.     Thus, the Joint Report highlights that restricting firearm access of 18-20-year-olds will not only be expected to reduce gun crime and violence directly in this high-risk age group but will also generate indirect benefits by reducing firearm access by still younger family members and friends.

30.     When passing SB 1100, the legislature specifically considered data showing that long guns are frequently used in the commission of crime in California. Specifically, it was noted that of the 26,682 guns used in crime that were entered into the California Department of Justice Automated Firearms Systems database, 11,500 were long guns.[12]

31.     Decades of research has shown that while everything from sticks to knives to handguns to rifles can be used in assaults, there is a considerable variation in the survivability of assault depending on the instrumentality employed. Since a semi-automatic centerfire rifle is generally more powerful than rimfire rifles, greater restrictions on access to more powerful weapons by those in the high-crime 18-20-year-old age cohort is likely to reduce firearm deaths and injuries.

32.     Both common sense and consistent empirical evidence have established that there is a strong instrumentality effect in violent activity. A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[13] Phil Cook and Anthony Braja conducted a very careful study of files of 511 gunshot victims kept by the Boston Police Department and similarly

---

[12] Statement of Sen. Anthony Portantino on SB 1100 to Senate Public Safety Committee, April 17, 2018. A video of Sen. Anthony Portantino's statement is available at https://bit.ly/3c9exWe.

[13] Zimring  FE,  *The Medium Is the Message: Firearm Caliber as a Determinant of Death from Assault*, J LEGAL STUD. 1:97-124 (1972). The description of the Zimring study comes from Anthony A. Braga & Philip J. Cook, *The Association of Firearm Caliber with Likelihood of Death From Gunshot Injury in Criminal Assaults*, JAMA Netw. Open. 1(3) (2018), *available at* https://bit.ly/2RhJBMc.

1  found that survivability from gunshot wounds varied considerably based on
2  attributes of the weapon and ammunition that generated the wound. The authors
3  calculated that switching to less deadly firearm options could reduce the homicide
4  rate substantially.[14]

5    33.    Based on decades of compelling evidence and research, "It is widely
6  accepted among medical and public health professionals that the likelihood of death
7  in an assault increases with the power of the gun."[15] In 2020, Frank Zimring and
8  Duke economist Phil Cook shared the Stockholm Prize in Criminology based in
9  part on their work confirming this effect.[16] Thus, restricting access to one of the
10 more lethal firearms capable of firing multiple rounds in quick succession— semi-
11 automatic centerfire rifles—would be expected to diminish firearm homicides and
12 injuries.

13 **III.  SECTION 27510'S LIMITATIONS ARE FURTHER JUSTIFIED BY THE**
14 **INCREASING RISK OF AND SUBSTANTIAL HARM FROM MASS**
15 **SHOOTINGS BY 18-20-YEAR-OLDS**

16 **A.    The 18-20 Age Group Is Among the Most Dangerous for Mass**
17 **Shootings**

18    34.    The 18-20-year-old population not only commits higher rates of
19 homicide and other violent crimes, but it also has a high rate of engaging in public
20 mass shootings, defined as shootings in a public place, unrelated to the commission
21 of another crime, in which four or more individuals are murdered (excluding the
22 shooter).[17]  These shootings are particularly difficult to stop because traditional

23 ───────────────
   [14] Braga & Cook, *supra* note 13.
24    [15] *Id.*
25    [16] Stockholm Univ., 2020 Winners of the Stockholm Prize in Criminology
   (Sept. 13, 2020), https://bit.ly/3fIbiHr.
26    [17] For further discussion of the definition of public mass shootings used in
27 this report and the effectiveness of the federal assault weapons ban in limiting the
   deaths from mass shootings, *see* John J. Donohue III & Theodora Boulouta, *The*
28                                                                    (continued…)

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1   steps aimed at deterrence, such as imposing higher penalties for these crimes, are

2   ineffectual; as my evaluation of the national public mass shooting data reveals, over

3   the period from 1982 to the present, in 70 percent of such shootings committed by

4   those aged 18-20, the shooter died at the scene (50 percent of the time by suicide

5   and 20 percent of the time being killed by police).

6       35.   Figure 5 below provides information on public mass shootings

7   throughout the United States from 1982-2022 in which four or more individuals

8   were killed, and indicates the number of incidents, deaths, and overall casualties in

9   different age categories under the age of 63.[18] The first category depicted is for

10  those under 18, and from that point on, it shows three-year age increments

11  beginning with 18-20 and ending with 60-62 (although there are no mass shooting

12  incidents for this last age group, so the field is left blank).[19]  The Figure reveals that

13  the 122 deaths in mass shootings committed by 18-20-year-olds were greater than

14  those committed by any other three-year age group.  Not only is the mass shooting

15  problem in the U.S. getting worse, but the growth rate is fastest for young shooters.

16      36.   It should be noted that the number of public mass shootings

17  documented in Figure 5 does not include attempted mass shootings that were cut

18  short before reaching the four-fatality threshold. For example, the Poway,

19  California synagogue shooting of April 27, 2019, in which a 19-year-old launched

20  an attack with a semiautomatic rifle purchased two weeks earlier, is not included in

21  the Figure 5 numbers because only one of the four shooting victims died before the

22

23  *Assault Weapon Ban Saved Lives*, Stanford Law School Legal Aggregate (Oct. 15, 2019), https://stanford.io/3whsito.

24      [18] This data is from the Mother Jones Mass Shootings Database.
25  https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/.

26      [19] Over this 41-year period ending in 2022, there were only three mass
27  shootings by those older than 62, including the most recent in which a 64-year-old killed 59 and injured 546 in Las Vegas in 2017. The other two—the Mohawk Valley shooting (2013) and the Navistar shooting (2001)—each resulted in four
28  deaths.

15

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

shooter's rifle malfunctioned and he fled the scene (although this case would fall under an alternative definition of mass shootings involving four or more individuals shot).[20] Similarly, the Gilroy, California Garlic Festival shooting, committed by a 19-year-old, was stopped by rapid police intervention after three victims were killed and 11 others shot (thereby also falling short of the 4-fatality threshold).[21]

37.     A factor that underscores the prudence of the California legislation is that the problem of mass shootings seems to be worsening most for younger cohorts.  Specifically, the *New York Times* reports that

> Six of the nine deadliest mass shootings in the United States since 2018 were by people who were 21 or younger, representing a shift for mass casualty shootings, which before 2000 were most often initiated by men in their mid-20s, 30s and 40s.[22]

38.     Given the powerful contagion effects that influence these younger individuals, this alarming trend justifies efforts to limit highly lethal weaponry for 18-20-year-olds. This sentiment was echoed by U.S. Senator John Cornyn, a Republican from Texas, who lauded Congress's  passage of an enhanced background check process for those in this age group purchasing firearms through licensed dealers:  "It's focused on that age cohort that is disproportionately represented in some of the mass shootings that we've seen around the country, and

---

[20] When the mass shooter lowered his gun to reload or deal with a malfunction, an unarmed congregant ran at the shooter, prompting him to flee the synagogue and jump back in his car to escape, thereby ending the attack. Pauline Repard, *'There was chaos': Witnesses in Court Hearing Recall Poway Synagogue Shooting*, L.A. Times, Sept. 20, 2019, *available at* https://lat.ms/3ypCL7V; *DA to Seek Death Penalty Against Poway Synagogue Shooting Suspect*, City News Serv., Mar. 5, 2020, https://bit.ly/33ZmMPW.

[21] Eric Levenson & Cheri Mossburg, *Gilroy Festival Shooter Had a 'Target List' with Religious and Political Groups*, CNN, Aug. 6, 2019, https://cnn.it/2RoVL64.

[22] Glenn Thrush and Matt Richtel, "A Disturbing New Pattern in Mass Shootings: Young Assailants," *The New York Times*, June 2, 2022, https://www.nytimes.com/2022/06/02/us/politics/mass-shootings-young-men-guns.html.

16

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1   it seems to be working."[23]  The enhanced background checks, which rolled out in

2   some states in late 2022 and were imposed nationwide in January 2023, require the

3   Federal Bureau of Investigation to conduct a more detailed background check than

4   standard background checks.  The FBI's data shows that since the enhanced

5   background check process first rolled out in 2022, they have stopped the sales of

6   firearms to hundreds of 18-20-year-olds who were ineligible to purchase firearms—

7   including more than 250 such would-be purchasers who would not have been

8   denied under the standard background check process.[24]

9        39.  These concerns are intensified by the downward trajectory of youth

10  mental health, which has been widespread across racial and ethnic groups and urban

11  and rural areas, leading the U.S. surgeon general in December 2021 to warn of a

12  "'devastating' mental health crisis among adolescents. Numerous hospital and

13  doctor groups have called it a national emergency, citing rising levels of mental

14  illness, a severe shortage of therapists and treatment options."[25]

23

24

25

26

27

28

---

23   Chip Brownlee, "Biden's Enhanced Background Checks Appear to Be
Working," *The Trace*, July 18, 2023,
https://www.thetrace.org/2023/07/background-checks-young-gun-buyers/.

24   *Id.*

25   Matt Richtel, 'It's Life or Death': The Mental Health Crisis Among U.S.
Teens, *The New York Times*, May 3, 2022,
https://www.nytimes.com/2022/04/23/health/mental-health-crisis-teens.html.

1

**Figure 5**



Mass shooting data from Mother Jones. Incident is included if 4+ fatalities, not including perpetrator. Data from 1982 to 2022.

Source: Author's calculations based on data from the Mother Jones Mass Shooter Database.

40.      Some of the most dramatic and socially damaging mass shootings have been conducted by individuals in the 18-20 age group, including:

(a) the Columbine High School shooting, which killed 13 people (18-year-old and 17-year-old shooters);

(b) the Sandy Hook Elementary School shooting, which killed 26 people (19-year-old shooter who used a semi-automatic rifle);

(c) the Marjory Stoneman Douglas High School shooting in Parkland, Florida, which killed 17 people with a semi-automatic rifle (19-year-old shooter);

18

(d) in April 2021, a 19-year-old shooter killed 8 people and wounded others at a FedEx facility in Indianapolis. Despite specific warnings to the police from his mother that he was too dangerous to possess firearms, this shooter had legally purchased the two semiautomatic rifles he used in the attack. Indeed, the police had seized a shotgun from him, only to have him "legally purchase a much more powerful weapon than a shotgun," according to the Chief of the Indianapolis Metropolitan Police Department.[26] Officials concluded that the shooter decided to kill himself "in a way he believed would demonstrate his masculinity…;"[27]

(e) the May 14, 2022 supermarket shooting in Buffalo, New York (10 killed) was committed by an 18-year-old with a semi-automatic rifle; and

(f) the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas (19 children and 2 adults killed) was committed by an 18-year-old with a semi-automatic rifle that he lawfully purchased on his 18th birthday.

41.     John Lott's declaration filed in support of Plaintiffs' November 2019 Motion for Preliminary Injunction, ECF. No. 21-17, contains a figure (appearing on page 6 of his declaration) that seems designed to obscure the reality of the notable lethality in public mass shootings of 18-20 year olds.  Lott's figure should be ignored for a number of reasons.  First, his figure is constructed in a way to minimize the relative lethality of the 18-20-year-old group because he includes the less lethal 16 and 17 year olds in the same 16-20 grouping; in contrast, my Figure 5 appropriately uses three-year age groups to correctly identify the effect for the age group relevant in this litigation.  Second, my figure is more comprehensive: while Lott's figure only looks at mass shootings from 1998-2019, my Figure 5 includes

---

[26] Andrés R. Martínez et al, *FedEx Gunman Bought 2 Rifles After Police Seized His Shotgun, Chief Says*, N.Y. Times, Apr. 17, 2001, *available at* https://nyti.ms/3f3gK7u.

[27] Elizabeth DePompei, '*Demonstrate his masculinity': Indianapolis FedEx shooter's motivations revealed*, Indianapolis Star, Aug. 13, 2021. https://www.indystar.com/story/news/crime/2021/07/28/fedex-shooting-indianapolis-fbi-reveals-brandon-holes-motives/5400900001/.

1    all public mass shootings from 1982-2022. Third, while Lott's figure only looks at

2    mass shooting *incidents*, mine is more comprehensive in also showing the harm

3    from these incidents:  note that Figure 5 highlights clearly that mass shootings by

4    18-20 year olds have resulted in more fatalities (122) than those committed by any

5    other three-year age group.

6          42.    The more complete and precise offender data shown in Figure 5 shows

7    that 18-20-year-old public mass shooters have traditionally been among the most

8    dangerous, as judged by numbers shot and killed.  Moreover, the emergence of the

9    this age group as the most deadly for public mass shootings is reflected in the

10    recent increase in mass shootings by 18-20-year-olds.  Indeed, two of the most

11    horrendous recent mass shootings were committed by 18-year-olds with semi-

12    automatic rifles:  the May 14, 2022 supermarket shooting in Buffalo, New York (10

13    killed) and the May 24, 2022 shooting at Robb Elementary School in Uvalde, Texas

14    (19 children and 2 adults killed).

15          43.    In addition, while Figure 5 limits the count of public mass shootings to

16    those in which at least four persons are killed, there were two other shootings by

17    19-year-olds in 2019 with numerous victims shot, which were fortunately stopped

18    by the unusually rapid intervention of an unarmed citizen and a police officer. In

19    the Poway, California synagogue shooting of April 27, 2019, a 19-year-old, who

20    launched an attack with a rifle purchased two weeks earlier, still managed to shoot

21    four and kill one before being chased away. Three months later at the Gilroy,

22    California Garlic Festival shooting, another 19-year-old only fell short of the four

23    death threshold because of rapid police intervention after three victims were killed

24    and 11 others shot. All of these considerations underscore the particular need to

25    keep the most lethal weaponry away from potential mass shooters in this age group.

26    Moreover, any claim about infrequent mass public shooting ignores the far more

27    common problems of overall homicide and suicide among 18-20-year-olds that the

28    challenged firearm restrictions can also be expected to help reduce.

44.     The particular danger posed by troubled 18-20 years olds with access to highly lethal weaponry was vividly illustrated by the horrific killing of 17 at Marjory Stoneman Douglas High School in February 2018 by a 19-year-old who had purchased his rifle legally.  This horrific event prompted states and businesses to take action to limit the ability of this group to purchase firearms. Almost immediately after the Parkland shooting, Walmart and Dick's Sporting Goods announced they would raise the minimum age for all firearm purchases to 21.[28] At the same time, Florida enacted a similar age-based statutory limitation.[29] Furthermore, in March of 2018, Citibank announced that it would no longer allow any company with which it does business to sell guns to anyone under the age of 21.[30]

45.     But other credit card companies still allow citizens to buy guns using credit cards, thereby facilitating the ability of those as young as 18 years old to purchase a firearm with credit in advance of a mass shooting. As we saw recently in Atlanta and Boulder—when two 21-year-olds bought guns shortly before killing 8 and 10 individuals, respectively—perpetrators of mass shootings frequently procure their weapons a short time prior to beginning their deadly assaults. Since 18-20-year-olds often have relatively limited financial resources, the risk that they could show up at a gun dealer as they prepare to launch a mass murder and buy a gun with a credit card knowing that they may not ever have to pay anything is chilling. Wells Fargo announced that it would still facilitate such transactions, and it

---

[28] Julie Creswell and Michael Corkery, *Walmart and Dick's Raise Minimum Age for Gun Buyers to 21*, The New York Times, Feb. 28, 2018; https://www.nytimes.com/2018/02/28/business/walmart-and-dicks-major-gun-retailers-will-tighten-rules-on-guns-they-sell.html.

[29] Laws of Florida, ch. 2018-3.

[30] Jackie Wattles, *Citigroup Restricts Gun Sales by Business Customers*, CNN.com, Mar. 22, 2018, https://cnn.it/33Y10Mx.

announced that in its view, age limitations on gun purchases required a "legislative solution."[31] California has supplied this legislative solution.

## B.    The Problem of Mass Shootings Will Continue to Get Worse Without Effective Legislative Solutions

46.    Although overall crime has been trending down over the last 25 years (assuming the COVID-19 pandemic has not started a reversal of this longer-term trend), the opposite is true for the trend in public mass shootings. According to a report of the Congressional Research Service, the average of 2.7 public mass shootings per year in the 1980s rose to an average of 4.5 events per year from 2010 to 2013.[32]

47.    Since 2013, things have only gotten worse. My analysis of the Mother Jones public mass shooting database confirms this ominous trend. The Mother Jones database identifies killings occurring in a public place that are not related to armed robbery, gang activity, or domestic violence. Figure 6 below shows the trend in fatalities from public mass shootings *in which at least four deaths occurred* (not including the perpetrator).[33] The figure is divided into two periods: the ten years that the federal assault weapons ban was in place (1994-2004) and the period since the federal ban has lapsed. The Figure reveals that the federal assault weapons ban

---

[31] Kate Rooney, *Wells Fargo Customers Can Still Buy Guns with a Credit Card, But Now They Can't Buy Bitcoin*, CNBC.com, June 11, 2018, https://cnb.cx/3v4OwP0 (statement of John Shrewsberry, the chief financial officer of Wells Fargo).

[32] William J. Krouse & Daniel J. Richardson, Cong. Research Serv., Mass Murder with Firearms: Incidents and Victims, 1999-2013, at 14-15 (2015), *available at* https://bit.ly/3fvpAcZ; Mark Follman, *Yes, Mass Shootings Are Occurring More Often*, Mother Jones, Oct. 21, 2014, *available at* https://bit.ly/3oxWuOj.

[33] Mother Jones currently employs a 3-fatality threshold for including a shooting in its list, but for incidents occurring before 2015, Mother Jones utilized a 4-fatality threshold, which I used throughout my analysis to ensure all comparisons over time were consistent. For additional documentation of the worsening problem of mass public shootings, *see* Donohue & Boulouta, *supra* note 17.

22

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1  largely served its goal of restraining the growth in mass shooting deaths—indeed,

2  mass shooting fatalities trended downward for the duration of the federal ban.

3      48.    Since the ban lapsed, however, there has been a clear upward trend in

4  mass shootings, with only the exception of the unusual and idiosyncratic pandemic

5  year of 2020 when much of the country was shut down. The total number of

6  casualties (individuals killed or injured) in mass shootings since 2004 has been

7  growing at an even faster rate. The consequences of such a sustained and unabating

8  upward trend in deaths from public mass killings are dire and clearly merit the

9  serious efforts that California has taken to restrain this deadly and injurious pattern,

10  including the amendments to Section 27510 to raise minimum age limits for sale of

11  long guns to 18-20-year-olds.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 6**

Unabated Growth in U.S. Public Mass Shooting Deaths Since the End of the Federal Assault Weapons Ban in September 2004



Mass shooting data from Mother Jones. Incident is included if 4+ fatalities, not including perpetrator.

Source: Author's calculations from Mother Jones mass shooting database.

49.    The empirical evidence supports the view that legislative restrictions on weaponry have reduced deaths and injuries from mass shootings. Figures 7 and 8 below further illustrate the restraining influence of the federal assault weapons ban on deaths from public mass shootings in which at least four were killed and the ominous developments since that ban lapsed in late 2004.  Figure 7 illustrates that deaths from these mass shootings fell 23.2 percent (from 125 to 96) during the ten years of the federal assault weapons ban from September 1994 through 2004 and rose sharply after the federal ban was lifted. Note the dotted line in Figure 7 shows that over this entire period violent crime was declining, which highlights that the

24

restraint in mass shooting deaths during the federal assault weapons ban was not simply the product of a declining violent crime rate.

50.     After 96 total deaths in public mass shootings during the decade in which the federal assault weapons ban was in effect (1994-2004), public mass shooting deaths more than tripled, rising to 296 in the decade after it lapsed (2004-2014). This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in Figure 6 confirms.[34]

51.     The last column of Figure 7 shows the astonishing increase in public mass shooting deaths over the nearly 20-year period since the lapse of the federal assault weapons ban.[35]

52.     The evident effectiveness of the assault weapons ban in reducing mass shooting deaths is exactly what we would expect, since during the decade of the federal assault weapons ban, mass killers could not simply enter a gun store and

---

[34] This downward trend in violent crime even as mass shootings rise after 2004 is important evidence of the harmful impact of ending the federal assault weapons ban.  Without that evidence, one might mistakenly think that the drop in mass shooting deaths during the decade of the federal assault weapons ban was simply part of downward violent crime drop that occurred in that decade.  The experience after 2004 undermines that view because the violent crime rate continued to decline after the federal ban lapsed, yet mass shooting deaths began to rise sharply and unrelentingly.

[35] While the Mother Jones data set has not updated the death toll, two additional victims have died from the Las Vegas shooting (thus, Figure 7 should actually show a two-higher fatality count in the last period).  The 59th victim of the Las Vegas shooting, whose spinal cord was severed and whose body was laced with shrapnel from the exploding bullets, died from her injuries two years after the massacre. The following article highlights some of the devastating injuries that result from being shot by a semi-automatic centerfire rifle, such as that used by the Las Vegas shooter.  *See* CNN Wire, *SoCal Woman Dies 2 Years After Las Vegas Massacre, Bringing Shooting's Death Toll to 59*, https://ktla.com/news/local-news/l-a-woman-dies-2-years-after-las-vegas-massacre-bringing-shootings-death-toll-to-59-family/.  The 60th victim died shortly after the 59th "from complications of the gunshot wound to her left leg that she suffered nearly three years earlier in the attack." Rio Lacanlale, "Las Vegas woman becomes 60th victim of October 2017 mass shooting," *Las Vegas Review-Journal*, September 17, 2020. https://www.reviewjournal.com/crime/shootings/las-vegas-woman-becomes-60th-victim-of-october-2017-mass-shooting-2123456/.

1  buy an assault weapon with a large capacity magazine, as they can do in most of the
2  U.S. today.[36]

3  **Figure 7**



Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place. Violent crime rate from UCR; dots mark ten-year averages, except for the last dot, which ends in 2020. From 2015 to 2022, 42 incidents and 436 fatalities were observed. Incident is included if 4+ fatalities, not including perpetrator.

Source: Author's calculations from Mother Jones mass shooting database.

53.    Figure 8 illustrates the average number of fatalities in each mass
shooting for the same four periods shown in Figure 7. The pattern is the same:
fatalities per incident fell during the federal assault weapon ban and have risen
sharply thereafter. With the weaponry available to citizens getting increasingly
more potent and plentiful, the average number of people who die in every incident

---

[36] Only 9 states and the District of Columbia ban assault weapons, and all those states, plus Colorado and Vermont, restrict the permissible size of the ammunition magazines.

has grown by more than 60 percent since the elimination of the federal assault weapons ban in 2004.

**Figure 8**

Public Mass Shootings Became Less Deadly During the Federal Assault Weapons Ban and Increasingly More Deadly Since it Lapsed



Mass shooting data from Mother Jones; dates begin and end in September to reflect the period from 9/13/1994 to 9/12/2004 when the federal assault weapons ban was in place. Incident is included if 4+ fatalities, not including perpetrator.

Source: Author's calculations from Mother Jones mass shooting database.

54.     Moreover, public mass shootings are not only becoming more deadly, but according to the research of Adam Lankford & James Silver, the perpetrators have also gotten younger in the last decade: 67% of high-fatality incidents—those in which eight or more victims were killed—from 2010 to 2019 were committed by

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1  perpetrators younger than 30, compared with only 25% of high-fatality incidents
2  from 1966 to 2009.[37]

3       55.    Note that the numbers of mass shootings would be substantially
4  larger using alternative definitions, such as the Gun Violence Archive ("GVA")
5  definition of four individuals wounded by gunfire in a single incident. Using that
6  more capacious definition, the United States now suffers more than a mass shooting
7  every day. The following Figure 9 highlights how mass shootings (using the GVA
8  definition) jumped sharply in mid-year 2020. The line in red shows that by late
9  August of 2020, the number of mass shootings had surged ahead of the pace of the
10  last four years, and the year ended with "more than 600 such shootings."[38] The
11  deadly pace continued in 2021 with the killing of 9 individuals at the San Jose light
12  rail facility being the 232nd mass shooting for the year by May 26, 2021, according
13  to GVA.[39] 2021 ended with 692 mass shootings under the GVA definition, up 66%
14  from 2019's total of 417.

15
16
17
18
19
20
21
22
23

24  [37] Adam Lankford & James Silver, *Why Have Public Mass Shootings Become More Deadly?*,19 Criminology & Pub. Policy 37, 43 (2019), *available at*
25  https://bit.ly/3yHTQdy (this study does not provide a finer age breakdown).

26  [38] Daniel Victor & Derrick Bryson Taylor, *A Partial List of Mass Shootings in the United States in 2021*, N.Y. Times, May 27, 2021, *available at*
27  https://nyti.ms/3hAvrjX.

    [39] Gun Violence Archive, https://bit.ly/3bTevla (2020 data); Gun Violence
28  Archive, https://bit.ly/3up2mL4 (2021 data).

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

**Figure 9**

Mass Shootings Surged in 2020



Source: The Trace, September 3, 2020.

56.     The long-term trend in shootings in school settings is also troubling.[40] Indeed, the authors of a 2018 study on mass school shootings emphasized the young age of school shooters and concluded that "[m]ore people have died or been injured in mass school shootings in the US in the past 18 years than in the entire 20th century."[41]

57.     A more recent study in 2020 found that indiscriminate school shootings—shootings with primarily random targets—have grown at an alarming rate. From 2012-2019, the annual rate of these shootings was almost five times

_____

[40] Antonis Katsiyannis et al., *Historical Examination of United States Intentional Mass School Shootings in the 20th and 21st Centuries: Implications for Students, Schools, and Society*, 27 J. of Child & Family Studies 2562 (2018), *available at* https://bit.ly/340hjby.

[41] ScienceDaily.com, *Rapid Rise in Mass School Shootings in the United States, Study Shows: Researchers Call for Action to Address Worrying Increase in the Number of Mass School Shootings in Past Two Decades* (Apr. 19, 2018), https://bit.ly/3wfU9u3 (referring to the study of Antonis Katsiyannis et al, *supra* note 10).

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

higher than during the period from 1999-2011.[42] Most importantly, the study found that these incidents were more likely to occur in states with fewer firearm restrictions, underscoring the value of California's stronger firearm regulations.[43]

## C.   The Victims of Mass Shootings Are Far More Numerous Than Reflected in the Number of Deaths

58.   The harms of mass shootings extend far beyond the statistical counts of the dead and injured. The impact of the elevated stress experienced by students and parents across the country, as America's tragic mass shooting problem continues unabated, is undeniable. Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Horrific mass shootings, although less common than homicides generally, have generated widespread apprehension and increased demand for effective responses from government.  As Gabriel Sanchez of the Brookings Institution noted only 23 days into 2023:[44]

> Gun violence continues to be a major public health crisis across the country with the rise of mass shootings. There were more than 600 mass shooting events that took place in 2022 alone, and 2023 is so far unfortunately following the same trend, with an astonishing 36 mass shootings having already taken place across the country. In fact, over the past weekend, two mass shootings occurred, including an incident in Monterey Park, California that left 10 people dead, and a separate shooting at a night club in Louisiana resulting in numerous serious injuries.

---

[42] Phillip B. Levine & Robin McKnight, *Not All School Shootings Are the Same and the Differences Matter,* Nat'l Bureau of Econ. Research Paper No. 26728, 2020, at 10, https://bit.ly/33YqdX7.

[43] The authors also note that "Gun sales (measured as the average number of guns sold per capita in the state between 1999 and 2019) are also 34 percent higher than the national average in states where indiscriminate shootings occur." *Id* at 15.

[44] Gabriel Sanchez and Carly Bennett, *Voters Want Congress to Address Gun Violence and Mass Shootings*, 2023, https://www.brookings.edu/blog/how-we-rise/2023/01/23/voters-want-congress-to-address-gun-violence-and-mass-shootings/.

The <u>2022 Midterm Voter Election Poll</u> made clear that voters want Congress to address mass shootings and support a host of public policies aimed at addressing gun violence. When asked to identify the most important issues that they want Congress and the President to address, 17% of voters identified "mass shootings and gun policy" as one of their top priorities. Mass shootings were sixth among all priorities mentioned by voters, coming in higher than education or immigration. Mass shootings and gun policy are a high priority for voters regardless of whether they live in rural, suburban, or small or large urban areas of the country—voters from all geographical areas named gun policy as a key priority at either 16% or 17%.

59. A recent study of broad scope by Maya Rossin-Slater, et al. (2020) tries to estimate the impact on mental health of the over 338,000 American students who experienced and survived a school shooting since 2019.[45] Using large-scale prescription data from 2006 to 2015, the authors examined the effects of 44 school shootings on youth antidepressant use in a difference-in-difference framework. Their main finding was that local exposure to fatal school shootings increased youth antidepressant use by 21.4 percent in the following two years.[46] The authors conclude:

> [W]e find that exposure to a single, fatal school shooting leads to worse mental health among local youth for years. These lasting impacts are consistent with the development of chronic mental health conditions for which clinical practice guidelines recommend long or indefinite treatment. Other factors, such as heightened insecurity in the local community, could further contribute to persistent mental health effects.

---

[45] The latest tally of the number of children in the United States who had endured a shooting at a K-12 school since 1999 is 338,000. John Woodrow Cox and Steven Rich, *After Parkland: What we've learned tracking school shootings for 5 years*, The Washington Post, February 14, 2023, https://www.washingtonpost.com/dc-md-va/2023/02/14/school-shootings-parkland-5th-anniversary/.

[46] Maya Rossin-Slater, Molly Schnell, Hannes Schwandt, Sam Trejo, Lindsey Uniat, *Local Exposure to School Shootings and Youth Antidepressant Use*, PNAS, Vol. 117:38, https://www.pnas.org/doi/10.1073/pnas.2000804117. *See also My Son Survived Sandy Hook. It's Changed Me as a Parent*, The Washington Post, December 13, 2019, https://www.washingtonpost.com/lifestyle/2019/12/13/i-cry-high-school-meets-how-sandy-hook-changed-me-parent/.

60. Given such evidence, any notion that the problem of public mass shootings in the U.S. is relatively minor is untenable.[47] With only five percent of the world's population, the U.S. has roughly one-third of the public mass shootings across 171 countries since the late 1960s.[48]

61. A considerable body of scientific literature has documented the significant emotional and mental health harms that mass shootings inflict on survivors, community members, surviving victims, active responders, and children. The consistent finding of these studies is that mass shootings can lead to increased levels of post-traumatic stress disorder (PTSD), anxiety, and depression.[49] For example, the February 14, 2008 mass shooting at Northern Illinois University left five victims dead and 17 more wounded. Researchers determined that this shooting led to dramatic increases in the levels of post-traumatic stress (PTS) symptoms in a sample of Northern Illinois University students.[50]

---

[47] Since 2016, thousands of Americans have been wounded in mass shootings, often destroying the lives of the survivors and family members: "Beyond the colossal medical bills and the weight of trauma and grief, mass shooting survivors and family members contend with scores of other changes that upend their lives." Claire Savage, "The aftermath of mass shootings infiltrates every corner of survivors' lives," *Associated Press*, July 2, 2023, *available at* https://apnews.com/article/mass-shootings-survivors-aftermath-trauma-wounded-d4aaf16c41d3235d252d2ebb2c633067?utm_source=The+Trace+mailing+list&utm_campaign=9029cceaf2-trace_briefing_july_07_2023&utm_medium=email&utm_term=0_-9029cceaf2-%5BLIST_EMAIL_ID%5D.

[48] Lankford, Adam, *Public Mass Shooters and Firearms: A Cross-National Study of 171 Countries*, Violence and Victims, Vol 31, Issue 2, DOI: 10.1891/0886-6708.VV-D-15-00093, http://connect.springerpub.com/content/sgrvv/31/2/187.

[49] James M. Shultz et al., *Multiple Vantage Points on the Mental Health Effects of Mass Shootings*, 16 Current Psychiatry Reports 469 (2014), *available at* https://bit.ly/3v8DIPR.

[50] Joseph R. Bardeen et al., *Emotion Regulation Difficulties as a Prospective Predictor of Posttraumatic Stress Symptoms Following a Mass Shooting*, 27 J. of Anxiety Disorders 188 (2013), *available at* https://bit.ly/3fziXGD. This longitudinal study assessed the presence of PTS symptoms in a sample of female undergraduates at Northern Illinois University at three time points: T1, the starting period (pre-shooting) (n=1,045); T2, short term post-shooting (17-100 days post-shooting, n=691); and T3, roughly 7-8 months post-shooting (n=588). In the sample of 691 students that were assessed at T1 and T2, clinically significant levels of PTS rose from 20% pre-shooting to almost 50% post-shooting.

62.     The medical and social consequences of this increase in PTS can be profound, as the medical literature notes:

> PTSD has substantial impact on the individual and society. There has been emerging evidence demonstrating that, among the anxiety disorders, PTSD is one of the most strongly associated with suicidal behaviour, even after adjusting for other … mental disorders. . . . Data from several cross-sectional and longitudinal studies have replicated this finding. People with PTSD also struggle with interpersonal problems, parenting difficulties, and reductions in household income, and have several mental and physical health comorbidities….

> Studies in combat veterans [citations] and in the general population have shown that PTSD is associated with several physical health conditions. … Our group demonstrated that, even after adjusting for other … disorders, PTSD was associated with bone and joint disease, neurological conditions, cardiovascular conditions, respiratory conditions, and metabolic disease (odds ratios ranging between 1.5 and 3.0). The mechanisms that underlie these associations between PTSD and physical health problems are not well understood. It is possible that PTSD increases the risk of developing physical health problems through sleep disturbances, physical symptoms, obesity, or development of comorbid depression and substance use.[51]

## IV.   CALIFORNIA'S AGE RESTRICTION CAN ALSO HELP REDUCE THE RISING YOUTH SUICIDE RATE

### A.     The Increased Risk of Suicide Among Young Adults Is Elevated by Access to Firearms

63.     Apart from posing a threat to others, adolescents and young adults, including 18-20-year-olds, are also prone to harming themselves given their particular vulnerability to a range of mental health issues. The stresses associated with the life transitions inherent in this age group place adolescents and young adults at an increased risk of conditions like depression and anxiety.[52] According to a 2019 study conducted across two large national datasets of U.S. college students

---

[51] Jitender Sareen, *Posttraumatic Stress Disorder in Adults: Impact, Comorbidity, Risk Factors, and Treatment*, 59 Can. J. Psychiatry 460 (2014), *available at* https://bit.ly/2S1vkDC.

[52] *See* Justin Hunt & Daniel Eisenberg, *Mental Health Problems and Help-Seeking Behavior Among College Students*, 46 J. Adolescent Health, 3, 5 (2010), *available at* https://bit.ly/3f5nzFB ("Mental disorders are as prevalent among college students as same-aged non-students, and these disorders appear to be increasing in number and severity").

33

from 2007 to 2018, about 41 percent of college students exhibited symptoms of moderate to severe depression, and about 34 percent exhibited symptoms of moderate to severe anxiety.[53]

64.     Further, many major psychiatric conditions unrelated to life transitions, such as bipolar disorder, depression, and schizophrenia, develop in adolescence.[54] And despite the high prevalence of mental health issues among college age adolescents, many go untreated.[55] One study that conducted surveys in 2007 and 2009 of random samples of students on 26 U.S. campuses found that, on average, only 36 percent of students who had one or more mental illnesses had received treatment in the previous year.[56]

65.     Jeffrey Swanson, one of the top researchers on issues of guns and mental health, emphasizes the considerable risk of firearm suicide among young adults, noting that background checks designed to weed out those with the most serious depression are not likely to adequately address this problem on their own:

> Suicide is the third leading cause of death in Americans age 15 to 24, perhaps not coincidentally the age group when young go off to college, join the military, and experience a first episode of major mental illness…. Depression is the particular psychiatric illness most strongly associated with suicide. …. Depression is not, however, a disorder that gets most individuals a gun-disqualifying record of involuntary commitment. In other words, people suffering from the

---

[53] Mary E. Duffy et al., *Trends in Mood and Anxiety Symptoms and Suicide-Related Outcomes Among U.S. Undergraduates, 2007–2018: Evidence from Two National Surveys*, 65 J. Adolescent Health 590, 593 (2019), *available at* https://bit.ly/3yvk42D.

[54] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 Nature Reviews Neuroscience 947, 952 (2008), *available at* https://go.nature.com/2RrsnvZ ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis including schizophrenia and substance abuse all most commonly emerge during adolescence.").

[55] *See* Daniel Eisenberg et al., *Mental Health Service Utilization Among College Students in the United States*, 199 J. Nervous & Mental Diseases 301 (2011), *available at* https://bit.ly/3wmzhRY.

[56] *See id.*

34

one mental health condition that is most closely and frequently linked to suicidality are unlikely to show up in a gun background check.[57]

66.      The combination of impulsivity, low emotional regulation, and the onset of mental illness in the 18-20-year-old cohort contributes to high rates of suicide and suicide attempts in that age group. In fact, suicide is the second leading cause of death in the U.S. among this age group.[58] In the American College Health Association's National College Health Assessment for Spring 2019, which surveyed 54,497 undergraduate students, 9.3 percent of students reported "seriously considering suicide" and 1.6 percent reported attempting suicide within the previous 12 months.[59] Suicide attempts resulting in death or hospital treatment "remains high through age 25."[60] Taken as a whole, these statistics are of particular relevance to the present case because firearms are the most common means of suicide in the United States.[61]

67.      As the American Public Health Association ("APHA") recognizes, access to firearms is a key risk factor for suicide, with particularly high risk for young adults.[62] The APHA policy statement notes:

> While suicide affects all individuals, males are four times more likely than females to die by suicide, and the prevalence of suicidal thoughts, planning, and attempts is significantly higher among younger age groups (18–29 years) than older age groups….

---

[57] Jeffrey Swanson et al., *Preventing Gun Violence Involving People with Serious Mental Illness*, *in* Reducing Gun Violence in America 49 (Daniel Webster & Jon Vernick, eds., 2013).

[58] Melonie Heron*, Deaths: Leading Causes for 2017*, 68 Nat'l Vital Statistics Reports 1, 11 (2019), https://bit.ly/3oxWz4C.

[59] Am. College Health Ass'n, Nat'l College Health Assessment, Executive Summary: Undergraduate Student Reference Group (Spring 2019), https://bit.ly/3fBVzbl.

[60] Daniel Webster et al., Johns Hopkins Bloomberg School of Public Health, *Firearms on College Campuses: Research Evidence and Policy Implications* 21 (2016) at 3, *available at* https://bit.ly/3p9CeD3 .

[61] Suicide Prevention Resource Center, "Means of Suicide," https://bit.ly/3wnzXGB.

[62] Am. Pub. Health Ass'n, Reducing Suicides by Firearms (2018), https://bit.ly/2RqBiOd.

35

There is ample evidence that suicidality is transitory. Should a person survive a suicidal impulse, his or her prognosis is quite good. The results of a meta-analysis of nearly 100 studies of suicide attempters showed that 90% of attempters who survive do not go on to die by suicide. In fact, many suicide attempts occur with little planning, often in response to a short-term crisis. However, if a person attempts suicide through a means that is highly lethal, such as a firearm, the odds of survival are quite low.

One must not opt to make a suicide attempt using a highly lethal means such as a firearm if there is to be any opportunity to obtain mental health treatment or endure a painful short-term crisis.[63]

## B. The Most Directly Relevant and Methodologically Sound Study Finds that Age Restrictions on Firearm Purchases Reduced Suicides for 18-20-Year-Olds

68.    While Plaintiffs' experts summarize a number of studies, none of these studies contains an assessment of an age restriction like the one challenged here, let alone a similar regulation in a state with universal background checks and the range of complementary gun safety laws found in California. The most recent and important study of age restrictions that explores the effect of state restrictions on all handgun purchases to those who are 21 on suicide rates is Julia Raifman et al. (2020).[64] The Raifman et al. study uses a sophisticated and compelling methodology and the most up-to-date data, and for these reasons, provides more useful insights than the less relevant and less reliable studies found in the declarations of Plaintiffs' experts. The Raifman et al. study clearly finds that these restrictions limiting the sale of handguns to individuals aged 21 and older reduce suicides among those in the 18-20-year-old age group. A copy of the Raifman et al. study is attached as **Exhibit C**.

---

[63] *Id.*

[64] Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ 1 (2020), attached hereto as **Exhibit C**.

36

69.     The Raifman et al. study makes use of a particularly valuable methodological approach called a "regression discontinuity" analysis to more precisely evaluate the patterns of suicide in 46 states during the time period from 2001 to 2017.[65] This regression discontinuity modeling showed that states with more relaxed restrictions experienced a jump in suicides at 18—when gun access through purchase first became available—that was not seen in the states that delayed access until 21. The study describes the conclusion of their regression discontinuity analysis as follows:

> Based on the predicted probabilities of suicide at ages 18 to 20, an average of 344 adolescent suicide deaths would have been averted in each state with a minimum handgun purchaser age of 21 compared with age 18 from 2001 to 2017.[66]

This is the single most methodologically sound assessment of the impact of state laws restricting *handgun* access to those in the precise age category addressed by SB 1100's and SB 61's amendments to California Penal Code section 27510. California's regime that also prohibits (with certain exceptions) sales and  transfers of handguns and long guns to this vulnerable age group will only be that much more effective in saving lives.

70.     Raifman et al. also discuss Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004). Raifman et al. describe and evaluate this study as follows:

> [Webster et al.] evaluated the link between suicides and laws for minimum purchase age passed in 29 states between 1976 and 2001 and found that the policies for limiting handgun sales to those aged 21 or older were associated with statistically significant reductions in firearm related suicides but not in overall suicides. This study was based on a difference-in-differences design but did not examine pre-period trends in all cause suicide to assess the suitability of the

---

[65] For this regression discontinuity analysis, Raifman et al. excluded four states that experienced policy changes during the period:  Missouri, South Carolina, West Virginia, and Wyoming.  *See id.* at 2.

[66] *Id.* at 4.

> comparison group. We conducted an analysis based on more recent data most relevant to the current policy environment, including a difference-in-differences analysis in which we evaluated parallel trends.

Utilizing advances in econometric methodology (with a "regression discontinuity" analysis) and more current data, Raifman et al. buttressed the link Webster identified in 2004 between firearm-related suicides and age restrictions on the ability to purchase handguns, finding that limiting firearm access to those who were 21 led to a large and statistically significant decline in suicides for those aged 18-20.

71.     Notably, a cross-sectional study conducted between 2007 and 2014 based on suicidal acts resulting in an emergency room visit, a hospitalization, or death, found that about 90 percent of suicide attempts with a firearm during that period resulted in a fatality compared to 4 percent of all attempts not involving a firearm.[67] As scholars have noted, "[s]uicide attempters often have second thoughts, but when a method like a gun works so effectively, there's no opportunity to reconsider."[68] Access to firearms during a suicide attempt often determines whether an individual attempting suicide will die or recover.

72.     Daniel Webster, John Donohue, et al. (2016) summarized the research concerning access to guns on college campuses, noting:

> A large body of literature clearly shows that firearm access is associated with increased rates of suicide, suggesting that increased access to firearms on college campuses could significantly increase suicide in this vulnerable group. . . .
>
> The combination of challenges with impulse control, emotional regulation, and onset of mental illness contribute to high rates of suicide and suicide attempts among adolescents and young adults.
>
> The lethality of a given means or method of suicide attempt accounts for a substantial portion of the variation observed in suicide mortality

---

[67] Andrew Conner et al., *Suicide Case-Fatality Rates in the United States, 2007 to 2014: A Nationwide Population-Based Study*, 172 Annals of Internal Medicine 885, 890 (2019).

[68] Jane E. Brody, *After a Suicide Attempt, the Risk of Another Try*, N.Y. Times, Nov. 7, 2016, *available at* https://nyti.ms/3hOPon0.

and points to the unrealized potential for means restrictions strategies to reduce suicide.

The method used for a suicide attempt depends on availability; there is a strong association between the availability of firearms in households and death by suicide. Having ready access to firearms is linked with suicide not only for the gun owner but for all members of the household, especially for children and adolescents.[69]

**C.   A Number of Other Studies Have Found that Age Restriction Laws and Other Policies to Keep Guns from this Age Cohort Effectively Reduce Suicides**

73.    The APHA policy statement highlights the results of two interventions that reduced gun access for young adults, leading to substantial reductions in firearm suicides:

Between 2003 and 2005, about 90% of all suicides in the Israeli Defense Force (IDF), a mandatory population-based army drafting all youths 18–21 years of age, were firearm suicides. Since many IDF soldiers go home on the weekends, the IDF changed its weapons policy in 2006 to require that firearms remain on base when soldiers take a weekend leave. After this policy change, the overall IDF suicide rate decreased by 40% in 2007–2008. Most of this decrease was due to a reduction in weekend firearm suicides; there was no significant change in weekday suicide rates. A study of suicides in Switzerland showed that when the army halved the number of soldiers from 2003 to 2004 (leading to a decrease in gun availability nationwide), both firearm suicide and overall suicide (but not non-firearm suicide) rates dropped among military-aged men but not military-aged women or older men.

These IDF and Switzerland data support nationwide research indicating that restricting firearm access is effective in decreasing overall suicide rates.[70]

74.    Similar findings have emerged from examinations of age restriction laws in the United States. For example, a 2004 study by Webster et al. documented

---

[69] Webster, *Firearms on College Campuses*, *supra* note 60 (internal citations omitted).

[70] Am. Pub. Health Ass'n, *supra* note 62.

39

a significant decline in suicides in the 18-20-year-old group following implementation of age restriction statutes limiting access to firearms.[71]

75.     In 1994, the federal government adopted the Federal Crime Control and Law Enforcement Act of 1994, which prohibited handgun possession for those under age 18. A 2015 study by Mark Gius concluded that this federal minimum-age restriction on firearm possession contributed to a "very significant decline" in youth firearm suicide and unintentional death rates.[72] While it is challenging to ascertain the impact of a federal law since there is no obvious comparison group, the data presented in the Gius study—which I depict in Figures 10 and 11 below—provides visual support for his conclusion that the federal law did curtail both suicides and unintentional firearm deaths in the 18-20-year-old age group. Note that in Figure 10, we see that the youth firearm suicide rate had been rising, but this upward trend is abruptly reversed following the adoption of the federal law. That conclusion would be wholly consistent with the well-established link between firearm availability and suicide—a link highlighted in the Raifman et al. study discussed above, which convincingly demonstrates the effectiveness of minimum-age requirements in reducing youth suicides.[73]

---

[71] Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594 (2004).

[72] Mark Gius, *The Impact of Minimum Age and Child Access Prevention Laws on Firearm-Related Youth Suicides and Unintentional Deaths*, 52 Soc. Sci. J. 168, 173 (2015).

[73] For example, a study of 26 million Californians over the age of 21 found that handgun owners committed suicide at much higher rates than nonowners. David M. Studdert et al., *Handgun Ownership and Suicide in California*, 382 New Eng. J. Med. 2220, 2220, 2224 (2020) ("Handgun ownership is associated with a greatly elevated and enduring risk of suicide by firearm"), *available at* https://bit.ly/2VUfoEG.

1

**Figure 10**

The Rising Trend in Youth Firearm Suicides Was Sharply Reversed in 1994 When the Federal Government Imposed Minimum Age Requirements for Handgun Possession



Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 1.

76.     Similarly, Figure 11, which depicts the national youth unintentional firearm death rate over time, reveals another abrupt improvement starting at the time of adoption of the federal gun restriction in 1994: while youth accidental deaths had been relatively stable for a decade, they began a sharp decline after 1994.

41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Figure 11**

The Youth Unintentional Firearm Death Rate Fell Sharply After 1994 When the Federal Government Imposed Minimum Age Requirements for Handgun Possession



Source: M. Gius / The Social Science Journal 52 (2015) 168–175, Chart 2.

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

77.     Considering the Raifman et al. study, the APHA findings, the RAND commentary on the frequent use of long guns in youth suicides, and the extensive literature linking gun access to firearm suicides in general and specifically among 18-20-year-olds, the restrictions at issue in this litigation are well-designed to prevent avoidable deaths in this vulnerable age group. These age restrictions on long gun sale and transfer are particularly critical given the growing stresses and increased levels of suicide among 18-20-year-olds over the last decade.[74]

78.     Figure 12 below plots the rate of suicide (by all methods) for this cohort from 2005-2019, which shows a strong rising trend from 2009-2019. For the rest of the country (not including California), 18-20-year-olds committed suicide at a rate of 10.52 per 100,000 in 2009 and at 15.45 per 100,000 in 2021, an increase of 46.9 percent. For California, the comparable numbers jumped from 6.79 to 8.73, an increase of 28.6 percent.[75]

---

[74] Given the focus of the age restriction on access to long guns at issue in this litigation, it is important to note that the 2018 RAND study, referenced by Plaintiffs' declarant Thomas Marvell, cites four prominent studies in support of the claim that 40 to 50 percent of suicides by youth under 21 were committed with long guns.  Andrew R. Morral et al., RAND Corp., The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States 146 (2020), https://www.rand.org/pubs/research_reports/RR2088.html, citing the following four studies:  Johnson, R. M., C. Barber, D. Azrael, D. E. Clark, and D. Hemenway, "Who Are the Owners of Firearms Used in Adolescent Suicides?" Suicide and Life-Threatening Behavior, Vol. 40, No. 6, 2010, pp. 609–611; Wright, M. A., G. J. Wintemute, and B. E. Claire, "Gun Suicide by Young People in California: Descriptive Epidemiology and Gun Ownership," Journal of Adolescent Health, Vol. 43, No. 6, 2008, pp. 619–622; Shah, S., R. E. Hoffman, L. Wake, and W. M. Marine, "Adolescent  Suicide and Household Access to Firearms in Colorado: Results of a Case-Control Study," Journal of Adolescent Health, Vol. 26, No. 3, 2000, pp. 157–163; and Kellermann, A. L., F. P. Rivara, G. Somes, D. T. Reay, J. Francisco, J. G. Banton, J. Prodzinski, C. Fligner, and B. B. Hackman, "Suicide in the Home in Relation to Gun Ownership," New England Journal of Medicine, Vol. 327, No. 7, 1992, pp. 467–472.

[75] Of course, a growing population of individuals at significant risk of suicide within the most homicidal age cohort raises concomitant concerns about the increasing risk of mass shootings by individuals in this cohort.  Specifically, fully 70 percent of 18-20-year-olds who commit public mass shootings with at least four fatalities die at the scene of the crime, either by suicide (50 percent) or being killed at the scene by police (20 percent). These numbers are based on all public mass shootings by 18-20-year-olds from 1982 to the present in which at least four people were killed, excluding the shooter.

43

**Figure 12**



Source: Centers for Disease Control and Prevention.

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

**Figure 13**



Source: Centers for Disease Control and Prevention.

79.     While one might take comfort that California's overall suicide rate has increased at a slower pace than the rest of the nation over the last decade, the recent trend over the last five years in *firearm* suicides has been more concerning. As Figure 13 illustrates, for the rest of the country (not including California), 18-20-year-olds committed suicide with a firearm at a rate of 5.19 per 100,000 in 2014 and at 8.17 in 2021, a troubling increase of 57.4 percent. For California, the numbers jumped from 1.61 to 2.96—an increase of 83.9 percent. This large increase in firearm suicide by 18-20-year-olds in California in only five years underscores, once again, the value of restricting firearm access for this increasingly vulnerable age group.

80.     The data highlight the need for measures to limit firearm access for the increasingly stressed and vulnerable 18-20-year-old cohort, given that this age group in California is at elevated risk of homicidal violence, has traditionally been a major contributor to the growing problem of public mass shootings, and is at increasing risk of self-harm given the massive increase in firearm suicides among 18-20-year-olds in the last five years in California, which much evidence has shown is strongly influenced by gun availability.[76]

## V.     NEUROBIOLOGICAL AND BEHAVIORAL FACTORS OF THE 18-20-YEAR-OLD AGE GROUP INCREASE THE RISKS OF GUN VIOLENCE

81.     There is considerable evidence that a substantial number of 18-20-year-olds are impulsive, immature, and prone to making poor or unreasoned decisions for a number of reasons, including underdeveloped cognitive abilities and issues with mental health, such as depression, anxiety, and suicidality. Neuroscience and social science data support the conclusion that 18-20-year-olds pose a considerable risk of increased danger to themselves and others if they possess firearms. The heightened risk is due to three principal factors: (1) the still-developing cognitive systems of 18-20-year-olds increases their risk of impulsive behavior; (2) the frequency of binge drinking during emerging adulthood is a stimulant to violence that is obviously more dangerous when accompanied with gun possession; and (3) the onset of mental illness during emerging adulthood is correlated with self-harm and suicide attempts.[77]  We have already discussed the problem of suicide for these late adolescents, and now turn to points 1 and 2 below.

---

[76] Justin Thomas Briggs & Alexander Tabarrok, *Firearms and Suicides in US States*, 37 Int'l Rev. of Law & Econ. 180 (2014), *available at* https://bit.ly/3wkew9r ("This study investigates the relationship between firearm prevalence and suicide in a sample of all US states over the years 2000–2009.  We find strong, positive effects of gun prevalence on suicide….").

[77] Webster, *Firearms on College Campuses*, *supra* note 60.

### A. The Observed Pattern of Young Adult Violence Is Consistent with the Neurobiological Development of 18-20-Year-Olds

82. Young adults are at an increased risk of violence and misuse of firearms in part because emerging adulthood is a time of considerable change in the neurobiological systems that support decision-making, emotional and behavioral regulation, and motivation.[78] Indeed, the brain's higher association areas continue to develop well into the third decade of life.[79] One of the last parts of the brain to mature—and which continues to develop into the mid-twenties—is the prefrontal cortex, which supports self-control, including judgment, impulse control and inhibition, and long-range planning.[80] The limbic system, which controls basic emotions like anger, pleasure, and fear, develops well before the prefrontal cortex, meaning that until the cerebral cortices can catch up with the limbic system, the desire for rewards and susceptibility to social pressures can, at times, lead to an overriding of rational thinking by more impulsive, emotional, or irrational behavior.[81] Moreover, young adults are uniquely prone to negative emotional states, and their responses to these "frequent" negative states "tend to be more intense, variable, and subject to extremes relative to adults."[82]

---

[78] *See generally* Jay N. Giedd et al., Brain development during childhood and adolescence: a longitudinal MRI study, 2 *Nature Neuroscience* 861 (1999), https://go.nature.com/3hEOJoc. The "higher association areas" of the brain are "parts of the cerebral cortex that receive inputs from multiple areas; association areas integrate incoming sensory information, and also form connections between sensory and motor areas. Because they are involved in organizing information that comes from various other areas of the brain, association areas are often linked to complex functions." *See*, https://www.neuroscientificallychallenged.com/glossary/association-areas.

[79] BJ Casey et al., *The Adolescent Brain*, 1124 Annals of the N.Y. Academy of Sciences 111, 120 (2008), https://bit.ly/2ScxOyz.

[80] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 456 (2013), https://bit.ly/3bGgw3N.

[81] *Id.* at 453.

[82] Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 Brain & Cognition 124, 125 (2010), https://bit.ly/3yriI9l.

47

83.     As a result of the neurobiological factors, adolescents (including older adolescents aged 18-20) and young adults in their early- to mid-twenties may be more likely to act on negative emotions like stress or rage and are thus more prone to using firearms impulsively and dangerously.[83] Members of this age group typically have lower self-control and react more impulsively to perceived threats than do their younger counterparts and older adults, which results in a greater proclivity towards more risky and violent behavior.[84] These factors explain why gun possession among 18-20-year-olds correlates with such high rates of murder and firearm violence, as seen in Figures 1-4.

84.     Laurence Steinberg, a professor of psychology and neuroscience at Temple University who has worked extensively on issues involving adolescent brain development, explained that a disproportionate number of crimes are committed by males in their late teens and early 20s because during adolescence a "huge mismatch" develops between parts of the brain that cause impulsive behavior and emotional sensitivity and other parts of the brain that regulate acting out on such impulses.[85]

85.     These important scientific considerations support California's restrictions on access to the most lethal weaponry until age 21.

---

[83] *Id.*

[84] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 Developmental Neuroscience 220 (2014), https://bit.ly/33Z0nT6 (finding that adolescents—particularly males—were more likely to react impulsively to threat cues than their older and younger peers); Laurence Steinberg et al., *Age Differences in Sensation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evidence for a Dual Systems Model*, 44 Developmental Psychology 1764, 1766 (2008), https://bit.ly/2RvXu9y (finding that adolescents are vulnerable to risk taking because of a combination of higher inclination to seek excitement and immature capacities for self-control).

[85] Glenn Thrush and Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, The New York Times, June 2, 2022, https://www.nytimes.com/2022/06/02/us/politics/mass-shootings-young-men-guns.html (quoting Dr. Lawrence Steinberg).

### B. The 18-20-Year-Old Cohort Is Susceptible to Heavy Alcohol Use, Which Has an Established Link to Violence that Can Only Be Exacerbated by Access to Firearms

86.     18-20-year-olds are known to frequently drink heavily at a higher rate than other groups, and there is a close association between alcohol use and violence.[86] Indeed, my own research has highlighted that increases in alcohol consumption in a state is one of the strongest factors associated with higher homicide rates.[87] According to a 2019 national survey of approximately 34,000 college-age students from across the U.S., almost 53 percent of college students ages 18 to 22 reported drinking alcohol in the past month, and about 33 percent engaged in binge drinking during the same time frame.[88]

87.     An evaluation of data from the National Highway Traffic Safety Administration, the Centers for Disease Control and Prevention, national coroner studies, census and college enrollment data for 18-24-year-olds, the National Household Survey on Drug Abuse, and the Harvard College Alcohol Survey estimated that, over a three-year period, more than 600,000 students aged 18 to 24 had been assaulted by another student who had been drinking.[89] The Bureau of Justice Statistics of the U.S. Department of Justice reported that in a year-long period, alcohol was involved in 41 percent of on-campus acts of violence for

---

[86] *See* Charles C. Branas et al., *Alcohol Use and Firearm Violence*, 38 Epidemiologic Revs. 32, 42-43 (2016), *available at* https://bit.ly/2Rs9PvC (alcohol and firearm use "studies consistently reported that alcohol use was significantly associated with the possession of firearms, the ownership of firearms, and the use of firearm as a suicide means, and that the association was stronger for heavy alcohol use").

[87] *See* John J. Donohue & Steven Levitt, *The Impact of Legalized Abortion on Crime over the Last Two Decades*, 22 Am. Law & Econs. Rev. 241, 256 tbl. 4 (2020), *available at* https://bit.ly/3oAyfyR.

[88] Substance Abuse and Mental Health Services Administration (SAMHSA), Results from the 2019 National Survey on Drug Use and Health: Percentages, 2018 and 2019, https://bit.ly/3bKgKXT.

[89] *See* Ralph Hingson et al., *Magnitude of Alcohol-Related Mortality and Morbidity Among U.S. College Students Ages 18-24: Changes from 1998 to 2001*, Ann. Rev. of Pub. Health 259 (2005).

49

students living on campus, and 18 percent of on-campus acts of violence for students living off campus.[90] Off-campus acts of violence involving students were shown to have a similarly high association with alcohol use: 37 percent for students living on campus, and 31 percent for students living off campus.[91]

88.     The link between alcohol and violence is unmistakable in the crime literature, and an interesting study by Scott Phillips et al. suggests that removing firearms from those abusing alcohol should lessen the social harm from the alcohol-violence link. This study focused on male-male violence and found that greater alcohol intoxication is associated with violence escalating to a lethal level.[92] The study concluded that the greater the level of intoxication, the more likely that one will have a gun, and it is the presence of the gun that leads to the more homicidal outcome.[93]

89.     Professor Wintemute, who has reviewed the "existing research on the relationships between alcohol misuse; ownership, access to, and use of firearms; and the commission of firearm violence," concluded: "Acute and chronic alcohol misuse is positively associated with firearm ownership, risk behaviors involving firearms, and risk for perpetrating both interpersonal and self-directed firearm violence…. For men, deaths from alcohol-related firearm violence equal those from alcohol-related motor vehicle crashes."[94] I agree with Professor Wintemute's conclusion that keeping guns away from alcohol abusers would be "an effective violence prevention measure."[95]

---

[90]Lawrence A. Greenfeld, *Alcohol and Crime:  An Analysis of National Data on the Prevalence of Alcohol Involvement in Crime*, U.S. Dep't of Justice, Bureau of Justice Statistics (1998), https://bit.ly/3ysMWsn.

[91]*Id.*

[92] Scott Phillips et al., *Reconsidering the Relationship Between Alcohol and Lethal Violence*, 22 J. Interpers. Violence 66 (2007).

[93] *Id.*

[94] Garen Wintemute, *Alcohol Misuse, Firearm Violence Perpetration, and Public Policy in the United States*, 79 Preventive Med. 15 (2015).

[95] *Id.*

50

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

## VI. CALIFORNIA'S GUN SAFETY REGULATIONS HAVE HELPED THE STATE TO MORE EFFECTIVELY ADDRESS FIREARM HOMICIDE AND OVERALL VIOLENCE RELATIVE TO OTHER STATES

90.  California has consistently shown that legislative efforts to keep guns away from higher-risk individuals are beneficial.[96] In my opinion, restricting access to firearms for the higher-risk cohort of 18-20-year-olds would generate similar benefits in reduced gun crime as California's efforts to restrict access to firearms for other high-risk groups.

91.  Indeed, the data indicate that the state's cumulative efforts at strengthening gun safety measures has led to very encouraging results. Fifteen years ago, California had a considerably higher *rate of firearm homicide* than the rest of the country as shown in Figure 14 below. Specifically, in 2005, California's rate was more than 25 percent higher than the rest of the country: 5.2 per 100,000 in California and 4.0 per 100,000 for the rest of the country.

92.  Over time, California has implemented numerous gun safety measures and initiatives, including restrictions on assault weapons, high-capacity magazines, and concealed carry licenses, as well as a universal background check system.  The state's comprehensive efforts to reduce gun violence have borne fruit, as illustrated in Figure 14 (based on my calculations from FBI crime data): in the 2005-2021 period—when firearm homicide in California *fell* 9.5 percent—firearm homicide in the rest of the country *rose* by 61.8 percent. Similarly, California has performed much better than the rest of the country over this period in both overall homicides and firearm assaults, which show a pattern similar to that of Figure 14.

---

[96] Garen J. Wintemute et al., *Subsequent Criminal Activity Among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase*, 285 JAMA 1019 (2001), https://bit.ly/3fy6Rh2 (prohibiting those convicted of violent misdemeanors from purchasing a handgun reduced future criminal offending for the covered group by roughly 22 percent); M. A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89 Am. J. Pub. Health 88 (1999), https://bit.ly/3bE1go8u (law preventing felons from buying guns led to a 19.4 percent statistically significant reduction in their future violent criminality).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 14**

California's Firearm Homicide Rate Was Well Above the Rest of the Country 15 Years Ago, and Is Now Well Below It



| | California | The Rest of the Country |
|---|---|---|
| 2005 | 5.2 | 4.0 |
| 2021 | 4.7 | 6.5 |
| % Change | -9.5 | 61.8 |

Source:  Author's calculations based on FBI crime data.[97]

93.    It is also interesting to compare California—the largest state that has tried to limit gun violence—with Texas, which banned carrying guns outside the home for protection from 1871 to 1995.  In 1995, California had a 22 percent higher murder rate than the gun-restrictive Texas.  After 25 years of increasing gun restrictions in California, Texas's simultaneous pro-gun strategy has now left it with a 27 percent higher murder rate than California.[98] When Paul Clement on behalf of the NRA told the U.S. Supreme Court during oral argument in *Bruen* that

---

[97] Fed. Bureau of Investigation, Uniform Crime Reporting Program, Summary Reporting System, Estimated Crimes (Data Set) (Sept. 10, 2021), *available at* https://cde.ucr.cjis.gov/LATEST/webapp/#; National Center for Health Statistics, Vintage 2020 Postcensal Series, *supra* note 3.

[98] Specifically, by 2021, Texas's murder rate of 8.1 was 27.3 percent higher than California's murder rate of 6.36, even though in 1995, when Texas was still gun restrictive and prior to California's dedicated efforts at prudent gun safety regulation, California's murder rate of 11.26 per 100,000 in California was substantially higher than the murder rate of 9.24 per 100,000 in Texas, according to CDC data.

being more permissive with respect to firearm regulation would make "no difference" to crime, he was dead wrong.[99]

## VII. THE CLAIMS BY PLAINTIFFS' DECLARANTS IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION ARE DEVOID OF MERIT

94.    John Lott and Thomas Marvell submitted declarations in support of the 2019 Motion for Preliminary Injunction in this case to advance the unlikely proposition that restricting the ability of a high-risk age group to purchase or transfer firearms at licensed retailers will not contribute to a reduction in homicides, violent gun crime, gun suicides, and gun accidents. This argument is without merit for all the reasons previously discussed.  Moreover, their theories and declarations rely on fatally flawed studies and misleading claims.

95.    Abundant evidence over the last 50 years demonstrates the instrumentality effect—i.e., that the deadliness of the weapon has an effect on the outcomes of gun violence and injury.  Yet, Plaintiffs' experts Marvell and Lott say not a word about this critical effect, nor do they acknowledge that the work demonstrating this effect was internationally acclaimed and recognized in 2020, when Berkeley law professor Frank Zimring and Duke economist Phil Cook shared the Stockholm Prize in Criminology based in part on their work confirming this effect.[100]

96.    Moreover, the evidence on the link between firearm acquisition and suicide—an issue of particular importance for the 18-20-year-old age group—is powerful. Indeed, one study found that, in California, "[i]n the first week after the purchase of a handgun, the rate of suicide by means of firearms among purchasers (644 per 100,000 person-years) was 57 times as high as the adjusted rate in the

---

[99] *New York State Rifle & Pistol Association v. Bruen*, Nov. 23, 2021, https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_7m5e.pdf.

[100] Stockholm Univ., 2020 Winners of the Stockholm Prize in Criminology (Sept. 13, 2020), https://bit.ly/3fIbiHr.

general population."[101] Moreover, recent evidence suggests that long guns are used more often to commit suicide than had previously been realized, even more so for those under 21 than for older individuals—*precisely because handguns traditionally have been more tightly regulated than long guns*.[102] Theory and evidence strongly suggest that California's efforts to restrict acquisition of long guns by those under 21 will not only reduce homicides, but will also reduce suicides in this vulnerable age group. In addition, reduced firearm access by (typically less cautious) 18-20-year-olds can only reduce accidental firearm deaths and injuries.[103]

97.     Lott and Marvell, however, try to argue that the instrumentality effect is somehow diminished for the 18-20-year age group—the age group with the highest homicide rate in the country that is simultaneously experiencing a troubling increase in its rate of suicide. Their supposition that reducing access to firearms for 18-20-year-olds will not save lives or reduce gun violence is contradicted by a range of psychological, neurobiological, biological, and empirical evidence. Since Lott and Marvell offer no evidence concerning the California gun regulation at

---

[101] Garen J. Wintemute et al., *Mortality Among Recent Purchasers of Handguns*, 341 N.E. J. of Medicine 1583, 1583 (1999), *available at* https://bit.ly/3kEMaEo.

[102] Noting that "[f]irearms account for the majority of US suicides, largely due to lethality and accessibility" and that "long guns are less regulated than handguns which is a concern for increased suicide risk," a recent study in Maryland found that roughly 40 percent of suicides among those aged 18-21 were committed with long guns. Paul S. Nestadt et al., *Prevalence of Long Gun Use in Maryland Firearm Suicides*, 7 Injury Epidemiology 1 (2020), *available at* https://bit.ly/3kJGDwl.

[103] Notably, young people appear to be far more likely to be injured or die in firearm accidents than older adults.  *See* Sarah J. Solnick & David Hemenway, *Unintentional Firearm Deaths in the United States 2005-2015*, 6 Inj. Epidemiology 1, 3-4 (2019) (finding that "children and teens, ages 10 to 19," and "young adults, aged 20 to 29," have an elevated risk of dying in a gun accident than older adults), *available at* https://bit.ly/3zowb14; Victor Lee et al., *Emergency Department Visits for Firearm-Related Injuries Among Youth in the United States, 2006-2015*, 48 J. L., Med. & Ethics 67, 70 (2020) (finding that, between 2006 and 2015, 36,780 18-20-year-olds reported to a hospital emergency room for unintentional firearm injury and an additional 2,399 reported for firearm injury caused by a suicide attempt or self-harm), *available at* https://bit.ly/3isoUGR.

issue in this case, their invocation of weak or flawed studies about different regulations in other states, under circumstances that make it difficult to determine the true impact of the laws examined, provides little reason to depart from California's evidence-based decision to restrict gun sales to 18-20-year-olds by licensed retailers. Moreover, Lott and Marvell's claims that keeping guns away from a particularly vulnerable group of individuals will not prevent some suicides are hollow in the face of the compelling new evidence from Raifman et al. on how age-based firearm restrictions have reduced suicides for 18-20-year-olds.[104]

98.    Indeed, Marvell's declaration in support of the preliminary injunction motion begins its recitation of the literature by referencing a study by Gary Kleck,[105] which very explicitly laid out the rationale for enacting age-based firearm restrictions covering 18-20-year-olds:

> [G]un control measures specific to young adults reduce violent crime within that group. This focus is especially important because criminal violence in America is at its highest in the young adult ages. For example, national arrest data for 2017 indicate that the single ages with the highest rates of arrest for murder were 18, 19, and 20 years old (U.S. FBI, 2019, Table 38). Society therefore has an especially strong interest in reducing violence among young adults, and it would seem reasonable to focus violence-prevention efforts especially heavily on this group.
>
> There are also good reasons to believe that gun control measures would be especially likely to be effective if they focused on young adults. First, precisely because violent criminal behavior is more common within this group, any one instance of denying a gun to such a person is more likely to prevent a violent crime with a gun. Second, young adults are more likely to use firearms when they commit violence crimes (Department of the Treasury and Department of Justice, 1999, pp. 7, 9).

99.    This overview is quite right. The most reasonable inference that can be drawn from the evidence presented in this declaration is that regulations limiting access to firearms to those aged 18-20 who have appropriate training or oversight, and placing additional, stringent limitations on access to some of the deadliest types

---

[104] Raifman et al., *see supra* note 64.

[105] Gary Kleck, *Regulating Guns Among Young Adults*, 44 Am. J. of Crim. Justice 689 (2019), https://bit.ly/3fyFl2W.

of firearms (such as semi-automatic centerfire rifles), will have beneficial effects in saving lives and reducing injuries.  This is underscored by the fact that the 18-20-year-old cohort is at greater risk of violence and suicide.  Certainly nothing that appears in the Marvell and Lott declarations provides any basis to reject this determination.

### A. John Lott and Thomas Marvell Rely on Studies with Limited Empirical Value in this Case

100.  Lott and Marvell rely on evaluations of gun regulations that are both substantively different from the California laws at issue in this litigation and that have been enacted in states that are substantially different from California on matters of gun policy.  Marvell begins his declaration with the admission that "[t]he impact of increasing minimum age to purchase a firearm from 18 to 21 is difficult to determine because very few states have made such a change." Neither he nor Lott offers any empirical evidence about the actual effects of SB 1100 and SB 61, the precise legal amendments at issue in this case, which are unique among the states.

101.  An ideal empirical study on the impact of SB 1100 and SB 61 would examine all states with 1) age-based restrictions similar to the California law challenged here that restrict the ability of young people aged 18-20 to purchase, receive, or transfer long guns at licensed retailers (while prohibiting those retailers from selling or transferring more lethal, semiautomatic centerfire rifles to individuals in this age group), and 2) a comparable gun-safety regime in place to enhance the effectiveness of those laws (e.g., universal background checks, waiting periods, and other provisions).

102.  Instead, Lott and Marvell offer studies about different types of age restrictions in states that do not have a regulatory regime to prevent gun violence that is comparable to that of California, with its demonstrated record of reducing violent crime through prudent gun safety measures.  In addition, the laws Lott and

1   Marvell review are often directed at a younger age group, and the researchers they

2   cite look at an age group different from the 18-20-year-old group that is the focus of

3   SB 1100 and SB 61, further undermining Lott's and Marvell's opinions in this case.

4   But as noted above, those under 18 have a dramatically lower homicide rate than

5   those in the 18-20 age category, so there is simply less opportunity to diminish their

6   lower crime rates.  Moreover, those seventeen years of age and under work less and

7   have far less access to capital than older individuals, so restrictions on gun

8   purchasing will have less of an impact on the overall possession of weapons by the

9   youngest cohort.

10      103.   At the same time, Lott and Marvell make no mention of

11   methodologically superior studies that do show the effectiveness of age-based

12   restrictions as well as the massive evidence on the instrumentality effect of weapons,

13   which provides compelling justification for restrictions on firearm acquisition for the

14   age group with the highest homicide rate in the country.

15   **B.    Plaintiffs' Experts Rely on Studies Plagued by Practical and**
16   **Methodological Shortcomings That Further Undermine Their**
17   **Value in this Litigation Concerning SB 1100 and SB 61**

18      104.   Across the fields of econometrics and statistics, there is a hierarchy of

19   research methodologies concerning the empirical evaluation of law and policy.[106]

20   The studies cited by Plaintiffs' experts to suggest there are no benefits from age-

21   based restrictions are 1) either too low in the hierarchy to generate results that could

---

22   [106] The apex of the methodological hierarchy for causal inference would be a
23   randomized control trial, which is commonly used in the medical literature to
     evaluate drugs, vaccines, and medical treatments.  Since RTC laws are not
24   randomly assigned (i.e., adopted by states randomly), one necessarily must use a less
     rigorous econometric approach than randomized samples.  Of course, studies done
25   at any level in the hierarchy can be performed and interpreted well or poorly, as the
     discussion below highlights.  Well-informed judgment that can evaluate the entire
26   corpus of empirical information in light of the most sound theoretical onsiderations
     will ultimately be needed to draw the most compelling causal inferences.  As I
27   explain, the reports of Lott and Marvell are often untethered from the broader
     insights of the entire corpus of theory and empiricism concerning gun safety
28   measures and therefore fail to demonstrate the requisite well-informed judgment.

57

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

be expected to overturn a strong body of contrary theory and evidence, or 2) were conducted before the empirical field had fully understood how to assess statistical significance and the need to establish the existence of "parallel trends" in conducting panel data analyses.[107] Moreover, their cited studies also labor under a practical difficulty: the laws they do look at are often few in number with an insufficient number of years of data available to expect to be able to identify a statistically significant effect, even if it exists.  In statistical jargon, they are "under-powered."

## C. The First Study on which Marvell Relies Embodies the Type of Econometric and Interpretive Errors that Lead to Erroneous Conclusions about the Impact of Firearm Regulations

105.   The very first article that Marvell discusses in support of his theory that the firearm restrictions in SB 1100 and SB 61 would not be effective in saving lives, avoiding injuries, and reducing suicides is a study by Gary Kleck that evaluates a 1968 federal law prohibiting licensed gun dealers (but not private citizens) from selling handguns to persons under 21.[108] Kleck describes his methodology for determining the effect of the 1968 law as follows:

> We do this by measuring the average trend in the 18-to-20 year old share of arrests in the years immediately before the [Gun Control Act or GCA] went into effect in late 1968 (i.e., in 1963-1968) and comparing this with the average trend in the years immediately after the GCA (i.e., 1969-1973), excluding 1968 because part of it was before the GCA went into effect and part was after.  If the relevant provisions of the GCA were effective,

---

[107] In my Presidential address to the American Law and Economics Association, which was published in the *American Law and Economics Review* in 2015, I explained that there is a hierarchy of empirical methodologies, specifically noting that the regression discontinuity approach is just below the randomized control experiment and superior to the panel data methodology that is used in the best of the studies that Marvell discusses.  *See* John J. Donohue, *Empirical Evaluation of Law:  The Dream and the Nightmare*, 17 Am. Law & Econ. Rev. 313 (2015), *available at* https://bit.ly/3hSJgtD.

[108] Gary Kleck, *Regulating Guns Among Young Adults*, 44 Am. J. Crim. Justice 689 (2019).

the post-1968 trends should be either downward or at least be less steeply upward than they had been before the GCA.[109]

Kleck then concludes that the law had no effect because the growth rate in the share of crime committed by 18-20-year-olds was *not* notably less from 1969-1973 than in the five years prior to the adoption of the federal law.[110]

106.   This type of time-series analysis is considered lower in the methodological hierarchy because it does not allow a "treatment-control" comparison, and instead only provides a "before-after" assessment.[111]   The first thing to note is that Kleck's simple test would only be accurate if everything other than the 1968 law was the same before and after 1968 (or at least the influences on crime for those who were 18-20 were identical to those who were an age other than 18-20).   As is well known, however, the period beginning in 1968 was one of enormous youth rebellion, increased drug use, protests over civil rights and the Vietnam War, and major urban riots after the deaths of Martin Luther King and Robert Kennedy in 1968.   In fact, in 1968, 536,000 U.S. military personnel were in Vietnam—largely young men who could not be committing crimes in the U.S.—but American forces had largely returned by 1973.   As might be expected, these societal changes influenced the rates of crime in dramatic ways in the 5 years after the federal law went into effect.   Kleck fails to account for these factors in his analysis.

107.   But even if Kleck had found that the law had no effect during the period examined, what would that tell us about the very different law and situation relevant to the litigation in this case?   Kleck provides the answer:  essentially nothing.   He writes:

---

[109] *Id.* at 97.

[110] *Id.* at 99.

[111] One of the difficulties with analyzing a federal law is that there is no obvious comparison group, like there is when evaluating changes in state laws when enough other states have not made the change.  Thus, the nature of the legal change that is to be evaluated and limitations on the available data can constrain the choices of researchers to less-preferred methodological approaches.

> Why did the new ban on handgun buying not reduce violent crime among the young adults who should have been affected?  One obvious explanation would be that they bought handguns from other sources besides licensed dealers, such as friends or relatives. …  It is even possible that the ban did reduce handgun acquisition in this group, but that this did not reduce the youths' involvement in violent crime. *Criminally inclined young adults could substitute long guns like shotguns or rifles … to use in crimes* …. (emphasis supplied.)

108.   There are a number of important reasons why the 1968 handgun sale restriction would not be as effective as the legal regime that California has in place: 1) In contrast to the legal system Kleck was investigating, California has *universal* background checks requiring every gun sale to proceed through a licensed dealer, so the option of an 18-20-year-old buying a handgun through a private dealer legally has long been foreclosed in California, and 2) SB 1100 and SB 61 limit the circumstances under which these young people may purchase, receive, or transfer long guns.  In sum, Kleck's study is too misdirected in its focus to aid in assessing the effectiveness of Section 27510 and it is too flawed methodologically to be reliable.  Indeed, the last study cited in Marvell's declaration was a RAND study on the impact of gun laws, which *specifically* indicated that the methodology employed by Kleck was not likely to yield reliable results and therefore was not worthy of consideration.[112]

109.   The shortcomings of the research cited by Lott and Marvell are underscored by the fact that there is a study of an age-based firearm restriction that does not labor under these disadvantages, which does not appear in their discussions of the literature.  This superior study by Raifman et al., which analyzes more comprehensive data, refutes their conclusion and finds a clear benefit in reducing

---

[112] Andrew R. Morral et al., RAND Corp., The Science of Gun Policy:  A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States (2018), *available at* https://bit.ly/3yQT91E.  I agree with the RAND analysts' rejection of the methodology employed in the Kleck paper—which Marvell seems to implicitly accept in noting that Kleck's actual statistical work uses a very weak statistical methodology.

1      suicides in the 18-20-year-old group when comparable age-based restrictions are

2      adopted.[113] Specifically, this study employs a methodological design ("a regression

3      discontinuity" analysis) that is superior to the studies cited by Plaintiffs' experts,[114]

4      and, since it was recently conducted, it has the advantages of both more complete

5      data and the benefits of the latest statistical techniques in causal inference.

6
7

### D. Lott's Declaration is Marred By Numerous Factual and Interpretive Errors that Undermine His Claims

8        110.    In an apparent attempt to undercut the well-established neuroscientific

9      data about the relative immaturity of the 18-20-year-old cohort, Lott references the

10      experience from Texas, Michigan, and Nevada regarding 18-20-year-olds who hold

11      concealed handgun carry permits.[115] Lott's contention that young concealed carry

12      permit holders are not that dangerous is misguided for two reasons. First, data

13      regarding the very limited number of 18-20-year-old concealed carry permit holders

14      in other states with different firearms regulation regimes tells us very little about the

15      entire population of 18-20-year-olds, which the data show to be—comparatively—a

16      more violent and homicidal age group than all other age groups.[116] Since the

---

17
18          [113] *See* the discussion above of Julia Raifman et al., *State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses*, 370 BMJ (2020), *supra* note 64.

19
20
21
22          [114] The closer one comes to mimicking the advantages of a randomized control analysis, the better the chance of securing valid estimates of the impact of any particular legal or policy initiative. Regression discontinuity studies do come closer than standard observational studies because they evaluate behavior on either side of a distinct demarcation where those just on one side or other of the cutoff in question (here, an age-based cutoff) can be thought of as close to randomly distributed in their tendency to commit crime.

23          [115] ECF No. 21-17 at 12-14.

24
25
26
27
28          [116] When the Texas legislature adopted a right-to-carry law, it barred 18-20-year-olds from getting a permit because of their diminished maturity. A decade later in 2005, an exception was created "to allow persons under 21 who had military training to apply for concealed handgun licenses … because this group's 'extensive training in handling weapons' mitigated the legislature's concern that persons under 21 generally were not sufficiently mature to handle guns responsibly." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013). So Lott is basing his comparison on a group that the legislature thought was clearly more responsible than the average 18-20-year-old, which at the start undermines the value of his evidence.

regulation in question here is of a very different and more comprehensive scope, Lott's evidence does not provide useful insight into the value of California's regulation.

111.   Second, Lott badly misinterprets his own data. He states:

> Michigan and Texas grant to 18-to-20-year-olds (sic) and provide data by year of age of permit holders, though relatively few permits are granted (for 2018, 322 permits). For 18-to-20-year-olds in Texas who were granted such a permit in 2018, only 5 of 322 were revoked (0.015%) and zero were suspended.[117]

Lott's first sentence seems to suggest he is referring to revocations of Michigan and Texas permit holders who are aged 18-20. He alludes to the small number of permits in this category, which he lists as 322 in 2018. While one might think he was referring to the combined permits in this age category for both Michigan and Texas, the next sentence and his subsequent exhibit show that 322 is the number for Texas alone.

112.   The data that Lott does present is from a Texas report that he construes as establishing that 5 of the 322 18-20-year-old permit holders in Texas had their permits revoked for misconduct in 2018. Apparently trying to persuade his audience that the Texas revocation rate is low, Lott misstates that 5 of 322 is *only .015 percent*. Lott's calculation is off by two orders of magnitude: The true percentage is 1.552 percent, which is 100 times greater than the percentage that Lott reports.

113.   Two points must be made about this egregious error. First, the standard metric for criminal misconduct is not measured in percentage terms, but rather in crimes per 100,000. Thus, 1.552 revocations per 100 would ordinarily be referenced as a misconduct rate of 1,552 per 100,0000—a rate that is in fact considered a troublingly high rate of misconduct. For comparison, in 2019, California's violent crime rate for the state was 430 per 100,000. In other words, Lott's evidence

---

[117] ECF No. 21-17, ¶ 18.

1   actually suggests that the Texas permit holders have a high rate of criminal

2   misconduct.[118]

3       114.   Indeed, comparing those who have been caught and had their licenses

4   revoked to the total amount of violent crime is unduly beneficial to Lott's

5   comparisons, as a very substantial proportion of violent crimes are not solved and

6   do not result in criminal conviction.[119] The bottom line is that even if Lott's

7   evidence is correct, it stands for the opposite of his claim:  these 18-20-year-old

8   Texans with concealed carry permits seem to be at a rather high risk of criminality.

9       115.   Lott also presents figures in two tables, for which he provides no data

10  source, that purport to tell us that the revocation rate of Texas permit holders who

11  are 18-20 is lower than it is for those 21 and above.[120] But this is contradicted by his

12  own Exhibit 7, which shows a 1.552 percent revocation rate for those 18-20-year-

13  olds (5 of 322) and a .367 percent revocation rate for those older than 20 (1253 of

14  341,761). In other words, Lott's Exhibit 7 data indicates that the 2018 revocation

15  rate for 18–20-year-olds was 4.2 times *higher* than it is for older Texas permit

16  holders. (Note that the .367 percent revocation rate for older Texans from Lott's

17  Exhibit 7 is more than twice the figure that Lott shows in his unsourced tables,[121]

18  but since I do not have his data, I cannot determine whether older permit holders

19  _____

20  [118] While Texas did not release the basis for the revocations for the youthful permit holders, it does report that in 2018 permit holders overall were

21  convicted of 41,180 criminal offenses, predominantly for violent crime.  *See* Tex. Dep't of Pub. Safety, Conviction Rates for Handgun License Holders (2019),

22  https://bit.ly/3vtHNi2.

    [119] To see this point, note that if 430 violent crimes were committed by a

23  population of 100,000, we would not expect to catch and convict all of these criminals.  Thus, the number that would be caught and sanctioned would be smaller

24  than 430.  Since the violent crime clearance rate in California is usually around 45 percent, one might expect to catch fewer than 200. The number who were then

25  subsequently convicted would be smaller still. But in Texas, the rate at which youthful permit holders were caught, deemed to have committed misconduct, and

26  had their permits revoked in 2018 was 1552 per 100,000—a dramatically higher rate than the overall rate of violent criminals caught and convicted in California.

27  [120] ECF No. 21-17, p. 14.

28  [121] *Id.*

had their permits revoked at unusually high rates in 2018.  However, since there are so many errors in his report around these numbers, they should not be relied on.) But even if Lott's claim were true and Texas permit holders who were 18-20 years old were less criminally disposed than older Texans, this could well be because Texas only allows 18–20-year-olds to carry handguns if they are in the military. But California has the same age-based treatment for purchases of semi-automatic centerfire rifles that Texas has for issuing right to carry ("RTC") permits:  18–20-year-olds are subject to a restriction, unless they are in the military or, in California, law enforcement.

116.   Lott makes a passing reference to Michigan's permit revocation data, but there is a well-known case from Michigan that highlights why Lott's reliance on permit revocations understates the level of misconduct by right-to-carry permit holders and provides little basis for assessing the age limitations imposed by Section 27510. In 2013, two Michigan permit holders became embroiled in a road rage incident and pulled over to the side of the road to settle their dispute.  They both jumped out of their cars and proceeded to shoot each other, with each killing the other.[122] Since both permit holders were dead, there was no need to proceed to permit revocation, which highlights that revocations can undercount even the most extreme misconduct committed by permit holders. In sum, Lott's data on permit revocations in Texas understates the harm caused by permit holders.

### E.   More Semi-Automatic Rifles in the Hands of 18-20-Year-Olds Will Lead to Increased Social Harms

117.   Plaintiffs' Memorandum of Points and Authorities in Support of their Motion For Preliminary Injunction indicates that they seek to enable 18-20-year-olds to acquire semi-automatic centerfire rifles "for self-defense and all other lawful purposes." Conspicuously, the Plaintiffs' experts do not suggest success in this

---

[122] Hunter Stuart, *2 Concealed Carry Holders Kill Each Other in Road Rage Incident*, Huffington Post, Sept. 19, 2013, https://bit.ly/3hHX5f2.

venture would be protective for the 18-20-year-olds or anyone else. Indeed, 18 recent studies have shown that more guns being carried has a net harmful effect on violent crime.[123] RAND has evaluated the entire array of gun scholarship and concludes on the basis of this literature review that more gun carrying leads to pernicious social consequences. Specifically, RAND concludes that adoption of a right to carry concealed weapons increases total and firearm homicides.[124]

118.   Since these 18 studies showing that RTC laws lead to increases in violent crime do not capture the additional harms of greater gun accidents that follow from greater gun prevalence—a complete cost-benefit calculus tips even further against gun acquisition by a high-risk age group. (According to the CDC, in 2020, a total of 535 Americans were killed by gun accidents and 29,000 more were injured seriously enough to visit the emergency department.[125])

119.   Indeed, while anecdotes of instances when guns have been used for protection can perpetuate the myth that guns might provide sufficient benefits to offset their large costs, the empirical evidence does not support this view. A study of over-age-21 gun carriers in Philadelphia from 2003–2006, who almost all said they carried to protect against crime, found that gun possession was associated with a significantly increased risk of being shot in an assault.[126]

120.   A recent study focused on younger gun carriers in Phoenix and Philadelphia from 2000–2010 and found that, at times when they were carrying guns, they were at vastly higher rates of being shot than when they were not carrying:

---

[123] The 18 articles are listed in **Exhibit D**, attached hereto.

[124] RAND. 2023. "Effects of Concealed-Carry Laws on Violent Crime." https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html. Accessed on 2023-01-31.

[125] WISQARS™ — Web-based Injury Statistics Query and Reporting System. https://www.cdc.gov/injury/wisqars/index.html.

[126] Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, Am J Public Health. 2009; 99: 2034–2040. doi:10.2105/AJPH.2008.143099.

> The key finding is that even among populations with chronic exposure to gun violence, gun carrying is associated with increased risk of **gun violence victimization** and exposure, while even the temporary cessation of gun carrying is associated with the reduction of such risks.[127]

121.    Moreover, evidence from the National Crime Victimization Survey ("NCVS") has consistently shown that people confronted by a criminal are able to try to defend with a gun less than 0.9 percent of the time. This identical percentage was observed when looking at NCVS data for 1992-2001 as well as for 2007-2011.[128]

122.    The persistence of this minute percentage over a roughly two-decade time period during which time RTC laws expanded greatly across the nation underscores the low level of effectiveness of greater gun availability in protecting against crime. Specifically, in the first period from 1992-2001, 41 percent of the U.S. population lived in states with RTC (or permitless carry) laws. By the second period of 2007-2011, this percentage had jumped to 67 percent—a 63% increase in the proportion of the country living in RTC states. And yet this massive increase in gun carrying did nothing to elevate the likelihood of defensive gun use, which was at exactly the same low rate it had been in the earlier period.

123.    Effective gun use in response to criminal threat is rare for many reasons. First, criminals will have the first-mover advantage on potential victims, thereby greatly limiting the possibility of using a gun for defense even when one is armed. Second, a gun can only be useful for self-defense if it is in one's possession

---

[127] David Hureau and Theodore Wilson, *The Co-Occurrence of Illegal Gun Carrying and Gun Violence Exposure: Evidence for Practitioners from Young People Adjudicated for Serious Involvement in Crime*, American Journal of Epidemiology, Vol. 190, No. 12, 2021, *available at* https://academic.oup.com/aje/advance-article/doi/10.1093/aje/kwab188/6311494?guestAccessKey=fc0cb67b-f839-4da3-bba7-42c0a8bc9e57.

[128] David Hemenway and Sara J. Solnick, The epidemiology of self-defense gun use: Evidence from the National Crime Victimization Surveys 2007–2011, Preventive Medicine. Volume 79, October 2015, Pages 22-27.

when the infrequent need for it arises—and typically less than one percent of the population experiences threatened or actual violent crime each year. Moreover, the semi-automatic rifles at issue in this litigation are not well-adapted to defensive use in close quarters.[129]

124. Guns are stolen far more frequently than they are even attempted to be used for defensive purposes, and given the characteristics of the high-risk age group at issue in this litigation, theft is one very real harmful consequence to add to the other potential ills described throughout this report.[130] I estimate that, as a result of RTC laws, gun carrying has increased by roughly 16 million permit holders, which has increased the number of gun thefts by roughly 100,000 per year since guns left in cars and elsewhere by permit holders are an easy target for thieves.[131] In large cities, where gun thefts have increased by 50 percent, gun theft is an important pathway to increased violent crime.[132] Similarly, Khalil analyzed crime data from the FBI's National Incident-Based Reporting System ("NIBRS") for over 400

---

[129] Retired Air Force colonel Dean L. Winslow notes that semi-automatic rifles "are not optimal for home defense" and their high-velocity bullets "are too likely to go through a wall to endanger someone in the next room." Dean L. Winslow, *I Spoke My Mind on Guns. Then My Senate Confirmation Was Put on Hold,* The Washington Post, Dec. 20, 2017. According to Maryland Police Superintendent Marcus Brown, semi-automatic rifles are less effective for defense, since "they are less maneuverable in confined areas." Brown Decl. ¶ 20, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014). Massachusetts Chief of Police Mark K. Leahy indicated that he would never recommend a semi-automatic rifle for self-defense. Leahy Decl. ¶ 22, *Worman v. Healy,* 293 F. Supp. 3d 251 (D. Mass. 2018).

[130] David Hemenway *et al.*, *Whose Guns are Stolen? The Epidemiology of Gun Theft Victims*, 4 Injury Epidemiology 1, 3 (2017) (people who carried firearms at least once in the past month were three times more likely to have a firearm stolen than other gun owners). John Donohue, Sam Cai, Matt Bondy, and Phil Cook, "Why Does Right-to-Carry Cause Violent Crime to Increase?" February 2023.

[131] Donohue, John J., Abhay Aneja, and Kyle D. Weber. *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, Journal of Empirical Legal Studies 16, no. 2 (2019): 198–247 at 207, https://doi.org/10.1111/jels.12219.

[132] Billings, Stephen B., *Smoking Gun? Linking Gun Ownership to Neighborhood Crime* (January 6, 2023) (more RTC permits lead to increased gun thefts and then to increased violent crime); John Donohue, Sam Cai, Matt Bondy, and Phil Cook, "Why Does Right-to-Carry Cause Violent Crime to Increase?" February 2023.

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

jurisdictions from 34 different states from 1993–2010 and found that stolen firearms led to statistically significant increases in homicide, aggravated assault, and robbery.[133]

## CONCLUSION

125.   The gun safety measures at issue in this litigation are appropriately targeted to the 18-20-year-old age group because that group is at heightened risk of committing firearm homicide and other violent crime, and should reduce suicide and firearm accidents in this vulnerable age group. Due to challenges of underdeveloped neurobiological function and worsening levels of stress and mental health issues, this age group is at an increased risk of making poor decisions and acting impulsively (in general and in connection with alcohol and drug consumption), which is why governments and businesses have imposed an array of age-based restrictions for those under age 21 to reduce the damage that can follow from this incomplete brain maturation.

126.   It is worth considering the lesson from an actual case of a 19-year-old who killed his parents in 2003 with a recently purchased shotgun. The perpetrator, a very troubled teenager struggling with mental illness and homicidal thoughts, purchased the murder weapon at a sporting goods store in Falls Church, Virginia two days before the murders.[134] In an interview with CNN, the 19-year-old killer

---

[133] Khalil, U., 2017, *Do more guns lead to more crime? Understanding the role of illegal firearms*, Journal of Economic Behavior & Organization 133, 342–361, https://www.sciencedirect.com/science/article/abs/pii/S0167268116302669.

[134] Tom Jackman, "Virginia Teenager Pleads Guilty to Murdering Parents," Wash. Post, June 25, 2003, https://wapo.st/3rlQBFa.  The killer, who is serving 40 years for the double murder, described how he had been playing violent video games in his bedroom, when he picked up a shotgun, looked at his poster for the Matrix film, and decided:

> That was it, there was nothing left in my life….I wanted to end my life and theirs."  He then walked downstairs and shot his mother in the chest as she turned towards him from her computer. His father, who had been on the phone to Cooke's sister at the time, tried to take cover under the desk but Cooke fired at him several times.

(continued…)

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

stated that the availability of firearms for young people is "[a]bsolutely" "a big problem" and that the availability of certain semiautomatic rifles, like AR-platform assault weapons, exacerbate the problem:

> If I had an assault weapon, things would have been much worse. And I thank God I didn't have an AR-15 or some other type of assault weapon because the way I was back then mentally, I would have gone to the mall that night or to one of my old high schools the next morning and killed as many people as I possibly could. But because I didn't have an assault weapon, that didn't happen. So I thank God I didn't have one of those things, and the gun does matter.[135]

127.    This is precisely the type of firearms violence that SB 1100 and SB 61 were designed to prevent, and this unfortunate episode underscores the sound basis for limiting the circumstances under which licensed firearms dealers may sell or transfer long guns, and in particular the more lethal semi-automatic centerfire rifles, to 18-20-year-olds.

---

I was numb. There had been so many years of hurt from mother's abuse and bullying, rejection from girls, all types of things like that, I just - I didn't care about anything anymore.

He went back upstairs to reload the weapon and as he came back down his mother confronted him, clasping her chest and saying: "What are you doing Joshua? Why did you do this?"

Cooke said: "I loaded the gun, I pointed it at her face and I shot her in the face. I walked down the steps, I stepped over her body and I shot my father in the head one more time."

Daily Mail Reporter, "'I was like a zombie': Joshua Cooke describes the moment he shot adopted parents when he was 19 years old as he calls for assault weapons to be banned," August 24, 2013, https://www.dailymail.co.uk/news/article-2401316/Joshua-Cooke-describes-moment-shot-adopted-parents-19.html.

[135] *Id.*

69

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

1       I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3       Executed on September 7, 2023, at Stanford, California.

4

5

6

7

8                              John J. Donohue

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report and Declaration of Prof. John J. Donohue (3:19-cv-01226-L-AHG)

**TABLE OF EXHIBITS**

| Exhibit | Description | Page |
|---|---|---|
| A | Professor John J. Donohue Curriculum Vitae | 1 |
| B | U.S. Fed. Bureau of Investigation, Uniform Crime Reports, 2019 (2021) | 31 |
| C | Julia Raifman et al., State Handgun Purchase Age Minimums in the US and Adolescent Suicide Rates: Regression Discontinuity and Difference-in-Differences Analyses, 370 BMJ 1 (2020) | 33 |
| D | 18 Studies in Last 6 Years that Have Found More Gun Carrying Leads to Increased Violent Crime | 42 |

# EXHIBIT A

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail:  jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

### Full-time Positions

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

### Temporary Appointments

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia,  June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

1

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

**EDUCATION**

## Yale University, 1981-1986

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.

  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.

- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

## Harvard Law School, 1974-1977 (J.D.)

- Graduated Cum Laude.

2

- <u>Activities</u>:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a) First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

## Hamilton College, 1970-1974 (B.A.)

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

**PUBLICATIONS**

## Books and Edited Volumes:

- <u>Law and Economics of Discrimination</u>, Edward Elgar Publishing, 2013.

- <u>Employment Discrimination:  Law and Theory</u>, Foundation Press, 2005, 2021 (5th edition) (with George Rutherglen).

- <u>Economics of Labor and Employment Law</u>:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- <u>Foundations of Employment Discrimination Law</u>, Foundation Press, 2003 (2d edition).

- <u>Foundations of Employment Discrimination Law</u>, Oxford University Press, 1997 (Initial edition).

## Book Chapters:

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in <u>Encyclopedia of Law and Economics,</u> Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., <u>Encyclopedia of Law and Economics</u> (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, <u>Controlling Crime: Strategies and Tradeoffs</u> (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).
- "The Evolution of Employment Discrimination Law in the 1990s:  A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).
- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, Evaluating Gun Policy:  Effects on Crime and Violence (Washington D.C.:  Brookings, 2003).

**Articles:**

- Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," JAMA. 2022;328(12):1191-1192.
  https://jamanetwork.com/journals/jama/fullarticle/2796675.

- John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook, (2022) "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities," https://www.nber.org/papers/w30190.
  - Featured in August 2022 Issue of NBER Digest.
  - Featured in August 11, 2022 issue of *The Economist*: "A Supreme Court ruling could spell even more gun crime: Right-to-carry laws are associated with increases in violence."
- "The Supreme Court's gun decision will lead to more violent crime," *Washington Post*, July 8, 2022, https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court/.
- Daniel Cerqueira, Danilo Coelho, John J. Donohue III, Marcelo Fernandes, & Jony Pinto Junior, "A panel-based proxy for gun prevalence in US and Mexico" *International Review of Law & Economics* (2022). https://www.sciencedirect.com/science/article/abs/pii/S0144818822000369.

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," The Conversation (December 6, 2021), https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, 'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase, The National Law Journal, November 4, 2021. https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/.
- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.
- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."
- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302.

- https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238.

  - ■ NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.

    - ○ Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694

    - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html

    - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/

- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227

    - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.

https://www.newsweek.com/does-death-penalty-deter-killers-364164

- 

- "Is Widespread Gun Ownership Worth the Price of More Violence?" San Francisco Chronicle, July 2, 2015. https://www.sfchronicle.com/opinion/article/Is-widespread-gun-ownership-worth-the-price-of-6363574.php.

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

  - o   Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?"  San Francisco Chronicle, December 21, 2012.   http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qIkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill the Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws:  Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "A Clarification on Data Availability," Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

9

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

  - Reprinted in American Bar Foundation, Anaylzying Law's Reach:  Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

  - Excerpted in Lynne Dallas, Law and Public Policy:  A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did *Miranda* Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum:  Essays on Criminal Justice  45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

- - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds:  The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).

- - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).

- - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).

- - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

11

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).

  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics:  The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation:  A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony:  Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.:  JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De  Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia:  Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "Packed and Loaded: Stanford's John Donohue on Supreme Court's Guns Decision," *Stanford Law School Legal Aggregate Blog* (Jun. 24, 2022), https://law.stanford.edu/2022/06/24/packed-and-loaded-stanfords-john-donohue-on-supreme-courts-guns-decision/?utm_source=june302022&utm_medium=mc&utm_campaign=law%40stanford&utm_content=Stanford-law-news.

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem.

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- *"Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate? Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES:

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually by the Neuroscience and Law Center, **Fordham University School of Law,** November 1, 2022.

- "Can We Get Strong Gun Safety Legislation Passed?" Vi Seminar, **Palo Alto, CA,** July 18, 2022.

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually at Fordham Law School, November 1, 2022.

- "*Bruen*, Permissive Gun Carrying, Constitutional Law, and Violent Crime," Faculty Workshop, **Stanford Law School**, July 13, 2022.

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut**, Hartford, April 7, 2022.

- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law**, May 11, 2022.

- "Guns and Crime in American Life and Law," **University of Zurich**, April 5, 2022.

- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics**, November 17, 2021.

- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" **Minnesota Continuing Legal Education Webcast**, November 2, 2021.

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021; Crime Seminar, **Northwestern Law School**, March 3, 2022.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.

14

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

15

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford**

16

**University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14,  2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16,  2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://

www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization**, May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate:  "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

- "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** November 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

20

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School, "**Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment:  The U.S. Record:  A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty:  The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law:  The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland,** March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines:  Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception:  An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002;  **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics

Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on Why is Crime Decreasing? **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on Rethinking Equality in the Global Society, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

23

- "The Power of Law:  Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?"  The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy:  Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?"  Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?"  **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority:  Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School,** February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

25

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**; Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon.  **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action. Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

## PROFESSIONAL ACTIVITIES

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.

- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.

- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.

- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.

- Legal Scholarship Network Advisory Board Member, SSRN.

- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.

- Fellow of the Society for Empirical Legal Studies, 2015 - present.

- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.

- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.

- President, American Law and Economics Association, May 2011 – May 2012.

- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.

- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.

- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.

- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.

- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.

- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.

- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, <u>Measuring Racial Discrimination</u> (2004), http://www.nap.edu/catalog/10887.html.

- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.

- Editorial Board, <u>Journal of Empirical Legal Studies</u>, July 2003 – present.

- Editorial Board, <u>International Review of Law and Economics</u>, October 1999 – present.

- Editorial Board, <u>Law and Social Inquiry</u>, February 2000 – present.

- Board of Editors, <u>American Law and Economics Review</u>, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, <u>Law and Social Inquiry</u>.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

## PRO BONO LEGAL WORK

- Co-wrote <u>amicus brief</u> for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in *New York State Rifle & Pistol Association v. Bruen*, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in *New York State Rifle & Pistol Association v. City of New York*, which quotes my article *Right-to-Carry Laws and Violent Crime* in the brief, August 12, 2019.

**Exhibit A**
Page 29

- Co-wrote underlined amicus brief for the 9th Circuit Court of Appeals for "Empirical Scholars Concerning Deterrence and the Death Penalty In Support of Petitioner/Appellee," *Jones v. Davis*, No. 09 Cv. 2158 CJC, which discusses the lack of deterrence of the death penalty, March 6, 2015.

- Death Penalty case:  Heath v. Alabama.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  Baker v. Georgia.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

## RESEARCH GRANTS

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

## BAR ADMISSIONS
- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

## PROFESSIONAL and HONORARY ASSOCIATIONS

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- Stanford Center for Racial Justice – August 2020 to present.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

- American Law and Economics Association

## PERSONAL
- Born:  January 30, 1953.

# EXHIBIT B

**Table 38**

**Arrests**

by Age, 2019

[10,831 agencies; 2019 estimated population 229,735,355]

| Offense charged | Total all ages | Ages under 15 | Ages under 18 | Ages 18 and over | Under 10 | 10-12 | 13-14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65 and over |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | 6,917,552 | 156,886 | 485,964 | 6,431,588 | 2,550 | 36,601 | 117,645 | 94,426 | 108,807 | 125,845 | 170,444 | 192,362 | 192,045 | 198,861 | 201,462 | 206,878 | 213,855 | 1,164,519 | 1,046,118 | 875,810 | 610,752 | 459,614 | 368,597 | 280,854 | 148,619 | 100,798 |
| **Total percent distribution[1]** | 100.0 | 2.3 | 7.0 | 93.0 | * | 0.5 | 1.7 | 1.4 | 1.6 | 1.8 | 2.5 | 2.8 | 2.8 | 2.9 | 2.9 | 3.0 | 3.1 | 16.8 | 15.1 | 12.7 | 8.8 | 6.6 | 5.3 | 4.1 | 2.1 | 1.5 |
| Murder and nonnegligent manslaughter | 7,711 | 74 | 601 | 7,110 | | 11 | 63 | 107 | 165 | 255 | 400 | 413 | 389 | 370 | 317 | 299 | 295 | 1,408 | 950 | 747 | 501 | 340 | 223 | 197 | 127 | 134 |
| Rape[2] | 16,966 | 1,264 | 2,887 | 14,079 | 31 | 357 | 876 | 499 | 516 | 608 | 748 | 579 | 591 | 523 | 469 | 409 | 421 | 2,077 | 2,016 | 1,765 | 1,252 | 982 | 821 | 629 | 395 | 402 |
| Robbery | 56,854 | 2,665 | 12,266 | 44,588 | 8 | 333 | 2,324 | 2,692 | 3,312 | 3,597 | 3,797 | 3,172 | 2,520 | 2,245 | 2,034 | 1,831 | 1,849 | 8,733 | 6,548 | 4,511 | 2,777 | 1,739 | 1,372 | 904 | 385 | 171 |
| Aggravated assault | 277,561 | 6,867 | 19,499 | 258,062 | 138 | 1,864 | 4,865 | 3,723 | 4,185 | 4,724 | 5,825 | 6,592 | 7,093 | 7,931 | 8,070 | 8,623 | 8,932 | 48,857 | 42,678 | 35,119 | 24,082 | 18,096 | 14,342 | 11,016 | 6,134 | 4,672 |
| Burglary | 120,242 | 4,806 | 14,504 | 105,738 | 88 | 1,024 | 3,694 | 3,089 | 3,286 | 3,323 | 3,953 | 3,872 | 3,310 | 3,281 | 3,232 | 3,548 | 3,746 | 20,129 | 18,695 | 15,020 | 9,419 | 6,665 | 5,130 | 3,456 | 1,498 | 784 |
| Larceny-theft | 604,287 | 18,480 | 62,200 | 542,087 | 231 | 3,754 | 14,495 | 12,482 | 14,536 | 16,702 | 20,361 | 19,232 | 17,194 | 16,399 | 15,966 | 15,967 | 16,364 | 94,072 | 88,432 | 73,764 | 50,915 | 38,842 | 31,941 | 23,360 | 11,785 | 7,493 |
| Motor vehicle theft | 57,738 | 2,626 | 9,742 | 47,996 | 4 | 260 | 2,362 | 2,442 | 2,450 | 2,224 | 2,010 | 1,793 | 1,653 | 1,630 | 1,600 | 1,653 | 1,782 | 10,017 | 8,986 | 6,845 | 4,092 | 2,648 | 1,758 | 994 | 361 | 174 |
| Arson | 6,369 | 717 | 1,264 | 5,105 | 50 | 247 | 420 | 210 | 177 | 160 | 146 | 122 | 105 | 122 | 111 | 120 | 154 | 868 | 831 | 785 | 542 | 353 | 326 | 258 | 130 | 132 |
| Violent crime[3] | 359,092 | 10,870 | 35,253 | 323,839 | 177 | 2,565 | 8,128 | 7,021 | 8,178 | 9,184 | 10,770 | 10,756 | 10,593 | 11,069 | 10,890 | 11,162 | 11,497 | 61,075 | 52,192 | 42,142 | 28,612 | 21,157 | 16,758 | 12,746 | 7,041 | 5,379 |
| Violent crime percent distribution[3] | 100.0 | 3.0 | 9.8 | 90.2 | * | 0.7 | 2.3 | 2.0 | 2.3 | 2.6 | 3.0 | 3.0 | 2.9 | 3.1 | 3.0 | 3.1 | 3.2 | 17.0 | 14.5 | 11.7 | 8.0 | 5.9 | 4.7 | 3.5 | 2.0 | 1.5 |
| Property crime[3] | 788,636 | 26,629 | 87,710 | 700,926 | 373 | 5,285 | 20,971 | 18,223 | 20,449 | 22,409 | 26,470 | 25,019 | 22,262 | 21,432 | 20,909 | 21,288 | 22,046 | 125,086 | 116,944 | 96,414 | 64,968 | 48,508 | 39,155 | 28,068 | 13,774 | 8,583 |
| Property crime percent distribution | 100.0 | 3.4 | 11.1 | 88.9 | * | 0.7 | 2.7 | 2.3 | 2.6 | 2.8 | 3.4 | 3.2 | 2.8 | 2.7 | 2.7 | 2.7 | 2.8 | 15.9 | 14.8 | 12.2 | 8.2 | 6.2 | 5.0 | 3.6 | 1.7 | 1.1 |
| Other assaults | 717,793 | 38,619 | 88,269 | 629,524 | 736 | 11,229 | 26,654 | 16,913 | 16,818 | 15,919 | 14,660 | 16,145 | 16,496 | 19,478 | 19,774 | 20,581 | 21,296 | 115,533 | 102,880 | 86,441 | 60,842 | 45,807 | 36,425 | 27,271 | 14,538 | 11,357 |
| Forgery and counterfeiting | 32,495 | 98 | 611 | 31,884 | 2 | 23 | 73 | 93 | 149 | 271 | 747 | 1,177 | 1,269 | 906 | 902 | 887 | 1,037 | 5,856 | 5,570 | 4,805 | 3,174 | 2,161 | 1,533 | 1,079 | 509 | 272 |
| Fraud | 79,954 | 645 | 2,620 | 77,334 | 2 | 108 | 535 | 464 | 661 | 850 | 1,502 | 2,009 | 2,266 | 2,129 | 2,195 | 2,311 | 2,454 | 14,302 | 13,515 | 11,393 | 7,918 | 5,656 | 4,224 | 2,967 | 1,442 | 1,051 |
| Embezzlement | 10,003 | 25 | 400 | 9,603 | 0 | 5 | 20 | 26 | 117 | 232 | 431 | 545 | 470 | 388 | 408 | 309 | 350 | 1,667 | 1,412 | 1,114 | 863 | 630 | 443 | 336 | 144 | 93 |
| Stolen property; buying, receiving, possessing | 64,027 | 1,368 | 6,487 | 57,540 | 2 | 118 | 1,248 | 1,358 | 1,732 | 2,029 | 2,314 | 2,231 | 2,053 | 1,905 | 1,952 | 1,985 | 1,955 | 11,730 | 10,218 | 8,245 | 5,145 | 3,292 | 2,295 | 1,374 | 585 | 261 |
| Vandalism | 128,474 | 9,891 | 22,744 | 105,730 | 314 | 2,926 | 6,651 | 4,247 | 4,355 | 4,251 | 4,316 | 4,161 | 3,920 | 3,994 | 3,999 | 3,979 | 3,945 | 20,757 | 17,210 | 13,364 | 8,735 | 6,120 | 4,815 | 3,421 | 1,700 | 1,294 |
| Weapons; carrying, possessing, etc. | 110,130 | 3,347 | 11,563 | 98,567 | 63 | 863 | 2,421 | 2,092 | 2,705 | 3,419 | 4,186 | 4,342 | 4,232 | 4,308 | 4,230 | 4,160 | 4,241 | 20,241 | 15,171 | 11,690 | 7,529 | 5,146 | 3,800 | 2,767 | 1,452 | 1,072 |
| Prostitution and commercialized vice | 20,015 | 30 | 214 | 19,801 | 0 | 8 | 22 | 26 | 55 | 103 | 477 | 818 | 881 | 893 | 927 | 817 | 853 | 3,954 | 2,862 | 2,176 | 1,531 | 1,236 | 1,013 | 674 | 369 | 320 |
| Sex offenses (except rape and prostitution) | 28,973 | 2,310 | 4,739 | 24,234 | 40 | 619 | 1,651 | 859 | 775 | 795 | 828 | 700 | 624 | 601 | 556 | 611 | 599 | 3,095 | 3,290 | 3,100 | 2,306 | 1,962 | 1,756 | 1,642 | 1,165 | 1,399 |
| Drug abuse violations | 1,067,764 | 10,881 | 55,701 | 1,012,063 | 55 | 1,695 | 9,131 | 9,689 | 13,996 | 21,135 | 36,298 | 41,116 | 38,389 | 37,432 | 36,358 | 36,652 | 36,982 | 193,061 | 165,241 | 135,033 | 89,556 | 62,814 | 47,410 | 33,345 | 15,620 | 6,756 |
| Gambling | 1,909 | 26 | 150 | 1,759 | 1 | 3 | 22 | 29 | 45 | 50 | 32 | 67 | 55 | 36 | 30 | 52 | 48 | 252 | 232 | 229 | 191 | 176 | 151 | 115 | 49 | 64 |
| Offenses against the family and children | 58,720 | 772 | 2,098 | 56,622 | 27 | 188 | 557 | 434 | 458 | 434 | 635 | 741 | 825 | 1,039 | 1,101 | 1,250 | 1,401 | 9,965 | 11,267 | 10,330 | 7,181 | 4,662 | 2,948 | 1,916 | 869 | 492 |
| Driving under the influence | 658,902 | 89 | 3,580 | 655,322 | 5 | 13 | 71 | 161 | 858 | 2,472 | 7,152 | 11,113 | 12,995 | 20,860 | 22,770 | 24,184 | 24,752 | 121,140 | 98,297 | 80,832 | 60,960 | 50,411 | 42,321 | 36,682 | 22,344 | 18,019 |
| Liquor laws | 112,467 | 2,681 | 17,072 | 95,395 | 6 | 379 | 2,296 | 2,738 | 4,508 | 7,145 | 14,821 | 15,621 | 13,296 | 2,745 | 2,084 | 1,642 | 1,608 | 7,072 | 6,453 | 6,013 | 5,005 | 4,884 | 5,042 | 4,692 | 2,733 | 1,684 |
| Drunkenness | 219,696 | 372 | 2,414 | 217,282 | 5 | 52 | 315 | 362 | 576 | 1,104 | 3,032 | 3,735 | 3,972 | 6,276 | 6,178 | 6,158 | 6,207 | 32,949 | 31,445 | 28,206 | 21,909 | 19,407 | 18,295 | 15,956 | 8,799 | 4,758 |
| Disorderly conduct | 211,960 | 16,045 | 36,877 | 175,083 | 224 | 4,335 | 11,486 | 7,733 | 7,029 | 6,070 | 5,379 | 5,212 | 5,439 | 6,489 | 6,030 | 5,767 | 5,753 | 29,318 | 26,167 | 22,237 | 15,820 | 12,967 | 10,870 | 8,730 | 5,056 | 3,849 |
| Vagrancy | 16,104 | 77 | 255 | 15,849 | 3 | 15 | 59 | 62 | 60 | 56 | 245 | 216 | 306 | 218 | 245 | 286 | 280 | 2,051 | 2,114 | 2,206 | 1,710 | 1,670 | 1,696 | 1,335 | 815 | 456 |
| All other offenses (except traffic) | 2,219,328 | 28,480 | 96,409 | 2,122,919 | 497 | 5,684 | 22,299 | 19,448 | 22,558 | 25,923 | 36,139 | 46,633 | 51,096 | 56,651 | 59,911 | 62,805 | 66,542 | 385,355 | 363,582 | 309,797 | 216,774 | 160,921 | 127,147 | 95,722 | 49,609 | 33,635 |
| Suspicion | 329 | 7 | 17 | 312 | 0 | 0 | 7 | 1 | 4 | 5 | 10 | 5 | 6 | 12 | 13 | 12 | 9 | 60 | 56 | 43 | 23 | 27 | 10 | 16 | 6 | 4 |
| Curfew and loitering law violations | 10,781 | 3,624 | 10,781 | | 18 | 578 | 3,028 | 2,447 | 2,721 | 1,989 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

[1] Because of rounding, the percentages may not add to 100.0.

[2] The rape figures in this table are aggregate totals of the data submitted based on both the legacy and revised Uniform Crime Reporting definitions.

[3] Violent crimes are offenses of murder and nonnegligent manslaughter, rape, robbery, and aggravated assault. Property crimes are offenses of burglary, larceny-theft, motor vehicle theft, and arson.

* Less than one-tenth of 1 percent.

# EXHIBIT C

Exhibit C
Page 33

**RESEARCH**




# State handgun purchase age minimums in the US and adolescent suicide rates: regression discontinuity and difference-in-differences analyses

Julia Raifman,[1] Elysia Larson,[2] Colleen L Barry,[3] Michael Siegel,[4] Michael Ulrich,[4] Anita Knopov,[5] Sandro Galea[4]

[1]Department of Health Law, Policy, and Management, Boston University School of Public Health, Boston, MA 02118, USA

[2]Harvard TH Chan School of Public Health, Boston, MA, USA

[3]Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA

[4]Boston University School of Public Health, Boston, MA, USA

[5]Brown University School of Emergency Medicine, Providence, RI, USA

Correspondence to: J Raifman jraifman@bu.edu
(or @juliaraifman on Twitter ORCID 0000-0001-9468-658X)

Additional material is published online only. To view please visit the journal online.

Cite this as: *BMJ* 2020;370:m2436
http://dx.doi.org/10.1136/bmj.m2436

Accepted: 1 June 2020

## ABSTRACT

**OBJECTIVE**
To evaluate the association between US state policies that establish 18 or 21 years as the minimum purchaser age for the sale of handguns and adolescent suicide rate.

**DESIGN**
Regression discontinuity and difference-in-differences analyses.

**SETTING**
46 US states without policy changes between 2001 and 2017; Missouri and South Carolina, which lowered the age for handgun sales in 2007 and 2008, respectively; and West Virginia and Wyoming, which increased the age for handgun sales in 2010.

**PARTICIPANTS**
Adolescents aged 13 to 20 years (554 461 961 from 2001 to 2017) in the regression discontinuity analysis, and adolescents aged 18 to 20 years (168 934 041 from 2002 to 2014) in the main difference-in-differences analysis.

**MAIN OUTCOME MEASURE**
Suicide rate per 100 000 adolescents.

**RESULTS**
In the regression discontinuity analysis, state policies that limited the sale of handguns to those aged 18 or older (relative to 21 or older) were associated with an increase in suicide rate among adolescents aged 18 to 20 years equivalent to 344 additional suicides

in each state where they were in place between 2001 and 2017. In the difference-in-differences analysis, state policies that limited the sale of handguns to those aged 21 or older were associated with 1.91 fewer suicides per 100 000 adolescents aged 18 to 20 years (95% confidence interval −3.13 to −0.70, permutation adjusted P=0.025). In the difference-in-differences analysis, there were 1.83 fewer firearm related suicides per 100 000 adolescents (−2.66 to −1.00, permutation adjusted P=0.002), with no association between age 21 handgun sales policies and non-firearm related suicides. Separate event study estimates indicated increases in suicide rates in states that lowered the age of handgun sales, with no association in states that increased the age of handgun sales.

**CONCLUSIONS**
A clear discontinuity was shown in the suicide rate by age at age 18 in states that limited the sale of handguns to individuals aged 18 or older. State policies to limit the sale of handguns to individuals aged 21 or older were associated with a reduction in suicide rates among adolescents. Increases in suicide rates were observed after states lowered the age of handgun sales, but no effect was found in states that increased the age of handgun sales.

## Introduction

More than 48 000 suicides occurred in the United States in 2018; an increase in the suicide rates for the 10th consecutive year both overall and among adolescents.[1] Suicide is a particular concern in adolescents as it is the second most common cause of death in this age group after unintentional injuries.[2] Firearms account for more than half of the deaths from suicide in the US.[3]

Firearms are common in US households, with 41% of Americans reporting living in a household with a gun in 2017.[4] Firearms are a particularly lethal method of suicide attempts,[5] and access to firearms is associated with increased deaths from suicide.[6-8] Firearm purchases have been specifically related to suicide—one study found the risk of suicide by firearms to be 57 times greater among Californians who had purchased a handgun in the past week compared with that in the general population of adults in the state.[9] Though few changes have occurred in most state firearm policies in recent years, changing the legal age at which handguns can be purchased has been politically feasible; since 2018, three states increased the minimum age of handgun purchase.[10-12] We investigated the relation between the minimum age of handgun purchase in US states and suicide among adolescents.

## WHAT'S ALREADY KNOWN ON THIS TOPIC

Firearms are a particularly lethal means of suicide attempts

Access to firearms is associated with suicide for the general population and for adolescents

A study based on suicide data from 1976 to 2001 found that policies restricting the sale of handguns to those aged 21 or older were associated with reductions in firearm related suicides but not overall suicides among adolescents aged 18 to 20 years

## WHAT THIS STUDY ADDS

In a regression discontinuity analysis, restricting the sale of handguns to purchasers aged 18 years or older, relative to 21 years or older, was associated with an increased suicide rate among adolescents aged 18 to 20 years

In a difference-in-differences analysis, lowering the age minimum for handgun purchases from 21 to 18 years was associated with an increase in the suicide rate among adolescents aged 18 to 20 years in two states

Increasing the age of handgun purchases from 18 to 21 years was not associated with a change in the suicide rate in two states with high levels of household firearm ownership

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

Exhibit C
Page 34

1

A 1968 US federal law required that licensed firearms dealers only sell handguns to those aged 21 or older, but it did not impose a minimum purchaser age on unlicensed sales. The 1994 Brady Handgun Violence Prevention Act[13] limited all firearm sales across the US to purchasers aged 18 years or older. By June 2020, 17 states had policies requiring the sale of unlicensed handguns to be limited to individuals aged 21 or older; the other 33 states continued to permit unlicensed sales to those aged 18 to 20 years.[14] Federal policy permits the sellers of firearms to be unlicensed if they do not regularly sell firearms for profit, without defining regular sales.[15]

Little evidence exists about whether policies for limiting handgun sales to those aged 21 or older are associated with deaths from suicide, particularly since the introduction of the 1994 Brady act. One study evaluated the link between suicides and laws for minimum purchase age passed in 29 states between 1976 and 2001 and found that the policies for limiting handgun sales to those aged 21 or older were associated with statistically significant reductions in firearm related suicides but not in overall suicides.[16] This study was based on a difference-in-differences design but did not examine pre-period trends in all cause suicide to assess the suitability of the comparison group. We conducted an analysis based on more recent data most relevant to the current policy environment, including a difference-in-differences analysis in which we evaluated parallel trends.

We estimated the impact of policies to restrict the sale of handguns to those aged 21 or older on suicide rates in adolescents. We used two methods for analyzing observational data: a regression discontinuity approach to evaluate whether suicide rates among adolescents aged 18 to 20 diverged from age trends in suicide rates among adolescents aged 13 to 17 when states limited handgun purchases to those aged 18 or older relative to aged 21 or older; and a difference-in-differences approach to compare temporal trends in the suicide rate in states that changed policies relative to all other states. We conducted difference-in-differences analyses based on two states that rescinded the age 21 minimum and two states that implemented the age 21 minimum.

## Methods

### Sample

We obtained data on suicide rates by state and age from 1999 to 2018.[3] For the regression discontinuity analysis, we excluded states with policy changes. To include as many states as possible, we used data from 2001 to 2017 (two states changed policies in 2018 and two states changed policies between 1999 and 2001). We included the full population of adolescents aged 13 to 20 years in all 46 US states that did not change their policies between 2001 and 2017. Four states—Missouri, South Carolina, West Virginia, and Wyoming—implemented policy changes between 2001 and 2017 and were therefore excluded.[14 17]

For the difference-in-differences analyses, we determined that Missouri, South Carolina, West Virginia, and Wyoming implemented policy changes between 2004 and 2013, the period that allowed for at least five years of data before and after each state policy change. The sample was the full US population of adolescents aged 18 to 20 years from 2002 to 2014, the period five years preceding and five years following policy changes in the four intervention states (policy changes occurred between 2007 and 2010).

### Data

The main exposure of interest for the regression discontinuity analysis was being aged 18 to 20 years old in a state with a policy that limited handgun sales to purchasers aged 18 or older (versus aged 21 or older). From the State Firearms Law Database[14] and the Giffords Center law database[17] we determined that the minimum age for handgun purchasers throughout the study period was 18 years in 34 states and 21 years in 12 states. The two databases had consistent information on state handgun purchaser age, with the exception of Illinois, where adolescents aged 18 to 20 years can purchase a handgun with parental permission; we considered Illinois to have a minimum purchaser age of 18 years. We weighted data based on the size of the state population aged 13 to 20 years.

The main exposure of interest for the difference-in-differences analysis was a policy change in the minimum purchaser age for handgun sales. In August 2007, Missouri implemented a policy to reduce the minimum purchaser age from 21 to 18 years, when it repealed the Missouri Revised Statutes Section 571.090. In the same year, Missouri rescinded its policy requiring a permit and background check to purchase handguns. In April 2008, South Carolina implemented the 2008 South Carolina Laws Act 192 (H.B. 4364), reducing the minimum purchaser age from 21 to 18 years. In contrast, in 2010, West Virginia amended Section 61-7-10 of the Code of West Virginia, restricting unlicensed firearm sales to the licensed firearm sales age, thereby limiting handgun sales to purchasers aged 21 years or older. In March 2010, Wyoming increased the minimum age of handgun purchase from 18 to 21 years with the Wyoming Firearms Freedom Act.[18] We considered the policy change period to begin in the calendar year of policy implementation in each state.

The main outcomes were suicide rate by age (regression discontinuity analysis) or by year (difference-in-differences analysis). From the National Vital Statistics System, we obtained cause specific and intent specific suicide data for the full US population in the relevant age group, with deaths classified using ICD-10 codes (international classification of diseases, 10th revision). We used US Census data on population size by age, state, and year drawn from the Web-based Injury Statistics Query And Reporting System (WISQARS).[3] From this same system we also calculated covariate data on population density and demographic characteristics.

Exhibit C
Page 35

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

doi: 10.1136/bmj.m2436 | *BMJ* 2020;370:m2436 | the**bmj**

## Analysis

In the regression discontinuity analysis, we described population characteristics in states with age 18 relative to age 21 handgun sales policies and among those younger (ages 13 to 17) and older (ages 18 to 20) than the age 18 threshold. We used a modified regression discontinuity approach[19 20] based on the discontinuity in access to firearms when people reached the age of 18 years in states with a minimum handgun purchaser age of 18 years. The premise is that adolescents just above and just below age 18 years have similar characteristics but differ in their access to firearms when the age of handgun purchase is 18 years; we evaluated whether the adolescent populations above and below the threshold had similar characteristics by comparing the ethnicity/race of the adolescent populations aged 13 to 17 and aged 18 to 20 in each policy group. We extended the typical regression discontinuity analysis by using states with a minimum handgun purchaser age of 21 years as a comparison group. To account for overdispersion, we estimated negative binomial regression models, with total suicides as the outcome and log population as an offset (appendix equations 1 and 2). The main indicators of interest were a binary indicator for being aged 18 to 20 years in a state with a minimum handgun purchaser age of 18 years and a term interacting this binary indicator with continuous age. We also adjusted for age and a second order polynomial for age. We estimated the number of suicides that would be averted with a minimum handgun purchaser age of 21 years, by computing and summing the predicted probabilities of suicide at each age between 18 and 20 years in states with an age 18 relative to age 21 handgun purchaser minimum. Trends in suicide rates by age are depicted graphically by minimum age of handgun sales for all states without policy changes from 2001 to 2017 and for the intervention states during the five years prior to and following policy changes. In a sensitivity analysis, we estimated a model that allowed for differing age trends in states with different policies through terms interacting continuous age and age squared with the policy group.

In the difference-in-differences approach[21 22] we compared changes in suicide rates before and after policy changes with changes in the suicide rates over time in comparison states. As a first step, we compared population characteristics in intervention and comparison states.

An important assumption in difference-in-differences analyses is that there would be parallel trends in the outcome in intervention states and comparison states in the absence of any intervention; parallel trends in the pre-period suggest there would have been parallel trends in the post-period in the absence of a policy change. We tested for parallel trends by evaluating whether there were differences in temporal trends in suicide rates in intervention relative to comparison states before policy changes. The main regression analysis was repeated for the period before policy changes, interacting time in years with being

in an intervention state. Separate parallel trends tests were conducted on the states that decreased the age minimum age of handgun purchasers from 21 to 18 years in 2007 and 2008 and for the states that increased the age minimum from 18 to 21 years in 2010. We also repeated the main analysis as separate event study models[23 24] for states that decreased or increased the minimum age of handgun purchasers. In the event study models, we replaced the binary policy indicator with binary indicators for living in intervention states in a series of two year periods before and after policy changes. The reference group was being in a comparison state or being in an intervention state in the two year period before the policy change.

For the main difference-in-differences analysis, we estimated a linear regression model, with the rate of suicides per 100 000 adolescents as the outcome for total and for firearm and non-firearm suicides to determine if changes in firearm related suicides drove changes in total suicides. We chose a linear regression model based on evidence that maximum likelihood models underestimate standard errors in the presence of fixed effects.[25] The main indicator of interest was living in a policy change state during the period when handgun sales were restricted to those aged 21 or older. We included state and year fixed effects that controlled for each state and year and that capture any time invariant state characteristics, such as geography and the minimum age for handgun purchases in neighboring states. We adjusted for state characteristics that changed over time, including the proportion of firearm related suicide deaths in adults, population density, and the proportion of the population that was white or Native American. We adjusted for changes in state background check policies[26 27] and handgun permit to purchase policies[28] as documented in the State Firearms Law Database[14] and the Giffords Center law database.[17] We did not adjust for policies requiring locked storage of firearms because no states changed this policy during the study period. We know of no other policy changes that would have differentially affected suicides in intervention relative to comparison states. We weighted the analysis by the proportion of all adolescents aged 18 to 20 years who lived in each state in each year and clustered standard errors by state to account for serial autocorrelation.[29]

Difference-in-differences models with a small number of groups can lead to underestimation of standard errors.[30] To precisely estimate the P value of the main analysis, we ran 1000 permutations of the main analyses, randomly assigning states to "placebo" policy changes in the years when intervention states actually changed policies. Based on the distribution of $t$ statistics from this analysis, we calculated the likelihood of observing a $t$ statistic with an absolute value greater than that estimated in the main analysis. We calculated the per cent reduction in suicides relative to the mean rate in all states before 2007, when Missouri was the first study state with a policy change. We estimated the number of suicides that would

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

Exhibit C

Page 36

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

**RESEARCH**

be averted with handgun sales limited to purchasers with a minimum age of 21 relative to 18 in the 33 states with an age 18 minimum in March 2020 based on the most recent, 2018 data on the number of adolescents aged 18 to 20 years in each state.

To explore effect heterogeneity and further evaluate the parallel trends assumption, we repeated the main analysis with a term interacting the policy change with a binary indicator for increasing, relative to decreasing, the age of handgun sales. We also evaluated heterogeneity based on the separate event study models for states that decreased or increased the age of handgun sales.[23][24] Finally, we graphed estimates of the total and cause specific suicide fatality rate during the five years preceding and following policy changes in each intervention state and during the corresponding period in the 46 comparison states.

We conducted several difference-in-differences sensitivity analyses. To ensure the analysis was not sensitive to functional form, we repeated the analysis as a negative binomial regression, with total suicide deaths as the outcome and log population as the offset. To evaluate whether those not exposed to policy changes experienced changes in suicide rates, we repeated the main analysis among those aged 13 to 17 years. To evaluate alternative comparison groups, we estimated the effects of the policy changes relative to synthetic control states separately for the two states that changed the minimum age for handgun purchases from 21 to 18 years and from 18 to 21 years using the synth_runner package in Stata 15. The synthetic controls were generated from the subset of states with the same policies before intervention state policy changes. We estimated the deaths averted by multiplying annual effect estimates by state population size.[31] Finally, to ensure the analysis was not sensitive to the period in which the study was conducted, we repeated the main analysis separately over four years and over six years before and after policy changes.

### Patient and public involvement

Patients and the public were not involved in this study.

### Results

In the regression discontinuity analysis, the race/ethnicity of the population of adolescents older and younger than 18 years was similar (table 1), although the large population size meant that differences of less than 0.1 percentage points were statistically significant. Adolescents in states that limited the sale of handguns to those older than 21 years were more likely to be Asian or Pacific Islanders than those in states that limited the sale to age 18 and older. States with age 21 limits had lower firearm ownership in 2004 (24% $v$ 43%) and were more population dense (400 $v$ 89 people per square mile (154 $v$ 34 per square kilometer)).

In the regression discontinuity analysis, a discontinuity was found in the suicide rate (incident rate ratio 1.26, 95% confidence interval 1.10 to 1.45) and the slope of increases in the suicide rate with age

(1.09, 1.03 to 1.16) at age 18 in states with age 18 handgun sales policies (fig 1 and table 2). Based on the predicted probabilities of suicide at ages 18 to 20, an average of 344 adolescent suicide deaths would have been averted in each state with a minimum handgun purchaser age of 21 compared with age 18 from 2001 to 2017. In the sensitivity analysis that allowed for differing age trends in states with a minimum handgun purchaser age of 18 or age 21, the main effect estimates were consistent for the increase in the suicide rate at age 18 (1.19, 1.10 to 1.28) and the increase in the slope of the increase in the rate (1.23, 1.14 to 1.32); based on the predicted probabilities of suicide in this analysis, an estimated 406 deaths would have been averted with a minimum handgun purchaser age of 21 compared with age 18.

In the difference-in-differences analysis, the characteristics of adolescents in the intervention states differed from those in the comparison states (table 3). In particular, comparison states had greater population density and lower firearm ownership, and a greater share of the adolescent population was Asian or Pacific Islander. Household firearm ownership was particularly high in Wyoming (66%) and West Virginia (59%) relative to comparison states (38%), and population density was particularly low in Wyoming relative to comparison states (5 $v$ 170 people per square mile (2 $v$ 65 people per square kilometer)).

The event studies show that temporal trends in suicide rates in intervention states (Missouri, South Carolina, West Virginia, and Wyoming) relative to comparison states were characterized by fluctuations but were relatively parallel to trends in comparison states before policy changes (fig 2). The tests for parallel trends also indicated that temporal trends in suicide rates did not differ in Missouri and South Carolina (which decreased the minimum age of handgun purchase) relative to comparison states for total (0.02 suicides per 100 000 adolescents per year, 95% confidence interval −0.57 to 0.61, appendix table 2) or cause specific suicides (firearms: 0.03 suicides per 100 000 adolescents per year, −0.42 to 0.47; non-firearms: fewer than −0.01 suicides per 100 000 adolescents per year, −0.28 to 0.27). Although there were no statistically significant differences in the trends in the total suicide rate (−0.91 suicides per 100 000 adolescents per year, −2.05 to 0.23) or cause specific suicide rate (firearms: −0.46 suicides per 100 000 adolescents per year, −1.96 to 1.04; non-firearms: −0.45 suicides per 100 000 adolescents per year, −0.88 to 0.03) in West Virginia and Wyoming (which increased the minimum age of handgun purchase) relative to comparison states, the downward trend in suicide rates before the policy changes could suggest that any decline in suicide rates after these states increased the age for purchase of handguns was the result of a pre-existing downward trend in suicide rates.

In the difference-in-differences analysis, limiting the age of handgun purchase to those 21 years or older was associated with an average of 1.91 fewer suicides per 100 000 adolescents aged 18 to 20 years (−3.13 to

4

doi: 10.1136/bmj.m2436 | *BMJ* 2020;370:m2436 | thebmj

Exhibit 4c
Page 37

Table 1 | Characteristics of adolescents above and below the age threshold in states with a minimum age of 21 or 18 years for the purchase of handguns, 2001-17. Values are numbers (percentages) unless stated otherwise

| Characteristics | Age 13-17 years | Age 18-20 years | P value |
|---|---|---|---|
| **Minimum age 18 for handgun sales (n=363 946 635 in 34 states)** | | | |
| Race: | | | |
|   White | 175 117 772 (77.5) | 106 739 756 (77.4) | <0.001 |
|   Black | 38 968 541 (17.2) | 23 552 489 (17.1) | <0.001 |
|   Native American | 4 399 178 (1.9) | 2 595 448 (1.9) | <0.001 |
|   Asian/Pacific Islander | 7 531 743 (3.3) | 5 041 708 (3.7) | <0.001 |
| Population density (people/square mile) | 34 (89.4) | – | – |
| Household firearm ownership (50 states) | 34 (43.0) | – | – |
| **Minimum age 21 for handgun sales (n=190 515 326 in 12 states)** | | | |
| Race: | | | |
|   White | 88 745 290 (75.0) | 54 220 002 (75.0) | <0.001 |
|   Black | 17 228 045 (14.6) | 10 197 231 (14.1) | <0.001 |
|   Native American | 1 627 432 (1.4) | 1 009 453 (1.4) | <0.001 |
|   Asian/Pacific Islander | 10 648 459 (9.0) | 6 839 414 (9.5) | <0.001 |
| Population density (people/square mile) | 12 (400.4) | – | – |
| Household firearm ownership (50 states) | 12 (24.1) | – | – |

Household firearm ownership is from the 2004 the Behavioral Risk Factor Surveillance System.



**Handgun sales period**
— Age 18
– – Age 21

**States that changed the minimum purchaser age for handgun sales (n=4), five years before and after policy changes**

Suicides per 100 000 adolescents

**States that did not change the minimum purchaser age for handgun sales, 2001-17 (n=46)**

Suicides per 100 000 adolescents

Age

Fig 1 | Suicide rate by age and minimum age of handgun purchase policy in states that changed policies and in states that did not change policies. Top panel: total suicide rate (with 95% confidence intervals) by age during the five years before and after policy changes (2002-06 and 2007-11 in Missouri; 2003-07 and 2008-12 in South Carolina; 2005-09 and 2010-14 in West Virginia and Wyoming). Missouri and South Carolina had a minimum handgun purchase age of 21 in the earlier periods and changed the minimum to age 18 in the later periods. West Virginia and Wyoming had a minimum handgun purchase age of 18 in earlier periods and changed the minimum to age 21 in later periods. Bottom panel: total suicide rate (with 95% confidence intervals) by age in states with age 21 and age 18 minimum handgun purchase age policies throughout 2001-17

−0.70, permutation adjusted P=0.025, table 4); this would be equivalent to an 18.1% reduction relative to a mean of 10.54 suicides per 100 000 adolescents between 2002 and 2006. With 1220 suicide fatalities among adolescents aged 18 to 20 years in 2018 in the 33 states that did not have a minimum age of 21 years for handgun purchases by March 2020, an 18.1% reduction would be equivalent to 221 (range 81-362) fewer suicides each year if all 33 states passed laws to limit the sale of handguns to those aged 21 or older. Policies limiting handgun purchases to people aged 21 or older were associated with 35.5% reduction in firearm related suicides (−1.83 suicides per 100 000 adolescents, −2.66 to −1.00, permutation adjusted P=0.002). No association was found between limiting the age of handgun sales to age 21 or older and non-firearm related suicides (−0.08 suicides per 100 000 adolescents, −0.70 to 0.54, permutation adjusted P=0.771).

In the heterogeneity analysis, there was not a statistically significant interaction between policies limiting handgun sales to those aged 21 or older and the direction of the policy change (increasing relative to decreasing) for total suicides (−0.05 suicides per 100 000 adolescents, −4.57 to 4.47, appendix table 3) or firearm related suicides (0.71 suicides per 100 000 adolescents, −2.37 to 3.79). However, the event study estimates depicted in figure 2 and the state specific estimates depicted in appendix figure 1 clearly show that the average difference-in-differences effect estimate was driven by an increase in the suicide rate in states that lowered the age that handguns could be purchased (Missouri and South Carolina) and no effect in the states that increased the age for handgun purchases (West Virginia and Wyoming).

Each of the difference-in-differences sensitivity analyses were consistent with the main results. The negative binomial regression analysis indicated that the total suicide rate decreased by 18% (incident rate ratio 0.82, 95% confidence interval 0.75 to 0.90, appendix table 3). In the falsification test among adolescents aged 13 to 17, limiting the age for handgun purchases to age 21 or older was not associated with changes in the total suicide rate (0.55 suicides per 100 000 adolescents, 95% confidence interval −0.20 to 1.29, appendix table 5) in this group who would not have been affected by policy changes. The synthetic control analyses were consistent with the event study estimates, indicating that reducing the age of handgun purchases from 21 to 18 years was associated with an estimated 42 more suicide deaths (average increase of 1.50 suicides per 100 000 adolescents, standardized P<0.001, appendix figure 2 parts (a) and (b) among adolescents aged 18 to 20 years in Missouri and South Carolina. Increasing the age from 18 to 21 years was not associated with a significant change in the suicide rate in West Virginia and Wyoming (standardized P=0.72, appendix figure 2 parts (c) and (d)). Limiting the age of handgun purchases to age 21 or older were associated with suicides when including four years (−2.51 suicides per 100 000 adolescents, −3.82 to

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

Exhibit C
Page 38

**RESEARCH**

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

**Table 2 | Regression discontinuity analysis estimates for limiting handgun sales to purchasers age 18, relative to age 21 or older and suicides**

| Variables | Incident rate ratio (95% CI) |
|---|---|
| Treated (age 18-20 in states with age 18 limit on handgun sales, binary) | 1.26 (1.10 to 1.45) |
| Treated×continuous age | 1.09 (1.03 to 1.16) |
| Age (continuous) | 1.09 (1.04 to 1.14) |
| Age$^2$ (continuous) | 0.96 (0.95 to 0.97) |

Estimates are based on negative binomial regression analyses with log population as an offset. Data are from all states from 1999 to 2017 and are weighted based on state population size. Based on predicted probabilities, an average of 344 suicides would have been averted in each state between 2001 and 2017 among adolescents aged 18 to 20 years with policies restricting the minimum age of handgun sales to age 21 years relative to age 18 years.

−1.20, appendix table 6) and six years (−1.24 suicides per 100 000 adolescents, −2.33 to −0.70, appendix table 7) of data before and after policy changes.

**Discussion**

Suicide rates have been increasing in the US, particularly among adolescents.[32] In two complementary analyses, we found that policies restricting the sale of handguns to those aged 21 or older were associated with a reduction in suicide rates among adolescents. In our regression discontinuity analysis of deviations in age trends among adolescents aged 18 to 20 years, policies that limited the sale of handguns to those aged 18 or older were associated with an absolute increase in suicides at age 18 years and an increase in the slope of age trends in suicide. In this analysis, we estimated an excess of 344 suicides among adolescents aged 18 to 20 years in each state with a minimum age of 18 years, relative to 21 years, for the purchase of handguns.

In our difference-in-differences analyses, policies restricting the sale of handguns to ages 21 or older were associated with 1.91 fewer suicides per 100 000 adolescents aged 18 to 20 years, equivalent to an 18.1% relative reduction in the total suicide rate. Event study estimates revealed that the result was driven by increases in suicide rates in states that lowered the age for handgun purchases, with no effect in the states that increased the age. It is possible that the high levels of firearm ownership in Wyoming and West Virginia (66% and 59% of households in 2004, relative to 38% in the 46 comparison states) meant that the change in age of handgun purchases had little effect on access to firearms by adolescents in these states.

The main result was robust to several sensitivity analyses varying the form of the regression, the time

period of the study, and a synthetic comparison group. In cause specific analyses, there was a 35.5% reduction in the firearm suicide rate, while there was no change in the non-firearm suicide rate.

Our findings that policies restricting the age of handgun purchases to age 21 or older are associated with a reduction in suicides among adolescents contribute to research indicating that restriction of the means of access, particularly to firearms, is associated with a reduction in suicides.[6-8] Past research indicates that child access prevention laws requiring firearms to be stored in a locked location are associated with an 8% reduction in suicides among adolescents younger than 17 years.[16] Our estimate of an 18% reduction in suicide is consistent with previous estimates of means restriction, which were associated with 10% to 34% reductions in suicide.[33-35] As a rare outcome, suicide is difficult to study in randomized trials and in policy studies. Evidence on the efficacy of strategies to reduce suicide among adolescents, including antidepressants for those with depression, is mixed.[36 37] Recent evidence suggests that policies raising the incomes of low wage workers are associated with a reduction in suicides, with a 10% increase in the earned income tax credit associated with a 5.5% decline in suicides and a 10% increase in the minimum wage associated with a 3.6% decline in suicides.[38]

**Strengths and limitations of this study**

The strengths of this study include the use of data on the full population of adolescents in all US states and the complementary, rigorous analytical approaches. At the same time, this observational study is subject to several limitations. Suicide is a rare and a stigmatized outcome, and it is possible that deaths due to suicidal intent were underreported.[39] Suicides might also be related to each other in ways that we could not detect in our analysis and which would not be fully captured by clustering standard errors by state. In the difference-in-differences study, spillover effects and the possibility that adolescents aged 18 to 20 years might cross state lines to purchase firearms in neighboring states with lower ages for handgun purchases could have led us to underestimate policy effects. We also could not control for unmeasured state characteristics that changed over time. Although state characteristics that do not change over time should not affect the difference-

**Table 3 | Characteristics of adolescents aged 18 to 20 years in intervention and comparison states, 2002-14. Values are numbers (percentages) unless stated otherwise**

| Characteristics | Person years in intervention states (n=7 197 257) | Person years in 46 comparison states (n=161 736 784) | P value |
|---|---|---|---|
| Race: | | | |
| White | 5 549 361 (77.1) | 123 976 436 (76.7) | <0.001 |
| Black | 1 462 380 (20.3) | 26 044 785 (16.1) | <0.001 |
| Native American | 54 867 (0.8) | 2 775 827 (1.7) | <0.001 |
| Asian/Pacific Islander | 130 649 (1.8) | 8 939 736 (5.5) | <0.001 |
| Population density (people/square mile) | 76 | 170 | <0.001 |
| Household firearm ownership (50 states) | 52.9 | 38.4 | <0.001 |

1 square mile=2.6 square kilometers.
West Virginia and Wyoming were outliers for some demographic characteristics. The population density in Wyoming was 5 per square mile. Household firearm ownership was 66% in Wyoming and 59% in West Virginia, whereas household firearm ownership was 43% in South Carolina and 44% in Missouri.

Exhibit C
Page 39

doi: 10.1136/bmj.m2436 | BMJ 2020;370:m2436 | the bmj



**Decreasing age of handgun sales in Missouri and South Carolina relative to 46 comparison states**



**Increasing age of handgun sales in West Virginia and Wyoming relative to comparison states**

Fig 2 | Event study estimates of suicide rates among adolescents aged 18 to 20 years old. Coefficient estimates represent the estimated association between policy change and suicide rate in a given period relative to policy change. Estimated coefficients are based on running the main regression with all covariates, and the main policy variable replaced with binary indicators for years before or after policy changes in intervention states, with comparison states set to zero. Separate event studies were conducted for states that (top panel) decreased and (bottom panel) increased the minimum age of handgun purchase. Estimates were binned by two year periods because suicide is a rare event and individual year trends are volatile. The period immediately before the policy change was used as the reference period. The thin lines are 95% confidence intervals

in-differences analysis, differences existed between intervention and comparison states that could suggest different suicide mortality trajectories in these states. The generalizability of the difference-in-differences analyses is also limited. In such analyses we focused on just four states with policy changes. West Virginia and Wyoming passed the age 21 handgun sales policy and Missouri and South Carolina rescinded the age 21 handgun sales policy. The populations of each state differ substantially from those of the US population.

## Conclusion

This study found that state policies setting the minimum age of handgun sales to 21 years, such as those passed in Florida and Vermont in 2018 and in Washington in 2019, were associated with a reduction in suicides among adolescents aged 18 to 20 years. In a regression discontinuity analysis, minimum age 18 handgun purchase policies were associated with an average 344 excess deaths from suicide among adolescents aged 18 to 20 years in each state between 2001 and 2017, relative to a minimum age of 21 handgun purchase policies. In a difference-in-differences analysis, restricting the age of handgun purchases to age 21 or older were associated with an 18% reduction in the suicide rate among adolescents, an effect estimate driven by increases in the suicide rate in Missouri and South Carolina after those states eliminated age 21 handgun sales policies. Changing the age of handgun sales policies from 18 to 21 years across the country or in the 33 states without such policies might reduce deaths from suicide among adolescents. Such a change is in keeping with public sentiment—in 2018, 67% of American adults reported support for more policies regulating firearms.[40]

**Contributors:** JR conceived the study and drafted the manuscript. JR, EL, MS, MU, AK, CLB, and SG contributed to the acquisition, analysis, or interpretation of the data and to critical revision of the manuscript. JR and EL conducted the statistical analysis. MS obtained funding for the analysis. JR accepts full responsibility for the work as guarantor with full access to the data. The corresponding author attests that all listed authors meet authorship criteria and that no others meeting the criteria have been omitted.

**Funding:** This study was supported by the Robert Wood Johnson Foundation, Evidence for Action Program (grant #73337). The funder played no role in the study.

**Competing interests:** All authors have completed the ICMJE uniform disclosure form at www.icmje.org/coi_disclosure.pdf and declare: MS reports grants from the Robert Wood Johnson Foundation, during the conduct of the study; no support from any organization for the submitted work; no financial relationships with any organizations that might have an interest in the submitted work in the previous three years; no other relationships or activities that could appear to have influenced the submitted work.

**Ethical approval:** Not required.

**Data sharing:** Data are publicly available from the National Vital Statistics System. Data analysis files are available from the corresponding author at jraifman@bu.edu.

Table 4 | Results of difference-in-differences analysis on policies restricting the sale of handguns to age 21 or older and suicides in adolescents

| Variables | Suicide fatalities per 100 000 adolescents (95% CI) | | |
| --- | --- | --- | --- |
| | Total suicides | Firearm suicides | Non-firearm suicides |
| Age 21 handgun sales | −1.91* (−3.13 to −0.70) | −1.83† (−2.66 to −1.00) | −0.08 (−0.70 to 0.54) |
| Per cent of firearm related suicides among ages ≥21 years | −8.99 (−16.10 to −1.88) | −3.88 (−8.65 to 0.89) | −5.11 (−11.66 to 1.44) |
| Population density | 0.02 (−0.02 to 0.06) | 0.01 (−0.02 to 0.04) | 0.01 (−0.02 to 0.04) |
| Per cent of population of each race/ethnicity: | | | |
|   Native American | 1.02 (−0.84 to 2.88) | −1.65 (−3.22 to −0.09) | 2.68 (1.18 to 4.17) |
|   White | 0.65 (−0.22 to 1.52) | 0.14 (−0.45 to 0.74) | 0.50 (0.09 to 0.92) |
|   Other | Reference | | |
| Handgun permit policy | −0.69 (−1.24 to −0.14) | −0.48 (−1.04 to 0.08) | −0.21 (−0.92 to 0.51) |
| Universal background checks | −0.23 (−1.23 to 0.77) | 0.03 (−0.42 to 0.49) | −0.26 (−1.26 to 0.74) |

Main effect estimates are in the top row. State and year fixed effects are also included adjusting for each state and year.
*Permutation adjusted P<0.05.
†Permutation adjusted P<0.01 for main effect estimates.

Exhibit C
Page 40

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

**RESEARCH**

The manuscript's guarantor (JR) affirms that the manuscript is an honest, accurate, and transparent account of the study being reported; that no important aspects of the study have been omitted; and that any discrepancies from the study as planned have been explained.

**Dissemination to participants and related patient and public communities:** We will disseminate the research findings by creating a press release that summarizes the most important findings in the manuscript and links to the full manuscript. We will share the press release with media and with non-profit organizations focused on adolescent health, suicide prevention, and firearm injury prevention.

This is an Open Access article distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/.

1   Centers for Disease Control and Prevention. Data Briefs - Number 328 - November 2018. 2018. https://www.cdc.gov/nchs/products/databriefs/db328.htm (accessed 7 Dec 2018).

2   Centers for Disease Control and Prevention. 10 Leading Causes of Death by Age Group, United States - 2016. Atlanta, GA: 2016. https://www.cdc.gov/injury/images/lc-charts/leading_causes_of_death_age_group_2016_1056w814h.gif

3   Centers for Disease Control and Prevention. WISQARS (Web-based Injury Statistics Query and Reporting System) Injury Center.

4   Parker K, Horowitz JM, Igielnik R, et al. America's complex relationship with guns. Pew Res. Center's Soc. Demogr. Trends Proj. 2017. https://www.pewsocialtrends.org/2017/06/22/the-demographics-of-gun-ownership/ (accessed 6 Jun 2018).

5   Shenassa ED, Catlin SN, Buka SL. Lethality of firearms relative to other suicide methods: a population based study. J Epidemiol Community Health 2003;57:120-4. doi:10.1136/jech.57.2.120

6   Miller M, Barber C, White RA, Azrael D. Firearms and suicide in the United States: is risk independent of underlying suicidal behavior?Am J Epidemiol 2013;178:946-55. doi:10.1093/aje/kwt197

7   Miller M, Azrael D, Hepburn L, Hemenway D, Lippmann SJ. The association between changes in household firearm ownership and rates of suicide in the United States, 1981-2002. Inj Prev 2006;12:178-82. doi:10.1136/ip.2005.010850

8   Knopov A, Sherman RJ, Raifman JR, Larson E, Siegel MB. Household Gun Ownership and Youth Suicide Rates at the State Level, 2005-2015. Am J Prev Med 2019;56:335-42. doi:10.1016/j.amepre.2018.10.027

9   Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. N Engl J Med 1999;341:1583-9. doi:10.1056/NEJM199911183412106

10  Vermont General Assembly. S.55 (Act 94) An act relating to the disposition of unlawful and abandoned firearms. Vt. Legis. 2018. https://legislature.vermont.gov/bill/status/2018/S.55 (accessed 24 Oct 2018).

11  The Florida Senate. Senate Bill 7026: Public Safety. Fla. Senate. 2018. https://www.flsenate.gov/Session/Bill//2018/07026 (accessed 24 Oct 2018).

12  Chapter 9.41 RCW: FIREARMS AND DANGEROUS WEAPONS. https://app.leg.wa.gov/RCW/default.aspx?cite=9.41 (accessed 20 Mar 2020).

13  Public Law. Law 103-159. Brady Handgun Violence Prev Act 1993;18.

14  Siegel M, Pahn M, Xuan Z, et al. Firearm-related laws in all 50 US states, 1991-2016. Am J Public Health 2017;107:1122-9. doi:10.2105/AJPH.2017.303701

15  U.S. Department of Justice. Do I need a license to buy and sell firearms? Washington, D.C.: 2016. https://www.atf.gov/file/100871/download

16  Webster DW, Vernick JS, Zeoli AM, Manganello JA. Association between youth-focused firearm laws and youth suicides. JAMA 2004;292:594-601. doi:10.1001/jama.292.5.594

17  Giffords Law Center to Prevent Gun Violence. https://lawcenter.giffords.org/ (accessed 3 Mar 2020).

18  Sixtieth legislature of the state of Wyoming 2010 budget session. HB0095 - Wyoming Firearms Freedom Act-2. https://www.wyoleg.gov/Legislation/2010/HB0095 (accessed 10 Feb 2020).

19  Moscoe E, Bor J, Bärnighausen T. Regression discontinuity designs are underutilized in medicine, epidemiology, and public health: a review of current and best practice. J Clin Epidemiol 2015;68:122-33. doi:10.1016/j.jclinepi.2014.06.021

20  Bor J, Moscoe E, Mutevedzi P, Newell ML, Bärnighausen T. Regression discontinuity designs in epidemiology: causal inference without randomized trials. Epidemiology 2014;25:729-37. doi:10.1097/EDE.0000000000000138

21  Dimick JB, Ryan AM. Methods for evaluating changes in health care policy: the difference-in-differences approach. JAMA 2014;312:2401-2. doi:10.1001/jama.2014.16153

22  Wooldridge J. Econometric Analysis of Cross Section and Panel Data. MIT Press, 2010. https://mitpress.mit.edu/books/econometric-analysis-cross-section-and-panel-data-second-edition accessed 29 June 2020.

23  Goodman-Bacon A. Difference-in-differences with variation in treatment timing. NBER Working Paper No 25018. Issued in September 2018.

24  Venkataramani AS, Cook E, O'Brien RL, Kawachi I, Jena AB, Tsai AC. College affirmative action bans and smoking and alcohol use among underrepresented minority adolescents in the United States: A difference-in-differences study. PLoS Med 2019;16:e1002821. https://doi.org/10.1371/journal.pmed.1002821

25  Greene W. The behaviour of the maximum likelihood estimator of limited dependent variable models in the presence of fixed effects. Econom J 2004;7:98-119. doi:10.1111/j.1368-423X.2004.00123.x

26  Sen B, Panjamapirom A. State background checks for gun purchase and firearm deaths: an exploratory study. Prev Med 2012;55:346-50. doi:10.1016/j.ypmed.2012.07.019

27  Sumner SA, Layde PM, Guse CE. Firearm death rates and association with level of firearm purchase background check. Am J Prev Med 2008;35:1-6. doi:10.1016/j.amepre.2008.03.023

28  Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. Prev Med 2015;79:43-9. doi:10.1016/j.ypmed.2015.07.013.

29  Bertrand M, Duflo E, Mullainathan S. How much should we trust differences-in-differences estimates? National Bureau of Economic Research 2002. http://www.nber.org.ezp-prod1.hul.harvard.edu/papers/w8841 (accessed 4 May 2016).

30  Rokicki S, Cohen J, Fink G, et al. Inference With Difference-in-Differences With a Small Number of Groups: A Review, Simulation Study, and Empirical Application Using SHARE Data. Med Care 2017;56:97-105. doi:10.1097/MLR.0000000000000830.

31  Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health 2015;105:e49-54. doi:10.2105/AJPH.2015.302703

32  Stone DM, Simon TR, Fowler KA, et al. Vital Signs: Trends in State Suicide Rates - United States, 1999-2016 and Circumstances Contributing to Suicide - 27 States, 2015. MMWR Morb Mortal Wkly Rep 2018;67:617-24. doi:10.15585/mmwr.mm6722a1.

33  Kreitman N. The coal gas story. United Kingdom suicide rates, 1960-71. Br J Prev Soc Med 1976;30:86-93. doi:10.1136/jech.30.2.86.

34  Myung W, Lee G-H, Won H-H, et al. Paraquat prohibition and change in the suicide rate and methods in South Korea. PLoS One 2015;10:e0128980. doi:10.1371/journal.pone.0128980

35  Gunnell D, Fernando R, Hewagama M, Priyangika WD, Konradsen F, Eddleston M. The impact of pesticide regulations on suicide in Sri Lanka. Int J Epidemiol 2007;36:1235-42. doi:10.1093/ije/dym164.

36  Jane Garland E, Kutcher S, Virani A, Elbe D. Update on the Use of SSRIs and SNRIs with Children and Adolescents in Clinical Practice. J Can Acad Child Adolesc Psychiatry 2016;25:4-10.

37  Zalsman G, Hawton K, Wasserman D, et al. Suicide prevention strategies revisited: 10-year systematic review. Lancet Psychiatry 2016;3:646-59. doi:10.1016/S2215-0366(16)30030-X

38  Dow WH, Godøy A, Lowenstein CA, et al. Can Economic Policies Reduce Deaths of Despair? National Bureau of Economic Research, 2019, 10.3386/w25787.

39  Gosney H, Hawton K. Inquest verdicts: youth suicides lost. Psychiatrist 2007;31:203-5.

40  Gallup. Guns. Gallup.com. https://news.gallup.com/poll/1645/Guns.aspx (accessed 23 Jul 2018).

**Supplemental information:** equations and additional tables and figures

BMJ: first published as 10.1136/bmj.m2436 on 22 July 2020. Downloaded from http://www.bmj.com/ on 3 June 2021 by guest. Protected by copyright.

Exhibit C
Page 41

# EXHIBIT D

*Journal of Empirical Legal Studies*
Volume 16, Issue 2, 198–247, April 2019

# Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis

*John J. Donohue, Abhay Aneja, and Kyle D. Weber*[*]

This article uses more complete state panel data (through 2014) and new statistical techniques to estimate the impact on violent crime when states adopt right-to-carry (RTC) concealed handgun laws. Our preferred panel data regression specification, unlike the statistical model of Lott and Mustard that had previously been offered as evidence of crime-reducing RTC laws, both satisfies the parallel trends assumption and generates statistically significant estimates showing RTC laws *increase* overall violent crime. Our synthetic control approach also finds that RTC laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption. Using a consensus estimate of the elasticity of crime with respect to incarceration of 0.15, the average RTC state would need to roughly double its prison population to offset the increase in violent crime caused by RTC adoption.

## I. Introduction

For two decades, there has been a spirited academic debate over whether "shall-issue" concealed carry laws (also known as right-to-carry or RTC laws) have an important impact on crime. The "More Guns, Less Crime" hypothesis originally articulated by John Lott and David Mustard (1997) claimed that RTC laws decreased violent

---

[*]Address correspondence to John J. Donohue, Stanford Law School, 559 Nathan Abbott Way, Stanford, CA 94305; email: donohue@law.stanford.edu. Abhay Aneja, Haas School of Business, 2220 Piedmont Avenue, Berkeley, CA 94720; email: aaneja@law.stanford.edu; Kyle D. Weber, Columbia University, 420 W. 118th Street, New York, NY 10027; email: kdw2126@columbia.edu.

We thank Phil Cook, Dan Ho, Stefano DellaVigna, Rob Tibshirani, Trevor Hastie, Stefan Wager, Jeff Strnad, and participants at the 2011 Conference of Empirical Legal Studies (CELS), 2012 American Law and Economics Association (ALEA) Annual Meeting, 2013 Canadian Law and Economics Association (CLEA) Annual Meeting, 2015 NBER Summer Institute (Crime), and the Stanford Law School faculty workshop for their comments and helpful suggestions. Financial support was provided by Stanford Law School. We are indebted to Alberto Abadie, Alexis Diamond, and Jens Hainmueller for their work developing the synthetic control algorithm and programming the Stata module used in this paper and for their helpful comments. The authors would also like to thank Alex Albright, Andrew Baker, Jacob Dorn, Bhargav Gopal, Crystal Huang, Mira Korb, Haksoo Lee, Isaac Rabbani, Akshay Rao, Vikram Rao, Henrik Sachs and Sidharth Sah who provided excellent research assistance, as well as Addis O'Connor and Alex Chekholko at the Research Computing division of Stanford's Information Technology Services for their technical support.

Exhibit D
Page 43

crime (possibly shifting criminals in the direction of committing more property crime to avoid armed citizens). This research may well have encouraged state legislatures to adopt RTC laws, arguably making the pair's 1997 paper in the *Journal of Legal Studies* one of the most consequential criminological articles published in the last 25 years.

The original Lott and Mustard paper as well as subsequent work by John Lott in his 1998 book *More Guns, Less Crime* used a panel data analysis to support the theory that RTC laws reduce violent crime. A large number of papers examined the Lott thesis, with decidedly mixed results. An array of studies, primarily those using the limited data initially employed by Lott and Mustard for the period 1977–1992 and those failing to adjust their standard errors by clustering, supported the Lott and Mustard thesis, while a host of other papers were skeptical of the Lott findings.[1]

It was hoped that the 2005 National Research Council report *Firearms and Violence: A Critical Review* (hereafter the NRC Report) would resolve the controversy over the impact of RTC laws, but this was not to be. While one member of the committee—James Q. Wilson—did partially endorse the Lott thesis by saying there was evidence that murders fell when RTC laws were adopted, the other 15 members of the panel pointedly criticized Wilson's claim, saying that "the scientific evidence does not support his position." The majority emphasized that the estimated effects of RTC laws were highly sensitive to the particular choice of explanatory variables and thus concluded that the panel data evidence through 2000 was too fragile to support any conclusion about the true effects of these laws.

This article answers the call of the NRC Report for more and better data and new statistical techniques to be brought to bear on the issue of the impact of RTC laws on crime. First, we revisit the state panel data evidence to see if extending the data for an additional 14 years, thereby providing additional crime data for prior RTC states as well as on 11 newly adopting RTC states, offers any clearer picture of the causal impact of allowing citizens to carry concealed weapons. We distill from an array of different panel data regressions for various crime categories for two time periods using two major sets of explanatory variables—including our preferred specification (DAW) and that of Lott and Mustard (LM)—a subset of regressions that satisfy the critical parallel trends assumption. All the statistically significant results from these regressions show RTC laws are associated with *higher* rates of overall violent crime, property crime, or murder.

Second, to address some of the weaknesses of panel data models, we undertake an extensive synthetic control analysis in order to present the most complete and robust

---

[1]In support of Lott and Mustard (1997), see Lott's 1998 book *More Guns, Less Crime* (and the 2000 and 2010 editions). Ayres and Donohue (2003) and the 2005 National Research Council report *Firearms and Violence: A Critical Review* dismissed the Lott/Mustard hypothesis as lacking credible statistical support, as did Aneja et al. (2011) (and Aneja et al. (2014) further expanding the latter). Moody and Marvell (2008) and Moody et al. (2014) continued to argue in favor of a crime-reducing effect of RTC laws, although Zimmerman (2014) and McElroy and Wang (2017) find that RTC laws *increase* violent crime and Siegel et al. (2017) find RTC laws increase murders, as discussed in Section III.B.

results to guide policy in this area.[2] This synthetic control methodology—first introduced in Abadie and Gardeazabal (2003) and expanded in Abadie et al. (2010, 2014)—uses a matching methodology to create a credible "synthetic control" based on a weighted average of other states that best matches the prepassage pattern of crime for each "treated" state, which can then be used to estimate the likely path of crime if RTC-adopting states had not adopted an RTC law. By comparing the actual crime pattern for RTC-adopting states with the estimated synthetic controls in the postpassage period, we derive year-by-year estimates for the impact of RTC laws in the 10 years following adoption.[3]

To preview our major findings, the synthetic control estimate of the average impact of RTC laws across the 33 states that adopt between 1981 and 2007[4] indicates that violent crime is substantially higher after 10 years than would have been the case had the RTC law not been adopted. Essentially, for violent crime, the synthetic control approach provides a similar portrayal of RTC laws as that provided by the DAW panel data model and undermines the results of the LM panel data model. According to the aggregate synthetic control models—regardless of whether one uses the DAW or LM covariates—RTC laws led to increases in violent crime of 13–15 percent after 10 years, with positive but not statistically significant effects on property crime and murder. The median effect of RTC adoption after 10 years is 12.3 percent if one considers all 31 states with 10 years worth of data and 11.1 percent if one limits the analysis to the 26 states with the most compelling prepassage fit between the adopting states and their synthetic controls. Comparing our DAW specification findings with the results generated using placebo treatments, we are able to reject the null hypothesis that RTC laws have no impact on aggregate violent crime.

The structure of the article proceeds as follows. Section II begins with a discussion of the ways in which increased carrying of guns could either dampen crime (by thwarting or deterring criminals) or increase crime by directly facilitating violence or aggression by permit holders (or others), greatly expanding the loss and theft of guns, and burdening the functioning of the police in ways that diminish their effectiveness in controlling crime. We then show that a simple comparison of the drop in violent crime from

------

[2]Abadie et al. (2014) identify a number of possible problems with panel regression techniques, including the danger of extrapolation when the observable characteristics of the treated area are outside the range of the corresponding characteristics for the other observations in the sample.

[3]The accuracy of this matching can be qualitatively assessed by examining the root mean square prediction error (RMSPE) of the synthetic control in the pretreatment period (or a variation on this RMSPE implemented in this article), and the statistical significance of the estimated treatment effect can be approximated by running a series of placebo estimates and examining the size of the estimated treatment effect in comparison to the distribution of placebo treatment effects.

[4]Note that we do not supply a synthetic control estimate for Indiana, even though it passed its RTC law in 1980, owing to the fact that we do not have enough pretreatment years to accurately match the state with an appropriate synthetic control. Including Indiana as a treatment state, though, would not meaningfully change our results. Similarly, we do not generate synthetic control estimates for Iowa and Wisconsin (whose RTC laws went into effect in 2011) or for Illinois (2014 RTC law), because of the limited postpassage data.

1977–2014 in the states that have resisted the adoption of RTC laws is almost an order of magnitude greater than in RTC-adopting states (a 42.3 percent drop vs. a 4.3 percent drop), although a spartan panel data model with only state and year effects reduces the differential to 20.2 percent. Section III discusses the panel data results, showing that the DAW model indicates that RTC laws have increased violent and property crime, with weaker evidence that RTC laws increased homicide (but not non-gun homicide) over our entire data period, while both the DAW and the LM model provide statistically significant evidence that RTC laws have increased murder in the postcrack period.

The remainder of the article shows that, using either the DAW or LM explanatory variables, the synthetic control approach uniformly supports the conclusion that RTC laws lead to substantial increases in violent crime. Section IV describes the details of our implementation of the synthetic control approach and shows that the mean and median estimates of the impact of RTC laws show greater than double-digit increases by the 10th year after adoption. Section V provides aggregate synthetic control estimates of the impact of RTC laws, and Section VI concludes.

# II. The Impact of RTC Laws: Theoretical Considerations and Simple Comparisons

## A. *Gun Carrying and Crime*

### 1. Mechanisms of Crime Reduction

Allowing citizens to carry concealed handguns can influence violent crime in a number of ways, some benign and some invidious. Violent crime can fall if criminals are deterred by the prospect of meeting armed resistance, and potential victims or armed bystanders may thwart or terminate attacks by either brandishing weapons or actually firing on the potential assailants. For example, in 2012, a Pennsylvania concealed carry permit holder became angry when he was asked to leave a bar because he was carrying a weapon and, in the ensuing argument, he shot two men, killing one, before another permit holder shot him (Kalinowski 2012). Two years later, a psychiatric patient in Pennsylvania killed his caseworker, and grazed his psychiatrist before the doctor shot back with his own gun, ending the assault by wounding the assailant (Associated Press 2014).

The impact of the Pennsylvania RTC law is somewhat ambiguous in both these cases. In the bar shooting, it was a permit holder who started the killing and another who ended it, so the RTC law may actually have increased crime. The case of the doctor's use of force is more clearly benign, although the RTC law may have made no difference: a doctor who routinely deals with violent and deranged patients would typically be able to secure a permit to carry a gun even under a may-issue regime. Only a statistical analysis can reveal whether in aggregate extending gun carrying beyond those with a demonstrated need and good character, as shall-issue laws do, imposes or reduces overall costs.

Some defensive gun uses can be socially costly and contentious even if they do avoid a robbery or an assault. For example, in 1984, when four teens accosted Bernie Goetz on a New York City subway, he prevented an anticipated robbery by shooting all four,

permanently paralyzing one.[5] In 2010, a Pennsylvania concealed carry holder argued that he used a gun to thwart a beating. After a night out drinking, Gerald Ung, a 28-year-old Temple University law student, shot a 23-year-old former star lacrosse player from Villanova, Eddie DiDonato, when DiDonato rushed Ung angrily and aggressively after an altercation that began when DiDonato was bumped while doing chin ups on scaffolding on the street in Philadelphia. When prosecuted, Ung testified that he always carried his loaded gun when he went out drinking. A video of the incident shows that Ung was belligerent and had to be restrained by his friends before the dispute became more physical, which raises the question of whether his gun carrying contributed to his belligerence, and hence was a factor that precipitated the confrontation. Ung, who shot DiDonato six times, leaving DiDonato partially paralyzed with a bullet lodged in his spine, was acquitted of attempted murder, aggravated assault, and possessing an instrument of crime (Slobodzian 2011). While Ung avoided criminal liability and a possible beating, he was still prosecuted and then hit with a major civil action, and the incident did impose significant social costs, as shootings frequently do.[6]

In any event, the use of a gun by a concealed carry permit holder to thwart a crime is a statistically rare phenomenon. Even with the enormous stock of guns in the United States, the vast majority of the time that someone is threatened with violent crime no gun will be wielded defensively. A five-year study of such violent victimizations in the United States found that victims reported failing to defend or to threaten the criminal with a gun 99.2 percent of the time—this in a country with 300 million guns in civilian hands (Planty & Truman 2013). Adding 16 million permit holders who often dwell in low-crime areas may not yield many opportunities for effective defensive use for the roughly 1 percent of Americans who experience a violent crime in a given year, especially since criminals can attack in ways that preempt defensive measures.[7]

### 2. Mechanisms of Increasing Crime

Since the statistical evidence presented in this article suggests that the benign effects of RTC laws are outweighed by the harmful effects, we consider five ways in which RTC laws could increase crime: (a) elevated crime by RTC permit holders or by others, which can be induced by the greater belligerence of permit holders that can attend gun carrying or even through counterproductive attempts by permit holders to intervene protectively; (b) increased crime by those who acquire the guns of permit holders via loss or theft; (c) a change in culture induced by the hyper-vigilance about one's rights and the need

-------

[5]The injury to Darrell Cabey was so damaging that he remains confined to a wheelchair and functions with the intellect of an eight-year-old, for which he received a judgment of $43 million against Goetz, albeit without satisfaction (Biography.com 2016).

[6]According to the civil lawsuit brought by DiDonato, his injuries included "severe neurological impairment, inability to control his bowels, depression and severe neurologic injuries" (Lat 2012).

[7]Even big city police officers rarely need to fire a weapon despite their far greater exposure to criminals. According to a 2016 Pew Research Center survey of 7,917 sworn officers working in departments with 100 or more officers, "only about a quarter (27%) of all officers say they have ever fired their service weapon while on the job" (Morin & Mercer 2017).

to avenge wrongs that the gun culture can nurture; (d) elevated harm as criminals respond to the possibility of armed resistance by increasing their gun carrying and escalating their level of violence; and (e) all of the above factors will either take up police time or increase the risks the police face, thereby impairing the crime-fighting ability of police in ways that can increase crime.

*a. Crime committed or induced by permit holders:* RTC laws can lead to an increase in violent crime by increasing the likelihood a generally law-abiding citizen will commit a crime or increasing the criminal behavior of others. Moreover, RTC laws may facilitate the criminal conduct of those who generally have a criminal intent. We consider these two avenues below.

### i. The pathway from the law-abiding citizen

Evidence from a nationally representative sample of 4,947 individuals indicates that Americans tend to overestimate their gun-related abilities. For example, 82.6 percent believed they were less likely than the average person to use a gun in anger. When asked about their "ability to responsibly own a handgun," 50 percent of the respondents deemed themselves to be in the top 10 percent and 23 percent placed their ability within the top 1 percent of the U.S. population. Such overconfidence has been found to increase risk taking and could well lead to an array of socially harmful consequences ranging from criminal misconduct and gun accidents to lost or stolen guns (Stark & Sachau 2016).

In a number of well-publicized cases, concealed carry permit holders have increased the homicide toll by killing someone with whom they became angry over an insignificant issue, ranging from merging on a highway and talking on a phone in a theater to playing loud music at a gas station (Lozano 2017; Levenson 2017; Scherer 2016). In one particularly tragic example in January 2019 at a bar in State College, Pennsylvania, a lawful permit holder, Jordan Witmer, got into a fight with his girlfriend. When a father and son sitting at the bar tried to intervene, Witmer killed both of them, shot his girlfriend in the chest, and fled. When his car crashed, Witmer broke into a nearby house, killed the 82-year-old homeowner, who was with his wife on their 60th wedding anniversary, and then killed himself (Sauro 2019). Another such example occurred in July 2018 when Michael Drejka started to hassle a woman sitting in a car in a disabled parking spot while her husband and five-year-old son ran into a store. When the husband emerged, he pushed Drejka to the ground, who then killed him with a shot to the chest. The killing is caught on video and Drejka is being prosecuted for manslaughter in Clearwater, Florida (Simon 2018).

When Philadelphia permit holder Louis Mockewich shot and killed a popular youth football coach (another permit holder carrying his gun) over a dispute concerning snow shoveling in January 2000, Mockewich's car had an NRA bumper sticker reading "Armed with Pride" (Gibbons & Moran 2000). An angry young man, with somewhat of a paranoid streak, who has not yet been convicted of a crime or adjudicated as a "mental defective," may be encouraged to carry a gun if he resides in an RTC state.[8] That such

---

[8]The Gun Control Act of 1968 prohibits gun possession by felons and adjudicated "mental defectives" (18 U.S.C. 922(d)(4), 2016).

individuals will be more likely to be aggressive once armed and hence more likely to stimulate violence by others should not be surprising.

Recent evidence suggests that as gun carrying is increasing with the proliferation of RTC laws, road rage incidents involving guns are rising (Biette-Timmons 2017; Plumlee 2012). Incidents in which "someone in a car brandished a gun in a threatening manner or fired a gun at another driver or passenger have more than doubled in the last three years, from 247 in 2014 to 620 in 2016 …. The highest-profile recent road rage incidents involved two NFL players, Joe McKnight and Will Smith, killed … in separate road rage shootings in New Orleans" (Shen 2017).[9] In the nightmare case for RTC, two Michigan permit-holding drivers pulled over to battle over a tailgating dispute in September 2013 and each shot and killed the other (Stuart 2013). Without Michigan's RTC law, this would likely have not been a double homicide. Indeed, two studies—one for Arizona and one for the nation as a whole—found that "the evidence indicates that those with guns in the vehicle are more likely to engage in 'road rage'" (Hemenway et al. 2006; Miller et al. 2002).[10] These studies may suggest either that gun carrying emboldens more aggressive behavior or reflects a selection effect for more aggressive individuals.[11] If this is correct, then it may not be a coincidence that there are so many cases in which a concealed carry holder acts belligerently and is shot by another permit holder.[12]

———

[9]Joe McNight and Ronald Gasser were arguing through their open car windows as they drove for miles. When they were both stopped at a red light, McNight walked over to Gasser's car, and the "two argued through the passenger-side window until Gasser pulled a gun from between his seat and the center console and shot McNight three times." Gasser was convicted of manslaughter and sentenced to a prison term of 30 years (Calder 2018).

[10]A perfect illustration was provided by 25-year-old Minnesota concealed carry permit holder Alexander Weiss, who got into an argument after a fender bender caused by a 17-year-old driver. Since the police had been called, it is hard to imagine that this event could end tragically—unless someone had a gun. Unfortunately, Weiss, who had a bumper sticker on his car saying "Gun Control Means Hitting Your Target," killed the 17-year-old with one shot to the chest and has been charged with second-degree murder (KIMT 2018).

[11]While concealed carry permit holders should be free of any felony conviction, and thus show a lower overall rate of violence than a group that contains felons, a study in Texas found that when permit holders do commit a crime, it tends to be a severe one: "the concentration of convictions for weapons offenses, threatening someone with a firearm, and intentionally killing a person stem from the ready availability of a handgun for CHL holders" (Phillips et al. 2013). See, for example, a Texas permit holder who told police he shot a man in the head at an IHOP restaurant in Galveston because "he was annoyed by the noise the victim and others were making just a table away" (ABC News 2018).

[12]We have just cited three of them: the 2012 Pennsylvania bar shooting, the 2000 Philadelphia snow-shoveling dispute, and the 2013 Michigan road-rage incident. Here are two more. Former NFL player Will Smith, a concealed carry permit holder with a loaded gun in his car, was engaged in a road rage incident with another permit holder, who killed him with seven shots in the back and one into his side and shot his wife, hitting both knees. The shooter was convicted of manslaughter and sentenced to 25 years in prison (Lane 2018). In yet another recent case, two permit holders glowered at each other in a Chicago gas station, and when one drew his weapon, the second man pulled out his own gun and killed the 43-year-old instigator, who died in front of his son, daughter, and pregnant daughter-in-law (Hernandez 2017). A video of the encounter can be found at https://www.youtube.com/watch?v=I2j9vvDHlBU. According to the police report obtained by the *Chicago Tribune*, a bullet from the gun exchange broke the picture window of a nearby garden apartment and another shattered the window of a car with four occupants that was driving past the gas station. No charges were brought against the surviving permit holder, who shot first but in response to the threat initiated by the other permit holder.

In general, the critique that the relatively low number of permit revocations proves that permit holders do not commit enough crime to substantially elevate violent criminality is misguided for a variety of reasons. First, only a small fraction of 1 percent of Americans commits a gun crime each year, so we do not expect even a random group of Americans to commit much crime, let alone a group purged of convicted felons. Nonetheless, permit revocations clearly understate the criminal misconduct of permit holders, since not all violent criminals are caught and we have just seen five cases where six permit holders were killed, so no permit revocation or criminal prosecution would have occurred regardless of any criminality by the deceased.[13] Second, and perhaps more importantly, RTC laws increase crime by individuals other than permit holders in a variety of ways. The messages of the gun culture, perhaps reinforced by the adoption of RTC laws, can promote fear and anger, which are emotions that can invite more hostile confrontations leading to violence. For example, if permit holder George Zimmerman hassled Trayvon Martin only because Zimmerman was armed, then the presence of Zimmerman's gun could be deemed to have encouraged a hostile confrontation, regardless of who ultimately becomes violent.[14]

Even well-intentioned interventions by permit holders intending to stop a crime have elevated the crime count when they ended with the permit holder either being killed by the criminal[15] or shooting an innocent party by

─────

[13]In addition, NRA-advocated state laws that ban the release of information about whether those arrested for even the most atrocious crimes are RTC permit holders make it extremely difficult to monitor their criminal conduct.

[14]Psychologists have found that the very act of carrying a gun tends to distort perceptions of reality in a way that exaggerates perceived threats. "We have shown here that … the act of wielding a firearm raises the likelihood that nonthreatening objects will be perceived as threats. This bias can clearly be horrific for victims of accidental shootings" (Witt & Brockmole 2012). As one permit holder explained: "a gun causes its bearer to see the world differently. A well-lit city sidewalk full of innocent pedestrians becomes a scene—a human grouping one of whose constituents you might need to shoot. Something good in yourself is, by this means, sacrificed. And more. In a sudden, unwieldy hauling-out of your piece, or just by having your piece in your pocket, you can fumble around and shoot yourself, as often happens and isn't at all funny. Or you might shoot some little girl on a porch across the street or two streets away, or five streets away. Lots and lots of untoward things can happen when you're legally carrying a concealed firearm. One or two of them might turn out to be beneficial—to you. But a majority are beneficial to neither man nor beast. Boats are said, by less nautical types, always to be seeking a place to sink. Guns—no matter who has them—are always seeking an opportunity to go off. Anybody who says different is a fool or a liar or both" (Ford 2016).

[15]In 2016 in Arlington, Texas, a man in a domestic dispute shot at a woman and then tried to drive off (under Texas law it was lawful for him to be carrying his gun in his car, even though he did not have a concealed carry permit.) When he was confronted by a permit holder, the shooter slapped the permit holder's gun out of his hand and then killed him with a shot to the head. Shortly thereafter, the shooter turned himself into the police (Mettler 2016). Similarly, when armed criminals entered a Las Vegas Walmart in 2014 and told everyone to get out because "[t]his is a revolution," one permit holder told his friend he would stay to confront the threat. He was gunned down shortly before the police arrived, adding to the death toll rather than reducing it (NBC News 2014). Finally, in January 2010, Stephen Sharp arrived at work at a St. Louis power plant just as co-worker Timothy Hendron began firing at fellow workers with an AK-47. Retrieving a pistol from his truck, Sharp opened fire at Hendron, and fecklessly discharged all six rounds from across the parking lot. Unharmed, Hendron returned fire, grievously wounding Sharp and continuing his rampage unabated. When the police arrived, there was "no clear distinction between attacker and victims." In the end, Hendron killed three and wounded five before killing himself (Byers 2010).

mistake.[16] Indeed, an FBI study of 160 active shooter incidents found that in almost half (21 of 45) the situations in which police engaged the shooter to end the threat, law enforcement suffered casualties, totaling nine killed and 28 wounded (Blair & Schweit 2014). One would assume the danger to an untrained permit holder trying to confront an active shooter would be greater than that of a trained professional, which may in part explain why effective intervention in such cases by permit holders to thwart crime is so rare. Although the same FBI report found that in 21 of a total of 160 active shooter incidents between 2000 and 2013, "the situation ended after unarmed citizens safely and successfully restrained the shooter," there was only one case—in a bar in Winnemucca, Nevada in 2008—in which a private armed citizen other than an armed security guard stopped a shooter, and that individual was an active-duty Marine (Holzel 2008).

### ii. The pathway from those harboring criminal intent

Over the 10-year period from May 2007 through January 2017, the Violence Policy Center (2017) lists 31 instances in which concealed carry permit holders killed three or more individuals in a single incident. Many of these episodes are disturbingly similar in that there was substantial evidence of violent tendencies and/or serious mental illness, but no effort was made to even revoke the carry permit, let alone take effective action to prevent access to guns. For example, on January 6, 2017, concealed handgun permit holder Esteban Santiago, 26, killed five and wounded six others at the Fort Lauderdale-Hollywood Airport, before sitting on the floor and waiting to be arrested as soon as he ran out of ammunition. In the year prior to the shooting, police in Anchorage, Alaska, charged Santiago with domestic violence, and visited the home five times for various other complaints (KTUU 2017). In November 2016, Santiago entered the Anchorage FBI office and spoke of "mind control" by the CIA and having "terroristic thoughts" (Hopkins 2017). Although the police took his handgun at the time, it was returned to him on December 7, 2016 after Santiago spent four days in a mental health facility because, according to federal officials, "there was no mechanism in federal law for officers to permanently seize the weapon"[17] (Boots 2017). Less than a month later, Santiago flew with his gun to Florida and opened fire in the baggage claim area.[18]

In January 2018, the FBI charged Taylor Wilson, a 26-year-old Missouri concealed carry permit holder, with terrorism on an Amtrak train when, while carrying a loaded

---

[16]In 2012, "a customer with a concealed handgun license … accidentally shot and killed a store clerk" during an attempted robbery in Houston (MacDonald 2012). Similarly, in 2015, also in Houston, a bystander who drew his weapon upon seeing a carjacking incident ended up shooting the victim in the head by accident (KHOU 2015). An episode in June 2017 underscored that interventions even by well-trained individuals can complicate and exacerbate unfolding crime situations. An off-duty Saint Louis police officer with 11 years of service was inside his home when he heard the police exchanging gunfire with some car thieves. Taking his police-issued weapon, he went outside to help, but as he approached he was told by two officers to get on the ground and then shot in the arm by a third officer who "feared for his safety" (Hauser 2017).

[17]Moreover, in 2012, Puerto Rican police confiscated Santiago's handguns and held them for two years before returning them to him in May 2014, after which he moved to Alaska (Clary et al. 2017).

[18]For a similar story of repeated gun violence and signs of mental illness by a concealed carry permit holder, see the case of Aaron Alexis, who murdered 12 at the Washington Navy Yard in September 2013 (Carter et al. 2013).

weapon, he tried to interfere with the brakes and controls of the moving train. According to the FBI, Wilson had (1) previously joined an "alt-right" neo-Nazi group and traveled to the Unite the Right rally in Charlottesville, Virginia in August 2017; (2) indicated his interest in "killing black people" and was the perpetrator of a road-rage incident in which he pointed a gun at a black woman for no apparent reason while driving on an interstate highway in April 2016; and (3) possessed devices and weapons "to engage in criminal offenses against the United States." Research is needed to analyze whether having a permit to legally carry weapons facilitates such criminal designs (Pilger 2018).

In June 2017, Milwaukee Police Chief Ed Flynn pointed out that criminal gangs have taken advantage of RTC laws by having gang members with clean criminal records obtain concealed carry permits and then hold the guns after they are used by the active criminals (Officer.com 2017). Flynn was referring to so-called human holsters who have RTC permits and hold guns for those barred from possession. For example, Wisconsin permit holder Darrail Smith was stopped three times while carrying guns away from crime scenes before police finally charged him with criminal conspiracy. In the second of these, Smith was "carrying three loaded guns, including one that had been reported stolen," but that was an insufficient basis to charge him with a crime or revoke his RTC permit (DePrang 2015). Having a "designated permit holder" along to take possession of the guns when confronted by police may be an attractive benefit for criminal elements acting in concert (Fernandez et al. 2015; Luthern 2015).

*b. Increased gun thefts:* The most frequent occurrence each year involving crime and a good guy with a gun is not self-defense but rather the theft of the good guy's gun, which occurs hundreds of thousands of times each year.[19] Data from a nationally representative web-based survey conducted in April 2015 of 3,949 subjects revealed that those who carried guns outside the home had their guns stolen at a rate over 1 percent per year (Hemenway et al. 2017). Given the current level of roughly 16 million permit holders, a plausible estimate is that RTC laws result in permit holders furnishing more than 100,000 guns per year to criminals.[20] As Phil Cook has noted, the relationship between gun theft and crime is a complicated one for which few definitive data are currently available (Cook

---

[19]According to Larry Keane, senior vice president of the National Shooting Sports Foundation (a trade group that represents firearms manufacturers): "There are more guns stolen every year than there are violent crimes committed with firearms." More than 237,000 guns were reported stolen in the United States in 2016, according to the FBI's National Crime Information Center. The actual number of thefts is obviously much higher since many gun thefts are never reported to police, and "many gun owners who report thefts do not know the serial numbers on their firearms, data required to input weapons into the NCIC." The best survey estimated 380,000 guns were stolen annually in recent years, but given the upward trend in reports to police, that figure likely understates the current level of gun thefts (Freskos 2017b). According to National Crime Information Center data, the number of guns reported stolen nationally jumped 60 percent between 2007 and 2016 (Freskos 2018a).

[20]While the Hemenway et al. study is not large enough and detailed enough to provide precise estimates, it establishes that those who have carried guns in the last month are more likely to have them stolen. A recent Pew Research Survey found that 26 percent of American gun owners say they carry a gun outside of their home "all or most of the time" (Igielnik & Brown 2017, surveying 3,930 U.S. adults, including 1,269 gun owners). If 1 percent of 16 million permit holders have guns stolen each year, that would suggest 160,000 guns were stolen. Only guns stolen outside the home would be attributable to RTC laws, so a plausible estimate of guns stolen per year owing to gun carrying outside the home might be 100,000.

2018). But if there was any merit to the outrage over the loss of about 1,400 guns during the Fast and Furious program that began in 2009 and the contribution that these guns made to crime (primarily in Mexico), it highlights the severity of the vastly greater burdens of guns lost by and stolen from U.S. gun carriers.[21] A 2013 report from the Bureau of Alcohol, Tobacco, Firearms, and Explosives concluded that "lost and stolen guns pose a substantial threat to public safety and to law enforcement. Those that steal firearms commit violent crimes with stolen guns, transfer stolen firearms to others who commit crimes, and create an unregulated secondary market for firearms, including a market for those who are prohibited by law from possessing a gun" (Office of the Director—Strategic Management 2013; Parsons & Vargas 2017).

For example, after Sean Penn obtained a permit to carry a gun, his car was stolen with two guns in the trunk. The car was soon recovered, but the guns were gone (Donohue 2003). In July 2015 in San Francisco, the theft of a gun from a car in San Francisco led to a killing of a tourist on a city pier that almost certainly would not have occurred if the lawful gun owner had not left it in the car (Ho 2015). Just a few months later, a gun stolen from an unlocked car was used in two separate killings in San Francisco and Marin in October 2015 (Ho & Williams 2015). According to the National Crime Victimization Survey, in 2013 there were over 660,000 auto thefts from households. More guns being carried in vehicles by permit holders means more criminals will be walking around with the guns stolen from permit holders.[22]

As Michael Rallings, the top law enforcement official in Memphis, Tennessee, noted in commenting on the problem of guns being stolen from cars: "Laws have unintended consequences. We cannot ignore that as a legislature passes laws that make guns more accessible to criminals, that has a direct effect on our violent crime rate" (Freskos 2017a). An Atlanta police sergeant elaborated on this phenomenon: "Most of our criminals, they go out each and every night hunting for guns, and the easiest way to get them is out of people's cars. We're finding that a majority of stolen guns that are getting in the hands of criminals and being used to commit crimes were stolen out of vehicles" (Freskos 2017c). In 2015, 70 percent of guns reported stolen in Atlanta came from cars and trucks (Freskos 2016). Another Atlanta police officer stated that weapons stolen from cars "are used in crimes to shoot people, to rob people" because criminals find these guns to be easy to steal and hard to trace. "For them, it doesn't cost them anything to break into a car and steal a gun" (Freskos 2016).[23]

------

[21]"Of the 2,020 guns involved in the Bureau of Alcohol, Tobacco, Firearms, and Explosives probe dubbed 'Operation Fast and Furious,' 363 have been recovered in the United States and 227 have been recovered in Mexico. That leaves 1,430 guns unaccounted for" (Schwarzschild & Griffin 2011). Wayne LaPierre of the NRA was quoted as saying: "These guns are now, as a result of what [ATF] did, in the hands of evil people, and evil people are committing murders and crimes with these guns against innocent citizens" (Horwitz 2011).

[22]In early December 2017, the sheriff in Jacksonville, Florida announced that his office knew of 521 guns that had been stolen so far in 2017—from unlocked cars alone! (Campbell 2017).

[23]Examples abound: Tario Graham was shot and killed during a domestic dispute in February 2012 with a revolver stolen weeks earlier out of pickup truck six miles away in East Memphis (Perrusquia 2017). In Florida, a handgun stolen from an unlocked Honda Accord in mid-2014 helped kill a police officer a few days before Christmas that year (Sampson 2014). A gun stolen from a parked car during a Mardi Gras parade in 2017 was used a few days later to kill 15-year-old Nia Savage in Mobile, Alabama, on Valentine's Day (Freskos 2017a).

Of course, the permit holders whose guns are stolen are not the killers, but they can be the but-for cause of the killings. Lost, forgotten, and misplaced guns are another dangerous byproduct of RTC laws.[24]

*c. Enhancing a culture of violence:* The South has long had a higher rate of violent crime than the rest of the country. For example, in 2012, while the South had about one-quarter of the U.S. population, it had almost 41 percent of the violent crime reported to police (Fuchs 2013). Social psychologists have argued that part of the reason the South has a higher violent crime rate is that it has perpetuated a "subculture of violence" predicated on an aggrandized sense of one's rights and honor that responds negatively to perceived insults. A famous experiment published in the *Journal of Personality and Social Psychology* found that southern males were more likely than northern males to respond aggressively to being bumped and insulted. This was confirmed by measurement of their stress hormones and their frequency of engaging in aggressive or dominant behavior after being insulted (Cohen et al. 1996). To the extent that RTC laws reflect and encourage this cultural response, they can promote violent crime not only by permit holders, but by all those with or without guns who are influenced by this crime-inducing worldview.

Even upstanding citizens, such as Donald Brown, a 56-year-old retired Hartford firefighter with a distinguished record of service, can fall prey to the notion that resort to a lawful concealed weapon is a good response to a heated argument. Brown was sentenced to seven years in prison in January 2018 by a Connecticut judge who cited his "poor judgment on April 24, 2015, when he drew his licensed 9mm handgun and fired a round into the abdomen of Lascelles Reid, 33." The shooting was prompted by a dispute "over renovations Reid was performing at a house Brown owns" (Owens 2018). Once again, we see that the RTC permit was the pathway to serious violent crime by a previously law-abiding citizen.

*d. Increasing violence by criminals:* The argument for RTC laws is often predicated on the supposition that they will encourage good guys to have guns, leading only to benign effects on the behavior of bad guys. This is highly unlikely to be true.[25] Indeed, the

———

[24]The growing TSA seizures in carry-on luggage are explained by the increase in the number of gun carriers who simply forget they have a gun in their luggage or briefcase (Williams & Waltrip 2004). A chemistry teacher at Marjory Stoneman Douglas High School in Parkland, Florida, who had said he would be willing to carry a weapon to protect students at the school, was criminally charged for leaving a loaded pistol in a public restroom. The teacher's 9mm Glock was discharged by an intoxicated homeless man who found it in the restroom (Stanglin 2018).

[25]Consider in this regard, David Friedman's theoretical analysis of how right-to-carry laws will reduce violent crime: "Suppose one little old lady in ten carries a gun. Suppose that one in ten of those, if attacked by a mugger, will succeed in killing the mugger instead of being killed by him—or shooting herself in the foot. On average, the mugger is much more likely to win the encounter than the little old lady. But—also on average—every hundred muggings produce one dead mugger. At those odds, mugging is a very unattractive profession—not many little old ladies carry enough money in their purses to justify one chance in a hundred of being killed getting it. The number of muggers—and muggings—declines drastically, not because all of the muggers have been killed but because they have, rationally, sought safer professions" (Friedman 1990). There is certainly no empirical support for the conjecture that muggings will "decline drastically" in the wake of RTC adoption. What Friedman's analysis overlooks is that muggers can decide not to mug (which is what Friedman posits) or they can decide to initiate their muggings by cracking the old ladies over the head or by being

evidence that gun prevalence in a state is associated with higher rates of lethal force by police (even controlling for homicide rates) suggests that police may be more fearful and shoot quicker when they are more likely to interact with an armed individual (Nagin forthcoming).[26] Presumably, criminals would respond in a similar fashion, leading them to arm themselves more frequently, attack more harshly, and shoot more quickly when citizens are more likely to be armed. In one study, two-thirds of prisoners incarcerated for gun offenses "reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun" (Cook et al. 2009). Such responses by criminals will elevate the toll of the crimes that do occur.

Indeed, a panel data estimate over the years 1980 to 2016 reveals that the percentage of robberies committed with a firearm rises by 18 percent in the wake of RTC adoption ($t = 2.60$).[27] Our synthetic controls assessment similarly shows that the percentage of robberies committed with a firearm increases by 35 percent over 10 years ($t = 4.48$).[28] Moreover, there is no evidence that RTC laws are reducing the overall level of robberies: the panel data analysis associates RTC laws with a 9 percent higher level of overall robberies ($t = 1.85$) and the synthetic controls analysis suggests a 7 percent growth over 10 years ($t = 1.19$).

*e. Impairing police effectiveness:* According to an April 2016 report of the Council of Economic Advisers: "Expanding resources for police has consistently been shown to reduce crime; estimates from economic research suggests that a 10% increase in police size decreases crime by 3 to 10%" (CEA 2016:4). In summarizing the evidence on fighting crime in the *Journal of Economic Literature*, Aaron Chalfin and Justin McCrary note that adding police manpower is almost twice as effective in reducing violent crime as it is in reducing property crime (Chalfin & McCrary 2017). Therefore, anything that RTC laws do to occupy police time, from processing permit applications to checking for permit validity to dealing with gunshot victims, inadvertent gun discharges, and the staggering number of stolen guns is likely to have an opportunity cost expressed in higher violent crime.

The presence of more guns on the street can complicate the job of police as they confront (or shy away from) armed citizens. Daniel Nagin finds a pronounced positive association between statewide prevalence of gun ownership and police use of lethal force (Nagin forthcoming). A Minnesota police officer who stopped Philando Castile for a broken taillight shot him seven times only seconds after Castile indicated he had a permit to carry a weapon because the officer feared the permit holder might be reaching for the

---

prepared to shoot them if they start reaching for a gun (or even wear body armor). Depending on the response of the criminals to increased gun carrying by potential victims, the increased risk to the criminals may be small compared to the increased risk to the victims. Only an empirical evaluation can answer this question.

[26]See footnotes 29–31 and accompanying text for examples of this pattern of police use of lethal force.

[27]The panel data model uses the DAW explanatory variables set forth in Table 2.

[28]The weighted average proportion of robberies committed by firearm in the year prior to RTC adoption (for states that adopted RTC between 1981 and 2014) is 36 percent while the similar proportion in 2014 for the same RTC states is 43 percent (and for non-RTC states is 29 percent).

gun. Another RTC permit holder, stranded in his disabled car early one morning on a Florida highway exit ramp, grabbed the gun he had legally purchased three days earlier when a police officer in plainclothes pulled up in a van with tinted windows and no lights. "It was not immediately clear what happened after [the officer] got out of his van, but the permit holder at some point started running … and [the officer] fired six times," killing the permit holder, whose body fell "about 80 to 100 feet from his vehicle," with his undischarged handgun on the ground somewhere in between (Robles & Hauser 2015). After a similar encounter between an officer and a permit holder, the officer asked the gun owner: "Do you realize you almost died tonight?" (Kaste 2019).[29]

A policemen trying to give a traffic ticket has more to fear if the driver is armed. When a gun is found in a car in such a situation, a greater amount of time is needed to ascertain the driver's status as a permit holder. A lawful permit holder who happens to have forgotten his permit may end up taking up more police time through arrest and/or other processing.

Moreover, police may be less enthusiastic about investigating certain suspicious activities or engaging in effective crime-fighting actions given the greater risks that widespread gun carrying poses to them, whether from permit holders or the criminals who steal their guns.[30] In a speech at the University of Chicago Law School in October 2015, then-FBI Director James Comey argued that criticism of overly aggressive policing led officers to back away from more involved policing, causing violent crime to rise (Donohue 2017a). If the more serious concern of being shot by an angry gun toter impairs effective policing, the prospect of increased crime following RTC adoption could be far more substantial than the issue that Comey highlighted.[31]

---

[29]A permit to carry instructor has posted a YouTube video about "How to inform an officer you are carrying a handgun and live" that is designed to "keep yourself from getting shot unintentionally" by the police. The video, which has over 4.2 million views, has generated comments from non-Americans that it "makes the US look like a war zone" and leads to such unnatural and time-consuming behavior that "an English officer … would look at you like a complete freak" (Soderling 2016).

[30]"Every law enforcement officer working today knows that any routine traffic stop, delivery of a warrant or court order, or response to a domestic disturbance anywhere in the country involving people of any race or age can put them face to face with a weapon. Guns are everywhere, not just in the inner city" (Wilson 2016). In offering an explanation for why the United States massively leads the developed world in police shootings, criminologist David Kennedy stated: "Police officers in the United States in reality need to be conscious of and are trained to be conscious of the fact that literally every single person they come in contact with may be carrying a concealed firearm." For example, police in England and Wales shot and killed 55 people over the 25-year period from 1990–2014, while in just the first 24 days of 2015, the United States (with six times the population) had a higher number of fatal shootings by police (Lopez 2018).

[31]A vivid illustration of how even the erroneous perception that someone accosted by the police is armed can lead to deadly consequences is revealed in the chilling video of five Arizona police officers confronting an unarmed man they incorrectly believed had a gun. During the prolonged encounter, the officers shouted commands at an intoxicated 26-year-old father of two, who begged with his hands in the air not to be shot. The man was killed by five bullets when, following orders to crawl on the floor toward police, he paused to pull up his slipping pants. A warning against the open carry of guns issued by the San Mateo County, California, Sheriff's Office makes the general point that law enforcement officers become hyper-vigilant when encountering an armed individual: "Should the gun carrying person fail to comply with a law enforcement instruction or move in a way that could be construed as threatening, the police are forced to respond in kind for their own protection. It's well and good in hindsight to say the gun carrier was simply 'exercising their rights' but the result could be deadly" (Lunny 2010).

The presence of multiple gun carriers can also complicate police responses to mass shootings and other crimes. When police arrived at an Alabama mall in November 2018, they saw a 21-year-old concealed carry permit holder with gun drawn, and mistakenly killed him, thinking he was the shooter. In fact, the dead man had been assisting and protecting shoppers, and the real shooter escaped (McLaughlin & Holcombe 2018). Another benign intervention that ended in tragedy for the good guy with a gun occurred in July 2018 when police officers arrived as a "good Samaritan" with a concealed carry permit was trying to break up a fight in Portland, Oregon. The police saw the gun held by the permit holder—a Navy veteran, postal worker, and father of three—and in the confusion shot and killed him (Guevarra 2018).

Good guys with guns also can interfere with police anti-crime efforts. For example, police reported that when a number of Walmart customers (fecklessly) pulled out their weapons during a shooting on November 1, 2017, their "presence 'absolutely' slowed the process of determining who, and how many, suspects were involved in the shootings, said Thornton [Colorado] police spokesman Victor Avila" (Simpson 2017).

Similarly, in 2014, a concealed carry permit holder in Illinois fired two shots at a fleeing armed robber at a phone store, thereby interfering with a pursuing police officer. According to the police: "Since the officer did not know where the shots were fired from, he was forced to terminate his foot pursuit and take cover for his own safety" (Glanton & Sadovi 2014).

Indeed, preventive efforts to get guns off the street in high-crime neighborhoods are less feasible when carrying guns is presumptively legal. The passage of RTC laws normalizes the practice of carrying guns in a way that may enable criminals to carry guns more readily without prompting a challenge, while making it harder for the police to know who is and who is not allowed to possess guns in public.

Furthermore, negligent discharges of guns, although common, rarely lead to charges of violent crime but they can take up valuable police time for investigation and in determining whether criminal prosecution or permit withdrawal is warranted. For example, on November 16, 2017, Tennessee churchgoers were reflecting on the recent Texas church massacre in Sutherland Springs when a permit holder mentioned he always carries his gun, bragging that he would be ready to stop any mass shooter. While proudly showing his Ruger handgun, the permit holder inadvertently shot himself in the palm, causing panic in the church as the bullet "ripped through [his wife's] lower left abdomen, out the right side of her abdomen, into her right forearm and out the backside of her forearm. The bullet then struck the wall and ricocheted, landing under the wife's wheelchair." The gun discharge prompted a 911 call, which in the confusion made the police think an active shooting incident was underway. The result was that the local hospital and a number of schools were placed on lockdown for 45 minutes until the police finally ascertained that the shooting was accidental (Eltagouri 2017).[32]

---

[32]Negligent discharges by permit holders have occurred in public and private settings from parks, stadiums, movie theaters, restaurants, and government buildings to private households (WFTV 2015; Heath 2015). Thirty-nine-year-old Mike Lee Dickey, who was babysitting an eight-year-old boy, was in the bathroom removing his handgun from his waistband when it discharged. The bullet passed through two doors, before striking the child in his arm while he slept in a nearby bedroom (Associated Press 2015). In April 2018, a 21-year-old pregnant mother of two in

Everything that takes up added police time or complicates the job of law enforcement will serve as a tax on police, rendering them less effective on the margin, and thereby contributing to crime. Indeed, this may in part explain why RTC states tend to increase the size of their police forces (relative to nonadopting states) after RTC laws are passed, as shown in Table 1.[33]

### B. A Simple Difference-in-Differences Analysis

We begin by showing how violent crime evolved over our 1977–2014 data period for RTC and non-RTC states.[34] Figure 1 depicts percentage changes in the violent crime rate over our entire data period for three groups of states: those that never adopted RTC laws, those that adopted RTC laws sometime between 1977 and before 2014, and those that adopted RTC laws prior to 1977. It is noteworthy that the 42.3 percent drop in violent crime in the nine states that never adopted RTC laws is almost an order of magnitude greater than the 4.3 percent reduction experienced by states that adopted RTC laws during our period of analysis.[35]

The NRC Report presented a "no-controls" estimate, which is just the coefficient estimate on the variable indicating the date of adoption of a RTC law in a crime rate panel data model with state and year fixed effects. According to the NRC Report: "Estimating the model using data to 2000 shows that states adopting right-to-carry laws saw 12.9 percent increases in violent crime—and 21.2 percent increases in property crime—relative to national crime patterns." Estimating this same model using 14 additional years of data (through 2014) and 11 additional adopting states (listed at the bottom of Appendix Table C1) reveals that the average postpassage increase in violent crime was

---

Indiana was shot by her three-year-old daughter when the toddler's father left the legal but loaded 9mm handgun between the console and the front passenger seat after he exited the vehicle to go inside a store. The child climbed over from the backseat and accidentally fired the gun, hitting her mother though the upper right part of her torso. (Palmer 2018) See also Savitsky (2019) (country western singer Justin Carter dies when the gun in his pocket discharges and hits him in the face); Schwarz (2014) (Idaho professor shoots himself in foot during class two months after state legalizes guns on campuses); Murdock (2018) (man shoots himself in the groin with gun in his waistband in the meat section of Walmart in Buckeye, Arizona); Barbash (2018) (California teacher demonstrating gun safety accidentally discharges weapon in a high school classroom in March 2018, injuring one student); Fortin (2018) (in February 2018, a Georgia teacher fired his gun while barricaded in his classroom); US News (2018) (in April 2018, an Ohio woman with a valid concealed carry permit accidentally killed her two-year-old daughter at an Ohio hotel while trying to turn on the gun's safety); and Fox News (2016) ("the owner of an Ohio gun shop was shot and killed when a student in a concealed carry permit class accidentally discharged a weapon," striking the owner in the neck in a different room after the bullet passed through a wall).

[33]See Adda et al. (2014), describing how local depenalization of cannabis enabled the police to reallocate resources, thereby reducing violent crime.

[34]The FBI violent crime category includes murder, rape, robbery, and aggravated assault.

[35]Over the same 1977–2014 period, the states that avoided adopting RTC laws had substantially smaller increases in their rates of incarceration and police employment. The nine never-adopting states increased their incarceration rate by 205 percent, while the incarceration rates in the adopting states rose by 262 and 259 percent, for those adopting RTC laws before and after 1977, respectively. Similarly, the rate of police employment rose by 16 percent in the never-adopting states and by 38 and 55 percent for those adopting before and after 1977, respectively.

*214   Donohue et al.*

*Figure 1:*   The decline in violent crime rates has been far greater in states with no RTC laws, 1977−2014.



DATA SOURCES: UCR for crime rates; Census for state populations.
NOTE: Illinois excluded since its concealed carry law did not go into effect until 2014. From 1977–2013, the violent crime rate in Illinois fell by 36 percent, from 631 to 403 crimes per 100,000 people.

20.2 percent, while the comparable increase in property crime was 19.2 percent (both having $p$ values less than 5 percent).[36]

Of course, it does not prove that RTC laws increase crime simply because RTC states experience a worse postpassage crime pattern. For example, it might be the case that some states decided to fight crime by allowing citizens to carry concealed handguns while others decided to hire more police and incarcerate a greater number of convicted criminals. If police and prisons were more effective in stopping crime, the "no-controls" model might show that the crime experience in RTC states was worse than in other states even if this were not a true causal result of the adoption of RTC laws. As it turns out, though, RTC states not only experienced higher rates of violent crime but they also had larger increases in incarceration and police than other states. Table 1 provides panel data evidence on how incarceration and two measures of police employment changed after RTC adoption (relative to nonadopting states). All three measures rose in RTC states, and the 7–8 percent greater increases in police in RTC states are statistically significant. In other words, Table 1 confirms that RTC states did *not* have relatively declining rates of

<hr/>

[36]The dummy variable model reports the coefficient associated with a RTC variable that is given a value of 0 when a RTC law is not in effect in that year, a value of 1 when a RTC law is in effect that entire year, and a value equal to the portion of the year a RTC law is in effect otherwise. The date of adoption for each RTC state is shown in Appendix Table A1. Note the fact that violent crime was noticeably higher in 1977 in the nine states that did not adopt RTC laws indicates that it will be particularly important that the parallel trends requirement of a valid panel data analysis is established, which is an issue to which we carefully attend in Section III.A.3. All our appendices are posted online at https://works.bepress.com/john_donohue/.

Exhibit D
Page 59

Table 1:   Panel Data Estimates Showing Greater Increases in Incarceration and Police Following RTC Adoption: State- and Year-Fixed Effects, and No Other Regressors, 1977–2014

|  | *Incarceration* | *Police Employment per 100k* | *Police Officers per 100k* |
|---|:---:|:---:|:---:|
|  | *(1)* | *(2)* | *(3)* |
| Dummy variable model | 6.78 (6.22) | 8.39*** (3.15) | 7.08** (2.76) |

NOTE: OLS estimations include state- and year-fixed effects and are weighted by population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The police employment and sworn police officer data are from the Uniform Crime Reports (UCR). The source of the incarceration rate is the Bureau of Justice Statistics (2014). *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

incarceration or total police employees after adopting their RTC laws that might explain their comparatively poor postpassage crime performance.

## III. A Panel Data Analysis of RTC Laws

### A. Estimating Two Models on the Full Data Period 1977–2014

We have just seen that RTC law adoption is followed by *higher* rates of violent and property crime (relative to national trends) and that the elevated crime levels after RTC law adoption occur despite the fact that RTC states actually invested relatively more heavily in prisons and police than non-RTC states. While the theoretical predictions about the effect of RTC laws on crime are indeterminate, these two empirical facts based on the actual patterns of crime and crime-fighting measures in RTC and non-RTC states suggest that the most plausible working hypothesis is that RTC laws *increase* crime. The next step in a panel data analysis of RTC laws would be to test this hypothesis by introducing an appropriate set of explanatory variables that plausibly influence crime.

The choice of these variables is important because any variable that both influences crime and is simultaneously correlated with RTC laws must be included if we are to generate unbiased estimates of the impact of RTC laws. At the same time, including irrelevant and/or highly collinear variables can also undermine efforts at valid estimation of the impact of RTC laws. At the very least, it seems advisable to control for the levels of police and incarceration because these have been the two most important criminal justice policy instruments in the battle against crime.

### 1. The DAW Panel Data Model

In addition to the state and year fixed effects of the no-controls model and the identifier for the presence of an RTC law, our preferred "DAW model" includes an array of other factors that might be expected to influence crime, such as the levels of police and incarceration, various income, poverty, and unemployment measures, and six demographic controls designed to capture the presence of males in three racial categories (black, white, other) in two high-crime age groupings (15–19 and 20–39). Table 2 lists the full

Table 2:   Table of Explanatory Variables for Four Panel Data Studies

| *Explanatory Variables* | *DAW* | *LM* |
|---|:---:|:---:|
| Right-to-carry law | x | x |
| Lagged per capita incarceration rate | x | |
| Lagged police staffing per 100,000 residents | x | |
| Poverty rate | x | |
| Unemployment rate | x | |
| Per capita ethanol consumption from beer | x | |
| Percentage of state population living in metropolitan statistical areas (MSA) | x | |
| Real per capita personal income | x | x |
| Real per capita income maintenance | | x |
| Real per capita retirement payments | | x |
| Real per capita unemployment insurance payments | | x |
| Population density | | x |
| Lagged violent or property arrest rate | | x |
| State population | | x |
| 6 Age-sex-race demographic variables —all 6 combinations of black, white, and other males in 2 age groups (15–19, 20–39) indicating the percentage of the population in each group | x | |
| 36 Age-sex-race demographic variables —all possible combinations of black, white, and other males in 6 age groups (10–19, 20–29, 30–39, 40–49, 50–64, and over 65) and repeating this all for females, indicating the percentage of the population in each group | | x |

NOTE: The DAW model is advanced in this article and the LM model was previously published by Lott and Mustard.

set of explanatory variables for both the DAW model and the comparable panel data model used by Lott and Mustard (LM).[37]

Mathematically, the simple dummy model takes the following form:

$$\ln\left(crime\ rate_{it}\right) = \beta X_{it} + \gamma RTC_{it} + \alpha_t + \delta_i + \varepsilon_{it} \tag{1}$$

where $\gamma$ is the coefficient on the RTC dummy, reflecting the average estimated impact of adopting a RTC law on crime. The matrix $X_{it}$ contains either the DAW or LM covariates

[37]While we attempt to include as many state-year observations in these regressions as possible, District of Columbia incarceration data are missing after the year 2001. In addition, a handful of observations are also dropped from the LM regressions owing to states that did not report any usable arrest data in various years. Our regressions are performed with Huber-White robust standard errors that are clustered at the state level, and we lag the arrest rates used in the LM regression models. The rationales underlying both choices are described in more detail in Aneja et al. (2014). All the regressions presented in this article are weighted by state population.

Table 3:   Panel Data Estimates Suggesting that RTC Laws Increase Violent and Property Crime: State- and Year-Fixed Effects, DAW Regressors, 1979–2014

|  | *Murder Rate* | *Firearm Murder Rate* | *Nonfirearm Murder Rate* | *Violent Crime Rate* | *Property Crime Rate* |
|---|---|---|---|---|---|
|  | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 2.27 (5.05) | 2.90 (6.74) | 1.53 (3.32) | 9.02*** (2.90) | 6.49** (2.74) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. The violent and property crime data are from the Uniform Crime Reports (UCR) while the murder data are from the National Vital Statistics System (NVSS). Six demographic variables (based on different age-sex-race categories) are included as controls in the regression above. Other controls include the lagged incarceration rate, the lagged police employee rate, real per capita personal income, the unemployment rate, poverty rate, beer, and percentage of the population living in MSAs. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

and demographic controls for state $i$ in year $t$. The vectors $\alpha$ and $\delta$ are year and state fixed effects, respectively, while $\varepsilon_{it}$ is the error term.

The DAW panel data estimates of the impact of RTC laws on crime are shown in Table 3.[38] The results are consistent with, although smaller in magnitude than, those observed in the no-controls model: RTC laws on average increased violent crime by 9.0 percent and property crime by 6.5 percent in the years following adoption.[39] The effect of RTC laws on murder is seen in Table 3 to be very imprecisely estimated and not statistically significant.[40]

We should also note one caveat to our results. Panel data analysis assumes that the treatment in any one state does not influence crime in nontreatment states. However, as we noted above,[41] RTC laws tend to lead to substantial increases in gun thefts and those guns tend to migrate to states with more restrictive gun laws, where they elevate violent crime. This flow of guns from RTC to non-RTC states has been documented by gun trace data (Knight 2013), and Olson et al. (2019) find that "firearm trafficking from states with less restrictive firearm legislation to neighboring states with more restrictive firearm legislation

---

[38]The complete set of estimates for all explanatory variables (except the demographic variables) for the DAW and LM dummy models are shown in Appendix Table B1.

[39]Defensive uses of guns are more likely for violent crimes because the victim will clearly be present. For property crimes, the victim is typically absent, thus providing less opportunity to defend with a gun. It is unclear whether the many ways in which RTC laws could lead to more crime, which we discuss in Section II.A.2, would be more likely to facilitate violent or property crime, but our intuition is that violent crime would be more strongly influenced, which is in fact what Table 3 suggests.

[40]We thank Phil Cook for informing us that UCR murder data are both less complete and less discerning than murder data collected by the National Vital Statistics. Note that we subtract all cases of justifiable homicides from the murder counts in our own Vital Statistics data.

[41]See text at footnotes 20–22.

increases firearm homicide rates in those restrictive states."[42] As a result, our panel data esti-mates of the impact of RTC laws are downward biased by the amount that RTC laws induce crime spillovers into non-RTC states.[43] One police investigation revealed that of the 224 guns a single gun trafficker in the DC area was known to have sold in just five months of 2015, 94 were later found at crime scenes from Virginia to New York (Hermann & Weiner 2019).

## 2. The LM Panel Data Model

Table 2's recitation of the explanatory variables contained in the Lott and Mustard (LM) panel data model reveals there are no controls for the levels of police and incarcer-ation in each state, even though a substantial literature has found that these factors have a large impact on crime. Indeed, as we saw in Table 1, both factors grew substantially and statistically significantly after RTC law adoption. A Bayesian analysis of the impact of RTC laws found that "the incarceration rate is a powerful predictor of future crime rates," and specifically faulted this omission from the Lott and Mustard model (Strnad 2007:201, n.8). We have discussed an array of infirmities with the LM model in Aneja et al. (2014), including their reliance on flawed pseudo-arrest rates, and highly collinear demographic variables.

As noted in Aneja et al. (2014):

> The Lott and Mustard arrest rates … are a ratio of arrests to crimes, which means that when one person kills many, for example, the arrest rate falls, but when many people kill one person, the arrest rate rises, since only one can be arrested in the first instance and many can in the sec-ond. The bottom line is that this "arrest rate" is not a probability and is frequently greater than one because of the multiple arrests per crime. For an extended discussion on the abundant problems with this pseudo arrest rate, see Donohue and Wolfers (2009).

The LM arrest rates are also econometrically problematic since the denominator of the arrest rate is the numerator of the dependent variable crime rate, improperly leaving the dependent variable on both sides of the regression equation. We lag the arrest rates by one year to reduce this problem of ratio bias.

Lott and Mustard's use of 36 demographic variables is also a potential concern. With so many enormously collinear variables, the high likelihood of introducing noise into the estimation process is revealed by the wild fluctuations in the coefficient estimates on these variables. For example, consider the LM explanatory variables "neither black nor white male aged 30–39" and the identical corresponding female category. The LM dummy variable model for violent crime suggests that the male group will significantly

---

[42]"Seventy-five percent of traceable guns recovered by authorities in New Jersey [a non-RTC state] are purchased in states with weaker gun laws, according to … firearms trace data … compiled by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives … between 2012 and 2016" (Pugliese 2018). See also Freskos (2018b).

[43]Some of the guns stolen from RTC permit holders may also end up in foreign countries, which will stimulate crime there but not bias our panel data estimates. For example, a recent analysis of guns seized by Brazilian police found that 15 percent came from the United States. Since many of these were assault rifles, they were probably not guns carried by American RTC permit holders (Paraguassu & Brito 2018).

Table 4:   Panel Data Estimates of the Impact of RTC Laws: State-and Year-Fixed Effects, Using Actual and Modified LM Regressors, 1977–2014

| | *Panel A: LM Regressors Including 36 Demographic Variables* | | | | |
| | Murder Rate | Firearm Murder Rate | Nonfirearm Murder Rate | Violent Crime Rate | Property Crime Rate |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | –5.17 (3.33) | –3.91 (4.82) | –5.70** (2.45) | –1.38 (3.16) | –0.34 (1.71) |

| | *Panel B: LM Regressors with 6 DAW Demographic Variables* | | | | |
| | Murder Rate | Firearm Murder Rate | Nonfirearm Murder Rate | Violent Crime Rate | Property Crime Rate |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 3.75 (5.92) | 4.34 (7.85) | 2.64 (4.02) | 10.03** (4.81) | 7.59** (3.72) |

| | *Panel C: LM Regressors with 6 DAW Demographic Variables and Adding Controls for Incarceration and Police* | | | | |
| | Murder Rate | Firearm Murder Rate | Nonfirearm Murder Rate | Violent Crime Rate | Property Crime Rate |
| | *(1)* | *(2)* | *(3)* | *(4)* | *(5)* |
| Dummy variable model | 4.99 (5.50) | 5.96 (7.20) | 3.76 (4.29) | 10.05** (4.54) | 8.10** (3.63) |

NOTE: All models include year- and state-fixed effects, and OLS estimates are weighted by state population. Robust standard errors (clustered at the state level) are provided next to point estimates in parentheses. In Panel A, 36 demographic variables (based on different age-sex-race categories) are included as controls in the regressions above. In Panel B, only six demographic variables are included. In Panel C, only six demographic variables are included and controls are added for incarceration and police. For all three panels, other controls include the previous year's violent or property crime arrest rate (depending on the crime category of the dependent variable), state population, population density, real per capita income, real per capita unemployment insurance payments, real per capita income maintenance payments, and real retirement payments per person over 65. *$p < 0.1$; **$p < 0.05$; ***$p < 0.01$. All figures reported in percentage terms.

*increase* crime (the coefficient is 219), but their female counterparts have an even greater dampening effect on crime (with a coefficient of –258). Both conflicting estimates (not shown in Appendix Table B1) are statistically significant at the 0.01 level, and they are almost certainly picking up noise rather than revealing true relationships. Bizarre results are common in the LM estimates among these 36 demographic variables.[44]

———

[44]Aneja et al. (2014) test for the severity of the multicollinearity problem using the 36 LM demographic variables, and the problem is indeed serious. The variance inflation factor (VIF) is shown to be in the range of 6 to 7 for the RTC variable in the LM dummy model when the 36 demographic controls are used. Using the six DAW variables reduces the multicollinearity for the RTC dummy to a tolerable level (with VIFs always below the desirable threshold of 5).

Table 4, Panel A shows the results of the LM panel data model estimated over the period 1977–2014. As seen above, the DAW model generated estimates that RTC laws raised violent and property crime (in the dummy model of Table 3), while the estimated impact on murders was too imprecise to be informative. The LM model generates no statistically significant estimates, except for an apparent decline in non-firearm-related murders. We can almost perfectly restore the DAW Table 3 findings, however, by simply limiting the inclusion of 36 highly collinear demographic variables to the more typical array used in the DAW regressions, as seen in Panel B of Table 4. This modified LM dummy variable model suggests that RTC laws increase violent and property crime, mimicking the DAW dummy variable model estimates, and this same finding persists if we add in controls for police and incarceration, as seen in Panel C of Table 4.

### 3. Testing the DAW and LM Models for the Parallel Trends Assumption

Many researchers are content to present panel data results such as those shown in Tables 3 and 4 without establishing their econometric validity. This can be a serious mistake. We have already registered concerns about the choice of controls included in the LM model, but, as we will see, the LM model regressions in Panel A of Table 4—including the spurious finding that RTC laws reduce non-firearm homicides—uniformly violate the critical assumption of parallel trends. In sharp contrast, the DAW model illustrates nearly perfect parallel trends in the decade prior to RTC adoption for violent crime and sufficiently satisfies this assumption in three of the other four regressions in Table 3 (murder, non-firearm murder, and property crime).

To implement this test and to provide more nuanced estimates of the impact of RTC laws on crime than in the simple dummy models of Tables 3 and 4, we ran regressions showing the values on yearly dummy variables for 10 years prior to RTC adoption to 10 years after RTC adoption. If the key parallel trends assumption of panel data analysis is valid, we should see values of the pre-adoption dummies that show no trend and are close to zero. Figure 2 shows that the DAW violent crime model performs extremely well: the pre-adoption dummies are virtually all zero (and hence totally flat) for the eight years prior to adoption, and violent crime starts rising in the year of adoption, showing statistically significant increases after the law has been in effect for at least a full year. The upward trend in violent crime continues for the entire decade after adoption. Figure 2 also highlights that the single dummy models of Tables 3 and 4 (which implicitly assume an immediate and constant post-adoption impact on crime) are mis-specified. Importantly, we can now see the exact timing and pattern of the estimated impact on crime, which can, and in this case does, provide further support for a causal interpretation of the estimated increase in violent crime.

In contrast to the ideal performance of the DAW violent crime model, all of the Table 4 regressions using the LM model perform extremely poorly. For example, consider the LM model for firearm murder depicted in Figure 3, which shows that there is

*Figure 2:*   The impact of RTC laws on violent crime, DAW model, 1979−2014.



Note: We regress crime on dummies for pre− and post−passage years and DAW covariates. Reference year is year before adoption and adoption year is first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

an enormously steep downward trend in the values of the pre-adoption dummies. Indeed, we see that the downward trend reverses just at the time of adoption of the RTC law and after six years we observe statistically significant increases in firearm

*Figure 3:*   The impact of RTC laws on firearm murder, LM model, 1977–2014



murder above the prior trend. Thus, while Table 4 ostensibly showed a statistically insignificant 3.9 percent drop in violent crime, the more discerning analysis of Figure 3 shows that that estimate is econometrically invalid, given such an influential violation of the parallel trends requirement. In fact, the LM model estimated for Figure 3 provides evidence that the adoption of RTC laws reversed a previous benign trend starting exactly at the time of RTC adoption and led to higher levels of firearm homicide.

Appendix D depicts the same year-by-year estimates for the other crimes using both the DAW and LM models. It is worth noting that, for our entire data period, the four DAW and LM murder and firearm murder figures show an apparent malign break in trend at the time of RTC adoption, while the trend for non-firearm murder remains unchanged in the DAW and LM models. The unchanged downward trend in the LM non-firearm model illustrates the violation of the parallel trends assumption, invalidating the anomalous finding for that crime in Panel A of Table 4.[45]

For the DAW and LM property crime panel data estimates, we see almost the same pattern. While the pre-adoption performance of the DAW property crime model (see Appendix Figure D2) is not quite as perfect as it was for violent crime, it still shows a roughly flat pattern for the eight years prior to adoption, followed by a persistent pattern of increasing property crime in the 10 years after RTC adoption. The increase in property crime turns statistically significant at the time of adoption. In Appendix Figure D3, however, we again see the same deficient pattern observed for the LM model in Appendix Figure D1: property crime falls in the 10 years prior to adoption, and the pattern reverses itself, leading to increasing property crime in the decade following RTC adoption.

We also conducted a panel data assessment looking at the 11 states that adopted RTC laws in the period from 2000–2014 when the confounding effect of the crack epidemic had subsided. The results provide further support that RTC laws increase crime, including estimates that overall murder and firearm murder rise substantially with RTC adoption. See further discussion and relevant figures and estimates in Appendix C. Figure 4 shows the year-by-year estimated effect of RTC laws on overall murder for the DAW model for this postcrack time period. The figure shows a flat pretrend (albeit with some variance around it) and then a sizeable jump in murder starting just at the year of RTC adoption. The LM model shows substantially the same statistically significant increase in murder.

---

[45]Appendix Figure D1 also illustrates why the LM dummy model estimate on violent crime in Panel A of Table 4 was not positive and statistically significant (as it was for the DAW model in Table 3 and the modified LM models in Panels B and C of Table 4): Appendix Figure D1 reveals that, for the LM model, violent crime was trending down throughout the pre-adoption period, dropping from 5 percentage points to zero over that decade, at which point it reverses and violent crime increases to roughly a 6 percent increase by 10 years after RTC adoption. The v-shape pattern over that two-decade period leads the LM dummy model to obscure the increase in violent crime that is clearly seen in Appendix Figure D1.

*Figure 4:*   The impact of RTC laws on murder, DAW model, 2000–2014



## B.  Summary of Panel Data Analysis

The uncertainty about the impact of RTC laws on crime expressed in the NRC Report was based on an analysis of data only through 2000. The preceding evaluation of an array of different specifications over the full data period from the late 1970s through 2014 as well as in the postcrack period has given consistent evidence that something bad happened to murder and violent and property crime right at the time of RTC adoption. The most statistically significant crime increases for the full period were seen for DAW violent and property crime. For the postcrack period, the largest and most highly statistically significant increases were seen for murder and firearm murder.

Other work has also provided evidence that RTC laws increase murder and/or overall violent crime—see Zimmerman (2014), examining postcrack-era data and the recent work by Donohue (2017b) and Siegel et al. (2017) concluding that RTC laws increase firearm and handgun homicide. Work by McElroy and Wang (2017) reinforces this conclusion, with results from a dynamic model that accounts for forward-looking behavior finding that violent crime would be one-third lower if RTC laws had not been passed. We discuss other recent published studies finding that RTC laws increase violent crime in Appendix C.

Despite the substantial panel data evidence in the post-NRC literature that supports the finding of the pernicious influence of RTC laws on crime, the NRC suggestion that

new techniques should be employed to estimate the impact of these laws is fitting. The important paper by Strnad (2007) used a Bayesian approach to argue that none of the published models used in the RTC evaluation literature rated highly in his model selection protocol when applied to data from 1977–1999.

Durlauf et al. attempt to sort out the different specification choices in evaluating RTC laws by using their own Bayesian model averaging approach using county data from 1979–2000. Applying this technique, the authors find that in their preferred spline (trend) model, RTC laws elevate violent crime in the three years after RTC adoption: "As a result of the law being introduced, violent crime increases in the first year and continues to increase afterwards" (2016:50). By the third year, their preferred model suggests a 6.5 percent increase in violent crime. Since their paper only provides estimates for three postpassage years, we cannot draw conclusions beyond this but note that their finding that violent crime increases by over 2 percent per year owing to RTC laws is a substantial crime increase. Moreover, the authors note: "For our estimates, the effect on crime of introducing guns continues to grow over time" (2016:50).[46]

Owing to the substantial challenges of estimating effects from observational data, it will be useful to see if yet another statistical approach that has different attributes from the panel data methodology can enhance our understanding of the impact of RTC laws. The rest of this article will use this synthetic control approach, which has been deemed "arguably the most important innovation in the policy evaluation literature in the last 15 years" (Athey & Imbens 2017).

## IV. ESTIMATING THE IMPACT OF RTC LAWS USING SYNTHETIC CONTROLS

The synthetic control methodology, which is becoming increasingly prominent in economics and other social sciences, is a promising new statistical approach for addressing the impact of RTC laws.[47] While most synthetic control papers focus on a single

---

[46]While our analysis focused on crime at the state level, there is obviously heterogeneity in crime rates within states, which is amalgamated into our population-weighted state average figures. A paper by Kovandzic et al. (KMV) buttresses the view that our state-focused estimates are not giving a misleading impression of the impact of RTC laws on violent crime. KMV limited their analysis to urban areas within each state, estimating the impact of RTC laws on crime using a panel data analysis from 1980–2000 on 189 cities with a population of 100,000 or more (Kovandzic et al. 2005). Although they did not estimate an overall violent crime effect, they did report that RTC laws were associated with a highly statistically significant increase in the rate of aggravated assault, the largest single component of violent crime. Their figures suggest that RTC laws led to a 20.1 percent increase in aggravated assault in the 10 years following adoption.

[47]The synthetic control methodology has been deployed in a wide variety of fields, including health economics (Nonnemaker et al. 2011), immigration economics (Bohn et al. 2014), political economy (Keele 2009), urban economics (Ando 2015), the economics of natural resources (Mideksa 2013), and the dynamics of economic growth (Cavallo et al. 2013).

treatment in a single geographic region, we look at 33 RTC adoptions occurring over three decades throughout the country. For each adopting ("treated") state we will find a weighted average of other states ("a synthetic control") designed to serve as a good counterfactual for the impact of RTC laws because it had a pattern of crime similar to that of the adopting state prior to RTC adoption. By comparing what actually happened to crime after RTC adoption to the crime performance of the synthetic control over the same period, we generate estimates of the causal impact of RTC laws on crime.[48]

### A. *The Basics of the Synthetic Control Methodology*

The synthetic control method attempts to generate representative counterfactual units by comparing a treatment unit (i.e., a state adopting an RTC law) to a set of control units across a set of explanatory variables over a preintervention period. The algorithm searches for similarities between the treatment state of interest and the control states during this period and then generates a synthetic counterfactual unit for the treatment state that is a weighted combination of the component control states.[49] Two conditions are placed on these weights: they must be nonnegative and they must sum to 1. In general, the matching process underlying the synthetic control technique uses pretreatment values of both the outcome variable of interest (in our case, some measure of crime) and other predictors believed to influence this outcome variable.[50] For the reasons set forth in Appendix K, we use every lag of the dependent variable as predictors in the DAW and LM specifications. Once the synthetic counterfactual is generated and the weights associated with each control unit are assigned, the *synth* program then calculates values for the outcome variable associated with this counterfactual and the root mean squared prediction error (RMSPE) based on differences between the treatment and synthetic control units in the pretreatment period. The effect of the treatment can then be estimated by comparing the actual values of the dependent variable for the treatment unit to the corresponding values of the synthetic control.

### B. *Generating Synthetic Controls for 33 States Adopting RTC Laws During Our Data Period*

To illustrate the procedure outlined above, consider the case of Texas, whose RTC law went into effect on January 1, 1996. The potential control group for each treatment state

---

[48]For a more detailed technical description of this method, we direct the reader to Abadie and Gardeazabal (2003) and Abadie et al. (2010, 2014).

[49]Our analysis is done in Stata using the *synth* software package developed by Alberto Abadie, Alexis Diamond, and Jens Hainmueller.

[50]Roughly speaking, the algorithm that we use finds $\mathbf{W}$ (the weights of the components of the synthetic control) that minimizes $\sqrt{(\mathbf{X_1} - \mathbf{X_0W})'\mathbf{V}(\mathbf{X_1} - \mathbf{X_0W})}$, where $\mathbf{V}$ is a diagonal matrix incorporating information about the relative weights placed on different predictors, $\mathbf{W}$ is a vector of nonnegative weights that sum to 1, $\mathbf{X_1}$ is a vector containing pretreatment information about the predictors associated with the treatment unit, and $\mathbf{X_0}$ is a matrix containing pretreatment information about the predictors for all the control units.

consists of all nine states with no RTC legislation as of the year 2014, as well as states that pass RTC laws at least 10 years after the passage of the treatment state (e.g., in this case, the five states passing RTC laws after 2006, such as Nebraska and Kansas, whose RTC laws went into effect at the beginning of 2007). Since we estimate results for up to 10 years postpassage,[51] this restriction helps us avoid including states with their own permissive concealed carry laws in the synthetically constructed unit (which would mar the control comparison).

After entering the necessary specification information into the *synth* program (e.g., treatment unit, list of control states, explanatory variables, etc.), the algorithm proceeds to construct the synthetic unit from the list of control states specific to Texas and generates values of the dependent variable for the counterfactual for both the pretreatment and posttreatment periods. The rationale behind this methodology is that a close fit in the prepassage time series of crime between the treatment state and the synthetic control generates greater confidence in the accuracy of the constructed counterfactual. Computing the posttreatment difference between the dependent variables of the treatment state and the synthetic control unit provides the synthetic control estimate of the treatment effect attributable to RTC adoption in that state.

1. Synthetic Control Estimates of Violent Crime in Two States

Figure 5 shows the synthetic control graph for violent crime in Texas over the period from 1977 through 2006 (10 years after the adoption of Texas's RTC law). The solid black line shows the actual pattern of violent crime for Texas, and the vertical line indicates when the RTC law went into effect. Implementing the synthetic control protocol identifies three states that generate a good fit for the pattern of crime experienced by Texas in the pre-1996 period. These states are California, which gets a weight of 57.7 percent owing to its similar attributes compared to Texas, Nebraska with a weight of 9.7 percent, and Wisconsin with a weight of 32.6 percent.

One of the advantages of the synthetic control methodology is that one can assess how well the synthetic control (call it "synthetic Texas," which is identified in Figure 5 by the dashed line) matches the pre-RTC-passage pattern of violent crime to see whether the methodology is likely to generate a good fit in the 10 years of postpassage data. Here the fit looks rather good in mimicking the rises and falls in Texas violent crime from 1977–1995. This pattern increases our confidence that synthetic Texas will provide a good prediction of what would have happened in Texas had it not adopted an RTC law.

Looking at Figure 5, we see that while both Texas and synthetic Texas (the weighted average violent crime performance of the three mentioned states) show declining crime rates in the postpassage decade after 1996, the crime drop is

---

[51]Our choice of 10 years is informed by the tradeoffs associated with using a different timeframe. Tables 5 and 6 indicate that the increase in violent crime due to RTC laws is statistically significant at the .01 level for all years after seven years post-adoption.

*Right-to-Carry Laws and Violent Crime*    227

*Figure 5:*   Texas: Violent crime rate.



Effect of 1996 RTC Law 10 Years After Adoption: 16.9%
NOTE: Passage Year Difference From SC: 3.6% Composition of SC: CA (0.577); NE (0.097); WI (0.326) CVRMSPE:
0.06 (8 of 33 states, where 1 denotes the state with the best pre-passage fit.).
States Never Passing RTC Laws Included in Synthetic Control: CA;
RTC Adopting States Included in Synthetic Control: NE (2007); WI (2012).

substantially greater in synthetic Texas, which had no RTC law over that period, than in
actual Texas, which did. As Figure 5 notes, 10 years after adopting its RTC law, violent
crime in Texas was 16.9 percent *higher* than we would have expected had it not adopted
an RTC law.[52]

Figure 5 also illustrates perhaps the most important lesson of causal inference: one
cannot simply look before and after an event to determine the consequence of the event.
Rather, one needs to estimate the difference between what did unfold and the counter-
factual of what would have unfolded without the event. The value of the synthetic control
methodology is that it provides a highly transparent estimate of that counterfactual, using
a tool designed to ensure the validity of the parallel trends assumption that we have
already seen is so critical to achieving meaningful causal estimates. Thus, when Lott

---

[52]Texas's violent crime rate 10 years post-adoption exceeds that of "synthetic Texas" by 20.41 percent
$= \frac{517.3 - 429.6}{429.6} \times 100\%$. While some researchers would take that value as the estimated effect of RTC, we chose to sub-
tract off the discrepancy in 1996 between the actual violent crime rate and the synthetic control value in that year.
This discrepancy is 3.55 percent $= \frac{644.4 - 622.3}{622.3} \times 100\%$ (shown in the line just below the graph of Figure 5). See foot-
note 58 for further discussion of this calculation. Figure 5 shows a (rounded) estimated violent crime increase in
Texas of 16.9 percent. We arrive at this estimate by subtracting the 1996 discrepancy of 3.55 percent from the
20.41 percent 10th-year discrepancy, which generates a TEP of 16.86 percent.

(2010) quotes a Texas District Attorney suggesting that he had reversed his earlier opposition to the state's RTC law in light of the perceived favorable experience with the law, we see why it can be quite easy to draw the inaccurate causal inference that Texas's crime decline was facilitated by its RTC law. The public may perceive the falling crime rate post-1996 (the solid black line), but our analysis suggests that Texas would have experienced a more sizable violent crime decline if it had not passed an RTC law (the dotted line). More specifically, Texas experienced a 19.7 percent decrease in its aggregate violent crime rate in the 10 years following its RTC law (between 1996 and 2006), while the state's synthetic control experienced a larger 31.0 percent decline. This counterfactual would not be apparent to residents of the state or to law enforcement officials, but our results suggest that Texas's RTC law imposed a large social cost on the state.

The greater transparency of the synthetic control approach is one advantage of this methodology over the panel data models that we considered above. Figure 5 makes clear what Texas is being compared to, and we can reflect on whether this match is plausible and whether anything other than RTC laws changed in these three states during the post-passage decade that might compromise the validity of the synthetic control estimate of the impact of RTC laws.

Figure 6 shows our synthetic control estimate for Pennsylvania, which adopted an RTC law in 1989 that did not extend to Philadelphia until a subsequent law went into

*Figure 6:*   Pennsylvania: Violent crime rate.



Effect of 1989 RTC Law 10 Years After Adoption: 24.4%

NOTE: Passage Year Difference From SC: -1.1%. Composition of SC: DE (0.078); HI (0.073); MD (0.038); NE (0.016); NJ (0.103); OH (0.27); WI (0.424) CVRMSPE: 0.017 (1 of 33 states, where 1 denotes the state with the best pre-passage fit.).

States Never Passing RTC Laws Included in Synthetic Control: DE; HI; MD; NJ;

RTC Adopting States Included in Synthetic Control: NE (2007); OH (2004); WI (2012).

*Figure 7:*   The effect of RTC laws on violent crime after 10 years, synthetic control estimates for 31 states (1977–2014).



effect on October 11, 1995. In this case, synthetic Pennsylvania is comprised of eight states and the prepassage fit is nearly perfect. Following adoption of the RTC laws, synthetic Pennsylvania shows substantially better crime performance than actual Pennsylvania after the RTC law is extended to Philadelphia in late 1995, as illustrated by the second vertical line at 1996. The synthetic control method estimates that RTC laws in Pennsylvania increased its violent crime rate by 24.4 percent after 10 years.[53]

2.  State-Specific Estimates Across All RTC States

Because we are projecting the violent crime experience of the synthetic control over a 10-year period, there will undoubtedly be a deviation from the "true" counterfactual and our estimated counterfactual. If we were only estimating the impact of a legal change for a single state, we would have an estimate marred by this purely stochastic aspect of changing crime. Since we are estimating an average effect across a large number of states, the

---

[53]In Appendix I, we include all 33 graphs showing the path of violent crime for the treatment states and the synthetic controls, along with information about the composition of these synthetic controls, the dates of RTC adoption (if any) for states included in these synthetic controls, and the estimated treatment effect (expressed in terms of the percent change in a particular crime rate) 10 years after adoption (or seven years after adoption for two states that adopted RTC laws in 2007, since our data end in 2014). The figures also document the discrepancy in violent crime in the year of adoption between the actual and synthetic control values.

stochastic variation will be diminished as the overestimates and underestimates will tend to wash out in our mean treatment estimates. Figure 7 shows the synthetic control estimates on violent crime for all 31 states for which we have 10 years of postpassage data. For 23 of the 31 states adopting RTC laws, the increase in violent crime is noteworthy.[54] Although three states were estimated to have crime reductions greater than the −1.6 percent estimate of South Dakota, if one averages across all 31 states, the (population-weighted) mean treatment effect after 10 years is a 14.3 percent *increase* in violent crime. If one instead uses an (unweighted) median measure of central tendency, RTC laws are seen to *increase* crime by 12.3 percent.

### 3. Less Effective Prepassage Matches

Section IV.B.1 provided two examples of synthetic controls that matched the crime of the treatment states well in the prepassage period, but this does not always happen. For example, we would have considerably less confidence in the quality of the synthetic control estimates for Maine, whose poor estimate is depicted in Appendix Figure I11. Maine also happens to be the state showing the greatest reduction in violent crime following RTC adoption, as indicated in Figure 7.

For Maine, one sees that the synthetic control and the state violent crime performance diverged long before RTC adoption in 1986, and that, by the date of adoption, Maine's violent crime rate was already 37.9 percent below the synthetic control estimate. The violent crime rate of actual Maine was trending down, while the synthetic control estimate had been much higher and trending up in the immediate pre-adoption period. The difficulty in generating good prepassage matches for states like Maine stems from their unusually low violent crime in the prepassage period.

Appendix Figure D11 reproduces Figure 7 while leaving out the five states for which the quality of prepassage fit is clearly lower than in the remaining 26 states.[55] This knocks out North Dakota, South Dakota, Maine, Montana, and West Virginia, thereby eliminating three of the five outlier estimates at both ends of the scale, and leaving the mean and median effects of RTC laws relatively unchanged from Figure 7. As Appendix Figure D11 shows, the (weighted) mean increase in crime across the listed 26 RTC-adopting states is 13.7 percent while the (unweighted) median increase is now 11.1 percent. Increases in violent crime of this magnitude are troubling. Consensus estimates of the elasticity of crime with respect to incarceration hover around 0.15 today, which suggests that to offset the increase in crime caused by RTC adoption, the average RTC state would need to approximately double its prison population.

---

[54]The smallest of these, Kentucky, had an increase of 4.6 percent.

[55]In particular, for these five states, the prepassage CVRMSPE—that is, the RMSPE transformed into a coefficient of variation by dividing by the average prepassage crime rate—was 19 percent or greater. See note 61 for further discussion of this statistic.

# V. Aggregation Analysis Using Synthetic Controls

A small but growing literature applies synthetic control techniques to the analysis of mul-
tiple treatments.[56] We estimate the percentage difference in violent crime between each
treatment (RTC-adopting) state and the corresponding synthetic control in both the year
of the treatment and in the 10 years following it. This estimate of the treatment effect
percentage (TEP) obviously uses data from fewer posttreatment years for the two treat-
ment states[57] in which RTC laws took effect less than 10 years before the end of our
sample.

   We could use each of these 10 percentage differences as our estimated effects of
RTC laws on violent crime for the 10 postpassage years, but, as noted above, we make
one adjustment to these figures by subtracting from each the percentage difference in
violent crime in the adoption year between the treatment and synthetic control states. In
other words, if 10 years after adopting an RTC law, the violent crime rate for the state
was 440 and the violent crime rate for the synthetic control was 400, one estimate of the
effect of the RTC law could be 10 percent $\left(=\frac{440-400}{400}\right)$. Rather than use this estimate, how-
ever, we have subtracted from this figure the percentage difference between the synthetic
and treatment states in the year of RTC adoption. If, say, the violent crime rate in the
treatment state that year was 2 percent higher than the synthetic control value, we would
subtract 2 from 10 to obtain an estimated 10th-year effect of RTC laws of 8 percent.[58] We

-----

[56]The closest paper to the present study is Arindrajit Dube and Ben Zipperer (2013), who introduce their own
methodology for aggregating multiple events into a single estimated treatment effect and calculating its signifi-
cance. Their study centers on the effect of increases in the minimum wage on employment outcomes, and, as we
do, the authors estimate the percentage difference between the treatment and the synthetic control in the post-
treatment period. While some papers analyze multiple treatments by aggregating the areas affected by these treat-
ments into a single unit, this approach is not well-equipped to deal with a case such as RTC law adoption where
treatments affect the majority of panel units and more than two decades separate the dates of the first and last
treatment under consideration, as highlighted in Figure 7.

[57]These two states are Kansas and Nebraska, which adopted RTC laws in 2007. See note 4 discussing the states for
which we cannot estimate the impact of RTC laws using synthetic controls.

[58]It is unclear ex ante whether one should implement this subtraction. The intuitive rationale for our choice of
outcome variable was that pretreatment differences between the treatment state and its synthetic control at the
time of RTC adoption likely reflected imperfections in the process of generating a synthetic control and should
not contribute to our estimated treatment effect if possible. In other words, if the treatment state had a crime
rate that was 5 percent greater than that of the synthetic control in both the pretreatment and posttreatment
period, it would arguably be misleading to ignore the pretreatment difference and declare that the treatment
increased crime rates by 5 percent. On the other hand, subtracting off the initial discrepancy might be adding
noise to the subsequent estimates.
   We resolve this issue with the following test of our synthetic control protocol: we pretend that each RTC-
adopting state actually adopted its RTC law five years before it did. We then generate synthetic control estimates
of this phantom law over the next five years of actual pretreatment data. If our synthetic control approach is
working perfectly, it should simply replicate the violent crime pattern for the five pretreatment years. Conse-
quently, the estimated "effect" of the phantom law should be close to zero. Indeed, when we follow our subtrac-
tion protocol, the synthetic controls match the pretreatment years more closely than when we do not provide
this normalization. Specifically, with subtraction the estimated "effect" in the final pretreatment year is a wholly
insignificant 3.2 percent; without subtraction, it jumps to a statistically significant 5.3 percent. Consequently,

then look across all the state-specific estimates of the impact of RTC laws on violent crime for each of the 10 individual postpassage years and test whether they are significantly different from zero.[59]

### A. RTC Laws Increase Violent Crime

We begin our analysis of the aggregated synthetic control results using predictors derived from the DAW specification. Table 5 shows our results on the full sample examining violent crime.[60] Our estimates of the normalized average treatment effect percentage (TEP) suggest that states that passed RTC laws experienced more deleterious changes in violent criminal activity than their synthetic controls in the 10 years after adoption. On average, treatment states had aggregate violent crime rates that were almost 7 percent higher than their synthetic controls five years after passage and around 14 percent higher 10 years after passage. Table 5 suggests that the longer the RTC law is in effect (up to the 10th year that we analyze), the greater the cost in terms of increased violent crime.

As we saw in Figures 6 (Pennsylvania) and I11(Maine), the validity of using the posttreatment difference between crime rates in the treatment state (the particular state adopting an RTC law that we are analyzing) and its corresponding synthetic control as a measure of the effect of the RTC law depends on the strength of the match between these two time series in the pretreatment period. To generate an estimate of pretreatment fit that takes into account differences in pretreatment crime levels, we estimate the coefficient of variation for the root mean squared prediction error (RMSPE), which

---

normalization is the preferred approach for violent crime. It should also be noted that our actual synthetic control estimates will be expected to perform better than this phantom RTC estimate since we will be able to derive our synthetic controls from five additional years of data, thereby improving our pretreatment fit.

As it turns out, the choice we made to subtract off the initial-year crime discrepancy is a conservative one, in that the estimated crime increases from RTC laws would be *greater* without subtraction. We provide synthetic control estimates for the DAW model without subtraction of the adoption-year percentage difference for violent crime, murder, and property crime in Appendix F. Comparison of these Appendix F estimates with those in the text (Table 5) reveals that our preferred method of subtracting yields more conservative results (i.e., a smaller increase in violent crime due to RTC). In Table 5, we estimate the 10th-year TEP for violent crime as roughly 13.5 to 14.3 percent, while the comparable estimates without subtraction are roughly 17–18 percent, as seen in Appendix Tables F1, F2, and F3. Indeed, without subtraction, every estimated impact would show RTC laws lead to a statistically significant increase in every crime category we consider except non-firearm homicide, as seen in Appendix F.

[59]This test is performed by regressing these differences in a model using only a constant term and examining whether that constant is statistically significant. These regressions are weighted by the population of the treatment state in the posttreatment year under consideration. Robust standard errors corrected for heteroskedasticity are used in this analysis.

[60]We discuss the synthetic control estimates for murder and property crime in Section V.F.

Table 5:  The Impact of RTC Laws on the Violent Crime Rate, DAW Covariates, Full Sample, 1977–2014

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Average normalized treatment effect percentage (TEP) | -0.117 | 2.629* | 3.631* | 4.682** | 6.876*** | 7.358** | 10.068*** | 12.474*** | 14.021*** | 14.344*** |
| | (1.076) | (1.310) | (1.848) | (2.068) | (2.499) | (3.135) | (2.823) | (3.831) | (3.605) | (2.921) |
| $N$ | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |
| Pseudo $p$ value | 0.936 | 0.274 | 0.220 | 0.192 | 0.094 | 0.106 | 0.060 | 0.038 | 0.032 | 0.032 |

NOTE: Standard errors in parentheses. Column numbers indicate postpassage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the nested option, and each year's estimate and statistical significance is computed as explained in note 59. $*p < 0.10$; $**p < 0.05$; $***p < 0.01$.

is the ratio of the synthetic control's pretreatment RMSPE to the pretreatment average level of the outcome variable for the treatment state.[61]

To evaluate the sensitivity of the aggregate synthetic control estimate of the crime impact of RTC laws in Table 5, we consider two subsamples of treatment states: states whose coefficients of variation are less than two times the average coefficient of variation for all 33 treatments and states whose coefficients of variation are less than this average. We then rerun our synthetic control protocol using each of these two subsamples to examine whether restricting our estimation of the average treatment effect to states for which a relatively "better" synthetic control could be identified would meaningfully change our findings.

All three samples yield roughly identical conclusions: RTC laws are consistently shown to increase violent crime, with the 10th-year increase ranging from a low of 13.5 (when we remove the six states with above-average values of the CV RMSPE) to a high of 14.3 percent (Table 5).

### B. The Placebo Analysis

Our ability to make valid inferences from our synthetic control estimates depends on the accuracy of our standard error estimation. To test the robustness of the standard errors that we present under the first row of Table 5, we incorporate an analysis using placebo treatment effects similar to Ando (2015).[62] For this analysis, we generate 500 sets of randomly generated RTC dates that are designed to resemble the distribution of actual RTC

---

[61]While the RMSPE is often used to assess this fit, we believe that the use of this measure is not ideal for comparing fit across states, owing to the wide variation that exists in the average pretreatment crime rates among the 33 treatment states that we consider. For example, the pretreatment RMPSE associated with our synthetic control analysis using the DAW predictor variables and aggregate violent crime as the outcome variable is nearly identical for Texas (37.1) and Maine (36.4), but the pretreatment levels of Texas's aggregate violent crime rate are far greater than Maine's. To be more specific, Texas's average violent crime rate prior to the implementation of its RTC law (from 1977 through 1995) was 617 violent crimes per 100,000 residents, while the corresponding figure for Maine was 186 violent crimes per 100,000 residents, less than one-third of Texas's rate. The more discerning CV of the RMSPE is 0.06 for Texas (with a year of adoption discrepancy of only 3.6 percent), while for Maine, the CV is a dramatically higher at 0.196 (with an initial year discrepancy of –37.9 percent). Accordingly, since the percentage imprecision in our synthetic pretreatment match for Maine is so much greater than for Texas, we have greater confidence in our estimates that in the 10th year, Texas's RTC law had increased violent crime by 16.9 percent than we do in an estimate that Maine's law had decreased violent crime by 16.5 percent.

[62]Ando (2015) examines the impact of constructing nuclear plants on local real per capita taxable income in Japan by generating a synthetic control for every coastal municipality that installed a nuclear plant. Although the average treatment effect measured in our article differs from the one used by Ando, we follow Ando in repeatedly estimating average placebo effects by randomly selecting different areas to serve as placebo treatments. (The sheer number of treatments that we are considering in this analysis prevents us from limiting our placebo treatment analysis to states that never adopt RTC laws, but this simply means that our placebo estimates will likely be biased *against* finding a qualitatively significant effect of RTC laws on crime, since some of our placebo treatments will be capturing the effect of the passage of RTC laws on crime rates.) Our estimated average treatment effect can then be compared to the distribution of average placebo treatment effects. Heersink and Peterson (2016) and Cavallo et al. (2013) also perform a similar randomization procedure to estimate the significance of their estimated average treatment effects, although the randomization procedure in the latter paper differs from ours by restricting the timing of placebo treatments to the exact dates when actual treatments took place.

passage dates that we use in our analysis.[63] For each of the 500 sets of randomly generated RTC dates, we then use the synthetic control methodology and the DAW predictors to estimate synthetic controls for each of the 33 states whose randomly generated adoption year is between 1981 and 2010. We use these data to estimate the percentage difference between each placebo treatment and its corresponding synthetic control during both the year of the treatment and each of the 10 posttreatment years (for which we have data). Using the methodology described in notes 52 and 58, we then test whether the estimated treatment effect for each of the 10 posttreatment years is statistically significant.

To further assess the statistical significance of our results, we compare each of the 10 coefficient estimates in Table 5 with the distribution of the 500 average placebo treatment effects that use the same crime rate, posttreatment year, and sample as the given estimate. To assist in this comparison process, we report a pseudo $p$ value that is equal to the proportion of our placebo treatment effects whose absolute value is greater than the absolute value of the given estimated treatment effect. This pseudo $p$ value provides another intuitive measure of whether our estimated average treatment effects are qualitatively large compared to the distribution of placebo effects. Our confidence that the treatment effect that we are measuring for RTC laws is real increases if our estimated treatment effect is greater than the vast majority of our estimated average placebo treatment effects. Examining our pseudo $p$ values in Table 5, we see that our violent crime results are always statistically significant in comparison to the distribution of placebo coefficients at the 0.05 level eight years or more past RTC adoption.

*C. Synthetic Control Estimates Using LM's Explanatory Variables*

In our Section III panel data analysis, we saw that RTC laws were associated with significantly higher rates of violent crime in the DAW model (Table 3), but not in the LM model (Table 4, Panel A). Under the synthetic controls approach, however, we find that the results are the same whether one uses the DAW or LM explanatory variables. This is necessarily true when one uses yearly lags in implementing the synthetic controls – see Kaul et al. (2016) – but it is also true when we use three lags of the dependent variable in our synthetic control protocol, as shown in Table 6. The detrimental effects of RTC laws on violent crime rates are statistically significant at the 0.05 level starting three years after the passage of an RTC law, and appear to increase over time. The treatment effects associated with violent crime in Table 6 range from 9.6 percent in the seventh posttreatment year to 12.8 percent in the 10th posttreatment year. Remarkably, the DAW and LM synthetic control estimates of the impact of RTC laws on violent crime are nearly identical

---

[63]More specifically, we randomly choose eight states to never pass RTC laws, six states to pass RTC laws before 1981, 33 states to pass RTC laws between 1981 and 2010, and three states to pass their RTC laws between 2011 and 2014. (Washington, DC is not included in the placebo analysis since it is excluded from our main analysis.) These figures were chosen to mirror the number of states in each of these categories in our actual data set.

*236   Donohue et al.*

Table 6:  The Impact of RTC Laws on the Violent Crime Rate, LM covariates, Full Sample, 1977–2014

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Average Normalized TEP | 0.309 | 1.981 | 4.063* | 5.211* | 7.159** | 6.981** | 9.644*** | 11.160*** | 12.115*** | 12.794*** |
| | (1.318) | (1.646) | (2.192) | (2.572) | (2.887) | (3.319) | (3.016) | (3.680) | (3.857) | (3.200) |
| $N$ | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 31 | 31 | 31 |

NOTE: Standard errors in parentheses. Column numbers indicate post-passage year under consideration; $N$ = number of states in sample. The synthetic controls method is run using the non-nested option, and each year's estimate and statistical significance is computed as explained in footnote 59. * $p < 0.10$; ** $p < 0.05$; *** $p < 0.01$.

(compare Tables 6 and Appendix Table K1), and this is true even when we limit the sample of states in the manner described above.[64]

### D.  The Contributions of Donor States to the Synthetic Control Estimates: Evaluating Robustness

One of the key elements of the synthetic control approach is its selection among plausible control states. For each state adopting an RTC law in year X, the approach selects among states that do not have RTC laws through at least ten years after X, including never-adopting states. Appendix Figure D10 lists all the states that are eligible under this criterion to serve as synthetic controls for one or more of the 33 adopting states, and shows how often they are selected. The horizontal length of each bar tells us how much that state contributes to our synthetic control violent crime estimates.[65] As the figure indicates, Hawaii appears most frequently—contributing to a synthetic control 18 of the 33 times it is eligible and averaging a 15.2 percent contribution—but California, a substantial contributor to multiple large states, edges it out for the largest average contribution (18.1 percent).

Hawaii's relatively large contribution as a donor state in the synthetic control estimates has some advantages but also raises concern that this small state might be unrepresentative of the states for which it is used as a control. For example, note that the largest share of Virginia's synthetic control comes from Hawaii (27.9 percent), with Rhode Island, Kansas, and Nebraska making up the lion's share of the remaining synthetic control. We had already mentioned one problem with the panel data analysis caused by the tendency of lax gun control states to serve as a source for guns that contribute to crime in the non-RTC states, and Virginia has always been a major source of that interstate flow. Since Virginia's guns are not likely to end up in Hawaii, the bias that the treatment infects the control is reduced for that particular match. Nonetheless, one may be concerned that Hawaii might be unduly skewing the estimates of the impact of RTC laws on violent crime.

To address this, as well as the analogous concern for other potentially idiosyncratic control states, we generated 18 additional TEP estimates, with each one generated by dropping a single one of the 18 states that appears as an element of our synthetic control analysis (as identified in Appendix Figure D10). The results of this exercise are presented in Appendix Figure D12, which shows that our estimated increase in violent crime resulting from the adoption of an RTC law is extremely robust: All 18 estimates remain statistically significant at the 0.01 percent level, and

---

[64]The 10th-year effect in the synthetic control analysis using the LM variables is 12.4 percent when we eliminate the three states with more than twice the average CV of the RMSPE. Knocking out the seven states with above-average values of this CV generates a similar 12.5 percent effect.

[65]In particular, it reflects the portion of each synthetic state it becomes part of, weighted by the treated state's population. For example, Texas's population is 13.6 percent of the total treated states' population. As a result, a state that made up 50 percent of synthetic Texas (but is not a donor for any other treatment state) would have a bar of size 6.8 percent.

the smallest TEP, which comes from dropping Illinois as a control state, is 12.0 percent. Note in particular that dropping Hawaii from the list of potential donor states slightly *increases* the estimate of the increase in violent crime caused by RTC laws. In fact, when we dropped Hawaii completely as a potential control and repeated the previous protocol of dropping one state at a time, the estimated increase in violent crime from RTC never fell below 12 percent (which was the value when New York was dropped as well as Hawaii). Indeed, the synthetic control finding that RTC laws increase violent crime is so robust that even if we drop California, New York, and Hawaii from the pool of potential donor states, RTC laws still increase violent crime by 8.9 percent after 10 years ($p = 0.018$).

### E.  Does Gun Prevalence Influence the Impact of RTC Laws?

The wide variation in the state-specific synthetic control estimates that was seen in Figures 7 and D11 suggests that there is considerable noise in some of the outlier estimates of a few individual states. For example, it is highly improbable that RTC laws led to a 16.5 percent decrease in violent crime in Maine and an 80.2 percent increase in violent crime in Montana, the two most extreme estimates seen in Figure 7. Since averaging across a substantial number of states will tend to eliminate the noise in the estimates, one should repose much greater confidence in the aggregated estimates than in any individual state estimate. Indeed, the fact that we can average across 33 separate RTC-adopting states is what generates such convincing and robust estimates of the impact of RTC laws on violent crime.

Another way to distill the signal from the noise in the state-specific estimates is to consider whether there is a plausible factor that could explain underlying differences in how RTC adoption influences violent crime. For example, RTC laws might influence crime differently depending on the level of gun prevalence in the state.

Figure 8 shows the scatter diagram for 33 RTC-adopting states, and relates the estimated impact on violent crime to a measure of gun prevalence in each RTC-adopting state. The last line of the note below the figure provides the regression equation, which shows that gun prevalence is positively related to the estimated increase in crime ($t = 2.39$).[66]

### F.  The Murder and Property Crime Assessments with Synthetic Controls

The synthetic control estimates of the impact of RTC laws on violent crime uniformly generate statistically significant estimates, and our phantom RTC law synthetic control estimates for the five pretreatment years (described in note 58) give us confidence that the synthetic control approach is working well for our violent crime estimates, as illustrated in Appendix Table L1. Since the estimated increases in violent crime are

---

[66]The gun prevalence data were collected by the data analytics firm YouGov in a 2013 online survey (Kalesan et al. 2016); 4,486 people were initially surveyed, although only 4,000 results are used in the final data set. YouGov used a proximity matching method to select the survey results for inclusion, matching respondents by race, age, gender, and education to the demographic breakdown of the 2010 American Community Survey.

*Figure 8:*   The impact of gun ownership on the increase in violent crime due to RTC laws (synthetic control estimates, 1977−2014).



NOTE: Treatment effect displayed is for the 10th year after RTC adoption (but 7th post−passage year for Kansas and Nebraska). Treatment Effect = −9.15 + 0.69 * Gun Prevalence. t = 2.39; R $^2$ = 0.16. Regression weighted by population in the final TEP year.

statistically significant and consistently observed in both our panel data and synthetic control analyses, these represent our most robust finding.

Just as we saw in the panel data analysis, the synthetic controls provide evidence of increases in the murder and firearm murder categories, but it is weaker and less precise than our violent crime estimates. For example, both Appendix Tables E1 and E2 show estimated crime increases of 8.7 percent (murder) and 15.3 percent (firearm murder), but only the 8.7 figure is statistically significant at the 0.10 level. Interestingly, our phantom law test works well for murder and even suggests statistically significant increases in that crime beginning right at the time of RTC adoption (Appendix Table L3). The firearm murder estimates perform less well in this test, generating an estimated fall in crime of 6.8 percent in the year prior to RTC adoption (Appendix Table L5).

The results from implementing this phantom law approach for property crime are perhaps our less encouraging estimates. While our estimated "effect" in the year prior to adoption would ideally be close to zero in this test, for property crime it is 6.9 percent, with the latter significant at the 0.10 level. (The full results of this test for all the crime categories are shown in Appendix L.) If we accept our normalized estimate for the impact of RTC laws on property crime it would give little reason to reject a null hypothesis of no effect (Appendix Table E8). Because our synthetic control estimates for violent crime are validated by our phantom adoption test and generate uniform and highly

robust results whether dropping selected donor states or states with poor fit, or using either the DAW or LM models, we have greater confidence in and therefore highlight our violent crime estimates. Accordingly, we consign our further discussion of the synthetic control estimates of murder and property crime to Appendix E.

## VI. Conclusion

The extensive array of panel data and synthetic control estimates of the impact of RTC laws that we present uniformly undermine the "More Guns, Less Crime" hypothesis. There is not even the slightest hint in the data from any econometrically sound regression that RTC laws reduce violent crime. Indeed, the weight of the evidence from the panel data estimates as well as the synthetic control analysis best supports the view that the adoption of RTC laws substantially raises overall violent crime in the 10 years after adoption.

In our initial panel data analysis, our preferred DAW specification predicted that RTC laws have led to statistically significant and substantial increases in violent crime. We also presented both panel data and synthetic control estimates that RTC laws substantially increase the percentage of robberies committed with a firearm, while having no restraining effect on the overall number of robberies. Moreover, to the extent the massive theft of guns from carrying guns outside the home generates crime spillovers to non-RTC states, our estimated increases in violent crime are downward biased.

We then supplemented our panel data results using our synthetic control methodology, and the finding from our panel data analysis was strongly buttressed. Whether we used the DAW or LM specifications, states that passed RTC laws experienced 13–15 percent *higher* aggregate violent crime rates than their synthetic controls after 10 years (results that were significant at either the 0.05 or 0.01 level after five years).

The synthetic control effects that we measure represent meaningful increases in violent crime rates following the adoption of RTC laws, and this conclusion remained unchanged after restricting the set of states considered based on model fit and after considering a large number of robustness checks. The consistency across different specifications and methodologies of the finding that RTC elevates violent crime enables far stronger conclusions than were possible over a decade ago when the NRC Report was limited to analyzing data only through 2000 with the single tool of panel data evaluation.

The best available evidence using different statistical approaches—panel data regression and synthetic control—with varying strengths and shortcomings and with different model specifications all suggest that the net effect of state adoption of RTC laws is a substantial increase in violent crime.

## References

Abadie, Alberto, Alexis Diamond, & Jens Hainmueller (2010) "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," 105 (490) *J. of the American Statistical Association* 493.

———— (2014) Comparative Politics and the Synthetic Control Method," 59(2) *American J. of Political Science* 495.

Abadie, Alberto, & Javier Gardeazabal (2003) "The Economic Costs of Conflict: A Case Study of the Basque Country," 93(1) *American Economic Rev.* 113.

ABC News (2018) "Man Annoyed by IHOP Customer Before Allegedly Shooting Him in Head," *ABC News.* https://abc13.com/man-annoyed-by-ihop-customer-before-allegedly-shooting-him/3160627/

Adda, Jérôme, Brendon McConnell, & Imran Rasul (2014) "Crime and the Depenalization of Cannabis Possession: Evidence from a Policing Experiment," 122(5) *J. of Political Economy* 1130.

Ando, Michihito (2015) "Dreams of Urbanization: Quantitative Case Studies on the Local Impacts of Nuclear Power Facilities Using the Synthetic Control Method," 85 *J. of Urban Economics* 68.

Aneja, Abhay, John J. Donohue, & Alexandria Zhang (2011) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," 13(2) *American Law & Economics Rev.* 565.

———— (2014) "The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy," *National Bureau of Economic Research Working Paper* 18294.

Associated Press (2014) "Official: Suspect in Deadly Hospital Shooting Had Lengthy History of Gun Arrests, Violence," July 26 *Fox News.* http://www.foxnews.com/us/2014/07/26/official-suspect-in-deadly-hospital-shooting-had-lengthy-history-gun-arrests.html

———— (2015) "8-Year-Old Arizona Boy Accidentally Shot by Baby Sitter," September 8 *Daily Record.* http://www.canoncitydailyrecord.com/ci_28778997/8-year-old-arizona-boy-accidentally-shot-by

Athey, Susan, & Guido W. Imbens (2017) "The State of Applied Econometrics: Causality and Policy Evaluation," 31(2) *J. of Economic Perspectives* 3.

Ayres, Ian, & John J. Donohue (2003) "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 *Stanford Law Rev.* 1371.

Barbash, Fred (2018) "Calif. Teacher Resigns After Unintentionally Firing Weapon in Gun Safety Class," April 12 *Washington Post.* https://www.washingtonpost.com/news/morning-mix/wp/2018/04/12/calif-teacher-resigns-after-unintentionally-firing-weapon-in-gun-safety-class/?noredirect=on&utm_term=.68faa7eb0133

Biette-Timmons, Nora (2017) "More People Are Pulling Guns During Road-Rage Incidents," August 10 *Trace.* https://www.thetrace.org/2017/08/guns-road-rage-cleveland-2017

Biography.com (2016) "Bernhard Goetz," November 15 *Online.* https://www.biography.com/people/bernhard-goetz-578520

Blair, J. Pete, & Katherine W. Schweit (2014) *A Study of Active Shooter Incidents in the United States Between 2000 and 2013.* Washington, DC: Texas State Univ. & Federal Bureau of Investigation, U.S. Department of Justice.

Bohn, Sarah, Magnus Lofstrom, & Steven Raphael (2014) "Did the 2007 Legal Arizona Workers Act Reduce the State's Unauthorized Immigrant Population?" 96(2) *Rev. of Economics & Statistics* 258.

Boots, Michelle Theriault (2017) "In Alaska, a High Bar for Taking Guns from the Mentally Ill," January 9 *Anchorage Daily News.* https://www.adn.com/alaska-news/2017/01/09/in-alaska-a-high-bar-for-the-mentally-ill-to-part-with-their-guns/

Bureau of Alcohol, Tobacco, Firearms, & Explosives (2012) *2012 Summary: Firearms Reported Lost and Stolen.* https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

Bureau of Justice Statistics (2014) *The Nation's Two Measures of Homicide.* https://www.bjs.gov/content/pub/pdf/ntmh.pdf

Byers, Christine (2010) "Police Report Details AAB Shooting Chaos," November 18 *St. Louis Post-Dispatch.* https://www.stltoday.com/news/local/crime-and-courts/police-report-details-abb-shooting-chaos/article_bb52f36b-3757-5c95-a775-384c52dfd887.html

Calder, Chad (2018) "Legal Analysts Weigh in on Ronald Gasser's Defense in Joe McKnight Killing as Trial Set to Begin," January 15 *New Orleans Advocate*. https://www.theadvocate.com/new_orleans/news/courts/article_f51f97ca-fa45-11e7-a3eb-2fa820d7858f.html

Campbell, Elizabeth (2017) "521 Guns Stolen in 2017 from Unlocked Cars, Jacksonville Police Say," December 11 *News 4 Jax*. https://www.news4jax.com/news/local/jacksonville/521-guns-stolen-in-2017-from-unlocked-cars-jacksonville-police-say

Carter, Chelsea J., Ed Lavandera, & Evan Perez (2013) "Who Is Navy Yard Gunman Aaron Alexis?" *CNN*. http://www.cnn.com/2013/09/16/us/navy-yard-suspects/index.html

Cavallo, Eduardo, Sebastian Galiani, Ilan Noy, & Juan Pantano (2013) "Catastrophic Natural Disasters and Economic Growth," 95(5) *Rev. of Economics & Statistics* 1549.

CEA (2016) *Economic Perspectives on Incarceration and the Criminal Justice System*. Washington, DC: Council of Economic Advisors, Executive Office of the President of the United States.

Chalfin, Aaron, & Justin McCrary (2017) "Criminal Deterrence: A Review of the Literature," 55(1) *J. of Economic Literature* 5.

Clary, Mike, Megan O'Matz, & Lisa Arthur (2017) "Puerto Rico Police Seized Guns from Airport Shooter Esteban Santiago," January 13 *Sun Sentinel*. http://www.sun-sentinel.com/news/fort-lauderdale-hollywood-airport-shooting/fl-santiago-guns-puerto-rico-20170113-story.html

Cohen, Dov, Richard E. Nisbett, Brian F. Bowdle, & Norbert Schwarz (1996) "Insult, Aggression, and the Southern *Culture of Honor*: An 'Experimental Ethnography'," 70(5) *J. of Personality & Social Psychology* 945.

Cook, Philip J. (2018) "Gun Theft and Crime," 95(1) *J. of Urban Health* 305.

Cook, Philip J., Jens Ludwig, & Adam M. Samaha (2009) "Gun Control After *Heller*: Threats and Sideshows from a Social Welfare Perspective," 56(5) *UCLA Law Rev.* 1041.

DePrang, Emily (2015) "The Mystery of Milwaukee's 'Human Holster'," July 16 *Trace*. https://www.thetrace.org/2015/07/concealed-carry-wisconsin-human-holster/

Donohue, John J. (2003) "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," 2 (3) *Criminology & Public Policy* 397.

——— (2017a) "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117(5) *Columbia Law Rev.* 1297.

——— (2017b) "Laws Facilitating Gun Carrying and Homicide," 107(12) *American J. of Public Health* 1864.

Donohue, John J., & Justin Wolfers (2009) "Estimating the Impact of the Death Penalty on Murder," 11(2) *American Law & Economics Rev.* 249.

Dube, Arindrajit, & Ben Zipperer (2013) "Pooling Multiple Case Studies Using Synthetic Controls: An Application to Minimum Wage Policies," *IZA Discussion Paper* 8944. https://ssrn.com/abstract=2589786

Durlauf, Steven N., Salvado Navarro, & David A. Rivers (2016) "Model Uncertainty and the Effect of Shall-Issue Right-to-Carry Laws on Crime," 81 *European Economic Rev.* 32.

Eltagouri, Marwa (2017) "Man Accidentally Shoots Himself and His Wife at a Church, Shortly After a Discussion on Shootings," November 17 *Washington Post*. https://www.washingtonpost.com/news/acts-of-faith/wp/2017/11/17/a-man-accidentally-shot-himself

Fernandez, Manny, Liam Stack, & Alan Blinder (2015) "9 Are Killed in Biker Gang Shootout in Waco," May 17 *New York Times*. http://www.nytimes.com/2015/05/18/us/motorcycle-gang-shootout-in-waco-texas.html

Ford, Richard (2016) "Richard Ford on America's Gun Problem," March 18 *Financial Times*. https://www.ft.com/content/d0cea3d0-eaab-11e5-bb79-2303682345c8

Fortin, Jacey (2018) "Georgia Teacher Fired Gun While Barricaded in Classroom, Police Say," February 28 *New York Times*. https://www.nytimes.com/2018/02/28/us/georgia-teacher-gun-shooting.html

Fox News (2016) "Ohio Gun Shop Owner Killed During Concealed Carry Class," June 19 *Fox News*. https://www.foxnews.com/us/ohio-gun-shop-owner-killed-during-concealed-carry-class

Freskos, Brian (2016) "Guns Are Stolen in America Up to Once Every Minute. Owners Who Leave Their Weapons in Cars Make it Easy for Thieves," September 21 *Trace*. https://www.thetrace.org/2016/09/stolen-guns-cars-trucks-us-atlanta/

——— (2017a) "As Thefts of Guns from Cars Surge, Police Urge Residents to Leave Their Weapons at Home," March 6 *Trace*. https://www.thetrace.org/2017/03/as-thefts-of-guns-from-cars-surge-police-urge-residents-to-leave-their- weapons-at-home/

——— (2017b) "Missing Pieces," November 20 *Trace*. https://www.thetrace.org/features/stolen-guns-violent-crime-america/

——— (2017c) "These Gun Owners Are at the Highest Risk of Having Their Firearms Stolen," April 11 *Trace*. https://www.thetrace.org/2017/04/gun-owners-high-risk-firearm-theft/

——— (2018a) "Citing *The Trace*'s Reporting, Top Gun Violence Scholar Calls for More Research on Threat of Stolen Firearms," April 26 *Trace*. https://www.thetrace.org/rounds/stolen-guns-research-agenda-phil-cook/

——— (2018b) "Maryland Will Invest in Gun Trafficking Crackdown," April 30 *Trace*. https://www.thetrace.org/2018/04/maryland-gun-trafficking-task-force-wiretapping-baltimore/

Friedman, David D. (1990) *Price Theory: An Intermediate Text*. South-Western Publishing Co. http://www.daviddfriedman.com/Academic/Price_Theory/PThy_Chapter_20/PThy_Chapter_20.html

Fuchs, Erin (2013) "Why the South Is More Violent Than the Rest of America," September 18 *Business Insider*. http://www.businessinsider.com/south-has-more-violent-crime-fbi-statistics-show-2013-9

Gibbons, Thomas, & Robert Moran (2000) "Man Shot, Killed in Snow Dispute," January 27 *Philadelphia Inquirer*. http://articles.philly.com/2000-01-27/news/25598207_1_snow-dispute-man-shot-christian-values

Glanton, Dahleen, & Carlos Sadovi (2014) "Concealed Carry Shooting Reignites Debate," July 31 *Chicago Tribune*. http://www.chicagotribune.com/news/ct-crestwood-concealed-carry-0730-20140730-story.html

Gueverra, Ericka Cruz (2018) "Man Killed by Armed PSU Officers Had Valid Concealed Carry Permit," June 30 *OPB*. https://www.opb.org/news/article/portland-state-shooting-victim-jason-erik-washington/

Hauser, Christine (2017) "White Police Officer in St. Louis Shoots Off-Duty Black Colleague," June 26 *New York Times*. https://www.nytimes.com/2017/06/26/us/saint-louis-black-officer.html?_r=0

Heath, Michelle (2015) "Gun Goes Off Inside Christus Facility, Injures Woman," October 19 *Beaumont Enterprise*. http://www.beaumontenterprise.com/news/article/Gun-goes-off-inside-Christus-facility-injures-6578001.php

Heersink, Boris, & Brenton Peterson (2016) "Measuring the Vice-Presidential Home State Advantage with Synthetic Controls," 44(4) *American Politics Research* 734.

Hemenway, David, Deborah Azrael, & Matthew Miller (2017) "Whose Guns Are Stolen? The Epidemiology of Gun Theft Victims," 4(1) *Injury Epidemiology* 11.

Hemenway, David, Mary Vriniotis, & Matthew Miller (2006) "Is an Armed Society a Polite Society? Guns and Road Rage," 38(4) *Accident Analysis and Prevention* 687.

Hermann, Peter, & Rachel Weiner (2019) "He Put 224 Guns on the Streets. His Family Would Pay a Price," January 24 *Washington Post*. https://www.washingtonpost.com/local/public-safety/he-put-224-guns-on-the-streets-his-family-would-pay-a-price/2019/01/23/68cd2520-1a57-11e9-8813-cb9dec761e73_story.html?utm_term=.8bfebbb0072e

Hernandez, Alex V. (2017) "Police: No Charges in Fatal Shootout at Elmwood Park Gas Station," April 10 *Chicago Tribune*. http://www.chicagotribune.com/suburbs/elmwood-park/news/ct-elm-elmwood-park-shooting-tl-0413-20170409-story.html

Ho, Vivian (2015) "Gun Linked to Pier Killing Stolen from Federal Ranger," July 8 *San Francisco Chronicle*. http://www.sfchronicle.com/crime/article/Gun-linked-to-S-F-pier-killing-was-BLM-6373265.php

*244   Donohue et al.*

Ho, Vivian, & Kale Williams (2015) "Gun in 2 Killings Stolen from Unlocked Car in Fisherman's Wharf, Cops Say," October 9 *San Francisco Chronicle*. http://www.sfgate.com/crime/article/Gun-in-2-killings-stolen-from-unlocked-car-in-6562039.php

Holzel, Dee (2008) "Shootout in Winnemucca: Three Dead, Two Injured in Early-Morning Gunfight," May 24 *Elko Daily Free Press*. https://elkodaily.com/news/local/shootout-in-winnemucca-three-dead-two-injured-in-early-morning/article_83fe3832-cc3b-528b-88bd-a85ce65f5967.html

Hopkins, Kyle (2017) "Accused Florida Airport Shooter to Appear in Alaska Case by Phone," March 28 *2 KTUU Anchorage*. http://www.ktuu.com/content/news/Diagnosed-with-serious-mental-illness-accused-airport-shooter-to-appear-in-Alaska-case-by-phone-417394013.html

Horwitz, Josh (2011) "Speaking of 'Fast and Furious': NRA Leaders Well-Versed in Fomenting Foreign Conflicts," September 13 *Huffington Post*. https://www.huffingtonpost.com/josh-horwitz/speaking-of-fast-and-furi_b_959633.html

Igielnik, Ruth, & Anna Brown (2017) *Key Takeaways on Americans' Views of Guns and Gun Ownership*. Pew Research Center. http://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership

Kalesan, Bindu, Marcos D. Villarreal, Katherine M. Keyes, & Sandro Galea (2016) "Gun Ownership and Social Gun Culture," 22(3) *Injury Prevention* 216.

Kalinowski, Bob (2012) "Police: Plymouth Homicide Suspect Shot by Patron," September 10 *Citizens' Voice*. http://citizensvoice.com/news/police-plymouth-homicide-suspect-shot-by-patron-1.1370815

Kaste, Martin (2019) "Gun Carry Laws Can Complicate Police Interactions," July 19 *NPR*. https://www.npr.org/2016/07/19/486453816/open-carry-concealed-carry-gun-permits-add-to-police-nervousness

Kaul, Ashok, Stefan Klobner, Gregor Pfeifer & Manuel Schieler (2016) "Synthetic Control Methods: Never Use All Pre-Intervention Outcomes as Economic Predictors."

Keele, Luke (2009) "An Observational Study of Ballot Initiatives and State Outcomes," *Working Paper*. https://www.researchgate.net/publication/228715196_An_observational_study_of_ballot_initiatives_and_state_outcomes

KHOU (2015) "One Man Injured After Carjacking, Shooting at Gas Station," September 27 *KHOU 11*. http://www.khou.com/news/one-man-injured-after-carjacking-shooting-at-gas-station/142447940

KIMT (2018) "Update: Court Documents Chronicle Tense Moments Prior to Rochester Shooting" January 17 *KIMT 3 News*. http://www.kimt.com/content/news/Rochester-shooting-Weiss-charged-with-2nd-degree-murder-469747873.html

Knight, Brian (2013) "State Gun Policy and Cross-State Externalities: Evidence from Crime Gun Tracing," 5(4) *American Economic J.: Economic Policy* 200.

Kovandzic, Tomislav, Thomas Marvell, & Lynne Vieraitis (2005) "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities," 9 *Homicide Studies* 292.

KTUU (2017) "Esteban Santiago, Accused Fort Lauderdale Shooter, Agreed to Anger Management Courses in Alaska," January 9 *2 KTUU Anchorage*. http://www.ktuu.com/content/news/Esteban-Santiago-accused-Fort-Lauderdale-shooter-had-agreed-to-under-anger-management-in-Alaska-410177225.html

Lane, Emily (2018) "Cardell Hayes Again Claims Self-Defense in Will Smith Shooting Death: Appeal," February 15 *NOLA.com*. https://www.nola.com/crime/2018/02/cardell_hayes_self_defense_wil.html

Lat, David (2012) "*DiDonato v. Ung*: The Temple Law Shooter Gets Hit—With a Civil Suit," January 12 *Above the Law*. https://abovethelaw.com/2012/01/didonato-v-ung-the-sequelor-the-temple-law-shooter-gets-hit-with-a-lawsuit

Levenson, Eric (2017) "Judge Denies 'Stand Your Ground' Defense in Movie Theater Shooting," March 11 *CNN*. http://www.cnn.com/2017/03/10/us/stand-your-ground-movie-trial/index.html

Lopez, German (2018) "Police Shootings Are Also Part of America's Gun Problem," April 9 *Vox.* https://www.vox.com/2018/4/9/17205256/gun-violence-us-police-shootings

Lott, John R. (2010) *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago, IL: Univ. of Chicago Press.

Lott, John R., & David B. Mustard (1997) "Crime, Deterrence, and Right-to-Carry Concealed Handguns," 26(1) *J. of Legal Studies* 1.

Lozano, Alicia Victoria (2017) "28-Year-Old David Desper Charged in Road Rage Killing of 18-Year-Old Bianca Roberson," July 2 *NBC Philadelphia.* https://www.nbcphiladelphia.com/news/local/Police-Update-on-Road-Rage-Killing-of-18-Yr-Old-432100983.html

Lunny, SanRay (2010) *Unloaded Open Carry.* San Mateo County Sheriff's Office. http://www.calgunlaws.com/wp-content/uploads/2012/09/San-Mateo-County-Sheriffs-Office_Unloaded-Open-Carry.pdf

Luthern, Ashley (2015) "Concealed Carry Draws Opposite Views—And a Murky Middle," June 11 *Milwaukee Wisconsin J. Sentinel.* http://www.jsonline.com/news/crime/concealed-carry-draws-opposite-views--and-a-murky-middle-b99510854z1-307079321.html

MacDonald, Sally (2012) "CHL Holder Fired Shot that Killed Store Clerk," May 31 *Free Republic.* http://www.freerepublic.com/focus/f-news/2889792/posts

McElroy, Majorie B., & Will Peichun Wang (2017) "Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data." https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2992058

McLaughlin, Eliott, & Madeline Holcombe (2018) "Mother of Man Killed by Police at Alabama Mall Ponders Open Casket as Family Seeks Justice," November 26 *CNN.* https://www.cnn.com/2018/11/25/us/alabama-shooting-family-seeks-answers/index.html

Mettler, Katie (2016) "'He Thought He Could Help': Concealed Carry Gun-Wielder Intervenes in Domestic Dispute and Is Shot Dead," May 3 *Washington Post.* https://www.washingtonpost.com/news/morning-mix/wp/2016/05/03/he-thought-he-could-help

Mideksa, Torben K. (2013) "The Economic Impact of Natural Resources," 65(2) *J. of Environmental Economics & Management* 277.

Miller, Matthew, Deborah Azrael, David Hemenway, & Frederic I. Solop (2002) "'Road Rage' in Arizona: Armed and Dangerous," 34(6) *Accident Analysis & Prevention* 807.

Moody, Carlisle E., & Thomas B. Marvell (2008) "The Debate on Shall-Issue Laws," 5(3) *Econ J. Watch* 269.

Moody, Carlisle E., Thomas B. Marvell, Paul R. Zimmerman, & Fasil Alemante (2014) "The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," 4 *Rev. of Economics & Finance* 33.

Morin, Rich, & Andrew Mercer (2017) *A Closer Look at Police Officers Who Have Fired Their Weapon on Duty.* Pew Research Center. https://www.pewresearch.org/fact-tank/2017/02/08/a-closer-look-at-police-officers-who-have-fired-their-weapon-on-duty/

Murdock, Jason (2018) "Arizona Man Accidentally Shoots Himself in Groin in Walmart," November 29 *Newsweek.* https://www.newsweek.com/arizona-man-accidentally-shoots-himself-groin-walmart-1236287

Nagin, Daniel S. (Forthcoming) "Firearm Availability and Police Use of Force," *Annals of American Academy of Political & Social Science.*

National Research Council (2005) *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press.

NBC News (2014) "Cost of Bravery: Vegas Bystander Died Trying to Stop Rampage," June 10 *NBC News.* https://www.nbcnews.com/storyline/vegas-cop-killers/cost-bravery-vegas-bystander-died-trying-stop-rampage-n127361

Nonnemaker, James, Mark Engelen, & Daniel Shive (2011) "Are Methamphetamine Precursor Control Laws Effective Tools to Fight the Methamphetamine Epidemic?" 20(5) *Health Economics* 519.

Office of the Director—Strategic Management (2013) *2012 Summary: Firearms Reported Lost and Stolen.* U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives. https://www.atf.gov/resource-center/docs/2012-firearms-reported-lost-and-stolenpdf-1/download

Officer.com (2017) "Chief: Concealed-Carry Law Is 'Irresponsible'," June 29 *Officer.com*. https://www.officer.com/command-hq/news/12348064/milwaukee-police-chief-calls-concealedcarry-law-irresponsible

Olson, Erik J., Mark Hoofnagle, Elinore J. Kaufman, William C. Schwab, Patrick Reilly, & Mark J. Seamon (2019) "American Firearm Homicides: The Impact of Your Neighbors," February 7 *J. of Trauma & Acute Care Surgery*. https://journals.lww.com/jtrauma/Abstract/publishahead/American_Firearm_Homicides__The_Impact_of_Your.98406.aspx#pdf-link

Owens, David (2018) "Retired Hartford Firefighter Donald Brown Sentenced to 7 Years in Shooting," January 9 *Hartford Courant*. http://www.courant.com/news/connecticut/hc-hartford-donald-brown-sentenced-0110-story.html

Palmer, Ewan (2018) "Pregnant Woman Shot by Daughter, 3, After Finding Gun in Car," April 18 *Newsweek*. http://www.newsweek.com/pregnant-woman-shot-daughter-3-after-finding-gun-car-outisde-platos-closet-891073

Paraguassu, Lisandra, & Ricardo Brito (2018) "U.S. Biggest Source of Illegal Foreign Guns in Brazil: Report," January 10 *Reuters*. https://www.reuters.com/article/us-usa-brazil-arms/u-s-biggest-source-of-illegal-foreign-guns-in-brazil-report-idUSKBN1EZ2M5

Parsons, Chelsea, & Eugenio Weigend Vargas (2017) *Stolen Guns in America: A State-by-State Analysis*. Center for American Progress. https://cdn.americanprogress.org/content/uploads/2017/07/25052308/StolenGuns-report.pdf

Perrusquia, Marc (2017) "Stolen Guns: 'Getting Them Is the Easy Part'," *Commercial Appeal*. http://projects.commercialappeal.com/woundedcity/stolen-guns-this-fence-makes-a-bad-neighbor.php

Phillips, Charles D., Obioma Nwaiwu, Darcy K. McMaughan Moudouni, Rachel Edwards, & Szu hsuan Lin (2013) "When Concealed Handgun Licensees Break Bad: Criminal Convictions of Concealed Handgun Licensees in Texas, 2001–2009," 103(1) *American J. of Public Health* 86.

Pilger, Lori (2018) "FBI Accuses White Supremacist of Terror Attack on Amtrak Train in Rural Nebraska," January 4 *Lincoln J. Star*. http://journalstar.com/news/state-and-regional/nebraska/fbi-accuses-white-supremacist-of-terror-attack-on-amtrak-train/article_82f0860e-3c75-5a66-ab0c-a2e3a3c16aab.html

Planty, Michael, & Jennifer Truman (2013) "Firearm Violence, 1993–2011." *U.S. Department of Justice Bureau of Justice Statistics BJS Special Report* 241730.

Plumlee, Rick (2012) "Eight with Concealed-Carry Permits Charged with Felonies in Sedgwick County," November 17 *Wichita Eagle*. http://www.kansas.com/latest-news/article1103131.html

Pugliese, Nicholas (2018) "It's Tough to Buy a Gun in New Jersey. So Where Do All the Guns Used in Crimes Come From?" April 16 *NorthJersey.com*. https://www.northjersey.com/story/news/new-jersey/2018/04/16/nj-new-jersey-where-do-guns-used-crimes-come/503115002/

Robles, Frank, & Christine Hauser (2015) "Lawyers Provide Details in Police Shooting of Corey Jones in Florida," October 22 *New York Times*. https://www.nytimes.com/2015/10/23/us/florida-corey-jones-police-shooting.html

Sampson, Zachary T. (2014) "Stolen Guns, Like One Used to Kill Tarpon Springs Officer, Routine at Crime Scenes," December 24 *Tampa Bay Times*. http://www.tampabay.com/news/publicsafety/crime/gun-police-say-was-used-to-kill-tarpon-springs-officer-stolen-from/2211436

Sauro, Sean (2019) "Plans Made to Honor Men Killed in State College Shooting Spree," January 26 *Penn Live*. https://www.pennlive.com/news/2019/01/plans-made-to-honor-men-killed-in-state-college-shooting-spree.html

Savitsky, Sasha (2019) "Country Singer Justin Carter Dead at 35 After Accidental Shooting," March 22 *Fox News*. https://www.foxnews.com/entertainment/country-singer-justin-carter-dead-at-35-after-accidental-shooting

Scherer, Jasper (2016) "Fla. 'Loud Music' Murder: Firing into Car Full of Teens Playing Rap Music Not 'Self-Defense,' Court Rules," November 18 *Washington Post*. https://www.washingtonpost.com/news/morning-mix/wp/2016/11/18/fla-loud-music-murder-firing

Schwarz, Hunter (2014) "Idaho Professor Shoots Himself in Foot Two Months After State Legalizes Guns on Campuses," September 5 *Washington Post.* https://wapo.st/1nAtjTj?tid=ss_mail&utm_term=.a706e9990995

Schwarzschild, Todd, & Drew Griffin (2011) "ATF Loses Track of 1,400 Guns in Criticized Probe," July 12 *CNN.* http://www.cnn.com/2011/POLITICS/07/12/atf.guns/index.html

Shen, Aviva (2017) "When the Driver Who Just Cut You Off Also Has a Gun," April 10 *Trace.* https://www.thetrace.org/2017/04/road-rage-shootings-guns/

Siegel, Michael, Molly Pahn, Ziming Xuan, Craig S. Ross, Sandro Galea, Bindu Kalesan, Eric Fleegler, & Kristin A. Goss (2017) "Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States," 107(12) *American J. of Public Health* 1923.

Simon, Darran (2018) "Manslaughter Defendant in 'Stand Your Ground' Case Said He Felt Scared in Altercation," September 3 *CNN.* https://www.cnn.com/2018/09/03/us/michael-drejka-stand-your-ground-jailhouse-interview/index.html

Simpson, Kevin (2017) "Shoppers Pulled Guns in Response to Thornton Walmart Shooting, But Police Say that Slowed Investigation," November 2 *Denver Post.* http://www.denverpost.com/2017/11/02/shoppers-pulled-weapons-walmart-shooting/

Slobodzian, Joseph A. (2011) "Ung Acquitted in Wounding of DiDonato in Old City," February 16 *Inquirer.* http://www.philly.com/philly/news/local/20110216_Ung_acquitted_in_wounding_of_DiDonato_in_Old_City.html

Soderling, Luke (2016) *How to Inform an Officer You Are Carrying a Handgun and Live* [video file]. https://www.youtube.com/watch?v=fOO99qcASEM

Stanglin, Doug (2018) "Parkland Teacher Charged with Leaving Loaded Gun in Public Restroom," April 13 *USA Today.* https://www.usatoday.com/story/news/2018/04/13/parkland-teacher-charged-leaving-loaded-gun-public-restroom/514855002/

Stark, Emily, & Daniel Sachau (2016) "Lake Wobegon's Guns: Overestimating Our Gun-Related Competences," 4(1) *J. of Social & Political Psychology* 8.

Strnad, Jeff (2007) "Should Legal Empiricists Go Bayesian?" 9(1) *American Law & Economics Rev.* 195.

Stuart, Hunter (2013) "2 Concealed Carry Holders Kill Each Other In Road Rage Incident," September 19 *Huffington Post.* http://www.huffingtonpost.com/2013/09/19/michigan-concealed-carry-road-rage-two-dead_n_3956491.html

US News (2018) "Cops: Mom Was Turning on Safety When Gun Fired, Killing Girl," April 23 *US News.* https://www.usnews.com/news/best-states/ohio/articles/2018-04-23/cops-mom-was-turning-on-safety-when-gun-fired-killing-girl

Violence Policy Center (2017) *Mass Shootings Committed by Concealed Carry Killers: May 2007 to the Present.* http://concealedcarrykillers.org/wp-content/uploads/2017/06/ccwmassshootings.pdf

WFTV (2015) "3 Injured When Man's Gun Goes Off in Sanford Cracker Barrel," November 2 *WFTV 9.* http://www.wftv.com/news/local/man-not-charged-after-gun-goes-sanford-cracker-bar/26880670

Williams, Clois, & Steven Waltrip (2004) *Aircrew Security: A Practical Guide.* New York, NY: Ashgate Publishing.

Wilson, Robert (2016) "Common Sense," February 29 *American Scholar.* https://theamericanscholar.org/common-sense/#

Witt, Jessica K., & James R. Brockmole (2012) "Action Alters Object Identification: Wielding a Gun Increases the Bias to See Guns," 38(5) *J. of Experimental Psychology: Human Perception & Performance* 1159.

Zimmerman, Paul R. (2014) "The Deterrence of Crime Through Private Security Efforts: Theory and Evidence," 37 *International Rev. of Law & Economics* 66.

# Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States

*Michael Siegel, MD, MPH, Ziming Xuan, ScD, SM, MA, Craig S. Ross, PhD, MBA, Sandro Galea, MD, DrPH, MPH, Bindu Kalesan, PhD, MPH, MSc, Eric Fleegler, MD, MPH, and Kristin A. Goss, PhD, MPP*

*Objectives.* To examine the relation of "shall-issue" laws, in which permits must be issued if requisite criteria are met; "may-issue" laws, which give law enforcement officials wide discretion over whether to issue concealed firearm carry permits or not; and homicide rates.

*Methods.* We compared homicide rates in shall-issue and may-issue states and total, firearm, nonfirearm, handgun, and long-gun homicide rates in all 50 states during the 25-year period of 1991 to 2015. We included year and state fixed effects and numerous state-level factors in the analysis.

*Results.* Shall-issue laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates, but were not significantly associated with long-gun or nonfirearm homicide.

*Conclusions.* Shall-issue laws are associated with significantly higher rates of total, firearm-related, and handgun-related homicide. (*Am J Public Health.* 2017;107:1923–1929. doi:10.2105/AJPH.2017.304057)

 **See also Donohue, p. 1864, and also Galea and Vaughan, p. 1867.**

Firearm violence is a major public health problem. In 2015, there were approximately 36 000 firearm-related deaths in the United States; 13 463 were homicides, 22 018 were suicides, and 489 were unintentional injuries.[1] During the same year, 72.9% of homicides were firearm homicides[1] and, of these, approximately 90% were committed with a handgun. A central question in the debate about public policies to reduce firearm violence is whether easier access to concealed handguns increases or decreases the rate of firearm–related homicides.[2] Some have argued that the feared or actual presence of armed citizens may deter violent crime.[3] Others have suggested that a higher prevalence of people carrying guns will increase the likelihood that an altercation results in a fatality.[4] Thus, having a clear understanding of the impact of concealed-carry laws on firearm-related homicide would help guide policymakers who are aiming to reduce firearm violence.

As of the end of 2015, all states allowed certain persons to carry concealed handguns, but there were 3 major variations in permitting policy[5] (Table 1). In 9 states, law enforcement officials had wide discretion over whether to issue concealed-carry permits; these are referred to as "may-issue" states. In 32 states, there was little or no discretion; these are referred to as "shall-issue" states because permits must be issued if requisite criteria are met. In an additional 9 states, there was no permit necessary to carry a concealed handgun; these are referred to as "permitless-carry" states. The wide variation in these policies between states and over time presents the opportunity to compare homicide rates between states with varying concealed-carry permitting policies to examine the impact of concealed-carry laws on homicide.

The critical difference between may-issue and shall-issue laws is that in may-issue states, law enforcement officials may use their judgment in making decisions about whether to approve or deny a permit application, whereas in shall-issue states, no judgment is involved—the application must be approved unless the applicant is categorically prohibited from concealed handgun possession. In may-issue states, the element of discretion allotted to law enforcement is typically a judgment regarding the "suitability" or "need" of a person to carry a concealed weapon (Table 2). Law enforcement officials have a wide degree of latitude in making these judgments. In shall-issue states, the categorical prohibitions consist of a list of specific criminal convictions.

Unfortunately, the existing literature on the impact of concealed carry laws is inconsistent. At least 10 national studies have examined the relationship between shall-issue concealed-carry laws and firearm-related or total homicide rates at the state level (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[3,6–14] In 2 studies, shall-issue laws were found to decrease homicide rates.[3,6] In 2 studies, these laws were found to increase homicide rates.[7,8] Six studies reported no clear impact of shall-issue laws on homicide rates.[9–14] The inconsistency of these results has understandably created some confusion about what approach is most effective to address the firearm violence problem.

Most of the published literature on this topic includes data that are more than a decade old: the most recent year of data analyzed was

**ABOUT THE AUTHORS**

*Michael Siegel, Ziming Xuan, Craig S. Ross, and Sandro Galea are with the Boston University School of Public Health, Boston, MA. Bindu Kalesan is with the Boston University School of Medicine. Eric Fleegler is with Children's Hospital Boston. Kristin A. Goss is with the Sanford School of Public Policy, Duke University, Durham, NC.*

*Correspondence should be sent to Michael Siegel, MD, MPH, Department of Community Health Sciences, Boston University School of Public Health, 801 Massachusetts Ave, Boston, MA 02118 (e-mail: mbsiegel@bu.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted August 1, 2017.*

*doi: 10.2105/AJPH.2017.304057*

Exhibit D
Page 902

TABLE 1—Concealed-Carry Permitting Laws and Age-Adjusted Firearm Homicide Rates by US State, 2015, and Status of Laws During the Period of 1991 to 2015

| State | Age-Adjusted Firearm Homicide Rate,[a] 2015 (per 100 000) | Status of Concealed-Carry Permitting Law, 2015 | Effective Date of Current (as of 2015) Concealed-Carry Law |
|---|---|---|---|
| Hawaii[b] | 0.75 | May issue | Before 1991 |
| New Hampshire | 0.96 | Shall issue | Before 1991 |
| Rhode Island | 0.99 | May issue | Before 1991 |
| Maine | 1.14 | Shall issue | Before 1991 |
| Massachusetts | 1.26 | May issue | Before 1991 |
| Utah | 1.39 | Shall issue | 1995 |
| Idaho | 1.29 | Shall issue | Before 1991 |
| Iowa | 1.62 | Shall issue | Before 1991 |
| North Dakota | 1.69 | Shall issue | Before 1991 |
| Vermont | 1.76 | Permitless carry | Before 1991 |
| Minnesota | 1.77 | Shall issue | 2003 |
| South Dakota | 1.97 | Shall issue | Before 1991 |
| New York | 2.07 | May issue | Before 1991 |
| Wyoming | 2.16 | Permitless carry | 2011[c] |
| Montana | 2.17 | Shall issue | Before 1991 |
| Washington | 2.32 | Shall issue | Before 1991 |
| Oregon | 2.35 | Shall issue | Before 1991 |
| Connecticut | 2.43 | May issue | Before 1991 |
| Colorado | 2.46 | Shall issue | 2003 |
| Nebraska | 2.67 | Shall issue | 2007 |
| West Virginia | 2.89 | Shall issue | Before 1991 |
| Wisconsin | 3.18 | Shall issue | 2011 |
| New Jersey | 3.22 | May issue | Before 1991 |
| Virginia | 3.29 | Shall issue | 1995 |
| Kansas | 3.35 | Shall issue | 2007 |
| California | 3.52 | May issue | Before 1991 |
| Arizona | 3.56 | Permitless carry | 2010[c] |
| Kentucky | 3.96 | Shall issue | 1996 |
| Texas | 4.04 | Shall issue | 1995 |
| Pennsylvania | 4.34 | Shall issue | Before 1991 |
| Ohio | 4.38 | Shall issue | 2004 |
| Nevada | 4.49 | Shall issue | 1995 |
| North Carolina | 4.54 | Shall issue | 1995 |
| Indiana | 4.61 | Shall issue | Before 1991 |
| Florida | 4.66 | Shall issue | Before 1991 |
| Michigan | 4.74 | Shall issue | 2001 |
| New Mexico | 4.79 | Shall issue | 2001 |
| Alaska | 5.22 | Permitless carry | 2003[c] |

*Continued*

2010, and only 3 of the 10 studies examined data past the year 1998 (Table A, available as a supplement to the online version of this article at http://www.ajph.org). Since 1998, 11 additional states have enacted shall-issue laws.[5] This provides more variation over time and a longer follow-up period to examine this research question. Moreover, Ayres and Donohue[15] and Hepburn et al.[11] have suggested that the relationship between concealed-carry laws and homicide rates may have been different during the period before and after the early 1990s. In addition, studies that included homicide rates from before 1994 were examining a trend that was increasing, whereas studies examining homicide rates after 1994 were capturing declining trends. For these reasons, a reexamination of this research question with more recent data is needed.

One limitation of the existing literature is that no previously published research has examined the specific impact of concealed-carry laws on handgun versus long-gun homicide rates. This is important because if such laws increase homicide by making it easier for people at high risk for violence to carry handguns, this effect should only be observed in relation to handgun-related homicides, not homicides committed with long guns. On the other hand, if permissive concealed-carry laws deter crime by generating fear among potential perpetrators of encountering an armed individual, then all crime including handgun, long-gun, and nonfirearm homicide should decrease.

Another limitation of previous studies is that nearly all of them used linear models. However, homicide rates represent count data, and the distribution of homicide rates across states is highly skewed[16] (Figure A, available as a supplement to the online version of this article at http://www.ajph.org). Plassmann and Tideman argued that a count model (such as a Poisson or negative binomial model) is the most reliable for analyzing crimes, such as homicides, with low occurrence rates.[16] Beyond the Plassmann and Tideman study, only 1 other study[11] used a count model.

We examined the relationship between shall-issue concealed-carry laws and total, firearm-related, and non–firearm-related homicide rates, as well as handgun versus long-gun homicide rates across all 50 states

Exhibit D
Page 94

TABLE 1—*Continued*

| State | Age-Adjusted Firearm Homicide Rate,[a] 2015 (per 100 000) | Status of Concealed-Carry Permitting Law, 2015 | Effective Date of Current (as of 2015) Concealed-Carry Law |
|---|---|---|---|
| Arkansas | 5.34 | Shall issue | 1995 |
| Illinois | 5.45 | Shall issue | 2013 |
| Tennessee | 5.51 | Shall issue | 1994 |
| Georgia | 5.73 | Shall issue | Before 1991 |
| Oklahoma | 5.87 | Shall issue | 1995 |
| Delaware | 6.12 | May issue | Before 1991 |
| South Carolina | 7.55 | Shall issue | 1996 |
| Maryland | 7.69 | May issue | Before 1991 |
| Missouri | 7.92 | Shall issue | 2003 |
| Alabama | 8.43 | Shall issue | 2013 |
| Mississippi | 9.11 | Shall issue | 1991 |
| Louisiana | 9.96 | Shall issue | 1996 |

*Note.* "May-issue" states are those in which law enforcement officials had wide discretion over whether to issue concealed-carry permits. "Shall-issue" states are those in which there was little or no discretion; permits must be issued if requisite criteria are met. "Permitless-carry" states are those in which there was no permit necessary to carry a concealed handgun.

[a]From Centers for Disease Control and Prevention (CDC).[1]

[b]Data for Hawaii are unavailable for the years 2010 to 2015 because the CDC's Web-Based Injury Statistics Query and Reporting Systems does not report homicide counts fewer than 10. The data here are from 2009.

[c]Changed from "may issue" to "shall issue" in 1994.

during the 25-year time period of 1991 to 2015 with both count and linear regression models. We examined the specificity of the relationship between concealed-carry laws and homicide rates by separately modeling firearm versus nonfirearm homicide rates and then within firearm-related homicides by modeling handgun versus long-gun homicide rates. We analyzed the relationship between shall-issue concealed-carry laws and homicide rates by using both a count and a linear regression model, thus examining the robustness of results to the type of model used.

## METHODS

We used a quasi-experimental panel design, taking advantage of changes in state concealed-carry permitting laws over time, to explore the relationship between these laws and total, firearm-related, and non–firearm-related homicide rates in the 50 states over a 25-year period, 1991 to 2015. We

modeled homicide rates in 2 ways: (1) using a negative binomial regression with homicide rates as the outcome variable and (2) using linear regression with log-transformed homicide rates as the outcome variable. In both cases, we included year and state fixed effects and controlled for a range of time-varying, state-level factors.

## Variables and Data Sources

*Outcome variables.* The main outcome variable was the age-adjusted firearm homicide rate in each year analyzed. For example, Missouri's shall-issue law went into effect in 2003; thus, we analyzed homicide rates associated with Missouri's shall-issue law for the years 2004 to 2015. We obtained homicide rates from the Centers for Disease Control and Prevention's (CDC's) Web-Based Injury Statistics Query and Reporting Systems (WISQARS) database.[1] This is the ideal source for homicide data because there is complete annual reporting from all 50 states and because the data are extracted from the

Vital Statistics death registry maintained by the National Center for Health Statistics, which is based on standardized death certificates. The completeness of reporting is approximately 99%.[17] The CDC age-adjusted the rates to the 2000 standard population.

The second outcome variable was the handgun or long-gun homicide rate, obtained from the Federal Bureau of Investigation's Uniform Crime Reports, Supplemental Homicide Reports (SHR).[18] Although WISQARS does provide mortality data from *International Classification of Diseases, Ninth Revision* and *Tenth Revision,* codes that can list handgun and long gun as the cause of death, unfortunately, most death certificates involving a firearm homicide do not specify the type of weapon used. Therefore, most firearm homicide deaths in WISQARS are classified as "other and unspecified" firearm, and it is not possible to use these data to disaggregate handgun and long-gun homicides.[19] By contrast, the SHR is missing data on the type of weapon used in firearm homicides in just 13.4% of cases. Thus, the SHR is the best, if not only, source for state-specific, firearm type–specific homicide data.

The SHR disaggregates firearm homicides into handgun, rifle, shotgun, and other (and unknown). We used the handgun deaths to generate handgun homicide rates and the sum of rifle, shotgun, and other gun deaths to generate long-gun homicide rates for each state and year. Although SHR data may include listing of multiple weapons in an incident, only 1 weapon may be associated with a homicide death.[20] Because of missing data on weapon type, we excluded 13.4% of firearm homicide cases in estimating handgun homicide rates. Nevertheless, there was little discrepancy between the firearm homicide totals from WISQARS and the SHR, which were correlated at $r = 0.98$.

Because not all local law enforcement agencies complete the supplemental reports, the SHR data set excludes approximately 10% of all homicides.[21] This problem was addressed by applying weights that adjusted each state- and year-specific estimate up to the overall number of homicides reported in the Uniform Crime Report for that state and year. Fox kindly provided us with updated SHR files that added previously

Exhibit D

| TABLE 2—Elements of Discretion in Law Enforcement Decisions to Approve or Deny Concealed Handgun Carry Permits: "May-Issue" US States, 2015 | | |
|---|---|---|
| State | Elements of Discretion | Citation |
| California | Applicant must be of "good moral character" and must have "good cause" for issuance of the license. | California Penal Code § 26150, § 26155 |
| Connecticut | Applicant must intend only to make "legal use" of the handgun and must be a "suitable person to receive such permit." | Connecticut General Statutes § 29-28 |
| Delaware | Applicant must be "of good moral character," must desire the handgun for "personal protection" or "protection of the person's property," and must submit signed, written statements of 5 "respectable citizens" of the county who testify that the applicant is a person "of sobriety and good moral character" and "bears a good reputation for peace and good order in the community" and that a handgun is "necessary for the protection of the applicant or the applicant's property." The Superior Court has discretion to approve or deny the application. | Delaware Code § 1441 |
| Hawaii | Must be "an exceptional case," the applicant must show "reason to fear injury to the applicant's person or property," the applicant must be "a suitable person" to be licensed, and the chief of police must determine that the person "is qualified to use the firearm in a safe manner." | Hawaii Revised Statutes § 134-9 |
| Maryland | Applicant must have a "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger," and the applicant must not have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." | Maryland Public Safety Code § 5-306 |
| Massachusetts | Applicant must be a "suitable" person and must not be judged to potentially create a risk to public safety. | Massachusetts General Laws 140 § 131 |
| New Jersey | Applicant must demonstrate a "justifiable need to carry a handgun" and must submit endorsements by 3 individuals who have known the applicant for at least 3 years that the applicant is "a person of good moral character and behavior." | New Jersey Statutes § 2C:58–4 |
| New York | Applicant must be "of good moral character," must be "of good character, competency, and integrity," and there must be no "good cause" for denial of the license. | New York Penal Law § 400.00 |
| Rhode Island | Applicant must have "good reason to fear an injury to his or her person or property" or have "any other proper reason" for carrying a handgun and must be a "suitable person to be so licensed." | General Laws of Rhode Island § 11-47-11 |

*Note.* "May-issue" states are those in which law enforcement officials had wide discretion over whether to issue concealed-carry permits.

missing data for Florida and included data through 2015.[21]

*Main predictor variable.* Using *Thomson Reuters Westlaw* to access historical state statutes and session laws, we developed a database indicating the presence or absence of 100 provisions of firearm laws in each state over the 25-year period.[5] We coded laws by the year they went into effect, regardless of the month of the effective date. However, in the analytic models, we lagged the state laws by 1 year, which ensured that all laws were in effect during the year in which their impact was being assessed. Following Lott and Mustard,[22] we assessed the impact of laws starting in the first full year they were in effect.

We examined the potential impact of shall-issue laws, comparing them to may-issue laws. In other words, using the may-issue states as the reference group, we estimated the impact of shall-issue laws on homicide rates. Because only 4 states had permitless-carry laws in place during the study period, there were not enough observations to allow any meaningful analyses of these laws. Therefore, we deleted state–year observations in which a permitless-carry law was in effect.

*Control variables.* We controlled for 12 state-level factors that (1) were found in the previous literature[3,6–14] to be significantly related to homicide rates and (2) were significantly related to the presence of shall-issue laws in our data set (i.e., the regression coefficient for the variable was significant at a level of $P = .05$ in a logistic regression with shall-issue law as the dependent variable): household firearm ownership (using the standard proxy, which is the percentage of all suicides committed with a firearm), proportion of Blacks, proportion of young adults (aged 18 to 29 years), proportion of men among young adults, proportion of the population living in urban areas, total population, population density, per capita alcohol consumption, the nonhomicide violent crime rate (aggravated assault, robbery, and forcible rape), the poverty rate, unemployment rate, median household income, per capita disposable income, incarceration rate, and per capita number of law enforcement officers. Variable definitions and data sources are provided in Table B, available as a supplement to the online version of this article at http://www.ajph.org. We also controlled for the following state firearm laws that could serve as alternative explanations for changes in homicide during the study period: (1) universal background checks required for all handgun purchases, (2) waiting periods required for all handgun purchases, and (3)

Exhibit D
Page 96

permits required to purchase or possess firearms.

## Analysis

*Count models.* Because homicide rates are not normally distributed but skewed and overdispersed, we modeled this outcome by using a negative binomial distribution. To control for clustering in our data by year (25 levels) and by state (50 levels), we entered year and state as fixed effects in the regression models. We used robust standard errors that account for the clustering of observations, serial autocorrelation, and heteroskedasticity.[23]

Our final model was as follows:

$$(1) \quad Pr(H_{st} = h_{st}) = [\Gamma(y_{st} + \alpha^{-1})/ \\ \Gamma((y_{st} + 1)\Gamma\alpha^{-1})][1/ \\ (1 + \alpha\,\mu_{st})]^{1\alpha}[\mu_{st}/(\alpha^{-1} + \mu_{it})]^{y_{st}},$$

where $Pr(H_{st} = h_{st})$ is the probability that state $s$ in year $t$ has a homicide rate equal to $h_{st}$, $E(H_{st}) = \mu_{st}$, and $Var(H_{st}) = \mu_{st} + \mu^2{}_{st}$.

The mean homicide rate was then modeled as follows:

$$(2) \quad ln(\mu_{st}) = \alpha + \beta_1 CC_{st} + \\ \beta_2 C_{st} + S + T + e,$$

where $CC_{st}$ is a dummy variable for the presence of a shall-issue law, $C$ is a vector of control variables, $S$ represents state fixed effects, and $T$ represents year fixed effects.

The negative binomial regression coefficients are reported as incidence rate ratios (IRRs). The IRR indicates the percentage difference in homicide rate for states with a shall-issue concealed-carry law compared with states with a may-issue law.

*Linear models.* To check the robustness of our findings, we repeated the analyses with a linear regression model, with the log-transformed homicide rate as the outcome variable, again by using robust standard errors.[23] As with the negative binomial models, we included year and state fixed effects, and we included the same state-level control variables.

We conducted analyses with Stata version 14.1 (StataCorp LP, College Station, TX).

We evaluated the significance of regression coefficients by using a Wald test at $\alpha = 0.05$.

We checked the robustness of our results by conducting several sensitivity analyses, including

1. Restricting the analysis to the 23 states in which shall-issue laws were adopted during the study period,
2. Using raw count data instead of homicide rates,
3. Restricting the analysis to states with population greater than 1 000 000,
4. Restricting the analysis to the period 1991 to 2002,
5. Restricting the analysis to the period 2003 to 2015, and
6. Using SHR instead of WISQARS homicide data (thus avoiding the problem of missing data for some smaller states after 1998).

## RESULTS

During the study period, 23 states adopted shall-issue laws (Table 1). By 2015, 37 states had such laws. In the same year, the average firearm homicide rate in the states with shall-issue laws was 4.11 per 100 000, compared with 3.41 per 100 000 in the may-issue states. The number of states that had permitless-carry laws in effect at all during the study period was small (n = 4), as was the number of observations (n = 46), limiting our ability to analyze the impact of these laws. Because CDC does not report homicide counts of fewer than 10 in years after 1998, we were missing outcome data for several years for 6 states (Hawaii, New Hampshire, North Dakota, South Dakota, Vermont, and Wyoming); a sensitivity analysis with SHR data revealed that these omissions do not affect our findings.

In negative binomial regression models, shall-issue concealed-carry permitting laws were significantly associated with 6.5% higher total homicide rates compared with may-issue states (IRR = 1.065; 95% confidence interval [CI] = 1.032, 1.099; Table 3). The association was specific to firearm homicide rates, which were 8.6% higher in shall-issue states (IRR = 1.086; 95% CI = 1.047, 1.126). There was no significant

association between shall-issue laws and nonfirearm homicide rates (IRR = 1.014; 95% CI = 0.963, 1.068). Further disaggregation within firearm homicides showed that the association between shall-issue laws and firearm homicide rates was specific to handgun homicides. Shall-issue states had handgun homicide rates that were 10.6% higher (IRR = 1.106; 95% CI = 1.039, 1.177), but there was no significant association with long-gun homicide rates (IRR = 0.999; 95% CI = 0.915, 1.090).

The results of the linear regression analyses were similar. Here, shall-issue laws were significantly associated with 6.6% higher total homicide rates compared with may-issue states (95% CI = 3.0%, 10.4%; data not shown). The association was specific to firearm homicide rates, which were 11.7% higher in "shall issue" states (95% CI = 6.4%, 17.2%); there was no significant association between these laws and nonfirearm homicide rates. Further disaggregation within firearm homicides showed that the association between shall-issue laws and firearm homicide rates was specific to handgun homicide. Shall-issue states had handgun homicide rates that were 19.8% higher (95% CI = 10.3%, 30.1%), but rates of long-gun homicide were not significantly different in states with shall-issue compared with may-issue laws.

The significant association between shall-issue laws and higher total, firearm, and handgun-related homicide rates remained when we restricted the analysis to the 23 states in which these laws were adopted during the study period (Table 3). This pattern of results was robust to a series of additional sensitivity checks, including using raw count data, restricting the analysis to states with a population of more than 1 000 000, restricting the analysis to the period 1991 to 2002, restricting the analysis to the period 2003 to 2015, and using SHR instead of WISQARS homicide data.

## DISCUSSION

To the best of our knowledge, this is the first study to examine the relationship between concealed-carry permitting laws and handgun-specific homicide rates. We found that, when we used both count and linear

Exhibit D
Page 97

models and after we controlled for a range of time-varying state factors and for unobserved time-invariant state factors by using a fixed-effects model, shall-issue concealed-carry permitting laws were significantly associated with 6.5% higher total homicide rates, 8.6% higher firearm-related homicide rates, and 10.6% higher handgun-specific homicide rates compared with may-issue states.

A major reason for inconsistent results in the existing literature on the effects of concealed-carry laws may be that the relationship between concealed-carry laws and homicide rates was different during the period before and after the early 1990s.[11,15] It is possible that despite the enactment of early shall-issue laws in the 1970s and 1980s, the demand for handgun permits in those states was modest. There has been a striking increase in the demand for pistols, especially those designed for concealed carry, during the past decade.[24] Recently, Steidley found that the adoption of shall-issue laws during the period 1999 to 2013 was associated with a persistent, long-term increase in handgun sales in all 7 states studied.[25] Our analysis provides further support for the hypothesis that the relationship between shall-issue laws and higher homicide rates increased over time, as the regression coefficients for these laws was higher for the second half of the study period

(2003–2015) compared with the first half (1991–2002).

Our finding that the association between shall-issue laws and homicide rates is specific to handgun homicides adds plausibility to the observed relationship. If the relationship between shall-issue laws and homicide rates were spurious, one might expect to see the relationship hold for long-gun as well as handgun homicide rates. Moreover, this finding is inconsistent with the hypothesis that permissive concealed-carry laws deter crime by increasing the presence of armed individuals. Were that the case, one would expect to see lower handgun, nonhandgun, and nonfirearm homicide rates in shall-issue compared with may-issue states. The lack of an association between shall-issue laws and long-gun homicide rates is also inconsistent with the hypothesis that the presence of more concealed weapons escalates the level of violence in encounters that may involve a long gun.

### Strengths and Limitations

This study has several novel strengths, including the use of both count and linear models, the use of recent data (through 2015), and the disaggregation of homicide types. Nevertheless, caution should be exercised in assessing causality from an ecological study

such as this one. In particular, these results should be interpreted with caution because of the possibility that they reflect a reverse association. That is, it is possible that the adoption of shall-issue concealed carry laws is associated with higher baseline homicide rates so that we are picking up not a causal effect of these laws on homicide but a systematic difference in baseline homicide rates between states that do or do not have these laws. However, our findings hold even when the analysis is restricted to states that started with may-issue laws at the beginning of the study period and adopted shall-issue laws during the study period.

An additional limitation of this study is that we could not consider the enforcement of concealed-carry laws.[26] Enforcement of these laws may vary not only among states, but also among counties in the same state.[11] In addition, we did not have information on the number of concealed-carry permits issued in each state or the number of homicides committed by concealed-carry permittees.

It is also important to note that we examined only fatal firearm injuries. Further research should investigate potential effects of concealed-carry laws on nonfatal firearm injuries.

Finally, we were unable to analyze the impact of permitless-carry laws because of the small number of observations. Only 4 states

**TABLE 3—Sensitivity Analyses of Relationship Between "Shall-Issue" Concealed-Carry Permitting Laws and Homicide Rates: United States, 1991–2015**

| Type of Analysis | Homicide Rate, IRR (95% CI) | | |
| --- | --- | --- | --- |
| | Total | Firearm | Handgun |
| Main analysis | 1.065 (1.032, 1.099) | 1.086 (1.047, 1.126) | 1.106 (1.039, 1.177) |
| Analysis restricted to states that adopted shall-issue concealed-carry laws during study period | 1.063 (1.028, 1.099) | 1.068 (1.030, 1.108) | 1.074 (1.002, 1.150) |
| Analysis using raw count of homicides with population as the exposure variable | 1.051 (1.020, 1.083) | 1.079 (1.039, 1.120) | 1.139 (1.067, 1.217) |
| Analysis restricted to states with population >1 million | 1.055 (1.023, 1.087) | 1.067 (1.030, 1.105) | 1.095 (1.029, 1.166) |
| Analysis restricted to years before 2003 (1991–2002) | 1.058 (1.014, 1.104) | 1.067 (1.019, 1.116) | 1.107 (1.037, 1.180) |
| Analysis restricted to years after 2002 (2003–2015) | 1.064 (1.009, 1.122) | 1.100 (1.028, 1.176) | 1.274 (1.092, 1.488) |
| Analysis using Supplemental Homicide Report data instead of Vital Statistics data | 1.044 (1.006, 1.083) | 1.094 (1.047, 1.143) | 1.106 (1.039, 1.177) |

*Note.* "Shall-issue" states are those in which there was little or no discretion; permits must be issued if requisite criteria are met. CI = confidence interval; IRR = incidence rate ratio. All models include year and state fixed effects and control for the following time-varying, state-level factors: household gun-ownership levels, proportion of young men, proportion of young adults, proportion of Blacks, proportion living in an urban area, total population, population density, median household income, poverty rate, unemployment rate, per capita disposable income, per capita alcohol consumption, violent crime rate, incarceration rate, per capita law enforcement officers, universal background check laws for all handguns, waiting periods for all handguns, and permits required for all firearms.

Exhibit D

Page 98

had permitless–carry laws in place during the study period. However, in the past 2 years, an additional 5 states have enacted such laws. Elucidating the impact of permitless–carry laws will require follow–up for the 9 states that now have such laws in effect.

## Conclusions

Despite these limitations, this study suggests that there is a robust association between shall-issue laws and higher rates of firearm homicides. The trend toward increasingly permissive concealed-carry laws is inconsistent with public opinion, which tends to oppose the carrying of guns in public.[27] Our findings suggest that these laws may also be inconsistent with the promotion of public safety. *AJPH*

## CONTRIBUTORS

M. Siegel conceptualized the study, led the data analysis and writing, and was the principal author of this article. Z. Xuan and C. S. Ross assisted with the study design and analytical plan. All authors contributed toward the interpretation of data analyses, critical review of the article, and revision of the article.

## ACKNOWLEDGMENTS

Support for this research was provided by the Robert Wood Johnson Foundation Evidence for Action Program (grant 73337).

We gratefully acknowledge the assistance of James Alan Fox, PhD, the Lipman Family Professor of Criminology, Law, and Public Policy at the School of Criminology and Criminal Justice at Northeastern University, who kindly provided the Multiply-Imputed Supplemental Homicide Reports File, 1976–2015, including the data sets and a codebook.

**Note.** The views expressed here do not necessarily reflect those of the Robert Wood Johnson Foundation.

## HUMAN PARTICIPANT PROTECTION

This study made use of secondary data only and did not require institutional review board approval.

## REFERENCES

1. Centers for Disease Control and Prevention. Web-Based Injury Statistics Query and Reporting Systems: fatal injury reports. Available at: http://www.cdc.gov/injury/wisqars/fatal_injury_reports.html. Accessed March 15, 2017.

2. Donohue JJ. Guns, crime, and the impact of state right-to-carry laws. *Fordham Law Rev.* 2005;73:623–652.

3. Lott JR. *More Guns, Less Crime: Understanding Crime and Gun Control Laws*. 3rd ed. Chicago, IL: The University of Chicago Press; 2010.

4. Miller M, Azrael D, Hemenway D. Firearms and violent death in the United States. In: Webster DW, Vernick JS, eds. *Reducing Gun Violence in America: Informing Policy With Evidence and Analysis.* Baltimore, MD: The Johns Hopkins University Press; 2013.

5. Siegel M, Pahn M, Xuan Z, et al. Firearm-related laws in all 50 states, 1991–2016. *Am J Public Health.* 2017; epub ahead of print May 18, 2017.

6. Lott JR Jr, Whitley JE. Safe-storage gun laws: accidental deaths, suicides, and crime. *J Law Econ.* 2001;44:659–689.

7. Zimmerman PR. The deterrence of crime through private security efforts: theory and evidence. *Int Rev Law Econ.* 2014;37:66–75.

8. Ludwig J. Concealed-gun-carrying laws and violent crime: evidence from state panel data. *Int Rev Law Econ.* 1998;18:239–254.

9. Aneja A, Donohue JJ, Zhang A. The impact of right-to-carry laws and the NRC report: lessons for the empirical evaluation of law and policy. *Am Law Econ Rev.* 2011; 13(2):565–632.

10. Rosengart M, Cummings P, Nathens A, Heagerty P, Maier R, Rivara F. An evaluation of state firearm regulations and homicide and suicide death rates. *Inj Prev.* 2005;11(2):77–83.

11. Hepburn L, Miller M, Azrael D, Hemenway D. The effect of nondiscretionary concealed weapon carrying laws on homicide. *J Trauma.* 2004;56(3):676–681.

12. Sommers PM. Deterrence and gun control: an empirical analysis. *Atl Econ J.* 1980;8:89–94.

13. DeZee MR. Gun control legislation: impact and ideology. *Law Policy Q.* 1983;5(3):367–379.

14. Murray DR. Handguns, gun control laws and firearm violence. *Soc Probl.* 1975;23:81–93.

15. Ayres I, Donohue JJ III. Shooting down the "more guns, less crime" hypothesis. *Stanford Law Rev.* 2003;55:1193–1300.

16. Plassmann F, Tideman TN. Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. *J Law Econ.* 2001;44:771–798.

17. Regoeczi W, Banks D. *The Nation's Two Measures of Homicide*. Washington, DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Studies; 2014.

18. National Archive of Criminal Justice Data. *Uniform Crime Reporting Program Data Series. Supplemental Homicide Reports, 1981–2015.* Ann Arbor, MI: Inter-university Consortium for Political and Social Research; 2016.

19. Rokaw WM, Mercy JA, Smith JC. Comparing death certificate data with FBI crime reporting statistics on US homicides. *Public Health Rep.* 1990;105(5):447–455.

20. Supplementary homicide report (OMB form no. 1110–0002), offense 1a. Murder and nonnegligent manslaughter. Washington, DC: Federal Bureau of Investigation; 2017. Available at: https://ucr.fbi.gov/nibrs/addendum-for-submitting-cargo-theft-data/shr. Accessed June 17, 2017.

21. Fox J. Multiply-imputed supplementary homicide reports file, 1976–2015. Boston, MA: Northeastern University; 2017.

22. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud.* 1997;26:1–68.

23. White H. A heteroskedasticity-consistent covariance matrix estimator and a direct test for heteroskedasticity. *Econometrica.* 1980;48(4):817–838.

24. Smith VM, Siegel M, Xuan Z, et al. Broadening the perspective on gun violence: an examination of the firearms industry, 1990–2015. *Am J Prev Med.* 2017; Epub ahead of print.

25. Steidley T. *Movements, Malefactions, and Munitions: Determinants and Effects of Concealed Carry Laws in the United States* [dissertation]. Columbus, OH: The Ohio State University; 2016.

26. Lott JR. Not all right-to-carry laws are the same, yet much of the literature keeps ignoring the differences. Crime Prevention Research Center. 2014. Available at: https://ssrn.com/abstract=2524729. Accessed April 15, 2017.

27. Wolfson JA, Teret SP, Azrael D, Miller M. US public opinion on carrying firearms in public places. *Am J Public Health.* 2017;107(6):929–937.

Exhibit D
Page 100

International Review of Law and Economics 57 (2019) 1–11



Contents lists available at ScienceDirect

# International Review of Law and Economics



---

# Using the synthetic control method to determine the effects of concealed carry laws on state-level murder rates



## Mark Gius

*Department of Economics, Quinnipiac University, Hamden, CT 06518, United States*

**A R T I C L E   I N F O**

*Article history:*
Received 18 July 2018
Received in revised form 26 October 2018
Accepted 29 October 2018
Available online 2 November 2018

*JEL classification:*
K14
K42

*Keywords:*
Concealed carry
Synthetic control method
Shall issue

**A B S T R A C T**

The purpose of the present study is to determine the relationship between concealed carry (CCW) laws and state-level murder rates. Specifically, this study will examine the impact of a change in CCW status from "prohibited" to "shall issue" on murder rates. Using a synthetic control method, results of the present study suggest that only in New Mexico did the move from "prohibited" CCW status to "shall issue" CCW status result in an increase in murder rates and gun related murder rates. For the remaining states, the change in CCW status had no effect on murder rates. As a robustness check on the results found using the synthetic control method, a fixed effects model was also estimated. These results indicate that states that changed from "prohibited" to "shall issue" experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates. It is important to note that none of the results in the present study indicate that a move from "prohibited" to "shall issue" CCW status may result in a decline in murder rates.

© 2018 Elsevier Inc. All rights reserved.

---

## 1. Introduction

There is a common belief among gun rights proponents that firearms should be readily available to the general public in order to promote deterrence. According to this argument, criminals would be less likely to commit crimes if they believed that their victims or innocent bystanders may be armed. This deterrent effect has been discussed at great length in many prior studies (Kovandzic and Marvell, 2003; Kovandzic et al., 2005; Lott and Mustard, 1997). Gun control proponents, however, believe that, by increasing the supply and availability of firearms, the probability that a crime will be committed also increases. Most gun control proponents fear that minor altercations may become violent and deadly if more people are armed.

One of the more prevalent and important types of gun control measures that may affect the overall availability of firearms is the concealed carry law. Concealed carry (CCW) refers to the carrying of firearms in a concealed fashion. Laws regulating the concealed carry of firearms differ substantially between states and have changed quite significantly over the past thirty years. There are no federal laws regulating the concealed carry of firearms.

There are four broad types of state-level CCW laws (Barati, 2016; Donohue, 2003; Gius, 2014). The first is "unrestricted"; individuals

*E-mail address:* Mark.gius@quinnipiac.edu

https://doi.org/10.1016/j.irle.2018.10.005
0144-8188/© 2018 Elsevier Inc. All rights reserved.

in states with unrestricted access do not need a permit to carry a concealed handgun. For years, the only state that had no CCW restrictions was Vermont. The next type of CCW law is "shall issue". In a "shall issue" state, a permit is required to carry a concealed weapon, but state and local authorities must issue a permit to any qualified applicant who requests one. "Shall issue" and unrestricted are considered to be permissive CCW laws.

The third type of CCW law is "may issue." In a "may issue" state, local and state authorities can deny requests for concealed carry permits, even requests from qualified applicants. "May issue" laws restrict the ability of citizens to carry concealed weapons. Finally, the last category is "prohibited"; in years past, some states prohibited the concealed carry of firearms. As of 2018, there are no states that prohibit concealed carry.

Presently, the following nine states and the District of Columbia require a permit to carry a concealed handgun and are "may issue": California, Connecticut (per statute; in practice "shall issue"), Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island (Barati, 2016; Donohue, 2003; Gius, 2014). The following six states do not require a permit to carry a concealed handgun: Alaska, Arizona, Kansas, Maine, Vermont, and Wyoming (Barati, 2016; Donohue, 2003; Gius, 2014). All other states require a permit and are "shall issue" (Barati, 2016; Donohue, 2003; Gius, 2014).

It is important to note that these four categories of CCW laws are rather broad, and not all states within a given category are equally

Exhibit D
Page 100

**Table 1**
Summary of Papers that Examined Effects of Concealed Carry Laws on Violent Crime Rates.

| | Permissive CCW Laws Reduce Crime | Permissive CCW Laws Increase Crime | Insignificant or Mixed Results |
|---|---|---|---|
| Ayers and Donohue, 2003 | | | X |
| Barati, 2016 | | | X |
| Bartley and Cohen, 1998 | X | | |
| Benson and Mast, 2001 | X (Model Specific) | | |
| Black and Nagin, 1998 | | | X |
| Blau et al., 2016 | | | X |
| Bronars and Lott, 1998 | X | | |
| Crifasi et al., 2016 | | | X |
| Dezhbakhsh and Rubin, 1998 | | | X |
| Donohue, 2003 | | | X |
| Duwe et al., 2002 | | | X |
| Ginwalla et al., 2013 | | X | |
| Gius, 2014 | X | | |
| Helland and Tabarrok, 2004 | X | | |
| Kleck and Patterson, 1993 | | | X |
| Kovandzic and Marvell, 2003 | | | X (Only Florida) |
| Kovandzic et al., 2005 | | | X |
| Lott, 1998 | X | | |
| Lott and Mustard, 1997 | X | | |
| Ludwig, 1998 | | X | |
| Moody, 2001 | X | | |
| Moody et al., 2014 | X | | |
| Olson and Maltz, 2001 | X | | |
| Phillips et al., 2015 | | | X |
| Plassman and Tideman, 2001 | X | | |
| Rubin and Dezhbakhsh, 2003 | | | X |
| Shi and Lee, 2017 | | | X |
| Smith and Petrocelli, 2018 | | | X |

restrictive. These broad categories are not definitive because the way in which a state not only interprets CCW statutes but also enforces them has an impact on the actual restrictiveness of the law. In addition, some cities and counties have more restrictive concealed carry laws than their home states. Finally, it is important to note that permits to carry concealed firearms are required in both "shall issue" and "may issue" states. The only difference between these two types of CCW statutes is that, in "shall issue" states, the issuing authority must issue a CCW permit to any qualified applicant. In a "may issue" state, the issuing authority may deny a permit to anyone, even qualified applicants. Hence, the vast majority of states in the U.S. require a permit to carry a concealed weapon.

Regarding CCW research, Table 1 summarizes the findings of most of the research in this area over the past 20 years. As can be seem from this table, most studies found that permissive concealed carry laws ("shall issue" or unrestricted) either reduce violent crime or they have no significant effects on crime. Only two studies (Ginwalla et al., 2013; Ludwig, 1998) found that permissive concealed carry laws increase homicide rates. Some studies, such as Ayers and Donohue (2003), Donohue (2003), and Kovandzic and Marvell (2003), found that states with more permissive concealed carry laws had higher property crime rates. However, Devaraj and Patel (2018) found that property crime rates fell when Chicago went from "prohibited" CCW status to "shall issue". Hence, most prior research has found that permissive CCW laws either reduce violent crime, or that they have no statistically significant effects on violent crime.

In one of the earliest studies on CCW laws, Lott and Mustard (1997) found that states with "shall issue" concealed carry laws had lower crime rates than states with more restrictive carry laws. They found that "shall issue" laws resulted in a 7.65% drop in murders and a 5% drop in rapes. Their research suggests that individuals would be less likely to commit crimes if they knew that others may be carrying concealed weapons. Much of the research that followed Lott

and Mustard (1997) used the same type of model (log-linear) and the same type of data (county-level). In addition, most of these studies used panel data estimation techniques, weighted observations, and clustered standard error corrections.

One of the most recent studies on the relationship between CCW laws and crime is Barati (2016). In this study, the author used a difference-in-differences model in order to determine the effects of a change in state-level CCW status on various crime rates. Specifically, Barati (2016) attempted to determine if the effects of a "shall issue" CCW law differed depending on what type of law was in effect prior to the passage of the "shall issue" law. Using data for the period 1991–2008, the author found that switching from a "may issue" law to a "shall issue" law had no statistically-significant effects on any of the crime rates examined. However, when a state switched from prohibited to "shall issue", then robbery, burglary, and larceny rates all fell. The change from prohibited to "shall issue" had no statistically-significant effects on motor vehicle thefts, murders, or aggravated assaults. A similar approach regarding the effects of a change in CCW status from "prohibited" to "shall issue" is employed in the present study.

The purpose of the present study is to determine the relationship between concealed carry laws and state-level murder rates. Specifically, this study will examine the impact of the change in CCW status from "prohibited" to "shall issue" on murder rates. The reason why this change is important is because, over the past 30 years, many states have loosened their CCW laws and have changed from "prohibited" to "shall issue". In addition, as noted earlier, both "may issue" and "shall issue" states require permits for concealed carry. Therefore, a change from "may issue" to "shall issue" is not as significant nor as noteworthy as a change from "prohibited" to "shall issue". Also, very few states, even today, allow unrestricted concealed carry. Hence, examining the impact of a shift to "unrestricted" carry on crime would be somewhat problematic. Therefore, the present study will attempt to determine the relationship between changes in CCW laws and state-level murder rates.

Another important distinction of the present study is that a synthetic control method will be used to examine the impact of this change in CCW laws. In most prior studies on this topic, a fixed effects model with panel data was used to estimate the relationship between gun control laws and crime rates. Although well-established in the area of policy analysis, fixed effects may not be the most appropriate statistical method to use in the analysis of the effects of gun control measures on crime. The results are highly dependent upon the time period being examined, and misspecification of the model may make it difficult to establish causal relationships between gun control laws and crime (Donohue et al., 2017). A superior and more appropriate statistical method for this type of analysis may be the synthetic control method. Only one other study used the synthetic control method to examine the impact of a change in CCW laws on crime rates (Donohue et al., 2017).

Results of the present study suggest that only in New Mexico did the move from "prohibited" to "shall issue" result in an increase in murder rates and gun-related murder rates. For the remaining states, the change in CCW status had no effects on murder rates or the results were inconclusive. As a robustness check on the results found using the synthetic control method, a fixed effects model was also estimated. These results suggest that states that shifted from "prohibited" to "shall issue" experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates. It is important to note that neither the synthetic control method nor the traditional fixed effects model found that a move to more permissive CCW laws resulted in fewer murders.

Exhibit D
Page 101

*M. Gius / International Review of Law and Economics 57 (2019) 1–11*                                                                 3

## 2. Empirical technique and data

In order to determine if CCW laws are related to murder rates, a synthetic control method (SCM) is used in the present study. The synthetic control method (SCM) examines how a treatment (law) can affect a particular outcome (murder rates). In an SCM, there is one individual or entity (state) that receives the treatment (treated group) and several entities that do not receive the treatment (control group). The SCM then synthesizes a control from a weighted sum of potential control entities. The outcome variable for the treated group is then compared to the outcome variable for the synthesized control group. If the outcome measure diverges in the treatment period, then the treatment is assumed to have caused the difference. If the outcome measures for the treated group and synthesized control group do not diverge, then it can be assumed that the treatment did not affect the outcome. Finally, the synthesized control group's outcome measure should match the treated unit's outcome measure during the pretreatment period.

The advantages of using an SCM procedure over a fixed effects procedure or a case study method are numerous. First, a weighted combination of control states provides a much better comparison to the treated state than a single control state (Abadie et al.,2010). Second, the relative contribution of each state in the synthetic control group can be ascertained (Abadie et al., 2010). Third, in an SCM procedure, it can be determined if there are differences with regards to the intervention variable and the other predictor variables between the treated state and the control group (Abadie et al., 2010). Due to these advantages, the SCM statistical procedure has been used in several studies examining the effects of public policies, laws, and exogenous shocks on various outcome measures (Kreif et al., 2016; Abadie et al., 2015, 2010; Abadie and Gardeazabal, 2003)

For purposes of the present study, the "treatment" is considered to be when a state changes its CCW laws from "prohibited" to "shall issue". Hence, only those states that changed their CCW laws from "prohibited" to "shall issue" are in the treatment group. All other states are in the potential control group. From this set of possible controls, a synthesized control group was created.

The outcome variables are the gun related murder rate (gun-related murders per 100,000 persons) and the murder rate (murders per 100,000 persons). The primary reason murder rates, instead of other crime rates, were used is because it is important to differentiate between total murders and gun-related murders. Given that the enactment of a permissive CCW law may reduce gun-related murders, it is imperative that this type of outcome measure is examined. In addition, state-level data on the incidence of other types of gun related crimes are either non-existent or are unreliable.

The predictor variables used in this analysis were selected based upon their use in prior research (Barati, 2016; Bartley and Cohen, 1998; Gius, 2014; Lott and Mustard, 1997; Moody and Marvell, 2009; Moody, 2001; Olson and Maltz, 2001). These variables include the percentage of the state population that is African-American, per capita real income, percentage of population that is college educated, unemployment rate, percentages of population aged 18 to 24 and 25 to 34, population density, per capita alcohol consumption, the ratio of gun-related suicides to total suicides, and the percentage of the state's population that lives in large cities. The statistical software package R was used to conduct the SCM (Abadie et al., 2011). States that had missing observations were excluded from the analyses. Eight states were in the treatment group, and 31 states were in the potential control group.

Only one other study used the synthetic control method to examine the impact of a change in CCW laws on crime rates (Donohue et al., 2017). The present study differs from this prior research in that the present study examines murder rates and defines the treatment as a change in CCW laws from "prohibited" to "shall issue". Donohue et al. (2017) looked at violent crime rates,

and they only examined the repeal of the prohibition of concealed carry.

In order to test the robustness of the results obtained from the SCM analysis, a fixed effects model that controls for both state-level and year fixed effects was also estimated. All observations were weighted using state-level population (to correct for potential heteroscedasticity), standard errors were corrected using a clustering method (standard errors were clustered at the state level), and a log-linear functional form was used. Given the above, the following equation was estimated in the present study:

$$\ln Y_{i,t} = \alpha_0 + \alpha_i + \gamma_t + \beta' \mathbf{X} + \varepsilon_{i,t} \qquad (1)$$

In the above equation, Y denotes the murder rate or gun-related murder rate, $\alpha_i$ denotes the state-level effects, $\gamma_t$ denotes the year effects, and X denotes the vector of explanatory variables which includes a concealed carry dummy variable that denotes a change from "prohibited" status to "shall issue" status. This model is very similar to those used by other studies on this topic (Barati, 2016; Bartley and Cohen, 1998; Gius, 2014; Lott and Mustard, 1997; Moody and Marvell, 2009; Moody, 2001; Olson and Maltz, 2001).

In order to determine if fixed or random effects are more appropriate in the present study, a Hausman Test was used. Results of the test suggested that fixed effects was the more appropriate model. Clustering standard errors was necessary in order to account for potentially nonrandom variations within certain groups. Although there has been some criticism regarding the use of clustering to correct standard errors, most of this criticism was directed at studies that used too few clusters (Cameron et al., 2008). The present study uses many state-level clusters, thus justifying the use of clustered standard errors.

A log-linear function was used because it corrects for nonlinearities in the data. In order to test the appropriateness of the log-linear functional form, both the extended projection test for non-nested hypotheses (Davidson and MacKinnon, 1981) and the Ramsey test (Ramsey, 1969) were used. Both tests indicated that the log-linear model was more appropriate in the present study.

It is important to note that, given that the functional form used in the present study is log-linear, the coefficients on the dummy variables must be transformed in order to be properly interpreted. For example, if the coefficient on a dummy variable is 0.2, then that variable is associated with a 22% increase in the dependent variable being examined ($e^{0.2} = 1.22$ or 22%).

In order to determine the effect of a change in CCW status from "prohibited" to "shall issue", a CCW dummy variable was created that takes the value of one if the state changed their gun control laws from "prohibited" to "shall issue"; otherwise, the CCW dummy variable takes the value of zero. A state that changes from "prohibited" to "shall issue" will only have a value of one for the CCW dummy variable when the state has a "shall issue" CCW law. Although there has been some criticism in the past regarding the use of binary variables to denote the status of gun control in a particular state, almost all prior studies use dummy variables in their regression analyses. Some of the studies that used this approach are Gius (2014), Rubin and Dezhbakhsh (2003), Dezhbakhsh and Rubin (1998), Lott and Mustard (1997), and Kleck and Patterson (1993).

Another issue with using a binary variable to denote the status of gun control laws in a particular state is that a change in gun control laws may be coincident with an exogenous change in the crime rate, thus possibly resulting in a spurious correlation between gun control and crime (Moody, 2001). One way to test for this possibility is to include as explanatory variables in the crime regression both lags and leads of the CCW dummy variable. If these variables are insignificant, then this potential source of error does not exist (Moody, 2001). In the present study, this error was tested for by including two lags and two leads of the CCW dummy variable.

Exhibit D
Page 102

*M. Gius / International Review of Law and Economics 57 (2019) 1–11*

Results of this test indicated that this type of spurious correlation did not exist. Results of this test are available upon request.

In addition to concealed carry laws, it is also assumed that murder rates are dependent upon state demographics and various other state-level socioeconomic factors. The same explanatory variables that were used in the SCM analysis are used in the fixed effects regressions. As noted earlier, these variables were selected based upon their use in prior research (Barati, 2016; Bartley and Cohen, 1998; Gius, 2014; Lott and Mustard, 1997; Moody and Marvell, 2009; Moody, 2001; Olson and Maltz, 2001).

State-level data on murder and gun-related murder rates were obtained from the *Supplementary Homicide Reports* (1990–2014), which were provided by the Bureau of Justice Statistics, U.S. Department of Justice. Unfortunately, some of the values for murders committed were suspiciously low. In order to maintain the integrity of the data, any suspicious observations were deleted. The method by which suspicious data were identified was through a linear trend of the gun murder rates at the state level. If a data point was identified as an outlier, then that observation was deleted. Using this methodology, only 18 observations were deleted from the data set. Given that the final data set used in the fixed effects analysis had 1203 observations, these deletions were not expected to have any appreciable effect on the results of the fixed effects analysis. In addition, there were 29 missing observations (murder rates) in the original SHR data set. Hence, there were a grand total of 47 missing observations in the data used in the fixed effects regression.

It is important to note that, in the fixed effects regressions, the existence of missing observations did not require that the entire state be eliminated from the data set. Only that year's data in which there was a missing observation had to be deleted. Hence, for the fixed effects models, an unbalanced panel data set was used to estimate the regressions. In the SCM analysis, however, states had to have data for every year examined (1990–2014); no missing observations were allowed in the data. Hence, eleven states were eliminated from the original data in order to construct a data set that could be used in the SCM analysis.

Information on CCW laws were obtained from Gottlieb (1991), Gottlieb (1981), Henderson (2005), Henderson, (2000), Ludwig and Cook (2003), and the National Rifle Association. If the above references contradicted one another, then the author examined the original state law in order to determine the status of the CCW law in a particular state. State-level data on total suicides and firearm-related suicides were obtained from the National Center for Injury Prevention and Control, the Centers for Disease Control (CDC). The WISQARS system is used to obtain the necessary data from the CDC website. Per capita alcohol consumption data were obtained from the National Institute on Alcohol Abuse and Alcoholism. All other state-level data were obtained from relevant Census Bureau reports. Data used in the present study is for the years 1990-2014. The sample size for the fixed effects model is 1203. Data used for the SCM analyses differ somewhat from the fixed effects model data in that there is only one treated state per SCM estimation. Hence, the sample sizes of the eight data sets used for the SCM analyses were 800. Descriptive statistics for the fixed effects data set are presented on Table 2.

## 3. Results

For the SCM analysis, the eight states that were in the treatment group (changed from "prohibited" CCW to "shall issue" law) are as follows: Arkansas (1995), Missouri (2003), Nebraska (2006), New Mexico (2003), North Carolina (1995), Ohio (2004), Oklahoma (1995), and Texas (1995). Dates noted in parentheses are when the states adopted "shall issue" CCW laws. Although several other states also switched from "prohibited" to "shall issue", these states

**Table 2**
Descriptive Statistics (Fixed Effects Data).

| Variable | Mean | Standard Deviation |
|---|---|---|
| Gun-related murder rate (per 100,000 persons) | 3.15 | 2.21 |
| Murder rate (per 100,000 persons) | 5.13 | 2.93 |
| Percent of population that is African-American | 0.099 | 0.095 |
| Per capita real income | $16,413 | $2,999 |
| Percent of population college educated | 0.25 | 0.06 |
| Unemployment rate | 0.057 | 0.019 |
| Gun-related suicide ratio | 0.56 | 0.13 |
| Percent population 18-24 | 0.099 | 0.009 |
| Percent population 25-34 | 0.14 | 0.016 |
| Population density | 183.83 | 251.95 |
| Per capita alcohol consumption | 2.32 | 0.49 |
| Percent population in large cities | 0.137 | 0.137 |

were not included due to missing observations and incomplete data.

Although several states enacted "unrestricted" CCW laws (no permit required for concealed carry) in the past several years, very few states adopted such laws prior to 2014. Hence, this lack of data precluded any analysis pertaining to the impact of "unrestricted" concealed carry on murder rates.

An important aspect of the SCM analysis is that the actual outcome measure for a treated state should be similar to the outcome measure for the synthetic version of the treated state in the pre-treatment period. In order to test the similarity between the outcome measures for the treated state and the synthetic state, two statistical measures were used. The first measure was the Mean Squared Prediction Error (MSPE) in the pre-treatment period. The larger the MSPE, the greater is the difference between the two measures. Unfortunately, the MSPE is affected by the units of measurement and the scale of the outcome measure.

The other statistical test that was used is the hypothesis test for the difference between the means of the actual outcome measure and the synthetic outcome measure. In the pre-treatment period, this test should be statistically insignificant, thus indicating that there is no statistical difference between the actual outcome measure and the synthetic outcome measure. Both the MSPE and the pre-treatment period $t$-tests are presented in Table 3. As can be seen from these results, several states have $t$-tests that are statistically significant in the pre-treatment period, thus indicating that the actual outcome measure differs from the synthetic outcome measure; these states were excluded from the SCM analysis. After excluding states that had significant $t$-tests in the pre-treatment period, there were only four states that remained in the treated state pool.

In order to determine if the change in CCW law significantly affected the murder rates in the post-treatment period, the hypothesis test for the difference between the means of the actual outcome measure and the synthetic outcome measure was once again employed. In the post-treatment period, if the law had a significant effect on the murder rates, then the $t$-test should be statistically significant. These results are also reported on Table 3.

The results of the SCM analyses on the four treated states are presented on Chart 1. The vertical line on the chart denotes the year when a "shall issue" law was adopted. As can be seen from these charts and from the post-treatment $t$-tests provided on Table 3, the only state that experienced a consistent divergence in the outcome variable post-treatment was New Mexico (murder and gun-related murder). The switch from "prohibited" CCW to "shall issue" CCW resulted in an increase in both total murder rates and gun related murder rates in New Mexico.

For all other treated states, the switch from "prohibited" to "shall issue" had no statistically significant effects on either gun-related murder rates or total murder rates. Hence, according to the SCM results, the overall impact of a loosening of concealed carry laws on

Exhibit D
Page 103

**Table 3**
Treatment States MSPE and *t*-tests for Pre- and Post-Treatment Periods.

| State | MSPE | Pre-Treatment t Test Statistic | Post-Treatment t Test Statistic |
|---|---|---|---|
| Arkansas (gun murder)[a] | 0.965 | 1.603[*] | −1.413 |
| Arkansas (murder)[a] | 3.115 | 3.33[***] | 0.0557 |
| Missouri (gun murder)[a] | 1.195 | 2.128[**] | 4.514[***] |
| Missouri (murder)[a] | 2.719 | 2.6711[***] | 5.369[***] |
| Nebraska (gun murder) | 0.400 | −0.694 | 1.33 |
| Nebraska (murder) | 1.166 | −0.1514 | −1.304 |
| New Mexico (gun murder) | 0.542 | 0.295 | 2.816[***] |
| New Mexico (murder) | 2.184 | −0.0129 | 2.299[**] |
| North Carolina (gun murder)[1] | 0.335 | 2.091[**] | 0.381 |
| North Carolina (murder)[a] | 1.386 | 3.347[***] | −0.436 |
| Ohio (gun murder)[a] | 1.445 | −3.548[***] | −3.028[***] |
| Ohio (murder) | 0.4045 | −0.0297 | −0.767 |
| Oklahoma (gun murder) | 0.1026 | 0.0148 | 0.1916 |
| Oklahoma (murder) | 0.469 | 0.0110 | 1.33 |
| Texas (gun murder)[a] | 2.595 | 2.133[*] | −1.011 |
| Texas (murder)[a] | 8.885 | 3.3675[***] | −2.558[***] |

Notes.
MSPE denotes the Mean Squared Prediction Error for the pre-treatment period.
[*]10% significance; [**]5% significance; [***]1% significance.

[a] The synthetic outcome was statistically significantly different from the actual outcome in the pre-treatment period. States that possess this attribute were not included in the SCM analysis.



**Chart 1.** Nebraska SCM Results CCW Law Had No Effect on Gun-Related Murder Rate (Vertical line denotes year CCW law was changed.).
Weights Given to Control States.
Connecticut = 2.2%.
South Dakota = 84%.
Virginia = 13.8%.
All Others = 0%.

murder rates was somewhat mixed and inconclusive. These results are not directly comparable to those found in Donohue et al. (2017) primarily because their study examined the effects of CCW laws on violent crime rates and not on murder rates. Nonetheless, Donohue et al. (2017) found that the repeal of the prohibition of concealed carry resulted in an increase in violent crime rates.

In order to test the robustness of the synthetic control model in this scenario, two placebo tests were conducted (Abadie et al., 2011). In this test, the SCM is applied to a control state that is similar to the treated state but did not enact a change in its CCW law. It is assumed that the change in the similar control state occurred in the same year as that in the treated state. The only treated state tested in this manner was New Mexico. For gun related murders, the most similar state was Arizona, and for murder rates, the most similar state was Mississippi. Results are presented on Charts 8 and 9. As

can be seen from these charts, the outcome trajectories for Arizona and Mississippi and their synthetic counterparts are very similar.

Another method that was used to test the robustness of the SCM results was a permutation test (Abadie et al., 2011). In this test, the control states are subjected to the same synthetic control method as was the treated state. Then, the gaps between the synthetic outcomes and the actual outcomes for each of the control states and the treated state (New Mexico) are then plotted on a chart in order to determine if the true synthetic control unit is different from the other control units. Ideally, there should be small gaps prior to the treatment and large gaps afterwards. Results are presented on Charts 10 and 11. Please note that in New Mexico (the treated state), the change in CCW laws occurred in 2003. As can be seen from these charts, the outcome measures track very similarly pre-treatment, but after 2003, there is much more of a divergence. This denotes that the change in murder and gun related murder rates

Exhibit D
Page 104



**Chart 2.** Nebraska SCM Results CCW Law Had No Effect on Murder Rate (Vertical line denotes year CCW law was changed.).
Weights Given to Control States.
Arizona = 12%.
South Dakota = 88%.
All Others = 0%.



**Chart 3.** New Mexico SCM Results CCW Law Significantly Increased Gun-Related Murder Rate (Vertical line denotes year CCW law was changed.).
Weights Given to Control States.
Arizona = 47.6%West Virginia = 15%.
Nevada = 3.3%All Others = 0%.
North Dakota = 5.8%.
South Dakota = 28.3%.

cannot be attributed to the change in CCW laws in the control states (Abadie et al., 2011).

In the final test on the robustness of the results obtained from the SCM analysis, a fixed effects model that controls for both state-level and year fixed effects was also estimated. Observations were weighted using state-level population, standard errors were corrected using a clustering method, and a log-linear functional form was used. Results are presented on Tables 4 and 5.

These results suggest that states that switched from "pro-hibited" CCW status to "shall issue" CCW status experienced an increase in both the gun-related murder rate and the total murder rate. According to these results, states that switched from "pro-

hibited" to "shall issue" had gun-related murder rates that were 12.3% higher than other states, and they had total murder rates that were 4.9% higher than other states. These results differ from those found in Barati (2016) who found that a change from "pro-hibited" CCW status to "shall issue" had no statistically significant effects on murder rates.

## 4. Conclusion

Even though murder rates are lower now than they have been in decades, many individuals still believe that guns are needed for self-defense, even in public settings. These individuals believe that

*M. Gius / International Review of Law and Economics 57 (2019) 1–11*                    7



**Chart 4.** New Mexico SCM Results CCW Law Significantly Increased Murder Rate (Vertical line denotes year CCW law was changed.).
Weights Given to Control States.
Alaska = 14.5%All Others = 0%.
Mississippi = 60.5%.
Nevada = 5%.
Wyoming = 20%.



**Chart 5.** Ohio SCM Results CCW Law Had No Effect on Murder Rate (Vertical line denotes year CCW law was changed.).
Weights Given to Control States.
Indiana = 1.2% Maryland = 1.9% Pennsylvania = 16.2%.
Hawaii = 1.1% Rhode Island = 1.2% West Virginia = 17.4%.
New Jersey = 13.9%South Dakota = 23.3% Tennessee = 11.6%.
All Others = 12.2%.

allowing private citizens to carry guns would deter potential criminals from committing criminal acts. Unfortunately, much of the evidence to date suggests that permissive CCW laws have little to no effect on crime. Nonetheless, many states over the past twenty years have loosened regulations regarding the concealed carry of firearms.

Although there have been numerous studies examining CCW laws since Lott and Mustard (1997), the present study takes a different approach in examining the effects of CCW laws on crime. First, the present study looks at those states that changed their CCW laws from "prohibited" to "shall issue". The only other study

that specifically examined this type of shift in the legal status of concealed weapons was Barati (2016). Second, the present study is the only published study that uses the synthetic control method to determine the effects of a change in CCW laws on murder rates. As noted earlier, most prior studies that examined the effects of CCW laws on crime either used a fixed effects model or a difference-in-differences model.

Using SCM, it was found that only one of the four treated states experienced an increase in murder rates when they switched from "prohibited" CCW status to "shall issue" status.

Exhibit D
Page 106



**Chart 6.** Oklahoma SCM Results CCW Law Had No Effect on Gun Related Murder Rate (Vertical line denotes year CCW law was changed.). Weights Given to Control States.
Arizona = 10%.
Oregon = 29.6%.
Tennessee = 56.5%.
Utah = 3.9%.
All Others = 0%.



**Chart 7.** Oklahoma SCM Results CCW Law Had No Effect on Murder Rate (Vertical line denotes year CCW law was changed.). Weights Given to Control States.
Arizona = 21.4% All Others = 0%.
Tennessee = 34.5%.
Utah = 5.7%.
West Virginia = 38.3%.

As a check on the robustness of the SCM results, a two-way fixed effects model was also estimated, and it was found that states that switched from "prohibited" to "shall issue" experienced a 12.3% increase in gun-related murder rates and a 4.9% increase in overall murder rates when compared to other states. These results hold even after controlling for important demographic variables such as the percentage of state's population that is African-American, gun ownership (ratio of firearm suicides to total suicides), and alcohol consumption.

It is important to note that none of the results of the present study suggest that a move from "prohibited" CCW status to "shall issue" CCW is associated with a decline in murder rates. Hence, the deterrent effects of permissive CCW laws that have been discussed at great lengths in many prior studies do not appear to be supported by the evidence found in this study (Kovandzic and Marvell, 2003; Kovandzic et al., 2005; Lott and Mustard, 1997).

Although the fixed effects results suggest that a switch from "prohibited" CCW status to "shall issue" status increases murder rates on average, the results obtained from the SCM methodology

*M. Gius / International Review of Law and Economics 57 (2019) 1–11*

9



**Chart 8.** Placebo Test: Trends in Gun Murder Rates: Arizona vs. synthetic Arizona.



**Chart 9.** Placebo Test: Trends in Murder Rates: Mississippi vs. synthetic Mississippi.



**Chart 10.** Permutation Test: Gun Murder Rates in New Mexico and Control States. Control States: Arizona, West Virginia, Nevada, North Dakota, and South Dakota.



**Chart 11.** Permutation Test: Murder Rates in New Mexico and Control States. Control States: Alaska, Mississippi, Nevada, and Wyoming.

**Table 4**
Fixed Effects – Gun-Related Murder Rate.

| Variable | Coefficient | Test Statistic |
| --- | --- | --- |
| Constant | −0.81 | −1.78[*] |
| CCW dummy variable | 0.116 | 3.21[***]> |
| Percent of population that is African-American | 7.76 | 5.67[***]> |
| Per capita real income | −0.000016 | −1.39 |
| Percent of population college educated | −0.147 | −0.49 |
| Unemployment rate | 0.753 | 0.85 |
| Gun-related suicide ratio | 0.92 | 2.96[***]> |
| Percent population 18-24 | −2.12 | −2.30[**] |
| Percent population 25-34 | −2.42 | −1.66[*] |
| Population density | 0.0023 | 3.20[***]> |
| Per capita alcohol consumption | 0.467 | 5.99[***]> |
| Percent population in large cities | −0.93 | −1.63 |

$R^2 = 0.87$.
1% p-value ***>; 5% p-value **; 10% p-value *.

**Table 5**
Fixed Effects – Murder Rate.

| Variable | Coefficient | Test Statistic |
| --- | --- | --- |
| Constant | 0.167 | 0.48 |
| CCW dummy variable | 0.048 | 1.74[*] |
| Percent of population that is African-American | 6.71 | 6.44[***]> |
| Per capita real income | −0.000019 | −2.24[**] |
| Percent of population college educated | −0.0492 | −0.21 |
| Unemployment rate | 1.26 | 1.87[*] |
| Gun-related suicide ratio | 0.548 | 2.31[**] |
| Percent population 18-24 | −1.33 | −1.90[*] |
| Percent population 25-34 | −0.21 | −0.19 |
| Population density | −0.000015 | −0.03 |
| Per capita alcohol consumption | 0.457 | 7.69[***]> |
| Percent population in large cities | −0.898 | −2.06[**] |

$R^2 = 0.871$.
1% p-value ***>; 5% p-value **; 10% p-value *.

indicate that these effects may be more state-specific and may not be applicable to all states. In addition, the fixed effects methodology may not be the most appropriate statistical technique to use to evaluate of the effects of CCW laws on crime rates. Donohue et al. (2017) note that "the problems posed by high-dimensional estimation, misspecified models, and a lack of knowledge of the correct set of explanatory variables" may pose insurmountable problems when attempting to estimate the effects of any gun control legislation on crime (Donohue et al., 2017, p.16).

Another potential problem with the results found in the present study is the uncertainty involved with any examination of the effects of concealed carry laws on crime over the past 30 years. Crime rates increased during the 1980s and early 1990s and then fell to historic lows. During this period, however, there were numerous changes in gun control laws, both at the state and Federal level. Most of the changes loosened existing statutes, but some laws increased restrictions on various types of firearms. Hence, there were changes in the regulation of firearms at the same time that there were societal changes that were resulting in lower crime rates. Donohue (2003) believes that ". . . a disaggregated data push toward a more-guns, more-crime conclusion. . ." (pg. 324) and that ". . .crime swings that occurred in the late 1980s and 1990s happened to correlate with the passage of shall-issue laws, and the panel data model seems unable to separate out the contribution of the relatively minor influence of the shall issue law from the major impacts of these broad swings" (Donohue, 2003, pg. 325). Therefore, even though some of the results of the present study suggest that concealed carry laws are significantly and positively related to murder, it is reasonable to assume that various societal factors may have much greater effects on crime than any single gun control statute.

Finally, given the inconclusiveness of the SCM results, no public policy proposals should be gleaned from this study. Some prior studies have shown that crime rates are negatively affected by permissive CCW laws, while other studies have found that crime rates are either unaffected or are positively related to CCW laws. This inconclusiveness is no doubt due to the variety of CCW laws at the state level and the uncertainty regarding the frequency with which citizens avail themselves of the opportunity to defend themselves from criminal acts. Given that one of the goals of CCW laws is deterrence, it is difficult to measure deterrence if it is unknown how many persons are actually carrying concealed weapons on a regular basis. Binary variables denoting the legal status of concealed carry laws are poor substitutes for this type of data.

## References

Abadie, A., Diamond, A., Hainmueller, J., 2015. Comparative politics and the synthetic control method. Am. J. Pol. Sci. 59 (2), 495–510.
Abadie, A., Diamond, A., Hainmueller, J., 2011. Synth: an r package for synthetic control methods in comparative case studies. J. Stat. Softw. 42 (13), 1–17.
Abadie, A., Diamond, A., Hainmueller, J., 2010. Synthetic control methods for comparative case studies: estimating the effect of California's tobacco control program. J. Am. Stat. Assoc. 105 (490), 493–505.
Abadie, A., Gardeazabal, J., 2003. The economic costs of conflict: a case study of the basque country. Am. Econ. Rev. 93 (1), 113–132.
Ayers, Ian, Donohue, John, 2003. Shooting down the more guns, less crime hypothesis. Stanford Law Rev. 55, 1193–1314.
Barati, M., 2016. New evidence on the impact of concealed carry weapon laws on crime. Int. Rev. Law Econ. 47, 1–8.
Bartley, William, Cohen, Mark, 1998. The effect of concealed weapons laws: an extreme bound analysis. Econ. Inq. 36, 258–265.
Benson, Bruce, Mast, Brent, 2001. Privately produced general deterrence. J. Law Econ. 44 (S2), 725–746.
Black, Dan, Nagin, Daniel, 1998. Do Right-To-Carry Laws Deter Violent Crime? J. Legal Stud. 27, 209–219.
Blau, Benjamin, Gorry, Devon, Wade, Chip, 2016. Guns, laws, and public shootings in the United States. Appl. Econ. 48 (49), 4732–4746.
Bronars, Stephen, Lott, John, 1998. Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. Am. Econ. Rev. 88 (2), 475–479.
Cameron, C., Gelbach, J., Miller, D., 2008. Bootstrap-based improvements for inference with clustered errors. Rev. Econ. Stat. 90 (3), 414–427.
Crifasi, Cassandra, Pollack, Keshia, Webster, Daniel, 2016. Effects of state-level policy changes on homicide and nonfatal shootings of law enforcement officers. Inj. Prev. 22, 274–278.
Davidson, R., MacKinnon, J., 1981. Several tests for model specification in the presence of alternative hypotheses. Econometrica 49, 781–793.
Devaraj, Srikant, Patel, Pankaj, 2018. An examination of the effects of 2014 concealed weapons law in Illinois on property crimes in Chicago. Appl. Econ. Lett. 25 (16), 1125–1129.
Dezhbakhsh, Hashem, Rubin, Paul, 1998. Lives saved or lives lost? The effects of concealed handgun laws on crime. Am. Econ. Rev. 88 (2), 468–474.
Donohue, John, 2003. The impact of concealed-carry laws. In: Ludwig, John, Cook, Philip (Eds.), Evaluating Gun Policy:Effects on Crime and Violence. The Brookings Institution, Washington, D.C, pp. 287–341.
Donohue, John, Aneja, Abhay, Weber, Kyle, 2017. "Right-to-Carry Laws and Violent Crime: a Comprehensive Assessment Using Panel Data and a State-level Synthetic Controls Analysis," NBER Working Paper.
Duwe, Grant, Kovandzic, Tomislav, Moody, Carlisle, 2002. The impact of right-to-Carry concealed firearm laws on mass shootings. Homicide Stud. 6 (4), 271–296.
Ginwalla, Rashna, Rhee, Peter, Friese, Randall, Green, Donald, Gries, Lynn, Joseph, Bellal, Kulvatunyou, Narong, Lubin, Dafney, O'Keeffe, Terence, Vercruysse, Gary, Wynne, Julie, Tang, Andrew, 2013. Repeal of the concealed weapons law and its impact on gun-related injuries and deaths. J. Trauma Acute Care Surg. 76 (3), 569–575.
Gius, Mark, 2014. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl. Econ. Lett. 21 (4), 265–267.
Gottlieb, Alan, 1981. The Rights of Gun Owners. Caroline House Publishers, Aurora, Illinois.
Gottlieb, Alan, 1991. The Rights of Gun Owners. Merril Press, Bellevue, Washington.
Helland, Eric, Tabarrok, Alexander, 2004. Using placebo laws to test "More guns, less crime. Advances in Economic Analysis & Policy 4 (1), 1–7.
Henderson, Harry, 2000. Gun Control. Facts on File, New York, New York.
Henderson, Harry, 2005. Gun Control. Facts on File, New York, New York.
Kleck, Gary, Patterson, E.Britt, 1993. The impact of gun control and gun ownership levels on violence rates. J. Quant. Criminol. 9 (3), 249–287.
Kovandzic, Tomislav, Marvell, Thomas, 2003. Right-to-Carry Concealed Handguns and Violent Crime: Crime Control through Gun Decontrol? Criminol. Public Policy 2 (3), 363–396.

*M. Gius / International Review of Law and Economics 57 (2019) 1–11*                                                                                         11

Kovandzic, Tomislav, Marvell, Thomas, Vieraitis, Lynne, 2005. The Impact of "Shall Issue" Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities. Homicide Stud. 9 (4), 292–323.

Kreif, Noemi, Grieve, Richard, Hangartner, Dominik, James, Alex, Turner, Silviya Nikolova, Sutton, Matt, 2016. Examination of the synthetic control method for evaluating health policies with multiple treated units. Health Econ. 25, 1514–1528.

Lott, John, 1998. The concealed-handgun debate. J. Legal Stud. 27 (1), 221–243.

Lott, John, Mustard, David, 1997. Crime, deterrence, and right-to-Carry concealed handguns. J. Legal Stud. 26 (1), 1–68.

Ludwig, Jens, 1998. 'Concealed-Gun-Carrying laws and violent crime: evidence from state panel data. Int. Rev. Law Econ. 18 (3), 239–254.

Ludwig, John, Cook, Philip (Eds.), 2003. Evaluating Gun Policy: Effects on Crime and Violence. The Brookings Institution, Washington, D.C.

Moody, Carlisle, 2001. Testing for the effects of concealed weapons laws: specification errors and robustness. J. Law Econ. 44 (S2), 799–813.

Moody, Carlisle, Marvell, Thomas, 2009. The Debate on Shall Issue Laws, Continued. Econ J. Watch 6 (2), 203–217.

Moody, Carlisle, Marvell, Thomas, Zimmerman, Paul, Alemante, Fasil, 2014. The impact of right-to-Carry laws on crime: an exercise in replication. Q. Rev. Econ. Finance 4 (1), 33–43.

Olson, David, Maltz, Michael, 2001. Right-to-Carry concealed weapon laws and homicide in large U.S. counties: the effect on weapon types, victim characteristics, and victim-offender relationships. J. Law Econ. 44 (S2), 747–770.

Phillips, Charles, Nwaiwu, Obioma, Lin, Szu-hsuan, Edwards, Rachel, Imanpour, Sara, Ohsfeldt, Robert, 2015. Concealed handgun licensing and crime in four states. Isrn Discret. Math., 803742.

Plassman, Florenz, Tideman, T. Nicolaus, 2001. Does the Right to Carry Concealed Handguns Deter Countable Crimes? Only a Count Analysis Can Say. J. Law Econ. 44 (2), 771–798.

Ramsey, J.B., 1969. Tests for specification errors in classical linear least-squares regression analysis. J. R. Stat. Soc. Ser. B 31, 350–371.

Rubin, Paul, Dezhbakhsh, Hashem, 2003. The effect of concealed handgun laws on crime: beyond the dummy variables. Int. Rev. Law Econ. 23, 199–216.

Shi, Wei, Lee, Lung-fei, 2017. The effects of gun control on crimes: a spatial interactive fixed effects approach. Empir. Econ., http://dx.doi.org/10.1007/s00181-017- 1415-2.

Smith, Michael, Petrocelli, Matthew, 2018. The effect of concealed handgun carry deregulation in Arizona on crime in Tucson. Crim. Justice Policy Rev., 1–18.

men. Available at: https://www.cdc.gov/hiv/group/msm/index.html. Accessed October 2, 2017.

4. Parsons JT, Rendina HJ, Lassiter JM, Whitfield TH, Starks TJ, Grov C. Uptake of HIV pre-exposure prophylaxis (PrEP)

in a national cohort of gay and bisexual men in the United States. *J Acquir Immune Defic Syndr.* 2017;74(3):285–292.

5. Rolle CP, Rosenberg ES, Siegler AJ, et al. Challenges in translating PrEP interest into uptake in an observational study

of young black MSM. *J Acquir Immune Defic Syndr.* 2017;76(3):250–258.

6. Chaillon A, Hoenigl M, Mehta SR, Weibel N, Little SJ, Smith DM. A practical online tool to estimate antiretroviral coverage for HIV infected and

susceptible populations needed to reduce local HIV epidemics. *Sci Rep.* 2016;6: 28707.

# Laws Facilitating Gun Carrying and Homicide

 **See also Siegel, et al., p. 1923.**

In "Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States," Siegel et al. (p. 1923) estimate the impact of right-to-carry (RTC) laws on murders over the period from 1991 to 2015. They advance the current literature in a number of ways and bring new data to bear on this important issue. Siegel et al. conclude that RTC laws lead to a substantial increase in murders, almost all of which come through increased firearms killings—specifically from handguns.

## VITAL STATISTICS

Although earlier studies on this topic have typically relied on crime data from the Uniform Crime Reports, the authors used murder data from the National Vital Statistics and from the Supplemental Homicide Reports, which enabled them not only to get a different set of estimates on overall homicides but also to explore subcategories of crime that can illuminate our understanding of the impact of RTC laws. The Vital Statistics data are particularly attractive because they are collected under mandatory obligations (as opposed to police data, which are submitted on a voluntary basis) and are gathered pursuant to public health norms that place

a high value on measurement and science.[1] A potential pitfall is that the Vital Statistics include justifiable homicide by citizens in their intentional homicide counts (homicides by police in the line of duty are separately classified as "legal intervention" cases). Although this could be problematic if RTC laws increased justifiable homicides in a way that reduced other criminal victimizations, the evidence is now quite strong that RTC laws have led to an increase in overall violent crime.[2] Thus, the value of having the best count of intentional killings is worth the cost of having some justifiable homicides in the measure. After all, as Phil Cook noted in an e-mail to me, "Any reasonable social objective function would say we want to reduce the number of intentional killings, whether criminal or resulting from legal intervention or self-defense."

## REPRODUCING

The first row of Table 1 simply reproduces the first line of Table 3 in the Siegel et al. article (while presenting standard errors in parentheses rather than confidence intervals). The first row depicts their estimated incident rate ratios for the impact of RTC laws on five homicide measures, using a negative binomial model for data from 1991 to 2015 and

controlling for year and state fixed effects and an array of time-varying, state-level factors. The story emerging from the first row is that RTC laws increase murders, particularly firearm and handgun murders, but seem to have virtually no effect on nongun murders or long-gun murders. This story buttresses the fears of those who think that removing constraints on who can carry handguns will increase intentional killings and criminal use of guns.

## REPLICATING

Although Siegel et al. show in their Table 4 that the basic results shown in the first row of my Table 1 are relatively unaffected by a number of permutations, I was interested in further probing some of the econometric choices underlying these estimates. Accordingly, I tried to replicate the first row using the data I had available (I had one less year of data, so I used 1991–2014), making a number of data choices that I thought were used by the authors in creating their own data set and analysis (for more complete details of all the models

in Table 1, see the version of this comment on my bepress Web page, http://works.bepress.com/john_donohue). The result is shown in the first replication row of Table 1, which is fairly close to the first row values in that it again shows that RTC laws increase total, firearm, and handgun homicides, while showing no statistically significant effect on nonfirearm homicides and long-gun homicides. The first replication row attempt at replication adjusts its standard errors via clustering by state, which elevates the standard errors, as is typically the case, and which I have found to be necessary.[3]

## CRACK COCAINE EPIDEMIC

One potential concern in estimating the impact of RTC laws on crime is that the period from about 1985 through 1992 was one of substantially increasing crime in certain (usually non-RTC) states owing to the crack cocaine epidemic, which tended to improperly make RTC laws seem beneficial even though this simply reflected a serious problem of omitted variable bias. One might fear that by using the data from 1991 to 2015, the authors might be causing the reverse problem: making RTC states look worse than in fact they were as the crack problem

**ABOUT THE AUTHOR**

*John J. Donohue is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford University, Stanford, CA, and is with the National Bureau of Economic Research, Cambridge, MA.*

*Correspondence should be sent to John J. Donohue, Stanford University Law School 559 Nathan Abbott Way, Stanford, CA 94305 (e-mail: jjd@stanford.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This editorial was accepted September 11, 2017.*

*doi: 10.2105/AJPH.2017.304144*

Exhibit D

TABLE 1—The Impact of Right-to-Carry Laws on Intentional Homicides Using Variations in Specification and Time Period: United States, 1991–2015

| | CDC, IRR (SE) | | | SHR, IRR (SE) | |
|---|---|---|---|---|---|
| | Total | Firearm | Nonfirearm | Handgun | Long Gun |
| Original results, 1991–2015 | 1.065* (0.017) | 1.086* (0.020) | 1.014 (0.027) | 1.106* (0.035) | 0.999 (0.045) |
| My replications | | | | | |
| Original model, 1991–2014 | 1.078* (0.036) | 1.087* (0.043) | 1.049 (0.035) | 1.164* (0.083) | 1.110 (0.102) |
| Original model, 2000–2014 | 1.077* (0.038) | 1.085* (0.044) | 1.068 (0.051) | 1.169* (0.078) | 1.100 (0.131) |
| Modified model, 1991–2014 | 1.092* (0.046) | 1.133* (0.061) | 1.041 (0.041) | 1.177* (0.089) | 1.204* (0.108) |
| Modified model, 2000–2014 | 1.051 (0.042) | 1.089* (0.045) | 1.020 (0.053) | 1.171* (0.084) | 1.103 (0.156) |
| DAW model, 1991–2014 | 1.094* (0.047) | 1.133* (0.062) | 1.049 (0.040) | 1.157 (0.091) | 1.204* (0.108) |
| DAW model, 2000–2014 | 1.060 (0.043) | 1.095* (0.045) | 1.037 (0.052) | 1.158* (0.085) | 1.095 (0.153) |

*Note.* CDC = Centers for Disease Control and Prevention; DAW = the basic model that I used in my own study of RTC laws[2]; IRR = incident rate ratio; SHR = Federal Bureau of Investigation's Uniform Crime Reports, Supplemental Homicide Reports. Standard errors clustered in the replication rows. I calculated standard errors for the first row based on authors' confidence intervals, using the delta rule.
*$P < .05$.

subsided and differentially lowered the rate of murder.

To address this problem, I ran the authors' model on data from 2000 to 2014 (a period past the influence of the crack epidemic). The results are shown in the "Original model, 2000–2014" row of Table 1 and again show the almost identical pattern that RTC laws increase murders—specifically by firearms and handguns with no statistically significant impact on nonfirearm and long-gun homicides. The "Original model, 2000–2014" row results importantly show that the authors' results remain robust even when the influence of crack cocaine is controlled for and a different set of 10 states that adopted RTC laws after 2000 is analyzed (as opposed to the full set of 26 states that adopted after 1991).

Siegel et al. made a number of modeling choices that one could handle differently, so I made a few plausible modifications to see if the results would be influenced be these changes. Specifically, I dropped other gun control policies (background check, permit for sale, waiting periods), which might be highly correlated with RTC laws, and dropped all other crime rates

(e.g., violent crime), which might be endogenous. I included the proportions of the population that are male; either Black, White, or other race; and either aged 15 to 19 years or 20 to 39 years (rather than the proportions aged 18–29 years and the male proportion of that age group that Siegel et al. used). Alabama data was excluded because of possible missing data, and I re-coded the RTC laws so that the year in which they take effect is counted as the proportion of the year for which the law was in effect. Rather than using both disposable and median household income as controls, only disposable income was included to reduce overfitting. The Siegel et al. model used controls for population density, total population, and urbanization, while my modified model only includes population and percentage of population in a metropolitan statistical area (as a measure of urbanization). I further dropped the gun prevalence measure because of possible confounding with the treatment effect. When I made these changes in a "modified model," they turned out to somewhat strengthen the overall results over the 1991 to

2014 period ("Modified model, 1991–2014" row) and had little impact on four of the five estimates over the 2000 to 2014 period, while weakening the finding on overall homicides ("Modified model, 2000–2014" row).

For completeness, I also repeated the approach of the modified model rows (now shown in the DAW model rows), while using the basic model that I used in Donohue et al.[2] (as opposed to the original model rows or my modified version of the modified model rows). The DAW model rows are quite similar to the results of the modified model rows.

## OVERWHELMING SUPPORT

The evidence in Table 1 overwhelmingly supports the view that RTC laws increase firearm homicides by at least 8.5% and handgun homicides by perhaps as much as 16% while having no statistically significant impact on nonfirearm homicides. In all of the rows in the table, RTC laws are consistently associated with increases in total homicides of from 5% to 9.5% (but these estimates lost statistical

significance for the shortened 2000–2014 period in the modified and DAW models). This will be important information for judges and policymakers to consider in evaluating RTC laws.

The impact of RTC laws on long-gun homicides is less certain because the estimates are not statistically significant in five of the seven rows and vary more widely than do those in the other four columns from a slight drop to a 20% increase (presumably because of the lower number of long-gun homicides and the weaknesses of the Federal Bureau of Investigation's Uniform Crime Reports, Supplemental Homicide Reports data). The somewhat anomalous statistically significant estimates of RTC laws on long-gun homicides (for the years 1991–2014 in the "Modified model, 1991–2014" and "DAW model, 1991–2014" rows) may provide evidence that the states with large crack problems (who often resisted passing RTC laws) saw larger drops in long-gun homicides in the postcrack era. AJPH

John J. Donohue, JD, PhD

## ACKNOWLEDGMENTS
I am grateful to Phil Cook for his insights into the particular value of the National Vital Statistics data and to Jacob Dorn, Sidharth Sah, and Henrik Sachs for excellent research assistance.

## REFERENCES
1. US Department of Justice. Program report: the nation's two measures of homicide. 2014. Available at: https://www.bjs.gov/content/pub/pdf/ntmh.pdf. Accessed October 11, 2017.
2. Donohue JJ, Aneja A, Weber KD. Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis. Cambridge, MA: National Bureau of Economic Research; 2017. NBER working paper 23510.
3. Aneja A, Donohue JJ, Zhang A. The impact of right-to-carry laws and the NRC report: lessons for the empirical evaluation of law and policy. *Am Law Econ Rev.* 2011;13(2):565–631.

Exhibit D
Page 101

# The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study


Check for updates

*Michael Siegel[1], Molly Pahn[1], Ziming Xuan[1], Eric Fleegler[2], and David Hemenway[3]*

[1]Department of Community Health Sciences, Boston University School of Public Health, Boston, MA, USA; [2]Division of Emergency Medicine, Boston Children's Hospital, Boston, MA, USA; [3]Harvard T.H. Chan School of Public Health, Boston, MA, USA.

**BACKGROUND:** Firearm injuries are a major cause of mortality in the USA. Few recent studies have simultaneously examined the impact of multiple state gun laws to determine their independent association with homicide and suicide rates.

**OBJECTIVE:** To examine the relationship between state firearm laws and overall homicide and suicide rates at the state level across all 50 states over a 26-year period.

**DESIGN:** Using a panel design, we analyzed the relationship between 10 state firearm laws and total, age-adjusted homicide and suicide rates from 1991 to 2016 in a difference-in-differences, fixed effects, multivariable regression model. There were 1222 observations for homicide analyses and 1300 observations for suicide analyses.

**PARTICIPANTS:** Populations of all US states.

**MAIN MEASURES:** The outcome measures were the annual age-adjusted rates of homicide and suicide in each state during the period 1991–2016. We controlled for a wide range of state-level factors.

**KEY RESULTS:** Universal background checks were associated with a 14.9% (95% CI, 5.2–23.6%) reduction in overall homicide rates, violent misdemeanor laws were associated with a 18.1% (95% CI, 8.1–27.1%) reduction in homicide, and "shall issue" laws were associated with a 9.0% (95% CI, 1.1–17.4%) increase in homicide. These laws were significantly associated only with firearm-related homicide rates, not non-firearm-related homicide rates. None of the other laws examined were consistently related to overall homicide or suicide rates.

**CONCLUSIONS:** We found a relationship between the enactment of two types of state firearm laws and reductions in homicide over time. However, further research is necessary to determine whether these associations are causal ones.

KEY WORDS: community health; firearms; health policy; injury; prevention; public health.

J Gen Intern Med 34(10):2021–8
DOI: 10.1007/s11606-019-04922-x
© Society of General Internal Medicine 2019

***Electronic supplementary material*** *The online version of this article* (*https://doi.org/10.1007/s11606-019-04922-x*) *contains supplementary material, which is available to authorized users.*

*Received January 30, 2018*
*Revised August 21, 2018*
*Accepted January 10, 2019*
*Published online March 28, 2019*

## INTRODUCTION

From 1991 to 2016, the average annual firearm death rate in the USA was 11.4 per 100,000 individuals.[1] This amounts to 859,871 lives lost due to a single cause of preventable death over a 26-year period.[1] Although numerous studies have evaluated the impact of state firearm laws on homicide or suicide rates (Online Supplemental Tables S1, S2), a major limitation is that most examined the impact of only one type of policy. Because states that enact one type of law are also more likely to enact others,[2] it is difficult to isolate the effect of one law without considering the simultaneous impact of other policies.

To improve our ability to draw causal inferences, a stronger study design would examine the relationship between the enactment of *multiple* types of state firearm laws over time and differences in fatality rates between states. However, we are aware of only one multi-year panel study of homicide rates that examined multiple laws and included data from the past decade; this study was conducted at the level of urban counties, and only 34 states were included.[3] We are not aware of any panel study at the state level that used data within the past decade to assess simultaneously the effect of multiple state firearm laws on homicide or suicide death rates.

One reason why many previous studies have focused on a single type of law is the absence of a comprehensive national database of state firearm laws. For most previous studies, researchers had to track down the status of state firearm laws by conducting their own legal research, a painstaking process that precluded a single study of a large range of gun-related policies. We recently created a novel database in which we recorded, quantified, and classified the largest-to-date compilation of firearm provisions by state over a 26-year period.[2] In this study, we examine the simultaneous impact of 10 different types of state firearm laws on overall homicide and suicide rates over a 26-year period using the same model specification.

## METHODS

### Data Sources

We ascertained the annual presence or absence of 10 state firearm laws in all 50 states from 1991 to 2016 using the State Firearm Law Database, which provides a panel of firearm-related laws in each state, for each year.[2] The database was

compiled using the Thompson Reuters Westlaw database of state statutes and session laws and a database assembled by Everytown for Gun Safety.[4]

We obtained homicide and suicide mortality data from the Centers for Disease Control and Prevention Web-Based Injury Statistics Query and Reporting System (WISQARS), which are derived from the vital statistics death registry of the National Center for Health Statistics.[1] WISQARS reports annual state-specific, age-adjusted fatality rates for homicide and suicide.

## Study Population

We assembled annual, state-specific age-adjusted total homicide and suicide rates in each state from 1991 to 2016. We excluded homicides due to legal intervention (1% of firearm deaths), unintentional firearm fatalities (2.5% of firearm deaths), and fatalities of undetermined intent (1% of firearm deaths) from our analysis.

## Outcome Measures

The main outcome measures were the annual, age-adjusted homicide rate and age-adjusted suicide rate in each state over the study period. Because there were 50 states and 26 years, the total number of possible observations was 1300. However, the CDC does not report death rates when the absolute number of deaths in a state during a given year is less than 10. For this reason, we did not have a complete panel of homicide data for three states: North Dakota, Vermont, and Wyoming. We therefore excluded these states from the homicide analyses, yielding a total of 1222 observations. There were no missing data for suicide death rates, so there were 1300 observations for analyses involving this outcome.

## Main Predictor Variables

From the state law database, we selected 10 laws to analyze based on several considerations: (1) laws that are currently being considered by state legislatures; (2) laws that have been examined in prior research; and (3) laws that were enacted by at least two states during the study period. We analyzed the following 10 laws (defined in detail in Table 1): (1) universal background checks, either through point-of-purchase checks or a permit to purchase requirement; (2) ban on handgun possession for people convicted of a violent misdemeanor; (3) age 21 limit for handgun possession; (4) "shall issue" laws; (5) permitless carry laws; (6) prohibition against gun trafficking; (7) ban on "junk guns"; (8) "stand your ground" laws; (9) assault weapons ban; and (10) ban on large-capacity ammunition magazines. Laws were lagged by 1 year in the analysis; that is, we considered the potential effect of a law only in the full first year after its enactment.

## Data Analysis

Unlike many earlier analyses in the public health literature, we employed a difference-in-differences approach to the analysis

of policy outcomes,[5, 6] an approach that is widely used in the econometric and criminology literature on the effect of state firearm laws and was first introduced by Lott and Mustard in their classic 1997 paper.[7] Using multivariable linear regression, we evaluated the association between the firearm law provisions in each state (which were time-varying) and the homicide and suicide rates over the study period, while controlling for several other time-varying state-level factors. We included year and state fixed effects and estimated cluster-robust standard errors, which account for the clustering of observations, serial autocorrelation, and heteroskedasticity.[8] By including state fixed effects, our analysis focuses on the time series of observations within each state, comparing changes in homicide or suicide rates within a state from before to after the implementation of a particular firearm law, using states without that law as controls. Because the outcome variables are not normally distributed but skewed, we log-transformed the homicide and suicide rates.

Our final model was as follows:

$$ln\,(\mu_{st}) = \alpha + (B_s LAW_{st}) + (C_s CONTROL_{st}) + S + T + e,$$

where $\mu_{st}$ is the homicide or suicide rate in state $s$ in year $t$, $LAW_{st}$ is a dummy variable for the presence or absence of a particular state firearm law in state $s$ in year $t$, $CONTROL_{st}$ is a vector of control variables, $S$ represents state fixed effects, and $T$ represents year fixed effects.

We controlled for the following time-varying state-level factors, chosen because of their association with homicide or suicide rates in the published literature and their association with both death rates and the adoption of firearm laws in our data set: (1) the percent of the population that is black; (2) the percent of population ages 15–29 that is male; (3) per capita law enforcement officers; (4) the violent crime rate (excluding homicide); (5) the divorce rate; (6) the unemployment rate; (7) the poverty rate; (8) per capita alcohol consumption; (9) the incarceration rate; (10) population density; (11) log of population; and (12) household gun ownership percentage.

Because annual survey data of household gun ownership at the state level are not available, most previous studies have used the ratio of firearm suicides to all suicides (FS/S) as a proxy for household firearm ownership.[9] This proxy is highly correlated ($r = 0.80$) with state-specific measures of firearm ownership on a cross-sectional basis.[10] Recently, we developed a new proxy measure that improves the correlation with survey-measured gun ownership from 0.80 to 0.95.[10] This new proxy measure incorporates a state's hunting license rate in addition to FS/S.[10] In this study, we used this new proxy.

Per capita law enforcement officers and violent crime rates were obtained from the FBI Uniform Crime Reports;[11] incarceration rates were obtained from the Bureau of Justice Statistics;[12] and per capita alcohol consumption was obtained from the National Institute on Alcohol Abuse and Alcoholism (NIAAA) for 1991–2015[13] and from Statistica[14] for 2016. Hunting licensing data were obtained from the U.S. Fish and Wildlife Service.[15] The remaining variables were obtained

JGIM    *Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study*    **2023**

**Table 1 Description of State Firearm Laws Examined**

| Law | Brief description | Detailed description | States with law in 1991 | Additional states with law in 2016 | Law changes from 1991 to 2016 |
|---|---|---|---|---|---|
| Universal background checks | Background checks conducted through permit requirement for all firearm sales or through required background checks for all sales) | Individuals must undergo a background check to purchase any type of firearm, either at the point of purchase or through a license/permit application. This may or may not include exemptions for buyers who have already undergone a background check for a concealed carry permit or other licensing requirements. | CA, IL, MA, NJ, RI | CO, CT, DE, HI, NY, OR, WA | 7 |
| Violent misdemeanor is prohibiting for handgun possession | Handgun possession is prohibited for people who have committed a violent misdemeanor punishable by less than 1 year of imprisonment | Must cover possession of handguns, not just purchase. Must cover assault, not just aggravated assault. Must extend beyond domestic violence-related misdemeanors, restraining orders, and stalking. Must not require that misdemeanor be punishable by imprisonment of more than 1 year. Must not require that misdemeanor involve use of a firearm or result in injury. | CA, HI, NY | CT, MD | 2 |
| Age 21 limit for handgun possession | No possession of handguns until age 21 | You must be 21 to possess a handgun. No exemption for parental consent. Exclusions for adult-supervised hunting, sporting, or training activities are OK. Exception for possession on private premises NOT OK unless minor required to be under adult supervision. | IA, RI, SC | CT, HI, MD, MA, NJ, NY (SC repealed) | 7 |
| Shall issue law | Law provides no discretion to law enforcement authorities in deciding whether to grant a concealed carry permit. | A permit must be issued unless the applicant meets pre-established disqualifying criteria. | FL, GA, ID, IN, IA, ME, MS, MT, NH, ND, OR, PA, SD, WA, WV | AL, AR, CO, IL, KY, LA, MI, MN, MO, NE, NV, NM, NC, OH, OK, SC, TN, TX, UT, VA, WA, WI (WV moved to permitless carry) | 23 |
| Permitless carry | No permit is required to carry a concealed handgun. | Age restrictions may apply, and a voluntary permitting system may still be in place. | VT | AK, AZ, ID, KS, ME, MS, WV, WY | 8 |
| Trafficking prohibited | No person may purchase a firearm with the intent to re-sell to a person who is prohibited from buying or possessing a firearm | The law prohibits the purchase of a firearm with the intent to re-sell to a prohibited person. We make no distinction between whether the trafficker (original purchaser) must actually know or have reason to believe that the buyer is prohibited. An exemption for sale to relatives is acceptable. | FL, MA, ND, OH, VA | CA, CO, CT, DE, IL, MN, NY, UT, VA | 9 |
| Junk gun ban | Ban on junk guns (sometimes called "Saturday night specials") | The law prohibits the sale of handguns that fail to meet one or more of the following requirements: (1) Passes drop testing and firing testing; (2) Passes a melting point test; (3) Possesses specific handgun safety features; (4) Appears on a list of approved handguns. This may or may not apply to private sellers. | HI, IL, MD, MN, SC | CA, MA (SC repealed) | 3 |
| Stand your ground law | A "stand your ground" law is in place | Use of deadly force is allowed to be a first resort if you are threatened in a public place in which you have the right to be present. There is no duty to retreat. Does not count as stand your ground law if it only | None | AL, AK, AZ, FL, GA, IN, KS, KY, LA, MI, MS, MO, MT, NV, NH, NC, OK, PA, SC, SD, TN, TX, UT, WV | 24 |

*(continued on next page)*

Exhibit D
Page 115

**2024**   *Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study*   JGIM

**Table 1. (continued)**

| Law | Brief description | Detailed description | States with law in 1991 | Additional states with law in 2016 | Law changes from 1991 to 2016 |
|---|---|---|---|---|---|
| Assault weapons ban | Ban on sale of assault weapons beyond just assault pistols | applies when person is in a vehicle. Law bans the sale of both assault pistols and other assault weapons. | CA, NJ | CT, MD, MA, NY | 4 |
| Large capacity ammunition magazine ban | Ban on sale large capacity magazines beyond just ammunition for pistols | Law bans the sale of both assault pistol ammunition and other large-capacity magazines. | NJ | CA, CO, CT, MD, MA, NY | 6 |

from the U.S. Census. We conducted the analysis using Stata version 15 (StataCorp LP, College Station, TX).

Because the outcome variables are log-transformed, the regression coefficients can be interpreted as the percentage change in the firearm homicide or suicide rate associated with the presence of a particular law by exponentiating the coefficient, subtracting 1, and then multiplying by 100 (i.e., a coefficient of 0.10 for a given law would indicate a 10.5% increase in the mortality rate associated with that law).

To test the plausibility of any observed associations between firearm laws and overall homicide or suicide rates, we conducted a falsification test: we analyzed the relationship between these laws and firearm compared to non-firearm mortality rates. These laws would be expected to primarily affect only the firearm-related rates.

In a final sensitivity analysis, we modeled the secular time trend in firearm homicide or suicide rates by including year as a continuous variable in the model rather than as a fixed effect.

## RESULTS

Over the 26-year study period, there was a substantial variation in the violent death rates across states. In 2016, overall homicide rates ranged from a low of 1.3 per 100,000 in Maine and New Hampshire to a high of 14.2 per 100,000 in Louisiana (Table 2). In 2016, overall suicide rates ranged from a low of 7.2 per 100,000 in New Jersey to a high of 26.0 per 100,000 in Montana. Across the study period, there were a total of 93 law changes among the 10 laws studied (Table 1).

When examined individually, universal background checks and violent misdemeanor laws were significantly associated with lower overall homicide rates and "shall issue" laws were significantly associated with higher homicide rates (Table 3). After simultaneously controlling for all 10 firearm laws, universal background checks were associated with 14.9% lower overall homicide rates (95% confidence interval [CI], 5.2%–23.6%); violent misdemeanor laws were associated with 18.1% lower homicide rates (95% CI, 8.1–27.1%); and "shall issue" laws were associated with 9.0% higher homicide rates (95% CI, 1.1%–17.4%). None of the other seven laws were significantly associated with overall homicide rates. In a

falsification test, each of these three laws was found to be significantly associated only with the firearm-related homicide rate, not the non-firearm-related homicide rate (Online Supplemental Table S3).

In the fully adjusted model, household gun ownership was not associated with overall rates of homicide (Table 3). Factors that were significant positive predictors of overall homicide rates were the percentage of males, the violent crime rate, and population density. Overall population was negatively associated with homicide rates.

When examined individually, four of the 10 firearm laws were significantly associated with overall suicide rates (Table 4). However, after simultaneously controlling for all 10 firearm laws, only two laws were significantly related to suicide rates: bans on junk guns were associated with 6.4% lower suicide rates (95% CI, 3.5–9.2%) and permitless carry laws were associated with 5.1% higher suicide rates (95% CI, 0.2–10.4%). Both laws failed the falsification test, as both were significantly related to non-firearm as well as firearm homicide rates (Online Supplemental Table S4). None of the other laws were significantly associated with overall suicide rates.

In the fully adjusted model, household gun ownership was not associated with overall rates of suicide (Table 4). Factors that were significant positive predictors of suicide rates were the violent crime rate, unemployment rate, poverty rate, and per capita alcohol consumption. Overall population was negatively related to suicide rates.

Entering year as a continuous variable instead of as a fixed effect had no appreciable impact on the results (Online Supplemental Table S5).

## DISCUSSION

To the best of our knowledge, this is the first study using data from within the past decade to simultaneously model the effect of multiple state firearm laws on homicide and suicide rates at the state level using a multi-year panel design. Using a difference-in-differences analysis, we found that laws requiring universal background checks and those prohibiting firearm possession by people with a conviction for a violent

**Table 2  Status of State Firearm Laws and Violent Death Rates, 2016**

| State | UBC | VM | 21 | SI | PC | TP | JG | SYG | AW | LCM | Age-adjusted overall homicide rate (per 100,000) | Age-adjusted overall suicide rate (per 100,000) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Louisiana | | | | √ | | | | √ | | | 14.2 | 14.1 |
| Mississippi | | | | | √ | | | √ | | | 12.0 | 12.7 |
| Alabama | | | | √ | | | | √ | | | 11.8 | 15.6 |
| Maryland | | √ | √ | | | √ | | | √ | √ | 10.0 | 9.3 |
| Missouri | | | | √ | | | | | | | 9.9 | 18.3 |
| New Mexico | | | | √ | | | | | | | 9.5 | 22.5 |
| Illinois | √ | | | √ | | √ | √ | | | | 9.2 | 10.7 |
| South Carolina | | | | √ | | | | √ | | | 9.0 | 15.7 |
| Tennessee | | | | √ | | | | √ | | | 8.7 | 16.3 |
| Arkansas | | | | √ | | | | | | | 8.7 | 18.2 |
| Oklahoma | | | | √ | | | | √ | | | 8.6 | 20.9 |
| Georgia | | | | √ | | | | √ | | | 7.9 | 13.3 |
| Alaska | | | | | √ | | | √ | | | 7.5 | 25.4 |
| Indiana | | | | √ | | | | √ | | | 7.5 | 15.4 |
| North Carolina | | | | √ | | | | √ | | | 7.4 | 13.0 |
| Nevada | | | | √ | | | | √ | | | 7.4 | 21.4 |
| Kentucky | | | | √ | | | | √ | | | 7.1 | 16.8 |
| Delaware | √ | | | | | √ | | | | | 7.0 | 11.5 |
| Florida | | | | √ | | √ | | √ | | | 6.8 | 13.9 |
| Michigan | | | | √ | | | | √ | | | 6.6 | 13.3 |
| Ohio | | | | √ | √ | | | √ | | | 6.5 | 14.1 |
| West Virginia | | | | | √ | | | √ | | | 6.3 | 19.5 |
| Arizona | | | | | √ | | | √ | | | 6.3 | 17.6 |
| Pennsylvania | | | | √ | | | | √ | | | 6.0 | 14.7 |
| Texas | | | | √ | | | | √ | | | 6.0 | 12.6 |
| Virginia | | | | √ | | √ | | | | | 5.5 | 13.2 |
| Kansas | | | | | √ | | | √ | | | 5.3 | 17.9 |
| California | √ | √ | | | | √ | √ | | √ | √ | 5.2 | 10.5 |
| Wisconsin | | | | √ | | | | | | | 4.8 | 14.6 |
| South Dakota | | | | | | | | √ | | | 4.7 | 20.5 |
| New Jersey | √ | | √ | | | | | | √ | √ | 4.6 | 7.2 |
| Montana | | | | √ | | | | √ | | | 4.3 | 26.0 |
| Colorado | √ | | | √ | | √ | | | | √ | 4.2 | 20.5 |
| New York | √ | √ | √ | | | √ | | | √ | √ | 3.5 | 8.1 |
| Nebraska | | | | √ | | | | | | | 3.3 | 13.0 |
| Oregon | √ | | | √ | | | | | | | 3.2 | 17.8 |
| Wyoming | | | | | √ | | | | | | 3.0 | 25.2 |
| Washington | √ | | | √ | | | | | | | 2.9 | 14.8 |
| Iowa | | | √ | √ | | | | | | | 2.8 | 14.5 |
| Hawaii | √ | √ | √ | | | | √ | | | | 2.8 | 12.0 |
| Connecticut | √ | √ | √ | | | √ | | | √ | √ | 2.6 | 10.0 |
| Utah | | | | √ | | √ | √ | | | | 2.5 | 21.8 |
| Minnesota | | | | √ | | √ | √ | | | | 2.4 | 13.2 |
| Rhode Island | √ | | √ | | | | | | | | 2.3 | 11.1 |
| North Dakota | | | | √ | | √ | | | | | 2.2 | 19.0 |
| Massachusetts | √ | | √ | | | √ | √ | | √ | √ | 2.0 | 8.7 |
| Idaho | | | | | √ | | | | | | 2.0 | 21.3 |
| Vermont | | | | | √ | | | | | | 1.9 | 17.3 |
| New Hampshire | | | | √ | | | | √ | | | 1.3 | 17.3 |
| Maine | | | | | √ | | | | | | 1.3 | 15.7 |

*Includes the following 10 laws: UBC, universal background checks; VM, violent misdemeanor prohibitor; 21, age 21 limit for handgun purchase; SI, shall issue; PC, permitless carry; TP, trafficking prohibited; JG, junk gun ban; SYG, stand your ground law; AW, assault weapons ban; LCM, large capacity magazine ban*

misdemeanor were associated with significant reductions in the overall homicide rate, while "shall issue" laws were associated with a significant increase in the homicide rate. There was no significant association between homicide and the other laws studied, and we did not find consistent relationships between any of the laws and overall suicide rates.

This study has several strengths. First, it is one of the first studies to clearly define each law with attention to the detailed provisions of the law, including its scope, exceptions, and exemptions. One reason for some of the conflicting results of previous studies (Online Supplemental Tables S1, S2) may be the inconsistent definition of state statutes.

Second, using a difference-in-differences approach helps to address the major threat to validity in this type of research: states with lower homicide rates to begin with may be more likely to enact stronger gun laws. By including state and year fixed effects, we are using a "within-estimator" that assesses differences within states over time.[5, 6] Studies that do not include state fixed effects are also assessing differences across states at a given time ("between effects"), which may reflect different propensities of states with lower or higher homicide rates to enact laws, rather than law effects. Thus, the difference-in-differences approach is less subject to the possibility of "reverse causation" (i.e., it is the level of the homicide

**2026**   *Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study*   JGIM

**Table 3 Linear Regression Model Results: Factors Affecting Homicide Rates, 1991–2016**

| | Regression coefficient for state firearm laws entered one at a time (95% CI) | Regression coefficient, fully adjusted model [all laws entered together] (95% CI) |
|---|---|---|
| Percent black | | 0.043 (−0.004, 0.089) |
| Percent male among population ages 15–29 | | *0.100* (0.021, 0.179)* |
| Per capita law enforcement officers | | −0.023 (−0.079, 0.033) |
| Violent crime rate | | *0.054* (0.026, 0.081)* |
| Divorce rate | | −0.030 (−0.066, 0.005) |
| Unemployment rate | | 0.002 (−0.015, 0.019) |
| Poverty rate | | 0.002 (−0.005, 0.010) |
| Per capita alcohol consumption | | 0.138 (−0.021, 0.298) |
| Incarceration rate (per 1000 population) | | −0.025 (−0.058, 0.008) |
| Population density (per 0.1 mile$^2$) | | *0.032* (0.010, 0.054)* |
| Log of population | | *−0.629* (−1.081, −0.177)* |
| Proxy for household gun ownership percentage | | 0.001 (−0.004, 0.007) |
| **Firearm laws** | | |
| Universal background checks | *−0.173* (−0.299, −0.048)* | *−0.161* (−0.269, −0.053)* |
| Violent misdemeanor is prohibiting for handgun possession | *−0.155* (−0.276, −0.033)* | *−0.200* (−0.316, −0.084)* |
| Age 21 limit for handgun possession | −0.117 (−0.245, 0.010) | −0.068 (−0.200, 0.064) |
| Shall issue law | *0.082* (0.018, 0.146)* | *0.086* (0.011, 0.160)* |
| Permitless carry law | −0.063 (−0.152, 0.027) | 0.015 (−0.101, 0.131) |
| Trafficking prohibited | −0.045 (−0.133, 0.044) | 0.005 (−0.050, 0.061) |
| Junk gun ban | −0.028 (−0.177, 0.121) | −0.010 (−0.136, 0.116) |
| Stand Your Ground law | 0.020 (−0.042, 0.083) | 0.009 (−0.050, 0.067) |
| Ban on assault weapons | −0.143 (−0.300, 0.013) | −0.092 (−0.222, 0.039) |
| Ban on large capacity ammunition magazines | −0.089 (−0.205, 0.027) | 0.038 (−0.036, 0.112) |
| $R^2$ | | 0.94 |

*Outcome variable is the log of the age-adjusted total homicide rate. All models include year and state fixed effects. Standard errors are robust and adjusted for state-level clustering*
*CI, confidence interval*
*\*Coefficient is statistically significant from zero (p < 0.05). Also shown in italic*

rates that are affecting the law enactment, not the other way around). The inclusion of state fixed effects has the added advantage of controlling for any differences between states in time-invariant factors.

Third, including a large panel of time-varying state factors as independent variables helps address the problem of omitted variable bias. Nevertheless, it is still possible that states which were experiencing large declines in homicide were more likely to enact a particular law; even the within-estimator may not be sufficient to rule out the possibility of reverse causation.

Our finding of a negative association between universal background checks (including permit laws) and homicide rates is consistent with several other studies.[3, 16–20] Our finding of a negative association between violent misdemeanor laws and homicide rates is consistent with one other recent study, which reported a 24% reduction in intimate partner homicide in states with these laws.[21] However, caution should be exercised when interpreting this finding because only two states implemented violent misdemeanor laws during the study period. While historically the literature on the impact of concealed carry–permitting laws has been inconsistent and several studies have found an association between "shall issue" laws and reduced murder rates,[7, 22–29] the three most recent studies to examine these laws found a positive association with homicide rates.[3, 30, 31]

Our finding that there was no association between stand your ground laws and homicide rates conflicts with the findings of two previous studies on these laws.[32, 33] However, both of these studies examined only the decade of 2000–2010.

When we restrict our analysis to that decade, we obtain similar results.

A second important finding of this study is that changes in household gun ownership were not found to be significantly associated with homicide or suicide rates, a result that differs from several previous studies.[34, 35] The discrepancy in these results could possibly be due to our inclusion of state fixed effects. It is possible that although there is a strong cross-sectional relationship between the prevalence of firearm ownership and homicide and suicide rates, small changes in firearm ownership that are observed over time are not sufficient enough to result in measurable differences in overall population homicide or suicide rates. Even if we had survey-based measures of household gun ownership, the margin of error is probably greater than the actual change in gun ownership levels from year to year. There is too much noise in our measure of gun ownership and too little variability in true levels of household gun ownership to determine if changes in gun ownership are related to differences in homicide or suicide rates. Few of the previous studies included state fixed effects. Because of the conflict with the existing literature, further study is required before any definitive conclusion is drawn.

It is important to note that the absence of an observed association of a law and overall homicide or suicide rates does not necessarily mean that these laws are ineffective. It may also be that the laws are not broad enough to affect overall population death rates or that the laws are not being adequately enforced.

Exhibit D
Page 118

Case 3:19-cv-01226-L-AHG   Document 134-8   Filed 03/15/24   PageID.14501   Page 194 of 453

JGIM     *Siegel et al.: The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991–2016: a Panel Study*     **2027**

**Table 4  Linear Regression Model Results: Factors Affecting Suicide Rates, 1991–2016**

| | Regression Coefficient for State Firearm Laws Entered One at a Time (95% CI) | Regression Coefficient, Fully Adjusted Model [All Laws Entered Together] (95% CI) |
|---|---|---|
| Percent black | | $-0.015$ ($-0.033$, 0.003) |
| Percent male among population ages 15–29 | | 0.018 ($-0.014$, 0.049) |
| Per capita law enforcement officers | | 0.006 ($-0.015$, 0.027) |
| Violent crime rate | | *0.018\* (0.007, 0.029)* |
| Divorce rate | | $-0.008$ ($-0.028$, 0.012) |
| Unemployment rate | | *0.008\* (0.001, 0.016)* |
| Poverty rate | | *0.004\* (0.000, 0.007)* |
| Per capita alcohol consumption | | *0.075\* (0.012, 0.138)* |
| Incarceration rate (per 1000 population) | | 0.007 ($-0.011$, 0.025) |
| Population density (per 0.1 mile$^2$) | | $-0.001$ ($-0.010$, 0.007) |
| Log of population | | *$-0.349$\* ($-0.601$, $-0.097$)* |
| Proxy for household gun ownership percentage | | 0.001 ($-0.001$, 0.003) |
| Firearm laws | | |
| Universal background checks | 0.008 ($-0.034$, 0.050) | $-0.010$ ($-0.033$, 0.053) |
| Violent misdemeanor is prohibiting for handgun possession | $-0.024$ ($-0.064$, 0.016) | $-0.043$ ($-0.090$, 0.004) |
| Age 21 limit for handgun possession | *$-0.040$\* ($-0.078$, $-0.001$)* | $-0.030$ ($-0.070$, 0.010) |
| Shall issue law | 0.000 ($-0.025$, 0.024) | 0.004 ($-0.022$, 0.029) |
| Permitless carry law | *0.063\* (0.006, 0.120)* | *0.050\* (0.002, 0.099)* |
| Trafficking prohibited | $-0.013$ ($-0.047$, 0.021) | $-0.002$ ($-0.043$, 0.038) |
| Junk gun ban | *$-0.074$\* ($-0.101$, $-0.047$)* | *$-0.066$\* ($-0.097$, $-0.036$)* |
| Stand Your Ground law | $-0.014$ ($-0.033$, 0.006) | $-0.018$ ($-0.037$, 0.001) |
| Ban on assault weapons | $-0.037$ ($-0.081$, 0.006) | 0.001 ($-0.063$, 0.066) |
| Ban on large-capacity ammunition magazines | *$-0.052$\* ($-0.099$, $-0.005$)* | $-0.004$ ($-0.053$, 0.046) |
| $R^2$ | | 0.94 |

*Outcome variable is the log of the age-adjusted total suicide rate. All models include year and state fixed effects. Standard errors are robust and adjusted for state-level clustering*

*CI confidence interval*

*\*Coefficient is statistically significant from zero (p < 0.05). Also shown in italic*

Several other limitations deserve mention. First, the firearm ownership proxy has been validated with cross-sectional data, but not with longitudinal data.[36] It is not clear whether this proxy is able to accurately measure changes in household gun ownership over time.

Second, while we controlled for a range of state-level factors associated with homicide death rates, there may be unidentified omitted variables. For example, in the early 1990s, firearm homicide rates were very high in many cities, seemingly related to the crack cocaine epidemic.[37, 38] Nevertheless, when we restrict the analysis to the period 2000–2016, our results remain essentially unchanged, although the precision of the estimates decreases.

Third, we accounted only for the presence or absence of firearm law provisions, not for the implementation and enforcement of these laws. Fourth, trying to incorporate the most important explanatory variables in a large regression almost invariably leads to some multicollinearity. For example, when we use all the other independent variables to explain variations in the gun ownership proxy, the adjusted $R^2$ is 0.69.

Finally, we do not disaggregate homicide rates by the age or other characteristics of either the offender or victim, which could mask the effect of laws intended to affect a particular subpopulation. For example, age restrictions on gun possession would only be expected to affect youth suicide rates, not adult rates.

In conclusion, this study provides evidence that universal background checks and laws prohibiting gun ownership by people with a history of a violent misdemeanor are associated with lower overall homicide rates, while laws that provide no

discretion to law enforcement officials in approving concealed carry permits are associated with higher homicide rates. Further research on the impact of state firearm laws is necessary to assess causality and should rely upon detailed definitions of each law.

***Corresponding Author:*** *Michael Siegel, Department of Community Health Sciences, Boston University School of Public Health, 801 Massachusetts Avenue, 4th Floor, Boston, MA 02118, USA (e-mail: mbsiegel@bu.edu).*

***Funding Information*** *Support for this research was provided by the Robert Wood Johnson Foundation, Evidence for Action Program (grant 73337).*

***Compliance with Ethical Standards:***

***Conflict of Interest:*** *The authors declare that they do not have a conflict of interest.*

***Disclaimer:*** *The views expressed here do not necessarily reflect the views of the Robert Wood Johnson Foundation.*

## REFERENCES

1. Centers for Disease Control and Prevention. Web-based Inquiry Statistics Query and Reporting System (WISQARS). Atlanta, GA: National Center for Injury Prevention and Control; 2018. https://webappa.cdc.gov/sasweb/ncipc/mortrate.html. Accessed 14 Dec 2018.
2. **Siegel M, Pahn M, Xuan Z**, et al. Firearm-related laws in all 50 US states, 1991–2016. Am J Public Health. 2017;107(7):1122–9.

Exhibit D
Page 119

3. **Crifasi CK**, **Merrill-Francis M**, **McCourt A**, et al. Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95(3):383–90.

4. Everytown for Gun Safety. Gun law navigator. New York: Everytown for Gun Safety: 2018. https://everytownresearch.org/navigator/index.html. Accessed 14 Dec 2018.

5. **Wooldridge JM**. Introductory Econometrics: a Modern Approach (5th edition). Mason, OH: South-Western Cengage Learning: 2013.

6. **Wooldridge JM**. Econometric analysis of cross section and panel data (2nd edition). Cambridge, MA: MIT Press; 2010.

7. **Lott JR**, **Mustard DB**. Crime, deterrence, and right-to-carry concealed handguns. J Legal Stud. 1997:26:1–67.

8. **White H**. A heteroskedasticity-consistent covariance matrix estimator and a direct test for heteroskedasticity. Econometrica. 1980:48(4):817–38.

9. **Azrael D**, **Cook PJ**, **Miller M**. State and local prevalence of firearm ownership: measurement, structure, and trends. J Quant Criminol. 2004;20(1):43–62.

10. **Siegel M**, **Ross CS**, **King C**. A new proxy measure for state-level gun ownership in studies of firearm injury prevention. Inj Prev. 2014;20:204–7.

11. Federal Bureau of Investigation. Uniform crime reporting statistics. Washington, DC: U.S. Department of Justice; 2016. http://www.ucrdatatool.gov. Accessed 14 Dec 2018.

12. U.S. Bureau of Justice Statistics. Prison Population Counts. Washington, DC: U.S. Department of Justice; 2018. http://www.bjs.gov/index.cfm?ty=tp&tid=131. Accessed 14 Dec 2018.

13. **LaVallee, RA**, **Yi H**. Apparent per capita alcohol consumption: national, state, and regional trends, 1977–2010. Arlington, VA: CSR, Incorporated and National Institute on Alcohol Abuse and Alcoholism; 2012.

14. Statista. Alcohol consumption per capita from all beverages in the U.S. in 2016, by state. New York: Statistica; 2018. https://www.statista.com/statistics/442848/per-capita-alcohol-consumption-of-all-beverages-in-the-us-by-state/. Accessed 14 Dec 2018.

15. U.S. Fish & Wildlife Service. Historical hunting license data. http://wsfrprograms.fws.gov/Subpages/LicenseInfo/Hunting.htm. Accessed 14 Dec 2018.

16. **Fleegler EW**, **Lee LK**, **Monuteaux MC**, **Hemenway D**, **Mannix R**. Firearm legislation and firearm-related fatalities in the United States. JAMA Intern Med. 2013;173(9):732–40.

17. **Rudolph KE**, **Stuart EA**, **Vernick JS**, **Webster DW**. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health. 2015;105(8):e49–54.

18. **Webster D**, **Crifasi CK**, **Vernick JS**. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. J Urban Health. 2014;91(2):293–302.

19. **Sumner SA**, **Layde PM**, **Guse CE**. Firearm death rates and association with level of firearm purchase background check. Am J Prev Med. 2008;35(1):1–6.

20. **Ruddell R**, **Mays GL**. State background checks and firearms homicides. J Crim Justice. 2005;33:127–36.

21. **Zeoli AM**, **McCourt A**, **Buggs S**, **Frattaroli S**, **Lilley D**, **Webster DW**. Analysis of the strength of legal firearm restrictions for perpetrators of

domestic violence and their association with intimate partner homicide. Am J Epidemiol. 2018;187(7): 1449–55.

22. **Gius M**. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett. 2014;21(4):265–7.

23. **Moody CE**, **Marvell TB**, **Zimmerman PR**, **Alemante F**. The impact of right-to-carry laws on crime: an exercise in replication. Review of Economics & Finance. 2014;4(1):33–43.

24. **Lott JR**. More guns, less crime: understanding crime and gun-control laws. Chicago, IL: The University of Chicago Press; 2010.

25. **Olson DE**, **Maltz MD**. Right-to-carry concealed weapon laws and homicide in large U.S. counties: the effect on weapon types, victim characteristics, and victim-offender relationships. J Law Econ. 2001;44:747–70.

26. **Lott JR, Jr.**, **Whitley JE**. Safe-storage gun laws: accidental deaths, suicides, and crime. J Law Econ. 2001;44:659–89.

27. **Dezhbakhsh H**, **Rubin PH**. Lives saved or lives lost? The effects of concealed-handgun laws on crime. AEA Papers and Proceedings. 1998;88(2):468–74.

28. **Bronars SG**, **Lott JR**, Jr. Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. AEA Papers and Proceedings. 1998;88(2):475–9.

29. **Lott JR**, **Whitley JE**. Abortion and crime: unwanted children and out-of-wedlock births. Econ Inquiry. 2006;45:304–24.

30. **Donohue JJ**, **Aneja A**, **Weber KD**. Right-to-carry laws and violent crime: a comprehensive assessment using panel data, the LASSO, and a state-level synthetic controls analysis. NBER working paper no. 23510. Cambridge, MA: National Bureau of Economic Research; 2017. http://www.nber.org/papers/w23510. Accessed 14 Dec 2018.

31. **Siegel M**, **Xuan Z**, **Ross CS**, et al. Easiness of legal access to concealed firearm permits and homicide rates in the United States. Am J Public Health. 2017;107(12):1923–9.

32. **McClellan CB**, **Tekin E**. Stand your ground laws, homicides, and injuries. NBER working paper no. 18187. Cambridge, MA: National Bureau of Economic Research; 2012. http://www.nber.org/papers/w18187. Accessed 14 Dec 2018.

33. **Cheng C**, **Hoekstra M**. Does strengthening self-defense law deter crime or escalate violence? Evidence from expansions to Castle Doctrine. J Hum Resour. 2013;48(3):821–54.

34. **Hepburn LM**, **Hemenway D**. Firearm availability and homicide: a review of the literature. Aggress Violent Behav. 2004;9(4):417–40.

35. **Miller M**, **Hemenway D**. The relationship between firearms and suicide: a review of the literature. Aggress Violent Behav. 1999;4(1):59–75.

36. **Kleck G**. Measures of gun ownership levels for macro-level crime and violence research. J Res Crime Delinq. 2004;41(1):3–36.

37. **Blumstein A**, **Rosenfeld R**. Explaining recent trends in US homicide rates. J Crim Law Criminol. 1998;88(4):1175–1216.

38. **Cook P**, **Laub J**. The unprecedented epidemic in youth violence. In Tonry M, ed. Crime and justice: an annual review of research. Chicago: University of Chicago Press; 1998:26–64.

***Publisher's Note*** *Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.*

Exhibit D
Page 120

J Urban Health (2018) 95:383–390
https://doi.org/10.1007/s11524-018-0273-3



# Association between Firearm Laws and Homicide in Urban Counties

**Cassandra K. Crifasi · Molly Merrill-Francis · Alex McCourt · Jon S. Vernick · Garen J. Wintemute · Daniel W. Webster**

Published online: 21 May 2018
© The New York Academy of Medicine 2018

**Abstract** Laws related to the sale, use, and carrying of firearms have been associated with differences in firearm homicide rates at the state level. Right-to-carry (RTC) and stand your ground (SYG) laws are associated with increases in firearm homicide; permit-to-purchase (PTP) laws and those prohibiting individuals convicted of violent misdemeanors (VM) have been associated with decreases in firearm homicide. Evidence for the effect of comprehensive background checks (CBC) not tied to PTP is inconclusive. Because firearm homicide tends to concentrate in urban areas, this study was designed to test the effects of firearm laws on homicide in large, urban U.S. counties. We conducted a longitudinal study using an interrupted time series design to evaluate the effect of firearm laws on homicide in large, urban U.S. counties from 1984 to 2015 ($N = 136$). We used mixed effects Poisson regression models with random intercepts for counties and year fixed effects to account for national trends. Models also included county and state characteristics associated with violence. Homicide was stratified by firearm versus all other methods to test for specificity of the laws' effects. PTP laws were associated with a 14% reduction in firearm homicide in large, urban counties (IRR = 0.86, 95% CI 0.82–0.90). CBC-only, SYG, RTC, and VM laws were all associated with increases in firearm homicide. None of the laws were associated with differences in non-firearm homicide rates. These findings are consistent with prior research at the state level showing PTP laws are associated with decreased firearm homicide. Testing the effects of PTP laws specifically in large, urban counties strengthens available evidence by isolating the effects in the geographic locations in which firearm homicides concentrate.

**Keywords** Gun policy · Firearm · Homicide

## Introduction

In 2016, there were 14,415 firearm homicides in the United States (U.S.), which accounted for nearly 75% of all homicides [1]. Firearm homicides are not distributed equally across the U.S.; 63% occurred in large, urban counties (classified as Large Central Metro and Large Fringe Metro by the U.S. Census Bureau) which contain 56% of the U.S. population [2]. States have enacted policies in response to firearm homicide, but the effect of these policies specifically in urban areas is unknown. In this study, we aim to evaluate the effect of five firearm-related policies on homicide in large, urban counties: comprehensive background checks, permit-to-purchase, right-to-carry, stand your ground, and violent misdemeanor prohibitions.

Weaknesses in federal law allow prohibited individuals to obtain firearms through unregulated private

C. K. Crifasi (✉) · M. Merrill-Francis · A. McCourt · J. S. Vernick · G. J. Wintemute · D. W. Webster
Center for Gun Policy and Research, Johns Hopkins University Bloomberg School of Public Health, Baltimore, MD, USA
e-mail: crifasi@jhu.edu

G. J. Wintemute
Violence Prevention Research Program, Department of Emergency Medicine, University of California Davis, Sacramento, CA, USA

Springer

sales. Currently, only nineteen[1] states and the District of Columbia have laws requiring point of sale background checks be conducted when the seller is a private party. These laws are often referred to as comprehensive background-check (CBC) laws. CBC laws require all sellers, both licensed retailers and private parties, to make firearm transfers contingent on the purchaser passing a background check. Private sales include those made at gun shows, sales arranged between strangers online, and transfers between friends and acquaintances. The most recent estimate by Miller and colleagues suggests that approximately 20% of guns are obtained without a background check [3]. In the 13 states with the least restrictive firearm laws, state prison inmates who were incarcerated for a gun crime were more likely to report obtaining that gun through an unregulated private sale than from a licensed dealer [4]. Data on recovered crime guns suggest more than 80% of criminals using firearms to commit crime were not the purchaser of record [5]. There is inconclusive evidence on the effect of background checks for private sales on firearm homicide at the state level.

Realizing that requiring background checks for private sales may, by itself, not be sufficient, ten states and the District of Columbia have an additional handgun purchaser licensing requirement; often referred to as permit-to-purchase (PTP) laws. PTP laws typically require that prospective handgun purchasers apply directly to a state or local law enforcement agency, many require applicants to submit fingerprints, for a purchase permit prior to approaching a seller. PTP laws may include a more thorough background check which law enforcement can take 30 days or more to complete. Sellers, both licensed and private, can only sell to someone with a valid purchase permit which is valid for varying lengths. States with longer duration permits may also require a point of sale background check to ensure that the purchaser has not become prohibited since the issuance of the permit. Prior research has found that PTP laws are associated with reductions in the diversion of guns to criminals [6] and gun homicide [7, 8].

It is important to note the differences between CBC and PTP laws because they are often conflated in research when in fact they are implemented differently, in ways that may influence their effectiveness. CBC laws generally depend upon the use of the National Instant Criminal Background Check System (NICS) that is also used by licensed dealers; however, issues with the NICS have been identified related to which records are reported to the system and the quality and timeliness of records that are reported [9]. PTP laws provide a longer period for law enforcement to conduct its background check at the local level, and these checks may have access to more records increasing the likelihood that law enforcement can identify and screen out those with a prohibiting condition.

Right-to-carry (RTC) laws require law enforcement to issue concealed carry permits to any individual that meets objective criteria or allow for permitless carry (permitless carry allows for individuals who are not otherwise prohibited from gun ownership to carry without obtaining a permit). RTC laws make it easier for individuals to carry loaded, concealed firearms in public spaces, and may require little or no safety training or demonstrations of competence and proficiency. Previous research suggests that RTC laws are associated with increased rates of violence at the state level [10, 11].

Stand your ground (SYG) laws are those that give individuals expanded protections for use of deadly force in a response to a perceived threat with no duty to retreat. These laws may make otherwise non-lethal encounters deadly if individuals are carrying loaded, concealed firearms, and feel emboldened to use their firearms in self-defense rather than leaving or de-escalating a volatile situation. Research on SYG laws shows they are associated with increases in rates of state-level firearm homicide [12, 13].

Violent misdemeanor (VM) prohibitions extend criminal prohibiting conditions for the purchase of a firearm to those who have been convicted of a misdemeanor crime of violence. States with these laws recognize that prohibiting a broader pool of potentially risky firearm owners may screen out individuals at risk of committing violence but who have not yet been convicted of a felony or domestic violence misdemeanor. Previous research showed decreased risk of future gun crime among those prohibited for a VM crime [14]. A recent study by Zeoli et al. found lower rates of intimate partner homicide in states with VM prohibitions [15].

Studies evaluating the effect of CBC, PTP, RTC, SYG, and VM laws on firearm homicide have been conducted at the state level. However, firearm homicide occurs more frequently in urban areas, so evaluations at the state level may underestimate the effectiveness of these laws in the places where homicides predominate.

---

[1] While Nevada passed a CBC law, there are implementation issues related to how the law was written and whether it will be enforced.



Exhibit D
Page 122

This study sought to explore the effects of these firearm laws on homicide in large, urban counties where firearm homicide is more likely to occur. We also sought to separate out the effects of states with CBC-only laws and those with PTP. Based on prior research, we hypothesized that PTP and VM laws would be associated with protective effects on homicide rates, CBC-only laws would have no effect, and RTC and SYG would be associated with harmful effects.

**Methods**

Design

We conducted a quasi-experimental longitudinal study using an interrupted time series to evaluate the effect of firearm laws on homicide in large, urban U.S. counties from 1984 to 2015. Because these laws are related to firearms, county-year counts of homicide were stratified by firearm versus all other methods to test for specificity of the laws' effects.

Data and Measures

Based on previous research, we hypothesized that, due to the specificity of the laws regarding firearms, changes to these laws would affect only firearm homicides. The primary outcome for the study was annual, county-level counts of firearm homicide obtained from the Centers for Disease Control and Prevention's Wide-ranging ONline Data for Epidemiologic Research (WONDER) system [16]. Because firearm homicide tends to concentrate in urban areas, we restricted our analysis to counties with U.S. Census urbanization codes of "Large Central Metro" and "Large Fringe Metro" and populations greater than 200,000 across the study period resulting in a sample that contained 136 counties over 32 years for a total of 4352 county-year observations.[2]

We accessed additional county-level variables from WONDER including the percent of the population who were African American males age 15–24 and county population. County-level percent poverty was obtained from the U.S. Census and interpolated

between census years [17]. Average annual measures of county-level unemployment were obtained from the Bureau of Labor Statistics Local Area Unemployment Statistics [18]. State-level variables were used for two covariates that were not readily available at the county level: incarceration rates [19] and state law enforcement expenditures [20].

We conducted legal research to identify the effective dates for each state's policies including month, day, and year. Indicators for policy variables were generated based on these effective dates. Policy indicators were coded as 1 when a law was in effect and 0 otherwise. To reduce measurement error, the policy indicators were coded as a proportion for the number of days the policy was in effect in the year in which a policy was first implemented (see Table 1).

Exploratory data analysis revealed outliers for non-firearm homicide counts for counties near New York City in 2001 due to the attack at the World Trade Center; nearly 3000 additional lives were lost due to non-firearm homicide. For counties within approximately 50 miles of New York City, we excluded the counts of non-firearm homicide for 2001 only.

Analytic Methods

We conducted an interrupted time series analysis to estimate the effects of firearm laws on county-level firearm homicide. We used non-firearm homicide as a negative control to test for the specificity of the laws' effects. We used mixed effects Poisson regression models to account for repeated measures by county and allow counties to have unique intercepts; the likelihood ratio test for mixed effects versus a Poisson model indicated the need for random intercepts ($p < 0.001$).

County-level percent poverty, unemployment, and African American males age 15–24, state-level incarceration rates, and law enforcement expenditures were included in the final model. Year fixed effects were used to account for national trends in homicide and county-level population was included as an offset to generate incident rate ratios (IRRs). Additionally, models were run with and without a county-level proxy for firearm ownership (the ratio of firearm suicide to all suicide). Analyses were conducted using Stata IC v 14.2 [21]. This study was deemed to be "not human subjects research" by the Johns Hopkins Bloomberg School of Public Health Institutional Review Board.

---

[2] States with no counties that met the inclusion criteria: Alaska, Arkansas, Hawaii, Idaho, Iowa, Maine, Mississippi, Montana, Nebraska, New Mexico, North Dakota, South Carolina, South Dakota, Vermont, West Virginia, and Wyoming

Exhibit D
Page 123

C.K. Crifasi et al.

**Table 1** Firearm laws and effective dates by state

| State (# of counties) | Permit to purchase | Comprehensive background check only | Right to carry | Stand your ground | Violent misdemeanor restriction |
|---|---|---|---|---|---|
| Alabama (1) | | | Pre-1984 | 6/1/06 | |
| Arizona (1) | | | 4/13/94 | 4/24/06 | |
| California (12) | | 1/1/91 | | | 1/1/91 |
| Colorado (4) | | 7/1/13 | 5/17/03 | | |
| Connecticut (1) | 10/1/95 | | | | |
| Delaware (1) | | 7/1/13 | | | |
| Florida (9) | | | 10/1/87 | 10/1/05 | |
| Georgia (4) | | | 8/25/89 | 7/1/06 | |
| Illinois (7) | Pre-1984 | | 1/5/14 | | 1/1/95 |
| Indiana (2) | | Pre-1984–11/30/98 | Pre-1984 | 7/1/06 | |
| Kansas (1) | | | 1/1/07 | 5/26/06 | |
| Kentucky (1) | | | 10/1/96 | 7/12/06 | |
| Louisiana (2) | | | 4/19/96 | 8/1/06 | |
| Maryland (5) | 10/1/13 | 10/1/96–10/1/13 | | | 10/1/03 |
| Massachusetts (6) | Pre-1984 | | | | |
| Michigan (4) | Pre-1984 | | 7/1/01 | 10/1/06 | |
| Minnesota (4) | | | 5/28/03 | | 10/1/03 |
| Missouri (3) | Pre-1984–8/28/07 | | 2/26/04 | 8/28/07 | |
| Nevada (1) | | | 10/1/95 | 10/1/11 | |
| New Hampshire (1) | | | Pre-1984 | 11/13/11 | |
| New Jersey (13) | Pre-1984 | | | | |
| New York (14) | Pre-1984 | | | | Pre-1984 |
| North Carolina (2) | Pre-1984 | | 12/1/95 | 12/1/11 | |
| Ohio (6) | | | 4/8/04 | | |
| Oklahoma (1) | | | 1/1/96 | 11/1/06 | |
| Oregon (3) | | 8/9/2015 | 1/1/90 | | |
| Pennsylvania (8) | | 10/11/95 | 6/17/89 | 8/29/11 | |
| Rhode Island (1) | | Pre-1984 | Pre-1984 | | |
| Tennessee (2) | | 5/10/94–11/1/98 | 10/1/96 | 5/22/07 | |
| Texas (6) | | | 1/1/96 | 9/1/07 | |
| Utah (1) | | | 5/1/95 | 3/1/94 | |
| Virginia (3) | | | 5/5/95 | | |
| Washington (4) | | 12/4/14 | Pre-1984 | | |
| Wisconsin (2) | | | 11/1/11 | | |
| Total states with law during study period (total # of changes) | 9 (3) | 10 (9) | 27 (22) | 18 (18) | 5 (4) |

## Results

Table 1 presents the laws included in the study and the associated effective dates by state for those states with counties that met our inclusion criteria.

Table 2 presents the effects of the firearm policies we examined on firearm homicide in large, urban counties after controlling for identified covariates. PTP laws were associated with a 14% reduction in firearm homicide (IRR = 0.86, 95% CI 0.82–0.90). CBC-only laws were



Exhibit D
Page 124

**Table 2** Effects of firearm laws on firearm homicide in large, urban U.S. counties, 1984–2015

| | IRR[a] | 95% CI[b] |
|---|---|---|
| Permit to purchase | 0.86 | 0.82–0.90 |
| Comprehensive background check only | 1.16 | 1.13–1.18 |
| Right to carry | 1.04 | 1.02–1.06 |
| Stand your ground | 1.07 | 1.05–1.10 |
| Violent misdemeanor prohibitions | 1.14 | 1.12–1.17 |
| County-level % population African American male youth | 1.53 | 1.49–1.57 |
| County-level poverty rate | 1.00 | 1.00–1.00 |
| County-level unemployment rate | 1.00 | 1.00–1.01 |
| State-level incarceration rate | 1.00 | 1.00–1.00 |
| State-level law enforcement expenditures | 0.99 | 0.99–0.99 |

The model also included year fixed effects

[a] Incidence rate ratio

[b] 95% confidence interval

associated with a 16% increase in firearm homicide (IRR = 1.16, 95% CI 1.13–1.18). RTC laws were associated with a 4% increase in firearm homicide (IRR = 1.04, 95% CI 1.02–1.06). SYG laws were associated with a 7% increase in firearm homicide (IRR = 1.07, 95% CI 1.05–1.10). VM laws were associated with a 14% increase in firearm homicide (IRR = 1.16, 95% CI 1.12–1.17). When we included the proxy for county-level firearm ownership, there were negligible differences in the point estimates; however, the firearm ownership proxy itself was associated with a 37% increase in firearm homicide (IRR = 1.37, 95% CI 1.26–1.49).

Because of the IRR estimates for CBC-only and VM laws were in the direction opposite to our hypotheses, we also tested the effects of 1-, 2-, and 3-year leads and lags of the laws. These estimates reveal firearm homicide rates trending upward in the years immediately prior to CBC-only (Fig. 1) and VM laws (Fig. 2) going into effect with statistically significant increased firearm homicide rates 1 year prior to the laws' introduction. The IRRs were above 1.0 each year following the introduction of CBC-only and VM laws, but leveled off for CBC-only and were essentially the same as the 1-year lead for VM laws.

Table 3 presents the effects of the same set of firearm policies on non-firearm homicide rates. None of the firearm policy variables of interest were associated with changes in non-firearm homicide, supporting the specificity of the laws' effects. When we included the proxy for county-level firearm ownership, there were

negligible differences in the point estimates; however, the firearm ownership proxy itself was associated with an 18% reduction in non-firearm homicide (IRR = 0.82, 95% CI 0.73–0.92).

**Discussion**

This study is the first study to our knowledge that examines the impact of PTP laws in large, urban counties where firearm homicide is more likely to occur. Our study also is the first to separate the impacts of CBC laws from PTP to understand how CBC laws affect firearm homicide independent from a permitting mechanism. Our study also examined the effects of other firearm-related policies on firearm homicide.

Our results are consistent with previous research finding that PTP reduces firearm homicides without increasing homicides by other means. However, we saw no benefit of a CBC system without a PTP law. It is possible that the application process required to obtain a permit, which puts the purchaser directly in contact with law enforcement, acts to hold potential purchasers more accountable and reduces the likelihood of straw purchases made on behalf of prohibited persons. The added time to conduct the background check at the local level may also make it easier to identify and screen out prohibited individuals who may be at increased risk of using that firearm to commit a homicide. Additionally, the built-in waiting period as part of the permitting process may prevent impulsive firearms purchases.

Our study suggests an increased risk of firearm homicide in large, urban counties associated with enactment of RTC laws which is consistent with previous research conducted at the state level. Counties in states with RTC laws experienced a 4% increase in firearm homicide relative to counties in states with more restrictions on the issuance of concealed carry weapons permits. Future research should explore whether specific elements of RTC laws, or lack thereof, have differential impacts on firearm homicide. For example, some RTC states allow law enforcement to deny issuing a concealed carry permit based on "dangerousness," or require a demonstration of proficiency. These differences can inform policy discussions around which elements, if any, may mitigate the harmful effects of expanded carrying of loaded, concealed firearms by civilians.

Our findings related to the effects of SYG laws are also consistent with previous research on the effects of

Exhibit D
Page 125

388                                                                                                                          C.K. Crifasi et al.

**Fig. 1** Effects of CBC-only laws on firearm homicide 1-, 2-, and 3-year pre- and post-enactment



these laws on state-level firearm homicide [12, 13]. Counties in states with SYG laws experienced a 7% increase in firearm homicide. SYG laws are common in states with RTC laws and a high prevalence of gun ownership. Removing a duty to retreat in the context of populations with many armed individuals appears to increase firearm homicide.

In contrast to recent research finding protective effects of prohibitions for violent misdemeanants on intimate partner homicide [15], our study found increased risk of firearm homicide in counties of states with VM laws. However, the increased IRR for firearm homicide associated with VM laws in the year prior to the effective date suggests that the conditions influencing the passage of VM laws may increase firearm homicides. Identifying and controlling for such factors is necessary to generate unbiased estimates of the VM law effects. Future research should explore the effects of VM laws on firearm homicide in suburban and rural counties.

The increase in firearm homicide associated with CBC-only laws should be explored further. It is possible

that CBC-only laws are harmful; however, we have not identified a plausible theory to explain how requiring a prospective firearm purchaser to undergo a background check would result in increased homicide rates. It is possible that states experiencing historically high rates of firearm homicide during the late 1980s and early 1990s were more likely to implement CBC-only laws to reduce violence. If these states then experienced slower declines in firearm homicide compared to states that did not pass these laws, the CBC-only laws would appear harmful in our analysis. The upward trend in the IRRs for CBC-only laws in the 3 years prior to implementation, and the statistically significant increased rate for CBC-only laws in the year prior, suggests there may be an endogenous relationship between CBC-only laws and firearm homicide such that states may have passed these laws in response to increasing rates of firearm homicide. The lack of any beneficial effect of CBC-only laws could also reflect issues related to enforcement of CBC-only laws. The enforceability challenges associated with CBC-only laws are beginning to be

**Fig. 2** Effects of VM laws on firearm homicide 1-, 2-, and 3-year pre- and post-enactment



Exhibit D
Page 126

**Table 3** Effects of firearm laws on non-firearm homicide in large, urban U.S. counties, 1984–2015

|  | IRR[a] | 95% CI[b] |
|---|---|---|
| Permit to purchase | 1.04 | 0.97–1.13 |
| Comprehensive background check only | 0.97 | 0.94–1.01 |
| Right to carry law | 1.03 | 1.00–1.06 |
| Stand your ground | 1.01 | 0.97–1.04 |
| Violent misdemeanor prohibitions | 0.99 | 0.96–1.02 |
| County-level % population African American male youth | 1.52 | 1.47–1.58 |
| County-level poverty rate | 1.01 | 1.00–1.02 |
| County-level unemployment rate | 0.99 | 0.99–1.00 |
| State-level incarceration rate | 1.00 | 1.00–1.00 |
| State-level law enforcement expenditures | 1.00 | 1.00–1.00 |

The model also included year fixed effects

[a] Incidence rate ratio

[b] 95% confidence interval

documented.[22, 23] PTP laws may be easier to comply with and enforce than CBC-only laws since sellers can only transfer a firearm to someone who has a valid permit. Future research should expand the inclusion criteria for county population size and/or urbanization. This may also allow for more states to be represented in the data and produce more robust results. Within PTP and CBC-only laws, there remain differences among states, including standards for obtaining the permit, duration of the permit, and whether a point-of-sale background check is also required in PTP states. These issues warrant additional research. Additionally, future research should explore the effects of these laws on firearm suicide at the county level.

There are some limitations to our study. As with all observational studies, there is a risk of selection bias as states choose whether to pass a policy or not. However, we attempted to minimize this bias by including county-level demographics and pre-law enactment data to estimate baseline trends. Importantly, our assessment of the effects of CBC-only and VM laws in the years prior to the laws going into effect underscores the challenges of studies of this type where omitted variables may bias estimates of the laws' impacts. This study only includes counties classified as the most urban with populations of 200,000 or greater across the entire study period. These counties may be different from those not included. Our inclusion criteria also excluded counties that may have had a population of 200,000 or more at some point

during the study period but did not maintain that population level across the entire study period. However, limiting our sample to large, urban counties where firearm homicide is more likely to occur would give us more reliable estimates of policy effects. Our study relied on two covariates that were not readily available at the county level. For example, law enforcement expenditures were only available at the state level.

This study adds to the growing body of evidence that PTP laws are associated with reductions in firearm homicide. States that are considering a range of policies related to the transfer of firearms should consider a handgun purchaser licensing system through a PTP law as a mechanism to reduce firearm homicide.

**Acknowledgements**   This research was supported by a grant from The Joyce Foundation to the Johns Hopkins Center for Gun Policy and Research http://www.joycefdn.org/grants).

## References

1. CDC WISQARS - Fatal Injury Reports, National and Regional, 2016: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention; 2017 [Available from: https://webappa.cdc.gov/sasweb/ncipc/mortrate.html.

2. CDC WONDER: Compressed Mortality, 2016 [Available from: https://wonder.cdc.gov/mortSQL.html2018.

3. Miller M, Hepburn L, Azrael D. Firearm acquisition without background checks: results of a national survey firearm acquisition without background checks. Ann Intern Med. 2017;166(4):233–9.

4. Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. Injury Prevention 2012;epub doi: https://doi.org/10.1136/injuryprev-2011-040290

5. ATF Crime Gun Trace Reports: The youth crime gun interdiction initiative. In: Firearms BoAT, ed. Washington, DC: U.S. Department of Treasury, 2002.

6. Webster D, Vernick J, McGinty E, et al. Preventing the diversion of guns to criminals through effective firearm sales laws. In: Webster D, Vernick J, editors. Reducing gun violence in America: informing policy with evidence and analysis. Baltimore, MD: The Johns Hopkins University Press; 2013.

7. Webster D, Crifasi CK, Vernick J. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. J Urban Health. 2014;91:1–10. https://doi.org/10.1007/s11524-014-9865-8.

8. Rudolph KE, Stuart EA, Vernick JS, et al. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health. 2015;105(8):e49–54.

9. SEARCH. Improving the National Instant Background Screening System for firearms purchases: recommendations

Springer

C.K. Crifasi et al.

by SEARCH. Version 2 ed: *The National Consortium for Justice Information and Statistics*, 2013.

10. Andrés AR, Hempstead K. Gun control and suicide: the impact of state firearm regulations in the United States, 1995–2004. *Health Policy.* 2011;101(1):95–103.

11. Donohue JJ, Aneja A, Weber KD. *Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic controls analysis: National Bureau of Economic Research.* Stanford, CA: Stanford University; 2017.

12. Cheng C, Hoekstra M. Does strengthening self-defense law deter crime or escalate violence? Evidence from expansions to castle doctrine. *J Hum Resour.* 2013;48(3):821–54.

13. Humphreys DK, Gasparrini A, Wiebe DJ. Evaluating the impact of Florida's "stand your ground" self-defense law on homicide and suicide by firearm: an interrupted time series study. *JAMA Intern Med*. 2017;177(1):44–50. https://doi.org/10.1001/jamainternmed.2016.6811.

14. Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA*. 2001;285(8):1019–26.

15. Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their association with intimate partner homicide. *Am J Epidemiol*. 2017;

16. CDC. *Wide-ranging ONline Data for Epidemiologic Research (WONDER)* [Available from: https://wonder.cdc.gov/2018.

17. Census United States Census Bureau Washington, D.C.: United States Department of Commerce; [Available from: https://www.census.gov/# accessed November 10 2013.

18. BLS Local Area Unemployment Statistics Washington, D.C.: United States Department of Labor; [Available from: http://www.bls.gov/lau/ accessed November 7 2012.

19. BJS Sourcebook of Criminal Justice Statistics: University at Albany; [Available from: http://www.albany.edu/sourcebook/ accessed November 1 2012.

20. Census State & Local Government Finances Washington, D.C.: United States Department of Commerce; [Available from: http://www.census.gov/govs/estimate/.

21. *Stata Statistical Software: Release 14* [program]. College Station, TX: StataCorp LP, 2015.

22. Castillo-Carniglia A, Kagawa RMC, Webster DW, Vernick JS, Cerdá M, Wintemute GJ Comprehensive background check policy and firearm background checks in three US states. *Injury Prevention* 2017, injuryprev-2017-042475

23. Crifasi CK, Merrill-Francis M, Webster DW, Wintemute GJ, Vernick JS Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland. *Injury Prevention* 2018:injuryprev-2017-042582.

Exhibit D
Page 128

Journal of Urban Health is a copyright of Springer, 2018. All Rights Reserved.

AJPH OPEN-THEMED RESEARCH

# State-Level Changes in Firearm Laws and Workplace Homicide Rates: United States, 2011 to 2017

*Erika L. Sabbath, ScD, Summer Sherburne Hawkins, PhD, and Christopher F. Baum, PhD*

*Objectives.* To test whether year-over-year strengthening of state-level firearm laws is associated with decreases in workplace homicide rates.

*Methods.* In this time-series ecological study of working people in all 50 US states, we used federal data on workplace homicides by state and year from 2011 to 2017, linked to an index of state–year firearm laws, to characterize the regulatory environment (overall and within legislative categories). We used generalized linear regression to model associations between changes in firearm laws and changes in workplace homicide rates the following year.

*Results.* From 2011 to 2017, more than 3000 people died as a result of workplace homicides; over that period, 23 states strengthened firearm regulations and 23 weakened them. We modeled the impact of states strengthening laws within the interquartile range (IQR; equivalent to adding 20.5 firearm laws). This change was associated with a 3.7% reduction in the workplace homicide rate (95% confidence interval [CI] = −3.86, −3.51). Positive IQR changes in specific categories of firearm laws—concealed carry permitting (−5.79%; 95% CI = −6.09, −3.51), domestic violence–related restrictions (−5.31%; 95% CI = −5.57, −5.05), and background checks (−5.07%; 95% CI = −5.32, −4.82)—were also associated with significant reductions.

*Conclusions.* Strengthening state-level firearm laws may reduce the population-level mortality and morbidity burden posed by workplace homicides. (*Am J Public Health.* 2020;110:230–236. doi:10.2105/AJPH.2019.305405)

**G**un violence is a public health crisis in the United States.[1] In 2017, 13 205 working-aged adults died from homicide by firearm, the ninth-leading cause of death in this age group.[2] Overall, mortality due to gun–related causes among individuals 18 to 64 years of age exceeds that of motor vehicle crashes.

Despite the mortality and morbidity burden attributable to firearms, the United States has passed little federal legislation to regulate their purchase, distribution, storage, or use. Most firearm-related legislative activity has occurred at the state level. Since the early 1990s, every state has passed policies either strengthening or weakening restrictions on the sale, possession, and use of firearms.[3] On average, states have become slightly more restrictive in their firearm policies in the past 30 years,

particularly policies related to limitations on gun ownership among domestic violence offenders and other high-risk individuals, although many have become more permissive in areas such as "stand your ground" laws and concealed carrying of firearms.[4]

From a public health perspective, the same structural barriers that have inhibited federal legislation on gun violence also restrict research into its determinants.[5] However, a growing evidence base has

documented the relationship between state-level firearm policy changes and firearm-associated homicide rates.[6] These studies generally show that, at a population level, background checks[7] and regulations for gun buyers (specifically permit to purchase)[8] are associated with reductions in—although not elimination of—state-level firearm homicide rates, even after state-level social and demographic characteristics have been taken into account. There is less evidence of the relationship between firearm-related homicides and other types of gun control measures, such as limits on firearm trafficking or bans on assault weapons or high-capacity magazines.[6] In addition, when states strengthen firearm policies intended to protect specific vulnerable populations (e.g., children, domestic violence victims), homicide rates in those groups tend to decline.[9,10]

Each year, approximately 400 homicides by firearm occur when people are at work, accounting for about 9% of the approximately 4800 workplace fatalities occurring in the United States annually.[11] In addition to mortality among victims, workplace homicide can lead to broader morbidity in the form of long-term trauma among coworkers, who are often witnesses and survivors. This trauma is exacerbated by witnesses' need to return to the scene of the homicide each day to earn a living themselves.[12]

In most research on workplace homicides, national surveillance data have been used to

### ABOUT THE AUTHORS
*Erika L. Sabbath and Summer Sherburne Hawkins are with the School of Social Work, Boston College, Chestnut Hill, MA. Christopher F. Baum is with the Department of Economics, Boston College.*

*Correspondence should be sent to Erika L. Sabbath, ScD, Boston College School of Social Work, 140 Commonwealth Ave, Chestnut Hill, MA 02467 (e-mail: erika.sabbath@bc.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted September 18, 2019.*
*doi: 10.2105/AJPH.2019.305405*

Exhibit D
Page 130

identify trends in rates and subgroups of workers at particular risk.[13,14] A few small studies of employer-level determinants of workplace homicide have shown that homicides are more likely to occur at workplaces that permit weapons on site[15] and under working conditions such as solo work at night or poor exterior lighting.[16] However, higher-level determinants of workplace homicide are unknown. Specifically, to our knowledge, there has been no research on how the state-level policy environment is associated with the likelihood of being killed by another individual at work.

In this study, we assessed whether strengthening of state-level firearm laws from 2011 through 2017 was associated with decreases in state-level workplace homicide rates. Also, we tested for associations between changes in subcategories of firearm laws and workplace homicide rates.

## METHODS

This study was a time-series ecological investigation. Participants were any people who worked for pay in each of the 50 US states between 2011 and 2017.

### Workplace Homicide Rates

Our outcome variable was workplace homicide rates. We identified all workplace homicides occurring in the United States between 2011 and 2017 by state and year using the Census of Fatal Occupational Injuries (CFOI).[17] CFOI, the national surveillance system for tracking all occupational fatalities occurring within the country, is a federal–state cooperative program administered through the US Department of Labor's Bureau of Labor Statistics. CFOI is considered the definitive record of occupational fatalities in the United States.

After a death occurs at work, information about the fatality is compiled via data including death certificates and records from workers' compensation, the media, the Occupational Safety and Health Administration, and the company at which the event took place. Two independent sources must confirm the work relatedness of a fatality if it is to be entered into CFOI. CFOI classifies each verified work-related fatality according to the

Occupational Injury and Illness Classification System to document the nature, source, secondary source, and event or exposure that led to the fatality.[17] Only fatalities experienced by workers are included in CFOI counts, even if a single event led to casualties among both workers and patrons or clients.

Fatalities categorized as "intentional injury by person" are classified by the Occupational Injury and Illness Classification System as homicides. The subcategories included in this definition are as follows: intentional shooting by another person; stabbing, cutting, slashing, or piercing; hitting, kicking, beating, or shoving; strangulation by another person; bombing or arson; and multiple violent acts by another person.[17]

We generated state and year workplace homicide rates by dividing the number of workplace homicides (publicly available from CFOI) by the number of people (in 100 000s) employed in the state during the year in question. The latter data are publicly available through the Current Population Survey, administered by the US Census Bureau.[18]

### Firearm-Related Legislation

We obtained information on firearm laws from the State Firearm Laws Database, a publicly available, nonpartisan, comprehensive database on the presence of firearm laws in each state from 1990 to the present; we used data from 2011 to 2017.[3,4] The database has been employed in a number of empirical studies of firearm policies and population health.[7,19]

The database contains dichotomous indicators on the presence or absence of each of 132 firearm-related legislative provisions for each state–year combination during the study period. Each of the 132 laws is coded so that 1 refers to more restrictive gun access and 0 refers to more liberal access. The law indicators are then summed to create a measure of the overall firearm policy environment in a given state, with higher scores equivalent to stronger firearm regulations.

The 132 firearm laws each fit into one of 13 policy subcategories according to type of law (e.g., laws related to restrictions on domestic violence offenders, laws related to concealed carry permitting). These subcategories contain between one law ("stand your ground" provisions) and 21 laws

(laws related to domestic violence). Within each subcategory, the number of law indicators is summed and coded so that higher scores are equivalent to stronger firearm regulations.

### Covariates

Using publicly available data from a variety of sources, we adjusted for covariates associated with state-level variation in homicide, suicide, and accidental firearm mortality rates.[20] All covariates were measured according to state and year. We initially adjusted for unemployment rate,[21] percentage of residents below the federal poverty line,[22] racial/ethnic composition (percentage Black, percentage Hispanic),[18] percentage of residents with a college education,[18] percentage of male residents,[18] violent crime rate (exclusive of homicide),[23] population density,[24] and percentage of the population that is of working age (18–64 years).[6] Percentage of Hispanic residents, population density, and proportion of the population 18 to 64 years of age were not significantly associated with workplace homicide rates in any models and thus were not retained in our analyses.

### Statistical Analysis

We examined associations between state-level firearm laws and state-level workplace homicide risk factors. We used a generalized linear model approach to take into account that the dependent variable, the state–year workplace homicide rate, is strictly positive. We fit the model with a log link and $\gamma$-distributed errors using robust standard errors clustered by state. We specified a log-$\gamma$ model because the log-$\gamma$ technique (unlike the Gaussian regression commonly used in log-linear models) requires no external transformation, it is more straightforward to interpret, and its residuals allow evaluations of model fit.[25]

In the estimated model, the key variable explaining a state's workplace homicide rate was the preceding year's firearm law index in that state. We included this lag in the firearm law index to reduce potential error caused by laws being in effect for parts but not all of a given year, as our workplace homicide data were available only annually. Models were adjusted for state-level time-varying characteristics (unemployment rate, percentage of

Exhibit D
Page 106

residents below the federal poverty line, percentage of Black residents, percentage of residents with a college education, percentage of male residents, and nonhomicidal violent crime rate) as well as year fixed effects to control for time trends.

The generalized linear model was specified as $\log(\text{homrate}_{i,t}) = \beta_0 + \beta_1\text{lawtotal}_{i,t-1} + \beta_2\text{povertyrate}_{i,t} + \beta_3\text{pctmale}_{i,t} + \beta_4\text{pctcollege}_{i,t} + \beta_5\text{violentcrimerate}_{i,t} + \beta_6\text{pctblack}_{i,t} + \beta_7\text{unemployrate}_{i,t} + \Phi Y_t + \eta_{i,t}$ for $i = 1, 50$ and $t = 2012, 2017$. $Y_t$ values are indicator variables for the years 2013 to 2017, with coefficients in the $\Phi$ vector. The covariate of interest was the preceding year's firearm index value for state $i$, $\text{lawtotal}_{i,t-1}$.

Subsequently, we examined 13 subcategories of firearm laws[4] involving at least one state policy change in the given subcategory over the study period. One policy subcategory (immunity from prosecution for gun manufacturers) included in the State Firearms Law Database did not meet this criterion and was therefore not analyzed in regression models. We modeled each subcategory of firearm laws and workplace homicide rates separately to avoid multicollinearity.

We present parameter estimates ($b$ values) as well as average marginal effects to describe the predicted change in workplace mortality rates in response to an interquartile range (IQR) positive increase in the state-level policy environment. An IQR change across all policy areas is interpreted as the number of firearm laws that a state would need to add or strengthen to move from being in the weakest firearm law quartile to the strongest quartile. Across all policy areas, this would mean strengthening 20.5 firearm laws on average. We also modeled the effect of an IQR change within specific policy areas (e.g., for concealed carry permitting, this is equivalent to a state strengthening or adding 2 concealed carry laws). We used Stata version 15.1 (StataCorp LLC, College Station, TX) in conducting all of our analyses.

## RESULTS

There were 3131 workplace homicides during the study period, ranging from a low of 404 in 2013 to a high of 500 in 2016, which translated to an average of 0.31 homicides per 100 000 workers. On average, workplace homicides accounted for 9% of all workplace fatalities (Table 1).

Over the study period, the Occupational Injury and Illness Classification System classified 2474 (79%) homicides as "intentional shooting of another person." Of these homicides, 61% involved a handgun and 12% involved a rifle; other weapons were not reported. Seven percent of assailants were family members or intimate partners of the victim; 11% were customers, clients, or patients; and 15% were current or former

coworkers (Table 1). Retail sales workers, cashiers, and police officers were most likely to be killed by another person while at work.[11]

The 2011 through 2017 period was an active one for the enactment and implementation of firearm regulations (Table 2). Across all years of the study period, the average state had 26 laws restricting firearms (range = 3–104), with an IQR of 20.5; states in the 25th percentile of firearm policies had 10 firearm-restricting laws, and states in the 75th percentile had 30.5 such laws.

Overall, 23 states strengthened firearm regulations, 23 weakened regulations, and 9 did not change firearm laws during the study period. Five states appeared on both the "strengthened" and "weakened" lists because they either strengthened regulations in one subcategory of laws but weakened them in another (South Carolina, Virginia, and West Virginia) or weakened and then strengthened laws within the same subcategory (Idaho and Oklahoma). The legislative subcategories with the most activity were domestic violence–related laws (17 states strengthened and 3 states weakened regulations), possession regulations (4 states strengthened and 10 states weakened regulations), and concealed carry permitting (6 states strengthened and 8 states weakened regulations).

Using generalized linear models (Table 3), we first tested overall associations between changes in state-level firearm laws and

**TABLE 1—Characteristics of Workplace Homicides in the United States From 2011 to 2017**

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | All |
|---|---|---|---|---|---|---|---|---|
| **Overall characteristics** | | | | | | | | |
| Total number of workplace homicides | 468 | 475 | 404 | 409 | 417 | 500 | 458 | 3131 |
| Workplace homicide rate per 100 000 workers | 0.337 | 0.337 | 0.283 | 0.282 | 0.282 | 0.332 | 0.300 | 0.307 |
| Workplace fatalities classified as homicides, % | 10 | 10 | 9 | 8 | 9 | 10 | 9 | 9 |
| Workplace homicides classified as "intentional shooting of another person," % | 78 | 80 | 80 | 75 | 85 | 79 | 77 | 79 |
| **Type of weapon used, %[a]** | | | | | | | | |
| Handgun | 56 | 56 | 58 | 63 | 63 | 66 | 66 | 61 |
| Rifle | 14 | 10 | 14 | 10 | 12 | 13 | 10 | 12 |
| **Relationship of assailant to victim, %** | | | | | | | | |
| Family member or intimate partner | 8 | 7 | 7 | 7 | 8 | 9 | 6 | 7 |
| Coworker or former coworker | 10 | 13 | 18 | 15 | 16 | 13 | 17 | 15 |
| Client, customer, or patient | 11 | 12 | 9 | 12 | 11 | 9 | 12 | 11 |

*Source.* Data for this table were drawn from multiple sources.[11,17,18]
[a]Weapon was not reported for all shootings.

Exhibit D
Page 132

TABLE 2—Summary of Changes in State-Level Firearm Laws: United States, 2011–2017

| Policy Subcategory | Explanation of Policy Area | Total Possible Laws, No. | Laws per State, Mean No. | Laws in 25th Percentile, No. | Laws in 75th Percentile, No. | States That Strengthened Gun Control During 2011–2017 | States That Weakened Gun Control During 2011–2017 |
|---|---|---|---|---|---|---|---|
| Concealed carry permitting | Restrictions to concealed carrying of firearms | 7 | 4.01 | 3 | 5 | ID, LA, MI, MO, NC, OH | ID, IL, KS, ME, MO, NH, ND, WV |
| Domestic violence–related laws | Laws aimed at preventing those with a history of domestic violence from purchasing or owning firearms | 21 | 4.16 | 0 | 6.5 | AL, CA, CO, CT, DE, HI, IL, IN, LA, ME, MD, MN, NV, NJ, NY, OR, UT | AL, AR, VA |
| Background checks | Background checks for all sales | 11 | 2.33 | 0 | 4.5 | CO, DE, NV, NY, OR, WA | . . . |
| Dealer regulations | Regulations around dealer recordkeeping, licensing, and reporting | 17 | 2.68 | 0 | 5 | CO, DE, NY, WA | AL, GA, SC |
| Child safety provisions | Regulations around locking and storage of firearms around minors | 11 | 1.63 | 0 | 3 | CA | . . . |
| Gun trafficking | Protections against purchasing with intent to resell or purchase without background checks or resell to persons prohibited from gun ownership | 7 | 0.76 | 0 | 2 | CA, IN, MN | . . . |
| Buyer regulations | Age, permitting, and training requirements for gun purchase | 17 | 2.35 | 0 | 3 | CA, CT, DE, MD, WA | MI, VA, WI |
| Ammunition regulations | Restrictions on purchasing age, recordkeeping, and licensing for sale of ammunition | 7 | 0.69 | 0 | 1 | CT | . . . |
| High-risk gun owner prohibitions | Prohibitions on gun possession by people with a history of certain mental health problems, substance use, or criminal activity | 10 | 3.06 | 1 | 5 | AL, CT, DE, NV, OR, SC | AL, RI |
| Possession regulations | Restrictions on possession of guns among young people and restrictions on carrying firearms in some areas | 12 | 2.62 | 1 | 3 | CA, CT, OK, WA | AR, GA, IL, MS, MO, OK, SD, TN, TX, WV |
| Assault weapons and large-capacity magazines | Ban on purchase, transfer, and possession of assault weapons and large-capacity magazines | 8 | 0.67 | 0 | 0 | CA, CO, CT, MD, NY | . . . |
| No preemption | No laws that prohibit local governments from passing firearm regulations that are more stringent than those at the state level | 3 | 0.41 | 0 | 0 | . . . | IL |
| No "stand your ground" laws | No "stand your ground" legislation in place | 1 | 0.54 | 0 | 1 | . . . | MO |
| Total | . . . | 132 | 26.24 | 10 | 30.5 | CA, CO, CT, DE, HI, ID, IN, LA, ME, MD, MN, NV, NJ, NY, NC, OH, OK, OR, SC, VT, VA, WA, WV | AL, AK, AR, GA, ID, IL, IA, KS, MI, MS, MO, NH, ND, OK, RI, SC, SD, TN, TX, UT, VA, WV, WI |

*Source.* State Firearm Laws Project[3] and Siegel et al.[4]

Exhibit D
Page 133

TABLE 3—Adjusted Associations Between Changes in State-Level Firearm Laws and Workplace Homicide Rates: United States, 2011–2017

| | b (95% CI) | Policies in IQR,[a] No. | Effect of IQR Change on Homicide Rate, % (95% CI) |
|---|---|---|---|
| Overall effect of firearm policies | −0.0055 (−0.0087, −0.0023) | 20.5 | −3.68 (−3.86, −3.51) |
| Legislative subcategories | | | |
| Concealed carry permitting | −0.0913 (−0.144, −0.0385) | 2 | −5.79 (−6.09, −5.50) |
| Domestic violence related | −0.0256 (−0.0391, −0.0121) | 6.5 | −5.31 (−5.57, −5.05) |
| Background checks | −0.0351 (−0.0584, −0.0119) | 4.5 | −5.07 (−5.32, −4.82) |
| Dealer regulations | −0.0304 (−0.0508, −0.0100) | 5 | −4.88 (−5.11, −4.65) |
| Child safety provisions | −0.0407 (−0.0699, −0.0116) | 3 | −3.99 (−4.18, −3.80) |
| Gun trafficking | −0.0584 (−0.113, −0.0034) | 2 | −3.82 (−4.00, −3.64) |
| Buyer regulations | −0.0276 (−0.0498, −0.0054) | 3 | −2.75 (−2.88, −2.62) |
| Ammunition regulations | −0.068 (−0.122, −0.0138) | 1 | −2.28 (−2.38, −2.17) |
| High-risk gun owner prohibitions | −0.028 (−0.0580, 0.0020) | 4 | −3.67 (−3.85, −3.50) |
| Possession regulations | −0.0195 (−0.0507, −0.0118) | 2 | −1.32 (−1.39, −1.26) |
| Assault weapon bans | −0.0115 (−0.0554, 0.0325) | 0 | 0.00 (0.00, 0.00) |
| No preemption | −0.0623 (−0.142, 0.0174) | 0 | 0.00 (0.00, 0.00) |
| No "stand your ground" law | 0.0225 (−0.123, 0.168) | 1 | 0.79 (0.75, 0.83) |

*Note.* CI = confidence interval; IQR = interquartile range. Units for parameter estimates are interpreted as the change in workplace homicides per 100 000 working people associated with a 1-unit increase in the firearm laws index the preceding year. Values were adjusted for the following variables by state and year: unemployment rate, percentage of residents below the federal poverty line, percentage of Black residents, percentage of residents with a college education, percentage of male residents, and nonhomicide violent crime rate. Data include year fixed effects.

[a]Interquartile range refers to the effect of adding or strengthening laws at the state level. The IQR is interpreted as the number of laws in a given area that a state would need to add to become one of the strongest, rather than one of the weakest, states with respect to firearm-restricting laws in that area.

changes in workplace homicide rates. In adjusted models, we found a negative association between strengthening of firearm laws and homicide rates; that is, as laws became more restrictive, homicide rates decreased (b = −0.005; 95% confidence interval [CI] = −0.0087, −0.0023; P = .001). An IQR positive increase in state firearm laws (adding 20.5 laws) was associated with, on average, a 3.68% decrease in the workplace homicide rate.

We then modeled the associations between 13 subcategories of firearm policies and workplace homicide rates. We found that, in 8 of the 13 subcategories, strengthening laws was associated with statistically significant reductions (P < .05) in workplace homicide rates. Strengthening concealed carry permitting legislation was associated with a 5.79% reduction (equivalent to strengthening 2 laws); domestic violence–related restrictions, with a 5.31% reduction (strengthening 6.5 laws); background checks, with a 5.07% reduction (strengthening 4.5 laws); dealer regulations, with a 4.88% reduction (strengthening 5

laws); child safety provisions, with a 3.99% reduction (strengthening 3 laws); gun trafficking restrictions, with a 3.82% reduction (strengthening 2 laws); buyer regulations, with a 2.75% reduction (strengthening 3 laws); and ammunition regulations, with a 2.28% reduction (strengthening 1 law).

There were no statistically significant associations between workplace homicide rates and high-risk gun owner prohibitions, possession regulations, assault weapons bans, preemption, or "stand your ground" laws.

In sensitivity analyses, we found that the association between state firearm policy changes and workplace homicides did not vary meaningfully by the number of state firearm policies at baseline (Table A, available as a supplement to the online version of this article at http://www.ajph.org).

## DISCUSSION

Using state-level data on workplace homicides, we tested whether year-over-year

strengthening of firearm laws was associated with lower rates of workplace homicides. We found that as states strengthened regulations related to firearms, workplace homicide rates decreased. Although other studies have shown that stronger firearm laws reduce overall homicide rates, this study provides some of the first evidence that workplace homicide rates are also sensitive to changes in state firearm laws. More broadly, it provides further evidence that certain firearm restrictions may be an effective tool for reducing homicide rates in a variety of settings, including workplaces.

Several of the legislative subcategories associated with reductions in workplace homicide rates are meaningful in a workplace context. One is strengthening restrictions on gun possession among domestic violence offenders. We found that strengthening 6.5 laws, the IQR for policies related to firearm possession among these offenders, would be associated with a 5.31% reduction in workplace homicides. About 7% of workplace homicides are committed by a relative or intimate partner of the victim (Table 1).

Prior studies have shown that laws requiring domestic violence offenders to relinquish their firearms are associated with decreases in firearm-related intimate partner homicide.[10] Such policies may reduce workplace homicides in 2 ways. First, they may directly reduce abusers' ability to kill their intimate partner (and the partner's coworkers) while the partner is at work. Second, perpetrators of domestic violence are more likely than the general population to exhibit behaviors (especially stalking) that may be precursors to homicides involving people other than the intimate partner.[26] Removing guns from abusers may therefore protect their other potential victims.

An IQR increase in concealed carry policies (strengthening 2 laws) was associated with a 5.7% decrease in workplace homicides. Some, but not all, prior research has revealed that when states or cities liberalize concealed carry permitting from "may issue" (in which local law enforcement can deny a permit even if a person has passed a background check) to "shall issue" (in which law enforcement does not have this discretion), firearm homicide rates increase.[27] In addition to permitting, concealed carry regulations also dictate places in which people are allowed to carry a

Exhibit D
Page 134

concealed weapon, including schools, colleges, houses of worship, bars, hospitals or medical facilities, prisons, and public sporting events.[4] Each of these locations represents someone's workplace, as well as a public space. Therefore, changing policies to allow unrestricted concealed carrying of firearms in these settings may increase the risk of homicide for people who work there.

We also found associations between workplace homicides and strengthening of laws surrounding background checks, buyer regulations, dealer regulations, and limits on firearm trafficking, with effect sizes ranging from a 2.75% reduction (buyer regulations) to a 5% reduction (background checks). These policy changes may have been associated with decreases in workplace homicide by reducing gun ownership or the number of firearms in circulation; research has shown a positive relationship between state-level gun ownership rates and state-level homicide rates.[28]

We did not adjust for gun ownership, as it is likely a mediator of the relationship between the latter categories of firearm laws (background checks, buyer regulations, dealer regulations, and limits on firearm trafficking) and workplace homicide rates. Including this mediating factor in our models could have led to overadjustment and erroneous conclusions that the laws are ineffective.[29] Furthermore, consistency between findings in these 4 policy domains as well as areas in which the observed associations are not plausibly driven by gun ownership (concealed carry permitting, child safety laws) suggests that the overall patterns revealed in our analysis are not solely attributable to ownership.

Strengthening of child safety policies was significantly, and unexpectedly, associated with decreases in workplace homicide rates. We hypothesize that an unintended effect of making firearms less accessible to children is that the same firearms are less accessible to theft or misuse by adults other than the original owner. Further research involving other data sets (e.g., individual-level data) will help elucidate potential mechanisms for such associations.

Strengthening of 4 subcategories of firearm laws—possession regulations, assault weapon bans, preemption, and stand-your-ground laws—was not significantly (or nearly significantly) associated with reductions in workplace homicide rates. Not enough states

changed assault weapon or preemption laws to allow us to test effects of policy changes on workplace homicide rates (the IQR for both policy areas was 0). Both possession and stand-your-ground regulations are tangential to workplace homicide risk factors. Possession regulations consist mostly of restrictions on gun ownership to individuals 18 years (or 21 years) and older and restrictions on guns at schools or colleges,[4] but most working adults are older than 21 years and are not employed in educational settings. Stand-your-ground defenses are typically invoked in conflicts occurring at someone's home, making them less relevant in a workplace context.

## Limitations and Strengths

To protect the confidentiality of victims, CFOI provides data only by year and one other characteristic. Because our study design necessitated collecting data by state and year, we were unable to further stratify by other characteristics that could have been informative. These characteristics include events involving firearms versus other kinds of weapons and whether events involved one or multiple victims. With regard to the latter, 79% of workplace homicides during the study period were classified as shootings; non-shooting homicides likely contributed to random error and biased results toward the null. With respect to mass shootings, aggregate CFOI data reveal that only 5% to 8% of workplace homicides involve more than one victim, making mass shootings an unlikely driver of our results.[30]

Although the Centers for Disease Control and Prevention tracks nonfatal workplace injuries (including homicides) in a separate database, there is insufficient detail in publicly available surveillance data by state and year to capture physical and psychological morbidity related to nonfatal firearm injuries. This limitation is compounded by known underreporting of nonfatal workplace injuries.[31]

Other limitations relate to our study design. We used state-level policy changes and homicide rates; the ecological fallacy is therefore a threat to the validity of our findings. However, the majority of studies of firearm policies and homicide are ecological.[6] We also cannot account for implementation: policies in some states may be more strictly enforced than policies in other states. Level of

enforcement of firearm policies may be related to unobserved confounders at the state level.

Strengths of our study were 7 years of both policy and homicide data, the substantial amount of policy change activity over the study period, the lack of missing data, the use of a comprehensive policy assessment tool, the robust outcome measure, and the lack of conflict of interest that could come from funding by either gun-rights or gun-control entities. All of these factors have been identified as weaknesses of prior research on firearm policies and homicide.[29]

## Conclusions

Our findings add to a growing body of evidence indicating that although firearm legislation cannot prevent every gun-related death, strengthening such policies is associated with reductions in homicide rates at a population level.[6,9,10] Our effect sizes were modest, but the pattern we observed is consistent with the population approach to improving public health: small shifts in disease rates as a consequence of policy or practice changes can have a meaningful impact on population health over time.[32] With the addition of this study, we have evidence that workplace homicides are another category of outcomes sensitive to changes in firearm policies.

Originally, smoking bans in restaurants and bars were implemented as an occupational health precaution for bartenders and servers.[33] Over time, these policies were shown to benefit respiratory health not only among workers but also patrons.[34] Following a similar model, unions, industry groups, and other worker advocates could lobby for more restrictive firearm policies at the state level to protect the health of their workforces and the lives of those they serve. Our findings suggest that strengthening the state-level firearm policy environment within our interquartile range (adding 20.5 firearm laws) would save, on average, the lives of 16 workers each year who would have died from workplace homicides, with further benefits extending to their families, coworkers, and employers. **AJPH**

**CONTRIBUTORS**
E. L. Sabbath drafted the article and assembled the data. E. L. Sabbath and C. F. Baum designed the study.

Exhibit D
Page 16

C. F. Baum analyzed the data. All of the authors contributed to interpreting the results and editing the article for intellectual content.

## ACKNOWLEDGMENTS
We thank Marco Ghiani for his work in managing the policy data.

## CONFLICTS OF INTEREST
The authors declare no conflicts of interest.

## HUMAN PARTICIPANT PROTECTION
No protocol approval was needed for this study because no human participants were involved.

## REFERENCES
1. Bauchner H, Rivara FP, Bonow RO, et al. Death by gun violence—a public health crisis. *JAMA Psychiatry.* 2017;74(12):1195–1196.

2. Centers for Disease Control and Prevention. CDC-WISQARS: 10 leading causes of death, United States 2017. Available at: https://www.cdc.gov/injury/wisqars. Accessed November 20, 2019.

3. State Firearm Laws Project. State Firearm Laws Database and codebook 2018. Available at: http://statefirearmlaws.org/resources. Accessed November 20, 2019.

4. Siegel M, Pahn M, Xuan Z, et al. Firearm-related laws in all 50 US states, 1991–2016. *Am J Public Health.* 2017;107(7):1122–1129.

5. Metzl JM. Repeal the Dickey amendment to address polarization surrounding firearms in the United States. *Am J Public Health.* 2018;108(7):864–865.

6. Lee LK, Fleegler EW, Farrell C, et al. Firearm laws and firearm homicides: a systematic review. *JAMA Intern Med.* 2017;177(1):106–119.

7. Siegel M, Pahn M, Xuan Z, Fleegler E, Hemenway D. The impact of state firearm laws on homicide and suicide deaths in the USA, 1991–2016: a panel study. *J Gen Intern Med.* 2019;34(10):2021–2028.

8. Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health.* 2015;105(8):e49–e54.

9. Safavi A, Rhee P, Pandit V, et al. Children are safer in states with strict firearm laws: a national inpatient sample study. *J Trauma Acute Care Surg.* 2014;76(1):146–150.

10. Díez C, Kurland RP, Rothman EF, et al. State intimate partner violence–related firearm laws and intimate partner homicide rates in the United States, 1991 to 2015. *Ann Intern Med.* 2017;167(8):536–543.

11. Bureau of Labor Statistics. Injuries, illnesses, and fatalities: workplace homicides. Available at: https://www.bls.gov/iif/oshwc/cfoi/workplace-homicides.htm. Accessed November 20, 2019.

12. Blake RA, Lating JM, Sherman MF, Kirkhart MW. Probable PTSD and impairment in witnesses of work-related fatalities. *J Loss Trauma.* 2014;19(2):189–195.

13. Loomis D, Wolf SH, Runyan CW, Marshall SW, Butts JD. Homicide on the job: workplace and community determinants. *Am J Epidemiol.* 2001;154(5):410–417.

14. Konda S, Tiesman HM, Hendricks S, Gurka AK. Non-robbery-related occupational homicides in the retail industry, 2003–2008. *Am J Ind Med.* 2014;57(2):245–253.

15. Loomis D, Marshall SW, Ta ML. Employer policies toward guns and the risk of homicide in the workplace. *Am J Public Health.* 2005;95(5):830–832.

16. Loomis D, Marshall SW, Wolf SH, Runyan CW, Butts JD. Effectiveness of safety measures recommended for prevention of workplace homicide. *JAMA.* 2002;287(8):1011–1017.

17. Bureau of Labor Statistics. Census of Fatal Occupational Injuries. Available at: https://www.bls.gov/iif/oshfat1.htm. Accessed November 20, 2019.

18. US Census Bureau. Current Population Survey table creator. Available at: https://www.census.gov/cps/data/cpstablecreator.html?#. Accessed November 20, 2019.

19. Ghiani M, Hawkins SS, Baum CF. Gun laws and school safety. *J Epidemiol Community Health.* 2019;73(6):509–515.

20. Price JH, Thompson AJ, Dake JA. Factors associated with state variations in homicide, suicide, and unintentional firearm deaths. *J Community Health.* 2004;29(4):271–283.

21. Iowa Community Indicators Program. Annual unemployment rates by state. Available at: https://www.icip.iastate.edu/tables/employment/unemployment-states. Accessed November 20, 2019.

22. US Census Bureau. Historical poverty tables: people and families—1959 to 2017. Available at: https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-poverty-people.html. Accessed November 20, 2019.

23. Federal Bureau of Investigation. Crime Data Explorer. Available at: https://crime-data-explorer.fr.cloud.gov/downloads-and-docs. Accessed November 20, 2019.

24. RAND State Statistics. Historical population density (states only). Available at: https://www.randstatestats.org/us/stats/historical-population-density-(states-only).html. Accessed November 20, 2019.

25. Hardin JW, Hilbe JM. *Generalized Linear Models and Extensions.* College Station, TX: Stata Press; 2007.

26. Aldridge ML, Browne KD. Perpetrators of spousal homicide: a review. *Trauma Violence Abuse.* 2003;4(3):265–276.

27. Hamill ME, Hernandez MC, Bailey KR, Zielinski MD, Matos MA, Schiller HJ. State level firearm concealed-carry legislation and rates of homicide and other violent crime. *J Am Coll Surg.* 2019;228(1):1–8.

28. Monteaux MC, Lee LK, Hemenway D, Mannix R, Fleegler EW. Firearm ownership and violent crime in the US: an ecologic study. *Am J Prev Med.* 2015;49(2):207–214.

29. Santaella-Tenorio J, Cerdá M, Villaveces A, Galea S. What do we know about the association between firearm legislation and firearm-related injuries? *Epidemiol Rev.* 2016;38(1):140–157.

30. Bureau of Labor Statistics. Census of fatal occupational injuries, 2017. Available at: https://www.bls.gov/iif/oshwc/cfoi/cfoi-chart-data-2017.htm. Accessed November 20, 2019.

31. Gray W, Mendeloff J. *Fatality Rates in Construction Vary 3-Fold by State: Do OSHA and Workers' Compensation Play a Role?* Silver Spring, MD: Center for Construction Research and Training; 2019.

32. Rose G. Sick individuals and sick populations. *Int J Epidemiol.* 2001;30(3):427–432.

33. Eisner MD, Smith AK, Blanc PD. Bartenders' respiratory health after establishment of smoke-free bars and taverns. *JAMA.* 1998;280(22):1909–1914.

34. Pickett MS, Schober SE, Brody DJ, Curtin LR, Giovino GA. Smoke-free laws and secondhand smoke exposure in US non-smoking adults, 1999–2002. *Tob Control.* 2006;15(4):302–307.

Exhibit D

Page 136



**Statistics and Public Policy**

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/uspp20

# Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime

Willem M. Van Der Wal

**To cite this article:** Willem M. Van Der Wal (2022) Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime, Statistics and Public Policy, 9:1, 163-174, DOI: 10.1080/2330443X.2022.2120136

**To link to this article:**  https://doi.org/10.1080/2330443X.2022.2120136

© 2022 The Author(s). Published with license by Taylor & Francis Group, LLC

View supplementary material 

Published online: 14 Oct 2022.

Submit your article to this journal 

Article views: 1126

View related articles 

View Crossmark data

STATISTICS AND PUBLIC POLICY
2022, VOL. 9, NO. 1, 163–174
https://doi.org/10.1080/2330443X.2022.2120136





OPEN ACCESS | Check for updates

# Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime

Willem M. Van Der Wal[a]

vanderwalresearch.com, Zoetermeer, Netherlands

**ABSTRACT**

Right-to-carry (RTC) laws allow the legal carrying of concealed firearms for defense, in certain states in the United States. I used modern causal inference methodology from epidemiology to examine the effect of RTC laws on crime over a period from 1959 up to 2016. I fitted marginal structural models (MSMs), using inverse probability weighting (IPW) to correct for criminological, economic, political and demographic confounders. Results indicate that RTC laws significantly increase violent crime by 7.5% and property crime by 6.1%. RTC laws significantly increase murder and manslaughter, robbery, aggravated assault, burglary, larceny theft and motor vehicle theft rates. Applying this method to this topic for the first time addresses methodological shortcomings in previous studies such as conditioning away the effect, overfit and the inappropriate use of county level measurements. Data and analysis code for this article are available online.

**ARTICLE HISTORY**
Received January 2020
Accepted August 2022

**KEYWORDS**
Causal modeling; Concealed carry; Firearms; Gun laws; Inverse probability weighting; Longitudinal data; Marginal structural model; Multiple imputation; Random effects

## 1. Introduction

Lott and Mustard (1997) concluded that the introduction of right-to-carry (RTC) laws in states in the United States *decreases* violent crime. These laws allow the legal carrying of concealed firearms for self-defense. Since then, many studies (see Section 5) have been conducted on this issue, with conflicting results. For example, Donohue, Aneja, and Weber (2019) concluded that RTC laws substantially *increase* violent crime. As described in Lott and Mustard (1997), Lott (2010), and Donohue, Aneja, and Weber (2019) RTC laws could simultaneously both have a positive effect (e.g., by deterrence) and a negative effect (e.g., by escalation or displacement) on crime.

The National Research Council (U.S.) (2004) concluded that to reach a robust scientifically supported conclusion, new analytical approaches are needed. For example, as described in Section 5, many methods typically used in previous studies can suffer from adjusting away the effect, overfitting and inappropriate use of county level measurements, among others. In this article, I attempt to address these deficiencies using *marginal structural models* (MSMs), a causal inference technique popular in epidemiology (Hernán, Brumback, and Robins 2000; Robins, Hernán, and Brumback 2000; Hernán and Robins 2006a).

## 2. Background: Marginal Structural Models (MSMs)

MSMs are used in epidemiology to estimate the causal effect of a treatment on a chosen outcome in medical patients, from observational data (Robins, Hernán, and Brumback 2000; Hernán, Brumback, and Robins 2000; Hernán and Robins 2006a). I

introduce the theory of MSMs and illustrate their advantages over standard models below.

MSMs are based on the concept of *counterfactuals*, also called *potential outcomes* (Robins 1999; Höfler 2005). Counterfactuals are the outcomes that could have been observed, had a certain exposure been applied to an observational unit. For instance, the outcome after exposure to a medical treatment of patients, or the outcome after the introduction of RTC laws in states in the United States. Causal effects can then be defined as contrasts between these potential outcomes (Hernán 2004; Hernán and Robins 2006a).

For example, consider patients receiving either a medical treatment or a placebo in a clinical trial. The outcome $Y$ could be survival (yes or no). With dichotomous exposure $A$, the potential outcome for individual $i$ when receiving treatment level 0, the placebo is $Y_{i,a=0}$. The potential outcome for individual $i$ when receiving treatment level 1, the medical treatment is $Y_{i,a=1}$. The causal effect of the medical treatment on survival, as compared to the placebo, for individual $i$ could then be expressed as the difference between $Y_{i,a=0}$ and $Y_{i,a=1}$.

At the population level, the causal effect of a dichotomous exposure $A$ on an outcome $Y$ can be defined as a contrast between distributions of potential outcomes. The distribution of outcomes when every observational unit would have received exposure level 0 is $f(y_{a=0})$. The distribution of outcomes when every unit would have received exposure level 1 is $f(y_{a=1})$. The causal effect comparing these two distributions could be expressed for instance as a difference or ratio of the survival rates. Such a contrast is referred to as a *marginal causal effect*. This is precisely the effect that is desired when estimating the

**CONTACT** Willem M. Van Der Wal ✉ willem@vanderwalresearch.com ● vanderwalresearch.com, Zoetermeer, Netherlands.
● Supplementary materials for this article are available. Please go to *www.tandfonline.com/uspp*.
© 2022 The Author(s). Published with license by Taylor and Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited. The moral rights of the named authors have been asserted.

causal effect of a specific action, treatment or policy, such as when estimating the effect of RTC laws on crime (Hernán 2004).

## 2.1. Marginal Structural Models (MSMs)

Using the counterfactual framework, the marginal causal effect of an exposure on a chosen outcome can be described quantitatively using a MSM (Hernán, Brumback, and Robins 2000; Robins, Hernán, and Brumback 2000; Hernán and Robins 2006a). For example, the MSM

$$E(Y_a) = \beta_0 + \beta_1 a \tag{1}$$

could describe the causal effect of a dichotomous exposure $A$ on a continuous outcome $Y$. The response variable $Y_a$ is the potential outcome that would have been observed, when every unit of observation would have received the same specific treatment level $a$. Parameter $\beta_1$ then quantifies the causal effect of $A$ on $Y$. This parameter is equal to the difference in the mean of $Y$ between the distributions of the potential outcomes corresponding to the two treatment levels of $A$, $f(y_{a=0})$ and $f(y_{a=1})$. The parameters of such a MSM could be estimated by fitting the standard regression model

$$E(Y) = \beta_0 + \beta_1 A \tag{2}$$

on observations $\{Y_i, A_i\}$ from a randomized experiment with no selection bias. However, in observational studies bias due to confounding is often present, as described in the next paragraph.

## 2.2. Confounding

Confounding occurs when one or more covariates have a causal effect both on the exposure allocation and on the outcome (Pearl 2009). Such covariates are referred to as "confounders." An example of a confounder in a medical setting is disease progression in HIV positive individuals, when estimating the effect of treatment on mortality. Disease progression could both affect the start of treatment as well as mortality (Hernán, Brumback, and Robins 2000). Or, in the present study, for example the composition of the state legislature could possibly affect both the introduction of RTC laws as well as crime rates, either directly or indirectly. Unadjusted effect estimators such as Equation (2) are biased estimators of the causal effect when confounding is present (Greenland and Morgenstern 2001). Adjusting for confounding is possible using various methods. I will describe both traditional "conditional" regression models in which confounders are included as covariates, and inverse probability weighting (IPW) to correct for confounding while fitting a MSM.

## 2.3. Conditional Models and their Drawbacks

The most commonly used statistical method to adjust for confounding is conditioning, as was indeed done in previous studies on the effect of RTC laws on crime (Section 5). Conditioning amounts to the pooling of associations, estimated within strata defined by confounders. In this manner, an overall adjusted effect estimate is obtained. Such a pooled estimate can be obtained by using stratification methods, or by including

confounders as covariates in regression models (Fitzmaurice 2004; Ranstam 2008).

A drawback of conditioning is that effects can be *adjusted away*, especially in a longitudinal setting. I will illustrate this in the context of estimating the effect of RTC laws on crime. I indicate time in years since a chosen baseline using $j$. Consider the time-varying exposure $A_j$, the implementation of a RTC law at the state level (0 = no, 1 = yes). Also, consider violent crime rate $Y_j$ at the state level, and the composition of the state legislature $L_j$. The effect of $A_j$ on $Y_j$ could be confounded by time-varying covariate $L_j$. I illustrate this temporal structure at time points $j$ and $j − 1$ in Figure 1 using a directed acyclic graph (DAG) (Hernán, Hernández-Díaz, and Robins 2004; Hernán and Robins 2006b). DAGs illustrate the assumed causal structure between variables, with nodes representing variables, and causal effects depicted by unidirectional edges (arrows).

Suppose that state legislature composition $L_j$ is a confounder for the effect of $A_j$ on $Y_j$, assuming it has a causal effect on both $A_j$ and $Y_j$, as indicated by ⋆. Assuming that the implementation of a RTC law at a given time point also has an effect on the composition of the state legislature at a subsequent time point (the effect of $A_{j−1}$ on $L_j$), $A_{j−1}$ has an indirect effect on $Y_j$ through $L_j$, as indicated by ⋆⋆. When "adjusting" for the state legislature composition in the previous year by including it as a covariate in a regression model, the indirect effect of RTC laws on crime is adjusted away (Robins 1997; Robins, Greenland, and Hu 1999).

The problem of adjusting away the effect will occur when conditioning on any variable that is also intermediate for the effect of the exposure. This can occur when estimating the effect of RTC laws on crime, when including possible longitudinal confounders in the regression model, as was done in previous studies on this topic. The association will still be a biased estimate of the true causal effect.

Other drawbacks of conditional regression models include *non-collapsibility* and *collider stratification*, which can both introduce more bias. Non-collapsibility entails that effect estimates from conditional models are only true estimates of marginal effects with a model that uses a linear or log-linear link function (Greenland, Robins, and Pearl 1999). Collider stratification is the introduction of bias by conditioning on a common effect of two variables. This can also occur in the longitudinal situation illustrated in Figure 1. For a more detailed explanation I refer to the literature (Greenland 2003; Whitcomb et al. 2009).

In this article, I use inverse probability weighting (IPW) to address some of the limitations of conditional modeling, as explained below.

## 2.4. Introduction to Inverse Probability Weighting (IPW)

The parameters of MSMs can be estimated using IPW to correct for confounding (Robins 1998). Fitting a MSM using IPW amounts to weighting each observation by the inverse of the probability of the observed exposure level, given the observed value of the confounders. Subsequently, a MSM regressing the outcome on the exposure is fitted on the weighted dataset. I illustrate this in a point treatment study (i.e. with a specific

**Figure 1.** Illustration of the temporal structure between a (possible) confounder such as state legislature composition $L$, RTC law implementation $A$ and the crime rate $Y$ at two subsequent time points $j-1$ and $j$. Confounding is indicated by $\star$. By conditioning on $L$, the indirect effect of $A$ on $Y$ through $L$, as indicated by $\star\star$, is adjusted away.

time point) below, and generalize to a longitudinal setting in Section 3.4.

Consider a point treatment setting with a dichotomous exposure $A$, outcome $Y$ and a vector of possible confounders $\boldsymbol{K}$ measured at a single time point. Using IPW, we can adjust for confounders $\boldsymbol{K}$ by weighting each observation $i$ by the inverse probability weight

$$w_i = \frac{1}{\mathrm{P}(A_i = a_i | K_i = k_i)}. \quad (3)$$

I indicate the observed exposure and confounder status with $a$ and $\boldsymbol{k}$, respectively. The denominator of Equation (3) contains the probability of the observed exposure level given the observed values of confounders $\boldsymbol{K}$. The denominator can be estimated from a model regressing $\mathrm{P}(A = 1)$ on $\boldsymbol{K}$, either using the predicted probability or one minus the predicted probability, for $a_i = 1$ and $a_i = 0$, respectively. Weighting by $w_i$ creates a pseudo-population in which $\boldsymbol{K}$ no longer predicts $A$, but in which the causal effect of $A$ on $Y$ is still present (Robins 1998). Weighting observations $i$ by $w_i$ one can then fit a model such as Equation (2) to estimate the parameters of MSM Equation (1).

To increase statistical efficiency and attain better coverage of confidence intervals, it is recommended to use stabilized weights (Hernán, Brumback, and Robins 2000; Cole and Hernán 2008), for example,

$$sw_i = \frac{\mathrm{P}(A_i = a_i)}{\mathrm{P}(A_i = a_i | K_i = k_i)}. \quad (4)$$

The numerator of Equation (4) contains the probability of the observed exposure level, which can be estimated using the observed proportions. To further stabilize the weights, one can condition both in the numerator and in the denominator of Equation (4) on a set of covariates $\boldsymbol{V}$ that are not confounders.

### 2.5. Assumptions

The following assumptions are made when fitting a MSM using IPW (Cole and Hernán 2008). The assumption of *consistency* states that the counterfactual outcome corresponding to the observed exposure level is precisely the observed outcome (Robins, Greenland, and Hu 1999; Cole and Hernán 2008). This means that the exposure, the causal effect of which is to be estimated, needs to be clearly defined. It is also necessary to assume *positivity*, which means that every level of the exposure of interest has a positive probability of being allocated in every stratum defined by the measured confounders (Cole and

Hernán 2008; Petersen et al. 2012). This assumption is also known as the assumption of *experimental treatment assignment* (*ETA*). The assumption of *conditional exchangeability* means that within strata defined by the measured confounders, potential outcomes are independent of the observed exposure level (Hernán and Robins 2006a). In practice, this holds when there are no unmeasured confounders.

## 3. Methods

I have estimated the causal effect of the adoption of RTC laws in states in the United States on crime rates with a MSM for each crime type, correcting for confounding using IPW. I combined this method with multiple imputation to deal with missing values. Below I describe the details of this method. I have implemented the described method in the R software (R Core Team 2021), version 4.0.5. I have made the data and statistical code available with this article, for full transparency and falsifiability, and to allow researcher to improve upon this analysis as they see fit (see supplementary materials).

### 3.1. Data

Observational units $i$ are all 50 states in the United States, with measurements taken in calendar years $T_j = 1959, 1960, \ldots,$ 2016, with $j = 0, 1, \ldots, 57$ corresponding to those 58 calendar years, respectively. I have chosen to start the follow up at 1959 since that is when the first RTC law was implemented, in New Hampshire (Donohue, Aneja, and Weber 2019). I included the following variables in the dataset:

*Total reported numbers of crimes* $Y_{ij}^c$ in each state $i$, at the end of each year $j$, with $c = 1, 2, \ldots, 9$ representing violent crime total, murder/manslaughter, forcible rape, robbery, aggravated assault, property crime total, burglary, larceny theft and motor vehicle theft, respectively. These variables as well as total state population $P_{ij}$ were obtained from Federal Bureau of Investigation (2019c) for 1960 up to 2014 for most states and for 1965 up to 2014 for the state of New York. $Y_{ij}^c$ and $P_{ij}$ for all states in 2015 and 2016 were obtained from Federal Bureau of Investigation (2019a) and Federal Bureau of Investigation (2019b), respectively. Corresponding crime rates can be computed from $Y_{ij}^c$ and $P_{ij}$. Measurements for these variables were missing for the state of New York in 1959 up to 1964 and in 1959 for the other states.

I have also used *RTC law implementation* $A_{ij}$ with $0 =$ restrictive (no-issue or may-issue) and 1 = permissive (shall-

issue or unrestricted) according to Donohue, Aneja, and Weber (2019). $A_{ij} = 1$ for the years in which a RTC law was in effect for the majority of that year, and $A_{ij} = 0$ otherwise.

I have collected possible longitudinal confounders for the effect of RTC laws on crime in vector $\boldsymbol{L}_{ij}$ including the following. I used the *state violent crime rate* and *property crime rate* per 100.000 people, as computed above, at the end of year $j-2$. Since this variable is measured at the end of year, I have used a lag of two years to satisfy proper temporal ordering, as illustrated in Figure 1. This necessitated state level measurements of this variable from 1957 up to 2014. Measurements for these variables were missing for the state of New York in 1957 up to 1964 and in 1957, 1958, and 1959 for the other states.

I also included the *state share of the total U.S. Gross Domestic Product (GDP)*, at the end of year $j-2$ to satisfy proper temporal ordering. This necessitated state level measurements for this variable from 1957 up to 2014. I obtained measurements from 1963 up to 2014 for every state from Bureau of Economic Analysis (2019), therefore, the variable had missing values for 1957 up to 1962. To improve normality, I used a natural logarithm transformation.

As possible confounders I also used *various demographic variables* including the proportions of the population that is female, white non-hispanic, and of age between 0–18, 19–39, and 40–64 (with 65 and above redundant), respectively. Since these variable are measured at the end of year, I employed a lag of two years necessitating measurements from 1957 up to 2014. I computed these proportions from population counts by sex, race and age obtained from different tables including US Census Bureau (2017a, 2017b, 2019a, 2019b, 2019c, 2019). These population counts also included measurements for 1950 which I used to add further support to the multiple imputation model described in Section 3.2. Values for 1957, 1958, 1959, and 1961 up to 1969 were missing.

I used *Population density* computed from the population counts $P_{ij}$ and the state land areas in square miles obtained from US Census Bureau (2016). These were transformed using a natural logarithm to improve normality, and lagged by two years for similar reasons as the demographic variables.

As possible confounders I also included an indicator variable indicating that the *state legislation has a Republican majority*, measured at the beginning of the previous year, to satisfy temporal ordering according to Figure 1. I used data from Klarner (2013) and National Conference of State Legislatures (NCSL) (2019), before and from 1978 onwards, respectively. And I also used an indicator variable indicating that the *state governor is a Republican*, measured at the beginning of the previous year, to satisfy temporal ordering according to Figure 1. I used data from Klarner (2013) and National Conference of State Legislatures (NCSL) (2019), before and from 2009 onwards, respectively. The interaction between the indicator variables for the state legislation and state governor party was also included.

I assumed that the above included criminological, economic, political and demographic possible confounders all are likely to affect both the implementation of a RTC law and crime rates, just like variable $L$ in Figure 1 with $j$ representing follow-up time in years. The temporal ordering in Figure 1 is always satisfied since I used a lag of one year for confounders measured at the beginning of the year and a lag of two years for confounders measured at the end of the year.

I have used natural splines (De Boor 2001) with three degrees of freedom fitted on calendar time and follow-up time in the imputation model (Section 3.2), the main MSM models (Section 3.3) and the models for the implementation of a RTC law (Section 3.4). A natural spline with three degrees of freedom has two boundary knots and one interior knot, so that within two distinct periods different cubic trends can be fitted. I consider this choice sufficiently flexible to model calendar year in the context of crime rates and RTC law implementation, based on the observed trend of an increase of crime rates from 1960 up to the "crack era" of the 1980s and 1990s, followed by a decrease. I illustrate this trend in the longitudinal plots in the supplementary materials. I assumed that the relatively limited amount of data does not allow for a more complex model, although I explore varying degrees of freedom in the sensitivity analysis (Section 3.5).

I assessed the positivity assumption (see Section 2.5) graphically, using scatterplots of the implementation of a RTC law (yes/no) against each possible confounder, for each of the multiple imputation datasets that were generated as described below (see supplementary materials).

### 3.2. Multiple Imputation

To deal with the missing values in the data as described above I performed multiple imputation for multivariate, multilevel data using Markov chain Monte Carlo (MCMC) according to Schafer and Yucel (2002). I used a multivariate linear mixed-effects model to impute the missing values. As dependent variables I used the natural logarithm of the crime numbers, natural logarithm of state population numbers, natural logarithm of the state share of the total U.S. Gross Domestic Product (GDP), the proportions of the population that is female, white non-hispanic, and of age between 0–18, 19–39, and 40–64, respectively. As independent predictors in this model I used the intercept, the indicator for RTC law implementation, a natural spline (De Boor 2001) with three degrees of freedom fitted on calendar year, and a random intercept for each state.

Using 200 MCMC iterations after 5.000 burn-in iterations, I generated 25 imputed datasets from this model. The number of iterations and datasets was chosen based on technical feasibility in the sensitivity analysis as described below. On each of these 25 imputed datasets MSMs for the effect of RTC laws on crime rates were fitted using IPW as described below. Estimates and standard errors were combined according to Rubin's rules (Rubin 1987). After this, I performed a sensitivity analysis as described in Section 3.5.

### 3.3. Marginal Structural Models

To model the causal effect of the implementation of RTC laws on crime, for each of the crime types $c$ I have estimated the parameters of a separate generalized linear mixed model (GLMM) (Wolfinger and O'connell 1993), with a quasi-Poisson link function:

$$\log\left(\frac{\mathrm{E}(Y_{aij}^c)}{P_{ij}}\right) = \theta_0^c + \theta_1^c a_{ij} + \boldsymbol{\theta}_2^c \boldsymbol{f}^1(T_i) + \xi_{ij}^c. \quad (5)$$

These models convert the numbers of crimes for each type per state and year $Y_{ij}^c$ to crime rates using the offset $P_{ij}$. The models include the effect $\theta_1^c$ of the dummy variable for the RTC laws per state, per year, $a_{ij}$. The function $f^1(T_j)$ indicates a natural spline (De Boor 2001) with three degrees of freedom, as a flexible modeling of calendar time. $\xi_i^c$ indicates a normally distributed random intercept at the state level. This approach is somewhat similar to the generalized estimating equation (GEE) model described by eq (1b) in Hernán, Brumback, and Robins (2002), with the addition of the random intercept.

Compared to a standard Poisson link function, the quasi-Poisson link function uses an additional scale parameter allowing for under- or overdispersion of the error distribution (Zeileis, Kleiber, and Jackman 2008). I have also incorporated an autoregressive correlation structure of order one (AR1) (Littell, Pendergast, and Natarajan 2000) between the repeated outcomes of each state. I consider this structure an appropriate choice for repeated measures over time, since the correlation between measurements declines when those measurements are spaced further apart in time (Littell, Pendergast, and Natarajan 2000). While using IPW to correct for confounding as described below, I performed two-sided significance testing at a significance level of 5%, compared to 0 under the null hypothesis for the main effects $\theta_1^c$.

The causal effects estimated by $\theta_1^c$ can be interpreted in the following manner. The MSMs Equation (5) model for each crime rate the contrast between two distributions of potential outcomes: (a) the repeated measurements of the crime rates in each state, when all states would *never* have implemented a RTC law during follow-up, and (b) the repeated measurements of the crime rates in each state, when all states would *always* had a RTC law implemented, during the complete follow-up. This effect is quantified by the parameters $\theta_1^c$, from which the risk ratios $e^{\theta_1^c}$ can be computed. When such a risk ratio would for example, be equal to 1.1, that should be interpreted as the implementation of a RTC law increasing the corresponding crime rate by 10%, while a risk ratio of 0.9 would equal a decrease by 10%.

### 3.4. Inverse Probability Weighting

I have fitted model Equation (5) on the observed data, for each of the crime types, correcting for confounding by the longitudinal variables in $L_{ij}$, using IPW. I have weighted each observation $ij$ by the stabilized weights $sw_{ij}$, similarly to Hernán, Brumback, and Robins (2002):

$$sw_{ij} = \prod_{k=0}^{j} \frac{P(A_{ik} = a_{ik} | \bar{A}_{ik-1} = \bar{a}_{ik-1})}{P(A_{ik} = a_{ik} | \bar{A}_{ik-1} = \bar{a}_{ik-1}, \bar{L}_{ik} = \bar{l}_{ik})}. \quad (6)$$

This weight is for each measurement $j$ for each state $i$ the product over all previous time points of a ratio of probabilities. The factors in the numerator contain the probability of the observed exposure status at each time point, $a_{ij}$, given the observed exposure history up to the previous time point $\bar{a}_{ij-1} = a_{i0}, a_{i1}, \ldots, a_{ij-1}$. The factors in the denominator contain the probability of the observed exposure status at each time point, $a_{ij}$, given the observed exposure history up to the previous time and the observed history of the longitudinal confounders $\bar{l}_{ij} = l_{i0}, l_{i1}, \ldots, l_{ij}$.

I have estimated the factors in Equation (6) as follows. The introduction of a RTC law was never reversed in any state. I assumed that after the first instance of having a RTC law within follow up in a specific state, the elements $P(A_{ik} = a_{ik} | \ldots)$ are equal to one. In other words, after the first instance of having a RTC law within follow up, the probability of having a RTC law in that state is always one. Using only the data up to and including the first year in which a RTC law was implemented within follow up, I have estimated the other elements in the denominator of Equation (6) using the regression model

$$\log(-\log(1 - P(A_{ij} = 1))) = \beta_0 + \beta_1 f^2(j) + \beta_2 L_{ij}. \quad (7)$$

Model Equation (7) is similar to a Cox proportional hazards model, but with the outcome observed in discrete time, using the complementary log-log link function (Prentice and Gloeckler 1978). I have included main effects of the longitudinal confounders $L$, including the interaction between state legislature composition and governor party. The function $f^2(j)$ indicates a natural spline with three degrees of freedom fitted on follow up time, as a flexible baseline hazard function. The elements in the numerator of Equation (6) were estimated using a similar model including only $f^2(j)$ and the intercept.

As a robustness check, I computed Pearson correlation coefficients between the measured predictors that were included in the models fitted to estimate the weights. I regarded excessively high correlations (i.e., > 0.8) as an indication of possibly problematic multicollinearity in these models. When computing these correlations, I used only the data up to and including the first year in which a RTC law was implemented within follow up, to which these models were fitted, before imputation.

Note that exposure allocation model Equation (7) uses 16 parameters including the intercept. Given the 42 observed "events" corresponding to the first instance of having a RTC law implemented within follow up (see Section 4), I consider this the maximum acceptable complexity of the model, based on the simulation studies performed by Vittinghoff and McCulloch (2007).

### 3.5. Sensitivity Analysis

I have performed a sensitivity analysis to examine the robustness of the results. I have fitted the following variations of the main MSMs.

Variants 1–11 each subtract a specific component of the model Equation (7): in variant (1) violent crime is dropped from the model, in (2) property crime is dropped, in (3) GDP share, (4) proportion female, (5) proportion white non-hispanic, (6) the age variables, (7) population density, (8) the interaction between the indicator that the state legislature has a Republican majority and the indicator that the state governor is Republican, (9) state legislature, (10) state governor and in (11) both the state legislature and governor indicators are dropped.

In variant (12) I have added to the exposure allocation model specified by Equation (7) both the two-way interactions and the three way interactions between the spline fitted on follow-up time, the indicator that the state legislature has a Republican majority and the indicator that the state governor is Republican. In this manner, possible paradigm shifts within the Democratic and Republican party are captured. These paradigm shifts could

modify the effect of these political variables on the probability that a RTC law is implemented.

As explained in Cole and Hernán (2008), the statistical efficiency of an IPW estimator can be increased by truncating the weights, at the cost of introducing a small amount of bias. When truncating, weights below or above a chosen percentile are set to that percentile, at the lower and upper end of the distribution of the weights, respectively. That is, a one-sided truncation proportion of 0.01 would indicate truncating at the 1st and 99th percentile. In the sensitivity analysis I have included the following variants: (13) weights truncated at the 1st and 99th percentile, (14) weights truncated at the 2nd and 98th percentile and (15) weights truncated at the 5th and 95th percentile.

Both in the exposure allocation model Equation (7) and the MSMs Equation (5) natural splines with three degrees of freedom are used on follow-up time and calendar time, respectively. I examined the sensitivity of the main effect estimates to the number of degrees of freedom. I fitted the following variants: variant (16) with a spline with two degrees of freedom in the exposure allocation model, variant (17) including a spline with four degrees of freedom in the exposure allocation model, variant 18) using a spline with two degrees of freedom in the MSMs and variant (19) using a spline with four degrees of freedom in the MSMs.

According to Donohue, Aneja, and Weber (2019), while a RTC law was implemented in 1989 in Pennsylvania, this only came into effect in the capital Philadelphia in 1996. Therefore, I examined the effect of changing the implementation year for Pennsylvania from 1989 to 1996 in the sensitivity analysis in variant 20).

In variant (21) I fitted GEE models for the causal effect of RTC law implementation on crime, as an alternative to the GLMM Equation (5). And similarly to Equation (5) these models also used a Poisson link function with an additional scale parameter and an AR1 correlation structure between the repeated outcomes. In addition, these models used fixed effects for each state and each year, resulting in relatively complex models.

In the next three variants I examined changes to the imputation model, while using the main MSMs. In variants (22) I dropped the indicator for RTC law implementation from the imputation model. In variants (23) I decreased the number of degrees of freedom for the natural spline fitted on calendar time to two. In variants (24) I increased this number of degrees of freedom to four.

In addition to the above described variants of the main MSMs, I have fitted two additional models, to compare the results with. In variant (25) I fitted standard regression models similar to Equation (5), but unweighted, and including the same covariates as Equation (7) to adjust for confounding by conditioning. In this manner, any effect of the implementation of a RTC law on crime that is indirect through any of the included covariates will be adjusted away, as described in Section 2.3. In variant (26) I fitted standard regression models similar to Equation (5), but unweighted, and without any other way of correcting for confounding. Therefore, these models are unadjusted.

Variants (27) were designed as MSMs similar to the main MSMs, but using a selection of states and years that is similar to the synthetic control approach of Donohue, Aneja, and Weber (2019). As described by Donohue, Aneja, and Weber (2019), the synthetic control approach estimated the effect of implementation of a RTC law for the 33 states that implemented a RTC law during 1981–2007, while using follow-up data from 1977 to 2014. Synthetic controls where constructed for each of the 33 "treatment" states using states with either (a) no RTC legislation as of the year 2014, or (b) states that passed RTC laws at least 10 years after the implementation in the specific treatment state (Donohue, Aneja, and Weber 2019). To emulate this selection I included any state where no RTC was implemented, or where a RTC law was implemented in 1981 or later. This resulted in using 44 states in total. I also used follow-up data from 1977 to 2014. Note that this selection precludes any left-truncation in the exposure allocation model Equation (7), since no switches can occur before the start of follow-up by definition.

## 4. Results

### 4.1. Descriptive Statistics

The dataset contains 2900 years of total follow up. There were 42 states that had a RTC law implemented. This led to 1889 years of follow up without and 1011 years with a RTC law implemented, respectively. Table 1 presents basic descriptive statistics for the state crime rates, including the % of missing measurements that were imputed. Note that based on the minimum, there are no zero crime rates for any of these crime types at the state level. This precludes the occurrence of zero-inflation. The occurrence of zero-inflation would be problematic when using Poisson regression (He et al. 2014). Table 2 presents basic descriptive statistics for the possible confounders for the effect of RTC laws on crime, that were corrected for, using IPW as described in Section 3.4. This table also includes the % of missing measurements that were imputed, which is at maximum 20.7%. Absolute Pearson correlations between predictors averaged 0.24, with an interquartile range of 0.11 up to 0.32 and a maximum of 0.69. This does not indicate any relevant amount of multi-collinearity.

### 4.2. Main Results

Main results are presented in Table 3. At the chosen 5% significance level, RTC laws have a statistically significant effect on all crime rates except forcible rape. This includes 7.5% more violent crime total, 5.7% more murder/manslaughter, 10.9% more rob-

Table 1. Descriptive statistics of state crime rates (recorded crimes per 100,000 population) measured in each state and year (1959–2016).

| Crime rate (/100,000 population) | Mean | SD | Minimum | Maximum | % Missing |
|---|---|---|---|---|---|
| Violent crime total | 372.8 | 226.0 | 9.5 | 1244.3 | 1.9% |
| Murder/manslaughter | 6.0 | 3.6 | 0.2 | 20.3 | 1.9% |
| Forcible rape | 28.2 | 15.1 | 0.8 | 102.2 | 1.9% |
| Robbery | 110.8 | 90.9 | 1.9 | 684.0 | 1.9% |
| Aggravated assault | 227.0 | 144.6 | 3.6 | 785.7 | 1.9% |
| Property crime total | 3556.3 | 1365.0 | 573.1 | 7996.0 | 1.9% |
| Burglary | 890.3 | 430.7 | 182.6 | 2906.7 | 1.9% |
| Larceny theft | 2330.4 | 877.6 | 293.3 | 5106.1 | 1.9% |
| Motor vehicle theft | 335.6 | 200.3 | 28.4 | 1571.1 | 1.9% |

NOTE: Missing values were imputed as described in Section Exhibit D

**Table 2.** Descriptive statistics of covariates: possible confounders for the effect of RTC laws on crime.

| Variable | Mean | SD | Minimum | Maximum | % Missing |
|---|---|---|---|---|---|
| Violent crime rate | 372.9 | 228.5 | 9.5 | 1244.3 | 5.3% |
| Property crime rate | 3596.1 | 1368.8 | 573.1 | 7996.0 | 5.3% |
| State share of total GDP (nat. log) | −4.5 | 1.0 | −6.2 | −2.0 | 10.3% |
| Proportion female | 0.51 | 0.01 | 0.43 | 0.53 | 20.7% |
| Proportion white non-hispanic | 0.80 | 0.15 | 0.23 | 1.00 | 20.7% |
| Proportion 0–18 | 0.29 | 0.04 | 0.21 | 0.45 | 20.7% |
| Proportion 19–39 | 0.31 | 0.03 | 0.23 | 0.44 | 20.7% |
| Proportion 40–64 | 0.28 | 0.04 | 0.19 | 0.38 | 20.7% |
| Population density (nat. log) | 4.25 | 1.46 | −0.93 | 7.10 | 5.3% |
| State legislation Republican[1] | 0.29 | 0.45 | 0.00 | 1.00 | 0.0% |
| State governor party Republican[1] | 0.45 | 0.50 | 0.00 | 1.00 | 0.0% |

NOTE: Missing values were imputed as described in Section 3.2.
[1]Dichotomous variable, therefore, the mean indicates a proportion.

**Table 3.** Main results: estimated effects of right-to-carry (RTC) laws on state crime rates in the USA 1959–2016, change in crime rate (%) with 95% confidence interval and *p*-value.

| Outcome | Effect | (95% CI) | Sig. |
|---|---|---|---|
| Violent crime total | 7.5% | (3.8%, 11.4%) | 0.000 |
| Murder/manslaughter | 5.7% | (0.5%, 11.1%) | 0.032 |
| Forcible rape | 0.8% | (−2.0%, 3.7%) | 0.572 |
| Robbery | 10.9% | (5.5%, 16.5%) | 0.000 |
| Aggravated assault | 6.5% | (2.5%, 10.7%) | 0.001 |
| Property crime total | 6.1% | (3.5%, 8.8%) | 0.000 |
| Burglary | 7.5% | (3.7%, 11.5%) | 0.000 |
| Larceny theft | 5.7% | (3.1%, 8.2%) | 0.000 |
| Motor vehicle theft | 6.2% | (2.8%, 9.7%) | 0.000 |

bery, 6.5% more aggravated assault, 6.1% more property crime total, 7.5% more burglary, 5.7% more larceny theft and 6.2% more motor vehicle theft.

### 4.3. Exposure Allocation Model, IPW Weights and Positivity

Table 4 contains effect estimates from exposure allocation model Equation (7), for numeric predictors (relative to a shift of one standard deviation) and binary predictors (relative to a one unit shift), respectively. These effects are summarized across the 25 multiple imputation datasets using the minimum, mean and maximum. The effect estimates presented in Table 4 are not to be interpreted as causal effects estimates, since they are obtained from a conditional model which was fitted with prediction as a goal. However, what can be concluded is that most of the included variables seem to have an effect on the implementation of a RTC law of a relevant magnitude. In addition, some of the estimated effects seem (post hoc) to have a direction that is quite logical. For example, when both the state legislature majority and governor are Republican, it seems almost three times more likely that a RTC law will be implemented. But it must be stressed that when one is interested in the causal effects of these variables, corresponding MSMs should be fitted.

I have included positivity plots for each multiple imputation dataset in the supplementary materials. Across the observed range of most predictors, there are both measurements with and

**Table 4.** Estimated effects of numeric and binary predictors on the implementation of a right-to-carry (RTC) law, summarized across the 25 multiple imputation (MI) datasets.

| Variable and type | Summary over MI datasets | | |
|---|---|---|---|
| *Numeric variable* | Relative risk: effect of 1 SD | | |
| | Min. | Mean | Max. |
| Violent crime rate | 1.24 | 1.31 | 1.41 |
| Property crime rate | 0.64 | 0.69 | 0.75 |
| State share of total GDP (nat. log) | 0.88 | 0.94 | 1.02 |
| Proportion female | 0.87 | 1.24 | 1.62 |
| Proportion white non-hispanic | 0.98 | 1.14 | 1.24 |
| Proportion 0–18 | 0.39 | 0.73 | 1.16 |
| Proportion 19–39 | 0.70 | 0.99 | 1.45 |
| Proportion 40–64 | 0.53 | 1.07 | 2.25 |
| Population density (nat. log) | 0.34 | 0.44 | 0.56 |
| *Binary variable* | Relative risk: effect of 1 unit | | |
| | Min. | Mean | Max. |
| State legislation Republican | 1.11 | 1.21 | 1.34 |
| State governor party Republican | 0.67 | 0.68 | 0.71 |
| State legislation Republican × state governor Republican | 2.57 | 2.85 | 3.12 |

without the implementation of a RTC law. This lends support to the validity of the positivity assumption. In some ranges, often with sparser data, either no measurements *with* or no measurements *without* the implementation of a RTC law are observed. However, these ranges are relatively small, and close to the ranges with both outcomes observed. Since these are continuous variables, a small amount of extrapolation will be performed when computing the weights. The positivity assumption seems to be appropriate, especially in light of the results from the sensitivity analysis (Section 4.4) in which variables are dropped from the analysis.

Descriptive statistics and boxplots for the IPW weights are also presented in the supplementary materials. From these I conclude that the mean is always close to one, and that the variability of the weights is comparable to that of Hernán, Brumback, and Robins (2002).

### 4.4. Sensitivity Analysis Results

Table 5 contains the results of the sensitivity analysis. The *variants 1 through 24* all produce results that are very similar to the main results. These models all support the conclusion that the implementation of a RTC law at the state level increases both violent crime and property crime rates. The effect estimates for total violent crime and total property crime were always statistically significant, at least at the 0.05 level or lower. The effect estimates for total violent crime and total property crime were always in the order of magnitude of an increase of 5%–10% and 3%–7%, respectively. The effect estimates for the other crime rates were also always similar to the main results, for variants 1 through 24.

The sensitivity analysis indicates that the results are not sensitive to dropping any variable or interaction term from the model. By adding the two-way and three-way interactions with time and the political variables, results similar to the main MSMs are obtained. By progressively truncating the weights,

Including the

Page 144

**Table 5.** Sensitivity analysis: estimated effects[1] of right-to-carry (RTC) laws on state crime rates in the USA 1959–2016, change in crime rate (%) for different model variations.

| Model (see Section 3.5) | Violent crime | Murder/manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Larceny theft | Motor vehicle theft |
|---|---|---|---|---|---|---|---|---|---|
| Main MSM results | 7.5% | 5.7% | 0.8% | 10.9% | 6.5% | 6.1% | 7.5% | 5.7% | 6.2% |
| 1) Drop violent crime | 9.9% | 7.5% | 1.6% | 13.0% | 9.2% | 7.0% | 9.0% | 6.4% | 7.1% |
| 2) Drop property crime | 5.5% | 4.8% | −0.7% | 8.7% | 4.5% | 3.8% | 4.8% | 3.4% | 4.1% |
| 3) Drop GDP share | 7.5% | 5.5% | 0.7% | 10.8% | 6.6% | 6.1% | 7.5% | 5.6% | 6.2% |
| 4) Drop female | 7.0% | 6.1% | 0.9% | 9.9% | 6.2% | 5.8% | 7.1% | 5.4% | 5.7% |
| 5) Drop white non-hispanic | 7.7% | 5.1% | 1.0% | 11.1% | 6.7% | 6.4% | 7.9% | 5.9% | 6.4% |
| 6) Drop age | 8.4% | 5.5% | 1.0% | 12.0% | 7.4% | 6.8% | 8.7% | 6.1% | 6.7% |
| 7) Drop population density | 8.3% | 6.9% | 2.6% | 10.1% | 8.1% | 6.8% | 8.6% | 6.4% | 5.5% |
| 8) Drop int. legislature×governor | 5.4% | 5.6% | 0.4% | 8.8% | 4.1% | 5.1% | 6.2% | 4.7% | 5.8% |
| 9) Drop state legislature | 5.8% | 6.6% | 1.8% | 8.2% | 4.8% | 5.6% | 6.5% | 5.1% | 6.7% |
| 10) Drop state governor | 5.4% | 5.6% | 0.3% | 8.7% | 4.0% | 5.1% | 6.1% | 4.6% | 5.8% |
| 11) Drop legislature and governor | 5.8% | 6.6% | 1.8% | 8.1% | 4.7% | 5.5% | 6.5% | 5.0% | 6.7% |
| 12) +interactions with time | 9.0% | 6.7% | 0.6% | 12.5% | 8.2% | 7.0% | 8.7% | 6.5% | 7.3% |
| 13) Weights truncated, 1st/99th% | 6.9% | 4.9% | 2.2% | 8.6% | 6.5% | 6.5% | 8.0% | 6.2% | 5.5% |
| 14) Weights truncated, 2nd/98th% | 6.7% | 4.8% | 2.4% | 8.2% | 6.3% | 6.5% | 7.9% | 6.2% | 5.2% |
| 15) Weights truncated, 5th/95th% | 5.7% | 4.3% | 2.6% | 7.0% | 5.4% | 5.9% | 7.1% | 5.8% | 4.0% |
| 16) df=2 spline in weights model | 5.7% | 4.2% | −1.1% | 9.3% | 4.6% | 4.9% | 6.0% | 4.4% | 5.5% |
| 17) df=4 spline in weights model | 6.9% | 4.7% | 0.5% | 9.8% | 6.0% | 6.0% | 7.2% | 5.6% | 6.2% |
| 18) df=2 spline in MSM | 6.9% | 4.7% | 0.5% | 9.5% | 6.1% | 5.5% | 6.0% | 5.2% | 6.3% |
| 19) df=4 spline in MSM | 7.2% | 5.3% | 0.6% | 10.6% | 6.2% | 6.1% | 7.4% | 5.6% | 6.4% |
| 20) RTC implemented 1996 in PA | 8.1% | 4.5% | 0.7% | 10.9% | 7.5% | 6.4% | 8.2% | 5.8% | 5.9% |
| 21) GEE fixed effects state and year | 6.0% | −1.9% | 2.9% | 11.1% | 3.8% | 5.0% | 5.9% | 4.5% | 7.6% |
| 22) Drop RTC from imputation model | 7.8% | 6.2% | 0.9% | 10.9% | 7.0% | 6.3% | 7.8% | 5.9% | 5.9% |
| 23) df=2 spline in imputation model | 7.8% | 6.0% | 0.9% | 10.9% | 6.9% | 6.1% | 7.6% | 5.7% | 5.9% |
| 24) df=4 spline in imputation model | 7.9% | 6.1% | 1.0% | 11.3% | 7.0% | 6.4% | 7.9% | 5.9% | 6.2% |
| 25) Conditional model | 1.5% | 0.1% | 1.4% | 2.5% | 1.0% | 3.6% | 3.5% | 3.8% | 3.0% |
| 26) Unadjusted model | 1.2% | −0.2% | 1.3% | 2.1% | 0.7% | 3.3% | 3.3% | 3.4% | 2.6% |
| 27) MSM, 1977–2014, 44 states[2] | 2.8% | 5.6% | −1.3% | 7.8% | 0.9% | 2.7% | 2.5% | 2.8% | 2.1% |

[1]Underlined estimates are significant at the 0.05 level or lower.
[2]Similarly to Donohue, Aneja, and Weber (2019).

the results are more and more skewed in the negative direction, indicating less adjustment for confounding. Changing the number of degrees of freedom in the models, or adjusting the RTC implementation year for Pennsylvania from 1989 to 1996 does not change the results in a relevant amount. The alternative GEE models (variants 21) and variants 22 through 24 that examine changes to the imputation model also produce results quite similar to the main MSM results.

The conditional models (*variants 25*) always produce estimates that are much smaller than the main results, and are far less often statistically significant. This confirms the expectation that using the conditional models, while adjusting for confounding, the effect of RTC laws on crime are at least partially adjusted away by conditioning on one or more variables that are intermediate for the effect of RTC laws. Estimates from the unadjusted models (*variants 26*) are even smaller, indicating that it is likely that confounding skews the estimates in the negative direction.

The estimated effects from the MSMs that were fitted on the period 1977–2014, similarly to Donohue, Aneja, and Weber (2019) (*variants 27*), were in the same direction as the main results except forcible rape (−1.3%). The effects were somewhat smaller in magnitude. The effects from variants (27) attained statistical significance for total violent crime, murder/manslaughter, robbery, total property crime and larceny theft. I make a further comparison with the results of Donohue, Aneja, and Weber (2019) in Section 5.4.

None of the model variants in the sensitivity analysis support the conclusion that RTC laws significantly *decrease* any of the crime rates.

## 5. Discussion and Conclusion

### 5.1. Discussion

The results from this study are very robust to variations in model specification, as investigated in Section 4.4. The assumptions made by fitting a MSM using IPW (see Section 2.5) are valid.

I have demonstrated the validity of the *positivity* assumption in Section 4.3. Regarding the assumption of *conditional exchangeability*, I have minimized unmeasured confounding by including a wide range of measured covariates, including crime rates, an economic indicator, demographic and political variables. The addition of new covariates could be tested in follow-up studies, for example, by other researchers that will have access to the data from this study as made available through the supplementary material.

Regarding the assumption of *consistency*, the specified exposure of the implementation of a RTC law at the state level is well-defined. However, it is of interest to estimate the effect of RTC

laws conditional on possible longitudinal effect modifiers such as changes in incarceration rates or law enforcements budgets. To do so is not possible using a MSM, since it would lead to adjusting away the effect. When sufficient data is available, such an analysis could be done as a follow-up study using a so called history-adjusted marginal structural model (Petersen et al. 2007).

When drawing causal conclusions from a standard conditional model, the above described assumptions are also implicitly made. In addition, in the specific longitudinal situation described in this study, it would be necessary to assume that there are no longitudinal covariates included that are also intermediate to the effect of the exposure, as described in Section 2.3.

### 5.2.   Comparison to Lott and Mustard (1997) and Lott (2010)

While being groundbreaking in performing the first in-depth statistical analysis on the effect of RTC laws on crime, both the study by Lott and Mustard (1997) and the update Lott (2010) have some methodological drawbacks. A concern is that they use 36 highly collinear demographic variables, resulting in unstable effect estimates, as noted by Donohue, Aneja, and Weber (2019).

When examining Lott and Mustard (1997) and Lott (2010) using the causal modeling framework of MSMs, I conclude that by using standard regression models, effects can be adjusted away, inducing biased estimates. Also, unlike the present study, crime rates at a previous time point were not used as predictors for the implementation of RTC laws. Other methodological issues include that Lott and Mustard (1997) and Lott (2010) did not properly adjust for zero inflation which certainly occurs at the county level, which is apparent when studying county-level crime data (see e.g., United States Department of Justice/Federal Bureau of Investigation 2014). The period examined was limited in both studies. They did not correct for clustering at the state level, whereas the present study uses random effects of state to do so.

### 5.3.   Comparison to Other Studies

Other previous studies have investigated the effect of RTC laws on crime including Aneja, Donohue, and Zhang (2011), Ayres and Donohue (2002), Bartley and Cohen (1998), Benson and Mast (2001), Black and Nagin (1998), Donohue (2003), Donohue and Ayres (1999), Donohue and Levitt (2001), Duwe, Kovandzic, and Moody (2002), Helland and Tabarrok (2004), Hepburn et al. (2004), Kovandzic and Marvell (2003), Kovandzic, Marvell, and Vieraitis (2005), Ludwig (1998), Moody and Marvell (2008), Olson and Maltz (2001), Plassmann and Tideman (2001), Plassmann and Whitley (2003), Rosengart (2005), and Rubin and Dezhbakhsh (2003).

These studies typically use standard conditional models, so that effects can be adjusted away. Previous studies also have never allowed for the possibility that crime rates at a previous time point could be a confounder for the effect of RTC laws on crime at a subsequent time point.

Many previous studies use a linear regression model with a normal error distribution, which is less appropriate for

crime rates than Poisson models (Plassmann and Tideman 2001). Still, when using a Poisson link function, other studies do not take into account the possibility of under- or overdispersion.

A common problem in these studies is that the assumption of independence of measurements is made, when there is in reality a clustering of measurements taken within the same geographical unit (e.g., state or county). When dependence of measurements within clusters is assumed, a common failure is to not assume an appropriate correlation structure between the longitudinal measurements.

Many studies have corrected for covariates measured at the county level. Since RTC laws are implemented at the state level, not the county level, confounding occurs only at the state level, and it is sufficient to adjust only for state level variables. The use of county level measurements introduces unnecessary complexity and instability, in addition to having to deal with possible zero-inflation.

Many of these studies also suffer from overfit. Given the amount of available data, overly complex models were fit, yielding unstable results. Since there are only 50 states, and measurements within states are highly correlated, with crime rates which are very low proportions, I regard the available dataset as relatively small. Therefore, I was conservative in the amount of nuisance parameters that I used.

I could not find a previous study in which none of the above-mentioned problems was present. In most of the cited studies several of these problems persist. As mentioned in the introduction, the National Research Council (U.S.) (2004) indeed concluded that to reach a robust scientifically supported conclusion, new analytical approaches should be developed. The present study is a response to that call for action, as was also done earlier by Donohue, Aneja, and Weber (2019), as described in the next paragraph.

### 5.4.   Comparison to Donohue, Aneja, and Weber (2019)

The method of constructing state level synthetic controls in Donohue, Aneja, and Weber (2019) is somewhat similar to the G-computation algorithm described in Van der Wal et al. (2009) to fit a MSM, estimating a causal effect with panel data. The present study and Donohue, Aneja, and Weber (2019) both estimate a causal effect while adequately correcting for longitudinal confounders, but using different methods

The specific causal effects that were estimated are different in both studies. The present study estimated a risk ratio between crime rates when all 50 states would *never* have implemented a RTC law versus when all states would have *always* implemented a RTC law, during the complete follow-up. Donohue, Aneja, and Weber (2019) compared crime rates between having a RTC law versus not having a RTC law, after the moment that a RTC law was actually implemented, in the 33 states that did implement a RTC law.

The choice of possible confounders that are adjusted for is also not the same for Donohue, Aneja, and Weber (2019) and the present study. Both studies use a broad selection of possible criminological, economic, political and demographic confounders which would suggest that confounding adjustment is adequate in both studies. Given the limited amount of data, it

is necessary to use parsimonious models. Both approaches are comparable in complexity.

Donohue, Aneja, and Weber (2019) used follow-up from 1977 to 2014, while the present study has a much longer follow-up, which is likely to yield more statistical power. Another difference is that Donohue, Aneja, and Weber (2019) did not incorporate an AR1 autoregressive correlation structure, while the present study does.

Using the synthetic control approach, Donohue, Aneja, and Weber (2019) mainly found a significant effect of RTC law implementation on violent crime rates. This effect was estimated conditional on year after implementation of the RTC law, and ranged from −0.117% after 1 year up to 14.344% after 10 years, averaging 8.45%. The pseudo *p*-values of Donohue, Aneja, and Weber (2019), taking full account of the uncertainty in the estimate, indicate that the effect is significant at the 0.05 level only after 8 years. When fitting a MSM on a similar (but not equal) selection of data in the sensitivity analysis (variant 27 in Section 4.4), I have found a statistically significant effect of RTC laws on violent crime of 2.8. And while Donohue, Aneja, and Weber (2019) found no convincing effect of RTC laws on murder and property crimes, in variant 27 I have found significant increases of 5.6% for murder/manslaughter, 7.8% for robbery, 2.7% for total property crime and 2.8% for larceny theft. These differences can be explained from the many methodological differences described above. Furthermore, from the main MSM encompassing all 50 states, I have found even larger effects of RTC laws on crime, that where always statistically significant except for forcible rape. My main MSM takes into account more fully the development of crime rates over time in the states that have not implemented a RTC law.

In addition to the main synthetic control approach, Donohue, Aneja, and Weber (2019) also fitted standard conditional regression models (referred to as "panel data estimates"), on all states. They found significant effects of 9.02% more violent crime and 6.49% more property crime. Judging from my own sensitivity analysis, these conditional estimates are likely to underestimate the true effect, although the estimates of Donohue, Aneja, and Weber (2019) are substantially larger than those from variant 25 in Section 4.4. Donohue, Aneja, and Weber (2019) also clearly demonstrated the instability that arises by including the 36 demographic variables of Lott and Mustard (1997) and Lott (2010).

Certainly, both from the present study and Donohue, Aneja, and Weber (2019) can be concluded that the implementation of a RTC law at the state level will cause a substantial increase in violent crime.

### 5.5.  Conclusion

This study demonstrates that marginal structural models (MSMs), fitted by inverse probability weighting (IPW), are an appropriate and convenient instrument for policy evaluation in a longitudinal setting, comparing separate entities such as states, cities or countries. This method allows for correction for confounding variables, while avoiding the drawbacks of more standard conditional models such as adjusting away the effect. I have applied this method to this topic for the first time, while addressing methodological shortcomings in previous studies.

The results from the present study support the conclusion of Donohue, Aneja, and Weber (2019) that RTC laws increase violent crime. However, while Donohue, Aneja, and Weber (2019) estimated the effect of implementing a RTC law only in 33 states that did implement such a law using their novel synthetic control approach, the present study estimates the difference in having and not having a RTC law implemented in all 50 U.S. states.

The results indicate that RTC laws cause a substantial increase in both violent crime (7.5%) and property crime rates (6.1%). In the 42 states with a RTC law in effect in 2016, the increase corresponds to approximately 66.000 additional violent crimes and 352.000 additional property crimes per year.

### Supplementary Materials

`rtcdat.rda:` Dataset used in this study. (R datafile)
`rtcdat_metadata.txt:` Metadata for `rtcdat`. (text file)
`rtc_analysis.R:` R code to replicate the main results. (R script)
`rtc_supplementary_material.pdf:` Supplementary material including longitudinal plots of crime rates and predictors as described in Section 3.1, positivity plots as described in Sections 3.1 and 4.3, boxplots and descriptive statistics for the weights as described in Section 4.3. (PDF file)

### ORCID

Willem M. Van Der Wal ⬤ http://orcid.org/0000-0001-9827-690X

### References

Aneja, A., Donohue, J. J., and Zhang, A. (2011), "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," *American Law and Economics Review*, 13, 565–631. [171]

Ayres, I., and Donohue, J. J. (2002), "Shooting Down the More Guns, Less Crime Hypothesis," Technical Report, National Bureau of Economic Research. [171]

Bartley, W. A., and Cohen, M. A. (1998), "The Effect of Concealed Weapons Laws: An Extreme Bound Analysis," *Economic Inquiry*, 36, 258–265. [171]

Benson, B. L., and Mast, B. D. (2001), "Privately Produced General Deterrence," *The Journal of Law and Economics*, 44, 725–746. [171]

Black, D. A., and Nagin, D. S. (1998), "Do Right-to-Carry Laws Deter Violent Crime?" *The Journal of Legal Studies*, 27, 209–219. [171]

Bureau of Economic Analysis, U. D. o. C. (2019), "GDP by State," Available at *https://www.bea.gov/data/gdp/gdp-state*. Accessed November 02, 2019. [166]

Cole, S. R., and Hernán, M. A. (2008), "Constructing Inverse Probability Weights for Marginal Structural Models," *American Journal of Epidemiology*, 168, 656–664. [165,168]

De Boor, C. (2001). *A Practical Guide to Splines*, New York: Springer-Verlag. [166,167]

Donohue, J. J. (2003), "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," *Criminology & Public Policy*, 2, 397–410. [171]

Donohue, J. J., Aneja, A., and Weber, K. D. (2019), "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis," *Journal of Empirical Legal Studies*, 16, 198–247. [163,165,166,168,170,171,172]

Donohue, J. J., and Ayres, I. (1999), *Nondiscretionary Concealed weapons Law: A Case Study of Statistics, Standards of Proof, and Public Policy*, Ph. D. Thesis, Yale Law School. [171]

Donohue, J. J., and Levitt, S. D. (2001), "The Impact of Legalized Abortion on Crime," *The Quarterly Journal of Economics*, 116, 379–420. [171]

Duwe, G., Kovandzic, T., and Moody, C. E. (2002), "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings," *Homicide Studies*, 6, 271–296. [171]

Federal Bureau of Investigation. (2019a), "Crime in the U.S. 2015," Available at: *https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015*. Accessed July 20, 2019. [165]

——— (2019b), "Crime in the U.S. 2016," Available at: *https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016*. Accessed July 20, 2019. [165]

——— (2019c), "Uniform Crime Reporting Statistics: State-by-State and National Crime Estimates by Year(s)," Available at: *https://www.ucrdatatool.gov/Search/Crime/State/StatebyState.cfm*. Accessed October 19, 2019. [165]

Fitzmaurice, G. (2004), "Adjusting for Confounding," *Nutrition*, 20, 594–596. [164]

Greenland, S. (2003), "Quantifying Biases in Causal Models: Classical Confounding vs Collider-Stratification Bias," *Epidemiology*, 14, 300–306. [164]

Greenland, S., and Morgenstern, H. (2001), "Confounding in Health Research," *Annual Review of Public Health*, 22, 189–212. [164]

Greenland, S., Robins, J. M., and Pearl, J. (1999), "Confounding and Collapsibility in Causal Inference," *Statistical Science*, 14, 29–46. [164]

He, H., Tang, W., Wang, W., and Crits-Christoph, P. (2014), "Structural Zeroes and Zero-Inflated Models," *Shanghai Archives of Psychiatry*, 26, 236–242. [168]

Helland, E., and Tabarrok, A. (2004), "Using Placebo Laws to Test "More Guns, Less Crime"," *Advances in Economic Analysis & Policy*, 4, 1–7. [171]

Hepburn, L., Miller, M., Azrael, D., and Hemenway, D. (2004), "The Effect of Nondiscretionary Concealed Weapon Carrying Laws on Homicide," *Journal of Trauma and Acute Care Surgery*, 56, 676–681. [171]

Hernán, M. A. (2004), "A Definition of Causal Effect for Epidemiological Research," *Journal of Epidemiology and Community Health*, 58, 265–271. [163,164]

Hernán, M. A., Brumback, B., and Robins, J. M. (2000), "Marginal Structural Models to Estimate the Causal Effect of Zidovudine on the Survival of HIV-Positive Men," *Epidemiology*, 11, 561–570. [163,164,165]

Hernán, M. A., Brumback, B. A., and Robins, J. M. (2002), "Estimating the Causal Effect of Zidovudine on CD4 Count with a Marginal Structural Model for Repeated Measures," *Statistics in Medicine*, 21, 1689–1709. [167,169]

Hernán, M. A., Hernández-Díaz, S., and Robins, J. M. (2004), "A Structural Approach to Selection Bias," *Epidemiology*, 15, 615–625. [164]

Hernán, M. A., and Robins, J. M. (2006a), "Estimating Causal Effects from Epidemiological Data," *Journal of Epidemiology & Community Health*, 60, 578–586. [163,164,165]

——— (2006b), "Instruments for Causal Inference: An Epidemiologist's Dream?" *Epidemiology*, 17, 360–372. [164]

Höfler, M. (2005), "Causal Inference Based on Counterfactuals," *BMC Medical Research Methodology*, 5, 28. [163]

Klarner, C. (2013), "State Partisan Balance Data, 1937 – 2011," Available at *https://doi.org/10.7910/DVN/LZHMG3*. Accessed September 04, 2019. [166]

Kovandzic, T. V., and Marvell, T. B. (2003), "Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Decontrol?" *Criminology & Public Policy*, 2, 363–396. [171]

Kovandzic, T. V., Marvell, T. B., and Vieraitis, L. M. (2005), "The Impact of "Shall-Issue" Concealed Handgun Laws on Violent Crime Rates Evidence from Panel Data for Large Urban Cities," *Homicide Studies*, 9, 292–323. [171]

Littell, R. C., Pendergast, J., and Natarajan, R. (2000), "Tutorial in Biostatistics: Modelling Covariance Structure in the Analysis of Repeated Measures Data," *Statistics in Medicine*, 19, 1793–1819. [167]

Lott, J., and Mustard, D. (1997), "Crime, Deterrence, and Right-to-Carry Concealed Handguns," *The Journal of Legal Studies*, 26, 1–68. [163,171,172]

Lott, J. R. (2010), *More Guns, Less Crime: Understanding Crime and Gun-Control Laws* (3rd ed.), Chicago: The University of Chicago Press. [163,171,172]

Ludwig, J. (1998). Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data," *International Review of law and Economics*, 18, 239–254. [171]

Moody, C. E., and Marvell, T. B. (2008), "The Debate on Shall-Issue Laws," *Econ Journal Watch*, 5, 269–293. [171]

National Conference of State Legislatures (NCSL). (2019), "State Partisan Composition," Available at *http://www.ncsl.org/research/about-state-legislatures/partisan-composition.aspx*. Accessed July 31, 2019. [165]

National Research Council (U.S.). (2004), *Firearms and Violence: A Critical Review*, Washington, DC: National Academies Press. [163,171]

Olson, D. E., and Maltz, M. D. (2001), "Right-to-Carry Concealed Weapon Laws and Homicide in Large US Counties: The Effect on Weapon Types, Victim Characteristics, and Victim-Offender Relationships," *The Journal of Law and Economics*, 44, 747–770. [171]

Pearl, J. (2009), *Causality: Models, Reasoning and Inference* (2nd ed.), Cambridge, U.K.; New York: Cambridge University Press. [164]

Petersen, M. L., Deeks, S. G., Martin, J. N., and van der Laan, M. J. (2007), "History-adjusted Marginal Structural Models for Estimating Timevarying Effect Modification," *American Journal of Epidemiology*, 166, 985–993. [171]

Petersen, M. L., Porter, K. E., Gruber, S., Wang, Y., and van der Laan, M. J. (2012), "Diagnosing and Responding to Violations in the Positivity Assumption," *Statistical Methods in Medical Research*, 21, 31–54. [165]

Plassmann, F., and Tideman, T. N. (2001), "Does the Right to Carry Concealed Handguns Deter Countable Crimes? Only a Count Analysis Can Say," *The Journal of Law and Economics*, 44, 771–798. [171]

Plassmann, F., and Whitley, J. (2003), "Confirming "More Guns, Less Crime"," *Stanford Law Review*, 55, 1313–1369. [171]

Prentice, R. L., and Gloeckler, L. A. (1978), "Regression Analysis of Grouped Survival Data with Application to Breast Cancer Data," *Biometrics*, 34, 57–67. [167]

R Core Team. (2021), "R: A Language and Environment for Statistical Computing," Available at *https://www.R-project.org/*. [165]

Ranstam, J. (2008), "Adjusting Results for Confounding Bias," *Acta Radiologica*, 49, 769–770. [164]

Robins, J. M. (1997), "Causal Inference from Complex Longitudinal Data," in *Latent Variable Modeling and Applications to Causality*, pp. 69–117, New York: Springer. [164]

——— (1998), "Marginal Structural Models," in *1997 proceedings of the American Statistical Association, Section on Bayesian Statistical Science*, Alexandria, pp. 1–10. American Statistical Association. [164,165]

——— (1999), "Association, Causation, and Marginal Structural Models," *Synthese*, 121, 151–179. [163]

Robins, J. M., Greenland, S., and Hu, F.-C. (1999), "Estimation of the Causal Effect of a Time-Varying Exposure on the Marginal Mean of a Repeated Binary Outcome," *Journal of the American Statistical Association*, 94, 687–700. [164,165]

Robins, J. M., Hernán, M. A., and Brumback, B. (2000), "Marginal Structural Models and Causal Inference in Epidemiology," *Epidemiology*, 11, 550–560. [163,164]

Rosengart, M. (2005), "An Evaluation of State Firearm Regulations and Homicide and Suicide Death Rates," *Injury Prevention*, 11, 77–83. [171]

Rubin, D. B. (1987), *Multiple Imputation for Nonresponse in Surveys*, New York: Wiley. [166]

Rubin, P. H., and Dezhbakhsh, H. (2003), "The Effect of Concealed Handgun Laws on Crime: Beyond the Dummy Variables," *International Review of Law and Economics*, 23, 199–216. [171]

Schafer, J. L., and Yucel, R. M. (2002), "Computational Strategies for Multivariate Linear Mixed-Effects Models With Missing Values," *Journal of Computational and Graphical Statistics*, 11, 437–457. [166]

The University of Minnesota. (2019), "IPUMS NHGIS Data Finder," Available at *https://data2.nhgis.org/*. Accessed October 21, 2019. [166]

United States Department of Justice/Federal Bureau of Investigation. (2014), "Uniform Crime Reporting Program Data: County-Level Detailed Arrest and Offense Data, United States, 2012," Available at *https://doi.org/10.3886/ICPSR35019.v1*. Accessed February 20, 2020. [171]

US Census Bureau. (2016), "State Area Measurements and Internal Point Coordinates," Available at *http://www.census.gov/geo/reference/state-area.html*. Accessed March 14, 2016. [166]

——— (2017a), "Population Estimates Data," Available at *http://www.census.gov/popest/data/state/asrh*. Accessed September 10, 2017. [166]

——— (2017b), "Population Estimates Data," Available at *http://www.census.gov/popest/data/intercensal/state*. Accessed September 10, 2017. [166]

——— (2019a), "American Factfinder," Available at *https://factfinder. census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk*. Accessed October 21, 2019. [166]

——— (2019b), "Population Estimates Data," Available at *https://www2. census.gov/programs-surveys/popest*. Accessed October 21, 2019. [166]

——— (2019c), "State Intercensal Tables: 1970-1979," Available at *https:// www.census.gov/data/tables/time-series/demo/popest/1970s-state.html*. Accessed October 21, 2019. [166]

Van der Wal, W. M., Prins, M., Lumbreras, B., and Geskus, R. B. (2009), "A Simple G-Computation Algorithm to Quantify the Causal Effect of a Secondary Illness on the Progression of a Chronic Disease," *Statistics in Medicine*, 28, 2325–2337. [171]

Vittinghoff, E., and McCulloch, C. E. (2007), "Relaxing the Rule of Ten Events per Variable in Logistic and Cox Regression," *American Journal of Epidemiology*, 165, 710–718. [167]

Whitcomb, B. W., Schisterman, E. F., Perkins, N. J., and Platt, R. W. (2009), "Quantification of Collider-Stratification Bias and the Birth-weight Paradox," *Paediatric and Perinatal Epidemiology*, 23, 394–402. [164]

Wolfinger, R., and O'connell, M. (1993), "Generalized Linear Mixed Models a Pseudo-Likelihood Approach," *Journal of Statistical Computation and Simulation*, 48, 233–243. [166]

Zeileis, A., Kleiber, C., and Jackman, S. (2008), "Regression Models for Count Data in R," *Journal of Statistical Software*, 27, 1–25. [167]



American Journal of Epidemiology
© The Author(s) 2022. Published by Oxford University Press on behalf of the Johns Hopkins Bloomberg School of
Public Health. All rights reserved. For permissions, please e-mail: journals.permissions@oup.com.

Vol. 192, No. 3
https://doi.org/10.1093/aje/kwac160
Advance Access publication:
September 20, 2022

## Original Contribution

# Impact of Changes to Concealed-Carry Weapons Laws on Fatal and Nonfatal Violent Crime, 1980–2019

Mitchell L. Doucette*, Alexander D. McCourt, Cassandra K. Crifasi, and Daniel W. Webster

* Correspondence to Dr. Mitchell L. Doucette, Center for Gun Violence Solutions, Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, 615 N. Wolfe Street, Baltimore, MD 21205 (e-mail: mdoucet3@jhu.edu).

Initially submitted November 19, 2021; accepted for publication September 9, 2022.

The United States faces rapidly rising rates of violent crime committed with firearms. In this study, we sought to estimate the impact of changes to laws that regulate the concealed carrying of weapons (concealed-carry weapons (CCW) laws) on violent crimes committed with a firearm. We used augmented synthetic control models and random-effects meta-analyses to estimate state-specific effects and the average effect of adopting shall-issue CCW permitting laws on rates of 6 violent crimes: homicide with a gun, homicide by other means, aggravated assault with a gun, aggravated assault with a knife, robbery with a gun, and robbery with a knife. The average effects were stratified according to the presence or absence of several shall-issue permit provisions. Adoption of a shall-issue CCW law was associated with a 9.5% increase in rates of assault with a firearm during the first 10 years after law adoption and was associated with an 8.8% increase in rates of homicide by other means. When shall-issue laws allowed violent misdemeanants to acquire CCW permits, the laws were associated with higher rates of gun assaults. It is likely that adoption of shall-issue CCW laws has increased rates of nonfatal violent crime committed with firearms. Harmful effects of shall-issue laws are most clear when provisions intended to reduce risks associated with civilian gun-carrying are absent.

concealed-carry laws; firearms; firearm violence; guns; gun violence; health policy evaluation; synthetic control method; weapons

Abbreviations: ASCM, augmented synthetic control modeling; ASCM+FE, augmented synthetic control modeling with fixed effects; ATT, average treatment effect in the treated; CCW, concealed-carry weapons; CDC, Centers for Disease Control and Prevention; CI, confidence interval; REMA, random-effects meta-analysis; RMSE, root mean square error; SCM, synthetic control modeling; SCM+FE, synthetic control modeling with fixed effects; UCR, Uniform Crime Reporting.

***Editor's note:*** *An invited commentary on this article and the authors' response will appear in an upcoming issue.*

---

Though some states allow the open carrying of firearms, laws that regulate the carrying of concealed firearms have been intensely debated for the last few decades. During the past 40 years, many states have removed restrictions on concealed gun-carrying. In 1980, 21 states did not permit civilians to carry a concealed firearm under any circumstances. In 2021, 21 states did not require any special vetting or licensing of individuals who wished to carry concealed firearms in public, referred to as "permitless" concealed-carry weapons (CCW) laws, and an additional 21 states had

what is known as "shall-issue" CCW permitting laws, which place relatively modest requirements on legal gun owners for carrying their firearms concealed outside of the home. The remaining 8 states and the District of Columbia had "may-issue" CCW laws, which provide law enforcement agencies with considerable discretion over who they issue a license to carry weapons to and often require applicants to prove that they have a "good cause" or special cause for needing to carry a concealed gun. Although these 8 states have maintained may-issue policies, many of these laws are under scrutiny as part of ongoing litigation (1).

The changing landscape of state laws governing concealed gun-carrying over the past 40 years has provided researchers an opportunity to estimate the relationship

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

Exhibit D
Page 150

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

between these laws and public safety. Indeed, no other type of gun law has been studied as frequently with a wide array of methods and findings [2]. Early research on CCW laws by Lott and Mustard [3] suggested that movement from no-issue or may-issue laws to shall-issue laws led to reductions in violent crime. The "more guns, less crime" hypothesis that was foundational to this work posited that if more civilians were legally carrying firearms in public, criminals would be deterred from engaging in crime, as they would not know whether a potential target was armed. The study, however, contained serious flaws previously noted in the literature [4, 5]. Despite these flaws, this hypothesis and perceived deterrent benefits have been used to argue for lowering restrictions on concealed gun-carrying.

Recent research [2, 5–14] estimated the impacts of shall-issue laws on violent crime outcomes, with additional years of data and statistical techniques that addressed problems present in Lott and Mustard's research. Many studies that sought to estimate the association between CCW laws and violent crime have been described and critiqued elsewhere [2]. Findings have been somewhat mixed; however, many of the most recent studies have found evidence that adopting a right-to-carry law is associated with increases in violent crime, including homicides [5–14]. The majority of these studies used panel regression to estimate the impact of right-to-carry laws on violent outcomes as Lott and Mustard did [3], and most addressed weaknesses in the above Lott and Mustard study. Moreover, when studies examined the relationship between CCW laws and violent crime, they used total nonfatal violent crime as the outcome measure rather than disaggregated violent crimes committed with firearms.

Some shall-issue laws have certain restrictions or requirements for obtaining a license to carry a concealed firearm, and these provisions have not been examined in prior studies. These provisions are likely to influence the number of licenses issued, how well individuals with histories of violence are screened out, and the ability of the person applying for a license to carry to safely handle a firearm. In this study, we estimated the association between violent crime and moving from a may- or no-issue CCW law to a shall-issue CCW law within strata defined by whether: 1) violent misdemeanants are ineligible to receive a license to carry; 2) officials can deny applicants based on a history of dangerous behavior; 3) the law has a "suitability" clause that allows officials to deny a license to someone deemed to be of questionable character; and 4) the law requires firearm safety training that includes applicants' engaging in some form of live-fire training. The first 3 restrictive provisions could reduce the number of individuals at elevated risk for committing acts of violence who can legally carry concealed firearms, and the fourth could potentially prevent individuals who are insufficient at handling a firearm safely from carrying a gun and reduce the overall number of people licensed to carry, because the safety tests require time and money [15].

The current study examined relationships between the adoption of shall-issue laws and rates of disaggregated nonfatal and fatal violent crime committed with a firearm and other means. Further, we sought to understand whether the impact of shall-issue law adoption varies based on the presence or absence of provisions intended to limit risks associated with civilian gun-carrying. We hypothesized that moving to a shall-issue CCW law from a may-issue/no-issue CCW law increased rates of fatal and nonfatal violent crime at the individual state level and in the aggregate. Further, we hypothesized that CCW permit provisions designed to restrict CCW permits from being issued to risky gun possessors would attenuate violence-producing effects of shall-issue laws.

## METHODS

We used a quasi-experimental design to estimate the association between shall-issue law adoption and annual state-level counts of fatal and nonfatal violent crimes. We estimated the average treatment effect in the treated (ATT) for fatal and nonfatal violent crimes related to the changes in CCW laws using a comparative time-series analysis. We identified the average effect of laws weighting state-specific effects based on the inverse of the standard error using random-effects meta-analysis (REMA).

### Variables and data sources

This study examined 6 separate outcomes: rates of 1) aggravated assault committed with a gun, 2) robbery committed with a gun, 3) homicide committed with a gun, 4) aggravated assault committed with a knife, 5) robbery committed with a knife, and 6) homicide committed by other means, excluding firearms (nongun homicides). Counts of aggravated assaults and robberies committed with a gun or a knife were ascertained from the Federal Bureau of Investigation's Uniform Crime Reporting (UCR) Program ("Offenses Known and Clearances by Arrest" files) [16]. Counts of gun and nongun homicides were obtained from the Centers for Disease Control and Prevention's (CDC) National Center for Health Statistics. We defined firearm homicide using *International Classification of Diseases, Tenth Revision*, codes X93, X94, X95, and *U01.4. Nonfirearm homicides (or homicides by all other means not involving a firearm) were defined using *International Classification of Diseases, Tenth Revision*, codes X85–X92, Y87.1, *U01.(0–.3, .5–.9), and *U02. We accessed the yearly compressed mortality files via data request to the CDC. We aggregated outcomes to the state level and indexed them by year. We obtained population counts by state from the CDC's Web-based Injury Statistics Query and Reporting System (WISQARS) to generate violent crime rates per 100,000 population.

The following covariates were included in each of the statistical models: percentage of the population living in a Metropolitan Statistical Area, percentage of black males aged 15–19 years, percentage of White males aged 15–19 years, percentage of the population living in poverty, and percent unemployed, as well as personal income, rate of ethanol consumption, rate of incarceration, and law enforcement employment per capita (number of law enforcement employees per 100,000 population indexed at the state-year level). Rates of incarceration and police employment were

Exhibit D
Page 151

**344** Doucette et al.

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

extrapolated for 2019. Covariate data were acquired from the US Census Bureau, the Bureau of Labor Statistics, the Bureau of Justice Statistics, the UCR Program, and the National Institute on Alcohol Abuse and Alcoholism. These covariates were chosen on the basis of their demonstrated relationship with violent crime, as described in the literature, and theory: Sociodemographic variables capture factors, including racism and concentrated disadvantage, that affect the distribution of violence; other variables reflect the distribution of policing and incarceration, which affects crime and crime reporting; and alcohol consumption was included to account for the close relationship between alcohol use and violence (7, 17–22).

State laws were identified through searches of each state's legal code. We determined effective dates (dates the law went into effect) through review of each statute's legislative history. We compared our findings with public databases of state gun laws and prior research on concealed-carry laws (5, 23, 24). During our study period, 36 states adopted a shall-issue CCW law as a change from a may-issue/no-issue CCW law. Our analysis focused on evaluating transitions from no-issue or may-issue laws to shall-issue laws and changes in key provisions relevant to reducing risk associated with civilian gun-carrying. The following permit provisions were identified: a live-fire training requirement, discretion to deny whenever an applicant was deemed "unsuitable" (e.g., immoral, unstable), discretion to deny if an applicant had a history of dangerousness, and prohibition based on prior violent misdemeanor convictions. Table 1 provides effective dates for the adoption or repeal of each type of law and permit provision. Within our analysis, we analyzed the presence and absence of each shall-issue law provision separately and analyzed the impact of having no permit provisions and at least 1, 2, or 3 permit provisions.

**Analysis**

We used a data-driven approach to examine the ATT of adopting a shall-issue CCW law. We compared the performance of 4 model specifications related to the synthetic control method, including synthetic control modeling (SCM), SCM with fixed effects (SCM+FE), augmented synthetic control modeling (ASCM), and ASCM with fixed effects (ASCM+FE). The ASCM method is an extension of the synthetic control method developed by Abadie and Gardeazabal (25). The SCM creates a "synthetic state" for the outcome of interest in the state, with the policy change based on a set of weights among a donor pool of comparison states that were "at risk" of the policy change. Weights are calculated using lagged outcomes and covariate values from the donor states and seek to minimize the error in predicting the observed values of the outcome variable in the treated state during the period prior to the policy change (25–27). The SCM approach then uses those weights to forecast into the post–policy-change period for the synthetic treatment state, allowing a counterfactual comparison (25–28). Specifying fixed effects demeans the lagged outcomes in the pretreatment period prior to the creation of the weighted synthetic control model.

The ASCM method is like the SCM method in that it creates a weighted synthetic state. The synthetic control state is then augmented using a linear regression model, regressing the synthetic state on the treated state. The linear regression model's coefficients are estimated using a ridge estimator, rather than ordinary least squares, introducing the L2-norm penalty term. The use of the ridge estimator can produce more precise standard errors around the true effect value when data suffer from multicollinearity. The L2-norm is fine-tuned using the constant $\lambda$, which is selected using leave-one-out cross-validation. This technique works to minimize overfitting of the counterfactual in the pretreatment period. The ridge estimator introduces potentiality for negatively weighted donor states and improves the originally estimated synthetic donor pretreatment fit. ASCM has recently been used to examine opioid use (29), firearm violence (30), and air pollution (31). The ASCM method is notably useful when the pool of potential donor states is small.

As part of our model evaluation, we considered the root mean square error (RMSE) during the pretreatment period as well as the RMSE in the 3 years to implementation. These measures, and their relative distance from each other, provide an estimation of overall synthetic control model performance, as well as an estimation of how much the synthetic control model diverges from the treatment trend immediately prior to treatment. Synthetic controls with high RMSE divergence in the years prior to implementation may provide biased estimates of the ATT. The ATT is calculated as the average difference between the treated state and the augmented synthetic control state during the postimplementation period. We specified jackknife standard errors for inference (32, 33). We used the R package "augsynth" (34). For all models, the donor pool consisted of the 8 may-issue states with unchanged CCW laws during the study period (California, Connecticut, Delaware, Hawaii, Massachusetts, Maryland, New Jersey, and New York) (Table 1). We did not include late-adopting shall-issue states in our donor pool.

Prior research suggests that the impact of CCW law changes peaks at around 10 years (35). Forecasting counterfactuals for long periods increases risks of confounding factors' biasing estimates of policy impacts. Therefore, each model is restricted to 10 years post–law change. To ensure that the most relevant and recent trends were used to construct the policy counterfactuals, pretreatment training years were restricted to the 10 years prior to law change. Alaska removed its permit provision for carrying a concealed weapon less than 10 years after adopting a shall-issue CCW permitting system. We ended its posttreatment period in the year before the permitless CCW system was enacted. We include model specification data (SCM, SCM+FE, ASCM, and ASCM+FE) for all models, including donor pool weights, covariate balance, and, for ASCM and ASCM+FE, lambda cross-validation.

A priori, we excluded Kansas and Missouri, as well as Florida's nonfatal outcomes, from our analysis due to issues with data reporting and possible confounding. Examination of Florida's participation in the UCR reporting system showed that approximately 95% of law enforcement agencies in the state reported data in the year prior to shall-issue

**Table 1.**   Legal Landscape Regarding Concealed-Carry Weapons Laws in the United States, 1980–2019[a]

| State | Overall CCW Permitting Law | | | Specific Permitting Requirements | | | |
|---|---|---|---|---|---|---|---|
| | May-Issue Permit | Shall-Issue Permit[b] | Permitless Carry | Live Fire | Dangerousness | Suitability | Any Violent Misdemeanor Prohibition for CCW Permit |
| Alabama | | 2013[c] | | | 2013 | Pre-1980–2013 | Pre-1980 |
| Alaska | | 1994 | 2003 | 1994–2003 | | | 1994–2003 |
| Arizona | | 1994 | 2010 | | | | |
| Arkansas | | 1994[c] | | | 1995–2021 | | |
| California | Pre-1980 | | | | | Pre-1980 | 1991 |
| Colorado | | 2003[c] | | | 2003 | | |
| Connecticut | Pre-1980 | | | | | Pre-1980 | 1994 |
| Delaware | Pre-1980 | | | 1998 | | Pre-1980 | |
| Florida | | 1987 | | 2016 | | Pre-1980–1987 | 1987 |
| Georgia | | 1989[c] | | | | Pre-1980 | 1983 |
| Hawaii | Pre-1980 | | | 1995[d] | | Pre-1980 | 1981 |
| Idaho | | 1990 | 2016[e] | | | | 1990–2016 |
| Illinois | | 2014[c] | | 2014 | 2014 | | 1996 |
| Indiana | | Pre-1980[c] | | | | Pre-1980 | |
| Iowa | | 2011[c] | | | 2011 | | Pre-1980 |
| Kansas | | 2007 | 2015[e] | 2007–2015 | 2007–2015 | | |
| Kentucky | | 1996 | 2019[e] | 1996–2019 | 1997 | | |
| Louisiana | | 1996 | | | 1996 | | 1996 |
| Maine | | 1981 | 2015[e] | | | 1981–2015 | |
| Maryland | Pre-1980 | | | 2013 | | | 1996 |
| Massachusetts | Pre-1980 | | | | Pre-1980 | Pre-1980 | |
| Michigan | | 2001 | | 2001 | | Pre-1980–2001 | 2001 |
| Minnesota | | 2003[c] | | 2003 | 2003 | | 2003 |
| Mississippi | | 1991 | 2016[e] | | | | |
| Missouri | | 2004[c] | 2017[e] | 2004–2017 | 2004–2007 | | 2004–2017 |
| Montana | | 1991[c] | | | 1991 | Pre-1980 | 1991 |
| Nebraska | | 2007 | | 2007 | | | 2007 |
| Nevada | | 1995 | | | | | 1995 |
| New Hampshire | | Pre-1980[c] | 2017[f] | | | Pre-1980–2017 | |
| New Jersey | Pre-1980 | | | | | Pre-1980 | |
| New Mexico | | 2004 | | 2004 | | Pre-1980 | 2004 |
| New York | Pre-1980 | | | | | | Pre-1980 |
| North Carolina | | 1995 | | 1995 | | | 1995 |
| North Dakota | | 1985 | 2017[d] | 1985–2017 | 2013–2017 | | 1985 |
| Ohio | | 2004 | | 2004 | | | 2004 |
| Oklahoma | | 1995 | 2019[e] | 1995–2019 | | | 1995–2019 |
| Oregon | | 1990[c] | | | 1990 | Pre-1980–1990 | 1991 |
| Pennsylvania | | 1989[c] | | | 1989 | Pre-1980 | 1995 |
| Rhode Island | Pre-1980[c] | | | Pre-1980 | | Pre-1980 | |
| South Carolina | | 1996 | | Pre-1980 | | | |
| South Dakota | | 1985 | 2019[e] | | 1985–2019 | Pre-1980 | |

**Table continues**

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

*Am J Epidemiol.* 2023;192(3):342–355

Exhibit D
Page 153

**Table 1.**   Continued

| State | Overall CCW Permitting Law | | | Specific Permitting Requirements | | | |
|---|---|---|---|---|---|---|---|
| | May-Issue Permit | Shall-Issue Permit[b] | Permitless Carry | Live Fire | Dangerousness | Suitability | Any Violent Misdemeanor Prohibition for CCW Permit |
| Tennessee | | 1996 | | 1989 | | | |
| Texas | | 1996 | | 1996 | | | 1996 |
| Utah | | 1995[c] | | | 1995–2010 | Pre-1980–2010 | 1986 |
| Vermont | | | Pre-1980 | | | | |
| Virginia | | 1995[c] | | | 1995 | Pre-1980–1995 | 1995 |
| Washington | | Pre-1980 | | | | | |
| West Virginia | | 1989–May 24, 2016 | 2016[e] | | | Pre-1980–1989 | 2013–2016 |
| Wisconsin | | 2011 | | | | | |
| Wyoming | | 1994[c] | 2011 | | 1994–2011 | 1983–1994 | |

Abbreviation: CCW, concealed-carry weapons.

[a] A dash between years indicates that the law or provision was repealed.

[b] Alaska, Arizona, Arkansas, Illinois, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Tennessee, Texas, Wisconsin, and Wyoming were all considered no-issue CCW states prior to adopting a shall-issue CCW permitting system.

[c] Some limited discretion was afforded to the issuing agency.

[d] Hawaii requires live-fire training for a license to possess a gun, which is a prerequisite for carrying a concealed weapon.

[e] Adoption of the law occurred in the second half of the year during the study period.

[f] Adoption of the law occurred in the first half of the year during the study period.

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

adoption, 0% of law enforcement agencies reported data in 1988 (the first full year of shall-issue implementation), and 63% of law enforcement agencies reported data in the subsequent 5 years (36). Because the reduction in reporting agency would probably manifest as reductions in reported crime, we elected to remove Florida from our analysis. Kansas passed a stand-your-ground law 1 year prior to adopting a shall-issue CCW law, and Missouri repealed its permit-to-purchase law within 3 years of adopting a shall-issue CCW law, both of which are associated with increases in firearm homicides and thus may present biased estimates of effect related to shall-issue law adoption (37–41). Web Table 1 provides law adoption dates for stand-your-ground and permit-to-purchase laws.

To examine the average effect related to adopting a shall-issue CCW law across states, and to understand whether different shall-issue permit provisions affect the relationship between shall-issue laws and violent crime, we calculated an inverse standard error weighted average using a REMA. We specified a random-effects model to account for difference in implementation and context relevant to gun violence across states and time. Random-effects models assume that there is a distribution of true effect sizes, and the weighted average represents the mean of the population of true effects. For each outcome, we conducted stratified REMA according to the presence of a given CCW permitting provision. We calculated measures of $I^2$ and $T^2$ to understand heterogeneity of effects. REMAs have been used previously to understand the

average impact of law changes related to firearm violence (6, 42). We used the R package "meta" for this analysis (43).

## RESULTS

Figure 1 displays trendlines of fatal and nonfatal outcomes from 1980 to 2019. We provide trend lines for may-issue laws, shall-issue laws, and the national average. For Figure 1, CCW laws are categorized on the basis of whether states are never adopters or adopters. This implies that a late-adopting shall-issue CCW law state is included in the "shall-issue" trendline throughout the duration.

Examination of RMSE performance across model specifications indicated that ASCM+FE provided both the best and most consistent RMSE in the pretreatment period (Figure 2). Figure 2 shows the overall RMSE and the prior-3-years RMSE for all shall-issue–adopting states across all 6 outcomes. Note that, on average, the ASCM+FE models provide the lowest RMSE across model selections and that the gap between the overall RMSE and prior-3-years RMSE is smallest. In addition to RMSE performance, ASCM+FE provided the best covariate balance, on average, comparing treatment and synthetic control models (Web Figures 1–9). Donor pool weights are also provided in Web Figures 10–43. Web Figures 44–77 provide lambda cross-validation for ASCM and ASCM+FE.

Exhibit D
Page 154



**Figure 1.** Trends in fatal (A) and nonfatal (B) violent crime rates per 100,000 population according to type of concealed-carry weapons (CCW) law, United States, 1980–2019.

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

Figure 3 shows a gap plot for the state of Alabama. In the figure, columns represent the 4 model specifications and rows represent the 6 violent crime outcomes. In this image, we see a visual representation of the RMSE for the full prelaw period and the RMSE for the 3 years prior to shall-issue law adoption, as well as the ATT and the standard error. Examining the model specifications for gun homicide rates (row 1), we see that the difference between observed rates and the synthetic control models prior to the shall-issue law was closest to 0 for the 2 models with fixed effects in the pretreatment period. This can also be seen in Figure 2; examining gun homicide in Alabama, we note that the values for ASCM+FE and SCM+FE are clustered together, with the other RMSE values further away from 0. We also see that there is large uncertainty in the non–fixed-effects models (Figure 3). Web Figure 78 shows that the standard errors are much larger for the ASCM and SCM models than for

the ASCM+FE and SCM+FE models for gun homicides in Alabama (Web Figures 79–83 show the ATTs and standard errors according to model specifications for the other violent crime outcomes). Gap plots for every treatment state are provided in Web Figures 84–116.

Violent crime, in general, trended upwards during the 10 years after shall-issue law implementation. Table 2 shows the ATTs and standard errors for our violent crime outcomes with an ASCM+FE model specification. Rates of gun and nongun homicide were largely greater in the postimplementation period. Rates of gun assaults were largely increasing, while rates of knife assaults decreased. Rates of gun robbery and knife robbery did not show discernable trends.

Results of the REMA indicated that adopting a shall-issue law was associated with an additional 5.31 gun assaults per 100,000 population (95% confidence interval (CI): 1.19, 9.43) (Figure 4). This translates to a 9.5% increase in rates

**348** Doucette et al.



Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

**Figure 2.** Root mean square errors (RMSEs) from 4 models of the relationship between concealed-carry weapons (CCW) laws and crime rates per 100,000 population for 6 violent crime outcomes, United States, 1980–2019. A) Homicide with a gun; B) homicide by other means; C) assault with a gun; D) robbery with a gun; E) assault with a knife; F) robbery with a knife. Circular points represent the overall RMSE, whereas triangular points represent the RMSE for the 3 years prior to law adoption. Red represents values from augmented synthetic control modeling (ASCM), green represents values from augmented synthetic control modeling with fixed effects (ASCM+FE), teal represents values from synthetic control modeling (SCM), and purple represents values from synthetic control modeling with fixed effects (SCM+FE). AK, Alaska; AL, Alabama; AR, Arkansas; AZ, Arizona; CO, Colorado; FL, Florida; GA, Georgia; IA, Iowa; ID, Idaho; IL, Illinois; KY, Kentucky; LA, Louisiana; MI, Michigan; MN, Minnesota; MS, Mississippi; MT, Montana; NC, North Carolina; ND, North Dakota; NE, Nebraska; NM, New Mexico; NV, Nevada; OH, Ohio; OK, Oklahoma; OR, Oregon; PA, Pennsylvania; SC, South Carolina; SD, South Dakota; TN, Tennessee; TX, Texas; UT, Utah; VA, Virginia; WI, Wisconsin; WV, West Virginia; WY, Wyoming.



**Figure 3 Continues**

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

of gun assaults above forecasted counterfactuals. Shall-issue law adoption was associated with an additional 0.19 nongun homicides per 100,000 population (95% CI: 0.07, 0.31), an 8.8% increase. The adoption of shall-issue laws was associated with non–statistically significant increases in rates of all other violent crimes. Heterogeneity of effect across states was moderate to high for all outcomes except assaults and robberies with a knife (Web Figure 117).

Differential associations related to the presence or absence of shall-issue CCW-law permitting provisions existed by and large for gun assaults and nongun homicides (Web Figures 118–123). For gun assaults, states with violent misdemeanor prohibition provisions saw a nonsignificant increase of 2.81 crimes per 100,000 population (95% CI: −1.51, 7.13). When states allowed violent misdemeanants to obtain CCW permits, shall-issue laws were associated

Exhibit D
Page 157

**350** Doucette et al.



**Figure 3.** Gap plots comparing treated and synthetic control model outcomes for the relationship between concealed-carry weapons laws and rates of 6 violent crimes, Alabama, 1980–2019. The 4 columns of data represent crime rates per 100,000 population for augmented synthetic control modeling (ASCM) (red), augmented synthetic control modeling with fixed effects (ASCM+FE) (green), synthetic control modeling (SCM) (teal), and synthetic control modeling with fixed effects (SCM+FE) (purple), respectively. Plots A–D, homicide with a gun; plots E–H, homicide by other means; plots I–L, assault with a gun; plots M–P, assault with a knife; plots Q–T, robbery with a gun; plots U–X, robbery with a knife.

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

with a significant increase of 12.7 gun assaults per 100,000 population (95% CI: 0.97, 24.42). Shall-issue states with live-fire training requirements and suitability provisions displayed nonsignificant relationships with gun assaults, while states without such provisions displayed significantly greater rates. The same differential relationships existed for nongun homicides.

Web Figures 118–123 also present differences in estimates of shall-issue law effects based on the number of provisions intended to reduce risks. States that adopted shall-issue CCW laws without any provisions saw 10.26 (95% CI: 2.87, 17.65) additional gun assaults and 1.44 (95% CI: 0.44, 2.45) additional gun homicides per 100,000 population—21.6% and 29.8% increases in rates above those expected, respectively. Differential associations also existed for shall-issue CCW law states with at least 2 and at least 3 permitting provisions for rates of gun assault and nongun homicide. For both outcomes, shall-issue states with at least 2 or at least 3 provisions displayed nonsignificant relationships, whereas states without at least 2 or without at least 3 provisions displayed significant increases in association.

## DISCUSSION

There have been dramatic changes in state laws governing civilian carrying of concealed firearms from the 1980s to

2021, resulting in large-scale deregulation. Consistent with many recent studies (5–8, 14), we found that states that moved from a may-issue CCW law to a less restrictive shall-issue CCW law experienced increased rates of violent crime. Specifically, shall-issue law adoption was associated with a 9.5% increase in rates of aggravated gun assault. Shall-issue laws were also associated with an 8.8% increase in nongun homicides.

Evidence of violence-generating effects of moving from may-issue laws to shall-issue laws was most evident when states allowed individuals with prior convictions for a violent misdemeanor crime to obtain CCW permits. Under these conditions, shall-issue laws were associated with significant increases in gun assault rates. Shall-issue laws that prohibited violent misdemeanants from obtaining CCW permits were not associated with changes in gun-related violent crime. Violent misdemeanants who are allowed to purchase handguns legally subsequently commit violent and firearm-related crimes at 7 times the rate at which handgun purchasers without such convictions commit these crimes after purchasing a handgun (43). Laws that prohibit violent misdemeanants from acquiring firearms are associated with lower rates of violent and firearm-related crime (44). State-level studies have also found firearm prohibitions for violent misdemeanants to be associated with reduced rates of intimate partner homicides (45), total homicides (12), and firearm injuries treated in hospitals (46).

Exhibit D
Page 158

**Table 2.** Average Treatment Effect in the Treated[a] (and Standard Error[b]) for the Association Between Adoption of a Shall-Issue Concealed-Carry Weapons Law and Violent Crime Outcomes, United States, 1980–2019

| State | Homicide Committed With a Gun | Homicide Committed by Other Means | Assault Committed With a Gun | Assault Committed With a Knife | Robbery Committed With a Gun | Robbery Committed With a Knife |
|---|---|---|---|---|---|---|
| Alabama | 1.62 (0.43)[c] | −0.21 (0.18) | 16.56 (7.87)[c] | −19.26 (27.70) | 13.10 (12.49) | −2.19 (3.20) |
| Alaska | −0.20 (0.50) | 1.22 (0.64) | 8.12 (21.48) | 0.96 (17.30) | −8.95 (25.38) | −0.06 (6.09) |
| Arkansas | 0.34 (1.11) | 0.82 (0.74) | 23.90 (23.17) | −3.00 (19.03) | 17.06 (38.14) | 8.73 (12.99) |
| Arizona | 2.44 (0.60)[c] | 0.83 (0.22)[c] | −1.60 (17.75) | −8.91 (7.06) | 1.69 (22.59) | 6.73 (6.46) |
| Colorado | −0.98 (0.61) | 0.04 (0.14) | 15.32 (9.30) | −0.10 (6.03) | −2.64 (9.04) | −2.78 (3.37) |
| Florida | −3.10 (0.39)[c] | −0.41 (0.27) |  |  |  |  |
| Georgia | −0.96 (0.82) | −0.43 (0.19)[c] | 4.52 (8.42) | −6.32 (12.12) | 7.54 (13.17) | −2.25 (1.97) |
| Iowa | 0.42 (0.19)[c] | 0.19 (0.11) | 8.34 (0.49)[c] | 0.57 (14.68) | 7.21 (9.14) | 1.19 (1.39) |
| Idaho | 0.33 (0.41) | 0.50 (0.26) | −1.78 (17.02) | −0.61 (23.38) | −19.36 (25.68) | 3.06 (3.79) |
| Illinois | 1.50 (0.20)[c] | −0.06 (0.06) | −3.28 (5.68) | 0.87 (8.89) | 5.59 (8.66) | −0.76 (2.37) |
| Kentucky | −0.06 (0.89) | 1.05 (0.39)[c] | 4.25 (16.34) | −16.15 (24.01) | 7.96 (23.12) | 2.72 (6.26) |
| Louisiana | 0.61 (2.43) | 0.52 (0.32) | 6.30 (15.04) | 25.17 (35.77) | 12.40 (31.22) | 4.26 (13.92) |
| Michigan | −0.70 (0.86) | −0.31 (0.12)[c] | 2.80 (9.70) | −2.53 (8.63) | 1.76 (9.19) | −2.02 (3.68) |
| Minnesota | −0.42 (0.74) | −0.11 (0.21) | −0.38 (11.05) | −11.56 (14.29) | −0.13 (10.55) | −2.79 (3.48) |
| Mississippi | 1.39 (0.67)[c] | 1.22 (0.38)[c] | 4.16 (18.99) | −13.64 (20.14) | 13.02 (25.71) | 13.02 (7.09) |
| Montana | −0.10 (0.30) | 0.85 (0.46) | −17.70 (14.99) | −15.49 (18.74) | −18.32 (21.53) | 2.33 (4.03) |
| North Carolina | −0.15 (1.06) | 0.06 (0.37) | 22.15 (23.64) | −17.61 (18.80) | 23.88 (28.56) | 0.43 (10.52) |
| North Dakota | −0.01 (0.40) | 0.03 (0.14) | −2.33 (7.20) | −8.96 (12.43) | 9.48 (13.27) | 0.62 (7.14) |
| Nebraska | 0.12 (0.43) | 0.11 (0.08) | 4.28 (9.34) | −1.33 (9.73) | −2.42 (1.59) | −0.75 (0.35)[c] |
| New Mexico | −0.42 (1.21) | −0.22 (0.18) | −10.38 (4.16)[c] | −9.08 (11.47) | −10.29 (3.68) | −1.53 (1.64) |
| Nevada | 1.56 (1.07) | 0.18 (0.24) | 8.90 (36.74)[c] | 16.29 (9.21) | −3.43 (29.01) | −6.71 (8.84) |
| Ohio | 0.41 (0.76) | 0.41 (0.21) | 8.66 (2.72)[c] | 0.31 (5.56) | 11.60 (4.02)[c] | 0.38 (1.64) |
| Oklahoma | −0.33 (0.48) | 0.40 (0.29) | 11.71 (19.50) | 7.44 (10.96) | −14.47 (31.71) | 4.43 (7.28) |
| Oregon | −0.01 (0.35) | 0.19 (0.29) | −6.34 (6.24) | −5.84 (13.68) | −31.58 (21.38) | −5.35 (5.67) |
| Pennsylvania | 1.65 (0.96) | 0.33 (0.13)[c] | 20.68 (17.02) | 8.89 (6.27) | 36.67 (10.82) | 5.76 (2.73) |
| South Carolina | 0.78 (0.70) | 0.30 (0.27) | 8.51 (24.75) | −27.58 (38.45) | 9.61 (44.87) | −3.14 (11.67) |
| South Dakota | −0.46 (0.50) | −0.63 (1.02) | 9.31 (9.85) | 1.89 (8.92) | 7.68 (15.75) | −1.38 (8.55) |
| Tennessee | 0.58 (0.70) | 0.33 (0.37) | 73.39 (14.34) | 43.02 (11.91) | 13.39 (20.98) | 5.47 (4.11) |
| Texas | −0.40 (2.98) | 0.19 (0.10) | 10.17 (16.21) | −0.99 (12.94) | −3.00 (48.64) | 11.46 (8.45) |
| Utah | 0.24 (0.60) | 0.54 (0.26) | 7.97 (16.37) | 10.21 (11.87) | 6.83 (14.21) | 6.83 (4.33) |
| Virginia | −0.55 (1.23) | 0.46 (0.17)[c] | −2.32 (27.95) | −11.18 (14.35) | −5.66 (39.48) | −0.70 (7.23) |
| Wisconsin | 0.83 (0.23)[c] | −0.01 (0.08) | 13.63 (4.31)[c] | 17.40 (13.58) | 7.97 (9.85) | 1.65 (1.19) |
| West Virginia | −0.48 (1.21) | 0.96 (0.40)[c] | −1.88 (9.76) | 2.12 (14.57) | −4.78 (24.88) | 8.12 (3.73) |
| Wyoming | 0.02 (0.47) | 1.22 (0.29)[c] | −22.50 (21.93) | −16.65 (17.07) | −28.23 (36.88) | −1.40 (12.16) |

[a] The augmented synthetic control method with fixed effects was used for model specifications. Each model also included jackknife standard errors for inference.

[b] All standard errors were calculated using the jackknife method. Web material shows the pretreatment covariate balance (Web Figures 1–9), donor pool contribution (Web Figures 10–43), and gap plots (Web Figures 84–116) for each of these synthetic control models.

[c] The 95% confidence interval did not include 0.

Assaults are the most common type of violent crime. Increasing gun-carrying could increase the frequency with which individuals use firearms inappropriately in response to interpersonal conflicts, provocations, or situations that they want to control by threat of deadly force. Berkowitz and Lepage (47) found evidence of a "weapon effect" (48)

linking the presence of a firearm with increased aggressive thoughts, perceptions of situations as hostile or dangerous, and aggressive behavior. Most legal gun owners may be law-abiding and not prone to violence; however, a small percentage may be at heightened risk of committing violent acts. For example, between 2001 and 2003, the National Comorbidity

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

Exhibit D
Page 159



**Figure 4.** Impact of adoption of shall-issue concealed-carry weapons laws on violent crime outcomes in a random-effects meta-analysis, United States, 1980–2019. Bars show 95% confidence intervals (CIs). The average treatment effect in the treated (ATT) represents the change in the number of crimes per 100,000 population.

Survey Replication collected extensive data on a nationally representative sample of adults. Swanson et al. (49) found that nearly 1 in 20 men surveyed reported carrying a gun outside the home and impulsive, angry behavior patterns.

As cultural norms regarding civilian gun-carrying shift after shall-issue law adoption toward more individuals' being armed with a concealed firearm, more hostile altercations are likely to involve firearms, such as an argument over a parking space (50, 51). There is also evidence that drivers drive more aggressively when there is a gun in the vehicle (52, 53), and one news report noted an uptick in road rage incidents involving fatal shootings in recent years (54). In a systematic review, Braga et al. (55) synthesized existing literature on the instrumentality of firearms. They found that the presence of firearms likely made otherwise nonfatal altercations result in a fatality (55). Further, recent evidence from Donohue et al. (56) found that adopting a right-to-carry law was associated with a 35% increase in firearm theft—meaning that adoption of these laws may introduce thousands of guns into illegal gun markets and/or the hands of criminals. Given this lethality, increased exposure to firearms outside the home in response to legal and cultural changes supporting more gun-carrying appears to increase the likelihood of violence involving firearms.

Opponents of firearm regulations often argue that legal gun owners prevent violent crime, especially if they are allowed to carry concealed guns in public. However, many states have relatively low standards for legal gun possession. In those states, the greatest numbers of persons incarcerated for firearm-related violent crimes were persons who legally possessed a gun before using that gun to commit the crime leading to their incarceration (57).

Shall-issue laws were associated with increases in nongun homicides, but we did not find a significant link between these laws and rates of knife assaults and knife robberies. Many nongun homicides are due to domestic violence involving family members or intimate partners and usually occur in the home. The association between shall-issue laws and these crimes is most likely due to confounding with conditions more specific to domestic homicide than to factors influencing violence outside the home, given the

null findings and point estimates near 0 in the aggregate models for assaults and robberies committed with knives. The strongest and most consistent association for shall-issue laws was an increase in aggravated gun assaults.

Stratifying our REMA analysis by the absence or presence of shall-issue permitting provisions produced differential results. For aggravated gun assaults and nongun homicides, states with shall-issue laws that required the permittee to undergo live-fire training, allowed law enforcement officers limited discretion regarding a permittee's suitability to carry a concealed weapon, and/or prohibited violent misdemeanants from obtaining a permit did not experience increased rates of violent crime in comparison with states without such provisions. The cumulative impact of these provisions was notable; states with shall-issue laws that had at least 1, 2, or 3 of the provisions we examined had no statistically significant relationship with rates of gun assault or nongun homicide.

This study was not without limitations. Like other methods for estimating the impact of public policies, the ASCM and SCM methods rest on several assumptions. The methods' ability to provide an accurate counterfactual on which to make causal inference is based on the pretreatment fit between treated states and their ASCMs. A strong pretreatment fit is necessary to fulfill the parallel trend assumption needed for causal inference. We assessed and reported not only overall model fit but model fit for the 3-year period leading up to shall-issue-law adoption to identify potential biases. The literature is currently uncertain as to what indicates "good" pretreatment fit. We defined strongly performing models as having a pretreatment RMSE within 2 standard deviations of the mean RMSE and calculated our inverse-standard-error–weighted averages excluding states with poor treatment fit.

ASCM assumes no anticipation in effect and no spillover from the donor pool. To examine no anticipation in effect, we calculated the prior-3-years RMSE and compared it with the overall RMSE as part of our model selection. Because of our very small donor pool ($n = 8$), we had limited ability to test the assumption of no spillover. It is likely that a citizen in a shall-issue state with a CCW license could have carried

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

their weapon unlawfully into a may-issue state—although, to affect our model estimates, they would have needed to commit a violent firearm-related crime. The likelihood that this scenario happened frequently enough to impact state-level rates of violent crime per 100,000 population is small.

The synthetic control method is also limited by its inability to control for other state laws. As such, we excluded Missouri and Kansas as treatment states a priori. We also could not assess implementation and enforcement of law provisions. Training practices or limited law enforcement discretion, for example, may not be implemented in a way that reflects statutory text. Future work should examine specific permitting standards using quantitative and qualitative methods. However, our use of the REMA method did allow us to understand whether the presence of certain CCW-law permitting provisions confounded the relationship between law adoption and violent crime rates.

Use of the Federal Bureau of Investigation's "Offenses Known and Clearances by Arrest" data had limitations. The primary limitation is that this data set only includes crimes reported to police, and many crimes go unreported. A 2008 National Crime Victimization Survey found that the percentages of personal crimes reported to police were highest for aggravated assault with an injury (74.1%) and robbery with an injury (72.7%) [58]. Thus, the UCR Program is likely to account for the most serious forms of violent crime. Reporting data to the UCR Program is done on a voluntary basis, and reporting practices may vary by state and over time [59]. The National Archive of Criminal Justice Data, where these data are archived, imputes county-level data when there is missingness and the imputed values are aggregated at the state level [60]. Imputation for problems with state-level UCR data that are flagged on the UCR "Methods" page reveal no connection between such problems and the states and years of shall-issue adoption [61]. The limitations surrounding underreporting and missingness in UCR data probably contribute to measurement error, and the direction of bias due to nondifferential misclassification is hard to predict.

In conclusion, during the 10 years of postadoption time, adoption of shall-issue CCW laws was associated with increased rates of aggravated gun assault and nongun homicide. It appears that restricting shall-issue CCW permits from petitioners with violent misdemeanor convictions mitigates some of the harmful impact of adopting a shall-issue law, as does requiring live firearm training. Shall-issue states should consider adopting a violent misdemeanor prohibition or a live firearm training provision as part of their CCW system. States that become shall-issue states in the future should work to ensure that these provisions are included in their CCW systems to lessen the negative health impacts of the adoption of such laws.

## ACKNOWLEDGMENTS

Author affiliations: Center for Gun Violence Solutions, Johns Hopkins Bloomberg School of Public Health, Johns Hopkins University, Baltimore, Maryland, United States (Mitchell L. Doucette, Alexander D. McCourt, Cassandra K. Crifasi, Daniel W. Webster).

This work was funded by the Joyce Foundation and the New Venture Fund.

Mortality-related data are not providable because of data-use agreements. Data from the Uniform Crime Reporting Program are publicly accessible.

We thank Drs. Elizabeth Stuart and Eli Ben-Michael for their assistance and advice.

The views expressed in this article are those of the authors and do not reflect those of the funders or the authors' institution.

Conflict of interest: none declared.

## REFERENCES

1. Howe A. In major Second Amendment case, court will review limits on carrying a concealed gun in public. https://www.scotusblog.com/2021/10/in-major-second-amendment-case-court-will-review-limits-on-carrying-a-concealed-gun-in-public/. Published October 27, 2021. Accessed March 16, 2022.
2. RAND Corporation. Effects of concealed-carry laws on violent crime. https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html. Updated April 22, 2020. Accessed October 4, 2021.
3. Lott JR Jr, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. J Legal Stud. 1997;26(1):1–68.
4. Webster DW, Vernick JS, Ludwig J, et al. Flawed gun policy research could endanger public safety. Am J Public Health. 1997;87(6):918–921.
5. Donohue JJ, Aneja A, Weber KD. Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic control analysis. J Empir Leg Stud. 2019;16(2):198–247.
6. Doucette ML, Crifasi CK, Frattaroli S. Right-to-carry laws and firearm workplace homicides: a longitudinal analysis (1992–2017). Am J Public Health. 2019;109(12):1747–1753.
7. Crifasi CK, Merrill-Francis M, McCourt A, et al. Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95(3):383–390.
8. Siegel M, Xuan Z, Ross CS, et al. Easiness of legal access to concealed firearm permits and homicide rates in the United States. Am J Public Health. 2017;107(12):1923–1929.
9. Knopov A, Siegel M, Xuan Z, et al. The impact of state firearm laws on homicide rates among black and white populations in the United States, 1991–2016. Health Soc Work. 2019;44(4):232–240.
10. McElroy MB, Wang P. Seemingly inextricable dynamic differences: the case of concealed gun permit, violent crime and state panel data. https://doi.org/10.2139/ssrn.2992058. Published June 24, 2017. Accessed September 21, 2021.
11. Zimmerman PR. The deterrence of crime through private security efforts: theory and evidence. Int Rev Law Econ. 2014;37(C):66–75.
12. Siegel M, Pahn M, Xuan Z, et al. The impact of state firearm laws on homicide and suicide deaths in the USA, 1991–2016: a panel study. J Gen Intern Med. 2019;34(10):2021–2028.
13. Strnad J. Should legal empiricists go Bayesian? Am Law Econ Rev. 2007;9(1):195–303.
14. Schell TL, Cefalu M, Griffin BA, et al. Changes in firearm mortality following the implementation of state laws

Exhibit D
Page 161

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

regulating firearm access and use. *Proc Natl Acad Sci U S A.* 2020;117(26):14906–14910.

15. Kaplan J. Jacob Kaplan's concatenated files: Uniform Crime Reporting Program data: offenses known and clearances by arrest, 1960–2019. https://www.openicpsr.org/openicpsr/project/100707/version/V16/view. Published January 16, 2021. Accessed January 1, 2021

16. Doucette ML, Green C, Necci Dineen J, et al. Impact of ShotSpotter technology on firearm homicides and arrests among large metropolitan counties: a longitudinal analysis, 1999–2016. *J Urban Health.* 2021;98(5):609–621.

17. Wintemute GJ. The epidemiology of firearm violence in the twenty-first century United States. *Annu Rev Public Health.* 2015;36(1):5–19.

18. Wintemute GJ. Alcohol misuse, firearm violence perpetration, and public policy in the United States. *Prev Med.* 2015;79:15–21.

19. Krivo LJ, Peterson RD, Kuhl DC. Segregation, racial structure, and neighborhood violent crime. *AJS.* 2009;114(6): 1765–1802.

20. Kalesan B, Vasan S, Mobily ME, et al. State-specific, racial and ethnic heterogeneity in trends of firearm-related fatality rates in the USA from 2000 to 2010. *BMJ Open.* 2014; 4(9):e005628.

21. Jacoby SF, Dong B, Beard JH, et al. The enduring impact of historical and structural racism on urban violence in Philadelphia. *Soc Sci Med.* 2018;199:87–95.

22. Giffords Law Center to Prevent Gun Violence. Concealed carry. https://lawcenter.giffords.org/gun-laws/policy-areas/guns-in-public/concealed-carry/. Published 2022. Accessed March 16, 2022.

23. Everytown for Gun Safety. Gun Law Navigator. https://maps.everytown.org/navigator/. Published 2022. Accessed March 16, 2022.

24. Abadie A, Gardeazabal J. The economic costs of conflict: a case study of the Basque Country. *Am Econ Rev.* 2003;93(1): 113–132.

25. Abadie A, Diamond A, Hainmueller J. Comparative politics and the synthetic control method. *Am J Polit Sci.* 2014;59(2): 495–510.

26. Abadie A, Diamond A, Hainmueller J. Synthetic control methods for comparative case studies: estimating the effect of California's tobacco control program. *J Am Stat Assoc.* 2010; 105(490):493–505.

27. Bouttell J, Craig P, Lewsey J, et al. Synthetic control methodology as a tool for evaluating population-level health interventions. *J Epidemiol Community Health.* 2018;72(8): 673–678.

28. McGinty EE, Bicket MC, Seewald NJ, et al. Effects of state opioid prescribing laws on use of opioid and other pain treatments among commercially insured U.S. adults. *Ann Intern Med.* 2022;175(5):617–627.

29. Doucette ML, Ward JA, McCourt A, et al. Officer-involved shootings and concealed carry weapons permitting laws: analysis of gun violence archive data, 2014–2020. *J Urban Health.* 2022;99(3):373–384.

30. Cole MA, Elliott RJR, Liu B. The impact of the Wuhan Covid-19 lockdown on air pollution and health: a machine learning and augmented synthetic control approach. *Environ Resour Econ (Dordr).* 2020;76(4):1–28.

31. Efron B. Nonparametric estimates of standard error: the jackknife, the bootstrap and other methods. *Biometrika.* 1981; 68(3):589–599.

32. Ferman B, Pinto C. Synthetic controls with imperfect pre-treatment fit. *Quantitative Economics.* 2021;12(4): 1197–1221.

33. Ben-Michael E. augsynth: the augmented synthetic control method. https://rdrr.io/github/ebenmichael/augsynth/. Published 2021. Accessed August 26, 2021.

34. Donohue JJ. Laws facilitating gun carrying and homicide. *Am J Public Health.* 2017;107(12):1864–1865.

35. Federal Bureau of Investigation. Crime Data Explorer. (2020 data). https://crime-data-explorer.app.cloud.gov/pages/explorer/crime/crime-trend. Published 2021. Accessed November 1, 2021.

36. McCourt AD, Crifasi CK, Stuart EA, et al. Purchaser licensing, point-of-sale background check laws, and firearm homicide and suicide in 4 US states, 1985–2017. *Am J Public Health.* 2020;110(10):1546–1552.

37. Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health.* 2014;91(2):293–302.

38. Hasegawa RB, Webster DW, Small DS. Evaluating Missouri's handgun purchaser law: a bracketing method for addressing concerns about history interacting with group. *Epidemiology.* 2019;30(3):371–379.

39. Humphreys DK, Gasparrini A, Wiebe DJ. Evaluating the impact of Florida's "stand your ground" self-defense law on homicide and suicide by firearm: an interrupted time series study. *JAMA Intern Med.* 2017;177(1):44–50.

40. Rudolph KE, Stuart EA, Vernick JS, et al. Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health.* 2015;105(8): e49–e54.

41. French B, Heagerty PJ. Analysis of longitudinal data to evaluate a policy change. *Stat Med.* 2008;27(24): 5005–5025.

42. Schwarzer G, Carpenter JR, Rücker G. *Meta-Analysis With R.* (Use R!). Cham, Switzerland: Springer International Publishing AG; 2015.

43. Wintemute GJ, Drake CM, Beaumont JJ, et al. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. *JAMA.* 1998;280(24):2083–2087.

44. Wintemute GJ, Wright MA, Drake CM, et al. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA.* 2001;285(8): 1019–1026.

45. Zeoli AM, McCourt A, Buggs S, et al. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their associations with intimate partner homicide. *Am J Epidemiol.* 2018;187(11): 2365–2371.

46. Neufeld MY, Poulson M, Sanchez SE, et al. State firearm laws and nonfatal firearm injury-related inpatient hospitalizations: a nationwide panel study. *J Trauma Acute Care Surg.* 2022;92(3):581–587.

47. Berkowitz L, Lepage A. Weapons as aggression-eliciting stimuli. *J Pers Soc Psychol.* 1967;7(2 part 1):202–207.

48. Benjamin AJ, Bushman BJ. The weapons priming effect. *Curr Opin Psychol.* 2016;12:45–48.

49. Swanson JW, Sampson NA, Petukhova MV, et al. Guns, impulsive angry behavior, and mental disorders: results from the National Comorbidity Survey Replication (NCS-R). *Behav Sci Law.* 2015;33(2-3):199–212.

50. Robinson C. Argument over parking spaces in Birmingham leaves 1 dead, 2 injured by gunfire. https://www.al.com/news/birmingham/2020/09/argument-over-parking-spaces-in-birmingham-leaves-1-dead-2-injured-by-gunfire.html. Published September 27, 2020. Updated September 27, 2020. Accessed October 15, 2021.

Exhibit D

51. D'Angeleo B. Argument over parking spot leaves Florida man dead. https://www.wftv.com/news/trending/argument-over-parking-spot-leaves-florida-man-dead/XQSK3ENO5JD47CUBSP6O3QCQHY/. Published October 2, 2021. Accessed October 15, 2021.

52. Bushman BJ, Kerwin T, Whitlock T, et al. The weapons effect on wheels: motorists drive more aggressively when there is a gun in the vehicle. *J Exp Soc Psychol.* 2017;73:82–85.

53. Hemenway D, Vriniotis M, Miller M. Is an armed society a polite society? Guns and road rage. *Accid Anal Prev.* 2006; 38(4):687–695.

54. Deliso M. "Disconcerting" rise in road rage shootings resulting in death or injury, data shows. https://abcnews.go.com/US/disconcerting-rise-road-rage-shootings-resulting-death-injury/story?id=78181165. Published June 12, 2021. Accessed October 15, 2021.

55. Braga AA, Griffiths E, Sheppard K, et al. Firearm instrumentality: do guns make violent situations more lethal? *Annu Rev Criminol.* 2021;4(1):147–164.

56. Donohue JJ, Cai SV, Bondy MV, et al. More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in US cities. (NBER Working Paper 30190). Cambridge, MA: National Bureau of Economic Research; 2022. https://www.nber.org/papers/w30190. Accessed June 27, 2022.

57. Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. *Inj Prev.* 2013;19(1):26–31.

58. Maston C, Klaus P. *Criminal Victimization in the United States, 2002. Statistical Tables. National Crime Victimization Survey.* Washington, DC: US Department of Justice; 2003. https://doi.org/10.1037/e571572010-001. Accessed October 20, 2021.

59. Maltz MD. *Analysis of Missingness in UCR Crime Data.* (NCJ no. 215343). Washington, DC: US Department of Justice; 2006. https://www.ojp.gov/ncjrs/virtual-library/abstracts/analysis-missingness-ucr-crime-data. Accessed March 28, 2022.

60. National Archive of Criminal Justice Data. Resource guide: Uniform Crime Reporting Program. https://www.icpsr.umich.edu/web/pages/NACJD/guides/ucr.html. Published 2022. Accessed March 28, 2022.

61. Federal Bureau of Investigation. *Crime in the United States, 2019.* Washington, DC: US Department of Justice; 2020. https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/methodology. Accessed March 28, 2022.

Downloaded from https://academic.oup.com/aje/article/192/3/342/6698676 by University of California, Los Angeles user on 15 March 2023

Exhibit D
Page 163

J Urban Health (2022) 99:373–384
https://doi.org/10.1007/s11524-022-00627-5



# Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws: Analysis of Gun Violence Archive Data, 2014–2020

**Mitchell L. Doucette** · **Julie A. Ward** · **Alex D. McCourt** · **Daniel Webster** · **Cassandra K. Crifasi**

Accepted: 9 March 2022 / Published online: 10 May 2022
© The New York Academy of Medicine 2022

**Abstract** About 1,000 civilians are killed every year by a law enforcement officer in the USA, more than 90% by firearms. Most civilians who are shot are armed with a firearms. Higher rates of officer-involved shootings (OIS) are positively associated with state-level firearm ownership. Laws relaxing restrictions on civilians carrying concealed firearms (CCW) have been associated with increased violent crime. This study examines associations between CCW laws and OIS. We accessed counts of fatal and nonfatal OIS from the Gun Violence Archive (GVA) from 2014–2020 and calculated rates using population estimates. We conducted legal research to identify passage years of CCW laws. We used an augmented synthetic control models with fixed effects to estimate the effect of Permitless CCW law adoption on OIS over fourteen biannual semesters. We calculated an inverse variance weighted average of the overall effect. On average, Permitless CCW adopting states saw a 12.9% increase in the OIS victimization rate or an additional 4 OIS victimizations per year, compared to what would have happened had law adoption not occurred. Lax laws regulating civilian carrying of concealed firearms were associated with higher incidence of OIS. The increase in concealed gun carrying frequency associated with these laws may influence the perceived threat of danger faced by law enforcement. This could contribute to higher rates of OIS.

## Introduction

In the mid-2010's, several media and nonprofit organizations began collecting data on officer involved shooting (OIS) incidents using open-source data collection methods to better understand incident frequency. These sources, including The Counted, developed by *The Guardian* [1]; Fatal Force, developed by the *Washington Post* [2]; the Gun Violence Archive [3]; and others [4, 5] identify incidents more comprehensively than the Centers for Disease Control and Prevention (CDC), which often undercount or misclassify police involvement in homicides and provide no estimates of nonfatal shootings [6, 7]. These sources estimate around 1,000 fatal OIS per year [8] and have been recently validated against newer, national-level repositories (e.g., the National Violent Death Reporting System) with better, though incomplete, data [9].

Several studies have examined the relationship between firearm prevalence and state-level laws and fatal OIS in the USA [8, 10]. Hemenway and

**Supplementary Information** The online version contains supplementary material available at https://doi.org/10.1007/s11524-022-00627-5.

M. Doucette (✉) · J. Ward · A. McCourt · D. Webster · C. Crifasi
Center for Gun Violence Solutions, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD, USA
e-mail: Mdoucet3@jhu.edu

Exhibit 5
Page 164

colleagues (2018) used data from the *Washington Post's* Fatal Force database to examine fatal OIS across the USA; finding rates of fatal OIS per 1 million (M) population were significantly associated with firearm availability at the state level [8]. The authors hypothesized that the relationship between fatal OIS and gun ownership may be due to increases in both the likelihood of an officer encountering an armed person and officers' perceived risk of personal injury in an encounter where gun ownership is prevalent [8]. Nagin (2020) also found that fatal OIS rates were associated with firearm availability at the state level [10]. Kivisto and colleagues (2017) examined whether state-level firearm legislation impacted rates of fatal OIS. They identified that states with stronger legislative strength scores had lower rates of fatal police shootings per 1 M population [11].

A prior analysis of fatal OIS has found that most incidents occurred outside the home, and the majority of victims were armed with a firearm [12]. Over the past four decades, most states have implemented Shall Issue concealed carry weapons (CCW) laws or Permitless CCW laws which make public carry of a concealed weapon easier [13–16]. These laws, often referred to as right-to-carry (RTC) laws, can remove law enforcement discretion in issuing CCW permits (Shall Issue) or drop the need for a permit all together (Permitless) compared to states without RTC laws, which allow law enforcement broad discretion to deny permits (May Issue). A recent survey of gun owners found states with RTC laws have higher rates of self-reported public concealed gun carrying than that of states without [16]. As of 2021, there are 21 states with Permitless carry, 21 states with some form of Shall Issue laws, and 8 states with May Issue laws.

The fluctuations in these state laws have provided researchers the opportunity to examine their impact on firearm violence. Early research on CCW laws from Lott and Mustard (LM) found an association between adopting a Shall Issue CCW law from a May or a No Issue CCW law and reductions in crime [17]. However, this research contained flaws including measurement error in law adoption time, the use of an endogenous explanatory variable, inclusion of over 35 colinear covariates, and omission of variables shown to affect crime (police presence and incarceration rates) [18, 19]. More recent research examining the impact of these laws have addressed these methodological issues [20]. While the findings have been somewhat mixed, a majority of recent studies have found evidence that RTC laws increase violent crime including homicides [13, 14, 19, 21–26]. As firearm availability is associated with increased fatal OIS, Shall Issue and Permitless CCW laws could influence fatal and nonfatal rates of OIS; however, the impact of RTC laws on OIS is currently unknown.

Given the relationship between state-level firearm availability and OIS, and the impact of RTC laws on public gun carrying, we sought to understand the impact of changes in CCW permitting laws on OIS. We hypothesized that removing the need for a permit to carry a concealed weapon in public would be associated with increased incidence of OIS rates.

## Methods

We conducted a comparative time-series analysis to evaluate the impact of Permitless CCW laws on rates of total (fatal + non-fatal) OIS violence using the Gun Violence Archive (GVA). The GVA is the only source that provides an accounting of both fatal and nonfatal firearm injuries to civilians as part of an OIS incident.

### Data and Measures

We accessed counts of total OIS violence from the GVA from 2014 to 2020. Counts of total, fatal, and nonfatal OIS violence are provided in Supplemental Table 1. The GVA, a nonprofit organization, uses law enforcement, media, government, and commercial sources to provide a daily account of firearm violence throughout the USA. We selected the GVA because it is the only source that attempts to capture both fatal and nonfatal data. The data is fully accessible and available for free to download. We used 2014 as our starting year as this was the first full year data were available [27]. Earlier studies have used the GVA to examine firearm violence [28]. Other studies have used the GVA to validate other national databases as sources of data for police involved shootings [9]. GVA provides links to the news media reports it uses to provide gun violence frequency. GVA categorizes violence by several types of incidents (e.g., officer involved shooting, child involved incident, drive by etc.). Incident output has the following variables: incident state, day, address, number of persons killed, and number of persons injured. We downloaded all OIS

Exhibit D
Page 165

incidents from 2014 to 2020. We manually reviewed all OIS incidents from 2014 to 2020 to exclude law enforcement officers shot as part of an OIS incident or when an officer fired their weapon, but no one was wounded or killed. The GVA does not provide race/ethnicity of victims. GVA was selected over other data sources as it is the only national source of fatal and nonfatal OIS.

Our analysis focused on the impact of adopting a Permitless CCW law from a Shall Issue CCW law or the impact of removing the permit requirement to carry a concealed weapon. We conducted legal research to identify implementation dates and Shall Issue CCW permit provisions for all 50 States. We collected these provisions from the Westlaw and HeinOnline legal research databases. To identify the relevant policies, we used a standard search strategy for each state for the years 1980–2020. We classified states by whether they issued CCW permits on a May Issue basis, Shall Issue basis, or allowed for Permitless carry. All laws were operationalized dichotomously, with "0" representing the absence of a law and "1" representing the presence of a law. No states moved from a May Issue CCW law to a Permitless CCW law. Table 1 provides the status of each state's CCW law regime and the year of law adoption.

Analysis

To examine the relationship between CCW laws and OIS, we collapsed data to the semester-level or two time periods per year, giving us 14 time periods from 2014 to 2020 over 50 states or 700 state-time indexes. Our outcome of interest was the total number of victims fatally and nonfatally shot by police indexed by state-year. We employed a comparative time-series analysis approach to explore the relationship between CCW permitting laws and rates of total OIS violence.

The following covariates were included in the study's analyses: percent population living in MSA, black males 15–19, white males 15–19, unemployed, per capital alcohol consumption, rate of incarceration, and law enforcement officers per capita. The rates of incarceration and police employment were interpolated for 2019 and 2020. All other variables were linearly extrapolated for 2020. Covariates were acquired from the US Census Bureau [29], the Bureau of Labor Statistics [30], the Bureau of Justice Statistics [31], the Uniform Crime Reports [32], and the National Institute on Alcohol Abuse and Alcoholism [33].

To look at the average treatment effect on the treated (ATT) of adopting a Permitless CCW system on OIS, we considered four potential model specifications related to the synthetic control method including synthetic control models (SCM) [34–36], SCM with fixed effects (SCM + Fixed effects) [37–39], augmented synthetic control models (ASCM) [37], and ASCM with fixed effects (ASCM + Fixed effects) [37–39]. The ASCM builds off the SCM developed by Abadie and Gardeazabal (2003) [34–36]. The SCM, which creates a weighted synthetic state based on covariate values, referred to as the control state, reduces bias when estimating the effects of a new state policy. The method uses a pool of "non-treated" states or states without the policy of interest, to identify a weighted combination of states that mirrors the treated state prior to the law change or pre-law adoption period. This creates a control state with limited selection bias likely to satisfy the parallel line assumption necessary for causal inference and act as a counterfactual to compare what would have happened in the treated state had the law not been changed. Specifying a fixed effect, referred to as demeaning, subtracts the pre-treatment mean within the treatment and donor states from each outcome observation prior to identifying the weighted synthetic state [38, 39].

The ASCM method, developed by Ben-Michael, Feller, and Rothstein (2019), builds on the original SCM [37]. In the original SCM, the ability of the synthetic control state to act as the treatment state's counterfactual is measured by the pre-treatment root mean square error (RMSE) or the how different the treated state and control state are prior to the law change. For certain interventions, where the potential donor pool is small, or the pre-treatment RMSE fit is infeasible, the SCM may not act as an accurate counterfactual as the pre-adoption trend lines may diverge. The ASCM uses ridge regression as an outcome model and extends the SCM to policy settings where pre-treatment RMSE fit is poor. The ridge regression outcome model estimates the bias arising from inadequate pre-treatment RMSE fit and de-biases the synthetic control estimate [37]. In a traditional SCM, donor state weights are always nonnegative. ASCM with ridge regression produces donor state weights that can be negative as it seeks to minimize variance, which allows for improved pre-treatment RMSE fit. As part

Exhibit 19
Page 166

Springer

**Table 1** Legal landscape of concealed carry weapon laws

| State | Overall concealed carry permitting law | | | |
|---|---|---|---|---|
| | No Issue | May Issue permits | Shall Issue permits | Permitless Carry |
| Alabama | | Pre-1980–8/1/13 | 8/1/13[a] | |
| Alaska | Pre-1980–10/1/94 | | 10/1/94–9/9/03 | 9/9/03 |
| Arizona | Pre-1980–7/16/94 | | 7/16/94–7/28/10 | 7/28/10 |
| Arkansas | Pre-1980–7/27/94 | | 7/27/94[a] | |
| California | | Pre-1980 | | |
| Colorado | Pre-1980–6/8/81 | 6/8/81–5/17/03 | 5/17/03[a] | |
| Connecticut | | Pre-1980 | | |
| Delaware | | Pre-1980 | | |
| Florida | | Pre-1980–10/1/87 | 10/1/87 | |
| Georgia | | Pre-1980–8/25/89 | 8/25/89[a] | |
| Hawaii | | Pre-1980 | | |
| Idaho | | Pre-1980–7/1/90 | 7/1/90–7/1/16 | 7/1/16 |
| Illinois | Pre-1980–1/5/14 | | 1/5/14[a] | |
| Indiana | | | Pre-1980[a] | |
| Iowa | | Pre-1980–1/1/11 | 1/1/11[a] | |
| Kansas | Pre-1980–1/1/07 | | 1/1/07–7/1/15 | 7/1/15 |
| Kentucky | Pre-1980–10/1/96 | | 10/1/96–6/27/19 | 6/27/19 |
| Louisiana | Pre-1980–4/19/96 | | 4/19/96 | |
| Maine | Pre-1980–9/18/81 | | 9/18/81–10/15/15 | 10/15/15 |
| Maryland | | Pre-1980 | | |
| Massachusetts | | Pre-1980 | | |
| Michigan | | Pre-1980–7/1/01 | 7/1/01 | |
| Minnesota | | Pre-1980–5/28/03 | 5/28/03[a] | |
| Mississippi | Pre-1980–7/1/91 | | 7/1/91–4/15/16 | 4/15/16 |
| Missouri | Pre-1980–2/26/04 | | 2/26/04–1/1/17[a] | 1/1/17 |
| Montana | | Pre-1980–10/1/91 | 10/1/91[a] | |
| Nebraska | Pre-1980–1/1/07 | | 1/1/07 | |
| Nevada | | Pre-1980–10/1/95 | 10/1/95 | |
| New Hampshire | | | Pre-1980–2/22/17[a] | 2/22/17 |
| New Jersey | | Pre-1980 | | |
| New Mexico | Pre-1980–1/1/04 | | 1/1/04 | |
| New York | | Pre-1980 | | |
| North Carolina | Pre-1980–12/1/95 | | 12/1/95 | |
| North Dakota | Pre-1980–8/1/85 | | 8/1/85–8/1/17 | 8/1/17 |
| Ohio | Pre-1980–4/8/04 | | 4/8/04 | |
| Oklahoma | Pre-1980–9/1/95 | | 9/1/95–11/1/19 | 11/1/19 |
| Oregon | | Pre-1980–1/1/90 | 1/1/90[a] | |
| Pennsylvania | | Pre-1980–6/17/89 | 6/17/89[a] | |
| Rhode Island | | | Pre-1980[a] | |
| South Carolina | | Pre-1980–8/23/96 | 8/23/96 | |
| South Dakota | | Pre-1980–7/1/85 | 7/1/1985–7/1/19 | 7/1/19 |
| Tennessee | Pre-1980–11/1/89 | 11/1/89–10/1/96 | 10/1/96 | |
| Texas | Pre-1980–1/1/96 | | 1/1/96 | |
| Utah | | Pre-1980–5/1/95 | 5/1/95[a] | |
| Vermont | | | | Pre-1980 |

Exhibit D
Page 167

**Table 1** (continued)

| State | Overall concealed carry permitting law | | | |
|-------|----------|-----------------|-------------------|------------------|
| | No Issue | May Issue permits | Shall Issue permits | Permitless Carry |
| Virginia | | Pre-1980–7/1/95 | 7/1/95[a] | |
| Washington | | | Pre-1980 | |
| West Virginia | | Pre-1980–7/7/89 | 7/7/89–5/24/16 | 5/24/16 |
| Wisconsin | Pre-1980–11/1/11 | | 11/1/11 | |
| Wyoming | Pre-1980–7/1/83 | 7/1/83–10/1/94 | 10/1/94–7/1/11[a] | 7/1/11 |

[a]denotes some limited discretion afforded the issuing agency

of the pre-treatment trend creation, the augmentation uses a leave-one-out cross-validation process to identify the value of λ. This provides the optimal λ value, 2 standard deviations above the minimum λ value, to protect against overfitting.

We used a data-driven approach in our model selection process. We evaluated the following diagnostics and present each below and in the supplemental material. First, we plotted the overall pre-treatment RMSE and the divergent pre-treatment RMSE or the RMSE in the last two semesters of pre-treatment period. Model specifications with similar overall and divergent pre-treatment RMSE indicate a well performing and consistent counterfactual. Models with disparate RMSE values would suggest fluctuations close to treatment adoption and thus a potentially biased ATT. Second, we inspected gap plots related to the four potential model selections to examine pre-treatment RMSE trends. This evaluation provided a visual representation of the overall and divergent pre-treatment RMSE and thus how well the synthetic counterfactual could best mirror the treatment state had the policy not been adopted. All analyses were conducted using R [31ss] with the package "augsynth" [41]. We provide pre-treatment donor weights for treated state across model specifications as well as pre-treatment mean covariate values for treated and synthetic states across each model specification.

We examined the impact of adopting a Permitless CCW system from a Shall Issue CCW system using a three-semester moving average of OIS rates per 1 million (M) population for 11 treatment states (Table 1). We compared each Permitless CCW adopting state to a donor pool of Shall Issue states that did not change their permitting system between 2014 and 2020

($n = 26$). The ATT for each Permitless CCW adopter was calculated as the average difference in mean OIS rate between the treated state and the augmented synthetic control state in the post-implementation period. We specified jackknife standard errors [42]. For each state, we divided the average population size by 1 M and multiplied by the ATT to understand how many OIS were associated with law adoption.

To understand the overall ATT across law adopters, we calculated an inverse variance weighted average ATT in R using the package "meta," [43] specifying random effects assuming a heterogenous treatment effect. These analyses excluded states with poor performing RMSE, defined as pre-treatment RMSE greater than 2 standard deviations above the mean. As a sensitivity analysis, we separately examined the rate of fatal and nonfatal OIS violence presenting the inverse variance weighted average ATT.

**Results**

Figure 1 provides the median counts for total, fatal, and nonfatal OIS violence from 2014–2020. The median count for total OIS violence slightly fluctuated during the 7-year study period starting slightly below 20 in the first semester of 2014 and ending slightly above 20 in the second semester of 2020. Notably, the disaggregated median counts of fatal and nonfatal OIS violence were similar across time. Figures 2, 3, and 4 are diagnostic plots specific to Missouri. Diagnostic plots and tables for all other states are in the Supplemental Material. Figure 2 and Supplemental Figs. 1–10 provide the donor state weights that make up each of the synthetic controls. Supplemental Figs. 11–17 provide the mean value of

Exhibit 15
Page 168

Springer

Doucette et. al



**Fig. 1** Median counts of total, fatal, and nonfatal shootings in the USA, 2014–2020 Gun Violence Archive Data

**Fig. 2** Comparison of donor weights across model specifications for Missouri, 2014–2020 Gun Violence Archive data



covariates for the treated and synthetic control states during the pre-treatment period across our four model specifications.

Figure 3 provides the overall and divergent RMSE in the pre-treatment period. Examining the overall RMSE, it appears the ASCM + Fixed effect model


Exhibit D
Page 169

Officer-Involved Shootings and Concealed Carry Weapons Permitting Laws                                379



**Fig. 3** Comparison of RMSE and pre-treatment RMSE divergence across model specifications

has the smallest RMSE in the pre-treatment period. The ASCM + Fixed effects, excluding Oklahoma, are all generally close to 0, indicating strong pre-treatment fit. The ASCM model provides strong pre-treatment fit for majority of states, excluding North Dakota, Oklahoma, and South Dakota. The SCM and SCM+ Fixed effect models indicate comparatively large RMSE considering the ASCM models. Examining the relationship between overall RMSE and divergent RMSE indicates that both the ASCM and ASCM+Fixed effects produced consistent RMSE, with limited divergence in the time periods immediately preceding the treatment year. The SCM and SCM+Fixed effects displayed large RMSE divergence within states. Overall and divergent RMSE performance can be visually seen in the gap plots presented in Fig. 4 and Supplemental Figs. 18–27, which display the difference between treatment and synthetic control across model specifications. Figure 4 reveals that Missouri's pre-treatment RMSE

performance is the strongest for the ASCM + Fixed effect model.

Overall, adopting a Permitless CCW law from a Shall Issue law resulted in an additional 0.78 OIS victims per 1 M population per semester or an additional 2 OIS victims per semester than what we would have normally expected across all states that adopted Permitless carry (Fig. 5). This represents a 12.9% increase in OIS victimization rate. We excluded Oklahoma from this analysis as its overall RMSE was greater than 2 standard deviations above the average, indicating a poor counterfactual from which to draw inference. Idaho (ATT=2.01; SE=0.931), Mississippi (ATT=0.88; SE=0.304), Missouri (ATT=2.08; SE=0.529), and West Virginia (ATT=1.59; SE=0.514) had significantly greater average rates of OIS in the post-law adoption period compared to the pre-law adoption period compared to their synthetic control states. In the post-law period, the results suggest that Idaho averaged an additional

Exhibit 1
Page 170

🖄 Springer

Doucette et. al



**Fig. 4** Gap plot comparison of model specifications related to the impact of permitless concealed carry weapons law adoption on officer involved shooting rates per 1 million in Missouri, 2014–2020 Gun Violence Archive data

**Fig. 5** Impact of permitless concealed carry weapons law adoption on officer involved shooting rates per 1 million, 2014–2020 Gun Violence Archive data



3.53 OIS victims per semester, Mississippi averaged an additional 2.63 OIS victims per semester, Missouri averaged an additional 12.76 OIS victims per semester, and West Virginia averaged an additional 2.8 OIS victims per semester above what we would have normally expected had the law not changed (data

Exhibit D
Page 171

not shown). Comparing the findings above from the ASCM + Fixed effect model to the other model specifications shows general agreement around the estimated ATT and level of significance for Idaho, Mississippi, Missouri, and West Virginia (Supplemental Table 28).

Supplemental Figs. 29 and 30 provide the overall ATT related to rates of nonfatal and fatal OIS violence separately. Notably, nonfatal and fatal violence displayed positive but nonsignificant relationships with Permitless CCW adoption. In addition, $\lambda$ cross-validation figures for ASCM and ASCM + Fixed effects models are provided in Supplemental material (Supplemental Figs. 31–41).

## Discussion

This article is the first to examine the relationship between CCW laws and fatal and nonfatal OIS violence. Our research introduces several important findings. Using Shall Issue states to construct policy counterfactuals indicated that adopting a Permitless CCW law resulted in additional OIS victimization. Using our data-drive approach, the ASCM + Fixed effect models provided the best pre-treatment counterfactuals to calculate the causal impact of Permitless CCW law adoption. These models displayed strong overall pre-treatment RMSE fit for 10 of the 11 treatment states, and we calculated an average of the ATT inverse weighted by the size of each model's jackknife standard error. We estimate that removing the need for a permit to carry a concealed weapon increased OIS victimization rates by 12.9%.

There has been much study of the impact of Shall Issue laws and RTC laws on firearm-related crime [26]. However, this study is among the first to examine the impact of moving from a Shall Issue CCW law to a Permitless CCW law. There is a growing need to examine the impact of moving from a Shall Issue CCW law to a Permitless CCW law on firearm-related crime. Evidence found here suggests there is likely an increase in rates of total OIS violence after Permitless CCW law adoption.

Less restrictive CCW laws may prompt increases public civilian gun carrying. Removal of the need for a permit eliminates economic costs associated with the permitting process and removes opportunity cost associated with obtaining the permit

(e.g., time filling out paperwork, time spent at the police station, time on other requirements like live fire training, etc.). Those who found the economic cost and/or opportunity cost of obtaining a Shall Issue permit to high may choose to carry a concealed weapon in the absence of such requirement. Law enforcement might internalize this potential behavior change and increase the perceived risk of meeting an armed suspect or increase the number of calls for service for weapons complaints. Given that between 75 and 95% of homicides of law enforcement officers are committed with a firearm [44], it is plausible that less restrictive CCW laws can increase an officer's perceived risk of personal injury in an encounter which may in turn increase the likelihood that deadly force is used [45]. Prior research has found a relationship between state-level gun prevalence and OIS victimization [8]. Our findings are consistent with the theory that expanded access to firearms through lower restrictions for concealed carry increases both fatal and nonfatal OIS incidents.

This study is not without limitations. First, we acknowledge the limitations associated with the use of GVA data. While GVA data has been confirmed against other media-based data repositories of fatal OIS [9], and the use of media-based data collection for fatal OIS violence itself has been validated [46], the use of media reports to identify nonfatal shootings has not, and reporting of violence remains inherently biased. There is selection bias within the use of media reports in determining how much of a given outcome occurs due to publication bias. This is especially true for nonfatal shootings. A visual examination of Fig. 1 suggests that the number of victims fatal and nonfatal shot is similar from year to year. However, for violent crimes, particularly police involved violence, we hypothesize that the implicit "newsworthiness" of events is high; thus, we have reason to believe a reasonable valid capture of OIS violence through GVA and other media-based data repositories. Our decision to use fatal and nonfatal data is important as fatal violence data does not tell a complete story [47]. While not significant, it is notable that the direction of effect is similar when considering the disaggregated outcomes of fatal and nonfatal OIS violence rates compared to the total OIS violence rate direction. It may be that the use of fatal data alone is inadequate for examinations of potential policy determinants of OIS.

Exhibit 15
Page 172

🖄 Springer

Another limitation of the GVA is that race/ethnicity is not readily available. While the inability to disaggregate our outcome by race/ethnicity does not bias our study's external validity to the population at large, it does pose additional questions about potential differential effects. Research has shown African Americans are disproportionately likely to be victims of a law enforcement officer involved shooting [48–51]. Due to our lack of data, we are unable to estimate whether the impact of CCW laws differs by the race/ethnicity of victims.

The use of ASCM + Fixed effects supplied the best available estimate of effect related to removing the permit requirement for who can legally carry a concealed weapon. However, the model's ability to successfully provide an accurate counterfactual is based on the likeness of donor pool states and pre-treatment fit between treated and control states. In the context of this study, we included 26 donor states that continuously issued Shall Issue CCW permits between 2014 and 2020. While the literature is currently unclear as to what qualifies as a "good" pre-treatment fit [52], the RMSE for 10 of the 11 states was small indicating the ATT produced from the comparison of the treated and synthetic states is valid (Fig. 5). Pre-treatment covariate averages were similar for the states with good pre-treatment fit among the ASCM + Fixed effect models (Supplemental Tables 2–13). Consider in tandem, strong RMSE and covariate balance suggest the ATTs were calculated using valid counterfactuals.

A primary robustness check for the SCM includes backdating or in-time placebo testing [53]. We were unable to conduct rigorous robustness checks due to limited pre-treatment data availability. In some instances, such as Kansas and Maine, there were only 4 pre-treatment periods, making in-time placebo testing not possible. This is a limitation of the data. To combat this limitation, we examined the extent to which the RMSE in the last 2 semesters during the pre-treatment period diverged from the RMSE overall. We argue that states with similar overall and divergent RMSE imply a consistent counterfactual better able to predict what would have happened in the treatment group had the policy not been adopted. The ASCM + Fixed effect model specification had strong overall RMSE with small divergence, indicating a robust prediction ability that was consistent across the pre-treatment period.

## Conclusion

From 2014 to 2020, moving from a Shall Issue CCW law to a Permitless CCW law was associated with a 12.9% increase in the rate of OIS. Policy makers in Shall Issue CCW law states considering Permitless CCW law adoption and policy makers currently in Permitless CCW law states should consider the negative health consequences Permitless CCW laws.

**Acknowledgements**   This research was supported by a grant from The Joyce Foundation to the Johns to Johns Hopkins Center for Gun Violence Solutions (https://www.joycefdn.org/grants) and by a grant from the New Venture fund to the Johns Hopkins Center for Gun Violence Solutions (https://newventurefund.org/for-grantseekers). Julie Ward acknowledges support from the National Institute of Child Health and Human Development (T32-HD 094687).

## References

1. Swaine J, Laughland O, Lartey J, et al. The Counted: people killed by police in the United States – interactive. the Guardian. http://www.theguardian.com/us-news/ng-interactive/2015/jun/01/the-counted-police-killings-us-database. Accessed March 11, 2021.
2. Fatal Force: Police shootings database. Washington Post. https://www.washingtonpost.com/graphics/investigations/police-shootings-database/. Accessed March 11, 2021.
3. Gun Violence Archive. https://www.gunviolencearchive.org/. Accessed March 11, 2021.
4. Mapping Police Violence. Mapping police violence. https://mappingpoliceviolence.org.   Accessed   March 11, 2021.
5. Fatal Encounters – A step toward creating an impartial, comprehensive and searchable national database of people killed during interactions with police. https://fatalencounters.org/. Accessed March 11, 2021.
6. Loftin C, Wiersema B, McDowall D, Dobrin A. Underreporting of justifiable homicides committed by police officers in the united states, 1976–1998. *Am J Public Health*. 2003;93(7):1117–21. https://doi.org/10.2105/AJPH.93.7.1117.
7. Feldman JM, Gruskin S, Coull BA, Krieger N. Quantifying underreporting of law-enforcement-related deaths in United States vital statistics and news-media-based data sources: a capture–recapture analysis. *PLoS Med*. 2017;14(10):e1002399.   https://doi.org/10.1371/journal.pmed.1002399.
8. Hemenway D, Azrael D, Conner A, Miller M. Variation in rates of fatal police shootings across US states: the role of firearm availability. *J Urban Health*. 2019;96(1):63–73. https://doi.org/10.1007/s11524-018-0313-z.
9. Conner A, Azrael D, Lyons VH, Barber C, Miller M. Validating the national violent death reporting

Exhibit D
Page 173

system as a source of data on fatal shootings of civilians by Law enforcement officers. *Am J Public Health*. 2019;109(4):578–84. https://doi.org/10.2105/AJPH.2018.304904.

10. Nagin DS. Firearm availability and fatal police shootings. *Ann Am Acad Pol Soc Sci*. 2020;687(1):49–57. https://doi.org/10.1177/0002716219896259.

11. Kivisto AJ, Ray B, Phalen PL. Firearm legislation and fatal police shootings in the united states. *Am J Public Health*. 2017;107(7):1068–75. https://doi.org/10.2105/AJPH.2017.303770.

12. Zimring F. When police kill. Harvard University Press. 2018. https://www.hup.harvard.edu/catalog.php?isbn=9780674986800. Accessed October 20, 2021.

13. Doucette ML, Crifasi CK, Frattaroli S. Right-to-carry laws and firearm workplace homicides: a longitudinal analysis (1992–2017). *Am J Public Health*. 2019;109(12):1747–53. https://doi.org/10.2105/AJPH.2019.305307.

14. Siegel M, Xuan Z, Ross CS, et al. Easiness of legal access to concealed firearm permits and homicide rates in the united states. *Am J Public Health*. 2017;107(12):1923–9. https://doi.org/10.2105/AJPH.2017.304057.

15. Cherney S, Morral AR, Schell TL. Development of the RAND state firearm Law database and supporting materials. 2019. https://www.rand.org/pubs/tools/TL283-1.html. Accessed March 1, 2020.

16. Rowhani-Rahbar A, Azrael D, Lyons VH, Simonetti JA, Miller M. Loaded handgun carrying among US adults, 2015. *Am J Public Health*. 2017;107(12):1930–6. https://doi.org/10.2105/AJPH.2017.304072.

17. Lott Jr John R, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud*. 1997;26(1):1–68. https://doi.org/10.1086/467988.

18. Webster DW, Vernick JS, Ludwig J, Lester KJ. Flawed gun policy research could endanger public safety. *Am J Public Health*. 1997;87(6):918–21. https://doi.org/10.2105/AJPH.87.6.918.

19. Donohue JJ, Aneja A, Weber KD. Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic control analysis. *J Empir Leg Stud*. 2019;16(2):198–247. https://doi.org/10.1111/jels.12219.

20. Smart R. Effects of concealed-carry laws on violent crime. RAND. 2020. https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html. Accessed October 4, 2021.

21. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between firearm laws and homicide in urban counties. *J Urban Health*. 2018;95(3):383–90. https://doi.org/10.1007/s11524-018-0273-3.

22. Knopov A, Siegel M, Xuan Z, Rothman EF, Cronin SW, Hemenway D. The impact of state firearm laws on homicide rates among black and white populations in the united states, 1991–2016. *Health Soc Work*. 2019;44(4):232–40. https://doi.org/10.1093/hsw/hlz024.

23. McElroy MB, Wang P. Seemingly inextricable dynamic differences: the case of concealed gun permit, violent crime and state panel data. 2017. https://doi.org/10.2139/ssrn.2992058

24. Siegel M, Pahn M, Xuan Z, Fleegler E, Hemenway D. The impact of state firearm laws on homicide and suicide deaths in the USA, 1991–2016: a Panel Study. *J Gen Intern Med*. 2019;34(10):2021–8. https://doi.org/10.1007/s11606-019-04922-x.

25. Strnad J. Should legal empiricists Go Bayesian? *Am Law Econ Rev*. 2007;9(1):195–303.

26. Schell TL, Cefalu M, Griffin BA, Smart R, Morral AR. Changes in firearm mortality following the implementation of state laws regulating firearm access and use. *Proc Natl Acad Sci U S A*. 2020;117(26):14906–10. https://doi.org/10.1073/pnas.1921965117.

27. General Methodology | Gun Violence Archive. https://www.gunviolencearchive.org/methodology. Accessed February 4, 2022.

28. Klassen AB, Marshall M, Dai M, Mann NC, Sztajnkrycer MD. Emergency medical services response to mass shooting and active shooter incidents, United States, 2014–2015. *Prehosp Emerg Care*. 2019;23(2):159–66. https://doi.org/10.1080/10903127.2018.1484970.

29. Explore Census Data. Published 2022. https://data.census.gov/cedsci/. Accessed February 28, 2022.

30. Databases, tables & calculators by subject. Published 2022. https://www.bls.gov/data/. Accessed February 28, 2022.

31. Home | Bureau of Justice Statistics. Published 2022. https://bjs.ojp.gov/. Accessed February 28, 2022.

32. Uniform Crime Reporting (UCR) Program. Federal Bureau of Investigation. Published 2022. https://www.fbi.gov/services/cjis/ucr. Accessed February 28, 2022.

33. Publications | National institute on alcohol abuse and alcoholism | Surveillance Reports. https://pubs.niaaa.nih.gov/publications/surveillance.htm. Accessed February 28, 2022.

34. Abadie A, Gardeazabal J. The economic costs of conflict: a case study of the Basque country. *Am Econ Rev*. 2003;93(1):113–32. https://doi.org/10.1257/000282803321455188.

35. Abadie A, Diamond A, Hainmueller J. Synthetic control methods for comparative case studies: estimating the effect of California's tobacco control program. *J Am Stat Assoc*. 2010;105(490):493–505. https://doi.org/10.1198/jasa.2009.ap08746.

36. Abadie A, Diamond A, Hainmueller J. Comparative politics and the synthetic control method. *Am J Polit Sci*. 2014;59(2):495–510.

37. Ben-Michael E, Feller A, Rothstein J. The augmented synthetic control method. Journal of the American Statistical Association. Published online May 14, 2021:1–34. https://doi.org/10.1080/01621459.2021.1929245

38. Ferman B, Pinto C. Synthetic controls with imperfect Pre-treatment Fit. arXiv:191108521 [econ]. Published online January 12, 2021. http://arxiv.org/abs/1911.08521. Accessed November 9, 2021.

39. Doudchenko N, Imbens GW. Balancing, regression, difference-in-differences and synthetic control methods: a synthesis. arXiv:161007748 [stat]. Published online September 19, 2017. http://arxiv.org/abs/1610.07748. Accessed November 9, 2021.

✢ Springer

Exhibit 5
Page 174

40. R Core Team. R: A language and environment for statistical computing. R Foundation for Statistical Computing. 2021. www.R-project.org/. Accessed May 1, 2021.

41. Ben-Michael E. Augsynth: the augmented synthetic control method. 2021. https://rdrr.io/github/ebenmichael/augsynth/. Accessed November 18, 2021.

42. Efron B. Nonparametric estimates of standard error: the jackknife, the bootstrap and other methods. Biometrika. 1981;68(3):589–99. https://doi.org/10.2307/2335441.

43. Schwarzer G, Carpenter JR, Rücker G. Meta-Analysis with R. Springer International Publishing, Switzerland; 2015. https://doi.org/10.1007/978-3-319-21416-0

44. Crifasi CK, Pollack KM, Webster DW. Effects of state-level policy changes on homicide and nonfatal shootings of law enforcement officers. Inj Prev. 2016;22(4):274–8. https://doi.org/10.1136/injuryprev-2015-041825.

45. Sherman LW, Langworthy RH. Measuring homicide by police officers. J Crim Law Criminol (1973-). 1979;70(4):546–60. https://doi.org/10.2307/1142641.

46. Ozkan T, Worrall JL, Zettler H. Validating media-driven and crowdsourced police shooting data: a research note. J Crime Just. 2018;41(3):334–45. https://doi.org/10.1080/0735648X.2017.1326831.

47. Nix J, Shjarback JA. Factors associated with police shooting mortality: a focus on race and a plea for more comprehensive data. PLoS ONE. 2021;16(11):e0259024. https://doi.org/10.1371/journal.pone.0259024.

48. Edwards F, Lee H, Esposito M. Risk of being killed by police use of force in the United States by age, race-ethnicity, and sex. Proc Natl Acad Sci U S A. 2019;116(34):16793–8. https://doi.org/10.1073/pnas.1821204116.

49. Edwards F, Esposito MH, Lee H. Risk of police-involved death by race/ethnicity and place, united states, 2012–2018. Am J Public Health. 2018;108(9):1241–8. https://doi.org/10.2105/AJPH.2018.304559.

50. DeGue S, Fowler KA, Calkins C. Deaths Due to use of lethal force by Law enforcement. Am J Prev Med. 2016;51(5 Suppl 3):S173–87. https://doi.org/10.1016/j.amepre.2016.08.027.

51. Sikora AG, Mulvihill M. Trends in mortality Due to legal intervention in the United States, 1979 Through 1997. Am J Public Health. 2002;92(5):841–3.

52. Bouttell J, Craig P, Lewsey J, Robinson M, Popham F. Synthetic control methodology as a tool for evaluating population-level health interventions. J Epidemiol Commun Health. 2018;72(8):673–8. https://doi.org/10.1136/jech-2017-210106.

53. Abadie A. Using synthetic controls: feasibility, data requirements, and methodological aspects. J Econ Lit. 2021;59(2):391–425. https://doi.org/10.1257/jel.20191450.

**Publisher's Note**   Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Exhibit D
Page 175

# Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017)

*Mitchell L. Doucette, PhD, MS, Cassandra K. Crifasi, PhD, MPH, and Shannon Frattaroli, PhD, MPH*

*Objectives.* To examine the impact of right-to-carry (RTC) firearm laws on firearm workplace homicides (WPHs) in the United States from 1992 to 2017.

*Methods.* We employed 2 longitudinal methods to examine the average effect (pooled, cross-sectional, time-series analysis) and the state-specific effect (random effects meta-analysis) of RTC laws on WPHs committed by firearms from 1992 to 2017 in a 50-state panel. Both methods utilized a generalized linear mixed model with a negative binomial distribution.

*Results.* From 1992 to 2017, the average effect of having an RTC law was significantly associated with 29% higher rates of firearm WPHs (95% confidence interval [CI] = 1.14, 1.45). No other state-level policies were associated with firearm WPHs. Sensitivity analyses suggest robust findings. State-specific estimates suggest that passing an RTC law during our study period was significantly associated with 24% increase in firearm WPH rates (95% CI = 1.09, 1.40).

*Conclusions.* This is the first study to our knowledge to examine the link between RTC firearm laws and firearm WPHs. Findings indicate that RTC laws likely pose a threat to worker safety and contribute to the recent body of literature that finds RTC laws are associated with increased incidence of violence. (*Am J Public Health.* 2019;109:1747–1753. doi:10.2105/AJPH.2019.305307)

In 2017, there were 458 workplace homicides (WPHs), defined as a homicide in which an employee or owner is killed while working, in the United States.[1] The majority (76.6%) of these homicides were committed by firearm (n = 351).[1] While greater than 80% of WPH decedents are male,[2,3] WPHs have been either the first or second leading cause of death among female workers for many years.[4] In 2015, 43% of female WPH victims were killed by intimate partners or relatives, compared with 2% of male WPH victims.[5] A study of workplaces in North Carolina from 1994 to 1998 found that workplaces that allowed employee access to firearms had nearly 5-times-greater odds of having a WPH compared with workplaces that prohibited weapons.[6]

A recent national epidemiological investigation of firearm WPHs identified that the circumstances around these crimes have changed. Investigations of WPH etiology in the 1990s found that approximately 80% of these crimes were committed in the course of robbery.[7,8] New evidence from 2011 to 2015 found that robberies accounted for only 47% of WPHs, with the majority of firearm WPHs now being committed in the course of non-robbery events, chiefly as part of arguments and other forms of interpersonal violence.[9] The authors hypothesized that changes in firearm exposure in workplaces may be contributing to the change in firearm WPH etiology.[9] Importantly, research has found that workplace violence prevention measures aimed at preventing robbery-motivated WPHs do not easily translate into preventing non–robbery-motivated WPHs.[10]

Over the past 26 years, the adoption of shall-issue concealed carry laws, or right-to-carry (RTC) laws, by the majority of US states has, by design, likely increased firearm exposure in the general population. States with RTC laws either issue permits to carry a concealed firearm on a "shall"-issue basis, giving no discretion to authorities over who can carry a concealed firearm, or do not require a permit to carry a concealed firearm.[11,12] These laws effectively lower the barrier to entry for who can legally carry a concealed firearm in public.

Disagreement in the literature regarding the impact of RTC laws on violent crimes has existed for many years. Previous work from Lott and Mustard touting the protective effects of RTC laws on violent crimes progressed the "more guns, less crime" hypothesis.[13] Although the statistical methods used to derive Lott and Mustard's hypothesis were largely dismissed by the 2005 National Research Council's Report on Firearms and Violence,[14] their research was used as evidence to support the passing of new RTC laws in 25 states[11] from 1992 to 2017. Much of the evidence from the mid-2000s showed null findings regarding the relationship between RTC laws and various violent crime outcomes.[15,16] However, recent examinations of the impact of RTC laws on violent crime suggest that these laws are associated with increased levels of violent crimes. These analyses have included various causal methodologies and additional years of data compared with analyses from the mid-2000s.[11,12,17] Their findings all suggest a likely relationship between RTC laws and violent crimes and homicides in particular.

**ABOUT THE AUTHORS**

*Mitchell L. Doucette is with the Department of Health Science, Eastern Connecticut State University, Willimantic, and the Injury Prevention Center at Connecticut Children's Medical Center, Hartford. Cassandra K. Crifasi and Shannon Frattaroli are with the Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD.*

*Correspondence should be sent to Mitchell L. Doucette, Department of Health Sciences, Eastern Connecticut State University, 83 Windham St, Willimantic, CT 06226 (e-mail: doucettemi@easternct.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 21, 2019.*

*doi: 10.2105/AJPH.2019.305307*

Exhibit D
Page 476

Donohue et al. identified that RTC laws were associated with 13% to 15% greater rates of violent crimes 10 years after adoption by using synthetic control methods.[12] Crifasi et al. found that RTC laws were associated with an increase (4%) in firearm homicides in large urban US counties by using a generalized linear mixed model, with random effects at the county level.[17] Siegel et al. found that RTC laws were associated with 8.6% higher firearm homicide rates by using a fixed-effects panel analysis, modeling firearm homicides as counts and rates.[11]

RTC laws, and consequent increased firearm carrying in the general population, could potentially have an impact on firearm WPH incidence. As studies suggest that gun carrying potentially emboldens aggressive behaviors,[18,19] arguments between co-workers or ex–co-workers, customers–employees, and domestic partners may turn deadly as a result of access to lethal means. Furthermore, those carrying a concealed weapon may intervene in a well-intentioned way—to thwart crime, for example—only to unintentionally induce fatal violence.[12]

Given the potential ways RTC laws may have an impact on firearm WPH, we analyzed the relationship between these laws and firearm WPHs from 1992 to 2017 by using 2 longitudinal methodologies. We hypothesized that states removing barriers to civilian gun carrying would experience higher rates of WPH by firearm.

## METHODS

We conducted a pooled, cross-sectional, time-series analysis across a 50-state panel to examine the average effect of RTC firearm laws on firearm WPHs from 1992 to 2017 in the United States. We also conducted a random-effect meta-analysis to produce state-specific effect sizes. We used a generalized linear mixed model with a negative binomial distribution for both estimations.

## Variables and Data Sources

Our dependent variable was counts of firearm WPHs by state and year. We obtained these data via public data request from the Census of Fatal Occupational Injuries (CFOI), maintained by the Bureau of Labor Statistics (BLS). CFOI is the most comprehensive database of workplace deaths within the United States. For inclusion in CFOI, the decedent must be an employee or employer killed in the act of working and each death must be verified with at least 2 independent source documents (e.g., medical examiner's report, police report, workplace injury report, media).[20] Of note, non-employees killed in workplaces are not considered WPHs.

In addition to the presence or absence of RTC laws, we included the following state-level statutes as predictors in our analysis: permit-to-purchase laws,[21] parking lot laws,[22] stand-your-ground laws,[17] firearm prohibition laws for those convicted of a violent misdemeanor,[23,24] firearm prohibition laws that allow dating partners to petition for a domestic violence restraining order,[24] and firearm prohibition laws that allow ex-parte domestic violence restraining orders.[24] These laws were included in the analysis as they have either previously displayed significant relationships with firearm homicides in the general population or, in the case of parking lot laws, may directly affect firearm exposure in the workplace. Sixteen states passed laws specifically aimed at securing employee firearm access while at work via their motor vehicles, referred to as parking lot laws, from 2003 to 2013.[22] As these laws have not been evaluated, their impact is unclear. However, these laws prohibit businesses from restricting employees from keeping guns in cars parked in company lots.[25]

To analyze the effect of these laws over time, we coded each law as "0" in the years before the law took effect, as a fraction of months the law was in effect in its first year, and as "1" for all subsequent years. We ascertained effective dates for all laws through legal research and checked them against existing literature for accuracy[22,24,26] (see Table A, available as a supplement to the online version of this article at http://www.ajph.org, for effective dates).

We included several state-level covariates potentially associated with the relationship between workplace homicides and RTC laws. A priori variables selected for inclusion were a proxy measure for household gun availability,[27,28] state firearm homicide rate,[11,12,17] state expenditure on law enforcement,[17,21,29] the percentage of the population living in a metropolitan statistical area (MSA),[21] percentage of employees working in the retail industry,[2,30] and number of employed persons. We obtained law enforcement expenditure, which was available from 1992 to 2015, via the US Census Bureau.[31] As such, law enforcement expenditure was linearly interpolated for 2016 and 2017 by state. We obtained number of persons employed and the percentage of employees working in the retail industry from the Current Employment Survey through the BLS.[32] We used the percentage employed persons working in retail to account for the difference in size of states' retail employment, as the retail industry is known to have higher rates of robbery-motivated WPH compared with other industries.[2,30]

Household gun availability is the ratio of firearm suicides to overall suicides and was calculated with data from the Centers for Disease Control and Prevention's Web-based Injury Statistics Query and Reporting System (WISQARS).[33] This proxy measure is widely used in longitudinal firearm policy analysis for both homicide and suicide outcomes[17,21,27–29,34–41] and was validated using Behavioral Risk Factor Surveillance System survey data from 2001, 2002, and 2004, years during which respondents were asked about firearm ownership. We obtained state firearm homicide rates from WISQARS.[33]

Other included state-level demographics were the percentage of the state population who reported being Black,[3] married, male,[3] living in poverty,[11,17] part of a union,[42] and high-school graduates, and the household median income.[11] We obtained state-level demographics, including MSA, from the Current Population Survey microdata available through the Integrated Public Use Microdata Series.[43] We obtained census regions,[3] stratified into Northeast, Midwest, West, and South, from the US Census Bureau.[31] We tested but ultimately excluded percentage of the state reporting being White[3] and percentage of the state reporting being aged 65 years or older[3] because of lack of significant relationship with the outcome. (See Table B, available as a supplement to the online version of this article at http://www.ajph.org, for correlation matrix with state-level demographic covariates.)

## Analysis

To evaluate the average effect of having an RTC law and the state-specific effect of

Exhibit D
Page 191

passing an RTC law on firearm WPHs, we used a generalized linear mixed model specifying a negative binomial distribution, clustered robust sandwich estimators of the variance within each state, and state and year fixed effects. We used the natural log of number of employed persons as our population offset, interpreting results as incidence rate ratios (IRRs). We included all variables and firearm laws in both the average effect and the state-specific effect model. We specified an independent correlation structure to model the intrastate correlation over time. French and Heagerty found a heterogeneous policy effect of RTC laws on population-level homicide rates.[16] Thus, we included a random intercept term to account for variation in firearm WPHs within states and a random slope term for RTC laws to address the law's heterogeneous effect across states.[16]

We conducted several additional sensitivity analyses on the average effect model, which included the following:

1. We assessed the impact of RTC laws in the first full year they were in effect, modeling a delayed effect for the laws'

impact (Lott and Mustard model). We modeled the impact of RTC laws in this fashion to mirror Lott and Mustard's effect modeling from 1997.[13]

2. We restricted the average effect model to the years 1998 to 2017.[11,44]

3. We modified the average effect model to exclude all variables related to violent crime that could potentially confound the outcome (Lean model).[44]

4. We restricted the Lean model to the years 1998 to 2017. We chose to restrict the models from 1998 to 2017 to address confounding related to the crack cocaine epidemic. This period also coincides with the total number of WPHs leveling off after steep declines starting in 1994 (Figure 1).

As an additional sensitivity analysis, we included a placebo test of workplace deaths related to falls, which includes falls to the same level and falls to a lower level.

We evaluated the state-specific effect of passing an RTC law on firearm WPHs by fitting the generalized linear mixed model with (1) 50 state indicator variables and (2) interaction terms between RTC laws and each of the 25 states that passed an RTC law

during the study period.[16] The IRRs produced by the interaction terms represented the ratio of incidence rates comparing after implementation to before implementation for a given state. We conducted all statistical analyses with Stata version 15.0 (StataCorp LP, College Station, TX).

State and year indexed public data requests from CFOI contain a potential limitation. In accordance with federal–state cooperative agreements with all 50 states, BLS releases aggregate data by state–year index when counts are 1 or greater unless the state–year index contains a single death and that death is not a matter of public record (i.e., CFOI confirmed the death through private documents only).[45] For this study, 13 502 of the 13 866 (97.4%) firearm WPHs from 1992 to 2017 were included in our data request. Those 13 502 deaths were presented across 900 of the possible 1300 state–year indices (26 years*50 states). To check whether the missing 2.6% of data affected our analysis, we ran the average effect analysis in 2 ways: (1) a complete case analysis, using only the positive integer counts provided in the data request, and (2) as a total population analysis, assuming all censored state



**FIGURE 1—Firearm Workplace Homicide (a) Total Counts and (b) Average Rates: United States, 1992–2017**

Exhibit D
Page 4770

and year data points to be "0," ignoring the censored 2.6% of data.

## RESULTS

Figure 1 displays the national and regional trends of firearm WPH counts and rates per 1 million employees. The total number of firearm WPHs dropped precipitously from 1992 to 1998, and has been gradually declining over the past 20 years (Figure 1). Firearm WPH rates also sharply declined in the beginning years of this study, with a more gradual decline starting at the turn of the 21st century. Southern states accounted for the largest portion of firearm WPH counts in almost every year and were above the national average rate in every year. Table C (available as a supplement to the online version of this article at http://www.ajph.org) provides the counts and rates of firearm WPHs by state and year.

Table 1 presents the average effect size of RTC laws and 6 other laws on firearm WPHs. In the complete case analysis (CCA), states with RTC laws had 1.29 times greater rates of firearm WPH when we controlled for all other confounders. In the total population analysis (TPA), RTC states had 1.34 times

greater rates compared with non-RTC states. The 95% confidence intervals (CIs) for the average effect for the CCA (1.14, 1.45) and the TPA (1.16, 1.54) were similar, suggesting comparable spreads around each model's effect size. No other firearm policies displayed significant associations with firearm WPH rates across both types of analyses.

The coefficients for region displayed large differences across analysis methods. For example, Southern states showed no significant differences in firearm WPH rates compared with Northeastern states in the CCA, yet were associated with 10.378 times greater rates of firearm WPH rates in the TPA. We elected to use the CCA to conduct our sensitivity analyses and to produce state-specific effects as it had a more conservative estimate of the relationship between RTC laws and firearm WPHs with a slightly smaller 95% CI compared with the TPA.

### Sensitivity Analyses

The sensitivity analyses for the average effect model displayed similar, significant associations between RTC laws and firearm WPH incidence (Table 2). When the effect of state laws was modeled with the Lott and Mustard method, RTC laws were associated

with 26.6% higher firearm WPH rates compared with non-RTC states (95% CI = 1.12, 1.42). Restricting the average-effect model to 1998 to 2017 maintained a significant relationship between RTC laws and firearm WPHs (IRR = 1.21; 95% CI = 1.02, 1.43). When the model excluded variables that could potentially confound the relationship between firearm WPH and RTC laws (Lean model), we found RTC states had a 33.4% greater rate of firearm WPHs (95% CI = 1.11, 1.59). Restricting the Lean model from 1998 to 2017 displayed significant relationships between RTC states and increased firearm WPH rates (IRR = 1.26; 95% CI = 1.06, 1.49). Fall-related workplace deaths, used as a negative control, were not associated with any of the included state firearm laws (IRR = 1.02; 95% CI = 0.94, 1.10).

### State-Specific Effects

Our examination of state-specific effects of passing an RTC law suggested similar findings to the average effect of having an RTC over the study period. Figure 2 displays the IRRs associated with passing an RTC law for the 25 states that did so between 1992 and 2017 (see

| TABLE 1—Effect of State Firearm Policies on Firearm-Related Workplace Homicides, All 50 States: United States, 1992–2017 | | |
|---|---|---|
| | Complete Case Analysis (State-Year Indices = 900), IRR (95% CI) | Total Population Analysis (State-Year Indices = 1300),[a] IRR (95% CI) |
| State firearm laws | | |
| Right-to-carry | 1.29 (1.14, 1.45) | 1.34 (1.16, 1.54) |
| Permit-to-purchase | 0.97 (0.77, 1.21) | 0.98 (0.81, 1.18) |
| Parking lot laws | 1.04 (0.87, 1.23) | 0.96 (0.80, 1.15) |
| Stand your ground | 0.94 (0.81, 1.08) | 0.91 (0.76, 1.07) |
| Domestic violence restraining order—dating partners | 1.00 (0.89, 1.12) | 0.99 (0.87, 1.13) |
| Domestic violence restraining order—ex parte orders | 0.91 (0.78, 1.05) | 0.91 (0.78, 1.04) |
| Violent misdemeanor | 1.10 (0.96, 1.24) | 1.12 (0.96, 1.30) |
| Region (Ref: Northeast) | | |
| Midwest | 1.18 (0.46, 2.90) | 10.38 (4.34, 24.82) |
| West | 0.68 (1.03, 8.72) | 5.80 (3.79, 8.87) |
| South | 1.11 (0.83, 3.56) | 0.39 (0.33, 0.44) |

*Note.* CI = confidence interval; IRR = incidence rate ratio. The model also included state and year fixed effects; homicide rate; law enforcement expenditure linearly interpolated for 2016 and 2017; household firearm availability as a ratio of firearm suicides to total suicides; percentage population Black, married, living in a metropolitan statistical area, living in poverty, part of a union, and graduated high school; household median income; and percentage of workers in the retail sector. The model used the natural log of employment as its population offset, random intercepts for between-state workplace homicides, and random modeling policy effect of right-to-carry laws. Within-state correlation was structured as independent, and robust standard errors were clustered by state. We generated estimates via a public data request from the Bureau of Labor Statistics' Census of Fatal Occupational Injury data. The views expressed here do not necessarily reflect the views of the Bureau of Labor Statistics. Included in the initial analysis, but ultimately not used because of lack of correlation was percentage of the population White and percentage of the population aged 65 years or older (see Table B, available as a supplement to the online version of this article at http://www.ajph.org, for correlation matrix).
[a]50 states by 26 years.

Exhibit D
Page 179

**TABLE 2—Sensitivity Analyses of Relationship Between Right-to-Carry Laws and Firearm-Related Workplace Homicides in the United States, Using Complete Case Analysis: 1992–2017**

| State Firearm Laws | Lott and Mustard Model,[a] IRR (95% CI) | Average-Effect Model, 1998–2017,[b] IRR (95% CI) | Lean Model,[c] IRR (95% CI) | Lean Model, 1998–2017, IRR (95% CI) | Occupational Deaths by Falls,[d] IRR (95% CI) |
|---|---|---|---|---|---|
| | | | Sensitivity Models | | |
| Right-to-carry | 1.27 (1.12, 1.42) | 1.21 (1.02, 1.43) | 1.33 (1.11, 1.59) | 1.26 (1.06, 1.49) | 1.02 (0.94, 1.10) |
| Permit-to-purchase | 0.92 (0.72, 1.18) | 1.03 (0.87, 1.21) | . . . | . . . | 0.94 (0.68, 1.03) |
| Parking lot laws | 1.07 (0.91, 1.26) | 1.01 (0.84, 1.22) | . . . | . . . | 0.94 (0.89, 1.26) |
| Stand your ground | 0.93 (0.80, 1.06) | 0.94 (0.80, 1.09) | . . . | . . . | 0.98 (0.79, 1.07) |
| Domestic violence restraining order—dating partners | 1.01 (0.91, 1.12) | 0.95 (0.81, 1.10) | . . . | . . . | 1.01 (0.91, 1.16) |
| Domestic violence restraining order—ex parte orders | 0.91 (0.78, 1.04) | 1.01 (0.90, 1.15) | . . . | . . . | 1.00 (0.77, 1.04) |
| Violent misdemeanor | 1.09 (0.96, 1.23) | 1.07 (0.93, 1.24) | . . . | . . . | 1.07 (0.92, 1.24) |

*Note.* CI = confidence interval; IRR = incidence rate ratio. Where else noted, the models also include state and year fixed effects; homicide rate; law enforcement expenditure linearly interpolated for 2016 and 2017; household firearm availability as a ratio of firearm suicides to total suicides; percentage population Black, married, living in a metropolitan statistical area, living in poverty, part of a union, and graduated high school; household median income; and percentage of workers in the retail sector. The model used the natural log of employment as its population offset, random intercepts for between-state workplace homicides, and random subject effect of right-to-carry laws. Within-state correlation was structured as independent, and robust standard errors were clustered by state. Estimates were generated by authors via a data request from the Bureau of Labor Statistics' Census of Fatal Occupational Injury data. The views expressed here do not necessarily reflect the views of the Bureau of Labor Statistics.

[a] All laws coded 1 in the first full year of implementation.[13] For law-effective date, see Table A, available as a supplement to the online version of this article at http://www.ajph.org.

[b] 1998 represents the first year that declines in firearm workplace homicides leveled off (Figure 1). It also represents a cut point to reduce bias from the violent crack cocaine epidemic.

[c] Other gun policy variables, household gun availability, homicide rate, and law enforcement expenditure withheld because of potential confounding.

[d] Census of Fatal Occupational Injuries deaths related to falls include fall to same level and fall to lower level.

Table A, available as a supplement to the online version of this article at http://www.ajph.org, for states and law passage dates. The overall IRR associated with passing an RTC law was 1.24 (95% CI = 1.09, 1.40). Thirteen of the 25 states that passed an RTC law had significantly higher incidence of firearm WPH after implementation (Arkansas, Illinois, Kansas, Kentucky, Louisiana, Minnesota, Missouri, New Mexico, Oklahoma, South Carolina, Tennessee, Virginia, and Wisconsin) while 4 states had significantly lower rates of firearm WPH (Alaska, Arizona, Iowa, and Nebraska) and 7 states did not have significant changes (Colorado, Michigan, Nevada, North Carolina, Ohio, Texas, and Utah). Wyoming did not have sufficient pre–post data to produce a state-specific estimate.

## DISCUSSION

This study represents the first study, to our knowledge, to examine the relationship between RTC laws and firearm WPH incidence. Our results indicate that, regardless of longitudinal methodology, and when we controlled for a range of covariates and heterogenous policy effects, states with RTC laws experienced higher firearm WPH incidence rates than did non-RTC states. States that had an RTC law between 1992 and 2017 experienced 29% greater rates of firearm WPHs. The 25 states that passed an RTC law from 1992 to 2017, on average, experienced 24% greater rates in firearm WPH incidence after law implementation (Figure 2) despite the overall rate of firearm WPHs decreasing over the study period (Figure 1). That our findings of the association between RTC laws and greater incidence of firearm WPH remained over several sensitivity analyses adds greater plausibility to the observed relationship.

Our results are consistent with more recent and robust examinations of the impact of RTC laws, which suggest that these laws are associated with higher rates of violent crime.[11,12,17] However, the strength of the relationship between RTC laws and our violent crime outcome is notably higher than that in previous studies. We hypothesize that the strong relationship is attributable in part to exposure of firearms in the workplace and the nature of WPH as a subset of homicides. In

their study conducted with North Carolina occupational death data from 1994 to 1998, Loomis et al. found that workplaces that allowed employee access to firearms had 5-fold greater WPH incidence.[6] As 25 states have passed RTC laws over the past 26 years and as firearm WPHs have become primarily interpersonal crimes,[9] the strength of relationship we found is plausible; it is more likely that conflicts in workplaces, whether between co-workers or ex–co-workers and customers–employees or those known to the employee, end fatally as access to lethal means has increased.

As we consider the impact of RTC laws and the consequences of increased firearm exposure in general, we must consider the impact on worker safety. Lawmakers considering the issue of state reciprocity for RTC laws should consider information provided here. We demonstrated that RTC laws are associated with increased firearm WPH rates. Thus, mandating state reciprocity for RTC laws could have a negative impact on worker safety. Mandating that states with stringent concealed carry permitting laws

Exhibit D
Page 690



|  | IRR (95% CI) | % Weight |
|---|---|---|
| AK (1994) | 0.54 (0.43, 0.69) | 4.41 |
| AZ (1994) | 0.81 (0.69, 0.95) | 4.41 |
| AR (1995) | 2.11 (1.84, 2.42) | 3.93 |
| CO (2003) | 0.97 (0.86, 1.09) | 4.45 |
| IL (2013) | 1.21 (1.02, 1.44) | 4.20 |
| IA (2011) | 0.72 (0.61, 0.85) | 4.44 |
| KS (2007) | 1.31 (1.10, 1.56) | 4.14 |
| KY (1996) | 1.28 (1.13, 1.46) | 4.32 |
| LA (1996) | 1.37 (1.11, 1.69) | 3.94 |
| MI (2001) | 1.08 (0.91, 1.29) | 4.26 |
| MN (2003) | 1.66 (1.32, 2.08) | 3.59 |
| MO (2004) | 1.73 (1.43, 2.09) | 3.76 |
| NE (2007) | 0.58 (0.50, 0.66) | 4.50 |
| NV (1995) | 0.86 (0.74, 1.00) | 4.41 |
| NM (2004) | 1.36 (1.22, 1.52) | 4.36 |
| NC (1995) | 1.21 (0.99, 1.49) | 4.07 |
| OH (2004) | 1.10 (0.98, 1.23) | 4.43 |
| OK (1996) | 1.39 (1.26, 1.55) | 4.38 |
| SC (1996) | 1.28 (1.13, 1.44) | 4.35 |
| TN (1996) | 1.65 (1.48, 1.84) | 4.28 |
| TX (1996) | 0.95 (0.79, 1.15) | 4.28 |
| UT (1995) | 1.15 (0.93, 1.43) | 4.07 |
| VA (1995) | 2.02 (1.64, 2.49) | 3.41 |
| WI (2011) | 2.12 (1.78, 2.53) | 3.59 |
| Overall ($I^2 = 95.2\%$; $P < .001$) | 1.24 (1.09, 1.40) | 100.00 |

Incidence Rate Ratio

*Note.* CI = confidence interval; IRR = incidence rate ratio. Weights are from random effects analyses. Wyoming was not included because of no pre–post law implementation data.[14]

**FIGURE 2—Impact of a Passing a Right-to-Carry Law on Firearm Workplace Homicides: United States, 1992–2017**

allow individuals from states with less stringent or nonexistent concealed carry permitting laws to carry a concealed weapon likely places employees at increased risk of death.

Future research should further the understanding of firearm exposure in the workplace. In general, RTC laws allow private employers to prohibit customer and employee firearms from their premises.[25] The penetration of these prohibitions and whether businesses that prohibit gun carrying succeed in enforcing this option is not known. Answers to these questions will further the knowledge base around the impact of firearm exposure on violent workplace deaths.

## Limitations

This study is not without limitations. The nature of CFOI data request created the need to perform the analysis as a CCA, using only the available data, and as a TPA, setting the censored data equal to "0." Thus, the TPA likely underestimates the true incidence of firearm WPHs. However, the coefficient estimates for the relationship between RTC laws and firearm deaths were similar across both analysis types, with the TPA displaying a larger coefficient compared with the CCA. Therefore, we are confident that the estimates produced by the CCA model are unaffected by the 2.6% of censored data and are likely conservative estimates of the relationship between RTC laws and firearm WPHs.

While CFOI provides the most comprehensive accounting of fatal occupational injuries, it contains reporting limitations. CFOI does not contain information on potential confounding factors such as lifestyle or work conditions.[46] Although CFOI uses at least 2 documents to verify death characteristics, homicides that occur in the

workplace can be prone to misclassification, underestimating the true count. As with most studies of the effect of state laws, there is potential for selection bias and omitted variable bias. Controlling for state-level factors across time that may have prompted the enactment of state laws reduces the potential influence of selection bias. To address omitted variable bias, we used state and year fixed effects to account for unaccounted time-invariant factors and state-invariant factors.

It is also important to note that CFOI only presents data on workers, meaning non-employees could have been killed during a WPH event and are not accounted for in these data. As such, our results likely underestimate the true effect of these policies as it does not fully account for the total number of deaths related to violent crime in the workplace.

Historical bias is always a potential threat to internal validity within panel data analysis. However, several of our sensitivity analyses excluded data before 1998, avoiding potential confounding with the crack cocaine epidemic, with the relationship between RTC laws and firearm WPH holding significant.

We were unable to include an important sensitivity analysis that used nonfirearm workplace homicides as an outcome. This is because of data availability. As firearms are the mechanism of death in around 80% of WPH, there were not enough accessible data under CFOI data publishability rules to conduct this type of sensitivity analysis.

## Conclusions

This study fills an important knowledge gap by producing the first estimates, to our knowledge, of the effect of state firearm laws on firearm WPH incidence. We found, overall, that RTC laws were associated with approximately a 29% increase in the risk of firearm WPH. The ongoing conversation over RTC laws' impact on safety does not consider workers. As our study shows, states with RTC laws have greater expected firearm WPHs. There is reason to introduce worker safety into the conversation. **AJPH**

Exhibit D
Page 181

## CONTRIBUTORS

All authors contributed equally to the submitted article.

## ACKNOWLEDGMENTS

This work represents aspects of M. L. Doucette's doctoral thesis work conducted at the Johns Hopkins Bloomberg School of Public Health.

M. L. Doucette was supported in part by the Johns Hopkins Education and Research Center for Occupational Safety and Health (T42-OH 008428) as well as the 2017–2018 Nancy A. Robertson Scholarship in Injury Prevention and the 2017–2018 William Haddon Jr Fellowship in Injury Prevention.

## CONFLICTS OF INTEREST

The authors declare that there is no conflict of interest regarding the publication of this article.

## HUMAN PARTICIPANT PROTECTION

This work was deemed to not be human participant research and was thus exempt from protocol review.

## REFERENCES

1. Bureau of Labor Statistics, US Department of Labor. National Census of Fatal Occupational Injuries in 2017. 2018. Available at: https://www.bls.gov/news.release/pdf/cfoi.pdf. Accessed January 10, 2019.

2. Moracco KE, Runyan CW, Loomis DP, Wolf SH, Napp D, Butts JD. Killed on the clock: a population-based study of workplace homicide, 1977–1991. *Am J Ind Med.* 2000;37(6):629–636.

3. Menéndez CC, Konda S, Hendricks S, Amandus HA. Disparities in work-related homicide rates in selected retail industries in the United States, 2003–2008. *J Safety Res.* 2013;44:25–29.

4. Tiesman HM, Gurka KK, Konda S, Coben JH, Amandus HE. Workplace homicides among US women: the role of intimate partner violence. *Ann Epidemiol.* 2012; 22(4):277–284.

5. Bureau of Labor Statistics, US Department of Labor. National Census of Fatal Occupational Injuries in 2015. 2016. Available at: https://www.bls.gov/news.release/archives/cfoi_12162016.pdf. Accessed September 10, 2018.

6. Loomis D, Marshall SW, Ta ML. Employer policies toward guns and the risk of homicide in the workplace. *Am J Public Health.* 2005;95(5):830–832.

7. Toscano G, Windau J. Profile of fatal work injuries in 1996. In: *Fatal Workplace Injuries in 1996—A Collection of Data and Analysis.* Washington, DC: Bureau of Labor Statistics, US Department of Labor; 1998.

8. Casteel C, Peek-Asa C. Effectiveness of Crime Prevention Through Environmental Design (CPTED) in reducing robberies. *Am J Prev Med.* 2000;18(4 suppl): 99–115.

9. Doucette ML, Bulzacchelli MT, Frattaroli S, Crifasi CK. Firearm-related workplace homicides: recent trends and narrative text analysis. *Inj Epidemiol.* 2019; 6(5):1–9.

10. Loomis D, Marshall SM, Wolf SH, Runyan CW, Butts JD. Effectiveness of safety measures recommended for prevention of workplace homicide. *JAMA.* 2002; 287(8):1011–1017.

11. Siegel M, Xuan Z, Ross CS, et al. Easiness of legal access to concealed firearm permits and homicide rates in the United States. *Am J Public Health.* 2017;107(12): 1923–1929.

12. Donohue J, Aneja A, Weber K. Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic control analysis. *J Empir Leg Stud.* 2019;16(2):198–247.

13. Lott JR, Mustard DB. Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud.* 1997;26(1):1–68.

14. National Research Council. *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press; 2005.

15. Santaella-Tenorio J, Cerda M, Villaveces A, Galea S. What do we know about the association between firearm legislation and firearm-related injuries? *Epidemiol Rev.* 2016;38(1):140–157.

16. French B, Heagerty PJ. Analysis of longitudinal data to evaluate a policy change. *Stat Med.* 2008;27(24): 5005–5025.

17. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between firearm laws and homicide in urban counties [erratum *J Urban Health.* 2018;95(5):773–776]. *J Urban Health.* 2018; 95(3):383–390.

18. Phillips CD, Nwaiwu O, Moudouni McMaughan DK, Edwards R, Lin S. When concealed handgun licensees break bad: criminal convictions of concealed handgun licensees in Texas, 2001–2009. *Am J Public Health.* 2013;103(1):86–91.

19. Hemenway D, Vriniotis M, Miller M. Is an armed society a polite society? Guns and road rage. *Accid Anal Prev.* 2006;38(4):687–695.

20. Marsh SM, Jackson LL. A comparison of fatal occupational injury event characteristics from the Census of Fatal Occupational Injuries and the Vital Statistics Mortality System. *J Safety Res.* 2013;46:119–125.

21. Crifasi CK, Pollack KM, Webster DW. Effects of state-level policy changes on homicide and nonfatal shootings of law enforcement officers. *Inj Prev.* 2016; 22(4):274–278.

22. Doucette ML. *Workplace Homicides: Reconsidering the Role of Firearms* [PhD thesis]. Baltimore, MD: Department of Health Policy and Management, The Johns Hopkins Bloomberg School of Public Health; 2018. Available at: https://jscholarship.library.jhu.edu/bitstream/handle/1774.2/61053/DOUCETTE-DISSERTATION-2018.pdf?sequence=1&isAllowed=y. Accessed May 30, 2019.

23. Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *JAMA.* 2001;285(8):1019–1026.

24. Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the strength of legal firearms restrictions for perpetrators of domestic violence and their association with intimate partner homicide. *Am J Epidemiol.* 2018;187(11):2365–2371.

25. Steines S. Parking-lot laws: an assault on private-property rights and workplace safety. *Iowa Law Rev.* 2008; 93(3):1171–1205.

26. Cherney S, Morral AR, Schell TL. RAND State Firearm Law Database. RAND Corporation. 2018. Available at: https://www.rand.org/pubs/tools/TL283.html. Accessed May 4, 2019.

27. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership measurement, structure, and trends. *J Quant Criminol.* 2004;20(1):43–62.

28. Miller M, Azrael D, Hemenway D. Rates of household firearm ownership and homicide across US regions and states, 1988–1997. *Am J Public Health.* 2002; 92(12):1988–1993.

29. Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. *Prev Med.* 2015;79:43–49.

30. Konda S, Tiesman HM, Hendricks S, Gurka KK. Non-robbery-related occupational homicides in the retail industry, 2003–2008. *Am J Ind Med.* 2014;57(2): 245–253.

31. US Census Bureau. American Fact Finder. Available at: https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t. Accessed January 18, 2018.

32. Bureau of Labor Statistics. Employment. Databases, tables & calculators by subject. 2018. Available at: https://www.bls.gov/data. Accessed January 2, 2018.

33. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS). 2016. Available at: https://www.cdc.gov/injury/wisqars. Accessed June 1, 2017.

34. Hemenway D, Azrael D, Conner A, Miller M. Variation in rates of fatal police shootings across US states: the role of firearm availability. *J Urban Health.* 2019;96(1): 63–73.

35. Kleck G. Measures of gun ownership levels for macro-level crime and violence research. *J Res Crime Delinq.* 2004;41(1):3–36.

36. Miller M, Azrael D, Hemenway D. Firearm availability and unintentional firearm deaths, suicide, and homicide among 5–14 year olds. *J Trauma.* 2002;52(2): 267–274, discussion 274–265.

37. Miller M, Azrael D, Hemenway D. Firearm availability and suicide, homicide, and unintentional firearm deaths among women. *J Urban Health.* 2002;79(1):26–38.

38. Wiebe DJ, Krafty RT, Koper CS, Nance ML, Elliott MR, Branas CC. Homicide and geographic access to gun dealers in the United States. *BMC Public Health.* 2009;9(1):199.

39. Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides [erratum *J Urban Health.* 2014;91(3):598–601]. *J Urban Health.* 2014;91(2):293–302.

40. Kagawa RMC, Castillo-Carniglia A, Vernick JS, et al. Repeal of comprehensive background check policies and firearm homicide and suicide. *Epidemiology.* 2018;29(4): 494–502.

41. Castillo-Carniglia A, Kagawa RMC, Cerda M, et al. California's comprehensive background check and misdemeanor violence prohibition policies and firearm mortality. *Ann Epidemiol.* 2019;30:50–56.

42. Berdahl TA. Racial/ethnic and gender differences in individual workplace injury risk trajectories: 1988–1998. *Am J Public Health.* 2008;98(12):2258–2263.

43. Flood S, King M, Rodgers R, Ruggles S, Warren JR. Integrated Public Use Microdata Series, Current Population Survey: Version 6.0. Minneapolis, MN: Integrated Public Use Microdata Series; 2018.

44. Donohue JJ. Laws facilitating gun carrying and homicide. *Am J Public Health.* 2017;107(12):1864–1865.

45. Bureau of Labor Statistics, Department of Labor. Census of Fatal Occupational Injuries: presentation, handbook of methods. 2017. Available at: https://www.bls.gov/opub/hom/cfoi/presentation.htm. Accessed April 20, 2018.

46. Tiesman HM, Hendricks SA, Bell JL, Amandus HA. Eleven years of occupational mortality in law enforcement: the Census of Fatal Occupational Injuries, 1992–2002. *Am J Ind Med.* 2010;53(9):940–949.

Exhibit D
Page 192





**Justice Quarterly**

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/rjqy20

# Comparing the Impact of Household Gun Ownership and Concealed Carry Legislation on the Frequency of Mass Shootings and Firearms Homicide

Emma E. Fridel

**To cite this article:** Emma E. Fridel (2021) Comparing the Impact of Household Gun Ownership and Concealed Carry Legislation on the Frequency of Mass Shootings and Firearms Homicide, Justice Quarterly, 38:5, 892-915, DOI: 10.1080/07418825.2020.1789693

**To link to this article:** https://doi.org/10.1080/07418825.2020.1789693

Published online: 23 Jul 2020.

Submit your article to this journal 🖉

Article views: 6802

View related articles 🗗

View Crossmark data 🗗

Citing articles: 10 View citing articles 🗗

Exhibit D
Page 183

JUSTICE QUARTERLY
2021, VOL. 38, NO. 5, 892–915
https://doi.org/10.1080/07418825.2020.1789693

 



# Comparing the Impact of Household Gun Ownership and Concealed Carry Legislation on the Frequency of Mass Shootings and Firearms Homicide

Emma E. Fridel 🔘

College of Criminology & Criminal Justice, Florida State University, Tallahassee, FL, USA

**ABSTRACT**

Although mass shootings have fueled calls for large-scale changes in gun ownership and concealed carry legislation over the past thirty years, few studies have evaluated whether permissive gun policies actually deter mass shootings, and none have determined if their effects are the same on firearms homicide in general. This study examines the impact of household gun ownership and concealed carry legislation on annual counts of mass shootings and firearms homicides in the United States from 1991 to 2016. Negative binomial regressions with fixed effects and generalized estimating equations (GEE) indicate that mass shootings disproportionately occur in states with higher levels of gun ownership, while firearms homicide rates are higher in permissive concealed carry states. As the two crimes do not respond to changes in gun ownership and concealed carry legislation in the same way, lawmakers must contextualize mass shootings as a small, unique part of overall gun violence when considering policy interventions.

**ARTICLE HISTORY**
Received 5 May 2020
Accepted 25 June 2020

**KEYWORDS**
Mass shootings; firearms homicide; gun ownership; concealed carry

## Introduction

Gun violence is a major public health crisis in the United States: nearly 40,000 residents die from suicide, homicide, and accidents involving firearms annually, making a single year of gun-related deaths equivalent to casualties from the Korean War (Cook, Moore, & Braga, 2011). In particular, firearms homicide accounted for 14,542 deaths in 2017 (Centers for Disease Control & Prevention, 2019), representing over 75% of all homicides, and the United States' firearms homicide rate is 25.2 times greater than that of similar high-income nations (Grinshteyn & Hemenway, 2016).

Mass shootings represent the epitome of the firearms violence epidemic. Defined as the killing of four or more individuals (excluding the offender) with a firearm within 24 hours, mass shootings occur 23 times a year on average and account for less than 1% of all homicides in the United States (Fridel, 2017; Krouse & Richardson, 2015). Despite their rarity, mass shootings have fueled moral panics, inspired social movements like March for Our Lives, and sparked calls for policy change on both sides of

CONTACT Emma E. Fridel ✉ efridel@fsu.edu
© 2020 Academy of Criminal Justice Sciences

Exhibit D
Page 184

the political aisle. Nearly 80% of American adults experience stress related to mass shootings, and approximately one third avoid certain places and events due to their fear of victimization (American Psychological Association, 2019).

Despite the ubiquity of gun violence in the United States, widespread fear of mass shootings in particular has disproportionately influenced the public discourse on firearms ownership and legislation. Although household gun ownership has been declining since the early 1990s (Smith & Son, 2015), gun purchases and permit applications spike dramatically in the wake of infamous mass shootings (Liu & Wiebe, 2019; Wallace, 2015), especially among individuals with no history of firearms ownership (Studdert, Zhang, Rodden, Hyndman, & Wintemute, 2017). In 2019 alone, 13% of Americans surveyed purchased a weapon to protect themselves against mass shootings, with an additional 16% seriously considering the option (Brenan, 2019).

Aside from influencing individual gun-purchasing behavior, mass shootings are often used to garner support for more restrictive or permissive firearms laws. For example, one study found each incident increased the number of firearm bills introduced in any given state's legislature by 15% (Luca, Malhotra, & Poliquin, 2019). One of the most widely discussed—and most widely implemented—policies to prevent mass shootings is permissive concealed carry legislation. Suzanna Gratia Hupp famously called for fewer restrictions on concealed carry, arguing that she could have stopped the 1991 massacre at Luby's cafeteria in Killeen, Texas if she were not legally obligated to leave her firearm locked in her car (Hupp, 2009). Over twenty years later, Wayne LaPierre of the National Rifle Association (NRA) pithily reiterated Hupp's argument following the 2012 Sandy Hook Elementary School shooting, stating "The only thing that stops a bad guy with a gun is a good guy with a gun" (National Public Radio, 2012). Indeed, 56% of Americans believe that increased gun-carrying in public makes the nation safer (Newport, 2015). State laws have changed along with public opinion: while only 15 states maintained permissive concealed carry policies in the early 1990s, that number increased to 41 states as of 2018 (Siegel, Pahn et al. 2017).

Despite these large-scale changes in gun purchasing and carrying behavior, it remains unclear if these measures are an effective deterrent, as few studies have empirically examined the impact of gun ownership and/or concealed carry legislation on the frequency of mass shootings (Duwe, Kovandzic, & Moody, 2002; Lin, Fei, Barzman, & Hossain, 2018; Lott & Landes, 2000; Reeping et al., 2019; Webster, McCourt, Crifasi, Booty, & Stuart, 2020). Even further, research has yet to determine whether the effects of gun ownership and concealed carry legislation vary for mass shootings and firearms homicide. Doing so is critical, given that these extreme incidents disproportionately shape the gun control policies that influence the thousands of firearms homicides committed in the United States each year. Ultimately, broadening our understanding of the relationship between guns and homicide is crucial for combating moral panics, developing effective crime control policies, and dispelling public fear and old stereotypes. To address this gap in the literature, the present study utilizes cross-sectional panel models and generalized estimating equations (GEE) to compare the impact of household gun ownership and concealed carry legislation on the incidence rate of mass shootings and firearms homicide in the 50 U.S. states from 1991 to 2016. The study begins with a discussion of previous empirical work on gun

ownership, firearms homicide, and mass shootings before turning to the literature on concealed carry legislation.

## Literature review

### Household gun ownership

Scholars have long debated the link between the homicide rate and prevalence of gun ownership (Hepburn & Hemenway, 2004; Kleck, 1997; Kleck & Hogan, 1999). Some argue that guns have a positive relationship with homicide as they are more lethal in comparison to other weapons, increasing the likelihood of an assault becoming a murder (Zimring, 1968, 1991, 1972). Due to their psychological association with power, firearms may also subconsciously prime the individuals who wield them to act more aggressively (Anderson, Benjamin, & Bartholow, 1998; Berkowitz & Lepage, 1967; Bartholow, Sestir, & Davis, 2005; Killias & Haas, 2002; Bettencourt & Kernahan, 1997). Guns can also serve as the great equalizer, emboldening smaller, weaker aggressors to attack stronger victims whom they may not have been able to overpower otherwise (Kleck & Hogan, 1999). Assailants may be more likely to use lethal force with a firearm as they can be used at a distance, allowing offenders to be physically and psychologically removed from their actions (Wolfgang, 1958).

In contrast, the relative lethality of firearms may serve as an effective deterrent to homicide in certain situations. Perpetrators with a specific goal such as robbery may employ guns to threaten their victims into compliance, thus decreasing the likelihood of conflict. The threat of lethal force may also give pugnacious opponents a socially acceptable means of retreat, deescalating the conflict. Merely wielding a gun may also satisfy assailants who seek to establish dominance or control over their victims, precluding the need to use the weapon; armed attackers are automatically in a superior position to their opponents, a goal that might be impossible in the absence of a gun (Kleck & Hogan, 1999). Similarly, some studies have shown that the dire consequences of gun usage serve to reduce aggression for both parties involved in a dispute (Hindelang, 1976; Kleck, 1997). In this way, the presence of a gun reduces the situation into an all-or-nothing scenario, with two extreme choices: kill or do not attack at all. As most individuals involved in potentially lethal conflicts do not necessarily intend to commit murder, firearms in the majority of such incidents would decrease the likelihood of an attack (Kleck & Hogan, 1999). Particularly relevant to mass murder, potential offenders may also be less likely to attempt a crime when there is a possibility their victim is armed with a firearm (Lott, 2000).

Despite these competing theoretical rationales, prior research has consistently shown that gun ownership rates are positively associated with the firearms homicide rate. Time series analysis of firearm availability at the city (Fisher, 1976; McDowall, 1991; Newton & Zimring, 1969), county (Duggan, 2001), state (Siegel, Ross, & King, 2013; Sorenson & Berk, 2001), and regional/national (Kleck, 1979; Miller, Azrael, & Hemenway, 2002; Phillips, Votey, & Howell, 1976) levels in the United States show a significant, positive relationship between gun ownership and homicide rates, a finding replicated in most cross-sectional ecological studies across levels (Lester, 1988; Miller, Hemenway, & Azrael, 2007; Seitz, 1972). Similarly, international comparisons utilizing

multiple measures of firearms availability have repeatedly found significant positive correlations between household gun ownership and both the gun and overall homicide rate (Hemenway & Miller, 2000; Hemenway, Shinoda-Tagawa, & Miller, 2002; Killias, 1993a, 1993b). Even at the individual level, studies have linked household gun ownership to an increased risk of homicide victimization (Bailey et al., 1997; Cummings, Koepsell, Grossman, Savarino, & Thompson, 1997) and offending (Kleck & Hogan, 1999).

Although the majority of studies find support for this relationship (Hepburn & Hemenway, 2004), some scholars question their methods, specifically related to the measurement of firearms availability and the potential for reciprocal causation. As detailed survey data are frequently unavailable for the desired time period and/or levels of analysis, many researchers employ gun ownership proxies, including the proportion of suicides committed with a firearm, subscriptions to gun magazines, guns per capita, number of permits or licenses, accident rate, and registration rate (Kleck & Hogan, 1999). Even more problematic is the inability of many studies to establish causal direction, leading Kleck (1979, pp. 908) to argue "crime is a cause of gun ownership just as gun ownership is a cause of crime." In most studies, it remains unclear if there are more homicides in areas with more guns, or people obtain guns for self-protection because they live in dangerous areas. As a result, several studies have either found no significant relationship between gun ownership and homicide (Magaddino & Medoff, 1984), a positive relationship where homicide rates impact gun ownership but not the reverse (Kleck, 1984; Kleck & Patterson, 1993), or even a negative association where more guns decrease crime rates (Bordua, 1986; Lott, 2000). In response to these criticisms, more recent studies have employed various measures of firearm availability and examined the effect of gun ownership on non-firearm homicides, with the findings remaining robust to these changes (Miller et al., 2007; Siegel et al., 2013). In sum, most violence scholars agree with Cook's (2013, pp. 49) summary of the literature: "More guns, more homicides."

While guns are often assumed to have a causal impact on the rate of mass shootings in the United States, thus far only a few studies have directly tested this assumption, with mixed results. Using a time series analysis on 344 mass shootings from 1998 to 2015, Reeping and colleagues (2019) found that a 10% increase in household gun ownership was associated with a 35% increase in the incidence rate of mass shootings at the state level. The study has been criticized, however, for relying on the FBI's Supplementary Homicide Reports (SHR) to measure annual state mass shooting counts. Prior research has consistently shown that the SHR: suffers from a high degree of missing data (e.g., the state of Florida); utilizes multiple records for incidents with more than 11 victims and/or offenders (thus artificially inflating counts); and creates false positives via reporting errors (e.g., four single-victim homicides reported as one quadruple homicide) (Loftin, McDowall, Curtis, & Fetzer, 2015; Rokaw, Mercy, & Smith, 1990; Wiersema, Loftin, & McDowall, 2000). To address some of these concerns, Webster et al. (2020) removed duplicate records and supplemented the SHR data with cases from the Gun Violence Archive and the Stanford Geospatial Center and Stanford Libraries, finding that gun ownership did not significantly influence the mass shooting incidence rate. Another analysis using data on mass shootings from Mother Jones

similarly failed to find a relationship between gun ownership and mass shooting rates (Lin et al., 2018).

### *Concealed carry legislation*

The research regarding concealed carry legislation, firearms homicide, and mass shootings is even murkier than the literature on household gun ownership. The United States has three types of concealed carry laws. The most permissive type of legislation is permitless carry, where firearms owners do not need to apply for an additional permit to carry a concealed weapon. In contrast, "shall-issue" states require individuals to apply for a concealed carry permit, but law enforcement has minimal discretion in whether to deny an applicant, as long as they meet certain requirements. The more restrictive "may-issue" policy also requires an additional permit, but grants law enforcement broad discretion in approving or denying an application, even if all prerequisites are fulfilled; individuals may be required to provide a heightened showing or establish good cause as to why they need the permit, and may be denied without being given a reason why. Although historically, most states maintained restrictive no-issue or may-issue policies, the United States has experienced a dramatic shift towards more permissive concealed carry legislation over the past thirty years. In the early 1990s, for example, 35 states were may-issue, 14 were shall-issue, and only Vermont allowed permitless carry; in 2016, by contrast, only 9 states were may-issue, 29 were shall-issue, and 12 were permitless carry. On average, 7% of the population has a concealed carry permit, although this figure varies substantially by state (Lott, 2018).

Proponents of less restrictive right-to-carry laws argue that increased gun-carrying by the public serves as general deterrent to violent crime (Lott, 2000). Potential offenders may decide, for example, that the costs of crime outweigh the benefits if they fear being mortally wounded. Wright and Rossi (1991) found that 39% of convicted felons refrained from committing a crime because they knew or believed that their victim was armed. Even when an offender is not deterred from committing the crime entirely, armed bystanders may be able to disrupt the attack and mitigate its damage. The benefits of more permissive concealed carry legislation are hypothesized to be even greater for mass public shootings in comparison to other homicides, as the probability that at least one victim has a weapon increases dramatically with crowd size (Lott & Landes, 2000).

In contrast, some scholars posit that more permissive concealed carry legislation is an unlikely deterrent, and may actually increase homicide rates. Instead of refraining from crime entirely, offenders may simply choose a more vulnerable victim, thus resulting in a displacement rather than deterrent effect (Green, 1987; McDowall, Lizotte, & Wiersema, 1991). In the same vein, perpetrators often have very limited information about whether or not a potential victim is armed, and thus may not include this factor in his or her decision-making process. Similarly, criminals may dismiss armed resistance as a minimal risk, given the element of surprise and relatively low rate of gun-carrying among the general public (Duwe et al., 2002). Aside from failing to decrease the homicide rate, right-to-carry laws may inadvertently encourage lethal violence. For example, more permissive concealed carry laws may inadvertently

lead to an arms race between the public and criminals, as potential offenders increasingly carry weapons to protect themselves. Most incarcerated felons cite protection as the main reason they carried firearms, and 63% state that they fired their weapon during the commission of the crime in self-defense (Cook, Ludwig, & Samaha, 2009; McDowall, 1995; Wright & Rossi, 1991). Increased gun-carrying in public may also indirectly contribute to violent crime by facilitating gun trafficking and straining police resources. Carrying a concealed weapon outside the home increases the likelihood of loss or theft, firearms which may subsequently be funneled to criminals via the illegal gun market. Donohue and colleagues (2019) suggest that as many as 100,000 firearms in the United States are accidently furnished to criminals by legal concealed carry permit holders each year. In the same vein, permissive concealed carry laws may hamper crime control efforts by the police, who waste valuable time differentiating legal and illegal carriers and responding to gun-related accidents (Donohue, Aneja, & Weber, 2019).

Like the its theoretical underpinnings, the empirical literature examining the relationship between more permissive concealed carry legislation and crime has been decidedly mixed. In their widely-debated study, Lott and Mustard (1997) compared crime rates for U.S. counties from 1977 to 1992 using a fixed effects model and found a deterrent effect of shall-issue policies, arguing that up to 1,500 homicides could be prevented annually by adopting the less stringent law in may-issue states. This study sparked a flurry of replication studies, with some finding a decrease in homicides associated with more permissive concealed carry (Bronars & Lott, 1998; Gius, 2014; Lott, 2000; Lott & Whitley, 2001), an increase in homicides (Ludwig, 1998; McDowall, Loftin, & Wiersema, 1995; Rosengart et al., 2005), or no effect at all (Aneja, Donohue, & Zhang, 2011; Hepburn, Miller, Azrael, & Hemenway, 2004; Kovandzic & Marvell, 2003; Zimmerman, 2014). In response, the National Research Council reviewed the literature and determined that "estimated effects are highly sensitive to seemingly minor changes in the model specification and control variables … Thus, the committee concludes that with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates" (Wellford, Pepper, & Petrie, 2005, p. 150). More recent research utilizing a longer time period, more control variables, and more advanced statistical methods, however, suggests that permissive concealed carry laws significantly increase the homicide rate (Crifasi et al., 2018; Donohue et al., 2017; Doucette, Crifasi, & Frattaroli, 2019; Siegel et al., 2017).

Despite the widespread belief that arming the public prevents mass shootings or helps to save lives, only three studies have considered the impact of permissive concealed carry legislation on these rare crimes. Lott and Landes (2000) used data from 23 states from 1977 to 1997 to evaluate the impact of right-to-carry laws on public shootings in which two or more victims were killed or wounded. Employing a series of Poisson regressions, the authors found that right-to-carry legislation significantly decreased the combined number of killed/wounded victims by 78% and the overall number of shooting incidents by 67%. Defining mass murder as the killing of four or more victims, Duwe et al. (2002) and Webster et al. (2020) replicated these analyses using different methodologies, yet found no evidence of a deterrent effect of right-to-carry legislation on either the number of incidents or victims. While all three studies represent important contributions to the literature, they suffer from several

methodological limitations. Although pioneering at the time, the work of Lott and Landes (2000) and Duwe et al. (2002) is over two decades old, uses small samples, and only considers public mass shootings (which represent approximately 20% of all incidents) (Fridel, 2017). Webster et al. (2020)'s work is similarly laudable for addressing these concerns, yet remains limited by its utilization of a notoriously unreliable dataset (the SHR) to measure the dependent variable.[1]

## Current study

Despite the public's widespread interest in gun ownership and concealed carry legislation in the wake of each massacre, little research has focused on the relationship between these factors and the frequency of mass shootings in the United States. The few pioneering studies that do directly examine this issue, however, reach opposite conclusions and are limited by the lack of reliable data on these rare crimes. Most importantly, prior work has failed to ask a crucial question: Do levels of household gun ownership and concealed carry legislation impact mass shootings in the same way as they do firearms homicide more generally? Implementing policy to address rare events is myopic: arguably, the effects of gun policies on two dozen mass shootings are only relevant for lawmakers if they are representative of the other 12,000 firearms homicides committed in the United States each year.

Addressing these gaps in the literature, the present study builds upon previous work by: (1) addressing data quality concerns with a robust mass shooting dataset validated by both official and media records; and (2) contextualizing the gun control debate by comparing the impact of policies on both mass shootings and firearms homicide. Using data from the Centers for Disease Control and Prevention (CDC) Web-based Injury Statistics Query and Reporting System (WISQARS) and the expanded USA TODAY mass murder database, the current study employs two cross-sectional negative binomial regression models to examine the impact of household gun ownership and concealed carry legislation on the incidence of mass shootings and firearms homicide in the United States from 1991 to 2016.

## Methods

### Data and sample

This study utilized two separate cross-sectional panel models to predict counts of firearm homicides and mass shootings in the 50 U.S. states from 1991 to 2016 (N = 1250 state-years). Data on firearm homicides were derived from the Centers for Disease Control and Prevention (CDC) Web-based Injury Statistics Query and Reporting System (WISQARS). WISQARS represents an ideal homicide data source as it extracts

---

[1]Notably, Webster and colleagues did try to address the gaps in the SHR by appending cases in the Gun Violence Archive (GVA) and the Stanford Geospatial Center and Stanford Libraries. However, these data are equally problematic, as both sources use different definitions than the one employed in the study (four or more shot yet not necessarily killed for GVA, and three or more shot yet not necessarily killed for Stanford). Even further, GVA data was only available for a fraction of the time period (2014-2017), and the Stanford data only included public mass shootings.

information from standardized death certificates directly and has a 99% reporting rate across the U.S. (Centers for Disease Control & Prevention, 2019).

In comparison to homicide, there are no official data sources designed to count mass shootings. WISQARS, for example, does not link multiple victims killed in the same incident, while the FBI's SHR suffers from a high degree of missing data, multiple records for incidents with large victim counts, and reporting errors. Crowd-sourced databases are equally problematic as they often focus exclusively on public mass shootings, lack a consistent definition, and are of questionable validity (Fridel, 2017). In order to address these challenges, a unique dataset of all mass murders in the United States from 1991 to 2016 was created. First, a master list compiled all cases included by the SHR, the Congressional Research Service (Krouse & Richardson, 2015), USA TODAY (Overberg et al., 2016), Gun Violence Archive (GVA), Stanford Geospatial Center and Stanford Libraries, Mother Jones, Everytown for Gun Safety, and the New York City Police Department report on active shooters (Kelly, 2010). Media accounts, court documents, academic journal articles, and available law enforcement records (provided by USA TODAY's Freedom of Information Act requests) were then utilized to validate each incident. Additional media searches were also conducted using Newspapers.com and LexisNexis to identify missing cases not included in any of the other datasets. To date, this represents the most comprehensive and accurate database available on mass shooting incidents in the United States, with a total sample size of 592 mass shootings during the study period. The SHR, for example, missed 157 validated incidents (after excluding the state of Florida and removing duplicate records) and included an additional 135 erroneous cases that could not be corroborated by other sources.

Annual state-level data on key independent and control variables were appended from multiple sources (detailed in Table 1), including the: U.S. Census Bureau Current Population Survey; U.S. Bureau of Labor Statistics; National Vital Statistics System; CDC's WISQARS and Wide-ranging Online Data for Epidemiological Research (WONDER); National Institute of Alcoholism and Alcohol Abuse; U.S. Fish and Wildlife Service; FBI's Uniform Crime Reports (UCR); U.S. Bureau of Justice Statistics, National Prisoner Statistics Data; and Henry J. Kaiser Family Foundation State Mental Health Agency (SMHA). Information on firearms legislation over time was provided by the State Firearms Laws Database, which used *Thomson Reuters Westlaw* to track the presence or absence of more than 100 firearms provisions by state since 1991 (Siegel et al., 2017).

### Measures

Study variables are described briefly in this section, while a more description of all measures is provided in Table 1, including the definition, data source, and extent of missing information for each variable. Table 2 shows descriptive statistics for all variables for may-issue states, shall-issue/permitless carry states, and the sample in totality.

### Outcome and key independent variables

The current study examined two dependent variables, including annual state counts of firearms homicide victims and mass shooting incidents. The CDC defines firearms homicide as injuries inflicted by another person with intent to injure or kill with a

900   EMMA E. FRIDEL

**Table 1.** Data source for all study variables.

| Variable | Definition | Data Source | Notes |
|---|---|---|---|
| Firearm homicides | Count of victims | CDC WISQARS | Complete panel series |
| Mass shootings | Count of incidents with four or more persons shot to death within 24 hours, not including the perpetrator(s) and unborn children | Expanded USA TODAY Mass Murder Database | Complete panel series |
| Gun ownership | Proportion of suicides committed with a gun (ICD codes X72, X73, and X74) | CDC WISQARS and CDC WONDER | Complete panel series; data from 1991-1998 is derived from WISQARS while data from 1999-2016 is derived from WONDER |
| Concealed carry legislation | 1 = Shall issue or permitless carry; 0 = May issue (lagged by one year) | State Firearms Laws Database | Complete panel series |
| Mental health expenditures | Expenditures per capita reported in actual dollars | The Henry J. Kaiser Family Foundation State Mental Health Agency (SMHA) | Data imputed for 1991-1992, 1994-1996, 1998-2000, and 2016 for all states; Arkansas (2011); Florida (2013); Hawaii (2007); and New Mexico (2013) |
| Divorce rate | Number of divorces and annulments by state of occurrence per 1,000 population | CDC/NCHS, National Vital Statistics System | Data imputed for California, Colorado (1995-1998); Connecticut (1991); Georgia (2004-2016); Hawaii (2003-2016); Illinois (1991); Indiana; Louisiana (1991-2001, 2004-2012); Maine (1996); Minnesota (2005-2016); Nevada (1991-1993); New Jersey (1991); New Mexico (2016); Oklahoma (1999-2003); and Texas (1996-1997) |
| Unemployment | Percentage of persons aged 16 and older in the civilian labor force who do not have a job, are currently available for work, and have actively looked for work in the prior four weeks, or if they are waiting to be recalled to a job from which they have been laid off | U.S. Bureau of Labor Statistics, Local Area Unemployment Statistics and Current Population Survey | Complete panel series |
| Advantage index | Weighted principal components factor regression score of median household income, education, and poverty. Factor loadings were all above ± 0.70 with a first eigenvalue score of 2.144. | U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplements (Median household income); U.S. Census Bureau, Educational attainment reports and tables from previous years (Education); and U.S Census Bureau, Historical Poverty Tables (Poverty) | Education data interpolated for 1992 |
| Percent male | Percentage of the population that is male | CDC WONDER Bridged Race Population Estimates | Complete panel series |

(continued)

Table 1.   (Continued)

| Variable | Definition | Data Source | Notes |
|---|---|---|---|
| Percent aged 18-24 | Percentage of the population aged 18 to 24 | CDC WONDER Bridged Race Population Estimates | Complete panel series |
| Alcohol consumption | Per capita alcohol consumption among persons aged 14 years and older | National Institute of Alcoholism and Alcohol Abuse | Data imputed for Georgia (2000) |
| Hunting | Number of paid hunting licenses per 100 persons aged 15 or older | US Fish and Wildlife Service. Historical hunting license data. | Complete panel series |
| Property crime rate | Number of burglaries, larcenies, and motor vehicle thefts per 100,000 population | FBI, Uniform Crime Reports (UCR) | Complete panel series |
| Violent crime rate | Number of rapes, assaults, and robberies per 100,000 population | FBI, Uniform Crime Reports (UCR) | Complete panel series |
| Incarceration rate | Number of sentenced prisoners with a sentence of at least one year per 10,000 population | BJS, National Prisoner Statistics data series | Complete panel series |
| Non-firearm homicide rate | Number of homicide victims killed with a weapon other than a firearm per 100,000 population | CDC WISQARS | Complete panel series |
| Ethnic heterogeneity | Blau's (1977) index by summing the squared proportion of the population in each racial/ethnic group and then subtracting this summation from 1. The equation for this measure is as follows: $1 - \Sigma pi^2$, where pi is the proportion of the population in each racial/ethnic group (White, Black, Hispanic, Asian, and American Indian). | CDC WONDER Bridged Race Population Estimates | Complete panel series |
| Region | South, West, Northeast, or Midwest, as defined by the U.S. Census | U.S. Census Bureau | Complete panel series |

firearm, excluding injuries due to legal intervention, operations of war, and justifiable homicides. As WISQARS does not provide linkage information, firearms homicide was measured as a count of victims rather than incidents. However, given that nearly 90% of homicides are single-victim incidents (Federal Bureau of Investigation, 2017), this limitation is not too serious. Consistent with prior work (Fridel, 2017; Ressler, Burgess, & Douglas, 1988), mass shootings are defined as the intentional killing of four or more persons (excluding the offender and unborn children) with a firearm within a 24-hour period. Less than 10% (N = 62) of incidents involved other weapons in addition to a firearm.

Household gun ownership and concealed carry legislation represented the two primary independent variables of interest in this study. Household gun ownership was measured using a common proxy, the proportion of suicides committed with a firearm. This measure has been extensively validated in the prior literature, correlates highly with state-specific survey measures, and has been demonstrated as the best

**Table 2.** Descriptive statistics for may-issue states, shall-issue/permitless carry states, and all U.S. States, 1992-2016.

| Predictors | May-Issue States N = 445 State-Years | | | Shall-Issue/Permitless Carry States N = 805 State-Years | | | All States N = 1250 State-Years | | |
|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | [Range] | Mean | SD | [Range] | Mean | SD | [Range] |
| Firearm homicides | 334.50 | 470.22 | [3.00–3183.00] | 209.21 | 233.45 | [0.00–1222.00] | 257.45 | 353.24 | [0.00–3183.00] |
| Mass shootings | 0.49 | 0.94 | [0.00–6.00] | 0.40 | 0.74 | [0.00–6.00] | 0.44 | 0.84 | [0.00–6.00] |
| Gun ownership | 47.36 | 16.22 | [14.29–78.52] | 59.08 | 8.07 | [35.81–81.04] | 55.15 | 12.99 | [14.29–84.00] |
| Advantage | 0.19 | 1.07 | [-2.64–2.90] | –0.05 | 0.93 | [-2.82–3.12] | 0.00 | 1.00 | [-2.82–3.12] |
| Unemployment | 5.60 | 1.80 | [2.40–12.20] | 5.61 | 1.90 | [2.30–13.70] | 5.64 | 1.86 | [2.30–13.70] |
| Ethnic heterogeneity | 0.41 | 0.14 | [0.13–0.67] | 0.34 | 0.16 | [0.04–0.64] | 0.36 | 0.16 | [0.04–0.67] |
| Divorce rate | 3.71 | 1.30 | [1.21–9.17] | 4.16 | 1.08 | [1.21–10.40] | 4.04 | 1.20 | [1.21–10.40] |
| Property crime rate | 3693.61 | 1064.95 | [1544.60–7221.40] | 3315.28 | 1003.29 | [1406.60–7500.10] | 3498.26 | 1069.05 | [1406.60–7500.10] |
| Violent crime rate | 496.75 | 211.54 | [207.03–1108.86] | 384.30 | 190.81 | [65.33–1198.24] | 429.19 | 210.69 | [64.25–1198.24] |
| Incarceration rate | 33.85 | 11.80 | [8.50–67.39] | 39.11 | 15.83 | [6.71–88.56] | 36.80 | 14.76 | [6.71–88.56] |
| Non-firearm homicide rate | 2.09 | 1.07 | [0.64–11.71] | 1.84 | 0.81 | [0.00–5.95] | 1.97 | 0.96 | [0.00–11.71] |
| Mental health expenditures | 90.72 | 57.51 | [12.76–269.60] | 92.55 | 68.50 | [12.76–410.35] | 90.79 | 64.62 | [12.76–410.35] |
| Alcohol consumption | 2.31 | 0.39 | [1.21–4.25] | 2.35 | 0.54 | [1.20–4.76] | 2.34 | 0.49 | [1.20–4.76] |
| Hunting licenses | 6.27 | 5.90 | [0.63–46.09] | 12.79 | 9.04 | [1.04–43.25] | 10.54 | 8.68 | [0.63–46.09] |
| Percent male | 48.93 | 0.74 | [47.98–52.64] | 49.41 | 0.77 | [47.91–52.37] | 49.23 | 0.80 | [47.88–52.64] |
| Percent aged 18-24 | 9.76 | 0.72 | [7.92–12.81] | 9.98 | 0.86 | [8.08–14.39] | 9.92 | 0.82 | [7.92–14.289] |
| Region | | | | | | | | | |
| South | 24.72% | | | 36.02% | | | 32.00% | | |
| Northeast | 28.09% | | | 12.42% | | | 18.00% | | |
| West | 20.00% | | | 29.32% | | | 26.00% | | |
| Midwest | 27.19% | | | 22.24% | | | 24.00% | | |

Exhibit D
Page 194

available proxy (Azrael, Cook, & Miller, 2004; Cook & Ludwig, 2006; Kleck, 2004; Siegel
et al., 2013). Consistent with prior research, concealed carry legislation was operation-
alized as a binary measure, with shall-issue and permitless carry states coded as 1 and
may-issue states coded as 0 (Siegel et al., 2017). Laws were lagged by one year to
ensure that they were in effect when the homicide incidents occurred (Lott & Mustard,
1997; Siegel et al., 2017).

### Control variables

The analysis also controlled for a variety of predictors that previous work has shown
to be significantly related to homicide rates, including: socioeconomic advantage,
racial/ethnic heterogeneity, unemployment rate, divorce rate, property crime rate, vio-
lent crime rate (excluding homicide), incarceration rate, non-firearm homicide rate,
mental health expenditures per capita, alcohol consumption per capita, number of
hunting licenses per capita, percent male, percent aged 18 to 29, and census region.
Missing data on mental health expenditures per capita, alcohol consumption per cap-
ita, and the divorce rate were imputed in *STATA 15* with chained equations (N = 10
imputations).

### Analytical strategy

This analysis used a cross-sectional panel design to examine the impact of changing
firearms legislation and ownership over time on both firearms homicide and mass
shootings. Due to the rarity of mass shooting incidents, both outcomes were meas-
ured as counts, as often recommended for studying crimes with low base rates
(Hepburn et al., 2004; Plassmann & Tideman, 2001; Siegel et al., 2017). Overdispersed
data required the use of negative binomial regression models for both firearms homi-
cide and mass shootings. The total population of the state was included as an expos-
ure variable for both models.

   The model also accounted for clustering by year and by state. Year fixed effects (in
the form of a dummy variable for each cross section from 1991 to 2016 minus one)
were included to purge the model of cross-sectional bias. Following prior work (Miller
et al., 2002; Siegel et al., 2017), generalized estimating equations (GEE) was utilized to
control for clustering within states over time. GEE is a semiparametric, population-
averaged or marginal approach that treats dependence as a nuisance feature of the
data (Liang & Zeger, 1986). As GEE requires no assumptions about the distribution, it
is robust to misspecification of the working correlation matrix, reducing the potential
for omitted variable bias. Considering that sensitivity to model misspecification was
one of the National Research Council's major criticisms of the concealed carry litera-
ture, GEE is well-suited for this study. An exchangeable (compound symmetry) working
correlation matrix and robust (Huber-White sandwich estimators) standard errors were
used to produce consistent point estimates and standard errors even if the working
correlation matrix is misspecified (Liang & Zeger, 1986).

   Given the large number of related predictor variables, several tests for potential
multicollinearity were conducted. First, all variance inflation factors (VIF) were under 4,
well below the traditional threshold of 10, as well as the more rigorous cutoff of 5

(Menard, 1995; O'Brien, 2007). Second, a series of regression models for both homicide and mass murder counts were estimated without potentially collinear predictors. The results remained largely unchanged when: (1) the unemployment and divorce rates were included in the advantage index; (2) the hunting licenses per capita variable was eliminated from the model; (3) the property crime rate and the non-gun homicide rate were excluded; (4) the violent crime rate and the non-gun homicide rate were excluded; and (5) the unemployment and divorce rate variables were incorporated in the advantage index, and the hunting licenses per capita, property crime rate, and non-gun crime rate were excluded from the model. Taken together, the consistency in results across models as well as the relatively low VIF values suggest that multicollinearity is not too serious a concern.

## Results

Table 3 presents the results of the population-averaged negative binomial regressions of gun ownership and concealed carry legislation on firearms homicide and mass shootings. Standardized regression coefficients in the form of incidence rate ratios (IRR) and 95% confidence intervals are presented to facilitate interpretation. IRRs indicate the percentage increase or decrease in the outcome incidence rate for every one standard deviation increase in the predictor [(IRR $-$ 1) $\times$ 100%].

Consistent with prior research, firearms homicide was more likely to occur in areas with more permissive concealed carry laws, higher levels of racial/ethnic heterogeneity, higher property crime rates, and in Southern states (relative to states in the Northeast and West). Specifically, the firearms homicide incidence rate increased by

**Table 3.** Population-averaged negative binomial regression of concealed carry legislation on firearms homicide and mass shootings: United States, 1991-2016.

| (Standardized) Predictor | Firearms Homicide | | Mass Shootings | |
|---|---|---|---|---|
| | IRR | 95% CI | IRR | 95% CI |
| Gun ownership | 1.046 | [0.978, 1.119] | 1.525*** | [1.199, 1.940] |
| Shall-issue or permitless carry | 1.108** | [1.026, 1.196] | 0.881 | [0.696, 1.115] |
| Advantage | 0.988 | [0.925, 1.055] | 0.933 | [0.769, 1.133] |
| Unemployment | 1.010 | [0.974, 1.048] | 0.987 | [0.820, 1.187] |
| Ethnic heterogeneity | 1.290*** | [1.133, 1.469] | 1.021 | [0.780, 1.336] |
| Divorce rate | 0.976 | [0.923, 1.032] | 0.948 | [0.854, 1.053] |
| Property crime rate | 1.174*** | [1.104, 1.248] | 1.148 | [0.937, 1.408] |
| Other violent crime rate | 1.037 | [0.954, 1.128] | 0.987 | [0.847, 1.150] |
| Incarceration rate | 0.976 | [0.895, 1.065] | 1.053 | [0.901, 1.230] |
| Non-firearm homicide rate | 1.014 | [0.993, 1.035] | 1.017 | [0.881, 1.173] |
| Mental health expenditures | 1.003 | [0.958, 1.051] | 0.949 | [0.811, 1.112] |
| Alcohol consumption | 1.052 | [0.928, 1.192] | 0.977 | [0.849, 1.123] |
| Hunting licenses | 0.987 | [0.906, 1.075] | 0.842 | [0.673, 1.054] |
| Percent male | 1.043 | [0.915, 1.189] | 1.131 | [0.858, 1.491] |
| Percent aged 18-24 | 1.012 | [0.981, 1.044] | 0.946 | [0.797, 1.124] |
| Region (reference = South) | | | | |
|     Northeast | 0.553* | [0.332, 0.922] | 1.417 | [0.808, 2.484] |
|     West | 0.448*** | [0.315, 0.637] | 1.183 | [0.737, 1.898] |
|     Midwest | 0.731 | [0.491, 1.088] | 1.441 | [0.922, 2.250] |

ABBREVIATIONS: IRR = incidence rate ratio; CI = confidence interval.  .
The results for year fixed effects (not shown) are available upon request.
* $p < 0.05$ ** $p < 0.01$ ***$p < 0.001$.



**Figure 1.** Predicted Annual Firearms Homicide Counts in May-Issue and Shall-Issue/Permitless Carry States by Household Gun Ownership: 50 U.S. States, 1991–2016.

10.8% (CI = 1.026–1.196) in shall-issue or permitless carry states in comparison to their may-issue counterparts; this point estimate is within the 95% confidence interval presented by Siegel et al. (2017), and thus confirmed their findings. In addition, for every one standard deviation increase in racial/ethnic heterogeneity and the property crime rate, the firearms homicide incidence rate respectively increased by 29.0% and 17.4%. Consistent with the Southern culture of violence hypothesis (Cohen & Nisbett, 1994; Nisbett & Cohen, 1996), firearms homicide rates were 44.7% lower in the Northeast and 55.2% lower in the West in comparison to the South.

Figure 1 contextualizes the impact of more permissive concealed carry legislation by presenting predicted annual firearm homicide counts for shall-issue/permitless carry and may-issue states across levels of household gun ownership. An average state in an average year experienced an additional 16 to 22 firearms homicides annually in states with more permissive concealed carry laws, an effect that is relatively consistent across all levels of gun ownership (tests for an interaction between gun ownership and concealed carry legislation were not significant; results available upon request). It is interesting to note that although gun ownership was not a significant predictor of firearms homicide in the full model (IRR = 1.046, CI = 0.978–1.119), it was positively associated with firearms homicide in models (not shown) excluding concealed carry legislation (IRR = 1.063, CI = 1.002–1.128). This suggests that the concealed carry legislation variable may suppress the effects of gun ownership frequently found in previous work (results available upon request) (Siegel et al., 2013).

In comparison to firearms homicide, only one state-level correlate significantly predicted mass shootings: gun ownership. Specifically, every one standard deviation increase in gun ownership increased the incidence rate of mass shootings by 53.5% (CI = 1.199–1.940). Contrary to the common "good guy with a gun" argument, mass

Exhibit D
Page 197

906   EMMA E. FRIDEL



**Figure 2.** Predicted Number of Years Between Mass Shootings By Levels of Household Gun Ownership, 50 U.S. States, 1991–2016.
*Note:* An average level of household gun ownership is zero standard deviations from the mean; lowest and highest levels are 2 standard deviations below and above the mean, respectively; and low and high levels are 1 standard deviation below and above the mean, respectively.

shootings were no more or less likely to occur in areas with more permissive concealed carry laws (IRR = 0.881, CI = 0.696–1.115).

To illustrate this finding, Figure 2 presents the predicted number of years between mass shootings for states with different levels of household gun ownership (calculated as one divided by the predicted annual number of incidents). States with average levels of gun ownership experienced a mass shooting every 2.41 years; states with the highest levels of gun ownership experienced a mass shooting nearly twice as frequently—every 1.25 years; and states with the lowest levels of gun ownership experienced a mass shooting almost two times less often—every 4.66 years.[2]

### Sensitivity analyses

Various sensitivity analyses were conducted to ensure the validity of the results. Findings remained substantively unchanged when: (1) fixed effects for state were employed instead of GEE; (2) outcome variables were modeled as rates per 100,000 population; (3) mass murders were measured as number of victims instead of incidents; (4) all independent variables were lagged by one year; (5) additional control variables were added, including the lagged firearm homicide rate, a binary measure of the assault weapons ban (1994-2004), and other "common sense" gun laws often proposed in the wake of mass shootings (i.e., universal background checks, universal permiting, mandatory waiting periods, prohibitions for violent misdemeanors and domestic violence restraining orders, high capacity magazine bans, and the total

---

[2]The predicted annual counts of mass shootings were 0.21, 0.30, 0.41, 0.58, and 0.80 for states with the lowest, low, average, high, and highest levels of gun ownership, respectively.

number of firearms laws). Models using non-firearm homicides and mass murders as the outcome found no significant findings in terms of firearm variables, lending credence to the results.

## Discussion

Using a novel dataset, this study represents the first to compare the impact of household gun ownership and concealed carry legislation on both firearm homicides and mass shootings. More permissive concealed carry legislation was associated with a 10.8% increase in the firearms homicide incidence rate, yet had no significant effect on mass shootings. Similarly, household gun ownership was associated with a 53.5% increase in the mass shooting incidence rate, yet has a minimal impact on firearm homicides when accounting for concealed carry legislation.

These findings are not without certain empirical limitations. The low base rate of mass shootings: (1) required a count model approach instead of the typical modeling of homicide rates; (2) reduced variation in the outcome, as over 70% of state-years experienced no incidents; and (3) prevented the examination of specific types of incidents (e.g., public mass shootings) most likely to be impacted by concealed carry legislation. Additionally, using the semi-parametric approach of GEE lowers the model power which, in combination with the reduced variation in the number of mass shootings, indicates that these results are relatively conservative. Due to the small number of permitless carry states, particularly in earlier years, it was not possible to examine differences between shall-issue and permitless carry policies (Siegel et al., 2017).

Finally, although the percentage of suicides committed with a firearm has been vigorously validated as a proxy, this measure does not distinguish between legal and illegal gun ownership, which may have disparate effects on violent crime (Stolzenberg & D'Alessio, 2000; Dierenfeldt, Brown, & Roles, 2017). The empirical literature remains divided as to the relationship between homicide and gun ownership, with scholars finding a positive effect of both legal (Semenza, Stansfield, & Link, 2020; Steidley, Ramey, & Shrider, 2017) and illegal gun availability (Stolzenberg & D'Alessio, 2000; Dierenfeldt et al., 2017) on violent crime rates. As Kleck (1997, p. 215) summarizes, "it is possible that gun possession among prospective aggressors [illegal ownership] increases lethal violence, while gun possession among prospective victims [legal ownership] reduces it, with no net effect of overall gun ownership levels on violence rates." In this way, the inability to separate legal and illegal gun ownership may partially explain why gun ownership was not a significant predictor of firearms homicide, despite widespread support for this relationship in the literature. Future research should attempt to disentangle the effects of legal and illegal gun ownership on firearms homicide and mass shootings, though the lack of sufficient data on illegal gun ownership represents a challenge in this regard (Azrael, Hepburn, Hemenway, & Miller, 2017).

Despite these limitations, this study has important implications for both research and policy. First, consistent with some prior work (Reeping et al., 2019), household gun ownership is strongly associated with mass shootings at the state level. Equally important to note is that other factors often cited in the wake of mass shootings, such

as access to mental healthcare, do not significantly influence the rate of these crimes. The fact that gun ownership was the only significant macro-level predictor of mass shootings provides evidence that guns represent a fruitful target for intervention currently validated by research. There are several explanations for the strong relationship between levels of gun ownership and mass shooting rates. Guns are incontrovertibly quicker and more lethal than most other personal weapons, and therefore increase the likelihood of multiple deaths during an assault (Zimring, 1968, 1972, 1991). Firearms are also psychologically associated with power and aggression, and thus their presence in an argument can trigger aggressive behavior due to this learned association (Anderson et al., 1998; Bartholow et al., 2005; Berkowitz & Lepage, 1967; Bettencourt & Kernahan, 1997; Killias & Haas, 2002). Considering that two-thirds of mass shootings occur in private residences (Fridel, 2016), easy access to firearms during domestic disputes may facilitate impulsive or unplanned family massacres. Indeed, prior research has shown that the risk of dying from homicide or suicide in the home is dramatically increased in households with firearms, regardless of gun storage and safety practices (Cummings et al., 1997; Dahlberg, Ikeda, & Kresnow, 2004). High levels of community gun ownership may also facilitate mass shootings outside the home. Approximately three-quarters of school shootings, for example, involve guns stolen from the home or from another relative (National Threat Assessment Center, 2019). Easy access to weapons stored in cars may similarly provide opportunities for impulsive workplace massacres, like the 2003 shooting at the Lockheed Martin plant in Meridian, Mississippi. The greater prevalence of firearms may also indirectly facilitate felony-related mass shootings linked to robberies, gang warfare, and drug trafficking, which often involve illegally obtained weapons. Criminals otherwise prohibited from purchasing firearms are more easily able to steal or obtain guns in communities with many gun owners (Duggan, 2001). Areas in which guns are prevalent also tend to have a robust secondhand market and host gun shows, both of which are much less regulated than federally licensed dealers.

Second, there is no evidence that permissive concealed carry laws prevent mass shootings or mitigate their damage. The lack of a deterrent effect is hardly surprising, considering that the vast majority of armed victims fail to defend themselves or threaten their attacker during other, more common crimes (Planty & Truman, 2013). One study examining homicides in Sweden over a twenty-year period found that only 0.2% were committed by legal gun owners in self-defense (Killias & Markwalder, 2012). In addition, over 60% of mass murders are family killings, and so the majority of victims in these cases trust and are not threatened by their attacker (Fridel, 2017). Even so, mass shooters who act in public spaces often extensively plan their attacks, precluding the impulsive use of a concealed weapon during an argument. Furthermore, over one-third commit suicide or suicide-by-cop during the assault, indicating that the "good guy with a gun" is unlikely an effective deterrent, and may even be appealing for those who want to engage in a firefight (Fridel, 2017). Anecdotal evidence similarly suggests that armed citizens rarely stop or prevent mass shootings, as only one active shooter incident in the United States from 2000 to 2013 was resolved by an armed private citizen (excluding security guards and off-duty law enforcement officers), who was notably an active-duty marine; in contrast, 21 incidents were stopped by unarmed

citizens without such training during the same time period (Blair & Schweit, 2014). Given that nearly half of incidents in which law enforcement officers confronted active shooters resulted in police casualties, the "good guy with a gun" is more likely to be wounded himself or accidentally kill an innocent bystander than successfully stop a mass shooting (Donohue et al., 2017).

Although permissive concealed carry laws do not impact mass shootings, they significantly increase the firearms homicide rate. Even assuming permit holders are generally law-abiding citizens (Lott, 2018), increased gun-carrying in public may indirectly contribute to violence through several distinct pathways. Some scholars have suggested that offenders may use guns more often in states with permissive concealed carry laws in order to protect themselves against potentially armed victims. For example, Cook and colleagues (2009) found that two-thirds of prisoners incarcerated for gun offenses considered the armed status of potential victims as very or somewhat important in their choice to use a gun themselves. Increased gun-carrying in public also elevates the likelihood of loss or theft, in turn contributing to trafficking and the illegal gun market. Approximately 1% of individuals who carry firearms outside the home have their weapons stolen (Hemenway et al., 2017), leading to an estimated 100,000 guns being funneled from concealed carry permit holders to criminals each year in the United States (Donohue et al., 2017). Finally, permissive concealed carry laws may increase crime by wasting valuable police time and resources as they differentiate illegal and legal carriers and respond to gun-related accidents; the size of police forces in permissive states has increased significantly in comparison to their more restrictive counterparts, potentially due to the increased demands on law enforcement (Donohue et al., 2017).

Regardless of the precise mechanism underlying its association with increased firearm homicide rates, the national trend towards more permissive concealed carry is deeply troubling. Since 2007, the number of concealed handgun permits has skyrocketed by 273%, a figure that does not even count those with concealed firearms in permitless carry states (Lott, 2018). The public health implications are clear: permissive concealed carry legislation is a significant contributor to the gun violence epidemic in the United States.

Perhaps the most important finding of this study, however, is that gun ownership and legislation do not impact mass shootings and firearms homicides in the same way. As a result, policymakers likely need to enact distinct prevention initiatives in order to address different types of gun violence. The results of the current study, for example, indicate that reducing gun ownership (potentially through universal background checks and permit requirements) benefits mass shooting prevention efforts, while reinstating more restrictive concealed carry legislation decreases the overall firearms homicide rate. The fact that neither intervention appears to have a deleterious effect on the other crime (e.g., higher levels of gun ownership do not reduce the firearms homicide rate, and more permissive concealed carry legislation is not associated with a reduction in mass shootings) suggests that a two-pronged approach would be most beneficial in combating both mass shootings and firearms homicide. Considering that other policies not considered here may prevent one type of gun violence while promoting another, it is imperative that legislators recognize the distinct correlates of

mass shootings and firearms homicide and consider potential collateral consequences before enacting an intervention.

## Conclusion

In viewing mass shootings as the epitome of gun violence in the United States, policymakers on both sides of the gun control debate fundamentally assume that mass shootings are representative of firearms homicide more generally, and therefore that strategies to prevent mass shootings will also reduce gun violence overall. The present study examines two such interventions—levels of household gun ownership and permissive concealed carry legislation—and finds evidence that mass shootings are poor proxies of gun violence more generally. It is imperative that policymakers enact legislation that will help reduce the thousands of firearms homicides occurring in the United States each year, rather than focusing on the rare mass shooting, however tragic such incidents may be. It is essential that lawmakers and researchers alike properly contextualize mass shootings as a small part of the gun violence epidemic, or else risk missing the forest for the trees.

## Acknowledgements

The author would like to thank James Alan Fox, Gregory M. Zimmerman, and Anthony A. Braga for their comments on earlier drafts of this manuscript.

## Disclosure statement

No potential conflict of interest was reported by the author.

## Notes on contributor

Emma E. Fridel is an assistant professor in the College of Criminology and Criminal Justice at Florida State University. She primarily studies violence and aggression with a focus on homicide, including homicide–suicide, serial and mass murder, and legal intervention homicides. Her work has recently been published in *Criminology*, *Social Forces*, the *Journal of Quantitative Criminology*, and *Justice Quarterly*.

## ORCID

*Emma E. Fridel* https://orcid.org/0000-0001-9346-2156

## References

American Psychological Association. (2019). One-third of US adults say fear of mass shootings prevents them from going to certain places or events. https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting

Anderson, C. A., Benjamin, A. J., & Bartholow, B. D. (1998). Does the gun pull the trigger? Automatic priming effects of weapon pictures and weapon names. *Psychological Science*, *9*(4), 308–314. doi:10.1111/1467-9280.00061

Aneja, A., Donohue, J. J., & Zhang, A. (2011). The impact of right-to-carry laws and the NRC report: Lessons for the empirical evaluation of law and policy. *American Law and Economics Review*, *13*(2), 565–632. doi:10.1093/aler/ahr009

Azrael, D., Cook, P. J., & Miller, M. (2004). State and local prevalence of firearms ownership: Measurement, struture, and trends. *Journal of Quantitative Criminology*, *20*(1), 43–62. doi:10.1023/B:JOQC.0000016699.11995.c7

Azrael, D., Hepburn, L., Hemenway, D., & Miller, M. (2017). The stock and flow of U.S. firearms: Results from the 2015 National Firearms Survey. *The Russell Sage Foundation Journal of the Social Sciences*, *3*(5), 38–57.

Bailey, J. E., Kellerman, A. L., Somes, G., Banton, J. G., Rivara, F., & Rushforth, N. B. (1997). Risk factors for violent death of women in the home. *Archives of Internal Medicine*, *157*(7), 777–782. doi:10.1001/archinte.157.7.777

Bartholow, B. D., Sestir, M. A., & Davis, E. B. (2005). Correlates and consequences of exposure to video game violence: Hostile personality, empathy, and aggressive behavior. *Personality & Social Psychology Bulletin*, *31*(11), 1573–1586. doi:10.1177/0146167205277205

Berkowitz, L., & Lepage, A. (1967). Weapons as aggressive-eliciting stimuli. *Journal of Personality and Social Psychology*, *7*(2, Pt.1), 202–207. doi:10.1037/h0025008

Bettencourt, B. A., & Kernahan, C. (1997). A meta-analysis of aggression in the presence of violent cues: Effects of gender differences and aversive provocation. *Aggressive Behavior*, *23*(6), 447–456. doi:10.1002/(SICI)1098-2337(1997)23:6<447::AID-AB4>3.0.CO;2-D

Blair, J. P., & Schweit, K. W. (2014). *A study of active shooter incidents, 2000-2013*. Washington, DC: Texas State University and the Federal Bureau of Investigation, U.S. Department of Justice.

Bordua, D. J. (1986). Firearms ownership and violent crime. In J. M. Byrne & R. J. Sampson (Eds.), *The social ecology of crime (pp. 156–188)*. New York, NY: Springer-Verlag.

Brenan, M. (2019). *Nearly half in U.S. fear being the victim of a mass shooting*. Retrieved from https://news.gallup.com/poll/266681/nearly-half-fear-victim-mass-shooting.aspx

Bronars, S., & Lott, J. R. (1998). Criminal deterrence, geographic spillovers, and the right to carry concealed handguns. *The American Economic Review*, *88*, 475–479.

Centers for Disease Control and Prevention. (2019). Web-based injury statistics query and reporting systems: Fatal injury data. https://www.cdc.gov/injury/wisqars/fatal.html

Cohen, D., & Nisbett, R. E. (1994). Self-protection and the culture of honor: Explaining southern homicide. *Personality and Social Psychology Bulletin*, *20*(5), 551–567. doi:10.1177/0146167294205012

Cook, P. J. (2013). The great American gun war: Notes from four decades in the trenches. *Crime and Justice*, *42*(1), 19–73. doi:10.1086/670397

Cook, P. J., & Ludwig, J. (2006). The social costs of gun ownership. *Journal of Public Economics*, *90*(1-2), 379–391. doi:10.1016/j.jpubeco.2005.02.003

Cook, P. J., Ludwig, J., & Samaha, A. M. (2009). Gun control after Heller: Threats and sideshows from a social welfare perspective. *UCLA Law Review*, *56*(5), 1041–1093.

Cook, P. J., Moore, M. H., & Braga, A. A. (2011). Gun control. In J. Q. Wilson & J. Petersilia (Eds.), *Crime and public policy (pp. 257–292)*. New York, NY: Oxford University Press.

Crifasi, C., Merrill-Francis, M., McCourt, A., Vernick, J., Wintemute, G., & Wesbter, D. (2018). Association between firearm laws and homicide in urban counties. *Journal of Urban Health : Health*, *95*(3), 383–390. doi:10.1007/s11524-018-0273-3

Cummings, P., Koepsell, T. D., Grossman, D. C., Savarino, J., & Thompson, R. S. (1997). The association between the purchase of a handgun and homicide or suicide. *American Journal of Public Health*, *87*(6), 974–978. doi:10.2105/ajph.87.6.974

Dahlberg, L. L., Ikeda, R. M., & Kresnow, M-J. (2004). Guns in the home and risk of a violent death in the home: Findings from a national study. *American Journal of Epidemiology*, *160*(10), 929–936. doi:10.1093/aje/kwh309

Dierenfeldt, R., Brown, T. C., & Roles, R. A. (2017). Re-considering the structural covariates of gun crime: An examination of direct and moderated effects. *Deviant Behavior*, *38*(2), 208–225. doi: 10.1080/01639625.2016.1196974

Donohue, J. J., Aneja, A., & Weber, K. D. (2019). *Right-to-carry laws and violent crime: A comprehensive assessment using panel data and a state-level synthetic control analysis.*

Doucette, M. L., Crifasi, C. K., & Frattaroli, S. (2019). Right-to-carry laws and firearm workplace homicides: A longitudinal analysis (1992-2017). *American Journal of Public Health*, *109*(12), 1747–1753. doi:10.2105/AJPH.2019.305307

Duggan, M. (2001). More guns, more crime. *Journal of Political Economy*, *109*(5), 1086–1114. doi: 10.1086/322833

Duwe, G., Kovandzic, T., & Moody, C. E. (2002). The impact of right-to-carry concealed firearm laws on mass public shootings. *Homicide Studies*, *6*(4), 271–296. doi:10.1177/108876702237341

Federal Bureau of Investigation. (2017). Crime in the United States: Expanded homicide data table 4. https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/tables/expanded-homicide-data-table-4.xls

Fisher, J. C. (1976). Homicide in Detroit: The role of firearms. *Criminology*, *14*(3), 387–400. doi:10.1111/j.1745-9125.1976.tb00030.x

Fridel, E. E. (2016). Mass murder in the United States: 2006-2016. In P. Overberg, M. Hoyer, M. Hannan, J. Upton, B. Hansen, & E. Durkin (Eds.), *USA TODAY: Explore the data on U.S. mass killings since 2006*. Northeastern University. Retrieved from http://www.usatoday.com/story/news/nation/2013/09/16/mass-killings-data-map/2820423/

Fridel, E. E. (2017). A multivariate comparison of family, felony, and public mass murders in the United States. *Journal of Interpersonal Violence*, 088626051773928. doi:10.1177/0886260517739286

Gius, M. (2014). An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. *Applied Economics Letters*, *21*(4), 265–267. doi:10.1080/13504851.2013.854294

Green, G. S. (1987). Citizen gun ownership and criminal deterrence: Theory, research, and policy. *Criminology*, *25*(1), 63–81. doi:10.1111/j.1745-9125.1987.tb00789.x

Grinshteyn, E., & Hemenway, D. (2016). Violent death rates: The US compared with other high-income OECD countries, 2010. *The American Journal of Medicine*, *129*(3), 266–273. doi:10.1016/j.amjmed.2015.10.025

Hemenway, D., & Miller, M. (2000). Firearm availability and homicide rates across 26 high-income countries. *Journal of Trauma, Injury, Infection, and Critical Care*, *49*(6), 1227–1233.

Hemenway, D., Shinoda-Tagawa, T., & Miller, M. (2002). Firearm availability and female homicide victimization rates among 25 populous high-income countries. *JAMWA: Journal of the American Medical Women's Association*, *57*, 1–5.

Hemenway, D., Azrael, D., & Miller, M. (2017). Whose guns are stolen? The epidemiology of gun theft victims. *Injury Epidemiology*, 4(11), 1–5.

Hepburn, L., Miller, M., Azrael, D., & Hemenway, D. (2004). The effect of nondiscretionary concealed weapon carrying laws on homicide. *The Journal of Trauma*, *56*(3), 676–681. doi:10.1097/01.ta.0000068996.01096.39

Hepburn, L. M., & Hemenway, D. (2004). Firearm availability and homicide: A review of the literature. *Aggression and Violent Behavior*, *9*(4), 417–440. doi:10.1016/S1359-1789(03)00044-2

Hindelang, M. J. (1976). Criminal victimization in eight American cities: A descriptive analysis of common theft and assault. Ballinger.

Hupp, S. G. (2009). *From Luby's to the legislature: One woman's fight against gun control*. San Antonio, TX: Privateer Publications.

Kelly, R. (2010). *Active shooter report: Recommendations and analysis for risk mitigation*. New York, NY: New York City Police Department.

Killias, M. (1993a). *Gun ownership, suicide, and homicide: An international perspective*. Rome, Italy: UNICRI.

Killias, M. (1993b). International correlations between gun ownership and rates of homicide and suicide. *CMAJ: Canadian Medical Association Journal = Journal de L'Association Medicale Canadienne*, 148(10), 1721–1725.

Killias, M., & Haas, H. (2002). The role of weapons in violent acts: Some results of a Swiss national cohort study. *Journal of Interpersonal Violence*, 17(1), 14–32. doi:10.1177/0886260502017001002

Killias, M., & Markwalder, N. (2012). Firearms and homicide in Europe. In M. C. Liem & W. A. Pridemore (Eds.), *Handbook of European homicide research: Patterns, explanations, and country studies* (pp 261–272). New York, NY: Springer.

Kleck, G. (1979). Capital punishment, gun ownership, and homicide. *American Journal of Sociology*, 84(4), 882–910. doi:10.1086/226865

Kleck, G. (1984). The relationship between gun ownership levels and rates of violence in the United States. In D. B. Kates (Ed.), *Firearms and violence: Issues of public policy* (pp. 99–135). Cambridge, MA: Ballinger.

Kleck, G. (1997). *Targeting guns: Firearms and their control*. New York, NY: Aldine de Gruyter.

Kleck, G. (2004). Measures of gun ownership levels for macro-level crime and violence research. *Journal of Research in Crime and Delinquency*, 41(1), 3–36. doi:10.1177/0022427803256229

Kleck, G., & Hogan, M. (1999). National case-control study of homicide offending and gun ownership. *Social Problems*, 46(2), 275–293. doi:10.1525/sp.1999.46.2.03x0189g

Kleck, G., & Patterson, E. B. (1993). The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology*, 9(3), 249–287. doi:10.1007/BF01064462

Kovandzic, T. V., & Marvell, T. B. (2003). Right-to-carry concealed handguns and violent crime: Crime control through gun decontrol? *Criminology & Public Policy*, 2(3), 363–396. doi:10.1111/j.1745-9133.2003.tb00002.x

Krouse, W. J., & Richardson, D. J. (2015). *Mass murder with firearms: Incidents and victims, 1999–2013*. Washington, DC: Congressional Research Service.

Lester, D. (1988). Firearm availability and the incidence of suicide and homicide. *Acta Psychiatrica Belgica*, 88(5-6), 387–393.

Liang, K.-Y., & Zeger, S. L. (1986). Longitudinal data analysis using generalized models. *Biometrika*, 73(1), 13–22. doi:10.1093/biomet/73.1.13

Lin, P.-I., Fei, L., Barzman, D., & Hossain, M. (2018). What have we learned from the time trend of mass shootings in the U.S.? *PLoS One*, 13(10), e0204722. doi:10.1371/journal.pone.0204722

Liu, G., & Wiebe, D. J. (2019). A time-series analysis of firearms purchasing after mass shooting events in the United States. *JAMA Network Open*, 2(4), e191736. doi:10.1001/jamanetworkopen.2019.1736

Loftin, C., McDowall, D., Curtis, K., & Fetzer, M. D. (2015). The accuracy of the Supplementary Homicide Report rates for large U.S. cities. *Homicide Studies*, 19(1), 6–27. doi:10.1177/1088767914551984

Lott, J. R. (2000). *More guns, less crime: Understanding crime and gun control laws*. Chicago, IL: Universtiy of Chicago Press.

Lott, J. R. (2018). *Concealed carry permit holders across the United States: 2018*. Crime Prevention Research Center, Knoxville, TN URL: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3233904#:~:text=Despite%20the%20expectations%20of%20many,of%20American%20adults%20have%20permits

Lott, J. R., & Landes, W. M. (2000). *Multiple victim public shootings*. Unpublished paper.

Lott, J. R., & Mustard, D. B. (1997). Crime, deterrence, and right-to-carry concealed handguns. *The Journal of Legal Studies*, 26(1), 1–68. doi:10.1086/467988

Lott, J. R., & Whitley, J. E. (2001). Safe-storage gun laws: Accidental deaths, suicides, and crime. *The Journal of Law and Economics*, 44(S2), 659–689. doi:10.1086/338346

Luca, M., Malhotra, D., & Poliquin, C. (2019). *The impact of mass shootings on gun policy*. Retrieved from https://www.hbs.edu/faculty/Publication%20Files/16-126_ce055015-fc1c-4a8c-9a8a-8a9361d808bb.pdf

Ludwig, J. (1998). Concealed-gun-carrying laws and violent crime: Evidence from state panel data. *International Review of Law and Economics*, 18(3), 239–254. doi:10.1016/S0144-8188(98)00012-X

Magaddino, J. P., & Medoff, M. H. (1984). An empirical analysis of federal and state firearm control laws. In D. B. Kates (Ed.), *Firearms and Violence: Issues of Public Policy* (pp. 225–258). Cambridge, MA: Ballinger.

McDowall, D. (1991). Firearm availability and homicide rates in Detroit, 1951-1986. *Social Forces*, 69(4), 1085–1099. doi:10.2307/2579303

McDowall, D. (1995). Firearms and self-defense. *The Annals of the American Academy of Political and Social Science*, 539(1), 130–140. doi:10.1177/0002716295539001010

McDowall, D., Lizotte, A. J., & Wiersema, B. (1991). General deterrence through civilian gun ownership: An evaluation of the quasi-experimental evidence. *Criminology*, 29(4), 541–559. doi:10.1111/j.1745-9125.1991.tb01079.x

McDowall, D., Loftin, C., & Wiersema, B. (1995). Easing concealed firearms laws: Effects on homicide in three states. *The Journal of Criminal Law and Criminology (1973-)*, 86(1), 193–206. doi:10.2307/1144006

Menard, S. (1995). *Applied logistic regression analysis: Sage university series on quantitative applications in the social sciences*. Thousand Oaks, CA: Sage.

Miller, M., Azrael, D., & Hemenway, D. (2002). Rates of household firearm ownership and homicide across US regions and states, 1988-1997. *American Journal of Public Health*, 92(12), 1988–1993. doi:10.2105/ajph.92.12.1988

Miller, M., Hemenway, D., & Azrael, D. (2007). State-level homicide victimization rates in the US in relation to survey measures of household firearm ownership, 2001-2003. *Social Science & Medicine (1982)*, 64(3), 656–664. doi:10.1016/j.socscimed.2006.09.024

National Public Radio. (2012). Only thing that stops a bad guy with a gun is a good guy with a gun. https://www.npr.org/2012/12/21/167824766/nra-only-thing-that-stops-a-bad-guy-with-a-gun-is-a-good-guy-with-a-gun

National Threat Assessment Center. (2019). *Protecting America's schools: A U.S. Secret Service analysis of targeted school violence*. U.S. Secret Service, Washington, D.C: Department of Justice.

Newport, F. (2015). *Majority say more concealed weapons would make U.S. safer*. Retrieved from https://news.gallup.com/poll/186263/majority-say-concealed-weapons-safer.aspx

Newton, G. D., & Zimring, F. (1969). Firearms and Violence in American Life: A Staff Report to the National Commission on the Causes and Prevention of Violence. U.S. Government Printing Office.

Nisbett, R. E., & Cohen, D. (1996). *Culture of honor: The psychology of violence in the South*. Boulder, CO: Westview Press.

O'Brien, R. M. (2007). A caution regarding rules of thumb for variance inflation factors. *Quality & Quantity*, 41(5), 673–690. doi:10.1007/s11135-006-9018-6

Overberg, P., Hoyer, M., Hannan, M., Upton, J., Hansen, B., & Durkin, E. (2016). Explore the data on U.S. mass killings since 2006. Retrieved from http://www.usatoday.com/story/news/nation/2013/09/16/mass-killings-data-map/2820423/

Phillips, L., Votey, H. L., & Howell, J. (1976). Handguns and homicide: Minimizing losses and the costs of control. *The Journal of Legal Studies*, 5(2), 463–478. doi:10.1086/467559

Planty, M., & Truman, J. (2013). *Firearm violence, 1993-2011*. Washington, D.C.: Bureau of Justice Statistics, U.S. Department of Justice. Special report 241730

Plassmann, F., & Tideman, T. N. (2001). Does the right to carry concealed handguns deter countable crimes? Only a count analysis can say. *The Journal of Law and Economics*, 44(S2), 771–798. doi:10.1086/323311

Reeping, P. M., Cerda, M., Kalesan, B., Wiebe, D. O J., Galea, S., & Brana, C. C. (2019). State gun laws, gun ownership, and mass shootings in the US: Cross sectional time series. *The British Medical Journal*, 364(1542), 1–6.

Ressler, R. K., Burgess, A. W., & Douglas, J. E. (1988). *Sexual homicide: Patterns and motives*. Lexington, MA: Lexington Books.

Rokaw, W. M., Mercy, J. A., & Smith, J. C. (1990). Comparing death certificate data with FBI crime reporting statistics on U.S. homicides. *Public Health Reports*, 105(5), 447–455.

Rosengart, M., Cummings, P., Nathens, A., Heagerty, P., Maier, R., & Rivara, F. (2005). An evaluation of state firearm regulations and homicide and suicide death rates. *Injury Prevention*, *11*(2), 77–83. doi:10.1136/ip.2004.007062

Seitz, S. T. (1972). Firearms, homicides, and gun control effectiveness. *Law & Society Review*, *6*(4), 595–614. doi:10.2307/3052950

Semenza, D. C., Stansfield, R., & Link, N. W. (2020). The dynamics of race, place, and homicide context in the relationship between firearm dealers and gun violence. *Justice Quarterly*.

Siegel, M., Pahn, M., Xuan, Z., Ross, C. S., Galea, S., Kalesan, B., … Goss, K. A. (2017). Firearm-related laws in all 50 U.S. states, 1991-2016. *American Journal of Public Health*, *107*(7), 1122–1129. doi:10.2105/AJPH.2017.303701

Siegel, M., Ross, C. S., & King, C. (2013). The relationship between gun ownership and firearm homicide rates in the United States, 1981-2010. *American Journal of Public Health*, *103*(11), 2098–2105. doi:10.2105/AJPH.2013.301409

Siegel, M., Xuan, Z., Ross, C. S., Galea, S., Kalesan, B., Fleegler, E., & Goss, K. A. (2017). Easiness of legal access to concealed firearm permits and homicide rates in the United States. *American Journal of Public Health*, *107*(12), 1923–1929. doi:10.2105/AJPH.2017.304057

Smith, T. W., & Son, J. (2015). *General Social Survey final report: Trends in gun ownership in the United States, 1972-2014*. Chicago, IL: NORC at the University of Chicago.

Sorenson, S., & Berk, R. (2001). Handgun sales, beer sales, and youth homicide. *Journal of Public Health Policy*, *22*(2), 182–197. doi:10.2307/3343459

Steidley, T., Ramey, D. M., & Shrider, E. A. (2017). Gun shops as local institutions: Federal firearms licensees, social disorganization, and neighborhood violent crime. *Social Forces*, *96*(1), 265–298. doi:10.1093/sf/sox039

Stolzenberg, L., & D'Alessio, S. J. (2000). Gun availability and violent crime: New evidence from the National Incident-Based Reporting System. *Social Forces*, *78*(4), 1461–1482. doi:10.2307/3006181

Studdert, D. M., Zhang, Y., Rodden, J. A., Hyndman, R. J., & Wintemute, G. J. (2017). Handgun acquisitions in California after two mass shootings. *Annals of Internal Medicine*, *166*(10), 698–706. doi:10.7326/M16-1574

Wallace, L. N. (2015). Responding to violence with guns: Mass shootings and gun acquisition. *The Social Science Journal*, *52*(2), 156–167. doi:10.1016/j.soscij.2015.03.002

Webster, D. W., McCourt, A. D., Crifasi, C. K., Booty, M. D., & Stuart, E. A. (2020). Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. *Criminology & Public Policy*, *19*(1), 171–212. doi:10.1111/1745-9133.12487

Wellford, C. F., Pepper, J. V., & Petrie, C. V. (2005). *Firearms and violence: A critical review*. Washington, D.C.:The National Academies Press.

Wiersema, B., Loftin, C., & McDowall, D. (2000). A comparison of Supplementary Homicide Reports and National Vital Statistics System homicide estimates for U.S. counties. *Homicide Studies*, *4*(4), 317–340. doi:10.1177/1088767900004004002

Wolfgang, M. (1958). Patterns in Criminal Homicide. The University of Pennslyvania Press.

Wright, J. D., & Rossi, P. H. (1991). *Armed and considered dangerous: A survey of felons and their weapons*. Hawthorne, NY: Aldine de Gruyter.

Zimmerman, P. R. (2014). The deterrence of crime through private security efforts: Theory and evidence. *International Review of Law and Economics*, *37*, 66–75. doi:10.1016/j.irle.2013.06.003

Zimring, F. (1968). Is gun control likely to reduce violent killings? *University of Chicago Law Review*, *35*, 21–37.

Zimring, F. (1972). The medium is the message: Firearm caliber as a determinant of death from assault. *The Journal of Legal Studies*, *1*(1), 97–123. doi:10.1086/467479

Zimring, F. (1991). Firearms, violence and public policy. *Scientific American*, *265*(5), 48–54. doi:10.1038/scientificamerican1191-48



## Justice Quarterly

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/rjqy20

# The Futility of Shooting Down Strawmen: A Response to Kleck (2020)

Emma E. Fridel

**To cite this article:** Emma E. Fridel (2021) The Futility of Shooting Down Strawmen: A Response to Kleck (2020), Justice Quarterly, 38:5, 925-941, DOI: 10.1080/07418825.2020.1856401

**To link to this article:** https://doi.org/10.1080/07418825.2020.1856401

Published online: 25 Dec 2020.

Submit your article to this journal ⬚

Article views: 497

View related articles ⬚

View Crossmark data ⬚

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=rjqy20

JUSTICE QUARTERLY
2021, VOL. 38, NO. 5, 925–941
https://doi.org/10.1080/07418825.2020.1856401






# The Futility of Shooting Down Strawmen: A Response to Kleck (2020)

Emma E. Fridel 

College of Criminology and Criminal Justice, Florida State University, Tallahassee, FL, USA

**ABSTRACT**

In response to my recent article on guns, firearms homicide, and mass shootings, Kleck questions the reliability of my findings and cited concerns related to spuriousness, invalid measurement, and causal ordering. Most of the points raised by Kleck were addressed as sensitivity analyses in the original manuscript; the remaining issues reflect challenges that face the field of firearms research as a whole, including Kleck's own work. Rebutting his critiques and defending the literature more broadly, this response elaborates on the modeling strategy utilized in the original article, provides additional sensitivity analyses validating these decisions, and discusses the futility of shooting down strawman arguments that fail to advance scholarship.

**ARTICLE HISTORY**
Received 21 October 2020
Accepted 20 November 2020

**KEYWORDS**
Firearms; homicide; mass shootings

## Background

In a recent article titled "Comparing the impact of household gun ownership and concealed carry legislation on the frequency of mass shootings and firearms homicide," Fridel (2020) found that firearms homicide rates are elevated in states with permissive concealed carry legislation, while mass shootings disproportionately occur in states with higher levels of gun ownership. Kleck (2020) discusses five methodological concerns regarding this study, including: analyzing firearms homicide instead of total homicide rates; failing to control for other gun laws; failing to control for other confounders; using a proxy for household gun ownership in longitudinal analysis; and failing to address reverse causation. In addition, Kleck (2020) questions the article's characterization of previous literature, contending that only the weakest studies were included.

Curiously, Kleck's critique is not specific to the study in question, and blatantly overlooks sensitivity analyses in the original article (see pages 15–16) that Kleck (2020) directly addressed at least three of his five main points. As Kleck's critique recycles concerns that he has expressed over the past forty years (see Kleck, 1979, 2004, 2015; Kleck, Kovandzic, & Bellows, 2016; Kovandzic, Schaffer, & Kleck, 2013), Kleck's critique is more of a condemnation of the field of firearms research as a whole, rather than of my study in particular. Nevertheless, Kleck and I agree on several important

---

**CONTACT** Emma E. Fridel ✉ efridel@fsu.edu
© 2020 Academy of Criminal Justice Sciences

Exhibit D
Page 209

methodological challenges facing both my study and gun violence research more broadly. As such, the purpose of this response is twofold: first, to refute Kleck's mischaracterization of my recent work and its methodological rigor; and second, to highlight the concerns that we share in this line of inquiry. In doing so, this academic discourse contributes to the literature by clarifying common misconceptions, discussing challenges confronting firearms researchers, and highlighting directions for future work seeking to disentangle the controversial relationship between guns and violence.

## Response to methodological concerns

### Spuriousness and confounding variables

Kleck highlights several potential sources of spuriousness in the study results, including: analyzing firearms homicide instead of total homicide rates; failing to control for alternate gun laws and other potential confounders; and failing to control for time-invariant differences across states via fixed effects. I agree that these concerns are valid, so much so that the original article included a stand-alone sensitivity analysis section testing and refuting each potential issue (see pages 15–16 of the original manuscript). Although this discussion should have been sufficient to satisfy Kleck had he carefully reviewed it, I begin by reiterating the rationale for each of these modeling decisions in depth before presenting additional analyses to validate them.

### Firearms homicide and total homicide

First, Kleck contends that the study should have used the total number of homicides and mass murders as dependent variables, rather than focusing on firearms-related deaths. This argument is related to a potential displacement effect, as offenders who would have killed with a gun may simply choose an alternate weapon, resulting in no net effect on the number of murders. From a theoretical standpoint, it seems implausible that the vast majority of offenders—many of whom act impulsively during a quarrel—would both: (1) choose to continue with a less deadly and convenient weapon and (2) still succeed in killing the victim(s). Nevertheless, the original article noted that gun ownership and concealed carry legislation have no significant effects on the number of non-gun homicides (IRR = 1.036, p = 0.383 for gun ownership and IRR = 0.980, p = 0.593 for shall-issue/permitless carry laws) and mass murders (IRR = 0.958, p = 0.831; IRR = 0.825, p = 0.499 for shall-issue/permitless carry laws). Even if both of these models committed a rather unlikely Type II error as indicated by Kleck, the coefficients are in the opposite direction of a displacement effect, consistent with some previous work (Miller, Azrael, & Hemenway, 2002). When accompanied by this type of sensitivity analysis, modeling firearms homicides is essentially equivalent to analyzing all homicides, with the additional benefit of focusing on the types of incidents most likely to be impacted by gun ownership and legislation (Siegel, Ross, & King, 2013).

### Confounding variables

Second, Kleck questions whether the original results represent spurious relationships due to potential omitted variable bias. Specifically, he recommends including additional gun laws and structural characteristics known to be correlated with homicide

and/or mass murder. While omitted variable bias is a limitation of all research, Kleck is particularly concerned due to the small number of statistically significant control variables in both models. Once again, Kleck overlooks or intentionally disregards sensitivity analyses in the original article that address these very issues.

For example, the sensitivity analyses reported in the original manuscript included measures of the total number of gun laws, universal background checks, universal permitting, high-capacity magazine bans, prohibitions for violent misdemeanors, prohibitions for domestic violence (DVRO), mandatory waiting periods, and the Brady assault weapons ban *simultaneously* along with the other predictors; these results were substantively similar to the models presented in the manuscript. Moving beyond additional gun control measures, the original analysis also controlled for structural factors that have repeatedly been shown to impact homicide rates, including socioeconomic (dis)advantage, population age structure, and familial disruption (Land, McCall, & Cohen, 1990; Morenoff, Sampson, & Raudenbush, 2001; Sampson, 1987; Tcherni, 2011). Therefore, while many of the control variables were not statistically significant in this particular analysis, they remain key theoretical correlates of homicide that cannot be ignored (Alba & Messner, 1995a). Indeed, several of these variables *were* statistically significant in various sensitivity analyses not shown in the original manuscript due to space constraints (but see Tables 1 and 2 below). As the goal of the study was to be as conservative and parsimonious as possible, maximizing the total number of significant control variables was not prioritized when choosing the final models to be presented for publication.

Regardless, Kleck recommends controlling for other potential confounders, including poverty, percent black, percent elderly, income inequality, population density, percent single-parent households, total homicide rates, and "pro-violent culture." This comment is perplexing, as: (1) most of these variables were already included in the main analysis; and (2) several of the recommended covariates represent outdated measures that are theoretically and operationally inconsistent with more recent research. In order to control for the age structure of the population, for example, the models included the proportion of residents most likely to commit homicide (percent aged 18–24), rather than the proportion least likely to commit homicide (percent elderly). Similarly, measures like poverty and percent black—while traditionally used in decades past—have more recently been measured as part of a (dis)advantage index (Land et al., 1990) and Blau's (1977) index for racial/ethnic heterogeneity (Sampson & Groves, 1989), both of which were included in the study. As suggested, the total homicide rate (lagged by one year) was also included as part of the sensitivity analyses (see page 15 in the original manuscript). The remaining confounders recommended by Kleck were either too nebulous to operationalize (e.g., "pro-violent culture"[1]) or were not available annually at the state level for the study period (including percent single-parent households, income inequality, and population density). While this is certainly a limitation, omitted variable bias is an omnipresent issue that pervades all empirical research.

---

[1]"Pro-violent culture" has often been included in the form of regional controls for the Southern culture of violence hypothesis (Gastil, 1971; Loftin & Hill, 1974). Regional dummies were included in the original models, so it remains unclear what other measures of "pro-violent culture" should have been included.

928   ⊕   E. E. FRIDEL

**Table 1.** Negative binomial regression of concealed carry legislation on firearms homicide and total homicide in the United States.

| (Standardized) Predictor | Firearms Homicide GEE, 1991-2016 | | Total Homicide FE, 1991-2016 | | Total Homicide FE, 2006-2016 | |
|---|---|---|---|---|---|---|
| | IRR | 95% CI | IRR | 95% CI | IRR | 95% CI |
| Gun ownership[a] | 1.046 | [0.978-1.119] | 1.029 | [0.990-1.070] | 1.049 | [0.997-1.103] |
| Shall-issue or permitless carry | 1.108** | [1.026-1.196] | 1.048** | [1.016-1.081] | 1.095** | [1.035-1.159] |
| Advantage | 0.988 | [0.925-1.055] | — | — | — | — |
| Unemployment | 1.010 | [0.974-1.048] | 0.990 | [0.970-1.010] | 0.993 | [0.970-1.015] |
| Ethnic heterogeneity | 1.290*** | [1.133-1.469] | — | — | — | — |
| Divorce rate | 0.976 | [0.923-1.032] | 1.000 | [0.973-1.028] | 0.942* | [0.897-0.989] |
| Property crime rate | 1.174*** | [1.104-1.248] | 1.070*** | [1.037-1.105] | 1.106*** | [1.032-1.185] |
| Other violent crime rate | 1.037 | [0.954-1.128] | 1.002 | [0.972-1.033] | 1.082* | [1.012-1.157] |
| Incarceration rate | 0.976 | [0.895-1.065] | 0.977 | [0.948-1.008] | 1.028 | [0.971-1.089] |
| Non-firearm homicide rate | 1.014 | [0.993-1.035] | — | — | — | — |
| Mental health expenditures | 1.003 | [0.958-1.051] | 0.990 | [0.968-1.013] | 1.016 | [0.981-1.053] |
| Alcohol consumption | 1.052 | [0.928-1.192] | 1.010 | [0.965-1.057] | 1.023 | [0.948-1.105] |
| Hunting licenses | 0.987 | [0.906-1.075] | 1.037 | [0.975-1.102] | 0.997 | [0.911-1.090] |
| Percent male | 1.043 | [0.915-1.189] | 1.099** | [1.029-1.173] | 1.007 | [0.855-1.186] |
| Percent aged 18-24 | 1.012 | [0.981-1.044] | 1.003 | [0.983-1.023] | 0.997 | [0.949-1.046] |
| Region (reference = South) | | | | | | |
| Northeast | 0.553* | [0.332-0.922] | — | — | — | — |
| West | 0.448*** | [0.315-0.637] | — | — | — | — |
| Midwest | 0.731 | [0.491-1.088] | — | — | — | — |
| *Additional Gun Control Laws* | | | | | | |
| Universal background checks | — | — | 0.908** | [0.847-0.974] | 0.886** | [0.809-0.971] |
| Universal permitting | — | — | 0.875 | [0.749-1.021] | 0.870** | [0.781-0.968] |
| Mandatory waiting periods | — | — | 1.586* | [1.051-2.392] | 0.684 | [0.087-5.398] |
| High-capacity magazine ban | — | — | 0.999 | [0.926-1.076] | 1.119 | [0.984-1.272] |
| Prohibitions for violence | — | — | 0.967 | [0.867-1.078] | 0.959 | [0.852-1.079] |
| Domestic violence restraining orders | — | — | 1.017 | [0.981-1.054] | 1.028 | [0.967-1.093] |
| Total number of gun laws | — | — | 0.999 | [0.996-1.001] | 0.998 | [0.992-1.004] |
| Assault weapons ban | — | — | 0.835*** | [0.752-0.927] | — | — |
| *Alternative Control Variables* | | | | | | |
| Poverty | — | — | 0.987 | [0.968-1.007] | 0.981 | [0.958-1.003] |
| Education | — | — | 0.989 | [0.953-1.026] | 1.085 | [0.984-1.197] |
| Median income | — | — | 0.982 | [0.942-1.023] | 0.998 | [0.962-1.036] |
| Percent black | — | — | 1.527*** | [1.302-1.791] | 1.155 | [0.688-1.940] |
| Percent elderly | — | — | 1.042 | [0.989-1.096] | 0.983 | [0.902-1.071] |
| Total homicide rate (lagged) | — | — | 1.158*** | [1.130-1.187] | 1.127*** | [1.072-1.184] |
| Gini coefficient | — | — | — | — | 1.023 | [0.977-1.072] |
| Single female-headed households | — | — | — | — | 0.938* | [0.889-0.989] |
| Population density | — | — | — | — | 1.049 | [0.656-1.678] |

*Abbreviations:* GEE = generalized estimating equations; FE = fixed effects; IRR = incidence rate ratio; CI = confidence interval.
The results for year and state fixed effects (not shown) are available upon request.
*p < 0.05.
**p < 0.01.
***p < 0.001.
[a]Gun ownership is lagged by one year in both the fixed effects models, but not in the original GEE model shown above.

### Clustering by state

Finally, Kleck takes umbrage with the treatment of time-invariant differences among states. This concern reflects Kleck's failure to carefully review my original article as well as his apparent lack of understanding of the statistical method utilized in the analysis: generalized estimating equations (GEE). As discussed in the original manuscript (see page 15), fixed effects for both year *and* state were already included as sensitivity analyses, with no substantive changes in the magnitude, direction, or significance of

**Table 2.** Negative binomial regression of household gun ownership on mass shootings and mass murders in the United States.

| (Standardized) Predictor | Mass Shootings GEE, 1991-2016 IRR | 95% CI | All Mass Murders GEE, 1991-2016 IRR | 95% CI | All Mass Murders GEE, 2006-2016 IRR | 95% CI |
|---|---|---|---|---|---|---|
| Gun ownership[a] | 1.525*** | [1.199-1.940] | 1.420** | [1.106-1.823] | 1.599* | [1.001-2.565] |
| Shall-issue or permitless carry | 0.881 | [0.696-1.115] | 0.889 | [0.695-1.136] | 0.330*** | [0.204-0.534] |
| Advantage | 0.933 | [0.769-1.133] | — | — | — | — |
| Unemployment | 0.987 | [0.820-1.187] | 1.032 | [0.847-1.258] | 1.015 | [0.780-1.321] |
| Ethnic heterogeneity | 1.021 | [0.780-1.336] | — | — | — | — |
| Divorce rate | 0.948 | [0.854-1.053] | 0.978 | [0.843-1.135] | 0.956 | [0.721-1.269] |
| Property crime rate | 1.148 | [0.937-1.408] | 1.015 | [0.857-1.202] | 1.081 | [0.725-1.612] |
| Other violent crime rate | 0.987 | [0.847-1.150] | 0.974 | [0.847-1.121] | 1.422* | [1.002-2.018] |
| Incarceration rate | 1.053 | [0.901-1.230] | 1.109 | [0.958-1.283] | 1.008 | [0.772-1.316] |
| Non-firearm homicide rate | 1.017 | [0.881-1.173] | — | — | — | — |
| Mental health expenditures | 0.949 | [0.811-1.112] | 0.932 | [0.793-1.095] | 0.947 | [0.764-1.173] |
| Alcohol consumption | 0.977 | [0.849-1.123] | 0.821* | [0.697-0.967] | 0.643*** | [0.499-0.828] |
| Hunting licenses | 0.842 | [0.673-1.054] | 0.855 | [0.709-1.032] | 0.952 | [0.724-1.253] |
| Percent male | 1.131 | [0.858-1.491] | 1.351* | [1.000-1.825] | 1.843** | [1.248-2.721] |
| Percent aged 18-24 | 0.946 | [0.797-1.124] | 0.939 | [0.785-1.122] | 0.988 | [0.743-1.313] |
| Region (reference = South) | | | | | | |
| Northeast | 1.417 | [0.808-2.484] | 1.846* | [1.046-3.258] | 2.124 | [0.840-5.368] |
| West | 1.183 | [0.737-1.898] | 1.228 | [0.807-1.869] | 1.444 | [0.567-3.678] |
| Midwest | 1.441 | [0.922-2.250] | 1.505** | [1.111-2.040] | 2.100* | [1.026-4.299] |
| *Additional Gun Control Laws* | | | | | | |
| Universal background checks | | | 0.639* | [0.411-0.994] | 0.518 | [0.226-1.19] |
| Universal permitting | | | 0.927 | [0.510-1.683] | 0.744 | [0.283-1.955] |
| Mandatory waiting periods | | | 1.800* | [1.077-3.008] | 3.402* | [1.102-10.501] |
| High-capacity magazine ban | | | 1.162 | [0.751-1.799] | 2.800* | [1.025-7.652] |
| Prohibitions for violence | | | 0.719 | [0.394-1.314] | 0.192* | [0.049-0.750] |
| Domestic violence restraining orders | | | 1.004 | [0.782-1.290] | 1.325 | [0.864-2.031] |
| Total number of gun laws | | | 1.000 | [0.988-1.012] | 0.983* | [0.967-0.999] |
| Assault weapons ban | | | 0.724 | [0.276-1.901] | — | — |
| *Alternative Control Variables* | | | | | | |
| Poverty | | | 0.971 | [0.777-1.214] | 1.331 | [0.905-1.958] |
| Education | | | 1.338** | [1.112-1.608] | 1.271 | [0.801-2.018] |
| Median income | | | 0.842 | [0.580-1.221] | 1.299 | [0.879-1.922] |
| Percent black | | | 1.005 | [0.788-1.282] | 1.402 | [0.984-1.997] |
| Percent elderly | | | 1.196* | [1.006-1.422] | 1.336 | [0.988-1.806] |
| Total homicide rate (lagged) | | | 1.286* | [1.027-1.610] | 0.867 | [0.539-1.392] |
| Gini coefficient | | | — | — | 1.390 | [0.920-2.101] |
| Single female-headed households | | | — | — | 0.677 | [0.408-1.122] |
| Population density | | | — | — | 0.935 | [0.658-1.327] |

*ABBREVIATIONS*: GEE = generalized estimating equations; IRR = incidence rate ratio; CI = confidence interval.
The results for year fixed effects (not shown) are available upon request.
*p < 0.05.
**p < 0.01.
***p < 0.001.
[a]Gun ownership is lagged by one year in both mass murder models, but not in the original GEE mass shootings model shown above.

the two key independent variables (gun ownership and concealed carry legislation). Nevertheless, I reiterate and expand upon the discussion of clustering by state here.

Although fixed-effects models have long been considered the gold standard for longitudinal panel models, GEE is also frequently used to control for clustering within states (Miller et al., 2002; Siegel et al., 2017). A population-averaged, semiparametric approach that treats dependence as a nuisance feature of the data, GEE is quite flexible: it requires no assumptions about the distribution and is robust to misspecification

of the working correlation matrix (see Liang & Zeger, 1986 for an overview). Essentially, GEE has the benefits of a random effects model (assuming constant within-unit marginal covariance), without the often problematic assumption that any unit heterogeneity is orthogonal to the explanatory variables (Wawro, 2009).[2] In other words, GEE captures *both* between- and within-state variation and thus examines the average response over the population as a whole; in contrast, fixed-effects models focus exclusively on within-unit change, and thus are optimal for estimating state-specific means. As a result, GEE is better suited to address the original study's goal: examining the impact of household gun ownership and concealed carry legislation on homicide and mass murder in the United States *as a whole*. As Bell, Fairbrother, and Jones (2019, pages 1054–1055) summarize, "Social science is concerned with understanding the world as it exists, not just dynamic changes within it. Thus with a panel dataset, for example, it will often be worth modelling associations at the higher level in order to understand the ways in which individuals differ—not just the ways in which they change over time." Considering that gun ownership varies widely between (but not as much within) states and concealed carry legislation varies both between and within states,[3] capturing both sources of variation is crucial for understanding the full picture of gun violence in America.

GEE also has several other advantages relative to the traditional fixed-effects approach. Because it is robust to the misspecification of the working correlation matrix, GEE reduces the potential for omitted variable bias, one of Kleck's main concerns. In addition, GEE tends to be quite conservative in comparison to fixed-effects models due to its semiparametric approach, which may explain why so few control variables were significant when using this type of analysis. Finally, GEE is essentially the only option for modeling rare event panel data, such as mass murder. States that did not experience an incident during the time period, for example, have no overlap between the fixed effects and the outcome (e.g., separation). As a result of the lack of variation in the dependent variable, these states are excluded from the model, and the parameter estimates are only calculated using states that experienced at least one incident (see Cook et al., 2020 for an overview of this issue). This produces an inaccurate estimate of the baseline event risk by introducing sample selection bias, leading some researchers to argue that fixed effects should rarely—if ever—be used with rare event cross-sectional panel data (Beck & Katz, 2001; Nel & Righarts, 2008; Wright, 2009).[4] GEE was thus necessary to facilitate comparison across the homicide and mass murder models, the primary goal of the original study.

### Additional sensitivity analyses

Explanations for these modeling decisions notwithstanding, I conducted a series of additional sensitivity analyses to further assuage Kleck's concerns. Table 1 presents the

---

[2]This is the case when an exchangeable correlation matrix is specified, as was done in the original study.

[3]During the original study period, for example, 26 states changed from may-issue to shall-issue or permitless carry laws (within-unit variation). In 1991, 15 states were shall-issue or permitless carry, yet by 2016 41 states had adopted these policies (between-unit variation).

[4]It is important to note that these researchers were specifically analyzing binary dependent variables. Although mass murders are operationalized here as a count variable (to facilitate comparison with homicide), they are so rare as to be essentially a binary. Indeed, only 13% of the state-years in the sample experienced more than one mass murder.

results of three separate negative binomial regression models on homicide. The first column displays the original study results (using GEE to examine firearms homicide during the full study period, 1991–2016), showing that the incidence rate of firearms homicide is 10.8% higher in shall-issue or permitless carry states than in their may-issue counterparts (IRR = 1.108; 95% CI = 1.026, 1.196). Following Kleck's advice, the second model: uses all homicide counts as the dependent variable; includes various additional confounders; and employs fixed effects for year and state instead of GEE. As some of the recommended predictors were not available for the entire study period, the third model appends data on the Gini coefficient of income inequality, the percentage of single female-headed households with children, and population density from the American Community Survey (ACS), at the cost of restricting the analysis to 2006–2016. Consistent with the study results, shall-issue and permitless carry states have significantly higher homicide incidence rates than may-issue states in both the full (IRR = 1.048; 95% CI = 1.016, 1.081) and truncated time periods (IRR = 1.095; 95% CI = 1.035, 1.159). As expected given the greater power of the fixed effects approach, several additional control variables are statistically significant in the two new models, exceeding the arbitrary threshold of five or more confounders established by Kleck (2015).

Table 2 replicates these three models with mass murder, employing GEE with fixed effects for year instead of a full fixed effects design for reasons explained above (Beck & Katz, 2001). As shown in the first column, the original model finds that the incidence rate of mass shootings is increased by 52.5% for every one standard deviation increase in household gun ownership (IRR = 1.525; 95% CI = 1.199, 1.940). This result is substantively unchanged when analyzing all mass murders and controlling for additional confounders, both in the full (IRR = 1.420; 95% CI = 1.106, 1.823) and truncated time periods (IRR = 1.599; 95% CI = 1.001, 2.565).[5] As with homicide in general, several additional predictors are significant, again meeting Kleck's (2015) spuriousness threshold. Taken together, these analyses suggest that Kleck's concerns are largely unfounded, as the key findings remain remarkably robust to changes in: the measurement of the dependent variable; the inclusion of control variables, and the analytical strategy.

### Measurement validity

Kleck also questions the validity of the proxy used to measure household gun ownership, the percentage of suicides committed with a firearm (FS/S). Specifically, while he agrees that the measure is the best available proxy for cross-sectional data, he contends that FS/S is not valid longitudinally (Kleck, 2004; Kovandzic et al., 2013) despite its frequent usage in time series or panel studies (Azrael, Cook, & Miller, 2004; Cook & Ludwig, 2006; Miller et al., 2002; Siegel et al., 2013, 2017). In fact, Kleck (2004, p. 3) goes so far as to argue that *all* longitudinal research involving household gun

---

[5]It is important to note that the third model presented in Table 2 is relatively unstable due to the truncated time frame and more importantly, the reduced variation in the dependent variable. For example, Delaware, Hawaii, Mississippi, Rhode Island, and New Hampshire have not experienced a single mass murder since 2006. Compounding these issues are the larger number of covariates and high levels of multicollinearity (VIF > 10) introduced by including theoretical similar variables (e.g., poverty, median income, and percent single female-headed households). As a result, this model should be interpreted with caution, and is presented for exploratory purposes only.

ownership is "impossible" because there are no known measures that are valid indicators of firearms prevalence over time.

What Kleck fails to mention, however, is that validating a proxy longitudinally requires comparison with an established criterion (typically survey data) measured over a relatively long period of time. This is the unfortunate Catch-22 of gun research: *It is impossible to adequately evaluate FS/S as a longitudinal proxy of gun ownership because there are no valid annual, state-level survey data on gun ownership*. If such data existed, it would be unnecessary to use FS/S longitudinally in the first place! As a result, attempts to resolve this paradox have been inherently flawed. Kovandzic et al. (2013, pages 486), for example, asserted that FS/S is an "abysmal" proxy over time by comparing it to changes in the percentage of households with a gun from the General Social Survey (GSS) between 1980 and 1998 (with gaps[6]) at the state level. The researchers themselves acknowledge, however, that this test has major shortcomings because the GSS was not designed to be representative at the state level, and only samples an average of 30 individuals per state per year. Therefore, it is hardly surprising that the GSS firearms prevalence estimates were uncorrelated with FS/S, considering the underlying noise in the data. When similar analyses are conducted with census divisions instead of states (a level of analysis for which the GSS is representative and has an adequate sample size), FS/S and household gun ownership have a significant, positive intertemporal correlation (see Azrael et al., 2004). Kovandzic et al. (2013) justify their conclusions, however, by comparing changes in FS/S over time with data on firearms ownership from the CDC's Behavioral Risk Factor Surveillance System (BRFSS), a telephone survey with a substantially larger sample size per state. However, the BRFSS only contains data for three, nonconsecutive years (2001, 2002, and 2004) nearly two decades ago, hardly a long enough period to effectively examine changes in FS/S over time. Further complicating the matter is the fact that surveys are not infallible measures—as Kleck (2004, p. 4) notes, "Surveys themselves are subject to errors and probably underestimate gun ownership, perhaps by 5 percent to 13 percent (Kleck, 1997, pages 65–69)."

Therefore, while Kleck is correct in asserting that FS/S has not been validated longitudinally, his claim that "the research record is clear" that the proxy is actually invalid is certainly not. In addition, Kleck provides minimal theoretical justification, either here or elsewhere (Kleck, 2004; Kovandzic et al., 2013), as to why FS/S would be correlated with gun ownership across areas, but not over time. The one potential explanation he proffers is that gun ownership does not vary as much within states over time as it does between states. For example, Kleck (1997, 2015) notes that national household gun ownership rates remained relatively steady from 1959 to 1993. This argument is relatively weak, however, for two reasons: (1) the fact that there is *relatively less* temporal variation does not necessarily suggest that there is *none at all*; and (2) much has changed over the past thirty years, with rates of household gun ownership experiencing a dramatic decline nationwide. Figure 1 shows the national percentage of households with guns from the GSS from 1973 to 2018. While nearly half of all Americans lived in residences with guns in the 1970s, less than a third do so today. Over the period of the original study (1991–2016), national household gun ownership rates

---

[6]Data are not available for 1983, 1986, 1992, 1995, and 1997, as the GSS was not fielded or did not include the relevant questions during these years.



**Figure 1.** Household gun ownership in the United States, 1973–2018 (General Social Survey).

experienced a 22% decline. With smaller units of analysis like the state, there is likely to be even more variation. Alternatively, some researchers have suggested that FS/S may be a valid longitudinal proxy that is artificially undermined by widespread sampling error and systematic underreporting in survey estimates (Azrael et al., 2004).

In sum, there is no compelling empirical or theoretical evidence to conclusively validate *or* invalidate FS/S as a longitudinal proxy of household gun ownership. Until annual state-level estimates are available, researchers can either use the best cross-sectional proxy for gun ownership as I and many others have done (Cook & Ludwig, 2006; Duggan, 2001; Miller et al., 2002; Moody & Marvell, 2005; Siegel et al., 2013, 2017) or follow Kleck and eschew longitudinal research altogether. In the absence of better data, it is impossible to determine which is the better approach.

### *Reverse causation*

Kleck's final methodological critique touches on one of the most disputed questions in firearms research: do more guns cause more crime, or does more crime cause people to buy more guns? Specifically, he suggests that the original results could also indicate that mass shootings and higher firearms homicide rates motivate individuals to buy guns for protection, which in turn promotes the enactment of more permissive concealed carry legislation. I agree that disentangling the guns-crime nexus is an important yet difficult task, and therefore included a sensitivity analysis lagging all predictors by one year in the original article to address the issue as much as possible within the same modeling framework. Nevertheless, I concede that this does not fully resolve the causal ordering issue, a problem that pervades the vast majority of firearms research. However, Kleck's claim that *all* longitudinal research on guns and violence is invalid is deeply misleading and ignores equally problematic limitations with cross-sectional techniques. Therefore, it is important to briefly clarify the strengths and weaknesses of both approaches, rather than prematurely dismissing an entire set of valuable methods.

The longitudinal strategy to establish causality takes advantage of temporal ordering by including both x and y as lagged predictors in a panel model (Finkel, 2011); this was the strategy employed by the original study. Aside from decisively establishing that x comes before y, this approach offers several advantages over its cross-sectional counterpart. The quasi-experimental design is second only to the true experiment in methodological rigor, and the inclusion of multiple waves of data allows for the examination of changes over time (naturally crucial when exploring the effects of gun control legislation). Even further, such models are flexible as to the length of the lag, depending on the theoretical mechanisms at play. Aside from potential measurement issues using the FS/S proxy over time (see above), the panel approach has two major limitations. First, the appropriate length of the lag is often unknown, and the contemporaneous measure of x cannot be included due to multicollinearity. As a result, the model implicitly assumes that x has no immediate effect on y, which may or may not be the case. Second, if gun ownership is endogenous to violence, it (and to a lesser extent, its lag) will be correlated with the error term.

As a partial test for reverse causation, I conducted additional sensitivity analyses using homicide and mass murder to predict household gun ownership in the United States from 1991 to 2016. Table 3 displays the results of these OLS regression models, which all utilize fixed effects for year and state and include the various control variables previously mentioned, consistent with Kleck's recommendations as discussed above. In the first model, no predictors are lagged; thereafter, each model lags all predictors by one to five years. Neither homicide nor mass murder is a statistically significant predictor of gun ownership at the state level, either contemporaneously or over a five-year period. With regards to mass murder, these results are hardly surprising—the vast majority of incidents receive little media coverage, and thus are unlikely to significantly impact gun-purchasing behavior (Duwe, 2000). Although this sensitivity analysis cannot completely resolve the causal order problem, the results once again cast doubt on the reverse causation hypothesis.

The alternative to panel data is to use a cross-sectional instrumental variable approach, which utilizes variables that are strongly correlated with the endogenous explanatory variable, yet are not correlated with the error term (i.e., are exogenous); this is the tactic often employed by Kleck (see Kleck et al., 2016; Kleck & Patterson, 1993; Kovandzic et al., 2013). While this strategy effectively controls for reciprocal or simultaneous causation, it is inherently incapable of measuring change over time. Even further, the instrumental variable approach depends entirely on the validity of the exogenous instruments. Unfortunately, finding instruments that are both highly correlated with x and unrelated to y is a difficult task, and in some cases, "the best we can do is rely on a priori reasoning" rather than empirical evidence (Kovandzic et al., 2013, p. 498).

While several instruments have been validated using data from 30 years ago, large-scale cultural and demographic shifts in the United States make the use of these variables questionable at best. Prior work, for example, has utilized subscriptions to outdoor and/or firearms magazines, the state hunting license rate, percent military veterans, and percent voting Republican in the most recent presidential election as instruments for gun ownership (Kleck et al., 2016; Kleck & Patterson, 1993; Kovandzic et al., 2013), despite criticisms regarding their shaky theoretical grounding, lack

**Table 3.** Ordinary least squares (OLS) regression of violence on levels of household gun ownership in the United States, 1991–2016.

| (Standardized) Predictor | No Lag | | One Year Lag | | Two Year Lag | | Three Year Lag | | Four Year Lag | | Five Year Lag | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | SE | B | SE | B | SE | B | SE | B | SE | B | SE |
| Gun ownership | — | — | 0.800* | 0.379 | -0.202 | 0.387 | -0.042 | 0.391 | -0.406 | 0.401 | -0.060 | 0.410 |
| Total homicide rate | 0.151 | 0.326 | 0.104 | 0.322 | -0.326 | 0.331 | 0.371 | 0.333 | 0.115 | 0.342 | 0.393 | 0.351 |
| Other violent crime rate | -0.409 | 0.366 | -0.156 | 0.356 | 0.192 | 0.368 | -0.110 | 0.375 | 0.389 | 0.395 | 0.656 | 0.411 |
| Mass murder count | 0.065 | 0.112 | -0.055 | 0.111 | 0.069 | 0.113 | 0.041 | 0.113 | 0.075 | 0.116 | -0.049 | 0.119 |
| Poverty | 0.348 | 0.242 | 0.239 | 0.241 | 0.089 | 0.246 | 0.244 | 0.248 | -0.024 | 0.268 | 0.022 | 0.273 |
| Education | -0.322 | 0.432 | -0.952* | 0.425 | -0.027 | 0.441 | -0.192 | 0.443 | 0.487 | 0.453 | 0.764 | 0.459 |
| Median income | 0.363 | 0.47 | 0.527 | 0.474 | -0.211 | 0.492 | -0.789 | 0.505 | -0.729 | 0.564 | -0.575 | 0.594 |
| Unemployment | -0.790*** | 0.24 | -0.543* | 0.238 | -0.541* | 0.243 | -0.430 | 0.244 | -0.241 | 0.253 | -0.120 | 0.259 |
| Divorce rate | 0.491 | 0.324 | 0.088 | 0.302 | 0.038 | 0.310 | 0.154 | 0.319 | 0.119 | 0.328 | -0.275 | 0.344 |
| Property crime rate | -0.457 | 0.378 | -0.225 | 0.369 | -0.742* | 0.378 | -0.869* | 0.382 | -0.612 | 0.395 | -0.190 | 0.407 |
| Incarceration rate | -0.156 | 0.398 | -0.293 | 0.389 | -0.927* | 0.401 | -0.685 | 0.410 | -0.165 | 0.427 | -0.062 | 0.443 |
| Mental health expenditures | 0.018 | 0.28 | -0.043 | 0.255 | -0.129 | 0.274 | -0.206 | 0.294 | -0.288 | 0.371 | -0.398 | 0.301 |
| Alcohol consumption | 1.120* | 0.473 | 1.626*** | 0.477 | 1.579*** | 0.500 | 1.719*** | 0.518 | 1.572** | 0.555 | 1.070 | 0.596 |
| Hunting licenses | 0.195 | 0.604 | 0.244 | 0.570 | 0.574 | 0.587 | 0.594 | 0.596 | 0.658 | 0.621 | 1.043 | 0.636 |
| Percent male | 1.920** | 0.774 | 1.055 | 0.766 | 1.985** | 0.801 | 2.555** | 0.821 | 1.233 | 0.856 | 0.942 | 0.880 |
| Percent black | 5.451** | 2.041 | 4.641* | 2.011 | 5.804** | 2.098 | 3.199 | 2.176 | 2.634 | 2.311 | 1.636 | 2.445 |
| Percent aged 18-24 | 0.055 | 0.217 | 0.043 | 0.210 | 0.105 | 0.215 | 0.376 | 0.218 | 0.554* | 0.230 | 0.757*** | 0.230 |
| Percent elderly | 1.096 | 0.604 | 0.964 | 0.623 | 1.792*** | 0.673 | 2.198*** | 0.714 | 2.174*** | 0.778 | 2.261** | 0.823 |
| Total population | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Gun Control Laws | | | | | | | | | | | | |
| Shall-issue or permitless carry | 0.667 | 0.394 | 0.650 | 0.392 | 0.500 | 0.402 | 0.277 | 0.409 | 0.199 | 0.427 | 0.019 | 0.439 |
| Universal background checks | 0.406 | 0.836 | 0.254 | 0.837 | -0.107 | 0.926 | 0.158 | 1.020 | -0.569 | 1.194 | 0.434 | 1.230 |
| Universal permitting | -3.637 | 2.092 | -3.366 | 2.088 | -1.107 | 3.532 | -39.170*** | 4.013 | -40.701*** | 4.250 | -40.848*** | 4.468 |
| Mandatory waiting periods | -27.317*** | 5.375 | -27.652*** | 5.414 | -34.066*** | 6.351 | 1.140 | 2.989 | 1.013 | 3.205 | -0.483 | 3.362 |
| High-capacity magazine ban | -0.620 | 1.066 | -0.602 | 1.073 | -1.469 | 1.103 | -1.886 | 1.117 | -1.428 | 1.214 | -0.754 | 1.240 |
| Prohibitions for violence | -0.604 | 1.497 | -0.478 | 1.505 | -1.885 | 1.655 | -1.337 | 1.747 | -2.187 | 2.405 | -3.168 | 3.266 |
| Domestic violence restraining orders | 0.1630 | 0.467 | 0.067 | 0.469 | 0.409 | 0.491 | 0.431 | 0.503 | 0.309 | 0.523 | 0.607 | 0.538 |
| Total number of gun laws | -0.024 | 0.031 | -0.013 | 0.031 | -0.012 | 0.032 | -0.005 | 0.033 | -0.007 | 0.034 | -0.011 | 0.035 |
| Assault weapons ban | -10.000*** | 1.157 | -8.343*** | 1.155 | -9.501*** | 1.191 | -9.481*** | 1.203 | -10.061*** | 1.265 | -8.202*** | 1.303 |

ABBREVIATIONS: SE = standard error.
The results for year and state fixed effects (not shown) are available upon request.
*p < 0.05.
**p < 0.01.
***p < 0.001.

Exhibit D
Page 219

of statistical significance, and small effect sizes (Alba & Messner, 1995a, 1995b). While this may have been reasonable in 1990, magazine readership levels have plummeted in the internet era, with only 7% regularly reading news magazines, and 3% reading specialty magazines (Pew Research Center, 2012). Guns & Ammo, one of the premiere firearms magazines in the United States, only had a circulation of 364,272 in 2020 (Guns & Ammo, 2020). In the same vein, fewer Americans report hunting than ever before—while over 30% of Americans reported that they or their spouse hunted in 1977, only 17% did so in 2014 (Smith & Son, 2019). Participation in the military has also dramatically declined over the past forty years with the end of the draft, from 18% in 1980 to 7% in 2016; VA projections suggest that by 2045, the number of veterans will decline another 40%, making this instrumental variable less and less feasible (Bialik, 2017). The fact some researchers specifically utilize the percentage of Vietnam veterans only exacerbates the issue as this population continues to age. As magazine subscriptions, hunting, and military participation become more and more uncommon, adequately sampling these rare populations becomes increasingly challenging, leading to a greater risk of sampling bias (especially at lower levels of analysis, such as the city or county). The only proposed instrumental variable that has remained relatively prevalent over time and is based on a large portion of the population is the percent voting Republican. This variable, however, is at least partially endogenous due to the association between political conservatism and socioeconomic status, which in turn directly impacts crime (Ayres & Donohue, 2003).

How then should the endogeneity issue between guns and crime be resolved? Researchers are forced to choose between the Scylla of panel analysis and the Charybdis of instrumental variables, and it remains unclear which—if either—is the optimal approach. Currently, the only way to avoid these pitfalls is to simply refrain from conducting research in this area entirely.

### Evaluating past research

Perhaps Kleck's most concerning critique is not related to the original article at all, but rather the literature upon which the study is based. He states the vast majority of cited studies were "of the lowest methodological quality" (pages 9) with all but one scoring a zero or one out of three in his recent systematic review. Kleck (2015) evaluated 40 studies[7] on gun ownership and homicide from 1932 to 2014, scoring each based on the validity of the gun ownership measure, inclusion of various confounders, and controls for reciprocal causation. In order to obtain the highest possible score (three), a study must: (1) utilize the FS/S proxy cross-sectionally; (2) meet a threshold of five or more significant control variables; and (3) utilize the instrumental variable approach with the specific instruments described above. Studies that deviate even slightly from Kleck's recommendations are equally condemned—Cook and Ludwig (2003), for example, utilized the suggested instrumental variable approach, but received no credit due to their use of an unapproved instrument (percent rural). Aside

---

[7]Although Kleck (2015) considers Kovandzic, Schaffer, and Kleck (2012) and Kovandzic et al. (2013) to be separate publications, I regard the latter as an updated version of the former. Both publications have the same authors, and use the same data/sample and a similar method to examine the same research question.

from their somewhat arbitrary nature, these requirements ignore fundamental limitations of firearms data in the United States and preclude investigation of the most pressing research questions. Even further, all other methodological concerns are ignored in this rating system, including sample size, sampling bias, unit of analysis, treatment of missing data, recency, and multicollinearity. For example, only 13 of the 40 studies examined by Kleck (2015) were published since 2000, and only 3 were published since 2010, suggesting that the most recent (and thus most relevant) research has largely been ignored. In other words, there is no "gold standard" among research methods, and trying to rank studies in this sort of hierarchy without considering the exact data and research question involved is a pointless endeavor (see Sampson, 2010).

Given Kleck's extremely restrictive and oddly specific view of methodological quality, it is hardly surprising that almost no prior work meets the mark—except his own. In fact, Kleck (2015) suggests that only two studies over the past 80 years have used rigorous methods (scoring two or three): Both are co-authored by Kleck himself, and both use data that is at least thirty years old (Kleck & Patterson, 1993; Kovandzic et al., 2013). It seems implausible that nearly a century of firearms research has produced low-quality and unreliable results in all but two studies. Therefore, while Kleck is correct that the vast majority of previous work discussed in the original article received a low score in his review, he fails to clarify the reason why: with the exception of a single, omitted article (Kovandzic et al., 2013), there is simply nothing else left to cite.

## Discussion

### Summary

In response to my recently published study on firearms homicide and mass shootings (Fridel, 2020), Kleck (2020) identifies five methodological "errors," including concerns related to spuriousness, measurement validity, and proper causal ordering. All of these critiques were either already addressed in the original manuscript or represent fundamental limitations that plague nearly all firearms research. Specifically, the first three claims regarding spurious effects are simply unfounded, as demonstrated by sensitivity analyses presented in the original manuscript and discussed at length here. In particular, the findings remain robust when: the dependent variable is operationalized as the total number of homicides or mass murders; alternate control variables (including eight distinct gun control laws) are included; and fixed effects are utilized instead of GEE as a modeling strategy.

Kleck's (2020) remaining two critiques on longitudinal analysis highlight key challenges confronting the field of firearms research as a whole, including measuring gun ownership over time and accounting for potential reverse causation. We disagree not on the importance of these issues, but rather on the best way to address them. While I contend that there is no perfect way to disentangle the relationship between guns and crime, Kleck (2020) sets up and shoots down a series of strawman arguments against the use of *any* longitudinal methods in firearms research. Although he nonchalantly claims that "normal science would be enough" to address both

measurement and causal ordering issues, the fact that only a handful of studies con-
ducted in the past century have (partially) done so according to Kleck (2015) himself
strongly suggests otherwise. If longitudinal research is limited—which it undoubtedly
is—what real alternatives do gun researchers have? Cross-sectional approaches face
distinct yet equally problematic issues, as they are unable to address change over
time and rely on instruments of questionable validity. Kleck provides no viable solu-
tion to this problem, instead suggesting that researchers either: (1) assume that his
findings from decades past are equally relevant today; (2) replicate his cross-sectional
approach exactly (despite its limitations); or (3) simply refrain from conducting new
research in this area at all. Reducing complex methodological issues to strawmen
arguments without providing realistic alternatives is a futile endeavor that does not
advance scholarship.

### Future directions for firearms research

Reading Kleck's critique and this response thus begs the question: where do we go
from here? While at first blush it may seem that Kleck and I are diametrically opposed,
in reality we are equally concerned about several challenges that face the field as a
whole. Methodological preferences aside, we can both agree on two main areas cru-
cial to the future of firearms research, including the adequate measurement of gun
prevalence and an emphasis on policy-oriented research.

First, as discussed at length here and in much of Kleck's work (Kleck, 2004, 2015;
Kleck et al., 2016; Kovandzic et al., 2013), gun research has essentially been crippled
by a lack of high-quality, annual survey data that is representative at the state level.
No matter how one chooses to address the issue, the fact remains that almost all fire-
arms research relies upon proxies for estimates of gun ownership. While the percent-
age of suicides committed with a firearm (FS/S) is the best known substitute for legal
gun ownership, it has many limitations—it cannot be validated longitudinally, does
not necessarily account for illegal gun ownership and/or trafficking, and is of limited
utility at smaller units of analysis.[8] Adequate measurement of gun ownership remains
the sword of Damocles hanging over firearms research, and it will take years of data
collection, advocacy work, and ultimately federal funding to cut the thread.

Second, when nearly 40,000 Americans die from gun violence each year, firearms
researchers cannot ignore the policy implications of their work (Centers for Disease
Control & Prevention, 2019). Many studies are theoretically interesting and methodo-
logically advanced, yet remain largely irrelevant outside the ivory tower due to their
reliance on data from decades past. In other words, finding out what worked thirty
years ago does not necessarily help policymakers combating gun violence today, the
primary goal of research in this area. Ignoring the massive demographic and social
shifts in the United States over the past few decades is at best unrealistic, and at
worst promotes policies that may exacerbate the issue. Prior work on concealed carry
legislation, for example, has shown how dramatically policy recommendations can
change depending on the time period considered. While Lott and Mustard (1997)

---

[8]Small cities and counties with few suicides overall, for example, will yield unstable FS/S estimates.

found that more permissive concealed carry laws significantly decreased various types of violent crime from 1977 to 1992, an exact replication extending the analysis to 2000 resulted in a near complete reversal, with shall-issue laws significantly increasing most forms of violent crime except homicide (Wellford, Pepper, & Petrie, 2005). Even more recent work, however, suggests that permissive concealed carry laws significantly increase the homicide rate as well (Crifasi et al., 2018; Donohue, Aneja, & Weber, 2019; Doucette, Crifasi, & Frattaroli, 2019; Siegel et al., 2017). Unfortunately, an additional 12 states have adopted shall-issue or permitless carry laws since Lott and Mustard's (1997) highly-publicized study (Siegel, 2020). As this example demonstrates, it is imperative that firearms research prioritizes the use of contemporary data and methods to shape policies for contemporary problems.

Navigating the methodological minefield of firearms research is undoubtedly challenging because of these and many other issues, but ultimately the goal is to shoot for the best using the data and tools currently available. While we wait for better data and analytical techniques, the one thing upon which we all can agree is that firearms research continues to be vital, flaws and all.

## Disclosure statement

No potential conflict of interest was reported by the author.

## Notes on contributor

*Emma E. Fridel* is an assistant professor in the College of Criminology and Criminal Justice at Florida State University. She primarily studies violence and aggression with a focus on homicide, including homicide–suicide, serial and mass murder, and legal intervention homicides. Her work has recently been published in *Criminology*, *Social Forces*, the *Journal of Quantitative Criminology*, and *Justice Quarterly*.

## ORCID

*Emma E. Fridel*  http://orcid.org/0000-0001-9346-2156

## References

Alba, R. D., & Messner, S. J. (1995a). "Point Blank" against itself: Evidence and inference about guns, crime, and gun control. *Journal of Quantitative Criminology*, 11(4), 391–410. doi:10.1007/BF02630571

Alba, R. D., & Messner, S. J. (1995b). "Point Blank" and the evidence: A rejoinder to Gary Kleck. *Journal of Quantitative Criminology*, 11(4), 425–428. doi:10.1007/BF02630573

Ayres, I., & Donohue, J. J. (2003). Shooting down the "more guns, less crime" hypothesis. *Stanford Law Review*, 55(4), 1193–1312.

Azrael, D., Cook, P. J., & Miller, M. (2004). State and local prevalence of firearms ownership: Measurement, structure, and trends. *Journal of Quantitative Criminology*, 20(1), 43–62. doi:10.1023/B:JOQC.0000016699.11995.c7

Beck, N., & Katz, J. N. (2001). Throwing out the baby with the bath water: A comment on Green, Kim, and Yoon. *International Organization*, 55(2), 487–495. doi:10.1162/00208180151140658

Bell, A., Fairbrother, M., & Jones, K. (2019). Fixed and random effects models: Making an informed choice. *Quality & Quantity*, 53, 1051–1074.

Bialik, K. (2017). The changing face of America's veteran population. Retrieved from https://www.pewresearch.org/fact-tank/2017/11/10/the-changing-face-of-americas-veteran-population/

Blau, P. M. (1977). *Inequality and heterogeneity: A primitive theory of social structure*. New York, NY: Free Press.

Centers for Disease Control and Prevention. (2019). *Web-based injury statistics query and reporting systems: Fatal injury data*. Washington, D.C.

Cook, P. J., & Ludwig, J. (2003). Guns and burglary. In J. Ludwig & P. J. Cook (Eds.), *Evaluating gun policy* (pp. 74–118). Washington, D.C: Brookings Institution.

Cook, P. J., & Ludwig, J. (2006). The social costs of gun ownership. *Journal of Public Economics*, 90(1–2), 379–391. doi:10.1016/j.jpubeco.2005.02.003

Cook, S., Hays, J. C., & Franzese, R. J. (2020). Fixed effects in rare events data: A penalized maximum likelihood solution. *Political Science Research and Methods*, 8(1), 92–105.

Crifasi, C. K., Merrill-Francis, M., McCourt, A., Vernick, J. S., Wintemute, G. J., & Webster, D. W. (2018). Association between firearm laws and homicide in urban counties. *Journal of Urban Health: Bulletin of the New York Academy of Medicine*, 95(3), 383–390. doi:10.1007/s11524-018-0273-3

Donohue, J. J., Aneja, A., & Weber, K. D. (2019). Right-to-carry laws and violent crime: A comprehensive assessment using panel data and a state-level synthetic control analysis. *Journal of Empirical Legal Studies*, 16(2), 198–247. doi:10.1111/jels.12219

Doucette, M. L., Crifasi, C. K., & Frattaroli, S. (2019). Right-to-carry laws and firearm workplace homicides: A longitudinal analysis (1992–2017). *American Journal of Public Health*, 109(12), 1747–1753. doi:10.2105/AJPH.2019.305307

Duggan, M. (2001). More guns, more crime. *Journal of Political Economy*, 109(5), 1086–1114. doi:10.1086/322833

Duwe, G. (2000). Body-count journalism: The presentation of mass murder in the news media. *Homicide Studies*, 4(4), 364–399. doi:10.1177/1088767900004004004

Finkel, S. E. (2011). Models of reciprocal causation. In *Causal analysis with panel data* (pp. 23–44). Thousand Oaks, CA: Sage.

Fridel, E. E. (2020). Comparing the impact of household gun ownership and concealed carry legislation on the frequency of mass shootings and firearms homicide. *Justice Quarterly*. DOI: https://doi.org/10.1080/07418825.2020.1789693

Gastil, R. D. (1971). Homicide and a regional culture of violence. *American Sociological Review*, 36(3), 412–427. doi:10.2307/2093082

Guns & Ammo. (2020). At-A-Glance. Retrieved from https://www.outdoorsg.com/brands/shooting/gunsandammo/

Kleck, G. (1979). Capital punishment, gun ownership, and homicide. *American Journal of Sociology*, 84(4), 882–910. https://doi.org/10.1086/226865

Kleck, G. (1997). *Targeting guns: Firearms and their control*. New York, NY: Aldine de Gruyter.

Kleck, G. (2004). Measures of gun ownership levels for macro-level crime and violence research. *Journal of Research in Crime and Delinquency*, 41(1), 3–36. doi:10.1177/0022427803256229

Kleck, G. (2015). The impact of gun ownership rates on crime rates: A methodological review of the evidence. *Journal of Criminal Justice*, 43(1), 40–48. doi:10.1016/j.jcrimjus.2014.12.002

Kleck, G., Kovandzic, T., & Bellows, J. (2016). Does gun control reduce violent crime? *Criminal Justice Review*, 41(4), 488–513. doi:10.1177/0734016816670457

Kleck, G., & Patterson, E. B. (1993). The impact of gun control and gun ownership levels on violence rates. *Journal of Quantitative Criminology*, 9(3), 249–287. doi:10.1007/BF01064462

Kleck, G. (2020). The Continuing Vitality of Flawed Research on Guns and Violence: A Comment on Fridel (2020). Justice Quarterly.

Kovandzic, T., Schaffer, M. E., & Kleck, G. (2012). Gun prevalence, homicide rates, and causality: A GMM approach to endogeneity bias. In D. Gadd, S. Karstedt, & S. F. Messner (Eds.), *The sage handbook of criminology research methods*. Thousand Oaks, CA: Sage.

Kovandzic, T., Schaffer, M. E., & Kleck, G. (2013). Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach. *Journal of Quantitative Criminology*, 29(4), 477–541. doi:10.1007/s10940-012-9185-7

Land, K. C., McCall, P. L., & Cohen, L. E. (1990). Structural covariates of homicide rates: Are there any invariances across time and social space? *American Journal of Sociology*, 95(4), 922–963. doi:10.1086/229381

Liang, K.-Y., & Zeger, S. L. (1986). Longitudinal data analysis using generalized models. *Biometrika*, 73(1), 13–22. doi:10.1093/biomet/73.1.13

Loftin, C., & Hill, R. H. (1974). Regional subculture and homicide: An examination of the Gastil-Hackney thesis. *American Sociological Review*, 39(5), 714–724.

Lott, J. R., & Mustard, D. B. (1997). Crime, deterrence, and right-to-carry concealed handguns. *Journal of Legal Studies*, 26, 1–68.

Miller, M., Azrael, D., & Hemenway, D. (2002). Rates of household firearm ownership and homicide across US regions and states, 1988-1997. *American Journal of Public Health*, 92(12), 1988–1993. doi:10.2105/ajph.92.12.1988

Moody, C. E., & Marvell, T. B. (2005). Guns and crime. *Southern Economic Journal*, 71(4), 720–736. doi:10.2307/20062076

Morenoff, J. D., Sampson, R. J., & Raudenbush, S. W. (2001). Neighborhood inequality, collective efficacy, and the spatial dynamics of urban violence. *Criminology*, 39(3), 517–560. doi:10.1111/j.1745-9125.2001.tb00932.x

Nel, P., & Righarts, M. (2008). Natural disasters and the risk of violent civil conflict. *International Studies Quarterly*, 52(1), 159–185. https://doi.org/10.1111/j.1468-2478.2007.00495.x

Sampson, R. J. (1987). Urban black violence: The effect of male joblessness and family disruption. *American Journal of Sociology*, 93(2), 348–383. doi:10.1086/228748

Sampson, R. J. (2010). Gold standard myths: Observations on the experimental turn in quantitative criminology. *Journal of Quantitative Criminology*, 26(4), 489–500. doi:10.1007/s10940-010-9117-3

Sampson, R. J., & Groves, W. B. (1989). Community structure and crime: Testing social disorganization theory. *American Journal of Sociology*, 94(4), 774–802. doi:10.1086/229068

Siegel, M. (2020). State Firearms Laws Robert Wood Johnson Foundation.

Siegel, M., Ross, C. S., & King, C. (2013). The relationship between gun ownership and firearm homicide rates in the United States, 1981–2010. *American Journal of Public Health*, 103(11), 2098–2105. doi:10.2105/AJPH.2013.301409

Siegel, M., Xuan, Z., Ross, C. S., Galea, S., Kalesan, B., Fleegler, E., & Goss, K. A. (2017). Easiness of legal access to concealed firearm permits and homicide rates in the United States. *American Journal of Public Health*, 107(12), 1923–1929. https://doi.org/10.2105/AJPH.2017.304057

Smith, T. W., & Son, J. (2019). *General Social Survey final report: Trends in gun ownership in the United States, 1972–2018*. Chicago, IL: NORC at the University of Chicago.

Tcherni, M. (2011). Structural determinants of homicide: The big three. *Journal of Quantitative Criminology*, 27(4), 475–496. doi:10.1007/s10940-011-9134-x

Wawro, G. (2009). *Advanced topics in maximum likelihood models for panel and time-series cross-section data*. Ann Arbor, MI:ICPSR.

Wellford, C. F., Pepper, J. V., & Petrie, C. V. (2005). *Firearms and violence: A critical review*. Washington, D.C.: The National Academies Press.

Wright, J. (2009). How foreign aid can foster democratization in authoritarian regimes. *American Journal of Political Science*, 53(3), 552–571. https://doi.org/10.1111/j.1540-5907.2009.00386.x

# The Impact of State Firearm Laws on Homicide Rates among Black and White Populations in the United States, 1991–2016

*Anita Knopov, Michael Siegel, Ziming Xuan, Emily F. Rothman, Shea W. Cronin, and David Hemenway*

———

This study aimed to investigate the potential differential effects of state-level firearm laws on black and white populations. Using a panel design, authors examined the relationship between state firearm laws and homicide victimization rates among white people and black people in 39 states during the period between 1991 and 2016. Authors modeled homicide rates using linear regression with year and state fixed effects and controlled for a range of time-varying, state-level factors. Results showed that universal background check laws and permit requirement laws were associated with lower homicide rates among both white and black populations, and "shall issue" laws were associated with higher homicide rates among both white and black populations. Laws that prohibit firearm possession among people convicted of a violent misdemeanor or require relinquishment of firearms by people with a domestic violence restraining order were associated with lower black homicide rates, but not with white homicide rates. Author identification of heterogeneity in the associations between state firearm laws and homicide rates among different racial groups has implications for reducing racial health disparities.

KEY WORDS: *firearms; homicide; racial groups; violence prevention*

Although firearm violence affects people in all countries, 82 percent of all firearm homicides in high-income countries occur in the United States (Grinshteyn & Hemenway, 2016). In 2016, there were 14,415 firearm-related homicide deaths in the United States (Centers for Disease Control and Prevention [CDC], 2018). The risk of firearm-related homicide victimization is elevated for black individuals as compared with white individuals (CDC, 2018; Light & Ulmer, 2016; Phillips, 1997; Ulmer, Harris, & Steffensmeier, 2012). Black men ages 15 through 34 are six times more likely to die from homicide than white men of the same age, and 91 percent of homicides of black men are the result of gun violence (Hennekens, Drowos, & Levine, 2013). In 2016, the rate of firearm homicide victimization among black individuals in the United States (18.6 per 100,000) was more than eight times higher than among non-Hispanic white individuals (2.2 per 100,000) (CDC, 2018). Despite constituting only 14 percent of the U. S population, black people comprise 59 percent of firearm homicide victims (CDC, 2018).

Engaging in the promotion of evidence-based policies, in particular those that address racial disparities in firearm violence, is a critical focus of social work practice (National Association of Social Workers [NASW], 2018; Social Work Policy Institute, 2017; Van Soest & Bryant, 1995). NASW has issued a call for firearm violence to be declared a public health epidemic (Arp, Gonzalez, Herstand, & Wilson, 2017). In addition, NASW (2018) has implored public health social workers to promote effective firearm policies:

> The National Association of Social Workers stands by our previous statements that call for declaring all forms of gun violence—including mass shootings—to be declared a public health epidemic.
>
> Accordingly, we continue to urge public health officials to mobilize federal and state resources to prevent gun violence. NASW also continues to implore politicians to enact reasonable and effective gun laws, which would greatly reduce gun-related fatalities and injuries. (paras. 4–5)

Exhibit D
Page 296

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

doi: 10.1093/hsw/hlz024   © 2019 National Association of Social Workers

Many states have addressed the problem of firearm-related homicide by enacting firearm laws. Although numerous studies have examined the impact of state firearm laws on overall homicide rates, we are aware of only one study (McClellan & Tekin, 2012) that explored whether there may be a differential impact of *individual* firearm laws on black people compared with white people, and this study examined only a single type of firearm law ("stand your ground" laws). It is important to understand whether particular laws have a differential impact on the white versus black population to ensure that our laws not only reduce overall homicide, but also address the racial disparity in firearm homicides. Reducing the racial disparity in health outcomes is a stated objective of Healthy People 2020, which declares the following goal: "to achieve health equity, eliminate disparities, and improve the health of all groups" (Healthy People 2020, n.d., para. 3).

Two previous articles examined the relationship between the *total number* of laws and the black versus the white firearm homicide rates by state (Phillips, 2002; Resnick & Randi, 2017). One found that the total number of laws was significantly related only to the white firearm homicide rate, whereas the total number of laws had no effect on the black firearm homicide rate (Resnick & Randi, 2017). The other study failed to find a significant relationship between the firearm law index and either white or black homicide rates (Phillips, 2002). Although they advance the field, these studies do not help us identify which specific laws may be affecting homicide rates, so their implications for public policy are limited.

There are a number of reasons to believe that firearm laws may have a differential effect on black and white people. First, the patterns of homicide victimization between white people and black people are strikingly different, suggesting different precursors (Cooper & Smith, 2011). If the underlying causes of firearm homicide differ by race, then so may the impact of firearm policies. Second, there is evidence that the use of illegal firearms in homicides with black victims may be substantially higher than in homicides with white victims, especially in street crimes in urban areas (Kamm, 2014; Kennedy, Piehl, & Braga, 1996; Leovy, 2015). Third, existing literature reports a racial disparity in estimated household firearm ownership, with black people only half as likely as white people to report having a firearm in their household (Pew Research Center, 2016). Fourth, there is preliminary evidence of a differential impact of firearm legislation on white homicide rates compared with black homicide rates (McClellan & Tekin, 2012). McClellan & Tekin (2012) reported that "stand your ground" laws—that is, laws allowing people who perceive a threat of bodily harm to use deadly force without a duty to retreat—were associated with a significant increase in homicides among white individuals, but no change in homicides among black individuals.

Our article aims to evaluate the potential differential effects of individual state-level firearm laws on the black and white populations. Identifying heterogeneity in the effects of these laws on two racial groups may have implications for reducing existing racial disparities. We explore the relationship between multiple state firearm laws and black and white homicide rates across 39 states during the period between 1991 and 2016.

Previous studies tended to explore the impact of only a single law at a time because of the lack of a consistent data source that tracked state firearm laws over time. This is problematic because firearm laws tend to be enacted together and one cannot be certain that the observed relationship between one law and an outcome is not due to the simultaneous presence of another law. We took advantage of a new state firearm law database (http://www.statefirearmlaws.org) that allowed us to assess the independent effect of a law while controlling for the presence of other laws.

## METHOD
### Design Overview
Using a panel design, we analyzed serial cross-sectional data for the 26-year period between 1991 and 2016. This design allowed us to take advantage of changes in state laws over time to explore the relationship between specific types of laws (see Table 1) and homicide victimization rates among white people and black people. We modeled homicide rates using linear regression with log-transformed homicide rates as the outcome variable. We included year and state fixed effects. We also controlled for a range of time-varying, state-level factors and for race-specific measures of absolute deprivation in education, economic status, employment, and housing.

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

Exhibit D
Page 299

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

## Table 1: Laws Analyzed, Detailed Descriptions, and Law Changes during Study Period

| Law | Description | Number of States with Law in Effect | | State (Year) When Law Took Effect |
|-----|-------------|-----|-----|-----|
| | | 1991 | 2016 | |
| Universal background checks | Universal background checks are required for all firearm sales | 2 | 8 | CO (2013), CT (1999), DE (2013), NY (2013), OR (2015), WA (2014) |
| Permit-to-purchase requirement | Permits are required to obtain all firearms | 5 | 7 | CA (2015), CT (2014) |
| Prohibitions for violent offenders | Law prohibits handgun possession by people convicted of a violent misdemeanor crime or people who are subject to a domestic violence restraining order (and requires surrender of firearms) | 2 | 15 | CO (2013), CT (1994), IL (1995), IA (2010), MD (2009), MA (1994), MN (2014), NH (2000), NY (1996), NC (2003), TN (2009), WA (1994), WI (1996) |
| "Shall issue" | Law provides authorities with no discretion in deciding whether to grant a concealed carry permit | 14 | 32 | AL (2013), AK (1994), AZ (1994), AR (1995), CO (2003), IL (2013), IA (2011), KS (2007), KY (1996), LA (1996), MI (2001), MN (2003), MO (2003), NE (2007), NV (1995), NM (2001), NC (1995), OH (2004), OK (1995), SC (1996), TN (1994), TX (1995), UT (1995), VA (1995), WV (2016), WI (2011), WY (1994) |
| "Permitless carry" | No permit is required to carry a concealed handgun | 1 | 9 | AK (2003), AZ (2010), ID (2016), KS (2015), ME (2015), MS (2015), WV (2016), WY (2011) |
| "Stand your ground" law in place | State has a law that allows use of deadly force without a duty to retreat when threatened | 0 | 24 | AL (2006), AK (2013), AZ (2010), FL (2005), GA (2006), IN (2006), KS (2006), KY (2006), LA (2006), MI (2006), MS (2006), MO (2016), MT (2009), NV (2011), NH (2011), NC (2011), OK (2006), PA (2011), SC (2006), SD (2006), TN (2007), TX (2007), UT (1994), WV (2008) |
| Trafficking prohibited | No person may purchase a firearm with the intent to resell to a person who is prohibited from buying or possessing a firearm | 5 | 13 | CA (1994), CO (2000), CT (1993), DE (1994), IL (2000), MN (2015), NY (2000), UT (1994) |

Notes: Laws analyzed in this research study. A description of each law is provided as well as the total number of states that had the respective law in 1991 and the total number of states that had the respective law in 2016. Also shown are the states that implemented the law during the study period and the year the law change took effect.

### Variable and Data Sources

*Outcome Variables.* The main outcome variable was the age-adjusted homicide rate in each year, stratified by race (white or black), without regard to ethnicity. Homicide rates were obtained from the CDC's (2018) Web-based Injury Statistics Query and Reporting Systems database. Rates were age-standardized to the 2000 national population. Because the CDC does not report rates when there are fewer than 10 homicides in a given year and because of the small black population in certain states, there were insufficient data on black homicide rates in 11 states (Alaska, Idaho, Maine, Montana, New Hampshire, North Dakota, Rhode Island, South Dakota, Utah, Vermont, and Wyoming). Therefore, our analyses are based on data from 39 states.

*Main Predictor Variable.* We created a database representing the presence or absence of 133 provisions of firearm laws covering 14 categories in each state during the period between 1991 and 2016 using historical state statutes and session laws through Thomson Reuters Westlaw (the codebook is available online at http://www.statefirearm laws.org). The impact of laws was assessed starting in the first full year they were in effect, following the approach of Lott and Mustard (1997). In other words, we lagged the state laws by one year. This

Exhibit D
Page 300

| Table 2: Loadings from Principal Components Analysis Used to Derive Uncorrelated Composite Measures of Race-Specific Deprivation Variables | | | |
|---|---|---|---|
| **Variable** | **Component 1 Loadings** | **Component 2 Loadings** | **Component 3 Loadings** |
| Incarceration rate | **.50** | −.13 | −.03 |
| Single-parent households | **.47** | .01 | .09 |
| Unemployment rate | **.46** | −.03 | .13 |
| Rental housing | **.45** | .06 | −.37 |
| Poverty rate | **.35** | .16 | .17 |
| Median income | .02 | **−.72** | .04 |
| No college degree | .01 | **.66** | .04 |
| Labor nonparticipation | .02 | .00 | **.89** |
| Eigenvalue | 3.92 | 1.97 | **1.19** |

Notes: Total variance explained: 88.4 percent. Boldface values indicate variables whose loadings are most clearly associated with each of the components.

ensured that any impact of the law was assessed after its implementation.

Although we coded 133 provisions, most of these were detailed operative provisions within a single type of law, such as an assault weapon ban or background check law. We selected laws for analysis by considering laws that might be expected to affect overall homicide rates or that have been studied in previous research and choosing only laws for which there is enough variation over time to make analysis meaningful. Based on these criteria, we selected seven laws for analysis: (1) universal background checks for all firearms, (2) permits required to purchase all firearms, (3) prohibition of firearm possession by people with a history of a violent misdemeanor crime or relinquishment of firearms by people who are subject to a domestic violence restraining order, (4) "shall issue" laws; (5) "permitless carry" laws, (6) "stand your ground" laws, and (7) laws that prohibit firearm trafficking (see Table 1).

*Control Variables.* We controlled for nine state-level factors: percentage population that was black, percentage population that was Hispanic, percentage of young adult men (ages 18 through 29), total population, population density, per capita alcohol consumption, the nonhomicide violent crime rate (aggravated assault, robbery, and forcible rape), per capita number of law enforcement officers, and household firearm ownership, estimated using a well-established proxy—the proportion of suicides committed with a firearm—that has been validated for use at the state level (Azrael, Cook, & Miller, 2004). Note that although this proxy has been validated for cross-sectional analysis, no validated measure exists for time series analysis. We also included the lagged independent variable (the lag

of the appropriate homicide rate). These variables were obtained from the U.S. Census Bureau (population and demographics), National Institute on Alcohol Abuse and Alcoholism (alcohol consumption), Uniform Crime Reports (crime rates and law enforcement officers), and the CDC (firearm ownership proxy).

In addition, we controlled for eight race-specific socioeconomic factors: incarceration rates, lack of a college degree, poverty rates, labor force nonparticipation rates, proportion of children living in single-parent households, percentage of the population in rental housing, median household income, and unemployment rates. Because of multicollinearity among these variables, we could not include all eight of them in the regressions. Therefore, we used principal components analysis to create composite measures consisting of a smaller number of uncorrelated components that captured the maximum amount of the variance in the eight variables. Using the criterion of achieving eigenvalues above 1.0, we retained the first three components, obtained after orthogonal rotation. The variables that loaded most heavily on each component were component 1 (poverty, incarceration, unemployment, rental housing, and single-parent households), component 2 (income and education), and component 3 (labor nonparticipation) (see Table 2). These three component scores were entered into the model to control for race levels of specific deprivation.

## Analysis

As homicide victimization rates are not normally distributed, but skewed and overdispersed, we modeled the log-transformed homicide rates following the approach taken in previous work

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 8169566I, OUP on 30 November 2019

Exhibit D
Page 309

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

**Table 3: Final Model: Association of State Firearm Laws with Race-Specific Total Homicide Rates**

| Variable | Percentage Change in Homicide Rate and 95% CI | | |
| --- | --- | --- | --- |
| | White | Black | Overall |
| Lagged firearm homicide rate | 5.5* [3.1, 8.0] | 1.3* [0.8 1.9] | |
| Population (per 1 million) | −1.2 [−3.3, 0.9] | −4.2* [−6.9, −1.4] | |
| Population density (per 10 square miles) | 1.2 [−0.3, 2.6] | 3.8* [1.0, 6.6] | |
| Percent black | | | −1.0 [−4.4, 2.4] |
| Percent Hispanic | −0.3 [−1.0, 0.4] | −0.6 [−1.7, 0.5] | |
| Percent young male | 1.6 [−0.4, 3.7] | −3.1* [−6.0, −0.0] | |
| Per capita alcohol consumption | | | 10.9 [−3.0, 27.4] |
| Violent crime rate | 4.2* [2.0, 6.4] | 1.4 [−1.0, 3.9] | |
| Per capita law enforcement | | | −5.2* [−9.8, −0.3] |
| Household firearm ownership | | | 0.0 [−0.3, 0.3] |
| Socioeconomic deprivation component 1 | 1.5 [−1.0, 4.2] | −3.2 [−6.9, 0.7] | |
| Socioeconomic deprivation component 2 | | | 2.1 [−1.9, 6.2] |
| Socioeconomic deprivation component 3 | −4.9 [−10.0, 0.7] | 3.5 [−0.5, 7.6] | |
| Universal background checks (all firearms) | | | −11.2* [−19.0, −2.8] |
| Permit-to-purchase requirement | | | −11.3* [−20.0, −1.5] |
| Prohibitions for violent offenders | −3.2 [−8.4, 2.3] | −12.8* [−19.4, −5.6] | |
| "Shall issue" laws | | | 5.7* [0.4, 11.3] |
| "Permitless carry" laws | | | −6.3 [−14.3, 2.4] |
| "Stand your ground" laws | | | 2.9 [−3.2, 9.3] |
| Trafficking prohibited | −5.4* [−10.4, −0.1] | 3.4 [−5.9, 13.7] | |
| $R^2$ | 0.98 | | |

Note: All models controlled for the variables listed above.
*$p < .05$.

(Siegel et al., 2017). Because we had multiple observations for each state, there was a correlation between these observations over time. To control for this clustering, we entered year and state as fixed effects in the regression models. We used cluster robust standard errors that account for the clustering of observations within states, serial autocorrelation, and heteroscedasticity (White, 1980).

Because our primary aim was to assess possible differences in the relationship between firearm laws and homicide victimization rates by white versus black race, we used dummy variables to create interaction terms that allowed the regression coefficients for white and black homicide rates to be compared within a single model (Gujarti, 1970; Weaver & Wuensch, 2013). We created an indicator variable, δ, that was 0 for white homicide rates and 1 for black homicide rates. We used this indicator variable to create a series of interaction terms whereby each of the predictor variables was multiplied by δ. These interaction terms allowed us to estimate separate regression coefficients for each predictor variable for white and black homicide rates and to test the statistical sig-

nificance of differences in these coefficients. The coefficients of primary interest were the interaction term for the law variables. For example, the interaction term for universal background checks (UBCs) was δ × UBC where UBC = 1 if a UBC law was present and UBC = 0 if such a law was not in effect. The statistical significance of the coefficient for this interaction term was used to assess whether or not the regression coefficients for UBC for white versus black homicide rates were statistically different. We developed a final model in which we included only those interaction terms that were statistically significant at the .10 level. We simultaneously included all of the law variables in this final model to estimate the independent association of each law with the homicide rate.

Because we defined the interaction term as being 1 for black homicide rates and 0 for white homicide rates, the race-specific association of each variable and the white homicide rate was simply the regression coefficient for the variable itself (without the interaction term). The association of each variable and the black homicide rate was the sum of the regression coefficient for the variable

Exhibit D
Page 300



**Figure 1: Percentage Change in Homicide Rate Associated with State Firearm Laws, by Race (Fully Adjusted Results)**

*Regression coefficients are statistically different

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 8169566, OUP on 30 November 2019

itself and the regression coefficient for the interaction term.

Because the outcome variable was log-transformed, to generate estimates of the percentage change in the homicide rate associated with a law, we first exponentiated the regression coefficient for that law, then subtracted 1, and finally, multiplied by 100. Thus, the regression coefficients are reported as the percentage difference in homicide rate for states with a particular law compared with states without that law. We conducted analyses using STATA version 15.

### Validity Check

If the association between a law and lower overall homicide resulted from a true effect of the law, then one would expect that relationship to be driven by a lowering of the firearm homicide rate, not the nonfirearm homicide rate. For laws that we found to be associated with overall homicide rates, we examined their relationship with firearm and nonfirearm homicide rates as a validity check, as we would not expect these laws to decrease nonfirearm homicide rates. The finding of such a relationship would lead us to question the validity of an observed relationship between a law and the overall homicide rate.

### RESULTS

An important first finding was that within states, the presence or absence of particular firearm laws varied over time (see Table 1). For example, in 1991 no states had a "stand your ground" law. In 2016, 24 states had adopted this law.

In the regression analysis, two laws were significantly associated with lower homicide rates among both white and black populations: universal background checks (rate difference percent [RD]: −11.2; 95% confidence interval [CI]: −19.0, −2.8) and permit-to-purchase requirements (RD: −11.3; 95% CI: −20.0, −1.5) (see Table 3) (fully adjusted results displayed in Figure 1). "Shall issue" laws were significantly associated with higher homicide rates among both white and black populations (RD: 5.7; 95% CI: 0.4, 11.3).

Two laws had significantly different associations with white compared with black homicide rates. Prohibitions for violent offenders were negatively related to black homicide rates (RD: −12.8; 95% CI: −19.4, −5.6), but not to white homicide rates. Laws prohibiting firearm trafficking were negatively related to white homicide rates (RD: −5.4; 95% CI: −10.4, 0.1), but not black homicide rates. "Permitless carry" laws and "stand your ground" laws were not associated with homicide rates among either the white or the black population.

Exhibit D
Page 303

| Table 4:  Association of State Firearm Laws with Race-Specific Firearm and Nonfirearm Homicide Rates | | | | | | |
|---|---|---|---|---|---|---|
| | Percentage Change in Homicide Rate | | | | | |
| | Firearm | | | Nonfirearm | | |
| Variable | White | Black | Overall | White | Black | Overall |
| Universal background checks (all firearms) | | | −14.2* | | | −5.0 |
| Permit-to-purchase requirement | | | −18.4* | | | 6.4 |
| Prohibitions for violent offenders | −5.2 | −12.2* | | −3.8 | −3.7 | |
| "Shall issue" laws | | | 6.8* | | | 1.1 |
| "Permitless carry" laws | | | −4.3 | | | −1.9 |
| "Stand your ground" laws | | | 3.7 | | | 1.0 |
| Trafficking prohibited | −5.3 | −0.6 | | 0.2 | −5.7 | |

Note: All models controlled for the lagged firearm homicide rate, population, population density, percent black, percent Hispanic, percent young male, per capita alcohol consumption, violent crime rate, per capita law enforcement, household firearm ownership, and the three socioeconomic deprivation component scores.
*$p < .05$.

In the validity check, universal background checks, permit requirements, and prohibitions on firearm possession by violent offenders were all significantly associated only with the firearm homicide rate, not the nonfirearm homicide rate (see Table 4). However, firearm trafficking prohibition laws were not significantly associated with firearm homicide rates.

## DISCUSSION

This article is one of the first to examine the extent to which specific firearm provisions affect race-specific homicide rates in an effort to inform policy development and the understanding of disparities in violence. Our research introduces several important findings.

First, most specific firearms laws examined here show no differential association with black and white homicide rates, suggesting that they provide uniform violence reduction benefits or harms. Provisions for universal background check laws, permit-to-purchase laws, and "shall issue" laws demonstrated consistent associations with homicide rates. The negative association between universal background check laws and homicide rates observed here confirms prior research demonstrating reductions in homicide outcomes (Ruddell & Mays, 2005; Sumner, Layde, & Guse, 2008) and adds that these associations are present across racial groups. The finding that states with "shall issue" provisions, compared with the more restrictive "may issue" provisions, had significantly higher black and white homicide rates is consistent with prior research (Kennedy et al., 1996), adding that this association is not race-specific.

One legal provision has a differential association with homicide rates when disaggregated by race. Specifically, laws containing provisions requiring relinquishment of weapons by people subject to domestic violence restraining orders or prohibiting firearm possession among all people convicted of a violent misdemeanor had a greater magnitude of association with the black firearm homicide rate than the white firearm homicide rate. These findings add to previous research reporting that laws prohibiting firearm possession by people convicted of a violent misdemeanor were associated with decreased overall homicide rates (Frattaroli & Teret, 2016; Wintemute, Frattaroli, Claire, Vittes, & Webster, 2014; Zeoli et al., 2018) by suggesting that these laws may have a stronger relationship with the black homicide rate than the white homicide rate. As a result, it appears that policy innovation that is grounded on the principle of keeping firearms out of the hands of people who have been convicted of violent crimes may be especially protective for the black population, although the reason for this is not clear.

One possible explanation for the differential relationships observed here with regard to laws that require relinquishment of weapons by people subject to restraining orders or convicted of violent misdemeanors may have more to do with racial inequities in the criminal justice system than with the legal provision itself. There is reason to suspect that when a person of color is accused of a violent misdemeanor, there is a greater likelihood of both arrest and conviction than when a person is white. Stevenson and Mayson (2018) reported a profound racial disparity in arrests for misdemeanor

Exhibit D
Page 304

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

crimes, exactly the ones that are prohibiting for firearm possession in the laws we found to be associated with lower black homicide rates. Harris, Steffensmeier, Ulmer, and Painter-Davis (2009) found that white defendants are significantly less likely to be convicted after an arrest for aggravated assault than defendants who are black. Thus, it is possible that laws that keep firearms out of the hands of people convicted of a violent misdemeanor are more effective in reducing black homicide rates because black perpetrators of violent misdemeanors are more likely than white perpetrators to be convicted and therefore subject to the firearm prohibition.

Although we found a relationship between firearm trafficking laws and lower overall homicide rates, this finding failed the validity check, as these laws were not significantly associated with firearm homicide rates. This is not surprising, as a state's trafficking laws would be more likely to reduce the trafficking of guns *out* of that state.

Finally, our findings failed to confirm those of McClellan and Tekin (2012), who reported that "stand your ground" laws significantly increase homicides among white, but not black people. Here, we find no association between "stand your ground" laws and firearm homicide rates among either the white or the black population. One possible reason for this difference in findings is that the previous study examined only the decade of 2000–2010, during which the early "stand your ground" laws were enacted. When we restrict our analysis to the period prior to 2007, we obtain similar results. It may be that the early "stand your ground" laws had a greater impact than more recent ones because they received widespread publicity, unlike more recent laws that were enacted under the radar of most of the public.

### Limitations
This study has several limitations. First, the study does not consider the differential effect of legal provisions on Hispanic or Latino homicide rates. Second, the study tests the relationships using state-level data. Considering how legal provisions intersect with city or neighborhood context in which homicide occurs should be explored by future research more directly. Third, the study does not seek to disaggregate further by other characteristics of the homicide event (for example, victim–offender relationship, motivation, gender). To the

extent that these characteristics differ by race, they may confound the findings observed here and would be important to consider in their own right. Finally, the proxy used for household firearm ownership has not been validated for use in time series analysis, which may help explain why gun ownership was not found to be related to homicide rates in our analysis.

### Public Health Social Work Implications
In evaluating public policy, it is important to determine not only what works but what works for whom. Our article demonstrates that for one law there are differential relationships with firearm homicide rates based on race. Although not significantly associated with white firearm homicide rates, violent misdemeanor laws are associated with reduced black firearm homicide rates. Universal background checks, permit requirements, and "shall issue" laws are associated with both white and black homicide rates.

Reducing racial disparities in health is a recognized priority for public health social workers (Keefe, 2010). Social workers should promote firearm laws that are associated with reduced risk of death for the entire population, but should be particularly mindful that one strategy for reducing disproportionate black homicide victimization may be advocating for provisions that prevent those subject to domestic violence restraining orders, or who have been convicted of violent misdemeanors, from having access to firearms. Public health social workers can play a critical role in promoting evidence-based firearm policies to reduce overall rates of firearm violence and to lessen the enormous racial gap in these rates. **HSW**

### REFERENCES
Arp, J., Gonzales, R., Herstand, M., & Wilson, M. (2017). *Gun violence in the American culture* [Social Justice Brief ]. Washington, DC: National Association of Social Workers.
Azrael, D., Cook, P. J., & Miller, M. (2004). State and local prevalence of firearms ownership: Measurement, structure, and trends. *Journal of Quantitative Criminology, 20*, 43–62.
Centers for Disease Control and Prevention. (2018). *Web-based injury statistics query and reporting systems: Fatal injury reports*. Retrieved from http://www.cdc .gov/injury/wisqars/fatal_injury_reports.html
Cooper, A., & Smith, E. L. (2011). *Homicide trends in the United States, 1980-2008: Annual rates for 2009 and 2010*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.
Frattaroli, S., & Teret, S. P. (2016). Understanding and informing policy implementation: A case study of the

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

Exhibit D
Page 303

Downloaded from https://academic.oup.com/hsw/article-abstract/44/4/232/5610107 by 81695661, OUP on 30 November 2019

domestic violence provisions of the Maryland Gun Violence Act. *Evaluation Review, 30*, 347–360.

Grinshteyn, E., & Hemenway, D. (2016). Violent death rates: The US compared with other high-income OECD countries, 2010. *American Journal of Medicine, 129*, 266–273.

Gujarti, D. (1970). Use of dummy variables in testing for equality between sets of coefficients in two linear regressions: A note. *American Statistician, 24*, 50–52.

Harris, C. T., Steffensmeier, D., Ulmer, J. T., & Painter-Davis, N. (2009). Are blacks and Hispanics disproportionately incarcerated relative to their arrests? Racial and ethnic disproportionality between arrest and incarceration. *Race and Social Problems, 1*, 187–199.

Healthy People 2020. (n.d.). *Disparities*. Retrieved from http://www.healthypeople.gov/2020/about/foundation-health-measures/Disparities

Hennekens, C. H., Drowos, J., & Levine, R. S. (2013). Mortality from homicide among young black men: A new American tragedy. *American Journal of Medicine, 126*, 282–293.

Kamm, A. R. (2014). *African-American gun violence victimization in the United States: Response to the periodic report of the United States to the United National Committee on the Elimination of Racial Discrimination*. Apex, NC: Violence Policy Center and Amnesty International.

Keefe, R. H. (2010). Health disparities: A primer for public health social workers. *Social Work in Public Health, 25*, 237–257.

Kennedy, D. M., Piehl, A. M., & Braga, A. A. (1996). Youth violence in Boston: Gun markets, serious youth offenders, and a use-reduction strategy. *Law & Contemporary Problems, 59*, 147–196.

Leovy, J. (2015). *Ghettoside: A true story of murder in America*. New York: Spiegel & Grau.

Light, M., & Ulmer, J. (2016). Explaining the gaps in white, black, and Hispanic violence since 1990: Accounting for immigration, incarceration, and inequality. *American Sociological Review, 81*, 290–315.

Lott, J. R., & Mustard, D. B. (1997). Crime, deterrence, and right-to-carry concealed handguns. *Journal of Legal Studies, 26*, 1–67.

McClellan, C. B., & Tekin, E. (2012). *Stand Your Ground laws and homicides* (Working Paper 18187). Cambridge, MA: National Bureau of Economic Research.

National Association of Social Workers. (2018, May 21). *In wake of Santa Fe High School shooting NASW again calls for gun violence to be declared public health epidemic* [Press Release]. Retrieved from https://www.socialworkers.org/News/News-Releases/ArticleType/ArticleView/ArticleID/1652

Pew Research Center. (2016). *American Trends Panel Survey*. Retrieved from http://www.pewresearch.org/methodology/u-s-survey-research/american-trends-panel/

Phillips, J. A. (1997). Variation in African-American homicide rates: An assessment of potential explanations. *Criminology, 35*, 527–559.

Phillips, J. A. (2002). White, black, and Latino homicide rates: Why the difference? *Social Problems, 49*, 349–374.

Resnick, M. D., & Randi, N. (2017). Firearm deaths in America: Can we learn from 462,000 lives lost? *Annals of Surgery, 266*, 432–440.

Ruddell, R., & Mays, G. L. (2005). State background checks and firearms homicides. *Journal of Criminal Justice, 33*, 127–136.

Siegel, M., Xuan, Z., Ross, C. S., Galea, S., Kalesan, B., Fleegler, E., & Goss, K. A. (2017). Easiness of legal access to concealed firearm permits and homicide rates in the United States. *American Journal of Public Health, 107*, 1923–1929.

Social Work Policy Institute. (2017). *Maximizing social work's policy impact in a changing political landscape*. Washington, DC: National Association of Social Workers.

Stevenson, M. T., & Mayson, S. G. (2018). The scale of misdemeanor justice. *Boston University Law Review, 98*, 731–777.

Sumner, S. A., Layde, P. M., & Guse, C. E. (2008). Firearm death rates and association with level of firearm purchase background check. *American Journal of Preventive Medicine, 35*, 1–6.

Ulmer, J. T., Harris, C. T., & Steffensmeier, D. (2012). Racial and ethnic disparities in structural disadvantage and crime: White, black, and Hispanic comparisons. *Social Science Quarterly, 93*, 799–819.

Van Soest, D., & Bryant, S. (1995). Violence reconceptualized for social work: The urban dilemma. *Social Work, 40*, 549–557.

Weaver, B., & Wuensch, K. L. (2013). SPSS and SAS programs for comparing Pearson correlations and OLS regression coefficients. *Behavior Research Methods, 45*, 880–895.

White, H. (1980). A heteroskedasticity-consistent covariance matrix estimator and a direct test for heteroskedasticity. *Econometrica, 48*, 817–838.

Wintemute, G. J., Frattaroli, S., Claire, B. E., Vittes, K. A., & Webster, D. W. (2014). Identifying armed respondents to domestic violence restraining orders and recovering their firearms: Process evaluation of an initiative in California. *American Journal of Public Health, 104*, e113–e118.

Zeoli, A. M., McCourt, A., Buggs, S., Frattaroli, S., Lilley, D., & Webster, D. W. (2018). Analysis of the strength of legal firearm restrictions for perpetrators of domestic violence and their association with intimate partner homicide. *American Journal of Epidemiology, 187*, 1449–1455.

***Anita Knopov, MD,*** *is research associate;* ***Michael Siegel, MD, MPH,*** *is professor;* ***Ziming Xuan, ScD,*** *is associate professor;* ***Emily F. Rothman, PhD,*** *is professor, School of Public Health, Boston University.* ***Shea W. Cronin, PhD,*** *is assistant professor, Metropolitan College, Boston University.* ***David Hemenway, PhD,*** *is professor, Harvard T. H. Chan School of Public Health, Boston. Address correspondence to Michael Siegel, Boston University School of Public Health, 801 Massachusetts Avenue, Boston, MA 02118; e-mail: mbsiegel@bu.edu.* *Support for this research was provided by the National Institute of Justice (grant 2016-MU-MU-0047) and by the Robert Wood Johnson Foundation Evidence for Action Program (grant 73337). The views expressed here do not necessarily reflect those of the National Institute of Justice or the Robert Wood Johnson Foundation. Neither sponsor had any role in the design or conduct of the study; in the collection, analysis, and interpretation of the data; and in the preparation, review, or approval of the manuscript.*

Original manuscript received October 9, 2018
Final revision received June 6, 2019
Editorial decision June 24, 2019
Accepted June 24, 2019
Advance Access Publication October 30, 2019

**Exhibit D**
**Page 306**

© 2019 National Association of Social Workers. Copyright of Health & Social Work is the property of Oxford University Press / USA and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# DO CONCEALED GUN PERMITS DETER CRIME?

# DYNAMIC INSIGHTS FROM STATE PANEL DATA[*]

Marjorie B. McElroy[†]        Peichun Wang[‡]

January 7, 2018

## Abstract

Does the liberal permitting of concealed handguns deter violent crime? We propose a dynamic estimator that addresses the time-varying effects estimated by differences-in-differences estimators and reconcile contradictory results in the literature. Our estimator accounts for heterogeneous responses to concealed carry law passages across three subpopulations created by these policy changes. We estimate all three responses to be significant and the net effect at the state level evolves over time as a subpopulation-weighted average of the three. Our estimates suggest that a counterfactual policy passing concealed carry laws in all states in 2010 would increase overall violent crimes by over 4,000, or up to 5% in certain states.

**JEL Classification:** K14, C51

---

[*]We thank David Card, Phil Cook, Jin Soo Han, Daniel Ho, Yue Hou, Emily Owens, Frank Sloan, and seminar participants at Wharton, Duke, CELS Meeting at Cornell, SOLE Meeting, University of Wisconsin-Madison Institute for Research on Poverty Summer Workshop, SEA Meeting, and PAA Meeting for helpful comments. All remaining errors are our own.

[†]Address: Department of Economics, Duke University, 219A Social Sciences Building, Durham, NC 27708, USA. E-mail: mcelroy@econ.duke.edu.

[‡]Corresponding author address: Microsoft Research, 112/4307, 14865 NE 36th St, Redmond, WA 98052, USA. E-mail: will.wang@microsoft.com.

Exhibit D
Page 236

# 1   Introduction

Compared with other developed countries, the U.S. has remarkably high rates of gun ownership as well as violent crimes. Is there a causal relationship? We concentrate on one piece of this question, the relationship between violent crime and the liberal permitting of the right-to-carry concealed hand guns. Between 1980 and 2011, 36 states liberalized their permitting with the so-called shall-issue laws (SILs), providing for the liberal issue of concealed gun permits analogous to getting a driver's license. Setting off a long controversy, Lott and Mustard (1997) (henceforth LM) reasoned that SILs increase the probability that a given would-be perpetrator's crime will fail because he can no longer tell which prospective victim may carry a gun and respond with threats or gun shots. In this controversy the weapon of choice has been the differences-in-differences (DiD) estimator applied to state and county panel data spanning various intervals of time. Researchers have come to divergent conclusions spanning "more guns, less crime" to "more guns, more crime."

Elementary dynamic analysis highlights the possibility of three different effects of the introduction of SILs—one effect on those already vested in a life of violent crime, another effect on those teetering between entering such a life and the alternatives and, thereafter, a selection effect on the exit of those who chose to enter in the presence of SILs. With panel data on individual potential and actual violent criminals, an empirical specification to measure these effects would be straightforward. Unfortunately state (not individual) panels of crime rates for various types of violent crimes constitute the best available data.

To date the research on the impact of SILs has ignored any forward-looking behaviors and insights from analysis of the dynamics—insights such as the contemporaneous responses of existing violent criminals may differ between those who were hit with SILs after they became violent criminals and those who selected into a life of violent crime despite the presence of SILs. Rather, variations on a static DiD approach have been employed, typically estimating one effect of SILs for each type of violent crime. We argue that DiD estimators can be viewed as weighted sums of three effects where the weights depend on the shares of three corresponding sub-populations (potential entrants, those who were hit with SILs after they became violent criminals, and those who selected into a life of violent crime despite the presence of SILs). As the sub-populations change systematically as more time elapses since the passages of SILs, so will the DiD estimates. Thus suppose

because the time series lengthens as the years roll by, an early investigator applies DiD to a sample period including the immediate aftermath of SILs but not a longer run and a later investigator includes many time periods long after SILs passed. Then the DiD estimate of the first will tend to estimate a surprise effect and the DiD estimate of the second investigator will weigh the selection effect more heavily. And since these effects bear different magnitudes, the DiD estimate produced by the second investigator will tend to be different from the first investigator. This sensitivity of the DiD estimate to the time span of the sample period provides a setup for a long controversy.

This situation likely arose because there seemed to be no way to incorporate the basic dynamic insights into panel data on crime aggregated to state (county, city) averages. In contrast, the SIDD estimator proposed here and in more details in McElroy and Wang (2017), while using data aggregated to the state level can, nonetheless, tease out the three separate effects dictated by almost any dynamic model. We attack the problem indirectly—first by building a model of entry and exits from careers in violent crime and wrapping up all three effects in a net entry equation. Under appropriate assumptions we link this to the observed changes in the number of crimes at the state level, a well-measured dependent variable. In addition, we develop appropriate proxies for the relevant sub-populations of violent criminals.

Assuming that violent crime is a career, we provide a straightforward dynamic interpretation of what we term LM's deterrence hypothesis. Namely, SILs reduce the prospective value of a criminal career and also the continuation value for existing criminals. This is sufficient to sign the entry, selection and surprise effects, and we strongly reject this hypothesis. We show how the SIDD nests the standard DiD model thereby revealing exactly how the DiD scuttles the basic implications from dynamics. Tests resoundingly reject the restrictions that reduce the SIDD to a DiD model.

SIDD thus extends a static DiD model by incorporating the underlying dynamics of forward-looking agents flowing in and out of stocks (e.g., careers, marriages), and thereby avoiding the seemingly inextricable differences in evaluating a policy change's (e.g., SILs, divorce laws) impact on the stock of agents through different lengths of samples (especially when different in post-treatment lengths). SIDD does so by providing the proper level of aggregation by cohorts, recognizing that, given heterogeneity in agents' proclivity, potential entrants going into the stock and existing stock considering exiting are differentially impacted by the policy change, and that the existing stock who entered before and after the policy change are differentially impacted by the policy change.

3

Therefore, one added advantage of SIDD is that, by aggregating properly to the cohorts level, we eliminate the need for micro-data or structural models in order to incorporate dynamics, and instead estimate on the often readily available state panel data. Note that SIDD, however, differs from the usual heterogeneous treatment effect models in that the SIDD cohorts are created by the ex-ante unexpected policy change due to selection rather than based on exogenous characteristics of the agents.

On the empirical side, we remain *a priori* agnostic to different hypotheses of the effects of SILs on violent crime but argue that SILs might have an significant impact on violent crime in *some* direction. Many have argued that it is almost impossible for SILs to have any significant effect if SILs do not significantly change the number of gun owners, gun permit holders, or existing gun owners' concealed carry behavior (e.g., Duggan, 2001). For the deterrence effect (if any), we argue that it is the perception of criminals that the potential victim might have a gun that leads to deterrence rather than the actual probability of such an event. For the alternative hypothesis, removing restrictions on gun use (e.g., SILs) would increase citizens' perceived value of guns and potentially increase gun purchases regardless of whether they actually hold a concealed carry permit (option value of obtaining a permit later or trading)—the increased gun availability to amateurs and exposure to theft would both allow for easier gun access to criminals.

We estimate that SIL passage differentially impacts the cohorts of potential entrants, existing criminals that began their careers before the advent of SIL, and those who started after, thus rejecting DiD as a plausible model specification. Specifically, our preferred SIDD specification estimates that SIL increases young males' entry probability into violent crimes by 0.04 percentage points on top of a base rate of 0.1% (entry effect). Consistent within the dynamic framework, those who entered violent crimes when the entry barrier is lowered by SIL have a higher exit rate by 13 percentage points in a given year than the base rate before the SIL passage (selection effect). Finally, those who became violent criminals before SIL passages now have a 11 percentage points increase in exit rate in the year that SIL goes into effect and a smaller increase of about 5 percentage points 5 years later (surprise effect). These estimates largely are significant (with robbery being most salient among other sub-categories of violent crimes) and remain unchanged when estimated on samples with varying lengths.

The overall impact of the three SIDD effects (entry, selection and surprise effects) turns out

to be dominated by the positive entry effect and results in higher churning in and out for violent criminals as well as higher overall crime levels, as illustrated in our counterfactual example. We find that, if we had adopted SILs in all 11 states and Washington, D.C. that still had stricter gun laws in 2010, we could have seen over 4,000 more violent crimes in that year, with plausibly many more as time passes by. This effect differs across states, with California seeing the largest increase in violent crimes and Washington, D.C. a small decrease in the first year. Percentage-wise, the impact is most significant in Rhode Island and Wisconsin at a 5% increase of violent crimes. Decomposing the overall effect into entry and surprise effects in the first year shows increased churning rate in and out of violent crimes as well. We argue that one can interpret these results as an upper bound for the impact of the recently proposed Concealed Carry Reciprocity Act of 2017.

We now discuss our empirical findings in the context of the literature on concealed carry laws. Since the initial LM study (Lott and Mustard, 1997), concealed carry laws have not only been focus of a public debate but also a heated academic one. In twenty years, many papers have employed similar data (state/county panel) of varying lengths and similar approaches (variations of DiD) but could not reach consensus. Some have thus concluded that "it is not an easy task to tease out the net effects of [right-to-carry] laws on crime via panel data analyses" (Donohue, 2009), and that "data available on these questions are too weak to support unambiguous conclusions or strong policy statements" (National Research Council, 2005). In particular, there is a common thread in this literature that points out the time-varying dynamic effects of concealed carry laws on crimes.[1] Our SIDD approach aims to uncover robust estimates of policy impacts by *explaining*

---

[1] Examples include Ayres and Donohue (2009): "Adding data has consistently made RTC look worse"; Donohue (2003): "With the expanded data set, there is much evidence that could be amassed to support the view that shall-issue laws tend to increase crime, at least in most states. But the third set of factors that undermines the more-guns, less-crime hypothesis probably weakens that conclusion too: the results tend to be sensitive to whether one uses county or state data, which time period one looks at, and what statistical method one employs"; and Kovandzic and Marvell (2003): "Although it is often difficult to state, a priori, when the effect of a legal intervention should become evident, we question the assumption underlying the use of binary dummy variables that RTC laws have a once-and-for-all impact on violent crime...even if researchers using the dummy

the underlying dynamics given different states of the world when evaluating different lengths of samples, and thus yields both significant and time-consistent estimates.

We attempt to thoroughly survey studies that evaluate effects of concealed carry weapon laws on crime using variations of DiD with state and/or county panel data (almost 30 papers). Several earlier studies have found supporting evidence for LM's deterrence hypothesis (Lott and Mustard, 1997; Lott, 1998, 2010; Bartley and Cohen, 1998; Bronars and Lott, 1998; Lott and Landes, 1999; Benson and Mast, 2001; Moody, 2001; Mustard, 2001; Plassmann and Whitley, 2003), while many later papers find no, mixed, or opposite evidence against the deterrence hypothesis (Black and Nagin, 1998; Ludwig, 1998; Dezhbakhsh and Rubin, 1998; Duggan, 2001; Plassmann and Tideman, 2001; Duwe, Kovandzic and Moody, 2002; Ayres and Donohue, 2003b,a; Rubin and Dezhbakhsh, 2003; Kovandzic and Marvell, 2003; Helland and Tabarrok, 2004; Kovandzic, Marvell and Vieraitis, 2005; Grambsch, 2008; Ayres and Donohue, 2009; Donohue, 2009; Moody and Marvell, 2008, 2009; Donohue, Aneja and Weber, 2017; Manski and Pepper, 2017). It is worth noting that, in Section 3.3, when we re-visit the most popular specifications of Lott and Mustard (1997) and Ayres and Donohue (2003b) with more robust controls and clustered standard errors (Bertrand, Duflo and Mullainathan, 2004), much of the claimed effects from both papers disappear. The SIDD model bears a more general form than the static DiD models used in these papers and provides testable restrictions that reduce SIDD to DiD, which were strongly rejected by the data. Our SIDD estimates also suggest strongly against the deterrence hypothesis as we find overwhelmingly higher new entry into violent crimes after SIL passages. Moreover, similar to implications of SIDD, many of these papers discuss SIL's time-varying effects on crimes (Lott, 1998, 2010; Bartley and Cohen, 1998; Moody, 2001; Black and Nagin, 1998; Dezhbakhsh and Rubin, 1998; Plassmann and Tideman, 2001; Ayres and Donohue, 2003b,a; Rubin and Dezhbakhsh, 2003; Kovandzic and Marvell, 2003; Kovandzic, Marvell and Vieraitis, 2005; Grambsch, 2008; Moody and Marvell, 2008, 2009; Donohue, Aneja and Weber, 2017; Manski and Pepper, 2017). In particular, while Manski and Pepper (2017)'s bounded-variation approach takes an agnostic view towards the data generating process, our SIDD

---

variable approach are correct that announcement effects surrounding the passage of RTC laws are enough to cause prospective criminals to desist from committing crime, it is unlikely that these effects would remain fixed over time."

model aims to explain more variations in the data by exploiting fundamental dynamics of forward-looking agents and thus yield useful counterfactual policy recommendations.

The rest of the paper is organized as follows: Section 2 presents the SIDD model, its relation to the standard DiD, and its dynamic implications; Section 3 discusses the empirical setting of violent crimes and concealed carry laws as they relate to specifications of SIDD and various data aspects; Section 4 describes the results; and Section 5 concludes.

## 2   Model

This section presents a spare model that captures the essential consequences of forward-looking behaviors on the part of potential and actual violent criminals in order to identify the differing effects of SILs across three sub-populations as well as the total effect. Treating violent crime as an occupation lets us capture the effects of SILs on entry into and exit from a career in violent crime in a familiar way. Potential entrants are all those who are capable but not yet criminals; potential exitors are all those who are currently violent criminals. To simplify the language, in this paper, we refer to careers in violent crimes as "careers" and use violent criminals and criminals interchangeably. We also refer to the potential entrants and exitors as the "entry cohort" and the "exit cohort" even though it is not, strictly speaking, a cohort but a stage of life.

### 2.1   Micro-foundation

Assume the choice governing entry is captured by a value function and those governing exit by a continuation function. The passage and presence of SILs affect both. Begin with the entry cohort. Let $(s, t)$ denote state $s$ in period $t$ and let $N^{En}$ be the number of potential entrants in $(s, t)$. Then a familiar, straightforward reduced-form representation of decisions to enter careers in violent crime would be

$$Entry_{st} = (\alpha_0 + \alpha_1 I_{st}^{SIL} + \epsilon_{st}^{En})N_{st}^{En} \tag{1}$$

where $I_{st}^{SIL} = 1$ if SILs are in effect, and $\epsilon_{st}^{En}$ is a well-behaved random error. Parameters to be estimated are the base entry rate, $\alpha_0$, and the impact of SILs on entry, $\alpha_1$. Note that the dependent variable $Entry_{st}$ is unobserved.

With forward-looking behaviors, the contemporaneous effects of SILs on exits from careers in violent crime depend on whether this career was chosen before or after the passage of SILs. For those whose entry was prior, the passage of a SIL induces a surprise change in the continuation value of this career and consequently exit rates change by the surprise effect, denoted by $\beta_2$. In the case that the advent of SILs causes continuation values to fall, the exit rates increase and $\beta_2 > 0$, and vice versa. Use $N_{st}^{Surprised}$ to denote the size of the surprised cohort.

In contrast to the surprised cohort, those who chose their careers in violent crime after the passage of SILs presumably capitalized the effect of SILs on the value of a career in violent crime when they selected into careers of violent crime. Use $N_{st}^{Selected}$ to denote the size of this selected cohort. For if the pool of potential entrants is heterogeneous in their "quality" (proclivity for violent crime) the change in the value of the violent career path induced by SILs will affect not just the quantity of entrants as in Equation 1 but also their quality and, in turn, change their exit rate down the road. This is captured by the selection effect $\beta_1$. In the case that the advent of SILs decreases continuation values, the marginal and average violent criminal will have a higher quality, be more buffered from negative career shocks, and thus have a lower probability of exiting or $\beta_1 < 0$, and vice versa. These effects are captured in the reduced form exit equations,

$$Exit_{st}^{Selected} = (\beta_0 + \beta_1 I_{st}^{SIL} + \epsilon_{st}^{Ex})N_{st}^{Selected}, \qquad (2)$$

and

$$Exit_{st}^{Surprised} = (\beta_0 + \beta_2 I_{st}^{SIL} + \epsilon_{st}^{Ex})N_{st}^{Surprised}, \qquad (3)$$

where $\beta_0$ is the base exit rate. Thus, as shown below, in contrast to diff-in-diff specifications, this enables the SIDD to explain turning points in criminal activity and not just either upswings or downturns. Finally, subtracting exits from entrances gives the net increase in criminals,

$$
\begin{aligned}
NetEntry_{st} =& (\alpha_0 + \alpha_1 I_{st}^{SIL} + \epsilon_{st}^{En})N_{st}^{En} \\
& -(\beta_0 + \beta_1 I_{st}^{SIL} + \epsilon_{st}^{Ex})N_{st}^{Selected} \\
& -(\beta_0 + \beta_2 I_{st}^{SIL} + \epsilon_{st}^{Ex})N_{st}^{Surprised} \\
=& (\alpha_0 + \alpha_1 I_{st}^{SIL})N_{st}^{En} - (\beta_0 + \beta_1 I_{st}^{SIL})N_{st}^{Selected} - (\beta_0 + \beta_2 I_{st}^{SIL})N_{st}^{Surprised} + \epsilon_{st} \quad (4)
\end{aligned}
$$

where the error $\epsilon_{st} = \epsilon_{st}^{En} N_{st}^{En} - \epsilon_{st}^{Ex} N_{st}^{Selected} - \epsilon_{st}^{Ex} N_{st}^{Surprised}$. Equation 4 is the basic model for the SIDD. Later in the empirical work, we investigate the effect of floodgate and aging effects to this model. Our approach highlights the importance of three separate effects of SILs: $\alpha_1$ a direct effect on entry of youths into violent criminal careers and $\beta_1$ the subsequent selection effect on their exits; and $\beta_2$ the surprise effect on cohorts of older criminals who began their careers prior to SILs. These three parameters capture the two fundamental implications of dynamic analysis. These are (i) the impact of SILs on behaviors are not symmetric between potential entrants and exitors (youths in their entry windows and violent criminals)—roughly, the $\alpha$'s are not equal to the corresponding $\beta$'s; and (ii) the impact of SILs on exits from violent criminal careers differs between those who began their careers before the advent of SILs and those who began after, i.e., $\beta_1 \neq \beta_2$.

Given ideal panel data on individuals, we could observe entries and exits of potential and actual criminals and form sub-samples of criminals according to whether their entry preceded or post-dated the advent of SILs. Then the strategy would be to estimate each of these three separate effects–using variations of DiD–on the corresponding three sub-samples. In reality such data are not on the visible horizon. Unlike other occupations, the pool of criminals as well as their entries and exits go unobserved. The panel data we do have are aggregated to the state (or county or city) level and, of course, do not parse out the criminal population, much less record entry dates. Thus a three-separate-regression estimation strategy for state panel data that parallels that for micro panel data is precluded. In particular, this strategy is precluded because the crime rates (dependent variables) available are for the entire state population, not for the three key sub-populations. The point of using the SIDD model is that, despite observing only the impact of SILs on violent crimes aggregated to the state level, nonetheless the SIDD provides a way to identify the three fundamental dynamic effects of SILs.

It is worth pausing to create a sketch of the model as contained in Table I. The first two rows in Table I show the contribution of each cohort (entry, selected and surprised) to the aggregate net entry rate with the two columns giving these contributions before and after SILs, respectively. In the third row, weighting each previous row by cohort sizes and then subtracting exits from entries gives the net entry rate before and after SILs. $N_{st}^{Ex}$ is the number of all potential exitors. Finally weighting the share-weighted columns by $(1 - I_{st}^{SIL})$ and $I_{st}^{SIL}$ gives the desired net entry rate for each $(s, t)$ in the last row. Note that the expression in the last row is the same with Equation 4.

LM's deterrence hypothesis has a natural interpretation in terms of the SIDD. Recall the channel they envisioned was that in the presence of concealed guns born by law-abiding citizens, violent criminals faced lower payoffs in the form of increased risk from their intended victim because they can no longer tell which victims are unarmed and which not. This translated into our SIDD model as lowering the value of entering a career in violent crime and also lowering the continuation value for those who are already criminals. Consequently, we interpret the deterrence hypothesis as implying that SILs reduce entry via lowering the career value, i.e., $\alpha_1 < 0$. Also, thereafter, those who select into crime are fewer in number but more hardcore than otherwise, i.e., $\beta_1 < 0$. Finally, and this likely gets closest to what LM had in mind: the advent of SILs is a negative surprise for the continuation value for current criminals and they exit at higher rates than otherwise, i.e., $\beta_2 > 0$.

## 2.2   Relation to DiD

To show that the SIDD nests the basic DiD we return to the two basic insights from a dynamic model of entry and exit into crime. These are (i) differential impacts of SILs between potential entrants and exitors—roughly, the $\alpha$'s are not equal to the corresponding $\beta$'s; and (ii) the impact of SILs on criminals' exits by those who began their careers before and after the advent of SIL are not equal, i.e., $\beta_1 \neq \beta_2$. It is exactly the denial of these insights that reduces the SIDD to the DiD estimator.

Let us impose these in turn on the specification of the SIDD in Equation 4. First deny insight (ii) by imposing the restriction that those who became criminals before and after the advent of SIL exhibit the same contemporaneous responses to the presence of SILs, or $\beta_1 = \beta_2 = \beta_*$, a common value. In that case Equation 4 becomes

$$NetEntry_{st} = (\alpha_0 + \alpha_1 I_{st}^{SIL})N_{st}^{En} - (\beta_0 + \beta_* I_{st}^{SIL})N_{st}^{Ex} + \epsilon_{st}. \qquad (5)$$

Then further deny insight (i) by imposing that the contemporaneous impact of SILs is the same for potential entrants as for existing criminals, or $\alpha_0 = -\beta_0$ and $\alpha_1 = -\beta_*$. Equation 5 is reduced

to

$$NetEntry_{st} = \alpha_0 N_{st} + \alpha_1 I_{st}^{SIL} N_{st} + \epsilon_{st}, \tag{6}$$

where $N_{st} = N_{st}^{En} + N_{st}^{Ex}$ is the total relevant population at risk to contribute to the net change in the number of criminals. Equation 6 is then the familiar DiD form and is, as everyone knows, completely static.

## 2.3   Treatment Dynamics

Under the SIDD, how would passages of SILs affect crime rates? As Equation 4 and Table I show, the obvious effects are captured by $\alpha_1$, $\beta_1$ and $\beta_2$ that affect entry and exit of the corresponding sub-populations. We turn to how the size and share of each sub-population evolve over time.

First set aside the entry cohort and presume it is exogenous (i.e., fertility is independent of SILs). Divide the selected ($N_{st}^{Selected}$) and surprised ($N_{st}^{Surprised}$) cohorts by the total exit cohort ($N_{st}^{Ex}$) so they sum to one, $s_{st}^{*Selected} + s_{st}^{*Surprised} = 1$. Prior to SILs, crime evolves according the pre-SIL entry and exit rates as they hit the associated entry and exit cohorts. Further, note that as of the period when SILs become effective ($t^*$), essentially all criminals would have entered before this. Thus in $t^*$ none of the stock of criminals were selected into crime under SILs so that $s_{st^*}^{*Selected} = 0$ and thus $s_{st^*}^{*Surprised} = 1$. This contrasts with the long run here defined as beginning when the last survivor in the surprised cohort retires or exits ($t^{**}$) . By then the cohort shares have reversed: $s_{st^*}^{*Selected} = 1$ and $s_{st^*}^{*Surprised} = 0$ and they remain there going forward. Most importantly, for $t$ in between $t^*$ and $t^{**}$, the shares evolve systematically with $s_{st^*}^{*Selected}$ growing (approaching 1) at the expense of $s_{st^*}^{*Surprised}$ (approaching 0). These shares are the weights on the selection and surprise effects. Hence, the impact of these effects on crime rates go from the surprise effect ($\beta_2$) dominating in the immediate aftermath of the passage of SILs, then fading as these older criminals exit and the fraction selected into crime grows until, in the long run, only the selection effect of SILs remains. These trends are summarized in Table II.

# 3   Empirical Setting

To remain comparable to the previous literature, we begin by describing the standard sources of data used in the concealed carry law literature as well as this analysis. We then turn to addressing the usual data limitations given the nature of crimes and how we overcome these challenges to construct an otherwise standard state panel dataset for the estimation of SIDD. Finally, we provide descriptive evidence in comparing DiD and SIDD.

## 3.1   Main Data Sources

The main and standard sources of data provide information on crime (and arrest) rates and demographics on the state-year level. We rely on the Uniform Crime Reporting (UCR) Program by the Federal Bureau of Investigation for violent crime and arrest rates, and the Regional Economic Information System (REIS) of the Bureau of Economic Analysis for demographic control variables. We construct a state panel dataset from 1980-2011[2]. Table B.2 summarizes the UCR and REIS data.

UCR contains type-specific violent crime and arrest rates in the following five categories: (1) murder and non-negligent manslaughter, (2) forcible rape, (3) robbery, (4) aggravated assault, and (5) total violent crimes (henceforth murder, rape, robbery, aggravated assault, and violent crimes). Crime rates refer to the incidences of reported crimes (interpreted as the actual number of crimes) and are our outcome of interest. Arrest rates refer to the number of arrests made in each crime category in a state-year and are thus typically used as proxy for law enforcement intensity.

REIS contains several demographic variables that characterize the welfare level in a state-year. These include real per capita personal income, income maintenance, unemployment insurance, and retirement payment for people older than 65. These variables are typically included in a DiD regression to control for the correlation of law passages with state-year level variations that are not controlled for by state and year fixed effects or state-specific trends. While not perfect, we also

---

[2]Majority of the literature surveyed in Section 1 rely on UCR and REIS with varying lengths of sample. We restrict our sample to 1980-2011 given availability of other age-specific data sources at the time of writing, detailed in Section 3.4.

include these variables for comparability.

The third piece of data concerns the passage years of SILs in each state. Given the disagreement in the literature, we conduct independent research into the years SIL went into effect in each state up to 2011. Figure B.1 plots the flow and stock of states with SILs over time (state-specific passage years in Table B.1 in Appendix B.1). During the 32 years in our sample, 36 states passed SILs (from 5 to 41 SIL states) due to what many believe to be a combination of lobbying effort and academic influence, while the academic literature reaches no conclusion on the effect of SIL on violent crimes. It is also interesting to note that, most studies in the literature use data samples up to the late 1990's when the majority of SIL states had just passed the law. If we believe that the effect of SIL on violent crimes could be in any way dynamic, it is not hard to imagine that results might be different in a sample with longer post-treatment years.

Finally, since we do not observe the beginning of each criminal's career as it relates to his state's passage of SIL, we infer the selected and surprised cohorts from Equations 2 and 3 by assuming an entry window for violent criminals between the age of 13 to 21. Further rationale and robustness of the entry window assumption are discussed in Section 3.4 and Appendix A.1. We thus compile age specific male population[3] from the Census and national arrest rates by age groups from the Bureau of Justice Statistics (BJS)[4].

## 3.2   Violent Crimes and Concealed Carry Laws

It is well known that U.S. crime rates peaked in the early 1990's and have since fallen over time. While a SIDD model with parameters $\beta_2 < 0$ and $\beta_1 > 0$ can explain an upswing followed by a downturn in the crime rate, this does not make the SIDD a good candidate for explaining the national time trend. This can be seen in Figure B.2. There states are partitioned into five groups

---

[3]Violent crimes reported to be committed by females are far less than those by males and are likely to be different in nature. We restrict attention to males only.

[4]The BJS arrests data differs from the UCR arrests data in that it reports arrest rates on the age-group/year level for each crime category. It covers the period 1980-2011 and reports in 17 age groups: 9 or younger, 10-12, 13-14, 15, 16, 17, 18-20, 21-24, 25-29, 30-34, 35-39, 40-44, 45-49, 50-54, 55-59, 60-64, and 65 or older.

with the states within a group all adopting SILs about the same time[5]. The first group of states adopted SILs prior to 1985 or have always had equivalent or more liberal laws as SIL; the last group includes states that adopted SILs in 2011 or had never adopted SIL by 2011. If the swings were all explained by SIDD and the passage of SILs, the peak crime rates for each group would all occur some years after that group adopted SILs and Figure B.2 would have a series of humps whose max moves to the right as adoption years become more recent. Instead, we see that for all groups, crime rates peak in the early 1990's and thus we could best hope SIDD and SILs to explain deviations from the overwhelming (non-linear) national time trend.

Additionally, Figure B.2 also lends some support to the usual assumption in the literature that SIL passages are plausibly unrelated to local crime rates. For instance, the group of states with the second lowest crime rates was the last group to pass SILs while the group with the lowest crime rates was the earliest.

Figure B.3 then assists in visualizing the relationship between violent crime rates and SIL passages by stacking all the "treated" states against "untreated" states at different point in time. Specifically, we follow Gormley and Matsa (2011)[6]. Figure B.3 presents the result for both the level of crime rates and changes in crime rates. It is evident that it would be hard for one to draw any conclusion from this "DiD-type comparison." In particular, the overall declining crime rates cannot be used as evidence for the deterrence hypothesis in comparison to the control group. As for the changes in crime rates, while a small overall positive effect of SILs on violent crime rates can be detected, it is clear much of the dynamics are left to be explained.

---

[5]See Figure 1 of Ayres and Donohue (2003*b*) for comparison. We follow them for this categorization but extend it to a longer panel and finer groupings.

[6]The procedure is as follows: First define a 20-year window around each of the 16 treatment years for the 36 states that adopted SILs within our sample and normalize the treatment year to zero. Then for each window, use all states who never adopted SILs within the window as the control group and states that exactly adopted SIL in that corresponding year as the treated group. Call these two groups together a cohort and average across cohorts separately for the treated and the control groups.

### 3.3   Re-visit DiD

Given the noisy relationship between violent crime rates and SIL passages presented in Figure B.3, we review estimates in LM and AD, which both employ a DiD-type specification. LM adopts a simple "dummy variable model," where they control for state and year fixed effects (but not trends). Column (1) in Table B.3 shows our replication result[7]. Specifically, the dependent variable is the log of violent crime rates and the demographic controls include arrest rates, state population, population density, real per capita personal income, income maintenance, unemployment insurance, and retirement payment for people older than 65. In particular, LM also control for a large set of race and age group variables (18 groups divided into three races - black, white, and others - and six age groups - 10-19, 20-29, 30-39, 40-49, 50-59, and 65+). Similar to LM, we find a roughly 8.8% (vs. 5-10% in LM) reduction in violent crimes following SIL passages.

In columns (2) and (3), we keep the same specification but expand the sample to 1999 and 2011, respectively. Despite having more data, we find gradually smaller and less precisely estimated effects. With this specification and the full sample in (3), we find essentially no effect of SILs on violent crimes. We then compare column (4) with (1) by dropping the controversial race and age controls. We also find a small and insignificant effect. The last two columns are our preferred specifications, where we exclude the race and age controls but instead control for state-specific linear and quadratic time trends and account for serially correlated errors by clustering on the state level. We find no effects of SILs on either the log or the level of violent crimes. Overall, we find that the original LM specification is sensitive to controls, sample lengths, and assumptions on error structures.

We now turn to AD, who employ a longer sample up to 1999 and a "hybrid model" by including a time trend interacted with the SIL dummy to capture possible long run effects. While this posits a similar idea to SIDD, we argue that SIDD bears a more flexible and interpretable model, especially in evaluating long-run policy implications. Columns (1) and (2) in Table B.4 again shows our replication result first. We find, similar to AD, by including a trend interacted with treatment, a negative short-run effect but a positive long-run effect on violent crimes. Confirming this finding are columns (3) and (4), where we again find time-inconsistent estimates for the standard treatment

---

[7]Note that we differ slightly by starting our sample in 1980.

effect as we vary the sample lengths. However, in our preferred specifications (5) and (6), these results are also sensitive to the set of controls and clustered standard errors.

## 3.4   Data Challenges

Before turning to specifying the model, we briefly discuss two sets of challenges unique to the crime setting in applying the SIDD framework.

First, as is standard in the crime literature, only crime rates–rather than the criminal population–are available to researchers. To illustrate the SIDD framework, we first take the simplest assumption that there is a constant relationship $\kappa = \frac{\text{crimes}}{\text{criminals}}$ across all criminals. In that case, multiplying through Equation 4 by $\kappa$ converts the dependent variable to the observed change in the crime rate and changes the interpretation of the coefficients. Thus, the parameters to be estimated become $\alpha'_i = \kappa \alpha_i$ in place of $\alpha_i$. Note, however, that the percent increase in entry rate due to SILs is nonetheless identified because $\frac{\alpha_1 - \alpha_0}{\alpha_0} = \frac{\alpha'_1 - \alpha'_0}{\alpha'_0}$. We also make an attempt to estimate $\kappa$ to better interpret the $\alpha$'s. Specifically, we include in our estimation two variables representing population admitted to and released from prisons each year and interpret the estimated coefficients as $\kappa$. Constructions of these variables are based on Neal and Rick (2014) and detailed in Appendix B.4.

It is worth discussing the implications if the crime intensity $\kappa$ varies across cohorts and in response to SILs. The SIDD dependent variable is the time-differenced crime rate. In turn the number of crimes is the number of criminals times the average $\frac{\text{crimes}}{\text{criminals}}$. Data limitations preclude parsing out changes in this intensity between changes in the components. If data permitted, we could pursue a more complex model that distinguished, for example, the effects of SILs on the numbers of entrants and their average intensity . But, it is not hard to see that such a dynamic model would predict that either both effects are positive or both effects are negative and our entry parameter $\alpha_1$ measures the combination of these two. Hence, although we refer to "entries and exits of criminals," a more accurate descriptor would be "increases and decreases in the crime level." We prefer, however, "entries and exits" because it constantly reminds us of the dynamic decision making underpinning our model.

Second, as mentioned earlier, we, by default, do not observe the entry timings of violent criminals as they relate to SIL passages. In order to infer the composition of violent criminals who entered

before a SIL passage (surprised) and those who entered after a SIL passage (selected), we make the following assumptions. First, we infer the age distribution of violent criminals in a state-year with the age distribution of national arrests in that year. Specifically, this assumes that the probability of arrest in a state-year does not vary across ages, and that arrests for each age group as a fraction of total arrests in a state-year does not vary across states. Appendix B.2 details this procedure. Second, we assume that all violent criminals entered during an entry window between ages 13 to 21 and can exit between ages 22 to 64[8]. Given this parsimonious design, we can then assign each age cohort to either the surprised cohort or selected cohort. For example, Florida's SIL went into effect in 1988. In 1998, a 40-year-old violent criminal in Florida would be assigned to the surprised cohort because he was 30 years old in 1988 and thus is assumed to have entered already. On the other hand, a 22-year-old violent criminal would be assigned to the selected cohort because he was 12 years old in 1988 and could not have entered before the law passage. Finally, in 1998 Florida, a 28-year-old violent criminal was 18 years old in 1988 and thus would be assigned with $\frac{5}{9}$ probability to the surprised cohort and $\frac{4}{9}$ probability to the selected cohort.

## 3.5   Intuition and Extensions

We further illustrate the intuition for our cohort definitions and estimation of SIDD using the Florida example in Figure B.4. The entry cohort is defined using Census male population between age 13 and 21[9]. The total exit cohort (dash-dotted line) measures the stock of violent criminals (up to the intensity multiplier $\kappa$). By definition, before SIL passage, the exit cohort is fully composed

---

[8]There are several reasons behind this choice of entry and exit windows. First, the BJS national arrests data (Figure B.7) suggests that the age distribution of violent criminals peaks around 20 regardless of types of crime and time, which is consistent with classic sociology theory (Hirschi and Gottfredson, 1983). Second, the age range 13 to 64 covers, on average, 98% of violent crimes committed across state-years. Third, the cutoff age 21 is picked by the SIDD model that maximizes the log-likelihood of the estimated baseline. Robustness around the choice of entry and exit windows is shown in Section A.1.

[9]We do not attempt to further exclude the violent criminal population since the average violent crimes per population is only 0.48%.

of the surprised cohort (dotted line) - those who became a violent criminal prior to SIL. As time goes by since the adoption of SIL, the selected cohort (dashed line) keeps increasing and eventually replaces all the surprised cohort, as the violent criminal stock is replaced with entrants from the post-SIL era. A new equilibrium establishes as the selected cohort coincides with the total exit cohort. In Figure B.4 we also show the lengths of samples used in LM and AD. In states where SILs were adopted before 1992, LM's sample weighs more on the surprise effect in a DiD model while AD's sample weighs more on the selection effect. We show in Section 4.3 that in the full national sample, given gradual passages of SILs among different states, DiD would be biased by the changing weights (shares of cohorts) of surprise and selection effects while SIDD teases them apart consistently.

As alluded to earlier, there are two extensions to the baseline SIDD model to allow for more flexibility given the specific empirical setting. First, we incorporate aging effects into the base exit rates of violent criminals. In theory, there are many reasons why the base exit rates for violent criminals are different at different ages - people at different stages of their life cycles have different physical conditions for the profession of crime, have accumulated various levels of human capital specific to the crime career, have different lengths of career left until retirement and thus different continuation values, and etc. Indeed, these are supported by the data (Appendix B.3). This would bias the SIDD estimates as our cohorts are defined based on age, as illustrated in Figure B.5. While the overall entry and exit cohorts stay relatively constant in their average age, the surprised cohort ages quickly over time as they are not replenished with young counterparts and will eventually all reach retirement age. On the other hand, the selected cohort also ages due to the aging of its initial young constituents but will be balanced out by new entrants and eventually converge to an average age around 34 when the surprised cohort completely disappears. It is thus important to account for the differential aging effect in exit across these two cohorts as not to attribute the difference to the estimated selection or surprise effects.

The second extension is to incorporate floodgate effects into the surprise effect. In a dynamic model, the surprise effect only measures the average change in exit rates among the surprised cohort. However, with heterogeneity in continuation values (as a result of either heterogeneous proclivity for violent crime or length of remaining career until retirement), the marginal criminals are to be surprised first, with fewer and "higher-quality" incumbent criminals to be surprised as

time passes after the initial SIL passage. We therefore expect the surprise effect to be most salient in the immediate years following passages of SILs and to gradually taper off over time. We non-parametrically estimate these "floodgate effects" by decomposing the average surprise effect over the years succeeding the SIL passages.

We now turn to specifying the empirical model to be estimated as well as the two extensions of aging and floodgate effects.

# 4   Estimation and Results

In this section we present the specifications and estimates of SIDD, as well as hypothesis and model specification tests comparing SIDD to DiD, and then turn to a counterfactual policy experiment that decomposes the three effects of SIDD.

## 4.1   Specifications

As outlined in Sections 3.4 and 3.5, we now present the SIDD specifications applied to violent criminals. We begin by specifying the estimating Equation 7 for the baseline model in Equation 4:

$$
\begin{aligned}
\Delta_{st}^{C}(NetEntry) = {} & \alpha_0' \sum_{a=13}^{21} N_{ast}^{En} + \alpha_1' \sum_{a=13}^{21} N_{ast}^{En} I_{st}^{SIL} \\
& - \beta_0 \sum_{a=22}^{64} N_{ast}^{Ex} - \beta_1 I_{st}^{SIL} \sum_{a=22}^{64} N_{ast}^{Selected} - \beta_2 I_{st}^{SIL} \sum_{a=22}^{64} N_{ast}^{Surprised} \\
& + \Gamma X_{st} + \epsilon_{st}.
\end{aligned}
\tag{7}
$$

By multiplying through Equation 4 by the crime intensity $\kappa$, we transform the dependent variable to changes in violent crimes, i.e., difference between the number of crimes in state $s$ in year $t+1$ and year $t$, and then weighted by the state population in year $t$. $N_{ast}^{En}$ are population of males at age $a$ in state $s$ and year $t$ as the entry cohort. Note that $\alpha_i' = \kappa \alpha_i$, where $\alpha_0$ is the base entry probability for young males into violent crimes and $\alpha_1$ the change in entry probability after SIL adoption. $I_{st}^{SIL}$ are indicator functions of whether state $s$ has SIL in effect in year $t$. $N_{ast}^{Ex}$ are imputed violent crimes committed by age cohort $a$ in state $s$ and year $t$, i.e., the imputed $\tilde{C}_{ast}$

as detailed in Appendix B.2. $N_{ast}^{Ex}$ are then divided into $N_{ast}^{Selected}$ and $N_{ast}^{Surprised}$ based on age relative to SIL passage year and the procedure outlined in Section 3.4. Note that since $N_{ast}^{Ex}$ are on the crime- rather than criminal-level, we directly interpret $\beta_0$, $\beta_1$ and $\beta_2$ as the base exit rate, selection effect and surprise effect. Finally, the set of controls $X_{st}$ includes prison admissions and releases, state population, population density, real per capita personal income, income maintenance, unemployment insurance, and retirement payment for people older than 65, state and year fixed effects, and state-specific linear and quadratic time trends.

We now add in aging effects. Given the evidence for non-linear exit rates over age (Appendix B.3), we parametrize the base exit rate as a quadratic function (robustness in Appendix A.2) in age to capture life cycle effects on exit rates, i.e. $\beta_0 = \gamma_0 + \gamma_1 a + \gamma_2 a^2$, and estimate $\gamma_i$'s in place of $\beta_0$ as follows:

$$
\begin{aligned}
\Delta_{st}^{C}(NetEntry) = {} & \alpha_0' \sum_{a=13}^{21} N_{ast}^{En} + \alpha_1' \sum_{a=13}^{21} N_{ast}^{En} I_{st}^{SIL} \\
& - \gamma_0 \sum_{a=22}^{64} N_{ast}^{Ex} - \gamma_1 \sum_{a=22}^{64} a N_{ast}^{Ex} - \gamma_2 \sum_{a=22}^{64} a^2 N_{ast}^{Ex} \\
& - \beta_1 I_{st}^{SIL} \sum_{a=22}^{64} N_{ast}^{Selected} - \beta_2 I_{st}^{SIL} \sum_{a=22}^{64} N_{ast}^{Surprised} \\
& + \Gamma X_{st} + \epsilon_{st}.
\end{aligned}
\tag{8}
$$

At last, we incorporate floodgate effects. We non-parametrically estimate the tapering-off of the surprised effect in years following SIL passage by letting $\beta_2 = \sum_{j=0}^{9+} \lambda_j I_{st}^{j}$, where $I_{st}^{j}$ are dummies indicating the $j^{th}$ year after SIL passage (robustness in Appendix A.3). $\lambda_j$'s then represent the evolution of the surprise effects after the initial passages of SILs. Put together, we arrive at the preferred SIDD specification in the crime setting:

$$\Delta_{st}^{C}(NetEntry) = \alpha_0' \sum_{a=13}^{21} N_{ast}^{En} + \alpha_1' \sum_{a=13}^{21} N_{ast}^{En} I_{st}^{SIL}$$

$$- \gamma_0 \sum_{a=22}^{64} N_{ast}^{Ex} - \gamma_1 \sum_{a=22}^{64} a N_{ast}^{Ex} - \gamma_2 \sum_{a=22}^{64} a^2 N_{ast}^{Ex}$$

$$- \beta_1 I_{st}^{SIL} \sum_{a=22}^{64} N_{ast}^{Selected} - \sum_{j=0}^{9+} \lambda_j J_{st}^{j} \sum_{a=22}^{64} N_{ast}^{Surprised}$$

$$+ \Gamma X_{st} + \epsilon_{st}. \tag{9}$$

Because the exit cohorts are imputed from lagged crime rates (relative to the dependent variable), we follow the dynamic panel data literature (Anderson and Hsiao, 1982) and use lagged variables $N_{as,t+1}^{Ex}$, $N_{as,t+1}^{Selected}$ and $N_{as,t+1}^{Surprised}$ as instruments for all exit cohorts in the model by assuming that crime rates $C_{st}$ follow an $AR(1)$ process. We then estimate Equation 9 with two stage least squares (OLS estimates also reported in Appendix A.4).

Table III presents estimates of different specifications of SIDD, with and without aging and floodgate effects, on the total violent crimes. The first column shows results for the baseline model in Equation 7, which includes the three SIDD effects - direct entry effect, surprise effect, and selection effect - as well as the base entry and exit rates. We report a selected few parameters of interest and sign the relevant parameters of SIDD with respect to the deterrence hypothesis. Notably, the signs of the estimated direct entry effect ($\alpha_1'$) and selection effect ($\beta_1$) contradict those predicted under the deterrence hypothesis. The two signs are nonetheless internally consistent within the dynamic framework - more entry into violent crimes after SIL passages leads to higher churning rate out of the criminal force years later when it comes to the exit of these marginal criminals, resulting in a labor force shakeout. The surprise effect, is estimated to increase exit rates in the post-SIL era for cohorts who became criminals before SIL passages. The older incumbent cohorts were shocked negatively by SIL passages despite positive reactions of the potential entrants. We thus only find evidence on partial deterrence of SILs on the incumbent criminals.

We now discuss the magnitudes of the estimated coefficients in the baseline model in light of the unobservable crime intensity $\kappa$. Recall that from Section 3.4 once we multiply Equation 4 through by $\kappa$, we now identify parameters $\beta_i$'s but only $\alpha_i' = \kappa \alpha_i$ as well as $\frac{\alpha_1 - \alpha_0}{\alpha_0} = \frac{\alpha_1' - \alpha_0'}{\alpha_0'}$. Therefore, the

baseline SIDD estimates a roughly 18% increase in entry probability from males between 13-21 into violent criminals due to the adoption of SIL. This is equivalent to a 0.04 percentage points increase on top of a base 0.2% entry probability if we interpret the estimated coefficient of the imprisoned rate as $\kappa \approx 9.4$[10]. However, with the lower entry barrier into violent criminals after SIL passages, we also estimate that those who became violent criminals after SIL passages are almost 50% more likely to exit in a given year than the base rate before SIL passages (selection effect). Finally, those who became violent criminals before SIL passages are 20% more likely to exit in a given year due to SIL passages (surprise effect).

Column 2 relaxes the fixed base exit rate assumption by introducing aging effects. We find strong evidence supporting life cycle effects on exit rates for violent criminals. The resulting parabola of exit rates constructed from these estimates suggests the lowest exit rate around age 34, consistent with a theory of countervailing physical condition life-cycle and human capital accumulation. All estimated SIDD coefficients stay statistically unchanged from the baseline model except for the selection effect. This is not surprising as the previously estimated selection effect is an artifact of the much younger selected cohort, which is now accounted for by the aging effects.

On the other hand, Column 3 relaxes the surprise effect to be flexible over time with floodgate effects. The estimated SIDD coefficients (except that of surprise effect) again stay statistically unchanged from the baseline model. Consistent with an underlying dynamic model, the floodgate effect is estimated to be largest in the immediate years following passages of SILs and taper off as time goes by. Note that we non-parametrically estimate the surprise effect by each year succeeding SIL passages and thus obtain less precise estimates for later years. We however refuse the temptation of re-running the regressions with ex-post cutoffs for grouping post-SIL years but only report such results in Table A.3 (Appendix A.3) for robustness.

Finally, we combine aging and floodgate effects and arrive at our preferred SIDD specification, as in Equation 9, presented in Column 4 of Table III. The estimated coefficient $\alpha_i$'s suggest that SIL increases entry probability of young males between 13 and 21 into violent criminals by 43% or 0.04 percentage points on top of a base 0.1% entry rate. The estimated coefficient $\beta_i$'s suggest that

---

[10]The inclusion of imprisoned and released population does not affect the rest of the coefficient estimates.

1) SIL passages surprise existing criminals who would have an increase of 11 percentage points in exit rate in the year SIL goes into effect and an increase of about 5 percentage points 5 years later; and 2) new criminals selected by SIL passages on average have a higher exit rate by 13 percentage points in a given year than the base rate before SIL passages.

With the SIDD estimates in hand, we now turn to a series of formal hypothesis and specification tests. Table IV presents the results, where we compare across the four SIDD specifications from Table III. First, when applicable, the estimated parabola of exit rates bottoms out at age 34 and is precisely estimated. Second, while individual floodgate effects (especially in later years) can be noisily estimated, we show that the aging effects and floodgate effects are both jointly statistically significant. Third, we turn to testing the deterrence hypothesis put force by LM. As is evident from the individual estimates of the SIDD parameters, the one-sided tests in Table IV formally rejects the deterrence hypothesis that $\alpha_1 < 0$, $\beta_1 < 0$, and $\beta_2 > 0$. Finally, we test the model restrictions that reduce SIDD to a standard DiD, as discussed in Section 2.2. Specifically, we test two conditions: 1) there is a homogenous effect on exit rate from SIL passages for violent criminals who entered before and after, i.e. $\beta_1 = \beta_2 = \beta_*$; and 2) there is a homogenous impact of SILs between potential entrants and exitors, i.e. $\alpha_0 = -\beta_0$ and $\alpha_1 = -\beta_*$. Note that in SIDD specifications where we specify floodgate effects in place of the surprise effect, we also change the conditions $\beta_1 = \beta_2 = \beta_*$ and $\alpha_1 = -\beta_*$ to $\beta_1 = \lambda_j, \forall j$ and $-\alpha_1 = \beta_1 = \lambda_j, \forall j$, respectively; with aging effects, we change replace the condition $\alpha_0 = -\beta_0$ with $\alpha_0 = -\gamma_0$ and $\gamma_1 = \gamma_2 = 0$. The resulting tests are shown at the bottom of Table III, which overall strongly reject the DiD specification. In particular, the differential impacts of SILs on criminals' exits by those who began their careers before and after the advent of SIL are most evident in our preferred specification, while the differential impacts of SILs between potential entrants and exitors are strong across all specifications.

## 4.2    Preferred SIDD Specification by Crime Types

We have so far estimated SIDD on the total violent crimes. To further evaluate effects of SIL on specific types of violent crimes, we now compare SIDD estimates across sub-categories of violent crime. Table V shows the results of our preferred SIDD specification estimated on murder, rape, robbery, and aggravated assault, with total violent crimes presented again for comparison. We first note that the SIDD estimates are consistent in signs (except imprecisely estimated parameters)

across the four sub-categories and the total violent crime, suggesting similar impact of SIL on different types of violent crimes. Specifically, we find SILs to reduce the barrier of entry for potential entrants of robbery. Consistent with easier entry, we find the post-SIL selected violent criminals to have higher exit rates, though less precisely estimated for the sub-categories than for the total violent crime. The impacts of SIL on those who began their careers before the advent of SIL are also consistent across crime types, although only statistically significant for robbery. The dynamic floodgate effects are, however, present in all sub-categories of violent crime, as depicted in Figure B.6. Figure B.6 plots the floodgate effects over time against the estimated selection effect (leftmost) for each crime type. Positive (especially if larger than the surprise effects) selection effects are evidence against the deterrence hypothesis, while the differences between surprise and selection effects would also imply misspecification of a DiD. We defer the formal tests of these arguments to later. Finally, the significant estimates of robbery compared the other three sub-categories of violent crime confirms our prior that robbery is most likely to be rationally planned ahead and thus affected by the advent of SIL.

We again formally test the deterrence hypothesis and SIDD and DiD specifications for each crime type, shown in Table VI. First, ages for lowest exit rates are similar across crime types, with murder being highest and rape and aggravated assault lowest. Second, both aging and floodgate effects are jointly significant across all crime types but murder. Third, while we find strongest evidence for robbery, there is suggestive evidence that SIL lowers the barrier of entry into murder and aggravated assault to reject the deterrence hypothesis as well. Finally, across the sub-categories of violent crimes, we find strong evidence in both differential impacts of SILs on selected and surprised cohorts as well as differential impacts of SILs between potential entrants and exitors for every crime type (with one exception in murder) to reject a standard DiD specification.

## 4.3   DiD vs SIDD

Our estimates have so far shown that the data rejects model restrictions that reduce SIDD down to a standard DiD. In this section, we further explore features in the data that drive the time-inconsistent estimates of DiD we see in the literature (Section 3.3) as they relate to the theory of SIDD. Results in Table VI show that there are differential impacts of SILs between potential entrants and exitors as well as between those who began their careers before and after the advent

Exhibit D
Page 259

of SIL. We now explore these differential effects might systematically evolve over time and manifest themselves potentially in the time-inconsistent DiD estimates we see.

Expanding on our previous Florida example, Figure I plots the evolutions of average cohort sizes of potential entrants, exitors, selected criminals, and surprised criminals across states over time. As discussed in Section 2.3, these cohort dynamics would dictate the overall impact of SILs on crimes, especially in the transitional years before a new equilibrium establishes. Specifically, while the potential entrant cohort (solid line) measures male population between 13-21 and is thus flat over time, the entry effect - potential entrant cohort interacted with SIL passages (double solid line) - grows over time as more states adopt SILs. The exitor cohort exhibits a more nuanced story. The surprised cohort (dotted line) first increases as more states adopt SILs and then starts decreasing in late 1990's as the older criminal cohort exit without being replenished. On the other hand, the selected cohort (dashed line) keeps gradually increasing as more states adopt SILs and more new criminals having entered under SILs. Finally, note that the total exit cohort (dash-dotted line) is not the sum of the selected and surprised cohorts nationally as states adopt SILs at different times and some states never do so.

We also indicate by the two vertical lines the end of the samples used in LM and AD, respectively. Thus, by Figure I, we postulate the shorter LM sample ends right after a wave of SIL adoptions in early 1990's and the overall DiD estimate of SIL impact on crimes is dominated by a large surprise (floodgate) effect and small entry and selection effect. On the other hand, the longer AD sample ends much later when the floodgate effects taper off and the surprised cohort starts shrinking while entry and selection effect start kicking in. These changing dynamics would convolute the standard DiD - a weighted average with assumed constant weights - estimated on such different samples, while SIDD could achieve time-consistent estimates by properly accounting for these dynamics.

To provide more direct evidence, we re-run our analysis using LM's and AD's samples and compare SIDD estimates to DiD estimates run in parallel. Table VII first summarizes average cohort sizes depicted in Figure I as fractions of total population at risk (for violent crimes), per notation in Section 2.3. DiD specifications are estimated on both levels and changes in violent crimes as follows:

$$C_{st} = \alpha + \beta I_{st}^{SIL} + \Gamma X_{st} + \epsilon_{st},$$

and

$$\Delta_{st}^{C} = \alpha' + \beta' I_{st}^{SIL} + \Gamma' X_{st} + \epsilon_{st}',$$

where the dependent variable is the level of and change in total violent crimes, respectively, and $X_{st}$ includes the same set of controls as in our preferred SIDD specification in Equation 9. Note that, other than the more robust modifications made to LM and AD in Section 3.3, we also include in the controls prison admissions and releases to be comparable to the SIDD estimates[11]. Results are shown in the middle panel of Table VII. Much as debated in the literature and claimed in National Research Council (2005), we find imprecisely estimated coefficients of the DiD model with no consistency in signs over different lengths of samples. On the other hand, the bottom panel of Table VII shows that, teasing apart the three effects convoluting the DiD estimates - entry, selection and surprise effects - the SIDD estimates are much more precisely estimated with the same data as the DiD but also consistent over different lengths of samples[12]. In the shortest sample (1980-1992), SIDD also struggles to precisely pin down the entry, selection and surprise effects and attribute variations in crime rates mostly to the base entry and exit rates. Nonetheless, SIDD consistently estimates the entry, selection, and surprise effects across all samples, which yield the most important policy implications, as we now turn to in the next section.

## 4.4   Counterfactual Policy

Concealed carry policies in the U.S. have drawn considerable public attention in the past decades. By 2010, 39 states have SILs in effect. In this section, we consider a policy that would mandate the remaining 11 states[13] and Washington, D.C. to adopt SILs in 2010. While such blanket policy might be too strong to be realistic, a weaker but closely stated policy–the Concealed Carry Reciprocity Act

---

[11]The estimates of the DiD-in-levels specification for the 1980-1992 sample and the 1980-1999 sample are hence slightly different from those in Column 6 of Table B.3 and Table B.4, respectively.

[12]Different from our preferred SIDD specification, here we estimate the baseline SIDD model and with OLS to be comparable to the DiD estimates.

[13]California, Delaware, Hawaii, Iowa, Illinois, Massachusetts, Maryland, New Jersey, New York, Rhode Island, and Wisconsin.

of 2017–was recently proposed and passed the House in December 2017.[14] The CCRA mandates each state to recognize concealed carry gun permits of all other states.[15] In what follows, we evaluate, using our SIDD estimates, impacts of SIL adoptions on violent crimes in the 11 states and Washington, D.C.

Specifically, Equation 10 describes our counterfactual predictions for changes in violent crimes in the first year of SIL adoption. Aside from the base entry and exit rates, which remain unchanged, new SIL passage turns on the entry effect as well as the surprise effect (both bolded in Equation 10) with the first floodgate year $\lambda_0$. Note that there is no selection effect in the first year as all existing criminals have entered before the counterfactual SIL passage. By the same logic, the surprised

---

[14]See "H.R.38 - Concealed Carry Reciprocity Act of 2017," CONGRESS.GOV, https://www.congress.gov/bill/115th-congress/house-bill/38 and "House Votes to Sharply Expand Concealed-Carry Gun Rights," The New York Times, December 6th, 2017, https://www.nytimes.com/2017/12/06/us/politics/house-concealed-carry-guns-nra-reciprocity.html, accessed December 25th, 2017.

[15]This means that states with much stricter gun laws like New York and California would need to accommodate concealed carry by holders of permits approved by states with much looser gun laws. While the CCRA is not intended to enforce SIL adoptions across states, it could however effectively change people's perception of whether other people are carrying guns and their evaluations of costs and benefits of being violent criminals—what LM originally claimed as the mechanism for the deterrence hypothesis. Nonetheless care should be taken and our results could be interpreted as an upper bound of CCRA's impact on violent crimes.

cohort is composed of all existing criminals, i.e., $N_{ast}^{Surprised} = N_{ast}^{Ex}$.

$$\hat{\Delta}_{st}^{C} = \hat{\alpha}_0' \sum_{a=13}^{21} N_{ast}^{En} + \hat{\alpha}_1' \sum_{a=13}^{21} \mathbf{N_{ast}^{En}} \mathbf{I_{st}^{SIL}}$$

$$- \hat{\gamma}_0 \sum_{a=22}^{64} N_{ast}^{Ex} - \hat{\gamma}_1 \sum_{a=22}^{64} a N_{ast}^{Ex} - \hat{\gamma}_2 \sum_{a=22}^{64} a^2 N_{ast}^{Ex}$$

$$- \hat{\lambda}_0 \mathbf{I_{st}^0} \sum_{a=22}^{64} \mathbf{N_{ast}^{Surprised}}$$

$$+ \hat{\Gamma} X_{st} \tag{10}$$

Overall, even in the very short-term (one year), we find there to be over 4,000 more violent crimes across the 11 states and Washington, D.C., which amounts to a roughly 1% increase in violent crimes in 2010. However, Figure II shows large heterogeneity across states—in the short run, SIL passages would increase violent crimes for 9 states (California, Hawaii, Iowa, Illinois, Massachusetts, New Jersey, New York, Rhode Island, and Wisconsin) and decrease for 3 (Washington, D.C., Delaware, and Maryland). In particular, California could see an increase of 1,500 violent crimes in one year (top panel, Figure II), while Rhode Island and Wisconsin's violent crimes increase by 5% (bottom panel, Figure II).

We further decompose the overall predicted changes in crimes into our SIDD effects in Figure III. Note that since we are focusing on short-run (one year) impacts of SILs in this exercise, the overall effect is composed of entry and surprise effects only as there are no new criminals who have begun their careers after SIL yet. Moreover, in context of the floodgate effects, all of the existing criminals experience the surprise effect in the first year with $\lambda_0$. Figure III shows that the overall effect of SIL is a net effect of the offsetting entry and surprise effects in the first year of SIL passage. These effects vary across states and could result in an initial dip in total crime levels. As time passes by, the surprise effect tapers off while the entry effect generally dominates the selection effect, we could see those states with an initial dip having higher levels of crimes than what they started with.

# 5   Conclusions

In this paper, we propose a new model that generalizes the intrinsically static differences-in-differences (DiD) approach in evaluating impacts of policy or regime changes. Our model is motivated by the observation that many DiD studies with different lengths of samples exhibit *seemingly inextricable dynamic differences (SIDD)* and that underlying decision makers are heterogeneous and forward-looking. According to basic dynamic insights, such scenarios arise when the regime shift of interest impacts continuation values of a heterogeneous flow in and out of a stock, while the policymakers are typically interested in the overall effect of the policy on the stock. This overall effect exhibits the time-varying pattern as it is initially dominated by a direct entry effect and surprise exit effect from existing stocks that entered under the old regime, and a third selection effect kicks in later on as new stocks that entered under the new regime would have a different exit rate. Such dynamics would settle down into a steady state when all the old stocks are depleted and a new equilibrium thus establishes. While levels of stock in the new equilibrium may seem to be of primary interest to policymakers, we think the transitional era is also important to understand as it could very often take decades before the new equilibrium establishes.

The SIDD model accounts for these dynamic insights by providing proper levels of aggregation and is thus suitable for the often available state/county panel data. Specifically, we make distinctions between three cohorts among the whole population as risk (as it relates to the stock): 1) a cohort of potential entrants (entry effect); 2) a cohort of existing stock that entered under the new regime (selection effect); and 3) a cohort of existing stock that entered under the old regime (surprise effect). Signing the three distinct effects can be used to test a variety of different efficacy metrics of the policy. Restricting the three effects to be the same would reduce the SIDD model to a standard DiD and thus produces the corresponding DiD specification test. Finally, putting the three effects together can provide counterfactual analysis of policy experiments to uncover unbiased overall effect for any duration of post-treatment time.

We apply the SIDD model to the setting of concealed carry laws and violent crimes. Specifically, we are interested in the effect of shall-issue laws (SILs) on violent crimes. This question is of considerable policy importance and urgency, and the academic literature, when applying DiD on state/county panel data, reaches no consensus. Our estimates suggest that, although existing

violent criminals who began their careers before the advent of SILs were surprised and exhibited higher exit rates (surprise effect), SILs lowered the barrier of entry for new criminals (entry effect) and dominates the overall effect even though these new criminals also have higher exit rates (selection effect). These estimates are significant, time-consistent, and strongly rejects Lott and Mustard (1997)'s famous deterrence hypothesis. The three effects are also significantly different from each other to reject the DiD being a plausible model.

To further analyze the overall impact of adopting SILs, with our SIDD model and estimates we conduct a counterfactual policy experiment that passes SILs across all states in 2010. This policy is in spirit similar to the recently proposed Concealed Carry Reciprocity Act (CCRA) of 2017, which requires on a federal level states to recognize concealed carry permits from all other states. This proposal has just passed the House by December 2017 and spurred a fair amount of public debate. We estimate that, by passing SILs in all 11 remaining states and Washington, D.C. in 2010, this policy would increase total violent crimes by over 4,000 in 2010 alone and plausibly many more over time. We also find significant heterogeneity across states and a by-product of higher churning rate in and out of violent crimes.

Finally, we think the SIDD model has much broader use beyond the crime setting, suitable for any analysis of regime changes concerning flows in and out of stocks. For example, marriage and divorce is another suitable setting for applying SIDD[16] as divorce law changes affect divorce costs and thus continuation values of marriages. As Wolfers (2006) points out, the dynamic responses of divorce rates after changes in divorce laws are salient but still puzzling. The SIDD model offers a micro-founded explanation for these dynamic patterns and yields straightforward policy implications.

---

[16]See Iyvarakul, McElroy and Staub (2011) for another similar SIDD application in the marriage setting.

# References

Anderson, Theodore W. and Cheng Hsiao. 1982. "Formulation and Estimation of Dynamic Models Using Panel Data." *Journal of Econometrics* 18(1):47–82.

Ayres, Ian and John J. Donohue. 2003*a*. "The Latest Misfires in Support of the More Guns, Less Crime Hypothesis." *Stanford Law Review* 55(4):1371–1398.

Ayres, Ian and John J. Donohue. 2003*b*. "Shooting Down the More Guns, Less Crime Hypothesis." *Stanford Law Review* 55(4):1193–1312.

Ayres, Ian and John J. Donohue. 2009. "Yet Another Refutation of the More Guns, Less Crime Hypothesis–With Some Help from Moody and Marvell." *Econ Journal Watch* 6(1):35–59.

Bartley, William Alan and Mark A. Cohen. 1998. "The Effect of Concealed Weapons Laws: An Extreme Bound Analysis." *Economic Inquiry* 36(2):258–265.

Benson, Bruce L. and Brent D. Mast. 2001. "Privately Produced General Deterrence." *The Journal of Law and Economics* 44(2):725–746.

Bertrand, Marianne, Esther Duflo and Sendhil Mullainathan. 2004. "How Much Should We Trust Differences-in-Differences Estimates?" *The Quarterly Journal of Economics* 119(1):249–275.

Black, Dan A. and Daniel S. Nagin. 1998. "Do Right-to-Carry Laws Deter Violent Crimes?" *The Journal of Legal Studies* 27(1):209–219.

Bronars, Stephen G. and John R. Lott. 1998. "Criminal Deterrence, Geographic Spillovers, and the Right to Carry Concealed Handguns." *The American Economic Review* 88(2):475–479.

Dezhbakhsh, Hashem and Paul H. Rubin. 1998. "Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime." *The American Economic Review* 88(2):468–474.

Donohue, John J. 2003. *The Impact of Concealed-Carry Laws.* The Brookings Institution, Washington, DC.

Donohue, John J. 2009. "More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006." *Econ Journal Watch* 6(2):218–238.

Donohue, John J., Abhay Aneja and Kyle D. Weber. 2017. "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis." *NBER Working Paper* .

Duggan, Mark. 2001. "More Guns, More Crime." *Journal of Political Economy* 109(5):1086–1114.

Duwe, Grant, Tomislav Kovandzic and Carlisle E Moody. 2002. "The Impact of Right-to-Carry Concealed Firearm Laws on Mass Public Shootings." *Homicide Studies* 6(4):271–296.

Gormley, Todd A. and David A. Matsa. 2011. "Growing out of Trouble: Corporate Responses to Liability Risk." *Review of Financial Studies* 24(8):2781–2821.

Grambsch, Patricia. 2008. "Regression to the Mean, Murder Rates, and Shall-Issue Laws." *The American Statistician* 62(4):289–295.

Helland, Eric and Alexander Tabarrok. 2004. "Using Placebo Laws to Test 'More Guns, Less Crime'." *Advances in Economic Analysis & Policy* 4(1).

Hirschi, Travis and Michael Gottfredson. 1983. "Age and the Explanation of Crime." *The American Journal of Sociology* 89(3):552–584.

Iyvarakul, Tongyai, Marjorie B. McElroy and Kalina Staub. 2011. "Dynamic Optimization in Models for Panel Data: A Cohort Panel Data Model of the Effects of Divorce Laws on Divorce Rates." Working paper.

Kovandzic, Tomislav V. and Thomas B. Marvell. 2003. "Right-to-Carry Concealed Handguns and Violent Crime: Crime Control Through Gun Decontrol?" *Criminology & Public Policy* 2(3):363–396.

Kovandzic, Tomislav V., Thomas B. Marvell and Lynne M. Vieraitis. 2005. "The Impact of 'Shall-Issue' Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities." *Homicide Studies* 9(4):292–323.

Lott, John R. 2010. *More Guns, Less Crime.* University of Chicago Press.

Exhibit D
Page 267

Lott, John R. and William M. Landes. 1999. "Multiple Victim Public Shootings, Bombings, and Right-to-Carry Concealed Handgun Laws: Contrasting Private and Public Law Enforcement." *Mimeo* .

Lott, Jr, John R. 1998. "The Concealed-Handgun Debate." *The Journal of Legal Studies* 27(1):221–243.

Lott, Jr, John R. and David B. Mustard. 1997. "Crime, Deterrence and Right-to-Carry Concealed Handguns." *Journal of Legal Studies* 26(1):1–68.

Ludwig, Jens. 1998. "Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data." *International Review of Law and Economics* 18(3):239–254.

Manski, Charles F. and John V. Pepper. 2017. "How Do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions." *Review of Economics and Statistics* forthcoming.

McElroy, Marjorie B. and Peichun Wang. 2017. "Seemingly Inextricable Dynamic Differences: The Case of Entry and Exit in Panels of Averages." *Mimeo* .

Moody, Carlisle E. 2001. "Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness." *The Journal of Law and Economics* 44(2):799–813.

Moody, Carlisle E. and Thomas B. Marvell. 2008. "The Debate on Shall-Issue Laws." *Econ Journal Watch* 5(3):269–293.

Moody, Carlisle E. and Thomas B. Marvell. 2009. "The Debate on Shall Issue Laws, Continued." *Econ Journal Watch* 6(2):203–217.

Mustard, David B. 2001. "The Impact of Gun Laws on Police Deaths." *The Journal of Law and Economics* 44(S2):635–657.

National Research Council, NAS. 2005. *Firearms and Violence: A Critical Review.* National Academies Press.

Neal, Derek and Armin Rick. 2014. "The Prison Boom and the Lack of Black Progress after Smith and Welch." *NBER working paper* .

Plassmann, Florenz and John Whitley. 2003. "Confirming 'More Guns, Less Crime'." *Stanford Law Review* pp. 1313–1369.

Plassmann, Florenz and T. Nicolaus Tideman. 2001. "Does the Right to Carry Concealed Handguns Deter Countable Crimes?  Only a Count Analysis Can Say." *Journal of Law and Economics* 44:771–798.

Rubin, Paul H. and Hashem Dezhbakhsh. 2003. "The Effect of Concealed Handgun Laws on Crime: Beyond the Dummy Variables." *International Review of Law and Economics* 23(2):199–216.

Wolfers, Justin. 2006. "Did Unilateral Divorce Laws Raise Divorce Rates?  A Reconciliation and New Results." *The American Economic Review* 96(5):1802–1820.

Exhibit D
Page 269

**Table I:** Effects of SILs on Criminal Careers

| Cohorts | Before SIL $I_{st}^{SIL} = 0$ | After SIL $I_{st}^{SIL} = 1$ |
|---|---|---|
| *Entry* $N_{st}^{En}$ | $\alpha_0$ | $\alpha_0 + \alpha_1$ |
| *Exit* $N_{st}^{Selected}$ $N_{st}^{Surprised}$ | $\beta_0$ $\beta_0$ | $\beta_0 + \beta_1$ $\beta_0 + \beta_2$ |
| *Net Entry* $N_{st}^{Ex} = N_{st}^{Selected} + N_{st}^{Surprised}$ | $\alpha_0 N_{st}^{En} - \beta_0 N_{st}^{Ex}$ | $(\alpha_0 + \alpha_1)N_{st}^{En} - \beta_0 N_{st}^{Ex}$ $-\beta_1 N_{st}^{Selected} - \beta_2 N_{st}^{Surprised}$ |

$$\alpha_0 N_{st}^{En} + \alpha_1 I_{st}^{SIL} N_{st}^{En} - \beta_0 N_{st}^{Ex} - \beta_1 I_{st}^{SIL} N_{st}^{Selected} - \beta_2 I_{st}^{SIL} N_{st}^{Surprised}$$

Notes: Breakdown of the SIDD into entry and exit, before and after SIL. Multiplying cohort sizes in column 1 with average effects in columns 2 & 3 yields the respective contributions of each cohort to the total effect of SILs on criminal careers. Summing across rows then gives the total effect, or equivalently, our SIDD.

35

**Table II:** Evolutions of Criminal Cohorts

| Impacts on Criminal Cohorts | Before Passage Old Equilibrium | At Passage | After Passage | |
|---|---|---|---|---|
| | | | Transition Years | New Equilibrium |
| | $t < t^*$ | $t = t^*$ | $t^* < t < t^{**}$ | $t \geq t^{**}$ |
| $s_{st^*}^{*Surprised}\beta_2$ | 0 | $\beta_2$ | $0 < s_{st}^{*Surprised}\beta_2 < \beta_2$ | 0 |
| $s_{st^*}^{*Selected}\beta_1$ | 0 | 0 | $0 < s_{st}^{*Selected}\beta_1 < \beta_1$ | $\beta_1$ |

Notes: Exit cohort sizes and contributions to the total effect over time. Cohorts are normalized by the total exit cohort size $N_{st}^{Ex}$.

**Table III:** SIDD Specification Comparisons

| | (1)<br>Baseline | (2)<br>w/ Aging | (3)<br>w/ Floodgate | (4)<br>w/ Both |
|---|---|---|---|---|
| Entry $\alpha_0'$ | 0.0226** | 0.0092 | 0.0246*** | 0.0127 |
| | (0.0126) | (0.3531) | (0.0059) | (0.1973) |
| SIL Entry $\alpha_1'$ (-) | 0.0040*** | 0.0063*** | 0.0035** | 0.0055*** |
| | (0.0080) | (0.0013) | (0.0112) | (0.0098) |
| Exit $\beta_0$ | 0.5860*** | | 0.5815*** | |
| | (0.0000) | | (0.0000) | |
| Exit $\gamma_0$ | | 59.6538*** | | 60.1104*** |
| | | (0.0050) | | (0.0044) |
| Exit $\gamma_1$ | | -3.6894*** | | -3.7184*** |
| | | (0.0039) | | (0.0034) |
| Exit $\gamma_2$ | | 0.0540*** | | 0.0544*** |
| | | (0.0027) | | (0.0024) |
| Selection $\beta_1$ (-) | 0.2421* | -0.0908 | 0.3505** | 0.1283* |
| | (0.0692) | (0.4327) | (0.0275) | (0.0928) |
| Surprise $\beta_2$ (+) | 0.1047*** | 0.1226** | | |
| | (0.0014) | (0.0109) | | |
| Floodgate $\lambda_0$ (+) | | | 0.1004*** | 0.1063** |
| | | | (0.0009) | (0.0267) |
| Floodgate $\lambda_1$ (+) | | | 0.0832** | 0.0935** |
| | | | (0.0316) | (0.0494) |
| Floodgate $\lambda_2$ (+) | | | 0.0984*** | 0.0979 |
| | | | (0.0046) | (0.1295) |
| Floodgate $\lambda_3$ (+) | | | 0.0909*** | 0.0844 |
| | | | (0.0050) | (0.1912) |
| Floodgate $\lambda_4$ (+) | | | 0.0826** | 0.0761 |
| | | | (0.0160) | (0.2783) |
| Floodgate $\lambda_5$ (+) | | | 0.0569 | 0.0485 |
| | | | (0.1346) | (0.5588) |
| Floodgate $\lambda_6$ (+) | | | 0.0561 | 0.0508 |
| | | | (0.2063) | (0.6086) |
| Imprisoned $\kappa_0$ | -9.4222*** | -12.5397*** | -9.3944*** | -12.5419*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) |
| Released $\kappa_1$ | 13.8232*** | 11.2368*** | 13.7189*** | 11.0485*** |
| | (0.0000) | (0.0003) | (0.0000) | (0.0002) |
| Log-likelihood | -7669 | -7675 | -7664 | -7661 |
| F-statistic | 152.2 | 134.4 | 119.4 | 131.0 |
| Nb. Obs | 1549 | 1549 | 1549 | 1549 |

Notes: All regressions are run on the total violent crimes. Arrest rates of violent crimes, demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). Key coefficients relevant for testing the deterrence hypothesis are signed in parentheses. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

**Table IV:** Hypothesis and Specification Tests: SIDD Specifications (Table III)

| | (1) Baseline | (2) w/ Aging | (3) w/ Floodgate | (4) w/ Both |
|---|---|---|---|---|
| Turning point | | 34.2*** | | 34.2*** |
| | | (0.0000) | | (0.0000) |
| *Joint significance tests* | | | | |
| Aging ($\gamma$'s) | | 17.99*** | | 17.57*** |
| | | (0.0001) | | (0.0002) |
| Floodgates ($\lambda$'s) | | | 30.39*** | 35.18*** |
| | | | (0.0007) | (0.0001) |
| *Deterrence hypothesis tests* | | | | |
| $\alpha_1 < 0$ | 0.0040*** | 0.0063*** | 0.0035*** | 0.0055*** |
| *(one-sided)* | (0.0040) | (0.0007) | (0.0056) | (0.0049) |
| $\beta_1 < 0$ | 0.2421** | -0.0908 | 0.3505** | 0.1283** |
| *(one-sided)* | (0.0346) | (0.7837) | (0.0138) | (0.0464) |
| $\beta_2 > 0$ | 0.1047 | 0.1226** | 0.0418 | 0.0425 |
| *(one-sided)* | (0.9993) | (0.9946) | (0.9987) | (0.9507) |
| *Diff-in-diff nested specification tests* | | | | |
| (1) $\beta_1 = \lambda_j, \forall j$ | 1.05 | 3.08* | 16.67* | 24.66*** |
| | (0.3046) | (0.0794) | (0.0819) | (0.0060) |
| (2) $\alpha_0 = -\beta_0$ | 50.94*** | 315.90*** | 51.08*** | 311.97*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) |
| (3) $-\alpha_1 = \beta_1 = \lambda_j, \forall j$ | 12.41*** | 7.61** | 30.46*** | 44.31*** |
| | (0.0020) | (0.0223) | (0.0013) | (0.0000) |
| (2) & (3) | 71.30*** | 339.54*** | 124.23*** | 560.05*** |
| | (0.0000) | (0.000) | (0.0000) | (0.0000) |

Notes: Age of the turning point, F-statistics for the joint significance tests, point estimates of the SIDD parameters, and F-statistics for the DiD tests are shown. For specifications with floodgate effects, we replace $\beta_2$ with the weighted cumulative surprise effect of the first five floodgate effects, i.e. $\sum_{j=0}^{4} \lambda_j \frac{\sum_i I_{st}^{ij}}{\sum_{i,j} I_{st}^{ij}} > 0$. One-sided $p$ values are in parentheses for the deterrence hypothesis tests. Two-sided $p$ values are in parentheses for the rest. *, **, and *** indicate one-sided (deterrence hypothesis tests) and two-sided (rest) statistical significance at 10, 5, and 1 percent level. Condition (1) is replaced with $\beta_1 = \beta_2$ in Columns 1 and 2. Condition (2) is replaced with $\alpha_0 = \gamma_0$ and $\gamma_1 = \gamma_2 = 0$ in Columns 2 and 4. Condition (3) is replaced with $-\alpha_1 = \beta_1 = \beta_2$ in Columns 1 and 2.

**Table V:** SIDD with Aging and Non-Parametric Floodgate Effects: Crime Types

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
|  | Violent | Murder | Rape | Robbery | Agg. Ast. |
| Entry $\alpha_0'$ | 0.0127 | 0.0004** | 0.0009 | 0.0107** | 0.0088 |
|  | (0.1973) | (0.0274) | (0.2623) | (0.0413) | (0.1511) |
| SIL Entry $\alpha_1'$ (-) | 0.0055*** | 0.0001 | -0.0001 | 0.0014** | 0.0015 |
|  | (0.0098) | (0.1365) | (0.5425) | (0.0309) | (0.1645) |
| Exit $\gamma_0$ | 60.1104*** | 17.2929** | 15.7054* | 136.2461*** | 15.3286*** |
|  | (0.0044) | (0.0217) | (0.0508) | (0.0001) | (0.0016) |
| Exit $\gamma_1$ | -3.7184*** | -0.8931* | -1.0993** | -8.4225*** | -1.0516*** |
|  | (0.0034) | (0.0886) | (0.0204) | (0.0001) | (0.0002) |
| Exit $\gamma_2$ | 0.0544*** | 0.0106 | 0.0183*** | 0.1239*** | 0.0172*** |
|  | (0.0024) | (0.2111) | (0.0069) | (0.0000) | (0.0000) |
| Selection $\beta_1$ (-) | 0.1283* | 0.0879 | 0.2263 | 0.5960 | 0.0114 |
|  | (0.0928) | (0.8692) | (0.3380) | (0.1038) | (0.8680) |
| Floodgate $\lambda_0$ (+) | 0.1063** | 0.1280 | -0.0317 | 0.1960* | 0.0331 |
|  | (0.0267) | (0.2484) | (0.5190) | (0.0562) | (0.3795) |
| Floodgate $\lambda_1$ (+) | 0.0935** | 0.1508 | -0.0219 | 0.1939** | 0.0211 |
|  | (0.0494) | (0.2163) | (0.7074) | (0.0135) | (0.5573) |
| Floodgate $\lambda_2$ (+) | 0.0979 | 0.0886 | 0.0076 | 0.1641 | 0.0378 |
|  | (0.1295) | (0.3869) | (0.9029) | (0.1439) | (0.3748) |
| Floodgate $\lambda_3$ (+) | 0.0844 | 0.1682 | -0.0667 | 0.2050 | 0.0147 |
|  | (0.1912) | (0.2040) | (0.4325) | (0.1564) | (0.7065) |
| Floodgate $\lambda_4$ (+) | 0.0761 | 0.1259 | -0.0685 | 0.1994 | 0.0079 |
|  | (0.2783) | (0.1297) | (0.3344) | (0.2052) | (0.8527) |
| Floodgate $\lambda_5$ (+) | 0.0485 | 0.1020 | -0.0559 | 0.1473 | -0.0059 |
|  | (0.5588) | (0.4261) | (0.4712) | (0.4535) | (0.9087) |
| Floodgate $\lambda_6$ (+) | 0.0508 | 0.0890 | -0.0559 | 0.1570 | -0.0184 |
|  | (0.6086) | (0.3893) | (0.4939) | (0.5219) | (0.7669) |
| Imprisoned $\kappa_0$ | -12.5419*** | 1.6440 | 0.8868 | -7.6805*** | -9.1950** |
|  | (0.0000) | (0.2974) | (0.6568) | (0.0000) | (0.0104) |
| Released $\kappa_1$ | 11.0485*** | 0.2360 | -1.3856 | 7.1060*** | 9.1661** |
|  | (0.0002) | (0.3818) | (0.5032) | (0.0002) | (0.0207) |
| Log-likelihood | -7661 | -2271 | -4012 | -6816 | -7082 |
| F-statistic | 131.0 | 720.2 | 73.5 | 217.1 | 120.8 |
| Nb. Obs | 1549 | 1548 | 1547 | 1546 | 1549 |

Notes: Arrest rates (of corresponding crime categories), demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). The F-statistics test for the joint significance of all estimated coefficients and reject the null (all coefficients are equal to zero) in all specifications. Key coefficients relevant for testing the deterrence hypothesis are signed in parentheses. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at 10, 5, and 1 percent level.

**Table VI:** Hypothesis and Specification Tests: Crime Types (Table V)

| | (1)<br>Violent | (2)<br>Murder | (3)<br>Rape | (4)<br>Robbery | (5)<br>Agg. Ast. |
|---|---|---|---|---|---|
| Turning point | 34.2*** | 42.1*** | 30.1*** | 34.0*** | 30.6*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) | (0.0000) |
| *Joint significance tests* | | | | | |
| Aging ($\gamma$'s) | 17.57*** | 68.82*** | 9.43*** | 62.13*** | 24.91*** |
| | (0.0002) | (0.0000) | (0.0090) | (0.0000) | (0.0000) |
| Floodgates ($\lambda$'s) | 35.18*** | 7.56 | 32.79*** | 37.17*** | 17.38* |
| | (0.0001) | (0.6717) | (0.0003) | (0.0005) | (0.0663) |
| *Deterrence hypothesis tests* | | | | | |
| $\alpha_1 < 0$ | 0.0055*** | 0.0001* | -0.0001 | 0.0014** | 0.0015* |
| *(one-sided)* | (0.0049) | (0.0683) | (0.7288) | (0.0155) | (0.0823) |
| $\beta_1 < 0$ | 0.1283** | 0.0879 | 0.2263 | 0.5960* | 0.0114 |
| *(one-sided)* | (0.0464) | (0.4346) | (0.1690) | (0.0519) | (0.4340) |
| $\beta_2 > 0$ | 0.0425 | 0.0911 | 0.0107 | 0.1847 | 0.0032 |
| *(one-sided)* | (0.9507) | (0.9053) | (0.8072) | (0.9525) | (0.7811) |
| *Diff-in-diff nested specification tests* | | | | | |
| (1) $\beta_1 = \lambda_j, \forall j$ | 24.66*** | 11.92 | 33.30*** | 22.39** | 16.90* |
| | (0.0060) | (0.2902) | (0.0002) | (0.0132) | (0.0767) |
| (2) $\alpha_0 = -\gamma_0,\ \gamma_1 = \gamma_2 = 0$ | 311.97*** | 122.86*** | 33.40*** | 322.73*** | 75.35*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) | (0.0000) |
| (3) $-\alpha_1 = \beta_1 = \lambda_j, \forall j$ | 44.31*** | 15.69 | 33.41*** | 33.33*** | 17.88* |
| | (0.0000) | (0.1529) | (0.0005) | (0.0005) | (0.0845) |
| (2) & (3) | 560.05*** | 213.88*** | 88.38*** | 614.15*** | 156.09*** |
| | (0.0000) | (0.0000) | (0.0000) | (0.0000) | (0.0000) |

Notes: Age of the turning point, F-statistics for the joint significance tests, point estimates of the SIDD parameters, and F-statistics for the DiD tests are shown. We replace $\beta_2$ with the weighted cumulative surprise effect of the first five floodgate effects, i.e. $\sum_{j=0}^{4} \lambda_j \frac{\sum_i I_{st}^{ij}}{\sum_{i,j} I_{st}^{ij}} > 0$. One-sided $p$ values are in parentheses for the deterrence hypothesis tests. Two-sided $p$ values are in parentheses for the rest. *, **, and *** indicate one-sided (deterrence hypothesis tests) and two-sided (rest) statistical significance at the 10, 5, and 1 percent level.

**Table VII:** Comparison of DiD with SIDD for Different Sample Lengths

|  | (1) 1980-1992 | (2) 1980-1999 | (3) 1980-2011 |
|---|---|---|---|
| *Average Cohort Sizes* |  |  |  |
| $s^{En}$ | 0.9585 | 0.9559 | 0.9574 |
| $s^{En}I^{SIL}$ | 0.1707 | 0.2762 | 0.4230 |
| $s^{Ex} = 1 - s^{En}$ | 0.0415 | 0.0441 | 0.0426 |
| $s^{*Selected}$ | 0.4727 | 0.3235 | 0.3585 |
| $s^{*Surprised}$ | 0.5273 | 0.6765 | 0.6415 |
| *Diff-in-Diff in Levels* |  |  |  |
| SIL Dummy | 0.5935 | -39.1931** | -2.2416 |
|  | (0.9715) | (0.0316) | (0.8864) |
| *Diff-in-Diff in Changes* |  |  |  |
| SIL Dummy | -3.8001 | -0.9630 | 2.9158 |
|  | (0.7577) | (0.9162) | (0.5943) |
| *Baseline SIDD* |  |  |  |
| Entry | 0.1298** | 0.0099 | 0.0206** |
|  | (0.0482) | (0.7214) | (0.0294) |
| SIL Entry | 0.0017 | 0.0031** | 0.0041*** |
|  | (0.3423) | (0.0270) | (0.0024) |
| Exit | 1.0421*** | 0.4589*** | 0.3683*** |
|  | (0.0000) | (0.0000) | (0.0000) |
| Selection | 0.2454 | 0.3129** | 0.1868 |
|  | (0.5834) | (0.0357) | (0.1429) |
| Surprise | 0.0404 | 0.1107*** | 0.1025*** |
|  | (0.5444) | (0.0000) | (0.0003) |

Notes: All regressions are run on the total violent crimes. All regressions are run using OLS. Arrest rates of violent crimes, demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

**Figure I:** Evolutions of National Average Cohort Sizes



Notes: Entry cohorts (solid line and double solid line) are measured per 100,000 population on the left axis. Exit cohorts (dashed/dotted lines) are measured per 100,000 population on the right axis. Cohorts are averaged across all states. The vertical dashed lines indicate where LM and AD's samples end, respectively.

Exhibit D
Page 277

**Figure II:** Mean Predicted Impact of CCRA





Notes: Bars represent mean predicted change in violent crimes in levels (top) and percentages (bottom) for the 11 states and Washington, D.C., had they all counterfactually passed SILs in 2010. Estimates are based on the OLS regression on total violent crimes.

**Figure III:** Decomposing Impact of CCRA into Entry and Surprise Effects



Notes: Bars represent mean predicted change in violent crimes, decomposed into entry (dark) and surprise (light) effects, for the 11 states and Washington, D.C., had they all counterfactually passed SILs in 2010. Estimates are based on the OLS regression on total violent crimes.

# A    Appendix: Robustness

## A.1    Entry and Exit Windows

To apply SIDD to the crime setting, we stipulate an entry window for males between 13-21 and an exit window for males between 22-64 for reasons detailed in Footnote 8 in Section 3.4. In this section, we arbitrarily vary the range of these windows and show that our results are not sensitive to the choices of the cutoff ages[17]. Specifically, in Table A.1, each column presents estimates of our preferred SIDD specification with the beginning of the entry window, cutoff between entry and exit windows, and the end of the exit window indicated by the column header, e.g., Column 1 specifies an entry window of males between 11-21 and exit window 22-64.

## A.2    Aging Effects

Next, we explore different functional forms of the aging effects in exit rates. Given countervailing forces of age on exit rate in theory and evidence in Appendix B.3, we employ a quadratic functional form for exit rates as a function of age. Table A.2, on the other hand, presents estimates of our preferred SIDD specification with different functional forms of aging effects. Columns 1 estimates SIDD with no aging effects while Columns 2-4 parametrizes aging effects with polynomials up to the third order. Given the shape of exit rate in Figure B.8, we argue that, although the cubic term is statistically significant, the quadratic functional form is parsimonious and sufficiently flexible. In Column 5, we specify the exit rate as a translog function of age, i.e. replacing age with $log\,(age)$ in a quadratic function. Finally, Column 6 simply replaces age with a proxy for criminal experience $(age - 21)$ in the quadratic specification. Across all specifications, our SIDD parameters (entry, selection and surprise effects) remain largely invariant.

## A.3    Floodgate Effects

In our preferred SIDD specification (Equation 9 and Table V), we estimate the floodgate effect for each year after SIL passages. While remaining non-parametric, we are bound to get noisy estimates, especially for later years, given the sparsity of data. In this section, we explore alternative

---

[17]The reported standard errors however do not take into account the uncertainty of the cutoffs.

specifications of floodgate effects that increase our power and allow more insights into the shape of floodgate effects over time. Table A.3 presents results where we group individual years succeeding SIL passages. We obtain similar results as Table V with slightly more precise estimates for the floodgate effects. Similarly, results of a restrictive linear specification are presented in Table A.4, which also verifies the tapering-off of floodgate effects shown in Figure B.6.

## A.4   OLS Estimates

Table A.5 presents OLS estimates of our preferred SIDD specification.

## A.5   SIDD on Levels

DiD models are often applied to levels (rather than changes) of the outcome of interest, as is the case in the literature reviewed in Section 3.3, while SIDD models entry and exit decisions and is by default estimated on changes of the outcome of interest. One can make the argument that variations of the outcome can be much more easily explained on levels as suggested by Figure B.3. In this section, we entertain a variant of SIDD that can be estimated on levels of crimes. Recall that the SIDD model can be written as follows:

$$\Delta_{st}^{C}(NetEntry) = \Lambda Z_{ast} + \Gamma X_{st} + \epsilon_{st},$$

or

$$C_{s,t+1} = \theta C_{st} + \Lambda Z_{ast} + \Gamma X_{st} + \epsilon_{st}, \tag{11}$$

where $Z_{ast}$ includes the SIDD variables and $C_{st}$ is the level of crime rate in state $s$ and time $t$. Note that the SIDD model restricts $\theta = 1$. We now treat Equation 11 as our SIDD on levels and test if we could reject the null hypothesis that $\theta = 1$. Table A.6 shows the results in comparison to estimates of SIDD on changes. First, the estimate of $\theta$ is 1.05 with a standard error of 0.44 and therefore the data cannot reject our SIDD (on changes) specification ($\theta = 1$). Second, coefficient estimates of the SIDD variables of interest (entry, selection and surprise effects) remain largely unchanged across the two specifications.

46

# B   Appendix: Data

## B.1   SIL Passage Years by State

Table B.1 details our coding of SIL passage years of the 50 states and Washington, D.C.

## B.2   Arrest and Crime Rates by Age

We make use of the BJS national arrests data by the 17 age groups and first impute the number of arrest for each age cohort using shape-preserving piecewise cubic Hermite interpolating polynomials. Figure B.7 shows the resulting national arrest age distribution for 1980 and 2010 in the four violent crime categories.

Then, to impute crime rates by age, first let $p_{st}$ be the probability of arrest for criminals in state $s$ and year $t$, assuming it does not vary by age. We also assume that the crime intensity $\kappa_{ast} = \kappa$ does not vary across state-years or by age. Then let $C$ be the number of crimes and $A$ the number of arrests. By construction, $\frac{C_{ast}}{\kappa} \cdot p_{st} = A_{ast}$, where the subscript $a$ indicates age. Summing over age and dividing the two resulting Equations, $\frac{\frac{C_{ast}}{\kappa} p_{st}}{\sum_a \frac{C_{ast}}{\kappa} p_{st}} = \frac{A_{ast}}{\sum_a A_{ast}}$, or equivalently, $C_{ast} = \frac{A_{ast}}{\sum_a A_{ast}} C_{st}$. Additionally assume that arrests for each age group as a fraction of total arrests in a state-year does not vary across states, i.e., $\frac{A_{at}}{\sum_a A_{at}} = \frac{A_{ast}}{\sum_a A_{ast}}$. Then we arrive at crime rates by age at the state-year level, $C_{ast} = \frac{A_{at}}{\sum_a A_{at}} C_{st}$, where $A_{at}$ are the national arrests by age imputed from BJS and $C_{st}$ are the state-year level crime rates data from UCR.

## B.3   Evidence for Aging Effects

From the imputed age-specific crime rates from Appendix B.2, we can shed some light on the cutoff age between entry and exit windows as well as the shape of exit rate as a function of age. Specifically, we compute the fraction changes from crime age cohort $a$ in year $t$ to crime age cohort $a + 1$ in year $t + 1$ averaged over all state-years and plot them against age. On the left of Figure B.8, we see that entry roughly happens before around age 20 as indicated by positive year-to-year

percent changes[18]. On the right, we zoom in on the age range 22-64 and observe that exit rate roughly decreases in the 20's and bottoms out in the early 30's[19].

## B.4   Prison Admissions and Releases

We include in our estimation state-level prison admissions and releases each year to account for incapacitated criminals and estimate the crime intensity parameter $\kappa$. We construct these two variables as follows:

State admissions (releases) by crime type =

$$\text{State incarcerated total} \times \frac{\text{Federal admissions (releases) by crime type}}{\text{Ferderal total stock}},$$

where we combine state-level incarcerated population and federal prison stocks, admissions, and releases from Neal and Rick (2014) (pg. 78-80, Tables 9a, 9b, 9c) to impute the state-level admissions and releases of criminals by crime type[20].

---

[18]The fraction change however does not reflect entry probability since the denominator is existing criminals but not potential entrants.

[19]This is also only approximately reflecting exit rate to the extent that we assume entry stops at age 21.

[20]Our incarceration data runs up to 2006 and we extrapolate to 2010 using 2006 values. Federal prison data ranges between 1989-2010 and we also extrapolate by keeping values of the end years. We linearly interpolate for 1991 where data from Neal and Rick (2014) is missing.

**Table A.1:** Entry Window and Retirement Cutoffs: Entry Start - Entry End - Retirement

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
|  | 11-21-64 | 15-21-64 | 13-19-64 | 13-23-64 | 13-21-54 | 13-21-74 |
| Entry $\alpha_0'$ | 0.015 | 0.009 | 0.013 | 0.009 | 0.016 | 0.010 |
|  | (0.137) | (0.376) | (0.275) | (0.296) | (0.102) | (0.275) |
| SIL Entry $\alpha_1'$ (-) | 0.005*** | 0.007** | 0.006*** | 0.005** | 0.004** | 0.006*** |
|  | (0.006) | (0.016) | (0.007) | (0.014) | (0.011) | (0.006) |
| Exit $\gamma_0$ | 60.514*** | 59.708*** | 43.577*** | 78.877** | 57.549*** | 62.038*** |
|  | (0.004) | (0.005) | (0.000) | (0.014) | (0.001) | (0.003) |
| Exit $\gamma_1$ | -3.743*** | -3.697*** | -2.775*** | -4.760** | -3.542*** | -3.828*** |
|  | (0.003) | (0.004) | (0.000) | (0.011) | (0.001) | (0.002) |
| Exit $\gamma_2$ | 0.055*** | 0.054*** | 0.041*** | 0.069*** | 0.052*** | 0.056*** |
|  | (0.002) | (0.003) | (0.000) | (0.009) | (0.001) | (0.001) |
| Selection $\beta_1$ (-) | 0.128* | 0.126 | 0.144* | 0.116 | 0.232** | 0.116 |
|  | (0.094) | (0.107) | (0.056) | (0.223) | (0.032) | (0.113) |
| Floodgate $\lambda_0$ (+) | 0.110** | 0.102** | 0.083** | 0.120** | 0.089** | 0.117** |
|  | (0.022) | (0.035) | (0.019) | (0.037) | (0.027) | (0.015) |
| Floodgate $\lambda_1$ (+) | 0.096** | 0.090* | 0.070** | 0.106* | 0.073** | 0.106** |
|  | (0.042) | (0.063) | (0.049) | (0.062) | (0.065) | (0.029) |
| Floodgate $\lambda_2$ (+) | 0.100 | 0.094 | 0.072 | 0.114 | 0.078 | 0.112* |
|  | (0.118) | (0.153) | (0.143) | (0.138) | (0.153) | (0.085) |
| Floodgate $\lambda_3$ (+) | 0.087 | 0.080 | 0.059 | 0.101 | 0.062 | 0.096 |
|  | (0.172) | (0.227) | (0.216) | (0.196) | (0.238) | (0.141) |
| Floodgate $\lambda_4$ (+) | 0.079 | 0.071 | 0.055 | 0.094 | 0.051 | 0.087 |
|  | (0.254) | (0.325) | (0.307) | (0.262) | (0.397) | (0.197) |
| Floodgate $\lambda_5$ (+) | 0.051 | 0.043 | 0.031 | 0.064 | 0.021 | 0.063 |
|  | (0.530) | (0.616) | (0.632) | (0.508) | (0.772) | (0.431) |
| Floodgate $\lambda_6$ (+) | 0.054 | 0.045 | 0.032 | 0.069 | 0.018 | 0.072 |
|  | (0.579) | (0.665) | (0.692) | (0.544) | (0.839) | (0.455) |
| Imprisoned $\kappa_0$ | -12.502*** | -12.534*** | -14.623*** | -11.582*** | -13.671*** | -12.136*** |
|  | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Released $\kappa_1$ | 11.136*** | 10.885*** | 14.061*** | 9.984*** | 13.467*** | 10.530*** |
|  | (0.000) | (0.000) | (0.000) | (0.001) | (0.001) | (0.000) |
| Nb. Obs | 1549 | 1549 | 1549 | 1549 | 1549 | 1549 |

Notes: All regressions are run on the total violent crimes. Arrest rates of violent crimes, demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$ and $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). Key coefficients relevant for testing the deterrence hypothesis are signed in parentheses. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

Exhibit D
Page 284

**Table A.2:** Parametrizations of Aging Effects

| | (1) Constant | (2) Linear | (3) Quadratic | (4) Cubic | (5) Translog | (6) Quad. Exp. |
|---|---|---|---|---|---|---|
| Entry $\alpha_0'$ (+) | 0.025*** | 0.013 | 0.013 | 0.011 | 0.013 | 0.013 |
| | (0.006) | (0.118) | (0.197) | (0.252) | (0.169) | (0.197) |
| SIL Entry $\alpha_1'$ (-) | 0.004** | 0.002** | 0.005*** | 0.007*** | 0.005** | 0.005*** |
| | (0.011) | (0.030) | (0.010) | (0.003) | (0.012) | (0.010) |
| Exit $\gamma_0$ | 0.581*** | -4.808*** | 60.110*** | -132.621*** | 722.985*** | 6.021** |
| | (0.000) | (0.000) | (0.004) | (0.001) | (0.001) | (0.010) |
| Exit $\gamma_1$ | | 0.167*** | -3.718*** | 12.860*** | -416.823*** | -1.433*** |
| | | (0.000) | (0.003) | (0.001) | (0.001) | (0.006) |
| Exit $\gamma_2$ | | | 0.054*** | -0.407*** | 59.830*** | 0.054*** |
| | | | (0.002) | (0.001) | (0.001) | (0.002) |
| Exit $\gamma_3$ | | | | 0.004*** | | |
| | | | | (0.001) | | |
| Selection $\beta_1$ (-) | 0.351** | 0.276** | 0.128* | 0.023 | 0.183** | 0.128* |
| | (0.027) | (0.031) | (0.093) | (0.802) | (0.047) | (0.093) |
| Floodgate $\lambda_0$ (+) | 0.100*** | 0.055* | 0.106** | 0.124** | 0.095** | 0.106** |
| | (0.001) | (0.084) | (0.027) | (0.011) | (0.031) | (0.027) |
| Floodgate $\lambda_1$ (+) | 0.083** | 0.043 | 0.094** | 0.116** | 0.082* | 0.093** |
| | (0.032) | (0.212) | (0.049) | (0.018) | (0.061) | (0.049) |
| Floodgate $\lambda_2$ (+) | 0.098*** | 0.059 | 0.098 | 0.129** | 0.085 | 0.098 |
| | (0.005) | (0.163) | (0.130) | (0.048) | (0.156) | (0.130) |
| Floodgate $\lambda_3$ (+) | 0.091*** | 0.050 | 0.084 | 0.124* | 0.070 | 0.084 |
| | (0.005) | (0.215) | (0.191) | (0.070) | (0.232) | (0.191) |
| Floodgate $\lambda_4$ (+) | 0.083** | 0.039 | 0.076 | 0.123* | 0.060 | 0.076 |
| | (0.016) | (0.368) | (0.278) | (0.084) | (0.360) | (0.278) |
| Floodgate $\lambda_5$ (+) | 0.057 | 0.015 | 0.048 | 0.100 | 0.032 | 0.048 |
| | (0.135) | (0.762) | (0.559) | (0.217) | (0.684) | (0.559) |
| Floodgate $\lambda_6$ (+) | 0.056 | 0.013 | 0.051 | 0.111 | 0.031 | 0.051 |
| | (0.206) | (0.814) | (0.609) | (0.235) | (0.739) | (0.609) |
| Imprisoned $\kappa_0$ | -9.394*** | -5.553*** | -12.542*** | -6.719*** | -13.039*** | -12.541*** |
| | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) | (0.000) |
| Released $\kappa_1$ | 13.719*** | 8.543*** | 11.048*** | 6.442*** | 11.925*** | 11.047*** |
| | (0.000) | (0.008) | (0.000) | (0.001) | (0.000) | (0.000) |
| Nb. Obs | 1549 | 1549 | 1549 | 1549 | 1549 | 1549 |

Notes: All regressions are run on the total violent crimes. Arrest rates of violent crimes, demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ and $\gamma_3$ are coefficients of the constant, linear, quadratic and cubic terms of the exit function (of age). For the translog function, we replace age with $log(age)$; for the quadratic experience column, we replace age with $age - 21$. $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

**Table A.3:** SIDD with Grouped Floodgate Effects

|  | (1) Violent | (2) Murder | (3) Rape | (4) Robbery | (5) Agg. Ast. |
|---|---|---|---|---|---|
| Entry $\alpha_0'$ | 0.0111 | 0.0004** | 0.0009 | 0.0102* | 0.0079 |
|  | (0.2646) | (0.0307) | (0.2204) | (0.0568) | (0.1944) |
| SIL Entry $\alpha_1'$ (-) | 0.0060*** | 0.0001 | -0.0001 | 0.0015** | 0.0016 |
|  | (0.0040) | (0.1419) | (0.6503) | (0.0122) | (0.1089) |
| Exit $\gamma_0$ | 59.4846*** | 16.9929** | 15.5993** | 136.2863*** | 13.9894*** |
|  | (0.0052) | (0.0260) | (0.0422) | (0.0001) | (0.0035) |
| Exit $\gamma_1$ | -3.6783*** | -0.8754* | -1.0921** | -8.4226*** | -0.9673*** |
|  | (0.0041) | (0.0993) | (0.0148) | (0.0001) | (0.0006) |
| Exit $\gamma_2$ | 0.0538*** | 0.0104 | 0.0182*** | 0.1238*** | 0.0159*** |
|  | (0.0028) | (0.2272) | (0.0042) | (0.0000) | (0.0001) |
| Selection $\beta_1$ (-) | -0.0144 | -0.2460 | 0.0947 | 0.4984 | -0.0748 |
|  | (0.8523) | (0.6311) | (0.6035) | (0.1235) | (0.1973) |
| Floodgate 0-1 (+) | 0.1178*** | 0.1403 | -0.0119 | 0.2122*** | 0.0418 |
|  | (0.0065) | (0.2236) | (0.8076) | (0.0058) | (0.2120) |
| Floodgate 2-4 (+) | 0.1157* | 0.1426 | -0.0153 | 0.2146* | 0.0454 |
|  | (0.0529) | (0.1809) | (0.8067) | (0.0638) | (0.2282) |
| Floodgate 5-9 (+) | 0.0606 | 0.1739 | -0.0629 | 0.1699 | -0.0051 |
|  | (0.4854) | (0.2104) | (0.4405) | (0.4055) | (0.9247) |
| Floodgate >9 (+) | 0.0403 | 0.3761 | -0.0609 | 0.0595 | -0.0003 |
|  | (0.7096) | (0.1181) | (0.4929) | (0.8486) | (0.9963) |
| Imprisoned $\kappa_0$ | -12.4591*** | 1.6781 | 0.8750 | -7.7667*** | -8.4234** |
|  | (0.0000) | (0.2836) | (0.6734) | (0.0000) | (0.0174) |
| Released $\kappa_1$ | 11.1201*** | 0.2327 | -1.2004 | 7.2127*** | 8.9469** |
|  | (0.0002) | (0.3934) | (0.5780) | (0.0001) | (0.0214) |
| Log-likelihood | -7668 | -2282 | -4026 | -6818 | -7086 |
| F-statistic | 120.3 | 728.4 | 71.8 | 217.3 | 127.4 |
| Nb. Obs | 1549 | 1548 | 1547 | 1546 | 1549 |

Notes: Arrest rates (of corresponding crime categories), demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). The F-statistics test for the joint significance of all estimated coefficients and reject the null (all coefficients are equal to zero) in all specifications. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at 10, 5, and 1 percent level.

51

**Table A.4:** SIDD with Linear Floodgate Trend

|  | (1) Violent | (2) Murder | (3) Rape | (4) Robbery | (5) Agg. Ast. |
|---|---|---|---|---|---|
| Entry $\alpha_0'$ | 0.0117 | 0.0004** | 0.0009 | 0.0101* | 0.0084 |
|  | (0.2372) | (0.0281) | (0.2384) | (0.0579) | (0.1707) |
| SIL Entry $\alpha_1'$ (-) | 0.0058*** | 0.0001 | -0.0001 | 0.0016*** | 0.0016 |
|  | (0.0081) | (0.1498) | (0.6146) | (0.0090) | (0.1434) |
| Exit $\gamma_0$ | 59.7641*** | 17.3313*** | 16.0996** | 136.3335*** | 14.8863*** |
|  | (0.0048) | (0.0220) | (0.0373) | (0.0001) | (0.0014) |
| Exit $\gamma_1$ | -3.6950*** | -0.8951* | -1.1235** | -8.4256*** | -1.0220*** |
|  | (0.0037) | (0.0899) | (0.0137) | (0.0001) | (0.0002) |
| Exit $\gamma_2$ | 0.0540*** | 0.0106 | 0.0186*** | 0.1239*** | 0.0167*** |
|  | (0.0026) | (0.2133) | (0.0043) | (0.0000) | (0.0000) |
| Selection $\beta_1$ (-) | 0.0164 | 0.0321 | 0.1636 | 0.4496 | -0.0393 |
|  | (0.8453) | (0.9416) | (0.4582) | (0.1400) | (0.5306) |
| Floodgate cons. (+) | 0.1502*** | 0.1323 | 0.0161 | 0.2438*** | 0.0715** |
|  | (0.0003) | (0.2629) | (0.7345) | (0.0001) | (0.0250) |
| Floodgate slope (-) | -0.0152 | -0.0008 | -0.0153 | -0.0066 | -0.0141** |
|  | (0.1090) | (0.9440) | (0.1717) | (0.8049) | (0.0270) |
| Imprisoned | -12.4224*** | 1.6473 | 0.8349 | -7.8048*** | -8.3531** |
|  | (0.0000) | (0.2945) | (0.6712) | (0.0000) | (0.0192) |
| Released | 10.9879*** | 0.2315 | -1.3497 | 7.2699*** | 8.5237** |
|  | (0.0003) | (0.3885) | (0.5118) | (0.0001) | (0.0315) |
| Log-likelihood | -7664 | -2276 | -4022 | -6820 | -7084 |
| F-statistic | 131.4 | 735.2 | 36.0 | 234.5 | 99.0 |
| Nb. Obs | 1549 | 1548 | 1547 | 1546 | 1549 |

Notes: Arrest rates (of corresponding crime categories), demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). The F-statistics test for the joint significance of all estimated coefficients and reject the null (all coefficients are equal to zero) in all specifications. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at 10, 5, and 1 percent level.

**Table A.5:** Preferred SIDD Specification by Crime Types: OLS Estimates

| | (1) Violent | (2) Murder | (3) Rape | (4) Robbery | (5) Agg. Ast. |
|---|---|---|---|---|---|
| Entry $\alpha'_0$ (+) | 0.0113 | 0.0003* | 0.0010 | 0.0085 | 0.0081 |
| | (0.1695) | (0.0721) | (0.2426) | (0.1336) | (0.1359) |
| SIL Entry $\alpha'_1$ (-) | 0.0037** | 0.0002*** | -0.0001 | 0.0011** | 0.0011 |
| | (0.0171) | (0.0001) | (0.6034) | (0.0378) | (0.2312) |
| Exit $\gamma_0$ | 23.9278** | 26.2844*** | 13.5852 | 56.8658*** | 6.7145* |
| | (0.0254) | (0.0004) | (0.2431) | (0.0026) | (0.0760) |
| Exit $\gamma_1$ | -1.5546** | -1.4362*** | -0.9142 | -3.5977*** | -0.5281** |
| | (0.0174) | (0.0045) | (0.1765) | (0.0016) | (0.0157) |
| Exit $\gamma_2$ | 0.0239** | 0.0182** | 0.0149 | 0.0544*** | 0.0096*** |
| | (0.0106) | (0.0244) | (0.1075) | (0.0008) | (0.0017) |
| Selection $\beta_1$ (-) | 0.0782 | 0.9846*** | 0.2706 | 0.2853* | -0.0841 |
| | (0.3342) | (0.0035) | (0.1809) | (0.0887) | (0.2897) |
| Floodgate $\lambda_0$ (+) | 0.0740** | 0.3098*** | -0.0173 | 0.1304* | 0.0278 |
| | (0.0473) | (0.0002) | (0.7218) | (0.0846) | (0.4259) |
| Floodgate $\lambda_1$ (+) | 0.0598 | 0.3305*** | -0.0121 | 0.1413*** | 0.0096 |
| | (0.1017) | (0.0001) | (0.8388) | (0.0057) | (0.7692) |
| Floodgate $\lambda_2$ (+) | 0.0710 | 0.2672** | 0.0172 | 0.1092 | 0.0325 |
| | (0.2004) | (0.0156) | (0.7788) | (0.2734) | (0.4281) |
| Floodgate $\lambda_3$ (+) | 0.0553 | 0.3491*** | -0.0596 | 0.1536 | 0.0059 |
| | (0.2709) | (0.0001) | (0.4972) | (0.1997) | (0.8671) |
| Floodgate $\lambda_4$ (+) | 0.0460 | 0.3064*** | -0.0624 | 0.1171 | 0.0043 |
| | (0.4008) | (0.0008) | (0.3322) | (0.3239) | (0.9103) |
| Floodgate $\lambda_5$ (+) | 0.0238 | 0.2806*** | -0.0464 | 0.0583 | -0.0051 |
| | (0.7178) | (0.0089) | (0.5177) | (0.6997) | (0.9146) |
| Floodgate $\lambda_6$ (+) | 0.0319 | 0.2370*** | -0.0534 | 0.0934 | -0.0105 |
| | (0.6728) | (0.0085) | (0.4779) | (0.5947) | (0.8519) |
| Imprisoned $\kappa_0$ | -7.7904*** | 1.3410 | 0.4806 | -3.7638*** | -9.9245*** |
| | (0.0000) | (0.4183) | (0.8291) | (0.0067) | (0.0076) |
| Released $\kappa_1$ | 7.0690*** | 0.2185 | -0.9636 | 4.1956*** | 8.7086** |
| | (0.0001) | (0.2568) | (0.6828) | (0.0006) | (0.0323) |
| Nb. Obs | 1549 | 1548 | 1547 | 1546 | 1549 |

Notes: Arrest rates (of corresponding crime categories), demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). Key coefficients relevant for testing the deterrence hypothesis are signed in parentheses. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

**Table A.6:** SIDD on Levels vs. Changes

|  | (1)<br>SIDD on changes | (2)<br>SIDD on levels |
|---|---|---|
| Lagged crime $\theta$ |  | 1.0531** |
|  |  | (0.0171) |
| Entry $\alpha_0'$ (+) | 0.0127 | 0.0113 |
|  | (0.1973) | (0.2602) |
| SIL Entry $\alpha_1'$ (-) | 0.0055*** | 0.0043** |
|  | (0.0098) | (0.0166) |
| Exit $\gamma_0$ | 60.1104*** | 33.5141*** |
|  | (0.0044) | (0.0007) |
| Exit $\gamma_1$ | -3.7184*** | -2.1545*** |
|  | (0.0034) | (0.0002) |
| Exit $\gamma_2$ | 0.0544*** | 0.0330*** |
|  | (0.0024) | (0.0001) |
| Selection $\beta_1$ (-) | 0.1283* | 0.2044** |
|  | (0.0928) | (0.0159) |
| Floodgate $\lambda_0$ (+) | 0.1063** | 0.0828* |
|  | (0.0267) | (0.0597) |
| Floodgate $\lambda_1$ (+) | 0.0935** | 0.0733* |
|  | (0.0494) | (0.0928) |
| Floodgate $\lambda_2$ (+) | 0.0979 | 0.0832 |
|  | (0.1295) | (0.1811) |
| Floodgate $\lambda_3$ (+) | 0.0844 | 0.0699 |
|  | (0.1912) | (0.2543) |
| Floodgate $\lambda_4$ (+) | 0.0761 | 0.0567 |
|  | (0.2783) | (0.3948) |
| Floodgate $\lambda_5$ (+) | 0.0485 | 0.0300 |
|  | (0.5588) | (0.7048) |
| Floodgate $\lambda_6$ (+) | 0.0508 | 0.0335 |
|  | (0.6086) | (0.7145) |
| Imprisoned $\kappa_0$ | -12.5419*** | -7.3298*** |
|  | (0.0000) | (0.0000) |
| Released $\kappa_1$ | 11.0485*** | 6.3333*** |
|  | (0.0002) | (0.0000) |
| Nb. Obs | 1549 | 1498 |

Notes: Arrest rates (of corresponding crime categories), demographic and welfare controls, state and year fixed effects and state-specific linear and quadratic time trends are controlled for but not reported. $\gamma_0$, $\gamma_1$, $\gamma_2$ are coefficients of the constant, linear and quadratic terms of the exit function (of age). $\lambda_j$'s measure the surprise effect in the $j^{th}$ year after SIL passage (years 7, 8, and 9+ are not reported). Key coefficients relevant for testing the deterrence hypothesis are signed in parentheses. Standard errors are clustered at the state level. Two-sided $p$ values are in parentheses. *, **, and *** indicate statistical significance at the 10, 5, and 1 percent level.

**Table B.1:** SIL Passage Years by State, up to 2011

| Pre-1985 | 1986-1992 | 1995-1997 | 2002-2007 | Post-2011 |
|---|---|---|---|---|
| Alabama (*always*) | Maine (*1986*) | Alaska (*1995*) | Michigan (*2002*) | Iowa (*2011*) |
| Vermont (*always*) | North Dakota (*1986*) | Arizona (*1995*) | Missouri (*2002*) | Wisconsin (*2011*) |
| New Hampshire (*1960*) | South Dakota (*1987*) | Tennessee (*1995*) | Colorado (*2004*) | California (*never*) |
| Washington (*1962*) | Florida (*1988*) | Wyoming (*1995*) | Minnesota (*2004*) | Delaware (*never*) |
| Connecticut (*1970*) | Virginia (*1989*) | Arkansas (*1996*) | New Mexico (*2004*) | Hawaii (*never*) |
| Indiana (*1981*) | Georgia (*1990*) | Nevada (*1996*) | Ohio (*2005*) | Illinois (*never*) |
| | Pennsylvania (*1990*) | North Carolina (*1996*) | Kansas (*2007*) | Maryland (*never*) |
| | West Virginia (*1991*) | Oklahoma (*1996*) | Nebraska (*2007*) | Massachusetts (*never*) |
| | Idaho (*1991*) | Texas (*1996*) | | New Jersey (*never*) |
| | Mississippi (*1991*) | Utah (*1996*) | | New York (*never*) |
| | Oregon (*1991*) | Kentucky (*1997*) | | Rhode Island (*never*) |
| | Montana (*1992*) | Louisiana (*1997*) | | Washington, D.C. (*never*) |
| | | South Carolina (*1997*) | | |

Notes: State-level SIL passage years are loosely categorized by adoption waves. Years in parentheses indicate the year that state SIL went into effect, typically the following year of law passage. We categorize any concealed carry laws that are equivalent to or more restrictive than may-issue laws (MILs) as non-SILs and laws that are more lenient than SILs (e.g., no permit required) as SILs.

**Table B.2:** Summary Statistics of Main Data Sources: Crime/Arrest Rates and Demographics

|  | Mean | SD | Min | Max | N |
|---|---|---|---|---|---|
| *Crime Rates* | | | | | |
| *(Crimes/100,000 pop.)* | | | | | |
| Violent | 480.2 | 308.2 | 47.01 | 2922 | 1632 |
| Murder | 6.69 | 6.95 | 0.16 | 80.60 | 1632 |
| Rape | 35.08 | 13.42 | 7.30 | 102.2 | 1632 |
| Robbery | 145.3 | 151.3 | 6.40 | 1635 | 1632 |
| Agg. Assault | 293.1 | 171.6 | 31.32 | 1558 | 1632 |
| *Arrest Rates* | | | | | |
| *(Arrests/100,000 pop.)* | | | | | |
| Violent | 167.4 | 110.0 | 3.13 | 1314 | 1600 |
| Murder | 5.14 | 4.97 | 0 | 52.00 | 1599 |
| Rape | 10.41 | 6.48 | 0 | 92.49 | 1598 |
| Robbery | 35.98 | 44.75 | 0.16 | 1252 | 1597 |
| Agg. Assault | 116.1 | 74.70 | 2.78 | 656.2 | 1600 |
| *Control Variables* | | | | | |
| State Pop. (M) | 5.24 | 5.83 | 0.41 | 37.69 | 1632 |
| Pop. Density ($pp/mile^2$) | 313.3 | 1192 | 0.62 | 9306 | 1632 |
| Inc. Mainten. ($) | 404.5 | 179.7 | 104.3 | 1282 | 1632 |
| Income ($000's) | 28.87 | 7.01 | 15.01 | 64.88 | 1632 |
| Unemploy. Insur. ($) | 142.9 | 103.1 | 18.86 | 780.5 | 1632 |
| Retire. Pay. ($000's) | 3.53 | 1.13 | 1.18 | 7.00 | 1632 |

Notes: Data contains 50 states and Washington, DC, for years 1980-2011. Crime type definitions - murder and non-negligent manslaughter is defined as the willful (non-negligent) killing of one human being by another; rape is defined as the carnal knowledge of a female forcibly and against her will; robbery is defined as the taking or attempting to take anything of value from the care, custody, or control of a person or persons by force or threat of force or violence and/or by putting the victim in fear; aggravated assault is defined as an unlawful attack by one person upon another for the purpose of inflicting severe or aggravated bodily injury. Demographic control variables include state population, population density, income maintenance, real per capita personal income, unemployment insurance, and retirement payment for people older than 65.

**Table B.3:** Replication and Variations of Lott and Mustard (1997)

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| SIL Dummy | -0.0881*** | -0.0276* | -0.0063 | -0.0260 | -0.0015 | -0.8789 |
|  | (0.0000) | (0.0716) | (0.5885) | (0.1298) | (0.9615) | (0.9550) |
| Dep. Var. | log | log | log | log | log | level |
| Sample | 1980-1992 | 1980-1999 | 1980-2011 | 1980-1992 | 1980-1992 | 1980-1992 |
| Race & age controls | Y | Y | Y | N | N | N |
| State trends | N | N | N | N | Y | Y |
| Clustering | N | N | N | N | Y | Y |
| Demographic controls | Y | Y | Y | Y | Y | Y |

Notes: All regressions are run on the total violent crimes. Two-sided $p$ values are in parentheses. *, **, and *** indicate two-sided statistical significance at the 10, 5, and 1 percent level.

**Table B.4:** Replication and Variations of Ayres and Donohue (2003*b*)

|  | (1) | (2) | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| SIL Dummy | 0.0737*** | -0.0832** | -0.0260 | 0.1088*** | -0.0385* | -38.0306* |
|  | (0.0000) | (0.0135) | (0.1298) | (0.0000) | (0.0665) | (0.0582) |
| SIL Trend |  | 0.0107*** |  |  |  |  |
|  |  | (0.0000) |  |  |  |  |
| Dep. Var. | log | log | log | log | log | level |
| Sample | 1980-1999 | 1980-1999 | 1980-1992 | 1980-2011 | 1980-1999 | 1980-1999 |
| Race & age controls | N | N | N | N | N | N |
| State trends | N | N | N | N | Y | Y |
| Clustering | N | N | N | N | Y | Y |
| Demographic controls | Y | Y | Y | Y | Y | Y |

Notes: All regressions are run on the total violent crimes. Two-sided *p* values are in parentheses. *, **, and *** indicate two-sided statistical significance at the 10, 5, and 1 percent level.

**Figure B.1:** Flow and Stock of SIL Adoptions across the U.S.



Notes: Bars indicate the number of SIL passages in each year (right axis) and the line shows the cumulative total number of SIL states (left axis).

**Figure B.2:** State Violent Crime Rates by SIL Passage Years



Notes: Total violent crime rates are averaged across states (weighted by state population) within same waves and plotted over time. The solid triangles indicate the average SIL passage year of the group.

Exhibit D
Page 295

**Figure B.3:** Stacked Comparison of Crime Rates: A Graphical DiD Illustration



Notes: Solid lines represent crime rates for the treated group. Dashed lines represent crime rates for the control group. Treated and control groups are constructed similar to Gormley and Matsa (2011). X-axis indicates years from SIL adoption, centered around the adoption year. Y-axis indicates the number of (changes of) crimes per 100,000 population.

61

**Figure B.4:** Illustration of Cohort Size Evolutions



Notes: Entry cohort is measured per 100,000 population on the left axis. Exit cohorts are measured per 100,000 population on the right axis. The solid vertical line indicates SIL passage in Florida in 1988. The vertical dashed lines indicate where LM and AD's samples end, respectively.

62

**Figure B.5:** Illustration of Average Cohort Age Evolutions



Notes: Evolutions of the average age in each cohort. The solid vertical line indicates SIL passage in Florida in 1988.

**Figure B.6:** Estimated Selection and Floodgate Effects by Crime Types



Notes: Point estimates of selection (leftmost on each plot) and floodgate effects from SIDD on violent crimes and sub-categories (Table V).

**Figure B.7:** Arrests by Age in 1980 and 2010 (# of Arrests)



Notes: Rugged blue lines represent the data as we simply divide arrests evenly in an age group. Smooth orange lines represent the well-fitted single-age arrests.

**Figure B.8:** Aging Effects on Violent Crime Entry and Exit



Notes: Year-to-year fraction changes of imputed age-specific crime rates, averaged across all state-year observations. The left panel shows the entire career span (13-64, entry and exit). The right panel zooms in on the 22-64 age range.

# Smoking Gun? Linking Gun Ownership to Crime Victimization

## Stephen B. Billings[*]

## January 6, 2023

### Abstract

Using linked individual data on concealed handgun permits (CHP), reported crimes and arrests, I examine the dynamics of gun-ownership and criminal victimization. I initially show that being male, Republican, older, born in-state and a recent crime victim increases the probability that an adult obtains a CHP. Getting a CHP increases property crime victimization by 46% with the largest impact on having a firearm stolen. Individual CHP holders see no change in violent crime victimization thus dispelling any benefits in terms of protection. Obtaining a CHP has a small (2%) effect on total crime and a larger effect on violent crime using a gun (8%) within the CHP holders neighborhood. Results suggest stolen guns spillover to neighborhood crime which is an important component of the larger social costs of gun ownership.

[*]Leeds School of Business, University of Colorado, 995 Regents Drive, Boulder, CO 80309 (email: stephen.billings@colorado.edu)

Acknowledgments: I thank the participants at the 2019 University of Colorado applied micro workshop, the NC State applied micro seminar, University of Southern California, Rutgers University, the Transatlantic Economics of Crime Workshop 2021, the Economics of Crime Online Seminar Series 2020, APPAM Fall Research Conference 2020 as well as helpful comments from Phil Cook, Robin McKnight and John McDonald. I would also like to thank Monica Nguyen of the Charlotte-Mecklenburg Police Department for all her assistance obtaining the reported crime/crime victimization data and the Mecklenburg County Sheriff's Office for allowing me to access to the CHP data. Gavin Off from the Charlotte Observer for sharing gun permit data.

Exhibit D
Page 304

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

# 1. Introduction

The tragedy of gun violence is revisited with great regularity and each high profile shooting renews debates about the role of guns in US society. Even after shooting events such as Columbine High School in 1999, Rep. Gabrielle Giffords in 2011, Sandy Hook Elementary School in 2012, San Bernardino in 2015 and Parkland High School in 2018, national gun legislation was unchanged and only with the recent Robb Elementary School shooting in 2022 was there a modification to national gun laws.[2] Furthermore, following each shooting and COVID-19, we saw large increases in gun purchases.[3] Local gun laws and enforcement did react to these high profile events with a number of subsequent changes (both more and less restrictive) to gun accessibility and permitting (Yourish et al. (2013)). These local policy changes have been incorporated into recent research which consistently finds a positive relationship between gun availability and crime.[4] Unfortunately, how gun policy and availability translates into criminal outcomes is less clear and complicated by limited data on gun ownership as well as a diverse set of channels through which legal guns end up in the hands of criminals.

At the crux of this policy debate is how are legal guns obtained and used by criminals? Gun tracing data highlights a role for interstate trafficking or larger scale straw purchasing within jurisdictions that have limited supply and typically more regulated gun access (Cook et al. (2015) , Collins et al. (2017)).[5] Research also supports a substantial role for informal and local social connections to transfer guns between legal and illegal purchasers (Braga et al. (2010) , Papachristos (2009) , Papachristos et al. (2015) , Papachristos and Wildeman (2014) , Miller et al. (2017) ) as well as evidence of a robust market for individuals to steal guns from homes, cars and persons and sell to criminals (Kleck and Wang (2008) , Khalil (2017)). Finally, there is even reason to suspect that licensed gun dealers may be providing guns to individuals that later use them in criminal acts (Cook (2018), Cook et al. (2015) ).

Even with evidence supporting a diverse set of channels through which criminals obtain guns, there are some drawbacks to this literature. First, the decision to obtain a legal gun as well as how it is stored and used is endogenous to both individual as well as neighborhood crime risk. This endogeneity may be reflected in both the use of a legal gun as well as how a gun may enter the illegal market as underlying crime risk impacts

---

[2] Luca et al. (2020) provides evidence that mass shootings lead to a 15% increase in gun legislative discussions but no actual changes in the law.

[3] Levine and McKnight (2017) find approximately a 60% increase in gun purchases after Sandy Hook.

[4] Cook and Donohue (2017) and Cook and Ludwig (2019) provide a review of this literature.

[5] A straw purchaser is defined as anyone who legally obtains a gun on behalf of another individual who is unable to obtain the gun legally.

2

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

both the demand and supply of guns.[6] Second, this literature is often based on surveys of inmates, small samples of recovered guns or aggregated measures of gun availability and crime. Given data scarcity, there is limited revealed preference data on guns and crime at the individual or even neighborhood level. This type of data may help disentangle some of the various findings in the literature. For example, if individual gun owners are later arrested for crimes or become victims of crime, it reveals quite different dynamics of how legal guns are being obtained for criminal acts. Disaggregated details about crimes also reveal how guns may enter illegal networks as one can use the location and timing of events like a stolen gun and look at subsequent crimes using guns.

The paper presented here provides two main contributions to understanding how local gun ownership impacts crime. First, I provide evidence on criminal victimization and arrests for individuals who obtain concealed handgun permits (CHPs). This evidence is compelling since my dataset allows for a rich description of the timing, location and details of victimization and arrests and thus can leverage temporal variation at the individual level while controlling for a rich set of confounding neighborhood factors. Individual analysis is rare in the guns and crime literature more broadly and is a yet an unexplored determinant of crime victimization. Second, I provide evidence that individual gun ownership spills over onto broader neighborhood crime and thus can provide an estimate of the local social costs of crime.

My analysis begins with the creation of a unique individual panel dataset that links registered voters to concealed handgun permits (CHPs) and reported crime victims from 2007 through 2011 in Charlotte, NC.[7] All of these datasets are linkable by full name, birth year and residential address. CHP holders are typically white, age 30 and older, male, politically more Republican and more likely to have been a crime victim.

I incorporate a stacked difference-in-difference model to estimate the impact of getting a CHP on individual crime victimization. This model avoids concerns regarding two-way fixed effects panel models with differential timing (Roth et al. (2022), Goodman-Bacon (2021)). Specifically, I create a control group by doing an exact match between CHP and non-CHP holders based on voter attributes, voter victimization history, neighborhood of residence and the month that a new CHP is issued and estimate a difference-in-difference model with matched group by time and individual fixed effects. To limit concerns about unobserved crime risk, I show that results are robust to limiting the sample

---

[6]For example, higher crime in my neighborhood may lead more criminals to demand guns or obtain guns through theft while at the same time inducing an increase in the supply of legal guns obtained for personal protection.

[7]Approximately 86% of CHP holders are also registered voters making them representative of the main population of potential gun owners. In comparison, about 75% of the 18+ population in Charlotte are registered voters.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

to only those permits issued during shocks to gun demand following the inauguration of Barack Obama and the shooting of Rep. Gabrielle Giffords. I also provide models that only focus on crime victims where the offender is unknown to the victim. Individual analysis highlights that getting a CHP increases overall victimization by 46%, but effects are limited to non-violent crimes.[8]

Spillovers to broader neighborhood crime represent an important social cost of gun ownership, especially since CHP holders are more likely to be victims of a firearm being stolen. Given the scale of my data and a robust literature on the typical distance an offender travels to commit a criminal act, I test for neighborhood spillovers up to the Census Block Group (CBG) 2000 definition of neighborhoods.[9] I adopt the same methodology as the individual analysis but restrict matched CHP with non-CHP holders to be living in different neighborhoods in the same census tract and then make the outcome the number of reported crimes for varying distances from the CHP and matched CHP control individuals. Results highlight a 2% increase in total neighborhood crimes.

In order to highlight a more direct role of guns in criminal outcomes, I estimate models on three hypothesized effect of more legal guns for both CHP holders and neighborhood spillovers: 1) guns offer personal protection and influence the quantity and severity (injuries and death) of violent encounters between individuals (no effects); 2) guns increase the payoff from property crimes (CHP holders experience a 69% increase in burglaries and a 268% increase in having a firearm stolen); 3) legal guns end up in illegal markets and are more likely to become part of crimes in the future (7.7% increase in neighborhood violent crimes using a gun). I also show limited changes in 911 calls, but a decrease in violent crime clearance in the neighborhood of a new CHP. Putting all the results together complements recent work by Donohue et al. (2022), where stolen guns lead to an increase in violent crimes that is compounded by less effective policing. To put my results in terms of actual costs, I take estimates on the costs of crime from McCollister et al. (2010) and estimate crime category specific models to generate a per capita social cost of crime. Each additional CHP and its associated guns generate a social cost of crime of $17.14 per person.

Subsequent analysis that examines specific crime categories, as well as incorporates a sample of The Trace data for Charlotte suggests a limited role of interstate trade in guns or large-scale arms dealers, but rather a narrative that property crimes are yielding more

---

[8]Each additional CHP coincides with multiple guns (based on Brauer et al. (2013)), so effects could be interpreted as about 4.4 guns leading to these estimated impacts.

[9]A sizable literature (Phillips (1980) , Gabor and Gottheil (1984) , Rhodes and Conly (1981) , Repetto (1974) , Barker (2000) and Capone and Nichols Jr (1976) ) in criminology finds the distance between an arrestee's home address and the location of reported crimes to be on average between 0.35 and 2.41 miles across a range of urban settings, which is about the size of a CBG in my data.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

guns as CHPs increase.[10] These stolen guns coincide with a range of criminal activity in the neighborhood such as violent crime using a gun (robbery) as well as theft from auto and burglary. I am unable to rule out criminals acquiring guns through social networks or illegal dealers, but do find evidence that CHP holders are no more likely to be subject to arrest after acquiring a CHP and if anything become more law abiding. This fact could suggest the presence of straw purchasers who need to avoid criminal detection, but the fact that these individuals are not being arrested more often for weapons crimes does limit the scale of this underlying channel.

The localized nature of my results indicates that policies such as Child Access Prevention and gun storage laws may limit their theft and thus prevent future neighborhood crimes. Even more promising for thwarting this mechanism of stolen guns are biometric recognition devices that limit gun use to only registered owners ((Cook and Goss 2020)). These policy implications are not in contradiction to existing findings of a larger role of straw purchasers and interstate commerce for guns in places like Chicago (Cook et al. (2015) , Collins et al. (2017)) since the regulatory environment and supply of guns in southern cities like Charlotte may be more conducive to a local supply of guns through theft.[11] In the end, my conclusions are specific to CHP holders and thus may not reflect the specific impacts of other legal handgun purchases such as through pistol purchase permits (PPP) or gun shows.[12]

This paper contributes to a larger literature on the social costs of gun ownership. This literature does provide consistent evidence that more guns or easier access to guns in the home lead to higher rates of accidental shootings (e.g. Levine and McKnight (2017) , Grossman et al. (2012), DeSimone et al. (2013) ,Wiebe (2003a) , Hemenway (2011) , Morrow and Hudson (1986) ) and higher rates of suicide ( e.g. Anestis and Houtsma (2018) , Lang (2013) , Miller et al. (2006), Miller et al. (2007), Ghiani et al. (2019) and Wiebe (2003b), Miller et al. (2022), Wintemute et al. (1999), Studdert et al. (2020)). The research on the impact of legal guns on crime often focuses on Right To Carry (RTC) concealed handgun laws and recent work (Donohue et al. (2019), Donohue et al. (2022) and McElroy and Wang (2017)) provides more conclusive panel evidence that less restrictive RTC handgun laws increase violent crime. There are also a number of papers that use non-RTC variation in gun access to find more guns are often associated with an increase in gun

---

[10]The Trace data collects administrative police data which provides individual observations linking original purchasing jurisdiction to where the gun is later recovered as part of a criminal investigation. This data is available for download at https://www.thetrace.org/missing-pieces-data/ .

[11]Collins et al. (2017) does find stronger support for the stolen gun channel in New Orleans and Prince George's County, MD based on inmate interviews.

[12]The fact that I do later provide evidence that the number of CHP holders in a neighborhood has an almost one to one relationship with the number of PPP holders is suggestive that these effects may hold across other types of gun purchases.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

homicides (Duggan (2001), Cheng and Hoekstra (2013), Williams Jr (2017) and McClellan and Tekin (2017) ). Across this literature, lowering the psychological (e.g. "stand your ground laws") or transaction costs (e.g. permits, background checks) of obtaining a gun appears to increase gun related violence.

The relationship between guns and crime victimization also contributes to a growing literature on the determinants of crime victimization. This literature spans a number of contexts but provides evidence of how policies, private actions and individual attributes impact criminal victimization. For example, Ayres and Levitt (1998) and Gonzalez-Navarro (2013) show that the adoption of Lojack anti-auto theft devices deterred auto theft more broadly. Vollaard and Van Ours (2011) show that a policy to require burglary proof windows and doors for new homes in the Netherlands decreased burglaries by 26% and Van Ours and Vollaard (2016) show that a European Union policy that required automatic engine immobilizers decreases auto theft by 40%. Actions, such as alcohol consumption, may directly contribute to higher and lower victimization rates ( Chalfin et al. (2019) , Randi Hjalmarsson and Mitrut (2021)). More broadly, papers (Jensen and Brownfield (1986), Mayhew and Elliott (1990) ,Sampson and Lauritsen (1990), Wittebrood and Nieuwbeerta (1999), Pedersen (2001) ) in criminal justice show that routine activity or life style theory explains the positive association between being both a victim and offender.

The paper continues with a description on gum permitting in North Carolina (Section 2), details on the individual dataset incorporated into my analysis (Section 3) as well as specifics on the estimation model and individual results in Section 4. I estimate neighborhood spillovers in Section 5. Section 6 provides a discussion of mechanisms and an estimate of the local social costs from each additional CHP.

## 2. Gun Permitting in North Carolina

Before providing details on data and estimation, one needs to understand how individuals obtain handguns in NC and the role of gun-permitting in generating my main measure of gun ownership. In 1995, North Carolina changed from a "no issue" to a "shall issue" state, which meant that prior to 1996, concealed handguns were not allowed and starting in 1996, residents could conceal carry if issued a permit by the state. North Carolina also requires a pistol purchase permit (PPP) to buy a handgun and NC Gen. Stat. 14-402 states that all sales of handguns (private or licensed gun dealers) must only be to permitted buyers. Specifically, a Concealed Handgun Permit (CHP) is needed to be able to carry a handgun under clothing or in other ways concealed into almost any structure or outside. There are some restrictions on carrying guns in government buildings as

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

well as institutions that serve alcohol, but the latter has been allowed in subsequent legislative sessions. A person must be 21 years old, a resident of North Carolina for at least 30 days, have a valid driver's license, undergo a mental health medical background check (this requirement was removed in 2015), undergo a criminal background check and participate in a firearm safety course to obtain a CHP.

The background check does provide some discretion since a CHP may be approved or denied based on "good moral character" which is loosely defined as "honesty, fairness, and respect for the rights of others and for the laws of the State and nation" (Supreme Court of NC. Willis, 288 N.C. 1,10 (1975)). There is some evidence of individuals with previous arrests receiving CHPs and based on my analysis, about 1.8% of new CHP holders between 2007 and 2011 had at least one previous arrest and 0.3% had a felony arrest in the previous 5 years.[13] In practice, only a felony conviction would disqualify an individual from obtaining a CHP. An application for a CHP costs $90 and allows a person to purchase unlimited guns without any additional background checks. The process for obtaining a CHP typically takes about 45 days, but can be longer or shorter depending on the number of applications.

The choice of a CHP versus simply purchasing a gun (pistol purchase permit (PPP)) is based on two main differences between these two types of ownership: 1) A CHP allows for multiple gun purchases for up to five years while a PPP allows for only one gun to be purchased. 2) A CHP allows for concealed carry while a PPP is more limited in the usage and carrying options for prospective gun owners. The exact reasons for choosing a CHP versus a PPP are not well documented, but CHPs are more amendable to individuals that want to regularly carry a gun outside the home for protection.[14] Alternatively, one could purchase a handgun from a private owner or gun show, or one could purchase a long gun which does not require a permit. These alternative methods of gun ownership are universally difficult to measure.

## 3.  Data

In order to examine the impact of the supply of legal guns on individual crime victimization and arrest, one requires rich and spatially disaggregate data on reported crimes, arrests and permitted gun ownership. The requirements of such data limits national analysis but does allow for specific jurisdictions that have publicly available reported

---

[13]For the general population of voters, 8.3% had any arrests and 0.8% had a felony arrest in the previous five years.

[14]According to a 2017 Pew Research survey on gun ownership (Igielnik and Brown (2017)), 67% of gun owners cited protection as a major reason for getting a gun and 26% of gun owners say they regularly carry a gun outside of the home.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

crime data as well as concealed handgun or purchase permit microdata. In my case, the city of Charlotte and specifically Mecklenburg County which encompass the city of Charlotte, NC plus a few smaller towns has made this data available. My main measure of gun ownership is from a 2012 snapshot of the registry of concealed handgun permits which details individuals who received a CHP in the previous five years and I focus on new permits and not permit renewals. Prior to 2014, Mecklenburg County, NC provided data on individuals with concealed handgun permits (CHPs). This data contains identifiable information such as full name, date-of-birth, residential address, date permit issued and if this is a new permit or a renewed permit for the universe of active permit holders. Few permits expire (10%) and even fewer permit application are denied (1%) during my study period of 2007 through 2011.

I am limited to examining CHPs since pistol purchase permits (PPP) data does not contain the pistol permit issuance date and has more limited individual information. North Carolina changed public access laws to exclude gun permits in 2014 thus limiting the time frame for which I am able to directly incorporate this data to 2007 through the end of 2011, given the data was originally requested in 2012. Figure 1 provides the frequency of new CHPs over time.[15] Two things to note: 1) the initial spike in CHPs due to the introduction of CHPs in 1996 and the large spike in CHPs after the inauguration of Barack Obama in early 2009. The inauguration of Obama generated a large spike in the demand for guns as individuals feared that the federal government would pass policies limiting gun purchases or even the creation of a national registry of new gun owners.[16] The shooting of US Representative Gabrielle Giffords in January 2011 produces a noticeable uptick in CHPs as legislation was introduced to expand background checks and additional gun restrictions.[17] These spikes become even more pronounced after the end of my CHP dataset with events such as the mass shooting at Sandy Hook Elementary in 2012.

To better understand how the number of CHPs compares to background checks for most firearms, I incorporate data from the National Instant Criminal Background Check System (NICS). This database provides the number of background checks by state and month since 1998 for handguns and long guns. I focus on handgun background checks and those associated with permits and purchases. Figure A2 provides the number

---

[15]Throughout this paper, I will define the date of a CHP based on when the permit is issued, not the application date. This measure of CHP will better match when an individual is able to purchase a new gun.

[16]See Depetris-Chauvin (2015) for an in-depth study of gun purchases around the inauguration of Barack Obama in 2009.

[17]Appendix Figure A1 confirms that the narrative around gun bans/restrictions and legislative actions on guns spiked around the same time as the upticks in CHPs by examining Google trends for searches that include gun bans. The spike in searches for Obama occurred closer to the election then the subsequent inauguration seen in the CHPs, but is still consistent with this narrative.

Exhibit D
Page 369

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

of monthly CHPs and NICS background checks for handguns in Mecklenburg County over my study period.[18] This figure has two purposes. First, this figure shows us that background checks correspond well with the timing of CHPs and are often conducted just prior to a CHP being issued.[19] In some cases, the NICS background checks may precede the timing of CHPs as the background check can occur weeks or even months before the CHP is actually issued. Second, I can later use this figure to scale up the number of CHPs to estimate the number of total background checks which provides an estimate of total guns. From this figure, one would expect roughly 4 background checks for every CHP and based on survey estimates of gun sellers (Brauer et al. (2013)) , these 4 background checks would correspond to about 4.4 new guns.

In order to further explore the relationship between CHP holders and other gun purchasers, I can leverage a dataset on pistol purchase permit (PPP) holders over this time period.[20] This data provides enough information to assign individuals who received PPPs between 2008 and 2012 to neighborhoods of residence and represents the main avenue for purchasing legal guns, outside of CHPs and private/gun show purchases, in Charlotte. Figure 2 provides the correlation between PPPs and CHPs across Census Block Group (CBG) neighborhoods. Results highlight a consistent and almost one-to-one positive relationship between the number of CHPs and PPPs in a neighborhood. The similarity in neighborhoods for CHP and PPP holders as well as similar timing of CHPs and background checks in Figure A2 is reassuring that CHPs holders are representative of gun-buyers more broadly.

The primary dataset to link the underlying adult population to CHP holders and neighborhoods is the universe of registered voters based on annual snapshots from 2005-2013. This publicly available dataset provides annual snapshots of registered voters and contains a number of useful details including full name, residential address, birth year, political affiliation, race, age and gender. I exclude any voters that has been labeled removed. This dataset allows one to create a panel of registered voters including neighborhood of residence. These snapshots are typically taken right around annual elections in October and November and thus individuals who are politically active will have updated any new residence by the time of the snapshot if they were planning to vote in the upcoming election.[21] The process for updating voter registrations and voting more

---

[18] Since, NCIS is only available at the state level, I use a general population share to scale down NICS counts for the state in order to indicate the total for Mecklenburg County (Charlotte, NC).

[19] The two time series in this figure generate a correlation of 0.34.

[20] Pistol Purchase Permit (PPP) data was provided from the reporters in Off and Henderson (May 12, 2013) and provides individual information on anyone who obtained a PPP in the last 5 years but no info on the timing of purchase.

[21] Any concerns about updated voter registration information is partially mitigated by the fact that I attempt to merge unmatched individuals across any year of voter registration records using the uniqueness of

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

broadly during this time period is not onerous even though more recently (after my study period) there were a number of state legislative changes that required voter identification as well as restrictions on early voting.

The main crime dataset incorporated into my analysis is the universe of reported crimes from the Charlotte-Mecklenburg Police Department (CMPD) which contains exact latitudes and longitudes of reported crimes, whether a crime was cleared by arrest, details about the type of crime and even details about crime victims (including names, date-of-birth, address of crime victims). This dataset of reported crimes spans 2005 through 2013 and allows the creation of detailed crime outcomes that can be gun-specific such as violent crime using a firearm as well as if specific CHP holders are later crime victims or arrested for any crime. The detailed nature of the dataset allows me to link up crime victims to registered voters even if a victim changed residences.

Given the individual nature of my data, I create an annual panel dataset of registered voters linked up to CHPs based on full name, birth year and address.[22] Approximately 86% of CHP holders can be directly merged to registered voters based on name, age and address. This high match rate indicates that almost all gun owners are registered voters and have a number of demographic attributes that correlate with political participation.[23] I lose approximately 4% of the original voter data due to missing or incomplete geographical information. Since my focus is on the impacts of legal handgun ownership (which requires no felony convictions) on crimes, I am less concerned with other scholars (Uggen and Manza (2002), Hjalmarsson and Lopez (2010) ) finding that criminals are less likely to be registered voters.

Table 1 provides summary statistics for a monthly dataset of registered voters merged with CHP, crime and property data. This table highlights a couple interesting differences between individuals who have new CHPs (N=8,555) and those that do not (N=739,990). First, CHP holders are more likely to be male, white, Republican and older. These permit holders also tend to have been registered voters for a longer time period (likely lived in NC longer) and have slightly higher levels of individual crime victimization and lower levels of arrest, but live in neighborhoods with lower levels of reported crimes.

Figure 3 highlights the general trends on crime victimization and CHPs that exist in this data.[24] I include victimization rates separately for individuals that ever held a CHP versus did not have a CHP during the 2007-2011 time period. The bars provide the

---

full name and birth year. Additionally, the high match rates using my primary matching algorithm of unique full names, age and residential address limits this concern.

[22]See Appendix A1 for details on data merging

[23]Registered voters in Mecklenburg County, NC represent about 75% of the population aged 18 and above.

[24]I have historic monthly counts of CHPs issued but there is no identifying information for CHPs prior to 2007 in my dataset.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

monthly number of new CHPs. The general trend in crime from 2007 through the end of 2011 is a decline in crimes while there is a general increase in CHPs. These crime trends hold for violent and property crimes as well as other crimes in aggregate.[25]

# 4. CHPs and Individual Crime

There are a number of threats to the validity of estimating the effect of obtaining a CHP on crime victimization including omitted individual and neighborhood attributes, of which some can be included as controls. For unobserved attributes such as risk preferences, law-abiding beliefs and impulse control we have to rely on fixed effects for individuals and neighborhoods and assume that these attributes are unchanged during the time period under examination. The remaining threats to validity relate to time varying unobservables such as an individual is fearful of being a crime victim which correlates with obtaining a gun and future victimization.[26] There are three methods incorporated into my analysis to address this concern. First, I will incorporate rich information of prior victimizations, which is the best measure of current crime risk available. Second, I run some of my analysis based only on gun permits obtained during exogenous shocks to gun demand (the inauguration of Obama and shooting of Rep. Giffords). Third, I examine outcomes for only crime victimizations where the offender was unknown thus minimizing sources of crime risk known to a victim.

## 4.1. Predictors of Getting a CHP

To explore the role of individual attributes and crime risk in obtaining a CHP, I present two sets of results using linear probability models to predict getting a CHP. Table 2 provides some initial analysis to formalize the differences between CHP and non-CHP holders using a cross-section of my dataset based on the January 2007 voter snapshot. This table provides OLS analysis based on a dependent variable equal to 100 if an individual ever obtained a new permit between 2007 and 2011 and a zero otherwise. In Column 1, I examine what factors explain ever getting a new CHP with column 2 including neighborhood (Census Block Group 2000) fixed effects. Across all models, individuals

---

[25]I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. These definitions expand FBI violent or property indexed crime categories to include a larger set of crimes that are often reported to local police and likely incur social costs. Later results would be quite similar with the more narrow FBI definitions.

[26]The literature provides some evidence of this concern with Depew and Swensen (2019) , Tannenbaum (2020) and Costanza et al. (2013) showing positive impacts of crime on permitting activity in smaller cities in NC as well as Connecticut and New York.

Exhibit D
Page 384

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

that are male, white, Republican, older and born in NC are more likely to get a CHP.[27] In terms of neighborhood attributes highlighted in Column 1, those neighborhoods that have higher population density, higher poverty rates and more neighborhood property crime in the previous year tend to have fewer people obtain CHPs, but the magnitude of these effects are small and the model is low in explanatory power. Across columns, being a male and Republican have the largest magnitude of impacts on getting a new CHP.

Table 3 provides estimates of how dynamics factors impact getting a CHP. These results are based on my main dataset that uses annual data for voter attributes and residential information but allows CHPs and crime to be observed at the monthly time period. I only include individuals that ever obtained a new CHP in this table and drop observations for an individual after they obtain a CHP since I code the dependent variable as equal to 100 only in the month of obtaining a CHP. Table 3 provides the impact of if this is an individual's first year in their current neighborhood, neighborhood crimes, number of CHPs issued in the neighborhood and if the individual was a crime victim over the last 12 months. Results highlight that once one controls for both neighborhood (CBG) and individual fixed effects, neighborhood crime does not explain getting a CHP but being a crime victim matters. Variables for neighborhood crime and CHPs are normalized to be mean zero and standard deviation one so that effect sizes for neighborhood CHPs in column 3 indicate that a one standard deviation increase in neighborhoods CHPs in the last year (14.9) increase an individual's probability of getting a CHP by about 0.097 p.p. or 45%. Being a victim of a property crime increase the probability of getting a CHP by 0.044 p.p. or 21% , while being a victim of a violent crime increased CHPs by 0.062 p.p. or 29%. Given the predictive nature of neighborhood attributes and individual crime victimization, individual analysis will control for these factors.

## 4.2.  CHPs and Crime Victimization

As an initial analysis of the impacts of obtaining a CHP on individual crime victimization, I estimate the following Equation 1 where $\beta_1$ represents the coefficient of interest for the time period $(Post_t)$ after which an individual $i$ obtained a new CHP. $\gamma_i$ indicates an individual fixed effect; $\delta_{nt}$ indicates a CBG j by month t fixed effect; $X_{int-1}$ provides individual and neighborhood attributes that can vary over time and includes the variables listed in Table 2 for previous time period $t - 1$; and $Y_{int}$ is equal to 100 if individual $i$ in neighborhood $n$ is a crime victim. in month $t$.

---

[27]These attributes are consistent with existing research ( Glaeser and Glendon (1998) , Costanza et al. (2013) , Thompson and Stidham (2010)) which highlights that being Republican, white, older and male correlate with gun ownership survey data.

Exhibit D
Page 383

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

$$Y_{int} = \alpha + \beta_1 Post_t * CHP_i + \beta_2 CHP_i + X_{int} + \gamma_i + \delta_{nt} + \epsilon_{int} \tag{1}$$

Table 4 provides results from Equation 1 with models that include various fixed effects. The model in column 4 represents a standard two-way fixed effect model and indicates that obtaining a new CHP generates a 15% (0.061/0.398) increase in any crime victimization relative to the mean crime victimization rate. Given the recent literature that highlights a number of issues in implementing standard two-way fixed effects model in the presence of heterogeneous treatment and differential timing (Roth et al. (2022)), I implement a stacked difference-in-difference model in subsequent results in columns 5 through 7 of Table 4. As discussed by Goodman-Bacon (2021), creating cohorts of matched treatment and control groups allows implementation of difference-in-difference models that avoid sources of bias when treatment is staggered.

To estimate my stacked difference-in-difference model, I take all individuals who ever obtain a new CHP between 2007 and 2011 and match up to 10 non-CHP holders based on exactly matching all the individuals attributes given in Table 1 as well as the CBG neighborhood of residence in the month for which the CHP holder received a new a CHP. Matching is done with replacement such that a non-CHP holder may be matched to multiple CHP holders. This month of matching provides the timing of treatment for later event study plots and difference-in-difference estimates. I further match exactly on the total number of previous crime victimizations an individual was subject to up to five years prior to the month of treatment.[28] This final matching dimension is the best available measure of crime risk.

In the end, I am able to match 8,420 new CHP holders to an average of 5.2 control observations.[29] I observe these matched groups of CHP and non-CHP holders for the 12 months prior and following the timing of when a CHP is issued to allow me to observe criminal victimization outcomes for a full year pre/post treatment. I estimate a two period difference-in-difference estimator given by Equation 2 where $\beta_1$ is the main coefficient of interest and $Post_t$ is equal to one for the month and subsequent 12 months after a CHP is issued to group j. In order to limit comparisons between treatment and matched control observations in the same time period relative to treatment, I include matched group by month fixed effect $\delta_{njt}$. $CHP_i$ is my measure of treatment and indicates if an individual ever obtained a new CHP. I cluster standard errors at the level of the matched

---

[28]Since my crime victimization data begins in 2005, individuals contain at least 2 years of victimization data.

[29]For later arrest outcomes the average number of control observation increases to 5.4 control observations. I lose 135 CHP holders that do not have any valid control matches for victimization and arrest models.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

group as well as at the individual level.

$$y_{injt} = \alpha + \beta_1 Post_t * CHP_i + \beta_2 CHP_i + \gamma_i + \delta_{njt} + \epsilon_{injt} \qquad (2)$$

In order to highlight the validity of the parallel pre-trends assumption in this stacked difference-in-difference estimation, I estimate a series of figures that provide coefficients for each month pre/post treatment for different crime categories using Equation 3.

$$y_{injt} = \alpha + \Sigma_{t=-12}^{12} \beta_t D_{njt} * CHP_i + \gamma_i + \delta_{njt} + \epsilon_{injt} \qquad (3)$$

where $y_{injt}$ represents criminal victimization outcomes, $\beta_t$ indicates the main coefficients of interest and highlights the additional effect on victimizations for CHP holders in the 12 month period prior to and after obtaining a CHP in time t=0. $D_{njt}$ is a dummy for the month t for group j in CBG neighborhood $n$ and I omit t-1 as the reference time period.

Result of this estimation for the full sample of matched CHP and non-CHP individuals is provided in Figure 4. This figure highlights no presence of pre-trends in crime victimization as well as elevated crime victimization after a CHP for property crimes, but not for violent crimes. Effects for property crimes occur immediately as well as throughout the year following the new CHP and the largest effects occur for a stolen firearm. Results implementing this stacked difference-in-difference across crime categories with a focus on crimes that involves guns are presented in Table 5. Getting a new CHP is associated with a 46% (0.173/0.379) increase in being a crime victim relative to mean crime victimization rates. In terms of gun specific crimes, a new gun owner is 268% (0.051/0.019) more likely to have a gun stolen.[30] All together, these results suggest getting a CHP increases property crime victimization with additional victimization for gun-specific crimes.

Given concerns about unobserved crime risk impacting obtaining a CHP as well as future victimization, I estimate a version of Table 5 where I only include in the dependent variable victimizations where the victim does not know the offender (80% of crimes with victimizations). Appendix Table A1 shows results are quite similar when focusing on crimes with unknown offenders. Unknown offenders would be more consistent with unexpected or unknown crime risk. Appendix Table A2 provides results for a number of crime categories and shows that consistent with results for stolen property, only crime victimizations classified as burglaries increase for CHP holders.

---

[30]These results compare well with Hemenway et al. (2017) who finds a 2.4% 5-year victimization rate for gun theft. The comparable 5 year stolen gun victimization rate for my sample of CHPs is 2.9%

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

The lack of any effects on violent crime victimization is important since it rejects the widespread belief that carrying a gun is an effective form of protection from victimization. The overall magnitude of property crimes indicates a number of additional property crimes beyond simply stealing a gun. This increase in property crimes may relate to behavioral changes by the gun owner who may become more careless about protecting their property. Broader increases in property victimization by new CHP holders could also be a result of targeting victims with high valued items. To explore this further, Appendix Table A3 reports models that examine commonly stolen items that are high value. Specifically, I find results for any property being stolen (47% increase) with the earlier increase in firearms stolen and other categories are positive, but not statistically significant. Table 6 disaggregates stolen gun outcomes into if the gun was stolen from home, automobile or other locations. Results highlight that guns are stolen from both homes and automobiles but not from other locations. The fact that results for multiple guns stolen indicate even smaller effects as a percentage of the mean than any firearms stolen is inconsistent with straw purchasers obtaining legal guns to sell illegally. This conclusion is based on the assumption that using a CHP to purchase a large number of guns increases your likelihood of being a victim of multiple stolen guns.[31] I explore the role of straw purchasers and illegal dealers in Section 6.

## 4.3.  CHPs and Arrest

In order to highlight the potential of CHP holders being involved in transferring guns to criminals or using guns for criminal activities, I provide results for estimating Equation 2 by simply replacing the outcome to being arrested and refining matching to be based on prior arrests.[32] Matching for the arrest sample does generate more observations of matched CHP holders and control non-CHP holders since prior arrests are less common than prior victimizations for CHP holders and the general population of registered voters. The results in Table 7 indicate that individuals who obtain a CHP are less likely to be arrested, but results are imprecise and insignificant for a number of arrest types.[33] Appendix Figure A3 confirms no pre-trends in arrests across arrest categories. The fact

---

[31] It is unclear if straw purchasers would report stolen guns. One could imagine a straw purchaser buying a large number of guns to sell for profit and then reporting these guns as stolen to avoid legal repercussions as these illegal guns are used in later criminal acts. It also likely that straw purchasers do not want to be involved with the police and thus may never report stolen guns.

[32] Appendix Table A4 provides results for standard two-way fixed effects analogous to Table 4 for crime victimizations. Results vary more across these arrest models than for victimizations and are consistent with the noisy results related to arrest more broadly.

[33] I classify arrests as likely felonies, misdemeanors or technical arrests based on the nature of crime classifications. Felonies include FBI Indexed Property and Violent crimes, while Misdemeanors include other arrests linked to reported crimes. Technical arrests contain arrests without a reported crime and are typically vehicle or court violations.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

that CHP holders are, if anything, less likely to be arrested is suggestive of a general narrative that individuals who legally obtain a gun may be more law abiding individuals and this only increases after getting a CHP. This result does not dispel the presence of straw purchasers since individuals who legally obtain guns to sell may take effort to avoid criminal detection and thus obtain fewer arrests. Overall, these results do suggest that any concern about selection on unobservables for obtaining a CHP indicate that they would be along the dimensions of law abiding behavior. These results would correlate with behavior that leads to less crime victimization as CHP holders likely avoid situations involving criminal activities.[34]

## 5. Neighborhood Spillovers from CHPs

Since the largest impact of obtaining a CHP is on stolen firearm victimization, there is a large scope for impacts beyond the individual CHP holder. Therefore, this section provides an analysis of larger neighborhood effects of an individual obtaining a CHP. The goal to estimate crime spillovers that may be a result of more legal guns in the neighborhood, actions of the original CHP holder or actions by the various agents that may obtain a firearm once it has been stolen. In this neighborhood analysis, impacts will be limited to the Census Block Group (CBG) of each CHP and matched control individual. The initial choice of CBG neighborhoods is justified for looking at crime outcomes because the CBG size encompasses the typical distance upon which a criminal travels from their home. The average distance traveled is similar to the average diameter of a CBG neighborhood in my study area.[35] Additionally, Appendix Figure A4 shows that distance between an arrested individual's home and the corresponding reported crime that led to arrest for all crimes as well as violent crimes and just stolen gun reported crimes. The median distance from an arrestee's home address and the reported crime location that led to arrest is 1.9 miles for all crimes, 0.38 miles for violent crimes and 1.25 miles for stolen firearms.[36]

To estimate neighborhood spillovers, I estimate a version of the main model for individual crime victimization with two changes to the model. First, I no longer match on

---

[34] A simple correlation between being a crime victim and arrested for a crime indicates a positive relationship of 0.08 for all crimes and 0.09 for violent crimes.

[35] A back on the envelope calculation weighted by the population of registered voters finds the average CBG to be 2.4 square miles or a diameter of 1.5 miles which corresponds well with the distance to crime literature (Townsley and Sidebottom (2010)).

[36] Given these distances are calculated based on arrested individuals, one could imagine non-cleared reported crimes could be be shorter or longer distances. Friends and neighborhoods could be less cooperative with the police for short Journey to Crime (JTC) thus under-sampling short distances, but criminals that travel further may make it more difficult for the police to find the offender.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

CBG of residence but rather a different CBG in the same Census tract of residence. This change in matching criteria generates a small increase in the main crime victimization results (for Table 5, column 1 the coefficient increases from 0.173 to 0.219). Second, I modify the dependent variable ($y_{indjt}$) to represent the aggregate number of crimes in CBG $n$ for individual $i$ in month $t$ at distance $d$. In some models, I simply include the entire CBG as distance $d$, but in other models I will specific distance bands from individual $i$. I exclude any crime victimizations for individual $i$ in estimating spillovers.

$$y_{indjt} = \alpha + \beta_1 Post_t * CHP_i + \beta_2 CHP_i + \gamma_i + \delta_{njt} + \epsilon_{injt} \qquad (4)$$

In order to get a sense of the spatial decay in effects for the main crime outcomes explored previously, I report the coefficients for all crimes as well as property, violent, violent crime injuries, firearms stolen and violent crimes using guns for four different distances up to the entire CBG. Figure 5 presents results for less than 1/10 mile which is equivalent to the same building as well as neighboring buildings for individual $i$.[37] Results for other distance bands highlight quite immediate neighbors up to 1 mile which is still smaller than a typical CBG. These figures show positive impacts for both property and violent crimes that decay with distance. Focusing on gun-related crimes, one sees some small positive impacts for violent crime using a gun that decays with distance. To formalize neighborhood spillovers and generate estimates for the entire CBG, Table 8 provides results for the main crime outcomes and highlights an increase in total crimes of 2% when an individual gets a new CHP as well as a 8% increase in violent crimes using guns.

A common concern in any study of neighborhood crime is the role of policing behavior or changes in reporting of crimes by victims. Policing behavior may shift to gun-related crimes as officers are concerned about the increased number of new legal guns shifting to illegal activity which may impact both the reporting as well as clearance of crimes. For a subset of my study period (prior to 2010), Appendix Table A5 shows that there is almost no changes in calls for service in the neighborhood of a new CHP holder which is suggestive of no systematic change in how residents are reporting illegal activity to the police. The other aspect of policing would be how does law enforcement investigate and clear reported crime? As discussed by Donohue et al. (2022), increases in concealed handguns through changes in RTC laws led to more stolen guns and lower rates of violent crime clearance by police. Table 8 investigates if crime clearance changed in my difference-in-difference model at the neighborhood level and finds small and

---

[37]Models focusing only on likely family members were too underpowered to provide any additional insight given the fuzzy matching that is needed to match on last name instead of full name and age.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

insignificant effects on crime clearance with the exception of violent crimes that see a decrease in clearance rates consistent with Donohue et al. (2022).[38] These two sets of results are consistent with limited changes in crime reporting but that changes in policing behavior may be contributing to my main results through lowering the probability of being caught for potential criminals.

## 6. Mechanisms and Social Costs

As discussed earlier, there are a number of mechanisms that may generate a positive relationship between new CHPs and crime including interstate trafficking and large scale straw purchasing, informal transfer of guns to criminals based on social connections, stolen guns and even licensed gun dealers acting outside of the law. The nature of my results does provide some limits to interstate trafficking and large scale straw purchasing as the immediate effects of CHPs on neighborhood crime is too soon to be a result of larger-scale distribution to criminals. Nonetheless, to test for guns flowing in/out of my study area, I obtained additional data from the gun tracing database (thetrace.org) and calculated the number of guns originating in Charlotte that were later traced to crimes outside of Charlotte from 2010 to 2012 and found less than 3% of guns left the city as well as calculated that only 3% of guns recovered in Charlotte were from outside of the city.[39] This data does not support large flows of guns between Charlotte and other cities being the main driver of gun related upticks in crime.

The role of local straw purchases may still be important as people buy legal guns and sell/transfer to other people. There is really no way to highlight if legal gun buyers are providing guns through informal networks, especially if these transfers involve small quantities of guns. One could even imagine that straw purchasers may be less likely to get arrested in order to continue their business of selling legally obtained guns. Of course, the sale of illegal guns does generate increased risk of weapons arrest. Earlier results suggest that gun buyers are largely law-abiding in general and this does not change after obtaining a CHP. This result does provide limits to the scale upon which CHPs holders are doing illegal activities such as transferring guns to friends or selling guns to people otherwise one would see an increase in arrests after obtaining a CHP (especially for weapons arrests).

---

[38] Crime clearance outcomes in Columns 7-9 include controls for the number of reported crimes by specific crime categories in order to control for any changes in crime composition which can impact clearance rates.

[39] These percentages (3%) are calculated from a total of 361 guns recovered and 363 guns reported stolen in Charlotte. These percentages of guns leaving Charlotte as well as ended up in Charlotte are quite low relative to other locations. For example, this dataset finds substantially larger (37%) percentages of guns originating from other locations that are eventually recovered in Chicago.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

The final and most consistent mechanism highlighted in my analysis is the role of stolen guns. Results at the individual level provide strong evidence that increases in CHPs coincide with large increases in stolen guns and in general CHP holders are only victims of property crimes. Moving to the neighborhood spillovers highlights an increase in violent crimes using guns. This result is consistent with a mechanism of stolen guns being transferred to criminals that are using guns to commit violent crimes.

To put my results in terms of actual social costs, I estimate the impacts of CHPs on CBG neighborhood crime for specific crime categories and combine these estimates with the costs of crime from McCollister et al. (2010) to generate a estimated impact of the neighborhood social costs of the additional crime created by an expansion in CHPs.[40] Under a number of assumptions such as linear marginal effects and that the time window for outcomes as well as definition of neighborhoods capture the full impacts of CHPs, one could estimate the aggregate impacts of new CHPs on crime and compute a social cost. As shown in Table 9, each additional CHP would predict 6.1 additional annual crimes in a neighborhood for a social cost of $42,835 per neighborhood which equates to about $ 17.14 per person.[41] The presence of some significant effects on neighborhood crimes that are not directly related to guns (e.g. auto theft, theft from auto and vandalism) is still consistent with an increase in property crimes due to a higher payoff from crimes that may yield more guns after more CHPs are issued. Since gun owners are more likely to be property crime victims, property crime costs which equate to $12.76 per person likely encompass some private costs, but may also incur social costs as gun availability may increase neighborhood criminality (which include more property crimes in general). The remaining $4.38 in violent crime costs per person are often born by other residents from earlier analysis and thus is a primarily a external cost that is not incorporated into gun ownership decisions.

Directly comparing these cost estimates to existing literature is not easy, but Cook and Ludwig (2006) find marginal social costs of between $100 and $1800 for an additional gun. Cook et al. (2000) put gun assaults at $80 Billion and $20 Billion for accidental shootings/suicides. That would translate to about $285 per person for gun-related crimes ($80B/280M).[42] The best comparison to my results would be if one were to eliminate all new CHPs over the study period and calculate how much social costs decreased in Table 9. Eliminating all new CHPs in my dataset would be equivalent to removing 24.3 CHPs

---

[40]Specifically, I estimate my main neighborhood spillover model (Equation 4) with the inclusion of the individual CHP holders and matched non-CHP holders and report those estimate in column 3 of Table 9

[41]The fact that one additional CHP generates 6 additional crimes reflects the fact that on average each CHP corresponds with multiple background checks and gun purchases and that one gun that moves to the illegal market may be used for multiple crimes and transferred across multiple criminals.

[42]There were approximately 280 million people in the US in 2000.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

from each neighborhood which would reduce social costs by about $416 ($17.14 * 24.3) per capita which is not that far out of line with the existing estimates mentioned above. My estimates may be larger because I account for a larger number of crime categories than existing estimates, but I may also underestimate the social costs of a gun that is used for crimes outside my definition of neighborhoods.

## 7.  Conclusions

Together, results highlight that gun owners are 46% more likely to be crime victims and victimization often involves having a gun stolen. There is no evidence that legal gun owners are committing crimes themselves and CHP holders are more broadly law abiding. Analysis of neighborhood spillovers from CHPs finds increases in total crimes of about 2% and violent crimes using a gun of 8%. Additional analysis using a sample of gun tracing data over this time period as well as further explorations of stolen gun crimes and other crime categories highlight a narrative of new CHP holders being a victim of stolen guns that are then used locally in a range of criminal activities.

Context and local gun restrictions may help explain while I find a large role for stolen guns, while some other scholars (e.g. Cook et al. (2015) , Collins et al. (2017)) stress a large role for straw purchase and transfer of guns from illegal dealers. For example, a place like Charlotte with moderate restrictions on obtaining legal guns is quite ripe for having stolen guns as a large supplier of illegal guns. Whereas a place like Chicago, which has high demand for guns in general and some of the strictest gun laws in the US, makes obtaining guns via theft more costly thus generating large incentives to bring in guns from outside the city and state. A place like Chicago also provides a larger potential return to more established arm dealers within a large city to purchase illegal guns. This difference in context is important in thinking more broadly about gun policy since it suggests that different gun restrictions lend themselves to different mechanisms through which guns can be used by criminals.

My results suggest that policies that target gun security and storage may have substantial benefits beyond limiting the theft of guns including the prevention of future neighborhood violent crimes. Policies such as Child Access Prevention laws legally mandate safe and secure storage for homes with children and have been shown to decrease child access to guns and decrease injuries (Anderson and Sabia (2018) , DeSimone et al. (2013) , Webster et al. (2004) ). Safe storage laws are effective in limiting accidental deaths and suicides (Fleegler et al. (2013), Grossman et al. (2005) ). For both of these commonly used policies to promote the secure storage of guns, my results indicate that the benefits of these policies may be understated as they also prevent gun theft more

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

broadly and associated spillovers to nearby violent crime. It is unlikely that federal gun policy will ever meaningfully limit gun ownership more broadly, but stronger policies that limit gun theft may have substantial benefits on local crime and thus something that may appeal to state and county policymakers and policing agencies.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

# References

Anderson, D. M. and Sabia, J. J.: 2018, Child-access-prevention laws, youths' gun carrying, and school shootings, *The Journal of Law and Economics* **61**(3), 489–524.

Anestis, M. D. and Houtsma, C.: 2018, The association between gun ownership and statewide overall suicide rates, *Suicide and Life-Threatening Behavior* **48**(2), 204–217.

Ayres, I. and Levitt, S. D.: 1998, Measuring positive externalities from unobservable victim precaution: an empirical analysis of lojack, *The Quarterly Journal of Economics* **113**(1), 43–77.

Barker, M.: 2000, The criminal range of small-town burglars. in profiling property crimes, eds. david canter and laurence alison. dartmouth, u.k.

Braga, A. A., Papachristos, A. V. and Hureau, D. M.: 2010, The concentration and stability of gun violence at micro places in boston, 1980–2008, *Journal of Quantitative Criminology* **26**(1), 33–53.

Brauer, J. et al.: 2013, 14 the us firearms industry production and supply.

Capone, D. L. and Nichols Jr, W. W.: 1976, Urban structure and criminal mobility, *American Behavioral Scientist* **20**(2), 199–213.

Chalfin, A., Hansen, B. and Ryley, R.: 2019, The minimum legal drinking age and crime victimization, *Technical report*, National Bureau of Economic Research.

Cheng, C. and Hoekstra, M.: 2013, Does strengthening self-defense law deter crime or escalate violence? evidence from expansions to castle doctrine, *Journal of Human Resources* **48**(3), 821–854.

Collins, M. E., Parker, S. T., Scott, T. L. and Wellford, C. F.: 2017, A comparative analysis of crime guns, *RSF: The Russell Sage Foundation Journal of the Social Sciences* **3**(5), 96–127.

Cook, P. J.: 2018, Gun markets, *Annual Review of Criminology* **1**, 359–377.

Cook, P. J. and Donohue, J. J.: 2017, Saving lives by regulating guns: Evidence for policy, *Science* **358**(6368), 1259–1261.

Cook, P. J. and Goss, K. A.: 2020, *The gun debate: What everyone needs to know®*, Oxford University Press.

Cook, P. J. and Ludwig, J.: 2006, The social costs of gun ownership, *Journal of Public Economics* **90**(1-2), 379–391.

Cook, P. J. and Ludwig, J.: 2019, Understanding gun violence: Public health vs. public policy, *Journal of Policy Analysis and Management* **38**(3), 788–795.

Cook, P. J., Ludwig, J. et al.: 2000, *Gun violence: The real costs*, Oxford University Press on Demand.

Exhibit D
Page 393

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

Cook, P. J., Parker, S. T. and Pollack, H. A.: 2015, Sources of guns to dangerous people: What we learn by asking them, *Preventive medicine* **79**, 28–36.

Costanza, S., Kilburn, J. and Miles, B.: 2013, The spatial dynamics of legal handgun concealment, *Crime Mapping: A Journal of Research and Practice* **5**(1), 39–62.

Depetris-Chauvin, E.: 2015, Fear of obama: An empirical study of the demand for guns and the us 2008 presidential election, *Journal of Public Economics* **130**, 66–79.

Depew, B. and Swensen, I. D.: 2019, The decision to carry the effect of crime on concealed-carry applications, *Journal of Human Resources* **54**(4), 1121–1153.

DeSimone, J., Markowitz, S. and Xu, J.: 2013, Child access prevention laws and nonfatal gun injuries, *Southern economic journal* **80**(1), 5–25.

Donohue, J. J., Aneja, A. and Weber, K. D.: 2019, Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic control analysis, *Journal of Empirical Legal Studies* **16**(2), 198–247.

Donohue, J. J., Cai, S. V., Bondy, M. V. and Cook, P. J.: 2022, More guns, more unintended consequences: The effects of right-to-carry on criminal behavior and policing in us cities, *Technical report*, National Bureau of Economic Research.

Duggan, M.: 2001, More guns, more crime, *Journal of political Economy* **109**(5), 1086–1114.

Fleegler, E. W., Lee, L. K., Monteaux, M. C., Hemenway, D. and Mannix, R.: 2013, Firearm legislation and firearm-related fatalities in the united states, *JAMA internal medicine* **173**(9), 732–740.

Gabor, T. and Gottheil, E.: 1984, offender characteristics and spatial mobility: An empirical study and some policy implications, *Canadian Journal of Criminology and Criminal Justice* **26**, 267–81.

Ghiani, M., Hawkins, S. S. and Baum, C. F.: 2019, Associations between gun laws and suicides, *American journal of epidemiology* **188**(7), 1254–1261.

Glaeser, E. L. and Glendon, S.: 1998, Who owns guns? criminals, victims, and the culture of violence, *The American Economic Review* **88**(2), 458–462.

Gonzalez-Navarro, M.: 2013, Deterrence and geographical externalities in auto theft, *American Economic Journal: Applied Economics* **5**(4), 92–110.

Goodman-Bacon, A.: 2021, Difference-in-differences with variation in treatment timing, *Journal of Econometrics* **225**(2), 254–277.

Grossman, D. C., Mueller, B. A., Riedy, C., Dowd, M. D., Villaveces, A., Prodzinski, J., Nakagawara, J., Howard, J., Thiersch, N. and Harruff, R.: 2005, Gun storage practices and risk of youth suicide and unintentional firearm injuries, *Jama* **293**(6), 707–714.

Grossman, D. C., Stafford, H. A., Koepsell, T. D., Hill, R., Retzer, K. D. and Jones, W.: 2012, Improving firearm storage in alaska native villages: a randomized trial of household gun cabinets, *American journal of public health* **102**(S2), S291–S297.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Hemenway, D.: 2011, Risks and benefits of a gun in the home, *American Journal of Lifestyle Medicine* **5**(6), 502–511.

Hemenway, D., Azrael, D. and Miller, M.: 2017, Whose guns are stolen? the epidemiology of gun theft victims, *Injury epidemiology* **4**(1), 1–5.

Hjalmarsson, R. and Lopez, M.: 2010, The voting behavior of young disenfranchised felons: Would they vote if they could?, *American Law and Economics Review* **12**(2), 356–393.

Igielnik, R. and Brown, A.: 2017, Key takeaways on americans' views of guns and gun ownership.
**URL:** *https://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/*

Jensen, G. F. and Brownfield, D.: 1986, Gender, lifestyles, and victimization: Beyond routine activity, *Violence and victims* **1**(2), 85–99.

Khalil, U.: 2017, Do more guns lead to more crime? understanding the role of illegal firearms, *Journal of Economic Behavior & Organization* **133**, 342–361.

Kleck, G. and Wang, S.-Y. K.: 2008, The myth of big-time gun trafficking and the overinterpretation of gun tracing data, *UCLA L. Rev.* **56**, 1233.

Lang, M.: 2013, Firearm background checks and suicide, *The Economic Journal* **123**(573), 1085–1099.

Levine, P. B. and McKnight, R.: 2017, Firearms and accidental deaths: Evidence from the aftermath of the sandy hook school shooting, *Science* **358**(6368), 1324–1328.

Luca, M., Malhotra, D. and Poliquin, C.: 2020, The impact of mass shootings on gun policy, *Journal of Public Economics* **181**, 104083.

Mayhew, P. and Elliott, D.: 1990, Self-reported offending, victimization, and the british crime survey, *Violence and Victims* **5**(2), 83–96.

McClellan, C. and Tekin, E.: 2017, Stand your ground laws, homicides, and injuries, *Journal of human resources* **52**(3), 621–653.

McCollister, K. E., French, M. T. and Fang, H.: 2010, The cost of crime to society: New crime-specific estimates for policy and program evaluation, *Drug and alcohol dependence* **108**(1-2), 98–109.

McElroy, M. B. and Wang, W.: 2017, Seemingly inextricable dynamic differences: The case of concealed gun permit, violent crime and state panel data, *Violent Crime and State Panel Data (June 24, 2017)* .

Miller, M., Azrael, D., Hepburn, L., Hemenway, D. and Lippmann, S. J.: 2006, The association between changes in household firearm ownership and rates of suicide in the united states, 1981–2002, *Injury Prevention* **12**(3), 178–182.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

Miller, M., Hepburn, L. and Azrael, D.: 2017, Firearm acquisition without background checks: results of a national survey, *Annals of internal medicine* **166**(4), 233–239.

Miller, M., Lippmann, S. J., Azrael, D. and Hemenway, D.: 2007, Household firearm ownership and rates of suicide across the 50 united states, *Journal of Trauma and Acute Care Surgery* **62**(4), 1029–1035.

Miller, M., Zhang, Y., Prince, L., Swanson, S. A., Wintemute, G. J., Holsinger, E. E. and Studdert, D. M.: 2022, Suicide deaths among women in california living with handgun owners vs those living with other adults in handgun-free homes, 2004-2016, *JAMA psychiatry* .

Morrow, P. L. and Hudson, P.: 1986, Accidental firearm fatalities in north carolina, 1976-80., *American journal of public health* **76**(9), 1120–1123.

Off, G. and Henderson, B.: May 12, 2013, Dozens of felons hold gun permits in mecklenburg county, *Charlotte Observer* .

Papachristos, A. V.: 2009, Murder by structure: Dominance relations and the social structure of gang homicide, *American journal of sociology* **115**(1), 74–128.

Papachristos, A. V. and Wildeman, C.: 2014, Network exposure and homicide victimization in an african american community, *American Journal of Public Health* **104**(1), 143–150.

Papachristos, A. V., Wildeman, C. and Roberto, E.: 2015, Tragic, but not random: The social contagion of nonfatal gunshot injuries, *Social Science & Medicine* **125**, 139–150.

Pedersen, W.: 2001, Adolescent victims of violence in a welfare state: Sociodemography, ethnicity and risk behaviours, *British Journal of Criminology* **41**(1), 1–21.

Phillips, P. D.: 1980, Characteristics and typology of the journey to crime, *in* D. E. Georges-Abeyie and K. D. Harries (eds), *Barriers to Reentry? The Labor Market for Released Prisoners in Post-Industrial America*, New York: Columbia University Press.

Randi Hjalmarsson, Anna Bindler, N. K. and Mitrut, A.: 2021, Discontinuities in the age-victimization profile and the determinants of victimization, *Technical report*, Working Paper.

Repetto, T.: 1974, Residential crime.

Rhodes, W. and Conly, C.: 1981, Crime and mobility: an empirical study. in brantingham, p. & brantingham, p.(eds.) environmental criminology. beverly hills.

Roth, J., SantAnna, P., Bilinski, A. and Poe, J.: 2022, Whats trending in difference-in-differences, *A Synthesis of the Recent Econometrics Literature* p. 54.

Sampson, R. J. and Lauritsen, J. L.: 1990, Deviant lifestyles, proximity to crime, and the offender-victim link in personal violence, *Journal of research in crime and delinquency* **27**(2), 110–139.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Studdert, D. M., Zhang, Y., Swanson, S. A., Prince, L., Rodden, J. A., Holsinger, E. E., Spittal, M. J., Wintemute, G. J. and Miller, M.: 2020, Handgun ownership and suicide in california, *New England journal of medicine* **382**(23), 2220–2229.

Tannenbaum, D. I.: 2020, Does the disclosure of gun ownership affect crime? evidence from new york, *Journal of Public Economics* **181**, 104075.

Thompson, J. A. and Stidham, R.: 2010, Packing heat in the tar heel state: a county-level assessment of concealed carry permits, *Criminal Justice Review* **35**(1), 52–66.

Townsley, M. and Sidebottom, A.: 2010, All offenders are equal, but some are more equal than others: Variation in journeys to crime between offenders, *Criminology* **48**(3), 897–917.

Uggen, C. and Manza, J.: 2002, Democratic contraction? political consequences of felon disenfranchisement in the united states, *American Sociological Review* pp. 777–803.

Van Ours, J. C. and Vollaard, B.: 2016, The engine immobiliser: A non-starter for car thieves, *The Economic Journal* **126**(593), 1264–1291.

Vollaard, B. and Van Ours, J. C.: 2011, Does regulation of built-in security reduce crime? evidence from a natural experiment, *The Economic Journal* **121**(552), 485–504.

Webster, D. W., Vernick, J. S., Zeoli, A. M. and Manganello, J. A.: 2004, Association between youth-focused firearm laws and youth suicides, *Jama* **292**(5), 594–601.

Wiebe, D. J.: 2003a, Firearms in us homes as a risk factor for unintentional gunshot fatality, *Accident Analysis & Prevention* **35**(5), 711–716.

Wiebe, D. J.: 2003b, Homicide and suicide risks associated with firearms in the home: a national case-control study, *Annals of emergency medicine* **41**(6), 771–782.

Williams Jr, M. C.: 2017, Gun violence in black and white: Evidence from policy reform in missouri, *Technical report*, Working Paper, MIT.

Wintemute, G. J., Parham, C. A., Beaumont, J. J., Wright, M. and Drake, C.: 1999, Mortality among recent purchasers of handguns, *New England Journal of Medicine* **341**(21), 1583–1589.

Wittebrood, K. and Nieuwbeerta, P.: 1999, Wages of sin? the link between offending, lifestyle and violent victimisation, *European Journal on Criminal Policy and Research* **7**(1), 63–80.

Yourish, K., Andrews, W., Buchanan, L. and McLean, A.: 2013, State gun laws enacted in the year since newtown, *The New York Times* .

Exhibit D
Page 399

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure 1: New Concealed Handgun Permit Holders



This figure provides the frequency of new CHPs issued from 1996-2011. Month of CHP is based on the date the permit was issued to an individual, which in some cases may be months after the initial application for a new CHP.

Exhibit D
Page 300

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure 2: Concealed Handgun Permit Holders vs. Pistol Purchase Permit Holders



This figure provides the distribution of Concealed Handgun Permits (CHPs) per Census Block Group (CBG) neighborhood issued 2007-2011 relative to Pistol Purchase Permits (PPPs) per CBG neighborhood issued from 2008-2012. Since I cannot distinguish if an individual has previously obtained a PPP, I include all CHP holders regardless if they are new or renewing. There are a total of 14,468 CHPs issued and approximately 20,749 PPPs issued over the five year time period. This figure highlights that the population of PPP holders live in similar neighborhoods as CHP holders.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure 3: Victimization Rates and CHPs



The figure plots monthly crime victimization rates separately for individuals that received a new Concealed Handgun Permit (CHP) at some point in 2007-2011 and non-CHP holders (2007-2011). The bars provide the monthly number of new CHPs.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure 4: Temporal Impacts of New CHPs on Crime Victimization



Difference-in-difference model based on pre-CHP matched individuals on observables and specified as Equation 3. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Firearm stolen is any crime that involves a firearm in the list of items reported stolen. Serious Injury indicates any crime where the victim reports an injury other than a minor injury. Violent Crime Using Gun indicates any reported violent crimes where a firearm was included as part of the crime report. All models include fixed effects for each matching group by time as well as individual. Standard errors are clustered by matching group as well as by individual.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

### Table 1: Monthly Summary Statistics

| | Registered Voters - No CHP | | Registered Voters - w/ CHP | |
|---|---|---|---|---|
| | Mean | Std Dev | Mean | Std Dev |
| **Individual Attributes** | | | | |
| Male | 0.44 | (0.50) | 0.75 | (0.43) |
| Democrat | 0.45 | (0.50) | 0.27 | (0.44) |
| Republican | 0.29 | (0.45) | 0.49 | (0.50) |
| Black | 0.30 | (0.46) | 0.18 | (0.38) |
| Hispanic | 0.02 | (0.13) | 0.01 | (0.10) |
| age 30-50 | 0.49 | (0.50) | 0.50 | (0.50) |
| age 51+ | 0.33 | (0.47) | 0.37 | (0.48) |
| Registered in NC > 5 years | 0.63 | (0.48) | 0.67 | (0.47) |
| Born Out-of-State | 0.69 | (0.46) | 0.68 | (0.47) |
| **Crime Victim (p.p.)** | | | | |
| Victim - Prop Crime | 0.28 | (5.25) | 0.39 | (6.27) |
| Victim - Vio Crime | 0.08 | (2.79) | 0.05 | (2.32) |
| Victim - Tot Crime | 0.40 | (6.52) | 0.49 | (7.12) |
| Arrested - Any Crime | 0.17 | (4.19) | 0.06 | (2.59) |
| **Neigh Crimes** | | | | |
| Prop Crimes in Neigh | 16.1 | (19.5) | 14.1 | (18.7) |
| Vio Crimes in Neigh | 3.8 | (4.7) | 3.1 | (4.1) |
| Tot Crimes in Neigh | 24.4 | (27.5) | 20.9 | (26.2) |

Summary Statistics are based on monthly data for individual registered voters constructed from annual snapshots (2007-2011) merged with concealed handgun permits (CHP) in Mecklenburg County (Charlotte), NC. Criminal justice data is based on individual reported crime victimizations and arrests merged with each individual. Datasets are merged primarily based on full name, birth year and address. Neigh is defined as Census Block Group 2000 in all models unless otherwise stated. Crime Victimizations and Arrest are reported in percentage points and thus are scale to be 0 or 100 for a monthly victimization or arrest. Al individual attributes are binary variables.

I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Observations equal to 34,651,212 for individual that never obtained a CHP 2007-2011 and equal to 475,800 for new CHP holders 2007-2011.

Exhibit D

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

Figure 5: Impact of New CHPs on Neighbor Crime

A. General Crimes



B. Gun Crimes



Difference-in-difference model based on pre-CHP matched individuals on observables and specified as Equation 4. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Firearm stolen is any crime that involves a firearm in the list of items reported stolen. Serious Injury indicates any crime where the victim reports an injury other than a minor injury. Violent Crime Using Gun indicates any reported violent crimes where a firearm was included as part of the crime report. Dependent variable indicates the number of crimes in a given distance band and month for the specified category. Given the differing spatial extent of areas covered by each distance interval, I scale results to be percent effects (coefficient/mean of dependent variable.). Standard errors are clustered by matching group as well as by individual.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table 2: Individual Attributes and New CHPs

|  | (1) Ever New CHP | (2) Ever New CHP |
|---|---|---|
| Individual Att. |  |  |
| Homebuyer's Income ($ 10k) | 0.007 | 0.007 |
|  | (0.004) | (0.004) |
| Male | 1.514*** | 1.519*** |
|  | (0.052) | (0.052) |
| Democrat | −0.221*** | −0.229*** |
|  | (0.041) | (0.042) |
| Republican | 0.681*** | 0.672*** |
|  | (0.051) | (0.050) |
| Black | 0.038 | −0.011 |
|  | (0.047) | (0.049) |
| Hispanic | −0.206 | −0.202 |
|  | (0.132) | (0.134) |
| age 30-50 | 0.108** | 0.113** |
|  | (0.051) | (0.050) |
| age 51+ | 0.144** | 0.155*** |
|  | (0.056) | (0.056) |
| Born Out-of-State | −0.319*** | −0.283*** |
|  | (0.049) | (0.047) |
| Registered in NC > 5 years | 0.059 | 0.046 |
|  | (0.039) | (0.040) |
| Homebuyer's Income Missing | 0.103 | 0.139** |
|  | (0.065) | (0.065) |
| Neigh Vars. |  |  |
| CBG Black (%) | −0.052 |  |
|  | (0.141) |  |
| CBG Hispanic (%) | 0.737 |  |
|  | (0.469) |  |
| CBG Pop Density (00s pop/sq mi) | −0.017*** |  |
|  | (0.002) |  |
| CBG Median HH Income (00s) | 0.000 |  |
|  | (0.000) |  |
| HHs in Poverty (%) | −0.382*** |  |
|  | (0.111) |  |
| Neigh Prop Crime (t-1) | −0.100*** |  |
|  | (0.038) |  |
| Neigh Vio Crime (t-1) | 0.035 |  |
|  | (0.039) |  |
| CBG FEs |  | ✓ |
| R-squared | 0.01 | 0.01 |
| Dep. Var. (mean) | 1.278 | 1.278 |
| Observations | 505,812 | 505,812 |

Dataset is based on a 2007 annual snapshot of individual registered voters merged with each concealed handgun permits (CHP) in Mecklenburg County (Charlotte), NC. Neighborhood crime is based on individual reported crimes in 2006 and scaled to be mean zero and standard deviation one one across CBGs. Datasets are merged primarily based on full name, birth year and address. Neighborhood is defined as Census Block Group 2000 in all models unless otherwise stated. Observation counts are smaller than the total number of individuals given the focus only on individuals that are present in 2007 voter registration records.

* p < 0.1, ** p < 0.05, *** p < 0.01. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Model is based on a dependent variable equal to 100 if an individual ever gets a new CHP 2007-2011.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table 3: Crime Risk and New CHPs

|  | (1)<br>New<br>CHP | (2)<br>New<br>CHP | (3)<br>New<br>CHP |
|---|---|---|---|
| New to Neighborhood | −0.078*** | −0.022** | −0.017 |
|  | (0.009) | (0.011) | (0.011) |
| Neigh Prop Crime (last year) | −0.001 | 0.086** | −0.008 |
|  | (0.032) | (0.040) | (0.032) |
| Neigh Vio Crime (last year) | −0.009 | 0.003 | −0.008 |
|  | (0.015) | (0.020) | (0.015) |
| Neigh CHPs (last year) | 0.097*** | 0.097*** | 0.097*** |
|  | (0.012) | (0.008) | (0.012) |
| Prop Crime Victim (last year) | 0.033*** | 0.045*** | 0.044*** |
|  | (0.008) | (0.009) | (0.010) |
| Vio Crime Victim (last year) | 0.046** | 0.062** | 0.062** |
|  | (0.021) | (0.026) | (0.027) |
| CBG FEs | ✓ |  | ✓ |
| Individual FEs |  | ✓ | ✓ |
| R-squared | 0.040 | 0.056 | 0.065 |
| Dep. Var. (mean) | 0.214 | 0.214 | 0.214 |
| Observations | 475,800 | 475,800 | 475,800 |

Dataset is based on a 2007-2011 monthly panel created from annual snapshot of individual registered voters merged with each concealed handgun permits (CHP) in Mecklenburg County (Charlotte), NC. Neighborhood crime is based on individual reported crimes in 2006-2011. Datasets are merged primarily based on full name, birth year and address. Neighborhood is defined as Census Block Group 2000 in all models unless otherwise stated.

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Model is based on a dependent variable equal to 100 if an individual ever gets a new CHP in a given month. I only include individuals that ever get a new CHP in this model and drop observations for months after an individual gets a new CHP.

Exhibit D
Page 305

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table 4: Any Crime Victimization and CHPs

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|
| | Any Crime Victim | Any Crime Victim | Any Crime Victim | Any Crime Victim | Any Crime Victim | Any Crime Victim | Any Crime Victim *Obama & Gifford Shocks* |
| New CHP | 0.091*** | 0.105*** | 0.105*** | 0.061** | 0.093*** | 0.173*** | 0.234*** |
| | (0.014) | (0.014) | (0.014) | (0.027) | (0.035) | (0.043) | (0.076) |
| Covs. Individual | ✓ | ✓ | ✓ | ✓ | | | |
| Covs. CBG | | ✓ | | | | | |
| CBG by month FEs | | | ✓ | ✓ | | | |
| Individual FEs | | | | ✓ | | ✓ | ✓ |
| Matched Group by Month FEs | | | | | ✓ | ✓ | ✓ |
| Dep. Var. (mean) | 0.398 | 0.398 | 0.398 | 0.398 | 0.379 | 0.379 | 0.236 |
| Observations | 35,127,012 | 35,127,012 | 35,127,012 | 35,127,012 | 1,786,079 | 1,786,079 | 421,071 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. Cols 1 through 4 incorporated a standard panel model based on Equation 1 and cols 5 through 7 incorporate difference-in-difference monthly models based on pre-CHP matched individuals on observables and specified as Equation 2. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Standard errors are clustered at CBG by month in columns 1-3; at CBG by month and individual in column 4; at matching group in column 5; at matching group and individual in column 6-7. Columns 5-7 weight models by the inverse of the number of matched control individuals for a given CHP holder. Columns one and two include month fixed effects. Column 7 limits my analysis to only permits and matched controls obtained Jan.-June 2009 and Jan.-June 2011, which corresponds with the large uptick in CHPs following the election and inauguration of Barack Obama and the shooting of Gabrielle Giffords.

Table 5: Crime Victimization and CHPs

| | (1) Any Crime Victim | (2) Vio Crime Victim | (3) Prop Crime Victim | (4) Injury Victim | (5) Gun Stolen Victim | (6) Vio Crime Using Gun Victim |
|---|---|---|---|---|---|---|
| New CHP Holder*Post | 0.173*** | 0.011 | 0.135*** | 0.002 | 0.051*** | 0.005 |
| | (0.043) | (0.015) | (0.038) | (0.006) | (0.013) | (0.009) |
| Dep. Var. (mean) p.p. | 0.379 | 0.050 | 0.292 | 0.008 | 0.019 | 0.016 |
| Observations | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include a difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. All models include fixed effects for each matching group by time period as well as individual. I weight models by the inverse of the number of matched control individuals for a given CHP holder. Standard errors are clustered by matching group as well as by individual.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table 6: Stolen Gun Victimizations and CHPs

|  | (1) Firearm Stolen | (2) Multi Guns Stolen | (3) Firearm Stolen from Car | (4) Firearm Stolen from Home | (5) Firearm Stolen from Other |
|---|---|---|---|---|---|
| New CHP Holder*Post | 0.051*** | 0.006 | 0.017** | 0.036*** | 0.004 |
|  | (0.013) | (0.005) | (0.008) | (0.011) | (0.004) |
| Dep. Var. (mean) p.p. | 0.019 | 0.004 | 0.005 | 0.014 | 0.002 |
| Observations | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 |

* p < 0.1, ** p < 0.05, *** p < 0.01. All columns include a difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I weight models by the inverse of the number of matched control individuals for a given CHP holder. All models include fixed effects for each matching group by time as well as individual. Standard errors are clustered by matching group as well as by individual.

Table 7: Arrests and CHPs

|  | (1) Any Arrest | (2) Misdemeanor Arrest | (3) Felony Arrest | (4) Weapons Arrest | (5) Technical Arrest |
|---|---|---|---|---|---|
| New CHP Holder*Post | −0.023* | −0.018 | −0.002 | 0.001 | −0.010 |
|  | (0.013) | (0.012) | (0.005) | (0.002) | (0.011) |
| Dep. Var. (mean) p.p. | 0.064 | 0.045 | 0.014 | 0.002 | 0.040 |
| Observations | 1,962,041 | 1,962,041 | 1,962,041 | 1,962,041 | 1,962,041 |

* p < 0.1, ** p < 0.05, *** p < 0.01. All columns include a difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. Felonies include FBI Indexed Property and Violent crimes (arson, assault, manslaughter, rape, robbery, auto theft and burglary), while Misdemeanors include arrests linked to non-felony reported crimes. Technical arrests contain arrests without a reported crime and are typically vehicle or court violations. I weight models by the inverse of the number of matched control individuals for a given CHP holder. All model include fixed effects for matching group by time and individual. Standard errors are clustered by matching group as well as by individual.

Exhibit D
Page 309

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table 8: Neighborhood Spillovers in Crime

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| | Neigh Any Crime | Neigh Vio Crime | Neigh Prop Crime | Neigh Injury Crime | Neigh Gun Stolen | Neigh Vio Crime Using Gun | Neigh Crimes Clear Rate (p.p.) | Neigh Clear Vio Crimes (p.p.) | Neigh Clear Crimes Using Gun (p.p.) |
| New CHP*Post | 0.511* | 0.044 | 0.486** | −0.004 | 0.009 | 0.043*** | −0.160 | −0.789** | −0.180 |
| | (0.269) | (0.042) | (0.191) | (0.006) | (0.008) | (0.010) | (0.190) | (0.400) | (0.806) |
| Dep. Var. (mean) | 26.365 | 3.706 | 18.032 | 0.336 | 0.462 | 0.555 | 32.825 | 64.097 | 31.994 |
| Observations | 1,646,655 | 1,646,655 | 1,646,655 | 1,646,655 | 1,646,655 | 1,646,655 | 1,242,747 | 933,169 | 527,494 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include a difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 4. I define violent crimes as arson, (aggravated and simple), manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Dependent variable indicates the number of crimes in the CBG neighborhood in a given month for the specified category. The number of observations differs from other models since I have fewer matched control observations here given the need to match to individuals in different neighborhoods. I omit any reported crimes directly linked to a given CHP or matched non-CHP holder. I weight models by the inverse of the number of matched control individuals for a given CHP holder. Observation counts are lower for crime clearances since neighborhoods by months without a reported crime are excluded. Standard errors are clustered by matching group as well as by individual.

Table 9: Social Costs of Gun Ownership

| Crime Category | Mean Ann. Neigh Tot Crime | Est. Ann. Increase in Crime per CHP | Costs Estimates McCollister et al. (2010) | Neigh Social Cost for add. CHP | Per Capita Social Cost of add. CHP |
|---|---|---|---|---|---|
| Assaults | 32.0 | 0.00 | 19,537 | $94 | |
| Auto Theft | 10.7 | 1.51*** | 10,534 | $15,906 | |
| Burglary | 25.8 | 0.81* | 6,170 | $4,998 | |
| Drugs | 13.6 | -0.03 | 8,347 | $(250) | |
| Forgery | 12.1 | -0.54* | 5,265 | $(2,843) | |
| Hit and Run | 10.0 | 0.11 | 8,347 | $922 | |
| Larceny | 35.7 | -0.99 | 3,523 | $(3,479) | |
| Murder | 0.1 | 0.00 | 1,278,424 | $(1,227) | |
| Other | 30.7 | -0.28 | 8,347 | $(2,364) | |
| Robbery | 6.0 | 0.41*** | 21,398 | $8,773 | |
| Sex Offenses | 1.4 | 0.08 | 41,247 | $3,300 | |
| Stolen Property | 0.9 | 0.01 | 7,974 | $48 | |
| Theft from Auto | 34.0 | 4.14*** | 3,523 | $14,585 | |
| Vandalism | 19.6 | 0.90** | 4,860 | $4,374 | $17.14 |
| Total | 232.5 | 6.13* | | $42,835 | |

In order to generate estimates, I simply scale up monthly estimates using Equation 4 with the dependent variable equal to the number of monthly crimes within the CBG neighborhood of a CHP or non-CHP holder classified by row heading. If cost estimates from MFF (2010) are not available , I use the weighted average of social costs across all crime categories with costs ($8,347) estimates. Given the time period of analysis and cost estimates, costs are roughly based on 2010 ($s) . I include all reported crimes even if they represent a victimization of a given CHP or matched non-CHP holder.

Exhibit D
Page 330

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

# A. Online Appendix

## A.1. Master Dataset Creation - Individuals

This section provides some more details on the merging on datasets using individual information. The base dataset for the creation of the master dataset used in all analysis is annual snapshots of voter registration records from the state of North Carolina for 2005 through 2013 (https://dl.ncsbe.gov/index.html?prefix=data/). The main dataset that provides individual level data on Concealed Handgun Permit (CHP) holders is from the NC Department of Public Safety. This data was requested in 2012 and contains information on full name, residential address and date of birth. In 2014, state senate bill 226 removed the public record element of gun permit data and thus this data is no longer available for public request and thus my analysis is limited to the data previously requested that contained 2007 through the end of 2011. The final main dataset merged with voter registration records is incident level data for reported crimes in Charlotte/Mecklenburg County for 2005 through 2013. Some unique elements of this crime dataset include identifying individual data on crime victimization, lots of specific details on the location and crime categories of a reported crime, date and time of incident.

Voter registration data is merged with CHP data primarily based on full name, birth year and address. In some cases, data is merged based on full names and birth year that are unique in the voter registration dataset. The merging of CHP data to voter registration data was conducted in three stages. First, I match each CHP to all unique voters based on full name and home address. This matching algorithm does a good job of linking up individuals with 91% of matcheable CHPs merged using this method. Second, I match each CHP to unique voters based on age, full name and address. This method matches about 8% of matcheable CHPs and deals with multigenerational families such as fathers and sons of the same name living together. Third, I attempted to match based on full name and age or fuzzy versions of the first two matching algorithms. These fuzzy merges provided less than 1% of matcheable observations. In the end, approximately 86% of CHPs can be directly merged to a registered voter based on full name, age and address. Registered voters in Mecklenburg County, NC represent about 75% of the population aged 18 and above. I lose approximately 4% of the original voter registration data due to missing or incomplete geographical information. Crime victimization data is merged to registered voters based on full name, birth year and address or unique full name and birth year. In general there is not a metric to determine the quality of matching across these datasets since they do not contain the same variables other than match variables.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

## A.2.  Appendix Tables and Figures

Figure A1: Google Trends around Obama Spike and Giffords Shooting



This figure provides the Google trends figure for my study period for the terms "Gun Ban AND Obama" and "Gun Ban AND Congress". The y-scale is normalized to 100 for the most popular week upon which this search terms was used in the US.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure A2: New Concealed Handgun Permit Holders vs. NICS Handgun Background Checks



This figure provides the frequency of new CHPs issued versus estimated NICS handgun background checks for gun permits for Mecklenburg County, NC. NICS background checks for gun purchases are provided monthly at the state level, so I estimate for Mecklenburg County by taking the share of NC population in Mecklenburg County and multiplying it with the total NICS handgun background checks for the state. In some cases, the NICS background checks may precede the timing of CHPs as the background check can occur weeks or even months before the CHP is actually issued. These two time series have a correlation of 0.34.

40

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure A3: Temporal Impacts of New CHPs on Criminal Arrest



Difference-in-difference model based on pre-CHP matched individuals on observables and specified as a quarterly version of Equation 3. These models aggregate months to quarters in specifying time periods interacted with being in the treatment group given the low frequency of arrests. All model include fixed effects for matching group and individual. I weight models by the inverse of the number of matched control individuals for a given CHP holder. Standard errors are clustered by matching group by month as well as by individual. I classify arrests as likely felonies, misdemeanors or technical arrests based on the nature of crime classifications. Felonies include FBI Indexed Property and Violent crimes (arson, assault, manslaughter, rape, robbery, auto theft and burglary), while Misdemeanors include arrests linked to non felony reported crimes. Technical arrests contain arrests without a reported crime and are typically vehicle or court violations.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Figure A4: Journey to Crime



This figure provides the distance between an arrested individual's home address and the location of the reported crime linked to the arrest. I conduct this analysis for all reported crimes with linked arrests from 2007-2011 in Mecklenburg County, NC. This data was collected as part of a larger effort by the Charlotte Mecklenburg Police Department (CMPD) to better track crime clearance and profile potential offenders for non-cleared reported crimes. I limit analysis to up to 10 miles apart since less than 5% of observations register a longer journey to crime.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table A1: Crime Victimizations and CHPs - Unknown Offenders

|  | (1) Any Crime Victim | (2) Vio Crime Victim | (3) Prop Crime Victim | (4) Injury Victim | (5) Gun Stolen Victim | (6) Vio Crime Using Gun Victim |
|---|---|---|---|---|---|---|
| New CHP Holder*Post | 0.128*** | 0.005 | 0.109*** | 0.002 | 0.047*** | −0.001 |
|  | (0.039) | (0.011) | (0.036) | (0.005) | (0.012) | (0.008) |
| Dep. Var. (mean) p.p. | 0.319 | 0.023 | 0.270 | 0.006 | 0.017 | 0.014 |
| Observations | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 |

Dataset is based on a monthly panel of individual registered voters from 2007-2011 merged with each concealed handgun permits (CHP) in Mecklenburg County (Charlotte), NC. Criminal justice data is based on individual reported crimes and arrests from 2005-2013. Datasets are merged primarily based on full name, birth year and address. Neigh is defined as Census Block Group 2000 in all models unless otherwise stated.

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. All models include fixed effects for each matching group by time as well as individual. I weight models by the inverse of the number of matched control individuals for a given CHP holder. Standard errors are clustered by matching group as well as by individual. This table limits results to only crime victimization where the offender is unknown to the victim.

Exhibit D
Page 344

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table A2: Other Crime Victimizations and CHPs

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|---|---|---|
| | Assault Victim | Burglary Victim | Fraud/Forgery Victim | Larceny Victim | Robbery Victim | Theft from Auto Victim | Vandalism Victim | Other Victim |
| New CHP Holder*Post | 0.002 | 0.044*** | 0.005 | 0.017 | 0.001 | 0.019 | 0.001 | −0.002 |
| | (0.013) | (0.016) | (0.011) | (0.014) | (0.006) | (0.020) | (0.014) | (0.012) |
| Dep. Var. (mean) p.p. | 0.038 | 0.064 | 0.019 | 0.037 | 0.012 | 0.097 | 0.036 | 0.036 |
| Observations | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 |

Dataset is based on a monthly panel of individual registered voters from 2007-2011 merged with each concealed handgun permits (CHP) in Mecklenburg County (Charlotte), NC. Criminal justice data is based on individual reported crimes and arrests from 2005-2013. Datasets are merged primarily based on full name, birth year and address. Neigh is defined as Census Block Group 2000 in all models unless otherwise stated.

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I weight models by the inverse of the number of matched control individuals for a given CHP holder. I define crimes based on NIBRS classifications. All models include fixed effects for each matching group by time as well as individual. Standard errors are clustered by matching group as well as by individual.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

### Table A3: Stolen Items and CHPs

| | (1)<br>Any<br>Prop<br>Stolen | (2)<br>Firearm<br>Stolen | (3)<br>TV<br>Stolen | (4)<br>Computer<br>Stolen | (5)<br>Other<br>Electronic<br>Stolen | (6)<br>Jewelry<br>Stolen | (7)<br>Money<br>Stolen | (8)<br>Prop Value<br>$(000s) |
|---|---|---|---|---|---|---|---|---|
| New CHP Holder*Post | 0.146*** | 0.051*** | 0.008 | 0.010 | 0.005 | 0.007 | 0.009 | 1.572 |
| | (0.039) | (0.013) | (0.011) | (0.014) | (0.010) | (0.011) | (0.015) | (1.704) |
| Dep. Var. (mean) p.p. | 0.309 | 0.019 | 0.021 | 0.036 | 0.024 | 0.020 | 0.044 | 5.030 |
| Observations | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 | 1,786,079 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include a difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I weight models by the inverse of the number of matched control individuals for a given CHP holder. All models include fixed effects for each matching group by time as well as individual. Standard errors are clustered by matching group as well as by individual.

45

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

### Table A4: Any Arrests and CHPs

| | (1)<br><br>Any<br>Arrest | (2)<br><br>Any<br>Arrest | (3)<br><br>Any<br>Arrest | (4)<br><br>Any<br>Arrest | (5)<br><br>Any<br>Arrest | (6)<br><br>Any<br>Arrest | (7)<br>Any<br>Crime<br>Victim<br>*Obama &<br>Gifford<br>Shocks* |
|---|---|---|---|---|---|---|---|
| New CHP | −0.023*** | −0.019** | −0.021** | −0.015 | −0.017* | −0.023* | 0.022 |
| | (0.009) | (0.009) | (0.009) | (0.011) | (0.009) | (0.013) | (0.030) |
| Covs. Individual | ✓ | ✓ | ✓ | ✓ | | | |
| Covs. CBG | | ✓ | | | | | |
| CBG by month FEs | | | ✓ | ✓ | | | |
| Individual FEs | | | | ✓ | | ✓ | ✓ |
| Matched Group X Time FEs | | | | | ✓ | ✓ | ✓ |
| Dep. Var. (mean) | 0.170 | 0.170 | 0.170 | 0.170 | 0.064 | 0.064 | 0.051 |
| Observations | 35,127,012 | 35,127,012 | 35,127,012 | 35,127,012 | 1,962,041 | 1,962,041 | 473,395 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. Cols 1 through 4 incorporated a standard panel model based on Equation 1 and cols 5 through 7 incorporate difference-in-difference monthly models based on pre-CHP matched individuals on observables and specified as Equation 2. I define felony crime arrests as arson, (aggravated and simple) assault, manslaughter, rape, robbery, auto theft and burglary. I define misdemeanor crime arrests as forgery/fraud , hit and run, larceny, stolen property and vandalism. Technical arrests involve arrests for traffic or other violations not captured in felony or misdemeanor categories. Standard errors are clustered at CBG by month in columns 1-3; at CBG by month and individual in column 4; at matching group in column 5; at matching group and individual in column 6-7. Columns 5-7 weight models by the inverse of the number of matched control individuals for a given CHP holder. Columns one and two include month fixed effects. Column 7 limits my analysis to only permits and matched controls obtained Jan.-June 2009 and Jan.-June 2011, which corresponds with the large uptick in CHPs following the election and inauguration of Barack Obama and the shooting of Gabrielle Giffords.

Exhibit D
Page 349

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

*Preliminary Draft : January 6, 2023*

Table A5: Calls for Service and CHPs

|  | (1) Any Call for Service | (2) Alarm Call | (3) Susp. Person Call | (4) Gun Related Call | (5) Domestic Disturb. Call | (6) Car Accident Call |
|---|---|---|---|---|---|---|
| New CHP Holder*Post | −0.186* | 0.042* | −0.014 | −0.008 | −0.014 | −0.014 |
|  | (0.109) | (0.024) | (0.016) | (0.008) | (0.016) | (0.017) |
| Dep. Var. (mean) | 68.484 | 7.820 | 3.426 | 0.823 | 3.500 | 4.237 |
| Observations | 968,295 | 968,295 | 968,295 | 968,295 | 968,295 | 968,295 |

* $p < 0.1$, ** $p < 0.05$, *** $p < 0.01$. All columns include difference-in-difference monthly model based on pre-CHP matched individuals on observables and specified as Equation 2. I am limited to 2007-2009 given data availability and include all calls for service within 1 mile of the focal individual. I weight models by the inverse of the number of matched control individuals for a given CHP holder. I define violent crimes as arson, (aggravated and simple) assault, manslaughter, rape, robbery and define property crimes as auto theft, burglary, forgery/fraud , hit and run, larceny, stolen property and vandalism. Standard errors are clustered by matching group as well as by individual.

This preprint research paper has not been peer reviewed. Electronic copy available at: https://ssrn.com/abstract=4101076

J Urban Health
https://doi.org/10.1007/s11524-023-00759-2

ORIGINAL ARTICLE



# The Relationship between Concealed Carry Licenses and Firearm Homicide in the US: A Reciprocal County-Level Analysis

Richard Stansfield · Daniel Semenza · Ian Silver

Accepted: 12 June 2023
© The New York Academy of Medicine 2023

**Abstract** This study investigates the reciprocal county-level relationship between the number of concealed carry weapon (CCW) licenses issued and homicides between 2010 and 2019 in a sample of eleven states. We utilize a random intercept cross-lagged panel model (RI-CLPM) approach accounting for reciprocal effects over time between homicide and concealed carry licenses, providing a robust methodological approach to the study of concealed carry and homicide. The results of the RI-CLPM found that increases in the number of CCWs in 2010–2017 were statistically associated with increases in total gun homicide in 2011–2018. Reciprocally, we found some limited evidence that increases in gun homicide were associated with changes in the number of CCWs issued in subsequent years during the early part of our study period. Far from concealed carry making people safer, our model finds acute safety risks associated with expansion of legal firearm carrying. As the right to carry firearms expands in many states, we emphasize the importance of responsible gun ownership practices, and draw attention to the need to implement preventive laws that keep guns out of the hands of people with prior violent histories and from places where violence risk is amplified.

**Keywords** Concealed carry licenses · Gun availability · Gun homicide

## Introduction

The enduring debate around firearm safety in the United States (US) often focuses on how laws that enable people to carry guns in public impact levels of gun violence. This issue has received renewed attention considering a recent Supreme Court ruling in New York State (New York State Rifle & Pistol Association v. Bruen), which deemed that requiring a proper-cause reason to obtain an unrestricted license to carry a concealed firearm outside the home violates both the Fourteenth and Second amendments. The decision makes it highly likely that other states with proper-cause licensing requirements, such as New Jersey, California, and Massachusetts, will be challenged in court. This could have the effect of requiring several "may-issue" states to adopt less restrictive "shall-issue" policies. As such, policymakers and researchers alike are actively considering how broader concealed carry across more states might influence rates of gun violence during a time where

R. Stansfield (✉) · D. Semenza
Rutgers University Camden, 405-407 Cooper Street, Camden, NJ 08102, USA
e-mail: Richard.stansfield@rutgers.edu

D. Semenza
New Jersey Gun Violence Research Center, Piscataway, USA

I. Silver
RTI International, Raleigh, USA

Published online: 31 July 2023

Springer

shootings have risen throughout many parts of the country.

All states in the US allow persons to carry concealed handguns under varying conditions, with three broad categories of permitting in use [1]. As of the start of 2023, there are 26 "permitless carry" states, where no permit is necessary to carry a concealed handgun outside the home (although other state and federal regulations governing legal ownership still apply). There are currently eight states that allow a resident to apply for a permit for a concealed carry weapon (CCW), but license approval is not guaranteed. Law enforcement "may" issue the permit depending on if a resident meets all requirements and can justify need for a CCW. The remaining 18 states are considered "shall-issue" states, whereby residents that complete all local requirements can receive a concealed carry permit without the need for additional justification or approval. In the past 7 years, the number of permitless carry states has tripled, pulling into focus a need to examine the implications of rising gun carrying in public.

Many researchers argue laws that enable more people to carry guns in public will increase shootings [1–4] and crimes committed with a firearm [5, 6]. In opposition, others claim concealed carry laws enable citizens to defend themselves or other citizens against potential attacks [7–9]. Despite substantial scholarly attention to the issue of how concealed carry influences firearm violence, there are several limitations to past research. First, most studies that examine how concealed carry impacts rates of firearm violence rely on measurements that codify the presence of particular state policies related to concealed carry [2–6] or self-report surveys of carrying behaviors [10]. Although these studies are informative, there is a need for research that leverages objective data about both concealed carrying behaviors (e.g., permit applications, licenses issued) and firearm violence (e.g., standardized homicide data). For example, different state provisions in their permitting policy may alter the specific number of licenses issued, such that no two shall-issue states, or may-issue states, may be alike [5]. Second, few studies have incorporated longitudinal data to analyze the *reciprocal* relationship between concealed carry and rates of firearm violence. Firearm violence may influence the number of concealed carry licenses if people are concerned about high crime rates and want to protect themselves

[3]. We leverage a series of longitudinal, reciprocal models to assess the association between concealed carry permitting and total firearm homicide rates.

## Concealed Carry and Crime Research

After several states enacted laws expanding the right to carry concealed weapons in public, academic literature emerged to suggest that violent crime, especially homicide, may be reduced due to the deterrent effect of more bystanders being armed [7, 10]. In general, these researchers reasoned that more people with access to a gun in public would be able to defend themselves from an attack or step in to stop a violent crime from taking place between others. Several studies reported significant decreases in violent crime because of shall-issue concealed carry laws [7, 11], although much of this work has been questioned due to the use of improper methods and statistically improbable estimates of defensive use prevalence [12]. Additionally, self-defensive firearm use appears to be remarkably rare and is often not socially beneficial such that it protects most members of society [13, 14]. Furthermore, incidents of self-defensive firearm use can result in collateral injuries or deaths to parties not involved in the dispute at all [15].

Reviving this line of thinking, Lott and colleagues recently detailed exponential growth in the number of permit holders in the US, alongside general linear declines in murder and violent crime rates over the past two decades [8, 9]. Critical of recent studies of right-to-carry laws, Moody and Lott point out that many studies erroneously assume that less restrictive laws instantly cause more people to apply for licenses and carry concealed handguns [8]. They also note that states who have adopted shall-issue or permitless carry laws recently tend to still have higher restrictions in the form of fees or training requirements. In distinguishing between early- and late-adopting right-to-carry law states, they conducted a state-level analysis between 1970 and 2014 to document that right-to-carry states experienced lower murder rates than states that did not adopt. They suggest that because early-adopting states issue more permits than late-adopting states, this creates more of a risk for would-be criminals, and therefore, murder has declined further.



Concealed Carry Licenses and Firearm Homicide in the US

Most recent public health literature supports the notion that more firearms in public result in more shootings and deaths given the higher mortality associated with intentional firearm use in contrast to other weapons [1–5]. For example, a recent study found that moving from a may-issue to a shall-issue law over time was associated with an additional 5.3 gun assaults per 100,000 people on average above forecasted counterfactuals [5]. In the study, violence-generating effects were particularly noticeable when states allowed people with prior misdemeanor violent convictions to obtain CCW permits [5]. These findings are supported by criminological literature demonstrating that more guns make situations inherently more lethal [16]. These findings suggest that any increase in the number of firearms legally obtained or carried by people should increase the overall homicide rate, even if levels of other violent crimes remain unchanged [17].

The impacts of firearm carrying in public extend beyond the individual carrier to criminal behavior and policing more broadly. In one of the few city-level studies of right-to-carry policies, Donahue and colleagues analyzed a sample of 47 large US cities to document approximately 30% increases in violent crime and robbery associated with the introduction of right-to-carry laws [3]. Extending prior research, the authors found support for two potential mechanisms driving this relationship. First, they found that expansion of right-to-carry laws were associated with a 35% increase in the stolen gun rate, thereby also increasing illegal firearm availability at large. The researchers also found that crime increased via diminished police effectiveness. The authors suggest that police effectiveness is likely diminished broadly by right-to-carry laws for numerous reasons including diverting police time to activities related to checking firearm permits, responding to gun thefts, and responding to accidental discharges. Law enforcement organizations similarly raise concerns about weakening concealed carry requirements [18]. The authors' main conclusion is stark, suggesting that any crime-inhibiting benefits from increased firearm carrying are swamped by crime-stimulating impacts.

## Current Study

The review of the literature described above reveals ample theoretical and empirical reason to expect that recent expansions in right-to-carry laws may have profound implications for public safety. We seek to assess the impact of change in the number of licenses issued (as a different proxy for expanded public firearm carrying [9]) on firearm homicide, while simultaneously accounting for potential reciprocity between homicide and local firearm carrying. Additionally, we control for other potential indicators of gun availability, including the number of gun stores in local areas and the percentage of suicides commited with a firearm, in addition to commonly used macro-level correlates of homicide [19, 20].

Most of the research described herein focused on state-level laws related to conceal carry rather than the actual number of licenses issued at the local level. This involves using a treatment variable, where a 0 indicates times and places where concealed carrying is prohibited (or a may-issue law is in place) and a 1 is used for the times and places where a shall-issue law goes into effect [3, 5, 7]. A limited number of studies have alternatively assessed the impact of concealed carry permitting on crime using a measure of the number of licenses issued. Using a county-level analysis for four states, namely Florida, Michigan, Pennsylvania, and Texas, Phillips and colleagues found no relationship between lagged licensing rates and crime rates [21]. In another study of Florida counties, Carter and Binder examined the association between firearm violence and concealed gun applications and permits [22]. In their diagnostic testing, they found that concealed carry applications in the previous year had no effect on armed violent crime. Notably, however, these studies are limited in time frame and geographic coverage. We utilize a unique longitudinal dataset with annual counts of the licenses issued for each county in a sample of eleven states.

The issue of reciprocal relationships was one of the major methodological problems highlighted by the National Research Council in its review of studies examining the effects of gun laws and firearm availability on firearm violence [23]. The potential for changes in violent crime to be reciprocally related to the passing of shall-issue laws and license applications has been discussed in many of the studies mentioned above [24]. Scholars have suggested that protective gun ownership and carrying may be driven by a fear of crime in a person's community [22]. Recent Pew Research data suggest that protection tops the reasons for people owning a gun in the US, where



over two-thirds cite protection as the primary reason [25]. Failure to account for reciprocal causation could result in inconsistent and biased estimates of firearm licensing or legislation on crime [23, 26].

While some studies have attempted to address these concerns in studies of licensing and violent crime [27, 28], they have largely documented effects from a policy change in a single state or over short periods of time, whereas many other state or local factors may explain crime changes in states with a concealed carry law change. We hope to overcome some methodological concerns of prior studies on this topic by using a cross-lagged panel modeling approach that accounts for the reciprocal effects over time between firearm homicide and the number of concealed carry licenses issued over a 10-year time period. We specifically test the following two hypotheses:

**H1.** Increased change in the number of concealed carry licenses issued will be associated with increased changes in firearm homicide.

**H2.** Increased change in the number of firearm homicides will be associated with increases in the number of concealed carry licenses issued.

### Data and Methods

Data for our dependent variable, the count of firearm homicides per county-year, come from the Center for Disease Control and Prevention (CDC) Multiple Cause of Death data. These county-level mortality data are based on death certificates for US residents and provided to the National Center for Health Statistics (NCHS). We defined gun homicide using ICD-10 codes X93 (assault by handgun discharge), X94 (assault by rifle, shotgun, and larger firearm discharge), and X95 (assault by other and unspecified firearm discharges). All deaths caused by a homicide with a firearm were counted per the county-year of the victim's place of death. These data were advantageous given that the NCHS combines detailed information from death certificate data with information from autopsy reports and police records, providing a more complete picture of the incident, including distinguishing between firearm and non-firearm homicides. These data are also advantageous because they are more

complete and more accurate than other official data sources, such as the Uniform Crime Reports (UCR) or NIBRS, concerns about which have been extensively documented [29].

The current study only utilizes data from the eleven states for which the numbers of concealed carry licenses issued were also available for all counties during the time period of our study, 2010–2019 (Colorado, Iowa, Kansas, Michigan, Minnesota, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, and Utah). States including Iowa, Ohio, Oklahoma, and Utah have since passed laws allowing residents to carry concealed weapons without a permit, although these laws were not in effect during the time period of this study. As such, changes in licensing between 2010 and 2019 should reflect changes in the ability of people to publicly carry in these states. Kansas did allow permitless carry beginning in 2015. Observations for Kansas counties after 2015 were excluded as a result. These eleven states combine for 832 counties available for analysis. Table 1 reveals that the average number of firearm homicides per county in our sample ranged from 2.27 per year in 2010 to 3.53 in 2019. Homicide is a rare outcome to study at the county level per year, especially for smaller, more rural counties. In part, this is why many prior studies of firearm availability and homicide either conduct research at the state level or pool county homicides over several years. We discuss this further in the analytical strategy, below.

Licenses Issued

We obtained the number of concealed carry licenses issued for each county from Trent Steidley's concealed carry weapons licenses database, a longitudinal collection of county-level data on weapons licenses [30]. Data on license applications and issuances were collected from a series of freedom of information requests sent to state governments, with funding support from the Center on American Politics at the University of Denver. Not all states provide information on the number of licenses issued at the county level, and there is some variation in measurement across states. Data for the eleven states used in our analysis were standardized so that we measure the annual number of new licenses issued per county for the years 2010–2019.



Concealed Carry Licenses and Firearm Homicide in the US

**Table 1** Descriptive statistics of concealed carry licenses issued (CCWs) and homicides, 2010–2019

| Variable | Mean | SD |
|---|---|---|
| *No. of CCWs issued* | | |
| 2010 | 524.28 | 1.02 |
| 2011 | 737.55 | 1.23 |
| 2012 | 800.20 | 1.55 |
| 2013 | 1311.62 | 2.12 |
| 2014 | 988.57 | 1.77 |
| 2015 | 1002.91 | 1.80 |
| 2016 | 1465.17 | 2.36 |
| 2017 | 1247.58 | 2.17 |
| 2018 | 1336.27 | 2.12 |
| 2019 | 1258.36 | 1.97 |
| *Total firearm homicides* | | |
| 2010 | 2.27 | 5.61 |
| 2011 | 3.18 | 8.92 |
| 2012 | 3.23 | 9.15 |
| 2013 | 3.17 | 9.37 |
| 2014 | 3.36 | 14.59 |
| 2015 | 2.66 | 12.55 |
| 2016 | 3.47 | 15.91 |
| 2017 | 3.50 | 15.37 |
| 2018 | 3.37 | 16.09 |
| 2019 | 3.53 | 16.40 |
| *Time invariant covariates* | | |
| Total population (2010–2019) | 83992.27 | 177542.95 |
| Percent male in college (2010–2019) | 20.74 | 9.22 |
| Percent divorce (2010–2019) | 10.74 | 2.27 |
| Percent black (2010–2019) | 5.25 | 9.00 |
| Percent in poverty (2010–2019) | 10.05 | 3.97 |
| Female male income ratio (2010–2019) | 0.61 | 0.08 |
| Percent firearm suicides (2010–2019) | 58.44 | 10.41 |
| Number of gun stores (2010–2019) | 21.18 | 24.14 |
| Non-gun homicides (2010–2019) | 0.96 | 2.68 |

$N = 832$ counties. *SD*, standard deviation

### Analytic Strategy

A four-part analytic plan was developed for the current study. First, descriptive statistics were produced (Table 1). Second, the reciprocal association between firearm homicide (2010–2019) and number of CCWs (2010–2019) was evaluated through the employment of a random intercept cross-lagged panel model (RI-CLPM) [31, 32]. A RI-CLPM is a longitudinal path model that permits the estimation of the reciprocal association between two or more constructs while adjusting for the mean trend of a construct across all observations. The reciprocal association can be simultaneously estimated by predicting variation in the lagged observations with prior observations of both constructs.

In the context of the current study, the reciprocal effects were examined by (1) regressing the number of CCWs at a subsequent time period (e.g., 2011) on the number of CCWs at the preceding time period (e.g., 2010) and total firearm homicide during the preceding time period (e.g., 2010), while simultaneously (2) regressing firearm homicide at a subsequent time period (e.g., 2011) on the number of CCWs at the preceding time period (e.g., 2010) and firearm homicide during the preceding time period (e.g., 2010). Latent random intercepts for firearm homicide (2011–2019) and the number of CCWs issued (2011–2019) were estimated by fixing the factor loadings across all observations to 1 and specifying a residual covariance between the latent intercepts [32].

Similar to a random intercept model, the RI-CLPM permits the estimation of the effects of one construct on another construct independent of the variation associated with prior observations [31, 32]. Nevertheless, distinct from traditional random intercept model, a cross-lagged panel model can simultaneously evaluate the effects of the number of CCWs on firearm homicide and the effects of firearm homicide on the number of CCWs while adjusting for the continuity within a construct over time [32]. The ability to simultaneously examine these reciprocal processes addresses a notable limitation in the extant literature [26].

Two iterations of the RI-CLPM were estimated, where the first model adjusted for several basic demographic and economic characteristics of the counties: the average population from 2010 to 2019, average percent males in college from 2010 to 2019, average percent divorce from 2010 to 2019, the average female to male income ratio from 2010 to 2019, the average percent black from 2010 to 2019, and average percent in poverty from 2010 to 2019 within all the estimated regression equations. The second model adjusted for these same demographic measures, but also accounted for other proxies of gun ownership and availability in the county, including the average percent of suicides committed with a firearm from 2010 to 2019, the average number of licensed

gun stores from 2010 to 2019, and average number of homicides perpetrated without a gun from 2010 to 2019, within all of the estimated regression equations. This second modeling allowed us to assess the association between licensing and firearm homicide, net of gun availability, and violence more broadly.

Given the existence of missing license issuing data in some counties, we employed the full information maximum likelihood estimator in the *Lavaan* package in R to estimate the main models [33]. Importantly, due to the large variance of the number of CCWs issued between counties, the construct was transformed by multiplying the number of CCWs issued by .0001. This transformation maintains the interpretability of the unstandardized estimates, where a 1 unit change in no. of CCWs issued represents 1000 concealed carry licenses issued within a county. Finally, we note that the global fit statistics of the model could potentially become biased due to the rarity of homicide estimated in the model. We evaluated the fit of the data using $R^2$ values for each endogenous variable and plotted trajectories to confirm appropriate model fit [34].

## Results

Figure 1 illustrates the RI-CLPM examining the reciprocal effects of firearm homicide on the number of CCWs issued with limited control variables. The estimates presented in Fig. 1 represent the unstandardized regression coefficients (single-headed arrows) and the unstandardized residual covariances (double-headed arrows). Focusing on the between-construct regression coefficients,

increases in the number of CCWs issued in 2010–2015 and 2017 were statistically associated with increases in firearm homicide in 2011–2016 and 2018, respectively. Specifically, a one thousand license increase in the number of CCWs issued was associated with between a .266 and a 1.898 increase in total firearm homicide. Alternatively, increases in firearm homicide in 2010 and 2018 were associated with increases in the number of CCWs issued in 2011 and 2019, but increases in firearm homicide in 2012, 2015, 2016, and 2017 were associated with decreases in the number of CCWs issued in 2013, 2016, 2017, and 2018.

Figure 2 provides the RI-CLPM examining the reciprocal effects of total gun homicide on the number of CCWs issued with all of the control variables. The results of the second RI-CLPM support the findings of the first RI-CLPM. In particular, increases in the number of CCWs in 2010–2017 were statistically associated with increases in firearm homicide in 2011–2018. The estimates suggest that a one thousand license increase in the number of CCWs issued was associated with between a .385 and 2.128 increase in total firearm homicide. Regarding the reciprocal pathway, it appeared that increases in firearm homicide in 2010, 2011, and 2013 were associated with increases in the number of CCWs issued in 2011, 2012, and 2014. Taken together, the models suggest that the number of CCWs issued the previous year was associated with increases in total firearm homicide the subsequent year. On the other hand, firearm homicide the previous year had limited little impact on the number of CCWs the subsequent year.



**Fig. 1** Random intercept cross-lagged panel model examining the reciprocal association between total firearm homicide (2010–2019) and conceal carry licenses issued (limited controls). *Notes*: FH, firearm homicide; # of CCWs issued, number of concealed carry licenses issued. The cross-lagged panel model was estimated using the full information maximum likelihood (FIML) estimator in Lavaan. All estimates on single-headed arrows represent the unstandardized regression coeffi-

cients, while all estimates on double-headed arrows represent the unstandardized covariance. The estimates adjust for the influence of the average population from 2010 to 2019, average percent males in college from 2010 to 2019, average percent divorce from 2010 to 2019, average percent black from 2010 to 2019, and average percent in poverty from 2010 to 2019. A 1 unit change in no. of CCWs issued represents 1000 concealed carry licenses issued. *$p < .05$



**Fig. 2** Random intercept cross-lagged panel model examining the reciprocal association between firearm homicide (2010–2019) and conceal carry licenses issued (full controls). *Notes*: FH, firearm homicide; # of CCWs issued, number of concealed carry licenses issued. The cross-lagged panel model was estimated using the full information maximum likelihood (FIML) estimator in Lavaan. All estimates on single-headed arrows represent the unstandardized regression coefficients, while all estimates on double-headed arrows represent the unstandardized covariance. The estimates adjust for the influence of the average population from 2010 to 2019, average percent males in college from 2010 to 2019, average percent divorce from 2010 to 2019, average percent black from 2010 to 2019, and average percent in poverty from 2010 to 2019, average percent of firearm suicides from 2010 to 2019, average number of gun stores from 2010 to 2019, average number of homicides without a gun from 2010 to 2019, and average female to male income ratio from 2010 to 2019. A 1 unit change in # of CCWs issued represents 1000 concealed carry licenses issued. *$p <$ .05

## Discussion

The current study revisited the relationship between concealed carry and firearm homicide, an often studied and debated topic with significant implications for public safety and gun violence prevention. One primary conclusion emerged. Increases in the number of licenses issued generally increased firearm homicides in subsequent years. Conversely, our models did not offer evidence that firearm homicide decreased because of CCW licenses issued. The findings are diametrically opposed to suggestions that more legal carrying would broadly reduce gun violence via self- or bystander-facilitated defense. Additionally, we found some limited evidence to suggest that increases in CCWs issued follow increases in firearm homicide. This relationship waned over time, however.

With nuanced evidence of an association between CCW licenses and homicide, it is imperative that discourse on the topic of gun violence avoids simplified notions such as "good guy with a gun" or "bad guy with a gun." Such depictions obscure the everyday interactions and disputes between ordinary people that can boil over into violence and the lethal potential of access to a firearm in such a context. Instead of considering good guys and bad guys with guns, it is far more productive to focus on a broader harm reduction framework that does not rely on an oppositional "us versus them" framework. More guns in public can create significant harm in everyday interactions, whether through accidental shootings, road rage incidents, or domestic incidents between people that are estranged. And a move towards shall-issue and permitless carry policies may increase the likelihood of prohibited buyers and persons with prior violent history obtaining guns [35]. The adoption of shall-issue laws is particularly risky for future violence when states allowed people with prior misdemeanor violent convictions to obtain a CCW [5]. These findings together speak to the instrumentality effect of firearms, with mounting evidence that increases in guns contribute to fatalities that would otherwise have been non-fatal assaults [16].

Therefore, the first major policy implication is to ensure guns do not end up in the wrong hands. In response to the Bruen decision, some States including New Jersey submitted legislation to strengthen background checks and ensuring permits could only be obtained after extensive review and gun safety training. This is not a policy to limit the right to gun ownership, but part of a broad standard that gun owners and non-owners alike support [36]. Data suggest that an increasing majority of gun owners and people identifying as either Democrat or Republican support universal background checks, stronger regulations of gun dealers, and requiring tests of safe handling practices prior to carrying a concealed weapon [36]. This public sentiment is echoed in recent iterations of the National Survey of Gun Policy [37], revealing high support among gun owners for conceal carry applicants to demonstrate competence in safe and lawful gun use. While public support exists, however, ordinary citizens may need to be more activated to discuss these policies with their elected representatives.



In addition to strengthening standards at the point of purchase and demonstrating responsible gun ownership, concealed carry also needs some guard rails controlling the carrying of handguns in public places, such as schools, alcohol serving outlets, sports arenas, and other highly populated public spaces. The National Survey on Gun Policy in 2019 and 2021 also revealed broad declining support for expanding the locations for civilian gun carrying [37]. Yet recent reports have detailed upticks in the number of guns carried into airports in the US [38]. And several recent studies reveal double digit increases in homicide as a result of weakening carry laws and expanding carrying in public [1, 3–5], including a 29% increase in firearm workplace homicides [4]. Thus, restricting customer and employee firearm access in the workplace and allowing private business and public buildings to enforce these restrictions may help to reduce lethal escalation. Colleges and universities have had some success in prohibiting legal gun owners from carrying weapons on to campus. But policies allowing gun carrying on campus have increased the risk of assault, self-harm, and lethality [39].

There are several limitations to the present study that provide opportunity for additional research. First, our analysis is limited to fatal firearm violence (homicides) and does not include non-fatal shootings. Non-fatal shootings make up the vast majority of interpersonal firearm assaults in the US, occurring roughly four times as frequently as homicides. Although there remains no official, national-level data repository that tracks non-fatal shootings, it is imperative that subsequent studies test the reciprocal relationships explored in this study using non-fatal data where feasible. Second, our study is limited to the timeframe where data from all sources were available (2010–2019). This time period includes years of relatively low homicide rates compared to other decades, although homicide rates did begin to slowly increase during this period starting in 2014. Additionally, we were unable to examine the impact of conceal carry on discrete homicide types. Our findings could be more muted if assessing the relationship between CCW and gun violence related to gang-related activity, drug markets, robbery, or other incidents less likely to rely on legal firearms acquisition. Stolen guns, straw purchases, and guns trafficked from states with softer gun regulations often facilitate gun violence in many of America's largest cities with a higher prevalence of gang and drug market activity [16].

Finally, we are mindful of the generalizability of our findings. Concealed carry licenses are not required in permitless carry states, making it more difficult to ascertain numbers of people carrying firearms in public in those states. But by using data on licenses prior to the rapid expansion in permitless carry policies, we highlight the need for research to consider the role that increased numbers of guns in public can play in creating additional harm. It is clear that study of the dynamics between legal firearm availability, right to carry legislation, and the extent of gun violence is far from over. Instead, researchers moving forward must consider how increases in carrying of firearms can impact certain types of gun violence, for certain groups, and in certain contexts. These inquiries will likely lead to more consistent conclusions around the harm generated by increases in firearms in public.

**Acknowledgments**   The authors received no specific funding for this work. The authors would like to thank Trent Steidley for allowing use of his data on CCW licenses and his feedback on an earlier draft of the paper.

**Data Availability**   All data are publicly available.

## References

1. Siegel M, Xuan Z, Ross CS, Galea S, Kalesan B, Fleegler E, Goss KA. Easiness of legal access to concealed firearm permits and homicide rates in the United States. Am J Public Health. 2017;107(12):1923–9.

2. Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between firearm laws and homicide in urban counties. J Urban Health. 2018;95:383–90.

3. Donohue JJ, Aneja A, Weber KD. Right-to-carry laws and violent crime: a comprehensive assessment using panel data and a state-level synthetic control analysis. J Empirical Legal Stud. 2019;16(2):198–247.

4. Donohue JJ, Cai SV, Bondy MV, Cook PJ. More guns, more unintended consequences: the effects of right-to-carry on criminal behavior and policing in US cities: National Bureau of Economic Research; 2022. https://www.nber.org/papers/w30190

5. Doucette ML, McCourt AD, Crifasi CK, Webster DW. Impact of changes to concealed-carry weapons laws on fatal and nonfatal violent crime, 1980–2019. Am J Epidemiol. 2023;192(3):342–55.

6. Hepburn L, Miller M, Azrael D, Hemenway D. The effect of nondiscretionary concealed weapon carrying laws on homicide. J Trauma Acute Care Surg. 2004;56(3):676–81.

7. Lott JR. More guns, less crime: understanding crime and gun control laws. Chicago, University of Chicago Press; 2013.

8. Moody CE, Lott JR. Do right-to-carry concealed weapons laws still reduce crime? Academia Letters. Article 4888. 2022

9. Lott JR, Wang R. Concealed carry permit holders across the United States. 2021. Available at SSRN: https://ssrn.com/abstract=3937627.



10. Kleck G, Gertz M. Carrying guns for protection: results from the National Self-Defense Survey. J Res Crime Delinq. 1998;35(2):193–224.

11. Bartley WA, Cohen MA. The effect of concealed weapons laws: an extreme bound analysis. Econ Inq. 1998;36(2):258–65.

12. Cook PJ, Ludwig J, Hemenway D. The gun debate's new mythical number: how many defensive uses per year? J Policy Anal Manage. 1997;16(3):463–9.

13. Hemenway D, Solnick SJ. The epidemiology of self-defense gun use: evidence from the National Crime Victimization Surveys 2007–2011. Prev Med. 2015;1(79):22–7.

14. Hemenway D, Shawah C, Lites E. Defensive gun use: what can we learn from news reports?. Inj Epidemiol 2022 9(1):1-0.

15. Cook PJ, Ludwig J. Gun violence: the real costs. New York, Oxford University Press; 2000.

16. Braga AA, Griffiths E, Sheppard K, Douglas S. Firearm instrumentality: do guns make violent situations more lethal? Annu Rev Criminol. 2021 4:147–64.

17. Cook PJ, Braga AA, Moore MH. Gun control. Crime and Public Policy. 2011;25:257–92.

18. Kruesi K. Tennessee GOP pushes gun bill over law enforcement concerns: Associated Press; 2021. https://apnews.com/article/joe-biden-violence-legislation-racial-injustice-tennessee-74925fdeb101c8e78cc311e6fd85b7f2. Accessed 20 May 2023.

19. Haviland MJ, Gause E, Rivara FP, Bowen AG, Hanron A, Rowhani-Rahbar A. Assessment of county-level proxy variables for household firearm ownership. Prev Med. 2021;148:106571.

20. Siegel M, Ross CS, King C. A new proxy measure for state-level gun ownership in studies of firearm injury prevention. Inj Prev. 2014;20(3):204–7.

21. Phillips CD, Nwaiwu O, Lin SH, Edwards R, Imanpour S, Ohsfeldt R. Concealed handgun licensing and crime in four states. J Criminol. 2015;803742.

22. Carter JG, Binder M. Firearm violence and effects on concealed gun carrying: large debate and small effects. J Interpers Violence. 2018;33(19):3025–52.

23. National Research Council. Firearms and violence: a critical review. Washington, D.C.: National Academies Press; 2004.

24. Aneja A, Donohue JJ, Zhang A. The impact of right to carry laws and the NRC report: the latest lessons for the empirical evaluation of law and policy. American Law and Economics Review. 2011;13(2):565–631.

25. Igielnik R, Brown A. Key takeaways on American's views of guns and gun ownership. Pew Research Center. https://www.pewresearch.org/fact-tank/2017/06/22/key-takeaways-on-americans-views-of-guns-and-gun-ownership/. Accessed 1 Dec 2022.

26. Leshner AI, Altevogt BM, Lee AF, McCoy MA, Kelley PW. Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence: Executive Office, Institute of Medicine (EO); Institute of Medicine (IOM); Committee on Law and Justice; Division of Behavioral and Social Sciences and Education (DBASSE); National Research Council. Firearm-Related Violence; 2013.

27. Gius M. The effects of state and federal background checks on state-level gun-related murder rates. Appl Econ. 2015;47(38):4090–101.

28. Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association between Connecticut's permit-to-purchase handgun law and homicides. Am J Public Health. 2015;105(8):e49–54.

29. Pridemore WA. A cautionary note on using county-level crime and homicide data. Homicide Stud. 2005;9(3):256–68.

30. Steidley T. Concealed carry weapons license database. Ann Arbor, MI: Inter-university Consortium for Political and Social Research (distributor). 2021. https://www.openicpsr.org/openicpsr/project/149062/version/V1/view. Accessed 7 July 2022.

31. Lüdtke O, Robitzsch A. A comparison of different approaches for estimating cross-lagged effects from a causal inference perspective. Struct Equ Model Multidiscip J. 2022;29(6):888–907.

32. Selig JP, Little TD. Autoregressive and cross-lagged panel analysis for longitudinal data. In: Laursen B, Little TD, Card NA, editors. Handbook of developmental research methods. The Guilford Press; 2012. p. 265–278.

33. Du H, Bentler PM. Distributionally weighted least squares in structural equation modeling. Psychol Methods. 2022;27(4):519.

34. Coffman DL, Millsap RE. Evaluating latent growth curve models using individual fit statistics. Struct Equ Modeling. 2006;13(1):1–27.

35. Wintemute GJ, Parham CA, Wright MA, Beaumont JJ, Drake CM. Weapons of choice: previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. J Trauma Acute Care Surg. 1998;44(1):155–60.

36. Barry CL, Stone EM, Crifasi CK, Vernick JS, Webster DW, McGinty EE. Trends in public opinion on US gun laws: majorities of gun owners and non–gun owners support a range of measures. Health Aff. 2019;38(10):1727–34.

37. Crifasi CK, Ward JA, McGinty EE, Barry CL, Webster DW. Public opinion on laws regulating public gun carrying. Prev Med. 2022;159:107067.

38. Associated Press. Roughly 18 guns were seized everyday at US airports last year. 2023. https://apnews.com/article/politics-transportation-security-administration-philadelphia-airport-c68de51fe36a39c544e030a92b9602cb. Accessed 20 May 2023.

39. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

Springer Nature or its licensor (e.g. a society or other partner) holds exclusive rights to this article under a publishing agreement with the author(s) or other rightsholder(s); author self-archiving of the accepted manuscript version of this article is solely governed by the terms of such publishing agreement and applicable law.



NBER WORKING PAPER SERIES

WHY DOES RIGHT-TO-CARRY CAUSE VIOLENT CRIME TO INCREASE?

John J. Donohue
Samuel V. Cai
Matthew V. Bondy
Philip J. Cook

Working Paper 30190
http://www.nber.org/papers/w30190

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
June 2022, Revised June 2023

Previously circulated as "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities." We are grateful to Thomas Marvell, Arjun Ravi, and Richard Sweeney, as well as participants at the ETH Zürich Workshop and Lecture Series in Law and Economics, the 2022 Annual Conference on Empirical Legal Studies, and at Tel Aviv University for comments on the paper. Theodora Boulouta, Ammar Inayatali, and Nicolas Peña Tenjo provided outstanding research assistance.  John Donohue has at various times served as an expert witness in litigation involving firearm regulation. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2022 by John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Why Does Right-to-Carry Cause Violent Crime to Increase?
John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook
NBER Working Paper No. 30190
June 2022, Revised June 2023
JEL No. K0,K14,K40,K42

### ABSTRACT

While the recent state panel data literature has broadly concluded that "right-to-carry" (RTC) concealed handgun regimes increase violent crime, there is little empirical evidence on the precise mechanisms that drive this increase. Using data from 217 US cities, we find that the effect of RTC on violent crime is concentrated to large urban centers. In cities with an average population of over 250,000 between 1979 and 2019, we find that the introduction of RTC increases violent crime by 20 percent. We then present novel estimates that RTC increases gun theft by 50 percent and lowers violent crime clearance rates by 9 percent in these large cities. Leveraging city-level heterogeneity in RTC-induced violent crime effects, we demonstrate that these two mechanisms explain a substantial portion of the RTC-induced increase in violent crime.

John J. Donohue
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
and NBER
donohue@law.stanford.edu

Samuel V. Cai
Stanford Law School
samcai@law.stanford.edu

Matthew V. Bondy
Stanford Law School
mvbondy@law.stanford.edu

Philip J. Cook
Professor Emeritus of Economics
Sanford School of Public Policy
Duke University
PO Box 90312
Durham, NC 27708
and NBER
pcook@duke.edu

# Why Does Right-to-Carry Cause Violent Crime to Increase?

By John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook [*]

*While the recent state panel data literature has broadly concluded that "right-to-carry" (RTC) concealed handgun regimes increase violent crime, there is little empirical evidence on the precise mechanisms that drive this increase. Using data from 217 US cities, we find that the effect of RTC on violent crime is concentrated in large urban centers. In cities with an average population of over 250,000 between 1979 and 2019, we find that the introduction of RTC increases violent crime by 20 percent. We then present novel estimates that RTC increases gun theft by 50 percent and lowers violent crime clearance rates by 9 percent in these large cities. Leveraging city-level heterogeneity in RTC-induced violent crime effects, we demonstrate that these two mechanisms explain a substantial portion of the RTC-induced increase in violent crime.*

## I. Introduction

The United States has undergone a major shift in gun policy over the last four decades. In 1979, most states either banned the concealed carry of firearms or had "may-issue" laws that required someone who wished to carry a concealed firearm to obtain a license, which would screen out those who had no particularized need or who failed to meet other qualifications. An extensive gun lobby campaign persuaded most states to adopt shall-issue laws, which mandate that authorities issue a concealed-carry permit to virtually any individual who applies and is not legally prohibited from possessing a gun. Half the states have taken another step to deregulation by adopting "constitutional carry" or permitless carry regimes, which eliminate the need for any permit or license to carry a concealed handgun. The vast majority of states that have adopted permitless carry have done so in the last few years, and in June 2022, the Supreme Court decided 6-3 in *New York State Rifle Association v. Bruen* to strike down New York's century-old statute requiring a person to show "proper cause" to obtain a concealed carry license. The *Bruen* decision could lay the groundwork for right-to-carry (RTC) to become the law of the land if the Court goes further to strike down the remaining state laws that provide authorities with some discretion in screening applicants.

Many economists, beginning with Lott and Mustard (1997), have exploited the staggered adoption of RTC laws to examine whether concealed carrying affects violent crime. Lott and Mustard argued that these laws could actually reduce crime, while much of the early literature found no statistically significant effects (Black and Nagin, 1998; Dezhbakhsh and Rubin, 1998; Ludwig, 1998). These initial attempts to evaluate the impact of RTC laws were hampered by the small number of RTC adoptions and limited number of years the laws were in place, as well as the confounding effect of the crack-cocaine induced crime rise of the late 1980s to early 1990s. Substantially more RTC

[*] Donohue: Stanford Law School and NBER (email: jjd@law.stanford.edu). Cai: Stanford Law School (email: samcai@law.stanford.edu). Bondy: Stanford Law School (email: mvbondy@law.stanford.edu). Cook: Duke University Sanford School of Public Policy and NBER (email: pcook@duke.edu). We are grateful to Thomas Marvell, Arjun Ravi, and Richard Sweeney, as well as participants at the ETH Zürich Workshop and Lecture Series in Law and Economics, the 2022 Annual Conference on Empirical Legal Studies, and at Tel Aviv University for comments on the paper. Theodora Boulouta, Ammar Inayatali, and Nicolas Peña Tenjo provided outstanding research assistance. This paper was previously circulated as NBER Working Paper No. 30190 in June 2022 under the title "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities."

adoptions, many more years of data allowing for longer panels, and the development of new tools—such as synthetic controls (Donohue, Aneja and Weber, 2019), marginal structural models (Van Der Wal, 2022), and Bayesian methods (Schell et al., 2020)[1]—have enabled a substantial number of researchers to provide a clearer picture of the impact of RTC laws in the last five years. The predominant conclusion of this recent literature is that RTC laws increase violent crime.[2] This development has enabled the RAND Corporation, which has conducted an extensive project to evaluate the research concerning various gun regulations, to update its earlier tepid endorsement of the harmful effects of RTC laws to a much clearer statement that RTC laws impose substantial crime burdens on adopting states. The report recently summarized its overall conclusion as, "Across all of the 18 policies that we examined, only three—child-access prevention laws, concealed carry laws, and stand-your-ground laws—had evidence that we classified as *supportive*, our highest evidence rating, for an effect on a particular outcome" (emphasis in the original) (RAND, 2023b).[3] With the direction of the effect now becoming clear, a natural next step is to clarify *the mechanisms* through which RTC laws increase crime. Of course, gun carrying may thwart and deter some criminals.[4] But if the current weight of the evidence on RTC laws is correct, any such crime-reducing benefits are small relative to the crime-enhancing impacts of increased gun carrying.[5]

To the extent the literature addresses mechanisms, it tends to focus on the somewhat narrow question of how a normally law-abiding person carrying a concealed weapon may commit a crime that they would not have committed but for a law that eases restrictions on carrying or using a firearm. Work by Cheng and Hoekstra (2013) and McClellan and Tekin (2017) has found that the expansion of Stand Your Ground laws, which make it harder to prosecute those who use deadly force in cases of real or apparent self-defense, results in more (legally unjustified) homicides. Other literature has studied the effect of concealed carrying on mechanisms that affect both law-abiding citizens and criminals. Colmer and Doleac (2022) find that lenient concealed carry laws strengthen the temperature-homicide relationship, suggesting that RTC may increase the likelihood of firearm confrontations to occur as stress increases. Some journalistic commentators and law-enforcement officials have suggested RTC laws are associated with more road rage incidents (Goodman, 2022), while Bushman et al. (2017) find the mere presence of a gun in the vehicle encourages aggressive driving. To our knowledge, McElroy and Wang (2017) is the only study to explicitly focus on career criminals rather than permitholders, modeling how RTC shifts entry and exit patterns for different cohorts. While this body of work is informative, a comprehensive explanation of the mechanisms

---

[1]Schell et al. (2020) find that firearm homicides increased one year after implementation of RTC laws with probability of .99, but suggest that this effect weakens over time.

[2]See Table 1 of Donohue (2023) summarizing 14 recent papers.

[3]In earlier versions of the report, the RAND authors found that there was support for the finding that RTC laws increased violent crime, but they concluded that on their five-level criteria, this support only reached level 3, indicating "limited" evidence of this finding (and "no studies with equivalent or stronger methods provided contradictory evidence"). After the latest flurry of articles finding substantial crime increases flow from RTC adoption, RAND adjusted its evaluation of the literature, stating that the evidence in support of this harmful effect was now at their highest level 5, indicating it was "supportive" of the finding that RTC laws increase total and firearm homicides (RAND, 2023a).

[4]There is anecdotal evidence of some thwarting, injuring, and killing of criminals by permit holders as well as anecdotal evidence of some malign effects when permit holders are killed when they try to thwart a crime (Mettler, 2016), inadvertently kill non-criminals (Flores, 2022), or try to portray their own criminal assaults as self-defense gun use (Booker, 2019). Prior empirical research has linked observable victim precaution measures, such as private security (Meehan and Benson, 2017), security alarm systems (Zimmerman, 2014), and neighborhood public safety organizations (Cook and MacDonald, 2011), to lower rates of robbery. Ayres and Levitt (1998) analyze the staggered rollout of Lojack across US geographic markets and find that the introduction of Lojack decreased auto-theft rates, which suggests that the deterrence effect of unobservable victim protection can have positive externalities even for unprotected victims. It will take further work to establish if there is any similar deterrent effect from concealed carry, and also to ascertain whether and to what extent criminals respond with greater violence to all potential victims because they cannot observe those who are carrying weapons.

[5]This point is driven home most dramatically by the fact that when we disaggregate violent crime into its various subcategories, we find that RTC laws induced large *increases* in robberies (results available upon request), despite this being the crime most often committed outside the home and therefore the crime with the largest potential for RTC-induced deterrence (Cook, Moore and Braga, 2004).

2

driving the RTC-induced increase in violent crime has been elusive.

In this article, we explore two underappreciated mechanisms by which RTC laws might stimulate crime: a decline in criminals' perceived probability of detection and an increase in the net returns from firearm crime. Given the consensus in the literature that policing can reduce violent crime (Chalfin and McCrary, 2017; Klick and Tabarrok, 2005; Levitt, 2002; Weisburd, 2021), RTC laws may increase crime if they interfere with or degrade the quality or effectiveness of law enforcement. Police may have fewer resources to fight crime if they are encumbered by processing more complaints about road-rage incidents, gun thefts, accidental discharges, and injuries or deaths. Additionally, in the case of shall-issue regimes, police may spend more time processing concealed carry permit applications and taking time to check permit validity (Donohue, Aneja and Weber, 2019). Further, police officers may be both more likely to shy away from engaging in effective crime-fighting actions due to the increased risk posed by guns and quicker to use lethal force (Doucette et al., 2022). This use of force could strain police-community relations (Ang et al., 2021; Cook and MacDonald, 2010) in ways that ultimately impair the solving of crimes. While Donohue, Aneja and Weber (2019) has speculated on a possible decline in the quantity or quality of policing due to RTC, we provide the first empirical estimates of this effect and demonstrate how it may be linked to the overall criminogenic effect of RTC laws.

A second possible mechanism is that RTC laws increase both the supply and demand for guns used in crime. On the supply side, more widespread carrying in public facilitates gun theft, which makes guns more readily available on the underground market (Cook, 2018). There is direct evidence that increased legal carrying of firearms outside the home creates more opportunities for gun theft, particularly from vehicles (Elinson and McWhirter, 2022). A working paper by Billings (2023) uses data from Mecklenburg County, North Carolina (a shall-issue regime for Billings (2023)'s entire study period) to match concealed carry permit holders to non concealed-carry permit holders with similar demographic characteristics and finds that concealed carry permit holders are 268 percent more likely to have a gun stolen. Billings (2023) also finds that obtaining concealed carry permits also leads to statistically significant increases in violent crimes committed with a gun in the neighborhoods of permit holders. Although the study does not measure the impact of change in gun policy, Billings (2023) provides strong evidence that increasing the number of concealed carry permits may lead to increases in firearm theft and also bolsters confidence in our hypothesis that increases in gun thefts leads to increases in violent crimes.

Our study of RTC laws covers a broader set of mechanisms than Billings (2023)—highlighting how RTC may also affect the demand side factors that make stealing and using a gun more valuable to criminals. Since RTC laws increase the level of lawful gun carrying, it becomes easier and less costly for criminals to carry guns as police become less proactive about searching individuals for illegal firearms. RTC may also raise the prospect that criminals meet armed resistance while executing a crime, which increases the opportunity cost of *not* carrying a gun to the scene of the crime. Further, a general increase in criminality due to RTC, whether due to declines in police effectiveness or other mechanisms, may lead to an increase in the number of guns stolen as the number of thefts increases. These demand-side factors, coupled with the supply-side factors mentioned previously, will have the net effect of increasing firearm theft.

We exploit the differential timing in the adoption of RTC laws to demonstrate two important forces driving the criminogenic effect of RTC laws—a reduction in the quality of policing and an increase in gun theft—in America's largest cities, focusing on the period from 1979 to 2019. We view our treatment as plausibly exogenous for several reasons. RTC adoption came via different paths for different states (either court ordered or legislatively mandated), often only after repeated failed attempts, and was driven by a relatively small group of progun operatives and citizens (Patrick, 2010). Additionally, the RTC laws present in the cities in our sample were adopted at the state

3

level, suggesting that forces driving the passage of state RTC laws were at least one step removed from the forces driving city crime trends. In our results section, we produce event-study plots and perform tests of conditional parallel pre-trends to further justify our empirical strategy.

Using Uniform Crime Reporting (UCR) records, we perform a difference-in-differences (DiD) analysis to estimate the impact of RTC laws on violent crimes, the monetary value of stolen guns, and clearance rates (the proportion of violent crimes for which police are able to identify and arrest the perpetrators or resolve a case in which the perpetrator may have been killed).[6] As expected, we confirm that RTC laws cause statistically significant increases in violent crime, and find that the effect is concentrated in large cities. We therefore focus our analysis of the underlying mechanisms on cities on the 65 cities with an average population throughout our time period of more than a quarter of a million residents, where violent crime rises by 20 percent in the wake of RTC adoption. In these cities, we find that RTC laws cause a roughly 10 percent decline in the rates that police clear violent crime, suggesting that RTC laws strike at the very heart of law enforcement's abilities to address criminal conduct. We also find that the introduction of an RTC law elevates gun thefts by roughly 50 percent, introducing tens of thousands of guns into the hands of criminals or illegal gun markets each year. We address issues regarding the robustness of our findings to threats from heterogeneous treatment effects using the De Chaisemartin and d'Haultfoeuille (2020) estimator. Our main findings are robust to adjustments to the data we include, the covariates selected, and our level of clustering.

Next, we demonstrate that the cities with the largest declines in clearance rates and the greatest surges in gun theft due to RTC also were the ones that had the most profound increases in violent crime. While our analysis likely understates the relationship between violent crime and these mechanisms due to data constraints, we find that declines in clearance and increases in gun theft may explain at least 30 percent of the RTC-induced increase in violent crime.

The central contribution of our paper is to illustrate that RTC regimes have considerable implications for the dynamics of crime beyond the behavior of permitholders. Indeed, the criminogenic mechanisms associated with RTC laws we document are only inadvertently caused by the action of law-abiding concealed carry permitholders. Understanding these mechanisms is crucial at this moment, as policymakers in New York and the seven other states compelled by the *Bruen* decision to weaken at least some of their protections against the burdens of more permissive concealed carry seek to develop strategies and policies that can mitigate the expected harmful consequences.

The remainder of this paper is organized as follows. Section II describes the data used to complete our empirical analysis. Section III presents our methodology. Section IV contains and discusses our empirical estimates. Section V concludes.

## II.  Data

Our data come from U.S. cities with yearly population between 1979 and 2019 averaging above 100,000, although for reasons we describe below, we focus our analysis on the subset of 65 cities with an average population above 250,000.[7] We choose to focus on cities for three main reasons: first, since the vast majority of studies analyzing RTC laws rely on state data, we advance the literature by increasing within-unit homogeneity by using large-city data. Second, in addition to

---

[6]We will frequently refer to our findings on "gun thefts", which implicitly assumes that the passage of RTC laws is uncorrelated with the value of the average stolen gun. RTC adoption typically leads to the purchase of more concealable handguns, which on average tend to be cheaper than other firearms, such as rifles, shotguns, and handguns purchased for the home. This would mean our estimates on gun thefts based on dollar value understate the actual number of guns stolen. On the other hand, if the RTC law prompts the purchase of more new guns, that might tend to enhance the average dollar value of stolen weapons. The two effects cut in opposite ways, so the assumption that the dollar value of stolen guns is unchanged by RTC passage is reasonable, and, if anything, likely to be conservative (Buck, 2022).

[7]Although Charlotte, NC would qualify as a large city, we drop Charlotte due to a change in the area served by the police department in 1993.

being a preferable unit of observation, city data is also higher quality than state data because large, concentrated population centers suffer from smaller measurement error biases than other geographic areas in the US (Boylan, 2019). Finally, restricting the sample to more homogeneous units bolsters our confidence that our proposed counterfactuals are reasonable.

We take agency-level monthly crime, clearance, and stolen property data cleaned by Jacob Kaplan from the FBI Uniform Crime Reporting (UCR) Return A files (Kaplan, $2021b,c$) and aggregate to the city-year level using an agency-city crosswalk published by the Bureau of Justice Statistics (2018). We use the RTC adoption dates from Donohue, Aneja and Weber (2019), updating the statutory history and newspaper archive research through to 2019. City-years in which concealed carrying is prohibited or the state grants concealed carry permits on a "may-issue" basis are regarded as non-RTC observations. Because we expect permitless carry to generally act in the same direction as shall-issue laws on our proposed criminogenic mechanisms,[8] and because permitless carry regimes account for only 2 percent of the city-years in our data, we code both permitless carry and shall-issue identically as RTC regimes.

Our choice of control variables makes only one addition to the nine socioeconomic and demographic controls used in Kovandzic, Marvell and Vieraitis (2005), one of the few city-level studies of the effect of RTC laws. That study's nine controls are the percentage of the population made up of female headed households, the percentage of people living alone, per capita income, percentage of people in poverty, and four demographic controls—all of which we obtain at the city level through Census and American Community Survey (ACS) data—as well as the one-year lagged prison incarceration rate, for which we construct a proxy using county- and state-level jail and prison data. We add one-year lagged sworn officers per capita at the city level obtained from UCR police employment data (Kaplan, $2021a$), due to the well-established relationship between police force size and crime.

We apply a light cleaning procedure that removed crime observations that were sharp discontinuities from the preceding and following years, removing about 8.8 percent[9] of the data across our main specifications in Tables 2 and 3. We also removed all observations for a particular city-crime if that city-crime was missing more than 15 observations out of the 41 total city-crime observations from 1979 to 2019. This deletion is justified by our sense that the data with high degrees of missingness would lead to more unreliable estimates for the years in which the particular crime data for that city does exist and also makes it impractical to apply our cleaning procedure.[10] Our results are robust to specifications that do not remove any data[11] and a fully balanced panel[12] using a multiple imputation approach (Honaker, King and Blackwell, 2011).

Table 1 reports summary statistics from UCR violent crime, clearance, and stolen property data. Column 1 shows overall values for our entire sample, and columns (2)-(5) show these values for both 1979 and 2019 for never-adopters (the cities in our sample that were never covered by RTC laws), and for switchers (cities in our sample that adopted an RTC law between 1979 and 2019). A superficial comparison of the change in crime between 1979 and 2019 for the 16 never-adopting and 48 switching cities helps motivate our empirical estimates.[13] Violent crime in the never-adopting

---

[8]All cities in our sample that eventually adopt permitless carry move from shall-issue to permitless carry. While the burden on police from processing concealed carry permits may decrease, permitless carry imposes other strains on police time and likely enhances police fear due to increased civilian concealed carry.

[9]This calculation does not include the regressions underlying Columns 1 and 2 of Table 2. In these regressions, our cleaning procedure removes 16.7 percent of the data, owing to the more erratic nature of crime data reported from smaller cities.

[10]Additionally, if a city is missing data for any component of calculating violent crime or violent crime clearance, we drop that city-year in our regressions.

[11]We always drop crime-years for which a city reported zero cases of a certain type of crime, which would be incompatible with our logged models and are almost certainly due to a failure to report given how large the cities in our sample are.

[12]The fully balanced panel still excludes city-crimes that were missing for more than 15 out of the 41 years, since it would be impractical to attempt to impute a city-crime rate from data that sparse.

[13]One city in our sample, Seattle, is always treated.

cities is much higher in 1979 than in the cities adopting RTC (the switching cities), but by 2019 violent crime was over 30 percent higher in the RTC-adopting cities. Violent crime clearance rates rose substantially in the never-adopting cities but deteriorated in RTC-adopting cities. While the value of stolen guns per capita declined by a similar amount in both groups of cities, the percentage decline is substantially larger for never-adopting cities (76 percent) than for RTC cities (63 percent). These simple comparisons are consistent with our theory of the criminogenic effects of RTC laws, which is more fully explicated by the more complete statistical analysis below.

### Table 1—: Summary Statistics

| Variable | Overall | Never-Adopters 1979 | Never-Adopters 2019 | Switchers 1979 | Switchers 2019 |
|---|---|---|---|---|---|
| Violent Crime | 11.43 | 15.38 | 5.95 | 9.66 | 8.06 |
| | (6.39) | (4.75) | (2.57) | (4.50) | (3.58) |
| Violent Crime Clearance | 40.32 | 32.00 | 48.77 | 45.74 | 36.72 |
| | (11.44) | (9.07) | (14.45) | (10.27) | (10.47) |
| Stolen Gun Value | 1166.93 | 1910.74 | 453.30 | 2042.34 | 764.97 |
| | (1042.94) | (1145.83) | (361.96) | (1280.66) | (453.04) |

*Note:* All values are weighted by population. Crime variables are measured per 1,000 population, stolen guns are thousands of 2019 US dollars per 1,000 population, and clearance rates are percentages. Population-weighted standard deviations in parentheses. Owing to missing data on stolen guns for the large city of Los Angeles, the values reported in columns 2 and 4 for stolen guns are not 1979 values but 1986 values (the first year Los Angeles reported stolen guns data). Some cities are not included in this table because of missing data in the first or final year, because our data cleaning procedure has identified the city as missing too much data to be included in our regressions, or because the city had RTC in 1979 (and therefore is neither a switcher nor a never-adopter). The violent crime values in this table are derived from 59 cities, the violent crime clearance values are from 56 cities, and the gun theft values are from 44 cities.

### III.   Methods

Our two-way fixed effects model takes the following form:

$$(1) \qquad Y_{it} = \beta RTC_{it} + \gamma' X_{it} + \alpha_t + \delta_i + \epsilon_{it}$$

where $Y_{it}$ represents 100 times the log rate of a given outcome variable in unit $i$ at time $t$ and $X$ represents a constant and our set of covariates. The coefficient $\beta$ reflects the average estimated treatment effect of adopting an RTC law on crime (in comparison with a restrictive law), and $\alpha$ and $\delta$ represent time and city fixed effects, respectively. We code the first RTC year as a fractional value that reflects the proportion of the year that the law is in place. We define violent crime as the sum of robbery, homicide, and aggravated assault.[14] Standard errors are clustered at the *state* level, the level at which "random assignment" occurs.[15]

We first estimate the average effect of RTC laws using a static model and then provide event-study analyses that illustrate the dynamic effect of RTC laws. Our event studies regress our outcome variables on a set of yearly dummies for each of the 10 years prior to RTC adoption to 10 years after RTC adoption and bin all more distant periods into 11-or-more years before (or after) RTC adoption dummies, omitting the dummy for one year prior to adoption. Equation 2 shows the model

---

[14] We exclude rape due to the change in definition of rape in UCR coding in 2013. The quality of the data on rape is poor relative to other violent crimes (Kruttschnitt et al., 2014). Moreover, legal and social changes on the reporting of sexual violence and how police handle this reporting (Clay-Warner and Burt, 2005; Miczek, Reiss and Roth, 1993, 408-416) suggest trends in rape could be changing temporally and geographically throughout our study window to a greater degree than for other types of crime in ways that are difficult to measure. The study of the effect of RTC laws on this category of violence merits further research using more suitable data.

[15] Because Philadelphia adopted RTC later than the rest of Pennsylvania, we treat it as a separate state for the purpose of our clustering of standard errors. Philadelphia's RTC was mandated by state-level legislation.

used for our event-study analyses: let $AdoptYear$ be the rounded year of RTC implementation for the cities that came under a RTC regime during our 1979-2019 data period, and equal to zero for all other cities. That is, we compute the least squares fit for:

$$(2) \qquad Y_{it} = \sum_{k \in \{-11^+, -10,...,10,11^+\} \setminus \{-1\}} \beta_k \mathbf{1}[t = AdoptYear_i + k] + \gamma' X_{it} + \alpha_t + \delta_i + \epsilon_{it}$$

## IV. Results

### A. Effects of RTC on Violent Crime, Gun Theft, and Clearance

We present our results in Table 2, which shows a positive effect of RTC on violent crime concentrated in major cities. This finding is consistent with Siegel et al. (2020), which finds that RTC causes larger increases in firearm homicides in large cities compared to suburban or rural areas. The first column of Table 2 adds an interaction term between the RTC indicator and a binary variable for whether a city has an average population less than 250,000 ("small cities") across the years in our study. We select this cutoff given the common use by federal agencies as an indication of a large urban area (US Department of Agriculture, 2013; United States Government Publishing Office, 2021; National Center for Education Statistics, 2019). Column (1) reveals that RTC laws led to a statistically significant increase in violent crime of 0.20 log points in large cities, which corresponds to a 22 percent increase. This finding is consistent with the majority of the recent state-based empirical literature and theoretical predictions, which also concludes that RTC adoption elevates violent crime.[16] We also see that the effect is on average roughly 0.09 log-points lower in small cities compared to large cities. This finding does not depend on the precise threshold for demarcating small and large cities. In Column (2), we break our cities up by average population quartiles rather than use a binary threshold, again using the most populous cities as the reference group. While Quartile 3 experiences an RTC-induced increase in violent crime of a very similar size as in Quartile 4, and the criminogenic effect in Quartile 2 is a non-significant 0.07 log-points less severe than Quartile 4. The difference in effect size between the smallest and largest quartiles is significant at the 5-percent level, with cities in Quartile 1 experiencing an average increase in violent crime due to RTC of only 2 percent, which is not significant. Finally, Column (3) restricts the sample to large cities only. Because the effect seems to be concentrated in major urban areas, we focus on the large-city subsample for the remainder of this paper.

Table 3 presents novel evidence suggesting that RTC adoption causes a statistically significant 0.40 log-point, or 50 percent, increase in the value of stolen guns, in Column (1), and a statistically significant 9 percent decline in the clearance rate of violent crimes, in Column (3). The strikingly high magnitudes of these results suggest that the aggregation of these two mechanisms alone may explain a significant proportion of the overall criminogenic effect of RTC laws.

We note that one reason that gun thefts may increase in the wake of RTC adoption is that the robbery, larceny, and burglary increases resulting from the new regime mechanically leads to more gun thefts. To determine if this factor alone explains some or all of the RTC-induced increase in gun thefts, we re-estimate our stolen guns regression in Column (2), controlling for the one-year lagged log rate of the total value of stolen property (excluding firearms) per capita. We lag this

---

[16]While the focus of our article is on the mechanisms driving the RTC-induced increase in violent crime, agency level UCR and Supplemental Homicide Report (SHR) provide rich data decomposing violent crime by sub-categories of crime—robbery, homicide, and aggravated assault—and by weapon type. In the appendix, we show the effect of RTC on firearm and nonfirearm violent crime. As would be theoretically predicted, both nonfirearm and firearm violent crime are estimated to increase following RTC adoption, and the increase in firearm violent crime is larger in magnitude than nonfirearm violent crime (analyses available by request).

Table 2—: Effect of Right to Carry on Crime by City Population, OLS Estimates (1979-2019)

| | 100 x log violent crime rate | | |
|---|---|---|---|
| | Full Sample | Full Sample | Large Cities Only |
| | (1) | (2) | (3) |
| RTC Law | 20.00*** | 19.78*** | 18.52** |
| | (4.91) | (5.08) | (6.14) |
| | p = 0.00 | p = 0.00 | p = 0.01 |
| RTC x Small (Less than 250k) | −9.01* | | |
| | (3.84) | | |
| | p = 0.02 | | |
| RTC x Quartile 1 (100k-126k) | | −17.92** | |
| | | (5.88) | |
| | | p = 0.01 | |
| RTC x Quartile 2 (127k-176k) | | −7.03 | |
| | | (7.34) | |
| | | p = 0.34 | |
| RTC x Quartile 3 (177k-303k) | | −3.15 | |
| | | (5.16) | |
| | | p = 0.55 | |
| Observations | 7,094 | 7,094 | 2,468 |
| $R^2$ | 0.88 | 0.88 | 0.86 |
| Adjusted $R^2$ | 0.87 | 0.87 | 0.85 |

† $p < 0.1$; * $p < 0.05$; ** $p < 0.01$; *** $p < 0.001$

*Note:* City-level panel data estimates with city and year fixed effects, 1979-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II, with coefficients reported in our Online Appendix but not shown here to conserve space. All regressions are weighted by time-varying city populations.

control variable to mitigate endogeneity concerns, but recognize that even with this correction the model is less-than-ideal because of the risk that it includes a covariate that is affected by our treatment variable. For this reason we prefer the specification in Column (1). The high magnitude of the estimated effect even when controlling for the total value of stolen property indicates that the RTC-triggered increase in stolen guns is caused primarily by factors other than the overall increase in stolen property that RTC laws may stimulate. This result suggests that the greater vulnerability to theft afforded by increased firearm carrying and other factors described in the introduction are the leading factors driving the increase in gun thefts following the introduction of RTC laws.

Similarly, one factor that might contribute to the 9 percent decline in clearance rates shown in Column (3) is that the increased crime resulting from RTC adoption may impair the ability of the police to clear crimes at the same rate. To determine if this factor alone explains some or all of the RTC-induced drop in clearance rates, we re-estimate our preferred clearance rate regression, Column (3), controlling for the lagged log violent crime rate in Column (4). Adding this control reduces the size of the clearance drop from about 9 percent to 8 percent ($p = 0.06$).[17] This suggests that the RTC-triggered decline in police effectiveness is largely driven by factors other than the overall increase in violent crime that RTC laws stimulate. While an in-depth examination of the

[17]Note that the regression estimate controlling for violent crime is likely biased downward by the presence of ratio bias. This occurs because overall violent crime is in the denominator of the clearance rate dependent variable and in the numerator of the independent variable, which will bias the estimate downward because violent crime is measured with error.

Table 3—: Effect of Right to Carry on Gun Theft and Policing, OLS Estimates (1979-2019)

| | 100 x log rate of . . . | | | |
| --- | --- | --- | --- | --- |
| | Gun Theft | Gun Theft | Clearance | Clearance |
| | (1) | (2) | (3) | (4)[†] |
| RTC Law | 40.27*** | 30.96** | −9.22* | −8.09[†] |
| | (12.19) | (10.15) | (4.47) | (4.27) |
| | p = 0.00 | p = 0.01 | p = 0.04 | p = 0.06 |
| Lagged 100 x Log Value of Nongun Property Theft | | 0.40*** | | |
| | | (0.08) | | |
| | | p = 0.00 | | |
| Lagged 100 x Log Violent Crime Rate | | | | −0.07 |
| | | | | (0.07) |
| | | | | p = 0.35 |
| Observations | 2,157 | 2,127 | 2,286 | 2,283 |
| $R^2$ | 0.80 | 0.81 | 0.54 | 0.54 |
| Adjusted $R^2$ | 0.79 | 0.80 | 0.52 | 0.52 |

† $p < 0.1$; * $p < 0.05$; ** $p < 0.01$; *** $p < 0.001$

*Note:* City-level panel data estimates with city and year fixed effects, 1979-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II, with coefficients reported in our Online Appendix but not shown here to conserve space. Models (1) and (2) drop the cities of Chicago, Minneapolis, New York, Newark, Omaha, San Jose, and Washington, because our data cleaning procedure described in Section II identified these cities as missing more than 15 years of gun theft data. All regressions are weighted by time-varying city populations.

"mechanisms driving the mechanisms" of RTC-induced declines in violent crime clearance and increases in gun theft is outside the scope of this paper, we do find evidence that is consistent with the literature suggesting that officers pull back from more active policing when their feeling of danger on the job is elevated.[18] Since the greatest danger to police from criminal activity is posed by those with firearms, it would not be unreasonable to assume that police would feel greater apprehension as the number of their contacts with armed individuals—often in highly contentious interactions—increases. Following Cho, Gonçalves and Weisburst (2021), we use rates of "quality-of-life" (low-level) arrests as a measure of risk-avoidance behavior by police. We find suggestive evidence of a sizable 17 percent decline in quality-of-life arrests following the passage of RTC laws ($p = 0.08$), and we also demonstrate that the magnitude of the decline in quality-of-life arrests following RTC is associated with the magnitude of the decline in violent crime clearance following RTC.[19]

To address concerns that staggered DiD estimates such as those of Tables 2 and 3 can be contaminated by "unclean" comparisons (Roth et al., 2022), we re-estimate our results using the method from De Chaisemartin and d'Haultfoeuille (2020).[20] We use the Honaker, King and Blackwell (2011) multiple imputation approach to achieve balanced panel data, improving the efficiency of the the De Chaisemartin and d'Haultfoeuille (2020) estimator. While the Table 4 point estimates on violent crime and gun theft are not meaningfully changed relative to Tables 2 and 3, the column (4) point estimate on the decline in violent crime clearance rates resulting from RTC adoption doubles

---

[18]We do not examine the number of law enforcement officers killed in action as an outcome variable because the effect of RTC is theoretically ambiguous: a proliferation of illegal firearms and elevated crime might lead to more officers being killed, but on the other hand, if police become less engaged (as our regressions suggest), they may be exposed to fewer situations that could result in death.

[19]See appendix for details.

[20]Among the proposed estimators to address bias from heterogeneous treatment effects in staggered treatment settings, the procedure from De Chaisemartin and d'Haultfoeuille (2020) is most similar to Callaway and Sant'Anna (2021) and Sun and Abraham (2021), particularly when treatment is monotonic. For our modeling, we prefer De Chaisemartin and d'Haultfoeuille (2020) because it allows us to condition on time-varying covariates and use population weights in Stata.

to -0.20 log points, or 18 percent ($p = 0.077$). Although the gun theft and clearance estimates in Table 4 are less precise than the OLS estimates, pre-passage trends appear flat in the corresponding event studies.

Table 4—: Effect of Right to Carry on Crime, de Chaisemartin and D'Haultfoeuille Estimates

| | 100 x log rate of ... | | | | |
|---|---|---|---|---|---|
| | Violent Crime | Gun Theft | Gun Theft | Clearance | Clearance |
| | (1) | (2) | (3) | (4) | (5) |
| RTC Law | 17.35** | 36.98* | 40.98* | -20.26† | -23.22† |
| | (6.24) | (18.42) | (20.25) | (11.44) | (12.44) |
| | p = 0.005 | p = 0.045 | p = 0.043 | p = 0.077 | p = 0.062 |
| Stolen Property Control | No | No | Yes | No | No |
| Violent Crime Control | No | No | No | No | Yes |

† $p < 0.1$; * $p < 0.05$; ** $p < 0.01$; *** $p < 0.001$

*Note:* Average treatment effects using De Chaisemartin and d'Haultfoeuille (2020) difference-in-differences estimator on 1979-2019 panel data, using same controls as in Tables 2 and 3. As in Table 3, Models (2) and (3) drop the cities of Chicago, Minneapolis, New York, Newark, Omaha, San Jose, and Washington. All regressions are weighted by time-varying city populations. The OLS analogue to the violent crime estimate in Column 1 of this table is Column (3) of Table 2, and Columns (2) through (5) above correspond to Columns (1) through (4) of Table 3.

Additionally, we provide a battery of tests in our Online Appendix showing that our findings from Tables 2 and 3 are robust to the inclusion or exclusion of certain controls,[21] the precise population threshold for our analysis, whether we impute missing data or use a complete-case analysis, and the exclusion of particular cities.

## B.   Event Study Analysis

We supplement our static regression models with an event-study analysis. The purpose of this analysis is two-fold: first, we comment on the validity of the conditional parallel trends assumption, and second, we can observe how the impact of the RTC on the outcome variables changes over time.

A standard test for assessing the parallel trends assumption is to establish that one cannot reject the assumption that the yearly dummies from two up to five years prior to adoption are jointly different from zero. We find non-significance at the 0.1-level for all F-tests on all our Table 2 outcome variable regressions.[22] Beyond our F-tests and visual inspections of the event-study analyses, we also note that for all our statistically significant outcome variables, any deviations from parallel pretrends are small relative to the treatment effect. Manski and Pepper (2018) used partial identification analysis to study the effect of RTC laws on crime in three states.[23] As a quantitative analysis in the spirit of Manski and Pepper (2018), we consider the magnitude of our estimated treatment effects relative to any prepassage deviation from parallel pretrends. For example, consider how our point estimate that RTC laws increase violent crime by 0.1852 log points compares to the largest deviation from zero in any of the five placebo years prior to RTC passage, $\hat{\theta} = \max\{|\hat{\beta}_{-5}|, ..., |\hat{\beta}_{-2}|\} = 0.0252$. The estimated treatment effect is $0.1852/0.0252 = 7.36$ times as large as this $\hat{\theta}$, meaning that the magnitude of the deviation from parallel trends in the *post*-treatment period that would be required to reverse the sign of our average treatment effect is

[21]Due to possible concerns about the quality of the incarceration data, we run a version of our model that excludes this control. We also try a specification that adds a control for the unemployment rate.

[22]See Appendix D for event-study plots and F-tests of all variables.

[23]We note Manski and Pepper (2018) base their primary analysis on a simple comparison of RTC-adopting Virginia versus non-adopting Maryland, but use 1989 as the RTC passage date for Virginia when the correct date is 1995. As a result, the RAND report concluded that Manski and Pepper (2018) did not provide useful estimates of the impact of RTC laws, but their analytical structure is valuable for our purposes.



Figure 1. : Event Plots for Key Outcomes

*Note:* 95 percent confidence intervals with cluster-robust standard errors displayed. Clearance model displayed here does not include control for violent crime rate and gun theft model does not control for property crime.

more than seven times as large as any deviation observed in the five years prior to passage.[24] De Chaisemartin and d'Haultfoeuille (2020) style event plots can be found in the Appendix and are qualitatively similar to the OLS event plots.

### C. Relationship Between Mechanism and Outcome Effect Magnitudes

We now turn our attention to the question of whether there is indeed a connection between the violent-crime effects of RTC and our findings regarding our proposed mechanisms—gun theft and clearance. We present a collage of evidence that suggests causal relationships in both cases. Our approach draws on a treatment-intensity analysis similar to Khanna (2020) and Chalfin et al. (2022). It should be noted upfront that we view this task as inherently less precise than our main findings presented above because it exploits heterogeneity in the effects of RTC adoption across the cities in our sample rather than a strictly exogenous source of variation. Obviously, using an estimated treatment effect for an individual city as a dependent variable will necessarily introduce greater imprecision than trying to get an average treatment effect across 39 cities, but our analysis in this section corroborates the hypothesis that RTC laws increase crime by increasing gun thefts and damaging police effectiveness in clearing crimes.

If our proposed mechanisms are correct, then one testable implication should be that the cities that experienced especially severe declines in clearance rates due to RTC should have suffered relatively large increases in violent crime, and similarly, the cities with the largest increases in gun theft due to RTC should have on average experienced greater increases in violent crime relative

---

[24]A similar analysis for gun theft and violent crime clearance yields multipliers of 3.35 and 4.35, respectively.

to other cities. As a first step, we calculate uncontaminated city-level effects of RTC on violent crime, gun theft, and clearance in the following manner. For each RTC-adopting city, we run the same model used in our main results presented in Equation 1 using only that single RTC-adopting city and all never-treated cities, constraining the data to be from 10 years before the RTC date through 10 years post RTC to maximize comparability across cities.[25] Figure 2 shows the pattern of city-level estimated effects of RTC on violent crime conditional on having above- or below-median changes in clearance and gun theft conform to our theoretical expectations.



Figure 2. : Violent Crime Effect Sizes Conditional on Mechanism Magnitudes

*Note:* Estimates derived from 39 treated cities for which estimates of the effects of RTC on all three outcomes–clearance, gun theft, and violent crime–were obtainable. Cities with above-median effects are labeled "high" and all others are "low."

We can go one step further and calculate the implied elasticities of violent crime with respect to clearance and gun theft using the following regression:

$$(3) \qquad \Delta_{RTC}(\ln Crime)_i = \alpha + \beta(\Delta_{RTC}(\ln Clearance)_i) + \gamma(\Delta_{RTC}(\ln \text{Gun Theft})_i) + \epsilon_i$$

where $\Delta_{RTC}$ represents the effect of RTC on an outcome relative to the counterfactual for individual city $i$. Column (1) of Table 5 shows the results of this regression for violent crime, while Columns (2) and (3) show the regression results when only the clearance or the gun theft effect variable is included respectively.

For our regression results to take on a causal interpretation, one must assume that the magnitudes of the *RTC-induced* clearance and gun theft effects for each city $i$ are uncorrelated with the error term $\epsilon_i$. The most prominent mechanisms driving violent crime increases discussed in the literature are related to impulsive human behavior (Colmer and Doleac, 2022), which is plausibly stable over time and place and at most weakly correlated with our observed mechanisms, which relate to local criminal conditions and institutions. Thus, we reason that omitted variables exert a relatively small influence on our estimates relative to the magnitude of the coefficients observed.

---

[25]Due to endogeneity concerns we use the specification from Columns (1) and (3) of Table 3, which do not control for the level of violent crime in our clearance estimates and do not control for stolen property in our gun-theft estimates. However, we present an alternative specification of Table 5 in the Online Appendix that uses the specifications from Columns (2) and (4) of Table 3, which do include such controls.

Table 5—: Implied Elasticities of Crime With Respect to Clearance and Gun Theft

| | Change in 100 times log rate of ... | | |
| | Violent Crime | Violent Crime | Violent Crime |
| | (1) | (2) | (3) |
|---|---|---|---|
| Change in 100 times log clearance rate | −0.12 | −0.14 | |
| | (0.10) | (0.11) | |
| | p = 0.24 | p = 0.21 | |
| Change in 100 times log value stolen guns rate | 0.09 | | 0.10 |
| | (0.07) | | (0.07) |
| | p = 0.19 | | p = 0.17 |
| Constant | 13.58** | 17.09*** | 14.97*** |
| | (4.38) | (3.85) | (4.21) |
| | p = 0.01 | p = 0.00 | p = 0.00 |
| Observations | 39 | 39 | 39 |
| $R^2$ | 0.09 | 0.04 | 0.06 |
| Adjusted $R^2$ | 0.04 | 0.01 | 0.04 |

† $p < 0.1$; * $p < 0.05$; ** $p < 0.01$; *** $p < 0.001$

*Note:* Some treated cities are not included in these regressions because they do not have ten years of observations both before and after RTC adoption, or because of excessive missing data or other anomalies in at least one of the following variables: violent crime, gun theft, or clearance. Those cities are: Chicago, Indianapolis, Jacksonville, Miami, Milwaukee, Minneapolis, Omaha, Tampa, and Washington. All regressions are weighted by time-varying city populations.

Another possible concern in interpreting Table 5 is that causality runs in the opposite direction of what we propose. For instance, a positive correlation between the size of the increase in gun theft and the size of the increase in violent crime may simply reflect the fact that RTC regimes increase robberies; some robbery victims will inevitably be carrying concealed weapons and hence gun thefts will also rise. This concern is mitigated by the fact that the vast majority of guns are stolen through (nonviolent) property crimes (Langton, 2012). We find it more plausible that causality runs in the direction we propose because existing empirical evidence indicates firearm availability is an important margin influencing criminal behavior. Only 40 percent of robberies are committed with a firearm in our sample, despite the fact that firearms greatly increase payoff to robbery by increasing the probability of "success" and allowing criminals to pursue more robust targets like commercial establishments (Cook, 1987, 1991). Likewise, we believe that on balance the data casts doubt on the notion that causality flows purely from rising crime to a mechanical decrease in clearance. Our results in Column (4) of Table 3 and the observed decline in quality-of-life arrests suggest that a decline in the criminal's probability of detection plays some role in the RTC effect on clearance.

Despite these caveats, the directions of the coefficients in Table 5 bolster our confidence that declines in violent crime clearance and increases in gun theft are among the mechanisms driving increase in violent crime. The left-hand-side and right-hand-side variables are both measured in logarithmic terms, so we can roughly interpret the coefficients (between -1 and 1) roughly as elasticities. As noted above, the effects of RTC in each individual city are estimated with substantial measurement error, these elasticities are likely attenuated toward zero. Attenuation bias is probably one reason why our estimated elasticity of violent crime with respect to policing, -0.12, is noticeably smaller in magnitude than estimates in the literature on police force size and visibility (Bun et al.,

13

2020, p.2308-2310), which has found elasticities ranging from -0.225 to -0.9. (It is also worth noting, however, that ours is a slightly different elasticity, since we measure the elasticity of the *RTC effect on* crime with respect to the *RTC effect on* clearance.) The literature on the elasticity of gun theft with respect to violent crime is underdeveloped, but Khalil (2017)[26] estimates elasticities of gun theft with respect to various subcomponents of violent crime that would imply an elasticity of gun theft with respect to overall violent crime of about 0.04, which is lower than our estimated elasticities of 0.09 and 0.11. We note that because of data constraints, both our current analysis and Khalil (2017) attempt to estimate the elasticity of stolen firearms with respect to violent crime *in the jurisdiction in which the firearm was reported stolen.* Thus, our calculated elasticity is an underestimate of stolen firearms with respect to violent crime in all jurisdictions since it does not consider how illegal gun flows may cross borders, creating negative spillover effects. Studies of firearms recovered in Chicago between 2009 and 2013 (Cook et al., 2014) and Boston between 1991 and 1995 (Braga, 2017) suggest that around 60 to 70 percent of guns recovered come from out of state, and Knight (2013) suggests that guns may flow from states with weaker gun laws to those with stronger gun laws. The large externalities associated with increased gun theft in a particular jurisdiction suggest that our implied elasticity understates the harmful impact of RTC laws on crime caused by increased firearm theft.

If we consider the regression constant in Table 5 to be the RTC-induced rise in violent crime that is not due to either of our two proposed mechanisms, then given that the cities contributing to these regressions have a weighted average of an RTC-induced rise in violent crime of .1896 log points, the regression from Column (1) suggests that our two mechanisms explain 28 percent of the increase in violent crime due to RTC laws. An alternative way of calculating the salience of our two mechanisms is to multiply the RTC effects on clearance and gun theft by the elasticities in Table 5 and compare the sum to the estimated effect of RTC on violent crime. Using OLS estimates (from Tables 2 and 3), we find our mechanisms explain 26 percent, and using the De Chaisemartin and d'Haultfoeuille (2020) estimates (from Table 4), 31 percent, of the increase in violent crime due to RTC. However, due to the measurement error in our estimating procedure and the negative externalities of firearm theft due to gun flows across borders, we believe that our elasticities likely understate the true relationship between our mechanisms and violent crime. If we hold our elasticity for gun theft fixed at a conservative value of 0.09 and vary the clearance elasticity to be within the bounds of what is accepted in the policing literature, our two mechanisms explain a more reasonable 30 to 64 percent of the criminogenic effect of RTC.

## V.  Conclusion

Our study solidifies the prior empirical support for the finding that RTC laws substantially increase violent crime based on state panel data analyses and importantly demonstrates that this effect is found on a large-city panel data set. We begin our analysis by demonstrating that criminogenic effect of RTC is primarily focused in large urban centers. The central and most novel contribution of our article, however, is to advance the understanding of two mechanisms governing criminal and police responses to gun laws in America's largest cities: RTC laws inhibit the ability of police to solve crimes and lead to a surge in gun theft. In doing so, we demonstrate that the empirical landscape is more complicated than a simple matter of whether concealed carry can deter or thwart crime or whether it allows for people to more easily reach for a gun in a moment of anger. Our work illuminates two significant and largely unexpected harmful consequences that flow from the adoption of RTC laws.

---

[26]Although Khalil (2017) does not claim a source of exogenous variation in gun thefts, we discuss our finding in reference to this value due to the current gap in the literature.

14

More positively, our findings suggest some possible initiatives that major urban areas might adopt to try to mitigate some of the harmful consequences of permissive rules governing concealed carry. Efforts to discourage concealed carry permitholders from engaging in careless behavior that allows guns to fall into the hands of criminals may have large benefits. Efforts at alerting gun owners to the substantial problem of gun theft may also prove beneficial. Steps can also be taken to reduce officer fear or to directly offset the RTC-induced decline in police effectiveness through various means, including improving police monitoring and incentives in ways that maximize the social benefits and minimize social costs of policing (Kapustin, Neumann and Ludwig, 2022; Cheng and Long, 2018; Owens and Ba, 2021).

At least two avenues for future research are apparent. First, more granular data on the illicit market for stolen guns and the flow of illegal firearms could clarify the extent to which firearms stolen under an RTC regime increase crime by converting thieves into violent criminals or simply increasing the weaponry available to violent criminals, who thereby become more dangerous and criminally productive. Second, given the right data, it may be possible to clarify the reasons for RTC-induced declines in police effectiveness by measuring whether RTC laws reduce the quantity or quality of police-civilian interactions, effectively pose a tax on police time, degrade police-community relations, or diminish risky but effective crime-suppressing police interventions or operations.

## References

**Ang, Desmond, Panka Bencsik, Jesse Bruhn, and Ellora Derenoncourt.** 2021. "Police Violence Reduces Civilian Cooperation and Engagement with Law Enforcement." HKS Working Paper RWP21-022. https://scholar.harvard.edu/ang/publications/police-violence-reduces-civilian-cooperation-and-engagement-law-enforcement. Accessed on 2022-09-12.

**Ayres, Ian, and Steven D Levitt.** 1998. "Measuring Positive Externalities from Unobservable Victim Precaution: An Empirical Analysis of Lojack." *The Quarterly Journal of Economics*, 113(1): 43–77.

**Billings, Stephen B.** 2023. "Smoking Gun? Linking Gun Ownership to Neighborhood Crime." Unpublished manuscript.

**Black, Dan A, and Daniel S Nagin.** 1998. "Do Right-to-Carry Laws Deter Violent Crime?" *The Journal of Legal Studies*, 27(1): 209–219.

**Booker, Brakkton.** 2019. "Florida Man Who Shot And Killed A Black Man Over Parking Dispute Gets 20 Years." *NPR.* https://www.npr.org/2019/10/10/769089719/florida-man-who-shot-and-killed-a-black-man-in-parking-dispute-gets-20-years. Accessed on 2023-02-06.

**Boylan, Richard T.** 2019. "Imputation Methods Make Crime Studies Suspect: Detecting Biases via Regression Discontinuity." Working Paper. https://cear.gsu.edu/files/2019/05/Boylan-3.pdf. Accessed on 2022-09-12.

**Braga, Anthony A.** 2017. "Long-Term Trends in the Sources of Boston Crime Guns." *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5): 76–95.

**Buck, Jordan.** 2022. "How Much Do Typical Guns Cost? (Rifle, handgun, shotgun)." *Backfire.* https://backfire.tv/gun-cost/. Accessed on 2023-02-06.

**Bun, Maurice JG, Richard Kelaher, Vasilis Sarafidis, and Don Weatherburn.** 2020. "Crime, Deterrence and Punishment Revisited." *Empirical Economics*, 59(5): 2303–2333.

**Bureau of Justice Statistics.** 2018. "Law Enforcement Agency Identifiers Crosswalk, United States, 2012 (ICPSR 35158)." https://doi.org/10.3886/ICPSR35158.v2. Accessed on 2022-09-12.

**Bushman, Brad J., Thomas Kerwin, Tyler Whitlock, and Janet M. Weisenberger.** 2017. "The weapons effect on wheels: Motorists drive more aggressively when there is a gun in the vehicle." *Journal of Experimental Social Psychology*, 73: 82–85.

**Callaway, Brantly, and Pedro HC Sant'Anna.** 2021. "Difference-in-Differences with Multiple Time Periods." *Journal of Econometrics*, 225(2): 200–230.

**Chalfin, Aaron, and Justin McCrary.** 2017. "Criminal Deterrence: A Review of the Literature." *Journal of Economic Literature*, 55(1): 5–48.

**Chalfin, Aaron, Benjamin Hansen, Jason Lerner, and Lucie Parker.** 2022. "Reducing Crime Through Environmental Design: Evidence from a Randomized Experiment of Street Lighting in New York City." *Journal of Quantitative Criminology*, 38(1): 127–157.

**Cheng, Cheng, and Mark Hoekstra.** 2013. "Does Strengthening Self-Defense Law Deter Crime or Escalate Violence? Evidence from Expansions to Castle Doctrine." *Journal of Human Resources*, 48(3): 821–854.

**Cheng, Cheng, and Wei Long.** 2018. "Improving Police Services: Evidence from the French Quarter Task Force." *Journal of Public Economics*, 164: 1–18.

**Cho, Sungwoo, Felipe Gonçalves, and Emily Weisburst.** 2021. "Do Police Make Too Many Arrests? The Effect of Enforcement Pullbacks on Crime." https://docs.iza.org/dp14907.pdf. Accessed on 2022-09-16.

**Clay-Warner, Jody, and Callie Harbin Burt.** 2005. "Rape Reporting After Reforms: Have Times Really Changed?" *Violence Against Women*, 11(2): 150–176.

**Colmer, Jonathan, and Jennifer L Doleac.** 2022. "Access to Guns in the Heat of the Moment: More Restrictive Gun Laws Mitigate the Effect of Temperature on Violence." Working Paper. http://dx.doi.org/10.2139/ssrn.4195573. Accessed on 2022-09-12.

**Cook, Philip J.** 1987. "Robbery Violence." *Journal of Criminal Law and Criminology*, 78: 357.

**Cook, Philip J.** 1991. "The Technology of Personal Violence." *Crime and Justice*, 14: 1–71.

**Cook, Philip J.** 2018. "Gun Markets." *Annual Review of Criminology*, 1: 359–377.

**Cook, Philip J, and John MacDonald.** 2010. "The Role of Private Action in Controlling Crime." In *Controlling Crime: Strategies and Tradeoffs*. 331–363. University of Chicago Press.

**Cook, Philip J, and John MacDonald.** 2011. "Public Safety Through Private Action: An Economic Assessment of BIDS." *The Economic Journal*, 121(552): 445–462.

**Cook, Philip J, Mark H Moore, and Anthony A Braga.** 2004. "Gun Control." In *Crime: Public Policies for Crime Control.* , ed. James Q Wilson and Joan Petersilia, Chapter 11, 291–329. Institute for Contemporary Studies.

**Cook, Philip J, Richard J Harris, Jens Ludwig, and Harold A Pollack.** 2014. "Some Sources of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Traffickers." *Journal of Criminal Law and Criminology*, 104: 717.

**De Chaisemartin, Clément, and Xavier d'Haultfoeuille.** 2020. "Two-Way Fixed Effects Estimators with Heterogeneous Treatment Effects." *American Economic Review*, 110(9): 2964–96.

**Dezhbakhsh, Hashem, and Paul H Rubin.** 1998. "Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime." *The American Economic Review*, 88(2): 468–474.

**Donohue, John J.** 2023. "The Effect of Permissive Gun Laws on Crime." *The Annals of the American Academy of Political and Social Science*. Forthcoming.

**Donohue, John J, Abhay Aneja, and Kyle D Weber.** 2019. "Right-to-Carry Laws and Ciolent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis." *Journal of Empirical Legal Studies*, 16(2): 198–247.

**Doucette, Mitchell L, Julie A. Ward, Alex D McCourt, Daniel Webster, and Cassandra K. Crifasi.** 2022. "Officer-involved Shootings and Concealed Carry Weapons Permitting Laws, 2014-2020." *Journal of Urban Health*.

**Elinson, Zusha, and Cameron McWhirter.** 2022. "Gun Thefts Are Rising and Leading to More Crime, Including Sacramento Mass Shooting." *Wall Street Journal*. https://www.wsj.com/articles/rise-in-first-time-gun-owners-linked-to-more-gun-thefts-in-major-cities-11651160540. Accessed on 2022-09-12.

**Flores, Rosa.** 2022. "A 9-year-old girl who was shot in the Houston area on Valentine's Day has died)." *CNN*. https://www.cnn.com/2022/02/15/us/houston-9-year-old-shot-and-killed/index.html. Accessed on 2023-02-06.

**Goodman, J. David.** 2022. "Angry Drivers, Lots of Guns: An Explosion in Road Rage Shootings." *The New York Times*. https://www.nytimes.com/2022/04/12/us/road-rage-shootings-guns-texas.html. Accessed on 2022-08-22.

**Honaker, James, Gary King, and Matthew Blackwell.** 2011. "Amelia II: A Program for Missing Data." *Journal of Statistical Software*, 45: 1–47.

**Kaplan, Jacob.** 2021a. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Law Enforcement Officers Killed and Assaulted (LEOKA) 1960-2020." Data Set. Inter-University Consortium for Political and Social Research, Ann Arbor, MI. https://doi.org/10.3886/E102180V11.

**Kaplan, Jacob.** 2021b. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Offenses Known and Clearances by Arrest, 1960-2019." Data Set. Inter-University Consortium for Political and Social Research, Ann Arbor, MI. https://doi.org/10.3886/E100707V17.

**Kaplan, Jacob.** 2021c. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting (UCR) Program Data: Property Stolen and Recovered (Supplement to Return A) 1960-2020." Data Set. Inter-University Consortium for Political and Social Research, Ann Arbor, MI. https://doi.org/10.3886/E105403V8.

**Kapustin, Max, Terrence Neumann, and Jens Ludwig.** 2022. "Policing and Management." National Bureau of Economic Research Working Paper No. 29851.

**Khalil, Umair.** 2017. "Do More Guns Lead to More Crime? Understanding the Role of Illegal Firearms." *Journal of Economic Behavior & Organization*, 133: 342–361.

**Khanna, Gaurav.** 2020. "Does affirmative action incentivize schooling? Evidence from India." *Review of Economics and Statistics*, 102(2): 219–233.

**Klick, Jonathan, and Alexander Tabarrok.** 2005. "Using Terror Alert Levels to Estimate the Effect of Police on Crime." *The Journal of Law and Economics*, 48(1): 267–279.

**Knight, Brian.** 2013. "State Gun Policy and Cross-State Externalities: Evidence fro Crime Gun Tracing." *American Economic Journal: Economic Policy*, 5(4): 200–229.

**Kovandzic, Tomislav V, Thomas B Marvell, and Lynne M Vieraitis.** 2005. "The Impact of "Shall-Issue" Concealed Handgun Laws on Violent Crime Rates: Evidence from Panel Data for Large Urban Cities." *Homicide Studies*, 9(4): 292–323.

**Kruttschnitt, Candace, William D Kalsbeek, Carol C House, et al.** 2014. "Estimating the Incidence of Rape and Sexual Assault."

**Langton, Lynn.** 2012. *Firearms stolen during household burglaries and other property crimes, 2005-2010.* US Department of Justice, Office of Justice Programs, Bureau of Justice . . . .

**Levitt, Steven D.** 2002. "Using Electoral Cycles in Police Hiring to Estimate the Effects of Police on Crime: Reply." *American Economic Review*, 92(4): 1244–1250.

**Lott, Jr, John R, and David B Mustard.** 1997. "Crime, Deterrence, and Right-to-Carry Concealed Handguns." *The Journal of Legal Studies*, 26(1): 1–68.

**Ludwig, Jens.** 1998. "Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data." *International Review of Law and Economics*, 18(3): 239–254.

**Manski, Charles F, and John V Pepper.** 2018. "How do Right-to-Carry Laws Affect Crime Rates? Coping with Ambiguity Using Bounded-Variation Assumptions." *Review of Economics and Statistics*, 100(2): 232–244.

**McClellan, Chandler, and Erdal Tekin.** 2017. "Stand Your Ground Laws, Homicides, and Injuries." *Journal of Human Resources*, 52(3): 621–653.

**McElroy, Marjorie B, and Will Wang.** 2017. "Seemingly Inextricable Dynamic Differences: The Case of Concealed Gun Permit, Violent Crime and State Panel Data." *SSRN working paper*, http://dx.doi.org/10.2139/ssrn.2992058. Accessed on 2022-02-09.

**Meehan, Brian, and Bruce L Benson.** 2017. "Does Private Security Affect Crime?: A Test Using State Regulations as Instruments." *Applied Economics*, 49(48): 4911–4924.

**Mettler, Katie.** 2016. "He Thought He Could Help': Concealed Carry Gun-Wielder Intervenes in Domestic Dispute and Is Shot Dead." *Washington Post.* https://www.washingtonpost.com/news/morning-mix/wp/2016/05/03/he-thought-he-could-help-concealed-carry-gun-wielder-intervenes-in-domestic-dispute-and-is-shot-dead/. Accessed on 2023-02-06.

**Miczek, Klaus A, Albert J Reiss, and Jeffrey A Roth.** 1993. *Understanding and Preventing Violence.* Vol. 3, National Academies Press.

**National Center for Education Statistics.** 2019. "NCES Locale Classifications and Criteria." https://nces.ed.gov/programs/edge/Geographic/LocaleBoundaries. Accessed on 2022-09-12.

**Owens, Emily, and Bocar Ba.** 2021. "The Economics of Policing and Public Safety." *Journal of Economic Perspectives*, 35(4): 3–28.

**Patrick, Brian Anse.** 2010. *Rise of the Anti-Media: In-forming America's Concealed Weapon Carry Movement.* Rowman & Littlefield.

**RAND.** 2023*a*. "Effects of Concealed-Carry Laws on Violent Crime." https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime.html. Accessed on 2023-01-31.

**RAND.** 2023*b*. "What Science Tells Us About the Effects of Gun Policies." https://www.rand.org/research/gun-policy/key-findings/what-science-tells-us-about-the-effects-of-gun-policies.html. Accessed on 2023-01-31.

**Roth, Jonathan, Pedro HC Sant'Anna, Alyssa Bilinski, and John Poe.** 2022. "What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature." https://doi.org/10.48550/arXiv.2201.01194. Accessed on 2022-09-12.

**Schell, Terry L, Matthew Cefalu, Beth Ann Griffin, Rosanna Smart, and Andrew R Morral.** 2020. "Changes in Firearm Mortality Following the Implementation of State Laws Regulating Firearm Access and Use." *Proceedings of the National Academy of Sciences*, 117(26): 14906–14910.

**Siegel, Michael, Benjamin Solomon, Anita Knopov, Emily F Rothman, Shea W Cronin, Ziming Xuan, and David Hemenway.** 2020. "The impact of state firearm laws on homicide rates in suburban and rural areas compared to large cities in the United States, 1991-2016." *The Journal of Rural Health*, 36(2): 255–265.

**Sun, Liyang, and Sarah Abraham.** 2021. "Estimating Dynamic Treatment Effects in Event Studies with Heterogeneous Treatment Effects." *Journal of Econometrics*, 225(2): 175–199.

**United States Government Publishing Office.** 2021. "Urban Areas for the 2020 Census-Proposed Criteria." *Federal Register*, 86(32). https://www.federalregister.gov/documents/2021/02/19/2021-03412/urban-areas-for-the-2020-census-proposed-criteria. Accessed 2022-09-12.

**US Department of Agriculture.** 2013. "Rural-Urban Continuum Codes." https://www.ers.usda.gov/data-products/rural-urban-continuum-codes.aspx. Accessed 2022-09-12.

**Van Der Wal, Willem M.** 2022. "Marginal Structural Models to Estimate Causal Effects of Right-to-Carry Laws on Crime." *Statistics and Public Policy*, 1–29.

**Weisburd, Sarit.** 2021. "Police Presence, Rapid Response Rates, and Crime Prevention." *Review of Economics and Statistics*, 103(2): 280–293.

**Zimmerman, Paul R.** 2014. "The Deterrence of Crime Through Private Security Efforts: Theory and Evidence." *International Review of Law and Economics*, 37: 66–75.