ROB BONTA
Attorney General of California
ANYA BINSACCA
Supervising Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
TODD GRABARSKY
Deputy Attorney General
CAROLYN DOWNS
Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
State Bar No. 275496
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6617
  Fax:  (916) 731-2124
  E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSE CHAVEZ, *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,**<br><br>Defendants. | 3:19-cv-01226-L-AHG<br><br>**DECLARATION OF DEPUTY ATTORNEY GENERAL STEPHANIE ALBRECHT IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:    The Honorable M. James Lorenz<br>Action Filed:    July 1, 2019 |

1

I, Stephanie Albrecht, hereby declare as follows:

1.     I am a Deputy Attorney General with the California Department of Justice and serve as counsel in this action for Defendants Attorney General Rob Bonta, in his official capacity, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms.  I make this declaration in support of Defendants' Motion for Summary Judgment.  I have personal, first-hand knowledge of the matters set forth below and, if called as a witness, I could and would testify competently thereto.

2.     Attached hereto are the following:

**Exhibit 1:**     A true and correct copy of the California Department of Fish and Wildlife's Home Study/On-line Hunter Education Course, Instructor Manual (Aug. 2015), *available at* https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=105034&inline (last accessed March 13, 2024).

**Exhibit 2:**     A true and correct copy of a website printout of all available traditional hunter education courses as of March 2024 through July 2025 that were obtained from a search of the California Department of Fish and Wildlife's Traditional Hunter Education course "Upcoming Events" page at https://www.register-ed.com/programs/california/160 on March 13, 2024.

**Exhibit 3:**     A true and correct copy of a website printout of all available follow-up courses for hybrid hunter education courses as of March 2024 through January 2025 that were obtained from a search of the California Department of Fish and Wildlife's Online Course and Follow-Up Class "Upcoming Events" page at https://www.register-ed.com/programs/california/161 on March 13, 2024.

**Exhibit 4:**     A true and correct copy of a website printout of a hunter education course listing in Escondido, California on August 12, 2023 that was obtained from a search of the California Department of Fish and Wildlife's

2

Albrecht Decl. (3:19-cv-01226-L-AHG)

1   Traditional Hunter Education course "Upcoming Events" page at

2   https://www.register-ed.com/programs/california/160 on or about August 2, 2023.

3          **Exhibit 5:**    A true and correct copy of a website printout of a hunter

4   education course listing in Ramona, California on August 26 and 27, 2023 that was

5   obtained from a search of the California Department of Fish and Wildlife's

6   Traditional Hunter Education course "Upcoming Events" page at

7   https://www.register-ed.com/programs/california/160 on or about August 2, 2023.

8          **Exhibit 6:**    A true and correct copy of the current schedule of the

9   California Department of Fish and Wildlife's California hunting license and tag

10  fees, obtained from https://wildlife.ca.gov/Licensing/Hunting on March 13, 2024.

11         **Exhibit 7:**    A true and correct copy of California Department of Fish

12  & Wildlife, Hunting License Fees Reported by License Year (2010s), available at

13  https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59820&inline (last accessed

14  March 13, 2024).

15         **Exhibit 8:**    A true and correct copy of California Department of Fish

16  & Wildlife, Hunting Licenses Reported by License Year (2010s), available at

17  https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59821&inline (last accessed

18  March 13, 2024).

19         **Exhibit 9:**    A true and correct copy of California Department of Fish

20  & Wildlife, Hunting License Fees Reported by License Year (2020s), available at

21  https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=178043&inline (last

22  accessed March 13, 2024).

23         **Exhibit 10:**    A true and correct copy of California Department of Fish

24  & Wildlife, Hunting Licenses Reported by License Year (2020s), available at

25  https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=178041&inline (last

26  accessed March 13, 2024).

27         **Exhibit 11:**    A true and correct copy of California Department of Fish

28  & Wildlife, Hunting Licenses and Tags: Frequently Asked Questions, available at

https://wildlife.ca.gov/Licensing/Hunting#22079125-hunter-education (last accessed March 13, 2024).

**Exhibit 12:**    A true and correct copy of California Department of Fish & Wildlife, Description: California Hunter Education:  Option 1:  Traditional Hunter Education Courses, available at https://wildlife.ca.gov/Hunter-Education#333301205-option-1-traditional-hunter-education-courses (last accessed March 13, 2024).

**Exhibit 13:**    A true and correct copy of California Department of Fish & Wildlife, Description:  California Hunter Education:  Option 2: Online Course and Follow-Up Class (Hybrid Format), available at https://wildlife.ca.gov/Hunter-Education#333301491-option-2-online-course-and-follow-up-class-hybrid-format (last accessed March 13, 2024).

**Exhibit 14:**    A true and correct copy of California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—Who Needs Hunter Education, available at https://wildlife.ca.gov/Hunter-Education/FAQ#29812898-who-needs-hunter-education (last accessed March 13, 2024).

**Exhibit 15:**    A true and correct copy of California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—Can I Take a Hunter Education Class Online, available at https://wildlife.ca.gov/Hunter-Education/FAQ#29812899-can-i-take-a-hunter-education-class-online (last accessed March 13, 2024).

**Exhibit 16:**    A true and correct copy of California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—How Old Do You Have to Be to Take a Hunter Education Class?, available at https://wildlife.ca.gov/Hunter-Education/FAQ - 29812901-how-old-do-you-have-to-be-to-take-a-hunter-education-class (last accessed March 13, 2024).

**Exhibit 17:**    A true and correct copy of California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education— What Will I Learn in the Course?  How Long Will It Take?, available at https://wildlife.ca.gov/Hunter-Education/FAQ#29812913-what-will-i-learn-in-the-course-how-long-will-it-take (last accessed March 13, 2024).

**Exhibit 18:**    A true and correct copy of the main web page for Hunter-ed.com (online California Hunter Education Program website), available at https://www.hunter-ed.com/california/ (last accessed March 13, 2024).

**Exhibit 19:**    A true and correct copy of Hunter-ed.com Study Guide for Hunting Education (timed online hunter education course) (high-level course topic listing), available at https://www.hunter-ed.com/california/studyGuide/20100501/ (last accessed March 13, 2024).

**Exhibit 20:**    A true and correct copy of records of the August 13, 2013 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 683, 2013-2014 Reg. Sess. (Cal. 2013), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201320140SB683# (last accessed March 13, 2024).

**Exhibit 21:**    A true and correct copy of the April 17, 2018 hearing of the California Senate Committee on Public Safety regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 22:**    A true and correct copy of the April 30, 2018 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 23:**    A true and correct copy of the May 26, 2018 California Senate Rules Committee Floor Analyses regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 24:**    A true and correct copy of the June 19, 2018 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 25:**    A true and correct copy of the August 8, 2018 hearing of the California Assembly Committee on Appropriations regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 26:**    A true and correct copy of the August 20, 2018 California Assembly Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 27:**    A true and correct copy of the August 23, 2018 California Assembly Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1100# (last accessed March 13, 2024).

**Exhibit 28:**    A true and correct copy of the August 28, 2018 California Senate Floor Analyses regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180

SB1100# (last accessed March 13, 2024).

**Exhibit 29:**    A true and correct copy of the April 2, 2019 hearing of the California Senate Committee on Public Safety regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200

SB61# (last accessed March 13, 2024).

**Exhibit 30:**    A true and correct copy of the April 22, 2019 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200

SB61# (last accessed March 13, 2024).

**Exhibit 31:**    A true and correct copy of the May 16, 2019 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200

SB61# (last accessed March 13, 2024).

**Exhibit 32:**    A true and correct copy of the May 20, 2019 California Senate Rules Committee Floor Analyses regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200

SB61# (last accessed March 13, 2024).

**Exhibit 33:**    A true and correct copy of the June 25, 2019 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at

https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200

SB61# (last accessed March 13, 2024).

**Exhibit 34:**    A true and correct copy of the July 10, 2019 hearing of the California Assembly Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61# (last accessed March 13, 2024).

**Exhibit 35:**    A true and correct copy of the September 4, 2019 California Assembly Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) ), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61# (last accessed March 13, 2024).

**Exhibit 36:**    A true and correct copy of the September 6, 2019 California Assembly Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) ), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61# (last accessed March 13, 2024).

**Exhibit 37:**    A true and correct copy of the September 13, 2019 California Senate Floor Analyses regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) ), available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200SB61# (last accessed March 13, 2024).

**Exhibit 38:**    A true and correct copy of California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Firearms Safety Certificate Program Frequently Asked Questions, available at https://oag.ca.gov/firearms/fscfaqs (last accessed March 13, 2024).

**Exhibit 39:**    A true and correct copy of California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Firearm Safety Certificate Manual for California Firearms Dealers and DOJ Certified Instructors (published June 2020), available at

https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/hscman.pdf? (last accessed March 13, 2024).

**Exhibit 40:**    A true and correct copy of Office of the Attorney General, California Department of Justice, Bureau of Firearms: Firearm Safety Certificate Study Guide (published June 2020), available at https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/hscsg.pdf (last accessed March 13, 2024).

**Exhibit 41:**    A true and correct copy of California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Public Frequently Asked Questions, available at https://oag.ca.gov/firearms/pubfaqs (last accessed March 13, 2024).

**Exhibit 42:**    A true and correct copy of California Department of Justice, Bureau of Firearms: Department of Justice Fees, available at https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/firearms-fees.pdf (last accessed March 13, 2024).

**Exhibit 43:**    A true and correct copy of Office of the Attorney General, California Department of Justice, California Justice Information Services Division, Justice Data & Investigative Services Bureau, Criminal Justice Statistics Center, Crime in California 2022 (published June 30, 2023), available at https://data-openjustice.doj.ca.gov/sites/default/files/2023-06/Crime%20In%20CA%202022f.pdf (last accessed March 13, 2024).

**Exhibit 44:**    A true and correct copy of Office of the Attorney General, California Department of Justice, California Justice Information Services Division, Justice Data & Investigative Services Bureau, Criminal Justice Statistics Center, Homicide in California 2022 (published June 30, 2023), available at https://data-openjustice.doj.ca.gov/sites/default/files/2023-06/Homicide%20In%20CA%202022f.pdf (last accessed March 13, 2024).

1    **Exhibit 45:**    A true and correct copy of Office of the Attorney General,

2    Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the

3    Commission of Crimes 2022, available at

4    https://oag.ca.gov/system/files/media/firearms-report-2022.pdf (last accessed

5    March 13, 2024).

6    **Exhibit 46:**    A true and correct copy of Office of the Attorney General,

7    Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the

8    Commission of Crimes 2021, available at

9    https://oag.ca.gov/system/files/media/firearms-report-2021.pdf (last accessed

10    March 13, 2024).

11    **Exhibit 47:**    A true and correct copy of Office of the Attorney General,

12    Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the

13    Commission of Crimes 2020, available at

14    https://oag.ca.gov/sites/default/files/firearms-report-20.pdf (last accessed March 13,

15    2024).

16    **Exhibit 48:**    A true and correct copy of Office of the Attorney General,

17    Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the

18    Commission of Crimes 2019, available at

19    https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/firearms-report-19.pdf

20    (last accessed March 13, 2024).

21    **Exhibit 49:**    A true and correct copy of Office of the Attorney General,

22    Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the

23    Commission of Crimes 2018, available at

24    https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/firearms-report-18.pdf

25    (last accessed March 13, 2024).

26    **Exhibit 50:**    A true and correct copy of State of California

27    Commission on Peace Officer Standards and Training (POST), Legislative

28

Albrecht Decl. (3:19-cv-01226-L-AHG)

Mandated Training, available at https://post.ca.gov/legislative-mandated-training (last accessed March 13, 2024).

**Exhibit 51:**    A true and correct copy of State of California Commission on Peace Officer Standards and Training (POST), Training and Testing Specifications for Peace Officer Basic Courses, available at https://post.ca.gov/training-and-testing-specifications-for-peace-officer-basic-courses (last accessed March 13, 2024).

**Exhibit 52:**    A true and correct copy of State of California Commission on Peace Officer Standards and Training (POST), Regular Basic Course Training Specifications, available at https://post.ca.gov/regular-basic-course-training-specifications (last accessed March 13, 2024).

**Exhibit 53:**    A true and correct copy of State of California Commission on Peace Officer Standards and Training (POST), Regular Basic Course Minimum Content and Hourly requirements, available at https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fpost.ca.gov%2FPortals%2F0%2Fpost_docs%2Ftraining%2Ftrainingspecs%2FRBC_MINIMUM_HOURLY_REQUIREMENT.docx&wdOrigin=BROWSELINK (last accessed March 13, 2024).

**Exhibit 54:**    A true and correct copy of the Declaration of Maricela Leyva Chavez in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction submitted in this matter on March 16, 2023 (ECF No. 111-7).

**Exhibit 55:**    A true and correct copy of Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories submitted on August 18, 2023.

**Exhibit 56:**    A true and correct copy of the transcript of the Deposition of Andrew Morris taken on August 3, 2023.

Albrecht Decl. (3:19-cv-01226-L-AHG)

**Exhibit 57:**    A true and correct copy of the transcript of the Deposition of Jose Chavez taken on August 4, 2023.

**Exhibit 58:**    A true and correct copy of the transcript of the Deposition of Darin Prince taken on August 15, 2023.

**Exhibit 59:**    A true and correct copy of the transcript of the Deposition of John Phillips taken on August 16, 2023.

**Exhibit 60:**    A true and correct copy of Hunter-ed.com Study Guide for Hunting Education (timed online hunter education course) (detailed course topic listing), available at https://www.hunter-ed.com/california/studyGuide/20100501/ (last accessed July 31, 2023).

3.    Exhibits 1-17 and 20-53 are judicially noticeable as government documents not subject to reasonable dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994) (records and reports of administrative bodies "clearly" constitute materials of which the court may take judicial notice); *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies.") (citation omitted); *L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 938 (C.D. Cal. 2011) (results of records searches from the Secretary of State's corporate search website were judicially noticeable because they could be verified by readily accessible resources whose accuracy cannot reasonably be questioned); *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG POR, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) (documents from FDA website were properly subject to judicial notice).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on March 15, 2024, in Los Angeles, California.

Stephanie Albrecht

1

**TABLE OF CONTENTS**

2

| Exhibit No. | Description | Page No. |
|---|---|---|
| 1 | California Department of Fish and Wildlife's Home Study/On-line Hunter Education Course, Instructor Manual (Aug. 2015) | 1-19 |
| 2 | Website printout of all available traditional hunter education courses as of March 2024 through July 2025 that were obtained from a search of the California Department of Fish and Wildlife's Traditional Hunter Education course "Upcoming Events" page | 20-51 |
| 3 | Website printout of all available follow-up courses for hybrid hunter education courses as of March 2024 through January 2025 that were obtained from a search of the California Department of Fish and Wildlife's Online Course and Follow-Up Class "Upcoming Events" page | 52-59 |
| 4 | Website printout of a hunter education course listing in Escondido, California on August 12, 2023 that was obtained from a search of the California Department of Fish and Wildlife's Traditional Hunter Education course "Upcoming Events" page | 60-63 |
| 5 | Website printout of a hunter education course listing in Ramona, California on August 26 and 27, 2023 that was obtained from a search of the California Department of Fish and Wildlife's Traditional Hunter Education course "Upcoming Events" page | 64-66 |
| 6 | Current schedule of the California Department of Fish and Wildlife's California hunting license and tag fees | 67-77 |

14

| 7 | California Department of Fish & Wildlife, Hunting License Fees Reported by License Year (2010s) | 78-80 |
| 8 | California Department of Fish & Wildlife, Hunting Licenses Reported by License Year (2010s) | 81-83 |
| 9 | California Department of Fish & Wildlife, Hunting License Fees Reported by License Year (2020s) | 84-86 |
| 10 | California Department of Fish & Wildlife, Hunting Licenses Reported by License Year (2020s) | 87-90 |
| 11 | California Department of Fish & Wildlife, Hunting Licenses and Tags: Frequently Asked Questions | 91-95 |
| 12 | California Department of Fish & Wildlife, Description: California Hunter Education: Option 1: Traditional Hunter Education Courses | 96-102 |
| 13 | California Department of Fish & Wildlife, Description:  California Hunter Education: Option 2: Online Course and Follow-Up Class (Hybrid Format) | 103-109 |
| 14 | California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—Who Needs Hunter Education | 110-115 |
| 15 | California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—Can I Take a Hunter Education Class Online | 116-121 |
| 16 | California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—How Old Do You Have to Be to Take a Hunter Education Class? | 122-127 |

Albrecht Decl. (3:19-cv-01226-L-AHG)

| 17 | California Department of Fish & Wildlife, Frequently Asked Questions About California Hunter Education—What Will I Learn in the Course?  How Long Will It Take? | 128-134 |
|----|----|----|
| 18 | The main web page for Hunter-ed.com (online California Hunter Education Program website) | 135-150 |
| 19 | Hunter-ed.com Study Guide for Hunting Education (timed online hunter education course) (high-level course topic listing) | 151-154 |
| 20 | Records of the August 13, 2013 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 683, 2013-2014 Reg. Sess. (Cal. 2013) | 155-161 |
| 21 | The April 17, 2018 hearing of the California Senate Committee on Public Safety regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 162-169 |
| 22 | The April 30, 2018 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 170-173 |
| 23 | The May 26, 2018 California Senate Rules Committee Floor Analyses regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 174-182 |
| 24 | The June 19, 2018 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 183-187 |
| 25 | The August 8, 2018 hearing of the California Assembly Committee on Appropriations regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 188-190 |
| 26 | The August 20, 2018 California Assembly Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 191-194 |

16

| 27 | The August 23, 2018 California Assembly Floor Analysis regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 195-198 |
|---|---|---|
| 28 | The August 28, 2018 California Senate Floor Analyses regarding Sen. Bill 1100, 2017-2018 Reg. Sess. (Cal. 2018) | 199-205 |
| 29 | The April 2, 2019 hearing of the California Senate Committee on Public Safety regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 206-213 |
| 30 | The April 22, 2019 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 214-217 |
| 31 | The May 16, 2019 hearing of the California Senate Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 218-219 |
| 32 | The May 20, 2019 California Senate Rules Committee Floor Analyses regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 220-231 |
| 33 | The June 25, 2019 hearing of the California Assembly Committee on Public Safety regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 232-238 |
| 34 | The July 10, 2019 hearing of the California Assembly Committee on Appropriations regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 239-241 |
| 35 | The September 4, 2019 California Assembly Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 242-245 |
| 36 | The September 6, 2019 California Assembly Floor Analysis regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 246-249 |

17

| 37 | The September 13, 2019 California Senate Floor Analyses regarding Sen. Bill 61, 2019-2020 Reg. Sess. (Cal. 2019) | 250-261 |
|---|---|---|
| 38 | California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Firearms Safety Certificate Program Frequently Asked Questions | 262-280 |
| 39 | California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Firearm Safety Certificate Manual for California Firearms Dealers and DOJ Certified Instructors (published June 2020) | 281-317 |
| 40 | Office of the Attorney General, California Department of Justice, Bureau of Firearms: Firearm Safety Certificate Study Guide (published June 2020) | 318-368 |
| 41 | California Department of Justice, Division of Law Enforcement, Bureau of Firearms: Public Frequently Asked Questions | 369-387 |
| 42 | California Department of Justice, Bureau of Firearms: Department of Justice Fees | 388-389 |
| 43 | Office of the Attorney General, California Department of Justice, California Justice Information Services Division, Justice Data & Investigative Services Bureau, Criminal Justice Statistics Center, Crime in California 2022 (published June 30, 2023) | 390-472 |
| 44 | Office of the Attorney General, California Department of Justice, California Justice Information Services Division, Justice Data & Investigative Services Bureau, Criminal Justice Statistics Center, Homicide in California 2022 (published June 30, 2023) | 473-524 |
| 45 | Office of the Attorney General, Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the Commission of Crimes 2022 Report | 525-532 |

18

| 46 | Office of the Attorney General, Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the Commission of Crimes 2021 Report | 533-539 |
|----|-----------------------------------------------------------------------------------------------------------------------------------------------|---------|
| 47 | Office of the Attorney General, Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the Commission of Crimes 2020 Report | 540-546 |
| 48 | Office of the Attorney General, Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the Commission of Crimes 2019 Report | 547-553 |
| 49 | Office of the Attorney General, Division of Law Enforcement, Bureau of Forensic Services, Firearms Used in the Commission of Crimes 2018 Report | 554-562 |
| 50 | State of California Commission on Peace Officer Standards and Training (POST), Legislative Mandated Training | 563-578 |
| 51 | State of California Commission on Peace Officer Standards and Training (POST), Training and Testing Specifications for Peace Officer Basic Courses | 579-582 |
| 52 | State of California Commission on Peace Officer Standards and Training (POST), Regular Basic Course Training Specifications | 583-586 |
| 53 | State of California Commission on Peace Officer Standards and Training (POST), Regular Basic Course Minimum Content and Hourly requirements | 587-588 |
| 54 | The Declaration of Maricela Leyva Chavez in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction submitted in this matter on March 16, 2023 (ECF No. 111-7) | 589-593 |

| 55 | Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories submitted on August 18, 2023 | 594-662 |
|---|---|---|
| 56 | The transcript of the Deposition of Andrew Morris taken on August 3, 2023 | 663-827 |
| 57 | The transcript of the Deposition of Jose Chavez taken on August 4, 2023 | 828-1051 |
| 58 | The transcript of the Deposition of Darin Prince taken on August 15, 2023 | 1052-1189 |
| 59 | The transcript of the Deposition of John Phillips taken on August 16, 2023 | 1190-1350 |
| 60 | Hunter-ed.com Study Guide for Hunting Education (timed online hunter education course) (detailed course topic listing) | 1351-1363 |

Albrecht Decl. (3:19-cv-01226-L-AHG)

# EXHIBIT 1

Exhibit 1
DX0001

# Home Study/On-line Hunter Education Course

## Instructor Manual
### California Department of Fish and Wildlife



**August 2015**

Exhibit 1
DX0002

## Table of Contents

**Title**                                                                          **Page**

Study Options…………………………………...............................................3
   ❖ Workbook packets
   ❖ Internet sites
Expenses…………………………………………………………………….3
Review…………………………………………………………………….4
Class Length……………………………………………………………….4
Instructors……………………………………………………………….4
Course Outline…………………………………………………………….4
Practical Test……………………………………………………………….4
Written Test………………………………………………………….…….5
Recommended Class Materials…………………………………………….5
Student letter……………………………………………………………….6
Internet/On-line Options………………………………………………….7
   ❖ Today's Hunter
   ❖ Hunter Course
   ❖ California Hunter Ed Course
   ❖ International Hunter Education Association (IHEA)
IHEA Affidavit………………………………………………………….8
Abbreviated Outline……………………………………………….........9
Extended Outline………………………………………………………11
Practical Firearms Test…………………………………………………17
Home Study/ On-line Exam……………………………………………19
Home Study/On-line Exam Answer Sheet HEI Key…………………........32
Home Study/On-line Exam Answer Sheet…………………………………33

Exhibit 1
DX0003

## Home Study/On-line Course
## General Information

## Study Options

### 1. <u>Workbook Packets</u>

Packets should be prepared ahead of time so they will be complete and consistent for the students. Students should have at least two weeks for studying. The following should be included in the packet:

Student Hunter Education Manual
Home Study Workbook
Hunting Regulations (mammal, waterfowl, and upland game)
Introduction letter
Phone numbers for further information about the class
Miscellaneous booklets (Hunter's Handbook and other informational pamphlets)

### 2. <u>Internet Sites</u>

There are five internet sites students can study on. Each site has a substantial amount of information, and all have review tests.  The Today's Hunter, Huntercourse.com and Hunter Ed Course sites will give the student a completion voucher, and have some of the necessary California regulation information.  Today's Hunter, Huntercourse.com and Hunter Ed Course are sites that charge the student for the service provided.

The International Hunter Education Association (IHEA) site is free of charge at this time, but does not give the student a completion certificate. The student will have to sign the affidavit form when taking your class. It also does not have California regulation information, so students will have to acquire the Mammal and Waterfowl regulation booklets from a license agent or from you. Today's Hunter and IHEA also have a Spanish version of the on-line course.

Today's Hunter - http://www.hunter-ed.com/ca

Hunter Course - http://www.huntercourse.com/usa/california

Hunter Ed Course - http://hunteredcourse.com/state/online-hunter-safety-course-california/

IHEA - http://homestudy.ihea.com

IHEA Spanish - http://homestudy.ihea.com/espanol/

**Expenses**

Some of the people who sign up will not show up on class day. To prevent students from abusing the procedure this way, and to help you prepare for the class, you may find it best to charge a registration fee when students initially sign up.  The cost of holding the class is then spread out to all who receive the

materials, and the charge to each person can be less. This may also encourage students to study and attend the classroom session.

An alternative, if you charge at all, is to collect expenses on the day of the class. Because you will not know how many students will attend, this method may or may not cover any expenses you have incurred.

## Home Study/On-line Classroom Session

**Review**

Remember, the classroom session is a review only. If the students have studied, they will already have been exposed to all the information and answers they need to pass the written exam. Do not "teach the test" by trying to address all the exam questions. That defeats one purpose of a home study/on-line program, which is to allow students to learn at home. It also rewards those who do not take the time to study at home.

**Class Length**

Another purpose of the home study/on-line program is to minimize the amount of time spent in a classroom. By following the provided outline, you will be able to keep your instruction and testing time to four hours. You will be able to hit the important points, and will probably cover about 50% of the exam material.

**Instructors**

Team teaching is the preferred method for this course. The pace is fast, and one instructor often catches a point missed by another. The practical test will run more smoothly with at least three instructors. With a class size of 15-20, three instructors can rotate students through the stations and easily complete this section within the 30 minute time frame.

**Course Outline**

An abbreviated outline is provided with the number of test questions relating to each subject and suggested time for instruction on each. You should use this as a guide to help stay in the four hour time frame.

If you wish to use the extended outline, it covers at least 50 % of the exam questions, and can be altered to fit your teaching style.

It takes determination and self-control to stay within the suggested time frames. If you get into too much detail in any one area, you will soon find yourself behind, and the class will be longer. Force yourself to move at a faster pace, and don't worry if you do not cover every point.

**Practical Test**

One of the critical sections of this session is the practical test. Here you can watch the students as they handle firearms to determine if they are proficient.  Some students may be new to firearm handling.  They may be unfamiliar with different types of firearms and will need some coaching. If a student repeatedly handles firearms unsafely, you should take appropriate

Exhibit 1
DX0005

action.  This may include additional instruction at the time or failure of the class. As an instructor, you have the responsibility to provide certificates only to those students you believe will be safe and responsible in the field.

**Written Test**
         The home study/on-line exam is more detailed than the traditional course exam. It has no true/false questions and it contains a few fill-in-the-blanks. It was designed specifically to test for knowledge gained either from the workbook or from the internet sites. It is difficult to pass if a student has not studied. Most students can complete the test within an hour, but be prepared for an occasional student who may require more time due to reading or comprehension problems. The answer key is the same as the regular course.

**Recommended Class Materials**
         Firearms - Long guns: one of each type of action
                 Handguns: revolver and semi-auto
                 Muzzleloader
         Ammo - Ammunition displays or examples
                 Dummy cartridges and shot shells
         Archery - Bow
                 Arrows with varied points
         Survival kit
         Rope for simulated fence for practical test
         Video – *Sportsman's Role in Wildlife Management*
         Miscellaneous - trespass permission slips, and other DFG materials/pamphlets

**Student letter**
         Included with the student study packet *(see page 6)*

Dear Student,

Thank you for enrolling in the California Hunter Education Home Study/On-line Program.

By enrolling in this class you have taken it upon YOURSELF to study and learn the necessary information to pass the final Hunter Education exams and obtain your California Hunter Education Certificate. The four hour classroom session will serve only as a review of what you have studied in your course materials. It cannot and will not cover everything you need to know to pass the course.

Please study the Student Hunter Education Manual and other study guides enclosed in this packet. Particular attention should be paid to the chapters on Hunter Responsibility, Wildlife Management, Firearms, and Archery. We have also provided the latest California Hunting Regulations for your use. There are only a few questions on the test regarding regulations, so please do not spend all of your time studying them. The enclosed Hunter Education Manual and study guides contain most of the information you need to know.

You are also required to complete the Home Study Workbook. It must be turned in at the beginning of the classroom session. This course has been designed to let you review these materials at your own pace in the comfort of your home. We cannot stress enough that it is up to YOU, the student, to STUDY. If you take time to LEARN this material, you should pass this course and earn your Hunter Education Certificate.

At the end of the classroom session you will be required to pass a written examination plus a practical test of your firearms handling and safety skills. The written test is comprised of 100 questions, multiple choice and fill-in-the-blank. You may also be required to write the ten commandments of shooting safety. The practical test may consist of handling a loaded or unloaded firearm, demonstrating how to properly cross a fence with a firearm, demonstrating proper muzzle control of a firearm, and/or other similar skills. **IF YOU ARE A MINOR UNDER THE AGE OF 18, A PARENT OR LEGAL GUARDIAN MUST ACCOMPANY YOU TO THIS SESSION TO SIGN A PERMISSION FORM ALLOWING YOU TO HANDLE FIREARMS.**

Once again, thank you for enrolling in this course. Good luck!

The four hour follow-up course will be held at:

_____

_____

Contact Phone: _____

6

Exhibit 1

DX0007

**Internet/On-line Options**

1. **Today's Hunter**
http://www.hunter-ed.com/ca
This site will provide you with a numbered voucher which you will need to enroll in the four hour follow-up course. This site also has some necessary California specific regulation information you will need. This site has the option to narrate the material throughout the course in English or Spanish.  This site also has a "study guide" for students.  The administrator of this site charges a fee at the end of the course to print off the voucher.

2.  **Hunter Course**
http://www.huntercourse.com/usa/california
This site will provide you with a numbered voucher which you will need to enroll in the four hour follow-up course.  This site also has some necessary California specific regulation information you will need.  This site has the option to narrate the material throughout the course.  This site also has a "hunter safety practice test" for students. The administrator of this site charges a fee at the end of the course to print off the voucher.

3.  **Hunter Ed Course**
 http://hunteredcourse.com/state/online-hunter-safety-course-california/
This site will provide you with a numbered voucher which you will need to enroll in the four hour follow-up course.  This site also has some necessary California specific regulation information you will need.  This site will narrate the material throughout the course. The administrator of this site charges a fee to get started.

4.  **International Hunter Education Association (IHEA)**
http://homestudy.ihea.com
If you use this site, you will be required to sign an affidavit at the classroom session stating that you have completed and passed all the tests on the site. This site is free of charge. This site does NOT provide California specific regulation information, so you will need to obtain the free Mammal and Waterfowl booklets available from license agents, or study on-line at http://www.dfg.ca.gov/about/hunting
IHEA also has a Spanish version of the on-line course which can be viewed at http://www.homestudy.ihea.com/espanol

**IHEA Affidavit**
All students completing IHEA on-line site must sign the affidavit form. *(see page 8)*

# International Hunter Education Association (IHEA) Certification

If you have used the IHEA website to study for this Home Study/ On-line course, you must read the following statement and certify that it is true.

*I hereby certify that I have taken all the quizzes and tests at the IHEA website, and that I have passed all of them with at least an 80% score.*

| Printed Name | Signature | Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Exhibit 1
DX0009

# Home Study/On-line Classroom Session Outline
## Abbreviated Outline

| # Related Test Questions | Topic | Time Allotted |
|---|---|---|
| | **Student Registration/Introductions** | 10 minutes |
| 10 | **Hunter Responsibility**<br>Ethics<br>Rights/Privileges<br>Landowners<br>Poaching | 15 minutes |
| 17 | **Wildlife Conservation and Management**<br>Video – *Sportsman's Role in Wildlife Management*<br>(Skip veterinarian section and last waterfowl section)<br>Principles of Wildlife Management<br>    \*\*The CA version of *Sportsman's Role in Wildlife Management* the above sections were deleted so the video can be played straight through\*\* | 25 minutes |
| | **BREAK** | 5 minutes |
| | **Firearms Descriptions and Safeties** | 20 minutes |
| 7 | Rifles<br>    Parts, Actions, Safeties | |
| 5 | Shotguns<br>    Parts, Actions, Safeties | |
| 2 | Handguns<br>    Parts, Actions, Safeties | |
| 4 | Muzzleloaders | |
| 15 | **Firearms Handling and Safety**<br>Ten Commandments<br>Carrying<br>Shooting Zones<br>Fences/Obstacles<br>Cleaning/Storage | 15 minutes |
| 9 | **Ammunition**<br>Parts, Calibers, Gauges | 10 minutes |

Exhibit 1
DX0010

| # Related Test Questions | Topic | Time Allotted |
|---|---|---|
| 8 | **Shooting** | 10 minutes |
| | Fundamentals | |
| |    Positions, Sights, Firing | |
| | Skill | |
| |    Leading, Vital areas, Shooting Decisions | |
| 6 | **Archery** | 10 minutes |
| | Types of bows, Arrows, Points | |
| | Parts | |
| | Tree Stand Safety | |
| 8 | **Survival** | 10 minutes |
| | Preparedness | |
| |    Map, Compass, First aid kit, Food/water | |
| | Hypothermia | |
| | If lost | |
| 5 | **Wildlife ID and Game Care** | 5 minutes |
| 12 | **Regulations** | 10 minutes |
| | Residence safety zones | |
| | Trespass | |
| | Using another's license/tag | |
| | Firearms and ammo | |
| |    Caliber restrictions | |
| |    Plugged shotguns | |
| | **BREAK** | 10 minutes |
| | **Practical Test** | 40 minutes |
| | Firearms handling safety | |
| | Fence crossing | |
| | Muzzle control | |
| | **Written Test** | 45 minutes |

# Home Study/On-line Classroom Session
# Extended Outline

Initial announcements - Instructor introductions                                    (10 min)

This is a review only of the important subjects

There will be a practical firearm handling portion -NEED PARENT'S SIGNATURE ON STUDENT RECORD FORM IF STUDENT IS UNDER 18

## Hunter Responsibility                                                              (15 min)
- Hunters are often alone, so they must act responsibly by obeying the laws, respecting other's properties, and using good sense without someone telling them to. This is collectively known as the Hunter's Code, or Hunter's Ethics.  Basically it means to do what is right
  - Examples are: not taking a questionable shot, leaving gates as you find them, shooting only within your effective range
- Hunting is a privilege, not a right. Some rights are guaranteed by law, such as freedom of speech
  - Privileges can be taken away. If we want to continue hunting, we must demonstrate we are responsible
  - Most people in the country believe it is okay to hunt, as long as animals are used for meat and are not wasted
- Breaking the law at any time is considered poaching

## Wildlife Conservation and Management                        (25 min, including video)
- Remember that good habitat is the best thing for wildlife
- The amount of wildlife that habitat can support is the carrying capacity.  If there are too many animals for the habitat to support, excess animals will probably die
  - Legal hunting helps remove these excess animals and keep the population within their habitat limit
  - Wildlife managers try to keep the number of animals just below the number that the habitat will support
  - Prior to our understanding of habitats, deer on the Kaibab were allowed to overpopulate, with a resulting crash of population when deer died because the habitat couldn't support them. Many starved, which is the most important death rate factor for many animal populations.
- The best habitat provides food, water, shelter, and space
  - It is most important that these factors are arranged properly
  - Two of the tools wildlife managers use to keep these arrangements are fires and timber harvests

These keep habitat in various stages of succession, which is the gradual change from one habitat type to another as plant communities grow.
Most wildlife do better at the edges of habitat types, where two different types of habitats come together

## Firearms: Descriptions and Safeties                                    (20 min)

- ➤ Primary difference rifle/shotgun
  - o Shotgun barrels are smooth, rifle/handguns have lands and grooves spiraling down the barrel (rifling).
- ➤ 3 main parts of rifle/shotgun
  - o Action-does all the work (demonstrate)
  - o Barrel- guides the projectile
  - o Stock-part that allows you to hold onto the gun
- ➤ 5 types of common actions
  - o Bolt Action-most common hunting action and usually the strongest
  - o Lever Action - point out that old lever rifles have no safety
  - o Pump or Slide Action-most common shotgun action
  - o Semi-automatic-NOT an automatic, must pull trigger for each shot
        Often mistakenly called 'automatic' because they are "autoloaders" the action does all the work automatically
  - o Break Action-generally used/found on shotguns
- ➤ Single shot/Repeater-magazines
  - o Single shots must be loaded/reloaded by hand for each shot
  - o Repeaters use a magazine to hold ammunition
  - o Different magazines for different guns: Removable, fixed (non-removable), rotary, tubular
- ➤ Safety (s) on guns
  - o Carry gun with the safety on at all times
  - o Take safety off ONLY just before you shoot
  - o NEVER, NEVER trust your safety-it is a mechanical device and can fail!
- ➤ Sights
  - o Three main types: open, peep, telescopic
  - o Sights compensate for gravity and loss of velocity (speed)
  - o When adjusting open sights (sighting-in), move the REAR sight in the direction you want the bullet to go on the target.
- ➤ Handguns
  - o Parts of a Revolver: Barrel, Cylinder, Frame, Grip
        Cylinder holds ammo; it is the part that brings up a fresh round to fire; it turns, thus 'revolver'
        Single action revolver must be cocked for each shot; double action only needs trigger pull
        There ARE NO SAFETIES on revolvers. ALWAYS carry with the hammer down on an empty chamber
  - o Semi-Automatic: Barrel, Frame, Grip, Slide

Exhibit 1

A magazine holds ammo, and the slide moves back and forth to chamber a fresh round for firing

Most semi-autos have a safety, but they don't all work the same

➤ Black Powder/ Muzzleloading
  o Use only black powder or Pyrodex in muzzleloaders or black powder guns.

  Black powder and pyrodex produce LESS pressure than modern gun powders. If you run out of the proper powder, do NOT substitute smokeless powder

  o Checking for loaded muzzleloader

  Use your ramrod. Before you load your gun for the first time, you should have dropped your ramrod into the barrel, and marked it so you would be able to tell that you have an unloaded gun. If you drop the ramrod into the barrel and it doesn't drop all the way down to this mark, something is in your barrel, probably a load of powder and bullet!

  o No safety. Half-cock not safe!!

  o Hang Fire – when the muzzleloader (or any firearm) doesn't fire when you first pull the trigger. Keep the muzzle pointed in a safe direction, as the firearm may fire after a delay.


**Firearms Handling and Safety**                                    (15 min)
➤ Primary rules of firearms safety
  o CONTROL the direction of the muzzle. <u>ALWAYS</u> POINT THE GUN IN A SAFE DIRECTION

  A "safe direction" is away from people and things you don't want to shoot/kill; It may be up, down, to the side

  As you hunt and move around this direction will change.  Practice handling your gun is the only way to make this "second nature" to you.

  o TREAT every firearm as if it were loaded-ALWAYS!

  Every time you pick-up or handle a gun, first thing you must do is check to see if it is loaded. Every time

  o IDENTIFY YOUR TARGET AND BEYOND

  Don't shoot game that is NOT legal. You don't want to shoot somebody or something in the background. You must have backstop for your bullets.  The best backstop for target shooting is a dirt bank cleared of rocks


➤ Methods of Carrying – demonstrate
  o Shoulder, cradle, double hand, elbow, sling, trail


➤ Zone of fire
  o The area in which a hunter can shoot safely


➤ Shooting from a boat

- o NEVER stand-up to shoot; shoot while seated in the bottom of the boat or on a seat in the boat

- ➢ Fences and Obstacles
    - o Unload firearm before crossing; action open, muzzle away
    - o Demonstrate one person/two person crossing

- ➢ Cleaning and Storage
    - o Clean after use; watch for obstructions in barrel
    - o Oil lightly; store horizontal or muzzle down to prevent oil build-up
    - o Store firearms separately from ammunition

## Ammunition                                                                (10 min)
- ➢ Caliber vs gauge
    - o Caliber is the measurement of the diameter of the bore, usually in hundredths or thousandths-of-an-inch. Can be in millimeters Generally, the bigger/larger the number, the larger/bigger the bullet and/or cartridge
    - o Gauge is determined by the number of pure lead balls, the same diameter as the barrel, that it takes to weigh one pound

- ➢ Parts of a cartridge
    - o Case (hull or shot shell when dealing with shotgun ammo)
    - o Primer; rimfire has primer in the rim; center-fire in center
    - o Powder
    - o Bullet or shot-a projectile

- ➢ How ammo works
    - o The firing pin strikes the primer, primer explodes and ignites the powder, powder burns very rapidly producing PRESSURE which sends the bullet down the barrel

- ➢ Ammunition markings/identification
    - o All modern commercial ammo is marked on the head or back of the case with the caliber and type of cartridge that it is; the box of ammo is also marked. On your gun, someplace-usually on the barrel, the caliber is stamped/marked
    - o Only carry ammo for the gun you are using. This is especially true if you are using a shotgun. NEVER carry 20 gauge and 12 gauge ammo

## Shooting                                                                  (10 min)
- ➢ Fundamentals
    - o Positions - practice positions you may use in the field.
      In the field when shooting a rifle, be as stable as you can - use a tree, rock, etc

- o Sights - open and peep sights are more limited than telescope
  Shotgun often has only a bead at the front
- o Firing - with rifle just squeeze trigger slowly, as your target is
  usually stationary
  With shotgun point and pull or slap the trigger, as you have a
  moving target

➢ Skills - practice makes perfect

➢ Using firearms is all about safety
  Do not shoot until you are absolutely sure of your target and what is
  beyond it.  Better to take a few seconds now than to be sorry for the rest
  of your life

**Archery**                                                          (10 min)
➢ Bows - compound and recurve are the most popular
  - o Compounds use cams of some kind to ease the holding weight and
    increase speed
  - o Recurve no sites, no let-off
  - o Use a bowstringer to put string on recurves

➢ Arrows - made of wood, fiberglass, aluminum, or carbon
  - o Should be matched in stiffness to the bow
  - o Should be the right length for you and your bow

➢ Points  - practice points for targets
  - o Broadheads should be razor sharp to work - they cut blood vessels
  - o Most accidents with points and broadheads are self inflicted

➢ Treestands - many archers use them.  Do not climb with equipment in
  hand. Use a haul line and safety harnesses

**Survival**                                                        (10 min)
➢ Always carry a survival kit with you when hunting
  - o It should include items which will help you survive minor injuries
    and a stay overnight in the field

➢ If you get hurt, or realize you are lost, panic is your worst enemy
  - o STOP (sit, think, observe, plan)

➢ Hypothermia - loss of heat, can happen even on warm days
  - o If you have to stay out overnight, shelter will help prevent it. A small
    fire will make you feel better and may help, too

**Wildlife ID and Game Care**                                    (5 min)
> Know what you are shooting at, and know the law so you know what you <u>can</u> shoot at. If in doubt, don't shoot

> If you do shoot something, both hunter ethics and the law dictate that you find the game and take care of it and not waste it
>   o Biggest causes of meat spoilage - dirt, heat, moisture
>   o Field dress your game as soon as possible

**Regulations**                                                  (10 min)
> Many are related to ethics
>   o Respect other's properties
>     Don't trespass - hunt on private land with written permission only
>     Don't shoot close to buildings (150 yards)

> Don't use someone else's license or tags

> Some are related to safety
>   o Don't shoot from vehicles; don't even have a loaded firearm in a vehicle
>   o Don't shoot from or across roads

> Know the rules for the firearm you are using
>   o You can't possess firearms when hunting under archery only season/tag
>   o Shotguns must be plugged, so it may hold only three shells

> Know the rules for the game you are after
>   o Legal limits - bag limits are usually daily, possession limits may be two days' worth
>   o Tags - some animals, like big game, can't be hunted without a tag

> You will lose your license if you have three violations in five years

**Practical Firearms Test**

**Instructors**:  Three recommended
**Equipment**:  Enough rifles and/or shotguns to have at least two at each station.
Try to have a variety of actions.
Simulated fence; can be rope tied to chairs if done in classroom
Dummy cartridges and shot shells
**Procedure**:  Split class into sections, and have each go to a station. Rotate when
finished, either as a group or singly.
**Time**: Approximately 30 minutes.
**Objective**:  Improve student's safety practices. Look for individuals who are
unable to apply safety principles after correction.


**Station 1**
What is the first thing you do when you pick up a gun?
Answer: Check to see if it is loaded *(Have student demonstrate how to physically and visually check)*
Show where the caliber is stamped on this firearm
*Watch to make sure student controls muzzle*
Show how to load this firearm using dummy rounds.
*Watch to make sure student controls muzzle. Assisting with loading is okay*
Show how to unload this firearm.
*Have student demonstrate*
Show how you would apply and release the safety.
*Watch to make sure student controls muzzle. Assisting with safety operation is Okay*


**Station 2 (Can be combined with #1 or #3)**
Identify three cartridges or shot shells.
*Have student point out markings and identification*
How would you carry your firearm with another hunter on your right?
*Have two students demonstrate*
How would you carry your firearm with another hunter on your left?
*Have two students demonstrate*
How would you carry your firearm with another hunter on both sides of you?
*Have two students demonstrate*
How would you carry your firearm with another hunter in front of you?
*Have two students demonstrate*
How would you carry your firearm with another hunter behind you?
*Have two students demonstrate*
How would you carry your firearm with another hunter facing you?
*Have two students demonstrate*

**Station 3**
Show how to cross a fence alone
      *Have student demonstrate*
Show how to cross a fence with another hunter
      *Have two students demonstrate*

# EXHIBIT 2

Exhibit 2
DX0020

Active Programs (/programs/california)

| Update registration (/users/login) | Cancel registration (/users/login) |



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

| Use my current location | — OR — | Use a ZIP Code |

---

**MARCH 2024**

> MAR
> **13**
> WED
>
> ### Traditional Hunter Education (/events/view/209735)
>
> **Registration Open**    12 of 25 seats remaining
>
> **LOCATION & SCHEDULE**
> **CWA Roseville Home Office**    Roseville, CA 95678
> Wednesday, March 13, 2024    5:00pm - 9:00pm
> Plus, 1 additional day. (/events/view/209735)

> MAR
> **14**
> THU
>
> ### Traditional Hunter Education with Live Fire (/events/view/209518)
>
> **Registration Open**    3 of 6 seats remaining
>
> **LOCATION & SCHEDULE**
> **South Bay Rod and Gun Club**    Dulzura, CA 91917
> Thursday, March 14, 2024    8:00am - 4:00pm
> Plus, 1 additional day. (/events/view/209518)



Exhibit 2
DX0021

MAR
**15**
FRI

### Traditional Hunter Education (/events/view/207849)

**Registration Open**   7 of 30 seats remaining

LOCATION & SCHEDULE
**Cold Springs Church**   Placerville, CA 95667
Friday, March 15, 2024   5:00pm - 8:00pm
Plus, 1 additional day. (/events/view/207849)

---

MAR
**15**
FRI

### Traditional Hunter Education (/events/view/206664)

**Registration Open**   14 of 25 seats remaining

LOCATION & SCHEDULE
**Knights Landing Sportsmans Club**   Knights Landing, CA 95645
Friday, March 15, 2024   6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206664)

---

MAR
**16**
SAT

### Traditional Hunter Education (/events/view/208222)

**Registration Open**   8 of 40 seats remaining

LOCATION & SCHEDULE
**King's View Assembly of God**   Ione, CA 95640
Saturday, March 16, 2024   8:00am - 5:00pm

---

MAR
**16**
SAT

### Traditional Hunter Education (/events/view/204745)

**Full Event with Wait List**   0 of 10 seats remaining

LOCATION & SCHEDULE
**Livermore-Pleasanton Rod & Gun Club**   Livermore, CA 94551
Saturday, March 16, 2024   8:00am - 4:30pm
Plus, 1 additional day. (/events/view/204745)

---

MAR
**16**
SAT

### Traditional Hunter Education (/events/view/206308)

**Registration Open**   18 of 25 seats remaining

LOCATION & SCHEDULE
**Oaktree Gun Club**   Newhall, CA 91321
Saturday, March 16, 2024   8:00am - 5:00pm

---

MAR
**22**
FRI

### Traditional Hunter Education (/events/view/210994)

**Registration Open**   25 of 25 seats remaining

LOCATION & SCHEDULE
**Bayside Blue Oaks Church**   Roseville, CA 95678
Friday, March 22, 2024   5:00pm - 9:00pm
Plus, 1 additional day. (/events/view/210994)

Exhibit 2
DX0022

| MAR **23** SAT | **Traditional Hunter Education (/events/view/208279)** |

**Registration Open**    28 of 40 seats remaining

**LOCATION & SCHEDULE**
**Turlock Sportsman Club**    Crows Landing, CA 95313
Saturday, March 23, 2024    8:00am - 5:00pm

| MAR **23** SAT | **Traditional Hunter Education (/events/view/206141)** |

**Registration Open**    12 of 15 seats remaining

**LOCATION & SCHEDULE**
**The Gun Shop**    Lancaster, CA 93534
Saturday, March 23, 2024    9:00am - 5:00pm

---

← Previous    1    2 (/programs/california/160/page:2?_=1710356519807)

3 (/programs/california/160/page:3?_=1710356519807)

Next → (/programs/california/160/page:2?_=1710356519807)

Last → (/programs/california/160/page:11?_=1710356519807)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

Exhibit 2
DX0023

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

### Find events near you

Use my current location    — OR —    Use a ZIP Code

**MARCH 2024**

MAR
**24**
SUN

### Traditional Hunter Education (/events/view/207047)

**Registration Open**    5 of 6 seats remaining

**LOCATION & SCHEDULE**
**Los Angeles Rifle & Revolver Club**    South El Monte, CA 91733
Sunday, March 24, 2024    9:30am - 5:30pm

MAR
**24**
SUN

### Traditional Hunter Education (/events/view/210553)

**Registration Open**    5 of 50 seats remaining

**LOCATION & SCHEDULE**
**Lake Earl Grange**    Crescent City, CA 95531
Sunday, March 24, 2024    10:00am - 5:00pm
Plus, 3 additional days. (/events/view/210553)



Exhibit 2
DX0024

| MAR<br>**26**<br>TUE | ### Traditional Hunter Education (/events/view/208839)<br>**Registration Open**   14 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Greenhorn Outfitter LLC**   Bakersfield, CA 93308<br>Tuesday, March 26, 2024   5:00pm - 9:00pm<br>Plus, 1 additional day. (/events/view/208839) |
|---|---|
| MAR<br>**28**<br>THU | ### Traditional Hunter Education (/events/view/209744)<br>**Full Event with Wait List**   0 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Winema Lodge**   Tulelake, CA 96134<br>Thursday, March 28, 2024   5:30pm - 8:30pm<br>Plus, 3 additional days. (/events/view/209744) |
| MAR<br>**30**<br>SAT | ### Traditional Hunter Education (/events/view/207120)<br>**Registration Open**   17 of 25 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Canada' De Los Osos Ecological Reserve**   Gilroy, CA 95020<br>Saturday, March 30, 2024   8:00am - 6:00pm |
| MAR<br>**30**<br>SAT | ### Traditional Hunter Education (Mandarin) (/events/view/211112)<br>**Registration Open**   8 of 10 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Chinese Sporting Clays & Hunting Club**   San Gabriel, CA 91776<br>Saturday, March 30, 2024   8:00am - 6:00pm |

**APRIL 2024**

| APR<br>**1**<br>MON | ### Traditional Hunter Education (/events/view/210781)<br>**Registration Open**   20 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Kern River Valley Gun Association**   Kernville, CA 93238<br>Monday, April 1, 2024   5:30pm - 7:30pm<br>Plus, 2 additional days. (/events/view/210781) |
|---|---|
| APR<br>**6**<br>SAT | ### Traditional Hunter Education with Live Fire (/events/view/205317)<br>**Registration Open**   14 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Ukiah Gun Club**   Ukiah, CA 95482<br>Saturday, April 6, 2024   8:00am - 3:00pm |

Exhibit 2<br>DX0025

Plus, 1 additional day. (/events/view/205317)



APR
**6**
SAT

## Traditional Hunter Education (/events/view/205167)

**Registration Open**   19 of 30 seats remaining

**LOCATION & SCHEDULE**
**Naval Base San Diego**   San Diego, CA 91950
Saturday, April 6, 2024   8:00am - 5:00pm



APR
**6**
SAT

## Traditional Hunter Education (/events/view/206217)

**Registration Open**   5 of 12 seats remaining

**LOCATION & SCHEDULE**
**Department of Fish & Wildlife Office, Seal Beach**   Seal Beach, CA 90740
Saturday, April 6, 2024   8:00am - 5:00pm

← First (/programs/california/160?_=1710356587366)

← Previous (/programs/california/160?_=1710356587366)      1 (/programs/california/160?_=1710356587366)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1?limit:100.rss)

2      3 (/programs/california/160/page:3?_=1710356587366)

Next → (/programs/california/160/page:3?_=1710356587366)

Last → (/programs/california/160/page:11?_=1710356587366)

Exhibit 2
DX0026

Active Programs (/programs/california)

| Update registration (/users/login) | Cancel registration (/users/login) |



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

## Find events near you

| Use my current location | — **OR** — | Use a ZIP Code |

---

**APRIL 2024**



APR
**6**
SAT

### Traditional Hunter Education (/events/view/201634)

**Registration Open**   14 of 25 seats remaining

**LOCATION & SCHEDULE**
**Ramona Town Hall**   Ramona, CA 92065
Saturday, April 6, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/201634)

APR
**6**
SAT

### Traditional Hunter Education (/events/view/206309)

**Registration Open**   24 of 25 seats remaining

**LOCATION & SCHEDULE**
**Oaktree Gun Club**   Newhall, CA 91321
Saturday, April 6, 2024   8:00am - 5:00pm



Exhibit 2
DX0027

APR
**6**
SAT

## Traditional Hunter Education (/events/view/209402)

**Registration Open**    15 of 15 seats remaining

**LOCATION & SCHEDULE**
**1faithsimon2**    Murrieta, CA 92563
Saturday, April 6, 2024    8:00am - 5:00pm

APR
**12**
FRI

## Traditional Hunter Education (/events/view/208030)

**Registration Open**    22 of 25 seats remaining

**LOCATION & SCHEDULE**
**Capay Fire Station**    Orland, CA 95963
Friday, April 12, 2024    8:00am - 5:00pm

APR
**12**
FRI

## Traditional Hunter Education (/events/view/206187)

**Registration Open**    79 of 100 seats remaining

**LOCATION & SCHEDULE**
**Auburn Elks Lodge #1691**    Auburn, CA 95603
Friday, April 12, 2024    6:00pm - 9:30pm
Plus, 1 additional day. (/events/view/206187)

APR
**13**
SAT

## Traditional Hunter Education (Espanol) (/events/view/210739)

**Registration Open**    14 of 20 seats remaining

**LOCATION & SCHEDULE**
**Freestyle Photo Studio & Gun Store**    Delano, CA 93215
Saturday, April 13, 2024    7:00am - 5:30pm

APR
**13**
SAT

## Traditional Hunter Education (/events/view/206200)

**Registration Open**    46 of 50 seats remaining

**LOCATION & SCHEDULE**
**Mike Raahauge Shooting Enterprises**    Corona, CA 92880
Saturday, April 13, 2024    7:00am - 4:00pm

APR
**13**
SAT

## Traditional Hunter Education (/events/view/205211)

**Registration Open**    36 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game Association**    Escondido, CA 92027
Saturday, April 13, 2024    7:30am - 5:00pm

APR
**16**
TUE

## Traditional Hunter Education (/events/view/207972)

**Registration Open**    17 of 25 seats remaining

**LOCATION & SCHEDULE**

Exhibit 2
DX0028

**Sacramento Gun Range**    Sacramento, CA 95827
Tuesday, April 16, 2024    5:30pm - 9:30pm
Plus, 2 additional days. (/events/view/207972)

APR
**20**
SAT

## Traditional Hunter Education (/events/view/206976)

**Registration Open**    22 of 25 seats remaining

**LOCATION & SCHEDULE**
**Bass Pro Shop**    San Jose, CA 95118
Saturday, April 20, 2024    8:00am - 2:00pm
Plus, 1 additional day. (/events/view/206976)

← First (/programs/california/160?_=1710356622385)

← Previous (/programs/california/160/page:2?_=1710356622385)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

2 (/programs/california/160/page:2?_=1710356622385)    3

4 (/programs/california/160/page:4?_=1710356622385)

Next → (/programs/california/160/page:4?_=1710356622385)

Last → (/programs/california/160/page:11?_=1710356622385)

Exhibit 2
DX0029

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

Use my current location    — OR —    Use a ZIP Code

---

**APRIL 2024**

APR
**22**
MON

## Traditional Hunter Education (/events/view/210478)

**Registration Open**    50 of 50 seats remaining

**LOCATION & SCHEDULE**
**4H Building**    Yuba City, CA 95991
Monday, April 22, 2024    6:00pm - 9:00pm
Plus, 3 additional days. (/events/view/210478)

APR
**27**
SAT

## Traditional Hunter Education (/events/view/207121)

**Registration Open**    23 of 25 seats remaining

**LOCATION & SCHEDULE**
**Canada' De Los Osos Ecological Reserve**    Gilroy, CA 95020
Saturday, April 27, 2024    8:00am - 6:00pm



Exhibit 2
DX0030

<table>
<tr><td>APR<br>**27**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/210577)

**Registration Open**    30 of 30 seats remaining

**LOCATION & SCHEDULE**
**CRPA Training Center**    Fullerton, CA 92835
Saturday, April 27, 2024    8:00am - 6:00pm

</td></tr>
</table>

<table>
<tr><td>APR<br>**27**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/204752)

**Full Event with Wait List**    0 of 10 seats remaining

**LOCATION & SCHEDULE**
**Livermore-Pleasanton Rod & Gun Club**    Livermore, CA 94551
Saturday, April 27, 2024    8:00am - 4:30pm
Plus, 1 additional day. (/events/view/204752)

</td></tr>
</table>

**MAY 2024**

<table>
<tr><td>MAY<br>**1**<br>WED</td><td>

### Traditional Hunter Education with Live Fire (/events/view/207884)

**Registration Open**    32 of 40 seats remaining

**LOCATION & SCHEDULE**
**Stage Stop Gun Shop**    Atwater, CA 95301
Wednesday, May 1, 2024    6:00pm - 9:30pm
Plus, 2 additional days. (/events/view/207884)

</td></tr>
</table>

<table>
<tr><td>MAY<br>**4**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/206201)

**Registration Open**    49 of 50 seats remaining

**LOCATION & SCHEDULE**
**Mike Raahauge Shooting Enterprises**    Corona, CA 92880
Saturday, May 4, 2024    7:00am - 4:00pm

</td></tr>
</table>

<table>
<tr><td>MAY<br>**4**<br>SAT</td><td>

### Traditional Hunter Education with Live Fire (/events/view/205318)

**Registration Open**    20 of 20 seats remaining

**LOCATION & SCHEDULE**
**Ukiah Gun Club**    Ukiah, CA 95482
Saturday, May 4, 2024    8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205318)

</td></tr>
</table>

<table>
<tr><td>MAY<br>**4**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/206218)

**Registration Open**    11 of 12 seats remaining

**LOCATION & SCHEDULE**
**Department of Fish & Wildlife Office, Seal Beach**    Seal Beach, CA 90740
Saturday, May 4, 2024    8:00am - 5:00pm

</td></tr>
</table>

Exhibit 2
DX0031

<table>
<tr><td>MAY<br>**4**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/206311)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Oaktree Gun Club**    Newhall, CA 91321
Saturday, May 4, 2024    8:00am - 5:00pm

</td></tr>
</table>

<table>
<tr><td>MAY<br>**11**<br>SAT</td><td>

### Traditional Hunter Education (/events/view/205212)

**Registration Open**    46 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game Association**    Escondido, CA 92027
Saturday, May 11, 2024    7:30am - 5:00pm

</td></tr>
</table>

← First (/programs/california/160?_=1710356643621)

← Previous (/programs/california/160/page:3?_=1710356643621)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

3 (/programs/california/160/page:3?_=1710356643621)    4

5 (/programs/california/160/page:5?_=1710356643621)

Next → (/programs/california/160/page:5?_=1710356643621)

Last → (/programs/california/160/page:11?_=1710356643621)

Exhibit 2
DX0032

Active Programs (/programs/california)    Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

Use my current location    — OR —    Use a ZIP Code

---

**MAY 2024**

**MAY 11 SAT**

### Traditional Hunter Education (/events/view/210979)

**Registration Open**    20 of 20 seats remaining

**LOCATION & SCHEDULE**
**1faithsimon2**    Murrieta, CA 92563
Saturday, May 11, 2024    8:00am - 5:00pm

**MAY 18 SAT**

### Traditional Hunter Education (/events/view/207122)

**Registration Open**    23 of 25 seats remaining

**LOCATION & SCHEDULE**
**Canada' De Los Osos Ecological Reserve**    Gilroy, CA 95020
Saturday, May 18, 2024    8:00am - 6:00pm

**MAY**

### Traditional Hunter Education (/events/view/204753)

**Registration Open**    10 of 10 seats remaining



Exhibit 2
DX0033

**18**
**SAT**

**LOCATION & SCHEDULE**
**Livermore-Pleasanton Rod & Gun Club**   Livermore, CA 94551
Saturday, May 18, 2024   8:00am - 4:30pm
Plus, 1 additional day. (/events/view/204753)

**MAY**
**20**
**MON**

## Traditional Hunter Education (/events/view/210479)

Registration Open   50 of 50 seats remaining

**LOCATION & SCHEDULE**
**4H Building**   Yuba City, CA 95991
Monday, May 20, 2024   6:00pm - 9:00pm
Plus, 3 additional days. (/events/view/210479)

**JUNE 2024**

**JUN**
**1**
**SAT**

## Traditional Hunter Education with Live Fire (/events/view/205319)

Registration Open   17 of 20 seats remaining

**LOCATION & SCHEDULE**
**Ukiah Gun Club**   Ukiah, CA 95482
Saturday, June 1, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205319)

**JUN**
**1**
**SAT**

## Traditional Hunter Education (/events/view/206219)

Registration Open   11 of 12 seats remaining

**LOCATION & SCHEDULE**
**Department of Fish & Wildlife Office, Seal Beach**   Seal Beach, CA 90740
Saturday, June 1, 2024   8:00am - 5:00pm

**JUN**
**1**
**SAT**

## Traditional Hunter Education (/events/view/210578)

Registration Open   30 of 30 seats remaining

**LOCATION & SCHEDULE**
**CRPA Training Center**   Fullerton, CA 92835
Saturday, June 1, 2024   8:00am - 5:00pm

**JUN**
**1**
**SAT**

## Traditional Hunter Education (/events/view/201635)

Registration Open   24 of 25 seats remaining

**LOCATION & SCHEDULE**
**Ramona Town Hall**   Ramona, CA 92065
Saturday, June 1, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/201635)

**JUN**
**8**

## Traditional Hunter Education (/events/view/206202)

Registration Open   50 of 50 seats remaining

Exhibit 2
DX0034

| SAT | **LOCATION & SCHEDULE** |
|-----|------------------------|
| | **Mike Raahauge Shooting Enterprises**   Corona, CA 92880 |
| | Saturday, June 8, 2024   7:00am - 4:00pm |

| JUN **8** SAT | ## Traditional Hunter Education (/events/view/206314) |
|---|---|
| | **Registration Open**   25 of 25 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Oaktree Gun Club**   Newhall, CA 91321 |
| | Saturday, June 8, 2024   8:00am - 5:00pm |

← First (/programs/california/160?_=1710356667263)

← Previous (/programs/california/160/page:4?_=1710356667263)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

4 (/programs/california/160/page:4?_=1710356667263)     5

6 (/programs/california/160/page:6?_=1710356667263)

Next → (/programs/california/160/page:6?_=1710356667263)

Last → (/programs/california/160/page:11?_=1710356667263)

Exhibit 2
DX0035

Active Programs (/programs/california)

Update registration (/users/login)      Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

Use my current location    — **OR** —    Use a ZIP Code

---

**JUNE 2024**



JUN
**11**
TUE

## Traditional Hunter Education (/events/view/208295)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Sacramento Gun Range**    Sacramento, CA 95827
Tuesday, June 11, 2024    5:30pm - 9:30pm
Plus, 2 additional days. (/events/view/208295)

---

JUN
**22**
SAT

## Traditional Hunter Education (/events/view/206315)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Oaktree Gun Club**    Newhall, CA 91321
Saturday, June 22, 2024    8:00am - 5:00pm



Exhibit 2
DX0036

| | |
|---|---|
| **JUN**<br>**22**<br>**SAT** | **Traditional Hunter Education (/events/view/210747)**<br><br>Registration Open    20 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Reed's Indoor Range**    Santa Clara, CA 95054<br>Saturday, June 22, 2024    10:30am - 5:30pm<br>Plus, 1 additional day. (/events/view/210747) |
| **JUN**<br>**29**<br>**SAT** | **Traditional Hunter Education (/events/view/207123)**<br><br>Registration Open    23 of 25 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Canada' De Los Osos Ecological Reserve**    Gilroy, CA 95020<br>Saturday, June 29, 2024    8:00am - 6:00pm |

**JULY 2024**

| | |
|---|---|
| **JUL**<br>**6**<br>**SAT** | **Traditional Hunter Education (/events/view/206316)**<br><br>Registration Open    25 of 25 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Oaktree Gun Club**    Newhall, CA 91321<br>Saturday, July 6, 2024    8:00am - 5:00pm |
| **JUL**<br>**13**<br>**SAT** | **Traditional Hunter Education (/events/view/205213)**<br><br>Registration Open    50 of 50 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**Escondido Fish & Game Association**    Escondido, CA 92027<br>Saturday, July 13, 2024    7:30am - 5:00pm |
| **JUL**<br>**13**<br>**SAT** | **Traditional Hunter Education with Live Fire (/events/view/210014)**<br><br>Special Registration<br><br>**LOCATION & SCHEDULE**<br>**Jay Busby's Classroom**    Bakersfield, CA 93305<br>Saturday, July 13, 2024    8:00am - 5:00pm<br>Plus, 1 additional day. (/events/view/210014) |
| **JUL**<br>**15**<br>**MON** | **Traditional Hunter Education with Live Fire (/events/view/206168)**<br><br>Registration Open    22 of 25 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**San Luis Obispo Sportsmen's Association**    San Luis Obispo, CA 93405<br>Monday, July 15, 2024    6:30pm - 9:30pm<br>Plus, 3 additional days. (/events/view/206168) |

Exhibit 2<br>DX0037



### Traditional Hunter Education (/events/view/206665)

**Registration Open**   23 of 25 seats remaining

**LOCATION & SCHEDULE**
**Knights Landing Sportsmans Club**   Knights Landing, CA 95645
Friday, July 19, 2024   6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206665)

### Traditional Hunter Education with Live Fire (/events/view/205324)

**Registration Open**   25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Ukiah Gun Club**   Ukiah, CA 95482
Saturday, July 20, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205324)

← First (/programs/california/160?_=1710356686368)

← Previous (/programs/california/160/page:5?_=1710356686368)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

5 (/programs/california/160/page:5?_=1710356686368)    6

7 (/programs/california/160/page:7?_=1710356686368)

Next → (/programs/california/160/page:7?_=1710356686368)

Last → (/programs/california/160/page:11?_=1710356686368)

Exhibit 2
DX0038

Active Programs (/programs/california)

Update registration (/users/login)     Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

Use my current location    — OR —    Use a ZIP Code

---

**JULY 2024**

| JUL **20** SAT | **Traditional Hunter Education (/events/view/210983)** |

**Registration Open**    15 of 15 seats remaining

**LOCATION & SCHEDULE**
**1faithsimon2**    Murrieta, CA 92563
Saturday, July 20, 2024    8:00am - 5:00pm

| JUL **20** SAT | **Traditional Hunter Education (/events/view/208308)** |

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Bass Pro Shop**    San Jose, CA 95118
Saturday, July 20, 2024    8:00am - 2:00pm
Plus, 1 additional day. (/events/view/208308)



Exhibit 2
DX0039

JUL
**20**
SAT

## Traditional Hunter Education (/events/view/201915)

**Registration Open**   22 of 25 seats remaining

LOCATION & SCHEDULE
**Personal Protection Academy**   Murrieta, CA 92562
Saturday, July 20, 2024   8:00am - 6:00pm

---

JUL
**20**
SAT

## Traditional Hunter Education (/events/view/206318)

**Registration Open**   25 of 25 seats remaining

LOCATION & SCHEDULE
**Oaktree Gun Club**   Newhall, CA 91321
Saturday, July 20, 2024   8:00am - 5:00pm

---

JUL
**27**
SAT

## Traditional Hunter Education (/events/view/207124)

**Registration Open**   25 of 25 seats remaining

LOCATION & SCHEDULE
**Canada' De Los Osos Ecological Reserve**   Gilroy, CA 95020
Saturday, July 27, 2024   8:00am - 6:00pm

---

JUL
**27**
SAT

## Traditional Hunter Education (/events/view/205692)

**Registration Open**   26 of 30 seats remaining

LOCATION & SCHEDULE
**Livermore Rodeo Grounds**   Livermore, CA 94550
Saturday, July 27, 2024   8:00am - 5:00pm
Plus, 1 additional day. (/events/view/205692)

---

JUL
**31**
WED

## Traditional Hunter Education with Live Fire (/events/view/207885)

**Registration Open**   40 of 40 seats remaining

LOCATION & SCHEDULE
**Stage Stop Gun Shop**   Atwater, CA 95301
Wednesday, July 31, 2024   6:00pm - 9:30pm
Plus, 2 additional days. (/events/view/207885)

---

**AUGUST 2024**

AUG
**3**
SAT

## Traditional Hunter Education with Live Fire (/events/view/205325)

**Registration Open**   25 of 25 seats remaining

LOCATION & SCHEDULE
**Ukiah Gun Club**   Ukiah, CA 95482
Saturday, August 3, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205325)

Exhibit 2
DX0040

<table>
<tr><td>AUG<br>**10**<br>SAT</td><td></td></tr>
</table>

**AUG**
**10**
**SAT**

## Traditional Hunter Education (/events/view/206203)

**Registration Open**    50 of 50 seats remaining

**LOCATION & SCHEDULE**
**Mike Raahauge Shooting Enterprises**    Corona, CA 92880
Saturday, August 10, 2024    7:00am - 4:00pm

**AUG**
**10**
**SAT**

## Traditional Hunter Education (/events/view/205214)

**Registration Open**    50 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game Association**    Escondido, CA 92027
Saturday, August 10, 2024    7:30am - 5:00pm

← First (/programs/california/160?_=1710356710991)

← Previous (/programs/california/160/page:6?_=1710356710991)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

6 (/programs/california/160/page:6?_=1710356710991)    7

8 (/programs/california/160/page:8?_=1710356710991)

Next → (/programs/california/160/page:8?_=1710356710991)

Last → (/programs/california/160/page:11?_=1710356710991)

Exhibit 2
DX0041

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

### Find events near you

Use my current location    — **OR** —    Use a ZIP Code

**AUGUST 2024**

AUG
**10**
SAT

### Traditional Hunter Education with Live Fire (/events/view/210017)

**Special Registration**

**LOCATION & SCHEDULE**
**Jay Busby's Classroom**    Bakersfield, CA 93305
Saturday, August 10, 2024    8:00am - 5:00pm
Plus, 1 additional day. (/events/view/210017)

AUG
**13**
TUE

### Traditional Hunter Education (/events/view/208296)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Sacramento Gun Range**    Sacramento, CA 95827
Tuesday, August 13, 2024    5:30pm - 9:30pm
Plus, 2 additional days. (/events/view/208296)



Exhibit 2
DX0042

| AUG **16** FRI | **Traditional Hunter Education (/events/view/206666)** |
|---|---|
| | Registration Open    25 of 25 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Knights Landing Sportsmans Club**    Knights Landing, CA 95645 |
| | Friday, August 16, 2024    6:00pm - 9:00pm |
| | Plus, 1 additional day. (/events/view/206666) |

| AUG **24** SAT | **Traditional Hunter Education (/events/view/206204)** |
|---|---|
| | Registration Open    200 of 200 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Mike Raahauge Shooting Enterprises**    Corona, CA 92880 |
| | Saturday, August 24, 2024    7:00am - 4:00pm |

| AUG **24** SAT | **Traditional Hunter Education (/events/view/207125)** |
|---|---|
| | Registration Open    25 of 25 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Canada' De Los Osos Ecological Reserve**    Gilroy, CA 95020 |
| | Saturday, August 24, 2024    8:00am - 6:00pm |

| AUG **24** SAT | **Traditional Hunter Education (/events/view/210981)** |
|---|---|
| | Registration Open    15 of 15 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **1faithsimon2**    Murrieta, CA 92563 |
| | Saturday, August 24, 2024    8:00am - 5:00pm |

**SEPTEMBER 2024**

| SEP **7** SAT | **Traditional Hunter Education with Live Fire (/events/view/205329)** |
|---|---|
| | Registration Open    25 of 25 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Ukiah Gun Club**    Ukiah, CA 95482 |
| | Saturday, September 7, 2024    8:00am - 3:00pm |
| | Plus, 1 additional day. (/events/view/205329) |

| SEP **7** SAT | **Traditional Hunter Education with Live Fire (/events/view/209142)** |
|---|---|
| | Registration Open    19 of 20 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Coyote Point Rifle and Pistol Club**    San Mateo, CA 94401 |
| | Saturday, September 7, 2024    9:00am - 5:00pm |
| | Plus, 1 additional day. (/events/view/209142) |

Exhibit 2
DX0043

<table>
<tr><td>SEP<br>**10**<br>TUE</td><td>

### Traditional Hunter Education (/events/view/208297)

**Registration Open**   25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Sacramento Gun Range**   Sacramento, CA 95827
Tuesday, September 10, 2024   5:30pm - 9:30pm
Plus, 2 additional days. (/events/view/208297)
</td></tr>
</table>

SEP
**20**
FRI

### Traditional Hunter Education (/events/view/206667)

**Registration Open**   25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Knights Landing Sportsmans Club**   Knights Landing, CA 95645
Friday, September 20, 2024   6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206667)

← First (/programs/california/160?_=1710356740902)

← Previous (/programs/california/160/page:7?_=1710356740902)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

7 (/programs/california/160/page:7?_=1710356740902)   8

9 (/programs/california/160/page:9?_=1710356740902)

Next → (/programs/california/160/page:9?_=1710356740902)

Last → (/programs/california/160/page:11?_=1710356740902)

Exhibit 2
DX0044

Active Programs (/programs/california)

| Update registration (/users/login) | Cancel registration (/users/login) |



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

| Use my current location | — OR — | Use a ZIP Code |

---

**SEPTEMBER 2024**



SEP
**21**
SAT

### Traditional Hunter Education (/events/view/208311)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Bass Pro Shop**   San Jose, CA 95118
Saturday, September 21, 2024   8:00am - 2:00pm
Plus, 1 additional day. (/events/view/208311)

---

SEP
**23**
MON

### Traditional Hunter Education with Live Fire (/events/view/206169)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**San Luis Obispo Sportsmen's Association**   San Luis Obispo, CA 93405
Monday, September 23, 2024   6:30pm - 9:30pm
Plus, 3 additional days. (/events/view/206169)



Exhibit 2
DX0045

SEP
**28**
SAT

## Traditional Hunter Education (/events/view/207126)

Registration Open    25 of 25 seats remaining

LOCATION & SCHEDULE
**Canada' De Los Osos Ecological Reserve**    Gilroy, CA 95020
Saturday, September 28, 2024    8:00am - 6:00pm

**OCTOBER 2024**

OCT
**5**
SAT

## Traditional Hunter Education with Live Fire (/events/view/205330)

Registration Open    25 of 25 seats remaining

LOCATION & SCHEDULE
**Ukiah Gun Club**    Ukiah, CA 95482
Saturday, October 5, 2024    8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205330)

OCT
**11**
FRI

## Traditional Hunter Education (/events/view/206668)

Registration Open    25 of 25 seats remaining

LOCATION & SCHEDULE
**Knights Landing Sportsmans Club**    Knights Landing, CA 95645
Friday, October 11, 2024    6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206668)

OCT
**12**
SAT

## Traditional Hunter Education (/events/view/206205)

Registration Open    50 of 50 seats remaining

LOCATION & SCHEDULE
**Mike Raahauge Shooting Enterprises**    Corona, CA 92880
Saturday, October 12, 2024    7:00am - 4:00pm

OCT
**12**
SAT

## Traditional Hunter Education (/events/view/205215)

Registration Open    50 of 50 seats remaining

LOCATION & SCHEDULE
**Escondido Fish & Game Association**    Escondido, CA 92027
Saturday, October 12, 2024    7:30am - 5:00pm

OCT
**12**
SAT

## Traditional Hunter Education with Live Fire (/events/view/210018)

Special Registration

LOCATION & SCHEDULE
**Jay Busby's Classroom**    Bakersfield, CA 93305
Saturday, October 12, 2024    8:00am - 5:00pm
Plus, 1 additional day. (/events/view/210018)

Exhibit 2
DX0046



## Traditional Hunter Education (/events/view/207127)

**Registration Open**   25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Canada' De Los Osos Ecological Reserve**   Gilroy, CA 95020
Saturday, October 26, 2024   8:00am - 6:00pm

**NOVEMBER 2024**



## Traditional Hunter Education (/events/view/206669)

**Registration Open**   25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Knights Landing Sportsmans Club**   Knights Landing, CA 95645
Friday, November 1, 2024   6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206669)

← First (/programs/california/160?_=1710356768700)

← Previous (/programs/california/160/page:8?_=1710356768700)
RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

8 (/programs/california/160/page:8?_=1710356768700)          9

10 (/programs/california/160/page:10?_=1710356768700)

Next → (/programs/california/160/page:10?_=1710356768700)

Last → (/programs/california/160/page:11?_=1710356768700)

Exhibit 2
DX0047

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

### Find events near you

Use my current location    — **OR** —    Use a ZIP Code

**NOVEMBER 2024**

| NOV 2 SAT | **Traditional Hunter Education with Live Fire (/events/view/205332)** |
|---|---|
| | **Registration Open**    25 of 25 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Ukiah Gun Club**    Ukiah, CA 95482 |
| | Saturday, November 2, 2024    8:00am - 3:00pm |
| | Plus, 1 additional day. (/events/view/205332) |

| NOV 9 SAT | **Traditional Hunter Education (/events/view/206206)** |
|---|---|
| | **Registration Open**    50 of 50 seats remaining |
| | **LOCATION & SCHEDULE** |
| | **Mike Raahauge Shooting Enterprises**    Corona, CA 92880 |
| | Saturday, November 9, 2024    7:00am - 4:00pm |



Exhibit 2
DX0048

<table>
<tr><td>NOV<br>**9**<br>SAT</td><td></td></tr>
</table>

| NOV **9** SAT | ### Traditional Hunter Education (/events/view/205216) |

NOV
**9**
SAT

### Traditional Hunter Education (/events/view/205216)

**Registration Open**    49 of 50 seats remaining

**LOCATION & SCHEDULE**
**Escondido Fish & Game Association**    Escondido, CA 92027
Saturday, November 9, 2024   7:30am - 5:00pm

NOV
**12**
TUE

### Traditional Hunter Education (/events/view/208298)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Sacramento Gun Range**    Sacramento, CA 95827
Tuesday, November 12, 2024   5:30pm - 9:30pm
Plus, 2 additional days. (/events/view/208298)

**DECEMBER 2024**

DEC
**2**
MON

### Traditional Hunter Education with Live Fire (/events/view/206173)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**San Luis Obispo Sportsmen's Association**    San Luis Obispo, CA 93405
Monday, December 2, 2024   6:30pm - 9:30pm
Plus, 3 additional days. (/events/view/206173)

DEC
**7**
SAT

### Traditional Hunter Education with Live Fire (/events/view/205335)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Ukiah Gun Club**    Ukiah, CA 95482
Saturday, December 7, 2024   8:00am - 3:00pm
Plus, 1 additional day. (/events/view/205335)

DEC
**13**
FRI

### Traditional Hunter Education (/events/view/206670)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Knights Landing Sportsmans Club**    Knights Landing, CA 95645
Friday, December 13, 2024   6:00pm - 9:00pm
Plus, 1 additional day. (/events/view/206670)

DEC
**14**
SAT

### Traditional Hunter Education (/events/view/205693)

**Registration Open**    14 of 14 seats remaining

**LOCATION & SCHEDULE**
**Livermore Rodeo Grounds**    Livermore, CA 94550
Saturday, December 14, 2024   8:00am - 5:00pm

Exhibit 2
DX0049

Plus, 1 additional day. (/events/view/205693)



DEC
**14**
SAT

## **Traditional Hunter Education (/events/view/210749)**

### **Registration Opens on October 8, 2024**

**LOCATION & SCHEDULE**
**Reed's Indoor Range**   Santa Clara, CA 95054
Saturday, December 14, 2024   10:30am - 5:30pm
Plus, 1 additional day. (/events/view/210749)

**MARCH 2025**

MAR
**15**
SAT

## **Traditional Hunter Education (/events/view/210641)**

### **Registration Open**   20 of 20 seats remaining

**LOCATION & SCHEDULE**
**Personal Protection Academy**   Murrieta, CA 92562
Saturday, March 15, 2025   8:00am - 6:00pm

← First (/programs/california/160?_=1710356788988)

← Previous (/programs/california/160/page:9?_=1710356788988)
RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)
9 (/programs/california/160/page:9?_=1710356788988)   10

11 (/programs/california/160/page:11?_=1710356788988)

Next → (/programs/california/160/page:11?_=1710356788988)

Last → (/programs/california/160/page:11?_=1710356788988)

Exhibit 2
DX0050

Active Programs (/programs/california)

| Update registration (/users/login) | Cancel registration (/users/login) |



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Traditional Hunter Education

### Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

| Use my current location | — OR — | Use a ZIP Code |

---

**JULY 2025**



JUL
**19**
SAT

### Traditional Hunter Education (/events/view/210958)

**Registration Open**    25 of 25 seats remaining

**LOCATION & SCHEDULE**
**Personal Protection Academy**    Murrieta, CA 92562
Saturday, July 19, 2025    8:00am - 6:00pm

---

| ← First (/programs/california/160?_=1710356822038) |

← Previous (/programs/california/160/page:10?_=1710356822038)

RSS (https://www.register-ed.com/programs/california/160-traditional-hunter-education/page:1/limit:100.rss)

9 (/programs/california/160/page:9?_=1710356822038)

| 10 (/programs/california/160/page:10?_=1710356822038) | 11 | Next → |



Exhibit 2
DX0051

# EXHIBIT 3

Exhibit 3
DX0052

Active Programs (/programs/california)

| Update registration (/users/login) | Cancel registration (/users/login) |



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Online Course and Follow-Up Class

### Overview

This is a 2 component course. Students must complete an Online Course prior to attending a Follow-Up Class. The Follow-Up is a review only of what the student has learned online.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

| Use my current location | — **OR** — | Use a ZIP Code |

---

**MARCH 2024**

MAR
**16**
SAT

### Online Course and Follow-Up Class (/events/view/209141)

**Registration Open**   7 of 15 seats remaining

**LOCATION & SCHEDULE**
**Blue Collar Firearms**   Colton, CA 92324
Saturday, March 16, 2024   8:00am - 12:00pm

MAR
**21**
THU

### Online Course and Follow-Up Class (/events/view/205757)

**Registration Open**   18 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**   Midway City, CA 92655
Thursday, March 21, 2024   4:30pm - 8:30pm

MAR

### Online Course and Follow-Up Class (/events/view/206783)

**Registration Open**   8 of 20 seats remaining



Exhibit 3
DX0053

**23**
**SAT**

LOCATION & SCHEDULE
**Bass Pro Shop**   San Jose, CA 95118
Saturday, March 23, 2024   8:00am - 12:00pm

**APRIL 2024**

APR
**6**
**SAT**

### Online Course and Follow-Up Class (/events/view/208803)

Registration Open   11 of 12 seats remaining

LOCATION & SCHEDULE
**Becker Residence**   Paradise, CA 95969
Saturday, April 6, 2024   10:00am - 3:00pm

APR
**18**
**THU**

### Online Course and Follow-Up Class (/events/view/208236)

Registration Open   20 of 20 seats remaining

LOCATION & SCHEDULE
**American Legion Post 555**   Midway City, CA 92655
Thursday, April 18, 2024   4:30pm - 8:30pm

APR
**20**
**SAT**

### Online Course and Follow-Up Class (/events/view/210978)

Registration Open   15 of 15 seats remaining

LOCATION & SCHEDULE
**1faithsimon2**   Murrieta, CA 92563
Saturday, April 20, 2024   8:00am - 12:00pm

**MAY 2024**

MAY
**16**
**THU**

### Online Course and Follow-Up Class (/events/view/208237)

Registration Open   20 of 20 seats remaining

LOCATION & SCHEDULE
**American Legion Post 555**   Midway City, CA 92655
Thursday, May 16, 2024   4:30pm - 8:30pm

MAY
**18**
**SAT**

### Online Course and Follow-Up Class (/events/view/208304)

Registration Opens on March 18, 2024

LOCATION & SCHEDULE
**Bass Pro Shop**   San Jose, CA 95118
Saturday, May 18, 2024   8:00am - 12:00pm

Exhibit 3
DX0054

**JUNE 2024**

| JUN<br>**15**<br>SAT | ## Online Course and Follow-Up Class (/events/view/208305)<br>**Registration Opens on April 15, 2024**<br><br>**LOCATION & SCHEDULE**<br>**Bass Pro Shop**   San Jose, CA 95118<br>Saturday, June 15, 2024   8:00am - 12:00pm |
|---|---|
| JUN<br>**20**<br>THU | ## Online Course and Follow-Up Class (/events/view/208238)<br>**Registration Open**   19 of 20 seats remaining<br><br>**LOCATION & SCHEDULE**<br>**American Legion Post 555**   Midway City, CA 92655<br>Thursday, June 20, 2024   4:30pm - 8:30pm |

← Previous    |    1    |    2 (/programs/california/161/page:2?_=1710357402093)

3 (/programs/california/161/page:3?_=1710357402093)

RSS (https://www.register-ed.com/programs/california/161-online-course-and-follow-up-class/page:1/limit:100.rss)

Next → (/programs/california/161/page:2?_=1710357402093)

Last → (/programs/california/161/page:3?_=1710357402093)

Exhibit 3
DX0055

Active Programs (/programs/california)

Update registration (/users/login)    Cancel registration (/users/login)

 **MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

## Online Course and Follow-Up Class

### Overview

This is a 2 component course. Students must complete an Online Course prior to attending a Follow-Up Class. The Follow-Up is a review only of what the student has learned online.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

## Find events near you

Use my current location    — **OR** —    Use a ZIP Code

**JULY 2024**

JUL
**13**
SAT

### Online Course and Follow-Up Class (/events/view/210982)

**Registration Open**    15 of 15 seats remaining

**LOCATION & SCHEDULE**
**1faithsimon2**    Murrieta, CA 92563
Saturday, July 13, 2024    8:00am - 12:00pm

JUL
**18**
THU

### Online Course and Follow-Up Class (/events/view/208240)

**Registration Open**    20 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**    Midway City, CA 92655
Thursday, July 18, 2024    4:30pm - 8:30pm



Exhibit 3
DX0056

**AUGUST 2024**

AUG<br>
**15**<br>
THU

### Online Course and Follow-Up Class (/events/view/208241)

**Registration Open**   20 of 20 seats remaining

LOCATION & SCHEDULE
**American Legion Post 555**   Midway City, CA 92655
Thursday, August 15, 2024   4:30pm - 8:30pm

AUG<br>
**17**<br>
SAT

### Online Course and Follow-Up Class (/events/view/210980)

**Registration Open**   15 of 15 seats remaining

LOCATION & SCHEDULE
**1faithsimon2**   Murrieta, CA 92563
Saturday, August 17, 2024   8:00am - 12:00pm

AUG<br>
**24**<br>
SAT

### Online Course and Follow-Up Class (/events/view/208306)

**Registration Opens on June 24, 2024**

LOCATION & SCHEDULE
**Bass Pro Shop**   San Jose, CA 95118
Saturday, August 24, 2024   8:00am - 12:00pm

**SEPTEMBER 2024**

SEP<br>
**19**<br>
THU

### Online Course and Follow-Up Class (/events/view/208242)

**Registration Open**   20 of 20 seats remaining

LOCATION & SCHEDULE
**American Legion Post 555**   Midway City, CA 92655
Thursday, September 19, 2024   4:30pm - 8:30pm

**OCTOBER 2024**

OCT<br>
**12**<br>
SAT

### Online Course and Follow-Up Class (/events/view/208310)

**Registration Open**   25 of 25 seats remaining

LOCATION & SCHEDULE
**Bass Pro Shop**   San Jose, CA 95118
Saturday, October 12, 2024   8:00am - 12:00pm

OCT<br>
**17**<br>
THU

### Online Course and Follow-Up Class (/events/view/208243)

**Registration Open**   20 of 20 seats remaining

LOCATION & SCHEDULE
**American Legion Post 555**   Midway City, CA 92655

Exhibit 3
DX0057

Thursday, October 17, 2024    4:30pm - 8:30pm

**NOVEMBER 2024**

NOV
**21**
THU

## Online Course and Follow-Up Class (/events/view/208244)

**Registration Open**    20 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**    Midway City, CA 92655
Thursday, November 21, 2024    4:30pm - 8:30pm

**DECEMBER 2024**

DEC
**19**
THU

## Online Course and Follow-Up Class (/events/view/208246)

**Registration Open**    20 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**    Midway City, CA 92655
Thursday, December 19, 2024    4:30pm - 8:30pm

← First (/programs/california/161?_=1710357428834)

← Previous (/programs/california/161?_=1710357428834)    1 (/programs/california/161?_=1710357428834)

RSS (https://www.register-ed.com/programs/california/161-online-course-and-follow-up-class/page:1/limit:100.rss)

2    3 (/programs/california/161/page:3?_=1710357428834)

Next → (/programs/california/161/page:3?_=1710357428834)

Last → (/programs/california/161/page:3?_=1710357428834)

Exhibit 3
DX0058

Active Programs (/programs/california)    Update registration (/users/login)    Cancel registration (/users/login)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)

# Upcoming Events

---

## Online Course and Follow-Up Class

### Overview

This is a 2 component course. Students must complete an Online Course prior to attending a Follow-Up Class. The Follow-Up is a review only of what the student has learned online.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

---

### Find events near you

Use my current location  — **OR** —  Use a ZIP Code

---

**JANUARY 2025**



JAN
**16**
THU

### Online Course and Follow-Up Class (/events/view/208248)

**Registration Open**   20 of 20 seats remaining

**LOCATION & SCHEDULE**
**American Legion Post 555**   Midway City, CA 92655
Thursday, January 16, 2025   4:30pm - 8:30pm

---

← First (/programs/california/161?_=1710357467590)

← Previous (/programs/california/161/page:2?_=1710357467590)

RSS (https://www.register-ed.com/programs/california/161-online-course-and-follow-up-class/page:1/limit:100.rss)

1 (/programs/california/161?_=1710357467590)    2 (/programs/california/161/page:2?_=1710357467590)    3

Next →



Exhibit 3
DX0059

# EXHIBIT 4

Exhibit 4
DX0060

Update registration (/users/login)    Cancel registration (/users/login)

Upcoming Events (/programs/california/160-traditional-hunter-education)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife
https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)



You're registering for:

# Traditional Hunter Education

**Registration Open**   30 of 50 seats remaining

**Register Now (/events/register/191013)**

**LOCATION & SCHEDULE**

## Meeting on:

Saturday, August 12, 2023                                    7:30am - 5:00pm

## Located at:

**Escondido Fish & Game**
16525 Guejito Road
Escondido, CA 92027
Get directions (https://maps.google.com?sensor=false&zoom=12&q=16525+Guejito+Road%2C+Escondido+CA)

**About the Event**
From Escondido, take East Valley Parkway to Lake Wohlford Road, turn onto Lake Wohlford Road, proceed approximately 4.5 miles to Guejito Road. Turn right onto Guejito Road. Site entrance is on the right about 500 feet after turning onto Guejito Road. Park near the large buildings on the left or right after entering. All registrations must be completed through the online registration process through the CA Dept of Fish & Wildlife website at www.wildlife.ca.gov. (http://www.wildlife.ca.gov.) No walk-ins accepted. Course fee of $20 per person must be paid in cash only, no credit/debit cards, checks, or e-payments accepted. Bring exact amount. Download, print, and bring the Student Consent Form to class. Also bring the form for minors. Bring a lunch or dine at, or order from, the Lake Wohlford Cafe minutes from the class site. Entrance to the site will be open 1/2 hour prior to start of class.

**About the Location**
From Escondido, take East Valley Parkway to Lake Wohlford Road, turn onto Lake Wohlford Road, proceed approximately 4.5 miles to Guejito Road. Turn right onto Guejito Road. Site entrance is on the right about 500 feet after turning onto Guejito Road. Park near the large buildings on the left or right after entering. All registrations must be completed through the online registration process through the CA Dept of Fish & Wildlife website, no walk-ins accepted. Course fee of $20 per person must be paid in cash only, no credit/debit cards, checks, or e-payments accepted. Bring exact amount. Download, print, and bring the Student Consent Form to class. Also bring the form for minors. Bring a lunch or dine at, or order from, the Lake Wohlford Cafe minutes from the class site. Entrance to the site will be open 1/2 hour prior to start of class.

**DETAILS**



Exhibit 4
DX0061

## Requirements

**Important** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you have previously held a CDFW license (i.e. Fishing), your GO ID is printed on the license above your name.** Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

All students must download, print, and sign a Student Consent Form (https://s3.amazonaws.com/register-ed.com/uploads/et_20170109_002052728_1505009058.pdf). Students **17 years of age and younger** must have the form signed by a parent or guardian. **The signed form must be brought to class.**

In order to be certified the student must attend the entire class including all sessions. Students will need to show safe handling of firearms and pass the Hunter Education test with a score of 80% or better. There is no minimum age to attend California Hunter Education. Parents or guardians are encouraged to attend with young students, especially those younger than age 16, to help define new words or provide additional tutoring during and after class.

**Special Accommodations** If you require special assistance or accommodations, please see the form, Reasonable Accommodation: Request for Services (https://s3.amazonaws.com/register-ed.com/uploads/et_20160502_002052728_1304264900.pdf). If you have any questions, please contact the instructor or regional director directly.

## Cancellation Policies

You must cancel your registration before Friday, August 11, 2023, at 12:00pm CDT.

## Organized by:

**David Premetz**
Send a message



Map data ©2023  Report a map error (https://www.google.com/maps/@33.179353,-116.97271,13z/data=!10m1!1e1!12b1?source=apiv3&rapsrc=apiv3) (https://maps.google.com/maps?ll=33.179353,-116.97271&z=13&t=m&hl=en-US&gl=US&mapclient=apiv3)

## ABOUT THE PROGRAM

## Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

Exhibit 4
DX0062

Classes are generally scheduled for 1-3 sessions. Students will receive training in firearms safety and handling, sportsmanship and ethics, wildlife management and conservation, archery, black powder, wildlife identification, game care, first aid, and survival. After a student has successfully completed the course of instruction and passed the final examination, they are awarded a Certificate of Completion.

Register Now (/events/register/191013)

Exhibit 4
DX0063

# EXHIBIT 5

Exhibit 5
DX0064

Update registration (/users/login)     Cancel registration (/users/login)

Upcoming Events (/programs/california/160-traditional-hunter-education)



**MANAGED AND APPROVED BY:**

# California Department of Fish & Wildlife

https://www.wildlife.ca.gov/ (https://www.wildlife.ca.gov/)



You're registering for:

## Traditional Hunter Education

**Registration Open**   25 of 25 seats remaining

Register Now (/events/register/201629)

**LOCATION & SCHEDULE**

## Meeting on:

Saturday, August 26, 2023                    7:45am - 3:00pm

Sunday, August 27, 2023                      8:00am - 12:00pm

## Located at:

**Ramona Town Hall**
729 Main Street
Ramona, CA 92065
Get directions (https://maps.google.com?sensor=false&zoom=12&q=729+Main+Street%2C+Ramona+CA)

**About the Event**
This California Hunter Education Course is taught by volunteer instructors certified by the California Department of Fish and Wildlife (CDFW). The class takes place over two days, Saturday and Sunday. Ensure you print out, complete, and sign the waiver located on the registration page and bring it to the first day of class.

The class is free to all.

This hunter education course consists of a minimum of ten hours of classroom instruction. In addition to attending class, students are required to complete the chapter review exercises for the chapters covered on the first day and study at home.

Parents are encouraged to participate with their children in the course. There is not a minimum age requirement to take the course, but young children below 8 years old may find the course demanding. To determine if your child is ready for the class, your child should be able to safely handle, shoulder and hold a shotgun or rifle and manipulate it through a loading and simulated firing exercise. Instructors may turn away children who do not meet this minimum safety standard.

Participants should bring snacks, drinks to class. Students should also bring paper and pen/pencil to class to take notes. I will have pencils and highlighters in class.

Students who successfully complete the course of instruction are awarded a Certificate of Completion. This certificate must be presented when applying for a hunting license.

The Hunter Education Instructor makes the final decision in determining whether a student is qualified to receive a Certificate of Completion. A student who is unsafe or fails to demonstrate good sportsmanship will not be issued a Certificate of Completion. A student who does not pass the examination cannot be tested again on the same day.

**About the Location**
Ramona Town Hall is located on Main Street between 7th and 8th streets. Parking is available on Main Street or in parking lots just off 7th street and Main Street. Additional parking is available behind the Ramona Food and Clothes Store on 8th and "B" street.

**DETAILS**



Exhibit 5
DX0065

## Requirements

**Important** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you have previously held a CDFW license (i.e. Fishing), your GO ID is printed on the license above your name.** Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

All students must download, print, and sign a Student Consent Form (https://s3.amazonaws.com/register-ed.com/uploads/et_20170109_002052728_1505009058.pdf). Students **17 years of age and younger** must have the form signed by a parent or guardian. **The signed form must be brought to class.**

In order to be certified the student must attend the entire class including all sessions. Students will need to show safe handling of firearms and pass the Hunter Education test with a score of 80% or better. There is no minimum age to attend California Hunter Education. Parents or guardians are encouraged to attend with young students, especially those younger than age 16, to help define new words or provide additional tutoring during and after class.

**Special Accommodations** If you require special assistance or accommodations, please see the form, Reasonable Accommodation: Request for Services (https://s3.amazonaws.com/register-ed.com/uploads/et_20160502_002052728_1304264900.pdf). If you have any questions, please contact the instructor or regional director directly.

## Cancellation Policies

You must cancel your registration before Friday, August 25, 2023, at 7:45am CDT.

## Organized by:

**Gary F Brennan**
Instructor Mobile Phone: 831-421-2450
Send a message



**ABOUT THE PROGRAM**

## Overview

The Traditional Hunter Education course consists of a minimum of 10 hours of classroom, homework, and field instruction. The Traditional Course is most often preferred by first-time hunters.

**STOP** All students are required to obtain a California Get Outdoors ID (GO ID) prior to registering for California Hunter Education courses. **If you are a previous CDFW license holder (i.e. Fishing), your GO ID is printed on the license above your name.**

Click here (https://www.ca.wildlifelicense.com/InternetSales/CustomerSearch/Begin) to get a GO ID. Click here (https://wildlife.ca.gov/Hunter-Education/GetGOID) for instructions.

Classes are generally scheduled for 1-3 sessions. Students will receive training in firearms safety and handling, sportsmanship and ethics, wildlife management and conservation, archery, black powder, wildlife identification, game care, first aid, and survival. After a student has successfully completed the course of instruction and passed the final examination, they are awarded a Certificate of Completion.

Register Now (/events/register/201629)

Exhibit 5
DX0066

# EXHIBIT 6

Exhibit 6
DX0067

# Hunting Licenses and Tags

| Items & Fees | Tag Reporting | Reduced-Fee | Forms |
|---|---|---|---|
| FAQs | Exchanges, Returns, Preference Points | | |

# License Items and Fees

**Purchase these items ONLINE or at any CDFW License Sales Office or License Agent.**

*Valid JULY 1, 2023 through JUNE 30, 2024*

Fish and Game Code Section 70 defines "Resident" as any person who has resided continuously in the State of California for six months or more immediately prior to the date of their application for a license or permit, any person on active military duty with the Armed Forces of the United States or auxiliary branch thereof, or any person enrolled in the Job Corps established pursuant to Section 2883 of Title 29 of the United States Code.

Fish and Game Code Section 86 defines "Take" as hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture or kill.

License fees include a 3% nonrefundable application fee, not to exceed $7.50 per item.

Licenses issued from license agents include a 5% nonrefundable license agent handling fee.

## Hunting Licenses

| Title | Fee | Description |
|---|---|---|
| Resident Hunting License | $58.58 | Required for any resident 16 years of age or older who takes birds or mammals. |

Exhibit 6
DX0068

| Title | Fee | Description |
|-------|-----|-------------|
| Nonresident Hunting License | $204.69 | Required for any nonresident 16 years of age or older who takes birds or mammals. |
| Junior Hunting License | $15.38 | Required for any resident or nonresident less than 16 years of age who takes birds or mammals. To qualify, hunter must be less than 16 years of age at the beginning of the license year (July 1). |
| One-Day Nonresident Hunting License | $28.08 | **IMPORTANT!** This license is only available for nonresidents taking resident and migratory game birds on Licensed Game Bird Clubs (Upland Game Bird Validation is also required) or Licensed Domesticated Migratory Game Bird Shooting Areas (Federal Duck Stamp and California Duck Validation are also required). This license is only available for purchase online or at any CDFW License Sales Offices. |
| Two-Day Nonresident Hunting License | $58.58 | Starting with the 2023-2024 hunting license year, a Two-Day Nonresident Hunting License allows a nonresident 16 years of age or older to take resident and migratory game birds, resident small game mammals, wild pigs, nongame mammals and furbearers for two consecutive days. Additional validations and tags may be required for certain species. IMPORTANT! This license is NOT valid for deer, bear, elk, pronghorn antelope, or bighorn sheep. |
| Disabled Veteran Reduced Fee Hunting License | $9.01 at CDFW Offices $9.46 from License Agents | Available for any resident or nonresident honorably discharged disabled veteran with a 50 percent or greater service-connected disability. After you prequalify for your first Disabled Veteran Reduced Fee Hunting License, you can purchase a disabled veteran license anywhere licenses are sold. Disabled Veteran Reduced Fee Hunting License |

Exhibit 6
DX0069

| Title | Fee | Description |
|---|---|---|
| Recovering Service Member Reduced-Fee Hunting License | $9.01 at CDFW Offices $9.46 from License Agents | Available to any recovering service member. A recovering service member is defined as a member of the armed forces, including a member of the National Guard or a Reserve, who is undergoing medical treatment, recuperation or therapy and is in an outpatient status while recovering from a serious injury or illness related to the member's military service. After you prequalify for your Recovering Service Member Reduced-Fee Hunting License, you can purchase a recovering service member hunting license anywhere licenses are sold.  Recovering Service Member Reduced-Fee Hunting License |
| Duplicate Hunting License | $12.96 | Available Online, at any CDFW License Sales Offices and License Agents. |

# Big Game Tag Drawing Applications

**More information about Applying for the Big Game Tag Drawing**

Exhibit 6
DX0070

or Second-Deer
Tag Drawing
Application

| | | |
|---|---|---|
| Elk, Pronghorn Antelope and Bighorn Sheep Tag Drawing Applications | $8.13 per application | See the Big Game Hunting Digest for more information about the Big Game Drawing. |

# Big Game Tags

| Title | Fee | Description |
|---|---|---|
| Bear Tag | $30.81 Resident Junior $56.98 Resident $361.90 Nonresident | Resident and nonresident licensed hunters age 12 or older as of July 1 of the current license year, may purchase. One bear tag per license year. |
| Elk Tag | $25.41 Resident Junior $554.80 Resident $1,700.35 Nonresident | Resident and nonresident licensed hunters age 12 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Elk Tag Drawing Application per license year. |
| Pronghorn Antelope Tag | $25.41 Resident Junior $186.84 Resident $571.60 Nonresident | Resident and nonresident licensed hunters, age 12 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Pronghorn Tag Drawing Application per license year. |
| Bighorn Sheep Tag | $532.75 Resident $1,977.05 Nonresident | Resident and nonresident licensed hunters, age 16 or older as of July 1 of the current license year, may enter a drawing for this tag. Each person may submit only one Bighorn Sheep Tag Drawing Application per license year. Hunters can not apply as a party. Applicants can not apply if they have |

Exhibit 6
DX0071

| Title | Fee | Description |
|-------|-----|-------------|
| | | previously been issued a California Bighorn Sheep Tag through the Big Game Drawing. |
| Wild Pig Tag | $28.08 Resident $94.22 Nonresident | Resident and nonresident licensed hunters, 12 years of age or older at the time of application, may purchase an unlimited number of Wild Pig Tags. Tags are nonrefundable and nontransferable. |

# Bird Hunting Validations

| Title | Fee | Description |
|-------|-----|-------------|
| California Duck Validation | $37.29 | Required for any person taking waterfowl, excluding juniors hunting under the authority of a Junior Hunting License. |
| Upland Game Bird Validations | $23.25 | Required for any person taking upland game bird species, excluding juniors hunting under the authority of a Junior Hunting License. |
| Federal Duck Stamp | $25.00 | Required for any person hunting waterfowl. Hunters under the age of 16 are exempt from the Federal Duck Stamp requirement. Federal Duck Stamps are not sold at CDFW offices. Federal Duck Stamps can be purchased at many post offices and some license agents. More information about the Federal Duck Stamp (USFWS)⧉. |
| Harvest Information Program (HIP) Validation | NO FEE | Required for any person hunting ducks, dove, gallinules, geese, band-tailed pigeon, black brant, coots, and snipe. This validation is free to hunters who complete the Harvest Information Program (HIP) Survey. The validation is available where hunting licenses are sold. The HIP Validation is imprinted on your hunting license document when you answer the HIP Survey questions. If you hunt migratory game birds, verify that a HIP Validation has |

Exhibit 6
DX0072

| Title | Fee | Description |
|---|---|---|
| | | been printed on your hunting license. The HIP Survey provides wildlife biologists with data needed to make wildlife management decisions and formulate hunting seasons. More information about HIP⧉ |

# Passes for State-Operated Hunting Areas

| Title | Fee | Description |
|---|---|---|
| Type A One-Day Pass | $26.49 | Allows a licensed hunter to hunt on a Type A State-operated Wildlife Area for one day if space is available. Junior hunters are exempt from permit requirements. |
| Type A Two-Day Pass | $42.38 | Allows a licensed hunter to hunt on a Type A State-operated Wildlife Area. This pass may be used as follows: 1) by one person for any two authorized shoot days; or 2) by two persons on any one authorized shoot day. Junior hunters are exempt from pass requirements. |
| Type A Season Pass | $198.98 | Allows a licensed hunter unlimited season access to Type A and Type B State-operated Wildlife Areas for one person if space is available. Junior hunters are exempt from permit requirements. |
| Type B Season Pass | $66.70 | Allows a licensed hunter unlimited season access to Type B State-operated Wildlife Areas for one person if space is available. Junior hunters are exempt from pass requirements. |

# Reservation Applications for State-Operated Hunting Areas

Exhibit 6
DX0073

| Title | Fee | Description |
|---|---|---|
| Reservation Application | $1.34 per application | Allows a licensed hunter to apply for reservation drawings to hunt on State-operated Wildlife Areas. |

# Lifetime Hunting Licenses

| License Package | Fee | Description |
|---|---|---|
| Ages 0-9 | $679.75 | Available to any resident showing proof of completion of hunter education training. Lifetime hunting licensees receive an annual hunting license each year for life. |
| Ages 10-39 | $1,112.00 | Lifetime Hunting Packages must first be purchased from a CDFW License Sales Office. See Lifetime License application and information for more detail. |
| Ages 40-61 | $1,001.75 | **Note: Applicants for a Lifetime Hunting Package are not required to provide proof of hunter education at the time of purchase. However, proof of hunter education is required prior to the issuance of the lifetime hunting license.** |
| Ages 62+ | $679.75 | |
| Lifetime Bird Hunting Privilege Package | $394.50 | Lifetime licensees who purchase the Lifetime Bird Hunting Privilege Package receive Upland Game Bird and California Duck Validations each year for life. |
| Lifetime Big Game Hunting Privilege Package | $827.50 | Lifetime licensees who purchase the Big Game Hunting Privilege Package receive a First Deer Tag Application and five Wild Pig Tags each year for life. This privilege package may be purchased for applicants under 12 years of age. However, the tags cannot be redeemed until the applicant is 12 years of age or older. |

# Permits for Hunters with Disabilities

Exhibit 6
DX0074

| Title | Fee | Description |
|-------|-----|-------------|
| Mobility Impaired Disabled Persons Motor Vehicle Hunting License Application | NO FEE | Available to any resident or nonresident for mobility impaired disabled hunter who must use a motor vehicle to pursue game. A person must be either permanently or fully confined to a wheelchair, a single or double amputee above the knee or double amputee below the knee or depend upon the aid of a walker, crutches, etc. to walk. Certification from the hunter's physician is required. The license is only available from the CDFW's License and Revenue Branch.<br><br>Mobility Impaired Disabled Persons Motor Vehicle Hunting License (PDF Form). |
| Visually Disabled Muzzleloader Scope Permit | NO FEE | Available to any resident or nonresident visually impaired hunter having a permanent loss, significant limitation, or diagnosed disease or disorder, which substantially impairs the vision of a hunter, preventing the hunter from viewing and aligning the sights of a muzzle-loading rifle with the target in order to hunt deer. A visually disabled hunter may use a scope of no more than one power while hunting under the conditions of a muzzle-loading deer hunt tag. Certification from the hunter's physician or optometrist is required annually, except if the physician or optometrist indicated on the initial application that the hunter's disability is permanent the hunter will be able to provide a copy of their previously issued Visually Disabled Muzzleloader Scope Permit to renew the permit. The permit is only available from the CDFW's License and Revenue Branch.<br><br>Visually Disabled Muzzleloader Scope Permit Application (PDF Form). |
| Disabled Archer Permit | NO FEE | Available to any resident or nonresident hunter's having permanent loss, significant limitation, or diagnosed disease or disorder, which substantially impairs one or |

Exhibit 6
DX0075

| Title | Fee | Description |
|-------|-----|-------------|
| | | both upper extremities preventing a hunter to draw and hold a bow in a firing position. Allows the hunter to hunt with a crossbow or other device to draw and hold a bow in a firing position under the conditions of an archery tag or during archery season. Certification from the hunter's physician is required annually, except if the physician indicated on the initial application that the hunter's disability is permanent the hunter will be able to provide a copy of their previously issued Disabled Archer Permit to renew the permit. The permit is only available from the CDFW's License and Revenue Branch. |

Disabled Archer Permit Application (PDF Form).

# Duplicate Fees

| Title | Fee | Description |
|-------|-----|-------------|
| Duplicate Hunting License | $12.96 | Replaces a lost or stolen hunting license. |
| Duplicate Hunting Validation | $3.50 | (California Duck Validation and Upland Game Bird Validation) Replaces lost or stolen hunting validations. |
| Duplicate Big Game Tag | $12.96 | Replaces lost or stolen big game tags. Available only at CDFW license sales offices. Duplicate Big Game Tag Affidavit (PDF Form) |
| Duplicate Hunter Education Certificate | $8.13 | Replaces a lost or stolen Hunter Education Certificate. |

Exhibit 6
DX0076

# Related Information

- Available Deer Tags (PDF) ↗
- Big Game Tags and Drawings
- Certificate of Nonreceipt / CNR (PDF) ↗
- Collectible Stamps
- Free Hunt Days
- General Hunting Information
- Hunter Education Requirements
- Hunting Regulations
- Licensed Game Bird Clubs (PDF) ↗
- Search For a Licensed Guide (Fishing and Hunting)
- Waterfowl Hunting Reservations

**License and Revenue Branch**

P.O. Box 944209, Sacramento, CA 94244-2090 | Sales Offices

(916) 928-5805 | LRB@wildlife.ca.gov

Exhibit 6
DX0077

# EXHIBIT 7

Exhibit 7
DX0078



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Fees Reported by License Year

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | $ 39.50 | $ 40.25 | $ 41.50 | $ 42.50 | $ 43.00 | $ 43.50 | $ 43.50 | $ 43.50 | $ 44.75 | $ 46.25 |
| Lifetime Hunting* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Junior Hunting (Annual) | $ 10.25 | $ 10.50 | $ 10.75 | $ 11.00 | $ 11.25 | $ 11.50 | $ 11.50 | $ 11.50 | $ 11.75 | $ 12.25 |
| Lifetime Junior Hunting* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Disabled Veteran Hunting | $ 6.25 | $ 6.25 | $ 6.50 | $ 6.75 | $ 6.75 | $ 6.75 | $ 6.75 | $ 6.75 | $ 7.00 | $ 7.25 |
| Recovering Service Member | $ - | $ - | $ - | $ 6.75 | $ 6.75 | $ 6.75 | $ 6.75 | $ 6.75 | $ 7.00 | $ 7.25 |
| Non-Resident Hunting (Annual) | $ 137.75 | $ 140.00 | $ 144.00 | $ 147.75 | $ 149.50 | $ 151.50 | $ 151.50 | $ 152.00 | $ 156.50 | $ 161.50 |
| Non-Resident 1-Day Hunting | $ 19.00 | $ 19.25 | $ 19.75 | $ 20.25 | $ 20.50 | $ 20.75 | $ 20.75 | $ 20.75 | $ 21.25 | $ 22.00 |
| Non-Resident 2-Day Hunting | $ 39.50 | $ 40.25 | $ 41.50 | $ 42.50 | $ 43.00 | $ 43.50 | $ 43.50 | $ 43.50 | $ 44.75 | $ 46.25 |
| | | | | | | | | | | |
| Resident First Deer Tag | $ 22.50 | $ 23.00 | $ 23.75 | $ 24.25 | $ 24.50 | $ 28.75 | $ 28.75 | $ 28.75 | $ 29.50 | $ 30.50 |
| Non-Resident First Deer Tag | $ 229.25 | $ 233.00 | $ 239.50 | $ 245.75 | $ 248.50 | $ 255.75 | $ 255.75 | $ 256.50 | $ 263.75 | $ 272.50 |
| Resident Second Deer Tag | $ 29.00 | $ 29.50 | $ 30.25 | $ 31.00 | $ 31.25 | $ 35.75 | $ 35.75 | $ 35.75 | $ 36.75 | $ 38.00 |
| Non-Resident Second Deer Tag | $ 229.25 | $ 233.00 | $ 239.50 | $ 245.75 | $ 248.50 | $ 255.75 | $ 255.75 | $ 256.50 | $ 263.75 | $ 272.50 |
| Lifetime Deer Tag* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Duplicate/Exchange Deer Tag | $ 8.75 | $ 9.00 | $ 9.25 | $ 9.50 | $ 9.50 | $ 9.75 | $ 9.75 | $ 9.75 | $ 10.00 | $ 10.25 |
| | | | | | | | | | | |
| Resident Pronghorn Antelope Tag | $ 126.25 | $ 128.25 | $ 131.75 | $ 135.25 | $ 136.75 | $ 138.50 | $ 138.50 | $ 138.75 | $ 142.75 | $ 147.50 |
| Resident Pronghorn Antelope Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $ 20.00 |
| Non-Resident Pronghorn Antelope Tag | $ 390.75 | $ 397.25 | $ 408.50 | $ 419.25 | $ 424.00 | $ 429.50 | $ 429.50 | $ 430.75 | $ 443.25 | $ 457.75 |
| Resident Bighorn Sheep Tag | $ 357.50 | $ 363.50 | $ 373.75 | $ 383.50 | $ 388.00 | $ 393.00 | $ 400.00 | $ 401.00 | $ 412.75 | $ 426.25 |
| Non-Resident Bighorn Sheep Tag | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,548.00 | $ 1,598.25 |
| Resident Elk Tag | $ 379.25 | $ 385.50 | $ 396.50 | $ 406.75 | $ 411.50 | $ 417.00 | $ 417.00 | $ 418.00 | $ 430.25 | $ 444.25 |
| Resident Elk Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $ 20.00 |
| Non-Resident Elk Tag | $ 1,172.50 | $ 1,192.25 | $ 1,226.00 | $ 1,258.00 | $ 1,272.50 | $ 1,289.25 | $ 1,289.25 | $ 1,292.75 | $ 1,330.50 | $ 1,373.75 |
| | | | | | | | | | | |
| Resident Antelope Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Non-Resident Antelope Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Resident Bighorn Sheep Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Non-Resident Bighorn Sheep Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Resident Elk Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Non-Resident Elk Tag Drawing Application | Not Avail. | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Elk, Antelope, Sheep Tag Return Processing Fee | $ 25.00 | 25.50 | 26.25 | 27.00 | 27.25 | 27.50 | 27.50 | 27.50 | 28.25 | 29.25 |
| Elk, Antelope, Sheep Drawing Applications | $ 7.50 | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above |
| | | | | | | | | | | |
| Fundraising Deer Tag Random Drawing | N/A | $ 5.00 | $ 5.25 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.75 | $ 6.00 |
| Fundraising Bighorn Sheep Tag Random Drawing | N/A | N/A | $ 5.25 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.75 | $ 6.00 |
| Fundraising Antelope Tag Random Drawing | N/A | N/A | $ 5.25 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.75 | $ 6.00 |
| Fundraising Elk Tag Random Drawing | N/A | $ 5.00 | $ 5.25 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.50 | $ 5.75 | $ 6.00 |
| | | | | | | | | | | |
| Resident Bear Tags | $ 34.75 | $ 35.25 | $ 36.25 | $ 37.25 | $ 37.75 | $ 42.25 | $ 42.25 | $ 42.25 | $ 43.25 | $ 44.75 |

Exhibit 7

DX0079



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Fees Reported by License Year

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Bear Tags (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $ 24.25 |
| Non-Resident Bear Tags | $ 241.75 | $ 245.75 | $ 252.75 | $ 259.25 | $ 262.25 | $ 269.75 | $ 269.75 | $ 270.50 | $ 278.25 | $ 287.50 |
| | | | | | | | | | | |
| Resident Wild Pig Tag | $ 19.00 | $ 19.25 | $ 19.75 | $ 20.25 | $ 20.50 | $ 20.75 | $ 20.75 | $ 20.75 | $ 21.25 | $ 22.00 |
| Non-Resident Wild Pig Tag | $ 63.50 | $ 64.50 | $ 66.25 | $ 68.00 | $ 68.75 | $ 69.75 | $ 69.75 | $ 70.00 | $ 72.00 | $ 74.25 |
| Lifetime Wild Pig Tags* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | |
| Bobcat Hunting Tags** | $ 14.00 | $ 14.25 | $ 2.95 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 |
| Bobcat Shipping Tags | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | $ 3.00 | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| Duck Validation | $ 17.25 | $ 17.50 | $ 18.00 | $ 18.50 | $ 18.75 | $ 19.00 | $ 19.00 | $ 19.00 | $ 19.50 | $ 20.25 |
| Collector Duck Stamp | $ 17.25 | $ 17.50 | $ 18.00 | $ 18.50 | $ 18.75 | $ 19.00 | $ 19.00 | $ 19.00 | $ 19.50 | $ 20.25 |
| Lifetime Duck Validation* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Waterfowl Reservation Application | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 |
| 1-Day Type A Wildlife Area Permit | $ 17.75 | $ 18.00 | $ 18.50 | $ 19.00 | $ 19.25 | $ 19.50 | $ 19.50 | $ 19.50 | $ 20.00 | $ 20.75 |
| 2-Day Type A Wildlife Area Pass | $ 28.75 | $ 29.25 | $ 30.00 | $ 30.75 | $ 31.00 | $ 31.50 | $ 31.50 | $ 31.50 | $ 32.50 | $ 33.50 |
| Type A Wildlife Area Season Pass | $ 133.50 | $ 135.75 | $ 139.50 | $ 143.25 | $ 145.00 | $ 147.00 | $ 147.00 | $ 147.50 | $ 151.75 | $ 156.75 |
| Type B Wildlife Area Season Pass | $ 44.50 | $ 45.25 | $ 46.50 | $ 47.75 | $ 48.25 | $ 49.00 | $ 49.00 | $ 49.25 | $ 50.75 | $ 52.50 |
| Upland Game Bird Validation | $ 8.00 | $ 8.25 | $ 8.50 | $ 8.75 | $ 8.75 | $ 8.75 | $ 8.75 | $ 8.75 | $ 9.00 | $ 9.25 |
| Collector Upland Game Bird Stamp | $ 8.00 | $ 8.25 | $ 8.50 | $ 8.75 | $ 8.75 | $ 8.75 | $ 8.75 | $ 8.75 | $ 9.00 | $ 9.25 |
| Lifetime Upland Game Bird Validation* | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Harvest Information Program Validation | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Exhibit 7
DX0080

# EXHIBIT 8

Exhibit 8
DX0081



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year

AS OF 10/31/2021

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | 251,572 | 246,701 | 248,262 | 251,046 | 248,473 | 238,655 | 238,495 | 233,531 | 229,320 | 219,076 |
| Lifetime Hunting | 4,987 | 4,676 | 4,858 | 4,942 | 5,203 | 5,277 | 5,585 | 5,845 | 6,042 | 6,262 |
| Junior Hunting (Annual) | 20,520 | 20,553 | 20,505 | 20,959 | 19,818 | 25,878 | 23,770 | 22,301 | 21,123 | 19,936 |
| Lifetime Junior Hunting | 691 | 649 | 739 | 769 | 855 | 1,107 | 1,144 | 1,180 | 854 | 1,238 |
| Disabled Veteran Hunting | 2,019 | 2,370 | 2,734 | 3,124 | 3,527 | 3,827 | 4,099 | 4,325 | 4,609 | 4,713 |
| Recovering Service Member | 0 | 0 | 4 | 7 | 12 | 7 | 7 | 6 | 3 | 3 |
| Non-Resident Hunting (Annual) | 3,711 | 3,915 | 3,965 | 3,736 | 3,707 | 3,720 | 3,768 | 3,923 | 3,893 | 3,813 |
| Non-Resident 1-Day Hunting | 565 | 171 | 144 | 236 | 253 | 246 | 224 | 279 | 244 | 278 |
| Non-Resident 2-Day Hunting | 3,164 | 3,231 | 3,007 | 3,022 | 2,911 | 3,033 | 2,907 | 3,271 | 3,188 | 2,997 |
| *Sub Total - Hunting Licenses* | *287,229* | *282,266* | *284,218* | *287,841* | *284,759* | *281,750* | *279,999* | *274,661* | *269,276* | *258,316* |
| Resident First Deer Tag | 139,283 | 140,633 | 139,895 | 143,697 | 143,126 | 143,047 | 142,022 | 142,021 | 139,763 | 137,839 |
| Non-Resident First Deer Tag | 978 | 975 | 974 | 942 | 962 | 997 | 1,078 | 1,122 | 1,157 | 1,233 |
| Resident Second Deer Tag | 40,600 | 38,933 | 38,639 | 40,172 | 38,649 | 40,490 | 41,498 | 42,312 | 39,791 | 40,927 |
| Non-Resident Second Deer Tag | 64 | 54 | 50 | 56 | 55 | 56 | 65 | 57 | 67 | 71 |
| Lifetime Deer Tag | 2,160 | 1,916 | 2,028 | 2,043 | 2,117 | 2,233 | 2,317 | 2,408 | 2,511 | 2,583 |
| Duplicate/Exchange Deer Tag | 566 | 215 | 240 | 191 | 222 | 238 | 153 | 165 | 141 | 154 |
| *Sub Total - Deer Tags* | *183,651* | *182,726* | *181,826* | *187,101* | *185,131* | *187,061* | *187,133* | *188,085* | *183,430* | *182,807* |
| Resident Pronghorn Antelope Tag | 231 | 240 | 240 | 198 | 197 | 252 | 270 | 241 | 245 | 227 |
| Resident Pronghorn Antelope Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 16 |
| Non-Resident Pronghorn Antelope Tag | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Resident Bighorn Sheep Tag | 21 | 25 | 23 | 18 | 12 | 11 | 18 | 18 | 17 | 25 |
| Non-Resident Bighorn Sheep Tag | 1 | 2 | 3 | 4 | 2 | 1 | 0 | 0 | 1 | 3 |
| Resident Elk Tag | 415 | 421 | 439 | 409 | 352 | 381 | 313 | 322 | 348 | 332 |
| Resident Elk Tag (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 24 |
| Non-Resident Elk Tag | 7 | 5 | 3 | 4 | 5 | 3 | 2 | 4 | 5 | 3 |
| *Sub Total - Antelope, Bighorn Sheep, Elk Tags* | *675* | *694* | *709* | *633* | *569* | *649* | *604* | *586* | *617* | *631* |
| Resident Antelope Tag Drawing Application | N/A | 22,715 | 23,039 | 21,929 | 22,636 | 24,018 | 24,599 | 26,223 | 26,618 | 26,652 |
| Non-Resident Antelope Tag Drawing Application | N/A | 282 | 301 | 307 | 351 | 400 | 435 | 496 | 519 | 547 |
| Resident Bighorn Sheep Tag Drawing Application | N/A | 12,179 | 12,756 | 12,329 | 12,706 | 13,521 | 14,103 | 15,443 | 16,111 | 16,350 |
| Non-Resident Bighorn Sheep Tag Drawing Application | N/A | 668 | 682 | 688 | 725 | 776 | 795 | 850 | 898 | 919 |
| Resident Elk Tag Drawing Application | N/A | 31,602 | 32,194 | 31,369 | 32,493 | 34,938 | 35,570 | 38,449 | 39,011 | 38,795 |
| Non-Resident Elk Tag Drawing Application | N/A | 474 | 489 | 517 | 573 | 620 | 699 | 775 | 820 | 877 |
| Elk, Antelope, Sheep Tag Return Processing Fee | 11 | 3 | 24 | 7 | 24 | 6 | 8 | 42 | 16 | 15 |
| Elk, Antelope, Sheep Drawing Applications | 61,034 | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above | See Above |
| *Sub Total - Antelope, Bighorn Sheep, Elk Draw* | *61,045* | *67,923* | *69,485* | *67,146* | *69,508* | *74,279* | *76,209* | *82,278* | *83,993* | *84,155* |
| Fundraising Deer Tag Random Drawing | N/A | 15,516 | 18,054 | 17,984 | 17,720 | 22,359 | 23,575 | 24,362 | 22,295 | 22,249 |
| Fundraising Bighorn Sheep Tag Random Drawing | N/A | N/A | 16,488 | 12,585 | 0 | 0 | 10,451 | 12,306 | 11,924 | 9,299 |
| Fundraising Antelope Tag Random Drawing | N/A | N/A | 6,548 | 6,335 | 5,927 | 7,988 | 8,840 | 9,129 | 8,503 | 8,787 |
| Fundraising Elk Tag Random Drawing | N/A | 12,020 | 13,696 | 13,110 | 14,152 | 17,232 | 18,033 | 16,243 | 21,410 | 19,726 |

Exhibit 8

DX0082



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 10/31/2021**

| Licenses | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Sub Total - Fundraising Drawing* | *0* | *27,536* | *54,786* | *50,014* | *37,799* | *47,579* | *60,899* | *62,040* | *64,132* | *60,061* |
| Resident Bear Tags | 24,576 | 24,954 | 24,625 | 23,328 | 26,481 | 27,483 | 27,172 | 27,752 | 27,809 | 26,428 |
| Resident Bear Tags (Junior) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1,226 |
| Non-Resident Bear Tags | 268 | 237 | 247 | 69 | 95 | 98 | 81 | 94 | 95 | 101 |
| *Sub Total - Bear* | *24,844* | *25,191* | *24,872* | *23,397* | *26,576* | *27,581* | *27,253* | *27,846* | *27,904* | *27,755* |
| Resident Wild Pig Tag | 48,125 | 49,461 | 50,956 | 51,986 | 49,076 | 44,082 | 42,942 | 41,433 | 39,549 | 38,539 |
| Non-Resident Wild Pig Tag | 1,218 | 1,016 | 1,197 | 1,192 | 1,085 | 1,051 | 1,041 | 866 | 902 | 825 |
| Lifetime Wild Pig Tags | 11,225 | 7,759 | 8,196 | 8,269 | 8,127 | 8,297 | 8,273 | 8,280 | 8,052 | 8,134 |
| *Sub Total - Wild Pig Tags* | *60,568* | *58,236* | *60,349* | *61,447* | *58,288* | *53,430* | *52,256* | *50,579* | *48,503* | *47,498* |
| Bobcat Hunting Tags** | 3,684 | 4,593 | 12,461 | 12,632 | 12,538 | 11,650 | 11,323 | 11,988 | 12,067 | 10,661 |
| Bobcat Shipping Tags | 1,078 | 1,525 | 1,577 | 1,483 | 804 | N/A | N/A | N/A | N/A | N/A |
| *Sub Total - Bobcat Tags* | *4,762* | *6,118* | *14,038* | *14,115* | *13,342* | *11,650* | *11,323* | *11,988* | *12,067* | *10,661* |
| Duck Validation | 67,551 | 67,637 | 68,806 | 68,095 | 67,929 | 66,603 | 66,570 | 64,531 | 63,855 | 61,794 |
| Collector Duck Stamp | 59 | 419 | 261 | 681 | 464 | 434 | 337 | 327 | 348 | 296 |
| Lifetime Duck Validation | 2,625 | 2,237 | 2,198 | 2,240 | 2,320 | 2,406 | 2,484 | 2,580 | 2,603 | 2,685 |
| Waterfowl Reservation Application | 740,522 | 759,168 | 833,433 | 876,700 | 860,488 | 1,006,387 | 1,037,814 | 1,026,383 | 1,012,301 | 982,488 |
| 1-Day Type A Wildlife Area Permit | 36,004 | 13,473 | 11,710 | 10,324 | 10,697 | 10,576 | 8,594 | 9,593 | 9,490 | 8,803 |
| 2-Day Type A Wildlife Area Pass | 3,071 | 13,184 | 14,771 | 15,300 | 17,898 | 17,803 | 14,467 | 15,171 | 14,660 | 14,217 |
| Type A Wildlife Area Season Pass | 3,822 | 5,404 | 5,476 | 5,411 | 4,413 | 4,553 | 5,210 | 4,941 | 4,827 | 4,963 |
| Type B Wildlife Area Season Pass | 785 | 958 | 962 | 778 | 576 | 611 | 746 | 797 | 752 | 751 |
| Upland Game Bird Validation | 175,505 | 173,373 | 173,590 | 175,616 | 171,121 | 160,541 | 158,646 | 156,449 | 154,656 | 145,085 |
| Collector Upland Game Bird Stamp | 30 | 130 | 87 | 165 | 133 | 183 | 149 | 107 | 82 | 95 |
| Lifetime Upland Game Bird Validation | 2,649 | 2,278 | 2,404 | 2,491 | 2,589 | 2,627 | 2,788 | 2,890 | 2,938 | 3,028 |
| Harvest Information Program Validation | 22,467 | 174,251 | 184,441 | 183,293 | 165,209 | 174,169 | 148,831 | 160,290 | 156,546 | 146,325 |
| *Sub Total - Game Bird Hunting* | *1,055,090* | *1,212,512* | *1,298,139* | *1,341,094* | *1,303,837* | *1,446,893* | *1,446,636* | *1,444,059* | *1,423,058* | *1,370,530* |
| Lifetime Hunting Package - Age 0 to 9 | 115 | 132 | 161 | 149 | 156 | 156 | 135 | 151 | 162 | 181 |
| Lifetime Hunting Package - Age 10 to 39 | 158 | 186 | 151 | 160 | 194 | 168 | 211 | 189 | 202 | 191 |
| Lifetime Hunting Package - Age 40 to 61 | 103 | 89 | 99 | 90 | 110 | 101 | 109 | 127 | 120 | 111 |
| Lifetime Hunting Package - Age 62 and Over | 40 | 50 | 44 | 47 | 53 | 51 | 36 | 61 | 52 | 54 |
| Lifetime Hunting Privilege Package - Big Game | 155 | 144 | 147 | 163 | 150 | 151 | 153 | 175 | 181 | 187 |
| Lifetime Hunting Privilege Package - Game Bird | 162 | 202 | 172 | 176 | 183 | 156 | 190 | 201 | 191 | 191 |
| *Sub Total - Lifetime Packages* | *733* | *803* | *774* | *785* | *846* | *783* | *834* | *904* | *908* | *915* |
| **TOTAL HUNTING** | **1,678,597** | **1,864,005** | **1,989,196** | **2,033,573** | **1,980,655** | **2,131,655** | **2,143,146** | **2,143,026** | **2,113,888** | **2,043,329** |

\***Lifetime License** statistics reflect the sale of lifetime packages since the implementation of the Automated License Data System in 2010.

\*\* **Bobcat Hunting Tags** issued prior to 2012 were sold as a set of 5 tags. 2012 and after tags were sold individually.

Exhibit 8

DX0083

# EXHIBIT 9

Exhibit 9
DX0084



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Fees Reported by License Year

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | $ 47.25 | $ 48.75 | $ 50.00 | $ 54.25 | - | - | - | - | - | - |
| Lifetime Hunting | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Junior Hunting (Annual) | $ 12.50 | $ 13.00 | $ 13.25 | $ 14.25 | - | - | - | - | - | - |
| Lifetime Junior Hunting | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Disabled Veteran Hunting | $ 7.50 | $ 7.75 | $ 8.00 | $ 8.75 | - | - | - | - | - | - |
| Recovering Service Member | $ 7.50 | $ 7.75 | $ 8.00 | $ 8.75 | - | - | - | - | - | - |
| Non-Resident Hunting (Annual) | $ 165.00 | $ 170.00 | $ 174.75 | $ 189.50 | - | - | - | - | - | - |
| Non-Resident 1-Day Hunting | $ 22.50 | $ 23.25 | $ 24.00 | $ 26.00 | - | - | - | - | - | - |
| Non-Resident 2-Day Hunting | $ 47.25 | $ 48.75 | $ 50.00 | $ 54.25 | - | - | - | - | - | - |
| Resident First Deer Tag | $ 31.00 | $ 32.00 | $ 32.75 | $ 35.75 | - | - | - | - | - | - |
| Non-Resident First Deer Tag | $ 278.50 | $ 287.00 | $ 294.75 | $ 319.75 | - | - | - | - | - | - |
| Resident Second Deer Tag | $ 38.75 | $ 40.00 | $ 41.00 | $ 44.50 | - | - | - | - | - | - |
| Non-Resident Second Deer Tag | $ 278.50 | $ 287.00 | $ 294.75 | $ 319.75 | - | - | - | - | - | - |
| Lifetime Deer Tag | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Duplicate/Exchange Deer Tag | $ 10.50 | $ 10.75 | $ 11.00 | $ 12.00 | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag | $ 150.75 | $ 155.25 | $ 159.50 | $ 173.00 | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag (Junior) | $ 20.50 | $ 21.25 | $ 21.75 | $ 23.50 | - | - | - | - | - | - |
| Non-Resident Pronghorn Antelope Tag | $ 467.75 | $ 482.00 | $ 495.25 | $ 537.25 | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag | $ 435.75 | $ 449.00 | $ 461.25 | $ 500.25 | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag | $ 1,633.50 | $ 1,683.25 | $ 1,729.25 | $ 1,875.75 | - | - | - | - | - | - |
| Resident Elk Tag | $ 454.00 | $ 467.75 | $ 480.50 | $ 521.25 | - | - | - | - | - | - |
| Resident Elk Tag (Junior) | $ 20.50 | $ 21.25 | $ 21.75 | $ 23.50 | - | - | - | - | - | - |
| Non-Resident Elk Tag | $ 1,404.00 | $ 1,446.75 | $ 1,486.25 | $ 1,612.25 | - | - | - | - | - | - |
| Resident Antelope Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Non-Resident Antelope Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Resident Elk Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Non-Resident Elk Tag Drawing Application | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | - | - | - | - | - | - |
| Elk, Antelope, Bighorn Sheep Tag Return Fee | $ 30.00 | $ 31.00 | $ 31.50 | $ 34.50 | - | - | - | - | - | - |
| Fundraising Deer Tag Random Drawing | $ 6.25 | $ 6.50 | $ - | $ - | - | - | - | - | - | - |

Exhibit 9



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Fees Reported by License Year

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Fundraising Bighorn Sheep Tag Random Drawing | $ 6.25 | $ 6.50 | $ - | $ - | - | - | - | - | - | - |
| Fundraising Antelope Tag Random Drawing | $ 6.25 | $ 6.50 | $ - | $ - | - | - | - | - | - | - |
| Fundraising Elk Tag Random Drawing | $ 6.25 | $ 6.50 | $ - | $ - | - | - | - | - | - | - |
| Resident Bear Tags | $ 45.75 | $ 47.25 | $ 48.50 | $ 52.75 | - | - | - | - | - | - |
| Resident Bear Tags (Junior) | $ 24.75 | $ 25.75 | $ 26.25 | $ 28.50 | - | - | - | - | - | - |
| Non-Resident Bear Tags | $ 293.75 | $ 302.75 | $ 311.00 | $ 337.50 | - | - | - | - | - | - |
| Resident Wild Pig Tag | $ 22.50 | $ 23.25 | $ 24.00 | $ 26.00 | - | - | - | - | - | - |
| Non-Resident Wild Pig Tag | $ 76.00 | $ 78.25 | $ 80.50 | $ 87.25 | - | - | - | - | - | - |
| Lifetime Wild Pig Tags | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Duck Validation * | $ 20.75 | $ 21.50 | $ 32.00 | $ 34.50 | - | - | - | - | - | - |
| Collector Duck Stamp | $ 20.75 | $ 21.50 | $ 22.00 | $ 23.75 | - | - | - | - | - | - |
| Lifetime Duck Validation | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Waterfowl Reservation Application | $ 1.25 | $ 1.25 | $ 1.25 | $ 1.25 | - | - | - | - | - | - |
| 1-Day Type A Wildlife Area Permit | $ 21.25 | $ 22.00 | $ 22.50 | $ 24.50 | - | - | - | - | - | - |
| 2-Day Type A Wildlife Area Pass | $ 34.25 | $ 35.25 | $ 36.25 | $ 39.25 | - | - | - | - | - | - |
| Type A Wildlife Area Season Pass | $ 160.25 | $ 165.25 | $ 169.75 | $ 184.25 | - | - | - | - | - | - |
| Type B Wildlife Area Season Pass | $ 53.75 | $ 55.50 | $ 57.00 | $ 61.75 | - | - | - | - | - | - |
| Upland Game Bird Validation * | $ 9.50 | $ 9.75 | $ 20.00 | $ 21.50 | - | - | - | - | - | - |
| Collector Upland Game Bird Stamp | $ 9.50 | $ 9.75 | $ 10.00 | $ 10.75 | - | - | - | - | - | - |
| Lifetime Upland Game Bird Validation | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Harvest Information Program Validation | $ - | $ - | $ - | $ - | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 0 to 9 | $ 554.75 | $ 571.75 | $ 587.25 | $ 637.00 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 10 to 39 | $ 911.50 | $ 939.25 | $ 965.00 | $ 1,046.75 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 40 to 61 | $ 820.50 | $ 845.50 | $ 868.50 | $ 942.25 | - | - | - | - | - | - |
| Lifetime Hunting Package - Age 62 and Over | $ 554.75 | $ 571.75 | $ 587.25 | $ 637.00 | - | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Big Game | $ 676.50 | $ 697.25 | $ 716.25 | $ 777.00 | - | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Game Bird | $ 319.25 | $ 329.00 | $ 338.00 | $ 366.75 | - | - | - | - | - | - |

* A $10 fee increase occurred in 2022 (AB-614).

Exhibit 9
DX0086

# EXHIBIT 10

Exhibit 10
DX0087

 CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2024**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Hunting (Annual) | 247,185 | 231,047 | 223,491 | 216,142 | - | - | - | - | - | - |
| Lifetime Hunting | 6,924 | 7,066 | 7,393 | 7,569 | - | - | - | - | - | - |
| Junior Hunting (Annual) | 19,132 | 16,977 | 15,581 | 14,365 | - | - | - | - | - | - |
| Lifetime Junior Hunting | 1,053 | 1,098 | 1,090 | 1,109 | - | - | - | - | - | - |
| Disabled Veteran Hunting | 5,084 | 5,004 | 5,050 | 5,110 | - | - | - | - | - | - |
| Recovering Service Member | 6 | 3 | 2 | 1 | - | - | - | - | - | - |
| Non-Resident Hunting (Annual) | 3,907 | 4,374 | 4,674 | 4,046 | - | - | - | - | - | - |
| Non-Resident 1-Day Hunting | 342 | 385 | 359 | 311 | - | - | - | - | - | - |
| Non-Resident 2-Day Hunting | 2,643 | 2,887 | 3,033 | 2,999 | - | - | - | - | - | - |
| *Sub Total - Hunting Licenses* | *286,276* | *268,841* | *260,673* | *251,652* | - | - | - | - | - | - |
| Resident First Deer Tag | 143,891 | 141,555 | 138,910 | 137,317 | - | - | - | - | - | - |
| Non-Resident First Deer Tag | 1,292 | 1,442 | 1,581 | 1,663 | - | - | - | - | - | - |
| Resident Second Deer Tag | 43,806 | 43,810 | 44,908 | 43,710 | - | - | - | - | - | - |
| Non-Resident Second Deer Tag | 62 | 94 | 115 | 139 | - | - | - | - | - | - |
| Lifetime Deer Tag | 2,722 | 2,811 | 2,921 | 3,076 | - | - | - | - | - | - |
| Duplicate/Exchange Deer Tag | 86 | 122 | 129 | 93 | - | - | - | - | - | - |
| *Sub Total - Deer Tags* | *191,859* | *189,834* | *188,564* | *185,998* | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag | 195 | 129 | 183 | 183 | - | - | - | - | - | - |
| Resident Pronghorn Antelope Tag (Junior) | 15 | 15 | 15 | 16 | - | - | - | - | - | - |
| Non-Resident Pronghorn Antelope Tag | 1 | 1 | 1 | 1 | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag | 25 | 26 | 26 | 23 | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag | 2 | 3 | 3 | 3 | - | - | - | - | - | - |
| Resident Elk Tag | 255 | 217 | 306 | 381 | - | - | - | - | - | - |
| Resident Elk Tag (Junior) | 12 | 16 | 14 | 16 | - | - | - | - | - | - |
| Non-Resident Elk Tag | 2 | 2 | 2 | 5 | - | - | - | - | - | - |
| *Sub Total - Antelope, Bighorn Sheep, Elk Tags* | *507* | *409* | *550* | *628* | - | - | - | - | - | - |
| Resident Antelope Tag Drawing Application | 29,841 | 29,854 | 30,391 | 30,267 | - | - | - | - | - | - |
| Non-Resident Antelope Tag Drawing Application | 656 | 729 | 830 | 898 | - | - | - | - | - | - |
| Resident Bighorn Sheep Tag Drawing Application | 18,652 | 18,672 | 19,107 | 19,094 | - | - | - | - | - | - |
| Non-Resident Bighorn Sheep Tag Drawing Application | 1,015 | 1,084 | 1,186 | 1,248 | - | - | - | - | - | - |

Exhibit 10
DX0088



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2024**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| Resident Elk Tag Drawing Application | 44,273 | 44,503 | 44,364 | 44,442 | - | - | - | - | - | - |
| Non-Resident Elk Tag Drawing Application | 998 | 1,092 | 1,247 | 1,330 | - | - | - | - | - | - |
| Elk, Antelope, Bighorn Sheep Tag Return Fee | 97 | 142 | 27 | 18 | - | - | - | - | - | - |
| *Sub Total - Antelope, Bighorn Sheep, Elk Drawing* | *95,532* | *96,076* | *97,152* | *97,297* | - | - | - | - | - | - |
| | | | | | | | | | | |
| Fundraising Deer Tag Random Drawing | 27,473 | 61,753 | 0 | | - | - | - | - | - | - |
| Fundraising Bighorn Sheep Tag Random Drawing | 16,557 | 15,643 | 0 | - | - | - | - | - | - | - |
| Fundraising Antelope Tag Random Drawing | 10,011 | 9,210 | 0 | - | - | - | - | - | - | - |
| Fundraising Elk Tag Random Drawing | 20,906 | 23,333 | 0 | - | - | - | - | - | - | - |
| *Sub Total - Fundraising Drawing* | *74,947* | *109,939* | *0* | - | - | - | - | - | - | - |
| | | | | | | | | | | |
| Resident Bear Tags | 28,521 | 29,539 | 31,230 | 30,625 | - | - | - | - | - | - |
| Resident Bear Tags (Junior) | 1,729 | 1,758 | 1,799 | 1,643 | - | - | - | - | - | - |
| Non-Resident Bear Tags | 138 | 150 | 221 | 186 | - | - | - | - | - | - |
| *Sub Total – Bear Tags* | *30,388* | *31,447* | *33,250* | *32,454* | - | - | - | - | - | - |
| | | | | | | | | | | |
| Resident Wild Pig Tag | 44,624 | 41,107 | 38,989 | 30,969 | - | - | - | - | - | - |
| Non-Resident Wild Pig Tag | 1,000 | 941 | 1,063 | 551 | - | - | - | - | - | - |
| Lifetime Wild Pig Tags | 8,299 | 8,436 | 8,433 | 8,324 | - | - | - | - | - | - |
| *Sub Total - Wild Pig Tags* | *53,923* | *50,484* | *48,485* | *39,844* | - | - | - | - | - | - |
| | | | | | | | | | | |
| Duck Validation * | 69,631 | 66,686 | 62,228 | 63,086 | - | - | - | - | - | - |
| Collector Duck Stamp | 279 | 315 | 59 | 27 | - | - | - | - | - | - |
| Lifetime Duck Validation | 2,864 | 2,933 | 3,010 | 3,177 | - | - | - | - | - | - |
| Waterfowl Reservation Application | 1,238,138 | 1,240,782 | 1,065,148 | 1,133,120 | - | - | - | - | - | - |
| 1-Day Type A Wildlife Area Permit | 10,102 | 9,756 | 10,157 | 11,372 | - | - | - | - | - | - |
| 2-Day Type A Wildlife Area Pass | 19,040 | 13,784 | 13,426 | 13,054 | - | - | - | - | - | - |
| Type A Wildlife Area Season Pass | 5,804 | 5,925 | 5,194 | 5,329 | - | - | - | - | - | - |
| Type B Wildlife Area Season Pass | 930 | 678 | 633 | 674 | - | - | - | - | - | - |
| Upland Game Bird Validation * | 162,911 | 151,574 | 138,372 | 131,467 | - | - | - | - | - | - |
| Collector Upland Game Bird Stamp | 77 | 98 | 37 | 19 | - | - | - | - | - | - |
| Lifetime Upland Game Bird Validation | 3,216 | 3,295 | 3,443 | 3,573 | - | - | - | - | - | - |
| Harvest Information Program Validation | 156,879 | 143,894 | 134,601 | 131,209 | - | - | - | - | - | - |

Exhibit 10



# CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE

## Hunting

Items Reported by License Year
**AS OF 1/31/2024**

| Licenses | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Sub Total - Game Bird Hunting* | *1,669,871* | *1,639,720* | *1,436,308* | *1,496,107* | *-* | *-* | *-* | *-* | *-* | *-* |
| Lifetime Hunting Package - Age 0 to 9 | 258 | 226 | 215 | 229 | 9 | - | - | - | - | - |
| Lifetime Hunting Package - Age 10 to 39 | 190 | 227 | 206 | 194 | 14 | - | - | - | - | - |
| Lifetime Hunting Package - Age 40 to 61 | 143 | 169 | 150 | 140 | 5 | - | - | - | - | - |
| Lifetime Hunting Package - Age 62 and Over | 49 | 59 | 65 | 51 | 6 | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Big Game | 228 | 223 | 225 | 195 | 13 | - | - | - | - | - |
| Lifetime Hunting Privilege Package - Game Bird | 254 | 278 | 291 | 270 | 17 | - | - | - | - | - |
| *Sub Total – Lifetime Packages* | *1,122* | *1,182* | *1,152* | *1,079* | *64* | *-* | *-* | *-* | *-* | *-* |
| **TOTAL HUNTING** | **2,404,425** | **2,387,932** | **2,066,134** | **2,105,059** | **64** | **-** | **-** | **-** | **-** | **-** |

* A $10 fee increase occurred in 2022 (AB-614).

Exhibit 10
DX0090

# EXHIBIT 11

Exhibit 11
DX0091

# Hunting Licenses and Tags

| Items & Fees | Tag Reporting | Reduced-Fee | Forms |
|---|---|---|---|

| FAQs | Exchanges, Returns, Preference Points |
|---|---|

# Frequently Asked Questions

## General License Questions

### Hunter Education

**Q: I lost my California Hunter Education Certificate. How can I get a copy?**

A: Duplicate hunter education certificates can be issued to any person who completed and passed a hunter education class after 1989. If the student took the class after that date, they should contact their nearest CDFW License Sales Office to obtain a duplicate.

**CDFW does not have records prior to 1989**. If the class was completed prior to 1989, the hunter should contact the original instructor, club, or organization where the course was taught to obtain a duplicate. **If the hunter is unable to obtain a duplicate through these means, they will have to repeat the course.**

**Q: Who must show proof of hunter education when applying for a California hunting license?**

A: California requires hunter education training for **ANYONE** who has not formerly held a California hunting license, who does not have a hunter education certificate of completion, or who does not have a current, valid, hunting license or a hunting license issued in either of the two previous years from any state, province, European Country or South Africa.

**Q: Where can I find information about Hunter Safety/Education classes?**

Exhibit 11
DX0092

A: Visit CDFW's California Hunter Education web page or call your nearest Hunter Education District Staff.

**Q: How old do you have to be to take a hunter education course?**

A: There isn't a minimum age requirement to take the course, but young children may find the course demanding. A Hunter Education Instructor may be able help you decide whether your child is old enough to take the course.

**Q: Can I take a hunter education course online?**

A: Yes. There are three different class format options approved by the California Hunter Education Program, one of which is an online-only option. For information about the different class format options and earning a California hunter education certificate, please visit CDFW's California Hunter Education web page.

**Q: I don't have time to take a California Hunter Education course. What can I do?**

A: CDFW offers a comprehensive equivalency testing program at CDFW Offices. You may request information on this method of testing from the regional offices. There is a non-refundable, administrative fee required to take the examination. If you fail the examination, you must take a hunter education class to become certified. **Warning!** Not all states accept the equivalency certificate as proof of hunter education. All states will accept the certificate of completion that is awarded upon completion of a hunter education class.

**Q: Will you accept a Hunter Education Certificate from another state?**

A: Yes.

**Q: I have a hunting license from another country. Why won't you accept it as proof of hunter education?**

A: CDFW's Hunter Education Program Administrator determines which countries provide acceptable hunter education training. You may contact him by email at Robert.Pelzman@wildlife.ca.gov for more information.

**Q: What will I learn in the Hunter Education Course and how long will it take?**

A: The Hunter Education Course consists of a minimum of 10 hours of classroom, homework, and field instruction in the following areas: firearms safety and handling, sportsmanship and ethics, wildlife

Exhibit 11
DX0093

management and conservation, archery, black powder, wildlife identification, game care, first aid, and survival. After a student has successfully completed the course of instruction and passed the final examination, they are awarded a Certificate of Completion. Parents are encouraged to participate with their children in the course and its related activities. There is not a minimum age requirement to take the course, but young children may find the course demanding.

A fee may not be charged for an instructor's service; however, fees may be used to cover the purchase of training aids such as slides, flip charts, targets, and other training aids. The Hunter Education Instructor makes the final decision in determining whether a student is qualified to receive a Certificate of Completion. A student who is unsafe, or fails to demonstrate good sportsmanship will not be issued a Certificate of Completion.

**Q: Are senior citizens exempt from having to take a hunter education course?**

A: No.

**Q: Is a law enforcement officer (active duty, reserve or retired military) required to take a hunter education course even if he/she had firearms training?**

A: Yes. All first time California hunters must successfully complete a hunter education training course or pass an equivalency exam. Visit the CDFW's California Hunter Education web page for more information.

| Pre-Season Tag Returns |
| --- |
| Post Season Tag Returns |

# Related Information

- Available Deer Tags (PDF) ↗
- Big Game Tags and Drawings
- Certificate of Nonreceipt / CNR (PDF) ↗
- Collectible Stamps

Exhibit 11
DX0094

- [Free Hunt Days](#)
- [General Hunting Information](#)
- [Hunter Education Requirements](#)
- [Hunting Regulations](#)
- [Licensed Game Bird Clubs (PDF)](#)⧉
- [Search For a Licensed Guide (Fishing and Hunting)](#)
- [Waterfowl Hunting Reservations](#)

### License and Revenue Branch

P.O. Box 944209, Sacramento, CA 94244-2090 | Sales Offices

(916) 928-5805 | LRB@wildlife.ca.gov

Exhibit 11
DX0095

# EXHIBIT 12

Exhibit 12
DX0096



Login     About CDFW     Contact


California Department of
**Fish and Wildlife**

Home ⋮ Hunter Education

# California Hunter Education

In an effort to raise safety and conservation awareness, California's first hunter education law was enacted in 1954. California requires hunter education training for those who have never held a California hunting license, who do not have a hunter education certificate, or who do not have a hunting license from another state or province issued within the past two years. Students may choose between three class format options. Classes are offered throughout the State by more than 1,000 certified volunteer instructors, all dedicated to keeping hunting safe, ethical, and available to all Californians.

---

### Option 1: Traditional Hunter Education Courses

The Traditional Hunter Education Course consists of a minimum of ten hours of classroom, homework, and field instruction in the following areas: firearms safety and handling, sportsmanship and ethics, wildlife management and conservation, archery, black powder, wildlife identification, game care, first aid, and survival. After a student has successfully completed the course of instruction and passed the final examination, they are awarded a Certificate of Completion.

The Traditional Course allows for individual interaction with the instructor. The Traditional Course is most often preferred by first time hunters. See more information about the Traditional Course.

- **Browse / Register for a Traditional Classes** ⧉
- **Navegar / Registrarse Para Classes Trandicionales (Español)** ⧉

### Option 2: Online Course and Follow-up Class (Hybrid Format)

### Option 3: Online Only Certification Course

Exhibit 12
DX0097

# Advanced Hunter Education



## Bow Hunting Classes⧉

### Notes to Parents

- If the student is under 18 years of age, the required Student Consent form (PDF Form) must be signed by the parent or guardian.
- Parents or guardians are encouraged to attend with young students, especially those younger than age 16, to help define new words or provide additional mentoring during and after class.
- Generally, parents/guardians will not be allowed to assist students while taking the required exam.
- The Online Course and Follow-up class is designed for students 12 years and older.
- Questions regarding our program? See Frequently Asked Questions.

The Hunter Education Program, as a state mandated, federally funded program, must be made available to all persons. No one may be refused training, certification, or otherwise discriminated against because of age, race, color, creed, sex, sexual orientation, religion, disability or national origin. Additionally, the program must be made available to all persons as required by the Americans with Disabilities Act. If a student needs reasonable accommodations, please contact the District Coordinator for your county. For American Sign Language (ASL) interpreting services, please contact the District Coordinator at least 60 days prior to the desired class date.

Exhibit 12
DX0098



Exhibit 12
DX0099

Hunter Education

**Traditional Classes** ⬀

**Home Study / Online Classes
(Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com ⬀

- Step 2: Follow-up Class ⬀

**Online Only Certification Course** ⬀

**Advanced Hunter Education**

**Bow Hunting Classes** ⬀

**Apprentice Hunts** ⬀

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

Exhibit 12
DX0100

*The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or* CivilRights@wildlife.ca.gov, *the* Equal Employment Opportunity Commission⧉, *or the* U.S. Department of the Interior⧉, *or contact their office as follows:*

*Chief, Public Civil Rights Division*
*Department of the Interior*
*1849 C Street NW*
*Washington, DC 20240*

## Hunter Education Program

P.O. Box 980215, West Sacramento, CA 95798-9939
HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⧉

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Exhibit 12
DX0101

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission⧉

Wildlife Conservation Board⧉

Register to Vote⧉

Accessibility

Conditions of Use

Privacy Policy

Site Map

Contact Us



© 2024 State of California

Exhibit 12
DX0102

# EXHIBIT 13

Exhibit 13
DX0103

⚠ See the **Emergency Closures** page before visiting a CDFW office, facility or property.



Login   About CDFW   Contact    


California Department of
**Fish and Wildlife**

Home ⋮ Hunter Education

# California Hunter Education

In an effort to raise safety and conservation awareness, California's first hunter education law was enacted in 1954. California requires hunter education training for those who have never held a California hunting license, who do not have a hunter education certificate, or who do not have a hunting license from another state or province issued within the past two years. Students may choose between three class format options. Classes are offered throughout the State by more than 1,000 certified volunteer instructors, all dedicated to keeping hunting safe, ethical, and available to all Californians.

| Option 1: Traditional Hunter Education Courses |
| --- |

Option 2: Online Course and Follow-up Class (Hybrid Format)

The online course, alone, is NOT a qualification for a hunter education certificate. Once you have completed an online course, you will still need to attend a 4-hour follow up class with a certified Hunter Education Instructor. Access is permitted to the 4-hour follow-up class only after a student has completed the written Home Study or Online component of the class.

**Step 1: Attend an Online Course.** Choose a course from one of the following providers:

- **Hunter-Ed.com California**⧉

**Step 2: Attend a 4-hour Follow-up Class.**

- **Browse/Register for a Follow-up Class**⧉

| Option 3: Online Only Certification Course |
| --- |

Exhibit 13
DX0104

## Advanced Hunter Education



What Are the Benefits of Attending In-Person Hunter Education Clinics and Cla...

## Bow Hunting Classes⧉

### Notes to Parents

- If the student is under 18 years of age, the required Student Consent form (PDF Form) must be signed by the parent or guardian.
- Parents or guardians are encouraged to attend with young students, especially those younger than age 16, to help define new words or provide additional mentoring during and after class.
- Generally, parents/guardians will not be allowed to assist students while taking the required exam.
- The Online Course and Follow-up class is designed for students 12 years and older.
- Questions regarding our program? See Frequently Asked Questions.

The Hunter Education Program, as a state mandated, federally funded program, must be made available to all persons. No one may be refused training, certification, or otherwise discriminated against because of age, race, color, creed, sex, sexual orientation, religion, disability or national origin. Additionally, the program must be made available to all persons as required by the Americans with Disabilities Act. If a student needs reasonable accommodations, please contact the District Coordinator for your county. For American Sign Language (ASL) interpreting services, please contact the District Coordinator at least 60 days prior to the desired class date.

Exhibit 13
DX0105



Exhibit 13
DX0106

Hunter Education

**Traditional Classes** ⧉

**Home Study / Online Classes
(Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com ⧉

- Step 2: Follow-up Class ⧉

**Online Only Certification Course** ⧉

**Advanced Hunter Education**

**Bow Hunting Classes** ⧉

**Apprentice Hunts** ⧉

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

Exhibit 13
DX0107

The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or CivilRights@wildlife.ca.gov, the Equal Employment Opportunity Commission⧉, or the U.S. Department of the Interior⧉, or contact their office as follows:

Chief, Public Civil Rights Division
Department of the Interior
1849 C Street NW
Washington, DC 20240

**Hunter Education Program**

P.O. Box 980215, West Sacramento, CA 95798-9939

HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⧉

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Exhibit 13
DX0108

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission

Wildlife Conservation Board

Register to Vote

Accessibility

Conditions of Use

Privacy Policy

Site Map

Contact Us

© 2024 State of California

Exhibit 13
DX0109

# EXHIBIT 14

Exhibit 14
DX0110

 See the **Emergency Closures** page before visiting a CDFW office, facility or property.

Login    About CDFW    Contact     



Home : Hunter Education : FAQ

# Frequently Asked Questions about California Hunter Education

---

**Who needs hunter education?**

In most states, hunters cannot hunt legally unless they have had some type of formal education in the proper handling of firearms. Today, California requires hunter education training for all persons who have not formerly held a California hunting license; who do not have a hunter education certificate of completion; or who do not hold a current hunting license, or a hunting license issued in either of the two previous hunting years, from another state or province.

---

How do I replace a lost certificate?

---

Can I take a hunter education class online?

---

How old do you have to be to take a hunter education class?

---

May I purchase a hunting license without taking a class?

---

What will I learn in the course? How long will it take?

---

I passed a Hunter Education course in Indiana and recently settled here in California. Does CA accept out-of-state Hunter Education certificates?

---

I am a 54-year-old Peace Officer who also served in the military. Would my age or either of these occupations exempt me from having to take the Hunter Education class?

---

Exhibit 14
DX0111



Hunter Education

Exhibit 14
DX0112

**Traditional Classes** ⬈

**Home Study / Online Classes
(Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com ⬈

- Step 2: Follow-up Class ⬈

**Online Only Certification Course** ⬈

**Advanced Hunter Education**

**Bow Hunting Classes** ⬈

**Apprentice Hunts** ⬈

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

---

*The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or CivilRights@wildlife.ca.gov, the Equal Employment Opportunity Commission ⬈, or the U.S. Department of the Interior ⬈, or contact their office as follows:*

*Chief, Public Civil Rights Division*
*Department of the Interior*
*1849 C Street NW*
*Washington, DC 20240*

Exhibit 14
DX0113

**Hunter Education Program**

P.O. Box 980215, West Sacramento, CA 95798-9939

HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⬈

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission⬈

Exhibit 14
DX0114

Wildlife Conservation Board⏷

Register to Vote⏷

Conditions of Use

Site Map

Accessibility

Privacy Policy

Contact Us

© 2024 State of California

Exhibit 14
DX0115

# EXHIBIT 15

Exhibit 15
DX0116

 

⚠ See the **Emergency Closures** page before visiting a CDFW office, facility or property.



Login    About CDFW    Contact    🔍



Home ⋮ Hunter Education ⋮ FAQ

# Frequently Asked Questions about California Hunter Education

| Who needs hunter education? |
| --- |

| How do I replace a lost certificate? |
| --- |

**Can I take a hunter education class online?**

Yes and no. Online classes are offered in California, but to obtain a valid hunter education certificate, you will ALSO need to attend a 4-hour home study / online follow-up class with a certified hunter education instructor. The online course will not get you a certificate. The benefit of taking an online class is having the ability to study at your own pace, and that you only have to take a 4-hour follow-up classroom session (versus a 10+ hour class). See more about Online Classes.

| How old do you have to be to take a hunter education class? |
| --- |

| May I purchase a hunting license without taking a class? |
| --- |

| What will I learn in the course? How long will it take? |
| --- |

| I passed a Hunter Education course in Indiana and recently settled here in California. Does CA accept out-of-state Hunter Education certificates? |
| --- |

| I am a 54-year-old Peace Officer who also served in the military. Would my age or either of these occupations exempt me from having to take the Hunter Education class? |
| --- |

Exhibit 15
DX0117



Hunter Education

Exhibit 15
DX0118

**Traditional Classes**⧉

**Home Study / Online Classes (Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com⧉

- Step 2: Follow-up Class⧉

**Online Only Certification Course**⧉

**Advanced Hunter Education**

**Bow Hunting Classes**⧉

**Apprentice Hunts**⧉

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

*The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or CivilRights@wildlife.ca.gov, the Equal Employment Opportunity Commission⧉, or the U.S. Department of the Interior⧉, or contact their office as follows:*

*Chief, Public Civil Rights Division*
*Department of the Interior*
*1849 C Street NW*
*Washington, DC 20240*

Exhibit 15
DX0119

## Hunter Education Program

P.O. Box 980215, West Sacramento, CA 95798-9939

HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⇗

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission⇗

Exhibit 15
DX0120

Wildlife Conservation Board↗

Register to Vote↗

Conditions of Use

Site Map

Accessibility

Privacy Policy

Contact Us

© 2024 State of California

Exhibit 15
DX0121

# EXHIBIT 16

Exhibit 16
DX0122

 ⚠ See the **Emergency Closures** page before visiting a CDFW office, facility or property.

Login    About CDFW    Contact    🔍  


California Department of
**Fish and Wildlife**

Home ⋮ Hunter Education ⋮ FAQ

# Frequently Asked Questions about California Hunter Education

| Who needs hunter education? |
| --- |

| How do I replace a lost certificate? |
| --- |

| Can I take a hunter education class online? |
| --- |

**How old do you have to be to take a hunter education class?**

There is not a minimum age requirement to take the course, but young children may find the course demanding. A Hunter Education Instructor may be able help you decide whether your child is old enough.

| May I purchase a hunting license without taking a class? |
| --- |

| What will I learn in the course? How long will it take? |
| --- |

| I passed a Hunter Education course in Indiana and recently settled here in California. Does CA accept out-of-state Hunter Education certificates? |
| --- |

| I am a 54-year-old Peace Officer who also served in the military. Would my age or either of these occupations exempt me from having to take the Hunter Education class? |
| --- |

Exhibit 16
DX0123



Hunter Education

Exhibit 16
DX0124

**Traditional Classes**⧉

**Home Study / Online Classes (Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com⧉

- Step 2: Follow-up Class⧉

**Online Only Certification Course**⧉

**Advanced Hunter Education**

**Bow Hunting Classes**⧉

**Apprentice Hunts**⧉

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

*The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or CivilRights@wildlife.ca.gov, the Equal Employment Opportunity Commission⧉, or the U.S. Department of the Interior⧉, or contact their office as follows:*

*Chief, Public Civil Rights Division*
*Department of the Interior*
*1849 C Street NW*
*Washington, DC 20240*

Exhibit 16
DX0125

**Hunter Education Program**

P.O. Box 980215, West Sacramento, CA 95798-9939

HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⧉

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission⧉

Exhibit 16
DX0126

Register to Vote⧉

Conditions of Use

Site Map

♿ Accessibility

Privacy Policy

Contact Us

© 2024 State of California

Exhibit 16
DX0127

# EXHIBIT 17

Exhibit 17
DX0128

 See the **Emergency Closures** page before visiting a CDFW office, facility or property.



Login    About CDFW    Contact     

Home ⋮ Hunter Education ⋮ FAQ

# Frequently Asked Questions about California Hunter Education

| Who needs hunter education? |
| How do I replace a lost certificate? |
| Can I take a hunter education class online? |
| How old do you have to be to take a hunter education class? |
| May I purchase a hunting license without taking a class? |

### What will I learn in the course? How long will it take?

The Hunter Education course consists of a minimum of ten hours of classroom, homework, and field instruction in the following areas: firearms safety and handling, sportsmanship and ethics, wildlife management and conservation, archery, black powder, wildlife identification, game care, first aid, and survival. After a student has successfully completed the course of instruction and passed the final examination, they are awarded a Certificate of Completion. Parents are encouraged to participate with their children in the course and its related activities. There is not a minimum age requirement to take the course, but young children may find the course demanding.

A fee may not be charged for an instructor's service; however, fees may be used to cover the purchase of training aids such as slides, flip charts, targets, and other training aids.

The Hunter Education Instructor makes the final decision in determining whether a student is qualified to receive a Certificate of Completion. A student who is unsafe, or fails to demonstrate good sportsmanship will not be issued a Certificate of Completion.

***The Ten Commandments of Firearms Safety***

Exhibit 17
DX0129

1. Treat every gun as if it were loaded.
2. Watch that Muzzle! Be able to control the direction of the muzzle at all times.
3. Be sure the barrel and action are clear of obstructions.
4. Be sure of your target before you pull the trigger.
5. Unload guns when not in use.
6. Never point a gun at anything you do not intend to shoot.
7. Never climb a fence or tree or jump a ditch with a loaded gun.
8. Never shoot a bullet at a flat, hard surface or water.
9. Store guns and ammunition separately, beyond the reach of children and careless adults.
10. Avoid alcoholic beverages and mind altering drugs before or during shooting.

I passed a Hunter Education course in Indiana and recently settled here in California. Does CA accept out-of-state Hunter Education certificates?

I am a 54-year-old Peace Officer who also served in the military. Would my age or either of these occupations exempt me from having to take the Hunter Education class?

Exhibit 17

DX0130



Hunter Education

Exhibit 17
DX0131

**Traditional Classes** ⬀

**Home Study / Online Classes (Hybrid Format)**
- Step 1: Select course from a provider: Hunter-Ed.com ⬀
- Step 2: Follow-up Class ⬀

**Online Only Certification Course** ⬀

**Advanced Hunter Education**

**Bow Hunting Classes** ⬀

**Apprentice Hunts** ⬀

**Frequently Asked Questions**
Who needs Hunter Education?
How do I get a duplicate certificate?

**Hunting Accident Statistics**

**Become an Instructor**

**Instructor Resources**

**Chronic Waste Disease**

**Contact Us**

---

*The agency receives federal funds. Under federal law, discrimination is prohibited on the basis of race, color, age, sex, national origin, disability, etc. If you believe you have been discriminated against in any program, activity or facility of this agency, please contact CDFW's CRO Officer at (916) 902-5577 or CivilRights@wildlife.ca.gov, the Equal Employment Opportunity Commission ⬀, or the U.S. Department of the Interior ⬀, or contact their office as follows:*

*Chief, Public Civil Rights Division*
*Department of the Interior*
*1849 C Street NW*
*Washington, DC 20240*

---

Exhibit 17
DX0132

**Hunter Education Program**

P.O. Box 980215, West Sacramento, CA 95798-9939

HunterEducation@wildlife.ca.gov | (916) 653-1235

About CDFW

Budget

Justice, Equity, Diversity, Inclusion

Law Enforcement

Organizational Structure

Strategic Vision⬀

Tribal Affairs

Opportunities

Employment

Grants

Public Meetings and Notices

Vendors/Contractors

Volunteer

Get in Touch

Contact CDFW

News Room

Public Records Act Requests

Regions

Related Agencies

Fish and Game Commission⬀

Exhibit 17
DX0133

Wildlife Conservation Board⧉

Register to Vote⧉

Conditions of Use

Site Map

♿ Accessibility

Privacy Policy

Contact Us

© 2024 State of California

Exhibit 17
DX0134

# EXHIBIT 18

Exhibit 18
DX0135

 

# Official California Hunter Safety Course Online



Take this California-approved course to complete your online hunter safety education. Hunter-ed.com is a delegated provider for the California Department of Fish and Wildlife.

**Get Started →**



Lifetime Card



Exhibit 18
DX0136



Do you need California Hunting Education?

You need education if you are a first-time hunter who will be buying a hunting license in California or you do not have a hunting license from another state or province issued within the last two years.

# How to Get your Hunter Education Certificate in **4 Easy Steps**

**Step 1**



est. 2–3 mins

## Sign Up

Sign up for a Hunter Ed account, pay for the official course, and get started. It only takes a few minutes.

**Step 2**



est. 3–4 hrs

## Study & Pass the Online Course



Exhibit 18
DX0137

Step 3



est. 1–5 mins

## Print Your Temp Card Immediately

After passing the online course, you're able to print your hunter education certificate immediately.

Step 4



est. 0 mins

## Go Hunting!

That's it. You're ready to buy your tag and hit the field.

Get Certified

## California Department of Fish and Wildlife Requirements

Exhibit 18
DX0138



ID to complete the course. Visit CDFW's Online License website to locate your existing GO ID or create a new one. Contact CDFW at 916-928-2537 or LRB@wildlife.ca.gov for assistance.

There is no minimum age requirement to take this online course.

You do not have to be a resident of California to take this online course.

## Get Certified

| Study Guide | ↗ |
|---|---|
| California Hunting Laws and Regulations | ↗ |
| California Hunting License | ↗ |
| Hunting Courses for Other States | ↗ |



## What Hunters Are Saying About Our Online Hunter Safety Courses

Hunter Ed has a rating of 4.8 out of 5 based on 192,286 ratings and reviews.

★ ★ ★ ★ ★

**Shannon N.**

Very well put together with both an audio and visual experience



Exhibit 18
DX0139



# What to Expect From Hunter Ed

## Live-Action, High-Definition Videos

Our course videos feature a combination of professional educators (who double as professional actors), entertaining storylines, and up-to-date scenarios that give you one of the most effective ways to learn safe hunting practices.



Watch this 73-second sample to see how we put you in the hunter's camo.

## Comprehensive Instruction in California Hunting Safety Education

This official training program is developed to meet the standards for Hunting safety education established by California. **Hunter Ed is the only safety course provider** that develops print materials on behalf of government agencies responsible for Hunting laws and regulations.

Exhibit 18
DX0140



# Learn Your Way on Any Device

Hunter Ed offers online courses that are fully mobile-friendly from start to finish. This safety course is designed to work on **your smartphone, tablet, laptop, or desktop computer**.



# Saved Progress

You may complete the course at your own pace. The course can be completed in one sitting or a little at a time over several days. Log in and out at any time, and we'll keep track of your progress. Most students finish the course in a few hours.



Exhibit 18
DX0141





California Department of Fish and Wildlife

1416 9th Street, Suite 1342-6A Sacramento, CA 95814

# Made in the U.S.A.

This California hunter safety course is proudly made to serve students, agencies, and organizations in the state of California and worldwide.

## How do I get my California Hunter Education Certificate?

### 1. Study and pass the California Department of Fish and Wildlife–Approved online course.

Study and pass the $24.95 course. Throughout the California Hunter Ed Course, you'll be tested on what you've learned.

### 2. Print your Hunter Education Certificate.

After successfully completing the online course, you'll be able to immediately print out your Hunter Education Certificate.

### 3. Get ready to go hunting!

Exhibit 18
DX0142



license or permit where required.

Get Started →

California Deer Season

Deer Season in California is divided into specific periods based on the hunting zone and the species of deer being hunted. California is home to many unique

Read More



## Hunt More Strategically

The HuntWise app combines pinpoint mapping features with accurate weather forecasting to provide hunters with the ideal tool to determine the best times and places to hunt all major North American game species. Complete your Hunter's Ed certification and you can get 50% off everything HuntWise PRO has to offer.

## You can take advantage of this offer during checkout.



Exhibit 18
DX0143







# Get protected by a leader in ATV insurance

Your homeowners policy won't cover your ATV if you ride off property. That's why Progressive offers ATV insurance, so you can roam worry-free. Getting this coverage is a smart decision, one that can help you cover costs if you get in an accident. And keep you exploring for years to come. Insure Your Passion®.

GET A QUOTE

Exhibit 18
DX0144





Let's Get Started!

# California Frequently Asked Questions

## Price and Payment

### How much does the California Hunter Ed Course cost?

The California Hunter Ed Course fee is $24.95.

Exhibit 18

DX0145



### Do you need California Hunting education?

You need education if you are a first-time hunter who will be buying a hunting license in California or you do not have a hunting license from another state or province issued within the last two years.

### What is the minimum age to take this online course?

There is no minimum age requirement to take this online course.

### Do I have to be a resident to take the California Hunter Ed Course?

You do not have to be a resident of California to take this online course.

## Course Approval and Acceptance

### Is the California Hunter Ed Course approved by the California Department of Fish and Wildlife?

The California Hunter Ed Course is approved and accepted by the California Department of Fish and Wildlife.

### Is my California Hunter Education Certificate accepted elsewhere?

All U.S. states, provinces, and other countries that have mandatory hunter education requirements will accept the California Hunter Education Certificate. Likewise, California will accept Hunter Education certifications that are issued by other jurisdictions that meet official IHEA-USA requirements. (This is known as "reciprocity.")

## Quizzes and/or Exams

### I failed a unit quiz. Have I failed the course?

If you fail a unit quiz, you can take it again until you pass. You must score at least 80% on the unit quizzes to pass.



Exhibit 18
DX0146



online course once you have passed the unit quizzes.

## About Your Certification

### What is the proof of online California Hunter Ed Course completion?

Once you pass and pay for the online course, you will be able to immediately print out the Hunter Education Certificate. This is your proof of online course completion, and it serves as your permanent certificate.

## Replacement of Lost or Damaged Documents

### How do I replace my Hunter Education Certificate if I've lost it or it has been damaged?

To replace a lost, destroyed, or damaged Hunter Education Certificate, go to https://www.wildlife.ca.gov/Hunter-Education/FAQ#29812903-how-do-i-replace-a-lost-certificate.

# Visiting another state?

 **Alabama**
Get Certified

 **Alaska**
Get Certified

 **Arizona**
Get Certified

 **Arkansas**
Get Certified

 **California**
Get Certified

 **Colorado**
Get Certified

Exhibit 18
DX0147



**Florida**
Get Certified

**Georgia**
Get Certified

**Hawaii**
Get Certified

**Idaho**
Get Certified

See More

---

# We're people, not robots.

Your Hunter Ed course comes with a dedicated customer service team made up of real people, not robots. We're here to provide assistance to you through all channels—phone, email, and chat.

**We're available to help you:**

Mon-Fri 8am to 8pm CST
Sat-Sun 8am to 5pm CST
1-800-830-2268 (toll free)



Hunter-ed.com is produced by Kalkomey Enterprises, LLC. Kalkomey is an official state-delegated provider that provides hunting education courses and certification and publishing hunting safety education materials.

Follow Us | Hunter Ed blog |     

# The California Hunter Ed Course



Exhibit 18
DX0148



accurate, interesting, and easy to understand.

Top ⬆    Log In    Select Another State Course    Home    Register    Partners
Today's Hunter

## More Online Recreational Safety Courses from Kalkomey

boat-ed®

bowhunter-ed™

crossbow-ed™

offroad-ed™

snowmobile-ed™

concealedcarry-ed™





DRONEcourse.com
Educating Operators Online

## Customer Support

We provide support Monday through Friday from 8AM to 8PM CST and Saturday and Sunday from 8AM to 5PM CST.

## Phone

1-800-830-2268

## About Kalkomey Enterprises, LLC

Kalkomey is the official provider of recreational safety education materials for all 50 states. We provide online boating and hunting and other recreational safety education. View press releases.

Hunter Ed is produced by Kalkomey Enterprises, LLC.

224 W. Campbell Rd. #512
Richardson, TX 75080

Exhibit 18
DX0149



kalkomey™ © 1998–2024 All rights reserved. Privacy Policy and Terms of Use.

Exhibit 18
DX0150

# EXHIBIT 19

Exhibit 19
DX0151

**You are looking at a preview of what's in <u>the timed course</u>.**

Register for the Course

# Study Guide for Hunting Education

---

▶ **Unit 1: Introduction to Hunter Education**

▶ **Unit 2: Know Your Firearm Equipment**

▶ **Unit 3: Basic Shooting Skills**

▶ **Unit 4: Basic Hunting Skills**

▶ **Unit 5: Primitive Hunting Equipment and Techniques**

▶ **Unit 6: Be a Safe Hunter**

▶ **Unit 7: Be a Responsible and Ethical Hunter**

▶ **Unit 8: Preparation and Survival Skills**

▶ **Unit 9: Understanding Wildlife**



Hunter-ed.com is produced by Kalkomey Enterprises, LLC. Kalkomey is an official state-delegated provider that provides hunting education courses and certification and publishing hunting safety education materials.

## Follow Us

Hunter Ed blog



Exhibit 19
DX0152

The California Hunter Ed Course

Hunter Ed is committed to Hunting education safety. We work with the California Department of Fish and Wildlife to produce Hunting safety education that's accurate, interesting, and easy to understand.

Top ↑    Log In    Select Another State Course    Home    Register    Partners    Today's Hunter

# More Online Recreational Safety Courses from Kalkomey

 boat-ed®

 bowhunter-ed™

 crossbow-ed™

 offroad-ed™

 snowmobile-ed™

 concealedcarry-ed™

ilearntoboat™

ilearntohunt™

 DRONEcourse.com
Educating Operators Online

## Customer Support

We provide support Monday through Friday from 8AM to 8PM CST and Saturday and Sunday from 8AM to 5PM CST.

## Phone

1-800-830-2268

## About Kalkomey Enterprises, LLC

Kalkomey is the official provider of recreational safety education materials for all 50 states. We provide online boating and hunting and other recreational safety education. View press releases.

Hunter Ed is produced by Kalkomey Enterprises, LLC.

Exhibit 19
DX0153

224 W. Campbell Rd. #512
Richardson, TX 75080
1-800-830-2268



© 2004–2024 All rights reserved. Privacy Policy and Terms of Use.

Exhibit 19
DX0154

# EXHIBIT 20

Exhibit 20
DX0155

Date of Hearing:  August 13, 2013
Counsel:              Shaun Naidu

ASSEMBLY  COMMITTEE  ON PUBLIC SAFETY
Tom Ammiano, Chair

SB 683 (Block) – As Amended:  August 7, 2013

<u>SUMMARY</u>:  Extends the safety certificate requirement for handguns to all firearms and requires the performance of a safe handling demonstration to receive a long gun.  Specifically, <u>this bill</u>:

1)  Starting January 1, 2015, extends the safety certificate requirement for handguns to all firearms and makes conforming changes.

2)  Requires long-gun recipients, except as specified, to perform a safe handling demonstration before receiving that firearm from a licensed firearm dealer.  Requires the Department of Justice (DOJ) to adopt regulations by January 1, 2015 establishing a long-gun safe-handling demonstration that includes, at a minimum, loading and unloading the long gun.

3)  Exempts individuals with valid current-season hunting licenses, or valid hunting licenses from the hunting season immediately preceding the calendar year, from the firearm safety certificate requirement when acquiring a firearm other than handguns.  This exemption is in addition to the current list of exemptions to the handgun safety certificate requirements.

4)  Exempts individuals with unexpired handgun safety certificates from the firearm safety certificate requirement when acquiring only handguns.

<u>EXISTING LAW</u>:

1)  Prohibits a dealer, except as specified, from delivering a handgun unless the person receiving the handgun presents to the dealer a valid handgun safety certificate.  (Penal Code Section 26840.)

2)  Punishes as a misdemeanor any person who purchases or receives any handgun, except as specified, without a valid handgun safety certificate or any person who sells, delivers, loans, or transfers any handgun, except as specified, to a person who does not have a valid handgun safety certificate.  (Penal Code Section 31615.)

3)  Requires the safety certificate applicant to complete and pass a written test prescribed by DOJ and administered by a DOJ-certified instructor.  The test must cover, but is not limited to, the following:

    a)  The laws applicable to carrying and handling firearms, particularly handguns;

    b)  The responsibilities of ownership of firearms, particularly handguns;

Exhibit 20
DX0156

   c) Current law as it relates to the sale and transfer of firearms laws;

   d) Current law as it relates to the permissible use of lethal force;

   e) What constitutes safe firearm storage;

   f) Risks associated with bringing handguns into the home; and,

   g) Prevention strategies to address issues associated with bringing firearms into the home. (Penal Code Section 31640.)

4) Authorizes a certified instructor who administers the handgun safety test to charge a fee of $25, $15 of which is to be paid to DOJ to cover DOJ's cost in carrying out and enforcing provisions relating to the handgun safety certificate and other specified provisions of law. (Penal Code Section 31650.)

5) Provides that DOJ shall develop handgun safety certificates, which expire 5 years after the date of issue, to be issued by DOJ-certified instructors to those persons who have complied with specified requirements. A handgun safety certificate shall include, but not be limited to, the following information:

   a) A unique handgun safety certificate identification number;

   b) The holder's full name;

   c) The holder's date of birth;

   d) The holder's driver's license or identification number;

   e) The holder's signature;

   f) The signature of the issuing instructor; and,

   g) The date of issuance. (Penal Code Section 31655.)

6) Exempts the following persons from the handgun safety certificate requirement:

   a) Any active or honorably-retired peace officer, as defined;

   b) Any active or honorably-retired deferral officer or law enforcement agent;

   c) Any reserve peace officer, as defined;

   d) Any person who has successfully completed the specified peace officer training course;

   e) A licensed firearms dealer, as specified;

   f) A federally-licensed collector, as specified;

Exhibit 20
DX0157

g)  A person to whom a firearm is being returned, where the person receiving the firearm is the owner of the firearm;

h)  A family member of a peace officer killed in the line who is obtaining the firearm of the slain officer;

i)  Any individual who has a valid concealed weapons permit, who is authorized to carry a loaded firearm, or who is the holder of a special weapons permit, as specified;

j)  An active or honorably-retired member of the United States Armed Forces, the National Guard, the Air National Guard, or the other active reserve components of the United States. (Penal Code Section 31700(a).)

FISCAL EFFECT:  Unknown

COMMENTS:

1)  Author's Statement:  According to the author, "SB 683 is about education and preventing unintended injuries. Currently anyone age 18 or older can buy a long gun without having to show that he or she understands how to safely use and properly store it in the home. Long guns can be just as dangerous as hand guns. And long gun laws are just as complicated as hand gun laws. So it makes sense to establish similar requirements to buy a long gun as those required to purchase a hand gun.

"The purpose of the current Handgun Safety Certificate is to ensure that persons who buy a handgun have a basic familiarity with the firearm and are aware of the laws that govern gun ownership. This bill expands this program by establishing the Firearm Safety Certificate which seeks to generate more responsible, law-abiding gun owners by requiring every purchaser to take a written objective test that covers California laws applicable to the handling of both hand guns and long guns, the responsibilities of firearm ownership, the private transfer of firearms, and safe firearm storage."

2)  Safety Certificate Background:  Beginning in 1993, possession of a handgun safety certificate was required to transfer firearms. The Department of Justice was required to create the requisite process to obtain a handgun safety certificate. Exemptions were provided for specified classes of persons who did not need to either successfully take the course or challenge the course with a specified exam.

Senate Bill 52 (Scott), Chapter 942, Statutes of 2001, repealed the basic firearms safety certificate scheme and replaced it with the more stringent handgun safety certificate scheme. SB 52 provided that, effective January 1, 2003, no person may purchase, transfer, receive, or sell a handgun without a Handgun Safety Certificate (HSC).

This bill would extend what currently is a requirement for handgun buyers to learn basic safety and laws regarding handguns to instead include this requirement to buyers of all firearms. The subjects covered would be:

a)  The laws applicable to carrying and handling firearms;

Exhibit 20
DX0158

    b)  The responsibilities of ownership of firearms;

    c)  Current law as it relates to the sale and transfer of firearms;

    d)  Current law as it relates to the permissible use of lethal force;

    e)  What constitutes safe firearm storage;

    f)  Risks associated with bringing a firearm into the home; and,

    g)  Prevention strategies to address issues associated with bringing firearms into the home.

3)  <u>Hunting License v. Firearm Safety Certificate</u>:  California requires any person hunting, pursuing, catching, capturing, killing, or attempting any of these actions on, birds or mammals to have a hunting license issued by this state. (Fish and Game Code (FGC) Sections 86 and 1054.2.) In order to obtain a California hunting license, the state "requires all first time resident hunters, regardless of age, to complete hunter education training or pass a comprehensive equivalency test before purchasing a hunting license." (California Department of Fish and Wildlife, *California Hunter Education Program* <http://www.dfg.ca.gov/huntered/> [as of Aug. 7, 2013]; FGC Sections 1053.5 and 3050.) Consequently, "[e]ach year approximately 30,000 students complete the state's ten-hour minimum hunter education course." (California Department of Fish and Wildlife, *California Hunter Education Program*, supra.) A hunting license generally is valid for one year from July 1 to June 30. (FGC Section 3037.) Additionally, California allows the issuance of a lifetime hunting license for state residents of any age. (FGC Section 3031.2.)

Topics covered by the hunting education course generally are Introduction to Hunter Education, Hunting Safety, Hunter Responsibility, Outdoor Safety, Wildlife Conservation, and Hunting Opportunities. (See, e.g., International Hunter Education Association, *Introduction to Hunter Education* <http://homestudy.ihea.com/> [as of Aug. 7, 2013].) The amount of firearm safety information included in the hunting education course is more extensive than that in the safety certificate education component prompting the exemption in this bill from the safety certificate requirement for those in possession of a hunting license. An argument, however, can be made that while the hunting education requirement is more intensive and extensive, it does not cover all aspects included by the safety certificate education component (such as the applicable laws regarding the sale and transfer of firearms and persons ineligible to possess firearms) which would be useful to all firearm owners.

4)  <u>Loaning of Long Guns</u>:  Under existing law, there is an exception for a minor possessing a handgun safety certificate when a handgun is temporarily loaned for the purpose of the minor engaging in lawful, recreational sport (such as competitive shooting) or other specified activities. (Penal Code Section 31810.) As argued in its opposition letter, the California Waterfowl Association notes that this bill "is impractical in cases where firearms need to be temporarily loaned to others, particularly youth, for hunting or other recreational shooting purposes while participants are in the field or at a shooting range. In such cases, it would not likely be possible for someone to obtain a safety certificate in a timely manner." As this bill does not create a loan-to-minors exception to the firearm safety certificate, the author may wish to address the inconsistency that this bill will create between long guns and handguns.

Exhibit 20
DX0159

5) <u>Argument in Support</u>:  According to the <u>Law Center to Prevent Gun Violence</u>, "SB 683 would require *every* firearm purchaser to have a valid Firearm Safety Certificate before buying a weapon, regardless of whether the firearm to be acquired is a handgun or a long gun.  This expansion reflects the prominent role that long guns (rifles and shotguns) play in our gun violence epidemic.  For example, of the 26,682 crime guns entered into the state's Automated Firearm System (AFS) database in 2009, 11,500 were long guns.  Moreover, requiring long gun owners to obtain a Firearm Safety Certificate will help ensure that all gun owners know how to handle their weapons safely and understand their responsibilities under California law.

"Expanding the certificate requirement to apply to all firearm buyers is a reasonable method of making sure that gun owners are informed about basic principles of gun safety and California law while imposing only a minimal burden upon them."

6) <u>Argument in Opposition</u>:  According to the <u>California Association of Federal Firearms Licensees</u>, "This measure would make the qualification test for a '*firearm* safety certificate' unnecessarily difficult as it will require detailed knowledge of the many firearm types that a purchaser doesn't – and may never – own.

"Handgun purchasers seeking to exercise Second Amendment rights acknowledged by the U.S. Supreme County in *D.C., et al. v. Heller*, 128 S.Ct. 2783 (2008), would no longer just need to know the details of handguns.  Under SB 683, they would also need to learn, know, and pass a test on the intricacies of firearm categories like rifles, shotguns, other long guns, and firearms Federally [sic] classified as Any Other Weapons, each having myriad action types such as lever, pump, semi-automatic, single-shot, and others – this despite the fact that they may never chose to own any of them."

7) <u>Prior Legislation</u>:

   a) AB 35 (Shelley), Chapter 940, Statutes of 2001, required any person who wants to purchase or otherwise transfer a handgun, except as specified, to obtain a handgun safety certificate.  Enactment of AB 35 was contingent upon the enactment of SB 52, with the bill that was chaptered last establishing the handgun safety certificate scheme.

   b) SB 52 (Scott), Chapter 942, Statutes of 2001, required any person who wants to purchase or otherwise transfer a handgun, except as specified, to obtain a handgun safety certificate.  Enactment of SB 52 was contingent upon the enactment of AB 35, with the bill that was chaptered last establishing the handgun safety certificate scheme.

<u>REGISTERED SUPPORT / OPPOSITION</u>:

<u>Support</u>

Courage Campaign (Sponsor)
American Academy of Pediatrics, California
American Association of University Women, Santa Barbara-Goleta Valley Branch
Anti-Defamation League
Auburn Area Democratic Club
Bend the Arc: Jewish Partnership for Justice

Exhibit 20
DX0160

Brady Campaign to Prevent Gun Violence, California Chapter
Brady Campaign to Prevent Gun Violence, Orange County Chapter
California Church IMPACT
California Medical Association
City of Santa Monica
Clergy & Laity United for Economic Justice
Coalition Against Gun Violence, A Santa Barbara County Coalition
Coalition to Stop Gun Violence
CREDO Action
Diablo Valley Democratic Club
Doctors for America
Jewish Public Affairs Committee of California
Laguna Woods Democratic Club
Law Center to Prevent Gun Violence
League of Women Voters of California
Los Angeles Mayor Antonio Villaraigosa (former)
Nevada County Democratic Women's Club
PICO California
Santa Barbara Rape Crisis Center
Tri-Cities Democratic Forum
Women Against Gun Violence
Women For: Orange County
Violence Prevention Coalition of Greater Los Angeles
Violence Prevention Coalition of Orange County
Youth ALIVE!

Eleven private individuals

<u>Opposition</u>

California Association of Federal Firearms Licensees
California Rifle and Pistol Association, Inc.
California Waterfowl Association

<u>Analysis Prepared by</u>:    Shaun Naidu / PUB. S. / (916) 319-3744

Exhibit 20
DX0161

# EXHIBIT 21

Exhibit 21
DX0162

# SENATE COMMITTEE ON PUBLIC SAFETY
### Senator Nancy Skinner, Chair
### 2017 - 2018  Regular

| | | | | |
|---|---|---|---|---|
| **Bill No:** | SB 1100 | **Hearing Date:** | April 17, 2018 | |
| **Author:** | Portantino | | | |
| **Version:** | March 19, 2018 | | | |
| **Urgency:** | No | **Fiscal:** | | Yes |
| **Consultant:** | GC | | | |

### Subject:  *Firearms:  Transfers*

## HISTORY

Source:         Author

Prior Legislation:     AB 1674 (Santiago),  2015, vetoed
                       AB 202 (Knox), Ch. 128, Stats. of 1999

Support:       California  Chapters of the Brady Campaign;  Giffords  Law Center to Prevent Gun
               Violence

Opposition:    Firearms  Policy  Coalition

## PURPOSE

***The purpose of this bill is to extend the prohibition on purchasing more than one handgun a
month to include all firearms and increases the age from 18 to 21 years for a person to
purchase a firearm from a licensed dealer.***

*Existing law* prohibits  a person from making  more than one application  to purchase a handgun
within  any 30-day period. (Pen. Code § 27535.)

*Existing law* prohibits  a firearms  dealer from delivering  a handgun  to a person whenever the
dealer is notified  by the Department of Justice that within the preceding 30-day period the
purchaser has made another application  to purchase a handgun  that does not fall within  an
exception  to the 30-day prohibition.  A violation  of that delivery  prohibition  by the dealer is a
crime. (Pen. Code § 27540.)

*This bill* extends the prohibition  on purchasing  more than one handgun  a month  to all firearms,
including  long guns.

*Existing law* exempts the following  from the one handgun  a month  prohibition:  (Pen. Code, §
27535, subd. (b).)

- Any law enforcement  agency.
- Any agency duly authorized  to perform  law enforcement  duties.
- Any state or local correctional  facility.

Exhibit 21
DX0163

- Any private security company licensed to do business in California.
- Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.
- Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.
- Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.
- Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).
- Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.
- The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.
- The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.
- The return of any handgun to its owner.
- A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

*This bill* adds the following exceptions to the one gun a month prohibition:

- The purchase of a firearm, other than a handgun, by a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife.
- The acquisition of a firearm, other than a handgun, at an auction or similar event conducted by a nonprofit public benefit or mutual benefit corporation to fund the activities of that corporation or local chapters of that corporation.

*Existing law* prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years. (Pen. Code § 27510.)

*Existing law* also prohibits the sale or transfer of a firearm, other than a handgun, except as specifically exempted, to any person below the age of 18 years. (Pen. Code § 27510.)

*This bill* prohibits the sale or transfer by a licensed dealer of a long gun to a person below the age of 21 years, increasing the age from 18 years to 21 years of age. The bill exempts long gun purchases or transfers when the purchaser or transferee has a valid, unexpired hunting permit.

Exhibit 21
DX0164

## COMMENTS

### 1.  Need for This Bill

According to the author:

> While handguns are used in the majority of gun deaths, long guns have been used to perpetrate many of the largest mass shootings in U.S. history, including the tragic event that took place in San Bernardino, California.

> California is home to the most stringent gun laws in the county. One example is requiring an individual to be 21 years of age in order to purchase a handgun. Another is the general limitation on a gun dealer delivery of only one handgun to an individual in a 30 day period.

> Since these laws have taken effect, data shows that there has been a successful reduction in the incidence of gun trafficking while not burdening legitimate gun owners or persons who wish to acquire guns.

> In order to be uniformly consistent, California should apply the 30 day delivery period and 21 year age limit to long guns.

> Firearms will not be delivered whenever the dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a firearm. In addition, because of the interaction of state and federal law, receivers or frames (the gun minus the barrel) are also applicable to the 30-day purchase period. This bill will also define a frame or a receiver of a firearm.

> Lastly, this bill would also prohibit the sale or transfer of any firearm by a licensed dealer, except as specially exempted, to any person below the age of 21 years.

### 2.  One Gun a Month

According to the Senate Public Safety Analysis of Assembly Bill 202 (Knox, of 1999), which created the one-handgun-a-month law in California:

> The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely traveled to Virginia to purchase quantities of weapons to take back for illegal sale in other states. Purchases of more than one handgun per 30-day period in Virginia is allowed upon completion of an "enhanced" background check when the purchase is for lawful business or personal use, for purposes of collectors, bulk sales and purchases from estates, to replace a lost or stolen weapon, and similar situations.

Exhibit 21
DX0165

Supporters of limits on purchases of handguns assume that the Virginia limits and the limits in this bill would only affect a very small proportion of legitimate handgun purchasers. A family of two adults could still purchase 24 handguns a year under the provisions of both this bill and the Virginia law.

Virginia repealed this law in 2012. But, according to the Law Center to Prevent Gun Violence:

Virginia's one-gun-a-month law – which was in effect from 1993 to 2012 and prohibited the purchase of more than one handgun per person in any 30-day period – significantly reduced the number of crime guns traced to Virginia dealers. Virginia initially adopted its law after the state became recognized as a primary source of crime guns recovered in states in the northeastern U.S. After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by:

- 71% for guns recovered in New York;
- 72% for guns recovered in Massachusetts; and
- 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/ [footnotes omitted].)

Other states that have limits on the number of firearms that can be sold in one month include:

- California: California law prohibits any person from purchasing more than one handgun within any 30-day period. In addition, a licensed firearms dealer may not deliver a handgun to any person following notification from the California Department of Justice that the purchaser has applied to acquire a handgun within the preceding 30-day period. Finally, firearms dealers must conspicuously post in their licensed premises a warning, in block letters at least one inch in height, notifying purchasers of these restrictions.

- District of Columbia: A person may not register more than one handgun in the District during any 30-day period. Since every handgun must be registered, this amounts to a purchase and sale limitation of one handgun per 30-day period. . .

- Maryland: Maryland prohibits any person from purchasing more than one handgun or assault weapon within a 30-day period. Under limited circumstances, a person may be approved by the Secretary of the Maryland State Police to purchase multiple handguns or assault weapons in a 30-day period. Maryland also penalizes any dealer or other seller who knowingly participates in an illegal purchase of a handgun or assault weapon. . .

- New Jersey: New Jersey prohibits licensed firearms dealers from knowingly delivering more than one handgun to any person within any 30-day period. With limited exceptions, no person may purchase more than one handgun within any 30-day period. New Jersey requires a handgun purchaser to obtain a separate permit for

Exhibit 21
DX0166

SB 1100  (Portantino)                                              Page **5** of **7**

each handgun purchased, and present the permit to the seller. The seller must keep a copy of each permit presented.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/[footnotes omitted].)

***Senate Bill 1674 (Santiago), of 2015: Veto Message***

The Governor stated in his veto message of Senate Bill 1674, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period:

> This bill generally prohibits the purchase of more than one firearm within any 30-day period. It should be noted that California already bans the purchase of more than one handgun per month.

> While well-intentioned, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need.

> Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed.

## 3.  Increasing the Age for Purchase of Long Guns

This bill would increase the minimum age from 18 to 21 years for a person to purchase all firearms in California. The age restriction would also impact the ability to transfer a weapon. Under current law a person must be 21 years of age to purchase a handgun, and this bill applies those same rules to the purchase and transfer of all firearms (including long guns). The bill creates an exception to this rule when the purchaser or transferee has a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

On February 14, 2018 Nikolas Cruz shot and killed seventeen people and wounded an additional seventeen people at Marjory Stoneman Douglas High School in Parkland, Florida. The perpetrator was 19-years old at the time of the incident, and he used assault rifles. Following the incident Florida passed legislation to increase the minimum age for buying rifles to 21-years. The National Rifle Association challenged the law and filed a lawsuit in the United States District court for the Northern District of Florida alleging that the ban on gun sales to people under 21 years of age is unconstitutional because it violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution because 18-year-olds are classified as adults.

On March 1, 2018 George Skelton wrote an editorial for the LA Times[1] on this bill. He stated the following regarding this provision:

> In Sacramento, state Sen. Anthony Portantino (D-La Cañada Flintridge) proposes taking an even bigger step. He introduced legislation Wednesday to increase the legal age to 21 in California for buying any gun, including a shotgun or rifle with low ammo capacity. A shooter with a hunting license would be exempt because he'd taken a gun safety course.

---

[1] http://www.latimes.com/politics/la-pol-ca-skelton-guns-schools-teachers-20180301-story.html

Exhibit 21
DX0167

What about a skeet shooter? Or someone who just likes to plink tin cans out by the barn?

Doesn't make sense that an 18-year-old can enlist in the Army and be armed with an automatic M-16 to fight terrorists, but can't buy a bolt-action plinker back home until he's 21.

In Florida, where the gun lobby usually prevails in the Legislature, a House committee bucked the NRA on Tuesday and approved a bill to raise the rifle-buying age from 18 to 21. This came after emotional testimony from parents of students killed in the school shooting.

The committee also voted to allow arming of teachers. But it rejected a ban on assault weapons.

Everyone needs to get their priorities straight: Let the teachers teach. Treat 18-year-olds like adults. Get rid of all assault weapons.

However, there are a number of instances when lawmakers have limited the ability of person's under the age of 21 to engage in activities which are otherwise lawful. Notably, persons under the age of 21 are not allowed to ingest alcohol or marijuana under California law.

## 4.  California Hunting Licenses

This bill creates an exemption from the prohibition on persons under the age of 21 purchasing or receiving a long gun if the person under the age of 21 has a valid, unexpired hunting license. In order to obtain a hunting license in California a person must:

- Complete the California Hunter Education Certification requirements
- Choose the correct type of hunting license.
- Purchase a license through the California Department of Fish and Wildlife website or a California approved agent.

The Official California Hunter Safety Course is an online course that costs $28.95. There is no minimum age for the course. The course requires a follow-up course that is a 4-hour review of the online course with a certified hunter education instructor. The course includes a student demonstration of safe firearm handling and a test. Following completion of the follow-up course the enrollee receives a Hunter Education Certificate.

## 5.  Argument in Support

According to the California Chapters of the Brady Campaign:

The California Brady Campaign generally believes that handguns and long guns (rifles, shotguns and lower receivers) should be subject to the same laws. Modern sporting rifles are often high powered semi-automatic weapons with exchangeable magazines that can pose a greater threat than handguns. In the early 1990s, it was thought that handguns made up an overwhelming share of crime guns, but the data shows that is no longer the case. Of the 26,682 crime guns entered into the

Exhibit 21
DX0168

Department of Justice Firearms Systems database in 2009, 11,500 were long guns.[i]

Existing law prohibits the sale or transfer of a handgun to a person below the age of 21 years. SB 1100 will similarly prohibit, with exceptions, the sale or transfer of a long gun by a licensed firearm dealer to a person under age 21. Additionally, the bill will require those who manufacture or assemble a long gun to be at least 21 years old in order to obtain a serial number for the firearm and register it with the California Department of Justice. These provisions makes sense as those under age 21 are disproportionally linked to crime. In 2015, 23.4 percent of those arrested for murder and non-negligent manslaughter in the U.S. were under 21[ii] and 26.5 percent of those arrested for "weapons carrying, possession, etc." were under age 21.[iii] Individuals age 18 to 20 comprise only 4% of the population but commit 17% of gun homicides.[iv]

Maturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds. This is recognized in other areas – those under age 21 cannot buy alcohol, rent a car, or purchase a handgun – and the same age restriction should apply to long guns.

Additionally, SB 1100 will limit purchases of long guns from licensed firearms dealers in California to no more than one gun per person per 30-day period, with appropriate exemptions. This is current law for handguns and is a recognized strategy for curbing the illegal flow of guns by taking the profit out of selling guns from bulk purchases on the black market. It stands to reason that a person buying large quantities of guns at one time may be acting as a straw purchaser or gun trafficker. Moreover, many of these bulk purchases are for lower receivers, which can be built up into military-style weapons and sold for a big profit. Firearms acquired in bulk are frequently used in crime. A University of Pennsylvania report found that a quarter of all guns used in crime were purchased as part of a multiple-gun sale and that guns purchased in bulk were up to 64% more likely to be used for illegal purposes than guns purchased individually.[v] Limiting multiple-gun sales within a short period of time for all firearm, including long guns, is clearly in the interest of public safety.

-- END –

---

[i] Data provided by the California Department of Justice, April 6, 2010.
[ii] FBI 2015 Crime in the United States, https://ucr.fbi.gov/crime-in-the-u.s/2015/crime-in-the-u.s.-2015/tables/table-41.
[iii] Ibid.
[iv] "Uniform Crime Reporting Program Data: Supplementary Homicide Reports, 2015," US Department of Justice, Federal Bureau of Investigation, https://ucr.fbi.gov/nibrs/addendumfor-submitting-cargo-theft-data/shr.
[v] Koper, Christopher S.; Jerry Lee Center of Criminology, Univ. of Penn., *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use -- A report to the National Institute of Justice, U.S. Department of Justice* (2007). https://www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf.

Exhibit 21
DX0169

# EXHIBIT 22

Exhibit 22
DX0170

# SENATE COMMITTEE ON APPROPRIATIONS
## Senator Ricardo Lara, Chair
### 2017 - 2018  Regular  Session

**SB 1100 (Portantino) - Firearms:  transfers**

| | |
|---|---|
| **Version:** March 19, 2018 | **Policy Vote:** PUB. S. 5 - 2 |
| **Urgency:** No | **Mandate:** Yes |
| **Hearing Date:** April 30, 2018 | **Consultant:** Shaun Naidu |

**This bill meets the criteria for referral to the Suspense File.**

**Bill Summary:**  SB 1100 would prohibit the purchase or receipt of more than one long gun a month, except as specified, and would increase the minimum age requirement to purchase a long gun from 18 to 21 years of age, except as specified.

**Fiscal Impact:**
- <u>Department of Justice (DOJ)</u>: One-time costs of about $350,000 to modify the various firearm databases impacted by this measure and minor and absorbable ongoing costs.  (special fund*)

- <u>Revenue loss</u>: The Bureau of Firearms within DOJ estimates an anticipated decrease in revenue of about $2.2 million annually  resulting from a reduction in Dealer Record of Sale (DROS) submissions because of the limitation on long gun purchases per month.  (special fund*)  Additionally, there would be unknown but potentially-significant loss of sales tax revenue due to the expansion of the 30-day single purchase restriction to include all firearms, including long guns.  (General Fund, various funds)

- <u>Court</u>: Unknown, potentially-significant cost pressures to the court to adjudicate charges brought against dealers who sell or transfer a long gun to a person under age 21, except of specified, as proscribed by this measure.  While the superior courts are not funded on a workload basis, an increase in workload could result in delayed court services and would put pressure on the General Fund to fund additional staff and resources.  (General Fund**)

- <u>Prosecution & incarceration</u>:  Unknown potential increase in non-reimbursable local enforcement and incarceration costs (local funds) to prosecute and incarcerate those charged with and found guilty of conduct proscribed by this bill.  Costs would be offset, to a degree, by fee and assessment revenue.

*DROS Account—**Staff notes** that this account is structurally imbalanced.
**Trial Court Trust Fund

**Background:** Existing law prohibits any person from applying to purchase more than one handgun within any 30-day period with certain specified exceptions.  The exceptions to this prohibition are as follows:
- Any law enforcement agency
- Any agency duly authorized to perform law enforcement duties

Exhibit 22
DX0171

- Any state or local correctional facility
- Any private security company licensed to do business in California
- Any person who is properly identified as a full-time paid peace officer, as defined, and who is authorized to, and does, carry a firearm during the course and scope of employment as a peace officer
- Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm
- Any person who may claim an exemption from the waiting period set forth in statute
- Any transaction conducted through a licensed firearms dealer for private party transactions
- Any person who is licensed as a collector and has a current certificate of eligibility issued by DOJ
- The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement
- The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to completing the handgun purchase application to a local law enforcement agency, as specified.
- The return of any handgun to its owner
- A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training

There is a graduated penalty structure for applying for more than one handgun within a 30-day period outside of the excepted situations. The first violation is an infraction punishable by a base fine of $50; a second violation is an infraction punishable by a base fine of $100; and a third or subsequent violation is a misdemeanor that is punishable of imprisonment in the county jail for up to six months and/or a base fine of up to $1,000. Additionally, each application to purchase a handgun in violation of the 30-day purchase prohibition is deemed a separate offense.

A firearms dealer is prohibited from selling, supplying, delivering, or giving possession or control of a handgun to a person under 21 years of age or any other firearm to a person under 18 years of age. A violation of this prohibition is a felony that is punishable by imprisonment for two, three, or four years pursuant to the 2011 Realignment Legislation if the firearm was delivered to someone who the dealer knew or should have known is a minor or a misdemeanor that is punishable by imprisonment in county jail for up to one year and/or a base fine of up to $1,000 regarding the delivery of a handgun. The punishment is increased to an alternate felony/misdemeanor if the transferred firearm was used in a subsequent felony for which a person was convicted and a sentence was imposed.

**Proposed Law:** This bill would extend the 30-day limitation and the dealer-delivery prohibition related to handguns to all types of firearms. It also would except from those prohibitions the purchase of a non-handgun firearm by a person who possesses a valid, unexpired hunting license issued by the state and the acquisition of a non-handgun firearm at specified charity fundraising events. Additionally, SB 1100 would prohibit the sale or transfer of any firearm by a licensed dealer, except as specified, to any person

Exhibit 22
DX0172

**SB 1100 (Portantino)**                                                    Page **3** of 3

younger than 21 years of age. Lastly, it would make conforming changes related to age restrictions on the issuance of a serial number by DOJ for an assembled firearm, colloquially known as a ghost gun.

**Related Legislation:** AB 1674 (Santiago, 2015) would have prohibited the purchase of more than one long gun within any 30-day period. AB 1674 was vetoed by the governor, as he believed that the bill "would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need. He also stated that the additional restriction was not needed "given California's stringent laws restricting gun ownership."

AB 202 (Knox, Ch. 128, Stats. 1999) limited the purchase of handguns to no more than one in a 30-day period per person.

**Staff Comments:** All implementation costs borne by DOJ resulting from this measure would be funded through the DROS Account, which is structurally imbalanced. The 2018-19 proposed expenditure from the account exceeds the estimated revenue by over $700,000, leaving a diminished estimated reserve of $5.5 million. As DOJ estimates a loss of $2.2 million in revenue to the DROS Account due to the prohibition on purchasing more than one firearm within a month should this bill become law, another funding source, potentially the General Fund, may be needed to backfill the current and any new workload requirements funded from the DROS Account due to the imbalance of the fund.

Additionally, as SB 1100 would take effect on January 1, 2019 if it was signed into law, DOJ would need a specific appropriation from the DROS Account to allow it to commence work immediately to update the databases impacted by this bill.

**-- END --**

Exhibit 22
DX0173

# EXHIBIT 23

Exhibit 23
DX0174

**SENATE RULES COMMITTEE**                                    SB 1100
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:    SB 1100
Author:     Portantino (D), et al.
Amended:    3/19/18
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 4/17/18
AYES:  Skinner, Bradford, Jackson, Mitchell,  Wiener
NOES:  Anderson, Stone

SENATE APPROPRIATIONS COMMITTEE: 5-1, 5/25/18
AYES:  Lara, Beall,  Bradford, Hill,  Wiener
NOES:  Nielsen
NO VOTE RECORDED:  Bates

---

**SUBJECT:**  Firearms:  transfers

**SOURCE:**   Author

---

**DIGEST:**   This bill extends the prohibition on purchasing more than one handgun a month to include all firearms and increases the age from 18 to 21 years for a person to purchase a firearm from a licensed dealer.

**ANALYSIS:**

Existing law:

1) Prohibits a person from making more than one application to purchase a handgun within any 30-day period. (Pen. Code § 27535.)

2) Prohibits a firearms dealer from delivering a handgun to a person whenever the dealer is notified by the Department of Justice (DOJ) that within the preceding 30-day period the purchaser has made another application to purchase a handgun that does not fall within an exception to the 30-day prohibition. A

Exhibit 23
DX0175

violation of that delivery prohibition by the dealer is a crime. (Pen. Code §
27540.)

3) Exempts the following from the one handgun a month prohibition: (Pen. Code,
§ 27535, subd. (b).)

a) Any law enforcement agency.

b) Any agency duly authorized to perform law enforcement duties.

c) Any state or local correctional facility.

d) Any private security company licensed to do business in California.

e) Any person who is properly identified as a full-time paid peace officer and
who is authorized to, and does carry a firearm during the course and scope of
employment as a peace officer.

f) Any motion picture, television, or video production company or
entertainment or theatrical company whose production by its nature involves
the use of a firearm.

g) Any person who may make a valid claim an exemption from the waiting
period set forth in Section 27540.

h) Any transaction conducted through a licensed firearms dealer pursuant to
Chapter 5 (commencing with Section 28050).

i) Any person who is licensed as a collector and has a current certificate of
eligibility issued by DOJ.

j) The exchange of a handgun where the dealer purchased that firearm from the
person seeking the exchange within the 30-day period immediately
preceding the date of exchange or replacement.

k) The replacement of a handgun when the person's handgun was lost or stolen,
and the person reported that firearm lost or stolen prior to the completion of
the application to purchase to any local law enforcement agency of the city,
county, or city and county in which the person resides.

l) The return of any handgun to its owner.

Exhibit 23
DX0176

SB 1100
Page 3

   m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

4) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years. (Pen. Code § 27510.)

5) Prohibits the sale or transfer of a firearm, other than a handgun, except as specifically exempted, to any person below the age of 18 years. (Pen. Code § 27510.)

This bill:

1) Extends the prohibition on purchasing more than one handgun a month to all firearms, including long guns.

2) Adds the following exceptions to the one gun a month prohibition:

   a) The purchase of a firearm, other than a handgun, by a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

   b) The acquisition of a firearm, other than a handgun, at an auction or similar event conducted by a nonprofit public benefit or mutual benefit corporation to fund the activities of that corporation or local chapters of that corporation.

3) Prohibits the sale or transfer by a licensed dealer of a long gun to a person below the age of 21 years, increasing the age from 18 years to 21 years of age. This bill exempts long gun purchases or transfers when the purchaser or transferee has a valid, unexpired hunting permit.

**Background**

According to the Senate Public Safety Committee analysis of AB 202 (Knox, Chapter 128, Statutes of 1999), which created the one-handgun-a-month law in California:

The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely traveled to Virginia to purchase quantities of weapons to take back for illegal sale in other states. Purchases of more than one handgun

Exhibit 23
DX0177

per 30-day period in Virginia is allowed upon completion of an "enhanced" background check when the purchase is for lawful business or personal use, for purposes of collectors, bulk sales and purchases from estates, to replace a lost or stolen weapon, and similar situations.

Supporters of limits on purchases of handguns assume that the Virginia limits and the limits in this bill would only affect a very small proportion of legitimate handgun purchasers. A family of two adults could still purchase 24 handguns a year under the provisions of both this bill and the Virginia law.

Virginia repealed this law in 2012. But, according to the Law Center to Prevent Gun Violence:

Virginia's one-gun-a-month law – which was in effect from 1993 to 2012 and prohibited the purchase of more than one handgun per person in any 30-day period – significantly reduced the number of crime guns traced to Virginia dealers. Virginia initially adopted its law after the state became recognized as a primary source of crime guns recovered in states in the northeastern U.S. After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by:

1) 71% for guns recovered in New York;

2) 72% for guns recovered in Massachusetts; and

3) 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/ [footnotes omitted].)

Other states that have limits on the number of firearms that can be sold in one month include:

1) California: California law prohibits any person from purchasing more than one handgun within any 30-day period. In addition, a licensed firearms dealer may not deliver a handgun to any person following notification from DOJ that the purchaser has applied to acquire a handgun within the preceding 30-day period. Finally, firearms dealers must conspicuously post in their licensed premises a warning, in block letters at least one inch in height, notifying purchasers of these restrictions.

Exhibit 23
DX0178

2) District of Columbia: A person may not register more than one handgun in the District during any 30-day period. Since every handgun must be registered, this amounts to a purchase and sale limitation of one handgun per 30-day period. . .

3) Maryland: Maryland prohibits any person from purchasing more than one handgun or assault weapon within a 30-day period. Under limited circumstances, a person may be approved by the Secretary of the Maryland State Police to purchase multiple handguns or assault weapons in a 30-day period. Maryland also penalizes any dealer or other seller who knowingly participates in an illegal purchase of a handgun or assault weapon. . .

4) New Jersey: New Jersey prohibits licensed firearms dealers from knowingly delivering more than one handgun to any person within any 30-day period. With limited exceptions, no person may purchase more than one handgun within any 30-day period. New Jersey requires a handgun purchaser to obtain a separate permit for each handgun purchased, and present the permit to the seller. The seller must keep a copy of each permit presented.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/[footnotes omitted].)

*Increasing the Age for Purchase of Long Guns*

This bill increases the minimum age from 18 to 21 years for a person to purchase all firearms in California. The age restriction would also impact the ability to transfer a weapon. Under current law a person must be 21 years of age to purchase a handgun, and this bill applies those same rules to the purchase and transfer of all firearms (including long guns). This bill creates an exception to this rule when the purchaser or transferee has a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

On February 14, 2018 Nikolas Cruz shot and killed seventeen people and wounded an additional 17 people at Marjory Stoneman Douglas High School in Parkland, Florida. The perpetrator was 19-years old at the time of the incident, and he used assault rifles. Following the incident Florida passed legislation to increase the minimum age for buying rifles to 21 years. The National Rifle Association challenged the law and filed a lawsuit in the United States District Court for the Northern District of Florida alleging that the ban on gun sales to people under 21 years of age is unconstitutional because it violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution because 18-year-olds are classified as adults.

Exhibit 23
DX0179

On March 1, 2018, George Skelton wrote an editorial for the LA Times on this bill. He stated the following regarding this provision:

> In Sacramento, state Sen. Anthony Portantino (D-La Cañada Flintridge) proposes taking an even bigger step. He introduced legislation Wednesday to increase the legal age to 21 in California for buying any gun, including a shotgun or rifle with low ammo capacity. A shooter with a hunting license would be exempt because he'd taken a gun safety course.

> What about a skeet shooter? Or someone who just likes to plink tin cans out by the barn?

> Doesn't make sense that an 18-year-old can enlist in the Army and be armed with an automatic M-16 to fight terrorists, but can't buy a bolt-action plinker back home until he's 21.

> In Florida, where the gun lobby usually prevails in the Legislature, a House committee bucked the NRA on Tuesday and approved a bill to raise the rifle-buying age from 18 to 21. This came after emotional testimony from parents of students killed in the school shooting.

> The committee also voted to allow arming of teachers. But it rejected a ban on assault weapons.

> Everyone needs to get their priorities straight: Let the teachers teach. Treat 18-year-olds like adults. Get rid of all assault weapons.

However, there are a number of instances when lawmakers have limited the ability of person's under the age of 21 to engage in activities which are otherwise lawful. Notably, persons under the age of 21 are not allowed to ingest alcohol or marijuana under California law.

*California Hunting Licenses*

This bill creates an exemption from the prohibition on persons under the age of 21 purchasing or receiving a long gun if the person under the age of 21 has a valid, unexpired hunting license. In order to obtain a hunting license in California a person must:

1) Complete the California Hunter Education Certification requirements.

2) Choose the correct type of hunting license.

Exhibit 23
DX0180

SB 1100
Page 7

3) Purchase a license through the California Department of Fish and Wildlife website or a California approved agent.

The Official California Hunter Safety Course is an online course that costs $28.95. There is no minimum age for the course. The course requires a follow-up course that is a four-hour review of the online course with a certified hunter education instructor. The course includes a student demonstration of safe firearm handling and a test. Following completion of the follow-up course the enrollee receives a Hunter Education Certificate.

**FISCAL EFFECT:** Appropriation:  No    Fiscal Com.:  Yes    Local:  Yes

According to the Senate Appropriations Committee:

- DOJ: One-time costs of about $350,000 to modify the various firearm databases impacted by this measure and minor and absorbable ongoing costs. (special fund*)

- Revenue loss: The Bureau of Firearms within DOJ estimates an anticipated decrease in revenue of about $2.2 million annually resulting from a reduction in Dealer Record of Sale submissions because of the limitation on long gun purchases per month. (special fund*)  Additionally, there would be unknown but potentially-significant loss of sales tax revenue due to the expansion of the 30-day single purchase restriction to include all firearms, including long guns. (General Fund, various funds)

- Court: Unknown, potentially-significant cost pressures to the court to adjudicate charges brought against dealers who sell or transfer a long gun to a person under age 21, except of specified, as proscribed by this measure.  While the superior courts are not funded on a workload basis, an increase in workload could result in delayed court services and would put pressure on the General Fund to fund additional staff and resources. (General Fund**)

- Prosecution & incarceration:  Unknown potential increase in non-reimbursable local enforcement and incarceration costs (local funds) to prosecute and incarcerate those charged with and found guilty of conduct proscribed by this bill.  Costs would be offset, to a degree, by fee and assessment revenue.

**SUPPORT:** (Verified  5/25/18)

California Chapters of the Brady Campaign
City of Santa Monica
Giffords Law Center to Prevent Gun Violence

Exhibit 23
DX0181

SB 1100
Page 8

**OPPOSITION:** (Verified   5/25/18)

California Sportsmen's Lobby
Firearms Policy Coalition
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International

Prepared by:   Gabe Caswell / PUB. S. /
5/26/18 15:11:25

**\*\*\*\* END \*\*\*\***

Exhibit 23
DX0182

# EXHIBIT 24

Exhibit 24
DX0183

SB 1100
Page 1

Date of Hearing:  June 19, 2018
Chief Counsel:     Gregory Pagan

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

SB 1100 (Portantino) – As Amended June 11, 2018

**SUMMARY:** Increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.  Specifically, **this bill**:

1) Exempts the sale of a firearm, that is not a handgun, to the following persons that are 18 years of age or older:

   a) A person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   c) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

   d) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment; and,

   e) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the individuals in these organizations are properly identified.  Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member.

2) Makes conforming changes to the age requirements for an application for the granting of serial number by DOJ to persons wishing to manufacture or assemble a firearm.

**EXISTING LAW**:

1) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years. (Pen. Code § 27510.)

2) Prohibits any person from making an application to purchase more than one handgun within any 30-day period.  (Pen. Code, § 27535, subd. (a).)

3) Exempts from the above 30-day prohibition any of the following:

   a) Any law enforcement agency;

Exhibit 24
DX0184

SB 1100
Page 2

b) Any agency duly authorized to perform law enforcement duties;

c) Any state or local correctional facility;

d) Any private security company licensed to do business in California;

e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

h) Any private party transaction conducted through a licensed firearms dealer;

i) Any person who is a licensed collector and has a current certificate of eligibility issued by the Department of Justice (DOJ);

j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

k) A community college that is certified by the Commission on Peace Officer Standards and Training (POST) to present law enforcement academy basic course or other commission-certified training. (Pen. Code, § 27535, subd. (b).)

4) Prohibits a handgun from being delivered when a licensed firearms dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a handgun and the purchase was not exempted, as specified. (Pen. Code, § 27540, subd. (f).

5) Provides that the penalties for making more than one application to purchase a handgun within any 30-day period is as follows:

a) A first violation is an infraction punishable by a fine of fifty dollars ($50);

b) A second violation is an infraction punishable by a fine of one hundred ($100); and,

c) A third violation is a misdemeanor. (Pen. Code, § 27590, subd. (e)(1)-(3).)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Author's Statement**: According to the author, "Raising the age limit to 21 years of age to purchase a firearm and having the one gun a month law apply to all firearms insures we as Californians are taking proper steps toward public safety. While Washington continues to be unable to pass prudent gun legislation it is imperative that California steps up. Young people

Exhibit 24
DX0185

**SB 1100**
Page 3

across America are demanding that legislators respond to the crisis of gun violence on campuses. As a dad and a legislator I am determined to build on their leadership and help California act appropriately."

2) **Argument in Support**: According to the *California Chapters of the Brady Campaign to Prevent Gun Violence*, "Existing law prohibits the sale or transfer of a handgun to any person below the age of 21 years. SB 1100 will similarly prohibit, with exceptions, the sale or transfer of a long gun by a licensed firearm dealer to a person under age of 21. Additionally, the bill will require those who manufacture or assemble a long gun to be at least 21 years old in order to obtain a serial number for the firearm and register it with the California Department of Justice. These provisions makes sense as those under age 21 are disproportionally linked to crime. In 2015, 23.4 percent of those arrested for murder and non-negligent manslaughter in the U.S. were under 21 and 26.5 percent of those arrested for "weapons carrying, possession, etc." were under age 21. Individuals age 18 to 20 compromise only 4% of the population but commit 17% of gun homicides.
"Maturity, impulsive or reckless behavior, and responsibility vary greatly among 18-20 year olds. This is recognized in other areas – those under age 21 cannot buy alcohol, rent a car, or purchase a handgun – and the same age restriction should apply to long guns.

3) **Argument in Opposition**: According to the *Outdoor Sportsmen's Coalition of California,* "SB 1100 would needlessly raise the age for purchasing a rifle or shotgun from 18 to 21onth.

"Rather than raise the minimum age for lawful individuals to purchase a rifle or shotgun, or limit such purchases to one firearm per month, experience with mass homicides and other crimes involving firearms has clearly shown that the focus should be on preventing criminals and individuals suffering from mental illness from acquiring firearms, not on those who are not a part of the problem.

"Persons who have an intent to commit such crimes, or other illegal acts involving the use of a firearm, will always be able to obtain firearms through unlawful sources without going through a licensed firearms dealer.

"The restrictions proposed in SB 1100 will not prevent it.

4) **Related Legislation**: AB 3 (Bonta) is similar to this bill in that it prohibits the sale of any firearm to a person under 21 years of age. AB 3 is pending hearing in the Senate public Safety Committee.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Chapters of the Brady Campaign to prevent Gun Violence
Giffords Law Center to Prevent Gun Violence
American Academy of Pediatrics
Bay Area Student Activists
City of Santa Monica

Exhibit 24
DX0186

**SB 1100**
Page 4

**Opposition**

California Sportsman's Lobby
Gun Owners of California
Firearms Policy Coalition
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
California Sportsman's Lobby
National Shooting Sports Foundation

**Analysis Prepared by**:    Gregory Pagan / PUB. S. / (916) 319-3744

Exhibit 24
DX0187

# EXHIBIT 25

Exhibit 25
DX0188

**SB 1100**

Page 1

Date of Hearing:  August 8, 2018

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez Fletcher, Chair
SB 1100 (Portantino) – As Amended June 28, 2018

Policy Committee:   Public Safety                              Vote:    5 - 2

Urgency:  No        State Mandated Local Program:  Yes        Reimbursable:  No

**SUMMARY**:

This bill increases, from 18 to 21 years, the age at which a person can purchase a long-gun from a licensed dealer, except as specified.

**FISCAL EFFECT**:

1) GF costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the Department of Justice (DOJ) to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**COMMENTS**:

1) **Background and purpose.** Under current law, people under the age of 21 years are prohibited from purchasing a handgun. However, the minimum age to purchase a long-gun, such as a rifle, is 18 years. This bill will increase the minimum age to purchase a long-gun, with certain exceptions, to provide parity with the state's existing handgun laws. According to the author:

> Raising the age limit to 21 years of age to purchase a firearm and having the one gun a month law apply to all firearms insures we as Californians are taking proper steps toward public safety. While Washington continues to be unable to pass prudent gun legislation it is imperative that California steps up. Young people across America are demanding that legislators respond to the crisis of gun violence on campuses. As a dad and a legislator I am determined to build on their leadership and help California act appropriately.

2) **Related legislation.**

AB 3 (Bonta), of the current legislative session, is similar to this bill in that it prohibits the sale of any firearm to a person under 21 years of age. AB 3 is currently on the Senate Appropriations Committee's suspense file.

Exhibit 25
DX0189

SB 1177 (Portantino),  of the current legislative  session,  expands existing  restrictions  limiting people to the purchase of no more than one handgun  per month  to all firearms,  including long-guns.  SB 1177 is pending  hearing  in this committee.

**Analysis Prepared by**: Jessica Peters / APPR. / (916) 319-2081

Exhibit 25
DX0190

# EXHIBIT 26

Exhibit 26
DX0191

SENATE THIRD READING
SB 1100 (Portantino)
As Amended  June 28, 2018
Majority vote

SENATE VOTE:  24-10

| Committee | Votes | Ayes | Noes |
|-----------|-------|------|------|
| **Public Safety** | 5-2 | Jones-Sawyer, Carrillo, Kamlager-Dove, Quirk, Santiago | Lackey, Kiley |
| **Appropriations** | 12-5 | Gonzalez Fletcher, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Friedman, Eduardo Garcia, Nazarian, Quirk, Reyes | Bigelow, Brough, Fong, Gallagher, Obernolte |

**SUMMARY**: Increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.  Specifically, **this bill**:

1) Exempts the sale of a firearm, that is not a handgun, to the following persons that are 18 years of age or older:

   a) A person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   c) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

   d) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment; and,

   e) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the individuals in these organizations are properly identified.  Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member.

   f) A person who provides proper identification that that he or she is an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States. For the purposes of this exemption proper identification includes an Armed Forces Identification or other written documentation certifying that he person is an honorably discharged member.

2) Makes conforming changes to the age requirements for an application for the granting of serial number by DOJ to persons wishing to manufacture or assemble a firearm.

Exhibit 26
DX0192

**SB 1100**

Page 2

**EXISTING LAW**:

1) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years.

2) Prohibits any person from making an application to purchase more than one handgun within any 30-day period.

3) Exempts from the above 30-day prohibition any of the following:

   a) Any law enforcement agency;

   b) Any agency duly authorized to perform law enforcement duties;

   c) Any state or local correctional facility;

   d) Any private security company licensed to do business in California;

   e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

   f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

   g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

   h) Any private party transaction conducted through a licensed firearms dealer;

   i) Any person who is a licensed collector and has a current certificate of eligibility issued by the Department of Justice (DOJ);

   j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

   k) A community college that is certified by the Commission on Peace Officer Standards and Training (POST) to present law enforcement academy basic course or other commission-certified training.

4) Prohibits a handgun from being delivered when a licensed firearms dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a handgun and the purchase was not exempted, as specified.

5) Provides that the penalties for making more than one application to purchase a handgun within any 30-day period is as follows:

   a) A first violation is an infraction punishable by a fine of $50;

   b) A second violation is an infraction punishable by a fine of $100; and,

   c) A third violation is a misdemeanor.

Exhibit 26

DX0193

**SB 1100**
Page 3

**FISCAL EFFECT**:  According to the Assembly Appropriations Committee:

1) General Fund costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the Department of Justice (DOJ) to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**COMMENTS**:  According to the author, "Raising the age limit to 21 years of age to purchase a firearm and having the one gun a month law apply to all firearms insures we as Californians are taking proper steps toward public safety.  While Washington continues to be unable to pass prudent gun legislation it is imperative that California steps up.  Young people across America are demanding that legislators respond to the crisis of gun violence on campuses.  As a dad and a legislator I am determined to build on their leadership and help California act appropriately."

Please see the policy committee analysis for a full discussion of this bill.

**Analysis Prepared by**: Gregory Pagan / PUB. S. / (916) 319-3744                FN: 0004093

Exhibit 26
DX0194

# EXHIBIT 27

Exhibit 27
DX0195

SENATE THIRD READING
SB 1100 (Portantino)
As Amended  August 23, 2018
Majority vote

SENATE VOTE:  26-9

| Committee | Votes | Ayes | Noes |
|---|---|---|---|
| **Public Safety** | 5-2 | Jones-Sawyer, Carrillo, Kamlager-Dove, Quirk, Santiago | Lackey, Kiley |
| **Appropriations** | 12-5 | Gonzalez Fletcher, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Friedman, Eduardo Garcia, Nazarian, Quirk, Reyes | Bigelow, Brough, Fong, Gallagher, Obernolte |

**SUMMARY**:  Increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.  Specifically,  **this bill**:

1) Exempts  the sale of a firearm,  that is not a handgun,  to the following  persons  that are 18 years of age or older:

   a)  A person who possesses  a valid,  unexpired  hunting  license  issued by the Department  of Fish and Wildlife;

   b)  An active peace officer,  who is authorized  to carry a firearm  in the course and scope of his or her employment;

   c)  An active federal officer,  or law enforcement  agent,  who is authorized  to carry a firearm in the course and scope of his or her employment;

   d)  A reserve peace officer,  who is authorized  to carry a firearm  in the course and scope of his or her employment;  and,

   e)  An active member of the United States Armed Forces, the National  Guard, the Air national  Guard, or the active reserve components  of the United States, where the individuals  in these organizations  are properly  identified.  Proper  identification  includes the Armed Forces Identification  Card or other written  documentation  certifying  that the individual  is an active or honorably  retired member.

   f)  A person who provides  proper identification  that that he or she is an honorably discharged  member of the United States Armed Forces, the National  Guard, the Air National  Guard, or the active reserve components  of the United States. For the purposes of this exemption  proper identification  includes  an Armed Forces Identification  or other written  documentation  certifying  that he person is an honorably  discharged  member.

2) Makes conforming  changes to the age requirements  for an application  for the granting  of serial number  by the Department  of Justice (DOJ) to persons wishing  to manufacture  or assemble  a firearm.

Exhibit 27
DX0196

**SB 1100**
Page 2

**EXISTING LAW**:

1) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years.

2) Prohibits any person from making an application to purchase more than one handgun within any 30-day period.

3) Exempts from the above 30-day prohibition any of the following:

   a) Any law enforcement agency;

   b) Any agency duly authorized to perform law enforcement duties;

   c) Any state or local correctional facility;

   d) Any private security company licensed to do business in California;

   e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

   f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

   g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

   h) Any private party transaction conducted through a licensed firearms dealer;

   i) Any person who is a licensed collector and has a current certificate of eligibility issued by the Department of Justice (DOJ);

   j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

   k) A community college that is certified by the Commission on Peace Officer Standards and Training (POST) to present law enforcement academy basic course or other commission-certified training.

4) Prohibits a handgun from being delivered when a licensed firearms dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a handgun and the purchase was not exempted, as specified.

5) Provides that the penalties for making more than one application to purchase a handgun within any 30-day period is as follows:

   a) A first violation is an infraction punishable by a fine of $50;

   b) A second violation is an infraction punishable by a fine of $100; and,

   c) A third violation is a misdemeanor.

Exhibit 27
DX0197

**SB 1100**
Page 3

**FISCAL EFFECT**:  According to the Assembly Appropriations Committee:

1) General Fund costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the Department of Justice (DOJ) to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**COMMENTS**:  According to the author, "Raising the age limit to 21 years of age to purchase a firearm and having the one gun a month law apply to all firearms insures we as Californians are taking proper steps toward public safety.  While Washington continues to be unable to pass prudent gun legislation it is imperative that California steps up.  Young people across America are demanding that legislators respond to the crisis of gun violence on campuses.  As a dad and a legislator I am determined to build on their leadership and help California act appropriately."

Please see the policy committee analysis for a full discussion of this bill.

**Analysis Prepared by**: Gregory Pagan / PUB. S. / (916) 319-3744                FN: 0004600

Exhibit 27
DX0198

# EXHIBIT 28

Exhibit 28
DX0199

**SENATE RULES COMMITTEE**                                      SB 1100
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:    SB 1100
Author:     Portantino (D), et al.
Amended:    8/23/18
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 4/17/18
AYES:  Skinner, Bradford, Jackson, Mitchell,  Wiener
NOES:  Anderson, Stone

SENATE APPROPRIATIONS COMMITTEE: 5-1, 5/25/18
AYES:  Lara, Beall,  Bradford, Hill,  Wiener
NOES:  Nielsen
NO VOTE RECORDED:  Bates

SENATE FLOOR: 24-10, 5/29/18
AYES:  Allen, Atkins, Beall,  De León, Dodd, Galgiani,  Glazer, Hernandez,
   Hertzberg, Hill,  Hueso, Jackson, Lara, Leyva, McGuire,  Mitchell,  Monning,
   Pan, Portantino, Roth, Skinner,  Stern, Wieckowski,  Wiener
NOES:  Anderson, Bates, Fuller,  Gaines, Moorlach, Morrell,  Nielsen, Stone,
   Vidak, Wilk
NO VOTE RECORDED:  Berryhill,  Bradford, Cannella,  Newman, Nguyen

ASSEMBLY FLOOR: 47-30, 8/28/18 - See last page for vote

---

**SUBJECT:**  Firearms:  transfers

**SOURCE:**   Author

---

**DIGEST:**   This bill increases the age for which a person can purchase a long-gun from a licensed dealer from 18 to 21 years of age, except as specified.

*Assembly Amendments* add additional exemptions including sale and control by specified members of the military  and active peace officers.

Exhibit 28
DX0200

SB 1100
Page 2

**ANALYSIS:**

Existing law:

1) Prohibits the sale or transfer of a handgun, except as specifically exempted, to any person below the age of 21 years.

2) Prohibits any person from making an application to purchase more than one handgun within any 30-day period.

3) Exempts from the above 30-day prohibition any of the following:

   a) Any law enforcement agency;

   b) Any agency duly authorized to perform law enforcement duties;

   c) Any state or local correctional facility;

   d) Any private security company licensed to do business in California;

   e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

   f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

   g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

   h) Any private party transaction conducted through a licensed firearms dealer;

   i) Any person who is a licensed collector and has a current certificate of eligibility issued by the Department of Justice (DOJ);

   j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

   k) A community college that is certified by the Commission on Peace Officer Standards and Training to present law enforcement academy basic course or other commission- certified training.

4) Prohibits a handgun from being delivered when a licensed firearms dealer is notified by the DOJ that within the preceding 30-day period the purchaser has made another application to purchase a handgun and the purchase was not exempted, as specified.

Exhibit 28
DX0201

5) Provides that the penalties for making more than one application to purchase a handgun within any 30-day period is as follows:

   a) A first violation is an infraction punishable by a fine of $50;

   b) A second violation is an infraction punishable by a fine of $100; and,

   c) A third violation is a misdemeanor.

This bill:

1) Exempts the sale of a firearm, that is not a handgun, to the following persons that are 18 years of age or older:

   a) A person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   c) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

   d) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   e) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the individuals in these organizations are properly identified. Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member; and,

   f) A person who provides proper identification that that he or she is an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or the active reserve components of the United States. For the purposes of this exemption proper identification includes an Armed Forces Identification or other written documentation certifying that he person is an honorably discharged member.

2) Makes conforming changes to the age requirements for an application for the granting of serial number by the DOJ to persons wishing to manufacture or assemble a firearm.

Exhibit 28
DX0202

SB 1100
Page 4

## Background

This bill increases the minimum age from 18 to 21 years for a person to purchase all firearms in California. The age restriction also impacts the ability to transfer a weapon. Under current law a person must be 21 years of age to purchase a handgun, and this bill applies those same rules to the purchase and transfer of all firearms (including long guns). This bill creates an exception to this rule when the purchaser or transferee has a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

On February 14, 2018 Nikolas Cruz shot and killed 17 people and wounded an additional 17 people at Marjory Stoneman Douglas High School in Parkland, Florida. The perpetrator was 19-years old at the time of the incident, and he used assault rifles. Following the incident Florida passed legislation to increase the minimum age for buying rifles to 21-years. The National Rifle Association challenged the law and filed a lawsuit in the United States District court for the Northern District of Florida alleging that the ban on gun sales to people under 21 years of age is unconstitutional because it violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution because 18-year-olds are classified as adults.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:  Yes   Local:  Yes

According to the Assembly Appropriations Committee:

1) GF costs of $342,000 in 2018-19, $654,000 in 2019-20, and $556,000 in 2020-21 and ongoing for the DOJ to hire three additional staff and pay for overtime and other cost associated with increased workload to update and maintain information technology systems and criminal records systems.

2) DOJ anticipates annual losses of $152,000 in revenue to the Dealers Record of Sale Fund, $75,000 to the Firearms Safety and Enforcement Special Fund, and $8,000 to the Firearms Safety Account from a reduction in submissions resulting from the increased minimum age to purchase long-guns.

**SUPPORT:** (Verified 8/27/18)

California Chapters of the Brady Campaign to Prevent Gun Violence
City of Santa Monica
Giffords Law Center to Prevent Gun Violence

Exhibit 28
DX0203

**OPPOSITION:** (Verified  8/27/18)

California  Sportsman's Lobby
Firearms Policy Coalition
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International

**ARGUMENTS IN SUPPORT:** According to the California  Chapters of the
Brady Campaign to Prevent Gun Violence:

> Existing  law prohibits the sale or transfer of a handgun to any person below the
> age of 21 years.  SB 1100 will  similarly  prohibit, with exceptions, the sale or
> transfer of a long gun by a licensed firearm dealer to a person under age of 21.
> Additionally,  the bill  will  require those who manufacture or assemble a long
> gun to be at least 21 years old in order to obtain a serial number for the firearm
> and register it with the California Department of Justice.  These provisions
> makes sense as those under age 21 are disproportionally  linked to crime.  In
> 2015, 23.4 percent of those arrested for murder and non-negligent  manslaughter
> in the U.S. were under 21 and 26.5 percent of those arrested for "weapons
> carrying,  possession, etc." were under age 21.  Individuals  age 18 to 20
> compromise only 4% of the population but commit 17% of gun homicides.

> Maturity,  impulsive or reckless behavior, and responsibility  vary greatly among
> 18-20 year olds.  This is recognized in other areas – those under age 21 cannot
> buy alcohol, rent a car, or purchase a handgun – and the same age restriction
> should apply to long guns.

**ARGUMENTS IN OPPOSITION:**  According to the Outdoor Sportsmen's
Coalition  of California:

> SB 1100 would needlessly raise the age for purchasing a rifle  or shotgun from
> 18 to 21onth.

> Rather than raise the minimum  age for lawful  individuals  to purchase a rifle  or
> shotgun, or limit  such purchases to one firearm per month, experience with
> mass homicides and other crimes involving  firearms has clearly  shown that the
> focus should be on preventing  criminals  and individuals  suffering  from mental
> illness from acquiring  firearms, not on those who are not a part of the problem.

> Persons who have an intent to commit such crimes, or other illegal  acts
> involving  the use of a firearm,  will  always be able to obtain firearms through
> unlawful  sources without going through a licensed firearms dealer.

Exhibit 28
DX0204

SB 1100
Page 6

The restrictions proposed in SB 1100 will not prevent it.


ASSEMBLY FLOOR: 47-30, 8/28/18
AYES: Aguiar-Curry, Baker, Berman, Bloom, Bonta, Burke, Calderon, Carrillo,
   Chau, Chiu, Chu, Eggman, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia,
   Gipson, Gloria, Gonzalez Fletcher, Grayson, Holden, Irwin, Jones-Sawyer,
   Kalra, Kamlager-Dove, Levine, Limón, Low, Maienschein, McCarty, Medina,
   Mullin, Muratsuchi, Nazarian, O'Donnell, Quirk, Quirk-Silva, Reyes, Rivas,
   Rubio, Santiago, Mark Stone, Thurmond, Ting, Weber, Wood, Rendon
NOES: Acosta, Travis Allen, Arambula, Bigelow, Brough, Caballero, Cervantes,
   Chávez, Chen, Choi, Cooley, Cunningham, Dahle, Flora, Fong, Frazier,
   Gallagher, Gray, Harper, Kiley, Lackey, Mathis, Mayes, Melendez, Obernolte,
   Patterson, Salas, Steinorth, Voepel, Waldron
NO VOTE RECORDED: Cooper, Daly, Rodriguez


Prepared by:  Gabe Caswell / PUB. S. /
8/28/18 21:35:58

**** **END** ****

Exhibit 28
DX0205

# EXHIBIT 29

Exhibit 29
DX0206

# SENATE COMMITTEE ON PUBLIC SAFETY
### Senator Nancy Skinner, Chair
### 2019 - 2020  Regular

| | | | | |
|---|---|---|---|---|
| **Bill No:** | SB 61 | **Hearing Date:** | April 2, 2019 | |
| **Author:** | Portantino | | | |
| **Version:** | January 3, 2019 | | | |
| **Urgency:** | No | **Fiscal:** | Yes | |
| **Consultant:** | GC | | | |

### Subject:  *Firearms: Transfers*

## HISTORY

Source:        Author

Prior Legislation:    SB 1177 (Portantino),  2018, vetoed
                      AB 1674 (Santiago),  2015, vetoed


Support:      Bay Area Student Activists;  Brady California  United  Against  Gun Violence;
              Coalition  Against  Gun Violence;  Giffords  Law Center to Prevent  Gun Violence;
              Los Angeles  County  Board  of Supervisors;  Los Angeles  City Attorney

Opposition:   California  Rifle  and Pistol  Association;  California  Sportsman's Lobby; National
              Shooting  Sports  Foundation;  Outdoor  Sportsmen's  Coalition  of California;  Safari
              Club International;  Safari  Club International  Foundation


## PURPOSE

***The purpose of this bill is to extend the prohibition on purchasing more than one handgun a
month to include all firearms.***

*Existing law* prohibits  a person from making  more than one application  to purchase a handgun
within  any 30-day period. (Pen. Code § 27535.)

*Existing law* prohibits  a firearms  dealer from delivering  a handgun  to a person whenever  the
dealer is notified  by the Department  of Justice that within  the preceding  30-day period the
purchaser  has made another  application  to purchase a handgun  that does not fall within  an
exception  to the 30-day prohibition.  A violation  of that delivery  prohibition  by the dealer is a
crime. (Pen. Code § 27540.)

*This bill* extends the prohibition  on purchasing  more than one handgun  a month to all firearms,
including  long guns.

*Existing law* exempts the following  from the one handgun  a month prohibition:  (Pen. Code, §
27535, subd. (b).)

Exhibit 29
DX0207

- Any law enforcement agency.
- Any agency duly authorized to perform law enforcement duties.
- Any state or local correctional facility.
- Any private security company licensed to do business in California.
- Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.
- Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.
- Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.
- Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).
- Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.
- The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.
- The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.
- The return of any handgun to its owner.
- A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

*This bill* adds the following exceptions to the one gun a month prohibition:

- The purchase of a firearm, other than a handgun, by a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife.
- The acquisition of a firearm, other than a handgun, at an auction or similar event conducted by a nonprofit public benefit or mutual benefit corporation to fund the activities of that corporation or local chapters of that corporation.

## COMMENTS

**1. Need for This Bill**

According to the author:

> In California, existing law prohibits applying to purchase more than one handgun within a 30-day period and prohibits a firearms dealer from delivering a handgun to a person who has submitted more than one purchase application within a 30-day period. Unfortunately, when this became law it failed to include long guns. This is a simple fix to existing law that creates a safer process for the purchasing and delivering of all types of firearms in California.

Exhibit 29
DX0208

## 2. One Gun a Month

According to the Senate Public Safety Analysis of Assembly Bill 202 (Knox, of 1999), which created the one-handgun-a-month law in California:

> The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely traveled to Virginia to purchase quantities of weapons to take back for illegal sale in other states. Purchases of more than one handgun per 30-day period in Virginia is allowed upon completion of an "enhanced" background check when the purchase is for lawful business or personal use, for purposes of collectors, bulk sales and purchases from estates, to replace a lost or stolen weapon, and similar situations.

> Supporters of limits on purchases of handguns assume that the Virginia limits and the limits in this bill would only affect a very small proportion of legitimate handgun purchasers. A family of two adults could still purchase 24 handguns a year under the provisions of both this bill and the Virginia law.

Virginia repealed this law in 2012. But, according to the Law Center to Prevent Gun Violence:

> Virginia's one-gun-a-month law – which was in effect from 1993 to 2012 and prohibited the purchase of more than one handgun per person in any 30-day period – significantly reduced the number of crime guns traced to Virginia dealers. Virginia initially adopted its law after the state became recognized as a primary source of crime guns recovered in states in the northeastern U.S. After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by:

> - 71% for guns recovered in New York;
> - 72% for guns recovered in Massachusetts; and
> - 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.

> (http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/ [footnotes omitted].)

Other states that have limits on the number of firearms that can be sold in one month include:

- California: California law prohibits any person from purchasing more than one handgun within any 30-day period. In addition, a licensed firearms dealer may not deliver a handgun to any person following notification from the California Department of Justice that the purchaser has applied to acquire a handgun within the preceding 30-day period. Finally, firearms dealers must conspicuously post in their licensed premises a warning, in block letters at least one inch in height, notifying purchasers of these restrictions.

Exhibit 29
DX0209

- District of Columbia: A person may not register more than one handgun in the District during any 30-day period. Since every handgun must be registered, this amounts to a purchase and sale limitation of one handgun per 30-day period. . .

- Maryland: Maryland prohibits any person from purchasing more than one handgun or assault weapon within a 30-day period. Under limited circumstances, a person may be approved by the Secretary of the Maryland State Police to purchase multiple handguns or assault weapons in a 30-day period. Maryland also penalizes any dealer or other seller who knowingly participates in an illegal purchase of a handgun or assault weapon. . .

- New Jersey: New Jersey prohibits licensed firearms dealers from knowingly delivering more than one handgun to any person within any 30-day period. With limited exceptions, no person may purchase more than one handgun within any 30-day period. New Jersey requires a handgun purchaser to obtain a separate permit for each handgun purchased, and present the permit to the seller. The seller must keep a copy of each permit presented.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/[footnotes omitted].)

### Assembly Bill 1674 (Santiago), of 2015: Veto Message

The Governor stated in his veto message of Senate Bill 1674, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period:

> This bill generally prohibits the purchase of more than one firearm within any 30-day period. It should be noted that California already bans the purchase of more than one handgun per month.

> While well-intentioned, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need.

> Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed.

### Senate Bill 1177 (Portantino), of 2018: Veto Message

The Governor stated in his veto message of Senate Bill 1177, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period, with the same exemptions included in this bill:

> This bill prohibits any person from purchasing more than one long-gun per month.

> I vetoed a substantially similar bill in 2016, and my views have not changed.

Exhibit 29
DX0210

## 3. California Hunting Licenses

This bill creates an exemption from the prohibition on persons under the age of 21 purchasing or receiving a long gun if the person under the age of 21 has a valid, unexpired hunting license. In order to obtain a hunting license in California a person must:

- Complete the California Hunter Education Certification requirements
- Choose the correct type of hunting license.
- Purchase a license through the California Department of Fish and Wildlife website or a California approved agent.

The Official California Hunter Safety Course is an online course that costs $28.95. There is no minimum age for the course. The course requires a follow-up course that is a 4-hour review of the online course with a certified hunter education instructor. The course includes a student demonstration of safe firearm handling and a test. Following completion of the follow-up course the enrollee receives a Hunter Education Certificate.

## 4. Argument in Support

According to Brady California:

> In 1999, legislation (AB 202) was enacted that limits purchases of handguns from licensed firearms dealers in California to no more than one per person per 30-day period. The purpose of the bill was to curb the illegal flow of handguns by taking the profit out of selling guns from bulk purchases on the black market. SB 61 applies existing law under AB 202 to long guns, including rifles, shotguns, and lower receivers.

> Under SB 61, firearms (handguns *and* long guns) will not be delivered whenever the dealer is notified by the Department of Justice that within the preceding 30-day period, the purchaser had made another application to purchase a firearm. Private party transactions will continue to be exempt. Additionally, rifle and shotgun (but not lower receiver) purchasers with a valid hunting license issued by the Department of Fish and Wildlife and the acquisition of a rifle or shotgun at an auction or similar event conducted by a nonprofit will be exempt.

> It stands to reason that a person buying large quantities of guns at one time may be acting as a straw purchaser or gun trafficker. Moreover, firearms acquired this way are frequently used in crime. In fact, an ATF study of tracing data demonstrated that 22% of all handguns recovered in crime in 1999 were originally purchased as part of a multiple sale. A similar study found that 20% of all handguns recovered in crime in 2000 were originally purchased as part of a multiple sale. Additionally, a University of Pennsylvania report found that a quarter of all guns used in crime were purchased as part of a multiple-gun sale and that guns purchased in bulk were up to 64% more likely to be used for illegal purposes than guns purchased individually.

> Since 1999, Californians have typically purchased more long guns than handguns every year. Currently, these long guns include high powered featureless weapons

Exhibit 29
DX0211

with exchangeable magazines that enable rapid reload and lower receivers, which can be assembled into illegal military-style weapons. Limiting multiple-gun sales within a short period of time for such weapons, which are more lethal than handguns, is clearly in the interest of public safety.

The Department of Justice began to retain records of long gun purchases on January 1, 2014. An analysis of the transaction data from the period January 2014 through June 2015 shows that 81.9% of long guns were sold as a single long gun purchase within a 30-day period. *Clearly, the vast majority of long gun purchasers will not be impacted by SB 61.* However, at the opposite end of the spectrum, an individual purchased 177 long guns in two transactions within a one month period (April 2014). Furthermore, sales to single individuals ranging from 5 to 54 long guns per month occurred on 1,787 occasions, totaling 12,090 guns. Department data also shows that when multiple long guns are transferred in a sale, it is more than twice as likely that lower receivers are included. The largest bulk sale of long guns in one month to an individual (177 long guns) was composed *entirely* of lower receivers, which can be built into illegal assault weapons and sold on the black market.

Brady California believes that handguns and long guns should generally be subject to the same laws. Preventing the flow of illegal guns is important to public safety regardless of whether the firearm is a handgun or a long gun. Limiting firearms sales to one gun per 30-day period is a recognized strategy to reduce gun trafficking and keep firearms out of dangerous hands. Brady California thanks you for introducing SB 61.

## 5. Argument in Opposition

According to California Rifle and Pistol Association:

SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

Exhibit 29
DX0212

The author and proponents have argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase. Both California and Federal law already address the author's concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ.

SB 61, does allow for numerous exemptions to the restriction which do not apply to the general public, though well intended by the author will create a nightmare DOJ and law enforcement to implement and enforce. Additionally, the author has argued this bill is necessary because the vast majority of firearms recovered from APPS seizures are long guns. However, data from the Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF, clearly shows the vast majority of firearms recovered by law enforcement are handguns, which are already subject to the 30-day restriction, illustrating the restrictions ineffectiveness at reducing crime.

The author and proponents have tried three previous versions of this bill in the last three years. All vetoed by Governor Brown; 2016: AB 1674, 2017: SB 497 and in 2018: SB 1177. In his 2018 veto statement the Governor stated: "I am returning SB 1177 without my signature. This bill prohibits any person from purchasing more than one long-gun per month. I vetoed a substantially similar bill in 2016, and my views have not changed", in his 2016 veto statement Governor Brown said in part; " while well-intended, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need. Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed".

-- END –

Exhibit 29
DX0213

# EXHIBIT 30

Exhibit 30
DX0214

## SENATE COMMITTEE ON APPROPRIATIONS
### Senator Anthony Portantino, Chair
### 2019 - 2020  Regular  Session

**SB 61 (Portantino) - Firearms:  transfers**

**Version:** January 3, 2019      **Policy Vote:** PUB. S. 5 - 2
**Urgency:** No      **Mandate:** Yes
**Hearing Date:** April 22, 2019      **Consultant:** Shaun Naidu

**Bill Summary:**  SB 61 would prohibit the purchase of more than one long gun in a 30-day period, except as specified.

**Fiscal Impact:**

- <u>Fee revenue loss</u>:  The Department of Justice estimates an overall annual revenue reduction of 10 percent in fee collection resulting from fewer firearm purchases, equating to an overall annual loss of $2.23 million.  See comment below.  (Various special funds)

- <u>Tax revenue loss</u>:  Unknown, likely-significant loss in sales tax revenue resulting from the limitation on the number of long guns a person may purchase.  (General Fund, local funds)

- <u>System update</u>:  The Department of Justice (DOJ) anticipates that need of 1.0 limited-term Information Technology Specialist I in FY 2020-21 at a cost of $281,000, inclusive of attendant equipment and operating expenses.  (Special fund*, General Fund)

\* Dealers Record of Sale Special Account (DROS)—structurally imbalanced

**Background:**  Existing law prohibits any person from making an application to purchase more than one handgun within any 30-day period.  The handgun purchase limitation, however, does not apply to the following:
- Any law enforcement agency;
- Any agency duly authorized to perform law enforcement duties;
- Any state or local correctional facility;
- Any private security company licensed to do business in California;
- Any person who is properly identified as a full-time paid peace officer, as defined, and who is authorized to, and does, carry a firearm during the course and scope of employment as a peace officer;
- Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm;
- Any person who may claim an exemption from the waiting period set forth in Penal Code section 27540;
- Any private party transaction conducted through a licensed firearms dealer;
- Any person who is licensed as a collector and the regulations issued pursuant thereto and has a current certificate of eligibility issued by DOJ;
- The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement;

Exhibit 30
DX0215

**SB 61 (Portantino)** Page **2** of 3

- The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase the replacement handgun;
- The return of any handgun to its owner; or
- A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

The punishment for making an application to purchase more than one handgun within a 30-day period without an exception is as follows:
- A first violation is an infraction punishable by a base fine of $50.
- A second violation is an infraction punishable by a base fine of $100.
- A third or subsequent violation is a misdemeanor punishable by imprisonment in the county jail for up to six months, a base fine of up to $1,000, or both the imprisonment and fine.

Each application to purchase a handgun during the prohibited period is deemed a separate offense.

**Proposed Law:** This bill would extend the limitation of making an application to purchase more than one handgun in a 30-day period, along with the exceptions to the limitation, to all types of firearms. This bill would expand the exception to the limitation relative to long guns to a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife and the acquisition of a long gun at an auction or similar event conducted by a nonprofit public benefit or mutual benefit corporation to fund the activities of the corporation or its local chapter. For the purpose of these two exceptions, the barrel must be at least 16 inches in length.

**Related Legislation:** SB 1177 (Portantino, 2018) and AB 1674 (Santiago, 2016) similarly attempted to extend the limitation of purchasing one handgun within a 30-day period to the purchase of all types of firearms. The Governor vetoed both measures. In his message on AB 1674, the Governor stated that he believed that the bill "would have the effect of burdening lawful citizens who wish to sell certain firearms they no longer need[ ]" and that this additional restriction is not needed given the state's stringent laws restricting gun ownership. With respect to SB 1177, the Governor stated that his "views have not changed" since vetoing AB 1674.

**Staff Comments:** The Department of Justice estimates annual reductions of the specified amounts of fee collection for the following special funds resulting from SB 61: a $1.7 million decrease to DROS, a $441,000 decrease to the Firearms Safety and Enforcement Special Fund, and an $88,000 to the Firearm Safety Account is predicted to decrease by $88,000. In addition to experiencing the largest impact with respect to fee revenue loss, DROS also would be used to fund the limited-term position the department anticipates requiring to implement SB 61. The Dealers Record of Sale Special Account has experienced significant revenue decreases in recent years to the extent that it is structurally imbalanced. From FY 2017-18 to FY 2018-19 DROS revenues dropped by 22 percent; proposed revenue for FY 2019-20 is projected to remain consistent with 2018-19, however. The FY 2019-20 proposed budget anticipates a beginning balance of $6.159 million, revenues of $21.471 million,

Exhibit 30
DX0216

**SB 61 (Portantino)**                                            Page **3** of **3**

expenditures of $24.88 million, and an ending reserve of $2.75 million.  Given the operational deficit of DROS, the revenue loss and added expense resulting from SB 61 would create cost pressure on the General Fund to backfill any shortage.

**-- END --**

Exhibit 30
DX0217

# EXHIBIT 31

Exhibit 31
DX0218

# SENATE COMMITTEE ON APPROPRIATIONS
## Senator Anthony Portantino, Chair
### 2019 - 2020  Regular  Session

**SB 61 (Portantino) - Firearms:  transfers**

**Version:** January 3, 2019          **Policy Vote:** PUB. S. 5 - 2
**Urgency:** No                       **Mandate:** Yes
**Hearing Date:** May 16, 2019        **Consultant:** Shaun Naidu

# *********** ANALYSIS ADDENDUM – SUSPENSE FILE ***********
## The following information is revised to reflect amendments
## adopted by the committee on May 16, 2019

**Bill Summary:**  SB 61 would prohibit the purchase of more than one long gun in a 30-day period, except as specified.

**Fiscal Impact:**

- Fee revenue loss:  The Department of Justice estimates an overall annual revenue reduction of 10 percent in fee collection resulting from fewer firearm purchases, equating to an overall annual loss of $2.23 million.  See comment below.  (Various special funds)

- Tax revenue loss:  Unknown, likely-significant loss in sales tax revenue resulting from the limitation on the number of long guns a person may purchase.  (General Fund, local funds)

- System update:  The Department of Justice (DOJ) anticipates that need of 1.0 limited-term Information Technology Specialist I in FY 2020-21 at a cost of $281,000, inclusive of attendant equipment and operating expenses.  (Special fund*, General Fund)

* Dealers Record of Sale Special Account (DROS)—structurally imbalanced

**Author Amendments:**  Prohibit the sale of a semiautomatic centerfire rifle to specified exempted persons under age 21 and delay the effective date of specified provisions.

### -- END --

Exhibit 31
DX0219

# EXHIBIT 32

Exhibit 32
DX0220

**SENATE RULES COMMITTEE**                                              SB 61
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:     SB 61
Author:      Portantino (D), et al.
Amended:     5/17/19
Vote:        21

---

SENATE PUBLIC SAFETY COMMITTEE:  5-2, 4/2/19
AYES:  Skinner, Bradford, Jackson, Mitchell,  Wiener
NOES:  Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE: 4-2, 5/16/19
AYES:  Portantino, Bradford, Hill,  Wieckowski
NOES:  Bates, Jones

---

**SUBJECT:**  Firearms:  transfers

**SOURCE:**   Author

---

**DIGEST:**   This bill is to extends the prohibition on purchasing more than one
handgun a month to include all firearms.

**ANALYSIS:**

Existing law:

1) Prohibits a person from making more than one application to purchase a
   handgun within any 30-day period. (Pen. Code § 27535.)

2) Prohibits a firearms dealer from delivering a handgun to a person whenever the
   dealer is notified by the Department of Justice that within the preceding 30-day
   period the purchaser has made another application to purchase a handgun that
   does not fall within an exception to the 30-day prohibition. A violation of that
   delivery prohibition by the dealer is a crime. (Pen. Code § 27540.)

Exhibit 32
DX0221

SB 61
Page 2

3) Exempts the following from the one handgun a month prohibition: (Pen. Code, § 27535, subd. (b).)

   a) Any law enforcement agency.

   b) Any agency duly authorized to perform law enforcement duties.

   c) Any state or local correctional facility.

   d) Any private security company licensed to do business in California.

   e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

   f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.

   g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

   h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

   i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

   j) The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

   k) The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

   l) The return of any handgun to its owner.

   m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

Exhibit 32
DX0222

SB 61
Page 3

This bill:

1) Extends the prohibition on purchasing more than one handgun a month to all firearms, including long guns.

2) Exempts the following from the one handgun a month prohibition: (Pen. Code, § 27535, subd. (b).)

   a) Any law enforcement agency.

   b) Any agency duly authorized to perform law enforcement duties.

   c) Any state or local correctional facility.

   d) Any private security company licensed to do business in California.

   e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

   f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.

   g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

   h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

   i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

   j) The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

   k) The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

Exhibit 32
DX0223

l) The return of any handgun to its owner.

m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training,

3) Specifies that specified licensees shall not sell, supply, deliver, or give possession or control of a semiautomatic centerfire rifle to any person who is under 21 years of age, with specified exemptions.

## Background

*One Gun a Month.* According to the Senate Public Safety Analysis of Assembly Bill 202 (Knox, of 1999), which created the one-handgun-a-month law in California:

> The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely traveled to Virginia to purchase quantities of weapons to take back for illegal sale in other states. Purchases of more than one handgun per 30-day period in Virginia is allowed upon completion of an "enhanced" background check when the purchase is for lawful business or personal use, for purposes of collectors, bulk sales and purchases from estates, to replace a lost or stolen weapon, and similar situations.

> Supporters of limits on purchases of handguns assume that the Virginia limits and the limits in this bill would only affect a very small proportion of legitimate handgun purchasers. A family of two adults could still purchase 24 handguns a year under the provisions of both this bill and the Virginia law.

Virginia repealed this law in 2012. But, according to the Law Center to Prevent Gun Violence:

> Virginia's one-gun-a-month law – which was in effect from 1993 to 2012 and prohibited the purchase of more than one handgun per person in any 30-day period – significantly reduced the number of

Exhibit 32
DX0224

crime guns traced to Virginia dealers. Virginia initially adopted its law after the state became recognized as a primary source of crime guns recovered in states in the northeastern U.S. After the law's adoption, the odds of tracing a gun originally acquired in the Southeast to a Virginia gun dealer (as opposed to a dealer in a different southeastern state) dropped by:

- 71% for guns recovered in New York;
- 72% for guns recovered in Massachusetts; and
- 66% for guns recovered in New Jersey, New York, Connecticut, Rhode Island and Massachusetts combined.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/ [footnotes omitted].)

Other states that have limits on the number of firearms that can be sold in one month include:

- California: California law prohibits any person from purchasing more than one handgun within any 30-day period. In addition, a licensed firearms dealer may not deliver a handgun to any person following notification from the California Department of Justice that the purchaser has applied to acquire a handgun within the preceding 30-day period. Finally, firearms dealers must conspicuously post in their licensed premises a warning, in block letters at least one inch in height, notifying purchasers of these restrictions.

- District of Columbia: A person may not register more than one handgun in the District during any 30-day period. Since every handgun must be registered, this amounts to a purchase and sale limitation of one handgun per 30-day period.

- Maryland: Maryland prohibits any person from purchasing more than one handgun or assault weapon within a 30-day period. Under limited circumstances, a person may be approved by the Secretary of the Maryland State Police to purchase multiple handguns or assault weapons in a 30-day period. Maryland also penalizes any dealer or other seller who knowingly participates in an illegal purchase of a handgun or assault weapon.

- New Jersey: New Jersey prohibits licensed firearms dealers from knowingly delivering more than one handgun to any person within any 30-day period. With limited exceptions, no person may purchase more than one handgun

Exhibit 32
DX0225

within any 30-day period. New Jersey requires a handgun purchaser to obtain a separate permit for each handgun purchased, and present the permit to the seller. The seller must keep a copy of each permit presented.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-summary/[footnotes omitted].)

*Assembly Bill 1674 (Santiago), of 2015: Veto Message.*  The Governor stated in his veto message of Senate Bill 1674, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period:

> This bill generally prohibits the purchase of more than one firearm within any 30-day period. It should be noted that California already bans the purchase of more than one handgun per month.

> While well-intentioned, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need.

> Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed.

*Senate Bill 1177 (Portantino), of 2018: Veto Message.*  The Governor stated in his veto message of Senate Bill 1177, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period, with the same exemptions included in this bill:

> This bill prohibits any person from purchasing more than one long-gun per month.

> I vetoed a substantially similar bill in 2016, and my views have not changed.

*California Hunting Licenses.*  This bill creates an exemption from the prohibition on persons under the age of 21 purchasing or receiving a long gun if the person under the age of 21 has a valid, unexpired hunting license. In order to obtain a hunting license in California a person must:

- Complete the California Hunter Education Certification requirements.
- Choose the correct type of hunting license.

Exhibit 32
DX0226

- Purchase a license through the California Department of Fish and Wildlife website or a California approved agent.

The Official California Hunter Safety Course is an online course that costs $28.95. There is no minimum age for the course. The course requires a follow-up course that is a 4-hour review of the online course with a certified hunter education instructor. The course includes a student demonstration of safe firearm handling and a test. Following completion of the follow-up course the enrollee receives a Hunter Education Certificate.

**FISCAL EFFECT:**  Appropriation:  No  Fiscal Com.:  Yes  Local:  Yes

According to the Senate Appropriations Committee:

*Fee revenue loss:*  The Department of Justice estimates an overall annual revenue reduction of 10 percent in fee collection resulting from fewer firearm purchases, equating to an overall annual loss of $2.23 million.  See comment below. (Various special funds)

*Tax revenue loss:*  Unknown, likely-significant loss in sales tax revenue resulting from the limitation on the number of long guns a person may purchase. (General Fund, local funds)

*System update:*  The Department of Justice anticipates that need of 1.0 limited-term Information Technology Specialist I in FY 2020-21 at a cost of $281,000, inclusive of attendant equipment and operating expenses. (Special fund*, General Fund)

* Dealers Record of Sale Special Account (DROS)—structurally imbalanced

**SUPPORT:** (Verified  5/16/19)

Bay Area Student Activists
Brady California United Against Gun Violence
Coalition Against Gun Violence
Giffords Law Center to Prevent Gun Violence
Los Angeles County Board of Supervisors
Los Angeles City Attorney

**OPPOSITION:** (Verified  5/16/19)

California Rifle and Pistol Association
California Sportsman's Lobby

Exhibit 32
DX0227

SB 61
Page 8

Gun Owners of California
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
Safari Club International Foundation

**ARGUMENTS IN SUPPORT:** According to Brady California United Against
Gun Violence:

> In 1999, legislation (AB 202) was enacted that limits purchases of
> handguns from licensed firearms dealers in California to no more than
> one per person per 30-day period. The purpose of the bill was to curb
> the illegal flow of handguns by taking the profit out of selling guns
> from bulk purchases on the black market. SB 61 applies existing law
> under AB 202 to long guns, including rifles, shotguns, and lower
> receivers.

> Under SB 61, firearms (handguns *and* long guns) will not be delivered
> whenever the dealer is notified by the Department of Justice that
> within the preceding 30-day period, the purchaser had made another
> application to purchase a firearm. Private party transactions will
> continue to be exempt. Additionally, rifle and shotgun (but not lower
> receiver) purchasers with a valid hunting license issued by the
> Department of Fish and Wildlife and the acquisition of a rifle or
> shotgun at an auction or similar event conducted by a nonprofit will
> be exempt.

> It stands to reason that a person buying large quantities of guns at one
> time may be acting as a straw purchaser or gun trafficker. Moreover,
> firearms acquired this way are frequently used in crime. In fact, an
> ATF study of tracing data demonstrated that 22% of all handguns
> recovered in crime in 1999 were originally purchased as part of a
> multiple sale. A similar study found that 20% of all handguns
> recovered in crime in 2000 were originally purchased as part of a
> multiple sale. Additionally, a University of Pennsylvania report found
> that a quarter of all guns used in crime were purchased as part of a
> multiple-gun sale and that guns purchased in bulk were up to 64%
> more likely to be used for illegal purposes than guns purchased
> individually.

Exhibit 32
DX0228

Since 1999, Californians have typically purchased more long guns than handguns every year. Currently, these long guns include high powered featureless weapons with exchangeable magazines that enable rapid reload and lower receivers, which can be assembled into illegal military-style weapons. Limiting multiple-gun sales within a short period of time for such weapons, which are more lethal than handguns, is clearly in the interest of public safety.

The Department of Justice began to retain records of long gun purchases on January 1, 2014. An analysis of the transaction data from the period January 2014 through June 2015 shows that 81.9% of long guns were sold as a single long gun purchase within a 30-day period. *Clearly, the vast majority of long gun purchasers will not be impacted by SB 61*. However, at the opposite end of the spectrum, an individual purchased 177 long guns in two transactions within a one month period (April 2014). Furthermore, sales to single individuals ranging from 5 to 54 long guns per month occurred on 1,787 occasions, totaling 12,090 guns. Department data also shows that when multiple long guns are transferred in a sale, it is more than twice as likely that lower receivers are included. The largest bulk sale of long guns in one month to an individual (177 long guns) was composed *entirely* of lower receivers, which can be built into illegal assault weapons and sold on the black market.

Brady California believes that handguns and long guns should generally be subject to the same laws. Preventing the flow of illegal guns is important to public safety regardless of whether the firearm is a handgun or a long gun. Limiting firearms sales to one gun per 30-day period is a recognized strategy to reduce gun trafficking and keep firearms out of dangerous hands. Brady California thanks you for introducing SB 61.

**ARGUMENTS IN OPPOSITION:** According to California Rifle and Pistol Association:

SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's

Exhibit 32
DX0229

wildlife.   The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

The author and proponents have argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month.  For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive.  Each transaction requiring a trip to the licensed dealer.

Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase. Both California and Federal law already address the author's concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired

Exhibit 32
DX0230

effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ.

SB 61, does allow for numerous exemptions to the restriction which do not apply to the general public, though well intended by the author will create a nightmare DOJ and law enforcement to implement and enforce. Additionally, the author has argued this bill is necessary because the vast majority of firearms recovered from APPS seizures are long guns. However, data from the Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF, clearly shows the vast majority of firearms recovered by law enforcement are handguns, which are already subject to the 30-day restriction, illustrating the restrictions ineffectiveness at reducing crime.

The author and proponents have tried three previous versions of this bill in the last three years. All vetoed by Governor Brown; 2016: AB 1674, 2017: SB 497 and in 2018: SB 1177. In his 2018 veto statement the Governor stated: "I am returning SB 1177 without my signature. This bill prohibits any person from purchasing more than one long-gun per month. I vetoed a substantially similar bill in 2016, and my views have not changed", in his 2016 veto statement Governor Brown said in part; " while well-intended, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need. Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed".


Prepared by:  Gabe Caswell / PUB. S. /
5/20/19 10:19:57

**\*\*\*\* END \*\*\*\***

Exhibit 32
DX0231

# EXHIBIT 33

Exhibit 33
DX0232

SB 61
Page 1

Date of Hearing:   June 25, 2019
Chief Counsel:     Gregory Pagan

ASSEMBLY COMMITTEE ON PUBLIC SAFETY
Reginald Byron Jones-Sawyer, Sr., Chair

SB 61 (Portantino) – As Amended June 11, 2019

**SUMMARY:** Prohibits the sale of a semiautomatic centerfire rifle to any person under 21 years of age, and prohibits a person from making an application to purchase more than one long gun in any 30-day period, except as specified.   Specifically, **this bill**:

1) Prohibits a person from making an application to purchase more than one firearm of any type within any 30-day period and makes conforming changes to the existing prohibition against the purchase of more than one handgun in any 30-day period. (Pen. Code, § 27535, subd. (a).)

2) Adds the following entities to the existing exemption to the 30-day prohibition relating to sale of handguns:

   a) The purchase of a firearm other than a handgun by a person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife;

   b) The acquisition of a firearm, other than a handgun, at an auction or similar event conducted by a nonprofit public benefit, or mutual benefit corporation to fund the activities of that corporation or local chapter of that corporation; and,

   c) Clarifies that for the purpose of the above exemption, the frame or receiver of a firearm is a handgun, unless the application to purchase and delivered to the recipient is equipped with, is attached to, or is currently accompanied by, a barrel of 16 inches or greater in length.

3) Provides that effective January 1, 2021 a licensed firearms dealer shall not sell, supply, deliver, or give a semiautomatic centerfire rifle to any person under 21 years of age. This provision shall not apply to any of the following persons 18 years of age or older:

   a) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   b) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

   c) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

   d) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the

Exhibit 33
DX0233

SB 61
Page 2

individuals in these organizations are properly identified. Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member; and,

e) A person who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife and a certificate of eligibility issued by the Department of Justice (DOJ).

**EXISTING LAW:**

1) Prohibits a licensed firearms dealer from selling, supplying, or giving possession or control of a firearm to any person under 21 years of age. (Pen. Code, § 27510, subd. (a).)

2) Provides that the above prohibition does not apply to or affect the sale, supplying, or giving possession or control of a firearm to any person 18 years of age or older who possesses a valid, unexpired hunting license issued by the Department of Fish and Wildlife. (Pen. Code, § 27510, subd. (b)(1).)

3) Exempts the sale of a firearm, that is not a handgun, to the following persons that are 18 years of age or older:

a) An active peace officer, who is authorized to carry a firearm in the course and scope of his or her employment;

b) An active federal officer, or law enforcement agent, who is authorized to carry a firearm in the course and scope of his or her employment;

c) A reserve peace officer, who is authorized to carry a firearm in the course and scope of his or her employment; and,

d) An active member of the United States Armed Forces, the National Guard, the Air national Guard, or the active reserve components of the United States, where the individuals in these organizations are properly identified. Proper identification includes the Armed Forces Identification Card or other written documentation certifying that the individual is an active or honorably retired member. (Pen. Code, §27510, subd. (b)(2).)

4) Prohibits any person from making an application to purchase more than one handgun within any 30-day period. (Pen. Code, § 27535, subd. (a).)

5) Exempts from the above 30-day prohibition any of the following:

a) Any law enforcement agency;

b) Any agency duly authorized to perform law enforcement duties;

c) Any state or local correctional facility;

d) Any private security company licensed to do business in California;

Exhibit 33
DX0234

e) Any person who is a peace officer, as specified, and is authorized to carry a firearm in the course and scope of employment;

f) Any motion picture, television, video production company or entertainment or theatrical company whose production by its nature involves a firearm;

g) Any authorized representative of a law enforcement agency, or a federally licensed firearms importer or manufacturer;

h) Any private party transaction conducted through a licensed firearms dealer;

i) Any person who is a licensed collector and has a current certificate of eligibility issued by the DOJ;

j) The exchange, replacement, or return of a handgun to a licensed dealer within the 30-day period; and,

k) A community college that is certified by the Commission on Peace Officer Standards and Training (POST) to present law enforcement academy basic course or other commission-certified training. (Pen. Code, § 27535, subd. (b).)

6) Provides that a person may request a certificate of eligibility form the DOJ, and requires the department to examine its records and records available to the department in the National Instant Criminal Background Check System (NICS) in order to determine if the applicant is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm. (Pen. Code, § 26710, subds. (a) & (b).)

7) Requires DOJ to issue a certificate of eligibility to an applicant if the if the department's records indicate that the person is not a person who is prohibited by state or federal law from possessing a firearm, and requires the department regulations to administer the certificate of eligibility program and shall recover the full costs of administering the program by imposing fees assessed to applicants who apply for those certificates. (Pen. Code, § 26710, subds. (c) & (d).)

**FISCAL EFFECT**: Unknown

**COMMENTS**:

1) **Author's Statement:** According to the author, "More and more shootings are occurring with long guns so it is important that we treat the laws of both handguns and long guns the same. The law that passed last year requiring no one under the age of 21 to purchase a firearm has exemptions that we are strengthening and tightening when it comes to the purchase of semi-automatic center fire rifle by requiring the person to obtain a CEO with the DOJ as well."

2) **Governor's Vetoes:** AB 1174 (Santiago), of the 2015-2016 Legislative Session, and SB 1177 (Portantino), of the 2017-2018 Legislative Session, each prohibited any person from making more than one application to purchase a long gun within any 30 day period. Both AB 1174 and SB 1177 were vetoed by the Governor.

Exhibit 33
DX0235

In regard to AB 1174, the Governor stated in his veto message, "This bill generally prohibits the purchase of more than one firearm within any 30 day period. It should be noted that California already bans the purchase of more than one handgun per month. While well intentioned, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms they no longer need. Given California's restricting gun ownership, I do not believe this additional restriction is needed."

In regard to SB 1177, the Governor stated in his veto message, "This bill prohibits a person from purchasing more than one long-gun per month. I vetoed a substantially similar bill in 2016, and my views have not changed."

3) **Argument in Support:** According to the *Ventura County Board of Supervisors*, "As you know, Ventura County was the site of the November 2018 shooting at the Borderline bar, which tragically resulted in 12 deaths. This mass shooting has left our community shattered and in search of ways to prevent similar tragedies. We appreciate the Legislature's multi-- - pronged effort to advance legislation in 2019 that reduces the likelihood that persons who pose a threat to themselves or others are restricted from possessing firearms. As a general policy, the County of Ventura supports legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides.

"We believe SB 61 would be part of the solution in reducing gun violence. It would make long guns generally subject to the same purchasing restrictions as handguns. Limitations imposed on the purchase of handguns were enacted 20 years ago (AB 202, 1999). That legislation was intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market. SB 61 would apply the law enacted under AB 202 to long guns, as specified. It would, however, include several narrow exceptions."

4) **Argument in Opposition:** According to the California Rifle and Pistol Association "SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

"SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

"You and your proponents argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate

Exhibit 33
DX0236

recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

"Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase."

"Both California and Federal law already address your concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ."

5) **Prior Legislation:**

a) SB 1100 (Portantino), Chapter 894, Statutes of 2018, increased the age for which a person can purchase a long-gun from a licensed dealer from 18-21 years of age, except as specified.

b) SB 1177 (Portantino), of the 2017-2018 Legislative Session, prohibited any person from making more than one application to purchase more than one long one within any 30 day period. SB 1177 was vetoed by the Governor.

c) AB 1674 (Santiago), of the 2015-2016 Legislative Session, prohibited any person from making more than one application to purchase more than one long gun within any 30 day period. SB 1674 was vetoed by the Governor.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

Bay Area Student Activists
Brady California United Against Gun Violence
California Police Chiefs Association
Coalition Against Gun Violence, A Santa Barbara County Coalition
Laguna Woods Democratic Club
Los Angeles City Attorney
Los Angeles County Board of Supervisors
Physicians for Social Responsibility - San Francisco Bay Area Chapter

Exhibit 33
DX0237

**SB 61**
Page 6

Ventura County Board of Supervisors
Women For: Orange County

**Oppose**

California Rifle and Pistol Association, Inc.
California Sportsman's Lobby, Inc.
Gun Owners of California, Inc.
National Rifle Association - Institute for Legislative Action
National Shooting Sports Foundation, Inc.
Outdoor Sportsmen's Coalition of California
Safari Club International - California Chapters

**Analysis Prepared by**: Gregory Pagan / PUB. S. / (916) 319-3744

Exhibit 33
DX0238

# EXHIBIT 34

Exhibit 34
DX0239

SB 61
Page 1

Date of Hearing:  July 10, 2019

ASSEMBLY COMMITTEE ON APPROPRIATIONS
Lorena Gonzalez, Chair
SB 61 (Portantino) – As Amended June 11, 2019

Policy Committee:    Public Safety                                    Vote:    5 - 2

Urgency:  No          State Mandated Local Program:  Yes          Reimbursable:  Yes

**SUMMARY**:

This bill prohibits a person from making an application to purchase more than one firearm of any type within any 30-day period. This bill specifically prohibits a person from making an application to purchase more than one long gun in any 30-day period unless the person has a hunting license issued by the Department of Fish and Wildlife and a certificate of eligibility issued by the Department of Justice (DOJ). This bill also prohibits, beginning January 1, 2021, the sale of a semiautomatic centerfire rifle to any person under 21 years of age.

**FISCAL EFFECT**:

1)  DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

2)  Sales tax revenue loss (GF) likely in the hundreds of thousands of dollars to low millions of dollars annually due to the limitation on the number of firearms that may be purchased in a 30-day period.

3)  One-time costs (GF/Dealer Record of Sale Account) of $281,000 to the DOJ for limited term information technology staff and equipment to update systems to track both handguns and long guns to ensure only one purchase within a 30-day period.

**COMMENTS**:

1)  **Purpose.** According to the author:

> More and more shootings are occurring with long guns so it is important that we treat the laws of both handguns and long guns the same. The law that passed last year requiring no one under the age of 21 to purchase a firearm has exemptions that we are strengthening and tightening when it comes to the purchase of semi-automatic center fire rifle by requiring the person to obtain a [certificate of eligibility] with the DOJ as well.

2)  **Dealer Record of Sale (DROS) Special Account.** The DROS Special Account has experienced significant revenue decreases in recent years to the extent that it is structurally imbalanced. Penal Code section 30015, subdivision (a) codified the allocation of $24 million dollars from the DROS Special Account to address the APPS backlog in 2013 largely resulting in the structural imbalance. AB 74 (Committee on Budget), Chapter 23, Statutes of 2019, allocates approximately $22 million dollars to backfill the DROS Special Account.

Exhibit 34
DX0240

Additionally, existing law specifically limits how DOJ may use DROS funds, including costs associated with the Armed Prohibited Persons System (APPS), background checks, inspection for security and safe storage, regulating transfer for sale via the internet, certain public education campaigns, private patrol operator regulations and re-testing for not unsafe handguns. DOJ is not authorized to use DROS funds for general law enforcement purposes.

Over the past five years, there is increasing litigation over whether DOJ is improperly using DROS funds. Case law prohibits taxing a constitutional right unless it is necessary to meet the "expense incident to the administration of the act and to the maintenance of public order in the matter licensed." Cox v. New Hampshire (1941) 312 U.S. 569, 577. Further loss of revenue to the DROS Special Account due to the reduction in the number of firearms sold may result in increased fees and a greater need to use DROS funds for general law enforcement activities. This may result in more litigation and associated costs.

3) **Related Legislation.** AB 1669 (Bonta) creates the Dealers' Record of Sale Supplemental Subaccount within the DROS Special Account to offset the reasonable costs of firearms-related regulatory and enforcement activities related to the sale, purchase, manufacturing, lawful or unlawful possession, loan, or transfer of firearms. AB 1669 is pending hearing in the Senate Public Safety Committee.

4) **Prior Legislation.**

   a) SB 1100 (Portantino), Chapter 894, Statutes of 2018, increased the minimum age, from 18 years to 21 years, for which a person may purchase a long-gun from a licensed dealer, except as specified.

   b) SB 1177 (Portantino), of the 2017-2018 Legislative Session, prohibited any person from making more than one application to purchase more than one long gun within any 30-day period. SB 1177 was vetoed by the Governor.

   c) AB 1674 (Santiago), of the 2015-2016 Legislative Session, prohibited any person from making more than one application to purchase more than one long gun within any 30-day period. SB 1674 was vetoed by the Governor.

**Analysis Prepared by**: Kimberly Horiuchi / APPR. / (916) 319-2081

Exhibit 34
DX0241

# EXHIBIT 35

Exhibit 35
DX0242

SENATE THIRD READING
SB 61 (Portantino)
As Amended  September 3, 2019
Majority  vote

## SUMMARY:

Prohibits  the sale of a semiautomatic  centerfire  rifle  to any person under 21 years of age, and prohibits  a person from making  an application  to purchase  more than one semiautomatic centerfire  rifle  in any 30-day period, except as specified.

**Major Provisions**

1)  Prohibits  a person from making  an application  to purchase  more than one centerfire automatic  rifle  within any 30-day period and makes conforming  changes to the existing prohibition  against the purchase of more than one handgun  in any 30-day period.

2)  Adds the following  entities  to the existing  exemption  to the 30-day prohibition  relating  to sale of handguns:

   a)  The purchase  of a firearm  other than a handgun  by a person who possesses a valid, unexpired  hunting  license  issued by the Department  of Fish and Wildlife;

   b)  The acquisition  of a firearm,  other than a handgun,  at an auction or similar  event conducted  by a nonprofit  public benefit,  or mutual benefit  corporation  to fund the activities  of that corporation  or local chapter of that corporation;  and,

   c)  Clarifies  that for the purpose of the above exemption,  the frame or receiver of a firearm  is a handgun,  unless the application  to purchase  and delivered  to the recipient  is equipped with, is attached to, or is currently  accompanied  by, a barrel of 16 inches  or greater in length.

3)  Provides that a licensed  firearms  dealer shall not sell, supply,  deliver, or give possession  of a firearm  to any person under 21 years of age. This provision  shall not apply to or affect the sale of a firearm  that is not a handgun  or a semiautomatic  centerfire  rifle  to a person 18 years of age or older that possesses a valid  unexpired  hunting  license  issued by the Department  of Fish and Wildlife,  or is an honorably  discharged  member of the United  States military.

4)  States that the provisions  of this bill are severable.

## COMMENTS:

**According  to the Author:**

"More and more shootings  are occurring  with long guns so it is important  that we treat the laws of both handguns  and long guns the same. The law that passed last year requiring  no one under the age of 21 to purchase  a firearm  has exemptions  that we are strengthening  and tightening when it comes to the purchase of semi-automatic  center fire rifle  by requiring  the person to obtain a CEO with the DOJ as well."

Exhibit 35
DX0243

**Arguments in Support:**

According to the Ventura County Board of Supervisors, "As you know, Ventura County was the site of the November 2018 shooting at the Borderline bar, which tragically resulted in 12 deaths. This mass shooting has left our community shattered and in search of ways to prevent similar tragedies. We appreciate the Legislature's multi-¬ pronged effort to advance legislation in 2019 that reduces the likelihood that persons who pose a threat to themselves or others are restricted from possessing firearms. As a general policy, the County of Ventura supports legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides.

"We believe SB 61 would be part of the solution in reducing gun violence. It would make long guns generally subject to the same purchasing restrictions as handguns. Limitations imposed on the purchase of handguns were enacted 20 years ago (AB 202, 1999). That legislation was intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market. SB 61 would apply the law enacted under AB 202 to long guns, as specified. It would, however, include several narrow exceptions."

**Arguments in Opposition:**

According to the California Rifle and Pistol Association "SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

"SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

"You and your proponents argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

"Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first

Exhibit 35
DX0244

**SB 61**
Page 3

firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase."

"Both California and Federal law already address your concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ."

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

2) Sales tax revenue loss (General Fund (GF)) likely in the hundreds of thousands of dollars annually due to the limitation on the number of centerfire semiautomatic rifles that may be purchased in a 30-day period.

3) One-time costs (GF/Dealer Record of Sale Account) of less than $100,000 to the DOJ for limited term information technology staff and equipment to update systems to track centerfire semiautomatic rifles to ensure only one purchase within a 30-day period.

## VOTES:

**SENATE FLOOR: 27-10-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Chang, Grove, Jones, Moorlach, Morrell, Nielsen, Stone, Wilk
**ABS, ABST OR NV:** Roth

**ASM PUBLIC SAFETY: 5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Quirk, Santiago, Wicks
**NO:** Lackey, Mathis
**ABS, ABST OR NV:** Kamlager-Dove

**ASM APPROPRIATIONS: 13-5-0**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Maienschein, Petrie-Norris, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte

## UPDATED:

VERSION: September 3, 2019

CONSULTANT: Gregory Pagan (Counsel)/ PUB. S. / (916) 319-3744          FN: 0001642

Exhibit 35
DX0245

# EXHIBIT 36

Exhibit 36
DX0246

SENATE THIRD READING
SB 61 (Portantino)
As Amended  September 6, 2019
Majority  vote

## SUMMARY:

Prohibits  the sale of a semiautomatic  centerfire  rifle  to any person under 21 years of age, and prohibits  a person from making  an application  to purchase more than one semiautomatic centerfire  rifle  in any 30-day period, except as specified.

### Major Provisions

1) Prohibits  a person from making  an application  to purchase more than one centerfire automatic  rifle  within any 30-day period and makes conforming  changes to the existing prohibition  against the purchase of more than one handgun  in any 30-day period.

2) Adds the following  entities  to the existing  exemption  to the 30-day prohibition  relating  to sale of handguns:

    a) The purchase  of a firearm  other than a handgun  by a person who possesses a valid, unexpired  hunting  license  issued by the Department  of Fish and Wildlife;

    b) The acquisition  of a firearm,  other than a handgun,  at an auction or similar  event conducted  by a nonprofit  public  benefit,  or mutual  benefit  corporation  to fund the activities  of that corporation  or local chapter of that corporation;  and,

    c) Clarifies  that for the purpose of the above exemption,  the frame  or receiver of a firearm  is a handgun,  unless the application  to purchase and delivered  to the recipient  is equipped with, is attached to, or is currently  accompanied  by, a barrel of 16 inches  or greater  in length.

3) Provides  that a licensed  firearms  dealer shall not sell, supply, deliver,  or give possession of a firearm  to any person under 21 years of age. This provision  shall not apply to or affect the sale of a firearm  that is not a handgun  or a semiautomatic  centerfire  rifle  to a person 18 years of age or older that possesses a valid  unexpired  hunting  license  issued by the Department  of Fish and Wildlife,  or is an honorably  discharged  member  of the United States military.

4) States that the provisions  of this bill  are severable.

## COMMENTS:

### According  to the Author:

"More and more shootings  are occurring  with  long guns so it is important  that we treat the laws of both handguns  and long guns the same.  The law that passed last year requiring  no one under the age of 21 to purchase a firearm  has exemptions  that we are strengthening  and tightening when it comes to the purchase of semi-automatic  center fire  rifle  by requiring  the person to obtain a CEO with  the [Department  of Justtice]  as well."

Exhibit 36
DX0247

**Arguments in Support:**
According to the Ventura County Board of Supervisors, "As you know, Ventura County was the site of the November 2018 shooting at the Borderline bar, which tragically resulted in 12 deaths. This mass shooting has left our community shattered and in search of ways to prevent similar tragedies. We appreciate the Legislature's multi-¬ pronged effort to advance legislation in 2019 that reduces the likelihood that persons who pose a threat to themselves or others are restricted from possessing firearms. As a general policy, the County of Ventura supports legislation that reduces the likelihood of accidental or intentional homicides and, in particular, mass homicides.

"We believe SB 61 would be part of the solution in reducing gun violence. It would make long guns generally subject to the same purchasing restrictions as handguns. Limitations imposed on the purchase of handguns were enacted 20 years ago (AB 202, 1999). That legislation was intended to reduce the illegal flow of handguns by eliminating the opportunity to sell guns from bulk purchases on the black market. SB 61 would apply the law enacted under AB 202 to long guns, as specified. It would, however, include several narrow exceptions."

**Arguments in Opposition:**
According to the California Rifle and Pistol Association "SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

"SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

"You and your proponents argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

"Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first

Exhibit 36
DX0248

firearm.  Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase."

"Both California and Federal law already address your concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ."

## FISCAL COMMENTS:

According to the Assembly Appropriations Committee:

1) DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

2) Sales tax revenue loss (General Fund (GF)) likely in the hundreds of thousands of dollars annually due to the limitation on the number of centerfire semiautomatic rifles that may be purchased in a 30-day period.

3) One-time costs (GF/Dealer Record of Sale Account) of less than $100,000 to the DOJ for limited term information technology staff and equipment to update systems to track centerfire semiautomatic rifles to ensure only one purchase within a 30-day period.

## VOTES:

**SENATE FLOOR:  27-10-1**
**YES:** Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo, Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire, Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Chang, Grove, Jones, Moorlach, Morrell, Nielsen, Stone, Wilk
**ABS, ABST OR NV:** Roth

**ASM PUBLIC SAFETY:  5-2-1**
**YES:** Jones-Sawyer, Bauer-Kahan, Quirk, Santiago, Wicks
**NO:** Lackey, Mathis
**ABS, ABST OR NV:** Kamlager-Dove

**ASM APPROPRIATIONS:  13-5-0**
**YES:** Gonzalez, Bloom, Bonta, Calderon, Carrillo, Chau, Eggman, Gabriel, Eduardo Garcia, Maienschein, Petrie-Norris, Quirk, Robert Rivas
**NO:** Bigelow, Brough, Diep, Fong, Obernolte

## UPDATED:

VERSION: September 6, 2019

CONSULTANT:  Gregory Pagan (Counsel) / PUB. S. / (916) 319-3744          FN: 0002053

Exhibit 36
DX0249

# EXHIBIT 37

Exhibit 37
DX0250

**SENATE RULES COMMITTEE**                                      SB 61
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

## UNFINISHED BUSINESS

---

Bill No:    SB 61
Author:     Portantino (D), et al.
Amended:    9/6/19
Vote:       21

---

SENATE PUBLIC SAFETY COMMITTEE: 5-2, 4/2/19
AYES: Skinner, Bradford, Jackson, Mitchell, Wiener
NOES: Moorlach, Morrell

SENATE APPROPRIATIONS COMMITTEE: 4-2, 5/16/19
AYES: Portantino, Bradford, Hill, Wieckowski
NOES: Bates, Jones

SENATE FLOOR: 27-10, 5/22/19
AYES: Allen, Archuleta, Atkins, Beall, Bradford, Caballero, Dodd, Durazo,
  Galgiani, Glazer, Hertzberg, Hill, Hueso, Hurtado, Jackson, Leyva, McGuire,
  Mitchell, Monning, Pan, Portantino, Rubio, Skinner, Stern, Umberg,
  Wieckowski, Wiener
NOES: Bates, Borgeas, Chang, Grove, Jones, Moorlach, Morrell, Nielsen, Stone,
  Wilk
NO VOTE RECORDED: Roth

ASSEMBLY FLOOR: 46-17, 9/13/19
(ROLL CALL NOT AVAILABLE)

---

**SUBJECT:** Firearms: transfers

**SOURCE:** Author

---

**DIGEST:** This bill prohibits the sale of a semiautomatic centerfire rifle to any person under 21 years of age, and prohibits a person from making an application to purchase more than one semiautomatic centerfire rifle in any 30-day period, except as specified.

Exhibit 37
DX0251

SB 61
Page 2

*Assembly Amendments* (1) limit the purchase limitations to one gun a month for semiautomatic centerfire rifles, in addition to handguns which are limited under existing law; (2) remove the language defining frames or receivers as firearms under specified scenarios; and (3) add double-jointing language to prevent chaptering issues with SB 172 (Portantino) and AB 645 (Irwin).

## ANALYSIS:

Existing law:

1) Prohibits a person from making more than one application to purchase a handgun within any 30-day period. (Pen. Code § 27535.)

2) Prohibits a firearms dealer from delivering a handgun to a person whenever the dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a handgun that does not fall within an exception to the 30-day prohibition. A violation of that delivery prohibition by the dealer is a crime. (Pen. Code § 27540.)

3) Exempts the following from the one handgun a month prohibition: (Pen. Code, § 27535, subd. (b).)

   a) Any law enforcement agency.

   b) Any agency duly authorized to perform law enforcement duties.

   c) Any state or local correctional facility.

   d) Any private security company licensed to do business in California.

   e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

   f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves the use of a firearm.

   g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

Exhibit 37
DX0252

h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

j) The exchange of a handgun where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

k) The replacement of a handgun when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

l) The return of any handgun to its owner.

m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training.

This bill:

1) Extends the prohibition on purchasing more than one handgun a month to also include semiautomatic centerfire rifles.

2) Exempts the following from the one gun a month prohibition: (Pen. Code, § 27535, subd. (b).)

a) Any law enforcement agency.

b) Any agency duly authorized to perform law enforcement duties.

c) Any state or local correctional facility.

d) Any private security company licensed to do business in California.

e) Any person who is properly identified as a full-time paid peace officer and who is authorized to, and does carry a firearm during the course and scope of employment as a peace officer.

f) Any motion picture, television, or video production company or entertainment or theatrical company whose production by its nature involves

Exhibit 37
DX0253

SB 61
Page 4

the use of a firearm.

g) Any person who may make a valid claim an exemption from the waiting period set forth in Section 27540.

h) Any transaction conducted through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050).

i) Any person who is licensed as a collector and has a current certificate of eligibility issued by the Department of Justice.

j) The exchange of a handgun or semiautomatic centerfire rifle where the dealer purchased that firearm from the person seeking the exchange within the 30-day period immediately preceding the date of exchange or replacement.

k) The replacement of a handgun or semiautomatic centerfire rifle when the person's handgun was lost or stolen, and the person reported that firearm lost or stolen prior to the completion of the application to purchase to any local law enforcement agency of the city, county, or city and county in which the person resides.

l) The return of any handgun or semiautomatic centerfire rifle to its owner.

m) A community college that is certified by the Commission on Peace Officer Standards and Training to present the law enforcement academy basic course or other commission-certified law enforcement training,

3) Specifies that specified licensees shall not sell, supply, deliver, or give possession or control of a semiautomatic centerfire rifle to any person who is under 21 years of age, with specified exemptions.

**Background**

*One Gun a Month.* According to the Senate Public Safety Committee analysis of AB 202 (Knox, 1999), which created the one-handgun-a-month law in California:

> The State of Virginia enacted a "one-handgun-a-month" law in 1993 (before the Federal Brady Bill, which required at least a five day waiting period plus a background check for states without such requirements). That state had weak restrictions on handgun sales and it has been stated that gun traffickers from New York City routinely

Exhibit 37
DX0254

traveled to Virginia to purchase quantities of weapons to take back for
illegal sale in other states. Purchases of more than one handgun per
30-day period in Virginia is allowed upon completion of an
"enhanced" background check when the purchase is for lawful
business or personal use, for purposes of collectors, bulk sales and
purchases from estates, to replace a lost or stolen weapon, and similar
situations.

Supporters of limits on purchases of handguns assume that the
Virginia limits and the limits in this bill would only affect a very
small proportion of legitimate handgun purchasers. A family of two
adults could still purchase 24 handguns a year under the provisions of
both this bill and the Virginia law.

Virginia repealed this law in 2012. But, according to the Law Center to Prevent
Gun Violence:

Virginia's one-gun-a-month law – which was in effect from 1993 to
2012 and prohibited the purchase of more than one handgun per
person in any 30-day period – significantly reduced the number of
crime guns traced to Virginia dealers. Virginia initially adopted its
law after the state became recognized as a primary source of crime
guns recovered in states in the northeastern U.S. After the law's
adoption, the odds of tracing a gun originally acquired in the
Southeast to a Virginia gun dealer (as opposed to a dealer in a
different southeastern state) dropped by:

- 71% for guns recovered in New York;
- 72% for guns recovered in Massachusetts; and
- 66% for guns recovered in New Jersey, New York, Connecticut, Rhode
  Island and Massachusetts combined.

(http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-
summary/ [footnotes omitted].)

Other states that have limits on the number of firearms that can be sold in one
month include:

- California: California law prohibits any person from purchasing more than one
  handgun within any 30-day period. In addition, a licensed firearms dealer may

Exhibit 37
DX0255

not deliver a handgun to any person following notification from the California
Department of Justice that the purchaser has applied to acquire a handgun
within the preceding 30-day period. Finally, firearms dealers must
conspicuously post in their licensed premises a warning, in block letters at least
one inch in height, notifying purchasers of these restrictions.

- District of Columbia: A person may not register more than one handgun in the
  District during any 30-day period. Since every handgun must be registered, this
  amounts to a purchase and sale limitation of one handgun per 30-day period.

- Maryland: Maryland prohibits any person from purchasing more than one
  handgun or assault weapon within a 30-day period. Under limited
  circumstances, a person may be approved by the Secretary of the Maryland
  State Police to purchase multiple handguns or assault weapons in a 30-day
  period. Maryland also penalizes any dealer or other seller who knowingly
  participates in an illegal purchase of a handgun or assault weapon.

- New Jersey: New Jersey prohibits licensed firearms dealers from knowingly
  delivering more than one handgun to any person within any 30-day period.
  With limited exceptions, no person may purchase more than one handgun
  within any 30-day period. New Jersey requires a handgun purchaser to obtain a
  separate permit for each handgun purchased, and present the permit to the
  seller. The seller must keep a copy of each permit presented.

  (http://smartgunlaws.org/multiple-purchases-sales-of-firearms-policy-
  summary/[footnotes omitted].)

*AB 1674 (Santiago, 2015): Veto Message.* The Governor stated in his veto
message of Senate Bill 1674, which would have prohibited any person from
making an application to purchase more than one firearm within any 30-day
period:

> This bill generally prohibits the purchase of more than one firearm within
> any 30-day period. It should be noted that California already bans the
> purchase of more than one handgun per month.

> While well-intentioned, I believe this bill would have the effect of burdening
> lawful citizens who wish to sell certain firearms that they no longer need.

Exhibit 37
DX0256

Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed.

*SB 1177 (Portantino, 2018): Veto Message.*  The Governor stated in his veto message of Senate Bill 1177, which would have prohibited any person from making an application to purchase more than one firearm within any 30-day period, with the same exemptions included in this bill:

This bill prohibits any person from purchasing more than one long-gun per month.

I vetoed a substantially similar bill in 2016, and my views have not changed.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:  Yes   Local:  Yes

According to the Assembly Appropriations Committee:

- DOJ estimates an overall annual revenue reduction of 10% in fee collection (Firearms Safety and Enforcement Fund/Dealer Record of Sale Special Account) resulting from fewer firearm purchases, equating to an overall loss of $2.23 million dollars annually.

- Sales tax revenue loss (GF) likely in the hundreds of thousands of dollars to low millions of dollars annually due to the limitation on the number of firearms that may be purchased in a 30-day period.

- One-time costs (GF/Dealer Record of Sale Account) of $281,000 to the DOJ for limited term information technology staff and equipment to update systems to track both handguns and long guns to ensure only one purchase within a 30-day period.

**SUPPORT:** (Verified  9/12/19)

Bay Area Student Activists
Brady California United Against Gun Violence
Coalition Against Gun Violence
Giffords Law Center to Prevent Gun Violence
Los Angeles City Attorney
Los Angeles County Board of Supervisors

Exhibit 37
DX0257

**OPPOSITION:** (Verified  9/12/19)

California Rifle and Pistol Association
California Sportsman's Lobby
Gun Owners of California
National Shooting Sports Foundation
Outdoor Sportsmen's Coalition of California
Safari Club International
Safari Club International Foundation

**ARGUMENTS IN SUPPORT:**  According to Brady California United Against Gun Violence:

> In 1999, legislation (AB 202) was enacted that limits purchases of handguns from licensed firearms dealers in California to no more than one per person per 30-day period. The purpose of the bill was to curb the illegal flow of handguns by taking the profit out of selling guns from bulk purchases on the black market. SB 61 applies existing law under AB 202 to long guns, including rifles, shotguns, and lower receivers.

> Under SB 61, firearms (handguns *and* long guns) will not be delivered whenever the dealer is notified by the Department of Justice that within the preceding 30-day period, the purchaser had made another application to purchase a firearm. Private party transactions will continue to be exempt. Additionally, rifle and shotgun (but not lower receiver) purchasers with a valid hunting license issued by the Department of Fish and Wildlife and the acquisition of a rifle or shotgun at an auction or similar event conducted by a nonprofit will be exempt.

> It stands to reason that a person buying large quantities of guns at one time may be acting as a straw purchaser or gun trafficker. Moreover, firearms acquired this way are frequently used in crime. In fact, an ATF study of tracing data demonstrated that 22% of all handguns recovered in crime in 1999 were originally purchased as part of a multiple sale. A similar study found that 20% of all handguns recovered in crime in 2000 were originally purchased as part of a multiple sale. Additionally, a University of Pennsylvania report found that a quarter of all guns used in crime were purchased as part of a multiple-gun sale and that guns purchased in bulk were up to 64%

Exhibit 37
DX0258

more likely to be used for illegal purposes than guns purchased individually.

Since 1999, Californians have typically purchased more long guns than handguns every year. Currently, these long guns include high powered featureless weapons with exchangeable magazines that enable rapid reload and lower receivers, which can be assembled into illegal military-style weapons. Limiting multiple-gun sales within a short period of time for such weapons, which are more lethal than handguns, is clearly in the interest of public safety.

The Department of Justice began to retain records of long gun purchases on January 1, 2014. An analysis of the transaction data from the period January 2014 through June 2015 shows that 81.9% of long guns were sold as a single long gun purchase within a 30-day period. *Clearly, the vast majority of long gun purchasers will not be impacted by SB 61.* However, at the opposite end of the spectrum, an individual purchased 177 long guns in two transactions within a one month period (April 2014). Furthermore, sales to single individuals ranging from 5 to 54 long guns per month occurred on 1,787 occasions, totaling 12,090 guns. Department data also shows that when multiple long guns are transferred in a sale, it is more than twice as likely that lower receivers are included. The largest bulk sale of long guns in one month to an individual (177 long guns) was composed *entirely* of lower receivers, which can be built into illegal assault weapons and sold on the black market.

Brady California believes that handguns and long guns should generally be subject to the same laws. Preventing the flow of illegal guns is important to public safety regardless of whether the firearm is a handgun or a long gun. Limiting firearms sales to one gun per 30-day period is a recognized strategy to reduce gun trafficking and keep firearms out of dangerous hands. Brady California thanks you for introducing SB 61.

**ARGUMENTS IN OPPOSITION:** According to California Rifle and Pistol Association:

SB 61 would significantly reduce long gun sales in California. This translates into a loss of manufacturing jobs at both the state and national levels, and a significant loss of revenue for California

Exhibit 37
DX0259

businesses. Additionally, this bill will significantly impact the millions of dollars of Federal Pitman Roberson tax money that would be earmarked to develop and enhance habitat critical for California's wildlife. The Department of Justice (DOJ), has estimated previous versions of this same bill's implementation alone will cost hundreds of thousands of dollars, and result in significant overtime hours for Department personal to perform the necessary analysis, development, testing, and implementation to various Department databases.

SB 61 will also effectively prohibit the creation of new businesses in California involving hands on instruction in the safe handling of firearms. Should this bill become law, certified firearm instructors would no longer be able acquire the necessary firearms without having to wait months, if not years, to conduct classes for groups such as the Boy Scouts of America, Hunter Education, Youth shooting sports, and other clubs or organizations that wish to participate in firearm safety classes.

The author and proponents have argued in testimony there is no legitimate reason for anyone to need to purchase more than one firearm a month. There are, in fact, numerous legitimate recreational and Second Amendment protected reasons why an individual might want, and need, to transfer more than one firearm a month. For example, someone new to the sport of recreational competitive shooting, 'Three Gun' competitions, may very well need to purchase a pistol, shotgun, and rifle without having to wait 30 days between each purchase. This bill would require someone wanting to acquire all three types of firearms to undergo a process that would take at least 70 days assuming everything goes smoothly. The procedure for purchasing these firearms is already very time and travel intensive. Each transaction requiring a trip to the licensed dealer.

Currently individuals in California must go through the following steps to purchase a firearm; Obtain a firearm safety certificate; Go to a California licensed firearms dealer; Complete 4473 and (Dealer Record of Sales) DROS applications; Pass the required background check; Wait the required 10 days; Go back to dealer; Perform a safe handling demonstration; Pick up first firearm. Under SB 61 the individual would have to wait the required 30 days, then go back to dealer again; and repeat the process for each subsequent purchase.

Exhibit 37
DX0260

Both California and Federal law already address the author's concerns regarding the trafficking of firearms by narrowly limiting the number of firearms an individual can sell. Rather than having the desired effect of targeting criminals, this bill will impact only the law abiding, thereby further limiting available funding to DOJ.

SB 61, does allow for numerous exemptions to the restriction which do not apply to the general public, though well intended by the author will create a nightmare DOJ and law enforcement to implement and enforce. Additionally, the author has argued this bill is necessary because the vast majority of firearms recovered from APPS seizures are long guns. However, data from the Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF, clearly shows the vast majority of firearms recovered by law enforcement are handguns, which are already subject to the 30-day restriction, illustrating the restrictions ineffectiveness at reducing crime.

The author and proponents have tried three previous versions of this bill in the last three years. All vetoed by Governor Brown; 2016: AB 1674, 2017: SB 497 and in 2018: SB 1177. In his 2018 veto statement the Governor stated: "I am returning SB 1177 without my signature. This bill prohibits any person from purchasing more than one long-gun per month. I vetoed a substantially similar bill in 2016, and my views have not changed", in his 2016 veto statement Governor Brown said in part; " while well-intended, I believe this bill would have the effect of burdening lawful citizens who wish to sell certain firearms that they no longer need. Given California's stringent laws restricting gun ownership, I do not believe this additional restriction is needed".

Prepared by:  Gabe Caswell / PUB. S. /
9/13/19 19:33:29

**** **END** ****

Exhibit 37
DX0261

# EXHIBIT 38

Exhibit 38
DX0262

 **Subscribe to Our Newsletter**    Enter your email    Subscribe



**ROB BONTA**

*Attorney General*

# Frequently Asked Questions

Home   /   Firearms   /   Firearm Safety Certificate   /   *Frequently Asked Questions*

# Firearm Safety Certificate Program

## Links to Topics below

General FAQs

FSC Program DOJ Certified Instructor FAQs

Firearms Dealers' FAQs

Certified Instructor Training (Comparable Entity) FAQs

## General FAQs

1. What are the Firearm Safety Certificate requirements?
2. What are the exemptions from the Firearm Safety Certificate requirement?

Exhibit 38
DX0263

3. If I already have a Handgun Safety Certificate, do I still need a Firearm Safety Certificate?

4. Do I need a Firearm Safety Certificate if I begin a long gun transaction prior to January 1, 2015, but don't take possession of the long gun until after December 31, 2014?

5. How do I get a Firearm Safety Certificate?

6. How much does the Firearm Safety Certificate cost?

7. Are there any minimum qualifications/requirements for a person who wants to take the Firearm Safety Certificate Test?

8. How can I prepare for the Firearm Safety Certificate Test?

9. How can I get a Firearm Safety Certificate Study Guide?

10. If I don't pass the FSC test, can I take it again?

11. How long is a Firearm Safety Certificate valid?

12. If I lose my Firearm Safety Certificate, can I get a replacement

13. Do I need a Firearm Safety Certificate if I am receiving a firearm from my mother or father?

14. Do I have to carry my Firearm Safety Certificate with me whenever I possess or transport my firearm?

15. Is a Firearm Safety Certificate required when a firearm is being loaned?

16. I am moving into California and intend to bring my firearm with me. Do I need a Firearm Safety Certificate?

17. What is the "safe handling demonstration" requirement?

18. When must the safe handling demonstration take place?

19. What are the exemptions to the safe handling demonstration requirement?

Back To Top

1. **What are the Firearm Safety Certificate requirements?**

Exhibit 38
DX0264

- Prior to purchasing or acquiring a firearm, unless exempted, you must have a valid Firearm Safety Certificate (FSC). You must present your FSC to the firearms dealer at the time you begin a transaction to purchase or acquire a firearm.

2. **What are the exemptions from the Firearm Safety Certificate requirement?**

- There are several FSC requirement exemptions. In addition to the previous Handgun Safety Certificate (HSC) exemptions, a person issued a valid hunting license is exempt from the FSC requirement for long guns only. (Pen. Code, § 31700, subd. (c).)

3. **If I already have a Handgun Safety Certificate, do I still need a Firearm Safety Certificate?**

- o A valid HSC can still be used to purchase/acquire handguns until it expires. For long gun purchases/acquisitions made on or after January 1, 2015, an FSC is required. An FSC can be used to purchase/acquire both handgun and long guns.

4. **Do I need a Firearm Safety Certificate if I begin a long gun transaction prior to January 1, 2015, but don't take possession of the long gun until after December 31, 2014?**

- Yes. Effective January 1, 2015, an FSC must be obtained prior to taking possession of a long gun, regardless of when the DROS transaction was initiated.

5. **How do I get a Firearm Safety Certificate?**

- To obtain an FSC you must score at least 75% (23 correct answers out of 30 questions) on the FSC Test covering firearm safety and basic firearms laws. The true/false and multiple choice test is administered by Instructors certified by the Department of Justice who are generally located at firearms dealerships.

6. **How much does the Firearm Safety Certificate cost?**

Exhibit 38
DX0265

- The fee for taking the FSC Test and obtaining an FSC is twenty-five dollars ($25). The $25 fee entitles you to take the test twice (from the same DOJ Certified Instructor) if necessary.

7. **Are there any minimum qualifications/requirements for a person who wants to take the Firearm Safety Certificate Test?**

   - Yes. The FSC applicant must be at least 18 years of age and must present clear evidence of identity and age by presenting a California Driver License or California Department of Motor Vehicles Identification Card.

8. **How can I prepare for the Firearm Safety Certificate Test?**

   - The best way to prepare for the FSC Test is to read the FSC Study Guide. The study guide contains all the information necessary to pass the test. The FSC webinar is also a useful study tool.

9. **How can I get a Firearm Safety Certificate Study Guide?**

   - The FSC Study Guide is available to view or download from this website at http://www.oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/hscsg.pdf.

10. **If I don't pass the FSC test, can I take it again?**

    - Yes. The $25 fee entitles you to take the test twice if necessary. If you fail the test the first time, you may retake another version of the test from the same FSC Program DOJ Certified Instructor without any additional fee after 24 hours have elapsed. The FSC Program DOJ Certified Instructor is required to offer or make available to you the FSC Study Guide or refer you to view the webinar.

11. **How long is a Firearm Safety Certificate valid?**

    - An FSC is valid for five years from the date of issuance.

12. **If I lose my Firearm Safety Certificate, can I get a replacement**

Exhibit 38
DX0266

- Yes. A replacement FSC is available only through the FSC Program DOJ Certified Instructor who issued your FSC. The FSC replacement cost is $5. The replacement FSC will reflect the same expiration date as your original FSC.

13. **Do I need a Firearm Safety Certificate if I am receiving a firearm from my mother or father?**

   - Yes. Prior to taking possession of the firearm, you must have a valid FSC. Pursuant to Penal Code section 27875, subdivison (c), within 30 days of the transfer, you must also report the acquisition to DOJ on Form BOF 4544, pdf.

14. **Do I have to carry my Firearm Safety Certificate with me whenever I possess or transport my firearm?**

   - No. Mere possession/ownership of a firearm does not require an FSC. However, you do have to present your FSC to the firearms dealer at the time you begin a transaction to purchase/acquire a firearm.

15. **Is a Firearm Safety Certificate required when a firearm is being loaned?**

   - It depends on the specific circumstances. Generally, a person being loaned a firearm must have a current FSC. However, an FSC is not required if the loan does not exceed three days in duration **and** the person loaning the firearm is at all times within the presence of the person being loaned the firearm.

16. **I am moving into California and intend to bring my firearm with me. Do I need a Firearm Safety Certificate?**

   - No, you do not need an FSC to move into California with your firearm. However, there are important rules related to personal firearm importation that must be followed, and which are explained on this website. (Pen. Code, § 17000.)

17. **What is the "safe handling demonstration" requirement?**

Exhibit 38
DX0267

- The safe handling demonstration is a statutory requirement that firearm purchasers/recipients execute a series of specific steps related to safely loading and unloading the firearm. The safe handling demonstration must be performed under the supervision of a FSC Program DOJ Certified Instructor, and the purchaser must sign an affidavit attesting to the completion of the safe handling demonstration. The performance steps of a successful, safe handling demonstration can be found beginning on page 12 of the Firearm Safety Certificate Study Guide, pdf.

18. **When must the safe handling demonstration take place?**

- The safe handling demonstration must be performed on or after the date the Dealer Record of Sale (DROS) is submitted to DOJ, and prior to the delivery of the firearm. You may find it helpful to perform the safe handling demonstration prior to actually initiating the DROS to ensure that you will be able to take possession of the make and model you select.

19. **What are the exemptions to the safe handling demonstration requirement?**

- The exemptions to the safe handling demonstration are the same as the exemptions from the FSC requirement. If a firearm purchaser/recipient has a valid exemption from the FSC requirement, he or she is also exempt from the safe handling demonstration requirement. A copy of the proof of exemption documentation must be retained with the original DROS, but a Safe Handling Demonstration Affidavit would not be required.

Back To Top

# FSC Program DOJ Certified Instructor FAQs

Exhibit 38
DX0268

1. What is the DOJ Certified Instructor's role in the Firearm Safety Certificate Program?

2. What are the qualifications for becoming a FSC Program DOJ Certified Instructor?

3. Where can I obtain the firearms safety instruction training that will qualify me to obtain FSC Program DOJ Certified Instructor certification?

4. How do I apply to become a FSC Program DOJ Certified Instructor?

5. How long is my FSC Program DOJ Instructor Certification valid?

6. What are the requirements for renewing my FSC Program Certified DOJ Instructor Certificate?

7. If I lose my FSC Program DOJ Certified Instructor Certificate can I get a replacement?

8. How much can I charge for administering the Firearm Safety Certificate Test and issuing the Firearm Safety Certificate?

9. Are there any minimum qualifications/requirements for a person who wants to take the Firearm Safety Certificate Test?

10. Can a FSC Program DOJ Certified Instructor delegate administering the Firearm Safety Certificate Test and issuing FSCs to their employees?

11. Can a FSC Program DOJ Certified Instructor delegate overseeing the safe handling demonstration to their employees?

12. When a FSC Program DOJ Certified Instructor purchases/acquires a firearm, can they sign the Certified Instructor portion of the Safe Handling Demonstration Affidavit?

13. What is meant by "that handgun" and "that long gun" as used in the safe handling demonstration requirements in Penal Code sections 26850, subdivision (a), and 26860, subdivision (a)?

14. When must the Safe Handling Demonstration be performed?

15. What are the Safe Handling Demonstration Affidavit responsibilities?

Exhibit 38
DX0269

16. How do I obtain the necessary Firearm Safety Certificate Program materials?

17. What is meant by "that handgun" and "that long gun" as used in the safe handling demonstration requirements in Penal Code sections 26850, subdivision (a), and 26860, subdivision (a)?

18. What must I do if I discontinue my participation in the Firearm Safety Certificate Program?

19. How long must I retain Firearm Safety Certificate Test Answer Sheets and Firearm Safety Certificate issuance records?

Back To Top

1. **What is the DOJ Certified Instructor's role in the Firearm Safety Certificate Program?**
   - The FSC Program DOJ Certified Instructor administers the Firearm Safety Certificate (FSC) test, issues FSCs, and oversees safe handling demonstrations.

2. **What are the qualifications for becoming a FSC Program DOJ Certified Instructor?**
   - FSC Program DOJ Certified Instructor applicants must have a Certificate of Eligibility as proof of being able to lawfully possess firearms in California.

     FSC Program DOJ Certified Instructor applicants also must possess a certification to provide firearms training from one of the entities identified in Penal Code section 31635.

3. **Where can I obtain the firearms safety instruction training that will qualify me to obtain FSC Program DOJ Certified Instructor certification?**

Exhibit 38
DX0270

- The training entities specified in Penal Code section 31635 provide the necessary training to qualify individuals for FSC Program DOJ Certified Instructor certification. However, not all of these training courses are available to the public.

  Entities determined by DOJ to give comparable instruction in firearms safety to those identified in Penal Code section 31635 are listed on this website and are generally available to the public.

4. **How do I apply to become a FSC Program DOJ Certified Instructor?**

   - You must submit a Firearm Safety Certificate Program Certified Instructor Application, BOF 037, pdf, to DOJ with copies of your qualifying certification pursuant to Penal Code section 31635 and your valid Certificate of Eligibility. Alternatively, you may apply online through the FSC Certified Instructor Firearm Certification System at https://fcs.doj.ca.gov/login-form

5. **How long is my FSC Program DOJ Instructor Certification valid?**

   - The FSC Program DOJ Instructor Certification is valid for five (5) years.

6. **What are the requirements for renewing my FSC Program DOJ Certified Instructor Certificate?**

   - Upon login to the FSC program web-based application, DOJ Certified Instructors will receive pop-up notifications beginning 60 days prior to expiration of their DOJ Certified Instructor Certification. To complete the renewal request, you should see "Renew CI" under the "User" section on the left hand menu bar.

     Once your renewal request has been submitted and approved, your updated CI card will be available under "My User Profile" and you will see the option to Print CI card. The renewal process can take 3-4 business days to process.

**Exhibit 38**
DX0271

7. **If I lose my FSC Program Certified DOJ Instructor Certificate, can I get a replacement?**

   ○ Yes. In the event of loss or destruction, you may reprint your FSC Program Certified Instructor Certificate through the web-based application.

8. **How much can I charge for administering the Firearm Safety Certificate Test and issuing the Firearm Safety Certificate?**

   ○ The maximum fee you can charge for administering the FSC Test and issuing an FSC is $25. This fee entitles the applicant to take the test twice if necessary.

9. **Are there any minimum qualifications/requirements for a person who wants to take the Firearm Safety Certificate Test?**

   ○ Yes, the FSC applicant must be at least 18 years of age and must present clear evidence of identity and age by presenting a California Driver License or California Identification Card.

10. **Can a FSC Program DOJ Certified Instructor delegate administering the Firearm Safety Certificate Test and issuing FSCs to their employees?**

    ○ No. A FSC Program DOJ Certified Instructor must perform all functions of the FSC requirements, including administering the FSC Test and issuing FSCs.

11. **Can a FSC Program DOJ Certified Instructor delegate overseeing the safe handling demonstration to their employees?**

    ○ No. Only FSC Program DOJ Certified Instructors may oversee the safe handling demonstration.

12. **When a FSC Program DOJ Certified Instructor purchases/acquires a firearm, can they sign the Certified Instructor portion of the Safe Handling Demonstration Affidavit?**

Exhibit 38
DX0272

○ Yes, a FSC Program DOJ Certified Instructor may oversee their own safe handling demonstration and sign the safe handling demonstration affidavit.

13. **What is meant by "that handgun" and "that long gun" as used in the safe handling demonstration requirements in Penal Code sections 26850, subdivision (a), and 26860, subdivision (a)?**

○ "That handgun" and "That long gun" is either the very handgun or long gun being transferred, or one of the same make and model as the one being transferred.

14. **When must the Safe Handling Demonstration be performed?**

○ The safe handling demonstration must be performed on or after the date the DROS is submitted to DOJ, and prior to the delivery of the firearm. The Safe Handling Demonstration Affidavit (Form BOF 039) must be completed prior to the delivery of the firearm.

15. **What are the Safe Handling Demonstration Affidavit responsibilities?**

○ The firearms dealer or their employee agent must complete and attach to the Dealer Record of Sale (DROS) an affidavit stating the safe handling demonstration requirement was met. The DOJ Safe Handling Demonstration Affidavit Form, BOF 039, pdf, must be signed and dated by the FSC Program DOJ Certified Instructor, the firearm purchaser/recipient, and the dealer or their employee agent delivering the firearm.

16. **How do I obtain the necessary Firearm Safety Certificate Program materials?**

○ As a FSC Program DOJ Certified Instructor, you will be given access to the web-based application. Upon login, FSC materials, including the FSC Study Guide, FSC Manual, and test materials are available for viewing/printing. The FSCs will be generated individually through the system.

**Exhibit 38**
DX0273

17. **What can I do if I make a mistake after entering the individual's information in the FSC system for their Firearm Safety Certificate?**

   ○ After you have entered the individual's information into the web-based application, you will be allowed to preview the information entered before you formally submit the information that generates the FSC. Once you have submitted the information and the FSC is generated, you cannot edit the record. If a mistake is made after you have submitted the information, a replacement FSC would be required, and the FSC Program DOJ Certified Instructor must pay the $5 replacement fee.

18. **What must I do if I discontinue my participation in the Firearm Safety Certificate Program?**

   ○ You must notify DOJ within two (2) business days prior to discontinuing your participation in the FSC Program. You can submit your notification via email to boffscprogram@doj.ca.gov .

19. **How long must I retain Firearm Safety Certificate Test Answer Sheets and Firearm Safety Certificate issuance records?**

   ○ You must retain all completed test answer sheets for five (5) years from the test date. FSC issuance records will be available through the web-based application for five (5) years.

Back To Top

---

# Firearms Dealers' FAQs

1. What is the firearms dealer's role in the Firearm Safety Certificate Program?

2. How do I obtain the necessary Firearm Safety Certificate Program materials?

3. What are my Firearm Safety Certificate Program documentation requirements for the transfer of firearms?

Exhibit 38
DX0274

4.  It is illegal to photocopy federal credentials. How do I retain a copy of the proof of exemption documentation for individuals with federal credentials?

5.  What are the exemptions from the Firearm Safety Certificate requirement?

6.  What are the Firearm Safety Certificate requirement exemption codes?

7.  What are the Safe Handling Demonstration Affidavit responsibilities?

1.  **What is the firearms dealer's role in the Firearm Safety Certificate Program?**

    ○  The firearms dealer:

        ■  Ensures and documents that firearm purchasers/transferees present a valid Firearm Safety Certificate (FSC) or valid exemption documentation at the time of purchase;

        ■  Completes and maintains a Safe Handling Demonstration Affidavit attesting that the mandated safe handling demonstration was successfully performed; and

        ■  Makes the FSC Study Guide available to the public via this website at http://www.oag.ca.gov/firearms/forms.

2.  **How do I obtain the necessary Firearm Safety Certificate Program materials?**

    ○  FSC Program DOJ Certified Instructors will be given access to the web-based application. Upon login, FSC materials, including the FSC Study Guide, FSC Manual, and test materials are available for viewing/printing. The FSCs will be generated individually through the system.

Exhibit 38
DX0275

3. **What are the Firearm Safety Certificate Program documentation requirements for the transfer of firearms?**

   ○ In addition to entering the FSC number or the FSC exemption code on the Dealer Record of Sale (DROS), you must keep a copy of the FSC or a copy of the proof of exemption documentation with the original DROS for three years.

   You must also complete and attach to the DROS an affidavit stating the safe handling demonstration requirement was met.

4. **It is illegal to photocopy federal credentials. How do I retain a copy of the proof of exemption documentation for individuals with federal credentials?**

   ○ For individuals with federal credentials record the person's name, federal agency, and credential number rather than photocopying the credentials.

5. **What are the exemptions from the Firearm Safety Certificate requirement?**

   ○ There are several FSC requirement exemptions. In addition to the previous HSC exemptions, a person issued a valid hunting license is exempt from the FSC requirement for long guns only [Penal Code 31700(c)].

6. **What are the Firearm Safety Certificate requirement exemption codes?**

   ○
   - X01 = Special Weapons Permit Holder
   - X02 = Operation of Law Representative
   - X03 = Handgun being returned to the owner
   - X13 = FFL collector with COE (curio and relic handguns only)
   - X21 = Military - Active Duty
   - X22 = Military - Reserve
   - X25 = Military - Honorably Retired
   - X31 = Peace Officer - California - Active
   - X32 = Peace Officer - Federal - Active
   - X33 = Peace Officer - California - Honorably Retired

Exhibit 38
DX0276

- X34 = Peace Officer - California - Reserve

- X35 = Peace Officer - Federal - Honorably Retired

- X41 = Carry Concealed Weapon (CCW) Permit Holder

- X81 = P.O.S.T. 832 PC (Firearms) Training

- X91 = Particular and Limited Authority Peace Officers

- X95 = Law Enforcement Service Gun to Family Member

- X98 = Valid Hunting License (long guns only)

7. **What are the Safe Handling Demonstration Affidavit responsibilities?**

   - The firearms dealer or their employee agent must complete and attach to the Dealer Record of Sale (DROS) the DOJ Safe Handling Demonstration Affidavit, BOF 039, pdf stating the safe handling demonstration requirement was met. The affidavit must be signed and dated by the FSC Program DOJ Certified Instructor, the firearm purchaser/recipient, and the dealer or their employee agent delivering the firearm.

   Back To Top

---

# Certified Instructor Training (Comparable Entity) FAQs

1. Does the California Department of Justice recognize training entities that can provide the marketplace with individuals qualified to serve as FSC Program DOJ Certified Instructors?

2. What are the minimum requirements for California Department of Justice recognition of an entity providing comparable instruction in firearms safety specified in Penal Code section 31635?

3. How do I apply for California Department of Justice recognition of my firearms training entity for the FSC Program?

Exhibit 38
DX0277

4. Is there a fee to apply for California Department of Justice recognition of a comparable entity for the FSC Program?

1. **Does the California Department of Justice recognize training entities that can provide the marketplace with individuals qualified to serve as FSC Program DOJ Certified Instructors?**

   ○ Yes, Penal Code section 31635 authorizes DOJ to recognize entities which provide comparable instruction in firearms safety training as the entities specified within that subdivision. The statute also authorizes DOJ to issue a FSC Program DOJ Certified Instructor card to applicants possessing training certification from any entity so recognized by DOJ.

2. **What are the minimum requirements for California Department of Justice recognition of an entity providing comparable instruction in firearms safety specified in Penal Code section 31635?**

   ○ The training must be conducted by a FSC Program DOJ Certified Instructor with a minimum of 100 hours of verifiable experience in providing firearm safety teaching/training. The proposed training curriculum must include the following course content: Instruction on Safe Handling Demonstration Steps for the following conventional firearm types:

     ▪ Semiautomatic pistol
     ▪ Double action revolver
     ▪ Single action revolver
     ▪ Pump action long gun
     ▪ Bolt action long gun
     ▪ Semiautomatic long gun with detachable magazine
     ▪ Semiautomatic long gun with fixed magazine

Exhibit 38
DX0278

- Break top long gun (single or multiple barrel versions)
- Lever action long gun

Instruction on Safe Handling Demonstration Steps as required by Penal Code section 26850 for the following Handguns with Alternative Designs:

- Semiautomatic pistol with a non-locking slide
- Semiautomatic pistol with a fixed magazine
- Semiautomatic pistol with a magazine-operated toggle lock
- Semiautomatic pistol with a top-feeding magazine
- Semiautomatic pistol with a tip-up barrel
- Break-top revolver
- Single shot pistol
- Derringer

Instruction on how to render a handgun safe in the event of a jam (malfunction) as required by Penal Code section 26850, subdivision (c).

Requirement for all students to successfully perform the Safe Handling Demonstration with the conventional firearm types. The firearms used for the demonstration must be provided by the FSC Program DOJ Certified Instructor.

A sample copy of the Certificate of Completion.

3. **How do I apply for California Department of Justice recognition of my firearms training entity for the FSC Program?**

An application for DOJ Recognition of Entity Giving Comparable Firearms Safety Instruction to Entities Specified in Penal Code Section 31635 form is available for download from this website at http://www.oag.ca.gov/firearms/forms .

**Exhibit 38**
DX0279

4.  **Is there a fee to apply for California Department of Justice recognition of a comparable entity for the FSC Program?**

No. There is no DOJ fee associated with the application process.

Back To Top

---

Office of the Attorney General     Accessibility     Privacy Policy     Conditions of Use     Disclaimer

© 2024 DOJ

Exhibit 38
DX0280

# EXHIBIT 39

Exhibit 39
DX0281





# Firearm Safety Certificate

## M A N U A L

for
**California Firearms Dealers**
and
**DOJ Certified Instructors**



**California Department of Justice**
**Division of Law Enforcement**
**Bureau of Firearms**
**June 2020**

Exhibit 39
DX0282

# FIREARM SAFETY CERTIFICATE MANUAL
## For California Firearms Dealers and DOJ Certified Instructors

# TABLE OF CONTENTS



**Introduction**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Firearms Dealer Responsibilities**
    The Firearm Safety Certificate Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
    Verifying and Recording FSC Information on a DROS. . . . . . . . . . . . . . . . 2
    Firearm Safety Certificate Exemptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Safe Handling Demonstration Affidavits. . . . . . . . . . . . . . . . . . . . . . . . . . .6
    Firearm Safety Certificate Study Guide. . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**DOJ Certified Instructor Responsibilities**
    The Firearm Safety Certificate Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    Firearm Safety Certificate - Certified Instructor Cards. . . . . . . . . . . . . . . 7
    Administering the FSC Test and Issuing FSCs. . . . . . . . . . . . . . . . . . . . . . . 7
    Firearm Safety Certificate Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    The Firearm Safety Certificate Test Format. . . . . . . . . . . . . . . . . . . . . . . . 7
    Firearm Safety Certificate Test Guidelines. . . . . . . . . . . . . . . . . . . . . . . . . 8
    Scoring the Firearm Safety Certificate Test. . . . . . . . . . . . . . . . . . . . . . . . .8
    Firearm Safety Certificate Issuance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    Firearm Safety Certificate Card Replacement. . . . . . . . . . . . . . . . . . . . . . .9
    Firearm Safety Certificate Record Keeping. . . . . . . . . . . . . . . . . . . . . . . . .9
    FSC Test Disqualification and Specific Acts of Collusion. . . . . . . . . . . . . 10
    Safe Handling Demonstrations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**APPENDIX I**
    Safe Handling Demonstration Steps (Conventional Firearms). . . . . . . . . . 12
        ❖  Semiautomatic Pistol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        ❖  Double-Action Revolver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        ❖  Single-Action Revolver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        ❖  Pump Action Long Gun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
        ❖  Break-Top Long Gun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
        ❖  Bolt Action Long Gun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        ❖  Lever Action Long Gun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22
        ❖  Semiautomatic Long Gun With a Detachable Magazine. . . . . . . . .23
        ❖  Semiautomatic Long Gun With a Fixed Magazine. . . . . . . . . . . . 24

Exhibit 39
DX0283

Safe Handling Demonstration Steps (Alternative Designs). . . . . . . . . . . . 25
   ❖ Semiautomatic Pistol With a Non-Locking Slide. . . . . . . . . . . . . 25
   ❖ Semiautomatic Pistol With a Fixed Magazine. . . . . . . . . . . . . . . .26
   ❖ Semiautomatic Pistol With a Magazine Operated Toggle Lock. . . . 26
   ❖ Semiautomatic Pistol With a Top-Feeding Magazine. . . . . . . . . . .27
   ❖ Semiautomatic Pistol With a Tip-Up Barrel. . . . . . . . . . . . . . . . . 27
   ❖ Break-Top Revolver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
   ❖ Single Shot Pistol. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
   ❖ Derringer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Firearm Malfunctions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
Safe Handling Demonstration – Glossary of Terms. . . . . . . . . . . . . . . . . 32

**APPENDIX II**
FSC Exemption Code List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

Exhibit 39
DX0284

# INTRODUCTION



This Department of Justice (DOJ) Firearm Safety Certificate (FSC) Manual contains the FSC Program guidelines and procedures for California firearms dealers and DOJ Certified Instructors. You should use the manual as your first source of information regarding the FSC Program. If you need information not found in the manual, you may contact the Bureau of Firearms at (916) 210-2300.

The growing concern over the number of accidental firearm shootings, especially those involving children, prompted passage of the initial handgun safety law which went into effect in 1994. The stated intent of the California Legislature in enacting the current FSC law is for persons who obtain firearms to have a basic familiarity with those firearms, including, but not limited to, the safe handling and storage of those firearms.

The statutory authority for this program is contained in Penal Code sections 26840 and 31610 through 31700. These statutes mandate DOJ to develop, implement and maintain the FSC Program. Pursuant to Penal Code section 26840, a firearms dealer cannot deliver a firearm unless the person receiving the firearm presents a valid FSC, which is obtained by passing a written test on firearm safety. Prior to taking delivery of a firearm from a licensed firearms dealer, the purchaser/recipient must also successfully perform a safe handling demonstration with that firearm. Specific categories of persons who are experienced and proficient with firearms are exempt from the FSC and safe handling demonstration requirements.

Exhibit 39

DX0285

# FIREARMS DEALER RESPONSIBILITIES



The two primary FSC statutory responsibilities of licensed firearms dealers are: (1) confirming firearm purchasers/recipients have obtained the required FSC or qualify for an exemption; and (2) confirming firearm purchasers/recipients have successfully performed the mandatory safe handling demonstration. This section of the manual provides firearms dealers with detailed information regarding these responsibilities related to the sale or transfer of firearms, including record keeping requirements necessary to confirm compliance by purchasers and dealers. Firearms dealers who are also DOJ Certified Instructors should refer to the <u>DOJ Certified Instructor Responsibilities</u> section for additional information related specifically to their role as Certified Instructors.

## <u>The Firearm Safety Certificate Law</u>

California Penal Code sections 26840, 26850, and 26860, state that no dealer may deliver a firearm unless the person receiving the firearm presents to the dealer a valid firearm safety certificate and no firearms dealer may deliver a firearm unless the recipient performs a safe handling demonstration with that firearm. The law exempts certain categories of individuals from the FSC and safe handling demonstration requirements.

Pursuant to Penal Code section 31610, it is the intent of the Legislature in enacting these laws to require that persons who obtain firearms have a basic familiarity with those firearms, including, but not limited to, the safe handling and storage of those firearms.

## <u>Verifying and Recording FSC Information on a DROS</u>

As a firearms dealer, prior to submission of a Dealer's Record of Sale (DROS) for a firearm transaction, you must verify and record the firearm purchaser/recipient's FSC number or exempt status.

You must verify the name of the individual on the FSC is the same as the purchaser/recipient on the DROS. Once you have verified the certificate holder's identity as valid for that certificate, the FSC number must be recorded in the FSC field on the electronic DROS transaction form. You must keep a copy of the FSC with the original DROS. Please note: A DOJ Certified Instructor card is the equivalent of a standard FSC when purchasing a firearm.

Your purchaser/recipient may claim an exemption to the FSC requirement. Exemptions are described in the next subject area, <u>FSC Exemptions</u>. Whenever a purchaser/recipient claims an FSC exemption, you must verify the individual's identity and proof of exemption. You must record the applicable exemption code on the DROS and keep a copy of the proof of exemption documentation with the original DROS. Pursuant to U.S. Code, Title 18, section 701, it is a misdemeanor to photocopy federal credentials. Accordingly, for individuals with federal credentials (exemptions X32 and X35), record the person's name, federal agency, and credential number rather than photocopying the credentials. DOJ will not accept a firearm DROS transaction for processing unless it has the FSC number or the appropriate exemption status code recorded on it.

## Firearm Safety Certificate Exemptions

If a firearm purchaser/recipient is exempt from the FSC requirement, he/she must show proof of his/her exempt status for dealer verification before submission of the DROS. Appendix II on page 33 provides an easy reference table of the FSC exemption categories and corresponding exemption codes. The FSC exemption categories, corresponding exemption codes, Penal Code authorization, and narrative summary of each exemption category are as follows:

- **Special Weapons Permit Holder**
  **Exemption Code: X01; Authorized by Penal Code section 31700, subdivision (a)(12)**
  A person who holds any of the following permits or license issued by DOJ: assault weapon permit; short barreled shotgun/short barreled rifle permit; machine gun permit; machine gun license; or destructive device permit.

- **Operation of Law Representative**
  **Exemption Code X02; Authorized by Penal Code section 31700, subdivision (b)**
  The following persons who take title or possession of a firearm by operation of law in a representative capacity, until or unless they transfer title ownership of the firearm to themselves in a personal capacity:
  1. The executor or administrator of an estate;
  2. A secured creditor or an agent or employee thereof when the firearms are possessed as collateral for, or as a result of, or an agent or employee thereof when the firearms are possessed as collateral for, or as a result of, a default under a security agreement under the Commercial Code;
  3. A levying officer, as defined in Code of Civil Procedure section 481.140, 511.060, or 680.260;
  4. A receiver performing his or her functions as a receiver;
  5. A trustee in bankruptcy performing his or her duties; or
  6. An assignee for the benefit of creditors performing his or her functions as an assignee.

- **Firearm Being Returned to the Owner**
  **Exemption Code: X03; Authorized by Penal Code section 31700, subdivision (a)(7)**
  A person to whom a firearm is being returned, where the person receiving the firearm is the owner of the firearm such as the return of a pawned or consigned firearm.

- **FFL Collector with COE when Purchasing C & R Firearms**
  **Exemption Code: X13; Authorized by Penal Code section 31700, subdivision (a)(6)**
  Any federally licensed collector who is acquiring or being loaned a firearm that is a curio or relic, as defined in Code of Federal Regulations, Title 27, section 178.11 who has a current Certificate of Eligibility (COE) issued by DOJ pursuant to Penal Code section 26710.

- **Military - Active Duty**
  **Exemption Code: X21; Authorized by Penal Code section 31700, subdivision (a)(10)**
  An active member of the United States Armed Forces, the National Guard, or the Air National Guard.

Exhibit 39
DX0287

- **Military - Reserve**
  **Exemption Code: X22; Authorized by Penal Code section 31700, subdivision (a)(10)**
  The active reserve components of the United States Armed Forces.

- **Military - Honorably Retired**
  **Exemption Code: X25; Authorized by Penal Code section 31700, subdivision (a)(10)**
  Any person honorably retired from the United States Armed Forces, the National Guard, or the Air National Guard.

- **Peace Officer - California - Active**
  **Exemption Code: X31; Authorized by Penal Code section 31700, subdivision (a)(1)**
  Any California peace officer who is authorized to carry a firearm while on duty.

- **Peace Officer - Federal - Active**
  **Exemption Code: X32; Authorized by Penal Code section 31700, subdivision (a)(2)**
  Any federal peace officer who is authorized to carry a firearm while on duty.

- **Peace Officer - California - Honorably Retired**
  **Exemption Code: X33; Authorized by Penal Code section 31700, subdivision (a)(1)**
  Any honorably retired California peace officer, which includes any:
  1. Sheriff;
  2. Undersheriff or deputy sheriff;
  3. Chief of police or police officer of a city or district;
  4. Marshal or deputy marshal of a municipal court;
  5. Constable or deputy constable of a judicial district;
  6. Port warden or special officer of the Harbor Department of the City of Los Angeles;
  7. Inspector or investigator of a district attorney's office;
  8. California Highway Patrol peace officer;
  9. California State University Police peace officer;
  10. Law Enforcement Liaison Unit member of the Department of Corrections;
  11. Department of Fish and Game (Department of Fish and Wildlife) employees designated by the director as peace officers;
  12. Department of Parks and Recreation employees designated by the director as peace officers;
  13. Director of Forestry and Fire Protection and employees designated by the director as peace officers;
  14. Department of Alcoholic Beverage Control employees designated by the director as peace officers; or
  15. Department of Corrections or Department of the Youth Authority parole officer or correctional officers.

- **Peace Officer - California - Reserve**
  **Exemption Code: X34; Authorized by Penal Code section 31700, subdivision (a)(3)**
  Any person deputized or appointed as a Level I, Level II, or Level III reserve peace officer as defined in Penal Code section 832.6.

- **Peace Officer - Federal - Honorably Retired**
  **Exemption Code: X35; Authorized by Penal Code section 31700, subdivision (a)(2)**

Exhibit 39
DX0288

Any honorably retired federal officer or law enforcement agent.

- **Carry Concealed Weapon (CCW) Permit Holder**
  **Exemption Code: X41; Authorized by Penal Code section 31700, subdivision (a)(9)**
  Any individual who has a valid concealed weapons permit issued pursuant to Chapter 4 (commencing with Penal Code section 26150).

- **P.O.S.T. 832 PENAL CODE (Firearms) Training**
  **Exemption Code: X81; Authorized by Penal Code section 31700, subdivision (a)(4)**
  Any person who has successfully completed the Commission on Peace Officer Standards and Training (P.O.S.T.) "Arrest and Firearms" training, or greater POST training which includes "Arrest and Firearms."

- **Particular and Limited Authority Peace Officers**
  **Exemption Code: X91; Authorized by Penal Code section 31700, subdivision (a)(11)**
  The following persons who have completed a P.O.S.T approved regular course in firearms training:
  1. Patrol special police officers appointed by the police commission of any city or County under the express terms of its charter;
  2. Animal control officers or zookeepers;
  3. Animal humane officers;
  4. Harbor police officers;

  The following persons who have a certificate issued by the Department of Consumer Affairs pursuant to Penal Code section 25850, subdivision (a):
  1. Guards of messengers of common carriers, banks and other financial institutions;
  2. Guards of contact carriers operating armored vehicles;
  3. Private investigators and private patrol operators licensed pursuant to Chapter 11.5 of Division 3 of the Business and Professions Code;
  4. Alarm company operators licensed pursuant to Chapter 11.6 of Division 3 of the Business and Professions Code; or
  5. Uniformed security guards or night watch persons.

- **Law Enforcement Service Gun to Family Member**
  **Exemption Code: X95; Authorized by Penal Code section 31700, subdivision (a)(8)**
  A family member of a peace officer or deputy sheriff from a local agency who receives an inoperable firearm pursuant to Government Code section 50081.

- **Valid (CA only) Hunting License (Long Guns Only)**
  **Exemption Code X98; Authorized by Penal Code section 31700, subdivision (c)**
  A person, validly identified, who has been issued a valid hunting license that is unexpired or that was issued for the hunting season immediately preceding the calendar year in which the person takes title of possession of a firearm is exempt from the firearm safety certificate requirement in subdivision (a) of Section 31615, except as to handguns.

**Note:** Please refer to the California Penal Code for specific exemption requirements.

Please note that firearms dealers are no longer exempt from the FSC requirement when acquiring a firearm for their personal ownership regardless of whether the firearm is acquired from another

dealer or from the dealer's own inventory. Firearms acquired strictly as inventory are exempt, however there is no need for an exemption code for DROS purposes because a DROS is not completed in this circumstance.

## Safe Handling Demonstration Affidavits

Pursuant to Penal Code sections 26850 and 26860, no firearms dealer may deliver a firearm unless the purchaser/recipient has successfully performed a safe handling demonstration with that firearm. As used in the statute, "that firearm" means the firearm being transferred. The safe handling demonstration must be performed under the supervision of a DOJ Certified Instructor, but it is the responsibility of the firearms dealer to complete and attach to the DROS an affidavit stating the safe handling demonstration requirement was met. The DOJ Safe Handling Affidavit form (BOF 039) must be signed and dated by the DOJ Certified Instructor, the firearm purchaser/recipient, and the dealer or employee of the dealer delivering the firearm. If the licensed dealer or an employee of the dealer is also the DOJ Certified Instructor who supervised the safe handling demonstration, he/she is authorized to sign the affidavit as both the dealer/employee delivering the firearm, and as the DOJ Certified Instructor.

The Safe Handling Demonstration Affidavit form (BOF 039) can be downloaded from the Bureau of Firearms website at http://oag.ca.gov/firearms/fsc.

If a firearm purchaser/recipient has a valid exemption from the FSC requirement, he or she is also exempt from the safe handling demonstration requirement. A copy of the proof of exemption documentation must be retained with the original DROS, but a Safe Handling Demonstration Affidavit would not be required.

## Firearm Safety Certificate Study Guide

Pursuant to Penal Code section 31630, subdivision (a), firearms dealers are required to make the Firearm Safety Certificate Study Guide available to the general public. The Department no longer prints hard copies of the study guide; therefore, this requirement can be fulfilled by providing the following link to the Attorney General's website: http://oag.ca.gov/firearms/fsc. From this page, the study guide can be downloaded free of charge.

# DOJ CERTIFIED INSTRUCTOR RESPONSIBILITIES



The three FSC Program responsibilities of DOJ Certified Instructors are: (1) proctoring the FSC written test; (2) issuing FSCs to persons who pass the test; and (3) overseeing the mandatory safe handling demonstrations performed by firearm purchasers/recipients. This section of the manual provides DOJ Certified Instructors with detailed information regarding these responsibilities.

## The Firearm Safety Certificate Law

Pursuant to Penal Code sections 26840, 26850, and 26860, no dealer may deliver a firearm unless the person receiving the firearm presents to the dealer a valid firearm safety certificate and no firearms dealer may deliver a firearm unless the recipient performs a safe handling demonstration with that firearm. Furthermore, only DOJ Certified Instructors are authorized to issue FSCs and oversee safe handling demonstrations.

Pursuant to Penal Code section 31610, it is the intent of the Legislature in enacting these laws to require that persons who obtain firearms have a basic familiarity with those firearms, including, but not limited to, the safe handling and storage of those firearms.

## Firearm Safety Certificate - Certified Instructor Cards

All DOJ Certified Instructors are issued a "DOJ Certified Instructor" card. DOJ Certified Instructors are required to have their card readily available for display when acting as a DOJ Certified Instructor. Additionally, the DOJ Certified Instructor card can be used as the equivalent of a standard FSC when purchasing a firearm.

## Administering the FSC Test and Issuing FSCs

Only DOJ Certified Instructors are authorized to administer the FSC test and issue certificates pursuant to Penal Code sections 31640, subdivision (a) and 31645, subdivision (a).

## Firearm Safety Certificate Fees

The fee for taking the FSC test and being issued an FSC is twenty-five dollars ($25). The fee entitles the applicant to take the test twice if necessary. Fifteen dollars ($15) of the fee is forwarded to DOJ and the remaining ten dollars ($10) compensates the DOJ Certified Instructor for administering the test. FSCs are issued through a web-based application and are recorded under the name of the specific DOJ Certified Instructor who issued them.

## The Firearm Safety Certificate Test Format

There are three different versions of the FSC test available in both English and Spanish. Each test consists of 10 true/false questions and 20 multiple choice questions related to a minimum of the following seven topics specified in Penal Code section 31640:

- The laws applicable to carrying and handling firearms, particularly handguns;
- The responsibilities of ownership of firearms, particularly handguns;
- Current law as it relates to the private sale and transfer of firearms;
- Current law as it relates to the permissible use of lethal force;
- What constitutes safe firearm storage;
- Issues associated with bringing a firearm into the home, including suicide; and
- Prevention strategies to address issues associated with bringing firearms into the home.

## Firearm Safety Certificate Test Guidelines

Applicants for the FSC test must be at least 18 years of age and must present clear evidence of identity and age in the form of a valid California Driver License or California Department of Motor Vehicles Identification Card. (Note: unless specifically exempted, individuals must be 21 years of age to purchase a firearm.)

FSC test applicants must have a physical environment conducive to taking the test. This area must be free from distractions and excessive noise that could be disruptive to the applicant taking the test.

The applicant may not use any notes, review materials, or obtain assistance from any person once he/she begins the FSC test. The DOJ Certified Instructor must maintain adequate supervision at all times to ensure the applicant does not receive outside assistance. The DOJ Certified Instructor may give only administrative instructions to the applicant while he/she is taking the test.

If an FSC test recipient is unable to read the test, the DOJ Certified Instructor, or a translator if necessary, shall administer the test orally. If a translator is being used, the DOJ Certified Instructor must inform the translator that only the language of an FSC test may be interpreted. No further explanation of the questions or answers to the questions may be provided.

On the answer sheet, the DOJ Certified Instructor must write in their name as the proctor and also the FSC test version number (1, 2, or 3) that is being administered. The DOJ Certified Instructor shall instruct the individual to mark his/her answers on the answer sheet only, **not** on the test. To avoid this problem, DOJ Certified Instructors are encouraged to laminate their FSC test copies. FSC test applicants are not permitted to keep a copy of their test or answer sheet.

## Scoring the Firearm Safety Certificate Test

All three versions of the FSC test use the same answer key template for scoring the tests. The answer key is available through the web-based application. The answer key is confidential and should be kept in a secure location out of sight at all times. Mark, as incorrect, answers that do not match the answers on the answer key. Write the total number of correct answers on the applicant's answer sheet. The applicant must correctly answer at least 23 of the 30 questions to pass the test and receive an FSC.

If the applicant fails the FSC test, the DOJ Certified Instructor shall advise the applicant that, after 24 hours have elapsed, he/she may take a different version of the FSC test without any additional fee (one free retest). To retake the FSC test, the applicant must return to the same DOJ

Exhibit 39
DX0292

Certified Instructor who administered the first test except upon permission by the Department, which shall be granted for good cause shown. Additionally, the DOJ Certified Instructor may refer him/her to the Attorney General's website to view the Firearm Safety Certificate audio/visual materials for additional instruction specifically directed to individuals who have previously failed the FSC test.

## Firearm Safety Certificate Issuance

If the applicant is successful in passing the FSC test, the DOJ Certified Instructor is required to issue an FSC at that time. The Department issues a user-id and temporary password to all DOJ Certified Instructors for access to the Firearm Safety Certificate program web-based application. Upon successful login, DOJ Certified Instructors can issue an FSC through the web-based application. The recipient's last name, first name, middle name, California driver license or I.D. card number, and date of birth must be entered into the system in order to create the FSC record. If the DOJ Certified Instructor is also a licensed firearms dealer and has a magnetic stripe reader, the individual's California driver license or I.D. card can be swiped through the reader to capture the personal information. The issue date and expiration date will be generated by the system. DOJ Certified Instructors will be able to preview the information entered before submission and make any edits if necessary. Once the information is submitted, the record cannot be edited. If mistakes are discovered, a replacement FSC would need to be issued and the DOJ Certified Instructor would be subject to the five dollar ($5) replacement fee. Information regarding Firearm Safety Certificate card replacement is provided below in more detail.

The FSC can be printed in black or color ink. It is recommended to use white paper or card stock. If you experience problems printing the FSC (i.e., printer jam, no paper in printer, etc.), the FSC will be available for reprint for a period of 24 hours from the time payment is received.

Your information as the DOJ Certified Instructor will also be generated on the FSC. The DOJ Certified Instructor and the recipient must sign the FSC once it is printed.

## Firearm Safety Certificate Card Replacement

If an FSC card holder experiences loss or destruction of an FSC (or an error was discovered after submission), the issuing DOJ Certified Instructor must issue a replacement FSC, upon request and proof of identification, to the original FSC holder. A DOJ Certified Instructor may search the web-based application for an FSC record; however, only records for FSCs issued by that particular DOJ Certified Instructor will display. The current fee for replacement authorized by DOJ Certified Instructors to charge is five dollars ($5) which is forwarded to DOJ (Pen. Code, § 31660, subdivision (b).)

## FSC Record Keeping

You must retain all applicants' completed FSC test answer sheets for five years from the test date. The completed answer sheets must be made available for inspection upon request by any peace officer, or authorized DOJ personnel upon presentation of proper identification.

The FSC record information will be stored in the automated system. A DOJ Certified Instructor will be able to search records by entering the FSC holder's name, date of birth, California driver

license number or I.D. card number and/or FSC number.  Only records for FSCs issued by the particular DOJ Certified Instructor will display.

## FSC Test Disqualification and Specific Acts of Collusion

If a DOJ Certified Instructor observes a test applicant using reference materials or receiving unauthorized assistance while taking the FSC test, the applicant is automatically disqualified. The DOJ Certified Instructor must note his or her observations and reasons for the disqualification on the back of the applicant's test answer sheet.  Additionally, the DOJ Certified Instructor must sign and date the test answer sheet. Fifteen dollars ($15) must be returned to the applicant because no FSC will have been issued. The DOJ Certified Instructor shall advise the applicant that although the test can be retaken after 24 hours have elapsed, he or she will be required to pay the entire $25 fee regardless of whether the disqualification occurred on their first or second attempt at taking the FSC test.

Pursuant to Penal Code section 27550, the following are considered acts of collusion punishable by imprisonment for up to four years depending on the specific circumstances:

- Answering a test applicant's questions while taking the written test;
- Knowingly grading the examination falsely;
- Providing an advance copy of the test to an applicant;
- Allowing another to take the written test for the applicant, purchaser, or transferee;
- Using or allowing another to use one's identification, proof of residency, or thumbprint;
- Allowing others to give unauthorized assistance during the examination;
- Reference to unauthorized materials during the examination and cheating by the applicant; and
- Providing originals or photocopies of the written test, or any version thereof to any person other than as authorized by the Department.

## Safe Handling Demonstrations

Pursuant to Penal Code sections 26850 and 26860, before taking delivery of a firearm from a licensed firearms dealer, firearm purchasers/recipients must successfully perform a safe handling demonstration with "that firearm" he/she is acquiring. The safe handling demonstration must be performed under the supervision of a DOJ Certified Instructor on or after the date the DROS is submitted to DOJ and prior to delivery of the firearm by the dealer.

The safe handling demonstration is comprised of a series of six to twelve statutorily mandated steps depending on the type of firearm. Appendix I (beginning on page 12) specifically identifies each step for three conventional handgun types, six conventional long gun types and also handguns identified by DOJ as having an alternative design from the three conventional handgun types. The specified safe handling demonstration steps may not be appropriate for a particular model of firearm.  If uncertain, refer to the owner's manual.

As part of the safe handling demonstration, the DOJ Certified Instructor should:

- Make recipients aware of the volume of ammunition the firearm can accommodate.

- Show the recipient how the safe handling demonstration is to be performed.

- Prompt the recipient through each step of the safe handling demonstration. Should the recipient make an error at any time during the demonstration, such as touching the trigger, stop the demonstration. Identify the error and explain the corrective action to the recipient. The recipient must then start the demonstration from step number one.

DOJ requires the six basic gun safety rules below be incorporated into the safe handling demonstrations:

1. Treat all guns as if they are loaded.
2. Keep the gun pointed in the safest possible direction.
3. Keep your finger off the trigger until you are ready to shoot.
4. Know your target, its surroundings and beyond.
5. Know how to properly operate your gun.
6. Store your firearm safely and securely to prevent unauthorized use. Firearms and ammunition should be stored separately.

The recipient may attempt the demonstration as many times as may be necessary. However, to be considered a successful demonstration, the recipient must correctly perform each step from start to finish without error.

Upon completion of the demonstration the DOJ Certified Instructor must inform the recipient how to render the firearm safe in the event of a jam (malfunction). Information regarding various firearm malfunctions is provided on page 30.

Following successful completion of the demonstration the DOJ Certified Instructor, firearm recipient, and firearms dealer (or dealer authorized employee) must sign and date a Safe Handling Demonstration Affidavit (BOF 039) certifying the safe handling demonstration requirement was met. If the DOJ Certified Instructor who supervised the safe handling demonstration is also the licensed firearms dealer or an employee of the dealer, he/she is authorized to sign the affidavit as both the DOJ Certified Instructor and as the dealer/employee delivering the firearm.



# APPENDIX I

## SAFE HANDLING DEMONSTRATION STEPS

Pursuant to Penal Code section 26850, subdivision (b), the following are the safe handling demonstration requirements that must be performed with the firearm being acquired.  Please note that a dummy round as stated in this manual refers to one brightly colored orange, red, or other readily identifiable dummy round.   If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

---

**SEMIAUTOMATIC PISTOL:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable.  While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



---

| | | |
|---|---|---|
| **1.** | Remove the magazine. | |
| **2.** | Lock the slide back.  If the model of firearm does not allow the slide to be locked back, pull the slide back, visually and physically inspect the chamber to ensure that it is clear. | |
| **3.** | Visually and physically inspect the chamber, to ensure that the firearm is unloaded. | |

| 4. | Remove the firearm safety device, if applicable. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step. |  |
|---|---|---|
| 5. | Load one dummy round into the magazine |  |
| 6. | Insert the magazine into the magazine well of the firearm. |  |
| 7. | Manipulate the slide release or pull back and release the slide. |  |
| 8. | Remove the magazine. |  |

| 9. | Visually inspect the chamber to reveal that a round can be chambered with the magazine removed. |  |
|---|---|---|
| 10. | Lock the slide back to eject the dummy round. If the firearm is of a model that does not allow the slide to be locked back, pull the slide back and physically check the chamber to ensure that the chamber is clear. |  |
| 11. | Apply the safety, if applicable. |  |
| 12. | Apply the firearm safety device, if applicable. |  |

| **DOUBLE-ACTION REVOLVER:**<br>The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable.  While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following: |  |
|---|---|

| **1.** | Open the cylinder. | |
|---|---|---|
| **2.** | Visually and physically inspect each chamber, to ensure that the revolver is unloaded. | |
| **3.** | Remove the firearm safety device.  If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step. | |
| **4.** | While maintaining muzzle awareness and trigger discipline, load one dummy round into a chamber of the cylinder and rotate the cylinder so that the round is in the next-to-fire position | |

| 5. | Close the cylinder |  |
|---|---|---|
| 6. | Open the cylinder and eject the round |  |
| 7. | Visually and physically inspect each chamber to ensure that the revolver is unloaded |  |
| 8. | Apply the firearm safety device, if applicable |  |

| SINGLE-ACTION REVOLVER: | |
|---|---|
| **SINGLE-ACTION REVOLVER:**<br>The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable.  While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following: |  |

| | | |
|---|---|---|
| **1.** | Open the loading gate. | |
| **2.** | Visually and physically inspect each chamber, to ensure that the revolver is unloaded. | |
| **3.** | Remove the firearm safety device required to be sold with the firearm.  If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step. | |
| **4.** | Load one dummy round into a chamber of the cylinder, close the loading gate and rotate the cylinder so that the round is in the next-to-fire position (the revolver may need to be placed on half-cock or the loading gate reopened). | |

| 5. | Open the loading gate and unload the revolver. |  |
| 6. | Visually and physically inspect each chamber to ensure that the revolver is unloaded. |  |
| 7. | Apply the firearm safety device, if applicable |  |

\* 1873 Rule:  Recipients of original versions of single action army revolvers should be advised to carry five rounds in the cylinder and leave the chamber under the hammer empty.

The following safe handling demonstration steps for long guns are generally applicable to the various firearm models of each firearm "type" (e.g. pump action long gun, break-top revolver, etc.). However, the specified safe handling demonstration steps may not be appropriate for a particular model of firearm. If uncertain, refer to the owner's manual or consult with a DOJ Certified Instructor.

| **Pump action long gun:**<br>The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the receiver, at all times, the firearms recipient shall correctly and safely perform the following: |  |
| --- | --- |

1. Open the ejection port.
2. Visually and physically inspect the chamber to ensure the firearm is unloaded. Visually and physically inspect the magazine follower to ensure the magazine is unloaded (if the magazine follower is not visible, there may be shotshells or cartridges lodged in the tubular magazine).
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into the magazine loading port.
   Pull the forend (or forearm) rearward toward the receiver causing the dummy round to
5. enter the breech. Push the forend forward to chamber the round. The dummy round should have moved from the tubular magazine into the chamber.
   Push the action (carrier) release button and again pull the forend toward the receiver
6. causing the action to open. The dummy round should extract from the chamber and be ejected through the ejection port.
7. Engage the safety.
8. Apply the firearm safety device, if applicable.

**Break-top long gun:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the receiver, at all times, the firearms recipient shall correctly and safely perform the following:



1. Open the breech.
2. Visually and physically inspect the chamber/barrel to ensure the firearm is unloaded.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into a barrel.
5. Close and lock the action.
6. Unlock and open the action.
7. Remove the dummy round.
8. Apply the firearm safety device, if applicable.

**Bolt action long gun:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the receiver, at all times, the firearm recipient shall correctly and safely perform the following:



1. Visually and physically inspect the chamber/barrel to ensure the long gun is unloaded. Also visually and physically inspect the internal magazine to ensure it is unloaded.
2. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
3. While maintaining muzzle awareness and trigger discipline, load one dummy round into the chamber/barrel.
4. Close and lock the action.
5. Unlock and open the action.
6. Remove the dummy round.
7. Apply the firearm safety device, if applicable.

| **Lever action long gun:** The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the long gun receiver, at all times, the firearm recipient shall correctly and safely perform the following: |  |
|---|---|

| 1. | Open the breech. |
|---|---|
| 2. | Visually and physically inspect the chamber/barrel to ensure the firearm is unloaded. Visually and physically inspect the magazine follower to ensure the magazine is unloaded (if the magazine follower is not visible, there may be cartridges lodged in the tubular magazine). |
| 3. | Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step. |
| 4. | While maintaining muzzle awareness and trigger discipline, load one dummy round into the chamber/barrel. |
| 5. | Close and lock the action. |
| 6. | Unlock and open the action. |
| 7. | Remove the dummy round. |
| 8. | Apply the firearm safety device, if applicable. |

**Please use caution when handling a lever action firearm with an exposed hammer. Use only flat point, hollow point, round nose flat point, or similar rounds. Never use pointed or conical point rounds in a center fire rifle with a tubular magazine. Failure to follow these instructions may result in injury to yourself or others, or cause damage to the firearm.**

**Semiautomatic long gun with a detachable magazine:**

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the receiver, at all times, the firearm recipient shall correctly and safely perform the following:



1.  Remove the magazine if possible.
2.  Pull the bolt back and lock it open if possible.
3.  Visually and physically inspect the barrel/chamber to ensure the firearm is unloaded.
4.  Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
5.  While maintaining muzzle awareness and trigger discipline, load one dummy round into the magazine.
6.  Insert the magazine into the magazine well.
7.  Close and lock the action.
8.  Unlock and open the action.
9.  Remove the dummy round.
10. Apply the firearm safety device, if applicable.

**Semiautomatic long gun with a fixed magazine:**

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the receiver, at all times, the firearm recipient shall correctly and safely perform the following:



1. Pull the bolt back and lock it open if possible.
2. Visually and physically inspect the barrel/chamber to ensure the firearm is unloaded. Also visually and physically inspect the internal magazine to ensure it is unloaded.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into the magazine.
5. Close and lock the action.
6. Unlock and open the action.
7. Remove the dummy round (the dummy round should have extracted from the chamber and ejected from the breech).
8. Apply the firearm safety device, if applicable.

## SAFE HANDLING DEMONSTRATION STEPS

## FOR FIREARMS WITH ALTERNATIVE DESIGNS

The safe handling demonstration steps for firearms with designs not conducive to the statutorily mandated demonstration steps are as follows:

| | |
|---|---|
| **Semiautomatic pistol with a non-locking slide:**<br>The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following: | <br>(Shown: Davis P32) |

1. Remove the magazine.
2. Because this type of firearm does not allow the slide to be locked back, pull the slide back, visually and physically check the chamber to ensure that it is clear.
3. Remove the firearm safety device, if applicable. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. Load one dummy round into the magazine.
5. Insert the magazine into the magazine well of the firearm.
6. Manipulate the slide release or pull back and release the slide.
7. Remove the magazine.
8. Visually and physically inspect the chamber to reveal that a round can be chambered with the magazine removed.
9. Lock the slide back to eject the dummy round. If the firearm is of a model that does not allow the slide to be locked back, pull the slide back and physically check the chamber to ensure that the chamber is clear.
10. Apply the safety, if applicable.
11. Apply the firearm safety device, if applicable.

**Semiautomatic pistol with a fixed magazine:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:


(Shown: 1896 Broom-handled Mauser)

1. Lock the slide back.
2. Load one dummy round into the stripper clip.
3. Insert the stripper clip into the magazine slot of the firearm.
4. Pull the stripper slip out of the slot to allow the slide to go forward.
5. Visually and physically inspect the chamber to reveal that a round is chambered.
6. Lock the slide back to eject the dummy round.
7. Apply the safety, if applicable.
8. Apply the firearm safety device, if applicable.

**Semiautomatic pistol with a magazine operated toggle lock:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:


(Shown: Luger)

1. Remove the magazine.
2. Visually and physically inspect the chamber, to ensure that the firearm is unloaded.
3. Insert the magazine into the magazine well of the firearm.
4. Lock toggle back.
5. Remove the magazine.
6. Remove the firearm safety device, if applicable. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
7. Load one dummy round into the magazine.
8. Insert the magazine into the magazine well of the firearm.
9. Manipulate the toggle release or pull back and release the toggle.
10. Remove the magazine.
11. Visually and physically inspect the chamber to reveal that a round can be chambered with the magazine removed.
12. Insert the magazine into the magazine well of the firearm.
13. Lock the toggle back to eject the dummy round. If the firearm is of a model that does not allow the toggle to be locked back, pull the toggle back and physically check the chamber to ensure that the chamber is clear.
14. Apply the safety, if applicable.
15. Apply the firearm safety device, if applicable.

**Semiautomatic pistol with a top-feeding magazine**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



(Shown: Steyr 1914)

| | |
|---|---|
| 1. | Open the slide. |
| 2. | Visually and physically inspect the chamber, to ensure that the firearm is unloaded. |
| 3. | Load one dummy round into the stripper clip. |
| 4. | Insert the stripper clip into the magazine slot of the firearm. |
| 5. | Pull the stripper clip out of the slot to allow the slide to go forward. |
| 6. | Visually and physically inspect the chamber to see that it is loaded. |
| 7. | Lock open the slide to eject the dummy round. |
| 8. | Remove the magazine. |
| 9. | Apply the safety, if applicable. |
| 10. | Apply the firearms safety device, if applicable. |

**Semiautomatic pistol with a tip-up barrel:**
The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



(Shown: Beretta Model 21 Jetfire)

| | |
|---|---|
| 1. | Remove the magazine. |
| 2. | Activate the barrel release to tip up the barrel. |
| 3. | Visually and physically inspect the chamber to ensure the firearm is unloaded. |
| 4. | Load one dummy round into the barrel. |
| 5. | Close the barrel. |
| 6. | Insert the magazine into the magazine well of the firearm. |
| 7. | Remove the magazine. |
| 8. | Activate the barrel release to tip up the barrel to reveal that a round can be chambered with the magazine removed. |
| 9. | Tip up the barrel to remove dummy round. |
| 10. | Apply safety, if applicable. |
| 11. | Apply firearms safety device, if applicable. |

Exhibit 39
DX0311

**Break top revolver:**

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



(Shown: Webley)

1. Open the revolver by unlocking the frame lock.
2. Visually and physically inspect each chamber to ensure that the revolver is unloaded.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into a chamber of the cylinder and rotate the cylinder so that the round is in the next-to-fire position.
5. Close the cylinder and the frame lock.
6. Open the revolver by unlocking the frame lock.
7. Tip the barrel forward from the frame, activating the ejection star, ejecting the dummy round.
8. Apply the firearm safety device, if applicable.

**Single shot pistol:**

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



(Shown: Harrington & Richardson)

1. Open the breech.
2. Visually and physically inspect the chamber to ensure that it is clear.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into the chamber.
5. Close the breech mechanism.
6. Open the breech to eject dummy round from the barrel.
7. Apply the firearm safety device, if applicable.

Exhibit 39
DX0312

**Derringer:**

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness, that is, the firearm is pointed in a safe direction, preferably down at the ground, and trigger discipline, that is, the trigger finger is outside of the trigger guard and alongside of the firearm frame, at all times, the firearm recipient shall correctly and safely perform the following:



(Shown: Derringer)

1. Open the breech.
2. Visually and physically inspect the barrels to ensure that the firearm is unloaded.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into a barrel.
5. Close and lock the action.
6. Unlock and open the action.
7. Remove the dummy round.
8. Apply the firearm safety device, if applicable.

Exhibit 39
DX0313

## **FIREARM MALFUNCTIONS**

Pursuant to Penal Code section 26850, subdivision (c), the recipient shall receive instruction regarding how to render "that handgun" safe in the event of a jam.

For the purposes of this guide, a jam is defined as a malfunction that prevents a firearm from firing properly.  Following is a list of common types of jams and recommended solutions:

- Failure to extract: spent cartridge not extracted from the chamber (semiautomatic) or the cylinder (revolver).
- Stove pipe: spent cartridge case sticking up in the ejection port (semiautomatic).
- Failure to feed: a cartridge gets stuck on the ramp of the barrel.
- Double feed: a spent cartridge case remains in the chamber while a new cartridge enters the chamber.

To clear "failure to extract" and/or "stove pipe" jams, while keeping your finger off the trigger and pointing the gun in a safe direction, attempt the following steps in order:

Semiautomatic:
- Remove the magazine (if necessary, pull the slide back before removing the magazine);
- Pull the slide back and lock it, if possible;
- Remove any live ammunition or cartridge case from the chamber and breech; and
- Visually inspect the chamber to ensure the chamber is empty.

Revolver:
- Open the action and remove any live ammunition or casings.

To clear "failure to feed" and/or "double feed" jams, while keeping your finger off the trigger and pointing the gun in a safe direction do the following:

- Remove the magazine (if necessary, pull the slide back before removing the magazine);
- Pull the slide back and lock it, if possible;
- Point the ejection port toward the ground; and
- Shake the firearm and allow the slide to go forward.

Other types of jams can occur as a result of exposing ammunition to environmental factors such as adverse temperatures or chemicals.  Avoid using ammunition that appears to be corroded or discolored, or if you are unsure of its storage history. This type of damage to a cartridge can result in a failure to fire in one of the following ways:

- Misfire: a failure of the cartridge to fire after the primer has been struck by the firing pin
- Hang Fire: a perceptible delay in the ignition of a cartridge after the primer has been struck by the firing pin

When a cartridge fails to fire immediately, it will not be known at first whether the problem is a misfire or a hang fire. Keep the gun pointed in a safe direction - a "hang fire" condition might

Exhibit 39
DX0314

exist and the cartridge could still fire. **Do not attempt to open the action of the gun to remove the cartridge for at least 30 seconds.**

A "squib load" jam is one which is caused by the development of less than normal pressure or velocity after ignition of the cartridge. Squib loads can result in the bullet failing to exit the barrel. If the bullet is lodged in the barrel, the firing of another shot could cause serious injury or damage. If this type of jam occurs **stop firing immediately**. Keep the muzzle pointed in a safe direction and unload the firearm. Check to be sure that the chamber is empty. Then with the action open carefully run a cleaning rod through the barrel to be sure that it is not obstructed.

**If any of the jams identified above cannot be resolved using the prescribed steps, we recommend that you seek competent assistance from a qualified gunsmith. It is important to always use the correct ammunition as recommended by the firearm manufacturer.**

Exhibit 39
DX0315

### SAFE HANDLING DEMONSTRATION - GLOSSARY OF TERMS

**Action:** A series of moving parts that allow a firearm to be loaded, fired and unloaded.

**Barrel:** The metal tube through which a bullet passes on its way to a target.

**Breech:** The part of a firearm at the rear of the barrel.

**Bullet:** The projectile located at the tip of the cartridge case.

**Caliber:** The bullet or barrel diameter.

**Cartridge:** A single unit of ammunition made up of the case, primer, propellant, and bullet.

**Cartridge Case:** A container for all other components which comprise a cartridge.

**Chamber:** The rear part of a gun barrel where the cartridge is located when the gun is loaded.

**Cylinder:** The part of a revolver that holds ammunition in individual chambers.

**Cylinder Latch:** A latch on double-action revolvers that allows the cylinder to swing out.

**Double-Action:** A type of firearm action in which a single pull of the trigger both cocks the hammer and releases it.

**Dummy Round:** A bright orange, red or other readily identifiable dummy round or an inert cartridge without powder and primer.

**Ejector Rod:** The part used to remove cartridges from the cylinder.

**Grip:** The handle of the firearm.

**Hammer:** The part of the firing mechanism which strikes the firing pin or primer.

**Jam:** A malfunction that prevents a firearm from firing properly.

**Magazine:** A separate box-like metal container for semi-automatic pistols into which cartridges are loaded.

**Magazine Release:** A device that releases the magazine so that it can be removed from the firearm.

**Magazine Well:** The opening in a firearm into which a magazine is inserted.

**Muzzle:** The front end of the barrel from which a bullet exits.

**Revolver:** A firearm that has a rotating cylinder containing a number of chambers.

**Round:** See cartridge.

**Safety:** A device on a firearm intended to help provide protection against accidental discharge under normal usage when properly engaged.

**Semiautomatic Pistol:** A firearm that fires a single cartridge each time the trigger is pulled, and which automatically extracts and ejects the empty cartridge case and reloads the chamber.

**Single-Action:** A type of firearm action in which pulling the trigger causes the hammer to release.

**Trigger Guard:** Located on the underside of the gun, the trigger guard is a rigid loop which partially surrounds the trigger to prevent damage or accidental discharge.

Page 32 of 33

Exhibit 39
DX0316

# APPENDIX  II

## FSC Exemption Code List

| | | |
|---|---|---|
| X01 | = | Special Weapons Permit Holder |
| X02 | = | Operation of Law Representative |
| X03 | = | Firearm being returned to the owner |
| X13 | = | FFL collector with COE (curio and relic firearms only) |
| X21 | = | Military - Active Duty |
| X22 | = | Military Reserve - Reserve |
| X25 | = | Military - Honorably Retired |
| X31 | = | Peace Officer - California - Active |
| X32 | = | Peace Officer - Federal - Active |
| X33 | = | Peace Officer - California - Honorably Retired |
| X34 | = | Peace Officer - California - Reserve |
| X35 | = | Peace Officer - Federal - Honorably Retired |
| X41 | = | Carry Concealed Weapon (CCW) Permit Holder |
| X81 | = | P.O.S.T. 832 PC (Firearms) Training |
| X91 | = | Particular and Limited Authority Peace Officers |
| X95 | = | Law Enforcement Service Gun to Family Member |
| X98 | = | Valid (CA only) Hunting License (Long Guns Only) |

Exhibit 39
DX0317

# EXHIBIT 40

Exhibit 40
DX0318



F S C

# Firearm Safety Certificate

**STUDY GUIDE**

Office of the Attorney General
California Department of Justice
Bureau of Firearms
June 2020

Exhibit 40
DX0319



# P r e f a c e

Firearm safety is the law in California. Every firearm owner should understand and follow firearm safety practices, have a basic familiarity with the operation and handling of their firearm, and be fully aware of the responsibility of firearm ownership. Pursuant to Penal Code section 26840, any person who acquires a firearm must have a Firearm Safety Certificate (FSC), unless they are statutorily exempt from the FSC requirement. To obtain an FSC, a person must pass a Department of Justice (DOJ) written test on firearm safety. The test is administered by DOJ Certified Instructors, who are often located at firearms dealerships.

This study guide provides the basic firearm safety information necessary to pass the test. Following the firearm safety information in this guide will help reduce the potential for accidental deaths and injuries, particularly those involving children, caused by the unsafe handling and storing of firearms.

In addition to safety information, this study guide provides a general summary of the state laws that govern the sale and use of firearms. Finally, there is a glossary that defines the more technical terms used in the study guide.

Simply reading this study guide will not make you a safe firearm owner. To be a safe firearm owner you must practice the firearm safety procedures described in the following pages.

Exhibit 40
DX0320

# Table of Contents



## Preface

## Introduction

Why Firearm Safety? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
Firearm Safety is the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Firearm Safety Certificate Information . . . . . . . . . . . . . . . . . . . . . . . . . 1
Causes of Firearm Accidents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Preventing Misuse Tragedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Becoming a Safe and Responsible Firearm Owner . . . . . . . . . . . . . . . . .3

## Chapter 1: Gun Safety Rules

The Six Basic Gun Safety Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Additional Safety Points . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Chapter 1: Self Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

## Chapter 2: Firearms and Children

Firearm Owner Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
   Summary of Safe Storage Laws Regarding Children . . . . . . . . . . .8
   You Cannot Be Too Careful With Children and Guns . . . . . . . . . .8
   Talking to Children About Guns . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Instill a Mind Set of Safety and Responsibility . . . . . . . . . . . . . . 9
Rules for Kids . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Chapter 2: Self Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## Chapter 3: Firearm Operation and Safe Handling

Safe Handling Demonstration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Revolver Parts and Operation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   How a Revolver Works. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
Double-Action Revolver Safe Handling. . . . . . . . . . . . . . . . . . . . . . . 13
Single-Action Revolver Safe Handling . . . . . . . . . . . . . . . . . . . . . . . . 15
Semiautomatic Pistol Parts and Operation. . . . . . . . . . . . . . . . . . . . . . 17
   How a Semiautomatic Pistol Works. . . . . . . . . . . . . . . . . . . . . . .17
Semiautomatic Pistol Safe Handling . . . . . . . . . . . . . . . . . . . . . . . . . 17
Long Gun Safe Handling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21
Ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

Exhibit 40
DX0321

Ammunition Components . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Components of a Cartridge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Physics of Gunfire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
Firearm and Ammunition Calibers . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Dangerous Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27
Malfunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Chapter 3: Self Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

## Chapter 4: Firearm Ownership

Understand the Safety Aspects of Your Firearm. . . . . . . . . . . . . . . . . 29
Carefully Read All Instructional Material. . . . . . . . . . . . . . . . . . . . . .29
Enroll in a Firearm Training Course . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Cleaning and Repair. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Safety and Storage Devices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Methods of Childproofing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32
Chapter 4: Self Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

## Prohibited Firearms Transfers and Straw Purchases . . . . 34

## Chapter 5: Firearms Laws

Introduction to the Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Sales and Transfers of Firearms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
New California Resident Requirement . . . . . . . . . . . . . . . . . . . . . . . . 38
Carrying a Concealed Weapon . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Firearms Aboard Common Carriers . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Firearms in the Home, Business or at the Campsite . . . . . . . . . . . . . . 39
The Use of Lethal Force in Self-Defense . . . . . . . . . . . . . . . . . . . . . . 39
Loaded Firearms in Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Large-Capacity Magazines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Firearm Storage During Prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Miscellaneous Prohibited Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Persons Ineligible to Possess Firearms . . . . . . . . . . . . . . . . . . . . . . . . 43
Chapter 5: Self Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .44

Safe Handling Demonstration Glossary . . . . . . . . . . . . . . . . . . . . . . . . 45

Exhibit 40
DX0322

# Introduction



### WHY FIREARM SAFETY?

Firearm safety is important to all Californians. No one wants firearm accidents to happen yet they do every day. Firearm accidents involving children are especially disturbing. Studies show that easy access to loaded firearms in homes is often a contributing factor in accidental shootings of children.

While there may be no way to guarantee safety, firearm owners can take steps to help prevent many accidental shootings. This study guide will give you valuable information to help you become a safe and responsible firearm owner.

### FIREARM SAFETY IS THE LAW

The intent of the California Legislature in enacting the FSC law is to ensure that persons who obtain firearms have a basic familiarity with those firearms, including but not limited to, the safe handling and storage of those firearms.  It is not the intent of the Legislature to require an FSC for the mere possession of a firearm.  (Pen. Code, § 31610.)

Firearms must be handled responsibly and securely stored to prevent access by children and other unauthorized users. California has strict laws pertaining to firearms, and you can be fined or imprisoned if you fail to comply with them. Visit the Web site of the California Attorney General at https://oag.ca.gov/firearms for information on firearms laws applicable to you and how you can comply.

### FIREARM SAFETY CERTIFICATE INFORMATION

To obtain an FSC, you must take the DOJ written test and receive a passing score of at least 75% (the information needed to pass the test is contained in this study guide).

An FSC is valid for five years from the date of issuance. If your FSC is lost, stolen or destroyed, a replacement may be obtained from the DOJ Certified Instructor who issued your original FSC.

Pursuant to Penal Code section 31700, there are exemptions from the FSC requirement including, but not limited to:

- Federal Firearms License Collectors with a Certificate of Eligibility (for Curio and Relic transactions only);

- Active, active reserve, or honorably retired military;

**1**

Exhibit 40
DX0323

- Carry Concealed Weapon (CCW) permit holders; and

- Persons who have completed Peace Officers Standards and Training
  (POST)(Pen. Code, § 832) firearms training.

For a complete list of exemptions visit the DOJ website at http://oag.ca.gov/firearms or
contact the DOJ Bureau of Firearms, General Information Line at (916) 210-2300. You are
required to provide documentation of your exemption to the firearms dealer each time you
acquire a firearm.

## CAUSES OF FIREARM ACCIDENTS

Ignorance and carelessness are major causes of firearm accidents. To help reduce the
number of firearm accidents, it is critical that gun safety rules are understood and
practiced at all times by every family member.

Following are some examples of firearm accidents that could have been avoided if the basic
gun safety rules had been practiced:

> *Two young children playing in their home found a loaded handgun with the
> magazine removed on a bedside table. One child was injured when the
> handgun was fired.*

> *A handgun owner assumed a firearm was unloaded. While cleaning it, he
> accidentally fired the handgun, causing injury to himself.*

> *A hunter was walking with his finger loosely on the trigger of his rifle.
> Distracted by a sudden noise behind him, he turned and accidentally fired,
> injuring his buddy walking nearby.*

Knowing the safety rules and applying them most of the time is not enough. Firearm
accidents can happen even to a person who knows the safety rules, but is careless in
following them.  For example, you may think you can leave your loaded firearm out on the
kitchen table just for a moment while you go outside to turn off the garden hose.  Although
you know you should never leave a firearm where a child may find it, you carelessly think
it will be alright "just this once."

REMEMBER: Ignorance and carelessness can result in firearm accidents. Basic gun safety
rules must be applied ALL OF THE TIME.

## PREVENTING MISUSE TRAGEDIES

It's a fact that many depressed, intoxicated, substance abusive, or enraged individuals
commit suicide every year with firearms, usually handguns. The developmental issues
associated with adolescence make teenagers particularly susceptible to this unfortunate
outcome. Safe and responsible firearm storage, particularly when a member of the
household is experiencing one of the aforementioned conditions, can help prevent
tragedies.

## BECOMING A SAFE AND RESPONSIBLE FIREARM OWNER

Becoming a safe firearm owner is similar to becoming a safe driver—you combine a good working knowledge of the equipment, the basic skills of operation, and a mind set dedicated to safe and responsible usage and storage.

This means you must have:

- Respect for the danger of firearms;

- An awareness and concern about the possible safety hazards related to firearms; and

- A desire to learn and practice safe conduct with firearms.

Developing a mind set for safe and responsible firearm usage and storage is the first step in actually becoming a responsible firearm owner. The next step is building your knowledge of firearms and gun safety, which you can do by reading and understanding the information in this study guide. The final steps are becoming skillful in handling firearms and using the safety knowledge that you have acquired.

Exhibit 40
DX0325

# CHAPTER 1
# Gun Safety Rules



This chapter will introduce you to specific gun safety rules to give you a better understanding of firearm safety.

## THE SIX BASIC GUN SAFETY RULES

There are six basic gun safety rules for gun owners to understand and practice at all times:

1. Treat all guns as if they are loaded.

2. Keep the gun pointed in the safest possible direction.

3. Keep your finger off the trigger until you are ready to shoot.

4. Know your target, its surroundings, and beyond.

5. Know how to properly operate your gun.

6. Store your gun safely and securely to prevent unauthorized use.  Guns and ammunition should be stored separately.

## 1.  Treat all guns as if they are loaded.

- Always assume that a gun is loaded even if you think it is unloaded.

- Every time a gun is handled for any reason, check to see that it is unloaded.  For specific instructions on how to unload a firearm, see Chapter 3.

- If you are unable to check a gun to see if it is unloaded, leave it alone and seek help from someone more knowledgeable about guns.

## 2.  Keep the gun pointed in the safest possible direction.

- Always be aware of where the gun is pointing.  A "safe direction" is one
- where an accidental discharge of the gun will not cause injury or damage.

- Only point a gun at an object that you intend to shoot.

- Never point a gun toward yourself or another person.

## 3.  Keep your finger off the trigger until you are ready to shoot.

- Always keep your finger off the trigger and outside the trigger guard until you are ready to shoot.

Exhibit 40
DX0326

- Even though it may be comfortable to rest your finger on the trigger, it is unsafe.

- If you are moving around with your finger on the trigger and stumble or fall, you could inadvertently pull the trigger.

- Sudden loud noises or movements can result in an accidental discharge because there is a natural tendency to tighten the muscles when startled.

- The trigger is for firing, the handle is for handling.

### 4. Know your target, its surroundings, and beyond.

- Check that the areas in front of and behind your target are safe before shooting.

- Be aware that if the bullet misses or completely passes through the target, it could strike a person or object.

- Identify the target and make sure it is what you intend to shoot. If you are in doubt, DON'T SHOOT!

- Never fire at a target that is only a movement, color, sound or unidentifiable shape.

- Be aware of all the people around you before you shoot.

### 5. Know how to properly operate your gun.

- It is important to become thoroughly familiar with your gun. You should know its mechanical characteristics including how to properly load, unload and clear a malfunction from your gun.

- Obviously, not all guns are mechanically the same. Never assume that what applies to one make or model is exactly applicable to another.

- You should direct questions regarding the operation of your gun to your firearms dealer, or contact the manufacturer directly.

### 6. Store your gun safely and securely to prevent unauthorized use. Guns and ammunition should be stored separately.

- Even when the gun is not in your hands, you must still think of safety.

- Use a California-approved firearms safety device on the gun, such as a trigger lock or cable lock, so it cannot be fired.

- Store your gun unloaded in a locked container, such as a California-approved lock box or a gun safe.

- Store your gun in a different location than the ammunition.

- For maximum safety you should use both a locking device and a storage container.

**5**

Exhibit 40
DX0327

## ADDITIONAL SAFETY POINTS

The six basic safety rules are the foundational rules for gun safety. However, there are additional safety points which must not be overlooked:

- Never handle a gun when you are in an emotional state such as anger or depression. Your judgment may be impaired.

- Never shoot a gun in celebration (such as on the Fourth of July or New Year's Eve, for example). Not only is this unsafe, but it is generally illegal. A bullet fired into the air can return to the ground with enough speed to cause injury or death.

- Do not shoot at water, flat or hard surfaces. The bullet can ricochet and hit someone or something other than the target.

- Hand your gun to someone only after you verify that it is unloaded and the cylinder or action is open.  Take a gun from someone only after you verify that it is unloaded and the cylinder or action is open.

- Guns, alcohol and drugs don't mix. Alcohol and drugs can negatively affect judgment as well as physical coordination. Alcohol and any other substances are likely to impair normal mental or physical functions and should not be used before or while handling guns.  Avoid handling and using your gun when you are taking medications that cause drowsiness or include a warning to not operate machinery while taking the drug.

- The loud noise from a fired gun can cause hearing damage, and the debris and hot gas that is often emitted can result in eye injury.  Always wear ear and eye protection when shooting a gun.



# CHAPTER 1: Self Test

1. A safe practice when handling a gun is to rest your finger on the outside of the trigger guard or along the side of the gun until you are ready to shoot. (page 4)

   True      False

2. To "know your target, its surroundings and beyond," you must consider that if the bullet misses or completely passes through the target, it could strike a person or object. (page 5)

   True      False

3. Drinking alcohol while handling firearms is safe if your blood alcohol level remains below the legal limit. (page 6)

   True      False

4. Which of the following safety points should you remember when handling a gun? (page 6)

   A. Never shoot a gun in celebration.
   B. Do not fire at water, flat or hard surfaces.
   C. Wear ear and eye protection when shooting a gun.
   D. All of the above.

5. As a safety measure, your firearm should always be pointed: (page 4)

   A. To the north.
   B. In the safest possible direction.
   C. Up.
   D. Down.

6. One of the safety rules is to know how to properly: (page 5)

   A. Clear a malfunction.
   B. Operate your gun.
   C. Load your gun.
   D. Clean your gun.

Answers: 1: True, 2: True, 3: False, 4: D, 5: B, 6: B

Exhibit 40
DX0329

# CHAPTER 2
# Firearms and Children



## FIREARM OWNER RESPONSIBILITY

It is a firearm owner's responsibility to take all possible steps to make sure a child cannot gain access to firearms. In fact, this responsibility is mandated by California law. The overall abiding rule is to store your gun in a safe and responsible manner at all times. As a firearm owner, you should be aware of the laws regarding children and firearms.

### Summary of Safe Storage Laws Regarding Children

You may be guilty of a misdemeanor or a felony if you keep a loaded firearm within any premises that are under your custody or control and a child under 18 years of age obtains and uses it, resulting in injury or death, or carries it to a public place, unless you stored the firearm in a locked container or locked the firearm with a locking device to temporarily keep it from functioning. Please refer to Page 42 for more specific information regarding safe storage laws related to children.

### You Cannot Be Too Careful with Children and Guns

There is no such thing as being too careful with children and guns. Never assume that simply because a toddler may lack finger strength, they can't pull the trigger. A child's thumb has twice the strength of the other fingers. When a toddler's thumb "pushes" against a trigger, invariably the barrel of the gun is pointing directly at the child's face. NEVER leave a firearm lying around the house. Please refer to Pages 31 and 32 for more information regarding safe storage and methods of childproofing your firearm.

Child safety precautions still apply even if you have no children or if your children have grown to adulthood and left home. A nephew, niece, neighbor's child or a grandchild may come to visit. Practice gun safety at all times.

To prevent injury or death caused by improper storage of guns in a home where children are likely to be present, you should store all guns unloaded, lock them with a firearms safety device and store them in a locked container. Ammunition should be stored in a location separate from the gun.

Exhibit 40
DX0330

## Talking to Children about Guns

Children are naturally curious about things they don't know about or think are "forbidden." When a child asks questions or begins to act out "gun play," you may want to address his or her curiosity by answering the questions as honestly and openly as possible. This will remove the mystery and reduce the natural curiosity. Also, it is important to remember to talk to children in a manner they can relate to and understand. This is very important, especially when teaching children about the difference between "real" and "make-believe." Let children know that, even though they may look the same, real guns are very different than toy guns. A real gun will hurt or kill someone who is shot.

## Instill a Mind Set of Safety and Responsibility

The American Academy of Pediatrics reports that adolescence is a highly vulnerable stage in life for teenagers struggling to develop traits of identity, independence and autonomy. Children, of course, are both naturally curious and innocently unaware of many dangers around them. Thus, adolescents as well as children may not be sufficiently safeguarded by cautionary words, however frequent contrary actions can completely undermine good advice. A "do as I say and not as I do" approach to gun safety is both irresponsible and dangerous.

Remember that actions speak louder than words. Children learn most by observing the adults around them. By practicing safe conduct you will also be teaching safe conduct.

## RULES FOR KIDS

Adults should be aware that a child could discover a gun when a parent or any other adult is not present. This could happen in the child's own home; the home of a neighbor, friend or relative; or in a public place such as a school or park. If this should happen, a child should know the following rules and be taught to practice them.

### 1. Stop

The first rule for a child to follow if he/she finds or sees a gun is to stop what he/she is doing.

### 2. Don't Touch!

The second rule is for a child not to touch a gun he/she finds or sees. A child may think the best thing to do if he/she finds a gun is to pick it up and take it to an adult. A child needs to know he/she should NEVER touch a gun he/she may find or see.

### 3. Leave the Area

The third rule is to immediately leave the area. This would include never taking a gun away from another child or trying to stop someone from using gun.

## 4. Tell an Adult

The last rule is for a child to tell an adult about the gun he/she has seen. This includes times when other kids are playing with or shooting a gun.

Please note that, while there is no better advice at this time for children or adolescents who encounter a gun by happenstance, the California Chapter of the American College of Emergency Physicians reports that such warnings alone may be insufficient accident prevention measures with children and adolescents.



# CHAPTER 2: Self Test

1. Toddlers lack the strength to pull the trigger of a firearm. (page 8)

   True      False

2. You may face misdemeanor or felony charges if you keep a loaded firearm where a child obtains and improperly uses it. (page 8)

   True      False

3. There is no such thing as being too careful with children and guns. (page 8)

   True      False

4. An important lesson children should learn is that guns are not toys. (page 9)

   True      False

5. The four safety "Rules for Kids" if they see a gun are: (page 9)

   A. _____
   B. _____
   C. _____
   D. _____

6. Child safety precautions only apply if you have children. (page 8)

   True      False

Answers: 1: False, 2: True, 3: True, 4: True, 5: A. Stop, B. Don't Touch, C. Leave the Area, D. Tell an Adult, 6: False

Exhibit 40
DX0333

# CHAPTER 3
# Firearm Operation and Safe Handling



## SAFE HANDLING DEMONSTRATION

Pursuant to Penal Code sections 26850 and 26860, prior to taking delivery of a firearm from a licensed firearms dealer in California, an individual must correctly perform a safe handling demonstration with the firearm he or she is acquiring. The safe handling demonstration must be performed in the presence of a DOJ Certified Instructor on or after the date the Dealer Record of Sale (DROS) is submitted to the DOJ and before the firearm is delivered.  This section lists each of the steps that constitute the statutorily mandated safe handling demonstrations for the most common handgun types (semiautomatic pistols, double-action revolvers and single-action revolvers).  This section also includes safe handling demonstration steps for most long gun types.  However, this information will not appear on the DOJ written test on firearm safety. Please note that a dummy round as stated in this guide refers to one bright orange, red or other readily identifiable dummy round. If no readily identifiable dummy round is available, an empty cartridge casing with an empty primer pocket may be used.

The safe handling demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle  awareness (that  is, the firearm is pointed  in a safe direction, preferably  down  at the ground) and trigger discipline  (that  is, the trigger finger is outside  of the trigger guard  and alongside of the firearm frame)  at all times,  the firearm recipient  shall correctly  and safely perform  the safe handling demonstration steps for each firearm type.

## REVOLVER PARTS AND OPERATION

### How  a Revolver Works

A revolver has a rotating cylinder containing a number of chambers. There are usually five or six chambers. The action of the trigger or hammer will line up a chamber with the barrel and firing pin. Releasing the cylinder latch allows the cylinder to swing out for loading, unloading and inspection.

Revolvers are either single or double-action.  The primary difference between these two types of revolvers is the function of the trigger. On a single-action revolver the trigger has a single function to release the hammer. The trigger on a double- action revolver has two functions to cock the hammer and to release it.

Exhibit 40
DX0334

## DOUBLE-ACTION REVOLVER SAFE HANDLING



barrel            cylinder

hammer

cylinder
latch

ejector rod

trigger

trigger guard

grip

1.  Open the cylinder.



2.  Visually and physically inspect each chamber to ensure that the revolver is unloaded.



3.  Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.



**13**

Exhibit 40
DX0335

4.   While maintaining muzzle awareness and trigger discipline, load one dummy round into a chamber of the cylinder and rotate the cylinder so that the round is in the next-to-fire position.





5.   Close the cylinder.



6.   Open the cylinder and eject the round.



7.   Visually and physically inspect each chamber to ensure that the revolver is unloaded.



8.   Apply the firearm safety device, if applicable.



NOTE: Simply spinning a revolver to an empty chamber does not unload it or make it safe. The cylinder rotates to the next chamber before the hammer falls.

Exhibit 40
DX0336

# SINGLE-ACTION REVOLVER SAFE HANDLING



barrel          cylinder          hammer

firearm safety device

grip

1. Open the loading gate.



2. Visually and physically inspect each chamber to ensure that the revolver is unloaded.



**15**

Exhibit 40
DX0337

3. Remove the firearm safety device required to be sold with the firearm. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.



4. Load one dummy round into a chamber of the cylinder, close the loading gate and rotate the cylinder so that the round is in the next-to-fire position (the revolver may need to be placed on half-cock or the loading gate reopened).



5. Open the loading gate and unload the revolver.



6. Visually and physically inspect each chamber to ensure that the revolver is unloaded.



7. Apply the firearm safety device, if applicable.



✱ 1873 Rule: Recipients of original versions of single-action army revolvers should be advised to carry five rounds in the cylinder and leave the chamber under the hammer empty.

**16**

Exhibit 40
DX0338

## SEMIAUTOMATIC PISTOL PARTS AND OPERATION

### How a Semiautomatic Pistol Works

A semiautomatic pistol has a single chamber. Each time the trigger is pulled, a cartridge is fired, the empty case is automatically extracted and ejected, the hammer is cocked, and a new cartridge is loaded into the chamber.

The primary difference between revolvers and semiautomatic pistols is how the ammunition is held. Revolvers use a cylinder to hold ammunition. Semiautomatic pistols use a magazine to hold ammunition. A magazine is a separate metal boxlike container into which cartridges are loaded. It is usually located within the grip. A button or catch releases the magazine.

Another difference is most semiautomatic pistols have a "safety" that is designed to prevent firing when engaged. However, it is not foolproof so do not rely on the safety to prevent an accidental discharge. A safety should be considered an additional safety measure.

Never pull the trigger on any firearm with the safety in the "safe" position because thereafter the firearm could fire at any time without the trigger ever being touched. If a firearm is dropped, it may land hard enough to activate the firing mechanism without the trigger being touched.

## SEMIAUTOMATIC PISTOL SAFE HANDLING



Exhibit 40
DX0339

1.  Remove the magazine.



2.  Lock the slide back. If the model of firearm does not allow the slide to be locked back, pull the slide back, visually and physically inspect the chamber to ensure that it is clear.



3.  Visually and physically inspect the chamber, to ensure that the firearm is unloaded.



4.  Remove the firearm safety device, if applicable. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.



5.  Load one dummy round into the magazine.



6.  Insert the magazine into the magazine well of the firearm.



Exhibit 40
DX0340

7. Manipulate the slide release or pull back and release the slide.



8. Remove the magazine.



9. Visually inspect the chamber to reveal that a round can be chambered with the magazine removed.



10. Lock the slide back to eject the dummy round. If the firearm is of a model that does not allow the slide to be locked back, pull the slide back and physically check the chamber to ensure that the chamber is clear.



11. Apply the safety, if applicable.



12. Apply the firearm safety device, if applicable.



**19**

Exhibit 40
DX0341

Note: If you release the slide before inserting the magazine, there will NOT be a cartridge in the chamber.

---

**CAUTION**

You should NOT assume a semiautomatic pistol is unloaded just because the magazine is removed from the handgun.

Do not allow the slide to go forward UNLESS you have:

1. Checked again to be sure the chamber is empty, and
2. Checked again to be sure the magazine has been REMOVED.

If you pull the slide back ejecting the cartridge, check the chamber, let the slide go forward, and THEN remove the magazine, you have a loaded, dangerous firearm (a cartridge is in the chamber) even though you have removed the magazine. It is common and sometimes fatal to make this error.

ALWAYS REMOVE THE MAGAZINE FIRST!

---

**20**

Exhibit 40
DX0342

## LONG GUN SAFE HANDLING

The demonstration shall commence with the firearm unloaded and locked with the firearm safety device with which it is required to be delivered, if applicable. While maintaining muzzle awareness (that is, the firearm is pointed in a safe direction, preferably down at the ground) and trigger discipline (that is, the trigger finger is outside of the trigger guard and alongside of the receiver) at all times, the firearms recipient shall correctly and safely perform the steps identified for each firearm type.

The following safe handling demonstration steps for long guns are generally applicable to the various firearm models of each firearm "type" (e.g. pump action long gun, break-top revolver, etc.). However, the specified safe handling demonstration steps may not be appropriate for a particular model of firearm. If uncertain, refer to the owner's manual or consult with a DOJ Certified Instructor.

### Pump Action Long Gun



1. Open the ejection port.
2. Visually and physically inspect the chamber to ensure the firearm is unloaded. Visually and physically inspect the magazine follower to ensure the magazine is unloaded (if the magazine follower is not visible, there may be shotshells or cartridges lodged in the tubular magazine).
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into the magazine loading port.
5. Pull the forend (or forearm) rearward toward the receiver causing the dummy round to enter the breech. Push the forend forward to chamber the round. The dummy round should have moved from the tubular magazine into the chamber.
6. Push the action (carrier) release button and again pull the forend toward the receiver causing the action to open. The dummy round should extract from the chamber and be ejected through the ejection port.
7. Engage the safety.
8. Apply the firearm safety device, if applicable.

Exhibit 40
DX0343

## Break-Top Long Gun



1. Open the breech.
2. Visually and physically inspect the chamber/barrel to ensure the firearm is unloaded.
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into a barrel.
5. Close and lock the action.
6. Unlock and open the action.
7. Remove the dummy round.
8. Apply the firearm safety device, if applicable.

## Bolt Action Long Gun



1. Visually and physically inspect the chamber/barrel to ensure the long gun is unloaded.  Also visually and physically inspect the internal magazine to ensure it is unloaded.
2. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
3. While maintaining muzzle awareness and trigger discipline, load one dummy round into the chamber/barrel.
4. Close and lock the action.
5. Unlock and open the action.
6. Remove the dummy round.
7. Apply the firearm safety device, if applicable.

Exhibit 40
DX0344

## Lever Action Long Gun

When handling a lever action firearm with an exposed hammer, please use caution and consult with a DOJ Certified Instructor for proper handling steps.  Use only flat point, hollow point, round nose flat point, or similar rounds.  Never use pointed or conical point rounds in a center fire rifle with a tubular magazine.  Failure to follow these instructions may result in injury to yourself or others, or cause damage to your firearm.



1. Open the breech.
2. Visually and physically inspect the chamber/barrel to ensure the firearm is unloaded.  Visually and physically inspect the magazine follower to ensure the magazine is unloaded (if the magazine follower is not visible, there may be cartridges lodged in the tubular magazine).
3. Remove the firearm safety device. If the firearm safety device prevents any of the previous steps, remove the firearm safety device during the appropriate step.
4. While maintaining muzzle awareness and trigger discipline, load one dummy round into the chamber/barrel.
5. Close and lock the action.
6. Unlock and open the action.
7. Remove the dummy round.
8. Apply the firearm safety device, if applicable.

Exhibit 40
DX0345

## Semiautomatic Long Gun With a Detachable Magazine



1.    Remove the magazine.
2.    Pull the bolt back and lock it open if possible.
3.    Visually and physically inspect the barrel/chamber to ensure the firearm is
      unloaded.
4.    Remove the firearm safety device. If the firearm safety device prevents any of the
      previous steps, remove the firearm safety device during the appropriate step.
5.    While maintaining muzzle awareness and trigger discipline, load one dummy
      round into the magazine.
6.    Insert the magazine into the magazine well.
7.    Close and lock the action.
8.    Unlock and open the action.
9.    Remove the dummy round.
10.   Apply the firearm safety device, if applicable.

## Semiautomatic Long Gun With a Fixed Magazine



1.    Pull the bolt back and lock it open if possible.
2.    Visually and physically inspect the barrel/chamber to ensure the firearm is
      unloaded.  Also visually and physically inspect the internal magazine to ensure it
      is unloaded.
3.    Remove the firearm safety device. If the firearm safety device prevents any of the
      previous steps, remove the firearm safety device during the appropriate step.
4.    While maintaining muzzle awareness and trigger discipline, load one dummy
      round into the magazine.
5.    Close and lock the action.
6.    Unlock and open the action.
7.    Remove the dummy round (the dummy round should have extracted from the
      chamber and ejected from the breech).

**24**

Exhibit 40
DX0346

## AMMUNITION

An often overlooked aspect of safe firearm operation is knowing about the ammunition you use. It is important for you to know which ammunition can be used safely in your firearm.

### Ammunition Components

A firearm cartridge, commonly referred to as a "round," is a single unit of ammunition made up of four parts: the case, the primer, the propellant and the bullet.

### Components of a Cartridge



The case is the metal cylinder that is closed at one end and contains the other three components.

The primer is the impact-sensitive chemical compound used for ignition. The propellant is a fast-burning chemical compound.

The bullet is the projectile fired from a firearm.  It is usually made of lead, sometimes covered with a layer of copper or other metal and is located at the tip of the cartridge.  People often mistakenly refer to the entire cartridge as a "bullet." Actually the bullet is just one part of a cartridge.

## PHYSICS OF GUNFIRE

To understand the power of a firearm, it is helpful to know some of the physics of gunfire.  The fall of the hammer causes the primer to ignite the powder, which burns to produce gases. These rapidly-expanding gases push the bullet through the barrel and toward the target.  The push of gases against the firearm results in what is called recoil. Some shooters are startled by recoil. Firearms vary in how much recoil they generate. Anticipation of recoil may cause an inexperienced shooter to grasp the firearm too tightly or flinch. Shooting a firearm properly minimizes the negative effects of recoil on the shooter.

Exhibit 40
DX0347

## FIREARM AND AMMUNITION CALIBERS

Firearms and ammunition are made in various calibers. Firearm caliber refers to barrel diameter. Revolvers generally have the caliber information on the barrel. Semiautomatic pistols generally have the caliber information on the slide. Ammunition caliber refers to bullet diameter. Ammunition has the caliber information on the box. Some of the more common calibers are the .22, .45, and 9 mm. You must only use the caliber of ammunition recommended by the manufacturer of your firearm.





.357 Magnum



9 mm Luger



Just because a cartridge fits your firearm does not necessarily mean the cartridge is safe to shoot. A firearm may not be able to handle the pressure created by using incorrect ammunition. This could result in damage to the firearm and possible injury to yourself or bystanders.

Never shoot ammunition that is old, dirty, corroded or wet, or ammunition that cannot be fully identified. This could cause a malfunction such as a jam or a misfire, or explosion of the firearm. Never throw ammunition in the trash. Call your local refuse department and ask for proper disposal instructions.

Some ammunition is illegal. Your firearms dealer can help you identify the correct and legal ammunition for your firearm. Purchase your ammunition from an authorized ammunition dealer only.

Exhibit 40
DX0348

## DANGEROUS RANGE

In order to shoot a firearm safely, you need to know not only your target but also the dangerous range of your ammunition. The dangerous range is the distance that a bullet can travel.  Most ammunition can travel at least a mile, with some having the capability of traveling MORE than two miles. Therefore, even though you may fire at a target only a few feet or yards away, your bullet could travel far beyond your target.  As it travels, the potential for damage widens.  The importance of the dangerous range is that you must consider how much farther the bullet can travel beyond the target because a bullet that misses or passes through a target could strike a person or object.  If you think only of your target and not the dangerous range, you might mistakenly think someone or something is "too far away" to be in danger.

Another important point to remember is that most ammunition can easily penetrate the interior walls of a house and still travel some distance before losing its energy. High velocity or magnum ammunition has even greater penetration and distance capabilities.

Remember: Once you fire, you are responsible for any damage or injury your bullet causes.

## MALFUNCTIONS

Any machine can malfunction. A firearm is no different.  If your firearm malfunctions, always keep the basic safety rules in mind and do the following:

**CAUTION**

STOP FIRING!

KEEP THE GUN POINTED IN A SAFE DIRECTION.

WAIT TEN SECONDS.

SEEK COMPETENT HELP.

If you are at a range, the usual procedure to follow when a malfunction occurs is to keep your firearm pointed down range, keep your finger off the trigger and raise your non-shooting hand until a range official arrives.  You have a potentially dangerous situation!

Exhibit 40
DX0349



# CHAPTER 3: Self Test

1. The importance of the "dangerous range" is that a bullet can travel far beyond the intended target. (page 27)

   True      False

2. The safety on a semiautomatic pistol is not foolproof. (page 17)

   True      False

3. Just because a cartridge fits into your firearm does not necessarily mean it is safe to shoot. (page 26)

   True      False

4. In the case of a malfunction, you should: (page 27)

   A. Keep your finger on the trigger.
   B. Immediately drop the firearm.
   C. Try and determine where the malfunction is.
   D. Keep the gun pointed in a safe direction.

5. After ensuring a double-action revolver is pointed in a safe direction and with your finger off the trigger, you begin unloading the firearm by: (page 13)

   A. Opening the cylinder.
   B. Locking the slide back.
   C. Opening the loading gate.
   D. Pushing the magazine release.

6. Firearm or ammunition caliber refers to: (page 26)

   A. Barrel length.
   B. Magazine capacity.
   C. Barrel or bullet diameter.
   D. Bullet velocity.

7. A magazine is part of a: (page 17)

   A. Single-action revolver.
   B. Double-action revolver.
   C. Semiautomatic pistol.
   D. Single-action and a double-action revolver.

Answers: 1: True, 2: True, 3: True, 4: D, 5: A, 6: C, 7: C

Exhibit 40
DX0350

## CHAPTER 4
# Firearm Ownership



### UNDERSTAND THE SAFETY ASPECTS OF YOUR FIREARM

Firearms must be handled responsibly and securely stored to prevent access by children and other unauthorized users. California has strict laws pertaining to firearms, and you can be fined or imprisoned if you fail to comply with them. Visit the Web site of the California Attorney General at https://oag.ca.gov/firearms for information on firearms laws applicable to you and how you can comply.

Get advice from a professional sales person on the safety aspects of the firearm you are considering buying.  Select the firearm that best suits your personal needs.  Ask a lot of questions! Ask about the correct ammunition for the firearm you have selected.

Become thoroughly familiar with the mechanics of the firearm you have selected.  By knowing exactly how your firearm works, you are more likely to recognize any possible safety problems.

### CAREFULLY READ ALL INSTRUCTIONAL MATERIAL

An owner's manual from the manufacturer of your firearm should be provided when you buy a new firearm. Manuals for used firearms usually can be obtained by writing or calling the manufacturer.

Carefully read the manual and use it to familiarize yourself with the firearm and its operation.

### ENROLL IN A FIREARM TRAINING COURSE

To help you learn to drive a car you probably had some "behind the wheel" training and practice before you got your driver's license.  This also applies to firearm ownership. The best way to become skilled in using and understanding how your firearm operates is to enroll in a "hands-on" training course.  There are many firearm training courses that can provide additional safety information.

For information on training courses in your area, contact a local firearms dealer or firearms safety organization.

### CLEANING AND REPAIR

Maintenance is part of being a responsible firearms owner.  Firearms should be cleaned regularly and especially after prolonged storage.  The barrel should be cleaned after every use. Accumulated moisture, dirt or grease can interfere with the efficient and safe operation of a firearm.

Exhibit 40
DX0351

Firearm cleaning kits and materials can be purchased from most firearms dealers. Be aware that some firearm cleaning substances are toxic. Carefully read and follow the instructions on the cleaning products.

You should clean your firearm in a location where you will have no distractions. Before you begin, always make sure your firearm is unloaded and remove any ammunition from the cleaning area.  Accidents can happen if cleaning procedures are not followed correctly and safely. Therefore, you should follow the cleaning instructions in your owner's manual and on your cleaning products. Firearms dealers or gunsmiths also are good sources for cleaning information.

Care should be taken to ensure adequate ventilation at all times to reduce the risk of inhaling lead particles. To avoid accidental ingestion of lead particles, never handle food or drink without first washing your hands. Do not smoke when exposed to lead. Wash your hands thoroughly after exposure.

Periodically inspect all firearms you own to be sure that they are in good working condition. If you notice any problems, have your firearm checked by a competent gunsmith. Any repairs should be made only by a gunsmith or the manufacturer of the firearm.  You should not attempt to make any major modifications to your firearm. Some modifications are illegal and dangerous. They also could void the manufacturer's warranty.

By keeping your firearm properly maintained, you will ensure that it is safe to operate and will function reliably for many years.



**30**

Exhibit 40
DX0352

## SAFETY AND STORAGE DEVICES

If you decide to keep a firearm in your home you must consider the issue of how to store the firearm in a safe and secure manner. In a special report by Harvard Public Health, it is stated that a gun in the home raises the suicide risk for everyone: gun owner, spouse and children alike.[1] California recognizes the importance of safe storage by requiring that all firearms sold in California be accompanied by a DOJ-approved firearms safety device or proof that the purchaser owns a gun safe that meets regulatory standards established by the DOJ. The current list of DOJ-approved firearms safety devices and the gun safe standards can be viewed at the following DOJ website: http://oag.ca.gov/firearms/fsdcertlist.

There are a variety of safety and storage devices currently available to the public in a wide range of prices. Some devices are locking mechanisms designed to keep the firearm from being loaded or fired, but don't prevent the firearm from being handled or stolen. There are also locking storage containers that hold the firearm out of sight. For maximum safety you should use both a firearm safety device and a locking storage container to store your unloaded firearm.

Two of the most common locking mechanisms are trigger locks and cable locks. Trigger locks are typically two-piece devices that fit around the trigger and trigger guard to prevent access to the trigger. One side has a post that fits into a hole in the other side. They are locked by a key or combination locking mechanism. Cable locks typically work by looping a strong steel cable through the action of the firearm to block the firearm's operation and prevent accidental firing. However, neither trigger locks nor cable locks are designed to prevent access to the firearm.

Smaller lock boxes and larger gun safes are two of the most common types of locking storage containers. One advantage of lock boxes and gun safes is that they are designed to completely prevent unintended handling and removal of a firearm. Lock boxes are generally constructed of sturdy, high-grade metal opened by either a key or combination lock. Gun safes are quite heavy, usually weighing at least 50 pounds. While gun safes are typically the most expensive firearm storage devices, they are generally more reliable and secure.

Remember: Safety and storage devices are only as secure as the precautions you take to protect the key or combination to the lock.




[1] Madeline Drexler, 2013. "Guns and Suicide: The Hidden Toll," *Harvard Public Health*

**31**

Exhibit 40
DX0353

## METHODS OF CHILDPROOFING

As a responsible firearm owner, you need to be aware of the methods of childproofing your firearm, whether or not you have children.

Whenever children could be around, whether your own, or a friend's, relative's or neighbor's, additional safety steps should be taken when storing firearms and ammunition in your home.

- Always store your firearm unloaded.

- Use a firearms safety device AND store the firearm in a locked container.

- Store the ammunition separately in a locked container.

Always storing your firearm securely is the best method of childproofing your firearm; however, your choice of a storage place can add another element of safety. Carefully choose the storage place in your home especially if children may be around.

- Do not store your firearm where it is visible.

- Do not store your firearm in a bedside table, under your mattress or pillow, or on a closet shelf.

- Do not store your firearm among your valuables (such as jewelry or cameras) unless it is locked in a secure container.

- Make sure the location you store your firearm and ammunition is not easily accessible to children.

- Consider storing firearms not possessed for self-defense in a safe and secure manner away from the home.

Exhibit 40
DX0354



## CHAPTER 4: Self Test

1. It is important to carefully read all instructional material you receive with your firearm. (page 29)

   True        False

2. Certain modifications, when made to a firearm, may void its warranty. (page 30)

   True        False

3. It is safe to store a loaded firearm in your bedside table. (page 32)

   True        False

4. Two common firearms safety devices are trigger locks and cable locks. (page 31)

   True        False

5. Which of the following steps should be taken to "childproof" your firearm? (page 32)

   A. Use a firearms safety device AND store the firearm in a locked container.

   B. Always store your firearm unloaded.

   C. Store ammunition separately in a locked container.

   D. All of the above.

Answers: 1: True, 2: True, 3: False, 4: True, 5: D

Exhibit 40
DX0355

# Prohibited Firearms Transfers and Straw Purchases



## What is a straw purchase?

A straw purchase is buying a gun for someone who is prohibited by law from possessing one, or buying a gun for someone who does not want his or her name associated with the transaction.

It is a violation of California law for a person who is not licensed as a California firearms dealer to transfer a firearm to another unlicensed person, without conducting such a transfer through a licensed firearms dealer. (Pen. Code, § 27545.) Such a transfer may be punishable as a felony. (Pen. Code, § 27590.)

Furthermore, it is a violation of federal law to either (1) make a false or fictitious statement on an application to purchase a firearm about a material fact, such as the identity of the person who ultimately will acquire the firearm (commonly known as "lying and buying") (18 U.S.C. 922(a)(6)), or (2) knowingly transfer a firearm to a person who is prohibited by federal law from possessing and purchasing it. (18 U.S.C. 922(d).) Such transfers are punishable under federal law by a $250,000 fine and 10 years in federal prison. (18 U.S.C. 924(a)(2).)

## Things to remember about prohibited firearms transfers and straw purchases:

An illegal firearm purchase (straw purchase) is a federal crime.

An illegal firearm purchase can bring a felony conviction sentence of 10 years in jail and a fine of up to $250,000.

Buying a gun and giving it to someone who is prohibited from owning one is a state and federal crime.

**Never buy a gun for someone who is prohibited by law or unable to do so.**

Exhibit 40
DX0356

# CHAPTER 5
# Firearms Laws



## INTRODUCTION TO THE LAWS

As the owner of a firearm, it is your responsibility to understand and comply with all federal, state and local laws regarding firearms ownership. Many of the laws described below pertain to the possession, use and storage of firearms in the home and merit careful review.  This section contains a general summary of the state laws that govern the use of firearms, particularly handguns, by persons other than law enforcement officers or members of the armed forces. It is not designed to provide individual guidance for specific situations, nor does it address federal or local laws. Persons having specific questions are encouraged to seek legal advice from an attorney, or consult their local law enforcement agency, local prosecutor or law library.

## SALES AND TRANSFERS OF FIREARMS

In California, only licensed California firearms dealers are authorized to engage in retail sales of firearms. These retail sales require the purchaser to provide personal identifier information for the Dealers' Record of Sale (DROS) document that the firearms dealer must submit to the DOJ. There is a mandatory 10-day waiting period before the firearms dealer can deliver the firearm to the purchaser.  During this 10-day waiting period, the DOJ conducts a firearms eligibility background check to ensure the purchaser is not prohibited from lawfully possessing firearms. Although there are exceptions, generally all firearms purchasers must be at least 21 years of age to purchase either a handgun (pistol or revolver) or a long gun (rifle or shotgun). Additionally, purchasers must be California residents with a valid driver's license or identification card issued by the California Department of Motor Vehicles.

Generally, it is illegal for any person who is not a California licensed firearms dealer (private party) to sell or transfer a firearm to another non-licensed person (private party) unless the sale is completed through a licensed California firearms dealer. "Private party transfers" can be conducted at any licensed California firearms dealership that sells firearms. The buyer and seller must complete the required DROS document in person at the licensed firearms dealership and deliver the firearm to the dealer who will retain possession of the firearm during the mandatory 10-day waiting period.  In addition to the applicable state fees, the firearms dealer may charge a fee not to exceed $10 per firearm for conducting the private party transfer.

Exhibit 40
DX0357

The infrequent transfer of firearms between immediate family members is exempt from the law requiring private party transfers to be conducted through a licensed firearms dealer. For purposes of this exemption, "immediate family" means parent and child, and grandparent and grandchild, but does not include other types of transfers, such as between brother and sister. Please note that the transferee must comply with the FSC requirement described below, prior to taking possession of the firearm. Within 30 days of the transfer, the transferee must also submit a report of the transaction to the DOJ. The required report form (Firearm Ownership Record BOF 4542A) can be downloaded from the DOJ's website at http://oag.ca.gov/firearms/forms.

The reclaiming of a pawned firearm is subject to the DROS and 10-day waiting period requirements.

### Proof-of-Residency Requirement

To purchase a handgun in California you must present documentation indicating that you are a California resident. Acceptable documentation includes a utility bill from within the last three months, a signed residential lease, a property deed or military permanent duty station orders indicating assignment within California. The address provided on the DROS must match either the address on the proof-of-residency document or the address on the purchaser's California Driver license or Identification Card. (Pen. Code, § 26845.)

### Firearm Safety Certificate Requirement

To purchase or acquire a firearm, you must have a valid FSC. To obtain an FSC, you must score at least 75% on an objective written test pertaining to firearms laws and safety requirements. The test is administered by DOJ Certified Instructors, who are generally located at firearms dealerships. An FSC is valid for five years. The fee for taking the FSC test and being issued an FSC is twenty-five dollars ($25). Firearms being returned to their owners, such as pawn returns, are exempt from this requirement. In the event of a lost, stolen or destroyed FSC, the issuing DOJ Certified Instructor will issue a replacement FSC for a fee of $5. You must present proof of identity to receive a replacement FSC. (Pen. Code, §§ 31610-31670.)

### Safe Handling Demonstration Requirement

Prior to taking delivery of a firearm, you must successfully perform a safe handling demonstration with the firearm being purchased or acquired. Safe handling demonstrations must be performed in the presence of a DOJ Certified Instructor sometime between the date the DROS is submitted to the DOJ and the delivery of the firearm, and are generally performed at the firearms dealership. The purchaser, firearms dealer and DOJ Certified Instructor must sign an affidavit stating the safe handling demonstration was completed. The steps required to complete the safe handling demonstration for most firearm types is described in Chapter 3. Pawn returns and intra-familial transfers are not subject to the safe handling demonstration requirement. (Pen. Code, § 26850.)

Exhibit 40
DX0358

## Firearms Safety Device Requirement

All firearms (long guns and handguns) purchased in California must be accompanied with a firearms safety device (FSD) that has passed required safety and functionality tests and is listed on the DOJ's official roster of DOJ-approved firearms safety devices. The current roster of certified FSDs is available on the Bureau of Firearms website at http://oag.ca.gov/firearms/fsdcertlist. The FSD requirement also can be satisfied if the purchaser signs an affidavit declaring ownership of either a DOJ-approved lock box or a gun safe capable of accommodating the firearm being purchased. Pawn returns and intra-familial transfers are not subject to the FSD requirement. (Pen. Code, §§ 23635-23690.)

## Roster of Handguns Certified for Sale in California

No handgun may be sold by a firearms dealer to the public unless it is of a make and model that has passed required safety and functionality tests and is listed on the DOJ's official roster of handguns certified for sale in California. The current roster of handguns certified for sale in California is available on the Bureau of Firearms website at http://certguns.doj.ca.gov. Private party transfers, intra-familial transfers, and pawn/consignment returns are exempt from this requirement. (Pen. Code, § 32000.)

## One-Handgun-per-Thirty-Days Requirement

No person shall make an application to purchase more than one handgun within any 30-day period. Exemptions to the one-handgun-per-thirty-days requirement include pawn returns, intra-familial transfers and private party transfers. (Pen. Code, § 27540.)

## Firearm Sales and Transfer Requirements

|  | Retail Sales | Private Party Transfers | Intra-familial Transfers | Pawn Returns |
|---|---|---|---|---|
| Proof-of-Residency Requirement (handguns) | Yes | Yes | No | Yes |
| Proof-of-Residency Requirement (long guns)* | No | No | No | No |
| Firearm Safety Certificate Requirement | Yes | Yes | Yes | No |
| Safe Handling Demonstration Requirement | Yes | Yes | No | No |
| Firearms Safety Device Requirement | Yes | Yes | No | No |
| Roster of Handguns Certified for sale in California | Yes | No | No | No |
| One Handgun Per 30 Days Requirement | Yes | No | No | No |

*Federal requirements may apply.

Exhibit 40
DX0359

## NEW CALIFORNIA RESIDENT REQUIREMENT

Persons who move to California with the intention of establishing residency
in this state must either report ownership of firearms to the DOJ within 60 days, or
sell or transfer the firearm(s) pursuant to California law. (Pen. Code,
§ 28050.) Persons who want to keep their firearms must submit a New Resident Firearm
Ownership Report, along with a $19 fee, to the DOJ. Forms are available at licensed
firearms dealers, the Department of Motor Vehicles or on-line at the Bureau of Firearms
web site at http://oag.ca.gov/firearms/forms. (Pen. Code, § 27560.)

## CARRYING A CONCEALED WEAPON

### Carrying a Concealed Handgun Without a License on One's Person or in a Vehicle

It is illegal for any person to carry a handgun concealed upon his or her person
or concealed in a vehicle without a license issued pursuant to Penal Code section
26150. (Pen. Code, § 25400.) A firearm locked in a motor vehicle's trunk or in a locked
container carried in the vehicle other than in the utility or glove compartment is not
considered concealed within the meaning of the Penal Code section 25400; neither is a
firearm carried within a locked container directly to or from a motor vehicle for any
lawful purpose. (Pen. Code, § 25610.)

The prohibition from carrying a concealed handgun does not apply to licensed hunters
or fishermen while engaged in hunting or fishing, or while going to or returning from
the hunting expedition. (Pen. Code, § 25640.) Notwithstanding this exception for
hunters or fishermen, these individuals may not carry or transport loaded firearms when
going to or from the expedition. The unloaded firearms should be transported in the
trunk of the vehicle or in a locked container other than the utility or glove compartment.
(Pen. Code, § 25610.)

There are also occupational exceptions to the prohibition from carrying a concealed
weapon, including authorized employees while engaged in specified activities. (Pen.
Code, §§ 25630 & 25640.)

### Licenses to Carry Concealed Weapons

A license to carry a concealed handgun or other firearm may be granted by the
sheriff of the county in which the applicant resides, or the chief of the city police
department of the city in which the applicant resides.  Such licenses are issued only
after finding that the applicant is of good moral character, that good cause exists for
such a license and the applicant is not prohibited from possessing firearms. (Pen.
Code, § 26150.)

Where the population of the county is less than 200,000 persons, the licensing
authority may issue a license to carry a pistol, revolver or other firearm capable of
being concealed upon the person, loaded and exposed. (Pen. Code, § 26150.)

Unless otherwise restricted, a license is valid throughout the state.

Exhibit 40
DX0360

## FIREARMS ABOARD COMMON CARRIERS

Federal and state laws generally prohibit a person from carrying any firearm or ammunition aboard any commercial passenger airplane. Similar restrictions may apply to other common carriers such as trains, ships and buses.  Persons who need to carry firearms or ammunition on a common carrier should always consult the carrier in advance to determine conditions under which firearms may be transported.

## FIREARMS IN THE HOME, BUSINESS OR AT THE CAMPSITE

Unless otherwise unlawful, any person over the age of 18 who is not prohibited from possessing firearms may have a loaded or unloaded firearm at his or her place of residence, temporary residence, campsite or on private property owned or lawfully possessed by the person. Any person engaged in lawful business (including nonprofit organizations) or any officer, employee or agent authorized for lawful purposes connected with the business may have a loaded firearm within the place of business if that person is over 18 years of age and not otherwise prohibited from possessing firearms.  (Pen. Code, §§ 25605 & 26035.)

NOTE: If a person's place of business, residence, temporary residence, campsite or private property is located within an area where possession of a firearm is prohibited by local or federal laws, such laws would prevail.

## THE USE OF LETHAL FORCE IN SELF-DEFENSE

The question of whether use of lethal force is justified in self-defense cannot be reduced to a simple list of factors.  This section is based on the instructions generally given to the jury in a criminal case where self-defense is claimed and illustrates the general rules regarding the use of lethal force in self-defense.

### Permissible Use of Lethal Force in Defense of Life and Body

The killing of one person by another may be justifiable when necessary to resist the attempt to commit a forcible and life-threatening crime, provided that a reasonable person in the same or similar situation would believe that (a) the person killed intended to commit a forcible and life-threatening crime; (b) there was imminent danger of such crime being accomplished; and (c) the person acted under the belief that such force was necessary to save himself or herself or another from death or a forcible and life-threatening crime.  Murder, mayhem, rape and robbery are examples of forcible and life-threatening crimes. (Pen. Code, § 197.)

### Limitations on the Use of Force in Self-Defense

The right of self-defense ceases when there is no further danger from an assailant. Thus, where a person attacked under circumstances initially justifying self-defense renders the attacker incapable of inflicting further injuries, the law of self-defense ceases and no further force may be used.  Furthermore, a person may only use the amount of force, up to deadly force, as a reasonable person in the same or similar circumstances would believe necessary to prevent imminent injury.  It is important to note the use of excessive force to counter an assault may result in civil or criminal penalties.

Exhibit 40
DX0361

The right of self-defense is not initially available to a person who assaults another. However, if such a person attempts to stop further combat and clearly informs the adversary of his or her desire for peace but the opponent nevertheless continues the fight, the right of self-defense returns and is the same as the right of any other person being assaulted.

## LOADED FIREARMS IN PUBLIC

It is illegal to carry a loaded firearm on one's person or in a vehicle while in any public place, on any public street, or in any place where it is unlawful to discharge a firearm. (Pen. Code, § 25850, subd. (a).)

It is illegal for the driver of any motor vehicle, or the owner of any motor vehicle irrespective of whether the owner is occupying the vehicle to knowingly permit any person to carry a loaded firearm into the vehicle in violation of Penal Code section 25850, or Fish and Game Code section 2006. (Pen. Code, § 26100.) Also, see "Miscellaneous Prohibited Acts" on next page.

In order to determine whether a firearm is loaded, peace officers are authorized to examine any firearm carried by anyone on his or her person or in a vehicle while in any public place, on any public street or in any prohibited area of an unincorporated territory. Refusal to allow a peace officer to inspect a firearm pursuant to these provisions is, in itself, grounds for arrest. (Pen. Code, § 25850, subd. (b).)

The prohibition from carrying a loaded firearm in public does not apply to any person while hunting in an area where possession and hunting is otherwise lawful or while practice shooting at target ranges. (Pen. Code, §§ 26005 & 26040.)

There are also occupational exceptions to the prohibition from carrying a loaded firearm in public, including authorized employees while engaged in specified activities. (Pen. Code, §§ 26015 & 26030.)

## LARGE-CAPACITY MAGAZINES

It is generally illegal to manufacture, offer for sale, give, lend, buy, or receive any large-capacity magazine or any large-capacity conversion kit that is capable of converting an ammunition feeding device into a large-capacity magazine. (Pen. Code, §§ 32310 & 32311.)

## FIREARM STORAGE DURING PROHIBITION

A person who is prohibited from owning or possessing a firearm can transfer his or her firearm(s) to a licensed firearms dealer for storage for the duration of the prohibition, provided the prohibition will end on a date specified in a court order. (Pen. Code, § 29830.)

Exhibit 40
DX0362

## MISCELLANEOUS PROHIBITED ACTS

### Obliteration or Alteration of Firearm Identification

It is illegal for any person to obliterate or alter the identification marks placed on any firearm including the make, model, serial number or any distinguishing mark lawfully assigned by the owner or by the DOJ. (Pen. Code, § 23900.)

It is illegal for any person to buy, sell or possess a firearm knowing its identification has been obliterated or altered. (Pen. Code, § 23920.)

### Openly Carrying an Unloaded Handgun

It is generally illegal for any person to carry upon his or her person or in a vehicle, an exposed and unloaded handgun while in or on:

- A public place or public street in an incorporated city or city and county; or
- A public street in a prohibited area of an unincorporated city or city and county. (Pen. Code, § 26350.)

### Unauthorized Possession of a Firearm on School Grounds

It is illegal for any unauthorized person to possess or bring a firearm upon the grounds of, or into, any public school, including the campuses of the University of California, California State University campuses, California community colleges, any private school (kindergarten through 12th grade) or private university or college. (Pen. Code, § 626.9.)

### Unauthorized Possession of a Firearm in a Courtroom, the State Capitol, etc.

It is illegal for any unauthorized person to bring or possess any firearm within a courtroom, courthouse, court building or at any meeting required to be open to the public. (Pen. Code, § 171b.)

It is illegal for any unauthorized person to bring or possess a loaded firearm within (including upon the grounds of) the State Capitol, any legislative office, any office of the Governor or other constitutional officer, any Senate or Assembly hearing room, the Governor's Mansion or any other residence of the Governor or the residence of any constitutional officer or any Member of the Legislature.  For these purposes, a firearm shall be deemed loaded whenever both the firearm and its unexpended ammunition are in the immediate possession of the same person. (Pen. Code, §§ 171c, 171d, & 171e.)

### Drawing or Exhibiting a Firearm

If another person is present, it is illegal for any person, except in self defense, to draw or exhibit a loaded or unloaded firearm in a rude, angry or threatening manner or in any manner use a firearm in a fight or quarrel. (Pen. Code, § 417. )

Exhibit 40
DX0363

## Threatening Acts with a Firearm on a Public Street or Highway

It is illegal for any person to draw or exhibit a loaded or unloaded firearm in a threatening manner against an occupant of a motor vehicle which is on a public street or highway in such a way that would cause a reasonable person apprehension or fear of bodily harm. (Pen. Code, § 417.3.)

## Discharge of a Firearm in a Grossly Negligent Manner

It is illegal for any person to willfully discharge a firearm in a grossly negligent manner which could result in injury or death to a person. (Pen. Code, § 246.3.)

## Discharge of a Firearm at an Inhabited/Occupied Dwelling, Building, Vehicle, Aircraft

It is illegal for any person to maliciously and willfully discharge a firearm at an inhabited dwelling, house, occupied building, occupied motor vehicle, occupied aircraft, inhabited house car or inhabited camper. (Pen. Code, § 246.)

## Discharge of a Firearm at an Unoccupied Aircraft, Motor Vehicle, or Uninhabited Building or Dwelling

It is illegal for any person to willfully and maliciously discharge a firearm at an unoccupied aircraft.  It is illegal for any person to discharge a firearm at an unoccupied motor vehicle, building or dwelling.  This does not apply to an abandoned vehicle, an unoccupied motor vehicle or uninhabited building or dwelling with permission of the owner and if otherwise lawful. (Pen. Code, § 247.)

## Discharge of a Firearm from a Motor Vehicle

It is illegal for any person to willfully and maliciously discharge a firearm from a motor vehicle.  A driver or owner of a vehicle who allows any person to discharge a firearm from the vehicle may be punished by up to three years imprisonment in state prison. (Pen. Code, § 26100.)

## Criminal Storage

"Criminal storage of firearm of the first degree" – Keeping any loaded firearm within any premises that are under your custody or control and you know or reasonably should know that a child (any person under 18) or a person prohibited from possessing a firearm or deadly weapon pursuant to state or federal law is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child or prohibited person obtains access to the firearm and thereby causes death or great bodily injury to himself, herself, or any other person. (Pen. Code, § 25100, subd. (a).)

"Criminal storage of firearm of the second degree" – Keeping any loaded firearm within any premises that are under your custody or control and you know or reasonably should know that a child (any person under 18) or a person prohibited from possessing a firearm or deadly weapon pursuant to state or federal law is likely to gain access to the firearm without the permission of the child's parent or legal guardian and the child or prohibited person obtains access to the firearm and thereby causes injury, other than great bodily

Exhibit 40
DX0364

injury, to himself, herself, or any other person, or carries the firearm either to a public
place or in violation of Penal Code section 417. (Pen. Code, § 25100, subd. (b).)

"Criminal Storage of firearm of the third degree" – Keeping any loaded firearm within any
premises that are under your custody or control and negligently storing or leaving a loaded
firearm in a location where you know or reasonably should know that a child (any person
under 18) is likely to gain access to the firearm without the permission of the child's
parent or legal guardian, unless you have taken reasonable action to secure the firearm
against access by the child. (Pen. Code, § 25100, subd. (c).)

None of the criminal storage offenses (first degree, second degree, third degree)
shall apply whenever the firearm is kept in a locked container or locked with a
locking device that has rendered the firearm inoperable. (Pen. Code, § 25105.)

## Sales, Transfers and Loans of Firearms to Minors

Generally, it is illegal to sell, supply, deliver, or give possession of any firearm,
either a handgun or a long gun, to a person under 21 years of age. (Pen. Code, §
27510.)

## Possession of a Handgun or Live Ammunition by Minors

It is unlawful for a minor to possess a handgun or live ammunition unless one
of the following circumstances exists:

- The minor is accompanied by his or her parent or legal guardian and the
  minor is actively engaged in a lawful recreational sporting, ranching or
  hunting activity, or a motion picture, television or other entertainment
  event;

- The minor is accompanied by a responsible adult and has prior written
  consent of his or her parent or legal guardian and is involved in one
  of the activities cited above; or

- The minor is at least 16 years of age, has prior written consent of his or
  her parent or legal guardian, and the minor is involved in one of the
  activities cited above. (Pen. Code, §§ 29610-29655.)

## PERSONS INELIGIBLE TO POSSESS FIREARMS

State and federal law make it unlawful for certain persons to own and/or
possess firearms.  For a complete list of prohibiting categories, see the
Department of Justice Publication "Firearm Prohibiting Categories and List
of Prohibiting Misdemeanors," available at:  https://oag/firearms/forms.

43

Exhibit 40
DX0365



# CHAPTER 5: Self Test

1. It is illegal for a person convicted of any felony offense to possess a firearm. (page 43)

   True     False

2. To legally give a firearm to your best friend as a birthday gift, you must complete the transfer of the firearm through a licensed firearms dealer. (page 35)

   True     False

3. It is illegal to lend a firearm to a minor without the permission of the minor's parent or legal guardian. (page 43)

   True     False

4. Generally, a person may legally have a loaded firearm, if otherwise lawful, at his or her campsite. (page 39)

   True     False

5. It is illegal to buy, sell or possess a firearm knowing its identification marks have been erased or altered. (page 41)

   True     False

Answers: 1: True, 2: True, 3: True, 4: True, 5: True

Exhibit 40
DX0366

# Safe Handling Demonstration Glossary

**Action:** A series of moving parts that allow a firearm to be loaded, fired and unloaded.

**Barrel:** The metal tube through which a bullet passes on its way to a target.

**Breech:** The part of a firearm at the rear of the barrel.

**Bullet:** The projectile located at the tip of the cartridge case.

**Caliber:** The bullet or barrel diameter.

**Cartridge:** A single unit of ammunition made up of the case, primer, propellant and bullet.

**Cartridge Case:** A container for all other components which comprise a cartridge.

**Chamber:** The rear part of a gun barrel where the cartridge is located when the gun is loaded.

**Cylinder:** The part of a revolver that holds ammunition in individual chambers.

**Cylinder Latch:** A latch on double-action revolvers that allows the cylinder to swing out.

**Double-Action:** A type of firearm action in which a single pull of the trigger both cocks the hammer and releases it.

**Dummy Round:** A bright orange, red or other readily identifiable dummy round or an inert cartridge without powder and primer.

**Ejector Rod:** The part used to remove cartridges from the cylinder.

**Grip:** The handle of the firearm.

**Hammer:** The part of the firing mechanism which strikes the firing pin or primer.

**Jam:** A malfunction that prevents a firearm from firing properly.

**Magazine:** A separate box-like metal container for semi-automatic pistols into which cartridges are loaded.

**Magazine Release:** A device that releases the magazine so that it can be removed from the firearm.

**Magazine Well:** The opening in a firearm into which a magazine is inserted.

**Muzzle:** The front end of the barrel from which a bullet exits.

**Revolver:** A firearm that has a rotating cylinder containing a number of chambers.

**Round:** See cartridge.

**Safety:** A device on a firearm intended to help provide protection against accidental discharge under normal usage when properly engaged.

**Semiautomatic pistol:** A firearm that fires a single cartridge each time the trigger is pulled, and which automatically extracts and ejects the empty cartridge case and reloads the chamber.

**Single-action:** A type of firearm action in which pulling the trigger causes the hammer to release.

**Trigger Guard:** Located on the underside of the gun, the trigger guard is a rigid loop which particularly surrounds the trigger to prevent damage or accidental discharge.

**45**

Exhibit 40
DX0367





If you have any comments or suggestions
regarding this publication, please send them to:

Department of Justice
Bureau of Firearms / FSC Unit
P.O. Box 160367
Sacramento, CA 95816-0367



or via our website at
http://oag.ca.gov/firearms



Printed on recycled paper

Exhibit 40
DX0368

# EXHIBIT 41

Exhibit 41
DX0369

 **Subscribe to Our Newsletter**    Enter your email    Subscribe



**ROB BONTA**
*Attorney General*

# Frequently Asked Questions

Home    /    Firearms    /    Frequently Asked Questions    /    *Frequently Asked Questions*

## Public

1.  Where do I find laws regarding the possession of firearms?
2.  I'm not sure whether I have a California record that would prevent me from owning/possessing a firearm. Is there a way to find out before I attempt to purchase one?
3.  What is the process for purchasing a firearm in California?
4.  How can I obtain a Carry Concealed Weapon (CCW) license?
5.  Can I give a firearm to my adult child? Can he/she give it back to me later?
6.  Can I give a firearm to my spouse or registered domestic partner? Can he/she give it back to me later?
7.  Is there a limit on the number of handguns that I can own or purchase?
8.  Does California have a law regarding the storage of firearms?
9.  Are large-capacity magazines legal?
10.  May I carry a concealed firearm in California?
11.  Who is prohibited from owning or possessing firearms?

Exhibit 41
DX0370

12. I live in another state and have a permit to carry a concealed handgun that was issued in my home state. Does my permit allow me to carry a concealed handgun while in California?

13. How much is the state fee when purchasing a firearm?

14. Can I sell a gun directly to another person (i.e. non-dealer)?

15. My firearm purchase was denied by DOJ and the dealer won't tell me why. How do I find out the reason for the denial?

16. Can I use a temporary license as identification for firearm purchases?

17. Can my driving record prevent me from purchasing a firearm?

18. Are there any exemptions from the waiting period?

19. Is the dealer required to give me a copy of the DROS information when I purchase a firearm?

20. Is there a maximum time limit for me to pick up a firearm after the dealer submits the DROS information?

21. What is the Firearm Safety Certificate (FSC) requirement?

22. How do I get an FSC?

23. If I lose my FSC, can I get it replaced?

24. I am a collector of firearms and I want to purchase a pair of consecutively-numbered pistols. Is there an exemption from the one-handgun-per-30-day restriction for curio or relic collectors?

25. I am moving into California and I own several firearms. What are the new-resident registration requirements?

26. How do I know if my firearms need to be registered?

27. Can I get a list of the firearms for which I am listed as the purchaser, transferee, or owner?

28. How is the waiting period for firearm purchases calculated?

29. I've been working in a firearms dealership for several years. My duties include showing various firearms to customers. My employer recently told

Exhibit 41
DX0371

me I have to get a Certificate of Eligibility (COE). Is it lawful for him to require
a COE?

30.  Who answers questions regarding the applicability of sales tax to the DROS
fee?

31.  My firearm is in the possession of a court or law enforcement agency. What
do I need to do to get it back?

32.  My firearm, ammunition and ammunition feeding devices are in the
possession of a court or law enforcement agency. What do I need to do to
get it back?

33.  My ammunition and/or ammunition feeding device are in the possession of
a court or law enforcement agency. What do I need to do to get it back?

34.  I was arrested for a crime several years ago but no charges were filed against
me. Can this affect my ability to purchase a firearm or to obtain a firearms
license or permit?

35.  What if my firearm/(s) is destroyed, how do I report it to DOJ?

Back To Top

1.  **Where do I find laws regarding the possession of firearms?**

   ○  The laws governing control of deadly weapons, including firearms, are
   found in Part 6 of the Penal Code, beginning at section 16000. These laws
   define the various types of dangerous weapons as well as restrictions and
   crimes related to their manufacture, sale, possession, and transportation.
   Of particular note, the laws relating to firearms are found in Title 4 of Part
   6, beginning at section 23500, and the applicable definitions and general
   rules are found in Title 1 of Part 6, beginning at section 16000. Laws that
   pertain to both firearms and other types of deadly weapons are found in
   Title 2 of Part 6, beginning at section 17500.

Exhibit 41
DX0372

2. **I'm not sure whether I have a California record that would prevent me from owning/possessing a firearm. Is there a way to find out before I attempt to purchase one?**

   ○ Yes, you may request a California Personal Firearms Eligibility Check (PFEC) by submitting a (PFEC) application, pdf to the Department of Justice. For more information about how to request a PFEC, please refer to the PFEC FAQ. Applications are also available through your local firearms dealer. Please be advised that a PFEC does not include a Federal NICS check. Therefore, you may still be prohibited from owning or possessing a firearm even though you receive a PFEC response indicating you are eligible to own or possess firearms.

   (Pen. Code, § 30105)

3. **What is the process for purchasing a firearm in California?**

   ○ Generally, all firearms purchases and transfers, including private party transactions and sales at gun shows, must be made through a California licensed dealer under the Dealer's Record of Sale (DROS) process. California law imposes a 10-day waiting period before a firearm can be released to a purchaser or transferee.

   Pursuant to Penal Code section 27510, a California licensed dealer is prohibited from selling, supplying, delivering, transferring or giving possession or control of **any firearm** to any person under the age of 21 years, except as specifically exempted. The exemptions apply to the sale, supplying, delivery, transfer, or giving possession or control of a firearm that is not a handgun to a person 18 years of age or older.

   The Exemptions Include:

Exhibit 41
DX0373

  a.  A person 18 years of age or older who possess a valid, unexpired hunting license issued by the Department of Fish and Wildlife.

  b.  An active peace officer, as described in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, who is authorized to carry a firearm in the course and scope of his or her employment.

  c.  An active federal officer or law enforcement agent who is authorized to carry a firearm in the course and scope of his or her employment as a reserve peace officer.

  d.  A person who provides proper identification of his or her active membership in the United States Armed Forces, the National Guard, the Air National Guard, or active reserve components of the United States.

  e.  A Person who provides proper identification that he or she is an honorably discharged member of the United States Armed Forces, the National Guard, the Air National Guard, or active reserve components of the United States.

As part of the DROS process, the purchaser must present "clear evidence of identity and age" which is defined as a valid, non-expired California Driver's License or Identification Card issued by the Department of Motor Vehicles (DMV). A military identification accompanied by permanent duty station orders indicating a posting in California is also acceptable.

If the purchaser is not a U.S. Citizen, then he or she is required to demonstrate that he or she is legally within the United States by providing the firearms dealer with documentation containing his/her Alien Registration Number or I-94 Number.

Exhibit 41
DX0374

Purchasers of handguns must provide proof of California residency, such as a utility bill, residential lease, property deed, or government-issued identification (other than a driver license or other DMV-issued identification), and either (1) possess a Handgun Safety Certificate (HSC) plus successfully complete a safety demonstration with their recently purchased handgun or (2) qualify for an HSC exemption.

(Pen. Code, § § 26800-26850.)

4. **How can I obtain a Carry Concealed Weapon (CCW) license?**

   ○ Contact your county sheriff's office or, if you are a resident of an incorporated city, your city police department, for information on obtaining a CCW license. They can answer your questions and provide you with a copy of their CCW license policy statement and the CCW license application. If you live within an incorporated city, you may apply to the police department or the county sheriff's office for a CCW license. However, only residents of a city may apply to a city police department for a CCW license.

   (Pen. Code, §§ 26150-26225.)

5. **Can I give a firearm to my adult child? Can he/she give it back to me later?**

   ○ Yes, as long as the adult child receiving the firearm is not in a prohibited category, pdf and the firearm is legal to possess (e.g., not an assault weapon). The transfer of a firearm between a parent and child or a grandparent and grandchild is exempt from the dealer transfer requirement. The exemption does not apply to step-children/step-parents, brothers, sisters, aunts, uncles, or cousins.

Exhibit 41
DX0375

If the firearm is a handgun, the recipient must obtain a Handgun Safety
Certificate prior to taking possession and must also submit a Report of
Operation of Law or Intra-Familial Handgun Transaction and $19 fee to the
DOJ within 30 days after taking possession.

The same rules apply to the return of the firearm at a later date.

(Pen. Code, §§ 27870-27875, 30910-30915.)

6. **Can I give a firearm to my spouse or registered domestic partner? Can
   he/she give it back to me later?**

   - Yes, as long as the person receiving the firearm is not in a prohibited
     category, pdf and the firearm is legal to possess (e.g., not an assault
     weapon), the transfer of a firearm between a husband and wife or
     registered domestic partners is exempt from the requirement to use a
     licensed dealer to perform the transfer.

     If the firearm is a handgun, the recipient must obtain a Handgun Safety
     Certificate prior to taking possession and must also submit a Report of
     Operation of Law or Intra-Familial Handgun Transaction, pdf and $19 fee
     to the DOJ within 30 days after taking possession.

     The same rules apply to the return of the firearm at a later date.

     (Pen. Code, §§ 16990, subd. (g), 27915, 27920, subd. (b).)

7. **Is there a limit on the number of handguns that I can own or purchase?**

   - There is no limit to the number of handguns that you may own but you
     are generally limited to purchasing no more than one handgun in any 30-
     day period. Handgun transactions related to law enforcement, private

Exhibit 41
DX0376

party transfers, returns to owners, and certain other specific
circumstances are exempt from the one-handgun-per-30-day purchase
limit.

(Pen. Code,§ 27535.)

8. **Does California have a law regarding the storage of firearms?**

   ○ Yes. If you keep any loaded firearm within any premise which is under
   your custody or control and know or reasonably should know that a child
   (person under 18 years of age) is likely to gain access to the firearm, you
   may be guilty of a felony if a child gains access to that firearm and thereby
   causes death or injury to any person including themselves unless the
   firearm was in a secure locked container or locked with a locking device
   that rendered it inoperable.

   (Pen. Code,§§ 25100, 25200.)

9. **Are large-capacity magazines legal?**

   ○ Generally, it is illegal to buy, manufacture, import, keep for sale, expose
   for sale, give or lend any large-capacity magazine (able to accept more
   than 10 rounds) in California. However, continued possession of large-
   capacity magazines that you owned in California prior to January 1, 2000,
   is legal provided you are not otherwise prohibited. A person prohibited
   from possessing firearms is also prohibited from owning or possessing
   any magazines or ammunition.

   (Pen. Code, §§16150, subd. (b), 30305, 32310.)

10. **May I carry a concealed firearm in California?**

    ○ Generally you may not carry a concealed firearm on your person in public
    unless you have a valid Carry Concealed Weapon (CCW) license. CCW
    licenses are issued only by a California county sheriff to residents of the

Exhibit 41
DX0377

county, or the chief of police to residents of the city. California law does not honor or recognize CCW licenses issued outside this state.

(Pen. Code, §§ 25400-25700, 26150-26225.)

11. **Who is prohibited from owning or possessing firearms?**

   ○ Any person who has a conviction for any misdemeanor listed in Penal Code section 29805 or for any felony, or is addicted to the use of any narcotic drug, or has been held involuntarily as a danger to self or others pursuant to Welfare and Institutions Code section 8103 is prohibited from buying, owning, or possessing firearms or ammunition. There are also prohibitions based on mental conditions, domestic restraining/protective orders, conditions of probation, and specific offenses committed as a juvenile. A list of prohibited categories is available on the Bureau of Firearms website.

   (Pen. Code, §§ 29800, 29805, 29815, 29820, 29825, 29855, 29860, 29900, 29905, 30305; Welf. & Inst. Code, §§ 8100-8103; 18 U.S.C. § 922, subd. (g), 27 C.F.R. § 478.22.)

12. **I live in another state and have a permit to carry a concealed handgun that was issued in my home state. Does my permit allow me to carry a concealed handgun while in California?**

   ○ No. CCW licenses/permits issued in other states are not valid in California.

   (Pen. Code, §§ 25400-25700.)

13. **How much is the state fee when purchasing a firearm?**

   ○ • The total state fee is $37.19. The DROS fee is $31.19 which covers the costs of the background checks and transfer registry. There is also a $1.00 Firearms Safety Act Fee, and a $5.00 Safety and Enforcement Fee. In the

Exhibit 41
DX0378

event of a private party transfer (PPT), the firearms dealer may charge an
additional fee of up to $10.00 per firearm.

If the transaction is not a PPT the dealer may impose other charges as
long as this amount is not misrepresented as a state fee. When settling on
the purchase price of a firearm, you should ask the dealer to disclose all
applicable fees.

(Pen. Code, §§ 23690, 28055, 28230, 28300, 28233.)

14. **Can I sell a gun directly to another person (i.e. non-dealer)?**

- • Generally, no. This type of transaction is referred to as a "private party
transfer" and must be conducted with both parties, in person, through a
fully licensed California firearms dealer. Failure to do so is a violation of
California law. The purchaser (and seller if the purchaser is denied), must
meet the normal firearm purchase and delivery requirements.

Firearms dealers are required to process private party transfers upon
request but may charge a fee not to exceed $10.00 per firearm for
conducting the transfer. For example:

  1. For private party transfers, the total allowable fees, including the
  DROS, safety, and dealer transfer fees, are not to exceed $47.19
  ($37.19 DROS fee and $10.00 PPT fee), and $10.00 for each
  subsequent firearm.

"Antique firearms," as defined in section 921(a)(16) of Title 18 of the
United States Code, and curio or relic rifles/shotguns, defined in section
478.11 of Title 27 of the Code of Federal Regulations that are over 50 years
old, are exempt from this requirement. For additional exceptions, refer to
Penal Code sections 27850 through 27966.

Exhibit 41
DX0379

(Pen. Code, § 27545, 28055)

15. **My firearm purchase was denied by the DOJ and the dealer won't tell me why. How do I find out the reason for the denial?**

   ○ If your DROS application is denied, you will receive a letter from the DOJ Bureau of Firearms within two weeks. The letter will explain the reason and instructions on how to get a copy of the record that resulted in the denial of your application. There will also be instructions on how to dispute and correct information in your record you believe is wrong.

16. **Can I use a temporary license as identification for firearm purchases?**

   ○ No. Neither temporary driver's licenses nor temporary identification cards are acceptable forms of proof of identity and age.

   (Pen. Code, § 16400.)

17. **Can my driving record prevent me from purchasing a firearm?**

   ○ Yes. If you have a conviction for a firearms-prohibiting offense, such as felony drunk driving, your driving record would affect your ability to purchase a firearm. Furthermore, your driver's license must be valid. A revocation, outstanding ticket, or fine may cause your license to be invalid.

18. **Are there any exemptions from the waiting period?**

   ○ Yes, but they don't apply to the general public. For example, waiting period exemptions include the following:

      a. Firearms dealers and persons who have obtained special weapons permits issued by the DOJ are exempt from the waiting period.

      b. Persons with a Curio & Relic collector's licenses issued by the ATF and who have a valid Certificate of Eligibility issued by the DOJ are exempt from the waiting period when purchasing curio and relic firearms.

      c. Peace officers with authorization from the head of his/her agency.

   (Pen. Code, §§ 26950-26970, 27650-27670.)

Exhibit 41
DX0380

19. **Is the dealer required to give me a copy of the DROS information when I purchase a firearm?**

   ○ Yes, upon request, the dealer must provide you with a copy of the DROS application. In private party transactions, the seller is also entitled to a copy of the DROS application upon request.

   (Pen. Code, § 28210.)

20. **Is there a maximum time limit for me to pick up a firearm after the dealer submits the DROS information?**

   ○ Yes. If you do not take physical possession of the firearm within 30 days of submission of the DROS information, the dealer must cancel the sale. If you still want to take possession of the firearm, you must repeat the entire DROS process, including payment of DROS fees and new 10-day waiting period.

   (Pen. Code, § 26835; 27 C.F.R. § 478.124, subd. (c).)

21. **What is the Firearm Safety Certificate (FSC) requirement?**

   ○ Prior to the submission of DROS information for a fiream, the purchaser must present an FSC or provide the dealer with proof of exemption pursuant to California Penal Code section 31700.

   (Pen. Code, §§ 26840, 31700.)

22. **How do I get an FSC?**

   ○ To obtain an FSC you must score at least 75% (23 correct answers out of 30 questions) on the FSC Test covering firearm safety and basic firearms laws. The true/false and multiple choice test is administered by Instructors certified by the Department of Justice who are generally located at firearms dealerships.

Exhibit 41
DX0381

(Pen. code, §§ 31610-31670.)

23. **If I lose my FSC, can I get it replaced?**

    ○   Yes. A replacement FSC is available only through the DOJ Certified
        Instructor who issued your FSC. The FSC replacement cost is $5. The
        replacement FSC will reflect the same expiration date as your original FSC.

        (Pen. code, § 31660.)

24. **I am a collector of firearms and I want to purchase a pair of consecutively-
    numbered pistols. Is there an exemption from the one-handgun-per-30-day
    restriction for curio or relic collectors?**

    ○   Yes, but you must have a valid federal Curio & Relic Collector's license and
        a valid Certificate of Eligibility.

        (Pen. Code, § 27535.)

25. **I am moving into California and I own several firearms. What are the new-
    resident registration requirements?**

    ○   You are considered a personal firearm importer as defined by California
        law. You may bring all of your California-legal firearms with you, but you
        must report them all to the California Department of Justice within 60 days
        as required utilizing the New Resident Firearm Ownership Report (BOF
        4010A), pdf. You may not bring ammunition feeding devices with a
        capacity greater than ten rounds, machine guns, or assault weapons into
        California.

        (Pen. code, §§ 17000, subd. (a), 27560.)

26. **How do I know if my firearms need to be registered?**

    ○   There is no firearm registration requirement in California except for
        assault weapon owners and personal handgun importers. However, you
        must submit a Firearm Ownership Report (FOR) Application (BOF 4542A),

Exhibit 41
DX0382

pdf to the California Department of Justice (the Department) for any firearm you are seeking return where no other record is on file with the Department identifying you as the most recent owner/possessor. Having a FOR application on file with the Department will authorize the return of your firearm in the event it is subsequently lost or stolen. With very few and specific exceptions, all firearm transactions must be conducted through a firearms dealer. If you purchased a handgun from a properly licensed California firearms dealer and underwent a background check via the state's Dealer's Record of Sale (DROS) process, a record of your handgun purchase is already on file with the Department. Therefore, it should not be necessary for you to submit a FOR application for handguns previously purchased in California. Unfortunately, this is not the case with regards to rifles or shotguns. Prior to January 1, 2014, the Department was prohibited by law from retaining DROS long gun information.

27. **Can I get a list of the firearms for which I am listed as the purchaser, transferee, or owner?**

   ○ Yes. To obtain a list of firearms listed in your name, complete and submit an Automated Firearms System Records Request, pdf to the Automated Firearms Unit, P.O. Box 820200, Sacramento, CA 94203-0200. The request must be signed, notarized, and include a photocopy of your photo ID card (i.e., driver's license or DMV ID).

28. **How is the waiting period for firearm purchases calculated?**

   ○ The waiting period for the purchase or transfer of a firearm is ten (10) 24-hour periods from the date and time the DROS information is submitted to the DOJ.

29. **I've been working in a firearms dealership for several years. My duties include showing various firearms to customers. My employer recently told**

Exhibit 41
DX0383

**me I have to get a Certificate of Eligibility (COE). Is it lawful for him to require a COE?**

- Yes. Licensed firearms dealers shall require their employees who handle, deliver, or sell firearms to obtain a Certificate of Eligibility from the DOJ. Upon application, a firearms eligibility check will be conducted to determine whether the applicant is eligible to lawfully possess firearms. If so, the applicant is issued a COE. A copy of the COE must be provided to the employer by the employee/applicant, and must be renewed annually, as required by the licensed dealer. For more information, please see the Firearm Dealer FAQs.

30. **Who answers questions regarding the applicability of sales tax to the DROS fee?**

- Questions regarding sales tax should be directed to the California Department of Tax and Fee Administration. Their website address is www.cdtfa.ca.gov.

31. **My firearm is in the possession of a court or law enforcement agency. What do I need to do to get it back?**

- Once the court or law enforcement agency in possession of your firearm notifies you the firearm is available for return, you must submit a completed Law Enforcement Gun Release (LEGR) application, pdf with the appropriate processing fee to the California Department of Justice (the Department). The processing fee for an LEGR application is $20.00 for the first firearm and $3.00 for each additional firearm listed on the application.

    If the court or agency in possession of your firearm determines that the firearm was reported stolen, the fee for the stolen firearm will be waived. You must send documentation from the court or agency confirming the

Exhibit 41
DX0384

firearm was reported stolen along with the LEGR application to qualify for the fee waiver.

Once the Department receives your LEGR application, a firearms eligibility check will be conducted to determine if you are lawfully eligible to possess firearms. DOJ will also confirm the firearm is recorded in the Department's Automated Firearms System (AFS) as being owned by or loaned to the individual seeking its return. If you have not previously reported your firearm to the Department, you must also submit a Firearms Ownership Report (FOR) application (BOF 4542A) along with the appropriate fees to the Department. If the firearm you are seeking return is a rifle/shotgun, the prior completion of a Dealer's Record of Sale (DROS) background check does not satisfy the aforementioned firearm reporting requirement. However, if the rifle/shotgun was registered as an assault weapon or 50 BMG rifle, the reporting requirement has been satisfied.

You will receive a notice of the results. If this notice states that you are eligible to possess firearms and the firearm is recorded to in your name, you should then take the notice to the court or law enforcement agency in possession of your firearm to claim it. The notice must be presented to the court or law enforcement agency within thirty (30) days of the date listed on the notice. Failure to do so will result in the need to submit a new application and fees and undergo another firearms eligibility background check.

32. **My firearm, ammunition and ammunition feeding devices are in the possession of a court or law enforcement agency. What do I need to do to get it back?**

- ○ Follow the instructions for submitting an application for LEGR. Once the Department receives your LEGR application, a firearms eligibility check will

Exhibit 41
DX0385

be conducted to determine if you are lawfully eligible to possess firearms. If you are eligible to possess firearms, the court or law enforcement agency can release the ammunition and/or feeding devices at the same time as the firearm.

33. **My ammunition and/or ammunition feeding device are in the possession of a court or law enforcement agency. What do I need to do to get it back?**

  ○ If you are seeking the return of ammunition and/or feeding devices ONLY, DO NOT submit a LEGR Application. Please visit the law enforcement agency or court that has custody of your property or contact the Bureau of Firearms by email at https://oag.ca.gov/firearms/contact for further instructions.

    **Effective July 1, 2020, the Department will be required to perform eligibility checks on individuals who are attempting to retrieve ammunition and/or ammunition feeding devices that are in the custody of a law enforcement agency or court.**

34. **I was arrested for a crime several years ago but no charges were filed against me. Can this affect my ability to purchase a firearm or to obtain a firearms license or permit?**

  ○ An arrest on your criminal history record without any disposition information explaining the outcome of the arrest may affect your ability to purchase a firearm or to obtain a firearms license or permit. If you are applying for a license or permit involving the possession of a firearm or dangerous weapon and the Department cannot determine the outcome of the arrest, you must first correct or complete the information in your criminal history record before the Department may issue you the license or permit. If you are trying to purchase a firearm and the Department cannot ascertain the outcome of the arrest and you do not correct or complete the information on your criminal history record, the decision

Exhibit 41
DX0386

whether to sell you the firearm rests with the firearms dealer. For further information on how to correct or complete the information on your criminal history record, please see https://oag.ca.gov/fingerprints/security_faq#incorrect.

(Pen. Code, §§ 851.6, 11115, subd. (b), 11116.5, 28220, subd. (f)(4).)

35. **What if my firearm/(s) is destroyed how do I report it to DOJ?**

- You must submit a No Longer In Possession (NLIP) BOF 4546 form along with providing the proof of the destroyed firearm(s):

    - Pictures of before & after the destruction of the firearm(s) with the serial number visible.
    - Copy of an insurance claim for the destroyed firearm(s) or statement from a gunsmith or a manufacturer stating that the firearm(s) was not repairable and could not be made operable.

    Other ways to destroy the firearm(s) (need to be reported on the NLIP BOF 4546 form) are:

    - Surrender it to Law Enforcement.
    - Surrender it to a gunsmith or a firearm manufacturer.

Back To Top

Office of the Attorney General    Accessibility    Privacy Policy    Conditions of Use    Disclaimer

© 2024 DOJ

Exhibit 41
DX0387

# EXHIBIT 42

Exhibit 42
DX0388




## CALIFORNIA DEPARTMENT OF JUSTICE
## BUREAU OF FIREARMS

## Department of Justice Fees

---

### Dealer's Record of Sale (DROS) Fee
(Pen. Code, § 28233; 11 Cal. Code Regs. § 4001) ............................................. $31.19

### Firearm Safety Fee (Pen. Code, § 23690) ...................................................... $1.00

### Firearm Safety Enforcement Fee (Pen. Code, § 28300) .......................... $5.00

### Total Fee at time of DROS Transaction: **$37.19**

---

### Dealer Fee for Private Party Transfer (per firearm)
(Pen. Code, § 28055) ........................................................................................ $10.00

---

### The following are fees associated with the Firearm Safety Certificate (FSC) program:

### DOJ FSC New Certificate Fee (Pen. Code, § 31650) .................................. $15.00

### FSC Test Fee (Pen. Code, § 31650) ................................................................. $10.00

### Total Fee at time of FSC Issuance: **$25.00**

### DOJ FSC Replacement Certificate Fee
(Pen. Code, § 31650) ........................................................................................ $5.00

Exhibit 42
DX0389

# EXHIBIT 43

Exhibit 43
DX0390



**2022**

# CRIME

## IN CALIFORNIA

Rob Bonta, Attorney General
California Department of Justice
California Justice Information Services Division
Justice Data & Investigative Services Bureau
Criminal Justice Statistics Center

Exhibit 43
DX0391



Exhibit 43
DX0392

# The Role of the
# Criminal Justice Statistics Center
# is to:

- Collect, analyze, and report statistical data that provide valid measures of crime and the criminal justice process.

- Examine these data on an ongoing basis to better describe crime and the criminal justice system.

- Promote the responsible presentation and use of crime statistics.



## CALIFORNIA DEPARTMENT OF JUSTICE
### Rob Bonta, Attorney General

Exhibit 43
DX0393

# Executive Summary
# Crime in California
# 2022

*Crime in California 2022* presents an overview of the criminal justice system in California. Current year statistics, provided by California law enforcement agencies (LEAs), are presented for reported crimes, arrests, dispositions of adult felony arrests, adult probation, criminal justice personnel, civilians' complaints against peace officers, domestic violence-related calls for assistance, anti-reproductive-rights crimes, law enforcement officers killed or assaulted, and violent crimes against senior citizens.

Facts for 2022:

## Crime Rates per 100,000 Population

- The violent crime rate increased 6.1 percent in 2022 (from 466.2 in 2021 to 494.6 in 2022), and the property crime rate increased 6.2 percent in 2022 (from 2,178.4 in 2021 to 2,313.6 in 2022) (Table 2).
- From 2017 to 2022, the property crime rate decreased 7.1 percent (from 2,491.0 in 2017 to 2,313.6 in 2022) (Table 2).
- The homicide rate decreased 5.0 percent in 2022 (from 6.0 in 2021 to 5.7 in 2022), while the robbery rate increased 10.2 percent in 2022 (from 110.8 in 2021 to 122.1 in 2022) (Table 2).
- The larceny theft rate increased 7.7 percent in 2022 (from 1,375.1 in 2021 to 1,480.3 in 2022), while the arson rate decreased 11.0 percent in 2022 (from 28.3 in 2021 to 25.2 in 2022) (Table 2).
- From 2017 to 2022, the burglary rate decreased 17.6 percent (from 445.9 in 2017 to 367.5 in 2022), while the aggravated assault rate increased 24.0 percent (from 266.1 in 2017 to 330.0 in 2022) (Table 2).
- From 2017 to 2022, the homicide rate increased 23.9 percent (from 4.6 in 2017 to 5.7 in 2022), while the robbery rate decreased 14.6 percent (from 142.9 in 2017 to 122.1 in 2022) (Table 2).

## Arrest Rates per 100,000 Population at Risk*

- The 2022 total arrest rate of 2,535.2 is 2.7 percent lower than the 2021 total arrest rate of 2,606.3 (Table 17).
- From 2021 to 2022, the adult total arrest rate decreased 3.8 percent (from 2,949.6 in 2021 to 2,836.3 in 2022), while the juvenile total arrest rate increased 34.7 percent (from 461.2 in 2021 to 621.1 in 2022) (Table 17).
- The total felony and misdemeanor arrest rates decreased 0.7 and 3.7 percent, respectively, in 2022 (from 877.2 and 1,725.0 in 2021 to 870.7 and 1,660.9 in 2022) (Table 17).
- The total violent offense arrest rate increased 3.4 percent in 2022 (from 308.1 in 2021 to 318.5 in 2022). The homicide arrest rate decreased 5.9 percent in 2022 (from 5.1 in 2021 to 4.8 in 2022), while the robbery arrest rate increased 14.4 percent in 2022 (from 37.4 in 2021 to 42.8 in 2022) (Table 22).
- The total property offense arrest rate increased 5.3 percent in 2022 (from 191.5 in 2021 to 201.7 in 2022). The burglary and theft arrest rates increased 9.4 and 12.2 percent, respectively, in 2022 (from 50.0 and 79.8 in 2021 to 54.7 and 89.5 in 2022), while the motor vehicle theft arrest rate decreased 8.5 percent in 2022 (from 49.4 in 2021 to 45.2 in 2022) (Table 22).

*Population at risk means those between the ages of 10-69. Please see Appendix 1 on Page 74 for more information.

Exhibit 43
DX0394

- The total felony drug offense arrest rate decreased 14.6 percent in 2022 (from 78.2 in 2021 to 66.8 in 2022). Dangerous drugs and marijuana arrest rates decreased 19.4 and 18.5, respectively, in 2022 (from 46.9 and 2.7 in 2021 to 37.8 and 2.2 in 2022) (Table 22).
- The petty theft and assault and battery arrest rates increased 21.3 and 11.2 percent, respectively, in 2022 (from 44.6 and 211.2 in 2021 to 54.1 and 234.9 in 2022), while the misdemeanor driving under the influence arrest rate decreased 5.9 percent in 2022 (from 346.3 in 2021 to 325.9 in 2022) (Table 27).

### Dispositions – Adult Felony Arrests

- In 2022, 61.4 percent of adult felony arrest dispositions resulted in conviction (Table 37).
- Probation with jail continues to be the most frequent sentence given for adult felony arrest convictions (Table 38A).
- From 2021 to 2022, the percentage of convictions resulting in incarceration in a state institution increased from 19.7 to 21.5 percent (Table 40).
- The percentage of violent and drug offense convictions resulting in incarceration in a state institution increased in 2022 (from 23.8 and 14.1 in 2021 to 25.2 and 19.6 in 2022), while the percentage of property offense convictions resulting in incarceration in a state institution decreased in 2022 (from 17.0 in 2021 to 16.7 in 2022) (Table 40).

### Adult Probation

- In 2022, the total number of adults on active probation was 151,402 – its lowest since 1980 (Table 41).
- From 2021 to 2022, there was an 11.4 percent increase in the number of adults placed on probation and a 9.6 percent decrease in the number of adults removed from probation (Table 42).
- From 2021 to 2022, there was an 10.1 percent increase in the number of adults placed on probation for a felony offense, and a 12.8 percent decrease in the number of adults removed from probation for a felony offense (Table 42).
- From 2021 to 2022, there was an 18.2 percent increase in the number of adults placed on probation for a misdemeanor offense, and a 6.2 percent increase in the number of adults removed from probation for a misdemeanor offense (Table 42).

### Criminal Justice Full-Time Personnel

- From 2021 to 2022, the total number of full-time criminal justice personnel decreased 1.4 percent (Table 44).
- From 2021 to 2022, the number of law enforcement, prosecution and probation personnel decreased 1.3, 0.3 and 3.6 percent, respectively (Table 44).

Exhibit 43
DX0395

## Civilians' Complaints Against Peace Officers

- The total number of reported civilians' complaints against peace officers decreased from 28,617 in 2021 to 26,036 in 2022 (Table 46).
- The total number of reported criminal complaints increased from 693 in 2021 to 1,093 in 2022 (Table 46).

## Domestic Violence-Related Calls For Assistance

- From 2021 to 2022, the total number of domestic violence-related calls for assistance decreased from 164,608 to 162,422 (Table 48).
- From 2021 to 2022, the total number of domestic violence-related calls for assistance involving a firearm decreased from 2,501 to 2,132 (Table 48).

## Law Enforcement Officers Killed or Assaulted

- The total number of law enforcement officers assaulted in the line of duty increased from 10,798 in 2021 to 12,304 in 2022 (Table 49).
- In 2022, five officers lost their lives in the line of duty, four feloniously and one accidentally (Table 49).
- From 2021 to 2022, the number of law enforcement officers assaulted with a firearm decreased 6.2 percent, while the number assaulted with a knife and other dangerous weapons increased 14.2 and 28.5 percent, respectively (Table 50).

## Violent Crimes Committed Against Senior Citizens

- From 2021 to 2022, violent crimes committed against senior citizens increased from 15,308 to 16,575 (Table 52).
- From 2021 to 2022, homicides committed against senior citizens increased from 204 to 234 (Table 52).

Exhibit 43
DX0396

# Understanding the Data
## Characteristics and Known Limitations

In 2016, the Federal Bureau of Investigation's (FBI) Director informed all state Statistical Analysis Centers that the FBI Uniform Crime Reporting (UCR) program would be transitioning to a National Incident-Based Reporting System (NIBRS) only data collection by January 1, 2021. The California DOJ embarked on a five-year effort to develop and implement a new state repository, the California Incident-Based Reporting System (CIBRS), to house the new FBI statistical reporting format. The CIBRS repository is a combination of the federal NIBRS requirements with additional California specific data elements. The California Department of Justice (DOJ) began collecting data in CIBRS in 2021. However, not all California LEAs have transitioned.

The 2021-2022 data represented in this 2022 publication are a combination of both the summary and incident-based reporting (IBR) formats. There is an established method for converting IBR data into summary data for comparison and trending purposes. In order to present the most comprehensive and complete picture of crime, the summary and IBR data were combined and are presented in the summary format for this year's publication.

There are a few details to consider with this combined approach:

1. Definitional differences exist between summary and IBR reporting. In 2013, the FBI changed the crime of "forcible rape" to "rape" for the summary data collection which was implemented in 2014. The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The IBR collection has built-in validations that prohibit the reporting of rape offenses where the victim and offenders' sex is the same. There are footnotes in each table impacted in this publication and both the summary and IBR values are presented.

   Summary and IBR number breakdowns for total rapes since the inclusion of IBR reporting are as follows for the crimes and arrest data:

### Rape Crimes Reported, 2021-2022
By Type of System Reported

| Year | Total | Summary Based | Incident Based |
|------|-------|---------------|----------------|
| 2022 | 14,346 | 8,851 | 5,495 |
| 2021 | 14,435 | 11,874 | 2,561 |

### Rape Arrests Reported, 2021-2022
By Type of System Reported

| Year | Total | Summary Based | Incident Based |
|------|-------|---------------|----------------|
| 2022 | 1,890 | 1,299 | 591 |
| 2021 | 1,964 | 1,809 | 155 |

2. California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The FBI only collects the values of male and female. There are footnotes in each table impacted in this publication and the counts for each new value are reflected where appropriate.

   Transgender number breakdowns since their inclusion in IBR reporting are as follows for the arrest data:

### IBR Transgender Arrests Reported 2021-2022

| Year | Transgender (Presents Male) | Transgender (Presents Female) |
|------|------------------------------|-------------------------------|
| 2022 | 68 | 198 |
| 2021 | 17 | 49 |

---

**4**

Exhibit 43
DX0397

## CRIMES
### Uniform Crime Reporting (UCR) Program

- Crime data from the UCR Program are available from 1952 to 2022.

- The number of reported homicide, rape, and aggravated assault crimes represents known victims; while for robbery, burglary, larceny-theft, motor vehicle theft, and arson, the number represents known incidents.

- If multiple crimes occur during the same event, only the most serious (based upon a hierarchy) is counted.  Arson is the exception.

- LEAs began submitting arson crimes data in 1979; however, 1980 was the first year of complete reporting.  Agencies must report as arson only fires determined through investigation to have been willfully or maliciously set.  Attempts to burn are included in this offense, but fires of suspicious or unknown origins are not.

- In 2011, the lower limit of felony theft in California was raised from $400 to $950.  It was not feasible to adjust the California DOJ's data collection process to collect the new lower limit of felony larceny-theft, and consequently, it is no longer possible to distinguish felony from misdemeanor larceny-theft.  Therefore, it was decided to include total larceny-theft crime in the property crime category regardless of value.

- In 2013, the FBI's UCR Program revised the definition of "forcible rape" (the carnal knowledge of a female forcibly and against her will) to "rape," which is now defined as "penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim."

  The California DOJ implemented this definition change in January 2014.  During 2014, agencies were encouraged to report using the new definition, but were allowed to report under the historical definition while transitioning their reporting systems.

## ARRESTS
### Monthly Arrest and Citation Register (MACR)

- Arrest data from the MACR reporting system are available from 1957 to 2022.

- If a person is arrested for multiple offenses on the same day, MACR selects only the most serious offense based on the severity of possible punishment.

- Felony arrest counts may include some misdemeanor warrants for felony offenses.

- The subjectivity of the classification and labeling process must be considered in analyses of race/ethnic group data.

- The Bakersfield Police Department was unable to provide arrest data for February through December 1995.  The Oakland Police Department was unable to provide any arrest data for 1995.  Estimates for both agencies were added to the 1995 statewide totals for publication trend tables.

- Beginning in 2004, the population category of "other" for race/ethnic group includes the Department of Finance's race/ethnic group of "multi-racial."

- In 2011, there were notable changes in California law that affected arrest data.  First, the lower limit of felony theft was raised from $400 to $950, contributing to the decline in felony theft arrests and the increase in misdemeanor theft arrests.  Second, some misdemeanor marijuana statutes were re-classified as infractions, leading to a significant decline in misdemeanor marijuana arrests.

- In 2014, the definition of rape changed.  Refer to the preceding, "Crimes" section for more detailed explanation and Appendix 2 for a list of included offense codes.

- In November 2014, California voters passed Proposition 47 which reduced numerous "non-violent" offenses from felonies to misdemeanors.  Caution should be used when comparing felony and misdemeanor arrest data to prior years.

Exhibit 43
DX0398

- In November 2016, California voters passed Proposition 64 which legalized the possession and use of marijuana for individuals 21 years of age and older and reduced the offense degree for a number of marijuana-related offenses. Caution should be used when comparing drug offense arrests to prior years.

## DISPOSITIONS OF ADULT FELONY ARRESTS

- Adult felony arrest disposition data (i.e., data related to the final law enforcement or prosecutorial outcome of a felony adult arrest) are extracted annually from the California DOJ Criminal History System. The data statistically capture the number of adult level final dispositions that occur each year as a result of a felony arrest and are displayed by the year of disposition regardless of the year in which an arrest occurred.

- Disposition data do not reflect the actual number of final dispositions occurring each year. Fluctuations from year to year may not necessarily be the result of actual occurrences in the criminal justice system but may reflect the degree to which reports of dispositions were reported and processed.

- "Final disposition" refers to the last adult-level legal action that is reported prior to the close of the annual file. Final disposition can occur at the law enforcement, prosecutorial, or court level. Intermediate dispositions (diversion programs, suspended proceedings, or subsequent actions) are not included in the data.

- Dispositions that occur at the law enforcement or prosecutorial level involving releases, rejections, or resolutions can be reported in one calendar year file, proceed to adjudication at the court level, and then be reported again in a subsequent year file. The law enforcement release or prosecutorial rejection reported in the prior year's file is not retroactively updated or removed.

- If a person is arrested for multiple offenses, the extract selects only the most serious offense based on the severity of possible punishment. If there are multiple dispositions, the extract selects the most serious disposition and the associated offense.

- Disposition data on state institutional commitments may vary from information compiled and reported by other state agencies because of differences in the data collection systems and criteria.

- The adult felony arrest disposition file includes some persons whose age at arrest was under 18. These minors received a final disposition in adult court under provisions of Welfare and Institutions Code sections 602, 707(a), 707(b), 707(c), and 707.1(a).

- In 2019, there was a decrease in the number of final dispositions and sentences for felony adult arrests reported to the California DOJ from 215,283 in 2018 to 110,002 in 2019.

## ADULT PROBATION

- Probation data include adults placed on supervised probation only. Court probation, diversion, and summary probation data are not included.

- Adult probation data are limited to original grants of probation and do not include subsequent grants of probation to those already under supervised probation in the same county. Probationers are counted for each jurisdiction in which they are on probation.

- From 2001 to 2005, San Francisco did not report adult probation data. San Francisco resumed reporting in 2006.

- Counts for adults on active probation for felony offenses may also include adults on probation for misdemeanor offenses for the following counties and years: Contra Costa (2000–2022), Kern (2010–2022), Lake (2001–2012), Merced (2003–2016),

Exhibit 43
DX0399

Sacramento (2003–2015), Shasta (2016-2022), Siskiyou (2000–2012), Tulare (2000–2009), and Yolo (2000–2009).

- Some counties may have counted individuals on Post Release Community Supervision.

- In 2014, the San Bernardino County Probation Department discovered inaccurate probation statistics due to a flaw in their case management records system.  Correcting the flaw resulted in a probation caseload decrease of 10,000 from previous years.

- In 2016, the Sacramento County Probation Department discovered that revoked and reinstated counts were not accurately reported in the data submitted for the reporting periods 2013-2015.  Correcting the reporting practice resulted in a reduced beginning felony caseload for 2016.

- In October 2018, the San Joaquin County Probation Department discovered that probation caseload data had historically been inaccurately reported.  An assessment of their records resulted in a decrease of both felony and misdemeanor caseloads by approximately 6,000.

### CRIMINAL JUSTICE PERSONNEL

- The UCR definition of law enforcement personnel specifies that LEAs report only personnel paid by funds designated for law enforcement.

- The 1996 data collection survey forms were revised in an attempt to collect counts on the number of criminal justice personnel employed by prosecutors, public defenders, and probation departments, regardless of the funding source.  Prior to 1996, counts excluded state and federally funded positions.

### CIVILIANS' COMPLAINTS AGAINST PEACE OFFICERS

- Data on civilians' complaints against peace officers have been collected since 1981.

- Because of the nature of the requirements of Penal Code section 832.5, reporting definitions and procedures may vary among individual reporting agencies.

- Based on a survey conducted in 2004, it was estimated that approximately one-third of complaints against peace officers were made by inmates in prison and jails.

- In 2007, two LEAs adjusted their reporting policies, substantially affecting the number of reported non-criminal and felony complaints.

- In 2017, California Penal Code section 13012 was amended replacing the word citizens' with civilians'.  This modification was applied to the 2018 data collection.

### DOMESTIC VIOLENCE-RELATED CALLS FOR ASSISTANCE

- Reporting of domestic violence-related calls for assistance began in July 1986.  The first full year of reporting was 1987.

- The definition of "domestic violence" is subject to varying interpretations by law enforcement agencies.  As a result, different types of domestic relationships are included in the database.

- The San Francisco Police Department did not report domestic violence data from April 1997 to December 1999.

- Included in the data are any cases that resulted in a report being written by the responding LEAs.  Therefore, data include both cases where an arrest was made and those where circumstances did not warrant an arrest.

Exhibit 43
DX0400

- In April 2002, LEAs were instructed to report personal weapons (hands, fists, or feet) only if the assault resulted in an injury (aggravated assault). This instruction resulted in a notable decrease in the number of personal weapons reported.

- Reporting anomalies have required minor adjustments to the 2014 and 2016 data. Data may not match those previously published.

- In 2017, California Penal Code section 13730 was amended. Beginning in 2018, LEAs were instructed to include whether there were indications that the incident involved strangulation or suffocation. This includes whether a witness or victim reported such an incident, or symptoms thereof, or whether an officer observed any other indications of strangulation or suffocation.

## LAW ENFORCEMENT OFFICERS KILLED OR ASSAULTED (LEOKA)

- LEOKA data from the UCR Program are available from 1990 to 2022.

- State correctional officers and federal agents are not included in LEOKA data.

Exhibit 43
DX0401

# List of Data Tables

| CRIMES | |
|---|---|
| **Table** | **Page** |

1 CRIMES, 1966–2022
Number and Rate per 100,000 Population............................11

2 CRIMES, 2017–2022
Number, Rate per 100,000 Population, and
Percent Change ................................................................ 13

3 CRIMES, 2017–2022
By Category and Crime....................................................... 14

4 HOMICIDE CRIMES, 2017–2022
By Type of Weapon Used.................................................... 14

5 RAPE CRIMES, 2017–2022
By Type ........................................................................... 15

6 ROBBERY CRIMES, 2017–2022
By Location, Type of Robbery, and Type of
Weapon Used ................................................................... 15

7 ASSAULT CRIMES, 2017–2022
By Type of Assault and Type of Weapon Used .................. 16

8 BURGLARY CRIMES, 2017–2022
By Location, Time of Day, Type of Burglary, and
Type of Entry .................................................................... 16

9 MOTOR VEHICLE THEFT CRIMES, 2017–2022
By Type of Vehicle ............................................................ 17

10 LARCENY-THEFT CRIMES, 2017–2022
Number, Rate per 100,000 Population, and
Percent Change ................................................................ 17

11 LARCENY-THEFT CRIMES, 2017–2022
By Type and Value Categories .......................................... 18

12 VALUE OF STOLEN AND RECOVERED PROPERTY,
2017–2022
By Type and Percent Change ............................................ 18

13 VALUE OF STOLEN AND RECOVERED PROPERTY,
2017–2022
By Type of Property........................................................... 19

14 ARSON CRIMES, 2017–2022
By Type of Property and Value of Property
Damage............................................................................. 20

15 CRIMES CLEARED, 2017–2022
Number of Crimes, Clearances, and Clearance Rate ........ 21

| ARRESTS | |
|---|---|
| **Table** | **Page** |

16 TOTAL ARRESTS, 1966–2022
Number and Rate per 100,000 Population at Risk.............. 22

17 TOTAL ARRESTS, 2017–2022
Number, Rate per 100,000 Population, and
Percent Change ................................................................ 24

18 TOTAL ARRESTS, 2017–2022
By Level of Offense for Adult and Juvenile Arrests ............ 25

19 FELONY ARRESTS, 2017–2022
By Category ...................................................................... 25

20 FELONY ARRESTS, 2017–2022
By Category and Offense.................................................... 26

21 FELONY ARRESTS, 2017–2022
By Category and Offense for Adult and Juvenile
Arrests .............................................................................. 27

22 FELONY ARRESTS, 2017–2022
Number, Rate per 100,000 Population at Risk, and
Percent Change ................................................................ 29

23 ADULT FELONY ARRESTS, 2017–2022
By Category, Offense, and Law Enforcement
Disposition........................................................................ 32

24 JUVENILE FELONY ARRESTS, 2017–2022
By Category, Offense, and Law Enforcement
Disposition........................................................................ 33

25 MISDEMEANOR ARRESTS, 2017–2022
By Offense ........................................................................ 34

26 MISDEMEANOR ARRESTS, 2017–2022
By Offense for Adult and Juvenile Arrests.......................... 35

27 MISDEMEANOR ARRESTS, 2017–2022
Number, Rate per 100,000 Population at Risk, and
Percent Change ................................................................ 36

28 ADULT MISDEMEANOR ARRESTS, 2017–2022
By Offense and Law Enforcement Disposition.................... 37

29 JUVENILE MISDEMEANOR AND STATUS OFFENSE
ARRESTS, 2017–2022
By Level of Offense, Offense, and Law Enforcement
Disposition........................................................................ 38

30 FELONY AND MISDEMEANOR ARRESTS, 2022
Gender, Age, and Race/Ethnic Group of Arrestee ............. 39

Exhibit 43
DX0402

**Table**                                                                                                                     **Page**

31   FELONY ARRESTS, 2022
     Category and Offense by Gender and Race/Ethnic
     Group of Arrestee.................................................................. 40

32   FELONY ARRESTS, 2022
     Category and Offense by Age Group of Arrestee................ 41

33   FELONY ARRESTS, 2022
     Category and Offense by Gender, Race/Ethnic Group,
     and Age Group of Arrestee..................................................... 42

34   MISDEMEANOR ARRESTS, 2022
     Offense by Gender and Race/Ethnic Group of
     Arrestee................................................................................. 48

35   MISDEMEANOR ARRESTS, 2022
     Offense by Age Group of Arrestee ........................................ 49

36   MISDEMEANOR ARRESTS, 2022
     Offense by Gender, Race/Ethnic Group, and Age
     Group of Arrestee.................................................................. 50

## DISPOSITIONS

37   DISPOSITIONS OF ADULT FELONY ARRESTS,
     1982–2022
     By Type of Disposition........................................................... 55

38A  DISPOSITIONS OF ADULT FELONY ARRESTS,
     2017–2022
     By Type of Disposition and Sentence ................................... 56

38B  DISPOSITIONS OF ADULT FELONY ARRESTS,
     2017–2022
     By Type of Disposition and Sentence
     Percent Distribution of Court Disposition .............................. 57

39   DISPOSITIONS OF ADULT FELONY ARRESTS, 2022
     Arrest Offense Category by Type of Disposition ................... 58

40   ADULT FELONY ARRESTEES CONVICTED,
     2017–2022
     By Convicted Offense Category and Type of
     Sentence ............................................................................... 59

## OTHER DATABASES

**Table**                                                                                                                     **Page**

41   ADULTS ON ACTIVE PROBATION AS OF
     DECEMBER 31, 1966–2022
     By Level of Offense................................................................ 60

42   ADULTS PLACED ON AND REMOVED FROM
     PROBATION, 2017–2022
     By Level of Offense, Type of Removal, and Rate
     per 100,000 Population at Risk.............................................. 61

43   CRIMINAL JUSTICE FULL-TIME PERSONNEL,
     1969–2022
     By Type of Agency ................................................................. 62

44   CRIMINAL JUSTICE FULL-TIME PERSONNEL,
     2017–2022
     By Type of Agency and Personnel Classification................. 63

45   LAW ENFORCEMENT FULL-TIME PERSONNEL,
     2017–2022
     By Type of Agency ................................................................. 64

46   CIVILIANS' COMPLAINTS AGAINST PEACE OFFICERS,
     1981–2022
     By Type of Complaint and Level of Criminal Complaint..... 65

47   CIVILIANS' COMPLAINTS AGAINST PEACE OFFICERS,
     2022
     By Type of Complaint by Finding .......................................... 66

48   DOMESTIC VIOLENCE-RELATED CALLS FOR
     ASSISTANCE, 1986–2022
     By Type of Call and Weapon.................................................. 67

49   LAW ENFORCEMENT OFFICERS KILLED OR
     ASSAULTED, 1990–2022
     Deaths and Assaults in the Line of Duty
     By Type of Activity.................................................................. 68

50   LAW ENFORCEMENT OFFICERS ASSAULTED,
     2017–2022
     By Type of Weapon and Injury .............................................. 69

51   ANTI-REPRODUCTIVE-RIGHTS CRIMES, 2017–2022
     By Type of Offense, Type of Weapon, Location, and
     Type of Victim......................................................................... 70

52   VIOLENT CRIME COMMITTED AGAINST SENIOR CITIZENS,
     2000-2022
     By Offense .............................................................................. 71

## POPULATION

53   POPULATION ESTIMATES, 1966–2022 ................................. 72

Exhibit 43
DX0403

Table 1
## CRIMES, 1966-2022
Number and Rate per 100,000 Population

| Year | Violent crimes | | | | | Property crimes | | | | Arson[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Homicide | Rape[1] | Robbery | Aggravated assault | Total | Burglary | Motor vehicle theft | Total larceny-theft | |
| | | | | | Number | | | | | |
| 2022 | 193,019 | 2,206 | 14,346 | 47,669 | 128,798 | 902,977 | 143,429 | 181,815 | 577,733 | 9,841 |
| 2021 | 183,546 | 2,361 | 14,435 | 43,628 | 123,122 | 857,599 | 136,275 | 179,956 | 541,368 | 11,138 |
| 2020 | 173,864 | 2,202 | 13,439 | 44,684 | 113,539 | 841,171 | 145,377 | 168,046 | 527,748 | 11,759 |
| 2019 | 173,205 | 1,679 | 14,720 | 52,050 | 104,756 | 915,197 | 151,596 | 140,732 | 622,869 | 8,266 |
| 2018 | 176,866 | 1,739 | 15,500 | 54,312 | 105,315 | 940,998 | 164,540 | 155,170 | 621,288 | 8,523 |
| 2017 | 178,553 | 1,829 | 14,724 | 56,609 | 105,391 | 986,769 | 176,638 | 168,327 | 641,804 | 8,650 |
| 2016 | 174,701 | 1,930 | 13,695 | 54,769 | 104,307 | 1,001,380 | 188,162 | 176,676 | 636,542 | 7,766 |
| 2015 | 166,588 | 1,861 | 12,793 | 52,785 | 99,149 | 1,023,828 | 197,189 | 170,788 | 655,851 | 7,380 |
| 2014 | 151,425 | 1,697 | 9,397 | 48,650 | 91,681 | 946,682 | 202,556 | 151,790 | 592,336 | 7,135 |
| 2013 | 151,634 | 1,745 | 7,459 | 53,621 | 88,809 | 1,018,333 | 231,909 | 165,217 | 621,207 | 7,446 |
| 2012 | 160,629 | 1,878 | 7,828 | 56,491 | 94,432 | 1,048,764 | 245,601 | 168,516 | 634,647 | 7,519 |
| 2011 | 155,313 | 1,794 | 7,678 | 54,358 | 91,483 | 974,666 | 230,334 | 147,030 | 597,302 | 7,164 |
| 2010 | 163,957 | 1,809 | 8,325 | 58,100 | 95,723 | 981,523 | 228,672 | 152,494 | 600,357 | 7,864 |
| 2009 | 174,579 | 1,970 | 8,698 | 64,006 | 99,905 | 1,006,788 | 229,523 | 163,651 | 613,614 | 9,233 |
| 2008 | 185,233 | 2,143 | 8,906 | 69,391 | 104,793 | 1,081,272 | 237,988 | 192,631 | 650,653 | 10,674 |
| 2007 | 191,493 | 2,258 | 9,047 | 70,702 | 109,486 | 1,112,366 | 237,759 | 220,126 | 654,481 | 11,400 |
| 2006 | 194,128 | 2,483 | 9,213 | 70,961 | 111,471 | 1,156,010 | 246,449 | 242,692 | 666,869 | 12,687 |
| 2005[a] | 189,593 | 2,503 | 9,345 | 63,424 | 114,321 | 1,195,381 | 249,563 | 256,909 | 688,820 | 12,272 |
| 2004 | 197,432 | 2,394 | 9,598 | 61,573 | 123,867 | 1,223,275 | 244,914 | 251,747 | 726,614 | 12,660 |
| 2003 | 204,591 | 2,402 | 9,918 | 63,597 | 128,674 | 1,209,030 | 240,705 | 240,708 | 727,527 | 13,677 |
| 2002 | 207,988 | 2,392 | 10,176 | 64,805 | 130,615 | 1,171,644 | 237,445 | 221,780 | 712,419 | 14,007 |
| 2001 | 210,510 | 2,201 | 9,882 | 63,299 | 135,128 | 1,120,487 | 229,922 | 201,074 | 689,491 | 15,060 |
| 2000 | 210,492 | 2,074 | 9,785 | 60,243 | 138,390 | 1,054,860 | 222,247 | 181,049 | 651,564 | 14,406 |
| 1999 | 207,874 | 2,006 | 9,443 | 60,027 | 136,398 | 1,053,936 | 223,828 | 168,465 | 661,643 | 14,454 |
| 1998 | 229,766 | 2,170 | 9,777 | 68,752 | 149,067 | 1,187,982 | 268,847 | 195,402 | 723,733 | 14,314 |
| 1997 | 257,409 | 2,579 | 10,182 | 81,413 | 163,235 | 1,311,157 | 298,882 | 228,540 | 783,735 | 15,875 |
| 1996 | 274,675 | 2,910 | 10,238 | 94,137 | 167,390 | 1,382,812 | 311,778 | 242,196 | 828,838 | 17,948 |
| 1995[b] | 304,998 | 3,530 | 10,550 | 104,581 | 186,337 | 1,535,960 | 353,817 | 280,317 | 901,826 | 17,105 |
| 1994 | 318,946 | 3,699 | 10,960 | 112,149 | 192,138 | 1,621,207 | 384,414 | 308,303 | 928,490 | 18,711 |
| 1993 | 336,100 | 4,095 | 11,754 | 126,347 | 193,904 | 1,676,990 | 413,671 | 319,225 | 944,094 | 20,343 |
| 1992 | 345,508 | 3,920 | 12,751 | 130,867 | 197,970 | 1,715,376 | 427,305 | 320,019 | 968,052 | 21,979 |
| 1991 | 330,916 | 3,876 | 12,942 | 125,105 | 188,993 | 1,726,455 | 426,066 | 316,631 | 983,758 | 19,375 |
| 1990 | 311,923 | 3,562 | 12,716 | 112,460 | 183,185 | 1,660,912 | 402,533 | 303,209 | 955,170 | 19,458 |
| 1989 | 284,015 | 3,159 | 11,956 | 96,424 | 172,476 | 1,680,633 | 410,148 | 298,392 | 972,093 | 19,102 |
| 1988 | 261,990 | 2,947 | 11,771 | 86,190 | 161,082 | 1,606,245 | 407,555 | 265,975 | 932,715 | 18,400 |
| 1987 | 254,137 | 2,929 | 12,114 | 83,373 | 155,721 | 1,546,647 | 420,182 | 229,695 | 896,770 | 18,490 |
| 1986 | 248,352 | 3,030 | 12,118 | 92,513 | 140,691 | 1,576,402 | 457,743 | 205,602 | 913,057 | 19,722 |
| 1985 | 202,066 | 2,781 | 11,442 | 86,464 | 101,379 | 1,519,041 | 449,065 | 177,330 | 892,646 | 20,455 |
| 1984 | 195,650 | 2,724 | 11,702 | 84,015 | 97,209 | 1,462,682 | 443,624 | 161,341 | 857,717 | 19,407 |
| 1983 | 194,489 | 2,640 | 12,092 | 85,824 | 93,933 | 1,486,292 | 460,401 | 158,899 | 866,992 | 17,705 |
| 1982 | 201,433 | 2,778 | 12,529 | 91,988 | 94,138 | 1,599,829 | 499,468 | 164,530 | 935,831 | 20,274 |
| 1981 | 208,165 | 3,140 | 13,545 | 93,638 | 97,842 | 1,622,123 | 539,809 | 162,267 | 920,047 | 24,534 |
| 1980 | 209,903 | 3,405 | 13,661 | 90,282 | 102,555 | 1,628,514 | 543,846 | 174,548 | 910,120 | 28,446 |
| 1979 | 183,704 | 2,941 | 12,199 | 75,649 | 92,915 | 1,505,448 | 494,736 | 167,244 | 843,468 | - |
| 1978 | 164,751 | 2,601 | 11,249 | 67,920 | 82,981 | 1,410,431 | 485,742 | 153,106 | 771,583 | - |
| 1977 | 152,827 | 2,481 | 10,715 | 62,207 | 77,424 | 1,364,015 | 462,736 | 144,014 | 757,265 | - |
| 1976 | 143,507 | 2,214 | 9,552 | 59,132 | 72,609 | 1,404,807 | 465,758 | 138,069 | 800,980 | - |
| 1975 | 138,400 | 2,196 | 8,787 | 59,747 | 67,670 | 1,384,429 | 468,433 | 132,933 | 783,063 | - |
| 1974 | 127,469 | 1,970 | 8,480 | 52,742 | 64,277 | 1,299,538 | 431,863 | 133,169 | 734,506 | - |
| 1973 | 116,506 | 1,862 | 8,349 | 49,524 | 56,771 | 1,181,761 | 407,375 | 131,223 | 643,163 | - |
| 1972 | 110,680 | 1,789 | 8,131 | 48,834 | 51,926 | 1,200,424 | 398,465 | 139,373 | 662,586 | - |
| 1971 | 104,489 | 1,633 | 7,281 | 47,477 | 48,098 | 1,245,966 | 391,157 | 143,911 | 710,898 | - |
| 1970 | 94,347 | 1,355 | 6,992 | 41,397 | 44,603 | 1,173,112 | 348,575 | 137,629 | 686,908 | - |
| 1969 | 89,191 | 1,376 | 6,958 | 39,212 | 41,645 | 1,082,544 | 321,749 | 131,466 | 629,329 | - |
| 1968 | 80,382 | 1,171 | 5,419 | 36,858 | 36,934 | - | 299,589 | 119,160 | - | - |
| 1967 | 67,671 | 1,051 | 4,430 | 28,508 | 33,682 | - | 265,780 | 97,087 | - | - |
| 1966 | 56,942 | 897 | 4,078 | 22,315 | 29,652 | - | 234,535 | 86,929 | - | - |

(continued)

Exhibit 43
DX0404

Table 1 - continued
**CRIMES, 1966-2022**
Number and Rate per 100,000 Population

| Year(s) | Violent crimes | | | | | Property crimes | | | | Arson[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Homicide | Rape[1] | Robbery | Aggravated assault | Total | Burglary | Motor vehicle theft | Total larceny-theft | |
| | | | | | Rate per 100,000 population | | | | | |
| 2022.......... | 494.6 | 5.7 | 36.8 | 122.1 | 330.0 | 2,313.6 | 367.5 | 465.9 | 1,480.3 | 25.2 |
| 2021.......... | 466.2 | 6.0 | 36.7 | 110.8 | 312.7 | 2,178.4 | 346.2 | 457.1 | 1,375.1 | 28.3 |
| 2020.......... | 437.0 | 5.5 | 33.8 | 112.3 | 285.4 | 2,114.4 | 365.4 | 422.4 | 1,326.6 | 29.6 |
| 2019.......... | 433.5 | 4.2 | 36.8 | 130.3 | 262.2 | 2,290.3 | 379.4 | 352.2 | 1,558.8 | 20.7 |
| 2018.......... | 444.1 | 4.4 | 38.9 | 136.4 | 264.4 | 2,362.8 | 413.2 | 389.6 | 1,560.0 | 21.4 |
| 2017.......... | 450.7 | 4.6 | 37.2 | 142.9 | 266.1 | 2,491.0 | 445.9 | 424.9 | 1,620.2 | 21.8 |
| 2016.......... | 443.9 | 4.9 | 34.8 | 139.2 | 265.0 | 2,544.5 | 478.1 | 448.9 | 1,617.5 | 19.7 |
| 2015.......... | 426.4 | 4.8 | 32.7 | 135.1 | 253.8 | 2,620.4 | 504.7 | 437.1 | 1,678.6 | 18.9 |
| 2014.......... | 393.3 | 4.4 | 24.4 | 126.4 | 238.1 | 2,459.0 | 526.1 | 394.3 | 1,538.6 | 18.5 |
| 2013.......... | 396.9 | 4.6 | 19.5 | 140.4 | 232.5 | 2,665.5 | 607.0 | 432.5 | 1,626.0 | 19.5 |
| 2012.......... | 424.7 | 5.0 | 20.7 | 149.3 | 249.6 | 2,772.6 | 649.3 | 445.5 | 1,677.8 | 19.9 |
| 2011.......... | 413.3 | 4.8 | 20.4 | 144.7 | 243.4 | 2,593.7 | 612.9 | 391.3 | 1,589.5 | 19.1 |
| 2010.......... | 439.3 | 4.8 | 22.3 | 155.7 | 256.5 | 2,630.1 | 612.8 | 408.6 | 1,608.7 | 21.1 |
| 2009.......... | 470.9 | 5.3 | 23.5 | 172.6 | 269.5 | 2,715.4 | 619.0 | 441.4 | 1,655.0 | 24.9 |
| 2008.......... | 502.6 | 5.8 | 24.2 | 188.3 | 284.3 | 2,933.8 | 645.7 | 522.7 | 1,765.4 | 29.0 |
| 2007.......... | 523.9 | 6.2 | 24.8 | 193.4 | 299.5 | 3,043.2 | 650.5 | 602.2 | 1,790.5 | 31.2 |
| 2006.......... | 535.6 | 6.9 | 25.4 | 195.8 | 307.5 | 3,189.3 | 679.9 | 669.6 | 1,839.8 | 35.0 |
| 2005[a]....... | 526.9 | 7.0 | 26.0 | 176.2 | 317.7 | 3,321.8 | 693.5 | 714.2 | 1,914.2 | 34.1 |
| 2004.......... | 552.2 | 6.7 | 26.8 | 172.2 | 346.5 | 3,421.5 | 685.0 | 704.1 | 2,032.3 | 35.4 |
| 2003.......... | 578.1 | 6.8 | 28.0 | 179.7 | 363.6 | 3,416.4 | 680.2 | 680.4 | 2,055.8 | 38.6 |
| 2002.......... | 595.3 | 6.8 | 29.1 | 185.5 | 373.8 | 3,353.5 | 679.6 | 634.8 | 2,039.1 | 40.1 |
| 2001.......... | 609.9 | 6.4 | 28.6 | 183.4 | 391.5 | 3,246.6 | 666.2 | 582.6 | 1,997.8 | 43.6 |
| 2000.......... | 619.1 | 6.1 | 28.8 | 177.2 | 407.0 | 3,102.5 | 653.7 | 532.5 | 1,916.3 | 42.4 |
| 1999.......... | 610.7 | 5.9 | 27.7 | 176.4 | 400.7 | 3,096.5 | 657.6 | 495.0 | 1,944.0 | 42.5 |
| 1998.......... | 686.0 | 6.5 | 29.2 | 205.3 | 445.1 | 3,546.3 | 802.7 | 583.4 | 2,160.8 | 42.7 |
| 1997.......... | 781.0 | 7.8 | 30.9 | 247.0 | 495.3 | 3,978.4 | 906.9 | 693.4 | 2,378.1 | 48.2 |
| 1996.......... | 848.2 | 9.0 | 31.6 | 290.7 | 516.9 | 4,270.2 | 962.8 | 747.9 | 2,559.5 | 55.4 |
| 1995[b]....... | 951.2 | 11.0 | 32.9 | 326.2 | 581.2 | 4,790.4 | 1,103.5 | 874.3 | 2,812.7 | 53.3 |
| 1994.......... | 992.4 | 11.5 | 34.1 | 348.9 | 597.8 | 5,044.2 | 1,196.1 | 959.3 | 2,888.9 | 58.2 |
| 1993.......... | 1,058.8 | 12.9 | 37.0 | 398.0 | 610.9 | 5,283.2 | 1,303.2 | 1,005.7 | 2,974.3 | 64.1 |
| 1992.......... | 1,103.9 | 12.5 | 40.7 | 418.1 | 632.5 | 5,480.4 | 1,365.2 | 1,022.4 | 3,092.8 | 70.2 |
| 1991.......... | 1,079.8 | 12.6 | 42.2 | 408.2 | 616.7 | 5,633.5 | 1,390.3 | 1,033.2 | 3,210.1 | 63.2 |
| 1990.......... | 1,055.3 | 12.1 | 43.0 | 380.5 | 619.8 | 5,619.2 | 1,361.8 | 1,025.8 | 3,231.5 | 65.8 |
| 1989.......... | 987.2 | 11.0 | 41.6 | 335.1 | 599.5 | 5,841.4 | 1,425.6 | 1,037.1 | 3,378.7 | 66.4 |
| 1988.......... | 933.7 | 10.5 | 41.9 | 307.2 | 574.0 | 5,724.2 | 1,452.4 | 947.9 | 3,323.9 | 67.2 |
| 1987.......... | 927.9 | 10.7 | 44.2 | 304.4 | 568.6 | 5,647.1 | 1,534.2 | 838.7 | 3,274.3 | 67.5 |
| 1986.......... | 928.7 | 11.3 | 45.3 | 346.0 | 526.1 | 5,894.9 | 1,711.7 | 768.8 | 3,414.4 | 73.8 |
| 1985.......... | 773.8 | 10.7 | 43.8 | 331.1 | 388.2 | 5,817.3 | 1,719.7 | 679.1 | 3,418.4 | 78.3 |
| 1984.......... | 764.6 | 10.6 | 45.7 | 328.3 | 379.9 | 5,716.4 | 1,733.8 | 630.6 | 3,352.1 | 75.8 |
| 1983.......... | 775.6 | 10.5 | 48.2 | 342.3 | 374.6 | 5,927.2 | 1,836.1 | 633.7 | 3,457.5 | 70.6 |
| 1982.......... | 820.6 | 11.3 | 51.0 | 374.7 | 383.5 | 6,517.5 | 2,034.8 | 670.3 | 3,812.5 | 82.6 |
| 1981.......... | 866.0 | 13.1 | 56.3 | 389.5 | 407.0 | 6,748.0 | 2,245.6 | 675.0 | 3,827.4 | 102.1 |
| 1980.......... | 886.9 | 14.4 | 57.7 | 381.4 | 433.3 | 6,880.6 | 2,297.8 | 737.5 | 3,845.3 | 120.2 |
| 1979.......... | 790.0 | 12.6 | 52.5 | 325.3 | 399.5 | 6,473.7 | 2,127.4 | 719.2 | 3,627.0 | - |
| 1978.......... | 721.4 | 11.4 | 49.3 | 297.4 | 363.3 | 6,175.5 | 2,126.8 | 670.4 | 3,378.4 | - |
| 1977.......... | 683.8 | 11.1 | 47.9 | 278.3 | 346.4 | 6,103.0 | 2,070.4 | 644.4 | 3,388.2 | - |
| 1976.......... | 654.2 | 10.1 | 43.5 | 269.6 | 331.0 | 6,404.2 | 2,123.4 | 629.4 | 3,651.6 | - |
| 1975.......... | 642.6 | 10.2 | 40.8 | 277.4 | 314.2 | 6,428.1 | 2,175.0 | 617.2 | 3,635.9 | - |
| 1974.......... | 602.0 | 9.3 | 40.1 | 249.1 | 303.6 | 6,137.7 | 2,039.7 | 629.0 | 3,469.1 | - |
| 1973.......... | 558.3 | 8.9 | 40.0 | 237.3 | 272.0 | 5,663.0 | 1,952.2 | 628.8 | 3,082.1 | - |
| 1972.......... | 537.7 | 8.7 | 39.5 | 237.2 | 252.3 | 5,831.5 | 1,935.7 | 677.1 | 3,218.8 | - |
| 1971.......... | 513.6 | 8.0 | 35.8 | 233.3 | 236.4 | 6,123.9 | 1,922.5 | 707.3 | 3,494.0 | - |
| 1970.......... | 470.8 | 6.8 | 34.9 | 206.6 | 222.6 | 5,854.1 | 1,739.5 | 686.8 | 3,427.9 | - |
| 1969.......... | 449.2 | 6.9 | 35.0 | 197.5 | 209.7 | 5,452.0 | 1,620.4 | 662.1 | 3,169.5 | - |
| 1968.......... | 411.1 | 6.0 | 27.7 | 188.5 | 188.9 | - | 1,532.1 | 609.4 | - | - |
| 1967.......... | 347.4 | 5.4 | 22.7 | 146.4 | 172.9 | - | 1,364.5 | 498.4 | - | - |
| 1966.......... | 297.6 | 4.7 | 21.3 | 116.6 | 155.0 | - | 1,225.9 | 454.4 | - | - |

Notes:   Rates may not add to totals because of rounding.
        Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance (see Table 53).
        Dash indicates data not available.

[a] Prior to 2005, the Los Angeles Police Department had included child abuse and domestic violence simple assaults in its aggravated assault statistics.  This
    change may have contributed to the large decrease in aggravated assaults from 2004 to 2005.

[b] Includes estimated annual 1995 data provided by the Oakland Police Department.

[1] In 2014, the crime of "forcible rape" was changed to "rape."  The  definition was expanded to include both male and female victims and reflects the various
    forms of sexual penetration understood to be rape.  The 2022 numbers for Rape consist of 8,851 reported under this current definition (SRS) and
    5,495 reported under the definition for IBR.  Caution should be used when comparing rape data to prior years.  For additional information, including the SRS
    and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Data for arson crimes are not available prior to 1980.  For additional information, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0405

Table 2
CRIMES, 2017-2022
Number, Rate per 100,000 Population, and Percent Change

| Year(s) | Violent crimes | | | | | Property crimes | | | | Arson |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Homicide | Rape[1] | Robbery | Aggra-vated assault | Total | Burglary | Motor vehicle theft | Total larceny-theft | |
| **Number** | | | | | | | | | | |
| 2022........... | 193,019 | 2,206 | 14,346 | 47,669 | 128,798 | 902,977 | 143,429 | 181,815 | 577,733 | 9,841 |
| 2021........... | 183,546 | 2,361 | 14,435 | 43,628 | 123,122 | 857,599 | 136,275 | 179,956 | 541,368 | 11,138 |
| 2020........... | 173,864 | 2,202 | 13,439 | 44,684 | 113,539 | 841,171 | 145,377 | 168,046 | 527,748 | 11,759 |
| 2019........... | 173,205 | 1,679 | 14,720 | 52,050 | 104,756 | 915,197 | 151,596 | 140,732 | 622,869 | 8,266 |
| 2018........... | 176,866 | 1,739 | 15,500 | 54,312 | 105,315 | 940,998 | 164,540 | 155,170 | 621,288 | 8,523 |
| 2017........... | 178,553 | 1,829 | 14,724 | 56,609 | 105,391 | 986,769 | 176,638 | 168,327 | 641,804 | 8,650 |
| **Percent change in number** | | | | | | | | | | |
| 2021 to 2022...... | 5.2 | -6.6 | - | 9.3 | 4.6 | 5.3 | 5.2 | 1.0 | 6.7 | -11.6 |
| 2020 to 2021...... | 5.6 | 7.2 | - | -2.4 | 8.4 | 2.0 | -6.3 | 7.1 | 2.6 | -5.3 |
| 2019 to 2020...... | 0.4 | 31.1 | -8.7 | -14.2 | 8.4 | -8.1 | -4.1 | 19.4 | -15.3 | 42.3 |
| 2018 to 2019...... | -2.1 | -3.5 | -5.0 | -4.2 | -0.5 | -2.7 | -7.9 | -9.3 | 0.3 | -3.0 |
| 2017 to 2018...... | -0.9 | -4.9 | 5.3 | -4.1 | -0.1 | -4.6 | -6.8 | -7.8 | -3.2 | -1.5 |
| 2017 to 2022...... | 8.1 | 20.6 | - | -15.8 | 22.2 | -8.5 | -18.8 | 8.0 | -10.0 | 13.8 |
| **Rate per 100,000 population[2]** | | | | | | | | | | |
| 2022........... | 494.6 | 5.7 | 36.8 | 122.1 | 330.0 | 2,313.6 | 367.5 | 465.9 | 1,480.3 | 25.2 |
| 2021........... | 466.2 | 6.0 | 36.7 | 110.8 | 312.7 | 2,178.4 | 346.2 | 457.1 | 1,375.1 | 28.3 |
| 2020........... | 437.0 | 5.5 | 33.8 | 112.3 | 285.4 | 2,114.4 | 365.4 | 422.4 | 1,326.6 | 29.6 |
| 2019........... | 433.5 | 4.2 | 36.8 | 130.3 | 262.2 | 2,290.3 | 379.4 | 352.2 | 1,558.8 | 20.7 |
| 2018........... | 444.1 | 4.4 | 38.9 | 136.4 | 264.4 | 2,362.8 | 413.2 | 389.6 | 1,560.0 | 21.4 |
| 2017........... | 450.7 | 4.6 | 37.2 | 142.9 | 266.1 | 2,491.0 | 445.9 | 424.9 | 1,620.2 | 21.8 |
| **Percent change in rate** | | | | | | | | | | |
| 2021 to 2022...... | 6.1 | -5.0 | - | 10.2 | 5.5 | 6.2 | 6.2 | 1.9 | 7.7 | -11.0 |
| 2020 to 2021...... | 6.7 | 9.1 | - | -1.3 | 9.6 | 3.0 | -5.3 | 8.2 | 3.7 | -4.4 |
| 2019 to 2020...... | 0.8 | 31.0 | -8.2 | -13.8 | 8.8 | -7.7 | -3.7 | 19.9 | -14.9 | 43.0 |
| 2018 to 2019...... | -2.4 | -4.5 | -5.4 | -4.5 | -0.8 | -3.1 | -8.2 | -9.6 | -0.1 | -3.3 |
| 2017 to 2018...... | -1.5 | -4.3 | 4.6 | -4.5 | -0.6 | -5.1 | -7.3 | -8.3 | -3.7 | -1.8 |
| 2017 to 2022...... | 9.7 | 23.9 | - | -14.6 | 24.0 | -7.1 | -17.6 | 9.6 | -8.6 | 15.6 |

Notes: Rates may not add to totals because of rounding.

Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 8,851 reported under this current definition (SRS) and 5,495 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance (see Table 53).

Exhibit 43
DX0406

Table 3
**CRIMES, 2017-2022**
By Category and Crime

| Category and crime | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Crimes within category | | | | | | | |
| Violent crimes | 178,553 | 100.0 | 176,866 | 100.0 | 173,205 | 100.0 | 173,864 | 100.0 | 183,546 | 100.0 | 193,019 | 100.0 |
| Homicide | 1,829 | 1.0 | 1,739 | 1.0 | 1,679 | 1.0 | 2,202 | 1.3 | 2,361 | 1.3 | 2,206 | 1.1 |
| Rape[1] | 14,724 | 8.2 | 15,500 | 8.8 | 14,720 | 8.5 | 13,439 | 7.7 | 14,435 | 7.9 | 14,346 | 7.4 |
| Robbery | 56,609 | 31.7 | 54,312 | 30.7 | 52,050 | 30.1 | 44,684 | 25.7 | 43,628 | 23.8 | 47,669 | 24.7 |
| Aggravated assault | 105,391 | 59.0 | 105,315 | 59.5 | 104,756 | 60.5 | 113,539 | 65.3 | 123,122 | 67.1 | 128,798 | 66.7 |
| Property crimes | 986,769 | 100.0 | 940,998 | 100.0 | 915,197 | 100.0 | 841,171 | 100.0 | 857,599 | 100.0 | 902,977 | 100.0 |
| Burglary | 176,638 | 17.9 | 164,540 | 17.5 | 151,596 | 16.6 | 145,377 | 17.3 | 136,275 | 15.9 | 143,429 | 15.9 |
| Motor vehicle theft | 168,327 | 17.1 | 155,170 | 16.5 | 140,732 | 15.4 | 168,046 | 20.0 | 179,956 | 21.0 | 181,815 | 20.1 |
| Total larceny-theft | 641,804 | 65.0 | 621,288 | 66.0 | 622,869 | 68.1 | 527,748 | 62.7 | 541,368 | 63.1 | 577,733 | 64.0 |

Note: Percentages may not add to 100.0 because of rounding.
[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape.
The 2022 numbers for Rape consist of 8,851 reported under this current definition (SRS) and 5,495 reported under the definition for IBR. Caution should be used when comparing rape data to prior years.
For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Table 4
**HOMICIDE CRIMES, 2017-2022**
By Type of Weapon Used

| Type of weapon used | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1,829 | | 1,739 | | 1,679 | | 2,202 | | 2,361 | | 2,206 | | | |
| Unknown | 33 | | 25 | | 23 | | 37 | | 49 | | 74 | | | |
| Known | 1,796 | 100.0 | 1,714 | 100.0 | 1,656 | 100.0 | 2,165 | 100.0 | 2,312 | 100.0 | 2,132 | 100.0 | 18.7 | -7.8 |
| Firearm | 1,274 | 70.9 | 1,178 | 68.7 | 1,142 | 69.0 | 1,606 | 74.2 | 1,734 | 75.0 | 1,570 | 73.6 | 23.2 | -9.5 |
| Knife or cutting instrument | 258 | 14.4 | 252 | 14.7 | 252 | 15.2 | 297 | 13.7 | 303 | 13.1 | 272 | 12.8 | 5.4 | -10.2 |
| Blunt object[1] | 76 | 4.2 | 112 | 6.5 | 71 | 4.3 | 78 | 3.6 | 80 | 3.5 | 64 | 3.0 | -15.8 | -20.0 |
| Personal weapon[2] | 103 | 5.7 | 87 | 5.1 | 102 | 6.2 | 101 | 4.7 | 83 | 3.6 | 87 | 4.1 | -15.5 | -4.8 |
| Other | 85 | 4.7 | 85 | 5.0 | 89 | 5.4 | 83 | 3.8 | 112 | 4.8 | 139 | 6.5 | 63.5 | 24.1 |

Note: Percentages may not add to 100.0 because of rounding.
[1] Club, etc.
[2] Hands, feet, etc.

Exhibit 43
DX0407

Table 5
RAPE CRIMES, 2017-2022
By Type

| | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total............................ | 14,724 | 100.0 | 15,500 | 100.0 | 14,720 | 100.0 | 13,439 | 100.0 | 14,435 | 100.0 | 14,346 | 100.0 | - | - |
| Rape[1] ........................ | 13,799 | 93.7 | 14,526 | 93.7 | 13,791 | 93.7 | 12,641 | 94.1 | 13,730 | 95.1 | 13,704 | 95.5 | - | - |
| Attempts to commit rape.......................... | 925 | 6.3 | 974 | 6.3 | 929 | 6.3 | 798 | 5.9 | 705 | 4.9 | 642 | 4.5 | - | - |

Note: Dash indicates that a percent change was not calculated due to data definition change.
[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape.
The 2022 numbers for Rape consist of 8,851 reported under this current definition (SRS) and 5,495 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Table 6
ROBBERY CRIMES, 2017-2022
By Location, Type of Robbery, and Type of Weapon Used

| Location, type of robbery, and weapon | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total............................ | 56,609 | 100.0 | 54,312 | 100.0 | 52,050 | 100.0 | 44,684 | 100.0 | 43,628 | 100.0 | 47,669 | 100.0 | -15.8 | 9.3 |
| **Location** | | | | | | | | | | | | | | |
| Highway[1]..................... | 22,494 | 39.7 | 21,231 | 39.1 | 19,782 | 38.0 | 16,613 | 37.2 | 15,674 | 35.9 | 16,434 | 34.5 | -26.9 | 4.8 |
| Commercial[2].................. | 16,040 | 28.3 | 15,620 | 28.8 | 14,903 | 28.6 | 13,000 | 29.1 | 13,454 | 30.8 | 15,729 | 33.0 | -1.9 | 16.9 |
| Residence...................... | 4,504 | 8.0 | 4,343 | 8.0 | 4,275 | 8.2 | 4,215 | 9.4 | 4,226 | 9.7 | 4,230 | 8.9 | -6.1 | 0.1 |
| Bank........................... | 596 | 1.1 | 568 | 1.0 | 443 | 0.9 | 410 | 0.9 | 468 | 1.1 | 533 | 1.1 | -10.6 | 13.9 |
| Other[3]....................... | 12,975 | 22.9 | 12,550 | 23.1 | 12,647 | 24.3 | 10,446 | 23.4 | 9,806 | 22.5 | 10,743 | 22.5 | -17.2 | 9.6 |
| **Type of robbery** | | | | | | | | | | | | | | |
| Armed.......................... | 27,128 | 47.9 | 25,070 | 46.2 | 23,201 | 44.6 | 21,367 | 47.8 | 22,542 | 51.7 | 25,015 | 52.5 | -7.8 | 11.0 |
| Strong-arm[4].................. | 29,481 | 52.1 | 29,242 | 53.8 | 28,849 | 55.4 | 23,317 | 52.2 | 21,086 | 48.3 | 22,654 | 47.5 | -23.2 | 7.4 |
| **Type of weapon used** | | | | | | | | | | | | | | |
| Armed.......................... | 27,128 | 100.0 | 25,070 | 100.0 | 23,201 | 100.0 | 21,367 | 100.0 | 22,542 | 100.0 | 25,015 | 100.0 | -7.8 | 11.0 |
| Firearm........................ | 15,349 | 56.6 | 13,501 | 53.9 | 12,414 | 53.5 | 11,176 | 52.3 | 12,413 | 55.1 | 13,714 | 54.8 | -10.7 | 10.5 |
| Knife or cutting instrument.... | 5,277 | 19.5 | 5,031 | 20.1 | 4,719 | 20.3 | 4,359 | 20.4 | 4,081 | 18.1 | 4,287 | 17.1 | -18.8 | 5.0 |
| Other dangerous weapon......... | 6,502 | 24.0 | 6,538 | 26.1 | 6,068 | 26.2 | 5,832 | 27.3 | 6,048 | 26.8 | 7,014 | 28.0 | 7.9 | 16.0 |

Notes: Percentages may not add to 100.0
[1] Streets, parks, parking lots, etc.
[2] Commercial house, gas or service station, convenience store, etc.
[3] Churches, schools, government buildings, trains, wooded areas, etc.
[4] Muggings and similar offenses where no weapon is used, but strong-arm tactics (limited to the use of personal weapons such as hands, arms, feet, fists, teeth, etc.) are employed or their use is threatened.

Exhibit 43
DX0408

Table 7
## ASSAULT CRIMES, 2017-2022
### By Type of Assault and Type of Weapon Used

| Type of assault and weapon used | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total | 363,977 | 100.0 | 367,972 | 100.0 | 362,253 | 100.0 | 350,624 | 100.0 | 367,872 | 100.0 | 398,052 | 100.0 | 9.4 | 8.2 |
| Aggravated assault | 105,391 | 29.0 | 105,315 | 28.6 | 104,756 | 28.9 | 113,539 | 32.4 | 123,122 | 33.5 | 128,798 | 32.4 | 22.2 | 4.6 |
| Firearm | 19,157 | 18.2 | 17,908 | 17.0 | 17,748 | 16.9 | 24,701 | 21.8 | 29,016 | 23.6 | 28,061 | 21.8 | 46.5 | -3.3 |
| Knife or cutting instrument | 17,123 | 16.2 | 16,936 | 16.1 | 16,413 | 15.7 | 17,556 | 15.5 | 18,127 | 14.7 | 19,319 | 15.0 | 12.8 | 6.6 |
| Other dangerous weapon | 36,579 | 34.7 | 36,494 | 34.7 | 35,093 | 33.5 | 38,116 | 33.6 | 39,833 | 32.4 | 43,186 | 33.5 | 18.1 | 8.4 |
| Personal weapon [1] | 32,532 | 30.9 | 33,977 | 32.3 | 35,502 | 33.9 | 33,166 | 29.2 | 36,146 | 29.4 | 38,232 | 29.7 | 17.5 | 5.8 |
| Not-aggravated assault [2] | 258,586 | 71.0 | 262,657 | 71.4 | 257,497 | 71.1 | 237,085 | 67.6 | 244,750 | 66.5 | 269,254 | 67.6 | 4.1 | 10.0 |

Note: Percentages may not add to 100.0 because of rounding.

[1] Hands, feet, etc.

[2] Assaults that do not involve the use of a firearm, knife, cutting instrument, or other dangerous weapon and in which there are no serious or aggravated injuries to the victims. Not-aggravated (simple) assaults are not included in the violent crime count. This category is shown here as a means of quality control and for the purpose of looking at total assault violence.

Table 8
## BURGLARY CRIMES, 2017-2022
### By Location, Time of Day, Type of Burglary, and Type of Entry

| Location, time of day, type of burglary, and type of entry | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total | 176,638 | 100.0 | 164,540 | 100.0 | 151,596 | 100.0 | 145,377 | 100.0 | 136,275 | 100.0 | 143,429 | 100.0 | -18.8 | 5.2 |
| **Location** | | | | | | | | | | | | | | |
| Residence | 95,942 | 54.3 | 85,693 | 52.1 | 72,710 | 48.0 | 57,802 | 39.8 | 50,579 | 37.1 | 53,210 | 37.1 | -44.5 | 5.2 |
| Nonresidence | 80,696 | 45.7 | 78,847 | 47.9 | 78,886 | 52.0 | 87,575 | 60.2 | 85,696 | 62.9 | 90,219 | 62.9 | 11.8 | 5.3 |
| **Time of day** | | | | | | | | | | | | | | |
| Daytime | 60,582 | 34.3 | 55,694 | 33.8 | 50,367 | 33.2 | 43,678 | 30.0 | 46,915 | 34.4 | 51,941 | 36.2 | -14.3 | 10.7 |
| Nighttime | 60,180 | 34.1 | 57,725 | 35.1 | 55,943 | 36.9 | 60,103 | 41.3 | 57,745 | 42.4 | 65,326 | 45.5 | 8.6 | 13.1 |
| Unknown | 55,876 | 31.6 | 51,121 | 31.1 | 45,286 | 29.9 | 41,596 | 28.6 | 31,615 | 23.2 | 26,162 | 18.2 | -53.2 | -17.2 |
| **Type of burglary** | | | | | | | | | | | | | | |
| Burglary | 166,705 | 94.4 | 155,306 | 94.4 | 143,232 | 94.5 | 137,295 | 94.4 | 128,735 | 94.5 | 135,818 | 94.7 | -18.5 | 5.5 |
| Attempted burglary | 9,933 | 5.6 | 9,234 | 5.6 | 8,364 | 5.5 | 8,082 | 5.6 | 7,540 | 5.5 | 7,611 | 5.3 | -23.4 | 0.9 |
| **Type of entry** | | | | | | | | | | | | | | |
| Burglary | 166,705 | 100.0 | 155,306 | 100.0 | 143,232 | 100.0 | 137,295 | 100.0 | 128,735 | 100.0 | 135,818 | 100.0 | -18.5 | 5.5 |
| Force | 109,141 | 65.5 | 102,415 | 65.9 | 96,594 | 67.4 | 93,904 | 68.4 | 87,104 | 67.7 | 93,284 | 68.7 | -14.5 | 7.1 |
| No force | 57,564 | 34.5 | 52,891 | 34.1 | 46,638 | 32.6 | 43,391 | 31.6 | 41,631 | 32.3 | 42,534 | 31.3 | -26.1 | 2.2 |

Notes: Percentages may not add to 100.0 because of rounding.
Data may not match previously published data.

Exhibit 43
DX0409

Table 9
**MOTOR VEHICLE THEFT CRIMES, 2017-2022**
By Type of Vehicle

| Type of vehicle | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total.................. | 168,327 | 100.0 | 155,170 | 100.0 | 140,732 | 100.0 | 168,046 | 100.0 | 179,956 | 100.0 | 181,815 | 100.0 | 8.0 | 1.0 |
| Autos................... | 123,726 | 73.5 | 110,141 | 71.0 | 98,110 | 69.7 | 111,694 | 66.5 | 117,347 | 65.2 | 114,760 | 63.1 | -7.2 | -2.2 |
| Trucks and buses[1]... | 32,127 | 19.1 | 33,524 | 21.6 | 31,303 | 22.2 | 41,708 | 24.8 | 46,675 | 25.9 | 46,254 | 25.4 | 44.0 | -0.9 |
| Other vehicles[2]...... | 12,474 | 7.4 | 11,505 | 7.4 | 11,319 | 8.0 | 14,644 | 8.7 | 15,934 | 8.9 | 20,801 | 11.4 | 66.8 | 30.5 |

Note: Percentages may not add to 100.0 because of rounding.

[1] Includes pickup trucks, vans, and motor homes.

[2] Includes motorcycles, snowmobiles, motor scooters, trail bikes, etc.

Table 10
**LARCENY-THEFT CRIMES, 2017-2022**
Number, Rate per 100,000 Population, and Percent Change

| Value categories | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 | Percent change | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2017-2022 | 2021-2022 |
| | | | | Number | | | | |
| Total.................. | 641,804 | 621,288 | 622,869 | 527,748 | 541,368 | 577,733 | -10.0 | 6.7 |
| Under $50............... | 185,186 | 161,456 | 158,298 | 143,341 | 130,568 | 126,736 | -31.6 | -2.9 |
| $50-$199............... | 108,836 | 105,185 | 100,697 | 80,539 | 67,676 | 69,168 | -36.4 | 2.2 |
| $200-$400.............. | 86,436 | 84,523 | 82,438 | 67,818 | - | - | - | - |
| Over $400.............. | 261,346 | 270,124 | 281,436 | 236,050 | - | - | - | - |
| Over $200.............. | - | - | - | - | 343,124 | 381,829 | - | 11.3 |
| | | | Rate per 100,000 population[1] | | | | | |
| Total.................. | 1,644.4 | 1,591.9 | 1,595.9 | 1,352.2 | 1,387.1 | 1,480.3 | -10.0 | 6.7 |
| Under $50............... | 474.5 | 413.7 | 405.6 | 367.3 | 334.5 | 324.7 | -31.6 | -2.9 |
| $50-$199............... | 278.9 | 269.5 | 258.0 | 206.4 | 173.4 | 177.2 | -36.5 | 2.2 |
| $200-$400.............. | 221.5 | 216.6 | 211.2 | 173.8 | - | - | - | - |
| Over $400.............. | 669.6 | 692.1 | 721.1 | 604.8 | - | - | - | - |
| Over $200.............. | - | - | - | - | 879.2 | 978.3 | - | 11.3 |

Note: Rates may not add to total because of rounding.

[1] Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance (see Table 53).

[a] Beginning in 2021, larceny theft value categories are based on standardized IBR to SRS data conversion which eliminates the $200-$400 category.

Exhibit 43
DX0410

## Table 11
### LARCENY-THEFT CRIMES, 2017-2022
By Type and Value Categories

| Type of larceny-theft and value categories | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021[a] Number | 2021[a] Percent | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total...................... | 641,804 | 100.0 | 621,288 | 100.0 | 622,869 | 100.0 | 527,748 | 100.0 | 541,368 | 100.0 | 577,733 | 100.0 | -10.0 | 6.7 |
| *Type of larceny-theft* | | | | | | | | | | | | | | |
| Shoplifting.................. | 91,553 | 14.3 | 89,378 | 14.4 | 90,309 | 14.5 | 64,105 | 12.1 | 64,027 | 11.8 | 81,955 | 14.2 | -10.5 | 28.0 |
| From motor vehicles........... | 256,625 | 40.0 | 243,040 | 39.1 | 245,795 | 39.5 | 195,903 | 37.1 | 191,629 | 35.4 | 184,589 | 32.0 | -28.1 | -3.7 |
| Motor vehicle accessories...... | 51,897 | 8.1 | 51,872 | 8.3 | 55,209 | 8.9 | 69,349 | 13.1 | 94,236 | 17.4 | 102,161 | 17.7 | 96.9 | 8.4 |
| Bicycles.................... | 28,996 | 4.5 | 27,336 | 4.4 | 24,494 | 3.9 | 24,217 | 4.6 | 21,309 | 3.9 | 21,521 | 3.7 | -25.8 | 1.0 |
| From buildings.............. | 69,892 | 10.9 | 69,324 | 11.2 | 66,657 | 10.7 | 48,003 | 9.1 | 40,476 | 7.5 | 44,439 | 7.7 | -36.4 | 9.8 |
| All other................... | 142,841 | 22.3 | 140,338 | 22.6 | 140,405 | 22.5 | 126,171 | 23.9 | 129,691 | 24.0 | 143,068 | 24.8 | 0.2 | 10.3 |
| Pocket-picking............... | 4,874 | 0.8 | 5,228 | 0.8 | 6,033 | 1.0 | 3,473 | 0.7 | 4,092 | 0.8 | 7,349 | 1.3 | 50.8 | 79.6 |
| Purse-snatching.............. | 2,599 | 0.4 | 2,312 | 0.4 | 2,444 | 0.4 | 1,652 | 0.3 | 1,563 | 0.3 | 2,104 | 0.4 | -19.0 | 34.6 |
| From coin machines........... | 1,406 | 0.2 | 1,037 | 0.2 | 1,055 | 0.2 | 794 | 0.2 | 682 | 0.1 | 633 | 0.1 | -55.0 | -7.2 |
| Other...................... | 133,962 | 20.9 | 131,761 | 21.2 | 130,873 | 21.0 | 120,252 | 22.8 | 123,354 | 22.8 | 132,982 | 23.0 | -0.7 | 7.8 |
| *Value categories* | | | | | | | | | | | | | | |
| Under $50.................. | 185,186 | 28.9 | 161,456 | 26.0 | 158,298 | 25.4 | 143,341 | 27.2 | 130,568 | 24.1 | 126,736 | 21.9 | -31.6 | -2.9 |
| $50 to $199................ | 108,836 | 17.0 | 105,185 | 16.9 | 100,697 | 16.2 | 80,539 | 15.3 | 67,676 | 12.5 | 69,168 | 12.0 | -36.4 | 2.2 |
| $200 to $400............... | 86,436 | 13.5 | 84,523 | 13.6 | 82,438 | 13.2 | 67,818 | 12.9 | - | - | - | - | - | - |
| Over $400.................. | 261,346 | 40.7 | 270,124 | 43.5 | 281,436 | 45.2 | 236,050 | 44.7 | - | - | - | - | - | - |
| Over $200.................. | - | - | - | - | - | - | - | - | 343,124 | 63.4 | 381,829 | 66.1 | - | 11.3 |

Note: Percentages may not add to subtotals or 100.0 because of rounding.

[a] Beginning in 2021, larceny theft value categories are based on standardized IBR to SRS data conversion which eliminates the $200-$400 category.

## Table 12
### VALUE OF STOLEN AND RECOVERED PROPERTY, 2017-2022
By Type and Percent Change
(Value Shown in Thousands of Dollars)

| Year(s) | Stolen Total Value | Stolen Total Percent | Stolen Motor vehicles Value | Stolen Motor vehicles Percent | Stolen All other Value | Stolen All other Percent | Recovered Total Value | Recovered Total Percent | Recovered Motor vehicles Value | Recovered Motor vehicles Percent | Recovered All other Value | Recovered All other Percent | Percent recovered to stolen[1] Total | Percent recovered to stolen[1] Motor vehicles | Percent recovered to stolen[1] All other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022.................. | $4,274,752 | 100.0 | 1,680,358 | 39.3 | 2,594,393 | 60.7 | $1,202,395 | 100.0 | 967,224 | 80.4 | 235,172 | 19.6 | 28.1 | 57.6 | 9.1 |
| 2021[a]............... | $3,428,835 | 100.0 | 1,464,750 | 42.7 | 1,964,086 | 57.3 | $1,105,648 | 100.0 | 919,654 | 83.2 | 185,994 | 16.8 | 32.2 | 62.8 | 9.5 |
| 2020.................. | $2,940,734 | 100.0 | 1,282,221 | 43.6 | 1,658,514 | 56.4 | $984,233 | 100.0 | 843,680 | 85.7 | 140,553 | 14.3 | 33.5 | 65.8 | 8.5 |
| 2019.................. | $2,819,081 | 100.0 | 1,042,003 | 37.0 | 1,777,079 | 63.0 | $880,637 | 100.0 | 687,552 | 78.1 | 193,086 | 21.9 | 31.2 | 66.0 | 10.9 |
| 2018.................. | $2,895,111 | 100.0 | 1,115,651 | 38.5 | 1,779,458 | 61.5 | $953,648 | 100.0 | 749,514 | 78.6 | 204,134 | 21.4 | 32.9 | 67.2 | 11.5 |
| 2017.................. | $2,684,284 | 100.0 | 1,089,849 | 40.6 | 1,594,435 | 59.4 | $940,499 | 100.0 | 744,369 | 79.1 | 196,130 | 20.9 | 35.0 | 68.3 | 12.3 |
| *Percent change in value* | | | | | | | | | | | | | | | |
| 2021 to 2022.......... | 24.7 | | 14.7 | | 32.1 | | 8.8 | | 5.2 | | 26.4 | | | | |
| 2017 to 2022.......... | 59.3 | | 54.2 | | 62.7 | | 27.8 | | 29.9 | | 19.9 | | | | |

Note: Values may not add to total because of rounding.

[1] Percent recovered is the ratio of the value of property recovered within the year to the value of property stolen within the same year.

[a] Total stolen and recovered values for 2021 will not match previously published data.

Exhibit 43
DX0411

Table 13
**VALUE OF STOLEN AND RECOVERED PROPERTY, 2017-2022**
By Type of Property
(Value Shown in Thousands of Dollars)

| Type of property | 2017 Value | 2017 Percent | 2018 Value | 2018 Percent | 2019 Value | 2019 Percent | 2020 Value | 2020 Percent | 2021[a] Value | 2021[a] Percent | 2022 Value | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Stolen** | | | | | | | | | | | | | | |
| Total.......................... | $2,684,284 | 100.0 | $2,895,111 | 100.0 | $2,819,081 | 100.0 | $2,940,734 | 100.0 | $3,428,835 | 100.0 | $4,274,752 | 100.0 | 59.3 | 24.7 |
| Currency, notes, etc....... | 208,500 | 7.8 | 249,173 | 8.6 | 230,734 | 8.2 | 193,127 | 6.6 | 250,783 | 7.3 | 358,788 | 8.4 | 72.1 | 43.1 |
| Jewelry and precious metals..... | 292,533 | 10.9 | 334,480 | 11.6 | 287,682 | 10.2 | 229,233 | 7.8 | 268,108 | 7.8 | 404,062 | 9.5 | 38.1 | 50.7 |
| Clothing and furs........... | 100,178 | 3.7 | 113,872 | 3.9 | 113,755 | 4.0 | 101,427 | 3.4 | 108,407 | 3.2 | 152,862 | 3.6 | 52.6 | 41.0 |
| Motor vehicles............. | 1,089,849 | 40.6 | 1,115,651 | 38.5 | 1,042,003 | 37.0 | 1,282,221 | 43.6 | 1,464,750 | 42.7 | 1,680,558 | 39.3 | 54.2 | 14.7 |
| Office equipment.......... | 122,975 | 4.6 | 132,897 | 4.6 | 136,306 | 4.8 | 83,079 | 2.8 | 88,115 | 2.6 | 111,321 | 2.6 | -9.5 | 26.3 |
| Televisions, radios, stereos, etc..... | 77,467 | 2.9 | 66,709 | 2.3 | 84,509 | 3.0 | 55,981 | 1.9 | 52,364 | 1.5 | 63,701 | 1.5 | -17.8 | 21.7 |
| Firearms.................... | 12,695 | 0.5 | 18,832 | 0.7 | 12,029 | 0.4 | 8,860 | 0.3 | 11,758 | 0.3 | 15,309 | 0.4 | 20.6 | 30.2 |
| Household goods.......... | 39,278 | 1.5 | 41,478 | 1.4 | 41,768 | 1.5 | 36,503 | 1.2 | 41,994 | 1.2 | 58,467 | 1.4 | 48.9 | 39.2 |
| Consumable goods....... | 29,989 | 1.1 | 31,258 | 1.1 | 55,212 | 2.0 | 45,030 | 1.5 | 34,483 | 1.0 | 55,506 | 1.3 | 85.1 | 61.0 |
| Livestock................... | 1,203 | 0.0 | 1,023 | 0.0 | 770 | 0.0 | 1,209 | 0.0 | 1,160 | 0.0 | 1,462 | 0.0 | 21.5 | 26.0 |
| Other[1].................... | 709,616 | 26.4 | 789,736 | 27.3 | 814,314 | 28.9 | 904,045 | 30.7 | 1,106,913 | 32.3 | 1,372,914 | 32.1 | 93.5 | 24.0 |
| **Recovered** | | | | | | | | | | | | | | |
| Total.......................... | $940,499 | 100.0 | $953,648 | 100.0 | $880,637 | 100.0 | $984,233 | 100.0 | $1,105,648 | 100.0 | $1,202,395 | 100.0 | 27.8 | 8.8 |
| Currency, notes, etc....... | 3,145 | 0.3 | 5,396 | 0.6 | 6,161 | 0.7 | 7,840 | 0.8 | 7,130 | 0.6 | 10,623 | 0.9 | 237.8 | 49.0 |
| Jewelry and precious metals..... | 5,634 | 0.6 | 10,772 | 1.1 | 5,306 | 0.6 | 3,824 | 0.4 | 4,389 | 0.4 | 6,493 | 0.5 | 15.2 | 47.9 |
| Clothing and furs........... | 6,210 | 0.7 | 5,626 | 0.6 | 6,078 | 0.7 | 4,015 | 0.4 | 4,304 | 0.4 | 8,080 | 0.7 | 30.1 | 87.7 |
| Motor vehicles............. | 744,369 | 79.1 | 749,514 | 78.6 | 687,552 | 78.1 | 843,680 | 85.7 | 919,654 | 83.2 | 967,224 | 80.4 | 29.9 | 5.2 |
| Office equipment.......... | 3,802 | 0.4 | 3,656 | 0.4 | 5,373 | 0.6 | 2,761 | 0.3 | 2,776 | 0.3 | 4,106 | 0.3 | 8.0 | 47.9 |
| Televisions, radios, stereos, etc..... | 2,486 | 0.3 | 3,823 | 0.4 | 2,659 | 0.3 | 1,365 | 0.1 | 1,959 | 0.2 | 3,640 | 0.3 | 46.4 | 85.8 |
| Firearms.................... | 1,417 | 0.2 | 972 | 0.1 | 1,509 | 0.2 | 676 | 0.1 | 586 | 0.1 | 737 | 0.1 | -48.0 | 25.8 |
| Household goods.......... | 1,550 | 0.2 | 1,354 | 0.1 | 1,150 | 0.1 | 1,101 | 0.1 | 909 | 0.1 | 2,314 | 0.2 | 49.3 | 154.6 |
| Consumable goods....... | 2,337 | 0.2 | 3,004 | 0.3 | 3,053 | 0.3 | 1,937 | 0.2 | 1,918 | 0.2 | 2,261 | 0.2 | -3.3 | 17.9 |
| Livestock................... | 89 | 0.0 | 112 | 0.0 | 144 | 0.0 | 78 | 0.0 | 250 | 0.0 | 125 | 0.0 | 40.4 | -50.0 |
| Other[1].................... | 169,460 | 18.0 | 169,419 | 17.8 | 161,653 | 18.4 | 116,956 | 11.9 | 161,773 | 14.6 | 196,794 | 16.4 | 16.1 | 21.6 |

Note: Values and percentages may not add to total or 100.0 because of rounding.
[a] Total stolen and recovered values for 2021 will not match previously published data.
[1] The "Other" category includes personal electronic devices.

Exhibit 43
DX0412

Table 14
## ARSON CRIMES, 2017-2022
By Type of Property and Value of Property Damage
(Value Shown In Thousands of Dollars)

| Type of property | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020[a] Number | 2020[a] Percent | 2021 Number | 2021 Percent | 2022[b] Number | 2022[b] Percent | % change 2017-2022 | % change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Number of crimes | | | | | | | |
| Total............................ | 8,650 | 100.0 | 8,523 | 100.0 | 8,266 | 100.0 | 11,759 | 100.0 | 11,138 | 100.0 | 9,841 | 100.0 | 13.8 | -11.6 |
| Total structural property.......... | 3,175 | 36.7 | 2,825 | 33.1 | 2,877 | 34.8 | 3,660 | 31.1 | 3,324 | 29.8 | 2,920 | 29.7 | -8.0 | -12.2 |
| Residential.......... | 1,477 | 17.1 | 1,275 | 15.0 | 1,284 | 15.5 | 1,416 | 12.0 | 1,191 | 10.7 | 1,011 | 10.3 | -31.6 | -15.1 |
| Single occupancy[1]........ | 1,001 | 11.6 | 853 | 10.0 | 855 | 10.3 | 943 | 8.0 | 756 | 6.8 | 611 | 6.2 | -39.0 | -19.2 |
| Other[2]........ | 476 | 5.5 | 422 | 5.0 | 429 | 5.2 | 473 | 4.0 | 435 | 3.9 | 400 | 4.1 | -16.0 | -8.0 |
| Storage[3].......... | 144 | 1.7 | 121 | 1.4 | 113 | 1.4 | 159 | 1.4 | 144 | 1.3 | 137 | 1.4 | -4.9 | -4.9 |
| Commercial.......... | 651 | 7.5 | 604 | 7.1 | 625 | 7.6 | 904 | 7.7 | 824 | 7.4 | 701 | 7.1 | 7.7 | -14.9 |
| Industrial, manufacturing...... | 61 | 0.7 | 49 | 0.6 | 57 | 0.7 | 66 | 0.6 | 74 | 0.7 | 57 | 0.6 | -6.6 | -23.0 |
| Other[4]........ | 590 | 6.8 | 555 | 6.5 | 568 | 6.9 | 838 | 7.1 | 750 | 6.7 | 644 | 6.5 | 9.2 | -14.1 |
| Community/public[5]........ | 572 | 6.6 | 497 | 5.8 | 491 | 5.9 | 652 | 5.5 | 587 | 5.3 | 545 | 5.5 | -4.7 | -7.2 |
| Other[8]........ | 331 | 3.8 | 328 | 3.8 | 364 | 4.4 | 529 | 4.5 | 578 | 5.2 | 526 | 5.3 | 58.9 | -9.0 |
| Total mobile property.......... | 1,979 | 22.9 | 2,047 | 24.0 | 1,773 | 21.4 | 2,332 | 19.8 | 1,978 | 17.8 | 1,720 | 17.5 | -13.1 | -13.0 |
| Motor vehicles[7]........ | 1,876 | 21.7 | 1,953 | 22.9 | 1,675 | 20.3 | 2,185 | 18.6 | 1,799 | 16.2 | 1,517 | 15.4 | -19.1 | -15.7 |
| Other[8]........ | 103 | 1.2 | 94 | 1.1 | 98 | 1.2 | 147 | 1.3 | 179 | 1.6 | 203 | 2.1 | 97.1 | 13.4 |
| Other property[9]........ | 3,496 | 40.4 | 3,651 | 42.8 | 3,616 | 43.7 | 5,767 | 49.0 | 5,836 | 52.4 | 5,201 | 52.9 | 48.8 | -10.9 |
| | | | | | | | Value of property damage | | | | | | | |
| Total............................ | $261,135 | 100.0 | $172,672 | 100.0 | $118,050 | 100.0 | $697,016 | 100.0 | $157,949 | 100.0 | $160,309 | 100.0 | -38.6 | 1.5 |
| Total structural property.......... | 212,531 | 81.4 | 147,727 | 85.6 | 91,683 | 77.7 | 666,265 | 95.6 | 128,288 | 81.2 | 127,557 | 79.6 | -40.0 | -0.6 |
| Residential.......... | 49,502 | 19.0 | 104,647 | 60.6 | 45,451 | 38.5 | 62,855 | 9.0 | 64,573 | 40.9 | 54,880 | 34.2 | 10.9 | -15.0 |
| Single occupancy[1]........ | 38,298 | 14.7 | 35,830 | 20.8 | 36,671 | 31.1 | 40,888 | 5.9 | 44,736 | 28.3 | 40,365 | 25.2 | 5.4 | -9.8 |
| Other[2]........ | 11,204 | 4.3 | 68,817 | 39.9 | 8,780 | 7.4 | 21,967 | 3.2 | 19,837 | 12.6 | 14,515 | 9.1 | 29.6 | -26.8 |
| Storage[3].......... | 7,645 | 2.9 | 2,167 | 1.3 | 3,478 | 2.9 | 5,118 | 0.7 | 12,403 | 7.9 | 5,597 | 3.5 | -26.8 | -54.9 |
| Commercial.......... | 124,773 | 47.8 | 35,181 | 20.4 | 35,204 | 29.8 | 71,127 | 10.2 | 43,090 | 27.3 | 51,064 | 31.9 | -59.1 | 18.5 |
| Industrial, manufacturing...... | 2,819 | 1.1 | 8,956 | 5.2 | 16,001 | 13.6 | 1,181 | 0.2 | 4,044 | 2.6 | 21,217 | 13.2 | 652.6 | 424.7 |
| Other[4]........ | 121,954 | 46.7 | 26,225 | 15.2 | 19,203 | 16.3 | 69,946 | 10.0 | 39,046 | 24.7 | 29,847 | 18.6 | -75.5 | -23.6 |
| Community/public[5]........ | 29,358 | 11.2 | 3,924 | 2.3 | 2,217 | 1.9 | 520,368 | 74.7 | 6,125 | 3.9 | 11,135 | 6.9 | -62.1 | 81.8 |
| Other[6]........ | 1,251 | 0.5 | 1,809 | 1.0 | 5,332 | 4.5 | 6,799 | 1.0 | 2,096 | 1.3 | 4,881 | 3.0 | 290.2 | 132.9 |
| Total mobile property.......... | 17,106 | 6.6 | 17,504 | 10.1 | 16,236 | 13.8 | 21,796 | 3.1 | 18,103 | 11.5 | 20,653 | 12.9 | 20.7 | 14.1 |
| Motor vehicles[7]........ | 16,187 | 6.2 | 16,605 | 9.6 | 15,310 | 13.0 | 20,791 | 3.0 | 15,655 | 9.9 | 18,251 | 11.4 | 12.8 | 16.6 |
| Other[8]........ | 919 | 0.4 | 899 | 0.5 | 926 | 0.8 | 1,005 | 0.1 | 2,448 | 1.5 | 2,402 | 1.5 | 161.4 | -1.9 |
| Other property[9]........ | 31,498 | 12.1 | 7,441 | 4.3 | 10,131 | 8.6 | 8,955 | 1.3 | 11,558 | 7.3 | 12,099 | 7.5 | -61.6 | 4.7 |

Notes: Values and percentages may not add to subtotals, total, or 100.0 because of rounding.
  Property type is determined by the point of origin of a fire.
[a] The increase in the Arson value of property damage in 2020 is due to the damages reported in the Lightning Complex Fire that occurred in Solano County.
[b] The increase in the industrial, manufacturing value of property damage in 2022 is due to the damages reported in the Home Depot fire that occurred in Santa Clara County.
[1] Single occupancy - houses, townhouses, duplexes, etc.
[2] Other residential - apartments, tenements, hotels, motels, etc.
[3] Storage - barns, garages, warehouses, etc.
[4] Other commercial - stores, restaurants, offices, etc.
[5] Community/public - churches, jails, schools, hospitals, etc.
[6] Other structural property - outbuildings, buildings under construction, etc.
[7] Motor vehicles - autos, trucks, buses, etc.
[8] Other mobile property - trailers, recreational vehicles, airplanes, boats, etc.
[9] Other property - crops, timber, fences, etc.

Exhibit 43
DX0413

Table 15
## CRIMES CLEARED, 2017-2022
Number of Crimes, Clearances, and Clearance Rate

| Crimes, clearances, and clearance rates | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|
| **Number of crimes reported** | | | | | | | | |
| Violent crimes | 178,553 | 176,866 | 173,205 | 173,864 | 183,546 | 193,019 | 8.1 | 5.2 |
| Homicide | 1,829 | 1,739 | 1,679 | 2,202 | 2,361 | 2,206 | 20.6 | -6.6 |
| Rape[1] | 14,724 | 15,500 | 14,720 | 13,439 | 14,435 | 14,346 | -15.8 | - |
| Robbery | 56,609 | 54,312 | 52,050 | 44,684 | 43,628 | 47,669 | -15.8 | 9.3 |
| Aggravated assault | 105,391 | 105,315 | 104,756 | 113,539 | 123,122 | 128,798 | 22.2 | 4.6 |
| Property crimes | 986,769 | 940,998 | 915,197 | 841,171 | 857,599 | 902,977 | -8.5 | 5.3 |
| Burglary | 176,638 | 164,540 | 151,596 | 145,377 | 136,275 | 143,429 | -18.8 | 5.2 |
| Motor vehicle theft | 168,327 | 155,170 | 140,732 | 168,046 | 179,956 | 181,815 | 8.0 | 1.0 |
| Total larceny-theft | 641,804 | 621,288 | 622,869 | 527,748 | 541,368 | 577,733 | -10.0 | 6.7 |
| Arson | 8,650 | 8,523 | 8,266 | 11,759 | 11,138 | 9,841 | 13.8 | -11.6 |
| **Number of clearances** | | | | | | | | |
| Violent crimes | 80,122 | 79,687 | 79,073 | 78,653 | 73,496 | 79,122 | -1.2 | 7.7 |
| Homicide | 1,144 | 1,116 | 1,084 | 1,296 | 1,286 | 1,294 | 13.1 | 0.6 |
| Rape[1] | 5,427 | 5,329 | 5,284 | 4,673 | 4,140 | 3,970 | - | - |
| Robbery | 17,324 | 16,758 | 16,401 | 14,816 | 12,276 | 13,356 | -22.9 | 8.8 |
| Aggravated assault | 56,227 | 56,484 | 56,304 | 57,868 | 55,794 | 60,502 | 7.6 | 8.4 |
| Property crimes | 103,843 | 97,984 | 97,686 | 78,143 | 62,766 | 65,011 | -37.4 | 3.6 |
| Burglary | 18,871 | 18,059 | 17,740 | 17,229 | 14,274 | 14,348 | -24.0 | 0.5 |
| Motor vehicle theft | 15,336 | 14,631 | 14,625 | 15,800 | 13,885 | 12,817 | -16.4 | -7.7 |
| Total larceny-theft | 69,636 | 65,294 | 65,321 | 45,114 | 34,607 | 37,846 | -45.7 | 9.4 |
| Arson | 1,624 | 1,682 | 1,685 | 2,091 | 2,215 | 2,297 | 41.4 | 3.7 |
| **Clearance rate[2]** | | | | | | | | |
| Violent crimes | 44.9 | 45.1 | 45.7 | 45.2 | 40.0 | 41.0 | -8.7 | 2.5 |
| Homicide | 62.5 | 64.2 | 64.6 | 58.9 | 54.5 | 58.7 | -6.1 | 7.7 |
| Rape[1] | 36.9 | 34.4 | 35.9 | 34.8 | 28.7 | 27.7 | - | - |
| Robbery | 30.6 | 30.9 | 31.5 | 33.2 | 28.1 | 28.0 | -8.5 | -0.4 |
| Aggravated assault | 53.4 | 53.6 | 53.7 | 51.0 | 45.3 | 47.0 | -12.0 | 3.8 |
| Property crimes | 10.5 | 10.4 | 10.7 | 9.3 | 7.3 | 7.2 | -31.4 | -1.4 |
| Burglary | 10.7 | 11.0 | 11.7 | 11.9 | 10.5 | 10.0 | -6.5 | -4.8 |
| Motor vehicle theft | 9.1 | 9.4 | 10.4 | 9.4 | 7.7 | 7.0 | -23.1 | -9.1 |
| Total larceny-theft | 10.9 | 10.5 | 10.5 | 8.5 | 6.4 | 6.6 | -39.4 | 3.1 |
| Arson | 18.8 | 19.7 | 20.4 | 17.8 | 19.9 | 23.3 | 23.9 | 17.1 |

Note: Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 8,851 reported under this current definition (SRS) and 5,495 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Percentage of clearances to total crimes reported.

Exhibit 43
DX0414

Table 16
## TOTAL ARRESTS, 1966-2022
Number and Rate per 100,000 Population at Risk

| Year | Total | | | Law violations | | | | | | | | | Status offenses[1] |
| | | | | Total | | | Felony | | | Misdemeanor | | | Juvenile |
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Number | | | | | | | |
| 2022...... | 780,888 | 754,888 | 26,000 | 779,748 | 754,888 | 24,860 | 268,182 | 256,280 | 11,902 | 511,566 | 498,608 | 12,958 | 1,140 |
| 2021...... | 792,797 | 773,442 | 19,355 | 791,582 | 773,442 | 18,140 | 266,845 | 257,713 | 9,132 | 524,737 | 515,729 | 9,008 | 1,215 |
| 2020...... | 853,576 | 827,866 | 25,710 | 851,128 | 827,866 | 23,262 | 273,542 | 262,210 | 11,332 | 577,586 | 565,656 | 11,930 | 2,448 |
| 2019...... | 1,055,622 | 1,012,441 | 43,181 | 1,051,565 | 1,012,441 | 39,124 | 293,509 | 277,221 | 16,288 | 758,056 | 735,220 | 22,836 | 4,057 |
| 2018...... | 1,091,694 | 1,045,271 | 46,423 | 1,086,759 | 1,045,271 | 41,488 | 302,514 | 285,249 | 17,265 | 784,245 | 760,022 | 24,223 | 4,935 |
| 2017...... | 1,097,083 | 1,040,834 | 56,249 | 1,090,253 | 1,040,834 | 49,419 | 306,024 | 286,651 | 19,373 | 784,229 | 754,183 | 30,046 | 6,830 |
| 2016...... | 1,120,759 | 1,058,016 | 62,743 | 1,113,428 | 1,058,016 | 55,412 | 308,860 | 289,204 | 19,656 | 804,568 | 768,812 | 35,756 | 7,331 |
| 2015...... | 1,158,812 | 1,086,889 | 71,923 | 1,150,118 | 1,086,889 | 63,229 | 314,748 | 293,367 | 21,381 | 835,370 | 793,522 | 41,848 | 8,694 |
| 2014[a]... | 1,212,845 | 1,126,022 | 86,823 | 1,201,964 | 1,126,022 | 75,942 | 439,958 | 412,307 | 27,651 | 762,006 | 713,715 | 48,291 | 10,881 |
| 2013...... | 1,205,536 | 1,108,599 | 96,937 | 1,193,726 | 1,108,599 | 85,127 | 442,741 | 411,929 | 30,812 | 750,985 | 696,670 | 54,315 | 11,810 |
| 2012...... | 1,238,496 | 1,117,776 | 120,720 | 1,222,104 | 1,117,776 | 104,328 | 429,807 | 393,439 | 36,368 | 792,297 | 724,337 | 67,960 | 16,392 |
| 2011...... | 1,267,196 | 1,117,633 | 149,563 | 1,245,369 | 1,117,633 | 127,736 | 419,914 | 376,511 | 43,403 | 825,455 | 741,122 | 84,333 | 21,827 |
| 2010...... | 1,394,425 | 1,208,558 | 185,867 | 1,366,831 | 1,208,558 | 158,273 | 448,552 | 396,532 | 52,020 | 918,279 | 812,026 | 106,253 | 27,594 |
| 2009...... | 1,466,852 | 1,262,156 | 204,696 | 1,436,662 | 1,262,156 | 174,506 | 466,441 | 407,886 | 58,555 | 970,221 | 854,270 | 115,951 | 30,190 |
| 2008...... | 1,543,665 | 1,314,561 | 229,104 | 1,509,666 | 1,314,561 | 195,105 | 499,628 | 434,665 | 64,963 | 1,010,038 | 879,896 | 130,142 | 33,999 |
| 2007...... | 1,551,900 | 1,315,044 | 236,856 | 1,515,864 | 1,315,044 | 200,820 | 523,276 | 457,085 | 66,191 | 992,588 | 857,959 | 134,629 | 36,036 |
| 2006...... | 1,539,364 | 1,306,515 | 232,849 | 1,502,868 | 1,306,515 | 196,353 | 534,460 | 469,271 | 65,189 | 968,408 | 837,244 | 131,164 | 36,496 |
| 2005...... | 1,508,210 | 1,289,431 | 218,779 | 1,477,212 | 1,289,431 | 187,781 | 538,166 | 477,005 | 61,161 | 939,046 | 812,426 | 126,620 | 30,998 |
| 2004...... | 1,499,083 | 1,280,937 | 218,146 | 1,468,343 | 1,280,937 | 187,406 | 522,781 | 462,910 | 59,871 | 945,562 | 818,027 | 127,535 | 30,740 |
| 2003...... | 1,471,083 | 1,247,763 | 223,320 | 1,438,863 | 1,247,763 | 191,100 | 507,081 | 446,203 | 60,878 | 931,782 | 801,560 | 130,222 | 32,220 |
| 2002...... | 1,426,233 | 1,196,599 | 229,634 | 1,396,913 | 1,196,599 | 194,114 | 487,364 | 425,825 | 61,539 | 903,249 | 770,774 | 132,475 | 35,620 |
| 2001...... | 1,420,680 | 1,180,194 | 240,486 | 1,380,667 | 1,180,194 | 200,473 | 472,677 | 408,684 | 63,993 | 907,990 | 771,510 | 136,480 | 40,013 |
| 2000...... | 1,424,893 | 1,181,803 | 243,090 | 1,385,361 | 1,181,803 | 203,558 | 459,632 | 395,743 | 63,889 | 925,729 | 786,060 | 139,669 | 39,532 |
| 1999...... | 1,496,459 | 1,238,334 | 258,125 | 1,453,720 | 1,238,334 | 215,386 | 467,936 | 399,433 | 68,503 | 985,784 | 838,901 | 146,883 | 42,739 |
| 1998...... | 1,571,724 | 1,301,765 | 269,959 | 1,531,917 | 1,301,765 | 230,152 | 508,257 | 432,153 | 76,104 | 1,023,660 | 869,612 | 154,048 | 39,807 |
| 1997...... | 1,620,381 | 1,343,861 | 276,520 | 1,580,746 | 1,343,861 | 236,885 | 547,550 | 464,802 | 82,748 | 1,033,196 | 879,059 | 154,137 | 39,635 |
| 1996...... | 1,622,535 | 1,348,340 | 274,195 | 1,585,442 | 1,348,340 | 237,102 | 533,989 | 448,349 | 85,640 | 1,051,453 | 899,991 | 151,462 | 37,093 |
| 1995[b].. | 1,656,379 | 1,394,732 | 261,647 | 1,624,207 | 1,394,732 | 229,475 | 570,803 | 482,887 | 87,916 | 1,053,404 | 911,845 | 141,559 | 32,172 |
| 1994...... | 1,652,723 | 1,394,894 | 257,829 | 1,624,789 | 1,394,894 | 229,895 | 581,264 | 489,265 | 91,999 | 1,043,525 | 905,629 | 137,896 | 27,934 |
| 1993...... | 1,667,522 | 1,412,431 | 255,091 | 1,643,443 | 1,412,431 | 231,012 | 564,307 | 472,334 | 91,973 | 1,079,136 | 940,097 | 139,039 | 24,079 |
| 1992...... | 1,718,254 | 1,471,058 | 247,196 | 1,695,153 | 1,471,058 | 224,095 | 564,416 | 470,932 | 93,484 | 1,130,737 | 1,000,126 | 130,611 | 23,101 |
| 1991...... | 1,791,312 | 1,546,002 | 245,310 | 1,767,750 | 1,546,002 | 221,748 | 541,346 | 447,681 | 93,665 | 1,226,404 | 1,098,321 | 128,083 | 23,562 |
| 1990...... | 1,979,355 | 1,736,828 | 242,527 | 1,955,744 | 1,736,828 | 218,916 | 577,268 | 485,895 | 91,373 | 1,378,476 | 1,250,933 | 127,543 | 23,611 |
| 1989...... | 1,969,168 | 1,730,927 | 238,241 | 1,946,265 | 1,730,927 | 215,338 | 590,285 | 501,259 | 89,026 | 1,355,980 | 1,229,668 | 126,312 | 22,903 |
| 1988...... | 1,903,067 | 1,673,864 | 229,203 | 1,879,183 | 1,673,864 | 205,319 | 550,446 | 469,688 | 80,758 | 1,328,737 | 1,204,176 | 124,561 | 23,884 |
| 1987...... | 1,859,342 | 1,635,731 | 223,611 | 1,834,012 | 1,635,731 | 198,281 | 496,246 | 422,663 | 73,583 | 1,337,766 | 1,213,068 | 124,698 | 25,330 |
| 1986...... | 1,794,481 | 1,558,601 | 235,880 | 1,769,204 | 1,558,601 | 210,603 | 469,982 | 393,790 | 76,192 | 1,299,222 | 1,164,811 | 134,411 | 25,277 |
| 1985...... | 1,716,040 | 1,485,079 | 230,961 | 1,690,267 | 1,485,079 | 205,188 | 413,673 | 340,152 | 73,521 | 1,276,594 | 1,144,927 | 131,667 | 25,773 |
| 1984...... | 1,680,721 | 1,458,674 | 222,047 | 1,653,997 | 1,458,674 | 195,323 | 384,861 | 315,872 | 68,989 | 1,269,136 | 1,142,802 | 126,334 | 26,724 |
| 1983...... | 1,653,914 | 1,435,788 | 218,126 | 1,631,397 | 1,435,788 | 195,609 | 373,609 | 302,421 | 71,188 | 1,257,788 | 1,133,367 | 124,421 | 22,517 |
| 1982...... | 1,621,944 | 1,378,695 | 243,249 | 1,597,903 | 1,378,695 | 219,208 | 386,995 | 302,559 | 84,436 | 1,210,908 | 1,076,136 | 134,772 | 24,041 |
| 1981...... | 1,632,351 | 1,366,481 | 265,870 | 1,604,898 | 1,366,481 | 238,417 | 386,195 | 293,168 | 93,027 | 1,218,703 | 1,073,313 | 145,390 | 27,453 |
| 1980...... | 1,542,850 | 1,260,324 | 282,526 | 1,512,454 | 1,260,324 | 252,130 | 372,190 | 274,814 | 97,376 | 1,140,264 | 985,510 | 154,754 | 30,396 |
| 1979...... | 1,442,037 | 1,147,485 | 294,552 | 1,411,235 | 1,147,485 | 263,750 | 357,632 | 256,467 | 101,165 | 1,053,603 | 891,018 | 162,585 | 30,802 |
| 1978...... | 1,382,805 | 1,098,602 | 284,203 | 1,351,539 | 1,098,602 | 252,937 | 334,647 | 233,957 | 100,690 | 1,016,892 | 864,645 | 152,247 | 31,266 |
| 1977...... | 1,402,930 | 1,091,287 | 311,643 | 1,360,991 | 1,091,287 | 269,704 | 327,215 | 224,961 | 102,254 | 1,033,776 | 866,326 | 167,450 | 41,939 |
| 1976...... | 1,395,447 | 1,043,153 | 352,294 | 1,314,685 | 1,043,153 | 271,532 | 327,535 | 224,532 | 103,003 | 987,150 | 818,621 | 168,529 | 80,762 |
| 1975...... | 1,439,857 | 1,068,907 | 370,950 | 1,353,720 | 1,068,907 | 284,813 | 393,688 | 265,816 | 127,842 | 960,062 | 803,091 | 156,971 | 86,137 |
| 1974...... | 1,488,102 | 1,079,971 | 408,131 | 1,380,204 | 1,079,971 | 300,233 | 402,421 | 267,904 | 134,517 | 977,783 | 812,067 | 165,716 | 107,898 |
| 1973...... | 1,383,234 | 1,020,617 | 362,617 | 1,280,177 | 1,020,617 | 259,560 | 358,024 | 239,395 | 118,629 | 922,153 | 781,222 | 140,931 | 103,057 |
| 1972...... | 1,340,438 | 987,206 | 353,232 | 1,154,325 | 987,206 | 167,119 | 343,578 | 240,231 | 103,347 | 810,747 | 746,975 | 63,772 | 186,113 |
| 1971...... | 1,347,479 | 968,025 | 379,454 | 1,139,121 | 968,025 | 171,096 | 332,693 | 229,476 | 103,217 | 806,428 | 738,549 | 67,879 | 208,358 |
| 1970...... | 1,340,072 | 957,137 | 382,935 | 1,123,750 | 957,137 | 166,613 | 315,232 | 214,836 | 100,396 | 808,518 | 742,301 | 66,217 | 216,322 |
| 1969...... | 1,299,951 | 905,834 | 394,117 | 1,070,157 | 905,834 | 164,323 | 299,574 | 198,529 | 101,045 | 770,583 | 707,305 | 63,278 | 229,794 |
| 1968...... | 1,188,905 | 822,454 | 366,451 | 975,922 | 822,454 | 152,648 | 258,462 | 168,511 | 89,951 | 716,640 | 653,943 | 62,697 | 213,803 |
| 1967...... | 1,118,261 | 794,834 | 323,427 | 920,248 | 794,834 | 125,414 | 203,233 | 138,488 | 64,745 | 717,015 | 656,346 | 60,669 | 198,013 |
| 1966...... | 1,047,056 | 744,036 | 303,020 | 856,191 | 744,036 | 112,155 | 166,245 | 114,283 | 51,962 | 689,946 | 629,753 | 60,193 | 190,865 |

(continued)

Table 16 - continued
**TOTAL ARRESTS, 1966-2022**
Number and Rate per 100,000 Population at Risk

| Year(s) | Total | | | Law violations | | | | | | | | | Status offenses[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Total | | | Felony | | | Misdemeanor | | | |
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Juvenile |
| | | | | | | Rate per 100,000 population at risk[2,3] | | | | | | | |
| 2022 | 2,535.2 | 2,836.3 | 621.1 | 2,531.5 | 2,836.3 | 593.9 | 870.7 | 962.9 | 284.3 | 1,660.9 | 1,873.4 | 309.5 | 27.2 |
| 2021 | 2,606.3 | 2,949.6 | 461.2 | 2,602.3 | 2,949.6 | 432.2 | 877.2 | 982.8 | 217.6 | 1,725.0 | 1,966.8 | 214.6 | 29.0 |
| 2020 | 2,812.3 | 3,163.7 | 614.5 | 2,804.2 | 3,163.7 | 556.0 | 901.2 | 1,002.0 | 270.9 | 1,903.0 | 2,161.6 | 285.1 | 58.5 |
| 2019 | 3,410.9 | 3,776.8 | 1,042.6 | 3,397.8 | 3,776.8 | 944.6 | 948.4 | 1,034.1 | 393.3 | 2,449.4 | 2,742.6 | 551.4 | 98.0 |
| 2018 | 3,527.5 | 3,912.2 | 1,097.5 | 3,511.6 | 3,912.2 | 980.9 | 977.5 | 1,067.6 | 408.2 | 2,534.1 | 2,844.6 | 572.7 | 116.7 |
| 2017 | 3,565.2 | 3,917.9 | 1,337.4 | 3,543.0 | 3,917.9 | 1,175.0 | 994.5 | 1,079.0 | 460.6 | 2,548.5 | 2,838.9 | 714.4 | 162.4 |
| 2016 | 3,655.1 | 3,994.5 | 1,502.5 | 3,631.2 | 3,994.5 | 1,326.9 | 1,007.3 | 1,091.9 | 470.7 | 2,623.9 | 2,902.6 | 856.2 | 175.6 |
| 2015 | 3,808.6 | 4,121.8 | 1,772.7 | 3,780.0 | 4,121.8 | 1,558.4 | 1,034.5 | 1,112.5 | 527.0 | 2,745.6 | 3,009.3 | 1,031.4 | 214.3 |
| 2014[a] | 4,017.3 | 4,309.3 | 2,138.3 | 3,981.3 | 4,309.3 | 1,870.3 | 1,457.3 | 1,577.9 | 681.0 | 2,524.0 | 2,731.4 | 1,189.3 | 268.0 |
| 2013 | 4,028.7 | 4,292.6 | 2,365.6 | 3,989.2 | 4,292.6 | 2,077.4 | 1,479.6 | 1,595.0 | 751.9 | 2,509.7 | 2,697.6 | 1,325.5 | 288.2 |
| 2012 | 4,165.1 | 4,367.5 | 2,914.5 | 4,109.9 | 4,367.5 | 2,518.7 | 1,445.4 | 1,537.3 | 878.0 | 2,664.5 | 2,830.2 | 1,640.7 | 395.7 |
| 2011 | 4,287.4 | 4,408.3 | 3,558.2 | 4,213.6 | 4,408.3 | 3,039.0 | 1,420.7 | 1,485.1 | 1,032.6 | 2,792.8 | 2,923.2 | 2,006.4 | 519.3 |
| 2010 | 4,737.7 | 4,802.2 | 4,357.4 | 4,644.0 | 4,802.2 | 3,710.5 | 1,524.0 | 1,575.6 | 1,219.6 | 3,120.0 | 3,226.6 | 2,491.0 | 646.9 |
| 2009 | 5,042.1 | 5,079.9 | 4,820.9 | 4,938.3 | 5,079.9 | 4,109.9 | 1,603.3 | 1,641.7 | 1,379.1 | 3,335.0 | 3,438.3 | 2,730.8 | 711.0 |
| 2008 | 5,347.0 | 5,369.2 | 5,222.9 | 5,229.2 | 5,369.2 | 4,447.8 | 1,730.6 | 1,775.4 | 1,481.0 | 3,498.6 | 3,593.9 | 2,966.9 | 775.1 |
| 2007 | 5,426.7 | 5,435.5 | 5,378.4 | 5,300.7 | 5,435.5 | 4,560.1 | 1,829.8 | 1,889.3 | 1,503.0 | 3,470.9 | 3,546.2 | 3,057.1 | 818.3 |
| 2006 | 5,436.1 | 5,463.0 | 5,290.4 | 5,307.2 | 5,463.0 | 4,461.2 | 1,887.4 | 1,962.2 | 1,481.1 | 3,419.8 | 3,500.8 | 2,980.1 | 829.2 |
| 2005 | 5,373.7 | 5,445.5 | 4,986.4 | 5,263.3 | 5,445.5 | 4,279.9 | 1,917.5 | 2,014.5 | 1,394.0 | 3,345.8 | 3,431.0 | 2,885.9 | 706.5 |
| 2004 | 5,385.5 | 5,459.7 | 4,987.6 | 5,275.1 | 5,459.7 | 4,284.8 | 1,878.1 | 1,973.0 | 1,368.9 | 3,397.0 | 3,486.6 | 2,915.9 | 702.8 |
| 2003 | 5,350.1 | 5,387.1 | 5,152.4 | 5,232.9 | 5,387.1 | 4,409.0 | 1,844.2 | 1,926.4 | 1,404.6 | 3,388.7 | 3,460.6 | 3,004.4 | 743.4 |
| 2002 | 5,264.5 | 5,242.1 | 5,384.2 | 5,133.0 | 5,242.1 | 4,549.0 | 1,798.9 | 1,865.5 | 1,442.9 | 3,334.0 | 3,376.6 | 3,106.1 | 835.2 |
| 2001 | 5,319.5 | 5,239.7 | 5,749.0 | 5,169.7 | 5,239.7 | 4,792.4 | 1,769.9 | 1,814.4 | 1,529.8 | 3,399.8 | 3,425.3 | 3,262.6 | 956.5 |
| 2000 | 5,427.6 | 5,329.2 | 5,962.6 | 5,277.0 | 5,329.2 | 4,992.9 | 1,750.8 | 1,784.6 | 1,567.1 | 3,526.2 | 3,544.7 | 3,425.9 | 969.7 |
| 1999 | 5,820.1 | 5,666.1 | 6,692.9 | 5,653.9 | 5,666.1 | 5,584.7 | 1,819.9 | 1,827.6 | 1,776.2 | 3,834.0 | 3,838.5 | 3,808.5 | 1,108.2 |
| 1998 | 6,221.4 | 6,055.2 | 7,170.4 | 6,063.9 | 6,055.2 | 6,113.1 | 2,011.9 | 2,010.2 | 2,021.4 | 4,052.0 | 4,045.1 | 4,091.7 | 1,057.3 |
| 1997 | 6,290.2 | 6,126.6 | 7,228.4 | 6,136.3 | 6,126.6 | 6,192.3 | 2,125.6 | 2,119.0 | 2,163.1 | 4,010.8 | 4,007.6 | 4,029.2 | 1,036.1 |
| 1996 | 6,349.4 | 6,177.8 | 7,354.0 | 6,204.2 | 6,177.8 | 6,359.2 | 2,089.6 | 2,054.2 | 2,296.9 | 4,114.6 | 4,123.5 | 4,062.3 | 994.8 |
| 1995[b] | 6,593.1 | 6,485.4 | 7,233.9 | 6,465.1 | 6,485.4 | 6,344.4 | 2,272.1 | 2,245.4 | 2,430.7 | 4,193.0 | 4,240.0 | 3,913.8 | 889.5 |
| 1994 | 6,690.3 | 6,581.7 | 7,346.0 | 6,577.2 | 6,581.7 | 6,550.1 | 2,353.0 | 2,308.6 | 2,621.2 | 4,224.2 | 4,273.1 | 3,928.9 | 795.9 |
| 1993 | 6,852.5 | 6,750.4 | 7,478.7 | 6,753.5 | 6,750.4 | 6,772.8 | 2,319.0 | 2,257.4 | 2,696.4 | 4,434.6 | 4,493.0 | 4,076.3 | 705.9 |
| 1992 | 7,166.7 | 7,119.9 | 7,458.1 | 7,070.3 | 7,119.9 | 6,761.1 | 2,354.1 | 2,279.3 | 2,820.5 | 4,716.2 | 4,840.6 | 3,940.6 | 697.0 |
| 1991 | 7,595.1 | 7,594.5 | 7,599.0 | 7,495.2 | 7,594.5 | 6,869.1 | 2,295.3 | 2,199.2 | 2,901.5 | 5,199.9 | 5,395.3 | 3,967.6 | 729.9 |
| 1990 | 8,539.4 | 8,672.2 | 7,696.0 | 8,437.6 | 8,672.2 | 6,946.8 | 2,490.5 | 2,426.1 | 2,899.5 | 5,947.1 | 6,246.0 | 4,047.3 | 749.2 |
| 1989 | 8,742.4 | 8,898.6 | 7,753.7 | 8,640.7 | 8,898.6 | 7,008.3 | 2,620.6 | 2,576.9 | 2,897.4 | 6,020.1 | 6,321.6 | 4,110.9 | 745.4 |
| 1988 | 8,662.1 | 8,863.3 | 7,430.5 | 8,553.4 | 8,863.3 | 6,656.3 | 2,505.4 | 2,487.0 | 2,618.1 | 6,048.0 | 6,376.2 | 4,038.2 | 774.3 |
| 1987 | 8,654.7 | 8,900.1 | 7,202.1 | 8,536.8 | 8,900.1 | 6,386.3 | 2,309.9 | 2,299.7 | 2,370.0 | 6,226.9 | 6,600.4 | 4,016.3 | 815.8 |
| 1986 | 8,541.3 | 8,705.7 | 7,593.7 | 8,421.0 | 8,705.7 | 6,780.0 | 2,237.0 | 2,199.6 | 2,452.9 | 6,184.0 | 6,506.2 | 4,327.1 | 813.7 |
| 1985 | 8,345.2 | 8,501.3 | 7,463.9 | 8,219.8 | 8,501.3 | 6,631.0 | 2,011.7 | 1,947.2 | 2,376.0 | 6,208.1 | 6,554.1 | 4,255.0 | 832.9 |
| 1984 | 8,333.6 | 8,538.5 | 7,198.9 | 8,201.1 | 8,538.5 | 6,332.5 | 1,908.3 | 1,849.0 | 2,236.7 | 6,292.8 | 6,689.5 | 4,095.8 | 866.4 |
| 1983 | 8,327.6 | 8,565.2 | 7,041.7 | 8,214.2 | 8,565.2 | 6,314.8 | 1,881.1 | 1,804.1 | 2,298.1 | 6,333.0 | 6,761.1 | 4,016.6 | 726.9 |
| 1982 | 8,313.0 | 8,398.7 | 7,858.5 | 8,189.8 | 8,398.7 | 7,081.8 | 1,983.5 | 1,843.1 | 2,727.8 | 6,206.3 | 6,555.6 | 4,354.0 | 776.7 |
| 1981 | 8,513.9 | 8,496.8 | 8,602.9 | 8,370.7 | 8,496.8 | 7,714.6 | 2,014.3 | 1,822.9 | 3,010.1 | 6,356.4 | 6,673.9 | 4,704.5 | 888.3 |
| 1980 | 8,196.1 | 7,987.4 | 9,277.8 | 8,034.6 | 7,987.4 | 8,279.6 | 1,977.2 | 1,741.6 | 3,197.7 | 6,057.4 | 6,245.7 | 5,081.9 | 998.2 |
| 1979 | 7,849.2 | 7,488.5 | 9,662.8 | 7,681.6 | 7,488.5 | 8,652.3 | 1,946.6 | 1,673.7 | 3,318.7 | 5,734.9 | 5,814.8 | 5,333.6 | 1,010.5 |
| 1978 | 7,676.7 | 7,365.2 | 9,177.1 | 7,503.2 | 7,365.2 | 8,167.5 | 1,857.8 | 1,568.5 | 3,251.3 | 5,645.4 | 5,796.7 | 4,916.2 | 1,009.6 |
| 1977 | 7,962.4 | 7,541.4 | 9,897.3 | 7,724.4 | 7,541.4 | 8,565.4 | 1,857.1 | 1,554.6 | 3,247.4 | 5,867.2 | 5,986.8 | 5,317.9 | 1,331.9 |
| 1976 | 8,080.2 | 7,408.3 | 11,047.1 | 7,612.6 | 7,408.3 | 8,514.6 | 1,896.6 | 1,594.6 | 3,229.9 | 5,716.0 | 5,813.7 | 5,284.7 | 2,532.5 |
| 1975 | 8,512.5 | 7,805.2 | 11,521.0 | 8,003.3 | 7,805.2 | 8,845.8 | 2,327.3 | 1,941.0 | 3,970.5 | 5,676.0 | 5,864.2 | 4,875.2 | 2,675.3 |
| 1974 | 8,984.1 | 8,095.8 | 12,660.1 | 8,332.7 | 8,095.8 | 9,313.1 | 2,429.5 | 2,008.3 | 4,172.7 | 5,903.2 | 6,087.5 | 5,140.4 | 3,347.0 |
| 1973 | 8,519.0 | 7,832.2 | 11,310.5 | 7,884.3 | 7,832.2 | 8,096.0 | 2,205.0 | 1,837.1 | 3,700.2 | 5,679.3 | 5,995.1 | 4,395.8 | 3,214.5 |
| 1972 | 8,416.5 | 7,737.4 | 11,152.0 | 7,247.9 | 7,737.4 | 5,276.2 | 2,157.3 | 1,882.9 | 3,262.8 | 5,090.6 | 5,854.6 | 2,013.4 | 5,875.8 |
| 1971 | 8,606.1 | 7,717.8 | 12,183.7 | 7,275.4 | 7,717.8 | 5,493.6 | 2,124.9 | 1,829.5 | 3,314.1 | 5,150.5 | 5,888.2 | 2,179.5 | 6,690.1 |
| 1970 | 8,714.0 | 7,756.6 | 12,601.8 | 7,307.4 | 7,756.6 | 5,483.0 | 2,049.8 | 1,741.0 | 3,303.9 | 5,257.5 | 6,015.6 | 2,179.1 | 7,118.8 |
| 1969 | 8,844.9 | 7,770.3 | 12,966.1 | 7,281.4 | 7,770.3 | 5,406.1 | 2,038.3 | 1,703.0 | 3,324.3 | 5,243.1 | 6,067.3 | 2,081.8 | 7,560.0 |
| 1968 | 8,268.1 | 7,212.2 | 12,314.8 | 6,775.2 | 7,212.2 | 5,129.8 | 1,797.4 | 1,477.7 | 3,022.9 | 4,983.8 | 5,734.5 | 2,107.0 | 7,185.0 |
| 1967 | 7,950.3 | 7,122.3 | 11,130.0 | 6,542.5 | 7,122.3 | 4,315.8 | 1,444.9 | 1,241.0 | 2,228.1 | 5,097.6 | 5,881.3 | 2,087.8 | 6,814.2 |
| 1966 | 7,644.6 | 6,843.3 | 10,729.4 | 6,251.1 | 6,843.3 | 3,971.2 | 1,213.8 | 1,051.1 | 1,839.9 | 5,037.3 | 5,792.2 | 2,131.3 | 6,758.2 |

Notes: Statewide arrest data from 1952 through 1965 can be found in Table 16 of *Crime in California*, 2006.

Since 1966 there have been many changes in laws, data collection procedures, etc.; therefore, caution should be used when comparing data for the 1966 through 2022 period.

Juvenile misdemeanor arrest data for 1973 through 2022 are not comparable to prior years because of changes in reporting criteria.

[a] In November 2014, California voters passed Proposition 47 which reduced some felony offenses to misdemeanors. These changes affected the offenses reported. Caution should be used when comparing felony and misdemeanor arrest data to prior years. For additional information, see Understanding the Data, Characteristics and Known Limitations and Appendix 2, Arrest Offense Codes.

[b] Includes estimated annual data for the Bakersfield Police Department and the Oakland Police Department. For additional information, see Understanding the Data, Characteristics and Known Limitations.

[1] Status offenses include truancy, incorrigibility, running away, and curfew violations. These offenses can only be committed or engaged in by a juvenile.

[2] Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance (see Table 53).

[3] Rates are based on the population at risk for each year. The categories are total (10-69 years of age), adult (18-69 years of age), and juvenile (10-17 years of age) (see Table 53).

Table 17
## TOTAL ARRESTS, 2017-2022
### Number, Rate per 100,000 Population, and Percent Change

| Year(s) | Total | | | Law violations — Total | | | Law violations — Felony | | | Law violations — Misdemeanor | | | Status offenses[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Juvenile |
| **Number** | | | | | | | | | | | | | |
| 2022 | 780,888 | 754,888 | 26,000 | 779,748 | 754,888 | 24,860 | 268,182 | 256,280 | 11,902 | 511,566 | 498,608 | 12,958 | 1,140 |
| 2021 | 792,797 | 773,442 | 19,355 | 791,582 | 773,442 | 18,140 | 266,845 | 257,713 | 9,132 | 524,737 | 515,729 | 9,008 | 1,215 |
| 2020 | 853,576 | 827,866 | 25,710 | 851,128 | 827,866 | 23,262 | 273,542 | 262,210 | 11,332 | 577,586 | 565,656 | 11,930 | 2,448 |
| 2019 | 1,055,622 | 1,012,441 | 43,181 | 1,051,565 | 1,012,441 | 39,124 | 293,509 | 277,221 | 16,288 | 758,056 | 735,220 | 22,836 | 4,057 |
| 2018 | 1,091,694 | 1,045,271 | 46,423 | 1,086,759 | 1,045,271 | 41,488 | 302,514 | 285,249 | 17,265 | 784,245 | 760,022 | 24,223 | 4,935 |
| 2017 | 1,097,083 | 1,040,834 | 56,249 | 1,090,253 | 1,040,834 | 49,419 | 306,024 | 286,651 | 19,373 | 784,229 | 754,183 | 30,046 | 6,830 |
| **Percent change in number** | | | | | | | | | | | | | |
| 2021 to 2022 | -1.5 | -2.4 | 34.3 | -1.5 | -2.4 | 37.0 | 0.5 | -0.6 | 30.3 | -2.5 | -3.3 | 43.8 | -6.2 |
| 2020 to 2021 | -7.1 | -6.6 | -24.7 | -7.0 | -6.6 | -22.0 | -2.4 | -1.7 | -19.4 | -9.1 | -8.8 | -24.5 | -50.4 |
| 2019 to 2020 | -19.1 | -18.2 | -40.5 | -19.1 | -18.2 | -40.5 | -6.8 | -5.4 | -30.4 | -23.8 | -23.1 | -47.8 | -39.7 |
| 2018 to 2019 | -3.3 | -3.1 | -7.0 | -3.2 | -3.1 | -5.7 | -3.0 | -2.8 | -5.7 | -3.3 | -3.3 | -5.7 | -17.8 |
| 2017 to 2018 | -0.5 | 0.4 | -17.5 | -0.3 | 0.4 | -16.0 | -1.1 | -0.5 | -10.9 | 0.0 | 0.8 | -19.4 | -27.7 |
| 2017 to 2022 | -28.8 | -27.5 | -53.8 | -28.5 | -27.5 | -49.7 | -12.4 | -10.6 | -38.6 | -34.8 | -33.9 | -56.9 | -83.3 |
| **Rate per 100,000 total population[2]** | | | | | | | | | | | | | |
| 2022 | 2,000.8 | 1,934.2 | 66.6 | 1,997.9 | 1,934.2 | 63.7 | 687.1 | 656.6 | 30.5 | 1,310.7 | 1,277.5 | 33.2 | 2.9 |
| 2021 | 2,013.8 | 1,964.6 | 49.2 | 2,010.7 | 1,964.6 | 46.1 | 677.8 | 654.6 | 23.2 | 1,332.9 | 1,310.0 | 22.9 | 3.1 |
| 2020 | 2,145.6 | 2,081.0 | 64.6 | 2,139.5 | 2,081.0 | 58.5 | 687.6 | 659.1 | 28.5 | 1,451.9 | 1,421.9 | 30.0 | 6.2 |
| 2019 | 2,641.8 | 2,533.7 | 108.1 | 2,631.6 | 2,533.7 | 97.9 | 734.5 | 693.8 | 40.8 | 1,897.1 | 1,839.9 | 57.1 | 10.2 |
| 2018 | 2,741.2 | 2,624.6 | 116.6 | 2,728.8 | 2,624.6 | 104.2 | 759.6 | 716.3 | 43.4 | 1,969.2 | 1,908.4 | 60.8 | 12.4 |
| 2017 | 2,769.5 | 2,627.5 | 142.0 | 2,752.3 | 2,627.5 | 124.8 | 772.5 | 723.6 | 48.9 | 1,979.7 | 1,903.9 | 75.8 | 17.2 |
| **Percent change in rate per 100,000 population** | | | | | | | | | | | | | |
| 2021 to 2022 | -0.6 | -1.5 | 35.4 | -0.6 | -1.5 | 38.2 | 1.4 | 0.3 | 31.5 | -1.7 | -2.5 | 45.0 | -6.5 |
| 2020 to 2021 | -6.1 | -5.6 | -23.8 | -6.0 | -5.6 | -21.2 | -1.4 | -0.7 | -18.6 | -8.2 | -7.9 | -23.7 | -50.0 |
| 2019 to 2020 | -18.8 | -17.9 | -40.2 | -18.7 | -17.9 | -40.2 | -6.4 | -5.0 | -30.1 | -23.5 | -22.7 | -47.5 | -39.2 |
| 2018 to 2019 | -3.6 | -3.5 | -7.3 | -3.6 | -3.5 | -6.0 | -3.3 | -3.1 | -6.0 | -3.7 | -3.6 | -6.1 | -17.7 |
| 2017 to 2018 | -1.0 | -0.1 | -17.9 | -0.9 | -0.1 | -16.5 | -1.7 | -1.0 | -11.2 | -0.5 | 0.2 | -19.8 | -27.9 |
| 2017 to 2022 | -27.8 | -26.4 | -53.1 | -27.4 | -26.4 | -49.0 | -11.1 | -9.3 | -37.6 | -33.8 | -32.9 | -56.2 | -83.1 |
| **Rate per 100,000 population at risk[3]** | | | | | | | | | | | | | |
| 2022 | 2,535.2 | 2,836.3 | 621.1 | 2,531.5 | 2,836.3 | 593.9 | 870.7 | 962.9 | 284.3 | 1,660.9 | 1,873.4 | 309.5 | 27.2 |
| 2021 | 2,606.3 | 2,949.6 | 461.2 | 2,602.3 | 2,949.6 | 432.2 | 877.2 | 982.8 | 217.6 | 1,725.0 | 1,966.8 | 214.6 | 29.0 |
| 2020 | 2,812.3 | 3,163.7 | 614.5 | 2,804.2 | 3,163.7 | 556.0 | 901.2 | 1,002.0 | 270.0 | 1,903.0 | 2,161.6 | 285.1 | 58.5 |
| 2019 | 3,410.9 | 3,776.8 | 1,042.6 | 3,397.8 | 3,776.8 | 944.6 | 948.4 | 1,034.1 | 393.3 | 2,449.4 | 2,742.6 | 551.4 | 98.0 |
| 2018 | 3,527.5 | 3,912.2 | 1,097.5 | 3,511.6 | 3,912.2 | 980.9 | 977.5 | 1,067.6 | 408.2 | 2,534.1 | 2,844.6 | 572.7 | 116.7 |
| 2017 | 3,565.2 | 3,917.9 | 1,337.4 | 3,543.0 | 3,917.9 | 1,175.0 | 994.5 | 1,079.0 | 460.6 | 2,548.5 | 2,838.9 | 714.4 | 162.4 |
| **Percent change in rate per 100,000 population at risk** | | | | | | | | | | | | | |
| 2021 to 2022 | -2.7 | -3.8 | 34.7 | -2.7 | -3.8 | 37.4 | -0.7 | -2.0 | 30.7 | -3.7 | -4.7 | 44.2 | -6.2 |
| 2020 to 2021 | -7.3 | -6.8 | -24.9 | -7.2 | -6.8 | -22.3 | -2.7 | -1.9 | -19.7 | -9.4 | -9.0 | -24.7 | -50.4 |
| 2019 to 2020 | -17.5 | -16.2 | -41.1 | -17.5 | -16.2 | -41.1 | -5.0 | -3.1 | -31.1 | -22.3 | -21.2 | -48.3 | -40.3 |
| 2018 to 2019 | -3.3 | -3.5 | -5.0 | -3.2 | -3.5 | -3.7 | -3.0 | -3.1 | -3.7 | -3.3 | -3.6 | -3.7 | -16.0 |
| 2017 to 2018 | -1.1 | -0.1 | -17.9 | -0.9 | -0.1 | -16.5 | -1.7 | -1.1 | -11.4 | -0.6 | 0.2 | -19.8 | -28.1 |
| 2017 to 2022 | -28.9 | -27.6 | -53.6 | -28.5 | -27.6 | -49.5 | -12.4 | -10.8 | -38.3 | -34.8 | -34.0 | -56.7 | -83.3 |

Note: Rates calculated from the total population may not add to subtotals or total because of rounding.

[1] Status offenses include truancy, incorrigibility, running away, and curfew violations. These offenses can only be committed or engaged in by a juvenile.

[2] Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance (see Table 53).

[3] Rates are based on the population at risk for each year. The categories are total (10-69 years of age), adult (18-69 years of age), and juvenile (10-17 years of age) (see Table 53).

Exhibit 43
DX0417

Table 18
**TOTAL ARRESTS, 2017-2022**
By Level of Offense for Adult and Juvenile Arrests

| Level of offense | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 1,097,083 | 100.0 | 1,091,694 | 100.0 | 1,055,622 | 100.0 | 853,576 | 100.0 | 792,797 | 100.0 | 780,888 | 100.0 |
| *Total* | | | | | | | | | | | | |
| Felony | 306,024 | 27.9 | 302,514 | 27.7 | 293,509 | 27.8 | 273,542 | 32.0 | 266,845 | 33.7 | 268,182 | 34.3 |
| Misdemeanor | 784,229 | 71.5 | 784,245 | 71.8 | 758,056 | 71.8 | 577,586 | 67.7 | 524,737 | 66.2 | 511,566 | 65.5 |
| Status offenses[1] | 6,830 | 0.6 | 4,935 | 0.5 | 4,057 | 0.4 | 2,448 | 0.3 | 1,215 | 0.2 | 1,140 | 0.1 |
| *Level of offense for adult and juvenile arrests* | | | | | | | | | | | | |
| Adult | 1,040,834 | 94.9 | 1,045,271 | 95.7 | 1,012,441 | 95.9 | 827,866 | 97.0 | 773,442 | 97.6 | 754,888 | 96.7 |
| Felony | 286,651 | 26.1 | 285,249 | 26.1 | 277,221 | 26.3 | 262,210 | 30.7 | 257,713 | 32.5 | 256,280 | 32.8 |
| Misdemeanor | 754,183 | 68.7 | 760,022 | 69.6 | 735,220 | 69.6 | 565,656 | 66.3 | 515,729 | 65.1 | 498,608 | 63.9 |
| Juvenile | 56,249 | 5.1 | 46,423 | 4.3 | 43,181 | 4.1 | 25,710 | 3.0 | 19,355 | 2.4 | 26,000 | 3.3 |
| Felony | 19,373 | 1.8 | 17,265 | 1.6 | 16,288 | 1.5 | 11,332 | 1.3 | 9,132 | 1.2 | 11,902 | 1.5 |
| Misdemeanor | 30,046 | 2.7 | 24,223 | 2.2 | 22,836 | 2.2 | 11,930 | 1.4 | 9,008 | 1.1 | 12,958 | 1.7 |
| Status offenses[1] | 6,830 | 0.6 | 4,935 | 0.5 | 4,057 | 0.4 | 2,448 | 0.3 | 1,215 | 0.2 | 1,140 | 0.1 |

Note: Percentages may not add to subtotals or 100.0 because of rounding.
[1] Status offenses include truancy, incorrigibility, running away, and curfew violations. These offenses can only be committed or engaged in by a juvenile.

Table 19
**FELONY ARRESTS, 2017-2022**
By Category

| Category | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 306,024 | 100.0 | 302,514 | 100.0 | 293,509 | 100.0 | 273,542 | 100.0 | 266,845 | 100.0 | 268,182 | 100.0 |
| Violent offenses | 111,478 | 36.4 | 112,461 | 37.2 | 108,785 | 37.1 | 102,881 | 37.6 | 93,728 | 35.1 | 98,115 | 36.6 |
| Property offenses | 77,223 | 25.2 | 72,962 | 24.1 | 68,357 | 23.3 | 63,789 | 23.3 | 58,245 | 21.8 | 62,131 | 23.2 |
| Drug offenses | 29,955 | 9.8 | 28,376 | 9.4 | 27,280 | 9.3 | 25,771 | 9.4 | 23,776 | 8.9 | 20,574 | 7.7 |
| All other | 87,368 | 28.5 | 88,715 | 29.3 | 89,087 | 30.4 | 81,101 | 29.6 | 91,096 | 34.1 | 87,362 | 32.6 |

Note: Percentages may not add to 100.0 because of rounding.

Exhibit 43
DX0418

Table 20
FELONY ARRESTS, 2017-2022
By Category and Offense

| Category and offense | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total........................ | 306,024 | | 302,514 | | 293,509 | | 273,542 | | 266,845 | | 268,182 | |
| Violent offenses......... | 111,478 | 100.0 | 112,461 | 100.0 | 108,785 | 100.0 | 102,881 | 100.0 | 93,728 | 100.0 | 98,115 | 100.0 |
| Homicide................. | 1,501 | 1.3 | 1,416 | 1.3 | 1,352 | 1.2 | 1,597 | 1.6 | 1,550 | 1.7 | 1,485 | 1.5 |
| Rape[1].................. | 2,557 | 2.3 | 2,541 | 2.3 | 2,233 | 2.1 | 2,067 | 2.0 | 1,964 | 2.1 | 1,890 | 1.9 |
| Robbery................. | 17,000 | 15.2 | 16,713 | 14.9 | 16,112 | 14.8 | 13,696 | 13.3 | 11,376 | 12.1 | 13,187 | 13.4 |
| Assault................. | 88,693 | 79.6 | 90,089 | 80.1 | 87,422 | 80.4 | 83,932 | 81.6 | 77,333 | 82.5 | 80,044 | 81.6 |
| Kidnapping.............. | 1,727 | 1.5 | 1,702 | 1.5 | 1,666 | 1.5 | 1,589 | 1.5 | 1,505 | 1.6 | 1,509 | 1.5 |
| Property offenses......... | 77,223 | 100.0 | 72,962 | 100.0 | 68,357 | 100.0 | 63,789 | 100.0 | 58,245 | 100.0 | 62,131 | 100.0 |
| Burglary................ | 22,551 | 29.2 | 20,887 | 28.6 | 19,884 | 29.1 | 18,670 | 29.3 | 15,217 | 26.1 | 16,833 | 27.1 |
| Theft.................. | 29,507 | 38.2 | 28,964 | 39.7 | 28,328 | 41.4 | 24,897 | 39.0 | 24,289 | 41.7 | 27,574 | 44.4 |
| Motor vehicle theft....... | 19,216 | 24.9 | 17,714 | 24.3 | 15,037 | 22.0 | 16,059 | 25.2 | 15,024 | 25.8 | 13,916 | 22.4 |
| Forgery, checks, access cards...... | 4,566 | 5.9 | 4,031 | 5.5 | 3,736 | 5.5 | 2,367 | 3.7 | 1,850 | 3.2 | 1,900 | 3.1 |
| Arson.................. | 1,383 | 1.8 | 1,366 | 1.9 | 1,372 | 2.0 | 1,796 | 2.8 | 1,865 | 3.2 | 1,908 | 3.1 |
| Drug offenses............ | 29,955 | 100.0 | 28,376 | 100.0 | 27,280 | 100.0 | 25,771 | 100.0 | 23,776 | 100.0 | 20,574 | 100.0 |
| Narcotics............... | 9,605 | 32.1 | 9,061 | 31.9 | 8,600 | 31.5 | 8,672 | 33.7 | 7,707 | 32.4 | 7,584 | 36.9 |
| Marijuana............... | 2,086 | 7.0 | 1,617 | 5.7 | 1,181 | 4.3 | 1,027 | 4.0 | 825 | 3.5 | 691 | 3.4 |
| Dangerous drugs......... | 17,107 | 57.1 | 16,457 | 58.0 | 16,352 | 59.9 | 15,042 | 58.4 | 14,264 | 60.0 | 11,637 | 56.6 |
| Other.................. | 1,157 | 3.9 | 1,241 | 4.4 | 1,147 | 4.2 | 1,030 | 4.0 | 980 | 4.1 | 662 | 3.2 |
| All other................. | 87,368 | 100.0 | 88,715 | 100.0 | 89,087 | 100.0 | 81,101 | 100.0 | 91,096 | 100.0 | 87,362 | 100.0 |

Note: Percentages may not add to 100.0 because of rounding.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 1,299 reported under the current definition (SRS) and 591 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0419

Table 21
FELONY ARRESTS, 2017-2022
By Category and Offense for Adult and Juvenile Arrests

| Category and offense | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **Total** | | | | | | | | | | | | |
| Total | 306,024 | 100.0 | 302,514 | 100.0 | 293,509 | 100.0 | 273,542 | 100.0 | 266,845 | 100.0 | 268,182 | 100.0 |
| **Adult and juvenile arrests** | | | | | | | | | | | | |
| Adult | 286,651 | 93.7 | 285,249 | 94.3 | 277,221 | 94.5 | 262,210 | 95.9 | 257,713 | 96.6 | 256,280 | 95.6 |
| Juvenile | 19,373 | 6.3 | 17,265 | 5.7 | 16,288 | 5.5 | 11,332 | 4.1 | 9,132 | 3.4 | 11,902 | 4.4 |
| **Category and offense for adult and juvenile arrests** | | | | | | | | | | | | |
| Violent offenses | 111,478 | 100.0 | 112,461 | 100.0 | 108,785 | 100.0 | 102,881 | 100.0 | 93,728 | 100.0 | 98,115 | 100.0 |
| Adult | 104,187 | 93.5 | 105,141 | 93.5 | 101,656 | 93.4 | 98,166 | 95.4 | 89,747 | 95.8 | 92,853 | 94.6 |
| Juvenile | 7,291 | 6.5 | 7,320 | 6.5 | 7,129 | 6.6 | 4,715 | 4.6 | 3,981 | 4.2 | 5,262 | 5.4 |
| Homicide | 1,501 | 100.0 | 1,416 | 100.0 | 1,352 | 100.0 | 1,597 | 100.0 | 1,550 | 100.0 | 1,485 | 100.0 |
| Adult | 1,403 | 93.5 | 1,332 | 94.1 | 1,284 | 95.0 | 1,518 | 95.1 | 1,449 | 93.5 | 1,391 | 93.7 |
| Juvenile | 98 | 6.5 | 84 | 5.9 | 68 | 5.0 | 79 | 4.9 | 101 | 6.5 | 94 | 6.3 |
| Rape[1] | 2,557 | 100.0 | 2,541 | 100.0 | 2,233 | 100.0 | 2,067 | 100.0 | 1,964 | 100.0 | 1,890 | 100.0 |
| Adult | 2,267 | 88.7 | 2,296 | 90.4 | 2,037 | 91.2 | 1,913 | 92.5 | 1,826 | 93.0 | 1,743 | 92.2 |
| Juvenile | 290 | 11.3 | 245 | 9.6 | 196 | 8.8 | 154 | 7.5 | 138 | 7.0 | 147 | 7.8 |
| Robbery | 17,000 | 100.0 | 16,713 | 100.0 | 16,112 | 100.0 | 13,696 | 100.0 | 11,376 | 100.0 | 13,187 | 100.0 |
| Adult | 14,037 | 82.6 | 13,763 | 82.3 | 13,166 | 81.7 | 11,730 | 85.6 | 9,971 | 87.6 | 11,341 | 86.0 |
| Juvenile | 2,963 | 17.4 | 2,950 | 17.7 | 2,946 | 18.3 | 1,966 | 14.4 | 1,405 | 12.4 | 1,846 | 14.0 |
| Assault | 88,693 | 100.0 | 90,089 | 100.0 | 87,422 | 100.0 | 83,932 | 100.0 | 77,333 | 100.0 | 80,044 | 100.0 |
| Adult | 84,835 | 95.7 | 86,116 | 95.6 | 83,582 | 95.6 | 81,445 | 97.0 | 75,023 | 97.0 | 76,913 | 96.1 |
| Juvenile | 3,858 | 4.3 | 3,973 | 4.4 | 3,840 | 4.4 | 2,487 | 3.0 | 2,310 | 3.0 | 3,131 | 3.9 |
| Kidnapping | 1,727 | 100.0 | 1,702 | 100.0 | 1,666 | 100.0 | 1,589 | 100.0 | 1,505 | 100.0 | 1,509 | 100.0 |
| Adult | 1,645 | 95.3 | 1,634 | 96.0 | 1,587 | 95.3 | 1,560 | 98.2 | 1,478 | 98.2 | 1,465 | 97.1 |
| Juvenile | 82 | 4.7 | 68 | 4.0 | 79 | 4.7 | 29 | 1.8 | 27 | 1.8 | 44 | 2.9 |

(continued)

Exhibit 43
DX0420

Table 21 - continued
**FELONY ARRESTS, 2017-2022**
By Category and Offense for Adult and Juvenile Arrests

| Category and offense | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Property offenses | 77,223 | 100.0 | 72,962 | 100.0 | 68,357 | 100.0 | 63,789 | 100.0 | 58,245 | 100.0 | 62,131 | 100.0 |
| Adult | 70,987 | 91.9 | 68,162 | 93.4 | 64,327 | 94.1 | 60,817 | 95.3 | 56,477 | 97.0 | 59,819 | 96.3 |
| Juvenile | 6,236 | 8.1 | 4,800 | 6.6 | 4,030 | 5.9 | 2,972 | 4.7 | 1,768 | 3.0 | 2,312 | 3.7 |
| Burglary | 22,551 | 100.0 | 20,887 | 100.0 | 19,884 | 100.0 | 18,670 | 100.0 | 15,217 | 100.0 | 16,833 | 100.0 |
| Adult | 19,880 | 88.2 | 18,941 | 90.7 | 18,348 | 92.3 | 17,507 | 93.8 | 14,678 | 96.5 | 16,152 | 96.0 |
| Juvenile | 2,671 | 11.8 | 1,946 | 9.3 | 1,536 | 7.7 | 1,163 | 6.2 | 539 | 3.5 | 681 | 4.0 |
| Theft | 29,507 | 100.0 | 28,964 | 100.0 | 28,328 | 100.0 | 24,897 | 100.0 | 24,289 | 100.0 | 27,574 | 100.0 |
| Adult | 27,919 | 94.6 | 27,664 | 95.5 | 27,125 | 95.8 | 24,066 | 96.7 | 23,668 | 97.4 | 26,671 | 96.7 |
| Juvenile | 1,588 | 5.4 | 1,300 | 4.5 | 1,203 | 4.2 | 831 | 3.3 | 621 | 2.6 | 903 | 3.3 |
| Motor vehicle theft | 19,216 | 100.0 | 17,714 | 100.0 | 15,037 | 100.0 | 16,059 | 100.0 | 15,024 | 100.0 | 13,916 | 100.0 |
| Adult | 17,494 | 91.0 | 16,341 | 92.2 | 13,881 | 92.3 | 15,161 | 94.4 | 14,485 | 96.4 | 13,291 | 95.5 |
| Juvenile | 1,722 | 9.0 | 1,373 | 7.8 | 1,156 | 7.7 | 898 | 5.6 | 539 | 3.6 | 625 | 4.5 |
| Forgery, checks, access cards | 4,566 | 100.0 | 4,031 | 100.0 | 3,736 | 100.0 | 2,367 | 100.0 | 1,850 | 100.0 | 1,900 | 100.0 |
| Adult | 4,511 | 98.8 | 3,997 | 99.2 | 3,690 | 98.8 | 2,345 | 99.1 | 1,829 | 98.9 | 1,874 | 98.6 |
| Juvenile | 55 | 1.2 | 34 | 0.8 | 46 | 1.2 | 22 | 0.9 | 21 | 1.1 | 26 | 1.4 |
| Arson | 1,383 | 100.0 | 1,366 | 100.0 | 1,372 | 100.0 | 1,796 | 100.0 | 1,865 | 100.0 | 1,908 | 100.0 |
| Adult | 1,183 | 85.5 | 1,219 | 89.2 | 1,283 | 93.5 | 1,738 | 96.8 | 1,817 | 97.4 | 1,831 | 96.0 |
| Juvenile | 200 | 14.5 | 147 | 10.8 | 89 | 6.5 | 58 | 3.2 | 48 | 2.6 | 77 | 4.0 |
| Drug offenses | 29,955 | 100.0 | 28,376 | 100.0 | 27,280 | 100.0 | 25,771 | 100.0 | 23,776 | 100.0 | 20,574 | 100.0 |
| Adult | 29,279 | 97.7 | 27,889 | 98.3 | 26,854 | 98.4 | 25,454 | 98.8 | 23,547 | 99.0 | 20,298 | 98.7 |
| Juvenile | 676 | 2.3 | 487 | 1.7 | 426 | 1.6 | 317 | 1.2 | 229 | 1.0 | 276 | 1.3 |
| Narcotics | 9,605 | 100.0 | 9,061 | 100.0 | 8,600 | 100.0 | 8,672 | 100.0 | 7,707 | 100.0 | 7,584 | 100.0 |
| Adult | 9,359 | 97.4 | 8,887 | 98.1 | 8,451 | 98.3 | 8,524 | 98.3 | 7,598 | 98.6 | 7,430 | 98.0 |
| Juvenile | 246 | 2.6 | 174 | 1.9 | 149 | 1.7 | 148 | 1.7 | 109 | 1.4 | 154 | 2.0 |
| Marijuana | 2,086 | 100.0 | 1,617 | 100.0 | 1,181 | 100.0 | 1,027 | 100.0 | 825 | 100.0 | 691 | 100.0 |
| Adult | 1,907 | 91.4 | 1,489 | 92.1 | 1,090 | 92.3 | 984 | 95.8 | 795 | 96.4 | 667 | 96.5 |
| Juvenile | 179 | 8.6 | 128 | 7.9 | 91 | 7.7 | 43 | 4.2 | 30 | 3.6 | 24 | 3.5 |
| Dangerous drugs | 17,107 | 100.0 | 16,457 | 100.0 | 16,352 | 100.0 | 15,042 | 100.0 | 14,264 | 100.0 | 11,637 | 100.0 |
| Adult | 16,867 | 98.6 | 16,277 | 98.9 | 16,174 | 98.9 | 14,918 | 99.2 | 14,175 | 99.4 | 11,541 | 99.2 |
| Juvenile | 240 | 1.4 | 180 | 1.1 | 178 | 1.1 | 124 | 0.8 | 89 | 0.6 | 96 | 0.8 |
| Other | 1,157 | 100.0 | 1,241 | 100.0 | 1,147 | 100.0 | 1,030 | 100.0 | 980 | 100.0 | 662 | 100.0 |
| Adult | 1,146 | 99.0 | 1,236 | 99.6 | 1,139 | 99.3 | 1,028 | 99.8 | 979 | 99.9 | 660 | 99.7 |
| Juvenile | 11 | 1.0 | 5 | 0.4 | 8 | 0.7 | 2 | 0.2 | 1 | 0.1 | 2 | 0.3 |
| All other | 87,368 | 100.0 | 88,715 | 100.0 | 89,087 | 100.0 | 81,101 | 100.0 | 91,096 | 100.0 | 87,362 | 100.0 |
| Adult | 82,198 | 94.1 | 84,057 | 94.7 | 84,384 | 94.7 | 77,773 | 95.9 | 87,942 | 96.5 | 83,310 | 95.4 |
| Juvenile | 5,170 | 5.9 | 4,658 | 5.3 | 4,703 | 5.3 | 3,328 | 4.1 | 3,154 | 3.5 | 4,052 | 4.6 |

In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 1,299 reported under the current definition (SRS) and 591 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0421

Table 22
## FELONY ARRESTS, 2017-2022
### Number, Rate per 100,000 Population at Risk, and Percent Change

| Year(s) | Total: Total | Total: Adult | Total: Juvenile | Violent Total: Total | Violent Total: Adult | Violent Total: Juvenile | Homicide: Total | Homicide: Adult | Homicide: Juvenile | Rape[1]: Total | Rape[1]: Adult | Rape[1]: Juvenile | Robbery: Total | Robbery: Adult | Robbery: Juvenile | Assault: Total | Assault: Adult | Assault: Juvenile | Kidnapping: Total | Kidnapping: Adult | Kidnapping: Juvenile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number** | | | | | | | | | | | | | | | | | | | | | |
| 2022 | 268,182 | 256,280 | 11,902 | 98,115 | 92,853 | 5,262 | 1,485 | 1,391 | 94 | 1,890 | 1,743 | 147 | 13,187 | 11,341 | 1,846 | 80,044 | 76,913 | 3,131 | 1,509 | 1,465 | 44 |
| 2021 | 266,845 | 257,713 | 9,132 | 93,728 | 89,747 | 3,981 | 1,550 | 1,449 | 101 | 1,964 | 1,826 | 138 | 11,376 | 9,971 | 1,405 | 77,333 | 75,023 | 2,310 | 1,505 | 1,478 | 27 |
| 2020 | 273,542 | 262,210 | 11,332 | 102,881 | 98,166 | 4,715 | 1,597 | 1,518 | 79 | 2,067 | 1,913 | 154 | 13,696 | 11,730 | 1,966 | 83,932 | 81,445 | 2,487 | 1,589 | 1,560 | 29 |
| 2019 | 293,509 | 277,221 | 16,288 | 108,785 | 101,656 | 7,129 | 1,352 | 1,284 | 68 | 2,233 | 2,037 | 196 | 16,112 | 13,166 | 2,946 | 87,422 | 83,582 | 3,840 | 1,666 | 1,587 | 79 |
| 2018 | 302,514 | 285,249 | 17,265 | 112,461 | 105,141 | 7,320 | 1,416 | 1,332 | 84 | 2,541 | 2,296 | 245 | 16,713 | 13,763 | 2,950 | 90,089 | 86,116 | 3,973 | 1,702 | 1,634 | 68 |
| 2017 | 306,024 | 286,651 | 19,373 | 111,478 | 104,187 | 7,291 | 1,501 | 1,403 | 98 | 2,557 | 2,267 | 290 | 17,000 | 14,037 | 2,963 | 88,693 | 84,835 | 3,858 | 1,727 | 1,645 | 82 |
| **Percent change in number** | | | | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | 0.5 | -0.6 | 30.3 | 4.7 | 3.5 | 32.2 | -4.2 | -4.0 | -6.9 | - | - | - | 15.9 | 13.7 | 31.4 | 3.5 | 2.5 | 35.5 | 0.3 | -0.9 | 63.0 |
| 2020 to 2021 | -2.4 | -1.7 | -19.4 | -8.9 | -8.6 | -15.6 | -2.9 | -4.5 | 27.8 | - | - | - | -16.9 | -15.0 | -28.5 | -7.9 | -7.9 | -7.1 | -5.3 | -5.3 | -6.9 |
| 2019 to 2020 | -6.8 | -5.4 | -30.4 | -5.4 | -3.4 | -33.9 | 18.1 | 18.2 | 16.2 | -7.4 | -6.1 | -21.4 | -15.0 | -10.9 | -33.3 | -4.0 | -2.6 | -35.2 | -4.6 | -1.7 | -63.3 |
| 2018 to 2019 | -3.0 | -2.8 | -5.7 | -3.3 | -3.3 | -2.6 | -4.5 | -3.6 | -19.0 | -12.1 | -11.3 | -20.0 | -3.6 | -4.3 | -0.1 | -3.0 | -2.9 | -3.3 | -2.1 | -2.9 | 16.2 |
| 2017 to 2018 | -1.1 | -0.5 | -10.9 | 0.9 | 0.9 | 0.4 | -5.7 | -5.1 | -14.3 | -0.6 | 1.3 | -15.5 | -1.7 | -2.0 | -0.4 | 1.6 | 1.5 | 3.0 | -1.4 | -0.7 | -17.1 |
| 2017 to 2022 | -12.4 | -10.6 | -38.6 | -12.0 | -10.9 | -27.8 | -1.1 | -0.9 | -4.1 | - | - | - | -22.4 | -19.2 | -37.7 | -9.8 | -9.3 | -18.8 | -12.6 | -10.9 | -46.3 |
| **Rate per 100,000 population at risk[2]** | | | | | | | | | | | | | | | | | | | | | |
| 2022 | 870.7 | 962.9 | 284.3 | 318.5 | 348.9 | 125.7 | 4.8 | 5.2 | 2.2 | 6.1 | 6.5 | 3.5 | 42.8 | 42.6 | 44.1 | 259.9 | 289.0 | 74.8 | 4.9 | 5.5 | 1.1 |
| 2021 | 877.2 | 982.8 | 217.6 | 308.1 | 342.3 | 94.9 | 5.1 | 5.5 | 2.4 | 6.5 | 7.0 | 3.3 | 37.4 | 38.0 | 33.5 | 254.2 | 286.1 | 55.0 | 4.9 | 5.6 | 0.6 |
| 2020 | 901.2 | 1,002.0 | 270.0 | 339.0 | 375.1 | 112.7 | 5.3 | 5.8 | 1.9 | 6.8 | 7.3 | 3.7 | 45.1 | 44.8 | 47.0 | 276.5 | 311.2 | 59.4 | 5.2 | 6.0 | 0.7 |
| 2019 | 948.4 | 1,034.1 | 393.3 | 351.5 | 379.2 | 172.1 | 4.4 | 4.8 | 1.6 | 7.2 | 7.6 | 4.7 | 52.1 | 49.1 | 71.1 | 282.5 | 311.8 | 92.7 | 5.4 | 5.9 | 1.9 |
| 2018 | 977.5 | 1,067.6 | 408.2 | 363.4 | 393.5 | 173.1 | 4.6 | 5.0 | 2.0 | 8.2 | 8.6 | 5.8 | 54.0 | 51.5 | 69.7 | 291.1 | 322.3 | 93.9 | 5.5 | 6.1 | 1.6 |
| 2017 | 994.5 | 1,079.0 | 460.6 | 362.3 | 392.2 | 173.4 | 4.9 | 5.3 | 2.3 | 8.3 | 8.5 | 6.9 | 55.2 | 52.8 | 70.5 | 288.2 | 319.3 | 91.7 | 5.6 | 6.2 | 1.9 |
| **Percent change in rate** | | | | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | -0.7 | -2.0 | 30.7 | 3.4 | 1.9 | 32.5 | -5.9 | -5.5 | -8.3 | - | - | - | 14.4 | 12.1 | 31.6 | 2.2 | 1.0 | 36.0 | 0.0 | -1.8 | 83.3 |
| 2020 to 2021 | -2.7 | -1.9 | -19.7 | -9.1 | -8.7 | -15.8 | -3.8 | -5.2 | 26.3 | - | - | - | -17.1 | -15.2 | -28.7 | -8.1 | -7.4 | -7.4 | -5.8 | -6.7 | -14.3 |
| 2019 to 2020 | -5.0 | -3.1 | -31.1 | -3.6 | -1.1 | -34.5 | 20.5 | 20.8 | 18.8 | -5.6 | -3.9 | -21.3 | -13.4 | -8.8 | -33.9 | -2.1 | -0.2 | -35.9 | -3.7 | 1.7 | -63.2 |
| 2018 to 2019 | -3.0 | -3.3 | -3.7 | -3.3 | -3.6 | -0.6 | -4.3 | -4.0 | -20.0 | -12.2 | -11.6 | -19.0 | -3.5 | -4.7 | 2.0 | -3.0 | -3.3 | -1.3 | -1.8 | -3.3 | 18.8 |
| 2017 to 2018 | -1.7 | -1.1 | -11.4 | 0.3 | 0.3 | -0.2 | -6.1 | -5.7 | -13.0 | -1.2 | 1.2 | -15.9 | -2.2 | -2.5 | -1.1 | 1.0 | 0.9 | 2.4 | -1.8 | -1.6 | -15.8 |
| 2017 to 2022 | -12.4 | -10.8 | -38.3 | -12.1 | -11.0 | -27.5 | -2.0 | -1.9 | -4.3 | - | - | - | -22.5 | -19.3 | -37.4 | -9.8 | -9.5 | -18.4 | -12.5 | -11.3 | -42.1 |

(continued)

Exhibit 43
DX0422

## Table 22 - continued
### FELONY ARRESTS, 2017-2022
Number, Rate per 100,000 Population at Risk, and Percent Change

| Year(s) | Total | | | Burglary | | | Property offenses | | | | | | | | | | | |
| | | | | | | | Theft | | | Motor vehicle theft | | | Forgery, checks, access cards | | | Arson | | |
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Number** | | | | | | | | | | | | | | | | | | |
| 2022 | 62,131 | 59,819 | 2,312 | 16,833 | 16,152 | 681 | 27,574 | 26,671 | 903 | 13,916 | 13,291 | 625 | 1,900 | 1,874 | 26 | 1,908 | 1,831 | 77 |
| 2021 | 58,245 | 56,477 | 1,768 | 15,217 | 14,678 | 539 | 24,289 | 23,668 | 621 | 15,024 | 14,485 | 539 | 1,850 | 1,829 | 21 | 1,865 | 1,817 | 48 |
| 2020 | 63,789 | 60,817 | 2,972 | 18,670 | 17,507 | 1,163 | 24,897 | 24,066 | 831 | 16,059 | 15,161 | 898 | 2,367 | 2,345 | 22 | 1,796 | 1,738 | 58 |
| 2019 | 68,357 | 64,327 | 4,030 | 19,884 | 18,348 | 1,536 | 28,328 | 27,125 | 1,203 | 15,037 | 13,881 | 1,156 | 3,736 | 3,690 | 46 | 1,372 | 1,283 | 89 |
| 2018 | 72,962 | 68,162 | 4,800 | 20,887 | 18,941 | 1,946 | 28,964 | 27,664 | 1,300 | 17,714 | 16,341 | 1,373 | 4,031 | 3,997 | 34 | 1,366 | 1,219 | 147 |
| 2017 | 77,223 | 70,987 | 6,236 | 22,551 | 19,880 | 2,671 | 29,507 | 27,919 | 1,588 | 19,216 | 17,494 | 1,722 | 4,566 | 4,511 | 55 | 1,383 | 1,183 | 200 |
| **Percent change in number** | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | 6.7 | 5.9 | 30.8 | 10.6 | 10.0 | 26.3 | 13.5 | 12.7 | 45.4 | -7.4 | -8.2 | 16.0 | 2.7 | 2.5 | - | 2.3 | 0.8 | - |
| 2020 to 2021 | -8.7 | -7.1 | -40.5 | -18.5 | -16.2 | -53.7 | -2.4 | -1.7 | -25.3 | -6.4 | -4.5 | -40.0 | -21.8 | -22.0 | - | 3.8 | 4.5 | -17.2 |
| 2019 to 2020 | -6.7 | -5.5 | -26.3 | -6.1 | -4.6 | -24.3 | -12.1 | -11.3 | -30.9 | 6.8 | 9.2 | -22.3 | -36.6 | -36.4 | - | 30.9 | 35.5 | -34.8 |
| 2018 to 2019 | -6.3 | -5.6 | -16.0 | -4.8 | -3.1 | -21.1 | -2.2 | -1.9 | -7.5 | -15.1 | -15.1 | -15.8 | -7.3 | -7.7 | - | 0.4 | 5.3 | -39.5 |
| 2017 to 2018 | -5.5 | -4.0 | -23.0 | -7.4 | -4.7 | -27.1 | -1.8 | -0.9 | -18.1 | -7.8 | -6.6 | -20.3 | -11.7 | -11.4 | -38.2 | -1.2 | 3.0 | -26.5 |
| 2017 to 2022 | -19.5 | -15.7 | -62.9 | -25.4 | -18.8 | -74.5 | -6.6 | -4.5 | -43.1 | -27.6 | -24.0 | -63.7 | -58.4 | -58.5 | -52.7 | 38.0 | 54.8 | -61.5 |
| **Rate per 100,000 population at risk[2]** | | | | | | | | | | | | | | | | | | |
| 2022 | 201.7 | 224.8 | 55.2 | 54.7 | 60.7 | 16.3 | 89.5 | 100.2 | 21.6 | 45.2 | 49.9 | 14.9 | 6.2 | 7.0 | 0.6 | 6.2 | 6.9 | 1.8 |
| 2021 | 191.5 | 215.4 | 42.1 | 50.0 | 56.0 | 12.8 | 79.8 | 90.3 | 14.8 | 49.4 | 55.2 | 12.8 | 6.1 | 7.0 | 0.5 | 6.1 | 6.9 | 1.1 |
| 2020 | 210.2 | 232.4 | 71.0 | 61.5 | 66.9 | 27.8 | 82.0 | 92.0 | 19.9 | 52.9 | 57.9 | 21.5 | 7.8 | 9.0 | 0.5 | 5.9 | 6.6 | 1.4 |
| 2019 | 220.9 | 240.0 | 97.3 | 64.2 | 68.4 | 37.1 | 91.5 | 101.2 | 29.0 | 48.6 | 51.8 | 27.9 | 12.1 | 13.8 | 1.1 | 4.4 | 4.8 | 2.1 |
| 2018 | 235.8 | 255.1 | 113.5 | 67.5 | 70.9 | 46.0 | 93.6 | 103.5 | 30.7 | 57.2 | 61.2 | 32.5 | 13.0 | 15.0 | 0.8 | 4.4 | 4.6 | 3.5 |
| 2017 | 251.0 | 267.2 | 148.3 | 73.3 | 74.8 | 63.5 | 95.9 | 105.1 | 37.8 | 62.4 | 65.9 | 40.9 | 14.8 | 17.0 | 1.3 | 4.5 | 4.5 | 4.8 |
| **Percent change in rate** | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | 5.3 | 4.4 | 31.1 | 9.4 | 8.4 | 27.3 | 12.2 | 11.0 | 45.9 | -8.5 | -9.6 | 16.4 | 1.6 | 1.6 | 20.0 | 1.6 | 0.0 | 63.6 |
| 2020 to 2021 | -8.9 | -7.3 | -40.7 | -18.7 | -16.3 | -54.0 | -2.7 | -1.8 | -25.6 | -6.6 | -4.7 | -40.5 | -21.8 | -22.2 | 0.0 | 3.4 | 4.5 | -21.4 |
| 2019 to 2020 | -4.8 | -3.2 | -27.0 | -4.2 | -2.2 | -25.1 | -10.4 | -9.1 | -31.4 | 8.8 | 11.8 | -22.9 | -35.5 | -34.8 | -54.5 | 34.1 | 37.5 | -33.3 |
| 2018 to 2019 | -6.3 | -5.9 | -14.3 | -4.9 | -3.5 | -19.3 | -2.2 | -2.2 | -5.5 | -15.0 | -15.4 | -14.2 | -6.9 | -8.0 | 37.5 | 0.0 | 4.3 | -40.0 |
| 2017 to 2018 | -6.1 | -4.5 | -23.5 | -7.9 | -5.2 | -27.6 | -2.4 | -1.5 | -18.8 | -8.3 | -7.1 | -20.5 | -12.2 | -11.8 | -38.5 | -2.2 | 2.2 | -27.1 |
| 2017 to 2022 | -19.6 | -15.9 | -62.8 | -25.4 | -18.9 | -74.3 | -6.7 | -4.7 | -42.9 | -27.6 | -24.3 | -63.6 | -58.1 | -58.8 | -53.8 | 37.8 | 53.3 | -62.5 |

(continued)

Exhibit 43
DX0423

Table 22 - continued
FELONY ARRESTS, 2017-2022
Number, Rate per 100,000 Population at Risk, and Percent Change

| Year(s) | Total | | | Narcotics | | | Drug offenses | | | | | | | | | All other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Marijuana | | | Dangerous drugs | | | Other | | | | | |
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile |
| **Number** | | | | | | | | | | | | | | | | | | |
| 2022 | 20,574 | 20,298 | 276 | 7,584 | 7,430 | 154 | 691 | 667 | 24 | 11,637 | 11,541 | 96 | 662 | 660 | 2 | 87,362 | 83,310 | 4,052 |
| 2021 | 23,776 | 23,547 | 229 | 7,707 | 7,598 | 109 | 825 | 795 | 30 | 14,264 | 14,175 | 89 | 980 | 979 | 1 | 91,096 | 87,942 | 3,154 |
| 2020 | 25,771 | 25,454 | 317 | 8,672 | 8,524 | 148 | 1,027 | 984 | 43 | 15,042 | 14,918 | 124 | 1,030 | 1,028 | 2 | 81,101 | 77,773 | 3,328 |
| 2019 | 27,280 | 26,854 | 426 | 8,600 | 8,451 | 149 | 1,181 | 1,090 | 91 | 16,352 | 16,174 | 178 | 1,147 | 1,139 | 8 | 89,087 | 84,384 | 4,703 |
| 2018 | 28,376 | 27,889 | 487 | 9,061 | 8,887 | 174 | 1,617 | 1,489 | 128 | 16,457 | 16,277 | 180 | 1,241 | 1,236 | 5 | 88,715 | 84,057 | 4,658 |
| 2017 | 29,955 | 29,279 | 676 | 9,605 | 9,359 | 246 | 2,086 | 1,907 | 179 | 17,107 | 16,867 | 240 | 1,157 | 1,146 | 11 | 87,368 | 82,198 | 5,170 |
| **Percent change in number** | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | -13.5 | -13.8 | 20.5 | -1.6 | -2.2 | 41.3 | -16.2 | -16.1 | - | -18.4 | -18.6 | 7.9 | -32.4 | -32.6 | - | -4.1 | -5.3 | 28.5 |
| 2020 to 2021 | -7.7 | -7.5 | -27.8 | -11.1 | -10.9 | -26.4 | -19.7 | -19.2 | - | -5.2 | -5.0 | -28.2 | -4.9 | -4.8 | - | 12.3 | 13.1 | -5.2 |
| 2019 to 2020 | -5.5 | -5.2 | -25.6 | 0.8 | 0.9 | -0.7 | -13.0 | -9.7 | -52.7 | -8.0 | -7.8 | -30.3 | -10.2 | -9.7 | - | -9.0 | -7.8 | -29.2 |
| 2018 to 2019 | -3.9 | -3.7 | -12.5 | -5.1 | -4.9 | -14.4 | -27.0 | -26.8 | -28.9 | -0.6 | -0.6 | -1.1 | -7.6 | -7.8 | - | 0.4 | 0.4 | 1.0 |
| 2017 to 2018 | -5.3 | -4.7 | -28.0 | -5.7 | -5.4 | -29.3 | -22.5 | -21.9 | -28.5 | -3.8 | -3.5 | -25.0 | 7.3 | 7.9 | - | 1.5 | 2.3 | -9.9 |
| 2017 to 2022 | -31.3 | -30.7 | -59.2 | -21.0 | -20.6 | -37.4 | -66.9 | -65.0 | -86.6 | -32.0 | -31.6 | -60.0 | -42.8 | -42.4 | - | 0.0 | 1.4 | -21.6 |
| **Rate per 100,000 population at risk[2]** | | | | | | | | | | | | | | | | | | |
| 2022 | 66.8 | 76.3 | 6.6 | 24.6 | 27.9 | 3.7 | 2.2 | 2.5 | 0.6 | 37.8 | 43.4 | 2.3 | 2.1 | 2.5 | 0.0 | 283.6 | 313.0 | 96.8 |
| 2021 | 78.2 | 89.8 | 5.5 | 25.3 | 29.0 | 2.6 | 2.7 | 3.0 | 0.7 | 46.9 | 54.1 | 2.1 | 3.2 | 3.7 | 0.0 | 299.5 | 335.4 | 75.2 |
| 2020 | 84.9 | 97.3 | 7.6 | 28.6 | 32.6 | 3.5 | 3.4 | 3.8 | 1.0 | 49.6 | 57.0 | 3.0 | 3.4 | 3.9 | 0.0 | 267.2 | 297.2 | 79.5 |
| 2019 | 88.1 | 100.2 | 10.3 | 27.8 | 31.5 | 3.6 | 3.8 | 4.1 | 2.2 | 52.8 | 60.3 | 4.3 | 3.7 | 4.2 | 0.2 | 287.9 | 314.8 | 113.6 |
| 2018 | 91.7 | 104.4 | 11.5 | 29.3 | 33.3 | 4.1 | 5.2 | 5.6 | 3.0 | 53.2 | 60.9 | 4.3 | 4.0 | 4.6 | 0.1 | 286.7 | 314.6 | 110.1 |
| 2017 | 97.3 | 110.2 | 16.1 | 31.2 | 35.2 | 5.8 | 6.8 | 7.2 | 4.3 | 55.6 | 63.5 | 5.7 | 3.8 | 4.3 | 0.3 | 283.9 | 309.4 | 122.9 |
| **Percent change in rate** | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | -14.6 | -15.0 | 20.0 | -2.8 | -3.8 | 42.3 | -18.5 | -16.7 | -14.3 | -19.4 | -19.8 | 9.5 | -34.4 | -32.4 | 0.0 | -5.3 | -6.7 | 28.7 |
| 2020 to 2021 | -7.9 | -7.7 | -27.6 | -11.5 | -11.0 | -25.7 | -20.6 | -21.1 | -30.0 | -5.4 | -5.1 | -30.0 | -5.9 | -5.1 | 0.0 | 12.1 | 12.9 | -5.4 |
| 2019 to 2020 | -3.6 | -2.9 | -26.2 | 2.9 | 3.5 | -2.8 | -10.5 | -7.3 | -54.5 | -6.1 | -5.5 | -30.2 | -8.1 | -7.1 | -100.0 | -7.2 | -5.6 | -30.0 |
| 2018 to 2019 | -3.9 | -4.0 | -10.4 | -5.1 | -5.4 | -12.2 | -26.9 | -26.8 | -26.7 | -0.8 | -1.0 | 0.0 | -7.5 | -8.7 | 100.0 | 0.4 | 0.1 | 3.2 |
| 2017 to 2018 | -5.8 | -5.3 | -28.6 | -6.1 | -5.4 | -29.3 | -23.5 | -22.2 | -30.2 | -4.3 | -4.1 | -24.6 | 5.3 | 7.0 | -66.7 | 1.0 | 1.7 | -10.4 |
| 2017 to 2022 | -31.3 | -30.8 | -59.0 | -21.2 | -20.7 | -36.2 | -67.6 | -65.3 | -86.0 | -32.0 | -31.7 | -59.6 | -44.7 | -41.9 | -100.0 | -0.1 | 1.2 | -21.2 |

Note: Dash indicates that a percent change is not calculated when the base number is less than 50.
  Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape.  The 2022 numbers for Rape consist of 1,299 reported under this current definition (SRS) and 591 reported under the definition for IBR.  Caution should be used when comparing rape data to prior years.  For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Rates are based on the population at risk for each year.  The categories are total (10-69 years of age), adult (18-69 years of age), and juvenile (10-17 years of age) (see Table 53).

Exhibit 43
DX0424

Table 23
## ADULT FELONY ARRESTS, 2017-2022
By Category, Offense, and Law Enforcement Disposition

| Category, offense, and law enforcement disposition | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|
| Total............... | 286,651 | 285,249 | 277,221 | 262,210 | 257,713 | 256,280 | 100.0 | -10.6 | -0.6 |
| **Category and offense** | | | | | | | | | |
| Violent offenses........ | 104,187 | 105,141 | 101,656 | 98,166 | 89,747 | 92,853 | 36.2 | -10.9 | 3.5 |
| Homicide............... | 1,403 | 1,332 | 1,284 | 1,518 | 1,449 | 1,391 | 0.5 | -0.9 | -4.0 |
| Rape................... | 2,267 | 2,296 | 2,037 | 1,913 | 1,826 | 1,743 | 0.7 | - | - |
| Robbery................ | 14,037 | 13,763 | 13,166 | 11,730 | 9,971 | 11,341 | 4.4 | -19.2 | 13.7 |
| Assault................ | 84,835 | 86,116 | 83,582 | 81,445 | 75,023 | 76,913 | 30.0 | -9.3 | 2.5 |
| Kidnapping............. | 1,645 | 1,634 | 1,587 | 1,560 | 1,478 | 1,465 | 0.6 | -10.9 | -0.9 |
| Property offenses...... | 70,987 | 68,162 | 64,327 | 60,817 | 56,477 | 59,819 | 23.3 | -15.7 | 5.9 |
| Burglary............... | 19,880 | 18,941 | 18,348 | 17,507 | 14,678 | 16,152 | 6.3 | -18.8 | 10.0 |
| Theft.................. | 27,919 | 27,664 | 27,125 | 24,066 | 23,668 | 26,671 | 10.4 | -4.5 | 12.7 |
| Motor vehicle theft.... | 17,494 | 16,341 | 13,881 | 15,161 | 14,485 | 13,291 | 5.2 | -24.0 | -8.2 |
| Forgery, checks, access cards... | 4,511 | 3,997 | 3,690 | 2,345 | 1,829 | 1,874 | 0.7 | -58.5 | 2.5 |
| Arson.................. | 1,183 | 1,219 | 1,283 | 1,738 | 1,817 | 1,831 | 0.7 | 54.8 | 0.8 |
| Drug offenses.......... | 29,279 | 27,889 | 26,854 | 25,454 | 23,547 | 20,298 | 7.9 | -30.7 | -13.8 |
| Narcotics.............. | 9,359 | 8,887 | 8,451 | 8,524 | 7,598 | 7,430 | 2.9 | -20.6 | -2.2 |
| Marijuana.............. | 1,907 | 1,489 | 1,090 | 984 | 795 | 667 | 0.3 | -65.0 | -16.1 |
| Dangerous drugs........ | 16,867 | 16,277 | 16,174 | 14,918 | 14,175 | 11,541 | 4.5 | -31.6 | -18.6 |
| Other.................. | 1,146 | 1,236 | 1,139 | 1,028 | 979 | 660 | 0.3 | -42.4 | -32.6 |
| Sex offenses........... | 4,896 | 4,667 | 4,931 | 4,183 | 4,491 | 4,349 | 1.7 | -11.2 | -3.2 |
| Lewd or lascivious..... | 1,736 | 1,609 | 1,701 | 1,424 | 1,444 | 1,329 | 0.5 | -23.4 | -8.0 |
| Other.................. | 3,160 | 3,058 | 3,230 | 2,759 | 3,047 | 3,020 | 1.2 | -4.4 | -0.9 |
| All other.............. | 77,302 | 79,390 | 79,453 | 73,590 | 83,451 | 78,961 | 30.8 | 2.1 | -5.4 |
| Weapons................ | 20,561 | 20,864 | 20,749 | 22,277 | 25,115 | 23,867 | 9.3 | 16.1 | -5.0 |
| Driving under the influence.... | 4,930 | 4,906 | 4,918 | 4,215 | 4,826 | 4,547 | 1.8 | -7.8 | -5.8 |
| Hit-and-run............ | 1,276 | 1,207 | 1,057 | 988 | 999 | 856 | 0.3 | -32.9 | -14.3 |
| Escape................. | 235 | 321 | 279 | 209 | 239 | 267 | 0.1 | 13.6 | 11.7 |
| Other.................. | 50,300 | 52,092 | 52,450 | 45,901 | 52,272 | 49,424 | 19.3 | -1.7 | -5.4 |
| **Law enforcement disposition[2]** | | | | | | | | | |
| Released............... | 15,791 | 16,201 | 17,071 | 16,968 | 18,184 | 17,886 | 7.0 | 13 | -1.6 |
| Turned over to other agency........ | 3,301 | 3,921 | 3,839 | 3,046 | 15,218 | 33,616 | 13.1 | 918 | 120.9 |
| Complaint sought....... | 267,559 | 265,127 | 256,311 | 242,196 | 224,311 | 204,778 | 79.9 | -23 | -8.7 |

Note: Percentages may not add to subtotals or 100.0 because of rounding.
  Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration considered to be "rape." The 2022 numbers for Rape committed by adults consist of 1,206 reported under this current definition (SRS) and 537 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Starting in 2021, there was an increase in the Turned Over to Other Agency and decrease in the Complaint Sought dispositions. This was due to a record management system issue affecting several large agencies that caused no Complaint Sought dispositions to be reported in IBR.

Exhibit 43
DX0425

Table 24
**JUVENILE FELONY ARRESTS, 2017-2022**
By Category, Offense, and Law Enforcement Disposition

| Category, offense, and law enforcement disposition | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 19,373 | 17,265 | 16,288 | 11,332 | 9,132 | 11,902 | 100.0 | -38.6 | 30.3 |
| **Category and offense** | | | | | | | | | |
| Violent offenses | 7,291 | 7,320 | 7,129 | 4,715 | 3,981 | 5,262 | 44.2 | -27.8 | 32.2 |
| Homicide | 98 | 84 | 68 | 79 | 101 | 94 | 0.8 | -4.1 | -6.9 |
| Rape[1] | 290 | 245 | 196 | 154 | 138 | 147 | 1.2 | - | - |
| Robbery | 2,963 | 2,950 | 2,946 | 1,966 | 1,405 | 1,846 | 15.5 | -37.7 | 31.4 |
| Assault | 3,858 | 3,973 | 3,840 | 2,487 | 2,310 | 3,131 | 26.3 | -18.8 | 35.5 |
| Kidnapping | 82 | 68 | 79 | 29 | 27 | 44 | 0.4 | -46.3 | - |
| Property offenses | 6,236 | 4,800 | 4,030 | 2,972 | 1,768 | 2,312 | 19.4 | -62.9 | 30.8 |
| Burglary | 2,671 | 1,946 | 1,536 | 1,163 | 539 | 681 | 5.7 | -74.5 | 26.3 |
| Theft | 1,588 | 1,300 | 1,203 | 831 | 621 | 903 | 7.6 | -43.1 | 45.4 |
| Motor vehicle theft | 1,722 | 1,373 | 1,156 | 898 | 539 | 625 | 5.3 | -63.7 | 16.0 |
| Forgery, checks, access cards | 55 | 34 | 46 | 22 | 21 | 26 | 0.2 | -52.7 | - |
| Arson | 200 | 147 | 89 | 58 | 48 | 77 | 0.6 | -61.5 | - |
| Drug offenses | 676 | 487 | 426 | 317 | 229 | 276 | 2.3 | -59.2 | 20.5 |
| Narcotics | 246 | 174 | 149 | 148 | 109 | 154 | 1.3 | -37.4 | 41.3 |
| Marijuana | 179 | 128 | 91 | 43 | 30 | 24 | 0.2 | -86.6 | - |
| Dangerous drugs | 240 | 180 | 178 | 124 | 89 | 96 | 0.8 | -60.0 | 7.9 |
| Other | 11 | 5 | 8 | 2 | 1 | 2 | 0.0 | - | - |
| Sex offenses | 623 | 512 | 472 | 294 | 249 | 294 | 2.5 | -52.8 | 18.1 |
| Lewd or lascivious | 309 | 280 | 282 | 173 | 138 | 162 | 1.4 | -47.6 | 17.4 |
| Other | 314 | 232 | 190 | 121 | 111 | 132 | 1.1 | -58.0 | 18.9 |
| All other | 4,547 | 4,146 | 4,231 | 3,034 | 2,905 | 3,758 | 31.6 | -17.4 | 29.4 |
| Weapons | 1,810 | 1,612 | 1,728 | 1,315 | 1,541 | 2,074 | 17.4 | 14.6 | 34.6 |
| Driving under the influence | 34 | 33 | 35 | 30 | 19 | 40 | 0.3 | - | - |
| Hit-and-run | 40 | 44 | 44 | 26 | 20 | 24 | 0.2 | - | - |
| Escape | 7 | 11 | 7 | 3 | 2 | 4 | 0.0 | - | - |
| Other | 2,656 | 2,446 | 2,417 | 1,660 | 1,323 | 1,616 | 13.6 | -39.2 | 22.1 |
| **Law enforcement disposition[2]** | | | | | | | | | |
| Released | 1,484 | 1,079 | 1,119 | 955 | 1,067 | 2,096 | 17.6 | 41.2 | 96.4 |
| Turned over to other agency | 341 | 388 | 659 | 317 | 582 | 2,065 | 17.4 | 505.6 | 254.8 |
| Complaint sought | 17,548 | 15,798 | 14,510 | 10,060 | 7,483 | 7,741 | 65.0 | -55.9 | -3.4 |

Notes: Percentages may not add to subtotals because of rounding.
Dash indicates that a percent change is not calculated when the base number is less than 50.
Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape committed by juveniles consist of 93 reported under this current definition (SRS) and 54 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] Starting in 2021, there was an increase in the Turned Over to Other Agency and decrease in the Complaint Sought dispositions. This was due to a record management system issue affecting several large agencies that caused no Complaint Sought dispositions to be reported in IBR.

Exhibit 43
DX0426

Table 25
**MISDEMEANOR ARRESTS, 2017-2022**
By Offense

| Offense | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total............................ | 784,229 | 100.0 | 784,245 | 100.0 | 758,056 | 100.0 | 577,586 | 100.0 | 524,737 | 100.0 | 511,566 | 100.0 |
| Assault and battery.......... | 80,700 | 10.3 | 82,057 | 10.5 | 81,095 | 10.7 | 69,305 | 12.0 | 64,243 | 12.2 | 72,366 | 14.1 |
| Petty theft...................... | 34,831 | 4.4 | 30,358 | 3.9 | 28,887 | 3.8 | 18,427 | 3.2 | 13,569 | 2.6 | 16,660 | 3.3 |
| Drug offenses................. | 183,649 | 23.4 | 191,706 | 24.4 | 193,095 | 25.5 | 161,625 | 28.0 | 132,801 | 25.3 | 130,105 | 25.4 |
| Drunk............................. | 63,752 | 8.1 | 58,697 | 7.5 | 55,601 | 7.3 | 36,098 | 6.2 | 33,937 | 6.5 | 34,126 | 6.7 |
| Driving under the influence...... | 119,354 | 15.2 | 123,253 | 15.7 | 119,975 | 15.8 | 92,048 | 15.9 | 105,338 | 20.1 | 100,372 | 19.6 |
| All other........................ | 301,943 | 38.5 | 298,174 | 38.0 | 279,403 | 36.9 | 200,083 | 34.6 | 174,849 | 33.3 | 157,937 | 30.9 |

Note: Percentages may not add to 100.0 because of rounding.

Exhibit 43
DX0427

Table 26
**MISDEMEANOR ARRESTS, 2017-2022**
By Offense for Adult and Juvenile Arrests

| Offense | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| **Total** | | | | | | | | | | | | |
| Total.............. | 784,229 | 100.0 | 784,245 | 100.0 | 758,056 | 100.0 | 577,586 | 100.0 | 524,737 | 100.0 | 511,566 | 100.0 |
| **Adult and juvenile arrests** | | | | | | | | | | | | |
| Adult........................ | 754,183 | 96.2 | 760,022 | 96.9 | 735,220 | 97.0 | 565,656 | 97.9 | 515,729 | 98.3 | 498,608 | 97.5 |
| Juvenile..................... | 30,046 | 3.8 | 24,223 | 3.1 | 22,836 | 3.0 | 11,930 | 2.1 | 9,008 | 1.7 | 12,958 | 2.5 |
| **Offense for adult and juvenile arrests** | | | | | | | | | | | | |
| Assault and battery............. | 80,700 | 100.0 | 82,057 | 100.0 | 81,095 | 100.0 | 69,305 | 100.0 | 64,243 | 100.0 | 72,366 | 100.0 |
| Adult........................ | 72,145 | 89.4 | 74,008 | 90.2 | 73,309 | 90.4 | 65,367 | 94.3 | 60,845 | 94.7 | 66,967 | 92.5 |
| Juvenile..................... | 8,555 | 10.6 | 8,049 | 9.8 | 7,786 | 9.6 | 3,938 | 5.7 | 3,398 | 5.3 | 5,399 | 7.5 |
| Petty theft.................... | 34,831 | 100.0 | 30,358 | 100.0 | 28,887 | 100.0 | 18,427 | 100.0 | 13,569 | 100.0 | 16,660 | 100.0 |
| Adult........................ | 30,791 | 88.4 | 27,821 | 91.6 | 26,415 | 91.4 | 17,489 | 94.9 | 13,089 | 96.5 | 15,604 | 93.7 |
| Juvenile..................... | 4,040 | 11.6 | 2,537 | 8.4 | 2,472 | 8.6 | 938 | 5.1 | 480 | 3.5 | 1,056 | 6.3 |
| Drug offenses................. | 183,649 | 100.0 | 191,706 | 100.0 | 193,095 | 100.0 | 161,625 | 100.0 | 132,801 | 100.0 | 130,105 | 100.0 |
| Adult........................ | 180,458 | 98.3 | 189,217 | 98.7 | 190,958 | 98.9 | 160,752 | 99.5 | 132,197 | 99.5 | 129,387 | 99.4 |
| Juvenile..................... | 3,191 | 1.7 | 2,489 | 1.3 | 2,137 | 1.1 | 873 | 0.5 | 604 | 0.5 | 718 | 0.6 |
| Drunk........................ | 63,752 | 100.0 | 58,697 | 100.0 | 55,601 | 100.0 | 36,098 | 100.0 | 33,937 | 100.0 | 34,126 | 100.0 |
| Adult........................ | 63,047 | 98.9 | 58,173 | 99.1 | 55,137 | 99.2 | 35,826 | 99.2 | 33,741 | 99.4 | 33,860 | 99.2 |
| Juvenile..................... | 705 | 1.1 | 524 | 0.9 | 464 | 0.8 | 272 | 0.8 | 196 | 0.6 | 266 | 0.8 |
| Driving under the influence......... | 119,354 | 100.0 | 123,253 | 100.0 | 119,975 | 100.0 | 92,048 | 100.0 | 105,338 | 100.0 | 100,372 | 100.0 |
| Adult........................ | 118,927 | 99.6 | 122,807 | 99.6 | 119,526 | 99.6 | 91,637 | 99.6 | 105,028 | 99.7 | 99,936 | 99.6 |
| Juvenile..................... | 427 | 0.4 | 446 | 0.4 | 449 | 0.4 | 411 | 0.4 | 310 | 0.3 | 436 | 0.4 |
| All other..................... | 301,943 | 100.0 | 298,174 | 100.0 | 279,403 | 100.0 | 200,083 | 100.0 | 174,849 | 100.0 | 157,937 | 100.0 |
| Adult........................ | 288,815 | 95.7 | 287,996 | 96.6 | 269,875 | 96.6 | 194,585 | 97.3 | 170,829 | 97.7 | 152,854 | 96.8 |
| Juvenile..................... | 13,128 | 4.3 | 10,178 | 3.4 | 9,528 | 3.4 | 5,498 | 2.7 | 4,020 | 2.3 | 5,083 | 3.2 |

Exhibit 43
DX0428

Table 27
**MISDEMEANOR ARRESTS, 2017-2022**
Number, Rate per 100,000 Population at Risk, and Percent Change

| Year(s) | Total | | | Assault and battery | | | Petty theft | | | Drug offenses | | | Drunk | | | Driving under the influence | | | All other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile | Total | Adult | Juvenile |
| **Number** | | | | | | | | | | | | | | | | | | | | | |
| 2022 | 511,566 | 498,608 | 12,958 | 72,366 | 66,967 | 5,399 | 16,660 | 15,604 | 1,056 | 130,105 | 129,387 | 718 | 34,126 | 33,860 | 266 | 100,372 | 99,936 | 436 | 157,937 | 152,854 | 5,083 |
| 2021 | 524,737 | 515,729 | 9,008 | 64,243 | 60,845 | 3,398 | 13,569 | 13,089 | 480 | 132,801 | 132,197 | 604 | 33,937 | 33,741 | 196 | 105,338 | 105,028 | 310 | 174,849 | 170,829 | 4,020 |
| 2020 | 577,586 | 565,656 | 11,930 | 69,305 | 65,367 | 3,938 | 18,427 | 17,489 | 938 | 161,625 | 160,752 | 873 | 36,098 | 35,826 | 272 | 92,048 | 91,637 | 411 | 200,083 | 194,585 | 5,498 |
| 2019 | 758,056 | 735,220 | 22,836 | 81,095 | 73,309 | 7,786 | 28,887 | 26,415 | 2,472 | 193,095 | 190,958 | 2,137 | 55,601 | 55,137 | 464 | 119,975 | 119,526 | 449 | 279,403 | 269,875 | 9,528 |
| 2018 | 784,245 | 760,022 | 24,223 | 82,057 | 74,008 | 8,049 | 30,358 | 27,821 | 2,537 | 191,706 | 189,217 | 2,489 | 58,697 | 58,173 | 524 | 123,253 | 122,807 | 446 | 298,174 | 287,996 | 10,178 |
| 2017 | 784,229 | 754,183 | 30,046 | 80,700 | 72,145 | 8,555 | 34,831 | 30,791 | 4,040 | 183,649 | 180,458 | 3,191 | 63,752 | 63,047 | 705 | 119,354 | 118,927 | 427 | 301,943 | 288,815 | 13,128 |
| **Percent change in number** | | | | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | -2.5 | -3.3 | 43.8 | 12.6 | 10.1 | 58.9 | 22.8 | 19.2 | 120.0 | -2.0 | -2.1 | 18.9 | 0.6 | 0.4 | 35.7 | -4.7 | -4.8 | 40.6 | -9.7 | -10.5 | 26.4 |
| 2020 to 2021 | -9.1 | -8.8 | -24.5 | -7.3 | -6.9 | -13.7 | -26.4 | -25.2 | -48.8 | -17.8 | -17.8 | -30.8 | -6.0 | -5.8 | -27.9 | 14.4 | 14.6 | -24.6 | -12.6 | -12.2 | -26.9 |
| 2019 to 2020 | -23.8 | -23.1 | -47.8 | -14.5 | -10.8 | -49.4 | -36.2 | -33.8 | -62.1 | -16.3 | -15.8 | -59.1 | -35.1 | -35.0 | -41.4 | -23.3 | -23.3 | -8.5 | -28.4 | -27.9 | -42.3 |
| 2018 to 2019 | -3.3 | -3.3 | -5.7 | -1.2 | -0.9 | -3.3 | -4.8 | -5.1 | -2.6 | 0.7 | 0.9 | -14.1 | -5.3 | -5.2 | -11.5 | -2.7 | -2.7 | 0.7 | -6.3 | -6.3 | -6.4 |
| 2017 to 2018 | 0.0 | 0.8 | -19.4 | -1.2 | 2.6 | -5.9 | -12.8 | -9.6 | -37.2 | 4.4 | 4.9 | -22.0 | -7.9 | -7.7 | -25.7 | 3.3 | 3.3 | 4.4 | -1.2 | -0.3 | -22.5 |
| 2017 to 2022 | -34.8 | -33.9 | -56.9 | -10.3 | -7.2 | -36.9 | -52.2 | -49.3 | -73.9 | -29.2 | -28.3 | -77.5 | -46.5 | -46.3 | -62.3 | -15.9 | -16.0 | 2.1 | -47.7 | -47.1 | -61.3 |
| **Rate per 100,000 population at risk[1]** | | | | | | | | | | | | | | | | | | | | | |
| 2022 | 1,660.9 | 1,873.4 | 309.5 | 234.9 | 251.6 | 129.0 | 54.1 | 58.6 | 25.2 | 422.4 | 486.1 | 17.2 | 110.8 | 127.2 | 6.4 | 325.9 | 375.5 | 10.4 | 512.8 | 574.3 | 121.4 |
| 2021 | 1,725.0 | 1,966.8 | 214.6 | 211.2 | 232.0 | 81.0 | 44.6 | 49.9 | 11.4 | 436.6 | 504.1 | 14.4 | 111.6 | 128.7 | 4.7 | 346.3 | 400.5 | 7.4 | 574.8 | 651.5 | 95.8 |
| 2020 | 1,903.0 | 2,161.6 | 285.1 | 228.3 | 249.8 | 94.1 | 60.7 | 66.8 | 22.4 | 532.5 | 614.3 | 20.9 | 118.9 | 136.9 | 6.5 | 303.3 | 350.2 | 9.8 | 659.2 | 743.6 | 131.4 |
| 2019 | 2,449.4 | 2,742.6 | 551.4 | 262.0 | 273.5 | 188.0 | 93.3 | 98.5 | 59.7 | 623.9 | 712.3 | 51.6 | 179.7 | 205.7 | 11.2 | 387.7 | 445.9 | 10.8 | 902.8 | 1,006.7 | 230.0 |
| 2018 | 2,534.1 | 2,844.6 | 572.7 | 265.1 | 277.0 | 190.3 | 98.1 | 104.1 | 60.0 | 619.4 | 708.2 | 58.8 | 189.7 | 217.7 | 12.4 | 398.3 | 459.6 | 10.5 | 963.5 | 1,077.9 | 240.6 |
| 2017 | 2,548.5 | 2,838.9 | 714.4 | 262.3 | 271.6 | 203.4 | 113.2 | 115.9 | 96.1 | 596.8 | 679.3 | 75.9 | 207.2 | 237.3 | 16.8 | 387.9 | 447.7 | 10.2 | 981.2 | 1,087.2 | 312.1 |
| **Percent change in rate** | | | | | | | | | | | | | | | | | | | | | |
| 2021 to 2022 | -3.7 | -4.7 | 44.2 | 11.2 | 8.4 | 59.3 | 21.3 | 17.4 | 121.1 | -3.3 | -3.6 | 19.4 | -0.7 | -1.2 | 36.2 | -5.9 | -6.2 | 40.5 | -10.8 | -11.8 | 26.7 |
| 2020 to 2021 | -9.4 | -9.0 | -24.7 | -7.1 | -7.1 | -13.9 | -26.5 | -25.3 | -49.1 | -18.0 | -17.9 | -31.1 | -6.1 | -6.0 | -27.1 | 14.2 | 14.4 | -24.5 | -12.8 | -12.4 | -27.1 |
| 2019 to 2020 | -22.3 | -21.2 | -48.3 | -12.9 | -8.7 | -49.9 | -34.9 | -32.2 | -62.5 | -14.6 | -13.8 | -59.5 | -33.8 | -33.4 | -42.0 | -21.8 | -21.5 | -9.3 | -27.0 | -26.1 | -42.9 |
| 2018 to 2019 | -3.3 | -3.6 | -3.7 | -1.2 | -1.3 | -1.1 | -4.9 | -5.4 | -0.5 | 0.7 | 0.6 | -12.2 | -5.3 | -5.5 | -8.3 | -2.7 | -3.0 | 2.9 | -6.3 | -6.6 | -4.4 |
| 2017 to 2018 | -0.6 | 0.2 | -19.8 | 1.1 | 2.0 | -6.4 | -13.3 | -10.2 | -37.6 | 3.8 | 4.3 | -22.5 | -8.4 | -8.3 | -26.2 | 2.7 | 2.7 | 2.9 | -1.8 | -0.9 | -22.9 |
| 2017 to 2022 | -34.8 | -34.0 | -56.7 | -10.4 | -7.4 | -36.6 | -52.2 | -49.4 | -73.8 | -29.2 | -28.4 | -77.3 | -46.5 | -46.4 | -61.9 | -16.0 | -16.1 | 2.0 | -47.7 | -47.2 | -61.1 |

[1] Rates are based on the population at risk for each year. The categories are total (10-69 years of age), adult (18-69 years of age), and juvenile (10-17 years of age) (see Table 53).

Exhibit 43
DX0429

Table 28
ADULT MISDEMEANOR ARRESTS, 2017-2022
By Offense and Law Enforcement Disposition

| Offense and law enforcement disposition | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Number | Percent | 2017-2022 | 2021-2022 |
| Total.......................... | 754,183 | 760,022 | 735,220 | 565,656 | 515,729 | 498,608 | 100.0 | -33.9 | -3.3 |
| **Total** | | | | | | | | | |
| **Offense** | | | | | | | | | |
| Assault and battery............ | 72,145 | 74,008 | 73,309 | 65,367 | 60,845 | 66,967 | 13.4 | -7.2 | 10.1 |
| Burglary...................... | 14,280 | 13,496 | 13,377 | 7,289 | 5,575 | 6,960 | 1.4 | -51.3 | 24.8 |
| Petty theft................... | 30,791 | 27,821 | 26,415 | 17,489 | 13,089 | 15,604 | 3.1 | -49.3 | 19.2 |
| Checks and access cards....... | 1,073 | 1,003 | 965 | 892 | 817 | 521 | 0.1 | -51.4 | -36.2 |
| Drug offenses................. | 180,458 | 189,217 | 190,958 | 160,752 | 132,197 | 129,387 | 25.9 | -28.3 | -2.1 |
| Indecent exposure............. | 1,455 | 1,593 | 1,440 | 1,304 | 1,123 | 1,128 | 0.2 | -22.5 | 0.4 |
| Annoying children............. | 428 | 435 | 338 | 326 | 274 | 306 | 0.1 | -28.5 | 11.7 |
| Obscene matter................ | 47 | 47 | 34 | 37 | 41 | 28 | 0.0 | - | - |
| Lewd conduct.................. | 1,117 | 1,077 | 1,165 | 811 | 644 | 630 | 0.1 | -43.6 | -2.2 |
| Prostitution.................. | 6,751 | 6,071 | 5,502 | 4,228 | 4,490 | 3,936 | 0.8 | -41.7 | -12.3 |
| Drunk......................... | 63,047 | 58,173 | 55,137 | 35,826 | 33,741 | 33,860 | 6.8 | -46.3 | 0.4 |
| Liquor laws................... | 6,068 | 5,052 | 4,573 | 2,315 | 2,543 | 1,806 | 0.4 | -70.2 | -29.0 |
| Disorderly conduct............ | 6,788 | 7,206 | 4,742 | 3,288 | 2,128 | 1,889 | 0.4 | -72.2 | -11.2 |
| Disturbing the peace.......... | 2,364 | 2,469 | 2,433 | 2,319 | 1,873 | 1,644 | 0.3 | -30.5 | -12.2 |
| Vandalism..................... | 7,472 | 6,974 | 6,749 | 6,959 | 6,491 | 6,087 | 1.2 | -18.5 | -6.2 |
| Trespassing................... | 25,271 | 27,854 | 28,582 | 23,050 | 21,395 | 20,558 | 4.1 | -18.6 | -3.9 |
| Weapons....................... | 4,941 | 4,704 | 4,509 | 4,413 | 4,722 | 4,555 | 0.9 | -7.8 | -3.5 |
| Driving under the influence... | 118,927 | 122,807 | 119,526 | 91,637 | 105,028 | 99,936 | 20.0 | -16.0 | -4.8 |
| Hit-and-run................... | 5,501 | 5,271 | 4,937 | 4,155 | 3,816 | 1,266 | 0.3 | -77.0 | -66.8 |
| Selected traffic violations... | 7,721 | 7,602 | 6,770 | 7,086 | 5,259 | 2,791 | 0.6 | -63.9 | -46.9 |
| Gambling...................... | 271 | 341 | 497 | 614 | 698 | 289 | 0.1 | 6.6 | -58.6 |
| Nonsupport.................... | 46 | 59 | 50 | 39 | 37 | 30 | 0.0 | - | - |
| All other..................... | 197,221 | 196,742 | 183,212 | 125,460 | 108,903 | 98,430 | 19.7 | -50.1 | -9.6 |
| **Law enforcement disposition[1]** | | | | | | | | | |
| Released...................... | 30,742 | 32,786 | 34,772 | 28,661 | 30,200 | 42,337 | 8.5 | 37.7 | 40.2 |
| Turned over to other agency... | 9,341 | 11,697 | 11,045 | 5,878 | 35,209 | 94,480 | 18.9 | 911.5 | 168.3 |
| Complaint sought.............. | 714,100 | 715,539 | 689,403 | 531,117 | 450,320 | 361,791 | 72.6 | -49.3 | -19.7 |

Notes: Percentages may not add to 100.0 because of rounding.
    Dash indicates that a percent change is not calculated when the base number is less than 50.
[1] Starting in 2021, there was an increase in the Turned Over to Other Agency and decrease in the Complaint Sought dispositions. This was due to a record management system issue affecting several large agencies that caused no Complaint Sought dispositions to be reported in IBR.

Exhibit 43
DX0430

Table 29
## JUVENILE MISDEMEANOR AND STATUS OFFENSE ARRESTS, 2017-2022
By Level of Offense, Offense, and Law Enforcement Disposition

| Offense and law enforcement disposition | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 36,876 | 29,158 | 26,893 | 14,378 | 10,223 | 14,098 | 100.0 | -61.8 | 37.9 |
| **Offense** | | | | | | | | | |
| Assault and battery | 8,555 | 8,049 | 7,786 | 3,938 | 3,398 | 5,399 | 38.3 | -36.9 | 58.9 |
| Burglary | 1,407 | 924 | 933 | 405 | 212 | 537 | 3.8 | -61.8 | 153.3 |
| Petty theft | 4,040 | 2,537 | 2,472 | 938 | 480 | 1,056 | 7.5 | -73.9 | 120.0 |
| Checks and access cards | 42 | 26 | 29 | 15 | 19 | 14 | 0.1 | - | - |
| Drug offenses | 3,191 | 2,489 | 2,137 | 873 | 604 | 718 | 5.1 | -77.5 | 18.9 |
| Indecent exposure | 42 | 33 | 23 | 15 | 9 | 9 | 0.1 | - | - |
| Annoying children | 83 | 67 | 78 | 31 | 24 | 62 | 0.4 | -25.3 | - |
| Obscene matter | 83 | 35 | 64 | 26 | 13 | 34 | 0.2 | -59.0 | - |
| Lewd conduct | 113 | 64 | 72 | 25 | 16 | 44 | 0.3 | -61.1 | - |
| Prostitution | 14 | 8 | 16 | 5 | 5 | 10 | 0.1 | - | - |
| Drunk | 705 | 524 | 464 | 272 | 196 | 266 | 1.9 | -62.3 | 35.7 |
| Liquor laws | 1,140 | 934 | 848 | 448 | 377 | 456 | 3.2 | -60.0 | 21.0 |
| Disorderly conduct | 107 | 88 | 68 | 33 | 27 | 34 | 0.2 | -68.2 | - |
| Disturbing the peace | 1,198 | 1,007 | 1,083 | 361 | 301 | 417 | 3.0 | -65.2 | 38.5 |
| Vandalism | 1,655 | 1,166 | 1,281 | 852 | 656 | 812 | 5.8 | -50.9 | 23.8 |
| Trespassing | 988 | 705 | 565 | 518 | 329 | 338 | 2.4 | -65.8 | 2.7 |
| Weapons | 1,276 | 1,138 | 1,005 | 416 | 519 | 775 | 5.5 | -39.3 | 49.3 |
| Driving under the influence | 427 | 446 | 449 | 411 | 310 | 436 | 3.1 | 2.1 | 40.6 |
| Hit-and-run | 212 | 225 | 190 | 121 | 111 | 35 | 0.2 | -83.5 | -68.5 |
| Selected traffic violations | 294 | 239 | 223 | 278 | 237 | 138 | 1.0 | -53.1 | -41.8 |
| Joy riding | 42 | 28 | 40 | 34 | 13 | 22 | 0.2 | - | - |
| Gambling | 11 | 8 | 9 | 1 | 3 | 2 | 0.0 | - | - |
| Glue sniffing | 30 | 38 | 44 | 45 | 34 | 101 | 0.7 | - | - |
| All other | 4,391 | 3,445 | 2,957 | 1,869 | 1,115 | 1,243 | 8.8 | -71.7 | 11.5 |
| Status offenses[1] | 6,830 | 4,935 | 4,057 | 2,448 | 1,215 | 1,140 | 8.1 | -83.3 | -6.2 |
| **Law enforcement disposition[2]** | | | | | | | | | |
| Released | 8,859 | 6,555 | 5,516 | 3,043 | 2,028 | 3,251 | 23.1 | -63.3 | 60.3 |
| Turned over to other agency | 513 | 527 | 717 | 351 | 729 | 2,336 | 16.6 | 355.4 | 220.4 |
| Complaint sought | 27,504 | 22,076 | 20,660 | 10,984 | 7,466 | 8,511 | 60.4 | -69.1 | 14.0 |

Notes: Percentages may not add to 100.0 because of rounding.
  Dash indicates that a percent change is not calculated when the base number is less than 50.

[a] Total arrest and complaint sought law enforcement disposition counts for 2021 will not match previously published data.

[1] Status offenses include truancy, incorrigibility, running away, and curfew violations. These offenses can only be committed or engaged in by a juvenile.

[2] Starting in 2021, there was an increase in the Turned Over to Other Agency and decrease in the Complaint Sought dispositions. This was due to a record management system issue affecting several large agencies that caused no Complaint Sought dispositions to be reported in IBR.

Exhibit 43
DX0431

Table 30
**FELONY AND MISDEMEANOR ARRESTS, 2022**
Gender, Age, and Race/Ethnic Group of Arrestee

| Gender, age, and race/ethnic group | Total | | Felony | | Misdemeanor | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total.................. | 779,748 | 100.0 | 268,182 | 34.4 | 511,566 | 65.6 |
| **Gender**[1] | | | | | | |
| Male....................... | 606,365 | 77.8 | 215,145 | 35.5 | 391,220 | 64.5 |
| Female.................... | 173,383 | 22.2 | 53,037 | 30.6 | 120,346 | 69.4 |
| **Age** | | | | | | |
| Under 18................. | 24,860 | 3.2 | 11,902 | 47.9 | 12,958 | 52.1 |
| 18-29..................... | 238,756 | 30.6 | 88,149 | 36.9 | 150,607 | 63.1 |
| 18-19..................... | 21,946 | 2.8 | 10,216 | 46.6 | 11,730 | 53.4 |
| 20-29..................... | 216,810 | 27.8 | 77,933 | 35.9 | 138,877 | 64.1 |
| 30 and over............. | 516,132 | 66.2 | 168,131 | 32.6 | 348,001 | 67.4 |
| **Race/ethnic group** | | | | | | |
| White...................... | 256,277 | 32.9 | 76,413 | 29.8 | 179,864 | 70.2 |
| Hispanic.................. | 350,030 | 44.9 | 120,070 | 34.3 | 229,960 | 65.7 |
| Black...................... | 122,136 | 15.7 | 54,637 | 44.7 | 67,499 | 55.3 |
| Other...................... | 51,305 | 6.6 | 17,062 | 33.3 | 34,243 | 66.7 |
| American Indian...... | 4,271 | 0.5 | 1,482 | 34.7 | 2,789 | 65.3 |
| Asian Indian............ | 3,027 | 0.4 | 901 | 29.8 | 2,126 | 70.2 |
| Cambodian.............. | 272 | 0.0 | 105 | 38.6 | 167 | 61.4 |
| Chinese................... | 1,984 | 0.3 | 738 | 37.2 | 1,246 | 62.8 |
| Filipino................... | 2,852 | 0.4 | 963 | 33.8 | 1,889 | 66.2 |
| Japanese.................. | 247 | 0.0 | 70 | 28.3 | 177 | 71.7 |
| Korean.................... | 476 | 0.1 | 143 | 30.0 | 333 | 70.0 |
| Laotian.................... | 381 | 0.0 | 166 | 43.6 | 215 | 56.4 |
| Vietnamese.............. | 1,819 | 0.2 | 662 | 36.4 | 1,157 | 63.6 |
| Other Asian............. | 10,294 | 1.3 | 3,532 | 34.3 | 6,762 | 65.7 |
| Guamanian.............. | 124 | 0.0 | 51 | 41.1 | 73 | 58.9 |
| Hawaiian................. | 1,070 | 0.1 | 359 | 33.6 | 711 | 66.4 |
| Pacific Islander........ | 1,862 | 0.2 | 755 | 40.5 | 1,107 | 59.5 |
| Samoan................... | 593 | 0.1 | 228 | 38.4 | 365 | 61.6 |
| Other...................... | 22,033 | 2.8 | 6,907 | 31.3 | 15,126 | 68.7 |

Note: Percentages may not add to subtotals because of rounding.

[1] California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender.
The 2022 arrest numbers include 68 transgender (identifying as male) and 198 transgender (identifying as female) in the male
and female gender categories, respectively.  Arrest numbers for the non-binary gender category are not included in this table
due to the small population size.  Caution should be used when comparing gender data to prior years.  For additional information,
including the expanded gender category numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0432

Table 31
**FELONY ARRESTS, 2022**
Category and Offense by Gender and Race/Ethnic Group of Arrestee

| Category and offense | Total | Number | | | | | | Percent | | | | | | |
| | | Gender[1] | | Race/ethnic group | | | | Total | Gender | | Race/ethnic group | | | |
| | | Male | Female | White | Hispanic | Black | Other | | Male | Female | White | Hispanic | Black | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 268,182 | 215,145 | 53,037 | 76,413 | 120,070 | 54,637 | 17,062 | 100.0 | 80.2 | 19.8 | 28.5 | 44.8 | 20.4 | 6.4 |
| Violent offenses | 98,115 | 75,961 | 22,154 | 24,963 | 43,864 | 22,309 | 6,979 | 100.0 | 77.4 | 22.6 | 25.4 | 44.7 | 22.7 | 7.1 |
| Homicide | 1,485 | 1,323 | 162 | 273 | 688 | 447 | 77 | 100.0 | 89.1 | 10.9 | 18.4 | 46.3 | 30.1 | 5.2 |
| Rape[2] | 1,890 | 1,854 | 36 | 389 | 1,048 | 293 | 160 | 100.0 | 98.1 | 1.9 | 20.6 | 55.4 | 15.5 | 8.5 |
| Robbery | 13,187 | 10,850 | 2,337 | 2,632 | 5,376 | 4,567 | 612 | 100.0 | 82.3 | 17.7 | 20.0 | 40.8 | 34.6 | 4.6 |
| Assault | 80,044 | 60,605 | 19,439 | 21,360 | 36,010 | 16,660 | 6,014 | 100.0 | 75.7 | 24.3 | 26.7 | 45.0 | 20.8 | 7.5 |
| Kidnapping | 1,509 | 1,329 | 180 | 309 | 742 | 342 | 116 | 100.0 | 88.1 | 11.9 | 20.5 | 49.2 | 22.7 | 7.7 |
| Property offenses | 62,131 | 47,630 | 14,501 | 19,208 | 27,975 | 11,211 | 3,737 | 100.0 | 76.7 | 23.3 | 30.9 | 45.0 | 18.0 | 6.0 |
| Burglary | 16,833 | 13,533 | 3,300 | 5,459 | 6,918 | 3,499 | 957 | 100.0 | 80.4 | 19.6 | 32.4 | 41.1 | 20.8 | 5.7 |
| Theft | 27,574 | 20,599 | 6,975 | 8,913 | 12,108 | 4,735 | 1,818 | 100.0 | 74.7 | 25.3 | 32.3 | 43.9 | 17.2 | 6.6 |
| Motor vehicle theft | 13,916 | 10,723 | 3,193 | 3,422 | 7,424 | 2,399 | 671 | 100.0 | 77.1 | 22.9 | 24.6 | 53.3 | 17.2 | 4.8 |
| Forgery, checks, access cards | 1,900 | 1,304 | 596 | 687 | 778 | 273 | 162 | 100.0 | 68.6 | 31.4 | 36.2 | 40.9 | 14.4 | 8.5 |
| Arson | 1,908 | 1,471 | 437 | 727 | 747 | 305 | 129 | 100.0 | 77.1 | 22.9 | 38.1 | 39.2 | 16.0 | 6.8 |
| Drug offenses | 20,574 | 17,260 | 3,314 | 7,310 | 9,419 | 2,549 | 1,296 | 100.0 | 83.9 | 16.1 | 35.5 | 45.8 | 12.4 | 6.3 |
| Narcotics | 7,584 | 6,256 | 1,328 | 2,988 | 3,172 | 947 | 477 | 100.0 | 82.5 | 17.5 | 39.4 | 41.8 | 12.5 | 6.3 |
| Marijuana | 691 | 618 | 73 | 140 | 347 | 112 | 92 | 100.0 | 89.4 | 10.6 | 20.3 | 50.2 | 16.2 | 13.3 |
| Dangerous drugs | 11,637 | 9,883 | 1,754 | 3,987 | 5,583 | 1,423 | 644 | 100.0 | 84.9 | 15.1 | 34.3 | 48.0 | 12.2 | 5.5 |
| Other | 662 | 503 | 159 | 195 | 317 | 67 | 83 | 100.0 | 76.0 | 24.0 | 29.5 | 47.9 | 10.1 | 12.5 |
| Sex offenses | 4,643 | 4,496 | 147 | 1,340 | 2,105 | 866 | 332 | 100.0 | 96.8 | 3.2 | 28.9 | 45.3 | 18.7 | 7.2 |
| Lewd or lascivious | 1,491 | 1,453 | 38 | 281 | 999 | 113 | 98 | 100.0 | 97.5 | 2.5 | 18.8 | 67.0 | 7.6 | 6.6 |
| Other | 3,152 | 3,043 | 109 | 1,059 | 1,106 | 753 | 234 | 100.0 | 96.5 | 3.5 | 33.6 | 35.1 | 23.9 | 7.4 |
| Driving offenses | 5,467 | 4,262 | 1,205 | 1,482 | 3,033 | 553 | 399 | 100.0 | 78.0 | 22.0 | 27.1 | 55.5 | 10.1 | 7.3 |
| Driving under the influence | 4,587 | 3,558 | 1,029 | 1,254 | 2,575 | 432 | 326 | 100.0 | 77.6 | 22.4 | 27.3 | 56.1 | 9.4 | 7.1 |
| Hit-and-run | 880 | 704 | 176 | 228 | 458 | 121 | 73 | 100.0 | 80.0 | 20.0 | 25.9 | 52.0 | 13.8 | 8.3 |
| All other | 77,252 | 65,536 | 11,716 | 22,110 | 33,674 | 17,149 | 4,319 | 100.0 | 84.8 | 15.2 | 28.6 | 43.6 | 22.2 | 5.6 |
| Weapons | 25,941 | 23,851 | 2,090 | 5,164 | 12,143 | 7,384 | 1,250 | 100.0 | 91.9 | 8.1 | 19.9 | 46.8 | 28.5 | 4.8 |
| Escape | 271 | 226 | 45 | 95 | 124 | 46 | 6 | 100.0 | 83.4 | 16.6 | 35.1 | 45.8 | 17.0 | 2.2 |
| Other | 51,040 | 41,459 | 9,581 | 16,851 | 21,407 | 9,719 | 3,063 | 100.0 | 81.2 | 18.8 | 33.0 | 41.9 | 19.0 | 6.0 |

Note: Percentages may not add to 100.0 because of rounding.

[1] California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The 2022 arrest numbers include 23 transgender (identifying as male) and 57 transgender (identifying as female) in the male and female gender categories, respectively. Arrest numbers for the non-binary gender category are not included in this table due to the small population size. Caution should be used when comparing gender data to prior years. For additional information, including the expanded gender category numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[2] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 1,299 reported under the current definition (SRS) and 591 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0433

Table 32
FELONY ARRESTS, 2022
Category and Offense by Age Group of Arrestee

| Category and offense | Number | | | | | | Percent | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Under 18 | 18-19 | 20-29 | 30-39 | 40 and over | Total | Under 18 | 18-19 | 20-29 | 30-39 | 40 and over |
| Total.................. | 268,182 | 11,902 | 10,216 | 77,933 | 89,437 | 78,694 | 100.0 | 4.4 | 3.8 | 29.1 | 33.3 | 29.3 |
| Violent offenses.............. | 98,115 | 5,262 | 3,884 | 29,398 | 30,806 | 28,765 | 100.0 | 5.4 | 4.0 | 30.0 | 31.4 | 29.3 |
| Homicide.................. | 1,485 | 94 | 132 | 543 | 389 | 327 | 100.0 | 6.3 | 8.9 | 36.6 | 26.2 | 22.0 |
| Rape¹ | 1,890 | 147 | 88 | 496 | 523 | 636 | 100.0 | 7.8 | 4.7 | 26.2 | 27.7 | 33.7 |
| Robbery................... | 13,187 | 1,846 | 1,055 | 4,195 | 3,741 | 2,350 | 100.0 | 14.0 | 8.0 | 31.8 | 28.4 | 17.8 |
| Assault................... | 80,044 | 3,131 | 2,545 | 23,583 | 25,668 | 25,117 | 100.0 | 3.9 | 3.2 | 29.5 | 32.1 | 31.4 |
| Kidnapping.............. | 1,509 | 44 | 64 | 581 | 485 | 335 | 100.0 | 2.9 | 4.2 | 38.5 | 32.1 | 22.2 |
| Property offenses.............. | 62,131 | 2,312 | 1,816 | 17,483 | 23,536 | 16,984 | 100.0 | 3.7 | 2.9 | 28.1 | 37.9 | 27.3 |
| Burglary.................. | 16,833 | 681 | 547 | 4,917 | 6,281 | 4,407 | 100.0 | 4.0 | 3.2 | 29.2 | 37.3 | 26.2 |
| Theft.................. | 27,574 | 903 | 835 | 7,606 | 10,475 | 7,755 | 100.0 | 3.3 | 3.0 | 27.6 | 38.0 | 28.1 |
| Motor vehicle theft.............. | 13,916 | 625 | 351 | 4,100 | 5,334 | 3,506 | 100.0 | 4.5 | 2.5 | 29.5 | 38.3 | 25.2 |
| Forgery, checks, access cards | 1,900 | 26 | 60 | 460 | 790 | 564 | 100.0 | 1.4 | 3.2 | 24.2 | 41.6 | 29.7 |
| Arson.................. | 1,908 | 77 | 23 | 400 | 656 | 752 | 100.0 | 4.0 | 1.2 | 21.0 | 34.4 | 39.4 |
| Drug offenses.............. | 20,574 | 276 | 545 | 5,506 | 6,776 | 7,471 | 100.0 | 1.3 | 2.6 | 26.8 | 32.9 | 36.3 |
| Narcotics.................. | 7,584 | 154 | 249 | 2,492 | 2,550 | 2,139 | 100.0 | 2.0 | 3.3 | 32.9 | 33.6 | 28.2 |
| Marijuana.................. | 691 | 24 | 50 | 221 | 195 | 201 | 100.0 | 3.5 | 7.2 | 32.0 | 28.2 | 29.1 |
| Dangerous drugs.............. | 11,637 | 96 | 229 | 2,572 | 3,827 | 4,913 | 100.0 | 0.8 | 2.0 | 22.1 | 32.9 | 42.2 |
| Other.................. | 662 | 2 | 17 | 221 | 204 | 218 | 100.0 | 0.3 | 2.6 | 33.4 | 30.8 | 32.9 |
| Sex offenses.............. | 4,643 | 294 | 145 | 985 | 1,094 | 2,125 | 100.0 | 6.3 | 3.1 | 21.2 | 23.6 | 45.8 |
| Lewd or lascivious.............. | 1,491 | 162 | 67 | 295 | 345 | 622 | 100.0 | 10.9 | 4.5 | 19.8 | 23.1 | 41.7 |
| Other.................. | 3,152 | 132 | 78 | 690 | 749 | 1,503 | 100.0 | 4.2 | 2.5 | 21.9 | 23.8 | 47.7 |
| Driving offenses.............. | 5,467 | 64 | 222 | 1,980 | 1,586 | 1,615 | 100.0 | 1.2 | 4.1 | 36.2 | 29.0 | 29.5 |
| Driving under the influence... | 4,587 | 40 | 163 | 1,708 | 1,322 | 1,354 | 100.0 | 0.9 | 3.6 | 37.2 | 28.8 | 29.5 |
| Hit-and-run... | 880 | 24 | 59 | 272 | 264 | 261 | 100.0 | 2.7 | 6.7 | 30.9 | 30.0 | 29.7 |
| All other.................. | 77,252 | 3,694 | 3,604 | 22,581 | 25,639 | 21,734 | 100.0 | 4.8 | 4.7 | 29.2 | 33.2 | 28.1 |
| Weapons.................. | 25,941 | 2,074 | 2,113 | 8,886 | 7,297 | 5,571 | 100.0 | 8.0 | 8.1 | 34.3 | 28.1 | 21.5 |
| Escape.................. | 271 | 4 | 6 | 79 | 107 | 75 | 100.0 | 1.5 | 2.2 | 29.2 | 39.5 | 27.7 |
| Other.................. | 51,040 | 1,616 | 1,485 | 13,616 | 18,235 | 16,088 | 100.0 | 3.2 | 2.9 | 26.7 | 35.7 | 31.5 |

Note: Percentages may not add to 100.0 because of rounding.
¹ In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 1,299 reported under this current definition (SRS) and 591 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Table 33
FELONY ARRESTS, 2022
Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Total | 268,182 | 215,145 | 53,037 | 76,413 | 58,401 | 18,012 | 120,070 | 99,543 | 20,527 | 54,637 | 43,656 | 10,981 | 17,062 | 13,545 | 3,517 |
| Under 10 | 8 | 8 | 0 | 3 | 3 | 0 | 3 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 |
| 10-17 | 11,894 | 9,897 | 1,997 | 1,769 | 1,432 | 337 | 6,330 | 5,433 | 897 | 3,096 | 2,445 | 651 | 699 | 587 | 112 |
| 18-19 | 10,216 | 8,460 | 1,756 | 1,528 | 1,211 | 317 | 5,547 | 4,745 | 802 | 2,599 | 2,067 | 532 | 542 | 437 | 105 |
| 20-29 | 77,933 | 61,647 | 16,286 | 16,198 | 11,930 | 4,268 | 40,287 | 33,032 | 7,255 | 17,131 | 13,342 | 3,789 | 4,317 | 3,343 | 974 |
| 30-39 | 89,437 | 70,847 | 18,590 | 27,127 | 20,330 | 6,797 | 40,224 | 33,037 | 7,187 | 16,490 | 13,115 | 3,375 | 5,596 | 4,365 | 1,231 |
| 40-69 | 77,400 | 63,189 | 14,211 | 29,142 | 22,965 | 6,177 | 27,401 | 23,046 | 4,355 | 15,102 | 12,491 | 2,611 | 5,755 | 4,687 | 1,068 |
| 70 and over | 1,294 | 1,097 | 197 | 646 | 530 | 116 | 278 | 247 | 31 | 218 | 195 | 23 | 152 | 125 | 27 |
| Violent offenses | 98,115 | 75,961 | 22,154 | 24,963 | 18,492 | 6,471 | 43,864 | 35,121 | 8,743 | 22,309 | 17,079 | 5,230 | 6,979 | 5,269 | 1,710 |
| Under 10 | 4 | 4 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| 10-17 | 5,258 | 4,182 | 1,076 | 759 | 586 | 173 | 2,613 | 2,145 | 468 | 1,589 | 1,208 | 381 | 297 | 243 | 54 |
| 18-19 | 3,884 | 3,057 | 827 | 589 | 455 | 134 | 2,057 | 1,654 | 403 | 1,038 | 795 | 243 | 200 | 153 | 47 |
| 20-29 | 29,398 | 22,437 | 6,961 | 5,424 | 3,875 | 1,549 | 15,300 | 12,083 | 3,217 | 6,921 | 5,192 | 1,729 | 1,753 | 1,287 | 466 |
| 30-39 | 30,806 | 23,650 | 7,156 | 8,010 | 5,852 | 2,158 | 13,930 | 11,109 | 2,821 | 6,592 | 5,025 | 1,567 | 2,274 | 1,664 | 610 |
| 40-69 | 28,030 | 22,003 | 6,027 | 9,816 | 7,420 | 2,396 | 9,824 | 8,005 | 1,819 | 6,036 | 4,739 | 1,297 | 2,354 | 1,839 | 515 |
| 70 and over | 735 | 628 | 107 | 363 | 302 | 61 | 139 | 124 | 15 | 133 | 120 | 13 | 100 | 82 | 18 |
| Homicide | 1,485 | 1,323 | 162 | 273 | 231 | 42 | 688 | 613 | 75 | 447 | 411 | 36 | 77 | 68 | 9 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 94 | 92 | 2 | 6 | 6 | 0 | 62 | 60 | 2 | 22 | 22 | 0 | 4 | 4 | 0 |
| 18-19 | 132 | 122 | 10 | 7 | 6 | 1 | 82 | 75 | 7 | 40 | 38 | 2 | 3 | 3 | 0 |
| 20-29 | 543 | 480 | 63 | 81 | 67 | 14 | 275 | 244 | 31 | 161 | 148 | 13 | 26 | 21 | 5 |
| 30-39 | 389 | 341 | 48 | 87 | 77 | 10 | 157 | 135 | 22 | 122 | 108 | 14 | 23 | 21 | 2 |
| 40-69 | 314 | 276 | 38 | 85 | 69 | 16 | 109 | 96 | 13 | 100 | 93 | 7 | 20 | 18 | 2 |
| 70 and over | 13 | 12 | 1 | 7 | 6 | 1 | 3 | 3 | 0 | 2 | 2 | 0 | 1 | 1 | 0 |
| Rape[1] | 1,890 | 1,854 | 36 | 389 | 380 | 9 | 1,048 | 1,033 | 15 | 293 | 287 | 6 | 160 | 154 | 6 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 147 | 142 | 5 | 33 | 31 | 2 | 78 | 77 | 1 | 24 | 22 | 2 | 12 | 12 | 0 |
| 18-19 | 88 | 84 | 4 | 20 | 19 | 1 | 50 | 48 | 2 | 14 | 13 | 1 | 4 | 4 | 0 |
| 20-29 | 496 | 486 | 10 | 95 | 94 | 1 | 286 | 281 | 5 | 81 | 78 | 3 | 34 | 33 | 1 |
| 30-39 | 523 | 514 | 9 | 93 | 91 | 2 | 305 | 301 | 4 | 75 | 75 | 0 | 50 | 47 | 3 |
| 40-69 | 607 | 599 | 8 | 138 | 135 | 3 | 317 | 314 | 3 | 94 | 94 | 0 | 58 | 56 | 2 |
| 70 and over | 29 | 29 | 0 | 10 | 10 | 0 | 12 | 12 | 0 | 5 | 5 | 0 | 2 | 2 | 0 |
| Robbery | 13,187 | 10,850 | 2,337 | 2,632 | 2,069 | 563 | 5,376 | 4,571 | 805 | 4,567 | 3,702 | 865 | 612 | 508 | 104 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 1,846 | 1,542 | 304 | 159 | 119 | 40 | 814 | 706 | 108 | 774 | 628 | 146 | 99 | 89 | 10 |
| 18-19 | 1,055 | 885 | 170 | 102 | 83 | 19 | 463 | 395 | 68 | 444 | 367 | 77 | 46 | 40 | 6 |
| 20-29 | 4,195 | 3,454 | 741 | 689 | 545 | 144 | 1,924 | 1,626 | 298 | 1,419 | 1,149 | 270 | 163 | 134 | 29 |
| 30-39 | 3,741 | 3,052 | 689 | 934 | 738 | 196 | 1,476 | 1,256 | 220 | 1,137 | 903 | 234 | 194 | 155 | 39 |
| 40-69 | 2,321 | 1,892 | 429 | 729 | 567 | 162 | 698 | 588 | 110 | 785 | 648 | 137 | 109 | 89 | 20 |
| 70 and over | 29 | 25 | 4 | 19 | 17 | 2 | 1 | 0 | 1 | 8 | 7 | 1 | 1 | 1 | 0 |

(continued)

Exhibit 43
DX0435

Table 33 - continued
**FELONY ARRESTS, 2022**
Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Assault | 80,044 | 60,605 | 19,439 | 21,360 | 15,553 | 5,807 | 36,010 | 28,233 | 7,777 | 16,660 | 12,383 | 4,277 | 6,014 | 4,436 | 1,578 |
| Under 10 | 4 | 4 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| 10-17 | 3,127 | 2,368 | 759 | 554 | 424 | 130 | 1,634 | 1,280 | 354 | 760 | 529 | 231 | 179 | 135 | 44 |
| 18-19 | 2,545 | 1,911 | 635 | 453 | 340 | 113 | 1,426 | 1,103 | 323 | 524 | 365 | 159 | 142 | 102 | 40 |
| 20-29 | 23,583 | 17,484 | 6,099 | 4,468 | 3,091 | 1,377 | 12,513 | 9,644 | 2,869 | 5,117 | 3,689 | 1,428 | 1,485 | 1,060 | 425 |
| 30-39 | 25,668 | 19,330 | 6,338 | 6,795 | 4,859 | 1,936 | 11,740 | 9,204 | 2,536 | 5,159 | 3,856 | 1,303 | 1,974 | 1,411 | 563 |
| 40-69 | 24,456 | 18,950 | 5,506 | 8,762 | 6,569 | 2,193 | 8,574 | 6,893 | 1,681 | 4,982 | 3,838 | 1,144 | 2,138 | 1,650 | 488 |
| 70 and over | 661 | 559 | 102 | 326 | 268 | 58 | 122 | 108 | 14 | 118 | 106 | 12 | 95 | 77 | 18 |
| Kidnapping | 1,509 | 1,329 | 180 | 309 | 259 | 50 | 742 | 671 | 71 | 342 | 296 | 46 | 116 | 103 | 13 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 44 | 38 | 6 | 7 | 6 | 1 | 25 | 22 | 3 | 9 | 7 | 2 | 3 | 3 | 0 |
| 18-19 | 64 | 56 | 8 | 7 | 7 | 0 | 36 | 33 | 3 | 16 | 12 | 4 | 5 | 4 | 1 |
| 20-29 | 581 | 533 | 48 | 91 | 78 | 13 | 302 | 288 | 14 | 143 | 128 | 15 | 45 | 39 | 6 |
| 30-39 | 485 | 413 | 72 | 101 | 87 | 14 | 252 | 213 | 39 | 99 | 83 | 16 | 33 | 30 | 3 |
| 40-69 | 332 | 286 | 46 | 102 | 80 | 22 | 126 | 114 | 12 | 75 | 66 | 9 | 26 | 26 | 0 |
| 70 and over | 3 | 3 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| Property offenses | 62,131 | 47,630 | 14,501 | 19,208 | 14,055 | 5,153 | 27,975 | 22,381 | 5,594 | 11,211 | 8,284 | 2,927 | 3,737 | 2,910 | 827 |
| Under 10 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| 10-17 | 2,310 | 1,823 | 487 | 396 | 313 | 83 | 1,093 | 892 | 201 | 692 | 518 | 174 | 129 | 100 | 29 |
| 18-19 | 1,816 | 1,350 | 466 | 331 | 246 | 85 | 849 | 676 | 173 | 528 | 352 | 176 | 108 | 76 | 32 |
| 20-29 | 17,483 | 13,050 | 4,433 | 4,192 | 2,963 | 1,229 | 9,008 | 7,081 | 1,927 | 3,408 | 2,370 | 1,038 | 875 | 636 | 239 |
| 30-39 | 23,536 | 18,006 | 5,530 | 7,681 | 5,521 | 2,160 | 10,970 | 8,791 | 2,179 | 3,538 | 2,625 | 913 | 1,347 | 1,069 | 278 |
| 40-69 | 16,892 | 13,340 | 3,552 | 6,564 | 4,984 | 1,580 | 6,038 | 4,930 | 1,108 | 3,023 | 2,401 | 622 | 1,267 | 1,025 | 242 |
| 70 and over | 92 | 59 | 33 | 43 | 27 | 16 | 17 | 11 | 6 | 21 | 17 | 4 | 11 | 4 | 7 |
| Burglary | 16,833 | 13,533 | 3,300 | 5,459 | 4,237 | 1,222 | 6,918 | 5,783 | 1,135 | 3,499 | 2,742 | 757 | 957 | 771 | 186 |
| Under 10 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| 10-17 | 680 | 569 | 111 | 140 | 127 | 13 | 321 | 278 | 43 | 188 | 137 | 51 | 31 | 27 | 4 |
| 18-19 | 547 | 436 | 111 | 90 | 77 | 13 | 218 | 179 | 39 | 210 | 156 | 54 | 29 | 24 | 5 |
| 20-29 | 4,917 | 3,909 | 1,008 | 1,152 | 894 | 258 | 2,322 | 1,922 | 400 | 1,192 | 891 | 301 | 251 | 202 | 49 |
| 30-39 | 6,281 | 5,039 | 1,242 | 2,200 | 1,667 | 533 | 2,664 | 2,225 | 439 | 1,087 | 879 | 208 | 330 | 268 | 62 |
| 40-69 | 4,383 | 3,566 | 817 | 1,863 | 1,464 | 399 | 1,389 | 1,176 | 213 | 818 | 676 | 142 | 313 | 250 | 63 |
| 70 and over | 24 | 13 | 11 | 13 | 7 | 6 | 4 | 3 | 1 | 4 | 3 | 1 | 3 | 3 | 0 |
| Theft | 27,574 | 20,599 | 6,975 | 8,913 | 6,369 | 2,544 | 12,108 | 9,491 | 2,617 | 4,735 | 3,352 | 1,383 | 1,818 | 1,387 | 431 |
| Under 10 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 902 | 683 | 219 | 125 | 95 | 30 | 407 | 317 | 90 | 315 | 230 | 85 | 55 | 41 | 14 |
| 18-19 | 835 | 586 | 249 | 142 | 92 | 50 | 423 | 335 | 88 | 210 | 120 | 90 | 60 | 39 | 21 |
| 20-29 | 7,606 | 5,455 | 2,151 | 1,967 | 1,315 | 652 | 3,823 | 2,932 | 891 | 1,422 | 935 | 487 | 394 | 273 | 121 |
| 30-39 | 10,475 | 7,854 | 2,621 | 3,640 | 2,565 | 1,075 | 4,694 | 3,707 | 987 | 1,479 | 1,061 | 418 | 662 | 521 | 141 |
| 40-69 | 7,710 | 5,994 | 1,716 | 3,023 | 2,294 | 729 | 2,751 | 2,195 | 556 | 1,296 | 996 | 300 | 640 | 509 | 131 |
| 70 and over | 45 | 26 | 19 | 16 | 8 | 8 | 10 | 5 | 5 | 12 | 9 | 3 | 7 | 4 | 3 |

(continued)

Exhibit 43
DX0436

Table 33 - continued
## FELONY ARRESTS, 2022
### Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Identity theft........... | 2,137 | 1,400 | 737 | 833 | 511 | 322 | 819 | 533 | 286 | 295 | 212 | 83 | 190 | 144 | 46 |
| Under 10............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17............... | 8 | 3 | 5 | 0 | 0 | 0 | 4 | 1 | 3 | 3 | 1 | 2 | 1 | 1 | 0 |
| 18-19............... | 16 | 11 | 5 | 4 | 3 | 1 | 9 | 6 | 3 | 2 | 1 | 1 | 1 | 1 | 0 |
| 20-29............... | 516 | 323 | 193 | 165 | 85 | 80 | 249 | 163 | 86 | 78 | 55 | 23 | 24 | 20 | 4 |
| 30-39............... | 976 | 617 | 359 | 422 | 255 | 167 | 342 | 213 | 129 | 117 | 81 | 36 | 95 | 68 | 27 |
| 40-69............... | 620 | 445 | 175 | 242 | 168 | 74 | 215 | 150 | 65 | 95 | 74 | 21 | 68 | 53 | 15 |
| 70 and over......... | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| Other theft.......... | 25,437 | 19,199 | 6,238 | 8,080 | 5,858 | 2,222 | 11,289 | 8,958 | 2,331 | 4,440 | 3,140 | 1,300 | 1,628 | 1,243 | 385 |
| Under 10............ | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| 10-17............... | 894 | 680 | 214 | 125 | 95 | 30 | 403 | 316 | 87 | 312 | 229 | 83 | 54 | 40 | 14 |
| 18-19............... | 819 | 575 | 244 | 138 | 89 | 49 | 414 | 329 | 85 | 208 | 119 | 89 | 59 | 38 | 21 |
| 20-29............... | 7,090 | 5,132 | 1,958 | 1,802 | 1,230 | 572 | 3,574 | 2,769 | 805 | 1,344 | 880 | 464 | 370 | 253 | 117 |
| 30-39............... | 9,499 | 7,237 | 2,262 | 3,218 | 2,310 | 908 | 4,352 | 3,494 | 858 | 1,362 | 980 | 382 | 567 | 453 | 114 |
| 40-69............... | 7,090 | 5,549 | 1,541 | 2,781 | 2,126 | 655 | 2,536 | 2,045 | 491 | 1,201 | 922 | 279 | 572 | 456 | 116 |
| 70 and over......... | 44 | 25 | 19 | 16 | 8 | 8 | 10 | 5 | 5 | 12 | 9 | 3 | 6 | 3 | 3 |
| Motor vehicle theft... | 13,916 | 10,723 | 3,193 | 3,422 | 2,482 | 940 | 7,424 | 5,921 | 1,503 | 2,399 | 1,797 | 602 | 671 | 523 | 148 |
| Under 10............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17............... | 625 | 490 | 135 | 104 | 75 | 29 | 308 | 247 | 61 | 178 | 144 | 34 | 35 | 24 | 11 |
| 18-19............... | 351 | 264 | 87 | 73 | 54 | 19 | 172 | 135 | 37 | 91 | 65 | 26 | 15 | 10 | 5 |
| 20-29............... | 4,100 | 3,069 | 1,031 | 824 | 591 | 233 | 2,478 | 1,923 | 555 | 620 | 432 | 188 | 178 | 123 | 55 |
| 30-39............... | 5,334 | 4,077 | 1,257 | 1,322 | 944 | 378 | 2,993 | 2,378 | 615 | 774 | 557 | 217 | 245 | 198 | 47 |
| 40-69............... | 3,498 | 2,816 | 682 | 1,095 | 815 | 280 | 1,472 | 1,237 | 235 | 733 | 596 | 137 | 198 | 168 | 30 |
| 70 and over......... | 8 | 7 | 1 | 4 | 3 | 1 | 1 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| Forgery, checks, access cards....... | 1,900 | 1,304 | 596 | 687 | 440 | 247 | 778 | 553 | 225 | 273 | 190 | 83 | 162 | 121 | 41 |
| Under 10............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17............... | 26 | 23 | 3 | 5 | 5 | 0 | 15 | 12 | 3 | 1 | 1 | 0 | 5 | 5 | 0 |
| 18-19............... | 60 | 43 | 17 | 16 | 13 | 3 | 26 | 19 | 7 | 14 | 8 | 6 | 4 | 3 | 1 |
| 20-29............... | 460 | 300 | 160 | 134 | 82 | 52 | 203 | 139 | 64 | 94 | 62 | 32 | 29 | 17 | 12 |
| 30-39............... | 790 | 533 | 257 | 287 | 176 | 111 | 342 | 250 | 92 | 94 | 61 | 33 | 67 | 46 | 21 |
| 40-69............... | 562 | 403 | 159 | 244 | 163 | 81 | 191 | 132 | 59 | 70 | 58 | 12 | 57 | 50 | 7 |
| 70 and over......... | 2 | 2 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arson................ | 1,908 | 1,471 | 437 | 727 | 527 | 200 | 747 | 633 | 114 | 305 | 203 | 102 | 129 | 108 | 21 |
| Under 10............ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17............... | 77 | 58 | 19 | 22 | 11 | 11 | 42 | 38 | 4 | 10 | 6 | 4 | 3 | 3 | 0 |
| 18-19............... | 23 | 21 | 2 | 10 | 10 | 0 | 10 | 8 | 2 | 3 | 3 | 0 | 0 | 0 | 0 |
| 20-29............... | 400 | 317 | 83 | 115 | 81 | 34 | 182 | 165 | 17 | 80 | 50 | 30 | 23 | 21 | 2 |
| 30-39............... | 656 | 503 | 153 | 232 | 169 | 63 | 277 | 231 | 46 | 104 | 67 | 37 | 43 | 36 | 7 |
| 40-69............... | 739 | 561 | 178 | 339 | 248 | 91 | 235 | 190 | 45 | 106 | 75 | 31 | 59 | 48 | 11 |
| 70 and over......... | 13 | 11 | 2 | 9 | 8 | 1 | 1 | 1 | 0 | 2 | 2 | 0 | 1 | 0 | 1 |

(continued)

Exhibit 43
DX0437

Table 33 - continued
**FELONY ARRESTS, 2022**
Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Drug offenses......... | 20,574 | 17,260 | 3,314 | 7,310 | 5,738 | 1,572 | 9,419 | 8,093 | 1,326 | 2,549 | 2,333 | 216 | 1,296 | 1,096 | 200 |
| Under 10............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................ | 276 | 253 | 23 | 33 | 28 | 5 | 160 | 147 | 13 | 27 | 27 | 0 | 56 | 51 | 5 |
| 18-19................ | 545 | 472 | 73 | 109 | 85 | 24 | 360 | 324 | 36 | 42 | 35 | 7 | 34 | 28 | 6 |
| 20-29................ | 5,506 | 4,529 | 977 | 1,542 | 1,136 | 406 | 3,049 | 2,598 | 451 | 578 | 505 | 73 | 337 | 290 | 47 |
| 30-39................ | 6,776 | 5,535 | 1,241 | 2,539 | 1,914 | 625 | 3,096 | 2,629 | 467 | 736 | 666 | 70 | 405 | 326 | 79 |
| 40-69................ | 7,409 | 6,417 | 992 | 3,057 | 2,550 | 507 | 2,740 | 2,383 | 357 | 1,150 | 1,085 | 65 | 462 | 399 | 63 |
| 70 and over......... | 62 | 54 | 8 | 30 | 25 | 5 | 14 | 12 | 2 | 16 | 15 | 1 | 2 | 2 | 0 |
| Narcotics............ | 7,584 | 6,256 | 1,328 | 2,988 | 2,250 | 738 | 3,172 | 2,750 | 422 | 947 | 867 | 80 | 477 | 389 | 88 |
| Under 10............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................ | 154 | 142 | 12 | 22 | 20 | 2 | 75 | 69 | 6 | 11 | 11 | 0 | 46 | 42 | 4 |
| 18-19................ | 249 | 217 | 32 | 59 | 48 | 11 | 149 | 135 | 14 | 17 | 15 | 2 | 24 | 19 | 5 |
| 20-29................ | 2,492 | 2,064 | 428 | 840 | 606 | 234 | 1,283 | 1,138 | 145 | 217 | 191 | 26 | 152 | 129 | 23 |
| 30-39................ | 2,550 | 2,013 | 537 | 1,194 | 867 | 327 | 942 | 792 | 150 | 265 | 243 | 22 | 149 | 111 | 38 |
| 40-69................ | 2,118 | 1,801 | 317 | 870 | 707 | 163 | 716 | 609 | 107 | 426 | 397 | 29 | 106 | 88 | 18 |
| 70 and over......... | 21 | 19 | 2 | 3 | 2 | 1 | 7 | 7 | 0 | 11 | 10 | 1 | 0 | 0 | 0 |
| Marijuana............ | 691 | 618 | 73 | 140 | 122 | 18 | 347 | 311 | 36 | 112 | 101 | 11 | 92 | 84 | 8 |
| Under 10............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................ | 24 | 20 | 4 | 4 | 2 | 2 | 18 | 16 | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| 18-19................ | 50 | 46 | 4 | 9 | 7 | 2 | 33 | 33 | 0 | 5 | 5 | 0 | 1 | 1 | 0 |
| 20-29................ | 221 | 195 | 26 | 40 | 36 | 4 | 126 | 110 | 16 | 38 | 34 | 4 | 17 | 15 | 2 |
| 30-39................ | 195 | 179 | 16 | 37 | 34 | 3 | 93 | 87 | 6 | 38 | 32 | 6 | 27 | 26 | 1 |
| 40-69................ | 198 | 176 | 22 | 48 | 42 | 6 | 75 | 65 | 10 | 29 | 28 | 1 | 46 | 41 | 5 |
| 70 and over......... | 3 | 2 | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| Dangerous drugs..... | 11,637 | 9,883 | 1,754 | 3,987 | 3,219 | 768 | 5,583 | 4,805 | 778 | 1,423 | 1,307 | 116 | 644 | 552 | 92 |
| Under 10............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................ | 96 | 89 | 7 | 7 | 6 | 1 | 67 | 62 | 5 | 13 | 13 | 0 | 9 | 8 | 1 |
| 18-19................ | 229 | 192 | 37 | 38 | 27 | 11 | 165 | 145 | 20 | 14 | 14 | 0 | 7 | 7 | 1 |
| 20-29................ | 2,572 | 2,112 | 460 | 620 | 465 | 155 | 1,503 | 1,254 | 249 | 305 | 265 | 40 | 144 | 128 | 16 |
| 30-39................ | 3,827 | 3,180 | 647 | 1,240 | 954 | 286 | 1,974 | 1,688 | 286 | 408 | 369 | 39 | 205 | 169 | 36 |
| 40-69................ | 4,877 | 4,278 | 599 | 2,057 | 1,745 | 312 | 1,868 | 1,651 | 217 | 673 | 641 | 32 | 279 | 241 | 38 |
| 70 and over......... | 36 | 32 | 4 | 25 | 22 | 3 | 6 | 6 | 1 | 5 | 5 | 0 | 1 | 1 | 0 |
| Other drugs......... | 662 | 503 | 159 | 195 | 147 | 48 | 317 | 227 | 90 | 67 | 58 | 9 | 83 | 71 | 12 |
| Under 10............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................ | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 |
| 18-19................ | 17 | 17 | 0 | 3 | 3 | 0 | 11 | 11 | 0 | 1 | 1 | 0 | 2 | 2 | 0 |
| 20-29................ | 221 | 158 | 63 | 42 | 29 | 13 | 137 | 96 | 41 | 18 | 15 | 3 | 24 | 18 | 6 |
| 30-39................ | 204 | 163 | 41 | 68 | 59 | 9 | 87 | 62 | 25 | 25 | 22 | 3 | 24 | 20 | 4 |
| 40-69................ | 216 | 162 | 54 | 82 | 56 | 26 | 81 | 58 | 23 | 19 | 19 | 0 | 29 | 29 | 0 |
| 70 and over......... | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |

(continued)

Exhibit 43
DX0438

Table 33 - continued
## FELONY ARRESTS, 2022
### Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Sex offenses............ | 4,643 | 4,496 | 147 | 1,340 | 1,290 | 50 | 2,105 | 2,049 | 56 | 866 | 840 | 26 | 332 | 317 | 15 |
| Under 10.............. | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................. | 293 | 254 | 39 | 53 | 47 | 6 | 169 | 150 | 19 | 52 | 42 | 10 | 19 | 15 | 4 |
| 18-19................. | 145 | 139 | 6 | 34 | 31 | 3 | 89 | 87 | 2 | 15 | 14 | 1 | 7 | 7 | 0 |
| 20-29................. | 985 | 954 | 31 | 194 | 184 | 10 | 532 | 516 | 16 | 181 | 179 | 2 | 78 | 75 | 3 |
| 30-39................. | 1,094 | 1,061 | 33 | 279 | 269 | 10 | 520 | 509 | 11 | 229 | 222 | 7 | 66 | 61 | 5 |
| 40-69................. | 1,993 | 1,955 | 38 | 719 | 698 | 21 | 743 | 735 | 8 | 385 | 379 | 6 | 146 | 143 | 3 |
| 70 and over.......... | 132 | 132 | 0 | 61 | 61 | 0 | 51 | 51 | 0 | 4 | 4 | 0 | 16 | 16 | 0 |
| Lewd or lascivious.... | 1,491 | 1,453 | 38 | 281 | 268 | 13 | 999 | 980 | 19 | 113 | 112 | 1 | 98 | 93 | 5 |
| Under 10.............. | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................. | 161 | 153 | 8 | 26 | 25 | 1 | 103 | 98 | 5 | 26 | 25 | 1 | 6 | 5 | 1 |
| 18-19................. | 67 | 63 | 4 | 16 | 13 | 3 | 43 | 42 | 1 | 5 | 5 | 0 | 3 | 3 | 0 |
| 20-29................. | 295 | 289 | 6 | 47 | 46 | 1 | 202 | 199 | 3 | 28 | 28 | 0 | 18 | 16 | 2 |
| 30-39................. | 345 | 335 | 10 | 63 | 61 | 2 | 246 | 240 | 6 | 19 | 19 | 0 | 17 | 15 | 2 |
| 40-69................. | 565 | 555 | 10 | 112 | 106 | 6 | 372 | 368 | 4 | 35 | 35 | 0 | 46 | 46 | 0 |
| 70 and over.......... | 57 | 57 | 0 | 17 | 17 | 0 | 32 | 32 | 0 | 0 | 0 | 0 | 8 | 8 | 0 |
| Other sex............ | 3,152 | 3,043 | 109 | 1,059 | 1,022 | 37 | 1,106 | 1,069 | 37 | 753 | 728 | 25 | 234 | 224 | 10 |
| Under 10.............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................. | 132 | 101 | 31 | 27 | 22 | 5 | 66 | 52 | 14 | 26 | 17 | 9 | 13 | 10 | 3 |
| 18-19................. | 78 | 76 | 2 | 18 | 18 | 0 | 46 | 45 | 1 | 10 | 9 | 1 | 4 | 4 | 0 |
| 20-29................. | 690 | 665 | 25 | 147 | 138 | 9 | 330 | 317 | 13 | 153 | 151 | 2 | 60 | 59 | 1 |
| 30-39................. | 749 | 726 | 23 | 216 | 208 | 8 | 274 | 269 | 5 | 210 | 203 | 7 | 49 | 46 | 3 |
| 40-69................. | 1,428 | 1,400 | 28 | 607 | 592 | 15 | 371 | 367 | 4 | 350 | 344 | 6 | 100 | 97 | 3 |
| 70 and over.......... | 75 | 75 | 0 | 44 | 44 | 0 | 19 | 19 | 0 | 4 | 4 | 0 | 8 | 8 | 0 |
| Driving offenses...... | 5,467 | 4,262 | 1,205 | 1,482 | 1,048 | 434 | 3,033 | 2,509 | 524 | 553 | 410 | 143 | 399 | 295 | 104 |
| Under 10.............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................. | 64 | 49 | 15 | 17 | 13 | 4 | 40 | 31 | 9 | 2 | 0 | 2 | 5 | 5 | 0 |
| 18-19................. | 222 | 174 | 48 | 55 | 44 | 11 | 140 | 111 | 29 | 17 | 12 | 5 | 10 | 7 | 3 |
| 20-29................. | 1,980 | 1,533 | 447 | 371 | 268 | 103 | 1,282 | 1,036 | 246 | 172 | 120 | 52 | 155 | 109 | 46 |
| 30-39................. | 1,586 | 1,251 | 335 | 399 | 286 | 113 | 896 | 753 | 143 | 185 | 133 | 52 | 106 | 79 | 27 |
| 40-69................. | 1,547 | 1,202 | 345 | 602 | 412 | 190 | 658 | 561 | 97 | 172 | 141 | 31 | 115 | 88 | 27 |
| 70 and over.......... | 68 | 53 | 15 | 38 | 25 | 13 | 17 | 17 | 0 | 5 | 4 | 1 | 8 | 7 | 1 |
| Driving under the influence............ | 4,587 | 3,558 | 1,029 | 1,254 | 866 | 388 | 2,575 | 2,133 | 442 | 432 | 319 | 113 | 326 | 240 | 86 |
| Under 10.............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17................. | 40 | 32 | 8 | 13 | 11 | 2 | 24 | 18 | 6 | 0 | 0 | 0 | 3 | 3 | 0 |
| 18-19................. | 163 | 126 | 37 | 43 | 32 | 11 | 107 | 85 | 22 | 7 | 4 | 3 | 6 | 5 | 1 |
| 20-29................. | 1,708 | 1,314 | 394 | 330 | 234 | 96 | 1,115 | 897 | 218 | 133 | 93 | 40 | 130 | 90 | 40 |
| 30-39................. | 1,322 | 1,039 | 283 | 323 | 223 | 100 | 759 | 642 | 117 | 146 | 103 | 43 | 94 | 71 | 23 |
| 40-69................. | 1,307 | 1,008 | 299 | 519 | 347 | 172 | 557 | 478 | 79 | 142 | 115 | 27 | 89 | 68 | 21 |
| 70 and over.......... | 47 | 39 | 8 | 26 | 19 | 7 | 13 | 13 | 0 | 4 | 4 | 0 | 4 | 3 | 1 |

(continued)

Exhibit 43
DX0439

## Table 33 - continued
## FELONY ARRESTS, 2022
### Category and Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Category, offense, and age | Total — Total | Total — Male | Total — Female | White — Total | White — Male | White — Female | Hispanic — Total | Hispanic — Male | Hispanic — Female | Black — Total | Black — Male | Black — Female | Other — Total | Other — Male | Other — Female |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hit-and-run | 880 | 704 | 176 | 228 | 182 | 46 | 458 | 376 | 82 | 121 | 91 | 30 | 73 | 55 | 18 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 24 | 17 | 7 | 4 | 2 | 2 | 16 | 13 | 3 | 2 | 0 | 2 | 2 | 2 | 0 |
| 18-19 | 59 | 48 | 11 | 12 | 12 | 0 | 33 | 26 | 7 | 10 | 8 | 2 | 4 | 2 | 2 |
| 20-29 | 272 | 219 | 53 | 41 | 34 | 7 | 167 | 139 | 28 | 39 | 27 | 12 | 25 | 19 | 6 |
| 30-39 | 264 | 212 | 52 | 76 | 63 | 13 | 137 | 111 | 26 | 39 | 26 | 13 | 12 | 12 | 0 |
| 40-69 | 240 | 194 | 46 | 83 | 65 | 18 | 101 | 83 | 18 | 30 | 30 | 0 | 26 | 16 | 10 |
| 70 and over | 21 | 14 | 7 | 12 | 6 | 6 | 4 | 4 | 0 | 1 | 0 | 1 | 4 | 4 | 0 |
| All other felonies | 77,252 | 65,536 | 11,716 | 22,110 | 17,778 | 4,332 | 33,674 | 29,390 | 4,284 | 17,149 | 14,710 | 2,439 | 4,319 | 3,658 | 661 |
| Under 10 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 3,693 | 3,336 | 357 | 511 | 445 | 66 | 2,255 | 2,068 | 187 | 734 | 650 | 84 | 193 | 173 | 20 |
| 18-19 | 3,604 | 3,268 | 336 | 410 | 350 | 60 | 2,052 | 1,893 | 159 | 959 | 859 | 100 | 183 | 166 | 17 |
| 20-29 | 22,581 | 19,144 | 3,437 | 4,475 | 3,504 | 971 | 11,116 | 9,718 | 1,398 | 5,871 | 4,976 | 895 | 1,119 | 946 | 173 |
| 30-39 | 25,639 | 21,344 | 4,295 | 8,219 | 6,488 | 1,731 | 10,812 | 9,246 | 1,566 | 5,210 | 4,444 | 766 | 1,398 | 1,166 | 232 |
| 40-69 | 21,529 | 18,272 | 3,257 | 8,384 | 6,901 | 1,483 | 7,398 | 6,432 | 966 | 4,336 | 3,746 | 590 | 1,411 | 1,193 | 218 |
| 70 and over | 205 | 171 | 34 | 111 | 90 | 21 | 40 | 32 | 8 | 39 | 35 | 4 | 15 | 14 | 1 |
| Weapons | 25,941 | 23,851 | 2,090 | 5,164 | 4,573 | 591 | 12,143 | 11,266 | 877 | 7,384 | 6,864 | 520 | 1,250 | 1,148 | 102 |
| Under 10 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 2,073 | 1,944 | 129 | 176 | 158 | 18 | 1,352 | 1,268 | 84 | 446 | 427 | 19 | 99 | 91 | 8 |
| 18-19 | 2,113 | 1,989 | 124 | 161 | 148 | 13 | 1,221 | 1,152 | 69 | 625 | 591 | 34 | 106 | 98 | 8 |
| 20-29 | 8,886 | 8,148 | 738 | 1,131 | 972 | 159 | 4,386 | 4,081 | 305 | 2,951 | 2,713 | 238 | 418 | 382 | 36 |
| 30-39 | 7,297 | 6,619 | 678 | 1,822 | 1,592 | 230 | 3,118 | 2,851 | 267 | 2,021 | 1,869 | 152 | 336 | 307 | 29 |
| 40-69 | 5,529 | 5,109 | 420 | 1,854 | 1,683 | 171 | 2,058 | 1,907 | 151 | 1,328 | 1,251 | 77 | 289 | 268 | 21 |
| 70 and over | 42 | 41 | 1 | 20 | 20 | 0 | 7 | 6 | 1 | 13 | 13 | 0 | 2 | 2 | 0 |
| Escape | 271 | 226 | 45 | 95 | 74 | 21 | 124 | 111 | 13 | 46 | 36 | 10 | 6 | 5 | 1 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 4 | 3 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| 18-19 | 6 | 5 | 1 | 2 | 2 | 0 | 1 | 1 | 0 | 2 | 1 | 1 | 1 | 1 | 0 |
| 20-29 | 79 | 65 | 14 | 18 | 14 | 4 | 44 | 39 | 5 | 14 | 10 | 4 | 3 | 2 | 1 |
| 30-39 | 107 | 90 | 17 | 40 | 28 | 12 | 48 | 44 | 4 | 17 | 16 | 1 | 2 | 2 | 0 |
| 40-69 | 74 | 62 | 12 | 34 | 29 | 5 | 29 | 25 | 4 | 11 | 7 | 4 | 0 | 0 | 0 |
| 70 and over | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cruelty to animals | 180 | 136 | 44 | 73 | 47 | 26 | 53 | 45 | 8 | 34 | 27 | 7 | 20 | 17 | 3 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 6 | 5 | 1 | 3 | 3 | 0 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| 18-19 | 6 | 5 | 1 | 3 | 3 | 0 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 |
| 20-29 | 39 | 31 | 8 | 15 | 12 | 3 | 9 | 7 | 2 | 12 | 10 | 2 | 3 | 2 | 1 |
| 30-39 | 54 | 39 | 15 | 16 | 10 | 6 | 21 | 16 | 5 | 8 | 5 | 3 | 9 | 8 | 1 |
| 40-69 | 73 | 54 | 19 | 35 | 18 | 17 | 20 | 19 | 1 | 10 | 10 | 0 | 8 | 7 | 1 |
| 70 and over | 2 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| Other | 50,860 | 41,323 | 9,537 | 16,778 | 13,084 | 3,694 | 21,354 | 17,968 | 3,386 | 9,685 | 7,783 | 1,902 | 3,043 | 2,488 | 555 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 1,610 | 1,384 | 226 | 332 | 285 | 47 | 900 | 797 | 103 | 284 | 220 | 64 | 94 | 82 | 12 |
| 18-19 | 1,480 | 1,269 | 211 | 244 | 197 | 47 | 828 | 738 | 90 | 331 | 266 | 65 | 77 | 68 | 9 |
| 20-29 | 13,577 | 10,900 | 2,677 | 3,311 | 2,506 | 805 | 6,677 | 5,591 | 1,086 | 2,894 | 2,243 | 651 | 695 | 560 | 135 |
| 30-39 | 18,181 | 14,596 | 3,585 | 6,344 | 4,862 | 1,482 | 7,625 | 6,335 | 1,290 | 3,164 | 2,554 | 610 | 1,048 | 845 | 203 |
| 40-69 | 15,853 | 13,048 | 2,805 | 6,458 | 5,166 | 1,292 | 5,292 | 4,482 | 810 | 2,986 | 2,478 | 508 | 1,117 | 922 | 195 |
| 70 and over | 159 | 126 | 33 | 89 | 68 | 21 | 32 | 25 | 7 | 26 | 22 | 4 | 12 | 11 | 1 |

Note: California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The 2022 arrest numbers include 23 transgender (identifying as male) and 57 transgender (identifying as female) in the male and female gender categories, respectively. Arrest numbers for the non-binary gender category are not included in this table due to the small population size. Caution should be used when comparing gender data to prior years. For additional information, including the expanded gender category numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male and female victims and reflects the current forms of sexual penetration understood to be rape. The 2022 numbers for Rape consist of 1,299 reported under the current definition (SRS) and 591 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0440

Table 34
MISDEMEANOR ARRESTS, 2022
Offense by Gender and Race/Ethnic Group of Arrestee

| Offense | Number | | | | | | | Percent | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Gender[1] | | Race/ethnic group | | | | Total | Gender | | Race/ethnic group | | | |
| | | Male | Female | White | Hispanic | Black | Other | | Male | Female | White | Hispanic | Black | Other |
| Total | 511,566 | 391,220 | 120,346 | 179,864 | 229,960 | 67,499 | 34,243 | 100.0 | 76.5 | 23.5 | 35.2 | 45.0 | 13.2 | 6.7 |
| Assault and battery | 72,366 | 51,672 | 20,694 | 21,865 | 31,072 | 13,876 | 5,553 | 100.0 | 71.4 | 28.6 | 30.2 | 42.9 | 19.2 | 7.7 |
| Burglary | 7,497 | 4,906 | 2,591 | 2,730 | 2,584 | 1,556 | 627 | 100.0 | 65.4 | 34.6 | 36.4 | 34.5 | 20.8 | 8.4 |
| Petty theft | 16,660 | 11,141 | 5,519 | 6,030 | 5,855 | 3,332 | 1,443 | 100.0 | 66.9 | 33.1 | 36.2 | 35.1 | 20.0 | 8.7 |
| Checks and access cards | 535 | 361 | 174 | 205 | 221 | 69 | 40 | 100.0 | 67.5 | 32.5 | 38.3 | 41.3 | 12.9 | 7.5 |
| Marijuana | 2,562 | 2,176 | 386 | 461 | 1,249 | 385 | 467 | 100.0 | 84.9 | 15.1 | 18.0 | 48.8 | 15.0 | 18.2 |
| Other drug | 127,543 | 101,477 | 26,066 | 54,470 | 53,903 | 12,353 | 6,817 | 100.0 | 79.6 | 20.4 | 42.7 | 42.3 | 9.7 | 5.3 |
| Indecent exposure | 1,137 | 1,018 | 119 | 420 | 335 | 294 | 88 | 100.0 | 89.5 | 10.5 | 36.9 | 29.5 | 25.9 | 7.7 |
| Annoying children | 368 | 341 | 27 | 92 | 186 | 59 | 31 | 100.0 | 92.7 | 7.3 | 25.0 | 50.5 | 16.0 | 8.4 |
| Obscene matter | 62 | 52 | 10 | 27 | 31 | 1 | 3 | 100.0 | 83.9 | 16.1 | 43.5 | 50.0 | 1.6 | 4.8 |
| Lewd conduct | 674 | 574 | 100 | 190 | 280 | 148 | 56 | 100.0 | 85.2 | 14.8 | 28.2 | 41.5 | 22.0 | 8.3 |
| Prostitution | 3,946 | 1,436 | 2,510 | 550 | 1,388 | 1,600 | 408 | 100.0 | 36.4 | 63.6 | 13.9 | 35.2 | 40.5 | 10.3 |
| Drunk | 34,126 | 27,243 | 6,883 | 14,515 | 14,491 | 3,056 | 2,064 | 100.0 | 79.8 | 20.2 | 42.5 | 42.5 | 9.0 | 6.0 |
| Liquor laws | 2,262 | 1,628 | 634 | 800 | 1,065 | 163 | 234 | 100.0 | 72.0 | 28.0 | 35.4 | 47.1 | 7.2 | 10.3 |
| Disturbing the peace | 2,061 | 1,504 | 557 | 638 | 881 | 378 | 164 | 100.0 | 73.0 | 27.0 | 31.0 | 42.7 | 18.3 | 8.0 |
| Vandalism | 6,899 | 5,493 | 1,406 | 2,244 | 2,965 | 1,198 | 492 | 100.0 | 79.6 | 20.4 | 32.5 | 43.0 | 17.4 | 7.1 |
| Trespassing | 20,896 | 15,500 | 5,396 | 7,609 | 7,893 | 4,233 | 1,161 | 100.0 | 74.2 | 25.8 | 36.4 | 37.8 | 20.3 | 5.6 |
| Weapons | 5,330 | 4,620 | 710 | 1,577 | 2,349 | 1,029 | 375 | 100.0 | 86.7 | 13.3 | 29.6 | 44.1 | 19.3 | 7.0 |
| Driving under the influence | 100,372 | 77,707 | 22,665 | 27,575 | 55,827 | 8,954 | 8,016 | 100.0 | 77.4 | 22.6 | 27.5 | 55.6 | 8.9 | 8.0 |
| Hit-and-run | 1,301 | 981 | 320 | 366 | 697 | 140 | 98 | 100.0 | 75.4 | 24.6 | 28.1 | 53.6 | 10.8 | 7.5 |
| Selected traffic violations | 2,929 | 2,640 | 289 | 639 | 1,672 | 325 | 293 | 100.0 | 90.1 | 9.9 | 21.8 | 57.1 | 11.1 | 10.0 |
| Gambling | 291 | 196 | 95 | 61 | 139 | 41 | 50 | 100.0 | 67.4 | 32.6 | 21.0 | 47.8 | 14.1 | 17.2 |
| All other | 101,749 | 78,554 | 23,195 | 36,800 | 44,877 | 14,309 | 5,763 | 100.0 | 77.2 | 22.8 | 36.2 | 44.1 | 14.1 | 5.7 |

Note: Percentages may not add to 100.0 because of rounding.

[1] California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The 2022 arrest numbers include 45 transgender (identifying as male) and 141 transgender (identifying as female) in the male and female gender categories, respectively. Arrest numbers for the non-binary gender category are not included in this table due to the small population size. Caution should be used when comparing gender data to prior years. For additional information, including the expanded gender category numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

Exhibit 43
DX0441

Table 35
**MISDEMEANOR ARRESTS, 2022**
Offense by Age Group of Arrestee

| Offense | Number | | | | | | Percent | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | Under 18 | 18-19 | 20-29 | 30-39 | 40 and over | Total | Under 18 | 18-19 | 20-29 | 30-39 | 40 and over |
| Total............................. | 511,566 | 12,958 | 11,730 | 138,877 | 167,241 | 180,760 | 100.0 | 2.5 | 2.3 | 27.1 | 32.7 | 35.3 |
| | | | | | | | | | | | | |
| Assault and battery............ | 72,366 | 5,399 | 2,148 | 19,531 | 21,858 | 23,430 | 100.0 | 7.5 | 3.0 | 27.0 | 30.2 | 32.4 |
| Burglary........................ | 7,497 | 537 | 250 | 2,022 | 2,447 | 2,241 | 100.0 | 7.2 | 3.3 | 27.0 | 32.6 | 29.9 |
| Petty theft..................... | 16,660 | 1,056 | 552 | 4,019 | 5,456 | 5,577 | 100.0 | 6.3 | 3.3 | 24.1 | 32.7 | 33.5 |
| Checks and access cards... | 535 | 14 | 30 | 120 | 198 | 173 | 100.0 | 2.6 | 5.6 | 22.4 | 37.0 | 32.3 |
| Marijuana...................... | 2,562 | 343 | 198 | 857 | 536 | 628 | 100.0 | 13.4 | 7.7 | 33.5 | 20.9 | 24.5 |
| | | | | | | | | | | | | |
| Other drug...................... | 127,543 | 375 | 1,141 | 29,152 | 49,387 | 47,488 | 100.0 | 0.3 | 0.9 | 22.9 | 38.7 | 37.2 |
| Indecent exposure............. | 1,137 | 9 | 15 | 290 | 376 | 447 | 100.0 | 0.8 | 1.3 | 25.5 | 33.1 | 39.3 |
| Annoying children............. | 368 | 62 | 20 | 53 | 90 | 143 | 100.0 | 16.8 | 5.4 | 14.4 | 24.5 | 38.9 |
| Obscene matter................ | 62 | 34 | 0 | 10 | 7 | 11 | 100.0 | 54.8 | 0.0 | 16.1 | 11.3 | 17.7 |
| Lewd conduct.................. | 674 | 44 | 16 | 173 | 207 | 234 | 100.0 | 6.5 | 2.4 | 25.7 | 30.7 | 34.7 |
| | | | | | | | | | | | | |
| Prostitution.................... | 3,946 | 10 | 441 | 2,057 | 768 | 670 | 100.0 | 0.3 | 11.2 | 52.1 | 19.5 | 17.0 |
| Drunk.......................... | 34,126 | 266 | 643 | 9,228 | 10,534 | 13,455 | 100.0 | 0.8 | 1.9 | 27.0 | 30.9 | 39.4 |
| Liquor laws.................... | 2,262 | 456 | 482 | 565 | 242 | 517 | 100.0 | 20.2 | 21.3 | 25.0 | 10.7 | 22.9 |
| Disturbing the peace.......... | 2,061 | 417 | 55 | 428 | 493 | 668 | 100.0 | 20.2 | 2.7 | 20.8 | 23.9 | 32.4 |
| Vandalism...................... | 6,899 | 812 | 258 | 1,793 | 2,055 | 1,981 | 100.0 | 11.8 | 3.7 | 26.0 | 29.8 | 28.7 |
| | | | | | | | | | | | | |
| Trespassing.................... | 20,896 | 338 | 253 | 4,091 | 7,261 | 8,953 | 100.0 | 1.6 | 1.2 | 19.6 | 34.7 | 42.8 |
| Weapons....................... | 5,330 | 775 | 315 | 1,693 | 1,379 | 1,168 | 100.0 | 14.5 | 5.9 | 31.8 | 25.9 | 21.9 |
| Driving under the influence.. | 100,372 | 436 | 2,544 | 37,465 | 29,551 | 30,376 | 100.0 | 0.4 | 2.5 | 37.3 | 29.4 | 30.3 |
| Hit-and-run.................... | 1,301 | 35 | 73 | 463 | 329 | 401 | 100.0 | 2.7 | 5.6 | 35.6 | 25.3 | 30.8 |
| Selected traffic violations..... | 2,929 | 138 | 485 | 1,363 | 507 | 436 | 100.0 | 4.7 | 16.6 | 46.5 | 17.3 | 14.9 |
| | | | | | | | | | | | | |
| Gambling....................... | 291 | 2 | 4 | 48 | 105 | 132 | 100.0 | 0.7 | 1.4 | 16.5 | 36.1 | 45.4 |
| All other....................... | 101,749 | 1,400 | 1,807 | 23,456 | 33,455 | 41,631 | 100.0 | 1.4 | 1.8 | 23.1 | 32.9 | 40.9 |

Note: Percentages may not add to 100.0 because of rounding.

Exhibit 43
DX0442

Table 36

**MISDEMEANOR ARRESTS, 2022**

Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Offense and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| Total | 511,566 | 391,220 | 120,346 | 179,864 | 128,675 | 51,189 | 229,960 | 186,303 | 43,657 | 67,499 | 50,277 | 17,222 | 34,243 | 25,965 | 8,278 |
| Under 10 | 10 | 8 | 2 | 1 | 1 | 0 | 7 | 5 | 2 | 2 | 2 | 0 | 0 | 0 | 0 |
| 10-17 | 12,948 | 8,923 | 4,025 | 2,820 | 1,866 | 954 | 7,253 | 5,195 | 2,058 | 2,013 | 1,261 | 752 | 862 | 601 | 261 |
| 18-19 | 11,730 | 8,554 | 3,176 | 2,723 | 1,853 | 870 | 6,586 | 5,226 | 1,360 | 1,639 | 940 | 699 | 782 | 535 | 247 |
| 20-29 | 138,877 | 104,524 | 34,353 | 36,219 | 25,225 | 10,994 | 75,255 | 59,985 | 15,270 | 18,458 | 12,648 | 5,810 | 8,945 | 6,666 | 2,279 |
| 30-39 | 167,241 | 128,453 | 38,788 | 58,945 | 41,883 | 17,062 | 76,017 | 62,049 | 13,968 | 21,364 | 16,131 | 5,233 | 10,915 | 8,390 | 2,525 |
| 40-69 | 177,128 | 137,914 | 39,214 | 76,997 | 56,218 | 20,779 | 64,149 | 53,240 | 10,909 | 23,591 | 18,948 | 4,643 | 12,391 | 9,508 | 2,883 |
| 70 and over | 3,632 | 2,844 | 788 | 2,159 | 1,629 | 530 | 693 | 603 | 90 | 432 | 347 | 85 | 348 | 265 | 83 |
| Assault and battery | 72,366 | 51,672 | 20,694 | 21,865 | 14,979 | 6,886 | 31,072 | 22,985 | 8,087 | 13,876 | 9,802 | 4,074 | 5,553 | 3,906 | 1,647 |
| Under 10 | 4 | 3 | 1 | 0 | 0 | 0 | 2 | 1 | 1 | 2 | 2 | 0 | 0 | 0 | 0 |
| 10-17 | 5,395 | 3,417 | 1,978 | 1,065 | 685 | 380 | 3,003 | 1,932 | 1,071 | 1,058 | 614 | 444 | 269 | 186 | 83 |
| 18-19 | 2,148 | 1,446 | 702 | 413 | 265 | 148 | 1,134 | 812 | 322 | 470 | 285 | 185 | 131 | 84 | 47 |
| 20-29 | 19,531 | 13,834 | 5,697 | 4,368 | 2,873 | 1,495 | 9,888 | 7,343 | 2,545 | 3,993 | 2,727 | 1,266 | 1,282 | 891 | 391 |
| 30-39 | 21,858 | 15,719 | 6,139 | 6,531 | 4,422 | 2,109 | 9,529 | 7,167 | 2,362 | 4,109 | 2,953 | 1,156 | 1,689 | 1,177 | 512 |
| 40-69 | 22,687 | 16,676 | 6,011 | 9,100 | 6,441 | 2,659 | 7,377 | 5,615 | 1,762 | 4,125 | 3,128 | 997 | 2,085 | 1,492 | 593 |
| 70 and over | 743 | 577 | 166 | 388 | 293 | 95 | 139 | 115 | 24 | 119 | 93 | 26 | 97 | 76 | 21 |
| Burglary | 7,497 | 4,906 | 2,591 | 2,730 | 1,744 | 986 | 2,584 | 1,772 | 812 | 1,556 | 1,041 | 515 | 627 | 349 | 278 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 537 | 284 | 253 | 137 | 63 | 74 | 240 | 143 | 97 | 104 | 53 | 51 | 56 | 25 | 31 |
| 18-19 | 250 | 127 | 123 | 76 | 37 | 39 | 93 | 60 | 33 | 50 | 22 | 28 | 31 | 8 | 23 |
| 20-29 | 2,022 | 1,351 | 671 | 625 | 421 | 204 | 796 | 556 | 240 | 438 | 274 | 164 | 163 | 100 | 63 |
| 30-39 | 2,447 | 1,665 | 782 | 1,031 | 674 | 357 | 814 | 582 | 232 | 458 | 323 | 135 | 144 | 86 | 58 |
| 40-69 | 2,193 | 1,450 | 743 | 839 | 534 | 305 | 636 | 427 | 209 | 496 | 361 | 135 | 222 | 128 | 94 |
| 70 and over | 48 | 29 | 19 | 22 | 15 | 7 | 5 | 4 | 1 | 10 | 8 | 2 | 11 | 2 | 9 |
| Petty theft | 16,660 | 11,141 | 5,519 | 6,030 | 3,889 | 2,141 | 5,855 | 4,127 | 1,728 | 3,332 | 2,221 | 1,111 | 1,443 | 904 | 539 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 1,056 | 588 | 468 | 255 | 123 | 132 | 480 | 301 | 179 | 195 | 112 | 83 | 126 | 52 | 74 |
| 18-19 | 552 | 308 | 244 | 117 | 71 | 46 | 224 | 139 | 85 | 139 | 69 | 70 | 72 | 29 | 43 |
| 20-29 | 4,019 | 2,704 | 1,315 | 1,195 | 781 | 414 | 1,646 | 1,166 | 480 | 869 | 548 | 321 | 309 | 209 | 100 |
| 30-39 | 5,456 | 3,751 | 1,705 | 2,106 | 1,363 | 743 | 1,960 | 1,447 | 513 | 998 | 677 | 321 | 392 | 264 | 128 |
| 40-69 | 5,494 | 3,735 | 1,759 | 2,320 | 1,528 | 792 | 1,530 | 1,065 | 465 | 1,115 | 802 | 313 | 529 | 340 | 189 |
| 70 and over | 83 | 55 | 28 | 37 | 23 | 14 | 15 | 9 | 6 | 16 | 13 | 3 | 15 | 10 | 5 |
| Identity theft | 920 | 610 | 310 | 324 | 192 | 132 | 395 | 279 | 116 | 125 | 83 | 42 | 76 | 56 | 20 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 7 | 3 | 4 | 3 | 1 | 2 | 3 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 0 |
| 18-19 | 13 | 9 | 4 | 6 | 4 | 2 | 6 | 4 | 2 | 0 | 0 | 0 | 1 | 1 | 0 |
| 20-29 | 249 | 162 | 87 | 75 | 40 | 35 | 117 | 81 | 36 | 41 | 29 | 12 | 16 | 12 | 4 |
| 30-39 | 379 | 225 | 154 | 121 | 60 | 61 | 165 | 109 | 56 | 55 | 30 | 25 | 38 | 26 | 12 |
| 40-69 | 271 | 211 | 60 | 118 | 87 | 31 | 104 | 84 | 20 | 29 | 24 | 5 | 20 | 16 | 4 |
| 70 and over | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other petty theft | 15,740 | 10,531 | 5,209 | 5,706 | 3,697 | 2,009 | 5,460 | 3,848 | 1,612 | 3,207 | 2,138 | 1,069 | 1,367 | 848 | 519 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 1,049 | 585 | 464 | 252 | 122 | 130 | 476 | 299 | 177 | 195 | 112 | 83 | 126 | 52 | 74 |
| 18-19 | 539 | 299 | 240 | 111 | 67 | 44 | 219 | 136 | 83 | 139 | 69 | 70 | 70 | 27 | 43 |
| 20-29 | 3,770 | 2,542 | 1,228 | 1,120 | 741 | 379 | 1,529 | 1,085 | 444 | 828 | 519 | 309 | 293 | 197 | 96 |
| 30-39 | 5,077 | 3,526 | 1,551 | 1,985 | 1,303 | 682 | 1,795 | 1,338 | 457 | 943 | 647 | 296 | 354 | 238 | 116 |
| 40-69 | 5,223 | 3,524 | 1,699 | 2,202 | 1,441 | 761 | 1,426 | 981 | 445 | 1,086 | 778 | 308 | 509 | 324 | 185 |
| 70 and over | 82 | 55 | 27 | 36 | 23 | 13 | 15 | 9 | 6 | 16 | 13 | 3 | 15 | 10 | 5 |

(continued)

Exhibit 43
DX0443

Table 36 - continued
**MISDEMEANOR ARRESTS, 2022**
Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Offense and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| **Checks and access cards.** | 535 | 361 | 174 | 205 | 139 | 66 | 221 | 141 | 80 | 69 | 49 | 20 | 40 | 32 | 8 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 14 | 11 | 3 | 5 | 4 | 1 | 6 | 5 | 1 | 3 | 2 | 1 | 0 | 0 | 0 |
| 18-19. | 30 | 22 | 8 | 12 | 8 | 4 | 11 | 9 | 2 | 4 | 3 | 1 | 3 | 2 | 1 |
| 20-29. | 120 | 80 | 40 | 36 | 19 | 17 | 62 | 44 | 18 | 14 | 10 | 4 | 8 | 7 | 1 |
| 30-39. | 198 | 123 | 75 | 74 | 49 | 25 | 91 | 54 | 37 | 22 | 12 | 10 | 11 | 8 | 3 |
| 40-69. | 172 | 125 | 47 | 77 | 59 | 18 | 51 | 29 | 22 | 26 | 22 | 4 | 18 | 15 | 3 |
| 70 and over. | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Drug offenses.** | 130,105 | 103,653 | 26,452 | 54,931 | 40,681 | 14,250 | 55,152 | 46,397 | 8,755 | 12,738 | 10,689 | 2,049 | 7,284 | 5,886 | 1,398 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 718 | 544 | 174 | 151 | 105 | 46 | 479 | 369 | 110 | 41 | 29 | 12 | 47 | 41 | 6 |
| 18-19. | 1,339 | 1,066 | 273 | 361 | 250 | 111 | 776 | 649 | 127 | 121 | 106 | 15 | 81 | 61 | 20 |
| 20-29. | 30,009 | 23,414 | 6,595 | 10,714 | 7,569 | 3,145 | 15,190 | 12,574 | 2,616 | 2,619 | 2,113 | 506 | 1,486 | 1,158 | 328 |
| 30-39. | 49,923 | 39,372 | 10,551 | 21,348 | 15,580 | 5,768 | 21,474 | 18,017 | 3,457 | 4,425 | 3,629 | 796 | 2,676 | 2,146 | 530 |
| 40-69. | 47,842 | 39,011 | 8,831 | 22,206 | 17,043 | 5,163 | 17,180 | 14,737 | 2,443 | 5,478 | 4,765 | 713 | 2,978 | 2,466 | 512 |
| 70 and over. | 274 | 246 | 28 | 151 | 134 | 17 | 53 | 51 | 2 | 54 | 47 | 7 | 16 | 14 | 2 |
| **Marijuana.** | 2,562 | 2,176 | 386 | 461 | 381 | 80 | 1,249 | 1,067 | 182 | 385 | 354 | 31 | 467 | 374 | 93 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 343 | 266 | 77 | 71 | 50 | 21 | 230 | 184 | 46 | 20 | 13 | 7 | 22 | 19 | 3 |
| 18-19. | 198 | 180 | 18 | 24 | 20 | 4 | 127 | 116 | 11 | 34 | 33 | 1 | 13 | 11 | 2 |
| 20-29. | 857 | 724 | 133 | 120 | 101 | 19 | 485 | 395 | 90 | 178 | 165 | 13 | 74 | 63 | 11 |
| 30-39. | 536 | 474 | 62 | 111 | 94 | 17 | 207 | 186 | 21 | 104 | 97 | 7 | 114 | 97 | 17 |
| 40-69. | 614 | 519 | 95 | 132 | 113 | 19 | 196 | 182 | 14 | 49 | 46 | 3 | 237 | 178 | 59 |
| 70 and over. | 14 | 13 | 1 | 3 | 3 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 7 | 6 | 1 |
| **Other drug.** | 127,543 | 101,477 | 26,066 | 54,470 | 40,300 | 14,170 | 53,903 | 45,330 | 8,573 | 12,353 | 10,335 | 2,018 | 6,817 | 5,512 | 1,305 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 375 | 278 | 97 | 80 | 55 | 25 | 249 | 185 | 64 | 21 | 16 | 5 | 25 | 22 | 3 |
| 18-19. | 1,141 | 886 | 255 | 337 | 230 | 107 | 649 | 533 | 116 | 87 | 73 | 14 | 68 | 50 | 18 |
| 20-29. | 29,152 | 22,690 | 6,462 | 10,594 | 7,468 | 3,126 | 14,705 | 12,179 | 2,526 | 2,441 | 1,948 | 493 | 1,412 | 1,095 | 317 |
| 30-39. | 49,387 | 38,898 | 10,489 | 21,237 | 15,486 | 5,751 | 21,267 | 17,831 | 3,436 | 4,321 | 3,532 | 789 | 2,562 | 2,049 | 513 |
| 40-69. | 47,228 | 38,492 | 8,736 | 22,074 | 16,930 | 5,144 | 16,984 | 14,555 | 2,429 | 5,429 | 4,719 | 710 | 2,741 | 2,288 | 453 |
| 70 and over. | 260 | 233 | 27 | 148 | 131 | 17 | 49 | 47 | 2 | 54 | 47 | 7 | 9 | 8 | 1 |
| **Indecent exposure.** | 1,137 | 1,018 | 119 | 420 | 370 | 50 | 335 | 304 | 31 | 294 | 262 | 32 | 88 | 82 | 6 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 9 | 8 | 1 | 3 | 3 | 0 | 3 | 2 | 1 | 2 | 2 | 0 | 1 | 1 | 0 |
| 18-19. | 15 | 12 | 3 | 1 | 1 | 0 | 7 | 7 | 0 | 4 | 4 | 0 | 3 | 0 | 3 |
| 20-29. | 290 | 254 | 36 | 79 | 70 | 9 | 103 | 92 | 11 | 91 | 77 | 14 | 17 | 15 | 2 |
| 30-39. | 376 | 339 | 37 | 126 | 107 | 19 | 124 | 117 | 7 | 100 | 90 | 10 | 26 | 25 | 1 |
| 40-69. | 427 | 385 | 42 | 198 | 176 | 22 | 91 | 81 | 10 | 96 | 88 | 8 | 42 | 40 | 2 |
| 70 and over. | 20 | 20 | 0 | 13 | 13 | 0 | 5 | 5 | 0 | 1 | 1 | 0 | 1 | 1 | 0 |
| **Annoying children.** | 368 | 341 | 27 | 92 | 82 | 10 | 186 | 173 | 13 | 59 | 57 | 2 | 31 | 29 | 2 |
| Under 10. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17. | 62 | 45 | 17 | 11 | 6 | 5 | 36 | 25 | 11 | 14 | 13 | 1 | 1 | 1 | 0 |
| 18-19. | 20 | 20 | 0 | 4 | 4 | 0 | 14 | 14 | 0 | 1 | 1 | 0 | 1 | 1 | 0 |
| 20-29. | 53 | 50 | 3 | 8 | 7 | 1 | 28 | 26 | 2 | 6 | 6 | 0 | 11 | 11 | 0 |
| 30-39. | 90 | 88 | 2 | 19 | 18 | 1 | 47 | 47 | 0 | 17 | 16 | 1 | 7 | 7 | 0 |
| 40-69. | 134 | 129 | 5 | 45 | 42 | 3 | 60 | 60 | 0 | 19 | 19 | 0 | 10 | 8 | 2 |
| 70 and over. | 9 | 9 | 0 | 5 | 5 | 0 | 1 | 1 | 0 | 2 | 2 | 0 | 1 | 1 | 0 |

(continued)

Exhibit 43
DX0444

Table 36 - continued
## MISDEMEANOR ARRESTS, 2022
### Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Offense and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| **Obscene matter** | 62 | 52 | 10 | 28 | 21 | 7 | 31 | 28 | 3 | 0 | 0 | 0 | 3 | 3 | 0 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 34 | 27 | 7 | 12 | 8 | 4 | 21 | 18 | 3 | 0 | 0 | 0 | 1 | 1 | 0 |
| 18-19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-29 | 10 | 8 | 2 | 4 | 2 | 2 | 4 | 4 | 0 | 0 | 0 | 0 | 2 | 2 | 0 |
| 30-39 | 7 | 6 | 1 | 4 | 3 | 1 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 40-69 | 10 | 10 | 0 | 7 | 7 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 70 and over | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Lewd conduct** | 674 | 574 | 100 | 190 | 161 | 29 | 280 | 249 | 31 | 148 | 112 | 36 | 56 | 52 | 4 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 44 | 40 | 4 | 6 | 6 | 0 | 31 | 28 | 3 | 4 | 3 | 1 | 3 | 3 | 0 |
| 18-19 | 16 | 8 | 8 | 1 | 1 | 0 | 7 | 5 | 2 | 6 | 0 | 6 | 2 | 2 | 0 |
| 20-29 | 173 | 135 | 38 | 31 | 25 | 6 | 77 | 65 | 12 | 50 | 32 | 18 | 15 | 13 | 2 |
| 30-39 | 207 | 187 | 20 | 58 | 49 | 9 | 83 | 78 | 5 | 53 | 47 | 6 | 13 | 13 | 0 |
| 40-69 | 226 | 196 | 30 | 89 | 75 | 14 | 82 | 73 | 9 | 35 | 30 | 5 | 20 | 18 | 2 |
| 70 and over | 8 | 8 | 0 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 |
| **Prostitution** | 3,946 | 1,436 | 2,510 | 550 | 192 | 358 | 1,388 | 879 | 509 | 1,600 | 190 | 1,410 | 408 | 175 | 233 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 10 | 5 | 5 | 0 | 0 | 0 | 5 | 1 | 4 | 5 | 2 | 3 | 0 | 0 | 0 |
| 18-19 | 441 | 40 | 401 | 61 | 8 | 53 | 112 | 27 | 85 | 253 | 2 | 251 | 15 | 3 | 12 |
| 20-29 | 2,057 | 508 | 1,549 | 245 | 35 | 210 | 668 | 337 | 331 | 1,030 | 74 | 956 | 114 | 62 | 52 |
| 30-39 | 768 | 416 | 352 | 114 | 46 | 68 | 330 | 266 | 64 | 234 | 52 | 182 | 90 | 52 | 38 |
| 40-69 | 657 | 455 | 202 | 123 | 97 | 26 | 269 | 241 | 28 | 78 | 60 | 18 | 187 | 57 | 130 |
| 70 and over | 13 | 12 | 1 | 7 | 6 | 1 | 4 | 4 | 0 | 0 | 0 | 0 | 2 | 2 | 0 |
| **Drunk** | 34,126 | 27,243 | 6,883 | 14,515 | 11,009 | 3,506 | 14,491 | 12,140 | 2,351 | 3,056 | 2,441 | 615 | 2,064 | 1,653 | 411 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 266 | 161 | 105 | 81 | 39 | 42 | 158 | 103 | 55 | 11 | 7 | 4 | 16 | 12 | 4 |
| 18-19 | 643 | 472 | 171 | 179 | 127 | 52 | 381 | 292 | 89 | 47 | 24 | 23 | 36 | 29 | 7 |
| 20-29 | 9,228 | 7,278 | 1,950 | 2,787 | 2,146 | 641 | 4,986 | 4,015 | 971 | 863 | 657 | 206 | 592 | 460 | 132 |
| 30-39 | 10,534 | 8,533 | 2,001 | 4,115 | 3,132 | 983 | 4,680 | 4,006 | 674 | 1,026 | 831 | 195 | 713 | 564 | 149 |
| 40-69 | 13,222 | 10,611 | 2,611 | 7,191 | 5,436 | 1,755 | 4,246 | 3,690 | 556 | 1,096 | 910 | 186 | 689 | 575 | 114 |
| 70 and over | 233 | 188 | 45 | 162 | 129 | 33 | 40 | 34 | 6 | 13 | 12 | 1 | 18 | 13 | 5 |
| **Liquor laws** | 2,262 | 1,628 | 634 | 800 | 506 | 294 | 1,065 | 828 | 237 | 163 | 125 | 38 | 234 | 169 | 65 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 456 | 288 | 168 | 167 | 89 | 78 | 251 | 175 | 76 | 15 | 11 | 4 | 23 | 13 | 10 |
| 18-19 | 482 | 334 | 148 | 221 | 133 | 88 | 204 | 163 | 41 | 15 | 9 | 6 | 42 | 29 | 13 |
| 20-29 | 565 | 396 | 169 | 184 | 111 | 73 | 279 | 208 | 71 | 35 | 24 | 11 | 67 | 53 | 14 |
| 30-39 | 242 | 198 | 44 | 57 | 45 | 12 | 114 | 97 | 17 | 30 | 23 | 7 | 41 | 33 | 8 |
| 40-69 | 505 | 404 | 101 | 169 | 126 | 43 | 213 | 183 | 30 | 65 | 57 | 8 | 58 | 38 | 20 |
| 70 and over | 12 | 8 | 4 | 2 | 2 | 0 | 4 | 2 | 2 | 3 | 1 | 2 | 3 | 3 | 0 |
| **Disorderly conduct** | 1,923 | 1,437 | 486 | 919 | 625 | 294 | 652 | 532 | 120 | 265 | 212 | 53 | 87 | 68 | 19 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 34 | 29 | 5 | 10 | 10 | 0 | 14 | 12 | 2 | 8 | 8 | 0 | 2 | 0 | 2 |
| 18-19 | 34 | 25 | 9 | 5 | 4 | 1 | 17 | 12 | 5 | 10 | 7 | 3 | 2 | 2 | 0 |
| 20-29 | 319 | 250 | 69 | 107 | 73 | 34 | 146 | 127 | 19 | 50 | 37 | 13 | 16 | 13 | 3 |
| 30-39 | 642 | 486 | 156 | 274 | 194 | 80 | 250 | 201 | 49 | 88 | 68 | 20 | 30 | 23 | 7 |
| 40-69 | 879 | 638 | 241 | 512 | 338 | 174 | 225 | 180 | 45 | 106 | 90 | 16 | 36 | 30 | 6 |
| 70 and over | 15 | 9 | 6 | 11 | 6 | 5 | 0 | 0 | 0 | 3 | 2 | 1 | 1 | 1 | 0 |

(continued)

Exhibit 43
DX0445

Table 36 - continued
## MISDEMEANOR ARRESTS, 2022
### Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Offense and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| **Disturbing the peace** | 2,061 | 1,504 | 557 | 638 | 462 | 176 | 881 | 648 | 233 | 378 | 269 | 109 | 164 | 125 | 39 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 417 | 279 | 138 | 62 | 43 | 19 | 265 | 178 | 87 | 71 | 42 | 29 | 19 | 16 | 3 |
| 18-19 | 55 | 41 | 14 | 13 | 10 | 3 | 27 | 23 | 4 | 13 | 8 | 5 | 2 | 0 | 2 |
| 20-29 | 428 | 312 | 116 | 93 | 62 | 31 | 214 | 166 | 48 | 75 | 53 | 22 | 46 | 31 | 15 |
| 30-39 | 493 | 387 | 106 | 157 | 127 | 30 | 198 | 151 | 47 | 94 | 70 | 24 | 44 | 39 | 5 |
| 40-69 | 645 | 466 | 179 | 298 | 209 | 89 | 172 | 125 | 47 | 122 | 93 | 29 | 53 | 39 | 14 |
| 70 and over | 23 | 19 | 4 | 15 | 11 | 4 | 5 | 5 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| **Vandalism** | 6,899 | 5,493 | 1,406 | 2,244 | 1,742 | 502 | 2,965 | 2,497 | 468 | 1,198 | 858 | 340 | 492 | 396 | 96 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 812 | 676 | 136 | 223 | 189 | 34 | 416 | 361 | 55 | 120 | 84 | 36 | 53 | 42 | 11 |
| 18-19 | 258 | 223 | 35 | 68 | 62 | 6 | 147 | 126 | 21 | 26 | 21 | 5 | 17 | 14 | 3 |
| 20-29 | 1,793 | 1,429 | 364 | 424 | 337 | 87 | 905 | 762 | 143 | 323 | 224 | 99 | 141 | 106 | 35 |
| 30-39 | 2,055 | 1,646 | 409 | 696 | 551 | 145 | 857 | 721 | 136 | 371 | 260 | 111 | 131 | 114 | 17 |
| 40-69 | 1,921 | 1,477 | 444 | 793 | 574 | 219 | 636 | 524 | 112 | 352 | 265 | 87 | 140 | 114 | 26 |
| 70 and over | 60 | 42 | 18 | 40 | 29 | 11 | 4 | 3 | 1 | 6 | 4 | 2 | 10 | 6 | 4 |
| **Trespassing** | 20,896 | 15,500 | 5,396 | 7,609 | 5,231 | 2,378 | 7,893 | 6,111 | 1,782 | 4,233 | 3,275 | 958 | 1,161 | 883 | 278 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 338 | 269 | 69 | 91 | 77 | 14 | 183 | 144 | 39 | 46 | 36 | 10 | 18 | 12 | 6 |
| 18-19 | 253 | 201 | 52 | 82 | 56 | 26 | 100 | 87 | 13 | 59 | 48 | 11 | 12 | 10 | 2 |
| 20-29 | 4,091 | 3,050 | 1,041 | 1,051 | 714 | 337 | 1,864 | 1,428 | 436 | 957 | 742 | 215 | 219 | 166 | 53 |
| 30-39 | 7,261 | 5,435 | 1,826 | 2,444 | 1,706 | 738 | 2,917 | 2,227 | 690 | 1,549 | 1,217 | 332 | 351 | 285 | 66 |
| 40-69 | 8,767 | 6,409 | 2,358 | 3,828 | 2,599 | 1,229 | 2,799 | 2,201 | 598 | 1,596 | 1,212 | 384 | 544 | 397 | 147 |
| 70 and over | 186 | 136 | 50 | 113 | 79 | 34 | 30 | 24 | 6 | 26 | 20 | 6 | 17 | 13 | 4 |
| **Weapons** | 5,330 | 4,620 | 710 | 1,577 | 1,309 | 268 | 2,349 | 2,091 | 258 | 1,029 | 880 | 149 | 375 | 340 | 35 |
| Under 10 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 773 | 665 | 108 | 129 | 104 | 25 | 492 | 430 | 62 | 93 | 78 | 15 | 59 | 53 | 6 |
| 18-19 | 315 | 285 | 30 | 49 | 40 | 9 | 193 | 180 | 13 | 57 | 50 | 7 | 16 | 15 | 1 |
| 20-29 | 1,693 | 1,483 | 210 | 346 | 288 | 58 | 822 | 741 | 81 | 409 | 354 | 55 | 116 | 100 | 16 |
| 30-39 | 1,379 | 1,178 | 201 | 496 | 407 | 89 | 498 | 442 | 56 | 288 | 239 | 49 | 97 | 90 | 7 |
| 40-69 | 1,141 | 983 | 158 | 537 | 452 | 85 | 338 | 293 | 45 | 180 | 157 | 23 | 86 | 81 | 5 |
| 70 and over | 27 | 24 | 3 | 20 | 18 | 2 | 4 | 3 | 1 | 2 | 2 | 0 | 1 | 1 | 0 |
| **Driving under the influence** | 100,372 | 77,707 | 22,665 | 27,575 | 18,953 | 8,622 | 55,827 | 46,123 | 9,704 | 8,954 | 6,500 | 2,454 | 8,016 | 6,131 | 1,885 |
| Under 10 | 4 | 3 | 1 | 1 | 1 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| 10-17 | 432 | 329 | 103 | 118 | 75 | 43 | 277 | 228 | 49 | 14 | 9 | 5 | 23 | 17 | 6 |
| 18-19 | 2,544 | 2,017 | 527 | 620 | 434 | 186 | 1,646 | 1,370 | 276 | 114 | 91 | 23 | 164 | 122 | 42 |
| 20-29 | 37,465 | 28,678 | 8,787 | 7,823 | 5,429 | 2,394 | 23,674 | 19,019 | 4,655 | 2,957 | 2,022 | 935 | 3,011 | 2,208 | 803 |
| 30-39 | 29,551 | 23,056 | 6,495 | 7,457 | 5,140 | 2,317 | 16,690 | 13,906 | 2,784 | 2,876 | 2,052 | 824 | 2,528 | 1,958 | 570 |
| 40-69 | 29,313 | 22,808 | 6,505 | 10,862 | 7,378 | 3,484 | 13,311 | 11,395 | 1,916 | 2,922 | 2,271 | 651 | 2,218 | 1,764 | 454 |
| 70 and over | 1,063 | 816 | 247 | 694 | 496 | 198 | 227 | 203 | 24 | 71 | 55 | 16 | 72 | 62 | 10 |
| **Glue sniffing** | 1,674 | 1,268 | 406 | 307 | 208 | 99 | 1,229 | 954 | 275 | 68 | 51 | 17 | 70 | 55 | 15 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 101 | 79 | 22 | 10 | 8 | 2 | 87 | 68 | 19 | 1 | 1 | 0 | 3 | 2 | 1 |
| 18-19 | 335 | 262 | 73 | 23 | 15 | 8 | 292 | 230 | 62 | 8 | 8 | 0 | 12 | 9 | 3 |
| 20-29 | 815 | 605 | 210 | 97 | 67 | 30 | 666 | 501 | 165 | 25 | 18 | 7 | 27 | 19 | 8 |
| 30-39 | 271 | 199 | 72 | 100 | 57 | 43 | 142 | 121 | 21 | 19 | 12 | 7 | 10 | 9 | 1 |
| 40-69 | 150 | 123 | 27 | 75 | 61 | 14 | 42 | 34 | 8 | 15 | 12 | 3 | 18 | 16 | 2 |
| 70 and over | 2 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(continued)

53

Exhibit 43
DX0446

Table 36 - continued
## MISDEMEANOR ARRESTS, 2022
### Offense by Gender, Race/Ethnic Group, and Age Group of Arrestee

| Offense and age | Total | | | White | | | Hispanic | | | Black | | | Other | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| **Hit-and-run** | 1,301 | 981 | 320 | 366 | 256 | 110 | 697 | 549 | 148 | 140 | 99 | 41 | 98 | 77 | 21 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 35 | 28 | 7 | 7 | 4 | 3 | 22 | 18 | 4 | 3 | 3 | 0 | 3 | 3 | 0 |
| 18-19 | 73 | 59 | 14 | 9 | 8 | 1 | 53 | 42 | 11 | 5 | 5 | 0 | 6 | 6 | 0 |
| 20-29 | 463 | 359 | 104 | 87 | 62 | 25 | 285 | 229 | 56 | 57 | 41 | 16 | 34 | 27 | 7 |
| 30-39 | 329 | 231 | 98 | 96 | 60 | 36 | 174 | 133 | 41 | 33 | 18 | 15 | 26 | 20 | 6 |
| 40-69 | 365 | 277 | 88 | 146 | 108 | 38 | 155 | 120 | 35 | 40 | 31 | 9 | 24 | 18 | 6 |
| 70 and over | 36 | 27 | 9 | 21 | 14 | 7 | 8 | 7 | 1 | 2 | 2 | 0 | 5 | 4 | 1 |
| **Selected traffic violations** | 2,929 | 2,640 | 289 | 639 | 565 | 74 | 1,672 | 1,535 | 137 | 325 | 286 | 39 | 293 | 254 | 39 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 138 | 132 | 6 | 49 | 48 | 1 | 59 | 54 | 5 | 8 | 8 | 0 | 22 | 22 | 0 |
| 18-19 | 485 | 459 | 26 | 100 | 94 | 6 | 313 | 297 | 16 | 28 | 26 | 2 | 44 | 42 | 2 |
| 20-29 | 1,363 | 1,244 | 119 | 234 | 208 | 26 | 852 | 791 | 61 | 146 | 128 | 18 | 131 | 117 | 14 |
| 30-39 | 507 | 445 | 62 | 116 | 103 | 13 | 266 | 240 | 26 | 72 | 60 | 12 | 53 | 42 | 11 |
| 40-69 | 427 | 354 | 73 | 136 | 110 | 26 | 177 | 149 | 28 | 71 | 64 | 7 | 43 | 31 | 12 |
| 70 and over | 9 | 6 | 3 | 4 | 4 | 0 | 5 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Gambling** | 291 | 196 | 95 | 61 | 34 | 27 | 139 | 94 | 45 | 41 | 30 | 11 | 50 | 38 | 12 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18-19 | 4 | 1 | 3 | 0 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 1 |
| 20-29 | 48 | 36 | 12 | 8 | 5 | 3 | 22 | 16 | 6 | 9 | 6 | 3 | 9 | 9 | 0 |
| 30-39 | 105 | 69 | 36 | 31 | 16 | 15 | 50 | 32 | 18 | 14 | 11 | 3 | 10 | 10 | 0 |
| 40-69 | 124 | 83 | 41 | 22 | 13 | 9 | 59 | 40 | 19 | 18 | 13 | 5 | 25 | 17 | 8 |
| 70 and over | 8 | 5 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 5 | 2 | 3 |
| **Cruelty to animals** | 38 | 22 | 16 | 17 | 10 | 7 | 7 | 5 | 2 | 10 | 5 | 5 | 4 | 2 | 2 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| 18-19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20-29 | 9 | 5 | 4 | 3 | 2 | 1 | 2 | 2 | 0 | 3 | 1 | 2 | 1 | 0 | 1 |
| 30-39 | 9 | 7 | 2 | 5 | 3 | 2 | 2 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| 40-69 | 18 | 8 | 10 | 9 | 5 | 4 | 3 | 1 | 2 | 3 | 0 | 3 | 3 | 2 | 1 |
| 70 and over | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Nonsupport** | 30 | 6 | 24 | 4 | 0 | 4 | 16 | 4 | 12 | 9 | 1 | 8 | 1 | 1 | 0 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 2 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 |
| 18-19 | 2 | 2 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 |
| 20-29 | 8 | 1 | 7 | 1 | 0 | 1 | 4 | 1 | 3 | 3 | 0 | 3 | 0 | 0 | 0 |
| 30-39 | 10 | 3 | 7 | 2 | 0 | 2 | 5 | 2 | 3 | 3 | 1 | 2 | 0 | 0 | 0 |
| 40-69 | 10 | 0 | 10 | 1 | 0 | 1 | 6 | 0 | 6 | 2 | 0 | 2 | 0 | 0 | 0 |
| 70 and over | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **All other** | 98,084 | 75,821 | 22,263 | 35,553 | 25,508 | 10,045 | 42,973 | 35,137 | 7,836 | 13,957 | 10,821 | 3,136 | 5,601 | 4,355 | 1,246 |
| Under 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10-17 | 1,265 | 1,017 | 248 | 228 | 177 | 51 | 724 | 596 | 128 | 197 | 146 | 51 | 116 | 98 | 18 |
| 18-19 | 1,434 | 1,124 | 310 | 307 | 224 | 83 | 829 | 681 | 148 | 208 | 148 | 60 | 90 | 68 | 22 |
| 20-29 | 22,295 | 17,062 | 5,243 | 5,668 | 3,920 | 1,748 | 12,071 | 9,774 | 2,297 | 3,435 | 2,478 | 957 | 1,131 | 890 | 241 |
| 30-39 | 32,324 | 24,916 | 7,408 | 11,481 | 8,033 | 3,448 | 14,448 | 11,930 | 2,518 | 4,489 | 3,471 | 1,018 | 1,825 | 1,422 | 403 |
| 40-69 | 39,799 | 31,096 | 8,703 | 17,414 | 12,806 | 4,608 | 14,489 | 11,971 | 2,518 | 5,528 | 4,494 | 1,034 | 2,368 | 1,825 | 543 |
| 70 and over | 757 | 606 | 151 | 445 | 348 | 97 | 141 | 125 | 16 | 100 | 81 | 19 | 71 | 52 | 19 |

Note: California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The 2022 arrest numbers include 45 transgender (identifying as male) and 141 transgender (identifying as female) in the male and female gender categories, respectively. Arrest numbers for the non-binary gender category are not included in this table due to the small population size. Caution should be used when comparing gender data to prior years. For additional information, including the expanded gender category numbers for prior years, see Understanding the Data, Characteristics and Known Limitations.

54

Exhibit 43
DX0447

Table 37

**DISPOSITIONS OF ADULT FELONY ARRESTS, 1982-2022**

By Type of Disposition

| Year | Total | | Law enforcement releases | | Prosecution rejections and resolutions[1] | | Court dispositions | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Dismissed, acquitted[2] | | Convicted | |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2022.......... | 227,248 | 100.0 | 4,587 | 2.0 | 40,373 | 17.8 | 42,751 | 18.8 | 139,537 | 61.4 |
| 2021.......... | 174,491 | 100.0 | 3,715 | 2.1 | 32,389 | 18.6 | 30,244 | 17.3 | 108,143 | 62.0 |
| 2020.......... | 132,351 | 100.0 | 3,904 | 2.9 | 27,348 | 20.7 | 21,277 | 16.1 | 79,822 | 60.3 |
| 2019[a]...... | 110,002 | 100.0 | 2,661 | 2.4 | 17,428 | 15.8 | 14,711 | 13.4 | 75,202 | 68.4 |
| 2018.......... | 215,283 | 100.0 | 6,524 | 3.0 | 40,099 | 18.6 | 27,154 | 12.6 | 141,506 | 65.7 |
| 2017.......... | 218,933 | 100.0 | 7,910 | 3.6 | 39,815 | 18.2 | 26,678 | 12.2 | 144,530 | 66.0 |
| 2016.......... | 207,022 | 100.0 | 7,058 | 3.4 | 36,588 | 17.7 | 25,961 | 12.5 | 137,415 | 66.4 |
| 2015.......... | 242,460 | 100.0 | 7,537 | 3.1 | 38,733 | 16.0 | 33,908 | 14.0 | 162,282 | 66.9 |
| 2014[b]...... | 315,782 | 100.0 | 10,227 | 3.2 | 48,235 | 15.3 | 39,632 | 12.6 | 217,688 | 68.9 |
| 2013.......... | 305,503 | 100.0 | 10,525 | 3.4 | 45,273 | 14.8 | 36,315 | 11.9 | 213,390 | 69.8 |
| 2012.......... | 295,465 | 100.0 | 9,572 | 3.2 | 48,029 | 16.3 | 35,451 | 12.0 | 202,413 | 68.5 |
| 2011.......... | 292,231 | 100.0 | 9,780 | 3.3 | 45,988 | 15.7 | 40,642 | 13.9 | 195,821 | 67.0 |
| 2010.......... | 298,647 | 100.0 | 9,980 | 3.3 | 46,054 | 15.4 | 40,793 | 13.7 | 201,820 | 67.6 |
| 2009.......... | 306,170 | 100.0 | 9,894 | 3.2 | 43,317 | 14.1 | 45,000 | 14.7 | 207,959 | 67.9 |
| 2008.......... | 325,241 | 100.0 | 9,435 | 2.9 | 41,610 | 12.8 | 46,485 | 14.3 | 227,711 | 70.0 |
| 2007.......... | 332,647 | 100.0 | 10,273 | 3.1 | 42,632 | 12.8 | 48,728 | 14.6 | 231,014 | 69.4 |
| 2006.......... | 319,818 | 100.0 | 9,107 | 2.8 | 42,506 | 13.3 | 46,456 | 14.5 | 221,749 | 69.3 |
| 2005.......... | 319,587 | 100.0 | 10,114 | 3.2 | 39,034 | 12.2 | 43,638 | 13.7 | 226,801 | 71.0 |
| 2004.......... | 345,415 | 100.0 | 10,721 | 3.1 | 43,179 | 12.5 | 48,150 | 13.9 | 243,365 | 70.5 |
| 2003.......... | 316,377 | 100.0 | 10,352 | 3.3 | 42,922 | 13.6 | 45,775 | 14.5 | 217,328 | 68.7 |
| 2002.......... | 287,499 | 100.0 | 11,195 | 3.9 | 39,833 | 13.9 | 41,020 | 14.3 | 195,451 | 68.0 |
| 2001.......... | 271,992 | 100.0 | 11,248 | 4.1 | 39,414 | 14.5 | 37,703 | 13.9 | 183,627 | 67.5 |
| 2000.......... | 267,512 | 100.0 | 7,698 | 2.9 | 37,152 | 13.9 | 36,576 | 13.7 | 186,086 | 69.6 |
| 1999 ......... | 278,715 | 100.0 | 9,616 | 3.5 | 40,217 | 14.4 | 36,004 | 12.9 | 192,878 | 69.2 |
| 1998.......... | 314,483 | 100.0 | 13,880 | 4.4 | 42,763 | 13.6 | 39,866 | 12.7 | 217,974 | 69.3 |
| 1997.......... | 326,768 | 100.0 | 14,289 | 4.4 | 47,829 | 14.6 | 42,842 | 13.1 | 221,808 | 67.9 |
| 1996.......... | 328,168 | 100.0 | 12,802 | 3.9 | 47,941 | 14.6 | 43,566 | 13.3 | 223,859 | 68.2 |
| 1995.......... | 345,125 | 100.0 | 15,100 | 4.4 | 45,877 | 13.3 | 45,838 | 13.3 | 238,310 | 69.1 |
| 1994.......... | 342,321 | 100.0 | 16,713 | 4.9 | 44,791 | 13.1 | 45,108 | 13.2 | 235,709 | 68.9 |
| 1993.......... | 345,469 | 100.0 | 16,464 | 4.8 | 44,512 | 12.9 | 43,157 | 12.5 | 241,336 | 69.9 |
| 1992.......... | 284,810 | 100.0 | 12,273 | 4.3 | 32,284 | 11.3 | 40,134 | 14.1 | 200,119 | 70.3 |
| 1991.......... | 303,707 | 100.0 | 20,222 | 6.7 | 45,756 | 15.1 | 42,002 | 13.8 | 195,727 | 64.4 |
| 1990.......... | 258,734 | 100.0 | 15,444 | 6.0 | 33,503 | 12.9 | 40,444 | 15.6 | 169,343 | 65.5 |
| 1989.......... | 275,151 | 100.0 | 20,773 | 7.5 | 45,682 | 16.6 | 41,069 | 14.9 | 167,627 | 60.9 |
| 1988.......... | 265,990 | 100.0 | 19,230 | 7.2 | 51,222 | 19.3 | 41,867 | 15.7 | 153,671 | 57.8 |
| 1987.......... | 270,496 | 100.0 | 21,019 | 7.8 | 52,464 | 19.4 | 43,413 | 16.0 | 153,600 | 56.8 |
| 1986.......... | 258,832 | 100.0 | 22,773 | 8.8 | 47,807 | 18.5 | 39,962 | 15.4 | 148,290 | 57.3 |
| 1985.......... | 240,978 | 100.0 | 23,003 | 9.5 | 39,732 | 16.5 | 37,710 | 15.6 | 140,533 | 58.3 |
| 1984.......... | 210,398 | 100.0 | 20,180 | 9.6 | 35,498 | 16.9 | 34,453 | 16.4 | 120,267 | 57.2 |
| 1983.......... | 201,158 | 100.0 | 19,006 | 9.4 | 37,215 | 18.5 | 33,284 | 16.5 | 111,653 | 55.5 |
| 1982.......... | 203,805 | 100.0 | 20,895 | 10.3 | 37,010 | 18.2 | 34,457 | 16.9 | 111,443 | 54.7 |

Source:  Data extracted from the California Department of Justice Criminal History System.  For additional information, see Understanding the Data,
   Characteristics and Known Limitations.

Notes: This table presents the number and type of final dispositions and sentences for felony arrests reported to the California Department of Justice by law
   enforcement agencies, district attorneys, and courts.  Caution should be used when interpreting this information because arrests and dispositions
   are underreported.  It should also be noted that approximately 1.3% of the adult felony convictions contained in these data represent a disposition that
   the California Department of Justice was unable to positively link to a criminal record;  accordingly, an arrest event was created based solely upon the
   disposition information provided.  There is no way for the California Department of Justice to estimate the exact percentage of underreported
   dispositions.  The nature, extent, and reasons for this underreporting vary from agency to agency and from year to year.
   Percentages may not add to subtotals or 100.0 because of rounding.

[a] In 2019, there was a decrease in the number of final dispositions and sentences for felony adult arrests reported to the California Department of Justice.
[b] In November 2014, California voters passed Proposition 47 which reduced some felony offenses to misdemeanors. Caution should be used when comparing
   felony arrest disposition data to prior years.
[1] The "prosecution rejections and resolutions" category includes single complaints, combined cases, and petitions to revoke probation.
[2] The "dismissed, acquitted" category includes diversions that have been dismissed.

Exhibit 43

DX0448

Table 38A
## DISPOSITIONS OF ADULT FELONY ARRESTS, 2017-2022
### By Type of Disposition and Sentence

| Type of disposition and sentence | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019[a] Number | 2019[a] Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total.................................................... | 218,933 | 100.0 | 215,283 | 100.0 | 110,002 | 100.0 | 132,351 | 100.0 | 174,491 | 100.0 | 227,248 | 100.0 |
| Law enforcement releases (PC 849(b)).... | 7,910 | 3.6 | 6,524 | 3.0 | 2,661 | 2.4 | 3,904 | 2.9 | 3,715 | 2.1 | 4,587 | 2.0 |
| Complainant refuses to prosecute........ | 57 | 0.0 | 36 | 0.0 | 14 | 0.0 | 21 | 0.0 | 41 | 0.0 | 32 | 0.0 |
| Arrestee exonerated...................... | 44 | 0.0 | 38 | 0.0 | 14 | 0.0 | 21 | 0.0 | 22 | 0.0 | 16 | 0.0 |
| Further investigation.................... | 328 | 0.1 | 303 | 0.1 | 58 | 0.1 | 121 | 0.1 | 100 | 0.1 | 78 | 0.0 |
| Admissible evidence insufficient......... | 648 | 0.3 | 534 | 0.2 | 181 | 0.2 | 399 | 0.3 | 440 | 0.3 | 441 | 0.2 |
| Ascertained evidence insufficient........ | 665 | 0.3 | 270 | 0.1 | 9 | 0.0 | 21 | 0.0 | 13 | 0.0 | 15 | 0.0 |
| Other[1].................................. | 6,156 | 2.8 | 5,334 | 2.5 | 2,383 | 2.2 | 3,315 | 2.5 | 3,095 | 1.8 | 3,996 | 1.8 |
| Unspecified.............................. | 12 | 0.0 | 9 | 0.0 | 2 | 0.0 | 6 | 0.0 | 4 | 0.0 | 9 | 0.0 |
| Prosecution rejections and resolutions... | 39,815 | 18.2 | 40,099 | 18.6 | 17,428 | 15.8 | 27,348 | 20.7 | 32,389 | 18.6 | 40,373 | 17.8 |
| Lack of corpus........................... | 490 | 0.2 | 421 | 0.2 | 201 | 0.2 | 398 | 0.3 | 326 | 0.2 | 413 | 0.2 |
| Lack of sufficient evidence.............. | 24,140 | 11.0 | 24,200 | 11.2 | 9,743 | 8.9 | 15,616 | 11.8 | 17,922 | 10.3 | 23,463 | 10.3 |
| Inadmissible search and seizure.......... | 474 | 0.2 | 632 | 0.3 | 282 | 0.3 | 325 | 0.2 | 347 | 0.2 | 508 | 0.2 |
| Victim unavailable/ decline to testify... | 1,718 | 0.8 | 1,640 | 0.8 | 798 | 0.7 | 1,238 | 0.9 | 1,706 | 1.0 | 2,395 | 1.1 |
| Witness unavailable/ decline to testify.. | 184 | 0.1 | 115 | 0.1 | 36 | 0.0 | 76 | 0.1 | 82 | 0.0 | 70 | 0.0 |
| Combined with other counts/cases......... | 491 | 0.2 | 389 | 0.2 | 155 | 0.1 | 357 | 0.3 | 520 | 0.3 | 568 | 0.2 |
| Interest of justice...................... | 2,811 | 1.3 | 3,299 | 1.5 | 855 | 0.8 | 1,845 | 1.4 | 3,149 | 1.8 | 3,447 | 1.5 |
| Deferred to revocation of parole......... | 164 | 0.1 | 153 | 0.1 | 102 | 0.1 | 191 | 0.1 | 113 | 0.1 | 122 | 0.1 |
| Prosecutor prefiling deferral/diversion.. | 644 | 0.3 | 578 | 0.3 | 137 | 0.1 | 498 | 0.4 | 597 | 0.3 | 758 | 0.3 |
| Probation revocation in lieu of filing... | 366 | 0.2 | 266 | 0.1 | 128 | 0.1 | 166 | 0.1 | 59 | 0.0 | 60 | 0.0 |
| Other[2].................................. | 8,333 | 3.8 | 8,406 | 3.9 | 4,991 | 4.5 | 6,638 | 5.0 | 7,568 | 4.3 | 8,569 | 3.8 |
| Court dispositions....................... | 171,208 | 78.2 | 168,660 | 78.3 | 89,913 | 81.7 | 101,099 | 76.4 | 138,387 | 79.3 | 182,288 | 80.2 |
| Dismissed................................ | 25,381 | 11.6 | 26,143 | 12.1 | 14,406 | 13.1 | 20,830 | 15.7 | 29,671 | 17.0 | 41,608 | 18.3 |
| Diversions dismissed..................... | 806 | 0.4 | 500 | 0.2 | 57 | 0.1 | 304 | 0.2 | 371 | 0.2 | 782 | 0.3 |
| Acquitted................................ | 491 | 0.2 | 511 | 0.2 | 248 | 0.2 | 143 | 0.1 | 202 | 0.1 | 361 | 0.2 |
| Convicted................................ | 144,530 | 66.0 | 141,506 | 65.7 | 75,202 | 68.4 | 79,822 | 60.3 | 108,143 | 62.0 | 139,537 | 61.4 |
| Sentence | | | | | | | | | | | | |
| Death.................................. | 11 | 0.0 | 5 | 0.0 | 3 | 0.0 | 5 | 0.0 | 3 | 0.0 | 2 | 0.0 |
| State institutions[3].................. | 28,333 | 12.9 | 28,414 | 13.2 | 12,954 | 11.8 | 16,886 | 12.8 | 21,306 | 12.2 | 30,062 | 13.2 |
| Probation.............................. | 11,465 | 5.2 | 10,656 | 4.9 | 5,336 | 4.9 | 5,147 | 3.9 | 8,107 | 4.6 | 9,994 | 4.4 |
| Probation with jail.................... | 80,995 | 37.0 | 80,929 | 37.6 | 45,288 | 41.2 | 45,864 | 34.7 | 60,948 | 34.9 | 76,532 | 33.7 |
| Jail................................... | 18,633 | 8.5 | 17,931 | 8.3 | 9,255 | 8.4 | 9,196 | 6.9 | 13,282 | 7.6 | 17,779 | 7.8 |
| Fine................................... | 1,421 | 0.6 | 1,320 | 0.6 | 686 | 0.6 | 946 | 0.7 | 1,253 | 0.7 | 1,448 | 0.6 |
| Other[4]............................... | 3,672 | 1.7 | 2,251 | 1.0 | 1,680 | 1.5 | 1,778 | 1.3 | 3,244 | 1.9 | 3,720 | 1.6 |

Source: Data extracted from the California Department of Justice Criminal History System. For additional information, see Understanding the Data, Characteristics and Known Limitations.

Notes: This table presents the number and type of final dispositions and sentences for felony arrests reported to the California Department of Justice by law enforcement agencies, district attorneys, and courts. Caution should be used when interpreting this information because arrests and dispositions are underreported. It should also be noted that approximately 1.3% of the adult felony convictions contained in these data represent a disposition that the California Department of Justice was unable to positively link to a criminal record; accordingly, an arrest event was created based solely upon the disposition information provided. There is no way for the California Department of Justice to estimate the exact percentage of underreported dispositions. The nature, extent, and reasons for this underreporting vary from agency to agency and from year to year.

Percentages may not add to subtotals or 100.0 because of rounding.

[a] In 2019, there was a decrease in the number of final dispositions and sentences for felony adult arrests reported to the California Department of Justice.

[1] The 'other' category includes release due to delay, subject reported deceased, handled administratively, Penal Code section 849(b)(2) - intoxication only, and Penal Code section 849(b)(5) - under the influence of a controlled substance and delivered to a treatment facility.

[2] The 'other' category includes rejection due to continuing investigations and due process or jurisdictional considerations.

[3] The 'State institutions' category includes sentences to prison, California Rehabilitation Center, and the Division of Juvenile Justice.

[4] The 'other' category includes no sentence given, sentence suspended, and sentence stayed.

Exhibit 43
DX0449

Table 38B
## DISPOSITIONS OF ADULT FELONY ARRESTS, 2017-2022
By Type of Disposition and Sentence
Percent Distribution of Court Dispositions

| Type of disposition and sentence | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019[a] Number | 2019[a] Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 218,933 | | 215,283 | | 110,002 | | 132,351 | | 174,491 | | 227,248 | |
| Law enforcement releases (PC 849(b)) | 7,910 | | 6,524 | | 2,661 | | 3,904 | | 3,715 | | 4,587 | |
| Complainant refuses to prosecute | 57 | | 36 | | 14 | | 21 | | 41 | | 32 | |
| Arrestee exonerated | 44 | | 38 | | 14 | | 21 | | 22 | | 16 | |
| Further investigation | 328 | | 303 | | 58 | | 121 | | 100 | | 78 | |
| Admissible evidence insufficient | 648 | | 534 | | 181 | | 399 | | 440 | | 441 | |
| Ascertained evidence insufficient | 665 | | 270 | | 9 | | 21 | | 13 | | 15 | |
| Other[1] | 6,156 | | 5,334 | | 2,383 | | 3,315 | | 3,095 | | 3,996 | |
| Unspecified | 12 | | 9 | | 2 | | 6 | | 4 | | 9 | |
| Prosecution rejections and resolutions | 39,815 | | 40,099 | | 17,428 | | 27,348 | | 32,389 | | 40,373 | |
| Lack of corpus | 490 | | 421 | | 201 | | 398 | | 326 | | 413 | |
| Lack of sufficient evidence | 24,140 | | 24,200 | | 9,743 | | 15,616 | | 17,922 | | 23,463 | |
| Inadmissible search and seizure | 474 | | 632 | | 282 | | 325 | | 347 | | 508 | |
| Victim unavailable/ decline to testify | 1,718 | | 1,640 | | 798 | | 1,238 | | 1,706 | | 2,395 | |
| Witness unavailable/ decline to testify | 184 | | 115 | | 36 | | 76 | | 82 | | 70 | |
| Combined with other counts/cases | 491 | | 389 | | 155 | | 357 | | 520 | | 568 | |
| Interest of justice | 2,811 | | 3,299 | | 855 | | 1,845 | | 3,149 | | 3,447 | |
| Deferred to revocation of parole | 164 | | 153 | | 102 | | 191 | | 113 | | 122 | |
| Prosecutor prefiling deferral/diversion | 644 | | 578 | | 137 | | 498 | | 597 | | 758 | |
| Probation revocation in lieu of filing | 366 | | 266 | | 128 | | 166 | | 59 | | 60 | |
| Other[2] | 8,333 | | 8,406 | | 4,991 | | 6,638 | | 7,568 | | 8,569 | |
| Court dispositions | 171,208 | 100.0 | 168,660 | 100.0 | 89,913 | 100.0 | 101,099 | 100.0 | 138,387 | 100.0 | 182,288 | 100.0 |
| Dismissed | 25,381 | 14.8 | 26,143 | 15.5 | 14,406 | 16.0 | 20,830 | 20.6 | 29,671 | 21.4 | 41,608 | 22.8 |
| Diversions dismissed | 806 | 0.5 | 500 | 0.3 | 57 | 0.1 | 304 | 0.3 | 371 | 0.3 | 782 | 0.4 |
| Acquitted | 491 | 0.3 | 511 | 0.3 | 248 | 0.3 | 143 | 0.1 | 202 | 0.1 | 361 | 0.2 |
| Convicted | 144,530 | 84.4 | 141,506 | 83.9 | 75,202 | 83.6 | 79,822 | 79.0 | 108,143 | 78.1 | 139,537 | 76.5 |
| Sentence | | | | | | | | | | | | |
| Death | 11 | 0.0 | 5 | 0.0 | 3 | 0.0 | 5 | 0.0 | 3 | 0.0 | 2 | 0.0 |
| State institutions[3] | 28,333 | 16.5 | 28,414 | 16.8 | 12,954 | 14.4 | 16,886 | 16.7 | 21,306 | 15.4 | 30,062 | 16.5 |
| Probation | 11,465 | 6.7 | 10,656 | 6.3 | 5,336 | 5.9 | 5,147 | 5.1 | 8,107 | 5.9 | 9,994 | 5.5 |
| Probation with jail | 80,995 | 47.3 | 80,929 | 48.0 | 45,288 | 50.4 | 45,864 | 45.4 | 60,948 | 44.0 | 76,532 | 42.0 |
| Jail | 18,633 | 10.9 | 17,931 | 10.6 | 9,255 | 10.3 | 9,196 | 9.1 | 13,282 | 9.6 | 17,779 | 9.8 |
| Fine | 1,421 | 0.8 | 1,320 | 0.8 | 686 | 0.8 | 946 | 0.9 | 1,253 | 0.9 | 1,448 | 0.8 |
| Other[4] | 3,672 | 2.1 | 2,251 | 1.3 | 1,680 | 1.9 | 1,778 | 1.8 | 3,244 | 2.3 | 3,720 | 2.0 |

Source: Data extracted from the California Department of Justice Criminal History System. For additional information, see Understanding the Data, Characteristics and Known Limitations.
Notes: This table presents the number and type of final dispositions and sentences for felony arrests reported to the California Department of Justice by law enforcement agencies, district attorneys, and courts. Caution should be used when interpreting this information because arrests and dispositions are underreported. It should also be noted that approximately 1.3% of the adult felony convictions contained in these data represent a disposition that the California Department of Justice was unable to positively link to a criminal record; accordingly, an arrest event was created based solely upon the disposition information provided. There is no way for the California Department of Justice to estimate the exact percentage of underreported dispositions. The nature, extent, and reasons for this underreporting vary from agency to agency and from year to year.
    Percentages may not add to subtotals or 100.0 because of rounding.
[a] In 2019, there was a decrease in the number of final dispositions and sentences reported to the California Department of Justice.
[1] The 'other' category includes release due to delay, subject reported deceased, handled administratively, Penal Code section 849(b)(2) – intoxication only, and Penal Code section 849(b)(3) – under the influence of a controlled substance and delivered to a treatment facility.
[2] The 'other' category includes rejection due to continuing investigations and due process or jurisdictional considerations.
[3] The 'state institutions' category includes sentences to prison, California Rehabilitation Center, and the Division of Juvenile Justice.
[4] The 'other' category includes no sentence given, sentence suspended, and sentence stayed.

57

Exhibit 43
DX0450

Table 39
DISPOSITIONS OF ADULT FELONY ARRESTS, 2022
Arrest Offense Category by Type of Disposition

| Type of disposition | Total | | Violent offenses[1] | | Property offenses[2] | | Drug offenses | | All other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total.......................... | 227,248 | 100.0 | 86,860 | 100.0 | 58,896 | 100.0 | 23,620 | 100.0 | 57,872 | 100.0 |
| Law enforcement releases.......... | 4,587 | 2.0 | 2,205 | 2.5 | 910 | 1.5 | 593 | 2.5 | 879 | 1.5 |
| Prosecution rejections and resolutions[3] ..... | 40,373 | 17.8 | 22,902 | 26.4 | 7,695 | 13.1 | 2,241 | 9.5 | 7,535 | 13.0 |
| Dismissed, acquitted[4] ................. | 42,751 | 18.8 | 14,438 | 16.6 | 10,899 | 18.5 | 6,167 | 26.1 | 11,247 | 19.4 |
| Convicted................. | 139,537 | 61.4 | 47,315 | 54.5 | 39,392 | 66.9 | 14,619 | 61.9 | 38,211 | 66.0 |

Source: Data extracted from the California Department of Justice Criminal History System. For additional information, see Understanding the Data, Characteristics and Known Limitations.

Notes: This table presents the number and type of final dispositions and sentences for felony arrests reported to the California Department of Justice by law enforcement agencies, district attorneys, and courts. Caution should be used when interpreting this information because arrests and dispositions are underreported.

It should also be noted that approximately 1.3% of the adult felony convictions contained in these data represent a disposition that the California Department of Justice was unable to positively link to a criminal record; accordingly, an arrest event was created based solely upon the disposition information provided. There is no way for the California Department of Justice to estimate the exact percentage of underreported dispositions. The nature, extent, and reasons for this underreporting vary from agency to agency and from year to year.

Percentages may not add to subtotals or 100.0 because of rounding.

[1] Violent offenses include homicide, rape, robbery, assault, and kidnapping.

[2] Property offenses include burglary; theft; motor vehicle theft; forgery, check, and access card offenses; and arson.

[3] The "prosecution rejections and resolutions" category includes single complaints, combined cases, and petitions to revoke probation.

[4] The "dismissed, acquitted" category includes diversions that have been dismissed.

Exhibit 43
DX0451

Table 40

## ADULT FELONY ARRESTEES CONVICTED, 2017-2022
### By Convicted Offense Category and Type of Sentence

| Convicted offense category and type of sentence | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019[a] Number | 2019[a] Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total convictions.................. | 144,530 | 100.0 | 141,506 | 100.0 | 75,202 | 100.0 | 79,822 | 100.0 | 108,143 | 100.0 | 139,537 | 100.0 |
| **Type of sentence** | | | | | | | | | | | | |
| State institutions[1] ............ | 28,344 | 19.6 | 28,419 | 20.1 | 12,957 | 17.2 | 16,891 | 21.2 | 21,309 | 19.7 | 30,064 | 21.5 |
| Probation[2] ......................... | 16,558 | 11.5 | 14,227 | 10.1 | 7,702 | 10.2 | 7,871 | 9.9 | 12,604 | 11.7 | 15,162 | 10.9 |
| Probation with jail................ | 80,995 | 56.0 | 80,929 | 57.2 | 45,288 | 60.2 | 45,864 | 57.5 | 60,948 | 56.4 | 76,532 | 54.8 |
| Jail..................................... | 18,633 | 12.9 | 17,931 | 12.7 | 9,255 | 12.3 | 9,196 | 11.5 | 13,282 | 12.3 | 17,779 | 12.7 |
| **Convicted offense category and type of sentence** | | | | | | | | | | | | |
| **Violent offenses[3]** ............. | 37,020 | 100.0 | 37,647 | 100.0 | 19,025 | 100.0 | 24,125 | 100.0 | 29,369 | 100.0 | 47,315 | 100.0 |
| State institutions[1] ............ | 9,560 | 25.8 | 9,770 | 26.0 | 4,296 | 22.6 | 6,065 | 25.1 | 6,990 | 23.8 | 11,924 | 25.2 |
| Probation[2] ......................... | 3,127 | 8.4 | 2,906 | 7.7 | 1,575 | 8.3 | 1,867 | 7.7 | 3,041 | 10.4 | 5,077 | 10.7 |
| Probation with jail................ | 21,800 | 58.9 | 22,436 | 59.6 | 11,931 | 62.7 | 14,530 | 60.2 | 17,081 | 58.2 | 26,061 | 55.1 |
| Jail..................................... | 2,533 | 6.8 | 2,535 | 6.7 | 1,223 | 6.4 | 1,663 | 6.9 | 2,257 | 7.7 | 4,253 | 9.0 |
| **Property offenses[4]** ........... | 35,011 | 100.0 | 34,087 | 100.0 | 18,710 | 100.0 | 17,936 | 100.0 | 25,518 | 100.0 | 39,392 | 100.0 |
| State institutions[1] ............ | 5,825 | 16.6 | 5,566 | 16.3 | 2,721 | 14.5 | 3,223 | 18.0 | 4,344 | 17.0 | 6,598 | 16.7 |
| Probation[2] ......................... | 3,494 | 10.0 | 3,000 | 8.8 | 1,713 | 9.2 | 1,798 | 10.0 | 2,862 | 11.2 | 4,060 | 10.3 |
| Probation with jail................ | 20,717 | 59.2 | 20,542 | 60.3 | 11,925 | 63.7 | 10,619 | 59.2 | 14,656 | 57.4 | 21,684 | 55.0 |
| Jail..................................... | 4,975 | 14.2 | 4,979 | 14.6 | 2,351 | 12.6 | 2,296 | 12.8 | 3,656 | 14.3 | 7,050 | 17.9 |
| **Drug offenses** ................... | 21,053 | 100.0 | 17,923 | 100.0 | 9,999 | 100.0 | 8,234 | 100.0 | 11,879 | 100.0 | 14,619 | 100.0 |
| State institutions[1] ............ | 2,419 | 11.5 | 2,329 | 13.0 | 1,126 | 11.3 | 1,112 | 13.5 | 1,679 | 14.1 | 2,865 | 19.6 |
| Probation[2] ......................... | 3,253 | 15.5 | 2,396 | 13.4 | 1,282 | 12.8 | 963 | 11.7 | 1,638 | 13.8 | 1,675 | 11.5 |
| Probation with jail................ | 10,019 | 47.6 | 8,577 | 47.9 | 5,080 | 50.8 | 4,268 | 51.8 | 5,892 | 49.6 | 7,874 | 53.9 |
| Jail..................................... | 5,362 | 25.5 | 4,621 | 25.8 | 2,511 | 25.1 | 1,891 | 23.0 | 2,670 | 22.5 | 2,205 | 15.1 |
| **All other offenses............** | 51,446 | 100.0 | 51,849 | 100.0 | 27,468 | 100.0 | 29,527 | 100.0 | 41,377 | 100.0 | 38,211 | 100.0 |
| State institutions[1] ............ | 10,540 | 20.5 | 10,754 | 20.7 | 4,814 | 17.5 | 6,491 | 22.0 | 8,296 | 20.0 | 8,677 | 22.7 |
| Probation[2] ......................... | 6,684 | 13.0 | 5,925 | 11.4 | 3,132 | 11.4 | 3,243 | 11.0 | 5,063 | 12.2 | 4,350 | 11.4 |
| Probation with jail................ | 28,459 | 55.3 | 29,374 | 56.7 | 16,352 | 59.5 | 16,447 | 55.7 | 23,319 | 56.4 | 20,913 | 54.7 |
| Jail..................................... | 5,763 | 11.2 | 5,796 | 11.2 | 3,170 | 11.5 | 3,346 | 11.3 | 4,699 | 11.4 | 4,271 | 11.2 |

Source: Data extracted from the California Department of Justice Criminal History System. For additional information, see Understanding the Data, Characteristics and Known Limitations.

Notes: This table presents the number and type of final dispositions and sentences for felony arrests reported to the California Department of Justice by law enforcement agencies, district attorneys, and courts. Caution should be used when interpreting this information because arrests and dispositions are underreported. It should also be noted that approximately 1.3% of the adult felony convictions contained in these data represent a disposition that the California Department of Justice was unable to positively link to a criminal record; accordingly, an arrest event was created based solely upon the disposition information provided. There is no way for the California Department of Justice to estimate the exact percentage of underreported dispositions. The nature, extent, and reasons for this underreporting vary from agency to agency and from year to year.
Data include convictions for both misdemeanors and felonies.
Percentages may not add to subtotals or 100.0 because of rounding.

[a] In 2019, there was a decrease in the number of final dispositions and sentences for felony adult arrests reported to the California Department of Justice.
[1] The "state institutions" category includes sentences to death, prison, California Rehabilitation Center (civil addict), and the Division of Juvenile Justice.
[2] The "probation" category includes straight probation, fine, and other (no diversion given, sentence suspended, and sentence stayed).
[3] Violent offenses include homicide, rape, robbery, assault, and kidnapping.
[4] Property offenses include burglary, theft, motor vehicle theft, forgery, check, and access card offenses, and arson.

Exhibit 43
DX0452

Table 41

**ADULTS ON ACTIVE PROBATION AS OF DECEMBER 31, 1966-2022**

By Level of Offense

| Year | Total | | Felony offense | | Misdemeanor offense | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 2022................. | 151,402 | 100.0 | 125,555 | 82.9 | 25,847 | 17.1 |
| 2021................. | 151,414 | 100.0 | 124,671 | 82.3 | 26,743 | 17.7 |
| 2020................. | 183,333 | 100.0 | 149,563 | 81.6 | 33,770 | 18.4 |
| 2019................. | 199,313 | 100.0 | 161,120 | 80.8 | 38,193 | 19.2 |
| 2018[a]............. | 209,763 | 100.0 | 166,745 | 79.5 | 43,018 | 20.5 |
| 2017................. | 233,046 | 100.0 | 183,623 | 78.8 | 49,423 | 21.2 |
| 2016[b]............. | 239,735 | 100.0 | 190,686 | 79.5 | 49,049 | 20.5 |
| 2015................. | 263,531 | 100.0 | 221,243 | 84.0 | 42,288 | 16.0 |
| 2014[c,d]........... | 285,681 | 100.0 | 244,122 | 85.5 | 41,559 | 14.5 |
| 2013................. | 296,964 | 100.0 | 254,106 | 85.6 | 42,858 | 14.4 |
| 2012................. | 294,993 | 100.0 | 249,173 | 84.5 | 45,820 | 15.5 |
| 2011................. | 297,917 | 100.0 | 247,770 | 83.2 | 50,147 | 16.8 |
| 2010................. | 311,692 | 100.0 | 255,006 | 81.8 | 56,686 | 18.2 |
| 2009................. | 331,270 | 100.0 | 266,249 | 80.4 | 65,021 | 19.6 |
| 2008................. | 341,584 | 100.0 | 269,023 | 78.8 | 72,561 | 21.2 |
| 2007................. | 347,199 | 100.0 | 269,384 | 77.6 | 77,815 | 22.4 |
| 2006................. | 346,495 | 100.0 | 268,828 | 77.6 | 77,667 | 22.4 |
| 2005................. | 344,442 | 100.0 | 263,911 | 76.6 | 80,531 | 23.4 |
| 2004................. | 341,214 | 100.0 | 257,043 | 75.3 | 84,171 | 24.7 |
| 2003................. | 352,449 | 100.0 | 252,530 | 71.7 | 99,919 | 28.3 |
| 2002................. | 336,740 | 100.0 | 239,618 | 71.2 | 97,122 | 28.8 |
| 2001................. | 328,540 | 100.0 | 235,951 | 71.8 | 92,589 | 28.2 |
| 2000................. | 333,288 | 100.0 | 238,520 | 71.6 | 94,768 | 28.4 |
| 1999................. | 338,785 | 100.0 | 244,460 | 72.2 | 94,325 | 27.8 |
| 1998................. | 330,945 | 100.0 | 233,625 | 70.6 | 97,320 | 29.4 |
| 1997................. | 302,236 | 100.0 | 210,960 | 69.8 | 91,276 | 30.2 |
| 1996................. | 289,503 | 100.0 | 197,862 | 68.3 | 91,641 | 31.7 |
| 1995................. | 286,986 | 100.0 | 193,389 | 67.4 | 93,597 | 32.6 |
| 1994................. | 285,105 | 100.0 | 186,701 | 65.5 | 98,404 | 34.5 |
| 1993................. | 280,749 | 100.0 | 153,278 | 54.6 | 127,471 | 45.4 |
| 1992................. | 302,754 | 100.0 | 148,989 | 49.2 | 153,765 | 50.8 |
| 1991................. | 315,421 | 100.0 | 141,923 | 45.0 | 173,498 | 55.0 |
| 1990................. | 305,700 | 100.0 | 131,277 | 42.9 | 174,423 | 57.1 |
| 1989................. | 285,018 | 100.0 | 117,189 | 41.1 | 167,829 | 58.9 |
| 1988................. | 265,643 | 100.0 | 104,149 | 39.2 | 161,494 | 60.8 |
| 1987................. | 242,529 | 100.0 | 93,699 | 38.6 | 148,830 | 61.4 |
| 1986................. | 220,614 | 100.0 | 87,194 | 39.5 | 133,420 | 60.5 |
| 1985................. | 210,449 | 100.0 | 81,921 | 38.9 | 128,528 | 61.1 |
| 1984................. | 197,413 | 100.0 | 75,562 | 38.3 | 121,851 | 61.7 |
| 1983................. | 176,555 | 100.0 | 72,152 | 40.9 | 104,403 | 59.1 |
| 1982................. | 157,009 | 100.0 | 67,300 | 42.9 | 89,709 | 57.1 |
| 1981................. | 152,563 | 100.0 | 64,632 | 42.4 | 87,931 | 57.6 |
| 1980................. | 151,382 | 100.0 | 61,648 | 40.7 | 89,734 | 59.3 |
| 1979................. | 150,566 | 100.0 | 59,207 | 39.3 | 91,359 | 60.7 |
| 1978................. | 153,113 | 100.0 | 61,371 | 40.1 | 91,742 | 59.9 |
| 1977................. | 149,587 | 100.0 | 61,303 | 41.0 | 88,284 | 59.0 |
| 1976................. | 152,242 | 100.0 | 63,458 | 41.7 | 88,784 | 58.3 |
| 1975................. | 153,140 | 100.0 | 63,753 | 41.6 | 89,387 | 58.4 |
| 1974................. | 158,887 | 100.0 | 71,599 | 45.1 | 87,288 | 54.9 |
| 1973................. | 150,292 | 100.0 | 72,539 | 48.3 | 77,753 | 51.7 |
| 1972................. | 143,183 | 100.0 | 72,757 | 50.8 | 70,426 | 49.2 |
| 1971................. | 132,078 | 100.0 | 68,379 | 51.8 | 63,699 | 48.2 |
| 1970................. | 117,095 | 100.0 | 62,141 | 53.1 | 54,954 | 46.9 |
| 1969................. | 102,042 | 100.0 | 55,124 | 54.0 | 46,918 | 46.0 |
| 1968................. | 93,282 | 100.0 | 46,263 | 49.6 | 47,019 | 50.4 |
| 1967................. | 83,517 | 100.0 | 39,474 | 47.3 | 44,043 | 52.7 |
| 1966................. | 80,645 | 100.0 | 36,053 | 44.7 | 44,592 | 55.3 |

Note: These data include adults placed on supervised probation only.  Data are limited to original grants of probation and
   do not include subsequent grants of probation to persons already under supervised probation in the same county.

[a] In 2018, San Joaquin County Probation discovered inaccurate reporting of caseload counts resulting in corrected
   felony and misdemeanor caseload counts for October.

[b] In 2016, Sacramento County Probation discovered inaccurate reporting of caseload counts from 2013-2015 resulting
   in a corrected beginning felony caseload count for 2016.

[c] In November 2014, California voters passed Proposition 47 which reduced numerous state statutes from felonies
   to misdemeanors. Caution should be used when comparing felony and misdemeanor data to prior years.

[d] San Bernardino County Probation revised their beginning caseload counts for 2014.  The revision resulted in a
   decrease of almost 9,000 felony cases and an increase of almost 400 misdemeanor cases.

60

Exhibit 43

DX0453

Table 42
**ADULTS PLACED ON AND REMOVED FROM PROBATION, 2017-2022**
By Level of Offense, Type of Removal, and Rate per 100,000 Population at Risk

| Placement and removal by level of offense | 2017 Number | 2017 Percent | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021 Number | 2021 Percent | 2022 Number | 2022 Percent | Percent change 2017-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Placed on probation** | | | | | | | | | | | | | | |
| Total.................... | 137,412 | 100.0 | 119,646 | 100.0 | 114,802 | 100.0 | 74,182 | 100.0 | 85,553 | 100.0 | 95,280 | 100.0 | -30.7 | 11.4 |
| Felony offense.......... | 104,146 | 75.8 | 90,836 | 75.9 | 89,724 | 78.2 | 61,213 | 82.5 | 72,603 | 84.9 | 79,972 | 83.9 | -23.2 | 10.1 |
| Misdemeanor offense..... | 33,266 | 24.2 | 28,810 | 24.1 | 25,078 | 21.8 | 12,969 | 17.5 | 12,950 | 15.1 | 15,308 | 16.1 | -54.0 | 18.2 |
| **Rate per 100,000 population at risk¹ - Placed on probation** | | | | | | | | | | | | | | |
| Total.................... | 517.2 | | 447.8 | | 428.3 | | 283.5 | | 326.3 | | 358.0 | | -30.8 | 9.7 |
| Felony offense.......... | 392.0 | | 340.0 | | 334.7 | | 233.9 | | 276.9 | | 300.5 | | -23.3 | 8.5 |
| Misdemeanor offense..... | 125.2 | | 107.8 | | 93.5 | | 49.6 | | 49.4 | | 57.5 | | -54.1 | 16.4 |
| **Removed from probation** | | | | | | | | | | | | | | |
| Total.................... | 133,943 | 100.0 | 136,638 | 100.0 | 122,539 | 100.0 | 90,472 | 100.0 | 108,173 | 100.0 | 97,753 | 100.0 | -27.0 | -9.6 |
| Felony offense.......... | 100,745 | 75.2 | 102,212 | 74.8 | 93,245 | 76.1 | 72,753 | 80.4 | 90,121 | 83.3 | 78,579 | 80.4 | -22.0 | -12.8 |
| Misdemeanor offense..... | 33,198 | 24.8 | 34,426 | 25.2 | 29,294 | 23.9 | 17,719 | 19.6 | 18,052 | 16.7 | 19,174 | 19.6 | -42.2 | 6.2 |
| Terminated.............. | 57,496 | 42.9 | 71,869 | 52.6 | 57,427 | 46.9 | 46,744 | 51.7 | 65,480 | 60.5 | 54,411 | 55.7 | -5.4 | -16.9 |
| Felony offense.......... | 44,151 | 33.0 | 52,594 | 38.5 | 42,339 | 34.6 | 37,147 | 41.1 | 55,135 | 51.0 | 42,396 | 43.4 | -4.0 | -23.1 |
| Misdemeanor offense..... | 13,345 | 10.0 | 19,275 | 14.1 | 15,088 | 12.3 | 9,597 | 10.6 | 10,345 | 9.6 | 12,015 | 12.3 | -10.0 | 16.1 |
| Revoked................. | 52,475 | 39.2 | 46,484 | 34.0 | 47,892 | 39.1 | 30,453 | 33.7 | 29,290 | 27.1 | 30,582 | 31.3 | -41.7 | 4.4 |
| Felony offense.......... | 38,759 | 28.9 | 35,757 | 26.2 | 37,763 | 30.8 | 25,546 | 28.2 | 24,572 | 22.7 | 26,193 | 26.8 | -32.4 | 6.6 |
| Misdemeanor offense..... | 13,716 | 10.2 | 10,727 | 7.9 | 10,129 | 8.3 | 4,907 | 5.4 | 4,718 | 4.4 | 4,389 | 4.5 | -68.0 | -7.0 |
| Other².................. | 23,972 | 17.9 | 18,285 | 13.4 | 17,220 | 14.1 | 13,275 | 14.7 | 13,403 | 12.4 | 12,760 | 13.1 | -46.8 | -4.8 |
| Felony offense.......... | 17,835 | 13.3 | 13,861 | 10.1 | 13,143 | 10.7 | 10,060 | 11.1 | 13,414 | 9.6 | 9,990 | 10.2 | -44.0 | -4.1 |
| Misdemeanor offense..... | 6,137 | 4.6 | 4,424 | 3.2 | 4,077 | 3.3 | 3,215 | 3.6 | 2,989 | 2.8 | 2,770 | 2.8 | -54.9 | -7.3 |
| **Rate per 100,000 population at risk¹ - Removed from probation** | | | | | | | | | | | | | | |
| Total.................... | 504.2 | | 511.4 | | 457.1 | | 345.7 | | 412.5 | | 367.3 | | -27.2 | -11.0 |
| Terminated.............. | 216.4 | | 269.0 | | 214.2 | | 178.6 | | 249.7 | | 204.4 | | -5.5 | -18.1 |
| Revoked................. | 197.5 | | 174.0 | | 178.7 | | 116.4 | | 111.7 | | 114.9 | | -41.8 | 2.9 |
| Other................... | 90.2 | | 68.4 | | 64.2 | | 50.7 | | 51.1 | | 47.9 | | -46.9 | -6.3 |

Notes: Rates and percentages may not add to subtotals, total, or 100.0 because of rounding.
   These data include adults placed on supervised probation only. Data are limited to original grants of probation and do not include subsequent grants of probation to persons already under supervised probation in the same county.
   Rates per 100,000 population at risk for 2017 will not match previously published data.
¹ Rates are based on the adult population at risk (18-69 years of age) for each year (see Table 53).
² "Other" includes transfer of jurisdiction from one county to another, death, sentence vacated, successful appeal, deportation, etc.

61

Exhibit 43
DX0454

Table 43
## CRIMINAL JUSTICE FULL-TIME PERSONNEL, 1969-2022
By Type of Agency

| Year | Total personnel | Law enforcement | Prosecution[1] | Public defense | Probation |
|---|---|---|---|---|---|
| 2022................ | 147,659 | 116,000 | 10,345 | 4,613 | 16,701 |
| 2021................ | 149,688 | 117,559 | 10,373 | 4,433 | 17,323 |
| 2020................ | 153,883 | 120,803 | 10,545 | 4,463 | 18,072 |
| 2019................ | 154,352 | 121,163 | 10,500 | 4,305 | 18,384 |
| 2018................ | 153,549 | 120,005 | 10,366 | 4,222 | 18,956 |
| 2017................ | 153,431 | 119,648 | 10,199 | 4,200 | 19,384 |
| 2016................ | 152,427 | 119,148 | 9,918 | 4,101 | 19,260 |
| 2015................ | 151,439 | 118,309 | 9,776 | 4,006 | 19,348 |
| 2014................ | 151,178 | 118,393 | 9,639 | 3,977 | 19,169 |
| 2013................ | 149,798 | 117,340 | 9,429 | 3,926 | 19,103 |
| 2012................ | 149,353 | 117,238 | 9,367 | 3,938 | 18,810 |
| 2011................ | 148,772 | 116,794 | 9,479 | 3,914 | 18,585 |
| 2010................ | 152,379 | 118,981 | 9,852 | 4,131 | 19,415 |
| 2009................ | 157,704 | 122,042 | 10,199 | 4,091 | 21,372 |
| 2008................ | 159,156 | 123,680 | 10,429 | 4,320 | 20,727 |
| 2007................ | 155,503 | 121,305 | 10,179 | 4,137 | 19,882 |
| 2006................ | 149,237 | 116,128 | 9,619 | 3,924 | 19,566 |
| 2005................ | 145,435 | 113,604 | 9,297 | 3,791 | 18,743 |
| 2004................ | 143,936 | 112,826 | 9,166 | 3,733 | 18,211 |
| 2003................ | 147,790 | 114,945 | 9,480 | 3,788 | 19,577 |
| 2002................ | 148,208 | 115,552 | 10,069 | 3,773 | 18,814 |
| 2001................ | 147,650 | 108,208 | 17,296 | 3,686 | 18,460 |
| 2000................ | 142,132 | 103,579 | 18,481 | 3,950 | 16,122 |
| 1999................ | 139,304 | 102,769 | 16,476 | 3,857 | 16,202 |
| 1998................ | 133,841 | 98,495 | 15,876 | 3,651 | 15,819 |
| 1997................ | 129,332 | 96,322 | 14,826 | 3,622 | 14,562 |
| 1996................ | 124,090 | 94,207 | 12,548 | 3,533 | 13,802 |
| 1995................ | 119,850 | 91,198 | 11,998 | 3,246 | 13,408 |
| 1994................ | 115,244 | 86,933 | 11,461 | 3,224 | 13,626 |
| 1993................ | 113,287 | 85,989 | 10,324 | 3,278 | 13,696 |
| 1992................ | 113,256 | 87,020 | 10,272 | 3,220 | 12,744 |
| 1991................ | 115,554 | 88,628 | 10,027 | 3,255 | 13,644 |
| 1990................ | 113,440 | 86,814 | 9,984 | 3,104 | 13,538 |
| 1989................ | 108,905 | 83,807 | 8,955 | 3,040 | 13,103 |
| 1988................ | 96,341 | 72,586 | 8,251 | 2,822 | 12,682 |
| 1987................ | 100,117 | 77,015 | 8,334 | 2,390 | 12,378 |
| 1986................ | 98,282 | 75,437 | 8,470 | 2,270 | 12,105 |
| 1985................ | 95,611 | 73,582 | 8,072 | 2,163 | 11,794 |
| 1984................ | 93,912 | 74,536 | 7,686 | 2,013 | 9,677 |
| 1983................ | 91,090 | 72,618 | 7,460 | 1,987 | 9,025 |
| 1982................ | 89,762 | 71,352 | 7,407 | 1,972 | 9,031 |
| 1981................ | 87,993 | 69,420 | 7,184 | 1,929 | 9,460 |
| 1980................ | 87,425 | 67,321 | 7,272 | 1,893 | 10,939 |
| 1979................ | 83,675 | 65,120 | 6,916 | 1,766 | 9,873 |
| 1978................ | 83,715 | 64,928 | 6,806 | 1,782 | 10,199 |
| 1977................ | 85,195 | 65,971 | 6,809 | 1,784 | 10,631 |
| 1976................ | 82,873 | 64,060 | 6,183 | 1,680 | 10,950 |
| 1975................ | 81,105 | 64,177 | 4,875 | 1,574 | 10,479 |
| 1974................ | 77,757 | 62,020 | 4,352 | 1,559 | 9,826 |
| 1973................ | 74,693 | 59,697 | 4,439 | 1,385 | 9,172 |
| 1972................ | 71,483 | 58,028 | 3,428 | 1,236 | 8,791 |
| 1971................ | 69,991 | 57,099 | 3,227 | 1,120 | 8,545 |
| 1970................ | 66,482 | 55,320 | 2,506 | 929 | 7,727 |
| 1969................ | 61,553 | 51,104 | 2,786 | 914 | 6,749 |

Note: Personnel in the Department of Justice and state regulatory agencies are not included.

[1] The passage of Assembly Bill 196 required that county-level child support programs, previously administered by district attorneys, be operated by local child support agencies. This accounts for the large decrease in prosecution personnel since 2001.

Exhibit 43
DX0455

Table 44
**CRIMINAL JUSTICE FULL-TIME PERSONNEL, 2017-2022**
By Type of Agency and Personnel Classification

| Type of agency and personnel classification | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Percent change | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2017-2022 | 2021-2022 | |
| Total............................................ | 153,431 | 153,549 | 154,352 | 153,883 | 149,688 | 147,659 | -3.8 | -1.4 |
| Law enforcement........................ | 119,648 | 120,005 | 121,163 | 120,803 | 117,559 | 116,000 | -3.0 | -1.3 |
| Prosecution................................ | 10,199 | 10,366 | 10,500 | 10,545 | 10,373 | 10,345 | 1.4 | -0.3 |
| Attorneys................................ | 4,113 | 4,100 | 4,048 | 4,113 | 4,051 | 3,975 | -3.4 | -1.9 |
| Investigators.......................... | 1,741 | 1,676 | 1,663 | 1,820 | 1,673 | 1,635 | -6.1 | -2.3 |
| Clerical and all other............ | 4,345 | 4,590 | 4,789 | 4,612 | 4,649 | 4,735 | 9.0 | 1.8 |
| Public defense.......................... | 4,200 | 4,222 | 4,305 | 4,463 | 4,433 | 4,613 | 9.8 | 4.1 |
| Attorneys................................ | 2,514 | 2,523 | 2,549 | 2,580 | 2,556 | 2,645 | 5.2 | 3.5 |
| Investigators.......................... | 517 | 529 | 527 | 547 | 546 | 530 | 2.5 | -2.9 |
| Clerical and all other............ | 1,169 | 1,170 | 1,229 | 1,336 | 1,331 | 1,438 | 23.0 | 8.0 |
| Probation.................................. | 19,384 | 18,956 | 18,384 | 18,072 | 17,323 | 16,701 | -13.8 | -3.6 |
| Probation officers.................. | 13,920 | 12,842 | 13,442 | 13,021 | 12,068 | 11,566 | -16.9 | -4.2 |
| All other................................ | 5,464 | 6,114 | 4,942 | 5,051 | 5,255 | 5,135 | -6.0 | -2.3 |

Sources: Law enforcement, district attorney, public defender, and probation personnel surveys conducted by the Criminal Justice Statistics Center. Law enforcement personnel counts are obtained from a one-day survey taken on October 31st. All other personnel survey counts are taken on June 30th.

Note: Personnel in the Department of Justice and state regulatory agencies are not included.

63

Exhibit 43
DX0456

Table 45
## LAW ENFORCEMENT FULL-TIME PERSONNEL, 2017-2022
### By Type of Agency

| Type of agency | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Percent change | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2017-2022 | 2021-2022 |
| **Total** | | | | | | | | |
| Total.......... | 119,648 | 120,005 | 121,163 | 120,803 | 117,559 | 116,000 | -3.0 | -1.3 |
| **Sworn and civilian** | | | | | | | | |
| Sworn.......... | 78,715 | 79,113 | 79,568 | 79,693 | 77,593 | 76,130 | -3.3 | -1.9 |
| Civilian.......... | 40,933 | 40,892 | 41,595 | 41,110 | 39,966 | 39,870 | -2.6 | -0.2 |
| **Agency** | | | | | | | | |
| Police departments.......... | 52,530 | 53,065 | 53,539 | 53,507 | 51,918 | 51,586 | -1.8 | -0.6 |
| Sworn.......... | 37,964 | 38,151 | 38,443 | 38,412 | 37,546 | 36,887 | -2.8 | -1.8 |
| Civilian.......... | 14,566 | 14,914 | 15,096 | 15,095 | 14,372 | 14,699 | 0.9 | 2.3 |
| Sheriffs' departments.......... | 52,542 | 52,310 | 52,975 | 52,932 | 51,675 | 50,650 | -3.6 | -2.0 |
| Sworn.......... | 30,690 | 30,796 | 31,016 | 31,373 | 30,454 | 29,767 | -3.0 | -2.3 |
| Civilian.......... | 21,852 | 21,514 | 21,959 | 21,559 | 21,221 | 20,883 | -4.4 | -1.6 |
| California Highway Patrol.......... | 10,737 | 10,529 | 10,529 | 10,204 | 9,870 | 9,774 | -9.0 | -1.0 |
| Sworn.......... | 7,401 | 7,286 | 7,230 | 7,001 | 6,736 | 6,651 | -10.1 | -1.3 |
| Civilian.......... | 3,336 | 3,243 | 3,299 | 3,203 | 3,134 | 3,123 | -6.4 | -0.4 |
| Other law enforcement agencies[1].......... | 3,839 | 4,101 | 4,120 | 4,160 | 4,096 | 3,990 | 3.9 | -2.6 |
| Sworn.......... | 2,660 | 2,880 | 2,879 | 2,907 | 2,857 | 2,825 | 6.2 | -1.1 |
| Civilian.......... | 1,179 | 1,221 | 1,241 | 1,253 | 1,239 | 1,165 | -1.2 | -6.0 |

Source: Law Enforcement Personnel Survey conducted by the Criminal Justice Statistics Center. The one-day survey is taken October 31st.

Note: Personnel in the Department of Justice and state regulatory agencies are not included.

[1] The "Other law enforcement agencies" category includes personnel from University of California, State Parks and Recreation, California State University, and Bay Area Rapid Transit.

Exhibit 43
DX0457

Table 46
## CIVILIANS' COMPLAINTS AGAINST PEACE OFFICERS, 1981-2022
By Type of Complaint and Level of Criminal Complaint

| Year | Total | | Non-criminal | | Criminal | | | | | |
|------|-------|-----------|-------------|-----------|-------|-----------|-------|-----------|------------|-----------|
| | | | | | Total | | Felony | | Misdemeanor | |
| | Reported[1] | Sustained | Reported | Sustained | Reported | Sustained | Reported | Sustained | Reported | Sustained |
| 2022 | 26,036 | 1,687 | 24,943 | 1,612 | 1,093 | 75 | 416 | 21 | 677 | 54 |
| 2021 | 28,617 | 1,777 | 27,924 | 1,699 | 693 | 78 | 240 | 19 | 453 | 59 |
| 2020 | 16,547 | 1,748 | 15,826 | 1,706 | 721 | 42 | 317 | 12 | 404 | 30 |
| 2019 | 15,890 | 1,316 | 15,025 | 1,264 | 865 | 52 | 393 | 13 | 472 | 39 |
| 2018 | 16,525 | 1,241 | 15,635 | 1,168 | 890 | 73 | 314 | 13 | 576 | 60 |
| 2017 | 16,841 | 1,169 | 15,946 | 1,084 | 895 | 85 | 342 | 22 | 553 | 63 |
| 2016 | 15,406 | 1,227 | 14,360 | 1,141 | 1,046 | 86 | 379 | 26 | 667 | 60 |
| 2015 | 14,402 | 1,325 | 13,080 | 1,195 | 1,322 | 130 | 428 | 41 | 894 | 89 |
| 2014 | 15,693 | 1,288 | 14,407 | 1,179 | 1,286 | 109 | 487 | 40 | 799 | 69 |
| 2013 | 17,032 | 1,646 | 15,815 | 1,531 | 1,217 | 115 | 461 | 32 | 756 | 83 |
| 2012 | 20,363 | 1,612 | 18,984 | 1,456 | 1,379 | 156 | 537 | 51 | 842 | 105 |
| 2011 | 18,590 | 1,724 | 17,112 | 1,554 | 1,478 | 170 | 589 | 58 | 889 | 112 |
| 2010 | 22,458 | 2,178 | 20,715 | 2,023 | 1,743 | 155 | 573 | 62 | 1,170 | 93 |
| 2009 | 22,614 | 1,844 | 21,181 | 1,692 | 1,433 | 152 | 600 | 51 | 833 | 101 |
| 2008 | 23,470 | 1,687 | 22,330 | 1,499 | 1,140 | 188 | 621 | 46 | 519 | 142 |
| 2007[a] | 24,358 | 1,735 | 23,460 | 1,638 | 898 | 97 | 401 | 27 | 497 | 70 |
| 2006 | 21,620 | 1,688 | 19,957 | 1,572 | 1,663 | 116 | 1,122 | 46 | 541 | 70 |
| 2005 | 21,653 | 2,143 | 19,851 | 2,020 | 1,802 | 123 | 1,283 | 37 | 519 | 86 |
| 2004 | 20,609 | 2,053 | 18,782 | 1,932 | 1,827 | 121 | 1,154 | 41 | 673 | 80 |
| 2003 | 20,937 | 1,992 | 19,267 | 1,841 | 1,670 | 151 | 1,035 | 47 | 635 | 104 |
| 2002 | 21,970 | 2,574 | 20,259 | 2,405 | 1,711 | 169 | 1,015 | 61 | 696 | 108 |
| 2001 | 22,455 | 2,688 | 20,377 | 2,523 | 2,078 | 165 | 1,373 | 52 | 705 | 113 |
| 2000 | 23,395 | 2,395 | 21,470 | 2,166 | 1,925 | 229 | 1,217 | 54 | 708 | 175 |
| 1999 | 19,034 | 2,549 | 17,802 | 2,307 | 1,232 | 242 | 604 | 94 | 628 | 148 |
| 1998 | 17,483 | 2,706 | 15,902 | 2,433 | 1,581 | 273 | 890 | 115 | 691 | 158 |
| 1997 | 16,966 | 2,458 | 15,702 | 2,240 | 1,264 | 218 | 601 | 75 | 663 | 143 |
| 1996 | 19,376 | 2,728 | 17,865 | 2,439 | 1,511 | 289 | 646 | 93 | 865 | 196 |
| 1995 | 19,233 | 3,340 | 17,470 | 2,968 | 1,763 | 372 | 798 | 152 | 965 | 220 |
| 1994 | 19,629 | 2,860 | 18,291 | 2,576 | 1,338 | 284 | 490 | 101 | 848 | 183 |
| 1993 | 18,931 | 2,555 | 17,070 | 2,315 | 1,861 | 240 | 739 | 97 | 1,122 | 143 |
| 1992 | 17,468 | 2,769 | 15,723 | 2,459 | 1,745 | 310 | 782 | 110 | 963 | 200 |
| 1991 | 16,467 | 2,632 | 15,063 | 2,377 | 1,404 | 255 | 544 | 89 | 860 | 166 |
| 1990 | 14,755 | 2,754 | 13,343 | 2,459 | 1,412 | 295 | 493 | 86 | 919 | 209 |
| 1989 | 14,855 | 2,759 | 13,388 | 2,491 | 1,467 | 268 | 603 | 98 | 864 | 170 |
| 1988 | 13,817 | 2,438 | 12,363 | 2,148 | 1,454 | 290 | 605 | 115 | 849 | 175 |
| 1987 | 14,180 | 2,244 | 13,334 | 2,077 | 846 | 167 | 251 | 57 | 595 | 110 |
| 1986 | 12,811 | 2,412 | 12,083 | 2,252 | 728 | 160 | 245 | 49 | 483 | 111 |
| 1985 | 13,999 | 2,839 | 13,172 | 2,593 | 827 | 246 | 290 | 97 | 537 | 149 |
| 1984 | 12,875 | 2,357 | 12,137 | 2,204 | 738 | 153 | 223 | 49 | 515 | 104 |
| 1983 | 12,008 | 2,353 | 11,321 | 2,194 | 687 | 159 | 228 | 75 | 459 | 84 |
| 1982 | 11,599 | 2,092 | 10,156 | 1,854 | 1,443 | 238 | 322 | 40 | 1,121 | 198 |
| 1981 | 8,686 | 1,552 | 8,081 | 1,450 | 605 | 102 | 188 | 42 | 417 | 60 |

Source: Civilians' Complaints Against Peace Officer counts are obtained from an annual survey conducted in January of the following statistical year.
Notes:    Data collection began in 1981.
    Because of the individual nature of the requirements of Penal Code section 832.5(a), reporting definitions and procedures vary among reporting agencies.
    The data collected under Penal Code section 13012(5) are accurate and complete to the extent that the contributing agencies met reporting obligations.
[1] Based on a survey conducted in 2004, it is estimated that complaints from inmates in prisons and jails may constitute approximately one-third of all complaints reported by law enforcement agencies.
[a] The increase in the number of reported non-criminal complaints and the decrease in the number of reported felony complaints result from reporting-policy changes made by two law enforcement agencies.

Exhibit 43
DX0458

Table 47
## CIVILIANS' COMPLAINTS AGAINST PEACE OFFICERS, 2022
By Type of Complaint by Finding

| Type of complaint | Reported | Sustained | Exonerated | Not sustained | Unfounded | Pending |
|---|---|---|---|---|---|---|
| Total complaints................ | 26,036 | 1,687 | 2,212 | 7,695 | 5,800 | 11,156 |
| Non criminal................ | 24,943 | 1,612 | 2,033 | 7,550 | 5,413 | 10,517 |
| Misdemeanor................ | 677 | 54 | 149 | 65 | 289 | 409 |
| Felony................ | 416 | 21 | 30 | 80 | 98 | 230 |
| *Local detention facility complaints* | | | | | | |
| Total detention facility complaints ... | 2,789 | 125 | 429 | 768 | 864 | 1,023 |
| Non criminal................ | 2,668 | 117 | 407 | 762 | 772 | 926 |
| Misdemeanor................ | 109 | 4 | 20 | 5 | 73 | 93 |
| Felony................ | 12 | 4 | 2 | 1 | 19 | 4 |
| *Profiling complaints* | | | | | | |
| Total profiling complaints............ | 2,085 | 28 | 132 | 451 | 995 | 1,400 |
| Race/ethnicity................ | 1,578 | 11 | 98 | 196 | 673 | 911 |
| Nationality................ | 48 | 2 | 6 | 8 | 22 | 15 |
| Gender................ | 116 | 3 | 8 | 17 | 42 | 49 |
| Age................ | 55 | 0 | 3 | 11 | 27 | 12 |
| Religion................ | 101 | 2 | 1 | 31 | 23 | 47 |
| Gender identity/expression......... | 229 | 1 | 5 | 41 | 31 | 153 |
| Sexual orientation................ | 161 | 2 | 5 | 36 | 30 | 88 |
| Mental disability................ | 131 | 2 | 8 | 35 | 37 | 49 |
| Physical disability................ | 252 | 10 | 11 | 84 | 40 | 106 |

Source: Civilians' Complaints Against Peace Officer counts are obtained from an annual survey conducted in January of the following statistical year.
Notes: Expanded categories of complaint findings and profiling data collection began in 2016 as a result of the passage of Assembly Bill 953 (2015).
Reporting agencies may use more findings than those captured on the annual survey. Complaints reported in previous years may be finalized and their findings reported in subsequent years. Consequently, the sum of the findings may not add up to the total reported.
More than one type of profiling complaint can be reported per citizen complaint. Consequently, the total number of profiling complaints is less than the sum of the types of complaints.
Because of the individual nature of the requirements of Penal Code section 832.5(e), reporting definitions and procedures vary among reporting agencies.
The data collected under Penal Code section 13012(5) are accurate and complete to the extent that the contributing agencies met reporting obligations.

Exhibit 43
DX0459

Table 48
DOMESTIC VIOLENCE-RELATED CALLS FOR ASSISTANCE, 1986-2022
By Type of Call and Weapon

| Year | Total calls | | | Type of weapon | | | | | | Total strangulation and suffocation[3] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Cases without a weapon | Cases involving a weapon | Total | Firearm | Knife or cutting instrument | Other dangerous weapon | Personal weapon[1] | Not reported[2] | Total | Cases with strangulation | Cases with suffocation[3] |
| 2022 | 162,422 | 72,578 | 89,844 | 89,844 | 2,132 | 3,205 | 15,018 | 69,489 | 0 | 10,051 | 8,130 | 1,934 |
| 2021 | 164,608 | 87,621 | 76,987 | 76,987 | 2,501 | 3,328 | 12,826 | 58,332 | 0 | 9,778 | 8,659 | 1,119 |
| 2020 | 160,646 | 88,018 | 72,628 | 72,628 | 1,974 | 3,361 | 11,028 | 56,265 | 0 | 9,715 | 8,581 | 1,134 |
| 2019 | 161,123 | 85,995 | 75,128 | 75,128 | 1,388 | 3,280 | 10,935 | 59,525 | 0 | 8,552 | 7,820 | 732 |
| 2018 | 166,890 | 90,183 | 76,707 | 76,707 | 1,383 | 3,370 | 11,481 | 60,473 | 0 | 7,531 | 7,029 | 502 |
| 2017 | 169,362 | 94,260 | 75,102 | 75,102 | 1,429 | 3,418 | 11,762 | 58,493 | 0 | - | - | - |
| 2016[4] | 164,569 | 93,782 | 70,787 | 70,787 | 1,281 | 3,357 | 11,059 | 55,090 | 0 | - | - | - |
| 2015 | 162,302 | 93,717 | 68,585 | 68,585 | 905 | 3,122 | 9,916 | 54,642 | 0 | - | - | - |
| 2014[4] | 155,965 | 89,319 | 66,646 | 66,646 | 813 | 2,911 | 9,911 | 53,011 | 0 | - | - | - |
| 2013 | 151,325 | 89,121 | 62,204 | 62,204 | 754 | 2,901 | 9,090 | 49,459 | 0 | - | - | - |
| 2012 | 157,634 | 94,085 | 63,549 | 63,549 | 804 | 3,009 | 9,303 | 50,433 | 0 | - | - | - |
| 2011 | 158,548 | 96,615 | 61,933 | 61,933 | 975 | 3,061 | 9,014 | 48,879 | 4 | - | - | - |
| 2010 | 166,361 | 100,496 | 65,865 | 65,865 | 867 | 2,991 | 9,895 | 52,112 | 0 | - | - | - |
| 2009 | 167,087 | 99,385 | 67,702 | 67,702 | 819 | 3,219 | 10,172 | 53,492 | 0 | - | - | - |
| 2008 | 166,343 | 101,124 | 65,219 | 65,219 | 940 | 3,258 | 10,006 | 51,015 | 0 | - | - | - |
| 2007 | 174,649 | 105,227 | 69,422 | 69,422 | 1,027 | 3,442 | 10,940 | 54,013 | 0 | - | - | - |
| 2006 | 176,299 | 95,353 | 80,946 | 80,946 | 1,277 | 3,662 | 11,953 | 64,054 | 0 | - | - | - |
| 2005 | 181,362 | 88,335 | 93,027 | 93,027 | 1,233 | 3,700 | 12,867 | 75,227 | 0 | - | - | - |
| 2004 | 186,439 | 88,703 | 97,736 | 97,736 | 1,193 | 4,028 | 13,054 | 79,461 | 0 | - | - | - |
| 2003 | 194,288 | 87,557 | 106,731 | 106,731 | 1,380 | 4,027 | 14,194 | 87,130 | 0 | - | - | - |
| 2002[2] | 196,569 | 76,710 | 119,859 | 119,859 | 1,528 | 4,091 | 15,295 | 98,945 | 0 | - | - | - |
| 2001 | 198,031 | 61,665 | 136,366 | 136,366 | 1,325 | 4,213 | 15,557 | 115,271 | 0 | - | - | - |
| 2000 | 196,880 | 61,724 | 135,156 | 135,156 | 1,441 | 4,363 | 15,048 | 114,304 | 0 | - | - | - |
| 1999[1] | 186,406 | 58,611 | 127,795 | 127,795 | 1,520 | 4,237 | 13,929 | 108,109 | 0 | - | - | - |
| 1998[1] | 196,832 | 60,174 | 136,658 | 136,658 | 1,921 | 4,422 | 15,535 | 114,780 | 0 | - | - | - |
| 1997[1] | 220,156 | 64,506 | 155,650 | 155,650 | 2,073 | 5,462 | 17,502 | 130,613 | 0 | - | - | - |
| 1996 | 227,899 | 68,824 | 159,075 | 159,075 | 2,327 | 5,868 | 16,474 | 134,406 | 0 | - | - | - |
| 1995[1] | 246,315 | 72,016 | 174,299 | 174,299 | 2,838 | 6,370 | 16,385 | 148,706 | 0 | - | - | - |
| 1994 | 250,439 | 68,199 | 182,240 | 182,240 | 3,089 | 6,491 | 16,716 | 155,944 | 0 | - | - | - |
| 1993 | 238,895 | 65,635 | 173,260 | 173,260 | 2,951 | 6,273 | 15,366 | 148,670 | 0 | - | - | - |
| 1992 | 240,826 | 65,473 | 175,353 | 175,353 | 3,053 | 6,507 | 14,518 | 151,275 | 0 | - | - | - |
| 1991 | 203,638 | 55,083 | 148,555 | 148,555 | 3,129 | 5,423 | 12,008 | 127,958 | 37 | - | - | - |
| 1990 | 195,019 | 54,079 | 140,940 | 140,940 | 2,610 | 5,417 | 10,879 | 117,693 | 4,341 | - | - | - |
| 1989 | 188,581 | 52,512 | 136,069 | 136,069 | 2,730 | 5,276 | 9,935 | 113,907 | 4,221 | - | - | - |
| 1988 | 182,540 | 54,345 | 128,195 | 128,195 | 2,532 | 5,048 | 9,634 | 110,068 | 913 | - | - | - |
| 1987 | 181,112 | 57,232 | 123,880 | 123,880 | 2,704 | 4,865 | 8,228 | 107,055 | 1,028 | - | - | - |
| 1986[5] | 83,661 | 27,818 | 55,843 | 55,843 | 1,255 | 2,293 | 4,062 | 47,778 | 455 | - | - | - |

[1] Hands, feet, etc.

[2] Prior to 1989, the "personal weapon" category was not recognized by all reporting agencies as a type of weapon. When those agencies began reporting personal weapon calls as cases involving weapons, they did not provide the type of weapon designation. This accounts for the large increase in "not reported" weapons in 1989 and 1990.

[3] Data for cases with strangulation or suffocation are not available prior to 2018. For additional information, See Understanding the Data, Characteristics and Known Limitations.

[4] Data may not match previously published data for 2014 and 2016.

[a] In April 2002, law enforcement agencies were instructed to report personal weapons only if the assault resulted in an injury (aggravated assault).

[b] The San Francisco Police Department was unable to provide complete data for 1998, and did not report data for 1998 and 1999 because of computer problems. In 1996, this department reported 6,422 domestic violence-related weapon calls.

[c] The San Francisco Police Department was unable to provide 1995 data. In 1994, this department reported 5,237 domestic violence-related calls for assistance.

[d] The Oakland Police Department was unable to provide complete data for 1991.

[e] Data collection began in July 1986; therefore, only six months of data are available and displayed for 1986.

Exhibit 43
DX0460

Table 49
## LAW ENFORCEMENT OFFICERS KILLED OR ASSAULTED, 1990-2022
Deaths and Assaults in the Line of Duty By Type of Activity

| Year | Law enforcement officers killed | | Total | Law enforcement officers assaulted — Type of activity | | | | | | | |
| | Felonious | Accidental | | Responding to disturbance | Crimes in progress[1] | Attempting other arrests | Handling prisoners | Investigating suspicious persons | Mentally deranged | Traffic pursuits and stops | All other[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 4 | 1 | 12,304 | 3,752 | 262 | 2,043 | 1,637 | 1,357 | 420 | 944 | 1,889 |
| 2021 | 5 | 4 | 10,798 | 3,442 | 242 | 1,634 | 1,377 | 1,150 | 406 | 835 | 1,712 |
| 2020 | 2 | 1 | 11,618 | 3,598 | 359 | 1,549 | 1,350 | 1,186 | 366 | 937 | 2,273 |
| 2019 | 4 | 1 | 10,512 | 3,376 | 309 | 1,551 | 1,472 | 1,202 | 355 | 799 | 1,448 |
| 2018 | 4 | 3 | 11,148 | 3,578 | 289 | 1,617 | 1,542 | 1,087 | 340 | 852 | 1,843 |
| 2017 | 2 | 4 | 10,770 | 3,468 | 313 | 1,495 | 1,363 | 1,133 | 388 | 926 | 1,684 |
| 2016 | 6 | 4 | 9,933 | 3,331 | 239 | 1,312 | 1,333 | 1,173 | 316 | 770 | 1,459 |
| 2015 | 2 | 2 | 9,924 | 3,154 | 308 | 1,345 | 1,265 | 1,225 | 353 | 704 | 1,570 |
| 2014 | 5 | 9 | 8,998 | 2,652 | 198 | 1,291 | 1,378 | 981 | 276 | 678 | 1,544 |
| 2013 | 5 | 2 | 8,388 | 2,680 | 265 | 1,177 | 1,181 | 924 | 180 | 722 | 1,259 |
| 2012 | 2 | 0 | 8,087 | 2,585 | 229 | 1,092 | 1,112 | 998 | 180 | 674 | 1,217 |
| 2011 | 2 | 4 | 8,424 | 2,847 | 227 | 938 | 1,138 | 975 | 173 | 738 | 1,388 |
| 2010 | 4 | 6 | 8,426 | 2,823 | 220 | 849 | 1,380 | 940 | 155 | 766 | 1,293 |
| 2009 | 4 | 2 | 8,996 | 2,929 | 211 | 881 | 1,594 | 1,050 | 183 | 901 | 1,247 |
| 2008 | 3 | 7 | 8,730 | 2,658 | 208 | 981 | 1,437 | 965 | 185 | 816 | 1,480 |
| 2007 | 4 | 5 | 8,480 | 2,492 | 176 | 910 | 1,504 | 845 | 246 | 932 | 1,375 |
| 2006 | 5 | 6 | 7,973 | 2,394 | 186 | 898 | 1,323 | 956 | 184 | 836 | 1,196 |
| 2005 | 5 | 9 | 8,372 | 2,399 | 159 | 961 | 1,532 | 948 | 178 | 900 | 1,295 |
| 2004 | 4 | 7 | 8,423 | 2,491 | 202 | 879 | 1,463 | 1,092 | 199 | 874 | 1,223 |
| 2003 | 6 | 11 | 8,218 | 2,517 | 195 | 755 | 1,307 | 1,033 | 168 | 919 | 1,324 |
| 2002 | 4 | 4 | 7,768 | 2,407 | 189 | 702 | 1,214 | 969 | 150 | 856 | 1,281 |
| 2001 | 6 | 5 | 7,748 | 2,555 | 180 | 675 | 1,171 | 979 | 179 | 933 | 1,076 |
| 2000 | 2 | 8 | 7,921 | 2,640 | 233 | 671 | 1,043 | 1,090 | 152 | 934 | 1,158 |
| 1999 | 4 | 3 | 6,857 | 2,253 | 171 | 656 | 979 | 1,022 | 133 | 809 | 834 |
| 1998 | 7 | 8 | 6,823 | 2,416 | 153 | 608 | 948 | 1,005 | 106 | 784 | 803 |
| 1997 | 7 | 6 | 6,874 | 2,439 | 192 | 783 | 654 | 1,017 | 160 | 796 | 833 |
| 1996 | 4 | 7 | 6,601 | 2,265 | 189 | 813 | 715 | 1,112 | 98 | 648 | 761 |
| 1995 | 10 | 3 | 7,088 | 2,486 | 175 | 885 | 809 | 1,091 | 141 | 760 | 741 |
| 1994 | 9 | 4 | 7,547 | 2,591 | 235 | 1,018 | 833 | 965 | 192 | 778 | 935 |
| 1993 | 8 | 5 | 7,492 | 2,514 | 270 | 950 | 868 | 1,031 | 105 | 725 | 1,029 |
| 1992 | 5 | 1 | 8,269 | 2,637 | 211 | 1,326 | 1,028 | 997 | 115 | 778 | 1,177 |
| 1991 | 3 | 1 | 7,570 | 2,280 | 211 | 1,291 | 1,038 | 1,003 | 70 | 793 | 884 |
| 1990 | 5 | 1 | 8,806 | 2,846 | 207 | 1,355 | 1,149 | 1,206 | 97 | 1,001 | 945 |

[1] "Crimes in progress" includes burglaries and robberies.

[2] "All other" includes "civil disorder", "ambush", and other miscellaneous types of activity.

Exhibit 43
DX0461

Table 50
LAW ENFORCEMENT OFFICERS ASSAULTED, 2017-2022
By Type of Weapon and Injury

| Type of weapon and injury | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2017-2022 | 2021-2022 |
| Total................................ | 10,770 | 100.0 | 11,148 | 100.0 | 10,512 | 100.0 | 11,618 | 100.0 | 10,798 | 100.0 | 12,304 | 100.0 | 14.2 | 13.9 |
| Firearm................................ | 429 | 4.0 | 282 | 2.5 | 291 | 2.8 | 379 | 3.3 | 386 | 3.6 | 362 | 2.9 | -15.6 | -6.2 |
| With injury................. | 32 | 0.3 | 22 | 0.2 | 24 | 0.2 | 23 | 0.2 | 34 | 0.3 | 29 | 0.2 | - | - |
| Without injury............ | 397 | 3.7 | 260 | 2.3 | 267 | 2.5 | 356 | 3.1 | 352 | 3.3 | 333 | 2.7 | -16.1 | -5.4 |
| Knife/other cutting inst......... | 201 | 1.9 | 199 | 1.8 | 175 | 1.7 | 207 | 1.8 | 240 | 2.2 | 274 | 2.2 | 36.3 | 14.2 |
| With injury................. | 18 | 0.2 | 14 | 0.1 | 18 | 0.2 | 29 | 0.2 | 28 | 0.3 | 38 | 0.3 | - | - |
| Without injury............ | 183 | 1.7 | 185 | 1.7 | 157 | 1.5 | 178 | 1.5 | 212 | 2.0 | 236 | 1.9 | 29.0 | 11.3 |
| Other dangerous weapon..... | 1,578 | 14.7 | 1,496 | 13.4 | 1,533 | 14.6 | 2,465 | 21.2 | 1,880 | 17.4 | 2,416 | 19.6 | 53.1 | 28.5 |
| With injury................. | 248 | 2.3 | 235 | 2.1 | 225 | 2.1 | 358 | 3.1 | 369 | 3.4 | 475 | 3.9 | 91.5 | 28.7 |
| Without injury............ | 1,330 | 12.3 | 1,261 | 11.3 | 1,308 | 12.4 | 2,107 | 18.1 | 1,511 | 14.0 | 1,941 | 15.8 | 45.9 | 28.5 |
| Hands, fists, feet.............. | 8,562 | 79.5 | 9,171 | 82.3 | 8,513 | 81.0 | 8,567 | 73.7 | 8,292 | 76.8 | 9,252 | 75.2 | 8.1 | 11.6 |
| With injury................. | 2,556 | 23.7 | 2,800 | 25.1 | 2,669 | 25.4 | 2,517 | 21.7 | 2,864 | 26.5 | 3,278 | 26.6 | 28.2 | 14.5 |
| Without injury............ | 6,006 | 55.8 | 6,371 | 57.1 | 5,844 | 55.6 | 6,050 | 52.1 | 5,428 | 50.3 | 5,974 | 48.6 | -0.5 | 10.1 |

Notes: Percentages may not add to subtotals or 100.0 because of rounding.
   Dash indicates that a percent change is not calculated when the base number is less than 50.

Exhibit 43
DX0462

Table 51
**ANTI-REPRODUCTIVE-RIGHTS CRIMES, 2017-2022**
By Type of Offense, Type of Weapon, Location, and Type of Victim

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|
| Events[1]........................................ | 10 | 11 | 6 | 5 | 3 | 6 |
| Offenses..................................... | 10 | 11 | 6 | 5 | 3 | 7 |
| Victims[2]..................................... | 10 | 11 | 6 | 5 | 3 | 8 |
| Suspects[3].................................. | 4 | 6 | 5 | 5 | 3 | 8 |
| **Type of offense** | | | | | | |
| Total........................................... | 10 | 11 | 6 | 5 | 3 | 7 |
| Arson...................................... | 0 | 0 | 0 | 0 | 0 | 1 |
| Assault.................................... | 3 | 3 | 2 | 3 | 2 | 1 |
| Burglary.................................. | 0 | 2 | 1 | 0 | 0 | 0 |
| Malicious mischief................... | 0 | 0 | 0 | 0 | 0 | 0 |
| Robbery.................................. | 0 | 0 | 1 | 0 | 0 | 0 |
| Theft....................................... | 1 | 0 | 0 | 0 | 0 | 0 |
| Threats................................... | 0 | 0 | 0 | 1 | 0 | 2 |
| Trespass................................. | 0 | 1 | 0 | 0 | 0 | 1 |
| Vandalism............................... | 6 | 5 | 2 | 1 | 1 | 2 |
| **Type of weapon** | | | | | | |
| Total........................................... | 10 | 11 | 6 | 5 | 3 | 3 |
| Handgun.................................. | 0 | 0 | 0 | 0 | 0 | 0 |
| Blunt object............................. | 0 | 2 | 0 | 0 | 1 | 0 |
| Personal weapons[4].................. | 2 | 1 | 2 | 2 | 0 | 1 |
| Other...................................... | 1 | 0 | 0 | 1 | 1 | 0 |
| Not applicable[5]....................... | 7 | 8 | 4 | 2 | 1 | 2 |
| **Location** | | | | | | |
| Total........................................... | 10 | 11 | 6 | 5 | 3 | 6 |
| Residence/home/driveway...... | 3 | 0 | 0 | 0 | 1 | 0 |
| Public health facility................ | 3 | 9 | 4 | 1 | 1 | 5 |
| Private health facility............... | 2 | 1 | 2 | 2 | 1 | 1 |
| Other...................................... | 2 | 1 | 0 | 2 | 0 | 0 |
| **Type of victim** | | | | | | |
| Total........................................... | 10 | 11 | 6 | 5 | 3 | 8 |
| Individual................................. | 6 | 4 | 3 | 3 | 2 | 4 |
| Client.................................. | 2 | 0 | 0 | 0 | 0 | 0 |
| Employee............................. | 3 | 1 | 1 | 2 | 0 | 1 |
| Other.................................. | 1 | 3 | 2 | 1 | 2 | 3 |
| Property.................................. | 4 | 7 | 3 | 2 | 1 | 4 |
| Business............................. | 0 | 3 | 1 | 0 | 0 | 2 |
| Government......................... | 0 | 0 | 0 | 0 | 0 | 0 |
| Health facility...................... | 4 | 4 | 2 | 2 | 1 | 2 |

[1] An "event" is an occurrence of one or more criminal offenses committed against one or more victims by
one or more suspects/perpetrators.

[2] A "victim" may be an individual, a reproductive health facility, a religious facility, a residence, etc. A victim
can have more than one offense committed against them.

[3] Suspect counts only reflect when certain demographics are reported.

[4] Hands, feet, etc.

[5] The type of weapon only applies to crimes against persons or in cases involving incendiary devices.

———

Exhibit 43
DX0463

Table 52
**VIOLENT CRIMES COMMITTED AGAINST
SENIOR CITIZENS, 2000-2022**
By Offense

| Year | Total | Homicide | Rape[1] | Robbery | Aggravated assault |
|---|---|---|---|---|---|
| 2022.................. | 16,575 | 234 | 348 | 4,868 | 11,125 |
| 2021.................. | 15,308 | 204 | 329 | 4,477 | 10,298 |
| 2020.................. | 13,500 | 190 | 300 | 3,986 | 9,024 |
| 2019.................. | 13,478 | 178 | 309 | 4,556 | 8,435 |
| 2018.................. | 13,373 | 184 | 335 | 4,701 | 8,153 |
| 2017.................. | 12,404 | 162 | 281 | 4,601 | 7,360 |
| 2016.................. | 11,069 | 163 | 221 | 4,356 | 6,329 |
| 2015.................. | 9,585 | 152 | 202 | 3,915 | 5,316 |
| 2014.................. | 9,427 | 137 | 176 | 4,058 | 5,056 |
| 2013.................. | 8,708 | 136 | 124 | 4,079 | 4,369 |
| 2012.................. | 8,773 | 139 | 124 | 4,252 | 4,258 |
| 2011.................. | 8,041 | 138 | 109 | 3,978 | 3,816 |
| 2010.................. | 7,596 | 114 | 107 | 3,789 | 3,586 |
| 2009.................. | 7,710 | 124 | 100 | 4,003 | 3,483 |
| 2008.................. | 8,000 | 147 | 109 | 4,265 | 3,479 |
| 2007.................. | 8,027 | 102 | 88 | 4,274 | 3,563 |
| 2006.................. | 8,106 | 113 | 107 | 4,346 | 3,540 |
| 2005.................. | 7,487 | 121 | 110 | 3,798 | 3,458 |
| 2004.................. | 7,765 | 126 | 111 | 3,757 | 3,771 |
| 2003.................. | 7,962 | 126 | 90 | 4,118 | 3,628 |
| 2002.................. | 7,251 | 123 | 115 | 3,634 | 3,379 |
| 2001.................. | 6,425 | 112 | 97 | 3,089 | 3,127 |
| 2000.................. | 6,608 | 130 | 102 | 3,009 | 3,367 |

Notes: This table provides summary statistical data on the total number of persons 60 years of age or older who
were victims of homicide, rape, robbery, or aggravated assault.

[1] In 2014, the crime of "forcible rape" was changed to "rape." The definition was expanded to include both male
and female victims and reflects the various forms of sexual penetration understood to be rape. The 2022
numbers for Rape consist of 198 reported under this current definition (SRS) and 150 reported under the
definition for IBR. Caution should be used when comparing rape data to prior years. For additional information,
including the SRS and IBR rape numbers for prior years, see Understanding the Data, Characteristics and Known
Limitations.

Exhibit 43
DX0464

Table 53
**POPULATION ESTIMATES, 1966-2022**

| Year | Total population | Population at risk | | |
|---|---|---|---|---|
| | | Total[1] | Adult[2] | Juvenile[3] |
| 2022.............. | 39,028,571 | 30,801,258 | 26,615,085 | 4,186,173 |
| 2021.............. | 39,368,613 | 30,418,892 | 26,222,173 | 4,196,719 |
| 2020.............. | 39,782,419 | 30,351,854 | 26,168,032 | 4,183,822 |
| 2019.............. | 39,959,095 | 30,948,835 | 26,807,124 | 4,141,711 |
| 2018.............. | 39,825,181 | 30,947,933 | 26,718,187 | 4,229,746 |
| 2017.............. | 39,613,045 | 30,771,994 | 26,566,180 | 4,205,814 |
| 2016.............. | 39,354,432 | 30,662,726 | 26,486,720 | 4,176,006 |
| 2015.............. | 39,071,323 | 30,426,258 | 26,369,040 | 4,057,218 |
| 2014.............. | 38,499,378 | 30,190,364 | 26,129,967 | 4,060,397 |
| 2013.............. | 38,204,597 | 29,923,597 | 25,825,829 | 4,097,768 |
| 2012.............. | 37,826,160 | 29,735,335 | 25,593,235 | 4,142,100 |
| 2011.............. | 37,578,616 | 29,556,094 | 25,352,813 | 4,203,281 |
| 2010.............. | 37,318,481 | 29,432,329 | 25,166,828 | 4,265,501 |
| 2009.............. | 37,077,204 | 29,092,061 | 24,846,056 | 4,246,005 |
| 2008.............. | 36,856,222 | 28,869,786 | 24,483,271 | 4,386,515 |
| 2007.............. | 36,552,529 | 28,597,658 | 24,193,795 | 4,403,863 |
| 2006.............. | 36,246,822 | 28,317,290 | 23,915,923 | 4,401,367 |
| 2005.............. | 35,985,582 | 28,066,451 | 23,678,907 | 4,387,544 |
| 2004.............. | 35,752,765 | 27,835,492 | 23,461,739 | 4,373,753 |
| 2003.............. | 35,388,928 | 27,496,472 | 23,162,159 | 4,334,313 |
| 2002.............. | 34,938,290 | 27,091,683 | 22,826,738 | 4,264,945 |
| 2001.............. | 34,512,742 | 26,707,152 | 22,524,040 | 4,183,112 |
| 2000.............. | 34,000,835 | 26,252,783 | 22,175,874 | 4,076,909 |
| 1999.............. | 34,036,000 | 25,711,892 | 21,855,190 | 3,856,702 |
| 1998.............. | 33,494,000 | 25,263,064 | 21,498,170 | 3,764,894 |
| 1997.............. | 32,957,000 | 25,760,375 | 21,934,916 | 3,825,459 |
| 1996.............. | 32,383,000 | 25,554,242 | 21,825,735 | 3,728,507 |
| 1995.............. | 32,063,000 | 25,122,782 | 21,505,839 | 3,616,943 |
| 1994.............. | 32,140,000 | 24,703,379 | 21,193,571 | 3,509,808 |
| 1993.............. | 31,742,000 | 24,334,534 | 20,923,632 | 3,410,902 |
| 1992.............. | 31,300,000 | 23,975,578 | 20,661,120 | 3,314,458 |
| 1991.............. | 30,646,000 | 23,585,168 | 20,356,984 | 3,228,184 |
| 1990.............. | 29,557,836 | 23,178,961 | 20,027,633 | 3,151,328 |
| 1989.............. | 28,771,207 | 22,524,392 | 19,451,763 | 3,072,629 |
| 1988.............. | 28,060,746 | 21,969,953 | 18,885,349 | 3,084,604 |
| 1987.............. | 27,388,477 | 21,483,563 | 18,378,758 | 3,104,805 |
| 1986.............. | 26,741,621 | 21,009,362 | 17,903,122 | 3,106,240 |
| 1985.............. | 26,112,632 | 20,563,314 | 17,468,941 | 3,094,373 |
| 1984.............. | 25,587,254 | 20,167,923 | 17,083,479 | 3,084,444 |
| 1983.............. | 25,075,581 | 19,860,746 | 16,763,095 | 3,097,651 |
| 1982.............. | 24,546,566 | 19,510,945 | 16,415,571 | 3,095,374 |
| 1981.............. | 24,038,711 | 19,172,812 | 16,082,355 | 3,090,457 |
| 1980.............. | 23,668,145 | 18,824,197 | 15,778,999 | 3,045,198 |
| 1979.............. | 23,255,000 | 18,371,691 | 15,323,376 | 3,048,315 |
| 1978.............. | 22,839,000 | 18,012,901 | 14,916,032 | 3,096,869 |
| 1977.............. | 22,350,000 | 17,619,453 | 14,470,680 | 3,148,773 |
| 1976.............. | 21,935,000 | 17,269,884 | 14,080,872 | 3,189,012 |
| 1975.............. | 21,537,000 | 16,914,556 | 13,694,793 | 3,219,763 |
| 1974.............. | 21,173,000 | 16,563,671 | 13,339,906 | 3,223,765 |
| 1973.............. | 20,868,000 | 16,237,031 | 13,031,007 | 3,206,024 |
| 1972.............. | 20,585,000 | 15,926,249 | 12,758,809 | 3,167,440 |
| 1971.............. | 20,346,000 | 15,657,238 | 12,542,795 | 3,114,443 |
| 1970.............. | 20,039,000 | 15,378,312 | 12,339,580 | 3,038,732 |
| 1969.............. | 19,856,000 | 14,697,200 | 11,657,600 | 3,039,600 |
| 1968.............. | 19,554,000 | 14,379,400 | 11,403,700 | 2,975,700 |
| 1967.............. | 19,478,000 | 14,065,700 | 11,159,800 | 2,905,900 |
| 1966.............. | 19,132,000 | 13,696,700 | 10,872,500 | 2,824,200 |

Source: Population estimates were provided by the Demographic Research Unit, California Department of Finance.

[1] Total population at risk: 10-69 years of age.

[2] Adult population at risk: 18-69 years of age.

[3] Juvenile population at risk: 10-17 years of age.

Exhibit 43
DX0465

# Appendix 1
## Computational Formulas

### CRIMES

**Crime rate** – A crime rate describes the number of crimes reported to law enforcement agencies for every 100,000 persons within a population.  A crime rate is calculated by dividing the number of reported crimes by the total population.  The result is then multiplied by 100,000.  For example, in 2022 there were 47,669 robberies in California and the population was 39,028,571.  This equals a robbery crime rate of 122.1 per 100,000.

$$\frac{47,669}{39,028,571} = 0.0012214 \times 100,000 = 122.1 \text{ per } 100,000$$

**Clearance rate** – A clearance rate describes the percentage of clearances reported to the number of crimes reported.  A clearance rate is calculated by dividing the number of clearances by the number of crimes reported.  The result is multiplied by 100.  For example, in 2022 there were 1,294 clearances for homicide crimes and 2,206 homicides reported.  This equals a homicide clearance rate of 58.7 percent.

$$\frac{1,294}{2,206} = 0.58658 \times 100 = 58.7 \text{ percent}$$

### ARRESTS

**Arrest rate** – An arrest rate describes the number of arrests made by law enforcement agencies per 100,000 total population or per 100,000 population considered to be at risk for arrest.  Regardless of the population used, both rates are calculated in the same manner.  An arrest rate is calculated by dividing the number of reported arrests by the desired population.  The result is multiplied by 100,000.

For example: 1) In 2022, there were 268,182 total felony arrests and the total population was 39,028,571, which equates to a 687.1 arrest rate; 2) In 2022, there were 268,182 total felony arrests and the population at risk (10-69 years of age) was 30,801,258, which equates to a 870.7 arrest rate.

$$1) \quad \frac{268,182}{39,028,571} = 0.0068714 \times 100,000 = 687.1 \text{ per } 100,000 \text{ population}$$

$$2) \quad \frac{268,182}{30,801,258} = 0.0087069 \times 100,000 = 870.7 \text{ per } 100,000 \text{ population at risk}$$

Exhibit 43
DX0466

## ADDITIONAL INFORMATION

**Percent change** – A percent change describes the change in number or rate from one year to another. A percent change is calculated by subtracting the base-year data from the current-year data. The result is divided by the base-year data and multiplied by 100. For example, in 2022 the robbery crime rate was 122.1. In 2017, the robbery crime rate was 142.9. The percent change in rate from 2017 to 2022 is a 14.6 percent decrease.

$$\frac{122.1 - 142.9}{142.9} = -0.14556 \times 100 = -14.6 \text{ percent}$$

**Populations at risk** – The Arrest tables in this report (16, 17, 22, and 27) include three comparison populations: total (10–69 years of age), adult (18–69 years of age), and juvenile (10–17 years of age). The term Population at Risk refers to that portion of the total population who, because of like characteristics to the specific study group, are considered "at risk". For example, juveniles, all persons ages 10-17 would constitute the at risk population. Both populations, 10-17 years of age and 18-69 years of age are grouped together as the population at risk for the purpose of this publication for arrest incident occurrences.

When a series of rates is calculated using different populations, the rate calculated for the total will not equal the sum of the rates for the parts. For example, the arrest rate calculated using the total at risk population will not equal the sum of the juvenile arrest rate (based on the juvenile at risk population) and the adult arrest rate (based on the adult at risk population).

Also, the percent changes calculated for these at risk rates cannot be added. This is because the percent change in the total arrest rate is the result of independent changes in both the number of arrests and the at risk populations of adults and juveniles.

Exhibit 43
DX0467

# Appendix 2
## Arrest Offense Codes

The following statutes and their offense groupings were valid at the time of the closeout of the 2022 arrest offense code file. All statutory codes listed are for Penal Code sections unless indicated as follows:

BP  - Business and Professions Code
CC  - Corporations Code
CI  - Civil Code
EC  - Education Code
FA  - Food and Agriculture Code
FC  - Financial Code

FG  - Fish and Game Code
GC  - Government Code
HN  - Harbors and Navigation Code
HS  - Health and Safety Code
IC  - Insurance Code
LC  - Labor Code

MV  - Military and Veterans Code
PR  - Public Resources Code
RT  - Revenue and Taxation Code
SH  - Streets and Highways Code
UI  - Unemployment Insurance Code
VC  - Vehicle Code
WI  - Welfare and Institutions Code

### FELONY-LEVEL ARREST OFFENSES

**Homicide** - 128, 187(a), 192(a), 192(b), 273ab(a), 18755(a)

**Rape** - 220, 220(a)(1), 220(a)(2), 220(b), 261(a)(1), 261(a)(2), 261(a)(3), 261(a)(4), 261(a)(4)(a), 261(a)(4)(b), 261(a)(4)(c), 261(a)(4)(d), 261(a)(5), 261(a)(6), 261(a)(7), 264(c)(1), 262.1(a), 264(c)(2), 264.1(a), 264.1(b)(1), 264.1(b)(2), 266c, 269(a)(1), 269(a)(2), 269(a)(3), 269(a)(4), 269(a)(5), 286(b)(1)*, 286(b)(2), 286(c)(1), 286(c)(2)(a), 286(c)(2)(b), 286(c)(2)(c), 286(c)(3), 286(d)(1), 286(e), 286(f), 286(f)(1), 286(f)(2), 286(f)(3), 286(f)(4), 286(g), 286(h)*, 286(i), 286(j), 286(k), 287(b)(1)*, 287(b)(2), 287(c)(2)(a), 287(c)(2)(b), 287(c)(2)(c), 287(c)(3), 287(d)(1)(a), 287(d)(1)(b), 287(d)(1)(c), 287(d)(2), 287(d)(3), 287(e)*, 287(f), 287(f)(1), 287(f)(2), 287(f)(3), 287(f)(4), 287(g), 287(h)*, 287(i), 287(j), 287(k), 288.7(a), 288.7(b), 289(a)(1)(a), 289(a)(1)(b), 289(a)(1)(c), 289(a)(2), 289(b), 289(c), 289(d), 289(d)(1), 289(d)(2), 289(d)(3), 289(d)(4), 289(e), 289(f), 289(g), 289(h)*, 289(i), 289(j)

**Robbery** - 211, 212.5(a), 212.5(b), 212.5(c), 213(a)(1)(a), 213(a)(2), 214, 215(a)

**Assault** – 69(a)*, 71(a)(1)*, 71(a)(2), 76(a)*, 95.1, 136.7(a)*, 139(a), 140(a)*, 146e(b), 148(b)*, 148(c), 148(d)*, 148(d)(1), 148.1(a), 148.1(b), 148.1(c), 148.1(d), 148.3(b), 148.4(b)(1), 148.4(b)(2), 149*, 151(a)(2), 186.26(a), 186.26(b), 186.26(c), 203, 205, 206, 217.1(a), 217.1(b), 218, 218.1*, 219, 219.1, 219.2*, 220, 222, 241.1, 241.4, 241.7, 242*, 243(c), 243(c)(1)*, 243(c)(2)*, 243(d), 243.1, 243.3*, 243.6*, 243.7, 243.9(a)*, 244, 244.5(b)*, 244.5(c)*, 245(a)(1)*, 245(a)(2)*, 245(a)(3), 245(a)(4)*, 245(b), 245(c), 245(d)(1), 245(d)(2), 245(d)(3), 245.2, 245.3, 245.5(a), 245.5(b), 245.5(c), 246*, 246.3(a)*, 247(a), 247(b), 247.5*, 273a(a)*, 273ab(b), 273d(a)*, 273.5(a)*, 273.5(f)(1)*, 273.5(f)(2)*, 347(a)(1), 347(b), 368(b)(1)*, 375(a)*, 375(d), 401(a), 405a, 417(b)*, 417(c)*, 417.3, 417.6(a), 417.8, 422(a)*, 422.7(a), 588a*, 601(a)(1), 601(a)(2), 625c, 664/187(a), 664/192(a), 1768.8(b) WI, 1768.85(a) WI*, 1808.4(d) VC, 4131.5, 4500, 4501(a), 4501(b), 4501.1(a), 4501.5, 11412, 11413(a), 11418(a)(1), 11418(a)(2),11418(b)(1), 11418(b)(2), 11418(b)(3), 11418(b)(4), 11418(c), 11418(d)(1), 11418(d)(2), 11418.1*, 11418.5(a)*, 11419(a)*, 12308, 12309, 15656(a) WI, 18715(a)(1), 18715(a)(2), 18715(a)(3), 18715(a)(4), 18715(a)(5), 18725(a), 18725(b), 18725(c), 18740, 18750, 18755(b), 20110(a), 20110(b), 21464(c), 23110(b) VC, 38318(b) VC, 38318.5(b) VC

**Kidnapping** - 157, 207(a), 207(b), 207(c), 207(d), 208(b), 209(a), 209(b)(1), 209.5(a), 209.5(b), 210, 278, 278.5(a), 280(b), 4503

**Burglary** -459*, 459.5(a)*, 460, 460(a), 460(b)*, 461, 461.1, 461.2, 463(a), 464, 664/459, 664/460, 664/460(a), 664/460(b)

**Theft** - 72, 72.5(a)*, 72.5(b)*, 115(a), 115.5(b), 116, 117, 134, 154(b), 155(b), 155.5(b), 156, 182(a)(4)*, 304 HN, 305 HN, 332(a)*, 334(a)*, 337.7, 350(a)*, 350(a)(2)*, 350(b), 350(c), 368(d)(1)*, 368(e)(1), 424(a)1, 424(a)2, 424(a)3, 424(a)4, 424(a)5, 424(a)6, 424(a)7, 463(b), 474, 481, 481.1(a), 483.5(f)*, 484(a)*, 484(b)(1)*, 484b*, 484c, 484.1(a)*, 485*, 487(a)*, 487(b)(1)(a), 487(b)(2)*, 487(b)(3)*, 487(c)*, 487(d)(2), 487a(a)*, 487a(b)*, 487a(c)*, 487b, 487d, 487e, 487g, 487h(a), 487i*, 487j*, 487k, 487m(a)*, 490.2*, 490.4(a)(1)*, 490.4(a)(2)*, 490.4(a)(3)*, 490.4(a)(4)*, 495, 496(a), 496(b), 496(d)*, 496a(a), 496c*, 496d(a), 497, 498(b)(1), 498(b)(2), 498(b)(3), 498(b)(4), 498(b)(5), 498(d), 499c(b)(1), 499c(b)(2), 499c(b)(3), 499c(b)(4), 499d, 500(a), 500(a)(1)*, 500(a)(2)*, 500(a)(3)*, 502(c)(1)(a), 502(c)(1)(b), 502(c)(2), 502(c)(3), 502(c)(4), 502(c)(5), 502(c)(6)*, 502(c)(7)*, 502(c)(8)*, 502(c)(10)*, 502(c)(11)*, 502(c)(12)*, 502(c)(13)*, 502(c)(14)*, 502.5*, 502.7(a)(1)*, 502.7(a)(2)*, 502.7(a)(3)*, 502.7(a)(4)*, 502.7(a)(5)*, 502.7(b)(1)*, 502.7(b)(2), 502.7(c)*, 502.7(d)*, 502.7(g), 502.8(b)*, 502.8(d), 502.8(e), 502.8(f), 503*, 504*, 504a*, 504b*, 505*, 506*, 506b, 507*, 508*, 514*, 528, 529(a)*, 529(a)(1)*, 529(a)(2)*, 529(a)(3)*, 529a*, 529.5(b), 530*, 530.5(a)*, 530.5(c)(2)*, 530.5(c)(3)*, 530.5(d)(1)*, 532(a)*, 532a(1)*, 532a(2)*, 532a(3)*, 532a(4)*, 532f(a)(1)*, 532f(a)(2)*, 532f(a)(3)*, 532f(a)(4)*, 533, 534, 535, 537(a)*, 537(a)(2), 537(c)(2)*, 537e(a), 537e(a)(3), 538*, 538.5, 548(a), 549, 550(a)(1), 550(a)(2), 550(a)(3), 550(a)(4), 550(a)(5), 550(a)(6), 550(a)(7), 550(a)(8), 550(a)(9), 550(b)(1), 550(b)(2), 550(b)(3), 550(b)(4), 560, 560.4, 566, 571(a), 571(b), 577, 578, 580, 581, 593d(b), 620, 642*, 648*, 650 BP, 666(a)*, 666(b)*, 750(a) IC, 892(a) CI, 1695.6(b)(1) CI, 1733 IC, 1778 LC, 1823 FC, 1871.4(a)(1) IC, 1871.4(a)(2) IC, 1871.4(a)(3) IC, 1871.4(a)(4) IC, 2102(a) UI, 2107 UI, 2108 UI, 2109 UI, 2110 UI, 2110.5 UI, 2114 UI, 2116(a) UI, 2116(b) UI, 2121 UI, 2255(b) CC, 2945.4(a) CI, 2945.4(g) CI*, 3215 LC, 3352 FC, 3361 FC, 3531 FC, 4463(a)(1) VC, 4463(a)(2) VC, 7027.3 BP, 7028.16 BP*, 7051 HS, 10238.6(c) BP, 10250.52 BP, 10752(a) VC, 10752(b) VC, 10801 VC, 10802 VC, 10803(a) VC, 10803(b) VC, 10855 VC*, 10980(b) WI, 10980(c)(2) WI, 10980(d) WI, 10980(g)(2) WI, 11010(a) BP, 11019(a) BP, 11022(a) BP, 11320 BP, 11482.5 WI, 11483 WI*, 11483.5 WI, 11760(a) IC, 11880(a) IC, 14014(a) WI*, 14025(a) WI, 14107(b)(1) WI, 14591(b)(1)(a) PR*, 14591(b)(1)(b) PR*, 14591(b)(1)(c) PR*, 14591(b)(1)(d) PR*, 14591(b)(1)(e) PR*, 14591(b)(1)(f)(2) PR*, 14591(b)(1)(g) PR*, 17410 WI, 17414(b) FC, 17511.12(a) BP, 17551(a) FA, 17551(b) FA, 18848 FA*, 22430(a) BP, 22753(a) BP*, 25110 CC, 25401 CC, 25540 CC, 25541 CC, 27443(a) GC, 27443(b) GC, 30475(b) RT, 30480 RT, 31110 CC, 31201 CC, 31410 CC, 31411 CC, 44209 HS, 94319.14(b) EC, 94320(f) EC, 94320(g) EC, 103800 HS

**Motor Vehicle Theft** – 487(d)(1)*, 666.5(a), 10851(a) VC*, 10851(b) VC, 10851(e) VC

Exhibit 43
DX0468

**Forgery, Check, and Access Cards** - 113, 114, 470(a)*, 470(b)*, 470(c), 470(d)*, 470a*, 470b, 471, 472, 475(a)*, 475(b)*, 475(c)*, 476*, 476a(a)*, 476a(b)*, 477, 478, 479, 480(a), 484e(a)*, 484e(b), 484e(d)*, 484f(a), 484f(b)*, 484g*, 484g(a)*, 484g(b)*, 484h(a)*, 484h(b)*, 484i(b), 484i(c)*, 617, 10980(e) WI

**Arson** - 451(a), 451(b), 451(c), 451(d), 451.5(a), 451.5(a)(1), 451.5(a)(2)(a), 451.5(a)(3), 452(a), 452(b), 452(c), 453(a)*, 454(a)(1), 454(a)(2), 455(a)

**Drug Offenses**

**Narcotic** - 11350(a) HS, 11350(b) HS*, 11351 HS, 11351.5 HS, 11352(a) HS, 11352(b) HS, 11353(a) HS, 11353(b) HS, 11353(c) HS, 11354(a) HS

**Marijuana** - 11358(d) HS, 11359(c) HS, 11359(d) HS 11360(a) HS*, 11361(a) HS, 11361(b) HS, 11362.4(d) HS

**Dangerous Drug** - 4060 BP*, 11353.5 HS, 11353.7 HS, 11370.1(a) HS, 11375(b)(1) HS*, 11377(a) HS*, 11378 HS, 11378.5 HS, 11379(a) HS, 11379(b) HS, 11379.2 HS, 11379.5(a) HS, 11379.5(b) HS, 11380(a) HS, 11550(e) HS

**All Other** - 4324(a) BP*, 4324(b) BP*, 4336(a) BP, 11104(a) HS, 11106(j) HS*, 11152 HS, 11153(a)(1) HS, 11154(a) HS, 11154(b) HS, 11155 HS, 11156 HS, 11157 HS, 11162.5(a) HS, 11166 HS*, 11173(a) HS*, 11173(b) HS, 11173(c) HS, 11173(d) HS, 11174 HS, 11355 HS*, 11363 HS, 11364.7(b) HS, 11366 HS*, 11366.5(a) HS, 11366.5(b) HS, 11366.6 HS, 11366.7(b) HS, 11366.8(a) HS, 11366.8(b) HS, 11368 HS*, 11370.6(a) HS, 11370.9(a) HS, 11370.9(b) HS, 11370.9(c) HS, 11371 HS, 11371.1 HS, 11379.6(a) HS, 11379.6(b) HS, 11382 HS*, 11383(a) HS, 11383(b) HS, 11383(c)(1) HS, 11383(c)(2) HS, 11383(f) HS, 11383(g) HS, 11383.5(b)(1) HS, 11383.5(e) HS, 11383.7(a) HS, 11383.7(b)(1) HS, 11390 HS, 11391 HS

**Sex Offenses**

**Lewd or Lascivious** - 220, 266j, 288(a), 288(b)(1), 288(b)(2), 288(c)(1)*, 288(c)(2)*, 288.5(a)

**All Other** - 243.4(a)*, 243.4(b), 243.4(c)*, 243.4(d)*, 243.4(j), 261.5(a), 261.5(c), 261.5(d), 265, 266*, 266a, 266b, 266d, 266e, 266f, 266g, 266h(a), 266h(b)(1), 266i(a), 266i(b)(1), 266i(a)(2), 266i(a)(3), 266i(a)(4), 266i(a)(5), 266i(a)(6), 266i(b)(1), 266i(b)(2), 267, 285, 288.2(a)(1)*, 288.2(a)(2)*, 288.2(b), 288.3, 288.3(a), 288.4(a)(2), 288.4(b), 289.6(a)*, 289.6(a)(2), 289.6(a)(3), 290(b)*, 290.002*, 290.006*, 290.010*, 290.011(a)*, 290.011(b)*, 290.011(c)*, 290.011(d)*, 290.011(f)*, 290.012(a)*, 290.012(b)*, 290.012(c)*, 290.013(a)*, 290.013(b), 290.014*, 290.015*, 290.018(b), 290.018(d)*, 290.018(f)*, 290.018(g)*, 311.1(a), 311.10(a)*, 311.11(a)*, 311.11(b), 311.11(c)(1)*, 311.11(c)(2)*, 311.2(a)*, 311.2(b), 311.2(c)*, 311.2(d), 311.3(a)*, 311.3(b)(1)*, 311.3(b)(2)*, 311.3(b)(3)*, 311.3(b)(4)*, 311.3(b)(5)*, 311.3(b)(6)*, 311.4(a)*, 311.4(b), 311.4(c), 311.5*, 311.7*, 313.1(a)*, 313.1(b)*, 313.1(c)(1)*, 313.1(c)(2)*, 314(1), 647f, 647.6(a)(1)*, 647.6(a)(2)*, 647.6(b), 647.6(c)(1), 647.6(c)(2), 729(a)*

**Driving Under the Influence** - 655(f) HN, 23153(a) VC*, 23153(b) VC*, 23153(d) VC, 23153(f) VC*,  23153(g) VC*, 23550(a) VC*, 23550.5(a) VC*

**Hit-and-Run** -  20001(a) VC, 20001(b)(1) VC*, 20001(b)(2) VC*

**Weapons** - 171b(a)(1), 171b(a)(2)*, 171b(a)(3), 171b(a)(4)*, 171b(a)(5)*, 171b(a)(6)*, 171c, 171c(a)(1)*, 171d(a)*, 171d(b)*, 186.28(a)*, 626.9(b)*, 626.9(d), 626.9(h), 626.9(i), 626.95(a)*, 626.10(a)(1)*, 626.10(b)*, 4502(a), 4502(b), 4574(a), 4574(b), 8101(a) WI, 8101(b) WI, 8103(a)(1) WI, 8103(f)(1) WI, 8103(f)(1)(b) WI*, 8103(i) WI*, 12761 HS*, 18710(a)*, 18720, 18730, 18735(a)*, 18745, 19100*, 19200(a)*, 20310*, 20410*, 20510*, 20610*, 20710*, 20910*, 21110*, 21310*, 21810*, 22011*, 22210*, 22410*, 22810(a)*, 22810(c)*, 22810(d)*, 22810(e)(1)*, 22810(g)(1)*, 22810(g)(2), 23900, 24310*, 24410*, 24510*, 24610*, 24710*, 25100(a)*, 25300(a), 25400(a)(1)*, 25400(a)(2)*, 25400(a)(3)*, 25400(c)(1), 25400(c)(2), 25400(c)(3), 25400(c)(4), 25400(c)(5)*, 25400(c)(6)*, 25400(c)(6)(b)*, 25800(a)*, 25850(a), 25850(c)(1)*, 25850(c)(2), 25850(c)(3), 25850(c)(4), 25850(c)(5)*, 25850(c)(6)*, 26100(b)*, 26100(c), 26100(d)*, 27500(a), 27500(b)*, 27505(a)*, 27510(a)*, 27515*, 27520*, 27545*, 27585(a), 28210(a)(1)*, 28250(b)(1), 28250(b)(2), 28250(b)(3), 29610(a), 29610(b), 29650*, 29800(a)(1), 29800(a)(2), 29800(b), 29805(a)*, 29805(a)(1)*, 29805(a)(2)*, 29805(b)*, 29805(c)*, 29815(a)*, 29820(b)*, 29825(a)*, 29900(a)(1), 29900(b)(1), 30210(a)*, 30210(b)*, 30305(a)(1)*, 30315*, 30320, 30600(a), 30605(a)*, 30720(a)*, 30725(b), 31500*, 32625(a), 32625(b), 32900*, 33210, 32310(a)*, 33215*, 33410, 33600*

**Escape** - 110, 836.6(a)*, 836.6(b)*, 871(b) WI, 1026.4(a), 1152(b) WI, 1768.7(a) WI, 1768.7(b) WI, 2042, 3002 WI, 4011.7*, 4530(a), 4530(b), 4530(c), 4532(a)(1), 4532(a)(2), 4532(b)(1)*, 4532(b)(2), 4533, 4534, 4535, 4536(a), 4550(a), 4550(b), 7326 WI

**Bookmaking** - 337.2, 337a(a)(1)*, 337a(a)(2)*, 337a(a)(3)*, 337a(a)(4)*, 337a(a)(5)*, 337a(a)(6)*, 337i, 337j(b)*, 337j(c)*

**All Other Felony Offenses**

Exhibit 43
DX0469

## MISDEMEANOR-LEVEL ARREST OFFENSES

**Manslaughter–Misd.** - 191.5(b)*, 192(c)(1)*, 192(c)(2), 192.5(b), 192.5(c)*, 192.5(d)

**Assault and Battery** – 69(a)*, 71(a)(1)*, 76(a)*, 95.1, 136.7(a)*, 139(a), 140(a)*, 147, 148(a)(1), 148(b)*, 148(d)*, 148.1(a)*, 148.1(b), 148.1(c), 148.1(d), 148.10(a)*, 148.2(1), 148.2.2, 148.2(2), 148.2(3), 148.2(4), 148.2.3, 148.2.4, 148.3(a), 148.4(a)(1), 148.4(a)(2), 149*, 151(a)(1), 217.1(a), 218.1*, 219.2*, 219.3, 240, 241(a), 241(b), 241(c), 241.1*, 241.2(a), 241.2(a)(1), 241.3(a), 241.4, 241.5(a), 241.6, 242*, 243(a), 243(b), 243(c)(1)*, 243(c)(2)*, 243(d)*, 243(e)(1), 243.10(a), 243.2(a)(1), 243.25, 243.3*, 243.35(a), 243.6*, 243.65(a), 243.8(a), 243.9(a)*, 244.5(b)*, 244.5(c)*, 245(a)(1)*, 245(a)(2)*, 245(a)(4)*, 245.5(c), 246*, 246.3(a)*, 246.3(b), 247.5*, 248, 273a(a)*, 273a(b), 273d(a)*, 273.5(f)(1)*, 273.5(f)(2)*, 347(b), 368(b)(1)*, 368(c), 374c, 375(a)*, 375(b), 383, 402a, 417(a)(1), 417(a)(2)(a), 417(a)(2)(b), 417(b)*, 417(c)*, 417.25(a), 417.26(a), 417.26(b), 417.4, 422(a)*, 422.4(a), 422.6(a), 422.7(a), 423.2(a), 423.2(b), 423.2(c), 423.2(d), 423.2(g), 423.2(h), 594.39(a), 1768.85(a) WI*, 2652, 2652.5, 4501.1(a), 11414(a), 11414(c), 11418.1*, 11418.5(a)*, 12680 HS, 15656(b) WI, 20170(a)

**Burglary–Misd.** - 459*, 459.5(a)*, 460(b)* , 490.4(a)(1)*, 490.4(a)(2)*, 490.4(a)(3)*, 490.4(a)(4)*

**Petty Theft** - 368(d)(1)*, 368(e)(2), 409(h), 463(b), 463(c), 484(a)*, 484(b)(1)*, 484b*, 484.1(a)*, 485*, 487(a)*, 487(b)(1)(a), 487(b)(2)*, 487(b)(3)*, 487(c)*, 487a(a)*, 487a(b)*, 487a(c)*, 487e, 487f, 487h(a)*, 487i*, 487j*, 487m(a)*, 488, 490, 490.1(a), 490.2*, 490.5(a), 490.7(b), 490.7(b)(2), 490.7(b)(3), 490.7(b)(4), 496c*, 499b(b), 499c(b)(1), 499c(b)(2), 499c(b)(3), 499c(b)(4), 499c(c), 499d, 499g, 502.5*, 530*, 530.5(a)*, 530.5(c)(1)*, 530.5(c)(2)*, 530.5(c)(3)*, 530.5(d)(1)*, 530.5(d)(2)*, 530.5(e), 532(a)*, 538*, 565, 642*, 666(a)*, 666(b)*, 8726 HS, 22435.1 BP, 22435.2 BP, 22435.2(a) BP, 22435.2(b) BP, 22435.2(c), 22435.2(e) BP, 22435.2(f) BP, 22435.11(a) BP, 22435.12 BP, 22753(a) BP*, 41950(a) PR

**Other Theft** - Includes approximately 200 statute codes that can be identified upon request.

**Checks and Access Cards** - 112(a), 470(a)*, 470(c), 470(b)*, 470(d)*, 470a*, 470b, 471, 472, 475(a)*, 475(b)*, 475(c)*, 476*, 476a(a)*, 476a(b)*, 484e(a)*, 484e(b), 484e(c), 484e(d)*, 484f(b)*, 484g, 484g(a)*, 484g(b)*, 484h(a)*, 484h(b)*, 484i(a), 484i(b), 484i(c)*, 484j

**Drug Offenses**

**Marijuana** - 11357(b) HS, 11357(c) HS, 11357.5(a) HS, 11357.5(b) HS, 11358(c) HS, 11359(b) HS, 11360(a) HS*, 11362.4(c) HS, 11362.77(a) HS, 34014(a) BP, 34016(b) BP, 34016(d) BP, 34016(e) BP

**Other Drugs** - 377, 379, 647(f), 2241 BP, 2242.1(a) BP, 2762(e) BP, 2878.5(a) BP, 4051 BP, 4059(a) BP, 4060 BP*, 4077(a) BP, 4141 BP, 4142 BP, 4148 BP, 4149 BP, 4163 BP, 4323 BP, 4324(a) BP*, 4324(b) BP*, 4325(a) BP, 4326(a) BP, 4326(b) BP, 4331(a) BP, 4332 BP, 11100(g)(1) HS, 11100(g)(2) HS, 11100(g)(3) HS, 11100.1(a) HS, 11104(c) HS, 11104.5 HS, 11106(j) HS*, 11150 HS, 11151 HS, 11157 HS*, 11159 HS, 11161(a) HS, 11162.5(b), 11162.6(c) HS, 11166 HS*, 11170 HS, 11171 HS, 11172 HS, 11173(a) HS*, 11173(d) HS, 11175 HS, 11180 HS, 11190 HS, 11207 HS, 11217 HS, 11350(a) HS*, 11350(b) HS*, 11352.1(b) HS, 11355 HS*, 11364(a) HS, 11364.5(a) HS, 11364.5(b) HS, 11364.7(a) HS, 11364.7(c) HS, 11365(a) HS, 11366 HS*, 11366.5 (a HS, 11368 HS*, 11375(b)(l) HS*,11375(b)(2) HS, 11375.5(a) HS, 11377(a) HS*, 11382 HS*, 11391 HS, 11473.5 HS, 11532(a) HS, 11550(a) HS, 11594 HS, 109575 HS, 109580 HS

**Indecent Exposure** - 314(1), 314(2)

**Annoying Children** - 261.5(b), 261.5(c), 261.5(d), 286(b)(1)*, 288(c)(1)*, 288.4(a)(1), 289(h)*, 647.6(a)(1), 647.6(a)(2)

**Obscene Matter** – 288.2(a)(1)*, 288.2(a)(2)*, 311.1(a)*, 311.10(a)*, 311.11(a), 311.11(c)(1)*, 311.11(c)(2)*, 311.2(a)*, 311.2(c)*, 311.3(a)*, 311.3(b), 311.3(b)(1)*, 311.3(b)(2)*, 311.3(b)(3)*, 311.3(b)(4)*, 311.3(b)(5)*, 311.3(b)(6)*, 311.4(a)*, 311.5*, 311.6, 311.7*, 313.1(a)*, 313.1(c)(1)*, 313.1(c)(2), 313.1(e)

**Lewd Conduct** - 288(c)(2)*, 647(a), 647(d), 647(i), 647(j)(1), 647(j)(2), 647(j)(3)(a), 647(j)(4)(a), 647(j)(4)(b), 647(l)(1),  647(l)(2), 653b(a)

**Prostitution** - 266*, 315, 316, 647(b)(1), 647(b)(2), 647(b)(3), 653.22(a)(1), 653.23(a)(1), 653.23(a)(2), 25601 BP

**Contribute to Delinquency of Minor** - 272, 272(a)(1), 272(b)(1), 273i(a)

**Drunk** - 647(f)

**Liquor Laws** - 172(a), 172a, 172b(1), 172d(1), 172g(a), 172l, 303, 303a, 307, 347b, 397, 11200, 23224(a) VC, 23224(b) VC, 23300 BP, 23301 BP, 25177 BP, 25351 BP, 25602(a) BP, 25604 BP, 25606 BP, 25607 BP, 25608 BP, 25609 BP, 25612.5(c)(3) BP, 25631 BP, 25632 BP, 25657(a) BP, 25657(b) BP, 25658(a) BP, 25658(b) BP, 25658(c) BP, 25659.5(a) BP, 25659.5(c) BP, 25659.5(d) BP, 25660.5 BP, 25661(a) BP, 25662(a) BP, 25663(a) BP, 25663(b) BP, 25664 BP, 25665 BP, 120305 HS

**Disorderly Conduct** - 647(c), 647(e), 647(h), 647b, 653b(a)

---

77

Exhibit 43
DX0470

**Disturbing the Peace** - 171f.2, 302(a), 403, 404(a), 404.6(a), 404.6(c)*, 405, 406, 407, 408, 409, 409.6(c), 415(1), 415(2), 415(3), 415.5(a)(1), 415.5(a)(2), 415.5(a)(3), 416(a), 602.10, 602.11(a), 626.2, 626.4(d), 626.6(a), 626.7(a), 626.8(a)(1), 626.8(a)(2), 626.8(a)(3), 626.8(a)(4), 626.81(a), 626.85(a)(1), 626.85(a)(2), 626.85(a)(3), 640(d)(1), 653ca, 653cb, 653m(a), 653m(b), 653x(a), 653y(b)(1), 653y(b)(2), 653y(c), 727, 6311.5 LC, 9051 GC, 11460(a), 11460(b)(1)

**Malicious Mischief** - 623b(b), 625b(a), 10750(a) VC, 10851.5 VC, 10852 VC, 10853 VC, 10854 VC, 28051 VC, 28051.5 VC

**Vandalism** - 422.6(b), 423.2(e), 423.2(f), 555.1, 587a, 587(b), 587.1(a), 587.1(b), 588b, 590, 591.5, 592(a), 592(b), 594.35(b), 594.35(c), 594.35(d), 594(a)(1)*, 594(a)(2)*, 594(a)(3)*, 594(b)(1)*, 594(b)(2)(i), 594(b)(2)(b), 594.3(a)*, 594.35(a)*, 594.35(b), 594.35(c), 594.35(d), 594.4(a)*, 603, 604, 605(1), 605(2), 605(3), 607, 615, 616, 618, 621*, 622, 622.5, 623(a), 623(a)(1), 623(a)(2), 623(a)(3), 623(a)(4), 623(a)(5), 623(a)(6), 640(d)(5), 640.5(b)(1), 640.5(c)(1), 640.7, 640.8, 11411(a), 11411(b), 11411(c)*, 11411(d)*, 23110(a) VC, 27491.3 GC, 38318(a) VC, 38319 VC

**Trespassing** - 171f.1, 369g(a), 369g(b), 369i(a)(1), 369i(b)(1),398 MV, 409.5(c), 554(a), 554(b), 554(c), 554(d), 554(e), 554(f), 554(g), 554(h), 554(i), 555, 558, 587b, 593b, 601(a)(1), 601(a)(2), 602(a), 602(b), 602(c), 602(d), 602(e), 602(f), 602(g), 602(h)(1), 602(i), 602(j), 602(k), 602(l)(1), 602(l)(2), 602(l)(3), 602(l)(4), 602(m), 602(n), 602(o), 602(o)(1), 602(o)(2), 602(p), 602(q), 602(r), 602(s), 602(t)(1), 602(u)(1), 602(v)(1), 602(w), 602(x)(1), 602(y), 602.1(a), 602.1(b), 602.4(a), 602.5, 602.5(a), 602.5(b), 602.6, 602.8(a), 602.9(a),602.9(b), 602.12(a), 602.13(a), 627.2, 627.7(a)(1), 627.7(a)(2), 627.7(a)(3), 627.8, 627.8, 634*, 1583 FG, 27174.2 SH, 32210 EC, 32211 EC

**Weapons** - 136.2(a)(7)(b)2, 171b(a)(1), 171b(a)(2)*, 171b(a)(3), 171b(a)(4)*, 171b(a)(5)*, 171b(a)(6)*, 171c(a)(1)*, 171c(a)(2), 171d(a)*, 171d(b)*, 171.5(b), 171.5(c)(2), 171.5(c)(3), 171.5(c)(4), 171.5(c)(5), 171.5(c)(6), 171.5(c)(7), 171.5(c)(8), 171.5(c)(9), 171.5(c)(10), 171.5(c)(11), 171.5(c)(12), 171.7(b), 186.28(a)*, 468, 626.10(a)(1)*, 626.10(a)(2)*, 626.10(b)*, 626.10(i), 626.9(b)*, 626.95(a)*, 4574(c), 8103(i) WI*, 8103(f)(1)(b) WI*, 12761 HS*, 17500, 17505, 17510(a)(1), 17510(a)(2), 17510(a)(3), 17512, 18205, 18710(a)*, 19100*, 19200(a)*, 18735(a)*, 19405, 19910, 19915(a), 20010, 20110(b), 20160(a), 20165, 20310*, 20410*, 20510*, 20610*, 20710*, 20810(a), 20910*, 21110*, 21310*, 21510(a), 21510(b), 21510(c), 21710, 21810*, 22011*, 22210*, 22410*, 22610(a), 22610(b), 22610(c)(1), 22610(d), 22615(a), 22615(b), 22810(a)*, 22810(b), 22810(c)*, 22810(d)*, 22810(e)(1)*, 22810(e)(3), 22810(g)(1)*, 22815(a), 22900, 22910(a), 23920, 24310*, 24410*, 24510*, 24710*, 25100(b), 25100(c), 25100(d), 25135, 25200(a), 25200(b), 25250(a), 25250(b), 25300(a), 25400(a)(1)*, 25400(a)(2)*, 25400(a)(3)*, 25400(c)(5)*, 25400(c)(6)*, 25400(c)(6)b)*, 25400(f), 25800(a)*, 25850(a), 25850(c)(5)*, 25850(c)(6)*, 26100(a), 26100(b)*, 26100(d)*, 26180(a), 26180(b), 26350(a)(2), 26350(a)(1)(a), 26350(a)(1)(b), 26350(a)(1)(c), 26350(a)(2)(b), 26350(a)(2)(c), 26400(a)(1), 26400(a)(2), 26500(a), 27310, 27315, 27330, 27340(b), 27500(b)*, 27505(a)*, 27510(a)*, 27515*, 27520*, 27545*, 27575(a), 27585(a), 28050(a), 28050(b), 28050(c), 28100(a), 28210(a)(1)*, 28250(a)(1), 28250(a)(3), 29010(a), 29010(c), 29180(b), 29180(c), 29180(d)(1), 29180(e), 29180(f), 29525, 29610(a)*, 29610(b)*, 29650*, 29805(a)*, 29805(a)(1)*, 29805(b)*, 29805(c)*, 29815(a)*, 29820(b)*, 29825(a)*, 29825(b), 30210(a)*, 30210(b)*, 30300(a)(1), 30300(a)(2), 30300(a)(3), 30305(a)(1)*, 30305(b)(1), 30306(a), 30306(b), 30310(a), 30312(a)(1), 30314(a), 30315*, 30342, 30342(a), 30352(a), 30352(b), 30352(c), 30352(d), 30355, 30360, 30362(a), 30362(b), 30363, 30605(a)*, 30610(a), 30720(a)*, 31500*, 31615(a)(1), 31615(a)(2), 31620(b), 32000(a), 31620(c), 32310(a), 32310(a)*, 32311(a), 32900*, 33215*, 33600*

**Driving Under the Influence** - 655(b) HN, 655(c) HN, 655(d) HN, 655(e) HN, 655(f) HN, 11362.3(a)(7) HS, 23152(a) VC, 23152(b) VC, 23152(c) VC, 23152(d) VC, 23152(e) VC, 23152(f) VC, 23152(g) VC, 23153(a) VC*, 23153(b) VC*, 23153(f) VC*, 23153(g) VC*, 23247(a) VC, 23247(b) VC, 23247(c) VC, 23247(d) VC, 23247(e) VS, 23546(a) VC, 23550(a) VC*, 23550.5(a) VC*, 23573(i) VC

**Glue Sniffing** - 380(a), 381(a), 381(b), 381b, 381c(b), 381d(a), 381e(a), 647(f)

**Hit-and-Run** - 20001(b)(1) VC*, 20001(b)(2) VC*, 20002(a)(1) VC, 20002(a)(2) VC, 20002(b) VC

**Joy Riding** - 487(d)(1)*, 499b(a), 10851(a) VC*

**Selected Traffic Violations** - 23103(a) VC, 23103(b) VC, 23104(a) VC, 23105(a) VC*, 23109(a) VC*, 23109(b) VC, 23109(c) VC, 23109(d) VC, 23109.1 VC*, 38316 VC, 38317 VC, 40508(a) VC, 40508(b) VC, 40508(c) VC, 40519 VC, 42005(e) VC

**Gambling** - 318, 319, 320, 321, 322, 323, 324, 326, 326.5(b), 326.5(n), 330, 330a(a), 330b(a), 330b(1), 330c, 330.1(a), 330.4, 331, 335, 336, 337a(a)(1)*, 337a(a)(2)*, 337a(a)(3)*, 337a(a)(4)*, 337a(a)(5)*, 337a(a)(6)*, 337i, 337j(a)(2)*, 337j(a)(3)*, 337j(b)*, 337j(c)*, 337k(a), 337s(b), 337.1, 337.2, 337.5, 11300, 11302, 11303, 11304, 19921(a) BP, 19940 BP, 19941(a)(1) BP

**Nonsupport** - 270*, 270a, 270c, 270.5(a), 270.6, 271, 271a

**All Other Misdemeanor Offenses**

---

Notes:    These codes are valid for 2022 data and may not be applicable for prior years.
        "All Other Felony Offenses" also includes sections in the Election Code and Water Code.
        "All Other Misdemeanor Offenses" also includes sections in the California Code of Regulations, City or County Ordinances, Civil Procedure Code, Election Code, Public Utilities Code, Uniform Fire Code, and Water Code.
        Arrests for attempted offenses are reported in their respective categories with the exception of homicide and manslaughter, which are captured in the felony assault category.

*These code sections can be either a felony or a misdemeanor.

---

Exhibit 43
DX0471

## Acknowledgments

The California Department of Justice is mandated by statute to submit an annual
*Crime in California* report to the Legislature.  The department extends its appreciation to all
the law enforcement agencies that provided complete and timely data.  This report
would not have been possible without their cooperation.

California Department of Justice
California Justice Information Services Division
Justice Data & Investigative Services Bureau
Criminal Justice Statistics Center
P.O. Box 903427  •  Sacramento, CA  94203-4270
https://openjustice.doj.ca.gov

Exhibit 43
DX0472

# EXHIBIT 44

Exhibit 44
DX0473



**2022**

# HOMICIDE

## IN CALIFORNIA

**Rob Bonta, Attorney General**
**California Department of Justice**
**California Justice Information Services Division**
**Justice Data & Investigative Services Bureau**
**Criminal Justice Statistics Center**

Exhibit 44
DX0474

# 2022

# HOMICIDE

## IN CALIFORNIA

Exhibit 44
DX0475

# The Role of the Criminal Justice Statistics Center
## is to:

- Collect, analyze, and report statistical data that provide valid measures of crime and the criminal justice process.

- Examine these data on an ongoing basis to better describe crime and the criminal justice system.

- Promote the responsible presentation and use of crime statistics.



**CALIFORNIA DEPARTMENT OF JUSTICE**

**Rob Bonta, Attorney General**

Exhibit 44
DX0476

# Executive Summary
# Homicide in California
# 2022

*Homicide in California 2022* contains information about the crime of homicide and its victims, including demographic data on victims, persons arrested for homicide, persons sentenced to death, peace officers feloniously killed in the line of duty, and justifiable homicides as reported to the California Department of Justice (CA DOJ) by California Law Enforcement Agencies (LEAs). This report focuses on the data reported to the CA DOJ in 2022 with prior years included for context. This data is provided to assist in policy development and to inform the public on the nature and volume of reported homicides in California. Please reference the Understanding the Data section for data collection processes and definition of terms used in this publication.

## Homicide Crimes

There were 2,206 homicides reported in 2022. This number represents a decrease of 6.6 percent from the 2,361 homicides reported in 2021. (Table 1)

The 2,206 reported homicides also translate to a rate of 5.7 homicide crimes per 100,000 population. This figure represents a decrease of 5.0 percent from the 6.0 rate reported in 2021. (Table 1)

**In 2022:**

- 83.6 percent of homicide victims were male and 16.4 percent were female. (Table 5)
- Of the homicides where the victim's race/ethnicity was identified, 46.1 percent of victims were Hispanic, 31.0 percent were black, 16.6 percent were white, and 6.3 percent were of other race/ethnic groups. (Table 6)
- While the largest proportion of black and Hispanic victims were aged 18-29 (each representing 34.3 percent of the respective race/ethnic group), over half of white and other race/ethnic group victims were aged 40 and over (57.7 and 54.0 percent, respectively). (Table 9)
- When the victim's relationship to the suspect was identified, 43.4 percent were killed by a friend or acquaintance; 36.9 percent by a stranger; and 14.6 percent by their spouse, parent, or child. Males were more likely than females to be killed by strangers (43.7 vs. 14.8 percent, respectively). Females were more likely than males to be killed by their spouse, parent, or child (37.1 vs. 7.7 percent, respectively). (Table 12)
- Of the homicides where location was reported, 40.3 percent occurred on the street or sidewalk and 28.7 percent in a residence. (Table 16)
- The largest proportion of male victims (43.8 percent) were killed on the street or sidewalk. Nearly half of the female victims (49.7 percent) were killed in a residence. (Table 16)
- Firearms continue to be the most common weapon used in homicides. In 2022, of the homicides where the weapon was identified, 73.6 percent involved a firearm. (Tables 18, 19)
- Of the homicides where the contributing circumstance was known, 36.9 percent were the result of an unspecified argument, 25.3 percent were gang-related, 6.8 percent were domestic violence-related, and 5.8 percent occurred in conjunction with the commission of a rape, robbery, or burglary. (Table 21)
- Among California's 36 counties with populations of 100,000 or more, Merced County experienced the highest reported homicide rate (12.3 per 100,000) and Santa Cruz County, the lowest (0.8 per 100,000). (Table 14)

1

Exhibit 44
DX0477

## Homicide Arrests

There were 1,485 arrests for homicide in 2022. This number represents a 4.2 percent decrease from the 1,550 arrests reported in 2021. (Table 26)

The 1,485 homicide arrests also translate to a rate of 4.8 homicide arrests per 100,000 population-at-risk*. This figure represents a 5.9 percent decrease from the 5.1 arrest rate reported in 2021. (Table 26)

**In 2022:**

- 89.1 percent of homicide arrestees were male and 10.9 percent were female. (Table 27)
- 46.3 percent of homicide arrestees were Hispanic, 30.1 percent were black, 18.4 percent were white, and 5.2 percent were of other race/ethnic groups. (Table 28)
- 45.5 percent of homicide arrestees were aged 18-29, 26.2 percent were aged 30-39, 22.0 percent were 40 years of age or older, and 6.3 percent were under the age of 18. (Table 29)

## Death Penalty Sentences

In 2022, two individuals, both Hispanic males, were sentenced to death in California. One individual, aged 20-24 at the time of arrest, was sentenced from Tulare County. The other, aged 40 and older at the time of arrest, was sentenced from San Diego County. (Tables 32, 33)

## Peace Officers Killed in the Line of Duty

In 2022, four California peace officers were feloniously killed in the line of duty. All four of the officers were Hispanic males and all were killed with firearms. (Tables 34, 35)

## Justifiable Homicides[1]

In 2022, there were 87 justifiable homicides reported. Of these, 64 were committed by a peace officer and 23 were committed by a private citizen. (Tables 36-39)

Of the 64 reported as deceased by justifiable homicide by peace officer:

- 95.3 percent were male and 4.7 percent were female.
- 50.0 percent were Hispanic, 29.7 percent were white, 15.6 percent were black, and 4.7 percent were of other race/ethnic groups.
- 45.3 percent were aged 40 or over, 28.1 percent were aged 18-29, and 26.6 percent were aged 30-39.
- All involved the use of a firearm.

Of the 23 reported as deceased by justifiable homicide by private citizen:

- 91.3 percent were male and 8.7 percent were female.
- 34.8 percent were Hispanic, 34.8 percent were white, 26.1 percent were black, and 4.3 percent were of other race/ethnic groups.
- 34.8 percent were aged 18-29, 34.8 percent were aged 30-39, and 30.4 percent were aged 40 or over.
- Firearms were used in 73.9 percent of the incidents.

---

*Population at risk means those between the ages of 10-69. Please see the Appendix on Page 47 for more information.*

[1]*Justifiable homicides are defined as the killing of a felon by a peace officer in the line of duty or the killing of a felon, during the commission of a felony, by a private citizen.*

*Note: Crime and arrest rates are calculated using annual population estimates provided by the Demographic Research Unit, California Department of Finance.*

Exhibit 44
DX0478

# Understanding the Data
## Characteristics and Known Limitations

In 2016, the Federal Bureau of Investigation (FBI) Director informed all state Statistical Analysis Centers that the FBI's Uniform Crime Reporting (UCR) program would be transitioning to a National Incident-Based Reporting System (NIBRS) only data collection by January 1, 2021. The CA DOJ embarked on a five-year effort to develop and implement a new state repository, the California Incident-Based Reporting System (CIBRS), to house the new FBI statistical reporting format. The CIBRS repository is a combination of the federal NIBRS requirements with additional California-specific data elements. The CA DOJ began collecting data in CIBRS in 2021. However, not all California LEAs have transitioned to the new format.

The 2021-2022 data presented in this publication is the result of a combination of incident information collected through the summary and incident-based (IBR) formats. Modifications have been made to some historical publication tables in an effort to accommodate variations in the CIBRS data values. The affected tables are footnoted accordingly.

While most definitions remain relatively consistent between systems, an important difference exists between the Summary Reporting System (SRS) and CIBRS reporting of rape. In 2013, the FBI changed the crime of "forcible rape" to "rape" for the summary data collection which was implemented in 2014. The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape. The IBR collection has built-in validations that prohibit the reporting of rape offenses where the genders of the victim and offender are the same. Any impacted tables will include footnotes which provide the breakdown of the summary and IBR values. Below is the distribution of reported Rape numbers for 2021-2022 by type of data collection system.

### Rape Crimes Reported, 2021-2022
#### By Type of System Reported

| Year | Total | Summary Based | Incident Based |
|------|-------|---------------|----------------|
| 2022 | 14,346 | 8,851 | 5,495 |
| 2021 | 14,435 | 11,874 | 2,561 |

### Rape Arrests Reported, 2021-2022
#### By Type of System Reported

| Year | Total | Summary Based | Incident Based |
|------|-------|---------------|----------------|
| 2022 | 1,890 | 1,299 | 591 |
| 2021 | 1,964 | 1,809 | 155 |

As with the implementation of any new data collection system, caution should be used when comparing these data with those of previous years.

Exhibit 44
DX0479

## HOMICIDE CRIMES

The FBI defines Criminal Homicide as "the willful (non-negligent) killing of one human being by another. (FBI, UCR Program, Summary Reporting System (SRS) User Manual v 1.0, 6/20/13).

Homicide incident data have historically been obtained from the Supplementary Homicide Report (SHR). The SHR is submitted monthly by California LEAs as part of the national UCR system. The number of reported homicide crimes represents known victims.

Per UCR definition:

- Suicides, fetal deaths, traffic fatalities, accidental deaths, assaults to murder, and attempts to murder are not classified as criminal homicide and are not included in this report.
- Justifiable homicides are defined as the killing of a felon by a peace officer in the line of duty or the killing of a felon, during the commission of a felony, by a private citizen.
- The findings of a court, coroner's inquest, etc., do not affect classifying or scoring of the SHR homicide counts.

Detailed data regarding the criminal homicide category are only as comprehensive as the information provided by contributing agencies.

Weapon – Reporting agencies give as complete a description of the weapon and its use as is available. For example, if a bottle was used in a criminal homicide, the agency will indicate whether the person was killed by beating, cutting, or stabbing.

Relationship – The relationship reported is that of the victim to the offender. For example, if a female is killed by her husband, the reported relationship is wife.

Circumstances – Statements of circumstances are based on information known to law enforcement. If the killing occurred in conjunction with the commission of another felony such as a robbery or rape, the agency identifies the specific offense involved.

Gender – California has expanded the sex (gender) categories it collects in CIBRS to include: male, female, non-binary, and transgender. The FBI only collects the values of male and female. When a homicide victim is reported as Transgender, the victim is categorized as they present. (*Transgender presenting as Male* is categorized as Male. *Transgender presenting as Female* is categorized as Female). The Male category includes victims whose gender was not identified and those whose identified gender category totaled less than 11.

This publication includes statistics on peace officers feloniously killed in the line of duty. For information on all line-of-duty deaths, please refer to the annual *Crime in California* publication (Table 49, Law Enforcement Officers Killed or Assaulted - Deaths and Assaults in the Line of Duty by Type of Activity).

## ARRESTS
### Monthly Arrest and Citation Register (MACR)

The MACR reporting system is designed to collect information on adult and juvenile arrests and citations in California.

If a person is arrested for multiple offenses on the same day, MACR selects only the most serious offense based on the severity of possible punishment.

The subjectivity of the classification and labeling process must be considered in the analysis of race/ethnic group data.

## POPULATION

Crime and arrest rates are calculated using annual population estimates provided by the Demographic Research Unit, California Department of Finance.

Beginning in 2004, the population category of "other" for race/ethnic group includes the Department of Finance's race/ethnic group of "multi-racial."

Exhibit 44
DX0480

# List of Data Tables

### Crimes

**Table 1**    **Violent Crimes, 2013–2022**
Number, Rate per 100,000 Population, and Percent Change ...................................................8

**Table 2**    **Homicide Crimes, 2013–2022**
By Gender of Victim
Number, Percent, and Rate per 100,000 Population ....................................................9

**Table 3**    **Homicide Crimes, 2013–2022**
By Race/Ethnic Group of Victim
Number, Percent, and Rate per 100,000 Population ...................................................10

**Table 4**    **Homicide Crimes, 2013–2022**
By Age of Victim
Number, Percent, and Rate per 100,000 Population ...................................................11

**Table 5**    **Homicide Crimes, 2013–2022**
By Gender of Victim ...................................................................................12

**Table 6**    **Homicide Crimes, 2013–2022**
By Race/Ethnic Group of Victim...................................................................12

**Table 7**    **Homicide Crimes, 2013–2022**
By Age of Victim ......................................................................................13

**Table 8**    **Homicide Crimes, 2022**
Race/Ethnic Group of Victim by Gender of Victim....................................................13

**Table 9**    **Homicide Crimes, 2022**
Race/Ethnic Group of Victim by Age of Victim......................................................14

**Table 10**    **Homicide Crimes, 2022**
Race/Ethnic Group of Victim by Gender and Age of Victim ........................................15

**Table 11**    **Homicide Crimes, 2013–2022**
By Relationship of Victim to Offender ...........................................................16

**Table 12**    **Homicide Crimes, 2022**
Gender and Race/Ethnic Group of Victim by Relationship of Victim to Offender..........17

**Table 13**    **Homicide Crimes, 2022**
Age of Victim by Relationship of Victim to Offender ................................................18

**Table 14**    **Homicide Crimes, 2013–2022**
By County
Number and Rate per 100,000 Population.........................................................19

**Table 15**    **Homicide Crimes, 2013–2022**
By Location of Homicide ..............................................................................23

**Table 16**    **Homicide Crimes, 2022**
Gender and Race/Ethnic Group of Victim by Location of Homicide.................................24

Exhibit 44
DX0481

Table 17    Homicide Crimes, 2022
Age of Victim by Location of Homicide .................................................... **25**

Table 18    Homicide Crimes, 2013–2022
By Type of Weapon Used .......................................................................... **26**

Table 19    Homicide Crimes, 2022
Gender and Race/Ethnic Group of Victim by Type of Weapon Used .................. **27**

Table 20    Homicide Crimes, 2022
Age of Victim by Type of Weapon Used .................................................... **28**

Table 21    Homicide Crimes, 2013–2022
By Contributing Circumstance .................................................................. **29**

Table 22    Homicide Crimes, 2022
Gender and Race/Ethnic Group of Victim by Contributing Circumstance ........... **30**

Table 23    Homicide Crimes, 2022
Age of Victim by Contributing Circumstance .............................................. **31**

Table 24    Homicide Crimes, 2022
Contributing Circumstance by Relationship of Victim to Offender .................... **32**

Table 25    Homicide Crimes Cleared, 2013–2022
Number Reported, Number Cleared, and Clearance Rate ............................... **33**

## Arrests

Table 26    Felony Arrests for Selected Violent Offenses, 2013–2022
Number, Rate per 100,000 Population at Risk, and Percent Change ................ **34**

Table 27    Homicide Arrests, 2013–2022
By Gender of Arrestee ............................................................................ **35**

Table 28    Homicide Arrests, 2013–2022
By Race/Ethnic Group of Arrestee ............................................................ **35**

Table 29    Homicide Arrests, 2013–2022
By Age of Arrestee ................................................................................ **36**

Table 30    Homicide Arrests, 2022
Race/Ethnic Group of Arrestee by Gender and Age of Arrestee ....................... **36**

Table 31    Homicide Arrests, 2022
Race/Ethnic Group of Arrestee by Gender and Age of Arrestee ....................... **37**

## Death Penalty Sentences

Table 32    Persons Sentenced to Death, 1978–2022 ........................................ **38**

Table 33    Persons Sentenced to Death, 2022
Sentencing County by Gender, Race/Ethnic Group, and Age ............................ **39**

Exhibit 44
DX0482

## Peace Officers Killed in the Line of Duty

**Table 34**  **Homicide Crimes and Peace Officers Feloniously Killed in the Line of Duty, 2013–2022**
Number and Rate per 100,000 Respective Population .................................................................**40**

**Table 35**  **Peace Officers Feloniously Killed in the Line of Duty, 2022**
Gender and Race/Ethnic Group of Deceased by Location and Weapon ..........................**41**

## Justifiable Homicides

**Table 36**  **Justifiable Homicides by Peace Officers or Private Citizens, 2022**
By Gender, Race/Ethnic Group, and Age of Deceased ..............................................................**42**

**Table 37**  **Justifiable Homicides by Peace Officers or Private Citizens, 2022**
By Location of Justifiable Homicide...............................................................................................**43**

**Table 38**  **Justifiable Homicides by Peace Officers or Private Citizens, 2022**
By Contributing Circumstance.......................................................................................................**44**

**Table 39**  **Justifiable Homicides by Peace Officers or Private Citizens, 2022**
By Type of Weapon Used.................................................................................................................**44**

## Historical

**Table 40**  **Homicide Crimes, 1987–2022**
Number and Rate per 100,000 Population.....................................................................................**45**

## Population

**Table 41**  **Population Estimates, 1987–2022**.........................................................................................**46**

Exhibit 44
DX0483

Table 1
**VIOLENT CRIMES, 2013-2022**
Number, Rate per 100,000 Population, and Percent Change

| Year(s) | Total | Homicide | Rape[1] | Robbery | Aggravated assault |
|---|---|---|---|---|---|
| Number | | | | | |
| 2022.................. | 193,019 | 2,206 | 14,346 | 47,669 | 128,798 |
| 2021[a].................. | 183,546 | 2,361 | 14,435 | 43,628 | 123,122 |
| 2020.................. | 173,864 | 2,202 | 13,439 | 44,684 | 113,539 |
| 2019.................. | 173,205 | 1,679 | 14,720 | 52,050 | 104,756 |
| 2018.................. | 176,866 | 1,739 | 15,500 | 54,312 | 105,315 |
| 2017.................. | 178,553 | 1,829 | 14,724 | 56,609 | 105,391 |
| 2016.................. | 174,701 | 1,930 | 13,695 | 54,769 | 104,307 |
| 2015.................. | 166,588 | 1,861 | 12,793 | 52,785 | 99,149 |
| 2014.................. | 151,425 | 1,697 | 9,397 | 48,650 | 91,681 |
| 2013.................. | 151,634 | 1,745 | 7,459 | 53,621 | 88,809 |
| Percent change in number | | | | | |
| 2021-2022........... | 5.2 | -6.6 | - | 9.3 | 4.6 |
| 2020-2021[a]........... | 5.6 | 7.2 | - | -2.4 | 8.4 |
| 2019-2020........... | 0.4 | 31.1 | -8.7 | -14.2 | 8.4 |
| 2018-2019........... | -2.1 | -3.5 | -5.0 | -4.2 | -0.5 |
| 2017-2018........... | -0.9 | -4.9 | 5.3 | -4.1 | -0.1 |
| 2016-2017........... | 2.2 | -5.2 | 7.5 | 3.4 | 1.0 |
| 2015-2016........... | 4.9 | 3.7 | 7.1 | 3.8 | 5.2 |
| 2014-2015........... | 10.0 | 9.7 | - | 8.5 | 8.1 |
| 2013-2014........... | -0.1 | -2.8 | - | -9.3 | 3.2 |
| 2013-2022[a]........... | 27.3 | 26.4 | - | -11.1 | 45.0 |
| Rate per 100,000 population[2] | | | | | |
| 2022.................. | 494.6 | 5.7 | 36.8 | 122.1 | 330.0 |
| 2021[a].................. | 466.2 | 6.0 | 36.7 | 110.8 | 312.7 |
| 2020.................. | 437.0 | 5.5 | 33.8 | 112.3 | 285.4 |
| 2019.................. | 433.5 | 4.2 | 36.8 | 130.3 | 262.2 |
| 2018.................. | 444.1 | 4.4 | 38.9 | 136.4 | 264.4 |
| 2017.................. | 450.7 | 4.6 | 37.2 | 142.9 | 266.1 |
| 2016.................. | 443.9 | 4.9 | 34.8 | 139.2 | 265.0 |
| 2015.................. | 426.4 | 4.8 | 32.7 | 135.1 | 253.8 |
| 2014.................. | 393.3 | 4.4 | 24.4 | 126.4 | 238.1 |
| 2013.................. | 396.9 | 4.6 | 19.5 | 140.4 | 232.5 |
| Percent change in rate | | | | | |
| 2021-2022........... | 6.1 | -5.0 | - | 10.2 | 5.5 |
| 2020-2021[a]........... | 6.7 | 9.1 | - | -1.3 | 9.6 |
| 2019-2020........... | 0.8 | 31.0 | -8.2 | -13.8 | 8.8 |
| 2018-2019........... | -2.4 | -4.5 | -5.4 | -4.5 | -0.8 |
| 2017-2018........... | -1.5 | -4.3 | 4.6 | -4.5 | -0.6 |
| 2016-2017........... | 1.5 | -6.1 | 6.9 | 2.7 | 0.4 |
| 2015-2016........... | 4.1 | 2.1 | 6.4 | 3.0 | 4.4 |
| 2014-2015........... | 8.4 | 9.1 | - | 6.9 | 6.6 |
| 2013-2014........... | -0.9 | -4.3 | - | -10.0 | 2.4 |
| 2013-2022[a]........... | 24.6 | 23.9 | - | -13.0 | 41.9 |

Notes:   Rates may not add to total because of rounding.
   Dash indicates that a percent change was not calculated due to data definition change.

[1] In 2014, the crime of "forcible rape" was changed to "rape". The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape according to the FBI standards. The 2022 numbers consist of 8,851 reported under this current definition (SRS) and 5,495 reported under the definition for IBR. Caution should be used when comparing rape data to prior years. For additional information, including the SRS and IBR numbers for prior years, see Understanding the Data (Page 3).

[2] Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance.

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

8

Exhibit 44
DX0484

Table 2
HOMICIDE CRIMES, 2013-2022
By Gender of Victim
Number, Percent, and Rate per 100,000 Population

| Gender of victim | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 | Percent change 2013-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | |
| Number of victims | 1,745 | 1,697 | 1,861 | 1,930 | 1,829 | 1,739 | 1,679 | 2,202 | 2,361 | 2,206 | 26.4 | -6.6 |
| Percent of victims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | |
| Population | 38,204,597 | 38,499,378 | 39,071,323 | 39,354,432 | 39,613,045 | 39,825,181 | 39,959,095 | 39,782,419 | 39,368,613 | 39,028,571 | 2.2 | -0.9 |
| Percent of population | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | |
| Rate | 4.6 | 4.4 | 4.8 | 4.9 | 4.6 | 4.4 | 4.2 | 5.5 | 6.0 | 5.7 | 23.9 | -5.0 |
| **Male[1]** | | | | | | | | | | | | |
| Number of victims | 1,432 | 1,388 | 1,540 | 1,604 | 1,467 | 1,388 | 1,346 | 1,817 | 1,970 | 1,845 | 28.8 | -6.3 |
| Percent of total victims | 82.1% | 81.8% | 82.8% | 83.1% | 80.2% | 79.8% | 80.2% | 82.5% | 83.4% | 83.6% | | |
| Population | 18,976,131 | 19,178,646 | 19,350,693 | 19,583,084 | 19,721,300 | 19,899,735 | 19,867,663 | 19,851,556 | 19,938,223 | 20,041,322 | 5.6 | 0.5 |
| Percent of population | 49.8% | 49.8% | 49.7% | 49.8% | 49.8% | 49.8% | 49.7% | 49.9% | 49.9% | 49.9% | | |
| Rate | 7.5 | 7.2 | 8.0 | 8.2 | 7.4 | 7.0 | 6.8 | 9.2 | 9.9 | 9.2 | 22.7 | -7.1 |
| **Female** | | | | | | | | | | | | |
| Number of victims | 313 | 309 | 321 | 326 | 362 | 351 | 333 | 385 | 391 | 361 | 15.3 | -7.7 |
| Percent of total victims | 17.9% | 18.2% | 17.2% | 16.9% | 19.8% | 20.2% | 19.8% | 17.5% | 16.6% | 16.4% | | |
| Population | 19,142,255 | 19,369,558 | 19,546,276 | 19,771,348 | 19,891,719 | 20,052,748 | 20,091,432 | 19,930,863 | 20,015,046 | 20,104,681 | 5.0 | 0.4 |
| Percent of population | 50.2% | 50.2% | 50.3% | 50.2% | 50.2% | 50.2% | 50.3% | 50.1% | 50.1% | 50.1% | | |
| Rate | 1.6 | 1.6 | 1.6 | 1.6 | 1.8 | 1.8 | 1.7 | 1.9 | 2.0 | 1.8 | 12.5 | -10.0 |

Notes: Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance.
Rates are calculated using the population for each subgroup shown; therefore, they may not add to the rate calculated for the total population.
Population breakdowns by gender may not add to total because of variations in population source data.
The "percent of population" category for male and female was calculated using the sum of the male and female populations.
[1] The "male" category includes homicide victims whose gender was not identified: 2015, 2017, 2018, 2021, and 2022 include one, three, one, two, and two, respectively. In 2022, this category also includes two victims whose identified gender category totaled less than 11.
[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

Exhibit 44
DX0485

Table 3
**HOMICIDE CRIMES, 2013-2022**
By Race/Ethnic Group of Victim
Number, Percent, and Rate per 100,000 Population

| Race/ethnic group of victim | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 | Percent change 2013-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | |
| Number of victims | 1,745 | 1,697 | 1,861 | 1,930 | 1,829 | 1,739 | 1,679 | 2,202 | 2,361 | 2,206 | 26.4 | -6.6 |
| Percent of victims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | |
| Population | 38,204,597 | 38,499,378 | 39,071,323 | 39,354,432 | 39,613,045 | 39,825,181 | 39,959,095 | 39,782,419 | 39,388,613 | 39,028,571 | 2.2 | -0.9 |
| Percent of population | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | |
| Rate | 4.6 | 4.4 | 4.8 | 4.9 | 4.6 | 4.4 | 4.2 | 5.5 | 6.0 | 5.7 | 23.9 | -5.0 |
| **White** | | | | | | | | | | | | |
| Number of victims | 370 | 360 | 394 | 373 | 353 | 378 | 331 | 359 | 412 | 362 | -2.2 | -12.1 |
| Percent of total victims | 21.2% | 21.2% | 21.2% | 19.3% | 19.3% | 21.7% | 19.7% | 16.3% | 17.5% | 16.4% | | |
| Population | 14,925,450 | 14,978,205 | 14,972,954 | 15,147,499 | 14,978,111 | 14,998,463 | 14,743,109 | 15,187,246 | 15,205,370 | 15,228,046 | 2.0 | 0.1 |
| Percent of population | 39.2% | 38.9% | 38.5% | 38.5% | 37.8% | 37.5% | 36.9% | 38.2% | 38.1% | 37.9% | | |
| Rate | 2.5 | 2.4 | 2.6 | 2.5 | 2.4 | 2.5 | 2.2 | 2.4 | 2.7 | 2.4 | -4.0 | -11.1 |
| **Hispanic** | | | | | | | | | | | | |
| Number of victims | 739 | 700 | 802 | 835 | 818 | 785 | 740 | 991 | 1,102 | 1,003 | 35.7 | -9.0 |
| Percent of total victims | 42.3% | 41.2% | 43.1% | 43.3% | 44.7% | 45.1% | 44.1% | 45.0% | 46.7% | 45.5% | | |
| Population | 14,739,555 | 14,934,682 | 15,172,006 | 15,412,728 | 15,663,806 | 15,880,670 | 15,521,303 | 15,681,521 | 15,796,762 | 15,917,310 | 8.0 | 0.8 |
| Percent of population | 38.7% | 38.7% | 39.0% | 39.2% | 39.5% | 39.7% | 38.8% | 39.4% | 39.5% | 39.6% | | |
| Rate | 5.0 | 4.7 | 5.3 | 5.4 | 5.2 | 4.9 | 4.8 | 6.3 | 7.0 | 6.3 | 26.0 | -10.0 |
| **Black** | | | | | | | | | | | | |
| Number of victims | 534 | 510 | 526 | 567 | 484 | 433 | 479 | 672 | 690 | 676 | 26.6 | -2.0 |
| Percent of total victims | 30.6% | 30.1% | 28.3% | 29.4% | 26.5% | 24.9% | 28.5% | 30.5% | 29.2% | 30.6% | | |
| Population | 2,209,668 | 2,226,129 | 2,236,361 | 2,260,738 | 2,252,850 | 2,266,042 | 2,382,482 | 2,283,480 | 2,285,724 | 2,310,783 | 4.6 | 0.7 |
| Percent of population | 5.8% | 5.8% | 5.7% | 5.7% | 5.7% | 5.7% | 6.0% | 5.7% | 5.7% | 5.8% | | |
| Rate | 24.2 | 22.9 | 23.5 | 25.1 | 21.5 | 19.1 | 20.1 | 29.4 | 30.1 | 29.3 | 21.1 | -2.7 |
| **Other** | | | | | | | | | | | | |
| Number of victims | 99 | 120 | 130 | 150 | 165 | 130 | 123 | 164 | 138 | 137 | 38.4 | -0.7 |
| Percent of total victims | 5.7% | 7.1% | 7.0% | 7.8% | 9.0% | 7.5% | 7.3% | 7.4% | 5.8% | 6.2% | | |
| Population | 6,243,713 | 6,409,188 | 6,515,648 | 6,533,467 | 6,718,252 | 6,807,308 | 7,312,201 | 6,630,172 | 6,655,413 | 6,689,864 | 7.1 | 0.5 |
| Percent of population | 16.4% | 16.6% | 16.8% | 16.6% | 17.0% | 17.0% | 18.3% | 16.7% | 16.7% | 16.7% | | |
| Rate | 1.6 | 1.9 | 2.0 | 2.3 | 2.5 | 1.9 | 1.7 | 2.5 | 2.1 | 2.0 | 25.0 | -4.8 |
| **Unknown** | | | | | | | | | | | | |
| Number of victims | 3 | 7 | 9 | 5 | 9 | 13 | 6 | 16 | 19 | 28 | - | - |
| Percent of total victims | 0.2% | 0.4% | 0.5% | 0.3% | 0.5% | 0.7% | 0.4% | 0.7% | 0.8% | 1.3% | | |
| Population | - | - | - | - | - | - | - | - | - | - | - | - |
| Percent of population | - | - | - | - | - | - | - | - | - | - | | |
| Rate | - | - | - | - | - | - | - | - | - | - | - | - |

Notes:  Percentages may not add to 100.0 because of rounding.
Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance.
Rates are calculated using the population for each subgroup shown; therefore, they may not add to the rate calculated for the total population.
Population breakdowns by race/ethnic group may not add to total because of variations in population source data.
Dash indicates that the percent of population and rate for the "unknown" category cannot be calculated because there are no unknown race/ethnic group population data.
[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data, (Page 3)

10

Exhibit 44
DX0486

Table 4
**HOMICIDE CRIMES, 2013-2022**
By Age of Victim
Number, Percent, and Rate per 100,000 Population

| Age of victim | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 | Percent change 2013-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | | | | | | |
| Number of victims | 1,745 | 1,697 | 1,861 | 1,930 | 1,829 | 1,739 | 1,679 | 2,202 | 2,361 | 2,206 | 26.4 | -6.6 |
| Percent of victims | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | - | - |
| Population | 38,204,597 | 38,499,378 | 39,071,323 | 39,354,432 | 39,613,045 | 39,825,181 | 39,959,095 | 39,782,419 | 39,368,613 | 39,028,571 | 2.2 | -0.9 |
| Percent of population | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | - | - |
| Rate | 4.6 | 4.4 | 4.8 | 4.9 | 4.6 | 4.4 | 4.2 | 5.5 | 6.0 | 5.7 | 23.9 | -5.0 |
| **Under 18** | | | | | | | | | | | | |
| Number of victims | 163 | 127 | 145 | 120 | 110 | 116 | 129 | 155 | 156 | 174 | 6.7 | 11.5 |
| Percent of total victims | 9.3% | 7.5% | 7.8% | 6.2% | 6.0% | 6.7% | 7.7% | 7.0% | 6.6% | 7.9% | | |
| Population | 9,150,549 | 9,097,971 | 9,102,486 | 9,257,380 | 9,260,616 | 9,261,018 | 9,061,051 | 9,221,529 | 9,170,435 | 8,893,756 | -2.8 | -3.0 |
| Percent of population | 24.0% | 23.6% | 23.4% | 23.5% | 23.4% | 23.2% | 22.7% | 23.2% | 23.0% | 22.2% | | |
| Rate | 1.8 | 1.4 | 1.6 | 1.3 | 1.2 | 1.3 | 1.4 | 1.7 | 1.7 | 2.0 | 11.1 | 17.6 |
| **18-29** | | | | | | | | | | | | |
| Number of victims | 714 | 693 | 718 | 754 | 652 | 613 | 571 | 744 | 796 | 660 | -7.6 | -17.1 |
| Percent of total victims | 40.9% | 40.8% | 38.6% | 39.1% | 35.6% | 35.3% | 34.0% | 33.8% | 33.7% | 29.9% | | |
| Population | 6,772,846 | 6,759,244 | 6,751,410 | 6,753,274 | 6,791,378 | 6,851,995 | 7,074,325 | 6,483,294 | 6,428,609 | 6,809,750 | 0.5 | 5.9 |
| Percent of population | 17.8% | 17.5% | 17.4% | 17.2% | 17.1% | 17.2% | 17.7% | 16.3% | 16.1% | 17.0% | | |
| Rate | 10.5 | 10.3 | 10.6 | 11.2 | 9.6 | 8.9 | 8.1 | 11.5 | 12.4 | 9.7 | -7.6 | -21.8 |
| **30-39** | | | | | | | | | | | | |
| Number of victims | 345 | 342 | 389 | 423 | 420 | 382 | 384 | 540 | 606 | 582 | 68.7 | -4.0 |
| Percent of total victims | 19.8% | 20.2% | 20.9% | 21.9% | 23.0% | 22.0% | 22.9% | 24.5% | 25.7% | 26.4% | | |
| Population | 5,234,980 | 5,319,450 | 5,379,452 | 5,360,601 | 5,354,174 | 5,350,446 | 5,428,609 | 5,568,057 | 5,609,759 | 5,137,042 | -1.9 | -8.4 |
| Percent of population | 13.7% | 13.8% | 13.8% | 13.6% | 13.5% | 13.4% | 13.6% | 14.0% | 14.0% | 12.8% | | |
| Rate | 6.6 | 6.4 | 7.2 | 7.9 | 7.8 | 7.1 | 7.1 | 9.7 | 10.8 | 11.3 | 71.2 | 4.6 |
| **40 and over** | | | | | | | | | | | | |
| Number of victims | 522 | 530 | 601 | 625 | 638 | 616 | 590 | 752 | 784 | 783 | 50.0 | -0.1 |
| Percent of total victims | 29.9% | 31.2% | 32.3% | 32.4% | 34.9% | 35.4% | 35.1% | 34.2% | 33.2% | 35.5% | | |
| Population | 16,960,010 | 17,371,539 | 17,663,621 | 17,983,177 | 18,206,851 | 18,489,024 | 18,394,510 | 18,509,539 | 18,744,466 | 19,305,455 | 13.8 | 3.0 |
| Percent of population | 44.5% | 45.1% | 45.4% | 45.7% | 46.0% | 46.3% | 46.0% | 46.5% | 46.9% | 48.1% | | |
| Rate | 3.1 | 3.1 | 3.4 | 3.5 | 3.5 | 3.3 | 3.2 | 4.1 | 4.2 | 4.2 | 32.3 | -2.4 |
| **Unknown** | | | | | | | | | | | | |
| Number of victims | 1 | 5 | 8 | 8 | 9 | 12 | 5 | 11 | 19 | 7 | - | - |
| Percent of total victims | 0.1% | 0.3% | 0.4% | 0.4% | 0.5% | 0.7% | 0.3% | 0.5% | 0.8% | 0.3% | - | - |
| Population | - | - | - | - | - | - | - | - | - | - | - | - |
| Percent of population | - | - | - | - | - | - | - | - | - | - | - | - |
| Rate | - | - | - | - | - | - | - | - | - | - | - | - |

Notes: Percentages may not add to 100.0 because of rounding.
Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance.
Rates are calculated using the population for each subgroup shown; therefore, they may not add to the rate calculated for the total population.
Population breakdowns by age will not add to total because of variations in population source data.
Dash indicates that the percent of population and rate for the "unknown" category cannot be calculated because there are no unknown age population data.

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

11

Exhibit 44
DX0487

Table 5
**HOMICIDE CRIMES, 2013-2022**
By Gender of Victim

| Year(s) | Total | | Male[1] | | Female | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 2022.......... | 2,206 | 100.0 | 1,845 | 83.6 | 361 | 16.4 |
| 2021[a]....... | 2,361 | 100.0 | 1,970 | 83.4 | 391 | 16.6 |
| 2020.......... | 2,202 | 100.0 | 1,817 | 82.5 | 385 | 17.5 |
| 2019.......... | 1,679 | 100.0 | 1,346 | 80.2 | 333 | 19.8 |
| 2018.......... | 1,739 | 100.0 | 1,388 | 79.8 | 351 | 20.2 |
| 2017.......... | 1,829 | 100.0 | 1,467 | 80.2 | 362 | 19.8 |
| 2016.......... | 1,930 | 100.0 | 1,604 | 83.1 | 326 | 16.9 |
| 2015.......... | 1,861 | 100.0 | 1,540 | 82.8 | 321 | 17.2 |
| 2014.......... | 1,697 | 100.0 | 1,388 | 81.8 | 309 | 18.2 |
| 2013.......... | 1,745 | 100.0 | 1,432 | 82.1 | 313 | 17.9 |

[1] The "male" category includes homicide victims whose gender was not identified: 2015, 2017, 2018, 2021, and 2022 include one, three, one, two, and two, respectively. In 2022, this category also includes two victims whose identified gender category totaled less than 11.
[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

Table 6
**HOMICIDE CRIMES, 2013-2022**
By Race/Ethnic Group of Victim

| Year(s) | Total including unknown | Unknown | Known race/ethnic group of victim | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total | | White | | Hispanic | | Black | | Other | |
| | | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2022.......... | 2,206 | 28 | 2,178 | 100.0 | 362 | 16.6 | 1,003 | 46.1 | 676 | 31.0 | 137 | 6.3 |
| 2021[a]....... | 2,361 | 19 | 2,342 | 100.0 | 412 | 17.6 | 1,102 | 47.1 | 690 | 29.5 | 138 | 5.9 |
| 2020.......... | 2,202 | 16 | 2,186 | 100.0 | 359 | 16.4 | 991 | 45.3 | 672 | 30.7 | 164 | 7.5 |
| 2019.......... | 1,679 | 6 | 1,673 | 100.0 | 331 | 19.8 | 740 | 44.2 | 479 | 28.6 | 123 | 7.4 |
| 2018.......... | 1,739 | 13 | 1,726 | 100.0 | 378 | 21.9 | 785 | 45.5 | 433 | 25.1 | 130 | 7.5 |
| 2017.......... | 1,829 | 9 | 1,820 | 100.0 | 353 | 19.4 | 818 | 44.9 | 484 | 26.6 | 165 | 9.1 |
| 2016.......... | 1,930 | 5 | 1,925 | 100.0 | 373 | 19.4 | 835 | 43.4 | 567 | 29.5 | 150 | 7.8 |
| 2015.......... | 1,861 | 9 | 1,852 | 100.0 | 394 | 21.3 | 802 | 43.3 | 526 | 28.4 | 130 | 7.0 |
| 2014.......... | 1,697 | 7 | 1,690 | 100.0 | 360 | 21.3 | 700 | 41.4 | 510 | 30.2 | 120 | 7.1 |
| 2013.......... | 1,745 | 3 | 1,742 | 100.0 | 370 | 21.2 | 739 | 42.4 | 534 | 30.7 | 99 | 5.7 |

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

12

Exhibit 44
DX0488

Table 7
**HOMICIDE CRIMES, 2013-2022**
By Age of Victim

| Year(s) | Total including unknown | Unknown | Known age of victim | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Total | | Under 18 | | 18-29 | | 30-39 | | 40 and over | |
| | | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2022............ | 2,206 | 7 | 2,199 | 100.0 | 174 | 7.9 | 660 | 30.0 | 582 | 26.5 | 783 | 35.6 |
| 2021[a]......... | 2,361 | 19 | 2,342 | 100.0 | 156 | 6.7 | 796 | 34.0 | 606 | 25.9 | 784 | 33.5 |
| 2020............ | 2,202 | 11 | 2,191 | 100.0 | 155 | 7.1 | 744 | 34.0 | 540 | 24.6 | 752 | 34.3 |
| 2019............ | 1,679 | 5 | 1,674 | 100.0 | 129 | 7.7 | 571 | 34.1 | 384 | 22.9 | 590 | 35.2 |
| 2018............ | 1,739 | 12 | 1,727 | 100.0 | 116 | 6.7 | 613 | 35.5 | 382 | 22.1 | 616 | 35.7 |
| 2017............ | 1,829 | 9 | 1,820 | 100.0 | 110 | 6.0 | 652 | 35.8 | 420 | 23.1 | 638 | 35.1 |
| 2016............ | 1,930 | 8 | 1,922 | 100.0 | 120 | 6.2 | 754 | 39.2 | 423 | 22.0 | 625 | 32.5 |
| 2015............ | 1,861 | 8 | 1,853 | 100.0 | 145 | 7.8 | 718 | 38.7 | 389 | 21.0 | 601 | 32.4 |
| 2014............ | 1,697 | 5 | 1,692 | 100.0 | 127 | 7.5 | 693 | 41.0 | 342 | 20.2 | 530 | 31.3 |
| 2013............ | 1,745 | 1 | 1,744 | 100.0 | 163 | 9.3 | 714 | 40.9 | 345 | 19.8 | 522 | 29.9 |

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

Table 8
**HOMICIDE CRIMES, 2022**
Race/Ethnic Group of Victim by Gender of Victim

| Gender of victim | Total | | White | | Hispanic | | Black | | Other | | Unknown | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total............ | 2,206 | 100.0 | 362 | 100.0 | 1,003 | 100.0 | 676 | 100.0 | 137 | 100.0 | 28 | 100.0 |
| Male[1]......... | 1,845 | 83.6 | 274 | 75.7 | 865 | 86.2 | 587 | 86.8 | 98 | 71.5 | 21 | - |
| Female......... | 361 | 16.4 | 88 | 24.3 | 138 | 13.8 | 89 | 13.2 | 39 | 28.5 | 7 | - |

Note: Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] The "male" category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11.

Exhibit 44
DX0489

Table 9
**HOMICIDE CRIMES, 2022**
Race/Ethnic Group of Victim by Age of Victim

| Age of victim | Total | | White | | Hispanic | | Black | | Other | | Unknown | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total including unknown.... | 2,206 | | 362 | | 1,003 | | 676 | | 137 | | 28 | |
| Unknown.... | 7 | | 0 | | 3 | | 0 | | 0 | | 4 | |
| Total known.... | 2,199 | 100.0 | 362 | 100.0 | 1,000 | 100.0 | 676 | 100.0 | 137 | 100.0 | 24 | 100.0 |
| Under 18.... | 174 | 7.9 | 15 | 4.1 | 102 | 10.2 | 47 | 7.0 | 10 | 7.3 | 0 | - |
| 18-29.... | 660 | 30.0 | 56 | 15.5 | 343 | 34.3 | 232 | 34.3 | 23 | 16.8 | 6 | - |
| 30-39.... | 582 | 26.5 | 82 | 22.7 | 272 | 27.2 | 191 | 28.3 | 30 | 21.9 | 7 | - |
| 40 and over.... | 783 | 35.6 | 209 | 57.7 | 283 | 28.3 | 206 | 30.5 | 74 | 54.0 | 11 | - |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

14

Exhibit 44
DX0490

Table 10
**HOMICIDE CRIMES, 2022**
Race/Ethnic Group of Victim by Gender and Age of Victim

| Gender and age of victim | Total | | White | | Hispanic | | Black | | Other | | Unknown | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total.......... | 2,206 | 100.0 | 362 | 100.0 | 1,003 | 100.0 | 676 | 100.0 | 137 | 100.0 | 28 | 100.0 |
| Under 18......... | 174 | 7.9 | 15 | 4.1 | 102 | 10.2 | 47 | 7.0 | 10 | 7.3 | 0 | – |
| 18-19............ | 97 | 4.4 | 2 | 0.6 | 64 | 6.4 | 24 | 3.6 | 5 | 3.6 | 5 | – |
| 20-24............ | 270 | 12.2 | 27 | 7.5 | 133 | 13.3 | 98 | 14.5 | 11 | 8.0 | 1 | – |
| 25-29............ | 293 | 13.3 | 27 | 7.5 | 146 | 14.6 | 110 | 16.3 | 7 | 5.1 | 3 | – |
| 30-34............ | 324 | 14.7 | 44 | 12.2 | 153 | 15.3 | 108 | 16.0 | 16 | 11.7 | 3 | – |
| 35-39............ | 258 | 11.7 | 38 | 10.5 | 119 | 11.9 | 83 | 12.3 | 14 | 10.2 | 4 | – |
| 40-44............ | 210 | 9.5 | 33 | 9.1 | 105 | 10.5 | 54 | 8.0 | 14 | 10.2 | 4 | – |
| 45-49............ | 129 | 5.8 | 23 | 6.4 | 56 | 5.6 | 43 | 6.4 | 7 | 5.1 | 0 | – |
| 50-54............ | 111 | 5.0 | 23 | 6.4 | 44 | 4.4 | 32 | 4.7 | 11 | 8.0 | 1 | – |
| 55 and over...... | 333 | 15.1 | 130 | 35.9 | 78 | 7.8 | 77 | 11.4 | 42 | 30.7 | 6 | – |
| Unknown........ | 7 | 0.3 | 0 | 0.0 | 3 | 0.3 | 0 | 0.0 | 0 | 0.0 | 4 | – |
| Male[1].......... | 1,845 | 100.0 | 274 | 100.0 | 865 | 100.0 | 587 | 100.0 | 98 | 100.0 | 21 | 100.0 |
| Under 18......... | 129 | 7.0 | 10 | 3.6 | 77 | 8.9 | 33 | 5.6 | 9 | 9.2 | 0 | – |
| 18-19............ | 89 | 4.8 | 2 | 0.7 | 60 | 6.9 | 21 | 3.6 | 4 | 4.1 | 2 | – |
| 20-24............ | 226 | 12.2 | 22 | 8.0 | 110 | 12.7 | 84 | 14.3 | 9 | 9.2 | 1 | – |
| 25-29............ | 245 | 13.3 | 20 | 7.3 | 123 | 14.2 | 96 | 16.4 | 5 | 5.1 | 1 | – |
| 30-34............ | 288 | 15.6 | 41 | 15.0 | 135 | 15.6 | 98 | 16.7 | 12 | 12.2 | 2 | – |
| 35-39............ | 226 | 12.2 | 32 | 11.7 | 107 | 12.4 | 74 | 12.6 | 9 | 9.2 | 4 | – |
| 40-44............ | 184 | 10.0 | 25 | 9.1 | 97 | 11.2 | 50 | 8.5 | 9 | 9.2 | 3 | – |
| 45-49............ | 113 | 6.1 | 20 | 7.3 | 47 | 5.4 | 40 | 6.8 | 6 | 6.1 | 0 | – |
| 50-54............ | 96 | 5.2 | 18 | 6.6 | 42 | 4.9 | 28 | 4.8 | 8 | 8.2 | 0 | – |
| 55 and over...... | 243 | 13.2 | 84 | 30.7 | 65 | 7.5 | 63 | 10.7 | 27 | 27.6 | 4 | – |
| Unknown........ | 6 | 0.3 | 0 | 0.0 | 2 | 0.2 | 0 | 0.0 | 0 | 0.0 | 4 | – |
| Female.......... | 361 | 100.0 | 88 | 100.0 | 138 | 100.0 | 89 | 100.0 | 39 | 100.0 | 7 | 100.0 |
| Under 18......... | 45 | 12.5 | 5 | 5.7 | 25 | 18.1 | 14 | 15.7 | 1 | – | 0 | – |
| 18-19............ | 8 | 2.2 | 0 | 0.0 | 4 | 2.9 | 3 | 3.4 | 1 | – | 0 | – |
| 20-24............ | 44 | 12.2 | 5 | 5.7 | 23 | 16.7 | 14 | 15.7 | 2 | – | 0 | – |
| 25-29............ | 48 | 13.3 | 7 | 8.0 | 23 | 16.7 | 14 | 15.7 | 2 | – | 2 | – |
| 30-34............ | 36 | 10.0 | 3 | 3.4 | 18 | 13.0 | 10 | 11.2 | 4 | – | 1 | – |
| 35-39............ | 32 | 8.9 | 6 | 6.8 | 12 | 8.7 | 9 | 10.1 | 5 | – | 0 | – |
| 40-44............ | 26 | 7.2 | 8 | 9.1 | 8 | 5.8 | 4 | 4.5 | 5 | – | 1 | – |
| 45-49............ | 16 | 4.4 | 3 | 3.4 | 9 | 6.5 | 3 | 3.4 | 1 | – | 0 | – |
| 50-54............ | 15 | 4.2 | 5 | 5.7 | 2 | 1.4 | 3 | 4.5 | 3 | – | 1 | – |
| 55 and over...... | 90 | 24.9 | 46 | 52.3 | 13 | 9.4 | 14 | 15.7 | 15 | – | 2 | – |
| Unknown........ | 1 | 0.3 | 0 | 0.0 | 1 | 0.7 | 0 | 0.0 | 0 | – | 0 | – |

Notes:  Percentages may not add to 100.0 because of rounding.
    Dash indicates that percent distributions are not calculated when the base number is less than 50.
    The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years.  For additional information, see Understanding the Data. (Page 3)
[1] The 'male' category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11.

15

Exhibit 44
DX0491

Table 11
## HOMICIDE CRIMES, 2013-2022
### By Relationship of Victim to Offender

| Relationship of victim to offender | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 2013-2022 | 2021-2022 |
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | | |
| Total including unknown | 1,745 | | 1,697 | | 1,861 | | 1,930 | | 1,829 | | | |
| Unknown | 843 | | 773 | | 837 | | 900 | | 852 | | | |
| Total known | 902 | 100.0 | 924 | 100.0 | 1,024 | 100.0 | 1,030 | 100.0 | 977 | 100.0 | 20.5 | -9.8 |
| Friend, acquaintance[1] | 423 | 46.9 | 423 | 45.8 | 485 | 47.4 | 498 | 48.3 | 467 | 47.8 | 11.6 | -3.7 |
| Spouse, parent, child | 149 | 16.5 | 148 | 16.0 | 153 | 14.9 | 138 | 13.4 | 149 | 15.3 | 6.7 | 1.9 |
| Spouse[2] | 64 | 7.1 | 59 | 6.4 | 72 | 7.0 | 59 | 5.7 | 65 | 6.7 | -18.8 | 0.0 |
| Parent, child[3] | 85 | 9.4 | 89 | 9.6 | 81 | 7.9 | 79 | 7.7 | 84 | 8.6 | 25.9 | 2.9 |
| All other relatives | 51 | 5.7 | 55 | 6.0 | 65 | 6.3 | 55 | 5.3 | 61 | 6.2 | 7.8 | -5.2 |
| Stranger | 279 | 30.9 | 298 | 32.3 | 321 | 31.3 | 339 | 32.9 | 300 | 30.7 | 43.7 | -20.0 |

| Relationship of victim to offender (cont.) | 2018 | | 2019 | | 2020 | | 2021[a] | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total including unknown | 1,739 | | 1,679 | | 2,202 | | 2,361 | | 2,206 | |
| Unknown | 734 | | 722 | | 1,067 | | 1,156 | | 1,119 | |
| Total known | 1,005 | 100.0 | 957 | 100.0 | 1,135 | 100.0 | 1,205 | 100.0 | 1,087 | 100.0 |
| Friend, acquaintance[1] | 452 | 45.0 | 432 | 45.1 | 526 | 46.3 | 490 | 40.7 | 472 | 43.4 |
| Spouse, parent, child | 183 | 18.2 | 157 | 16.4 | 163 | 14.4 | 156 | 12.9 | 159 | 14.6 |
| Spouse[2] | 81 | 8.1 | 66 | 6.9 | 59 | 5.2 | 52 | 4.3 | 52 | 4.8 |
| Parent, child[3] | 102 | 10.1 | 91 | 9.5 | 104 | 9.2 | 104 | 8.6 | 107 | 9.8 |
| All other relatives | 56 | 5.6 | 53 | 5.5 | 42 | 3.7 | 58 | 4.8 | 55 | 5.1 |
| Stranger | 314 | 31.2 | 315 | 32.9 | 404 | 35.6 | 501 | 41.6 | 401 | 36.9 |

Notes: Percentages may not add to subtotals or 100.0 because of rounding.
   Dash indicates that percent change is not calculated when the base number is less than 50.
[1] Includes ex-husband, ex-wife, boyfriend/ex-boyfriend, girlfriend/ex-girlfriend, neighbor, employer, employee, gang member, etc.
[2] Includes "common-law" marriage partner.
[3] Includes stepmother, stepfather, stepdaughter, and stepson.
[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years.  For additional information, see Understanding the Data. (Page 3)

Exhibit 44
DX0492

Table 12
**HOMICIDE CRIMES, 2022**
Gender and Race/Ethnic Group of Victim by Relationship of Victim to Offender

| Relationship of victim to offender | Total | Gender | | Race/ethnic group | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Male[1] | Female | White | Hispanic | Black | Other | Unknown |
| Number | | | | | | | | |
| Total including unknown...... | 2,206 | 1,845 | 361 | 362 | 1,003 | 676 | 137 | 28 |
| Unknown................... | 1,119 | 1,014 | 105 | 122 | 530 | 398 | 50 | 19 |
| Total known............ | 1,087 | 831 | 256 | 240 | 473 | 278 | 87 | 9 |
| Friend, acquaintance[2]... | 472 | 362 | 110 | 105 | 198 | 129 | 36 | 4 |
| Spouse, parent, child..... | 159 | 64 | 95 | 51 | 58 | 31 | 18 | 1 |
| Spouse[3]............... | 52 | 8 | 44 | 24 | 17 | 2 | 8 | 1 |
| Parent, child[4]......... | 107 | 56 | 51 | 27 | 41 | 29 | 10 | 0 |
| All other relatives........ | 55 | 42 | 13 | 9 | 27 | 13 | 6 | 0 |
| Stranger................. | 401 | 363 | 38 | 75 | 190 | 105 | 27 | 4 |
| Percent based on total known | | | | | | | | |
| Total known............ | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Friend, acquaintance[2]... | 43.4 | 43.6 | 43.0 | 43.8 | 41.9 | 46.4 | 41.4 | - |
| Spouse, parent, child..... | 14.6 | 7.7 | 37.1 | 21.3 | 12.3 | 11.2 | 20.7 | - |
| Spouse[3]............... | 4.8 | 1.0 | 17.2 | 10.0 | 3.6 | 0.7 | 9.2 | - |
| Parent, child[4]......... | 9.8 | 6.7 | 19.9 | 11.3 | 8.7 | 10.4 | 11.5 | - |
| All other relatives........ | 5.1 | 5.1 | 5.1 | 3.8 | 5.7 | 4.7 | 6.9 | - |
| Stranger................. | 36.9 | 43.7 | 14.8 | 31.3 | 40.2 | 37.8 | 31.0 | - |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] The "male" category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11.
[2] Includes ex-husband, ex-wife, boyfriend/ex-boyfriend, girlfriend/ex-girlfriend, neighbor, employer, employee, gang member, etc.
[3] Includes "common-law" marriage partner.
[4] Includes stepmother, stepfather, stepdaughter, and stepson.

17

Exhibit 44
DX0493

Table 13
HOMICIDE CRIMES, 2022
Age of Victim by Relationship of Victim to Offender

| Relationship of victim to offender | Total | Under 18 | 18-29 | 30-39 | 40 and over | Unknown |
|---|---|---|---|---|---|---|
| Number | | | | | | |
| Total including unknown | 2,206 | 174 | 660 | 582 | 783 | 7 |
| Unknown | 1,119 | 68 | 384 | 322 | 338 | 7 |
| Total known | 1,087 | 106 | 276 | 260 | 445 | 0 |
| Friend, acquaintance[1] | 472 | 42 | 119 | 120 | 191 | 0 |
| Spouse, parent, child | 159 | 44 | 8 | 11 | 96 | 0 |
| Spouse[2] | 52 | 0 | 5 | 10 | 37 | 0 |
| Parent, child[3] | 107 | 44 | 3 | 1 | 59 | 0 |
| All other relatives | 55 | 5 | 15 | 22 | 13 | 0 |
| Stranger | 401 | 15 | 134 | 107 | 145 | 0 |
| Percent based on total known | | | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Friend, acquaintance[1] | 43.4 | 39.6 | 43.1 | 46.2 | 42.9 | - |
| Spouse, parent, child | 14.6 | 41.5 | 2.9 | 4.2 | 21.6 | - |
| Spouse[2] | 4.8 | 0.0 | 1.8 | 3.8 | 8.3 | - |
| Parent, child[3] | 9.8 | 41.5 | 1.1 | 0.4 | 13.3 | - |
| All other relatives | 5.1 | 4.7 | 5.4 | 8.5 | 2.9 | - |
| Stranger | 36.9 | 14.2 | 48.6 | 41.2 | 32.6 | - |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
    The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] Includes ex-husband, ex-wife, boyfriend/ex-boyfriend, girlfriend/ex-girlfriend, neighbor, employer, employee, gang member, etc.

[2] Includes "common-law" marriage partner.

[3] Includes stepmother, stepfather, stepdaughter, and stepson.

18

Exhibit 44
DX0494

Table 14
HOMICIDE CRIMES, 2013-2022
By County
Number and Rate per 100,000 Population

| County | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Number | | | | | |
| Statewide total........... | 1,745 | 1,697 | 1,861 | 1,930 | 1,829 | 1,739 | 1,679 | 2,202 | 2,361 | 2,206 |
| Alameda........... | 113 | 102 | 119 | 116 | 90 | 92 | 96 | 143 | 146 | 158 |
| Alpine........... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Amador........... | 0 | 1 | 1 | 0 | 0 | 3 | 1 | 2 | 4 | 0 |
| Butte........... | 13 | 11 | 7 | 4 | 7 | 10 | 7 | 12 | 13 | 11 |
| Calaveras........... | 5 | 0 | 6 | 3 | 2 | 2 | 1 | 0 | 2 | 1 |
| Colusa........... | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 1 | 0 | 0 |
| Contra Costa........... | 42 | 47 | 57 | 53 | 42 | 40 | 54 | 44 | 50 | 44 |
| Del Norte........... | 0 | 1 | 0 | 0 | 4 | 1 | 2 | 2 | 1 | 3 |
| El Dorado........... | 5 | 3 | 9 | 2 | 5 | 5 | 5 | 0 | 3 | 11 |
| Fresno........... | 57 | 59 | 59 | 63 | 85 | 54 | 55 | 94 | 87 | 83 |
| Glenn........... | 0 | 1 | 3 | 1 | 1 | 1 | 2 | 2 | 0 | 0 |
| Humboldt........... | 8 | 11 | 12 | 12 | 8 | 11 | 6 | 9 | 8 | 7 |
| Imperial........... | 2 | 3 | 2 | 3 | 7 | 6 | 7 | 7 | 14 | 11 |
| Inyo........... | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 1 |
| Kern........... | 61 | 59 | 64 | 88 | 89 | 101 | 84 | 116 | 124 | 101 |
| Kings........... | 6 | 7 | 5 | 11 | 9 | 5 | 4 | 11 | 11 | 16 |
| Lake........... | 4 | 6 | 8 | 3 | 7 | 8 | 5 | 1 | 5 | 1 |
| Lassen........... | 2 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| Los Angeles........... | 543 | 526 | 592 | 622 | 580 | 570 | 508 | 677 | 841 | 739 |
| Madera........... | 13 | 9 | 4 | 7 | 7 | 12 | 3 | 9 | 5 | 6 |
| Marin........... | 2 | 5 | 6 | 3 | 4 | 5 | 1 | 1 | 1 | 5 |
| Mariposa........... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 |
| Mendocino........... | 4 | 6 | 6 | 8 | 4 | 13 | 3 | 6 | 8 | 2 |
| Merced........... | 27 | 29 | 27 | 6 | 19 | 9 | 12 | 24 | 27 | 35 |
| Modoc........... | 2 | 4 | 0 | 1 | 2 | 0 | 0 | 1 | 0 | 0 |
| Mono........... | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 | 1 | 0 |
| Monterey........... | 47 | 34 | 60 | 56 | 43 | 27 | 15 | 14 | 35 | 23 |
| Napa........... | 2 | 5 | 3 | 1 | 1 | 1 | 1 | 1 | 0 | 2 |
| Nevada........... | 2 | 3 | 0 | 6 | 5 | 2 | 3 | 5 | 4 | 2 |
| Orange........... | 51 | 61 | 57 | 57 | 62 | 49 | 57 | 59 | 71 | 60 |

(continued)

Exhibit 44
DX0495

Table 14 - continued
**HOMICIDE CRIMES, 2013-2022**
By County
Number and Rate per 100,000 Population

| County | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Number | | | | | |
| Placer.................. | 2 | 2 | 4 | 3 | 7 | 4 | 7 | 7 | 4 | 10 |
| Plumas.................. | 1 | 1 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 0 |
| Riverside.............. | 94 | 93 | 87 | 99 | 81 | 94 | 118 | 154 | 111 | 113 |
| Sacramento............. | 78 | 80 | 92 | 87 | 78 | 71 | 78 | 100 | 107 | 102 |
| San Benito............. | 4 | 4 | 1 | 1 | 2 | 1 | 1 | 3 | 1 | 3 |
| San Bernardino........ | 125 | 110 | 109 | 129 | 128 | 126 | 147 | 181 | 177 | 186 |
| San Diego............. | 71 | 74 | 84 | 101 | 80 | 85 | 86 | 114 | 119 | 106 |
| San Francisco........ | 48 | 45 | 53 | 58 | 56 | 47 | 40 | 49 | 56 | 56 |
| San Joaquin........... | 47 | 67 | 64 | 62 | 68 | 52 | 50 | 84 | 61 | 60 |
| San Luis Obispo...... | 5 | 3 | 3 | 4 | 2 | 3 | 5 | 7 | 2 | 3 |
| San Mateo............. | 11 | 11 | 14 | 9 | 7 | 12 | 10 | 16 | 18 | 13 |
| Santa Barbara........ | 6 | 16 | 18 | 13 | 8 | 11 | 17 | 8 | 18 | 21 |
| Santa Clara.......... | 53 | 40 | 44 | 57 | 46 | 32 | 45 | 53 | 57 | 41 |
| Santa Cruz........... | 11 | 9 | 6 | 5 | 3 | 5 | 6 | 12 | 12 | 2 |
| Shasta............... | 10 | 8 | 5 | 12 | 6 | 13 | 6 | 12 | 0 | 0 |
| Sierra............... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Siskiyou............. | 1 | 1 | 4 | 3 | 6 | 3 | 6 | 2 | 4 | 1 |
| Solano............... | 31 | 27 | 31 | 24 | 30 | 18 | 21 | 40 | 32 | 37 |
| Sonoma............... | 9 | 7 | 9 | 10 | 12 | 9 | 9 | 10 | 9 | 22 |
| Stanislaus........... | 33 | 32 | 39 | 34 | 41 | 40 | 25 | 33 | 26 | 27 |
| Sutter............... | 4 | 0 | 1 | 9 | 1 | 1 | 4 | 5 | 5 | 2 |
| Tehama............... | 4 | 6 | 3 | 3 | 8 | 4 | 3 | 7 | 2 | 4 |
| Trinity.............. | 1 | 3 | 1 | 3 | 1 | 2 | 2 | 1 | 1 | 0 |
| Tulare............... | 42 | 36 | 45 | 33 | 33 | 26 | 20 | 29 | 42 | 44 |
| Tuolumne............. | 0 | 1 | 0 | 1 | 2 | 2 | 2 | 1 | 1 | 0 |
| Ventura.............. | 34 | 20 | 24 | 31 | 26 | 35 | 24 | 20 | 20 | 18 |
| Yolo................. | 6 | 4 | 6 | 3 | 9 | 6 | 6 | 6 | 5 | 4 |
| Yuba................. | 3 | 2 | 5 | 4 | 3 | 7 | 7 | 2 | 6 | 5 |

(continued)

20

Exhibit 44
DX0496

Table 14 - continued
HOMICIDE CRIMES, 2013-2022
By County
Number and Rate per 100,000 Population

Rate per 100,000 population

| County | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Statewide total........... | 4.6 | 4.4 | 4.8 | 4.9 | 4.6 | 4.4 | 4.2 | 5.5 | 6.0 | 5.7 |
| Alameda.................. | 7.2 | 6.4 | 7.3 | 7.1 | 5.5 | 5.5 | 5.7 | 8.6 | 8.7 | 9.6 |
| Alpine................... | - | - | - | - | - | - | - | - | - | - |
| Amador................... | - | - | - | - | - | - | - | - | - | - |
| Butte.................... | 5.9 | 4.9 | 3.1 | 1.8 | 3.1 | 4.4 | 3.2 | 5.8 | 6.5 | 5.3 |
| Calaveras................ | - | - | - | - | - | - | - | - | - | - |
| Colusa................... | - | - | - | - | - | - | - | - | - | - |
| Contra Costa............. | 3.9 | 4.3 | 5.1 | 4.7 | 3.7 | 3.5 | 4.7 | 3.8 | 4.3 | 3.8 |
| Del Norte................ | - | - | - | - | - | - | - | - | - | - |
| El Dorado................ | 2.7 | 1.6 | 4.9 | 1.1 | 2.7 | 2.6 | 2.6 | 0.0 | 1.6 | 5.8 |
| Fresno................... | 5.9 | 6.1 | 6.0 | 6.4 | 8.5 | 5.3 | 5.4 | 9.2 | 8.6 | 8.2 |
| Glenn.................... | - | - | - | - | - | - | - | - | - | - |
| Humboldt................. | 5.9 | 8.2 | 8.9 | 8.8 | 5.9 | 8.1 | 4.4 | 6.8 | 5.9 | 5.2 |
| Imperial................. | 1.1 | 1.7 | 1.1 | 1.6 | 3.7 | 3.2 | 3.7 | 3.7 | 7.9 | 6.1 |
| Inyo..................... | - | - | - | - | - | - | - | - | - | - |
| Kern..................... | 7.0 | 6.8 | 7.2 | 9.9 | 9.9 | 11.1 | 9.2 | 12.7 | 13.7 | 11.1 |
| Kings.................... | 4.0 | 4.7 | 3.3 | 7.4 | 6.0 | 3.3 | 2.6 | 7.1 | 7.2 | 10.6 |
| Lake..................... | - | - | - | - | - | - | - | - | - | - |
| Lassen................... | - | - | - | - | - | - | - | - | - | - |
| Los Angeles.............. | 5.4 | 5.2 | 5.8 | 6.1 | 5.6 | 5.5 | 5.0 | 6.7 | 8.5 | 7.5 |
| Madera................... | 8.5 | 5.8 | 2.6 | 4.5 | 4.4 | 7.6 | 1.9 | 5.7 | 3.2 | 3.8 |
| Marin.................... | 0.8 | 1.9 | 2.3 | 1.1 | 1.5 | 1.9 | 0.4 | 0.4 | 0.4 | 2.0 |
| Mariposa................. | - | - | - | - | - | - | - | - | - | - |
| Mendocino................ | - | - | - | - | - | - | - | - | - | - |
| Merced................... | 10.3 | 10.9 | 10.0 | 2.2 | 6.9 | 3.2 | 4.2 | 8.4 | 9.5 | 12.3 |
| Modoc.................... | - | - | - | - | - | - | - | - | - | - |
| Mono..................... | - | - | - | - | - | - | - | - | - | - |
| Monterey................. | 11.1 | 8.0 | 13.8 | 12.7 | 9.7 | 6.1 | 3.4 | 3.2 | 8.0 | 5.3 |
| Napa..................... | 1.4 | 3.6 | 2.1 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.0 | 1.5 |
| Nevada................... | - | - | - | - | - | - | - | - | 3.9 | 2.0 |
| Orange................... | 1.6 | 1.9 | 1.8 | 1.8 | 1.9 | 1.5 | 1.8 | 1.8 | 2.2 | 1.9 |

(continued)

21

Exhibit 44
DX0497

Table 14 - continued
## HOMICIDE CRIMES, 2013-2022
By County
Number and Rate per 100,000 Population

| County | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021[a] | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Rate per 100,000 population | | | | | |
| Placer................. | 0.5 | 0.5 | 1.1 | 0.8 | 1.8 | 1.0 | 1.8 | 1.8 | 1.0 | 2.4 |
| Plumas................. | - | - | - | - | - | - | - | - | - | - |
| Riverside............. | 4.1 | 4.1 | 3.7 | 4.2 | 3.4 | 3.9 | 4.8 | 6.3 | 4.6 | 4.6 |
| Sacramento............ | 5.4 | 5.5 | 6.2 | 5.8 | 5.1 | 4.6 | 5.0 | 6.4 | 6.7 | 6.5 |
| San Benito........... | - | - | - | - | - | - | - | - | - | - |
| San Bernardino....... | 6.0 | 5.3 | 5.1 | 6.0 | 5.9 | 5.8 | 6.7 | 8.3 | 8.1 | 8.5 |
| San Diego............ | 2.2 | 2.3 | 2.6 | 3.1 | 2.4 | 2.5 | 2.6 | 3.4 | 3.6 | 3.2 |
| San Francisco........ | 5.8 | 5.4 | 6.1 | 6.7 | 6.4 | 5.3 | 4.5 | 5.4 | 6.5 | 6.7 |
| San Joaquin.......... | 6.7 | 9.4 | 8.8 | 8.4 | 9.1 | 6.8 | 6.5 | 10.8 | 7.8 | 7.6 |
| San Luis Obispo...... | 1.8 | 1.1 | 1.1 | 1.4 | 0.7 | 1.1 | 1.8 | 2.5 | 0.7 | 1.1 |
| San Mateo............ | 1.5 | 1.5 | 1.8 | 1.2 | 0.9 | 1.6 | 1.3 | 2.1 | 2.4 | 1.8 |
| Santa Barbara........ | 1.4 | 3.7 | 4.0 | 2.9 | 1.8 | 2.4 | 3.7 | 1.8 | 4.1 | 4.7 |
| Santa Clara.......... | 2.9 | 2.1 | 2.3 | 3.0 | 2.4 | 1.6 | 2.3 | 2.7 | 3.0 | 2.2 |
| Santa Cruz........... | 4.1 | 3.3 | 2.2 | 1.8 | 1.1 | 1.8 | 2.2 | 4.4 | 4.5 | 0.8 |
| Shasta............... | 5.6 | 4.5 | 2.8 | 6.7 | 3.4 | 7.3 | 3.4 | 6.8 | 0.0 | 0.0 |
| Sierra............... | - | - | - | - | - | - | - | - | - | - |
| Siskiyou............. | - | - | - | - | - | - | - | - | - | - |
| Solano............... | 7.3 | 6.3 | 7.2 | 5.5 | 6.9 | 4.1 | 4.7 | 9.1 | 7.1 | 8.3 |
| Sonoma............... | 1.8 | 1.4 | 1.8 | 2.0 | 2.4 | 1.8 | 1.8 | 2.0 | 1.9 | 4.6 |
| Stanislaus........... | 6.3 | 6.0 | 7.2 | 6.2 | 7.4 | 7.2 | 4.5 | 5.9 | 4.7 | 4.9 |
| Sutter............... | - | - | - | - | - | - | 3.9 | 4.9 | 4.9 | - |
| Tehama............... | - | - | - | - | - | - | - | - | - | - |
| Trinity.............. | - | - | - | - | - | - | - | - | - | - |
| Tulare............... | 9.2 | 7.8 | 9.7 | 7.0 | 7.0 | 5.5 | 4.2 | 6.0 | 8.8 | 9.3 |
| Tuolumne............. | - | - | - | - | - | - | - | - | - | - |
| Ventura.............. | 4.0 | 2.4 | 2.8 | 3.6 | 3.0 | 4.1 | 2.8 | 2.4 | 2.4 | 2.2 |
| Yolo................. | 2.9 | 1.9 | 2.8 | 1.4 | 4.1 | 2.7 | 2.7 | 2.7 | 2.3 | 1.8 |
| Yuba................. | - | - | - | - | - | - | - | - | - | - |

Notes:  Dash indicates that a rate is not computed when a county's population is less than 100,000 in a given year.
Rates are based on annual population estimates provided by the Demographic Research Unit, California Department of Finance.
Rates are calculated using the population for each county shown; therefore, they will not add to the rate calculated for the state.
[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

22

Exhibit 44
DX0498

Table 15
## HOMICIDE CRIMES, 2013-2022
### By Location of Homicide

| Location of homicide | 2013 Number | 2013 Percent | 2014 Number | 2014 Percent | 2015 Number | 2015 Percent | 2016 Number | 2016 Percent | 2017 Number | 2017 Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Total including unknown | 1,745 | | 1,697 | | 1,861 | | 1,930 | | 1,829 | |
| Unknown | 29 | | 26 | | 40 | | 18 | | 26 | |
| Total known | 1,716 | 100.0 | 1,671 | 100.0 | 1,821 | 100.0 | 1,912 | 100.0 | 1,803 | 100.0 |
| Residence | 678 | 39.5 | 661 | 39.6 | 627 | 34.4 | 670 | 35.0 | 612 | 33.9 |
| Victim's residence | 376 | 21.9 | 369 | 22.1 | 356 | 19.5 | 384 | 20.1 | 323 | 17.9 |
| Shared residence | 61 | 3.6 | 84 | 5.0 | 72 | 4.0 | 69 | 3.6 | 100 | 5.5 |
| Other residence | 241 | 14.0 | 208 | 12.4 | 199 | 10.9 | 217 | 11.3 | 189 | 10.5 |
| Residence (unspecified)[1] | - | | - | | - | | - | | - | |
| Street, sidewalk | 626 | 36.5 | 588 | 35.2 | 737 | 40.5 | 746 | 39.0 | 719 | 39.9 |
| All other | 412 | 24.0 | 422 | 25.3 | 457 | 25.1 | 496 | 25.9 | 472 | 26.2 |
| Hotel, motel | 21 | 1.2 | 18 | 1.1 | 24 | 1.3 | 17 | 0.9 | 30 | 1.7 |
| Liquor store | 2 | 0.1 | 5 | 0.3 | 6 | 0.3 | 12 | 0.6 | 7 | 0.4 |
| Bar, restaurant | 22 | 1.3 | 15 | 0.9 | 27 | 1.5 | 24 | 1.3 | 19 | 1.1 |
| Other business | 39 | 2.3 | 43 | 2.6 | 54 | 3.0 | 50 | 2.6 | 53 | 2.9 |
| Parking lot | 91 | 5.3 | 96 | 5.7 | 116 | 6.4 | 115 | 6.0 | 120 | 6.7 |
| Vehicle | 107 | 6.2 | 118 | 7.1 | 62 | 3.4 | 106 | 5.5 | 90 | 5.0 |
| Field, park | 70 | 4.1 | 72 | 4.3 | 94 | 5.2 | 90 | 4.7 | 82 | 4.5 |
| School | 3 | 0.2 | 1 | 0.1 | 3 | 0.2 | 2 | 0.1 | 6 | 0.3 |
| Other | 57 | 3.3 | 54 | 3.2 | 71 | 3.9 | 80 | 4.2 | 65 | 3.6 |

| Location of homicide (cont.) | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021[a] Number | 2021[a] Percent | 2022 Number | 2022 Percent | Percent change 2013-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total including unknown | 1,739 | | 1,679 | | 2,202 | | 2,361 | | 2,206 | | | |
| Unknown | 28 | | 20 | | 29 | | 15 | | 9 | | | |
| Total known | 1,711 | 100.0 | 1,659 | 100.0 | 2,173 | 100.0 | 2,346 | 100.0 | 2,197 | 100.0 | 28.0 | -6.4 |
| Residence | 606 | 35.4 | 577 | 34.8 | 681 | 31.3 | 708 | 30.2 | 631 | 28.7 | -6.9 | -10.9 |
| Victim's residence | 330 | 19.3 | 306 | 18.4 | 334 | 15.4 | 345 | 14.7 | 202 | 9.2 | -46.3 | -41.4 |
| Shared residence | 105 | 6.1 | 96 | 5.8 | 102 | 4.7 | 51 | 2.2 | 49 | 2.2 | -19.7 | -3.9 |
| Other residence | 171 | 10.0 | 175 | 10.5 | 245 | 11.3 | 219 | 9.3 | 165 | 7.5 | -31.5 | -24.7 |
| Residence (unspecified)[1] | - | - | - | | - | | 93 | 4.0 | 215 | 9.8 | - | 131.2 |
| Street, sidewalk | 615 | 35.9 | 618 | 37.3 | 842 | 38.7 | 920 | 39.2 | 885 | 40.3 | 41.4 | -3.8 |
| All other | 490 | 28.6 | 464 | 28.0 | 650 | 29.9 | 718 | 30.6 | 681 | 31.0 | 65.3 | -5.2 |
| Hotel, motel | 18 | 1.1 | 16 | 1.0 | 39 | 1.8 | 49 | 2.1 | 33 | 1.5 | - | - |
| Liquor store | 7 | 0.4 | 7 | 0.4 | 13 | 0.6 | 6 | 0.3 | 14 | 0.6 | - | - |
| Bar, restaurant | 32 | 1.9 | 17 | 1.0 | 13 | 0.6 | 34 | 1.4 | 33 | 1.5 | - | - |
| Other business | 57 | 3.3 | 52 | 3.1 | 71 | 3.3 | 71 | 3.0 | 95 | 4.3 | - | 33.8 |
| Parking lot | 116 | 6.8 | 109 | 6.6 | 171 | 7.9 | 170 | 7.2 | 175 | 8.0 | 92.3 | 2.9 |
| Vehicle | 90 | 5.3 | 83 | 5.0 | 141 | 6.5 | 123 | 5.2 | 86 | 3.9 | -19.6 | -30.1 |
| Field, park | 100 | 5.8 | 85 | 5.1 | 103 | 4.7 | 123 | 5.2 | 105 | 4.8 | 50.0 | -14.6 |
| School | 2 | 0.1 | 3 | 0.2 | 2 | 0.1 | 2 | 0.1 | 13 | 0.6 | - | - |
| Other | 68 | 4.0 | 92 | 5.5 | 96 | 4.4 | 140 | 6.0 | 127 | 5.8 | 122.8 | -9.3 |

Notes: Percentages may not add to subtotals or 100.0 because of rounding.
Dash indicates that a percent change is not calculated when the base number is less than 50 or that no data were reported.
[1] The "Residence (unspecified)" category was added in 2021 to capture the force of locations used in the IBR system.
[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

23

Exhibit 44
DX0499

Table 16
**HOMICIDE CRIMES, 2022**
Gender and Race/Ethnic Group of Victim by Location of Homicide

| Location of homicide | Total | Gender | | Race/ethnic group | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Male[1] | Female | White | Hispanic | Black | Other | Unknown |
| | | | | Number | | | | |
| Total including unknown | 2,206 | 1,845 | 361 | 362 | 1,003 | 676 | 137 | 28 |
| Unknown | 9 | 6 | 3 | 4 | 2 | 2 | 1 | 0 |
| Total known | 2,197 | 1,839 | 358 | 358 | 1,001 | 674 | 136 | 28 |
| Residence | 631 | 453 | 178 | 162 | 247 | 170 | 46 | 6 |
| Victim's residence | 202 | 134 | 68 | 47 | 80 | 58 | 16 | 1 |
| Shared residence | 49 | 27 | 22 | 15 | 14 | 16 | 4 | 0 |
| Other residence | 165 | 138 | 27 | 30 | 70 | 59 | 4 | 2 |
| Residence (unspecified)[2] | 215 | 154 | 61 | 70 | 83 | 37 | 22 | 3 |
| Street, sidewalk | 885 | 805 | 80 | 83 | 440 | 300 | 48 | 14 |
| All other | 681 | 581 | 100 | 113 | 314 | 204 | 42 | 8 |
| Hotel, motel | 33 | 23 | 10 | 1 | 17 | 13 | 0 | 0 |
| Liquor store | 14 | 14 | 0 | 3 | 3 | 8 | 0 | 0 |
| Bar, restaurant | 33 | 33 | 0 | 5 | 13 | 11 | 4 | 0 |
| Other business | 95 | 81 | 14 | 16 | 47 | 26 | 5 | 1 |
| Parking lot | 175 | 151 | 24 | 26 | 74 | 64 | 11 | 0 |
| Vehicle | 86 | 74 | 12 | 10 | 43 | 27 | 3 | 3 |
| Field, park | 105 | 93 | 12 | 20 | 49 | 29 | 7 | 0 |
| School | 13 | 10 | 3 | 1 | 1 | 3 | 1 | 3 |
| Other | 127 | 102 | 25 | 31 | 61 | 23 | 9 | 3 |
| | | | | Percent based on total known | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Residence | 28.7 | 24.6 | 49.7 | 45.3 | 24.7 | 25.2 | 33.8 | - |
| Victim's residence | 9.2 | 7.3 | 19.0 | 13.1 | 8.0 | 8.6 | 11.8 | - |
| Shared residence | 2.2 | 1.5 | 6.1 | 4.2 | 1.4 | 2.4 | 2.9 | - |
| Other residence | 7.5 | 7.5 | 7.5 | 8.4 | 7.0 | 8.8 | 2.9 | - |
| Residence (unspecified)[2] | 9.8 | 8.4 | 17.0 | 19.6 | 8.3 | 5.5 | 16.2 | - |
| Street, sidewalk | 40.3 | 43.8 | 22.3 | 23.2 | 44.0 | 44.5 | 35.3 | - |
| All other | 31.0 | 31.6 | 27.9 | 31.6 | 31.4 | 30.3 | 30.9 | - |
| Hotel, motel | 1.5 | 1.3 | 2.8 | 0.8 | 1.7 | 1.9 | 0.0 | - |
| Liquor store | 0.6 | 0.8 | 0.0 | 0.3 | 0.3 | 1.2 | 1.5 | - |
| Bar, restaurant | 1.5 | 1.8 | 0.0 | 1.4 | 1.3 | 1.6 | 2.9 | - |
| Other business | 4.3 | 4.4 | 3.9 | 4.5 | 4.7 | 3.9 | 3.7 | - |
| Parking lot | 8.0 | 8.2 | 6.7 | 7.3 | 7.4 | 9.5 | 8.1 | - |
| Vehicle | 3.9 | 4.0 | 3.4 | 2.8 | 4.3 | 4.0 | 2.2 | - |
| Field, park | 4.8 | 5.1 | 3.4 | 5.6 | 4.9 | 4.3 | 5.1 | - |
| School | 0.6 | 0.5 | 0.8 | 0.3 | 0.7 | 0.4 | 0.7 | - |
| Other | 5.8 | 5.5 | 7.0 | 8.7 | 6.1 | 3.4 | 6.6 | - |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)
[1] The "male" category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11.
[2] The "Residence (unspecified)" category was added in 2021 to capture the type of locations used in the IBR system.

24

Exhibit 44
DX0500

Table 17
HOMICIDE CRIMES, 2022
Age of Victim by Location of Homicide

| Location of homicide | Total | Under 18 | 18-29 | 30-39 | 40 and over | Unknown |
|---|---|---|---|---|---|---|
| | | Number | | | | |
| Total including unknown............... | 2,206 | 174 | 660 | 582 | 783 | 7 |
| Unknown............................... | 9 | 0 | 3 | 2 | 4 | 0 |
| Total known........................... | 2,197 | 174 | 657 | 580 | 779 | 7 |
| Residence............................. | 631 | 72 | 151 | 127 | 280 | 1 |
| Victim's residence................... | 202 | 22 | 32 | 34 | 114 | 0 |
| Shared residence..................... | 49 | 7 | 9 | 8 | 25 | 0 |
| Other residence...................... | 165 | 13 | 54 | 39 | 58 | 1 |
| Residence (unspecified)[1].......... | 215 | 30 | 56 | 46 | 83 | 0 |
| Street, sidewalk...................... | 885 | 62 | 285 | 262 | 272 | 4 |
| All other............................. | 681 | 40 | 221 | 191 | 227 | 2 |
| Hotel, motel........................ | 33 | 2 | 12 | 11 | 8 | 0 |
| Liquor store........................ | 14 | 0 | 4 | 3 | 7 | 0 |
| Bar, restaurant..................... | 33 | 0 | 8 | 15 | 10 | 0 |
| Other business...................... | 95 | 4 | 28 | 28 | 35 | 0 |
| Parking lot......................... | 175 | 9 | 60 | 43 | 63 | 0 |
| Vehicle............................. | 86 | 8 | 33 | 28 | 16 | 1 |
| Field, park......................... | 105 | 9 | 30 | 29 | 37 | 0 |
| School.............................. | 13 | 3 | 7 | 0 | 3 | 0 |
| Other............................... | 127 | 5 | 39 | 34 | 48 | 1 |
| | | Percent based on total known | | | | |
| Total known........................... | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Residence............................. | 28.7 | 41.4 | 23.0 | 21.9 | 35.9 | - |
| Victim's residence................... | 9.2 | 12.6 | 4.9 | 5.9 | 14.6 | - |
| Shared residence..................... | 2.2 | 4.0 | 1.4 | 1.4 | 3.2 | - |
| Other residence...................... | 7.5 | 7.5 | 8.2 | 6.7 | 7.4 | - |
| Residence (unspecified)[1].......... | 9.8 | 17.2 | 8.5 | 7.9 | 10.7 | - |
| Street, sidewalk...................... | 40.3 | 35.6 | 43.4 | 45.2 | 34.9 | - |
| All other............................. | 31.0 | 23.0 | 33.6 | 32.9 | 29.1 | - |
| Hotel, motel........................ | 1.5 | 1.1 | 1.8 | 1.9 | 1.0 | - |
| Liquor store........................ | 0.6 | 0.0 | 0.6 | 0.5 | 0.9 | - |
| Bar................................. | 1.5 | 0.0 | 1.2 | 2.6 | 1.3 | - |
| Other business...................... | 4.3 | 2.3 | 4.3 | 4.8 | 4.5 | - |
| Parking lot......................... | 8.0 | 5.2 | 9.1 | 7.4 | 8.1 | - |
| Vehicle............................. | 3.9 | 4.6 | 5.0 | 4.8 | 2.1 | - |
| Field, park......................... | 4.8 | 5.2 | 4.6 | 5.0 | 4.7 | - |
| School.............................. | 0.6 | 1.7 | 1.1 | 0.0 | 0.4 | - |
| Other............................... | 5.8 | 2.9 | 5.9 | 5.9 | 6.2 | - |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)
[1] The "Residence (unspecified)" category was added in 2021 to capture the type of locations used in the IBR system.

25

Exhibit 44
DX0501

Table 18
HOMICIDE CRIMES, 2013-2022
By Type of Weapon Used

| Type of weapon used | 2013 Number | 2013 Percent | 2014 Number | 2014 Percent | 2015 Number | 2015 Percent | 2016 Number | 2016 Percent | 2017 Number | 2017 Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Total including unknown | 1,745 | | 1,697 | | 1,861 | | 1,930 | | 1,829 | |
| Unknown | 46 | | 37 | | 40 | | 28 | | 33 | |
| Total known | 1,699 | 100.0 | 1,660 | 100.0 | 1,821 | 100.0 | 1,902 | 100.0 | 1,796 | 100.0 |
| Firearm | 1,225 | 72.1 | 1,169 | 70.4 | 1,276 | 70.1 | 1,368 | 71.9 | 1,273 | 70.9 |
| Handgun | 808 | 47.6 | 763 | 46.0 | 855 | 47.0 | 929 | 48.8 | 887 | 49.4 |
| All other firearms | 417 | 24.5 | 406 | 24.5 | 421 | 23.1 | 439 | 23.1 | 386 | 21.5 |
| Rifle | 28 | 1.6 | 40 | 2.4 | 34 | 1.9 | 37 | 1.9 | 36 | 2.0 |
| Shotgun | 47 | 2.8 | 43 | 2.6 | 33 | 1.8 | 36 | 1.9 | 34 | 1.9 |
| Other firearm | 4 | 0.2 | 9 | 0.5 | 0 | 0.0 | 3 | 0.2 | 4 | 0.2 |
| Firearm - unknown type | 338 | 19.9 | 314 | 18.9 | 354 | 19.4 | 363 | 19.1 | 312 | 17.4 |
| Non-firearm | 474 | 27.9 | 491 | 29.6 | 545 | 29.9 | 534 | 28.1 | 523 | 29.1 |
| Knife [1] | 238 | 14.0 | 256 | 15.4 | 263 | 14.4 | 280 | 14.7 | 258 | 14.4 |
| Blunt object [2] | 76 | 4.5 | 65 | 3.9 | 97 | 5.3 | 89 | 4.7 | 76 | 4.2 |
| Personal weapon [3] | 92 | 5.4 | 97 | 5.8 | 90 | 4.9 | 89 | 4.7 | 103 | 5.7 |
| All other | 68 | 4.0 | 73 | 4.4 | 95 | 5.2 | 76 | 4.0 | 86 | 4.8 |
| Rope [4] | 19 | 1.1 | 17 | 1.0 | 26 | 1.4 | 22 | 1.2 | 30 | 1.7 |
| Drugs | 3 | 0.2 | 3 | 0.2 | 4 | 0.2 | 3 | 0.2 | 1 | 0.1 |
| Other [5] | 46 | 2.7 | 50 | 3.0 | 65 | 3.6 | 51 | 2.7 | 55 | 3.1 |

| Type of weapon used (cont.) | 2018 Number | 2018 Percent | 2019 Number | 2019 Percent | 2020 Number | 2020 Percent | 2021[a] Number | 2021[a] Percent | 2022 Number | 2022 Percent | Percent change 2013-2022 | Percent change 2021-2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total including unknown | 1,739 | | 1,679 | | 2,202 | | 2,361 | | 2,206 | | | |
| Unknown | 25 | | 23 | | 37 | | 49 | | 74 | | | |
| Total known | 1,714 | 100.0 | 1,656 | 100.0 | 2,165 | 100.0 | 2,312 | 100.0 | 2,132 | 100.0 | 25.5 | -7.8 |
| Firearm | 1,178 | 68.7 | 1,142 | 69.0 | 1,606 | 74.2 | 1,734 | 75.0 | 1,570 | 73.6 | 28.2 | -9.5 |
| Handgun | 833 | 48.6 | 762 | 46.0 | 1,034 | 47.8 | 1,183 | 51.2 | 964 | 45.2 | 19.3 | -18.5 |
| All other firearms | 345 | 20.1 | 380 | 22.9 | 572 | 26.4 | 551 | 23.8 | 606 | 28.4 | 45.3 | 10.0 |
| Rifle | 24 | 1.4 | 34 | 2.1 | 41 | 1.9 | 39 | 1.7 | 39 | 1.8 | - | - |
| Shotgun | 27 | 1.6 | 26 | 1.6 | 31 | 1.4 | 10 | 0.4 | 13 | 0.6 | - | - |
| Other firearm | 5 | 0.3 | 1 | 0.1 | 1 | 0.0 | 20 | 0.9 | 31 | 1.5 | - | - |
| Firearm - unknown type | 289 | 16.9 | 319 | 19.3 | 499 | 23.0 | 482 | 20.8 | 523 | 24.5 | 54.7 | 8.5 |
| Non-firearm | 536 | 31.3 | 514 | 31.0 | 559 | 25.8 | 578 | 25.0 | 562 | 26.4 | 18.6 | -2.8 |
| Knife [1] | 252 | 14.7 | 252 | 15.2 | 297 | 13.7 | 303 | 13.1 | 272 | 12.8 | 14.3 | -10.2 |
| Blunt object [2] | 112 | 6.5 | 71 | 4.3 | 78 | 3.6 | 80 | 3.5 | 64 | 3.0 | -15.8 | -20.0 |
| Personal weapon [3] | 87 | 5.1 | 102 | 6.2 | 101 | 4.7 | 83 | 3.6 | 87 | 4.1 | -5.4 | 4.8 |
| All other | 85 | 5.0 | 89 | 5.4 | 83 | 3.8 | 112 | 4.8 | 139 | 6.5 | 104.4 | 24.1 |
| Rope [4] | 20 | 1.2 | 21 | 1.3 | 22 | 1.0 | 19 | 0.8 | 17 | 0.8 | - | - |
| Drugs | 0 | 0.0 | 2 | 0.1 | 3 | 0.1 | 7 | 0.3 | 17 | 0.8 | - | - |
| Other [5] | 65 | 3.8 | 66 | 4.0 | 58 | 2.7 | 86 | 3.7 | 105 | 4.9 | - | 22.1 |

Notes:   Percentages may not add to subtotals or 100.0 because of rounding.
   Dash indicates that a percent change is not calculated when the base number is less than 50.

[1] Any instrument used to cut or stab.
[2] Club, etc.
[3] Hands, feet, etc.
[4] Any instrument used to hang or strangle.
[5] Poison, arson, pellet gun, drowning, etc.
[a] The inclusion of data collected under California's IBR format began in 2021.   Caution should be used when comparing these data with those from prior years.   For additional information, see Understanding the Data. (Page 3)

26

Exhibit 44
DX0502

Table 19
## HOMICIDE CRIMES, 2022
### Gender and Race/Ethnic Group of Victim by Type of Weapon Used

| Type of weapon used | Total | Gender | | Race/ethnic group | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Male[1] | Female | White | Hispanic | Black | Other | Unknown |
| | | Number | | | | | | |
| Total including unknown | 2,206 | 1,845 | 361 | 362 | 1,003 | 676 | 137 | 28 |
| Unknown | 74 | 43 | 31 | 18 | 27 | 11 | 13 | 5 |
| Total known | 2,132 | 1,802 | 330 | 344 | 976 | 665 | 124 | 23 |
| Firearm | 1,570 | 1,378 | 192 | 190 | 749 | 546 | 75 | 10 |
| Handgun | 964 | 847 | 117 | 107 | 444 | 365 | 42 | 6 |
| All other firearms | 606 | 531 | 75 | 83 | 305 | 181 | 33 | 4 |
| Rifle | 39 | 32 | 7 | 7 | 19 | 11 | 2 | 1 |
| Shotgun | 13 | 10 | 3 | 5 | 5 | 1 | 1 | 0 |
| Other firearm | 31 | 26 | 5 | 8 | 15 | 7 | 1 | 0 |
| Firearm - unknown type | 523 | 463 | 60 | 63 | 266 | 162 | 29 | 3 |
| Non-firearm | 562 | 424 | 138 | 154 | 227 | 119 | 49 | 13 |
| Knife[2] | 272 | 225 | 47 | 62 | 116 | 66 | 26 | 2 |
| Blunt object[3] | 64 | 51 | 13 | 17 | 26 | 13 | 6 | 2 |
| Personal weapon[4] | 87 | 71 | 16 | 31 | 29 | 22 | 5 | 0 |
| All other | 139 | 77 | 62 | 44 | 56 | 18 | 12 | 9 |
| Rope[5] | 17 | 10 | 7 | 5 | 5 | 5 | 2 | 0 |
| Drugs | 17 | 9 | 8 | 12 | 5 | 0 | 0 | 0 |
| Other[6] | 105 | 58 | 47 | 27 | 46 | 13 | 10 | 9 |
| | | Percent based on total known | | | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Firearm | 73.6 | 76.5 | 58.2 | 55.2 | 76.7 | 82.1 | 60.5 | - |
| Handgun | 45.2 | 47.0 | 35.5 | 31.1 | 45.5 | 54.9 | 33.9 | - |
| All other firearms | 28.4 | 29.5 | 22.7 | 24.1 | 31.3 | 27.2 | 26.6 | - |
| Rifle | 1.8 | 1.8 | 2.1 | 2.0 | 1.9 | 1.7 | 1.6 | - |
| Shotgun | 0.6 | 0.6 | 0.9 | 1.5 | 0.5 | 0.2 | 0.8 | - |
| Other firearm | 1.5 | 1.4 | 1.5 | 2.3 | 1.5 | 1.1 | 0.8 | - |
| Firearm - unknown type | 24.5 | 25.7 | 18.2 | 18.3 | 27.3 | 24.4 | 23.4 | - |
| Non-firearm | 26.4 | 23.5 | 41.8 | 44.8 | 23.3 | 17.9 | 39.5 | - |
| Knife[2] | 12.8 | 12.5 | 14.2 | 18.0 | 11.9 | 9.9 | 21.0 | - |
| Blunt object[3] | 3.0 | 2.8 | 3.9 | 4.9 | 2.7 | 2.0 | 4.8 | - |
| Personal weapon[4] | 4.1 | 3.9 | 4.8 | 9.0 | 3.0 | 3.3 | 4.0 | - |
| All other | 6.5 | 4.3 | 18.8 | 12.8 | 5.7 | 2.7 | 9.7 | - |
| Rope[5] | 0.8 | 0.6 | 2.1 | 1.5 | 0.5 | 0.8 | 1.6 | - |
| Drugs | 0.8 | 0.5 | 2.4 | 3.5 | 0.5 | 0.0 | 0.0 | - |
| Other[6] | 4.9 | 3.2 | 14.2 | 7.8 | 4.7 | 2.0 | 8.1 | - |

Notes:  Percentages may not add to subtotals or 100.0 because of rounding.
Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years.  For additional information, see Understanding the Data. (Page 3)
[1] The "male" category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11.
[2] Any instrument used to cut or stab.
[3] Club, etc.
[4] Hands, feet, etc.
[5] Any instrument used to hang or strangle.
[6] Poison, arson, pellet gun, drowning, etc.

27

Exhibit 44
DX0503

Table 20
## HOMICIDE CRIMES, 2022
### Age of Victim by Type of Weapon Used

| Type of weapon used | Total | Under 18 | 18-29 | 30-39 | 40 and over | Unknown |
|---|---|---|---|---|---|---|
| | | Number | | | | |
| Total including unknown | 2,206 | 174 | 660 | 582 | 783 | 7 |
| Unknown | 74 | 8 | 19 | 15 | 31 | 1 |
| Total known | 2,132 | 166 | 641 | 567 | 752 | 6 |
| Firearm | 1,570 | 100 | 546 | 455 | 463 | 6 |
| Handgun | 964 | 66 | 338 | 282 | 274 | 4 |
| All other firearms | 606 | 34 | 208 | 173 | 189 | 2 |
| Rifle | 39 | 8 | 14 | 7 | 10 | 0 |
| Shotgun | 13 | 0 | 1 | 3 | 9 | 0 |
| Other firearm | 31 | 4 | 10 | 6 | 11 | 0 |
| Firearm - unknown type | 523 | 22 | 183 | 157 | 159 | 2 |
| Non-firearm | 562 | 66 | 95 | 112 | 289 | 0 |
| Knife[1] | 272 | 9 | 62 | 63 | 138 | 0 |
| Blunt object[2] | 64 | 6 | 6 | 11 | 41 | 0 |
| Personal weapon[3] | 87 | 12 | 6 | 10 | 59 | 0 |
| All other | 139 | 39 | 21 | 28 | 51 | 0 |
| Rope[4] | 17 | 2 | 6 | 2 | 7 | 0 |
| Drugs | 17 | 4 | 6 | 6 | 1 | 0 |
| Other[5] | 105 | 33 | 9 | 20 | 43 | 0 |
| | | Percent based on total known | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Firearm | 73.6 | 60.2 | 85.2 | 80.2 | 61.6 | - |
| Handgun | 45.2 | 39.8 | 52.7 | 49.7 | 36.4 | - |
| All other firearms | 28.4 | 20.5 | 32.4 | 30.5 | 25.1 | - |
| Rifle | 1.8 | 4.8 | 2.2 | 1.2 | 1.3 | - |
| Shotgun | 0.6 | 0.0 | 0.2 | 0.5 | 1.2 | - |
| Other firearm | 1.5 | 2.4 | 1.6 | 1.1 | 1.5 | - |
| Firearm - unknown type | 24.5 | 13.3 | 28.5 | 27.7 | 21.1 | - |
| Non-firearm | 26.4 | 39.8 | 14.8 | 19.8 | 38.4 | - |
| Knife[1] | 12.8 | 5.4 | 9.7 | 11.1 | 18.4 | - |
| Blunt object[2] | 3.0 | 3.6 | 0.9 | 1.9 | 5.5 | - |
| Personal weapon[3] | 4.1 | 7.2 | 0.9 | 1.8 | 7.8 | - |
| All other | 6.5 | 23.5 | 3.3 | 4.9 | 6.8 | - |
| Rope[4] | 0.8 | 1.2 | 0.9 | 0.4 | 0.9 | - |
| Drugs | 0.8 | 2.4 | 0.9 | 1.1 | 0.1 | - |
| Other[5] | 4.9 | 19.9 | 1.4 | 3.5 | 5.7 | - |

Notes: Percentages may not add to subtotals or 100.0 because of rounding.
Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] Any instrument used to cut or stab.
[2] Club, etc.
[3] Hands, feet, etc.
[4] Any instrument used to hang or strangle.
[5] Poison, arson, pellet gun, drowning, etc.

28

Exhibit 44
DX0504

Table 21
HOMICIDE CRIMES, 2013-2022
By Contributing Circumstance

| Contributing circumstance | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total including unknown... | 1,745 | | 1,697 | | 1,861 | | 1,930 | | 1,829 | |
| Unknown... | 634 | | 641 | | 737 | | 737 | | 705 | |
| Total known... | 1,111 | 100.0 | 1,056 | 100.0 | 1,124 | 100.0 | 1,193 | 100.0 | 1,124 | 100.0 |
| Rape, robbery, burglary... | 90 | 8.1 | 84 | 8.0 | 81 | 7.2 | 84 | 7.0 | 85 | 7.6 |
| Rape [1] | 3 | 0.3 | 4 | 0.4 | 0 | 0.0 | 2 | 0.2 | 5 | 0.4 |
| Robbery... | 81 | 7.3 | 73 | 6.9 | 75 | 6.7 | 74 | 6.2 | 73 | 6.5 |
| Burglary... | 6 | 0.5 | 7 | 0.7 | 6 | 0.5 | 8 | 0.7 | 7 | 0.6 |
| Argument... | 423 | 38.1 | 391 | 37.0 | 431 | 38.3 | 478 | 40.1 | 456 | 40.6 |
| Domestic violence... | 94 | 8.5 | 94 | 8.9 | 118 | 10.5 | 96 | 8.0 | 90 | 8.0 |
| All other argument... | 329 | 29.6 | 297 | 28.1 | 313 | 27.8 | 382 | 32.0 | 366 | 32.6 |
| Gang-, drug-related... | 402 | 36.2 | 341 | 32.3 | 350 | 31.1 | 392 | 32.9 | 365 | 32.5 |
| Gang-related... | 367 | 33.0 | 315 | 29.8 | 323 | 28.7 | 370 | 31.0 | 339 | 30.2 |
| Drug-related... | 35 | 3.2 | 26 | 2.5 | 27 | 2.4 | 22 | 1.8 | 26 | 2.3 |
| All other... | 196 | 17.6 | 240 | 22.7 | 262 | 23.3 | 239 | 20.0 | 218 | 19.4 |

| Contributing circumstance (cont.) | 2018 | | 2019 | | 2020 | | 2021[a] | | 2022 | | Percent change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | 2013-2022 | 2021-2022 |
| Total including unknown... | 1,739 | | 1,679 | | 2,202 | | 2,361 | | 2,206 | | | |
| Unknown... | 710 | | 666 | | 894 | | 1,065 | | 974 | | | |
| Total known... | 1,029 | 100.0 | 1,013 | 100.0 | 1,308 | 100.0 | 1,296 | 100.0 | 1,232 | 100.0 | 10.9 | -4.9 |
| Rape, robbery, burglary... | 74 | 7.2 | 77 | 7.6 | 111 | 8.5 | 91 | 7.0 | 72 | 5.8 | -20.0 | -20.9 |
| Rape [1] | 1 | 0.1 | 0 | 0.0 | 4 | 0.3 | 1 | 0.1 | 2 | 0.2 | - | - |
| Robbery... | 70 | 6.8 | 71 | 7.0 | 102 | 7.8 | 80 | 6.2 | 65 | 5.3 | -19.8 | -18.8 |
| Burglary... | 3 | 0.3 | 6 | 0.6 | 5 | 0.4 | 10 | 0.8 | 5 | 0.4 | - | - |
| Argument... | 439 | 42.7 | 453 | 44.7 | 534 | 40.8 | 552 | 42.6 | 538 | 43.7 | 27.2 | -2.5 |
| Domestic violence... | 110 | 10.7 | 90 | 8.9 | 87 | 6.7 | 82 | 6.3 | 84 | 6.8 | -10.6 | 2.4 |
| All other argument... | 329 | 32.0 | 363 | 35.8 | 447 | 34.2 | 470 | 36.3 | 454 | 36.9 | 38.0 | -3.4 |
| Gang-, drug-related... | 300 | 29.2 | 282 | 27.8 | 407 | 31.1 | 365 | 28.2 | 329 | 26.7 | -18.2 | -9.9 |
| Gang-related... | 276 | 26.8 | 256 | 25.3 | 369 | 28.2 | 345 | 26.6 | 312 | 25.3 | -15.0 | -9.6 |
| Drug-related... | 24 | 2.3 | 26 | 2.6 | 38 | 2.9 | 20 | 1.5 | 17 | 1.4 | - | - |
| All other... | 216 | 21.0 | 201 | 19.8 | 256 | 19.6 | 288 | 22.2 | 293 | 23.8 | 49.5 | 1.7 |

Notes:   Percentages may not add to subtotals or 100.0 because of rounding.
   Dash indicates that a percent change is not calculated when the base number is less than 50.
[1] In 2014, the crime of "forcible rape" was changed to "rape". The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape according to the FBI standards.  For additional information, see Understanding the Data (Page 3).
[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years.  For additional information, see Understanding the Data. (Page 3)

29

Exhibit 44
DX0505

Table 22
## HOMICIDE CRIMES, 2022
### Gender and Race/Ethnic Group of Victim by Contributing Circumstance

| Contributing circumstance | Total | Gender | | Race/ethnic group | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Male[1] | Female | White | Hispanic | Black | Other | Unknown |
| **Number** | | | | | | | | |
| Total including unknown | 2,206 | 1,845 | 361 | 362 | 1,003 | 676 | 137 | 28 |
| Unknown | 974 | 821 | 153 | 143 | 427 | 322 | 63 | 19 |
| Total known | 1,232 | 1,024 | 208 | 219 | 576 | 354 | 74 | 9 |
| Rape, robbery, burglary | 72 | 63 | 9 | 17 | 26 | 21 | 8 | 0 |
| Rape[2] | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 0 |
| Robbery | 65 | 60 | 5 | 12 | 26 | 19 | 8 | 0 |
| Burglary | 5 | 3 | 2 | 3 | 0 | 2 | 0 | 0 |
| Argument | 538 | 429 | 109 | 107 | 219 | 161 | 46 | 5 |
| Domestic violence | 84 | 21 | 63 | 21 | 30 | 19 | 13 | 1 |
| All other argument | 454 | 408 | 46 | 86 | 189 | 142 | 33 | 4 |
| Gang-, drug-related | 329 | 308 | 21 | 23 | 187 | 116 | 2 | 1 |
| Gang-related | 312 | 293 | 19 | 15 | 184 | 110 | 2 | 0 |
| Drug-related | 17 | 15 | 2 | 8 | 3 | 6 | 0 | 0 |
| All other | 293 | 224 | 69 | 72 | 144 | 56 | 18 | 3 |
| **Percent based on total known** | | | | | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Rape, robbery, burglary | 5.8 | 6.2 | 4.3 | 7.8 | 4.5 | 5.9 | 10.8 | - |
| Rape[2] | 0.2 | 0.0 | 1.0 | 0.9 | 0.0 | 0.0 | 0.0 | - |
| Robbery | 5.3 | 5.9 | 2.4 | 5.5 | 4.5 | 5.4 | 10.8 | - |
| Burglary | 0.4 | 0.3 | 1.0 | 1.4 | 0.0 | 0.6 | 0.0 | - |
| Argument | 43.7 | 41.9 | 52.4 | 48.9 | 38.0 | 45.5 | 62.2 | - |
| Domestic violence | 6.8 | 2.1 | 30.3 | 9.6 | 5.2 | 5.4 | 17.6 | - |
| All other argument | 36.9 | 39.8 | 22.1 | 39.3 | 32.8 | 40.1 | 44.6 | - |
| Gang-, drug-related | 26.7 | 30.1 | 10.1 | 10.5 | 32.5 | 32.8 | 2.7 | - |
| Gang-related | 25.3 | 28.6 | 9.1 | 6.8 | 31.9 | 31.1 | 2.7 | - |
| Drug-related | 1.4 | 1.5 | 1.0 | 3.7 | 0.5 | 1.7 | 0.0 | - |
| All other | 23.8 | 21.9 | 33.2 | 32.9 | 25.0 | 15.8 | 24.3 | - |

Notes: Percentages may not add to subtotals or 100.0 because of rounding.
Dash indicates that a percent change is not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] The "male" category includes two homicide victims whose gender was not identified and two whose identified gender category totaled less than 11. For additional information, see Understanding the Data. (Page 3)

[2] In 2014, the crime of "forcible rape" was changed to "rape". The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood to be rape according to the FBI standards. For additional information, see Understanding the Data (Page 3).

Exhibit 44
DX0506

Table 23
**HOMICIDE CRIMES, 2022**
Age of Victim by Contributing Circumstance

| Contributing circumstance | Total | Under 5 | 5-17 | 18-29 | 30-39 | 40-49 | 50-59 | 60-69 | 70 and over | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Number | | | | | |
| Total including unknown | 2,206 | 43 | 131 | 660 | 582 | 339 | 210 | 139 | 95 | 7 |
| Unknown | 974 | 11 | 54 | 300 | 245 | 150 | 95 | 67 | 47 | 5 |
| Total known | 1,232 | 32 | 77 | 360 | 337 | 189 | 115 | 72 | 48 | 2 |
| Rape, robbery, burglary | 72 | 0 | 2 | 18 | 15 | 10 | 10 | 0 | 8 | 0 |
| Rape[1] | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| Robbery | 65 | 0 | 2 | 16 | 15 | 10 | 8 | 8 | 6 | 0 |
| Burglary | 5 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 0 |
| Argument | 538 | 1 | 17 | 142 | 157 | 92 | 60 | 44 | 25 | 0 |
| Domestic violence | 84 | 0 | 3 | 23 | 21 | 15 | 11 | 6 | 5 | 0 |
| All other argument | 454 | 1 | 14 | 119 | 136 | 77 | 49 | 38 | 20 | 0 |
| Gang-, drug-related | 329 | 1 | 26 | 131 | 102 | 44 | 20 | 3 | 1 | 1 |
| Gang-related | 312 | 0 | 25 | 126 | 97 | 42 | 19 | 1 | 1 | 1 |
| Drug-related | 17 | 1 | 1 | 5 | 5 | 2 | 1 | 2 | 0 | 0 |
| Child abuse | 34 | 22 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| All other | 259 | 8 | 20 | 69 | 63 | 43 | 25 | 16 | 14 | 1 |
| | | | | | Percent based on total known | | | | | |
| Total known | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Rape, robbery, burglary | 5.8 | - | 2.6 | 5.0 | 4.5 | 5.3 | 8.7 | 12.5 | - | - |
| Rape[1] | 0.2 | - | 0.0 | 0.3 | 0.0 | 0.0 | 0.9 | 0.0 | - | - |
| Robbery | 5.3 | - | 2.6 | 4.4 | 4.5 | 5.3 | 7.0 | 11.1 | - | - |
| Burglary | 0.4 | - | 0.0 | 0.3 | 0.0 | 0.0 | 0.9 | 1.4 | - | - |
| Argument | 43.7 | - | 22.1 | 39.4 | 46.6 | 48.7 | 52.2 | 61.1 | - | - |
| Domestic violence | 6.8 | - | 3.9 | 6.4 | 6.2 | 7.9 | 9.6 | 8.3 | - | - |
| All other argument | 36.9 | - | 18.2 | 33.1 | 40.4 | 40.7 | 42.6 | 52.8 | - | - |
| Gang-, drug-related | 26.7 | - | 33.8 | 36.4 | 30.3 | 23.3 | 17.4 | 4.2 | - | - |
| Gang-related | 25.3 | - | 32.5 | 35.0 | 28.8 | 22.2 | 16.5 | 1.4 | - | - |
| Drug-related | 1.4 | - | 1.3 | 1.4 | 1.5 | 1.1 | 0.9 | 2.8 | - | - |
| Child abuse | 2.8 | - | 15.6 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | - | - |
| All other | 21.0 | - | 26.0 | 19.2 | 18.7 | 22.8 | 21.7 | 22.2 | - | - |

Notes:  Percentages may not add to subtotals or 100.0 because of rounding.
Dash indicates that percent distributions are not calculated when the base number is less than 50.
The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years.  For additional information, see
Understanding the Data. (Page 3)
[1] In 2014, the crime of "forcible rape" was changed to "rape".  The definition was expanded to include both male and female victims and reflects the various forms of sexual penetration understood
to be rape according to the FBI standards.  For additional information, see Understanding the Data (Page 3).

Table 24
**HOMICIDE CRIMES, 2022**
Contributing Circumstance by Relationship of Victim to Offender

| Relationship of victim to offender | Total | Rape | Robbery, burglary | Argument[1] | Gang-, drug-related | Child abuse | All other | Unknown |
|---|---|---|---|---|---|---|---|---|
| | | | **Number** | | | | | |
| Total including unknown........ | 2,206 | 2 | 70 | 538 | 329 | 34 | 259 | 974 |
| Unknown........................... | 1,119 | 0 | 36 | 128 | 228 | 1 | 102 | 624 |
| Total known...................... | 1,087 | 2 | 34 | 410 | 101 | 33 | 157 | 350 |
| Friend, acquaintance[2] ....... | 472 | 2 | 5 | 209 | 50 | 1 | 79 | 128 |
| Spouse[3]......................... | 52 | 0 | 0 | 33 | 0 | 0 | 3 | 16 |
| Parent, child[4] ................. | 107 | 0 | 1 | 22 | 1 | 32 | 15 | 36 |
| All other relatives............. | 55 | 0 | 0 | 27 | 1 | 0 | 7 | 20 |
| Stranger.......................... | 401 | 2 | 28 | 119 | 49 | 0 | 53 | 150 |
| | | | **Percent based on total known** | | | | | |
| Total known...................... | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Friend, acquaintance[2] ....... | 43.4 | - | - | 51.0 | 49.5 | - | 50.3 | 36.6 |
| Spouse[3]......................... | 4.8 | - | - | 8.0 | 0.0 | - | 1.9 | 4.6 |
| Parent, child[4] ................. | 9.8 | - | - | 5.4 | 1.0 | - | 9.6 | 10.3 |
| All other relatives............. | 5.1 | - | - | 6.6 | 1.0 | - | 4.5 | 5.7 |
| Stranger.......................... | 36.9 | - | - | 29.0 | 48.5 | - | 33.8 | 42.9 |

Notes: Dash indicates that percent distributions are not calculated when the base number is less than 50.
   The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years.
   For additional information, see Understanding the Data. (Page 3)

[1] Includes domestic violence.
[2] Includes ex-husband, ex-wife, boyfriend/ex-boyfriend, girlfriend/ex-girlfriend, neighbor, employer, employee, gang member, etc.
[3] Includes "common-law" marriage partner.
[4] Includes stepmother, stepfather, stepdaughter, and stepson.

Exhibit 44
DX0508

Table 25
**HOMICIDE CRIMES CLEARED, 2013-2022**
Number Reported, Number Cleared, and Clearance Rate

| Year(s) | Number of homicides reported | Number of homicides cleared | Clearance rate[1] |
|---|---|---|---|
| 2022.............. | 2,206 | 1,294 | 58.7 |
| 2021[a].............. | 2,361 | 1,286 | 54.5 |
| 2020.............. | 2,202 | 1,296 | 58.9 |
| 2019.............. | 1,679 | 1,084 | 64.6 |
| 2018.............. | 1,739 | 1,116 | 64.2 |
| 2017.............. | 1,829 | 1,144 | 62.5 |
| 2016.............. | 1,930 | 1,140 | 59.1 |
| 2015.............. | 1,861 | 1,145 | 61.5 |
| 2014.............. | 1,697 | 1,091 | 64.3 |
| 2013.............. | 1,745 | 1,146 | 65.7 |

[1]  A clearance rate is the percentage of crimes reported that have been "cleared" or solved for crime reporting purposes.  The homicide clearance rate is calculated by dividing the number of reported homicide clearances by the number of reported homicide crimes. The result is multiplied by 100.

[a]  The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

33

Exhibit 44
DX0509

Table 26
## FELONY ARRESTS FOR
## SELECTED VIOLENT OFFENSES, 2013-2022
Number, Rate per 100,000 Population at Risk, and Percent Change

| Year(s) | Total | Homicide | Rape[1] | Robbery | Assault |
|---|---|---|---|---|---|
| Number | | | | | |
| 2022...................... | 96,606 | 1,485 | 1,890 | 13,187 | 80,044 |
| 2021[a]................... | 92,223 | 1,550 | 1,964 | 11,376 | 77,333 |
| 2020...................... | 101,292 | 1,597 | 2,067 | 13,696 | 83,932 |
| 2019...................... | 107,119 | 1,352 | 2,233 | 16,112 | 87,422 |
| 2018...................... | 110,759 | 1,416 | 2,541 | 16,713 | 90,089 |
| 2017...................... | 109,751 | 1,501 | 2,557 | 17,000 | 88,693 |
| 2016...................... | 107,305 | 1,440 | 2,558 | 15,892 | 87,415 |
| 2015...................... | 108,157 | 1,439 | 2,467 | 15,903 | 88,348 |
| 2014...................... | 106,405 | 1,427 | 2,444 | 14,799 | 87,735 |
| 2013...................... | 101,658 | 1,423 | 1,601 | 15,934 | 82,700 |
| Percent change in number | | | | | |
| 2021-2022............ | 4.8 | -4.2 | - | 15.9 | 3.5 |
| 2020-2021[a].......... | -9.0 | -2.9 | - | -16.9 | -7.9 |
| 2019-2020............ | -5.4 | 18.1 | -7.4 | -15.0 | -4.0 |
| 2018-2019............ | -3.3 | -4.5 | -12.1 | -3.6 | -3.0 |
| 2017-2018............ | 0.9 | -5.7 | -0.6 | -1.7 | 1.6 |
| 2016-2017............ | 2.3 | 4.2 | 0.0 | 7.0 | 1.5 |
| 2015-2016............ | -0.8 | 0.1 | 3.7 | -0.1 | -1.1 |
| 2014-2015............ | 1.6 | 0.8 | - | 7.5 | 0.7 |
| 2013-2014............ | 4.7 | 0.3 | - | -7.1 | 6.1 |
| 2013-2022[a]........ | -5.0 | 4.4 | - | -17.2 | -3.2 |
| Rate per 100,000 population at risk[2] | | | | | |
| 2022...................... | 313.6 | 4.8 | 6.1 | 42.8 | 259.9 |
| 2021[a]................... | 303.2 | 5.1 | 6.5 | 37.4 | 254.2 |
| 2020...................... | 333.7 | 5.3 | 6.8 | 45.1 | 276.5 |
| 2019...................... | 346.1 | 4.4 | 7.2 | 52.1 | 282.5 |
| 2018...................... | 357.9 | 4.6 | 8.2 | 54.0 | 291.1 |
| 2017...................... | 356.7 | 4.9 | 8.3 | 55.2 | 288.2 |
| 2016...................... | 350.0 | 4.7 | 8.3 | 51.8 | 285.1 |
| 2015...................... | 355.5 | 4.7 | 8.1 | 52.3 | 290.4 |
| 2014...................... | 352.4 | 4.7 | 8.1 | 49.0 | 290.6 |
| 2013...................... | 339.7 | 4.8 | 5.4 | 53.2 | 276.4 |
| Percent change in rate | | | | | |
| 2021-2022............ | 3.4 | -5.9 | - | 14.4 | 2.2 |
| 2020-2021[a].......... | -9.1 | -3.8 | - | -17.1 | -8.1 |
| 2019-2020............ | -3.6 | 20.5 | -5.6 | -13.4 | -2.1 |
| 2018-2019............ | -3.3 | -4.3 | -12.2 | -3.5 | -3.0 |
| 2017-2018............ | 0.3 | -6.1 | -1.2 | -2.2 | 1.0 |
| 2016-2017............ | 1.9 | 4.3 | 0.0 | 6.6 | 1.1 |
| 2015-2016............ | -1.5 | 0.0 | 2.5 | -1.0 | -1.8 |
| 2014-2015............ | 0.9 | 0.0 | - | 6.7 | -0.1 |
| 2013-2014............ | 3.7 | -2.1 | - | -7.9 | 5.1 |
| 2013-2022[a]........ | -7.7 | 0.0 | - | -19.5 | -6.0 |

Note: Rates may not add to total because of rounding.
    Dash indicates that a percent change was not calculated due to data definition change.
[1] In 2014, the crime of "forcible rape" was changed to "rape". The definition was expanded to
    include both male and female victims and reflects the various forms of sexual penetration
    understood to be rape according to the FBI standards. The 2022 numbers consist of 1,299
    reported under this current definition (SRS) and 591 reported under the definition for IBR.
    Caution should be used when comparing rape data to prior years. For additional information,
    including the SRS and IBR rape numbers for prior years, see Understanding the Data (Page 3).
[2] Rates are based on annual population estimates provided by the Demographic Research Unit,
    California Department of Finance. Arrest rates are based on the total population at risk (10-69
    years of age).
[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be
    used when comparing these data with those from prior years. For additional information, see
    Understanding the Data. (Page 3)

Exhibit 44
DX0510

Table 27
**HOMICIDE ARRESTS, 2013-2022**
By Gender of Arrestee

| Year(s) | Total | | Male | | Female | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| 2022 | 1,485 | 100.0 | 1,323 | 89.1 | 162 | 10.9 |
| 2021[a] | 1,550 | 100.0 | 1,387 | 89.5 | 163 | 10.5 |
| 2020 | 1,597 | 100.0 | 1,403 | 87.9 | 194 | 12.1 |
| 2019 | 1,352 | 100.0 | 1,191 | 88.1 | 161 | 11.9 |
| 2018 | 1,416 | 100.0 | 1,249 | 88.2 | 167 | 11.8 |
| 2017 | 1,501 | 100.0 | 1,316 | 87.7 | 185 | 12.3 |
| 2016 | 1,440 | 100.0 | 1,282 | 89.0 | 158 | 11.0 |
| 2015 | 1,439 | 100.0 | 1,284 | 89.2 | 155 | 10.8 |
| 2014 | 1,427 | 100.0 | 1,260 | 88.3 | 167 | 11.7 |
| 2013 | 1,423 | 100.0 | 1,270 | 89.2 | 153 | 10.8 |

[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

Table 28
**HOMICIDE ARRESTS, 2013-2022**
By Race/Ethnic Group of Arrestee

| Year(s) | Total | | White | | Hispanic | | Black | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2022 | 1,485 | 100.0 | 273 | 18.4 | 688 | 46.3 | 447 | 30.1 | 77 | 5.2 |
| 2021[a] | 1,550 | 100.0 | 250 | 16.1 | 726 | 46.8 | 465 | 30.0 | 109 | 7.0 |
| 2020 | 1,597 | 100.0 | 279 | 17.5 | 754 | 47.2 | 462 | 28.9 | 102 | 6.4 |
| 2019 | 1,352 | 100.0 | 258 | 19.1 | 609 | 45.0 | 381 | 28.2 | 104 | 7.7 |
| 2018 | 1,416 | 100.0 | 282 | 19.9 | 672 | 47.5 | 370 | 26.1 | 92 | 6.5 |
| 2017 | 1,501 | 100.0 | 295 | 19.7 | 720 | 48.0 | 376 | 25.0 | 110 | 7.3 |
| 2016 | 1,440 | 100.0 | 298 | 20.7 | 617 | 42.8 | 401 | 27.8 | 124 | 8.6 |
| 2015 | 1,439 | 100.0 | 300 | 20.8 | 684 | 47.5 | 375 | 26.1 | 80 | 5.6 |
| 2014 | 1,427 | 100.0 | 287 | 20.1 | 657 | 46.0 | 388 | 27.2 | 95 | 6.7 |
| 2013 | 1,423 | 100.0 | 284 | 20.0 | 702 | 49.3 | 355 | 24.9 | 82 | 5.8 |

[a] The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

35

Exhibit 44
DX0511

Table 29
HOMICIDE ARRESTS, 2013-2022
By Age of Arrestee

| Year(s) | Total | | Under 18 | | 18-29 | | 30-39 | | 40 and over | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2022............ | 1,485 | 100.0 | 94 | 6.3 | 675 | 45.5 | 389 | 26.2 | 327 | 22.0 |
| 2021[a]......... | 1,550 | 100.0 | 101 | 6.5 | 777 | 50.1 | 340 | 21.9 | 332 | 21.4 |
| 2020............ | 1,597 | 100.0 | 79 | 4.9 | 820 | 51.3 | 368 | 23.0 | 330 | 20.7 |
| 2019............ | 1,352 | 100.0 | 68 | 5.0 | 646 | 47.8 | 318 | 23.5 | 320 | 23.7 |
| 2018............ | 1,416 | 100.0 | 84 | 5.9 | 748 | 52.8 | 302 | 21.3 | 282 | 19.9 |
| 2017............ | 1,501 | 100.0 | 98 | 6.5 | 749 | 49.9 | 366 | 24.4 | 288 | 19.2 |
| 2016............ | 1,440 | 100.0 | 91 | 6.3 | 745 | 51.7 | 325 | 22.6 | 279 | 19.4 |
| 2015............ | 1,439 | 100.0 | 88 | 6.1 | 768 | 53.4 | 313 | 21.8 | 270 | 18.8 |
| 2014............ | 1,427 | 100.0 | 95 | 6.7 | 807 | 56.6 | 278 | 19.5 | 247 | 17.3 |
| 2013............ | 1,423 | 100.0 | 105 | 7.4 | 759 | 53.3 | 283 | 19.9 | 276 | 19.4 |

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

Table 30
HOMICIDE ARRESTS, 2022
Race/Ethnic Group of Arrestee by Gender and Age of Arrestee

| Gender and age of arrestee | Total | | White | | Hispanic | | Black | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total.................... | 1,485 | 100.0 | 273 | 100.0 | 688 | 100.0 | 447 | 100.0 | 77 | 100.0 |
| Gender | | | | | | | | | | |
| Male................... | 1,323 | 89.1 | 231 | 84.6 | 613 | 89.1 | 411 | 91.9 | 68 | 88.3 |
| Female............... | 162 | 10.9 | 42 | 15.4 | 75 | 10.9 | 36 | 8.1 | 9 | 11.7 |
| Age | | | | | | | | | | |
| Under 18............ | 94 | 6.3 | 6 | 2.2 | 62 | 9.0 | 22 | 4.9 | 4 | 5.2 |
| 18-29................. | 675 | 45.5 | 88 | 32.2 | 357 | 51.9 | 201 | 45.0 | 29 | 37.7 |
| 30-39................. | 389 | 26.2 | 87 | 31.9 | 157 | 22.8 | 122 | 27.3 | 23 | 29.9 |
| 40 and over........ | 327 | 22.0 | 92 | 33.7 | 112 | 16.3 | 102 | 22.8 | 21 | 27.3 |

Note: The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

36

Exhibit 44
DX0512

Table 31
**HOMICIDE ARRESTS, 2022**
Race/Ethnic Group of Arrestee by Gender and Age of Arrestee

| Gender and age of arrestee | Total | | White | | Hispanic | | Black | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total......................... | 1,485 | 100.0 | 273 | 100.0 | 688 | 100.0 | 447 | 100.0 | 77 | 100.0 |
| Under 18............... | 94 | 6.3 | 6 | 2.2 | 62 | 9.0 | 22 | 4.9 | 4 | 5.2 |
| 18-19.................... | 132 | 8.9 | 7 | 2.6 | 82 | 11.9 | 40 | 8.9 | 3 | 3.9 |
| 20-24.................... | 286 | 19.3 | 37 | 13.6 | 154 | 22.4 | 82 | 18.3 | 13 | 16.9 |
| 25-29.................... | 257 | 17.3 | 44 | 16.1 | 121 | 17.6 | 79 | 17.7 | 13 | 16.9 |
| 30-34.................... | 242 | 16.3 | 50 | 18.3 | 104 | 15.1 | 75 | 16.8 | 13 | 16.9 |
| 35-39.................... | 147 | 9.9 | 37 | 13.6 | 53 | 7.7 | 47 | 10.5 | 10 | 13.0 |
| 40-44.................... | 116 | 7.8 | 30 | 11.0 | 43 | 6.3 | 36 | 8.1 | 7 | 9.1 |
| 45-49.................... | 68 | 4.6 | 15 | 5.5 | 37 | 5.4 | 13 | 2.9 | 3 | 3.9 |
| 50-54.................... | 54 | 3.6 | 17 | 6.2 | 13 | 1.9 | 20 | 4.5 | 4 | 5.2 |
| 55 and over.......... | 89 | 6.0 | 30 | 11.0 | 19 | 2.8 | 33 | 7.4 | 7 | 9.1 |
| Male..................... | 1,323 | 100.0 | 231 | 100.0 | 613 | 100.0 | 411 | 100.0 | 68 | 100.0 |
| Under 18............... | 92 | 7.0 | 6 | 2.6 | 60 | 9.8 | 22 | 5.4 | 4 | 5.9 |
| 18-19.................... | 122 | 9.2 | 6 | 2.6 | 75 | 12.2 | 38 | 9.2 | 3 | 4.4 |
| 20-24.................... | 259 | 19.6 | 31 | 13.4 | 142 | 23.2 | 75 | 18.2 | 11 | 16.2 |
| 25-29.................... | 221 | 16.7 | 36 | 15.6 | 102 | 16.6 | 73 | 17.8 | 10 | 14.7 |
| 30-34.................... | 214 | 16.2 | 46 | 19.9 | 91 | 14.8 | 65 | 15.8 | 12 | 17.6 |
| 35-39.................... | 127 | 9.6 | 31 | 13.4 | 44 | 7.2 | 43 | 10.5 | 9 | 13.2 |
| 40-44.................... | 99 | 7.5 | 25 | 10.8 | 36 | 5.9 | 33 | 8.0 | 5 | 7.4 |
| 45-49.................... | 61 | 4.6 | 11 | 4.8 | 35 | 5.7 | 12 | 2.9 | 3 | 4.4 |
| 50-54.................... | 46 | 3.5 | 14 | 6.1 | 11 | 1.8 | 17 | 4.1 | 4 | 5.9 |
| 55 and over.......... | 82 | 6.2 | 25 | 10.8 | 17 | 2.8 | 33 | 8.0 | 7 | 10.3 |
| Female.................. | 162 | 100.0 | 42 | 100.0 | 75 | 100.0 | 36 | 100.0 | 9 | 100.0 |
| Under 18............... | 2 | 1.2 | 0 | - | 2 | 2.7 | 0 | - | 0 | - |
| 18-19.................... | 10 | 6.2 | 1 | - | 7 | 9.3 | 2 | - | 0 | - |
| 20-24.................... | 27 | 16.7 | 6 | - | 12 | 16.0 | 7 | - | 2 | - |
| 25-29.................... | 36 | 22.2 | 8 | - | 19 | 25.3 | 6 | - | 3 | - |
| 30-34.................... | 28 | 17.3 | 4 | - | 13 | 17.3 | 10 | - | 1 | - |
| 35-39.................... | 20 | 12.3 | 6 | - | 9 | 12.0 | 4 | - | 1 | - |
| 40-44.................... | 17 | 10.5 | 5 | - | 7 | 9.3 | 3 | - | 2 | - |
| 45-49.................... | 7 | 4.3 | 4 | - | 2 | 2.7 | 1 | - | 0 | - |
| 50-54.................... | 8 | 4.9 | 3 | - | 2 | 2.7 | 3 | - | 0 | - |
| 55 and over.......... | 7 | 4.3 | 5 | - | 2 | 2.7 | 0 | - | 0 | - |

Notes:  Percentages may not add to 100.0 because of rounding.
     Dash indicates that percent distributions are not calculated when the base number is less than 50.
     The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these data with those from prior
     years. For additional information, see Understanding the Data. (Page 3)

37

Exhibit 44
DX0513

Table 32
**PERSONS SENTENCED TO DEATH,**
**1978-2022**

| Year(s) | Initial sentences |
|---|---|
| 2022……….. | 2 |
| 2021……….. | 3 |
| 2020……….. | 5 |
| 2019……….. | 3 |
| 2018……….. | 5 |
| 2017……….. | 11 |
| 2016……….. | 9 |
| 2015……….. | 14 |
| 2014……….. | 13 |
| 2013……….. | 24 |
| 2012……….. | 13 |
| 2011……….. | 10 |
| 2010……….. | 34 |
| 2009……….. | 29 |
| 2008……….. | 21 |
| 2007……….. | 17 |
| 2006……….. | 17 |
| 2005……….. | 22 |
| 2004……….. | 12 |
| 2003……….. | 22 |
| 2002……….. | 17 |
| 2001……….. | 25 |
| 2000……….. | 33 |
| 1999……….. | 42 |
| 1998……….. | 32 |
| 1997……….. | 40 |
| 1996……….. | 40 |
| 1995……….. | 38 |
| 1994……….. | 21 |
| 1993……….. | 34 |
| 1992……….. | 40 |
| 1991……….. | 26 |
| 1990……….. | 33 |
| 1989……….. | 33 |
| 1988……….. | 34 |
| 1987……….. | 25 |
| 1986……….. | 21 |
| 1985……….. | 16 |
| 1984……….. | 27 |
| 1983……….. | 35 |
| 1982……….. | 39 |
| 1981……….. | 39 |
| 1980……….. | 23 |
| 1979……….. | 20 |
| 1978……….. | 7 |

Note:   This table does not include persons who were
resentenced to death after their death sentence
was reversed on appeal.

Exhibit 44
DX0514

Table 33
**PERSONS SENTENCED TO DEATH, 2022**
Sentencing County by Gender, Race/Ethnic Group, and Age

| Sentencing county | Total | Gender | | Race/ethnic group | | | | Age at arrest | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Male | Female | White | Hispanic | Black | Other | Under 20 | 20-24 | 25-29 | 30-34 | 35-39 | 40 and over |
| Total.................. | 2 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| San Diego............ | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Tulare................. | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |

Note: This table does not include persons resentenced to death after their death sentence was reversed on appeal.

39

Exhibit 44
DX0515

Table 34
**HOMICIDE CRIMES AND PEACE OFFICERS FELONIOUSLY KILLED IN THE LINE OF DUTY, 2013-2022**
Number and Rate per 100,000 Respective Population

| Year(s) | California population | Homicides | | Sworn law enforcement personnel | Peace officers feloniously killed in the line of duty | |
|---|---|---|---|---|---|---|
| | | Number[1] | Rate[2] | | Number | Rate[3] |
| 2022............... | 39,028,571 | 2,206 | 5.7 | 76,130 | 4 | 5.3 |
| 2021[a]............. | 39,368,613 | 2,361 | 6.0 | 77,593 | 5 | 6.4 |
| 2020............... | 39,782,419 | 2,202 | 5.5 | 79,693 | 2 | 2.5 |
| 2019............... | 39,959,095 | 1,679 | 4.2 | 79,568 | 4 | 5.0 |
| 2018............... | 39,825,181 | 1,739 | 4.4 | 79,113 | 4 | 5.1 |
| 2017............... | 39,613,045 | 1,829 | 4.6 | 78,715 | 2 | 2.5 |
| 2016............... | 39,354,432 | 1,930 | 4.9 | 77,824 | 6 | 7.7 |
| 2015............... | 39,071,323 | 1,861 | 4.8 | 77,351 | 2 | 2.6 |
| 2014............... | 38,499,378 | 1,697 | 4.4 | 77,139 | 5 | 6.5 |
| 2013............... | 38,204,597 | 1,745 | 4.6 | 76,925 | 5 | 6.5 |

Note: California population estimates were provided by the Demographic Research Unit, California Department of Finance. Sworn law enforcement personnel numbers were obtained from the annual Full-Time Law Enforcement Personnel survey conducted by the Criminal Justice Statistics Center. (Personnel in state regulatory agencies are not included in this table.)

[1] Includes peace officers feloniously killed in the line of duty.

[2] Rate is based on California population.

[3] Rate is based on sworn law enforcement personnel.

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

40

Exhibit 44
DX0516

Table 35

**PEACE OFFICERS FELONIOUSLY KILLED IN THE LINE OF DUTY, 2022**

Gender and Race/Ethnic Group of Deceased by Location and Weapon

| Location and Weapon | Total | Gender | | Race/Ethnic Group | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Male | Female | White | Hispanic | Black | Other | |
| **Total** | | | | | | | | |
| Total............................. | 4 | 4 | 0 | 0 | 4 | 0 | 0 | |
| **Location** | | | | | | | | |
| Residence...................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Street, sidewalk............. | 2 | 2 | 0 | 0 | 2 | 0 | 0 | |
| Commercial establishment[1] | 2 | 2 | 0 | 0 | 2 | 0 | 0 | |
| All other[2]...................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Type of Weapon** | | | | | | | | |
| Firearm.......................... | 4 | 4 | 0 | 0 | 4 | 0 | 0 | |
| Handgun..................... | 4 | 4 | 0 | 0 | 4 | 0 | 0 | |
| Rifle........................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Shotgun...................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Other firearm.............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Firearm - unspecified... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Non-firearm.................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Knife[3] ........................ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Blunt Object[4] ............. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Personal weapon[5] ...... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| All Other[6] ................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |

Note: The inclusion of data collected under California's IBR format began in 2021.  Caution should be used when comparing these
data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] Hotel/Motel, Liquor store, Bar , Other business.

[2] Parking lot, Vehicle, Field/Park, or Other.

[3] Any instrument used to cut or stab.

[4] Club, etc.

[5] Hands, feet, etc.

[6] Rope, drugs, poison, arson, pellet gun, drowning, etc.

41

Exhibit 44
DX0517

Table 36
**JUSTIFIABLE HOMICIDES BY PEACE OFFICERS
OR PRIVATE CITIZENS, 2022**
By Gender, Race/Ethnic Group, and Age of Deceased

| Gender, race/ethnic group, and age of deceased | Total | | Peace officer justifiable | | Citizen justifiable | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | | | | | | |
| Total........................ | 87 | 100.0 | 64 | 100.0 | 23 | 100.0 |
| Gender | | | | | | |
| Male..................... | 82 | 94.3 | 61 | 95.3 | 21 | 91.3 |
| Female................. | 5 | 5.7 | 3 | 4.7 | 2 | 8.7 |
| Race/ethnic group | | | | | | |
| White.................... | 27 | 31.0 | 19 | 29.7 | 8 | 34.8 |
| Hispanic............... | 40 | 46.0 | 32 | 50.0 | 8 | 34.8 |
| Black.................... | 16 | 18.4 | 10 | 15.6 | 6 | 26.1 |
| Other.................... | 4 | 4.6 | 3 | 4.7 | 1 | 4.3 |
| Unknown............... | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Age | | | | | | |
| Under 18................ | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| 18-29.................... | 26 | 29.9 | 18 | 28.1 | 8 | 34.8 |
| 18-19................. | 3 | 3.4 | 1 | 1.6 | 2 | 8.7 |
| 20-24................. | 10 | 11.5 | 7 | 10.9 | 3 | 13.0 |
| 25-29................. | 13 | 14.9 | 10 | 15.6 | 3 | 13.0 |
| 30-39.................... | 25 | 28.7 | 17 | 26.6 | 8 | 34.8 |
| 30-34................. | 16 | 18.4 | 12 | 18.8 | 4 | 17.4 |
| 35-39................. | 9 | 10.3 | 5 | 7.8 | 4 | 17.4 |
| 40 and over.......... | 36 | 41.4 | 29 | 45.3 | 7 | 30.4 |
| 40-44................. | 17 | 19.5 | 16 | 25.0 | 1 | 4.3 |
| 45-49................. | 5 | 5.7 | 3 | 4.7 | 2 | 8.7 |
| 50-54................. | 8 | 9.2 | 5 | 7.8 | 3 | 13.0 |
| 55 and over....... | 6 | 6.9 | 5 | 7.8 | 1 | 4.3 |
| Unknown.............. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |

Note: The inclusion of data collected under California's IBR format began in 2021.  Caution should be
used when comparing these data with those from prior years. For additional information, see
Understanding the Data. (Page 3)

42

Exhibit 44
DX0518

Table 37
**JUSTIFIABLE HOMICIDES BY PEACE OFFICERS
OR PRIVATE CITIZENS, 2022**
By Location of Justifiable Homicide

| Location of justifiable homicide | Number | Percent |
|---|---|---|
| **Total** | | |
| Total...............…..…............. | 87 | |
| **Peace officer justifiable** | | |
| Total....…....….....…................. | 64 | 100.0 |
| Residence……...…................. | 16 | 25.0 |
| Felon's residence……........... | 12 | 18.8 |
| Other residence.................... | 4 | 6.3 |
| Residence (unspecified)....... | 0 | 0.0 |
| Street, sidewalk....................... | 34 | 53.1 |
| Commercial establishment....... | 4 | 6.3 |
| Hotel, motel........................ | 1 | 1.6 |
| Liquor store......................... | 0 | 0.0 |
| Bar..............…....…........... | 0 | 0.0 |
| Other business..................... | 3 | 4.7 |
| All other...............…............. | 10 | 15.6 |
| Parking lot............…............ | 5 | 7.8 |
| Vehicle................................ | 1 | 1.6 |
| Field, park...........…............ | 2 | 3.1 |
| School.................................. | 1 | 1.6 |
| Other...............…............... | 1 | 1.6 |
| **Citizen justifiable** | | |
| Total....…....….....…................. | 23 | 100.0 |
| Residence……...…................. | 13 | 56.5 |
| Felon's residence……........... | 2 | 8.7 |
| Civilian's residence….......... | 4 | 17.4 |
| Shared residence……........... | 1 | 4.3 |
| Other residence.................... | 1 | 4.3 |
| Residence (unspecified)....... | 5 | 21.7 |
| Street, sidewalk....................... | 1 | 4.3 |
| Commercial establishment....... | 4 | 17.4 |
| Hotel, motel........................ | 0 | 2.4 |
| Liquor store......................... | 0 | 0.0 |
| Bar..............…....…........... | 0 | 0.0 |
| Other business..................... | 4 | 17.4 |
| All other...............…............. | 5 | 21.7 |
| Parking lot............…............ | 3 | 13.0 |
| Vehicle................................ | 0 | 0.0 |
| Field, park...........…............ | 0 | 0.0 |
| School.................…............. | 0 | 0.0 |
| Other.................................... | 2 | 8.7 |

Note: The inclusion of data collected under California's IBR format began in
2021.  Caution should be used when comparing these data with those
from prior years. For additional information, see Understanding the
Data. (Page 3)

Exhibit 44
DX0519

Table 38
**JUSTIFIABLE HOMICIDES BY PEACE OFFICERS**
**OR PRIVATE CITIZENS, 2022**
By Contributing Circumstance

| Contributing circumstance | Number | Percent |
|---|---|---|
| Total | | |
| Total........................…….............................. | 87 | |
| Peace officer justifiable | | |
| Total........................…….............................. | 64 | 100.0 |
| Felon attacked peace officer..…….…............ | 43 | 67.2 |
| Felon killed during commission of crime....... | 11 | 17.2 |
| Felon resisted arrest..................................... | 1 | 1.6 |
| All other........................................................ | 9 | 14.1 |
| Felon attacked civilian................................ | 6 | 9.4 |
| Felon attempted flight................................. | 3 | 4.7 |
| Details not provided.................................... | 0 | 0.0 |
| Citizen justifiable | | |
| Total........................…….............................. | 23 | 100.0 |
| Felon attacked peace officer......................... | 0 | 0.0 |
| Felon killed during commission of crime....... | 9 | 39.1 |
| Felon attacked civilian.................................. | 9 | 39.1 |
| Felon attempted flight................................... | 1 | 4.3 |
| Details not provided..................................... | 4 | 17.4 |

Note: The inclusion of data collected under California's IBR format began in 2021.
　　Caution should be used when comparing these data with those from prior years.
　　For additional information, see Understanding the Data. (Page 3)

Table 39
**JUSTIFIABLE HOMICIDES BY PEACE OFFICERS**
**OR PRIVATE CITIZENS, 2022**
By Type of Weapon Used

| Type of weapon used | Total | | Peace officer justifiable | | Citizen justifiable | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total.............…........................…....... | 87 | 100.0 | 64 | 100.0 | 23 | 100.0 |
| Firearm.............…….................…........ | 81 | 93.1 | 64 | 100.0 | 17 | 73.9 |
| Handgun....................…….......... | 60 | 69.0 | 48 | 75.0 | 12 | 52.2 |
| Rifle..................…....................... | 7 | 8.0 | 5 | 7.8 | 2 | 8.7 |
| Shotgun.................…….............. | 1 | 1.1 | 0 | 0.0 | 1 | 4.3 |
| Other firearm.........…….............. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Firearm - unspecified.............. | 13 | 14.9 | 11 | 17.2 | 2 | 8.7 |
| Non-firearm.............…….............…..... | 6 | 6.9 | 0 | 0.0 | 6 | 26.1 |
| Knife[1]..........…….....................… | 5 | 5.7 | 0 | 0.0 | 5 | 21.7 |
| Blunt Object[2].........…….............. | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Personal weapon[3]..…............... | 0 | 0.0 | 0 | 0.0 | 0 | 0.0 |
| Other[4]........................…….......... | 1 | 1.1 | 0 | 0.0 | 1 | 4.3 |

Note:　The inclusion of data collected under California's IBR format began in 2021.　Caution should be used when
　　comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

[1] Any instrument used to cut or stab.
[2] Club, etc.
[3] Hands, feet, etc.
[4] Poison, arson, pellet gun, drowning, etc.

Exhibit 44
DX0520

Table 40
## HOMICIDE CRIMES, 1987–2022
Number and Rate per 100,000 Population

| Year(s) | Number | Rate[1] |
|---|---|---|
| 2022 | 2,206 | 5.7 |
| 2021[a] | 2,361 | 6.0 |
| 2020 | 2,202 | 5.5 |
| 2019 | 1,679 | 4.2 |
| 2018 | 1,739 | 4.4 |
| 2017 | 1,829 | 4.6 |
| 2016 | 1,930 | 4.9 |
| 2015 | 1,861 | 4.8 |
| 2014 | 1,697 | 4.4 |
| 2013 | 1,745 | 4.6 |
| 2012 | 1,878 | 5.0 |
| 2011 | 1,794 | 4.8 |
| 2010 | 1,809 | 4.8 |
| 2009 | 1,970 | 5.3 |
| 2008 | 2,143 | 5.8 |
| 2007 | 2,258 | 6.2 |
| 2006 | 2,483 | 6.9 |
| 2005 | 2,503 | 7.0 |
| 2004 | 2,394 | 6.7 |
| 2003 | 2,402 | 6.8 |
| 2002 | 2,392 | 6.8 |
| 2001 | 2,201 | 6.4 |
| 2000 | 2,074 | 6.1 |
| 1999 | 2,006 | 5.9 |
| 1998 | 2,170 | 6.5 |
| 1997 | 2,579 | 7.8 |
| 1996 | 2,910 | 9.0 |
| 1995 | 3,530 | 11.0 |
| 1994 | 3,699 | 11.5 |
| 1993 | 4,095 | 12.9 |
| 1992 | 3,920 | 12.5 |
| 1991 | 3,876 | 12.6 |
| 1990 | 3,562 | 12.1 |
| 1989 | 3,159 | 11.0 |
| 1988 | 2,947 | 10.5 |
| 1987 | 2,929 | 10.7 |

[1] Rates are based on annual population estimates provided by the Demographic Research Unit, CA Department of Finance.

[a] The inclusion of data collected under California's IBR format began in 2021. Caution should be used when comparing these data with those from prior years. For additional information, see Understanding the Data. (Page 3)

45

Exhibit 44
DX0521

Table 41
**POPULATION ESTIMATES, 1987-2022**

| Year(s) | Total population | Population at risk | | |
|---|---|---|---|---|
| | | Total[1] | Adult[2] | Juvenile[3] |
| 2022............... | 39,028,571 | 30,801,258 | 26,615,085 | 4,186,173 |
| 2021............... | 39,368,613 | 30,418,892 | 26,222,173 | 4,196,719 |
| 2020............... | 39,782,419 | 30,351,854 | 26,168,032 | 4,183,822 |
| 2019............... | 39,959,095 | 30,948,835 | 26,807,124 | 4,141,711 |
| 2018............... | 39,825,181 | 30,947,933 | 26,718,187 | 4,229,746 |
| 2017............... | 39,613,045 | 30,771,994 | 26,566,180 | 4,205,814 |
| 2016............... | 39,354,432 | 30,662,726 | 26,486,720 | 4,176,006 |
| 2015............... | 39,071,323 | 30,426,258 | 26,369,040 | 4,057,218 |
| 2014............... | 38,499,378 | 30,190,364 | 26,129,967 | 4,060,397 |
| 2013............... | 38,204,597 | 29,923,597 | 25,825,829 | 4,097,768 |
| 2012............... | 37,826,160 | 29,735,335 | 25,593,235 | 4,142,100 |
| 2011............... | 37,578,616 | 29,556,094 | 25,352,813 | 4,203,281 |
| 2010............... | 37,318,481 | 29,432,329 | 25,166,828 | 4,265,501 |
| 2009............... | 37,077,204 | 29,092,061 | 24,846,056 | 4,246,005 |
| 2008............... | 36,856,222 | 28,869,786 | 24,483,271 | 4,386,515 |
| 2007............... | 36,552,529 | 28,597,658 | 24,193,795 | 4,403,863 |
| 2006............... | 36,246,822 | 28,317,290 | 23,915,923 | 4,401,367 |
| 2005............... | 35,985,582 | 28,066,451 | 23,678,907 | 4,387,544 |
| 2004............... | 35,752,765 | 27,835,492 | 23,461,739 | 4,373,753 |
| 2003............... | 35,388,928 | 27,496,472 | 23,162,159 | 4,334,313 |
| 2002............... | 34,938,290 | 27,091,683 | 22,826,738 | 4,264,945 |
| 2001............... | 34,512,742 | 26,707,152 | 22,524,040 | 4,183,112 |
| 2000............... | 34,000,835 | 26,252,783 | 22,175,874 | 4,076,909 |
| 1999............... | 34,036,000 | 25,711,892 | 21,855,190 | 3,856,702 |
| 1998............... | 33,494,000 | 25,263,064 | 21,498,170 | 3,764,894 |
| 1997............... | 32,957,000 | 25,760,375 | 21,934,916 | 3,825,459 |
| 1996............... | 32,383,000 | 25,554,242 | 21,825,735 | 3,728,507 |
| 1995............... | 32,063,000 | 25,122,782 | 21,505,839 | 3,616,943 |
| 1994............... | 32,140,000 | 24,703,379 | 21,193,571 | 3,509,808 |
| 1993............... | 31,742,000 | 24,334,534 | 20,923,632 | 3,410,902 |
| 1992............... | 31,300,000 | 23,975,578 | 20,661,120 | 3,314,458 |
| 1991............... | 30,646,000 | 23,585,168 | 20,356,984 | 3,228,184 |
| 1990............... | 29,557,836 | 23,178,961 | 20,027,633 | 3,151,328 |
| 1989............... | 28,771,207 | 22,524,392 | 19,451,763 | 3,072,629 |
| 1988............... | 28,060,746 | 21,969,953 | 18,885,349 | 3,084,604 |
| 1987............... | 27,388,477 | 21,483,563 | 18,378,758 | 3,104,805 |

Source:  Population estimates were provided by the Demographic Research Unit, California
        Department of Finance.

[1] Total population at risk, 10-69 years of age.
[2] Adult population at risk, 18-69 years of age.
[3] Juvenile population at risk, 10-17 years of age.

Exhibit 44
DX0522

# Appendix
## Computational Formulas

**ARREST RATE** – An arrest rate describes the number of arrests made by law enforcement agencies per 100,000 total population or per 100,000 total population considered to be at risk for arrest (aged 10-69 years). The "at risk" population can be further distinguished by adults at risk (aged 18-69 years) and juveniles at risk (aged 10-17 years). Regardless of the population used, all rates are calculated in the same manner. An arrest rate is calculated by dividing the number of reported arrests by the respective population. The result is multiplied by 100,000. For example, in 2022 there were 1,485 homicide arrests. The total population was 39,028,571 and the total population at risk was 30,801,258. This equals a homicide arrest rate of 3.8 per 100,000 population and 4.9 per 100,000 population at risk.

$$\frac{1,485}{39,028,571} = 0.00003805 \times 100,000 = 3.8 \text{ per 100,000 total population}$$

$$\frac{1,485}{30,351,854} = 0.00004893 \times 100,000 = 4.9 \text{ per 100,000 total population at risk}$$

**CLEARANCE RATE** – A clearance rate is the percentage of crimes reported that have been cleared or solved for crime reporting purposes. It is calculated by dividing the number of reported clearances by the number of reported crimes. The result is multiplied by 100. For example, in 2022 there were 1,294 reported homicide clearances and 2,206 reported homicide crimes. This equals a homicide clearance rate of 58.7 percent.

$$\frac{1,294}{2,206} = 0.586582 \times 100 = 58.7 \text{ percent}$$

**CRIME RATE** – A crime rate describes the number of crimes reported to law enforcement agencies per 100,000 total population. A crime rate is calculated by dividing the number of reported crimes by the total population. The result is multiplied by 100,000. For example, in 2022 there were 2,206 homicides in California and the population was 39,028,571. This equals a homicide crime rate of 5.7 per 100,000 general population.

$$\frac{2,206}{39,028,571} = 0.000057 \times 100,000 = 5.7 \text{ per 100,000 population}$$

**PERCENT CHANGE** – A percent change describes a change in number or rate from one year to another. A percent change is calculated by subtracting base-year data from current-year data. The result is divided by base-year data and multiplied by 100. For example, in 2022 the homicide crime rate was 5.7. In 2013 the homicide crime rate was 4.6. The percent change in rate from 2013 to 2022 is a 23.9 percent increase.

$$\frac{5.7 - 4.6}{4.6} = 0.2391 \times 100 = 23.9 \text{ percent}$$

---

Note: When a series of rates are calculated using different populations, the rate calculated for the total will not be equal to the sum of the rates calculated for each subtotal. For example, the total arrest rate (calculated using the total at-risk population) will not equal the sum of the adult arrest rate (calculated using the adult at-risk population) and the juvenile arrest rate (calculated using the juvenile at-risk population).

Exhibit 44
DX0523

## Acknowledgments

The California Department of Justice is mandated by statute to submit an annual
*Homicide in California* report to the Legislature.  The department extends its appreciation to all
the law enforcement agencies that provided complete and timely data.  This report
would not have been possible without their cooperation.

---

California Department of Justice
California Justice Information Services Division
Justice Data & Investigative Services Bureau
Criminal Justice Statistics Center
P.O. Box 903427  •  Sacramento, CA  94203-4270
https://openjustice.doj.ca.gov

Exhibit 44
DX0524

# EXHIBIT 45

Exhibit 45
DX0525

OFFICE OF THE ATTORNEY GENERAL

ROB BONTA

# Firearms Used in the Commission of Crimes

# 2022

*This report is available online at*

http://oag.ca.gov/publications#crime



Division of Law Enforcement

Bureau of Forensic Services

Exhibit 45
DX0526

## Executive Summary

### Reporting Requirement

California Penal Code section 34200 requires the Department of Justice (DOJ) to provide the Legislature, on or before April 15 of each year, a written report on the specific types of firearms used in the commission of crimes based upon information obtained from state and local crime laboratories. Although DOJ is required to produce this annual report based on data obtained from state and local crime laboratories, there is no corresponding mandate for local crime laboratories to track or provide this data.

The report must include all of the following information regarding crimes in which firearms were used:

(a) A description of the relative occurrence of firearms most frequently used in the commission of violent[1] crimes, distinguishing whether the firearms used were handguns, rifles, shotguns, assault weapons, or other related types of weapons.

(b) A description of specific types of firearms that are used in homicides or street gang and drug trafficking crimes.

(c) The frequency with which stolen firearms were used in the commission of the crimes.

(d) The frequency with which fully automatic firearms were used in the commission of the crimes.

(e) Any trends of importance including those involving specialized ammunition or firearms modifications, such as conversion to a fully automatic weapon, removal of serial number, shortening of barrel, or use of a suppressor.

Cal. Penal Code section 34200.

### Scope of Report

The 2022 Firearms Used in the Commission of Crimes report includes data from the Department's 10 regional crime laboratories[2], which principally serve the rural areas of California. As has been the case in previous years, the Department did not receive data from any of the local public crime laboratories that serve California's major cities and urban areas.

Therefore, caution should be exercised when using or interpreting the data contained in this report, as it may not be representative of gun use trends within urban areas or within California as a whole.

---

[1] Violent felonies are defined in Penal Code section 667.5.
[2] A map of the Department's regional laboratories and the counties served by each is available at https://oag.ca.gov/bfs/services.

1

Exhibit 45
DX0527

## Report

The 10 regional crime laboratories operated by the Department's Bureau of Forensic Services (BFS) completed 540 requests for firearms analysis during the 2022 calendar year. Sixty-seven firearms qualified for inclusion in this report. A firearm is considered to be "qualified" for this report if forensic testing has positively tied the firearm to at least one of the violent crimes defined by Penal Code section 667.5. Small inconsistencies in data totals are attributable to the fact that the categories in this report, other than firearm types and calibers, are not mutually exclusive; as a result, individual firearms may fit, and be counted within, multiple categories. For example, if a laboratory examined a stolen shotgun with a shortened barrel used in a street gang homicide, that weapon would be counted in each of those categories.

### Types of Firearms and Calibers of Ammunition Used in Crimes

The 67 qualifying firearms examined[3] by BFS laboratories during this reporting period included 63 handguns (94.0%), three rifles (4.5%), and one shotgun (1.5%) (Figure 1). Of the 67 qualifying firearms, two handguns and one rifle were California assault weapons[4]; another two handguns were machine guns.



Figure 1. Types of firearms used in crimes.

The most commonly-encountered calibers were 9 mm Luger (S&W), followed by the 40 Smith & Wesson and 45 Automatic Colt.

---

[3] This figure may not include all qualifying firearms received during the reporting period, as qualification is determined upon examination. It may include qualifying firearms received during the previous reporting period.
[4] As defined in Penal Code sections 30510 and 30515.

Exhibit 45
DX0528

Pistol (ACP) (Figure 2).



*Figure 2. Calibers of ammunition used in crimes (displayed by caliber size).*

### Firearms Used in Crimes of Violence Other than Homicides

Thirty-six (53.7%) of the 67 qualifying firearms examined by BFS laboratories were submitted in cases involving crimes of violence other than homicides. These 36 firearms included 33 handguns (91.7%) and three rifles (8.3%) (Figure 3). Two of the handguns were fully-automatic machine guns and one of the rifles was a California assault weapon. The firearms examined in this category did not include any shotguns.



*Figure 3. Firearms used in crimes of violence other than homicides.*



*Figure 4. Firearms used in homicides.*

### Firearms Used in Homicides

Of the 67 qualifying firearms examined during this reporting period, 31 (46.3%) were submitted to the Department's laboratories in homicide cases. These 31 firearms included 30 handguns (96.8%) and one shotgun (less than 1%) (Figure 4). Two of the handguns were California assault weapons. No rifles or fully-automatic firearms were linked to homicides.

Exhibit 45
DX0529

**Firearms Without Serial Numbers**

Seventeen of the 67 firearms (25.4%) were submitted without serial numbers (Figure 5). Fifteen of these were kit firearms that are typically marketed in an unfinished state, 80 percent complete, and require additional machining and parts to produce a functional firearm. Eight of the 15 kit-type firearms were used in homicides. One of the eight was also a California assault weapon.



*Figure 5. No serial numbers present.*

Two of the firearms submitted without serial numbers were traditionally-manufactured firearms with serial numbers obliterated or removed. One of the two firearms examined with an obliterated serial number was a machine gun. Both firearms were used in crimes of violence other than homicides.

**Weapons Examined by Year**

The number of California assault weapons examined by BFS laboratories was the same in both 2022 and 2021. There has been very little change overall in the number of assault weapons examined in the last 20 years; as a category, their numbers have been nominal relative to the total number of firearms examined (Figure 6).

For information on California's assault weapons laws and regulations, please visit the Department's website at https://www.oag.ca.gov/ogvp/fed-assault-weapons-ban.

4

Exhibit 45
DX0530



*Figure 6. Weapons examined by year.*

Exhibit 45
DX0531

**Trends in 2022 Data**

*California Assault Weapons*

Three of the 67 qualifying firearms examined in 2022 were identified as California Assault Weapons (as defined in Pen. Code §§ 30510 and 30515), (see Figure 6 on page 4).

*Drug Trafficking Crimes*

None of the qualifying firearms were identified as being used in drug trafficking crimes.

*Fully-Automatic Firearms (Machine Guns, Submachine Guns or Fully-Automatic Conversions)*

Two of the qualifying firearms examined this year exhibited fully-automatic firing.

*Officer-Involved Shooting Incidents*

Four qualifying firearms were identified as being related to officer-involved shooting incidents. Three were handguns and one was a rifle.

*Short-Barreled Shotguns or Rifles*

None of the examined qualifying firearms were classified as short-barreled or short overall-length shotguns or rifles.

*Stolen Firearms*

None of the examined qualifying firearms were confirmed to have been reported stolen. However, information related to a firearm's ownership status is not often provided to the laboratory conducting the forensic examination.

*Street Gang Crimes*

One of the qualifying firearms was identified as being related to street gang crimes.

*Suppressors*

No firearms equipped with a suppressor (silencer) were examined in 2022.

*Unusual Ammunition*

There were no reported examinations of armor-piercing, exploding, Glazer-type, incendiary, frangible,[5] or tracer ammunition.

---

[5] A frangible bullet is designed to fragment or disintegrate upon impact with an object harder than itself, in order to minimize the potential for damage from ricochet or penetration.

Exhibit 45
DX0532

# EXHIBIT 46

Exhibit 46
DX0533

OFFICE OF THE ATTORNEY GENERAL

ROB BONTA

# Firearms Used in the Commission of Crimes

# 2021

*This report is available online at*

http://oag.ca.gov/publications#crime



Division of Law Enforcement

Bureau of Forensic Services

Exhibit 46
DX0534

# Executive Summary

## Reporting Requirement

California Penal Code section 34200 requires the Department of Justice (Department) to provide the Legislature, on or before April 15 of each year, a written report on the specific types of firearms used in the commission of crimes based upon information obtained from state and local crime laboratories. Although the Department is required to produce this annual report based on data obtained from state and local crime laboratories, there is no corresponding mandate for local crime laboratories to track or provide this data.

The report must include all of the following information regarding crimes in which firearms were used:

(a) A description of the relative occurrence of firearms most frequently used in the commission of violent[1] crimes, distinguishing whether the firearms used were handguns, rifles, shotguns, assault weapons, or other related types of weapons.

(b) A description of specific types of firearms that are used in homicides or street gang and drug trafficking crimes.

(c) The frequency with which stolen firearms were used in the commission of the crimes.

(d) The frequency with which fully automatic firearms were used in the commission of the crimes.

(e) Any trends of importance such as those involving specialized ammunition or firearms modifications, such as conversion to a fully automatic weapon, removal of serial number, shortening of barrel, or use of a suppressor.

## Scope of Report

As it has been in previous years, the 2021 Firearms Used in the Commission of Crimes report is again limited in scope because it only includes data from the Department's ten regional crime laboratories[2], which principally serve the rural areas of California. It does not include data from the crime laboratories that serve California's major cities and urban areas, as these laboratories are not statutorily mandated to provide data to the Department for this report. In response to the Department's request for data for this year's report, one laboratory provided data that did not qualify for inclusion. No other laboratories provided data in response to the Department's request. The absence of data from the local laboratories that serve population-dense regions means this report may not reflect gun use trends in urban areas or across California as a whole.

---

[1] Violent felonies are defined in Penal Code section 667.5
[2] A map of the Department's regional laboratories and the counties served by each is available at https://oag.ca.gov/bfs/services.

1

Exhibit 46
DX0535

## Report

The ten regional crime laboratories operated by the Department's Bureau of Forensic Services (BFS) completed examinations of 500 firearms during the 2021 calendar year, 113 of which qualified for inclusion in this report. A firearm is considered to be qualified for this report if forensic testing has positively tied it to at least one of the violent crimes defined by Penal Code section 667.5. Small inconsistencies in data totals are attributable to the fact that the categories in this report, other than firearm types and calibers, are not mutually exclusive; as a result, individual firearms may fit and be counted within multiple categories. For example, if a laboratory examined a stolen shotgun with a shortened barrel that was used in a street gang homicide, that weapon would be counted in each of those categories.

### Types of Firearms and Calibers of Ammunition Used in Crimes

The 113 qualifying firearms examined by BFS laboratories during this reporting period included 102 handguns (90.3%), 10 rifles (8.8%) and one machine gun (0.9%), (Figure 1). The machine gun and two of the rifles were California assault weapons.[3] None were classified as shotguns.

The most commonly-encountered calibers were 9 mm Luger and 40 Smith & Wesson (S&W), followed by 45 Automatic Colt Pistol (ACP) (Figure 2). No caliber was recorded for three of the 113 qualifying firearms.



*Figure 1. Types of firearms used in crimes.*



*Figure 2. Calibers of ammunition used in crimes (displayed by caliber size, from smallest to largest, L-R).*

---

[3] As defined in Penal Code sections 30510 and 30515

Exhibit 46
DX0536
2

## Firearms Used in Crimes of Violence Other than Homicides

Fifty-six (49.6%) of the 113 qualifying firearms examined by BFS laboratories were submitted in cases involving crimes of violence other than homicides. These 56 firearms included 49 handguns (87.5%), six rifles (10.7%) and one machine gun (1.8%) (Figure 3). The machine gun and one of the rifles were California assault weapons. The firearms examined in this category did not include any shotguns.



*Figure 3. Firearms used in crimes of violence other than homicides.*



*Figure 4. Firearms used in homicides.*

## Firearms Used in Homicides

Of the 113 qualifying firearms examined during this reporting period, 43 (38.0%) were submitted to the Department's laboratories in homicide cases. These 43 firearms included 39 handguns (90.7%) and four rifles (9.3%), one of which was a California assault weapon (Figure 4). No shotguns or fully-automatic firearms were linked to homicides.

## Street Gang Crimes

None of the qualifying firearms were identified as being related to street gang crimes.

## Drug Trafficking Crimes

Two handguns and one rifle were identified as being used in drug trafficking crimes.

Exhibit 46
DX0537

## Weapons Examined by Year

The number of California assault weapons examined by BFS laboratories increased from 2020 to 2021. However, there has been very little change overall in the number of assault weapons examined in the last 20 years; as a category, their numbers have been nominal relative to the total number of firearms examined.

California's original list of assault weapons, established in 1989, is found in Penal Code section 30510. The Department later promulgated regulations to add a list of named assault weapons to the California Code of Regulations (11 CCR 5499). California's definition of an assault weapon was expanded again in 1999, this time to include weapons exhibiting certain characteristics found in Penal Code section 30515.

While all three lists were in place by 2001, section 30515 was amended in 2016 and again in 2020. As a result of the 2016 amendment, additional firearms became classified as California assault weapons. The reported number of assault weapons examined in years following that amendment may include firearms that would not have been counted previously (Figure 5). As of the publication of this report, the Department has received assault weapon registration applications pursuant to the 2020 amendment.



*Figure 5. Weapons examined by year.*

Exhibit 46
DX0538

## Trends and Special Cases

### *California Assault Weapons*

Three of the 113 qualifying firearms examined in 2021 were identified as California Assault Weapons (as defined in Pen. Code §§ 30510 and 30515), (see Figure 5 on page 4).

### *Full-Auto Firearms (Machine Guns, Submachine Guns or Full-Auto Conversions)*

One qualifying firearm exhibiting full-auto fire was examined this year.

### *Officer-Involved Shooting Incidents*

Four firearms were identified as being related to officer-involved shooting incidents. All were handguns.

### *Serial Numbers Removed*

Three of the 113 firearms were submitted with the serial numbers removed.

### *Short-Barreled Shotguns or Rifles*

None of the examined firearms were classified as short-barreled or short overall-length shotguns or rifles.

### *Stolen Firearms*

One examined firearm was confirmed to have been reported stolen. However, information related to a firearm's ownership status is not often provided to the laboratory conducting the forensic examination.

### *Suppressors*

No firearms equipped with a suppressor (silencer) were examined in 2021.

### *Unusual Ammunition*

There were no reported examinations of armor-piercing, exploding, Glazer-type, incendiary, frangible[4] or tracer ammunition.

---

[4] A frangible bullet is designed to fragment or disintegrate upon impact with an object harder than itself, in order to minimize the potential for damage from ricochet or penetration.

Exhibit 46
DX0539

# EXHIBIT 47

Exhibit 47
DX0540

OFFICE OF THE ATTORNEY GENERAL

XAVIER BECERRA

# 2020

# Firearms

## Used in the Commission of Crimes

*This report is available online at*

http://oag.ca.gov/publications#crime



Division of Law Enforcement

Bureau of Forensic Services

Exhibit 47
DX0541

# Executive Summary

## Reporting Requirement

California Penal Code section 34200[1] requires the Department of Justice (Department) to provide the Legislature, on or before April 15 of each year, a written report on the specific types of firearms used in the commission of crimes based upon information obtained from state and local crime laboratories. Although the Department is required to produce this annual report based on data obtained from state and local crime laboratories, there is no corresponding mandate for local crime laboratories to track or provide this data.

The report `must` include all of the following information regarding crimes in which firearms were used:

(a) A description of the relative occurrence of firearms most frequently used in the commission of violent[2] crimes, distinguishing whether the firearms used were handguns, rifles, shotguns, assault weapons, or other related types of weapons.

(b) A description of specific types of firearms that are used in homicides or street gang and drug trafficking crimes.

(c) The frequency with which stolen firearms were used in the commission of the crimes.

(d) The frequency with which fully automatic firearms were used in the commission of the crimes.

(e) Any trends of importance such as those involving specialized ammunition or firearms modifications, such as conversion to a fully automatic weapon, removal of serial number, shortening of barrel, or use of a suppressor.

## Scope

The 2020 Firearms Used in the Commission of Crimes report is limited in scope because it only includes data from the Department's ten regional crime laboratories, which principally serve the rural areas of California. It does not include data from the crime laboratories that serve California's major cities and urban areas, as these laboratories are not statutorily mandated to provide data to the Department for this report. The absence of data from the local laboratories that serve population-dense regions means this report may not represent gun use trends in urban areas or across California as a whole.

---

[1] Previously California Penal Code section 12039
[2] Violent felonies are defined in Penal Code section 667.5

Exhibit 47
DX0542

1

# Report

The ten regional crime laboratories operated by the Department's Bureau of Forensic Services (BFS) completed examinations of 429 firearms during the 2020 calendar year, 82 of which qualified for inclusion in this report. A firearm is considered to be qualified for this report if forensic testing has positively tied it to at least one of the violent crimes defined by Penal Code section 667.5. Small inconsistencies in data totals are attributable to the fact that the categories in this report, other than firearm types and calibers, are not mutually exclusive; as a result, individual firearms may fit and be counted within multiple categories. For example, if a laboratory examined a stolen shotgun with a shortened barrel that was used in a homicide, that weapon would be counted in each of those categories.

## Types of Firearms and Calibers of Ammunition Used in Crimes

The 82 qualifying firearms examined by BFS laboratories during this reporting period included 75 handguns (91.5%), four rifles (4.9%) and three shotguns (3.7% percent), (Figure 1). None of the qualifying firearms were machine guns or assault weapons,[3] nor were any classified as short-barreled shotguns or rifles.

The most commonly-encountered calibers were 9 mm Luger and 40 Smith & Wesson (S&W), followed by 45 Automatic Colt Pistol (ACP) (Figure 2).



*Figure 1. Types of firearms used in crimes.*



*Figure 2. Calibers of ammunition used in crimes.*

---

[3] As defined in Penal Code sections 30510 and 30515

Exhibit 47
DX0543

## Firearms Used in Crimes of Violence Other than Homicides

Forty-eight (58.5%) of the 82 qualifying firearms examined by BFS laboratories were submitted in cases involving crimes of violence other than homicides. These 48 firearms included 45 handguns (93.8%) and three rifles (6.3%) ( Figure 3). The firearms examined in this category did not include any shotguns or machine guns.



*Figure 3. Firearms used in crimes of violence other than homicides.*



*Figure 4. Firearms used in homicides.*

## Firearms Used in Homicides

Of the 82 qualifying firearms examined during this reporting period, 34 (41.5%) were submitted to the Department's laboratories in homicide cases. These 34 firearms included 30 handguns (88.2%), one rifle (2.9%), and three shotguns (8.8%) (Figure 4). No fully-automatic firearms were linked to homicides.

## Street Gang Crimes

None of the qualifying firearms were identified as being related to street gang crimes.

## Drug Trafficking Crimes

Two handguns were identified as being used in drug trafficking crimes.

Exhibit 47
DX0544

## Weapons Examined by Year

The number of California assault weapons examined by BFS laboratories decreased from 2019 to 2020. However, there has been very little change in the number of assault weapons examined over the last 19 years; as a category, their numbers have been nominal relative to the total number of firearms examined.

California's original list of assault weapons, established in 1989, is found in Penal Code section 30510. The Department later promulgated regulations to add a list of named assault weapons to the California Code of Regulations (11 CCR 5499). California's definition of an assault weapon was expanded again in 1999, this time to include weapons exhibiting certain characteristics found in Penal Code section 30515.

While all three lists were in place by 2001, section 30515 was amended in 2016 and again in 2020. As a result of the 2016 amendment, additional firearms became classified as California assault weapons. The reported number of assault weapons examined in years following that amendment may include firearms that would not have been counted previously (Figure 5). As of the publication of this report, additional firearms have not yet been registered as assault weapons due to the 2020 amendment.



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Weapons Examined | 218 | 106 | 82 | 116 | 119 | 146 | 173 | 142 | 147 | 175 | 119 | 134 | 105 | 121 | 96 | 89 | 107 | 54 | 93 | 82 |
| California Assault Weapons | 8 | 6 | 1 | 4 | 6 | 8 | 0 | 8 | 8 | 9 | 5 | 6 | 2 | 4 | 6 | 4 | 0 | 6 | 3 | 0 |

■ Total Weapons Examined   ●‒‒● California Assault Weapons

*Figure 5. Weapons examined by year.*

Exhibit 47
DX0545

4

## Trends and Special Cases

### California Assault Weapons

None of the qualifying firearms examined in 2020 were identified as California Assault Weapons
(as defined in Pen. Code §§ 30510 and 30515), (see Figure 5 on page 4).

### Full-Auto Firearms (Machine Guns, Submachine Guns or Full-Auto Conversions)

No qualifying firearms exhibiting full-auto fire were examined this year.

### Officer-Involved Shooting Incidents

Three firearms were identified as being related to officer-involved shooting incidents: one
handgun, one rifle, and one shotgun.

### Serial Numbers Removed

Two of the 82 firearms were submitted with the serial numbers removed.

### Short-Barreled Shotguns or Rifles

None of the examined firearms were classified as short-barreled or short overall-length
shotguns or rifles.

### Stolen Firearms

One examined firearm was confirmed to have been reported stolen. However, information
related to a firearm's ownership status is not often provided to the laboratory conducting the
forensic examination.

### Suppressors

Three firearms equipped with a suppressor (silencer) were examined in 2020.

### Unusual Ammunition

There was one reported examination of frangible[4] ammunition this year. There were no
reported examinations of armor piercing, exploding, Glazer-type, incendiary or tracer
ammunition.

---

[4] A frangible bullet is designed to fragment or disintegrate upon impact with an object harder than itself, in order
to minimize the potential for damage from ricochet or penetration.

Exhibit 47
DX0546

# EXHIBIT 48

Exhibit 48
DX0547

OFFICE OF THE ATTORNEY GENERAL

XAVIER BECERRA

# 2019

# Firearms

## Used in the Commission of Crimes

*This report is available online at*

http://oag.ca.gov/publications#crime



Division of Law Enforcement

Bureau of Forensic Services

Exhibit 48
DX0548

# Executive Summary

## Reporting Requirement

California Penal Code section 34200[1] requires the Department of Justice (Department) to provide the Legislature on or before April 15 of each year a written report on the specific types of firearms used in the commission of crimes based upon information obtained from state and local crime laboratories. Although the Department is required to produce this annual report based on data obtained from state and local crime laboratories, there is no corresponding mandate for local crime laboratories to track or provide this data.

The report must include all of the following information regarding crimes in which firearms were used:

(a) A description of the relative occurrence of firearms most frequently used in the commission of violent[2] crimes, distinguishing whether the firearms used were handguns, rifles, shotguns, assault weapons, or other related types of weapons.

(b) A description of specific types of firearms that are used in homicides or street gang and drug trafficking crimes.

(c) The frequency with which stolen firearms were used in the commission of the crimes.

(d) The frequency with which fully automatic firearms were used in the commission of the crimes.

(e) Any trends of importance such as those involving specialized ammunition or firearms modifications, such as conversion to a fully automatic weapon, removal of serial number, shortening of barrel, or use of a suppressor.

## Scope

The 2019 Firearms Used in the Commission of Crimes report is limited in scope because it only includes data from the Department's ten regional crime laboratories, which principally serve the rural areas of California. It does not include data from the crime laboratories that serve California's major cities and urban areas, as these laboratories are not statutorily mandated to provide data to the Department for this report. The absence of data from the local laboratories that serve population-dense regions means this report may not represent gun use trends in urban areas or across California as a whole.

---

[1] Previously California Penal Code section 12039
[2] Violent felonies are defined in Penal Code section 667.5

Exhibit 48
DX0549

## Report

The ten regional crime laboratories operated by the Department's Bureau of Forensic Services (BFS) completed examinations of 506 firearms during the 2019 calendar year, 93 of which qualified for inclusion in this report. A firearm is considered to be qualified for this report if forensic testing has positively tied it to at least one of the violent crimes defined by Penal Code section 667.5. Small inconsistencies in data totals are attributable to the fact that the categories in this report, other than firearm types and calibers, are not mutually exclusive; as a result, individual firearms may fit and be counted within multiple categories. For example, if a laboratory examined a stolen shotgun with a shortened barrel that was used in a street gang-related homicide, that weapon would be counted in each of those categories.

### Types of Firearms and Calibers of Ammunition Used in Crimes (Figures 1 and 2)

The 93 qualifying firearms examined by DOJ during this reporting period included 82 handguns (88.2 percent), seven rifles (7.5 percent), three shotguns (3.2 percent), and one machine gun (1.1 percent, see Figure 1). Three firearms were assault weapons[3] and two firearms were classified as short-barreled shotguns or rifles.

The most commonly encountered calibers were 9 mm Luger and 40 Smith & Wesson (S&W), followed by 45 Auto (see Figure 2).



*Figure 1. Types of firearms used in crimes.*



---

[3] As defined in Penal Code sections 30510 and 30515

Exhibit 48
DX0550

*Figure 2. Calibers of ammunition used in crimes.*

## Firearms Used in Crimes of Violence Other Than Homicide (Figure 3)

Fourty-four of the firearms examined by BFS laboratories were submitted in cases involving crimes of violence other than homicide. These 44 firearms included 38 handguns (86.4 percent), four rifles (9.1 percent), one shotgun (2.3 percent), and one machine gun (2.3 percent, see Figure 3).



*Figure 3. Firearms used in crimes of violence other than homicide.*



## Firearms Used in Homicides (Figure 4)

The 30 firearms that were submitted to DOJ laboratories in homicide cases included twenty-seven handguns (90 percent), one rifle (3.3 percent), and two shotguns (6.7 percent, see Figure 4). There were no fully automatic firearms linked to homicides. These figures are graphically depicted in Figure 4.

*Figure 4. Firearms used in homicides.*

## Street Gang Crimes

Two handguns and one shotgun were identified as being related to street gang crimes.

## Drug Trafficking Crimes

Five handguns were identified as being used in drug trafficking crimes.

Exhibit 48
DX0551

## Weapons Examined by Year (Figure 5)

The number of California assault weapons examined by BFS laboratories decreased by 50% in 2019 when compared to 2018. However, there has been very little change in the number of assault weapons examined over the last 18 years; as a category, their numbers have been nominal relative to the total number of firearms examined.

The reported number of California Assault Weapons is based on a defined list for each year. That list has been legislatively expanded a number of times since 1998; as a result, the years following each increase may include firearms that would not have been counted previously.



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Weapons Examined | 218 | 106 | 82 | 116 | 119 | 146 | 173 | 142 | 147 | 175 | 119 | 134 | 105 | 121 | 96 | 89 | 107 | 54 | 93 |
| California Assault Weapons | 8 | 6 | 1 | 4 | 6 | 8 | 0 | 8 | 8 | 9 | 5 | 6 | 2 | 4 | 6 | 4 | 0 | 6 | 3 |

Legend: ▬ Total Weapons Examined   ●▬●▬● California Assault Weapons

*Figure 5. Weapons examined by year.*

Exhibit 48
DX0552

## Trends and Special Cases

### *California Assault Weapons*

Three of the 93 firearms examined in 2019 were identified as California Assault Weapons (as defined in Pen. Code §§ 30510 and 30515) (see Figure 5).

### *Stolen Firearms*

None of the firearms examined were confirmed to have been reported stolen. However, information related to a firearm's ownership status is often not provided to the laboratory conducting the forensic examination.

### *Serial Numbers Removed*

Four of the 93 firearms were submitted with the serial number removed.

### *Full-Auto Firearms (Machine Guns, Submachine Guns or Full-Auto Conversions)*

One qualifying firearm exhibiting full-auto fire was examined this year.

### *Short Barreled Shotguns or Rifles*

Two of the examined firearms were classified as a short-barreled or short overall-length shotgun or rifle.

### *Officer-Involved Shooting Incidents*

The thirteen firearms identified as being related to officer-involved shooting incidents were ten handguns, two rifles, and one shotgun.

### *Suppressors*

No firearms equipped with a suppressor (silencer) were examined this year.

### *Unusual Ammunition*

There were no reported examinations of armor piercing, exploding, frangible, Glazer-type, incendiary or tracer ammunition.

5

Exhibit 48
DX0553

# EXHIBIT 49

Exhibit 49
DX0554

OFFICE OF THE ATTORNEY GENERAL  -  CALIFORNIA DEPARTMENT OF JUSTICE

# 2018

# Firearms

## Used in the Commission of Crimes

**This report is available online at**

**http://oag.ca.gov/publications#crime**

**Division of Law Enforcement**

**Bureau of Forensic Services**

**(916) 210-7460**



**XAVIER BECERRA**

**ATTORNEY GENERAL**

Exhibit 49

DX0555

# Table of Contents

Legislative Mandate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Scope  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Firearm Categories Used in Crimes. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Crimes of Violence Other than Homicide  . . . . . . . . . . . . . . . . . . . . . . 3

Homicides . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Street Gang Crimes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Drug Trafficking Crimes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

California Assault Weapons by Year  . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Trends and Special Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Exhibit 49
DX0556

# Legislative Mandate

California Penal Code section 34200[1] requires the Department of Justice (DOJ) to provide the Legislature on or before April 15 of each year a written report on the specific types of firearms used in the commission of crimes based upon information obtained from state and local crime laboratories. Although DOJ is required to produce this annual report based on data obtained from state and local crime laboratories, there is no corresponding mandate for local crime laboratories to provide their data to the DOJ.  The report must include all of the following information regarding crimes in which firearms were used:

    (a)  A description of the relative occurrence of firearms most frequently used in the commission of violent crimes, distinguishing whether the firearms used were handguns, rifles, shotguns, assault weapons, or other related types of weapons.

    (b) A description of specific types of firearms that are used in homicides or street gang and drug trafficking crimes.

    (c) The frequency with which stolen firearms were used in the commission of the crimes.

    (d) The frequency with which fully automatic firearms were used in the commission of the crimes.

    (e) Any trends of importance such as those involving specialized ammunition or firearms modifications, such as conversion to a fully automatic weapon, removal of serial number, shortening of barrel, or use of a suppressor.

---

[1] Previously California Penal Code section 12039

1

Exhibit 49
DX0557

# Scope

The 2018 Firearms Used in the Commission of Crimes report is limited in scope because it only includes data from DOJ crime laboratories.  Data was collected from all ten of DOJ's regional laboratories.  Because DOJ's regional laboratories principally serve the rural areas of California, the data in this report may not represent gun use trends in urban areas or across California as a whole.  This report does not include data from the crime laboratories that serve California's major cities and urban areas as these laboratories are not statutorily mandated to provide data to the DOJ for purposes of this report.

During 2018, data collected from the DOJ's Bureau of Forensic Services (BFS) crime laboratories revealed that 54 of the 635 completed examinations involved firearms that qualified for inclusion in this report.  Small inconsistencies in data totals are reflective of the fact that data may fit multiple categories.

# Firearm Categories Used in Crimes

The 54 qualifying firearms examined by DOJ during the reporting period included 37 handguns (68.5 percent), 12 rifles (22.2 percent), and five shotguns (9.3 percent; see figure 1).  Six firearms were assault weapons (as defined in Pen. Code §§ 30510 and 30515) and four firearms were classified as a short-barreled shotgun or rifle. The most commonly encountered calibers were 9 mm Luger and 40 Smith & Wesson (S&W), followed by .22 Rimfire (see Figure 2, next page).



**Figure 1: Firearms types used in crimes**

Exhibit 49
DX0558

## Firearm Categories Used in Crimes, continued



**Figure 2: Calibers of weapons used in crimes**

## Crimes of Violence other than Homicide

Thirty-nine of the firearms examined by DOJ were submitted in cases involving crimes of violence other than homicide.  These 39 firearms included 28 handguns (71.8 percent), seven rifles (17.9 percent), and four shotguns (10.3 percent; see figure 3).



**Figure 3: Firearms used in crimes of violence (other than homicide).**

Exhibit 49
DX0559

## Homicides

The 10 firearms that were submitted to DOJ laboratories in homicide cases included seven handguns (70 percent), two rifles (20 percent), and one shotgun (10 percent). There were no fully automatic firearms linked to homicides.  No machine guns were used in 2018.  These figures are graphically depicted in Figure 4.



**Figure 4: Firearms used in homicides**

## Street Gang Crimes

Twelve handguns and one shotgun were identified as being related to street gang crimes.

## Drug Trafficking Crimes

Three handguns and one rifle were identified as being used in drug trafficking crimes.

## California Assault Weapons by Year

In 2018, California assault weapon use increased and represented over ten percent of total firearms.  Prior to this year, there has been relatively minimal change in assault weapon numbers compared to total weapons examined.



**Figure 5: California assault weapons used in the commission of cimes by year**

Note: The reported number of California Assault Weapons is based on a defined list for each year.  That list has been expanded a number of times since 1998; therefore, subsequent years may include firearms that were not counted previously.

# Trends and Special Cases

**California Assault Weapons**

- Six of the firearms examined in 2018 were identified as California Assault Weapons (as defined in Pen. Code §§ 30510 and 30515) (see Figure 5).

**Stolen Firearms**

- None of the firearms examined were confirmed to have been reported stolen.
- Ownership status was not determined for many of the firearms examined.

**Serial Numbers Removed**

- One firearm was submitted with the serial number removed.

**Full-Auto Firearms (Machine Guns, Submachine Guns or Full-Auto Conversions)**

- No qualifying firearm exhibiting full-auto fire was examined this year.

**Short Barreled Shotguns or Rifles**

- Seven of the examined firearms were classified as a short-barreled or short overall-length shotgun or rifle.

**Officer-Involved Shooting Incidents**

- The eight firearms identified as being related to officer-involved shooting incidents were three handguns, four rifles, and one shotgun.

**Suppressors**

- One firearm equipped with a suppressor (silencer) was examined this year.

**Unusual Ammunition**

- There were no reported examinations of armor piercing, exploding, frangible, Glazer-type, incendiary or tracer ammunition.

6

Exhibit 49
DX0562

# EXHIBIT 50

Exhibit 50
DX0563

Training  /  Rank and/or Assignment Training  /  Peace Officer  / Legislative Mandated Training

# Legislative Mandated Training

The increasingly diverse challenges and changing service demands confronting law enforcement require that the content and instructional methodologies of peace officer training be regularly evaluated and updated. Effective initial training is crucial if an officer is to acquire the critical knowledge, skills and abilities necessary to render high quality service.

Recognizing this, the California Legislature has identified and requires certain training be conducted in the basic courses. POST has created a quick reference document to assist law enforcement in locating Legislative Mandated Training requirements. Additional Basic Course training requirements are also available.

**Disclaimer:** This document is intended for use as a quick reference. Its purpose is not regulatory. For complete Legislative Mandated Training requirements refer to the appropriate law section provided for each requirement.

| Training Topic ^ | Training Information ^ | Update/Refresher Training ^ | Satisfied by the Basic Course Learnin Domain |
|---|---|---|---|
| 13519.10<br><br>Use of Force | REQUIRED | VOLUNTARY<br><br>Law enforcement agencies are encouraged to include periodic updates and | LD 3, LD 20, LD 3 LD 37, L 42 |

Exhibit 50
DX0564

| | | training on use of force. | |
|---|---|---|---|
| California Code of Regulations (CCR)<br><br>Title 8, Section 5193<br><br>Blood borne Pathogens | REQUIRED | REQUIRED<br><br>-Annually at a minimum as prescribed by CCR- | LD 34 |
| GC 8607<br><br>SEMS-<br><br>Standardized Emergency Management System (Disaster Response)<br><br>Incident Command System (ICS)<br><br>National Incident Management System (NIMS)<br><br>Federal (FEMA) Training Requirement<br><br>HSPD-5 | REQUIRED<br><br>Intro to SEMS<br><br>ICS 100<br><br>FEMA IS 700.a | N/A | LD 26 |

Exhibit 50<br>DX0565

| CA Executive Order S-2-05 | | | |
|---|---|---|---|
| HSC 1797.187 Carcinogenic Materials | REQUIRED | N/A | LD 26 |
| PC 13519.14 Human Trafficking | N/A | REQUIRED *for* Officers assigned field or investigative duties shall complete a minimum of two hours of training in a course or courses of instruction pertaining to the handling of human trafficking complaints within six months of being assigned to that position. | N/A |
| PC 13519.41 Sexual Orientation and | REQUIRED Law enforcement | N/A | LD 25, 4 |

Exhibit 50
DX0566

| | | | |
|---|---|---|---|
| Gender Minority Groups | officers and dispatchers. | | |
| PC 13514.5<br><br>Civil Disobedience | REQUIRED | VOLUNTARY<br><br>Law enforcement agencies are encouraged to include periodic updates and training on responding to acts of civil disturbance in AOT. | LD 24 |
| PC 13515<br><br>Elder and Dependent Abuse<br><br>"Elder/Dependent Adult Abuse" | REQUIRED<br><br>Every city police officer or deputy sheriff at a supervisory level and below assigned field or investigative duties within 18 months of field duties assignment. | N/A | LD 7 |

Exhibit 50

DX0567

| PC 13515.26<br><br>Persons with Mental Illness, Intellectual Disability, or Substance Use Disorder<br><br>PC 13519.2<br><br>Persons with Developmental Disabilities or Mental Illness | REQUIRED | N/A | LD 37 - 15 hours |
| PC 13516<br><br>Sexual Assault Investigative Procedures | REQUIRED | REQUIRED<br><br>Officers assigned to investigation duties which include the handling of cases involving the sexual exploitation or sexual abuse of children, shall successfully complete that training within six months of the date the assignment was | LD 10, 3 |

Exhibit 50

DX0568

| | | made. Satisfied by completing the ICI Sexual Assault Investigation course (#33430). | |
|---|---|---|---|
| PC 13517 <br><br> Child Abuse Or Neglect <br><br> "Child Abuse Investigation" | REQUIRED | N/A | LD 9 |
| PC 13518 <br><br> HSC 1797.183 <br><br> First Aid/CPR/AED | REQUIRED <br><br> Initial Public Safety First Aid and CPR course of instruction shall at minimum consist of not less than twenty-one (21) hours in First Aid and CPR and additional content as required in Title 22 of the | REQUIRED <br><br> -8 hours every 2 years- <br><br> Satisfactory completion of periodic refresher training or appropriate testing in CPR and other first aid as prescribed by EMSA. <br><br> Title 22 of the California Code of Regulations. | LD 34 - hours |

Exhibit 50
DX0569

California Code of Regulations, section 100017.

Every city/district police officer, (deputy) sheriff, (deputy) marshal, and CHP peace officer, *except those whose duties are primarily clerical or administrative.*

| PC 13519 | REQUIRED | REQUIRED *for* | LD 25 |
|---|---|---|---|
| Domestic Violence Complaints | | Law Enforcement Officers (below supervisory rank) assigned to patrol -every 2 years- OPTIONAL *for* Law Enforcement Officers | |

Exhibit 50
DX0570

| | (at/above supervisory rank) - periodic updates and training on DV as part of AOT. | | |
|---|---|---|---|
| PC 13519.1 | REQUIRED | N/A | LD 27 |
| Missing Persons | Law enforcement officers and dispatchers. | | |

Exhibit 50
DX0571

| PC 13519.12 | N/A | VOLUNTARY | LD 43 |
|---|---|---|---|
| Emergency Response Training Advisory Committee | | Peace officers and First responders to terrorism incidents at the rank of lieutenant and below who are assigned to a field position. | LD 26 |
| "Law Enforcement Response to Terrorism" (LERT) | | | |
| ~Includes IS 700.a, ICS 100~ | | | |
| "Public Safety Communications Terrorism Awareness Course" (PSC-TAC) | | Public safety communications personnel | |
| PC 13519.3 | REQUIRED | N/A | LD 7 |
| Sudden Infant Death Syndrome | | | |
| PC 13519.4 | REQUIRED | REQUIRED | LD 42 |
| Racial and Cultural Diversity Training; Racial Profiling | POST certified training. Every law | -every 5 years- | |

Exhibit 50
DX0572

| | | | |
|---|---|---|---|
| enforcement officer in CA. | | | |
| PC 13519.5 Gang and Drug Law Enforcement | REQUIRED | N/A | LD 12 LD 38 |
| PC 13519.6 Hate Crimes | REQUIRED | N/A | LD 42 |
| PC 13519.7 Sexual Harassment in the Workplace | REQUIRED | N/A | LD 42 |
| PC 13519.8 High Speed Vehicle Pursuits | REQUIRED | *CA Law Enforcement Pursuit Guidelines* (02/2007) and/or *Vehicle Pursuit Policy* (07/2017) 2-hour POST Learning Portal course may be used to satisfy this requirement. | LD 19 |
| PC 33220(b) | REQUIRED | N/A | LD 35 |

Exhibit 50
DX0573

| | | | |
|---|---|---|---|
| Short-barreled Shotguns or Short-barreled Rifles "Shotgun Course Part I" | When use is authorized by the agency and within the course and scope of duties ... Training requirement can be satisfied by completing the Regular Basic Course, Reserve Training Modules I or II, or Reserve Modules A, B, C, and D which all contain POST-certified shotgun training. | | |
| PC 832 "Arrest and Firearms" Course of Training | REQUIRED Every peace officer shall satisfactorily complete an introductory | N/A | LD 1, LD LD 3, LD LD 16, LD17, LD 18, LD 2 LD 33, |

Exhibit 50
DX0574

| | | | |
|---|---|---|---|
| | course of training.<br><br>*Training in the carrying and use of firearms shall not be required of a peace officer whose employing agency prohibits the use of firearms. | | LD 35 L 39 and L 42 |
| PC 832.6<br><br>Deputies or Appointees as Reserve or Auxiliary Officers | Level I<br><br>(Basic training course as prescribed by POST)<br><br>Level II<br><br>(POST-certified Modules II and III)<br><br>Level III | CPT<br><br>CPT | REQUIR<br><br>*Level I, and III reserve officers |

Exhibit 50
DX0575

| | (POST-certified Module III) | | |
|---|---|---|---|
| PC 872(b) <br><br> Hearsay Testimony | REQUIRED <br><br> For all law enforcement officers with less than 5 years of service and who wish to testify to hearsay evidence in preliminary hearings. | N/A | LD 17 |
| VC 40600 <br><br> Traffic Accident Investigation <br><br> (Notice to Appear) | REQUIRED | N/A | LD 29 |

# Continuing Professional Training Requirement

Exhibit 50
DX0576

Every peace officer (other than a Level III Reserve Peace Officer), Public Safety Dispatcher, and Public Safety Dispatch Supervisor shall satisfactorily complete the CPT requirement of 24 or more hours of POST-qualifying training during every two-year CPT cycle. Effective January 1, 2002, certain peace officers in specific duty assignments must satisfy a portion of the CPT requirement by completing Perishable Skills and Communications training.

## Perishable Skills/Communications Requirement for CPT.

Effective January 1, 2002, all peace officers (except reserve officers and jail deputies) below the middle management position are required to complete Perishable Skills training.

## Perishable Skills Program (PSP)

Perishable Skills Program consists of 12 hours of psychomotor, 2 hours of communications, and 4 hours of use of force training every 24 months.

- Category I - Tactical Firearms - 4 hour minimum

- Category II - Driver Training/Awareness - 4 hour minimum

- Category III - Arrest & Control - 4 hour minimum

- Category IV - Strategic Communications - 2 hour minimum

- Category V - Use of Force - 4 hour minimum

Courses in each of the above categories must include the specified minimum topics and exercises and meet the stated course objectives to qualify for the PSP program. All minimum topics and course objectives may be found in Commission Regulation 1005(d) ↗.

It is recommended that managers and executives complete, within their two-year compliance cycle, two hours of CPT devoted to updates in the perishable skills topical areas enumerated above.

Exhibit 50
DX0577

Page last updated 2/7/2024 12:02 PM

Copyright © 2024 State of California

Exhibit 50
DX0578

# EXHIBIT 51

Exhibit 51
DX0579

Training / Rank and/or Assignment Training /

Basic Course Presenters and Instructors / Basic Course Resources /

Training and Testing Specifications for Peace Officer Basic Courses

# Training and Testing Specifications for Peace Officer Basic Courses

The increasingly diverse challenges and changing service demands confronting law enforcement require that the content and instructional methodologies of peace officer training be regularly evaluated and updated. Effective initial training is crucial if an officer is to acquire the critical knowledge, skills and abilities necessary to render high quality service.

The Training and Testing Specifications list the minimum, mandated curriculum and testing for the POST-mandated basic courses. The curriculum for each basic course listed below is divided into individual topics, called Learning Domains. The Learning Domains contain the minimum required foundational information for given subjects and appear in sequential order. Each Learning Domain includes descriptions of learning needs, lists of related learning objectives, any required tests and instructional activities, and minimum hourly requirements. The Training and Testing Specifications are updated twice a year, or as needed, and coincide with the educational objectives (EO's) listed in the student workbooks used by academies.

[Copyright Notice](#)

Effective: October 1, 2020

- [Regular Basic Course Training Specifications](#)

- [PC832 Arrest and Firearms Training Specifications](#)

- [Modular Format - Module III Training Specifications](#)

Exhibit 51
DX0580

- Modular Format - Module II Training Specifications

- Modular Format - Module I Training Specifications

- Specialized Investigators' Basic Course Training Specifications

- Requalification Course Training Specifications

- Proposed Revisions to Training and Testing Specifications

---

## 🔗 Quick Links

- Basic Course Waiver Process

- Basic Training Academies

- Course Evaluation Instrument ⬈

- Course Catalog ⬈

- Learning Portal ⬈

- POST Regional Training Map

- POST Training Videos

- Proposed TTS Revisions

- Regulatory Actions

- Training and Testing Specifications (TTS)

---

## 📞✉ Contact Us

Basic Training Bureau
(916) 227-4252

---

Page last updated 2/12/2024 11:37 AM

Exhibit 51
DX0581

Copyright © 2024 State of California

Exhibit 51
DX0582

# EXHIBIT 52

Exhibit 52
DX0583

Training   /   Rank and/or Assignment Training   /
Basic Course Presenters and Instructors   /   Basic Course Resources   /
Regular Basic Course Training Specifications

# Regular Basic Course Training Specifications

In July 1993, the Commission adopted training specifications as its method of specifying the minimum, mandated curriculum for the Regular Basic Course. Listed below are the individual learning domains that make up the course curriculum.

Copyright Notice

- Regular Basic Course Minimum Hourly Requirements (docx)

- LD 01 Leadership, Professionalism and Ethics (doc)

- LD 02 Criminal Justice System (doc)

- LD 03 Principled Policing in the Community (doc)

- LD 04 Victimology/Crisis Intervention (doc)

- LD 05 Introduction to Criminal Law (doc)

- LD 06 Property Crimes (doc)

- LD 07 Crimes Against Persons (doc)

- LD 08 General Criminal Statutes (doc)

- LD 09 Crimes Against Children (doc)

- LD 10 Sex Crimes (doc)

- LD 11 Juvenile Law and Procedure (doc)

- LD 12 Controlled Substances (doc)

- LD 13 ABC Law (doc)

Exhibit 52
DX0584

- [LD 14 Officer Wellness](#) (doc)

- [LD 15 Laws of Arrest](#) (doc)

- [LD 16 Search and Seizure](#) (doc)

- [LD 17 Presentation of Evidence](#) (doc)

- [LD 18 Investigative Report Writing](#) (doc)

- [LD 19 Vehicle Operations](#) (doc)

- [LD 20 Use of Force/Deescalation](#) (docx)

- [LD 21 Patrol Techniques](#) (doc)

- [LD 22 Vehicle Pullovers](#) (doc)

- [LD 23 Crimes in Progress](#) (doc)

- [LD 24 Handling Disputes/Crowd Control](#) (doc)

- [LD 25 Domestic Violence](#) (doc)

- [LD 26 Critical Incidents](#) (doc)

- [LD 27 Missing Persons](#) (doc)

- [LD 28 Traffic Enforcement](#) (docx)

- [LD 29 Traffic Accident Investigation](#) (doc)

- [LD 30 Crime Scenes, Evidence, and Forensics](#) (doc)

- [LD 31 Custody](#) (doc)

- [LD 32 Lifetime Fitness](#) (doc)

- [LD 33 Arrest and Control](#) (doc)

- [LD 34 First Aid, CPR, and AED](#) (doc)

- [LD 35 Firearms/Chemical Agents](#) (doc)

- [LD 36 Information Systems](#) (doc)

- [LD 37 People with Disabilities](#) (doc)

Exhibit 52

DX0585

- LD 38 Gang Awareness (doc)

- LD 39 Crimes Against the Justice System (doc)

- LD 40 Weapons Violations (doc)

- LD 42 Cultural Diversity/Discrimination (doc)

- LD 43 Terrorism Awareness (doc)

## 🔗 Quick Links

- Basic Course Waiver Process

- Basic Training Academies

- Course Catalog ⧉

- Learning Portal ⧉

- POST Regional Training Map

- POST Training Videos

- Regulatory Actions

- Training and Testing Specifications (TTS)

## 📞✉ Contact Us

Basic Training Bureau
(916) 227-4252

Page last updated 1/29/2024 8:36 AM

Copyright © 2024 State of California

Exhibit 52
DX0586

# EXHIBIT 53

Exhibit 53
DX0587

MINIMUM CONTENT AND HOURLY REQUIREMENTS
**REGULAR BASIC COURSE (RBC) - STANDARD FORMAT**

October 1, 2023

| DOMAIN NUMBER | DOMAIN DESCRIPTION | MINIMUM HOURS |
|---|---|---|
| 01 | Leadership, Professionalism & Ethics | 8 hours |
| 02 | Criminal Justice System | 2 hours |
| 03 | Principled Policing in the Community | 26 hours |
| 04 | Victimology/Crisis Intervention | 6 hours |
| 05 | Introduction to Criminal Law | 4 hours |
| 06 | Property Crimes | 6 hours |
| 07 | Crimes Against Persons/Death Investigation | 6 hours |
| 08 | General Criminal Statutes | 2 hours |
| 09 | Crimes Against Children | 4 hours |
| 10 | Sex Crimes | 4 hours |
| 11 | Juvenile Law and Procedure | 3 hours |
| 12 | Controlled Substances | 12 hours |
| 13 | ABC Law | 2 hours |
| 14 | Officer Wellness | 8 hours |
| 15 | Laws of Arrest | 12 hours |
| 16 | Search and Seizure | 12 hours |
| 17 | Presentation of Evidence | 6 hours |
| 18 | Investigative Report Writing | 48 hours |
| 19 | Vehicle Operations | 40 hours |
| 20 | Use of Force/Deescalation | 16 hours |
| 21 | Patrol Techniques | 12 hours |
| 22 | Vehicle Pullovers | 14 hours |
| 23 | Crimes in Progress | 20 hours |
| 24 | Handling Disputes/Crowd Control | 8 hours |
| 25 | Domestic Violence | 10 hours |
| 26 | Critical Incidents | 8 hours |
| 27 | Missing Persons | 4 hours |
| 28 | Traffic Enforcement | 16 hours |
| 29 | Traffic Collision Investigations | 12 hours |
| 30 | Crime Scenes, Evidence, and Forensics | 12 hours |
| 31 | Custody | 2 hours |
| 32 | Lifetime Fitness | 44 hours |
| 33 | Arrest and Control | 60 hours |
| 34 | First Aid, CPR, and AED | 21 hours |
| 35 | Firearms/Chemical Agents | 72 hours |
| 36 | Information Systems | 2 hours |
| 37 | People with Disabilities | 15 hours |
| 38 | Gang Awareness | 2 hours |
| 39 | Crimes Against the Justice System | 4 hours |
| 40 | Weapons Violations | 4 hours |
| 42 | Cultural Diversity/Discrimination | 16 hours |
| 43 | Terrorism Awareness | 4 hours |
| | | |
| | Minimum Instructional Hours | 589 hours |
| | The minimum number of hours allocated to testing in the Course are shown below.[1] | |
| | Additional instructional and testing hours for POST-required content | 6 hours |

| TESTS | | HOURS |
|---|---|---|
| | Scenario Tests (40 hours test administration; 18 hours scenario demonstration) (LDs 1,4,7,20,21,22,23,25,30 and 37) | 58 hours |
| POST-Constructed Comprehensive Tests | | |
| | LD 34 | 1 hour |
| | RBC Test 1 (LDs 5,15,16,20,39) | 3 hours |
| | RBC Test 2 (LDs 5,6,7,8,9,10,15,16,20, and 39) | 3 hours |
| | RBC Test 3  (LDs 5,6,7,8,9,10,11,12,15,16,20,25,26, 28,37,39,40, and 43) | 4 hours |
| Total Minimum Required Hours | | 664 hours |

[1]Time required for exercise testing, instructional activities, and the Work Sample Test Battery is included in instructional hours.

Exhibit 53
DX0588

# EXHIBIT 54

Exhibit 54
DX0589

ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
S. CLINTON WOODS
Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
JENNIFER E. ROSENBERG
Deputy Attorney General
State Bar No. 275496
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6617
  Fax: (916) 731-2124
  E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his
official capacity as Attorney General of the
State of California, and Allison Mendoza, in
her official capacity as Acting Director of the
Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW JONES**, *et al.*, | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **DECLARATION OF MARICELA LEYVA CHAVEZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California**, *et al.*, | |
| Defendants. | Dept:       5B<br>Judge:      The Honorable M. James Lorenz and Magistrate Judge Alison H. Goddard |
| | Action Filed:      July 1, 2019 |

## DECLARATION OF MARICELA LEYVA CHAVEZ

I, Maricela Leyva Chavez, declare under penalty of perjury that the following is true and correct:

1.    Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to the truth of the matters set forth herein.

2.    I have been employed with the State of California, Department of Justice, Bureau of Firearms (BOF) Customer Support Center as a Staff Services Manager I since June 2018. I began working for the BOF in 2012 as a Program Technician II. I was later promoted to Staff Services Analyst, then to Associate Governmental Program Analyst, then to Staff Services Manager I over Assault Weapon Registration, and finally to Staff Services Manager I over the Customer Support Center (CSC).

3.    As a Staff Services Analyst in the CSC, I provided telephone assistance to the public, firearms dealers, and firearm-safety instructors regarding firearms related questions.

4.    As an Associate Governmental Program Analyst in the CSC, I was responsible for the financial accounting component of the Firearm Safety Certificate and Dealer Record of Sale programs. In addition, I assisted other analysts in the unit with the most difficult phone calls.

5.    As a Staff Services Manager I in the CSC, it is my responsibility to manage the CSC's daily functions, which include monitoring calls and correspondence received by BOF from firearms dealers, firearm-safety instructors, law enforcement agencies, manufacturers, and the public regarding firearms laws and regulations.

6.    When a purchaser buys a firearm from a licensed dealer, information regarding the transaction is entered by the dealer into the Dealer Record of Sale

1

Declaration of Maricela Leyva Chavez (3:19-cv-01226-L-AHG)

Exhibit 54
DX0591

1    (DROS) Entry System (DES), transmitted to the Department of Justice through

2    DES, and stored in the DROS database.

3    　　　7.   The information the Department receives includes the type of transaction

4    (e.g., sale, transfer, loan, etc.), as well as information regarding any Firearm Safety

5    Certificate exemption claimed by the purchaser. See California Penal Code sections

6    31600, et seq. and 31700, et seq.

7    　　　8.   As part of my job duties, I may request data from the California Justice

8    Information Services (CJIS) Application Development Bureau regarding statistical

9    information about the sales of firearms in California. On March 3, 2023, I

10   submitted a request to CJIS's Application Development Bureau for data on the

11   number and type of long guns the Department approved for sale or transfer through

12   a licensed firearms dealer to young adults aged 18-20 from January 1, 2019 to

13   present. This data does not include instances in which young adults aged 18-20

14   obtained a long gun via a transfer not required to be completed through a licensed

15   firearms dealer. See Pen. Code, § 27545 [requiring parties to complete the sale, loan

16   or transfer of a firearm through a licensed firearms dealer]; Pen. Code § 27850 et

17   seq. [listing exemptions to the requirement of using a dealer for a private party

18   transfer]). Transfers not required to be completed through a dealer include, but are

19   not limited to, a transfer by operation of law (including the transfer of a firearm

20   between spouses), new residents to California reporting firearm ownership, an

21   intrafamilial transfer (e.g., the transfer of a firearm between a parent and child or a

22   grandparent and grandchild), or the temporary loaning of a firearm.

23   　　　9.   Upon information and belief, a CJIS Application Development Bureau

24   Information Technology Specialist compiled the data I requested. I sorted and

25   filtered that data by year and by type and complied the table below:

26   / / /

27   / / /

28   / / /

Declaration of Maricela Leyva Chavez (3:19-cv-01226-L-AHG)

Exhibit 54
DX0592

| Approved Sales or Transfers by Firearm Type[1] | 2020 | 2021 | 2022 | 2023 (As of March 3, 2023) | Total |
|---|---|---|---|---|---|
| Semi-automatic rifles (Centerfire and Rimfire) | 1,085 | 1,022 | 858 | 137 | 3,102 |
| Semi-automatic shotguns | 717 | 946 | 799 | 113 | 2,575 |
| Combination semi-automatic rifles and shotguns[2] | 1 | 0 | 1 | 0 | 2 |
| Pump-action shotguns | 938 | 1,395 | 1,473 | 212 | 4,018 |
| Bolt-action rifles | 1,455 | 1,594 | 1,463 | 195 | 4,707 |
| Pump-action rifles | 16 | 17 | 26 | 6 | 65 |
| Lever-action rifles | 258 | 245 | 305 | 47 | 855 |
| Lever-action shotguns | 5 | 8 | 9 | 2 | 24 |
| Single-shot shotguns | 39 | 62 | 49 | 6 | 156 |
| Single-shot rifles | 20 | 44 | 18 | 1 | 83 |
| Other types of long guns not listed above | 148 | 171 | 171 | 24 | 514 |
| **Overall purchased or otherwise transferred long guns** | **4,682** | **5,504** | **5,172** | **743** | **16,101** |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 13, 2023, at Sacramento, CA.

*Maricela Leyva*
Maricela Leyva Chavez

---

[1] As explained above, this includes Department-approved transactions for the sale or transfer of long guns through a licensed firearms dealer to young adults aged 18-20.

[2] This is a firearm that includes at least two different types of barrels in a single firearm. For example, in the case of a double-barreled firearm, one barrel may be a smoothbore shotgun barrel, while the other barrel is a rifle barrel.

3

Declaration of Maricela Leyva Chavez (3:19-cv-01226-L-AHG)

Exhibit 54
DX0593

# EXHIBIT 55

Exhibit 55
DX0594

1  Rob Bonta
    Attorney General of California
2  Mark R. Beckington
    Supervising Deputy Attorney General
3  Stephanie Albrecht
    Deputy Attorney General
4  Jennifer E. Rosenberg
    Deputy Attorney General
5  State Bar No. 275496
    300 South Spring Street, Suite 1702
6    Los Angeles, CA  90013
    Telephone:  (213) 269-6617
7    Fax:  (916) 731-2124
    E-mail:  Jennifer.Rosenberg@doj.ca.gov
8  *Attorneys for Defendants Rob Bonta, in his*
    *official capacity as Attorney General of the*
9  *State of California, and Allison Mendoza, in*
    *her official capacity as Director of the*
10  *Department of Justice Bureau of Firearms*

11          IN THE UNITED STATES DISTRICT COURT

12         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

| | |
|---|---|
| **Jose Chavez; et al.,** | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **DEFENDANT ROB BONTA'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| **v.** | |
| **Rob Bonta, in his official capacity as Attorney General of the State of California; et al.,** | |
| Defendants. | |

PROPOUNDING PARTY:    Plaintiffs

RESPONDING PARTY:    Defendant Attorney General Bonta

SET NUMBER:    One

1    Defendant Rob Bonta, in his official capacity as Attorney General for the

2    State of California ("Defendant"), provides these supplemental responses and

3    objections to Plaintiffs' First Set of Interrogatories directed to former Defendant

4    Xavier Becerra in his official capacity as Attorney General of the State of

5    California[1] as follows:[2]

6    **PRELIMINARY STATEMENT**

7    Defendant has not yet completed the investigation of the facts relating to this

8    case and has not yet completed discovery in this action.  All of the responses

9    contained herein are based solely upon information and documents that are

10   presently available to and specifically known by Defendant, and disclose only those

11   contentions that presently occur to Defendant.  It is anticipated that further

12   discovery, independent investigation, legal research, or analysis will supply

13   additional facts and lead to additions, changes, and variations from the responses

14   herein.

15   Defendant expressly reserves the right to assert any and all objections as to

16   the admissibility of such responses into evidence in this action, or in any other

17   proceedings, on any and all grounds including, but not limited to, competency,

18   relevancy, materiality, and privilege.  Further, Defendant makes the responses and

19   objections herein without in any way implying that the Interrogatories and

20   responses to the Interrogatories are relevant or material to the subject matter of this

21   action.

22   An objection or response to an interrogatory shall not be construed as an

23   acknowledgment that Defendant performed any of the acts described in the

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Attorney General Rob Bonta is automatically substituted as a defendant in this matter in place of his predecessors, former Attorney General Xavier Becerra and former Acting Attorney General Matthew Rodriquez.

[2] Although Plaintiffs' First Set of Interrogatories was served on October 6, 2020, these responses are timely made pursuant to stipulation of the parties memorialized via e-mail.

1

1  interrogatory or definitions applicable to the interrogatory, or that Defendant

2  acquiesces in the characterization of the conduct or activities contained in the

3  interrogatory or definitions applicable to interrogatory.

4      The following responses are given without prejudice to the right to produce

5  evidence or witnesses that Defendant may later discover.  Defendant reserves the

6  right to supplement, clarify, revise, or correct any or all of the responses and

7  objections herein, and to assert additional objections or privileges, in one or more

8  subsequent supplemental response(s).

9                         **<u>GENERAL OBJECTIONS</u>**

10     1.     Defendant objects to each instruction, definition, and interrogatory to

11  the extent that it purports to impose any requirement or discovery obligation greater

12  than or different from those under the Federal Rules of Civil Procedure and the

13  applicable Rules and Orders of the Court.

14     2.     Defendant objects to the Interrogatories to the extent that any

15  particular interrogatory is overbroad, vague, ambiguous, unintelligible, unduly

16  burdensome, or not relevant to any party's claim or defense and proportional to the

17  needs of the case.

18     3.     Defendant objects to the definition of "YOU" and "YOUR" as

19  overbroad and unduly burdensome and without reasonable limitation as to time and

20  scope, as pertains to the issues in this case.

21     4.     Defendant objects to the definition of "PROCESSED AND

22  COMPLETED" as vague, unintelligible, and overbroad, including because it (1)

23  purports to cover firearms transactions "approved by the California Department of

24  Justice" but does not define "approved" or clarify whether it is meant to refer solely

25  to transactions processed through FFLs and (2) purports to cover transactions in

26  which firearms are "lawfully delivered" to a purchaser without defining the

27  intended scope of "lawfully."  Defendant also objects to the definition of

28

1    "PROCESSED AND COMPLETED" insofar as it does not clarify whether it

2    covers only firearms transactions in which firearms are purchased, or all firearms

3    transfers of any type.

4        5.    Defendant objects to the Interrogatories to the extent that any

5    particular interrogatory requires the production of information available to Plaintiffs

6    through the subpoena process or their own records.

7        6.    Defendant objects to the Interrogatories to the extent that any

8    individual interrogatory calls for information subject to a claim of privilege,

9    including, without limitation, the attorney-client privilege and/or the attorney work-

10   product doctrine, the governmental deliberative process privilege, the law

11   enforcement investigatory privilege, the official information privilege, the common

12   interest privilege, or any other applicable privilege or protection. Defendant hereby

13   claims the attorney-client privilege and invokes the attorney work-product doctrine.

14   The fact that Defendant may not specifically object to any individual interrogatory

15   on the ground that it seeks information subject to the attorney-client privilege and

16   the attorney work-product doctrine is not to be deemed a waiver of the protection of

17   non-disclosure afforded by the attorney-client privilege or the attorney work-

18   product doctrine. Should any disclosure by Defendant of such information occur, it

19   is inadvertent and shall not constitute a waiver of any privilege or protection.

20       7.    Defendant objects to the Interrogatories to the extent that any

21   individual interrogatory assumes the truth of facts either in dispute or not yet in

22   evidence.

23       8.    Defendant objects to the Interrogatories insofar as any individual

24   interrogatory calls for speculation or legal conclusions.

25       9.    To the extent that any individual Interrogatory purports to impose on

26   Defendant the burden of providing information which is not in Defendant's

27   possession, custody, or control, or is already in Plaintiffs' possession, custody or

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55
DX0598

control, or is not reasonably available to Defendant after a diligent search and
reasonable inquiry, Defendant objects on the grounds that the Interrogatories are
overbroad, unduly burdensome, oppressive, and the burden, expense and/or
intrusiveness of the discovery clearly outweighs the likelihood that the information
sought will lead to the discovery of admissible evidence.

10.    The foregoing objections apply to each and every response contained
herein and are incorporated by reference to the extent applicable in the specific
responses set forth below as though fully set forth therein.  The failure to mention
one of the foregoing objections in the specific response set forth below shall not be
deemed a waiver of such objection.

11.    Defendant will make reasonable efforts to respond to each
interrogatory, to the extent that no objection is made, as Defendant understands and
interprets the interrogatory.  If Plaintiffs' interpretation of any individual
interrogatory differs from that of Defendant, Defendant reserves the right to
supplement its objections and responses.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State the total number of firearm TRANSACTIONS that have been
PROCESSED AND COMPLETED through FFL DEALERS in California for each
year from 2014 to 2019.

**RESPONSE TO INTERROGATORY NO. 1:**

Defendant incorporates by reference the General Objections stated above,
including objections to definitions and instructions, as if fully set forth herein.

Defendant objects to the definition of "PROCESSED AND COMPLETED" as
vague, unintelligible, and overbroad, including because it (1) purports to cover

firearms transactions "approved by the California Department of Justice" but does not define "approved" or clarify whether it is meant to refer solely to transactions processed through FFLs and (2) purports to cover transactions in which firearms are "lawfully delivered" to a purchaser without defining the intended scope of "lawfully."  Defendant also objects to the definition of "PROCESSED AND COMPLETED" insofar as it does not clarify whether it covers only firearms transactions in which firearms are purchased, or all firearms transfers of any type.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Subject to and without waiving the foregoing objections, Defendant responds: Data responsive to this interrogatory was most recently retrieved and tabulated on February 12, 2021.  Defendant will provide the requested information for each full calendar year (January 1-December 31) from 2014-2020.  The data provided reflects the transactions created in California by FFL dealers through the Dealer Record of Sales Entry System.

As of February 12, 2021, the Department of Justice's records reflected that the following number of firearm transactions had been processed and completed by FFL dealers through the Dealer Record of Sales Entry System in California in each of the following years:

| Transaction Creation Year | Total Firearm Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year |
|---|---|
| 2014 | 876,639 |
| 2015 | 841,657 |
| 2016 | 1,275,982 |
| 2017 | 838,195 |
| 2018 | 756,864 |
| 2019 | 741,995 |
| 2020 | 1,165,299 |

Although not requested, Defendant also provides data responsive to this request, restricted to purchasers or transferees aged 18-20. As of February 12, 2021, the Department of Justice's records reflected that the following number of firearm transactions had been processed and completed by FFL dealers through the Dealer Record of Sales Entry System in California in each of the following years, where the purchaser or transferee was between the ages of 18-20:

| Transaction Creation Year | Total Firearm Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year for Purchasers or Transferees Aged 18-20 |
|---|---|
| 2014 | 12,947 |
| 2015 | 11,657 |
| 2016 | 18,801 |
| 2017 | 12,673 |
| 2018 | 14,000 |
| 2019 | 3,673 |
| 2020 | 4,677 |

1    As discovery is ongoing, Defendant also reserves the right to disclose any

2    additional facts, information, or evidence responsive to this request that may turn

3    up or become relevant in the future.

4    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

5    Defendant incorporates by reference all general and specific objections

6    asserted in Defendant's original response, as well as the entirety of Defendants'

7    original response.

8    Subject to and without waiving the foregoing objections and incorporation of

9    Defendant's original response, Defendant responds:

10    Data responsive to this interrogatory was most recently retrieved and tabulated

11    on June 30, 2023.  Defendant will provide updates to the requested information for

12    each full calendar year (January 1-December 31) from 2014-2022, as well as

13    partial-year data for January 1, 2023-June 30, 2023.  The data provided reflects the

14    transactions created in California by FFL dealers through the Dealer Record of

15    Sales Entry System.

16    As of June 30, 2023, the Department of Justice's records reflected that the

17    following number of firearm transactions had been processed and completed by

18    FFL dealers through the Dealer Record of Sales Entry System in California in each

19    of the following years:

20

21

22

23

24

25

26

27

28

7

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)
Exhibit 55
DX0602

| Transaction Creation Year | Total Firearm Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year |
|---|---|
| 2014 | 876,637 |
| 2015 | 841,656 |
| 2016 | 1,275,979 |
| 2017 | 838,190 |
| 2018 | 756,882 |
| 2019 | 742,036 |
| 2020 | 1,165,326 |
| 2021 | 1,020,764 |
| 2022 | 896,664 |
| Jan. 1, 2023- June 30, 2023 | 387,881 (partial year only) |

Although not requested, Defendant also provides updated data responsive to this request, restricted to purchasers or transferees aged 18-20. As of June 30, 2023, the Department of Justice's records reflected that the following number of firearm transactions had been processed and completed by FFL dealers through the Dealer Record of Sales Entry System in California in each of the following years, where the purchaser or transferee was between the ages of 18-20:

| Transaction Creation Year | Total Firearm Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year for Purchasers or Transferees Aged 18-20 |
|---|---|
| 2014 | 12,947 |
| 2015 | 11,657 |
| 2016 | 18,801 |
| 2017 | 12,672 |
| 2018 | 14,002 |

8

| 2019 | 3,673 |
| 2020 | 4,677 |
| 2021 | 5,497 |
| 2022 | 5,168 |
| Jan. 1, 2023-June 30, 2023 | 2,172 (partial year only) |

Although not requested, Defendant also provides updated data responsive to this request, restricted to purchasers or transferees aged 18-20, for transactions completed through Plaintiffs North County Shooting Center, Inc. and PWGG, L.P. As of August 15, 2023, the Department of Justice's records reflected that the following number of firearm transactions had been processed and completed by Plaintiffs North County Shooting Center, Inc. and PWGG, L.P. through the Dealer Record of Sales Entry System in California in each of the following years, where the purchaser or transferee was between the ages of 18-20:

| Transaction Creation Year | Total Firearm Transactions Processed and Completed in California in Full Calendar Year for Purchasers or Transferees Aged 18-20 by Dealer Plaintiff North County Shooting Center, Inc. | Total Firearm Transactions Processed and Completed in California in Full Calendar Year for Purchasers or Transferees Aged 18-20 by Dealer Plaintiff PWGG, L.P. |
|---|---|---|
| 2014 | 38 | 8 |
| 2015 | 17 | 10 |
| 2016 | 34 | 40 |
| 2017 | 26 | 26 |
| 2018 | 13 | 29 |
| 2019 | (no data found) | 7 |
| 2020 | 1 | 7 |
| 2021 | 5 | 6 |

9

| 2022 | 4 | 6 |
|---|---|---|
| Jan. 1, 2023-Aug. 15, 2023 | 3 (partial year only) | 1 (partial year only) |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**INTERROGATORY NO. 2:**

State the total number of PRIVATE PARTY TRANSACTIONS that have been PROCESSED AND COMPLETED through FFL DEALERS in California for each year from 2014 to 2019.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein.

Defendant objects to the definition of "PROCESSED AND COMPLETED" as vague, unintelligible, and overbroad, including because it (1) purports to cover firearms transactions "approved by the California Department of Justice" but does not define "approved" or clarify whether it is meant to refer solely to transactions processed through FFLs and (2) purports to cover transactions in which firearms are "lawfully delivered" to a purchaser without defining the intended scope of "lawfully." Defendant also objects to the definition of "PROCESSED AND COMPLETED" insofar as it does not clarify whether it covers only firearms transactions in which firearms are purchased, or all firearms transfers of any type.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures. Defendant also

1   objects that the interrogatory calls for information protected from disclosure by the

2   attorney-client privilege, the governmental deliberative process privilege, the

3   official information privilege, the attorney work product doctrine, and other

4   applicable privileges and protections.

5       Subject to and without waiving the foregoing objections, Defendant responds:

6   Data responsive to this interrogatory was most recently retrieved and tabulated on

7   February 12, 2021.  Defendant will provide the requested information for each full

8   calendar year (January 1-December 31) from 2014-2020.  The data provided

9   reflects the transactions created in California by FFL dealers through the Dealer

10   Record of Sales Entry System, and therefore does not include operation of law

11   transfers.  It includes private party transfers required by law to be conducted

12   through FFLs of any kind, not just private party sales.

13       Subject to the above qualifications, as of February 12, 2021, the Department

14   of Justice's records reflected that the following total number of private party

15   transactions had been processed and completed by FFL dealers through the Dealer

16   Record of Sales Entry System in California in each of the following years:

| Transaction Creation Year | Total Number of Private Party Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year |
|---|---|
| 2014 | 104,977 |
| 2015 | 120,286 |
| 2016 | 154,700 |
| 2017 | 119,903 |
| 2018 | 122,472 |
| 2019 | 122,257 |
| 2020 | 144,407 |

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55

DX0606

1    As discovery is ongoing, Defendant also reserves the right to disclose any

2  additional facts, information, or evidence responsive to this request that may turn

3  up or become relevant in the future.

4  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

5    Defendant incorporates by reference all general and specific objections

6  asserted in Defendant's original response, as well as the entirety of Defendants'

7  original response.

8    Subject to and without waiving the foregoing objections and incorporation of

9  Defendant's original response, Defendant responds:

10    Data responsive to this interrogatory was most recently retrieved and tabulated

11  on June 30, 2023.  Defendant will provide updates to the requested information for

12  each full calendar year (January 1-December 31) from 2014-2022, as well as

13  partial-year data for January 1, 2023-June 30, 2023.  The data provided reflects the

14  transactions created in California by FFL dealers through the Dealer Record of

15  Sales Entry System, and therefore does not include operation of law transfers.  It

16  includes private party transfers required by law to be conducted through FFLs of

17  any kind, not just private party sales.

18    Subject to the above qualifications, as of June 30, 2023, the Department of

19  Justice's records reflected that the following total number of private party

20  transactions had been processed and completed by FFL dealers through the Dealer

21  Record of Sales Entry System in California in each of the following years:

22

23

24

25

26

27

28

| Transaction Creation Year | Total Number of Private Party Transactions Processed and Completed through FFL Dealers in California in Full Calendar Year |
|---|---|
| 2014 | 104,977 |
| 2015 | 120,286 |
| 2016 | 154,699 |
| 2017 | 119,902 |
| 2018 | 122,481 |
| 2019 | 122,264 |
| 2020 | 144,427 |
| 2021 | 133,013 |
| 2022 | 124,367 |
| Jan. 1, 2023- June 30, 2023 | 58,757 (partial year only) |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**INTERROGATORY NO. 3:**

Of the total number of firearms TRANSACTIONS, state the percentage of PRIVATE PARTY TRANSACTIONS of firearms that have been PROCESSED AND COMPLETED for each year from 2014 to 2019.

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein.

Defendant objects to the definition of "PROCESSED AND COMPLETED" as vague, unintelligible, and overbroad, including because it (1) purports to cover firearms transactions "approved by the California Department of Justice" but does

13

1  not define "approved" or clarify whether it is meant to refer solely to transactions

2  processed through FFLs and (2) purports to cover transactions in which firearms are

3  "lawfully delivered" to a purchaser without defining the intended scope of

4  "lawfully."  Defendant also objects to the definition of "PROCESSED AND

5  COMPLETED" insofar as it does not clarify whether it covers only firearms

6  transactions in which firearms are purchased, or all firearms transfers of any type.

7  Defendant further objects to this interrogatory as vague and ambiguous in that it is

8  not clear whether the interrogatory seeks calculation of the percentage of total

9  firearms transactions conducted through FFL dealers that were private party

10  transactions, or something else.  Accordingly, Defendant cannot answer the

11  interrogatory as drafted.

12      Defendant also objects to the interrogatory to the extent that it seeks expert

13  materials, including information or facts that expert witnesses may locate or rely

14  on, outside of the framework and schedule for expert disclosures.  Defendant also

15  objects that the interrogatory calls for information protected from disclosure by the

16  attorney-client privilege, the governmental deliberative process privilege, the

17  official information privilege, the attorney work product doctrine, and other

18  applicable privileges and protections.

19      Subject to and without waiving the foregoing objections, Defendant responds:

20  In responding to this interrogatory, Defendant construes the interrogatory to be

21  asking what percentage of overall firearm transactions conducted through FFL

22  dealers were private party transactions.

23      Data responsive to this interrogatory was most recently retrieved and tabulated

24  on February 12, 2021.  Defendant will provide the requested information for each

25  full calendar year (January 1-December 31) from 2014-2020.  The data provided

26  reflects the transactions created in California by FFL dealers through the Dealer

27  Record of Sales Entry System, and therefore does not include operation of law

28

14

transfers.  It includes private party transfers required by law to be conducted through FFLs of any kind, not just private party sales.

Subject to the above qualifications, as of February 12, 2021, the Department of Justice's records reflected the following totals and percentages for calendar years January 2014-2020:

| Transaction Creation Year | Total Firearms Transactions Conducted Through FFL Dealers | Private Party Firearms Transactions Conducted Through FFL Dealers | Percentage of Firearms Transactions Conducted Through FFL Dealers That Were Private Party Transactions |
|---|---|---|---|
| 2014 | 876,639 | 104,977 | 12% |
| 2015 | 841,657 | 120,286 | 14.3% |
| 2016 | 1,275,982 | 154,700 | 12.1% |
| 2017 | 838,195 | 119,903 | 14.3% |
| 2018 | 756,864 | 122,472 | 16.2% |
| 2019 | 741,995 | 122,257 | 16.5% |
| 2020 | 1,165,299 | 144,407 | 12.4% |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Defendant incorporates by reference all general and specific objections asserted in Defendant's original response, as well as the entirety of Defendants' original response.

Subject to and without waiving the foregoing objections and incorporation of Defendant's original response, Defendant responds:

1    In responding to this interrogatory, Defendant construes the interrogatory to be
2    asking what percentage of overall firearm transactions conducted through FFL
3    dealers were private party transactions.  Data responsive to this interrogatory was
4    most recently retrieved and tabulated on June 30, 2023.  Defendant will provide
5    updates to the requested information for each full calendar year (January 1-
6    December 31) from 2014-2022, as well as partial-year data for January 1, 2023-
7    June 30, 2023.  The data provided reflects the transactions created in California by
8    FFL dealers through the Dealer Record of Sales Entry System, and therefore does
9    not include operation of law transfers.  It includes private party transfers required
10   by law to be conducted through FFLs of any kind, not just private party sales.

     Subject to the above qualifications, as of June 30, 2023, the Department of
     Justice's records reflected the following totals and percentages for the years:

| Transaction Creation Year | Total Firearms Transactions Conducted Through FFL Dealers | Private Party Firearms Transactions Conducted Through FFL Dealers | Percentage of Firearms Transactions Conducted Through FFL Dealers That Were Private Party Transactions |
|---|---|---|---|
| 2014 | 876,637 | 104,977 | 12.0% |
| 2015 | 841,656 | 120,286 | 14.3% |
| 2016 | 1,275,979 | 154,699 | 12.1% |
| 2017 | 838,190 | 119,902 | 14.3% |
| 2018 | 756,882 | 122,481 | 16.2% |
| 2019 | 742,036 | 122,264 | 16.5% |
| 2020 | 1,165,326 | 144,427 | 12.4% |
| 2021 | 1,020,764 | 133,013 | 13.0% |
| 2022 | 896,664 | 124,367 | 14.0% |
| Jan. 1, 2023-June 30, 2023 | 387,881 (partial year only) | 58,757 (partial year only) | 15.0% (partial year only) |

16

1

2        As discovery is ongoing, Defendant also reserves the right to disclose any

3   additional facts, information, or evidence responsive to this request that may turn

4   up or become relevant in the future.

5   **INTERROGATORY NO. 4:**

6        State the percentage of firearms TRANSACTIONS that have been

7   PROCESSED AND COMPLETED through FFL DEALERS that were not

8   PRIVATE PARTY TRANSACTIONS for each year from 2014 to 2019.

9   **RESPONSE TO INTERROGATORY NO. 4:**

10       Defendant incorporates by reference the General Objections stated above,

11  including objections to definitions and instructions, as if fully set forth herein.

12       Defendant objects to the definition of "PROCESSED AND COMPLETED" as

13  vague, unintelligible, and overbroad, including because it (1) purports to cover

14  firearms transactions "approved by the California Department of Justice" but does

15  not define "approved" or clarify whether it is meant to refer solely to transactions

16  processed through FFLs and (2) purports to cover transactions in which firearms are

17  "lawfully delivered" to a purchaser without defining the intended scope of

18  "lawfully."  Defendant also objects to the definition of "PROCESSED AND

19  COMPLETED" insofar as it does not clarify whether it covers only firearms

20  transactions in which firearms are purchased, or all firearms transfers of any type.

21  Defendant further objects to this interrogatory as vague and ambiguous in that it is

22  not clear whether the interrogatory seeks calculation of the percentage of total

23  firearms transactions conducted through FFL dealers that were dealer sales or other

24  transfers, or something else.  Accordingly, Defendant cannot answer the

25  interrogatory as drafted.

26       Defendant also objects to the interrogatory to the extent that it seeks expert

27  materials, including information or facts that expert witnesses may locate or rely

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55
DX0612

1   on, outside of the framework and schedule for expert disclosures.  Defendant also

2   objects that the interrogatory calls for information protected from disclosure by the

3   attorney-client privilege, the governmental deliberative process privilege, the

4   official information privilege, the attorney work product doctrine, and other

5   applicable privileges and protections.

6       Subject to and without waiving the foregoing objections, Defendant responds:

7   In responding to this interrogatory, Defendant construes the interrogatory to be

8   asking what percentage of overall firearm transactions conducted through FFL

9   dealers were any kind of transaction other than a private party transaction.

10      Data responsive to this interrogatory was most recently retrieved and tabulated

11  on February 12, 2021.  Defendant will provide the requested information for each

12  full calendar year (January 1-December 31) from 2014-2020.  The data provided

13  reflects the transactions created in California by FFL dealers through the Dealer

14  Record of Sales Entry System, and therefore does not include operation of law

15  transfers.

16      Subject to the above qualifications, as of February 12, 2021, the Department

17  of Justice's records reflected the following totals and percentages for calendar years

18  January 2014-2020:

19

20

21

22

23

24

25

26

27

28

| Transaction Creation Year | Total Firearms Transactions Conducted Through FFL Dealers | Number of Firearms Transactions Conducted Through FFL Dealers That Were Any Transaction Other Than a Private Party Transaction | Percentage of Firearms Transactions Conducted Through FFL Dealers That Were Any Transaction Other Than a Private Party Transaction |
|---|---|---|---|
| 2014 | 876,639 | 771,662 | 88% |
| 2015 | 841,657 | 721,371 | 85.7% |
| 2016 | 1,275,982 | 1,121,282 | 87.9% |
| 2017 | 838,195 | 718,292 | 85.7% |
| 2018 | 756,864 | 634,392 | 83.8% |
| 2019 | 741,995 | 619,738 | 83.5% |
| 2020 | 1,165,299 | 1,020,892 | 87.6% |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Defendant incorporates by reference all general and specific objections asserted in Defendant's original response, as well as the entirety of Defendants' original response.

Subject to and without waiving the foregoing objections and incorporation of Defendant's original response, Defendant responds:  In responding to this interrogatory, Defendant construes the interrogatory to be asking what percentage of overall firearm transactions conducted through FFL dealers were any kind of transaction other than a private party transaction.

Data responsive to this interrogatory was most recently retrieved and tabulated on June 30, 2023.  Defendant will provide updates to the requested information for

19

each full calendar year (January 1-December 31) from 2014-2022, as well as partial-year data for January 1, 2023-June 30, 2023.  The data provided reflects the transactions created in California by FFL dealers through the Dealer Record of Sales Entry System, and therefore does not include operation of law transfers.

Subject to the above qualifications, as of June 30, 2023, the Department of Justice's records reflected the following totals and percentages for the following years:

| Transaction Creation Year | Total Firearms Transactions Conducted Through FFL Dealers | Number of Firearms Transactions Conducted Through FFL Dealers That Were Any Transaction Other Than a Private Party Transaction | Percentage of Firearms Transactions Conducted Through FFL Dealers That Were Any Transaction Other Than a Private Party Transaction |
|---|---|---|---|
| 2014 | 876,637 | 771,660 | 88.0% |
| 2015 | 841,656 | 721,370 | 85.7% |
| 2016 | 1,275,979 | 1,121,280 | 87.9% |
| 2017 | 838,190 | 718,288 | 85.7% |
| 2018 | 756,882 | 634,401 | 83.8% |
| 2019 | 742,036 | 619,772 | 83.5% |
| 2020 | 1,165,326 | 1,020,899 | 87.6% |
| 2021 | 1,020,764 | 887,751 | 87.0% |
| 2022 | 896,664 | 772,297 | 86.1% |
| Jan. 1, 2023-June 30, 2023 | 387,881 (partial year only) | 329,147 (partial year only) | 84.9% (partial year only) |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

20

**INTERROGATORY NO. 5:**

Identify the total number of OPERATION OF LAW transfers have been PROCESSED AND COMPLETED each year from 2014 to 2020.

**RESPONSE TO INTERROGATORY NO. 5:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein.

Defendant objects to the definition of "PROCESSED AND COMPLETED" as vague, unintelligible, and overbroad, including because it (1) purports to cover firearms transactions "approved by the California Department of Justice" but does not define "approved" or clarify whether it is meant to refer solely to transactions processed through FFLs and (2) purports to cover transactions in which firearms are "lawfully delivered" to a purchaser without defining the intended scope of "lawfully."  Defendant also objects to the definition of "PROCESSED AND COMPLETED" insofar as it does not clarify whether it covers only firearms transactions in which firearms are purchased, or all firearms transfers of any type. Defendant further objects to this interrogatory as vague, ambiguous, and unintelligible, because "operation of law" firearms transfers are not PROCESSED AND COMPLETED through FFL DEALERS.  *See* Cal. Penal Code § 27920(a) (exempting operation of law transfers made pursuant to that section from the requirement in California Penal Code § 27545 that transfers be conducted through a FFL dealer).  Accordingly, Defendant cannot answer the interrogatory as drafted.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the

official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Subject to and without waiving the foregoing objections, Defendant responds: In responding to this interrogatory, Defendant construes the interrogatory to be asking for the total number of operation of law transfers for which the Department has data, and includes any operation of law transfer permissible under California law.  Because these kinds of transactions are not conducted through FFL DEALERS, they are not "PROCESSED AND COMPLETED" within Defendants' definition.  *See* Cal. Penal Code § 27920(a).  Nonetheless, Defendant is able to provide data reflecting the number of operation of law transfers entered into the California Firearms Application Reporting System ("CFARS") that the Department of Justice has in its records.

Data responsive to this interrogatory was most recently retrieved and tabulated on February 12, 2021.  Defendant will provide the requested information for each full calendar year (January 1-December 31) from 2014-2020.

Subject to the above qualifications, as of February 12, 2021, the Department of Justice's records reflected the following total number of operation of law transfers of any kind permissible under California law for each of the following years:

| Transaction Creation Year | Total Number of Operation of Law Transfers for Full Calendar Year |
|---|---|
| 2014 | 12,742 |
| 2015 | 13,404 |
| 2016 | 3,774 |
| 2017 | 3,083 |
| 2018 | 2,767 |
| 2019 | 2,919 |
| 2020 | 1,903 |

1

2      As discovery is ongoing, Defendant also reserves the right to disclose any

3  additional facts, information, or evidence responsive to this request that may turn

4  up or become relevant in the future.

5  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

6      Defendant incorporates by reference all general and specific objections

7  asserted in Defendant's original response, as well as the entirety of Defendants'

8  original response.

9      Subject to and without waiving the foregoing objections and incorporation of

10  Defendant's original response, Defendant responds:  In responding to this

11  interrogatory, Defendant construes the interrogatory to be asking for the total

12  number of operation of law transfers for which the Department has data, and

13  includes any operation of law transfer permissible under California law.  Because

14  these kinds of transactions are not conducted through FFL DEALERS, they are not

15  "PROCESSED AND COMPLETED" within Defendants' definition.  *See* Cal.

16  Penal Code § 27920(a).  Nonetheless, Defendant is able to provide updated data

17  reflecting the number of operation of law transfers entered into the California

18  Firearms Application Reporting System ("CFARS") that the Department of Justice

19  has in its records.

20      Data responsive to this interrogatory was most recently retrieved and tabulated

21  on June 30, 2023.  Defendant will provide updates to the requested information for

22  each full calendar year (January 1-December 31) from 2014-2022.

23      Subject to the above qualifications, as of June 30, 2023, the Department of

24  Justice's records reflected the following total number of operation of law transfers

25  of any kind permissible under California law for each of the following years:

26

27

28

| Transaction Creation Year | Total Number of Operation of Law Transfers for Full Calendar Year |
|---|---|
| 2014 | 12,742 |
| 2015 | 13,404 |
| 2016 | 3,774 |
| 2017 | 3,084 |
| 2018 | 2,770 |
| 2019 | 2,924 |
| 2020 | 2,081 |
| 2021 | 2,708 |
| 2022 | 2,373 |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**INTERROGATORY NO. 6:**

Identify the total number of HUNTERS LICENSE EXEMPTION transfers that have occurred in California since January 1, 2019.

**RESPONSE TO INTERROGATORY NO. 6:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein.

Defendant objects to this interrogatory on the ground that it is vague and ambiguous because it does not define "HUNTERS LICENSE EXEMPTION transfers." Accordingly, Defendant cannot answer the interrogatory as drafted.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures. Defendant also

24

1    objects that the interrogatory calls for information protected from disclosure by the

2    attorney-client privilege, the governmental deliberative process privilege, the

3    official information privilege, the attorney work product doctrine, and other

4    applicable privileges and protections.

5         Subject to and without waiving the foregoing objections, Defendant responds:

6    Although FFL dealers must verify at the point of sale or transaction the validity of

7    hunting licenses used for the purposes of invoking the hunting license exemption

8    set forth in Penal Code § 27510(b)(1) and maintain appropriate records, the

9    Department of Justice and Bureau of Firearms do not currently track when a

10    purchaser or transferee under the age of 21 uses the hunting license exemption set

11    forth in Penal Code § 27510(b)(1).  Department of Justice and Bureau of Firearms

12    are able to track firearms transactions completed through a FFL dealer, including

13    sales and other types of transfers, in which the purchaser or transferee invoked the

14    parallel hunter's license exemption from the Firearm Safety Certificate ("FSC")

15    requirement set forth in Penal Code § 31700(c).  Under that FSC exemption, "[a]

16    person, validly identified, who has been issued a valid hunting license that is

17    unexpired or that was issued for the hunting season immediately preceding the

18    calendar year in which the person takes title or possession of a firearm is exempt

19    from the firearm safety certificate requirement in subdivision (a) of Section 31615,

20    except as to handguns."  Penal Code § 31700(c).  The Dealer Record of Sale Entry

21    System is configured to record which FSC exemption was used, and not which

22    exemption from the provisions of Penal Code § 27510 was used.  Accordingly, in

23    responding to this interrogatory, Defendant construes "HUNTERS LICENSE

24    EXEMPTION transfers" to comprise those transfers in which purchasers or

25    transferees invoked Penal Code § 31700(c)'s hunting license exemption from the

26    FSC requirement.

27

28

Data responsive to this interrogatory was most recently retrieved and tabulated on March 25, 2021. Defendant will provide the requested information for full calendar years 2019 and 2021, and partial calendar year 2021. The data provided reflects the transactions completed in California by FFL dealers through the Dealer Record of Sales Entry System in which a hunter's license was recorded as a basis for exemption from California's FSC requirement.

Subject to the above qualifications, as of March 25, 2021, the Department of Justice's records reflected the following total number of hunter's license FSC exemption transfers completed in California through FFL dealers in each of the following time periods, for all age groups:

| Transaction Creation Period | Total Number of Hunters License Exemption Transfers (Exemption from Firearm Safety Certificate Requirement) |
|---|---|
| January 1, 2019-December 31, 2019 | 34,442 |
| January 1, 2020-December 31, 2020 | 34,491 |
| January 1, 2021-March 25, 2021 | 6,669 |

Although not requested, Defendant also provides data responsive to this request, restricted to purchasers or transferees aged 18-20. Data responsive to this interrogatory for the 18-20-year-old age group was most recently retrieved and tabulated on March 25, 2021. As of March 25, 2021, the Department of Justice's records reflected the following total number of hunter's license FSC exemption transfers completed in California through FFL dealers in each of the following time periods, where the purchaser or transferee was between the ages of 18-20:

| Transaction Creation Period | Total Number of Hunters License Exemption Transfers (Exemption from Firearm Safety Certificate Requirement) for Purchasers or Transferees Aged 18-20 |
|---|---|
| January 1, 2019- December 31, 2019 | 2,960 |
| January 1, 2020- December 31, 2020 | 4,010 |
| January 1, 2021- March 25, 2021 | 947 |

Although not requested, Defendant also provides data responsive to this request, restricted to purchasers or transferees aged 18-20, for long guns only. Data responsive to this interrogatory for the 18-20-year-old age group and long purchases only was most recently retrieved and tabulated on February 16, 2021 (for full calendar years 2015-2020) and March 25, 2021 (for the partial year 2021). As of February 16, 2021 and March 25, 2021, the Department of Justice's records reflected the following total number of hunter's license FSC exemption transfers completed in California through FFL dealers in each of the following time periods, where the purchaser or transferee was between the ages of 18-20, and the transfer involved long guns:

| Transaction Creation Period | Total Number of Hunters License Exemption Transfers (Exemption from Firearm Safety Certificate Requirement) for Purchasers or Transferees Aged 18-20, Transfer of Long Guns |
|---|---|
| January 1, 2015- December 31, 2015 | 2,115 |
| January 1, 2016- December 31, 2016 | 2,549 |

27

| | |
|---|---|
| January 1, 2017-December 31, 2017 | 1,878 |
| January 1, 2018-December 31, 2018 | 1,878 |
| January 1, 2019-December 31, 2019 | 2,960 |
| January 1, 2020-December 31, 2020 | 4,010 |
| January 1, 2021-March 25, 2021 | 947 |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Defendant incorporates by reference all general and specific objections asserted in Defendant's original response, as well as the entirety of Defendants' original response.

Subject to and without waiving the foregoing objections and incorporation of Defendant's original response, Defendant responds: Although FFL dealers must verify at the point of sale or transaction the validity of hunting licenses used for the purposes of invoking the hunting license exemption set forth in Penal Code § 27510(b)(1) and maintain appropriate records, the Department of Justice and Bureau of Firearms could not automatically track through the Dealer Record of Sale Entry System (the "DES") when a purchaser or transferee under the age of 21 used the hunting license exemption set forth in Penal Code § 27510(b)(1) until technological changes were made to the DES as of July 1, 2021. Prior to July 1, 2021, Department of Justice and Bureau of Firearms were able to track firearms transactions completed through a FFL dealer, including sales and other types of

28

1   transfers, in which the purchaser or transferee invoked the parallel hunter's license

2   exemption from the Firearm Safety Certificate ("FSC") requirement set forth in

3   Penal Code § 31700(c).  Under that FSC exemption, "[a] person, validly identified,

4   who has been issued a valid hunting license that is unexpired or that was issued for

5   the hunting season immediately preceding the calendar year in which the person

6   takes title or possession of a firearm is exempt from the firearm safety certificate

7   requirement in subdivision (a) of Section 31615, except as to handguns."  Penal

8   Code § 31700(c).  Until July 1, 2021, the DES was configured to directly record

9   only which FSC exemption was used, not which exemption from the provisions of

10  Penal Code § 27510 was used.  Beginning on July 1, 2021, the DES was configured

11  to permit dealers to record electronically which age exemption provision of Penal

12  Code § 27510 was invoked for sales and transfers of firearms to those aged 18-20.

13  Accordingly, in responding to this interrogatory, for the periods preceding July 1,

14  2021, Defendant construes "HUNTERS LICENSE EXEMPTION transfers" to

15  comprise those transfers in which purchasers or transferees invoked Penal Code §

16  31700(c)'s hunting license exemption from the FSC requirement.  For the periods

17  following July 1, 2021 Defendant construes "HUNTERS LICENSE EXEMPTION

18  transfers" to comprise those transfers in which purchasers or transferees invoked

19  Penal Code § 27510(b)(1)'s age limit exemption, except where otherwise noted.

20      Data responsive to this interrogatory was most recently retrieved and tabulated

21  on August 18, 2023.  Defendant will provide updates to the requested information

22  for each full calendar year (January 1-December 31) from 2014-2022, as well as

23  partial-year data for January 1, 2023-June 30, 2023.  The data provided reflects the

24  transactions completed in California by FFL dealers through the Dealer Record of

25  Sales Entry System in which a hunter's license was recorded as a basis for

26  exemption from California's FSC requirement and/or Penal Code § 27510's age

27  limit.

28

1   Subject to the above qualifications, as of August 18, 2023, the Department of

2   Justice's records reflected the following total number of FSC or Section 27510

3   hunter's license exemption transfers completed in California through FFL dealers in

4   each of the following time periods, for all age groups, except where noted:

| Transaction Creation Period | Total Number of Hunters License Exemption Transfers |
|---|---|
| January 1, 2019-December 31, 2019 (FSC Exemption, all ages) | 34,466 |
| January 1, 2020-December 31, 2020 (FSC Exemption, all ages) | 34,491 |
| January 1, 2021-December 31, 2021 (FSC Exemption, all ages) | 35,787 |
| July 1, 2021-December 31, 2021 (Penal Code § 27510 Age Exemptions; partial year) | 2,759 (partial year only; reflecting 18-20-year-olds only) |
| January 1, 2022-December 31, 2022 (FSC Exemption, all ages) | 32,623 |
| January 1, 2022-December 31, 2022 (Penal Code § 27510 Age Exemption) | 5,063 (reflecting 18-20-year-olds only) |
| January 1, 2023-June 30, 2023 (FSC Exemption, all ages) | 13,820 (partial year only) |

30

| January 1, 2023-June 30, 2023 (Penal Code § 27510 Age Exemptions; partial year) | 2,277 (partial year only; reflecting 18-20-year-olds only) |
|---|---|

Although not requested, Defendant also provides data responsive to this request, restricted to purchasers or transferees aged 18-20. Data responsive to this interrogatory for the 18-20-year-old age group was most recently retrieved and tabulated on August 18, 2023. As of August 18, 2023, the Department of Justice's records reflected the following total number of hunter's license FSC exemption transfers completed in California through FFL dealers in each of the following time periods, where the purchaser or transferee was between the ages of 18-20:

| Transaction Creation Period | Total Number of Hunters License Exemption Transfers for Purchasers or Transferees Aged 18-20 |
|---|---|
| January 1, 2019-December 31, 2019 (FSC Exemptions) | 3,096 |
| January 1, 2020-December 31, 2020 (FSC Exemptions) | 4,247 |
| January 1, 2021-December 31, 2021 (FSC Exemptions) | 5,205 |
| July 1, 2021-December 31, 2021 (Penal Code § 27510 Age Exemptions; partial year) | 2,759 (partial year only) |
| January 1, 2022-December 31, 2022 (Penal Code § 27510 Age Exemptions) | 5,063 |
| January 1, 2023-June 30, 2023 (Penal Code § 27510 Age Exemptions; partial year) | 2,277 (partial year only) |

31

1

2    Although not requested, Defendant also provides data regarding the total

3    number of firearms transfers completed in California through FFL dealers for each

4    full calendar year (January 1-December 31) from 2019-2022, as well as partial-year

5    data for January 1, 2023-June 30, 2023, for individual purchasers or transferees

6    aged 18-20, where the purchaser or transferee invoked one of California Penal Code

7    § 31700(a)'s exemptions to the FSC requirement for military or law enforcement

8    personnel (for 2019-2021 years), or the military and law enforcement exemptions in

9    Penal Code § 27510(b)(2) & (3) (for July 1, 2021-December 31, 2021, full year

10   2022, and January 1, 2023-June 30, 2023).  The data provided reflects the

11   transactions completed in California by FFL dealers through the Dealer Record of

12   Sales Entry System in which status as active, reserve, or retired status in the

13   military or law enforcement was recorded as a basis for exemption from

14   California's FSC requirement or Section 27510's age limit.

15   As of August 18, 2023, the Department of Justice's records reflected the

16   following total number of firearms transactions completed in California through

17   FFL dealers in each of the following time periods, for individual purchasers or

18   transferees aged 18-20, where the purchaser or transferee invoked one of California

19   Penal Code § 31700(a)'s exemptions to the FSC requirement for military or law

20   enforcement personnel, or one of the military and law enforcement age exemptions

21   in Penal Code § 27510(b)(2) & (3):

22

23

24

25

26

27

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)
Exhibit 55
DX0627

| Transaction Creation Period | Total Number of Military or Law Enforcement Exemption Transfers for Purchasers or Transferees Aged 18-20 |
|---|---|
| January 1, 2019-December 31, 2019 (FSC Exemptions) | 508 |
| January 1, 2020-December 31, 2020 (FSC Exemptions) | 491 |
| January 1, 2021-December 31, 2021 (FSC Exemptions) | 452 |
| July 1, 2021-December 31, 2021 (Penal Code § 27510 Age Exemptions; partial year) | 204 (partial year only) |
| January 1, 2022-December 31, 2022 (Penal Code § 27510 Age Exemptions) | 368 |
| January 1, 2023-June 30, 2023 (Penal Code § 27510 Age Exemptions; partial year) | 178 (partial year only) |

As discovery is ongoing, Defendant also reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**INTERROGATORY NO. 7:**

Do YOU contend that requiring YOUNG ADULTS to ENLIST in MILITARY SERVICE in order to purchase a firearm is equivalent to or necessary to satisfy reasonable safety training?

**RESPONSE TO INTERROGATORY NO. 7:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant also incorporates by reference his general and specific objections, as well as his responses, to the requests set forth in Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including but not limited to his response to request for admission 17.  Defendant objects on the ground that the interrogatory is vague, unintelligible, and ambiguous, including because Plaintiffs do not define "reasonable safety training" or identify which specific branch of the military the interrogatory references.  Defendant also objects on the ground that the interrogatory improperly calls for speculation.  Defendant further objects to this interrogatory on the basis that nothing in Section 27510 "requir[es] YOUNG ADULTS to ENLIST in MILITARY SERVICE in order to purchase a firearm." Section 27510 by its own terms regulates and penalizes only the conduct of FFLs in transactions that are required to be conducted through FFLs.  Accordingly, Defendant cannot answer the interrogatory as drafted.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

34

1       Subject to and without waiving the foregoing objections, Defendant responds

2   that firearm safety training for purposes of acquiring certain firearms can be

3   procured through avenues other than military training, including through training

4   for service in law enforcement, *see* Cal. Penal Code §27510(b)(3)(A)-(C), or

5   through an official hunter education course if the Young Adult seeks to acquire a

6   firearm that is neither a handgun nor a semiautomatic centerfire rifle from a FFL,

7   *see* Cal. Penal Code § 27510(b)(1).  In addition, as discovery is ongoing, Defendant

8   reserves the right to disclose any additional facts, information, or evidence

9   responsive to this request that may turn up or become relevant in the future,

10  including but not limited to whatever expert testimony, reports, and supporting

11  materials he offers in accordance with the Federal Rules of Civil Procedure and

12  scheduling orders in this case.

13

14  **INTERROGATORY NO. 8:**

15      If YOUR response to interrogatory 7 is in the affirmative, STATE ALL

16  FACTS substantiating YOUR response.

17  **RESPONSE TO INTERROGATORY NO. 8:**

18      Defendant incorporates by reference the General Objections stated above,

19  including objections to definitions and instructions, as if fully set forth herein.

20  Defendant also incorporates the objections set forth in his response to interrogatory

21  7 above as if fully set forth herein.  Defendant also incorporates by reference his

22  general and specific objections, as well as his responses, to the requests set forth in

23  Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including

24  but not limited to his response to request for admission 17.

25      Defendant also objects to the interrogatory to the extent that it seeks expert

26  materials, including information or facts that expert witnesses may locate or rely

27  on, outside of the framework and schedule for expert disclosures.  Defendant also

28

1  objects that the interrogatory calls for information protected from disclosure by the

2  attorney-client privilege, the governmental deliberative process privilege, the

3  official information privilege, the attorney work product doctrine, and other

4  applicable privileges and protections.

5      Defendants' response to interrogatory 7 consists of objections and a narrative

6  response, and is neither affirmative nor negative.  Therefore, no response to

7  interrogatory 8 is required.  Nonetheless, Defendant reiterates that nothing in

8  Section 27510 "requir[es] YOUNG ADULTS to ENLIST in MILITARY

9  SERVICE in order to purchase a firearm."  Section 27510 by its own terms

10  regulates and penalizes only the conduct of FFLs in transactions that are required to

11  be conducted through FFLs.  Accordingly, Defendant cannot answer the

12  interrogatory as drafted.

13      Subject to and without waiving the foregoing objections, Defendant responds

14  that firearm safety training for purposes of acquiring certain firearms can be

15  procured through avenues other than military training, including through training

16  for service in law enforcement, *see* Cal. Penal Code §27510(b)(3)(A)-(C), or

17  through an official hunter education course if the Young Adult seeks to acquire a

18  firearm that is neither a handgun nor a semiautomatic centerfire rifle from a FFL,

19  *see* Cal. Penal Code § 27510(b)(1).  At this time, Defendant intends to rely on

20  whatever expert testimony, reports, and supporting materials he offers in

21  accordance with the Federal Rules of Civil Procedure and scheduling orders in this

22  case.  In addition, as discovery is ongoing, Defendant reserves the right to disclose

23  any additional facts, information, or evidence responsive to this request that may

24  turn up or become relevant in the future.

25

26

27

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55

DX0631

**INTERROGATORY NO. 9:**

Do YOU contend that requiring YOUNG ADULTS to become ACTIVE LAW ENFORCEMENT in order to purchase a firearm is equivalent to or necessary to satisfy reasonable safety training?

**RESPONSE TO INTERROGATORY NO. 9:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant also incorporates by reference his general and specific objections, as well as his responses, to the requests set forth in Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including but not limited to his response to request for admission 17.  Defendant objects on the ground that the interrogatory is vague, unintelligible, and ambiguous, including because Plaintiffs do not define "reasonable safety training" or identify which specific law enforcement agency the interrogatory references.  Defendant also objects on the ground that the interrogatory improperly calls for speculation.  Defendant further objects to this interrogatory on the basis that nothing in Section 27510 "requir[es] YOUNG ADULTS to become ACTIVE LAW ENFORCEMENT in order to purchase a firearm."  Section 27510 by its own terms regulates and penalizes only the conduct of FFLs in transactions that are required to be conducted through FFLs. Accordingly, Defendant cannot answer the interrogatory as drafted.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

1        Subject to and without waiving the foregoing objections, Defendant responds

2    that firearm safety training for purposes of acquiring certain firearms can be

3    procured through avenues other than law enforcement training, including through

4    training for service in the armed forces, *see* Cal. Penal Code §27510(b)(3)(D), or

5    through an official hunter education course if the Young Adult seeks to acquire a

6    firearm that is neither a handgun nor a semiautomatic centerfire rifle from a FFL,

7    *see* Cal. Penal Code § 27510(b)(1).  In addition, as discovery is ongoing, Defendant

8    reserves the right to disclose any additional facts, information, or evidence

9    responsive to this request that may turn up or become relevant in the future,

10   including but not limited to whatever expert testimony, reports, and supporting

11   materials he offers in accordance with the Federal Rules of Civil Procedure and

12   scheduling orders in this case.

13

14   **INTERROGATORY NO. 10:**

15       If YOUR response to interrogatory 9 is in the affirmative, STATE ALL

16   FACTS substantiating YOUR response.

17   **RESPONSE TO INTERROGATORY NO. 10:**

18       Defendant incorporates by reference the General Objections stated above,

19   including objections to definitions and instructions, as if fully set forth herein.

20   Defendant also incorporates the objections set forth in his response to interrogatory

21   9 above as if fully set forth herein.  Defendant also incorporates by reference his

22   general and specific objections, as well as his responses, to the requests set forth in

23   Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including

24   but not limited to his response to request for admission 17.

25       Defendant also objects to the interrogatory to the extent that it seeks expert

26   materials, including information or facts that expert witnesses may locate or rely

27   on, outside of the framework and schedule for expert disclosures.  Defendant also

28

1  objects that the interrogatory calls for information protected from disclosure by the

2  attorney-client privilege, the governmental deliberative process privilege, the

3  official information privilege, the attorney work product doctrine, and other

4  applicable privileges and protections.

5      Defendants' response to interrogatory 9 consists of objections and a narrative

6  response, and is neither affirmative nor negative.  Therefore, no response to

7  interrogatory 10 is required.  Nonetheless, Defendant reiterates that nothing in

8  Section 27510 "requir[es] YOUNG ADULTS to become ACTIVE LAW

9  ENFORCEMENT in order to purchase a firearm."  Section 27510 by its own terms

10 regulates and penalizes only the conduct of FFLs in transactions that are required to

11 be conducted through FFLs.  Accordingly, Defendant cannot answer the

12 interrogatory as drafted.

13     Subject to and without waiving the foregoing objections, Defendant responds

14 that firearm safety training for purposes of acquiring certain firearms can be

15 procured through avenues other than law enforcement training, including through

16 training for service in the armed forces, *see* Cal. Penal Code §27510(b)(3)(D), or

17 through an official hunter education course if the Young Adult seeks to acquire a

18 firearm that is neither a handgun nor a semiautomatic centerfire rifle from a FFL,

19 *see* Cal. Penal Code § 27510(b)(1).  At this time, Defendant intends to rely on

20 whatever expert testimony, reports, and supporting materials he offers in

21 accordance with the Federal Rules of Civil Procedure and scheduling orders in this

22 case.  In addition, as discovery is ongoing, Defendant reserves the right to disclose

23 any additional facts, information, or evidence responsive to this request that may

24 turn up or become relevant in the future.

25

26

27

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55

DX0634

**INTERROGATORY NO. 11:**

Do you contend that LOANING FIREARMS pursuant to California Penal Code sections 27880, 27885, and 27910 transfers LEGAL OWNERSHIP of firearms?

**RESPONSE TO INTERROGATORY NO. 11:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant also incorporates by reference his general and specific objections, as well as his responses, to the requests set forth in Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including but not limited to his response to request for admission 3.

Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Defendant further objects that this interrogatory seeks Defendant's contentions regarding the scope and limits of multiple California laws in the Penal Code regarding loans of firearms, and thus poses multiple pure questions of law.  *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case" are not permitted." (quotation marks omitted)).  A party "is not required to write his brief on a motion for summary judgment in his responses to interrogatories." *Larson v.*

1    *Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal.
2    Apr. 28, 2017) (internal punctuation omitted).

3        Subject to and without waiving the foregoing objections, Defendant responds:
4    No, loaning firearms pursuant to California Penal Code §§ 27880, 27885, and
5    27910 does not permanently transfer legal ownership of a firearm from one
6    individual to another.  In addition, as discovery is ongoing, Defendant reserves the
7    right to disclose any additional facts, information, or evidence responsive to this
8    request that may turn up or become relevant in the future, including but not limited
9    to whatever expert testimony, reports, and supporting materials he offers in
10   accordance with the Federal Rules of Civil Procedure and scheduling orders in this
11   case.

12

13   **INTERROGATORY NO. 12:**

14       Do YOU contend that LOANING FIREARMS pursuant to California Penal
15   Code Section 27885 lawfully permits LOANING FIREARMS to YOUNG
16   ADULTS?

17   **RESPONSE TO INTERROGATORY NO. 12:**

18       Defendant incorporates by reference the General Objections stated above,
19   including objections to definitions and instructions, as if fully set forth herein.
20   Defendant also incorporates by reference his general and specific objections, as
21   well as his responses, to the requests set forth in Plaintiffs' First Set of Requests for
22   Admission as if fully set forth herein, including but not limited to his response to
23   request for admission 5.

24       Defendant also objects to the interrogatory to the extent that it seeks expert
25   materials, including information or facts that expert witnesses may locate or rely
26   on, outside of the framework and schedule for expert disclosures.  Defendant also
27   objects that the interrogatory calls for information protected from disclosure by the

28

1    attorney-client privilege, the governmental deliberative process privilege, the

2    official information privilege, the attorney work product doctrine, and other

3    applicable privileges and protections.

4        Defendant further objects that although this interrogatory references one

5    section of the Penal Code, it seeks Defendant's contentions regarding the scope and

6    limits of multiple California laws in the Penal Code and other code sections

7    regulating transfers, loans, and possession of firearms, and thus poses multiple pure

8    questions of law. *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-

9    YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories

10   directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the

11   facts of the case" are not permitted." (quotation marks omitted)).  A party "is not

12   required to write his brief on a motion for summary judgment in his responses to

13   interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017

14   WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (internal punctuation omitted).

15       Subject to and without waiving the foregoing objections, Defendant responds:

16   Yes.  Firearms may be loaned lawfully to young adults between the ages of 18-20

17   under the specific circumstances set forth in California Penal Code § 27885, where

18   the young adults are not prohibited by state or federal law from possessing,

19   receiving, owning, or purchasing a firearm.  In addition, as discovery is ongoing,

20   Defendant reserves the right to disclose any additional facts, information, or

21   evidence responsive to this request that may turn up or become relevant in the

22   future, including but not limited to whatever expert testimony, reports, and

23   supporting materials he offers in accordance with the Federal Rules of Civil

24   Procedure and scheduling orders in this case.

25

26

27

28

42

**INTERROGATORY NO. 13:**

If YOUR response to interrogatory 12 is in the affirmative, STATE ALL
FACTS substantiating YOUR response.

**RESPONSE TO INTERROGATORY NO. 13:**

Defendant incorporates by reference the General Objections stated above,
including objections to definitions and instructions, as if fully set forth herein.
Defendant also incorporates the objections set forth in his response to interrogatory
12 above as if fully set forth herein.  Defendant also incorporates by reference his
general and specific objections, as well as his responses, to the requests set forth in
Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including
but not limited to his response to request for admission 5.

Defendant also objects to the interrogatory to the extent that it seeks expert
materials, including information or facts that expert witnesses may locate or rely
on, outside of the framework and schedule for expert disclosures.  Defendant also
objects that the interrogatory calls for information protected from disclosure by the
attorney-client privilege, the governmental deliberative process privilege, the
official information privilege, the attorney work product doctrine, and other
applicable privileges and protections.

Defendant further objects that although interrogatories 12 and 13 reference
one section of the Penal Code, they seek Defendant's contentions regarding the
scope and limits of multiple California laws in the Penal Code and other code
sections regulating transfers, loans, and possession of firearms, and thus poses
multiple pure questions of law.  *See AngioScore, Inc. v. TriReme Med., Inc.*, No.
12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)
("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not
dependent on the facts of the case" are not permitted." (quotation marks omitted)).
A party "is not required to write his brief on a motion for summary judgment in his

43

1    responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-

2    WHO, 2017 WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (internal punctuation

3    omitted).

4        Subject to and without waiving the foregoing objections, Defendant states that

5    firearms may be loaned lawfully to young adults between the ages of 18-20 under

6    the specific circumstances set forth in California Penal Code § 27885, where the

7    young adults are not prohibited by state or federal law from possessing, receiving,

8    owning, or purchasing a firearm.  Section 27510 by its own terms regulates and

9    penalizes only the conduct of FFLs in transactions that are required to be conducted

10   through FFLs; it does not by its terms prohibit Young Adults from possessing,

11   owning, purchasing, or receiving transfer of firearms.  Subsection (d) of California

12   Penal Code § 27885 refers to individual *transferees* who are themselves "prohibited

13   by state or federal law from possessing, receiving, owning, or purchasing a

14   firearm."  Such individuals include those who are expressly prohibited from

15   possessing, receiving, owning, or purchasing firearms due to convictions for prior

16   offenses or under certain restraining orders or injunctions, *see* Cal. Penal Code §§

17   29800-29830, 29900-29905, or due to mental illness, *see* Cal. Welf. & Inst. Code

18   §§ 8100, 8103.  *See also* Cal. Penal Code § 27500 (identifying prohibited classes).

19   Furthermore, Section 27885 by its terms sets forth circumstances under which

20   certain types of loans may occur *without* the involvement of a FFL—in other

21   words, it sets forth parameters for certain types of loans between private parties

22   who do not hold FFL licenses.  *See* Cal. Penal Code § 27885 ("Section 27545 does

23   not apply to the loan of a firearm if all of the following conditions exist . . ."); *see*

24   Cal. Penal Code § 27545 (Setting forth general rule that "[w]here neither party to

25   the transaction holds a dealer's license issued pursuant to Sections 26700 to 26915,

26   inclusive, the parties to the transaction shall complete the sale, loan, or transfer of

27

28

44

1  that firearm through a licensed firearms dealer pursuant to Chapter 5 (commencing

2  with Section 28050).").

3      At this time, Defendant intends to rely on whatever expert testimony, reports,

4  and supporting materials he offers in accordance with the Federal Rules of Civil

5  Procedure and scheduling orders in this case.  In addition, as discovery is ongoing,

6  Defendant reserves the right to disclose any additional facts, information, or

7  evidence responsive to this request that may turn up or become relevant in the

8  future.

9

10  **INTERROGATORY NO. 14:**

11      Do YOU contend that honorably retired military have less basic training and

12  are less safe with semiautomatic centerfire firearms than active military.

13  **RESPONSE TO INTERROGATORY NO. 14:**

14      Defendant incorporates by reference the General Objections stated above,

15  including objections to definitions and instructions, as if fully set forth herein.

16  Defendant also incorporates by reference his general and specific objections, as

17  well as his responses, to the requests set forth in Plaintiffs' First Set of Requests for

18  Admission as if fully set forth herein, including but not limited to his response to

19  request for admission 16.  Defendant objects on the ground that the interrogatory,

20  which purports to require Defendant to compare members of unidentified armed

21  forces branches, of unidentified ranks or duties, and of unidentified eras, is vague,

22  ambiguous, unduly burdensome, overbroad, calls for information which is not in

23  Defendant's possession, custody, or control, and is not reasonably available to

24  Defendant after a diligent search and reasonable inquiry, and improperly calls for

25  speculation.  Defendant also objects on the ground that the interrogatory is

26  compound, thus presenting two separate interrogatories rather than one, and

27

28

1    therefore seeks to circumvent the limitation on the number of interrogatories that

2    may be served under Federal Rule of Civil Procedure 33.

3        Defendant also objects to the interrogatory to the extent that it seeks expert

4    materials, including information or facts that expert witnesses may locate or rely

5    on, outside of the framework and schedule for expert disclosures.  Defendant also

6    objects that the interrogatory calls for information protected from disclosure by the

7    attorney-client privilege, the governmental deliberative process privilege, the

8    official information privilege, the attorney work product doctrine, and other

9    applicable privileges and protections.

10       Subject to and without waiving any of the foregoing objections, Defendant

11   states:  Defendant does not have sufficient information to respond to this

12   interrogatory.  In addition, as discovery is ongoing, Defendant reserves the right to

13   disclose any additional facts, information, or evidence responsive to this request

14   that may turn up or become relevant in the future, including but not limited to

15   whatever expert testimony, reports, and supporting materials he offers in

16   accordance with the Federal Rules of Civil Procedure and scheduling orders in this

17   case

18

19   **INTERROGATORY NO. 15:**

20       If YOUR response to interrogatory 14 is in the affirmative, STATE ALL

21   FACTS substantiating YOUR response.

22   **RESPONSE TO INTERROGATORY NO. 15:**

23       Defendant incorporates by reference the General Objections stated above,

24   including objections to definitions and instructions, as if fully set forth herein.

25   Defendant also incorporates the objections set forth in his response to interrogatory

26   14 above as if fully set forth herein. Defendant also incorporates by reference his

27   general and specific objections, as well as his responses, to the requests set forth in

28

1    Plaintiffs' First Set of Requests for Admission as if fully set forth herein, including

2    but not limited to his response to request for admission 16.

3        Defendant also objects to the interrogatory to the extent that it seeks expert

4    materials, including information or facts that expert witnesses may locate or rely

5    on, outside of the framework and schedule for expert disclosures.  Defendant also

6    objects that the interrogatory calls for information protected from disclosure by the

7    attorney-client privilege, the governmental deliberative process privilege, the

8    official information privilege, the attorney work product doctrine, and other

9    applicable privileges and protections.

10       Defendants' response to interrogatory 14 consists of objections and is neither

11   affirmative nor negative.  Therefore, no response to interrogatory 15 is required.

12       Subject to and without waiving any of the foregoing objections, Defendant

13   states:  At this time, Defendant intends to rely on whatever expert testimony,

14   reports, and supporting materials he offers in accordance with the Federal Rules of

15   Civil Procedure and scheduling orders in this case.  In addition, as discovery is

16   ongoing, Defendant reserves the right to disclose any additional facts, information,

17   or evidence responsive to this request that may turn up or become relevant in the

18   future.

19

20   **INTERROGATORY NO. 16:**

21       Is YOUR response to each request for admissions served with this first set of

22   interrogatories an unqualified admission?  If not, for each response that is not an

23   unqualified admission: (a) state the number of the request; (b) state all facts upon

24   which YOU base your response; (c) state the name, address, and telephone number

25   of each person who has knowledge of those facts; and (d) identify all documents

26   and other tangible things that support YOUR response and state the name, address,

27   and telephone number of the person who has each document or thing.

28

**RESPONSE TO INTERROGATORY NO. 16:**

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant also incorporates by reference his general and specific objections, as well as his responses, to each of the requests set forth in Plaintiffs' First Set of Requests for Admission as if fully set forth herein. Defendant objects that this interrogatory with its multiple subparts is compound and seeks to circumvent the limitation on the number of interrogatories that may be served under Federal Rule of Civil Procedure 33. Defendant objects to this interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework for expert disclosures. Defendant objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections. Defendant further objects to the interrogatory on the grounds that it calls on Defendant to duplicate work and identify sources of evidence already completed and identified in responding to Plaintiffs' First Set of Requests for Admission. Defendant objects that this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence relevant to any party's claim or defense and proportional to the needs of the case. Defendant also objects on the grounds that the request is overbroad and without any reasonable limitation in time or scope. Defendant further objects that this interrogatory is vague and ambiguous.

Defendant further objects that this multi-part interrogatory seeks Defendant's contentions regarding the scope and limits of various California laws regulating the sale or transfer of firearms to Young Adults aged 18-20, and thus poses multiple pure questions of law. *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-

48

1   03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014)

2   ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not

3   dependent on the facts of the case" are not permitted." (quotation marks omitted)).

4   A party "is not required to write his brief on a motion for summary judgment in his

5   responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-

6   WHO, 2017 WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (internal punctuation

7   omitted).

8       Subject to and without waiving the foregoing objections, Defendant responds:

9   No, each of Defendant's responses to each request in Plaintiffs' First Set of

10  Requests for Admission served with Plaintiffs' First Set of Interrogatories was not

11  an unqualified admission.  With respect to the requests for admission that

12  Defendant denied in whole or in part or that Defendant admitted with qualifications

13  (Nos. 1, 2, 4, 5, 7, 8, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, and 23),

14  information sought by this interrogatory is set forth in pleadings, evidence, and

15  filings in this matter and in the interlocutory appeal, as well as in Defendant's

16  responses to Plaintiffs' First Set of Requests for Admission.  At this time,

17  Defendant intends to rely on those facts along with whatever expert testimony,

18  reports, and supporting materials he offers in accordance with the Federal Rules of

19  Civil Procedure and scheduling orders in this case.  With respect to request for

20  admission number 9, Defendant did not respond for the reasons and on the basis of

21  the objections stated in his response to that request for admission.  With respect to

22  request for admission number 16, the information known or readily obtainable is

23  insufficient to enable Defendant to admit or deny the request, and Defendant did

24  not respond for the reasons and on the basis of the objections stated in his response

25  to that request for admission.

26      In addition, as discovery is ongoing, Defendant reserves the right to disclose

27  any additional facts, information, or evidence responsive to this request that may

28

49

1   turn up or become relevant in the future.  Defendant will not respond to the
2   remainder of this interrogatory for the reasons stated above.

3   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

4       Defendant incorporates by reference all general and specific objections
5   asserted in Defendant's original response, as well as the entirety of Defendants'
6   original response.

7       Subject to and without waiving the foregoing objections and incorporation of
8   Defendant's original response, Defendant responds:

9       With respect to Plaintiffs' Requests for Admission numbers 20-23, the
10  California Department of Fish and Wildlife posted updated, full-license-year data
11  (for license years running from July 1 through June 30 of the following year), for
12  license years 2020, 2021, and 2022, as well as partial-license-year data for the 2023
13  license year, as of July 31, 2023.  This data, as well as data for the 2010-2019 full
14  license years, is posted publicly on the Department of Fish and Wildlife's web site
15  on its License Statistics web page
16  (https://wildlife.ca.gov/Licensing/Statistics/action/review/content/6949#huntinglice
17  nses).  Data for sets of license years may be accessed through that web page and at
18  the following links:

19  • Hunting Licenses, quantity issued, reported by license year:
20          o  For license years 2020-2023, reported as of July 31, 2023:
21             https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=178041&inline.
22             Defendant expects that the Department of Fish and Wildlife will post
23             updated data regularly for the remainder of the 2023 license year, as
24             well as for future years.
25          o  For license years 2010-2019, reported as of October 31, 2021:
26             https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59821&inline

27
28

- Hunting Licenses, fee listings, reported by license year:
  - For license years 2020-2023:
    https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=178043&inline
  - For license years 2010-2019:
    https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=59820&inline

The Department of Fish and Wildlife's License and Revenue Branch records custodian is Brent George. Mr. George can authenticate the data posted publicly at the above links regarding hunting licenses issued and related fees for each license year. Mr. George may be reached through: Nathan Goedde, Assistant Chief Counsel, California Department of Fish and Wildlife, P.O. Box 944209, Sacramento, CA 94244-2090, Phone: (916) 838-0054.

**INTERROGATORY NO. 17:**

STATE ALL FACTS substantiating YOUR first affirmative defense contained in YOUR "Defendants' Answer to Second Amended Complaint For Declaratory and Injunctive Relief" filed on November 21, 2019.

**RESPONSE TO INTERROGATORY NO. 17:**

Defendants' first affirmative defense alleged in their Answer to the Second Amended Complaint was: "The Second Amended Complaint, and the claims for relief alleged therein, fails to state facts sufficient to constitute a cause of action."

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant objects to the interrogatory as vague and ambiguous. Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures. Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information

51

privilege, the attorney work product doctrine, and other applicable privileges and protections.

Defendant further objects that the interrogatory seeks Defendant's contentions regarding the scope and limits of California's authority to regulate the sale or transfer of firearms by FFLs to Young Adults aged 18-20, and thus poses a pure question of law. *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case" are not permitted." (quotation marks omitted)). A party "is not required to write his brief on a motion for summary judgment in his responses to interrogatories." *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1 (N.D. Cal. Apr. 28, 2017) (internal punctuation omitted). Further, repeating the explanation, argument, and evidence set forth in the discovery responses and submissions of Defendants and amici in the trial court and Ninth Circuit briefing regarding Plaintiffs' preliminary injunction motion in response to this interrogatory would be redundant and serve no purpose, and thus is unduly burdensome and oppressive.

Subject to and without waiving any of the foregoing objections, Defendant responds: Information sought by this interrogatory and setting forth facts and argument regarding the failure of Plaintiffs to state a viable claim are set forth in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction and accompanying declarations and exhibits, ECF Nos. 25, 25-1, 25-2, 25-3, & 25-4, and again in Defendants' answering brief on appeal from the denial of the preliminary injunction and accompanying supplemental excerpts of record, *see Jones v. Becerra*, Ninth Circuit Case No. 20-56174, ECF Nos. 24 & 25, as well as in cases cited in those briefs. Information sought by this interrogatory is also set forth in Defendant's responses to Plaintiffs' First Set of Requests for Admission.

1   Information sought by this interrogatory is also set forth in the briefs and

2   accompanying addendum of amici curiae filed in support of Defendants' position in

3   the interlocutory appeal.  *See Jones v. Becerra*, Ninth Circuit Case No. 20-56174,

4   ECF No. 28 (Brief of Amici Curiae Illinois, Connecticut, Delaware, District of

5   Columbia, Hawaii, Maryland, Massachusetts, Michigan, Minnesota, New Jersey,

6   New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia,

7   and Washington in Support of Defendants-Appellees and Affirmance); ECF No. 29

8   (Brief of *Amici Curiae* Giffords Law Center to Prevent Gun Violence, Brady, the

9   American Federation of Teachers, and the California Federation of Teachers in

10  Support of Appellees and Affirmance): ECF Nos. 30, 30-1, & 30-2 (Brief of

11  Amicus Curiae Everytown for Gun Safety in Support of Appellees and Affirmance,

12  and accompanying addendum); ECF No. 33 (Brief of Amicus Curiae National

13  Education Association Supporting Affirmance in Favor of Defendant-Appellees).

14  At this time, Defendant intends to rely on those facts and evidence along with

15  whatever expert testimony, reports, and supporting materials he offers in

16  accordance with the Federal Rules of Civil Procedure and scheduling orders in this

17  case.  In addition, as discovery is ongoing, Defendant reserves the right to disclose

18  any additional facts, information, or evidence responsive to this request that may

19  turn up or become relevant in the future.

20  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

21       Defendant incorporates by reference all general and specific objections

22  asserted in Defendant's original response, as well as the entirety of Defendants'

23  original response.

24       Subject to and without waiving the foregoing objections and incorporation of

25  Defendant's original response, Defendant responds:

26       The information sought by this interrogatory is set forth in the parties'

27  pleadings, briefing, exhibits, attachments, declarations, evidence, discovery

28

1   responses, and other filings in this matter, including but not limited to all such

2   pleadings, briefing, exhibits, attachments, declarations, evidence, and filings

3   Defendants have submitted opposing Plaintiffs' original Motion for Preliminary

4   Injunction (ECF Nos. 25, 25-1, 25-2, 25-3, 25-4), in supplemental briefing (ECF

5   Nos. 96, 96-1, 96-2), and opposing Plaintiffs' January 16, 2023 Motion for

6   Preliminary Injunction, or Alternatively, Motion for Summary Judgment (ECF Nos.

7   111, 111-1, 111-2, 111-3, 111-4, 111-5, 111-6, 111-7, 111-8, 111-9, 111-10, 111-

8   11).  Plaintiffs were served with and are in possession of all of these pleadings,

9   briefing, exhibits, attachments, declarations, evidence, and other filings.  The

10  information sought by this interrogatory is also set forth in the briefing and

11  supplemental excerpts of record in the interlocutory appeal, *see Jones v. Becerra*,

12  Ninth Circuit Case No. 20-56174, ECF Nos. 24, 25, 29, 55, 58, 77, 78, 81, 82, and

13  84, as well as in cases cited in those briefs and submissions.  Plaintiffs were served

14  with and are in possession of all of these briefs and submissions.

15      Defendant may also rely on information gathered through the depositions of

16  Plaintiffs Jose Chavez (taken August 4, 2023) and Andrew Morris (taken August 3,

17  2023), as well as the depositions of Federal Rule of Civil Procedure 30(b)(6)

18  witnesses who were deposed as the persons most knowledgeable for Plaintiffs

19  North County Shooting Center, Inc. (taken August 15, 2023) and Plaintiff PWGG,

20  L.P. (taken August 16, 2023).  Defendant may also rely on information in exhibits

21  offered in the depositions of these four Plaintiffs and Plaintiff representatives.

22      In addition, Defendant intends to rely on whatever expert testimony, reports,

23  and supporting materials he offers in accordance with the Federal Rules of Civil

24  Procedure and scheduling orders in this case.  As discovery is ongoing, including

25  expert discovery, Defendant reserves the right to disclose any additional facts,

26  information, or evidence responsive to this request and relevant to the standing of

27  any plaintiffs in this action that may turn up or become relevant in the future.

28

54

1

2    **INTERROGATORY NO. 18:**

3        STATE ALL FACTS substantiating YOUR second affirmative defense

4    contained in YOUR "Defendants' Answer to Second Amended Complaint For

5    Declaratory and Injunctive Relief" filed on November 21, 2019.

6    **RESPONSE TO INTERROGATORY NO. 18:**

7        Defendants' second affirmative defense alleged in their Answer to the Second

8    Amended Complaint was:  "Plaintiffs' claims in this action are barred in that they

9    do not have standing to bring them."

10        Defendant incorporates by reference the General Objections stated above,

11    including objections to definitions and instructions, as if fully set forth herein.

12    Defendant objects to the interrogatory as vague and ambiguous.  Defendant also

13    objects to the interrogatory to the extent that it seeks expert materials, including

14    information or facts that expert witnesses may locate or rely on, outside of the

15    framework and schedule for expert disclosures.  Defendant also objects that the

16    interrogatory calls for information protected from disclosure by the attorney-client

17    privilege, the governmental deliberative process privilege, the official information

18    privilege, the attorney work product doctrine, and other applicable privileges and

19    protections.

20        Defendant further objects that the interrogatory seeks Defendant's contentions

21    regarding whether plaintiffs have standing, and thus poses a pure question of law.

22    *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014

23    WL 7188779, at *5 (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories directed to issues

24    of 'pure law'—i.e., abstract legal issues not dependent on the facts of the case" are

25    not permitted." (quotation marks omitted)).  A party "is not required to write his

26    brief on a motion for summary judgment in his responses to interrogatories."

27    *Larson v. Trans Union, LLC*, No. 3:12-CV-05726-WHO, 2017 WL 1540710, at *1

28

1   (N.D. Cal. Apr. 28, 2017) (internal punctuation omitted).  Further, repeating the

2   explanation, argument, and evidence set forth in the discovery responses and

3   submissions of Defendants in the trial court and Ninth Circuit briefing regarding

4   Plaintiffs' preliminary injunction motion in response to this interrogatory would be

5   redundant and serve no purpose, and thus is unduly burdensome and oppressive.

6        Subject to and without waiving any of the foregoing objections, Defendant

7   responds:  Information sought by this interrogatory and setting forth facts and

8   argument regarding the individual plaintiffs' lack of standing are set forth in

9   Defendants' answering brief on appeal from the denial of the preliminary injunction

10  and accompanying supplemental excerpts of record, *see Jones v. Becerra*, Ninth

11  Circuit Case No. 20-56174, ECF Nos. 24 & 25, as well as in cases cited in that

12  brief.   At this time, Defendant intends to rely on those facts and evidence along

13  with whatever expert testimony, reports, and supporting materials he offers in

14  accordance with the Federal Rules of Civil Procedure and scheduling orders in this

15  case, as well as facts and evidence he receives or has received in discovery, both as

16  to the standing of the individual plaintiffs and as to the standing of all other

17  plaintiffs in this matter.  In short, the Second Amendment claim in this action is

18  moot as to the individual plaintiffs; copies of drivers' licenses produced in this

19  litigation by individual plaintiffs Matthew Jones, Thomas Furrh, and Kyle

20  Yamamoto unequivocally establish that all three individual plaintiffs have already

21  attained the age of 21.  Accordingly, Section 27510's age restrictions no longer

22  apply to prohibit a FFL from selling or otherwise transferring a firearm to any of

23  the individual plaintiffs and they are free to purchase or receive transfer of

24  handguns and long guns of all lawful types so long as they are not otherwise

25  prohibited from doing so.

26       In addition, as discovery is ongoing, Defendant reserves the right to disclose

27  any additional facts, information, or evidence responsive to this request and

28

56

1   relevant to the standing of any plaintiffs in this action that may turn up or become

2   relevant in the future.

3   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

4       Defendant incorporates by reference all general and specific objections

5   asserted in Defendant's original response, as well as the entirety of Defendants'

6   original response.

7       Subject to and without waiving the foregoing objections and incorporation of

8   Defendant's original response, Defendant responds:

9       Former Plaintiffs Jones, Furrh, and Yamamoto were voluntarily dismissed

10  from this action after they turned 21.  Plaintiff Jose Chavez will turn 21 on

11  September 18, 2023, and claims as to Mr. Chavez will be mooted on that date

12  because the age limitations of California Penal Code § 27510 will no longer apply

13  to him.  *See* Response of Plaintiff Jose Chavez to Defendants' First Set of Requests

14  for Production (Set One), Attachment 1 (Jose Chavez Driver's License), production

15  page numbers JC001-002.

16      In addition, the information sought by this interrogatory is set forth in the

17  parties' pleadings, briefing, exhibits, attachments, declarations, evidence, and other

18  filings in this matter, including but not limited to all such pleadings, briefing,

19  exhibits, attachments, declarations, evidence, and filings Defendants have

20  submitted opposing Plaintiffs' original Motion for Preliminary Injunction (ECF

21  Nos. 25, 25-1, 25-2, 25-3, 25-4, in supplemental briefing (ECF Nos. 96, 96-1, 96-

22  2), and opposing Plaintiffs' January 16, 2023 Motion for Preliminary Injunction, or

23  Alternatively, Motion for Summary Judgment (ECF Nos. 111, 111-1, 111-2, 111-3,

24  111-4, 111-5, 111-6, 111-7, 111-8, 111-9, 111-10, 111-11).  Plaintiffs were served

25  with and are in possession of all of these pleadings, briefing, exhibits, attachments,

26  declarations, evidence, and other filings.

27

28

1    Defendant may also rely on information gathered through the depositions of

2    Plaintiffs Jose Chavez (taken August 4, 2023) and Andrew Morris (taken August 3,

3    2023), as well as the depositions of Federal Rule of Civil Procedure 30(b)(6)

4    witnesses who were deposed as the persons most knowledgeable for Plaintiffs

5    North County Shooting Center, Inc. (taken August 15, 2023) and Plaintiff PWGG,

6    L.P. (taken August 16, 2023).  Defendant may also rely on information in exhibits

7    offered in the depositions of these four Plaintiffs and Plaintiff representatives.

8    In addition, Defendant intends to rely on whatever expert testimony, reports,

9    and supporting materials he offers in accordance with the Federal Rules of Civil

10    Procedure and scheduling orders in this case.  As discovery is ongoing, including

11    expert discovery, Defendant reserves the right to disclose any additional facts,

12    information, or evidence responsive to this request and relevant to the standing of

13    any plaintiffs in this action that may turn up or become relevant in the future.

14    **INTERROGATORY NO. 19:**

15    STATE ALL FACTS substantiating YOUR third affirmative defense

16    contained in YOUR "Defendants' Answer to Second Amended Complaint For

17    Declaratory and Injunctive Relief" filed on November 21, 2019.

18    **RESPONSE TO INTERROGATORY NO. 19:**

19    Defendants' third affirmative defense alleged in their Answer to the Second

20    Amended Complaint was:  "The Second Amended Complaint, and each cause of

21    action therein, is improper because Plaintiffs have an adequate remedy at law."

22    Defendant incorporates by reference the General Objections stated above,

23    including objections to definitions and instructions, as if fully set forth herein.

24    Defendant also objects to the interrogatory to the extent that it seeks expert

25    materials, including information or facts that expert witnesses may locate or rely

26    on, outside of the framework and schedule for expert disclosures.  Defendant also

27    objects that the interrogatory calls for information protected from disclosure by the

28

58

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)
Exhibit 55
DX0653

attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Subject to and without waiving any of the foregoing objections, Defendant responds:  At this time, Defendant intends to rely on whatever expert testimony, reports, and supporting materials he offers in accordance with the Federal Rules of Civil Procedure and scheduling orders in this case.  In addition, as discovery is ongoing, Defendant reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:**

Defendant incorporates by reference all general and specific objections asserted in Defendant's original response.

Subject to and without waiving the foregoing objections, Defendant responds that Defendants' Answer to the Third Amended Complaint in this action, ECF No. 117, omits this previously asserted defense.

**INTERROGATORY NO. 20:**

STATE ALL FACTS substantiating YOUR fourth affirmative defense contained in YOUR "Defendants' Answer to Second Amended Complaint For Declaratory and Injunctive Relief" filed on November 21, 2019.

**RESPONSE TO INTERROGATORY NO. 20:**

Defendants' fourth affirmative defense alleged in their Answer to the Second Amended Complaint was:  "The Second Amended Complaint, and each cause of action therein, is barred by the equitable doctrines of estoppel, laches, unclean hands, and/or waiver."

59

1      Defendant incorporates by reference the General Objections stated above,

2  including objections to definitions and instructions, as if fully set forth herein.

3  Defendant also objects to the interrogatory to the extent that it seeks expert

4  materials, including information or facts that expert witnesses may locate or rely

5  on, outside of the framework and schedule for expert disclosures.  Defendant also

6  objects that the interrogatory calls for information protected from disclosure by the

7  attorney-client privilege, the governmental deliberative process privilege, the

8  official information privilege, the attorney work product doctrine, and other

9  applicable privileges and protections.

10      Subject to and without waiving any of the foregoing objections, Defendant

11  responds:  At this time, Defendant intends to rely on whatever expert testimony,

12  reports, and supporting materials he offers in accordance with the Federal Rules of

13  Civil Procedure and scheduling orders in this case.  In addition, as discovery is

14  ongoing, Defendant reserves the right to disclose any additional facts, information,

15  or evidence responsive to this request that may turn up or become relevant in the

16  future.

17  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

18      Defendant incorporates by reference all general and specific objections

19  asserted in Defendant's original response.

20      Subject to and without waiving the foregoing objections, Defendant responds

21  that Defendants' Answer to the Third Amended Complaint in this action, ECF No.

22  117, omits this previously asserted defense.

23

24  **INTERROGATORY NO. 21:**

25      STATE ALL FACTS substantiating YOUR fifth affirmative defense

26  contained in YOUR "Defendants' Answer to Second Amended Complaint For

27  Declaratory and Injunctive Relief" filed on November 21, 2019.

28

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55
DX0655

**RESPONSE TO INTERROGATORY NO. 21:**

Defendants' fifth affirmative defense alleged in their Answer to the Second Amended Complaint was: "To the extent Defendants have undertaken any conduct with respect to the subjects and events underlying the Second Amended Complaint, such conduct was, at all times material thereto, undertaken in good faith and in reasonable reliance on existing law."

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein. Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures. Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Subject to and without waiving any of the foregoing objections, Defendant responds: At this time, Defendant intends to rely on whatever expert testimony, reports, and supporting materials he offers in accordance with the Federal Rules of Civil Procedure and scheduling orders in this case. In addition, as discovery is ongoing, Defendant reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

**INTERROGATORY NO. 22:**

STATE ALL FACTS substantiating YOUR sixth affirmative defense contained in YOUR "Defendants' Answer to Second Amended Complaint For Declaratory and Injunctive Relief" filed on November 21, 2019.

**RESPONSE TO INTERROGATORY NO. 22:**

Defendants' sixth affirmative defense alleged in their Answer to the Second Amended Complaint was:  "Defendants have not knowingly or intentionally waived any applicable affirmative defense.  Defendants reserve the right to assert and rely upon additional affirmative defenses as may become available or apparent during discovery proceedings or as may be raised or asserted by others in this case, and to amend the Answer and/or affirmative defenses accordingly.  Defendants further reserve the right to amend the Answer to delete affirmative defenses that they determine are not applicable after subsequent discovery."

Defendant incorporates by reference the General Objections stated above, including objections to definitions and instructions, as if fully set forth herein.  Defendant also objects to the interrogatory to the extent that it seeks expert materials, including information or facts that expert witnesses may locate or rely on, outside of the framework and schedule for expert disclosures.  Defendant also objects that the interrogatory calls for information protected from disclosure by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections.

Subject to and without waiving any of the foregoing objections, Defendant responds:  At this time, Defendant intends to rely on whatever expert testimony, reports, and supporting materials he offers in accordance with the Federal Rules of Civil Procedure and scheduling orders in this case.  In addition, as discovery is ongoing, Defendant reserves the right to disclose any additional facts, information, or evidence responsive to this request that may turn up or become relevant in the future.

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)

Exhibit 55
DX0657

**INTERROGATORY NO. 23:**

State the name, address, telephone number, and relationship to YOU of any person who prepared or assisted in preparing the responses to these interrogatories. (Do not identify anyone who simply typed or reproduced the responses.).

**RESPONSE TO INTERROGATORY NO. 23:**

Defendant incorporates by reference the General Objections stated above as if fully set forth herein. Defendant further objects on the basis that the terms "YOU," "relationship to YOU," "prepared" and "assisted in the preparation" are vague and overbroad, causing Defendant to speculate as to the intended meanings of the terms. Defendant objects that this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence relevant to any party's claim or defense and proportional to the needs of the case. Defendant objects that the interrogatory calls for disclosure of information protected by the attorney-client privilege, the governmental deliberative process privilege, the official information privilege, the attorney work product doctrine, and other applicable privileges and protections. Defendant further objects to this interrogatory on the basis that a responding party need not identify the person or persons who assisted in preparation of the answers to interrogatories. *See Maple Drive-in Theatre Corp. v. Radio-Keith-Orpheum Corp.*, 153 F. Supp. 240, 244 (S.D.N.Y. 1956); *U.S. v. Nat'l Steel Corp.*, 26 F.R.D. 599, 600 (S.D. Tex. 1960).

Subject to and without waiving the foregoing objections, Defendant responds:

**Deputy Attorney General Jennifer Rosenberg**
300 South Spring Street, Suite 1702, Los Angeles, CA  90013
Telephone:  (213) 269-6617

**Supervising Deputy Attorney General Mark Beckington**
300 South Spring Street, Suite 1702, Los Angeles, CA  90013
Telephone:  (213) 269-6256

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)
Exhibit 55
DX0658

1

2 **Deputy Attorney General Robert Wilson**
Department of Justice Bureau of Firearms
3 *Deputy Attorney General Robert Wilson may be reached through counsel for*
4 *Defendants.*

5 **Narendra Mikkilineni, IT Manager II**
Division of Law Enforcement Systems Branch
6 California Department of Justice
7 *Mr. Mikkilineni may be reached through counsel for Defendants.*

8 **Rodney Smith, Director – Application Development Bureau**
9 California Department of Justice, California Justice Information Services Division
*Director Smith may be reached through counsel for Defendants.*
10

11 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23:**

12        Defendant incorporates by reference all general and specific objections

13 asserted in Defendant's original response.

14        Subject to and without waiving the foregoing objections, Defendant responds:

15

16 **Deputy Attorney General Jennifer Rosenberg**
300 South Spring Street, Suite 1702, Los Angeles, CA  90013
17 Telephone:  (213) 269-6617

18 **Supervising Deputy Attorney General Mark Beckington**
19 300 South Spring Street, Suite 1702, Los Angeles, CA  90013
Telephone:  (213) 269-6256
20

21 **Former Deputy Attorney General Robert Wilson (Retired)**
Department of Justice Bureau of Firearms
22 *Former Deputy Attorney General Robert Wilson may be reached through counsel*
23 *for Defendants.*

24 **Deputy Attorney General Charles Sarosy**
25 Department of Justice Bureau of Firearms
*Deputy Attorney General Charles Sarosy may be reached through counsel for*
26 *Defendants.*

27

28

**Narendra Mikkilineni, IT Manager II**
Division of Law Enforcement, Firearms and Enterprise Systems Branch
California Department of Justice
*Mr. Mikkilineni may be reached through counsel for Defendants.*
Note:  Mr. Mikkilineni oversaw the retrieval and compilation of the data included
in responses to both the original and supplemental responses to interrogatories
numbers 1-6, and Defendants may offer him as a witness to discuss the
maintenance and retrieval of that data.

**Rodney Smith, Director – Application Development Bureau**
California Department of Justice, California Justice Information Services Division

*Director Smith may be reached through counsel for Defendants.*

Dated:  August 18, 2023                    Respectfully submitted,

                                           ROB BONTA
                                           Attorney General of California
                                           MARK R. BECKINGTON
                                           Supervising Deputy Attorney General
                                           STEPHANIE ALBRECHT
                                           Deputy Attorney General

                                           JENNIFER E. ROSENBERG
                                           Deputy Attorney General
                                           *Attorneys for Defendants Rob Bonta,*
                                           *in his official capacity as Attorney*
                                           *General of the State of California, and*
                                           *Allison , in her official capacity as*
                                           *Director of the Department of Justice*
                                           *Bureau of*
                                           *Firearms*

SA2019103398

Defendant Rob Bonta's Supplemental Responses to Plaintiffs' First Set of Interrogatories
(3:19-cv-01226-L-AHG)
Exhibit 55
DX0660

1
2
## **VERIFICATION OF SUPPLEMENTAL INTERROGATORY ANSWERS**

3
4    I, Salvador Gonzalez, am employed by the State of California Department of

5 Justice as a Special Agent Supervisor in the Department of Justice Bureau of

6 Firearms. I believe, based on information provided to me, that the foregoing

7 answers are true and correct to the best of my knowledge, and reflect the

8 information available to the Department of Justice.

9    I declare under penalty of perjury under the laws of the United States of

10 America that the foregoing is true and correct.

11    Executed on August 18, 2023 at _____Sacramento_____, California.

12
13
14                                              Salvador Gonzalez
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1      **DECLARATION OF SERVICE BY E-MAIL**

2      Case Name: *Jose Chavez, et al. v Rob Bonta, et al.*
       Case No.:    3:19-cv-01226-L-AHG
3
       I declare:
4
5      I am employed in the Office of the Attorney General, which is the office of a
       member of the California State Bar, at which member's direction this service is
       made.  I am 18 years of age or older and not a party to this matter.
6
7      On August 18, 2023, I served the documents listed below by transmitting a true
       copy via electronic mail addressed as follows:

8
9      John W. Dillon, Esq.
       Dillon Law Group APC
       2647 Gateway Road, Suite 105
10     Carlsbad, CA  92009

11     E-mail Address:  JDillon@Dillonlawgp.com

12
          • DEFENDANT ROB BONTA'S SUPPLEMENTAL RESPONSES TO
13          PLAINTIFFS' FIRST SET OF INTERROGATORIES

14     I declare under penalty of perjury under the laws of the State of California and the
       United States of America the foregoing is true and correct and that this declaration
15     was executed on August 18, 2023, at Los Angeles, California.

16

17     _____        _____
              Jennifer E. Rosenberg
18               Declarant                          Signature

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 56

Exhibit 56
DX0663

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ; et al.,                     )
                                         )
                Plaintiff,               )      ORIGINAL
                                         )
        vs.                              ) No. 3:19-cv-01226-L-AHG
                                         )
ROB BONTA, in his official               )
capacity as Attorney General of          )
the State of California,                 )
et al.,                                  )
                                         )
                Defendants.              )
_____      )

DEPOSITION OF ANDREW MORRIS

taken on

Thursday, August 3, 2023

No. 23-127226



Exhibit 56
DX0664

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ; et al.,                )
                                    )
              Plaintiff,            )        ORIGINAL
                                    )
       vs.                          ) No. 3:19-cv-01226-L-AHG
                                    )
ROB BONTA, in his official          )
capacity as Attorney General of     )
the State of California,            )
et al.,                             )
                                    )
              Defendants.            )
_____     )

DEPOSITION OF ANDREW MORRIS

taken on

Thursday, August 3, 2023

No. 23-127226

Exhibit 56
DX0665

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   JOSE CHAVEZ; et al.,                )
                                         )
 6               Plaintiff,              )
                                         )
 7        vs.                            ) No. 3:19-cv-01226-L-AHG
                                         )
 8   ROB BONTA, in his official          )
     capacity as Attorney General of     )
 9   the State of California,            )
     et al.,                             )
10                                       )
                 Defendants.             )
11   _____ )

12

13

14

15           Deposition of ANDREW MORRIS, taken by the

16   Defendant at 300 South Spring Street, Room 9236,

17   Los Angeles, California, commencing at 10:58 a.m., on

18   Thursday, August 3, 2023, before DEANNA Z. HAAKER,

19   CSR #10309, pursuant to Notice.

20

21                       ---oOo---

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

2

Exhibit 56
DX0666

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3           DILLON LAW GROUP APC
             BY:  JOHN W. DILLON
 4           2647 Gateway Road
             Suite 105, No. 255
 5           Carlsbad, California  92009
             (760)642-7150
 6           JDillon@Dillonlawgp.com

 7

 8   FOR THE DEFENDANTS ROB BONTA, in his official
     capacity as Attorney General of the State of
 9   California, and ALLISON MENDOZA, in her
     official capacity as Acting Director of the
10   Department of Justice Bureau of Firearms:

11           DEPARTMENT OF JUSTICE
             BY:   JENNIFER E. ROSENBERG, DAG
12                 STEPHANIE ALBRECHT, DAG
             300 South Spring Street
13           Suite 1702
             Los Angeles, California  90013
14           (213) 269-6617
             Jennifer.Rosenberg@doj.ca.gov
15           Stephanie.Albrecht@doj.ca.gov

16

17

18

19

20

21

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

3

Exhibit 56
DX0667

```
 1                          I N D E X

 2

 3    WITNESS:

 4    ANDREW MORRIS

 5

 6
      EXAMINATION BY:                                PAGE
 7
            MS. ROSENBERG                      7
 8
            MR. DILLON                               153
 9

10    FURTHER EXAMINATION BY:

11          MS. ROSENBERG                      158

12

13

14                      E X H I B I T S

15
      DEFENDANTS':                                   PAGE
16

17    Ex 1 - NOTICE OF TAKING DEPOSITION OF          11
                PLAINTIFF ANDREW MORRIS
18
      Ex 2 - AMENDED NOTICE OF TAKING DEPOSITION     12
19
      Ex 3 - THIRD AMENDED COMPLAINT FOR
20              DECLARATORY AND INJUNCTIVE RELIEF     31

21    Ex 4 - STATE OF CA, PENAL CODE SECTION 27510   18

22    Ex 5 - STATE OF CA, PENAL CODE SECTION 27505   50

23    Ex 6 - DEFENDANTS' FIRST SET OF REQUESTS FOR   34
                PRODUCTION OF DOCUMENTS TO PLAINTIFF
24              ANDREW MORRIS

25
```

Exhibit 56

DX0668

```
 1                    E X H I B I T S (Continued)

 2
        DEFENDANTS':                                       PAGE
 3
        Ex 7 - DEFENDANTS' FIRST SET OF REQUESTS FOR         37
 4            ADMISSION TO PLAINTIFF ANDREW MORRIS

 5      Ex 8 - DEFENDANTS' FIRST SET OF INTERROGATORIES      38
              TO PLAINTIFF ANDREW MORRIS
 6
        Ex 9 - RESPONSE OF PLAINTIFF ANDREW MORRIS TO        38
 7            DEFENDANTS' FIRST SET OF REQUESTS FOR
              PRODUCTION (SET ONE)
 8
        Ex 10 - RESPONSE OF PLAINTIFF ANDREW MORRIS TO       41
 9             DEFENDANTS' FIRST SET OF REQUESTS FOR
               ADMISSION (SET ONE)
10
        Ex 11 - RESPONSE OF PLAINTIFF ANDREW MORRIS TO       42
11             DEFENDANTS' FIRST SET OF INTERROGATORIES
               (SET ONE)
12
        Ex 12 - DECLARATION OF ANDREW MORRIS IN SUPPORT      45
13             OF PLAINTIFFS' NOTICE OF MOTION AND
               MOTION FOR PRELIMINARY INJUNCTION; OR
14             IN THE ALTERNATIVE, MOTION FOR SUMMARY
               JUDGMENT
15
        Ex 13 - PLAINTIFFS' MEMORANDUM OF POINTS AND         46
16             AUTHORITIES IN SUPPORT OF NOTICE OF
               MOTION AND MOTION FOR PRELIMINARY
17             INJUNCTION; OR ALTERNATIVELY, MOTION
               FOR SUMMARY JUDGMENT
18
        Ex 14 - STATE OF CA, PENAL CODE SECTION 27880        63
19
        Ex 15 - LIBERTY UNIVERSITY WEAPONS POLICY            26
20
        Ex 16 - STATE OF CA, PENAL CODE SECTION 27545        63
21
        Ex 17 - STATE OF CA, PENAL CODE SECTION 27885        65
22
        Ex 18 - STATE OF CA, PENAL CODE SECTION 27910        68
23
        Ex 19 - STUDY GUIDE FOR HUNTING EDUCATION           104
24
        Ex 20 - TRADITIONAL HUNTER EDUCATION                112
25             REGISTRATION FORM
```

THE SULLIVAN GROUP OF COURT REPORTERS

5

Exhibit 56

DX0669

```
 1                    E X H I B I T S (Continued)

 2
        DEFENDANTS':                                      PAGE
 3

 4      Ex 21 - TRADITIONAL HUNTER EDUCATION            113
                   REGISTRATION FORM
 5
        Ex 22 - FIREARM SAFETY CERTIFICATE STUDY GUIDE  114
 6
        Ex 23 - SECOND AMENDMENT FOUNDATION             118
 7                 MEMBERSHIP REGISTRATION FORM

 8      Ex 24 - FPC REGISTRATION FORM                   120

 9      Ex 25 - FPC WEB PAGE                            121

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 56
DX0670

6

```
 1              Los Angeles, California, Thursday, August 3, 2023
 2                            10:58 a.m.
 3                            ---oOo---
 4
 5                          ANDREW MORRIS,
 6          called as a witness on behalf of the Defendant,
 7  having been placed under oath, was examined and testified
 8  as follows:
 9
10                          EXAMINATION
11  BY MS. ROSENBERG:
12      Q    Hello.  Good morning.  My name is Jenny
13  Rosenberg.  I am a deputy Attorney General here with the
14  California Department of Justice, and I am joined with my
15  colleague Stephanie Albrecht here, who is working on this
16  case.  We represent the attorney general, Rob Bonta, and
17  also Allison Mendoza, who is the director of the
18  Department of Justice, Bureau of Firearms, in this case.
19  And we'll be asking you some questions about the case
20  today, which I know you know.
21          So can you state your full name for the record
22  for me.
23      A    Andrew Christopher Morris.
24      Q    And you're represented by counsel today?
25      A    Yes.
```

1        Q      And you are a Plaintiff in this case?

2        A      Uh-huh.

3        Q      The case name is Chavez v. Bonta?

4        A      Uh-huh.

5        Q      Have you had your deposition taken before?

6        A      No.

7        Q      Do you understand, generally, what the

8   procedures are going to be?  I'm going to talk about them,

9   but do you have an understanding?

10       A      Yes.

11       Q      So one thing that I will say is that, because

12  the reporter is going to be taking down, word for word,

13  what we are doing today, we need to try to not talk over

14  each other.  That is hard for me, too.  So we'll work as a

15  team together and try not to talk over each other.  Also,

16  because the reporter can only take down whole words, I

17  need to make sure your responses are in full words.  No

18  "uh-huh," no shrugs, no "uh-huh" or gestures.  Either

19  "yes," "no," or other full sentences.

20              So you just took an oath to tell the truth under

21  penalty of perjury, right?

22       A      Yes.

23       Q      I'll be asking you questions, and those will be

24  answered under oath.  Understand?

25       A      Yes.

1    Q    Okay.  I know we're in an informal setting here.

2    We're in a conference room in a random office building,

3    but the oath is the same and has the same meaning as if

4    you were giving testimony in court.  Do you understand

5    that?

6    A    Yeah.

7    Q    So there may be circumstances where I ask you a

8    question where I would be asking for an estimate.  I would

9    ask you not to answer any questions with a speculation or

10    a guess.  It's okay to say you don't know if you don't

11    know the answer to a question.  But I am entitled to your

12    best recollection in cases where I'm asking for something

13    where you might estimate something.

14        I will give you an example between a guess and

15    an estimate so we're clear about how that operates.  You

16    are sitting in this conference room in front of a very

17    long table.  You might be able to estimate how many feet

18    long this table is.  But if I were to ask you how long the

19    table is in the conference room above us, since you

20    haven't been there, you would not be able to estimate

21    that.  That would be purely a guess.  So those sorts of

22    answers or purely a guess are ones that we can't have

23    today.

24    A    Understood.

25    Q    Let's see.  There might be times where your

Exhibit 56
DX0673

```
 1    counsel will make objections to the form of my question.
 2    Unless your counsel tells you not to answer a question,
 3    you are still required to answer the question, even if
 4    there has been an objection.  Do you understand?
 5         A    Yeah.
 6         Q    If you're tired or hungry, thirsty, need a break
 7    at some point, that's absolutely fine.  Please let me
 8    know.  This is not an endurance contest, and we're all
 9    human and we can take breaks as necessary.  But I would
10    say that if you need to take a break, if there is a
11    question pending -- meaning I have asked a question and
12    you have not yet answered -- you will need to answer the
13    question before we take a break and go off the record.  Do
14    you understand?
15         A    I understand, yes.
16         Q    Any questions about the procedures?
17         A    No.  I think they're fairly straightforward.
18         Q    Any reason you can't give your best testimony
19    today?
20         A    No.
21         Q    Are you suffering from any medical problems that
22    would prevent you from giving your best testimony today?
23         A    No.
24         Q    Are you currently taking any medications that
25    would prevent you from giving your best testimony today?
```

Exhibit 56
DX0674

```
 1        A    No.

 2        Q    Any other reason you would be unable to give

 3   your best testimony?

 4        A    No.

 5        MS. ROSENBERG:  Okay.  Great.  So now for some

 6   housekeeping.  I am going to give you what I will mark as

 7   Defendant's Exhibit No. 1.  I will mark this Exhibit 1.

 8                    (Exhibit 1 marked)

 9   BY MS. ROSENBERG:

10        Q    Take a look at Exhibit No. 1.  Have you seen

11   this before?

12        A    Yes.  I believe I have.

13        Q    What is it titled?

14        A    Would that be "notice of taking disposition

15   (sic) of Plaintiff Andrew Morris" or is it further down?

16        Q    It is the notice of taking deposition of

17   Plaintiff Andrew Morris.  That's correct.

18             Did you have a chance to review this document in

19   full before you came here today?

20        A    Yes.

21        Q    Did you discuss it with your counsel?

22        A    Yes.

23        Q    Did you discuss it with anybody else?

24        A    No.

25        Q    Are you acquainted with any of the other
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0675

1    Plaintiffs in this action?

2        A    No.

3        MS. ROSENBERG:  I am now going to give you what we'll

4    mark as Exhibit 2.

5                        (Exhibit 2 marked)

6    BY MS. ROSENBERG:

7        Q    All right.  Have you seen this document

8    before?

9        A    Yes.

10       Q    Let me rephrase it.  Have you seen the document

11   marked Exhibit 2 before?

12       A    Yes.

13       Q    Have you had a chance to review this document in

14   full?

15       A    Yes.

16       Q    Did you discuss it with your counsel?

17       A    Yes.

18       Q    Did you discuss it with anybody else?

19       A    No.

20       Q    Can you read the name of the document for me,

21   please.

22       A    Yes.  Amended notice of taking disposition (sic)

23   of Plaintiff Andrew Morris.

24       Q    That would be "deposition."  Amended notice of

25   taking deposition of Plaintiff Andrew Morris.

Exhibit 56
DX0676

```
 1              My next question for you is what did you do to

 2   prepare for the deposition today?

 3        A    Spoke with counsel and reviewed the documents in

 4   the case.

 5        Q    What documents did you review?

 6        A    I don't recall the name specifically, but they

 7   were the charges -- or rather the deposition, the charges,

 8   and any of the other affiliated documents with it.

 9        Q    By "charges," do you mean the complaint in this

10   action?

11        A    Yes.  That's what I meant.

12        Q    And is your understanding that the complaint is

13   the document filed to start the case brought by the

14   Plaintiffs in the matter?

15        A    Yes.

16        Q    Did you read any other documents filed in this

17   case?

18        A    Yes.

19        Q    What else did you review?

20        A    I have them with me.  My written responses that

21   I have notarized, in addition -- in addition to the

22   request for admission and interrogatories.

23        Q    Could I ask what documents are notarized?

24        A    I just meant the response -- the responses that

25   I have and the ones that were sent in towards this case
```

THE SULLIVAN GROUP OF COURT REPORTERS

13

Exhibit 56
DX0677

```
1    that I conferred with my counsel for.

2         Q    Understood.  We'll talk about those in a little.

3    Any other documents that you reviewed before this

4    deposition -- perhaps documents that were not filed in

5    this case?

6         A    No.  Not to my knowledge.

7         Q    Did you do any independent research before you

8    came here today?

9         A    Regarding what, specifically?

10        Q    Any independent research that you took to

11   prepare yourself for today's deposition?

12        A    No.

13        Q    Great.  All right.  We'll continue with a little

14   bit of housekeeping.  Can you tell me how you became

15   involved in this case.

16        A    Yes.  I have been involved in firearms-related

17   organizations in the past, and it came to my attention,

18   through a family member who is also involved, that there

19   was a law being passed to limit the rights of adults 18 to

20   20 to own firearms.

21        Q    Who is that family member?

22        A    My mother, Melissa Morris.

23        Q    And when you say you were involved with firearms

24   organizations, what do you mean by that?

25        A    I've been involved with San Diego County Gun
```

Exhibit 56
DX0678

```
 1   Owners, which is -- I've been involved with, mostly

 2   indirectly, through my mother, for about two years.

 3        Q    So since approximately 2021?

 4        A    Maybe slightly before that, yeah.  Maybe

 5   slightly before that.  2021, 2020, somewhere around

 6   there.

 7        Q    So when you say you came to find out about this

 8   case through your mother, can you explain to me what you

 9   mean by that?

10        A    Yes.  So I was looking for firearms because I'm

11   19.  So when I was 18, I was looking at them, and I

12   consulted a firearms dealer website, and it was -- it

13   wouldn't let me buy them.  So I went to my mom, who is the

14   expert in my family about that, and we discussed it, and

15   that's how I found out about the case.

16        Q    So she told you about the existence of this

17   case, whether it was named Chavez v. Bonta, or prior name,

18   Jones versus Becerra?

19        A    Specifically about the general -- I don't

20   recollect entirely because it was a little while ago, but

21   the general movement of firearms organizations to combat

22   that law.  I don't remember the exact name of the original

23   one or this one.  I don't think that was given, but rather

24   just a more vague description of what it was trying to

25   do.
```

Exhibit 56
DX0679

1      Q     Thank you.  So how did you become connected with

2  your counsel in this action?

3      A     I don't remember entirely, but I was put into

4  contact with him through a mutual of my mother's who was

5  leading up the -- or rather organizing the people who

6  would like to -- who were affected by the new law, and

7  also people who felt that the law was infringing on

8  people's rights in general, whether themselves or

9  others.

10      Q     What was the name of that person?

11      A     I don't remember.

12      Q     Do you recall what organization they worked

13  for?

14      A     I believe they were involved in San Diego County

15  Gun Owners, but they worked for Firearms Policy Coalition

16  or something of that caliber.

17      Q     Did this person that you are referencing as an

18  intermediary between your mom and you, did they reach out

19  to your mom to recruit you to be part of this case, or did

20  you reach out to them?  How did this come about?

21      A     I think it was mentioned at one of the trainings

22  or something of that nature that my mom was involved in.

23  Just generally, not necessarily recruiting.  But I

24  believe, if I remember correctly, she went and inquired

25  about my involvement and let me know, and then I inquired

Exhibit 56
DX0680

1    about my involvement to the mutual person between my

2    mother, as well.

3        Q    And that person put you in touch with your

4    counsel?

5        A    Yes.

6        Q    Okay.  Thank you.  Did you know any of the other

7    Plaintiffs involved in this action previously?

8        A    No.

9        MR. DILLON:  Objection.  Vague as to "plaintiffs."

10       MS. ROSENBERG:  Sure.

11   BY MS. ROSENBERG:

12       Q    Let me rephrase.  Did you know Matthew Jones,

13   who was a Plaintiff in this case before you joined --

14   before you joined this action?

15       A    No.

16       Q    Did you know a man named Thomas Furrh, who was a

17   Plaintiff in this action before you joined?

18       A    No.

19   BY MS. ROSENBERG:

20       Q    Were you acquainted with Kyle Yamamoto, who was

21   a Plaintiff in this action before you joined?

22       A    No.

23       Q    Okay.  Thank you.  So what made you want to join

24   this case?

25       A    As I mentioned previously, I was seeking to buy

1    a firearm when I was 18 and I was unable to.  And I was

2    disheartened by that, and then when opportunity arose --

3    or when I heard there was a case being filed, I wanted to

4    get involved in order to overturn that or assist in that

5    matter.

6         Q    By "overturn that," what do you mean?

7         A    I would like to be able to remove that law, such

8    that for people like me who are 18 to 20, who are law

9    abiding citizens, I can purchase a firearm.

10        Q    And by "that law," are you referencing Penal

11   Code Section 27510?

12        A    I believe so, yes.

13        Q    I will give you a copy of it and I will reask

14   that question.

15        MS. ROSENBERG:  I'm going to make this exhibit number

16   a little bit out of order from where I plan to have it

17   marked.  So I will mark this next exhibit, Exhibit 4.

18                        (Exhibit 4 marked)

19   BY MS. ROSENBERG:

20        Q    Can you read the title of this document that I

21   just handed you that is marked as Exhibit 4, please.

22        A    Yes.  "State of California Penal Code

23   Section 27510."

24        Q    Have you read this code section before today?

25        A    I have not read it in this format, but I have

Exhibit 56
DX0682

```
 1   been given a summary of or gone through a discussion about
 2   this penal code section.
 3        Q    Do you understand this to be the statutory code
 4   section that is challenged in this action?
 5        A    Yes.
 6        Q    We will come back to that as well.  But first, a
 7   little bit more housekeeping.  There will be a fair amount
 8   of housekeeping here.  What is your current age?
 9        A    Nineteen years old.
10        Q    Do you have a driver's license?
11        A    I do.
12        Q    Did you get your driver's license right when you
13   turned 16?
14        A    No, I did not.
15        Q    When did you first get your driver's license?
16        A    Around 17 years old.
17        Q    And can you tell me -- can you estimate what
18   month and year that would have been?
19        A    Assuming it was two years ago, I believe it was
20   late of 2021.
21        Q    Thank you.  You will turn 21 on December 29,
22   2024.  Is that right?
23        A    Yes.
24        Q    Did you graduate high school?
25        A    Yes.
```

Exhibit 56
DX0683

```
 1        Q      Where did you go to high school?

 2        A      I was homeschooled.

 3        Q      And where were you homeschooled?

 4        A      In Poway, California.

 5        Q      Do you attend college?

 6        A      Yes.

 7        Q      How long have you been in college?

 8        A      For one year.

 9        Q      So you are -- you have finished your freshman

10   year and going into your sophomore year.  Is that right?

11        A      Yes.

12        Q      You're currently on your summer break?

13        A      Yes.

14        Q      What college do you attend?

15        A      Liberty University.

16        Q      What do you study at Liberty University?

17        A      Business administration and finance.

18        Q      Do you attend in person or do you attend college

19   remotely?

20        A      Yes.  I attend in person.

21        Q      And where is the college located?

22        A      In Lynchburg, Virginia.

23        Q      Do you live in Lynchburg, Virginia, for the

24   majority of the year?

25        A      Yes.
```

THE SULLIVAN GROUP OF COURT REPORTERS

20

Exhibit 56
DX0684

```
 1        Q    Can you estimate which months of the year you
 2   live in Virginia?
 3        A    Approximately September through April.
 4        Q    And do you plan to return to Virginia for
 5   college this fall?
 6        A    Yes.
 7        Q    Where are you currently living?
 8        A    In Poway, California.  Do you need the full
 9   address?
10        Q    Yes, please.
11        A    Okay.  13718 Sagewood, one word, Drive, Poway,
12   California.
13        Q    And that's the address that's listed on your
14   driver's license?
15        A    Yes.
16        Q    For the months of the year that you live in
17   Virginia, do you live in student housing?
18        A    Yes.
19        Q    Can you tell me a little bit about what the
20   format of the housing is.  Let me rephrase.  Do you live
21   in a dormitory?
22        A    Yes.
23        Q    Is it an apartment-style dormitory?
24        A    Roughly, yes.
25        Q    Do you have roommates?  Let me rephrase.  When
```

```
 1   you're living in student housing, do you have roommates?

 2        A    Yes.  I have a single roommate.

 3        Q    And right now, while living in Poway,

 4   California, at the address you've listed for us, are you

 5   living with family members?

 6        A    Yes.

 7        Q    Who owns the house that you are staying in?

 8        A    My parents.  It's probably listed under their

 9   name, Louis and Melissa Morris.

10        Q    Can you spell Louis.

11        A    L-o-u-i-s.

12        Q    Have you lived in Poway, California, for all of

13   your life except the months in college?

14        A    No.  But I have lived there for ten years.

15        Q    Do you pay rent on your student housing in

16   Virginia?

17        A    Yes.

18        Q    Do you pay rent to your parents during the

19   summertime while living with them?

20        A    No.

21        Q    How do you cover your living expenses while

22   living in student housing?

23        A    Working over the summer and savings that I

24   have.

25        Q    Are those subsidized with funds from your
```

THE SULLIVAN GROUP OF COURT REPORTERS

22

Exhibit 56
DX0686

1    parents?

2        A    Yes.

3        Q    How about your school expenses -- books,

4    tuition, things like that?  How do you pay for that?

5        A    The same.  Savings that I have and money that I

6    make over the summer, independent from my parents.

7        Q    Do your parents also contribute to your school

8    expenses?

9        A    No.

10        Q    Do you have any scholarships?

11        A    Yes.

12        Q    I'm going to ask you some questions about both

13    residences, so we'll take them in turn.  Currently, where

14    you are living in Poway with your parents in your parents'

15    home, are there any firearms stored in that home?

16        A    Yes.

17        Q    Who do those firearms belong to?

18        A    Both of my parents.

19        Q    They own those firearms?

20        A    Yes.

21        Q    Do you know how many firearms they have in the

22    home?

23        A    No.  I don't know the exact number.

24        Q    Are you able to estimate?

25        A    I don't know entirely, but more than -- more

Exhibit 56
DX0687

```
 1   than about half a dozen, I'd say.
 2        Q    More than six firearms are in your parents'
 3   home?
 4        A    Yes.
 5        Q    And those more than six firearms belong to your
 6   parents?
 7        A    Yes.
 8        Q    Have you seen those firearms?
 9        A    Yes, I have.
10        Q    Have you ever used those firearms?
11        A    Yes.  Under supervision.
12        Q    Under the supervision of your parents?
13        A    Yes.
14        Q    On approximately how many occasions have you
15   used those firearms that belong to your parents?
16        A    At this point, probably half a dozen.  So six,
17   again.
18        Q    And where have you used those firearms that
19   belong to your parents under their supervision?
20        A    Primarily at gun clubs or shooting ranges.  So
21   the two primary ones are Poway Weapons and Gear and Lemon
22   Grove Rod and Gun Club.
23        Q    You said primarily at ranges.  Are there other
24   locations where you have used the firearms that belong to
25   your parents?
```

THE SULLIVAN GROUP OF COURT REPORTERS

24

Exhibit 56
DX0688

```
 1        A      Excuse me.  No.  I don't think there are any
 2   other locations that I've used them.
 3        Q      Have they ever been used on your parents'
 4   property?
 5        A      No.
 6        Q      Let me rephrase that.  Have you ever used them
 7   on your parents' property?
 8        A      No.
 9        Q      When you are living on campus in Virginia in
10   your student housing, are there any firearms that you
11   store in your dorm room or housing?
12        A      No.
13        Q      Does your roommate store any firearms in your
14   student housing?
15        A      No.
16        Q      Do you keep any firearms at the college at
17   all?
18        A      No.
19        Q      Do you store any other type of weapons in your
20   campus housing, your student housing?
21        A      No.
22        Q      So no knives or anything of the sort?
23        A      I have small pocketknives, but to my knowledge,
24   those are not considered weapons, based on specifications
25   that I'm unaware of the scope of that.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0689

1          MS. ROSENBERG:  I'm going to show you a document that

2     we will -- we're going to give it a number that is a

3     little bit out of order.  Let's call this Exhibit No. 15.

4                    (Exhibit 15 marked)

5     BY MS. ROSENBERG:

6          Q    Do you recognize this document?

7          A    Yes.

8          Q    So you have seen this document previously?

9          A    Yes.

10         Q    Have you read this document?

11         A    Yes.

12         Q    Did you read it in full?

13         A    I have.

14         Q    When did you read it?

15         A    Upon signing the papers to go to the university.

16    Signing the written agreement that I would follow the code

17    of conduct, including the weapons policy.

18         Q    What is the title of this document?

19         A    "Liberty University Weapons Policy."

20         Q    So let's skip to the second page of Exhibit 15

21    that you've just been handed, to the definition of

22    "weapon," which is Subsection F.  Is this what you're

23    referring to when you're thinking about the pocketknives

24    that you keep in your student housing?

25         A    No.  When I referred to weapon, I was referring

```
 1   to my understanding of California laws.  Not Liberty
 2   University policy.
 3         Q    Understood.  Okay.  Thank you.
 4              Turn to page 3 of Exhibit 15.  And if you skip
 5   down to the portion -- about the middle of the page, it's
 6   bold, italic and underlined, and follows Subparagraph
 7   little G.  Can you read that for us, please.
 8         A    Yes.
 9                  "For the avoidance of doubt, rifles,
10                  semi-automatic, bolt-action and otherwise,
11                  shotguns, muzzle loaders, and pistol carbines,
12                  and other firearms that are not handguns
13                  approved by LUPD under this policy, are not
14                  permitted in the residents' homes.  A person may
15                  apply to have weapons which are not permitted in
16                  residence halls stored with LUPD, as provided in
17                  this policy."
18         Q    Thank you very much.  So do you understand this
19   paragraph that you just read into the record to mean that
20   you are not permitted to store any type of long gun in
21   your student housing?
22         A    That is correct.  Yes.
23         Q    That's what you understand?
24         A    Yes.
25         Q    Are you currently employed?
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0691

```
 1          A     Yes.

 2          Q     Where were you employed?

 3          A     Axos Bank, centered in La Jolla, California.

 4          Q     Is that an internship?

 5          A     Yes.

 6          Q     Are you paid for it?

 7          A     Yes.

 8          Q     How long have you been working as an intern at

 9   Axos Bank?

10          A     Yes.  Since the end of May, 2023.

11          Q     And how long will your internship last?

12          A     I don't know.

13          Q     Will it end when you return to school in the

14   fall?

15          A     There's no guarantee that it will.  It might

16   continue as a remote internship.

17          Q     Have you been employed before this internship?

18          A     Yes.

19          Q     Where were you employed and for how long?

20          A     I've been employed several places.  I don't know

21   exactly how long, but I've worked for Starbucks

22   Corporation, AMC movie company, and I have worked for Axos

23   Bank in the past as an internship.

24          Q     In what year did you work for Axos Bank in a

25   previous internship?
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0692

1     A     Last summer.  So approximately June to August,

2   2022.

3     Q     Have you ever worked in the firearms industry?

4   And by "work," I mean were you employed and paid working

5   in the firearms industry?

6     A     No.

7     Q     Do you have any hobbies?

8     A     Reading books, using a computer.  When both me

9   and my parents have the time, I enjoy going to gun ranges.

10  But that is often rare for me because of the busyness of

11  my parents.

12    Q     Do you have any other hobbies?

13    A     Yes.

14    Q     What are they?

15    A     I enjoy dancing, rock climbing, fitness or

16  exercise.  Yeah.

17    Q     Do you do any volunteer work?

18    A     Not currently, but I have in the past.

19    Q     And how recently in the past?

20    A     Six months to a year ago.

21    Q     And what was that volunteer work?

22    A     It was working for or having an internship,

23  unpaid, for the Republican Party of San Diego County.

24    Q     Approximately how much time would you say you

25  spent on that particular volunteer work for the Republican

Exhibit 56

DX0693

1    Party?

2         A     In total?

3         Q     Sure.  It could be an estimate, obviously.

4         A     Over the course of the two or so years that I

5    was volunteering for them, maybe 400 hours.

6         Q     And as to the hobbies that we just discussed,

7    how much time -- again, this can be an estimate -- how

8    much time would you say you spend on hobbies each week?

9         A     Recently, I have not spent that much time on

10   hobbies because I'm working a full-time internship and

11   that takes up the majority of my day.

12        Q     During the school year, let's say, how much time

13   do you spend on hobbies?

14        A     Maybe 10 to 15 hours a week.

15        Q     Have you ever been a party to a lawsuit before

16   this?

17        A     No.

18        Q     You understand that you are a party to this

19   lawsuit that we are discussing today?

20        A     Yes.

21        Q     Have you ever given testimony in a legal

22   proceeding?

23        A     No.

24        Q     So you've never testified in court?

25        A     No.

1    Q    And other than the declaration that you

2    submitted in this case, have you ever provided any written

3    testimony in any legal proceeding?

4    A    No.

5    Q    Have you ever been charged with a crime?

6    A    No.

7    Q    Have you ever been the victim of a crime?

8    A    No.

9    Q    Have you ever been arrested but not convicted of

10   a crime?

11   A    No.

12   MS. ROSENBERG:  Before we get going on the real

13   substance here today, I want to provide a quick overview

14   of the action to kind of set our discussion going forward.

15           This case is titled Chavez v. Bonta.  That's

16   C-h-a-v-e-z, versus Bonta, B-o-n-t-a.  It is a Second

17   Amendment challenge to Proposition California Penal Code

18   Section 27510, which sets 21 as the lower age limit for

19   sale and transfers of certain firearms through federally

20   licensed firearms dealers, subject to certain statutory

21   exemptions.

22           I am going to hand you what I will mark as

23   Exhibit 3.

24                    (Exhibit 3 marked)

25   ///

Exhibit 56
DX0695

1    BY MS. ROSENBERG:

2        Q    Do you recognize the item marked Exhibit 3?

3        A    One second.

4        Q    Take your time.

5        A    Yes.  I believe I have seen this document

6    before.  However, I do not remember the entirety of its

7    contents.

8        Q    Can you tell me what the caption, the title of

9    this document is.

10       A    Yes.  "Third amended complaint for declaratory

11   and injunctive relief."

12       Q    And do you understand this to be the complaint

13   in the current lawsuit that we're discussing today?

14       A    Yes.

15       Q    I understand that you don't recall all of the

16   contents of Exhibit No. 3, but if you recall, have you had

17   a chance at any time to read it in full?

18       A    Yes.  I believe I have read it in full in the

19   past.

20       Q    When did you read it in full?

21       A    I do not recall exactly when.

22       Q    Did you have any involvement in the drafting of

23   Exhibit 3?

24       A    Upon reviewing this, it looks like part of this

25   is in collaboration with my counsel, so I'd say yes.  But

Exhibit 56
DX0696

1    not the entirety of it.

2        Q    I'm going to direct you to a number of

3    paragraphs, and you'll have an opportunity to read them,

4    and I'll ask a follow-up question.  Look at paragraphs 5,

5    6, 14, 50 and 51 of Exhibit 3, the third amended

6    complaint.

7        A    You want me to read these?

8        Q    Yes.

9        A    Out loud, for the record?

10       Q    No.  You can read them to yourself.

11       A    Okay.

12       Q    Did you have a chance to read all paragraphs 5,

13   6, 14, 50 and 51?

14       A    I did not read 51.  It slipped my mind.  One

15   moment.  Okay.  Yes.  I read all the sections mentioned.

16       Q    Do those paragraphs refer to you?

17       A    Yes, they do.

18       Q    Did you draft them?

19       A    I don't recall whether I drafted them or -- I

20   believe how it occurred --

21       MR. DILLON:  Object.  Going into privileged areas

22   here.  Discussions between attorney and client.

23   BY MS. ROSENBERG:

24       Q    I am asking whether or not you drafted these

25   paragraphs.  Not what your attorney told you about them.

THE SULLIVAN GROUP OF COURT REPORTERS

33

Exhibit 56
DX0697

```
 1  If your counsel feels comfortable with you answering that
 2  question, I would like for you to answer that question.
 3       A    I do not recall if I wrote these directly or
 4  they were written after discussion between me and my
 5  counsel.
 6       Q    Understood.  Thank you.  Did you see any errors
 7  in those paragraphs, or any inaccuracies?
 8       A    No.
 9       Q    Just a few more housekeeping things.  You were
10  asked to respond to various discovery requests in this
11  case.  Is that correct?
12       A    Yes.
13  MS. ROSENBERG:  I am going to hand you a number of
14  documents, and I will narrate as we go which ones are
15  which.  Start with Exhibit 6 -- again, we are going
16  slightly out of order.
17                      (Exhibit 6 marked)
18  BY MS. ROSENBERG:
19       Q    Do you recognize Exhibit 6?
20       A    Yes.
21       Q    What is the title of Exhibit 6?
22       A    "Defendants' first set of requests for
23  production of documents to Plaintiff Andrew Morris."
24       Q    Did you read Exhibit 6 --
25       A    Yes.
```

Exhibit 56
DX0698

1      Q      -- at any point?

2      A      Yes.

3      Q      Did you discuss them with your counsel?  I don't

4  need to know the substance of the discussion.  Just asking

5  whether you reviewed this first set of requests for

6  production of documents with your counsel.

7      A      Yes.

8      Q      Did you discuss them with anybody else?

9      A      No.

10     Q      And when you reviewed Exhibit 6, did you read

11 the definitions and instructions thereon?

12     A      Yes.

13     Q      In full?

14     A      Yes.

15     Q      Did you understand the definitions and

16 instructions that were provided in Exhibit 6?

17     A      From my recollection, yes, I understood the

18 entire definition and the instructions.

19     Q      Thank you.  Did you conduct searches of your

20 files in order to respond to the requests in Exhibit 6?

21     A      Can you rephrase.

22     Q      Sure.  Did you review any documents or

23 communications as defined in Exhibit 6 in order to

24 determine whether you possessed any documents or

25 communications responsive to the requests?

1          A       Yes.

2          Q       What did you do in your search -- excuse me.

3    What sources did you search to determine whether you have

4    any responsive documents or communications?

5          A       Primarily my personal files or anywhere I would

6    keep the documents requested.

7          Q       And by "personal files," are you referring to

8    electronic files?  Paper files?

9          A       A combination of both.  Most of my files are not

10   printed.  However, some of them were.

11         Q       Okay.  And your electronic files, are those

12   e-mails, folders on your desktop on your computer, text

13   messages?  What are the sources that you looked at?

14         A       Yes.  As you stated, e-mails, text messages --

15   anything on my computer, things of that nature, or files

16   that I have stored on my phone or my computer.

17         Q       And did that include looking through your text

18   messages?

19         A       Yes.  But primarily, from my recollection, for

20   location of documents, not documents themselves, if that

21   makes sense.

22         Q       Understood.  How about your social media?  Did

23   you review your social media, whether that's Facebook,

24   TikTok, Instagram, Twitter, any other social media

25   entity -- did you search any of those profiles that you

```
 1    might have in order to respond to the requests in Exhibit

 2    No. 6?

 3         A    No.

 4         Q    Do you have any social media profiles?

 5         A    Yes.

 6         Q    Why did you not search your social media

 7    profiles?

 8         A    Because I have very little information on my

 9    social media profiles, such that I knew already there

10    would be no information required on here for them.

11         Q    Great.  Thank you for that information.

12         MS. ROSENBERG:  I am going to be handing you the next

13    document, marked as Exhibit No. 7.

14                        (Exhibit 7 marked)

15    BY MS. ROSENBERG:

16         Q    Do you recognize Exhibit No. 7?

17         A    Yes.

18         Q    What is Exhibit No. 7?

19         A    "Defendants' first set of requests for admission

20    to Plaintiff Andrew Morris."

21         Q    Did you read Exhibit 7 in full at any point?

22         A    This whole document?

23         Q    Yes.

24         A    Yes.  I believe I have.  I don't -- one moment.

25    Yes, I have.
```

Exhibit 56
DX0701

```
 1      Q    Great.  Set aside No. 7 for now, we'll come back
 2  to it later.
 3      MS. ROSENBERG:  I'm going to be handing you what I've
 4  marked Exhibit 8.
 5                      (Exhibit 8 marked)
 6  BY MS. ROSENBERG:
 7      Q    Do you recognize Exhibit 8?
 8      A    Yes.
 9      Q    What is it?
10      A    "Defendants' first set of interrogatories to
11  Plaintiff Andrew Morris."
12      Q    Did you read the first set of interrogatories to
13  Plaintiff Andrew Morris?
14      A    Yes.
15      Q    In full?
16      A    Yes.
17      Q    Set that aside for now.
18      MS. ROSENBERG:  I'm going to be handing you what I
19  have marked as Exhibit 9.
20                      (Exhibit 9 marked)
21  BY MS. ROSENBERG:
22      Q    Do you recognize Exhibit 9?
23      A    Yes.
24      Q    What is it?
25      A    "Response of Plaintiff Andrew Morris to
```

THE SULLIVAN GROUP OF COURT REPORTERS

38

Exhibit 56
DX0702

```
1    Defendants' first set of requests for production, set
2    one."
3         Q    Did you help prepare this document?
4         MR. DILLON:  Vague as to "prepare."
5    BY MS. ROSENBERG:
6         Q    Let me rephrase.  I want to clarify.  I do not
7    need to know what you discussed with your counsel, but did
8    you assist your counsel in formulating responses to the
9    requests that appear in this response of Plaintiff Andrew
10   Morris to Defendants' first set of requests for
11   production?
12        A    Yes.
13        Q    Did you read the completed responses before
14   these requests were served on Defendants?
15        A    Yes.
16        Q    And you approved the content?
17        A    Yes.
18        Q    You read them for accuracy?
19        A    Yes.
20        Q    And you read them for completeness?
21        A    Yes.
22        Q    Is it your understanding that you produced all
23   documents responsive to the requests in Exhibit 9?
24        A    Can you rephrase.
25        Q    Sure.  Exhibit 9, is it your understanding
```

```
 1    that -- back up.  Exhibit No. 9, which is -- contains your
 2    responses to Defendants' first set of requests for
 3    production -- is it your opinion that you produced all
 4    responsive documents along with these responses?
 5         A    Yes.
 6         Q    Your counsel also e-mailed me a collection of
 7    e-mails sent to you from the Firearms Policy Coalition
 8    last evening, August 2nd, 2023.  Those were additional
 9    documents that you did not produce along with Exhibit 9.
10    Is that correct?
11         A    Yes.
12         Q    Together with Exhibit 9 and those supplemental
13    e-mails that your counsel e-mailed me last evening, is
14    that the extent of the documents you had in your
15    possession that were responsive to the requests that are
16    reflected in Exhibit 6 and Exhibit 9?
17         A    To the best of my knowledge, yes.
18         Q    Are there any categories of documents that were
19    requested that you could not find?
20         A    I don't know.  I don't recall specifically.  I
21    do not think so, but I don't know for sure.
22         Q    Are there any categories of documents requested
23    that you found but did not produce?
24         A    No.
25         Q    Are there any categories of documents requested
```

1    that you did not try to find?

2        A    No.

3        Q    Let's look at Attachment A -- excuse me,

4    Attachment 1, at the end of Exhibit 9.  There is -- the

5    Bates range for this is AM001 through AM003.  Do you

6    recognize the attachment to Exhibit No. 9?

7        A    Yes.

8        Q    What is it?

9        A    It is my driver's license.

10       Q    And this is a current driver's license?

11       A    Yes.

12       Q    Is the address listed on this driver's license

13   the same address at which you are staying with your

14   parents currently?

15       A    Yes.

16       Q    You can set that aside for now and come back to

17   that later.

18       MS. ROSENBERG:  I am going to hand you what will be

19   Exhibit 10.

20                      (Exhibit 10 marked)

21   BY MS. ROSENBERG:

22       Q    Do you recognize Exhibit No. 10?

23       A    Yes.

24       Q    What is it?

25       A    "Response of Plaintiff Andrew Morris to

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0705

```
 1    Defendants' first set of requests for admission, set one."
 2         Q    Did you help prepare the responses that are
 3    reflected in Exhibit 10?
 4         A    Yes.
 5         Q    Did you draft the responses that appear in
 6    Exhibit 10?
 7         A    With collaboration from my counsel, yes.
 8         Q    And did you review the responses that appear in
 9    Exhibit No. 10, the response of Plaintiff Andrew Morris to
10    Defendants' first set of requests for admission?  Did you
11    review all the responses before they were served on
12    Defendants?
13         A    Yes.
14         Q    Did you review all of the responses for
15    accuracy?
16         A    Yes.
17         Q    Did you review all of the responses reflected in
18    Exhibit 10 for completeness?
19         A    Yes.
20         Q    Set that aside for now.
21         MS. ROSENBERG:  I am going to be handing you what I
22    have marked as Exhibit No. 11.
23                        (Exhibit 11 marked)
24    BY MS. ROSENBERG:
25         Q    Do you recognizes what has been marked as
```

Exhibit 56
DX0706

```
 1   Exhibit No. 11?
 2        A    Yes.
 3        Q    What is it?
 4        A    "Responses of Plaintiff Andrew Morris to
 5   Defendants' first set of interrogatories, set one."
 6        Q    Did you help prepare the responses that appear
 7   in Exhibit No. 11?
 8        A    Yes.
 9        Q    Did you draft the responses that appear in
10   Exhibit No. 11?
11        A    In collaboration with my counsel, yes.
12        Q    Were you asked to sign a verification of the
13   responses that appear in Exhibit No. 11?
14        A    I do not recall, but to my knowledge, yes.  But
15   I do not recall for sure.
16        Q    Let's flip to the back of Exhibit No. 11.  Can
17   you tell me whose signature appears on page 37, the final
18   line in Exhibit 11.
19        A    Yes.  John W. Dillon.
20        Q    Is there any attachment to this document?
21        A    No.
22        Q    Are you certain that you were asked to sign a
23   verification of this document, Exhibit No. 11?
24        A    I do not recall if it was this document or
25   another, considering that they were over the course of
```

Exhibit 56
DX0707

1    several months.  There were several, and I don't remember

2    exactly which ones I was supposed to sign or that I read

3    and signed.

4        Q    Understood.  These things can be a little bit

5    Byzantine, so it's hard to recall some of these things.

6            Are you aware that the Federal Rules of Civil

7    Procedure required you to answer the interrogatories under

8    oath?

9        A    Yes.

10       Q    So we don't -- we have not received a

11   verification of any sort for this document.  So I wanted

12   to ask if you are verifying now that the responses in

13   Exhibit No. 11 are true while you're under oath today?

14       A    Yes, they are.  I've read through them for

15   completeness and see that they are true.

16       Q    You verify that they are correct?

17       A    Yes.

18       Q    You verify that they are complete?

19       A    Yes.

20       MS. ROSENBERG:  Off the record for one moment.

21               (Discussion off the record)

22       MS. ROSENBERG:  Set that aside for now.  If you would

23   keep Exhibits 9, 10 and 11 close, we're going to use them

24   quite a bit today.

25           And I'll ask now, does anybody need to take a

```
 1   water break, bathroom break, five minutes themselves?

 2        MR. DILLON:  Your call.

 3        THE WITNESS:  I'm good.  I can get through this.

 4   BY MS. ROSENBERG:

 5        Q    I promise we are trying to make this as painless

 6   as possible.  May not feel like it.

 7        MS. ROSENBERG:  I'm going to be handing you Exhibit

 8   No. 12.  What I will mark as Exhibit No. 12, that is.

 9                     (Exhibit 12 marked)

10   BY MS. ROSENBERG:

11        Q    Do you recognize Exhibit No. 12?

12        A    Yes.

13        Q    What is Exhibit No. 12?

14        A    "Declaration of Andrew Morris in support of

15   Plaintiffs' notice of motion and motion for preliminary

16   injunction, or in the alternative, motion for summary

17   judgment."

18        Q    Let's look at page 3 of Exhibit 12, your

19   declaration.  Scroll down to line 21 on page 3, below

20   where it says "I declare under penalty of perjury under

21   the laws of the United States that the forgoing is true

22   and correct."  And this declaration was executed on

23   January 16, 2023, in San Diego, California.  I see a

24   signature appears.

25        A    Yes.
```

1        Q     Is that your signature?

2        A     Yes.

3        Q     You were signing under penalty of perjury that

4     the contents of your declaration were true.  Is that

5     correct?

6        A     Yes.

7        Q     Did you prepare this declaration?  Let me

8     rephrase.  Did you draft this declaration?

9        A     In collaboration with my counsel, yes.

10       Q     And did you review the declaration in full

11    before you signed it?

12       A     Yes.

13       Q     Set that aside for now, but keep it close, and

14    we'll use that later today.

15       MS. ROSENBERG:  All right.  I'm going to hand you

16    what I will mark as Exhibit 13.

17                         (Exhibit 13 marked)

18    BY MS. ROSENBERG:

19       Q     Do you recognize Exhibit 13 -- the document that

20    has been marked as Exhibit 13?

21       A     One moment.  Yes, I recognize it.

22       Q     What is the document marked as Exhibit 13?

23       A     "Plaintiff's memorandum of points and

24    authorities in support of notice of motion and motion for

25    preliminary injunction or alternatively, motion for

1    summary judgment."

2        Q    Thank you.  Is the motion for preliminary

3    injunction referenced in Exhibit 13 the motion that your

4    declaration which is marked as Exhibit No. 12 was filed in

5    support of?

6        A    To the best of my understanding, yes -- or my

7    recollection, rather.

8        Q    Thank you.  Did you have any involvement in the

9    drafting of Exhibit No. 13?

10       A    I do not believe so, no.

11       Q    Did you read a draft of Exhibit 13 before it was

12   filed?

13       A    No.

14       Q    So you did not review Exhibit 13 for accuracy,

15   to the extent it refers to you, before it was filed?

16       A    One moment.  Excuse me.  I believe I have read

17   through it.  There are so many documents that it's hard to

18   recollect which are which.  And considering this was the

19   beginning of the year -- sometimes even young people have

20   poor memories.

21       MR. DILLON:  Is that a knock on older people?

22       MS. ROSENBERG:  I don't know.  We're not older

23   people.

24       MR. DILLON:  Strike that from the record.

25       MS. ROSENBERG:  Note for the record everybody is

```
1   laughing, please.

2   BY MS. ROSENBERG:

3       Q    Let's pull up Exhibit No. 4, which is Penal Code

4   Section 27510.  Do you have that in front of you?

5       A    Yes.

6       Q    We talked about this a little bit earlier, and I

7   asked you if you had read Section 27510.  Am I correct in

8   understanding and stating back to you that you had not

9   read Section 27510 in full, but that you had had a summary

10  of it provided to you at some point by your counsel?

11      A    Yes.

12      Q    Great.  Are you aware Section 27510 applies only

13  to sales and transfers through federally licensed firearms

14  dealers?

15      A    Yes.

16      Q    And you're aware that it does not apply to

17  transfers of firearms that can be made without the need

18  for a firearms dealer as an intermediary, such as a gift

19  from a parent to a child or a bequest of a firearm made in

20  a will?

21      MR. DILLON:  Objection.  Calls for legal

22  conclusion.

23  BY MS. ROSENBERG:

24      Q    I'm asking for your understanding.  If you do

25  not understand that, it's okay to say no.
```

```
 1          MS. ROSENBERG:  May he answer?

 2          MR. DILLON:  Go ahead.

 3          THE WITNESS:  Yes.  That is my understanding.

 4   BY MS. ROSENBERG:

 5     Q     Let's look at Subdivision (b)(1) on Exhibit 4 of

 6   Penal Code Section 27510.  Would you mind reading

 7   Section (b)(1).  You can read this to yourself and we'll

 8   discuss it in a moment.

 9     A     Yes.  I read it.

10     Q     Do you understand that under this subdivision,

11   Section 27510, a person -- excuse me, a person 18 years of

12   age or older who possesses a valid, unexpired hunting

13   license issued by the Department of Fish and Wildlife may

14   be sold or transferred a firearm that is not a handgun or

15   semi-automatic centerfire rifle?

16     A     Can you restate, please.

17          MS. ROSENBERG:  Sure.  Would you read back my

18   question.

19                          (Record read)

20          MR. DILLON:  Objection.  Legal conclusion and

21   compound.

22          MS. ROSENBERG:  Let's get rid of that one.

23   BY MS. ROSENBERG:

24     Q     Do you understand that there are exceptions to

25   the limitations in Section 27510 that would permit
```

THE SULLIVAN GROUP OF COURT REPORTERS

49

Exhibit 56
DX0713

```
 1    somebody over the age of 18 to purchase a firearm that is

 2    not a handgun or a semi-automatic centerfire rifle if they

 3    have a valid, unexpired hunting license?

 4         A    Yes.

 5         MS. ROSENBERG:  I will give you what I will mark as

 6    Exhibit No. 5.

 7                     (Exhibit 5 marked)

 8    BY MS. ROSENBERG:

 9         Q    Have you ever seen the penal code section that

10    is reflected in what I have marked as Exhibit 5 before?

11         A    Yes.

12         Q    What is it?  What is the title of the penal code

13    section that is in Exhibit 5?

14         A    "State of California Penal Code Section 27505."

15         Q    Great.  Can you please read Subdivision (a) --

16    just the first two lines that are reflected on

17    Exhibit 5 -- for me, please, into the record.

18         A    Yes.  Would you like me to read (1) and (2) or

19    (a) going to --

20         Q    Just (a) -- so, 27505, A, in parentheses.

21    Please read the sentence that follows that.

22         A    "No person, corporation, or firm shall sell,

23    loan or transfer a firearm to a minor, nor sell a handgun

24    to an individual under 21 years of age."

25         Q    Thank you.  Do you understand that this
```

THE SULLIVAN GROUP OF COURT REPORTERS

50

Exhibit 56

DX0714

1    provision of Section 27505 prohibits federally licensed

2    firearms dealers from selling or transferring handguns to

3    anyone under the age of 21?

4         A    Yes.

5         Q    And just to clarify, you are aware that this

6    case that we're talking about today, Chavez v. Bonta, in

7    which you are a Plaintiff, challenges only Section 27510

8    restrictions on sales and transfers of firearms that are

9    not handguns?

10        A    Yes.

11        Q    So I may refer to some type of firearms today as

12   "long guns," l-o-n-g, guns, and I want to clarify, when I

13   reference a long gun, I will be referencing firearms that

14   are not handguns, including rifles and shotguns.  Do you

15   understand?

16        A    Yes.

17        Q    And do you understand that semi-auto centerfire

18   rifles are a subset of long guns?

19        A    Yes.

20        Q    Let's pull out Exhibit 12 again, which is your

21   January 16, 2023 declaration in support of the preliminary

22   injunction motion.  Let me know when you have it.

23        A    Yes, I have it before me.

24        Q    So if you'll go down to paragraph 7 of your

25   declaration, you say that:

Exhibit 56
DX0715

```
 1              "But for the California age-based gun ban and

 2              Defendants' policies, practices, customs and

 3              enforcement of said law, I would be eligible to

 4              purchase and possess firearms for lawful

 5              purposes including self-defense."

 6          Did I read that correctly?

 7      A    Yes.

 8      Q    Can you tell me what the basis for your belief

 9  that you are eligible to purchase and posses firearms for

10  lawful purposes, including self-defense?

11      A    Under the Second Amendment, any lawful adult

12  should have the ability to possess a firearm for private

13  or self-defense use.  And Penal Code 27510 is restricting

14  that right.

15      Q    Do you understand that there are laws outside of

16  the Constitution that set various forms of eligibility for

17  firearms purchases and transfers?

18          MR. DILLON:  Objection.  Calls for legal

19  conclusion.

20          MS. ROSENBERG:  I'm asking if he's aware.

21          THE WITNESS:  Yes.

22  BY MS. ROSENBERG:

23      Q    Is there anything that you can think of that

24  would render you ineligible to purchase or possess a

25  firearm?
```

THE SULLIVAN GROUP OF COURT REPORTERS

52

Exhibit 56
DX0716

```
 1        A    Apart from age, no.
 2        Q    You don't have any criminal convictions?
 3        A    No.
 4        Q    You have never had a criminal conviction, even
 5   if it was expunged or dismissed?
 6        A    No.
 7        Q    Have you ever been a subject of a domestic
 8   violence restraining order?
 9        A    No.
10        Q    Do you know what that is?
11        A    Yes.
12        Q    Have you ever been arrested, even if not charged
13   or convicted, for any crime?
14        A    Sorry.  Can you restate.
15        Q    Have you ever been arrested?
16        A    No.
17        Q    Even if you were not charged or convicted, have
18   you ever been arrested?
19        A    No.
20        Q    Have you ever been involuntarily committed to a
21   psychiatric facility or hospital on suspicion that you
22   were a danger to yourself or others?
23        A    No.
24        Q    Have you ever been subject to a background
25   check?
```

1        A     Yes.

2        Q     What were the circumstances of that background

3   check?

4        A     Upon applying for my internship, it was required

5   to get a background check, I believe with both the FBI and

6   just general -- I don't know exactly how that works -- in

7   order to verify that I was eligible to work.

8        Q     And when you reference the internship for which

9   you had this background check run, what are you referring

10  to?

11       A     My internship this summer that I'm currently

12  involved in, with Axos Bank.

13       Q     Do you currently own any firearms?

14       A     No.

15       Q     Have you ever owned a firearm?

16       A     No.

17       Q     At no point in your life did you own a

18  firearm?

19       A     No.

20       Q     If you know, how are the firearms that your

21  parents have in their home stored?

22       A     In secured safes or lockboxes.

23       Q     How do you know that that is how they are

24  stored?

25       A     Because I've been trained in firearm safety and

Exhibit 56

DX0718

1    that they are there and not for my use.  Primarily when I

2    was a minor, but still, now, because I'm not lawfully

3    allowed to possess one without going through -- without

4    going through a number of different processes.

5         Q    When you say you have been trained that you're

6    not to access them, what do you mean?

7         A    Based on my understanding, at least when I was a

8    minor, I am not able to possess a firearm without the

9    supervision and consent of a parent because of its

10   potential for deadly force.

11        Q    How did you come to that understanding?

12        A    Through teaching by my parents.

13        Q    Have you seen the storage boxes or lockers --

14   excuse me -- safes or lockers that your parents' firearms

15   are stored in?

16        A    Yes.

17        Q    Is that part of how you know that that's how

18   they are stored?

19        A    Yes.

20        Q    And would it be correct to say that your parents

21   have never permitted you to access their firearms safes or

22   lockers without their supervision?

23        A    Yes.  That is correct.  I've never been

24   permitted.

25        Q    Do you have a key or a code to enter those?  Do

```
 1   you have access to a key or code to enter those safes or

 2   lockers?

 3       A    No.

 4       Q    So speaking of your parents, I want to talk

 5   about them a little bit more, and your interaction with

 6   them and their firearms.  Can you pull out Exhibit 11,

 7   which were your interrogatory responses.

 8       A    Uh-huh.

 9       Q    Go down to your answer to interrogatory No. 12

10   at page 21.  Can you read for me the paragraph beginning

11   with the words "prior to filing" that begins on line 20 of

12   page 21 of Exhibit 11.

13       A    Yes.

14            "Prior to filing this complaint, I've gone

15            shooting recreationally with my parents

16            approximately 6 to 12 times in the past.  At

17            least one of those times was Lemon Grove Rod and

18            Gun Club in Alpine, California."

19       Q    Thank you.  Have you, on any other occasion,

20   handled a firearm, other than the six or so instances in

21   which we have discussed when you went shooting with your

22   parents?

23       A    Can you clarify what you mean by "handled"?

24       Q    Break that down.  Have you fired a firearm of

25   any kind outside the supervision of your parents?
```

```
 1        A     No.

 2        Q     Have you held a firearm at any time outside the

 3   supervision of your parents?

 4        A     Yes.

 5        Q     What were the circumstances of you holding a

 6   firearm outside the supervision of your parents?

 7        A     I was being trained by my eldest brother how to

 8   clean a firearm in my own home.

 9        Q     And your brother's name?

10        A     Matthew Morris.

11        Q     Do you have one brother?

12        A     I have several.

13        Q     Okay.  So to clarify, your elder brother Matthew

14   Morris?

15        A     My eldest brother, Matthew Morris.

16        Q     Thank you for that.  So your eldest brother,

17   Matthew Morris, was demonstrating how to clean a firearm,

18   and in that instance, you handled a firearm outside the

19   supervision of your parents.  Is that correct?

20        A     Yes.

21        Q     How old was your brother Matthew Morris at the

22   time this handling occurred?

23        A     I believe 24.

24        Q     Going back to the half dozen or so instances in

25   which you said you went shooting with your parents, do you
```

Exhibit 56
DX0721

1   recall what age or ages you were in any or all of those

2   instances?

3        A    Anywhere from -- I believe I started going to

4   the range around 15 years old.  So anywhere from 15 to

5   19.

6        Q    Have you ever gone hunting?

7        A    No.

8        Q    If you recall, what was the youngest age at

9   which you received firearms training or instruction from

10  your parents?

11       A    I believe 13 or 14 -- but not handling firearms,

12  but rather firearm safety.

13       Q    Understood.  Have you on any occasion received

14  firearms training from anyone other than your parents?

15       A    Yes.

16       Q    What were the circumstances of that training?

17       A    At Lemon Grove Rod and Gun Club, I was

18  instructed briefly about club policy regarding firearms

19  and specific safety instructions for that range by the

20  range safety officer, which I do not remember their

21  name.

22       Q    Did you take any firearm safety or shooting

23  courses?

24       A    No.

25       Q    Is your answer of no cabined to your experience

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0722

1    at the Lemon Grove Rod and Gun Club?

2         A    I've never taken an official -- or, say

3    certified course, perhaps.  But I have been instructed in

4    the proper dealings of a club or policy of firearms in

5    general by licensed range safety officers.

6         Q    About how long were these instructions -- about

7    how long a period would it take for these instructions to

8    be provided, if there was consistency across the

9    instances?

10        A    I don't recall, but I believe roughly an hour to

11   an hour and a half.

12        Q    Is that in total or each instance?

13        A    Each instance.

14        Q    So does this mean that on the six or more

15   occasions that you went shooting with your parents, each

16   time you had instructions from a gun club?

17        A    Not every instance, no.  From my recollection,

18   the way that Lemon Grove Rod and Gun Club works, you have

19   a yearly certification, and every year you have to renew

20   it with that course -- go ahead.

21        Q    No, please.

22        A    To clarify, the course that the range puts on

23   specifically for members and people who are there, to make

24   sure that they're abiding by their specific safety

25   policies.

Exhibit 56

DX0723

1    Q    So it is a course that is mandated by the gun

2    club.  It is not a statutory educational course?

3    A    Correct.

4    Q    I forgot to ask previously, in each of the six

5    instances -- six or more instances in which you went

6    shooting with your parents, whose firearms did you use?

7    A    Primarily my parents.

8    Q    Were there any firearms owned by anybody else

9    that you used?

10   A    Yes.  For Lemon Grove, they were provided by the

11   members running the program that I participated in.

12   Q    And so could you tell me the breakdown of how

13   many times approximately you think you used your parents'

14   firearms, and how many times approximately you think you

15   used those of Rod and Gun Club members who were providing

16   services.

17   A    Yes.  I believe it was basically one time that I

18   used Rod and Gun Club members' and all the other times

19   were provided by my parents.

20   Q    Okay.  And to clarify, by "used members'," you

21   mean that on one occasion -- you believe that on one

22   occasion you used a firearm of a member at the Lemon Grove

23   Rod and Gun Club?

24   A    Yes.

25   Q    And the remaining instances in which you went

Exhibit 56

DX0724

```
 1    shooting with your parents, you used firearms provided by

 2    your parents?

 3         A    Yes.

 4         Q    Thank you.  Can we look at your response to

 5    interrogatory No. 14.  Appears on pages 23 to 24 of

 6    Exhibit No. 11.  I'm going to direct you to -- at the very

 7    bottom of the page, and I'll read this.  Starting at

 8    line 25, the response says:

 9                   "To responding party's understanding, he has

10              never been loaned a firearm as permitted by

11              California Penal Code Section 27880, 27885,

12              27810, or any other California statute related

13              to loaning firearms, nor does responding party

14              have an interest or desire in such a loan."

15              Did I read that correctly?

16         A    Yes.

17         Q    And if we could go back up to the third line of

18    interrogatory No. 14.  It appears at -- it begins with

19    "describe" at approximately line 26 of page 22 of

20    Exhibit No. 11.  I'll read this one.  Interrogatory

21    states:

22                   "Describe and state all facts relating to any

23              instance in which you have been loaned a firearm

24              as permitted by California Penal Code Section

25              27880, 27885, 27910, or any other California
```

Exhibit 56
DX0725

```
 1              statute, including but not limited to who loaned
 2              the firearm to you, where the loan occurred and
 3              when and for how long the loan occurred."
 4         Did I read that correctly?
 5    A    Yes.
 6    Q    Do you see that on the question or the
 7  interrogatory that I just read, a code section listed is
 8  27910?  That's on line 1 of page 23 of Exhibit 11.
 9    A    Yes.
10    Q    And do you see in your response at line
11  approximately 27 on page 23 of Exhibit 11, instead of
12  referencing 27910, you referenced 27810?  Do you see
13  that?
14    A    Yes.
15    Q    Did you intend to reference 27910 in your
16  response?
17    A    Yes.
18    Q    Did you -- before formulating your response to
19  this interrogatory No. 13, did you have an opportunity to
20  and did you review Penal Code Section 27880 -- excuse me.
21  This is interrogatory No. 14.  Start over again.
22    A    Thank you.
23    Q    So it's my understanding that you, together with
24  your counsel, formulated the responses to the
25  interrogatories that appear in Exhibit No. 11.  Is that
```

Exhibit 56
DX0726

```
 1    correct?

 2         A    Yes.

 3         Q    So in formulating your response to interrogatory

 4    No. 14, did you review Penal Code Sections 27880, 27885

 5    and 27910?

 6         A    Yes.

 7         MS. ROSENBERG:  I am going to give you what I will

 8    mark as Exhibit No. 14.

 9                         (Exhibit 14 marked)

10    BY MS. ROSENBERG:

11         Q    Do you recognize the section of the penal code

12    that is reflected in what I have just marked as Exhibit

13    No. 14?

14         A    Yes.

15         Q    What is it?

16         A    State of California Penal Code Section 27880.

17         Q    Do you understand what Penal Code Section 27545

18    refers to?

19         A    I do not recall.

20         MS. ROSENBERG:  I'm going to hand you what I will

21    call Exhibit 16 -- mark as Exhibit 16.

22                         (Exhibit 16 marked)

23    BY MS. ROSENBERG:

24         Q    Exhibit 16 is a copy of Penal Code

25    Section 27545.  Is that right?
```

```
 1        A    Yes.

 2        Q    I'm going to read Section 27545 into the record.

 3   It says:

 4                 "Where neither party to the transaction holds

 5              a dealer's license issued pursuant to

 6              Sections 26700 to 26915, inclusive, the parties

 7              to the transaction shall complete the sale,

 8              loan, or transfer of that firearm through a

 9              licensed firearms dealer pursuant to Chapter 5,

10              commencing with Section 28050."

11              Did I read that correctly?

12        A    Yes.

13        Q    Just for background for the next questions --

14   what Section 27545 is saying is that most firearms

15   transactions, sales or transfers need to go through a

16   licensed dealer, and that applies to sales, loans or

17   transfers of firearms.  We can set that aside for now.

18              Do you understand what 27545 means?

19        A    Yes.

20        Q    Going back to Exhibit 14, I'm going to read a

21   portion of this and ask you what you understand.  I'm not

22   asking for a legal conclusion, but your understanding.

23   27880 reads in part:

24                 "Section 27545 does not apply to the loan of

25              a firearm if all the following requirements are
```

```
 1            satisfied:  The loan is to a spouse, registered
 2            domestic partner, or any of the following
 3            relations, whether by consanguinity, adoption,
 4            or steprelation."
 5            And Subdivision (a)(1) states "parent."  And
 6   Subdivision (a)(2) states "child."
 7            Do you understand that 27880 is saying that
 8   loans of firearms between parents and children are not
 9   required to be conducted through licensed firearms
10   dealers?
11       A    Yes.
12       Q    We can set that aside for now.
13       MS. ROSENBERG:  I'm going to give you what I will
14   mark as Exhibit 17.
15                      (Exhibit 17 marked)
16   BY MS. ROSENBERG:
17       Q    Have you ever seen the penal code section in
18   what has been marked Exhibit 17?
19       A    Yes.
20       Q    What is it?
21       A    State of California Penal Code Section 27885.
22       Q    Great.  So I will read a portion of this, sort
23   of like on the last one, and we'll discuss it.  Section
24   27885 states that:
25            "Section 27545 does not apply to the loan of
```

```
1                a firearm if all of the following conditions
2                exist:  Subdivision (a), the person loaning the
3                firearm is at all times within the presence of
4                the person being loaned the firearm.
5                Subdivision (b), the loan is for a lawful
6                purpose.  Subdivision (c), the loan does not
7                exceed three days in duration.  Subdivision (d),
8                the individual receiving the firearm is not
9                prohibited by state or federal law from
10               possessing, receiving, owning or purchasing a
11               firearm.  The person loaning the firearm is 18
12               years of age or older --"
13               Sorry, that was subdivision (e).  Subdivision
14   (e) reads:  "The person loaning the firearm is 18 years of
15   age or older."  And Subdivision (f) reads:  "The person
16   being loaned the firearm is 18 years of age or older."
17               So I want to go back and clarify.  Am I correct
18   in understanding that at least one of the instances in
19   which you went shooting with your parents occurred after
20   you attained the age of 18?
21        A    Yes.
22        Q    So sometime when you were 18 or 19?
23        A    Yes.
24        Q    In that instance, when you were 18 or 19, did
25   your parents remain with you for the entire time that you
```

THE SULLIVAN GROUP OF COURT REPORTERS

66

Exhibit 56
DX0730

```
 1   used their firearm?
 2        A    Yes.
 3        Q    And you were using the firearm for a lawful
 4   purpose?
 5        A    Yes.
 6        Q    And the use of that firearm did not exceed three
 7   days in duration?
 8        A    Yes.
 9        Q    And you were not prohibited by state or federal
10   law from possessing, receiving, owning or purchasing a
11   firearm at that time?
12        A    Yes.
13        Q    You were 18 years of age or older?
14        A    Yes.
15        Q    And your parents were 18 years of age or
16   older?
17        A    Yes.
18        MR. DILLON:  Objection.  Argumentative.  Speculative
19   with regard to the implication of the loan.
20   BY MS. ROSENBERG:
21        Q    Do you believe all of those items to be true
22   that we just discussed?
23        A    Yes.
24        MS. ROSENBERG:  I will give you what I'm going to
25   mark as Exhibit 18.
```

Exhibit 56
DX0731

```
 1                        (Exhibit 18 marked)

 2    BY MS. ROSENBERG:

 3        Q    Last one of these.  Have you seen the penal code

 4    section reflected in what has been marked Exhibit 18

 5    before?

 6        A    Yes.

 7        Q    What is it?

 8        A    State of California Penal Code Section 27910.

 9        Q    Okay.  And then, I'm going to read again and

10    we'll talk about it.  Section 27910 provides:

11                 "Section 27545 does not apply to the loan of

12                 a firearm to a person 18 years of age or older

13                 for the purposes of shooting at targets if the

14                 loan occurs on the premises of a target facility

15                 that holds a business or regulatory license or

16                 on the premises of any club or organization

17                 organized for the purposes of practicing

18                 shooting at targets upon established ranges,

19                 whether public or private, if the firearm is at

20                 all times kept within the premises of the target

21                 range or on the premises of the club or

22                 organization."

23                 So returning to the instances when you went

24    shooting with your parents at the Lemon Grove Rod and Gun

25    Club when you were over the age of 18 -- or 18 or older,
```

```
 1    was the firearm you used kept within the premises of the
 2    target range or premises of the club or organization?
 3         A    Yes.
 4         Q    And in answering that question, are you
 5    referring to your parents' firearms?
 6         A    Can you restate the previous question, please.
 7         Q    Yes.  Sure.  On one of the instances where you
 8    used one of your parents' firearms at a shooting range
 9    when you were 18 years of age or older under your parents'
10    supervision, was the firearm at all times kept within the
11    premises of the target range or on the premises of the
12    club or organization?
13         A    Yes.
14         Q    And in the instance when you went shooting at
15    the Lemon Grove Rod and Gun Club and used a firearm that
16    was given to you by one of the members providing a
17    class --
18         A    Yes.
19         Q    -- or instruction?
20         A    Yes.
21         Q    Did that firearm remain on the premises of the
22    club or organization?
23         A    Yes.
24         Q    Okay.  Thank you.  So do you understand from
25    what we have just discussed that Section 27880, 27885 and
```

1    27910 described instances where somebody can be loaned a

2    firearm?

3         A    Yes.

4         Q    And given what we have discussed about the

5    instances when you went shooting with your parents at gun

6    ranges or gun clubs, do you understand yourself to have

7    been loaned a firearm during that time?

8         MR. DILLON:  Objection.  Calls for a legal

9    conclusion.

10             Go ahead.

11        THE WITNESS:  For clarification, it is vague in my

12   mind because -- I'll set out the scenario.  There were

13   three of -- me and two of my siblings there in addition to

14   my parents.  We were given -- we own two firearms that

15   were being used at that point, and then one of the three

16   of us -- I believe my older brother -- may have been given

17   or loaned one, but I don't remember which one is which.

18   Nor can I know, because they're practically identical

19   firearms.

20   BY MS. ROSENBERG:

21        Q    Understood.

22        A    If that makes sense.

23        Q    Yes.  Go back to Exhibit 14, which is

24   Section 27880.  Do you understand this sets forth

25   instances in which there's a loan of a firearm between a

Exhibit 56
DX0734

1    parent and a child?

2        A    Yes.

3        Q    So you understand that loans can occur between

4    parents and children?

5        A    Yes.

6        Q    Given that understanding that there can be loans

7    between parents and children, do you now understand that

8    you were loaned a firearm by your parents?

9        MR. DILLON:  Calls for a legal conclusion.

10       THE WITNESS:  Yes.

11   BY MS. ROSENBERG:

12       Q    Can we turn back to Exhibit 11, which is your

13   interrogatory responses, and go to your answer to

14   interrogatory No. 26, which is on page 34.  That's the

15   wrong one.  My apologies.  Going back to interrogatory

16   No. 14 -- sorry about that.

17            Okay, let's look at your response to

18   interrogatory No. 14.  And if you go down to the very

19   bottom of page 23 of Exhibit 11, starting with line

20   approximately 25, can you read the paragraph beginning

21   with "to responding party's understanding."

22       A    I'm sorry.  What line is that on?

23       Q    Starting line 25.  Starts last two lines on

24   page 23.

25       A    "To responding party's understanding, he has

```
 1            never been loaned a firearm as permitted by
 2            California Penal Code Sections 27880, 27885,
 3            27810" -- which I believe should be 27910 -- "or
 4            to any other California statute relating to
 5            loaning firearms, nor does responding party have
 6            an interest or desire in such a loan."
 7       Q    Thank you.  Now, given your response that you
 8  received a loan of a firearm from your parents, am I
 9  correct in understanding that the passage that you just
10  read, beginning with "to responding party's
11  understanding," is not accurate?
12       MR. DILLON:  Objection.  Argumentative.
13       THE WITNESS:  From my understanding -- at the time
14  this was assembled, my understanding of a loan was such
15  that there was no supervision over it, but rather that it
16  was kept in my possession or used without supervision.
17  BY MS. ROSENBERG:
18       Q    But you now understand what a loan means and can
19  entail?
20       A    Yes.
21       MR. DILLON:  Objection.  Calls for legal
22  conclusion.
23  BY MS. ROSENBERG:
24       Q    So your understanding now -- would I be correct
25  to say that your understanding now is that you have
```

THE SULLIVAN GROUP OF COURT REPORTERS

72

Exhibit 56
DX0736

```
 1    received a loan of a firearm from your parents?

 2         A    Yes.

 3         Q    Turn to the response to interrogatory No. 26,

 4    which is on page 34 of Exhibit No. 11, your interrogatory

 5    responses.  I'm sorry, page 33 of interrogatory 26, which

 6    reads:  "Do you contend that your family member, spouse or

 7    domestic partner who own or possess firearms are not

 8    willing to gift or loan a firearm to you for

 9    self-defense?"  Did I read that correctly?

10         A    Yes.

11         Q    And if you go down to your response, and if we

12    go down to page 34, starting at line 12-ish, beginning

13    with -- starting line 13.  Starting with "as responding

14    party understands" -- can you read the sentence that

15    follows, that contains "as responding party understands."

16         A    Yes.  "As responding party understands with

17    regard to his parents' opinion, they would like him to

18    purchase a firearm on his own. " Do you need me to go

19    further?

20         Q    No.  That's fine.  How did you come to form that

21    understanding?

22         A    In regards to this question?

23         Q    Yes.

24         A    Regarding self-defense --

25         Q    Let me rephrase the question.
```

THE SULLIVAN GROUP OF COURT REPORTERS

73

Exhibit 56

DX0737

1    A    Okay.

2    Q    How did you come to understand with regard to

3  your parents' opinion that they would like you to purchase

4  a firearm on your own?

5    A    Because from my understanding, firearms are

6  expensive.  But I don't know for sure exactly how they

7  feel about it.  But -- I'm sorry.  Let me rephrase.  In my

8  parents' opinion, I feel that they would not gift or loan

9  me a firearm for self-defense because they are expensive,

10  and because they keep their firearms and they don't want

11  to -- they would like me to buy a firearm and own one for

12  myself instead of loaning it to me or giving it to me.  I

13  don't know if I answered your question.

14    Q    I'll ask a follow-up question.  Did your parents

15  tell you that directly?

16    A    Yes.  They said, from my recollection -- I don't

17  recall entirely, but from my recollection, my parents do

18  not want me to -- do not want to gift me a firearm because

19  they're expensive, nor loan me a firearm without their

20  supervision because they are their property and they would

21  rather supervise them.

22    Q    I understand that that is your recollection and

23  understanding -- your personal understanding of what your

24  parents feel.  But what I'm asking is if your parents told

25  you directly that they would like you to purchase a

Exhibit 56
DX0738

```
 1   firearm on your own.

 2        A    Yes.  They have told me that they would like me

 3   to purchase a firearm on my own.

 4        Q    And the reasons -- did they state reasons for

 5   them wanting you to purchase a firearm on your own?

 6        A    They did not, no.  I can only -- I can only

 7   assume that they are the reasons I already stated.

 8        Q    So you were guessing when you said that you

 9   thought that the reasons would be related to the expense

10   of firearms and the fact that your parents keep their

11   firearms secured?  Did I misstate your testimony?

12        A    Can I have a second to review?

13        Q    Sure.

14        A    Yes.  So from my recollection -- or what they

15   have told me is that, because firearms are expensive, they

16   have no interest in gifting them to me.  Is that answering

17   your question or is that the same?

18        Q    I think that you just said, before I reasked

19   this question, that your parents did not tell you directly

20   the reasons that they wanted you to buy a firearm on your

21   own.  Is that correct?

22        A    I'm sorry.  Can you restate that again.

23        MS. ROSENBERG:  Miss Court Reporter, are we able to

24   go back and get --

25                        (Record read)
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0739

1    BY MS. ROSENBERG:

2        Q    Does that clarify for you what I was asking, or

3    would you like me to rephrase the question?

4        A    Yes.  That makes sense.  So because it was early

5    2020, I believe, when I had just turned 18, when I sought

6    into this, I had a conversation with them about it because

7    I had not been able to purchase a firearm on a dealer's

8    website.  I had asked them directly whether I could be

9    gifted one or -- I didn't even mention loans, but gifted

10   one.  They said because they were expensive and left it at

11   that.  And I thought afterwards that it was because they

12   wanted them secured.  So I guess I mixed information, if

13   that makes sense.  So they told me directly because they

14   are expensive.

15           And I can imagine also that I would also need to

16   be able to secure the weapon against a number of other

17   siblings in my household that, while trained in firearms,

18   because of California law, they must be kept in a safe or

19   secured box as well.  So from my understanding, they told

20   me it was expensive, and I construed also the security

21   issues that come with that were another reason they would

22   not give me a firearm.

23       Q    You used the phrase "I imagine."  So the portion

24   of that relating to storage is something that you guessed

25   or imagined based on your understanding of circumstances.

THE SULLIVAN GROUP OF COURT REPORTERS

76

Exhibit 56
DX0740

```
 1    Is that correct?

 2         A    Yes.

 3         Q    It wasn't said directly by your parents?

 4         A    No.

 5         Q    Did you ask your parents directly if they would

 6    gift you a firearm?

 7         A    Yes.

 8         Q    And their response was no?

 9         A    Yes.

10         Q    Could I get you to read again on page 34 of

11    Exhibit 11.  This is still the interrogatory response to

12    interrogatory No. 26.  Could you read the sentence

13    beginning with "other third parties."  It's at about

14    line 16.

15         A    Yes.

16              "Other third parties, including responding

17    party's parents, have not gifted or loaned responding

18    party a firearm, nor does responding party have any such

19    interest or desire in such a gift or loan."

20         Q    You're the responding party in this sentence,

21    correct?

22         A    Yes.

23         Q    Does it remain true that you do not have any

24    interest or desire in a gift or a loan of a firearm?

25         A    Upon reviewing the definition of loan given in
```

1    these sections, I am unable to shoot a firearm without

2    being loaned one, as evidenced by these.  And so in that

3    instance, I only loan (sic) firearms from my parents out

4    of necessity, and I don't like doing that, as I mentioned

5    way earlier on.  I'm unable to have the freedom to shoot a

6    firearm when I want because I need to revolve around their

7    schedule.

8         Q    Let's separate this out.  Thank you for that

9    response regarding loans.  Does it remain true that you

10   have no interest or desire in the gift of a firearm, where

11   you would then have ownership of the firearm?

12        A    Yes.  Upon further research, when I initially

13   was looking into long guns, upon asking them and them

14   saying no, I decided it would be better for me to not have

15   it gifted in the first place, because if I wanted to have

16   a specific weapon and not one that they already owned or

17   anything of that nature, then I would need to make sure

18   that it wasn't gifted in that way.  Because everybody is

19   different and everybody's tastes, even in firearms, are

20   different.  Therefore, I have no interest in being gifted

21   a firearm or loaned one.

22        Q    So let's imagine a scenario in which you have

23   told your parents the exact model, make, color and any

24   other detail of a firearm that you would like to own.  And

25   further, let's imagine in that scenario that your parents

Exhibit 56
DX0742

1  decide they would like to gift you that exact make, model,

2  color, and any other detail of the firearm that you want.

3  In that circumstance, would it remain true that you would

4  not have any interest or desire in receiving that gift of

5  a firearm?

6      A    I personally would not want to receive a firearm

7  in the first place, even if it was my exact make, model

8  and everything.  I would want to purchase it with my own

9  money almost as a -- simply because I can.  Because I have

10  that ability, instead of needing to go through a third

11  party to obtain a firearm.

12      Q    Am I correct in understanding that, if given the

13  option, you would reject receiving a firearm as a gift --

14  let me rephrase.

15          Am I correct that you would reject receiving a

16  firearm through an avenue that is available to you by law?

17      MR. DILLON:  Objection.  Calls for a legal

18  conclusion.  Incomplete hypothetical.

19  BY MS. ROSENBERG:

20      Q    I'll rephrase again.  Do you understand that

21  you're eligible to receive a firearm via a gift from a

22  parent?

23      A    Yes.

24      MR. DILLON:  Calls for a legal conclusion.

25  ///

Exhibit 56
DX0743

1    BY MS. ROSENBERG:

2         Q    With that understanding, am I correct in

3    understanding your testimony to be that you would reject

4    receiving a firearm through this available channel of a

5    gift from your parents if given the option?

6         A    Yes.  I feel that being independent from my

7    parents from -- in a variety of different ways, including

8    firearm ownership -- I do not want to receive a firearm

9    from a parent that I did not purchase, even if it's my

10   exact make and model and everything that I want, because

11   there's still a channel of dependence in that manner.

12   Where if I wanted it myself, I would not be able to

13   purchase it, but I'd have to go through a third party and

14   tell them exactly what I want in order to receive that

15   firearm.

16        Q    Okay.  Thank you.  Let's go to Exhibit 12, which

17   is your declaration.  Let's look at paragraphs 8, 9 and 10

18   of Exhibit No. 12.  Those appear on the second and third

19   pages of the document, and I'll give you a moment to read

20   to yourself.

21        A    Did you say 8, 9, 11 and 12?

22        Q    No.  8, 9 and 10.

23        A    Okay.  I've read them.

24        Q    So does your declaration describe your efforts

25   to purchase a firearm in approximately 2022?

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0744

```
 1        A    Yes.

 2        Q    Can you walk me through the details?  You don't

 3   need to read from the declaration.  Walk me through the

 4   details on your attempt to purchase a firearm.

 5        A    Yes.  I turned 18 in December of 2021.  And in

 6   early 2022, I was researching owning a firearm, and I went

 7   through, I believe, a number of sites before making a

 8   decision, such as -- I think Remington was one of them,

 9   Heckler & Koch, something of that nature.  I found one

10   that I thought that I would enjoy that I could afford.

11   And on going through the system, there was a notice that

12   adults under the age of 21, per California law, would not

13   be able to purchase a long gun.

14        Q    Okay.  Let me back up and ask a couple of

15   detailed questions.  So your quest to purchase a firearm

16   was conducted online.  You did not walk into a store.  Is

17   that correct?

18        A    Yes.

19        Q    Do you recall which online retailer you visited

20   that was the one where you found the firearm you wanted to

21   purchase?

22        A    I do not recall the exact retailer that I chose,

23   nor the one that I wanted to purchase.  It was more than a

24   year and a half ago, at this point.

25        Q    Okay.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0745

```
 1        A     But I do remember some of the sites that I
 2   visited, such as -- I believe it's -- actually, I don't
 3   recall the name exactly.  I'm sorry.
 4        Q     It's okay.  Do you recall exactly what the
 5   system notification said, or do you have a recollection of
 6   what it said?
 7        A     Not exactly, but simply that California -- I
 8   don't remember word for word, but the gist was that
 9   California law would not allow anybody under the age of 21
10   to purchase a long gun and have it shipped to them.
11        Q     And do you recall, did the notification list out
12   any exemptions to that limitation?
13        A     I do not recall, no.
14        Q     So you don't recall that notification, for
15   example, stating that if you were a member of law
16   enforcement, you would be able to purchase a firearm?
17        A     I do not recall it stating that, no.
18        Q     And you don't recall that notification stating
19   that if you had a valid, unexpired hunting license, you
20   would be able to purchase a firearm?
21        A     No.  I do not recall.
22        Q     Did you look at FAQs -- frequently asked
23   questions -- or any other portion of that website to
24   receive further information about that limitation that
25   popped up in the notifications?
```

Exhibit 56
DX0746

```
 1        A     No.  As I stated previously, the further
 2   clarification I received was from my parents after being
 3   unable to purchase the firearm that I wanted.
 4        Q     And what did that clarification include from
 5   your parents?
 6        A     That specifically the one that I wanted -- I
 7   believe because it was a centerfire rifle -- would be
 8   unobtainable by a hunting license.  And that unless I
 9   wanted to join law enforcement or something of that
10   nature, that I would not be able to own it.
11        Q     So the firearm that you attempted to purchase in
12   early 2020 when you were researching firearms was a
13   semi-automatic centerfire rifle?
14        A     I believe so, yes.
15        Q     Do you recall the make, model -- anything about
16   it?
17        A     No.  I don't recall.
18        Q     Were you searching for any other type of
19   firearm?
20        A     Yes.
21        Q     What types of firearms were you interested in
22   purchasing?
23        A     Shotguns.  I believe those were the main two.
24   Centerfire semi-automatic rifles and shotguns were the two
25   I was looking at specifically.
```

Exhibit 56
DX0747

1      MS. ROSENBERG:  We'll go off the record to take a

2  break.  Take five minutes and come back at approximately

3  1:11 and resume.

4                        (Recess)

5  BY MS. ROSENBERG:

6      Q    We're back on the record in the deposition of

7  Andrew Morris in the Chavez v. Bonta case.  I will remind

8  you, Mr. Morris, you remain under oath just as before we

9  went on break.  Do you understand?

10     A    Yes.

11     Q    So a quick follow-up question.  I know you said

12 that you were not allowed to access the firearms that your

13 parents store in their home without their supervision or

14 permission, correct?

15     A    Yes.

16     Q    We won't tell them, but regardless of what you

17 were supposed to do, have you ever accessed the firearms

18 that your parents own that are stored in their home?

19     MR. DILLON:  Objection.  Going into Fifth Amendment

20 privilege.  Are you asking if he's illegally accessing

21 firearms?

22     MS. ROSENBERG:  I'm asking if he has ever accessed

23 the firearms stored in the home that his parents own

24 without their permission.

25     THE WITNESS:  No.

Exhibit 56
DX0748

```
 1   BY MS. ROSENBERG:

 2       Q    Okay.  Turn back to your desire to purchase a

 3   firearm, your attempt to purchase a firearm in 2022.  So I

 4   know you stated that you were looking at purchasing a

 5   semi-automatic centerfire rifle.  You also stated that you

 6   were looking at potentially buying a shotgun.  Is that

 7   correct?

 8       A    Yes.

 9       Q    Can we take a look at -- going back to

10   Exhibit 11, your interrogatory responses.  Go back to your

11   interrogatory response No. 19 on page 26 of Exhibit 11.

12   Could you read the sentence beginning with "I would

13   purchase pistols," sort of between lines 22 and 23 on page

14   26, please.

15       A    Yes.

16            "I would purchase revolvers, rifles and

17            shotguns, including but not limited to

18            bolt-action, lever-action, semi-automatic break

19            action, double action, single action, single

20            shot types of firearms, or any other lawful

21            firearm of my choosing per my Second Amendment

22            right.  I'm unable to do so, however, under

23            California law, due solely to my age."

24       Q    So in 2022, early 2022, and this time period

25   we're discussing where you were researching and attempting
```

Exhibit 56
DX0749

1    to purchase a firearm, were you also looking to acquire

2    these bolt-action, lever-action, semi-automatic break

3    action, double action, single action, or single shot types

4    of firearms at that time, or is that a desire you have

5    now?

6         A    Wasn't looking specifically to buy at that time

7    because I was limited in resources, primarily, in my funds

8    to purchase them.  I was looking to purchase a

9    semi-automatic centerfire or shotgun first and go from

10   there to purchase other ones.  But I was not doing the

11   research on those ones because I was not wanting to spend

12   my money on them yet, if that makes sense.

13        Q    It does.  Thank you.  So talk about your

14   research and preparation before you attempted to purchase

15   a firearm.  I know you have said that you were researching

16   particular firearms.  What other kinds of research did you

17   do in the run-up to attempting to purchase a firearm in

18   early 2022?  Let me clarify that I mean.  What other types

19   of research did you do, whether before 2022 or in 2022, in

20   a run-up to purchase a firearm in 2022?

21        A    Primarily discussing it with my parents because

22   they do own firearms.  So they're more knowledgeable than

23   I was, not having owned any firearms.  But also looking at

24   gun sale magazines or gun magazines in general, or online

25   resources -- I don't recall exactly which ones they were,

```
 1    but things of that nature that had lists or had

 2    information on firearms.

 3         Q    Did you research types of ammunition?

 4         A    Yes.

 5         Q    How about safety features?  Were you researching

 6    safety features of the firearms that you were

 7    considering?

 8         A    Yes.

 9         Q    What types of safety features were you

10    interested in?

11         A    I don't recall about interested in, but I

12    remember looking at safety features such as hard trigger

13    pulls and things of that nature that would restrict people

14    who -- specifically minors who don't have the strength to

15    pull a trigger or don't know what they're doing so they

16    don't fire a rifle without knowing what is happening and

17    cause an accident.  Or things that protect against

18    dropping or bumping, things of that nature.

19         Q    Did you purchase or were you planning to

20    purchase any type of gun storage?

21         A    Yes.  I was planning on purchasing a gun

22    storage.  Likely a hard case with a lock, because those

23    tend to be fairly inexpensive and give a lot of

24    protection.  But I didn't get very far in that regard

25    because I was stopped by the lack of my ability to
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0751

1   purchase a firearm.

2       Q    Are there any minors living in your parents'

3   home?  Let me rephrase.  In early 2022 when you were

4   considering purchasing a firearm, were there any minors

5   living in your parents' home?

6       A    Yes.

7       Q    Of what age?

8       A    I believe 11 and 14, but it could have been 12

9   and 15.  I don't remember exactly.

10      Q    Okay.  Thank you.  In your preparation for

11  purchasing a firearm, did you research or otherwise read

12  about firearms laws that would apply to you?

13      A    Yes.

14      Q    What did that research entail?

15      A    Learning -- or I guess I understood already,

16  based on my parents, that I was not legally allowed to own

17  a handgun, as that had been -- that law had been passed

18  prior to when I was searching for a long gun, I believe

19  several years in the past.  And also regarding safety and

20  lockboxes and away from reach of children and not having

21  them open, things of that nature, such that they are not

22  misused accidentally.

23      Q    Did you conduct any other research regarding the

24  laws that would apply to you?

25      A    Yes.  Other than regarding use of drugs, whether

THE SULLIVAN GROUP OF COURT REPORTERS

88

Exhibit 56

DX0752

1  legal or illegal, being under the influence of alcohol

2  while using a firearm and how that's prohibited, in

3  addition to safe storage in vehicles if you're driving to

4  a range -- things of that nature, I researched

5  specifically.  However, other, vague things I can't really

6  recall, I had discussions with my parents about.

7      Q   So for those topics that you had stated you

8  researched specifically, what sources did you consult

9  other than your parents?

10      A   Online websites.  I believe either the

11  California state gov website, or perhaps the NRA website,

12  or other online assistance for owning or keeping a

13  firearm, in addition to my parents.

14      Q   Did you consult the California Department of

15  Justice Bureau of Firearms website?

16      A   I don't recall exactly, but I remember I was

17  looking through several state government websites

18  regarding rules and regulations.

19      Q   Okay.  Have you ever taken the exam to procure a

20  firearm safety certificate?

21      A   I do not recall.  I'm not entirely sure.

22      Q   Did you -- in your research, did you look into

23  whether a license or certificate would be required before

24  you purchased a firearm?

25      A   I don't think I came across any information

Exhibit 56

DX0753

1    regarding license or anything like that.

2        Q    Was that a topic that you researched?

3        A    No.  I assumed that you did not need a license

4    or extra screening process or training, what have you, to

5    purchase a firearm.

6        Q    Did you research the law regarding concealed

7    carry?

8        A    I did not research that on the Internet.

9    However, I was made aware of that by my parents because

10   they are involved in things of that nature.

11       Q    When you say "involved in things of that

12   nature," what are you referring to?

13       A    I believe my mother -- she was training for it,

14   but being an instructor in concealed carry permits and how

15   to train other people in getting those.  So I knew

16   already, because I was not 21, because I could not own a

17   handgun, I was not able to obtain a concealed carry

18   permit.  But I was generally aware of the regulations for

19   concealed carry usage, even with a permit, such as not

20   being allowed in government buildings of any caliber or

21   specifically restricted locations.

22       Q    I want to go back to talk about the instances in

23   which you said that you received some instruction or

24   information at the Lemon Grove Rod and Gun Club.  Do you

25   recall talking about that?

```
 1        A    Yes.

 2        Q    I know we talked about the fact that those

 3   sessions lasted maybe an hour to an hour and a half.

 4        A    Yes.

 5        Q    Does that still sound accurate to you?

 6        A    Yes.

 7        Q    Let's not talk over each other.  I'll give you a

 8   chance to answer.  We talked about the length of time

 9   that those sessions lasted, but I don't think we talked

10   about what they covered.  Do you recall the topics those

11   instructional sessions covered?

12        A    Not completely, but I could name off specific

13   things, such as the layout of the range to give

14   information on where you should be pointing your firearms,

15   where you shouldn't be.  The schedule for the day with

16   breaks and instructions on heat, because it was, you know,

17   a hot day outside.  In addition to regulations regarding

18   where you need to point your firearm when you're walking,

19   when you're standing, where you need to be holding your

20   ammunition, what you need to be checking before being

21   ready to fire a firearm, such as people in the line of

22   fire.  People need to be behind you -- things of that

23   nature.  Also the way that firearms worked as well,

24   because we were shooting shotguns primarily.  So I believe

25   many of them were double action, which meant that there
```

```
 1    was extra steps with making sure that you're not burning
 2    yourself or dropping the firearm or things of that nature.
 3         Q    Did those sessions include a hands-on component
 4    where you would have to demonstrate safe handling of a
 5    firearm?
 6         A    Yes.
 7         Q    Every time?
 8         A    No.  Only for the yearly certification.
 9         Q    Okay.  I want to go back to briefly talking
10    about the time period when you were attempting to purchase
11    a firearm in early 2022.  Did you discuss -- before you
12    attempted to make the purchase, did you discuss the plan
13    to purchase a firearm with anyone at all?
14         A    Yes, primarily my family, and not in specific
15    terms, but in general, "I'd like to" or "I'm thinking
16    about purchasing a firearm."  Things of that nature.
17         Q    And you say primarily your family.  Who else did
18    you discuss your plan with?
19         A    Let me rephrase and say primarily my immediate
20    family, and in addition my extended family, such as my
21    grandparents.
22         Q    Nobody outside the family though?
23         A    Correct.
24         Q    Okay.  And you didn't post about your desire to
25    purchase a firearm on any of your social media accounts?
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0756

```
 1        A    No.
 2        Q    Were any of these discussions that you had with
 3   your immediate family or grandparents conducted via
 4   e-mail?
 5        A    No.
 6        Q    Were any of these discussions that you had with
 7   your immediate family or grandparents conducted via text
 8   message?
 9        A    I do not think so.  I think the primary
10   information that was done was done through verbal
11   speech -- or verbal interaction, rather.
12        Q    Thank you.  So we have talked quite a bit about
13   instruction and safety.  It does sound to me like you are
14   somebody who finds safety to be really important, and that
15   you take this really seriously, which is great.  So I
16   think you would agree -- tell me if you would agree with
17   the statement that firearms handling and ownership comes
18   with serious responsibilities.  Would you agree?
19        A    Yes.  I would agree.
20        Q    And firearms handling and ownership requires
21   care.  Would you agree?
22        A    Yes.
23        Q    Would you also agree that firearms handling and
24   ownership requires skill?
25        A    I would say not in every instance.
```

1      Q    Would you say firearms handling and ownership

2  requires a certain degree of maturity?

3      A    Yes.

4      Q    I want to clarify -- I know we have talked about

5  it many times.  Just to make sure I understand.  Have you

6  ever taken any firearms safety or training courses beyond

7  the yearly certification instruction sessions at the Lemon

8  Grove Rod and Gun Club?

9      A    I don't know for sure, but I don't think so,

10  apart from the -- apart from the training I've received

11  directly from my parents.

12      Q    When you were planning to make your firearms

13  purchase in early 2022, did you make any plan to take a

14  training course before or after becoming a firearm

15  owner?

16      A    No.  Because my parents have both been using

17  firearms, specifically long guns, for a while, so I

18  assumed I could be trained by them.  My mother, Melissa

19  Morris, is certified by the NRA in long gun usage, in safe

20  practices, and in accurate shooting, and so I was going to

21  rely on her for training in that regard.

22      Q    And forgive me if I asked this.  I don't think

23  that I did.  What types of firearms did you use in those

24  sessions where you went shooting with your parents?

25      A    Primarily handguns, but also shotguns as well.

Exhibit 56

DX0758

1      Q    Have you ever handled a semi-automatic
2  centerfire rifle?
3      A    Yes, but I don't believe I've shot one before.
4      Q    And in any of the instances where you went
5  shooting with your parents, did you handle a
6  semi-automatic centerfire rifle?
7      A    Yes, but once again, I don't think I shot it.
8      Q    Was that semi-automatic centerfire rifle one of
9  your parents' guns?
10     A    Yes.
11     Q    If you know, how -- let me rephrase.
12          If you know, was the semi-automatic centerfire
13  rifle that you handled, that belonged to your parents, of
14  the same make and model as the semi-automatic centerfire
15  rifle that you attempted to purchase in 2022?
16     A    I do not recall.
17     Q    If you recall, did the semi-automatic centerfire
18  rifle that belonged to your parents, that you handled with
19  their supervision, have similar features to the
20  semi-automatic centerfire rifle that you wished to
21  purchase in 2022?
22     A    No.  I don't recall.
23     Q    Do you have any future plans to take any
24  firearms training courses of any sort?
25     A    Yes, I do.  Not specifically.  But until the

1    penal code is removed, I don't -- because I'm not able to

2    shoot a firearm without my parents' supervision or loaning

3    it to me, and I'm unable to purchase it, I don't have the

4    ability to fire one.  However, I am taking a course in the

5    fall regarding, I believe it is, long guns.  It's an

6    official course run by the school for long gun shooting --

7    it might have been pistol.  I don't remember which one it

8    was.

9        Q    And this official firearms course that you have

10   just referenced being at a school, that is a course that

11   would be provided by your college, Liberty University?

12       A    Yes.

13       Q    Would that be conducted at their gun club?

14       A    Yes.

15       Q    Do you know who the instructors would be for

16   that course?

17       A    No.

18       Q    And that course would occur in Virginia?

19       A    Yes.

20       Q    So you will receive a lot of training, it sounds

21   like, from your parents.  I wonder if you could tell me

22   what you think the kinds of safety and firearms use topics

23   would be important for a responsible firearm user to know.

24       MR. DILLON:  Objection.  Compound.

25       MS. ROSENBERG:  I'll back it up and separate it.

Exhibit 56
DX0760

1    BY MS. ROSENBERG:

2       Q    What kinds of firearms safety topics do you

3    think would be important for a responsible firearm user to

4    know?

5       A    Primarily -- I would say the fact that it is

6    a -- it has the potential for lethal force.  Therefore,

7    treating it with respect and being able to handle it

8    without paying attention to something else.  So giving it

9    your primary attention, in addition to having little

10   distractions in the background so that's your only focus.

11   And being -- instruction on how to be calm and clean so

12   that you're not shaking, being unsafe, paying attention to

13   other things or messing with things with your hands while

14   using firearms.

15           For instance, at a gun range, where you have,

16   you know, potentially a lot of gear with you, to keep

17   track of only -- to have only one firearm that you have to

18   keep track of at a time, and things of that nature, where

19   you're being safe in your priorities.  In addition to the

20   way you're handling the gun -- keeping it pointed down

21   range where it needs to go and recognizing that it is a

22   weapon that has lethal force and does need to be treated

23   with respect.

24      Q    What kinds of firearm mechanics or use topics do

25   you think a responsible firearms owner should know or

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0761

1  learn?

2      A    Primarily, the most important one would be

3  safety, obviously.  How they work, how to identify them,

4  what different types there are.  In addition to misfire --

5  or how to deal with a misfire or a jam or something of

6  that nature, so that people are not endangering themselves

7  or others when dealing with it.  And having the mindset of

8  being focused on one single thing at a time.

9      Q    Thank you.  I'm going to run through a list of

10 topics, and I will probably repeat myself a lot, so I

11 apologize in advance if this might seem a little bit

12 boring.

13          Do you think a responsible firearm user should

14 know the basic components of ammunition?

15     A    Can you explain what you mean by "basic

16 components of ammunition."

17     Q    Sure.  Types of ammunition, the correct

18 ammunition for a firearm they are using, things of that

19 nature.  How ammunition functions.

20     A    Yes.  I think that it's a good idea to know what

21 type of ammunition you need to be using.  However, extra

22 details aren't always required, such as how ammunition

23 functions, because it's not -- it's not always pertinent

24 information.  However, using the wrong caliber or the

25 wrong type of ammunition could cause serious issues.  So

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0762

1    when safety is involved, because of that, I think it's

2    important that people know what they're doing and being

3    educated by that.

4        Q    Okay.  So selecting the correct ammunition for

5    your firearm is a topic that a responsible firearm user

6    should know or learn?

7        A    Yes.

8        Q    Should a responsible firearm user know the basic

9    parts of the firearm they're using?

10       A    Yes.  I think for the most part that's true,

11   depending on what type of firearm you're using, such as a

12   shotgun.  You need to know where different things are,

13   whether it's a breaking shotgun, or how it's loaded,

14   things of that nature.  Also for cleaning firearms such

15   that they don't misfire, being able to know that, because

16   misfires can be very dangerous, and without cleaning

17   firearms, it leads to issues like misfiring or jamming as

18   well.  And because of that, I think it's important to be

19   aware of gun maintenance without necessarily needing to

20   know every single part of the gun and how it works.

21       Q    Is it useful to know how each part of the gun

22   works?

23       A    It can be, for sure.  But I don't think it's

24   necessary to use a firearm.

25       Q    Understood.  Do you think it's important for a

Exhibit 56
DX0763

1  responsible firearm user to understand the basic firing

2  process of the firearm they're using?

3       A    Regarding pins and ammunition, how it's set off?

4  Or what do you mean specifically?

5       Q    That could be part of it, or it could be

6  releasing a safety, pulling a trigger, what happens after

7  pulling the trigger.  Are those topics important to know

8  for a responsible firearm user?

9       A    I think they're definitely important to know.

10 Once again, different types of safeties, what happens when

11 you fire a firearm and where different parts of a round

12 will go and what the gun does, so you're prepared for what

13 happens.  Because sometimes it can be pretty extreme,

14 depending on the weapon.

15      Q    To rephrase, let me make sure I'm understanding.

16 You're saying it is important to understand the safety

17 mechanism on a firearm.  Is that correct?

18      A    Yes.

19      Q    And it's important for a responsible firearm

20 owner to understand the range of a firearm, correct?

21      A    Yes.

22      Q    Is it important for a responsible firearm owner

23 to understand how the ammunition that will be discharged

24 from the firearm will react -- for example, what

25 trajectory it will have?

Exhibit 56
DX0764

```
 1        A     Yes.

 2        Q     For those firearm users who wish to use

 3   different types of firearms -- for example, bolt-action

 4   rifle, lever-action rifles, semi-automatic handgun, break

 5   action shotgun, double action revolvers, and other types

 6   of firearms -- is it important for a responsible firearm

 7   owner to understand the differences between the types of

 8   firearms that they wish to use?

 9        A     You mean how they're fired or how the powder is

10   ignited or --

11        Q     Yes.  How they function.

12        A     I think not necessarily.  I think the primary

13   things are, once again, loading -- how to load a firearm

14   properly such that you're not endangering yourself.  I

15   don't think it's always necessary to know exactly how the

16   actual mechanism inside works, but rather ammunition

17   safety and how it's loaded and how it reacts when being

18   fired.

19        Q     So to recap, it's important for a responsible

20   firearm owner to understand how the firearm is discharged?

21        MS. ROSENBERG:  I did not capture what he said.  Can

22   you read back what he said, please.

23                        (Record read)

24   BY MS. ROSENBERG:

25        Q     So to recap, it is important for a responsible
```

Exhibit 56
DX0765

 1  firearm owner to understand how to load a particular type

 2  of firearm.  Is that correct?

 3       A    Yes.

 4       Q    And it's important for a responsible firearm

 5  user to understand how the particular firearm they are

 6  using will react when a trigger is pulled.  Is that

 7  correct?

 8       A    Yes.

 9       Q    And we have already discussed that it's

10  important for a responsible firearm user to use the

11  correct ammunition in the firearm they are using.  Is that

12  correct?

13       A    Yes.

14       Q    And it's important for a responsible firearm

15  user to know firearm cleaning basics and how to clean and

16  store their firearm?

17       A    Yes.

18       Q    That was compound.  Let's run that back.

19       A    Yes.

20       Q    It's important for a responsible firearm owner

21  to understand firearm cleaning basics for their firearm.

22  Is that correct?

23       A    Yes.

24       Q    It's important for a responsible firearm user to

25  understand how to properly store their firearm.  Is that

Exhibit 56
DX0766

1    correct?

2         A    Yes.

3         Q    It is also important for a responsible firearm

4    user to understand how to store ammunition.  Is that

5    correct?

6         A    Yes.

7         Q    And it's important for a responsible firearm

8    user to know basic shooting skills.  Is that correct?

9         A    Can you clarify what you mean by "basic shooting

10   skills"?

11        Q    Sure.  Let me ask whether it's important for a

12   responsible firearm user to know the basics of

13   marksmanship?

14        A    Yes.

15        Q    So it's important for a responsible firearm user

16   to understand how to use a sight, for example?

17        A    Yes.

18        Q    Okay.  It's important -- would you say it's

19   important for a firearm user -- strike that.

20             Would you say it's important for a responsible

21   firearm user to have knowledge of firearm safety at a

22   shooting range?

23        A    Yes.

24        Q    And is it important for a responsible firearm

25   user to understand the safe transport of firearms?

THE SULLIVAN GROUP OF COURT REPORTERS

103

Exhibit 56
DX0767

1        A     Yes.

2        Q     Would it be important for a responsible firearm

3    user to understand the maximum projectile range of the

4    firearm they're using?

5        A     Yes.

6        Q     And I think we covered this.  It's important for

7    a responsible firearms user to understand the danger of

8    using the wrong ammunition, correct?

9        A     Yes.

10       Q     Would it surprise you to learn that all of those

11   topics that we just discussed are covered in the hunter

12   education course?

13       A     No.

14       Q     Great.  I'm glad it doesn't surprise you.

15       MS. ROSENBERG:  So I'm going to give you what I'm

16   going to mark as Exhibit 19.

17                      (Exhibit 19 marked)

18   BY MS. ROSENBERG:

19       Q     Have you ever seen Exhibit 19 before?

20       A     Not in its entirety or specifically, no.

21       Q     Can you read the title of Exhibit No. 19.

22       A     "Study Guide for Hunting Education."

23       Q     And at the very top of Exhibit 19, where it says

24   "study guide," what follows study guide?

25       A     "California Hunter Ed Course."

1      Q    What we're looking at is the study guide for the

2   California hunter education course.  If you would like to

3   take a quick perusal through it, I'll give you a few

4   moments.

5      A    (Witness complies.)

6      Q    Done?

7      A    Yes.

8      Q    I just asked you whether it would surprise you

9   to learn that all of the safety and training topics that

10  we just discussed were covered in the hunter education

11  course.  But now I would like to know whether you were

12  aware that all of those topics would be covered by the

13  hunter education course?

14     A    Not specifically all those topics, but rather

15  that an element of them -- or I assumed that topics to

16  that degree were covered in the course.

17     Q    Am I correct in understanding that you have not

18  made any attempt to enroll in the hunter education course,

19  either before or after filing the complaint?

20     A    Correct.  I've never made an attempt to enroll

21  in them.

22     Q    And am I correct that you have not made any

23  attempt to acquire a hunting license, either before or

24  after filing the complaint?

25     A    Correct.

Exhibit 56
DX0769

1        Q     Am I correct in understanding that you have gone

2   online and visited the hunter education course website?

3        A     Yes.

4        Q     But you did not read the study guide that is

5   Exhibit 19.  Is that correct?

6        A     No, I did not.

7        Q     Am I correct in understanding that you viewed

8   the costs and fees required in order to obtain a hunting

9   license?

10        A     Yes.

11        Q     Can we take a look at Exhibit 11 again.  This is

12   your interrogatory responses, your answer to No. 4 on

13   page 10.  Excuse me, page 11.  Am I correct that your

14   response to interrogatory No. 4 states, beginning at

15   line 8 on page 11 of Exhibit 11, "I have no interest in

16   hunting whatsoever and will not be forced to waste both my

17   time and money to learn about an irrelevant topic in order

18   to exercise my Second Amendment right."

19        A     That is correct.

20        Q     But you agree that many of the topics that we

21   just discussed that are included in the hunter education

22   course are relevant to firearm ownership and use?

23        MR. DILLON:  Objection.  Vague.

24   BY MS. ROSENBERG:

25        Q     But you have just agreed that the firearm safety

THE SULLIVAN GROUP OF COURT REPORTERS

106

Exhibit 56
DX0770

```
1    and training topics that are covered in Exhibit No. 19 in

2    the hunter education course are relevant to safe firearm

3    use, correct?

4         A    Yes.  However some of the other sections are not

5    relevant to firearm use whatsoever.

6         Q    But it is not your view that the firearm safety

7    and training topics that we just discussed that were

8    included in Exhibit 19, in the hunter education course,

9    are irrelevant to firearm ownership, right?

10        A    They're not wholly irrelevant, no.

11        Q    Is there anything that is preventing you from

12   taking a hunter education course in order to secure a

13   hunting license?

14        A    No.

15        Q    So there's no particular burden that is

16   preventing you from taking the hunter education course?

17        A    Aside from financial incentive -- I wouldn't

18   want to be spending my money on something that I'm not

19   going to be using.

20        Q    Are you aware that there are traditional hunter

21   education courses which consist of ten hours of classroom

22   and hands-on training time available for free within a few

23   miles of you in the next couple weeks?

24        A    Yeah.  Yes.  But in addition, because I've

25   already been trained in the use of a firearm and because
```

Exhibit 56

DX0771

```
 1    I'm not using all the firearms on this list, I don't find
 2    it -- I don't find it necessary to go through ten hours of
 3    training for something I already know or for stuff that's
 4    completely irrelevant for my firearm usage.  As mentioned
 5    previously, I work full time, and the hobbies that I
 6    typically spend 10 to 15 hours a week doing at school, I
 7    have not participated in hardly at all now.  And having an
 8    extra ten-hour course to do something I'm not interested
 9    in, just to get parts of something I already know, is not
10    relevant to me.
11         Q    Firearm ownership is something that you really
12    desire.  Is that fair to say?
13         A    Yes.
14         Q    In fact, it's so important to you that you're
15    participating in this lawsuit, though.  Is that right?
16         A    Correct.
17         Q    The main motivator for you joining this lawsuit
18    is that you would like to procure firearms.  Is that
19    right?
20         A    Yes.
21         Q    So what you're saying is you're not able to
22    spare eight or ten hours to take a hunter education course
23    that would then permit you to purchase a firearm?
24         MR. DILLON:  Objection.  Argumentative.
25         THE WITNESS:  In addition to me not finding it
```

THE SULLIVAN GROUP OF COURT REPORTERS

108

Exhibit 56
DX0772

1    necessary to spend eight to ten hours on that, in addition

2    to getting a hunting license, there are several firearms

3    that I still cannot own with a hunting license, that are

4    restricted, such as centerfire semi-automatic rifles.

5    BY MS. ROSENBERG:

6        Q    But it's true that you have expressed interest

7    in purchasing other firearms that are not semi-automatic

8    centerfire rifles, correct?

9        A    Correct.

10       Q    And you would acknowledge that if you were to

11   take a hunter education course and obtain a valid,

12   unexpired hunting license, you would be able to purchase

13   long guns that are not semi-automatic centerfire rifles?

14       A    Yes.  But once again, I don't find it -- I find

15   it irrelevant to have to purchase a license to shoot game

16   in order to own and use a firearm.

17       Q    Would it be fair to say that it is your personal

18   choice not to take a hunter education course?

19       MR. DILLON:  Objection.  Argumentative.

20       THE WITNESS:  Yes.

21   BY MS. ROSENBERG:

22       Q    Would it be fair to say then that it is your

23   choice not to procure a hunting license?

24       MR. DILLON:  Objection.  Argumentative.

25       THE WITNESS:  Yes.

```
 1   BY MS. ROSENBERG:

 2       Q    So you would agree that your choice not to take

 3   a hunter education course is a contributing factor to you

 4   not being able to purchase a firearm, correct?

 5       MR. DILLON:  Objection.  Argumentative.

 6       THE WITNESS:  Partially, yes.  But there are several

 7   firearms that I would like to purchase that, even with a

 8   hunting license, I am unable to purchase.

 9   BY MS. ROSENBERG:

10       Q    Understood.  But you acknowledge that if you

11   were to procure a hunting license by taking the hunter

12   education course, you could purchase a firearm, correct?

13       MR. DILLON:  Objection.  Calls for legal conclusion.

14   Incomplete hypothetical.

15   BY MS. ROSENBERG:

16       Q    Is that your understanding of the law?

17       A    Yes.

18       Q    So again, you are choosing not to take an

19   available avenue to purchase a firearm by declining to

20   take a hunter education course, correct?

21       MR. DILLON:  Objection.  Argumentative.

22       THE WITNESS:  Partially, yes.  But once again,

23   several of the firearms I'd like to own are centerfire

24   semi-automatic rifles.

25   ///
```

Exhibit 56
DX0774

BY MS. ROSENBERG:

Q    And just to make sure we have it on the record,
you're unwilling to take a hunter education course even if
it is entirely free.  Is that correct?

A    Yes.

Q    Are you aware that firearms ownership in general
comes with various fees and costs?

A    Yes, I'm aware.

Q    What types of fees and costs are you aware of?

A    Assuming that you cannot discharge firearms in
your backyard -- it is not permitted here -- you have to
often pay if you're at a range to use their system or to
use their ranges or to become a member so you can use it
consistently.  In addition, ammunition is also expensive.
Storing your firearm, cleaning your firearm, maintaining
it, storing when it's not being used, purchasing something
to transport your firearm -- all those things can
contribute to inherent costs.

Q    You stated that you were aware that there were
traditional hunter education courses available for free
just a few miles from you.  How did you become aware of
that, or what is the basis for your awareness?

A    I have several friends that have in the past had
hunting licenses, and they had procured them locally.  So
without complete evidence, I fully assumed that there were

Exhibit 56
DX0775

```
 1    places locally, considering they obtained them.
 2         MS. ROSENBERG:  I am going to hand you what I will
 3    mark as Exhibit 20.
 4                        (Exhibit 20 marked)
 5    BY MS. ROSENBERG:
 6         Q    So the exhibit that I have just marked as
 7    Exhibit No. 20 is a listing for a traditional hunter
 8    education course.  Is that correct?
 9         A    Yes.
10         Q    I should ask, have you reviewed Exhibit
11    No. 20?
12         A    Yes.
13         Q    So let me then ask, having reviewed Exhibit
14    No. 20, is it true that it is a listing for a traditional
15    hunter education course?
16         A    Yes.
17         Q    And that a traditional course will be held on
18    Saturday, August 12, 2023.  Is that correct?
19         A    Yes.
20         Q    And the location of the traditional hunter
21    education course listed in Exhibit 20 is in Escondido,
22    California.  Is that correct?
23         A    Yes.
24         Q    That's just a few miles from where you're
25    currently living.  Is that correct?
```

Exhibit 56
DX0776

1        A    Yes.

2        Q    If you'll go down to the "about the event" on

3   the first page of Exhibit 20, do you see a course fee of

4   $20 per person?

5        A    Yes.

6        Q    And having reviewed Exhibit 20, you don't see

7   any other fees listed.  Is that correct?

8        MS. ROSENBERG:  I will hand you what I will mark as

9   Exhibit 21.

10                        (Exhibit 21 marked)

11   BY MS. ROSENBERG:

12        Q    Actually, before we go to Exhibit 21, go back to

13   Exhibit 20.  Could you tell me how many seats out of 50

14   are listed as remaining open?

15        A    Thirty out of 50.

16        Q    I'm handing you what I just marked as

17   Exhibit 21.  Take a moment to review that, please.

18        A    I'm ready.

19        Q    So having reviewed what is marked as Exhibit 21,

20   am I correct in stating that this is another listing from

21   a traditional hunter education course?

22        A    Yes.

23        Q    And the meeting date or dates for the

24   traditional hunter education course listed on Exhibit 21

25   are Saturday, August 26, 2023, and Sunday, August 27,

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0777

```
 1    2023.  Is that correct?

 2         A    Yes.

 3         Q    And the location for the traditional hunter

 4    education course that is exhibited in Defendants' Exhibit

 5    No. 21 is Ramona, California.  Is that correct?

 6         A    Yes.

 7         Q    That is also -- Ramona is also only a few miles

 8    from where you're currently living.  Is that correct?

 9         A    Yes.

10         Q    If you go down to the "about the event" section

11    on the front page of Exhibit 21, do you see a statement

12    that the class is free to all?

13         A    Yes.

14         Q    And having reviewed Exhibit 21, do you see any

15    fee listed anywhere else?

16         A    There are no fees listed anywhere else.

17         MS. ROSENBERG:  I'm going to hand you what I will

18    mark as Exhibit 22.

19                        (Exhibit 22 marked)

20    BY MS. ROSENBERG:

21         Q    Am I correct in remembering you saying that you

22    could not recall whether you had ever taken an exam for a

23    firearm safety certificate?

24         A    Correct.  I did not recall.

25         Q    Do you know what a firearm safety certificate
```

```
 1   is?

 2        A    Yes.

 3        Q    Would you tell me your understanding of what a

 4   firearm safety certificate is.

 5        A    From my understanding, it certifies that you are

 6   a -- that you have gone through the material in order to

 7   understand how a firearm works, how it is stored, proper

 8   use, and any other information that is -- that regards

 9   firearm usage that -- that people are considered -- should

10   be able to -- I don't know if that makes sense.

11        Q    How did you gain that understanding?

12        A    By briefly looking through the study guide.

13        Q    Do you mean today or previously looking through

14   the study guide?

15        A    Both, yes.

16        Q    So if we look at Exhibit 22, could you tell me

17   what it is?

18        A    It is a firearm safety certificate study

19   guide.

20        Q    Who puts it out?

21        A    The Office of the Attorney General of

22   California.

23        Q    What is the date listed on the front of Exhibit

24   No. 22?

25        A    June 2020.
```

1      Q    Do you recall if the version of the firearm

2    safety certificate study guide that you previously

3    reviewed was an earlier version or this June 2020

4    version?

5      A    Likely the same version.

6      Q    But you have seen this document that is now

7    marked as Exhibit 22, correct?

8      A    Yes.

9      Q    Do you recall if you have read the entire

10   guide?

11     A    I do not think so, no.

12     Q    You do not think you read the entire guide.  Is

13   that correct?

14     A    Correct.

15     Q    Are you a member of the Second Amendment

16   Foundation?

17     A    Yes.

18     Q    Do you recall when you became a member of the

19   Second Amendment Foundation?

20     A    I do not recall, no.

21     Q    Could you tell us what the Second Amendment

22   Foundation is?

23     A    Yes.  It's an organization that watches for laws

24   that come in that -- laws that come in, and seeks to put

25   forward activists or educate public or members regarding

1    these laws such that they can be made aware and become

2    active in order to -- excuse me -- in order to use that

3    information to speak out about what they feel is unjust.

4         Q    And is the Second Amendment Foundation focused

5    on firearms laws?

6         A    Yes.

7         Q    Are you sure?  It's okay if you don't know.  I

8    want to make sure your answer is the answer you'd like to

9    give.

10        A    I'm not entirely sure.  From what I can

11   remember, it is, but I don't remember entirely.

12        Q    You're not responsible for reciting the entire

13   mission of every organization.  I'm not looking for that.

14             You don't recall when you became a member.  Is

15   that right?

16        A    Correct.

17        Q    Do you recall how you became a member of the

18   Second Amendment Foundation?

19        A    I do not recall.  I don't remember if it was my

20   affiliations with San Diego County Gun Owners, or whether

21   I heard about it through Republican Party individuals, or

22   whether it was through hearing about this lawsuit.

23        Q    Do you recall if you paid a fee to join as a

24   member of the Second Amendment Foundation?

25        A    I do not recall, no.

Exhibit 56
DX0781

```
 1        MS. ROSENBERG:  I am going to hand you what I will
 2   mark as Exhibit 23.
 3                     (Exhibit 23 marked)
 4   BY MS. ROSENBERG:
 5        Q    So what I have just marked as Exhibit 23 is a
 6   printout of a web page.  What is the organization
 7   associated with the web page listed at the top of page 1
 8   of Exhibit 23?
 9        A    Second Amendment Foundation.
10        Q    Do you recall ever seeing this web page
11   before?
12        A    Yes.
13        Q    What were the circumstances of seeing this web
14   page?
15        A    I believe I was reviewing it to see if I wanted
16   to become a member.
17        Q    Does this refresh your memory as to whether or
18   not you paid a membership fee to join the Second Amendment
19   Foundation?
20        A    Yes.  I don't -- one moment.  I don't recall
21   whether I paid for the membership or not.  However, I know
22   that if I did, I don't know if I renewed it, if that makes
23   sense.  Because it would have come up recently, assuming
24   it's an annual membership, but I don't remember whether I
25   paid for the membership or not.
```

1      Q    So you're unsure whether you renewed your

2    membership in the Second Amendment Foundation?

3      A    Yes.

4      Q    Does that mean you're not sure whether you're a

5    current dues-paying member of the Second Amendment

6    Foundation?

7      A    Yes.

8      Q    Thank you.  Are you a member of the Firearms

9    Policy Coalition?

10     A    Yes.

11     Q    Do you remember when you became a member of the

12   Firearms Policy Coalition?

13     A    I believe early 2022.  Perhaps later than

14   that.

15     Q    How did you become a member of the Firearms

16   Policy Coalition?

17     A    As previously stated, I don't recall exactly.

18   But between my connections in San Diego County Gun Owners

19   or the Republican Party or this lawsuit.

20     Q    Do you recall whether you paid a membership fee

21   to join the Firearms Policy Coalition?

22     A    I do not think I paid a membership fee, no.

23     Q    Do you know whether the Firearms Policy

24   Coalition charges a membership fee?

25     A    I do not know, no.

Exhibit 56

DX0783

```
 1        MS. ROSENBERG:  I am going to hand you what I will
 2   mark as Exhibit 24.
 3                      (Exhibit 24 marked)
 4   BY MS. ROSENBERG:
 5        Q    Have you ever seen Exhibit 24 before?
 6        A    I do not believe so, no.
 7        Q    Could you read the line that says "join FPC" on
 8   the first page of Exhibit 24, please.
 9        A    Are you referring to "Join FPC, win a Beretta
10   A300 Ultima Patrol"?
11        Q    Yes.  Thank you.
12             So you don't recall seeing a screen -- seeing
13   this screen when you became a member of the Firearms
14   Policy Coalition, correct?
15        A    Correct.
16        Q    Do you know if you joined online?
17        A    I don't know if I joined online, no.
18        Q    And you are not sure whether you paid a fee to
19   join the Firearms Policy Coalition, correct?
20        A    Correct.
21        Q    You have not renewed a fee recently for the
22   Firearms Policy Coalition, correct?
23        A    No.  I have not.
24        Q    If you know, did you receive an e-mail
25   confirming that you joined the Firearms Policy Coalition
```

```
 1  as a member when you joined?

 2       A    I don't know if I received an e-mail confirming.

 3  However, I have received several e-mails from them since I

 4  believe I joined.  So I assume that I had joined, or at

 5  the very least, given them my e-mail.  I don't know

 6  exactly how that works.

 7       MS. ROSENBERG:  I'm going to show you what -- or give

 8  you what I will mark as Exhibit 25.  And apologies, this

 9  was a very large printing, so I only have three copies.

10                      (Exhibit 25 marked)

11  BY MS. ROSENBERG:

12       Q    Take a moment to just flip through Exhibit 25.

13  Does the packet of materials that have been marked as

14  Exhibit 25 look familiar to you?

15       A    Yes.

16       Q    Are these the supplemental responses to the

17  Defendants' requests for production that you served

18  yesterday upon the Defendants?

19       A    Yes.

20       Q    This packet of materials consists solely of

21  e-mails.  Is that correct?

22       A    Yes.

23       Q    Are the e-mails in this packet of materials, to

24  your knowledge, the entire universe of documents

25  reflecting your membership in the Firearms Policy
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56

DX0785

```
 1   Coalition?

 2        A     To my knowledge, yes.

 3        Q     Set that aside.

 4              Are you a member of the Firearms Policy

 5   Foundation?

 6        A     I believe so, yes.

 7        Q     Could we take a look at Exhibit No. 12, your

 8   declaration from January 16 of 2023.  Do you have it

 9   handy?

10        A     Yes.

11        Q     If I could direct you to paragraph No. 4.  Am I

12   correct in stating that paragraph No. 4 lists the

13   organizational Plaintiffs to which you are a member?

14        A     Yes.

15        Q     Could I please have you read paragraph No. 4 out

16   loud.

17        A     Yes.

18              "I am currently a member of the organizational

19              Plaintiffs involved in this case. Specifically,

20              I'm a member of the Firearms Policy Coalition,

21              Second Amendment Foundation and the California

22              Gun Rights Foundation."

23        Q     Am I correct that the Firearms Policy Foundation

24   is not among the organizations you list in paragraph

25   No. 4?
```

Exhibit 56
DX0786

1    A    Yes.

2    Q    Does this refresh your recollection as to

3  whether or not you're a member of the Firearms Policy

4  Foundation?

5    A    I think it does.  I don't think I'm a member.

6  But because of the similar name to Firearms Policy

7  Coalition, I perhaps got them mixed up.  I do not remember

8  if I am a member or not.

9    Q    Could I have you take a look at Exhibit No. 11

10  again.  This is your interrogatory responses.  And you

11  have today verified on the record that your responses here

12  are true and correct.  Is that right?

13    A    Yes.

14    Q    Could I have you take a look at your response to

15  interrogatory 13 appearing on page 22 of Exhibit 11.

16  Could I have you read the two paragraphs that are the

17  responses to interrogatory No. 13 to yourself, and we'll

18  follow up with some questions.

19    A    Yes.  I've read them.

20    Q    Do you see at line -- starting at line 20-ish --

21  between 19 and 20 on page 22 of Exhibit No. 11, in your

22  response to interrogatory No. 13, where you have said:

23        "Responding party has been a member of

24        Firearms Policy Coalition, the Firearms Policy

25        Foundation and the California Gun Rights

Exhibit 56
DX0787

1          Foundation since January 1st, 2022.  Responding

2          party has been a member of the Second Amendment

3          Foundation since November 1st, 2022."

4          Did I read that correctly?

5     A    Yes.

6     Q    Given that you are unable to recall whether you

7  are a member of the Firearms Policy Foundation, do you

8  believe that your response to interrogatory No. 13 is

9  incorrect?

10    A    No.  I think that since it was January 1st of

11 2022 -- that was more than 18 months ago and my -- I did

12 not recall because it was a long time ago.

13    Q    So these -- if we scroll down to the final page,

14 page 37 of Exhibit No. 11, at around line 12, could you

15 read the date that it listed for these interrogatories,

16 please.  Excuse me.  These interrogatory responses.

17    A    Yes.  July 12th, 2023.

18    Q    Do you recall when you collaborated with your

19 counsel to provide responses to the interrogatories?

20    A    I do not recall, no.

21    Q    Was it in 2023?

22    A    Yes.

23    Q    Was it in summer 2023?

24    A    Yes.

25    Q    Would you say that it was sometime after May

THE SULLIVAN GROUP OF COURT REPORTERS

124

Exhibit 56

DX0788

1   2023?

2        A    Yes.

3        Q    You have stated on the record here that you

4   don't recall when you joined the Second Amendment

5   Foundation or the Firearms Policy Coalition or the

6   Firearms Policy Foundation, but your interrogatory

7   responses list very specific dates.  Could you explain how

8   you were able to determine those dates?

9        MR. DILLON:  Objection.  Privileged communication

10  between attorney-client.

11  BY MS. ROSENBERG:

12       Q    I will rephrase.  Did you rely upon any

13  documents to determine the dates upon which you joined the

14  Firearms Policy Coalition, the Firearms Policy Foundation,

15  the Second Amendment Foundation, and the California Gun

16  Rights Foundation?

17       A    I don't know.

18       Q    Did you provide those dates to your counsel for

19  these disclosures?

20       MR. DILLON:  Objection.  Privileged information.

21  Attorney-client communication.

22       MS. ROSENBERG:  It's the communication that has been

23  disclosed as part of discovery.

24       THE WITNESS:  Can you refer me to which interrogatory

25  this is, please.

```
 1    BY MS. ROSENBERG:

 2        Q    Yes.  Response to interrogatory No. 13, and the

 3    dates appear at lines 21 through 24 on page 22 of Exhibit

 4    No. 11, your responses to interrogatories.

 5        A    I believe the initial assignments were because I

 6    had just turned 18 and, therefore, I felt it was more

 7    relevant to me to be involved in this type of thing.  As

 8    for the Second Amendment Foundation, I believe that

 9    occurred once I heard about the lawsuit.

10        Q    And in providing these responses you just

11    provided, are you guessing or do you have a specific

12    recollection of having joined on these dates?

13        A    I don't know.  I do not have a specific

14    recollection for the first part.  However, for the second

15    part, the Second Amendment Foundation, I remember I was

16    joining because I heard about it through the lawsuit.

17        Q    Okay.  And just to reiterate, you do not have

18    any documents or communications reflecting your joining as

19    a member in any of these four organizations.  Is that

20    correct?

21        A    Correct.

22        Q    Are you a member of the California Gun Rights

23    Foundation?

24        A    No.  Wait.  Yes.  Sorry, could I take a break

25    for a couple minutes?  Just to go off --
```

Exhibit 56
DX0790

```
 1        Q    I would ask that you answer the question and
 2   then we'll take a break.
 3        A    To my knowledge, yes, I am a member.
 4        Q    I'll follow up with questions after we take a
 5   break.  How long would you like?
 6        A    Five minutes is fine.
 7        MS. ROSENBERG:  We'll go off the record.
 8                        (Recess)
 9   BY MS. ROSENBERG:
10        Q    So I know that our discussion about records has
11   been a little unclear.  I just wanted to remind you that
12   if you find additional documents that are responsive to
13   discovery requests, that you are under an obligation to
14   update your responses if they are relevant, which you will
15   discuss with your counsel.  I will provide no further
16   guidance except that we would appreciate anything else
17   that you find that is responsive.
18        A    Yes.
19        Q    I want to ask quickly if we can go back to Penal
20   Code Section 27510, which is Exhibit No. --
21        MR. DILLON:  4.
22   BY MS. ROSENBERG:
23        Q    If you would take a moment to read Section 27510
24   and let me know when you're done, please.
25        A    Uh-huh.  Okay.
```

THE SULLIVAN GROUP OF COURT REPORTERS

127

Exhibit 56
DX0791

```
1        Q    Does any portion of Section 27510 state that you
2   must have a desire to hunt in order to procure a hunting
3   license?
4        A    No.
5        Q    Thank you.  Put that down.
6             Are you a member of any fraternities or social
7   clubs on campus at school?
8        A    No.
9        Q    Do you participate in any other school-related
10  groups?  For example, choir, robotics?
11       A    Yeah.  Student government, primarily.
12       Q    What's your role in student government?
13       A    I am a senator among, I believe, 25 others who
14  represent the student body of 15,000.
15       Q    What are your responsibilities in that senator
16  role?
17       A    Being able to instruct others that need guidance
18  as it sits or also writing and putting forth legislation
19  to change the makeup of the school or the way that a
20  policy works, or something of that nature.
21       Q    I want to take those three things in parts.
22  When you say that part of your role is to -- is devoted to
23  changing the makeup of the school -- am I saying that
24  correctly?
25       A    Through legislation that is approved through the
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 56
DX0792

1    processes -- being able to improve the way that the school

2    is run or the way that a specific sector of the school --

3    such as the dining plan or on-campus housing -- works,

4    through a process that's been set up already.

5        Q    So by "makeup," what did you mean?

6        A    I'm sorry.  Did I say makeup of the school?

7        MS. ROSENBERG:  Madam reporter.

8                    (Record read)

9        THE WITNESS:  In reference to makeup, for instance,

10   the location of something.  Putting in a document saying

11   where a better location could be.  Or also the way that a

12   certain class is run or certain professors -- anything in

13   the scope of the school that is applicable to the

14   undergraduate student body.

15       Q    How many senators work on these same issues with

16   you?

17       A    There are, I believe, 28 senators in total,

18   including senate president and things of that nature --

19   secretary, all that.  So I am one of 28, I believe.

20       Q    And if you could help me understand, when you

21   said that part of your responsibility is to provide

22   guidance to those who "need guidance as it sits," what are

23   you referring to?

24       A    So for people who are less experienced than I

25   am, who would like to write legislation or have an idea to

Exhibit 56
DX0793

1    change something, the proper procedure for that, good

2    policies for enacting things, what things will be approved

3    and which things won't.

4        Q    When you say people less experienced than you

5    are, are you referring to other senators or referring to

6    the student body at large?

7        A    Within student government, there are senators

8    and delegates, and I have the responsibility of mentoring

9    both senators and delegates if need be.

10       Q    And what type of policy work are you involved

11   with as a senator at Liberty University?

12       A    Often it's quality of life for students.  One

13   example is locations for bikes on campus, where they can

14   be put.  How they're spending their money.  Or rooms for

15   people who are disabled or disability accommodations, and

16   being able to put forward an idea to the administration

17   for them to approve and enact that idea.

18       Q    Do you have any role in disciplinary proceedings

19   at the school?

20       A    No.

21       Q    Are you aware of any disciplinary proceedings at

22   the school?

23       A    Yes.

24       Q    Could you describe in general terms, not

25   referring to any specific person, the nature of the

Exhibit 56

DX0794

1    disciplinary proceedings of which you are aware at Liberty

2    University?

3        A    So within the student government association,

4    there is a judicial branch that deals with infractions of

5    the school's code of conduct, and the most common is a

6    parking violation that results in a fine, and coming in to

7    repeal a fine or to take it.  But anything from misconduct

8    of people within student government or of the student body

9    at large who are being processed through the student

10   government association.

11       Q    Anything more serious than parking violations

12   that you are aware of?

13       A    I couldn't tell you for sure, that students deal

14   with -- or oversee, rather -- students oversee.

15       Q    Fair enough.  So I think -- and correct me if

16   I'm wrong, but I think you testified earlier that you do

17   not have any firearms held by Liberty University or on the

18   Liberty University campus.  Is that correct?

19       A    Correct.

20       Q    You have no firearms with you when you are at

21   school?

22       A    Correct.

23       Q    And you have no firearms with you when you are

24   off campus around school, correct?

25       A    Correct.

THE SULLIVAN GROUP OF COURT REPORTERS

131

Exhibit 56

DX0795

1    Q    Do you have a desire to have firearms with you

2    when you are living in Virginia at school?

3    A    I do, but because Liberty -- or rather Virginia

4    has similar policies to California, restricting the

5    ability to have a concealed carry permit or things of that

6    nature, it is -- I have not had the time to navigate that

7    and figure out for sure whether I am willing to take on

8    the challenge of doing that.

9    Q    And let me clarify.  Are you currently a

10   resident of the state of California or a resident of the

11   state of Virginia?

12   A    I'm still a resident of the state of

13   California.

14   Q    If you know, is California your domicile?

15   A    Yes.

16   Q    What's the general vibe at school, would you

17   say, if there is one?  What's the population like there?

18   MR. DILLON:  Objection.  Vague.  I'm having

19   trouble.

20   BY MS. ROSENBERG:

21   Q    Sure.  Do you get a sense that there's a

22   particular personality that your school has?  It's okay if

23   you say no.

24   A    No.  I think there are a lot of different

25   personalities that people have on campus.

Exhibit 56
DX0796

```
 1          Q     Is Liberty University a dry campus?

 2          A     Yes, it is.

 3          Q     And what does that mean?

 4          A     There is no alcohol permitted on or off campus

 5   while you're a student.

 6          Q     If you are aware, do students, nonetheless,

 7   engage in drinking alcohol while they are students?

 8          A     From my understanding, students who are above

 9   the age of 21 will occasionally drink alcohol.  But it is

10   very rare and very -- disciplinary action can be taken by

11   the administration of the school if they are caught doing

12   that.

13          Q     Have you ever been to any parties while a

14   student?  Parties thrown by other students?

15          A     Yes.

16          Q     Were those on or off campus?

17          A     On campus.

18          Q     You have not been to any off-campus parties

19   while you've been a student at Liberty University?

20          A     No, I have not.

21          Q     When you were in high school, did you attend any

22   parties thrown by fellow students?

23          A     Aside from graduation parties, no.

24          Q     Have you ever witnessed underage drinking?

25          A     Yes.
```

Exhibit 56

DX0797

1        Q      Where?

2        A      I don't recall.

3        Q      Do you know which states you witnessed it in?

4        A      California.

5        Q      Do you recall what year you witnessed it?

6        A      Probably last year, before I graduated high

7    school.

8        Q      So it occurred in Poway, California?

9        A      Not necessarily.

10       Q      Somewhere in the greater San Diego area?

11       A      Yes, San Diego.

12       Q      What were the circumstances of seeing this

13   underage drinking occur?

14       A      I don't recall.

15       Q      Do you happen to know whether the person or

16   persons you saw engaging in underage drinking were over

17   the age of 18?

18           MR. DILLON:  Objection.  Calls for speculation.

19           MS. ROSENBERG:  I'm asking if he knows.

20           THE WITNESS:  I assume so, yes.  I don't know for

21   sure.  I assume they were over 18 considering -- if it was

22   last year, I wouldn't be spending time with people under

23   18.

24   BY MS. ROSENBERG:

25       Q      Thank you.  Have you ever been involved in a

THE SULLIVAN GROUP OF COURT REPORTERS

134

Exhibit 56

DX0798

```
 1   fight?

 2       A    No.

 3       Q    Have you ever witnessed one?

 4       A    Not to my recollection, no.

 5       Q    Have you ever needed to defend your home?

 6       A    No.

 7       Q    Have you ever used a weapon of any sort in an

 8   altercation?

 9       A    No.

10       Q    Have you ever felt that you might need to use a

11   weapon in a particular circumstance?

12       A    Yes.

13       Q    What is that?  What was that circumstance?

14       A    Walking around in San Diego at night, there are

15   a lot of sketchy or homeless people on drugs who have the

16   ability to overpower someone like me, who is -- I don't

17   work out.  I'm not super strong.  Considering they could

18   be on drugs and in their 30s or 40s, I could be very

19   easily overpowered.

20       Q    I understand.  Have you ever felt unsafe in your

21   parents' home?

22       A    No.

23       Q    Have you ever felt unsafe in your home at school

24   in Virginia?

25       A    No.
```

THE SULLIVAN GROUP OF COURT REPORTERS

135

Exhibit 56

DX0799

1    Q    Do you know anybody who has ever used a firearm

2    defensively?  And let me clarify.  Do you know anybody

3    personally who has used a firearm defensively?

4    A    I don't know.

5    Q    Do you know anybody who has died by suicide?

6    A    Yes.  But not via firearm.

7    Q    If you know, what was the method of suicide in

8    that case?

9    A    Via a rope.

10    Q    And how old was that person?

11    A    Thirteen.

12    Q    Do you know or have you known anyone who died an

13    accidental death from a gunshot?

14    A    No.

15    Q    Do you know anybody who has experienced an

16    accidental gunshot?

17    A    No.

18    Q    Let me rephrase that.  Do you know anybody who

19    has sustained injuries from an accidental firing of a

20    firearm?

21    A    No.

22    Q    Have any of your classmates or colleagues ever

23    been violent in front of you?

24    A    No.

25    Q    And I am asking at any time in your professional

THE SULLIVAN GROUP OF COURT REPORTERS

136

Exhibit 56

DX0800

1   or scholastic career?

2        A    Not seriously violent.

3        Q    What do you mean by "not seriously violent"?

4        A    I mean, I think play-fighting is fairly common

5   among guys.  So that's basically the furthest extent that

6   I've experienced.

7        Q    So you're thinking of horseplay or joking?

8        A    Yes.

9        Q    Understood.  If we could go back to Exhibit 11,

10  our favorite exhibit, your answers to interrogatory No. 3,

11  page 8.  I'm going to read a portion of your response to

12  interrogatory No. 3 on page 8 of Exhibit 11.  Your

13  responses to interrogatories.  It begins somewhere between

14  lines 21 and 22.  You have stated in your responses to

15  interrogatory No. 3:

16            "I do not currently own any firearms, but

17             wish to purchase at least one, such as a shotgun

18             or rifle, including a centerfire semi-automatic

19             rifle for self-defense and other lawful

20             purposes."

21        Did I read that correctly?

22      A    Yes.

23        Q    Setting aside your wishes and your desires, is

24  it your view that a firearm is necessary to you for

25  self-defense?

THE SULLIVAN GROUP OF COURT REPORTERS

137

Exhibit 56

DX0801

```
 1        MR. DILLON:  Objection.  Argumentative.

 2        THE WITNESS:  I think, while it might not be

 3   necessary, it is often vital to avoid my own injury.  For

 4   instance, if I were to have a knife or something like that

 5   and there were an altercation, because I have to

 6   physically get close to another person who would be

 7   attacking me, then I would be unsafe by defending myself

 8   in that manner.

 9   BY MS. ROSENBERG:

10        Q    Have you ever had to defend yourself against an

11   attack?

12        A    No.

13        Q    In that same interrogatory response to

14   interrogatory No. 3 on page 8 of Exhibit 11, you stated

15   that you wish to purchase a shotgun or rifle.  Would you

16   agree that a shotgun may be adequate for self-defense?

17        A    Yes.  I think it depends on the situation.

18   Every single situation is different, and sometimes -- if

19   you are, for instance, on a sidewalk and somebody is

20   attacking you, a shotgun is not acceptable because it

21   spreads.  It can go behind the person and potentially go

22   into somebody else.

23        Q    In that scenario, if you know -- in that

24   scenario you just described where you are on a sidewalk

25   and responding to an attack, do you have a view as to the
```

```
 1   most appropriate firearm for self-defense?

 2        MR. DILLON:  Objection.  Argumentative.

 3        THE WITNESS:  Once again, it depends on the

 4   situation, and every single situation is different.  It

 5   could be a handgun, a rifle, depending on a number of

 6   different factors.

 7   BY MS. ROSENBERG:

 8        Q    Have you conducted any research on statistics

 9   relating to defensive gun use?

10        A    Yes, but I couldn't recall specific numbers.

11        Q    Do you know what resources or what sources you

12   consulted when you conducted that research?

13        A    Probably the typical mainstream news sites.

14        Q    By "probably," do you mean that you are

15   guessing?

16        A    I would say in addition to social media, viewing

17   things of that nature giving statistics, there is also

18   news sites that I use regularly that often have

19   gun-related paraphernalia around it.  And statistics,

20   while I don't remember them, are definitely there, between

21   that and social media.  Sources such as the New York Times

22   or Fox News or NPR.

23        Q    You haven't consulted any scientific journals

24   regarding the statistics around defensive gun use, have

25   you?
```

THE SULLIVAN GROUP OF COURT REPORTERS

139

Exhibit 56
DX0803

```
1        A    I do not believe so.

2        Q    Let's look at the third amended complaint, which

3   I believe is Exhibit 3.  We're going to look at paragraph

4   No. 45.  I might be wrong on the paragraph number.  So on

5   page 22 of the third amended complaint, footnote 3, at the

6   bottom of the page, I am going to read the footnote.   In

7   the third amended complaint, the Plaintiffs state:

8                "With the signing of SB61, even if a young

9                adult were to go through the irrelevant,

10               inapplicable requirements and pay the necessary

11               fees to obtain a valid hunting license, they are

12               still prohibited from purchasing all handguns

13               and all semi-automatic centerfire rifles from

14               any licensed dealer or private party

15               transaction.  Thus, the most common, widely used

16               and accepted classes of firearm for

17               self-defense, and arguably the most common

18               classes of firearms, are prohibited from

19               purchase/acquisition by young adults, even when

20               they have complied with the state's so-called,

21               quote, 'exemption', unquote."

22               Did I read that correctly?

23       A    Yes.

24       Q    What facts are you aware of that support the

25   contention that semi-automatic centerfire rifles are among
```

Exhibit 56
DX0804

```
 1    the most common, widely used and accepted classes of
 2    firearms for self-defense?
 3         MR. DILLON:  Objection.  Calls for speculation.
 4    BY MS. ROSENBERG:
 5         Q    Are you aware of any facts supporting the
 6    statement in footnote 3 regarding whether semi-automatic
 7    centerfire rifles are the most common -- among the most
 8    common, widely used and accepted classes of firearms for
 9    self-defense?
10         A    I don't know.
11         Q    We're going to go to your responses to request
12    for production, which I believe is Exhibit No. 9.
13         A    Yes.
14         Q    So we're going to look at your response to
15    request for production No. 26.  First, look at request for
16    production No. 26 -- and this is on page 20 of Exhibit
17    No. 9, which is the response of Plaintiff Andrew Morris to
18    Defendants' first set of requests for production.  Request
19    for production No. 26 reads:
20              "All documents and communications relating
21              to, concerning, responsive to, substantiating,
22              informing or underlying the claim and
23              allegations in footnote 3 of the complaint that
24              semi-automatic centerfire rifles are among the
25              most common, widely used and accepted classes of
```

Exhibit 56

DX0805

1          firearms for self-defense, and arguably the most

2          common classes of firearms."

3          And in paragraph 45 of the complaint, that:

4    "Together with handguns, semi-automatic handguns make up

5    the majority of all firearms purchased and used in the

6    United States today."

7          Did I read that correctly?

8    A    Yes.

9    Q    Your response to request for production

10   No. 26 -- the request that I just read into the record --

11   states, at between lines 15 and 16 on page 21 of Exhibit

12   No. 9:  "Responding party has no documents responsive to

13   this request."  Is that correct?

14   A    Yes.

15   Q    You do not have any documents or communications

16   substantiating the claim that semi-automatic centerfire

17   rifles are among the most common, widely used and accepted

18   class of firearms for self-defense.  Is that correct?

19   A    Yes.

20   Q    I'm going to ask you a series of questions

21   asking if you're aware of certain facts.  If you are not,

22   it's okay to say "No."  If you're unsure, it's okay to say

23   "Unsure."  I'm looking for the truthful answers to whether

24   or not you're aware of these things.  It's not a pop quiz,

25   I promise.

1            Are you aware that people aged 18 to 20 make up

2    a disproportionate share of arrests for violent crime in

3    the United States?

4         A    Yes.

5         Q    Are you aware that although 18- to 20-year-olds

6    make up less than four percent of the population, they

7    make up more than 15 percent of homicide and manslaughter

8    arrests and have perpetrated 20 percent of all the mass

9    shootings leaving double-digit fatalities in recorded U.S.

10   history?

11        A    No.

12        Q    Are you aware that following the massacre in

13   Uvalde, Texas -- let me stop there.  Are you aware that

14   there was a mass shooting in Uvalde, Texas?

15        A    Yes.

16        Q    Where 21 people were killed?

17        A    Yes.

18        Q    Are you aware that following the massacre in

19   Uvalde, data shows that 40 percent of all mass public

20   shootings at K-12 schools involved 18- to 20-year-old

21   shooters?

22        A    Yes.

23        Q    Are you aware that just since 2020, 18- to

24   20-year-olds have been involved in mass shootings,

25   including those leading to the death of dozens of children

Exhibit 56

DX0807

1    and adults?

2        A    Yes.

3        Q    Are you aware those included the shooting we

4    just discussed, the May 2022 shootings at Robb Elementary

5    School in Uvalde, Texas, where 21 people were killed?

6        A    Yes.

7        Q    Are you aware that 18- to 20-year-olds were

8    involved in a mass shooting in a supermarket in Buffalo,

9    New York, in which ten people were killed?

10        A    No.

11        Q    Are you aware that in April 2021, 18- to

12    20-year-olds were involved in a shooting at a FedEx in

13    Indianapolis, Indiana, where eight people were killed?

14        A    No.

15        Q    Are you aware that neuroscientists believe that

16    18- to 20-year-olds demonstrate difficulties in exercising

17    self-restraint, controlling impulses, considering future

18    consequences, making decisions independently from their

19    peers, and resisting the coercive influence of others?

20        MR. DILLON:  Objection.  Compound.

21    BY MS. ROSENBERG:

22        Q    I'll separate those out.

23            Are you aware that neuroscientists believe that

24    18-year-olds demonstrate difficulties in exercising

25    self-restraint?

Exhibit 56
DX0808

```
 1        MR. DILLON:  Objection.  Vague and ambiguous.
 2   Argumentative.
 3        THE WITNESS:  Yes.
 4   BY MS. ROSENBERG:
 5        Q    Are you aware that neuroscientists believe that
 6   18- to 20-year-olds demonstrate difficulties in
 7   controlling impulses?
 8        MR. DILLON:  Same objections.
 9        THE WITNESS:  Yes.
10   BY MS. ROSENBERG:
11        Q    Are you aware that neuroscientists believe that
12   18- to 20-year-olds demonstrate difficulty considering
13   future consequences?
14        MR. DILLON:  Same objections.
15        THE WITNESS:  Yes.
16   BY MS. ROSENBERG:
17        Q    Are you aware that neuroscientists believe that
18   18- to 20-year-olds demonstrate difficulty making
19   decisions independently from their peers?
20        MR. DILLON:  Same objections.
21        THE WITNESS:  Yes.
22   BY MS. ROSENBERG:
23        Q    Are you aware that neuroscientists believe that
24   18- to 20-year-olds demonstrate difficulty resisting
25   coercive influence of others?
```

THE SULLIVAN GROUP OF COURT REPORTERS

145

Exhibit 56

DX0809

```
 1          MR. DILLON:  Objection.  Vague.  Ambiguous.
 2    Argumentative.
 3          THE WITNESS:  Yes.
 4    BY MS. ROSENBERG:
 5          Q    And are you aware that neuroscientists believe
 6    that 18- to 20-year-olds are especially at risk for
 7    violence?
 8          MR. DILLON:  Same objections.
 9          THE WITNESS:  No.
10    BY MS. ROSENBERG:
11          Q    Are you aware that neuroscientists believe that
12    18- to 20-year-olds are especially at risk for suicide?
13          MR. DILLON:  Same objections.
14          THE WITNESS:  Yes.
15    BY MS. ROSENBERG:
16          Q    Are you aware that neuroscientists believe that
17    18- to 20-year-olds are especially at risk for
18    non-suicidal self-injury?
19          MR. DILLON:  Same objections.
20          THE WITNESS:  Yes.
21    BY MS. ROSENBERG:
22          Q    And are you aware that neuroscientists believe
23    that 18- to 20-year-olds are especially at risk for
24    excessive drinking?
25          MR. DILLON:  Same objections.
```

Exhibit 56
DX0810

1        THE WITNESS:  Yes.

2   BY MS. ROSENBERG:

3        Q    Based on the awareness you just stated that you

4   have regarding neuroscientists' evaluation of 18- to

5   20-year-olds, would it be fair to say that at least some

6   portion of the 18- to 20-year-old population may not

7   possess the maturity necessary to safely use firearms?

8        MR. DILLON:  Objection.  Argumentative.  Calling for

9   speculation and compound.

10        THE WITNESS:  I think perhaps.  But in the same way,

11   if we're allowing people who are 18 to 20, as you said,

12   who are more likely to be influenced by their peers and

13   who are prone to underage drinking and prone to violence,

14   and if we're allowing them to join the military -- where,

15   from my experience with people that I know in the

16   military, there is an element of all those things that

17   exist there -- in addition to law enforcement, then I

18   think there can't be a double standard in both of those

19   instances simply because one is serving the country and

20   the other is using their individual rights.

21   BY MS. ROSENBERG:

22        Q    Would you agree that service in the military

23   involves some level of supervision and training?

24        MR. DILLON:  Objection.  Calls for speculation.

25        THE WITNESS:  Yes.

Exhibit 56
DX0811

1   BY MS. ROSENBERG:

2        Q     What informs your awareness of that?

3        A     Knowing people personally that have gone through

4   it several years ago or are still involved today.

5        Q     Have they described their supervision and

6   training to you in detail?

7        A     Not in detail, but briefly.

8        Q     You have never served in the military,

9   correct?

10       A     Correct.

11       Q     And no desire to serve in the military?

12       A     Correct.

13       Q     You don't have any personal knowledge of

14  firearms training and education that members of the

15  military might engage in, correct?

16       A     I don't know specifically what they engage in.

17  I do understand that they engage in some level of

18  training.

19       Q     I'm asking, you don't have any personal

20  experience with military training?

21       A     Correct.

22       MS. ROSENBERG:  Off the record for just five minutes

23  so I can consult with co-counsel.

24       MR. DILLON:  Sounds good.

25                      (Recess)

Exhibit 56
DX0812

```
 1   BY MS. ROSENBERG:

 2        Q    We're going to start wrapping up now.  I think I

 3   have a couple of final questions for you.

 4             Is it your contention that the age limitations

 5   in Penal Code Section 27510, which are the subject of this

 6   law suit, impose an unconstitutional burden on you?

 7        A    Yes.

 8        Q    In your own words, can you please describe what

 9   that burden is.

10        A    Yes.  So as previously mentioned, I would have

11   to go out of my way to either procure a hunting license

12   that I would never use, simply to own a firearm, or become

13   a member of the armed forces or reserves or become a

14   member of a -- a police officer or something of that

15   regard, in order to exercise the right to keep and bear

16   arms, which shall not be infringed through restricting my

17   rights to a long gun or a shotgun or anything of that

18   nature.  Specifically, as well, even with a hunting

19   license, I'm unable to procure a centerfire semi-automatic

20   rifle.  And I have to jump through a number of different

21   hoops or do something completely against my will in order

22   to exercise a right that was established by the Second

23   Amendment.

24        Q    Is that the full extent of the burden that you

25   feel Section 27510 imposes on you?
```

Exhibit 56

DX0813

1        A    No.   In addition, there is a financial and
2    safety issue, where, if I'm unable to procure a firearm,
3    I'm more at risk of potential issues with somebody on the
4    street or anything like that.   Where not only do firearms
5    assist in defense, but also in making people second-guess
6    their actions, if that makes sense.   If they're on the
7    other side of a firearm, they are less likely to commit an
8    act that would have that firearm discharge on them for
9    fear of their own life.   And that also fits within
10   self-defense.   If I'm unable to exercise my right to own a
11   firearm, then I'm unable to defend myself and deter others
12   from potentially attacking me.
13            And in addition to that, just lawful use of
14   being trained in firearms and being able to use them at
15   my -- whenever I would like to at a range or other lawful
16   purposes.   I'm unable to do that because of this penal
17   code.
18        MS. ALBRECHT:   I have a quick follow-up to that
19   answer of yours just now.   You mentioned the financial
20   burden.   What's the financial burden?
21        THE WITNESS:   So in referring to hunting rifles,
22   while there are many that the courses are free, taking ten
23   hours and spending -- you know, gas money is also a big
24   thing, especially in California, to drive somewhere.   And,
25   you know, of the two courses that you presented, only one

Exhibit 56
DX0814

```
 1   of them was free, and the other was $20.  While it isn't

 2   perhaps a lot of money, it is a financial burden.  In the

 3   state that we live in, gas is not cheap, and going and

 4   doing extra things, spending all hours of the day doing

 5   it -- so the courses that were provided were 7:30 to

 6   5:00 p.m.  All that's more than ten hours of work.  The

 7   financial burden of getting down there -- figuring out a

 8   ride, if I'm taking a car or -- doing any of that costs

 9   money.

10   BY MS. ROSENBERG:

11       Q    If I can follow up on that, I want to direct us

12   back to Exhibit No. 21, which is one of the traditional

13   hunter education courses that we discussed earlier.  Could

14   you tell me how many seats are remaining in this August 26

15   and August 27 traditional hunter education course.

16       A    Twenty-five.

17       Q    Out of?

18       A    Twenty-five.

19       Q    And this instance of the traditional hunter

20   education course, it's free to all, correct?

21       A    Yes.

22       Q    And you previously testified that Ramona,

23   California, is just a few miles from where your parents

24   live and where you are currently residing, correct?

25       A    Yes.
```

Exhibit 56
DX0815

```
 1        Q    Could you estimate how many miles?

 2        A    Estimate ten miles or so.

 3        Q    So it's your testimony that the cost of gas to

 4   travel ten miles would be a severe burden on your

 5   constitutional right?

 6        A    There is a number of different factors that

 7   constitute the burden.  Such as going through the entire

 8   process of hunter education and needing to purchase a

 9   license, from my understanding.  That also costs some

10   amount of money.  I don't know exactly how much that costs

11   as of now.  But that's another financial burden.  And even

12   going through all that process of spending an entire day

13   working -- I believe the restriction is at least ten hours

14   doing it.  Although the dates of this hunter education is

15   not fully ten hours -- even though I think the

16   certification must be ten hours -- anyway, the cost of

17   driving, the potential cost of paying for the course --

18   not all of them are free -- and the cost of having an

19   expired license that I have to renew every time it expires

20   in order to own a firearm, and still not being able to own

21   a centerfire rifle.  And going through a number of

22   different things otherwise, without doing the hunter

23   education, potentially endangering my own life in order to

24   purchase a firearm in law enforcement or military service

25   is an undue burden.
```

Exhibit 56

DX0816

```
 1        MS. ALBRECHT:  Would you estimate that you have spent
 2   more than ten hours as a result of your participation in
 3   this lawsuit, including your driving here today, from San
 4   Diego to downtown L.A., sitting for this deposition today?
 5        THE WITNESS:  Yes.
 6        MS. ALBRECHT:  And did you drive here today from San
 7   Diego to downtown L.A. to sit for this deposition?
 8        THE WITNESS:  Yes.
 9        MS. ROSENBERG:  Nothing further.
10          Do you have any?
11        MR. DILLON:  Yeah.  A couple.
12
13                         EXAMINATION
14   BY MR. DILLON:
15        Q    So you just testified regarding Defendants'
16   Exhibit 21.  Do you have that in front of you?
17        A    Yes.
18        Q    If you go down to the seventh paragraph, under
19   "about the event," can you read the last sentence,
20   starting with "a student who."
21        A    "A student who is unsafe or fails to demonstrate
22             good sportsmanship will not be issued a
23             certificate of completion.  A student who does
24             not pass the examination cannot be tested again
25             on the same day."
```

Exhibit 56
DX0817

1     Q    So is it your understanding you have to pass a

2    test in order to get the certificate of completion?

3     A    Yes.

4     Q    So you could take a hunters education course and

5    still not get a certificate of completion, correct?

6     A    Yes.

7     Q    And to get a certificate of completion, you

8    would have to know the various topics that were outlined

9    in Defendants' Exhibit 19.  Is that correct?

10     A    Yes.

11     Q    And if you refer to Defendants' Exhibit 19,

12    study guide for hunters education.

13     A    Yes.

14     Q    In order to complete and pass the hunters

15    education test, you would have to know subjects like

16    hunting strategies, correct?

17     A    Yes.

18     Q    Would you have to learn about vital shots?

19     A    I believe so, yes.

20    MS. ROSENBERG:  I'm sorry.  I need to object.  This

21    assumes facts not in evidence regarding what the test

22    entails.

23    MR. DILLON:  We're talking about the study guide for

24    the test.

25    ///

Exhibit 56
DX0818

1    BY MR. DILLON:

2        Q    So theoretically the test could cover anything

3    in the study guide.  Is that correct?

4        MS. ROSENBERG:  I'm not a witness here.

5        THE WITNESS:  Yes.

6    BY MR. DILLON:

7        Q    Sorry.  Mr. Morris, your understanding, does the

8    test consist of topics listed in the study guide for

9    hunters education?

10       A    Yes.

11       Q    And in that study guide, topics include basic

12   hunting skills.  Is that correct?

13       A    Yes.

14       Q    Do they include hunting strategies?

15       A    Yes.

16       Q    Do they include field care of game?

17       A    Yes.

18       Q    Does it include the primitive hunting equipment

19   and techniques?

20       A    Yes.

21       Q    Does it include the history of primitive hunting

22   equipment?

23       A    Yes.

24       Q    The subjects that you just testified to here,

25   are any of those, in your opinion, relevant to your Second

```
 1   Amendment right?
 2        A    No.
 3        Q    Has anyone ever gifted you a gun?
 4        A    No.
 5        Q    Has anyone offered to gift you a gun?
 6        A    No.
 7        Q    If someone were to let you hold a firearm, do
 8   you consider that a loan of a firearm?
 9        A    No.
10        Q    Based on your understanding, are loans
11   temporary?
12        A    Yes.
13        Q    Based on your understanding, does a loan
14   transfer ownership of a firearm?
15        MS. ROSENBERG:  Objection.  Calls for a legal
16   conclusion.
17   BY MR. DILLON:
18        Q    Is it your understanding, if you're loaned a
19   firearm, you would be the new owner of the firearm?
20        A    No.
21        Q    And if a person -- again, in your understanding,
22   if a person loans a firearm, do they remain the owner of
23   the firearm?
24        A    Can you restate.
25        Q    To your understanding, if a person loans a
```

Exhibit 56
DX0820

```
 1   firearm, to they remain the owner of the firearm?

 2        A    Yes.

 3        Q    Are you in law enforcement?

 4        A    No.

 5        Q    Are you in the military?

 6        A    No.

 7        Q    Are you retired military?

 8        A    No.

 9        Q    In your opinion -- strike that.

10             So earlier you spoke about a number of safety

11   rules and practices that people should partake in as gun

12   owners.  Do you recall that?

13        A    Yes.

14        Q    Do you believe that, in your opinion, the

15   government has the ability to require these safe

16   practices?

17        A    No.

18        MS. ROSENBERG:  Sorry.  If you would give me a moment

19   to object before answering.

20        THE WITNESS:  Of course.

21        MS. ROSENBERG:  Object.  Calls for a legal

22   conclusion.

23   BY MR. DILLON:

24        Q    In your personal opinion, do you believe the

25   government has the right to do that?
```

Exhibit 56

DX0821

```
 1        A     No.

 2        Q     And to your understanding, are you a member of

 3   the Second Amendment Foundation?

 4        A     Yes.

 5        Q     Are you a member of Firearms Policy Coalition?

 6        A     To the best of my knowledge, yes.

 7        Q     Best of your knowledge, are you a member of the

 8   Firearms Policy Foundation?

 9        A     Yes.

10        Q     Are you a member of the Gun Rights Foundation?

11        A     Yes.

12        Q     Have you received anything that would indicate

13   otherwise?

14        A     No.

15        MR. DILLON:  I think that's it.

16

17                          FURTHER EXAMINATION

18   BY MS. ROSENBERG:

19        Q     Just a couple follow-ups.  Are you aware that in

20   order to procure a safety certificate, you must take and

21   pass a test?

22        A     Yes.

23        Q     How did you come to that awareness?

24        A     I believe it's mentioned in the firearms safety

25   certificate study guide.
```

THE SULLIVAN GROUP OF COURT REPORTERS

158

Exhibit 56
DX0822

1      Q    To reiterate, you have not taken the exam

2  related to procuring a firearm safety certificate,

3  correct?

4      A    Not to my knowledge, no.

5      Q    Are you aware that there is a fee involved in

6  procuring a firearm safety certificate?

7      A    Yes.

8      MS. ROSENBERG:  I think we're done.  Thank you very

9  much for your time.

10              (Deposition concluded at 3:36 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 56

DX0823

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3

 4

 5      I,_____, do hereby certify

 6  under penalty of perjury that I have read the

 7  foregoing transcript of my deposition taken on

 8  _____; that I have made such corrections as;

 9  appear noted on the Deposition Errata Page, attached

10  hereto, signed by me; that my testimony as contained

11  herein, as corrected, is true and correct.

12

13

14         Dated this _____ day of _____,

15  2023, At_____, California.

16

17

18

19

20                          _____

21                              ANDREW MORRIS

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

160

Exhibit 56
DX0824

```
1              DEPONENT'S CHANGES OR CORRECTIONS

2   Note:  If you are adding to your testimony, print

3   the exact words you want to add.  If you are deleting

4   from your testimony, print the exact words you want

5   to delete.  Specify with "Add" or "Delete" and sign

6   this form.

7

8   DEPOSITION OF:      ANDREW MORRIS

9   CASE:               CHAVEZ V. BONTA

10  DATE OF DEPOSITION:  AUGUST 3, 2023

11

12  PAGE     LINE     CHANGE/ADD/DELETE        REASON

13  _____    _____    _____      _____

14  _____    _____    _____      _____

15  _____    _____    _____      _____

16  _____    _____    _____      _____

17  _____    _____    _____      _____

18  _____    _____    _____      _____

19  _____    _____    _____      _____

20  _____    _____    _____      _____

21  _____    _____    _____      _____

22  _____    _____    _____      _____

23  _____    _____    _____      _____

24  _____    _____    _____      _____

25  Deponent's Signature _____    Date _____
```

THE SULLIVAN GROUP OF COURT REPORTERS

161

Exhibit 56
DX0825

| PAGE | LINE | CHANGE/ADD/DELETE | REASON |
|------|------|-------------------|--------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

Deponent's Signature _____ Date _____

THE SULLIVAN GROUP OF COURT REPORTERS

162

Exhibit 56
DX0826

```
 1    STATE OF CALIFORNIA )
                          )
 2    COUNTY OF ORANGE    )

 3

 4            I, Deanna Z. Haaker, CSR 10309, Certified

 5    Shorthand Reporter, do hereby certify:

 6            That prior to being examined, the witness named

 7    in the foregoing deposition was by me duly

 8    sworn;

 9            That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter transcribed under my direction;

12            I further certify that I am neither counsel for,

13    nor related to, any party to said proceedings, not in any

14    way interested in the outcome thereof.

15            I declare under penalty of perjury under the

16    law of the State of California that the foregoing is

17    true and correct.

18

19    Dated: August 23, 2023

20

21

22    _____

23    Deanna Z. Haaker,
      CSR No. 10309

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

163

Exhibit 56

DX0827

# EXHIBIT 57

Exhibit 57
DX0828

Deposition of

# Jose Chavez

August 04, 2023

Chavez

vs.

Bonta



www.aptusCR.com | 866.999.8310

Exhibit 57
DX0829

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   JOSE CHAVEZ; et al.,                    )
                                            )
5                    Plaintiffs,            )
                                            ) Case No.:
6          v.                               ) 3:19-cv-
                                            ) 01226-L-AHG
7   ROB BONTA, in his official capacity as  )
    Attorney General of the State of        )
8   California; et al.,                      )
                                            )
9                    Defendants.            )
    _____)

10

11

12              REMOTE DEPOSITION OF

13                  JOSE CHAVEZ

14                  California

15           Friday, August 4, 2023

16

17

18

19

20   REPORTED BY:  ANNABELL ANDERSON
                   Certified Shorthand Reporter
21                 License No. 14143

22

23   Job No: 10125018

24

25

Exhibit 57
DX0830

```
 1                       INDEX OF APPEARANCES

 2

 3    FOR THE PLAINTIFFS:

 4           DILLON LAW GROUP APC
             BY:   JOHN W. DILLON, Attorney at Law
 5           2647 Gateway Road, Suite 105, No. 255
             Carlsbad, California  92009
 6           (760) 642-7150
             jdillon@dillonlawgp.com
 7           (Appeared via Videoconference)

 8

 9    FOR THE DEFENDANTS:

10           CITY OF LOS ANGELES
             BY:   JENNIFER E. ROSENBERG, Attorney at Law
11           300 South Spring Street, Suite 1702
             Los Angeles, California  90013
12           (213) 269-6617
             jennifer.rosenberg@doj.ca.gov
13           (Appeared via Videoconference)

14

15           CITY OF LOS ANGELES
             BY:   STEPHANIE ALBRECHT, Attorney at Law
16           300 South Spring Street, Suite 1702
             Los Angeles, California  90013
17           (213) 269-6617
             (Appeared via Videoconference)

18

19    ALSO PRESENT:

20           Vincent Taisaque (Appeared via Videoconference)

21

22

23

24

25
```

Exhibit 57
DX0831

Jose Chavez

**Chavez vs.
Bonta**

1                              INDEX

2                                                      PAGE

3    EXAMINATION BY MS. ROSENBERG                        7

4    EXAMINATION BY MR. DILLON                         165

5    FURTHER EXAMINATION BY MS. ROSENBERG              174

6
                              --oOo--
7

8                            EXHIBITS

9    DEFENDANTS'
     EXHIBITS                                         PAGE
10
     Exhibit 1      Notice of taking deposition,       13
11                  5 pages.

12   Exhibit 2      Amended notice of taking            16
                    deposition of Plaintiff Jose
13                  Chavez, 5 pages.

14   Exhibit 15     State of California Penal Code       30
                    Section 626.9, 4 pages.
15
     Exhibit 11     Response of Plaintiff Jose Chavez    38
16                  to defendants' first set of
                    interrogatories, set one,
17                  38 pages.

18   Exhibit 8      Defendants' first set of            39
                    interrogatories to Plaintiff Jose
19                  Chavez, 10 pages.

20   Exhibit 3      Third amended complaint for         44
                    declaratory and injunctive relief,
21                  36 pages.

22   Exhibit 4      State of California Penal Code       46
                    Section 27510, 1 page.
23
     Exhibit 5      State of California Penal Code       49
24                  Section 27505, 2 pages.

25

**Page 3**

**www.aptusCR.com**

Exhibit 57
DX0832

Jose Chavez

```
 1                            EXHIBITS
                            (Continued)
 2

 3     DEFENDANTS'
       EXHIBITS                                              PAGE
 4
       Exhibit 6      Defendants' first set of requests        53
 5                    for production of documents to
                      Plaintiff Jose Chavez, 14 pages.
 6
       Exhibit 7      Defendants' first set of requests        59
 7                    for admission to Plaintiff Jose
                      Chavez, 7 pages.
 8
       Exhibit 9      Response of Plaintiff Jose Chavez        61
 9                    to defendants' first set of
                      requests for production, set one,
10                    25 pages.

11     Exhibit 10     Response of Plaintiff Jose Chavez        64
                      to defendants' first set of
12                    requests for admission, set one,
                      21 pages.
13
       Exhibit 12     Declaration of Jose Chavez in            67
14                    support of plaintiffs' notice of
                      motion and motion for preliminary
15                    injunction; or in the alternative,
                      motion for summary judgment,
16                    3 pages.

17     Exhibit 13     Plaintiffs' memorandum of points        69
                      and authorities in support of
18                    notice of motion and motion for
                      preliminary injunction, or
19                    alternatively, motion for summary
                      judgment, 31 pages.
20
       Exhibit 14     State of California Penal Code           77
21                    Section 27880, 1 page.

22     Exhibit 17     State of California Penal Code           78
                      Section 27885, 1 page.
23
       Exhibit 18     State of California Penal Code           81
24                    Section 27910, 1 page.

25
```

Exhibit 57
DX0833

Jose Chavez

**Chavez vs. Bonta**

```
1                          EXHIBITS
                          (Continued)
2

3    DEFENDANTS'
     EXHIBITS                                              PAGE
4
     Exhibit 22    Documents entitled "Firearm safety       98
5                  certificate study guide,"
                   50 pages.
6
     Exhibit 23    Documents entitled "Firearm safety       99
7                  certificate program FAQs,"
                   4 pages.
8
     Exhibit 19    Documents entitled "Study guide         123
9                  for hunting education," 12 pages.

10   Exhibit 20    Documents entitled "Traditional        160
                   Hunter education," 2 pages.
11
     Exhibit 21    Documents entitled "Traditional        161
12                 hunter education," 2 pages.

13   Exhibit 16    Documents entitled "Traditional        163
                   hunter education," 3 pages.
14
     Exhibit 24    State of California Penal Code          177
15                 Section 27545, 1 page.

16
                           --oOo--
17

18

19

20

21

22

23

24

25
```

**Page 5**

```
 1          BE IT REMEMBERED that, pursuant to Notice, and

 2   on Friday, the 4th day of August, 2023, commencing at the

 3   hour of 10:04 a.m. thereof, in a remote deposition,

 4   before me, ANNABELL ANDERSON, a Certified Shorthand

 5   Reporter in the State of California, appeared via

 6   videoconference:

 7

 8                        JOSE CHAVEZ,

 9

10    called as a witness herein, who, being by me first duly

11    sworn, was thereupon examined and interrogated as

12    hereinafter set forth.

13                        --oOo--

14          MS. ROSENBERG:  Thank you, Madam Court Reporter.

15          Good morning.  My name is Jenny Rosenberg.  I am

16   a deputy attorney general here at the California

17   Department of Justice.  I am joined by my colleague

18   Stephanie Albrecht, who is also a deputy attorney

19   general, and we represent the defendants in this action,

20   Attorney General Rob Bonta and also Allison Mendoza, who

21   is the director of the Department of Justice Bureau of

22   Firearms.

23          I'll be asking you some -- you some questions

24   today, but first, I want to go through a few housekeeping

25   and -- and rules setting provisions.
```

**www.aptusCR.com**

Exhibit 57
DX0835

1          EXAMINATION BY MS. ROSENBERG

2     Q.       First of all, Mr. Chavez, are you represented by

3     counsel today?

4     A.       Yes, I am.

5     Q.       Great.

6              So one of the most important ground rules that

7     we'll set out at the very beginning is that the court

8     reporter can only take down verbal responses.  Those

9     would be "yes," "no," "I don't know," full sentences,

10    et cetera.

11             So she won't be able to take down any head nods

12    or any "uh-huhs" or "huh-uhs" or "muh-uhs," so if you

13    could do your best to ensure that your responses are in

14    full words, that would be best.

15             And then moving on, first of all, are you a

16    plaintiff in this case, Chavez v Bonta?

17    A.       Yes.  I am a plaintiff.

18    Q.       Have you had your deposition taken before?

19    A.       No.  I have not.

20    Q.       And I should clarify, when I ask whether you've

21    had your deposition taken before, I mean in any action,

22    not just this action.  Same response?

23    A.       Correct.  I have not had a deposition before.

24    Q.       Great.

25             So we'll talk a little bit about the procedures

Exhibit 57
DX0836

Jose Chavez

1    for today.  First of all, you know that you took an oath

2    to tell -- to tell the truth under penalty of perjury,

3    correct?

4     A.    Correct.

5     Q.    Great.

6          So that will apply throughout the entire

7    proceeding including if we take breaks at certain points.

8    Once we come back on to the record, you will continue to

9    be under oath.  Do you understand?

10    A.    I understand.

11    Q.    Great.

12          The reporter here, again, will be transcribing

13    the questions and answers, so again, we need to speak in

14    full sentences, but in addition to that we --

15          THE REPORTER:  Slow down, please.

16          MS. ROSENBERG:  Sure.  My apologies.

17    BY MS. ROSENBERG:

18    Q.    That's another thing.  We should speak slowly

19    and clearly if we can, but to continue what I was saying,

20    we need to ensure that we don't have any crosstalk, that

21    we don't speak over each other, so if you would wait

22    until I finish asking a question before you begin

23    answering, that will provide us with the clearest record.

24          In addition, there may be points during this

25    deposition during which your counsel objects to a

**www.aptusCR.com**

Exhibit 57
DX0837

1   question that I have asked.  It may be to the form of a

2   question or there may be some other objection, but most

3   importantly, unless your counsel instructs you not to

4   answer a question, you are still required to answer the

5   question.  You understand?

6    A.      I understand.

7    Q.      Great.

8           And then, you know, I -- we're in a bit of an

9   informal setting here having this deposition done

10  remotely.  We may be in our spare bedrooms, our home

11  offices, in a conference room somewhere, but even though

12  these might be somewhat informal settings, this

13  proceeding is conducted with the same solemnity as if we

14  were in court.  Do you understand that?

15   A.      I understand.

16   Q.      Great.

17          So there may be points where I ask you a

18  question and you may not necessarily know the answer.  I

19  would ask that you don't speculate or guess at any

20  answers.  It's okay to say that you don't know, to say

21  yes or no, or to provide additional information.

22          But please don't guess about anything, and I

23  want to provide you with a caveat that there may be

24  instances where I ask you to estimate something or I ask

25  if you, you know, can think approximately of what year or

Exhibit 57
DX0838

1    what month something might have been done.  It's okay to

2    provide an estimate.  There is a difference between

3    guesses and estimates, and I'll give you, sort of, a key

4    example of that.

5           If I were to ask you to estimate how long your

6    kitchen table is, you likely would be able to estimate

7    approximately how many feet long your table is.  However,

8    if I were to ask you how long my dining room table is,

9    presuming that you had never seen it before, you would

10   have to guess.  So those are examples where we would not

11   want you to guess about how long my dining room table is,

12   so that will apply throughout the entire proceeding

13   today.

14          If you are tired or hungry, thirsty, need to

15   take a break for some reason, please speak up.  This is

16   not a marathon.  It's not an endurance contest.  It is

17   absolutely fine for us to take a break.  There is just

18   one rule that applies, and that is, if I have asked a

19   question and you have not yet answered the question, I

20   would ask that you answer the question before we take a

21   break and go off the record.  Do you understand?

22   A.      I understand.

23   Q.      After the deposition, the reporter will

24   repair -- prepare a transcript, and you will have the

25   opportunity to review it and to make corrections to the

Exhibit 57
DX0839

1   transcript, but I do caution you that if you make

2   corrections to your testimony, that could be commented on

3   at trial and it could affect your credibility, so just an

4   advisement there.

5           Do you have any questions about how we'll

6   proceed today?

7   A.      No, I don't.

8   Q.      Is there any reason you feel you can't give your

9   best testimony today?

10  A.      There isn't any reason.

11  Q.      You don't have any medical condition that might

12  prevent you from giving your best testimony today?

13  A.      I do not.

14  Q.      You're not taking any medications that might

15  affect your ability to provide your best testimony today,

16  are you?

17  A.      I am not.

18  Q.      Great.

19          Any other reason why you might not be able to

20  give your best testimony today?

21  A.      Not that I can think of.

22  Q.      Great.

23          All right.  So again, there will be some

24  housekeeping where we'll go through some documents, sort

25  of, at the beginning here, and then we will talk about

Exhibit 57
DX0840

1  some of those documents throughout the course of the

2  deposition.

3         So I wanted to let everybody here, who is on

4  record here, know that the way that Aptus Court Reporting

5  provides services here is that I will drag the exhibits

6  into the chat -- the meeting chat window, and you will be

7  able to download and save those documents.

8         You should do that throughout the course of the

9  deposition because we will be referring back and forth to

10  the various documents.  In addition, the meeting chat

11  will not be saved, so you will not be able to access the

12  meeting chat after we conclude the deposition.  So it's

13  important that you do save those exhibits if you would

14  like to refer to them.

15         In addition, you are only able to send messages

16  in the chat box to everybody who is on -- on the line

17  today.  You're not able to send any private messages, so

18  to the extent you need to confer with your counsel, you

19  would need to do that through some other means other than

20  through the chat function here on Zoom.

21         Do you understand?

22  A.      I understand.

23  Q.      Great.

24         So let's kick off with what I have marked as

25  Exhibit No. 1.  I'm going to drag that into the chat now.

Exhibit 57
DX0841

```
 1                    (Defendants' Exhibit 1 was marked for

 2                    identification.)

 3   BY MS. ROSENBERG:

 4    Q.      And once that -- once you have it and open it,

 5   please let me know.

 6    A.      Okay.  I have it open.

 7    Q.      Great.

 8            Have you seen this document before?

 9    A.      Yes, I have.

10    Q.      Could you tell me what document is, please?

11            I'm sorry.  Mr. Chavez, you are on mute.

12    A.      This document is on my cell phone.  It appears

13   it's a notice of taking a deposition.

14    Q.      So it's the notice of taking deposition of

15   Plaintiff Jose Chavez; is that correct?

16    A.      Yes.  Jose Chavez, et al., versus Rob Bonta.

17    Q.      Great.  Thank you.

18            So we -- I'm not sure if we need to take a break

19   here.  You will need to be able to -- to look at

20   documents that I show you throughout this deposition with

21   a full screen.

22            Do you need to take a moment?  We can go off the

23   record if you need to pull up an additional window or if

24   you need to access a different device so that you'll be

25   able to see documents.
```

Exhibit 57
DX0842

Jose Chavez

1            I'm sorry.  You're on mute again, Mr. Chavez.

2   A.      I may need to do that, because I have limited

3   access to Wi-Fi here and my phone is my primary device

4   for that, so I may have to use my hotspot for my

5   computer.

6   Q.      Understood.

7            So why don't we go off the record now, and you

8   can let us know when you're ready to proceed.

9   A.      Okay.  I'll log back on.

10  Q.      Okay.  Thank you.

11            (Off the record.)

12  BY MS. ROSENBERG:

13  Q.      So before we went off the record, I asked you,

14  Mr. Chavez, to take a look at what has been marked as

15  Exhibit 1.

16            I want to clarify for the record that when I say

17  "marked," the file for the exhibit is named with the

18  exhibit number.  The court reporter will add the actual

19  exhibit markings at a later date after the deposition.

20            So to continue, if you could take a look at

21  Exhibit No. 1.  Do you recognize this document?

22  A.      I recognize Exhibit No. 1.

23  Q.      Great.

24            And could you say for the record again what

25  Exhibit No. 1 is?

Exhibit 57
DX0843

Jose Chavez

1  A.      Exhibit No. 1 is a notice of taking deposition

2  of myself, Plaintiff Jose Chavez.

3  Q.      Great.  Thank you.

4          Did you have -- did you review Exhibit No. 1 in

5  full prior to today?

6  A.      I did.

7  Q.      And did you discuss it with your counsel?

8  A.      I did.

9  Q.      Did you discuss Exhibit No. 1 with anybody else?

10  A.      No.  I did not.

11  Q.      Are you acquainted with any of the other

12  plaintiffs in this action?

13  A.      Through the firearms policy group I am a part

14  of, yes.

15  Q.      Could you clarify which plaintiffs are you

16  acquainted with?

17  A.      All listed within my case here.

18  Q.      And do you know them through the Firearms Policy

19  Coalition?  Is that correct?

20  A.      I believe it's the Firearms Policy Foundation.

21  Q.      Great.  Thank you very much.

22          Did you discuss Exhibit No. 1 with any of the

23  other plaintiffs in this action?

24  A.      I have not discussed this exhibit with any of

25  the other plaintiffs.

Exhibit 57
DX0844

1    Q.      Okay.  Have you discussed the fact that you

2   would be deposed with any of the other plaintiffs?

3    A.      I have not.

4    Q.      Great.  Let's take a look at what has been

5   marked as Exhibit No. 2.

6           Madam Court Reporter, I will drag that into the

7   chat for you.

8               (Defendants' Exhibit 2 was marked for

9               identification.)

10  BY MS. ROSENBERG:

11   Q.      Mr. Chavez, do you recognize what has been

12  marked as Exhibit No. 2?

13   A.      I do.

14   Q.      Could you let us know for the record what

15  Exhibit No. 2 is?

16   A.      It says here that Exhibit No. 2 is -- is an

17  amended deposition notice and proof of service --

18   Q.      Thank you.

19   A.      -- for me.

20   Q.      And did you review what is marked as Exhibit

21  No. 2 in full before today?

22   A.      I did.

23   Q.      Did you discuss it with counsel?

24   A.      I did.

25   Q.      Did you discuss it with anybody else?

Exhibit 57
DX0845

Jose Chavez

1    A.      I did not.

2    Q.      Great.

3            So, Mr. Chavez, could you let me know what did

4    you do to prepare for today's deposition?

5    A.      I conferred with counsel.

6    Q.      Did you do any independent reading?

7    A.      I don't remember.

8    Q.      When did you prepare for this deposition?

9    A.      This past week.

10   Q.      Did you review documents on file in this action?

11   A.      I reviewed the documents on file provided by my

12   counsel.

13   Q.      Which documents were those?

14   A.      I believe they're listed in our -- our emails

15   back and forth.

16   Q.      Could you state them for the record, please?

17   A.      Let's see.  I don't have access to internet on

18   my computer, so I'd have to exit the Zoom meeting, but I

19   believe you can refer to my counsel for the documents

20   that we reviewed.

21   Q.      So unfortunately, Mr. Chavez, because we are on

22   record in a sworn proceeding, I actually need you to

23   state for the record which documents you reviewed.  We

24   can come back to this question later in the deposition,

25   you know, after a break at some point, but I will --

Exhibit 57
DX0846

1    A.     Okay.

2    Q.     -- need you to check that.  Okay?

3    A.     I believe -- okay.  I'd be happy to take a stab

4    at the answer.

5    Q.     No.  As we discuss previously, I don't want you

6    guess about anything.

7    A.     Okay.

8    Q.     I would like for you to provide the answers with

9    the -- the information that you have, so we'll come

10   back --

11   A.     Okay.

12   Q.     -- to this question later.

13          In addition to reviewing some of the documents

14   that are on file in this action, did you do any

15   independent research to prepare for this deposition?

16   A.     I did not.

17   Q.     How did you come to be involved in this case,

18   Mr. Chavez?

19   A.     I was referred to this case by one of my friends

20   from San Diego, Maxilian Minh Nhan Nguyen.

21   Q.     Could you spell his name for the record, please?

22   A.     Absolutely.  Maxilian is spelled

23   M-a-x-i-l-i-a-n.  His middle name is two parts.  It is

24   M-i-n-h, space, N-h-a-n, space, last name Nguyen spelled

25   N-g-u-y-e-n.

Exhibit 57
DX0847

1    Q.      Thank you very much.

2            So could you provide a little bit more detail?

3    When you say that you were referred by your friend

4    Maxilian, how did that -- how did that happen?

5    A.      My friend Maxilian and I, we share a common

6    interest in firearms.  I've always been interested in

7    purchasing a firearm, and he let me know that there was a

8    case being developed against the Attorney General Rob

9    Bonta, and he referred me to John Dillon for further

10   information.

11   Q.      So did you email Mr. -- or excuse me.

12           Did you contact Mr. Dillon directly yourself?

13   A.      I did.

14   Q.      Great.  Thank you.

15           And what made you want to join the case?

16   A.      I'd like to buy a firearm and I'm under the age

17   of 21.  As far as it stands in California, I'm unable to

18   purchase and own a firearm, and I'd like to make sure

19   that the age -- the minimum age is reduced down from 21

20   to 18.

21   Q.      When did you become involved in this case?  When

22   did you -- let me rephrase.

23           When did you reach out to Mr. Dillon to become

24   involved in this case?

25   A.      I believe it was around September of 2022.  I

Exhibit 57
DX0848

1  could be wrong as it was in the autumn of last fiscal

2  year.

3  Q.      Thank you.

4          Did you know any of the other plaintiffs in

5  this -- in this action before you joined the case?

6  A.      I did not.

7  Q.      So, Mr. Chavez, you mentioned that you're

8  currently under the age of 21.

9          What age are you currently?

10  A.      I'm currently 20 years old.

11  Q.      And you're going to be turning 21 next month,

12  right?

13  A.      In September, yes.

14  Q.      Right.

15          September 18 of 2023; is that right?

16  A.      Correct.

17  Q.      So that's just about 45 days from now, right?

18  A.      About, yes.

19  Q.      And, Mr. Chavez, do you have a driver's license?

20  A.      I do.

21  Q.      Did you get your driver's license right at age

22  16, the first available time?

23  A.      I did not.

24  Q.      When did you get a driver's license?

25  A.      I got my driver's license at about 19.

Exhibit 57
DX0849

1    Q.      Great.

2            So I want to talk a little bit about your

3    education.  Did you graduate high school?

4    A.      I graduated high school from Delta Charter.

5    Q.      In what year?

6    A.      2020.

7    Q.      And where is Delta Charter located?

8    A.      Delta Charter High School is located in Tracy,

9    California.

10   Q.      And did you attend college, or are you currently

11   attending college?

12   A.      I am currently attending college at the

13   University of California San Diego in La Jolla, a suburb

14   of San Diego, the city.

15   Q.      Great.

16           And are you currently finishing your bachelor's

17   degree?

18   A.      I am currently finishing my bachelor's degree,

19   yes.

20   Q.      When will you graduate with your bachelor's

21   degree?

22   A.      I will graduate with my bachelor's degree at the

23   end of the second summer session, which is approximately

24   the second week of September.

25   Q.      Of what year?

Exhibit 57
DX0850

1    A.      September 2023.  This year.

2    Q.      **Birthday and a graduation in the same month.**

3    **Very exciting.**

4            **What are your plans for after you graduate from**

5    **college?**

6    A.      After I graduate from college, I'm going to move

7    back to San Diego, and I'm going to work in the area

8    before attending law school in about three years.

9    Q.      **What do you plan to do working in the San Diego**

10   **area once you've graduated, for work that is?**

11   A.      I intend on working for the County of San Diego.

12   Currently looking for grant administration positions.

13   Q.      **And what will you -- what will -- excuse me.**

14           **What did you study during your time at UCSD?**

15   A.      I studied for two bachelor's degrees in the

16   arts.  The first degree is political science with an

17   emphasis on public law.  The second degree is history

18   with an emphasis in the history of the United States of

19   America.

20   Q.      **You have not yet applied yet to grad school; is**

21   **that right?**

22   A.      That is correct.

23   Q.      **And did you -- have you been engaged in any**

24   **extracurricular activities relating to your time at**

25   **school?**

Exhibit 57
DX0851

Jose Chavez

1   A.      I was involved in a multitude of clubs and

2   internships off and on campus.

3   Q.      Great.

4           **We would love to hear about that multitude of**

5   **groups and internships.  Could you tell us a little bit**

6   **more, please?**

7   A.      Yes.  I was involved in the UCSD speech and

8   debate club as a general member and extemporaneous

9   speaking coach.  I was also a newspaper -- a contributor

10  to the UC San Diego Guardian, student newspaper.

11          I was also a peer mentor for the UCSD

12  organization called OASIS, which stands for the Office of

13  Academic Support and Instructional Services.  I worked a

14  couple other on-campus jobs including being an

15  orientation leader for UC San Diego as well as a resident

16  assistant for UC San Diego.

17          Off campus, I volunteer as a speech and debate

18  coach at Mt. Carmel High School, and I've interned at

19  several organizations off campus including Supervisor

20  Joel Anderson, legislative internship program, which

21  eventually turned into a part-time job working

22  specifically in grant administration.

23  Q.      **You mentioned multiple internships.**

24          **What were the other internships that you**

25  **participated in?**

Exhibit 57
DX0852

Jose Chavez

1    A.       The other internship I participated in, I am

2    still participating in, is a Washington, D.C.,

3    internship.

4    **Q.       And what is the internship for?**

5    A.       I'm interning for the Speaker of the House,

6    Kevin McCarthy.

7    **Q.       On any particular subject matter area?**

8    A.       Yes.  I am a congressional intern that handles

9    whatever matters need to be handled, whether they be

10   legislatives or logistical.

11   **Q.       Thank you.**

12   **         Could you tell me a little bit more about your**

13   **peer mentorship position?  What -- what responsibilities**

14   **did you have in that role?**

15   A.       As a peer mentor, I served as the first point of

16   contact for 13 first-generation students at UC San Diego,

17   offering them advice on enrollment in classes,

18   acclimation to UCSD campus culture, and serving as a,

19   sort of, counsel during the ups and downs of the college

20   experience, walking many students through their first --

21   their first F on their first midterm and other bits of

22   turmoil joy.

23           I served as a mentor for these 13 students for a

24   full academic year and moved on from the program.

25   **Q.       When you say you served as counsel, do you mean**

Exhibit 57
DX0853

1   some --

2   A.      I didn't serve any legal role.  This whole job

3   was from a mentorship point of view.  I consoled in them.

4   They may have been proverbial on my end.

5   Q.      Thank you for the clarification.  I appreciate

6   that.

7           This is -- this is quite a list of -- of

8   additional activities.  Approximately how much time would

9   you say that you spent each week over the last year on

10  these extracurricular activities?

11  A.      Over the past year, I worked about 25 hours a

12  week for supervisor Joel Anderson from January 2023 to

13  June 2023.  And that was my sole extracurricular during

14  that period.

15          The contributions to the school newspaper as

16  well as the UC San Diego speech and debate team happened

17  throughout my first and second year averaging about 8 to

18  10 hours of extracurricular activity a week.

19  Q.      Is the internship that you're -- I'm sorry.  Did

20  somebody say something?  No.  Okay.

21          The internship that you're participating in now,

22  did you say that it is located in Washington, D.C.?

23  A.      Yes.  My internship is located in Washington,

24  D.C.

25  Q.      Are you living in Washington, D.C., or in one of

Exhibit 57
DX0854

Jose Chavez

1   the surrounding states?

2   A.      I am currently living in Washington, D.C.

3   Q.      How long have you been living in Washington,

4   D.C.?

5   A.      I've been in Washington, D.C., for approximately

6   the past five weeks.

7   Q.      And before you moved to D.C. for this

8   internship, where did you live?

9   A.      I lived in La Jolla, the suburb of the city of

10  San Diego in California.

11  Q.      For what period of time did you live in

12  La Jolla?

13  A.      I lived in La Jolla -- I'm trying to give you an

14  accurate figure -- from August 2022 to June 2023.  And I

15  also lived in La Jolla for the previous two academic

16  years, so that would be September of 2020 to June of 2021

17  and then September of 2021 to June of 2022.

18  Q.      So you've mentioned living in La Jolla.

19          Were those all at the same residence or the same

20  address, or were you living in different locations for

21  each of these periods of time?

22  A.      My mailing address remained the same.  I did get

23  a different box number every year that I stayed on

24  campus.

25  Q.      So I -- I'm not --

Exhibit 57
DX0855

**Jose Chavez**

```
 1              (Simultaneous colloquy.)
 2   BY MS. ROSENBERG:
 3    Q.      I'm not asking about mailing address.  I'm
 4   asking about the physical location.
 5           Did you -- did you live, for example, in the
 6   same apartment or the same home?
 7    A.      I did not live in the same apartment during my
 8   three years living in La Jolla at UC San Diego.
 9    Q.      Were -- for these three years, were you living
10   in student housing?
11    A.      Yes.
12    Q.      And that student housing was owned by the
13   University of California San Diego?
14    A.      Yes.
15    Q.      And you lived in student housing for each of the
16   three years?
17    A.      Correct.
18    Q.      Thank you.
19           From June of 2021 to September 2021, where did
20   you live?
21    A.      I lived in Tracy, California, my hometown.
22    Q.      Were you living at your parents' home?
23    A.      I was living at my grandparents' home.
24    Q.      And did you also live at your grandparents' home
25   in Tracy, California, from -- let's see -- June 2022 to
```

Exhibit 57
DX0856

```
 1   September 2022?

 2   A.      Yes.

 3   Q.      Did you grow up in your grandparents' home in

 4   Tracy, California?

 5   A.      Yes.

 6   Q.      Have you lived in any other location that we

 7   have not discussed yet today at any point in your life?

 8   A.      I was born in Watsonville, California, and I

 9   lived with my father's grandmother for the first three

10   years of my life after which I moved to Tracy,

11   California, to live with my grandparents.

12   Q.      Thank you.

13           During these -- during the time that you have

14   been a student at UCSD and in these periods where you

15   lived at your grandparents' home in Tracy, California,

16   did you pay any form of rent to your grandparents?

17   A.      I did not pay any rent to my grandparents.

18   Q.      Thank you.

19           Do you pay rent for your student housing?

20   A.      I do not pay rent for my student housing as it's

21   included within the greater tuition.

22   Q.      Okay.  But you do -- you do pay tuition?

23   A.      Yes, I do.

24   Q.      Okay.  And are you paying that or are you

25   subsidized by any other party?
```

Exhibit 57
DX0857

Jose Chavez

1    A.      I'm partially subsidized by the federal

2    government, the Pell Grant Program.

3    **Q.      Does anybody else help you with your school**

4    **expenses?**

5    A.      No.

6    **Q.      You didn't receive any financial assistance from**

7    **parents?**

8    A.      No, I don't receive any financial assistance

9    from my mother, father, or grandparents.

10    **Q.      Thank you.**

11          **During your time that you've lived in student**

12    **housing at UCSD in La Jolla, California, have any weapons**

13    **been stored in your home, the place -- the residence in**

14    **which you lived?**

15    A.      Could you be more specific as to what

16    constitutes a weapon in this context?

17    **Q.      Sure.  So let's -- let's parse that out.  Yes.**

18    **Thank you for that.**

19          **During the time that you lived in student**

20    **housing, have any firearms been stored in your home in**

21    **the student housing?**

22    A.      No.  No firearms have been owned in my domicile,

23    my home while utilizing student housing at UC San Diego.

24    **Q.      Thank you.**

25          **And the University of California San Diego**

Exhibit 57
DX0858

1   prohibits firearms from being -- from coming on to

2   campus; is that correct?

3   A.      Correct.

4   Q.      Is that a policy of the school, if you know?

5   A.      I believe so.  I'm not confident.

6   Q.      Okay.  Let's take a look at what I have marked

7   as Exhibit No. 15.

8   A.      I see that here.

9               (Defendants' Exhibit 15 was marked for

10              identification.)

11  BY MS. ROSENBERG:

12  Q.      Have you -- do you recognize Exhibit 15?

13  A.      Let's see.  I haven't seen this penal code

14  before.

15  Q.      Great.

16          Could you state for the record what the title of

17  Exhibit No. 15 is, please?

18  A.      Yes.  The title of Exhibit Number 15 is State of

19  California Penal Code Section 626.9.

20  Q.      Great.  Thank you.

21          And we're going to scroll down to Subdivision H.

22  If you could read to yourself, Subdivision H, please.

23  A.      One moment.  I'm still looking for

24  Subdivision H.  I see F.  One moment.

25  Q.      It will appear on page 3 of the PDF.

Exhibit 57
DX0859

1    A.     I see.

2               (Simultaneous colloquy.)

3               THE WITNESS:  Yes.  I found Subdivision H.  I'll

4    be reading it to myself now.

5    BY MS. ROSENBERG:

6    Q.     Thank you.

7           Let us know when you're done, please.

8    A.     I've read Subdivision H of this penal code.

9    Q.     Were you aware of this penal code before today?

10   A.     No.

11   Q.     So Subdivision H is a provision criminalizing

12   bringing firearms onto public or private university or

13   college campus; is that correct?

14   A.     That is correct.

15   Q.     Great.  Thank you.

16          We can set aside Exhibit No. 15 for now.  Thank

17   you.

18          Are there any firearms that are stored in your

19   grandparents' home?

20   A.     Not to my knowledge.

21   Q.     Have there ever been any firearms stored in your

22   grandparents' home at any time that you lived there?

23   A.     Not to my knowledge.

24   Q.     Where in Washington, D.C., are you living

25   currently?

Exhibit 57
DX0860

Jose Chavez

1    A.       I am currently living at 1608 Rhode Island

2   Avenue Northwest, which is the UC Washington Center.

3    Q.       Thank you.

4             Is that student housing?

5    A.       Yes.  It is student housing supported by the

6   University of California.

7    Q.       And when you say "supported by the University of

8   California," do you mean owned by the University of

9   California?

10   A.       Yes.

11   Q.       Thank you.

12            Are any firearms stored in -- at that address

13   that you are living at currently in Washington, D.C.?

14   A.       There are no firearms stored within my domicile

15   here at the UC Washington Center in Washington, D.C.  I

16   don't know if security -- may have their own.

17   Q.       Thank you for parsing that.  That's great.

18  Thank you very much.

19            Let's talk about employment.  I know we've

20  spoken at length about some internships.  Have you had --

21  in addition to any paid internships that you might have

22  had, have you had paid employment?

23   A.       Yes, I have.

24   Q.       What was your most recent paid employment?

25   A.       That would be my grant outreach assistant

Exhibit 57
DX0861

Jose Chavez

1  position with San Diego County Supervisor for District 2,

2  Joel Anderson.

3  Q.      Thank you.

4          And how about the -- the most recent paid

5  position before that?

6  A.      Before then, it would have been my resident

7  assistant position at the University of California

8  San Diego.  Although I was not paid, I was compensated

9  via being given a living space.

10         Does that constitute being paid?

11  Q.     For our purposes having been compensated with

12  the space to live in is -- is fine.  Thank you.

13         Have you had any other paid positions before

14  that?

15  A.      I was --

16  Q.     Paid or compensated.

17  A.      I was paid an hourly salary to be a peer mentor

18  for OASIS as noted earlier as well as being an

19  orientation leader for the University of California

20  San Diego.

21  Q.     Thank you.

22         Have you ever worked in the firearms industry?

23  A.      I have not.

24  Q.     Have you ever been a party to any other lawsuit?

25  A.      I have not.  Well, I'm a little confused here.

Exhibit 57
DX0862

1   I'm not sure how I should answer this because I suffered

2   16 brain surgeries throughout my youth and I was

3   represented in court, in the Superior Court of Santa

4   Cruz, by my mother in a case called, I believe, Chavez v.

5   Laura.

6           I don't believe I was a plaintiff because I was

7   two and a half years old when I underwent the first eight

8   surgeries, but my mother was representing me, so I don't

9   believe I was a plaintiff.

10  Q.      Thank you for that clarification.  I appreciate

11  it.

12          Have you ever given testimony in any other legal

13  proceeding?

14  A.      I have not.

15  Q.      So you -- you have not given any testimony,

16  whether oral or written, in any other legal proceeding;

17  is that correct?

18  A.      That is correct.

19  Q.      Have you ever participated in an arbitration?

20  A.      I have not.

21  Q.      Have you ever been charged with a crime?

22  A.      I have not.

23  Q.      Have you ever been arrested for a crime even if

24  you were not charged or convicted?

25  A.      I have not.

Exhibit 57
DX0863

Jose Chavez

1    Q.       And you've never been convicted of a crime; is

2    that correct?

3    A.       That is correct.  I have never been committed --

4    or convicted of crime.

5    Q.       Thank you.

6             Have you ever been the victim of crime?

7    A.       Trying to think.  I've undergone the brain

8    surgeries, as noted before.  I forgot the ruling and I

9    don't know if that necessarily is a tort to a crime.

10   Beyond that, I don't believe I've been robbed or I've had

11   my car hit.  I haven't undergone any tort litigation or

12   any other crimes like that.

13   Q.       Thank you.

14            Have you ever been involved in a fight?

15   A.       I have not.

16   Q.       Have you ever been physically harmed by any

17   other person in the context of an altercation?

18   A.       Within the context of an altercation, I have not

19   been physically harmed by another person.

20   Q.       Thank you.

21            Have you ever witnessed a fight?

22   A.       Yes.

23   Q.       What were the circumstances?

24   A.       The circumstances were as follows:  I was in 6th

25   grade waiting to be let into my classroom after recess

Exhibit 57
DX0864

Jose Chavez

1   and I noticed two of my friends grabbing each other by

2   the Polos and getting a little aggressive.

3           This was about, I would say, ten years ago.  The

4   teachers came, swept them up, and then we resumed classes

5   as usual.

6   **Q.     Is that the only time you've witnessed a fight**

7   **or an altercation?**

8   A.      In high school about six years later at Delta

9   Charter High School, there were several students that

10  were fighting in the quad, where students eat their

11  cafeteria lunches.  I remember seeing two of my teachers

12  run to break up the fight.

13          There were about 30 people standing around

14  taking pictures.  After a quick glance, I went to my, I

15  believe, fourth period class directly after lunch.

16  That's the second altercation I've witnessed.

17  **Q.     Any others that you can think of?**

18  A.      Not at the moment.

19  **Q.     Okay.  Thank you.**

20          **Have you ever witnessed somebody using a firearm**

21  **in self-defense?**

22  A.      I have not.

23  **Q.     Have you ever used a firearm in self-defense?**

24  A.      I have not.

25  **Q.     Have you ever handled a firearm?**

Exhibit 57
DX0865

1   A.      I have.

2   Q.      **What were the circumstances?**

3   A.      The circumstances were going shooting with my

4   friend Maxilian Minh Nhan Nguyen in Ocotillo Wells.   I

5   believe it was earlier this year.   We went to Ocotillo

6   Wells, and he brought some firearms and we went shooting

7   on Federal land.

8   Q.      **And Ocotillo Wells -- could you tell me what**

9   **Ocotillo Wells is.   Is that a business?   Is it a city?**

10  A.      I'd love to let you know.   Ocotillo Wells is a

11  census-designated place within Imperial County about

12  three hours from La Jolla.   It's not a business.   It's a

13  place where people who are registered to have firearms

14  are permitted to come out and shoot targets.

15  Q.      **So this -- this did not occur at a firing range**

16  **or a gun club; is that correct?**

17  A.      This specific instance did not.   I had

18  previously gone to a firing range within Claremont,

19  San Diego, with the same person, Maxilian Nguyen, in

20  around September of 2022.   There, we -- he brought his

21  firearms under the supervision of the range and we

22  utilized the range.

23  Q.      **Okay.   I would like for you to pull up what I**

24  **have marked as Exhibit No. 11.**

25  ///

1              (Defendants' Exhibit 11 was marked for

2              identification.)

3    A.     I have Exhibit No. 11.

4    **Q.     Great.**

5           **Could you tell me what Exhibit No. 11 is,**

6    **please?**

7    A.     Exhibit No. 11 is a response to -- it says here:

8              Response to defense's first sets ROGs to

9           Chavez or --

10             (Simultaneous colloquy.)

11          THE WITNESS:  Interrogatory.

12   BY MS. ROSENBERG:

13   **Q.     Let me clarify.  I'm asking for the title of the**

14   **document as you're looking at the document, not the file**

15   **name, which is an abbreviated name.**

16   A.     My apologies.  It says here:

17             Response of Plaintiff Jose Chavez to

18          Defendants' first set of interrogatories, set

19          one.

20   **Q.     Great.  Thank you.**

21          **Have you ever seen Exhibit No. 11 before?**

22   A.     I have not.

23   **Q.     I am also going to ask you to pull up for me,**

24   **please, Exhibit No. 8.**

25   ///

Exhibit 57
DX0867

Jose Chavez

1              (Defendants' Exhibit 8 was marked for

2              identification.)

3         THE WITNESS:  Okay.  I have Exhibit No. 8 open.

4    BY MS. ROSENBERG:

5    Q.     Great.  Thank you.

6           Could you tell us please what the title of

7    Exhibit No. 8 is?

8    A.     Defendants' first set of interrogatories to

9    Plaintiff Jose Chavez.

10   Q.     Great.  Thank you.

11          And have you seen Exhibit No. 8 before?

12   A.     Yes.  I recall seeing Exhibit No. 8 before.

13   Q.     Did you review Exhibit No. 8 in full?

14   A.     Yes, I did.

15   Q.     Did you discuss it with your counsel?

16   A.     I did.

17   Q.     Turning back to Exhibit No. 11, you stated that

18   you have never seen Exhibit No. 11 before; is that

19   correct?

20   A.     Let's see.  Yes.  That is what I stated.

21   Q.     And is that still correct that you have never

22   seen Exhibit No. 11 before today?

23   A.     After reviewing both documents, I'd like to

24   apologize and say that I do recognize Exhibit No. 11.  I

25   didn't scroll past the bottom.

Exhibit 57
DX0868

1   Q.      Understood.  Thank you.

2           Have you read Exhibit No. 11 in full at any time

3   before today?

4   A.      After scrolling through the document, I do

5   recognize that I have read the document in full with my

6   counsel.

7   Q.      Did you help to draft Exhibit No. 11?

8   A.      I did not.

9   Q.      Mr. Chavez, do you understand that Exhibit No. 8

10  was a set of questions posed to you about the basis of

11  this case and other details?

12  A.      Does drafting constitute writing the report or

13  does it constitute verbal --

14  Q.      So let's --

15  A.      -- contribution?

16  Q.      Let's clean that up.

17          Did you write any portion of Exhibit No. 11?

18  A.      One moment.  I have number 8 pulled up at the

19  moment.  Let me pull up number 11.  I have multiple tabs.

20  I apologize for the delay.  Here is number 11.

21          I did not type out this document, but I did

22  contribute to its production.

23  Q.      Thank you.

24          So I want to direct you down to page 21 of

25  Exhibit No. 11, your responses to the first set of

Exhibit 57
DX0869

1  interrogatories, and I'd like for you to read for the

2  record Interrogatory No. 12, which starts at about

3  line 13 on page 21.

4  A.      Okay.

5  Q.      Could you read that comment out loud, please?

6  A.      Let me open it up.  I think Adobe -- oh, Adobe

7  is preventing me from viewing these, but I've been

8  opening these document with a preview.  One moment.

9          You said page 21?

10  Q.      Page 21 of Exhibit 11, yes.  And I'd like for

11  you to read out loud for the record Interrogatory No. 12

12  starting at line 13.

13  A.       Describe and state all facts relating to

14          each instance in which you have practiced

15          shooting ranges -- practiced shooting at ranges

16          or taken any firearms instruction or education

17          at any time before or after the filing of the

18          complaint including the dates, locations, and

19          circumstances of each instance and the identity

20          of any instructor, family member, guardian, or

21          any other person who accompanied, supervised,

22          or instructed you.

23  Q.      Thank you very much.

24          Let's turn to page 22, and I would like for you

25  to read the final paragraph in your response to

Exhibit 57
DX0870

1    Interrogatory No. 12 starting at -- looks like between

2    lines 2 and 3.

3                  (Simultaneous colloquy.)

4              THE WITNESS:  After filing this complaint, I

5              went to Ocotillo Wells, California, with a

6              friend in which we shot a firearm

7              recreationally where it lawful to shoot.

8                  At all times while shooting, I was in the

9              presence of my friend.  The firearms were my

10             friend's firearms who was over 21.

11   BY MS. ROSENBERG:

12    Q.     Thank you.

13           So if we look back at Interrogatory No. 12, you

14   understand that the interrogatory asks for you to

15   describe each instance in which you practiced shooting at

16   targets both before and after filing the complaint?

17    A.     I understand that as written.

18    Q.     So I think if we were -- I think that we were

19   discussing previously your instances in which you went

20   shooting with your friend, Maxilian, and you mentioned

21   Ocotillo Wells, but if I remember correctly, you also

22   described another instance in which you went to a

23   shooting range to practice shooting with Maxilian.  Is

24   that correct?

25    A.     That is correct.

Exhibit 57
DX0871

Jose Chavez

1    Q.      So your response to Interrogatory No. 12 is not

2    complete; is that correct?

3    A.      That is correct.

4    Q.      Could you describe for us if there are

5    additional instances beyond the two that you've

6    described, please?

7    A.      Yes.  I'll need a minute to think.  The first

8    time that I shot a firearm under the supervision of my

9    friend Maxilian, who is over the age of 21, was at a

10   shooting range in Claremont, a suburb of San Diego,

11   California, in approximately mid-September 2022.

12           Months after, I went to Ocotillo Wells with my

13   friend Maxilian Nguyen and shot another -- or shot the

14   firearm recreationally where it was lawful to shoot.

15   There were two times where I shot firearms under the

16   supervision of my friend.

17   Q.      Thank you for that.

18           Have you shot a firearm in any other context at

19   any other time?

20   A.      I have not shot a firearm in any other context

21   at any other time.

22   Q.      Thank you very much.

23           So before we really get going, I want to provide

24   just a brief overview of the action.  This case named

25   Chavez v. Bonta is a Second Amendment challenge to

Exhibit 57
DX0872

1   provisions of California Penal Code Section 27510, which

2   sets 21 as the lower age limit for sales and transfers of

3   certain firearms through federally licensed firearms

4   dealers subject to statutory exemptions.

5           And I would like for you to pull up now Exhibit

6   No. 3, please.

7           THE REPORTER:  And to clarify, Counsel, these

8   exhibits you're referencing are being marked for this

9   deposition, correct?

10          MS. ROSENBERG:  Yes.  That is correct.

11              (Defendants' Exhibit 3 was marked for

12              identification.)

13          THE WITNESS:  Okay.  Let me pull up the document

14   on my computer.  I just need to find the folder.  There

15   we go.

16          You said Exhibit No. 3?

17   BY MS. ROSENBERG:

18   Q.      That's correct.

19   A.      I have Exhibit No. 3 open.

20   Q.      Great.

21          Do you recognize Exhibit No. 3?

22   A.      Yes, I do.

23   Q.      What is Exhibit No. 3?

24   A.      Exhibit No. 3 is a third amendment complaint --

25   amended complaint, excuse me, for declaratory and

1   injunctive relief.

2   Q.      Did you -- is this the complaint -- the current

3   complaint in this action?

4   A.      I believe so.

5   Q.      Did you have -- did you contribute at all to the

6   drafting of Exhibit No. 3, the third amended complaint?

7   A.      I contributed through correspondence with my

8   counsel, John Dillon.

9   Q.      Did you review the entirety of the third amended

10  complaint before it was filed?

11  A.      Yes, I did.

12  Q.      Please take a look at paragraph 4, 6, 13, 48,

13  and 49 of Exhibit No. 3, the third amended complaint.

14  You can look at them to yourself, and then I'll ask you

15  some questions.

16          MR. DILLON:  Sorry, Jennifer, I didn't catch the

17  first two paragraphs that you mentioned.  You cut out

18  there.

19          MS. ROSENBERG:  No worries.  I will -- I will

20  re-relate them.  They were paragraphs 4, 6, 13, 48, and

21  49.

22          THE WITNESS:  I will read them to myself.

23          I finished reviewing paragraphs 4, 6, 13, 48,

24  and 49.

25  ///

Exhibit 57
DX0874

```
 1   BY MS. ROSENBERG:
 2     Q.      Great.  Thank you.
 3             Do paragraphs 4, 6, 13, 48, and 49 refer to you?
 4     A.      Yes.  They refer to me as Plaintiff Jose Chavez.
 5     Q.      Did you write these paragraphs?
 6     A.      I contributed to the construction of these
 7   paragraphs through correspondence with my lawyer.
 8     Q.      Do you see any errors in them as of today?
 9     A.      I'd like to glance over them a second time
10   looking specifically for errors.
11             I have read the paragraphs and have no errors
12   noted.
13     Q.      Thank you.
14             I'd like for you to pull up exhibit -- what I
15   have marked as Exhibit No. 4, please.
16                 (Defendants' Exhibit 4 was marked for
17                 identification.)
18             THE WITNESS:  I have Exhibit No. 4.
19   BY MS. ROSENBERG:
20     Q.      Have -- could you please tell me what Exhibit
21   No. 4 is?
22     A.      Exhibit No. 4 is State of California Penal Code
23   Section 27510.
24     Q.      Have you ever read this penal code section
25   before?
```

Jose Chavez

1   A.      I have not.

2   Q.      Are you aware that Penal Code Section 27510 is

3   the subject of this lawsuit?

4   A.      I am aware.  I have not read the penal code.

5   Q.      Do you have -- could you tell me what your

6   general understanding is of the law that is being

7   challenged in this action, please?

8   A.      My general understanding of the law that is

9   being challenged is that the law prevents the purchasing

10  and ownership of firearms to 21-year-old and above

11  Californians as opposed to 18-year-old Californians.

12          18-year-old through 20-year-old Californians who

13  are interested in purchasing and owning a firearm are

14  unable to unless they reach 21 years of age.  And that is

15  my understanding of the law being contested.

16  Q.      Understood.

17          If you would take a moment please to read

18  through Penal Code Section 27510 so we can discuss it,

19  please, and let us know when you are ready.

20  A.      I read the penal code.

21  Q.      Thank you.

22          Do you understand that Section 27510 applies

23  only to firearms, sales, and transfers that are conducted

24  through federally licensed firearms dealers?

25  A.      I understand.

Exhibit 57
DX0876

1    Q.      Are you aware that there are certain firearms

2    transfers that may occur in California without needing to

3    go through the intermediary of federally licensed

4    firearms dealer?

5             MR. DILLON:  Objection.  Legal conclusion.

6    BY MS. ROSENBERG:

7    Q.      Just asking about your awareness.

8    A.      I've heard of those transfer mechanisms for

9    firearms.

10   Q.      Where did you hear of them?

11   A.      I've heard of them in passing from my friend

12   Maxilian Nguyen as well as on different forms of social

13   media, learning about the differences between the

14   transfer, the loaning, and ownership of firearms.

15   Q.      Thank you.

16           Do you understand that Section 27510 contains

17   exemptions to the age limit that it imposes in certain

18   circumstances?

19           MR. DILLON:  Objection.  Legal conclusion.

20           Go ahead; answer.

21           THE WITNESS:  I am aware of the exceptions

22   listed within the penal code.

23   BY MS. ROSENBERG:

24   Q.      Were you aware of them before reading Penal Code

25   Section 27510 today?

Exhibit 57
DX0877

Jose Chavez

1   A.      I was aware of some of the exceptions, not every

2   single exception listed within the penal code.

3   **Q.      Which exceptions were you aware of before**

4   **reading Section 27510 today?**

5   A.      I was aware of -- I believe, it is

6   subdivision -- I believe it's section -- is it Section B?

7   Subdivision A does not apply to affect the sale of

8   handguns or semiautomatics centerfire rifles to people

9   who are 18 years old with a valid unexpired hunting

10  license issued by the Department of Fish and Wildlife.

11          That was the main exception I was aware of.

12  Otherwise, I am becoming familiar with the others.

13  **Q.      Okay.  Thank you very much.**

14          **I would like for you to pull up now what I have**

15  **marked as Exhibit No. 5.**

16                  (Defendants' Exhibit 5 was marked for

17                  identification.)

18          THE WITNESS:  I have Exhibit No. 5 open.

19  BY MS. ROSENBERG:

20  **Q.      Great.  Thank you.**

21          **Could you please read the title of Exhibit**

22  **No. 5?**

23  A.      State of California Penal Code Section 27505.

24  **Q.      Have you ever read this penal code section**

25  **before?**

Exhibit 57
DX0878

Jose Chavez

1   A.      Not in full.  I am familiar with Subsection A at

2   the top.

3   Q.      And could you read for the record, please,

4   Subsection A at the top?

5   A.       No person, corporation, or firm shall sell,

6           loan, or transfer a firearm to a minor, nor

7           sell a handgun to an individual under 21 years

8           of age.

9   Q.      Thank you very much.

10          I would like for us to look back at the third

11  amended complaint, which is Exhibit No. 3, please.  And

12  we're going to go to page 19 of the third amended

13  complaint, Exhibit No. 3, and look at footnote number 2.

14          Could you please read footnote number 2 for the

15  record?

16  A.      On page 19, you said?

17  Q.      On page 19 of the third amended complaint,

18  footnote 2 at the bottom of page 19.

19  A.       To be clear, Plaintiffs do not contest the

20          State's ban on the sale or transfer of handguns

21          to adults under the age of 21 in this complaint.

22             Plaintiffs reserve the right to contest the

23          State's handgun band in a separate compliant

24          in -- or complaint, excuse me, in the future.

25  Q.      Great.  Thank you.

Exhibit 57
DX0879

Jose Chavez

```
 1          So do you understand that this case challenges
 2  only Section 27510's restrictions on sales and transfers
 3  of firearms that are not handguns?
 4  A.      I do.
 5  Q.      Thank you.
 6          Throughout the proceedings today, I might refer
 7  to -- to long guns.  And what I mean by "long guns" -- or
 8  what I will be referencing are firearms that are not
 9  handguns.  For example, shotguns and rifles.
10          Do you understand?
11  A.      Yes.  I believe this specific type of long gun
12  is also referred to as a centerfire rifle.  Would that be
13  accurate?  Are they --
14              (Simultaneous colloquy.)
15          THE WITNESS:  Are they interchangeable within
16  this context?
17  BY MS. ROSENBERG:
18  Q.      They are not.
19  A.      Okay.
20  Q.      So for the context of this proceeding -- and my
21  next question was going to be if you understood that
22  semiautomatic centerfire rifles are a subset of long
23  guns.  Were you aware of that before today?
24  A.      Yes.
25  Q.      Okay.  So to clarify, when I speak of long guns
```

Exhibit 57
DX0880

Jose Chavez

1   throughout the rest of this proceeding, I will be

2   referring to any rifle or shotgun, any firearm that is

3   not a handgun.  Does that make sense?

4   A.    That makes sense.

5   Q.    And that may include semiautomatic centerfire

6   rifles.  Do you understand?

7   A.    I understand.

8   Q.    Thank you.

9         When I am asking questions specifically related

10  to semiautomatic centerfire rifles, I will clearly state

11  that that is what I'm asking about.  Understood?

12  A.    Understood.

13  Q.    Great.  Thank you.

14        All right.  We are getting towards the end of

15  our housekeeping.  I know that it has seemed like it's

16  gone on forever, and I apologize for that, but we have

17  just a few more things that -- that I want to make sure

18  that we get on the record here.

19        Could you please pull up for us Exhibit No. 6.

20            (Reporter clarification.)

21        MS. ROSENBERG:  My apologies, Madam Court

22  Reporter.  Anytime I refer to an exhibit marked as any

23  particular number, I am referencing having marked the

24  exhibits specifically for today's deposition.

25  ///

Exhibit 57
DX0881

Jose Chavez

```
 1              (Defendants' Exhibit 6 was marked for
 2              identification.)
 3  BY MS. ROSENBERG:
 4   Q.     Do you have Exhibit 6 available?
 5   A.     I have Exhibit No. 6 pulled up here on my
 6  computer.
 7   Q.     Great.  Thank you.
 8          Could you please read the title of Exhibit No. 6
 9  for us?
10   A.      Defendants' first set of requests for
11          production of documents to Plaintiff Jose
12          Chavez.
13   Q.     Thank you.
14          Do you recognize Exhibit No. 6?
15   A.     I do.
16   Q.     Have you read Exhibit No. 6 in full?
17   A.     Before this meeting?
18   Q.     Yes.
19   A.     Yes, I have.
20   Q.     Thank you.
21          And when you read Exhibit No. 6 before, did you
22  read through the -- the definitions that are provided
23  starting on page 2 and running through page 4 of Exhibit
24  No. 6?
25   A.     I did.
```

Exhibit 57
DX0882

Jose Chavez

1   Q.      Thank you.

2           And also when you read through Exhibit No. 6

3   before today, did you read through the instructions that

4   are provided starting on page 4 and running

5   through page 8 of Exhibit No. 6?

6   A.      I did.

7   Q.      Great.   Thank you.

8           Did you conduct searches of your records in

9   order to respond to the requests in Exhibit No. 6?

10  A.      I conducted searches within my email.

11  Q.      Were your searches restricted only to email?

12  A.      All correspondence between me and my lawyer has

13  been on text and email.   I've searched both.

14  Q.      So I would like to refer you to paragraph

15  number 5 of the definitions that appears on page 3 of

16  Exhibit No. 6.

17          If we look at the definition of document or

18  documents, do you see that document was defined under the

19  definition provided here to include -- among other

20  things -- any electronic records, emails, information and

21  databases, instant messages, letters, licenses, logs,

22  memorandums, minutes, notes, papers, photographs,

23  receipts, recordings, text messages, time sheets, videos,

24  voice messages, and any other communications?

25  A.      I understand the definition as it is written.

Exhibit 57
DX0883

Jose Chavez

1    Q.      Okay.   And do you see also that it includes

2   books, calendars, charts, diaries --

3    A.      Check stubs, yes.

4    Q.      Great.   Thank you.

5            So when you said that you searched your emails

6   and text messages, is that the full extent of the

7   universe that you searched for records responsive to

8   these requests?

9    A.      Yes.

10   Q.      So you did not search voice messages, any

11  memoranda, minutes, notes, papers, or any of the other

12  items listed and defined in definition number 5 of

13  Exhibit No. 6?

14   A.      I don't recall.

15   Q.      We look at definition of communication and

16  communications that appears in paragraph 6 on page 3 of

17  Exhibit No. 6, please.

18   A.      Would you like me to --

19            (Simultaneous colloquy.)

20  BY MS. ROSENBERG:

21   Q.      Sure.   Please go ahead and do so.

22   A.       Communication and communications mean any

23            transfer of information of any nature.

24            whatsoever whether by oral, written, electronic,

25            or other means including, but not limited, to

www.aptusCR.com
Exhibit 57
DX0884

Jose Chavez

1              notes made or direct messages on -- or sent on,

2              excuse me, messaging applications or social

3              media sites or other applications.

4    Q.       Thank you.

5              So in preparing your responses to Exhibit No. 6,

6    these requests, did you search through any messaging

7    applications, any social media accounts that you have, or

8    any other applications?

9    A.       I limited my search to SMS messaging and my

10   email.

11   Q.       So your search -- your searches that you

12   conducted in order to respond to Exhibit No. 6, the

13   request for production, was not complete; is that

14   correct?

15             MR. DILLON:  Objection.  Argumentative.

16   BY MS. ROSENBERG:

17   Q.       Let me rephrase.

18             Your searches that you conducted in order to

19   respond to the requests provided in Exhibit No. 6, the

20   request for production, did not extend to all categories

21   of documents and communications that you were required

22   to -- to search in responding to Exhibit No. 6; is that

23   correct?

24   A.       I produced all communication and communications

25   as requested by counsel John Dillon.

1    Q.      Thank you.

2            But that is not actually the answer to my

3    question.  You have stated that you limited your searches

4    to your emails and your SMS, correct?

5    A.      Yes.

6    Q.      So you did not search any of the other

7    categories of documents or communications that are listed

8    in Exhibit No. 6 and the definitions of document and

9    communication; is that correct?

10   A.      That is correct.

11   Q.      So you did not provide all categories of

12   documents and communications requested in Exhibit No. 6,

13   correct?

14   A.      Correct.  I provided the communication and

15   communications as directed by my lawyer.  I was informed

16   that what I've provided was sufficient.

17   Q.      You don't need to tell me what your counsel has

18   discussed with you.  I want to make sure that we don't

19   stray into any territory that would be protected by the

20   attorney-client privilege.

21           But I do want to make clear that I'm asking

22   about your actions and anything that is non-privileged.

23   You understand?

24   A.      I understand.

25   Q.      Okay.  Thank you very much.

Exhibit 57
DX0886

Jose Chavez

1          Will you have an opportunity to search these

2    additional categories of documents and communications

3    some time in the next week?

4    A.     Yes.

5    Q.     Do you understand that you are under a duty to

6    provide complete and updated responses to all discovery

7    requests in this action?

8    A.     I understand.

9    Q.     Thank you very much.

10          Could I ask for you to agree that you will

11   search the additional categories of documents of

12   communications and produce any responsive documents that

13   are not privileged?

14   A.     Yes.  I will retrieve the relevant communication

15   and communications as defined here from direct messages

16   on messaging applications or social media sites or other

17   applications exceeding SMS and email in my previous

18   capacity.

19   Q.     And all categories of documents defined in

20   definition number 5 as well.  Those should be included in

21   your additional searches.  Do you understand?

22   A.     I understand.

23   Q.     Great.  Thank you very much.

24          Let's pull up Exhibit No. 7 now, please.

25   ///

Exhibit 57
DX0887

Jose Chavez

1                  (Defendants' Exhibit 7 was marked for

2                  identification.)

3   BY MS. ROSENBERG:

4    Q.      Do you have number 7 open?

5    A.      I have Exhibit No. 7 open.

6    Q.      Great.  Thank you very much.

7            Could you please read the title of Exhibit No. 7

8   for us?

9    A.       Defendants' first set of requests for

10           admission to Plaintiff Jose Chavez.

11   Q.      Thank you.

12           Have you seen what has been marked as Exhibit 7

13  before today?

14   A.      Yes.  I briefly scanned the document.

15   Q.      Did you scan the entire document?

16   A.      Yes.

17   Q.      And did you draft responses to the -- the

18  requests for admission contained in Exhibit No. 7?

19   A.      I participated in the drafting of the response

20  through correspondence, verbal correspondence, with my

21  lawyer.

22   Q.      Thank you.

23           And just to clarify, do you mean you provided

24  the information that would be contained in responses?

25   A.      Yes.

Exhibit 57
DX0888

1    Q.      And did you review the draft responses before

2    they were served on defendants?

3    A.      Yes.

4    Q.      You reviewed them for accuracy?

5    A.      I reviewed them for accuracy, yes.

6    Q.      You reviewed them for completeness?

7    A.      I reviewed them for accuracy and completeness,

8    yes.

9    Q.      Okay.  Great.  Thank you.

10          We can set that one aside.  And -- actually,

11   before we set Exhibit No. 7 aside, I just want to

12   clarify.  If we look at page 2, the section of

13   definitions starting at page 2 and running

14   through page 3, when you reviewed Exhibit 7 previously,

15   did you read each of these definitions before formulating

16   your responses?

17   A.      Yes, I did.

18   Q.      And looking at the instructions that begin

19   on page 3 and run through page 4, did you read each of

20   these instructions in full before formulating your

21   responses?

22   A.      Yes.

23   Q.      And -- okay.  Thank you.

24          We can set that one aside for now.  We have

25   already pulled up Exhibit No. 8, but let's -- let's look

Exhibit 57
DX0889

Jose Chavez

```
 1    at that one again, please.

 2            So this was the first set of interrogatories,

 3    correct?

 4     A.     Yes.

 5     Q.     And did you read this in full before formulating

 6    your responses?

 7     A.     Yes.

 8     Q.     You read the definitions and instructions

 9    appearing -- starting on page 2 and running

10    through page 5; is that correct?

11     A.     Yes.

12     Q.     Great.  Thank you.

13            So we can put 6, 7, and 8 aside for now.  And I

14    want to have us take a look at number -- what has been

15    marked as Exhibit No. 9, please.

16                (Defendants' Exhibit 9 was marked for

17                identification.)

18    BY MS. ROSENBERG:

19     Q.     Do you have Exhibit No. 9 available?

20     A.     I do.

21     Q.     Great.  Thank you.

22            Do you recognize Exhibit No. 9?

23     A.     Yes, I do.

24     Q.     Could you please tell us what the title of

25    Exhibit No. 9 is?
```

Exhibit 57
DX0890

1    A.      The title is,

2            Response of Plaintiff Jose Chavez to

3            Defendants' first set of requests for

4            production, set one.

5    Q.      Thank you.

6            So as we were just discussing in connection with

7    Exhibit No. 6, you helped to prepare the responses that

8    appear in Exhibit No. 9; is that correct?

9    A.      Yes.

10   Q.      Thank you.

11           Did anybody else help to prepare it other than

12   your attorney?

13   A.      No.

14   Q.      I would like for us to take a look at

15   Attachment 1, that appears as the final two pages of

16   Exhibit No. 9, please.

17           Do you see Attachment No. 1 that appears as the

18   final two pages of Exhibit No. 9?

19   A.      Yes.

20   Q.      Sorry.  The final one page.  It's not two pages.

21   It's one page.

22           What is attachment number 1 to Exhibit No. 9?

23   A.      Attachment number 1 is a photocopy of my

24   driver's license, my California driver's license.

25   Q.      Thank you very much.

1          Do you see that there is a statement:  Federal
2   limits apply on the driver's license?
3   A.      Yes.
4   Q.      Does that -- does that statement relate to any
5   existing convictions, criminal convictions?
6   A.      If I had criminal convictions, I suppose it
7   would.
8   Q.      But you do not have any criminal convictions; is
9   that correct?
10  A.      I do not have any criminal convictions.  That is
11  correct.
12  Q.      Okay.  Thank you.
13          Is there a reason that you have not applied for
14  a Real ID that does not contain the federal limits?
15  A.      Every time I get around to it, I forget, and the
16  deadline is further increased.  It's a matter of
17  procrastination.
18  Q.      Understood.  Thank you very much.  Appreciate
19  that.
20          So Attachment 1 is the sole document that you
21  produced in response to the request for production in
22  Exhibit No. 6; is that correct?
23  A.      I believe so.
24  Q.      You have not produced any other documents or
25  communications, correct?

Exhibit 57
DX0892

1   A.     I believe I was only asked for my driver's

2   license, yes.

3   **Q.     So as we've discussed in connection with Exhibit**

4   **No. 6, your searches were incomplete for your responses**

5   **and therefore, your responses in Exhibit No. 9 are**

6   **incomplete, correct?**

7          MR. DILLON:  Objection.  Argumentative.

8          THE WITNESS:  Under that premise, correct.

9   BY MS. ROSENBERG:

10  **Q.     Thank you.**

11  **       Are there any categories of documents requested**

12  **that you could not find?**

13  A.     I was requested to produce my driver's license.

14  I was able to find my driver's license.  I didn't have

15  any trouble finding that.

16  **Q.     Okay.  Okay.  Let's pull up Exhibit No. 10,**

17  **please -- what has been marked as Exhibit No. 10.**

18          (Defendants' Exhibit 10 was marked for

19          identification.)

20          THE WITNESS:  I have it open here.

21          Would you like me to read it?

22          (Simultaneous colloquy.)

23  BY MS. ROSENBERG:

24  **Q.     The title of it, please.  Yes.**

25  A.      Response of Plaintiff Jose Chavez to

1              Defendants' first set of requests for

2              admission, set one.

3      Q.      Great.  Thank you very much.

4              Do you recognize this document?

5      A.      I do.

6      Q.      Did you participate in the drafting of the

7      responses that appear in Exhibit No. 10?

8      A.      Yes.

9      Q.      Did anybody else help to prepare Exhibit No. 10

10     other than your counsel?

11     A.      No.

12     Q.      And do you verify that your responses to these

13     requests for admission are complete?

14     A.      I'll need a minute to read through the document.

15     Q.      Certainly.

16     A.      The document looks complete to me.

17     Q.      Thank you.

18             My question, however, was whether you are

19     verifying that the responses are correct and complete.

20     A.      The responses within the document do look

21     complete.

22     Q.      Thank you.

23             Let's pull up Exhibit No. 11, which you have

24     already been shown previously.

25             Exhibit No. 11 is responses to the first set of

Exhibit 57
DX0894

1    interrogatories; is that correct?

2    A.      That is correct.

3    Q.      And I think I've asked you previously.  Do you

4    recognize this document?

5    A.      Yes.

6    Q.      Thank you.

7            If you would take a moment to just scan through

8    this.  I'm not asking you to read the entire thing, but

9    if you could scan through this all the way to the back,

10   and then let me know if you see a signature of yours

11   anywhere in the document.

12   A.      I don't see a signature of mine in the document.

13   Q.      The only signature in the document is at the

14   very end, and it is that of your counsel, John W. Dillon;

15   is that correct?

16   A.      Correct.

17   Q.      Were you aware that you were required to provide

18   answers to these interrogatories under oath?

19   A.      I don't believe so.

20   Q.      You were not asked to sign a verification of

21   these interrogation responses?

22   A.      I was asked to sign a separate document that my

23   counsel and I were talking about, but I don't remember

24   specifically being asked to sign the Response of

25   Plaintiff Jose Chavez to Defendants' first set of

Exhibit 57
DX0895

1    interrogatories.

2            MR. DILLON:  Can we go off the record for a

3    moment?

4            MS. ROSENBERG:  Yes.

5                (Off the record.)

6    BY MS. ROSENBERG:

7     Q.        Thank you very much.

8            So I'll just remind you, Mr. Chavez, that you

9    remain under oath.  Although we've take an break, the

10   oath that you took at the beginning of the deposition

11   will last throughout these proceedings today.

12           Okay.  So I would like for us to move on and

13   look at what I have marked as Exhibit No. 12, please.

14               (Defendants' Exhibit 12 was marked for

15               identification.)

16   BY MS. ROSENBERG:

17    Q.        You have No. 12 available, Mr. Chavez?

18    A.        I do.

19    Q.        Great.

20            Do you recognize Exhibit No. 12?

21    A.        I do.

22    Q.        Could you tell us what it is, please?

23    A.        It's a declaration of myself, Jose Chavez, in

24   support of the plaintiff's notice of motion and motion

25   for preliminary injunction; also, titled, or, in the

Jose Chavez

1  alternative, motion for summary judgment.

2  Q.      Fantastic.  Thank you.

3          I want us to scroll down to page 3 of Exhibit

4  No. 12, your declaration.  Do you see where it says:

5              I declare under penalty of perjury, under

6          the laws of United States, that the foregoing is

7          true and correct and this declaration was

8          executed on January 16, 2023, in San Diego,

9          California.

10  A.      I do.

11  Q.      And there's a signature that appears below that

12  statement; is that correct?

13  A.      Yes.

14  Q.      Is that your signature?

15  A.      Yes.

16  Q.      Thank you.

17          Did you participate in the drafting of this

18  declaration?

19  A.      Yes.

20  Q.      And did you review this declaration before you

21  signed it?

22  A.      Yes.

23  Q.      Thank you.

24          Also going to have you take and pull up Exhibit

25  No. 13, please -- what is marked as Exhibit No. 13.

Exhibit 57
DX0897

Jose Chavez

```
 1                    (Defendants' Exhibit 13 was marked for
 2                    identification.)
 3   BY MS. ROSENBERG:
 4     Q.      Do you have Exhibit No. 13 available?
 5     A.      Yes.
 6     Q.      Do you recognize Exhibit No. 13?
 7     A.      Yes.
 8     Q.      Have you read Exhibit No. 13 before in full?
 9     A.      Yes.
10     Q.      Could you please tell us what Exhibit No. 13 is?
11     A.      Plaintiffs' memorandum of points and authorities
12   in support of notice of motion in motion for preliminary
13   injection, or, alternatively, motion for summary
14   judgment.
15     Q.      Thank you.
16             And did you participate in the drafting of this
17   memorandum of points and authorities?
18     A.      Please allow me to scan through.
19     Q.      Certainly.
20     A.      In my capacity as being a plaintiff, I
21   contributed.  However, I didn't contribute to the writing
22   of the introduction, relevant procedural history, or
23   other "juncts," there as I don't have a strong enough
24   legal understanding to contribute.
25     Q.      Fair enough.
```

www.aptusCR.com

Exhibit 57

DX0898

Jose Chavez

1           And you were not actually named official

2    plaintiff in the case at the time that this was filed,

3    correct?

4    A.      Correct.

5    Q.      Thank you.

6           All right.  So we can set Exhibit No. 13 aside

7    for now.  And let's go back to Exhibit No. 12.

8           Let me know when you have that available.

9    A.      I have it available.

10   Q.      All right.  Great.

11          So Exhibit No. 12, your declaration in support

12   of the preliminary injunction motion.  I would like for

13   us to take a look at paragraph 7, which appears on the

14   second page of the declaration.

15          Do you see paragraph number 7?

16   A.      Yes.

17   Q.      And in paragraph number 7 you say:

18              I am currently eligible under the laws of

19              the United States and of the State of California

20              to purchase, acquire, and receive firearms.

21              Correct?

22   A.      Correct.

23   Q.      Could you tell me what your basis is for

24   concluding that you are eligible under the laws of the

25   United States and the State of California to purchase,

Exhibit 57
DX0899

Jose Chavez

1   acquire, and receive firearms?

2   A.    I believe it is my Second Amendment right to be

3   able to purchase, acquire, and receive firearms as

4   ordained by the US Constitution.

5   Q.    So my question rather was what makes you believe

6   you are eligible under the laws rather than what you

7   believe your right to be.

8         What -- what do you believe formulates your

9   eligibility for purchasing or acquiring and receiving

10  firearms?

11  A.    Being an American citizen above 18 years of age.

12  Q.    Is there anything you can think of that would

13  render you ineligible to purchase or possess a firearm?

14  A.    Not to my knowledge.

15  Q.    Have you ever been a subject of a domestic

16  violence restraining order?

17  A.    No.

18  Q.    Have you ever been arrested?

19  A.    No.

20  Q.    Have you ever been involuntarily committed to a

21  psychiatric facility or hospital on suspicion that you

22  were a danger to yourself or others?

23  A.    Yes.

24  Q.    Could you tell us when that occurred?

25  A.    That occurred approximately in 2012 when I was

Exhibit 57
DX0900

1   starting 6th grade.

2   Q.       And how long were you involuntarily committed

3   for?

4   A.       One week.

5   Q.       Was there only one instance of involuntarily

6   commitment?

7   A.       Yes.

8   Q.       Was the commitment -- the involuntarily

9   commitment related to any -- any physical violence you

10  inflicted on yourself or anyone else?

11  A.       No.

12  Q.       Was the involuntary commitment related to any

13  physical violence you've threatened upon yourself or

14  anyone else?

15  A.       Yes.

16  Q.       Have you ever been the subject of a background

17  check?

18  A.       Yes.

19  Q.       For what purpose?

20  A.       To become a volunteer coach at Mt. Carmel High

21  School, a school within Poway Unified School District in

22  San Diego.

23  Q.       And what about for your current internship

24  working as a congressional intern?

25  A.       I -- I wasn't requested to provide a live scan.

```
 1    I can only assume they underwent their own form of a

 2    background check --

 3                   (Simultaneous colloquy.)

 4    BY MS. ROSENBERG:

 5    Q.      So I think I should be clear that when I'm

 6    asking about a background check, I'm asking about a check

 7    on data rather than on your fingerprints.

 8            Were you required to provide data or undergo a

 9    background check in order to become a congressional

10    intern?

11    A.      Not to my knowledge.

12    Q.      Okay.  Thank you.

13            Do you currently own any firearms?

14    A.      I do not.

15    Q.      Do you currently own any weapons other than

16    small pocket knives?

17    A.      I do not.

18    Q.      Have you ever owned any firearms?

19    A.      I have not.

20    Q.      Have you ever owned any weapons other than small

21    pocket knives?

22    A.      I have not.

23    Q.      Have you ever lived in a home wherein firearms

24    were stored?

25    A.      I'm not confident.  My reason being is that for
```

Exhibit 57
DX0902

Jose Chavez

1    parts of the previous two summers, I have lived in --

2    with my stepfather and mother.  My stepfather is a

3    retired Marine, and he has stated that he possesses

4    firearms.

5          He hasn't told his wife, my mother, my brother,

6    or myself of the locations of the firearms in the home.

7    And I myself have not seen the firearms.  I know that

8    there may or may not be firearms within his house.

9    **Q.        Could you clarify for me.  Were you visiting**

10   **that home or did you stay for any period of time beyond a**

11   **day or two and if so when?**

12   A.        I periodically stayed in this home for about

13   three days a week throughout the duration of the summer

14   from June to August, approximately, of 2023 -- excuse me

15   -- 2022.

16         This is the summer before my junior and senior

17   final year at UC San Diego as well as June 2021 through

18   September 2021.

19   **Q.        Have you ever observed your stepfather handling**

20   **his firearms?**

21   A.        I have not.

22   **Q.        And you have never handled any of your**

23   **stepfather's firearms; is that correct?**

24   A.        That is correct.

25   **Q.        Do you know the type of firearms that your**

Exhibit 57
DX0903

1    stepfather has?

2    A.        I don't.

3    Q.        Have you ever been loaned a firearm?

4    A.        I have not.

5    Q.        On the instances when you went shooting with

6    your friend Maxilian, did you use any of his firearms?

7    A.        I did use some of his firearms.  I don't believe

8    that constitutes a loan.

9    Q.        I'm sorry.  I should have asked first.  Your

10   friend Maxilian owns firearms; is that correct?

11   A.        Yes.  As an adult --

12             (Simultaneous colloquy.)

13             THE WITNESS:  -- over the age of 21, he does own

14   firearms.

15   BY MS. ROSENBERG:

16   Q.        Thank you.

17             So on these instances when you went shooting

18   with your friend Maxilian, you used his firearms,

19   correct?

20   A.        Correct.

21   Q.        Let's take a look at Exhibit No. 11, your

22   interrogatory responses, and we're going to look at

23   your -- we're going to look at Interrogatory No. 14.

24             Would you read Interrogatory No. 14 for the

25   record, please?  I believe it's on page 23 of Exhibit

Exhibit 57
DX0904

Jose Chavez

1   No. 11.

2   A.      Describe and state all facts relating to

3           any instance in which you have been loaned a

4           firearm as permitted by California Penal Code

5           Subsection -- I believe that's what the two

6           things mean -- 27880, 27885, 27910, or any

7           other California statute including, but not

8           limited to, who owned -- who loaned -- excuse

9           me -- the firearm to you, where the loan

10          occurred, and when and for how long the loan

11          occurred.

12  Q.      Thank you.

13          And let's scroll down to your response to

14  Interrogatory No. 14.  I'd like for us to look at the

15  final paragraph of your response, which begins at page 24

16  at around line 4.

17          Could you please read that final paragraph for

18  me, please?

19  A.      To responding party's understanding, he has

20          never been loaned a firearm as permitted by

21          California Penal Code Sections 27880, 27885,

22          27810, or any other California statute

23          relating to loaning firearms, nor does

24          responding party have an interest or desire in

25          such a loan.

Exhibit 57
DX0905

Jose Chavez

1   Q.      Thank you.

2           And this this paragraph that you've just read to

3   us in your response to Interrogatory No. 14, did you mean

4   to write 27910 instead of 27810?

5   A.      I meant to write -- I believe that's a question

6   for my counsel.

7                (Simultaneous colloquy.)

8           THE WITNESS:  Is there a typo here?  It looks

9   like there may be a typo.

10  BY MS. ROSENBERG:

11  Q.      So yes, so the interrogatory question asks about

12  California Penal Code Sections 27880, 27885, and 27910.

13  It may be that there was a typo.

14          But in any case, before you formulated your

15  response to this interrogatory, did you read these Penal

16  Code Sections 27880, 27885, and 27910?

17  A.      Yes.

18  Q.      I am going to ask you to pull up Exhibit

19  No. 14 -- or what's been marked as Exhibit No. 14,

20  please.

21               (Defendants' Exhibit 14 was marked for

22               identification.)

23          THE WITNESS:  Okay.

24  BY MS. ROSENBERG:

25  Q.      Do you recognize Exhibit No. 14?

Exhibit 57
DX0906

Jose Chavez

1    A.      It says -- I recognize the penal code.

2    Q.      Could you tell us the title of the -- of the

3    document?

4    A.      The title is:

5                   State of California Penal Code

6            Section 27880.

7    Q.      Thank you.

8            And have you before today read Section 27880 in

9    full?

10   A.      Not in full.

11   Q.      Okay.  You can set that one aside for now.

12           And then let's also pull up what has been marked

13   as Exhibit No. 17.

14                   (Defendants' Exhibit 17 was marked for

15                   identification.)

16   BY MS. ROSENBERG:

17   Q.      What is the title of Exhibit No. 17?

18   A.      State of California Penal Code Section 27885.

19   Q.      Thank you.

20           And have you -- or rather, are you familiar with

21   Penal Code Section 27885?

22   A.      I am.

23   Q.      And have you read it in full before today?

24   A.      Not in full.

25   Q.      Would you read it to yourself in full now,

Exhibit 57
DX0907

1    please?

2    A.      I've read the section of the Penal Code 27885

3    in --

4                (Simultaneous colloquy.)

5                THE WITNESS:  -- full just now.

6    BY MS. ROSENBERG:

7    Q.      Thank you very much.

8            So when you went shooting with your friend

9    Maxilian, did his firearm at all times remain in your

10   presence?

11           Excuse me.  Did Maxilian remain in your presence

12   at all times while you went shooting?

13   A.      Yes.

14   Q.      Okay.  And when you went shooting with Maxilian

15   and you used his firearms, were you using the firearms

16   for a lawful purpose?

17   A.      Yes.

18   Q.      Thank you.

19           When you went shooting with Maxilian and you

20   used his firearms, did you use them for three days or

21   more?

22   A.      No.

23   Q.      Was it limited to a single day?

24   A.      Yes.

25   Q.      At the time that you went shooting with your

Exhibit 57
DX0908

Jose Chavez

1   friend Maxilian and used his firearms, were you

2   prohibited by state or federal law from possessing,

3   receiving, owning, or purchasing a firearm?

4   A.      No.

5   Q.      At the time that you went shooting with your

6   friend Maxilian, was he 18 years of age or older?

7   A.      Yes.

8   Q.      And at the time that you went shooting with your

9   friend Maxilian, were you 18 years of age or older?

10  A.      Yes.

11  Q.      Thank you.

12          So the occasions in which you went shooting with

13  your friend Maxilian meet all the conditions that are

14  listed in Section 27885, correct?

15          MR. DILLON:  Objection.  Legal conclusion.

16  Argumentative.

17          THE WITNESS:  Yes.

18  BY MS. ROSENBERG:

19  Q.      You now understand that when you used your

20  friend Maxilian's firearms, they were loaned to you?

21          MR. DILLON:  Objection.  Legal conclusion.

22  Argumentative.

23          THE WITNESS:  I understand that Section 27885

24  has conditions that apply to the situation.  I do not

25  believe that the usage of the firearm constitutes a loan.

Exhibit 57
DX0909

```
 1  BY MS. ROSENBERG:
 2    Q.      What's your basis for that belief?
 3    A.      My basis -- my understanding of what constitutes
 4  a loan is a brief transfer of ownership independent of
 5  the loaning party.
 6    Q.      Thank you.
 7            Let's take a look at what has been marked as
 8  Exhibit No. 18.  That's -- drop that into the chat now.
 9                (Defendants' Exhibit 18 was marked for
10                identification.)
11            THE WITNESS:  I have the penal code pulled up.
12  BY MS. ROSENBERG:
13    Q.      Thank you.
14            And which penal code section is reflected in
15  what has been marked as Exhibit 18?
16    A.      The title of this document is:
17                State of California Penal Code
18            Section 27910.
19    Q.      Thank you.
20            So on any of the occasions where you went
21  shooting with your friend Maxilian, were those --
22  sorry -- were you shooting at a shooting range or on the
23  premises of a shooting club or organization?
24            MR. DILLON:  Objection.  Compound.
25  ///
```

Exhibit 57
DX0910

```
 1   BY MS. ROSENBERG:
 2   Q.      On any occasion where you went shooting with
 3   your friend Maxilian, did the shooting occur on a
 4   shooting range?
 5   A.      One time.
 6   Q.      And on that one time -- that one occasion where
 7   the shooting occurred on a shooting range, was the
 8   firearm that you used kept on the premises of the range
 9   at all times during the shooting session?
10   A.      Yes.
11   Q.      And on that one occasion where you went to a
12   shooting range and used your friend Maxilian's firearm,
13   were you 18 years of age or older?
14   A.      Yes.
15   Q.      And on that same occasion, were you using your
16   friend Maxilian's firearm for the purpose of shooting at
17   targets?
18   A.      Yes.
19   Q.      Thank you.
20           Okay.  Let's look back at Exhibit No. 11 again,
21   and we are going to look at Interrogatory No. 26, which
22   appears on, I believe, page 34.
23           You have that in front of you?
24   A.      Yes.
25   Q.      Could you please read Interrogatory No. 26,
```

1   which begins at approximately line 21 on page 34 of

2   Exhibit 11.

3   A.      Do you contend that your family members,

4           spouse, or domestic partner who own or possess

5           firearms are not willing to gift or loan a

6           firearm to you for self-defense?

7   Q.      Thank you.

8           Have you ever asked anyone if they would gift

9   you a firearm?

10  A.      No.

11  Q.      Have you ever inquired as to whether a parent or

12  a grandparent would be willing to gift or loan you a

13  firearm?

14  A.      No.

15  Q.      You've never asked your stepfather whether or

16  not he would let you borrow his firearm?

17  A.      My mom wouldn't like that.

18          MR. DILLON:  Vague and ambiguous.

19  BY MS. ROSENBERG:

20  Q.      So your answer no?

21  A.      My answer is no.

22  Q.      Could you read for me please the final paragraph

23  of your response to Interrogatory No. 26, which begins at

24  approximately line 9 on page 35 of Exhibit 11?

25  A.       Responding party cannot speak to the state

Exhibit 57
DX0912

```
1              of mind of third-parties and the reasons as to
2              why they would or would not gift or loan a
3              firearm.
4                    As far as responding party's aware, no
5              third-party has indicated that they wish to gift
6              or loan responding party a firearm, nor does
7              responding party have any such interest or
8              desire in such a gift or loan.
9    Q.        Thank you.
10             Do you really contend that you would not be
11   interested if a parent or a grandparent wanted to gift
12   you a firearm?
13             MR. DILLON:  Objection.  Argumentative.
14                   (Simultaneous colloquy.
15                   (Reporter clarification.)
16             THE WITNESS:  I do contend.
17   BY MS. ROSENBERG:
18   Q.        So you would reject a gift of a firearm; is that
19   correct?
20             MR. DILLON:  Objection.  Incomplete
21   hypothetical.
22   BY MS. ROSENBERG:
23   Q.        Let me rephrase.
24             If you were offered the gift of a firearm by
25   somebody who could legally provide you with a gift of a
```

Exhibit 57
DX0913

1   firearm, would you reject that gift?

2   A.      Yes.

3           MR. DILLON:  Objection.  Legal conclusion.

4   BY MS. ROSENBERG:

5   Q.      If you were to -- sorry.  I should ask first.

6           Are you married?

7   A.      No.

8   Q.      Do you have a domestic partner?

9   A.      No.

10  Q.      If, in the future, you were to marry or to gain

11  a domestic partner and that person wished to give you a

12  firearm, would you reject the gift of that firearm?

13          MR. DILLON:  Assumes facts.  Legal conclusion.

14  Incomplete hypothetical.

15  BY MS. ROSENBERG:

16  Q.      You can answer unless your counsel instructs you

17  not to.

18          MR. DILLON:  Go ahead.

19          THE WITNESS:  I would not accept that gift, no.

20  BY MS. ROSENBERG:

21  Q.      So let's talk about your attempt to purchase a

22  firearm that is the subject of -- of your testimony in

23  this case.

24          Could you walk me through the details of the

25  first time that you attempted to purchase a firearm?

Exhibit 57
DX0914

**Jose Chavez**

1   A.      Yes.  So it was towards the latter end of the

2   year of 2022.  I believe I was hanging out with my friend

3   Maxilian Nguyen, and we decided to go visit a shop called

4   Moreau Works, LLC, based in San Marcos.

5           Previously, we had visited other -- well, my

6   friend Maxilian had visited other gun shops and he wanted

7   to take me to Moreau Works, LLC.  We went to the shop and

8   we saw a variety of firearms.  And I asked -- I believe

9   his name was Thomas Moreau -- if I could purchase a

10  firearm.

11          And he asked me if I was 21 or older.  I told

12  him that I was 20 years old.

13          And he said, "Unfortunately, as a federal" -- I

14  believe he said he was a federally licensed firearm

15  salesman.  "I am not able to sell you a firearm."

16          And after that, I stopped pressing, decided to

17  leave the shop with my friend Maxilian Nguyen.

18  **Q.      So a follow-up question there.  Do you -- the**

19  **salesperson who you spoke to, did he provide any further**

20  **detail on why he could not sell you the firearm?**

21  A.      He just told me that because I was below the age

22  of 21, he was not permitted to sell me a firearm and --

23              (Simultaneous colloquy.)

24          THE WITNESS:  -- he decided not to elaborate

25  beyond that point.

Exhibit 57
DX0915

1    BY MS. ROSENBERG:

2    Q.      Did the salesperson ask you if you were a member

3    of law enforcement?

4    A.      He did not.

5    Q.      Did the salesman ask you if you were a member of

6    the armed forces?

7    A.      He did not.

8    Q.      And to clarify, when I say "the armed forces," I

9    mean any branch of the military.

10           Did he ask you if you were a member of any

11   branch of the military?

12   A.      He did not.

13   Q.      Did he ask you if you were an honorably

14   discharged veteran?

15   A.      He did not.

16   Q.      Did he ask you if you had a valid unexpired

17   hunting license?

18   A.      He asked me if I wanted to go hunting and if I

19   had a hunting license, and I told him that I did not have

20   a license.

21   Q.      Thank you.

22           Did he -- did the salesperson tell you that --

23   that you would be able to purchase a firearm if you had a

24   hunting license?

25           MR. DILLON:  Objection.  Legal conclusion.

```
 1              THE WITNESS:  He did not.
 2    BY MS. ROSENBERG:
 3     Q.      Before you went to purchase a firearm, did you
 4    do any research on firearms generally?
 5     A.      The extent of my knowledge at the time regarding
 6    firearms was with my friend Maxilian Nguyen.  I did not
 7    do extensive legal research.  I watched the videos that
 8    he had and gained the -- the knowledge that he had on
 9    firearms.
10     Q.      And what were the subjects of those videos that
11    you watched?
12     A.      I think they were about this -- this Russian guy
13    firing rifles from World War I --
14              (Simultaneous colloquy.)
15              THE WITNESS:  I forgot the Russian guy's name.
16    BY MS. ROSENBERG:
17     Q.      What other topics relating to firearms did you
18    discuss with your friend Maxilian before you sought to
19    purchase a firearm?
20     A.      I asked him about the types of firearms
21    available for purchase in California.  He told me about
22    different forms of long-form rifles, handguns, and
23    informed me that I would not be able to purchase a
24    firearm at the age of 20 -- purchase a firearm and claim
25    it for my ownership.
```

Exhibit 57
DX0917

Jose Chavez

1    Q.      Your friend Maxilian told you this before you

2    attempted to purchase a firearm?

3    A.      Correct.

4    Q.      Let me rephrase.

5            Your friend Maxilian told you that you would not

6    be able to purchase a firearm at the age of 20 before you

7    attempted to purchase a firearm?

8    A.      Correct.

9                    (Simultaneous colloquy.)

10           THE WITNESS:  But that was the one form of

11   resistance I felt, thus I felt inclined to go to Moreau

12   Works, LLC, and hear that from a licensed firearms

13   trader.

14   Q.      Did you --

15                   (Simultaneous colloquy.)

16   BY MS. ROSENBERG:

17   Q.      Sorry.  Go ahead.

18   A.      It's okay.

19   Q.      Did you do any research into firearms laws after

20   you learned from your friend Maxilian that you would not

21   be able to purchase a firearm at the age of 20?

22   A.      No.  I took his word for it.

23   Q.      But then you wanted to get confirmation from a

24   firearms dealer; is that correct?

25   A.      That is correct.

Exhibit 57
DX0918

1    Q.      And after you visited Moreau Works, did you

2    attempt to purchase a firearm at any other locations?

3    A.      After being informed that I would not be

4    eligible to purchase a firearm, I did not attempt to

5    purchase a firearm at any of the other locations.

6    Q.      Did you make inquiries at any other firearms

7    dealers?

8    A.      I'm sorry.  What is an inquiry in this context?

9    Q.      Did you inquire as to whether you would be able

10   to purchase a firearm at any other firearms dealers?

11   A.      No.

12   Q.      I would like to direct you to Exhibit No. 12,

13   your declaration in support of the preliminary injunction

14   motion, and I would ask you to take a look at

15   Paragraph 11 and read it for the record.

16   A.        I also confirmed my inability to purchase

17            any firearm under California law due to my age

18            and discussions with employees at least two

19            other licensed dealers, Gunther's Guns in

20            Carlsbad and Duncan Gun Works in San Marcos.

21              This is unlawful prohibition and

22            infringement on my Second Amendment Rights will

23            continue until I am 21 years old.

24   Q.      Thank you.

25            So when you had discussions with Gunther's Guns

Exhibit 57
DX0919

1    in Carlsbad -- or an employee at Gunther's Guns in

2    Carlsbad, when did that conversation occur?

3    A.      I believe that occurred about a month -- a

4    couple of months after my visit to Moreau Works, LLC.

5    Q.      And when did your discussion with an employee at

6    Duncan Gun Works in San Marcos about your ability to

7    purchase a firearm in California and your age occur?

8    A.      The same day that I visited Gunther's Guns in

9    Carlsbad.

10   Q.      So you -- in total, you had discussions with

11   three separate -- or excuse me -- with employees at three

12   separate firearms dealers about whether your age

13   prohibited you from purchasing a firearm; is that

14   correct?

15   A.      I attempted to purchase a firearm from one

16   company, Moreau Works, LLC, and I discussed my inability

17   to purchase any firearm with Gunther's Guns in Carlsbad

18   and Duncan Guns Works in San Marcos.

19           Discussions occurred, but one inquiry, one

20   attempt to purchase happened, and that was at Moreau

21   Works, LLC, in San Marcos.

22   Q.      Thank you.

23           And you -- when your friend Maxilian told you

24   that you would not be able to purchase a firearm at the

25   age of 20, did he tell you that just once?

Exhibit 57
DX0920

Jose Chavez

1    A.    Yes.

2    Q.    It didn't come up in multiple conversations?

3    A.    Not that I recall.

4    Q.    So would I be correct in understanding that on

5    four separate occasions you were informed that you would

6    not be able to purchase a firearm given that you were

7    under the age of 21?

8    A.    I was informed first by my friend Maxilian,

9    who's unlicensed, a friend of mine.  The first time I

10    tried to buy a gun, I was informed by a federally

11    licensed dealer.  And then the last two times we had a

12    discussion regarding my inability and people who are

13    under 21's ability to purchase firearms in California.

14    Q.    So you had four separate discussions with four

15    separate people about your inability to purchase a

16    firearm based on your age being under the age of 21; is

17    that correct?

18    A.    Yes.

19    Q.    And at no time after any of these four

20    conversations did you research the California statutes

21    that impose age limits on the sales and transfers of

22    firearms?

23          MR. DILLON:  Vague as to "research."

24    BY MS. ROSENBERG:

25    Q.    At any time after these four conversations in

1   which you were informed by four separate people that you

2   would not be able to purchase a firearm based on being

3   under the age of 21, did you conduct any research at all

4   about the laws that restrict the sales and transfers of

5   firearms based on age?

6    A.      I was given a piece of paper that described

7   California gun laws in 2022, but beyond that, I didn't

8   take it upon myself to do much further research as I knew

9   that I would not be able to come to purchase and own a

10   firearm at the age of 20 as opposed to 21.

11   Q.       When you say that you were given a piece of

12   paper, could you clarify who gave you the piece of paper?

13    A.      I was given a piece of paper by -- I believe it

14   might have been Duncan Gun Works.  It was one of the gun

15   stores that I attended, and it was a general

16   informational packet giving a brief overview of

17   California gun laws and the laws governing purchasing.

18            I had that packet, I skimmed it, and then I

19   disposed of it.

20   Q.       You say that you skimmed it.

21            Did you read it in full?

22    A.      I read the first part that essentially said as a

23   20-year-old, I would be ineligible.  I didn't scan the

24   other sections.

25   Q.       Did you ask anybody at Duncan Gun Works whether

Exhibit 57
DX0922

1  there were any exceptions to the age limitation on

2  purchase or -- sorry -- sale and transfer of firearms?

3  A.      No.

4  Q.      Did you ask anybody at Gunther's Guns in

5  Carlsbad whether there were any exceptions to the age

6  limitation on sales and transfers of firearms?

7  A.      No.

8  Q.      Did you ask anybody at Moreau Works, LLC,

9  whether there were any exceptions to the age limitations

10  on sales and transfers of firearms?

11  A.      No.

12  Q.      Did you ask your friend Maxilian whether he knew

13  of any exceptions to the age limitations imposed on the

14  sales and transfers of firearms?

15  A.      No.

16  Q.      I want to talk a little bit about your

17  preparation to become a firearm owner.

18        Before you attempted to purchase a firearm, what

19  did you do to prepare to become a firearm owner?

20        MR. DILLON:  Objection.  Vague.

21  BY MS. ROSENBERG:

22  Q.      Before you attempted to purchase a firearm, did

23  you make any preparations for safe storage of the firearm

24  that you would purchase?

25  A.      No.  As I went to Moreau Works, LLC, and I asked

1  if I could purchase a rifle.  I did not intend on

2  initiating that purchase that very day.  I understood

3  that if I was able to legally purchase and own a firearm,

4  that I would need to make further preparations.

5  **Q.      What was the basis for your understanding that**

6  **you would need to make further preparations?**

7  A.      I believe my friend Maxilian told me that he

8  has, and most gun owners have, a gun safe or another

9  storage mechanism for firearms.

10         Operating on that basis, I knew I didn't have a

11  storage mechanism for any firearm that I intended on

12  purchasing, thus if my inquiry and my interest in sales

13  were to turn into a potential sale and of course

14  acquiring, I would need to prepare.

15  **Q.      Did you do -- sorry.  Let me start over again.**

16  **        Before you attempted to purchase a firearm, did**

17  **you do any research into firearm safety?**

18  A.      After I went shooting at the range in Claremont,

19  I was told the four rules of firearm safety by my friend

20  Maxilian Nguyen.  To my recollection, the most important

21  rules are to always act as though a firearm is loaded,

22  never point a firearm at another person that you are not

23  intending on shooting, so exercise caution.

24         And with regards to the other two rules, they're

25  exceeding my memory, and I decided to go on to Google to

Exhibit 57
DX0924

```
 1   look up four rules of firearm safety.
 2   Q.      You decided to go and look at Google at what
 3   time or was that --
 4               (Simultaneous colloquy.)
 5           THE WITNESS:  This would have been briefly after
 6   my visit to the gun range in September.
 7   BY MS. ROSENBERG:
 8   Q.      When you visited the gun range in September,
 9   were you provided with any range rules or best practices
10   before you actually handled firearms?
11   A.      Yes.
12   Q.      Was there any sort of training or demonstration
13   before you handled firearms at that shooting range?
14   A.      There was not a formal training issued at the
15   fire range or firing range that I went to.  There were
16   general rules and a waiver I had to sign, and then I went
17   in with Maxilian Nguyen, and I was shown the rules of
18   firearm safety under his supervision.
19   Q.      When you say "was shown," could you please tell
20   me who showed you those four rules?
21   A.      By friend Maxilian Nguyen.
22   Q.      And do you mean that he gave you a piece of
23   paper or do you mean that he demonstrated these four
24   principles?
25   A.      He demonstrated these four principles.
```

Exhibit 57
DX0925

1    Q.      Thank you.

2            Before you attempted to purchase a firearm, did

3    you do any research into whether you would be required to

4    procure any sort of license to own a firearm or any

5    certification?

6    A.      I asked my friend Max or Maxilian, and he said,

7    "You're fine to come with me and shoot under my

8    supervision."

9    Q.      Sure.

10           So I'm -- I'm actually asking about before you

11   attempted to purchase a firearm.

12           So in preparation for becoming a firearm owner,

13   did you do any research into whether you would be

14   required to procure a license to own or carry a firearm

15   or any other sort of certification?

16   A.      No.

17   Q.      Do you -- do you have a firearm safety

18   certificate?

19   A.      No.

20   Q.      Have you ever taken the exam for the firearm

21   safety certificate?

22   A.      No.

23   Q.      Were you aware that there is an exam to procure

24   a firearm safety certificate?

25   A.      Yes.

Exhibit 57
DX0926

 1   Q.      How did you become aware of that?

 2   A.      I heard through my friend Maxilian that there

 3   were firearm safety courses available, and with a course

 4   or instruction, that implies that there is a final exam

 5   to test one's knowledge.

 6   Q.      I'm going to ask you to pull up what is marked

 7   as Exhibit No. 22.

 8              (Defendants' Exhibit 22 was marked for

 9              identification.)

10   BY MS. ROSENBERG:

11   Q.      You have Exhibit No. 22 available?

12   A.      I do.

13   Q.      Have you ever seen Exhibit No. 22 before?

14   A.      No.

15   Q.      Could you tell me what the title of Exhibit

16   No. 22 is, please?

17   A.      Firearm safety certificate study guide.

18   Q.      Thank you.

19           So you've never seen this study guide before,

20   correct?

21   A.      No.

22   Q.      Thank you.

23           I'm going to ask you to pull up what has been

24   marked as Exhibit No. 23, please.

25   ///

Exhibit 57
DX0927

Jose Chavez

```
 1                 (Defendants' Exhibit 23 was marked for
 2                 identification.)
 3           THE WITNESS:  I have it pulled up.
 4   BY MS. ROSENBERG:
 5    Q.     Great.  Thank you.
 6           First before we talk about Exhibit No. 23, I
 7   wanted to ask, have you ever visited the website for the
 8   Office of the Attorney General of the State of
 9   California?
10    A.     Yes.
11    Q.     Was it in relation to your attempt to purchase a
12   firearm?
13    A.     No.
14    Q.     What was the circumstance of visiting the
15   website for the office of attorney general?
16    A.     I heard that the previous attorney general of
17   California -- I believe it was Xavier Becerra -- was
18   promoted to be a cabinet member for President Joe Biden,
19   and I heard that he was succeeded by an assemblyman named
20   Rob Bonta, who had some relation to greater Sacramento.
21           I'm very interested in members of my community
22   in the valley.  I thought he may have had ties to
23   Stockton, California.  I visited the website and found
24   out that he was a resident of Sacramento and that my
25   initial thoughts were incorrect.
```

Exhibit 57
DX0928

Jose Chavez

1    Q.    Thank you.

2          Have you visited the website for the California

3    Department of Justice Bureau of Firearms at any point?

4    A.    No.

5    Q.    Okay.  So if you would take a look at what has

6    been marked as Exhibit No. 23, please.  This are --

7    excuse me -- is Exhibit No. 23 familiar to you?

8    A.    No.

9    Q.    Could you please read the title of Exhibit

10   No. 23?

11   A.    Firearm safety certificate program FAQs.  FAQs

12   standing for frequently asked questions.

13   Q.    Thank you.

14         I would ask you to scroll down to question

15   number 6, which is on page 3 of Exhibit No. 23, and that

16   question is titled:

17              How will I be able to obtain a firearm

18         safety certificate?

19         Could you please read the response?

20   A.     To obtain an FSC, you must score at least

21         75 percent, 23 correct answers, out of 30

22         questions on the FSC test covering firearm

23         safety and basic firearms laws.

24              The true/false and multiple choice test is

25         given by DOJ certified instructors, who are

Exhibit 57
DX0929

```
 1                generally located at firearms dealerships.
 2    Q.      Thank you.
 3            And let's scroll down to question number 8 on
 4    Exhibit No. 23, please.
 5            Could you please read that question?
 6    A.       Are there any minimum
 7            qualifications/requirements for a person who
 8            wants to take the firearm safety certificate
 9            test?
10    Q.      And could you please read the answer?
11    A.      Yes.
12              The FSC applicant must be at least 18 years
13            of age and must present clear evidence of
14            identity and age by presenting a California
15            driver's license or California Department of
16            Motor Vehicles Identification Card.
17    Q.      Thank you.
18            So were you aware that in order to procure a
19    firearm safety certificate, one is not required to take
20    any sort of course?
21    A.      No.
22    Q.      You believed that there was a course required in
23    order to procure a firearm safety certificate?
24    A.      Yes.
25    Q.      Okay.  Thank you.  We can set that aside for
```

Exhibit 57
DX0930

```
 1   now.
 2           In preparation for becoming a firearm owner, did
 3   you take any form of firearm safety training?
 4    A.      No.
 5    Q.      Did you look into taking any such course or
 6   training?
 7    A.      I thought about it, but did not come to search
 8   it on Google or utilize any web browsers to do my
 9   research, nor ask Maxilian my friend or any other people.
10    Q.      Okay.  Thank you.
11           Do you plan in the future to take any sort of
12   firearms safety or training courses?
13    A.      I would be open to taking the course.
14    Q.      Do you plan to take any such course?
15    A.      It's not on my agenda.
16    Q.      Have you ever needed to defend your home against
17   any sort of attack?
18    A.      No.  Number one, due to no extenuating
19   circumstances like those existing.  Number two, because
20   technically I'm not a homeowner.
21    Q.      Okay.  So let me rephrase.
22           Have you -- have you ever needed to defend the
23   place in which you lived?
24    A.      With a firearm?
25    Q.      In any way.
```

Exhibit 57
DX0931

```
 1    A.      I have not.
 2    Q.      Do you know of anyone who has used a firearm
 3   defensively -- let me rephrase that.
 4           Do you personally know anyone who has used a
 5   firearm defensively?
 6    A.      Within what context?
 7    Q.      In any context.
 8    A.      Within the context of the military?
 9    Q.      No.  Sorry.  That is a good question.
10           In civilian life, do you know anyone personally
11   who has used a firearm defensively?
12    A.      No.
13    Q.      Have you ever known anyone who died by suicide?
14    A.      Yes.
15    Q.      Did that person die by firearm?
16    A.      Yes.
17    Q.      How old was that person, if you know?
18    A.      I believe they were in their forties.
19    Q.      Do you know anyone who has experienced an injury
20   from an accidental gunshot?
21    A.      Within the context of civilian life, yes?
22    Q.      Yes.
23    A.      No.
24    Q.      Tell me a little bit about your desire to
25   purchase a firearm.  What's the basis for that desire?
```

Exhibit 57
DX0932

1    A.       I believe that it's my constitutional right to

2    own a firearm, and I'd like to participate in the civic

3    process by engaging with every part of the Bill of

4    Rights, the Constitution.

5    **Q.       So you believe that owning a firearm is part of**

6    **the civic process?**

7    A.       I believe --

8            MR. DILLON:  Objection.  Argumentative.

9            THE WITNESS:  Do I answer that?

10           MR. DILLON:  Go ahead.

11           THE WITNESS:  Okay.  I believe that owning a

12   firearm is a constitutionally ordained right, which --

13   the constitution of which governs our civic process.

14   BY MS. ROSENBERG:

15   **Q.       Do you have --**

16               (Reporter clarification.)

17   BY MS. ROSENBERG:

18   **Q.       Have you ever felt unsafe in any home in which**

19   **you lived regardless of whether you owned the home?**

20   A.       Have I ever -- can you repeat the question?

21   **Q.       Sure.  And I'll actually rephrase it.  It was**

22   **terrible question.**

23           **Have you ever felt unsafe in any residence in**

24   **which you have ever lived?**

25   A.       Yes.

Exhibit 57
DX0933

Jose Chavez

1    Q.      Were those feelings of lack of safety related to

2    outside threats?

3    A.      Yes.

4    Q.      Okay.  Did any of your -- your feelings of

5    unsafety relate to threats in the home?

6    A.      No.

7    Q.      What was the basis for your fear for your safety

8    from outside threats?

9    A.      When I was younger --

10           (Simultaneous colloquy.)

11   BY MS. ROSENBERG:

12   Q.      No.  Please go ahead.

13   A.      I'm sorry.  Okay.

14           When I was younger, I was particularly afraid of

15   the weather.  I distinctly remember when I was 6, I was

16   on vacation and I believe it was Coleville, a

17   census-designated place in California.  And my -- my

18   grandfather was going to put away the pool we were

19   renting and there was lightning.

20           Lightning was striking nearby, and I started to

21   fear the weather, thinking that in the future my family

22   members will be affected by lightning, so if there were

23   thunderstorms, when I was younger, those external threats

24   definitely scared me.

25           Otherwise, the external threats that caused me

Exhibit 57
DX0934

Jose Chavez

1   to have fear, I believe, they related solely to the

2   weather.  There weren't any external threats where I grew

3   up in Tracy, California, that brought on that level of

4   fear given the context of my house's security and

5   residential, I suppose, security as well.

6   **Q.      So you have never felt unsafe in any of the**

7   **places in which you've lived as an adult?**

8   A.      Correct.

9   **Q.      Do you have particular concerns about needing to**

10  **use a firearm to defend your home?**

11          MR. DILLON:  Objection.  Argumentative.  Vague

12  and ambiguous.

13          THE WITNESS:  Do I answer that?

14          MR. DILLON:  Go ahead.

15          THE WITNESS:  I believe that at any point in my

16  life, there could be a circumstance that warrants the

17  usage of a firearm to defend my home and my family.

18  BY MS. ROSENBERG:

19  **Q.      Do you currently have any particular concerns or**

20  **fears about needing to defend your home with a firearm?**

21  A.      In this very moment, I do not.  I am open to the

22  possibility of circumstances that warrant a firearm usage

23  occurring.

24  **Q.      So I want to take a look at -- again, at Exhibit**

25  **No. 11, your interrogatory responses, and this time we**

Exhibit 57
DX0935

1  are going to look at Interrogatory No. 3.  And we're

2  going to look at your answer to Interrogatory No. 3,

3  which appears on -- at least it begins on page 8 of

4  Exhibit 11.

5   A.     I have access to that.

6   Q.     Great.  Excellent.

7          So I am going to read a passage from your

8  response, and then we'll discuss it.  Beginning at about

9  line 22 on page 8 of Exhibit 11 you say:

10             I also have no interest in obtaining a

11             firearm for hunting purposes.  I do not

12             currently own fire -- any firearms but wish to

13             purchase at least one such as a shotgun or rifle

14             including a centerfire semiautomatic rifle for

15             self-defense and other lawful purposes.

16          Did I read that correctly?

17   A.    You did.

18   Q.    Thank you.

19          So setting aside your wishes or your desires, is

20  it your view that a firearm is necessary to you for

21  self-defense?

22          MR. DILLON:  Objection.  Vague and ambiguous.

23  Argumentative.

24          THE WITNESS:  I believe that a firearm is my

25  constitutional right and one constitutional right that,

Exhibit 57
DX0936

1   should extenuating circumstances arise, be beneficial.

2           There are circumstances, at least in my belief

3   and observance, that would be a alleviated by an

4   individual's possession of a firearm for self-defense.

5   BY MS. ROSENBERG:

6    **Q.      Thank you.**

7           **So I'm focusing specifically on you, and again,**

8   **we're setting aside your wishes and desires, which we**

9   **understand perfectly.**

10          **My question to you, is -- again, setting aside**

11  **your wishes and desires, is it your view that a firearm**

12  **is necessary to you for self-defense?**

13          MR. DILLON:  Objection.  Argumentative.  Asked

14  and answered.  Vague and ambiguous.

15          THE WITNESS:  I believe that I already answered

16  this question, number one.  And secondly, number two, I

17  believe that there are select circumstances that require

18  a firearm and select circumstances that do not.

19          I believe it's my constitutional right to have a

20  firearm at all times in preparation for either one of

21  those circumstances especially those that warrant the

22  possession of a firearm for self-defense.

23          To be more clear, when answering, is it

24  necessary to own a firearm for self-defense in select

25  circumstances where proportional force is necessary?

Exhibit 57
DX0937

Jose Chavez

1   Yes.

2   BY MS. ROSENBERG:

3   **Q.     My question was, is it necessary to you for**

4   **self-defense.**

5           MR. DILLON:  Objection.  Asked and answered.

6           THE WITNESS:  In select circumstances, yes.

7           MR. DILLON:  Argumentative.

8   BY MS. ROSENBERG:

9   **Q.     So in your interrogatory response to**

10  **Interrogatory No. 3, the portion that we've just read,**

11  **that begins at around line 21 on page 8 of Exhibit 11,**

12  **you stated that you wish to purchase a shotgun or a**

13  **rifle.  Correct?**

14  A.     Correct.

15  **Q.     Would you agree that a shotgun may be adequate**

16  **for self-defense?**

17          MR. DILLON:  Objection.  Argumentative.

18          THE WITNESS:  I believe that either of the

19  firearms would be adequate including shotguns.

20  BY MS. ROSENBERG:

21  **Q.     So the answer to the question is yes, you**

22  **believe a shotgun may be adequate for self-defense?**

23  A.     I believe that the type of firearm that I desire

24  to acquire should be up to me.  A shotgun individually --

25  contextually, I don't believe there's enough context to

Jose Chavez

1   warrant whether or not a shotgun would be adequate for

2   defense, so I suppose if I'm answering -- understanding

3   your question correctly, I guess my answer would be no.

4     **Q.      Have you done any research into the efficacy of**

5   **any particular firearm for self-defense?**

6           MR. DILLON:  Objection.  Vague as to "research."

7           THE WITNESS:  No.

8   BY MS. ROSENBERG:

9     **Q.      Have you done any research, including research**

10  **on the internet, reading magazine articles, visiting**

11  **firearms dealers, consulting firearms instructors, to**

12  **gain an understanding of the difference between types of**

13  **firearms?**

14          MR. DILLON:  Objection.  Vague.

15          THE WITNESS:  I have gone to gun dealerships, as

16  listed within the exhibits, and talked about the

17  different types of firearms available, which gave me a

18  surface-level understanding of the firearms available to

19  me and to other Americans.

20  BY MS. ROSENBERG:

21    **Q.      You wouldn't say that you're a firearms expert,**

22  **though, right?**

23  A.      No.  Or perhaps I should clarify my previous

24  answer.  No, I would not consider myself to be a firearms

25  expert.

Exhibit 57
DX0939

Jose Chavez

1    Q.       Thank you for that clarification.

2            Have you -- do you have any knowledge as to how

3    often semiautomatic centerfire rifles are used

4    defensively for self-defense?

5            MR. DILLON:  Objection.  Compound.  Vague and

6    ambiguous.

7            THE WITNESS:  I'm not sure.

8    BY MS. ROSENBERG:

9    Q.       Have you ever researched how often semiautomatic

10   centerfire rifles are used for self-defense?

11   A.       No.

12           MR. DILLON:  Objection.  Legal conclusion.

13   Argumentative.  Vague and ambiguous.

14   BY MS. ROSENBERG:

15   Q.       Would you agree with the statement that firearms

16   handling comes with serious responsibilities?

17           MR. DILLON:  Objection.  Vague and ambiguous.

18   Argumentative.  Compound.

19           THE WITNESS:  I believe that while there are

20   serious responsibilities that come with owning a firearm,

21   the right to own the firearm and become encumbered with

22   those responsibilities is constitutionally ordained,

23   serious as though they may be.

24   BY MS. ROSENBERG:

25   Q.       Thank you.

Exhibit 57
DX0940

Jose Chavez

1    So I want to make sure as we go forward that you

2  are focusing on the question that I am asking.

3   A.    Okay.

4   Q.    Okay.  So thank you for that answer, and I want

5  to go back and clarify because you have mentioned

6  ownership in your response and I was asking specifically

7  about firearms handling.

8    So my question was, would you agree with the

9  statement that firearms handling comes with serious

10  responsibilities?

11    MR. DILLON:  Objection.  Argumentative.

12  Incomplete hypothetical.  Vague and ambiguous.

13    THE WITNESS:  Yes.

14  BY MS. ROSENBERG:

15   Q.    Would you agree that firearms handling requires

16  care?

17    MR. DILLON:  Same objections.

18    THE WITNESS:  I agree in part with the

19  statement.  Of course handling firearms would handle

20  care.  However, there is an important qualifier that, you

21  know -- the qualifier is that the requiring of care still

22  does not abridge the right to handle.

23  BY MS. ROSENBERG:

24   Q.    Right.  So --

25   A.    While.

Exhibit 57
DX0941

1    Q.     Mr. Chavez, I have not asked about whether or

2    not care abridges a constitutional right.  I'm asking

3    specifically about whether or not firearms handling

4    requires care.

5           Do you believe that requiring a firearm --

6    excuse me -- handling a firearm requires care?

7           MR. DILLON:  Objection.  Same objections as

8    before.  And asked and answered.

9           THE WITNESS:  I believe I already answered that

10   question.  If you would like to ask again perhaps

11   another -- or rephrasing would be nice.

12   BY MS. ROSENBERG:

13   Q.     Do you believe that responsible handling of

14   firearms requires care?

15          MR. DILLON:  Same objections.

16          THE WITNESS:  I believe that responsible -- what

17   was the phrasing?  Responsible possession of --

18              (Simultaneous colloquy.)

19   BY MS. ROSENBERG:

20   Q.     Responsible -- do you -- I'll just resay it

21   again.

22          Do you believe that responsible handling of

23   firearms requires care?

24          MR. DILLON:  Objection.  Same objections.

25          THE WITNESS:  Yes, it comes with care.

Exhibit 57
DX0942

```
 1    Responsible handling comes with care naturally.
 2    BY MS. ROSENBERG:
 3     Q.      Great.  Thank you.
 4             So just to make sure that I understood.  You
 5    have never taken any firearm safety or training courses,
 6    correct?
 7     A.      Correct.
 8     Q.      Have you done any independent research on
 9    firearms safety whether before or after attempting to
10    purchase a firearm?
11             MR. DILLON:  Objection.  Vague and ambiguous.
12             THE WITNESS:  I believe I answered this question
13    before, but just to restate, beyond the packet
14    concerning, you know, firearms safety, I haven't done
15    extensive research online concerning the subject matter
16    you mentioned.
17    BY MS. ROSENBERG:
18     Q.      Thank you.
19             What kinds of safety topics do you think it
20    would be important for a responsible firearms user to
21    know?
22             MR. DILLON:  Objection.  Vague and ambiguous.
23    Incomplete hypothetical.  Speculation.  Argumentative.
24             THE WITNESS:  I would say whatever -- whatever
25    is relevant to a firearm owner that doesn't disqualify
```

Exhibit 57
DX0943

1   them from owning one.

2   BY MS. ROSENBERG:

3   Q.      I am going to ask the question again because I

4   did not understand your response.

5   A.      Okay.

6   Q.      And I'll rephrase it a little bit, which

7   hopefully will help us focus a little bit.

8           In order to act as a responsible firearm user,

9   what kinds of firearm safety topics do you think are

10  important to know?

11          MR. DILLON:  Same objections.  It's also

12  compound.

13          THE WITNESS:  As far as I've been educated, I

14  think that the full rules of etiquette are appropriate,

15  as described in my earlier testimony here.

16  BY MS. ROSENBERG:

17  Q.      Have you at any point researched what laws

18  govern firearm ownership in California?

19  A.      No.

20          MR. DILLON:  Compound.

21  BY MS. ROSENBERG:

22  Q.      So you have stated that you wish to purchase,

23  acquire, and/or possess various forms of long guns in --

24  within California, correct?

25  A.      Yes.

Exhibit 57
DX0944

Jose Chavez

1    Q.      And actually, I should have directed you to an

2    exhibit for where that statement appears before I ask

3    that question.  If we could look again at Exhibit No. 12,

4    your declaration, at paragraph number -- apologies.  I

5    have the wrong paragraph number.  We'll come back to

6    that.

7            Is the statement generally true that you wish to

8    purchase, acquire, and/or possess various forms of long

9    guns within California?

10   A.      Yes.

11   Q.      What forms of long guns are you interested in

12   owning?

13   A.      I'm interested in rifles and shotguns.

14   Q.      Within those two categories of rifles and

15   shotguns, what types of rifles and shotguns are you

16   interested in owning?

17   A.      I forgot the names.

18   Q.      I'll direct you to your interrogatory responses.

19   That's Exhibit No. 11, answer 19, which here appears on,

20   I think, page 26.

21   A.      Was that Exhibit 11?  I'm sorry.

22   Q.      On Exhibit 11, yes.

23   A.      Let me open this in preview.  I apologize.

24   Adobe --

25   Q.      So we're going to be looking at your

www.aptusCR.com

Exhibit 57
DX0945

1  interrogatory response to Interrogatory No. 19, and it

2  will appear at page 27 of Exhibit No. 11 starting at

3  approximately line 4, and I'll read your response.

4        I would purchase pistol, revolvers, rifles,

5        and shotguns including, but not limited to,

6        bolt-action, lever-action, semiautomatic,

7        break-action, double-action, single-action,

8        single shot types of firearms or any other

9        lawful firearm of my choosing per my Second

10       Amendment rights.

11       Did I read that correctly?

12  A.    Yes.

13  Q.    Do you know what each of those types of firearms

14  is?

15       MR. DILLON:  Vague and argumentative.

16       THE WITNESS:  I have a basic understanding of

17  each of the firearms listed.

18  BY MS. ROSENBERG:

19  Q.    And by basic understanding, what do you mean?

20  A.    I know what a pistol is.  I know what a revolver

21  is.  I know what a bolt-action firearm is.  I understand

22  semiautomatic.  I understand break-action, et cetera.

23  Q.    Do you also understand lever-action firearms?

24  A.    Yes.  I understand each of the firearms listed

25  as well as the bolt-action, lever-action, semiautomatic,

Exhibit 57
DX0946

1   break-action, double-action, single-action, and single

2   shot types of firearms listed within the parentheticals

3   and outside of the parentheticals.

4   Q.      All right.   Thank you.

5           I'm now going to ask you about a series of

6   things and whether or not you believe that a responsible

7   firearm user would -- should know these things or learn

8   them, and I will rephrase that question, but I -- it

9   might start to feel a little bit repetitive.   I wanted to

10  just let you know in advance.

11          Do you think that a responsible firearm user

12  should know the basic parts of their firearm?

13          MR. DILLON:   Objection.   Argumentative.

14  Speculation.   Compound.

15          THE WITNESS:   I don't think that they have to.

16  BY MS. ROSENBERG:

17  Q.      You think that a responsible firearm user should

18  understand how to select the correct ammunition for their

19  firearm?

20          MR. DILLON:   Objection.   Speculation.

21          THE WITNESS:   I think that they would be told

22  and they would be shown through the usage of their

23  firearm which ammo is appropriate and inappropriate.

24  BY MS. ROSENBERG:

25  Q.      So do you agree that a responsible firearm user

Exhibit 57
DX0947

1   should know what type of ammunition should be used in

2   their firearm?

3          MR. DILLON:  Objection.  Argumentative.

4   Speculation.  Incomplete hypothetical.  And vague and

5   ambiguous.

6          THE WITNESS:  Yes.

7   BY MS. ROSENBERG:

8   Q.     Do you think that it is important for a

9   responsible firearm owner to know how their firearm is

10  fired?

11         MR. DILLON:  Same objections.

12         THE WITNESS:  Are you talking about the chemical

13  reactions that lead to a firing, or could you be more

14  specific on what it means to know how a firearm fires.

15  BY MS. ROSENBERG:

16  Q.     Sure.

17         So let's break that down.  One -- one question

18  could be, do you think it's important for a responsible

19  firearm user to know the mechanism through which their

20  firearm is fired?

21         MR. DILLON:  Same objections.

22         THE WITNESS:  You said "important"?

23  BY MS. ROSENBERG:

24  Q.     Sure.  Let me say the question again.

25         Should a responsible firearm user know the

```
 1   mechanism through which their firearm is fired?
 2             MR. DILLON:  Same objections.
 3             THE WITNESS:  Sure.
 4   BY MS. ROSENBERG:
 5    Q.     Should a responsible firearm owner know the
 6   safety mechanism of their firearm?
 7             MR. DILLON:  Same objections.
 8             THE WITNESS:  Sure.
 9   BY MS. ROSENBERG:
10    Q.     Instead of "sure," could you provide responses
11   with "yes" or "no," please?  And I'll repeat the
12   question.
13             Should a responsible firearm owner know the
14   safety mechanism of their firearm?
15             MR. DILLON:  Same objections.
16             THE WITNESS:  Yes.
17   BY MS. ROSENBERG:
18    Q.     Should a responsible firearm owner know how to
19   safely handle their firearm?
20             MR. DILLON:  Same objections.
21             THE WITNESS:  Yes.
22   BY MS. ROSENBERG:
23    Q.     Should a responsible firearm owner know their
24   firearms' range?
25             MR. DILLON:  Objection.  Argumentative.
```

Exhibit 57
DX0949

Jose Chavez

1   Speculation.  Incomplete hypothetical.  Vague and

2   ambiguous.  And compound.

3           THE WITNESS:  Yes.

4   BY MS. ROSENBERG:

5   Q.      Should a responsible firearm owner know safety

6   practices to help avoid using the wrong ammunition?

7           MR. DILLON:  Same objections.

8           THE WITNESS:  Yes.

9   BY MS. ROSENBERG:

10  Q.      Should a responsible firearm owner understand

11  the dangers of using the wrong ammunition in their

12  firearm?

13          MR. DILLON:  Same objections.

14          THE WITNESS:  Yes.

15  BY MS. ROSENBERG:

16  Q.      Should a responsible firearm owner understand

17  how to clean their firearm?

18          MR. DILLON:  Same objections.

19          THE WITNESS:  Yes.

20  BY MS. ROSENBERG:

21  Q.      Should a responsible firearm owner know how to

22  safely store their firearm?

23          MR. DILLON:  Same objections.

24          THE WITNESS:  Yes.

25  ///

Exhibit 57
DX0950

1   BY MS. ROSENBERG:

2   **Q.     Should a responsible firearm owner know how to**

3   **safely store their ammunition?**

4          MR. DILLON:  Same objections.

5          THE WITNESS:  Yes.

6   BY MS. ROSENBERG:

7   **Q.     Should a responsible firearm owner know basic**

8   **shooting skills?**

9          MR. DILLON:  Same objections.

10          THE WITNESS:  Yes.

11   BY MS. ROSENBERG:

12   **Q.     Should a responsible firearm owner, who wishes**

13   **to shoot at a shooting range, know firearm safety within**

14   **a shooting range?**

15          MR. DILLON:  Same objections.

16          THE WITNESS:  Yes.

17   BY MS. ROSENBERG:

18   **Q.     Shooting a responsible firearms owner know safe**

19   **loading and unloading of their firearm?**

20          MR. DILLON:  Same objections.

21          THE WITNESS:  Yes.

22   BY MS. ROSENBERG:

23   **Q.     Should a responsible firearm owner know how to**

24   **safely transport their firearm?**

25          MR. DILLON:  Same objections.

www.aptusCR.com

Exhibit 57
DX0951

Jose Chavez

```
 1              THE WITNESS:  Yes.
 2    BY MS. ROSENBERG:
 3    Q.      Should a responsible firearm owner know how to
 4    safely store a firearm when there are children in the
 5    home?
 6              MR. DILLON:  Same objections.
 7              THE WITNESS:  Yes.
 8    BY MS. ROSENBERG:
 9    Q.      If a firearm owner owns different types of
10    firearms, should they know the differences in how those
11    firearms are fired?
12              MR. DILLON:  Same objections.
13              THE WITNESS:  Yes.
14    BY MS. ROSENBERG:
15    Q.      Are you aware that all of these safety topics
16    that we just discussed and practices for responsible
17    firearm owners are covered in the hunter education
18    course?
19              MR. DILLON:  Same objection.
20              THE WITNESS:  No.
21    BY MS. ROSENBERG:
22    Q.      All right.  Let's take a look at Exhibit
23    number -- what has been marked as Exhibit No. 19.
24                  (Defendants' Exhibit 19 was marked for
25                  identification.)
```

www.aptusCR.com

Exhibit 57
DX0952

1  BY MS. ROSENBERG:

2   Q.      Could you take a look at Exhibit No. 19,

3  Mr. Chavez?

4   A.      Yes.  I have it open.

5   Q.      Great.

6           Have you ever seen this before?

7   A.      No.

8   Q.      Could you tell me the title for Exhibit No. 19?

9   A.      Study guide for hunting education.

10   Q.      Great.  Thank you.

11           And if you would take a moment to just scroll

12  through to look at the topics that are covered in the

13  study guide, please, to yourself.

14   A.      I've read the study guide to myself.

15   Q.      Okay.  Thank you so much.

16           We'll go ahead and take a break now and go off

17  the record.

18              (Break taken in proceeding.)

19  BY MS. ROSENBERG:

20   Q.      So before we took a break for lunch, we were

21  discussing a number of firearms safety and training

22  topics that are covered in the hunter education course,

23  correct?

24   A.      Correct.

25   Q.      Am I correct in understanding that you have not

1   made any attempt to enroll in a hunter education course

2   or to acquire a hunting license either before or after

3   filing the complaint?

4    A.     Yes.

5    Q.     At the -- sort of, towards the beginning of our

6   discussions today, I asked you if you were aware of any

7   exceptions in the law that you are challenging in this

8   lawsuit to the age limitation that is imposed.

9           Do you remember us talking about that?

10   A.     I do.

11   Q.     Great.

12          So why don't we pull up Penal Code Section 27510

13   again, which was what we marked as Exhibit No. 4.

14          Do you have that in front of you?

15   A.     I do now.

16   Q.     Great.

17          So I believe that we previously talked about

18   Section 27510, Subdivision B(1); is that correct?

19   A.     Uh-huh.

20   Q.     So I'm going to go ahead and read that, and then

21   we will discuss it afterwards.  As a, sort of, precursor

22   here, the overarching beginning of Section 27510 begins

23   with Subdivision A, which says essentially that a

24   firearms dealer shall not sell, supply, deliver, or give

25   possession or control of a firearm to any person who's

Exhibit 57
DX0954

1    under 21 years of age.

2          And then following that is Subdivision B(1),

3    which says:

4              Subdivision A, which we just read, does not

5          apply to or affect the sale, supplying,

6          delivery, or giving possession or control of a

7          firearm that is not a handgun, semiautomatic

8          centerfire rifle, completed frame or receiver,

9          or firearm precursor part to person 18 years of

10         age or older who possesses a valid, unexpired

11         hunting license issued by the Department of Fish

12         and Wildlife.

13         Did I read that correctly?

14   A.    Yes.

15   Q.    So as we talked about earlier in the day

16   today -- what this subdivision means is that a person who

17   is 18 years of age or older who has a valid, unexpired

18   hunting license issued by the Department of Fish and

19   Wildlife is able to purchase any kind of long gun that's

20   not a handgun, a semiautomatic centerfire rifle, a

21   completed frame or receiver, or a firearm precursor part.

22         MR. DILLON:  Objection.  Legal conclusion.

23         MS. ROSENBERG:  Sure.  I am reading directly

24   from the statute.

25         MR. DILLON:  Vague as to the statute.

Exhibit 57
DX0955

```
 1              MS. ROSENBERG:  I was reading directly from
 2    Section 27510 of the penal code in Subdivision B(1).
 3    BY MS. ROSENBERG:
 4    Q.      So given our previous discussions and having
 5    just reviewed this subdivision of 27510, do you
 6    understand that if you were the owner of a valid,
 7    unexpired hunting license issued by the Department Fish
 8    and Wildlife, you could purchase various types of long
 9    guns?
10              MR. DILLON:  Vague as to valid.
11              THE WITNESS:  I understand that if I possessed a
12    hunting license, I would -- issued by the Department of
13    Fish and Wildlife, I would be able to purchase a firearm
14    for hunting.
15    BY MS. ROSENBERG:
16    Q.      So I'd like you to take another look at
17    Subdivision B(1).  You could read it to yourself if you'd
18    like and then I will follow-up with a question.
19    A.      Okay.
20    Q.      There is nothing in Subdivision B(1) that
21    requires that use of a firearm procured through that
22    exemption be limited to the purpose of hunting, correct?
23    A.      The implication that I perceive is that those
24    that have a hunting license are the only ones -- hunting
25    license that are 18 to 20 are those -- are the ones that
```

Exhibit 57
DX0956

1  are only permitted to be excluded from this section,

2  which implies to me, and my interpretation could be

3  incorrect, that the usage of the firearm must be for

4  hunting in and of itself as this exception doesn't apply

5  for self-defense, at least expressly but --

6  **Q.      Is there any --**

7  A.      -- we're --

8  **Q.      Is there -- any are there any words in**

9  **Subdivision B(1) of Section 27510 that says that a**

10  **firearm procured under that exemption may not be used for**

11  **self-defense?**

12        MR. DILLON:  Objection.  Legal conclusion.

13        THE WITNESS:  No.  However, the condition to

14  obtain the firearm is to possess a hunting license, so

15  there -- it is a conditional transfer that isn't further

16  qualified by the need for self-defense.  That's just what

17  I'm reading.

18        But if we're answering your question, there

19  isn't any expressed language that says that a firearm

20  transferred in this way would be precluded from being

21  used for self-defense.  The language here does not

22  explicitly state that.

23  BY MS. ROSENBERG:

24  **Q.      Thank you.**

25        **And Subdivision B(1) does not explicitly state**

Exhibit 57
DX0957

Jose Chavez

1   that a firearm procured under section B(1) may only be

2   used for hunting purposes, correct?

3   A.      It is not explicitly stated there, no.

4   Q.      Thank you.

5           Do you understand that in order to procure a

6   hunting license, one must attend a hunter education

7   course approved by the California Department of Fish and

8   Wildlife?

9   A.      I understand.

10  Q.      Great.

11          And have you visited the Department of Fish and

12  Wildlife website to view the -- to view information about

13  the hunter education course?

14  A.      No.

15  Q.      I want us to take a look at -- again, at

16  Exhibit 11, which is your interrogatory responses, and we

17  will look at your answer to Interrogatory No. 4, which I

18  believe appears -- it appears on page 11 of Exhibit 11.

19          And I'm going to read a portion of your

20  interrogatory response.  Beginning at around -- or

21  between lines 10 and 11 your response states:

22              I have gone online and visited the hunters

23          education course website and obtained

24          information regarding the content of the courses

25          and the costs and fees required.

Exhibit 57
DX0958

Jose Chavez

1          Is that statement true?

2    A.      Was the initial question -- I thought the

3    initial question was going to -- have I gone to the

4    Department of Fish and Wildlife to get certified for a

5    hunting license.  Is that not the case?

6    **Q.      It is not.  No.  What I asked was whether you**

7    **visited the Department of Fish and Wildlife website to**

8    **obtain information about the hunter education course.**

9    A.      Okay.  Well, that is true, because I did visit

10   the Department of Fish and Wildlife for my fishing

11   license in the past and revisited that to obtain

12   peripheral information.  I'm sorry I misunderstood the

13   first question.  I thought it was exclusively referring

14   to licensing and how to obtain it and pursuing that

15   successfully.  My apologies for misunderstanding your

16   question.

17   **Q.      No worries.  That's -- it's absolutely fine, and**

18   **I will encourage you throughout the rest of the**

19   **deposition that, if at any point you don't understand a**

20   **question, you do ask follow-up questions.  I do want to**

21   **make sure that we understand each other and that we get**

22   **the most truthful answer as possible, so not a problem at**

23   **all.**

24          **So could you explain to me the circumstances**

25   **behind you going online and visiting the hunter education**

Exhibit 57
DX0959

Jose Chavez

1   course website?  What did you view there?

2    A.      I'm thinking back to the first time I visited

3   the website to obtain a fishing license.  I've been

4   fishing since I was approximately 3 years old, and I

5   wasn't --

6            (Simultaneous colloquy.)

7            THE WITNESS:  But afterwards, I came to view the

8   hunting page.  I believe that was an off shot section.  I

9   was in my -- I was in my domicile in San Diego, and I

10  pulled up on my phone and scrolled through the page.

11  BY MS. ROSENBERG:

12   Q.      So I want to limit my question to -- I only want

13  to know about the circumstances relating to your desire

14  to procure a firearm.  I would like to understand the

15  circumstances behind your statement in your response to

16  Interrogatory No. 4, that you have gone online and

17  visited the hunters education course website and obtained

18  information regarding the content of the courses and the

19  costs and fees required.

20          Do you recall the circumstances of -- underlying

21  that statement in your interrogatory response?

22          MR. DILLON:  Asked and answered.

23  BY MS. ROSENBERG:

24   Q.      When did you visit the hunter education course

25  website?

Exhibit 57
DX0960

Jose Chavez

1   A.      Briefly after my range visit with Maxilian

2   Nguyen.

3   Q.      Which range visit was that?

4   A.      That was the one in Claremont.

5   Q.      And -- I'm sorry.  I don't recall.  When was --

6   A.      That was September of 2022.

7   Q.      If you would, I'll just remind you that we need

8   to not talk over each other, so if you'll give me a

9   moment to complete a question before you answer, we'll be

10  able to ensure that the court reporter hears us.  Is that

11  okay?

12  A.      Yes.

13  Q.      Great.

14          So I'm sorry.  When did you visit the hunter

15  education course website?

16  A.      September 2022.

17  Q.      Thank you.

18          If we turn to -- so it is correct that when you

19  visited the hunter education website, you reviewed the

20  costs and fees required in order to obtain a hunting

21  license, correct?

22  A.      Correct.

23  Q.      And you have stated -- I'm going to direct us

24  again to your response Interrogatory No. 4, that you will

25  not be forced to waste both my time and money to learn

Exhibit 57

DX0961

1   about an irrelevant topic in order to exercise my Second

2   Amendment rights.  Correct?

3    A.      Correct.

4    Q.      Coming back to the safety and training topics

5   that we discussed earlier, you agreed that many of the

6   topics that we covered are ones that are responsible

7   firearm owner should know.

8           MR. DILLON:  Argumentative.

9   BY MS. ROSENBERG:

10   Q.      Does that accurately state your testimony from

11  before?

12   A.      That accurately recounts the answers that I gave

13  to your questions, yes.

14   Q.      Thank you.

15          So is it your view that the firearm safety and

16  training components of the hunter education course are

17  irrelevant to your desire to purchase a firearm?

18          MR. DILLON:  Objection.  Argumentative.

19  Misstates the testimony.

20          THE WITNESS:  I believe in Interrogatory No. 4,

21  I said that the learning and the other irrelevant topic

22  would be a waste in -- a waste of my time and money.  So

23  no, I don't believe that the topic is irrelevant.  I

24  believe that it is wasteful.

25  ///

www.aptusCR.com

Exhibit 57
DX0962

1  BY MS. ROSENBERG:

2  **Q.**     **When you say "it is wasteful," what do you mean?**

3  A.     It is a time sink and it is a sink of my -- my

4  money as well.

5  **Q.**     **Could you clarify what you are referring to --**

6  **to when you say "it"?**

7  A.     The hunting license training.

8  **Q.**     **You believe that the hunter education course is**

9  **a time sink?**

10  A.     Is a waste of both my time and money and the

11  skills and the responsibilities that I deemed ideal

12  earlier, that it would be ideal for most firearm owners

13  to know about that information, the responsibilities, I

14  believe is relevant, but the hunter education course

15  itself is wasteful, wasteful of my time, as listed in my

16  interrogatory, and as well as my money.

17  **Q.**     **Are you aware that there are hunter education**

18  **courses that are available to you mere miles away from**

19  **where you reside close to school that are entirely free?**

20  A.     Yes.

21  **Q.**     **You are aware of that?**

22  A.     Yes.

23  **Q.**     **So when you say that you believe a hunter**

24  **education course would be a waste of your money, what do**

25  **you mean?**

Exhibit 57
DX0963

Jose Chavez

1    A.      There's a qualifier there.  It's a waste of both

2   my time and my money, so even though these hunter

3   education courses may be close to me and free, it would

4   still be a waste of my time to attend them as I do not

5   intent on obtaining a hunting license and going hunting

6   and using firearms as such.

7    **Q.      You would agree, however, that a free hunter**

8   **education course would not be a waste of money, correct?**

9           MR. DILLON:  Objection.  Speculation.

10  Incomplete hypothetical.

11          THE WITNESS:  While it wouldn't be a waste of

12  money, my qualms are qualified with both, the hunter

13  education course being both a waste of time and/or money.

14          In this case, time and money.  Money here may be

15  able to thrown out with a free education course, but I'm

16  still using my time to obtain the certification to

17  pre-qualify me to obtain a firearm for a purpose I don't

18  intend on using it for.

19  BY MS. ROSENBERG:

20  **Q.      I understand.  Mr. Chavez, if you would try**

21  **answer the questions as I ask them, I would appreciate**

22  **that very much going forward.**

23          **So we talked about your pretty extensive**

24  **extracurricular activities throughout your college**

25  **experience.  I know you stated -- you testified earlier**

Exhibit 57
DX0964

1    that you spent maybe 8 to 10 hours a week on newspaper

2    and other hobbies or -- excuse me -- extracurricular

3    activities.  Is that right?

4    A.    Yes.

5    Q.    And at the moment, you said that you're working

6    about 25 hours a week on your internship; is that

7    correct?

8    A.    No.  Earlier I stated that I was working

9    25 hours a week for Supervisor Joel Anderson as grant

10   outreach assistant, and I believe I stated the period I

11   was working there was January '23 to -- or sorry --

12   January 2023 to June 2023.

13   Q.    That's --

14         (Simultaneous colloquy.)

15   BY MS. ROSENBERG:

16   Q.    Thank you for that correction.  I appreciate

17   that.

18         So I -- I wanted to ask, you would not have 8 or

19   10 hours total to spare to devote to learning firearm

20   safety and training through a hunter education course?

21         MR. DILLON:  Objection.  Argumentative.

22   Speculation.  Incomplete hypothetical.  Vague and

23   ambiguous.

24         THE WITNESS:  Just like any other thing I would

25   choose to do, I could find 8 to 10 hours to dedicate to a

Jose Chavez

1  hunter education course or any other course I could find

2  feasibly online.  There is time to be made.

3  BY MS. ROSENBERG:

4      Q.     Thank you.

5            So you are choosing not to take a hunter

6  education course; is that correct?

7            MR. DILLON:  Objection.  Argumentative.

8  Incomplete hypothetical.

9            THE WITNESS:  Correct.

10  BY MS. ROSENBERG:

11     Q.     Is there anything -- aside from your choice, is

12  there anything that prevents you from taking a hunter

13  education course?

14            MR. DILLON:  Objection.  Argumentative.

15            THE WITNESS:  No.

16  BY MS. ROSENBERG:

17     Q.     Is there any particular burden beside the -- the

18  time that we've discussed that prevents you from taking a

19  hunter education course?

20            MR. DILLON:  Objection.  Argumentative.  Vague

21  and ambiguous.

22            THE WITNESS:  No.

23  BY MS. ROSENBERG:

24     Q.     So would I be right in understanding that while

25  you know that you could procure a firearm by taking a

Exhibit 57
DX0966

1   hunter education course and procuring a hunters

2   license -- or a hunting license, you are choosing not to

3   do so?

4           MR. DILLON:  Objection.  Argumentative.

5   Incomplete hypothetical.  Speculation.

6           THE WITNESS:  Yes.

7   BY MS. ROSENBERG:

8    Q.     Could you tell me in your own words what burden

9   you believe -- burden or injury you believe that you are

10  experiencing from not being able to purchase a firearm

11  until you turn 21 unless you take advantage of one of the

12  exemptions that's available in the law?

13          MR. DILLON:  Objection.  Legal conclusion.

14  Argumentative.  Speculation.  Incomplete hypothetical.

15  Vague and ambiguous.  And compound.

16          THE WITNESS:  I being deprived simply of my

17  constitutional right to own and bear arms.

18  BY MS. ROSENBERG:

19   Q.     How does that manifest as a burden to you?

20          MR. DILLON:  Same objections.

21          THE WITNESS:  I'm having my constitutional

22  rights deprived.  I find that to be a very

23  straightforward burden, but --

24  BY MS. ROSENBERG:

25   Q.     Thank you.

www.aptusCR.com

Exhibit 57
DX0967

1          About how much time do you estimate that you

2    spent preparing for and attending today's deposition so

3    far?

4     A.      Enough time to review the necessary

5    documentation.

6     Q.      So this is an opportunity for you to provide one

7    of those estimates that I mentioned earlier.

8          Could you estimate for me how much time you

9    believe that you spent preparing for today's deposition

10   and participating in it so far today?

11    A.      About two hours.

12    Q.      We've been convened since 10:00 o'clock this

13   morning, so it's been about four and a half hours.

14         Are you -- are the two hours that you are

15   referencing just the two hours that you spent preparing

16   for today's deposition?

17    A.      Yes.

18    Q.      Okay.  So in all total preparing for and

19   participating so far today in today's deposition that

20   would be about six and a half hours, correct?

21    A.      Yes.

22    Q.      And again, I'm looking for an estimate here.

23   About how much time would you estimate that you have

24   spent participating in this lawsuit from the very

25   beginning when you reached out to Mr. Dillon?

Exhibit 57
DX0968

Jose Chavez

1   A.      Well, I've been a part of this lawsuit for, I

2   would say, a little over ten months, but --

3                  (Simultaneous colloquy.)

4            THE WITNESS:  But my estimates I'm sure are not

5   perfect.

6   BY MS. ROSENBERG:

7   **Q.      Sure.  Of course.  Estimates are never perfect,**

8   **hence why they're estimates.**

9            **I think rather than discussing the period of**

10  **time that you've been involved in the lawsuit, what I am**

11  **asking for is an estimate of the number of hours that you**

12  **have spent participating in this lawsuit from the very**

13  **beginning.**

14  A.      How do I quantify those hours?  Do I quantify

15  them on a weekly basis? on a daily basis?  I can't come

16  up with a cumulative figure.

17  **Q.      Okay.  Let's break it down by month.**

18  **Approximately how much time -- sorry.**

19            **When did you reach out to Mr. Dillon?**

20  A.      Let's see.  That must have been after the time I

21  hung out with my friend Maxilian Nguyen in September, so

22  since about October of 2022.

23  **Q.      Okay.**

24                  (Simultaneous colloquy.)

25  ///

Exhibit 57
DX0969

1  BY MS. ROSENBERG:

2  **Q.        Why don't you tell me about how many hours do**

3  **you think you spent in October 2022 participating in this**

4  **lawsuit?**

5  A.      I would say about -- about maybe three hours a

6  week.

7  **Q.        Three hours a week in October 2022 or do you**

8  **mean --**

9  A.      In October 2022 going forward as well, but

10  that's -- that's a confident average I can give.

11  **Q.        Okay.  So you estimate that from October 2022**

12  **forward you have spent approximately three hours a week**

13  **participating in this lawsuit; is that right?**

14  A.      Yes.

15  **Q.        Great.  Okay.  Thank you.**

16  **        Are you a member of the Second Amendment**

17  **Foundation?**

18  A.      Is that a part of the Firearms Policy Coalition?

19  **Q.        It is not.**

20  A.      Let's see.  It's been a long time since I would

21  have signed up.  Let's see.  I can't -- I honestly can't

22  remember because I -- because I do remember that I signed

23  up for the Firearms Policy Coalition over the phone and

24  then I opted out of email updates.

25          So I'm really sorry.  There are a lot of

Exhibit 57
DX0970

1    organizations that, you know, I've definitely, like, been

2    interested in, conferring in that I don't get updates for

3    that drop from my membership.

4    Q.       Thank you.

5             So just to clarify for the record, you don't

6    recall whether or not you are a member of the Second

7    Amendment Foundation?

8    A.       Correct.

9    Q.       Do you recall if you are a member of the

10   Firearms Policy Foundation?

11   A.       Yes.

12   Q.       I want to make clear that the Firearms Policy

13   Foundation is a different organization from the Firearms

14   Policy Coalition.

15   A.       Yes.  I know I am a member of them both.

16   Q.       And by "them both," are you referring to the

17   Firearms Policy Coalition and the Firearms --

18   A.       And the Foundation.

19   Q.       Sorry.  Let's try not to talk over each other.

20            Okay.  And are you -- do you recall if you are a

21   member of the California Gun Rights Foundation?

22   A.       I don't recall.

23   Q.       You mentioned that you signed up for Firearms

24   Policy Coalition over the phone; is that correct?

25   A.       Yes.

Exhibit 57
DX0971

Jose Chavez

1    Q.      Do you know who you spoke with when you signed

2    up to become a member of the Firearms Policy Coalition?

3    A.      I believe I conferred with my -- my counsel.

4    Q.      Did your counsel sign you up to be a member of

5    the Firearms Policy Coalition?

6    A.      No.

7            MR. DILLON:  Objection.  Privileged information.

8    BY MS. ROSENBERG:

9    Q.      So if you could help me understand what you mean

10   by your last response, that you became involved with a

11   Firearms Policy Coalition somehow through your counsel.

12   Could you clarify your response there?

13   A.      I believe it was through my counsel as well as

14   Maxilian Nguyen.  I was given their website or their --

15   their phone number.  I made the call and, of course, now

16   I can't track the call that I have in my iPhone, but it

17   was through my friend Maxilian Nguyen as well as my

18   counsel that I was pointed in the direction of the

19   organization.

20   Q.      Thank you.

21           So just to clarify, when you spoke on the phone

22   to become a member of the Firearms Policy Coalition, were

23   you speaking to a representative of the Firearms Policy

24   Coalition?

25   A.      As far as I recall, yes.

Exhibit 57
DX0972

Jose Chavez

1   Q.      You called the Firearms Policy Coalition

2   directly?

3   A.      Yes.

4   Q.      Do you recall if you paid a membership fee for

5   the Firearms Policy Coalition membership?

6   A.      I don't recall.  I could check.

7   Q.      Do you recall if you paid a membership fee to

8   join the Firearms Policy Foundation?

9   A.      Let's see.  I'm sorry.  I don't recall.

10  Q.      When you signed up to become a member of the

11  Firearms Policy Foundation, did you sign up via a

12  website?

13  A.      I only remember a phone call.

14  Q.      I'm asking specifically about the Firearms

15  Policy Foundation and not the Firearms Policy Coalition.

16          Did you sign up for membership in the Firearms

17  Policy Foundation through a different phone call than the

18  one in which you signed up for the Firearms Policy

19  Coalition?

20  A.      Yes.

21  Q.      You had two separate phone calls to become a

22  member of the Firearm Policy Coalition and the Firearm

23  Policy Foundation, correct?

24  A.      Yes.

25  Q.      Did you call the Firearms Policy Foundation

Exhibit 57
DX0973

Jose Chavez

1    directly?

2    A.      Yes.

3    Q.      How did you become aware of the Firearms Policy

4    Foundation?

5    A.      Through my friend Maxilian Nguyen as well as my

6    counsel.

7    Q.      Do you have any duties as a member of the

8    Firearm Policy Coalition?

9    A.      I'm sorry.  The first part of your sentence cut

10   out.  Any what?

11   Q.      Sure.

12           So I asked, do you have any duties as a member

13   of the Firearms Policy Coalition?

14           MR. DILLON:  Vague as to "duty."

15           THE WITNESS:  As far as I know, I am not a board

16   member, so I don't believe I have any club or

17   foundation-oriented constitutional duties.  I'm fairly

18   certain that my only duty is to uphold the values of the

19   organization.

20   BY MS. ROSENBERG:

21   Q.      Thank you very much.

22           Let's take a look at Exhibit No. 9 again.  This

23   is your responses to the requests for production, and

24   we're going to look at your response -- or rather, we're

25   going to look at request for production number 15.

Exhibit 57
DX0974

Jose Chavez

1          Do you see -- do you see request for production
2     number 15 on --
3     A.      Yes, I do.
4     Q.      Could you read that request for me, please?
5     A.       Responding party objects to this request
6             on the grounds that it seeks documents --
7     Q.      Sorry, Mr. Chavez.  I have asked you to read the
8     request, not the response yet.
9             Could you please read the request for --
10    A.      Response -- yes.
11            Response to request for production number
12            15 --
13    Q.      Mr. Chavez, I am asking you to go to page 12 of
14    Exhibit No. 9 and read the request, not the response.
15    Please read the request.
16    A.      My apologies.  I'm sorry.  It's 5:35 over here,
17    Eastern Standard Time.  My apologies.
18            Request for production number 15:  All
19            documents and communications relating to or
20            concerning each instance in which you have
21            practiced shooting at targets or taken any
22            firearms instruction or education at any time
23            before or after the filing of the complaint.
24    Q.      And this is my error.  I asked you to read the
25    wrong one, so thank you for that.  But let's actually

Exhibit 57
DX0975

Jose Chavez

1   turn to page 13 and please read request for production

2   number 16.

3   A.      All documents and communications relating

4           to, concerning, or substantiating your

5           membership in Firearms Policy Coalition,

6           Incorporated; Firearms Policy Foundation; the

7           California Gun Rights Foundation; and the

8           Second Amendment Foundation including the

9           current status of length of membership in

10          each such organization.

11  Q.      Thank you.

12          And if we turn to page 14, this is part of your

13  response to request for production number 16.

14          Do you see that you state beginning at about

15  line 6:

16              Responding party has no other additional

17          documents responsive to this request.

18  A.      Yes.

19  Q.      Did you search your records for any documents or

20  communications that would show your membership in

21  institutional organizations?

22  A.      Yes.

23  Q.      Did you search only your emails?

24  A.      Yes.

25  Q.      You do you believe that any other document or

Exhibit 57
DX0976

Jose Chavez

1    communication in your possession would reflect your

2    membership in the Second Amendment Foundation?

3    A.      I don't believe so.

4    Q.      Do you believe that any other document or

5    communication would reflect your membership in the

6    California Gun Rights Foundation?

7    A.      I'm not sure.

8    Q.      Do you -- do you believe that there are any

9    other documents or communication --

10             (Reporter clarification.)

11   BY MS. ROSENBERG:

12   Q.      -- or communications that would reflect your

13   membership in the Firearms Policy Foundation?

14   A.      I'm not sure.  I don't think so.

15   Q.      And are you aware of any documents or

16   communications in your possession that would reflect your

17   membership in the Firearms Policy Coalition?

18   A.      Am I aware of them?  Beyond the emails that I

19   have?  Is that -- is that the question?

20   Q.      Well, let's break that apart.  Do you have --

21   sorry.

22             Do you have in your possession any emails

23   reflecting your membership in the Firearms Policy

24   Coalition?

25   A.      I believe so.

Exhibit 57
DX0977

Jose Chavez

1   Q.      You did not produce any emails reflecting your

2   membership in the Firearms Policy Coalition, correct?

3   A.      Correct.

4   Q.      Why did you not produce those emails responsive

5   to request for production number 16?

6   A.      I'd have to talk to my attorney.

7   Q.      Did you search for those emails reflecting your

8   membership in the Firearms Policy Coalition as requested

9   in request for production number 16?

10  A.      I saw them, yes.

11  Q.      You -- I'm sorry.  Let's break that apart.

12          By "I saw them," what do you mean?

13  A.      Well, I saw the Firearms Coalition emails and

14  then they got buried below the other spam emails that I

15  receive from SeatGeek and Discover.

16  Q.      When did you see the emails from Firearms Policy

17  Coalition that later got buried with other emails?

18  A.      Shortly after signing up in October 2022,

19  approximately.

20  Q.      Mr. Chavez, have you read the briefs filed by

21  the parties in support of and opposing the motion for

22  preliminary injunction that the plaintiffs filed in

23  January of 2023?

24  A.      I believe I skimmed them.

25  Q.      And by "them," does that also encompass the

Exhibit 57
DX0978

1   defendants -- our opposition to the plaintiffs' motion

2   for preliminary injunction?

3    A.      I believe so.  There are a lot of documents to

4   keep track of.

5    Q.      There are.  It is the nature of litigation,

6   unfortunately.

7           Okay.  We're getting towards the end here, so I

8   know it's the end of your day and -- and going to be

9   nearing the end of ours as well.

10          Mr. Chavez, are you aware that people aged 18 to

11  20 make up a disproportionate share of arrests for

12  violent crime in the United States?

13          MR. DILLON:  Objection.  Legal conclusion.

14  Incomplete hypothetical.  Vague and ambiguous.

15          THE WITNESS:  I'm aware.

16  BY MS. ROSENBERG:

17   Q.      Are you aware that although 18- to 20-year-olds

18  make up less than 4 percent of the population, they make

19  up more than 15 percent of homicide and manslaughter

20  arrests?

21          MR. DILLON:  Same objections.

22          THE WITNESS:  I'm aware.

23  BY MS. ROSENBERG:

24   Q.      Are you aware that although 18- to 20-year-olds

25  make up less than 4 percent of the population, they have

Exhibit 57
DX0979

1   perpetrated 20 percent of all of the mass shootings

2   leading double-digit fatalities in recorded U.S. history?

3          MR. DILLON:  Legal conclusion.  Argumentative.

4   Speculation.  Incomplete hypothetical.  Vague and

5   ambiguous.

6          THE WITNESS:  I am aware.

7   BY MS. ROSENBERG:

8   Q.      Are you aware of the mass shooting that occurred

9   in Uvalde, Texas, at an elementary school?

10          MR. DILLON:  Vague as to time.

11          THE WITNESS:  I'm aware.

12   BY MS. ROSENBERG:

13   Q.      I'll clarify.

14          Are you aware of the May 2022 mass shooting at

15   Robb Elementary School in Uvalde, Texas?

16   A.      Yes.  I'm aware.

17   Q.      Are you aware that following that massacre, data

18   show that 40 percent of all mass public shootings at K-12

19   schools involved 18- to 20-year-old shooters?

20          MR. DILLON:  Objection.  Argumentative.

21   Speculation.  Incomplete hypothetical.  Vague and

22   ambiguous.  Compound.

23          THE WITNESS:  I am now aware.

24   BY MS. ROSENBERG:

25   Q.      So you were not previously aware of that

Exhibit 57
DX0980

1    statistic, correct?

2    A.      I was not presented with that statistic

3    previously, no.

4    Q.      Are you aware that the May 2022 shooting at Robb

5    Elementary School in Uvalde, Texas, killed 21 people?

6    A.      Yes.

7    Q.      Are you aware that the May 2022 shooting at Robb

8    Elementary School in Uvalde, Texas, involved a shooter

9    between the age of 18 and 20?

10   A.      No.

11   Q.      Are you aware that there was shooting at a

12   supermarket in Buffalo, New York, that killed 10 people?

13          MR. DILLON:  Vague and ambiguous.

14          THE WITNESS:  No.

15   BY MS. ROSENBERG:

16   Q.      Were you aware of an April 2021 shooting at a

17   FedEx facility in Indianapolis, Indiana, in which eight

18   people were killed?

19          MR. DILLON:  Vague and ambiguous.

20          THE WITNESS:  No.

21   BY MS. ROSENBERG:

22   Q.      Are you aware that neuroscientists believe that

23   many 18- to 20-year-olds demonstrate difficulties in

24   exercising self-restraint?

25          MR. DILLON:  Objection.  Legal conclusion.

Exhibit 57
DX0981

1    Argumentative.  Speculation.  Incomplete hypothetical.

2    Vague and ambiguous.  And compound.

3              THE WITNESS:  Yes.

4    BY MS. ROSENBERG:

5      Q.      Are you aware that neuroscientists believe that

6    18- to 20-year-olds demonstrate difficulty controlling

7    impulses?

8              MR. DILLON:  Same objections.

9              THE WITNESS:  Yes.

10   BY MS. ROSENBERG:

11     Q.      Are you aware that neuroscientists believe that

12   18- to 20-year-olds demonstrate difficulty considering

13   future consequences?

14             MR. DILLON:  Same objection.

15             THE WITNESS:  Yes.

16   BY MS. ROSENBERG:

17     Q.      Are you aware that neuroscientists believe that

18   18- to 20-year-olds demonstrate difficulty controlling

19   impulses?  I think I might have asked that already.

20   Scratch that.

21             Are you aware that neuroscientists believe that

22   18- to 20-year olds demonstrate difficulty making

23   decision independently from their peers?

24             MR. DILLON:  Same objections.

25             THE WITNESS:  Yes.

Exhibit 57
DX0982

1  BY MS. ROSENBERG:

2  Q.      Are you aware that neuroscientists believe that

3  18- to 20-year-olds demonstrate difficulty resisting the

4  coercive influence of others?

5          MR. DILLON:  Same objections.

6          THE WITNESS:  Yes.

7  BY MS. ROSENBERG:

8  Q.      Are you aware that neuroscientists believe that

9  18- to 20-year-olds are especially at risk for violence?

10         MR. DILLON:  Same objections.

11         THE WITNESS:  Yes.

12 BY MS. ROSENBERG:

13 Q.      Are you aware that neuroscientists believe that

14 18- to 20-year-olds are especially at risk for suicide?

15         MR. DILLON:  Same objections.

16         THE WITNESS:  Yes.

17 BY MS. ROSENBERG:

18 Q.      Are you aware that neuroscientists believe that

19 18- to 20-year-olds are especially at risk for

20 non-suicide self-injury?

21         MR. DILLON:  Same objections.  Legal conclusion.

22 Argumentative.  Speculation.  Incomplete hypothetical.

23 Vague and ambiguous.  And compound.

24         THE WITNESS:  Yes.

25 ///

Exhibit 57
DX0983

Jose Chavez

```
 1   BY MS. ROSENBERG:
 2    Q.      Are you aware that neuroscientists believe that
 3   18- to 20-year-olds are especially at risk for excessive
 4   drinking?
 5           MR. DILLON:  Same objections.
 6           THE WITNESS:  Yes.
 7   BY MS. ROSENBERG:
 8    Q.      Mr. Chavez, you went to a pretty big college; is
 9   that correct?
10    A.      46,000 people, approximately.  Yes.
11    Q.      Did you observe your fellow students drinking in
12   excess while you were at UCSD?
13    A.      Not on campus.
14    Q.      Did you observe any of your fellow students
15   engaging in excessive drinking off campus while they were
16   enrolled at UCSD?
17    A.      Yes.
18           MR. DILLON:  Objection.  Legal conclusion.
19   BY MS. ROSENBERG:
20    Q.      Where did you observe this excessive drinking of
21   your fellow students?
22    A.      At a couple of my friends' apartments.
23    Q.      Were those at parties?
24    A.      No.
25    Q.      And if you know, were the people who you
```

Exhibit 57
DX0984

1   observed excessive -- engaging in excessive drinking

2   between the ages of 18 and 20?

3              MR. DILLON:  Objection.  Legal conclusion.

4   Speculation.  Vague and ambiguous.

5              THE WITNESS:  They were above the age of 21.

6   BY MS. ROSENBERG:

7    Q.       These were fellow students of yours at UCSD?

8    A.       Yes.

9    Q.       Were they graduate students?

10   A.       No.

11   Q.       You observed undergraduate students who are over

12   the age of 21 engaging in excessive drinking?

13             MR. DILLON:  Objection.

14             THE WITNESS:  Yes.

15             MR. DILLON:  Legal conclusion.  Speculation.

16   Incomplete hypothetical.  Vague and ambiguous.

17   BY MS. ROSENBERG:

18   Q.       Did you ever observe any of your fellow students

19   engaging in excessive drinking while they were under the

20   age of 21?

21             MR. DILLON:  Objection.

22             THE WITNESS:  Yes.

23             MR. DILLON:  Legal conclusion.  Speculation.

24   BY MS. ROSENBERG:

25   Q.       Would you agree, Mr. Chavez, that there is at

Exhibit 57
DX0985

1   least some issue with the ability of some people under

2   the age of 21 to act responsibly in some instances?

3            MR. DILLON:  Objection.  Argumentative.

4   Speculation.  Vague and ambiguous.  And compound.

5            THE WITNESS:  Yes.

6   BY MS. ROSENBERG:

7    Q.      And specifically in the context of excessive

8   drinking -- I should have narrowed the question.  I'll

9   try it again.

10           Do you believe that the instances of excessive

11  drinking that you observed that involved students under

12  the age of 21 reflected irresponsible behavior?

13           MR. DILLON:  Objection.  Speculation.

14  Argumentative.

15           THE WITNESS:  I'm sorry.  Could you repeat the

16  question one more time?  I'm sorry.

17  BY MS. ROSENBERG:

18   Q.      In your view, did the instances of excessive

19  drinking that you observed which involved people under

20  the age of 21 reflect irresponsible behavior?

21           MR. DILLON:  Same objection.

22           THE WITNESS:  Yes.

23  BY MS. ROSENBERG:

24   Q.      I wanted to ask a quick follow-up question from

25  something that we talked about much earlier in the day

Exhibit 57
DX0986

Jose Chavez

1   today.  You mentioned that you had more than a dozen

2   brain surgeries; is that correct?

3    A.     Yes.

4    Q.     Did all of those brain surgeries occur while you

5   were under the age of 5?

6    A.     No.

7    Q.     When was the last of your brain surgeries?

8    A.     March 2012.

9    Q.     Do you -- we can do the math later, but could

10   you estimate for me approximately how old you were in

11   March of 2012?

12   A.     I was 9 years old.

13   Q.     Do you have any ongoing treatment or medical

14   care associated with those brain surgeries?

15         MR. DILLON:  Objection.  Privileged.  That's

16   between him and his doctor.

17         You don't have to answer that.

18         MS. ROSENBERG:  I'm not asking for the content

19   of the discussions.  I am asking whether Mr. Chavez has

20   any ongoing medical care related to his previous

21   surgeries that he disclosed to us.

22         MR. DILLON:  Objection.  Vague.

23         THE WITNESS:  What constitutes further medical

24   care?  Is that -- is that solely medication?  Would it

25   be, like, devices used to alleviate certain conditions?

Exhibit 57
DX0987

Jose Chavez

1   Would be both?

2   BY MS. ROSENBERG:

3       Q.      It could be any of those things.

4              So do you currently have any ongoing medical

5   care related to your brain surgeries?

6    A.      I currently have -- I'm trying to read this -- a

7   VP shunt, so that is a device that treats my condition

8   called hydrocephalus and slit ventricle syndrome.

9       Q.      Do you take any medication to manage that

10  condition?

11             MR. DILLON:  You can answer if you've taken

12  medication.  You don't have to tell them what medication

13  you have.

14  BY MS. ROSENBERG:

15      Q.      That's right.

16   A.      I don't take medication for my VP shunt.

17      Q.      Okay.  And for the hydrocephalus?

18   A.      The device is one and the same.  No medication's

19  been taken for the VP shunt, the hydrocephalus, nor the

20  slit ventricle syndrome.

21      Q.      Understood.  Thank you.

22             MS. ROSENBERG:  Might we go off the record

23  briefly so I can -- with my co-counsel?

24             MR. DILLON:  Yep.

25                 (Off the record.)

Exhibit 57
DX0988

```
 1   BY MS. ROSENBERG:
 2    Q.      I have just a couple of documents that I would
 3   like for you to take a look at and that we'll put into
 4   the record, and then we'll be wrapping up.  So just to
 5   give you a heads-up that we're really nearing the end
 6   here.
 7           I would like for you to pull up what has been
 8   marked as Exhibit No. 20, please.
 9                  (Defendants' Exhibit 20 was marked for
10                  identification.)
11           THE WITNESS:  Okay.
12   BY MS. ROSENBERG:
13    Q.      One moment.
14           You have number 20 available?
15    A.      I do.
16    Q.      Great.
17           Could you tell me what the title of Exhibit
18   No. 20 is, please?
19    A.      This is an open registration for the traditional
20   hunter education session at the Ramona Town Hall on the
21   weekend of August 26th and the 27th of 2023.
22    Q.      Thank you very much.
23           And at the very top underneath traditional
24   hunter education, do you see where it says registration
25   open?
```

Exhibit 57
DX0989

1    A.      Yes.

2    Q.      Could you tell us how many seats are remaining

3    in this traditional hunter education course?

4    A.      It says 25 out of the 25.

5    Q.      Thank you.

6            And then if we go down to the about the event,

7    you'll go to the second paragraph under about the event.

8    Do you see that it says the class is free to all?

9    A.      I see that.

10   Q.      If you would take a quick -- quick scan or as

11   much time as you need to look at Exhibit No. 20, and then

12   tell me if you see any other fees listed in Exhibit

13   No. 20.

14   A.      There are no fees for this event, it appears.

15   Q.      Thank you.

16           And am I correct in understanding that Ramona

17   California is only less than 20 miles from UCSD campus?

18   A.      Correct.

19   Q.      We can set that one aside.

20           And if you could open for me, please, what has

21   been marked as Exhibit No. 21.

22               (Defendants' Exhibit 21 was marked for

23               identification.)

24           THE WITNESS:  It is open.

25   ///

Exhibit 57
DX0990

```
 1  BY MS. ROSENBERG:
 2   Q.      Great.
 3           Could you tell me what Exhibit 21 is?
 4   A.      It is an open registration for traditional
 5  hunter education at the Ramona Town Hall of -- on the
 6  weekend of September 30, 2023, through October 1, 2023.
 7   Q.      Thank you.
 8           And under registration open, how many seats are
 9  remaining?
10   A.      25 out of 25.
11   Q.      Thank you.
12           And then listed under about the event, do you
13  see that the session is also free to all?
14   A.      It says that there, yes.
15   Q.      And then if you would review both pages of
16  Exhibit 21, please, and tell me if you see any other fees
17  listed on Exhibit 21.
18   A.      There are no other fees associated with this
19  event to my knowledge.
20   Q.      That are listed on the exhibit, yes.  Thank you.
21           And then I am also going to --
22               (Reporter clarification.)
23  BY MS. ROSENBERG:
24   Q.      I'm sorry.  I was just saying that I am also
25  going to have you take a look at what was previously
```

Exhibit 57
DX0991

1   listed as Exhibit 28 in items that I sent to you, but I

2   am going to be renumbering it as Exhibit No. 16 so that

3   we have continuity of our exhibits and no missing

4   numbers, and I will put that in the chat now.

5                   (Defendants' Exhibit 16 was marked for

6                   identification.)

7   BY MS. ROSENBERG:

8   Q.      Do you have what was previously marked as

9   Exhibit 28 and is now marked as Exhibit 16 open?

10  A.      I do.

11  Q.      Great.

12          Is this another open registration for a

13  traditional hunter education course?

14  A.      It is.

15  Q.      Where is the -- where is this course located?

16          (Simultaneous colloquy.)

17  BY MS. ROSENBERG:

18  Q.      Sorry.  Let me rephrase.

19          Where does -- what is the location listing on

20  Exhibit No. 16 for this traditional hunter education

21  course?

22  A.      It's listed at Escondido Fish and Game in

23  Escondido, California.

24  Q.      Thank you.

25          And what date does Exhibit 16 say that this

Exhibit 57
DX0992

1    course will take place upon?

2    A.        August 12, 2023.

3    Q.        Thank you.

4             And under registration open, how many seats does

5    it say are remaining?

6    A.        Says that there are 30 seats remaining.

7    Q.        Great.

8             If you'll scroll down to about the event, do you

9    see that there is a listing that there is a course fee of

10   $20 per person?

11   A.        I do.

12   Q.        And could you tell me is Escondido, California,

13   within 20 miles of the UCSD campus?

14   A.        I would say about.

15   Q.        Thank you.

16            And could you take a look at all three pages of

17   Exhibit 16 and let me know if any other fees are listed

18   there?

19   A.        I don't see any other fees beyond the $20.

20   Q.        Thank you.

21            So with that, I think those are all the

22   questions that we have today absent any -- any response

23   to whatever cross Mr. Dillon would like to do now.

24            MR. DILLON:  Yeah.  Can I have about 3 to

25   5 minutes just to go over my notes?

Exhibit 57
DX0993

Jose Chavez

```
 1             MS. ROSENBERG:  Yeah.  Of course.

 2                  (Off the record.)

 3             MS. ROSENBERG:  Thank you very much.

 4        So I have reached the end of my questioning for

 5   now, Mr. Chavez, and your counsel may ask you some --

 6   some questions as well.  I would ask that when you answer

 7   your counsel's questions, you leave a moment for me to

 8   object if I need to so that we're not talking over each

 9   other.

10        I know the impulse could be to just answer right

11   away, so I'll just ask you to leave some space for me to

12   object if I need to.

13             THE WITNESS:  Absolutely.  As this is a remote

14   deposition, I don't -- I want to minimize the overlap, so

15   I will give you that time.

16             MS. ROSENBERG:  Thank you very much.

17             With that, take it away, John.

18                  EXAMINATION BY MR. DILLON

19   Q.    All right.  Mr. Chavez, to your understanding,

20   has anyone gifted you a firearm?

21   A.    To my understanding, nobody has gifted me a

22   firearm.

23   Q.    To your understanding, has anyone ever loaned

24   you a firearm?

25             MS. ROSENBERG:  Objection.  Asked and answered.
```

Exhibit 57
DX0994

```
 1   BY MR. DILLON:
 2     Q.      Go ahead.
 3     A.      To my understanding, nobody has loaned me a
 4   firearm.
 5     Q.      Under your understanding, if you're loaned a
 6   firearm, are you the new owner of the firearm?
 7     A.      According to my understanding, a loan does not
 8   constitute transfer of ownership, so no.  I don't believe
 9   that being loaned a firearm constitutes being the owner.
10     Q.      So then in a situation where a person or an
11   individual A loaned a firearm to individual B, who would
12   be the owner of the firearm, to your understanding?
13     A.      To my understanding, the person that loaned the
14   firearm continues to be the owner.  That would be person
15   A in this example, I believe.
16     Q.      According to your understanding, are firearm
17   loans temporary?
18     A.      To my understanding, a loan -- its nature is
19   temporary, so yes.
20     Q.      As a part of this lawsuit, are you seeking to
21   temporarily possess a firearm?
22     A.      No.  I am seeking to own a firearm and be -- I
23   suppose hold to capacity, not temporarily.
24     Q.      And you're seeking to purchase firearms, in
25   other words; is that correct?
```

Exhibit 57
DX0995

1    A.      Yes.  I am seeking to purchase a firearm and own

2    that firearm that I purchase.

3    **Q.      Okay.  Are you a member of the military?**

4    A.      No.

5    **Q.      Are you a member of law enforcement of any kind?**

6    A.      No.

7    **Q.      Is it your understanding that you'd have to**

8    **enter either law enforcement or the military in order to**

9    **meet some of the exemptions in Penal Code 27510?**

10          MS. ROSENBERG:  Objection.  Calls for a legal

11   conclusion.

12          THE WITNESS:  I understand that some of the

13   conditions listed earlier could be met if I joined the

14   military or law enforcement.  I understand that.

15   BY MR. DILLON:

16   **Q.      Okay.  Excuse me.**

17   **          You reviewed Defendants' Exhibit 19, which is a**

18   **study guide for hunting education; is that correct?**

19   A.      Correct.

20   **Q.      Can you pull that up for me?**

21   A.      Exhibit -- the California hunter education

22   course?

23   **Q.      It's Defendants' Exhibit 19.  I believe it's**

24   **titled "Study guide for hunting education."**

25   A.      I have it pulled up.

Jose Chavez

1   Q.      Okay.   Based on your understanding, does this

2   study guide list the topics which are tested on the

3   hunters education course?

4           MS. ROSENBERG:   Objection.   Incomplete

5   hypothetical.   Vague and ambiguous.

6   BY MR. DILLON:

7   Q.      What is your understanding of what this study

8   guide is for?

9   A.      I understand -- or at least I've come to

10  understand this study guide is to prepare Americans, but

11  specifically Californians, on how to become hunters.

12  Q.      Can I direct you over to Defendants' Exhibit 20,

13  please.

14  A.      One moment.

15          I have it open.

16  Q.      In the about the event section, we're going to

17  go to the last paragraph above the caption about the

18  location.   Can you read the last sentence?

19  A.      Let's see.

20              So additional parking is available behind

21          the -- that one?

22  Q.      No.   Sorry.

23          So in about the event under that section, you

24  have --

25              (Simultaneous colloquy.)

Exhibit 57
DX0997

1    BY MR. DILLON:

2    Q.      There's seven paragraphs underneath the heading

3    about the event; is that correct?

4    A.      Yes.

5    Q.      Okay.  In the last paragraph under that section,

6    the last sentence of that paragraph, what does that say?

7    A.       A student who does not pass the examination

8            cannot be tested again on the same day.

9    Q.      And what do you understand that sentence to be

10   discussing?

11   A.      I understand the sentence to be discussing the

12   examination that comes at the end of this hunter

13   education course which would prevent me from obtaining

14   the certification.

15   Q.      So theoretically you could go to one of these

16   hunters education courses, take the entire course, and

17   fail the test; is that correct?

18   A.      Theoretically, I could.

19   Q.      And under your understanding, if you failed the

20   test, could you purchase a hunting license?

21   A.      To my understanding, it looks like -- well, it

22   looks like this course is taught by instructors from the

23   Department of Fish and Wildlife, and if I don't pass this

24   course, it doesn't look like I qualify -- or would

25   qualify for a hunters license -- or hunting license.

Exhibit 57
DX0998

1          So the answer is it looks like I wouldn't

2    qualify for a hunting license.

3    Q.      And going back to Defendants' Exhibit 19, the

4    study guide for hunting education, can you pull that up,

5    please?

6    A.      Yes.  One moment.

7          It's pulled up.

8    Q.      So based off your view of Defendants' Exhibit 20

9    and your previous review of Defendants' Exhibit 19, the

10   study guide, is it your understanding that subjects on

11   this study guide are covered in the hunters education

12   course and test?

13   A.      That would be my understanding, yes.

14   Q.      Okay.  If you scroll down to page 5 on

15   Defendants' Exhibit 19.  Can you tell me what is written

16   down for -- under the headline unit 4?

17   A.      It says here:

18          Unit 4:  Basic hunting skills.

19   Q.      Okay.  And then on page 6 under topic 2, what is

20   that subject?

21   A.      It says:

22          Topic 2:  Hunting strategies.

23   Q.      Okay.  Can you tell me what topic 3 discusses?

24   A.      Topic 3:  Vital shots.

25   Q.      And topic 4?

Exhibit 57
DX0999

1    A.        Field care of game.

2    Q.        And on page 5, what's under the heading for unit

3    5 -- or page 7 under the heading unit 5?

4    A.        Primitive hunting equipment and techniques.

5    Q.        And scroll down to topic 3.

6              Can you tell me what that says?

7    A.        Know your bow and arrow.

8    Q.        And can you also tell me what topic 4 on page 8

9    says?

10   A.        Bow hunting safety and skills.

11   Q.        And how about topic 5?

12   A.        History of primitive hunting equipment.

13   Q.        And can you tell me what's listed for unit 6?

14   A.        A summary.  Oh, sorry.  Sorry.  My bad.  That's

15   topic 6.  For unit 6 it would be:

16              Be a safe hunter.

17   Q.        And can you tell me what is listed for unit 7?

18   A.        For unit 7 that is:

19              Be a responsible and ethical hunter.

20   Q.        And under unit 8?

21   A.        Preparation and survival skills.

22   Q.        And unit 9?

23   A.        Understanding wildlife.

24   Q.        Is it your understanding that the hunters

25   education course focuses on the subjects we just covered?

Exhibit 57
DX1000

```
 1    A.      Yes.

 2            MS. ROSENBERG:  Objection.  Vague and ambiguous.

 3    BY MR. DILLON:

 4    Q.      In your opinion, do any of these topics that we

 5    discuss such as understanding wildlife or preparation and

 6    survival skills, do they implicate your Second Amendment

 7    right?

 8            MS. ROSENBERG:  Objection.  Calls for a legal

 9    conclusion.

10            THE WITNESS:  Do I still answer that?

11    BY MR. DILLON:

12    Q.      Yes.  You go ahead.

13    A.      Okay.  Let me double-check here.  I would say

14    that -- unit 6 was being a safe hunter and understanding

15    wildlife would implicate my Second Amendment right.

16    Q.      In your opinion, does your right to self-defense

17    have anything to do with hunting techniques?

18    A.      I would say no.

19    Q.      In your opinion, does your right to self-defense

20    using a firearm have anything to do with the history of

21    primitive hunting?

22            MS. ROSENBERG:  Objection.  Calls for a legal

23    conclusion.

24            THE WITNESS:  I would say no.

25    ///
```

Exhibit 57
DX1001

```
 1   BY MR. DILLON:
 2    Q.      One moment here.
 3            And as far as you're aware, are you a member of
 4   the organizational plaintiffs involved in this case?
 5    A.      As far as I'm aware, yes.
 6    Q.      Earlier in this discussion, you discussed a
 7   number of situations or circumstances of what a
 8   responsible firearm owner should know; is that correct?
 9    A.      Yes.
10    Q.      Can you explain -- scratch that.
11            Do you believe -- in your opinion, should the
12   government be able to require these things?
13            MS. ROSENBERG:  Objection.  Calls for a legal
14   conclusion.
15            THE WITNESS:  No.
16   BY MR. DILLON:
17    Q.      Okay.  So in your opinion, you just think
18   they're good practices?
19    A.      In my opinion, they are good practices, but they
20   shouldn't be in charge -- or delegated to the government
21   to enforce.
22    Q.      I think that's all the questions I have.  Thank
23   you.
24            MS. ROSENBERG:  I have a couple of follow-up
25   questions for you.
```

Exhibit 57
DX1002

Jose Chavez

```
 1              FURTHER EXAMINATION BY MS. ROSENBERG
 2    Q.       Mr. Chavez, earlier you testified that you could
 3    not recall whether you were a member of the Second
 4    Amendment Foundation, but you have just testified that as
 5    far as you are aware, you are a member of all four of the
 6    institutional plaintiffs in this case, which includes the
 7    Second Amendment Foundation, the Firearms Policy
 8    Coalition, the Firearms Policy Foundation, and the
 9    California Gun Rights Foundation.
10              Did you review something that caused you to
11    change your testimony?
12    A.       Oh, I was asked -- I interpreted the question,
13    are you aware that you are a member of the plaintiffs of
14    this organization to mean the other plaintiffs that have
15    signed on, not specifically the organizations.  I think I
16    misinterpreted the question.
17              MS. ROSENBERG:  Madam Court Reporter, are we
18    able to go back -- far, far, back to where I asked
19    Mr. Chavez whether he was a member of the Second
20    Amendment Foundation?
21                 (Discussion held off the record.)
22              THE WITNESS:  I do remember her asking me that.
23    BY MS. ROSENBERG:
24    Q.       And you responded that you were not sure whether
25    you were a member of the Second Amendment Foundation.
```

Exhibit 57
DX1003

1          Did something occur between when you testified

2   that you were not sure and now when you have testified

3   that as far as you are aware, you are a member of all

4   four of the institutional organizations involved in

5   this --

6              (Reporter clarification.)

7   BY MS. ROSENBERG:

8   Q.      -- involved in this lawsuit including the Second

9   Amendment Foundation?

10   A.      I'm sure I must have briefly forgotten or had a

11   lapse in memory as today has been a long day and people

12   make mistakes including myself.

13   Q.      Of course.  Certainly.

14          Was there -- was there something that refreshed

15   your memory on the topic of whether you were a member of

16   the Second Amendment Foundation?

17   A.      I can't think of the specific thing.

18   Q.      Okay.  Earlier when I was asking you whether you

19   understood yourself to have been loaned a firearm by your

20   friend Maxilian, you testified that you believed that

21   loans meant that the person who is loaned the firearm

22   became the temporary owner of the firearm.

23          However, you have just testified with your

24   counsel that you believe that loans do not transfer

25   ownership of a firearm.  Is there something that caused

Exhibit 57
DX1004

1    you to change your testimony?

2    A.       I don't believe that my testimony was changed.

3    Temporary ownership is not full ownership.  And --

4              (Simultaneous colloquy.)

5              THE WITNESS:  I believe another qualifier -- I'm

6    sorry to interrupt.

7              I believe another qualifier I added in my

8    earlier testimony was that not only does a loan -- within

9    that context, not only does a loan constitute the giving

10   of a piece of property to another person from person A to

11   person B, but person A must absolve themselves of their

12   presence with that piece of property.  I believe I noted

13   that earlier.

14             When I went out to Ocotillo Wells with my friend

15   Maxilian Nguyen, the conditions were not sufficient to

16   constitute a loan as I was utilizing his property under

17   his direct supervision.  That doesn't constitute a loan

18   and I stand by my earlier statement.

19   BY MS. ROSENBERG:

20   Q.       I would like to direct your attention back to

21   what has been marked as Exhibit 17, Penal Code

22   Section 27885.  Let me know when you have it up.

23   A.       I have it up.

24   Q.       27885 describes the circumstances of loaning a

25   firearm given certain conditions, correct?

Exhibit 57
DX1005

Jose Chavez

```
1    A.      Let's see.  I opened 17.  You asked for 17 or

2    16?

3    Q.      One marked as -- it should be Penal Code

4    Section 27885.  I believe it's marked as number 17.

5    A.      Okay.  I have that open here.

6            Yes.  It says this is a list of -- it says that

7    this is a list of conditions that do not apply to a loan

8    of a firearm, yes.

9    Q.      That's actually not what this says.  I am going

10   to add another exhibit to our record here, and I'm going

11   to mark it as Exhibit No. 24.

12           Madam Court Reporter, is that right, that we're

13   in -- on 24?

14                   (Discussion held off the record.)

15                   (Defendants' Exhibit 24 was marked for

16                   identification.)

17   BY MS. ROSENBERG:

18   Q.      This was in your file that I emailed you,

19   Mr. Chavez.  This was previously marked as Exhibit

20   No. 16.  It is now marked as Exhibit 24.

21   A.      There we go.  So Penal Code 27545?

22   Q.      Right.

23           Penal Code Section 27545.  So I'm going to read

24   this quickly, and then we will go back to talk about

25   Penal Code Section 27885.
```

Exhibit 57
DX1006

1          Penal Code Section 27545, which is now marked as

2    Exhibit No. 24, states:

3               Where neither party to the transaction

4          holds a dealer's license issued pursuant to

5          Sections 26700 to 26915, inclusive, the parties

6          to the transaction shall complete the sale,

7          loan, or transfer of that firearm through a

8          licensed firearms dealer pursuant to Chapter 5,

9          commencing with Section 28050.

10         So Section 27545 is essentially stating that

11   where nobody -- where neither of the parties to a

12   transaction holds a dealer's license, that transaction

13   needs to go through a licensed firearms dealer.  Do you

14   understand?

15   A.     Yes.

16   Q.     So let's go back to Exhibit No. 17, Penal Code

17   Section 27885.  At the outset, Section 27885 references

18   Section 27545, which we just read, and Section 27885

19   says:

20              Section 27545 does not apply to the loan of

21         a firearm if all of the following conditions

22         exist.

23         So the requirement of conducting a transaction

24   through a firearms dealer does not apply to the loan of a

25   firearm if all the conditions listed exist.

Exhibit 57
DX1007

1          Do you understand?

2          MR. DILLON:  Objection.  Legal conclusion.

3   BY MS. ROSENBERG:

4    Q.     Do you understand that Section 27885 is listing

5   conditions for a particular type of loan?

6          MR. DILLON:  Objection.  Vague as to loan.

7          THE WITNESS:  I don't understand.  This is

8   probably due to my legislative inadequacy here.  I see --

9              (Simultaneous colloquy.)

10  BY MS. ROSENBERG:

11   Q.     We go back to 27545, which is, again, Exhibit

12  No. 24.  We just talked about how Section 27545 sets

13  forth the fact that where neither party to a firearms

14  transaction holds a dealer's license, the parties must

15  conduct their transaction, whether that's a sale, loan,

16  or transfer of a firearm, through a licensed firearms

17  dealers.

18          So 27545 says basically transactions need to go

19  through a firearm dealer unless somebody holds a dealer's

20  license in the transaction.  Do you understand?

21          MR. DILLON:  Objection.  Legal conclusion.

22          THE WITNESS:  I under -- I comprehend the text

23  of this penal code, yes.

24  BY MS. ROSENBERG:

25   Q.     Okay.  So going back to 27885, which is Exhibit

1   No. 17.  At the outset it says:

2            Section 27545 does not apply to the loan of

3            a firearm if all of the following conditions

4            exist.

5            So it is stating that the requirement of

6   conducting a transaction through a firearms dealer does

7   not apply to a loan if the conditions exist.

8            MR. DILLON:  Objection.  Legal conclusion.

9   BY MS. ROSENBERG:

10   Q.     It is describing -- I haven't posed a question

11   yet.

12            It is describing the conditions that are

13   necessary for a loan of a firearm.  Do you understand?

14            MR. DILLON:  Objection.  Legal conclusion.

15            THE WITNESS:  Let's see.  It's hard for me to

16   understand because it looks like Section 27545 talks

17   about the sale, loan, or transfer of a firearm and the

18   terms are used interchangeably within this conversation

19   as well as 27885, but I am going to lay that down to my

20   legislative inadequacy as listed before and say that I

21   understand what you're saying here.

22   BY MS. ROSENBERG:

23   Q.     So let's set aside 27545 for the moment.

24            Do you understand that subsections A, B, C, D,

25   E, and F of Penal Code Section 27885 are conditions?

Exhibit 57
DX1009

```
 1   A.      Yes.
 2           MR. DILLON:  Objection.  Vague and ambiguous.
 3   And legal conclusion.
 4   BY MS. ROSENBERG:
 5   Q.      Do you see that Section 27885 says:
 6              If all of the following conditions exist.
 7           Do you see that?
 8   A.      Uh-huh.  Yes, I do.
 9   Q.      Do you know see it says Section 27545 does not
10   apply to the loan of a firearm if all of the following
11   conditions exist?
12   A.      Yes.
13   Q.      Okay.  So do you now understand Section 27885
14   sets forth the conditions for a loan of a firearm?
15           MR. DILLON:  Objection.  Legal conclusion.
16           THE WITNESS:  I would if there was a formal
17   definition of a loan.
18           Is there a penal code where they expressly
19   define what a loan is in the context of the exchange of a
20   firearm?
21   BY MS. ROSENBERG:
22   Q.      Off of the top of my head, I'm not sure.  There
23   most likely is, yes.  Let's look at condition --
24           MR. DILLON:  It's not in evidence.  Let's not
25   testify --
```

Exhibit 57
DX1010

Jose Chavez

```
 1                 (Simultaneous colloquy.)
 2   BY MS. ROSENBERG:
 3    Q.      Let's look at Subdivision A of Section 27885.
 4   Subdivision A of Section 27885 reads:
 5                 The person loaning the firearm is at all
 6            times within the presence of the person being
 7            loaned the firearm.
 8            Do you see that?
 9    A.      Uh-huh.
10    Q.      You --
11    A.      Yes, I do.
12    Q.      You testified that you believed that a loan
13   required that the person loaning the firearm essentially
14   go away; is that right?
15    A.      Yes.
16    Q.      Okay.  Do you see here in Section 27885 that
17   Subdivision A is describing a loan in which the person
18   loaning the firearm is at all times within the presence
19   of the person being loaned the firearm?
20            MR. DILLON:  Objection.  Legal conclusion.
21   Vague and ambiguous.
22            THE WITNESS:  I see the text and I comprehend
23   the text.  However -- and we'll get to this later, I'm
24   sure, because we don't have a working definition of what
25   constitutes a loan, this term is thrown around very
```

Exhibit 57
DX1011

Jose Chavez

1   loosely.  And I understand what it's saying, but there

2   are multiple conflicting meanings which are confusing me.

3   BY MS. ROSENBERG:

4     Q.      Understood.

5             I am simply asking if you now understand that a

6   loan of a firearm can occur where the person loaning the

7   firearm remains within the presence of the person being

8   loaned the firearm?

9             MR. DILLON:  Objection.  Legal conclusion.

10  Incomplete hypothetical.

11            THE WITNESS:  Assuming I don't know what a loan

12  is, and in this context, I do not know.  The words

13  loan -- section A does apply to Penal Code Section 27545

14  with the loan word used there.  I don't see a working

15  definition.  I don't know what it means, but I do know

16  that Section A does apply.

17  BY MS. ROSENBERG:

18    Q.      Can you read Subdivision A, please?  Just

19  Subdivision A?

20                  (Simultaneous colloquy.)

21                  (Reporter clarification.)

22            MR. DILLON:  Objection.  Asked and answered.

23  We've been over this.

24  BY MS. ROSENBERG:

25    Q.      Please go ahead.  Please read Subdivision A.

Exhibit 57
DX1012

Jose Chavez

1  A.    The person loaning the firearm is at all

2        times within the presence of the person being

3        loaned the firearm.

4  Q.    Reading Subdivision A, do you understand that a

5  firearm can be loaned where the person loaning the

6  firearm remains at all times within the presence of the

7  person being loaned the firearm?

8        MR. DILLON:  Legal conclusion.  Speculation.

9        THE WITNESS:  No, I don't.  I don't have a

10  working definition of what constitutes a loan.

11  BY MS. ROSENBERG:

12  Q.    That's not the answer to my question.  That does

13  not answer the question that I have asked, but we will

14  leave it for here.

15        Let's take a look at what was marked as

16  Exhibit 23.

17  A.    Was that the FAQs?

18  Q.    It was, yes.

19  A.    I have it pulled up.

20  Q.    Great.

21        So let's look at page 3.  We previously read

22  question number 6:  How will I be able to obtain a

23  firearm safety certificate.  And we -- the answer to

24  number 6 explains that to obtain a firearm safety

25  certificate, you must score at least 75 percent on the

Exhibit 57
DX1013

1    FSC test.  Is that right?

2    A.      That is correct.

3    Q.      Could you go down to number 7 and read both the

4    question and the answer that are listed there?

5    A.       How much will the fire -- firearm safety

6            certificate cost?

7                 The fee for taking the FSC test and

8            obtaining an FSC is $25.  The $25 fee entitles

9            you to take the test twice from the same DOJ

10           certified instructor if necessary.

11   Q.      Thank you.

12                And then could we go down to question number 9.

13   Please read both the question and the answer.

14   A.       If I don't pass the test, can I take it

15           again?

16                Yes.  The $25 fee entitles you to take the

17           test twice if necessary.  If you fail the test

18           the first time, after 24 hours have elapsed, you

19           may retake another version of the test from the

20           same DOJ certified instructor without any

21           additional fee.

22                The DOJ certified instructor is required to

23           offer or make available to you the FSC study

24           guide or refer you to view the webinar.

25   Q.      Having read the question and answer for question

Exhibit 57
DX1014

1    number 9, do you understand that you may only take the

2    FSC test twice on the single $25 fee -- let me --

3    A.      Yes.

4    Q.      -- rephrase that.  Oh, okay.

5            So you understand that, should you not pass the

6    test on your two times, that you would have to pay the

7    $25 fee again?

8    A.      Yes.

9    Q.      Let's go to Exhibit No. 19.  This was the -- the

10   study guide for the hunter education course.  And let's

11   go down to unit number 6.

12           Would you please read what topic number 1 under

13   unit 6 is?

14   A.      One moment.

15               Unit 6:  Be a safe hunter.  Topic 1:  Why

16           firearm safety is important.

17   Q.      Thank you.

18           And could you also please read topic number 2

19   under unit 6?

20   A.      Safely carrying firearms in the field.

21   Q.      And could you please read topic number 3 under

22   unit number 6?

23   A.      Safely loading and unloading firearms.

24   Q.      Could you please read topic number 4 under

25   unit 6?

Exhibit 57
DX1015

Jose Chavez

1    A.      Transporting firearms.

2    **Q.      Could you please read topic number 5 under**

3    **unit 6?**

4    A.      Safe zone of fire.

5    **Q.      Could you please read topic number 6 under**

6    **unit 6?**

7    A.      Other safety considerations.

8    **Q.      Could you please read the topics that are listed**

9    **under topic 6?**

10   A.       Self-control and target identification.

11           Shooting accuracy.  Alcohol and drugs.  Beware

12           of hang fires.

13   **Q.      Thank you.**

14           **I think that's all I have for now.**

15           MS. ROSENBERG:  Stephanie, before we leave, do

16   you have anything?

17           MS. ALBRECHT:  Nothing for me.  Thank you.

18           THE REPORTER:  Any follow-up, Mr. Dillon?

19           MR. DILLON:  No follow-up.

20           THE REPORTER:  Okay.  Before we're off the

21   record, Mr. Dillon, do you need a copy of transcript?

22           MR. DILLON:  Please.

23           THE REPORTER:  Excellent.  Off the record.

24           (The deposition adjourned at 3:43 p.m.)

25                          --oOo--

Exhibit 57
DX1016

Jose Chavez

```
1              CERTIFICATE OF REPORTER
2          I, ANNABELL ANDERSON, a duly licensed
3    Certified Shorthand Reporter of the State of California,
4    hereby certify that the witness in the foregoing
5    deposition was by me duly sworn;
6              That said testimony was taken down in
7    stenographic shorthand by me, a disinterested person, at
8    the time and place therein stated and was thereafter
9    reduced to typewriting, and that the testimony as
10   transcribed is a true record of the testimony given by
11   the witness;
12             That before completion of the deposition,
13   review of the transcript [ ] was [ x ] was not requested.
14   If requested, any changes made by the deponent (and
15   provided to the reporter) during the period allowed are
16   appended hereto.
17             I further certify that I am not of counsel
18   or attorney for either or any of the parties to the said
19   deposition, nor in any way interested in the outcome of
20   this cause.
21             DATED this 16th day of August, 2023.
22
23
24             ANNABELL ANDERSON, CSR 14143
25
```

www.aptusCR.com

Exhibit 57
DX1017

Jose Chavez

1        DECLARATION UNDER PENALTY OF PERJURY

2   Case Name: Chavez vs. Bonta

3   Date of Deposition: 08/04/2023

4   Job No.: 10125018

5

6            I, JOSE CHAVEZ, hereby certify

7   under penalty of perjury under the laws of the State of

8   California_____ that the foregoing is true and correct.

9            Executed this __17__ day of

10  September_____, 2023, at _4:45p.m._____.

11

12

13        _____

14               JOSE CHAVEZ

15

16  NOTARIZATION (If Required)

17  State of _____

18  County of _____

19  Subscribed and sworn to (or affirmed) before me on

20  this _____ day of _____, 20__,

21  by_____,    proved to me on the

22  basis of satisfactory evidence to be the person

23  who appeared before me.

24  Signature: _____ (Seal)

25

Exhibit 57
DX1018

**Jose Chavez**

Chavez vs.
Bonta

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name: Chavez vs. Bonta
     Name of Witness: Jose Chavez
 3   Date of Deposition: 08/04/2023
     Job No.: 10125018
 4   Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
 5                  3. To correct transcription errors.

 6   Page _____ Line _____ Reason _____

 7   From See attached letter for  to _____
          corrections.
 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____
```

**www.aptusCR.com**

Exhibit 57
DX1019

**Jose Chavez**

**Chavez vs.
Bonta**

```
1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   ___X___   Subject to the above changes, I certify that the
               transcript is true and correct
23   _____  No changes have been made. I certify that the
               transcript  is true and correct.

24   _____

25                  JOSE CHAVEZ
```

**Page 191**

Exhibit 57
DX1020

---

### Exhibits

**EX 001 - CHAVEZ, J**
3:10 12:25 13:1
14:15,21,22,25 15:1,
4,9,22

**EX 002 - CHAVEZ, J**
3:12 16:5,8,12,15,
16,20,21

**EX 003 - CHAVEZ, J**
3:20 44:5,6,11,16,
19,21,23,24 45:6,13
50:11,13

**EX 004 - CHAVEZ, J**
3:22 46:15,16,18,20,
21,22 125:13

**EX 005 - CHAVEZ, J**
3:23 49:15,16,18,21,
22

**EX 006 - CHAVEZ, J**
4:4 52:19 53:1,4,5,8,
14,16,21,23,24 54:2,
5,9,16 55:13,17
56:5,12,19,22 57:8,
12 62:7 63:22 64:3,4

**EX 007 - CHAVEZ, J**
4:6 58:24 59:1,5,7,
12,18 60:11,14

**EX 008 - CHAVEZ, J**
3:18 38:24 39:1,3,7,
11,12,13 40:9 60:25

**EX 009 - CHAVEZ, J**
4:8 61:15,16,19,22,
25 62:8,16,18,22
64:5 145:22 146:14

**EX 010 - CHAVEZ, J**
4:11 64:16,17,18
65:7,9

**EX 011 - CHAVEZ, J**
3:15 37:24 38:1,3,5,

7,21 39:17,18,22,24
40:2,7,17,25 41:10
65:23,25 75:21,25
76:1 82:20 83:2,24
106:24,25 107:4,9
109:11 116:19,21,22
117:2 129:16,18

**EX 012 - CHAVEZ, J**
4:13 67:13,14,20
68:3,4 70:7,11 90:12
116:3

**EX 013 - CHAVEZ, J**
4:17 68:24,25 69:1,
4,6,8,10 70:6

**EX 014 - CHAVEZ, J**
4:20 77:18,19,21,25

**EX 015 - CHAVEZ, J**
3:14 30:7,9,12,17,18
31:16

**EX 016 - CHAVEZ, J**
5:13 163:2,5,9,20,25
164:17 177:19,20

**EX 017 - CHAVEZ, J**
4:22 78:13,14,17
176:21 178:16
179:25 180:1

**EX 018 - CHAVEZ, J**
4:23 81:8,9,15

**EX 019 - CHAVEZ, J**
5:8 123:23,24 124:2,
8 167:17,23 170:3,9,
15 186:9

**EX 020 - CHAVEZ, J**
5:10 160:8,9,17,18
161:11,12,13 168:12
170:8

**EX 021 - CHAVEZ, J**
5:11 161:21,22
162:3,16,17

**EX 022 - CHAVEZ, J**
5:4 98:7,8,11,13,15,

16

**EX 023 - CHAVEZ, J**
5:6 98:24 99:1,6
100:6,7,9,10,15
101:4 184:16

**EX 024 - CHAVEZ, J**
5:14 177:11,15,20
178:2 179:11,12

---

### $

**$20** 164:10,19

**$25** 185:8,16 186:2,7

---

### -

**--ooo--** 6:13 187:25

---

### 1

**1** 12:25 13:1 14:15,
21,22,25 15:1,4,9,22
62:15,17,22,23
63:20 162:6 186:12,
15

**10** 25:18 64:16,17,18
65:7,9 129:21 136:1,
19,25 152:12

**10:00** 139:12

**10:04** 6:3

**11** 37:24 38:1,3,5,7,
21 39:17,18,22,24
40:2,7,17,19,20,25
41:10 65:23,25
75:21 76:1 82:20
83:2,24 90:15
106:25 107:4,9
109:11 116:19,21,22
117:2 129:16,18,21

**12** 41:2,11 42:1,13
43:1 67:13,14,17,20

68:4 70:7,11 90:12
116:3 146:13 164:2

**13** 24:16,23 41:3,12
45:12,20,23 46:3
68:25 69:1,4,6,8,10
70:6 147:1

**14** 75:23,24 76:14
77:3,19,21,25
147:12

**15** 30:7,9,12,17,18
31:16 145:25 146:2,
12,18 150:19

**16** 20:22 34:2 68:8
147:2,13 149:5,9
163:2,5,9,20,25
164:17 177:2,20

**1608** 32:1

**17** 78:13,14,17
176:21 177:1,4
178:16 180:1

**18** 19:20 20:15 49:9
71:11 80:6,9 81:8,9,
15 82:13 101:12
126:9,17 127:25
150:10 152:9 156:2

**18-** 150:17,24 151:19
152:23 153:6,12,18,
22 154:3,9,14,19
155:3

**18-year-old** 47:11,12

**19** 20:25 50:12,16,17,
18 116:19 117:1
123:23,24 124:2,8
167:17,23 170:3,9,
15 186:9

---

### 2

**2** 16:5,8,12,15,16,21
33:1 42:2 50:13,14,
18 53:23 60:12,13

www.aptusCR.com

Exhibit 57
DX1021

**Jose Chavez**

61:9 170:19,22
186:18

**20** 20:10 86:12 88:24
89:6,21 91:25 93:10
127:25 150:11 151:1
152:9 156:2 160:8,9,
14,18 161:11,13,17
164:13 168:12 170:8

**20-year** 153:22

**20-year-old** 47:12
93:23 151:19

**20-year-olds** 150:17,
24 152:23 153:6,12,
18 154:3,9,14,19
155:3

**2012** 71:25 158:8,11

**2020** 21:6 26:16

**2021** 26:16,17 27:19
74:17,18 152:16

**2022** 19:25 26:14,17
27:25 28:1 37:20
43:11 74:15 86:2
93:7 132:6,16
140:22 141:3,7,9,11
149:18 151:14
152:4,7

**2023** 6:2 20:15 22:1
25:12,13 26:14 68:8
74:14 136:12 149:23
160:21 162:6 164:2

**21** 19:17,19 20:8,11
40:24 41:3,9,10
42:10 43:9 44:2
47:14 50:7,21 75:13
83:1 86:11,22 90:23
92:7,16 93:3,10
109:11 126:1 138:11
152:5 156:5,12,20
157:2,12,20 161:21,
22 162:3,16,17

**21's** 92:13

**21-year-old** 47:10

**22** 41:24 98:7,8,11,
13,16 107:9

**23** 75:25 98:24 99:1,6
100:6,7,10,15,21
101:4 136:11 184:16

**24** 76:15 177:11,13,
15,20 178:2 179:12
185:18

**25** 25:11 136:6,9
161:4 162:10

**26** 82:21,25 83:23
116:20

**26700** 178:5

**26915** 178:5

**26th** 160:21

**27** 117:2

**27505** 49:23

**27510** 44:1 46:23
47:2,18,22 48:16,25
49:4 125:12,18,22
127:2,5 128:9 167:9

**27510's** 51:2

**27545** 177:21,23
178:1,10,18,20
179:11,12,18 180:2,
16,23 181:9 183:13

**27810** 76:22 77:4

**27880** 76:6,21 77:12,
16 78:6,8

**27885** 76:6,21 77:12,
16 78:18,21 79:2
80:14,23 176:22,24
177:4,25 178:17,18
179:4,25 180:19,25
181:5,13 182:3,4,16

**27910** 76:6 77:4,12,
16 81:18

**27th** 160:21

**28** 163:1,9

**28050** 178:9

---

**3**

**3** 30:25 42:2 44:6,11,
16,19,21,23,24 45:6,
13 50:11,13 54:15
55:16 60:14,19 68:3
100:15 107:1,2
109:10 131:4 164:24
170:23,24 171:5
184:21 186:21

**30** 36:13 100:21
162:6 164:6

**34** 82:22 83:1

**35** 83:24

**3:43** 187:24

---

**4**

**4** 45:12,20,23 46:3,
15,16,18,21,22
53:23 54:4 60:19
76:16 117:3 125:13
129:17 131:16
132:24 133:20
150:18,25 170:16,
18,25 171:8 186:24

**40** 151:18

**45** 20:17

**46,000** 155:10

**48** 45:12,20,23 46:3

**49** 45:13,21,24 46:3

**4th** 6:2

---

**5**

**5** 49:15,16,18,22

54:15 55:12 58:20
61:10 158:5 164:25
170:14 171:2,3,11
178:8 187:2

**5:35** 146:16

---

**6**

**6** 45:12,20,23 46:3
52:19 53:1,4,5,8,14,
16,21,24 54:2,5,9,16
55:13,16,17 56:5,12,
19,22 57:8,12 61:13
62:7 63:22 64:4
100:15 105:15
147:15 170:19
171:13,15 172:14
184:22,24 186:11,
13,15,19,22,25
187:3,5,6,9

**626.9** 30:19

**6th** 35:24 72:1

---

**7**

**7** 58:24 59:1,4,5,7,12,
18 60:11,14 61:13
70:13,15,17 171:3,
17,18 185:3

**75** 100:21 184:25

---

**8**

**8** 25:17 38:24 39:1,3,
7,11,12,13 40:9,18
54:5 60:25 61:13
101:3 107:3,9
109:11 136:1,18,25
171:8,20

Exhibit 57
DX1022

Jose Chavez

**9**

**9** 61:15,16,19,22,25 62:8,16,18,22 64:5 83:24 145:22 146:14 158:12 171:22 185:12 186:1

**A**

**a.m.** 6:3

**abbreviated** 38:15

**ability** 11:15 91:6 92:13 157:1

**abridge** 112:22

**abridges** 113:2

**absent** 164:22

**absolutely** 10:17 18:22 130:17 165:13

**absolve** 176:11

**academic** 23:13 24:24 26:15

**accept** 85:19

**access** 12:11 13:24 14:3 17:17 107:5

**accidental** 103:20

**acclimation** 24:18

**accompanied** 41:21

**accounts** 56:7

**accuracy** 60:4,5,7 187:11

**accurate** 26:14 51:13

**accurately** 133:10,12

**acquainted** 15:11,16

**acquire** 70:20 71:1,3 109:24 115:23 116:8

125:2

**acquiring** 71:9 95:14

**act** 95:21 115:8 157:2

**action** 6:19 7:21,22 15:12,23 17:10 18:14 20:5 43:24 45:3 47:7 58:7

**actions** 57:22

**activities** 22:24 25:8, 10 135:24 136:3

**activity** 25:18

**actual** 14:18

**add** 14:18 177:10

**added** 176:7

**addition** 8:14,24 12:10,15 18:13 32:21

**additional** 9:21 13:23 25:8 43:5 58:2,11,21 147:16 168:20 185:21

**address** 26:20,22 27:3 32:12

**adequate** 109:15,19, 22 110:1

**adjourned** 187:24

**administration** 22:12 23:22

**admission** 59:10,18 65:2,13

**Adobe** 41:6 116:24

**adult** 75:11 106:7

**adults** 50:21

**advance** 118:10

**advantage** 138:11

**advice** 24:17

**advisement** 11:4

**affect** 11:3,15 49:7 126:5

**affected** 105:22

**afraid** 105:14

**age** 19:16,19 20:8,9, 21 43:9 44:2 47:14 48:17 50:8,21 71:11 75:13 80:6,9 82:13 86:21 88:24 89:6,21 90:17 91:7,12,25 92:7,16,21 93:3,5,10 94:1,5,9,13 101:13, 14 125:8 126:1,10, 17 152:9 156:5,12, 20 157:2,12,20 158:5

**aged** 150:10

**agenda** 102:15

**ages** 156:2

**aggressive** 36:2

**agree** 58:10 109:15 111:15 112:8,15,18 118:25 135:7 156:25

**agreed** 133:5

**ahead** 48:20 55:21 85:18 89:17 104:10 105:12 106:14 124:16 125:20 166:2 172:12 183:25

**Albrecht** 6:18 187:17

**Alcohol** 187:11

**alleviate** 158:25

**alleviated** 108:3

**Allison** 6:20

**altercation** 35:17,18 36:7,16

**alternative** 68:1

**alternatively** 69:13

**ambiguous** 83:18 106:12 107:22 108:14 111:6,13,17 112:12 114:11,22 119:5 121:2 136:23 137:21 138:15 150:14 151:5,22 152:13,19 153:2 154:23 156:4,16 157:4 168:5 172:2 181:2 182:21

**amended** 16:17 44:25 45:6,9,13 50:11,12, 17

**amendment** 43:25 44:24 71:2 90:22 117:10 133:2 141:16 142:7 147:8 148:2 172:6,15 174:4,7,20, 25 175:9,16

**America** 22:19

**American** 71:11

**Americans** 110:19 168:10

**ammo** 118:23

**ammunition** 118:18 119:1 121:6,11 122:3

**and/or** 115:23 116:8 135:13

**Anderson** 6:4 23:20 25:12 33:2 136:9

**ANNABELL** 6:4

**answering** 8:23 108:23 110:2 128:18

**answers** 8:13 9:20 18:8 66:18 100:21 133:12

Exhibit 57
DX1023

Jose Chavez

Chavez vs. Bonta

**Anytime** 52:22

**apartment** 27:6,7

**apartments** 155:22

**apologies** 8:16 38:16 52:21 116:4 130:15 146:16,17

**apologize** 39:24 40:20 52:16 116:23

**appeared** 6:5

**appearing** 61:9

**appears** 13:12 54:15 55:16 62:15,17 68:11 70:13 82:22 107:3 116:2,19 129:18 161:14

**applicant** 101:12

**applications** 56:2,3, 7,8 58:16,17

**applied** 22:20 63:13

**applies** 10:18 47:22

**apply** 8:6 10:12 49:7 63:2 80:24 126:5 128:4 177:7 178:20, 24 180:2,7 181:10 183:13,16

**approved** 129:7

**approximately** 9:25 10:7 21:23 25:8 26:5 43:11 71:25 74:14 83:1,24 117:3 131:4 140:18 141:12 149:19 155:10 158:10

**April** 152:16

**Aptus** 12:4

**arbitration** 34:19

**area** 22:7,10 24:7

**argumentative** 56:15 64:7 80:16,22 84:13 104:8 106:11 107:23 108:13 109:7,17 111:13,18 112:11 114:23 117:15 118:13 119:3 120:25 133:8,18 136:21 137:7,14,20 138:4, 14 151:3,20 153:1 154:22 157:3,14

**arise** 108:1

**armed** 87:6,8

**arms** 138:17

**arrested** 34:23 71:18

**arrests** 150:11,20

**arrow** 171:7

**articles** 110:10

**arts** 22:16

**asks** 42:14 77:11

**assemblyman** 99:19

**assistance** 29:6,8

**assistant** 23:16 32:25 33:7 136:10

**assume** 73:1

**Assumes** 85:13

**Assuming** 183:11

**attachment** 62:15,17, 22,23 63:20

**attack** 102:17

**attempt** 85:21 90:2,4 91:20 99:11 125:1

**attempted** 85:25 89:2,7 91:15 94:18, 22 95:16 97:2,11

**attempting** 114:9

**attend** 21:10 129:6

135:4

**attended** 93:15

**attending** 21:11,12 22:8 139:2

**attention** 176:20

**attorney** 6:16,18,20 19:8 62:12 99:8,15, 16 149:6

**attorney-client** 57:20

**August** 6:2 26:14 74:14 160:21 164:2

**authorities** 69:11,17

**autumn** 20:1

**Avenue** 32:2

**average** 141:10

**averaging** 25:17

**avoid** 121:6

**aware** 31:9 47:2,4 48:1,21,24 49:1,3,5, 11 51:23 66:17 84:4 97:23 98:1 101:18 123:15 125:6 134:17,21 145:3 148:15,18 150:10, 15,17,22,24 151:6,8, 11,14,16,17,23,25 152:4,7,11,16,22 153:5,11,17,21 154:2,8,13,18 155:2 173:3,5 174:5,13 175:3

**awareness** 48:7

—————————

**B**

**B(1)** 125:18 126:2 127:2,17,20 128:9, 25 129:1

**bachelor's** 21:16,18,

20,22 22:15

**back** 8:8 12:9 14:9 17:15,24 18:10 22:7 39:17 42:13 50:10 66:9 70:7 82:20 112:5 116:5 131:2 133:4 170:3 174:18 176:20 177:24 178:16 179:11,25

**background** 72:16 73:2,6,9

**bad** 171:14

**ban** 50:20

**band** 50:23

**based** 86:4 92:16 93:2,5 168:1 170:8

**basic** 100:23 117:16, 19 118:12 122:7 170:18

**basically** 179:18

**basis** 40:10 70:23 81:2,3 95:5,10 103:25 105:7 140:15

**bear** 138:17

**Becerra** 99:17

**bedrooms** 9:10

**begin** 8:22 60:18

**beginning** 7:7 11:25 67:10 107:8 125:5, 22 129:20 139:25 140:13 147:14

**begins** 76:15 83:1,23 107:3 109:11 125:22

**behavior** 157:12,20

**belief** 81:2 108:2

**believed** 101:22 175:20 182:12

Exhibit 57
DX1024

Jose Chavez

Chavez vs. Bonta

**beneficial** 108:1

**Beware** 187:11

**Biden** 99:18

**big** 155:8

**Bill** 104:3

**Birthday** 22:2

**bit** 7:25 9:8 19:2 21:2 23:5 24:12 94:16 103:24 115:6,7 118:9

**bits** 24:21

**board** 145:15

**bolt-action** 117:6,21, 25

**Bonta** 6:20 7:16 13:16 19:9 43:25 99:20

**books** 55:2

**born** 28:8

**borrow** 83:16

**bottom** 39:25 50:18

**bow** 171:7,10

**box** 12:16 26:23

**brain** 34:2 35:7 158:2, 4,7,14 159:5

**branch** 87:9,11

**break** 10:15,17,21 13:18 17:25 36:12 67:9 119:17 124:16, 18,20 140:17 148:20 149:11

**break-action** 117:7, 22 118:1

**breaks** 8:7

**briefly** 59:14 96:5 132:1 159:23 175:10

**briefs** 149:20

**bringing** 31:12

**brother** 74:5

**brought** 37:6,20 106:3

**browsers** 102:8

**Buffalo** 152:12

**burden** 137:17 138:8, 9,19,23

**Bureau** 6:21 100:3

**buried** 149:14,17

**business** 37:9,12

**buy** 19:16 92:10

**C**

**cabinet** 99:18

**cafeteria** 36:11

**calendars** 55:2

**California** 6:5,16 19:17 21:9,13 26:10 27:13,21,25 28:4,8, 11,15 29:12,25 30:19 32:6,8,9 33:7, 19 42:5 43:11 44:1 46:22 48:2 49:23 62:24 68:9 70:19,25 76:4,7,21,22 77:12 78:5,18 81:17 88:21 90:17 91:7 92:13,20 93:7,17 99:9,17,23 100:2 101:14,15 105:17 106:3 115:18,24 116:9 129:7 142:21 147:7 148:6 161:17 163:23 164:12 167:21 174:9

**Californians** 47:11,12 168:11

**call** 143:15,16 144:13,17,25

**called** 6:10 23:12 34:4 86:3 144:1 159:8

**calls** 144:21 167:10 172:8,22 173:13

**campus** 23:2,17,19 24:18 26:24 30:2 31:13 155:13,15 161:17 164:13

**capacity** 58:18 69:20 166:23

**caption** 168:17

**car** 35:11

**Card** 101:16

**care** 112:16,20,21 113:2,4,6,14,23,25 114:1 158:14,20,24 159:5 171:1

**Carlsbad** 90:20 91:1, 2,9,17 94:5

**Carmel** 23:18 72:20

**carry** 97:14

**carrying** 186:20

**case** 7:16 15:17 18:17,19 19:8,15,21, 24 20:5 34:4 40:11 43:24 51:1 70:2 77:14 85:23 130:5 135:14 173:4 174:6

**catch** 45:16

**categories** 56:20 57:7,11 58:2,11,19 64:11 116:14

**caused** 105:25 174:10 175:25

**caution** 11:1 95:23

**caveat** 9:23

**cell** 13:12

**census-designated** 37:11 105:17

**Center** 32:2,15

**centerfire** 49:8 51:12, 22 52:5,10 107:14 111:3,10 126:8,20

**certificate** 97:18,21, 24 98:17 100:11,18 101:8,19,23 184:23, 25 185:6

**certification** 97:5,15 135:16 169:14

**certified** 6:4 100:25 130:4 185:10,20,22

**cetera** 7:10 117:22

**challenge** 43:25

**challenged** 47:7,9

**challenges** 51:1

**challenging** 125:7

**change** 174:11 176:1

**changed** 176:2

**Chapter** 178:8

**charge** 173:20

**charged** 34:21,24

**Charter** 21:4,7,8 36:9

**charts** 55:2

**chat** 12:6,10,12,16, 20,25 16:7 81:8 163:4

**Chavez** 6:8 7:2,16 13:11,15,16 14:1,14 15:2 16:11 17:3,21 18:18 20:7,19 34:4 38:9,17 39:9 40:9 43:25 46:4 53:12

Exhibit 57
DX1025

Jose Chavez

59:10 62:2 64:25 66:24 67:8,17,23 113:1 124:3 135:20 146:7,13 149:20 150:10 155:8 156:25 158:19 165:5,19 174:2,19 177:19

**check** 18:2 55:3 72:17 73:2,6,9 144:6

**chemical** 119:12

**children** 123:4

**choice** 100:24 137:11

**choose** 136:25

**choosing** 117:9 137:5 138:2

**circumstance** 99:14 106:16

**circumstances** 35:23,24 37:2,3 41:19 48:18 102:19 106:22 108:1,2,17, 18,21,25 109:6 130:24 131:13,15,20 173:7 176:24

**citizen** 71:11

**city** 21:14 26:9 37:9

**civic** 104:2,6,13

**civilian** 103:10,21

**claim** 88:24

**Claremont** 37:18 43:10 95:18 132:4

**clarification** 25:5 34:10 52:20 84:15 104:16 111:1 148:10 162:22 175:6 183:21

**clarify** 7:20 14:16 15:15 38:13 44:7 51:25 59:23 60:12 74:9 87:8 93:12

110:23 112:5 134:5 142:5 143:12,21 151:13

**class** 36:15 161:8

**classes** 24:17 36:4

**classroom** 35:25

**clean** 40:16 121:17

**clear** 50:19 57:21 73:5 101:13 108:23 142:12

**clearest** 8:23

**close** 134:19 135:3

**club** 23:8 37:16 81:23 145:16

**clubs** 23:1

**co-counsel** 159:23

**coach** 23:9,18 72:20

**Coalition** 15:19 141:18,23 142:14, 17,24 143:2,5,11,22, 24 144:1,5,15,19,22 145:8,13 147:5 148:17,24 149:2,8, 13,17 174:8

**code** 30:13,19 31:8,9 44:1 46:22,24 47:2, 4,18,20 48:22,24 49:2,23,24 76:4,21 77:12,16 78:1,5,18, 21 79:2 81:11,14,17 125:12 127:2 167:9 176:21 177:3,21,23, 25 178:1,16 179:23 180:25 181:18 183:13

**coercive** 154:4

**Coleville** 105:16

**colleague** 6:17

**college** 21:10,11,12 22:5,6 24:19 31:13 135:24 155:8

**colloquy** 27:1 31:2 38:10 42:3 51:14 55:19 64:22 73:3 75:12 77:7 79:4 84:14 86:23 88:14 89:9,15 96:4 105:10 113:18 131:6 136:14 140:3,24 163:16 168:25 176:4 179:9 182:1 183:20

**commencing** 6:2 178:9

**comment** 41:5

**commented** 11:2

**commitment** 72:6,8, 9,12

**committed** 35:3 71:20 72:2

**common** 19:5

**communication** 55:15,22 56:24 57:9, 14 58:14 148:1,5,9

**communications** 54:24 55:16,22 56:21,24 57:7,12,15 58:2,12,15 63:25 146:19 147:3,20 148:12,16

**community** 99:21

**company** 91:16

**compensated** 33:8, 11,16

**complaint** 41:18 42:4,16 44:24,25 45:2,3,6,10,13 50:11,13,17,21,24 125:3 146:23

**complete** 43:2 56:13 58:6 65:13,16,19,21 132:9 178:6

**completed** 126:8,21

**completeness** 60:6,7

**compliant** 50:23

**components** 133:16

**compound** 81:24 111:5,18 115:12,20 118:14 121:2 138:15 151:22 153:2 154:23 157:4

**comprehend** 179:22 182:22

**computer** 14:5 17:18 44:14 53:6

**concerns** 106:9,19

**conclude** 12:12

**concluding** 70:24

**conclusion** 48:5,19 80:15,21 85:3,13 87:25 111:12 126:22 128:12 138:13 150:13 151:3 152:25 154:21 155:18 156:3,15,23 167:11 172:9,23 173:14 179:2,21 180:8,14 181:3,15 182:20 183:9 184:8

**condition** 11:11 128:13 159:7,10 181:23

**conditional** 128:15

**conditions** 80:13,24 158:25 167:13 176:15,25 177:7 178:21,25 179:5 180:3,7,12,25 181:6, 11,14

Exhibit 57
DX1026

**Jose Chavez**

**conduct** 54:8 93:3 179:15

**conducted** 9:13 47:23 54:10 56:12, 18

**conducting** 178:23 180:6

**confer** 12:18

**conference** 9:11

**conferred** 17:5 143:3

**conferring** 142:2

**confident** 30:5 73:25 141:10

**confirmation** 89:23

**confirmed** 90:16

**conflicting** 183:2

**confused** 33:25

**confusing** 183:2

**congressional** 24:8 72:24 73:9

**connection** 62:6 64:3

**consequences** 153:13

**considerations** 187:7

**consoled** 25:3

**constitute** 33:10 40:12,13 166:8 176:9,16,17

**constitutes** 29:16 75:8 80:25 81:3 158:23 166:9 182:25 184:10

**constitution** 71:4 104:4,13

**constitutional** 104:1 107:25 108:19 113:2 138:17,21 145:17

**constitutionally** 104:12 111:22

**construction** 46:6

**consulting** 110:11

**contact** 19:12 24:16

**contained** 59:18,24

**contend** 83:3 84:10, 16

**content** 129:24 131:18 158:18

**contest** 10:16 50:19, 22

**contested** 47:15

**context** 29:16 35:17, 18 43:18,20 51:16, 20 90:8 103:6,7,8,21 106:4 109:25 157:7 176:9 181:19 183:12

**contextually** 109:25

**continue** 8:8,19 14:20 90:23

**continues** 166:14

**continuity** 163:3

**contribute** 40:22 45:5 69:21,24

**contributed** 45:7 46:6 69:21

**contribution** 40:15

**contributions** 25:15

**contributor** 23:9

**control** 125:25 126:6

**controlling** 153:6,18

**convened** 139:12

**conversation** 91:2 180:18

**conversations** 92:2,

20,25

**convicted** 34:24 35:1, 4

**convictions** 63:5,6,8, 10

**copy** 187:21

**corporation** 50:5

**correct** 7:23 8:3,4 13:15 15:19 20:16 22:22 27:17 30:2,3 31:13,14 34:17,18 35:2,3 37:16 39:19, 21 42:24,25 43:2,3 44:9,10,18 56:14,23 57:4,9,10,13,14 61:3,10 62:8 63:9, 11,22,25 64:6,8 65:19 66:1,2,15,16 68:7,12 70:3,4,21,22 74:23,24 75:10,19, 20 80:14 84:19 89:3, 8,24,25 91:14 92:4, 17 98:20 100:21 106:8 109:13,14 114:6,7 115:24 118:18 124:23,24,25 125:18 127:22 129:2 132:18,21,22 133:2, 3 135:8 136:7 137:6, 9 139:20 142:8,24 144:23 149:2,3 152:1 155:9 158:2 161:16,18 166:25 167:18,19 169:3,17 173:8 176:25 185:2

**correction** 136:16

**corrections** 10:25 11:2

**correctly** 42:21 107:16 110:3 117:11 126:13

**correspondence**

45:7 46:7 54:12 59:20

**cost** 185:6

**costs** 129:25 131:19 132:20

**counsel** 7:3 8:25 9:3 12:18 15:7 16:23 17:5,12,19 24:19,25 39:15 40:6 44:7 45:8 56:25 57:17 65:10 66:14,23 77:6 85:16 143:3,4,11,13,18 145:6 165:5 175:24

**counsel's** 165:7

**County** 22:11 33:1 37:11

**couple** 23:14 91:4 155:22 160:2 173:24

**courses** 98:3 102:12 114:5 129:24 131:18 134:18 135:3 169:16

**court** 6:14 7:7 9:14 12:4 14:18 16:6 34:3 52:21 132:10 174:17 177:12

**covered** 123:17 124:12,22 133:6 170:11 171:25

**covering** 100:22

**credibility** 11:3

**crime** 34:21,23 35:1, 4,6,9 150:12

**crimes** 35:12

**criminal** 63:5,6,8,10

**criminalizing** 31:11

**cross** 164:23

**crosstalk** 8:20

**Cruz** 34:4

Exhibit 57
DX1027

**culture** 24:18

**cumulative** 140:16

**current** 45:2 72:23
147:9

**cut** 45:17 145:9

---

**D**

**D.C.** 24:2 25:22,24,25
26:2,4,5,7 31:24
32:13,15

**daily** 140:15

**danger** 71:22

**dangers** 121:11

**data** 73:7,8 151:17

**databases** 54:21

**date** 14:19 163:25

**dates** 41:18

**day** 6:2 74:11 79:23
91:8 95:2 126:15
150:8 157:25 169:8
175:11

**days** 20:17 74:13
79:20

**deadline** 63:16

**dealer** 48:4 89:24
92:11 125:24 178:8,
13,24 179:19 180:6

**dealer's** 178:4,12
179:14,19

**dealers** 44:4 47:24
90:7,10,19 91:12
110:11 179:17

**dealerships** 101:1
110:15

**debate** 23:8,17 25:16

**decided** 86:3,16,24

95:25 96:2

**decision** 153:23

**declaration** 67:23
68:4,7,18,20 70:11,
14 90:13 116:4

**declaratory** 44:25

**declare** 68:5

**dedicate** 136:25

**deemed** 134:11

**defend** 102:16,22
106:10,17,20

**defendants** 6:19 60:2
150:1

**defendants'** 13:1
16:8 30:9 38:1,18
39:1,8 44:11 46:16
49:16 53:1,10 59:1,9
61:16 62:3 64:18
65:1 66:25 67:14
69:1 77:21 78:14
81:9 98:8 99:1
123:24 160:9 161:22
163:5 167:17,23
168:12 170:3,8,9,15
177:15

**defense** 110:2

**defense's** 38:8

**defensively** 103:3,5,
11 111:4

**define** 181:19

**defined** 54:18 55:12
58:15,19

**definition** 54:17,19,
25 55:12,15 58:20
181:17 182:24
183:15 184:10

**definitions** 53:22
54:15 57:8 60:13,15
61:8

**degree** 21:17,18,21,
22 22:16,17

**degrees** 22:15

**delay** 40:20

**delegated** 173:20

**deliver** 125:24

**delivery** 126:6

**Delta** 21:4,7,8 36:8

**demonstrate** 152:23
153:6,12,18,22
154:3

**demonstrated** 96:23,
25

**demonstration** 96:12

**Department** 6:17,21
49:10 100:3 101:15
126:11,18 127:7,12
129:7,11 130:4,7,10
169:23

**deposed** 16:2

**deposition** 6:3 7:18,
21,23 8:25 9:9 10:23
12:2,9,12 13:13,14,
20 14:19 15:1 16:17
17:4,8,24 18:15 44:9
52:24 67:10 130:19
139:2,9,16,19
165:14 187:24

**deprived** 138:16,22

**deputy** 6:16,18

**describe** 41:13 42:15
43:4 76:2

**describes** 176:24

**describing** 180:10,12
182:17

**desire** 76:24 84:8
103:24,25 109:23
131:13 133:17

**desires** 107:19 108:8,
11

**detail** 19:2 86:20

**details** 40:11 85:24

**developed** 19:8

**device** 13:24 14:3
159:7,18

**devices** 158:25

**devote** 136:19

**diaries** 55:2

**die** 103:15

**died** 103:13

**Diego** 18:20 21:13,14
22:7,9,11 23:10,15,
16 24:16 25:16
26:10 27:8,13 29:23,
25 33:1,8,20 37:19
43:10 68:8 72:22
74:17 131:9

**difference** 10:2
110:12

**differences** 48:13
123:10

**difficulties** 152:23

**difficulty** 153:6,12,
18,22 154:3

**Dillon** 19:9,12,23
45:8,16 48:5,19
56:15,25 64:7 66:14
67:2 80:15,21 81:24
83:18 84:13,20 85:3,
13,18 87:25 92:23
94:20 104:8,10
106:11,14 107:22
108:13 109:5,7,17
110:6,14 111:5,12,
17 112:11,17 113:7,
15,24 114:11,22
115:11,20 117:15

Index: culture–Dillon

Exhibit 57
DX1028

Jose Chavez

118:13,20 119:3,11, 21 120:2,7,15,20,25 121:7,13,18,23 122:4,9,15,20,25 123:6,12,19 126:22, 25 127:10 128:12 131:22 133:8,18 135:9 136:21 137:7, 14,20 138:4,13,20 139:25 140:19 143:7 145:14 150:13,21 151:3,10,20 152:13, 19,25 153:8,14,24 154:5,10,15,21 155:5,18 156:3,13, 15,21,23 157:3,13, 21 158:15,22 159:11,24 164:23,24 165:18 166:1 167:15 168:6 169:1 172:3, 11 173:1,16 179:2,6, 21 180:8,14 181:2, 15,24 182:20 183:9, 22 184:8 187:18,19, 21,22

**dining** 10:8,11

**direct** 40:24 56:1 58:15 90:12 116:18 132:23 168:12 176:17,20

**directed** 57:15 116:1

**direction** 143:18

**directly** 19:12 36:15 126:23 127:1 144:2 145:1

**director** 6:21

**discharged** 87:14

**disclosed** 158:21

**Discover** 149:15

**discovery** 58:6

**discuss** 15:7,9,22

16:23,25 18:5 39:15 47:18 88:18 107:8 125:21 172:5

**discussed** 15:24 16:1 28:7 57:18 64:3 91:16 123:16 133:5 137:18 173:6

**discusses** 170:23

**discussing** 42:19 62:6 124:21 140:9 169:10,11

**discussion** 91:5 92:12 173:6 174:21 177:14

**discussions** 90:18,25 91:10,19 92:14 125:6 127:4 158:19

**disposed** 93:19

**disproportionate** 150:11

**disqualify** 114:25

**distinctly** 105:15

**District** 33:1 72:21

**doctor** 158:16

**document** 13:8,10,12 14:21 38:14 40:4,5, 21 41:8 44:13 54:17, 18 57:8 59:14,15 63:20 65:4,14,16,20 66:4,11,12,13,22 78:3 81:16 147:25 148:4

**documentation** 139:5

**documents** 11:24 12:1,7,10 13:20,25 17:10,11,13,19,23 18:13 39:23 53:11 54:18 56:21 57:7,12 58:2,11,12,19 63:24 64:11 146:6,19

147:3,17,19 148:9, 15 150:3 160:2

**DOJ** 100:25 185:9,20, 22

**domestic** 71:15 83:4 85:8,11

**domicile** 29:22 32:14 131:9

**double-action** 117:7 118:1

**double-check** 172:13

**double-digit** 151:2

**download** 12:7

**downs** 24:19

**dozen** 158:1

**draft** 40:7 59:17 60:1

**drafting** 40:12 45:6 59:19 65:6 68:17 69:16

**drag** 12:5,25 16:6

**drinking** 155:4,11,15, 20 156:1,12,19 157:8,11,19

**driver's** 20:19,21,24, 25 62:24 63:2 64:1, 13,14 101:15

**drop** 81:8 142:3

**drugs** 187:11

**due** 90:17 102:18 179:8

**duly** 6:10

**Duncan** 90:20 91:6, 18 93:14,25

**duration** 74:13

**duties** 145:7,12,17

**duty** 58:5 145:14,18

---

**E**

**earlier** 33:18 37:5 115:15 126:15 133:5 134:12 135:25 136:8 139:7 157:25 167:13 173:6 174:2 175:18 176:8,13,18

**Eastern** 146:17

**eat** 36:10

**educated** 115:13

**education** 21:3 41:16 123:17 124:9,22 125:1 129:6,13,23 130:8,25 131:17,24 132:15,19 133:16 134:8,14,17,24 135:3,8,13,15 136:20 137:1,6,13, 19 138:1 146:22 160:20,24 161:3 162:5 163:13,20 167:18,21,24 168:3 169:13,16 170:4,11 171:25 186:10

**efficacy** 110:4

**elaborate** 86:24

**elapsed** 185:18

**electronic** 54:20 55:24

**elementary** 151:9,15 152:5,8

**eligibility** 71:9

**eligible** 70:18,24 71:6 90:4

**email** 19:11 54:10,11, 13 56:10 58:17 141:24

**emailed** 177:18

Index: dining–emailed

Exhibit 57
DX1029

**Jose Chavez**

**emails** 17:14 54:20 55:5 57:4 147:23 148:18,22 149:1,4,7, 13,14,16,17

**emphasis** 22:17,18

**employee** 91:1,5

**employees** 90:18 91:11

**employment** 32:19, 22,24

**encompass** 149:25

**encourage** 130:18

**encumbered** 111:21

**end** 21:23 25:4 52:14 66:14 86:1 150:7,8,9 160:5 165:4 169:12

**endurance** 10:16

**enforce** 173:21

**enforcement** 87:3 167:5,8,14

**engaged** 22:23

**engaging** 104:3 155:15 156:1,12,19

**enroll** 125:1

**enrolled** 155:16

**enrollment** 24:17

**ensure** 7:13 8:20 132:10

**enter** 167:8

**entire** 8:6 10:12 59:15 66:8 169:16

**entirety** 45:9

**entitles** 185:8,16

**equipment** 171:4,12

**error** 146:24

**errors** 46:8,10,11

**Escondido** 163:22,23 164:12

**essentially** 93:22 125:23 178:10 182:13

**estimate** 9:24 10:2,5, 6 139:1,8,22,23 140:11 141:11 158:10

**estimates** 10:3 139:7 140:4,7,8

**et al** 13:16

**ethical** 171:19

**etiquette** 115:14

**event** 161:6,7,14 162:12,19 164:8 168:16,23 169:3

**eventually** 23:21

**evidence** 101:13 181:24

**exam** 97:20,23 98:4

**examination** 7:1 165:18 169:7,12 174:1

**examined** 6:11

**examples** 10:10

**exceeding** 58:17 95:25

**Excellent** 107:6 187:23

**exception** 49:2,11 128:4

**exceptions** 48:21 49:1,3 94:1,5,9,13 125:7

**excess** 155:12

**excessive** 155:3,15, 20 156:1,12,19 157:7,10,18

**exchange** 181:19

**exciting** 22:3

**excluded** 128:1

**exclusively** 130:13

**excuse** 19:11 22:13 44:25 50:24 56:2 74:14 76:8 79:11 91:11 100:7 113:6 136:2 167:16

**executed** 68:8

**exemption** 127:22 128:10

**exemptions** 44:4 48:17 138:12 167:9

**exercise** 95:23 133:1

**exercising** 152:24

**exhibit** 12:25 13:1 14:15,17,18,19,21, 22,25 15:1,4,9,22,24 16:5,8,12,15,16,20 30:7,9,12,17,18 31:16 37:24 38:1,3, 5,7,21,24 39:1,3,7, 11,12,13,17,18,22, 24 40:2,7,9,17,25 41:10 44:5,11,16,19, 21,23,24 45:6,13 46:14,15,16,18,20, 22 49:15,16,18,21 50:11,13 52:19,22 53:1,4,5,8,14,16,21, 23 54:2,5,9,16 55:13,17 56:5,12,19, 22 57:8,12 58:24 59:1,5,7,12,18 60:11,14,25 61:15, 16,19,22,25 62:7,8, 16,18,22 63:22 64:3,

5,16,17,18 65:7,9, 23,25 67:13,14,20 68:3,24,25 69:1,4,6, 8,10 70:6,7,11 75:21,25 77:18,19, 21,25 78:13,14,17 81:8,9,15 82:20 83:2,24 90:12 98:7, 8,11,13,15,24 99:1,6 100:6,7,9,15 101:4 106:24 107:4,9 109:11 116:2,3,19, 21,22 117:2 123:22, 23,24 124:2,8 125:13 129:16,18 145:22 146:14 160:8,9,17 161:11, 12,21,22 162:3,16, 17,20 163:1,2,5,9, 20,25 164:17 167:17,21,23 168:12 170:3,8,9,15 176:21 177:10,11,15,19,20 178:2,16 179:11,21 184:16 186:9

**exhibits** 12:5,13 44:8 52:24 110:16 163:3

**exist** 178:22,25 180:4,7 181:6,11

**existing** 63:5 102:19

**exit** 17:18

**expenses** 29:4

**experience** 24:20 135:25

**experienced** 103:19

**experiencing** 138:10

**expert** 110:21,25

**explain** 130:24 173:10

**explains** 184:24

Exhibit 57
DX1030

**Jose Chavez**

**explicitly** 128:22,25
129:3

**expressed** 128:19

**expressly** 128:5
181:18

**extemporaneous**
23:8

**extend** 56:20

**extensive** 88:7
114:15 135:23

**extent** 12:18 55:6
88:5

**extenuating** 102:18
108:1

**external** 105:23,25
106:2

**extracurricular** 22:24
25:10,13,18 135:24
136:2

---

**F**

**facility** 71:21 152:17

**fact** 16:1 179:13

**facts** 41:13 76:2
85:13

**fail** 169:17 185:17

**failed** 169:19

**Fair** 69:25

**fairly** 145:17

**familiar** 49:12 50:1
78:20 100:7

**family** 41:20 83:3
105:21 106:17

**Fantastic** 68:2

**FAQS** 100:11 184:17

**fatalities** 151:2

**father** 29:9

**father's** 28:9

**fear** 105:7,21 106:1,4

**fears** 106:20

**feasibly** 137:2

**federal** 29:1 37:7
63:1,14 80:2 86:13

**federally** 44:3 47:24
48:3 86:14 92:10

**Fedex** 152:17

**fee** 144:4,7 164:9
185:7,8,16,21 186:2,
7

**feel** 11:8 118:9

**feelings** 105:1,4

**fees** 129:25 131:19
132:20 161:12,14
162:16,18 164:17,19

**feet** 10:7

**fellow** 155:11,14,21
156:7,18

**felt** 89:11 104:18,23
106:6

**field** 171:1 186:20

**fight** 35:14,21 36:6,12

**fighting** 36:10

**figure** 26:14 140:16

**file** 14:17 17:10,11
18:14 38:14 177:18

**filed** 45:10 70:2
149:20,22

**filing** 41:17 42:4,16
125:3 146:23

**final** 41:25 62:15,18,
20 74:17 76:15,17

83:22 98:4

**financial** 29:6,8

**find** 44:14 64:12,14
136:25 137:1 138:22

**finding** 64:15

**fine** 10:17 33:12 97:7
130:17

**fingerprints** 73:7

**finish** 8:22

**finished** 45:23

**finishing** 21:16,18

**fire** 96:15 107:12
185:5 187:4

**firearm** 19:7,16,18
36:20,23,25 42:6
43:8,14,18,20 47:13
50:6 52:2 71:13 75:3
76:4,9,20 79:9 80:3,
25 82:8,12,16 83:6,
9,13,16 84:3,6,12,
18,24 85:1,12,22,25
86:10,14,15,20,25
87:23 88:3,19,24
89:2,6,7,21 90:2,4,5,
10,17 91:7,13,15,17,
24 92:6,16 93:2,10
94:17,18,19,22,23
95:3,11,16,17,19,21,
22 96:1,18 97:2,4,
11,12,14,17,20,24
98:3,17 99:12
100:11,17,22 101:8,
19,23 102:2,3,24
103:2,5,11,15,25
104:2,5,12 106:10,
17,20,22 107:11,20,
24 108:4,11,18,20,
22,24 109:23 110:5
111:20,21 113:5,6
114:5,10,25 115:8,9,
18 117:9,21 118:7,

11,12,17,19,23,25
119:2,9,14,19,20,25
120:1,5,6,13,14,18,
19,23 121:5,10,12,
16,17,21,22 122:2,7,
12,13,19,23,24
123:3,4,9,17 125:25
126:7,9,21 127:13,
21 128:3,10,14,19
129:1 131:14 133:7,
15,17 134:12 135:17
136:19 137:25
138:10 144:22 145:8
165:20,22,24 166:4,
6,9,11,12,14,16,21,
22 167:1,2 172:20
173:8 175:19,21,22,
25 176:25 177:8
178:7,21,25 179:16,
19 180:3,13,17
181:10,14,20 182:5,
7,13,18,19 183:6,7,8
184:1,3,5,6,7,23,24
185:5 186:16

**firearms** 6:22 15:13,
18,20 19:6 29:20,22
30:1 31:12,18,21
32:12,14 33:22 37:6,
13,21 41:16 42:9,10
43:15 44:3 47:10,23,
24 48:1,4,9,14 51:3,
8 70:20 71:1,3,10
73:13,18,23 74:4,6,
7,8,20,23,25 75:6,7,
10,14,18 76:23
79:15,20 80:1,20
83:5 86:8 88:4,6,9,
17,20 89:12,19,24
90:6,10 91:12 92:13,
22 93:5 94:2,6,10,14
95:9 96:10,13 100:3,
23 101:1 102:12
107:12 109:19
110:11,13,17,18,21,
24 111:15 112:7,9,

---

Exhibit 57
DX1031

15,19 113:3,14,23
114:9,14,20 117:8,
13,17,23,24 118:2
122:18 123:10,11
124:21 125:24 135:6
141:18,23 142:10,
12,13,17,23 143:2,5,
11,22,23 144:1,5,8,
11,14,15,16,18,25
145:3,13 146:22
147:5,6 148:13,17,
23 149:2,8,13,16
166:24 174:7,8
178:8,13,24 179:13,
16 180:6 186:20,23
187:1

**firearms'** 120:24

**fired** 119:10,20 120:1
123:11

**fires** 119:14 187:12

**firing** 37:15,18 88:13
96:15 119:13

**firm** 50:5

**first-generation**
24:16

**fiscal** 20:1

**Fish** 49:10 126:11,18
127:7,13 129:7,11
130:4,7,10 163:22
169:23

**fishing** 130:10 131:3,
4

**focus** 115:7

**focuses** 171:25

**focusing** 108:7 112:2

**folder** 44:14

**follow-up** 86:18
127:18 130:20
157:24 173:24
187:18,19

**footnote** 50:13,14,18

**force** 108:25

**forced** 132:25

**forces** 87:6,8

**foregoing** 68:6

**forever** 52:16

**forget** 63:15

**forgot** 35:8 88:15
116:17

**forgotten** 175:10

**form** 9:1 28:16 73:1
89:10 102:3

**formal** 96:14 181:16

**forms** 48:12 88:22
115:23 116:8,11

**formulated** 77:14

**formulates** 71:8

**formulating** 60:15,20
61:5

**forties** 103:18

**forward** 112:1 135:22
141:9,12

**found** 31:3 99:23

**Foundation** 15:20
141:17 142:7,10,13,
18,21 144:8,11,15,
17,23,25 145:4
147:6,7,8 148:2,6,13
174:4,7,8,9,20,25
175:9,16

**foundation-oriented**
145:17

**fourth** 36:15

**frame** 126:8,21

**free** 134:19 135:3,7,
15 161:8 162:13

**frequently** 100:12

**Friday** 6:2

**friend** 19:3,5 37:4
42:6,9,20 43:9,13,16
48:11 75:6,10,18
79:8 80:1,6,9,13,20
81:21 82:3,12,16
86:2,6,17 88:6,18
89:1,5,20 91:23
92:8,9 94:12 95:7,19
96:21 97:6 98:2
102:9 140:21 143:17
145:5 175:20 176:14

**friend's** 42:10

**friends** 18:19 36:1

**friends'** 155:22

**front** 82:23 125:14

**FSC** 100:20,22
101:12 185:1,7,8,23
186:2

**full** 7:9,14 8:14 13:21
15:5 16:21 24:24
39:13 40:2,5 50:1
53:16 55:6 60:20
61:5 69:8 78:9,10,
23,24,25 79:5 93:21
115:14 176:3

**function** 12:20

**future** 50:24 85:10
102:11 105:21
153:13

---

**G**

**gain** 85:10 110:12

**gained** 88:8

**game** 163:22 171:1

**gave** 93:12 96:22
110:17 133:12

**general** 6:16,19,20
19:8 23:8 47:6,8
93:15 96:16 99:8,15,
16

**generally** 88:4 101:1
116:7

**gift** 83:5,8,12 84:2,5,
8,11,18,24,25 85:1,
12,19

**gifted** 165:20,21

**give** 10:3 11:8,20
26:13 85:11 125:24
132:8 141:10 160:5
165:15

**giving** 11:12 93:16
126:6 176:9

**glance** 36:14 46:9

**good** 6:15 103:9
173:18,19

**Google** 95:25 96:2
102:8

**govern** 115:18

**governing** 93:17

**government** 29:2
173:12,20

**governs** 104:13

**grabbing** 36:1

**grad** 22:20

**grade** 35:25 72:1

**graduate** 21:3,20,22
22:4,6 156:9

**graduated** 21:4 22:10

**graduation** 22:2

**grandfather** 105:18

**grandmother** 28:9

**grandparent** 83:12
84:11

Exhibit 57
DX1032

**Jose Chavez**

**grandparents** 28:11, 16,17 29:9

**grandparents'** 27:23, 24 28:3,15 31:19,22

**grant** 22:12 23:22 29:2 32:25 136:9

**great** 7:5,24 8:5,11 9:7,16 11:18,22 12:23 13:7,17 14:23 15:3,21 16:4 17:2 19:14 21:1,15 23:3 30:15,20 31:15 32:17 38:4,20 39:5, 10 44:20 46:2 49:20 50:25 52:13 53:7 54:7 55:4 58:23 59:6 60:9 61:12,21 65:3 67:19 70:10 99:5 107:6 114:3 124:5, 10 125:11,16 129:10 132:13 141:15 160:16 162:2 163:11 164:7 184:20

**greater** 28:21 99:20

**grew** 106:2

**ground** 7:6

**grounds** 146:6

**group** 15:13

**groups** 23:5

**grow** 28:3

**guardian** 23:10 41:20

**guess** 9:19,22 10:10, 11 18:6 110:3

**guesses** 10:3

**guide** 98:17,19 124:9, 13,14 167:18,24 168:2,8,10 170:4,10, 11 185:24 186:10

**gun** 37:16 51:11 86:6

90:20 91:6 92:10 93:7,14,17,25 95:8 96:6,8 110:15 126:19 142:21 147:7 148:6 174:9

**guns** 51:7,23,25 90:19,25 91:1,8,17, 18 94:4 115:23 116:9,11 127:9

**gunshot** 103:20

**Gunther's** 90:19,25 91:1,8,17 94:4

**guy** 88:12

**guy's** 88:15

———————

**H**

**half** 34:7 139:13,20

**Hall** 160:20 162:5

**handgun** 50:7,23 52:3 126:7,20

**handguns** 49:8 50:20 51:3,9 88:22

**handle** 112:19,22 120:19

**handled** 24:9 36:25 74:22 96:10,13

**handles** 24:8

**handling** 74:19 111:16 112:7,9,15, 19 113:3,6,13,22 114:1

**hang** 187:12

**hanging** 86:2

**happen** 19:4

**happened** 25:16 91:20

**happy** 18:3

**hard** 180:15

**harmed** 35:16,19

**head** 7:11 181:22

**heading** 169:2 171:2, 3

**headline** 170:16

**heads-up** 160:5

**hear** 23:4 48:10 89:12

**heard** 48:8,11 98:2 99:16,19

**hears** 132:10

**held** 174:21 177:14

**helped** 62:7

**hereinafter** 6:12

**high** 21:3,4,8 23:18 36:8,9 72:20

**history** 22:17,18 69:22 151:2 171:12 172:20

**hit** 35:11

**hobbies** 136:2

**hold** 166:23

**holds** 178:4,12 179:14,19

**home** 9:10 27:6,22, 23,24 28:3,15 29:13, 20,23 31:19,22 73:23 74:6,10,12 102:16 104:18,19 105:5 106:10,17,20 123:5

**homeowner** 102:20

**hometown** 27:21

**homicide** 150:19

**honestly** 141:21

**honorably** 87:13

**hospital** 71:21

**hotspot** 14:4

**hour** 6:3

**hourly** 33:17

**hours** 25:11,18 37:12 136:1,6,9,19,25 139:11,13,14,15,20 140:11,14 141:2,5,7, 12 185:18

**house** 24:5 74:8

**house's** 106:4

**housekeeping** 6:24 11:24 52:15

**housing** 27:10,12,15 28:19,20 29:12,20, 21,23 32:4,5

**huh-uhs** 7:12

**hung** 140:21

**hungry** 10:14

**hunter** 123:17 124:22 125:1 129:6,13 130:8,25 131:24 132:14,19 133:16 134:8,14,17,23 135:2,7,12 136:20 137:1,5,12,19 138:1 160:20,24 161:3 162:5 163:13,20 167:21 169:12 171:16,19 172:14 186:10,15

**hunters** 129:22 131:17 138:1 168:3, 11 169:16,25 170:11 171:24

**hunting** 49:9 87:17, 18,19,24 107:11 124:9 125:2 126:11, 18 127:7,12,14,22, 24 128:4,14 129:2,6

www.aptusCR.com

Exhibit 57
DX1033

130:5 131:8 132:20 134:7 135:5 138:2 167:18,24 169:20,25 170:2,4,18,22 171:4, 10,12 172:17,21

**hydrocephalus** 159:8,17,19

**hypothetical** 84:21 85:14 112:12 114:23 119:4 121:1 135:10 136:22 137:8 138:5, 14 150:14 151:4,21 153:1 154:22 156:16 168:5 183:10

---

**I**

**ID** 63:14

**ideal** 134:11,12

**identification** 13:2 16:9 30:10 38:2 39:2 44:12 46:17 49:17 53:2 59:2 61:17 64:19 67:15 69:2 77:22 78:15 81:10 98:9 99:2 101:16 123:25 160:10 161:23 163:6 177:16 187:10

**identity** 41:19 101:14

**Imperial** 37:11

**implicate** 172:6,15

**implication** 127:23

**implies** 98:4 128:2

**important** 7:6 12:13 95:20 112:20 114:20 115:10 119:8,18,22 186:16

**importantly** 9:3

**impose** 92:21

**imposed** 94:13 125:8

**imposes** 48:17

**impulse** 165:10

**impulses** 153:7,19

**inability** 90:16 91:16 92:12,15

**inadequacy** 179:8 180:20

**inappropriate** 118:23

**inclined** 89:11

**include** 52:5 54:19

**included** 28:21 58:20

**includes** 55:1 174:6

**including** 8:7 23:14, 19 41:18 55:25 76:7 107:14 109:19 110:9 117:5 147:8 175:8, 12

**inclusive** 178:5

**incomplete** 64:4,6 84:20 85:14 112:12 114:23 119:4 121:1 135:10 136:22 137:8 138:5,14 150:14 151:4,21 153:1 154:22 156:16 168:4 183:10

**Incorporated** 147:6

**incorrect** 99:25 128:3

**increased** 63:16

**independent** 17:6 18:15 81:4 114:8

**independently** 153:23

**Indiana** 152:17

**Indianapolis** 152:17

**individual** 50:7

166:11

**individual's** 108:4

**individually** 109:24

**industry** 33:22

**ineligible** 71:13 93:23

**inflicted** 72:10

**influence** 154:4

**informal** 9:9,12

**information** 9:21 18:9 19:10 54:20 55:23 59:24 129:12,24 130:8,12 131:18 134:13 143:7

**informational** 93:16

**informed** 57:15 88:23 90:3 92:5,8,10 93:1

**infringement** 90:22

**initial** 99:25 130:2,3

**initiating** 95:2

**injection** 69:13

**injunction** 67:25 70:12 90:13 149:22 150:2

**injunctive** 45:1

**injury** 103:19 138:9

**inquire** 90:9

**inquired** 83:11

**inquiries** 90:6

**inquiry** 90:8 91:19 95:12

**instance** 37:17 41:14, 19 42:15,22 72:5 76:3 146:20

**instances** 9:24 42:19 43:5 75:5,17 157:2, 10,18

**instant** 54:21

**institutional** 147:21 174:6 175:4

**instructed** 41:22

**instruction** 41:16 98:4 146:22

**Instructional** 23:13

**instructions** 54:3 60:18,20 61:8

**instructor** 41:20 185:10,20,22

**instructors** 100:25 110:11 169:22

**instructs** 9:3 85:16

**intend** 22:11 95:1 135:18

**intended** 95:11

**intending** 95:23

**intent** 135:5

**interchangeable** 51:15

**interchangeably** 180:18

**interest** 19:6 76:24 84:7 95:12 107:10

**interested** 19:6 47:13 84:11 99:21 116:11, 13,16 142:2

**intermediary** 48:3

**intern** 24:8 72:24 73:10

**interned** 23:18

**internet** 17:17 110:10

**interning** 24:5

**internship** 23:20 24:1,3,4 25:19,21,23 26:8 72:23 136:6

Index: hydrocephalus–internship

Exhibit 57
DX1034

**internships** 23:2,5, 23,24 32:20,21

**interpretation** 128:2

**interpreted** 174:12

**interrogated** 6:11

**interrogation** 66:21

**interrogatories** 38:18 39:8 41:1 61:2 66:1, 18 67:1

**interrogatory** 38:11 41:2,11 42:1,13,14 43:1 75:22,23,24 76:14 77:3,11,15 82:21,25 83:23 106:25 107:1,2 109:9,10 116:18 117:1 129:16,17,20 131:16,21 132:24 133:20 134:16

**interrupt** 176:6

**introduction** 69:22

**involuntarily** 71:20 72:2,5,8

**involuntary** 72:12

**involved** 18:17 19:21, 24 23:1,7 35:14 140:10 143:10 151:19 152:8 157:11,19 173:4 175:4,8

**iphone** 143:16

**irrelevant** 133:1,17, 21,23

**irresponsible** 157:12, 20

**Island** 32:1

**issue** 157:1

**issued** 49:10 96:14 126:11,18 127:7,12

178:4

**items** 55:12 163:1

---

### J

**January** 25:12 68:8 136:11,12 149:23

**Jennifer** 45:16

**Jenny** 6:15

**job** 23:21 25:2

**jobs** 23:14

**Joe** 99:18

**Joel** 23:20 25:12 33:2 136:9

**John** 19:9 45:8 56:25 66:14 165:17

**join** 19:15 144:8

**joined** 6:17 20:5 167:13

**Jolla** 21:13 26:9,12, 13,15,18 27:8 29:12 37:12

**Jose** 6:8 13:15,16 15:2 38:17 39:9 46:4 53:11 59:10 62:2 64:25 66:25 67:23

**joy** 24:22

**judgment** 68:1 69:14

**juncts** 69:23

**June** 25:13 26:14,16, 17 27:19,25 74:14, 17 136:12

**junior** 74:16

**Justice** 6:17,21 100:3

---

### K

**K-12** 151:18

**Kevin** 24:6

**key** 10:3

**kick** 12:24

**killed** 152:5,12,18

**kind** 126:19 167:5

**kinds** 114:19 115:9

**kitchen** 10:6

**knew** 93:8 94:12 95:10

**knives** 73:16,21

**knowledge** 31:20,23 71:14 73:11 88:5,8 98:5 111:2 162:19

---

### L

**La** 21:13 26:9,12,13, 15,18 27:8 29:12 37:12

**lack** 105:1

**land** 37:7

**language** 128:19,21

**lapse** 175:11

**Laura** 34:5

**law** 22:8,17 47:6,8,9, 15 80:2 87:3 90:17 125:7 138:12 167:5, 8,14

**lawful** 42:7 43:14 79:16 107:15 117:9

**laws** 68:6 70:18,24 71:6 89:19 93:4,7,17 100:23 115:17

**lawsuit** 33:24 47:3 125:8 139:24 140:1, 10,12 141:4,13 166:20 175:8

**lawyer** 46:7 54:12 57:15 59:21

**lay** 180:19

**lead** 119:13

**leader** 23:15 33:19

**leading** 151:2

**learn** 118:7 132:25

**learned** 89:20

**learning** 48:13 133:21 136:19

**leave** 86:17 165:7,11 184:14 187:15

**legal** 25:2 34:12,16 48:5,19 69:24 80:15, 21 85:3,13 87:25 88:7 111:12 126:22 128:12 138:13 150:13 151:3 152:25 154:21 155:18 156:3,15,23 167:10 172:8,22 173:13 179:2,21 180:8,14 181:3,15 182:20 183:9 184:8

**legally** 84:25 95:3

**legislative** 23:20 179:8 180:20

**legislatives** 24:10

**length** 32:20 147:9

**letters** 54:21

**level** 106:3

**lever-action** 117:6, 23,25

**license** 20:19,21,24, 25 49:10 62:24 63:2 64:2,13,14 87:17,19, 20,24 97:4,14 101:15 125:2 126:11,18 127:7,12,

24,25 128:14 129:6 130:5,11 131:3 132:21 134:7 135:5 138:2 169:20,25 170:2 178:4,12 179:14,20

**licensed** 44:3 47:24 48:3 86:14 89:12 90:19 92:11 178:8, 13 179:16

**licenses** 54:21

**licensing** 130:14

**life** 28:7,10 103:10,21 106:16

**lightning** 105:19,20, 22

**limit** 44:2 48:17 131:12

**limitation** 94:1,6 125:8

**limitations** 94:9,13

**limited** 14:2 55:25 56:9 57:3 76:8 79:23 117:5 127:22

**limits** 63:2,14 92:21

**lines** 42:2 129:21

**list** 25:7 168:2 177:6, 7

**listed** 15:17 17:14 48:22 49:2 55:12 57:7 80:14 110:16 117:17,24 118:2 134:15 161:12 162:12,17,20 163:1, 22 164:17 167:13 171:13,17 178:25 180:20 185:4 187:8

**listing** 163:19 164:9 179:4

**litigation** 35:11 150:5

**live** 26:8,11 27:5,7, 20,24 28:11 33:12 72:25

**lived** 26:9,13,15 27:15,21 28:6,9,15 29:11,14,19 31:22 73:23 74:1 102:23 104:19,24 106:7

**living** 25:25 26:2,3, 18,20 27:8,9,22,23 31:24 32:1,13 33:9

**LLC** 86:4,7 89:12 91:4,16,21 94:8,25

**loaded** 95:21

**loading** 122:19 186:23

**loan** 50:6 75:8 76:9, 10,25 80:25 81:4 83:5,12 84:2,6,8 166:7,18 176:8,9,16, 17 177:7 178:7,20, 24 179:5,6,15 180:2, 7,13,17 181:10,14, 17,19 182:12,17,25 183:6,11,13,14 184:10

**loaned** 75:3 76:3,8,20 80:20 165:23 166:3, 5,9,11,13 175:19,21 182:7,19 183:8 184:3,5,7

**loaning** 48:14 76:23 81:5 176:24 182:5, 13,18 183:6 184:1,5

**loans** 166:17 175:21, 24

**located** 21:7,8 25:22, 23 101:1 163:15

**location** 27:4 28:6 163:19 168:18

**locations** 26:20 41:18 74:6 90:2,5

**log** 14:9

**logistical** 24:10

**logs** 54:21

**long** 10:5,7,8,11 26:3 51:7,11,22,25 72:2 76:10 115:23 116:8, 11 126:19 127:8 141:20 175:11

**long-form** 88:22

**loosely** 183:1

**lot** 141:25 150:3

**loud** 41:5,11

**love** 23:4 37:10

**lower** 44:2

**lunch** 36:15 124:20

**lunches** 36:11

---

**M**

---

**M-A-X-I-L-I-A-N** 18:23

**M-I-N-H** 18:24

**Madam** 6:14 16:6 52:21 174:17 177:12

**made** 19:15 56:1 125:1 137:2 143:15

**magazine** 110:10

**mailing** 26:22 27:3

**main** 49:11

**make** 10:25 11:1 19:18 52:3,17 57:18, 21 90:6 94:23 95:4,6 112:1 114:4 130:21 142:12 150:11,18,25 175:12 185:23

**makes** 52:4 71:5

**making** 153:22

**manage** 159:9

**manifest** 138:19

**manslaughter** 150:19

**marathon** 10:16

**March** 158:8,11

**Marcos** 86:4 90:20 91:6,18,21

**Marine** 74:3

**mark** 177:11

**marked** 12:24 13:1 14:14,17 16:5,8,12, 20 30:6,9 37:24 38:1 39:1 44:8,11 46:15, 16 49:15,16 52:22, 23 53:1 59:1,12 61:15,16 64:17,18 67:13,14 68:25 69:1 77:19,21 78:12,14 81:7,9,15 98:6,8,24 99:1 100:6 123:23, 24 125:13 160:8,9 161:21,22 163:5,8,9 176:21 177:3,4,15, 19,20 178:1 184:15

**markings** 14:19

**married** 85:6

**marry** 85:10

**mass** 151:1,8,14,18

**massacre** 151:17

**math** 158:9

**matter** 24:7 63:16 114:15

**matters** 24:9

**Max** 97:6

**Maxilian** 18:20,22

**Jose Chavez**

19:4,5 37:4,19 42:20,23 43:9,13 48:12 75:6,10,18 79:9,11,14,19 80:1, 6,9,13 81:21 82:3 86:3,6,17 88:6,18 89:1,5,20 91:23 92:8 94:12 95:7,20 96:17, 21 97:6 98:2 102:9 132:1 140:21 143:14,17 145:5 175:20 176:15

**Maxilian's** 80:20 82:12,16

**Mccarthy** 24:6

**meanings** 183:2

**means** 12:19 55:25 119:14 126:16 183:15

**meant** 77:5 175:21

**mechanism** 95:9,11 119:19 120:1,6,14

**mechanisms** 48:8

**media** 48:13 56:3,7 58:16

**medical** 11:11 158:13,20,23 159:4

**medication** 158:24 159:9,12,16

**medication's** 159:18

**medications** 11:14

**meet** 167:9

**meet all** 80:13

**meeting** 12:6,10,12 17:18 53:17

**member** 23:8 41:20 87:2,5,10 99:18 141:16 142:6,9,15, 21 143:2,4,22

144:10,22 145:7,12, 16 167:3,5 173:3 174:3,5,13,19,25 175:3,15

**members** 83:3 99:21 105:22

**membership** 142:3 144:4,5,7,16 147:5, 9,20 148:2,5,13,17, 23 149:2,8

**memoranda** 55:11

**memorandum** 69:11, 17

**memorandums** 54:22

**memory** 95:25 175:11,15

**Mendoza** 6:20

**mentioned** 20:7 23:23 26:18 42:20 45:17 112:5 114:16 139:7 142:23 158:1

**mentor** 23:11 24:15, 23 33:17

**mentorship** 24:13 25:3

**mere** 134:18

**messages** 12:15,17 54:21,23,24 55:6,10 56:1 58:15

**messaging** 56:2,6,9 58:16

**met** 167:13

**mid-september** 43:11

**middle** 18:23

**midterm** 24:21

**miles** 134:18 161:17 164:13

**military** 87:9,11 103:8 167:3,8,14

**mind** 84:1

**mine** 66:12 92:9

**Minh** 18:20 37:4

**minimize** 165:14

**minimum** 19:19 101:6

**minor** 50:6

**minute** 43:7 65:14

**minutes** 54:22 55:11 164:25

**misinterpreted** 174:16

**missing** 163:3

**Misstates** 133:19

**mistakes** 175:12

**misunderstanding** 130:15

**misunderstood** 130:12

**mom** 83:17

**moment** 13:22 30:23, 24 36:18 40:18,19 41:8 47:17 66:7 67:3 106:21 124:11 132:9 136:5 160:13 165:7 168:14 170:6 173:2 180:23 186:14

**money** 132:25 133:22 134:4,10,16,24 135:2,8,12,13,14

**month** 10:1 20:11 22:2 91:3 140:17

**months** 43:12 91:4 140:2

**Moreau** 86:4,7,9

89:11 90:1 91:4,16, 20 94:8,25

**morning** 6:15 139:13

**mother** 29:9 34:4,8 74:2,5

**motion** 67:24 68:1 69:12,13 70:12 90:14 149:21 150:1

**Motor** 101:16

**move** 22:6 67:12

**moved** 24:24 26:7 28:10

**moving** 7:15

**Mt** 23:18 72:20

**muh-uhs** 7:12

**multiple** 23:23 40:19 92:2 100:24 183:2

**multitude** 23:1,4

**mute** 13:11 14:1

---

**N**

**N-G-U-Y-E-N** 18:25

**N-H-A-N** 18:24

**named** 14:17 43:24 70:1 99:19

**names** 116:17

**narrowed** 157:8

**naturally** 114:1

**nature** 55:23 150:5 166:18

**nearby** 105:20

**nearing** 150:9 160:5

**necessarily** 9:18 35:9

**needed** 102:16,22

**needing** 48:2 106:9, 20

**neuroscientists** 152:22 153:5,11,17, 21 154:2,8,13,18 155:2

**newspaper** 23:9,10 25:15 136:1

**Nguyen** 18:20,24 37:4,19 43:13 48:12 86:3,17 88:6 95:20 96:17,21 132:2 140:21 143:14,17 145:5 176:15

**Nhan** 18:20 37:4

**nice** 113:11

**nods** 7:11

**non-privileged** 57:22

**non-suicide** 154:20

**Northwest** 32:2

**noted** 33:18 35:8 46:12 176:12

**notes** 54:22 55:11 56:1 164:25

**notice** 6:1 13:13,14 15:1 16:17 67:24 69:12

**noticed** 36:1

**number** 14:18 26:23 30:18 40:18,19,20 50:13,14 52:23 54:15 55:12 58:20 59:4 61:14 62:22,23 70:15,17 100:15 101:3 102:18,19 108:16 116:4,5 123:23 124:21 140:11 143:15 145:25 146:2,11,18 147:2,13 149:5,9

160:14 173:7 177:4 184:22,24 185:3,12 186:1,11,12,18,21, 22,24 187:2,5

**numbers** 163:4

---

**O**

**OASIS** 23:12 33:18

**oath** 8:1,9 66:18 67:9, 10

**object** 165:8,12

**objection** 9:2 48:5,19 56:15 64:7 80:15,21 81:24 84:13,20 85:3 87:25 94:20 104:8 106:11 107:22 108:13 109:5,17 110:6,14 111:5,12, 17 112:11 113:7,24 114:11,22 118:13,20 119:3 120:25 123:19 126:22 128:12 133:18 135:9 136:21 137:7,14,20 138:4, 13 143:7 150:13 151:20 152:25 153:14 155:18 156:3,13,21 157:3, 13,21 158:15,22 165:25 167:10 168:4 172:2,8,22 173:13 179:2,6,21 180:8,14 181:2,15 182:20 183:9,22

**objections** 112:17 113:7,15,24 115:11 119:11,21 120:2,7, 15,20 121:7,13,18, 23 122:4,9,15,20,25 123:6,12 138:20 150:21 153:8,24 154:5,10,15,21

155:5

**objects** 8:25 146:5

**observance** 108:3

**observe** 155:11,14,20 156:18

**observed** 74:19 156:1,11 157:11,19

**obtain** 100:17,20 128:14 130:8,11,14 131:3 132:20 135:16,17 184:22,24

**obtained** 129:23 131:17

**obtaining** 107:10 135:5 169:13 185:8

**occasion** 82:2,6,11, 15

**occasions** 80:12 81:20 92:5

**occur** 37:15 48:2 82:3 91:2,7 158:4 175:1 183:6

**occurred** 71:24,25 76:10,11 82:7 91:3, 19 151:8

**occurring** 106:23

**Ocotillo** 37:4,5,8,9,10 42:5,21 43:12 176:14

**October** 140:22 141:3,7,9,11 149:18 162:6

**offer** 185:23

**offered** 84:24

**offering** 24:17

**office** 23:12 99:8,15

**offices** 9:11

**official** 70:1

**older** 80:6,9 82:13 86:11 126:10,17

**olds** 153:22

**on-campus** 23:14

**one's** 98:5

**ongoing** 158:13,20 159:4

**online** 114:15 129:22 130:25 131:16 137:2

**open** 13:4,6 39:3 41:6 44:19 49:18 59:4,5 64:20 102:13 106:21 116:23 124:4 160:19,25 161:20,24 162:4,8 163:9,12 164:4 168:15 177:5

**opened** 177:1

**opening** 41:8

**Operating** 95:10

**opinion** 172:4,16,19 173:11,17,19

**opportunity** 10:25 58:1 139:6

**opposed** 47:11 93:10

**opposing** 149:21

**opposition** 150:1

**opted** 141:24

**oral** 34:16 55:24

**ordained** 71:4 104:12 111:22

**order** 54:9 56:12,18 71:16 73:9 101:18, 23 115:8 129:5 132:20 133:1 167:8

**organization** 23:12 81:23 142:13 143:19

Index: needing–organization

Jose Chavez

145:19 147:10 174:14

**organizational** 173:4

**organizations** 23:19 142:1 147:21 174:15 175:4

**orientation** 23:15 33:19

**outreach** 32:25 136:10

**outset** 178:17 180:1

**overarching** 125:22

**overlap** 165:14

**overview** 43:24 93:16

**owned** 27:12 29:22 32:8 73:18,20 76:8 104:19

**owner** 94:17,19 97:12 102:2 114:25 119:9 120:5,13,18,23 121:5,10,16,21 122:2,7,12,18,23 123:3,9 127:6 133:7 166:6,9,12,14 173:8 175:22

**owners** 95:8 123:17 134:12

**ownership** 47:10 48:14 81:4 88:25 112:6 115:18 166:8 175:25 176:3

**owning** 47:13 80:3 104:5,11 111:20 115:1 116:12,16

**owns** 75:10 123:9

---

**P**

---

**p.m.** 187:24

**packet** 93:16,18 114:13

**pages** 62:15,18,20 162:15 164:16

**paid** 32:21,22,24 33:4,8,10,13,16,17 144:4,7

**paper** 93:6,12,13 96:23

**papers** 54:22 55:11

**paragraph** 41:25 45:12 54:14 55:16 70:13,15,17 76:15, 17 77:2 83:22 90:15 116:4,5 161:7 168:17 169:5,6

**paragraphs** 45:17,20, 23 46:3,5,7,11 169:2

**parent** 83:11 84:11

**parentheticals** 118:2, 3

**parents** 29:7

**parents'** 27:22

**parking** 168:20

**parse** 29:17

**parsing** 32:17

**part** 15:13 93:22 104:3,5 112:18 126:9,21 140:1 141:18 145:9 147:12 166:20

**part-time** 23:21

**partially** 29:1

**participate** 65:6 68:17 69:16 104:2

**participated** 23:25 24:1 34:19 59:19

**participating** 24:2 25:21 139:10,19,24 140:12 141:3,13

**parties** 149:21 155:23 178:5,11 179:14

**partner** 83:4 85:8,11

**parts** 18:23 74:1 118:12

**party** 28:25 33:24 76:24 81:5 83:25 84:6,7 146:5 147:16 178:3 179:13

**party's** 76:19 84:4

**pass** 169:7,23 185:14 186:5

**passage** 107:7

**passing** 48:11

**past** 17:9 25:11 26:6 39:25 130:11

**pay** 28:16,17,19,20, 22 186:6

**paying** 28:24

**PDF** 30:25

**peer** 23:11 24:13,15 33:17

**peers** 153:23

**Pell** 29:2

**penal** 30:13,19 31:8,9 44:1 46:22,24 47:2, 4,18,20 48:22,24 49:2,23,24 76:4,21 77:12,15 78:1,5,18, 21 79:2 81:11,14,17 125:12 127:2 167:9 176:21 177:3,21,23, 25 178:1,16 179:23 180:25 181:18 183:13

**participating** 24:2
**penalty** 8:2 68:5

**people** 36:13 37:13 49:8 92:12,15 93:1 102:9 150:10 152:5, 12,18 155:10,25 157:1,19 175:11

**perceive** 127:23

**percent** 100:21 150:18,19,25 151:1, 18 184:25

**perfect** 140:5,7

**perfectly** 108:9

**period** 25:14 26:11 36:15 74:10 136:10 140:9

**periodically** 74:12

**periods** 26:21 28:14

**peripheral** 130:12

**perjury** 8:2 68:5

**permitted** 37:14 76:4, 20 86:22 128:1

**perpetrated** 151:1

**person** 35:17,19 37:19 41:21 50:5 85:11 95:22 101:7 103:15,17 125:25 126:9,16 164:10 166:10,13,14 175:21 176:10,11 182:5,6, 13,17,19 183:6,7 184:1,2,5,7

**personally** 103:4,10

**phone** 13:12 14:3 131:10 141:23 142:24 143:15,21 144:13,17,21

**photocopy** 62:23

**photographs** 54:22

Index: organizational–photographs
www.aptusCR.com
Exhibit 57
DX1039

**Jose Chavez**

phrasing 113:17

physical 27:4 72:9,13

physically 35:16,19

pictures 36:14

piece 93:6,11,12,13
96:22 176:10,12

pistol 117:4,20

place 29:13 37:11,13
102:23 105:17 164:1

places 106:7

plaintiff 7:16,17
13:15 15:2 34:6,9
38:17 39:9 46:4
53:11 59:10 62:2
64:25 66:25 69:20
70:2

plaintiff's 67:24

plaintiffs 15:12,15,
23,25 16:2 20:4
50:19,22 149:22
173:4 174:6,13,14

plaintiffs' 69:11
150:1

plan 22:9 102:11,14

plans 22:4

pocket 73:16,21

point 17:25 24:15
25:3 28:7 86:25
95:22 100:3 106:15
115:17 130:19

pointed 143:18

points 8:7,24 9:17
69:11,17

policy 15:13,18,20
30:4 141:18,23
142:10,12,14,17,24
143:2,5,11,22,23
144:1,5,8,11,15,17,

18,22,23,25 145:3,8,
13 147:5,6 148:13,
17,23 149:2,8,16
174:7,8

political 22:16

Polos 36:2

pool 105:18

population 150:18,25

portion 40:17 109:10
129:19

posed 40:10 180:10

position 24:13 33:1,
5,7

positions 22:12
33:13

possess 71:13 83:4
115:23 116:8 128:14
166:21

possessed 127:11

possesses 74:3
126:10

possessing 80:2

possession 108:4,22
113:17 125:25 126:6
148:1,16,22

possibility 106:22

potential 95:13

Poway 72:21

practice 42:23

practiced 41:14,15
42:15 146:21

practices 96:9 121:6
123:16 173:18,19

pre-qualify 135:17

precluded 128:20

precursor 125:21
126:9,21

preliminary 67:25
69:12 70:12 90:13
149:22 150:2

premise 64:8

premises 81:23 82:8

preparation 94:17
97:12 102:2 108:20
171:21 172:5

preparations 94:23
95:4,6

prepare 10:24 17:4,8
18:15 62:7,11 65:9
94:19 95:14 168:10

preparing 56:5 139:2,
9,15,18

presence 42:9 79:10,
11 176:12 182:6,18
183:7 184:2,6

present 101:13

presented 152:2

presenting 101:14

President 99:18

pressing 86:16

presuming 10:9

pretty 135:23 155:8

prevent 11:12 169:13

preventing 41:7

prevents 47:9
137:12,18

preview 41:8 116:23

previous 26:15 58:17
74:1 99:16 110:23
127:4 158:20 170:9

previously 18:5
37:18 42:19 60:14
65:24 66:3 86:5
125:17 151:25 152:3

162:25 163:8 177:19
184:21

primary 14:3

primitive 171:4,12
172:21

principles 96:24,25

prior 15:5

private 12:17 31:12

privilege 57:20

privileged 58:13
143:7 158:15

problem 130:22

procedural 69:22

procedures 7:25

proceed 11:6 14:8

proceeding 8:7 9:13
10:12 17:22 34:13,
16 51:20 52:1
124:18

proceedings 51:6
67:11

process 104:3,6,13

procrastination
63:17

procure 97:4,14,23
101:18,23 129:5
131:14 137:25

procured 127:21
128:10 129:1

procuring 138:1

produce 58:12 64:13
149:1,4

produced 56:24
63:21,24

production 40:22
53:11 56:13,20 62:4
63:21 145:23,25

Index: phrasing–production

Exhibit 57
DX1040

146:1,11,18 147:1,
13 149:5,9

**program** 23:20 24:24
29:2 100:11

**prohibited** 80:2 91:13

**prohibition** 90:21

**prohibits** 30:1

**promoted** 99:18

**proof** 16:17

**property** 176:10,12,
16

**proportional** 108:25

**protected** 57:19

**proverbial** 25:4

**provide** 8:23 9:21,23
10:2 11:15 18:8 19:2
43:23 57:11 58:6
66:17 72:25 73:8
84:25 86:19 120:10
139:6

**provided** 17:11 53:22
54:4,19 56:19 57:14,
16 59:23 96:9

**provision** 31:11

**provisions** 6:25 44:1

**psychiatric** 71:21

**public** 22:17 31:12
151:18

**pull** 13:23 37:23
38:23 40:19 44:5,13
46:14 49:14 52:19
58:24 64:16 65:23
68:24 77:18 78:12
98:6,23 125:12
160:7 167:20 170:4

**pulled** 40:18 53:5
60:25 81:11 99:3
131:10 167:25 170:7

184:19

**purchase** 19:18
70:20,25 71:3,13
85:21,25 86:9 87:23
88:3,19,21,23,24
89:2,6,7,21 90:2,4,5,
10,16 91:7,15,17,20,
24 92:6,13,15 93:2,9
94:2,18,22,24 95:1,
2,3,16 97:2,11 99:11
103:25 107:13
109:12 114:10
115:22 116:8 117:4
126:19 127:8,13
133:17 138:10
166:24 167:1,2
169:20

**purchasing** 19:7
47:9,13 71:9 80:3
91:13 93:17 95:12

**purpose** 72:19 79:16
82:16 127:22 135:17

**purposes** 33:11
107:11,15 129:2

**pursuant** 6:1 178:4,8

**pursuing** 130:14

**put** 61:13 105:18
160:3 163:4

---

**Q**

**quad** 36:10

**qualifications/
requirements** 101:7

**qualified** 128:16
135:12

**qualifier** 112:20,21
135:1 176:5,7

**qualify** 169:24,25
170:2

**qualms** 135:12

**quantify** 140:14

**question** 8:22 9:1,2,
4,5,18 10:19,20
17:24 18:12 51:21
57:3 65:18 71:5
77:5,11 86:18
100:14,16 101:3,5
103:9 104:20,22
108:10,16 109:3,21
110:3 112:2,8
113:10 114:12 115:3
116:3 118:8 119:17,
24 120:12 127:18
128:18 130:2,3,13,
16,20 131:12 132:9
148:19 157:8,16,24
174:12,16 180:10
184:12,13,22 185:4,
12,13,25

**questioning** 165:4

**questions** 6:23 8:13
11:5 40:10 45:15
52:9 100:12,22
130:20 133:13
135:21 164:22
165:6,7 173:22,25

**quick** 36:14 157:24
161:10

**quickly** 177:24

---

**R**

**Ramona** 160:20
161:16 162:5

**range** 37:15,18,21,22
42:23 43:10 81:22
82:4,7,8,12 95:18
96:6,8,9,13,15
120:24 122:13,14
132:1,3

**ranges** 41:15

**re-relate** 45:20

**reach** 19:23 47:14
140:19

**reached** 139:25 165:4

**reactions** 119:13

**read** 30:22 31:8 40:2,
5 41:1,5,11,25 45:22
46:11,24 47:4,17,20
49:21,24 50:3,14
53:8,16,21,22 54:2,3
59:7 60:15,19 61:5,8
64:21 65:14 66:8
69:8 75:24 76:17
77:2,15 78:8,23,25
79:2 82:25 83:22
90:15 93:21,22
100:9,19 101:5,10
107:7,16 109:10
117:3,11 124:14
125:20 126:4,13
127:17 129:19
146:4,7,9,14,15,24
147:1 149:20 159:6
168:18 177:23
178:18 183:18,25
184:21 185:3,13,25
186:12,18,21,24
187:2,5,8

**reading** 17:6 31:4
48:24 49:4 110:10
126:23 127:1 128:17
184:4

**reads** 182:4

**ready** 14:8 47:19

**Real** 63:14

**reason** 10:15 11:8,10,
19 63:13 73:25

**reasons** 84:1

**recall** 39:12 55:14
92:3 131:20 132:5

Exhibit 57
DX1041

142:6,9,20,22 143:25 144:4,6,7,9 174:3

**receipts** 54:23

**receive** 29:6,8 70:20 71:1,3 149:15

**receiver** 126:8,21

**receiving** 71:9 80:3

**recent** 32:24 33:4

**recess** 35:25

**recognize** 14:21,22 16:11 30:12 39:24 40:5 44:21 53:14 61:22 65:4 66:4 67:20 69:6 77:25 78:1

**recollection** 95:20

**record** 8:8,23 10:21 12:4 13:23 14:7,11, 13,16,24 16:14 17:16,22,23 18:21 30:16 41:2,11 50:3, 15 52:18 67:2,5 75:25 90:15 124:17 142:5 159:22,25 160:4 165:2 174:21 177:10,14 187:21,23

**recorded** 151:2

**recordings** 54:23

**records** 54:8,20 55:7 147:19

**recounts** 133:12

**recreationally** 42:7 43:14

**reduced** 19:19

**refer** 12:14 17:19 46:3,4 51:6 52:22 54:14 185:24

**references** 178:17

**referencing** 44:8 51:8 52:23 139:15

**referred** 18:19 19:3,9 51:12

**referring** 12:9 52:2 130:13 134:5 142:16

**reflect** 148:1,5,12,16 157:20

**reflected** 81:14 157:12

**reflecting** 148:23 149:1,7

**refreshed** 175:14

**registered** 37:13

**registration** 160:19, 24 162:4,8 163:12 164:4

**reject** 84:18 85:1,12

**relate** 63:4 105:5

**related** 52:9 72:9,12 105:1 106:1 158:20 159:5

**relating** 22:24 41:13 76:2,23 88:17 131:13 146:19 147:3

**relation** 99:11,20

**relevant** 58:14 69:22 114:25 134:14

**relief** 45:1

**remain** 67:9 79:9,11

**remained** 26:22

**remaining** 161:2 162:9 164:5,6

**remains** 183:7 184:6

**remember** 17:7 36:11 42:21 66:23 105:15

125:9 141:22 144:13 174:22

**REMEMBERED** 6:1

**remind** 67:8 132:7

**remote** 6:3 165:13

**remotely** 9:10

**render** 71:13

**rent** 28:16,17,19,20

**renting** 105:19

**renumbering** 163:2

**repair** 10:24

**repeat** 104:20 120:11 157:15

**repetitive** 118:9

**rephrase** 19:22 56:17 84:23 89:4 102:21 103:3 104:21 115:6 118:8 163:18 186:4

**rephrasing** 113:11

**report** 40:12

**reporter** 6:5,14 7:8 8:12,15 10:23 14:18 16:6 44:7 52:20,22 84:15 104:16 132:10 148:10 162:22 174:17 175:6 177:12 183:21 187:18,20,23

**Reporting** 12:4

**represent** 6:19

**representative** 143:23

**represented** 7:2 34:3

**representing** 34:8

**request** 56:13,20 63:21 145:25 146:1, 4,5,8,9,11,14,15,18 147:1,13,17 149:5,9

**requested** 56:25 57:12 64:11,13 72:25 149:8

**requests** 53:10 54:9 55:8 56:6,19 58:7 59:9,18 62:3 65:1,13 145:23

**require** 108:17 173:12

**required** 9:4 56:21 66:17 73:8 97:3,14 101:19,22 129:25 131:19 132:20 182:13 185:22

**requirement** 178:23 180:5

**requires** 112:15 113:4,6,14,23 127:21

**requiring** 112:21 113:5

**resay** 113:20

**research** 18:15 88:4, 7 89:19 92:20,23 93:3,8 95:17 97:3,13 102:9 110:4,6,9 114:8,15

**researched** 111:9 115:17

**reserve** 50:22

**reside** 134:19

**residence** 26:19 29:13 104:23

**resident** 23:15 33:6 99:24

**residential** 106:5

**resistance** 89:11

**resisting** 154:3

**respond** 54:9 56:12, 19

**responded** 174:24

**responding** 56:22 76:19,24 83:25 84:4, 6,7 146:5 147:16

**response** 7:22 38:7, 8,17 41:25 43:1 59:19 62:2 63:21 64:25 66:24 76:13, 15 77:3,15 83:23 100:19 107:8 109:9 112:6 115:4 117:1,3 129:20,21 131:15,21 132:24 143:10,12 145:24 146:8,10,11, 14 147:13 164:22

**responses** 7:8,13 40:25 56:5 58:6 59:17,24 60:1,16,21 61:6 62:7 64:4,5 65:7,12,19,20,25 66:21 75:22 106:25 116:18 120:10 129:16 145:23

**responsibilities** 24:13 111:16,20,22 112:10 134:11,13

**responsible** 113:13, 16,17,20,22 114:1, 20 115:8 118:6,11, 17,25 119:9,18,25 120:5,13,18,23 121:5,10,16,21 122:2,7,12,18,23 123:3,16 133:6 171:19 173:8

**responsibly** 157:2

**responsive** 55:7 58:12 147:17 149:4

**rest** 52:1 130:18

**restate** 114:13

**restraining** 71:16

**restrict** 93:4

**restricted** 54:11

**restrictions** 51:2

**resumed** 36:4

**retake** 185:19

**retired** 74:3

**retrieve** 58:14

**review** 10:25 15:4 16:20 17:10 39:13 45:9 60:1 68:20 139:4 162:15 170:9 174:10

**reviewed** 17:11,20,23 60:4,5,6,7,14 127:5 132:19 167:17

**reviewing** 18:13 39:23 45:23

**revisited** 130:11

**revolver** 117:20

**revolvers** 117:4

**Rhode** 32:1

**rifle** 51:12 52:2 95:1 107:13,14 109:13 126:8,20

**rifles** 49:8 51:9,22 52:6,10 88:13,22 111:3,10 116:13,14, 15 117:4

**rights** 90:22 104:4 117:10 133:2 138:22 142:21 147:7 148:6 174:9

**risk** 154:9,14,19 155:3

**Rob** 6:20 13:16 19:8

99:20

**Robb** 151:15 152:4,7

**robbed** 35:10

**ROGS** 38:8

**role** 24:14 25:2

**room** 9:11 10:8,11

**Rosenberg** 6:14,15 7:1 8:16,17 13:3 14:12 16:10 27:2 30:11 31:5 38:12 39:4 42:11 44:10,17 45:19 46:1,19 48:6, 23 49:19 51:17 52:21 53:3 55:20 56:16 59:3 61:18 64:9,23 67:4,6,16 69:3 73:4 75:15 77:10,24 78:16 79:6 80:18 81:1,12 82:1 83:19 84:17,22 85:4, 15,20 87:1 88:2,16 89:16 92:24 94:21 96:7 98:10 99:4 104:14,17 105:11 106:18 108:5 109:2, 8,20 110:8,20 111:8, 14,24 112:14,23 113:12,19 114:2,17 115:2,16,21 117:18 118:16,24 119:7,15, 23 120:4,9,17,22 121:4,9,15,20 122:1, 6,11,17,22 123:2,8, 14,21 124:1,19 126:23 127:1,3,15 128:23 131:11,23 133:9 134:1 135:19 136:15 137:3,10,16, 23 138:7,18,24 140:6 141:1 143:8 145:20 148:11 150:16,23 151:7,12, 24 152:15,21 153:4,

10,16 154:1,7,12,17 155:1,7,19 156:6,17, 24 157:6,17,23 158:18 159:2,14,22 160:1,12 162:1,23 163:7,17 165:1,3,16, 25 167:10 168:4 172:2,8,22 173:13, 24 174:1,17,23 175:7 176:19 177:17 179:3,10,24 180:9, 22 181:4,21 182:2 183:3,17,24 184:11 187:15

**rule** 10:18

**rules** 6:25 7:6 95:19, 21,24 96:1,9,16,17, 20 115:14

**ruling** 35:8

**run** 36:12 60:19

**running** 53:23 54:4 60:13 61:9

**Russian** 88:12,15

---

**S**

---

**Sacramento** 99:20,24

**safe** 94:23 95:8 122:18 171:16 172:14 186:15 187:4

**safely** 120:19 121:22 122:3,24 123:4 186:20,23

**safety** 95:17,19 96:1, 18 97:17,21,24 98:3, 17 100:11,18,23 101:8,19,23 102:3, 12 105:1,7 114:5,9, 14,19 115:9 120:6, 14 121:5 122:13 123:15 124:21

Exhibit 57
DX1043

**Jose Chavez**

133:4,15 136:20 171:10 184:23,24 185:5 186:16 187:7

**salary** 33:17

**sale** 49:7 50:20 94:2 95:13 126:5 178:6 179:15 180:17

**sales** 44:2 47:23 51:2 92:21 93:4 94:6,10, 14 95:12

**salesman** 86:15 87:5

**salesperson** 86:19 87:2,22

**San** 18:20 21:13,14 22:7,9,11 23:10,15, 16 24:16 25:16 26:10 27:8,13 29:23, 25 33:1,8,20 37:19 43:10 68:8 72:22 74:17 86:4 90:20 91:6,18,21 131:9

**Santa** 34:3

**save** 12:7,13

**saved** 12:11

**scan** 59:15 66:7,9 69:18 72:25 93:23 161:10

**scanned** 59:14

**scared** 105:24

**school** 21:3,4,8 22:8, 20,25 23:18 25:15 29:3 30:4 36:8,9 72:21 134:19 151:9, 15 152:5,8

**schools** 151:19

**science** 22:16

**score** 100:20 184:25

**scratch** 153:20 173:10

**screen** 13:21

**scroll** 30:21 39:25 68:3 76:13 100:14 101:3 124:11 164:8 170:14 171:5

**scrolled** 131:10

**scrolling** 40:4

**search** 55:10 56:6,9, 11,22 57:6 58:1,11 102:7 147:19,23 149:7

**searched** 54:13 55:5, 7

**searches** 54:8,10,11 56:11,18 57:3 58:21 64:4

**Seatgeek** 149:15

**seats** 161:2 162:8 164:4,6

**section** 30:19 44:1 46:23,24 47:2,18,22 48:16,25 49:4,6,23, 24 51:2 60:12 78:6, 8,18,21 79:2 80:14, 23 81:14,18 125:12, 18,22 127:2 128:1,9 129:1 131:8 168:16, 23 169:5 176:22 177:4,23,25 178:1,9, 10,17,18,20 179:4, 12 180:2,16,25 181:5,9,13 182:3,4, 16 183:13,16

**sections** 76:21 77:12, 16 93:24 178:5

**security** 32:16 106:4, 5

**seeking** 166:20,22,24 167:1

**seeks** 146:6

**select** 108:17,18,24 109:6 118:18

**Self-control** 187:10

**self-defense** 36:21, 23 83:6 107:15,21 108:4,12,22,24 109:4,16,22 110:5 111:4,10 128:5,11, 16,21 172:16,19

**self-injury** 154:20

**self-restraint** 152:24

**sell** 50:5,7 86:15,20, 22 125:24

**semiautomatic** 51:22 52:5,10 107:14 111:3,9 117:6,22,25 126:7,20

**semiautomatics** 49:8

**send** 12:15,17

**senior** 74:16

**sense** 52:3,4

**sentence** 145:9 168:18 169:6,9,11

**sentences** 7:9 8:14

**separate** 50:23 66:22 91:11,12 92:5,14,15 93:1 144:21

**September** 19:25 20:13,15 21:24 22:1 26:16,17 27:19 28:1 37:20 74:18 96:6,8 132:6,16 140:21 162:6

**series** 118:5

**serve** 25:2

**served** 24:15,23,25 60:2

**service** 16:17

**services** 12:5 23:13

**serving** 24:18

**session** 21:23 82:9 160:20 162:13

**set** 6:12 7:7 31:16 38:18 39:8 40:10,25 53:10 59:9 60:10,11, 24 61:2 62:3,4 65:1, 2,25 66:25 70:6 78:11 101:25 161:19 180:23

**sets** 38:8 44:2 179:12 181:14

**setting** 6:25 9:9 107:19 108:8,10

**settings** 9:12

**share** 19:5 150:11

**sheets** 54:23

**shoot** 37:14 42:7 43:14 97:7 122:13

**shooter** 152:8

**shooters** 151:19

**shooting** 37:3,6 41:15 42:8,15,20,23 43:10 75:5,17 79:8, 12,14,19,25 80:5,8, 12 81:21,22,23 82:2, 3,4,7,9,12,16 95:18, 23 96:13 122:8,13, 14,18 146:21 151:8, 14 152:4,7,11,16 187:11

**shootings** 151:1,18

**shop** 86:3,7,17

**shops** 86:6

**Shorthand** 6:4

**Shortly** 149:18

**shot** 42:6 43:8,13,15,

**Jose Chavez**

18,20 117:8 118:2
131:8

shotgun 52:2 107:13
109:12,15,22,24
110:1

shotguns 51:9
109:19 116:13,15
117:5

shots 170:24

show 13:20 147:20
151:18

showed 96:20

shown 65:24 96:17,
19 118:22

shunt 159:7,16,19

sign 66:20,22,24
96:16 143:4 144:11,
16

signature 66:10,12,
13 68:11,14

signed 68:21 141:21,
22 142:23 143:1
144:10,18 174:15

signing 149:18

simply 138:16 183:5

simultaneous 27:1
31:2 38:10 42:3
51:14 55:19 64:22
73:3 75:12 77:7 79:4
84:14 86:23 88:14
89:9,15 96:4 105:10
113:18 131:6 136:14
140:3,24 163:16
168:25 176:4 179:9
182:1 183:20

single 49:2 79:23
117:8 118:1 186:2

single-action 117:7
118:1

sink 134:3,9

sites 56:3 58:16

situation 80:24
166:10

situations 173:7

skills 122:8 134:11
170:18 171:10,21
172:6

skimmed 93:18,20
149:24

slit 159:8,20

Slow 8:15

slowly 8:18

small 73:16,20

SMS 56:9 57:4 58:17

social 48:12 56:2,7
58:16

sole 25:13 63:20

solely 106:1 158:24

solemnity 9:13

sort 10:3 11:24 24:19
96:12 97:4,15
101:20 102:11,17
125:5,21

sought 88:18

space 18:24 33:9,12
165:11

spam 149:14

spare 9:10 136:19

speak 8:13,18,21
10:15 51:25 83:25

Speaker 24:5

speaking 23:9 143:23

specific 29:15 37:17
51:11 119:14 175:17

specifically 23:22
46:10 52:9,24 66:24
108:7 112:6 113:3
144:14 157:7 168:11
174:15

speculate 9:19

Speculation 114:23
118:14,20 119:4
121:1 135:9 136:22
138:5,14 151:4,21
153:1 154:22 156:4,
15,23 157:4,13
184:8

speech 23:7,17 25:16

spell 18:21

spelled 18:22,24

spent 25:9 136:1
139:2,9,15,24
140:12 141:3,12

spoke 86:19 143:1,21

spoken 32:20

spouse 83:4

stab 18:3

stand 176:18

Standard 146:17

standing 36:13
100:12

stands 19:17 23:12

start 95:15 118:9

started 105:20

starting 41:12 42:1
53:23 54:4 60:13
61:9 72:1 117:2

starts 41:2

state 6:5 17:16,23
30:16,18 41:13
46:22 49:23 52:10
70:19,25 76:2 78:5,

18 80:2 81:17 83:25
99:8 128:22,25
133:10 147:14

State's 50:20,23

stated 39:17,20 57:3
74:3 109:12 115:22
129:3 132:23 135:25
136:8,10

statement 63:1,4
68:12 111:15 112:9,
19 116:2,7 130:1
131:15,21 176:18

states 22:18 26:1
68:6 70:19,25
129:21 150:12 178:2

stating 178:10 180:5

statistic 152:1,2

status 147:9

statute 76:7,22
126:24,25

statutes 92:20

statutory 44:4

stay 74:10

stayed 26:23 74:12

stepfather 74:2,19
75:1 83:15

stepfather's 74:23

Stephanie 6:18
187:15

Stockton 99:23

stopped 86:16

storage 94:23 95:9,
11

store 121:22 122:3
123:4

stored 29:13,20
31:18,21 32:12,14

Exhibit 57
DX1045

73:24

**stores** 93:15

**straightforward**
138:23

**strategies** 170:22

**stray** 57:19

**striking** 105:20

**strong** 69:23

**stubs** 55:3

**student** 23:10 27:10,
12,15 28:14,19,20
29:11,19,21,23 32:4,
5 169:7

**students** 24:16,20,23
36:9,10 155:11,14,
21 156:7,9,11,18
157:11

**studied** 22:15

**study** 22:14 98:17,19
124:9,13,14 167:18,
24 168:2,7,10 170:4,
10,11 185:23 186:10

**subdivision** 30:21,
22,24 31:3,8,11
49:6,7 125:18,23
126:2,4,16 127:2,5,
17,20 128:9,25
182:3,4,17 183:18,
19,25 184:4

**subject** 24:7 44:4
47:3 71:15 72:16
85:22 114:15 170:20

**subjects** 88:10
170:10 171:25

**Subsection** 50:1,4
76:5

**subsections** 180:24

**subset** 51:22

**subsidized** 28:25
29:1

**substantiating** 147:4

**suburb** 21:13 26:9
43:10

**succeeded** 99:19

**successfully** 130:15

**suffered** 34:1

**sufficient** 57:16
176:15

**suicide** 103:13
154:14

**summary** 68:1 69:13
171:14

**summer** 21:23 74:13,
16

**summers** 74:1

**Superior** 34:3

**supermarket** 152:12

**supervised** 41:21

**supervision** 37:21
43:8,16 96:18 97:8
176:17

**supervisor** 23:19
25:12 33:1 136:9

**supply** 125:24

**supplying** 126:5

**support** 23:13 67:24
69:12 70:11 90:13
149:21

**supported** 32:5,7

**suppose** 63:6 106:5
110:2 166:23

**surface-level** 110:18

**surgeries** 34:2,8 35:8
158:2,4,7,14,21
159:5

**surrounding** 26:1

**survival** 171:21 172:6

**suspicion** 71:21

**swept** 36:4

**sworn** 6:11 17:22

**syndrome** 159:8,20

---

**T**

**table** 10:6,7,8,11

**tabs** 40:19

**taking** 11:14 13:13,14
15:1 36:14 102:5,13
137:12,18,25 185:7

**talk** 7:25 11:25 21:2
32:19 85:21 94:16
99:6 132:8 142:19
149:6 177:24

**talked** 110:16 125:17
126:15 135:23
157:25 179:12

**talking** 66:23 119:12
125:9 165:8

**talks** 180:16

**target** 187:10

**targets** 37:14 42:16
82:17 146:21

**taught** 169:22

**teachers** 36:4,11

**team** 25:16

**technically** 102:20

**techniques** 171:4
172:17

**temporarily** 166:21,
23

**temporary** 166:17,19
175:22 176:3

**ten** 36:3 140:2

**term** 182:25

**terms** 180:18

**terrible** 104:22

**territory** 57:19

**test** 98:5 100:22,24
101:9 169:17,20
170:12 185:1,7,9,14,
17,19 186:2,6

**tested** 168:2 169:8

**testified** 135:25
174:2,4 175:1,2,20,
23 182:12

**testify** 181:25

**testimony** 11:2,9,12,
15,20 34:12,15
85:22 115:15
133:10,19 174:11
176:1,2,8

**Texas** 151:9,15
152:5,8

**text** 54:13,23 55:6
179:22 182:22,23

**theoretically** 169:15,
18

**thereof** 6:3

**thing** 8:18 66:8
136:24 175:17

**things** 52:17 54:20
76:6 118:6,7 159:3
173:12

**thinking** 105:21
131:2

**third-parties** 84:1

**third-party** 84:5

**thirsty** 10:14

**Thomas** 86:9

Index: stores–Thomas

**Jose Chavez**

**thought** 99:22 102:7 130:2,13

**thoughts** 99:25

**threatened** 72:13

**threats** 105:2,5,8,23, 25 106:2

**thrown** 135:15 182:25

**thunderstorms** 105:23

**ties** 99:22

**time** 20:22 22:14,24 25:8 26:11,21 28:13 29:11,19 31:22 36:6 40:2 41:17 43:8,19, 21 46:9 54:23 58:3 63:15 70:2 74:10 79:25 80:5,8 82:5,6 85:25 88:5 92:9,19, 25 96:3 106:25 131:2 132:25 133:22 134:3,9,10,15 135:2, 4,13,14,16 137:2,18 139:1,4,8,23 140:10, 18,20 141:20 146:17,22 151:10 157:16 161:11 165:15 185:18

**times** 42:8 43:15 79:9,12 82:9 92:11 108:20 182:6,18 184:2,6 186:6

**tired** 10:14

**title** 30:16,18 38:13 39:6 49:21 53:8 59:7 61:24 62:1 64:24 78:2,4,17 81:16 98:15 100:9 124:8 160:17

**titled** 67:25 100:16 167:24

**today** 6:24 7:3 8:1 10:13 11:6,9,12,15, 20 12:17 15:5 16:21 28:7 31:9 39:22 40:3 46:8 48:25 49:4 51:6,23 54:3 59:13 67:11 78:8,23 125:6 126:16 139:10,19 158:1 164:22 175:11

**today's** 17:4 52:24 139:2,9,16,19

**told** 74:5 86:11,21 87:19 88:21 89:1,5 91:23 95:7,19 118:21

**top** 50:2,4 160:23 181:22

**topic** 133:1,21,23 170:19,22,23,24,25 171:5,8,11,15 175:15 186:12,15, 18,21,24 187:2,5,9

**topics** 88:17 114:19 115:9 123:15 124:12,22 133:4,6 168:2 172:4 187:8

**tort** 35:9,11

**total** 91:10 136:19 139:18

**Town** 160:20 162:5

**track** 143:16 150:4

**Tracy** 21:8 27:21,25 28:4,10,15 106:3

**trader** 89:13

**traditional** 160:19,23 161:3 162:4 163:13, 20

**training** 96:12,14 102:3,6,12 114:5 124:21 133:4,16

134:7 136:20

**transaction** 178:3,6, 12,23 179:14,15,20 180:6

**transactions** 179:18

**transcribing** 8:12

**transcript** 10:24 11:1 187:21

**transfer** 48:8,14 50:6, 20 55:23 81:4 94:2 128:15 166:8 175:24 178:7 179:16 180:17

**transferred** 128:20

**transfers** 44:2 47:23 48:2 51:2 92:21 93:4 94:6,10,14

**transport** 122:24

**Transporting** 187:1

**treatment** 158:13

**treats** 159:7

**trial** 11:3

**trouble** 64:15

**true** 68:7 116:7 130:1, 9

**true/false** 100:24

**truth** 8:2

**truthful** 130:22

**tuition** 28:21,22

**turmoil** 24:22

**turn** 41:24 95:13 132:18 138:11 147:1,12

**turned** 23:21

**turning** 20:11 39:17

**type** 40:21 51:11 74:25 109:23 119:1

179:5

**types** 88:20 110:12, 17 116:15 117:8,13 118:2 123:9 127:8

**typo** 77:8,9,13

***

**U**

**U.S.** 151:2

**UC** 23:10,15,16 24:16 25:16 27:8 29:23 32:2,15 74:17

**UCSD** 22:14 23:7,11 24:18 28:14 29:12 155:12,16 156:7 161:17 164:13

**Uh-huh** 125:19 181:8 182:9

**uh-huhs** 7:12

**unable** 19:17 47:14

**undergo** 73:8

**undergone** 35:7,11

**undergraduate** 156:11

**underlying** 131:20

**underneath** 160:23 169:2

**understand** 8:9,10 9:5,6,14,15 10:21,22 12:21,22 40:9 42:14, 17 47:22,25 48:16 51:1,10 52:6,7 54:25 57:23,24 58:5,8,21, 22 80:19,23 108:9 115:4 117:21,22,23, 24 118:18 121:10,16 127:6,11 129:5,9 130:19,21 131:14 135:20 143:9 167:12,14 168:9,10

**Jose Chavez**

Chavez vs.
Bonta

169:9,11 178:14
179:1,4,7,20 180:13,
16,21,24 181:13
183:1,5 184:4 186:1,
5

**understanding** 47:6,
8,15 69:24 76:19
81:3 92:4 95:5
110:2,12,18 117:16,
19 124:25 137:24
161:16 165:19,21,23
166:3,5,7,12,13,16,
18 167:7 168:1,7
169:19,21 170:10,13
171:23,24 172:5,14

**understood** 14:6 40:1
47:16 51:21 52:11,
12 63:18 95:2 114:4
159:21 175:19 183:4

**underwent** 34:7 73:1

**unexpired** 49:9 87:16
126:10,17 127:7

**Unified** 72:21

**unit** 170:16,18 171:2,
3,13,15,17,18,20,22
172:14 186:11,13,
15,19,22,25 187:3,6

**United** 22:18 68:6
70:19,25 150:12

**universe** 55:7

**university** 21:13
27:13 29:25 31:12
32:6,7,8 33:7,19

**unlawful** 90:21

**unlicensed** 92:9

**unloading** 122:19
186:23

**unsafe** 104:18,23
106:6

**unsafety** 105:5

**updated** 58:6

**updates** 141:24 142:2

**uphold** 145:18

**ups** 24:19

**usage** 80:25 106:17,
22 118:22 128:3

**user** 114:20 115:8
118:7,11,17,25
119:19,25

**usual** 36:5

**utilize** 102:8

**utilized** 37:22

**utilizing** 29:23 176:16

**Uvalde** 151:9,15
152:5,8

---

**V**

**vacation** 105:16

**vague** 83:18 92:23
94:20 106:11 107:22
108:14 110:6,14
111:5,13,17 112:12
114:11,22 117:15
119:4 121:1 126:25
127:10 136:22
137:20 138:15
145:14 150:14
151:4,10,21 152:13,
19 153:2 154:23
156:4,16 157:4
158:22 168:5 172:2
179:6 181:2 182:21

**valid** 49:9 87:16
126:10,17 127:6,10

**valley** 99:22

**values** 145:18

**variety** 86:8

**Vehicles** 101:16

**ventricle** 159:8,20

**verbal** 7:8 40:13
59:20

**verification** 66:20

**verify** 65:12

**verifying** 65:19

**version** 185:19

**versus** 13:16

**veteran** 87:14

**victim** 35:6

**videoconference** 6:6

**videos** 54:23 88:7,10

**view** 25:3 107:20
108:11 129:12
131:1,7 133:15
157:18 170:8 185:24

**viewing** 41:7

**violence** 71:16 72:9,
13 154:9

**violent** 150:12

**visit** 86:3 91:4 96:6
130:9 131:24 132:1,
3,14

**visited** 86:5,6 90:1
91:8 96:8 99:7,23
100:2 129:11,22
130:7 131:2,17
132:19

**visiting** 74:9 99:14
110:10 130:25

**Vital** 170:24

**voice** 54:24 55:10

**volunteer** 23:17
72:20

**VP** 159:7,16,19

---

**W**

**wait** 8:21

**waiting** 35:25

**waiver** 96:16

**walk** 85:24

**walking** 24:20

**wanted** 12:3 84:11
86:6 87:18 89:23
99:7 118:9 136:18
157:24

**War** 88:13

**warrant** 106:22
108:21 110:1

**warrants** 106:16

**Washington** 24:2
25:22,23,25 26:2,3,5
31:24 32:2,13,15

**waste** 132:25 133:22
134:10,24 135:1,4,8,
11,13

**wasteful** 133:24
134:2,15

**watched** 88:7,11

**Watsonville** 28:8

**weapon** 29:16

**weapons** 29:12
73:15,20

**weather** 105:15,21
106:2

**web** 102:8

**webinar** 185:24

**website** 99:7,15,23
100:2 129:12,23
130:7 131:1,3,17,25

---

**Index: understanding–website**

Exhibit 57
DX1048

**Jose Chavez**

132:15,19 143:14 144:12

**week** 17:9 21:24 25:9, 12,18 58:3 72:4 74:13 136:1,6,9 141:6,7,12

**weekend** 160:21 162:6

**weekly** 140:15

**weeks** 26:6

**Wells** 37:4,6,8,9,10 42:5,21 43:12 176:14

**whatsoever** 55:24

**Wi-fi** 14:3

**wife** 74:5

**wildlife** 49:10 126:12, 19 127:8,13 129:8, 12 130:4,7,10 169:23 171:23 172:5,15

**window** 12:6 13:23

**wished** 85:11

**wishes** 107:19 108:8, 11 122:12

**witnessed** 35:21 36:6,16,20

**word** 89:22 183:14

**words** 7:14 128:8 138:8 166:25 183:12

**work** 22:7,10

**worked** 23:13 25:11 33:22

**working** 22:9,11 23:21 72:24 136:5,8, 11 182:24 183:14 184:10

**Works** 86:4,7 89:12 90:1,20 91:4,6,16, 18,21 93:14,25 94:8, 25

**World** 88:13

**worries** 45:19 130:17

**wrapping** 160:4

**write** 40:17 46:5 77:4, 5

**writing** 40:12 69:21

**written** 34:16 42:17 54:25 55:24 170:15

**wrong** 20:1 116:5 121:6,11 146:25

---

**X**

---

**Xavier** 99:17

---

**Y**

---

**year** 9:25 20:2 21:5, 25 22:1 24:24 25:9, 11,17 26:23 37:5 74:17 86:2

**years** 20:10 22:8 26:16 27:8,9,16 28:10 34:7 36:3,8 47:14 49:9 50:7 71:11 80:6,9 82:13 86:12 90:23 101:12 126:1,9,17 131:4 158:12

**York** 152:12

**younger** 105:9,14,23

**youth** 34:2

---

**Z**

---

**zone** 187:4

**Zoom** 12:20 17:18

Exhibit 57
DX1049



September 17, 2023

Jennifer Rosenberg
Deputy Attorney General
Department of Justice
Office of the Attorney General
jennifer.rosenberg@doj.ca.gov

Re: Jose Chavez Deposition Transcript Errata Sheet

On August 4, 2023, the deposition of Jose Chavez was taken. Thereafter, Mr. Chavez reviewed and corrected his deposition transcript as follows:

1. Page 58, Line 14,
   a. Add clarification: After my deposition, additional documents were found and produced to Defendants.
2. Page 142, Line 8
   a. Add clarification: After my deposition, I confirmed my active membership in the Second Amendment Foundation.
3. Page 142, Line 22
   a. Add clarification: After my deposition, I confirmed my active membership in the California Gun Rights Foundation.
4. Page 148, Line 3
   a. Add: Responsive documents were subsequently found and produced.
5. Page 148, Line 7
   a. Add: Responsive documents were subsequently found and produced.
6. Page 148, Line 14
   a. Add: Responsive documents were subsequently found and produced.

Mr. Chavez signed his deposition on September 17, 2023. With the above changes, Mr. Chavez certifies that the transcript is true and correct.

Respectfully,

/s/ John W. Dillon
John W. Dillon
of
Dillon Law Group APC

2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009

T  760.642.7150
F  760.642.7151

Dillonlawgp.com

Exhibit 57
DX1050

## <u>DECLARATION OF SERVICE BY ELECTRONIC MAIL</u>

**Case Name:**      Jose Chavez, et al. v. Rob Bonta, et al.
**Case No.:**        3:19-cv-01226-L-AHG

I, John W. Dillon, am a member of the California State Bar. I am over the age of 18 years of age and counsel for Plaintiffs in this matter. On September 17, 2023, I served the documents listed below by transmitting a true copy via electronic mail addressed as follows:

Jennifer Rosenberg
Office of the Attorney General               E-mail Address:
300 South Spring Street, Suite 1702          Jennifer.Rosenberg@doj.ca.gov
Los Angeles, CA 90013-1230

1. Deposition of Jose Chavez August 04, 2023 Full Transcript
2. September 17, 2023 Letter Detailing Modifications to Deposition Transcript
3. Proof of Service

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on September 17, 2023, in Carlsbad, California.

_____
John W. Dillon

Exhibit 57
DX1051

# EXHIBIT 58

Exhibit 58
DX1052

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ; et al.,          )
                             )
          Plaintiffs,         )
                             )     **CERTIFIED COPY**
     v.                       )
                             )   CASE NO.
                             )   3:19-cv-01226-L-AHG
ROB BONTA, in his official    )
capacity as Attorney General  )
of the State of California;   )
et al.,                       )
                             )
          Defendants.         )
_____)

VIDEOCONFERENCE DEPOSITION OF

DARIN PRINCE

AS PMK OF NORTH COUNTY SHOOTING CENTER, INC.

APPEARING REMOTELY VIA ZOOM WEBCAM

AUGUST 15, 2023

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 23-127524



THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 562.888.6488

Exhibit 58
DX1053

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


JOSE CHAVEZ; et al.,          )
                              )
          Plaintiffs,         )
                              )
     v.                       )   CASE NO.
                              )   3:19-cv-01226-L-AHG
ROB BONTA, in his official    )
capacity as Attorney General  )
of the State of California;   )
et al.,                       )
                              )
          Defendants.         )
_____)

**CERTIFIED COPY**


VIDEOCONFERENCE DEPOSITION OF

DARIN PRINCE

AS PMK OF NORTH COUNTY SHOOTING CENTER, INC.

APPEARING REMOTELY VIA ZOOM WEBCAM

AUGUST 15, 2023


Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 23-127524

Exhibit 58
DX1054

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   JOSE CHAVEZ; et al.          )
                                 )
5            Plaintiffs,         )
                                 )
6       v.                       )   Case No.
                                 )   3:19-cv-01226-L-AHG
7   ROB BONTA, in his official   )
    capacity as Attorney General )
8   of the State of California;  )
    et al.,                      )
9                                )
             Defendants.         )
10   _____)

11

12

13

14

15           VIDEOCONFERENCE DEPOSITION OF DARIN

16           PRINCE, PMK, taken on behalf of

17           DEFENDANTS, all parties appearing

18           remotely via Zoom Webcam, commencing

19           at 10:32 a.m., Tuesday, August 15, 2023,

20           before Debbie Strickland, CSR 9036.

21

22

23

24

25

Exhibit 58
DX1055

```
 1   A P P E A R A N C E S :      (Via Webcam)

 2        FOR PLAINTIFFS:

 3             DILLON LAW GROUP APC
               By:  JOHN W. DILLON, Attorney at Law
 4             2647 Gateway Road, Suite 105 No. 255
               Carlsbad, California 92009
 5             760.642.7150
               jdillon@dillonlawgp.com
 6

 7        FOR DEFENDANTS:

 8             CALIFORNIA DEPARTMENT OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
 9             By:  STEPHANIE ALBRECHT
                    Deputy Attorney General
10                       -and-
                    JENNIFER E. ROSENBERG
11                  Deputy Attorney General
               300 South Spring Street, Suite 1702
12             Los Angeles, California 90013
               213.269.6166
13             stephanie.albrecht@doj.ca.gov
               jennifer.rosenberg@doj.ca.gov
14

15

16

17

18

19

20

21

22

23

24

25
```

3

Exhibit 58
DX1056

```
 1                          I N D E X

 2    W I T N E S S :

 3    DARIN PRINCE, PMK                              PAGE

 4           EXAMINATION BY MS. ALBRECHT:             6

 5           EXAMINATION BY MS. ROSENBERG:           101

 6

 7    AFTERNOON SESSION:                             53

 8

 9

10

11    E X H I B I T S :

12    NUMBER              DESCRIPTION                PAGE

13      Ex 1       Notice of Rule 30(b)(6) Deposition  12
                   of Plaintiff North County Shooting
14                 Center, Inc.

15      Ex 2       Third Amended Complaint for        15
                   Declaratory and Injunctive Relief
16
        Ex 3       Defendants' First Set of Requests  88
17                 for Production to Plaintiff North
                   County Shooting Center
18
        Ex 4       (Skipped)
19
        Ex 5       (Skipped)
20
        Ex 6       (Skipped)
21
        Ex 7       (Skipped)
22
        Ex 8       Plaintiff North County Shooting    91
23                 Center's Supplemental Response to
                   Defendants' First Set of Requests
24                 for Production of Documents

25      Ex 9       (Skipped)
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 58

DX1057

```
 1   E X H I B I T S :      (Continued)

 2   NUMBER              DESCRIPTION                    PAGE

 3     Ex 10       Plaintiff North County Shooting       94
                   Center's Supplemental Response to
 4                 Defendants' First Set of Requests
                   for Admission
 5
       Ex 11       Plaintiff North County Shooting      102
 6                 Center's Response to Defendants'
                   First Set of Interrogatories
 7
       Ex 12       Plaintiff North County Shooting       94
 8                 Center's Supplemental Response to
                   Defendants' First Set of
 9                 Interrogatories

10     Ex 13       Declaration of Darin Prince in        71
                   Support of Plaintiffs' Motion
11                 for Summary Injunction

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 58
DX1058

```
 1        ALL PARTIES APPEARING REMOTELY VIA ZOOM WEBCAM

 2                   TUESDAY, AUGUST 15, 2023

 3                        10:32 A.M.

 4                           ***

 5        THE COURT REPORTER:  Good morning.  My name is

 6   Debbie Strickland.  I am a Certified Shorthand Reporter

 7   with The Sullivan Group of Court Reporters.  I will be

 8   swearing in the witness from a remote location.

 9        Will counsel please state their appearances

10   beginning with the questioning attorney.

11        MS. ALBRECHT:  Good morning.  My name is

12   Stephanie Albrecht.  I am counsel for Defendants in this

13   case.  And also with me today remotely is my colleague,

14   Jennifer Rosenberg.

15        MR. DILLON:  Good morning.  This is John Dillon,

16   counsel for Plaintiffs.

17        THE COURT REPORTER:  And would the witness

18   please raise his right hand.

19                           ***

20                     DARIN PRINCE, PMK,

21        having been duly administered an oath

22        remotely in accordance with CCP 2094,

23        was examined and testified as follows:

24   ///

25   ///
```

Exhibit 58
DX1059

1    BY MS. ALBRECHT:

2        Q    Good morning, Mr. Prince.  My name is Stephanie

3    Albrecht.  I am a Deputy Attorney General with the

4    California Department of Justice.  I represent the

5    Attorney General, Rob Bonta, and the Director of the

6    Department of Justice Bureau of Firearms, Allison

7    Mendoza, who are the defendants in this lawsuit.  I will

8    be asking you some questions today about this case.

9            Would you please state your name for the record.

10       A    Darin Prince.

11       Q    Thank you.

12            And Mr. Prince, are you represented by counsel

13   today?

14       A    I am.

15       Q    And are you here as a representative today of

16   North County Shooting Center, Inc.?

17       A    I am.

18       Q    Have you had your deposition taken before?

19       A    Yes.

20       Q    Approximately how many times?

21       A    Once.

22       Q    And in what context was that?

23       A    It was an automobile accident 22 years ago.

24       Q    I'm sorry?

25       A    Automobile accident 22 years ago.

```
 1        Q      22 years ago.

 2               And were you a party?  I assume that was -- was

 3    it as part of a lawsuit that your deposition --

 4        A      Yes.

 5        Q      -- was taken?

 6        A      Yes.

 7        Q      And were you a party to the lawsuit?

 8        A      I was a passenger in the car, but, I mean, I --

 9    so yes and no.  I mean, I was there, but --

10        Q      Were you a witness?

11        A      Yes.

12        Q      Understood.

13               So do you generally understand the procedures

14    for a deposition?

15        A      I do.

16        Q      Great.  I'm just going to go over some ground

17    rules even though you've had your deposition taken before

18    just to make sure we are all on the same -- we understand

19    each other.

20               So you took an oath to tell the truth today

21    under penalty of perjury; correct?

22        A      Correct, yes.

23        Q      And do you understand that I will be asking you

24    questions, and you will answer those questions under

25    penalty of perjury?
```

```
 1        A     Yes.

 2        Q     And do you understand that the court reporter

 3   will be transcribing both the questions and the answers

 4   today?

 5        A     Yes.

 6        Q     And seen though we're in an informal setting,

 7   we're not even in the same room together, we're all

 8   remote, but do you understand that the oath that you took

 9   has the same meaning as if you were in court today?

10        A     Yes.

11        Q     Great.

12              And so you understand that the same penalties

13   would apply for giving untrue testimony as if we were in

14   court today; correct?

15        A     Yes.

16        Q     Great.

17              And so it's important, since the court reporter

18   will be transcribing the questions and answers today,

19   that we not speak over each other.  And so I won't

20   interrupt you while you're answering, and I ask that you

21   not interrupt me while I ask the question just to make

22   sure that we get a clean transcript today.

23              Do you understand that?

24        A     Yes.

25        Q     Okay.
```

Exhibit 58
DX1062

```
 1              And, also, do you understand that the court
 2   reporter is not able to take down nonverbal responses
 3   such as head nods, so it's important that we use verbal
 4   responses today?
 5        A    Yes.
 6        Q    And in answering my questions today, I would ask
 7   that you not speculate or guess.  I am entitled to your
 8   best recollection and estimates where appropriate, but I
 9   would ask that you not guess.
10              Do you understand the difference?
11        A    Yeah.  You broke up there for a little bit.
12        Q    I apologize.  Let me start over.
13        A    If you would go over that again, I would
14   appreciate it.
15        Q    Sure.
16              In answering my questions today, I would ask
17   that you not speculate or guess in providing your
18   answers.  I am entitled to your best recollection and
19   estimates, but I would ask that you not guess or
20   speculate.
21              Do you understand the difference?
22        A    Yes.
23        Q    And if, for some reason, you don't understand a
24   question that I ask, please let me know.  If you answer a
25   question, I and others reading the transcript will assume
```

Exhibit 58
DX1063

1    that you understood the question.

2            Do you understand that?

3        A    Yes.

4        Q    Also, your counsel might, from time to time,

5    make objections to the form of my question.  You are

6    required to answer even if an objection is made unless

7    your counsel instructs you not to answer the question.

8            Do you understand that?

9        A    Yes.

10       Q    If you are tired or hungry or thirsty or for

11   whatever reason need a break, please let me know, and I

12   will, of course, accommodate that request.  I would only

13   ask that if there is a question pending, that you first

14   answer the question before we take a break.

15           Do you understand that?

16       A    Yes.

17       Q    Great.

18           And after your deposition today, the court

19   reporter will prepare a transcript, and you will have a

20   chance to review the transcript and make any changes or

21   corrections to the transcript.  If you make changes to

22   your testimony in the transcript, however, that could be

23   commented on at trial and could affect your credibility.

24           Do you understand that?

25       A    Yes.

11

```
 1        Q     Is there any -- do you have any questions about

 2    the procedures that I just described before we get

 3    started?

 4        A     No.

 5        Q     And is there any reason why you cannot give your

 6    best testimony today?

 7        A     No.

 8        Q     Are you suffering from any medical condition

 9    that would prevent you from giving your best testimony?

10        A     No.

11        Q     Are you currently taking any medication that

12    would prevent you from giving your best testimony today?

13        A     No.

14        Q     Great.  Then we will move on.

15              If you could please turn to what I'm marking as

16    Exhibit 1, which I have emailed to you, and open that,

17    and let me know once you have that open.

18        A     I have it open.

19        Q     Great.

20              (Exhibit Number 1 was marked

21              for identification.)

22    BY MS. ALBRECHT:

23        Q     And what's the title of the document?

24        A     It is Notice of Rule 30(b)(6) Deposition of

25    Plaintiff North County Shooting Center, Inc.
```

Exhibit 58
DX1065

```
 1        Q     Have you seen this document before?

 2        A     I have.

 3        Q     And have you reviewed it in full?

 4        A     I -- yes, I believe I have.

 5        Q     Have you reviewed the topics for examination

 6   that start on page 2 of the document, which is page 4 of

 7   the PDF?

 8        A     Let me review that.  Yes, I have.

 9        Q     And are you prepared to testify as the person

10   most knowledgeable for North County Shooting Center on

11   these topics for examination that are listed in the

12   document in Exhibit 1?

13        A     Yes.

14        Q     Did you discuss your deposition today with

15   anyone?

16        A     Yes.

17        Q     With whom did you discuss your deposition?

18        A     John Dillon.

19        Q     Anyone else?

20        A     No.

21        Q     Are you acquainted with the other plaintiffs in

22   this litigation?

23        A     No.

24        Q     What did you do to prepare for the deposition

25   today?
```

1     A     I was told to just look over the documents, and

2     that was it.

3     Q     And what documents did you look over?

4     A     My submissions and the documents that we have

5     here.

6     Q     And can you clarify what you mean by your

7     submissions?

8     A     The information that I gave in response to the

9     interrogatories.

10     Q     Other than reviewing the documents, did you do

11     any independent research in preparation for the

12     deposition today?

13     A     No.

14     Q     Okay.  So before we get started in earnest, I

15     think it would probably be helpful to just go over the

16     lawsuit and the claims brought in the lawsuit.

17          So as you probably know, Chavez v Bonta is a

18     Second Amendment challenge to provisions of California

19     Penal Code Section 27510 which sets 21 as the lower age

20     limit for sales and transfers of certain firearms through

21     federally licensed firearms dealers subject to certain

22     statutory exemptions.

23          Are you aware of that?

24     A     Yes.

25     Q     Great.

```
 1              If you could please take a look at what I am

 2    marking as Exhibit 2, which is the third amended

 3    complaint filed in this case.

 4        A    Okay.

 5              (Exhibit Number 2 was marked

 6              for identification.)

 7    BY MS. ALBRECHT:

 8        Q    Do you recognize this document?

 9        A    Yes.  I believe I've looked at it before.

10        Q    Do you recall when you reviewed it before?

11        A    I don't.  Yeah, I don't think it was a very long

12    time ago, but, yes, I believe I've seen it before.

13        Q    Do you understand that there were prior versions

14    of the complaint filed in this lawsuit?

15        A    Yes.

16        Q    And did you review those prior versions as well?

17        A    I did.

18        Q    Did you have any role in drafting the third

19    amended complaint which is Exhibit 2?

20        A    So I worked with John Dillon giving information,

21    and he helped me draft anything that I put forward.

22        Q    If you wouldn't mind taking a look at paragraphs

23    8, 16, and 56 through 59, and let me know when you've had

24    a chance to review those paragraphs.

25        A    And, I'm sorry, 8 -- what was the last one?
```

1    Q    It was 8, 16, and 56 through 59.

2    A    Yes, I've reviewed those.

3    Q    Great.

4         And do these paragraphs 8, 16, and 56 through 59

5    refer to North County Shooting Center?

6    A    They do, yes.

7    Q    And going forward, if I use the acronym NCSC,

8    will you understand that to refer to North County

9    Shooting Center?

10   A    Yes.

11   Q    Great.

12        And with respect to paragraphs 8, 16, and 56

13   through 59 in Exhibit 2, did you draft those paragraphs?

14   A    I did not.

15   Q    In reviewing them this morning, do you see any

16   errors in them?

17   A    No.  It was information I provided, and it is

18   correct.

19   Q    Great.  You can go ahead and close that exhibit.

20   A    Close 2?

21   Q    Yes.

22   A    Okay.

23   Q    So I'm hoping you can tell me a little bit about

24   NCSC.  What is it?

25   A    The North County Shooting Center is an

Exhibit 58
DX1069

```
 1    S corporation that was originally a gun shop in 2011.  We
 2    built and operate an indoor shooting range with
 3    instruction that has been operating since midyear 2018.
 4    It's 20 lanes indoor shooting.  We do retail firearms
 5    sales and instruction as well as indoor shooting sports.
 6         Q    When you say we, who are you referring to?
 7         A    The four owners and officers of the corporation.
 8         Q    And who are they?
 9         A    Stan Tuma, Diane Price-Tuma, myself, and my
10    wife, Cheryl Prince.
11         Q    And what is Stan Tuma's title?
12         A    He's the President of the corporation.
13         Q    President of North County Shooting Center, Inc.?
14         A    Yeah, that's correct.
15         Q    And what is Diane Tuma's title?
16         A    She is Secretary and Executive Vice President.
17         Q    And what is Cheryl Prince's title with the
18    company?
19         A    She's also an Executive Vice President.
20         Q    And your title?
21         A    Also Executive Vice President.
22         Q    You mentioned that North County Shooting Center
23    was a gun shop in 2011?
24         A    Yes.
25         Q    Did you own or were you involved with it when it
```

Exhibit 58
DX1070

```
 1    was a gun shop?

 2         A    Yes.   The four corporate officers have always

 3    been the same.   It was North County Shooting Center,

 4    Incorporated doing business as North County Firearms

 5    until we opened the range.

 6         Q    So to make sure I understand correctly, between

 7    2011 and 2018, North County Shooting Center, Inc. was

 8    doing business under another name?

 9         A    I'm sorry.   You'll have to repeat that.   You

10    broke up completely.

11         Q    Sorry about that.

12              Between 2011 and 2018, North County Shooting

13    Center, Inc. was doing business under a different name?

14         A    Yes.   North County Firearms DBA -- I'm sorry.

15              North County Shooting Center DBA North County

16    Firearms.

17         Q    Understood.

18              And is North County Shooting Center, Inc.

19    affiliated with any other entities?

20         A    No.

21         Q    And are the four officers that you identified

22    co-owners of the company?

23         A    Yes.

24         Q    And how many employees does North County

25    Shooting Center, Inc. have currently?
```

18

```
 1       A    Would you like me to include the owners?

 2       Q    To the extent that the owners --

 3       A    I'm sorry.  You froze up.  I'm getting no

 4  response.

 5       Q    Let me rephrase the question.

 6            How many employees, including the four officers,

 7  does North County Shooting Center, Inc. currently have?

 8       A    13.

 9       Q    And setting aside the four officers and owners,

10  what are the titles that the remaining employees hold?

11       A    Range staff.

12       Q    Do the four officers perform day-to-day

13  functions at North County Shooting Center?

14       A    Yes.

15       Q    Do they receive a salary?

16       A    Yes.

17       Q    So you said that the other employees other than

18  the officers are range staff.  Does that mean that they

19  work in the shooting range part of the facility or do

20  they also work in the retail part of the facility or the

21  company?

22       A    Every employee is cross-trained to work retail

23  and/or the range.

24       Q    And you mentioned firearms training.  Are the

25  employees also cross-trained to conduct training?
```

```
 1      A     No.  The trainers are specific trainers.

 2      Q     And the trainers, are they in addition to the

 3  nine range staff that we were just talking about?

 4      A     No.

 5      Q     So how many range staff -- or how many employees

 6  work at the range or in retail?

 7      A     At the range or in retail, I don't understand.

 8  Are you taking out the instructors?

 9      Q     Let me back up.

10            How many trainers do you have?

11      A     Three.

12      Q     So the three trainers exclusively conduct

13  training?  They don't perform any other functions?

14      A     I'm sorry.  You broke up.  I didn't hear.

15      Q     Do the three trainers --

16      A     No.  Everybody is cross --

17      Q     -- exclusively --

18      A     No.  They can sell, they can do retail, and they

19  can do range work as well.

20      Q     Sorry.  Just a remainder to let me finish my

21  question before you answer so we don't talk over each

22  other.

23            What are North County Shooting Center's

24  revenues, annual revenues?

25      A     Approximately 1.8 million.
```

1    Q    You said the year you opened the range was 2018;

2  correct?

3    A    Yes.

4    Q    And in 2018 do you recall what NCSC's annual

5  revenues were for 2018?

6    A    I'm sorry.  I don't recall.

7    Q    Do you recall what they were for 2019?

8    A    No.

9    Q    When you just mentioned 1.8 million in annual

10  revenues, was that for year 2022?

11    A    It's for the last 12 months running

12  continuously.

13    Q    Do you recall what the annual revenues were for

14  2020?

15    A    I'm sorry.  No, I don't.

16    Q    Do you recall what the annual revenues were for

17  2021?

18    A    I do not.

19    Q    Have you seen an increase or a decrease in

20  annual revenues over the past, say, five years since you

21  opened?

22    A    I would say it fluctuates.  The last two years

23  have probably been down.

24    Q    And when you say they have probably been down,

25  meaning you're not sure?

Exhibit 58
DX1074

```
 1        A     I'm not positive, no.

 2        Q     What is your role at the company?  I mean, I

 3   know your title is Executive Vice President, but what are

 4   your day-to-day functions?

 5        A     So I manage the sales floor, I fix firearms, I

 6   run the range, I schedule employees, and I order

 7   products, as well as employee training.

 8        Q     Does North County Shooting Center have a

 9   website?

10        A     It does.

11        Q     And who is responsible -- is anyone in charge of

12   maintaining that website or keeping it up to date?

13        A     Yes.  That would be Diane Price-Tuma.

14        Q     And does the company have social media?

15        A     Yes.

16        Q     What social media platforms?

17        A     I believe we have Instagram, Twitter, and I

18   believe that's it, not including our website.

19        Q     And who is responsible for maintaining the

20   social media platforms?

21        A     That would be Diane Price-Tuma.

22        Q     And where is North County Shooting Center

23   located?

24        A     It's located at 1440 Descanso Avenue,

25   San Marcos, California 92069.
```

Exhibit 58
DX1075

1       Q     And do you know whether there are any other

2   shooting ranges, say, within a 50-mile radius of North

3   County Shooting Center?

4       A     To clarify, you said 50 miles?

5       Q     Correct.

6       A     Yes, there are, I would say, many.

7       Q     Are you able to estimate how many there are?

8       A     Seven.

9       Q     You mentioned just a few minutes ago that one of

10  your responsibilities is managing the sales floor; is

11  that correct?

12      A     That is correct.

13      Q     And what does that mean?

14      A     That means being on the floor managing firearms

15  sales, assisting customers getting on and off the range,

16  and selling instruction.

17      Q     And how many other employees are on the sales

18  floor on average?

19      A     Two.

20      Q     And just to help me visualize how the business

21  is situated, is the sales floor separate from the range

22  in the training operations?  I mean, I assume it's

23  separate from the range, it has to be.  But are we in

24  different buildings?  If you could just describe

25  generally the setup of the company.

23

1    A    North County Shooting Center, Incorporated is in

2   an 18,500 square foot building with about 3,000 square

3   foot of showroom that has doors that go into the range

4   and a door that goes into the classroom.  So it's one

5   building and pretty closely situated to each other

6   division.

7    Q    And would you say that the sales floor is in the

8   center of the building?

9    A    Yes.  It's centrally located.  The other items

10  of the building are not for customer use, so, yes, I

11  would say that.

12   Q    And what do you mean the other items of the

13  building are not for customer use?

14   A    Storage, secure facility gun storage, break

15  room, employee restroom.  That's stuff that's not

16  accessible to the general public.

17   Q    And so North County Shooting Center sells

18  firearms?

19   A    We do.

20   Q    What types of firearms do you sell?

21   A    Hand guns, rifles, and shotguns.

22   Q    Do you also rent firearms?

23   A    Yes.

24   Q    And are those rentals confined for guests who

25  use -- who want to use the rentals in the shooting range

1    or can customers come and rent a firearm and take it with

2    them?

3        A    No.  A customer cannot rent a firearm and leave

4    the building.

5        Q    Understood.

6             Aside from firearms, what else do you sell?

7        A    Ammunition and firearms accessories.

8        Q    What types of accessories?

9        A    Holsters, gun bags, additional magazines, some

10   clothing.  I think that would be about it.

11       Q    Mr. Prince, what are the hours of operation for

12   the sales floor?

13       A    They are 10:00 a.m. to 6:00 p.m. seven days a

14   week.

15       Q    And do you have a sense as to how many customers

16   come into the store each day?

17       A    I'm sorry.  I didn't hear most of that question.

18       Q    Do you have a sense as to how many customers

19   come into the store each day?

20       A    That would be a guess.  I don't know.

21       Q    Do you know how many customers come into the

22   store per week?

23       A    I don't know that.

24       Q    How much of your time do you spend on the sales

25   floor each day?

```
 1        A    I'm almost always on the sales floor.

 2        Q    Do you see most of the customers that come into

 3   the store?

 4        A    I do.

 5        Q    Okay.  So I think you're well positioned to give

 6   me your best estimate as to approximately how many

 7   customers come into the store on a daily basis.  And to

 8   the extent it's easier to give that estimate on a weekly

 9   basis because it varies by the day of the week, that's

10   fine too.

11        A    I don't work Fridays or Saturdays which are our

12   two busiest days, so that would be part of my difficulty

13   in giving you that number.  I can tell you that the third

14   busiest day is a Sunday, and we can have easily 100

15   people to 150 people on a Sunday.

16             But to give you a daily, I couldn't do that.

17   Sometimes Tuesdays will only have 20 people, sometimes

18   Tuesdays will have 50 people.  So it's -- it fluctuates

19   greatly.

20        Q    Understood.

21             So are you able to estimate how many customers

22   might come in on your slowest day?

23        A    On the slowest day, it would be 20.

24        Q    And would it be accurate to estimate that on

25   your busiest day, which I understand you don't work on
```

26

1    your busiest days, you would have more than 150

2    customers?

3        A    Yes.  It's possible.

4        Q    And when we say customers, or when you refer to

5    customer, do you mean individuals who visit the store or

6    individuals who make a purchase at the store just to make

7    sure we're on the same page?

8        A    It would be individuals who visit the store.

9        Q    And on the days on which -- based on your

10   experience on the days on which you work, what percentage

11   of customers that visit the store make a purchase at the

12   store?

13       A    70 percent.

14       Q    And based on your experience on the sales floor,

15   what's the general or average age group of the customers

16   that visit the store?

17       A    It's extremely varied.  If I had to give you an

18   average, I would probably put the average at 30.

19       Q    What percentage of customers would you estimate

20   are 21 and older?

21           MR. DILLON:  Objection; speculation.

22           THE WITNESS:  Yeah.  I wouldn't be able to give

23   you that.

24   BY MS. ALBRECHT:

25       Q    Well, you just said you would estimate a

                                                              27

```
 1   range -- or an average, excuse me, of 30.  So would it

 2   be -- is that estimation based on -- strike that.

 3           Do customers generally come in by themselves or

 4   in groups?

 5       A    That's probably 50/50.  And quite honestly, it

 6   would be dependent on what they were there for.

 7       Q    Could you explain that?

 8       A    If you're purchasing a gun, you're most likely

 9   going to be there by yourself.  If you're coming to the

10   range, you would not be by yourself most often.

11       Q    Do you have a sense as to what percentage of

12   your customers are under the age of 18?

13           MR. DILLON:  Objection; calls for speculation.

14           THE WITNESS:  Yeah.  I would not be able to tell

15   you that.  I wouldn't know it.

16   BY MS. ALBRECHT:

17       Q    You could generally tell the difference between,

18   say, an 18-year-old and a 30-year-old, could you not?

19           MR. DILLON:  Objection; argumentative, calls for

20   speculation.

21           THE WITNESS:  Yeah.  I wouldn't want to -- I

22   wouldn't want to guess at that.

23   BY MS. ALBRECHT:

24       Q    When someone makes a purchase, how do you -- how

25   does one pay for the purchase?
```

28

Exhibit 58
DX1081

```
 1        A     Well, either with currency or a credit card.

 2        Q     Okay.

 3              And is there a system, like a point-of-sale

 4    system, that you use to ring up purchases for customers?

 5        A     Yes.

 6        Q     Is there -- are you familiar with the name of

 7    that system or software?

 8        A     Yes.  It's made by a company called Rapid POS.

 9        Q     And can you explain Rapid POS to me?  Is it like

10    at a register?  Is it more like an iPad?  Is there

11    information that the employee has to enter when ringing a

12    purchase?  Or is it just you just scan an item?  How does

13    it work?

14              MR. DILLON:  Objection; compound.

15              THE WITNESS:  Yeah.  This is a very complex

16    question, and I would have to answer it in several

17    different pieces.

18    BY MS. ALBRECHT:

19        Q     Okay.  So why don't you just explain to me,

20    please, how Rapid POS works in terms of ringing or

21    processing purchases?

22        A     Well, it's a simple point-of-sale system.  So if

23    there is no age or information required for the sale, it

24    is not required that we capture it.  If there is age

25    information that is required for the sale, it requires
```

```
 1    that we capture it.
 2        Q    And what types of purchases require age
 3    information?
 4        A    Ammunition sales and firearm sales.
 5        Q    And when you say age information is required,
 6    does that mean that the purchaser provides a form of ID
 7    to indicate their age?
 8        A    That's correct, per state and federal law.
 9        Q    And how is the age information entered into the
10    POS?
11        A    If age information is required, a driver's
12    license will be scanned, and it will populate that
13    information.
14        Q    Other than age information, is there any other
15    information that is captured in POS?
16        A    Depending on the type of transaction, yes.
17        Q    Could you explain that?
18        A    Of course, for ammunition and firearm sales, we
19    have to capture all information that is required either
20    by state or federal law.
21        Q    And what information is that?
22        A    Name, current address, age, and driver's license
23    number or other ID if they're using military ID, for
24    example.
25        Q    Other than driver's license and military ID, are
```

1  there any other forms of ID that are accepted for

2  firearms or ammunition purchases?

3      A    No.

4          MR. DILLON:  Objection; legal conclusion.

5  BY MS. ALBRECHT:

6      Q    And in order to capture a purchaser's name and

7  current address, does an employee at North County

8  Shooting Center just rely on the information on the ID or

9  is there any additional verification that's performed?

10     A    Pursuant to California law, it would be

11 dependent on the type of transaction.  But in certain

12 circumstances we are required to receive additional

13 identification for place of residence, specifically

14 firearms purchases.

15     Q    So other than the name, current address, and

16 driver's license number for firearms and ammunition

17 purchases, is there any additional information that may

18 be tracked in the POS system for purchases?

19     A    Yes.  As I said before, age.

20     Q    Anything else?

21     A    No.  There's no requirement for anything else.

22 Occasionally we'll take a phone number or an email if we

23 have to reach out to the customer for a special order.

24     Q    And is the Rapid POS system used only for

25 purchases, retail purchases, or also for training

Exhibit 58
DX1084

1    sessions that you might sell?

2        A    It would also be used for training sessions,

3    that's correct.

4        Q    And if someone wants to rent a lane in the

5    shooting range, would that also be processed through the

6    Rapid POS?

7        A    Yes, it would.

8        Q    So would it be accurate to say that Rapid POS

9    captures all customer transactions for North County

10   Shooting Center?

11       A    That would not be correct.

12       Q    Okay.  And can you explain why that is not

13   correct?

14       A    Sure.  Retail purchases not involving ammunition

15   or firearms would not have a name necessarily associated

16   with them.

17       Q    And are those purchases not processed through

18   the Rapid POS?

19       A    They are.  But because there's no legal

20   requirement to capture a name, it doesn't capture the

21   name.

22       Q    Understood.

23            So if I were to just go buy an article of

24   clothing and pay for it, you wouldn't associate my name

25   with that purchase necessarily?

1    A    That's correct.

2    Q    And other than the information that's captured

3    in Rapid POS for firearms and ammunition purchases, are

4    there any other records that are maintained for firearms

5    and ammunition purchases?

6    A    You broke up at the end.  Oh, okay.  You broke

7    up.  If you could repeat.

8    Q    Madam Court Reporter, could you please read back

9    the question.

10    A    Yeah.  You completely broke up there.  I didn't

11    get the end of that question.

12            (The record was read by the reporter as follows:

13            "Q  And other than the information that's

14            captured in Rapid POS for firearms and

15            ammunition purchases, are there any other

16            records that are maintained for firearms and

17            ammunition purchases?")

18            THE WITNESS:  The records are maintained, of

19    course, for compliance with California and federal

20    regulations.  But I don't think I understand the

21    question.  But those would be the reasons.  The other

22    information, that would be it.

23    BY MS. ALBRECHT:

24    Q    So there are no records related to firearms and

25    ammunition purchases other than what's in Rapid POS?

33

```
 1        A      No.  So I will be more clear.

 2               Of course, there is a DROS captured for the

 3   state in a firearms purchase.  There is an ammunition

 4   background check and delivery captured for ammunition

 5   purchases where the ammunition is carried out of the

 6   building.  And there are federal forms that are captured

 7   for firearms purchases pursuant to their regulations.

 8        Q      Thank you.

 9               Do you keep track of North County Shooting

10   Center's sales?

11               MR. DILLON:  Objection; vague.

12               THE WITNESS:  Yeah.  It is -- could you be a

13   little bit more specific?

14   BY MS. ALBRECHT:

15        Q      Sure.

16               Are you ever curious, at the end of a day, how

17   much you sold that day?

18        A      Of course.

19        Q      And how do you ascertain that information?

20        A      We can look at overall sales in the Rapid

21   Point-Of-Sale on a day-to-day basis, and month-to-month

22   if we wanted to.

23        Q      And does Rapid POS -- strike that.

24               If you wanted to know how many shotguns you sold

25   versus handguns, is that something you would be able to
```

34

Exhibit 58
DX1087

1    determine by looking at the data in Rapid POS?

2        A    I -- yeah.  I've got a call coming in.  Hold on.

3    All right.  Let me kill that.

4            Okay.  So you were breaking up even before the

5    call came in.  If I wanted to know how many shotguns did

6    you say?

7        Q    For example, if you wanted to know how many

8    shotguns you sold versus handguns that day, is that

9    information you would be able to look up in Rapid POS?

10       A    I would not know how to do that, no.

11       Q    Is there someone else at the company that would

12   be able to do that?

13       A    Not to my knowledge.

14       Q    So to your knowledge, all you are able to

15   determine is the dollar amount for sales that were

16   processed either on a daily basis or month-to-month

17   basis?

18       A    I believe I would be able to look up how many

19   firearms were sold.  I've just never even tried.  And I

20   don't know if it's possible to separate out shotguns and

21   handguns.

22       Q    You mentioned earlier that North County Shooting

23   Center had 1.8 million in revenues over the last 12

24   months; is that correct?

25       A    Yes.

Exhibit 58
DX1088

1    Q    Do you know approximately how much of that 1.8

2  million came from firearms sales?

3    A    I'm sorry, I don't.  I actually know that number

4  simply because I had to look it up for an insurance

5  premium quote.

6    Q    So you don't have any sense as to what

7  percentage of North County Shooting Center's revenues are

8  generated by the sale of firearms?

9    A    I could give you a rough estimate, but that's

10  all it would be would be an estimate.

11    Q    And what would that rough estimate be based on?

12  Mr. Prince, what would that rough estimate be based on,

13  your review of data, your just perception of the

14  business?

15    A    It would be perception of the business and the

16  number of guns that I've had to order.

17    Q    And what is that estimate?

18    A    I would say 35 percent gun sales.

19    Q    And you said that estimate would be based on the

20  number of guns you would have to order?

21    A    That's correct.

22    Q    So are you responsible for ordering firearms for

23  North County Shooting Center?

24    A    I actually place an order with Stan, let him

25  know what we need, and then that order gets placed by

```
 1   Stan.
 2        Q    But you determine what needs to be ordered in
 3   terms of firearms?
 4        A    In most cases on the five days that I work,
 5   that's correct.
 6        Q    How often do you place firearms orders?
 7        A    Every day.
 8        Q    And what is the most number of firearms that you
 9   would estimate you have ever ordered in a single day?
10        A    I wouldn't know that number.  I'm sorry.
11        Q    Can you give me an estimate?
12        A    The most number of guns?  No, actually, I don't
13   feel comfortable giving an estimate.  That's something I
14   would rather look up.
15        Q    And how would you look up that information?
16        A    I guess I would have to go back with the
17   distributor and see if they kept that information.
18        Q    Would Mr. Tuma have access to that information?
19        A    I don't know.
20        Q    Have you been in charge of ordering guns on the
21   days that you work since the range opened in 2018?
22        A    Yes.
23        Q    So would it be accurate to say that
24   approximately five days a week since 2018 you have been
25   ordering firearms or identifying which firearms need to
```

37

Exhibit 58
DX1090

1    be ordered?

2        A    That's a better way of putting it, yes,

3    identifying which ones need to be ordered.  Yes, I can

4    tell you.  Yes.

5        Q    But you're not able to give me your best

6    estimate as to how many guns are ordered, say, on a

7    weekly basis?

8            MR. DILLON:  Objection; asked and answered.

9            THE WITNESS:  I don't -- I mean, again, I'm not

10   there five days -- I'm only there five days a week.  I'm

11   not there our two busiest days.  So, no, I don't feel

12   comfortable giving you that number.

13   BY MS. ALBRECHT:

14       Q    I'm only asking about the days that you work.

15       A    But you asked for the most number I've ever

16   ordered in a day.  I can't tell you what that number is.

17   I don't have it offhand.

18       Q    Okay.

19            But during the five days that you work and

20   identify guns that need to be ordered, are you able to

21   give me an estimate of the number of guns that you would

22   identify for order for a five-day period?

23            MR. DILLON:  Objection; asked and answered.

24            THE WITNESS:  Yeah.  I don't feel -- without

25   looking that up and trying to go back through

```
 1    distribution, I don't feel comfortable telling you that.
 2    BY MS. ALBRECHT:
 3        Q    Are you able to tell me whether you ordered more
 4    than 10 guns in a five-day period?
 5        A    Yes.  I'm sure we order more than 10.
 6        Q    Okay.  Do you know if you order more than 50 in
 7    a five-day period?
 8        A    You broke up on your number.  I don't -- could
 9    you re-ask.
10        Q    Can you tell me if you order more than 50 in a
11    five-day period?
12        A    I don't believe it's that high.
13        Q    Are you able to tell me whether the number of
14    guns that you identify for order has changed
15    significantly over the last 12-month period?
16        A    It has not.
17            MR. DILLON:  Objection; compound and vague.
18    BY MS. ALBRECHT:
19        Q    Would you please estimate for me what percentage
20    of your gun sales are to individuals -- were to
21    individuals under the age of 21 over the last 12-month
22    period?
23        A    None.
24        Q    What percentage of gun sales were to individuals
25    under 21 in 2021?
```

Exhibit 58
DX1092

```
 1       A     You're breaking up.  I got almost none of that
 2   question.  I apologize.
 3       Q     Madam Court Reporter, could you please read the
 4   question to the witness.
 5             (The record was read by the reporter as follows:
 6             "Q  What percentage of gun sales were to
 7             individuals under 21 in 2021?")
 8             THE WITNESS:  None.
 9   BY MS. ALBRECHT:
10       Q     What percentage of gun sales were to individuals
11   under the age of 21 in 2020?
12       A     None.  Zero.
13       Q     What percentage of gun sales were to individuals
14   under the age of 21 in 2019?
15       A     I would have to look up that number.  I don't
16   know offhand.
17       Q     How would you go about looking up that number?
18       A     It would be -- it would be a very in-depth going
19   through each individual file which we store per the ATF's
20   regulations.  So it would be extremely time consuming.
21       Q     When you say it would require going through the
22   individual files, do you mean hard copy files, paper
23   files?
24       A     That's correct.  It would be far easier for the
25   Department of Justice to simply review the DROS system
```

Exhibit 58
DX1093

```
 1   which was recorded and saved prior to 2019.  So it's

 2   something you could actually do very easily.  It would be

 3   extremely difficult for me.

 4       Q    But your Rapid POS captures the information that

 5   would allow you to make that determination, does it not?

 6       A    Yes.  But I don't know how to filter -- Sorry.

 7   You were breaking up, so I thought you were done.

 8       Q    I was done.

 9       A    I don't know how to filter out by age in Rapid

10   POS.  It's not something I've ever done.

11            MS. ROSENBERG:  May we go off the record just

12   very quickly for a moment?

13            MR. DILLON:  Sure.

14            (A recess was taken.)

15   BY MS. ALBRECHT:

16       Q    Mr. Prince, who at the company made the decision

17   that Rapid POS would be the system that the company would

18   use to process sales?

19       A    I guess Stan Tuma and myself made that decision.

20       Q    And did you have any interactions with

21   representatives of the company before or after --

22       A    I did.  There were two -- I'm sorry.  I didn't

23   know you were not done.

24       Q    Did you have any interactions with

25   representatives -- have you had any interactions with
```

Exhibit 58
DX1094

1    representatives of the company?

2        A    Yes.  We have had interactions with the

3    representatives of the company.

4        Q    In what context?

5        A    If something needs to be fixed or debugged, then

6    we call them, and they take care of it.

7        Q    On what basis did you make the determination or

8    decision that Rapid POS would be a best fit for your

9    company?

10        A    Is that the end of the question?

11        Q    Yes.

12        A    I'm assuming you mean the determination to

13    choose Rapid.  We went with that system because at the

14    time it was one of two systems that actually populated

15    the ATF's Bound Book for us.  It was our main concern was

16    making sure that the Bound Book was being run by the

17    point-of-sale, and the other system was owned by a

18    company called AcuSport, which had filed for bankruptcy

19    about three or four days before we made our final

20    decision.

21            So it was actually made for us.  But that's why

22    we chose Rapid was to maintain the Federal Bound Book

23    requirement to be electronic.

24        Q    Did you or any other company employees receive

25    any training on the system?

Exhibit 58
DX1095

```
 1        A     Myself and my business partner, Stan Tuma.

 2        Q     And what did that training entail?

 3        A     Basically how to check people in and out of the

 4   range, maintain the Bound Book, and do point-of-sale

 5   transactions for sales, both credit card and cash.

 6        Q     Was there any training on how to check your

 7   sales numbers in Rapid?

 8        A     Yes, very basic numbers, like end-of-day reports

 9   or overall sales, yes.

10        Q     Is there a manual or some form of written

11   instructions that came with Rapid POS?

12        A     I'm sorry.  I got none of that.  And I am

13   plugged in.  Let me -- just for a second I'm going to see

14   if I can just go to phone only instead of wifi; is that

15   okay?

16        Q     Yes.  Well, I wouldn't be able to see you on

17   camera probably.

18        A     Well, let's give it a try because at this point

19   I'm not hearing a lot of your questions.  So hold on just

20   a second.

21             MR. DILLON:  Shall we go off the record while he

22   figured this out?

23             MS. ALBRECHT:  Yes.  That's a good idea.

24             (A discussion was held off the record.)

25   ///
```

Exhibit 58
DX1096

```
 1    BY MS. ALBRECHT:
 2        Q     Mr. Prince, would you please go back to
 3    Exhibit 1 that we looked at earlier.
 4        A     Yes.  It means I've got to unplug, but yes.
 5    Yes.
 6        Q     Great.
 7              And would you please go back to the topics for
 8    examination starting on page 2 of the document which is
 9    page 4 of the PDF.
10        A     Okay.
11        Q     Okay.  And would you mind reading the topic for
12    examination under number 2?
13        A     The term relate to or related to --
14        Q     No.  No.  Sorry.  Under topics for examination.
15    So, actually, number 2 is on the following page, which is
16    page 3 of the document and page 5 of the PDF.
17        A     At page 5:
18              "Knowledge of NCSC's retail operations between
19              2018 and present including, but not limited to,
20              number of employees, number of customers,
21              demographic of customer base, sales and rentals
22              of firearms, and financial performance."
23        Q     And earlier I asked you if you were the "person
24    most knowledgeable" on behalf of NCSC to give testimony
25    on all of the topics including the topic that you just
```

```
 1    read; correct?

 2        A    Yes.

 3        Q    And you said you were the person most

 4    knowledgeable?

 5        A    I am.

 6        Q    And yet you're not able to provide me

 7    information on the demographic of your customer base and

 8    the percentage of sales of firearms to individuals under

 9    21 in the year 2019 or 2018?

10            MR. DILLON:  Objection; compound, argumentative.

11            THE WITNESS:  So, yeah, I don't feel confident

12    in 2019, but, yes, everything else I have.  I've given

13    you the percentage of firearms sales, number of

14    employees.  I've given you what I got.

15    BY MS. ALBRECHT:

16        Q    I asked you the number of firearms sales to

17    individuals under the age of 21 for the years 2018 to

18    present, and you were only able to give me those numbers

19    for the last -- I think going back to 2019, but you were

20    not able to provide that number for 2018?

21        A    I am --

22            MR. DILLON:  Objection; misstates the testimony.

23            THE WITNESS:  Yeah.  I am doing the best I can

24    right now.  I apologize.

25    ///
```

Exhibit 58
DX1098

1  BY MS. ALBRECHT:

2      Q    So in preparing for today's deposition, did you

3  think that it was important to review these topics and

4  ensure that you would be able to provide information

5  relevant to all of these topics on behalf of the company?

6          MR. DILLON:  Objection; argumentative.

7          THE WITNESS:  No.  Again, I am doing the best I

8  can.  2019 was a long time ago.

9  BY MS. ALBRECHT:

10     Q    North County Shooting Center is a plaintiff in

11  this lawsuit; correct?

12     A    Yes.

13     Q    And North County Shooting Center has, as part of

14  this lawsuit, made allegations that changes in

15  California's firearms regulations have negatively

16  impacted North County Shooting Center; correct?

17     A    Yes.

18     Q    And given that your testimony is being taken

19  today as a representative of North County Shooting

20  Center, you did not take additional steps to review

21  information that might be relevant to those allegations?

22         MR. DILLON:  Objection; argumentative and

23  misstates testimony.

24  BY MS. ALBRECHT:

25     Q    You can answer.

```
 1      A     Oh, I'm sorry.  Okay.  Yes, and I do.  Every day
 2   we turn away business.  So I can tell you that we have
 3   been negatively impacted.  The actual numbers from 2019
 4   and 2018 when we first opened, I don't have them
 5   memorized.  And, again, I apologize.
 6      Q     And when you say every day you've had to turn
 7   away business, what do you mean?
 8      A     So if a party of people come in to shoot at the
 9   range, and any person is under the age of 21, we have to
10   turn away the entire party because we cannot provide a
11   firearm to somebody who is under 21, with limited
12   exceptions that nobody ever meets.
13      Q     And what is the basis for your understanding
14   that you have to turn away groups of people if any member
15   of their group is under 21?
16      A     We can't provide a firearm to anybody under the
17   age of 21.  And if they choose to shoot with that group,
18   we cannot rent them a firearm, which means,
19   unfortunately, we have to turn away the entire group or
20   they have to separate out the person who is under the
21   age of 21, and they can't shoot.
22            Of course, people most often do not do that.
23   Almost 100 percent of the time they leave.
24      Q     And what is the basis for your understanding of
25   the requirement that you turn away those groups with
```

1    members under the age of 21?

2        A    I'm not legally allowed to provide a firearm to

3    a person under the age of 21.  That is my understanding.

4        Q    And what is the basis for your understanding of

5    that?

6        A    I have been informed that I'm not allowed to do

7    that.  I'm not allowed to give a gun to somebody who is

8    under 21.  I cannot sell it to them.  I cannot provide it

9    to them.  It's the way the law appears to me.

10       Q    So is your understanding based on your review of

11   the law or -- you said you were informed.  Who informed

12   you?

13       A    One of our --

14            MR. DILLON:  Objection; compound.

15            THE WITNESS:  One of our attorneys, Jason Davis,

16   has informed us not to provide firearms to people under

17   the age of 21 unless they meet the very limited

18   exceptions.  And I have not seen a customer come in to

19   shoot who has met that limitation -- I'm sorry --

20   exception.

21   BY MS. ALBRECHT:

22       Q    You say that you have to turn away customers on

23   a daily basis?

24       A    Yes.

25       Q    And have you personally turned away customers?

Exhibit 58
DX1101

1       A       Very many.

2       Q       And are all of these customers that you've

3   turned away individuals who wanted to shoot at the range?

4       A       Yes.  Or wanted to purchase a firearm.

5       Q       So let's break that up.

6       A       Okay.

7       Q       How many people have you had to turn away who

8   wanted to shoot at the range in the last 12 months?

9       A       I don't have an exact number for you.  We don't

10  keep track.  It's just a daily occurrence.

11      Q       Why do you not keep track of that?

12      A       Because we are in the business of running a

13  range, not keeping track of who we can't service.

14      Q       But the whole basis for your participation in

15  this lawsuit is that you have had to turn away customers

16  because of changes in the law; correct?

17              MR. DILLON:  Objection; argumentative.

18              THE WITNESS:  That's correct.

19  BY MS. ALBRECHT:

20      Q       And so you don't seem -- you don't find it

21  important to keep record of how many customers you have

22  had to turn away?

23              MR. DILLON:  Objection; argumentative, misstates

24  testimony.

25              THE WITNESS:  Well, it's burdensome.

Exhibit 58
DX1102

```
 1   BY MS. ALBRECHT:

 2       Q    How many customers have you had to turn away who

 3   wanted to shoot at the range in the last five days?

 4       A    Customers, including those shooting with

 5   somebody who was under the age of 21, probably 15.  And

 6   again, I was not there on Friday or Saturday.

 7       Q    And these 15 customers that were turned away,

 8   did you personally turn them away?

 9       A    Yes.

10       Q    On what basis?

11       A    Well, one party was four people I remember

12   specifically, but they had a person who was 19 years old.

13   And we explained to them that the others could go in,

14   rent guns, and shoot, and they chose not to stay because

15   we could not provide a firearm to them because one person

16   was 19 years old.

17       Q    Are there any other reasons you've turned away

18   these 15 customers?

19       A    No.

20       Q    Has the number of customers that you've turned

21   away increased over the last 12 months?

22            MR. DILLON:  Objection; vague and ambiguous.

23            THE WITNESS:  I couldn't tell you if it's

24   increased or decreased.  Probably not.

25   ///
```

Exhibit 58
DX1103

```
 1   BY MS. ALBRECHT:

 2       Q    Let's talk about customers you've turned away

 3   who wanted to make firearms purchases.  How many

 4   customers would you estimate you've turned away wanting

 5   to make a firearms purchase in the last five days?

 6       A    Zero in the last five days.

 7       Q    How about in the last 30 days?

 8       A    I would say several.  I don't know the number,

 9   but several.

10       Q    And on what basis did you have to turn away

11   these customers?

12       A    They were not old enough to buy a firearm.

13       Q    Does North County Shooting Center maintain any

14   policies or procedures related to firearms?

15            MR. DILLON:  Objection; vague and ambiguous.

16            THE WITNESS:  I don't understand.

17   BY MS. ALBRECHT:

18       Q    Do you have -- does the company have any written

19   policies or procedures to train other employees or that

20   employees can use as reference with respect to firearms

21   specifically?

22       A    No.  We train with like a trainer like myself.

23   I think that's your question --

24       Q    Sure.

25       A    -- if I got that right.
```

Exhibit 58
DX1104

```
1        Q    There's no written handbook or manual or any
2   other reference guide that employees can turn to?
3        A    Not for firearm sales other than the specific
4   laws by ATF and DOJ, no.
5        Q    Okay.  I'm going to switch topics here shortly,
6   so I think this might be a good time for us to take a
7   break.
8        A    Okay.
9        Q    Can we go off the record?
10            MR. DILLON:  Yes.
11            (At the hour of 12:02 p.m., a luncheon
12            recess was taken, the deposition to be
13            resumed at 12:30 p.m.)
14                       -o0o-
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

Exhibit 58
DX1105

```
 1        ALL PARTIES APPEARING REMOTELY VIA ZOOM WEBCAM

 2                   TUESDAY, AUGUST 15, 2023

 3                       12:36 P.M.

 4                          ***

 5                   DARIN PRINCE, PMK,

 6            having been previously administered an

 7            oath remotely in accordance with CCP 2094,

 8            was examined and testified as follows:

 9                          ***

10                   EXAMINATION (Resumed)

11  BY MS. ALBRECHT:

12       Q    Mr. Prince, we've been talking about NCSC's

13  shooting range operations a little bit, but I wanted to

14  back up and get more basic information.

15            What types of range activities does NCSC offer?

16       A    Recreational shooting and instruction.

17       Q    And can you describe the difference between

18  those two categories?

19       A    Yeah, sure.  Recreational shooting would be an

20  individual coming in and shooting at the range.  And

21  instruction would be with an instructor to -- did I lose

22  you?

23            MR. DILLON:  We see you.

24            THE WITNESS:  With an instructor.

25  ///
```

```
 1   BY MS. ALBRECHT:

 2       Q    And what does NCSC offer for someone --

 3   apologies.

 4            What does NCSC require for someone to access the

 5   range?

 6       A    So they'll have to have identification and sign

 7   a waiver.

 8       Q    And to whom does an individual wanting to shoot

 9   at the range show his or her ID?

10       A    To the desk, the counter person at the range.

11       Q    And an individual wanting to shoot at the range

12   just shows his or her ID or is there anything else that

13   happens with respect to age verification?  Actually,

14   strike that.

15       A    Okay.

16       Q    Why does an individual wanting to shoot at the

17   range have to show ID?

18       A    We need to make sure that they are, in fact,

19   over 21 if they want to rent a firearm.  And if they are

20   under the age of 18, we would need a waiver signed by a

21   legal guardian or parent.  Otherwise they're allowed to

22   do a waiver on their own.

23       Q    You said that an individual wanting to rent a

24   firearm needs to show proof that he or she is over 21?

25       A    That's correct.
```

1    Q    Can someone bring his own personal firearm to

2    the shooting range to shoot?

3    A    Yes, they can.

4    Q    And in that instance do they need to show proof

5    that they are over 21?

6    A    No, they don't.

7    Q    Are there any age restrictions for someone

8    wanting to shoot at the range using his or her own

9    firearm that they brought with them?

10        MR. DILLON:  Objection; legal conclusion.

11        THE WITNESS:  Yeah.  That's -- they would have

12   to be over the age of 18 unless they were accompanied by

13   somebody who was over 18.

14   BY MS. ALBRECHT:

15   Q    So do all customers wanting to shoot at the

16   range need to show proof of their age?

17   A    They have to have ID, so yes.

18   Q    And does the staff range -- excuse me.

19        Does the range staff keep a copy of customers'

20   IDs?

21   A    No.  While they are on the range, yes, we keep

22   their ID.

23   Q    Right.  But once someone leaves the range, there

24   is no record of their ID?

25   A    Yes, there is a record of their ID, not a copy

Exhibit 58
DX1108

```
 1    of it.  But the information is there, yes.

 2         Q    And how is that information maintained?

 3         A    In the point-of-sale system because there's an

 4    associated waiver with that information.

 5         Q    And what's the name of that point-of-sale system

 6    at the range?

 7         A    Again, Rapid Point-Of-Sale.

 8         Q    So it's the same system that's also used in the

 9    retail part of the facility?

10         A    Yes, that's correct.

11         Q    Is there any -- strike that.

12              What information does the Rapid POS at the range

13    report?

14              MR. DILLON:  Objection; asked and answered.

15              THE WITNESS:  Yeah.  I did answer that before.

16    So it's gonna be name, age, and address.

17    BY MS. ALBRECHT:

18         Q    You mentioned associated waivers.  Is that

19    maintained in Rapid POS as well?

20         A    The waiver is not maintained in POS.  Just the

21    fact that they signed a waiver is maintained there.

22         Q    Does NCSC keep hard copies of the waivers?

23         A    No.  We did in the beginning.  Now we use an

24    online waiver system.

25         Q    And what's the name of the online waiver system?
```

Exhibit 58
DX1109

```
 1       A     Smartwaiver.com.

 2       Q     When did you start using smartsystem.com?

 3       A     It's Smart Waiver.

 4       Q     Smart Waiver.  When did you start using

 5  smartwaiver.com?

 6       A     I want to say in late 2020.

 7       Q     Prior to late 2020, did NCSC maintain hard

 8  copies of signed waivers?

 9       A     Yes.  We still maintain them.

10       Q     Do you have waivers going back to 2018?

11       A     Yes.

12       Q     Do you know how long smartwaiver.com maintains

13  copies of signed waivers?

14       A     I do not know how long at all.

15       Q     Do you know what percentage of -- let me back

16  up.

17             In order to shoot at the range, does someone

18  need to be a member?

19       A     Not always, but most often, yes.

20       Q     Okay.  And what circumstances does someone need

21  to be a member of NCSC to shoot at the range?

22       A     If they are planning on being a recurring

23  shooter, then they become a member.

24       Q     And how do you define recurring shooter?

25       A     We don't mandate that they become a member until
```

1   they have come back and shot again.

2       Q    And how does range staff know when someone was

3   previously there shooting?

4       A    If they are already in the system with a waiver,

5   then we know they've already been there shooting, either

6   in a class or on the range.

7       Q    And why is it that NCSC requires recurring

8   shooters to become members?

9       A    Because one of the requirements of the City of

10  San Marcos when we were opening was that we had to be a

11  members only club.

12      Q    And how does one become a member of NCSC?

13      A    They come in, fill out a waiver, and pay us to

14  be a member.

15      Q    Are there different types of memberships?

16      A    There are.

17      Q    What are the differences?

18      A    General is an hourly member, so you become a

19  member to meet the City's requirement, and then you have

20  to pay hourly to shoot.  Other levels of membership,

21  depending on how much you're there, don't require an

22  hourly membership.  Just the basic beginning membership

23  is more expensive.

24      Q    Are there membership fees?

25      A    Yes.

1      Q     And what are the membership fees?

2      A     Basic membership is $20.00 for the year.  And

3  then bronze membership is $450.00 for the year and,

4  again, requires no hourly shooting fee.  There are other

5  levels, but they are very infrequently used.

6      Q     Can someone wanting to shoot at the range make a

7  reservation or reserve a lane online?

8      A     No.

9      Q     What percentage of range customers bring their

10 own firearms versus renting one from NCSC?

11     A     It's speculation, but I would say about 30

12 percent of our guests do not provide their own firearms

13 for their range experience.

14          THE COURT REPORTER:  I'm sorry.  Was that 30,

15 3-0?

16          THE WITNESS:  3-0.

17 BY MS. ALBRECHT:

18     Q     And how many employees are working at the range

19 at any one time?

20     A     Never more than five, never fewer than three,

21 including one of the owners.

22     Q     Earlier today you gave me an estimate of NCSC's

23 revenue over the past 12 months being $1.8 million; is

24 that correct?

25     A     Yes.

Exhibit 58
DX1112

```
 1        Q     And does that number include revenue from the
 2   shooting range?
 3        A     Yes.
 4        Q     What percentage of the $1.8 million would you
 5   say comes from the shooting range?
 6        A     About 50 percent, which would include
 7   instruction.
 8        Q     And approximately what percentage of the
 9   50 percent comes from instruction?
10        A     It would be tough for me to break out, but
11   probably about 10 percent.
12        Q     And what percentage of customers at the range --
13   and to be clear, when I say customers, I include members
14   as well -- are over the age of 21?
15             MR. DILLON:  Objection; speculation.
16             THE WITNESS:  I wouldn't be able to put that
17   number out there.  I wouldn't know it.
18   BY MS. ALBRECHT:
19        Q     Why is that?  Why wouldn't you be able to
20   estimate that number, Mr. Prince?
21        A     I just don't have it.  It's not -- it's not
22   something -- I don't know everybody's age when they come
23   in to shoot.  It's just not something I do on a
24   day-to-day basis.  Everybody that comes through the door,
25   I don't ask them how old they are.
```

Exhibit 58
DX1113

1          So they're either old enough to go on the range

2   or they're not.  But I don't -- I don't make it a habit

3   of taking the time to ask everybody their age.

4      Q    Sure.  I understand that.  But I think -- do you

5   spend time at the range yourself?

6      A    You have asked me that before.  I'm on the floor

7   almost all the time.

8      Q    Okay.  Do you not spend any time at the range?

9          MR. DILLON:  Objection; Asked and answered,

10  misstates testimony.

11         THE WITNESS:  Yeah.  You did ask me to lay out

12  the layout of the building.  So I am technically at the

13  range almost all the time when I'm there.  But that

14  doesn't make me ask people how old they are.

15  BY MS. ALBRECHT:

16     Q    Sure.

17         So when you say -- when you were talking about

18  being on the sales floor earlier today, that includes the

19  range?

20     A    Yes, it does.

21     Q    Okay.  Understanding that you don't ask every

22  range customer for their age, it seems to me that you

23  would be able to use an educated estimate based on

24  looking at someone whether they are under 21 or over 21

25  or over 25 or over 30 or over 40 just based on your

Exhibit 58
DX1114

1    personal perception.

2            MR. DILLON:  Objection; argumentative,

3    speculation.

4            THE WITNESS:  I wish I was that good at that

5    game, but I'm not.

6    BY MS. ALBRECHT:

7        Q    So you have no estimate, based on your personal

8    observations, of how many range customers are over 21?

9        A    Looking at somebody, I honestly cannot tell if

10   they are 17 or 25.  And you asked me not to speculate

11   earlier, so I can't do that.

12       Q    Okay.

13           What percentage of range customers are over the

14   age of 40 in your estimation?

15           MR. DILLON:  Objection; speculation.

16           THE WITNESS:  Yeah.  Since I put my guess of my

17   average demographic at 30, I would say slightly over

18   half -- or I'm sorry -- slightly under half.

19   BY MS. ALBRECHT:

20       Q    Earlier you mentioned that you have had to turn

21   away range customers since Penal Code Section 27510 went

22   into effect; correct?

23       A    That's correct.

24       Q    And I believe you estimated that you turned away

25   approximately 15 customers in the past five days; is that

1    correct?

2        A    Yes.  In my past five working days, that is a

3    good number, 15.  Again, I don't work Friday and

4    Saturday, so I don't know what happened Friday and

5    Saturday.

6        Q    And we also talked earlier about you haven't

7    turned away customers who wanted to purchase firearms

8    because they were under the age of 21; correct?

9        A    Yes.

10       Q    And I believe you estimated that you've had to

11   turn away several such customers in the last 30 days;

12   correct?

13       A    That's correct.

14       Q    Would several be more than five?

15       A    No.  That number is decreasing with the amount

16   of time that has passed since that went into effect

17   because people who are purchasing a gun generally do some

18   research beforehand.  It was much more prevalent in the

19   beginning than it is now.

20       Q    Are you aware that there are exceptions to the

21   age limitations under Penal Code Section 27510?

22            MR. DILLON:  Objection; legal conclusion.

23            THE WITNESS:  Yes.

24   BY MS. ALBRECHT:

25       Q    And what is your understanding of what those

1   exemptions are?

2       A     Although they are hard to understand, if there

3   is a valid hunting license in place, the individual under

4   the age of 21 can buy shotguns or non-semi-automatic

5   center-fire rifles or rim-fire rifles if I have that

6   correct.

7       Q     Are you aware of any other exemptions?

8       A     I believe an active duty or honorably discharged

9   from the military individual can buy a non-center-fire

10  semi -- or I'm sorry -- a non-semi-automatic center-fire

11  or rim-fire or shotgun if they can show us proof of those

12  things.

13      Q     And in the last 12 months, how many firearms

14  sales has NCSC made to individuals who fall under one of

15  the exemptions of Section 27510?

16          MR. DILLON:  Objection; compound.

17          THE WITNESS:  Two.

18  BY MS. ALBRECHT:

19      Q     That's a number you had readily available.

20      A     Yeah.  I was involved in both of them, and they

21  were brought to me to verify the actual validity; again,

22  which is very, very confusing.  So they have to come to

23  me for that.  And it's very rare, so it sticks in my

24  mind.

25      Q     You did mention that exemptions are very

```
 1    confusing.  Have you sought guidance or assistance from

 2    anyone in trying to understand the exemptions better?

 3         A    Yes.  I attempted to call Department of Justice

 4    both times but got no answer, and got an answer much

 5    later.  But, yes, we do.

 6         Q    Who did you call at the Department of Justice?

 7         A    The phone number for the Firearms Bureau.

 8         Q    And when did you contact them?

 9         A    Originally at the point of sale.

10         Q    And how long ago was that approximately?

11         A    That I don't know.  I think the last one was

12    probably three or four months ago, and the other one was

13    much longer.

14         Q    And can you describe the circumstances?

15         A    I believe one was a hunting license and one was

16    an active duty military.

17         Q    And did you personally attempt to contact the

18    Bureau of Firearms?

19         A    Yes.

20         Q    And what was the purpose of your attempt to

21    contact them?

22         A    With the hunting license one, it's very

23    confusing to me.  I know there was a case about, if the

24    hunting license was valid, if it wasn't during hunting

25    season, that kind of stuff.  We generally don't like to
```

Exhibit 58
DX1118

```
 1   do them because we don't want to incur the liability, and
 2   I feel the law is ambiguous.  So we shy away from them.
 3       Q    So you attempted to contact the Bureau of
 4   Firearms to inquire as to whether a hunting license
 5   exemption applied to a customer wanting to make a
 6   purchase?
 7       A    Yes.
 8       Q    And did you receive a response to your inquiry?
 9       A    It was -- it was a while later.  And I actually
10   don't remember the response.  I just remember getting an
11   answer later.
12       Q    When you say a while later, are we saying
13   several hours later, several days, several weeks?
14       A    It was several days.
15       Q    And did you -- do you recall whether you made
16   the sale to the customer attempting to invoke the hunting
17   license exemption?
18       A    I don't believe we made the sale.
19       Q    And what was the other circumstance in which you
20   contacted the Bureau of Firearms?
21       A    It was for an active duty military personnel
22   attempting to buy a hunting rifle.
23       Q    And did you personally attempt to contact the
24   Bureau?
25       A    Yes, I did.
```

Exhibit 58
DX1119

1    Q    And what was the purpose of your attempt to

2    contact them?

3    A    Just to verify that it was a legitimate

4    transaction.

5    Q    Can you explain that further?

6    A    I wanted to make sure that it was -- I believe

7    it was a semi-automatic shotgun, and I wanted to make

8    sure a semi-automatic shotgun was a legitimate purchase

9    if I'm remembering it correctly.  And I believe within

10   several hours I was told yes, and I believe we made that

11   sale.

12   Q    With respect to the several customers that

13   you've turned away over the past 30 days who wanted to

14   make a firearms purchase, did you inquire as to whether

15   they met any of the exemptions under Section 27510 such

16   as the hunting license exemption or military exemption?

17   A    We inquired to both, although we don't like

18   doing those transactions because the law, in our opinion,

19   is ambiguous.  But it didn't matter because they didn't

20   meet any of the requirements anyway.

21   Q    I understand that you don't like making those

22   transactions.  Are staff trained to nonetheless ask

23   whether they meet any of the exemptions?

24   A    Yes, they are.

25   Q    Other than the Bureau of Firearms in those two

67

1    circumstances that you described, have you attempted to

2    seek guidance regarding the exemptions under 27510 from

3    anyone else?

4        A    No.

5        Q    You mentioned that you turn away groups who

6    wanted to shoot at the range if any member of that group

7    is under the age of 21; is that correct?

8        A    That is correct, yes.  We don't turn away the

9    entire group because of that.  Maybe clarify.  We let

10   them know that those under 21 cannot rent our firearms

11   and can't even go out with them.  Most of the time they

12   will all leave.

13       Q    Have there been instances in which such groups

14   made representations that they would not allow the member

15   under the age of 21 to hold or control or take possession

16   of a firearm?

17       A    We cannot put ourselves in a position of

18   providing a firearm to a group of people with somebody

19   who is under the age of 21 because I don't think it would

20   be looked upon as prudent if something happened, and they

21   did promise us they wouldn't let them hold it but then

22   let them hold it.  So we don't do it.

23       Q    We have not talked about the training programs

24   or courses that NCSC offers.  Could you tell me a little

25   bit more about the types of training courses that are

 1    offered?

 2        A    Sure.  Our most popular is what's called Basic

 3    Pistol One.  That's a three-hour course that allows a

 4    person to come in without their own firearm or with their

 5    own firearm and basically no knowing about it and leave

 6    being relatively proficient.

 7        Q    Okay.  And what are other types of training

 8    courses that are offered?

 9        A    They basically build upon Basic Pistol One.  So

10    Basic Pistol Two, and then Defensive Pistol, and then

11    Defensive Pistol Two.  And then we also have

12    accreditation with the County of San Diego to do CCW

13    training and CCW renewal.

14        Q    Are these group trainings?

15        A    Yes.  They have more than five people per

16    instructor, with the exception of the CCW training

17    because all shooting is done one-on-one with an

18    instructor.  They can also do private lessons if they

19    wish.

20        Q    And what do private lessons entail?

21        A    They are generally the same curriculum, but they

22    would be one-on-one with an instructor if somebody is

23    uncomfortable being around other people.  The class is

24    more expensive, but it's smaller groups or one-on-one.

25        Q    Do all your trainings require that students

Exhibit 58
DX1122

1    handle firearms?

2        A    Yes.

3        Q    All of them?

4        A    Yes.

5        Q    What is the Home Firearm Safety Course?

6        A    The home Firearm Safety Course is a course we

7    offer that has never been taken.

8        Q    Okay.  What does it cover?

9        A    It's basically handling a firearm for defense

10   inside the home.

11       Q    In the description on NCSC's website it states

12   it's a lecture-only course; is that correct?

13       A    It is.  That means there's no live fire, but

14   there is manipulation.  So it is a firearms handling

15   class, but there's no live fire.

16       Q    Sorry.  You will have to explain that to me a

17   little bit better.  What do you mean by live fire?

18       A    There's no going out on the range and shooting.

19       Q    Okay.  Whereas the other classes do involve

20   shooting at the range?

21       A    Yes.  Even Basic Pistol One has a component on

22   the range where it's live fire.

23       Q    And going back to the Home Firearm Safety

24   Lecture-Only course, does that require a student to

25   handle a firearm?

```
 1        A     For manipulation training, yes.  But, again,

 2     it's never -- we've never had the class, and there's no

 3     live fire.  So it depends on what you consider, like,

 4     handling a firearm.  Shooting it, no.  Touching it, yes.

 5        Q     Okay.  Is that what you meant by manipulation,

 6     touching the firearm?

 7        A     Yes.  Handling a firearm.

 8        Q     If you wouldn't mind taking a look at what I'm

 9     going to mark as Exhibit 13 out of order.  And let me

10     know once you've had a chance to pull that up.

11        A     Did you say 13?

12        Q     Yes.

13        A     Okay.

14              (Exhibit Number 13 was marked

15              for identification.)

16     BY MS. ALBRECHT:

17        Q     And if you could take a look at -- sorry.

18              Would you please read the title of the document.

19        A     Declaration of Darin Prince in Support of

20     Plaintiffs' Motion for Preliminary Injunction.

21        Q     Are you familiar with this document?

22        A     I am.

23        Q     If you could turn to the last page.

24        A     Okay.

25        Q     Is that your signature right below where it
```

```
 1    states, "I declare under penalty of perjury that the
 2    foregoing is true and correct"?
 3         A    Yes.
 4         Q    And if you could go to paragraph 7, please.
 5         A    Okay.
 6         Q    Do you see -- actually, if you could read the
 7    second sentence starting with "most".
 8         A    "Most NCSC classes require students to handle
 9              firearms in some manner."
10         Q    So you say that most classes require students to
11    handle firearms in some manner, not all; correct?
12         A    Yes.
13         Q    So which classes that NCSC offers do not require
14    students to handle firearms?
15         A    None, no classes that we have ever actually had
16    people sit down at.  They have never been filled.  I have
17    a simulator in the building which you can use, and it
18    does not require live fire, but we have never had a
19    single class in it.
20         Q    Okay.
21              And to be clear, I'm asking about class that
22    NCSC offers, not classes that students have actually
23    enrolled in.  And in those classes that NCSC offers,
24    could you please identify the ones that do not require
25    the handling of firearms?
```

72

1    A    None.

2    Q    Did you --

3    A    There is a training facility there that is

4  simulation, but, again, we -- so, yes, you could do it,

5  but we have never done it.  But it is offered, so we have

6  a simulator you could use that is not firearms mandatory.

7    Q    And is simulator the name -- what's the name of

8  that training?

9    A    No.  That would be -- it's a TI simulator.  You

10  can rent it by the half hour or the hour.

11    Q    Are there any other trainings that NCSC offers

12  that do not require the handling of a firearm whether

13  they have been taken by students or not?

14    A    No.

15    Q    Going back to your declaration in Exhibit 13,

16  did you prepare this declaration?

17    A    With counsel, yes.

18    Q    And did you review it closely before you signed

19  it?

20    A    Yes.

21    Q    If you could take a look at paragraph 5.

22    A    Yes.

23    Q    Would you mind reading the first sentence?

24    A    "Further, North County Shooting Center has been

25         forced to prohibit, and has prohibited, young

73

```
 1              adults ages 18 and 20 from attending various

 2              firearms classes hosted by NCSC."

 3      Q    And what do you mean by forced in that statement

 4  that you just read?

 5      A    Well, we cannot let them take the class if they

 6  don't have their own firearm.  So we are, unfortunately,

 7  not allowed to let them take that class.

 8      Q    Has anyone threatened enforcement against NCSC?

 9              MR. DILLON:  Objection; argumentative, legal

10  conclusion.

11              THE WITNESS:  I would say if it's the law,

12  then -- then yes.

13  BY MS. ALBRECHT:

14      Q    How do you mean that?

15      A    Well, if we're not allowed to give a gun that

16  belongs to the FFL to a student, then we would be in

17  violation if we did that.  If we rented them a gun that

18  belongs to the range, we have provided them with a

19  firearm.

20      Q    Has any government agency threatened that they

21  would bring an enforcement action against NCSC if they

22  provided a firearm to anyone under the age of 21?

23              MR. DILLON:  Objection; argumentative, legal

24  conclusion, speculation.

25              THE WITNESS:  Not that I have been directly
```

```
 1   told, no.

 2   BY MS. ALBRECHT:

 3       Q    Going back to paragraph 5, would you mind

 4   reading the second sentence?

 5       A    "As a direct result, NCSC has sustained

 6            financial injury, harm, and losses from the sale

 7            and rentals of otherwise lawful goods and

 8            services."

 9       Q    How has NCSC suffered financial injury?

10            MR. DILLON:  Objection; vague and ambiguous.

11            THE WITNESS:  I agree.

12   BY MS. ALBRECHT:

13       Q    Well, I'm referring to the sentence in your

14   declaration.

15       A    If I'm not allowed to put somebody into a class,

16   then I can't sell that class.

17       Q    And how has that resulted in financial injury?

18       A    It's --

19            MR. DILLON:  Objection; asked and answered.

20   BY MS. ALBRECHT:

21       Q    How many classes have you not been able to sell

22   as a result of Penal Code Section 27510 going into

23   effect?

24       A    I don't know that number.

25       Q    Can you provide an estimate of that number?
```

Exhibit 58
DX1128

```
 1        A    No.  It will be speculation.

 2        Q    Mr. Prince, you have been identified as the

 3   person most knowledgeable on behalf of NCSC to be able to

 4   testify today on this topic and related topics, and

 5   you've not been able to do so.  Is there anyone else --

 6             MR. DILLON:  Objection; misstates testimony.

 7   BY MS. ALBRECHT:

 8        Q    Is there anyone else at NCSC who is able to

 9   provide an estimate of the number of training classes

10   that you've not been able to fill as a result of

11   Section 27510 going into effect?

12             MR. DILLON:  Objection.

13             THE WITNESS:  No.

14             MR. DILLON:  Same objection.

15   BY MS. ALBRECHT:

16        Q    On what basis are you alleging that NCSC has

17   suffered financial injury if you're not able to provide

18   information on how many training classes NCSC has not

19   been able to fill as a result of Section 27510?

20             MR. DILLON:  Objection, argumentative, misstates

21   testimony.

22             THE WITNESS:  Yeah.  Not being able to give you

23   a number does not mean I know it doesn't happen.  If

24   people call and ask what the requirements are, and they

25   have to be 21, and we say, "Are you 21?" and they say no,
```

```
 1   we can't book that class.  We don't jot it down in a

 2   notebook, but it happens, which means we're losing that

 3   class.

 4   BY MS. ALBRECHT:

 5       Q    In the example that you just provided, someone

 6   calling and asking for information, you don't know that,

 7   setting aside the age limitations, those individuals

 8   would actually have enrolled in the training class, do

 9   you?

10            MR. DILLON:  Objection; argumentative and

11   speculative.

12            THE WITNESS:  Yeah.  That would be speculation.

13   You've asked me not to speculate.

14   BY MS. ALBRECHT:

15       Q    Well, Mr. Prince, it seems to me that you are

16   speculating that someone who calls to inquire about a

17   training class would actually enroll in that training

18   class but for the age limitation under Section 27510.

19            MR. DILLON:  Objection; argumentative, misstates

20   testimony.

21   BY MS. ALBRECHT:

22       Q    So my question to you is how do you know that

23   such a person making an inquiry and asking for

24   information would actually enroll in a training class but

25   for the age limitation?
```

```
 1          MR. DILLON:  Objection; speculation,
 2   argumentative.
 3          THE WITNESS:  Yeah.  I would be speculating.
 4   BY MS. ALBRECHT:
 5     Q    So you don't know?
 6          MR. DILLON:  Objection; argumentative.
 7   BY MS. ALBRECHT:
 8     Q    You may answer.
 9     A    No, I don't know.  But I will assume that when a
10   phone call about a class terminates at the age
11   requirement that they don't meet, I know they can't book
12   the class at that point, they know they can't book the
13   class at that point, you know, you would be speculating,
14   but you could, I suppose, leap to a conclusion.
15     Q    Do you understand that as part of this
16   litigation, NCSC may, at some point, have to quantify the
17   amount of financial injury that it claims it has suffered
18   as a result of Section 27510?
19          MR. DILLON:  Objection; speculation,
20   argumentative, legal conclusion, incomplete hypothetical.
21          THE WITNESS:  I'm not aware of that, the
22   qualifying.
23   BY MS. ALBRECHT:
24     Q    Quantifying.  Do you understand --
25     A    Quantifying.
```

Exhibit 58
DX1131

```
 1      Q    -- at some point NCSC would have to put a number

 2   next to the financial loss it claims that it has

 3   suffered?

 4           MR. DILLON:  Same objections.

 5           THE WITNESS:  Yeah.  And, again, I'm sorry.  I

 6   do not know that.

 7   BY MS. ALBRECHT:

 8      Q    Would NCSC be able to do so if it's required to

 9   do so as part of this litigation?

10           MR. DILLON:  Same objections.

11           THE WITNESS:  I don't know how.

12   BY MS. ALBRECHT:

13      Q    You earlier mentioned that you have a

14   representative at Rapid POS whom you've contacted in the

15   past for bugs and other issues related to the system; is

16   that correct?

17      A    Yes.

18      Q    Have you or anyone else at NCSC ever contacted

19   that representative to ask how to run reports in the

20   system that would identify the number of firearm sales to

21   particular age groups?

22      A    I know we have never reached out to ask that

23   question.

24      Q    Why not?

25      A    For one thing, it costs money.  Every time we
```

Exhibit 58
DX1132

```
 1   talk to them or try and get instructions or ask them to
 2   write a new report program for us, it's an expense.
 3        Q    But just putting in a call and asking a
 4   question, would that be an expense too?
 5        A    Yes.
 6        Q    Why don't we go off the record and take a break
 7   for about ten minutes.
 8        A    Okay.
 9             MR. DILLON:  Okay.
10             (A recess was taken.)
11   BY MS. ALBRECHT:
12        Q    Mr. Prince, are you aware of rules and
13   regulations and laws that require NCSC to keep records
14   related to firearms transactions?
15        A    Yes, I am.
16        Q    And do you understand that in case of an
17   inspection by law enforcement, NCSC would have to make
18   those records available to law enforcement?
19        A    Yes, I do.
20        Q    And what is your understanding of the
21   recordkeeping requirements generally?
22        A    For the ATF, the 4473s have to be kept forever
23   or until we close, and I believe the Cal DOJ is either
24   three or five years.  But it doesn't matter because we
25   keep them with our 4473s so far from the day we opened.
```

Exhibit 58
DX1133

1    Q    And if law enforcement requested an inspection

2  of those documents, how would you make those documents

3  available?

4    A    They are onsite, and law enforcement quite

5  regularly does do an inspection on those files.

6    Q    So to be clear, your testimony today is that you

7  are able to provide information related to firearms sales

8  to law enforcement if requested, but you're not able to

9  provide information to us today regarding the sales of

10  firearms?

11         MR. DILLON:  Objection; argumentative, misstates

12  testimony.

13         THE WITNESS:  Yeah, that's not true.  It's very

14  time consuming to go through those files.  And, of

15  course, when we get an audit or an ATF search, yes, we

16  are required by law to go through those files every time

17  as expense to us.  But, yes, we can do it.

18  BY MS. ALBRECHT:

19    Q    So have you gone through those files in, say,

20  the past year?

21    A    For what purpose?

22    Q    For any purpose.

23    A    Yes.  We were audited within the last three

24  months.

25    Q    And as part of that audit in the past three

1    months, did you yourself go through these firearm sales

2    records?

3        A    No.

4        Q    Who did?

5        A    The most recent was an ATF audit, and we simply

6    bring the files to the ATF auditor, and they go through

7    the files.

8        Q    Have you, in the past five years, gone through

9    these firearms sales files yourself for any reason?

10       A    Only on an individual file basis for an ATF

11   audit.

12       Q    And what did that entail?

13       A    The ATF calls us to do a trace on a firearm,

14   they give us the date the firearm was purchased and left

15   our building, and we go find that file and send them the

16   appropriate requested information.

17       Q    And approximately how much time did it take you

18   to go through the files to provide that information to

19   ATF?

20           MR. DILLON:  Objection; compound.

21           THE WITNESS:  To find a file, collect the

22   information, and send it off to ATF takes probably about

23   30 minutes, no more than that.

24   BY MS. ALBRECHT:

25       Q    This lawsuit has been going on since January

Exhibit 58
DX1135

```
 1   2019, are you aware of that?

 2        A    I am.

 3        Q    And have you personally been involved since

 4   then?

 5        A    I believe I have.

 6        Q    And how much time would you say you've spent as

 7   part of your participation in this lawsuit?

 8        A    Several hours.

 9        Q    Several?  More than five?

10        A    Let's call it ten hours or less.

11        Q    And does that include time in reviewing and

12   responding to discovery requests?

13        A    Yes.

14        Q    How much money do you think you've spent as part

15   of NCSC's participation in this lawsuit?

16        A    I wouldn't be able to give you that number.

17        Q    Do you have an estimate?

18        A    I don't.

19        Q    More than $100.00?

20        A    Yes.

21        Q    More than $1,000?

22        A    Yes.

23        Q    More than $3,000?

24        A    Probably not.

25        Q    You said earlier that it costs money every time
```

83

```
 1   you contact Rapid POS.  How much does it cost each time
 2   you contact them?
 3        A    I guess it's dependent on what we are asking
 4   them to do, but I don't know offhand.
 5        Q    Do you have a range?
 6        A    I'm sorry.  I would have to call them and get
 7   that number.  It's not something I have ever considered.
 8   If we need something from them, it's unfortunate that we
 9   have to pay, but that's the point-of-sale system we went
10   with.
11        Q    Is it possible it costs less than $100.00?
12             MR. DILLON:  Objection; calls for speculation,
13   asked and answered.
14             THE WITNESS:  I couldn't tell you.
15   BY MS. ALBRECHT:
16        Q    Who at NCSC would be able to provide me with
17   that information?
18        A    I guess we would call Rapid.  I could provide it
19   for you, but I would need to call Rapid.  And if I need
20   to do that, what am I asking Rapid to do for me?
21        Q    Well, I'm asking the questions here, Mr. Prince.
22   I was just asking who would be able to provide that
23   information, and you've answered that.
24             So no one at NCSC would have that information
25   without contacting Rapid?
```

```
 1      A    That's correct.  And if we were to contact

 2  Rapid, we would need to know what exactly we were asking

 3  them to do to get a bid on whatever we wanted them to do.

 4      Q    Earlier you talked about placing orders for

 5  firearms or, rather, identifying orders for firearms and

 6  asking Mr. Tuma to put in those orders; is that correct?

 7      A    That's correct.

 8      Q    How do you go about identifying what guns need

 9  to be ordered and how many?

10      A    I look at our current inventory and adjust it.

11  If we sold all of something, we need more of that

12  something.

13      Q    And when you say you look at your current

14  inventory, what does that mean?

15      A    It means I will go into the back shelf to look

16  and see how many Glock 19s I have and determine whether

17  or not I need more Glock 19s.

18      Q    Does NCSC maintain an electronic inventory

19  system of sorts?

20      A    There is supposedly an electronic inventory

21  built into Rapid POS.  It has never been very functional.

22  And we do it manually because it's very cumbersome.

23      Q    Have you or anyone else at NCSC contacted Rapid

24  POS to obtain assistance with the electronic inventory

25  function?
```

85

Exhibit 58
DX1138

1    A    Yes.

2    Q    And what was the result of that?

3    A    Requests for money to develop a system that

4  works better for us which, again, is an expense we don't

5  wish to do since we can simply go to a shelf and look at

6  what's back there.  There's not a lot of back stock in

7  our place.  So if a peg outside is empty of holsters, we

8  know we need more holsters.  If there's four Glock 19s on

9  the shelf in the back, we know we need more Glock 19s.

10  It's antiquated, but our system seems to be faster than

11  the POS.

12    Q    How many different items do you sell?

13    A    We probably have 3,000 SKUs.

14    Q    Aside from Rapid POS, are there any other

15  electronic systems that NCSC maintains?

16    A    Other than Smart Waiver, which we discussed, no.

17    Q    I'm going to turn to NCSC's discovery responses

18  in this case.  Are you aware that NCSC has been asked to

19  respond to various discovery requests as part of this

20  litigation?

21    A    Yes.

22    Q    Were you involved in responding to these

23  requests on behalf of NCSC?

24    A    If we were able to without a ton of burden, yes.

25    Q    How do you mean?

Exhibit 58
DX1139

1      A     I mean that we run a business, so,

2   unfortunately, some of requests are quite time consuming

3   if at all possible.

4      Q     And so it's your testimony that if they were too

5   burdensome, NCSC did not participate or assist in the

6   responses to these requests?

7            MR. DILLON:  Objection; misstates testimony.

8            THE WITNESS:  It's not responsive.  If we didn't

9   have time, we just couldn't do it.  We were operating a

10  business from day to day.

11  BY MS. ALBRECHT:

12     Q     Can you identify the discovery requests for

13  which you did not have time to respond?

14     A     We responded in those that we would not have

15  time to go through individual files on some of the

16  requests.  It's just there's no way for us to do it and

17  stay in business.

18     Q     Do you recall what those specific requests were?

19     A     I don't.

20     Q     If you wouldn't mind taking a look at what is

21  marked as Exhibit 3.

22     A     Bear with me.  I have to reopen.

23     Q     Sure.

24     A     Okay.

25  ///

Exhibit 58
DX1140

```
 1              (Exhibit Number 3 was marked

 2              for identification.)

 3    BY MS. ALBRECHT:

 4        Q    What's the title of the document?

 5        A    Defendants' First Set of Requests for Production

 6    to Plaintiff North County Shooting Center.

 7        Q    Have you seen this document before?

 8        A    Yes, I have.

 9        Q    Did you read it?

10        A    I did.

11        Q    Did you also read the definitions and

12    instructions that are on pages 2 through 7?

13        A    Yes.

14        Q    And did you conduct searches of NCSC's file to

15    respond to these requests?

16        A    No.

17        Q    No?

18        A    No.

19        Q    Is there anyone else at NCSC who conducted

20    searches to identify documents to respond to these

21    requests?

22        A    No.

23        Q    Do you know if NCSC has produced any documents

24    as part of this litigation?

25        A    I don't believe that we have, no.
```

1    Q    And why is it that you did not conduct any

2  searches to identify documents responsive to these

3  requests?

4    A    Unfortunately, I don't have the time to do that

5  and run the business.

6    Q    Do you understand that as a party to this

7  lawsuit, you are -- there are rules that require you and

8  NCSC, as a party to this litigation, to spend the time

9  and produce documents that have been requested?

10    A    Sure.  I mean, yes.  And I just have not had the

11  time.  That's an incredible amount of files to go through

12  to look for information --

13    Q    Is this lawsuit --

14    A    -- especially when --

15    Q    Excuse me.  Is this lawsuit important?

16    A    It is.

17        MR. DILLON:  Objection; argumentative.

18        THE WITNESS:  It is.  And the Department of

19  Justice has access to it at the push of a button.  You

20  can research the DROSs to find out the information you're

21  looking for.  It's not a push of the button for me.  It's

22  a manual search of thousands of files.

23  BY MS. ALBRECHT:

24    Q    Mr. Prince, the Department of Justice does not

25  have access to NCSC's communications related to some of

```
 1   the subjects of this litigation.  If you would take a

 2   look at these requests, and you stated earlier that

 3   you've reviewed them, you will see that the requests go

 4   far beyond any information that the Department of Justice

 5   may or may not have that only NCSC would have.

 6        A    Okay.  I don't see -- I don't see that kind of

 7   stuff other than line 6, which it says, "either by oral,"

 8   and I don't know how to give that to you other than what

 9   I have said.  If I asked somebody to leave the building

10   because we can't service them, what am I supposed to give

11   you?

12        Q    Okay.  Mr. Prince, I would ask that you please

13   take the time now to review the requests for production

14   numbers 1 through 42 that are listed in Exhibit 3 and let

15   me know once you've had a chance to review them.

16        A    Okay.  Are we doing that right now?

17        Q    Please.  And let me know once you've had a

18   chance to review them.

19        A    Okay.  I've reviewed them.

20        Q    Thank you.

21             Have you reviewed these requests previously?

22        A    Yes.

23        Q    And to confirm, you did not search for any

24   documents responsive to these requests?

25             MR. DILLON:  Objection; misstates testimony.
```

```
 1              THE WITNESS:  This is -- no, I did not.  This is
 2  a month's worth of work.
 3  BY MS. ALBRECHT:
 4       Q    Mr. Prince, if you could please go to
 5  Exhibit Number 8.
 6       A    Plaintiff North County Shooting Center's
 7  Supplemental Response to Defendants' First Set of
 8  Requests for Production of Documents.
 9              (Exhibit Number 8 was marked
10              for identification.)
11  BY MS. ALBRECHT:
12       Q    Have you seen this document before?
13       A    Yes.
14       Q    Did you assist in the preparation of this
15  document?
16       A    Yes.
17       Q    Are the responses provided in this document
18  accurate?
19       A    Yes.  I drafted them with counsel.
20       Q    If you could take a look at the response to
21  Request for Production Number 1.
22       A    I'm there.
23       Q    And in the second full paragraph around line 27,
24  would you read the sentence starting with "Additionally"?
25       A    "Additionally, Responding Party has already
```

```
 1              produced responsive documents.  After searching

 2              through its records, Responding Party has no

 3              other" --

 4       Q     Thank you.  Just that first sentence.

 5       A     Oh.

 6       Q     So NCSC's response here is that it has produced

 7  documents responsive to the document requests in this

 8  case; is that your understanding?

 9       A     That is correct.

10       Q     Who at NCSC provided the documents that were

11  produced as referenced in the sentence you just read?

12       A     It was -- I did.  And it was numbers, not

13  documents, but information based on what we were

14  experiencing as far as lost sales to counsel.

15       Q     Mr. Prince, this states that documents have been

16  produced, not information.

17       A     Okay.

18       Q     So who at NCSC would have provided those

19  documents?

20       A     I would have provided information to counsel.

21       Q     Would it surprise you to learn that NCSC

22  produced some documents to us, not a lot, but some

23  documents?

24       A     It's been a while, but, you know --

25       Q     Just to confirm, you did not search for any
```

Exhibit 58
DX1145

1   emails --

2       A    I don't recall.

3       Q    -- in response to these requests?

4       A    I don't recall.  Let me look at the date on

5   this.  I don't recall.

6       Q    Could you please open Exhibit 10.

7       A    It says it's waiting to open it.  Bear with me.

8       Q    Okay.

9       A    Okay.

10      Q    Before we look more closely at Exhibit 10, with

11  respect to Exhibit 8 that we were just looking at, the

12  supplemental responses to document requests, as you sit

13  here today, Mr. Prince, are you able to verify that these

14  responses are correct?

15      A    I'll have to re-open 8.  Hold on just a moment.

16  Yes, they appear correct.

17      Q    And as you sit here today, Mr. Prince, are you

18  able to verify that these responses are complete?

19      A    I would have to go over them again, but I worked

20  through these with counsel, so I'm going to say yes.

21      Q    Now, turning to Exhibit 10, would you please

22  read the title of the document.

23      A    I have Plaintiff North County Shooting Center's

24  Supplemental Response to Defendants' First Set of

25  Requests for Admissions.

```
 1              (Exhibit Number 10 was marked

 2              for identification.)

 3   BY MS. ALBRECHT:

 4       Q     Are you familiar with this document?

 5       A     I have seen it before, yes.

 6       Q     Did you help prepare it?

 7       A     Yes, with counsel.

 8       Q     Did anyone else at NCSC help prepare the

 9   document?

10       A     Not that I recall.

11       Q     And what did you do to supplement NCSC's

12   responses to the Requests for Admissions?

13       A     I would supply information to John.

14       Q     As you sit here today, are you able to verify

15   that these responses are correct?

16       A     They appear to be correct.

17       Q     Are you able to verify that the responses are

18   complete?

19       A     They appear to be complete.

20       Q     If you would please turn to Exhibit 12 next.

21       A     Yes.

22              (Exhibit Number 12 was marked

23              for identification.)

24   BY MS. ALBRECHT:

25       Q     Could you read the title of the document please?
```

Exhibit 58
DX1147

```
 1       A       Plaintiff North County Shooting Center's
 2   Supplemental Response to Defendants' First Set of
 3   Interrogatories.
 4       Q       Are you familiar with this document?
 5       A       I've seen this document before.
 6       Q       Did you help prepare it?
 7       A       Yes.
 8       Q       Did anyone else at NCSC help prepare it?
 9       A       Not as I recall.
10       Q       If you could turn to the last page of this
11   document, please.
12       A       All right.
13       Q       Is that your signature right below the
14   statement, "I verify under penalty of perjury under the
15   laws of the United States that the foregoing is true and
16   correct and that I execute this verification on July 26,
17   2023"?
18       A       Yes.
19       Q       Can we go off the record?
20       A       Sure.
21           MR. DILLON:   Okay.
22           (A recess was taken.)
23   BY MS. ALBRECHT:
24       Q       Mr. Prince, going back to the training courses
25   that NCSC offers, how does one sign up for training?
```

1    A    You call in.

2    Q    Is that the only way?

3    A    That is the only way.  I mean, no, you can walk

4    into the store, but you have to either call in or be in

5    the store.  I apologize.

6    Q    And what is the process for signing up either

7    over the phone or walking in?

8    A    We get your name and -- well, we find out what

9    schedule date works for you, get your name, and then

10   capture your credit card information.  And then your

11   scheduled.

12   Q    And are the training course sales processed via

13   Rapid POS or through a different system?

14   A    They are through Rapid, but they don't capture

15   any info, just the dollar amount.

16   Q    In 2018, how many firearms training courses did

17   NCSC sell?

18   A    I don't recall.

19   Q    Is there anyone else at NCSC who would recall?

20   A    No.

21   Q    Are you able to look up that information?

22   A    That would probably be a report I could pay for

23   and have drafted at Rapid, but it would be an expense.

24   Q    We talked earlier about sales reports that you

25   are able to run in Rapid POS that might not tell you what

Exhibit 58
DX1149

```
 1    types of items were sold, but it would provide you with

 2    overall sales numbers; is that correct?

 3         A    That's correct.

 4         Q    And I believe you said that it would probably

 5    tell you a number of firearms sales; correct?

 6         A    That's correct.

 7         Q    Would that tell you the number of training sales

 8    as well?

 9         A    No.  But there are four main training courses,

10    so I think it would be easier for Rapid to determine how

11    many of each of those have been sold.  I would just have

12    to pay for it.  But with firearms, you know, there's 40

13    different kinds of firearms that you would have to track,

14    so it would be more difficult that way.  But I'm sure

15    Rapid could do that.  Again, it would be an expense.

16         Q    Do you know how much of an expense that would

17    be?

18         A    I don't know.

19         Q    And so you have not inquired with Rapid as to

20    whether this is something they would be able to determine

21    and what the expense would be?

22         A    I have not.  I have not requested that

23    information from Rapid.

24         Q    Do you know how many firearms training courses

25    NCSC sold in 2019?
```

Exhibit 58
DX1150

```
 1        A     I don't.

 2        Q     Do you know how many training courses NCSC sold

 3   in 2020?

 4        A     I do not.

 5        Q     Do you know how many training courses NCSC sold

 6   in 2021?

 7        A     I do not.

 8        Q     Do you know how many training courses NCSC sold

 9   in 2022?

10        A     I do not.

11        Q     Do you know how many training courses NCSC has

12   sold year to date in 2023?

13        A     I do not.

14        Q     Do you know NCSC's revenues from training

15   courses sold in years 2018 through present?

16        A     No.  But that is a number I could determine.

17        Q     Is that a number you could determine without

18   additional expense from Rapid?

19        A     I don't believe so.  I would have to -- I would

20   have to get Rapid to write that report at expense.

21        Q     To confirm, you don't know the number of

22   training courses or NCSC's revenues from training courses

23   for the years 2018 through present as you sit here today;

24   correct?

25        A     That is correct.
```

Exhibit 58
DX1151

1    Q    So as you sit here today, you don't know whether

2    there has been a decrease in revenue from NCSC's training

3    courses over the years 2018 through present, do you?

4         MR. DILLON:  Objection; argumentative.

5         THE WITNESS:  I know there was a peak during

6    COVID, but I don't know the exact numbers because I've

7    never run that report.

8    BY MS. ALBRECHT:

9    Q    Earlier I asked you -- strike that.

10        Are you able to estimate the percentage of

11   NCSC's $1.8 million revenue from training courses over

12   the 12 months that came from -- strike that.

13        Are you able to estimate what percentage of

14   NCSC's revenue of $1.8 million over the past 12 months

15   came from training courses?

16   A    I would estimate about 5 percent.

17   Q    Earlier I asked you what percentage of NCSC's

18   gun sales in 2018 were to individuals under the age of

19   21, and you stated that you are not able to provide that

20   information; is that correct?

21   A    That's correct.

22   Q    Would Stan Tuma be able to provide that

23   information?

24   A    No.  That would be, again, going back through

25   individual DROSs or 4473s.  I don't think anybody would

Exhibit 58
DX1152

```
 1   know that without physically going through the files.
 2       Q    Have you taken any steps to determine the cost
 3   to NCSC for determining that number?
 4       A    No, I have not.
 5       Q    Has NCSC considered hiring another employee or a
 6   temp employee or consultant to assist it in identifying
 7   the percentage of gun sales to individuals under the age
 8   of 21 in 2018?
 9       A    We have not.
10       Q    Earlier you stated that you are not able to
11   provide an estimate of the lost revenue as a result of
12   Penal Code Section 27510 going into effect; is that
13   correct?
14       A    That's correct.
15       Q    Would Stan Tuma be able to provide that
16   estimate?
17       A    Not to my knowledge.
18       Q    Would Diane Prince-Tuma -- I apologize -- Diane
19   Price-Tuma be able to provide that information?
20       A    No.
21       Q    Would Cheryl Prince be able to provide that
22   information?
23       A    No.
24       Q    Is there anyone else at NCSC who would be able
25   to provide that information?
```

Exhibit 58
DX1153

```
 1      A    Not without an extensive search of our DROSs and

 2   our Federal 4473s.

 3      Q    And you have not conducted or taken steps to

 4   obtain a cost estimate for running those searches;

 5   correct?

 6      A    That's correct.

 7      Q    I don't have anything further.  I don't know if

 8   my colleague does.  Jenny?

 9                           ***

10                        EXAMINATION

11   BY MS. ROSENBERG:

12      Q    Yeah, I have just a couple of follow-up

13   questions for you.  And thank you for your time today,

14   Mr. Prince.

15      A    Uh-huh.

16      Q    I would like to ask was NCSC closed for any

17   portion of the COVID-19 pandemic?

18      A    It was not.

19      Q    It was not.  Okay.

20           And if we could take a look at what was marked

21   as Exhibit 5.  These are -- excuse me -- Exhibit 11 which

22   should be your responses to the first set of

23   interrogatories.

24           Do you have that available?

25      A    I'm pulling it up right now.
```

```
 1        Q     Okay.  Thank you.

 2        A     Plaintiff North County Shooting Center's

 3   Response to Defendants' First Set of Interrogatories.

 4        Q     Great.  Thank you very much.

 5              (Exhibit Number 11 was marked

 6              for identification.)

 7   BY MS. ROSENBERG:

 8        Q     Could you scroll to the very final page of the

 9   PDF to a page that's titled verification.

10        A     Yes.

11        Q     Thank you.  Do you see that page?

12        A     I do.

13        Q     That's page 32 of the PDF?

14        A     That's correct.

15        Q     Thank you.

16              And does the signature appear on page 32?

17        A     Yes, it does.

18        Q     Is that your signature?

19        A     Yes, it is.

20        Q     What is the date of the signature?

21        A     10/15/2020.

22        Q     So that would be October 15th of 2020; is that

23   correct?

24        A     That's correct.

25        Q     Okay.  Thank you very much.
```

1    So we talked a lot today about, in your view,

2  that searching for information regarding sales or

3  transfers made through the North County Shooting Center

4  would be time incentive; is that correct?

5    A    That's correct.

6    Q    Okay.  So I wanted to ask, since October 15 of

7  2020, has any employee of North County Shooting Center

8  had five minutes per day to do any of the searching for

9  responses that you did not provide response to in these

10  interrogatory responses?

11    MR. DILLON:  Objection; speculation,

12  argumentative, incomplete hypothetical.

13    THE WITNESS:  As I mentioned, it takes 30

14  minutes just to do a simple ATF trace, so five minutes

15  wouldn't be able to do anything for us.

16  BY MS. ROSENBERG:

17    Q    But you've stated that the records that you

18  would have to search through -- let me go back.

19    The records that you would need to search

20  through in order to, for example, determine the number of

21  sales and transfers that were made to those under the age

22  of 21 in the year 2018, would those be paper files?

23    A    Yes.

24    Q    Okay.

25    A    100 percent paper files.

```
 1      Q    Okay.  Thank you.

 2           So would anyone --

 3      A    You have the --

 4      Q    Go ahead.  Would you like -- were you further

 5  responding?

 6      A    No, that's fine.  Go ahead.

 7      Q    Okay.  Thank you.

 8           So these are paper files, and are those paper

 9  files housed on the premises of North County Shooting

10  Center?

11      A    Yes, by law.

12      Q    Thank you.

13           And are they organized by date, by last name of

14  sale?  What's the organization of those paper files?

15      A    Primarily by date.

16      Q    You say primarily by date.  Is there any other

17  manner of organizing those files?

18      A    Once you go to an individual date, they will

19  then be alphabetical.

20      Q    Okay.  Thank you.

21           So these are files that are on the premises of

22  North County Shooting Center.  Are there any employees

23  who have access to the place in which these files are

24  stored?

25      A    It's a locked room really for owners, but, yes,
```

Exhibit 58
DX1157

1    I suppose anybody could go up there.  We generally don't

2    let employees handle access to that information, but for

3    no other reason than there's never been a need.

4        Q    Understood.

5            So the following questions I'm going to ask,

6    they encompass not just employees but also the four

7    owners of North County Shooting Center.

8            As between the owners and any employee of the

9    North County Shooting Center, is there any person who

10   would have five minutes per day to look at paper files

11   that are housed at North County Shooting Center?

12           MR. DILLON:  Objection; argumentative, asked and

13   answered.

14           THE WITNESS:  I am working, so are my employees.

15   That's what we're there for.  So to separate time out for

16   that would -- it would not make sense to do it in

17   five-minute increments.  I understand where you're going

18   with this, but that wouldn't make any sense.  It will

19   take five minutes to pull down a box.

20   BY MS. ROSENBERG:

21       Q    Okay.  So --

22       A    So, no, that's not enough to have people going

23   through boxes.

24       Q    Okay.  So let's say it takes five minutes to

25   pull a box.  Would any owner or any employee have ten

```
 1    minutes per day to look at paper files.
 2        A    No.  We're running a business.
 3             MR. DILLON:  Objection; speculation,
 4    argumentative, asked and answered.
 5    BY MS. ROSENBERG:
 6        Q    Let me ask, Mr. Prince, do you believe that this
 7    lawsuit affects your business?
 8        A    Yes.
 9        Q    But you don't consider this lawsuit to be part
10    of your business activities?
11        A    It is --
12             MR. DILLON:  Objection; argumentative.
13             THE WITNESS:  -- part of our business
14    activities, but I'm trying to run a business
15    simultaneously.
16    BY MS. ROSENBERG:
17        Q    I'm sorry.  Could you repeat that.  I think you
18    and Mr. Dillon crossed a little bit there.
19        A    I'm trying to run a business simultaneously.
20        Q    Before you said, "I'm trying to run a business
21    simultaneously," what did you say?
22        A    It is part of our business because it's
23    affecting us, but it's -- I'm trying to run a business.
24    I don't go there to go through paperwork from 2018.
25        Q    But you voluntarily signed on to this lawsuit as
```

Exhibit 58
DX1159

```
 1    a plaintiff; is that correct?
 2         A    That is correct.
 3         Q    So you can't spare ten minutes per day since
 4    October 2020 to look through your own records in order to
 5    comply with your discovery obligations?
 6              MR. DILLON:  Objection; argumentative,
 7    speculation, asked and answered.
 8              THE WITNESS:  Yes.  And I have answered that
 9    question.
10              MR. DILLON:  Misstates testimony.
11              THE WITNESS:  I am on the floor running a
12    business.  That's my job there.
13    BY MS. ROSENBERG:
14         Q    Sorry.  My question was a yes or no question.
15    Was your answer no?
16         A    No.
17         Q    Does North County Shooting Center provide any
18    hunter education courses?
19         A    We do not.
20         Q    If you know, is any portion of your clientele
21    part of the hunter community?
22         A    Very little.
23         Q    What do you mean by very little?
24         A    I am assuming that some of my customers do, in
25    fact, hunt, but they can't do much hunting training at
```

Exhibit 58
DX1160

```
 1   our 25-yard indoor range.  So our range is mostly
 2   defensive.
 3        Q    Sure.  So let me clarify.
 4             Are you aware if any members of your purchasing
 5   customer base is part of the hunter community?
 6             MR. DILLON:  Objection; speculation.
 7             THE WITNESS:  I would not know that.  I don't
 8   discuss that.  If somebody comes in and says, "Hey, last
 9   weekend I was hunting," then I would assume that would be
10   enough.  But it is not a question I generally ask.
11   BY MS. ROSENBERG:
12        Q    Okay.  So you don't know whether it's a very
13   small portion of your clientele?
14        A    If I had to speculate, which you've asked me not
15   to do, I would say it's a very small portion of my
16   clientele.
17        Q    Right.  So I don't want you to speculate.
18             So you don't know whether or not any portion of
19   your clientele is among the hunter community; is that
20   correct?
21        A    That's correct.
22        Q    Okay.
23             Have you inquired with Rapid POS how much it
24   would cost for them to run searches of the requests that
25   we've made in our discovery requests?
```

Exhibit 58
DX1161

```
 1              MR. DILLON:  Objection; asked and answered.
 2              THE WITNESS:  I have not.  But the information
 3    you're seeking is not in their system.  It's in paper
 4    files onsite.
 5    BY MS. ROSENBERG:
 6        Q    Okay.  Thank you.
 7              And then you stated I think much earlier today
 8    that you -- that North County Shooting Center had made
 9    zero gun sales to anybody under the age of 21 in the year
10    2022; is that correct?
11        A    To the best of my knowledge, I believe that to
12    be correct.
13        Q    Okay.  And --
14        A    Possibly two -- oh, no.  That would have been
15    2023.  Yeah, I'm fairly confident zero.  But you would
16    actually know that better than I know.
17        Q    Understood.  I'm just clarifying our record
18    here.
19              And if you know -- sorry.  Scratch that.
20              Did you also testify earlier that North County
21    Shooting Center made zero sales and transfers of firearms
22    to anybody under the age of 21 in the year 2021?
23              MR. DILLON:  Objection; asked and answered.
24              THE WITNESS:  To the best of my knowledge, that
25    is a yes.  But, again, that's an easy search for
```

Exhibit 58
DX1162

```
 1    Department of Justice.

 2    BY MS. ROSENBERG:

 3         Q     Thank you.  If you could just focus your answer

 4    to the question I ask.  I understand your viewpoint on

 5    the records of the Department of Justice.

 6              So is it correct that North County Shooting

 7    Center, to the best of your knowledge, sold zero firearms

 8    to anybody under the age of 21 in the year 2020?

 9         A     Yes.

10              MR. DILLON:  Objection; asked and answered.

11    BY MS. ROSENBERG:

12         Q     If you know, have employees of the North County

13    Shooting Center, that's including all four owners, been

14    instructed to inquire as to whether somebody under the

15    age of 21 has a hunting license when that person attempts

16    to purchase or receive transfer of a firearm?

17         A     Yes.

18              MR. DILLON:  Objection; asked and answered.

19    BY MS. ROSENBERG:

20         Q     And that question is asked each time somebody

21    under the age of 21 attempts to purchase or receive

22    transfer of a firearm?

23         A     To the best of my knowledge, yes.

24         Q     Is that written in a policy somewhere?

25              MR. DILLON:  Objection; asked and answered.
```

```
 1              THE WITNESS:  Not to my knowledge.
 2   BY MS. ROSENBERG:
 3       Q    Has North County Shooting Center developed any
 4   policies specifically related to the sale, transfer,
 5   including loans of firearms, to those under the age of 21
 6   since the inception of the new age limit requirements in
 7   2019 of Section 27510?
 8              MR. DILLON:  Objection; asked and answered,
 9   compound, legal conclusion.
10              THE WITNESS:  Yeah.  I'm gonna have to ask you
11   to ask that one again because it's very confusing.
12   BY MS. ROSENBERG:
13       Q    No problem.
14              So Section 27510 took effect in 2019, do you
15   understand that?
16       A    Yes.
17       Q    Okay.  Since January of 2019, has North County
18   Shooting Center developed any written policies relating
19   to the sale and transfer of firearms to those under the
20   age of 21?
21       A    No.
22              MR. DILLON:  Objection; Asked and answered.
23   BY MS. ROSENBERG:
24       Q    What about oral policies or unwritten policies?
25              MR. DILLON:  Objection; asked and answered.
```

Exhibit 58
DX1164

```
1              THE WITNESS:  Not to my knowledge other than to

2    ask for a hunter's license, and then we would start

3    chasing down whether or not it was legit or not.

4    BY MS. ROSENBERG:

5         Q    Okay.  And after 27510's new age limits took

6    effect in January of 2019, did North County Shooting

7    Center provide any training to employees who conduct

8    sales or transfers of firearms to those under the age of

9    21?

10             MR. DILLON:  Objection; asked and answered.

11             THE WITNESS:  No.

12   BY MS. ROSENBERG:

13        Q    Did North County Shooting Center, any

14   representative of North County Shooting Center, provide

15   any oral instruction to employees about how to verify any

16   exemptions under 27510 when selling or transferring

17   firearms to those under the age of 21 after January 2019?

18             MR. DILLON:  Objection; asked and answered.

19             THE WITNESS:  Yes.  As I've answered before,

20   they are supposed to bring them to one of the owners to

21   see if it is a legit exemption.

22   BY MS. ROSENBERG:

23        Q    And you said that they, meaning employees, are

24   supposed to.  How was that requirement conveyed to any

25   employees or owners who conduct or complete sales and
```

Exhibit 58
DX1165

```
 1   transfers of firearms?
 2           MR. DILLON:  Objection; Asked and answered.
 3           THE WITNESS:  Verbally.
 4           MS. ROSENBERG:  I think that's all I have for
 5   now unless we have any following your counsel's
 6   questions.
 7           MR. DILLON:  I have no questions.
 8           MS. ROSENBERG:  Stephanie, anything further?
 9           MS. ALBRECHT:  Nothing further from me.  Thank
10   you.
11           THE COURT REPORTER:  Mr. Dillon, would you like
12   a copy of the transcript?
13           MR. DILLON:  Yes, please.
14           MS. ALBRECHT:  Okay.  Thank you.  Let's go off
15   the record.
16           (At the hour of 2:48 p.m., the
17           deposition was concluded.)
18                          -o0o-
19
20
21
22
23
24
25
```

Exhibit 58

DX1166

```
 1
 2
 3
 4
 5   STATE OF CALIFORNIA    )
                           )   ss.
 6   COUNTY OF _____ )
 7        I, __DARIN PRINCE, PMK  , having appeared remotely
 8   for my deposition on __August 15  , 2023, do this date
 9   declare under penalty of perjury that I have read the
10   foregoing deposition, I have made any corrections,
11   additions or deletions that I was desirous of making in
12   order to render the within transcript true and correct.
13        IN WITNESS WHEREOF, I have hereunto subscribed my
14   name this _____ day of _____, 2023.
15
16                         _____
17                              DARIN PRINCE, PMK
18
19
20
21
22
23
24
25
```

Exhibit 58
DX1167

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2   Note:  If you are adding to your testimony, print

 3   the exact words you want to add.  If you are deleting

 4   from your testimony, print the exact words you want

 5   to delete.  Specify with "Add" or "Delete" and sign

 6   this form.

 7

 8   DEPOSITION OF:      DARIN PRINCE, PMK

 9   CASE:              CHAVEZ v BONTA

10   DATE OF DEPOSITION:  AUGUST 15, 2023

11

12   PAGE    LINE    CHANGE/ADD/DELETE/REASON

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   Deponent's Signature _____ Date _____
```

Exhibit 58
DX1168

```
 1  PAGE      LINE      CHANGE/ADD/DELETE/REASON

 2  _____     _____     _____

 3  _____     _____     _____

 4  _____     _____     _____

 5  _____     _____     _____

 6  _____     _____     _____

 7  _____     _____     _____

 8  _____     _____     _____

 9  _____     _____     _____

10  _____     _____     _____

11  _____     _____     _____

12  _____     _____     _____

13  _____     _____     _____

14  _____     _____     _____

15  _____     _____     _____

16  _____     _____     _____

17  _____     _____     _____

18  _____     _____     _____

19  _____     _____     _____

20  _____     _____     _____

21  _____     _____     _____

22  _____     _____     _____

23  _____     _____     _____

24  _____     _____     _____

25  Deponent's Signature _____ Date _____
```

116

```
 1   STATE OF CALIFORNIA   )
                           )  SS.
 2   COUNTY OF LOS ANGELES )

 3

 4          I, Debbie Strickland, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify;

 6          That the foregoing proceedings were taken

 7   remotely before me at the time and place herein set

 8   forth; that any witnesses in the foregoing proceedings,

 9   prior to testifying, were administered an oath; that a

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; that the foregoing transcript is a true record

13   of the testimony given.

14          Further, that if the foregoing pertains to the

15   original transcript of a deposition in a Federal Case,

16   before completion of the proceedings, review of the

17   transcript [X] was [ ] was not requested.

18          I further certify I am neither financially

19   interested in the action nor a relative or employee of

20   any attorney or any party to this action.

21

22          Dated this _31st_ day of _August , 2023.

23

24          _____

25          DEBBIE STRICKLAND, CSR 9036
```

THE SULLIVAN GROUP OF COURT REPORTERS
Exhibit 58
DX1170

**Exhibits**

**Prince PMK Exhibit 1**
4:13 12:16,20 13:12
44:3

**Prince PMK Exhibit 2**
4:15 15:2,5,19 16:13

**Prince PMK Exhibit 3**
4:16 87:21 88:1 90:14

**Prince PMK Exhibit 8**
4:22 91:5,9 93:11

**Prince PMK Exhibit 1
0**
5:3 93:6,10,21 94:1

**Prince PMK Exhibit 1
1**
5:5 101:21 102:5

**Prince PMK Exhibit 1
2**
5:7 94:20,22

**Prince PMK Exhibit 1
3**
5:10 71:9,14 73:15

**$**

**$1,000**
83:21

**$1.8**
59:23 60:4 99:11,14

**$100.00**
83:19 84:11

**$20.00**
59:2

**$3,000**
83:23

**$450.00**
59:3

**-**

**-000-**
52:14 113:18

**1**

1

12:16,20 13:12 44:3
90:14 91:21

**1.8**
20:25 21:9 35:23 36:1

**10**
39:4,5 60:11 93:6,10,21
94:1

**10/15/2020**
102:21

**100**
26:14 47:23 103:25

**10:00**
25:13

**10:32**
6:3

**11**
101:21 102:5

**12**
21:11 35:23 49:8 50:21
59:23 64:13 94:20,22
99:12,14

**12-month**
39:15,21

**12:02**
52:11

**12:30**
52:13

**12:36**
53:3

**13**
19:8 71:9,11,14 73:15

**1440**
22:24

**15**
6:2 50:5,7,18 53:2
62:25 63:3 103:6

**150**
26:15 27:1

**15th**
102:22

**16**
15:23 16:1,4,12

**17**
62:10

**18**
28:12 54:20 55:12,13
74:1

**18,500**
24:2

**18-year-old**
28:18

**19**
50:12,16

**19s**
85:16,17 86:8,9

**2**

**2**
13:6 15:2,5,19 16:13,20
44:8,12,15 88:12

**20**
17:4 26:17,23 74:1

**2011**
17:1,23 18:7,12

**2018**
17:3 18:7,12 21:1,4,5
37:21,24 44:19 45:9,17,
20 47:4 57:10 96:16
98:15,23 99:3,18 100:8
103:22 106:24

**2019**
21:7 40:14 41:1 45:9,
12,19 46:8 47:3 83:1
97:25 111:7,14,17
112:6,17

**2020**
21:14 40:11 57:6,7 98:3
102:22 103:7 107:4
110:8

**2021**
21:17 39:25 40:7 98:6
109:22

**2022**
21:10 98:9 109:10

**2023**
6:2 53:2 95:17 98:12
109:15

**2094**
6:22 53:7

**21**
14:19 27:20 39:21,25

40:7,11,14 45:9,17
47:9,11,15,17,21 48:1,
3,8,17 50:5 54:19,24
55:5 60:14 61:24 62:8
63:8 64:4 68:7,10,15,19
74:22 76:25 99:19
100:8 103:22 109:9,22
110:8,15,21 111:5,20
112:9,17

**22**
7:23,25 8:1

**25**
61:25 62:10

**25-yard**
108:1

**26**
95:16

**27**
91:23

**27510**
14:19 62:21 63:21
64:15 67:15 68:2 75:22
76:11,19 77:18 78:18
100:12 111:7,14 112:16

**27510's**
112:5

**2:48**
113:16

**3**

**3**
44:16 87:21 88:1 90:14

**3,000**
24:2 86:13

**3-0**
59:15,16

**30**
27:18 28:1 51:7 59:11,
14 61:25 62:17 63:11
67:13 82:23 103:13

**30(b)(6)**
12:24

**30-year-old**
28:18

**32**
102:13,16

**35**
36:18

**4**

**4**
13:6 44:9

**40**
61:25 62:14 97:12

**42**
90:14

**4473s**
80:22,25 99:25 101:2

**5**

**5**
44:16,17 73:21 75:3
99:16 101:21

**50**
23:4 26:18 39:6,10
60:6,9

**50-mile**
23:2

**50/50**
28:5

**56**
15:23 16:1,4,12

**59**
15:23 16:1,4,13

**6**

**6**
90:7

**6:00**
25:13

**7**

**7**
72:4 88:12

**70**
27:13

**8**

**8**
15:23,25 16:1,4,12

91:5,9 93:11,15

**9**

**92069**
22:25

**A**

**a.m.**
6:3 25:13

**accepted**
31:1

**access**
37:18 54:4 89:19,25
104:23 105:2

**accessible**
24:16

**accessories**
25:7,8

**accident**
7:23,25

**accommodate**
11:12

**accompanied**
55:12

**accordance**
6:22 53:7

**accreditation**
69:12

**accurate**
26:24 32:8 37:23 91:18

**acquainted**
13:21

**acronym**
16:7

**action**
74:21

**active**
64:8 65:16 66:21

**activities**
53:15 106:10,14

**actual**
47:3 64:21

**Acusport**
42:18

**addition**
20:2

**additional**
25:9 31:9,12,17 46:20
98:18

**Additionally**
91:24,25

**address**
30:22 31:7,15 56:16

**adjust**
85:10

**administered**
6:21 53:6

**Admissions**
93:25 94:12

**adults**
74:1

**affect**
11:23

**affecting**
106:23

**affects**
106:7

**affiliated**
18:19

**age**
14:19 27:15 28:12
29:23,24 30:2,5,7,9,11,
14,22 31:19 39:21
40:11,14 41:9 45:17
47:9,17,21 48:1,3,17
50:5 54:13,20 55:7,12,
16 56:16 60:14,22 61:3,
22 62:14 63:8,21 64:4
68:7,15,19 74:22 77:7,
18,25 78:10 79:21
99:18 100:7 103:21
109:9,22 110:8,15,21
111:5,6,20 112:5,8,17

**agency**
74:20

**ages**
74:1

**agree**
75:11

**ahead**
16:19 104:4,6

**Albrecht**
6:11,12 7:1,3 12:22
15:7 27:24 28:16,23
29:18 31:5 33:23 34:14
38:13 39:2,18 40:9
41:15 43:23 44:1 45:15
46:1,9,24 48:21 49:19
50:1 51:1,17 53:11 54:1
55:14 56:17 59:17
60:18 61:15 62:6,19
63:24 64:18 71:16
74:13 75:2,12,20 76:7,
15 77:4,14,21 78:4,7,23
79:7,12 80:11 81:18
82:24 84:15 87:11 88:3
89:23 91:3,11 94:3,24
95:23 99:8 113:9,14

**allegations**
46:14,21

**alleging**
76:16

**Allison**
7:6

**allowed**
48:2,6,7 54:21 74:7,15
75:15

**alphabetical**
104:19

**ambiguous**
50:22 51:15 66:2 67:19
75:10

**amended**
15:2,19

**Amendment**
14:18

**ammunition**
25:7 30:4,18 31:2,16
32:14 33:3,5,15,17,25
34:3,4,5

**amount**
35:15 63:15 78:17
89:11 96:15

**and/or**
19:23

**annual**
20:24 21:4,9,13,16,20

**answering**
9:20 10:6,16

**answers**
9:3,18 10:18

**antiquated**
86:10

**apologies**
54:3

**apologize**
10:12 40:2 45:24 47:5
96:5 100:18

**appearances**
6:9

**APPEARING**
6:1 53:1

**appears**
48:9

**applied**
66:5

**apply**
9:13

**approximately**
7:20 20:25 26:6 36:1
37:24 60:8 62:25 65:10
82:17

**argumentative**
28:19 45:10 46:6,22
49:17,23 62:2 74:9,23
76:20 77:10,19 78:2,6,
20 81:11 89:17 99:4
103:12 105:12 106:4,12
107:6

**article**
32:23

**ascertain**
34:19

**assist**
87:5 91:14 100:6

**assistance**
65:1 85:24

**assisting**
23:15

**associate**
32:24

**assume**
8:2 10:25 23:22 78:9
108:9

**assuming**
42:12 107:24

**ATF**
52:4 80:22 81:15 82:5,
6,10,13,19,22 103:14

**ATF's**
40:19 42:15

**attempt**
65:17,20 66:23 67:1

**attempted**
65:3 66:3 68:1

**attempting**
66:16,22

**attempts**
110:15,21

**attending**
74:1

**attorney**
6:10 7:3,5

**attorneys**
48:15

**audit**
81:15,25 82:5,11

**audited**
81:23

**auditor**
82:6

**AUGUST**
6:2 53:2

**automobile**
7:23,25

**Avenue**
22:24

**average**
23:18 27:15,18 28:1
62:17

**aware**
14:23 63:20 64:7 78:21
80:12 83:1 86:18 108:4

---

**B**

**back**
20:9 33:8 37:16 38:25
44:2,7 45:19 53:14
57:10,15 58:1 70:23

73:15 75:3 85:15 86:6,9
95:24 99:24 103:18

**background**
34:4

**bags**
25:9

**bankruptcy**
42:18

**base**
44:21 45:7 108:5

**based**
27:9,14 28:2 36:11,12,
19 48:10 61:23,25 62:7
92:13

**basic**
43:8 53:14 58:22 59:2
69:2,9,10 70:21

**basically**
43:3 69:5,9 70:9

**basis**
26:7,9 34:21 35:16,17
38:7 42:7 47:13,24
48:4,23 49:14 50:10
51:10 60:24 76:16
82:10

**Bear**
87:22 93:7

**beginning**
6:10 56:23 58:22 63:19

**behalf**
44:24 46:5 76:3 86:23

**belongs**
74:16,18

**bid**
85:3

**bit**
10:11 16:23 34:13
53:13 68:25 70:17
106:18

**Bonta**
7:5 14:17

**book**
42:15,16,22 43:4 77:1
78:11,12

**Bound**
42:15,16,22 43:4

**box**
105:19,25

**boxes**
105:23

**break**
11:11,14 24:14 49:5
52:7 60:10 80:6

**breaking**
35:4 40:1 41:7

**bring**
55:1 59:9 74:21 82:6
112:20

**broke**
10:11 18:10 20:14 33:6,
10 39:8

**bronze**
59:3

**brought**
14:16 55:9 64:21

**bugs**
79:15

**build**
69:9

**building**
24:2,5,8,10,13 25:4
34:6 61:12 72:17 82:15
90:9

**buildings**
23:24

**built**
17:2 85:21

**burden**
86:24

**burdensome**
49:25 87:5

**Bureau**
7:6 65:7,18 66:3,20,24
67:25

**busiest**
26:12,14,25 27:1 38:11

**business**
18:4,8,13 23:20 36:14,
15 43:1 47:2,7 49:12
87:1,10,17 89:5 106:2,
7,10,13,14,19,20,22,23
107:12

Exhibit 58

DX1173

**button**
89:19,21

**buy**
32:23 51:12 64:4,9 66:22

**C**

**Cal**
80:23

**California**
7:4 14:18 22:25 31:10 33:19

**California's**
46:15

**call**
35:2,5 42:6 65:3,6 76:24 78:10 80:3 83:10 84:6,18,19 96:1,4

**called**
29:8 42:18 69:2

**calling**
77:6

**calls**
28:13,19 77:16 82:13 84:12

**camera**
43:17

**capture**
29:24 30:1,19 31:6 32:20 96:10,14

**captured**
30:15 33:2,14 34:2,4,6

**captures**
32:9 41:4

**car**
8:8

**card**
29:1 43:5 96:10

**care**
42:6

**carried**
34:5

**case**
6:13 7:8 15:3 65:23 80:16 86:18 92:8

**cases**
37:4

**cash**
43:5

**categories**
53:18

**CCP**
6:22 53:7

**CCW**
69:12,13,16

**center**
7:16 12:25 13:10 16:5, 9,25 17:13,22 18:3,7, 13,15,18,25 19:7,13 22:8,22 23:3 24:1,8,17 31:8 32:10 35:23 36:23 46:10,13,16,20 51:13 73:24 88:6 103:3,7 104:10,22 105:7,9,11 107:17 109:8,21 110:7, 13 111:3,18 112:7,13, 14

**Center's**
20:23 34:10 36:7 91:6 93:23 95:1 102:2

**center-fire**
64:5,10

**centrally**
24:9

**Certified**
6:6

**challenge**
14:18

**chance**
11:20 15:24 71:10 90:15,18

**changed**
39:14

**charge**
22:11 37:20

**chasing**
112:3

**Chavez**
14:17

**check**
34:4 43:3,6

**Cheryl**
17:10,17 100:21

**choose**
42:13 47:17

**chose**
42:22 50:14

**circumstance**
66:19

**circumstances**
31:12 57:20 65:14 68:1

**City**
58:9

**City's**
58:19

**claims**
14:16 78:17 79:2

**clarify**
14:6 23:4 68:9 108:3

**clarifying**
109:17

**class**
58:6 69:23 70:15 71:2 72:19,21 74:5,7 75:15, 16 77:1,3,8,17,18,24 78:10,12,13

**classes**
70:19 72:8,10,13,15,22, 23 74:2 75:21 76:9,18

**classroom**
24:4

**clean**
9:22

**clear**
34:1 60:13 72:21 81:6

**clientele**
107:20 108:13,16,19

**close**
16:19,20 80:23

**closed**
101:16

**closely**
24:5 73:18 93:10

**clothing**
25:10 32:24

**club**
58:11

**co-owners**
18:22

**Code**
14:19 62:21 63:21 75:22 100:12

**colleague**
6:13 101:8

**collect**
82:21

**comfortable**
37:13 38:12 39:1

**commented**
11:23

**communications**
89:25

**community**
107:21 108:5,19

**company**
17:18 18:22 19:21 22:2, 14 23:25 29:8 35:11 41:16,17,21 42:1,3,9, 18,24 46:5 51:18

**complaint**
15:3,14,19

**complete**
93:18 94:18,19 112:25

**completely**
18:10 33:10

**complex**
29:15

**compliance**
33:19

**comply**
107:5

**component**
70:21

**compound**
29:14 39:17 45:10 48:14 64:16 82:20 111:9

**concern**
42:15

**concluded**

113:17

**conclusion**
31:4 55:10 63:22 74:10, 24 78:14,20 111:9

**condition**
12:8

**conduct**
19:25 20:12 88:14 89:1 112:7,25

**conducted**
88:19 101:3

**confident**
45:11 109:15

**confined**
24:24

**confirm**
90:23 92:25 98:21

**confusing**
64:22 65:1,23 111:11

**considered**
84:7 100:5

**consultant**
100:6

**consuming**
40:20 81:14 87:2

**contact**
65:8,17,21 66:3,23 67:2 84:1,2 85:1

**contacted**
66:20 79:14,18 85:23

**contacting**
84:25

**context**
7:22 42:4

**continuously**
21:12

**control**
68:15

**conveyed**
112:24

**copies**
56:22 57:8,13

**copy**
40:22 55:19,25 113:12

**corporate**
18:2

**corporation**
17:1,7,12

**correct**
8:21,22 9:14 16:18 17:14 21:2 23:5,11,12 30:8 32:3,11,13 33:1 35:24 36:21 37:5 40:24 45:1 46:11,16 49:16,18 54:25 56:10 59:24 62:22,23 63:1,8,12,13 64:6 68:7,8 70:12 72:2, 11 79:16 85:1,6,7 92:9 93:14,16 94:15,16 95:16 97:2,3,5,6 98:24, 25 99:20,21 100:13,14 101:5,6 102:14,23,24 103:4,5 107:1,2 108:20, 21 109:10,12 110:6

**corrections**
11:21

**correctly**
18:6 67:9

**cost**
84:1 100:2 101:4 108:24

**costs**
79:25 83:25 84:11

**counsel**
6:9,12,16 7:12 11:4,7 73:17 91:19 92:14,20 93:20 94:7

**counsel's**
113:5

**counter**
54:10

**County**
7:16 12:25 13:10 16:5, 8,25 17:13,22 18:3,4,7, 12,14,15,18,24 19:7,13 20:23 22:8,22 23:3 24:1,17 31:7 32:9 34:9 35:22 36:7,23 46:10,13, 16,19 51:13 69:12 73:24 88:6 91:6 93:23 95:1 102:2 103:3,7 104:9,22 105:7,9,11 107:17 109:8,20 110:6, 12 111:3,17 112:6,13,

14

**couple**
101:12

**courses**
68:24,25 69:8 95:24 96:16 97:9,24 98:2,5,8, 11,15,22 99:3,11,15 107:18

**court**
6:5,7,17 9:2,9,14,17 10:1 11:18 33:8 40:3 59:14 113:11

**cover**
70:8

**COVID**
99:6

**COVID-19**
101:17

**credibility**
11:23

**credit**
29:1 43:5 96:10

**cross**
20:16

**cross-trained**
19:22,25

**crossed**
106:18

**cumbersome**
85:22

**curious**
34:16

**currency**
29:1

**current**
30:22 31:7,15 85:10,13

**curriculum**
69:21

**customer**
24:10,13 25:3 27:5 31:23 32:9 44:21 45:7 48:18 61:22 66:5,16 108:5

**customers**
23:15 25:1,15,18,21 26:2,7,21 27:2,4,11,15,

19 28:3,12 29:4 44:20 48:22,25 49:2,15,21 50:2,4,7,18,20 51:2,4, 11 55:15 59:9 60:12,13 62:8,13,21,25 63:7,11 67:12 107:24

**customers'**
55:19

---

**D**

**daily**
26:7,16 35:16 48:23 49:10

**Darin**
6:20 7:10 53:5 71:19

**data**
35:1 36:13

**date**
22:12 82:14 93:4 96:9 98:12 102:20 104:13, 15,16,18

**Davis**
48:15

**day**
25:16,19,25 26:9,14,22, 23,25 34:16,17 35:8 37:7,9 38:16 47:1,6 80:25 87:10 103:8 105:10 106:1 107:3

**day-to-day**
19:12 22:4 34:21 60:24

**days**
25:13 26:12 27:1,9,10 37:4,21,24 38:10,11,14, 19 42:19 50:3 51:5,6,7 62:25 63:2,11 66:13,14 67:13

**DBA**
18:14,15

**dealers**
14:21

**Debbie**
6:6

**debugged**
42:5

**decision**
41:16,19 42:8,20

**declaration**
71:19 73:15,16 75:14

**declare**
72:1

**decrease**
21:19 99:2

**decreased**
50:24

**decreasing**
63:15

**defendants**
6:12 7:7

**Defendants'**
88:5 91:7 93:24 95:2
102:3

**defense**
70:9

**defensive**
69:10,11 108:2

**define**
57:24

**definitions**
88:11

**delivery**
34:4

**demographic**
44:21 45:7 62:17

**Department**
7:4,6 40:25 65:3,6
89:18,24 90:4 110:1,5

**dependent**
28:6 31:11 84:3

**depending**
30:16 58:21

**depends**
71:3

**deposition**
7:18 8:3,14,17 11:18
12:24 13:14,17,24
14:12 46:2 52:12
113:17

**Deputy**
7:3

**Descanso**
22:24

**describe**
23:24 53:17 65:14

**description**
70:11

**desk**
54:10

**determination**
41:5 42:7,12

**determine**
35:1,15 37:2 85:16
97:10,20 98:16,17
100:2 103:20

**determining**
100:3

**develop**
86:3

**developed**
111:3,18

**Diane**
17:9,15 22:13,21
100:18

**Diego**
69:12

**difference**
10:10,21 28:17 53:17

**differences**
58:17

**difficult**
41:3 97:14

**difficulty**
26:12

**Dillon**
6:15 13:18 15:20 27:21
28:13,19 29:14 31:4
34:11 38:8,23 39:17
41:13 43:21 45:10,22
46:6,22 48:14 49:17,23
50:22 51:15 52:10
53:23 55:10 56:14
60:15 61:9 62:2,15
63:22 64:16 74:9,23
75:10,19 76:6,12,14,20
77:10,19 78:1,6,19
79:4,10 80:9 81:11
82:20 84:12 87:7 89:17
90:25 95:21 99:4
103:11 105:12 106:3,
12,18 107:6,10 108:6

**direct**
75:5

**directly**
74:25

**Director**
7:5

**discharged**
64:8

**discovery**
83:12 86:17,19 87:12
107:5 108:25

**discuss**
13:14,17 108:8

**discussed**
86:16

**discussion**
43:24

**distribution**
39:1

**distributor**
37:17

**division**
24:6

**document**
12:23 13:1,6,12 15:8
44:8,16 71:18,21 88:4,7
91:12,15,17 92:7 93:12,
22 94:4,9,25 95:4,5,11

**documents**
14:1,3,4,10 81:2 88:20,
23 89:2,9 90:24 91:8
92:1,7,10,13,15,19,22,
23

**DOJ**
52:4 80:23

**dollar**
35:15 96:15

**door**
24:4 60:24

**doors**
24:3

**draft**
15:21 16:13

109:1,23 110:10,18,25
111:8,22,25 112:10,18
113:2,7,11,13

**drafted**
91:19 96:23

**drafting**
15:18

**driver's**
30:11,22,25 31:16

**DROS**
34:2 40:25

**DROSS**
89:20 99:25 101:1

**duly**
6:21

**duty**
64:8 65:16 66:21

---

**E**

**earlier**
35:22 44:3,23 59:22
61:18 62:11,20 63:6
79:13 83:25 85:4 90:2
96:24 99:9,17 100:10
109:7,20

**earnest**
14:14

**easier**
26:8 40:24 97:10

**easily**
26:14 41:2

**easy**
109:25

**educated**
61:23

**education**
107:18

**effect**
62:22 63:16 75:23
76:11 100:12 111:14
112:6

**electronic**
42:23 85:18,20,24
86:15

**email**
31:22

**emailed**
12:16

**emails**
93:1

**employee**
19:22 22:7 24:15 29:11 31:7 100:5,6 103:7 105:8,25

**employees**
18:24 19:6,10,17,25 20:5 22:6 23:17 42:24 44:20 45:14 51:19,20 52:2 59:18 104:22 105:2,6,14 110:12 112:7,15,23,25

**empty**
86:7

**encompass**
105:6

**end**
33:6,11 34:16 42:10

**end-of-day**
43:8

**enforcement**
74:8,21 80:17,18 81:1,4,8

**enroll**
77:17,24

**enrolled**
72:23 77:8

**ensure**
46:4

**entail**
43:2 69:20 82:12

**enter**
29:11

**entered**
30:9

**entire**
47:10,19 68:9

**entities**
18:19

**entitled**
10:7,18

**errors**
16:16

**estimate**
23:7 26:6,8,21,24

27:19,25 36:9,10,11,12, 17,19 37:9,11,13 38:6, 21 39:19 51:4 59:22 60:20 61:23 62:7 75:25 76:9 83:17 90:10,13,16 100:11,16 101:4

**estimated**
62:24 63:10

**estimates**
10:8,19

**estimation**
28:2 62:14

**everybody's**
60:22

**exact**
49:9 99:6

**examination**
13:5,11 44:8,12,14 53:10 101:10

**examined**
6:23 53:8

**exception**
48:20 69:16

**exceptions**
47:12 48:18 63:20

**exclusively**
20:12,17

**excuse**
28:1 55:18 89:15 101:21

**execute**
95:16

**Executive**
17:16,19,21 22:3

**exemption**
66:5,17 67:16 112:21

**exemptions**
14:22 64:1,7,15,25 65:2 67:15,23 68:2 112:16

**exhibit**
12:16,20 13:12 15:2,5, 19 16:13,19 44:3 71:9, 14 73:15 87:21 88:1 90:14 91:5,9 93:6,10, 11,21 94:1,20,22 101:21 102:5

**expense**
80:2,4 81:17 86:4 96:23 97:15,16,21 98:18,20

**expensive**
58:23 69:24

**experience**
27:10,14 59:13

**experiencing**
92:14

**explain**
28:7 29:9,19 30:17 32:12 67:5 70:16

**explained**
50:13

**extensive**
101:1

**extent**
19:2 26:8

**extremely**
27:17 40:20 41:3

**F**

**facility**
19:19,20 24:14 56:9 73:3

**fact**
54:18 56:21 107:25

**fairly**
109:15

**fall**
64:14

**familiar**
29:6 71:21 94:4 95:4

**faster**
86:10

**federal**
30:8,20 33:19 34:6 42:22 101:2

**federally**
14:21

**fee**
59:4

**feel**
37:13 38:11,24 39:1 45:11 66:2

**fees**
58:24 59:1

**fewer**
59:20

**FFL**
74:16

**figured**
43:22

**file**
40:19 82:10,15,21 88:14

**filed**
15:3,14 42:18

**files**
40:22,23 81:5,14,16,19 82:6,7,9,18 87:15 89:11,22 100:1 103:22, 25 104:8,9,14,17,21,23 105:10 106:1 109:4

**fill**
58:13 76:10,19

**filled**
72:16

**filter**
41:6,9

**final**
42:19 102:8

**financial**
44:22 75:6,9,17 76:17 78:17 79:2

**find**
49:20 82:15,21 89:20 96:8

**fine**
26:10 104:6

**finish**
20:20

**fire**
70:13,15,17,22 71:3 72:18

**firearm**
25:1,3 30:4,18 47:11, 16,18 48:2 49:4 50:15 51:12 52:3 54:19,24 55:1,9 68:16,18 69:4,5 70:5,6,9,23,25 71:4,6,7 73:12 74:6,19,22 79:20

82:1,13,14 110:16,22

**firearms**
7:6 14:20,21 17:4 18:4,
14,16 19:24 22:5 23:14
24:18,20,22 25:6,7
31:2,14,16 32:15 33:3,
4,14,16,24 34:3,7 35:19
36:2,8,22 37:3,6,8,25
44:22 45:8,13,16 46:15
48:16 51:3,5,14,20
59:10,12 63:7 64:13
65:7,18 66:4,20 67:14,
25 68:10 70:1,14 72:9,
11,14,25 73:6 74:2
80:14 81:7,10 82:9 85:5
96:16 97:5,12,13,24
109:21 110:7 111:5,19
112:8,17 113:1

**fit**
42:8

**five-day**
38:22 39:4,7,11

**five-minute**
105:17

**fix**
22:5

**fixed**
42:5

**floor**
22:5 23:10,14,18,21
24:7 25:12,25 26:1
27:14 61:6,18 107:11

**fluctuates**
21:22 26:18

**focus**
110:3

**follow-up**
101:12

**foot**
24:2,3

**forced**
73:25 74:3

**foregoing**
72:2 95:15

**forever**
80:22

**form**

11:5 30:6 43:10

**forms**
31:1 34:6

**forward**
15:21 16:7

**Friday**
50:6 63:3,4

**Fridays**
26:11

**froze**
19:3

**full**
13:3 91:23

**function**
85:25

**functional**
85:21

**functions**
19:13 20:13 22:4

---

## G

**game**
62:5

**gave**
14:8 59:22

**general**
7:3,5 24:16 27:15 58:18

**generally**
8:13 23:25 28:3,17
63:17 65:25 69:21
80:21 105:1 108:10

**generated**
36:8

**give**
12:5 26:5,8,16 27:17,22
36:9 37:11 38:5,21
43:18 44:24 45:18 48:7
74:15 76:22 82:14
83:16 90:8,10

**giving**
9:13 12:9,12 15:20
26:13 37:13 38:12

**Glock**
85:16,17 86:8,9

**good**

6:5,11,15 7:2 43:23
52:6 62:4 63:3

**goods**
75:7

**government**
74:20

**Great**
8:16 9:11,16 11:17
12:14,19 14:25 16:3,11,
19 44:6 102:4

**greatly**
26:19

**ground**
8:16

**group**
6:7 27:15 47:15,17,19
68:6,9,18 69:14

**groups**
28:4 47:14,25 68:5,13
69:24 79:21

**guardian**
54:21

**guess**
10:7,9,17,19 25:20
28:22 37:16 41:19
62:16 84:3,18

**guests**
24:24 59:12

**guidance**
65:1 68:2

**guide**
52:2

**gun**
17:1,23 18:1 24:14 25:9
28:8 36:18 39:20,24
40:6,10,13 48:7 63:17
74:15,17 99:18 100:7
109:9

**guns**
24:21 36:16,20 37:12,
20 38:6,20,21 39:4,14
50:14 85:8

---

## H

**habit**
61:2

**half**
62:18 73:10

**hand**
6:18 24:21

**handbook**
52:1

**handguns**
34:25 35:8,21

**handle**
70:1,25 72:8,11,14
105:2

**handling**
70:9,14 71:4,7 72:25
73:12

**happen**
76:23

**happened**
63:4 68:20

**hard**
40:22 56:22 57:7 64:2

**harm**
75:6

**head**
10:3

**hear**
20:14 25:17

**hearing**
43:19

**held**
43:24

**helped**
15:21

**helpful**
14:15

**Hey**
108:8

**high**
39:12

**hiring**
100:5

**hold**
19:10 35:2 43:19 68:15,
21,22 93:15

**holsters**
25:9 86:7,8

**home**
70:5,6,10,23

**honestly**
28:5 62:9

**honorably**
64:8

**hoping**
16:23

**hosted**
74:2

**hour**
52:11 73:10 113:16

**hourly**
58:18,20,22 59:4

**hours**
25:11 66:13 67:10 83:8,
10

**housed**
104:9 105:11

**hungry**
11:10

**hunt**
107:25

**hunter**
107:18,21 108:5,19

**hunter's**
112:2

**hunting**
64:3 65:15,22,24 66:4,
16,22 67:16 107:25
108:9 110:15

**hypothetical**
78:20 103:12

---

**I**

**ID**
30:6,23,25 31:1,8 54:9,
12,17 55:17,22,24,25

**idea**
43:23

**identification**
12:21 15:6 31:13 54:6
71:15 88:2 91:10 94:2,
23 102:6

**identified**

18:21 76:2

**identify**
38:20,22 39:14 72:24
79:20 87:12 88:20 89:2

**identifying**
37:25 38:3 85:5,8 100:6

**IDS**
55:20

**impacted**
46:16 47:3

**important**
9:17 10:3 46:3 49:21
89:15

**in-depth**
40:18

**incentive**
103:4

**inception**
111:6

**include**
19:1 60:1,6,13 83:11

**includes**
61:18

**including**
19:6 22:18 44:19,25
50:4 59:21 110:13
111:5

**incomplete**
78:20 103:12

**Incorporated**
18:4 24:1

**increase**
21:19

**increased**
50:21,24

**incredible**
89:11

**increments**
105:17

**incur**
66:1

**independent**
14:11

**individual**
40:19,22 53:20 54:8,11,

16,23 64:3,9 82:10
87:15 99:25 104:18

**individuals**
27:5,6,8 39:20,21,24
40:7,10,13 45:8,17 49:3
64:14 77:7 99:18 100:7

**indoor**
17:2,4,5 108:1

**info**
96:15

**informal**
9:6

**information**
14:8 15:20 16:17 29:11,
23,25 30:3,5,9,11,13,
14,15,19,21 31:8,17
33:2,13,22 34:19 35:9
37:15,17,18 41:4 45:7
46:4,21 53:14 56:1,2,4,
12 76:18 77:6,24 81:7,9
82:16,18,22 84:17,23,
24 89:12,20 90:4 92:13,
16,20 94:13 96:10,21
97:23 99:20,23 100:19,
22,25 103:2 105:2
109:2

**informed**
48:6,11,16

**infrequently**
59:5

**Injunction**
71:20

**injury**
75:6,9,17 76:17 78:17

**inquire**
66:4 67:14 77:16
110:14

**inquired**
67:17 97:19 108:23

**inquiry**
66:8 77:23

**inside**
70:10

**inspection**
80:17 81:1,5

**Instagram**
22:17

**instance**
55:4

**instances**
68:13

**instructed**
110:14

**instruction**
17:3,5 23:16 53:16,21
60:7,9 112:15

**instructions**
43:11 80:1 88:12

**instructor**
53:21,24 69:16,18,22

**instructors**
20:8

**instructs**
11:7

**insurance**
36:4

**interactions**
41:20,24,25 42:2

**interrogatories**
14:9 95:3 101:23 102:3

**interrogatory**
103:10

**interrupt**
9:20,21

**inventory**
85:10,14,18,20,24

**invoke**
66:16

**involve**
70:19

**involved**
17:25 64:20 83:3 86:22

**involving**
32:14

**ipad**
29:10

**issues**
79:15

**item**
29:12

**items**

24:9,12 86:12 97:1

**J**

**January**
82:25 111:17 112:6,17

**Jason**
48:15

**Jennifer**
6:14

**Jenny**
101:8

**job**
107:12

**John**
6:15 13:18 15:20 94:13

**jot**
77:1

**July**
95:16

**Justice**
7:4,6 40:25 65:3,6
89:19,24 90:4 110:1,5

**K**

**keeping**
22:12 49:13

**kill**
35:3

**kind**
65:25 90:6

**kinds**
97:13

**knowing**
69:5

**knowledge**
35:13,14 44:18 100:17
109:11,24 110:7,23
111:1 112:1

**knowledgeable**
13:10 44:24 45:4 76:3

**L**

**lane**
32:4 59:7

**lanes**
17:4

**late**
57:6,7

**law**
30:8,20 31:10 48:9,11
49:16 66:2 67:18 74:11
80:17,18 81:1,4,8,16
104:11

**lawful**
75:7

**laws**
52:4 80:13 95:15

**lawsuit**
7:7 8:3,7 14:16 15:14
46:11,14 49:15 82:25
83:7,15 89:7,13,15
106:7,9,25

**lay**
61:11

**layout**
61:12

**leap**
78:14

**learn**
92:21

**leave**
25:3 47:23 68:12 69:5
90:9

**leaves**
55:23

**lecture-only**
70:12,24

**left**
82:14

**legal**
31:4 32:19 54:21 55:10
63:22 74:9,23 78:20
111:9

**legally**
48:2

**legit**
112:3,21

**legitimate**
67:3,8

**lessons**
69:18,20

**levels**
58:20 59:5

**liability**
66:1

**license**
30:12,22,25 31:16 64:3
65:15,22,24 66:4,17
67:16 110:15 112:2

**licensed**
14:21

**limit**
14:20 111:6

**limitation**
48:19 77:18,25

**limitations**
63:21 77:7

**limited**
44:19 47:11 48:17

**limits**
112:5

**listed**
13:11 90:14

**litigation**
13:22 78:16 79:9 86:20
88:24 89:8 90:1

**live**
70:13,15,17,22 71:3
72:18

**loans**
111:5

**located**
22:23,24 24:9

**location**
6:8

**locked**
104:25

**long**
15:11 46:8 57:12,14
65:10

**longer**
65:13

**looked**
15:9 44:3 68:20

**lose**
53:21

**losing**
77:2

**loss**
79:2

**losses**
75:6

**lost**
92:14 100:11

**lot**
43:19 86:6 92:22 103:1

**lower**
14:19

**luncheon**
52:11

**M**

**Madam**
33:8 40:3

**made**
11:6 29:8 41:16,19
42:19,21 46:14 64:14
66:15,18 67:10 68:14
103:3,21 108:25 109:8,
21

**magazines**
25:9

**main**
42:15 97:9

**maintain**
42:22 43:4 51:13 57:7,9
85:18

**maintained**
33:4,16,18 56:2,19,20,
21

**maintaining**
22:12,19

**maintains**
57:12 86:15

**make**
8:18 9:21 11:5,20,21
18:6 27:6,11 41:5 42:7
51:3,5 54:18 59:6 61:2,
14 66:5 67:6,7,14 80:17
81:2 105:16,18

**makes**
28:24

**making**
42:16 67:21 77:23

**manage**
22:5

**managing**
23:10,14

**mandate**
57:25

**mandatory**
73:6

**manipulation**
70:14 71:1,5

**manner**
72:9,11 104:17

**manual**
43:10 52:1 89:22

**manually**
85:22

**Marcos**
22:25 58:10

**mark**
71:9

**marked**
12:20 15:5 71:14 87:21
88:1 91:9 94:1,22
101:20 102:5

**marking**
12:15 15:2

**matter**
67:19 80:24

**meaning**
9:9 21:25 112:23

**means**
23:14 44:4 47:18 70:13
77:2 85:15

**meant**
71:5

**media**
22:14,16,20

**medical**
12:8

**medication**
12:11

**meet**
48:17 58:19 67:20,23
78:11

**meets**
47:12

**member**
47:14 57:18,21,23,25
58:12,14,18,19 68:6,14

**members**
48:1 58:8,11 60:13
108:4

**membership**
58:20,22,24 59:1,2,3

**memberships**
58:15

**memorized**
47:5

**Mendoza**
7:7

**mention**
64:25

**mentioned**
17:22 19:24 21:9 23:9
35:22 56:18 62:20 68:5
79:13 103:13

**met**
48:19 67:15

**midyear**
17:3

**miles**
23:4

**military**
30:23,25 64:9 65:16
66:21 67:16

**million**
20:25 21:9 35:23 36:2
59:23 60:4 99:11,14

**mind**
15:22 44:11 64:24 71:8
73:23 75:3 87:20

**minutes**
23:9 80:7 82:23 103:8,
14 105:10,19,24 106:1
107:3

**misstates**
45:22 46:23 49:23

**61**:10 76:6,20 77:19
81:11 87:7 90:25
107:10

**moment**
41:12 93:15

**money**
79:25 83:14,25 86:3

**month's**
91:2

**month-to-month**
34:21 35:16

**months**
21:11 35:24 49:8 50:21
59:23 64:13 65:12
81:24 82:1 99:12,14

**morning**
6:5,11,15 7:2 16:15

**Motion**
71:20

**move**
12:14

---

## N

**NCSC**
16:7,24 44:24 53:15
54:2,4 56:22 57:7,21
58:7,12 59:10 64:14
68:24 72:8,13,22,23
73:11 74:2,8,21 75:5,9
76:3,8,16,18 78:16
79:1,8,18 80:13,17
84:16,24 85:18,23
86:15,18,23 87:5 88:19,
23 89:8 90:5 92:10,18,
21 94:8 95:8,25 96:17,
19 97:25 98:2,5,8,11
100:3,5,24 101:16

**NCSC's**
21:4 44:18 53:12 59:22
70:11 83:15 86:17
88:14 89:25 92:6 94:11
98:14,22 99:2,11,14,17

**necessarily**
32:15,25

**negatively**
46:15 47:3

**nods**
10:3

**non-center-fire**
64:9

**non-semi-automatic**
64:4,10

**nonetheless**
67:22

**nonverbal**
10:2

**North**
7:16 12:25 13:10 16:5,
8,25 17:13,22 18:3,4,7,
12,14,15,18,24 19:7,13
20:23 22:8,22 23:2
24:1,17 31:7 32:9 34:9
35:22 36:7,23 46:10,13,
16,19 51:13 73:24 88:6
91:6 93:23 95:1 102:2
103:3,7 104:9,22 105:7,
9,11 107:17 109:8,20
110:6,12 111:3,17
112:6,13,14

**notebook**
77:2

**Notice**
12:24

**number**
12:20 15:5 26:13 30:23
31:16,22 36:3,16,20
37:8,10,12 38:12,15,16,
21 39:8,13 40:15,17
44:12,15,20 45:13,16,
20 49:9 50:20 51:8
60:1,17,20 63:3,15
64:19 65:7 71:14 75:24,
25 76:9,23 79:1,20
83:16 84:7 88:1 91:5,9,
21 94:1,22 97:5,7
98:16,17,21 100:3
102:5 103:20

**numbers**
43:7,8 45:18 47:3 90:14
92:12 97:2 99:6

---

## O

**oath**
6:21 8:20 9:8 53:7

**objection**
11:6 27:21 28:13,19
29:14 31:4 34:11 38:8,

23 39:17 45:10,22 46:6,
22 48:14 49:17,23
50:22 51:15 55:10
56:14 60:15 61:9 62:2,
15 63:22 64:16 74:9,23
75:10,19 76:6,12,14,20
77:10,19 78:1,6,19
81:11 82:20 84:12 87:7
89:17 90:25 99:4
103:11 105:12 106:3,12
107:6 108:6 109:1,23
110:10,18,25 111:8,22,
25 112:10,18 113:2

**objections**
11:5 79:4,10

**obligations**
107:5

**observations**
62:8

**obtain**
85:24 101:4

**Occasionally**
31:22

**occurrence**
49:10

**October**
102:22 103:6 107:4

**offer**
53:15 54:2 70:7

**offered**
69:1,8 73:5

**offers**
68:24 72:13,22,23
73:11 95:25

**offhand**
38:17 40:16 84:4

**officers**
17:7 18:2,21 19:6,9,12,
18

**older**
27:20

**one-on-one**
69:17,22,24

**online**
56:24,25 59:7

**onsite**
81:4 109:4

**open**
12:16,17,18 93:6,7

**opened**
18:5 21:1,21 37:21 47:4
80:25

**opening**
58:10

**operate**
17:2

**operating**
17:3 87:9

**operation**
25:11

**operations**
23:22 44:18 53:13

**opinion**
67:18

**oral**
90:7 111:24 112:15

**order**
22:6 31:6,23 36:16,20,
24,25 38:22 39:5,6,10,
14 57:17 71:9 103:20
107:4

**ordered**
37:2,9 38:1,3,6,16,20
39:3 85:9

**ordering**
36:22 37:20,25

**orders**
37:6 85:4,5,6

**organization**
104:14

**organized**
104:13

**organizing**
104:17

**originally**
17:1 65:9

**owned**
42:17

**owner**
105:25

**owners**
17:7 19:1,2,9 59:21

104:25 105:7,8 110:13
112:20,25

---

**P**

**p.m.**
25:13 52:11,13 53:3
113:16

**pages**
88:12

**pandemic**
101:17

**paper**
40:22 103:22,25 104:8,
14 105:10 106:1 109:3

**paperwork**
106:24

**paragraph**
72:4 73:21 75:3 91:23

**paragraphs**
15:22,24 16:4,12,13

**parent**
54:21

**part**
8:3 19:19,20 26:12
46:13 56:9 78:15 79:9
81:25 83:7,14 86:19
88:24 106:9,13,22
107:21 108:5

**participate**
87:5

**participation**
49:14 83:7,15

**PARTIES**
6:1 53:1

**partner**
43:1

**party**
8:2,7 47:8,10 50:11
89:6,8 91:25 92:2

**passed**
63:16

**passenger**
8:8

**past**
21:20 59:23 62:25 63:2
67:13 79:15 81:20,25

82:8 99:14

**pay**
28:25 32:24 58:13,20
84:9 96:22 97:12

**PDF**
13:7 44:9,16 102:9,13

**peak**
99:5

**peg**
86:7

**Penal**
14:19 62:21 63:21
75:22 100:12

**penalties**
9:12

**penalty**
8:21,25 72:1 95:14

**pending**
11:13

**people**
26:15,17,18 43:3 47:8,
14,22 48:16 49:7 50:11
61:14 63:17 68:18
69:15,23 72:16 76:24
105:22

**percent**
27:13 36:18 47:23
59:12 60:6,9,11 99:16
103:25

**percentage**
27:10,19 28:11 36:7
39:19,24 40:6,10,13
45:8,13 57:15 59:9
60:4,8,12 62:13 99:10,
13,17 100:7

**perception**
36:13,15 62:1

**perform**
19:12 20:13

**performance**
44:22

**performed**
31:9

**period**
38:22 39:4,7,11,15,22

**perjury**

THE SULLIVAN GROUP OF COURT REPORTERS
Exhibit 58
DX1182

8:21,25 72:1 95:14

**person**
13:9 44:23 45:3 47:9,20 48:3 50:12,15 54:10 69:4 76:3 77:23 105:9 110:15

**personal**
55:1 62:1,7

**personally**
48:25 50:8 65:17 66:23 83:3

**personnel**
66:21

**phone**
31:22 43:14 65:7 78:10 96:7

**physically**
100:1

**pieces**
29:17

**Pistol**
69:3,9,10,11 70:21

**place**
31:13 36:24 37:6 64:3 86:7 104:23

**placing**
85:4

**plaintiff**
12:25 46:10 88:6 91:6 93:23 95:1 102:2 107:1

**plaintiffs**
6:16 13:21

**Plaintiffs'**
71:20

**planning**
57:22

**platforms**
22:16,20

**plugged**
43:13

**PMK**
6:20 53:5

**point**
43:18 65:9 78:12,13,16 79:1

**point-of-sale**
29:3,22 34:21 42:17 43:4 56:3,5,7 84:9

**policies**
51:14,19 111:4,18,24

**policy**
110:24

**popular**
69:2

**populate**
30:12

**populated**
42:14

**portion**
101:17 107:20 108:13, 15,18

**POS**
29:8,9,20 30:10,15 31:18,24 32:6,8,18 33:3,14,25 34:23 35:1,9 41:4,10,17 42:8 43:11 56:12,19,20 79:14 84:1 85:21,24 86:11,14 96:13,25 108:23

**position**
68:17

**positioned**
26:5

**positive**
22:1

**possession**
68:15

**Possibly**
109:14

**Preliminary**
71:20

**premises**
104:9,21

**premium**
36:5

**preparation**
14:11 91:14

**prepare**
11:19 13:24 73:16 94:6, 8 95:6,8

**prepared**
13:9

**preparing**
46:2

**present**
44:19 45:18 98:15,23 99:3

**President**
17:12,13,16,19,21 22:3

**pretty**
24:5

**prevalent**
63:18

**prevent**
12:9,12

**previously**
53:6 58:3 90:21

**Price-tuma**
17:9 22:13,21 100:19

**primarily**
104:15,16

**Prince**
6:20 7:2,10,12 17:10 25:11 36:12 41:16 44:2 53:5,12 60:20 71:19 76:2 77:15 80:12 84:21 89:24 90:12 91:4 92:15 93:13,17 95:24 100:21 101:14 106:6

**Prince's**
17:17

**Prince-tuma**
100:18

**prior**
15:13,16 41:1 57:7

**private**
69:18,20

**problem**
111:13

**procedures**
8:13 12:2 51:14,19

**process**
41:18 96:6

**processed**
32:5,17 35:16 96:12

**processing**
29:21

**produce**
89:9

**produced**
88:23 92:1,6,11,16,22

**production**
88:5 90:13 91:8,21

**products**
22:7

**proficient**
69:6

**program**
80:2

**programs**
68:23

**prohibit**
73:25

**prohibited**
73:25

**promise**
68:21

**proof**
54:24 55:4,16 64:11

**provide**
45:6,20 46:4 47:10,16 48:2,8,16 50:15 59:12 75:25 76:9,17 81:7,9 82:18 84:16,18,22 97:1 99:19,22 100:11,15,19, 21,25 103:9 107:17 112:7,14

**provided**
16:17 74:18,22 77:5 91:17 92:10,18,20

**providing**
10:17 68:18

**provisions**
14:18

**prudent**
68:20

**public**
24:16

**pull**
71:10 105:19,25

**pulling**
101:25

**purchase**
27:6,11 28:24,25 29:12
32:25 34:3 49:4 51:5
63:7 66:6 67:8,14
110:16,21

**purchased**
82:14

**purchaser**
30:6

**purchaser's**
31:6

**purchases**
29:4,21 30:2 31:2,14,
17,18,25 32:14,17 33:3,
5,15,17,25 34:5,7 51:3

**purchasing**
28:8 63:17 108:4

**purpose**
65:20 67:1 81:21,22

**pursuant**
31:10 34:7

**push**
89:19,21

**put**
15:21 27:18 60:16
62:16 68:17 75:15 79:1
85:6

**putting**
38:2 80:3

**Q**

**qualifying**
78:22

**quantify**
78:16

**Quantifying**
78:24,25

**question**
9:21 10:24,25 11:1,5,7,
13,14 19:5 20:21 25:17
29:16 33:9,11,21 40:2,4
42:10 51:23 77:22
79:23 80:4 107:9,14
108:10 110:4,20

**questioning**
6:10

**questions**
7:8 8:24 9:3,18 10:6,16
12:1 43:19 84:21
101:13 105:5 113:6,7

**quickly**
41:12

**quote**
36:5

**R**

**radius**
23:2

**raise**
6:18

**range**
17:2 18:5 19:11,18,19,
23 20:3,5,6,7,19 21:1
22:6 23:15,21,23 24:3,
25 28:1,10 32:5 37:21
43:4 47:9 49:3,8,13
50:3 53:13,15,20 54:5,
9,10,11,17 55:2,8,16,
18,19,21,23 56:6,12
57:17,21 58:2,6 59:6,9,
13,18 60:2,5,12 61:1,5,
8,13,19,22 62:8,13,21
68:6 70:18,20,22 74:18
84:5 108:1

**ranges**
23:2

**Rapid**
29:8,9,20 31:24 32:6,8,
18 33:3,14,25 34:20,23
35:1,9 41:4,9,17 42:8,
13,22 43:7,11 56:7,12,
19 79:14 84:1,18,19,20,
25 85:2,21,23 86:14
96:13,14,23,25 97:10,
15,19,23 98:18,20
108:23

**rare**
64:23

**re-ask**
39:9

**re-open**
93:15

**reach**
31:23

**reached**
79:22

**read**
33:8,12 40:3,5 45:1
71:18 72:6 74:4 88:9,11
91:24 92:11 93:22
94:25

**readily**
64:19

**reading**
10:25 44:11 73:23 75:4

**reason**
10:23 11:11 12:5 82:9
105:3

**reasons**
33:21 50:17

**recall**
15:10 21:4,6,7,13,16
66:15 87:18 93:2,4,5
94:10 95:9 96:18,19

**receive**
19:15 31:12 42:24 66:8
110:16,21

**recent**
82:5

**recess**
41:14 52:12 80:10
95:22

**recognize**
15:8

**recollection**
10:8,18

**record**
7:9 33:12 40:5 41:11
43:21,24 49:21 52:9
55:24,25 80:6 95:19
109:17 113:15

**recorded**
41:1

**recordkeeping**
80:21

**records**
33:4,16,18,24 80:13,18
82:2 92:2 103:17,19
107:4 110:5

**Recreational**
53:16,19

**recurring**
57:22,24 58:7

**refer**
16:5,8 27:4

**reference**
51:20 52:2

**referenced**
92:11

**referring**
17:6 75:13

**register**
29:10

**regularly**
81:5

**regulations**
33:20 34:7 40:20 46:15
80:13

**relate**
44:13

**related**
33:24 44:13 51:14 76:4
79:15 80:14 81:7 89:25
111:4

**relating**
111:18

**relevant**
46:5,21

**rely**
31:8

**remainder**
20:20

**remaining**
19:10

**remember**
50:11 66:10

**remembering**
67:9

**remote**
6:8 9:8

**remotely**
6:1,13,22 53:1,7

**renewal**
69:13

Exhibit 58
DX1184

**rent**
24:22 25:1,3 32:4 47:18 50:14 54:19,23 68:10 73:10

**rentals**
24:24,25 44:21 75:7

**rented**
74:17

**renting**
59:10

**reopen**
87:22

**repeat**
18:9 33:7 106:17

**rephrase**
19:5

**report**
56:13 80:2 96:22 98:20 99:7

**reporter**
6:5,6,17 9:2,17 10:2 11:19 33:8,12 40:3,5 59:14 113:11

**Reporters**
6:7

**reports**
43:8 79:19 96:24

**represent**
7:4

**representations**
68:14

**representative**
7:15 46:19 79:14,19 112:14

**representatives**
41:21,25 42:1,3

**represented**
7:12

**request**
11:12 91:21

**requested**
81:1,8 82:16 89:9 97:22

**requests**
83:12 86:3,19,23 87:2, 6,12,16,18 88:5,15,21 89:3 90:2,3,13,21,24

**rent**
91:8 92:7 93:3,12,25 94:12 108:24,25

**require**
30:2 40:21 54:4 58:21 69:25 70:24 72:8,10,13, 18,24 73:12 80:13 89:7

**required**
11:6 29:23,24,25 30:5, 11,19 31:12 79:8 81:16

**requirement**
31:21 32:20 42:23 47:25 58:19 78:11 112:24

**requirements**
58:9 67:20 76:24 80:21 111:6

**requires**
29:25 58:7 59:4

**research**
14:11 63:18 89:20

**reservation**
59:7

**reserve**
59:7

**residence**
31:13

**respect**
16:12 51:20 54:13 67:12 93:11

**respond**
86:19 87:13 88:15,20

**responded**
87:14

**responding**
83:12 86:22 91:25 92:2 104:5

**response**
14:8 19:4 66:8,10 91:7, 20 92:6 93:3,24 95:2 102:3 103:9

**responses**
10:2,4 86:17 87:6 91:17 93:12,14,18 94:12,15, 17 101:22 103:9,10

**responsibilities**
23:10

**responsible**
22:11,19 36:22

**responsive**
87:8 89:2 90:24 92:1,7

**restrictions**
55:7

**restroom**
24:15

**result**
75:5,22 76:10,19 78:18 86:2 100:11

**resulted**
75:17

**resumed**
52:13 53:10

**retail**
17:4 19:20,22 20:6,7,18 31:25 32:14 44:18 56:9

**revenue**
59:23 60:1 99:2,11,14 100:11

**revenues**
20:24 21:5,10,13,16,20 35:23 36:7 98:14,22

**review**
11:20 13:8 15:16,24 36:13 40:25 46:3,20 48:10 73:18 90:13,15, 18

**reviewed**
13:3,5 15:10 16:2 90:3, 19,21

**reviewing**
14:10 16:15 83:11

**rifle**
66:22

**rifles**
24:21 64:5

**rim-fire**
64:5,11

**ring**
29:4

**ringing**
29:11,20

**Rob**
7:5

**role**
15:18 22:2

**room**
9:7 24:15 104:25

**Rosenberg**
6:14 41:11 101:11 102:7 103:16 105:20 106:5,16 107:13 108:11 109:5 110:2,11,19 111:2,12,23 112:4,12, 22 113:4,8

**rough**
36:9,11,12

**Rule**
12:24

**rules**
8:17 80:12 89:7

**run**
22:6 42:16 79:19 87:1 89:5 96:25 99:7 106:14, 19,20,23 108:24

**running**
21:11 49:12 101:4 106:2 107:11

**S**

**Safety**
70:5,6,23

**salary**
19:15

**sale**
29:23,25 36:8 65:9 66:16,18 67:11 75:6 104:14 111:4,19

**sales**
14:20 17:5 22:5 23:10, 15,17,21 24:7 25:12,24 26:1 27:14 30:4,18 34:10,20 35:15 36:2,18 39:20,24 40:6,10,13 41:18 43:5,7,9 44:21 45:8,13,16 52:3 61:18 64:14 79:20 81:7,9 82:1,9 92:14 96:12,24 97:2,5,7 99:18 100:7 103:2,21 109:9,21 112:8,25

**San**

22:25 58:10 69:12

**Saturday**
50:6 63:4,5

**Saturdays**
26:11

**saved**
41:1

**scan**
29:12

**scanned**
30:12

**schedule**
22:6 96:9

**scheduled**
96:11

**Scratch**
109:19

**scroll**
102:8

**search**
81:15 89:22 90:23
92:25 101:1 103:18,19
109:25

**searches**
88:14,20 89:2 101:4
108:24

**searching**
92:1 103:2,8

**season**
65:25

**Secretary**
17:16

**Section**
14:19 62:21 63:21
64:15 67:15 75:22
76:11,19 77:18 78:18
100:12 111:7,14

**secure**
24:14

**seek**
68:2

**seeking**
109:3

**sell**
20:18 24:20 25:6 32:1

48:8 75:16,21 86:12
96:17

**selling**
23:16 112:16

**sells**
24:17

**semi**
64:10

**semi-automatic**
67:7,8

**send**
82:15,22

**sense**
25:15,18 28:11 36:6
105:16,18

**sentence**
72:7 73:23 75:4,13
91:24 92:4,11

**separate**
23:21,23 35:20 47:20
105:15

**service**
49:13 90:10

**services**
75:8

**sessions**
32:1,2

**set**
88:5 91:7 93:24 95:2
101:22 102:3

**sets**
14:19

**setting**
9:6 19:9 77:7

**setup**
23:25

**shelf**
85:15 86:5,9

**shoot**
47:8,17,21 48:19 49:3,8
50:3,14 54:8,11,16
55:2,8,15 57:17,21
58:20 59:6 60:23 68:6

**shooter**
57:23,24

**shooters**
58:8

**shooting**
7:16 12:25 13:10 16:5,
9,25 17:2,4,5,13,22
18:3,7,12,15,18,25
19:7,13,19 20:23 22:8,
22 23:2,3 24:1,17,25
31:8 32:5,10 34:9 35:22
36:7,23 46:10,13,16,19
50:4 51:13 53:13,16,19,
20 55:2 58:3,5 59:4
60:2,5 69:17 70:18,20
71:4 73:24 88:6 91:6
93:23 95:1 102:2 103:3,
7 104:9,22 105:7,9,11
107:17 109:8,21 110:6,
13 111:3,18 112:6,13,
14

**shop**
17:1,23 18:1

**Shorthand**
6:6

**shortly**
52:5

**shot**
58:1

**shotgun**
64:11 67:7,8

**shotguns**
24:21 34:24 35:5,8,20
64:4

**show**
54:9,17,24 55:4,16
64:11

**showroom**
24:3

**shows**
54:12

**shy**
66:2

**sign**
54:6 95:25

**signature**
71:25 95:13 102:16,18,
20

**signed**
54:20 56:21 57:8,13

73:18 106:25

**significantly**
39:15

**signing**
96:6

**simple**
29:22 103:14

**simply**
36:4 40:25 82:5 86:5

**simulation**
73:4

**simulator**
72:17 73:6,7,9

**simultaneously**
106:15,19,21

**single**
37:9 72:19

**sit**
72:16 93:12,17 94:14
98:23 99:1

**situated**
23:21 24:5

**SKUS**
86:13

**slightly**
62:17,18

**slowest**
26:22,23

**small**
108:13,15

**smaller**
69:24

**Smart**
57:3,4 86:16

**smartsystem.com**
57:2

**smartwaiver.com**
57:5,12

**Smartwaiver.com.**
57:1

**social**
22:14,16,20

**software**
29:7

**sold**
34:17,24 35:8,19 85:11 97:1,11,25 98:2,5,8,12, 15 110:7

**sorts**
85:19

**sought**
65:1

**spare**
107:3

**speak**
9:19

**special**
31:23

**specific**
20:1 34:13 52:3 87:18

**specifically**
31:13 50:12 51:21 111:4

**speculate**
10:7,17,20 62:10 77:13 108:14,17

**speculating**
77:16 78:3,13

**speculation**
27:21 28:13,20 59:11 60:15 62:3,15 74:24 76:1 77:12 78:1,19 84:12 103:11 106:3 107:7 108:6

**speculative**
77:11

**spend**
25:24 61:5,8 89:8

**spent**
83:6,14

**sports**
17:5

**square**
24:2

**staff**
19:11,18 20:3,5 55:18, 19 58:2 67:22

**Stan**
17:9,11 36:24 37:1 41:19 43:1 99:22

100:15

**start**
10:12 13:6 57:2,4 112:2

**started**
12:3 14:14

**starting**
44:8 72:7 91:24

**state**
6:9 7:9 30:8,20 34:3

**stated**
90:2 99:19 100:10 103:17 109:7

**statement**
74:3 95:14

**states**
70:11 72:1 92:15 95:15

**statutory**
14:22

**stay**
50:14 87:17

**Stephanie**
6:12 7:2 113:8

**steps**
46:20 100:2 101:3

**sticks**
64:23

**stock**
86:6

**storage**
24:14

**store**
25:16,19,22 26:3,7 27:5,6,8,11,12,16 40:19 96:4,5

**stored**
104:24

**Strickland**
6:6

**strike**
28:2 34:23 54:14 56:11 99:9,12

**student**
70:24 74:16

**students**
69:25 72:8,10,14,22

73:13

**stuff**
24:15 65:25 90:7

**subject**
14:21

**subjects**
90:1

**submissions**
14:4,7

**suffered**
75:9 76:17 78:17 79:3

**suffering**
12:8

**Sullivan**
6:7

**Sunday**
26:14,15

**supplement**
94:11

**supplemental**
91:7 93:12,24 95:2

**supply**
94:13

**Support**
71:19

**suppose**
78:14 105:1

**supposed**
90:10 112:20,24

**supposedly**
85:20

**surprise**
92:21

**sustained**
75:5

**swearing**
6:8

**switch**
52:5

**system**
29:3,4,7,22 31:18,24 40:25 41:17 42:13,17, 25 56:3,5,8,24,25 58:4 79:15,20 84:9 85:19 86:3,10 96:13 109:3

**systems**
42:14 86:15

---

**T**

**takes**
82:22 103:13 105:24

**taking**
12:11 15:22 20:8 61:3 71:8 87:20

**talk**
20:21 51:2 80:1

**talked**
63:6 68:23 85:4 96:24 103:1

**talking**
20:3 53:12 61:17

**technically**
61:12

**telling**
39:1

**temp**
100:6

**ten**
80:7 83:10 105:25 107:3

**term**
44:13

**terminates**
78:10

**terms**
29:20 37:3

**testified**
6:23 53:8

**testify**
13:9 76:4 109:20

**testimony**
9:13 11:22 12:6,9,12 44:24 45:22 46:18,23 49:24 61:10 76:6,21 77:20 81:6,12 87:4,7 90:25 107:10

**thing**
79:25

**things**
64:12

THE SULLIVAN GROUP OF COURT REPORTERS
Exhibit 58
DX1187

**thirsty**
11:10

**thought**
41:7

**thousands**
89:22

**threatened**
74:8,20

**three-hour**
69:3

**TI**
73:9

**time**
11:4 15:12 25:24 40:20
42:14 46:8 47:23 52:6
59:19 61:3,5,7,8,13
63:16 68:11 79:25
81:14,16 82:17 83:6,11,
25 84:1 87:2,9,13,15
89:4,8,11 90:13 101:13
103:4 105:15 110:20

**times**
7:20 65:4

**tired**
11:10

**title**
12:23 17:11,15,17,20
22:3 71:18 88:4 93:22
94:25

**titled**
102:9

**titles**
19:10

**today**
6:13 7:8,13,15 8:20 9:4,
9,14,18,22 10:4,6,16
11:18 12:6,12 13:14,25
14:12 46:19 59:22
61:18 76:4 81:6,9
93:13,17 94:14 98:23
99:1 101:13 103:1
109:7

**today's**
46:2

**told**
14:1 67:10 75:1

**ton**

**86:24**

**topic**
44:11,25 76:4

**topics**
13:5,11 44:7,14,25
46:3,5 52:5 76:4

**touching**
71:4,6

**tough**
60:10

**trace**
82:13 103:14

**track**
34:9 49:10,11,13 97:13

**tracked**
31:18

**train**
51:19,22

**trained**
67:22

**trainer**
51:22

**trainers**
20:1,2,10,12,15

**training**
19:24,25 20:13 22:7
23:22 31:25 32:2 42:25
43:2,6 68:23,25 69:7,
13,16 71:1 73:3,8 76:9,
18 77:8,17,24 95:24,25
96:12,16 97:7,9,24
98:2,5,8,11,14,22 99:2,
11,15 107:25 112:7

**trainings**
69:14,25 73:11

**transaction**
30:16 31:11 67:4

**transactions**
32:9 43:5 67:18,22
80:14

**transcribing**
9:3,18

**transcript**
9:22 10:25 11:19,20,21,
22 113:12

**transfer**
110:16,22 111:4,19

**transferring**
112:16

**transfers**
14:20 103:3,21 109:21
112:8 113:1

**trial**
11:23

**true**
72:2 81:13 95:15

**truth**
8:20

**TUESDAY**
6:2 53:2

**Tuesdays**
26:17,18

**Tuma**
17:9 37:18 41:19 43:1
85:6 99:22 100:15

**Tuma's**
17:11,15

**turn**
12:15 47:2,6,10,14,19,
25 48:22 49:7,15,22
50:2,8 51:10 52:2 62:20
63:11 68:5,8 71:23
86:17 94:20 95:10

**turned**
48:25 49:3 50:7,17,20
51:2,4 62:24 63:7 67:13

**turning**
93:21

**Twitter**
22:17

**type**
30:16 31:11

**types**
24:20 25:8 30:2 53:15
58:15 68:25 69:7 97:1

---

**U**

**Uh-huh**
101:15

**uncomfortable**
69:23

**understand**
8:13,18,23 9:2,8,12,23
10:1,10,21,23 11:2,8,
15,24 15:13 16:8 18:6
20:7 26:25 33:20 51:16
61:4 64:2 65:2 67:21
78:15,24 80:16 89:6
105:17 110:4 111:15

**understanding**
47:13,24 48:3,4,10
61:21 63:25 80:20 92:8

**understood**
8:12 11:1 18:17 25:5
26:20 32:22 105:4
109:17

**unfortunate**
84:8

**United**
95:15

**unplug**
44:4

**untrue**
9:13

**unwritten**
111:24

---

**V**

**vague**
34:11 39:17 50:22
51:15 75:10

**valid**
64:3 65:24

**validity**
64:21

**varied**
27:17

**varies**
26:9

**verbal**
10:3

**Verbally**
113:3

**verification**
31:9 54:13 95:16 102:9

**verify**
64:21 67:3 93:13,18

Exhibit 58

DX1188

94:14,17 95:14 112:15

**versions**
15:13,16

**versus**
34:25 35:8 59:10

**Vice**
17:16,19,21 22:3

**view**
103:1

**viewpoint**
110:4

**violation**
74:17

**visit**
27:5,8,11,16

**visualize**
23:20

**voluntarily**
106:25

---
**W**

**waiting**
93:7

**waiver**
54:7,20,22 56:4,20,21,
24,25 57:3,4 58:4,13
86:16

**waivers**
56:18,22 57:8,10,13

**walk**
96:3

**walking**
96:7

**wanted**
34:22,24 35:5,7 49:3,4,
8 50:3 51:3 53:13 63:7
67:6,7,13 68:6 85:3
103:6

**wanting**
51:4 54:8,11,16,23
55:8,15 59:6 66:5

**WEBCAM**
6:1 53:1

**website**
22:9,12,18 70:11

**week**
25:14,22 26:9 37:24
38:10

**weekend**
108:9

**weekly**
26:8 38:7

**weeks**
66:13

**wife**
17:10

**wifi**
43:14

**work**
19:19,20,22 20:6,19
26:11,25 27:10 29:13
37:4,21 38:14,19 63:3
91:2

**worked**
15:20 93:19

**working**
59:18 63:2 105:14

**works**
29:20 86:4 96:9

**worth**
91:2

**write**
80:2 98:20

**written**
43:10 51:18 52:1
110:24 111:18

---
**Y**

**year**
21:1,10 45:9 59:2,3
81:20 98:12 103:22
109:9,22 110:8

**years**
7:23,25 8:1 21:20,22
45:17 50:12,16 80:24
82:8 98:15,23 99:3

**young**
73:25

---
**Z**

**ZOOM**
6:1 53:1

Exhibit 58
DX1189

# EXHIBIT 59

Exhibit 59
DX1190

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ; et al.,          )
                             )
          Plaintiffs,         )
                             )
     v.                       )   CASE NO.
                             )   3:19-cv-01226-L-AHG
ROB BONTA, in his official    )
capacity as Attorney General  )
of the State of California;    )
et al.,                       )
                             )
          Defendants.         )
_____)

**CERTIFIED COPY**

VIDEOCONFERENCE DEPOSITION OF

JOHN PHILLIPS

AS PMK FOR POWAY WEAPONS AND GEAR

APPEARING REMOTELY VIA ZOOM WEBCAM

AUGUST 16, 2023

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 23-127525



Exhibit 59
DX1191

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ; et al.,            )
                               )
          Plaintiffs,          )
                               )
     v.                        )   CASE NO.
                               )   3:19-cv-01226-L-AHG
ROB BONTA, in his official     )
capacity as Attorney General   )
of the State of California;    )
et al.,                        )
                               )
          Defendants.          )
_____)

CERTIFIED COPY

VIDEOCONFERENCE DEPOSITION OF

JOHN PHILLIPS

AS PMK FOR POWAY WEAPONS AND GEAR

APPEARING REMOTELY VIA ZOOM WEBCAM

AUGUST 16, 2023

Reported by:
DEBBIE STRICKLAND
CSR 9036
No. 23-127525

Exhibit 59
DX1192

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   JOSE CHAVEZ; et al.,          )
                                   )
 5             Plaintiffs,         )
                                   )
 6        vs.                      )   Case No.
                                   )   3:19-cv-01226-L-AHG
 7   ROB BONTA, in his official    )
     capacity as Attorney General  )
 8   of the State of California;   )
     et al.,                       )
 9                                 )
               Defendants.         )
10   _____)

11

12

13

14

15           VIDEOCONFERENCE DEPOSITION OF JOHN

16           PHILLIPS, PMK, taken on behalf of

17           DEFENDANTS, all parties appearing

18           remotely via Zoom Webcam, commencing

19           at 10:02 a.m., Wednesday, August 16,

20           2023, before Debbie Strickland, CSR 9036.

21

22

23

24

25
```

Exhibit 59
DX1193

```
 1   A P P E A R A N C E S :

 2        FOR PLAINTIFFS:

 3             DILLON LAW GROUP APC
               By:  JOHN W. DILLON, Attorney at Law
 4             2647 Gateway Road, Suite 105 No. 255
               Carlsbad, California 92009
 5             760.642.7150
               jdillon@dillonlawgp.com

 6

 7        FOR DEFENDANTS:

 8             CALIFORNIA DEPARTMENT OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
 9             By:  STEPHANIE ALBRECHT
                    Deputy Attorney General
10                       -and-
                    JENNIFER E. ROSENBERG
11                  Deputy Attorney General
               300 South Spring Street, Suite 1702
12             Los Angeles, California 90013
               213.269.6166
13             stephanie.albrecht@doj.ca.gov

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 59
DX1194

```
 1                        I N D E X

 2   W I T N E S S :

 3   JOHN PHILLIPS, PMK                                    PAGE

 4           EXAMINATION BY MS. ALBRECHT:                    8

 5           EXAMINATION BY MS. ROSENBERG:                 103

 6

 7   AFTERNOON SESSION:                                    61

 8

 9

10

11   E X H I B I T S :

12   NUMBER              DESCRIPTION                       PAGE

13   Ex 1        Notice of Rule 30(b)(6) Deposition         13
                 of Plaintiff Poway Weapons and
14               Gear

15   Ex 2        Third Amended Complaint for                16
                 Declaratory and Injunctive Relief
16

17   Ex 3        Defendants' First Set of Requests          61
                 for Production to Plaintiff Poway
18               Weapons and Gear

19   Ex 4        Defendants' First Set of Requests          82
                 for Admissions to Plaintiff Poway
20               Weapons and Gear

21   Ex 5        Defendants' First Set of                   86
                 Interrogatories to Plaintiff Poway
22               Weapons and Gear

23   Ex 6        Plaintiff Poway Weapons and Gear's         64
                 Response to Defendants' First Set
                 of Requests for Production of
24               Documents

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1195

4

```
 1   E X H I B I T S :      (Continued)

 2   NUMBER              DESCRIPTION                    PAGE

 3   Ex 7        Plaintiff Poway Weapons and Gear's      78
                 Supplemental Responses to
 4               Defendants' First Set of Requests
                 for Production of Documents
 5
     Ex 8        Summary                                 69
 6
     Ex 9        Plaintiff Poway Weapons and Gear's      83
 7               Response to Defendants' First Set
                 of Requests for Admissions
 8
     Ex 10       Plaintiff Poway Weapons and Gear's      84
 9               Supplemental Response to
                 Defendants' First Set of Requests
10               for Admissions

11   Ex 11       Plaintiff Poway Weapons and Gear's      86
                 Response to Defendants' First Set
12               of Interrogatories

13   Ex 12       Plaintiff Poway Weapons and Gear's      88
                 Supplemental Response to
14               Defendants' First Set of
                 Interrogatories
15
     Ex 13       Declaration of John Phillips in         92
16               Support of Plaintiffs' Motion for
                 Preliminary Injunction
17
     Ex 14       PWG Range Class Shotgun First Steps     97
18
     Ex 15       State of California Penal Code          99
19               Section 16685

20   Ex 16       Hunting Licenses and Tags License      100
                 Items and Fees Valid 7/1/23 to
21               6/30/24

22   Ex 17       1/26/22 Information Bulletin Re New    107
                 and Amended Firearms/Weapons Laws
23
     Ex 18       Frequently Asked Questions About       115
24               Online License Sales

25
```

Exhibit 59

DX1196

```
 1   E X H I B I T S :      (Continued)

 2   NUMBER               DESCRIPTION                    PAGE

 3   Ex 19        State of California Penal Code         124
                  Section 28210
 4
     Ex 20        State of California Fish and           127
 5                Game Code Section 3037

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

6

Exhibit 59
DX1197

```
 1          ALL PARTIES APPEARING REMOTELY VIA ZOOM WEBCAM
 2                  WEDNESDAY, AUGUST 16, 2023
 3                         10:02 A.M.
 4                            ***
 5          THE COURT REPORTER:  Good morning.  My name is
 6   Debbie Strickland.  I am a Certified Shorthand Reporter
 7   with The Sullivan Group of Court Reporters.  I will be
 8   swearing in the witness from a remote location.
 9          Will counsel please state their appearances
10   beginning with the questioning attorney.
11          MS. ALBRECHT:  Good morning.  Stephanie Albrecht
12   with the California Department of Justice representing
13   Defendants in this case.  I'm joined here remotely today
14   by my colleague, Jenny Rosenberg as well.
15          MR. DILLON:  Good morning.  This is John Dillon.
16   I'm counsel for the plaintiffs.  John Phillips is being
17   deposed today.
18          THE COURT REPORTER:  And would the witness
19   please raise his right hand.
20                            ***
21                    JOHN PHILLIPS, PMK,
22          having been duly administered an oath
23          remotely in accordance with CCP 2094,
24          was examined and testified as follows:
25   ///
```

THE SULLIVAN GROUP OF COURT REPORTERS

7

Exhibit 59
DX1198

```
 1                          EXAMINATION
 2   BY MS. ALBRECHT:
 3       Q     Good morning, Mr. Phillips.
 4       A     Good morning.
 5       Q     My name is Stephanie Albrecht.  I am a Deputy
 6   Attorney General with the California Department of
 7   Justice.  I represent the Attorney General, Rob Bonta,
 8   and Allison Mendoza, the Director of the Department of
 9   Bureau of Firearms, who are defendants in this lawsuit.
10   I will be asking you some questions today about this
11   case.
12       A     Okay.
13       Q     Would you please state your full name for the
14   record.
15       A     John Phillips.
16       Q     Thank you.
17             And are you represented by counsel today,
18   Mr. Phillips?
19       A     I am.
20       Q     And are you here today as a representative of
21   Poway Weapons and Gear?
22       A     I am.
23       Q     And if I use the acronym PWG, will you
24   understand that to refer to Poway Weapons and Gear?
25       A     I will.
```

Exhibit 59
DX1199

```
 1       Q    And do you understand that PWG is a plaintiff in
 2   this case titled Chavez v. Bonta?
 3       A    I do.
 4       Q    Have you had your deposition taken before?
 5       A    I have.
 6       Q    How many times?
 7       A    Maybe a half dozen.
 8       Q    And in what context were you deposed before in
 9   those approximately half a dozen instances?
10       A    I've been deposed in a law enforcement -- as a
11   formal law enforcement officer, I've been deposed in
12   business matters, and I've been deposed in a divorce
13   proceeding.
14       Q    And were you a party to any of the proceedings
15   in which you were deposed?
16       A    In the divorce proceeding, yes.
17       Q    And in the other proceedings you testified as a
18   witness?
19       A    I did.
20       Q    So I take it you generally understand the
21   procedures for depositions, but I'm going to just go over
22   some ground rules anyway to refresh your memory if that's
23   okay.
24       A    Great.
25       Q    So do you understand you took an oath to tell
```

THE SULLIVAN GROUP OF COURT REPORTERS

9

Exhibit 59
DX1200

```
1    the truth under penalty of perjury?

2         A    I do.

3         Q    And do you understand that I will be asking you

4    questions, and you will be answering under oath?

5         A    I do.

6         Q    And do you understand that the court reporter

7    will be transcribing the questions and answers today?

8         A    I do.

9         Q    And even though we are in an informal setting

10   here where we're all in different locations appearing

11   remotely, do you understand that the oath you took

12   nonetheless has the same meaning as if we were in court

13   today?

14        A    I do.

15        Q    And since the court reporter is transcribing the

16   questions and answers today, it is really important that

17   we not speak over one another.  So I would just ask that

18   you not interrupt me while I ask my questions, and I will

19   also not interrupt you while you answer my questions;

20   agreed?

21        A    Fair enough.

22        Q    Also, the reporter is not able to take down

23   nonverbal responses so that I would ask that you refrain

24   from head nods or any nonverbal gestures and provide

25   verbal responses.
```

THE SULLIVAN GROUP OF COURT REPORTERS

10

Exhibit 59

DX1201

```
 1      A      Okay.

 2      Q      And in answering, I would ask that you not

 3   speculate or guess, but I am entitled to your best

 4   recollection and estimates where appropriate.  And to

 5   make sure we're on the same page, I'm going to give you

 6   an example of the difference between an estimate and a

 7   guess.

 8          So if we were together in the same room for this

 9   deposition today and you stood up, and I stood next to

10   you, I would be able to guess your height based on my own

11   height.  But I would not be able to -- I'm sorry -- I

12   would be able to estimate your height based on my own

13   height.  But I would not be able to estimate, say, your

14   spouse's height who I have never met and is not present

15   in the same room.  If I try to speculate as to her

16   height, that would be a guess.

17          Do you understand the difference between a guess

18   and an estimate?

19      A      I do.

20      Q      And your counsel may, from time to time, make

21   objections to the form of my questions.  Unless your

22   counsel instructs you not to answer a question, you will

23   so be required to answer my question notwithstanding his

24   objections.

25          Do you understand that?
```

THE SULLIVAN GROUP OF COURT REPORTERS

11

Exhibit 59
DX1202

```
 1       A    I do.

 2       Q    And if, at any time, you are hungry, thirsty, or

 3   just need a break, please let me know, and I will do my

 4   best to accommodate that request.  I will just ask that

 5   if there's a question pending, that you first answer the

 6   question before we go on a break; understood?

 7       A    Yes.

 8       Q    Do you have any questions about the procedures

 9   for today's deposition?

10       A    No.

11       Q    Is there any reason that you feel you cannot

12   give your best testimony today?

13       A    No.

14       Q    Are you suffering from any medical condition

15   that would prevent you from giving your best testimony

16   today?

17       A    No.

18       Q    Are you currently taking any medication that

19   would prevent you from giving your best testimony today?

20       A    No.

21       Q    Okay.  I am going to share my screen to show you

22   an exhibit.  So this is your first -- just bear with me

23   for one second while I try to pull this up on my screen

24   and share it with you.

25            Are you able to see the document that I just
```

```
 1    shared with you?

 2         A    I am.

 3         Q    Great.

 4              Are you able to see the full document?  Because

 5    I don't see it on my screen.

 6         A    I -- no.  I see the top two-thirds of the page.

 7         Q    How about now?

 8         A    I do.  It's pretty small, but I can see the full

 9    document, or the full page.

10         Q    Great.

11              And I am going to mark this document as

12    Exhibit 1 titled Notice of Rule 30(b)(6) Deposition of

13    Plaintiff Poway Weapons and Gear.

14              (Exhibit Number 1 was marked

15              for identification.)

16    BY MS. ALBRECHT:

17         Q    Mr. Phillips, have you seen this document

18    before?

19         A    I have.

20         Q    And have you reviewed the document in full?

21         A    I have.

22         Q    I am going to scroll down to page 2, starting at

23    the bottom of page 2 of the document, which has a heading

24    titled Topics for Examination.

25              Do you see that?
```

Exhibit 59

DX1204

1     A     I do.

2     Q     And do you see that, starting on the bottom of

3  page 2 and continuing through page 3, there are eight

4  topics for examination listed in Exhibit 1?

5     A     I see that, yes.

6     Q     Have you reviewed these topics for examination?

7     A     I have.

8     Q     And are you prepared to testify here today as

9  the person most knowledgeable for PWG on these eight

10  topics?

11     A     I am.

12     Q     Did you discuss your deposition today with

13  anyone?

14     A     Yes.

15     Q     With whom?

16     A     My attorney, John Dillon.

17     Q     Anybody else?

18     A     No.

19     Q     Are you acquainted at all with the other

20  plaintiffs in this litigation?

21     A     I know of them or of the owner of North County

22  Shooting Sports, Mr. Prince, but just in passing.

23     Q     Did you discuss today's deposition with

24  Mr. Prince or any of the other plaintiffs?

25     A     No.

```
 1        Q    And what did you do to prepare for this
 2   deposition today?
 3        A    I reviewed the various documents.
 4        Q    Are you able to identify those documents that
 5   you reviewed?
 6        A    The interrogatory responses and my statement.
 7        Q    When you say statement, are you referring to a
 8   declaration that you submitted in support of a motion for
 9   preliminary injunction?
10        A    Yes, ma'am.
11        Q    Did you review any other documents?
12        A    Not that I recall.
13        Q    Other than the review of the documents that you
14   just identified, did you do anything else to prepare for
15   this deposition?
16        A    No.
17        Q    Did you do any independent research?
18        A    No.
19        Q    When I refer to this litigation, do you
20   understand that to refer to the lawsuit titled Chavez v.
21   Bonta?
22        A    I do.
23        Q    And do you understand that the case involves a
24   second amendment challenge to provisions of California
25   Penal Code Section 27510 which sets 21 as the lower age
```

```
 1    limit for sales and transfers of certain firearms through

 2    federally licensed firearms dealers subject to certain

 3    exemptions?

 4        A    I am aware.

 5        Q    I am going to share with you a document that I

 6    am marking as Exhibit 2.  Are you able to see the

 7    document, Mr. Phillips?

 8        A    I am.

 9             (Exhibit Number 2 was marked

10             for identification.)

11    BY MS. ALBRECHT:

12        Q    And this is a document titled Third Amended

13    Complaint for Declaratory and Injunctive Relief; correct?

14        A    Yes.

15        Q    Are you familiar with this document?

16        A    Yes.

17        Q    Do you recognize this document to be the most

18    reason complaint filed in this litigation, Chavez v

19    Bonta?

20        A    I believe it is, yes.

21        Q    Have you reviewed this third amended complaint

22    in Exhibit 2?

23        A    I believe I have.

24        Q    Do you recall when you reviewed it?

25        A    Within the last week or two.
```

Exhibit 59
DX1207

```
 1        Q    Have you reviewed any prior versions of the
 2   complaint in this action?
 3        A    I may have.
 4        Q    Did you have any role in drafting the third
 5   amended complaint in Exhibit 2?
 6        A    No.
 7        Q    Did you review any drafts of the third amended
 8   complaint?
 9        A    I don't recall.
10        Q    Okay.  I am going to refer you to paragraph 7 in
11   Exhibit 2.  Do you see that?
12        A    I do.
13        Q    Are you able to read it?
14        A    It's kind of small, but yes.  Yes, I'm aware of
15   that paragraph.
16        Q    Okay.  And do you understand this paragraph to
17   refer to PWG?
18        A    Yes.
19        Q    And did you review this paragraph?
20        A    Yes.
21        Q    Did you have a role in drafting this paragraph?
22        A    Yes.
23        Q    As you look at it here today, do you see any
24   errors in paragraph 7 of Exhibit 2?
25        A    No.
```

```
 1       Q    Okay.  I'm now going to pull up exhibit --
 2   excuse me -- paragraph 15 of Exhibit 2.  If you could
 3   please take a look at it and let me know when you've done
 4   so.
 5       A    Okay.  I'm familiar with that.
 6       Q    And do you recognize this paragraph 15 to refer
 7   to PWG?
 8       A    I do.
 9       Q    I am now going to scroll down to paragraphs 52
10   through 55.  If you could take a look and let me know
11   when you have gotten to the bottom of it, and I will
12   continue scrolling down.
13       A    Yeah, I'm familiar with all of that.
14       Q    Great.  And the rest of it through paragraph 55
15   as well?
16       A    Yes.
17       Q    Did you have a role in drafting these
18   paragraphs, 52 through 55?
19       A    Yes.
20       Q    And as you review them here today, do you see
21   any errors in them?
22       A    No.
23       Q    Can you describe for me what PWG is?
24       A    PWG is a federally licensed retailer and indoor
25   shooting range.
```

Exhibit 59
DX1209

```
 1        Q     And when was it -- when was PWG created?

 2        A     In 2014.

 3        Q     Are you the owner of PWG?

 4        A     Yes.

 5        Q     Are there any own -- are there any other owners?

 6        A     There are minority partners, yes.

 7        Q     How many minority partners are there?

 8        A     One.

 9        Q     And who is that person?

10        A     It's another entity, Danielson Range Ventures.

11        Q     And do you have an interest in that venture?

12        A     Yes.

13        Q     Other than owner, do you have any other titles

14   at PWG?

15        A     Founder.

16        Q     Are you involved in the day-to-day operations of

17   PWG?

18        A     I am.

19        Q     In what capacity?

20        A     I do all the books and I manage all the

21   day-to-day operations, and everything kind of stops with

22   me.

23        Q     Are you there on PWG's premises on a daily

24   basis?

25        A     Almost every day, yes.  Otherwise I might be
```

Exhibit 59

DX1210

```
 1    working from home.  I have two kids that I have to Uber
 2    around.
 3         Q    And what type of corporation is PWG?
 4         A    It's a limited partnership.
 5         Q    How many employees does PWG have?
 6         A    It bounces around, but let's call it an average
 7    of about 37.
 8         Q    And when you say it bounces around, in what
 9    circumstances does the number of employees bounce around?
10         A    We're in the retail environment, so there's a
11    lot of turnover.  And so sometimes we go as high as 42
12    and sometimes as low as 34.
13         Q    Do you ever hire temporary or seasonal staff?
14         A    No.
15         Q    Of the approximately 37 employees, are there
16    employees that are assigned specifically to the retail
17    operations of the business?
18         A    Yes.
19         Q    How many of those are assigned to the retail
20    operations?
21         A    Roughly 15.
22         Q    And how many -- are there employees that are
23    assigned specifically to the range?
24         A    Yes.
25         Q    How many employees?
```

Exhibit 59
DX1211

```
 1        A     Roughly ten.

 2        Q     And the remaining employees that are not

 3   assigned to retail or the shooting range, what parts of

 4   the business are they assigned to work in?

 5        A     They are the training staff.  Then there's also

 6   the memberships department, and the rest would be

 7   operations.

 8        Q     Can you describe the memberships department to

 9   me?

10        A     We have three memberships people that sell

11   memberships to be able to come to the range and get

12   discounts and come as much as they want.  So we have

13   monthly memberships much like a gym.

14        Q     And what does the operations department entail?

15        A     That would be compliance, so we review DROS

16   4473, every transition that happens for firearms

17   transactions, marketing, shipping, receiving, the

18   gunsmith, and general manager.

19        Q     Do you know what PWG's revenues were for 2022?

20        A     Roughly 6.5 million.

21        Q     Do you know what PWG's revenues were for 2021?

22        A     Not off the top of my head.

23        Q     Do you know PWG's revenues for any of the years

24   2018 through 2020?

25        A     Not as I sit here.  I can certainly get back to
```

Exhibit 59
DX1212

1    you with that.

2        Q    You mentioned marketing.  What does marketing

3    entail?

4        A    Social media, email blasts, signage around the

5    facility.

6        Q    And on which social media platforms does PWG

7    have a presence?

8        A    Well, depending on when we get kicked off

9    various ones, it kind of depends: Facebook, Instagram,

10   TikTok, LinkedIn, YouTube.  Those are kind of ones that

11   pop to mind right now.

12       Q    And which of these platforms has PWG been kicked

13   off of?

14       A    Well, we're not -- kicked off is probably not

15   the right way.  We have been suspended, and then you come

16   back, and it just depends on the day.

17            Facebook we've been suspended and brought back

18   to life a few times, Instagram.  And I think TikTok we

19   currently have been kicked off.  We don't know why.

20       Q    When you were suspended from Facebook, what were

21   the reasons for the suspension?

22       A    They don't tell you half the time.  You can --

23   maybe you have a price in one of your ads if you have a

24   MSRP for the sale of a firearm.  A lot of times they just

25   say you're in violation of community standards, and they

Exhibit 59
DX1213

1    don't give you a reason.

2        Q    Any other reasons that you're aware of?

3        A    Not that I'm aware of.  We try very, very hard

4    to comply with all requirements for social media.  It's

5    very, very open to interpretation as to what the rules

6    and regulations are.

7        Q    You mentioned failure to comply with Facebook's

8    community standards.  Is there a -- was there a

9    particular post that triggered the suspension?

10        A    One that pops to mind is I believe we did a gun

11    of the month, and we had been doing those for three to

12    four years.  And Facebook's algorithm found one of our

13    posts from three years ago that had the MSRP at what we

14    were selling the gun of the month for, and that violated

15    their terms.  And that was a few months ago that we got

16    suspended for a period.

17        Q    Does PWG maintain a website?

18        A    We do.

19        Q    And is anyone at PWG responsible for keeping

20    that website up to date?

21        A    Our marketing director and myself.

22        Q    You mentioned that PWG has an indoor shooting

23    range?

24        A    It does.

25        Q    And what type of range activities does PWG offer

Exhibit 59
DX1214

1    at its shooting range?

2        A    We have three different indoor ranges.  We have

3    a 25-yard bay, we have a 50-yard bay, and then we have a

4    100-yard indoor bay.  And they are all available for

5    recreational shooting as well as training through our

6    classes.  And then we also lease out the ranges to

7    government entities.

8        Q    Which government entities do you lease out the

9    ranges too?

10       A    It's a long list, U.S. Marshals, Secret Service,

11   San Diego P.D.  We have their entire department now under

12   contract at our facility.  We've had El Cajon P.D.,

13   La Mesa P.D., the list goes on and on, Border Patrol.

14   We've had all kinds of other agencies in there.

15       Q    And what percentage of the range use would you

16   say is for leases rather than recreational use?

17       A    Are you talking revenue or time?

18       Q    Revenue.

19       A    Up until recently, I would say the government

20   contracts accounted for 20 percent of our revenue.  But

21   with this newest contract with the San Diego Police

22   Department, government contracts are probably gonna

23   account for 75 percent of our revenue.

24       Q    And when you say 75 percent of your revenue, do

25   you mean your revenue in total or revenue coming from the

THE SULLIVAN GROUP OF COURT REPORTERS

24

Exhibit 59
DX1215

```
 1    range?

 2        A    My apologies.  Of range revenue.

 3        Q    And, sorry, you mentioned a recent contract that

 4    would increase the --

 5        A    Yes.

 6        Q    -- amount of revenue from government contracts?

 7        A    Yes.  The San Diego Police Department has lost

 8    the use of their private range due to some led poisoning

 9    issues, and so they needed a place that was big enough to

10    accommodate.  And we're big enough to accommodate all

11    1700 of their others that need to qualify three times a

12    year.  So they are using our facility Monday through

13    Friday on our 50-yard bay exclusively.

14        Q    For how long?  What is the term of the contract?

15        A    One-year contract.  The first year comes up I

16    believe in November.  And then they have five options for

17    renewal.

18        Q    Going back to recreational use, does someone

19    have to be a member with PWG to access the range?

20        A    No, ma'am.

21        Q    So for someone who is not a member to come in

22    and use the range, what are they required to do?

23        A    They are required to take a online safety video,

24    watch a safety video, and then take a small test.  And

25    then they are allowed to -- or then they need to sign a
```

Exhibit 59
DX1216

```
 1   waiver.  And then they are allowed to come in and utilize
 2   the facility.
 3       Q    Do they sign the waiver prior to coming in to
 4   the facility?
 5       A    They can do either.  The waiver is online on our
 6   website at pwgrange.com or we have kiosks in the facility
 7   that they can stand and watch the safety brief, take the
 8   safety test, and then sign the waiver.
 9       Q    And are visitors able to reserve online --
10   excuse me -- reserve a lane --
11       A    Yes.
12       Q    -- prior to coming into the facility?
13       A    Yes.
14       Q    Is that something that they can do on PWG's
15   website?
16       A    Yes.
17       Q    And what is required to reserve a lane on the
18   website?
19       A    If you're not a member, $5.00.  If you are a
20   member, it's free.  Other than creating an account,
21   that's all that's required.
22       Q    And what information is someone required to
23   provide in order to create an account?
24       A    Name and email address.
25       Q    And if someone does all that and is able to
```

1    successfully reserve a lane online, what happens when

2    they come to the facility?  Do they just go to the lane

3    or are there other steps that they need to take prior to

4    being able to shoot?

5        A    They need to check in still at our range

6    counter.  They need to present a photo ID so that we can

7    verify who they are.  We maintain that ID while they are

8    on the lane.  And then they are -- the waiver is checked

9    to make sure they have a waiver on file because they need

10   to sign that waiver annually.

11           And then they are allowed, and they are assigned

12   a lane usually.  If they made the reservation, they will

13   get their lane unless it's some sort of technical issue.

14   And then they will go out onto their lane, and they will

15   shoot.

16           And then when they are done, they will come back

17   and check out.  And then after checkout we'll return

18   their photo ID to them.

19       Q    When you said earlier that they provide a form

20   of ID to verify who they are, did you mean that staff

21   confirmed that the name on the reservation matches the

22   name on the ID?

23       A    Yes.  And also ensures that they are able to be

24   shooting there.  If somebody brought in a passport from,

25   say, India, they would not be able -- under federal law,

Exhibit 59
DX1218

```
 1   they would not be able to shoot at our facility.

 2       Q    And do visitors to the range generally bring

 3   their own firearms with them or do they request to rent a

 4   firearm?

 5       A    I would say 80 percent of the recreational

 6   shooters that come to the range bring their own firearm,

 7   so people who are coming just to recreationally shoot.

 8   That doesn't mean that they won't still use one of our

 9   rental firearms to try out different types of firearms.

10            The other 20 percent may come in with friends

11   that own a firearm.  Or they may be considering

12   purchasing a firearm, and they want to do the research on

13   what is a best fit for them.  Again, they come in with

14   people who obviously kind of know what they're doing and

15   they're introducing them to firearms.

16       Q    And what is the process for renting a firearm?

17       A    Same thing.  It's basically to present

18   identification so we know that they can legally possess a

19   firearm and that they are allowed to shoot at our

20   facility and that they have signed a waiver.  And

21   obviously there would be the issue of -- on long guns the

22   issue is, are there old enough to rent a firearm from us?

23       Q    And does PWG keep any kind of record of

24   individuals who rent firearms?

25       A    We do.
```

Exhibit 59
DX1219

1    Q    How so?

2    A    Our point-of-sale system.  With every rental

3  that goes out we record the serial number and then make

4  and model to the person.  And then when it comes back off

5  the range, we need to verify that that's the exact same

6  firearm and serial number coming back to us.

7    Q    What's the name of the point-of-sale system?

8    A    It's called Bizzflo, B-i-z-z-f-l-o.  And that

9  system, we started using it in mid 2020 I believe.

10    Q    And what system do you use prior to mid 2020?

11    A    Axis, A-x-i-s.  And we used that from 2014 to

12  the time we converted over to Bizzflo.

13    Q    And did Axis have the same recordkeeping

14  capability as Bizzflo?

15    A    I believe it did.  I don't know if it was as

16  user friendly as Bizzflo is.

17    Q    What was the reason for switching over to

18  Bizzflo?

19    A    Axis was a very old school software, kind of

20  older industry software.  And Bizzflo is much more

21  cloud-based and much more robust.

22    Q    And does the point-of-sale system maintain

23  information for shooters at the range who bring their own

24  firearms with them?

25    A    No.

THE SULLIVAN GROUP OF COURT REPORTERS

29

Exhibit 59

DX1220

```
 1        Q    And is the process for renting a lane that we
 2   just talked about different for individuals who are
 3   members of PWG?
 4        A    No.
 5        Q    So what does a membership provide for someone
 6   that an ordinary visitor does not get?
 7        A    Well, based on your level of membership -- let's
 8   go with the most basic one.  We have a basic membership
 9   for 25-yard range.  So if you have that, you pay a
10   monthly fee and you can come in and go out on the range
11   as many times as you'd like through the course of the
12   month.  You can be out there as long as you'd like.
13             Other memberships you might get additional
14   discounts or you might be able to bring guests.  But it
15   depends on your membership level.
16        Q    For individuals who rent firearms, you mentioned
17   that you check to make sure they are able to possess a
18   firearm; is that -- is that what you said?  Am I
19   remembering that correctly?
20        A    We check to make sure that they are -- they are
21   not -- that they have the right citizenship to be in an
22   FFL; and that they are of -- to rent a firearm, that they
23   are of legal age to rent that firearm.
24        Q    And what is the legal age requirement for
25   renting a firearm?
```

Exhibit 59
DX1221

```
 1        A     21.
 2        Q     And what percentage of the visitors to the
 3   shooting range are age 21 and over?
 4        A     I don't know that I would know that number or
 5   percentage.
 6        Q     Well, are you able to tell me what percentage of
 7   shooting range visitors are under the age of 21?
 8              MR. DILLON:  Objection; calls for speculation.
 9              THE WITNESS:  It would be purely a guess.
10   BY MS. ALBRECHT:
11        Q     Are you able to tell me what percentage of
12   visitors to the range who rent firearms are under the age
13   of 21?
14              MR. DILLON:  Objection; legal conclusion, calls
15   for speculation.
16              THE WITNESS:  You can't rent a firearm if you're
17   under 21.
18   BY MS. ALBRECHT:
19        Q     Are you aware that there are statutory
20   exemptions to the age limitations of Penal Code Section
21   27510?
22              MR. DILLON:  Calls for a legal conclusion.
23              THE WITNESS:  I am.
24   BY MS. ALBRECHT:
25        Q     What's your understanding of those exemptions?
```

```
 1      A     You're in the armed forces.  You can be in law
 2   enforcement.  You can have a hunter safety license.
 3   Those are what pop to mind as I sit here.
 4      Q     And so if someone is under 21 and meets one of
 5   these exemptions under Penal Code Section 27510, they are
 6   able to rent a firearm; correct?
 7      A     Correct.
 8            MR. DILLON:  Objection; legal conclusion,
 9   compound, and incomplete hypothetical.
10   BY MS. ALBRECHT:
11      Q     Do you know whether PWG has rented a firearm to
12   anyone under the age of 21 meeting these exemptions in
13   the last five years?
14            MR. DILLON:  Compound.
15            THE WITNESS:  I am not aware of that.
16   BY MS. ALBRECHT:
17      Q     Are you not aware or do you know that that has
18   not occurred?
19      A     I am not aware --
20            MR. DILLON:  Vague and ambiguous.
21            THE WITNESS:  I am not aware of anyone coming in
22   to rent a firearm that has met the legal requirement to
23   be exempt.
24   BY MS. ALBRECHT:
25      Q     What happens if someone wants to come in to
```

1  shoot and rent a firearm but is not over 21 and does not

2  meet the exemptions?

3           MR. DILLON:  Objection; compound.

4           THE WITNESS:  They are educated on the existing

5  law and denied rental.

6  BY MS. ALBRECHT:

7     Q    Do you know how many rentals PWG has denied in

8  the last five years?

9           MR. DILLON:  Compound, vague and ambiguous,

10  incomplete hypothetical.

11           THE WITNESS:  It would be purely a guess, but I

12  can tell you that it's substantial.

13  BY MS. ALBRECHT:

14     Q    And what is your basis for saying that they are

15  substantial?

16     A    Because we -- on an average day, we probably

17  deny, my estimation would be, two to three people during

18  the week per day on the range and probably a dozen a day

19  on the weekends.

20     Q    And what are the grounds for denial of a rental?

21     A    They don't meet the California legal requirement

22  of being over 21 -- or 21 or over.

23     Q    Does PWG keep track of how many people it has to

24  turn away who wish to rent a firearm but are not over 21?

25           MR. DILLON:  Calls for speculation.

```
1              THE WITNESS:  No, we don't.

2   BY MS. ALBRECHT:

3       Q    Do you know -- is staff at the range trained to

4   inquire as to whether individuals under the age of 21 who

5   seek to rent a firearm meet any of the statutory

6   exemptions?

7              MR. DILLON:  Compound, vague and ambiguous.

8              THE WITNESS:  We have a -- whenever we deny, we

9   try to educate people on the law and the reasoning behind

10  it, otherwise we end up being the bad guy.

11  BY MS. ALBRECHT:

12      Q    Right.

13             But does staff ask whether they, for example,

14  have a valid, unexpired hunting license?

15             MR. DILLON:  Asked and answered.

16             THE WITNESS:  We try to ascertain whether they

17  would legally be exempt because we know they are under

18  age.  So we would, you know, ask if they meet any of

19  these.  And, of course, the answer is no, and then we

20  educate them.

21  BY MS. ALBRECHT:

22      Q    Do you have any written instructions or policies

23  or procedures that instruct staff on how to handle

24  requests for rentals for individuals under the age of 21?

25             MR. DILLON:  Compound.
```

Exhibit 59
DX1225

```
 1            THE WITNESS:  I believe we have -- in our policy
 2   manual it's written that we don't rent to anyone under
 3   the age of 21 unless they meet the exemptions per the
 4   Penal Code.  As far as the day-to-day operations, we just
 5   keep a copy of the law at the counter -- of the Penal
 6   Code at the counter.
 7   BY MS. ALBRECHT:
 8       Q    You keep a copy of the Penal Code Section 27510
 9   at the counter?
10       A    Yes.
11       Q    You mentioned a policy manual.  Can you describe
12   what the policy manual generally covers?
13       A    It's an employee handbook/policy manual.  It
14   covers everything from how to clock in to how to close
15   the facility at night, everything in between.  It has
16   sections on how to sell a firearm, how to clean ranges,
17   how to clean the bathrooms, how to check a person into
18   the range.  It's a manual that's been built over ten
19   years.
20       Q    Have there been changes to the handbook over the
21   past five years?
22       A    Certainly.
23       Q    Do you know how many times it's changed over the
24   past five years?
25       A    Dozens.  We update that constantly based on
```

Exhibit 59
DX1226

```
 1    changes in our policy, whether it's for safety reasons,
 2    whether it's for efficiency reasons, or if the law
 3    changes, which in California the law changes quite often.
 4         Q    Do employees receive training on changes in the
 5    law?
 6         A    They do?
 7         Q    Who provides the training?
 8         A    The leads.  So on the range counter, if it's
 9    applicable to the range, it would be the range lead.  If
10    it's applicable to the retail sale of firearms, it would
11    be the retail lead.  If it's company-wide, it would be
12    the general manager or myself.
13         Q    And who trains the leads?
14         A    The general manager or myself.
15         Q    And who trains you?
16         A    My attorneys or myself --
17         Q    And how do you train them?
18         A    -- or the industry.  I'm a member of the
19    National Shooting Sports Foundation, and they, as well as
20    various other industry groups, update us constantly on
21    either new trends or new regulations or new laws.
22         Q    You mentioned you train yourself.  How do you
23    train yourself?
24         A    You read the law.
25         Q    Do you know what PWG's range revenues were for
```

THE SULLIVAN GROUP OF COURT REPORTERS

36

Exhibit 59
DX1227

1    2022?

2              MR. DILLON:  Asked and answered.

3              THE WITNESS:  Roughly 60 percent of the overall

4    revenue.

5    BY MS. ALBRECHT:

6        Q    So roughly 60 percent of 6.5 million?

7        A    Yes.

8        Q    How about for 2021?

9        A    We roughly -- every year we typically have

10   whether it's 50/50 week on the range or 50/40 range to

11   retail is kind of our retail model for all.  That's the

12   way the business was built.  The goal is to have 60

13   percent of revenue be range related.

14       Q    So would it be accurate to say that between 2014

15   and 2022, approximately 60 or 50 -- 50 or 60 percent of

16   PWG's overall revenues came from the shooting range

17   operations?

18       A    Yes.

19       Q    Was that also true for the year 2020?

20       A    I don't want to guess, but that's the model that

21   we strive for.

22       Q    I asked about 2020 specifically because, as you

23   know, the COVID pandemic affected business in general,

24   and so I'm trying to get a sense as to whether the

25   pandemic affected the shooting range business during

1    2020?

2        A    So now that you mention that, I forgot about

3    COVID.  Yes, our retail sales went up in 2020 because of,

4    not only COVID, but because of the BLM and protests and

5    people being locked up and being fearful.  So retail

6    outpaced the range because our ranges were also closed

7    for a period of time.  So that impacted our classes and

8    our training and our range revenue.

9            But I cannot, as I sit here, hazard a guess as

10   to what the numbers are.

11       Q    How long was the range closed for in 2020?

12       A    Roughly three to four months.

13       Q    And by approximately what percentage did the

14   retail revenue increase in 2020?

15       A    I don't want to guess.

16       Q    Approximately what percentage of PWG's range

17   revenue comes from firearm rentals?

18       A    As I sit here, I don't want to guess.  I don't

19   know.  I can certainly follow up with you on that.

20       Q    You stated earlier that approximately 80 percent

21   of visitors to the range bring their own firearms;

22   correct?

23       A    I did.

24       Q    Do you know if there has been a change in PWG's

25   revenue from rentals over the past five years?

Exhibit 59
DX1229

```
 1              MR. DILLON:  Objection; vague and ambiguous,
 2    calls for speculation, and compound.
 3              THE WITNESS:  I do know that we saw a decrease
 4    in rentals initially when the 21 rule went into effect.
 5    BY MS. ALBRECHT:
 6         Q    When you say initially, are you referring to the
 7    year 2019?
 8         A    Yes.
 9         Q    And how much of a decrease in rental revenue did
10    you see?
11         A    I don't have a specific number.  Just the
12    volume, I remember us discussing it and acknowledging it,
13    that it was lower.
14         Q    But the decrease in rental revenue was seasonal
15    in the year 2019?
16         A    We have no way to -- versus 2018, it's never
17    been as -- well, I don't want to guess.  I have no way to
18    measure that after the initial law went into effect.
19         Q    You have no way of measuring the impact on
20    revenue from rentals?
21              MR. DILLON:  Objection; misstates his testimony.
22              THE WITNESS:  I know that the rental -- I know
23    that rental volume went down after the law went into
24    effect.  I have no way of measuring whether it continued
25    to go down versus the demand wanting to go up.  That's --
```

THE SULLIVAN GROUP OF COURT REPORTERS

39

Exhibit 59
DX1230

```
 1    I don't have that crystal ball.

 2    BY MS. ALBRECHT:

 3        Q     But is there a way for you, not here today, but

 4    if you went back and looked at your records, would you be

 5    able to determine what number or percentage of revenues

 6    comes from firearms rentals?

 7        A     I would be able to do that, yes.

 8        Q     And how would you do that?

 9        A     Consult my point-of-sale system and run reports

10    respectively.

11        Q     But that is not something you've done to date?

12        A     No.

13        Q     So what is the basis for your understanding that

14    there was a drop in the volume of firearms rentals

15    initially after Penal Code Section 27510 went into

16    effect?

17        A     Day-to-day operations.  We know, you know,

18    typically how empty the rental counter is of all the

19    firearms out there on display, how they are always gone,

20    they are all being rented.  And after the law, they

21    were -- the cabinet was pretty much always full.  And we

22    started having discussions, and it was noted, yes, it

23    slowed down considerably.

24        Q     I asked you earlier if you knew what percentage

25    of firearm rentals were to individuals under the age of
```

Exhibit 59

DX1231

```
 1    21 prior to Section 27510 going into effect, do you

 2    recall that?

 3         A    Yes.

 4         Q    And you were not able to provide an estimate of

 5    that number; correct?

 6         A    Correct.

 7         Q    Yet you attribute the drop in firearm rentals in

 8    2019 to Section 27510 going into effect?

 9         A    Yes.

10         Q    Are there other reasons that there could have

11    been a drop in firearm rentals?

12              MR. DILLON:  Objection; argumentative.

13              THE WITNESS:  Not that I'm aware of.

14    BY MS. ALBRECHT:

15         Q    Is it possible that more visitors brought their

16    own firearms and, therefore, did not require renting a

17    firearm?

18              MR. DILLON:  Objection; argumentative, calls for

19    speculation, incomplete hypothetical.

20              THE WITNESS:  I would have no way of knowing

21    that.  I do know that we were rejecting people constantly

22    who wanted to rent firearms that were under age, or under

23    the new age.

24    BY MS. ALBRECHT:

25         Q    Did you personally reject any visitors who
```

```
 1    wanted to rent a firearm because they were under 21?
 2        A    Certainly.
 3        Q    Let's talk about the retail operations a little
 4    bit.  Can you just describe for me what the retail
 5    operations entail?
 6        A    Typical gun store.  You have retail counters
 7    full of handguns under protective glass.  Behind the
 8    counter you have long guns on the wall, ammunition behind
 9    the counter.  And you have associates back there to
10    answer questions of people wanting to research and look
11    at firearms for possible purchase.
12        Q    What types of firearms do you sell?
13        A    We sell handguns, we sell shotguns, we sell
14    modern sporting rifles, lever actions, revolver, I mean,
15    you name it.  If it's legal in California or if it's an
16    off-roster we sell to law enforcement, we sell it.
17             PWG is also an assault weapons dealer, legal
18    like California, so we sell to law enforcement assault
19    weapons.  So we maintain those as well.
20        Q    If someone wants to purchase a firearm, what's
21    the process?
22        A    It's a long one.  First they have to have their
23    firearm safety certificate.  And that's a test they have
24    to take if they don't have it.  It's every five years you
25    have to have it renewed.  It's a 30-question test.
```

THE SULLIVAN GROUP OF COURT REPORTERS

42

Exhibit 59

DX1233

1    There's a fee to have to pay, and then that has to be

2    administered, and they take that.

3           Once they have that, they have to obviously

4    choose a firearm.  Then they have to present us with ID

5    and documentation to prove residency.  And then they fill

6    out the 4473, which in turn we fill out the California

7    DROS.  And then we have to print all that out.  They have

8    to review it and make sure that everything on it is

9    correct.  We have to get copies of their proof of

10   residencies and IDs, then create a packet.

11          And then we sell the firearm to them obviously.

12   The transaction in the POS.  We take their money.  And

13   then the gun gets locked up in the back for a minimum of

14   10- to 24-hour periods before they can come back and do

15   the pickup process.

16      Q    Do you keep an electronic record of everything

17   that you've just described?

18      A    We do.

19      Q    And does --

20      A    Except --

21      Q    Go ahead.

22      A    We do except for the 4473, which is a physical

23   paper copy.

24      Q    Do you keep those physical paper copies of forms

25   4473 onsite?

Exhibit 59

DX1234

1       A    We're required to by law for 25 years.

2       Q    And for the electronic recordkeeping, what

3  system do you use?

4       A    Bizzflo.  The same one, the POS system.

5       Q    Does PWG use any other electronic systems for

6  any other purposes?

7            MR. DILLON:  Objection; vague and ambiguous and

8  compound.

9            THE WITNESS:  Yeah.  Can you delve into that a

10 little more?  I'm trying to understand what you're

11 looking for.

12 BY MS. ALBRECHT:

13      Q    Right.

14           So are there any other electronic systems that

15 PWG uses for, say, administrative purposes, Human

16 Resources purposes?  I'm just trying to get an overview

17 of the different systems there are.

18      A    Yes.  I pride myself on trying to be innovative

19 with technology, so we use a lot of technology.  So we

20 have ADP for our HR payroll for employees to check in for

21 their start and end of their shirt or their meal periods.

22           We use Dragonfly, which is a free wifi system,

23 that we track people who use our wifi around the

24 facility.  We use various marketing platforms to send our

25 marketing materials.  We use technology on our ranges so

Exhibit 59
DX1235

```
 1    that we can control the ranges via, you know, iPads and

 2    controllers for training.

 3              There's a number of different technology systems

 4    that we use.

 5       Q    What percentage of PWG's retail revenue comes

 6    from the sale of firearms?

 7       A    50 percent.  So to save you on the math, that

 8    would be 20 percent of our overall revenue.

 9       Q    Thank you.

10              And has that percentage been roughly the same

11    since PWG opened in 2024?

12       A    It started out higher when we first opened.  We

13    were a little bit heavier on, you know, firearms sales

14    because we've gotten bigger and have more membership,

15    more range utilization.  It's kind of settled out at that

16    20 percent outside of the year 2020 of COVID where we had

17    a spike in the firearm sales.

18       Q    Has there been a drop in sales of firearms in

19    the last five years?

20              MR. DILLON:  Objection, vague and ambiguous,

21    compound.

22              THE WITNESS:  The firearm sales changes based on

23    the political headwinds.  So they go up, they go down.

24    But, you know, as an average, we're kind of settling in

25    to where we are.
```

THE SULLIVAN GROUP OF COURT REPORTERS

45

Exhibit 59

DX1236

```
 1   BY MS. ALBRECHT:

 2       Q    Prior to 2019 when Penal Code Section 27510 went

 3   into effect, what percentage of firearm sales and

 4   transfers were to customers in the under 21 age group?

 5       A    I -- I don't know.

 6       Q    Is that information you would be able to

 7   retrieve from your POS system?

 8       A    It would be -- it would be a major task.  It

 9   would be easier for the DOJ to pull it because they have

10   every DROS.

11       Q    Has PWG been the subject of inspection or audit

12   by law enforcement in the last five years?

13       A    Yes.

14       Q    Approximately how many times over the past five

15   years?

16       A    Five years would get us back to 2018?

17       Q    Yes.  Let's say 2019.

18       A    Oh, since 2019?  I believe twice.

19       Q    And what was the context of those inspections or

20   audits?

21       A    California Department of Justice audit for us

22   being a firearms retailer in 2019.  And then we just had

23   a California Department of Justice assault weapons dealer

24   audit three weeks ago -- two weeks ago.  And we had no

25   violations.
```

```
 1        Q      As part of the DOJ audit in 2019, were you
 2    required to provide documents or information to DOJ?
 3        A      Yes.  They are entitled to review all copies of
 4    DROS's, the dealer record of sales, that are required to
 5    be kept on the property for I think five years, they
 6    usually go back a year, and make sure that we're doing
 7    our recordkeeping correctly.
 8        Q      And how did you go about providing the requested
 9    documentation to them?
10        A      I opened up the file cabinet.
11        Q      So you have a file cabinet that maintains these
12    records?
13        A      The paper copies of the DROS's, yes, and their
14    supportive materials for them.
15        Q      Is the file cabinet organized in any particular
16    manner?
17        A      Yes.  It's chronologically.
18        Q      Chronologically by year?
19        A      And purchase date.
20        Q      How many records would you estimate there are
21    for one year?
22        A      We sell typically 5 to 7 thousand firearms a
23    year.  So if you add in the sales, and then they need PPT
24    or private party transfers or any gifts or things like
25    that from, you know, family, transfers like that, it
```

```
 1    could go up if there.  But roughly 5 to 7 thousand.

 2        Q    Were you able to provide any documents to law

 3    enforcement as part of the recent assault weapons audit?

 4        A    They had access to review all of the documents

 5    for any transaction that happened involving assault

 6    weapons, the same DROS, as well as both inspections.

 7    They do a full inventory to match all the firearms on

 8    property to our Bound Book.

 9        Q    So did you provide them with records

10    specifically related to assault weapons transactions

11    only?

12        A    Yes.

13             MR. DILLON:  Vague and ambiguous.

14    BY MS. ALBRECHT:

15        Q    How did you go about doing that?

16        A    Same thing.  We have a file cabinet that keeps

17    those transactions chronologically by year and by

18    purchase date.

19        Q    Do you maintain records for assault weapons

20    transactions separate from other type of firearms

21    transactions?

22        A    Yes.

23        Q    Since Penal Code Section 27510 went into effect,

24    have you had to turn away any customers who wanted to

25    purchase a firearm?
```

Exhibit 59

DX1239

```
 1        A     Yes.

 2        Q     How many customers have you had to turn away?

 3              MR. DILLON:  Objection; calls for speculation.

 4              THE WITNESS:  My estimate would be one a day

 5    during the week and two to three every weekend day.

 6    BY MS. ALBRECHT:

 7        Q     And what is your estimate based on?

 8        A     Number of times that either I personally have to

 9    say no or my staff -- I witness my staff commenting on

10    that they had to deny somebody or educate somebody on the

11    law.

12        Q     Do you keep track of customers?

13              MR. DILLON:  Objection; vague and ambiguous.

14    BY MS. ALBRECHT:

15        Q     Strike that.

16              Do you keep a record of how many customers you

17    turn away as a result of Penal Code Section 27510?

18        A     We don't.

19        Q     You've been -- PWG has been a party to this

20    lawsuit since 2019; correct?

21        A     I believe so.

22        Q     Was it your decision for PWG to join the

23    lawsuit?

24        A     Yes.

25        Q     Is PWG's participation in this lawsuit something
```

Exhibit 59

DX1240

```
 1    that's important to you as the owner of PWG?

 2        A    Absolutely.

 3             MR. DILLON:  Objection; argumentative.

 4             THE WITNESS:  Absolutely.

 5    BY MS. ALBRECHT:

 6        Q    And yet it has not seemed important enough for

 7    you to keep a record of how many customers you have had

 8    to turn away as a result of Penal Code Section 27510

 9    going into effect?

10             MR. DILLON:  Argumentative.

11             THE WITNESS:  Turning away more than one person

12    is one too many.

13    BY MS. ALBRECHT:

14        Q    Since Penal Code Section 27510 went into effect,

15    how many firearm sales to individuals have you -- to

16    individuals under the age of 21 have you made who met the

17    statutory exemptions under Section 27510?

18             MR. DILLON:  Vague and ambiguous, compound.

19             THE WITNESS:  I wouldn't want to guess.  I have

20    no way of knowing as I sit here.

21    BY MS. ALBRECHT:

22        Q    Do you have any sense as to the financial impact

23    of Section 27510 going into effect on PWG's retail sales?

24             MR. DILLON:  Vague and ambiguous, compound.

25             THE WITNESS:  I'm turning away at least one
```

```
 1   person a day from buying a firearm, so 362 days a year
 2   we're open.  At least 362 firearms a year I could have
 3   sold.  And that's a very, very, very low number.
 4   BY MS. ALBRECHT:
 5       Q    Does PWG offer any training?
 6       A    We do.
 7       Q    What types of training?
 8       A    Roughly 80 percent of our training of all
 9   students that go through our training focus on
10   introductory classes such as we have a class called
11   Introduction to Handguns, or First Steps is what we call
12   it.  And there's one called Next Steps, which is
13   basically the follow-on class to Introduction to
14   Handguns.  And they're both three-hour classes that are
15   taken at separate times.
16       Q    And so these are group classes?
17       A    You can do group classes or you can pay for it
18   to be done privately with private instruction.
19       Q    Are there any other training classes that PWG
20   offers?
21       A    Yes.  We offer many more introductory classes on
22   long guns, shotguns.  We offer personal protection in the
23   home classes, personal defense, handgun defense, carving
24   classes, advanced through intermediate CCW class, so all
25   the way up to advanced firearm tactics training.
```

Exhibit 59
DX1242

1      Q    And how does someone sign up for a training

2   class?

3      A    They can do that either online at the website or

4   they can come into the facility and sign up in the

5   facility.

6      Q    And what information does someone need to

7   provide in order to sign up for a training class on the

8   website?

9      A    They need to create an account, so email, login

10  information, and their name obviously.  And then they

11  need to pay for the class to reserve their spot.

12          When they come into the facility, we will

13  then -- once again we take their ID.  That's held during

14  the period of the class.  And again we make sure that

15  they are legally allowed to be there based on citizenship

16  and nationality issues.  And that's really it while they

17  take the class.

18     Q    Are there any age requirements for individuals

19  to take a training class?

20     A    Well, based on California law, they have to be

21  21.

22     Q    Does that requirement also apply to someone who

23  does not intend to handle a firearm during training?

24          MR. DILLON:  Objection; calls for speculation,

25  incomplete hypothetical, vague and ambiguous.

```
 1          THE WITNESS:  We only have one class that would
 2  not involve the handling of a firearm, and that would be
 3  called Stop the Bleed where we teach people how to treat
 4  severe wounds.
 5  BY MS. ALBRECHT:
 6      Q    Are students able to bring their own firearms to
 7  training?
 8      A    Yes.
 9      Q    What percentage of students would you say
10  provide their own firearms during training?
11      A    I need you to be more specific.  Are we talking
12  at introductory, like beginning classes, or are we
13  talking advanced classes.
14      Q    I was referring to any class, but to the extent
15  there is a difference, please feel free to break that up.
16      A    Well, in our beginning classes many of the
17  times -- many times students don't have a firearm because
18  they want to take the class to learn about firearms in
19  order to make good, sound purchase decisions, to make
20  sure that they are prepared how to have an environment to
21  take it home to and be a safe environment; i.e., safes
22  and that kind of stuff, how to lock it up, and all the
23  legal requirements of owning a firearm.
24          So in our beginning classes, which is our First
25  Steps, I would say, and again this is an estimate, I
```

```
 1   would say 70 percent of people who come to our First

 2   Steps class do not have a firearm.  They do not own a

 3   firearm.  30 percent probably have a firearm that they

 4   bring to at least start out on.

 5       Q    And for the more advanced classes, what

 6   percentage of students bring there own firearms?

 7       A    95 percent.

 8       Q    And for students who bring their own firearms,

 9   do you have any minimum age requirements for someone who

10   brings their own firearm to a training class?

11       A    No.  As long as they are safe with that firearm

12   and able to manage that firearm, we don't have an age

13   requirement, no.

14       Q    So the age requirement under Section 27510 only

15   applies to individuals who seek to rent a firearm for

16   purposes of attending a training class?

17            MR. DILLON:  Calls for a legal conclusion.

18            THE WITNESS:  Our policy is that we cannot

19   transfer possession in any way, shape, or form of a

20   firearm to a person under the age of 21.  So whether they

21   want to use it for a class, whether they want to hold it,

22   whether they want to do anything, they cannot have access

23   to that firearm.

24   BY MS. ALBRECHT:

25       Q    How many students attend PWG's training classes
```

THE SULLIVAN GROUP OF COURT REPORTERS

54

Exhibit 59

DX1245

```
 1   per year?
 2           MR. DILLON:  Objection; compound.
 3           THE WITNESS:  Roughly 7,000 students a year.
 4   BY MS. ALBRECHT:
 5      Q    Has that number fluctuated significantly since
 6   between 2014 and present?
 7           MR. DILLON:  Vague and ambiguous.
 8           THE WITNESS:  During COVID obviously it went
 9   down exponentially because we couldn't hold classes, and
10   then we had to have such small class sizes when we
11   started back up.  But, again, it's grown.  Obviously when
12   we first opened, it was a much smaller number, and it's
13   grown to where we are today.
14   BY MS. ALBRECHT:
15      Q    And do you have a sense as to what percentage of
16   those roughly 7,000 students per year are under the age
17   of 21?
18           MR. DILLON:  Calls for speculation.
19           THE WITNESS:  Virtually none now since 2019.
20   BY MS. ALBRECHT:
21      Q    Do you know what that number was prior to 2019?
22           MR. DILLON:  Calls for speculation.
23           THE WITNESS:  Only based on my experience.  I
24   wouldn't have the ability to go back and get you an
25   actual count.  But as an instructor, I had a lot -- I
```

THE SULLIVAN GROUP OF COURT REPORTERS

55

Exhibit 59

DX1246

```
1    don't like the word a lot.  I had -- it was often in

2    classes that we would have kids take classes with their

3    parents.  So I would say almost every class had at least

4    someone under the age 21 prior to the law going into

5    effect.

6    BY MS. ALBRECHT:

7        Q    And after the law went into effect, did you

8    continue to have classes that were attended by

9    individuals under the age of 21?

10       A    Not that I can recall.

11            MR. DILLON:  Vague and ambiguous.

12   BY MS. ALBRECHT:

13       Q    You have no recollection of someone under the

14   age of 21 attending class with their own firearm?

15            MR. DILLON:  Asked and answered.

16            THE WITNESS:  I do know that there has been, on

17   rare occasion, if they own their own firearm and they

18   want to bring their teenage son or daughter in, I haven't

19   personally taught those classes, but I've heard that

20   there are a couple rare occasions that that has happened.

21   But it's incredibly rare.

22   BY MS. ALBRECHT:

23       Q    Do you have a sense as to how many students

24   under the age of 21 you've lost since Section 27510 went

25   into effect?
```

```
 1              MR. DILLON:  Objection; speculation.
 2              THE WITNESS:  I would have no way of knowing
 3    that.  I know we turn away a lot of people inquiring
 4    about our classes and getting training for their kids or
 5    the family.
 6    BY MS. ALBRECHT:
 7        Q    But you don't keep a record of students you've
 8    had to turn away?
 9              MR. DILLON:  Asked and answered.
10              THE WITNESS:  It would be impossible to keep
11    that record.
12    BY MS. ALBRECHT:
13        Q    Why would it be impossible?
14              MR. DILLON:  Argumentative.
15              THE WITNESS:  Because every phone call that
16    comes in during the course of a busy day, who they talk
17    to, all the different touch points that you have with
18    customers, people asking in passing, "Can my kid take a
19    class?" and, I mean, you wouldn't be able to compile that
20    information logically.
21    BY MS. ALBRECHT:
22        Q    Would it not be possible to say, in the most
23    simplest terms, keeping, you know, a sheet of paper on a
24    clipboard by the counter where staff can put a checkmark
25    every time they have told someone that someone under the
```

Exhibit 59
DX1248

1    age of 21 cannot attend a training class?

2            MR. DILLON:  Objection; argumentative, vague and

3    ambiguous, asked and answered, and incomplete

4    hypothetical.

5            THE WITNESS:  We have roughly 200,000 people

6    come into our facility a year.  We have 80,000 people

7    shoot on our range.  We have a lot of activity going on.

8    And I would not have my staff racing across the room to

9    check a piece of paper after they talk to somebody in the

10   classroom, and they have to have that pipe of paper at

11   retail.  It just isn't feasible.

12   BY MS. ALBRECHT:

13       Q    What percentage of PWG's overall revenue comes

14   from its training operations?

15       A    As I sit here, I don't have that.  It's a decent

16   chunk of our range revenue.

17       Q    I see.  Training revenue is encompassed in range

18   revenue?

19       A    Yes.  To be clear, my range revenue consists of

20   people going on the range, firearm rentals, memberships,

21   training.

22       Q    Thank you for that.

23            And what does your retail revenue consistent of

24   just to make sure we're clear?

25       A    Sure.  That would consistent of firearm sales

```
1    and any ammunition sales and any accessory sales.  So
2    basically retail product, not services.
3        Q    And does PWG track its sales from training
4    courses in Bizzflo?
5        A    We do.
6        Q    And what information do you keep track of in
7    Bizzflo related to training customers or students?
8        A    Obviously the customer or the student, you know,
9    their demographic information, meaning their name, email,
10   date they took the class, what class they took, and I
11   believe it goes down to the, you know, the session, which
12   session it was.  It was an a.m. session or a p.m.
13   session.
14       Q    Does it keep track of their age?
15       A    If a customer, when they set up their customer
16   profile, if they choose to enter their date of birth,
17   then we would have their age.  But the majority of our
18   customers don't like to put a bunch of personal
19   information in a customer profile.  So it typically is
20   their name, email, first and last name, and a phone
21   number.  That's pretty much what we get out of those
22   people.
23       Q    I believe you stated PWG has approximately 7,000
24   students per year; is that correct?
25       A    Yes.
```

Exhibit 59
DX1250

1        Q    Does that mean PWG sells approximately 7,000

2    training courses per year or is that number higher?

3        A    Well, that would be 7,000 students.  You could

4    put up to 18 students in a class.  So I don't know what

5    you're -- I mean, we also have private lessons.  So I

6    don't really know what you're asking, number of sessions,

7    training sessions, or students?

8    BY MS. ALBRECHT:

9        Q    I'm asking about the number of training sessions

10   per year.

11       A    Yeah.  I wouldn't know those off the top of my

12   head.

13       Q    So we've been going for over an hour and a half

14   now.  I think it might be a good time for a break since

15   it's close to lunch hour.  Why don't we do a 30-minute

16   break and come back?  Well, why don't we come back at

17   12:15 if that works for everyone?

18            MR. DILLON:  That's fine.

19            THE WITNESS:  Perfect.

20            MS. ALBRECHT:  Thank you.

21            (At the hour of 11:41 a.m., a luncheon

22            recess was taken, the deposition to be

23            resumed at 12:15 p.m.)

24                         -000-

25   ///

```
 1            ALL PARTES APPEARING REMOTELY VIA ZOOM WEBCAM

 2                    WEDNESDAY, AUGUST 16, 2023

 3                         12:17 P.M.

 4                            ***

 5                    JOHN PHILLIPS, PMK,

 6            having been previously administered an

 7            oath remotely in accordance with CCP 2094,

 8            was examined and testified as follows:

 9                            ***

10                    EXAMINATION (Resumed)

11   BY MS. ALBRECHT:

12       Q    Mr. Phillips, as part of this litigation, PWG

13   was asked to respond to various discovery requests; is

14   that correct?

15       A    Yes.

16       Q    And were you involved in responding to those

17   requests on behalf of PWG?

18       A    I was.

19       Q    I am going to share with you a document that I

20   am marking as Exhibit 3.  Mr. Phillips, do you see the

21   document titled Defendants' First Set of Requests for

22   Production to Plaintiff Poway Weapons and Gear?

23       A    Yes.

24            (Exhibit Number 3 was marked

25            for identification.)
```

Exhibit 59
DX1252

```
 1    BY MS. ALBRECHT:

 2         Q    Are you familiar with this document?

 3         A    Yes.

 4         Q    Have you review it in full?

 5         A    Yes.

 6         Q    If you look here on page 2 of Exhibit 3, there's

 7    a section titled Definitions.  Did you review that

 8    section as well?

 9         A    Yes.

10         Q    And under that section, number 6 provides the

11    definition for communication and communications, do you

12    see that?

13         A    Yes.

14         Q    Would you mind reading the definition for the

15    record?

16         A    The communication?

17         Q    Yes, please.

18         A    "Communication and communicaions mean any

19              transfer of information of any nature

20              whatsoever, whether by oral, written,

21              electronic, or other means, including but not

22              limited to including made, or direct messages

23              sent on, messaging applications or social media

24              sites or other applications."

25         Q    As part of responding to these requests for
```

THE SULLIVAN GROUP OF COURT REPORTERS

62

Exhibit 59

DX1253

1    production of documents, did you conduct searches for

2    communications as described in the definition of

3    communications in paragraph 6?

4        A    Yes.

5        Q    Did you search for emails that would be

6    responsive to the requests?

7        A    Yes.

8        Q    What other devices or applications or systems

9    did you search to identify responsive documents?

10            MR. DILLON:  Compound.

11            THE WITNESS:  I believe that's all that I

12   focused on.

13   BY MS. ALBRECHT:

14       Q    All that you focused on is emails?

15       A    And social media.

16       Q    Did you search any hard copy files that might be

17   responsive to the requests?

18       A    I searched wherever I could think that there

19   might be anything that would match what your request was.

20       Q    I'm now sharing with you what I am marking as

21   Exhibit 6, a document titled Plaintiff Poway Weapon and

22   Gear's Response to Defendants' First Set of Requests for

23   Production of Documents.

24            Have you seen this document before?

25       A    I believe so, yes.

```
 1              (Exhibit Number 6 was marked
 2              for identification.)
 3   BY MS. ALBRECHT:
 4        Q     Did you help prepare this document?
 5        A     Yes.
 6        Q     And did you verify that the responses contained
 7   herein in Exhibit 6 are correct?
 8        A     Yes.
 9        Q     Did you verify that the responses are complete?
10        A     To the best of my ability, yes.
11        Q     And did PWG produce documents responsive to the
12   requests to your knowledge?
13        A     Yes.
14        Q     Do you know what those documents are?
15        A     I believe they are all of our various marketing,
16   online, fliers, everything that we had that was relevant.
17        Q     Were you the only person for PWG responsible for
18   identifying responsive documents?
19        A     Yes.
20        Q     And to your knowledge, are the documents that
21   PWG produced the documents that you identified?
22        A     Yes.
23        Q     Are there any categories of documents requested
24   that you were not able to find?
25              MR. DILLON:  Objection; vague and ambiguous,
```

```
 1   compound.
 2           THE WITNESS:  Not that I can recall as I sit
 3   here.
 4   BY MS. ALBRECHT:
 5       Q    Are there any categories of documents that were
 6   requested that you were able to find but did not produce?
 7       A    No.
 8       Q    Are there any categories of documents requested
 9   that you did not try to find at all?
10       A    No.
11       Q    And you stated earlier that you searched emails
12   for responsive documents; correct?
13       A    Email blasts, yes.
14       Q    Can you explain that a bit further?  What do you
15   mean by email blasts?
16       A    Anything that went out in the way of marketing
17   materials was searched.
18       Q    Did you search emails among you or other PWG
19   staff or other people to whose email you have access for
20   responsive documents other than the email blasts?
21           MR. DILLON:  Objection; vague and ambiguous,
22   compound.
23           THE WITNESS:  I don't believe I did an email
24   search on other employees because they wouldn't be
25   relevant or they wouldn't have gone through me.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1256

```
 1    BY MS. ALBRECHT:

 2        Q     Do you have an email account?

 3        A     I do.

 4        Q     Do you have a PWG email account?

 5        A     I do.

 6        Q     Did you search your own PWG email account for

 7    communications that would be responsive to the document

 8    requests such as communications related to the impact of

 9    Section 27510 on PWG's business?

10        A     I did.

11        Q     Did you find any documents that were responsive?

12        A     No.

13        Q     Did you search your text messages for any

14    responsive documents?

15        A     I searched Teams, which is what we use to text.

16    And I did search that.

17        Q     When you say that we use to text, who is we?

18        A     For inside PWG for employees.

19        Q     Do you use any other text messaging platforms

20    such as do you have an iPhone, iMessage?

21        A     Not for --

22              MR. DILLON:  Vague and ambiguous.

23              THE WITNESS:  I'm sorry.  Not for work related

24    things.  Everything goes through Teams.

25    ///
```

```
 1   BY MS. ALBRECHT:

 2       Q    So you don't use any other messaging platforms

 3   for PWG-related communications?

 4            MR. DILLON:  Asked and answered.

 5            THE WITNESS:  Microsoft Teams.

 6   BY MS. ALBRECHT:

 7       Q    Do PWG employees other than yourself have a PWG

 8   email account?

 9       A    Yes.  Every employee.

10       Q    Did you search the other employees' PWG email

11   accounts for responsive documents?

12       A    No.

13       Q    Why is that?

14       A    Nothing that my employees would talk about, if

15   anything at all, would be authorized to represent PWG in

16   any way.

17       Q    Do PWG employees use PWG's email to communicate

18   among each other?

19       A    No.  We use -- or they shouldn't.  We use Teams.

20       Q    Have you checked to ensure that they haven't

21   used email to communicate with each other?

22       A    No.

23            MR. DILLON:  Objection.  Speculation,

24   argumentative.

25   ///
```

Exhibit 59
DX1258

```
 1   BY MS. ALBRECHT:

 2      Q    Is it possible that employees used email among

 3   each other to, say, complain about the fact that they had

 4   to turn away someone under the age of 21 who wanted to

 5   rent a firearm?

 6           MR. DILLON:  Objection; incomplete hypothetical,

 7   speculation, argumentative.

 8           THE WITNESS:  I suppose it is possible.

 9   BY MS. ALBRECHT:

10      Q    Do you agree that such communication would be

11   responsive to the requests in Exhibit 3 that we looked

12   at?

13           MR. DILLON:  Objection; argumentative, legal

14   conclusion.

15           THE WITNESS:  I felt that I was supposed to

16   respond with documents that were from PWG and authorized

17   by PWG and reflecting PWG, not the opinion of my

18   employees, so I did not check.

19   BY MS. ALBRECHT:

20      Q    And what is that understanding based on?

21           MR. DILLON:  Objection; vague and ambiguous,

22   compound, speculation.

23           THE WITNESS:  How I read the document.  I'm not

24   a lawyer.

25   ///
```

```
 1   BY MS. ALBRECHT:
 2      Q    Did you consult with your lawyer as to what you
 3   were required to do to identify responsive documents?
 4           MR. DILLON:  Just a warning, you're not to be
 5   questioned regarding privileged information or
 6   attorney-client privilege.  You can answer if you
 7   consulted with me.
 8           THE WITNESS:  I consulted.
 9           While you're looking, I'm going to hit a button
10   right over here to turn this fan down.  It's blowing on
11   me?
12   BY MS. ALBRECHT:
13      Q    No problem.
14           I am now going to share with you a document that
15   I am marking as Exhibit 8.  Do you see the document,
16   Mr. Phillips?
17      A    I do.
18           (Exhibit Number 8 was marked
19           for identification.)
20   BY MS. ALBRECHT:
21      Q    Do you see that on the right-hand side it has --
22   well, it's upside down, it has the letters PWG and the
23   number 0008?
24      A    I do.
25      Q    Have you seen this document before?
```

Exhibit 59
DX1260

1    A    I have.

2    Q    What is it?

3    A    It's a breakdown that we did in I guess 2020,

4    it's been a while, as to some of the statistics related

5    to this case.

6    Q    This document was produced in response to the

7    requests for documents; correct?

8    A    Yes.

9    Q    How did -- did you personally prepare this

10    document?

11    A    Yes.

12    Q    How did you go about preparing it?

13    A    Pulling data from, at the time, Axis, which was

14    our old POS system, and creating this.

15    Q    And this is something that you prepared

16    specifically for the purposes of this case?

17    A    I created this to help my attorney understand

18    some of the impact that we were seeing based on the law

19    change.

20    Q    There are four columns with the numbers 2017,

21    2018, 2019, 2020, and an additional column titled

22    % Change next to them, do you see that?

23    A    I do.

24    Q    Does 2017, 2018, 2019, 2020 refer to the years

25    2017 through 2020?

1    A    It does.

2    Q    And so the first row titled Students Under 21,

3 it shows the number 33 in column 2017.  What does that

4 represent?

5    A    That there were 33 students in the beginning

6 class, the beginner classes, that took that beginner

7 First Steps class.

8    Q    So that number is limited specifically to the

9 beginner First Steps class?

10    A    Yes.

11    Q    And why did you focus in on that beginners First

12 Steps class specifically?

13    A    That typically would be a class where people

14 would not have a firearm and need access to a firearm in

15 order to get the firearm safety training that they

16 deserve?

17    Q    And this is the class where roughly 30 percent

18 of students would not have their own firearm as we

19 discussed earlier?

20    A    Where 70 percent of students would not have

21 their own firearm.

22    Q    Thank you for that correction.

23         So am I reading this Exhibit 8 correctly to say

24 that in the year 2017, 33 students under the age of 21

25 enrolled in the beginner First Steps class?

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1262

```
 1      A     To the extent that we could identify, yes.  As I

 2  said, some of our customer records do not have birth

 3  dates in the customer profile.  So these are what we were

 4  able to identify.

 5      Q     Do you know what percentage of your students

 6  included their birth date in their profile?

 7      A     I don't.

 8      Q     Are you able to tell me whether it was most of

 9  them, half of them, just less than half of them?

10          MR. DILLON:  Asked and answered.

11          THE WITNESS:  Yeah.  I wouldn't want to guess.

12  BY MS. ALBRECHT:

13      Q     But you went through the records yourself in

14  Axis?

15      A     I did.

16      Q     So you saw personally where birth dates were

17  missing and where they weren't?

18      A     Yes.

19      Q     Okay.  So I think you're able to give me your

20  best estimate as to whether it was most of the students

21  that provided their birth dates or most of them did not

22  provide their birth dates?

23      A     I --

24          MR. DILLON:  Argumentative, vague and ambiguous,

25  speculation.
```

Exhibit 59
DX1263

```
 1              THE WITNESS:  This was three-plus years ago.  I
 2    just -- I wouldn't want to guess.  I could certainly go
 3    back and dig again and look and follow up with you.
 4    BY MS. ALBRECHT:
 5        Q    So going back to this Exhibit 8, so am I reading
 6    it correctly that in the year 2018, there were 36
 7    students under the age of 21 who enrolled in the beginner
 8    First Steps class for those students who provided a date
 9    of birth?
10        A    Yes.
11        Q    And there were 6 in 2019?
12        A    Yes.
13        Q    And 2 in 2020?
14        A    Yes.
15        Q    The next row has a title of DROS Transactions.
16    What does that cover?
17        A    That would be the dealer record of sales
18    transactions to people under 21.
19        Q    And for the dealer record of sales transactions,
20    did you have birth dates for all transactions?
21        A    Yes.  That's all in the DROS.
22        Q    So there were 26 transactions to individuals
23    under the age of 21 in 2017, 26 in 2018, 8 in 2019, and
24    1 in 2020?
25        A    Yes.
```

1    Q    So moving on to the next row, Rentals to Under

2    21, what does that include?

3    A    That would be firearm rentals to someone under

4    21.

5    Q    Firearm rentals to those under 21 who needed a

6    rental to shoot at the range and to attend a training

7    class or --

8    A    It doesn't --

9         MR. DILLON:  Objection; speculation, compound.

10        THE WITNESS:  I wouldn't know.  I wouldn't be

11   able to differentiate whether they needed it for a class

12   or they were just renting it to use on the range.

13   BY MS. ALBRECHT:

14   Q    So am I reading this correctly to say, then, in

15   2017 there were 294 firearm rentals to individuals under

16   the age of 21, 389 in 2018, 70 in 2019, and 7 in 2020?

17   A    Yes.

18   Q    Moving on to the next row, Firearms to Under 21,

19   what do those numbers represent?

20   A    That would be firearms sold to individuals under

21   the age of 21.

22   Q    So there were 11 such transactions in 2017, 15

23   in 2018, 4 in 2019, and 1 in 2020?

24   A    Yes.

25   Q    And the next row, Members Under 21, what is

```
 1    that?  What do those numbers represent?
 2        A    People who had memberships that were under the
 3    age of 21.
 4        Q    Do all members provide their date of birth?
 5        A    I would need to go back to verify that.  I can't
 6    recall if our membership signup requires a date of birth.
 7        Q    So you don't know if there are members under the
 8    age of 21 for the years listed here that were not
 9    captured in this document?
10        A    I would need to review that.  I don't want to
11    say yes or no until I review it.
12        Q    And the next row, Range Use (Sessions), what do
13    those numbers represent?
14        A    The number of people who came onto our -- paid
15    for a range session -- we charge by the hour -- that had
16    a range session that were under the age of 21.
17        Q    Is this limited to members --
18        A    No.
19        Q    -- or non-members or does it include both?
20        A    All range sessions.
21             MR. DILLON:  Compound.
22    BY MS. ALBRECHT:
23        Q    All range sessions.
24             And do all individuals who purchase range
25    sessions provide their date of birth?
```

```
 1        A    No.

 2        Q    So there may be -- I'm sorry.  Range Use

 3   (sessions), is this limited by age at all?

 4             MR. DILLON:  Objection; vague, ambiguous.

 5             THE WITNESS:  Where we could identify the age in

 6   the data we pulled, we reflected it herein.  We

 7   obviously -- when we take people's ID, we would be able

 8   to see their age.  But prior to 2020, that wasn't a

 9   concern.

10   BY MS. ALBRECHT:

11        Q    So the row titled Range Use (sessions), are

12   those numbers supposed to represent all range sessions

13   that PWG sold in those years?

14        A    To people that we were able to identify -- I'm

15   sorry -- that we were able to identify who were under 21.

16        Q    Okay.

17             And just to confirm, there may be additional

18   range sessions sold to individuals under the age of 21

19   that are not included in the numbers listed here;

20   correct?

21             MR. DILLON:  Objection; compound, vague and

22   ambiguous, and argumentative.

23             THE WITNESS:  It is possible.

24   BY MS. ALBRECHT:

25        Q    The numbers reflected in this Exhibit 8 only go
```

Exhibit 59
DX1267

1    up to the year 2020; correct?

2        A    Yes.

3        Q    Have you run the same numbers for the years '21,

4    '22, or year-to-date '23?

5        A    No.

6        Q    Why is that?

7        A    This was a pretty big task in itself, and I just

8    haven't had the bandwidth or the personnel to do it

9    again.

10        Q    How long did it take you to prepare this

11    document?

12        A    I remember it being done over the course of a

13    couple of weeks on and off with various people helping

14    pull the data so that I could go through it.  But I

15    don't -- call it a couple weeks.

16        Q    But on and off over the course of a couple

17    weeks?

18        A    Yes.

19        Q    So over the course of two weeks, would you say

20    you spent an hour a day?  Two hours a day?  Half the day?

21    Most of the day?

22        A    There were some days I spent most of the day and

23    some days I spent a few hours.  It was a pretty arduous

24    task.

25        Q    And who assisted you in preparing this document?

```
 1      A    I had my general manager help pull the data and
 2  email it to me, and then I pretty much was the one wading
 3  through it.
 4      Q    Did you seek assistance from Axis in pulling the
 5  data?
 6      A    No.
 7      Q    Does your current system, Bizzflo, allow you to
 8  pull the same data for years 2021-2022 if you wanted to?
 9          MR. DILLON:  Objection; argumentative.
10          THE WITNESS:  I believe I could.  It's just a
11  matter of how to extrapolate the data in a fashion that
12  would get us to this end result.
13  BY MS. ALBRECHT:
14      Q    I'm now going to show you a document marked as
15  Exhibit 7.  The document is titled Plaintiff Poway Weapon
16  and Gear's Supplemental Response to the Defendants' First
17  Set of Requests for Production of Documents.
18          Do you see this document?
19      A    I do.
20          (Exhibit Number 7 was marked
21          for identification.)
22  BY MS. ALBRECHT:
23      Q    Are you familiar with it?
24      A    I am.
25      Q    Did you help prepare the document?
```

1    A    I consulted with my attorney who worked on the

2  document.

3    Q    I'm going to scroll down to the very last page

4  of the document at page 36.  Do you see a date there?

5    A    I do.

6    Q    What's the date?

7    A    July 26th, 2023.

8    Q    So this is a recently created document; correct?

9    A    Yes.

10    Q    Does that refresh your recollection as to your

11  involvement in preparing this document?

12        MR. DILLON:  Objection; asked and answered.

13        THE WITNESS:  Again, I consulted with my

14  attorney who put this together.

15  BY MS. ALBRECHT:

16    Q    Did you draft any of the responses?

17    A    No.

18    Q    I am going to show you just some of the

19  responses and represent to you that most of the responses

20  contain the same statements.  And you are welcome to

21  scroll or have me scroll for you through the entire

22  document if you would like to see for yourself.

23    A    I'll take you at your word.

24    Q    But in the response to request for production

25  number 32, for example, the two -- actually, that is not

```
 1    a good example because that does not include the response
 2    to which I was referring to.  So it is not all the
 3    responses that contain the same two sentences, but most
 4    of them do.
 5              So if you look at the response to Request for
 6    Production Number 28, for example, the last two sentences
 7    of the response say,
 8              "Additionally, Responding Party has already
 9              produced responsive documents.  After searching
10              through its records, Responding Party has no
11              other additional documents responsive to this
12              request."
13              So in preparing these responses, did you conduct
14    additional searches for responsive documents?
15        A    I did.
16        Q    And what searches did you perform?
17        A    Much the same I did the first go-around, looking
18    through any email, my emails, on Teams, and anything
19    related to communications out through the marketing
20    department.
21        Q    And are you aware that the documents that PWG
22    did produce were produced in 2021?
23        A    I don't know the exact date.  I knew it was in
24    '20 or '21.  I didn't know the exact date.
25        Q    I will represent to you that they were produced
```

1    in 2021.

2         A    Okay.

3         Q    So as you sit here today, is it your testimony

4    that between 2021 and 2023, there have been no additional

5    new documents that would be responsive to any of the

6    document requests?

7         A    To the best of my recollection, that would be

8    correct.

9         Q    PWG has not created any new training classes,

10   for example, over the last two years?

11        A    No.

12        Q    The document, the summary document that we just

13   looked at a minute ago in Exhibit 8, you did not update

14   that document in connection with supplementing PWG's

15   responses to the document requests; correct?

16        A    I believe that's correct, yes.

17        Q    Would you agree that the document should have

18   been updated?

19             MR. DILLON:  Objection; argumentative, legal

20   conclusion, speculation.

21             THE WITNESS:  I'm gonna -- based on

22   conversations with my attorney, I thought we had done

23   what we needed to do.

24   BY MS. ALBRECHT:

25        Q    The document in Exhibit 8 only goes through year

```
 1    2020; correct?

 2        A    Yes.

 3        Q    And so in 2023 you didn't think it would be

 4    necessary to update that same document with numbers

 5    through 2022 at least?

 6            MR. DILLON:  Objection; argumentative, compound,

 7    vague and ambiguous, legal conclusion.

 8            THE WITNESS:  I thought that there was no need

 9    as the first document painted a pretty accurate picture

10    of what the current standard is.

11    BY MS. ALBRECHT:

12        Q    I am now going to share with you a document

13    marked as Exhibit 4 which is titled Defendants' First Set

14    of Requests for Admissions to Plaintiff Poway Weapons and

15    Gear.

16            Do you see that document?

17        A    I do.

18            (Exhibit Number 4 was marked

19            for identification.)

20    BY MS. ALBRECHT:

21        Q    Are you familiar with the document?

22        A    I am.

23        Q    Have you reviewed the document in full?

24        A    I have.

25        Q    I am now going to share with you a document
```

Exhibit 59
DX1273

```
 1   marked as Exhibit 9, which is a document titled Plaintiff
 2   Poway Weapons and Gear's Response to Defendants' First
 3   Set of Requests for Admissions.
 4           Do you see that document?
 5       A   I do.
 6           (Exhibit Number 9 was marked
 7           for identification.)
 8   BY MS. ALBRECHT:
 9       Q   Were you involved in the preparation of this
10   document?
11       A   I consulted with my attorney who then prepared
12   this.
13       Q   Did anyone else from PWG assist in preparing
14   this document?
15       A   No.
16       Q   And as you sit here today, do you verify that
17   the responses in Exhibit 9 are correct?
18       A   I do.
19       Q   Do you verify that the responses in Exhibit 9
20   are complete?
21       A   To the best of our ability, yes.
22       Q   I am now going to share with you what I am
23   marking as Exhibit 10, which is a document titled
24   Plaintiff Poway Weapons and Gear's Supplemental Response
25   to Defendants' First Set of Requests for Admissions.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1274

```
 1              Do you see that document?

 2      A     I do.

 3              (Exhibit Number 10 was marked

 4              for identification.)

 5   BY MS. ALBRECHT:

 6      Q     Do you recognize the document?

 7      A     I do.

 8      Q     Did you help prepare the document?

 9      A     I consulted with my attorney who then generated

10   the document.

11      Q     Did anyone else at PWG help prepare it?

12      A     No.

13      Q     And what did you do to supplement PWG's

14   responses to the Requests for Admissions?

15      A     I'm sorry?

16              MR. DILLON:  You are not to speak to any

17   privileged communications between you and myself.

18              THE WITNESS:  I'm trying to -- can you restate,

19   like, your question?

20   BY MS. ALBRECHT:

21      Q     Sure.

22              You see the title of the document is --

23      A     Yes.

24      Q     -- Supplemental Response; correct?

25      A     Correct.
```

1    Q    And if we scroll down to the last page of the

2    document, you will see that the date of the document is

3    July 25th, 2023; correct?

4    A    Yes.

5    Q    Do you understand this document to supplement

6    the responses that we looked at previously in Exhibit 9?

7    A    Yes.

8    Q    So I'm just asking what did you do to assist

9    your attorney in supplementing the responses?  And I'm

10   not asking about any conversations that you had with your

11   attorney or any instructions he gave you.  But to the

12   extent you took certain steps to ensure that the

13   responses were appropriately supplemented, I would like

14   to know what those steps were.

15        MR. DILLON:  Vague and ambiguous, compound.

16        THE WITNESS:  Based on the various conversations

17   and me reviewing the various documents, this was

18   generated as our response.

19   BY MS. ALBRECHT:

20   Q    I am now going to show you what's been marked as

21   Exhibit 5, which is a document titled Defendants' First

22   Set of Interrogatories to Plaintiff Poway Weapons and

23   Gear.

24        Do you see the document?

25   A    I do.

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1276

```
 1              (Exhibit Number 5 was marked

 2              for identification.)

 3   BY MS. ALBRECHT:

 4       Q     Have you seen it before today?

 5       A     I have.

 6       Q     Did you review the document in its entirety?

 7       A     I did.

 8       Q     Did you assist in preparing answers to these

 9   interrogatories?

10       A     Yes.

11       Q     I am now sharing with you what's been marked as

12   Exhibit 11, which is Plaintiff Poway Weapons and Gear's

13   Response to Defendants' First Set of Interrogatories.

14              Do you see the document?

15       A     I do.

16              (Exhibit Number 11 was marked

17              for identification.)

18   BY MS. ALBRECHT:

19       Q     Are you familiar with it?

20       A     I am.

21       Q     Are these the responses to Exhibit 10 that we

22   just looked at that you helped prepare?

23       A     I believe they are.

24       Q     Do you want me to scroll through it so that you

25   can confirm?
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1277

```
 1       A    I believe that's the correct document, yes.

 2       Q    Looking at the very last page of Exhibit 11, do

 3  you see a title on the top that says Verification?

 4       A    I do.

 5       Q    And do you see the signature on the bottom of

 6  the page?

 7       A    I do.

 8       Q    Is that your signature?

 9       A    It is.

10       Q    And so did you verify under penalty of perjury

11  that the responses contained in this documents are true

12  and correct?

13       A    I do.

14       Q    And as you sit here today, do you verify that

15  the responses are true?

16       A    I do.

17            MR. DILLON:  Asked and answered.

18  BY MS. ALBRECHT:

19       Q    Do you verify that they are correct?

20       A    I do.

21       Q    Do you verify that they are complete?

22       A    I do.

23       Q    I'm now going to show you what's been marked as

24  Exhibit 12, which is titled Plaintiff Poway Weapons and

25  Gear's Supplemental Response to Defendants' First Set of
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1278

```
 1  Interrogatories.
 2          Do you see that document?
 3      A   Yes.
 4          (Exhibit Number 12 was marked
 5          for identification.)
 6  BY MS. ALBRECHT:
 7      Q   Do you recognize it?
 8      A   Yes.
 9      Q   Scroll down to the last page, sorry, the second
10  to last page.  It shows a date of July 25th, 2023;
11  correct?
12      A   Yes.
13      Q   What did you do to help prepare the responses?
14      A   Gathered information and conveyed that to my
15  attorney who put it all into this document.
16      Q   Did anyone else from PWG assist in preparing the
17  responses?
18      A   No.
19      Q   The last page of Exhibit 12 has the heading
20  Verification on the top; correct?
21      A   Yes.
22      Q   And below the statement that reads,
23          "I verify under penalty of perjury under the
24          laws of the United States that the foregoing is
25          true and correct."
```

```
 1              And then there's a signature.  Do you see that

 2   signature?

 3        A     Yes.

 4        Q     Is that your signature?

 5        A     It is.

 6        Q     So you signed the document under oath?

 7        A     I did.

 8        Q     And do you verify as you sit here today that the

 9   responses are true?

10        A     I do.

11        Q     Do you verify that the responses are correct?

12        A     I do.

13        Q     Do you verify that they are complete?

14        A     I do.

15        Q     I am going to go back to a document that we just

16   looked at a few minutes ago, which is Exhibit 3 titled

17   Defendants' First Set of Requests for Production to

18   Plaintiff Poway Weapons and Gear.

19        A     Okay.

20        Q     Do you recall looking at this document a few

21   minutes ago?

22        A     I do.

23        Q     And do you recall stating that you reviewed it

24   in its entirety including the instructions and

25   definitions?
```

THE SULLIVAN GROUP OF COURT REPORTERS

89

Exhibit 59
DX1280

1      A     Yes.

2      Q     I am scrolling down to the instructions section

3   of Exhibit 3 which states under number 9 on page 7 that

4   you are required to supplement your answers and responses

5   promptly.

6          Do you see that?

7      A     Yes.

8      Q     Having read that, do you understand that PWG was

9   required to supplement the document in Exhibit 8 that we

10  looked at earlier which was the summary sheet that you

11  prepared?

12     A     Yes.

13         MR. DILLON:   Objection; argumentative,

14  speculation, legal conclusion.

15  BY MS. ALBRECHT:

16     Q     But you did not do so; correct?

17     A     We reviewed and supplied -- I believe we sent

18  anything that we needed to to update if there were any.

19     Q     I'm now showing you again the document that we

20  had previously looked at which is Exhibit 8?

21     A     Yes.

22     Q     Do you see it?

23     A     Yes.

24     Q     This is a document that you prepared; correct?

25     A     Correct.

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1281

1      Q      Having read the instructions in the request for

2   documents to supplement PWG's responses, do you

3   understand that PWG should have updated this document?

4           MR. DILLON:   Objection; argumentative,

5   speculation, legal conclusion.

6           THE WITNESS:   I'm not of that opinion.

7   BY MS. ALBRECHT:

8      Q      Why is that?

9      A      Because there hasn't been any update done to

10  this, so I provided anything that was -- that we had

11  relevant to this case.   And there is nothing that has

12  been generated since that.

13  BY MS. ALBRECHT:

14     Q      You generated this document in Exhibit 8 --

15     A      Yes.

16     Q      -- specifically for this litigation and

17  understanding that the documents would be produced in

18  discovery?

19     A      No.   I generated this document for my attorney

20  to review so he could understand the impacts of this law

21  on my business.   I believe it then became an exhibit in

22  the case as it was very -- it painted a very accurate

23  picture of the damage this law has done.

24     Q      But the picture is not accurate if it's

25  incomplete; correct?

```
 1            MR. DILLON:  Objection; argumentative, legal

 2   conclusion.

 3            THE WITNESS:  It was complete at the time that I

 4   generate it.

 5   BY MS. ALBRECHT:

 6      Q    I am now going to share with you a document

 7   that's been marked as Exhibit 13, which is titled

 8   Declaration of John Phillips in Support of Plaintiffs'

 9   Motion for Preliminary Injunction.

10            Do you recognize this document?

11      A    I do.

12            (Exhibit Number 13 was marked

13            for identification.)

14   BY MS. ALBRECHT:

15      Q    And what do you recognize it to be?

16      A    My declaration related to this case.

17      Q    Looking at page 4 where it states, "I declare

18   under penalty of perjury that the foregoing is true and

19   correct," is that your signature below it?

20      A    Yes.

21      Q    Did you prepare this declaration?

22      A    Yeah, in conjunction with my attorney.

23      Q    Did you draft any of the language in this

24   declaration in Exhibit 13?

25      A    Yes.
```

```
 1      Q     And did you review it before you signed it?

 2      A     Yes.

 3      Q     Looking at paragraph 5, it reads,

 4            "Because PWG is both a range and a retail store,

 5            PWG also has been forced to prohibit otherwise

 6            qualified young adults from using rental

 7            firearms and taking part in lawful shooting at

 8            the range, or face substantial criminal

 9            penalties."

10            Did I read that correctly?

11      A     Yes.

12      Q     What did you mean by forced?

13            MR. DILLON:  Objection; argumentative, legal

14   conclusion, speculation.

15            THE WITNESS:  It means that a law has been

16   enacted that no longer allows me to allow qualified young

17   adults to rent firearms or give them training at the

18   range.  So I'm forced to no longer allow that to happen

19   in my facility.

20   BY MS. ALBRECHT:

21      Q     And what is your -- what is the basis for your

22   understanding that you're no longer allowed to allow this

23   in your facility?

24      A     The letter of the law.

25            MR. DILLON:  Objection; legal conclusion, vague
```

THE SULLIVAN GROUP OF COURT REPORTERS

93

Exhibit 59

DX1284

```
 1    and ambiguous, compound, argumentative.

 2            THE WITNESS:  The letter of the law.

 3    BY MS. ALBRECHT:

 4        Q    Did you consult with anyone prior to making the

 5    determination that PWG would be forced to prohibit

 6    qualified young adults from using rental firearms?

 7        A    Yes.

 8        Q    Who did you consult with?

 9        A    Various attorneys and our industry, various

10    industry groups.

11        Q    Did you contact the California Department of

12    Justice's Bureau of Firearms?

13        A    No.

14        Q    Have you ever contacted the Bureau of Firearms

15    for any reason related to Penal Code 27510?

16        A    No.  Because if I did contact the Bureau of

17    Firearms, the Bureau of Firearms would not give me an

18    answer.  They would either tell me that they will get

19    back to me, and no one would answer it, or they would

20    send me -- or tell me to go look at the law, which has

21    been the case before.

22        Q    How would you know that if you have not

23    contacted them?

24        A    I've contacted them on --

25            MR. DILLON:  Objection; argumentative.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1285

1          THE WITNESS:  I have contacted them various

2    other times and various other laws.  And they are

3    notorious for refusing to give, one, their name of who I

4    talk to.  They give me an operator number.  And two, they

5    refuse to ever answer anything in writing or give any

6    guidance other than to refer me to the letter of the law.

7    BY MS. ALBRECHT:

8        Q    When was the last time that you contacted the

9    Bureau of Firearms?

10       A    Two weeks ago.

11       Q    For what reason?

12       A    A question on transferring a firearm to a peace

13   officer that was an assault weapon and getting the items

14   from them on that.

15       Q    Were you able to receive such items?

16       A    They were able to point me to the Penal Code.

17       Q    And did the Penal Code address your questions?

18       A    No.

19       Q    What did you do after that?

20       A    Called my lawyer.

21       Q    Has the Department of Justice or any other law

22   enforcement agency threatened PWG with an enforcement

23   action for failure to comply with Section 27510?

24          MR. DILLON:  Objection; argumentative,

25   speculation, legal conclusion.

```
 1              THE WITNESS:  No.
 2   BY MS. ALBRECHT:
 3       Q    Looking at Exhibit 13, paragraph 6, the second
 4   part of the first sentence in line 17 reads,
 5              "PWG has had to deny numerous otherwise
 6              qualified young adults customers from attending
 7              or taking part in PWG's firearms classes."
 8              Did I read that correctly?
 9       A    Yes.
10       Q    How many is numerous?
11       A    I'm not able to quantify that because they just
12   continually say no.  Go away.
13       Q    So in drafting this paragraph 6, you did not
14   have a specific number in mind when you used the word
15   numerous?
16              MR. DILLON:  Objection; argumentative and
17   speculation.
18              THE WITNESS:  It was far too many.  I guess I
19   could have said that.
20              MS. ALBRECHT:  Okay.  Why don't we take a quick
21   ten-minute break.
22              MR. DILLON:  Okay.
23              MS. ALBRECHT:  Come back at 1:35 if that works.
24              MR. DILLON:  Okay.
25              THE WITNESS:  Okay.  Thank you.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1287

```
 1              (A recess was taken.)
 2   BY MS. ALBRECHT:
 3       Q    Mr. Phillips, I am now going to show you what I
 4   am marking as Exhibit 14, which is a page from PWG's
 5   website.
 6            Do you see the document?
 7       A    I do.
 8            (Exhibit Number 14 was marked
 9            for identification.)
10   BY MS. ALBRECHT:
11       Q    Do you recognize it?
12       A    Yes.
13       Q    What is it?
14       A    It shows the PWG Shotgun First Steps class page.
15       Q    Would you say this is an informational page on
16   the Shotgun First Steps class that PWG offers?
17       A    Yes.
18       Q    And scrolling down here, it shows the cost of
19   the class being $119.00; correct?
20       A    Yes.
21       Q    And there's length, level, prerequisites,
22   required gear.  And under required gear, do you see where
23   it states,
24            "Personal Shotgun, Comfortable, closed heel,
25            closed toe shoes, range appropriate cloths
```

Exhibit 59
DX1288

```
 1              (sic).  (Per California law guest(s) must be 21

 2              or older to handle a PWG firearm.)"?

 3              Did I read that correctly?

 4      A    You did.

 5      Q    And nowhere in this document, which was pulled

 6   from the website, does it list out the exemptions that

 7   would apply under Penal Code Section 27510; correct?

 8      A    Correct.

 9      Q    And we talked earlier about what those

10   exemptions are including a valid hunting license and a

11   membership in the military; correct?

12      A    Yes.

13      Q    So an individual under the age of 21, from

14   looking at the webpage, would not know that he or she is

15   able to use a PWG firearm if he or she meets the

16   exemptions under Penal Code 27510; correct?

17              MR. DILLON:  Objection; speculation,

18   argumentative, incomplete hypothetical.

19              THE WITNESS:  In the hypothetical under the

20   exemptions, the only exemption that may apply here would

21   be a hunting license.  Certainly someone in the military

22   is not going to need our intro to shotgun class.

23   Certainly someone in law enforcement is not going to need

24   our intro to shotgun class.

25              So the only person potentially is with a valid
```

THE SULLIVAN GROUP OF COURT REPORTERS

98

Exhibit 59
DX1289

1    hunting license, and we, at PWG, don't even know what a

2    valid hunting license is.  So we choose to defer on the

3    side of only allowing someone who has a valid hunting

4    license in between the specific hunting season dates

5    referenced.

6    BY MS. ALBRECHT:

7        Q    When you say you at PWG don't know what a valid

8    hunting license is, what do you mean by that?

9        A    Valid.  What date is it valid?  Is it valid the

10   day it's issued or is it valid only during the period of

11   time of the hunting season for which it's issued?  There

12   is nowhere and no one at Department of Justice who will

13   answer that question, and nowhere I can reference that.

14       Q    I am going to share with you a document that I

15   am marking as Exhibit 15, which is a document with the

16   title State of California Penal Code Section 16685.

17            Do you see that?

18       A    I do.

19            (Exhibit Number 15 was marked

20            for identification.)

21   BY MS. ALBRECHT:

22       Q    Are you familiar with this Penal Code Section

23   16685?

24       A    I don't know if I am specifically, no.

25       Q    Feel free to review the document and let me know

 1   when you've done so.

 2       A    Okay.

 3       Q    So does this Penal Code Section 16685 expressly

 4   state what is meant by a valid and unexpired hunting

 5   license?

 6            MR. DILLON:  Objection; argumentative, legal

 7   conclusion.

 8            THE WITNESS:  So, no, it doesn't, because in my

 9   opinion, the last sentence, "for which the time period

10   authorized for the taking of birds or mammals has

11   commenced but not expired," so authorized by issuance of

12   the permit or of the specific hunting season?

13   BY MS. ALBRECHT:

14       Q    Are you familiar with the Department of Fish and

15   Wildlife website?

16       A    Vaguely.

17       Q    I am now going to share with you what I am

18   marking as Exhibit 16 which is from the website of the

19   Department of Fish and Wildlife.

20            And do you see on top where it says Hunting

21   Licenses and Tags?

22       A    Yes.

23            (Exhibit Number 16 was marked

24            for identification.)

25   ///

BY MS. ALBRECHT:

    Q    And then do you see, close to the middle of the page, where it states in red font, "Valid July 1, 2023 through June 30, 2024"?

    A    Yes.

    Q    And does that inform your understanding as to when hunting licenses are valid?

    A    No.

    Q    Having read this now, this document that I showed you from the Department of Fish and Wildlife website that states that hunting licenses are valid July 1 through June 30, do you understand now that generally hunting licenses are valid from July 1 of the current year through June 30 of the next year?

    MR. DILLON:  Objection; speculation, legal conclusion, argumentative.

    THE WITNESS:  Well, you just said generally, and so that means there's sometimes they may not.

    And two, when a hunting license is presented to me, there's nothing on that document that tells me when there is a date in which it's valid and not valid.

BY MS. ALBRECHT:

    Q    You stated earlier that you estimate that you -- or PWG turns away about one student per day who is under the age of 21 and is not qualified to take a training

Exhibit 59
DX1292

1    class.

2            Do you recall that?

3        A    I believe I said one person per day interested

4    in buying a firearm.  We turn away sometimes multiple

5    people a day interested in training and using our range

6    facility with firearms.

7        Q    When was the last time you've personally turned

8    someone away under the age of 21?

9        A    A frustrated Groupon person who purchased a

10   Groupon, even though we say that you have to be at least

11   21, they came in with a group of people who purchased it

12   who were over 21, and they couldn't get on the -- that

13   person couldn't get on the range and use a firearm.  So

14   it was about two weeks ago when they wanted to talk to

15   the owner of the company.

16       Q    I don't have any further questions.  I want to

17   see if my colleague has any questions that she would like

18   to ask.

19           MS. ROSENBERG:  I will.  But I need about ten

20   minutes if we could take a quick break, please.

21           MS. ALBRECHT:  Is that okay if we go off the

22   record?

23           MR. DILLON:  Yes, that's fine.

24           MS. ROSENBERG:  Great.  Thank you.

25           (A recess was taken.)

THE SULLIVAN GROUP OF COURT REPORTERS

102

Exhibit 59

DX1293

```
 1                          EXAMINATION
 2    BY MS. ROSENBERG:
 3        Q     Thank you for your time, first of all,
 4    Mr. Phillips, today.  I know it's a long day.  I have
 5    just a few questions for you.
 6              As a licensed firearms dealer, are you required
 7    to remain abreast of changes in firearms regulations and
 8    laws?
 9        A     Yes.
10        Q     What do you do to ensure that you are up to date
11    on all of the latest firearms statutes and regulations in
12    California?
13        A     I am a member of various industry groups, both
14    federally, internationally, and in the state.  I pay a
15    lot of money to attorneys to make sure that they keep me
16    abreast of any changes that I'm aware of.  We get
17    notifications through -- from California through the DROS
18    system that sends out notifications or updates on changes
19    in California law or the way the DOJ is interpreting the
20    law, and they provide information in bulletins.
21              So it's kind of putting all that together to try
22    and stay as up to date as we can as best we can.
23        Q     And do you read all of the information bulletins
24    that you receive through the DROS system?
25        A     Yeah.  DROS requires that you -- in order for
```

```
 1    you to get into DROS when you login with your personal

 2    ID, you have to click through and acknowledge that you

 3    have read them.

 4        Q    But do you actually read all of them before you

 5    click to verify that you have?

 6        A    Yes.

 7             MR. DILLON:  Objection; asked and answered.

 8    BY MS. ROSENBERG:

 9        Q    Madam Court Reporter, I just want to clarify

10    that when we are discussing the DROS system, that D-R-O-S

11    just for your purposes for this entire deposition when

12    we're referring to the DROS system.

13        Q    So Mr. Phillips, is it true, then, that each

14    employee of Poway Weapons and Gear who accesses the DROS

15    system is required to read the information bulletins

16    received through the DROS system?

17        A    Yes.

18        Q    And is there any manner in which you verify that

19    all of those employees who access the DROS system

20    actually do read the information bulletins?

21        A    I -- since it won't let them conduct business

22    unless they scroll through and acknowledge the bulletin,

23    I have never had to go in and specifically check.  I just

24    know they wouldn't be able to do their job had they not.

25        Q    And to clarify, what you mean is that these
```

Exhibit 59
DX1295

1    employees would not be able to do their job if they did

2    not click the button verifying that they had read the

3    bulletins?

4        A    I'm sorry.  I'll try and be more accurate.

5            In order for them to login and do a DROS,

6    meaning, you know, to sell a firearm and enter the

7    information, they first have to get through all those

8    informational bulletins and acknowledge each of them.  So

9    they wouldn't be able to transact business through the

10   California DROS system unless they had done so.

11           So I don't feel compelled that I need to check

12   that because they just wouldn't be able to do their job.

13       Q    But you are not able to verify that each of

14   those employees actually does read the information

15   bulletins; correct?

16           MR. DILLON:  Objection; speculation.

17           THE WITNESS:  I'm not able.

18   BY MS. ROSENBERG:

19       Q    Does Poway Weapons and Gear, whether that's you

20   or somebody else, conduct training sessions with

21   employees to discuss changes in firearms laws and

22   regulations?

23       A    Constantly.

24       Q    Constantly.  Could you define constantly for me?

25       A    Well, whenever we either get notification of a

THE SULLIVAN GROUP OF COURT REPORTERS

105

Exhibit 59

DX1296

```
 1   new interpretation from the DOJ, it doesn't necessarily
 2   mean that's the law, but it's a new way that they're
 3   looking at holding the firearms dealer accountable for
 4   conducting business, or when we do get notice of a new
 5   law coming into effect, then we have an all-hands
 6   meeting, whether that's an all staff meeting or whether
 7   we do it at the beginning of a shift.
 8        We have morning shifts and then we have
 9   afternoon shifts.  And so we'll have meetings and update
10   everybody on now the new PWG policy, but the new policy
11   is in effect because of what the DOJ or the federal law
12   or whatever is requiring.
13   Q    So PWG changes its policies each time that the
14   law is updated; is that correct?
15   A    Yes.  We want to keep our licenses, so yes.
16   Q    Thank you.
17        I want to show you what we will mark as -- Madam
18   Court Reporter, what exhibit number are we up to now?
19        THE COURT REPORTER:  17 will be next.
20        MS. ROSENBERG:  17 will be next.  Okay.  I am
21   going to show you what we will mark as Exhibit 17.  And
22   if you will give me a moment, I have not used the sharing
23   my screen feature before, so this will be a fun and
24   interesting experiment.
25   ///
```

Exhibit 59
DX1297

```
 1              (Exhibit Number 17 was marked

 2              for identification.)

 3  BY MS. ROSENBERG:

 4      Q    Okay.  Are you able to see a document entitled

 5  Information Bulletin.

 6      A    Yes.

 7      Q    So this information bulletin is what we are

 8  marking as Exhibit Number 17.  Am I correct in reading

 9  that the number on this information bulletin is

10  2021-DLE-11?

11      A    Yes.

12      Q    And what is the date on this information

13  bulletin?

14      A    January 26 of '22.

15      Q    Thank you.

16           And is this an information bulletin from the

17  California Department of Justice Division of Law

18  Enforcement?

19      A    Yes.

20      Q    And it comes -- the contact information listed

21  on this information bulletin is the Bureau of Firearms;

22  is that correct?

23      A    Yes.

24      Q    And there is a phone number listed for the

25  Bureau of Firearms that is 916-210-2300; is that correct?
```

THE SULLIVAN GROUP OF COURT REPORTERS

107

Exhibit 59
DX1298

```
 1        A     Yes.

 2        Q     The subject matter of this information bulletin

 3   is New and Amended Firearms/Weapons Laws; is that

 4   correct?

 5        A     Correct.

 6        Q     Okay.  Great.

 7              So we are going to scroll down.  This will take

 8   a moment.  While I'm scrolling I'll just ask, have you

 9   read this bulletin before?

10        A     I'm sure I have in order for me to get it into

11   my DROS.

12        Q     But you don't specifically recall reading this

13   bulletin?

14        A     I read a lot of bulletins, so I -- again, if

15   it's in the system, I've read it.

16        Q     Understood.

17              If we scroll down to what is page, it looks

18   like, 2 of the PDF going on to page 3 of the PDF, do you

19   see that there's a section that is titled SB 715 (Stats.

20   2021, Chapter 250) - Criminal Law?

21        A     Yes.

22        Q     Okay.  Thank you very much.

23              And if we scroll down to the description

24   underneath that title, the second bullet point reads as

25   follows, and you can tell me at the end after I've read
```

```
 1   it whether I've read it correctly:

 2              "Requires a licensed firearms dealer to visually

 3              inspect a hunting license to confirm that it is

 4              valid and unexpired, and requires the dealer to

 5              record the document number, GO ID and dates

 6              valid, whenever a hunting license is used to

 7              qualify for the exemption to the general

 8              prohibition on the sale of a firearm to a person

 9              under 21 years of age, applicable to firearms

10              that are not handguns or semiautomatic

11              centerfire rifles.  The dealer or salesperson

12              shall not deliver the firearm if, upon visual

13              inspection of the hunting license, they are

14              unable to confirm that the license is valid and

15              unexpired."

16         And then in parentheses it lists (Penal Code

17   Section 28210 and 28215.)

18         Did I read that correctly?

19      A    Yes.

20      Q    Were you aware of these Penal Code sections that

21   were enacted in SB 17 requiring licensed dealers to

22   visually inspect hunting licenses to confirm that they

23   are valid and unexpired?

24      A    Yes.

25      Q    And you see that in this listing there is a
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1300

```
 1   reference to recording the document number, GO ID, and

 2   the dates valid from the hunting license?

 3       A    Yes.

 4       Q    How many hunting licenses do you estimate that

 5   you have viewed since 2019 in completing firearms

 6   transactions?

 7       A    Very few because, again, per my prior testimony,

 8   we won't even take a hunting license unless they are in

 9   there trying to purchase during the period of the season

10   listed on the license.  So it stops the transaction

11   99 percent of the time.

12       Q    Could you tell me what you mean by stops the

13   transaction?

14       A    Well, if they come in to purchase, and they need

15   to get -- they need an exemption, and let's say,

16   hypothetically, let's say it's August 1st, and they got

17   their hunting license, but the season doesn't start until

18   September 1st and goes through September 15th, and their

19   license expires September 15th.

20            We wouldn't start the transaction until

21   September 1st when we knew that, based on our

22   understanding of what we've been told by the DOJ

23   auditors, that it has to be during the season.  So we

24   stop that transaction.

25            They can come back, which I'm not aware of
```

Exhibit 59
DX1301

1    anybody doing it because the seasons are decently short,

2    and they're losing ten days of their hunting season.

3        Q    So how would you, in that hypothetical scenario,

4    know that a hunting season didn't start until September?

5        A    We can look up what the hunting season is.  I

6    don't recall on the license if -- it might say the dates

7    of the season.  I can't remember as I sit here.  I would

8    have to look at a license.

9        Q    Right.

10            Just for the record, the valid dates are listed

11   on a hunting license.

12       A    Thank you.

13       Q    My colleague showed you earlier the webpage from

14   the Department of Fish and Wildlife website stating that

15   the validity period for hunting licenses is July 1st

16   through June 30th of the following year; correct?

17       A    Yes.

18       Q    And you were not aware of that previously?

19       A    No.  I would be very curious to know when that

20   got put on that website.

21       Q    So since Penal Code Sections 28210 and 28215

22   took effect, have you visited the Department of Fish and

23   Wildlife website at any time?

24       A    I don't believe I have, no.

25       Q    So you did not look at the Department of Fish

THE SULLIVAN GROUP OF COURT REPORTERS

111

Exhibit 59

DX1302

1    and Wildlife website to determine what the validity

2    period is for a hunting license?

3         A    I believe I was told -- I did not because I was

4    told by my DOJ auditors on two occasions that the

5    validity of the hunting period was during the listing

6    hunting season.

7         Q    Do you know who those DOJ auditors were?

8         A    One of them, her name is Marisol.  And I don't

9    remember -- that was for who inspected my gun range, or I

10   own a Sacramento gun range up in Sacramento, and they

11   audited me in February.

12             And the other one I don't recall because that

13   was in 2020 after this had gone into effect.  We were

14   audited by the DOJ.  And I don't remember who the

15   inspector was, but specifically they were checking on the

16   hunting licenses just because it was the new law.

17        Q    So you're not aware that the validity period for

18   hunting licenses has been July 1st through June 30th of

19   the follow year for many years?

20             MR. DILLON:  Assumes facts not in evidence,

21   legal conclusion, argumentative, speculative.

22             THE WITNESS:  I would not disagree that maybe,

23   according to the Fish and Game Department, that's a valid

24   period.  Again, based on what I've been told by the DOJ

25   and in reading the actual Penal Code, I don't know that

```
 1    I'm willing to risk my license and say that that is what

 2    the DOJ is going to accept as a valid period.

 3    BY MS. ROSENBERG:

 4        Q    So my colleague showed you previously Penal Code

 5    Section 16685; correct?

 6        A    Yes.

 7        Q    Can we pull that back up?  And that was exhibit

 8    number, was it, 14, 15?  Madam Court Reporter, do you

 9    know?

10             THE COURT REPORTER:  I don't know.  I'm just

11    writing down the numbers as you introduce them.

12             MS. ROSENBERG:  Sorry about that.

13             MS. ALBRECHT:  I believe it was Exhibit 14, and

14    I'm happy to pull that back up if that's helpful.

15    BY MS. ROSENBERG:

16        Q    I have it right here.  I'll share my screen and

17    show you that again.

18             So can you see what is marked as Exhibit 14,

19    Penal Code Cection 16685?

20        A    No.  You're not sharing it.

21        Q    Oh, let's see.  There we go.  Are you now able

22    to see what's marked as Exhibit 14, Penal Code Section

23    16685?

24        A    Yes, I see that.

25        Q    Okay.
```

THE SULLIVAN GROUP OF COURT REPORTERS

113

Exhibit 59

DX1304

```
 1          MS. ALBRECHT:  Apology.  I need to correct the
 2    record.  It is actually Exhibit 15, not Exhibit 14.
 3          MS. ROSENBERG:  Thank you very much for that
 4    correction.
 5      Q    So what I'm showing you is actually 15, what's
 6    been marked as Exhibit 15, Penal Code Section 16685.  So
 7    if you would take a moment just to read this in full to
 8    yourself.  You don't need to say it out lead.  Then let
 9    me know when you're done.
10      A    I've already read it.  I'm very aware of it now.
11      Q    Okay.  So then you are able to see that, as used
12    in the Penal Code, a valid and unexpired hunting license
13    is defined by Article 2 (commencing with Section 3031) of
14    Chapter 1 of Part 1 of Division 4 of the Fish and Game
15    Code, for which the time period authorized for the taking
16    of birds or mammals has commenced but not expired; is
17    that correct?
18          MR. DILLON:  Objection; legal conclusion,
19    speculation.
20          THE WITNESS:  So, again, we're contradictory.
21    One minute we're talking about the Department of Fish and
22    Game says it's from July 1st, 2023 to June 30th of 2024,
23    but right down here the last sentence says, "for which
24    the time period authorized for the taking of birds or
25    mammals," I read that and interpret that, based on what
```

```
 1    the DOJ has told me, the authorized period is the hunting

 2    season.  So which is it?

 3    BY MS. ROSENBERG:

 4         Q    Okay.  We can set that aside for now.

 5              I'm going to show you what I'm going to mark as

 6    Exhibit Number 18.  If you will give me just a moment and

 7    I will share that on my screen.

 8              Are you able to see a document that is titled

 9    Frequently Asked Questions About Online License Sales?

10         A    Yes.

11         Q    Great.

12              (Exhibit Number 18 was marked

13              for identification.)

14    BY MS. ROSENBERG:

15         Q    So the document titled Frequently Asked

16    Questions About Online License Sales is the document that

17    we have marked as Exhibit Number 18, and it is a list of

18    frequently asked questions.  And I've opened to the

19    section that refers to frequently asked questions about

20    hunting.

21              Do you see that?

22         A    Yes.

23         Q    Thank you very much.

24              So we are going to scroll through down to the

25    bottom of the first page of the PDF and the top of the
```

1    second page of the PDF.

2        Do you see that?

3    A    Yes.

4    Q    So the question under this frequently asked

5    questions that I've directed you to is titled Which

6    Hunting License Items can be Purchased On line?

7        Is that correct?

8    A    Yes.

9    Q    And then if we scroll down to hunting licenses,

10   on page 2 of the PDF do you see where that is at the very

11   top of the page?

12   A    Yes.

13   Q    Do you see that it lists a resident hunting

14   license as being valid July 1st through June 30?

15   A    Yes.

16   Q    Do you see where it states that nonresident

17   hunting licenses are valid July 1st through June 30?

18   A    Yes.

19   Q    Do you see where it says that junior hunting

20   licenses are valid July 1st through June 30?

21   A    Yes.

22   Q    Thank you.

23       So you've never seen this webpage before; is

24   that correct?

25   A    No.  I have no reason to, because if it's not

Exhibit 59
DX1307

```
 1    something that I can find on the California Department of
 2    Bureau of Firearms website, as my license is granted by
 3    them, it would have no relevancy to what I'm authorized
 4    by the Department to accept and honor.
 5        Q    So if we -- I'm gonna stop sharing this screen,
 6    and let's go back to Penal Code Section 16685 which was
 7    marked previously as Exhibit Number 15.
 8             Again, this Penal Code Section 16685 -- first of
 9    all, can you see it on your screen?
10        A    I can.  Thank you.
11        Q    Thank you.
12             So do you see that the Penal Code is stating in
13    16685 that,
14             "As used in this part, a valid and unexpired
15             'hunting license' means a hunting license issued
16             by the Department of Fish and Wildlife pursuant
17             to Article 2 (commencing with Section 3031) of
18             Chapter 1 of Part 1 of Division 4 of the Fish
19             and Game Code, for which the time period
20             authorized for the taking of birds or mammals
21             has commenced but not expired"?
22             Did I read that correctly?
23        A    Yes.
24        Q    Do you understand that this section of the Penal
25    Code is defining a valid and unexpired hunting license by
```

```
 1   reference to the Fish and Game Code?

 2            MR. DILLON:  Objection; legal conclusion.

 3            THE WITNESS:  I am taking it that on the

 4   license, when I get the license and it shows the period

 5   of time for the season which the license was issued, that

 6   is the authorized -- that is the time period authorized

 7   for the period of taking birds or mammals.  And that is

 8   how I interpret the law right now and how I was been told

 9   by the DOJ twice that it's only during the authorized

10   period of time for taking of those animals or birds.

11   BY MS. ROSENBERG:

12        Q    Thank you.

13            And am I correct in understanding that when you

14   say you've been advised by DOJ, you were only referencing

15   the two times that you were advised as such during an

16   audit?

17        A    Yes.  And had I been in violation of their

18   interpretation or what they advised me, I would

19   potentially face fines and loss of my license.  So I'm

20   stuck.

21        Q    Understood.

22            So after the passage of Section 27510 in 2019,

23   did you take any steps to educate yourself about what an

24   unexpired hunting license meant?

25        A    Yes.  I asked -- I did my research.  I asked my
```

```
 1   lawyers.  I asked industry groups.  We all originally
 2   thought it was while the license was valid until it
 3   expired, from the date of issuance until it expires,
 4   which it seems like you're alluding to.
 5          But since then we have been educated by the
 6   Department of Justice that that is not the case.  It is
 7   during the time period of the season.
 8      Q    And I think you told my colleague this earlier,
 9   but just to make sure, have you, at any point, called the
10   Department of Justice Bureau of Firearms to ask for
11   further clarification on what a valid and unexpired
12   hunting license is?
13      A    On this specific topic, no, because I know
14   better than to do that.
15      Q    And by know better, what do you mean?
16      A    It means that I will not get an answer.  They
17   will refer me to the Penal Code to interpret it just like
18   you're asking me to or they will tell me that someone
19   will get back to me, and no one ever does.
20          And when I ask for any answer in writing, it
21   will not give me any answer in writing nor will they even
22   tell me the name of the person to whom I'm talking.  So
23   even if they gave me guidance on that phone call, and I
24   asked, "Great.  I'm gonna document this call.  Can I get
25   your name?" the best case scenario I would get out of
```

THE SULLIVAN GROUP OF COURT REPORTERS

119

Exhibit 59

DX1310

```
 1    them is they would give me an operator number which, in

 2    talking to my auditors, the DOJ does not have operator

 3    numbers.

 4         So now I would not even be able to get myself

 5    out of trouble even if somebody gave me the wrong

 6    information.

 7    Q    Okay.  Understood.  Thank you very much.  I'm

 8    gonna stop sharing my screen here.

 9         And then I want to go back to talk about the

10    shotgun course.  Stephanie, would you be able to pull up

11    that exhibit?  I think it might have been marked as

12    Exhibit Number 16; is that right?

13         MS. ALBRECHT:  Let me take a look.  Give me one

14    second.

15         I believe that was Exhibit 14.  And you would

16    like me to pull it up?

17         MS. ROSENBERG:  Yes, please.

18         Okay.  Can we scroll down to the part that shows

19    the listing of the materials that -- the required gear?

20    Thank you very much.

21         So it looks like this appears on -- is that

22    page 3 of the PDF leading on to page 4 of the PDF?

23         MS. ALBRECHT:  Yes.

24         MS. ROSENBERG:  Thank you very much.

25    Q    So I know we talked about this earlier.  My
```

Exhibit 59

DX1311

1    colleague Stephanie talked about this earlier with you,

2    Mr. Phillips.  But here again under Required Gear, Poway

3    Weapons and Gear has advised potential class participants

4    that per California law, guests must be 21 or older to

5    handle a PWG firearm; correct?

6        A    Yes.

7        Q    And it does not advise that should a potential

8    participant be under the age of 21 and 18 or older, and

9    if they have a valid and unexpired hunting license, they

10   would be able to handle a firearm at PWG?

11       A    Correct.

12       Q    And the reason that you don't provide that

13   advisement of the exception is that you don't feel

14   comfortable providing firearms to those with hunting

15   licenses; is that correct?

16            MR. DILLON:  Objection, vague and ambiguous,

17   argumentative.

18   BY MS. ROSENBERG:

19       Q    Certainly feel free to re-word that in your own

20   words why it is that you don't provide the

21   acknowledgement of the exception?

22       A    One, there might be some clerical oversight, the

23   fact that we probably maybe should have put an asterisk

24   in here and say some exemptions may apply.  But we're

25   very aware of the fact that the only exemption that we

1    could even dream of applying would be a valid hunting

2    license during the period for which the license is issued

3    for taking of game.

4            And so we don't normally even have that shotgun

5    class during a season -- or during a time period where

6    there's hunting season going on.  So, again, it would

7    never be applicable.  So we do it in the timing.  Who is

8    going so take an intro class during the hunting season?

9        Q    But we just talked about the fact that a hunting

10   license is valid for the entire year-long season of July

11   1st through June 30th of the follow year; correct?

12           MR. DILLON:  Objection; legal conclusion and

13   argumentative.

14           THE WITNESS:  You've told me that the Department

15   of Fish and Game says they're legal from July 1 to June

16   30 of the following year.  From what I am reading in the

17   Penal Code and interpreting, and from the guidance that I

18   have gotten from the Department of Justice Bureau of

19   Firearms, they are only valid during the period for which

20   the license was issued.

21   BY MS. ROSENBERG:

22       Q    Okay.  So would it be fair to say -- sorry.  I

23   don't recall if we've asked this question before, so I'll

24   go back.

25           Are you aware of any circumstance in which

Exhibit 59
DX1313

```
 1   somebody between the ages of 18 and 20 took a firearms

 2   training course at PWG and used a PWG firearm during that

 3   course by using the hunting license exemption that we've

 4   been discussing?

 5       A    I am not.

 6            MR. DILLON:  Objection; asked and answered.

 7            THE WITNESS:  Sorry.

 8   BY MS. ROSENBERG:

 9       Q    Is there a PWG policy not to permit the use of

10   PWG firearms even if the person has a valid and unexpired

11   hunting license?

12       A    Absolutely not.

13       Q    What do you mean by absolutely not?

14       A    There's no policy that -- if a person meets any

15   of the exemptions, we would welcome them to use our

16   firearms.

17       Q    But you don't advise that that is a possibility

18   in your course materials?

19       A    On this webpage --

20            MR. DILLON:  Objection.

21            THE WITNESS:  Oh, sorry.

22            MR. DILLON:  Argumentative, speculation.

23            THE WITNESS:  On this webpage we don't put the

24   asterisk that says some exemptions may apply.  If a

25   person was to walk up to the counter or call in or was in
```

```
 1    another one of our classes and asked about it, we would

 2    certainly reference that there are exemptions because the

 3    staff is very aware of them.

 4    BY MS. ROSENBERG:

 5        Q    Understood.  Thank you.

 6             Stephanie, I think we can stop sharing the

 7    screen now.

 8             I want to show you a couple more documents, and

 9    then I think I should be done here before your counsel

10    has the opportunity to ask you some questions.  So I'm

11    going to show you what I will mark as Exhibit Number 19.

12             So what I've marked as Exhibit Number 19 is

13    titled State of California Penal Code Section 28210; is

14    that correct?

15        A    Yes.

16             (Exhibit Number 19 was marked

17             for identification.)

18    BY MS. ALBRECHT:

19        Q    Have you read this statutory section before?

20        A    Yeah.  It's been a while, but yes.

21        Q    Okay.  Thank you.

22             So would you read for me subdivision (a)(3)

23    that's starts with the words "for the sale or transfer"?

24        A    "For the sale or transfer of a firearm to a

25             person under 21 years of age pursuant to
```

```
 1              subdivision (b) of Section 27510, the

 2              salesperson shall visually inspect the hunting

 3              license to confirm that it is valid and

 4              unexpired and shall record the document number,

 5              GO ID, and dates valid."

 6    Q    Thank you very much.

 7         So do you understand from the subdivision that

 8  you have just read, which is Penal Code Section 28210,

 9  subdivision (a)(3), that the dates valid for the hunting

10  license appear on the hunting license?

11         MR. DILLON:  Objection; speculation.

12         THE WITNESS:  Can you repeat your question?  I

13  was re-reading it.

14  BY MS. ROSENBERG:

15    Q    Sure.  I'll rephrase.

16         So Penal Code Section 28210, subdivision (a)(3)

17  which you have just read into the record describes a

18  salesperson visually inspecting a hunting license in

19  order to confirm that the person who is wishing to buy or

20  receive transfer of a firearm is valid and unexpired; is

21  that right?

22    A    Correct.

23    Q    And it states that the salesperson who has

24  visually inspected the hunting license to confirm that it

25  is valid and unexpired shall report the document number,
```

THE SULLIVAN GROUP OF COURT REPORTERS

125

Exhibit 59

DX1316

```
 1    GO ID, and dates valid?

 2        A    Correct.

 3        Q    Thank you.

 4             So having read this subdivision that you just

 5    read into the record, do you understand that the dates

 6    valid for a hunting license are visible on a visual

 7    inspection of the hunting license?

 8             MR. DILLON:  Objection; speculation.

 9             THE WITNESS:  As I recall, a hunting license has

10    the dates valid of the hunting season.  It does not have

11    a valid beginning and end date listed on it.  It only has

12    the hunting season on it.

13    BY MS. ROSENBERG:

14        Q    Okay.  Thank you.

15             I think I'm done, Stephanie, unless you have

16    anything else.

17             MS. ALBRECHT:  Nothing else from me.  Thank you.

18             Mr. Dillon, do you have any questions you want

19    to ask?

20             MR. DILLON:  Can I get five minutes to just go

21    through my notes and see if there's anything?

22             MS. ALBRECHT:  Sure.  We'll regroup at 2:40.

23             MR. DILLON:  Okay.

24             (A recess was taken.)

25             MR. DILLON:  I have no questions.
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1317

```
 1   BY MS. ROSENBERG:

 2       Q    Okay.  I just wanted to show one more item to

 3   you, Mr. Phillips.  And my apologies, I was having

 4   trouble with my system here pulling up the document.  But

 5   I'm going to show you one more statute, and we'll take a

 6   look at it.  Hold on one second.

 7            Okay.  Are you able to see a document titled

 8   State of California Fish and Game Code Section 3037?

 9       A    Yes.

10       Q    Thank you very much.

11            Have you seen this section of the Fish and Game

12   Code before?

13       A    No.

14       Q    Okay.

15            MS. ALBRECHT:  And for the record, we are

16   marking this as Exhibit Number --

17            MS. ROSENBERG:  20.

18            MS. ALBRECHT:  -- 20?

19            MS. ROSENBERG:  Madam Court Reporter, is that

20   right?

21            THE COURT REPORTER:  Yes.

22            (Exhibit Number 20 was marked

23            for identification.)

24   BY MS. ROSENBERG:

25       Q    So could you read the entirety of Section 3037
```

Exhibit 59
DX1318

```
 1   of the Fish and Game Code into the record, Mr. Phillips.
 2      A    "A hunting license authorizes the person to whom
 3            it is issued to take birds and mammals, in
 4            accordance with law, for a term of one year from
 5            July 1st to June 30th, or, if issued after the
 6            beginning of such term, for the remainder of the
 7            term."
 8      Q    Thank you.
 9            And can you read the parenthetical underneath
10   the text of the statutory section 3037?
11      A    "(Amended by Stats. 1971, Chapter 1470.)"
12      Q    Thank you very much.
13            So do you see from Section 3037 that a hunting
14   license authorizes the holder of the license to take
15   birds and mammals from July 1st through June 30th of the
16   following year?
17            MR. DILLON:  Objection; legal conclusion,
18   argumentative, speculation, facts not in evidence.
19            THE WITNESS:  I see that.
20   BY MS. ROSENBERG:
21      Q    So you have never read Section 3037 of the Fish
22   and Game Code; correct?
23            MR. DILLON:  Asked and answered.
24            THE WITNESS:  No, I have not.
25            MS. ROSENBERG:  Okay.  Thank you.  I don't think
```

Exhibit 59
DX1319

```
 1   I have anything further.

 2             Stephanie, do you have anything?

 3             MS. ALBRECHT:  No, nothing from me.  Thanks very

 4   much for your time today, Mr. Phillips.

 5             THE WITNESS:  Okay.

 6             THE COURT REPORTER:  Mr. Dillon, would you like

 7   a copy?

 8             MR. DILLON:  Yes, please, as well as the

 9   exhibits.

10             MS. ALBRECHT:  Okay.  Let's go off the record.

11             (At the hour of 2:46 p.m., the

12             deposition was concluded.)

13                           -o0o-

14

15

16

17

18

19

20

21

22

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS

129

Exhibit 59

DX1320

1

2

3

4

5    STATE OF CALIFORNIA    )
                           )   ss.
6    COUNTY OF LOS ANGELES )

7        I, __JOHN PHILLIPS, PMK  , having appeared remotely

8    for my deposition on __August 16  , 2023, do this date

9    declare under penalty of perjury that I have read the

10   foregoing deposition, I have made any corrections,

11   additions or deletions that I was desirous of making in

12   order to render the within transcript true and correct.

13       IN WITNESS WHEREOF, I have hereunto subscribed my

14   name this _____ day of _____, 2023.

15

16                          _____
                                   JOHN PHILLIPS, PMK
17

18

19

20

21

22

23

24

25

THE SULLIVAN GROUP OF COURT REPORTERS

130

Exhibit 59

DX1321

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2    Note:  If you are adding to your testimony, print

 3    the exact words you want to add.  If you are deleting

 4    from your testimony, print the exact words you want

 5    to delete.  Specify with "Add" or "Delete" and sign

 6    this form.

 7

 8    DEPOSITION OF:       JOHN PHILLIPS, PMK

 9    CASE:                CHAVEZ v BONTA

10    DATE OF DEPOSITION:  AUGUST 16, 2023

11

12    PAGE     LINE     CHANGE/ADD/DELETE/REASON

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

25    Deponent's Signature _____ Date _____
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1322

131

```
 1   PAGE      LINE     CHANGE/ADD/DELETE/REASON

 2   _____     _____    _____

 3   _____     _____    _____

 4   _____     _____    _____

 5   _____     _____    _____

 6   _____     _____    _____

 7   _____     _____    _____

 8   _____     _____    _____

 9   _____     _____    _____

10   _____     _____    _____

11   _____     _____    _____

12   _____     _____    _____

13   _____     _____    _____

14   _____     _____    _____

15   _____     _____    _____

16   _____     _____    _____

17   _____     _____    _____

18   _____     _____    _____

19   _____     _____    _____

20   _____     _____    _____

21   _____     _____    _____

22   _____     _____    _____

23   _____     _____    _____

24   _____     _____    _____

25   Deponent's Signature _____ Date _____
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1323

```
 1    STATE OF CALIFORNIA    )
                             )   SS.
 2    COUNTY OF LOS ANGELES )

 3

 4          I, Debbie Strickland, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify;

 6          That the foregoing proceedings were taken

 7    remotely before me at the time and place herein set

 8    forth; that any witnesses in the foregoing proceedings,

 9    prior to testifying, were administered an oath; that a

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; that the foregoing transcript is a true record

13    of the testimony given.

14          Further, that if the foregoing pertains to the

15    original transcript of a deposition in a Federal Case,

16    before completion of the proceedings, review of the

17    transcript [ ] was [X] was not requested.

18          I further certify I am neither financially

19    interested in the action nor a relative or employee of

20    any attorney or any party to this action.

21

22          Dated this _31st_ day of _August , 2023.

23

24

25                              DEBBIE STRICKLAND, CSR 9036
```

THE SULLIVAN GROUP OF COURT REPORTERS

133

Exhibit 59

DX1324

## Exhibits

**Phillips Exhibit 1**
4:13 13:12,14 14:4

**Phillips Exhibit 2**
4:15 16:6,9,22 17:5,11, 24 18:2

**Phillips Exhibit 3**
4:16 61:20,24 62:6 68:11 89:16 90:3

**Phillips Exhibit 4**
4:18 82:13,18

**Phillips Exhibit 5**
4:20 85:21 86:1

**Phillips Exhibit 6**
4:22 63:21 64:1,7

**Phillips Exhibit 7**
5:3 78:15,20

**Phillips Exhibit 8**
5:5 69:15,18 71:23 73:5 76:25 81:13,25 90:9,20 91:14

**Phillips Exhibit 9**
5:6 83:1,6,17,19 85:6

**Phillips Exhibit 10**
5:8 83:23 84:3 86:21

**Phillips Exhibit 11**
5:11 86:12,16 87:2

**Phillips Exhibit 12**
5:13 87:24 88:4,19

**Phillips Exhibit 13**
5:15 92:7,12,24 96:3

**Phillips Exhibit 14**
5:17 97:4,8 113:13,18, 22 114:2 120:15

**Phillips Exhibit 15**
5:18 99:15,19 114:2,6 117:7

**Phillips Exhibit 16**
5:20 100:18,23 120:12

**Phillips Exhibit 17**
5:22 106:21 107:1,8

**Phillips Exhibit 18**
5:23 115:6,12,17

**Phillips Exhibit 19**

6:3 124:11,12,16

**Phillips Exhibit 20**
6:4 127:22

---

**$**

**$119.00**
97:19

**$5.00**
26:19

---

**(**

**(a)(3)**
124:22 125:9,16

**(b)**
125:1

---

**-**

**-000-**
60:24 129:13

---

**0**

**0008**
69:23

---

**1**

**1**
13:12,14 14:4 73:24 74:23 101:3,12,13 114:14 117:18 122:15

**10**
83:23 84:3 86:21

**10-**
43:14

**100-yard**
24:4

**10:02**
7:3

**11**
74:22 86:12,16 87:2

**11:41**
60:21

**12**
87:24 88:4,19

**12:15**
60:17,23

**12:17**
61:3

**13**
92:7,12,24 96:3

**14**
97:4,8 113:8,13,18,22 114:2 120:15

**1470**
128:11

**15**
18:2,6 20:21 74:22 99:15,19 113:8 114:2,5, 6 117:7

**15th**
110:18,19

**16**
7:2 61:2 100:18,23 120:12

**16685**
99:16,23 100:3 113:5, 19,23 114:6 117:6,8,13

**17**
96:4 106:19,20,21 107:1,8 109:21

**1700**
25:11

**18**
60:4 115:6,12,17 121:8 123:1

**19**
124:11,12,16

**1971**
128:11

**1:35**
96:23

**1st**
110:16,18,21 111:15 112:18 114:22 116:14, 17,20 122:11 128:5,15

---

**2**

**2**
13:22,23 14:3 16:6,9,22 17:5,11,24 18:2 62:6

73:13 108:18 114:13 116:10 117:17

**20**
24:20 28:10 45:8,16 80:24 123:1 127:17,18, 22

**200,000**
58:5

**2014**
19:2 29:11 37:14 55:6

**2017**
70:20,24,25 71:3,24 73:23 74:15,22

**2018**
21:24 39:16 46:16 70:21,24 73:6,23 74:16, 23

**2019**
39:7,15 41:8 46:2,17, 18,22 47:1 49:20 55:19, 21 70:21,24 73:11,23 74:16,23 110:5 118:22

**2020**
21:24 29:9,10 37:19,22 38:1,3,11,14 45:16 70:3,21,24,25 73:13,24 74:16,23 76:8 77:1 82:1 112:13

**2021**
21:21 37:8 80:22 81:1,4 108:20

**2021-2022**
78:8

**2021-DLE-11**
107:10

**2022**
21:19 37:1,15 82:5

**2023**
7:2 61:2 79:7 81:4 82:3 85:3 88:10 101:3 114:22

**2024**
45:11 101:4 114:22

**2094**
7:23 61:7

**21**
15:25 31:1,3,7,13,17

---

32:4,12 33:1,22,24
34:4,24 35:3 39:4 41:1
42:1 46:4 50:16 52:21
54:20 55:17 56:4,9,14,
24 58:1 68:4 71:2,24
73:7,18,23 74:2,4,5,16,
18,21,25 75:3,8,16
76:15,18 77:3 80:24
98:1,13 101:25 102:8,
11,12 109:9 121:4,8
124:25

**22**
77:4 107:14

**23**
77:4

**24-hour**
43:14

**25**
44:1

**25-yard**
24:3 30:9

**250**
108:20

**25th**
85:3 88:10

**26**
73:22,23 107:14

**26th**
79:7

**27510**
15:25 31:21 32:5 35:8
40:15 41:1,8 46:2 48:23
49:17 50:8,14,17,23
54:14 56:24 66:9 94:15
95:23 98:7,16 118:22
125:1

**28**
80:6

**28210**
109:17 111:21 124:13
125:8,16

**28215**
109:17 111:21

**294**
74:15

**2:40**
126:22

**2:46**
129:11

---

**3**

**3**
14:3 61:20,24 62:6
68:11 89:16 90:3
108:18 120:22

**30**
54:3 71:17 101:4,12,14
116:14,17,20 122:16

**30(b)(6)**
13:12

**30-minute**
60:15

**30-question**
42:25

**3031**
114:13 117:17

**3037**
127:8,25 128:10,13,21

**30th**
111:16 112:18 114:22
122:11 128:5,15

**32**
79:25

**33**
71:3,5,24

**34**
20:12

**36**
73:6 79:4

**362**
51:1,2

**37**
20:7,15

**389**
74:16

---

**4**

**4**
74:23 82:13,18 92:17
114:14 117:18 120:22

**42**
20:11

**4473**
21:16 43:6,22,25

---

**5**

**5**
47:22 48:1 85:21 86:1
93:3

**50**
37:15 45:7

**50-yard**
24:3 25:13

**50/40**
37:10

**50/50**
37:10

**52**
18:9,18

**55**
18:10,14,18

---

**6**

**6**
62:10 63:3,21 64:1,7
73:11 96:3,13

**6.5**
21:20 37:6

**60**
37:3,6,12,15

---

**7**

**7**
17:10,24 47:22 48:1
74:16 78:15,20 90:3

**7,000**
55:3,16 59:23 60:1,3

**70**
54:1 71:20 74:16

**715**
108:19

**75**
24:23,24

---

**8**

**8**
69:15,18 71:23 73:5,23
76:25 81:13,25 90:9,20
91:14

**80**
28:5 38:20 51:8

**80,000**
58:6

---

**9**

**9**
83:1,6,17,19 85:6 90:3

**916-210-2300**
107:25

**95**
54:7

**99**
110:11

---

**A**

**A-X-I-S**
29:11

**a.m.**
7:3 59:12 60:21

**ability**
55:24 64:10 83:21

**abreast**
103:7,16

**absolutely**
50:2,4 123:12,13

**accept**
113:2 117:4

**access**
25:19 48:4 54:22 65:19
71:14 104:19

**accesses**
104:14

**accessory**
59:1

**accommodate**
12:4 25:10

**accordance**

---

7:23 61:7 128:4

**account**
24:23 26:20,23 52:9
66:2,4,6 67:8

**accountable**
106:3

**accounted**
24:20

**accounts**
67:11

**accurate**
37:14 82:9 91:22,24
105:4

**acknowledge**
104:2,22 105:8

**acknowledgement**
121:21

**acknowledging**
39:12

**acquainted**
14:19

**acronym**
8:23

**action**
17:2 95:23

**actions**
42:14

**activities**
23:25

**activity**
58:7

**actual**
55:25 112:25

**add**
47:23

**additional**
30:13 70:21 76:17
80:11,14 81:4

**Additionally**
80:8

**address**
26:24 95:17

**administered**
7:22 43:2 61:6

**administrative**
44:15

**Admissions**
82:14 83:3,25 84:14

**ADP**
44:20

**ads**
22:23

**adults**
93:6,17 94:6 96:6

**advanced**
51:24,25 53:13 54:5

**advise**
121:7 123:17

**advised**
118:14,15,18 121:3

**advisement**
121:13

**affected**
37:23,25

**afternoon**
106:9

**age**
15:25 30:23,24 31:3,7,
12,20 32:12 34:4,18,24
35:3 40:25 41:22,23
46:4 50:16 52:18 54:9,
12,14,20 55:16 56:4,9,
14,24 58:1 59:14,17
68:4 71:24 73:7,23
74:16,21 75:3,8,16
76:3,5,8,18 98:13
101:25 102:8 109:9
121:8 124:25

**agencies**
24:14

**agency**
95:22

**ages**
123:1

**agree**
68:10 81:17

**agreed**
10:20

**ahead**
43:21

**Albrecht**
7:11 8:2,5 13:16 16:11
31:10,18,24 32:10,16,
24 33:6,13 34:2,11,21
35:7 37:5 39:5 40:2
41:14,24 44:12 46:1
48:14 49:6,14 50:5,13,
21 51:4 53:5 54:24
55:4,14,20 56:6,12,22
57:6,12,21 58:12 60:8,
20 61:11 62:1 63:13
64:3 65:4 66:1 67:1,6
68:1,9,19 69:1,12,20
72:12 73:4 74:13 75:22
76:10,24 78:13,22
79:15 81:24 82:11,20
83:8 84:5,20 85:19
86:3,18 87:18 88:6
90:15 91:7,13 92:5,14
93:20 94:3 95:7 96:2,
20,23 97:2,10 99:6,21
100:13 101:1,22 102:21
113:13 114:1 120:13,23
124:18 126:17,22
127:15,18 129:3,10

**algorithm**
23:12

**all-hands**
106:5

**Allison**
8:8

**allowed**
25:25 26:1 27:11 28:19
52:15 93:22

**allowing**
99:3

**alluding**
119:4

**ambiguous**
32:20 33:9 34:7 39:1
44:7 45:20 48:13 49:13
50:18,24 52:25 55:7
56:11 58:3 64:25 65:21
66:22 68:21 72:24 76:4,
22 82:7 85:15 94:1
121:16

**amended**
16:12,21 17:5,7 108:3
128:11

**amendment**
15:24

**ammunition**
42:8 59:1

**amount**
25:6

**animals**
118:10

**annually**
27:10

**answering**
10:4 11:2

**answers**
10:7,16 86:8 90:4

**apologies**
25:2 127:3

**Apology**
114:1

**appearances**
7:9

**appearing**
7:1 10:10 61:1

**appears**
120:21

**applicable**
36:9,10 109:9 122:7

**applications**
62:23,24 63:8

**applies**
54:15

**apply**
52:22 98:7,20 121:24
123:24

**applying**
122:1

**appropriately**
85:13

**approximately**
9:9 20:15 37:15 38:13,
16,20 46:14 59:23 60:1

**arduous**
77:23

**argumentative**
41:12,18 50:3,10 57:14
58:2 67:24 68:7,13
72:24 76:22 78:9 81:19
82:6 90:13 91:4 92:1

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1327

93:13 94:1,25 95:24 96:16 98:18 100:6 101:16 112:21 121:17 122:13 123:22 128:18

**armed**
32:1

**Article**
114:13 117:17

**ascertain**
34:16

**assault**
42:17,18 46:23 48:3,5, 10,19 95:13

**assigned**
20:16,19,23 21:3,4 27:11

**assist**
83:13 85:8 86:8 88:16

**assistance**
78:4

**assisted**
77:25

**associates**
42:9

**Assumes**
112:20

**asterisk**
121:23 123:24

**attend**
54:25 58:1 74:6

**attended**
56:8

**attending**
54:16 56:14 96:6

**attorney**
7:10 8:6,7 14:16 70:17 79:1,14 81:22 83:11 84:9 85:9,11 88:15 91:19 92:22

**attorney-client**
69:6

**attorneys**
36:16 94:9 103:15

**attribute**
41:7

**audit**
46:11,21,24 47:1 48:3 118:16

**audited**
112:11,14

**auditors**
110:23 112:4,7 120:2

**audits**
46:20

**August**
7:2 61:2 110:16

**authorized**
67:15 68:16 100:10,11 114:15,24 115:1 117:3, 20 118:6,9

**authorizes**
128:2,14

**average**
20:6 33:16 45:24

**aware**
16:4 17:14 23:2,3 31:19 32:15,17,19,21 41:13 80:21 103:16 109:20 110:25 111:18 112:17 114:10 121:25 122:25 124:3

**Axis**
29:11,13,19 70:13 72:14 78:4

**B**

**B-I-Z-Z-F-L-O**
29:8

**back**
21:25 22:16,17 25:18 27:16 29:4,6 40:4 42:9 43:13,14 46:16 47:6 55:11,24 60:16 73:3,5 75:5 89:15 94:19 96:23 110:25 113:7,14 117:6 119:19 120:9 122:24

**bad**
34:10

**ball**
40:1

**bandwidth**
77:8

**based**
11:10,12 30:7 35:25 45:22 49:7 52:15,20 55:23 68:20 70:18 81:21 85:16 110:21 112:24 114:25

**basic**
30:8

**basically**
28:17 51:13 59:2

**basis**
19:24 33:14 40:13 93:21

**bathrooms**
35:17

**bay**
24:3,4 25:13

**bear**
12:22

**beginner**
71:6,9,25 73:7

**beginners**
71:11

**beginning**
7:10 53:12,16,24 71:5 106:7 126:11 128:6

**behalf**
61:17

**big**
25:9,10 77:7

**bigger**
45:14

**birds**
100:10 114:16,24 117:20 118:7,10 128:3, 15

**birth**
59:16 72:2,6,16,21,22 73:9,20 75:4,6,25

**bit**
42:4 45:13 65:14

**Bizzflo**
29:8,12,14,16,18,20 44:4 59:4,7 78:7

**blasts**
22:4 65:13,15,20

**Bleed**
53:3

**BLM**
38:4

**blowing**
69:10

**Bonta**
8:7 9:2 15:21 16:19

**Book**
48:8

**books**
19:20

**Border**
24:13

**bottom**
13:23 14:2 18:11 87:5 115:25

**bounce**
20:9

**bounces**
20:6,8

**Bound**
48:8

**break**
12:3,6 53:15 60:14,16 96:21 102:20

**breakdown**
70:3

**bring**
28:2,6 29:23 30:14 38:21 53:6 54:4,6,8 56:18

**brings**
54:10

**brought**
22:17 27:24 41:15

**built**
35:18 37:12

**bullet**
108:24

**bulletin**
104:22 107:5,7,9,13,16, 21 108:2,9,13

**bulletins**
103:20,23 104:15,20

105:3,8,15 108:14

**bunch**
59:18

**Bureau**
8:9 94:12,14,16,17 95:9
107:21,25 117:2 119:10
122:18

**business**
9:12 20:17 21:4 37:12,
23,25 66:9 91:21
104:21 105:9 106:4

**busy**
57:16

**button**
69:9 105:2

**buy**
125:19

**buying**
51:1 102:4

**C**

**cabinet**
40:21 47:10,11,15
48:16

**Cajon**
24:12

**California**
7:12 8:6 15:24 33:21
36:3 42:15,18 43:6
46:21,23 52:20 94:11
98:1 99:16 103:12,17,
19 105:10 107:17 117:1
121:4 124:13 127:8

**call**
20:6 51:11 57:15 77:15
119:23,24 123:25

**called**
29:8 51:10,12 53:3
95:20 119:9

**calls**
31:8,14,22 33:25 39:2
41:18 49:3 52:24 54:17
55:18,22

**capability**
29:14

**capacity**
19:19

**captured**
75:9

**carving**
51:23

**case**
7:13 8:11 9:2 15:23
70:5,16 91:11,22 92:16
94:21 119:6,25

**categories**
64:23 65:5,8

**CCP**
7:23 61:7

**CCW**
51:24

**Cection**
113:19

**centerfire**
109:11

**certificate**
42:23

**Certified**
7:6

**challenge**
15:24

**change**
38:24 70:19,22

**changed**
35:23

**Chapter**
108:20 114:14 117:18
128:11

**charge**
75:15

**Chavez**
9:2 15:20 16:18

**check**
27:5,17 30:17,20 35:17
44:20 58:9 68:18
104:23 105:11

**checked**
27:8 67:20

**checking**
112:15

**checkmark**
57:24

**checkout**
27:17

**choose**
43:4 59:16 99:2

**chronologically**
47:17,18 48:17

**chunk**
58:16

**circumstance**
122:25

**circumstances**
20:9

**citizenship**
30:21 52:15

**clarification**
119:11

**clarify**
104:9,25

**class**
51:10,13,24 52:2,7,11,
14,17,19 53:1,14,18
54:2,10,16,21 55:10
56:3,14 57:19 58:1
59:10 60:4 71:6,7,9,12,
13,17,25 73:8 74:7,11
97:14,16,19 98:22,24
102:1 121:3 122:5,8

**classes**
24:6 38:7 51:10,14,16,
17,19,21,23,24 53:12,
13,16,24 54:5,25 55:9
56:2,8,19 57:4 71:6
81:9 96:7 124:1

**classroom**
58:10

**clean**
35:16,17

**clear**
58:19,24

**clerical**
121:22

**click**
104:2,5 105:2

**clipboard**
57:24

**clock**

35:14

**close**
35:14 60:15 101:2

**closed**
38:6,11 97:24,25

**cloths**
97:25

**cloud-based**
29:21

**Code**
15:25 31:20 32:5 35:4,
6,8 40:15 46:2 48:23
49:17 50:8,14 94:15
95:16,17 98:7,16 99:16,
22 100:3 109:16,20
111:21 112:25 113:4,
19,22 114:6,12,15
117:6,8,12,19,25 118:1
119:17 122:17 124:13
125:8,16 127:8,12
128:1,22

**colleague**
7:14 102:17 111:13
113:4 119:8 121:1

**column**
70:21 71:3

**columns**
70:20

**comfortable**
97:24 121:14

**commenced**
100:11 114:16 117:21

**commencing**
114:13 117:17

**commenting**
49:9

**communicate**
67:17,21

**communication**
62:11,16,18 68:10

**communications**
62:11,18 63:2,3 66:7,8
67:3 80:19 84:17

**community**
22:25 23:8

**company**

102:15

**company-wide**
36:11

**compelled**
105:11

**compile**
57:19

**complain**
68:3

**complaint**
16:13,18,21 17:2,5,8

**complete**
64:9 83:20 87:21 89:13 92:3

**completing**
110:5

**compliance**
21:15

**comply**
23:4,7 95:23

**compound**
32:9,14 33:3,9 34:7,25 39:2 44:8 45:21 50:18, 24 55:2 63:10 65:1,22 68:22 74:9 75:21 76:21 82:6 85:15 94:1

**concern**
76:9

**concluded**
129:12

**conclusion**
31:14,22 32:8 54:17 68:14 81:20 82:7 90:14 91:5 92:2 93:14,25 95:25 100:7 101:16 112:21 114:18 118:2 122:12 128:17

**condition**
12:14

**conduct**
63:1 80:13 104:21 105:20

**conducting**
106:4

**confirm**
76:17 86:25 109:3,14,

22 125:3,19,24

**confirmed**
27:21

**conjunction**
92:22

**connection**
81:14

**considerably**
40:23

**consistent**
58:23,25

**consists**
58:19

**constantly**
35:25 36:20 41:21 105:23,24

**consult**
40:9 69:2 94:4,8

**consulted**
69:7,8 79:1,13 83:11 84:9

**contact**
94:11,16 107:20

**contacted**
94:14,23,24 95:1,8

**contained**
64:6 87:11

**context**
9:8 46:19

**continually**
96:12

**continue**
18:12 56:8

**continued**
39:24

**continuing**
14:3

**contract**
24:12,21 25:3,14,15

**contracts**
24:20,22 25:6

**contradictory**
114:20

**control**

45:1

**controllers**
45:2

**conversations**
81:22 85:10,16

**converted**
29:12

**conveyed**
88:14

**copies**
43:9,24 47:3,13

**copy**
35:5,8 43:23 63:16 129:7

**corporation**
20:3

**correct**
16:13 32:6,7 38:22 41:5,6 43:9 49:20 59:24 61:14 64:7 65:12 70:7 76:20 77:1 79:8 81:8, 15,16 82:1 83:17 84:24, 25 85:3 87:1,12,19 88:11,20,25 89:11 90:16,24,25 91:25 92:19 97:19 98:7,8,11, 16 105:15 106:14 107:8,22,25 108:4,5 111:16 113:5 114:1,17 116:7,24 118:13 121:5, 11,15 122:11 124:14 125:22 126:2 128:22

**correction**
71:22 114:4

**correctly**
30:19 47:7 71:23 73:6 74:14 93:10 96:8 98:3 109:1,18 117:22

**cost**
97:18

**counsel**
7:9,16 8:17 11:20,22 124:9

**count**
55:25

**counter**
27:6 35:5,6,9 36:8 40:18 42:8,9 57:24

123:25

**counters**
42:6

**County**
14:21

**couple**
56:20 77:13,15,16 124:8

**courses**
59:4 60:2

**court**
7:5,7,18 10:6,12,15 104:9 106:18,19 113:8, 10 127:19,21 129:6

**cover**
73:16

**covers**
35:12,14

**COVID**
37:23 38:3,4 45:16 55:8

**create**
26:23 43:10 52:9

**created**
19:1 70:17 79:8 81:9

**creating**
26:20 70:14

**criminal**
93:8 108:20

**crystal**
40:1

**curious**
111:19

**current**
78:7 82:10 101:13

**customer**
59:8,15,19 72:2,3

**customers**
46:4 48:24 49:2,12,16 50:7 57:18 59:7,18 96:6

---

**D**

**D-R-O-S**
104:10

**daily**
19:23

**damage**
91:23

**Danielson**
19:10

**data**
70:13 76:6 77:14 78:1, 5,8,11

**date**
23:20 40:11 47:19 48:18 59:10,16 72:6 73:8 75:4,6,25 79:4,6 80:23,24 85:2 88:10 99:9 101:21 103:10,22 107:12 119:3 126:11

**dates**
72:3,16,21,22 73:20 99:4 109:5 110:2 111:6, 10 125:5,9 126:1,5,10

**daughter**
56:18

**day**
19:25 22:16 33:16,18 49:4,5 51:1 57:16 77:20,21,22 99:10 101:24 102:3,5 103:4

**day-to-day**
19:16,21 35:4 40:17

**days**
51:1 77:22,23 111:2

**dealer**
42:17 46:23 47:4 73:17, 19 103:6 106:3 109:2,4, 11

**dealers**
16:2 109:21

**Debbie**
7:6

**decent**
58:15

**decently**
111:1

**decision**
49:22

**decisions**
53:19

**declaration**
15:8 92:8,16,21,24

**Declaratory**
16:13

**declare**
92:17

**decrease**
39:3,9,14

**defendants**
7:13 8:9

**Defendants'**
61:21 63:22 78:16 82:13 83:2,25 85:21 86:13 87:25 89:17

**defense**
51:23

**defer**
99:2

**define**
105:24

**defined**
114:13

**defining**
117:25

**definition**
62:11,14 63:2

**definitions**
62:7 89:25

**deliver**
109:12

**delve**
44:9

**demand**
39:25

**demographic**
59:9

**denial**
33:20

**denied**
33:5,7

**deny**
33:17 34:8 49:10 96:5

**department**
7:12 8:6,8 21:6,8,14 24:11,22 25:7 46:21,23 80:20 94:11 95:21 99:12 100:14,19 101:10

107:17 111:14,22,25 112:23 114:21 117:1,4, 16 119:6,10 122:14,18

**depending**
22:8

**depends**
22:9,16 30:15

**deposed**
7:17 9:8,10,11,12,15

**deposition**
9:4 11:9 12:9 13:12 14:12,23 15:2,15 60:22 104:11 129:12

**depositions**
9:21

**Deputy**
8:5

**describe**
18:23 21:8 35:11 42:4

**describes**
125:17

**description**
108:23

**deserve**
71:16

**determination**
94:5

**determine**
40:5 112:1

**devices**
63:8

**Diego**
24:11,21 25:7

**difference**
11:6,17 53:15

**differentiate**
74:11

**dig**
73:3

**Dillon**
7:15 14:16 31:8,14,22 32:8,14,20 33:3,9,25 34:7,15,25 37:2 39:1,21 41:12,18 44:7 45:20 48:13 49:3,13 50:3,10, 18,24 52:24 54:17 55:2,

7,18,22 56:11,15 57:1, 9,14 58:2 60:18 63:10 64:25 65:21 66:22 67:4, 23 68:6,13,21 69:4 72:10,24 74:9 75:21 76:4,21 78:9 79:12 81:19 82:6 84:16 85:15 87:17 90:13 91:4 92:1 93:13,25 94:25 95:24 96:16,22,24 98:17 100:6 101:15 102:23 104:7 105:16 112:20 114:18 118:2 121:16 122:12 123:6,20,22 125:11 126:8,18,20,23, 25 128:17,23 129:6,8

**direct**
62:22

**directed**
116:5

**director**
8:8 23:21

**disagree**
112:22

**discounts**
21:12 30:14

**discovery**
61:13 91:18

**discuss**
14:12,23 105:21

**discussed**
71:19

**discussing**
39:12 104:10 123:4

**discussions**
40:22

**display**
40:19

**Division**
107:17 114:14 117:18

**divorce**
9:12,16

**document**
12:25 13:4,9,11,17,20, 23 16:5,7,12,15,17 61:19,21 62:2 63:21,24 64:4 66:7 68:23 69:14, 15,25 70:6,10 75:9

Exhibit 59
DX1331

77:11,25 78:14,15,18, 25 79:2,4,8,11,22 81:6, 12,14,15,17,25 82:4,9, 12,16,21,23,25 83:1,4, 10,14,23 84:1,6,8,10,22 85:2,5,21,24 86:6,14 87:1 88:2,15 89:6,15,20 90:9,19,24 91:3,14,19 92:6,10 97:9,6 98:5 99:14,15,25 101:9,20 107:4 109:5 110:1 115:8,15,16 119:24 125:4,25 127:4,7

**documentation**
43:5 47:9

**documents**
15:3,4,11,13 47:2 48:2, 4 63:1,9,23 64:11,14, 18,20,21,23 65:5,8,12, 20 66:11,14 67:11 68:16 69:3 70:7 78:17 80:9,11,14,21 81:5 85:17 87:11 91:2,17 124:8

**DOJ**
46:9 47:1,2 103:19 106:1,11 110:22 112:4, 7,14,24 113:2 115:1 118:9,14 120:2

**dozen**
9:7,9 33:18

**Dozens**
35:25

**draft**
79:16 92:23

**drafting**
17:4,21 18:17 96:13

**drafts**
17:7

**Dragonfly**
44:22

**dream**
122:1

**drop**
40:14 41:7,11 45:18

**DROS**
21:15 43:7 46:10 48:6 73:15,21 103:17,24,25 104:1,10,12,14,16,19

105:5,10 108:11

**DROS's**
47:4,13

**due**
25:8

**duly**
7:22

---

**E**

**earlier**
27:19 38:20 40:24 65:11 71:19 90:10 98:9 101:23 111:13 119:8 120:25 121:1

**easier**
46:9

**educate**
34:9,20 49:10 118:23

**educated**
33:4 119:5

**effect**
39:4,18,24 40:16 41:1,8 46:3 48:23 50:9,14,23 56:5,7,25 106:5,11 111:22 112:13

**efficiency**
36:2

**EI**
24:12

**electronic**
43:16 44:2,5,14 62:21

**email**
22:4 26:24 52:9 59:9,20 65:13,15,19,20,23 66:2, 4,6 67:8,10,17,21 68:2 78:2 80:18

**emails**
63:5,14 65:11,18 80:18

**employee**
35:13 67:9 104:14

**employees**
20:5,9,15,16,22,25 21:2 36:4 44:20 65:24 66:18 67:7,14,17 68:2,18 104:19 105:1,14,21

**employees'**

67:10

**empty**
40:18

**enacted**
93:16 109:21

**encompassed**
58:17

**end**
34:10 44:21 78:12 108:25 126:11

**enforcement**
9:10,11 32:2 42:16,18 46:12 48:3 95:22 98:23 107:18

**enrolled**
71:25 73:7

**ensure**
67:20 85:12 103:10

**ensures**
27:23

**entail**
21:14 22:3 42:5

**enter**
59:16 105:6

**entire**
24:11 79:21 104:11 122:10

**entirety**
86:6 89:24 127:25

**entities**
24:7,8

**entitled**
11:3 47:3 107:4

**entity**
19:10

**environment**
20:10 53:20,21

**errors**
17:24 18:21

**estimate**
11:6,12,13,18 41:4 47:20 49:4,7 53:25 72:20 101:23 110:4

**estimates**
11:4

**estimation**
33:17

**evidence**
112:20 128:18

**exact**
29:5 80:23,24

**examination**
8:1 13:24 14:4,6 61:10 103:1

**examined**
7:24 61:8

**exception**
121:13,21

**exclusively**
25:13

**excuse**
18:2 26:10

**exempt**
32:23 34:17

**exemption**
98:20 109:7 110:15 121:25 123:3

**exemptions**
16:3 31:20,25 32:5,12 33:2 34:6 35:3 50:17 98:6,10,16,20 121:24 123:15,24 124:2

**exhibit**
12:22 13:12,14 14:4 16:6,9,22 17:5,11,24 18:1,2 61:20,24 62:6 63:21 64:1,7 68:11 69:15,18 71:23 73:5 76:25 78:15,20 81:13, 25 82:13,18 83:1,6,17, 19,23 84:3 85:6,21 86:1,12,16,21 87:2,24 88:4,19 89:16 90:3,9,20 91:14,21 92:7,12,24 96:3 97:4,8 99:15,19 100:18,23 106:18,21 107:1,8 113:7,13,18,22 114:2,6 115:6,12,17 117:7 120:11,12,15 124:11,12,16 127:16,22

**exhibits**
129:9

**existing**
33:4

**experience**
55:23

**experiment**
106:24

**expired**
100:11 114:16 117:21 119:3

**expires**
110:19 119:3

**explain**
65:14

**exponentially**
55:9

**expressly**
100:3

**extent**
53:14 72:1 85:12

**extrapolate**
78:11

---

**F**

**face**
93:8 118:19

**Facebook**
22:9,17,20

**Facebook's**
23:7,12

**facility**
22:5 24:12 25:12 26:2, 4,6,12 27:2 28:1,20 35:15 44:24 52:4,5,12 58:6 93:19,23 102:6

**fact**
68:3 121:23,25 122:9

**facts**
112:20 128:18

**failure**
23:7 95:23

**fair**
10:21 122:22

**familiar**
16:15 18:5,13 62:2 78:23 82:21 86:19 99:22 100:14

**family**

47:25 57:5

**fan**
69:10

**fashion**
78:11

**fearful**
38:5

**feasible**
58:11

**feature**
106:23

**February**
112:11

**federal**
27:25 106:11

**federally**
16:2 18:24 103:14

**fee**
30:10 43:1

**feel**
12:11 53:15 99:25 105:11 121:13,19

**felt**
68:15

**FFL**
30:22

**file**
27:9 47:10,11,15 48:16

**filed**
16:18

**files**
63:16

**fill**
43:5,6

**financial**
50:22

**find**
64:24 65:6,9 66:11 117:1

**fine**
60:18 102:23

**fines**
118:19

**firearm**

22:24 28:4,6,11,12,16, 19,22 29:6 30:18,22,23, 25 31:16 32:6,11,22 33:1,24 34:5 35:16 38:17 40:25 41:7,11,17 42:1,20,23 43:4,11 45:17,22 46:3 48:25 50:15 51:1,25 52:23 53:2,17,23 54:2,3,10, 11,12,15,20,23 56:14, 17 58:20,25 68:5 71:14, 15,18,21 74:3,5,15 95:12 98:2,15 102:4,13 105:6 109:8,12 121:5, 10 123:2 124:24 125:20

**firearms**
8:9 16:1,2 21:16 28:3,9, 15,24 29:24 30:16 31:12 36:10 38:21 40:6, 14,19 41:16,22 42:11, 12 45:6,13,18 46:22 47:22 48:7,20 51:2 53:6,10,18 54:6,8 74:18,20 93:7,17 94:6, 12,14,17 95:9 96:7 102:6 103:6,7,11 105:21 106:3 107:21,25 109:2,9 110:5 117:2 119:10 121:14 122:19 123:1,10,16

**Firearms/weapons**
108:3

**Fish**
100:14,19 101:10 111:14,22,25 112:23 114:14,21 117:16,18 118:1 122:15 127:8,11 128:1,21

**fit**
28:13

**fliers**
64:16

**fluctuated**
55:5

**focus**
51:9 71:11

**focused**
63:12,14

**follow**
38:19 73:3 112:19 122:11

**follow-on**
51:13

**font**
101:3

**forced**
93:5,12,18 94:5

**forces**
32:1

**foregoing**
88:24 92:18

**forgot**
38:2

**form**
11:21 27:19 54:19

**formal**
9:11

**forms**
43:24

**found**
23:12

**Foundation**
36:19

**Founder**
19:15

**free**
26:20 44:22 53:15 99:25 121:19

**frequently**
115:9,15,18,19 116:4

**Friday**
25:13

**friendly**
29:16

**friends**
28:10

**frustrated**
102:9

**full**
8:13 13:4,8,9,20 40:21 42:7 48:7 62:4 82:23 114:7

**fun**
106:23

---

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1333

## G

**game**
112:23 114:14,22
117:19 118:1 122:3,15
127:8,11 128:1,22

**Gathered**
88:14

**gave**
85:11 119:23 120:5

**gear**
8:21,24 13:13 61:22
82:15 85:23 89:18
97:22 104:14 105:19
120:19 121:2,3

**Gear's**
63:22 78:16 83:2,24
86:12 87:25

**general**
8:6,7 21:18 36:12,14
37:23 78:1 109:7

**generally**
9:20 28:2 35:12 101:12,
17

**generate**
92:4

**generated**
84:9 85:18 91:12,14,19

**gestures**
10:24

**gifts**
47:24

**give**
11:5 12:12 23:1 72:19
93:17 94:17 95:3,4,5
106:22 115:6 119:21
120:1,13

**giving**
12:15,19

**glass**
42:7

**go-around**
80:17

**goal**
37:12

**good**

7:5,11,15 8:3,4 53:19
60:14 80:1

**government**
24:7,8,19,22 25:6

**granted**
117:2

**Great**
9:24 13:3,10 18:14
102:24 108:6 115:11
119:24

**ground**
9:22

**grounds**
33:20

**group**
7:7 46:4 51:16,17
102:11

**Groupon**
102:9,10

**groups**
36:20 94:10 103:13
119:1

**grown**
55:11,13

**guess**
11:3,7,10,16,17 31:9
33:11 37:20 38:9,15,18
39:17 50:19 70:3 72:11
73:2 96:18

**guest(s)**
98:1

**guests**
30:14 121:4

**guidance**
95:6 119:23 122:17

**gun**
23:10,14 42:6 43:13
112:9,10

**guns**
28:21 42:8 51:22

**gunsmith**
21:18

**guy**
34:10

**gym**
21:13

## H

**half**
9:7,9 22:22 60:13 72:9
77:20

**hand**
7:19

**handbook**
35:20

**handbook/policy**
35:13

**handgun**
51:23

**handguns**
42:7,13 51:11,14
109:10

**handle**
34:23 52:23 98:2 121:5,
10

**handling**
53:2

**happen**
93:18

**happened**
48:5 56:20

**happy**
113:14

**hard**
23:3 63:16

**hazard**
38:9

**head**
10:24 21:22 60:12

**heading**
13:23 88:19

**headwinds**
45:23

**heard**
56:19

**heavier**
45:13

**heel**
97:24

**height**
11:10,11,12,13,14,16

**held**
52:13

**helped**
86:22

**helpful**
113:14

**helping**
77:13

**high**
20:11

**higher**
45:12 60:2

**hire**
20:13

**hit**
69:9

**hold**
54:21 55:9 127:6

**holder**
128:14

**holding**
106:3

**home**
20:1 51:23 53:21

**honor**
117:4

**hour**
60:13,15,21 75:15
77:20 129:11

**hours**
77:20,23

**HR**
44:20

**Human**
44:15

**hungry**
12:2

**hunter**
32:2

**hunting**
34:14 98:10,21 99:1,2,
3,4,8,11 100:4,12,20
101:7,11,13,19 109:3,6,
13,22 110:2,4,8,17
111:2,4,5,11,15 112:2,

5,6,16,18 114:12 115:1,
20 116:6,9,13,17,19
117:15,25 118:24
119:12 121:9,14 122:1,
6,8,9 123:3,11 125:2,9,
10,18,24 126:6,7,9,10,
12 128:2,13

**hypothetical**
32:9 33:10 41:19 52:25
58:4 68:6 98:18,19
111:3

**hypothetically**
110:16

---

**I**

**i.e.**
53:21

**ID**
27:6,7,18,20,22 43:4
52:13 76:7 104:2 109:5
110:1 125:5 126:1

**identification**
13:15 16:10 28:18
61:25 64:2 69:19 78:21
82:19 83:7 84:4 86:2,17
88:5 92:13 97:9 99:20
100:24 107:2 115:13
124:17 127:23

**identified**
15:14 64:21

**identify**
15:4 63:9 69:3 72:1,4
76:5,14,15

**identifying**
64:18

**IDS**
43:10

**imessage**
66:20

**impact**
39:19 50:22 66:8 70:18

**impacted**
38:7

**impacts**
91:20

**important**
10:16 50:1,6

**impossible**
57:10,13

**include**
74:2 75:19 80:1

**included**
72:6 76:19

**including**
62:21,22 89:24 98:10

**incomplete**
32:9 33:10 41:19 52:25
58:3 68:6 91:25 98:18

**increase**
25:4 38:14

**incredibly**
56:21

**independent**
15:17

**India**
27:25

**individual**
98:13

**individuals**
28:24 30:2,16 34:4,24
40:25 50:15,16 52:18
54:15 56:9 73:22 74:15,
20 75:24 76:18

**indoor**
18:24 23:22 24:2,4

**industry**
29:20 36:18,20 94:9,10
103:13 119:1

**inform**
101:6

**informal**
10:9

**information**
26:22 29:23 46:6 47:2
52:6,10 57:20 59:6,9,19
62:19 69:5 88:14
103:20,23 104:15,20
105:7,14 107:5,7,9,12,
16,20,21 108:2 120:6

**informational**
97:15 105:8

**initial**
39:18

**initially**
39:4,6 40:15

**injunction**
15:9 92:9

**Injunctive**
16:13

**innovative**
44:18

**inquire**
34:4

**inquiring**
57:3

**inside**
66:18

**inspect**
109:3,22 125:2

**inspected**
112:9 125:24

**inspecting**
125:18

**inspection**
46:11 109:13 126:7

**inspections**
46:19 48:6

**inspector**
112:15

**Instagram**
22:9,18

**instances**
9:9

**instruct**
34:23

**instruction**
51:18

**instructions**
34:22 85:11 89:24 90:2
91:1

**instructor**
55:25

**instructs**
11:22

**intend**
52:23

**interest**

19:11

**interested**
102:3,5

**interesting**
106:24

**intermediate**
51:24

**internationally**
103:14

**interpret**
114:25 118:8 119:17

**interpretation**
23:5 106:1 118:18

**interpreting**
103:19 122:17

**interrogatories**
85:22 86:9,13 88:1

**interrogatory**
15:6

**interrupt**
10:18,19

**intro**
98:22,24 122:8

**introduce**
113:11

**introducing**
28:15

**Introduction**
51:11,13

**introductory**
51:10,21 53:12

**inventory**
48:7

**involve**
53:2

**involved**
19:16 61:16 83:9

**involvement**
79:11

**involves**
15:23

**involving**
48:5

**ipads**
45:1

**iphone**
66:20

**issuance**
100:11 119:3

**issue**
27:13 28:21,22

**issued**
99:10,11 117:15 118:5
122:2,20 128:3,5

**issues**
25:9 52:16

**item**
127:2

**items**
95:13,15 116:6

**J**

**January**
107:14

**Jenny**
7:14

**job**
104:24 105:1,12

**John**
7:15,16,21 8:15 14:16
61:5 92:8

**join**
49:22

**joined**
7:13

**July**
79:7 85:3 88:10 101:3,
11,13 111:15 112:18
114:22 116:14,17,20
122:10,15 128:5,15

**June**
101:4,12,14 111:16
112:18 114:22 116:14,
17,20 122:11,15 128:5,
15

**junior**
116:19

**Justice**
7:12 8:7 46:21,23 95:21

99:12 107:17 119:6,10
122:18

**Justice's**
94:12

**K**

**keeping**
23:19 57:23

**kicked**
22:8,12,14,19

**kid**
57:18

**kids**
20:1 56:2 57:4

**kind**
17:14 19:21 22:9,10
28:14,23 29:19 37:11
45:15,24 53:22 103:21

**kinds**
24:14

**kiosks**
26:6

**knew**
40:24 80:23 110:21

**knowing**
41:20 50:20 57:2

**knowledge**
64:12,20

**knowledgeable**
14:9

**L**

**La**
24:13

**lane**
26:10,17 27:1,2,8,12,
13,14 30:1

**language**
92:23

**latest**
103:11

**law**
9:10,11 27:25 32:1 33:5
34:9 35:5 36:2,3,5,24
39:18,23 40:20 42:16,

18 44:1 46:12 48:2
49:11 52:20 56:4,7
70:18 91:20,23 93:15,
24 94:2,20 95:6,21
98:1,23 103:19,20
106:2,5,11,14 107:17
108:20 112:16 118:8
121:4 128:4

**lawful**
93:7

**laws**
36:21 88:24 95:2 103:8
105:21 108:3

**lawsuit**
8:9 15:20 49:20,23,25

**lawyer**
68:24 69:2 95:20

**lawyers**
119:1

**lead**
36:9,11 114:8

**leading**
120:22

**leads**
36:8,13

**learn**
53:18

**lease**
24:6,8

**leases**
24:16

**led**
25:8

**legal**
30:23,24 31:14,22 32:8,
22 33:21 42:15,17
53:23 54:17 68:13
81:19 82:7 90:14 91:5
92:1 93:13,25 95:25
100:6 101:15 112:21
114:18 118:2 122:12,15
128:17

**legally**
28:18 34:17 52:15

**length**
97:21

**lessons**
60:5

**letter**
93:24 94:2 95:6

**letters**
69:22

**level**
30:7,15 97:21

**lever**
42:14

**license**
32:2 34:14 98:10,21
99:1,2,4,8 100:5 101:19
109:3,6,13,14 110:2,8,
10,17,19 111:6,8,11
112:2 113:1 114:12
115:9,16 116:6,14
117:2,15,25 118:4,5,19,
24 119:2,12 121:9
122:2,10,20 123:3,11
125:3,10,18,24 126:6,7,
9 128:2,14

**licensed**
16:2 18:24 103:6 109:2,
21

**licenses**
100:21 101:7,11,13
106:15 109:22 110:4
111:15 112:16,18
116:9,17,20 121:15

**life**
22:18

**limit**
16:1

**limitations**
31:20

**limited**
20:4 62:22 71:8 75:17
76:3

**Linkedin**
22:10

**list**
24:10,13 98:6 115:17

**listed**
14:4 75:8 76:19 107:20,
24 110:10 111:10
126:11

Exhibit 59
DX1336

**listing**
109:25 112:5 120:19

**lists**
109:16 116:13

**litigation**
14:20 15:19 16:18
61:12 91:16

**location**
7:8

**locations**
10:10

**lock**
53:22

**locked**
38:5 43:13

**logically**
57:20

**login**
52:9 104:1 105:5

**long**
24:10 25:14 28:21
30:12 38:11 42:8,22
51:22 54:11 77:10
103:4

**longer**
93:16,18,22

**looked**
40:4 68:11 81:13 85:6
86:22 89:16 90:10,20

**losing**
111:2

**loss**
118:19

**lost**
25:7 56:24

**lot**
20:11 22:24 44:19
55:25 56:1 57:3 58:7
103:15 108:14

**low**
20:12 51:3

**lower**
15:25 39:13

**lunch**
60:15

**luncheon**
60:21

---

**M**

**Madam**
104:9 106:17 113:8
127:19

**made**
27:12 50:16 62:22

**maintain**
23:17 27:7 29:22 42:19
48:19

**maintains**
47:11

**major**
46:8

**majority**
59:17

**make**
11:5,20 27:9 29:3
30:17,20 43:8 47:6
52:14 53:19 58:24
103:15 119:9

**making**
94:4

**mammals**
100:10 114:16,25
117:20 118:7 128:3,15

**manage**
19:20 54:12

**manager**
21:18 36:12,14 78:1

**manner**
47:16 104:18

**manual**
35:2,11,12,13,18

**Marisol**
112:8

**mark**
13:11 106:17,21 115:5
124:11

**marked**
13:14 16:9 61:24 64:1
69:16 78:14,20 82:13,
18 83:1,6 84:3 85:20
86:1,11,16 87:23 88:4

92:7,12 97:8 99:19
100:23 107:1 113:18,22
114:6 115:12,17 117:7
120:11 124:12,16
127:22

**marketing**
21:17 22:2 23:21 44:24,
25 64:15 65:16 80:19

**marking**
16:6 61:20 63:20 69:15
83:23 97:4 99:15
100:18 107:8 127:16

**Marshals**
24:10

**match**
48:7 63:19

**matches**
27:21

**materials**
44:25 47:14 65:17
120:19 123:18

**math**
45:7

**matter**
78:11 108:2

**matters**
9:12

**meal**
44:21

**meaning**
10:12 59:9 105:6

**means**
62:21 93:15 101:18
117:15 119:16

**meant**
100:4 118:24

**measure**
39:18

**measuring**
39:19,24

**media**
22:4,6 23:4 62:23 63:15

**medical**
12:14

**medication**
12:18

**meet**
33:2,21 34:5,18 35:3

**meeting**
32:12 106:6

**meetings**
106:9

**meets**
32:4 98:15 123:14

**member**
25:19,21 26:19,20
36:18 103:13

**members**
30:3 74:25 75:4,7,17

**membership**
30:5,7,8,15 45:14 75:6
98:11

**memberships**
21:6,8,10,11,13 30:13
58:20 75:2

**memory**
9:22

**Mendoza**
8:8

**mention**
38:2

**mentioned**
22:2 23:7,22 25:3 30:16
35:11 36:22

**Mesa**
24:13

**messages**
62:22 66:13

**messaging**
62:23 66:19 67:2

**met**
11:14 32:22 50:16

**Microsoft**
67:5

**mid**
29:9,10

**middle**
101:2

**military**
98:11,21

Exhibit 59
DX1337

**million**
21:20 37:6

**mind**
22:11 23:10 32:3 62:14
96:14

**minimum**
43:13 54:9

**minority**
19:6,7

**minute**
81:13 114:21

**minutes**
89:16,21 102:20 126:20

**missing**
72:17

**misstates**
39:21

**model**
29:4 37:11,20

**modern**
42:14

**moment**
106:22 108:8 114:7
115:6

**Monday**
25:12

**money**
43:12 103:15

**month**
23:11,14 30:12

**monthly**
21:13 30:10

**months**
23:15 38:12

**morning**
7:5,11,15 8:3,4 106:8

**motion**
15:8 92:9

**moving**
74:1,18

**MSRP**
22:24 23:13

**multiple**
102:4

**N**

**National**
36:19

**nationality**
52:16

**nature**
62:19

**necessarily**
106:1

**needed**
25:9 74:5,11 81:23
90:18

**newest**
24:21

**night**
35:15

**nods**
10:24

**non-members**
75:19

**nonetheless**
10:12

**nonresident**
116:16

**nonverbal**
10:23,24

**North**
14:21

**noted**
40:22

**notes**
126:21

**notice**
13:12 106:4

**notification**
105:25

**notifications**
103:17,18

**notorious**
95:3

**notwithstanding**
11:23

**November**

25:16

**number**
13:14 16:9 20:9 29:3,6
31:4 39:11 40:5 41:5
45:3 49:8 51:3 55:5,12,
21 59:21 60:2,6,9 61:24
62:10 64:1 69:18,23
71:3,8 75:14 78:20
79:25 80:6 82:18 83:6
84:3 86:1,16 88:4 90:3
92:12 95:4 96:14 97:8
99:19 100:23 106:18
107:1,8,9,24 109:5
110:1 113:8 115:6,12,
17 117:7 120:1,12
124:11,12,16 125:4,25
127:16,22

**numbers**
38:10 70:20 74:19 75:1,
13 76:12,19,25 77:3
82:4 113:11 120:3

**numerous**
96:5,10,15

**O**

**oath**
7:22 9:25 10:4,11 61:7
89:6

**Objection**
31:8,14 32:8 33:3 39:1,
21 41:12,18 44:7 45:20
49:3,13 50:3 52:24 55:2
57:1 58:2 64:25 65:21
67:23 68:6,13,21 74:9
76:4,21 78:9 79:12
81:19 82:6 90:13 91:4
92:1 93:13,25 94:25
95:24 96:16 98:17
100:6 101:15 104:7
105:16 114:18 118:2
121:16 122:12 123:6,20
125:11 126:8 128:17

**objections**
11:21,24

**occasion**
56:17

**occasions**
56:20 112:4

**occurred**
32:18

**off-roster**
42:16

**offer**
23:25 51:5,21,22

**offers**
51:20 97:16

**officer**
9:11 95:13

**older**
29:20 98:2 121:4,8

**One-year**
25:15

**online**
25:23 26:5,9 27:1 52:3
64:16 115:9,16

**onsite**
43:25

**open**
23:5 51:2

**opened**
45:11,12 47:10 55:12
115:18

**operations**
19:16,21 20:17,20 21:7,
14 35:4 37:17 40:17
42:3,5 58:14

**operator**
95:4 120:1,2

**opinion**
68:17 91:6 100:9

**opportunity**
124:10

**options**
25:16

**oral**
62:20

**order**
26:23 52:7 53:19 71:15
103:25 105:5 108:10
125:19

**ordinary**
30:6

**organized**
47:15

**originally**

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1338

119:1

**outpaced**
38:6

**oversight**
121:22

**overview**
44:16

**owner**
14:21 19:3,13 50:1
102:15

**owners**
19:5

**owning**
53:23

**P**

**P.D.**
24:11,12,13

**p.m.**
59:12 60:23 61:3
129:11

**packet**
43:10

**paid**
75:14

**painted**
82:9 91:22

**pandemic**
37:23,25

**paper**
43:23,24 47:13 57:23
58:9,10

**paragraph**
17:10,15,16,19,21,24
18:2,6,14 63:3 93:3
96:3,13

**paragraphs**
18:9,18

**parentheses**
109:16

**parenthetical**
128:9

**parents**
56:3

**part**
47:1 48:3 61:12 62:25
93:7 96:4,7 114:14
117:14,18 120:18

**PARTES**
61:1

**participant**
121:8

**participants**
121:3

**participation**
49:25

**PARTIES**
7:1

**partners**
19:6,7

**partnership**
20:4

**parts**
21:3

**party**
9:14 47:24 49:19 80:8,
10

**passage**
118:22

**passing**
14:22 57:18

**passport**
27:24

**past**
35:21,24 38:25 46:14

**Patrol**
24:13

**pay**
30:9 43:1 51:17 52:11
103:14

**payroll**
44:20

**PDF**
108:18 115:25 116:1,10
120:22

**peace**
95:12

**penal**
15:25 31:20 32:5 35:4,

5,8 40:15 46:2 48:23
49:17 50:8,14 94:15
95:16,17 98:7,16 99:16,
22 100:3 109:16,20
111:21 112:25 113:4,
19,22 114:6,12 117:6,8,
12,24 119:17 122:17
124:13 125:8,16

**penalties**
93:9

**penalty**
10:1 87:10 88:23 92:18

**pending**
12:5

**people**
21:10 28:7,14 33:17,23
34:9 38:5 41:21 42:10
44:23 53:3 54:1 57:3,18
58:5,6,20 59:22 65:19
71:13 73:18 75:2,14
76:14 77:13 102:5,11

**people's**
76:7

**percent**
24:20,23,24 28:5,10
37:3,6,13,15 38:20
45:7,8,16 51:8 54:1,3,7
71:17,20 110:11

**percentage**
24:15 31:2,5,6,11
38:13,16 40:5,24 45:5,
10 46:3 53:9 54:6 55:15
58:13 72:5

**Perfect**
60:19

**perform**
80:16

**period**
23:16 38:7 52:14 99:10
100:9 110:9 111:15
112:2,5,17,24 113:2
114:15,24 115:1 117:19
118:4,6,7,10 119:7
122:2,5,19

**periods**
43:14 44:21

**perjury**
10:1 87:10 88:23 92:18

**permit**
100:12 123:9

**person**
14:9 19:9 29:4 35:17
50:11 51:1 54:20 64:17
98:25 102:3,9,13 109:8
119:22 123:10,14,25
124:25 125:19 128:2

**personal**
51:22,23 59:18 97:24
104:1

**personally**
41:25 49:8 56:19 70:9
72:16 102:7

**personnel**
77:8

**Phillips**
7:16,21 8:3,15,18 13:17
16:7 61:5,12,20 69:16
92:8 97:3 103:4 104:13
121:2 127:3 128:1
129:4

**phone**
57:15 59:20 107:24
119:23

**photo**
27:6,18

**physical**
43:22,24

**pickup**
43:15

**picture**
82:9 91:23,24

**piece**
58:9

**pipe**
58:10

**place**
25:9

**plaintiff**
9:1 13:13 61:22 63:21
78:15 82:14 83:1,24
85:22 86:12 87:24
89:18

**plaintiffs**
7:16 14:20,24

**Plaintiffs'**
92:8

**platforms**
22:6,12 44:24 66:19
67:2

**PMK**
7:21 61:5

**point**
95:16 108:24 119:9

**point-of-sale**
29:2,7,22 40:9

**points**
57:17

**poisoning**
25:8

**Police**
24:21 25:7

**policies**
34:22 106:13

**policy**
35:1,11,12 36:1 54:18
106:10 123:9,14

**political**
45:23

**pop**
22:11 32:3

**pops**
23:10

**POS**
43:12 44:4 46:7 70:14

**possess**
28:18 30:17

**possession**
54:19

**possibility**
123:17

**post**
23:9

**posts**
23:13

**potential**
121:3,7

**potentially**
98:25 118:19

**Poway**
8:21,24 13:13 61:22
63:21 78:15 82:14 83:2,
24 85:22 86:12 87:24
89:18 104:14 105:19
121:2

**PPT**
47:23

**preliminary**
15:9 92:9

**premises**
19:23

**preparation**
83:9

**prepare**
15:1,14 64:4 70:9 77:10
78:25 84:8,11 86:22
88:13 92:21

**prepared**
14:8 53:20 70:15 83:11
90:11,24

**preparing**
70:12 77:25 79:11
80:13 83:13 86:8 88:16

**prerequisites**
97:21

**presence**
22:7

**present**
11:14 27:6 28:17 43:4
55:6

**presented**
101:19

**pretty**
13:8 40:21 59:21 77:7,
23 78:2 82:9

**prevent**
12:15,19

**previously**
61:6 85:6 90:20 111:18
113:4 117:7

**price**
22:23

**pride**
44:18

**Prince**

14:22,24

**print**
43:7

**prior**
17:1 26:3,12 27:3 29:10
41:1 46:2 55:21 56:4
76:8 94:4 110:7

**private**
25:8 47:24 51:18 60:5

**privately**
51:18

**privilege**
69:6

**privileged**
69:5 84:17

**problem**
69:13

**procedures**
9:21 12:8 34:23

**proceeding**
9:13,16

**proceedings**
9:14,17

**process**
28:16 30:1 42:21 43:15

**produce**
64:11 65:6 80:22

**produced**
64:21 70:6 80:9,22,25
91:17

**product**
59:2

**production**
61:22 63:1,23 78:17
79:24 80:6 89:17

**profile**
59:16,19 72:3,6

**prohibit**
93:5 94:5

**prohibition**
109:8

**promptly**
90:5

**proof**
43:9

**property**
47:5 48:8

**protection**
51:22

**protective**
42:7

**protests**
38:4

**prove**
43:5

**provide**
10:24 26:23 27:19 30:5
41:4 47:2 48:2,9 52:7
53:10 72:22 75:4,25
103:20 121:12,20

**provided**
72:21 73:8 91:10

**providing**
47:8 121:14

**provisions**
15:24

**pull**
12:23 18:1 46:9 77:14
78:1,8 113:7,14 120:10,
16

**pulled**
76:6 98:5

**pulling**
70:13 78:4 127:4

**purchase**
42:11,20 47:19 48:18,
25 53:19 75:24 110:9,
14

**purchased**
102:9,11 116:6

**purchasing**
28:12

**purely**
31:9 33:11

**purposes**
44:6,15,16 54:16 70:16
104:11

**pursuant**
117:16 124:25

**put**
57:24 59:18 60:4 79:14

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1340

88:15 111:20 121:23 123:23

**putting**
103:21

**PWG**
8:23 9:1 14:9 17:17 18:7,23,24 19:1,3,14,17 20:3,5 22:6,12 23:17, 19,22,25 25:19 28:23 30:3 32:11 33:7,23 42:17 44:5,15 45:11 46:11 49:19,22 50:1 51:5,19 59:3,23 60:1 61:12,17 64:11,17,21 65:18 66:4,6,18 67:7, 10,15,17 68:16,17 69:22 76:13 80:21 81:9 83:13 84:11 88:16 90:8 91:3 93:4,5 94:5 95:22 96:5 97:14,16 98:2,15 99:1,7 101:24 106:10, 13 121:5,10 123:2,9,10

**PWG's**
19:23 21:19,21,23 26:14 36:25 37:16 38:16,24 45:5 49:25 50:23 54:25 58:13 66:9 67:17 81:14 84:13 91:2 96:7 97:4

**PWG-RELATED**
67:3

**pwgrange.com**
26:6

**Q**

**qualified**
93:6,16 94:6 96:6 101:25

**qualify**
25:11 109:7

**quantify**
96:11

**question**
11:22,23 12:5,6 84:19 95:12 99:13 116:4 122:23 125:12

**questioned**
69:5

**questioning**
7:10

**questions**
8:10 10:4,7,16,18,19 11:21 12:8 42:10 95:17 102:16,17 103:5 115:9, 16,18,19 116:5 124:10 126:18,25

**quick**
96:20 102:20

**R**

**racing**
58:8

**raise**
7:19

**range**
18:25 19:10 20:23 21:3, 11 23:23,25 24:1,15 25:1,2,8,19,22 27:5 28:2,6 29:5,23 30:9,10 31:3,7,12 33:18 34:3 35:18 36:8,9,25 37:10, 13,16,25 38:6,8,11,16, 21 45:15 58:7,16,17,19, 20 74:6,12 75:12,15,16, 20,23,24 76:2,11,12,18 93:4,8,18 97:25 102:5, 13 112:9,10

**ranges**
24:2,6,9 35:16 38:6 44:25 45:1

**rare**
56:17,20,21

**re-reading**
125:13

**re-word**
121:19

**read**
17:13 36:24 68:23 90:8 91:1 93:10 96:8 98:3 101:9 103:23 104:3,4, 15,20 105:2,14 108:9, 14,15,25 109:1,18 114:7,10,25 117:22 124:19,22 125:8,17 126:4,5 127:25 128:9, 21

**reading**
62:14 71:23 73:5 74:14 107:8 108:12 112:25 122:16

**reads**
88:22 93:3 96:4 108:24

**reason**
12:11 16:18 23:1 29:17 94:15 95:11 116:25 121:12

**reasoning**
34:9

**reasons**
22:21 23:2 36:1,2 41:10

**recall**
15:12 16:24 17:9 41:2 56:10 65:2 75:6 89:20, 23 102:2 108:12 111:6 112:12 122:23 126:9

**receive**
36:4 95:15 103:24 125:20

**received**
104:16

**receiving**
21:17

**recent**
25:3 48:3

**recently**
24:19 79:8

**recess**
60:22 97:1 102:25 126:24

**recognize**
16:17 18:6 84:6 88:7 92:10,15 97:11

**recollection**
11:4 56:13 79:10 81:7

**record**
8:14 28:23 29:3 43:16 47:4 49:16 50:7 57:7,11 62:15 73:17,19 102:22 109:5 111:10 114:2 125:4,17 126:5 127:15 128:1 129:10

**recording**
110:1

**recordkeeping**
29:13 44:2 47:7

**records**
40:4 47:12,20 48:9,19 72:2,13 80:10

**recreational**
24:5,16 25:18 28:5

**recreationally**
28:7

**red**
101:3

**refer**
8:24 15:19,20 17:10,17 18:6 70:24 95:6 119:17

**reference**
99:13 110:1 118:1 124:2

**referenced**
99:5

**referencing**
118:14

**referring**
15:7 39:6 53:14 80:2 104:12

**refers**
115:19

**reflected**
76:6,25

**reflecting**
68:17

**refrain**
10:23

**refresh**
9:22 79:10

**refuse**
95:5

**refusing**
95:3

**regroup**
126:22

**regulations**
23:6 36:21 103:7,11 105:22

**reject**
41:25

**rejecting**
41:21

**related**
37:13 48:10 59:7 66:8, 23 70:4 80:19 92:16 94:15

**relevancy**
117:3

**relevant**
64:16 65:25 91:11

**Relief**
16:13

**remain**
103:7

**remainder**
128:6

**remaining**
21:2

**remember**
39:12 77:12 111:7 112:9,14

**remembering**
30:19

**remote**
7:8

**remotely**
7:1,13,23 10:11 61:1,7

**renewal**
25:17

**renewed**
42:25

**rent**
28:3,22,24 30:16,22,23 31:12,16 32:6,22 33:1, 24 34:5 35:2 41:22 42:1 54:15 68:5 93:17

**rental**
28:9 29:2 33:5,20 39:9, 14,22,23 40:18 74:6 93:6 94:6

**rentals**
33:7 34:24 38:17,25 39:4,20 40:6,14,25 41:7,11 58:20 74:1,3,5, 15

**rented**

32:11 40:20

**renting**
28:16 30:1,25 41:16 74:12

**repeat**
125:12

**rephrase**
125:15

**report**
125:25

**reporter**
7:5,6,18 10:6,15,22 104:9 106:18,19 113:8, 10 127:19,21 129:6

**Reporters**
7:7

**reports**
40:9

**represent**
8:7 67:15 71:4 74:19 75:1,13 76:12 79:19 80:25

**representative**
8:20

**represented**
8:17

**representing**
7:12

**request**
12:4 28:3 63:19 79:24 80:5,12 91:1

**requested**
47:8 64:23 65:6,8

**requests**
34:24 61:13,17,21 62:25 63:6,17,22 64:12 66:8 68:11 70:7 78:17 81:6,15 82:14 83:3,25 84:14 89:17

**require**
41:16

**required**
11:23 25:22,23 26:17, 21,22 44:1 47:2,4 69:3 90:4,9 97:22 103:6 104:15 120:19 121:2

**requirement**
30:24 32:22 33:21 52:22 54:13,14

**requirements**
23:4 52:18 53:23 54:9

**requires**
75:6 103:25 109:2,4

**requiring**
106:12 109:21

**research**
15:17 28:12 42:10 118:25

**reservation**
27:12,21

**reserve**
26:9,10,17 27:1 52:11

**residencies**
43:10

**residency**
43:5

**resident**
116:13

**Resources**
44:16

**respond**
61:13 68:16

**responding**
61:16 62:25 80:8,10

**response**
63:22 70:6 78:16 79:24 80:1,5,7 83:2,24 84:24 85:18 86:13 87:25

**responses**
10:23,25 15:6 64:6,9 79:16,19 80:3,13 81:15 83:17,19 84:14 85:6,9, 13 86:21 87:11,15 88:13,17 89:9,11 90:4 91:2

**responsible**
23:19 64:17

**responsive**
63:6,9,17 64:11,18 65:12,20 66:7,11,14 67:11 68:11 69:3 80:9, 11,14 81:5

**rest**
18:14 21:6

**restate**
84:18

**result**
49:17 50:8 78:12

**resumed**
60:23 61:10

**retail**
20:10,16,19 21:3 36:10, 11 37:11 38:3,5,14 42:3,4,6 45:5 50:23 58:11,23 59:2 93:4

**retailer**
18:24 46:22

**retrieve**
46:7

**return**
27:17

**revenue**
24:17,18,20,23,24,25 25:2,6 37:4,13 38:8,14, 17,25 39:9,14,20 45:5,8 58:13,16,17,18,19,23

**revenues**
21:19,21,23 36:25 37:16 40:5

**review**
15:11,13 17:7,19 18:20 21:15 43:8 47:3 48:4 62:4,7 75:10,11 86:6 91:20 93:1 99:25

**reviewed**
13:20 14:6 15:3,5 16:21,24 17:1 82:23 89:23 90:17

**reviewing**
85:17

**revolver**
42:14

**rifles**
42:14 109:11

**right-hand**
69:21

**risk**
113:1

**Rob**
8:7

**robust**
29:21

**role**
17:4,21 18:17

**room**
11:8,15 58:8

**Rosenberg**
7:14 102:19,24 103:2 104:8 105:18 106:20 107:3 113:3,12,15 114:3 115:3,14 118:11 120:17,24 121:18 122:21 123:8 124:4 125:14 126:13 127:1, 17,19,24 128:20,25

**roughly**
20:21 21:1,20 37:3,6,9 38:12 45:10 48:1 51:8 55:3,16 58:5 71:17

**row**
71:2 73:15 74:1,18,25 75:12 76:11

**rule**
13:12 39:4

**rules**
9:22 23:5

**run**
40:9 77:3

**S**

**Sacramento**
112:10

**safe**
53:21 54:11

**safes**
53:21

**safety**
25:23,24 26:7,8 32:2 36:1 42:23 71:15

**sale**
22:24 36:10 45:6 109:8 124:23,24

**sales**
16:1 38:3 45:13,17,18, 22 46:3 47:4,23 50:15,

23 58:25 59:1,3 73:17, 19 115:9,16

**salesperson**
109:11 125:2,18,23

**San**
24:11,21 25:7

**save**
45:7

**SB**
108:19 109:21

**scenario**
111:3 119:25

**school**
29:19

**screen**
12:21,23 13:5 106:23 113:16 115:7 117:5,9 120:8 124:7

**scroll**
13:22 18:9 79:3,21 85:1 86:24 88:9 104:22 108:7,17,23 115:24 116:9 120:18

**scrolling**
18:12 90:2 97:18 108:8

**search**
63:5,9,16 65:18,24 66:6,13,16 67:10

**searched**
63:18 65:11,17 66:15

**searches**
63:1 80:14,16

**searching**
80:9

**season**
99:4,11 100:12 110:9, 17,23 111:2,4,5,7 112:6 115:2 118:5 119:7 122:5,6,8,10 126:10,12

**seasonal**
20:13 39:14

**seasons**
111:1

**Secret**
24:10

**section**
15:25 31:20 32:5 35:8 40:15 41:1,8 46:2 48:23 49:17 50:8,14,17,23 54:14 56:24 62:7,8,10 66:9 90:2 95:23 98:7 99:16,22 100:3 108:19 109:17 113:5,22 114:6, 13 115:19 117:6,8,17, 24 118:22 124:13,19 125:1,8,16 127:8,11,25 128:10,13,21

**sections**
35:16 109:20 111:21

**seek**
34:5 54:15 78:4

**sell**
21:10 35:16 42:12,13, 16,18 43:11 47:22 105:6

**selling**
23:14

**sells**
60:1

**semiautomatic**
109:10

**send**
44:24 94:20

**sends**
103:18

**sense**
37:24 50:22 55:15 56:23

**sentence**
96:4 100:9 114:23

**sentences**
80:3,6

**separate**
48:20 51:15

**September**
110:18,19,21 111:4

**serial**
29:3,6

**Service**
24:10

**services**
59:2

**session**
59:11,12,13 75:15,16

**sessions**
60:6,7,9 75:12,20,23,25 76:3,11,12,18 105:20

**set**
59:15 61:21 63:22 78:17 82:13 83:3,25 85:22 86:13 87:25 89:17 115:4

**sets**
15:25

**setting**
10:9

**settled**
45:15

**settling**
45:24

**severe**
53:4

**shape**
54:19

**share**
12:21,24 16:5 61:19 69:14 82:12,25 83:22 92:6 99:14 100:17 113:16 115:7

**shared**
13:1

**sharing**
63:20 86:11 106:22 113:20 117:5 120:8 124:6

**sheet**
57:23 90:10

**shift**
106:7

**shifts**
106:8,9

**shipping**
21:17

**shirt**
44:21

**shoes**
97:25

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1343

**shoot**
27:4,15 28:1,7,19 33:1 58:7 74:6

**shooters**
28:6 29:23

**shooting**
14:22 18:25 21:3 23:22 24:1,5 27:24 31:3,7 36:19 37:16,25 93:7

**short**
111:1

**Shorthand**
7:6

**shotgun**
97:14,16,24 98:22,24 120:10 122:4

**shotguns**
42:13 51:22

**show**
12:21 78:14 79:18 85:20 87:23 97:3 106:17,21 113:17 115:5 124:8,11 127:2,5

**showed**
101:10 111:13 113:4

**showing**
90:19 114:5

**shows**
71:3 88:10 97:14,18 118:4 120:18

**sic**
98:1

**side**
69:21 99:3

**sign**
25:25 26:3,8 27:10 52:1,4,7

**signage**
22:4

**signature**
87:5,8 89:1,2,4 92:19

**signed**
28:20 89:6 93:1

**significantly**
55:5

**signup**
75:6

**simplest**
57:23

**sit**
21:25 32:3 38:9,18 50:20 58:15 65:2 81:3 83:16 87:14 89:8 111:7

**sites**
62:24

**sizes**
55:10

**slowed**
40:23

**small**
13:8 17:14 25:24 55:10

**smaller**
55:12

**social**
22:4,6 23:4 62:23 63:15

**software**
29:19,20

**sold**
51:3 74:20 76:13,18

**son**
56:18

**sort**
27:13

**sound**
53:19

**speak**
10:17 84:16

**specific**
39:11 53:11 96:14 99:4 100:12 119:13

**specifically**
20:16,23 37:22 48:10 70:16 71:8,12 91:16 99:24 104:23 108:12 112:15

**speculate**
11:3,15

**speculation**
31:8,15 33:25 39:2 41:19 49:3 52:24 55:18, 22 57:1 67:23 68:7,22

**signup**
72:25 74:9 81:20 90:14 91:5 93:14 95:25 96:17 98:17 101:15 105:16 114:19 123:22 125:11 126:8 128:18

**speculative**
112:21

**spent**
77:20,22,23

**spike**
45:17

**sporting**
42:14

**Sports**
14:22 36:19

**spot**
52:11

**spouse's**
11:14

**staff**
20:13 21:5 27:20 34:3, 13,23 49:9 57:24 58:8 65:19 106:6 124:3

**stand**
26:7

**standard**
82:10

**standards**
22:25 23:8

**start**
44:21 54:4 110:17,20 111:4

**started**
29:9 40:22 45:12 55:11

**starting**
13:22 14:2

**starts**
124:23

**state**
7:9 8:13 99:16 100:4 103:14 124:13 127:8

**stated**
38:20 59:23 65:11 101:23

**statement**
15:6,7 88:22

**statements**
79:20

**states**
88:24 90:3 92:17 97:23 101:3,11 116:16 125:23

**stating**
89:23 111:14 117:12

**statistics**
70:4

**stats**
108:19 128:11

**statute**
127:5

**statutes**
103:11

**statutory**
31:19 34:5 50:17 124:19 128:10

**stay**
103:22

**Stephanie**
7:11 8:5 120:10 121:1 124:6 126:15 129:2

**steps**
27:3 51:11,12 53:25 54:2 71:7,9,12,25 73:8 85:12,14 97:14,16 118:23

**stood**
11:9

**stop**
53:3 110:24 117:5 120:8 124:6

**stops**
19:21 110:10,12

**store**
42:6 93:4

**Strickland**
7:6

**Strike**
49:15

**strive**
37:21

**stuck**
118:20

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59
DX1344

**student**
59:8 101:24

**students**
51:9 53:6,9,17 54:6,8,
25 55:3,16 56:23 57:7
59:7,24 60:3,4,7 71:2,5,
18,20,24 72:5,20 73:7,8

**stuff**
53:22

**subdivision**
124:22 125:1,7,9,16
126:4

**subject**
16:2 46:11 108:2

**submitted**
15:8

**substantial**
33:12,15 93:8

**successfully**
27:1

**suffering**
12:14

**Sullivan**
7:7

**summary**
81:12 90:10

**supplement**
84:13 85:5 90:4,9 91:2

**Supplemental**
78:16 83:24 84:24
87:25

**supplemented**
85:13

**supplementing**
81:14 85:9

**supplied**
90:17

**support**
15:8 92:8

**supportive**
47:14

**suppose**
68:8

**supposed**
68:15 76:12

**suspended**
22:15,17,20 23:16

**suspension**
22:21 23:9

**swearing**
7:8

**switching**
29:17

**system**
29:2,7,9,10,22 40:9
44:3,4,22 46:7 70:14
78:7 103:18,24 104:10,
12,15,16,19 105:10
108:15 127:4

**systems**
44:5,14,17 45:3 63:8

---

**T**

**tactics**
51:25

**Tags**
100:21

**taking**
12:18 93:7 96:7 100:10
114:15,24 117:20
118:3,7,10 122:3

**talk**
42:3 57:16 58:9 67:14
95:4 102:14 120:9

**talked**
30:2 98:9 120:25 121:1
122:9

**talking**
24:17 53:11,13 114:21
119:22 120:2

**task**
46:8 77:7,24

**taught**
56:19

**teach**
53:3

**Teams**
66:15,24 67:5,19 80:18

**technical**
27:13

**technology**
44:19,25 45:3

**teenage**
56:18

**tells**
101:20

**temporary**
20:13

**ten**
21:1 35:18 102:19
111:2

**ten-minute**
96:21

**term**
25:14 128:4,6,7

**terms**
23:15 57:23

**test**
25:24 26:8 42:23,25

**testified**
7:24 9:17 61:8

**testify**
14:8

**testimony**
12:12,15,19 39:21 81:3
110:7

**text**
66:13,15,17,19 128:10

**thing**
28:17 48:16

**things**
47:24 66:24

**thirsty**
12:2

**thought**
81:22 82:8 119:2

**thousand**
47:22 48:1

**threatened**
95:22

**three-hour**
51:14

**three-plus**
73:1

**Tiktok**
22:10,18

**time**
11:20 12:2 22:22 24:17
29:12 38:7 57:25 60:14
70:13 92:3 95:8 99:11
100:9 102:7 103:3
106:13 110:11 111:23
114:15,24 117:19
118:5,6,10 119:7 122:5
129:4

**times**
9:6 22:18,24 25:11
30:11 35:23 46:14 49:8
51:15 53:17 95:2
118:15

**timing**
122:7

**title**
73:15 84:22 87:3 99:16
108:24

**titled**
9:2 13:12,24 15:20
16:12 61:21 62:7 63:21
70:21 71:2 76:11 78:15
82:13 83:1,23 85:21
87:24 89:16 92:7
108:19 115:8,15 116:5
124:13 127:7

**titles**
19:13

**today**
7:13,17 8:10,17,20
10:7,13,16 11:9 12:12,
16,19 14:8,12 15:2
17:23 18:20 40:3 55:13
81:3 83:16 86:4 87:14
89:8 103:4 129:4

**today's**
12:9 14:23

**toe**
97:25

**told**
57:25 110:22 112:3,4,
24 115:1 118:8 119:8
122:14

**top**
13:6 21:22 60:11 87:3
88:20 100:20 115:25
116:11

---

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

DX1345

**topic**
119:13

**topics**
13:24 14:4,6,10

**total**
24:25

**touch**
57:17

**track**
33:23 44:23 49:12 59:3,
6,14

**train**
36:17,22,23

**trained**
34:3

**training**
21:5 24:5 36:4,7 38:8
45:2 51:5,7,8,9,19,25
52:1,7,19,23 53:7,10
54:10,16,25 57:4 58:1,
14,17,21 59:3,7 60:2,7,
9 71:15 74:6 81:9 93:17
101:25 102:5 105:20
123:2

**trains**
36:13,15

**transact**
105:9

**transaction**
43:12 48:5 110:10,13,
20,24

**transactions**
21:17 48:10,17,20,21
73:15,18,19,20,22
74:22 110:6

**transcribing**
10:7,15

**transfer**
54:19 62:19 124:23,24
125:20

**transferring**
95:12

**transfers**
16:1 46:4 47:24,25

**transition**
21:16

**treat**
53:3

**trends**
36:21

**triggered**
23:9

**trouble**
120:5 127:4

**true**
37:19 87:11,15 88:25
89:9 92:18 104:13

**truth**
10:1

**turn**
33:24 43:6 48:24 49:2,
17 50:8 57:3,8 68:4
69:10 102:4

**turned**
102:7

**turning**
50:11,25

**turnover**
20:11

**turns**
101:24

**two-thirds**
13:6

**type**
20:3 23:25 48:20

**types**
28:9 42:12 51:7

**Typical**
42:6

**typically**
37:9 40:18 47:22 59:19
71:13

---

**U**

**U.S.**
24:10

**Uber**
20:1

**unable**
109:14

**underneath**
108:24 128:9

**understand**
8:24 9:1,20,25 10:3,6,
11 11:17,25 15:20,23
17:16 44:10 70:17 85:5
90:8 91:3,20 101:12
117:24 125:7 126:5

**understanding**
31:25 40:13 68:20
91:17 93:22 101:6
110:22 118:13

**understood**
12:6 108:16 118:21
120:7 124:5

**unexpired**
34:14 100:4 109:4,15,
23 114:12 117:14,25
118:24 119:11 121:9
123:10 125:4,20,25

**United**
88:24

**update**
35:25 36:20 81:13 82:4
90:18 91:9 106:9

**updated**
81:18 91:3 106:14

**updates**
103:18

**upside**
69:22

**user**
29:16

**utilization**
45:15

**utilize**
26:1

---

**V**

**vague**
32:20 33:9 34:7 39:1
44:7 45:20 48:13 49:13
50:18,24 52:25 55:7
56:11 58:2 64:25 65:21
66:22 68:21 72:24 76:4,
21 82:7 85:15 93:25
121:16

**Vaguely**
100:16

**valid**
34:14 98:10,25 99:2,3,
7,9,10 100:4 101:3,7,
11,13,21 109:4,6,14,23
110:2 111:10 112:23
113:2 114:12 116:14,
17,20 117:14,25 119:2,
11 121:9 122:1,10,19
123:10 125:3,5,9,20,25
126:1,6,10,11

**validity**
111:15 112:1,5,17

**venture**
19:11

**Ventures**
19:10

**verbal**
10:25

**Verification**
87:3 88:20

**verify**
27:7,20 29:5 64:6,9
75:5 83:16,19 87:10,14,
19,21 88:23 89:8,11,13
104:5,18 105:13

**verifying**
105:2

**versions**
17:1

**versus**
39:16,25

**video**
25:23,24

**viewed**
110:5

**violated**
23:14

**violation**
22:25 118:17

**violations**
46:25

**Virtually**
55:19

**visible**

126:6

**visited**
111:22

**visitor**
30:6

**visitors**
26:9 28:2 31:2,7,12
38:21 41:15,25

**visual**
109:12 126:6

**visually**
109:2,22 125:2,18,24

**volume**
39:12,23 40:14

---

**W**

**wading**
78:2

**waiver**
26:1,3,5,8 27:8,9,10
28:20

**walk**
123:25

**wall**
42:8

**wanted**
41:22 42:1 48:24 68:4
78:8 102:14 127:2

**wanting**
39:25 42:10

**warning**
69:4

**watch**
25:24 26:7

**weapon**
63:21 78:15 95:13

**weapons**
8:21,24 13:13 42:17,19
46:23 48:3,6,10,19
61:22 82:14 83:2,24
85:22 86:12 87:24
89:18 104:14 105:19
121:3

**WEBCAM**
7:1 61:1

**webpage**
98:14 111:13 116:23
123:19,23

**website**
23:17,20 26:6,15,18
52:3,8 97:5 98:6
100:15,18 101:11
111:14,20,23 112:1
117:2

**WEDNESDAY**
7:2 61:2

**week**
16:25 33:18 37:10 49:5

**weekend**
49:5

**weekends**
33:19

**weeks**
46:24 77:13,15,17,19
95:10 102:14

**whatsoever**
62:20

**wifi**
44:22,23

**Wildlife**
100:15,19 101:10
111:14,23 112:1 117:16

**wishing**
125:19

**word**
56:1 79:23 96:14

**words**
121:20 124:23

**work**
21:4 66:23

**worked**
79:1

**working**
20:1

**works**
60:17 96:23

**wounds**
53:4

**writing**
95:5 113:11 119:20,21

**written**
34:22 35:2 62:20

**wrong**
120:5

---

**Y**

**year**
25:12,15 37:9,19 39:7,
15 45:16 47:6,18,21,23
48:17 51:1,2 55:1,3,16
58:6 59:24 60:2,10
71:24 73:6 77:1 81:25
101:14 111:16 112:19
122:11,16 128:4,16

**year-long**
122:10

**year-to-date**
77:4

**years**
21:23 23:12,13 32:13
33:8 35:19,21,24 38:25
42:24 44:1 45:19 46:12,
15,16 47:5 70:24 73:1
75:8 76:13 77:3 78:8
81:10 109:9 112:19
124:25

**young**
93:6,16 94:6 96:6

**Youtube**
22:10

---

**Z**

**ZOOM**
7:1 61:1

1
2
3
4
5    STATE OF CALIFORNIA    )
                           )    ss.
6    COUNTY OF LOS ANGELES )

7         I, __JOHN PHILLIPS, PMK  , having appeared remotely

8    for my deposition on __August 16  , 2023, do this date

9    declare under penalty of perjury that I have read the

10   foregoing deposition, I have made any corrections,

11   additions or deletions that I was desirous of making in

12   order to render the within transcript true and correct.

13        IN WITNESS WHEREOF, I have hereunto subscribed my

14   name this 4th    day of October            , 2023.

15
                              /s/ John Phillips
16                     _____
17                          JOHN PHILLIPS, PMK
18
19
20
21
22
23
24
25

THE SULLIVAN GROUP OF COURT REPORTERS

130

Exhibit 59
DX1348

```
 1              DEPONENT'S CHANGES OR CORRECTIONS

 2    Note:  If you are adding to your testimony, print

 3    the exact words you want to add.  If you are deleting

 4    from your testimony, print the exact words you want

 5    to delete.  Specify with "Add" or "Delete" and sign

 6    this form.

 7

 8    DEPOSITION OF:        JOHN PHILLIPS, PMK

 9    CASE:                 CHAVEZ v BONTA

10    DATE OF DEPOSITION:  AUGUST 16, 2023

11

12    PAGE      LINE      CHANGE/ADD/DELETE/REASON

13    25        11        Should be "their officers" not "others."

14    43        43        Should be "10, 24-hour periods."

15    50        10        Should be "piece of paper" not "pipe of
                          paper."

16    _____     _____     _____

17    _____     _____     _____

18    _____     _____     _____

19    _____     _____     _____

20    _____     _____     _____

21    _____     _____     _____

22    _____     _____     _____

23    _____     _____     _____

24    _____     _____     _____

25    Deponent's Signature /s/ John Phillips     Date 10/04/23
```

THE SULLIVAN GROUP OF COURT REPORTERS

Exhibit 59

| 1 | PAGE | LINE | CHANGE/ADD/DELETE/REASON |
|---|------|------|--------------------------|
| 2 | _____ | _____ | _____ |
| 3 | _____ | _____ | _____ |
| 4 | _____ | _____ | _____ |
| 5 | _____ | _____ | _____ |
| 6 | _____ | _____ | _____ |
| 7 | _____ | _____ | _____ |
| 8 | _____ | _____ | _____ |
| 9 | _____ | _____ | _____ |
| 10 | _____ | _____ | _____ |
| 11 | _____ | _____ | _____ |
| 12 | _____ | _____ | _____ |
| 13 | _____ | _____ | _____ |
| 14 | _____ | _____ | _____ |
| 15 | _____ | _____ | _____ |
| 16 | _____ | _____ | _____ |
| 17 | _____ | _____ | _____ |
| 18 | _____ | _____ | _____ |
| 19 | _____ | _____ | _____ |
| 20 | _____ | _____ | _____ |
| 21 | _____ | _____ | _____ |
| 22 | _____ | _____ | _____ |
| 23 | _____ | _____ | _____ |
| 24 | _____ | _____ | _____ |
| 25 | Deponent's Signature _____ Date _____ | | |

THE SULLIVAN GROUP OF COURT REPORTERS

132

Exhibit 59
DX1350

# EXHIBIT 60

Exhibit 60
DX1351

> **You are looking at a preview of what's in <u>the timed course</u>.**
>
> Register for the Course

# Study Guide for Hunting Education

▼ **Unit 1: Introduction to Hunter Education**

    ▼ Topic 1: Firearm Safety Rules

        <u>Video: Welcome to Hunter Ed</u>

        <u>The Four Primary Rules of Firearm Safety</u>

        <u>Additional Rules About Firearm Safety</u>

    ▼ Topic 2: The Importance of Hunter Education

        <u>Why Hunter Education?</u>

        <u>Responsibility, Safety Skills, Knowledge, and Involvement</u>

    ▼ Topic 3: Funding for Hunter Education

        <u>Hunter Education Funding Sources</u>

        <u>Pittman–Robertson Act</u>

    ▼ Topic 4: Summary

        <u>What You Learned</u>

▼ **Unit 2: Know Your Firearm Equipment**

    ▼ Topic 1: What Is a Firearm?

        <u>Defining a Firearm</u>

        <u>Basic Parts of a Firearm</u>

        <u>Animation: Parts of a Bolt-Action Rifle</u>

        <u>Animation: Parts of a Pump-Action Shotgun</u>

        ? Support     ation: Parts of a Double-Action Revolver

Exhibit 60
DX1352

Animation: Parts of a Semi-Automatic Pistol

▼ Topic 2: What Is Ammunition?

Defining Ammunition

Basic Components of Ammunition

Selecting the Correct Ammunition

Rifle and Handgun Cartridges

Centerfire and Rimfire Ammunition

Shotshells

Choosing the Correct Type and Size of Shot

Shot Sizes

Non-Toxic Shot

▼ Topic 3: How a Firearm Works

The Basic Firing Process

How the Rifle and Handgun Fire

Video: How a Cartridge Is Fired

Video: How the Rifle and Handgun Fire

How the Shotgun Shoots

▼ Topic 4: Common Features of Firearms: Firearm Actions

Introduction to Firearm Actions

Bolt Action

Video: How a Bolt-Action Rifle Fires

Lever Action

Video: How a Lever-Action Rifle Fires

Pump Action

Semi-Automatic (or Autoloading) Action

Video: How a Semi-Automatic Handgun Fires

Break (or Hinge) Action

Video: How a Break-Action Shotgun Fires

Revolving Action

Video: How a Double-Action Revolver Fires

Exhibit 60
DX1353

Common Actions on Rifles and Shotguns

Common Actions on Handguns

▼ Topic 5: Common Features of Firearms: Firearm Safeties

Safety Mechanisms

Typical Locations of Safeties

Types of Safeties

Safeties Don't Replace Safe Handling

▼ Topic 6: Common Features of Firearms: Magazines and Sights

Magazines

Introduction to Sights

Sights: Bead and Open

Sights: Aperture (Peep)

Sights: Telescopic (Scope) and Dot

▼ Topic 7: Differences Between Firearms

Differences Between Rifles, Shotguns, and Handguns

Rifling in the Rifle or Handgun Bore

A Rifle's or Handgun's Caliber

A Shotgun's Gauge

Shotgun Choke and Shot String

Types of Chokes

Shot String at Various Distances

Steel Shot

▼ Topic 8: Using the Correct Ammunition

Match Firearms and Ammunition Correctly

Safety Practices to Help You Avoid Using Wrong Ammunition

The Danger of Using Wrong Ammunition

▼ Topic 9: A Firearm's Range

Know Your Firearm's Range

Maximum Projectile Range: Rifle

Maximum Projectile Range: Shotgun

Exhibit 60
DX1354

Study Guide | California Hunter Ed Course

Maximum Projectile Range: Handgun

Video: Understanding Ballistics

▼ Topic 10: Cleaning and Storing Firearms

Firearm Cleaning Basics

A Cleaning Kit

General Cleaning Instructions

Steps for Cleaning a Firearm

Where to Use a Brush, Cleaning Rod, and Cleaning Cable

Video: Cleaning a Firearm

Storing Your Firearm

Storing Ammunition

▼ Topic 11: Summary

What You Learned

What You Learned (cont.)

What You Learned (cont.)

▼ **Unit 3: Basic Shooting Skills**

▼ Topic 1: Good Marksmanship and Accuracy

Fundamentals of Good Marksmanship

Selecting the Proper Firearm and Ammunition

Determining Accuracy Limits

Protecting Your Vision and Hearing

▼ Topic 2: Rifle Firing

Sight Alignment

Aligning an Open Sight

Determining Your Dominant or Master Eye

Sighting-In a Rifle

Optional Sighting-In Techniques

Sighting-In Procedure

Adjusting Your Sight

Video: Sighting-In a Rifle

Exhibit 60
DX1355

Rifle-Firing Techniques

Firing Positions: Prone

Firing Positions: Standing

Firing Positions: Sitting

Firing Positions: Kneeling

▼  Topic 3: Shotgun Shooting

Shooting a Shotgun vs. a Rifle

Choosing the Proper Choke

Matching Choke to Your Quarry

Patterning Your Shotgun

The Patterning Procedure

When Is Your Shot Patterning Correct?

Shotgun-Shooting Stance

Shouldering, Pointing, and Pulling the Trigger of a Shotgun

Leading the Target: Swing-Through Method

Leading the Target: Sustained Lead

Snap-Shooting

▼  Topic 4: Handgun Shooting

Handgun Loading and Handling

Handgun-Shooting Position and Grip

Handgun Sight Alignment and Aiming

Handgun-Shooting Techniques

▼  Topic 5: Summary

What You Learned

What You Learned (cont.)

What You Learned (cont.)

▼  **Unit 4: Basic Hunting Skills**

▼  Topic 1: Planning and Preparation

Steps You Should Take to Prepare for a Hunt

Know Your Quarry

Exhibit 60
DX1356

<u>Understand Animal Characteristics</u>

▼   Topic 2: Hunting Strategies

<u>Introduction to Hunting Strategies</u>

<u>Still Hunting</u>

<u>Stalking</u>

<u>Posting</u>

<u>Using Ground Blinds</u>

<u>Video: Hunting From a Ground Blind</u>

<u>Using Elevated Stands</u>

<u>Game Calling</u>

<u>Driving</u>

<u>Flushing and Hunting With Dogs</u>

<u>Trapping</u>

▼   Topic 3: Vital Shots

<u>Where to Shoot</u>

<u>Animation: Choosing the Proper Shot Angle</u>

<u>Shot Angles: Broadside</u>

<u>Shot Angles: Quartering-Away</u>

<u>Shot Angles: Quartering-Toward</u>

<u>Shot Angles: Head-On</u>

<u>Shot Angles: Rear-End</u>

<u>Trailing Wounded Game</u>

<u>Approaching Downed Game</u>

▼   Topic 4: Field Care of Game

<u>Field Care Basics</u>

<u>Field Dressing Techniques</u>

<u>A Game Care Kit</u>

<u>Field Dressing Larger Game</u>

<u>Transporting Game</u>

▼   Topic 5: Summary

Exhibit 60
DX1357

What You Learned

▼ **Unit 5: Primitive Hunting Equipment and Techniques**

    ▼ Topic 1: Know Your Muzzleloader

        Introduction to Primitive Equipment

        Parts of a Muzzleloader Firearm

        Muzzleloader Locks

        In-Line Muzzleloaders

        Muzzleloading Rifles, Shotguns, and Handguns

        Powders for Muzzleloaders

        Projectiles for Muzzleloaders

    ▼ Topic 2: Basic Muzzleloader Safety and Skills

        Basic Muzzleloader Safety

        Loading a Muzzleloader

        Steps for Loading a Muzzleloader

        Steps for Loading an In-Line Muzzleloader

        Unloading a Muzzleloader

        Firing a Muzzleloader

        Muzzleloader Hang Fire Situations

        Cleaning a Muzzleloader

        Video: Modern In-Line Muzzleloading Safety

    ▼ Topic 3: Know Your Bow and Arrow

        Speed and Range of Modern Bows

        Common Bow Types: Longbow (Stick Bow)

        Common Bow Types: Recurve Bow

        Common Bow Types: Compound Bow

        Stringing a Bow

        Parts of an Arrow

        Common Types of Arrowheads: Points

        Common Types of Arrowheads: Broadheads

        The Crossbow

Exhibit 60
DX1358

▼  Topic 4: Bowhunting Safety and Skills

    Preparing for Safety Before You Go Out

    Bow-Shooting Safety

    Broadhead Safety

    Safety Accessories

    Bow-Shooting Position

    Nocking an Arrow

    Drawing and Anchoring the Bow

    Aiming the Bow

    Holding and Releasing the Bow

▼  Topic 5: History of Primitive Hunting Equipment

    History of Firearms

    History of the Bow and Arrow

▼  Topic 6: Summary

    What You Learned

    What You Learned (cont.)

▼  **Unit 6: Be a Safe Hunter**

▼  Topic 1: Why Firearm Safety Is Important

    Introduction to Firearm Safety

    Firearm Safety in the Home

    Hunting Incidents

    Main Causes of Hunting Incidents

    Video: Staying Safe After the Shot

    Importance of Safe Backstops

    Firearm Safety at the Shooting Range

▼  Topic 2: Safely Carrying Firearms in the Field

    Introduction to Safe Carries

    Video: Safe Firearm Carries

    Proper Field Carries: Trail Carry

    Proper Field Carries: Sling Carry

Exhibit 60
DX1359

Proper Field Carries: Elbow or Side Carry

Proper Field Carries: Two-Handed or "Ready" Carry

Proper Field Carries: Cradle Carry

Proper Field Carries: Shoulder Carry

Proper Field Carries: Three Hunters, Side by Side

Proper Field Carries: Three Hunters, Walking Single File

Proper Field Carries: Hunters Facing One Another

Crossing Obstacles: Alone

Crossing Obstacles: With Others

Passing a Firearm to Another Person

Video: Safe Fence Crossing

Checking for Obstructions

Video: Clearing Plugged Gun Barrels

▼ Topic 3: Safely Loading and Unloading Firearms

Loading Firearms

Video: Loading and Unloading Firearms

Unloading Firearms

▼ Topic 4: Transporting Firearms

Safely Transporting Firearms

Gun Cases for Transporting Firearms

Video: Transporting Firearms Safely

▼ Topic 5: Safe Zone-of-Fire

What Is a Zone-of-Fire?

Determining Your Safe Zone-of-Fire

Maintaining Your Safe Zone-of-Fire

Video: Safe Zones-of-Fire

▼ Topic 6: Other Safety Considerations

Self-Control and Target Identification

Shooting Accuracy

Alcohol and Drugs

Exhibit 60
DX1360

Beware of Hang Fires

▶ Topic 7: Hunting From Elevated Stands

▶ Topic 8: Hunting With Boats

▶ Topic 9: Hunting With All-Terrain Vehicles

▶ Topic 10: Summary

▼ **Unit 7: Be a Responsible and Ethical Hunter**

▶ Topic 1: Why Do We Have Hunting Laws?

▶ Topic 2: Hunter Ethics

▶ Topic 3: The Five Stages of Hunter Development

▶ Topic 4: Summary

▼ **Unit 8: Preparation and Survival Skills**

▼ Topic 1: Importance of Planning and Preparation

Preparing for Risks

Four Key Parts of Preparing

The Hunting Plan

Physical Conditioning

Clothing

Video: Effectiveness of Blaze Orange

Day Pack-Survival Kit and Equipment

▶ Topic 2: Topographic Maps and Compasses

▼ Topic 3: Survival Skills

Switching Into Survival Mode

Rules of Survival

S.T.O.P.: Stop, Think, Observe, Plan

Preparing a Shelter

Starting a Fire

Signaling for Help

Drinking Enough Water

Finding Food

▶ Topic 4: Coping With Extreme Weather

Exhibit 60
DX1361

▶ Topic 5: First Aid

▶ Topic 6: Summary

▶ **Unit 9: Understanding Wildlife**



Hunter-ed.com is produced by Kalkomey Enterprises, LLC. Kalkomey is an official state-delegated provider that provides hunting education courses and certification and publishing hunting safety education materials.

## Follow Us

Hunter Ed blog

### The California Hunter Ed Course

Hunter Ed is committed to Hunting education safety. We work with the California Department of Fish and Wildlife to produce Hunting safety education that's accurate, interesting, and easy to understand.

Top ↑    Log In    Select Another State Course    Home    Register    Partners    Today's Hunter

## More Online Recreational Safety Courses from Kalkomey















Exhibit 60
DX1362

7/31/23, 2:47 PM                                    Study Guide | California Hunter Ed Course



# Customer Support

We provide support Monday through Friday from 8AM to 8PM CST and Saturday and Sunday from 8AM to 5PM CST.

## Phone

1-800-830-2268

# About Kalkomey Enterprises, LLC

Kalkomey is the official provider of recreational safety education materials for all 50 states. We provide online boating and hunting and other recreational safety education. View press releases.

Hunter Ed is produced by Kalkomey Enterprises, LLC.

740 East Campbell Road, Suite 900
Richardson, TX 75081
1-800-830-2268



© 2004–2023 All rights reserved. Privacy Policy and Terms of Use.

Exhibit 60
DX1363