1  John W. Dillon (Bar No. 296788)
2  Dillon Law Group APC
   2647 Gateway Road
3  Suite 105, No. 255
4  Carlsbad, California 92009
   Telephone: (760) 642-7150
5  Facsimile: (760) 642-7151
6  E-mail:  jdillon@dillonlawgp.com

7  Attorneys for Plaintiffs

8
                    **UNITED STATES DISTRICT COURT**
9
                   **SOUTHERN DISTRICT OF CALIFORNIA**
10

11 | JOSE CHAVEZ, *et al.,* | ) | Case No.: 3:19-cv-01226-L-AHG |

                Plaintiffs,        )   Hon. M. James Lorenz and Magistrate Judge
12                                  )   Allison H. Goddard
   v.                              )
13                                  )   **APPENDIX IN SUPPORT OF**
   ROB BONTA, in his official      )   **PLAINTIFFS' MOTION FOR**
14 capacity as Attorney General of the )  **SUMMARY JUDGMENT**
   State of California, *et al.,*[1]  )  **PART 5**
15                                  )   **(BATES Nos. Pl.1151-Pl.1258)**
   Defendants.                     )
16                                  )
                                    )   Date: May 13, 2024
17                                  )   Time: 10:30 a.m.
                                    )   Place: Courtroom 5B (Fifth Floor)
18                                  )   Hon. M. James Lorenz
                                    )
19                                  )
                                    )
20 _____ )   Third Amended Complaint Filed: March 22,
21                                      2023

22

23                                         No oral argument will be heard pursuant to
24                                         local rules unless ordered by the Court

25 _____

26 [1]  Rob Bonta is automatically substituted for his predecessor, Xavier Becerra, as
   California Attorney General, and Allison Mendoza is automatically substituted for her
27 predecessors, former Directors Louis Lopez and Martin Horan, and former Acting
28 Directors Brent E. Orick and Blake Graham. Fed. R. Civ. P. 25(d).

Case 3:19-cv-01226-L-AHG   Document 136-6   Filed 03/15/24   PageID.17456   Page 2 of 109

Newspapers
by ancestry
https://www.newspapers.com/image/41021574
Printed on Oct 4, 2019



Copyright © 2019 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

**Pl.1151**

10/4/2019

Newspapers
by ancestry

https://www.newspapers.com/image/41021581

https://www.newspapers.com/image/41021581

Copyright © 2019 Newspapers.com. All Rights Reserved.

20 Feb 1788, Page 2 · The Pennsylvania Gazette at Newspapers.com

The Pennsylvania Gazette (Philadelphia, Pennsylvania) · Wed, Feb 20, 1788 · Page 2

Printed on Oct 4, 2019

Newspapers

https://www.newspapers.com/image/41021581

1/1



**Pl.1152**

10/4/2019

Newspapers
by ancestry

https://www.newspapers.com/image/41021581

20 Feb 1788, Page 2 · The Pennsylvania Gazette at Newspapers.com

The Pennsylvania Gazette (Philadelphia, Pennsylvania) · Wed, Feb 20, 1788 · Page 2

Printed on Oct 4, 2019

is very confiderable, the ftates have in their own hands, to the abfolute *exclufion* of Congrefs.

The power of the fword, fay the minority of Pennfylvania, is in the hands of Congrefs. My friends and countrymen, it is not fo, for THE POWERS OF THE SWORD ARE IN THE HANDS OF THE YEOMANRY OF AMERICA FROM SIX-TEEN TO SIXTY. The militia of thefe free commonwealths, entitled and accuftomed to their arms, when compared with any poffible army, muft be *tremendous and irrefiftable*. Who are thefe militia? *are they not ourfelves.* Is it feared, then, that we fhall turn our arms *each man againft his own bofom.* Congrefs have no power to difarm the militia. Their fwords, and every other terrible implement of the foldier, are *the birth-right of an American.* What claufe in the ftate or fœderal conftitutions hath *given away* that important right. It is faid, Congrefs can order the militia of Georgia to New-Hampfhire ! The gentlemen might have gone further, and faid, they might order the militia of Maryland TO MARCH OVER THE SURFACE OF THE CHESAPEAK. The latter would be obeyed as foon as the former. Thefe extravagancies operate againft all power. The legiflature of Pennfylvania may conftitutionally order their citi-zens to pay in taxes one half, or even *the whole, value* of their eftates, by the very claufe which vefts them with the power of providing for the real and evident exigences of the ftate govern-ment. Further, the power of the fword, even fo far as it is placed in the hands of Congrefs, is fubject to *the controul* of the ftate legiflatures, for they name one branch of the fœderal govern-ment (the Senate) without whom no military officers can be ap-pointed, no monies granted, no armies raifed, no navies provided. The ftate governments alfo have " *the authority* of training the militia, and *appointing all the officers.* The conftitution, inftead of providing a ftanding (or permanent) army, takes care that *it fhall not be ftanding,* fhall not *continue,* for it declares it fhall find itfelf *abfolutely unprovided* at the end of every two years. If the people fee the leaft reafon to apprehend a breach in the conftitution by the grant of money for more than two years, they can elect new

Copyright © 2019 Newspapers.com. All Rights Reserved.

Newspapers
POWERED BY

**Pl.1153**

**Plaintiffs' Exhibit AM**

**Pl.1154**

**Journal of Criminal Law and Criminology**

Volume 104
Issue 4 *Symposium On Guns In America*

Article 3

Fall 2015

# The Posse Comitatus And The Office Of Sheriff: Armed Citizens Summoned To The Aid Of Law Enforcement

David B. Kopel

Follow this and additional works at: https://scholarlycommons.law.northwestern.edu/jclc

Part of the Criminal Law Commons

Recommended Citation

David B. Kopel, *The Posse Comitatus And The Office Of Sheriff: Armed Citizens Summoned To The Aid Of Law Enforcement*, 104 J. Crim. L. & Criminology 761 (2015).
https://scholarlycommons.law.northwestern.edu/jclc/vol104/iss4/3

This Criminal Law is brought to you for free and open access by Northwestern University School of Law Scholarly Commons. It has been accepted for inclusion in Journal of Criminal Law and Criminology by an authorized editor of Northwestern University School of Law Scholarly Commons.

0091-4169/15/10404-0761
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY                                   Vol. 104, No. 4
Copyright © 2015 by Northwestern University School of Law                    Printed in U.S.A.

# THE *POSSE COMITATUS* AND THE OFFICE OF SHERIFF: ARMED CITIZENS SUMMONED TO THE AID OF LAW ENFORCEMENT

## DAVID B. KOPEL*

Posse comitatus *is the legal power of sheriffs and other officials to summon armed citizens to aid in keeping the peace.  The* posse comitatus *can be traced back at least as far as the reign of Alfred the Great in ninth-century England.  The institution thrives today in the United States; a study of Colorado finds many county sheriffs have active posses.  Like the law of the* posse comitatus*, the law of the office of sheriff has been remarkably stable for over a millennium.  This Article presents the history and law of the* posse comitatus *and the office of sheriff from their earliest days to the present.  This Article also describes how the past and present of the* posse comitatus *can be used in interpretation of the Second Amendment.*

* Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law.  Research Director, Independence Institute, Denver, Colorado.  Associate Policy Analyst, Cato Institute, Washington, D.C.  Professor Kopel is the author of ninety scholarly journal articles and fifteen books, including the first law school textbook on the Second Amendment: NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT (2012).  Kopel's website is http://www.davekopel.org.  The author would like to thank Christopher Lee Runyan, Justin Miller, Alycia Wilson, and Sean O'Connor for research assistance. All errors in this Article are Felix Frankfurter's fault.  *See* Orin Kerr, *Because We Thought the Errors in Your Article Were Cass Sunstein's Fault*, VOLOKH CONSPIRACY (Sept. 6, 2010, 10:18 PM), http://www.volokh.com/2010/09/06/because-we-thought-the-errors-in-your-article-were-cass-sunsteins-fault/ (last visited Dec. 26, 2013), *archived at* http://perma.cc/FDY4-D7A3; *Others' Mistakes, Maybe*, 17 GREEN BAG 2D 128 (2014) (discussing Kopel's use of footnote * to identify responsibility for errors).

761

Pl.1156

762 *KOPEL* [Vol. 104

TABLE OF CONTENTS

INTRODUCTION ................................................................................ 763
I. THE CONSTITUTIONAL OFFICE OF SHERIFF .......................... 765
    A. Anglo-Saxon Liberties ......................................................... 765
    B. The Anglo-Saxon Sheriff ...................................................... 769
    C. The Sheriff's Office from the Norman Conquest to the
        Fourteenth Century ............................................................ 774
        1. Sheriffs' Courts ............................................................. 775
        2. Election of Sheriffs ....................................................... 776
        3. Sheriff's Oath of Office and Bond ................................ 781
    D. The English Office of Sheriff in the Seventeenth Century and
        Thereafter .......................................................................... 781
        1. Autonomous and Indivisible ......................................... 782
        2. Modern Role in the United Kingdom ........................... 783
    E. The Sheriff in America .......................................................... 784
II. THE *POSSE COMITATUS* FOR THE KEEPER OF THE PEACE ..................... 787
    A. *Posse Comitatus* in England ................................................. 789
    B. *Posse Comitatus* in Colonial America and the Revolution ....... 792
    C. After Independence ............................................................... 793
    D. *Posse Comitatus* and the Civil War ..................................... 798
        1. Before the War ............................................................. 798
        2. After the War ............................................................... 800
    E. *Posse Comitatus* in Late Nineteenth Century America to the
        Present .............................................................................. 802
    F. Who Is Subject to *Posse Comitatus* Duty? ............................... 804
    G. Arms of the *Posse Comitatus* ................................................ 806
III. COLORADO SHERIFFS AND THEIR POSSES ............................ 808
    A. *Posse Comitatus* in Crime Emergencies ............................... 812
        1. Pitkin Sheriff's Office .................................................. 812
        2. Hinsdale Sheriff's Office .............................................. 813
        3. Rio Blanco Sheriff's Office .......................................... 815
        4. Jackson Sheriff's Office ................................................ 816
        5. Larimer Sheriff's Office ............................................... 816
        6. Morgan Sheriff's Office ................................................ 817
    B. *Posse Comitatus* in Low-Risk Situations ................................ 817
    C. Trained *Posse Comitatus* in Forcible Law Enforcement
        Situations .......................................................................... 818
        1. Alamosa County Sheriff's Office ................................. 818
        2. Baca County Sheriff's Office ....................................... 818
        3. Custer County Sheriff's Office ..................................... 819
        4. Delta County Sheriff's Office ....................................... 819

Pl.1157

5. Douglas County Sheriff's Office ........................................ 819
6. Elbert County Sheriff's Office ........................................... 819
7. Hinsdale County Sheriff's Office ....................................... 820
8. Kiowa County Sheriff's Office .......................................... 820
9. Lincoln County Sheriff's Office ......................................... 820
10. Logan County Sheriff's Office ......................................... 821
11. Montezuma County Sheriff's Office ................................. 821
12. Morgan County Sheriff's Office ....................................... 821
13. Prowers County Sheriff's Office ...................................... 821
   D. The Colorado Mounted Rangers ............................................... 821
IV. POSSE COMITATUS:
      THE RIGHT—AND DUTY—TO KEEP AND BEAR ARMS ................... 823
CONCLUSION ............................................................................... 828
APPENDIX .................................................................................... 830

INTRODUCTION

Most people know that in the American frontier West, sheriffs sometimes summoned "the posse" to assist in keeping the peace. The sheriff's *posse comitatus* authority to call forth armed citizens to aid law enforcement is deeply rooted in the Anglo-American legal system, originating no later than the ninth century. The *posse comitatus* power thrives in the twenty-first century United States. Sheriffs today use their *posse comitatus* power frequently, sometimes daily. This Article describes the historical roots, the modern uses, and the Second Amendment implications of *posse comitatus*.

The *posse comitatus* power does not belong exclusively to sheriffs, but the power was originally created for them, and they remain its most frequent users. Accordingly, Part I of this Article describes the origins and history of the office of sheriff. This Part explains how the nature of the Anglo-Saxon office provided the foundation for the American sheriff's role as a constitutional officer who is elected directly by the people and enjoys great independence in the performance of his duties. While police chiefs are appointed to their place within (and not at the top of) the chain of command of a city government, sheriffs are autonomous.

Part II explicates the law and history of the *posse comitatus* from Anglo-Saxon times to the present. The *posse comitatus* law of the twenty-first century United States is essentially the same as the *posse comitatus* law of England during the ninth century. The sheriff in carrying out his peacekeeping duty may summon to his aid the able-bodied adults of the

Pl.1158

county.  He has complete discretion about whom to summon and how the persons summoned shall be armed.

Part III provides a case study of the *posse comitatus* in modern Colorado.  Posses play numerous roles in Colorado.  They have thwarted the escapes of criminals, including serial killer Ted Bundy.  They also function as a citizen volunteer corps on a regular, structured basis; they assist sheriffs during county fairs, weather emergencies, and hostage situations, among many other duties.  The most highly trained posse in Colorado is the Colorado Mounted Rangers, which provides armed assistance to many sheriffs' offices and police departments as needed.

Finally, Part IV considers the relationship between the *posse comitatus* and the Second Amendment.  The Second Amendment aims to foster a "well-regulated militia," and, in furtherance of this purpose, the right of the people to keep and bear arms is safeguarded.  The *posse comitatus* and the militia are not identical, but they overlap and are intertwined to such a degree that the disarmament of one would inevitably destroy the other.  The Second Amendment's protection of the arms rights of citizens has the necessary effect of ensuring that there can be an effective *posse comitatus*.  Accordingly, sheriffs and other officials who have the authority to summon the *posse comitatus* are intended third-party beneficiaries of the individual right to keep and bear arms.  Sheriffs thus have proper third party standing to defend and advocate for the Second Amendment rights of citizens in their jurisdictions.

Following this Article, a lengthy Appendix summarizes state statutes related to the *posse comitatus*; almost all states continue the longstanding legal tradition that armed citizens may be summoned to aid of law enforcement.

The founding father of the *posse comitatus* was the first true King of England: Alfred the Great, who ruled from A.D. 871–899.  One reason he is the only English king called "the Great" is that he recognized that he could not fulfill his own duties solely through his own appointees.  To keep "the King's peace," the government needed the active participation of the people.  Routine suppression of violent crime and emergency community defense against riots, insurrections, and invasions all require that the armed people actively defend the authority of the government.  This is a moral point of the Second Amendment and of its counterparts in state constitutions.  This is the "active liberty" extolled by Justice Breyer.[1]

---

[1] STEPHEN BREYER, ACTIVE LIBERTY (2005) (defining "active liberty" to mean citizen participation in collective governance, as opposed to the "negative liberty" of an individual not being restrained by government).

Pl.1159

Armed citizens, under the guidance of the leaders chosen by the citizens, can embody and effectuate law and order.

## I. THE CONSTITUTIONAL OFFICE OF SHERIFF

This Part explains the history of the office of sheriff, from its Anglo-Saxon origins through its present role in the United States. Section A explores why the Anglo-Saxon model was so revered by the American Founders. Section B then describes the origins and features of the office of sheriff in Anglo-Saxon England. Section C shows the continuity and changes in the office in the three centuries following the Norman Conquest of 1066. The most important development was the demise of the custom of electing sheriffs. Section D describes the long, slow decline of the office of sheriff in England from the seventeenth century to the present. Finally, Section E shows how the office of sheriff has thrived in America, from colonial days to the present. On both sides of the Atlantic, the sheriff was legally autonomous, but in America, the practical autonomy, responsibility, influence, and power of the sheriff were much greater. In addition, the custom of electing sheriffs was restored in America after centuries of disuse. Popular elections became an explicit requirement of most state constitutions.

### A. ANGLO-SAXON LIBERTIES

To the American Founders, England before the Norman Conquest of 1066 was a land of liberty.[2] The American Revolution began because of violations of "the rights of Englishmen" (including the right to bear arms) as those rights existed in the late eighteenth century.[3] However, as with many revolutions, the ambitions for reform grew as the war continued.[4]

The importance of the people's right to bear arms was clear from the start of the Revolution. The war began on April 19, 1775, when Americans used their firearms to fight British soldiers who confiscated firearms and

---

[2] *See, e.g.*, Letter from John Adams to Abigail Adams (Aug. 14, 1776), *in* 2 ADAMS FAMILY CORRESPONDENCE 96 (L.H. Butterfield ed., 1963); MERRILL D. PETERSON, THOMAS JEFFERSON AND THE NEW NATION 57 (1970).

[3] David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 283, 291–92 (2012); William F. Swindler, *"Rights of Englishmen" Since 1776: Some Anglo-American Notes*, 124 U. PA. L. REV. 1083, 1089–91 (1976).

[4] GORDON S. WOOD, THE RADICALISM OF THE AMERICAN REVOLUTION (1992) (while the Revolution began because of specific grievances related to the British government's violations of the traditional rights of Englishmen, its length and ultimate success led many Americans to aim to create a new political system, rather than simply an improved version of the British one).

Pl.1160

gunpowder by conducting house-to-house searches in Lexington and Concord.[5]  The Americans chased and harried the Redcoats back to Boston, besieged them there, and fought several battles.[6]  On March 17, 1776, the British departed Boston by ship.[7]

The revolutionaries valued Anglo-Saxon traditions.  After the Declaration of Independence was announced, the Continental Congress had to decide on the public symbols of the new nation, so on July 6, 1776, a committee discussed the design of the Great Seal of the United States. Thomas Jefferson urged that the reverse of the seal depict "Hengist and Horsa, the Saxon Chiefs, from whom We claim the Honour of being descended and whose Political Principles and Form of Government We have assumed."[8]  Hengist and Horsa were the first Anglo-Saxon rulers in England, from the fifth century A.D.[9]

The American Revolutionaries and their European intellectual ancestors believed that societies of liberty had existed in ancient times, and that one purpose of political activity was to recover that lost liberty— especially to ensure that the government ruled under The Law, and not above it.[10]

The eighteenth century Americans who (like many Englishmen of the time) viewed Anglo-Saxon England as a historical model of freedom were part of a longstanding tradition of idealizing the ancient free Germanic tribes, who seemed so different from the despotic Roman Empire and the European governments of the second millennium A.D.  The idealization of Germanic liberty can be traced back as far as the first-century Roman historian Tacitus.  He extolled the liberties and democracy of the German

---

[5] Kopel, *supra* note 3, at 291–92.

[6] *Id.* at 309–10.

[7] NATHANIEL PHILBRICK, BUNKER HILL: A CITY, A SIEGE, A REVOLUTION 285 (2013).

[8] Letter from John Adams to Abigail Adams, *supra* note 2, at 96.

[9] It is not clear whether Hengist and Horsa were historical figures, or legendary. Allegedly, they were brothers who founded the Anglo-Saxon kingdom of Kent, the first such kingdom in England.  *See* BEDE, 1 ECCLESIASTICAL HISTORY OF THE ENGLISH PEOPLE ch. 15 (circa 731); GEOFFREY OF MONMOUTH, THE HISTORY OF THE KINGS OF BRITAIN 155−66, 186−93 (Lewis Thorpe trans., Penguin 1966) (c. 1136).

[10] For example, in 1644, the Scottish Presbyterian Samuel Rutherford published *Lex, Rex, or the Law and the Prince*.  The point of the title was that the law precedes the king, and so the monarch is bound to obey the law.  The great Anglo-American ideal of "the rule of law" embodies Rutherford's principle.  The law, not the individual who heads the government, is the supreme ruler.  Further, the true source of law is not the King's will, but God's will.  Accordingly, king-made "law" which is inconsistent with God's law of natural justice and goodness is merely a pretended law, not true law.  SAMUEL RUTHERFORD, LEX, REX, OR THE LAW AND THE PRINCE 113–19, 125–39 (Sprinkle Pubs., 1982) (1644) (consisting of Questions XXIV, XXVI, and XXVII).

**Pl.1161**

tribes, whom the Romans attempted to conquer but failed.[11]  These German tribes later became the ancestors of the English (the Anglo-Saxons) and, to at least some degree, of the French.[12]    The French author François Hotman's *Francogallia* lauded the ancient liberties of the era of Charlemagne (ruled A.D. 768–814), implicitly contrasting France's ancient, primitive freedom with the contemporary centralized despotism of the Bourbon kings.[13]   In the Anglosphere, and especially in America, many believed that the liberties of the Anglo-Saxons had been destroyed by the Norman Conquest in 1066.[14]

---

[11] TACITUS, DE ORIGINE ET SITU GERMANORUM §§ 11–12 (c. A.D. 98).  The book is commonly known as *Germania*.  *See* CHRISTOPHER B. KREBS, A MOST DANGEROUS BOOK: TACITUS'S *GERMANIA* FROM THE ROMAN EMPIRE TO THE THIRD REICH 17 (2011).  It was published during the reign of Trajan, one of the "five good emperors."  Trajan regarded himself as bound by the law, not above it.  *See* Robert G. Natelson, *The Government as Fiduciary: A Practical Demonstration from the Reign of Trajan*, 35 U. RICH. L. REV. 191, 211 (2001).

Germania was lost during the Dark Ages and rediscovered in 1425.  KREBS, *supra*, at 56.  It remained influential for centuries afterward.  For example, English opponents of the absolutist Stuart monarchs in the seventeenth century relied on Tacitus as part of their account of ancient Anglo-Saxon liberty.  Ralph E. Giesey & J.H.M. Salmon, *Introduction* to FRANÇOIS HOTMAN, FRANCOGALLIA 120–21 (Ralph E. Giesey & J.H.M. Salmon eds., Cambridge Univ. Press, 2010) (1586).  Montesquieu's 1748 *The Spirit of Laws* attributed the admirable features of the English system of government (such as a limited rather than absolute monarchy and an independent legislature) to the ancient Germanic liberty, as described by Tacitus.  KREBS, *supra*, at 157–62.

[12] WILLIAM STUBBS, SELECT CHARTERS AND OTHER ILLUSTRATIONS OF ENGLISH CONSTITUTIONAL HISTORY 1–7 (H.W.C. Davis ed., 9th ed. 1913); KREBS, *supra* note 11, at 158–59.

[13] HOTMAN, *supra* note 11.  The English radical Whig Algernon Sidney adopted and cited Hotman's argument.  ALGERNON SIDNEY, DISCOURSES CONCERNING GOVERNMENT 237 (London, Booksellers of London and Westminster 1698).  (Sidney was revered by the American founders; his *Discourses* synthesized and advanced a vast sweep of prior Western authors, from the Bible to his own time, which supported the legitimacy of armed resistance to tyranny); Giesey & Salmon, *supra* note 11, at 121–22.  Thomas Jefferson credited Sidney as one of four key intellectual sources for the Declaration of Independence.  Letter from Thomas Jefferson to Henry Lee (May 8, 1825), *in* THOMAS JEFFERSON, WRITINGS 1500, 1500–01 (Merrill D. Peterson ed., 1984).

The first English translations of *Francogallia* were published in the eighteenth century, with an introduction in which the prominent and influential Whig Robert Molesworth traced contemporary Whig principles to the ancient Franks and Saxons.  Giesey & Salmon, *supra* note 11, at 123–25.  A 1775 reprint was published and read by Englishmen who were sympathetic to the armed resistance of the Americans.  Justin Champion, *Introduction* to ROBERT MOLESWORTH, AN ACCOUNT OF DENMARK, at ix, xxxii–xxxiii (Justin Champion ed., 2011).

[14] *See, e.g.*, DAVID HUME, 1 HISTORY OF ENGLAND 160–85, 194–98, 208, 226–27 (Liberty Fund 1983) (1778); *id.* at 226–27 ("[I]t would be difficult to find in all history a revolution more destructive, or attended with a more complete subjection of the antient inhabitants."); *id.* at 437 (the majority of Anglo-Saxons were reduced "to a state of real

Pl.1162

The ideal of ancient Anglo-Saxon England became a powerful influence upon the new American nation, which was striving to create what Jefferson called "an Empire of liberty."[15]

The American view of Anglo-Saxon England as a land of liberty has influenced American law; the view is one of the sources of the Confrontation Clause in the Bill of Rights.[16]  Anglo-Saxon history would also help to shape the office of sheriff in the United States.  To Jefferson, "the office of sheriff" was "the most important of all the executive officers of the county."[17]  As the United States in the nineteenth century grew from a thinly populated nation on the Atlantic seaboard into a nation stretching from ocean to ocean, there was a nearly constant process of forming new territories and states, both of them composed of counties.  In creating the "most important" of all the county offices, the American people modeled the office on the best features of the Anglo-Saxon office of sheriff.  The Americans also included what they considered to be improvements that had taken place in the centuries after the Norman Conquest.[18]  As one historian would observe in 1930, "in America today . . . the sheriff retains many of his Anglo-Saxon and Norman characteristics."[19]  The same is true today: the fundamental structure of the American office of sheriff is as it was in the nineteenth century and is similar in many ways to its structure in the ninth century.

---

slavery"); FORREST MCDONALD, NOVUS ORDO SECLORUM: THE INTELLECTUAL ORIGINS OF THE CONSTITUTION 76–77 (1985) (noting influence of "the Norman yoke" in American Revolution ideology); CHARLES WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 6342, at n. 80–107 (summarizing the common view of Americans and of English Whigs about the imposition of "the Norman yoke" in 1066).

[15] *See* Letter from Thomas Jefferson to George Rogers Clark (Dec. 25, 1780), in 4 THE PAPERS OF THOMAS JEFFERSON 237, 237–38 (Julian P. Boyd ed., 1951) ("[W]e shall form to the American union a barrier against the dangerous extension of the British Province of Canada and add to the Empire of liberty an extensive and fertile Country thereby converting dangerous Enemies into valuable friends."); Letter from Thomas Jefferson to James Madison (Apr. 27, 1809), *in* 1 THE PAPERS OF THOMAS JEFFERSON: RETIREMENT SERIES 168, 169 (J. Jefferson Looney ed., 2004) ("[W]e should have such an empire for liberty as she has never surveyed since the creation: & I am persuaded no constitution was ever before so well calculated as ours for extensive empire & self government.").

[16] WRIGHT & GRAHAM, *supra* note 14, § 6342.

[17] Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), *in* 12 THE WORKS OF THOMAS JEFFERSON 3, 6 (Paul Leicester Ford ed., 1905).

[18] *See infra* text accompanying notes 60–146.

[19] CYRUS HARRELD KARRAKER, THE SEVENTEENTH-CENTURY SHERIFF: A COMPARATIVE STUDY OF THE SHERIFF IN ENGLAND AND IN THE CHESAPEAKE COLONIES, 1607–1689, at 159 (1930).

**Pl.1163**

B. THE ANGLO-SAXON SHERIFF

This Section describes the origins and early characteristics of the office of sheriff.  The formalization of that office into what is essentially the same office in modern America was one consequence of King Alfred the Great's victories against Danish invaders.  Therefore, this Section proceeds chronologically from ancient times until 1066, describing developments in the office of sheriff in the context of contemporary political events.

After Roman rule receded from England, Germanic tribes—specifically, the Angles and the Saxons[20]—repeatedly invaded Britain.  The tribes settled in England, which became a heptarchy (seven distinct kingdoms).[21]  The Anglo-Saxons needed an official who would directly enforce the king's laws and look out for the king's interests.  Thus was born "the king's reeve"—a man of the shire directly appointed by the king, whose duty was to carry out the king's commands.[22]

In the English system of government, the second oldest title of office is "sheriff."[23]  The Anglo-Saxon word for what we today call a "county" was "shire."[24]  The word "sheriff" is a compound of "seyre" (meaning "shire") and "reve" (meaning "bailiff" or "guardian").[25]  The sheriff is therefore the

---

[20] THE ANGLO-SAXON CHRONICLE 25–32 (James H. Ford ed., James Ingram trans., El Paso Norte Press 2005) (describing events of years A.D. 449–607); STUBBS, *supra* note 12, at 1.

[21] The seven kingdoms were Wessex, Mercia, Northumbria, East Anglia, Essex, Kent, and Sussex.  The first four of these were usually the most powerful.  These kingdoms later consolidated into larger states.  HUME, *supra* note 14, at 23–54; STUBBS, *supra* note 12, at 10–11.

[22] The king also had great landowners, "ealdormen" (who outranked the reeves), but on a practical basis, the reeves did more of the day-to-day work.  RICHARD ABELS, ALFRED THE GREAT 270–74 (1998).

[23] Thomas Garden Barnes, *Introduction* to MICHAEL DALTON, OFFICIUM VICECOMITUM: THE OFFICE AND AUTHORITIE OF SHERIFS iii (The Lawbook Exchange 2009) (1623) ("Older than the great officers of state, older than Parliament, older than the courts of law.").  The oldest title is "king."  WILLIAM ALFRED MORRIS, THE MEDIEVAL ENGLISH SHERIFF 1 (1927) ("With the single exception of kingship, no secular dignity now known to English-speaking people is older.").

[24] Consistent with the original title of "shire-reeve," the Colorado sheriffs who have filed suit against gun control laws enacted in 2013 (see Part III, *infra*) see themselves as protecting their counties against oppressive intrusions.

[25] WILLIAM HENRY WATSON, A PRACTICAL TREATISE ON THE OFFICE OF SHERIFF 1 (London, S. Sweet 1848); EDWARD COKE, 2 THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND; OR, A COMMENTARY UPON LITTLETON 168(a) (London 1823) (1628) ("'*Sherife.*' *Shireve* is a word compounded of two Saxon words, viz. *shire*, and *reve*.  *Shire*, *satrapia*, or *comitatus*, commeth of the Saxon verbe *shiram*, *i.e. partiri*, for that the whole realme is parted and divided into shires; and *reve* is *praefectus*, or *praepositus*; so as *shireve* is the *reve* of the shire, *praefectus satrapiae*, *provinciae*, or *comitatûs*.").  *Coke upon Littleton* is the first volume of Coke's *Institutes of the Laws of England*.  Prior to Blackstone,

Pl.1164

guardian of the county. One can find some references to "sheriffs" in Anglo-Saxon texts preceding Alfred the Great.[26] Nevertheless, we can trace the regularization of the office of sheriff and its *posse comitatus* power, as well as the militia that was later recognized by the Second Amendment, to Alfred's reign.

Of all English monarchs from post-Roman times to Queen Elizabeth II, only one is called "the Great." He is Alfred. As a second son, Alfred was not expected to become king. Well-educated, multilingual, and deeply religious, he studied for a while in Rome.[27] He ascended to the throne during a war with the Danes in which his older brother was killed.[28] The English lived in near-constant fear of Danish invasion and pillage; they were frequently oppressed by the Danes who had conquered parts of England.[29]

In A.D. 878, as *The Anglo-Saxon Chronicle* (a historical work begun during Alfred's time) explains, the Danes triumphed completely, and all the people of England were "subdued to their will;—ALL BUT ALFRED THE KING. He, with a little band, uneasily sought the woods and fastnesses of the moors."[30] With nothing but a guerilla band hiding in the swamps, Alfred kept alive the principle of English sovereignty and led the English back from the brink of annihilation. The bookish man became one of the greatest military strategists of his century. Once, he disguised himself as a harper, and entered the Danish camp—entertaining the Danes with song and story, meeting with the Danish prince Guthrum in his tent—and acquiring military intelligence.[31] His growing army finally expelled the most recent Danish invaders.[32] The Danish settlements in England were brought under

---

*Institutes* was the foundational text for Anglo-American courts, lawyers, and law students. "Littleton" was Thomas Littleton's *Treatise on Tenures*, first published in 1481 or 1482, although Coke's commentaries go far beyond the subjects covered by Littleton.

[26] *See* EDWARD COKE, 1 THE SELECTED WRITINGS OF SIR EDWARD COKE 61 (Steve Sheppard ed., Liberty Fund 2003) (1602) ("[T]he learned know that Sheriffes were great officers and ministers of justice, as now they are, long before the Conquest . . . ."); *id.* at 302 ("[A]s far as the Reign of the often named King *Arthur* . . . the Offices of the Keepers or Senators of the Shires or Counties, *Custodes seu Praepositi Comitatus*, of later times called Shireves . . . ."); COKE, *supra* note 25, at 168(a).

[27] HUME, *supra* note 14, at 64.

[28] *Id.* at 63–64. Their father had died earlier.

[29] *Id.* at 57–59, 62–63.

[30] THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 67 (discussing the events of A.D. 878). *See also* HUME, *supra* note 14, at 66–68 (explaining that for a while, Alfred disguised himself as a peasant and found refuge working as an assistant to a cowherd, then later assembled guerillas on two acres of firm ground in a bog in Somersetshire from whence he led raids for a year).

[31] HUME, *supra* note 14, at 68.

[32] *Id.* at 69.

Pl.1165

his sovereignty and were no longer able to plunder the English at will. He was the first King of England.[33]

King Alfred recognized that another wave of Danish invasion was inevitable, so he began building England's capacity for self-defense. This capacity was founded on the idea that all the freemen were to be armed, trained, and ready to fight to defend their local and national communities. He created the English militia, which consisted of all armed people.[34] In the 1939 case *United States v. Miller*, the Supreme Court unanimously acknowledged the militia of the Second Amendment to be the institution founded by Alfred.[35]

Among Alfred's most important ideas was dividing the militia in each shire into two parts, only one of which would be required to serve at a given time.[36] The practical benefit was enormous. The men who were not serving in a particular campaign could work the farms, keep the economy functioning, and take care of the women and children. Meanwhile, the men who were actively serving in the militia were willing to go on longer campaigns because they did not feel compelled to return home as fast as possible in order to plant, cultivate, or harvest the crops.[37] When the Danes tried invading again, they were routed.[38]

During the American Revolution nearly a millennium later, the militia system would again be a foundation of victory. Soldiers in the Continental Army might be away from home for years, but the majority of American fighters came from the militia. Because they were not full-time soldiers, they could return home to take care of their farms and keep the American economy functioning.[39]

A second security reform of Alfred the Great was reformation of the office of sheriff.[40] After the period of Danish oppression, the English had

---

[33] *Id.* at 70. Alfred's grandfather, Egbert, was the first to style himself King of England, but Egbert never ruled the large inland kingdom of Mercia. *Id.*

[34] *Id.* at 70–72.

[35] United States v. Miller, 307 U.S. 174, 179 (1939) ("Blackstone's Commentaries, Vol. 2, Ch. 13, p. 409 points out 'that king Alfred first settled a national militia in this kingdom' and traces the subsequent development and use of such forces.").

[36] ABELS, *supra* note 22, at 196–98; HUME, *supra* note 14, at 70–71; THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 71 ("A.D. 894 . . . The king had divided his army into two parts; so that they were always half at home, half out; besides the men that should maintain the towns."). Alfred may have copied the example of the legendary female warrior kingdom of the Amazons, which divided its military in half. ABELS, *supra* note 22, at 197–98.

[37] *See* HUME, *supra* note 14, at 70–71.

[38] *Id.* at 71–74.

[39] NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT 164–67 (2012).

[40] HUME, *supra* note 14, at 78. Hume here cites "Ingulf p. 870." This cite is to HISTORIA

Pl.1166

devolved into lawlessness and robbery.[41]  Alfred fixed England's county boundaries with greater precision and used the counties to organize national and community self-defense.[42]  The sheriff was the pillar of this self-defense system and often the leader of the county militia.[43]  As will be detailed in Part II, the sheriff exercised the authority to summon and command the armed body of the people not only in the militia, but also in several related forms: *posse comitatus*, "hue and cry," and "watch and ward."[44]

Thus, according to medieval historian Frank Barlow, "[i]t is not unlikely that every freeman had the duty, and right, to bear arms" in Anglo-Saxon times.[45]  When carrying out the duty to bear arms, the freeman would most commonly be under the leadership of the sheriff.  The Second Amendment also recognizes the individual right to keep and bear arms for all lawful purposes and the duty to bear arms when summoned to the defense of community, as in the militia or the *posse comitatus*; the legal implications will be explored in Part IV.[46]

As the county leader of the armed people, "the reeve became the guarantor of the survival of the group."[47]  "[T]he people maintained law and order among themselves" because the central government of the king had no practical ability to do so.[48]

---

CROYLANDENSIS (Chronicle of the Abbey of Croyland), which covers A.D 655–1486, and whose first named author is claimed to be "Ingulf" (or "Ingulph").  The document was probably written around the thirteenth or fourteenth centuries, but purported to be older, probably in order to support some of the Abbey's land claims.  W.G. SEARLE, INGULF AND THE HISTORIA CROYLANDENSIS (1894).  On the issue of sheriffs, *Historia* is a credible source, in that it likely reflects an oral tradition that was well established and widely known.

[41]  HUME, *supra* note 14, at 75–76.

[42]  COKE, *supra* note 26, at 303; JUDITH A. GREEN, ENGLISH SHERIFFS TO 1154, at 9 (1990); THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 65–75.

[43]  COKE, *supra* note 26, at 303; WATSON, *supra* note 25, at 1–2.  Shire boundaries were stabilized in the south earlier than elsewhere; they did not take their final shape until well after the Norman Conquest.  GREEN, *supra* note 42, at 9.  *The Anglo-Saxon Chronicle*'s first mention of sheriffs is for the year A.D. 778, which is a century before Alfred's reign.  THE ANGLO-SAXON CHRONICLE, *supra* note 20, at 54.  For more on Anglo-Saxon sheriffs and the historical uncertainties surrounding them, see GREEN, *supra* note 42, at 9–11.  Another of Alfred's reforms was the division of counties into smaller districts for maintenance of law and order; the armed community assemblies with twelve freeholders to resolve disputes were a foundation of the jury system.  HUME, *supra* note 14, at 76–77.  Alfred's law code became a basis of the common law.  *Id.* at 78.

[44]  *See* discussion *infra* Part II.

[45]  FRANK BARLOW, EDWARD THE CONFESSOR 172 (1970).  Barlow is the head of the History Department at the University of Exeter.

[46]  *See* discussion *infra* Part IV.

[47]  DAVID R. STRUCKHOFF, THE AMERICAN SHERIFF 3 (1994).

[48]  *Id.* at 4.

Pl.1167

A millennium later, Alfred the Great was still revered by Englishmen and Americans of all political persuasions.[49]  He had brought peace and security to England, while, in the words of the English political philosopher David Hume, "[he] preserved the most sacred regard to the liberty of his people; and it is a memorable sentiment preserved in his will, that it was just the English should for ever remain as free as their own thoughts."[50]

Government records from Anglo-Saxon England are hardly complete, but there are records of sheriffs present in all English counties by A.D. 992.[51]  The duties of sheriffs were numerous:

> [T]he original role of the sheriff was to act as the personal representative of the King in each county.  Mediaeval government was not based on any concept of separation of powers and the duties of sheriffs were therefore both executive and judicial.  They were responsible for commanding the local military [the militia] in cases of invasion or rebellion, they collected local taxes, investigated suspicious deaths, executed Royal Writs and generally maintained law and order. In their law enforcement role they could call upon the local freemen to form a posse comitatus to hunt for outlaws and, in their judicial role, they presided over the shire court, exercising both civil and criminal jurisdiction.[52]

The sheriff's responsibilities included mobilizing the people to resist invasion or for other military purposes, as leaders of the county militias.[53]  So when William the Conqueror invaded in 1066, "[h]is primary adversaries were King Harold's Sheriffs."[54]  Sheriff Esgar defended London

---

[49] *See, e.g.*, Daniel Webster, Oration at the Dedication of the Bunker Hill Monument, (June 17, 1825) (concluding paragraph extols "our fathers" as men like "Alfred, and other founders of states"), *in* WEBSTER'S FIRST BUNKER HILL ORATION 42 (Boston, Leach, Shewell, and Sanborn 1889); Barbara Yorke, *The Most Perfect Man in History?*, HIST. TODAY 49 (October 1999).

[50] HUME, *supra* note 14, at 79.

[51] Steve Gullion, *Sheriffs in Search of a Role*, 142 NEW L.J. 1156, 1156 (1992).  There are also records of "shire-reeves" during the reign of King Edgar (950–75).  *Id.*

[52] *Id.*

[53] MORRIS, *supra* note 23, at 27; *see also* ANGLO-SAXON CHRONICLE, *supra* note 20, at 147 (A.D. 1056, "Elnoth the Sheriff" slain during war against the Welsh king); BARLOW, *supra* note 45, at 173 (in Anglo-Saxon times, "[w]hereas the earl and the sheriffs would normally lead the troops on campaign, it would often fall to the bishop to see to the defence of his diocese, particularly at times when it was denuded of its best fighting men.").  *See also* ABELS, *supra* note 22, at 273 (ealdormen were responsible for levying men for the king's army; sheriffs were responsible for the defense of the village-based fortifications).  Sheriffs also occasionally summoned the militia (or "fyrd").  C. WARREN HOLLISTER, ANGLO-SAXON MILITARY INSTITUTIONS ON THE EVE OF THE NORMAN CONQUEST 68 (1962).  However, by late Saxon times, earls were probably higher ranked as military leaders than sheriffs.  *Id.* at 94–95.

[54] STRUCKHOFF, *supra* note 47, at 8.

Pl.1168

against William's army.[55]   At the Battle of Hastings, "King Harold's last battle was led by his sheriffs."[56]

Sheriffs tended to be from the lesser nobility.[57]   A baron might be a great landholder with real property in several counties (and, later, as a Member of Parliament, a player on the national political stage).  In contrast, the sheriff would usually be man of the shire.  His interests and property were within a single county.[58]  The sheriff needed to be man of independent means, because the national government provided him with no support, not even a salary.  He was responsible for paying all the expenses of his office (e.g., the salaries of the undersheriff and the deputies), and he would keep whatever revenues he earned from his services (e.g., fees for serving writs).[59]

## C. THE SHERIFF'S OFFICE FROM THE NORMAN CONQUEST TO THE FOURTEENTH CENTURY

Although the office of sheriff in tenth century England has much in common with the office in twenty-first century America, there were some important changes in the centuries following the Norman Conquest of 1066.  Two of these changes would later be incorporated by Americans: the elimination of the sheriff's judicial role[60] and the requirement that sheriffs take an oath and post a bond.[61]  Another Norman innovation—making the sheriff's office appointive rather than elective—was eventually accepted in England.[62]  But it would later be rejected in the United States.[63]

---

[55] MORRIS, *supra* note 23, at 27.

[56] STRUCKHOFF, *supra* note 47, at 8.

[57] *See* GREEN, *supra* note 42, at 15 (stating that on the eve of the Norman Conquest, sheriffs were "men of substance in their own shires, but their landed wealth was not on the same scale as that of the earls or the stallers . . .").

[58] The custom of local sheriffs did not always prevail.  In the fourteenth century, several Sheriffs served successively in multiple counties.  RICHARD GORSKI, THE FOURTEENTH-CENTURY SHERIFF 59, 159, 162–70 (2003).  During the thirteenth century, the issue was often contested, with locally-oriented sheriffs gaining temporary ascendency by the latter part of the century.  J.R. Madicott, *Edward I and the Lessons of Baronial Reform: Local Government, 1258–80*, *in* 1 THIRTEENTH CENTURY ENGLAND 27 (P.R. Coss & S.D. Lloyd eds., 1986).

[59] Although for concision I usually refer to pre-modern sheriffs as "he," there were some female sheriffs, such as the Countess of Salisbury, who was Sheriff of Whiltshire during Henry III (reigned 1227–1272).  J. H. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 530 n.4 (3d ed. 1990).  Also, "Ann Countess of Pembroke . . . had the office of hereditary sheriff of Westmoreland, and exercised it in person."  COKE, *supra* note 25, at 326(a) n.2.

[60] Discussed *infra* at Part I(C)(1).

[61] Discussed *infra* at Part I(C)(3).

[62] Discussed *infra* at Part I(C)(2).

[63] Discussed *infra* at Part I(E).

Pl.1169

Case 3:19-cv-01226-L-AHG   Document 136-6   Filed 03/15/24   PageID.17475   Page 21 of 109

### 1. Sheriffs' Courts

The most important step towards the end of the sheriffs' judicial function came with Magna Carta in 1215, although Magna Carta confirmed a trend that had been going on for a while.

The Norman Conquest had been disastrous for many of the English people, as they were subjugated to tyranny and poverty.[64] The problem was exacerbated by the conduct of King John (reigned 1199–1216).[65] According to David Hume's *The History of England*, "[t]he only happiness was, that arms were never yet ravished from the hands of the barons and people: The nation, by a great confederacy, might still vindicate its liberties."[66]

An armed revolt forced King John to agree to Magna Carta on June 12, 1215. Later monarchs were repeatedly compelled to declare that they too were bound by the Great Charter and would rule in accordance with it.[67] Magna Carta was created by the barons and contained great universal principles of ordered liberty, as well as items involving the narrower concerns of the barons of the time.

One broad principle of liberty contained in Magna Carta was the "law of the land" article, which is an ancestor of the U.S. Constitution's guarantees that no persons shall be deprived of life, liberty, or property without due process of law.[68] The Magna Carta of 1215 (although not its subsequent reissues by other monarchs) even included a provision authorizing the use of force against the king if he violated Magna Carta.[69]

One clause of Magna Carta required the discontinuance of the sheriffs' courts for holding pleas of the crown.[70] At the time, "pleas of the crown" was a legal term of art for certain cases involving issues where a royal interest was involved.[71] Efforts to restrict sheriffs' judicial role had been

---

[64] See HUME, *supra* note 14, at 437.

[65] *Id.* at 436–38.

[66] *Id.* at 437.

[67] WILLIAM SHARP MCKECHNIE, MAGNA CARTA 36–40, 139–59 (1914).

[68] U.S. CONST. amends. V, XIV:

No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any other way, nor will we proceed with force against him, or send others to do so, except by the lawful judgement of his equals or by the law of the land.

Magna Carta of 1215, *reprinted in* G.R.C. DAVIS, MAGNA CARTA 21 (1963).

[69] Magna Carta of 1215, *reprinted in* J.C. HOLT, MAGNA CARTA app. at 469–73 (2d ed. 1992) (quoting art. 61); David I. Caplan & Sue Wimmershoff-Caplan, *Magna Carta*, *in* 2 GUNS IN AMERICAN SOCIETY 371 (Gregg Lee Carter ed., 2d ed., 2007); David B. Kopel, *The Catholic Second Amendment*, 29 HAMLINE L. REV. 519, 540–41 (2006).

[70] Magna Carta of 1215 § 24, *supra* note 69, at 457 ("No sheriff, constable, coroners or other of our bailiffs may hold pleas of our Crown."); HUME, *supra* note 14, at 445.

[71] *See* MCKECHNIE, *supra* note 67, at 305–06.

Pl.1170

going on for the last century.[72]  The standard view of historians has been that the sheriffs and their courts were oppressive,[73] although a modern commentator suggests that the upper nobility's actions against the sheriffs' courts came about "not because of general dissatisfaction with their conduct, but because the earls and barons were displeased at the local feudal courts' loss of 'business' (from which they derived revenue) to the increasingly popular sheriffs' courts."[74]

Regardless, Magna Carta was a major step in sheriffs losing their judicial role.  Magna Carta did not by its terms apply in Scotland, so sheriffs continued to preside over the sheriffs' courts there, and these courts are the heart of the Scottish judicial system today.[75]  The Scottish sheriffs also had the same law enforcement powers and duties as their English counterparts, such as raising the hue and cry.[76]  In the United States, sheriffs retain many traditional duties to the courts, such as providing court security and serving warrants, but they have no judicial role in presiding over courts or deciding cases.

### 2. Election of Sheriffs

In the United States, it is axiomatic that the sheriff is elected by the people.[77]  The American principle is based on the Anglo-Saxon custom of electing sheriffs, although precisely how many sheriffs were elected in either Anglo-Saxon or Norman times is difficult to say.

There is some debate about whether sheriffs were elected or appointed during the Anglo-Saxon era.  According to Blackstone, in Anglo-Saxon times, "sheriffs were elected: following still that old fundamental maxim of the Saxon constitution, that where any officer was entrusted with such

---

[72] *See, e.g.*, STUBBS, *supra* note 12, at 121–22 (stating that Henry I (reigned 1100–1135) forbade sheriffs to hold sheriffs' courts more frequently than at customary times).

[73] *See e.g.*, GREEN, *supra* note 42, at 17; MCKECHNIE, *supra* note 67, at 311.

[74] MCKECHNIE, *supra* note 67, at 311; Tamara Buckwold, *From Sherwood Forest to Saskatchewan: The Role of the Sheriff in a Redesigned Judgment Enforcement System*, 66 SASK. L. REV. 219, 227 n.40 (2003); Gullion, *supra* note 51, at 1156.  It should be noted that at least some sheriffs had supported the Magna Carta movement.  Once King John regained his political power, these sheriffs were promptly dismissed from office.  MORRIS, *supra* note 23, at 161.  "The spirit of the sheriff and his office permeated Magna Carta from start to finish and considered in this aspect alone it is the finest example we possess to prove the importance of the sheriff's role in the governance of medieval England."  IRENE GLADWIN, THE SHERIFF 124 (1974).  Five clauses in Magna Carta directly dealt with the operation of sheriffs' offices; another clause removed certain named sheriffs; and nineteen others involved administrative reforms which the sheriffs would help to effectuate.  *Id.* at 123–24.

[75] Gullion, *supra* note 51, at 1157.

[76] WILLIAM C. DICKINSON, THE SHERIFF COURT BOOK OF FIFE 1515–1522, at xxxix (1928), *cited in* STRUCKHOFF, *supra* note 47, at 18.  "Hue and cry" is discussed *infra* Part II.

[77] *See infra* text accompanying notes 136–146.

Pl.1171

power, as if abused might tend to the oppression of the people, that power was delegated to him by the vote of the people themselves."[78]

While the sheriffs of nineteenth century England were appointed and not elected, the author of an 1848 treatise on sheriff law explained that "[s]heriffs were formerly chosen by the inhabitants of their respective counties; in confirmation of which it was ordained by the statute of 28 Edw. 1, c. 8 and 13, that 'the people should have the election of sheriffs in every shire, when the shrievalty is not of inheritance.'"[79]  It was not surprising that Americans embraced the principle of election of sheriffs or that most states have constitutionalized this principle.[80]  In the twentieth century, however, legal historians suggested that earlier writers had overstated the extent to which English sheriffs were elected.[81]  Modern historians have shown that from the time of the Norman Conquest onward, most sheriffs

---

[78] 1 WILLIAM BLACKSTONE, COMMENTARIES *409.  *See also* HUME, *supra* note 14, at 163 (citing § 35 of the laws of Edward the Confessor).  What Hume did not know is that the document known as "The Laws of Edward the Confessor" (Leges Edwardi Confessoris) is not original to the reign of Edward the Confessor (an Anglo-Saxon king who reigned 1042–66).  Rather, the document likely dates to the early 1100s, after the Norman Conquest, and is regarded as a reasonably accurate description of English law at the time it was actually written.  BRUCE R. O'BRIEN, GOD'S PEACE AND KING'S PEACE: THE LAWS OF EDWARD THE CONFESSOR 3–6 (1999).  As for sheriffs, election was certainly not standard in the early twelfth century.  It might be inferred that the document's assertions about Anglo-Saxon sheriff elections reflected a popular understanding or national memory that was credible to the document's twelfth century readers.

To make matters all the more complicated, the provision in *The Laws of Edward the Confessor* about the election of sheriffs was probably not in the original version.  Rather, it may be an interpolation that was added as some later unknown date.  At least that appears to be the conclusion of Benjamin Thorpe, whose 1840 compilation of Anglo-Saxon laws relegates to a footnote the material about sheriff elections.  *See Leges Regis Edwardi Confessoris in* BENJAMIN THORPE, ANCIENT LAWS AND INSTITUTES OF ENGLAND 197 (London, 1840) (note to § 32 explains that Thorpe is using Lambard's edition of *The Laws of Edward the Confessor* and that the language appears to be an interpolation; the sheriff language is part of a long paragraph which states in relevant part: "sicut et vicecomites provinciarum et comitatum eligi debent." In English: "and also the sheriffs [vicecomites] of the provinces and counties ought to be elected.").

[79] WATSON, *supra* note 25, at 9.  The statutory citation is to the twenty-eighth year of the reign of King Edward I, which would have been 1300.

[80] *See infra* text accompanying notes 136–146.

[81] GORSKI, *supra* note 58, at 34–35; GREEN, *supra* note 42, at 13–14 (describing appointment of sheriffs in the century following the Norman Conquest); MORRIS, *supra* note 23, at 17.

Pl.1172

were appointed.  As far as we know, they were elected only in London[82] and in some southwestern counties.[83]

We may never have a full sense of how the office of sheriff functioned in Anglo-Saxon times.  But we can be certain that when King Edward I and Parliament in 1300 promulgated the election statute (*Articuli supra Cartas*), the election of sheriffs was a change, rather than a "confirmation" of a then-current general practice.[84]  Edward Coke, an enormously influential legal writer, described Edward I as having "restored to his people the ancient election of sheriffes . . . ."[85]  But even after Edward I's statute of 1300, we have only one record from the following decade for a sheriff election taking place.[86]

The next king, Edward II, was unpopular during his reign, and most historians have regarded him as mediocre or worse.[87]  Among the problems was his very close relationship with his best friend, Piers Gaveston, whom much of the rest of the nobility believed unhinged Edward's judgment.[88]  There was also Edward's propensity for seizing whatever property he

---

[82] HUME, *supra* note 14, at 278 (indicating that Henry I, upon his coronation in 1100, issued a charter to London granting the city the right to elect its own sheriff); *id.* at 453–54 (noting that, later, King John granted to London the "power to elect and remove its sheriffs at pleasure").

[83] MORRIS, *supra* note 23, at 182–83 (noting that men of these counties paid a fee to the king for the privilege of electing the sheriff); WILLIAM STUBBS, 2 THE CONSTITUTIONAL HISTORY OF ENGLAND 217 (4th ed. 1896) ("[T]he freeholders of Cornwall and Devon had purchased the like privilege from John and Henry III.").

[84] GORSKI, *supra* note 58, at 12, 34–37; JOHN M. KEMBLE, ANGLO-SAXON LAWS AND INSTITUTES 60 (London, Richard & John E. Taylor 1841) (explaining that during the Anglo-Saxon period, elective sheriffs were replaced by appointed ones as kings gained more power); STUBBS, *supra* note 83, at 217–18 (Section 8 of the *Articuli Super Cartas* provided for election of sheriffs, except in counties where the office is hereditable or held in fee); *cf.* GORSKI, *supra* note 58, at 51 (King's rejection of 1361 petition from the people of Cumberland to elect their sheriff).

In 1258, the Provisions of Oxford required that sheriffs should live in their county, and should serve for only one year.  STUBBS, *supra* note 83, at 216–17.  The next year, it was provided that the king's discretion on appointments would be limited; he would have to appoint one of four men nominated by the county court.  *Id.* at 217.

[85] EDWARD COKE, 2 INSTITUTES OF THE LAWS OF ENGLAND 175 (The Lawbook Exchange 2002) (1628); *id.* at 558 ("Of ancient time," sheriffs were "in every severall county chosen in full or open county by the freeholders of that county . . . .").  Coke served as Attorney General, Speaker of the House of Commons, and Chief Justice in the early seventeenth century.  Payton v. New York, 445 U.S. 573, 594 n.36 (1980) (citing A. E. DICK HOWARD, THE ROAD FROM RUNNYMEDE 118–119 (1968)).

[86] MORRIS, *supra* note 23, at 184–85.

[87] *E.g.*, SEYMOUR PHILLIPS, EDWARD II 5 (2012) ("The general opinion of Edward II from his own day to the present has been that he was a failure."); STUBBS, *supra* note 83, at 323–25.

[88] STUBBS, *supra* note 83, at 319–32.  *See, e.g.* PHILLIPS, *supra* note 87, at 161–62.

Pl.1173

wanted.  These seizures were to support either his military adventures or the extravagant lifestyle that he and the Gaveston family led during the periods when the Gavestons had not been forced into temporary exile by Parliament.[89]

Rising tensions led an ad hoc assembly of barons to proclaim the Ordinances of 1311.[90]  Like Magna Carta, the Ordinances of 1311 contained provisions regarding civil liberty (e.g., a provision against uncompensated seizure of property) and provisions relating to the barons' narrow self-interests.  Item 17 demanded an end to the election of sheriffs.  The varying political balance of power affected how much heed Edward II was willing to pay to the Ordinances of 1311, but he did eventually accede to the demand about sheriffs by promulgating the Sheriff's Act of 1315.[91]  He thus gave statutory force to Item 17 of the Ordinances of 1311.[92]

Two other portions of the Ordinances, Items 10 and 39, perhaps provide some context for Item 17.  Many of the Ordinances attempted to end the King's habit of helping himself to other people's property; the formal term for such monarchical theft was "prises."  Item 10 of the Ordinances of 1311 stated, "[a]nd because it is to be feared that the people of the land will arise on account of the prises and divers oppressions inflicted before this time . . . ."  Given the continuing role of sheriffs as military leaders,[93] and given their continuing role in leading bodies of

---

[89]  PHILLIPS, *supra* note 87, at 156–71.

[90]  *Edward II*, 4 ENCYLOPAEDIA BRITANNICA 375 (15th ed., 2002); THE NEW ORDINANCES, 1311 (1311), *reprinted in* 3 ENGLISH HISTORICAL DOCUMENTS 527–39 (Harry Rothwell ed., 1975).

[91]  "That the Sheriffs from henceforth shall be assigned by the Chancellor, Treasurer, Barons of the Exchequer, and by the Justices . . . ."  Statute of Lincoln, 1315, 9 Edw. 2 stat. 2; WATSON, *supra* note 25, at 9 (noting that appointment is "on the morrow of All Souls"); *see also* 14 Edw. 3, ch. 7 1 STATUTES OF THE REALM 283 (1340) (sheriffs to be appointed by the Exchequer).  The process for appointment was that on November 1 (All Souls Day), high government officials would meet at the Exchequer in London.  They would choose three persons per county, and the king would from each list of three appoint a sheriff to a one-year term.  KARRAKER, *supra* note 19, at 7.  "The Exchequer was a court of audit meeting twice each year at Easter and Michaelmas in the treasury, to scrutinize the accounts presented by sheriffs and other financial agents. Its name was taken from the checked cloth on a table round which sat leading members of the royal household."  GREEN, *supra* note 42, at 12.  In Anglo-Saxon times, the king's revenue was kept in boxes or barrels in the king's bedroom. BARLOW, *supra* note 45, at 186.

[92]  "In addition, we ordain that sheriffs be appointed henceforth by the chancellor, treasurer and the others of the council that are present . . . ."  THE NEW ORDINANCES, 1311, *supra* note 90, at 530.

[93]  *See* GORSKI, *supra* note 58, at 52 (explaining the fourteenth century role of sheriffs in the northern counties bordering Scotland as military leaders); MORRIS, *supra* note 23, at 58, 117, 151–53; MICHAEL POWICKE, MILITARY OBLIGATION IN MEDIEVAL ENGLAND 157 (1962) (in 1319, Sheriff of York ordered to lead a fifteen day expedition against the Scots); STUBBS,

Pl.1174

armed men in the *posse comitatus* and other law enforcement activities (discussed *infra*), the possibility could arise that elected sheriffs would serve as the leaders of a discontented populace which might revolt against an oppressive, kleptocratic king.

Greater context for the abolition of sheriff elections comes from Item 39, which required that various officials, including sheriffs, "shall be sworn . . . to keep and hold all the ordinances made by the prelates, earls, and barons . . . without contravening any point of them."[94]   The motive for this clause appears to be that sheriffs (and some other officials) were not enforcing various decrees issued by the upper nobility.   In situations where the great baron of a county issued a decree the electorate did not like, perhaps some elected sheriffs had been reluctant to enforce such decrees.

In 1338, King Edward III ordered that the counties elect their sheriffs, but this was abandoned in 1340, replaced by appointment by the Exchequer, the treasury office of the monarchy.[95]   The "Good Parliament" of 1376 unsuccessfully demanded that sheriffs be elected.[96]   Still, kings continued to

---

*supra* note 83, at 220 (noting that, militarily, the sheriff was "the proper leader" for "minor tenants-in-chief" and for "the body of freemen sworn under the assize of arms"; furthermore, the leading tenants of the king directly commanded their own vassals, but sometimes the sheriffs were put in charge of them, too); *id.* at 230, 288 (noting that sheriff was responsible for enforcing the Assize of Arms, which required all free men to own various arms and armor).

[94]   THE NEW ORDINANCES, 1311, *supra* note 90, at 539.   The barons were plainly not opposed to the principle of using armed force against a monarch.   They had a long history of doing so, against Edward II and several of his predecessors.   However, it would be understandable for the great barons and earls to try to ensure that only they would have the ability to make the decision to use force.

[95]   STUBBS, *supra* note 83, at 281, 401–02.

[96]   THE PARLIAMENT ROLLS OF MEDIEVAL ENGLAND 1275–1504, vol. 5, EDWARDS III 1351–1377, at 373 (item 186, no. CXXVIII in petitions from the commons):

[T]he sheriffs of the counties of the realm should be chosen in the same manner ["by election from the best men of said counties"] from year to year, and not appointed by bribery in the king's court, as they used to do, for their own profit and by procurement of the maintainers of the region, to sustain their deceits and evils and their false quarrels, as they have commonly done before this time, in destruction of the people.

King Edward III brushed off the petition, responding "there is a bill which has been answered."   *Id.*   Presumably he was referring to the legislation described above, providing for appointment of sheriffs in most counties.   *See also* STUBBS, *supra* note 83, at 453–54. The "Good Parliament" was a widely supported effort to tame the massive corruption, military incompetence, and other abuses of the latter part of the reign of Edward III.   *See* GEORGE HOLMES, THE GOOD PARLIAMENT (1975).   To present the Parliament's position to the King, the Parliament chose Sheriff Peter de la Mare; he is today regarded as the first Speaker of the House of Commons.   *Id.* at 101–110, 134–38.   Sheriff de la Mare was later imprisoned after Edward III regained his political footing and then pardoned after Edward III was close to death.   *Id.* at 192.

**Pl.1175**

need money, and for the right price, they would grant a locality the right of electing its own sheriff; by the eighteenth century, twenty-one cities or boroughs enjoyed the right of election.[97]

However the sheriff was chosen, he was supposed to be a defender of liberty. As historian William Morris puts it, "[i]n the time of Henry III,[98] he was still regarded by the king and council as their agent in the maintenance of popular liberties and private rights."[99]

### 3. Sheriff's Oath of Office and Bond

Item 39 of the Ordinances of 1311 had also said that sheriffs should take an oath of office. This had been a longstanding baronial demand.[100] The oath requirement became a well-established and uncontroversial part of the common law.[101] Thus, almost every American state constitution that provides for an office of sheriff requires that the sheriff take an oath, as must all other constitutional officers. In England, the sheriff's oath was to the supreme ruler, the monarch; in the United States, the sheriff's oath is also to the supreme ruler, the law itself—an oath to uphold the U.S. Constitution and the constitution of the sheriff's state.[102]

In the sixteenth century, a statute mandated that before taking office, a sheriff must post a bond as a surety against any malfeasance for which he or his deputies might be found liable.[103] This requirement is still standard for American sheriffs, although the sheriff may now choose to instead purchase liability insurance.

### D. THE ENGLISH OFFICE OF SHERIFF IN THE SEVENTEENTH CENTURY AND THEREAFTER

By the time that emigrants from Great Britain were establishing colonies in America, the duties and scope of the office of sheriff were well understood and noncontroversial. In legal treatises, the laws concerning sheriffs tended to be addressed in larger treatises on other subjects, such as criminal law. The treatise entirely devoted to sheriffs was Michael Dalton's

---

[97] GLADWIN, *supra* note 74, at 357–58.

[98] Reigned 1216–1272. *Henry III*, 5 ENCYCLOPAEDIA BRITANNICA 837 (15th ed., 2002).

[99] MORRIS, *supra* note 23, at 213. For example, King Henry III instructed various sheriffs "to preserve the liberties of the church" and to enforce Magna Carta. *Id.* at 213 n.44.

[100] STRUCKHOFF, *supra* note 47, at 13.

[101] MORRIS, *supra* note 23, at 170–71 (discussing original oath from 1258); *see also* The Oath of the Sheriffs, 1 STATS. OF THE REALM 247 (Dawson's of Pall Mall 1963) (1810).

[102] WATSON, *supra* note 25, at 17–21 (oath in nineteenth century). Previously, the oath was much more detailed. DALTON, *supra* note 23, at 4b–6a (reprinting seventeenth century oath in full).

[103] DALTON, *supra* note 23, at 3a (citing 2 & 3 Edw. 6, ch. 34).

Pl.1176

*The Office and Authoritie of Sherifs.*[104]  Dalton was also the author of a very popular treatise on justices of the peace, which contained much content about sheriffs since both offices had similar powers and duties, such as summoning the *posse comitatus*.[105]

### *1. Autonomous and Indivisible*

By the seventeenth century, two other important principles of the office of sheriff had been established: the office is *autonomous* and the office is *indivisible*.  An early twentieth century case from Alberta, Canada, explained autonomy in terms that were no different than what had been said by Dalton and other commentators from centuries before:

> [T]he connection between the State and the sheriff after his appointment or election is of a very casual character.  He is practically placed in the sole and undisturbed discharge of the duties of the shrievalty.  He takes to his own use the emoluments of the office and out of them meets the expenditures of it.  He employs under sheriffs or deputy sheriffs and bailiffs of his own selection.  He assigns to them the work that they are to do, pays them their salaries and dismisses them at his pleasure.  His office is in its management entirely free from outside dictatorship or control.  He runs it as an institution for which he and he alone is responsible to those whose business passes through it.  And so in those jurisdictions he is held liable for the misconduct of those whom he employs in his office.[106]

The monarch could choose the sheriff, but could in no way limit the office of sheriff: "neither can she [the queen] abridge the sheriff of any thing incident or belonging to his office, for the office is entire and indivisible."[107]

The autonomy of sheriffs and of justices of the peace may have been one reason for slack enforcement of the arms control laws that were introduced in the Tudor period (1485–1603).  In general, the Tudor monarchs were trying to keep handguns and crossbows out of the hands of everyone except the gentry.[108]  A 1526 proclamation by King Henry VIII told the sheriffs and mayor of London to stop being "negligent, slack, or

---

[104] DALTON, *supra* note 23.

[105] THOMAS GARDEN BARNES, SHAPING THE COMMON LAW 136–51 (Allen D. Boyer ed., 2008); MICHAEL DALTON, THE COUNTREY JUSTICE (London, William Rollins & Samuel Roycroft 1622).

[106] Great N. Ins. Co. v. Young (1916), [1917] 32 D.L.R. 238, 241 (Can. Alta.).  *Cf.* MORRIS, *supra* note 23, at 167 (stating that the development of the sheriff's independence from the king began in the period 1206–1307, under Henry III and Edward I).

[107] Mitton's Case, (1584) 76 Eng. Rep. 965 (K.B.); 4 Co. Rep. 32 b ; DALTON, *supra* note 23, at 6b; WATSON, *supra* note 25, at 8.  *Mitton's Case* is cited in *State v. Cummins*, 99 Tenn. 667, 42 S.W. 880, 882 (1897) (sheriff may not be deprived of exclusive supervision of the county jails).

[108] JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 39, at 82–85.

Pl.1177

remiss" in enforcing the arms restrictions.[109]  In 1537, the King expressed his "displeasure and indignation" about the unenforcement of arms bans.[110]  In 1600, a proclamation of Queen Elizabeth I complained about the "slack execution" of the arms control laws, and "the common carrying and use of guns contrary to the said statutes" by "common and ordinary persons traveling the highways to carry pistols and other kind of pieces," and by "ruffians and other lewd and dissolute men."[111]

Another innovation was that a sheriff may not practice as an attorney during his term of office.[112]  Given the sheriff's intimate involvement with the judicial system, the prohibition is a sensible prevention of conflicts of interest.  The prohibition was carried forward into America[113] and today is often expressly stated in state statutes.[114]

### 2. Modern Role in the United Kingdom

The office of justice of the peace had been formally created in the fourteenth century, with roots from the previous century.[115]  By the time Michael Dalton was writing in the early seventeenth century, the justices of the peace were supplanting the sheriffs as having the greatest practical role in keeping the peace.  Other traditional sheriff duties, such as serving and enforcing writs, including by executing judgments, remained primarily the responsibility of sheriffs.[116]

Sheriffs in the seventeenth century continued to have a military role: "The sheriff was often appointed one of the commissioners of musters"[117]— the periodic assemblies of the militia to ensure that every militiaman had provided himself with appropriate equipment.  Likewise, the sheriff sometimes received assistance from the "trained bands,"[118] militia units that

---

[109] 1 TUDOR ROYAL PROCLAMATIONS 151–52 (Paul L. Hughes & James F. Larkin eds., 1964).

[110] *Id.* at 249–50.

[111] 3 TUDOR ROYAL PROCLAMATIONS 218–19 (Paul L. Hughes & James F. Larkin eds., 1969).

[112] DALTON, *supra* note 23, at 175–76.

[113] *See* GEORGE WEBB, THE OFFICE AND AUTHORITY OF A JUSTICE OF PEACE 306 (Williamsburg, William Parks 1736).

[114] *E.g.*, COLO. REV. STAT. § 30-10-520 (2013) ("No sheriff, undersheriff, or deputy shall appear or advise as attorney or counselor in any case in any court.").

[115] MCKECHNIE, *supra* note 67, at 16.

[116] Barnes, *supra* note 23, at iv (describing sheriffs' other duties as services to the common law courts, including maintaining the jail; collection of crown revenues; ministerial services to various local government bodies, such as commissions; and keeping a limited "court" which heard replevin cases and which supervised elections to Parliament).

[117] KARRAKER, *supra* note 19, at 22.

[118] *Id.*

Pl.1178

engaged in extra practice to maintain high proficiency.  During the English Civil War (1642–1651), both sides attempted to order sheriffs "to rally the counties to their support as though the military command were still theirs, *ex officio*."[119]

Everyone may have agreed the office of sheriff is indivisible, but in a constitutional system based on shared understandings, and lacking an authoritative text which supersedes all else, things that were once plainly illegal may become accepted innovations.  So in England, the sheriffs were over the centuries stripped of all responsibilities.[120]  Today the English office of sheriff is barely even ceremonial, consisting of holding an annual dinner for local judges and other important persons.[121]

E. THE SHERIFF IN AMERICA

Colonial Americans took the office of sheriff as they had inherited it from England, with one important exception: they restored the right of electing sheriffs, a task that was completed in the nineteenth century. While the office of sheriff was waning in England, the office became increasingly important in America.

Magna Carta applied in the American colonies, so sheriffs never served as judges.[122]  In the colonies, the sheriffs used all the traditional powers of the office to the fullest.  American sheriffs were more active than their English counterparts at finding criminals and delivering them to court, taking "an active law enforcement role."[123]

By all indications, the formal seventeenth century American understanding of the office was mostly the same as the English.  A study of Maryland and Virginia in the seventeenth century "proves the similarities in the office of sheriff in England and in her colonies to have been decidedly more numerous than the differences."[124]  Michael Dalton's English treatise

---

[119] *Id.* at 22–23.  *See generally* DALTON, *supra* note 23, at 13a ("[W]hen any of the kings enemies shall come into the land, the Sherife in defence of the realme, may commaund all the people of his countie to attend him; and he and they are to attend the king and defend the land."); *id.* at 136b ("Also the Sherife may take Posse Comitatus, in defence of the realme, when any of the kings enemies shall invade the land &c.").  But in practice, the military role of sheriffs had declined to an auxiliary role, beginning in the latter thirteenth century, under Henry III.  MORRIS, *supra* note 23, at 167, 234–38.

[120] Barnes, *supra* note 23, at iii; Gullion, *supra* note 51, at 1156.

[121] Barnes, *supra* note 23, at iii (explaining that sheriffs are almost entirely ceremonial, but professional undersheriffs oversee the execution of judicial writs); Gullion, *supra* note 51, at 1156.

[122] BARNES, *supra* note 105, at 30–31.

[123] Gullion, *supra* note 51, at 1157.

[124] KARRAKER, *supra* note 19, at 151.

Pl.1179

*Office of the Sheriffs* is known to have been used as a guide in Maryland.[125] Dalton's *Country Justice* treatise (about the justice of the peace, and also containing much information about sheriffs and their posse powers) was also influential in America.[126] Virginian George Webb's 1736 treatise on sheriffs and other local officials was conventional in its treatment of sheriffs, the *posse comitatus*, and so on, relying on mainstream English sources such as Dalton.[127]

However, while the office looked the same on paper on both sides of the Atlantic, there were very significant practical differences, all of which had the effect of elevating the sheriff in America. To begin with, the American colonial sheriff was even more independent of central authority. In the American colonies, sheriffs were formally appointed by the crown, as they were in England and Scotland.[128] The royal governor typically made appointments taking into account the advice of the county justices.[129] The governor rarely questioned the county's nominees of individuals to become sheriff.[130]

Although nominally appointed by the royal governor, the American sheriff "was more of a county than a colonial official . . . ."[131] Unlike the English counties, the American counties were self-governing.[132] "[A]s a member of the ruling group in the county, the sheriff shared its independence."[133]

The colonial sheriff enjoyed "little of the social functions and prestige of the English official, but economic and political forces more than compensated for this loss . . . restoring to him some of the importance his ancestor early had in England as conservator of the peace . . . ." In sum, "[t]he office was taking on new strength in the colonies while continuing to decline in England."[134]

An important American innovation was that the sheriff either had a salary or could only charge fees (e.g., for executing a civil judgment) that were fixed by law. This reform recognized the problem of some of the

---

[125] *Id.* at 111.
[126] BARNES, *supra* note 105, at 137–51.
[127] WEBB, *supra* note 113, at 292–306.
[128] STRUCKHOFF, *supra* note 47, at 23.
[129] *Id.* at 24.
[130] KARRAKER, *supra* note 19, at 157.
[131] *Id.* at 156.
[132] *Id.* at 156–57.
[133] *Id.* at 157.
[134] *Id.* at 158–59.

Pl.1180

unsalaried English sheriffs who had used their office for personal enrichment.[135]

The return of the long-lost practice of electing sheriffs began in 1652,[136] when the Royal Governor of Virginia told each county to choose its own sheriffs.  The commissioners of Northampton County asked the people of the county to elect the sheriff.  William Waters became the first sheriff elected in America.[137]  It was not surprising that the reestablishment of popular election of sheriffs came from a county government; other than the New England town meetings, the first democratic governments in the American colonies were county governments.[138]  New England already had the tradition of electing constables—low-level officers responsible for suppression of minor crimes; this was in contrast to the English custom of constables being appointed by the justices of the peace.[139]

The restoration of direct election of sheriffs "encouraged them to adopt an active role, whilst the fact that they were officials of county government helped to give them the opportunity to do so."[140]  Election "meant that sheriffs were amongst the first public officials to be elected in any newly settled area and were therefore able to develop their role with little opposition from competing organisations or officials."[141]  Americans came to understand the election of the sheriff as a right of the people.[142]  The 1802 Ohio Constitution was the first state constitution to formally specify that sheriffs must be elected.[143]  Today, the large majority of American state constitutions require that sheriffs be elected by the people of the county.[144]

---

[135] BRADLEY CHAPIN, CRIMINAL JUSTICE IN COLONIAL AMERICA 1600–1660, at 95–96 (1983).

[136] The year was 1652 by the modern calendar, which begins the new year on January 1. The year was 1651 by the "Old Style" calendar then in use, which began the year on March 25, the date on which Jesus was said to have been conceived by the Virgin Mary.  1751, 24 Geo. II ch. 23; ROBERT POOLE, TIME'S ALTERATION: CALENDAR REFORM IN EARLY MODERN ENGLAND 118–23 (1998).

[137] KARRAKER, *supra* note 19, at 74.  The surviving records from Virginia and Maryland, through 1689, do not specifically demonstrate the election of other sheriffs in those colonies during that period.  *Id.*

[138] Gullion, *supra* note 51, at 1157.

[139] CHAPIN, *supra* note 135, at 96.

[140] Gullion, *supra* note 51, at 1157.

[141] *Id.*

[142] STRUCKHOFF, *supra* note 47, at 23.

[143] *Id.* at 27; OHIO CONST. of 1802, art. VI § 1.  The 1836 Constitution of the independent Republic of Texas likewise required election of sheriffs.  TEX. CONST. of 1836, art. IV, § 12.

[144] ALA. CONST. art. V, § 138; ARIZ. CONST. art. XII, § 3; ARK. CONST. art. VII, § 46; CAL. CONST. art. XI, §§ 1(b), 4(c); COLO. CONST. art. XIV, § 8; DEL. CONST. art. III, § 22; FLA. CONST. art. VIII, § 1; GA. CONST. art. IX, § 1, para. III; IDAHO CONST. art. XVIII, § 6; ILL. CONST. art. VII, § 4; IND. CONST. art. VI, § 2; KY. CONST. § 99; LA. CONST. art. V, § 27;

Pl.1181

Developments in the United States confirmed the importance and independence of sheriffs, whose power came directly from the people.  The classic American treatise on sheriff law, written in 1884 by William L. Murfee, observed,

> the sheriff is, in each of the United States, a constitutional officer, recognized *eo nomine* as part of the machinery of the state government, and therefore, although it is competent for legislatures to add to his powers or exact from him the performance of additional duties, it is, upon well established legal principles, beyond their powers to circumscribe his common-law functions or to transfer them to other officers.[145]

Today, American sheriffs are elected in all states except Alaska (which has no counties), Hawaii, Rhode Island, and Connecticut (where the office of sheriff was abolished in 2000).[146]

## II. THE *POSSE COMITATUS* FOR THE KEEPER OF THE PEACE

The traditional American view is that the legislature may add new duties or powers to the office of sheriff, but may not remove any of the sheriff's inherent common law powers or duties.[147]  An example of a new duty, not traceable to the common law, is that by Colorado statute, the sheriff is the chief fire warden in his or her county.[148]

In America, the most important traditional responsibility of the sheriff has been keeping the peace.  This is the third item of what Edward Coke described as the "three-fold custody" of the sheriff.  First, the sheriff has custody of justice, because no suit begins without a sheriff serving process,

---

ME. CONST. art. IX, § 10; MD. CONST. art. IV, § 44; MASS. CONST. art. XIX; MICH. CONST. art. VII, § 4; MISS. CONST. art. V, § 138; NEV. CONST. art. IV, § 32; N.H. CONST. pt. 2, art. 71; N.J. CONST. art. VII, § 2, para. 2; N.M. CONST. art. X, § 2; N.Y. CONST. art. XIII, § 13; N.C. CONST. art. VII, § 2; N.D. CONST. art. VII, § 8; OR. CONST. art. VI, § 6; PA. CONST. art. IX, § 4; S.C. CONST. art. V, § 24; TENN. CONST. art. VII, § 1; TEX. CONST. art. V, § 23; VT. CONST. ch. II, §§ 43, 50; VA. CONST. art. VII, § 4; WASH. CONST. art. XI, § 5; W. VA. CONST. art. IX, § 1; WIS. CONST. art. VI, § 4.

[145] WILLIAM L. MURFEE, A TREATISE ON THE LAW OF THE SHERIFFS AND OTHER MINISTERIAL OFFICERS, at v (St. Louis, F.H. Thomas & Co., 1884); *see also id.* at 22 ("It is competent for the state legislature to impose upon him new duties growing out of public policy and convenience, but it cannot strip him of his time-honored and common-law functions and devolve them upon the incumbents of other offices created by legislative authority."); CLYDE F. SNYDER & IRVING HOWARDS, COUNTY GOVERNMENT IN ILLINOIS 78 (Carbondale: U. of Ill. Pr. 1960) ("[T]he sheriff . . . possesses certain common-law powers and duties of which he cannot be deprived by legislative enactment . . . ." The "common-law powers" are "vested in the sheriff by constitutional implication.") (citing People v. Clampitt, 200 N.E. 332 (Ill. 1936); Cnty. of Edgar v. Middleton, 86 Ill. App. 3d 502 (1899); Cnty. of McDonough v. Thomas, 84 Ill. App. 3d 408 (1899)).

[146] STRUCKHOFF, *supra* note 47, at 47; *Connecticut Sheriffs Ride into Sunset*, WORCESTER TEL. & GAZETTE, Nov. 9, 2000, at B3.

[147] MURFEE, *supra* note 145, at 22.

[148] COLO. REV. STAT. § 30-10-512 (2013).

Pl.1182

and because sheriffs are responsible for returning jurors to hear a trial. Second, the sheriff has custody of the law, since the sheriff executes the decisions in civil and criminal cases.[149]  And third, the sheriff has custody of the commonwealth, for "he is [principal Conservator of the Peace], within the countie, which is the life of the common wealth . . . ."[150]

This Article is principally concerned with the sheriff's duty of keeping the peace.  For various aspects of that duty, the sheriff has traditionally had the authority to summon assistance from armed citizens.  Formally, there are four separate prongs to this common law authority, although in practice they can easily overlap.  The first prong stems from the English sheriff's specific duty of keeping "watch and ward," to guard towns, which was given statutory expression during the reign of King Richard I (1189–1199).[151]  This is the power to arrange watches and patrols, and to require townsfolk to take turns on guard duty.[152]  "Ward" was the daytime activity, and "watch" the nighttime activity.[153]  Closely related to "watch and ward" was "hue and cry," the second traditional power.  Under English law originating long before the Norman Conquest of 1066, all able-bodied men were obliged to join in the *hutesium et clamor* (hue and cry) to pursue fleeing criminals.  Pursuing citizens were allowed to use deadly force if

---

[149] COKE, *supra* note 25, at 168(a) (BOOK 3, CH.1, § 248) (noting that the sheriff is custodian of "*vitae republicae*; he is *principalis conservator pacis*, within the countie, which is the life of common wealth, *vita republicae pax*.").

[150] *Id.*  Other commentators took the same view.  *See*, *e.g*, GEORGE ATKINSON, A PRACTICAL TREATISE ON SHERIFF LAW 424 (London, William Crofts 1839); DALTON, *supra* note 23, at 12b–13a; DALTON, *supra* note 105, at 3; ISAAC GOODWIN, NEW ENGLAND SHERIFF 13 (Worcestor, Dorr & Howland 1830) ("He is the principal conservator of the peace for his jurisdiction, and has power to call to his aid the *posse comitatus* or physical force of the county."); CHARLES W. HARTSHORN, NEW ENGLAND SHERIFF 13 (Worcester, Warren Lazell 1844) (same quotation); WILLIAM HAWKINS, 2 A TREATISE OF THE PLEAS OF THE CROWN 33 (2nd ed., London, Nutt & Gosling 1724) (ch.  8 § 4); WEBB, *supra* note 113, at 292 (noting that the sheriff was "Chief Conservator of the Peace of his County, almost 300 Years before Justices of Peace were instituted").  The role of the sheriff as keeper of "the king's peace"— and of "the sheriff's peace"—was well established in Anglo-Saxon and Norman times. MORRIS, *supra* note 23, at 149, 196.

[151] DALTON, *supra* note 23, at 6a–6b (sheriff's oath included supervising the watch and ward, by reference to his oath specifically to uphold the Statute of Winchester); MORRIS, *supra* note 23, at 150, 228–29, 278.  The Statute of Winchester was enacted by Edward I.  It required all free men to possess arms on a sliding scale based on their wealth: the wealthier the individual, the more extensive the required arms and armor.  Statute of Winchester, 1285, 13 Edw. 1, stat. 2.

[152] WILLIAM LAMBARDE, EIRENARCHA 185, 341 (London, Newbery & Bynneman 1581); FERDINANDO PULTON, DE PACE REGIS & REGNI 153a–153b (Lawbook Exchange 2007) (1609).  *See also* GOODWIN, *supra* note 150, at 234–35 (noting that justices of the peace may order constables to organize the watch and ward).

[153] ELIZABETH C. BARTELS, VOLUNTEER POLICE IN THE UNITED STATES 2 (2014).

Pl.1183

necessary to prevent escape.[154]  The third power of the sheriffs, to summon the *posse comitatus*, is described in the remainder of Part II.  The fourth power is to summon the militia.  The use of this military force is supposed to be rare and only for situations that the *posse comitatus* is incapable of resolving.

### A. *POSSE COMITATUS* IN ENGLAND

Richard Abels, a modern historian of the Anglo-Saxon period, reports that "[t]he reeves of the late ninth and the early tenth century also led posses in pursuit of thieves . . . ."[155]  The Latin phrase which was applied to this popular use of armed force for keeping the peace is *posse comitatus*, literally "[t]he power or force of the county."[156]  Historian Richard Kemble wrote that from the early days of the heptarchy and throughout the Anglo-Saxon period, the sheriff was "leader of the constitutional force, the *posse*

---

[154] For details about the hue and cry, *see* Statute of Winchester, 1285, 13 Edw. I, stat. 2, chs. 4–6 (formalizing hue and cry system; requiring all men aged fifteen to sixty to possess arms and armor according to their wealth; lowest category, having less than "Twenty Marks in Goods," must have swords, knives, bows, and other small arms); 4 WILLIAM BLACKSTONE, COMMENTARIES *293–94 (describing hue and cry system as still in effect); EDWARD COKE, THE THIRD PART OF THE INSTITUTES OF THE LAWS OF ENGLAND; CONCERNING HIGH TREASON, AND OTHER PLEAS OF THE CROWN AND CRIMINAL CAUSES 116–18 (William S. Hein & Co. 2008 (1628)); COKE, *supra* note 85, at 171–73 (ch. 9); DALTON, *supra* note 23, at 6a–6b (noting that the sheriff's oath included the hue and cry, by reference to his oath specifically to uphold the Statute of Winchester); *id.* at 14a (all men must "be ready at the commandement of the sherife (& at the cry of the countrey) to pursue and arrest all felons"); LAMBARDE, *supra* note 152, at 185, 233 (Book I, ch. 22), 341 (Book II, ch. 4); MORRIS, *supra* note 23, at 221–22, 227; FREDERICK POLLOCK & FREDERIC W. MAITLAND, 2 THE HISTORY OF ENGLISH LAW BEFORE THE TIME OF EDWARD I 576–81 (Liberty Fund 2010) (1895); PULTON, *supra* note 152, at 152b § 1 ("That all men generally shall be readie at the commandement and summons of the Sherifes, and at the crie of the Countrie to pursue and arrest felons when neede shall be."); STUBBS, *supra* note 83, at 123 (Statute of Winchester "carries us back to the earliest institutions of the race; it revises and refines the action of the hundred, hue and cry, watch and ward, the fyrd and the assize of arms."  It "shows the permanence and adaptability of ancient popular law."  The statute is "the culminating point" of Edward I's "legislative activity," being of "great constructive power"); WEBB, *supra* note 113, at 294 ("If a Felony is committed, the Sheriff may raise Hue and Cry, without other Warrant, to pursue and apprehend the Felon; and if he resists, or will not surrender himself, so that he cannot otherwise be taken, he may be kill'd by any Officer, or his Assistants.").

[155] ABELS, *supra* note 22, at 274; *see also* MORRIS, *supra* note 23, at 18 (stating that records show the Reeve of London led Londoners in pursuit of thieves during the reign of King Aethelstan in the early tenth century).

[156] BLACK'S LAW DICTIONARY 1046 (5th ed. 1979) ("The power or force of the county. The entire population of the county above the age of fifteen, which a sheriff may summon to his assistance, in certain cases, as to aid him in keeping the peace, in pursuing and arresting felons, etc.  Williams v. State, 253 Ark. 973, 490 S.W.2d 117, 121."); *see also* BLACK'S LAW DICTIONARY 1281 (9th ed. 2009) ("A group of citizens who are called together to help the sheriff keep the peace or conduct rescue operations. — Often shortened to *posse*.").

Pl.1184

*comitatus* or *levée en masse* of the free men."[157]  Kemble used this fact in support of his argument that in the early Anglo-Saxon period:

> The *graviones*, *geréfan*, or *shire-reeves* (by whatever name they may then have been called), were the essentially the people's officers; whether they were hereditary or not, these offices depended upon the popular will; and in a vast majority of cases, it is obvious that they must have been immediately dependent upon it,—that is to say, elective, and not hereditary.[158]

So it may well be that Alfred the Great did not invent the *posse comitatus*; it may also be that King Alfred's better organization of the shires, the shire-reeves, and the shire-based militias may have helped make the *posse comitatus* more effective.

William Henry Watson's 1848 treatise on the English sheriff explained that the *posse comitatus* power of the nineteenth century was formally the same as it had been in the ninth century.

> He may, and is bound, *ex officio*, to pursue and take all traitors, murderers, felons, and rioters; he hath also the custody and safe-keeping of the county gaol; he is to defend the same against rioters, and for this purpose, as well as for taking rioters and others breaking the peace, and also for attending the queen to the war when enemies come; he may command all the people of his county to attend him, which is called the *posse comitatus*, or power of the county, and this summons every person above fifteen years old, and under the degree of a peer, is bound to attend upon warning, under pain of fine and imprisonment.[159]

*Posse comitatus* was available whenever the sheriff needed a citizen armed force to enforce the law.[160]  The sheriff could use *posse comitatus* to suppress riots and also to enforce civil process—if and only if there was resistance to the civil process.[161]  Examples for use of *posse comitatus* in

[157] KEMBLE, *supra* note 84, at 60.

[158] *Id.*

[159] WATSON, *supra* note 25, at 2 (citing 1414, 2 Hen. 5, stat. 1 c. 8); *see also* Statute of Winchester, 1285, 13 Edw. 1, stat. 2, c. 39; DALTON, *supra* note 105, at 314 (seventeenth century); KARRAKER, *supra* note 19, at 22 (seventeenth century).

[160] COKE, *supra* note 85, at 192–94; *cf.* STUBBS, *supra* note 83, at 289 (describing instances in 1220, 1224, 1231, 1264, and 1267 when posses fought for or against the monarchy during the times when barons were resisting the king).

[161] RICHARD CROMPTON, L'OFFICE ET AUCTHORITIE DE IUSTICES DE PEACE 123 (2014) (1584) (print-on-demand reprint of 1584 edition; *posse comitatus* is in section on "Vicountes," a Norman French term for "Sheriff"; the page numbers of this edition disappear after 74, but the table of contents lists "posse comitatus" as 123); DALTON, *supra* note 23, at 13a–15b, 136a–137a; WILLIAM HAWKINS, 1 A TREATISE OF THE PLEAS OF THE CROWN 156, 158–61 (2nd ed., London, Nutt & Gosling 1724); *id.* at 159 (noting also that even without the direction of a sheriff, "private Persons may arm themselves in order to suppress a Riot; from whence it seems clearly to follow, that they may make use of Arms in the suppressing of it . . ."); LAMBARDE, *supra* note 152, at 233 (riot suppression); PULTON *supra* note 152, at 29a (in case of a riot, "the Justices of peace, the Shirife or undershirife shall come with the power of the Countie, if neede be, to arrest them"); JOHN STEPHEN, SUMMARY OF THE

Pl.1185

cases of resistance of civil process included a Precept of Restitution,[162] and Writs of Execution, Replevin, Estrepement, Capias, "or other Writ."[163]  The *posse comitatus* could be used to "to apprehend Felons, &c. Or disturbers of the peace."[164]  In other words, the posse could be used for the arrest of all types of criminals.  This included the power to arrest even "a great Lord."[165]

By the eighteenth century, the government of Great Britain was moving towards reduced use of the *posse comitatus* and sheriffs, notwithstanding protests from political writers who argued that the sheriffs and the *posse comitatus* were the law enforcement system that complied with England's unwritten constitutional tradition.[166]  The *posse comitatus* was still used in the early nineteenth century,[167] but, by the late nineteenth century, it, like many other formal powers of the sheriff, had fallen into disuse in England.[168]  America was different.

---

CRIMINAL LAW 46 (Philadelphia: J.S. Littell, 1840) (suppressing of unlawful riots, routs, and assemblies).

[162] HAWKINS, *supra* note 150, at 152.  A precept of restitution is used to restore the rightful owner to real property that is wrongly possessed by another.  "Precept" in this context is an order from an authority to compel an officer to perform some act.  BLACK'S LAW DICTIONARY 1059 (5th ed. 1979).

[163] DALTON, *supra* note 105, at 314.  A writ of replevin is for the return of personal property wrongly held by another.  A writ of execution is to satisfy the judgment of a court, such as by selling a defendant's property to pay his creditors.  FED. R. CIV. P. 69; BLACK'S LAW DICTIONARY 510 (5th ed. 1979).  A writ of estrepement compels a party not to commit waste on real property.  BLACK'S LAW DICTIONARY 496 (5th ed. 1979).  A writ of capias is for the sheriff to arrest a defendant in a civil case who has refused to appear in court.  Edmund M. Morgan, *The Court of Common Pleas in Fifteenth Century England*, 61 HARV. L. REV. 914, 915–16 (1948) (book review).

[164] DALTON, *supra* note 105, at 315.

[165] *Id.* at 314.

[166] WILLIAM JONES, AN INQUIRY INTO THE LEGAL MODE OF SUPPRESSING RIOTS, WITH A CONSTITUTIONAL PLAN OF FUTURE DEFENCE (2d ed., London, C. Dilly 1782) (calling for an organized and thorough plan for training the *posse comitatus* and ensuring that it was armed; arguing that law enforcement by *posse comitatus* was much safer for civil liberty than law enforcement by a standing army); LEON RADZINOWICZ, 2 A HISTORY OF ENGLISH CRIMINAL LAW AND ITS ADMINISTRATION FROM 1750, at 28–29 (1956) [hereinafter 2 RADZINOWICZ]; LEON RADZINOWICZ, 3 A HISTORY OF ENGLISH CRIMINAL LAW AND ITS ADMINISTRATION FROM 1750, at 93–96, 375–77 (1956); ANONYMOUS, REGULATIONS OF PAROCHIAL POLICE 24–42 (4th ed., London, J. Hatchard 1803) (also proposing a plan to train the population in posse service).

[167] 2 RADZINOWICZ, *supra* note 166, at 221 n.89 (citing 1816 use of posse to guard the Gas Light Company).  The last known use of the *posse comitatus* in England was in 1830 by the Sheriff of Oxfordshire to suppress riots.  GLADWIN, *supra* note 74, at 375.  During World War I and World War II, the power of sheriffs to raise the *posse comitatus* in case of invasion was reaffirmed.  *Id.*  But there being no invasion during either war, the power was apparently not exercised.  *Id.*

[168] In 1885, the legal historian Frederic Maitland wrote: "Now the whole history of English Justice and Police might be brought under this rubric, *The Decline and Fall of*

Pl.1186

## B. *POSSE COMITATUS* IN COLONIAL AMERICA AND THE REVOLUTION

The sheriff's role as conservator of the peace—with the authority to summon the *posse comitatus*, raise the hue and cry, and administer watch and ward—was straightforwardly recognized in the American colonies.[169] But the changes in the posse began to reflect—and intensify—the ways in which the Americans were reshaping their English legal heritage towards greater self-government and liberty.

Gautham Rao's article *The Federal* Posse Comitatus *Doctrine* explains: "In its migration to America, however, colonists transformed the *posse comitatus* from an instrument of royal prerogative to an institution of local self-governance."[170] The posse "functioned through, rather than upon, the local popular will."[171] In other words, the Americans brought the posse back to its traditional Anglo-Saxon role, shaking off six centuries of how the Norman Conquest and succeeding monarchs had partially undemocratized the posse and the sheriff.

According to Rao, "[t]he colonists' control of the *posse comitatus*—of the legal means of coercion—all but precipitated the American Revolution."[172] The policies of the government in London had so alienated the Americans that they were no longer willing to enforce what London wanted. The Prime Minister, Lord North, recognized the problem: the posse had switched sides; rather than providing the manpower to enforce Parliament's will, the posse was now actively resisting that will: "[O]ur regulations here are of no import, if you have nobody in that country to give

---

*Sheriff*." FREDERIC WILLIAM MAITLAND, JUSTICE AND POLICE 69 (London, MacMillan & Co. 1885). Maitland traced the beginning of the decline to "the Norman reigns." *Id.* So "there are many things which according to law books he might do, but which he never does. He might call out the power of the county (*posse comitatus*) to apprehend a criminal with hue and cry, but justices of the peace and police constables have long rendered needless this rusty machinery." *Id.* at 70.

[169] CHAPIN, *supra* note 135, at 31; KARRAKER, *supra* note 19, at 147 (Virginia); JOHN MILTON NILES, THE CONNECTICUT CIVIL OFFICER 188–89, 214 (Hartford, Huntington & Hopkins 1823); *cf.* BARTELS, *supra* note 153, at 2 (night watches created in Boston in 1636 and New York City in 1686). In Delaware, the role is affirmed in the state constitution. "Sheriffs shall be conservators of the peace within the counties respectively in which they reside." DEL. CONST. art. XV, § 1; *see also* sources in note 144 *supra* (describing constitutional office of sheriff).

[170] Gautham Rao, *The Federal* Posse Comitatus *Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America*, 26 LAW & HIST. REV. 1, 10 (2008); *see also* PAULINE MAIER, FROM RESISTANCE TO REVOLUTION 16–20 (1991) (noting, *inter alia*, use of *posse comitatus* to prevent impressment of Americans into the British navy).

[171] Rao, *supra* note 170, at 10.

[172] *Id.*

Pl.1187

them force."[173]  The problem was exacerbated by the fact that most sheriffs leaned Whig (towards citizen rights) rather than Tory (towards the authority of the monarch).[174]

So at the advice of Lord North and his party, the British government attempted to resort to military coercion of the Americans, and, starting in the fall of 1774, a gun control program designed to disarm them.  Forcible disarmament with house-to-house searches by the British redcoats was attempted at Lexington and Concord on the morning of April 19, 1775.  The Americans resisted with their personal arms, and the Revolutionary War began.[175]

## C. AFTER INDEPENDENCE

In the Early Republic, the *posse comitatus* was an accepted and uncontroversial institution; the federal government only rarely used its *posse comitatus* powers.

One of the first legal treatises of the new United States of America was produced by James Wilson, the preeminent lawyer of his day, soon to be appointed to the Supreme Court by President Washington.[176]  Quite conventionally, Wilson described *posse comitatus* as "the high power of ordering to [the sheriff's] assistance the whole strength of the county over which he presides" in order "to suppress . . . unlawful force and resistance."[177]

Joel Barlow's essay *Advice to the Privileged Orders* argued that if the state represented the people as a whole, not just one class, society would be more stable.[178]  Barlow noted that in Europe, an armed populace would be regarded "as a mark of an uncivilized people, extremely dangerous to a well

---

[173] House of Commons Debate, Mar. 28, 1774, 17 PARL. HIST. ENG. 1192–93, in JOHN PHILLIP REID, IN DEFIANCE OF THE LAW 230–33 (1981); Rao, *supra* note 170, at 10–11.

[174] REID, *supra* note 173, at 203.

[175] Kopel, *supra* note 3, at 308.

[176] OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1092 (2d ed. 2005).

[177] JAMES WILSON, *Of Government, in* 2 COLLECTED WORKS OF JAMES WILSON 1016 (Kermit L. Hall & Mark David Hall eds., 2007).  The treatise is based on series of lectures that Wilson delivered in 1790 and 1791 at the College of Philadelphia, which he revised for publication. He was aiming to become the American Blackstone.  Mark David Hall, *Bibliographical Essay: History of James Wilson's Law Lectures in id.* at 401.

[178] JOEL BARLOW, ADVICE TO THE PRIVILEGED ORDERS IN THE SEVERAL STATES OF EUROPE (Cornell University Press, 1956) (1792).  Barlow was a leading diplomat and writer during the 1780s and 1790s.  He was one of the "Connecticut wits," a group of writers centered around Yale.  *Joel Barlow: A Biographical Note, in id.* at ix.  He challenged the typical European belief that Europeans were more civilized than Americans.

Pl.1188

ordered society."[179]   But unlike the European rabble, which had no experience with self-government, Americans were their own sovereigns, and self-government brought out the best in man's character.   Thus, the American people could be trusted with guns: "It is *because the people are civilized, that they are with safety armed*."[180]   Barlow praised the "very important" "discoveries" which "had been made in modern nations, especially in England, and carried into successful practice, for the security of citizens against an undue exercise of the governing power; and some that were equally original for the regular assistance of the governing power against the turbulence of citizens."[181]   These were the *posse comitatus*, habeas corpus, the jury, and the rule that "parliament holds the purse."[182]

When the proposed Constitution was put before the American people, one of the objections of Anti-Federalists was that the new federal government did not have an enumerated *posse comitatus* power, but did have an enumerated militia power.   The Anti-Federalists argued that therefore the federal government would use the militia (that is, military force) to carry out its powers on a routine basis.[183]   In Federalist Number 29, Alexander Hamilton responded that the federal government did have *posse comitatus* power, by virtue of the Necessary and Proper Clause.[184]

---

[179] *Id.* at 16.

[180] *Id.*

[181] JOEL BARLOW, THE MARCH OF THIS GOVERNMENT, *quoted in* Christine M. Lizanich, *"The March of This Government": Joel Barlow's Unwritten History of the United States*, 33 WM. & MARY Q. 315, 325–26 (1976).   Barlow's appointment as Ambassador to France interrupted his work on the book, and he died before completing it.   *Id.* at 320.

[182] *Id.* at 325 n.24.

[183] *Letter from the Federal Farmer III* (Oct. 10, 1787), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST 234–45 (Herbert J. Storing ed., 1981); Brutus, *Essay IV*, *reprinted in id.* at 382–87 (claiming that the power to use the militia for law enforcement "is a novel one, in free governments—these have depended for the execution of the laws on the Posse Comitatus, and never raised an idea, that the people would refuse to aid the civil magistrate in executing those laws they themselves had made").

[184] THE FEDERALIST No. 29 (Alexander Hamilton):

In order to cast an odium upon the power of calling forth the militia to execute the laws of the Union, it has been remarked that there is nowhere any provision in the proposed Constitution for calling out the POSSE COMITATUS, to assist the magistrate in the execution of his duty, whence it has been inferred, that military force was intended to be his only auxiliary . . . .   The same persons who tell us in one breath, that the powers of the federal government will be despotic and unlimited, inform us in the next, that it has not authority sufficient even to call out the POSSE COMITATUS.   The latter, fortunately, is as much short of the truth as the former exceeds it.   It would be as absurd to doubt, that a right to pass all laws *necessary* and *proper* to execute its declared powers, would include that of requiring the assistance of the citizens to the officers who may be intrusted with the execution of those laws, as it would be to believe, that a right to enact laws necessary and proper for the imposition and collection of taxes would involve that of varying the rules of descent and of the

Pl.1189

After ratification of the Constitution, Hamilton's necessary and proper view of the federal *posse comitatus* power was uncontroversial.  In addition, the federal government has all the normal powers of local government in areas, such as territories, where the federal government has the authority to exercise local government.[185]  Thus, during the Jefferson administration, Secretary of State James Madison sent a written order that a French official "call for the assistance of the good citizens of the district, as the *posse comitatus*" to enforce the terms of the Louisiana Purchase.[186]  In an 1833 treatise on American constitutional law, Supreme Court Justice Joseph Story explained that while the *posse comitatus* would suffice for maintaining law and order in most situations, there were some circumstances in which either a militia or a standing army would be necessary.[187]

For local law enforcement, *posse comitatus* in the decades before 1850 thrived as a well-developed and popular institution.  Edward Livingston extolled the posse because "the same ties of property, of family, of love of country and of liberty" which make possemen "effective instruments for the suppression of disorder" also make them "unfit . . . to promote any scheme of usurpation.  The people can apprehend no danger to their liberties from

---

alienation of landed property, or of abolishing the trial by jury in cases relating to it.  It being therefore evident that the supposition of a want of power to require the aid of the POSSE COMITATUS is entirely destitute of color, it will follow, that the conclusion which has been drawn from it, in its application to the authority of the federal government over the militia, is as uncandid as it is illogical.  What reason could there be to infer, that force was intended to be the sole instrument of authority, merely because there is a power to make use of it when necessary?

*Id.*

[185]  *See* U.S. CONST., art. IV § 3, cl. 2; Block v. Hirsh, 256 U.S. 135, 156 (1921); Shively v. Bowlby, 152 U.S. 1 (1894); Am. Ins. Co. v. 356 Bales of Cotton, 26 U.S. 511, 542 (1828).

[186]  Madison's instruction was quoted in a Supreme Court case a few years later. Livingston v. Dorgenois, 11 U.S. 577, 578–79 (1813).

[187]  JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION 81–82 (Boston, Hilliard, Gray, & Co. 1833) (§ 1196):

In ordinary cases, indeed, the resistance to the laws may be put down by the *posse comitatus*, or the assistance of the common magistracy . . . .  The general power of the government to pass all laws necessary and proper to execute its declared powers, would doubtless authorize laws to call forth the *posse comitatus*, and employ the common magistracy, in cases, where such measures would suit the emergency.  But if the militia could not be called in aid, it would be absolutely indispensable to the common safety to keep up a strong regular force in time of peace.

*See also* Luther v. Borden, 48 U.S. 1, 76 (1849) (Woodbury, J., dissenting) ("The State courts, with the aid of the militia, as in Shays's rebellion and the Western insurrection, could, for aught which appears, by help of the *posse comitatus*, or at least by that militia, have in this case dispersed all opposition.").

Pl.1190

such a force . . . ."[188]  Citizens served in the posse readily and with pride.[189]
It was used for a wide variety of local enforcement, ranging from stopping
illegal fishing up to riots.[190]  Like jury service, posse service was a
mandatory duty of a citizen, one that should be performed with pride as part
of free citizen's rights and duties in a self-governing republic.[191]

In the early decades of the republic, before slavery became a major
conflict, federal use of *posse comitatus* in the states was rare and sporadic.
The Judiciary Act of 1789 gave U.S. Marshals authority to summon the
*posse comitatus*.[192]

---

[188] EDWARD LIVINGSTON, A SYSTEM OF PENAL LAW FOR THE STATE OF LOUISIANA 209–10
(Lawbook Exchange 2010) (1833).  Livingston was one of the parties in *Livingston v.
Dorgenois*, *supra* note 186.  He also served as Secretary of State for Andrew Jackson, and
also as a United States Senator for Louisiana and United States Representative for two states,
New York and Louisiana.  Roger J. Champagne, *Livingston, Edward*, *in* 17 ENCYCLOPEDIA
AMERICANA 615 (1980).

[189] Rao, *supra* note 170, at 11–12.

[190] *Id.  See also* Reed v. Bias, 8 Watts & Serg. 189, 191 (Pa. 1844) ("The sheriff, to
prevent personal damage to himself and his ordinary assistants from a mob assembled in
extraordinary numbers, and with a show of force to overawe the civil power, may call in the
assistance of the military.  He has the right, and it is his duty to use the proper and necessary
force to suppress all mobs and disturbers of the peace.  Without this power our liberty would
be but a name, and our lives and property insecure."); GOODWIN, *supra* note 150, at 13, 76,
149–50, 155 (conservation of the peace, recapture of escaped prisoners, suppression of riots,
arrest warrants); HARTSHORN, *supra* note 150, at 13, 123, 230–31 (any criminal case,
preservation of the peace, recapture of prisoners); JOHN H.B. LATROBE, THE JUSTICES'
PRACTICE UNDER THE LAWS OF MARYLAND 22 (Baltimore, Fielding Lucas, Jr. 1826)
(constable may order any person to assist him in making an arrest); MORDECAI M'KINNEY,
THE UNITED STATES CONSTITUTIONAL MANUAL 151, 160, 260 (Harrisburg, Penn.: Hickock &
Cantine, 1845) (sheriffs may raise the *posse comitatus* to suppress riots or affrays and to
arrest criminals); NILES, *supra* note 169, at 17, 190, 214, 270, 275–76 (suppression of riots,
execution of arrests; final item is form for a constable's return after having summoned
assistance and suppressed a riot); WILLIAM J. NOVAK, THE PEOPLE'S WELFARE 212 (1996)
(quarantine enforcement in Albany in 1832); HENRY POTTER, THE OFFICE AND DUTY OF A
JUSTICE OF THE PEACE 243–44 (Raleigh, Joseph Gales 1816) (noting posse use for riots and
affrays, forcible entry and detainer, pursuit and apprehension of all felons and all breakers or
disturbers of the pace; execution of any lawful writ, process, or warrant; preservation of the
peace).

[191] Avery v. Seely, 3 Watts & Serg. 494, 498 (Pa. 1841) (stating that sheriff may not take
his posse out of his own county); Comfort v. Commonwealth, 5 Whart. 437, 440 (Pa. 1840)
(holding that the constable has the same power as the sheriff to summon posse, including for
assistance in execution of a writ on a debt); Coyles v. Hurtin, 10 Johns. 85, 88 (N.Y. Sup. Ct.
1813) (holding that sheriff can order a person to perform a posse task, and can then leave the
person's presence; persons in posse service have the same civil immunities as the sheriff);
STEPHEN, *supra* note 161, at 29.

[192] 1 Stat. 73, 87 (1789) (creating, in § 27, office of U.S. Marshal in each federal judicial
district, who "shall have power to command all necessary assistance in the execution of his
duty").

Pl.1191

A modern scholar, Wesley Campbell, uses ratification history to argue against the Supreme Court decisions such as *Printz v. United States*, which forbid federal commandeering of state officials.[193]  Campbell infers from the ratification history not only a federal *posse comitatus* power, but also a federal power to commandeer county sheriffs to lead the *posse comitatus* in federal service.[194]  This is problematic because of the nature of the posse. The posse is an ad hoc organization.  It has no organization until it enters into the service of whoever lawfully summoned it.  As in England, the American common law recognized that many officials, not just the sheriffs, had the authority to summon a posse.  These officials were a "Judge of Record, Sheriff, Coroner,[195] Constable, or other Officer to whose Office belongs the Conservation of the Peace . . . ."[196]  The Appendix to this Article sets forth the modern state *posse comitatus* statutes; they follow the common law in providing that a variety of state or local officials, not just sheriffs, may summon a *posse comitatus*.

If a coroner summons the posse on Tuesday, then he is the posse commander that day.  If a judge summons the posse on Friday, then she is the posse commander for that day.  Accordingly, the power of a federal officer to summon a posse for his own use does not necessarily imply that the federal officer also has the power to summon any of the state officials—such as sheriffs, judges, and coroners—who also has posse-summoning power.

It is useful to contrast the posse with the state militia.  There are a variety of possible posse commanders, depending on the exigencies of law enforcement need.  There is no process for compulsory training of persons who might be summoned to posse service.  In contrast, the state militia is a regular body.  It is subject to periodic training and to musters (where militia members show that they possess the requisite arms for militia duty).[197]

---

[193] Wesley J. Campbell, *Commandeering and Constitutional Change*, 122 YALE L.J. 1104 (2013).

[194] *Id.* at 1139–44.

[195] The Office of Coroner in England was created in 1194.  Articles of the Eyre, 1 Stats. of the Realm 233 (art. 20).  The office was originally much broader than today, when forensic autopsies are the office's only routine law enforcement role.  Coroners presided at some judicial hearings and had arrest powers.  *See*, *e.g.*, WEBB, *supra* note 113, at 97–104.

[196] WEBB, *supra* note 113, at 253.

[197] *See, e.g.*, District of Columbia v. Heller, 554 U.S. 570, 650 n.12 (Stevens, J., dissenting)  (quoting an Act for Establishing a Militia, 1785 Del. Laws § 7) ("And be it enacted, That every person between the ages of eighteen and fifty . . . shall at his own expense, provide himself . . . with a musket or firelock, with a bayonet, a cartouch box to contain twenty three cartridges, a priming wire, a brush and six flints, all in good order, on or before the first day of April next, under the penalty of forty shillings, and shall keep the same by him at all times, ready and fit for service, under the penalty of two shillings and six

Pl.1192

Unlike the posse, the militia is led by a regular set of officers.[198]  The man who is the militia captain on Monday will still be the militia captain on Friday.  The U.S. Constitution expressly grants Congress the power to summon the state militias, including their state officers, into federal service.[199]  When the Constitution means to grant to the federal government the extraordinary power of commandeering state officers, the Constitution says so expressly.

Early practice shows that the federal *posse comitatus* power was not exercised as a power to commandeer state officers.  The Judiciary Act of 1789 authorized federal marshals to summon posses.  There appears to be no evidence indicating that from 1789 to the present, the federal posse power has ever been used by a federal marshal, or anyone else, to commandeer a state official in his official capacity (e.g., a sheriff or a state judge) into serving as posse commander in federal service.

In *Prigg v. Pennsylvania*, the Supreme Court ruled that the 1793 federal Fugitive Slave Act was constitutional.  Even though Article I had not given Congress an enumerated power over fugitive slaves, the fugitive slave provisions in Article IV created an implied power, according to the Court.[200]  At the same time, state and local officials had absolutely no obligation to assist in the recapture of fugitives, according to the *Prigg* Court.[201]

## D. *POSSE COMITATUS* AND THE CIVIL WAR

### *1. Before the War*

Everything changed with the congressional enactment of the Compromise of 1850.  In exchange for admission of California to the Union as a free state, northern legislators accepted a massive new federal Fugitive Slave Act.[202]  This time, the Act explicitly declared that citizens were required to serve when summoned in a federal *posse comitatus* hunting for

---

pence for each neglect or default thereof on every muster day").

[198] *See, e.g.*, S.D. CONST. art. 15, § 4.

[199] U.S. CONST. art. I, § 8, cl. 15–16: "To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions"; "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress . . . ."

[200] Prigg v. Pennsylvania, 41 U.S. 539 (1842).

[201] *Id.* at 615.

[202] FERGUS M. BORDEWICH, AMERICA'S GREAT DEBATE: HENRY CLAY, STEPHEN A. DOUGLAS, AND THE COMPROMISE THAT PRESERVED THE UNION (2012).

Pl.1193

fugitive slaves.[203]   The federal *posse comitatus* had been transformed, as Rao puts it, "from emergency to routine . . . from sporadic to ubiquitous."[204] The *posse comitatus* provisions of the Fugitive Slave Act of 1850 forced the North to become complicit in enforcing slavery, and thus to become part of the slave system.[205]   To many northerners, forced service to recapture slaves felt little different from slavery itself.[206]   The *posse comitatus* was supposed to be the people of the county participating in self-government by enforcing their own laws.  Now, federal *posse comitatus* had been perverted into a weapon that transformed free citizens into the minions of distant slave owners.

Making things even worse, the federal government began using federal soldiers on slave hunts and claimed that these men were merely acting as *posse comitatus*.[207]   To call the federal standing army a "*posse comitatus*" was as Orwellian as calling the federal army "the Massachusetts State Militia."   The posse and the militia were supposed to be the institutions that minimized the need for domestic use of a standing army.   The posse was not supposed to be used as a legal fiction to justify use of the military for ordinary law enforcement in a state that was not under martial law.

An 1854 poem by Walt Whitman, "A Boston Ballad," denounced the sight of federal troops—"the Federal foot and dragoons"—marching through Boston to transport a fugitive slave.[208]   King George's despotic principles had triumphed: "You have got your revenge, old buster!  The crown is come to its own, and more than its own."[209]

The innovative use of *posse comitatus* to enforce the Fugitive Slave Act brought slavery home to the North.  Indifference as slavery as a far-away institution was no longer possible.  According to the abolitionists, there were now only two choices for a free northern man: one option was to himself become a servant of the slave power in the federal *posse comitatus*. The only other choice was to put slavery everywhere in America on the

[203] Fugitive Slave Act of 1850, 9 Stat. 462, 462–63 (explaining that U.S. Marshals are authorized "to summon and call to their aid the bystanders, or *posse comitatus* of the proper county, when necessary to ensure a faithful observance of the clause of the Constitution referred to, in conformity with the provisions of this act; and all good citizens are hereby commanded to aid and assist in the prompt and efficient execution of this law, whenever their services may be required, as aforesaid, for that purpose . . . "); *see also* Extradition of Fugitives from Service, 6 Op. Att'y Gen. 466 (1854).

[204] Rao, *supra* note 170, at 25–26.

[205] *Id.* at 5, 20, 26–31.

[206] *Id.* at 27–28.

[207] *Id.* at 29.

[208] Walt Whitman, The Complete Poems 292–03 (Penguin Classics 2005).

[209] *Id.* at 204.

Pl.1194

road to destruction.[210] All sides agreed that Abraham Lincoln's plan to block any expansion of slavery into federal territories would eventually lead to the economic collapse of slavery in all the slave states.[211] Ascendant in Congress, the South had nationalized the issue of slavery, and thereby radicalized much of the North. The locally controlled *posse comitatus* of ordered liberty had helped bring about the American Revolution. The federally controlled *posse comitatus* of slavery would help cause the Civil War.

### 2. After the War

Victorious after four years of the bloodiest war in American history, the Radical Republicans and their political allies embarked upon a Reconstruction plan to demolish the slave power root and branch.[212] The Thirteenth Amendment and the abolition of *de jure* slavery was just the first step.

*Prigg v. Pennsylvania* had found an implicit pro-slavery federal power in the Fugitive Slave Clause of the Constitution.[213] So Congress looked to the other clauses of Article IV and found the guarantee that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[214] To the most ardent reconstructionists, this was enough to imply a congressional power to enact civil rights legislation—especially in conjunction with the enforcement power granted by Section Two of the Thirteenth Amendment.[215] Such legislation was enacted,[216] but Congress decided to put it on a more solid constitutional footing by proposing the Fourteenth Amendment for ratification, Section One of which provided that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."[217] Section Five gave Congress the power to enforce the Amendment by appropriate legislation.[218]

Likewise, federal slavery powers were later used for civil rights ends: the Civil Rights Act of 1866, the Enforcement Acts of 1870 and 1871, and

---

[210] Rao, *supra* note 170, at 26–31.

[211] DOUGLAS R. EGERTON, YEAR OF METEORS: STEPHEN DOUGLAS, ABRAHAM LINCOLN, AND THE ELECTION THAT BROUGHT ON THE CIVIL WAR 28, 35 (2010).

[212] *See* GARRETT EPPS, DEMOCRACY REBORN: THE FOURTEENTH AMENDMENT AND THE FIGHT FOR EQUAL RIGHTS IN POST-CIVIL WAR AMERICA (2006).

[213] U.S. CONST. art. IV, § 2, cl. 3.

[214] U.S. CONST. art. IV, § 2, cl. 1.

[215] MICHAEL KENT CURTIS, NO STATE SHALL ABRIDGE 42–43 (1986).

[216] Civil Rights Act of 1866, 14. Stat. 27–30.

[217] U.S. CONST. amend. XIV. CURTIS, *supra* note 215, at 42–43.

[218] *Id.*

Pl.1195

the Ku Klux Klan Act of 1871 all gave federal marshals authority to summon the *posse comitatus*.[219]  Anti-slavery Senator Lyman Trumbull noted that the *posse comitatus* provision of the 1866 Civil Rights Act was "copied from the late fugitive slave act, adopted in 1850 . . . ."[220]  But in the South in 1872 as in the North in 1852, there was resistance to serving in a federal *posse comitatus* for routine enforcement of federal laws which many local people did not accept.[221]  Again, the federal military was sometimes used as *posse comitatus*, under the pretext that the men were merely acting as citizens, rather than as soldiers.[222]  Finally in 1878, Congress passed the Posse Comitatus Act to forbid use of the army in law enforcement, except when expressly authorized by Congress.[223]

Today, the modern version of the civil rights statute provides that United States Magistrate Judges may appoint persons to serve warrants and process:

> [These] persons so appointed shall have authority to summon and call to their aid the bystanders or *posse comitatus* of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged . . . .[224]

The statutory authority of federal judges to raise the *posse comitatus*, as described above, is consistent with the American common law understanding of who may invoke the power.[225]  As U.S. Attorney General Edward Bates wrote, "[t]he right of the courts to call out the whole power of the county to enforce their judgments, is as old as the common law . . . ."[226]

---

[219] 14 Stat. 27, 28 (1866) (Civil Rights Act) (Empowering federal civil rights commissioners to appoint "suitable persons . . . to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty . . ."); 16 Stat. 140, 142 (1870) (Enforcement Act); 16 Stat. 433, 437 (1871) (voting rights).

[220] CONG. GLOBE, 39th Cong., 1st Sess. 475 (1866).

[221] Rao, *supra* note 170, at 50.

[222] *Id.* at 50–51.

[223] 20 STAT. 145, 152 (1878).  The law remains in effect today, albeit with major loopholes created for the "War on Drugs."  *See* David B. Kopel, *Smash-up Policing: When Law Enforcement Goes Military*, *in* BUSTED: STONE COWBOYS, NARCO-LORDS AND WASHINGTON'S WAR ON DRUGS 155–58 (Mike Gray ed., 2002).

[224] 42 U.S.C. § 1989 (2006).

[225] WEBB, *supra* note 113, at 253 ("By the Common Law, every Judge of Record, Sheriffs, Coroner, Constable, or other Office to whose office belongs the Conservation of the Peace, may command and take the Aid and Force of Others to pacify Riots, or Affrays . . . .") (citing 28 Edw. 3, c. 8).

[226] Suspension of the Privilege of the Writ of Habeas Corpus, 10 Op. Att'y Gen. 74, 80 (1861).

Pl.1196

E. *POSSE COMITATUS* IN LATE NINETEENTH CENTURY AMERICA TO
   THE PRESENT

    With the federal *posse comitatus* crisis of 1850–1878 finally resolved, the *posse comitatus* returned to its traditional American role, with the power of the county to be used in support of popularly-supported laws.[227]

    This is the period about which most people today have their greatest familiarity with the *posse comitatus*—of the western sheriff summoning the posse to pursue an escaped outlaw or to confront a violent gang. Frank Richard Prassel's *The Western Peace Officer* is the leading study of the office of sheriff in the western United States during the late nineteenth and early twentieth centuries. As Prassel observes, the original legal structure of the office of sheriff in the western territories and states is nearly identical to the modern structure of the office.[228]

    The *posse comitatus* power continued to be a core, essential power of the county sheriff.[229] To this day, in almost every American state, the sheriff's common law *posse comitatus* power[230] is given expression by a statute on the subject.[231] As noted above, the power to raise the hue and cry

---

[227] The federal *posse comitatus* power never went away. The Supreme Court in 1890 and 1895 affirmed the responsibility of every U.S. citizen to assist the federal government when needed in the *posse comitatus*. Cunningham v. Neagle, 135 U.S. 1, 65 (1890) ("marshals of the United States, with a *posse comitatus* properly armed and equipped . . ."); *In re* Quarles, 158 U.S. 532, 535 (1895) :

    It is the duty and the right, not only of every peace officer of the United States, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the *posse comitatus* in upholding the laws of his country.

*Cf.* Wright v. United States, 158 U.S. 232, 239 (1895) (enforcing federal statute protecting federal officers, including *posse comitatus*, on Indian lands when in performance of their official duties, or after they have performed such duties). The actual use of the federal *posse comitatus* had returned to its pre-1850 norm of being rare and uncontroversial.

[228] "Virtually no significant changes have occurred in the American system of county law enforcement during the past century. Most sheriffs and constables operate under the same basic laws and customs as existed at the creation of their posts." FRANK RICHARD PRASSEL, THE WESTERN PEACE OFFICER 119 (1972).

[229] MURFEE, *supra* note 145, at 21 ("For a thousand years the sheriff has been the principal conservator of the peace in his county, with full power to command, whenever necessary, the power of the county.").

[230] "He is also required, in his capacity as conservator of the peace, to suppress riots, mobs, and insurrections, and, in the discharge of his duty, to employ the whole power of the county, including any military force that may be necessary and available for that purpose." MURFEE, *supra* note 145, at 629; *see also* WEBB, *supra* note 113, at 252–53, 293–94.

[231] For example, in Colorado,

    It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful

Pl.1197

is closely related to the *posse comitatus* power. American sheriffs continued to have the power of hue and cry.[232]

One of the longstanding rules of the English law of sheriffs was that the sheriff is civilly liable for the acts performed by his undersheriff, his deputies, or anyone else in his service. This principle applies to the *posse comitatus*.[233] Concomitantly, persons serving in the sheriff's posse have the same legal immunities as does the sheriff herself.[234] Once workman's compensation was established, it was straightforwardly applied so that a person who is injured while serving in the posse is entitled to workman's compensation just as are full-time deputies.[235]

The *posse comitatus* is familiar enough to the Supreme Court that it figured in part of the questioning during oral argument in *Plyer v. Doe* in

---

assemblies and insurrections. For that purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they, and every coroner, may call to their aid such person of their county as they may deem necessary.

COLO. REV. STAT. § 30-10-516. A list of all state *posse comitatus* statutes is contained in the Appendix to this Article.

[232] For example, the first statutes of the Colorado Territory, created in 1861, stated:

When any felonious offense shall be committed, public notice thereof shall be immediately given in all public places near where the same was committed, and fresh pursuit shall forthwith be made after every person guilty thereof by sheriffs, coroners, constables, and all other persons who shall be by any of them commanded or summoned for that purpose.

1861 Colo. Sess. Laws 326; *see also* KARRAKER *supra* note 19, at 147–48 (explaining that colonial Virginia sheriffs could raise hue and cry, but "[i]t was probably little resorted to in Virginia because of the wide scattering of the population."); *cf.* NILES, *supra* note 169, at 188–89 (constables' hue and cry).

The New Mexico Territory specifically authorized the sheriff to cross county lines in order to perform an arrest and to take the *posse comitatus* with him for that purpose. N.M. STAT. § 15-40-14 (West 1953) (referencing historical law of 1868–69).

[233] Scott v. Vandiver, 476 F.2d 238, 242–43 (4th Cir. 1973). Conversely, when persons with no connection to a sheriff's office falsely call themselves "*posse comitatus*," the sheriff has no liability for the acts of these unauthorized imposters. *See* Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 717 (9th Cir. 1981). A particularly pernicious set of fraudsters was a private extremist organization of tax evaders in the latter twentieth century which wrongly called itself "*Posse Comitatus*." *See generally* JAMES CORCORAN, BITTER HARVEST: GORDON KAHL AND THE *POSSE COMITATUS* (1990) (describing the history of Kahl and his misguided followers).

[234] Filarsky v. Delia, 132 S. Ct. 1657, 1665 (2012) (citing numerous precedents and MURFEE, *supra* note 145); State v. Parker, 199 S.W.2d 338, 339–40 (Mo. 1947); Monterey Cnty. v. Rader, 248 P. 912, 914 (Cal. 1926); Robinson v. State, 18 S.E. 1018, 1019 (Ga. 1893).

[235] CAL. LAB. CODE § 3366 (2011); COLO. REV. STAT. § 8-40-202 (2013); Eaton v. Bernalillo Cnty., 128 P.2d 738 (N.M. 1942); *Monterey Cnty.*, 248 P. at 916; Annotation, *One Temporarily Impressed into Public Service in Emergency, as Within Workmen's Compensation Act*, 142 A.L.R. 657 (1943).

Pl.1198

1982.[236]  The case involved whether illegal aliens were entitled to attend American public schools; one hypothetical raised by a Justice involved the judicial authority to summon *posse comitatus*.[237]  More recently, the 2012 Supreme Court case *Filarsky v. Delia* featured a mini-treatise on *posse comitatus*, recapitulating some of the leading precedents on the subject.[238]

### F. WHO IS SUBJECT TO *POSSE COMITATUS* DUTY?

*Posse comitatus* is like the jury: it is a law enforcement duty of the citizen, and a person who fails to perform either duty may be criminally punished.[239]  This principle is not in desuetude, but has been affirmed by state court cases from the late twentieth century.[240]  The posse duty inheres in the inhabitants of the county; that is, the Sheriff of Hinsdale County can command posse service only from the inhabitants of Hinsdale County.[241]

Exemptions of able-bodied males from posse duty are rare.[242]  One 1848 English treatise[243] said that nobles did not have to serve in the *posse*

---

[236] 457 U.S. 202 (1982).

[237] Q. What about a *posse comitatus*, where a judge is theoretically, he may have difficulty doing it, but he is entitled to call upon bystanders to enforce an order of a court.  Wouldn't the people escorting these people to the border be much like a *posse comitatus*?  They are not officially endowed with status, but they are helping to enforce a federal statute?

Quoted in E. Barrett Prettyman, Jr., *The Supreme Court's Use of Hypothetical Questions at Oral Argument*, 33 CATH. U. REV. 555, 585–86 (1984).  The correct answer to the question, by the way, is "no."  If you are not summoned by a government officer, then you are not acting as *posse comitatus*.  *Posse comitatus* is a status, which confers, *inter alia*, the same civil immunities as enjoyed by other law enforcement officers, as well the same liabilities for supervisors for an agent's misconduct.  *See supra* text accompanying note 233.

[238] *Filarsky*, 132 S.Ct. at 1664.  As the Court explained, Sheriffs executing a warrant were empowered by the common law to enlist the aid of the able-bodied men of the community in doing so (citing 1 WILLIAM BLACKSTONE, COMMENTARIES *343); while serving as part of this "*posse comitatus*," a private individual had the same authority as the sheriff and was protected to the same extent.  See, e.g., *Robinson*, 18 S.E. at 1019.

[239] Sutton v. Allison, 47 N.C. 339 (1855); Houser v. Hampton, 29 N.C. 333 (1847); MURFEE, *supra* note 145, at 78 (citing Coyles v. Hurtin, 10 Johns. 85 (N.Y. Sup. Ct. 1813)).

[240] State v. Floyd, 584 A.2d 1157, 1159 (Conn. 1991); Williams v. State, 490 S.W.2d 117, 119 (Ark. 1973).

[241] State *ex rel.* Att'y Gen. v. McLain, 50 N.E. 907, 908 (Ohio 1898) ("[H]e may command the inhabitants of the county to assist him.").  *But see* OKLA. STAT. ANN. tit. 22, § 94 (West 2003) (under extraordinary circumstances, governor must summon posses of other counties to assist in a county where county's *posse comitatus* cannot solve the problem); MORRIS *supra* note 23, at 227 n. 178 (noting one thirteenth century example of the king ordering a sheriff to summon men from two counties, if necessary).

[242] LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) (ministers, the infirm or decrepit); PULTON, *supra* note 152, at 29a ("which be not of the Clergie"); STEPHEN, *supra* note 161, at 46 (citing Blackstone, "except women, clergymen, persons, decrepit and infants under the age of fifteen"); WEBB, *supra* note 113, at 252 ("But Clergy-men, and sick, lame, or

**Pl.1199**

*comitatus*, but many other prominent English commentators have viewed posse duty as encompassing everyone regardless of rank.[244] As with militia service, persons who are not able-bodied are exempt; some but not all commentators state that clergymen are exempt.[245]

Unlike with militia service, there is not necessarily an upper age limit for *posse comitatus*. In the view of some commentators, if you are sixty-five years old and able-bodied, you may be exempt from the militia, but not from *posse comitatus*.[246] James Wilson stated in 1790 that "[n]o man above fifteen and under seventy years of age, ecclesiastical or temporal, is exempted from this service."[247] The traditional lower age limit for *posse comitatus* duty was fifteen years old, which was six years below the age of majority in England and the United States.[248] One might argue that changing views about the legal responsibilities of minors might militate for eighteen years as the limit in the United States today.

Women were traditionally exempt.[249] Arguably, the exemption has continuing legal validity by analogy to women still being exempt from

---

impotent Persons are excepted.").

[243] WATSON, *supra* note 25, at 2.

[244] COKE, *supra* note 85, at 193 (ch. 17) ("no man ecclesiasticall or temporall is exempted from this service"); DALTON, *supra* note 105, at 313; HAWKINS, *supra* note 150, at ch. 28 § 201 ("all Persons whatsoever, and even noblemen, and all others of what condition or degree soever they may be, except women, clergymen, persons decrepit, and infants under the age of fifteen years"); *see also* DALTON, *supra* note 23, at 136b (similar list to Pulton, except "villaines" omitted); LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) ("all manner of Gentlemen, Yeomen . . ."); PULTON, *supra* note 152, at 29a ("Al Lords and other liege people of the Realme, as KNIGHTS, Esquires, gentlemen, yeomen, laborers, servants, apprentices, villaines [serfs], and all other of the age of 15 years or above.") (citing 13 Henry IV, ch. 7).

[245] LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) (ministers, the infirm or decrepit); PULTON, *supra* note 152, at 29a ("which be not of the Clergie"); STEPHEN, *supra* note 161, at 46 ("except women, clergymen, persons decrepit and infants under fifteen"); WEBB, *supra* note 113, at 252 ("But Clergy-men, and sick, lame, or impotent Persons are excepted.").

[246] KARRAKER, *supra* note 19, at 176–77 (reprinting an April 29, 1643, warrant for summoning the *posse comitatus*, applying to persons above the age of sixteen years and "under the age of three score years and able to travel, with such arms or weapons as they have or can provide"); M'KINNEY, *supra* note 190, at 260 (requiring all men above the age of fifteen years, "not aged or decrepid"); WEBB, *supra* note 113, at 252 ("all Males Persons therein, whether Freemen, or Servants, above the Age of 15 Years, and able to travel") (citing LAMBARDE, *supra* note 152, at 309). *But see* COKE, *supra* note 85, at 193 (ch. 17) ("being above 15 and under 70").

[247] WILSON, *supra* note 177, at 1017. *Cf.* STEPHEN, *supra* note 161, at 46 (citing ages fifteen and over, with no upper age limit).

[248] South v. Maryland *ex rel.* Pottle, 59 U.S. 396, 402 (1855); POTTER, *supra* note 190, at 243.

[249] *See e.g.*, PULTON, *supra* note 152, at 29a.

Pl.1200

conscription into the U.S. military[250] and into the statutory militia of the United States.[251]   On the other hand, the *Virginia Military Institute* case forbids women being excluded from state military service and training unless the exclusion has an "exceedingly persuasive justification."[252] Moreover, posse members will be assisting state or federal law enforcement officers, and these days, many such officers are female.   Given that women are universally recognized as capable of serving as sworn law enforcement officers, it seems difficult to argue that any inherent characteristics of women in general disable them from being able to participate in a posse.   At the least, the authority of a twenty-first century American sheriff to choose to accept female volunteers in the *posse comitatus* seems incontestable.   As for the number of persons which a sheriff or other authorized official may summon, the decision is entirely up to that officer.[253]

## G. ARMS OF THE *POSSE COMITATUS*

Because the sheriff must keep the peace, it is axiomatic that he "may lawfully beare armour or weapons."[254]   Because the sheriff and his officers may lawfully bear armour or weapons, so may his *posse comitatus*.[255] Thus, persons summoned to the *posse comitatus* "may take with them such Weapons as shall be necessary to enable them effectually to do it . . . ."[256] The posse member must bring not only arms, but also whatever other instruments, such as automobiles, are necessary for service, as Justice

---

[250] *See generally* Rostker v. Goldberg, 453 U.S. 57 (1981) (upholding men-only draft registration as not violating the Equal Protection standards of the Fifth Amendment's Due Process Clause).

[251] 10 U.S.C §§ 310–311 (2012).

[252] United States v. Virginia, 518 U.S. 515, 524 (1996) (citing Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982)).

[253] DALTON, *supra* note 23, at 136a–136b; LAMBARDE, *supra* note 152, at 233 (Book I, ch. 22) ("And it resteth in the discretion of the Justices [of the Peace] and Shirife or Undershirife how many, or, how fewe, they will have assist them . . . ."); PULTON, *supra* note 152, at 29a ("[S]aid Justices [of the Peace] and Shirife may take so many to assist them as they thinke good to arrest the offenders, and to cary them to the Gaole."); WEBB, *supra* note 113, at 252 ("of such a Number in his Discretion shall appear necessary").   Dalton noted a case in which a sheriff's bailiff in order to execute a replevy "tooke with him three hundred men armed (*modo guerino*) with Brigandines, Jacks, and Gunness, and it was holden lawfull."   DALTON, *supra* note 23, at 136b; DALTON, *supra* note 105, at 314.   The case was cited by many subsequent commentators.

[254] Statute of Winchester, 1285, 13 Edw. 1, stat. 2; Patton v. State, 86 S.W.2d 774 (Tex. Crim. App. 1935); DALTON, *supra* note 105, at 31; *see also* WEBB, *supra* note 113, at 294 ("In the Execution of his Office he may arm himself, and his Assistants, with Arms offensive and defensive . . . .").

[255] DALTON, *supra* note 23, at 14b.

[256] *Id.* at 136b; HAWKINS, *supra* note 150, at 161; *see also* CROMPTON, *supra* note 161, at 62.

Pl.1201

Benjamin Cardozo explained in 1928.[257]   However, the person who is summoning the posse has "discretion" as to "how many, or few, they have to attend them in their business, and in what form they shall be armed, weaponed, or otherwise furnished for it."[258]

As will be detailed below, Colorado sheriffs' policies for posse armament vary depending on the circumstances and the exigencies of the situation.   Usually, Colorado posses are used in situations where advance planning and training are possible.   Sometimes, the sheriff prefers that they not be armed, as when providing gate security at a county fair.   Other sheriffs might allow posse members in such a situation to carry a handgun if the person has a concealed handgun carry permit; the posse member would simply carry whatever handgun he or she usually carries for lawful protection.   At other times, posses are deployed in higher-risk environments.   These trained members may be called upon, for example, to assist in the service of high-risk warrants, or in a hostage siege.   For such posse members, the sheriffs' policies may be prescriptive about particular arms to be carried.   Finally, there are situations in which the citizens of a county may need to provide assistance on an ad hoc basis in an emergency, such as the manhunts for the escaped serial killer Ted Bundy or for the murderers of the Hinsdale County Sheriff.[259]   Then, the citizens simply bring whatever arms they happen to own.

As a general policy, it is often best when posse members have the same types of firearms as those carried by a full-time certified sheriff's deputy.   Having similar arms means that in an emergency, the firearms, magazines, and ammunition are interchangeable.   For example, if a deputy runs out of ammunition, a posse member can quickly provide a fresh magazine that will fit the deputy's gun.

Broadly speaking, compatibility with American law enforcement firearms would mean the following:

- For handguns, a full-size (not compact or subcompact)[260] semiautomatic pistol in the calibers of 9mm, .40, or .45, made by a reputable manufacturer

---

[257] "A person, who, after having been lawfully commanded to aid an officer in arresting any person, or in re-taking any person who has escaped from legal custody, or in executing any legal process, willfully neglects or refuses to aid such officer is guilty of a misdemeanor."   Babington v. Yellow Taxi Corp., 164 N.E. 726, 727 (N.Y. 1928) (citing Penal Law (Consol. Laws, c. 40) § 1848.).

[258] DALTON, *supra* note 23, at 136b; DALTON, *supra* note 105, at 101, 313.

[259] *See infra* Parts III.A.1 and III.A.2.

[260] For modern semiautomatic handguns, typical barrel lengths are about three inches up to five or six inches. Some grips can accommodate all four fingers, while some can only fit three fingers. The longer barrels and a full-hand grip would characterize a full-size handgun. A three-inch barrel for a three-finger grip would be a subcompact. The dividing lines between full, compact, and subcompact do not have formal definitions.

Pl.1202

such as Smith & Wesson, Glock, or Ruger.  Some sheriffs' offices may use a standardized .40 caliber only.

- The magazines for such firearms generally hold up to twenty or twenty-one rounds in 9mm, up to sixteen rounds in .40, and up to thirteen in .45 caliber. A sheriff's office may or may not allow the use of extenders to add one to three rounds of ammunition capacity.

- A person should carry at least two spare magazines.[261]  For rifles, an AR-15 platform semiautomatic rifle in .223 or .308 caliber.

- For the rifle, a magazine of twenty or thirty rounds, although a few allow the choice of ten.

- For shotguns, a pump-action shotgun, most commonly the Remington 8700, at least two spare magazines of the same size.[262]

The above are not the firearms of tactical officers such as "SWAT" or "emergency services."  These special teams often use machine guns, stun grenades, and the like.  Rather, the aforesaid arms such as the 9mm handgun or the AR-15 rifle are the typical firearms of an ordinary deputy on road patrol, ready to face a wide variety of possible situations.

### III. COLORADO SHERIFFS AND THEIR POSSES

This Part describes the use of *posse comitatus* in modern Colorado. Most of the materials presented are based on interrogatory and document production discovery responses from sheriffs' offices in the case of *Colorado Outfitters Association et al. v. Hickenlooper*.[263]  In that case, fifty-five of Colorado's sixty-two elected county sheriffs, as well as other plaintiffs, have filed a federal civil rights lawsuit against two gun bills passed by the Colorado legislature in March 2013.  The plaintiffs contend

---

[261] Nationally, 100% of sheriffs' offices authorize sworn personnel to use a semiautomatic handgun as the primary duty sidearm; 22% allow the choice to use a revolver instead.  For a backup weapon, the semiautomatic pistol is authorized by eighty percent, and the revolver by 52%.  ANDREA M. BURCH, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, NO. NCJ 238558, SHERIFFS' OFFICES, 2007—STATISTICAL TABLES, 13 (2012) (Table 28).

[262] The above is based on the author's experience based on representing law enforcement and law enforcement training organizations in numerous cases, including as amici in *District of Columbia v. Heller* and *McDonald v. Chicago*, and on the author's participation as an instructor at the annual meetings of the International Law Enforcement Educators and Trainers Association (ILEETA).  Information about modern American law enforcement choices for firearms can be found at the ILEETA website, http://www.ileeta.org, the website of the International Association of Law Enforcement Firearms Instructors, http://www.ielefia.com, the websites of the many state associations of law enforcement firearms instructors, and the products page of the law enforcement news website PoliceOne.com, http://www.policeone.com/police-products/firearms/.

[263] *See* text accompanying notes 284–318.

Pl.1203

Case 3:19-cv-01226-L-AHG   Document 136-6   Filed 03/15/24   PageID.17509   Page 55 of 109

that the bills violate the Second Amendment, the Fourteenth Amendment, and the Americans with Disabilities Act.[264]  I am the attorney for the fifty-five sheriff plaintiffs and for one retired police officer.[265]

This Part first provides the definitions and legal standards for various types of peace officers in Colorado.  Section A then details some modern uses of the *posse comitatus* in Colorado during crime emergencies.  The remainder of Part III describes a relatively new development in the *posse comitatus*: sheriffs using a posse of trained volunteers on a regular basis.  Section B briefly describes volunteer posse use for routine non-crime situations, such as providing security at a parade or fair.  Section C summarizes how Colorado sheriffs use their trained posses for violent crime control.  Finally, Section D describes a civic organization called the Colorado Mounted Rangers, whose members train to high standards, and who make themselves available as *posse comitatus* to the twenty-eight law enforcement agencies with whom they have memoranda of understanding.  Sheriffs and other chief law enforcement officers call out the Colorado Mounted Rangers during fire emergencies and in many other situations.

Let us begin by describing some terms for persons who serve Colorado in law enforcement.  Most states have analogous statutes or rules.  A "certified" or "sworn" officer is a person who has completed a certain number of hours of training pursuant to the statewide standards for Peace Officer Standards and Training (POST).  The training may be provided by law enforcement offices themselves, by community colleges, or by some other institution.  A person who has completed the course of instruction and passed a test thereon is eligible to be hired as a full-time certified peace officer.  A person who completes a shorter course of training is eligible to be a "reserve" officer.  Reserve officers typically serve as volunteers for a local law enforcement agency and are called to duty as necessary.  Reserve officers are "peace officers" for all legal purposes in Colorado.[266]

---

[264]  Plaintiff's Trial Brief at Civil Action No. 13-CV-1300-MSK-MJW, *Colorado Outfitters Ass'n. v. Hickenlooper*, (D. Colo. Mar. 14, 2014), *available at* http://coloradoguncase.org/Colorado-Outfitters-plaintiffs-pretrial-brief.pdf, *archived at* http://perma.cc/7U7E-HBT7.

[265]  The major filings in the case are available at http://www.ColoradoGunCase.org.  A nine day trial in the case concluded on April 9, 2013, and District Judge Marcia S. Krieger ruled against the plaintiffs on June 26, 2014.  In November 2012, the District Court had ruled that the "political subdivision doctrine" precludes standing for the sheriffs in their official capacities.  The court allowed eleven sheriffs who will be retiring in January 2015 to join the suit in their individual capacities as American citizens.  The case is presently on appeal to the Tenth Circuit, including on the sheriff standing issues.

[266]  COLO. REV. STAT. §§ 24-31-301, 24-31-305 (2013).  The minimum number of required hours for full Peace Officer Standards and Training certification in Colorado is 540; however, all the programs include many more hours than that. For the reserves, a minimum

Pl.1204

By the practices of all Colorado sheriffs' offices, every full-time deputy who is engaged in dealing with the general public (e.g., road patrol, detective work, undercover) will be a POST-certified officer who has passed a 1,500-hour course. These full-time employees may sometimes be supplemented by volunteer reserve officers. By Colorado statute (and by common law), sheriffs have the authority to hire and fire whomever they like, and to summon posses.[267]   Unlike in a municipal police department, sheriffs' deputies are not part of the civil service and do not engage in collective bargaining.

Based on available manpower, sometime sheriffs hire "noncertified" full-time deputies for more limited roles. The most common such role is being a jail deputy ("detention deputy").[268]   Other duties include providing security at courts and for the transport of prisoners, and in special situations, such as guarding a trial witness or a victim who has received death threats.

Not all jail deputies carry firearms, while deputies in these other roles typically do. Any deputy (whether certified or noncertified) who carries a firearm must periodically "qualify" with the firearm. That is, the deputy must pass a firearms shooting proficiency test. All offices require qualification before first using a gun; some offices require requalification annually and others require it several times a year. The particular form of the shooting qualification test and the required score are determined by the sheriff or by a deputy to whom he or she delegates the standard-setting. Some offices provide noncertified deputies with firearms; some offices allow or require deputies to provide their own firearms. Some offices have rules that allow noncertified deputies to carry guns depending on the deputy's experience or other factors.

At least seventeen county sheriffs' offices have organized posses, composed of citizen volunteers.[269]   Some posse members are certified reserve peace officers, but most are not. All posse members are trained by

---

of 253 hours of training is required. Telephone conversation with Sarah J. Bouma, Operations Assistant, Independence Institute, and Lori Jencks, Administrative Assistant for Colorado POST (June 11, 2014).

[267]   COLO. REV. STAT. §§ 16-2.5-103(2), 30-10-506 (2013).

[268]   See, e.g., Pl.'s Resp. to Def.'s Interrog. No. 4 (James L. Beicker, Sheriff of Fremont County).

[269]   Counties with posses include Adams, Alamosa, Baca, Custer, Grand, Hinsdale, Larimer, Lincoln, Logan, Mesa, Montezuma, Montrose, Morgan, Prowers, Rio Blanco, Teller, and Weld. See Section A, infra. Of these, the most populous are Adams County (460,000), Larimer County (310,000), Weld County (264,000), and Mesa County (148,000). These four counties comprise over one-fifth of the Colorado population. State & County Quick Facts, Colorado, U.S. CENSUS BUREAU (Mar. 27, 2014), http://quickfacts.census.gov/qfd/states/08000.html, archived at http://perma.cc/B7XJ-Q8J9.

Pl.1205

the sheriff's office and are required to follow regulations promulgated by the sheriff. Posses perform a wide range of duties based on the determination of the sheriff. For posse members who are allowed to carry firearms, they are almost always required to pass the same firearms qualification as full-time deputies, and they have usually been given firearms training by the sheriff's office.

The organized and trained posse is an important development in the story of the *posse comitatus*. A sheriff's *posse comitatus* authority, from Anglo-Saxon England to the modern United States, includes the authority to summon all able-bodied men. In modern Colorado, sheriffs have used only volunteers for their posses. Further, while there have sometimes been emergencies when a brand new posse is assembled (e.g., the incidents in Pitkin County, Hinsdale County, and Rio Blanco County[270]), the more common practice is that the posse volunteers are a particular group of individuals who have volunteered and undergone training and now assist the sheriff's office in a wide variety of ways. The need for assistance is sometimes known in advance (e.g., gate security at the county fair), or it may arise suddenly (e.g., a hostage situation or a wildfire). Regardless, the possemen and possewomen who assist in such situations are people who have previously come forward to volunteer for long-term service in the posse and who have received training appropriate for their duties.

Universally, the only rifle or handgun ammunition allowed is jacketed hollowpoint cartridges. The copper jacket surrounding a lead bullet reduces lead fouling in the firearm, and thereby reduces the risk of misfeeds or malfunctions. Hollowpoint bullets are designed to open up when they impact the target. This substantially reduces the risk that the bullet might overpenetrate (exit the target) and thereby endanger an innocent bystander. Because hollowpoints do not exit the target, all their kinetic energy is expended in the target. This significantly increase the possibility of delivering a "fight-stopping hit" that makes the target unable to inflict injury on whomever is being threatened.[271]

As will be described below, in addition to the posses organized by a particular sheriff's office, there is a statewide civic organization called the Colorado Mounted Rangers. The Rangers are ordinary citizens who train themselves to very high standards (in accordance with the POST curriculum). They have memoranda of understanding to provide aid to local law enforcement agencies upon request; that aid may include

---

[270] *See infra* text accompanying notes 272–86.

[271] Joshua F. Berry, *Hollow Point Bullets: How History Has Hijacked Their Use in Combat and Why It Is Time to Reexamine the 1899 Hague Declaration Concerning Expanding Bullets*, 206 MIL. L. REV. 88, 137–42 (2010).

Pl.1206

everything from crowd management at a parade to backcountry search and rescue.  Many but not all of the Rangers are armed.  They carry the same handguns and rifles as described in the preceding paragraphs.

Finally, there are sometimes situations in which the sheriffs need to call upon the armed assistance of whatever armed citizens may be available in an emergency.  Such situations range from manhunts to securing a burglarized building to deterring looting after a natural disaster.  Specific details of all the above situations are described in the next Section.

## A. *POSSE COMITATUS* IN CRIME EMERGENCIES

### *1. Pitkin Sheriff's Office*

Ted Bundy was perhaps the most notorious serial killer in American history.  Before his execution in 1989, he confessed to thirty murders, which were often accompanied by rape and torture of the victims.[272]  On June 6, 1977, Bundy jumped out a courthouse window during a break in a preliminary hearing at a state court in Aspen, Colorado.[273]  A posse was immediately assembled. As one author observed, "[t]he men who tracked Ted Bundy looked like something out of a Charles Russell or Frederick Remington painting, garbed in Stetsons, deer-skin vests, jeans, cowboy boots, and carrying sidearms.  They could have been possemen of a century earlier, looking for Billy the Kid or the James boys."[274]  Some "[p]ossemen in high-country rigs and on horseback started up the mountain roads around Aspen that afternoon . . . ."[275]  Other "deputies and volunteers made a house-by-house search" through Aspen.[276]  By June 10, the FBI had joined the manhunt.  The number of other searchers (certified law enforcement plus the posse) had declined from 150 to 70, given the feeling that Bundy was by then long gone from Pitkin County.[277]

Bundy, in the meantime, had broken into a mountain cabin in Castle Creek (just south of Aspen), and stolen some clothing and provisions.[278]  His effort to head south to get to U.S. Highway 50 was cut off by the snowpack that remained in the high mountains even in the late spring.  On June 10, he headed back to the Castle Creek cabin, but saw that the posse

---

[272]  This is the one incident in Part III for which the information was not produced as a result of sheriff responses to discovery in the Colorado sheriffs' case.  The Pitkin County Sheriff is one of seven elected Colorado sheriffs who did not file suit as a plaintiff.

[273]  RICHARD W. LARSEN, BUNDY: THE DELIBERATE STRANGER 179–82 (1980).

[274]  ANN RULE, THE STRANGER BESIDE ME 219 (2000).

[275]  LARSEN, *supra* note 273, at 182.

[276]  RULE, *supra* note 274, at 219.

[277]  *Id.* at 220.

[278]  *Id.* at 221.

Pl.1207

Case 3:19-cv-01226-L-AHG   Document 136-6   Filed 03/15/24   PageID.17513   Page 59 of 109

was already there.[279]  He snuck away, hungry and exhausted, suffering from the broken ankle that had resulted from his jump out of the courthouse window.[280]  After a night in the cold wilderness, Bundy found a Cadillac with the keys in the ignition.  By 2 A.M. on June 13, he was driving down Colorado Highway 82 on his way to Interstate 70, and from there, to a completed escape.[281]  But he was so exhausted he drove poorly, weaving around the road.  Some deputies on road patrol stopped the apparently drunk driver and immediately recognized that they had just apprehended Ted Bundy.[282]

A return to the Castle Creek cabin with its food and shelter would have restored some of Bundy's energy, perhaps sufficiently so that he would have been able to drive the stolen car without attracting attention to himself.  Had he made good on the final step of his escape, more young women would very likely have been the next victims of the serial killer.  Bundy escaped again on December 30, 1977, and he was not recaptured until February 12, 1978, in Pensacola, Florida.  In the interim, he had murdered three women.  Thus, the posse's success in thwarting his June 1977 escape very likely saved innocent lives.

### 2. Hinsdale Sheriff's Office

Hinsdale County is the most remote county in the lower forty-eight states and "contains some of the most rugged mountains in Colorado."[283]  As detailed *infra*, the Hinsdale County Sheriff's Office has a regular posse with trained volunteers.  But on one occasion, a much larger posse was needed.  Hinsdale Sheriff Ron Bruce described the events in that county of November 1994 in a series of answers to interrogatories.[284]

In 1994, Hinsdale Sheriff Roger Coursey was short-staffed.  In fact, he was the office's only law enforcement officer.  Not long before, there had been much upheaval in the Sheriff's Office, with the former sheriff and undersheriff having been indicted by the U.S. Attorney for illegal electronic surveillance.  The Board of County Commissioners appointed Deputy Roger Coursey Sheriff in August 1994.  He was elected to a four-year term that November.

---

[279] *Id.*

[280] *Id.*

[281] *Id.*

[282] *Id.* at 221–22.

[283] John Duer Irving & Howard Bancroft, *Geology and Ore Deposits near Lake City, Colo.*, U.S. GEOLOGICAL SURVEY BULLETIN 478, at 10 (D.C.: G.P.O. 1911).

[284] All information in Subsection 2 is taken from Pl.'s Resp. to Def.'s Interrog. (Ron Bruce, Sheriff of Hinsdale County).

Pl.1208

Sheriff Coursey reached out for the best help he could find in the most thinly populated county in Colorado. Ray Blaum was a retired Air Force Lieutenant Colonel and was willing to serve. Mr. Blaum was appointed Undersheriff and became a salaried employee of the Hinsdale County Sheriff's Office. Mr. Blaum was not POST-certified. For a duty sidearm, Mr. Blaum used a Beretta semiautomatic pistol, which he already personally owned.

At about 5:35 A.M. on the morning of November 18, 1994, the Sheriff's Office received a phone call from the Mineral County Sheriff's Office: there had been an attempt to break into a bank in Creede. The bank manager had observed a light colored pick-up truck with a camper shell fleeing north on Highway 149, towards Lake City, the only incorporated municipality in Hinsdale County. Sheriff Coursey and Undersheriff Blaum got into their respective patrol cars and drove to Highway 149. The robbers' vehicle was stopped shortly before 5:50 A.M. near Highway 149, in the driveway of the Alferd Packer Massacre Site.

Sheriff Coursey and Undersheriff Blaum took positions outside the robbers' vehicle. They ordered the suspects (one male and one female) to exit the vehicle. The male suspect fired one shot with a .44 revolver, killing Sheriff Coursey nearly instantly. As the vehicle fled, Undersheriff Blaum emptied the thirteen rounds of his Beretta semiautomatic towards the vehicle. Apparently he had loaded the Beretta with a short stack. Instead of having the full capacity of seventeen rounds in the magazine, plus one in the firing chamber, the gun had only twelve rounds in the magazine plus one in the chamber.

In a report immediately thereafter, Undersheriff Blaum described his shots as having "no apparent effect." In fact, all thirteen shots hit the truck. Most of the shots were absorbed by the camper shell, protecting the suspects inside the cab. But at least one shot hit a tire. The truck was abandoned within a couple miles of the scene of the crime.

The trail of the suspects' footprints in the snow, leading away from the truck, ran out after four and one-half miles when it intersected a dirt road. Bloodhounds attempted to follow the scent, but never succeeded. During the manhunt for two suspects, over one hundred local citizens were sworn in to assist the approximately two hundred law enforcement officers in conducting the search. Regarding the latter, Gunnison County Sheriff Rick Murdie and Gunnison Chief of Police Stu Ferguson were a significant help.

During this time, almost everyone in Lake City was carrying one kind of gun or another and usually more than one. Several hundred buildings and the surrounding land mass was searched without any report of a single shot being fired. There is no information on the firearms and magazines since they ran the gamut of nearly everything available at the time.

Pl.1209

After the manhunt had gone on for a month, on December 17, 1994, the suspects were both found dead not far from their abandoned truck. They had killed themselves not long after the crime, when they failed their attempt to climb the treacherously steep mountain.  Their bodies were concealed underneath the low branches of a tree.  Given the location of the bodies, the suspects had likely seen that the manhunt was in progress. Undersheriff Blaum's shot to the tire had ended the suspects' multistate crime spree, which had begun in Provo, Utah, on June 21.  The murderer, Mark Allen Vredenburg, had been a career criminal; his accomplice, Ruth Slater, an extreme alcoholic and abuser of prescription drugs. Vredenburg had used the revolver to kill Ruth Slater and then himself.[285]

The large citizens' posse aided in preventing the murderers from escaping.  Given that there were two people at large who were apparently ready to kill, it would have been foolish for individuals to go out on a manhunt alone or even in pairs.  The searchers had to operate in groups, so the armed citizen volunteers significantly increased the number of groups that could be in the field.

We will never know exactly how the killers perceived their tactical situation at the end, but it is reasonable to infer that the presence of so many groups of armed searchers in the field made it clear to the killers that there was no possibility of sneaking out through any accessible path, and no possibility of shooting their way past so many armed people.  Accordingly, the killers determined that their only possibility of escape was to climb a very steep mountain under difficult winter conditions.  When this proved impossible, the killers committed suicide.

### 3. Rio Blanco Sheriff's Office

Sheriff Si Woodruff recounted Rio Blanco County's experience with posse use.[286]  On September 8, 2003, two men in a stolen car fled on foot from a traffic stop.  The Sheriff deputized two individuals to assist the nighttime manhunt, allowing the deputies to get some rest. The posse members were previously known to the Sheriff's Office as very experienced

---

[285] Newspaper articles about the events include: Michael Booth, *Sheriff's Killers Left Note*, DENVER POST, Dec. 23, 1994, at 1B; Charlie Brennan, *Pair Sought in Slaying of Sheriff*, ROCKY MOUNTAIN NEWS, Nov. 19, 1994, at 6A; *Colorado Sheriff Killed in Pursuit*, FRESNO BEE, Nov. 20, 1994; Fawn Germer, *Grisly Discovery Lifts Burden*, ROCKY MOUNTAIN NEWS, Dec. 19, 1994, at 5A; Greg Lopez, *The New Sheriff*, ROCKY MOUNTAIN NEWS, Dec. 11, 1994, at 16A; *Mountain Avenges Sheriff*, NEW ORLEANS TIMES PICAYUNE, Dec. 20, 1994; Marilyn Robinson et al., *Sheriff's Killers Hunted*, DENVER POST, Nov. 19, 1994, at 1A; Tracy Seipel, *Dogs Sniffed out Suspects*, DENVER POST, Dec. 19, 1994, at 1A.

[286] All information in Subsection 3 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Si Woodruff, Sheriff of Rio Blanco County).

Pl.1210

pistol and rifle shooters. They had had Glock .40 handguns, AR-15 rifles, shotguns, and perhaps other arms. They joined the Sheriff's Office in an Office vehicle, assisting with patrol of the highway and operating the thermal vision camera. Both suspects were apprehended with no shots fired.

### 4. Jackson Sheriff's Office

Sheriff Scott Fischer reported that an armed posse was used after a jailbreak in September of 2003 or 2004, where the inmate fled to the town limits of Walden.[287]

### 5. Larimer Sheriff's Office

Erik Nilsson, presently an employee of the Sheriff's Office, recalled being deputized for *posse comitatus* service following the July 31, 1976, Big Thompson River flood.[288] At the time, Mr. Nilsson was a civilian member of the Larimer County Mountain Rescue Team. On August 4, 1976, he was transported by helicopter to the small town of Drake, which is located in a canyon. He acted as a visible law enforcement presence to maintain order and deter looting, and carried a loaded firearm.

In late June and early July 2012, during the High Park fire, Sheriff Justin Smith was prepared to use *posse comitatus* to provide armed security in evacuated areas, because the Colorado National Guard had to demobilize before the fire was fully contained. However, the weather changed quickly and the fire was contained before armed citizens were necessary.

During the September 2013 floods and aftermath, Sheriff Smith exercised *posse comitatus* authority on three occasions. On September 14, he deputized members of the Glenhaven Volunteer Fire Department to provide protection to the firefighters or the citizens of that community. On September 18, he deputized fire department personnel present in the Storm Mountain community above Drake. Later that day, he deputized a citizen who was assisting a Colorado State Trooper (who was a trapped resident of the neighborhood).

The *posse comitatus* deputizations were used because of concerns about the risk of looting and other disorder. The *posse comitatus* members had full authority to carry firearms in the performance of those duties as they saw necessary.

---

[287] Pl.'s Resp. to Def.'s Interrog. (Scott Fisher, Sheriff of Jackson County).

[288] All information in Subsection 5 is taken from Pl.'s Resp. to Def.'s Interrog. (Justin Smith, Sheriff of Larimer County).

Pl.1211

### 6. Morgan Sheriff's Office

Sheriff Jim Crone recalled that when he was a deputy:

> I was involved in a specific incident in March of 1985 where I was in pursuit of a stolen vehicle from Texas. The vehicle left the roadway and went cross-county into Adams County, and we were unable to pursue due to having no four-wheel drive vehicles. A local rancher offered himself and his pickup so he and I could follow the vehicle's tracks through the snow (in the middle of a blizzard at night). Locating the pickup, the rancher pursued it back into Morgan County.

> We went across country for several minutes and went back into Adams County. After the stolen pickup rammed us and I fired a shot into the front of the pickup, it stopped shortly thereafter. I gave the rancher my shotgun and had him cover me while I arrested both occupants of the pickup. The rancher fired no shots but stood armed, in view of the suspects, as my backup. I made the arrests alone in a remote area in which road signs were covered with snow and my radio could not reach out to the other cars looking for us.[289]

While citizen assistance in chases of suspects is rare, Sheriff Crone also noted the more common scenarios in which armed citizens,

> usually local farmers or ranchers, back us [sheriffs] up when involved with a combative suspect, a felony stop, or a crime in progress. In these instances, the citizens had told us they had ready access to a firearm (inside the house, vehicle, or on their person), if so needed.

> When searching a private residence or a business where a burglar alarm has gone off, I have had instances where an armed home/business/property owner has accompanied me while armed with a handgun, when I had no backup close at hand.

So when Sheriff Crone is the only law enforcement officer at crime scenes and has to clear a building, not knowing whether he will encounter violent criminals waiting to ambush him, he has been backed up by citizens armed with their personal handguns.

### B. *POSSE COMITATUS* IN LOW-RISK SITUATIONS

The posse of the Weld County Sheriff's Office is divided into various classes, depending on whether the posse member is a POST-certified Reserve officer, and on whether the posse member can provide his or her own horse.[290]

The large majority of posse members who are not POST-certified do not carry firearms while on duty, although there is a "Special Deputy"

---

[289] All information in Subsection 6 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Jim Crone, Sheriff of Morgan County).

[290] Pl.'s Resp. to Def.'s Interrog. No. 3 (John Cooke, Sheriff of Weld County).

Pl.1212

program to allow a few of them to do so.[291]  The situations in which the unarmed posse members assist the sheriff's office include:

> The Greeley Independence Stampede, The Farm Show, The County Fair, and The Cattle Baron's Ball.  Other miscellaneous events they assist with include United Way events, Pheasants Forever, sporting events, UNC Graduation, Rocky Mountain Senior Games, community celebrations, assisting other agencies when needed, Ducks Unlimited, election security, school events, Law Enforcement and Military memorial ceremonies, National Drug Take Back day, children's safety events, and Santa Cops.[292]

These events are typical of the event security provided by posse members throughout Colorado.

## C. TRAINED *POSSE COMITATUS* IN FORCIBLE LAW ENFORCEMENT SITUATIONS

Below are descriptions of how some sheriffs' offices have used or considered using armed posses on a regular basis.

### 1. Alamosa County Sheriff's Office

Posse members assist the day-to-day operation of the Alamosa County Sheriff's Office.[293]  After training provided by the office and after passing a qualification test, posse members are required to carry firearms.  Posse members provide their own firearms.

### 2. Baca County Sheriff's Office

The posse is typically comprised of twelve-to-twenty volunteer members, and, at the time of answering the interrogatories, had fifteen members.[294]

> The Baca County Sheriff's Posse's primary purpose is to support the Baca County Sheriff's Office during large public events, natural disasters, and incidents where the Baca County Sheriff's Office alone may be unable to provide the level of security or safety the public requires.  The Baca County Posse most frequently assists in yearly road closures for winter storms requiring manned road closures and during road closures due to large-scale fires.  During these events, their goal is to keep the public out of the area and provide scene security . . . .  Posse members are required to be armed, and they provide their own firearms.

---

[291] *Id.*; Cooke's Dep. 218:20–220:5, Oct. 23, 2013.

[292] Pl.'s Resp. to Def.'s Interrog. No. 3 (John Cooke, Sheriff of Weld County).

[293] All information in Subsection 1 is taken from Pl.'s Resp. to Def.'s Interrog. No. 4 (Dave Stong, Sheriff of Alamosa County).

[294] All information in Subsection 2 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Dave Campbell, Sheriff of Baca County).

Pl.1213

### 3. Custer County Sheriff's Office

The Custer County Sheriff's Office posse was established April 2, 2003. "The posse assists with parades, traffic control, crowd control, road closures, searches, inmate transfers and detention detail."[295]   It has also assisted with searches for escaped inmates, fugitives, or missing persons; with watching inmates; in searches and in the service of search warrants; in a hostage situation; in drug surveillance of a house; and in guarding the home of a teacher who had received death threats.  There is a limit of forty members, and currently twenty-five are certified to carry handguns, while sixteen are additionally certified to carry shotguns.  Posse members receive firearms training from the Custer County Sheriff's Office; they are not required to be POST-certified.

### 4. Delta County Sheriff's Office

"After the 9-11 terrorist attacks [the Delta County Sheriff's Office] considered deputizing non certified personnel to provide security for infrastructure in our county, mines, railroad, dams, etc." This was not acted upon.[296]

### 5. Douglas County Sheriff's Office

As of 1975, the office had a posse and a special deputies program.[297] Members would provide backup on a call when needed (especially at night); assist with search and rescue (notably, on horseback in the mountains); or provide security at events.   They provided their own firearms, vehicles, horses, and so on.  The most common firearms were .38 or .357 revolvers.  The programs were dissolved during the administration of Sheriff Zotos (1983–2002).

### 6. Elbert County Sheriff's Office

The posse was removed by the previous Sheriff of Elbert County and has been restored by the current Sheriff.[298]  Posse members serve as a force multiplier for the Office.[299]  For example, they have guarded the scenes of the small plane crashes.[300]   At present, the posse has been trained and

---

[295] All information in Subsection 3 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Fred Jobe, Sheriff of Custer County).

[296] Pl.'s Resp. to Def.'s Interrog. No. 4 (Fred McKee, Sheriff of Delta County).

[297] All information in Subsection 5 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (David Weaver, Sheriff of Douglas County).

[298] Heap Dep. 99:2–6, Oct. 16, 2013 (Shayne Heap, Sheriff of Elbert County).

[299] *Id.* at 99:12.

[300] *Id.* at 102:6–16.

Pl.1214

qualified in the Office's use of force practices for everything except firearms. The Sheriff expects to issue new policies providing for the training, qualification, and use of firearms by the posse.[301]

### 7. Hinsdale County Sheriff's Office

Currently, the Hinsdale County Sheriff's Office receives armed volunteer services from six men who are not POST-certified. Two of them are retired Air Force Colonels.[302] The volunteers get the same in-house training as do the sworn office staff. All of the Hinsdale County Sheriff's Office volunteers are encouraged to carry a firearm when in the field; they are required to have completed a concealed handgun permit class and qualification. Some Hinsdale volunteers have been issued patrol carbines with either a thirty or sixty round magazine; sometimes "they have provided their own carbine with the same capacity magazines." The Office trains "with standard capacity magazines for our carbines and select-fire firearms, up to and including sixty-round magazines." "Most [non-sworn staff] also personally own such firearms, including select-fire firearms (BATFE licensed)."

### 8. Kiowa County Sheriff's Office

The Kiowa County Sheriff's posse is used for search and rescue, traffic control, and to man road closure sites.[303]

### 9. Lincoln County Sheriff's Office

The Lincoln County Sheriff started a posse in 2007 for events, evidence searches, and missing person searches.[304] There are currently twenty members. The posse has also been deployed for gate security at the annual Lincoln County Fair. Posse members are authorized for ride-alongs with certified deputies. Posse members are allowed, but not required, to carry a handgun (of the same types authorized for sworn deputies) if the posse member has been through concealed carry training. Additional training for them is available through a simulator.

---

[301] *Id.* at 97:8–101:22

[302] All information in Subsection 7 is taken from Pl.'s Resp. to Def.'s Interrog. No. 4 (Ron Bruce, Sheriff of Hinsdale County).

[303] Pl.'s Resp. to Def.'s Interrog. No. 3 (Forest Frazee, Sheriff of Kiowa County).

[304] All information in Subsection 9 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Tom Nestor, Sheriff of Lincoln County).

Pl.1215

### 10. Logan County Sheriff's Office

Created in approximately 1960, the Logan County Sheriff's posse currently has fifteen members.[305]  The posse's duties are to perform "security for local sports activities, county fair, occasional medical security on an inmate, or any other duties assigned to them by the sheriff.  They are required to go through firearms training and qualify quarterly."  The current captain is a certified peace officer who is not an employee of the county.

### 11. Montezuma County Sheriff's Office

Created in 1968, the Montezuma Sheriff's posse currently has twenty-nine members and assists the office with law enforcement and search and rescue missions.[306]  They also provide security for community events, guard crime scenes, and have also assisted with court security and the transportation of inmates.  Posse members may carry a firearm as permitted or required by the sheriff.  Each posse member must complete a mandatory basic firearms training course and a qualification test.  They furnish their own firearms in accordance with office standards.[307]

### 12. Morgan County Sheriff's Office

At present, the posse has one member, who does not carry a firearm.  He assists deputies directing traffic at accident scenes, handcuffing a suspect when ordered by a deputy, and so on.  The Sheriff is in the early stages of a creating a new policy which would enlarge the posse and would allow posse members to carry arms.[308]

### 13. Prowers County Sheriff's Office

The posse has fifteen members, four of whom are certified reserve peace officers, and eleven of whom are noncertified members.[309]  Posse members may be issued a Glock .40 handgun.[310]

### D. THE COLORADO MOUNTED RANGERS

Some armed citizens have long-running close relationships with the sheriffs to provide aid.  One such group is the Colorado Mounted Rangers

---

[305]  All information in Subsection 10 is taken from Pl.'s Resp. to Def.'s Interrog. No. 3 (Brett L.  Powell, Sheriff of Logan County).

[306]  All information in Subsection 11 is taken from Pl.'s Resp. to Def.'s Interrog. Nos. 3, 6 (Dennis Spruell, Sheriff of Montezuma County).

[307]  Pl.'s Resp. to Def.'s Interrog. No. 3 (Dennis Spruell, Sheriff of Montezuma County).

[308]  Pl.'s Resp. to Def.'s Interrog. No. 4 (Jim Crone, Sheriff of Morgan County).

[309]  Pl.'s Resp. to Def.'s Interrog. No. 4 (Jim Faull, Sheriff of Prowers County).

[310]  *Id.*

Pl.1216

(also known as the Colorado Rangers).[311]  The Colorado Mounted Rangers were founded in 1861 and for many decades were the only statewide law enforcement organization.[312]   They were recently recognized by state statute.[313]

The Colorado Mounted Rangers provide approximately 50,000 hours of community service during a typical year.  This amounts to a contribution of over $2 million of law enforcement resources, at no cost to the taxpayer.  They are an unpaid, volunteer organization.[314]   The Colorado Mounted Rangers currently have Memoranda of Understanding to provide support to numerous law enforcement agencies in Colorado.[315]

One of the important posse roles of the Colorado Mounted Rangers is aiding law enforcement officers during forest wildfires.  For example, in the summer of 2013, the Colorado Mounted Rangers provided forest roadblock support for the Douglas and Jefferson County Sheriffs' Offices during the Lime Gulch Fire.[316]  Likewise, in Fremont County, the Rangers have been used during four wildfires in the last decade to close roads and maintain roadblocks.[317]

---

[311] This Section is based on the deposition of Major Ronald Abramson, who is head of Training for the Colorado Mounted Rangers, and on documents produced by the Colorado Mounted Rangers.  Abramson Dep., Oct. 23, 2013.

[312] *Id.* at 7:19–23.

[313] COLO. REV. STAT. § 24-33.5-822 (2013) (specifically authorizing law enforcement agencies to enter into memoranda of understanding with the Colorado Mounted Rangers).

[314] *Colorado Mounted Rangers*, COLORADO MOUNTED RANGERS, https://www.coloradoranger.org/index.php/organization, (last visited May 26, 2014), *archived at* https://perma.cc/Z2XE-BA5V.

[315] *Id.*  **Sheriff's Offices** (SOs): Archuleta County SO, Crowley County SO, Douglas County SO, Fremont County SO, Kiowa County SO, La Plata County SO, Weld County SO; **Police Departments** (PDs): Ault PD, Durango PD, Elizabeth PD, Fairplay PD, Fort Lupton PD, Fowler PD, Green Mountain Falls Marshal, Manitou Springs PD, Rocky Ford PD, Salida PD, Windsor PD; **County Governments**: Adams County Office of Emergency Management, Teller County; **Municipal Governments**: Town of Bayfield, Town of Monument, Town of Ordway, Town of Palmer Lake; **Fire Protection and Other**: Canon City Area Fire Protection District, Community College of Aurora.  *Id.*

[316] Pl.'s Resp. to Def.'s Interrog. No. 6 (David Weaver, Sheriff of Douglas County).

[317] Fremont County Sheriff James L. Beicker stated:

Since January 1, 2004 I have requested the assistance of the Colorado Mounted Rangers "J Troop." The majority of these individuals are not POST certified peace officers, but my understanding is that a few members of their organization are.

I have used their assistance on four wildfires in my county: Duckett Fire/ Park Fire/ Wetmore Fire/ Royal Gorge Fire.  On these incidents they were assigned to road closures, manning road blocks for evacuated areas.

They were allowed, but not required to carry firearms for this duty.  I have no documented evidence of who did carry or did not carry during these events.

The Fremont County Sheriff's Office has also utilized the J Troop Rangers for some

Pl.1217

The Rangers go deep into Colorado's twenty-four million acres of forest for fires, for search and rescue, and for other law enforcement tasks, where they are at risk of bear, mountain lion, and coyote attacks, and other extremely dangerous conditions. Often, the Rangers are beyond any radio communication; their patrol rifle is their only protection.

The Rangers' firearm training is a modified version of the Colorado State Patrol Academy course. Many of the Colorado Mounted Rangers, and especially the female Rangers, carry the Glock 17 or Springfield Armory XD 9mm pistols.[318] As in most sheriffs' offices, the AR-15 type carbine with several magazines of thirty rounds is the standard patrol rifle for the Colorado Mounted Rangers.

## IV. *POSSE COMITATUS:* THE RIGHT—AND DUTY—TO KEEP AND BEAR ARMS

*Posse comitatus* is expressly part of the Constitution of Puerto Rico,[319] and understanding the *posse comitatus* aids in understanding the constitutions of the fifty states and of the federal government. To most Americans of the nineteenth century, the Second Amendment had been easy to understand: a right of everyone to possess and carry arms, including firearms.[320] The protection of that right ensured that there would be an

---

annual community events . . . .

Pl.'s Resp. to Def.'s Interrog. No. 6 (James L. Beicker, Sheriff of Fremont County).

[318] The Glock and Springfield 9mm handguns are very controllable for persons with smaller bodies. Most female Rangers strongly prefer these handguns. They have less recoil than larger-caliber handguns, and are thus easier for them to shoot accurately. Because the 9mm cartridge is less powerful than larger calibers, greater magazine capacity is particularly important. The Glock 17 has a standard seventeen-round magazine, while Springfields have standard magazines of sixteen or more rounds.

Many certified law enforcement officers, including certified deputies, also carry the Glock 17 9mm pistol. Commonality of arms among full-time law enforcement officers and posse volunteers makes everyone safer, allowing interchangeability of magazines in a critical incident. Transcript of Record at 861–64, Colo. Outfitters Ass'n v. Hickenlooper, No. 13-CV-1300-MSK-MJW (D. Colo. argued Apr. 3, 2014); Plaintiff's Response Brief to Defendant's Motion to Dismiss at 33–34, Cooke v. Hickenlooper (D. Colo. filed Aug. 22, 2013).

[319] CONST. P.R. art. IV, § 4 (explaining that governor may "call out the militia and summon the posse comitatus in order to prevent or suppress rebellion, invasion or any serious disturbance of the public peace"); *see also* HAWAIIAN ORGANIC ACT OF 1900, § 67 (Among the powers of the Territorial Governor are that "whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory . . ."). 31 STAT. 153 (1900), 48 U. S. C. § 532 (1940).

[320] *See* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359.

Pl.1218

armed people from whom a well-regulated militia could be drawn when necessary.[321]   The Supreme Court's decision in *District of Columbia v. Heller*[322] accurately followed that understanding.

However, for several decades in the latter twentieth century, and a few years in the early twenty-first century, there was confusion about the meaning of the Second Amendment.  Various theories were invented for the purpose of negating the individual right.  A 1905 decision by the Kansas Supreme Court interpreted the right to arms in the Kansas State Constitution Bill of Rights as merely affirming the state government's own power over the militia.[323]   In dicta, the Kansas court said that the Second Amendment meant the same thing.[324]  This was the beginning of the "states' right" theory of the Second Amendment.[325]   In 1968, the New Jersey Supreme Court announced that the Second Amendment was a "collective right."[326]  The right belonged to all the people collectively, but could never be asserted by any individual.

In 1989, Dennis Henigan, an attorney for Handgun Control, Inc., invented the "narrow individual right" theory of the Second Amendment.[327] Historian Saul Cornell later elaborated on the theory.[328]  Under the "narrow individual right," the Second Amendment is an individual right, but solely for the purpose of militia service.  If a person is not the militia, the person has no right to arms.

The *Heller* Court unanimously rejected the "states' right" and "collective right" theories which had been dominant in the lower federal courts in the latter part of the twentieth century.  The Court split five-to-four between the standard model of the Second Amendment (the Scalia majority) and the Henigan–Cornell narrow individual right (the Stevens dissent).[329]  The *Heller* Court correctly viewed the Second Amendment in

---

[321] *Id.*

[322] District of Columbia v. Heller, 554 U.S. 570 (2008).

[323] City of Salina v. Blaksley, 83 P. 619, 620 (Kan. 1905).

[324] *Id.*

[325] *See* Kopel, *supra* note 320, at 1510–12.

[326] Burton v. Sills, 248 A.2d 521, 526 (N.J. 1968).  Thus, like "collective property" in a communist country, the right nominally belonged to the people, but really belonged to the government.

[327] Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. DAYTON L. REV. 5, 47–48 (1989) ("It may well be that the right to keep and bear arms is individual in the sense that it may be asserted by an individual.  But it is a narrow right indeed, for it is violated only by laws that, by regulating the individual's access to firearms, adversely affect the state's interest in a strong militia.").

[328] SAUL CORNELL, A WELL-REGULATED MILITIA (2008).

[329] District of Columbia v. Heller, 554 U.S. 570 (2008); *id.* at 636 (Stevens, J.,

Pl.1219

Case 3:19-cv-01226-L-AHG   Document 136-6   Filed 03/15/24   PageID.17525   Page 71 of 109

the context of Anglo-American common law and of American state constitutions. As *Heller* recognized, keeping and bearing arms is a right (as protected by the Second Amendment, and its state and common law analogues), *and* it can be a duty (as in Congress's powers in Article I, Section 8, cl. 15–16 to call forth the militia, and to provide for militia training and armament, and in the militia powers of state governments).[330]

The story of the *posse comitatus* in this Article provides additional perspective on the dual nature of the right/duty to keep and bear arms. Arguments about the duty side of original meaning of the body of the Constitution and its Amendments have focused exclusively on arms bearing in the militia. This is incomplete. As detailed in Part II, the Constitution *also* gave the new federal government *posse comitatus* power.

Historically, the *posse comitatus* is broader than the militia in membership. When the state carries out its duties of training the militia, the militia is an organized body. The *posse comitatus*, however, is often ad hoc. The sheriff or other proper official can call out the posse when needed and compel service of the posse, but there is no legal theory, or historical practice, for a government official to *require* unwilling persons to undergo posse training. Of course, since the sheriff has complete discretion about who may join the posse, a sheriff can require that volunteers undergo training, and that is what all Colorado sheriffs with regular posses do.

A common phrase in early state constitutions was that the people had the right to arms "for the defence of themselves and the state."[331] Later in the nineteenth century, the phrasing changed, but the principles remained the same. For example, in Missouri and Colorado: "[T]o keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned . . . ."[332] Modern commentators have sometimes broken the phrases into a dichotomy: "themselves" means personal self-defense, and "the state" means militia service.[333] It is true that

---

dissenting) ("a right that can be enforced by individuals").

[330] *Heller*, 554 U.S. at 596, 600 n.17 (2008).

[331] *E.g.* PA. CONST. art. XIII (1776).

[332] COLO. CONST. art II, § 13.

[333] *But see* Nathan Kozuskanich, *Defending Themselves: The Original Understanding of the Right to Bear Arms*, 38 RUTGERS L.J. 1041 (2007) (arguing that "themselves" and "the State" both refer exclusively to militia service). For a pro/con discussion, see David B. Kopel & Clayton E. Cramer, *The Keystone of the Second Amendment: The Quakers, the Pennsylvania Constitution, and the Flawed Scholarship of Nathan Kozuskanich*, 19 WIDENER L.J. 277 (2010); Nathan Kozuskanich, *History or Ideology? A Response to David B. Kopel and Clayton E. Cramer*, 19 WIDENER L.J. 321 (2010) (reply article); David B. Kopel & Clayton E. Cramer, *Credentials Are No Substitute for Accuracy: Nathan Kozuskanich, Stephen Halbrook, and the Role of the Historian*, 19 WIDENER L.J. 343 (2010) (sur-reply).

Pl.1220

the phrase includes self-defense and the militia, but it is inaccurate to divide the phrase into two totally separate categories. The duty to keep and bear arms was not solely for the militia. It was also for all the other common law practices by which armed citizens aided in the protection of their communities: hue and cry, watch and ward, and, especially, *posse comitatus*. When individuals are helping local law enforcement search for an escaped serial killer, or for the people who just murdered the sheriff, or who just perpetrated some other violent felony, they are certainly helping to defend the state. But they are also defending themselves. Apprehending murderers, robbers, and rapists who have harmed a third party is one way that the individual protects himself from surprise attack by these criminals. Moreover, the reason for the creation of the state in the first place was the protection of the rights and personal security of individuals. In the American theory of government, the state has no autonomous existence prior to the individuals; the state is an artificial entity created by the people, and the state's purpose is to serve as the agent of the people in safeguarding their lives, liberty, and property. Thus, the "defense of the state" is really a form of self-defense. When you aid the state in keeping the peace, you are protecting yourself. Inseparable from the "defense of the state" (in state constitutions) or "the security of a free state" (in the Second Amendment) is preventing tyranny. Tyranny could come from a hostile foreign invader, and the people must be armed so that they can resist such an invasion, just as Alfred the Great's militia was armed for that same purpose.

Alternatively, tyranny could come from within. As James Madison wrote in *The Federalist No. 46*, armed resistance by the state militias is the emergency, last resort against central government tyranny, although tyranny might at present appear very unlikely.[334] Senator and later Vice President Hubert Humphrey, the avatar of post–World War II American liberalism, agreed.[335]

The widespread armament of the people is itself a deterrent to any attempt to impose tyranny. As John Mitchell Kemble observed in his legal history of Anglo-Saxon England, "[t]he strength of the popular power was felt in a negative, not positive, action upon the governing body; the people

---

[334] THE FEDERALIST NO. 46 (James Madison).

[335] "Certainly one of the chief guarantees of freedom under any government, no matter how popular and respected, is the right of citizens to keep and bear arms . . . . [T]he right of citizens to bear arms is just one more guarantee against arbitrary government, one more safeguard against a tyranny which now appears remote in America, but which historically has proved to be always possible." Hubert H. Humphrey, *Know Your Lawmakers*, GUNS, Feb. 1960, at 4 (letter by then-Senator Humphrey to the magazine in response to a question about his views on the Second Amendment).

Pl.1221

were by far the strongest armed force, and the conviction of this, even if not worthier motives, kept the ruling body from enacting oppressive laws."[336]

Like the state constitutions, the Second Amendment intertwines the purposes of personal defense and defense of civil order in a republic. As explained in *Heller*, "[t]he phrase 'security of a free State' meant 'security of a free polity,' not security of each of the several States . . . ."[337]  That is why the Second Amendment applies in the District of Columbia and other federal areas and not just in the fifty states.  The principle is that *all* of the polities in the United States are supposed to be secure in their freedom. Secure freedom includes a polity's ability to repel invasion or suppress insurrection.[338]  Secure freedom includes sheriffs' ability to call on law-abiding armed citizens to "suppress all affrays, riots, and unlawful assemblies and insurrections."[339]

The Second Amendment right to keep and bear arms is an individual right belonging to all Americans for all lawful purposes, like the First Amendment freedom of speech and other fundamental rights.[340]  Thus, individual citizens have standing to raise Second Amendment claims.[341]

In addition, the Second Amendment formally announces an intended third-party beneficiary: the state militias.  Before *Heller*, some lower courts misread the Second Amendment and thought that the individual Second Amendment right exists *only* when it is in direct service of state militias.[342] *Heller* corrects this error and affirms the traditional American understanding that the Second Amendment right to keep and bear arms is for all law-abiding citizens, *and* that an intended beneficiary of that right is the state militia system.  Article I of the Constitution makes it clear that the militias exist for the benefit of both the states and the federal government, and are subject to the overlapping control of both.[343]  Thus the Second Amendment is partly a structural right enacted for the benefit of state and local governments.  Accordingly, state militia officers, including governors,

---

[336] KEMBLE, *supra* note 84, at 88.

[337] District of Columbia v. Heller, 554 U.S. 570, 597 (2008).

[338] *Id.*

[339] COLO. REV. STAT. § 30-10-516 (2013).

[340] McDonald v. City of Chicago, 130 S. Ct. 3020, 3031, 3036, 3044 (2010); *id.* at 3054–56 (Scalia, J., concurring); *Heller*, 554 U.S. at 578–89, 582, 591, 595, 606, 625–30.  *See also* David B. Kopel, *The First Amendment Guide to the Second Amendment*, 81 TENN. L. REV. 419 (2014).

[341] On this point, the nine Justices in *Heller* were unanimous.  *See Heller*, 554 U.S. at 592 (The provisions of the Second Amendment "guarantee the individual right to possess and carry weapons in case of confrontation"); *id.* at 636 (Stevens, J., dissenting) ("Surely it protects a right that can be enforced by individuals.").

[342] *See, e.g.*, cases cited in *Heller*, *supra* note 337, at 638 n.2 (Stevens, J., dissenting).

[343] U.S. CONST. art. I, § 8, cl. 15–16.

Pl.1222

should have standing to raise Second Amendment claims regarding laws or actions that interfere with the militia of their state.[344]

Besides the militia, there is another beneficiary of the Second Amendment and its state analogues: the *posse comitatus*. Creating the conditions for a well-regulated, functional militia also has the obvious and inescapable benefit of ensuring a strong and vigorous *posse comitatus*. A well-armed population fosters both. The original meaning of the Constitution was that the militia *and* the posse could be used to assist the federal government. The militia and the posse are complementary institutions, each of them requiring that the people as a whole be armed. The U.S. Constitution follows the model set down by Alfred the Great: the security of a free state requires that the entire people be armed, so that they may defend themselves and the state, in the militia, in the *posse comitatus*, and in whatever other capacity (e.g., hue and cry) the government needs the aid of the armed people.

The power to employ the *posse comitatus* was originally a power that belonged only to sheriffs.[345] Today, they remain the most frequent users of that power. Accordingly, sheriffs should be recognized as having standing under the Second Amendment and its state analogues to challenge laws or practices that interfere with the *posse comitatus*.

CONCLUSION

Historian Frank Richard Prassel observes: "An unwritten but basic tenet of democracy places enforcement of the law within the domain of ordinary citizens."[346] This was true, he writes, in early England, when "the task of upholding order fell to the over-all community."[347] Later, sophisticated law enforcement agencies were created, "but under principles of common law any man still possesses wide authority to protect himself, his family, and to some extent the general peace of the land."[348] This is one application of a fundamental principle of American law: "the people, not the government, possess the sovereignty."[349]

---

[344] In *Perpich v. Department of Defense*, 496 U.S. 334, 338 (1990), the Court recognized that a state governor had standing to sue over federal interference with his state's National Guard. However, the governor in that case did not assert Second Amendment claims, and the issue (federal deployment, without gubernatorial consent or declaration of a national emergency, of the Minnesota National Guard into Honduras for training exercises) did not involve any interference with anyone's possession of arms. *Id.*

[345] *See supra* text accompanying notes 155–157.

[346] PRASSEL, *supra* note 228, at 126.

[347] *Id.*

[348] *Id.*

[349] Mandel v. Mitchell, 325 F. Supp. 620, 629 (E.D.N.Y. 1971), *overruled by* Kleindienst

Pl.1223

A modern historian of sheriffs urges that their contemporary role should be recognized as one of "tribune of the people" who champions their rights.[350] This description is consistent with the most admirable aspects of the role of sheriffs, from Anglo-Saxon times to the present. The people elect a sheriff to be the guardian to their county: to lead the people in keeping the peace, in maintaining civil order, and in defending themselves against threats to their lives and liberties.

The *posse comitatus* has always been a vital part of this system. It was important well over a thousand years ago, and it remains important today. Whether in manhunts for escaped murderers or in augmenting the daily operations of a sheriff's office, the *posse comitatus* is one example of how in the American system of government, elected officials and armed citizens work together successfully to keep the peace.

---

v. Mandel, 408 U.S. 753 (1972).

[350] Johannes F. Spreen, *The Future Shire Reeve—Tribune of the People*, *in* CRIME AND JUSTICE IN AMERICA 43, 45 (John T. O'Brien & Marvin Marcus eds., 1979).

Pl.1224

830                  *KOPEL*                 [Vol. 104

## APPENDIX

    *This Appendix compiles* posse comitatus *statutes from across the United States.  For each state, this Appendix lists the statutory citation, the person or persons authorized to summon the* posse comitatus*, and the language of each relevant statute.*

### ALABAMA

| | | |
|---|---|---|
| ALA. CODE § 9-12-2 (LexisNexis 2001) | Sheriff | If resistance is apprehended by the sheriff in the execution of this chapter, he may summon to his aid the posse comitatus of his county, armed and equipped as the occasion may require, and may press into his service any steamboat or other vessel not actually engaged in carrying the public mail at the risk and expense of the state; and, if resistance is made by the boatmen of the boat or vessel attempted to be seized, such resistance is punishable in the same manner as is now provided by law for resistance to process. |
| ALA. CODE §§ 16-47-10, 16-48-12, 16-50-4, 16-51-12, 16-52-12, 16-54-13.1, 16-56-12, 16-59A-1, 22-50-21 (LexisNexis 2001) | Campus Police and State Health Facility Officers | [*Safety officials appointed by heads of educational and health institutions "shall have authority to summon a posse comitatus."  Institutions authorized include:* <br><br>    *Auburn University (§ 16-48-12)* <br>    *Alabama State University (§ 16-50-4)* <br>    *University of Northern Alabama (§ 16-51-12)* <br>    *Jacksonville State University (§ 16-52-12)* <br>    *University of Montevallo (§ 16-54-13.1)* <br>    *Troy University (§ 16-56-12)* <br>    *Oakwood University (§ 16-59A-1)* <br>    *State mental health facilities (§ 22-50-21)*] |

### ALASKA

| | | |
|---|---|---|
| ALASKA STAT. § 12.25.090 (2012) | Peace Officer | A peace officer making an arrest may orally summon as many persons as the officer considers necessary to aid in making the arrest.  A person when required by an officer shall aid in making the arrest. |

Pl.1225

### ARIZONA

| | | |
|---|---|---|
| ARIZ. REV. STAT. ANN. § 13-3801 (2010) | Peace Officer | A. Public offenses may be prevented by intervention of peace officers as follows:<br>1. By requiring security to keep the peace.<br>2. Forming a police detail in cities and towns and requiring their attendance in exposed places.<br>3. Suppressing riots.<br>B. When peace officers are authorized to act in preventing public offenses, other persons, who, by their command, act in their aid, are justified in so doing. |
| ARIZ. REV. STAT. ANN. § 13-3802 (2010) | Sheriff or Other Public Officer | A. When a sheriff or other public officer authorized to execute process finds, or has reason to believe that resistance will be made to execution of the process, such officer may command as many inhabitants of the county as the officer deems proper to assist in overcoming such resistance.<br>B. The officer shall certify to the court from which the process issued the names of those persons resisting, and they may be proceeded against for contempt of court. |
| ARIZ. REV. STAT. ANN. § 13-2403 (2010) | Peace Officer | A. A person commits refusing to aid a peace officer if, upon a reasonable command by a person reasonably known to be a peace officer, such person knowingly refuses or fails to aid such peace officer in:<br>1. Effectuating or securing an arrest; or<br>2. Preventing the commission by another of any offense.<br>B. A person who complies with this section by aiding a peace officer shall not be held liable to any person for damages resulting therefrom, provided such person acted reasonably under the circumstances known to him at the time.<br>C. Refusing to aid a peace officer is a class 1 misdemeanor. |

Pl.1226

832 *KOPEL* [Vol. 104

### ARKANSAS

| | | |
|---|---|---|
| ARK. CODE ANN. § 12-63-203(b)(3) (2003) | Police Officers | The police officer may summon a posse comitatus, if necessary. |
| ARK. CODE ANN. § 25-17-305(b) (2009) | Institutional Law Enforcement Officer | [An institutional law enforcement officer] shall have the authority to summon a posse comitatus if necessary. |
| ARK. CODE ANN. § 12-11-103 (2009) | Judge, Justice of the Peace, Sheriff, Coroner or Constable. | (a) When three (3) or more persons shall be riotously, unlawfully, or tumultuously assembled, it shall be the duty of any judge, justice of the peace, county sheriff, county coroner, or constable . . . to make a proclamation . . . , charging and commanding them immediately to disperse themselves and peaceably to depart to their habitations or lawful business. <br> (b) If upon the proclamation being made, the persons so assembled shall not immediately disperse and depart as commanded or if they shall resist the officer or prevent the making of the proclamation, then the officer shall command those present, and the power of the county if necessary, and shall disperse the unlawful assembly, arrest the offenders, and take them before some judicial officer, to be dealt with according to law. |

### CALIFORNIA

| | | |
|---|---|---|
| CAL. GOV'T CODE § 26604 (West 2008) | Sheriff | The sheriff shall command the aid of as many inhabitants of the sheriff's county as he or she thinks necessary in the execution of his or her duties. <br> If any person, under any pretense of any claim inconsistent with the sovereignty and jurisdiction of the State, intrudes upon any of the waste or ungranted lands of the State . . . the Governor . . . shall direct the sheriff of the county to remove the intruder . . . the sheriff may call to his aid the power of the county, as in cases of resistance to the writs of the people. |

Pl.1227

| | | |
|---|---|---|
| CAL. GOV'T CODE § 41602 (West 2012) | Chief of Police | His lawful orders shall be promptly executed by deputies, police officers, and watchmen in the city. Every citizen shall also lend his aid when required for the arrest of offenders and maintenance of public order. |
| CAL. PENAL CODE § 839 (West 2008) | | Persons making arrest may summon assistance. Any person making an arrest may orally summon as many persons as he deems necessary to aid him therein. |

## COLORADO

| | | |
|---|---|---|
| COLO. REV. STAT. § 30-1-104 (2013) | Sheriff | (1) Fees collected by sheriffs shall be as follows: (o) For serving writ with aid of posse comitatus with actual expenses necessarily incurred in executing said writ, in counties of every class, actual expenses, but not more than sixty dollars; for serving same without aid in counties of every class, actual expenses, but not more than four dollars . . . . |
| Colo. R. Civ. P. Form 24 | | *WRIT OF ASSISTANCE—PETITION FOR* COMES NOW the Plaintiff, above-named, by and through its attorneys of record, and moves this Honorable Court issue a Writ of Assistance to the Sheriff of the County of _____, State of Colorado, enabling the Sheriff to call to his aid the powers of his County, in accordance with Rule 104(h), in order that the Sheriff may execute the Writ of Replevin heretofore entered in the premises . . . . |
| Colo. R. Civ. P. 104 & CO ST CTY CT RCP Rule 404 | | (i) Sheriff May Break Building; When. If the property or any part thereof is in a building or enclosure, the sheriff shall demand its delivery, announcing his identity, purpose, and the authority under which he acts. If it is not voluntarily delivered, he shall cause the building or enclosure to be broken open in such manner as he reasonably believes will cause the least damage to the building or enclosure, and take the property into his possession. He may call upon the power of the county to aid and protect him . . . . |

Pl.1228

*KOPEL* [Vol. 104

## CONNECTICUT

| | | |
|---|---|---|
| CONN. GEN. STAT. ANN. § 6-31 (West 2008) (repealed 2000) | County Sheriffs Eliminated | [§ 6-31. Repealed. (2000, P.A. 00-99, § 153, eff. Dec. 1, 2000.)[351] |
| CONN. GEN. STAT. ANN. § 52-53 (West 2013) | State Marshals May "Depute" | A state marshal may, on any special occasion, depute, in writing on the back of the process, any proper person to serve it.  After serving the process, such person shall make oath before a justice of the peace that he or she faithfully served the process according to such person's endorsement thereon and did not fill out the process or direct any person to fill it out; and, if such justice of the peace certifies on the process that such justice of the peace administered such oath, the service shall be valid. |
| CONN. GEN. STAT. ANN. § 53a-167b (West 2012) | Peace Officer, Special Policeman, Motor Vehicle Inspector or Firefighter May "Command Assistance" | (a) A person is guilty of failure to assist a peace officer, special policeman, motor vehicle inspector or firefighter when, commanded by a peace officer, special policeman appointed under § 29-18b, motor vehicle inspector designated under § 14-8 and certified pursuant to § 7-294d or firefighter authorized to command assistance, such person refuses to assist such peace officer, special policeman, motor vehicle inspector or firefighter in the execution of such peace officer's, special policeman's, motor vehicle inspector's or firefighter's duties. (b) Failure to assist a peace officer, special policeman, motor vehicle inspector or firefighter is a class A misdemeanor. |

---

[351] For more information about Connecticut's repeal, see sources *supra* note 146.

Pl.1229

<u>**DELAWARE**</u>

| | | |
|---|---|---|
| DEL. CODE ANN. tit. 11, § 1241 (2007) | Police Officer | A person is guilty of refusing to aid a police officer when, upon command by a police officer identifiable or identified by the officer as such, the person unreasonably fails or refuses to aid the police officer in effecting an arrest, or in preventing the commission by another person of any offense.<br>Refusing to aid a police officer is a class B misdemeanor. |

<u>**FLORIDA**</u>

| | | |
|---|---|---|
| FLA. STAT. ANN. § 30.15(1)(h) (West 2010) | Sheriff | (1) Sheriffs, in their respective counties, in person or by deputy, shall:<br>(h) Have authority to raise the power of the county and command any person to assist them, when necessary, in the execution of the duties of their office; and, whoever, not being physically incompetent, refuses or neglects to render such assistance, shall be punished by imprisonment in jail not exceeding 1 year, or by fine not exceeding $500. |
| FLA. STAT. ANN. § 78.10 (West 2004) | Sheriff | In executing the writ of replevin, if the sheriff has reasonable grounds to believe that the property or any part thereof is secreted or concealed in any dwelling house or other building or enclosure, the sheriff shall publicly demand delivery thereof; and, if it is not delivered by the defendant or some other person, the sheriff shall cause such house, building, or enclosure to be broken open and shall make replevin according to the writ; and, if necessary, the sheriff shall take to his or her assistance the power of the county. |

Pl.1230

836 *KOPEL* [Vol. 104

## GEORGIA

GA. CODE
ANN.
§ 16-3-22(a)
(West 2003)

Any person who renders assistance reasonably and in good faith to any law enforcement officer who is being hindered in the performance of his official duties or whose life is being endangered by the conduct of any other person or persons while performing his official duties shall be immune to the same extent as the law enforcement officer from any criminal liability that might otherwise be incurred or imposed as a result of rendering assistance to the law enforcement officer.

## HAWAII

HAW. REV.
STAT. ANN.
§ 710-1011
(LexisNexis
2007)

Law
Enforcement
Officer

(1) A person commits the offense of refusing to aid a law enforcement officer when, upon a reasonable command by a person known to him to be a law enforcement officer, he intentionally refuses or fails to aid such law enforcement officer, in:

(a) Effectuating or securing an arrest; or

(b) Preventing the commission by another of any offense.

(2) Refusing to aid a law enforcement officer is a petty misdemeanor.

(3) A person who complies with this section by aiding a law enforcement officer shall not be held liable to any person for damages resulting therefrom, provided he acted reasonably under the circumstances known to him at the time.

**Pl.1231**

## IDAHO

| | | |
|---|---|---|
| IDAHO CODE ANN. § 8-305 (2010) | Sheriff | The sheriff shall forthwith take the property, if it be in the possession of the defendant or his agent, and retain it in his custody, either by removing the property to a place of safekeeping or, upon good cause shown, by installing a keeper.<br>If the property or any part thereof is in a building or inclosure, the sheriff shall demand its delivery, announcing his identity, purpose, and the authority under which he acts.  If it is not voluntarily delivered, he shall cause the building or inclosure to be broken open in such manner as he reasonably believes will cause the least damage to the building or inclosure, and take the property into his possession.  He may call upon the power of the county to aid and protect him . . . . |
| IDAHO CODE ANN. § 18-707 (2004) | Sheriff, Deputy Sheriff, Coroner, Constable, Judge or Other Officer Concerned in the Administration of Justice. | Every male person above eighteen (18) years of age who neglects or refuses to join the posse comitatus or power of the county . . . being thereto lawfully required by any sheriff, deputy sheriff, coroner, constable, judge or other officer concerned in the administration of justice, is punishable by fine of not less than fifty dollars ($50.00) nor more than $1,000. |

## ILLINOIS

| | | |
|---|---|---|
| 55 ILL. COMP. STAT. ANN. 5/3-6022 (West 2005) | Sheriff | To keep the peace, prevent crime, or to execute any warrant, process, order or judgment he or she may call to his or her aid, when necessary, any person or the power of the county. |

Pl.1232

838                              *KOPEL*                        [Vol. 104

### INDIANA

| | | |
|---|---|---|
| IND. CODE ANN. § 36-2-13-5 (West 2006) | Sheriff & Members of Sheriff's Department | The sheriff shall: suppress breaches of the peace, calling the power of the county to the sheriff's aid if necessary . . . . |
| IND. CODE ANN. § 36-8-10-9 (West 2006) | | (a) Each member of the department:  shall suppress all breaches of the peace within his knowledge, with authority to call to his aid the power of the county . . . . |

### IOWA

| | | |
|---|---|---|
| IOWA CODE ANN. § 331.652(2) (West 2013) | Sheriff | The sheriff, when necessary, may summon the power of the county to carry out the responsibilities of office. |

### KANSAS

| | | |
|---|---|---|
| KAN. STAT. ANN. § 22-2407 (2007) | Law Enforcement Officer | (1) A law enforcement officer making an arrest may command the assistance of any person who may be in the vicinity. (2) A person commanded to assist a law enforcement officer shall have the same authority to arrest as the officer who commands his assistance. (3) A person commanded to assist a law enforcement officer in making an arrest shall not be civilly or criminally liable for any reasonable conduct in aid of the officer or any acts expressly directed by the officer. |

Pl.1233

### KENTUCKY

| | | |
|---|---|---|
| KY. REV. STAT. ANN. § 70.060 (LexisNexis 2004) | Sheriff, Deputy Sheriff or Other Like Officer | Any sheriff, deputy sheriff or other like officer may command and take with him the power of the county, or a part thereof, to aid him in the execution of the duties of his office, and may summon as many persons as he deems necessary to aid him in the performance thereof. |
| KY. REV. STAT. ANN. § 432.550 (West 2006) | No Foreign Posses Allowed | No person shall, except with the consent of the General Assembly or of the Governor when the General Assembly is not in session, bring or cause to be brought into this state any armed person, not a citizen of this state, to preserve the peace, suppress domestic violence or to serve as a deputy of any officer or as a member of a posse comitatus, nor shall any officer knowingly summon any such person or any other person who has come into the state for that purpose to aid in suppressing violence . . . . |

### LOUISIANA

| | | |
|---|---|---|
| LA. CODE CIV. PROC. ANN. art. 325 (1999) | Peace Officer | In the execution of a writ, mandate, order, or judgment of a court, the sheriff may enter on the lands, and into the residence or other building, owned or occupied by the judgment debtor or defendant. If necessary to effect entry, he may break open any door or window. If resistance is offered or threatened, he may require the assistance of the police, of neighbors, and of persons present or passing by. |
| LA. CODE CRIM. PROC. ANN. art. 219 (2003) | | A peace officer making a lawful arrest may call upon as many persons as he considers necessary to aid him in making the arrest. A person thus called upon shall be considered a peace officer for such purposes. |

Pl.1234

840                           *KOPEL*                    [Vol. 104

## MAINE

| ME. REV. STAT. tit. 30-A, § 402 (2011) | Law Enforcement Officer | 1. Officer may require aid. Any law enforcement officer may require suitable aid in the execution of official duties in criminal and traffic infraction cases for the following reasons:<br>A. For the preservation of the peace; or<br>B. For apprehending or securing any person for the breach of the peace or in case of the escape or rescue of persons arrested on civil process.<br>2. Violation and penalty. Any person required to aid a law enforcement officer under this section who neglects or refuses to do so commits a civil violation for which a forfeiture of not less than $3 nor more than $50 to be paid to the county may be adjudged. |

## MARYLAND

| | Any Government Official Who Is a Conservator of the Peace | [*Not presently in statute. Common law power to summon a* posse comitatus *remains valid. City of Baltimore v. Siler, 263 Md. 439 (1971) (Mayor of Baltimore could have raised a posse to attempt to suppress riots in April 1968).*] |

## MASSACHUSETTS

| MASS. ANN. LAWS ch. 37, § 13 (LexisNexis 2006) | Sheriff | They may require suitable aid in the execution of their office in a criminal case, in the preservation of the peace, in the apprehending or securing of a person for a breach of the peace and in cases of escape or rescue of persons arrested upon civil process. |

## MICHIGAN

| MICH. COMP. LAWS ANN. § 600.4331(5) (West 2013) | Sheriff (Other Person When Court Orders Sheriff's Arrest) | In making the arrest the sheriff or other person so directed may call to his aid the power of the county as in other cases. |

Pl.1235

### MINNESOTA

| | | |
|---|---|---|
| MINN. STAT. ANN. § 387.03 (West 1997) | Sheriff | The sheriff shall keep and preserve the peace of the county, for which purpose the sheriff may require the aid of such persons or power of the county as the sheriff deems necessary . . . . |
| MINN. STAT. ANN. § 491A.01 Subd. 5 (West 2014) | | The sheriff is authorized to effect repossession of the property according to law, including, but not limited to: (1) entry upon the premises for the purposes of demanding the property and ascertaining whether the property is present and taking possession of it; and (2) causing the building or enclosure where the property is located to be broken open and the property taken out of the building and if necessary to that end, the sheriff may call the power of the county to the sheriff's aid . . . . |

### MISSISSIPPI

| | | |
|---|---|---|
| MISS. CODE ANN. § 19-25-39 (2012) | Sheriff | If the sheriff finds that resistance will be made against the execution of any process, he shall forthwith go in his proper person, taking the power of the county if necessary, and execute the same. He shall certify to the court the names of the persons making resistance, their aiders, assistants, favorers, and procurers. |

### MISSOURI

| | | |
|---|---|---|
| MO. ANN. STAT. § 105.210 (West 1997) | Officer | In all cases where, by the common law or a statute of this state, any officer is authorized to execute any process, he may call to his aid all male inhabitants above the age of twenty-one years in the county in which the officer is authorized to act. |
| MO. ANN. STAT. § 532.600 (West 1953) | | In the execution of such writs of attachment and precept, or either of them, the sheriff or other person to whom they shall be directed may call to his aid the power of the county, as is provided by law in the execution of writs and process by any officer. |

**Pl.1236**

842                               *KOPEL*                          [Vol. 104

### MONTANA

| MONT. CODE ANN. § 27-17-206 (2013) | Sheriff | If the property or any part of the property is concealed in a building or enclosure, the sheriff shall publicly demand its delivery. If the property is not delivered, the sheriff shall cause the building or enclosure to be broken open and take the property into the sheriff's possession and, if necessary, the sheriff may call to the sheriff's aid the power of the county. |
|---|---|---|

### NEBRASKA

| NEB. REV. STAT. § 23-1704 (2012) | Sheriff & Deputies | The sheriff and his deputies are conservators of the peace, and to keep the same, to prevent crime, to arrest any person liable thereto, or to execute process of law, they may call any person to their aid; and, when necessary, the sheriff may summon the power of the county. |
|---|---|---|

### NEVADA

| NEV. REV. STAT. ANN. § 248.090 (LexisNexis 2011) | Sheriff & Deputies | Sheriffs and their deputies shall keep and preserve the peace in their respective counties, and quiet and suppress all affrays, riots and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony, or breach of the peace, they may call upon the power of their county to aid in such arrest or in preserving the peace. |
|---|---|---|

### NEW HAMPSHIRE

| N.H. REV. STAT. ANN. § 104:12 (LexisNexis 2012) | Officer | An officer having authority to serve process or make an arrest may require suitable aid in the execution of his office. Any person who neglects or refuses to give such aid when so required shall be fined not more than $20. |
|---|---|---|

**Pl.1237**

### NEW JERSEY

[*Recognized in common law.* Snyder v. Van Natta, *7 N.J.L. 25, 1823 WL 1309 (1823);* Patten v. Halsted*, 1 N.J.L. 277 (1795). A 1941 statute exempted the New Jersey Guard from* posse comitatus *duty. L.1941, c. 109, p. 249, § 16. The exemption statute, N.J. Stat. Ann. 38:5-4.1 was repealed in 1963, as part of a general revision of the militia statutes. L.1963, c. 109.*]

### NEW MEXICO

| | | |
|---|---|---|
| N.M. STAT. ANN. § 4-41-10 (2013) | Local Sheriff and Sheriffs of Other Counties | Any sheriff is hereby authorized at any time to appoint respectable and orderly persons as special deputies to serve any particular order, writ or process or when in the opinion of any sheriff the appointment of special deputies is necessary and required for the purpose of preserving the peace, and it shall not be necessary to give or file any notice of such special appointment; however, the provision authorizing the carrying of concealed arms shall not apply to such persons. Provided, no person shall be eligible to appointment as a deputy sheriff unless he is a legally qualified voter of the state of New Mexico, and further provided that there shall be no additional fees or per diem paid by the counties for any additional deputies other than as provided by law. |
| N.M. STAT. ANN. § 4-41-12 (2013) | Sheriff | The various sheriffs of the several counties of this state shall have the right to enter any county of this state, or any part of this state, for the purpose of arresting any person charged with crime . . . and any sheriff entering any county as above mentioned, shall have the same power to call out the power of said county to aid him, as is conferred on sheriffs in their own counties. |

Pl.1238

844                           *KOPEL*                    [Vol. 104

### NEW YORK

| | | |
|---|---|---|
| N.Y. JUDICIARY LAW § 400 (West 2005) | Sheriff | If a sheriff, to whom a mandate is directed and delivered, finds, or has reason to apprehend, that resistance will be made to the execution thereof, he may command all persons in his county, or as many as he thinks proper, and with such arms as he directs, to assist him in overcoming the resistance and, if necessary, in arresting and confining the resisters, their aiders and abettors, to be dealt with according to law. |

### NORTH CAROLINA

| | | |
|---|---|---|
| N.C. GEN. STAT. ANN. § 1-415 (West 2013) | Sheriff & Law Enforcement Officer | The sheriff shall execute the order by arresting the defendant and keeping him in custody until discharged by law. The sheriff may call the power of the county to his aid in the execution of the arrest. |

### NORTH DAKOTA

| | | |
|---|---|---|
| N.D. CENT. CODE § 29-06-03 (2006) | Officer | Any officer making an arrest may summon as many persons orally as the officer deems necessary to aid the officer therein. |

### OHIO

| | | |
|---|---|---|
| OHIO REV. CODE ANN. § 311.07(A) (West 2005) | Sheriff | In the execution of official duties of the sheriff, the sheriff may call to the sheriff's aid such persons or power of the county as is necessary. |
| OHIO REV. CODE ANN. § 2921.23(B) (West 2014) | | . . . [F]ailure to aid a law enforcement officer [is] a minor misdemeanor. |

**Pl.1239**

## OKLAHOMA

| | | |
|---|---|---|
| OKLA. STAT. ANN. tit. 19, § 516(A) (West 2000) | Sheriff, Under-sheriffs and Deputies | It shall be the duty of the sheriff, under-sheriffs and deputies to keep and preserve the peace of their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections, for which purpose and for the service of process in civil and criminal cases, and in apprehending or securing any person for felony or breach of the peace, they and every constable may call to their aid such person or persons of their county as they may deem necessary. |
| OKLA. STAT. ANN. tit. 22, § 94 (West 2003) | | If it appears to the Governor that the power of the county is not sufficient to enable the sheriff to execute process delivered to him, or to suppress riots and to preserve the peace, he must, on the application of the sheriff, or the judge, of any court of record of such county, order such a force from any other county or counties as is necessary, and all persons so ordered or summoned by the Governor or acting Governor, are required to attend and act; and any such persons who, without lawful cause, refuse or neglect to obey the command, are guilty of a misdemeanor. |

## OREGON

| | | |
|---|---|---|
| OR. REV. STAT. § 206.050(1) (2013) | Police Officer | When an officer finds, or has reason to apprehend, that resistance will be made to the execution or service of any process, order or paper delivered to the officer for execution or service, and authorized by law, the officer may command as many adult inhabitants of the county of the officer as the officer may think proper and necessary to assist the officer in overcoming the resistance, and if necessary, in seizing, arresting and confining the resisters and their aiders and abettors, to be punished according to law. |

Pl.1240

846 *KOPEL* [Vol. 104

## PENNSYLVANIA

| | | |
|---|---|---|
| 42 PA. CONS. STAT. ANN. § 21115(a) (West 1982) | Sheriff & Mayors[352] | For the services performed in the capacity as a conservator of the peace or police officer in suppressing riots, mobs or insurrections, and when discharging any duty requiring the summoning of a posse, comitatus or special deputy sheriffs, the sheriff shall receive per diem compensation at the rate of $50 in a county for eight hours service, together with the mileage and necessary expenses, including subsistence for the sheriff and those under him, all to be paid by the county. |

## RHODE ISLAND

| | | |
|---|---|---|
| R.I. GEN. LAWS § 11-47-43 (2002) | | The provisions of § 11-47-42 [prohibiting the carrying of certain weapons], . . . so far as they relate to the possession or carrying of any billy, apply to sheriffs, constables, police, or other officers or guards whose duties require them to arrest or to keep and guard prisoners or property, nor to any person summoned by those officers to aid them in the discharge of their duties while actually engaged in their duties. |

## SOUTH CAROLINA

| | | |
|---|---|---|
| S.C. CODE ANN. § 15-17-90 (1977) | Sheriff, Deputy, Constable, or Other Officer | The sheriff or constable shall execute the order by arresting the defendant and keeping him in custody until discharged by law and may call the power of the county to his aid in the execution of the arrest, as in case of process. |

---

[352] "The power to summon a *posse comitatus* is 'the power which is devolved upon a sheriff to suppress riots . . . ,' which, in turn, was conferred by Third Class City Code upon the mayor." *Jenkins Sportswear v. City of Pittston*, 22 Pa. D. & C.2d 566, 575 (Pa. Com. Pl. 1961).

Pl.1241

| S.C. CODE ANN. § 23-15-70 (1989) | Sheriff, Deputy, Constable, or Other Officer | Any sheriff, deputy sheriff, constable or other officer specially empowered may call out the bystanders or posse comitatus of the proper county to his assistance whenever he is resisted or has reasonable grounds to suspect and believe that such assistance will be necessary in the service or execution of process in any criminal case and any deputy sheriff may call out such posse comitatus to assist in enforcing the laws and in arresting violators or suspected violators thereof. Any person refusing to assist as one of the posse . . . shall be guilty of a misdemeanor and, upon conviction shall be fined not less than thirty nor more than one hundred dollars or imprisoned for thirty days. |

### SOUTH DAKOTA

| S.D. CODIFIED LAWS § 21-15-7 (2004). | Sheriff | If the property, or any part thereof, be concealed in a building or enclosure, the sheriff shall publicly demand its delivery. If it be not forthwith delivered, he shall cause the building or enclosure to be broken open, and take the property into his possession and if necessary he may call to his aid the power of his county. |
| S.D. CODIFIED LAWS § 7-12-1 (2004) | Sheriff | The sheriff shall keep and preserve the peace within his county, for which purpose he is empowered to call to his aid such persons or power of his county as he may deem necessary. |

### TENNESSEE

| TENN. CODE ANN. § 38-3-112 (West 2013) | Governor | If it appears to the governor that the power of any county is not sufficient to enable the sheriff to execute process delivered to that sheriff, the governor may, on the application of the sheriff, order a posse or military force as is necessary from any other county or counties. |
| TENN. CODE ANN. § 8-8-213(b) (West 2013) | Sheriff | The sheriff shall furnish the necessary deputies to carry out the duties . . . and, if necessary, may summon to the sheriff's aid as many of the inhabitants of the county as the sheriff thinks proper. |

**Pl.1242**

848                *KOPEL*              [Vol. 104

## TEXAS

| | | |
|---|---|---|
| TEX. CODE CRIM. PROC. ANN. art. 8.01 (West 2005) | Officer | When any officer authorized to execute process is resisted, or when he has sufficient reason to believe that he will meet with resistance in executing the same, he may command as many of the citizens of his county as he may think proper; and the sheriff may call any military company in the county to aid him in overcoming the resistance, and if necessary, in seizing and arresting the persons engaged in such resistance. |
| TEX. CODE CRIM. PROC. ANN. art. 8.05 (West 2005) | Peace Officer | In order to enable the officer to disperse a riot, he may call to his aid the power of the county in the same manner as is provided where it is necessary for the execution of process. |
| TEX. CODE CRIM. PROC. ANN. art. 2.14 (West 2005) | Peace Officer | Whenever a peace officer meets with resistance in discharging any duty imposed upon him by law, he shall summon a sufficient number of citizens of his county to overcome the resistance; and all persons summoned are bound to obey. |

## UTAH

| | | |
|---|---|---|
| UTAH CODE ANN. § 76-8-307 (LexisNexis 2012) | Peace Officer | A person is guilty of a class B misdemeanor if, upon command by a peace officer identifiable or identified by him as such, he unreasonably fails or refuses to aid the peace officer in effecting an arrest or in preventing the commission of any offense by another person. |

## VERMONT

| | | |
|---|---|---|
| VT. STAT. ANN. tit. 24, § 300 (2005) | Sheriff or Other Officer | A sheriff or other officer in the discharge of the duties of his office, for the preservation of the peace, or the suppression or prevention of any criminal matter or cause, may require suitable assistance. |

Pl.1243

### VIRGINIA

| VA. CODE ANN. § 18.2-463 (2009) | Law Enforcement Officer | If any person on being required by any sheriff or other officer refuse or neglect to assist him: (1) in the execution of his office in a criminal case, (2) in the preservation of the peace, (3) in the apprehending or securing of any person for a breach of the peace, or (4) in any case of escape or rescue, he shall be guilty of a Class 2 misdemeanor. |
|---|---|---|

### WASHINGTON

| WASH. REV. CODE ANN. § 36.28.010 (West 2003) | Sheriff | The sheriff is the chief executive officer and conservator of the peace of the county. In the execution of his or her office, he or she and his or her deputies:<br>(6) Shall keep and preserve the peace in their respective counties, and quiet and suppress all affrays, riots, unlawful assemblies and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace, they may call to their aid such persons, or power of their county as they may deem necessary. |
|---|---|---|

### WEST VIRGINIA

| W. VA. CODE ANN. § 61-5-14 (LexisNexis 2010) | Sheriff or Other Officer | If any person shall, on being required by any sheriff or other officer, refuse or neglect to assist him in the execution of his office in a criminal case, or in the preservation of the peace, or the apprehending or securing of any person for a breach of the peace, or in any case of escape or rescue, he shall be guilty of a misdemeanor, and, upon conviction, shall be confined in jail not more than six months and be fined not exceeding one hundred dollars. |
|---|---|---|

Pl.1244

850                         *KOPEL*                    [Vol. 104

### WISCONSIN

| | | |
|---|---|---|
| WIS. STAT. ANN. § 59.28(1) (West 2013) | Sheriff, Undersheriff & Deputies | Sheriffs and their undersheriffs and deputies shall keep and preserve the peace in their respective counties and quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections; for which purpose, and for the service of processes in civil or criminal cases and in the apprehending or securing any person for felony or breach of the peace they and every coroner and constable may call to their aid such persons or power of their county as they consider necessary. |

### WYOMING

| | | |
|---|---|---|
| WYO. STAT. ANN. § 18-3-606 (2013) | Sheriff & Deputies | Each county sheriff and deputy shall preserve the peace in the respective counties and suppress all affrays, riots, unlawful assemblies and insurrections. Each sheriff or deputy sheriff may call upon any person to assist in performing these duties or for the service of process in civil and criminal cases or for the apprehension or securing of any person for felony or breach of peace. |

Pl.1245

**Plaintiffs' Exhibit AN**

Pl.1246

# ATTENTION ORIGINALISTS:
## THE SECOND AMENDMENT WAS ADOPTED IN 1791, NOT 1868

### MARK SMITH*

In June 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*,[1] its most significant case interpreting the scope of the Second Amendment since the landmark decision in *District of Columbia v. Heller*.[2] In rejecting a two-part interest balancing test, the Supreme Court instead adopted a "text, history, and tradition" test to determine the Second Amendment's meaning and scope.[3] *Bruen* requires governmental defendants to prove that there are "historical analogues" to modern restrictions on activity falling within the plain text of the Second Amendment by showing that the reason why those restrictions were imposed and the nature of the burden they entailed are sufficiently similar to the modern restriction in question.[4] *Bruen* approvingly quoted *Heller* that "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,"[5] and noted that *Heller* looked at mid-to-

---

* Mark W. Smith is a Visiting Fellow in Pharmaceutical Public Policy and Law in the Department of Pharmacology, University of Oxford; Presidential Scholar and Senior Fellow in Law and Public Policy, The King's College; Distinguished Scholar and Senior Fellow of Law and Public Policy, Ave Maria School of Law. He also hosts the Four Boxes Diner YouTube Channel, which addresses Second Amendment scholarship, history, and issues. *See* https://www.youtube.com/channel/UCryaem-nXjC27Yci0xTNfhQ. He is the author of multiple books including *First They Came for the Gun Owners: The Campaign to Disarm You and Take Your Freedoms* (Bombardier Books 2019) and *#Duped: How the Anti-gun Lobby Exploits the Parkland School Shooting—and How Gun Owners Can Fight Back* (Post Hill Press 2018). This article is excerpted and adapted from a more detailed one, which can be found on SSRN. It is titled *'Not All History Is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868,* and can be found on SSRN here: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297.

[1] 142 S. Ct. 2111 (2022).

[2] 554 U.S. 570 (2008).

[3] *Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . . ." To justify a restriction on such conduct, the government has the burden to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 1126. Contrary to what some courts have held, the "plain text" means the textual right determined in accordance with accepted principles of constitutional interpretation and Supreme Court precedent. For example, in a case challenging a law involving a ban on "self-manufacture of firearms" and a prohibition on "the sale of the tools and parts necessary to complete the self-manufacturing process," a court held that history need not be consulted because "[t]ry as you might, you will not find a discussion of those concerns (or any such 'right(s)') in the 'plain text' of the Second Amendment." *Defense Distributed v. Bonta*, Case No. 2:22-cv-06200, Doc. 19 at 7 (C.D. Cal. Oct. 21, 2022). But *Heller* held that the right to "keep" arms refers to "possessing arms." *Heller*, 554 U.S. at 583. The right to possess arms necessarily includes the right to acquire them (through purchase, self-manufacture, gift, inheritance, or otherwise) because no one is born with firearms in hand. The unreasonably literal interpretation adopted by the *Defense Distributed* case would require nearly every issue that could arise under the Second Amendment to be discussed and decided in the text of the Amendment itself. That, of course, would obviate the need for any historical inquiry.

[4] 142 S. Ct. 2111, 2130–33 (2022).

[5] *Bruen*, 142 S. Ct. at 2136 (emphasis added).

Pl.1247

late nineteenth century evidence only "as mere confirmation of what the Court thought had already been established."[6]

After *Bruen*, government defendants and their amici in Second Amendment lawsuits began arguing that the relevant period for determining original meaning is not 1791, when the Second Amendment became effective, but 1868, when the Fourteenth Amendment was enacted.[7] But every Supreme Court case that has examined historical evidence to determine the meaning or scope of the first eight provisions of the Bill of Rights has looked entirely or principally at the Founding period or earlier, not 1868.[8]

Here is the *Bruen* passage on which gun control defenders base their argument. After reviewing the historical methodology for courts to deploy, the Court observed:

> Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan v. Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [citations omitted] And we have *generally assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right *when the Bill of Rights was adopted in 1791*. See, *e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment).
>
> We also *acknowledge* that there is an *ongoing scholarly debate* on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings").[9]

This language has led gun control advocates to argue that the relevant time period is an open question and that the answer is 1868, not 1791. Undoubtedly, that is because there were more gun control laws on the books (think: Southern Black Codes) in 1868 than in 1791, and thus more opportunities to find historical "analogues" to restrict individual rights. For example, at the Founding period, there were no restrictions on the peaceable carrying of arms, other than by slaves, free blacks in certain jurisdictions, and Native Americans.[10] "There have been epochs or

---

[6] *Id.* at 2137.

[7] *See, e.g.*, Defendant John Harrington's Memorandum in Support of His Motion for Summary Judgement at 24, Worth v. Harrington (D. Minn. 2022) (No. 0:21-CV-01348); Amicus Letter of Everytown Law at 2, Lara v. Comm'r Pa. State Police (3d Cir. 2022) (No. 21-1832); [Proposed] Amicus Br. of Everytown for Gun Safety in Support of Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction at 7, Antonyuk v. Bruen (N.D.N.Y. 2022) (No. 1:22-cv-00734).

[8] *See infra* Parts C, D, and E.

[9] *Bruen*, 142 S. Ct. at 2137–38 (emphasis added). Professor Lash's SSRN article was published as *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022).

[10] *See* STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT chapters 6–7 (2008) (analyzing the constitutions and laws of the original states).

Pl.1248

phases in the latter part of the nineteenth and early part of the twentieth centuries in which the right to bear arms was impaired or denied to selected groups of people."[11] During Reconstruction and thereafter, a minority of states (mostly Southern) enacted bans on the carrying of small pistols, required pistols to be carried openly and, in the case of Texas, prohibited carrying pistols at all, other than on a journey. Some carry bans were invalidated by the courts.[12]

Apart from the Black Codes and Jim Crow laws, *Bruen* itself noted that there was a "slight uptick in gun regulation during the late-19th century—principally in the Western Territories."[13] The Court continued on to discount this gun regulation evidence because "As we suggested in *Heller*, however, late-19th century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence."[14]

But the relevant time period is not an open question. That the Founding period is the correct time to determine the original public meaning of an individual right is not a mere "assumption," as Justice Thomas stated in his respectful nod to an "ongoing scholarly debate." It is an integral and controlling part of the Court's Bill of Rights jurisprudence. As shown herein, it has been the Court's universal practice to look to the Founding period and relevant antecedents to determine original public understanding. No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791.

The Court has held that the meanings of the Constitution and the Bill of Rights are fixed when they were adopted. A provision of the Bill of Rights has only one meaning, whether applied against the federal government or the states. The time period for determining that single meaning, when history must be examined, is 1791. That is true of the three cases cited by *Bruen* in the quote above; it is true of all of the Supreme Court's Second Amendment cases beginning with *Heller*; and it is true of Supreme Court cases examining other rights provisions of the Bill of Rights. The Court has also declared that if a later interpretation differs from the original meaning when the Bill of Rights was ratified, the later interpretation must yield.

Even if one examines the ratification period of the Fourteenth Amendment, there is no evidence that the ratifiers thought the existing rights in the Bill of Rights somehow changed in meaning. Rather, the Fourteenth Amendment's purpose was to include blacks within the protections granted to citizens, and to protect their rights against state encroachments.

---

[11] STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS 255 (2021) (analyzing restrictions in the "Wild West," Jim Crow South, and anti-immigrant cities like New York).

[12] Stephen P. Halbrook, The Right to Bear Arms 241–47 (2021).

[13] *Bruen*, 142 S. Ct. at 2153–54.

[14] *Id.* at 2154.

**Pl.1249**

I.     1791 IS THE PROPER YEAR FOR DETERMINING THE ORIGINAL UNDERSTANDING OF THE SECOND AMENDMENT

### A. *The meaning and scope of each provision in the Bill of Rights is the same whether applied against the states or the federal government*

The key to understanding why the original public meaning of the Bill of Rights—including the Second Amendment—should be determined by reference to the Founding is found in *Bruen* itself: "[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government."[15] The Court does not apply one meaning when invoked against potential federal infringement and a different meaning when invoked against a potential state or locality infringement.

This has been a fundamental principle of Bill of Rights jurisprudence for over five decades. That an incorporated right has only a single meaning was made crystal clear in *McDonald*, which quoted *Malloy v. Hogan* as establishing that the Court has:

> abandoned "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights," stating that it would be "incongruous" to apply different standards "depending on whether the claim was asserted in a state or federal court."[16]

### B. *A constitutional provision's meaning is fixed when adopted*

*Bruen* explained that the Constitution's "meaning is fixed according to the understandings of those who ratified it."[17] Since the Bill of Rights is part of the Constitution and was ratified just three years after the unamended Constitution went into effect, its meaning was fixed then. Noting that the "Constitution can, and must, apply to *circumstances* beyond those *the Founders* specifically anticipated,"[18] *Bruen* quoted from *United States v. Jones*,[19] which concluded that installation of a tracking device on a vehicle was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment *when it was adopted*".[20] Circumstances may change, but the central meaning is fixed.

The conception that the Constitution has a fixed, original meaning goes far back in constitutional jurisprudence. As Justice Thomas noted in his concurrence in *McIntyre v. Ohio Elections Comm'n*:[21]

> When interpreting the Free Speech and Press Clauses, we must be guided by their original meaning, for "[t]he Constitution is a written instrument. *As such its meaning does not alter. That which it meant when adopted, it means now.*" *South Carolina v. United States*, 199 U.S. 437, 448 (1905). We have long recognized that the meaning of the Constitution "must necessarily depend on the words of

---

[15] *Bruen*, 142 S. Ct. at 2137 (emphasis added).

[16] McDonald v. City of Chicago, 561 U.S. 742, 765 (2010) (quoting Malloy v. Hogan, 378 U.S. 1, 5–6 (1964)).

[17] *Bruen*,142 S. Ct. at 2132.

[18] *Id.*

[19] 565 U.S. 400, 404–405 (2012).

[20] *Id.* (emphasis added).

[21] 514 U.S. 334, 359 (1995).

**Pl.1250**

the constitution [and] *the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions . . . in the several states.*" *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 721 (1838).

Thus, as long ago as 1838, that was an accepted proposition. It remained an accepted proposition in 1905 and remains so today.

*C.   The Bill of Rights means what it meant when it was adopted*

The relevant period for ascertaining the *single* meaning of a provision of the Bill of Rights is the ratification of those amendments during the Founding, not when the right was incorporated into the Fourteenth Amendment. *Bruen* recognized that the "Second Amendment's *historically fixed meaning*" must date, like the Amendment itself, to 1791, when the Court reaffirmed *Heller*'s finding that the right applies to new circumstances, specifically that the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence *in the 18th century*.'"[22]

In the passage from *Bruen* quoted above regarding the "assumption" that 1791 is the relevant time period, the Court cited three cases, all of which looked to the time of ratification of specific amendments in 1791 to determine their original public meaning: *Crawford v. Washington*, 541 U.S. 36 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011) (First Amendment). These cases all involve applications against the states of incorporated provisions of the Bill of Rights.

In *Crawford*, a Confrontation Clause case, the Court relied on Founding-era history "to understand [the clause's] meaning."[23] There is no indication in *Crawford* that when the Sixth Amendment applies through the Fourteenth Amendment to a state, the public understanding of the Sixth Amendment at the time of ratification of the Fourteenth Amendment determines its meaning, or changes the 1791 meaning.

The second case is *Virginia v. Moore*,[24] a Fourth Amendment case, where the protection of that Amendment was asserted against a state's actions. The Court again looked to the Founding era: "In determining whether a search or seizure is unreasonable, we begin with history. We look to the *statutes and common law of the founding era* to determine the norms that the Fourth Amendment was meant to preserve."[25]

The Court stated that it was "aware of no historical indication that *those who ratified the Fourth Amendment* understood it as a redundant guarantee of whatever limits on search and seizure legislatures might have enacted."[26] As with *Crawford*, there was no indication in *Virginia v. Moore* that the understanding of the ratifiers of the Fourteenth Amendment was relevant or should even be considered.

In the third case, *Nevada Comm'n on Ethics v. Carrigan*,[27] the issue was whether a provision of the state's law requiring legislators to recuse themselves from voting on certain measures violated

---

[22] *Bruen*, 142 S. Ct. at 2132 (quoting District of Columbia v. Heller, 554 U.S. 570, 582 (2008)) (emphasis added).

[23] Crawford v. Washington, 541 U.S. 36, 43 (2004).

[24] 553 U.S. 164 (2008).

[25] *Id.* at 168 (emphasis added).

[26] *Id.* (emphasis added).

[27] 564 U.S. 117 (2011).

**Pl.1251**

the First Amendment. The Court held that it did not, partially on the basis that such recusal laws existed during the Founding and were not considered to be speech restraints.

As in *Crawford* and *Moore*, the Court never considered whether the scope of the First Amendment should be determined by the understanding of the ratifiers of the Fourteenth Amendment. Instead, it noted that "Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws *existed in 1791* and have been in place ever since."[28]

When Supreme Court cases look at history to determine the intent of ratifiers, they always look to the Founding era as the period of sole or primary relevance.

*D.   All three of the Supreme Court's substantive interpretations of the Second Amendment assess its meaning and scope by looking at the Founding period*

There have been two Supreme Court cases—*Heller* and *Bruen*—that engaged in historical analysis and applied the substantive meaning of the Second Amendment; both used the Founding period to determine its scope and meaning.

*Heller* first analyzed the meaning of the Second Amendment's text by examining sources that either preceded 1791 or were close enough in time thereafter to ascertain what the language meant to the Founding generation.[29]

For example, the Court stated that in interpreting the Second Amendment's text:

[W]e are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.' Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens *in the founding generation.*[30]

*Heller* left no doubt that the meaning of the provisions of the Bill of Rights was set in 1791: "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*, whether or not future legislatures or (yes) even future judges think that scope too broad."[31]

*Caetano* applied the Second Amendment against Massachusetts.[32] Although this *per curiam* opinion did not itself engage in historical analysis, it expressly relied on *Heller*'s language and reasoning, which were rooted in the Founding period. There was no suggestion by the Court that 1868 was the proper date, or that the understanding of the ratifiers of the Fourteenth Amendment was even pertinent, much less controlling.

*Bruen* confirmed that the period when the Bill of Rights was ratified is the pertinent period. Addressing New York's historical arguments from medieval times to the end of the nineteenth century, the Court observed that "not all history is created equal" and then reaffirmed *Heller*'s

---

[28] *Id.* at 122 (emphasis added).

[29] District of Columbia v. Heller, 554 U.S. 570, 577–592 (2008).

[30] *Id.* at 576–77 (citations omitted) (emphasis added).

[31] *See id.* at 634–35 (emphasis added).

[32] Caetano v. Massachusetts, 577 U.S. 411 (2016).

Pl.1252

statement that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."[33]

E. *Supreme Court jurisprudence on all other provisions of the Bill of Rights looks to the Founding period, not 1868*

As *Bruen* explained, the meaning of a constitutional provision is fixed when adopted. That includes the provisions of the Bill of Rights, which have the same meaning when incorporated against the states or the federal government.

I have not found, and litigants in post-*Bruen* litigation have so far not identified, a *single* Supreme Court case in which the Court looked to the time of the Fourteenth Amendment's ratification as the principal period for determining the scope or meaning of any provision of the Bill of Rights.[34] A multitude of cases, beyond those cited above, discuss the Founding period and earlier as exclusively or primarily relevant.[35]

F. *If later understandings contradict the original understanding of the text, the original understanding controls*

It's true that *Heller*, *McDonald*, and *Bruen* all considered some amount of 19th-century history. *McDonald* did so not to discern the meaning or scope of the right to keep and bear arms, but rather to determine whether it has historically been considered "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."[36]

The post-Founding-era history examined by *Heller* and *Bruen* was used by the Court only to confirm, rather than to define or contradict, the Founding-era understanding. Regarding *Heller*, the *Bruen* Court observed:

> [W]e made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established."[37]

---

[33] N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2136 (2022).

[34] Litigants have cited lower court decisions, and I discuss the errors in those arguments in Part I.G.

[35] *See, e.g.,* Near v. Minnesota, 283 U.S. 697, 713–17 (1931) (First Amendment, freedom of the press); Reynolds v. United States, 98 U.S. 145, 163 (1878) (First Amendment, Free Exercise Clause); Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C., 565 U.S. 171, 182–84 (2012) (First Amendment, Establishment Clause and Free Exercise Clause); Fulton v. City of Philadelphia, 141 S. Ct. 1868, 1894–912 (2021) (First Amendment, Free Exercise Clause) (lengthy concurrence by Justices Alito, Thomas, and Gorsuch); Lynch v. Donnelly, 465 U.S. 668, 673–74 (1984) (First Amendment, Establishment Clause); Wyoming v. Houghton, 526 U.S. 295, 299 (1999) (Fourth Amendment); Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (Fourth Amendment); Benton v. Maryland, 395 U.S. 784, 795–96 (1969) (Fifth Amendment, Double Jeopardy Clause); Gamble v. United States, 139 S. Ct. 1960, 1965 (2019) (Fifth Amendment, Double Jeopardy Clause); Ramos v. Louisiana, 140 S. Ct. 1390, 1395–96 (2020) (Sixth Amendment, Jury Trial Clause); Powell v. Alabama, 287 U.S. 45, 60–67 (1932) (Sixth Amendment, Right to Counsel Clause); Klopfer v. North Carolina, 386 U.S. 213, 223–25 (1967) (Sixth Amendment, right to speedy trial); *In re* Oliver, 333 U.S. 257, 266–268 (1948) (Sixth Amendment, right to public trial); Duncan v. Louisiana, 391 U.S. 145, 151–54 (1968) (Sixth Amendment, right to jury trial in state cases); Washington v. Texas, 388 U.S. 14, 20, 23 (1967) (Sixth Amendment, Compulsory Process Clause); Timbs v. Indiana, 139 S. Ct. 682, 687–99 (2019) (Eighth Amendment, Excessive Fines Clause) (post-Civil War history discussed only to show the right's fundamental importance).

[36] McDonald v. City of Chicago, 561 U.S. 742, 767 (2010).

[37] *Bruen,* 142 S. Ct. at 2137 (quoting Gamble v. United States, 139 S. Ct. 1960, 1975–76 (2019)).

**Pl.1253**

The Court warned against giving "post-enactment history more weight than it can rightly bear," and reaffirmed *Heller*'s observation that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'"[38] In fact, faced with twentieth-century evidence that *did* contradict the Founding-era evidence, the *Bruen* Court rejected that evidence, stating that the Court will not "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."[39]

Justice Barrett, concurring in *Bruen*, also cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."[40] If there are no analogues at the Founding, one cannot simply jump to the late 19th century to look for them. Justice Barrett pointedly quoted from *Espinoza v. Montana Dept. of Revenue*,[41] which stated that a practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition" informing our understanding of the First Amendment.[42] If such a practice cannot establish a pertinent American tradition for the First Amendment, it cannot do so for the Second Amendment, either.

### G.  *The Court of Appeals' decisions cited to support 1868 as the determinative year have been abrogated or rely on an obvious misreading of* McDonald

The briefs supporting gun control in the *Worth, Lara,* and *Antonyuk* cases[43] rely on lower court cases that supposedly establish the time of the ratification of the Fourteenth Amendment as the key time period. Of the three submissions, the *Lara* brief has the most extensive argument on the point. The discussion in the *Lara* brief[44] cites *Gould v. Morgan*, noting that it was "criticized on other grounds by *Bruen*";[45] *Ezell v. City of Chicago*, which stated that "*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified";[46] *United States v. Greeno*;[47] and closes with a "see also" to *Drummond v. Robinson Twp.*;[48] and to *Binderup v. Att'y Gen.*[49]

But *Gould* was abrogated by *Bruen*. The Seventh Circuit in *Ezell* cites "*McDonald*, 130 S.Ct. at 3038–47" in support of the quoted sentence.[50] But there is no such holding in those pages of

---

[38] *Id.* at 2136–37 (quoting District of Columbia v. Heller, 554 U.S. 570, 614 (2008)).

[39] *Id.* at 2154 n.28.

[40] *Id.* at 2163 (Barrett, J., concurring).

[41] 140 S. Ct. 2246, 2258–2259 (2020).

[42] *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring).

[43] *See supra* note 7.

[44] Amicus Letter of Everytown Law at 2, Lara v. Comm'r Pa. State Police (3d Cir. 2022) (No. 21-1832).

[45] 907 F.3d 659, 669 (1st Cir. 2018).

[46] 651 F.3d 684, 702 (7th Cir. 2011).

[47] 679 F.3d 510, 518 (6th Cir. 2012).

[48] 9 F.4th 217, 227 (3d Cir. 2021).

[49] 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments).

[50] *Ezell*, 651 F.3d at 702.

**Pl.1254**

*McDonald*, and *Bruen* certainly did not read *McDonald* that way. The Seventh Circuit corrected itself shortly after *Ezell*, observing that "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning, according to *McDonald v. City of Chicago*."[51] *Greeno* quoted the mistaken language in *Ezell*,[52] as did *Binderup*.[53] The *Drummond* case did not hold that 1868 is the proper date.

## II.    THE INDIVIDUAL RIGHT TO BEAR ARMS IN THE SECOND AMENDMENT WAS UNDERSTOOD THE SAME WAY IN 1868 AS IN 1791

The debate about whether 1791 or 1868 is the critical year is significant only if there were important differences in the understandings of the ratifiers between those two time periods. But in the discourse that led to the Fourteenth Amendment, the right to keep and bear arms was represented as its text dictates, consistent with the same meaning as at the Founding.

Second Amendment concerns were prominent in debates over the Freedmen's Bureau Act and the Civil Rights Act of 1866. Rep. Thomas Eliot, who sponsored the Freedman's Bureau Act, noted that in Kentucky "[t]he civil law prohibits the colored man from bearing arms."[54] He also stated that the Act would invalidate a law providing that no freedman "shall be allowed to carry fire-arms" without employer permission and   police approval.[55] As enacted, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms."[56]

Another senator, Garret Davis, said that the Founders "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense."[57] Senator Samuel Pomeroy counted among the "safeguards of liberty" "the right to bear arms for the defense of himself and family and his homestead."[58] The amendment was needed, Rep. George W. Julian argued, because Southern courts declared the Civil Rights Act void and some states made it "a misdemeanor for colored men to carry weapons without a license."[59]

Indeed, the Freedmen's Bureau Act explicitly declared:

[T]he right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color, or previous condition of slavery.[60]

Just as the ratifiers of the Second Amendment sought to guarantee a pre-existing right, the ratifiers of the Fourteenth Amendment sought only to *extend* that protection, not change the right.

---

[51] Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

[52] *Greeno*, 679 F.3d at 518.

[53] *Binderup*, 836 F.3d at 362.

[54] CONG. GLOBE, 39th Cong., 1st Sess. 517 (1866).

[55] *Id.* at 657.

[56] *Id.* at 654.

[57] *Id.* at 371.

[58] *Id.* at 1182.

[59] *Id.* at 3210.

[60] Freedmen's Bureau Act of 1866, §14, 14 Stat. 173, 176–77 (1866) (emphasis added).

Pl.1255

III.    THE "SCHOLARLY DEBATE" REFERENCED IN *BRUEN* DOES NOT CHANGE THE SUPREME COURT'S SETTLED INCORPORATION JURISPRUDENCE

*Bruen* noted that "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)."[61] But the only two sources cited for the existence of this debate were Kurt Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 IND. L.J. 1439 (2022) and AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION xiv, 223, 243 (1998). Both of their positions are flawed.

*A. Professor Lash's approach is theoretically unsound and unlikely to be adopted*

Professor Lash believes that if a provision of the Bill of Rights meant something different to the ratifiers of the Fourteenth Amendment than it did to the ratifiers of the Bill of Rights, the 1868 meaning must control.

Noting that the Supreme Court has definitively and repeatedly held that the rights must mean the same thing against the federal government and the states, Lash inquires: If the meanings must be the same, "are the original 1791 meanings carried *forward* into the 1868 amendment, or are the understandings of the people of 1868 carried *backward* into the original Bill of Rights and applied against the federal government by way of 'reverse incorporation'?"[62]

Lash's theoretical answer to his own question is that rights as understood in 1868 must be "reverse incorporated" into the Bill of Rights. He states that there is only "one Freedom of Speech Clause—the one the people spoke into existence in 1791 but then *respoke* in 1868."[63] He argues that "[w]hen the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."[64]

There are several problems with this approach.

Lash's analysis is completely contrary to Supreme Court precedents. As noted above, constitutional meanings are fixed when they are ratified. When consulting history to determine the meaning of incorporated provisions of the Bill of Rights, every Supreme Court case has considered the Founding era to be dispositive, even though later evidence is sometimes examined for confirmation.

There also is no compelling basis for concluding that the 1868 meaning, if different, ought to prevail. That 1868 is later in time does not preclude using the original meaning of the Bill of Rights, and simply applying those original meanings to additional persons and entities—that is, in favor of blacks, and against the states—especially since that is what the debates in 1868, to the extent they mentioned the first eight amendments, seemed to contemplate.

Next, it is untrue that the ratifiers "spoke into existence" Bill of Rights provisions in 1791, but then "respoke" them in 1868. The Bill of Rights was a confirmation of existing rights, not an

---

[61] N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022).
[62] *Id.* at 1440.
[63] *Id.* at 1441.
[64] *Id.* at 1441.

**Pl.1256**

original grant of rights. The drafters of the Fourteenth Amendment extended those protections to people who had previously been denied them and guaranteed them against governments that had previously not been limited by them.

One suspects that the Supreme Court will not want to have the entirety of its Bill of Rights jurisprudence "transformed" retroactively based upon an unjustified and unprecedented reliance on 1868 as the focus for determining the meaning and scope of the Bill of Rights.

### B. *Professor Amar's approach contains similar flaws and his concerns have likely been superseded by* Heller

Turning to Professor Amar's book,[65] his emphasis on 1866 (not 1868)[66] is more subtle and less drastic than that proposed by Lash. He commends Justice Black's view "that *all* of the privileges and immunities of citizens recognized in the Bill of Rights" are incorporated through the Fourteenth Amendment.[67] But he does not recognize all of the provisions of the Bill of Rights as "privileges or immunities of citizens," stating that some are more akin to rights of states, and others are "alloyed provisions," part citizen right and part state right, that may have to undergo "refinement and filtration" before their citizen-right elements can be "absorbed" by the Fourteenth Amendment.[68] Amar's "refined incorporation" diverges in critical respects from the Court's current test, as stated in *McDonald*: whether the right "is fundamental to our scheme of ordered liberty, or as we have said in a related context, whether this right is 'deeply rooted in this Nation's history and tradition.'"[69]

Next, even though the right to keep and bear arms was a paradigmatic "privilege" of "citizens of the United States," the "right in 1789 and the right in 1868 meant different things," according to Amar.[70] But it is unclear, at best, whether Amar's distinction between 1868's relabeling the right as a privilege or immunity of citizens, and 1791's the "right of the people" in connection with the militia, has any continuing relevance in Second Amendment interpretation. At the time of Amar's book, the Second Amendment had not been incorporated, and was generally held by lower courts to relate only to militia service. The Court's opinion in *Heller* carefully recognized the role of the citizen militia in the colonies and early Republic, but it accurately determined that the right was an individual right for self-defense as well, the position for which Amar seems to be contending. Thus, *Heller* may have largely dispelled Amar's concerns about the nature of the right. Critically, however, these findings in *Heller* did not depend in any way on the understandings of the ratifiers in 1868, but looked to that general time period only as confirmation of the nature of the right as both militia-related and individual, just as it considered some antebellum interpretations as confirmation.

---

[65] Akhil R. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998).

[66] Professor Amar typically refers to 1866, the year the Fourteenth Amendment was drafted and sent to the states for ratification.

[67] AMAR, *supra* note 65, at xiv (emphasis in original).

[68] *Id.*

[69] 561 U.S. at 767 (citations omitted) (emphasis omitted).

[70] AMAR, *supra* note 65, at 257.

Pl.1257

CONCLUSION

The attempt to make the Fourteenth Amendment's ratification period the determinative time for ascertaining the Second Amendment's meaning has no basis in law or logic. The Supreme Court has held that provisions of the Bill of Rights have only a single meaning, whether applied against the federal government or the states. That meaning is fixed at the time of adoption: that is, in 1791.

All Supreme Court cases that have engaged in historical review of incorporated provisions have looked to 1791 as the determinative period. The Supreme Court has never looked to 1868 for anything more than confirmation of 1791 meaning. Neither litigants nor the scholars mentioned in the *Bruen* Court's reference to the "ongoing scholarly debate" have pointed to a single Supreme Court case that found the meaning of a provision of the Bill of Rights based primarily on the 1868 understanding to the exclusion of or in contradiction of the 1791 understanding.

In short, it can be said with confidence that the Supreme Court has not adopted and will not adopt 1868 as the primary or determinative period for construing the meaning of the Second Amendment or any other provisions of the Bill of Rights. Therefore, lower courts should confine themselves to looking to the Founding Era, not the Reconstruction Era, to define the meaning and scope of the Second Amendment.

**Pl.1258**