John W. Dillon (Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151
E-mail: jdillon@dillonlawgp.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

JOSE CHAVEZ, *et al.,*

        Plaintiffs,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.,*[1]

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 3:19-cv-01226-L-AHG

Hon. M. James Lorenz and Magistrate Judge Allison H. Goddard

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: May 13, 2024
Time: 10:30 a.m.
Dept.: Courtroom 5B

Action Filed: July 1, 2019

Third Amended Complaint Filed March 22, 2023

No oral argument will be heard pursuant to local rules unless ordered by the Court

---

[1] Rob Bonta is automatically substituted for his predecessor, Xavier Becerra, as California Attorney General, and Allison Mendoza is automatically substituted for her predecessors, former Directors Louis Lopez and Martin Horan, and former Acting Directors Brent E. Orick and Blake Graham. Fed.R. Civ.P. 25(d).

# TOPICAL INDEX

Page(s)

I.   INTRODUCTION ............................................................................... 1

II.  ARGUMENT ...................................................................................... 2

   A.  The Second Amendment Text Covers "All Americans,"
       Including 18-to-20-Year-Olds—Legal Adults Are Unquestionably
       Part of "the People." ................................................................... 2

       1. The Minority Status Of 18-20-Year-Olds At Earlier Periods
          Of American History Is Irrelevant ........................................... 4

       2. Defendants' Other Putatively *Textual* Arguments Also Fail ................ 7

          (i)   Regulation of Commercial Firearms ............................... 7

          (ii)  Objective Licensing Regime. ........................................ 10

   B.  This Nation's Historical Tradition of Firearms Regulations On
       Legal Minors ............................................................................ 13

       1.  A More Nuanced Analogical Approach is Unwarranted ................... 13

       2.  No Historical Laws Justify Restricting the Rights of Legal
           Adults Based on Age. ............................................................. 14

          (i)    No Age Restriction Laws ............................................. 14

          (ii)   Campus Rules and Policies are Inapposite ..................... 17

          (iii)  Public Discourse and Case Law do not Assist ................. 20

          (iv)   General Commercial Regulations Are Not to Be
                 Considered Under *Bruen* ............................................ 22

III. CONCLUSION ................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir. 1988).....................3

*Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011).........................................................19

*District of Columbia v. Heller,* 554 U.S. 570 ............................................... *Passim*

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857)................................................5

*Firearms Policy Coalition, Inc. v. McCraw*, 623 F.Supp.3d 740
(N.D. Tex. 2022)...................................................................................3, 6, 11

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
5 F.4th 407 (4th Cir. 2021) .....................................................................17

*Jones v. Bonta*, 2023 WL 8530834 (S.D. Cal. 2023) at *4-5 ............................ *Passim*

*Lara v. Commissioner Pennsylvania State Police,*
91 F.4th 122 (3rd Cir. 2024) ........................................1, 3, 5, 6, 15, 17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)......................................................16

*New York State Rifle & Pistol Assn. Inc. v. Bruen,* 597 U.S. 1 (2022) ............... *Passim*

*Parman v. Lemmon*, 119 Kan. 323, 120 Kan. 370, 244 P. 227 (1925) .......................21

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)..............................................................8

*Renna v. Bonta*, 667 F.Supp.3d 1048 (S.D. Cal. 2023) ...............................................7

*Russell Fouts v. Bonta*, 2024 WL 751001, at *4.............................................14, 15, 17

*State v. Allen*, 94 Ind. 441 (1884) ...............................................................................20

*State v. Quail*, 92 A. 859 (Del.Gen.Sess. 1914)...........................................................20

*Tankersly v. Commonwealth*, 9 S.W. 702 (Ky. 1888) .................................................20

*Teixeira v. Cty. of Alameda*, 873 F.3d 670 (9th Cir. 2017).........................................8

*United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012).......................................5

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................4, 5

*Worth v. Harrington*, 666 F.Supp.3d 920 (D. Minn. 2023) .......................3, 4, 5, 6, 19

**STATE CASES**

*Aymette v. State*, 21 Tenn. 154 (1840) ........................................................................20

*Coleman v. State*, 32 Ala. 581 (1858) .........................................................................19

*Page v. State*, 50 Tenn. 198 (1871).............................................................................20

ii

*State v. Callicutt*, 69 Tenn. 714 (1878) ........................................................ 19, 20, 21

**FEDERAL STATUTES**

Penal Code

    Section 27510 ..................................................................................... *Passim*
    Section 27545 ................................................................................................. 9
    Section 28050 ................................................................................................. 9

Federal Rules of Civil Procedure

    Section 56(c)(1)(A) ........................................................................................ 3

Federal Practice and Procedure

Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2723 ................... 3

**U.S. CONSTITUTION**

    First Amendment ........................................................................................ 13
    Second Amendment.............................................................................*Passim*
    Fourteenth Amendment ............................................................................. 16

**OTHER AUTHORITIES**

Patrick J. Charles, *Armed in America: A History of Gun Rights from
Colonia Militias to Concealed Carry* 137-138 (2019) .................................... 16

36 YALE BULLETIN & CALENDAR 4 (Sept. 28, 2007),
https://bit.ly/3PNmwt1 ............................................................................... 19

William Jo Novak's, *The People's Welfare: Law and Regulation in Nineteenth
Century America* (Uni. Of North Carolina Press 1996)....................................22

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide
For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch.
192, § 1 ..................................................................................................... 23

Powder, § 2, MASS ACTS (Rockwell & Churchill 1889) (Passed 1645)..................23

## I. INTRODUCTION

Defendants' summary judgment motion begins by reintroducing the means-end scrutiny analysis for Second Amendment challenges — an analysis the Supreme Court rejected in *New York State Rifle & Pistol Assn, Inc. v. Bruen,* 597 U.S. 1 (2022), "as having one step too many." *Id*. at 19 "While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *Id*. at 26. The Supreme Court in *Bruen* added: "The Second Amendment 'is the very product of an interest balancing by the people,' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense, "citing *District of Columbia v. Heller,* 554 U.S. 570, 635 (2008). *Id*. "[T]his balance — struck by the traditions of the American people… *demands* our *unqualified* deference." *Id*. (emphasis added).

Defendants also butcher the correct text as informed by history analysis required by *Heller* and reaffirmed in *Bruen*.

**First**, and despite Defendants' argument to the contrary, Plaintiffs, and every other 18-to-20-year-old legal adult, are unquestionably part of "the people" identified in the plain text of the Second Amendment. *Bruen,* 597 U.S. 1, 20, 31-32, 70. As such, the Second Amendment extends to "all Americans" (*Heller*, 554 U.S. at 581), regardless of age. *See Lara v. Commissioner Pennsylvania State Police,* 91 F.4th 122, 130-132 (3rd Cir. 2024) (holding that "18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extend") (footnote omitted). Defendants' argument to the contrary conflates *Bruen's* two distinct analytical prongs: the government maintains the burden to identify historical analogues under *Bruen*'s *second* prong, and the court in *Lara* made clear, "we are not limited to looking through that same retrospective lens at the first [prong]." *Lara*, 91 F.4th at 131. Under *Bruen*, when the plain text of the Second Amendment covers the conduct in question, as here, the burden *shifts* to the

government to justify its regulation through a sufficient showing of an analogous historical tradition of firearms regulation. *Bruen*, 597 U.S. at 19, 24.

**Second**, under *Bruen's* historical analysis, Defendants' attempt to justify their ban through highly generalized and compound references to irrelevant non-analogous historical laws and regulations. Nuanced approaches are impermissible; and Defendants' generalized references (many of which come too late) simply mask that there is no historical justification for prohibiting the sale, purchase, and acquisition of firearms to law-abiding legal adults based solely on their age.

Under the proper application of *Heller* and *Bruen*, this Court is asked to deny Defendant's motion and grant Plaintiffs' motion.[2]

## II.   ARGUMENT

### A.   The Second Amendment Text Covers "All Americans," Including 18-to-20-Year-Olds—Legal Adults Are Unquestionably Part of "the People."

Defendants boldly argue "Plaintiffs cannot establish that 18-20-year-olds are part of 'the People' protected by the Second Amendment." ECF No. 132-1 at 8. The argument is barred. Defendants have previously *agreed* that the Second Amendment covers legal adults (ages 18-20), and this Court's ruling already established in this case that Plaintiffs have satisfied *Bruen*'s textual analysis. *See Jones v. Bonta*, 2023 WL 8530834 (S.D. Cal. 2023) at *4-5:

> "Under *Bruen*, this Court looks first to the 'plain text' of the Second Amendment to determine whether Plaintiffs' conduct is protected under the Constitution. *The government agrees* for purposes of this motion that

---

[2]   To avoid duplication and comply with page limitation requirements, Plaintiffs incorporate by this reference their summary judgment legal memorandum; and in particular, the relevant procedural history, legal standards, California's pervasive scheme to prohibit the acquisition, possession, and ownership of firearms, including the almost total ban on the sale to legal adults (*i.e.*, 18-to-20-year-olds) of semiautomatic centerfire rifles and long guns, the pertinent factual background, argument and supporting evidence. *See* ECF No. 136-1, 136-2 through 136-6.

'18-20-year-olds are part of the 'people' protected by the Second Amendment *and* that the acquisition restrictions imposed through FFLs [federal licensed firearms dealers] implicate the right to 'keep and bear arms.' [Citing Defendants' Oppo. at 8-9]. Accordingly, *the first prong of the Bruen test is satisfied*. [Citing Defendants' Oppo. at 9, n. 4].'

*Id*. at *5 (emphasis added.)

Defendants' admissions to Plaintiffs' earlier motion in this case constitutes Defendants' judicial admissions. (*See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226-227 (9th Cir. 1988); *and see* Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2723 (updated June 12, 2023) ("admissions in the brief of the party opposing the motion may be used in determining that there is no genuine dispute as to any material fact, since they are functionally equivalent to 'admissions,' which is expressly mentioned in [Federal Rules of Civil Procedure] 56(c)(1)(A);" *see also Id*. at § 2722 (discussing use of admissions in summary judgment motions).

Additionally, this Court's prior ruling should eliminate the need to address *Bruen*'s textual analysis any further. *See Jones v. Bonta*, 2023 WL 8530834 (S.D. Cal. 2023) at *4-5 (above). The Ninth Circuit, in its now-vacated panel decision, *also* agreed that the Second Amendment's plain text shows the right to keep and bear arms "belongs to all Americans," citing *Heller*, 554 U.S. at 581. *See Jones v. Bonta*, 34 F.4th 704, 714 (9th Cir. 2022).

Moreover, Plaintiffs, in their pending summary judgment motion, have further shown that 18-to-20-year-old legal adults are part of "the people" under the Second Amendment's plain text. *See* ECF No. 136-1 at 9-12 (incorporated by reference). Similarly, the Third Circuit in *Lara* held that the Second Amendment's textual reference to "the people" covers "all adult Americans" and why. 91 F.4th at 13-132. See also *Firearms Policy Coalition, Inc. v. McCraw*, 623 F.Supp.3d 740, 747-750 (N.D. Tex. 2022) (concluding that "law-abiding 18-to-20-year-olds are a part of 'the people' referenced in the Second Amendment"); *Worth v. Harrington*, 666 F.Supp.3d

920, 912-916 (D. Minn. 2023) (same). This textual analysis is resolved in favor of Plaintiff.

Defendants may assert it can relitigate the textual analysis because they agreed "for purposes of" their prior opposition only. This is a distinction without a difference. Binding judicial admissions can arise in briefing, as here, and Defendants do not offer any explanation for the complete "about face" in position. Defendants may also assert they can fundamentally change their position now that the *Bruen* decision is in place. Not so. At bottom, the *Bruen* Court made clear that the first prong is to be decided based on the Second Amendment's *plain text*, and *not* on Defendants' skewed and incorrect *historical* analysis (*i.e.*, wrongly conflating the inquiries set forth in *Bruen*, 597 U.S. at 17, 24).

In sum, Plaintiffs have already established that 18-to-20-year-olds are part of "the people" under the plain text of the Second Amendment. *See* ECF No. 136-1, at 9-12. The *Heller* Court made clear that the "Second Amendment right is exercised individually and belongs to *all* Americans." *Id.* 554 U.S. at 581 (emphasis added). *Worth*, 888 F.Supp.3d at 913 (relying on *Heller, 554 U.S. at 580-581 and Bruen,* 597 U.S. at 70). The plain text of the Second Amendment is clear—18-to-20-year-olds are a part of "the people" under every metric imaginable.

### 1.   The Minority Status Of 18–20-Year-Olds At Earlier Periods Of American History Is Irrelevant

Shockingly, Defendants ignore their own prior admissions, this Court's ruling, and other case law, arguing inconsistently that the Second Amendment does not apply to legal adults, ages 18-to-20, because as a class, they are not "ordinary, law-abiding, adult citizens" ECF No. 132-1 at 8 (citing *Bruen*, 597 U.S. at 31-32). Defendants further assert that Plaintiff legal adults (18-to-20 years of age) are somehow removed from "the people" as used in the Second Amendment because they were considered minors at earlier periods of American history, and thus, not "members of the political community." ECF No. 132-1 at 8. Defendants make this

4

legal argument despite that the Supreme Court has already decided this issue, as *Heller* held that the Second Amendment "belongs to all Americans." *Id*. 554 U.S. at 580-581; and see *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Bruen*, 597 U.S. at 70; and *see Lara*, 91 F.4th at 130-132; *Worth*, 666 F.Supp.3d at 914-916.

**First**, Defendant's own language is a giveaway that this argument is not textual *but historical*. The claim that being a minor at earlier periods in American history has nothing to do with the individual's rights under the Second Amendment's *text*, and *Bruen* clearly treated the Amendment's history separately, emphasizing that once history is invoked, the law is presumed unconstitutional and can only be saved if the government manages to prove the regulation is consistent with historical limitations on the right. *See, e.g.*, 597 U.S. at 19, 24. ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). *See also Worth*, 666 F.Supp.3d at 916. As a result, Plaintiff further addresses the historical flaws with this argument below as part of the historical analysis under *Bruen*.

To the extent Defendants insist on casting their assertion as a retrospective textual argument—that "the people" encompasses *only* those who were understood to be part of "the people" at the Founding (see ECF No. 132-1 at 8-10)— is not an argument this Court should endorse. After all, "groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding but are today within the class that we refer to as 'the people.'" *United States v. Carpio-Leon*, 701 F.3d 974, 978 n.1 (4th Cir. 2012). Additionally, in affirming the Second Amendment right to keep and bear arms in public, the *Bruen* Court noted that in his infamous opinion, *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), Justice Taney "fretted" that if "free blacks" were recognized as citizens of the United States (and therefore, part of "the people"), they would be entitled to

the right to "keep and bear arms"— a right often denied in antebellum America. *Bruen*, 597 U.S. at 60.

Indeed, Defendants claim that the "most relevant" support for its unfounded claim that 18-to-20-year-old adults are not "members of the political community" is that "the Founders denied those under 21 the right to vote—thus excluding them from "membership in the polity." ECF No. 132-1 at 10. In other words, Defendants contend that the "the people" today are confined to "the people" at the founding. *Id.* at 10. The government's position appears to be that the political community at the time of the Founding was tied to voting eligibility, which applied primarily to white, male property owners, an abhorrent position to take. This Court should not accept such a claim, as the Second Amendment has never been coterminous with voting rights, and plainly cannot be cabined to that understanding of "the people" today. *Heller* used "political community" as a synonym for "national community" and "all Americans," plainly extending beyond voters. Of course, even if "political community" meant voters, Defendants' dubious argument is avoided entirely by treating anyone who is a member of "the political community" today as part of "the people." We treat other constitutional rights this way (the First and Fourth Amendments both apply to everyone who is part of "the people" today). *Lara*, 91 F.4th at 131-132; *Worth*, 666 F. Supp. 3d at 914., *McCraw*, 623 F. Supp. 3d at 748-749. This reading is also consistent with *Heller*. After all, *Heller* rejected the argument that "arms" in the Second Amendment meant only arms that existed at the Founding, as "bordering on the frivolous." 554 U.S. at 582. The same should be said of Defendants' argument that "the people" should mean only those who would have been part of "the people" at the Founding. Plaintiffs, and every other 18–20-year-old law-abiding adult in California, are undisputedly "members of the political community" today—they are legal adults who can exercise all their rights without qualification, including the right to vote.

6

In sum, this Court should flatly reject Defendants' inapplicable and incorrect *historical* arguments. That an entire group of people who are legal adults and who take part in their national and political community in every conceivable way could be excluded from the Second Amendment's reference to "the people" is absurd and fundamentally conflicts with *Heller* and its progeny. Legal precedent and logic demand that the Court ignore Defendants' wrongful conflation of the text and history analysis required by *Bruen*. Simply, this Court is asked to find that Plaintiffs, legal adults, are among "the people" under the plain text of the Second Amendment.

## 2. Defendants' Other Putatively *Textual* Arguments Also Fail.

### (i) Regulation of Commercial Firearms

Wrongly inserting another argument into *Bruen's* plain text analysis, Defendants claim that "Section 27510 imposes presumptively lawful 'conditions and qualifications on the commercial sale of arms,'" citing *Heller* and relying on Justice Kavanaugh's concurring opinion in *Bruen*. ECF No. 132-1 at 10. Defendants also rely on this Court's ruling that section 27510 simply limits commercial firearms transactions based on age and that the law contains exemptions *Id*. at 10-11. Not so.

**First**, Defendants again conflate the separate analyses required by *Bruen*. Plaintiffs' desire to purchase "arms" in the commercial market (semiautomatic centerfire rifles and long guns). These common firearms fall within the Second Amendment's plain text and is not subject to any longstanding presumptively lawful exception identified in *Heller*.

The *Heller* Court provided examples of "presumptively lawful regulatory measures" that were presumed to be consistent with the *historical* scope of the Second Amendment, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill, … laws forbidding the carrying of firearms in sensitive places …, *laws imposing conditions and qualifications on the commercial sale of arms* [,] … [and laws] prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. 544 U.S. 626-627 (emphasis added). If the commercial sales condition

7

identified in *Heller* were interpreted as broadly as Defendants suggest, the exception would eviscerate the Second Amendment's unqualified command that the "right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II; and *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1063-1067 (S.D. Cal. 2023), appeal filed, *Renna v. Bonta, et al.*, 9th Cir., Apr. 20, 2023.

**Second**, Defendants—having previously agreed that 18-to-20-year-olds are part of "the people" and that the acquisition restrictions imposed through FFLs unquestionably implicate the plain text right to "keep and bear arms" under the Second Amendment (*Jones v. Bonta*, 2023 WL 8530834 at *5)—bear the burden of demonstrating that this law (section 27510) fits within the historical regulation of the right ot keep and bear arms. This burden requires Defendants to prove that the relevant *historical* record contains laws imposing age-based "conditions and qualifications on the commercial sale of firearms." They have not met their burden. See ECF No. 136-1 at 13-25; and **Section B**, below.

**Third**, Defendants reliance on the commercial sales condition is insufficient under Ninth Circuit precedent. For example, in *Pena v. Lindley*, 898 F.3d 969, 976 (9th Cir. 2018), the court stated that the *Heller* Court "did not define the contours of the[] 'presumptively lawful' categories." *Pena*, 898 F.3d at 976. Further, the court in *Pena* refused to define the parameters of the Second Amendment's individual right in the context of commercial sales, observing that the Ninth Circuit in *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc) viewed the commercial sales condition as "sufficiently opaque" such that it could not be relied upon alone. *Pena*, 898 F.3d at 976. Judge Bybee, concurring in *Pena*, noted that the Supreme Court in *Heller* "could not have meant that anything that *could* be *characterized* as a condition and qualification on the of firearms is immune from more searching Second Amendment scrutiny." *Id.* at 1007 (original emphasis) (Bybee, J., concurring).

Here, according to the Ninth Circuit, in the now-vacated panel decision, Section 27510 is "an almost total ban" on semiautomatic centerfire rifles. *Jones*, 34

F.4th at 710. Now, this Court disagrees with the Ninth Circuit panel decision (*Jones v. Bonta*, 2023 WL 8530834 at *6), stating that due to severely limited "exceptions," Section 27510 "is not a firearms ban, including semiautomatic centerfire rifles, for individuals between 18 and 20 years old." *Id*. However, the challenged law operates as a total-ban on sales to legal adults (18-20) of semiautomatic centerfire rifles, and the law's long gun prohibition operates as a functional near-total-ban on such sales to legal adults. As such, these laws cannot fairly be cast as merely commercial sales conditions. No one would argue that a law prohibiting the sale of rifles to legal adults unless they pay a one-million-dollar tax is simply a lawful commercial sales condition. Instead, such a law would prohibit, substantively and functionally, rifle sales and possession to legal adults in violation of the Second Amendment. The challenged law (Section 27510) is substantively and functionally no different than the tax payment example above.

**Fourth,** Defendants admit that "[u]nder California law, all commercial sales and most transfers of firearms—including long guns, semiautomatic centerfire rifles, and handguns—must occur through a federal licensed firearms dealer," or FFL. *See* Penal Code §§ 27545, 28050; and ECF No. 132-1 at 3. Thus, all commercial sales and most transfers of firearms to legal adults (18-to-20-years old) are *prohibited* by California law. This prohibition includes all private transactions between two non-familial California residents. *See* ECF No. 136 at 2.

In other words, nearly all firearm transfers to 18-to-20-year-olds are prohibited. And while Defendants claim there are exceptions to the prohibitions stating firearms can be obtained by gift, bequest, [or] interstate succession" or "through a spouse," Defendants fail to show that any such transaction *has ever occurred in California* involving an 18-to-20-year-old adult. Without this data, there is no way to identify whether Defendants' so-called exceptions have ever been implemented. As Defendants are in charge of keeping this data, they are best suited to provide such evidence to this Court. Because Defendants have failed to provide such evidence,

Defendants' claim that 18-to-20-year-old adults can freely and easily acquire arms through the exceptions is not supported by *any* evidence.

**Finally**, Defendants cite Plaintiff Chavez and Morris testimony about firearm loans and gifts. ECF No. 132-1 at 11. The argument is meritless. Plaintiffs have never sought the ability to be *temporarily loaned* a firearm. Instead, they seek to purchase and acquire *ownership of firearms.* The Second Amendment right is not satisfied by the *subjective will* of third parties to *temporarily* allow an individual to use or handle their gun. And while Plaintiffs may have stated they would reject a *hypothetical* gifted firearm, because such a gift would not redress their inability to acquire and purchase a firearm in California, Defendants conveniently omit the fact that such a gift has never been offered to Plaintiffs.

### (ii)    Objective Licensing Regime.

Defendants again wrongly supplement the textual analysis under *Bruen's* first prong, claiming "Section 27510 also allows 18-to-20-year-olds to purchase long guns from FFLs, if they procure a hunting license after taking a hunters education course covering firearm safety training topics." ECF No. 132-1 at 11. Defendants assert that "this kind of objective licensing requirement mirrors the licensing regimes sanctioned by the Supreme Court in *Bruen*." *Id*. This argument strays far from the textual analysis under *Bruen* and is unsupported by any historical justification.

**First**, Defendants attempt to justify the licensing regime by relying on footnote 9 in *Bruen*, finding unconstitutional New York's "may-issue" permitting scheme and referring to licensing schemes that grant open-ended discretion to licensing officials and authorize "licenses only for those applicants who [could] show some special need apart from self-defense." *Id*. 597 U.S. at 38, n.9. The *Bruen* Court carefully added that its holding did not signal that the "shall-issue" regimes in 43 other states were also invalid because *unlike* New York, those states "appear[ed]" to condition the granting of a license on "narrow, objective, and definite standards" and did not

"require applicants to show an atypical need for armed self-defense." *Id*. As a result, the Supreme Court noted that those regimes "do not necessarily prevent law-abiding responsible citizens from exercising their Second Amendment right to public carry." *Id*.

Nothing in Plaintiffs' challenge would require this Court to find otherwise. Plaintiffs do not challenge the existence of a "shall-issue" licensing regime for public carry in California—instead, they challenge the age prohibition, which unconstitutionally separates legal adults 18-to-20-years-old from older adults in terms of their ability to exercise their Second Amendment right to acquire and purchase firearms. The Supreme Court did not state that every aspect of the 43 other states existing "shall issue" regimes was necessarily constitutional, nor did it provide a blanket "sanctioning" of all licensing regimes. In fact, footnote 9 states that certain specified features of such regimes that "prevent law-abiding responsible citizens from exercising their Second Amendment right to public carry" would render them unconstitutional. *Id*. at 38 n.9. California's age-based prohibition is just such a feature.

**First**, the so-called hunting license "licensing regime," as implemented, is not objective because Section 27510 subjects all individuals 18-to-20-years old to a different standard as to all other lawful adults based on the subjective and highly generalized assumption that 18-to-20-year-olds are too immature, dangerous, and impulsive to purchase and acquire firearms. *E.g.*, ECF No. 132-1 at 9. Under any "shall-issue" licensing scheme, determinations are based on the individual level, not highly generalized categorizations of particular groups.

**Second**, the only potentially valid justification for a "shall-issue" licensing scheme is to identify people who have a criminal record or otherwise are not entitled to possess firearms. In contrast, here, California's hunting license scheme does nothing to serve that "criminality" function. Requiring a hunting license unlawfully burdens Second Amendment rights and is wholly unjustified historically because

11

Defendants cannot show that non-hunters were excluded from the Second Amendment.

**Third**, it is undisputed that 18-to-20-year-olds must go through a background check for any firearms transfer, even if Section 27510 were enjoined. CA Penal Code section 27545. Further, individuals in California who wish to purchase a firearm must all take and pass the firearms safety test and obtain a firearms safety certificate before purchasing a firearm. CA Penal Code section 31615. Thus, California's conditions to ensure that all purchasers, regardless of age, are law-abiding citizens with firearms safety training *are already in place through other laws not challenged in this case*.[3] By requiring 18-to-20-year-old adults to go through *additional* courses, tests, and certifications, based solely on their age, the challenged law unconstitutionally burdens Second Amendment rights.

Defendants also reference Justice Alito's concurring statement that "federal law generally forbids . . . sale of a handgun to anyone under the age of 21," as indicating that that California's age-based firearms prohibition is constitutional. ECF No. 132-1 at 7. Justice Alito implied no such thing—he was merely responding to the dissent and noting an issue that was not before the Court in *Bruen*. 597 U.S. at 72-73. (Alito, J., concurring) (asking what do "statistics on children and adolescents killed by guns … have to do with the question whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home?"). Far from justifying Defendants' conclusion that the age-based prohibition is constitutional, if anything, these statements from *Bruen* demonstrate why the California's age-based ban on legal adults should not be thought of as part of a lawful "licensing regime," but instead as a distinct ban that operates to "prevent law-abiding responsible citizens from exercising their Second Amendment right" to purchase and acquire firearms.

_____

[3] To be clear, Plaintiffs do not concede that these other purchasing requirements are constitutional under the Second Amendment. Plaintiffs merely identify the fact that these other requirements are applied uniformly to all purchasers.

**B.     This Nation's Historical Tradition of Firearms Regulations On Legal Minors.**

**1.     A More Nuanced Analogical Approach is Unwarranted.**

Defendants claim that a "more nuanced" approach is warranted in this case, citing *Bruen's* statement that when a challenged law addresses either "unprecedented societal concerns or dramatic technological changes," a "more nuanced approach" is warranted because '[t]he regulatory challenges' of today would not be 'the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868.'" ECF No. 132-1 at 14-15. Defendants are wrong.

**First**, firearms and general societal public safety interests existed when the Second Amendment was ratified—it is not an interest divorced from the Second Amendment. *See Bruen*, 597 U.S. at 27-28 (stating that "other cases implicating *unprecedented* societal concerns or *dramatic* technological changes *may* require a more nuanced approach," when the "regulatory challenges posed by firearms today are not always the same as those" in 1791 or 1868) (emphasis added). In fact, Defendants freely admit, that "cheaper, deadlier, concealable firearms" and "the proliferation of gun violence" including "gun violence among minors under the age of 21" have existed in this Country since the Jacksonian period (1828-1854). ECF No. 132-1 at 15. In short, the firearms at issue (rifles and shotguns) present the *same* general societal concerns now as then (1791/1868). Thus, a "more nuanced approach" is not permissible. *Bruen*, 597 U.S. at 27.

And *Bruen* already made clear that Defendants' assertion about technological changes in modern firearms like semiautomatic rifles is not grounds for such a nuanced approach. "We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century.... Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second

13

Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen,* 597 U.S. at 28 (citations omitted). Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate self-defense. *Id.*

Further, the public safety concerns of criminal conduct by legal adults are hardly unprecedented or dramatic. Violent crime has been committed by this age-group (and others) since before the Founding. Moreover, it has already been shown that 0.25% of 18–20-year-old adults are arrested for violent crimes. *Jones*, 34 F.4th at 730.

Thus, when the same societal interest existed in early America, as here, analogous reasoning is not applied. Instead, "Only straightforward historical prohibitions on" purchasing and possessing a firearm by a legal adult between 18-to-20-years old are relevant. *See Russell Fouts v. Bonta*, 2024 WL 751001, at *4 (finding that "nuanced analogical reasoning is not applied" as to the use of a billy club when the "societal ill" is the same "in early America"). In this case, Defendants fail to meet their burden to show any historical law or regulation prohibiting 18-to-20-year-old adults from purchasing or possessing a firearm. Highly generalized arguments do not cut the muster.

### 2. No Historical Laws Justify Restricting the Rights of Legal Adults Based on Age.

#### (i) No Age Restriction Laws.

Plaintiffs have addressed Defendant's historical evidence in detail in Plaintiffs' summary judgment motion. *See* ECF No. 136 at 13-25. To avoid duplication, Plaintiffs will not repeat their analysis here.

However, based on Defendants' historical evidence, it is undisputed that no evidence exists of any age-based laws prohibiting the purchase, acquisition, sale, or

14

transfer of any firearm from before the Founding, at the Founding, or during the Early Republic. *See* Pl.32-39, Pl.49-84, Pl.86-100. In other words, while some gun regulations existed at the Founding, there were no laws or regulations restricting minors' or 18-to-20-year-old adults' ability to acquire, purchase, or possess weapons until 1856—and the 1856 Alabama law did not restrict the sale of any kind of long gun or rifle. Pl.32, Pl.49, Pl.86.

The prior Ninth Circuit panel opinion mirrors Plaintiffs' historical analysis. The panel collected 28 such laws passed between 1856 and 1897. *Id*. 34 F.4th at 720 and App'x 3. Of these, just two laws existed that placed special restrictions the rights of 18-to-20-year-olds before the Civil War, one from Alabama and one from Tennessee. See 1856 Ala. Acts. 17, 17; 1856 Tenn. Pub. Acts 92, 92. These exceptions merely prove the rule that has been uniformly demonstrated from the Founding—18-to-20-year-olds were considered to have full Second Amendment rights and restrictions on the exercise of those rights are evidenced nowhere until over 60 years *after* the Second Amendment was ratified. See *Bruen*, 597 U.S. at 36. In this case, leading up to 1856 "there is not just a vacuum at the founding era: instead, the founding-era evidence of militia membership undermines" the importance of these Reconstruction-era outliers. *Jones*, 34 F.4th at 722. This is precisely the sort of history on which the Supreme Court warned against putting "more weight than it can rightly bear" because, "to the extent later history contradicts what the text says, the text controls." *Bruen*, 597 U.S. at 34-35. See also *Lara*, 91 F.4th at 132-135 (applying historical evidence from the Second Amendment's ratification in 1791, and setting aside the government's "catalogue of statutes from the mid-to-late nineteenth century, as each was enacted at least 50 after the ratification of the Second Amendment"); and *Fouts*, 2024 WL 751001, at *7 (finding most of the State's laws, *circa* late 19th and 20th century, came "too late" and "cannot bear any weight").

Further, "[i]t would also be strange to rely on two southern laws restricting gun rights that were enacted before the Civil War given Congress's grave concerns about southern states disarming freed Blacks during this period." *Hirschfeld*, 5 F.4th at 440; *see also McDonald*, 561 U.S. at 770–78; and *Jones*, 34 F.4th at 722 (noting the "deeply offensive nature of many of" "the Reconstruction-era laws" restricting the Second Amendment rights of 18-to-20-year-olds). In fact, Ohio congressman John Bingham, the chief architect of the Fourteenth Amendment, made clear in an 1871 speech that the Southern Black Codes violated the constitutional rights of Freedmen largely because of their participation as members of the militia. Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonia Militias to Concealed Carry* 137-138 (2019) ("Armed In America"). "Recurring…to the language of the Constitution, we find that [the Second Amendment] couples this great right with the necessity for a militia, showing obviously enough that the people to be allowed to keep and bear arms are those of whom a militia can be composed." *Id*. at 139.

The Ninth Circuit in *Jones* likewise found that in the period immediately following ratification "every state's militia law obliged young adults to acquire and possess firearms." *Id*. 34 F.4th at 719. While the Ninth Circuit decision in *Jones* was vacated, its findings are accurate and undisputed. Moreover, after exhaustively surveying historical gun regulations related to firearm purchasing by 18-to-20-year-olds, the Fourth Circuit in *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,* 5 F.4th 407 (4th Cir. 2021), vacated as moot, concluded that "[w]hile some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856. 5 F.4th at 437.

Against this extensive evidence of Founding-era arms-bearing by 18-to-20-year-olds, there is no evidence of any laws prohibiting the right of 18-to-20-year-olds to purchase and acquire firearms solely because of their age. And no such age prohibition was ever placed on adults who have reached the age of majority. In fact,

16

in the concurrently filed declaration of Plaintiffs' counsel John W. Dillon and attached as **Exhibit A**, Plaintiffs have taken Defendants' "survey of relevant laws, ordinances, and authorities categorized among five charts" identified in the Declaration of Todd Grabarsky (ECF No. 133) and have provided point-by-point responses to each historical law, identifying why such law provides no support under the *Bruen* analysis or why such law is not relevantly similar to the challenged provision. *See also Lara*, 91 F.4th at 134-135 (rejecting statutes form the mid-to-late nineteenth century as too late in time), and *Fouts*, 2024 WL 751001, at *7.

With Defendants highly generalized references to firearms regulations at the Founding and their only support in regulations against 18-to-20-year-olds arriving late in the 19th century, Defendants cannot prove that banning commercial firearm sales to adults ages 18-to-20 has any analogue in the Founding era. *Lara*, 91 F.4th at 134-135.

### (ii)    Campus Rules and Policies are Inapposite.

Defendants claim that public and private educational institution rules and policies that prohibited students from possessing firearm on college and university campuses provide additional historical precursors to Penal Code § 27510. According to Defendants, "[t]he historical record reveals that at least twelve public universities and nearly fifty private colleges and universities imposed some firearm restrictions upon their students. These college students were generally aged 18-22." ECF No. 132-1 at 20. Defendants are wrong. The cited college rules and policies are not "relevantly similar" and do not support Defendants' claim. Instead, Defendants rely on these college rules and policies because they cannot cite any age-based laws or regulations on firearms during the Founding era.

**First**, Plaintiffs have already addressed Defendants' fundamentally flawed argument in their summary judgment motion, and again, incorporate by reference all argument and evidence herein. *See* ECF No.136-1 at 20-22.

**Second**, as stated in Plaintiffs' summary judgment motion, nearly all the municipal and state laws and regulations in place at the time these college rules were implemented explicitly contradict any notion that 18-to-20-year-olds were not able to purchase and acquire firearms, because there were no such municipal or state regulations implemented where these colleges were located. ECF No. 136-1, at 21. Plaintiffs conducted a thorough review of Defendants' Declaration of Todd Garbarsky. It is of no assistance to Defendants. **Exhibits 107** through **156** in **Chart B** listing "College and University Firearms Regulations" identify school policies enacted up until 1855. Tennessee, in 1856, was the first state to ever enact any kind of firearms age restriction on minors. As such, the state and municipal laws for every state in which these college and universities were located freely permitted 18-to-20-year-olds to purchase and acquire firearms contradicting these school policies. The same is true for nearly all the remaining college rules listed as **Exhibits 157** through **170.** Again, these college rules did not align with their surrounding state and local municipal laws. With the exception of Tennessee, Alabama, and Kentucky, the states in which these colleges and universities **[157-170]** were located in did not enact age-based firearms restrictions on minors until 1875 in Indiana, well after the relevant period under *Bruen*.

**Third**, these college rules only applied to college students. They did not apply to the vast majority of the population. Up until 1860, 99% of the population did not attend college. As such, these college rules applied to an extraordinarily small number of individuals. Considering Defendants' claim that "at least twelve public universities and nearly fifty private colleges and universities imposed some firearm restrictions upon their students," it is clear that these rules had absolutely no effect on nearly the entire population in the United States starting from before the Founding era and continuing through until 1900.

**Fourth**, these college rules applied to all students, regardless of age. As such, these are not age-based restrictions.

**Fifth**, the basis for these restrictions was not a generalized police power but rather *in loco parentis* authority of schools over students in their charge. In this capacity the schools could require other things of their students that, if commanded by the government, would certainly violate their constitutional rights. *See, e.g.*, University Church in Yale marks 250 years of tradition and reform, 36 YALE BULLETIN & CALENDAR 4 (Sept. 28, 2007), available at https://bit.ly/3PNmwt1 ("Yale students were required to attend daily chapel services for the first 170 years of the church's history."). The restrictions thus reflected the rights of parents, and those standing in their stead, over legal minors, and say nothing about restrictions the government may impose on law-abiding legal adults, or even children for that matter. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 795 n.3 (2011).

**Finally**, in *Worth*, 666 F.4th at 920-923, the court has already rejected the government's reliance on college campus restrictions in the context of Minnesota's age requirement for a permit to publicly carry a handgun. There, the court held that colonial-age restrictions on a few college campuses prohibiting possessing firearms were not relevantly similar analogues to the Minnesota 18-to-20-year-old permit prohibition and for good reason. *Id*. at 920-923.

### (iii)  Public Discourse and Case Law do not Assist.

Turning to the post-Civil war period, which again, it too late in time to overcome the Founding era understanding of the Second Amendment right, Defendants cite six cases it contends support the argument that "[t]he historical record reveals few challenges to age-based firearm restrictions, and suggest that state courts 'maintained that age-based restrictions on the purchase of firearms—including restrictions on the ability of person under 21 to purchase firearm comported with the Second Amendment guarantee.'" ECF No 132-1 at 21.

Specifically, Defendants collect a handful of state court cases purportedly upholding restrictions on the right of 18-to-20-year-olds to purchase pistols, and one treatise noting that the state could prohibit the sale of firearms to minors. *Id*. at 21-22.

19

Regarding the court cases, Defendants rely on *State v. Callicutt*, 69 Tenn. 714 (1878) and *Coleman v. State*, 32 Ala. 581 (1858), both of which upheld convictions for selling pistols to minors. In neither case did the court state the age of the minor in question and in *Coleman* the court did not address the constitutionality of the law. *See Jones*, 34 F.4th at 704. In *Callicutt*, the court did pass upon the constitutionality of the law but it only "addressed concealed carry of dangerous weapons, not the right to keep and bear arms more generally." *Jones*, 34 F.4th at 720. The only legal reasoning in *Callicutt* on the scope of the right to bear arms is a pair of citations to *Aymette v. State*, 21 Tenn. 154 (1840) and *Page v. State*, 50 Tenn. 198 (1871). And the *Heller* Court singled out *Aymette* as demonstrating an "odd reading of the right" which was "not the one [the Court] adopt[ed]," and simultaneously permitted citizens "to carry arms openly, unconnected with any service in a formal militia, but . . . use them only for the military purpose of banding together to oppose tyranny." 554 U.S. at 613. *Page* asserted the legislature could restrict carrying a revolver because it was not "an arm for war purposes." 50 Tenn. at 198. Again, *Heller* made clear that the Second Amendment is not limited to protecting arms for war purposes but "extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582. *Callicutt* is not good law and has nothing to say about the appropriate scope of the Second Amendment rights.

The other cases Defendants cite provide no support, and even contradict their position. *Tankersly v. Commonwealth*, 9 S.W. 702, 703 (Ky. 1888) was decided on jurisdictional, rather than Second Amendment, grounds. *State v. Quail*, 92 A. 859, 859 (Del.Gen.Sess. 1914), addressed only whether a concealed unloaded revolver could still be considered a concealed "deadly weapon" and did not consider the Second Amendment validity of the law. This case had nothing to do with any state age-restriction on firearms. Nor does the case imply that the defendant's age was ever an issue. *State v. Allen*, 94 Ind. 441 (1884), was an appeal after a court quashed the information related to an affidavit claiming the appellee unlawfully sold a pistol to a

minor. The court of appeals reversed the judgment and remanded the case for further proceedings. There is no discussion of the facts of the case or the final disposition. As such, it provides little evidence of anything.

Most surprising is Defendants' reliance on *Parman v. Lemmon*, 119 Kan. 323, 120 Kan. 370, 244 P. 227, 230 (1925). In that case, the court first held that shotguns were dangerous weapons that could not be sold to minors. The statute in question prevented "any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol … or other dangerous weapons, to any minor…shall be deemed guilty of a misdemeanor…" *Parman v. Lemmon*, 119 Kan. 323, 244 P. 227 (1925). A forceful dissent noted the historical importance of armed minors to the republic. *Id*. at 231-32 (Dawson, J., dissenting). On rehearing, the court *reversed*, saying "the Legislature did not intend to make law violators of 60 percent of the militia of the state, it being estimated that 60 percent of the personnel of that body are minors" holding that shotguns and rifles did not fall under the definition of "other dangerous weapons" in the statute. Most importantly, the court adopted the dissenters' views from the original case, which plainly asserts the ability for minors to exercise their Second Amendment right.

Defendants also rely on a Thomas M. Cooley treatise from 1868, which states that, "the State may prohibit the sale of arms to Minors." ECF No. 132-1 at 21. But this quote is from the section discussing the police power of the state and does not address the Second Amendment or the right to bear arms, and what's more, Cooley's authority for the sentence was *Callicutt*. *Jones*, 34 F.4th at 704. Cooley did not weigh on the legitimacy of the decision, instead he was "simply identifying [it] as a case related to his discussion, which is how he utilized footnotes to cite thousands of cases throughout the treatise." *See* Pl.756-757.

Nor is it appropriate for this Court to infer, from a lack of challenges to state laws, that such laws were viewed as comporting with the Second Amendment. See ECF No. 132-1 at 21. The historical record on this point hardly tilts decisively in

21

Defendants' favor—after all, there is just one case that examined the constitutionality of these laws, and as discussed above, it rested on grounds that were rejected by the Supreme Court in *Heller*. It is not clear from the record, in fact, that these laws were often enforced, an issue that could just as easily explain the lack of challenges to them. *Bruen*, 597 U.S. at 57-58. Moreover, the common-sense explanation for a lack of any constitutional challenges is the undisputed fact that age-based prohibitions were non-existent until well after the Founding.

### (iv) General Commercial Regulations Are Not to Be Considered Under *Bruen*.

Absent any analogous firearms regulations during the Founding era, Defendants rely on the highly generalized argument that "Section 27510 is part of a long tradition of regulating the commercial sale of products—including firearms and ammunition—to advance the goals of a well-regulated society including public safety, morals health, and welfare." ECF No. 132-1, at 22-24. In support, Defendants rely on several sources that discuss early economic and product regulations enforced through common law in the early part of this Nation's history. As directed by the controlling authority of the Supreme Court in *Bruen*, the only regulations that can be considered to justify Defendant's age-based ban are analogous *firearms regulations*. *Bruen,* 597 U.S. at 4 (emphasis added). Thus, the only regulations that can be considered by this Court are arms regulations, not general commercial regulations of products and goods.

Further, Defendants' handful of gunpowder and shooting gallery regulations are also insufficient under the *Bruen* standard. Defendants primarily rely on William Jo Novak's, *The People's Welfare: Law and Regulation in Nineteenth Century America* (Uni. Of North Carolina Press 1996) to support their assertions. Defendants claim that "between 1780 and 1835, Massachusetts passed regulations that closely specified and controlled the way numerous products were manufactured and sold, including gunpowder and firearms." ECF No. 132-1 at 22, n. 18. However, aside

22

from the generalized claim "legislatures passed laws directing 'trades to be conducted, and wares and goods to be fabricated, and put up for market in a certain manner," there is no discussion of what specific regulations were placed on either firearms or gunpowder. Citing to the generalized statutes of Massachusetts from 1780 to 1835, Novak merely lists "gunpowder (1809)" and "firearms (1814)" as products that some regulations were placed on.

Upon further inspection by Plaintiffs, Massachusetts passed a regulation that "all musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act…" 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1. This 1814 regulation requiring proof marks on gun barrels appear to be the same regulation referenced by Novak. Defendants' reliance on early "firearms regulations," which required inspection and proof marking of barrels, is fundamentally distinguishable from preventing legal adults from purchasing firearms based on their age.

As to gunpowder regulations in Massachusetts, there was a restriction on transporting gunpowder out of the jurisdiction without a license. *See* Powder, § 2, MASS ACTS (Rockwell & Churchill 1889) (Passed 1645). Again, this is very different from the prohibition on the sale of firearms to legal adults based on age. Moreover, neither of these Massachusetts regulations regulated the sale of firearms or gunpowder to minors, or any group. As such, they provide no historical justification for aged-based firearm bans.

Moreover, while Defendants claim that Ohio, Maryland, South Carolina, Michigan, and Alabama "enacted similar schemes," neither Defendants nor their experts cite the source laws that purportedly restricted firearms or gunpowder, with the exception of Alabama. Again, however, the referenced Alabama regulation was enacted in 1868, and required persons to acquire licenses before dealing in certain

23

products including firearms. Such a regulation would be analogous to today's laws requiring licensing for firearms dealers to engage in the business of selling firearms, but is in no way analogous to Defendants' age-based bans. William J. *Novak, The People's Welfare: Law and Regulation in Nineteenth Century America* 91 (Univ. of North Carolina Press 1996) ("Novak").

According to Defendants' own evidence, these early gunpowder regulations were ordinances akin to land-use and zoning ordinances.

> "On the whole, legal prohibitions on wooden buildings in early American cities closely followed the evolution of gunpowder restrictions. *Both were security and safety measures, passed to protect the public from the dangers of fires*; and both relied heavily on the common law of nuisance for remedies as well as underlying rationale. But bans on wooden buildings involved a somewhat different species of public regulation. Unlike gunpowder, there was nothing inherently dangerous or hazardous about a wooden structure." Novak, at 66 (emphasis added).

Novak further describes these regulations as such:

> "Indeed, in the *fire-limit ordinances* of the early nineteenth century we see a form of *urban land-use regulation* different only in degree from the *comprehensive zoning ordinances* of the Progressive Era." *Id.*, at 67 (emphasis added).

Defendants' references to shooting galleries regulations fair no better. At most, these could provide support for various licensing and zoning requirements for establishing shooting ranges. Defendants' two shooting gallery regulations (ECF No. 132-1 at 24) are city ordinances. The restrictions do not impose any condition or qualification on what arms can be sold. They do not impose any restriction on the ability of any individual or group of people to purchase and acquire firearms. Nor do these "licensing schemes" require any kind of licensing for the individual purchaser of any kind of firearm.

24

Both *Heller* and *Bruen* require a much closer connection between the government's historical justifications and the challenged laws. For example, in *Heller*, the government sought to ban handguns in the home. *Heller* reviewed the same historical laws offered then as Defendants' offer now. After reviewing these same concealed carry restrictions, the Supreme Court held that such restrictions did not justify the ban. Like here, the government in *Heller* argued the ban was not a ban as they allowed for the possession of a handgun as long as it was stored inoperable and because other firearms were lawful to purchase and possess. *Heller* rejected these arguments. *Heller*, 554 U.S. at 629. Again, in *Bruen*, the Supreme Court considered the very same historical concealed carry restrictions and held they were not analogous or sufficient to justify the "good cause" good cause requirements under New York's concealed carry permitting scheme. *Bruen*, 597 U.S. at 34-70. Any finding that these fire safety ordinances or licensing and zoning regulations is sufficiently analogous to justify a prohibition on the ability of law-abiding legal adults from purchasing firearms—or even to justify a hunting license scheme on certain groups as a prerequisite to purchasing firearms would fly in the face of the explicit mandates from the Supreme Court.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

April 29, 2024                    Respectfully submitted,

                                  DILLON LAW GROUP APC

                                  Attorneys for Plaintiffs

                                  By:   */s/ John W. Dillon*
                                        John W. Dillon