1  ROB BONTA
   Attorney General of California
2  ANYA BINSACCA
   Supervising Deputy Attorney General
3  TODD GRABARSKY
   STEPHANIE ALBRECHT
4  CAROLYN DOWNS
   Deputy Attorneys General
5  JENNIFER E. ROSENBERG
   Deputy Attorney General
6  State Bar No. 275496
     300 South Spring Street, Suite 1702
7    Los Angeles, CA  90013
     Telephone:  (213) 269-6617
8    Fax: (916) 731-2124
     E-mail:  Jennifer.Rosenberg@doj.ca.gov
9  *Attorneys for Defendants Rob Bonta, in
   his official capacity as Attorney General of
10 the State of California, and Allison Mendoza,
   in her official capacity as Director of
11 the Department of Justice Bureau of
   Firearms*

12                IN THE UNITED STATES DISTRICT COURT

13            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16 | **JOSE CHAVEZ; *et al.*,** | 3:19-cv-01226-L-AHG |

17 | Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

18 | v. | |

19 | | Date:      May 13, 2024 |

20 | **ROB BONTA, in his official capacity as Attorney General of the State of California; *et al.*,** | Time:      10:30 a.m.<br>Dept:      5B<br>Judge:     The Honorable M. James Lorenz and Magistrate Judge Allison H. Goddard |

21 | | |

22 | Defendants. | |

23 | | Action<br>Filed:      July 1, 2019 |

24 | | Third Amended Complaint Filed: March 22, 2023 |

25 | | |

26 | | ***NO ORAL ARGUMENT PURSUANT TO LOCAL RULE UNLESS ORDERED BY THE COURT*** |

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.     Individuals Aged 18-20 Are Allowed to, and Do, Regularly
Acquire a Broad Range of Firearms Under Section 27510 ................. 2

II.    Plaintiffs Fail to Meet Their Burden to Show That Section
27510's Age Limits Implicate the Second Amendment ...................... 3

    A.    Plaintiffs Cannot Establish That 18-20-Year-Olds Are
Among "the People" Accorded Second Amendment
Rights ........................................................................................... 4

          1.    The Framers Understood Individuals Under 21 to
Lack Independent Political and Legal Capacity .............. 4

          2.    Neither *Heller* Nor *Bruen* Decided Whether 18-20-
Year-Olds Are Among "the People" ............................... 6

          3.    Intratextual Analysis Does Not Support Plaintiffs'
Claim ............................................................................... 6

          4.    Mandatory Militia Service Did Not Imply an
Individual Right to Keep and Bear Arms for
Individuals Under 21 ....................................................... 8

    B.    Plaintiffs Fail to Establish That Their Proposed Course of
Conduct Falls Within the Second Amendment's Scope ......... 12

III.    Section 27510's Age Limit Provisions Are Consistent With the
Nation's Historical Tradition of Firearm Regulation ....................... 15

    A.    A "More Nuanced" Analogical Approach Is Warranted .......... 16

    B.    Plaintiffs Incorrectly Narrow the Historical Inquiry to
Only the Founding Era ............................................................. 17

    C.    Plaintiffs Improperly Demand a Historical Twin .................... 18

          1.    Historical Analogues from the Nineteenth Century
Are Relevantly Similar .................................................. 19

          2.    Historical Analogues with Exemptions for Hunting
Arms or Parental Consent Are Relevantly Similar ........ 22

          3.    Historical Analogues Need Not Include Training or
a License as a Prerequisite to Sales To Be
Relevantly Similar .......................................................... 23

          4.    College and University Regulations Are Relevant ........ 25

CONCLUSION .................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Antonyuk v. Chiumento*
    89 F.4th 271 (2d Cir. 2023) ............................................................18, 20, 21, 25

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023) ................................................................................ 18

*Binderup v. Att'y Gen. United States of Am.*
    836 F.3d 336 (3d Cir. 2016) (en banc) .................................................................. 20

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ................................................................................................. 4

*District of Columbia v. Heller*
    559 U.S. 570 (2008) .................................................................................4, 6, 9, 18

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) ................................................................................ 18

*Firearms Pol'y Coal., Inc. v. McCraw*
    623 F. Supp. 3d 740 (N.D. Tex. 2022) ................................................................. 14

*Hanson v. D.C.*
    671 F. Supp. 3d 1 (D.D.C. 2023) .......................................................................... 22

*Humane Soc'y of U.S. v. Gutierrez*
    558 F.3d 896 (9th Cir. 2009) ................................................................................ 25

*McRorey v. Garland*
    No. 23-10837, --- F.4th --- (5th Cir. Apr. 26, 2024) ....................................... 12, 14

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022) .............................................................................................*passim*

*Or. Firearms Fed'n v. Kotek*
    --- F.3d. ---, No. 2:22-CV-01815-IM, 2023 WL 4541027 (D. Or.
    July 14, 2023) ................................................................................................... 13, 15

*Powers v. Ohio*
    499 U.S. 400 (1991) ................................................................................................. 9

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4
5

*Rupp v. Bonta*
No. 8:17-cv-00746-JLS-JDE, 2024 WL 1142061 (C.D. Cal. Mar.
15, 2024) .......................................................................................... 18, 23, 25

6

*State v. Callicutt*
69 Tenn. 714 (1878) ............................................................................... 21

7
8

*Teixeira v. County of Alameda*
873 F.3d 670 (9th Cir. 2017) (en banc) ................................................ 13

9
10

*United States v. Alaniz*
69 F.4th 1124 (9th Cir. 2023) ...................................................... 17, 18, 19

11
12

*United States v. Perez-Garcia*
96 F.4th 1166 (9th Cir. 2024) ......................................................... 6, 19

13
14

*United States v. Portillo-Munoz*
643 F.3d 437 (5th Cir. 2011) .................................................................. 7

15
16

*United States v. Rene E.*
583 F.3d 8 (1st Cir. 2009) ................................................................. 6, 7

17

*United States v. Torres*
911 F.3d 1253 (9th Cir. 2019) .......................................................... 6, 7

18
19

**STATUTES**

20

California Penal Code § 27510 ........................................................*passim*

21

**CONSTITUTIONAL PROVISIONS**

22

U.S. Const. Amendment II .................................................................... 3

23

**COURT RULES**

24
25

CivLR 7.1(h) ......................................................................................... 2

26

Fed. R. Civ. P. 37(c)(1) ..................................................................... 10

27
28

1

**<u>TABLE OF AUTHORITIES</u>**
(continued)

2

<u>Page</u>

3

Sᴍᴀʟʟ Cᴀᴘs OTHER AUTHORITIES

4

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 Minn. L. Rev. (forthcoming June 2024) ...................................................................................... 5

5

6

7

Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers L. Rev. 101 (2024) .......................................................... 21

8

9

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y Rev. 1 (2021) ............................................................................ 7

10

11

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* (1880) ..................................................... 9

12

13

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883)......................................................................................... 10

14

15

1 William Blackstone, *Commentaries On the Laws of England* *451 (1st ed. 1765) ........................................................................................ 5

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs continue to promote the myth that "law-abiding 18-20-year-olds are prohibited" from "purchas[ing] and possess[ing] firearms" under California law. (ECF No. 136-1, "Pls. Mem." at 1.)  They incorrectly claim that California Penal Code section 27510 "imposes an outright ban on the ability of 18-to-20-year-old adults to acquire centerfire semiautomatic rifles," and that Section 27510's limitations on sales and transfers of long guns without a hunting license amount to "a near-total-ban." (*Id.* at 5-6.)  This Court has already rejected these same misstatements of the law, concluding that Section 27510—which only places limits on sales or transfers by licensed firearms dealers to 18-20-year-olds and does not place any restriction on firearm possession by 18-20-year-olds—"is not a firearms ban, including [on] semiautomatic centerfire rifles." (Order at 11.)  Rather, it "regulates commercial firearms transactions based on age by limiting rather than prohibiting the access of individuals 18 to 20 years of age to certain firearms offered by [dealers]." (*Id.*)  Individuals aged 18-20 remain free to purchase, receive transfer of, borrow, and possess firearms, including handguns, semiautomatic centerfire rifles, and other long guns, through one of Section 27510's express exemptions or through intrafamilial and operation-of-law transfers and loans that do not require a dealer intermediary (including spousal transfers, gifts from family members, or inheritance). (Order at 10-11; Defs. Mem. at 3-4, 10-13.)

Defendants' Memorandum in support of their motion for summary judgment (ECF No. 132-1, "Defs. Mem."), and evidence submitted with it (ECF Nos. 132-2 through 135), establish that the age limits imposed on sales and transfers of certain firearms in California Penal Code section 27510 pass constitutional muster at both the textual and historical analysis steps of the legal standard announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (*Bruen*).  In contrast, Plaintiffs' cross-motion relies heavily on mischaracterizations of the nature and scope of California law, the historical record, and the legal framework governing

Plaintiffs' claim.  Nothing in Plaintiffs' cross-motion, supporting Memorandum, or appendix demonstrates that they are entitled to judgment.[1]  Because Section 27510's age limits are constitutional under *Bruen*, Plaintiffs' motion should be denied, and Defendants' motion should be granted.[2]

## ARGUMENT

### I.  INDIVIDUALS AGED 18-20 ARE ALLOWED TO, AND DO, REGULARLY ACQUIRE A BROAD RANGE OF FIREARMS UNDER SECTION 27510

Section 27510 does not ban 18-20-year-olds from acquiring or possessing the regulated firearms.  Despite nearly five years of litigation, Plaintiffs have never identified a single 18-20-year-old who was unable to acquire a firearm for self-defense or other lawful purposes through one of Section 27510's enumerated exemptions or through an available intrafamilial or operation-of-law transfer. Defendants have produced evidence that 18-20-year-olds acquired more than 5,000 firearms per year through licensed firearms dealers in 2021 and 2022 using Section 27510's hunting license, military, and law enforcement exemptions.  (*See* ECF No. 135, Ex. 54 at DX 592-93; Ex. 55 at DX 603-04.)  These sales and transfers to 18-20-year-olds included several thousand completed under the hunting license exemption, and hundreds completed under the military and law enforcement exemptions.  (*Id.*, Ex. 55 at DX 626-28.)[3]  Long gun sales and transfers to 18-20-year-olds just through these exemptions in 2021 and 2022—not including intra-

---

[1] Plaintiffs inexplicably identify several documents they submitted as exhibits to their appendix as exhibits *Defendants* filed in connection with their March 2024 motion for summary judgment.  (*See* Pls. Appx. at 1-2 [describing Plaintiffs' Exs. G-J].)  However, these exhibits are actually Plaintiffs' annotations on excerpts from expert exhibits that Defendants filed in March 2023 in connection with their opposition to Plaintiffs' motion for *preliminary injunction*.  Plaintiffs also violate Civil Local Rule 7.1(h) by including substantive argument in their Exhibits E-I.  That improper argument must be disregarded.  (*See* Defs. Objs. at 5-8.)

[2] Defendants incorporate the argument, expert opinions, and evidence submitted with their motion for summary judgment here.  Bracketed numbers in this brief (e.g., **[4]**) continue to refer to the numbers assigned to laws and authorities listed in the charts of historical laws in the Grabarsky Declaration.  (ECF No. 133.)

[3] Several of these were completed through Plaintiff North County Shooting Center, despite their claim they were "forced to stop all sales and firearm transfers to 18-to-20-year-old[s]."  (ECF No. 135, Ex. 55 at DX 604-05; Pls. Mem. at 7.)

2

familial or operation-of-law transfers—included nearly 2,000 semiautomatic rifles (centerfire and rimfire), and a total of nearly 8,800 shotguns (semiautomatic, pump-action, lever-action, and single-shot), non-semiautomatic rifles (bolt-action, pump-action, lever-action, and single-shot), and other long guns. (*Id.*, Ex. 54 at 593.)

Moreover, contrary to Plaintiffs' contention (Pls. Mem. at 6), Defendants have presented evidence that individuals have also been successful in obtaining firearms through intrafamilial and operation-of-law transfers, loans, and supervised temporary possession. Department of Justice records disclosed in discovery reflect thousands of completed operation-of-law transfers per year. (ECF No. 135, Ex. 55 at DX 619.) Defendants submit with this opposition additional data reporting that 18-20-year-olds received nearly 350 firearms through intrafamilial and operation-of-law transfers in California in 2023 alone. (*See* Griffin Decl., ¶ 10.) Plaintiffs Chavez and Morris admit that they have borrowed firearms from parents or friends, or used parents' or friends' firearms under their supervision, and that the only thing stopping them from being able to acquire a firearm is their choice not to take a hunter education course. (Chavez Dep. 79:11-80:17; 134:11-13; 116: 11-13; 137:5-138:6; Morris Dep. 60:25-61:3, 71:6-10, 72:24-73; Morris Dep. 83:21-25; 86:8-10; 109:17-111:5, 110:10-24 [ECF No. 135, Exs. 56 & 57].)

## II. PLAINTIFFS FAIL TO MEET THEIR BURDEN TO SHOW THAT SECTION 27510'S AGE LIMITS IMPLICATE THE SECOND AMENDMENT

Plaintiffs admit that they bear the burden at the textual stage of the *Bruen* analysis to establish that Section 27510's age limit provisions prevent "the people" whose rights the Second Amendment protects from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes. U.S. Const. amend. II; *Bruen*, 597 U.S. at 31-33; *see* Pls. Mem. at 13. Plaintiffs have failed to meet this burden, meaning that not only are they *not* entitled to summary judgment, but Defendants *are* entitled to summary judgment. "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element

3

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[4]

### A. Plaintiffs Cannot Establish That 18-20-Year-Olds Are Among "the People" Accorded Second Amendment Rights

Plaintiffs offer three bases for their contention that 18-20-year-olds must have been understood as belonging to "the people" whose rights the Second Amendment enshrined:  (1) an incorrect conclusion that *District of Columbia v. Heller*, 559 U.S. 570, 595 (2008) (*Heller*) and *Bruen* settled the meaning of "the people" as including all Americans; (2) a flawed intratextual analysis of how "the people" is used in other parts of the Constitution; and (3) a conclusion that the "right to keep and bear arms was presumed . . . under the Second Amendment" in light of the inclusion of 18-20-year-olds among the subset of the population subject to compulsory militia participation.  (Pls. Mem. at 22-23; *see also id.* at 9-12.)  The backdrop to Plaintiffs' unsound legal arguments is their failure to grapple with the overwhelming evidence that the Framers would not have considered 18-20-year-olds to fall within the original public meaning of "the people."

### 1. The Framers Understood Individuals Under 21 to Lack Independent Political and Legal Capacity

As an initial matter, the Framers or Reconstruction-era Americans would not have understood 18-20-year-olds to be included among "the people" whose right the Second Amendment enshrines, because they considered people under 21 to lack independent political and legal capacity.  (Defs. Mem. at 8-10.)  As Defendants' experts explain, in both 1791 and 1868, Americans would have regarded 18-20-year-olds as lacking "full capacity to make judgments," and therefore possessing "no independent political and legal capacity" separate from their parents or

---

[4] Plaintiffs claim that "this Court has already held '18-20-year-olds are part of the 'people' protected by the Second Amendment and that the acquisition restrictions imposed through [dealers] implicate the right to 'keep and bear arms,'" and that "*Defendants agree*." (Pls. Mem. at 9 [citation omitted].)  Not so.  The Court and Defendants assumed that these elements were satisfied *only* for purposes of Plaintiffs' preliminary injunction motion.  (*See* Order at 9; ECF No. 111.)

4

guardians.  (Brewer Rpt. ¶ 13; Defs. Mem. at 8-10, 18.)[5]  In keeping with the English common law tradition, "[p]ersons aged 18-20 were considered 'infants' or 'minors'" whose legal identity was subsumed under the nearly absolute legal authority of their parents, legal guardians, or masters.  (Cornell Rpt. ¶¶ 25, 41-42.) This status "would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right[.]"  (*Id.* ¶ 41; *accord, e.g.*, *id.* ¶¶ 12-65.)[6]  This historical context, including consideration of domestic law and the patriarchal system, is critical to interpreting how the Constitution applied, or did not apply, in the Founding and Reconstruction Eras.  (*Id.* ¶ 25, 41-58.)

Plaintiffs concede that 21 was "the age of majority during much of the country's history," but claim that this fact "is of no consequence because the age of majority lacks meaning without reference to a particular right." (Pls. Mem. at 17 [quoting 1 William Blackstone, *Commentaries On the Laws of England* *451, *463-465 (1st ed. 1765)] (cleaned up)).  Yet Blackstone clarified that it was "generally true, that an infant [could] do no legal act," and parents had the power to limit their children's rights of association, to control their estates during infancy, and even to profit from their labor.  Blackstone, *Commentaries*, *452-53, *465.[7]

---

[5] Defendants' experts provided extensive historical analyses of Founding- and Reconstruction-Era attitudes, statutes, ordinances, and common law governing minors under the age of 21, numerous widely respected legal treatises from the seventeenth, eighteenth, and nineteenth centuries, justice of the peace manuals, colonial court records, and other historical authorities.  (Defs. Mem. at 8-10 & n.6.)

[6] Indeed, "[r]ather than analogize infants to citizens who enjoyed the full panoply of rights, Founding Era law analogized minors to individuals who were legally disabled under the law: married women under coverture, madmen, and "idiots." (Cornell Rpt. ¶ 44 [citation omitted].)

[7] While it is true that individuals under the age of 21 could act somewhat independently in certain very limited circumstances (Pls. Mem. at 17)—such as women choosing a guardian at age 14 or men swearing certain oaths at age 12— these acts must "be understood in the context of the way patriarchal society functioned in the eighteenth-century Anglo-American world."  *See* Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 Minn. L. Rev. (forthcoming June 2024) (manuscript at 120) (on file with authors) [Supp. Grabarsky Decl., Ex. 2, at 046-47]).  When evaluated in proper historical context, these "seemingly autonomous actions did not facilitate [the minors'] independence"; rather, they "integrated them more fully into patriarchal households: as wives subservient to a husband, as a child subservient to a guardian, or as a peacekeeper or militia member under adult male authority."  *Id.*

Infants under the age of 21 were considered to lack the judgment required for responsible self-governance, and were almost universally denied most of the core rights enjoyed by members of the political community.  (*See* Defs. Mem. at 9-10; Brewer Rpt. ¶¶ 12-20, 37-38.)

### 2.   Neither *Heller* Nor *Bruen* Decided Whether 18-20-Year-Olds Are Among "the People"

Plaintiffs contend that "binding Supreme Court authority has already answered whether the text of the Second Amendment encompasses young adults—it does." (Pls. Mem. at 10-11.)  They are wrong.  Neither *Bruen* nor *Heller* involved a dispute that the plaintiffs were among "the people."  *See United States v. Torres*, 911 F.3d 1253, 1259 (9th Cir. 2019) ("[T]he *Heller* decision did not resolve *who* had the Second Amendment right; *Heller* resolved if there were an individual right *per se* under the Second Amendment.") (quoting *Heller*, 559 U.S. at 595).  Thus, while the Supreme Court has referenced the Second Amendment right as "belong[ing] to all Americans," or "all members of the political community, not a specified subset," *Heller*, 554 U.S. at 580-81, it has more recently used "ordinary, law-abiding adult citizens," or "law-abiding, responsible citizens," *Bruen*, 597 U.S. at 26, 31-32.  *See United States v. Perez-Garcia*, 96 F.4th 1166, 1179 & n.9 (9th Cir. 2024) (*Bruen* "used the term 'law-abiding, responsible citizens' and its variants more than a dozen times when describing the Second Amendment's scope.")

Whatever the scope of "the people" may be for Second Amendment purposes, it cannot encompass "all Americans" or all "citizens."  (Pls. Mem. at 9-11.)  It is beyond dispute that the full Second Amendment right does not extend to minors under age 18.  *See United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) (upholding federal prohibition on handgun possession by persons under age 18 based on historical analysis).  Neither *Bruen* nor *Heller* compels a different result.

### 3.   Intratextual Analysis Does Not Support Plaintiffs' Claim

Plaintiffs assert that "the people" referenced in the Second Amendment must

6

1    be construed to include all Americans because the amendment contains no express

2    age limit, and because "the *two other* enumerated rights of 'the people'" within the

3    Bill of Rights—the First and Fourth Amendment rights—have been construed to

4    "apply to all Americans regardless of age."  (Pls. Mem. at 10-11 [citing *Tinker v.*

5    *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969); *New Jersey v.*

6    *T.L.O.*, 469 U.S. 325, 334 (1985)].)  Neither the Supreme Court nor the Ninth

7    Circuit has held that the scope of "the people" referenced in the Second

8    Amendment is coextensive with "the people" referenced in the Fourth.  *See Torres*,

9    911 F.3d at 1261 (declining to interpret scope of Second Amendment's "the

10   people" by reference to "the people" in the First and Fourth Amendments); *see also*

11   *United States v. Portillo-Munoz*, 643 F.3d 437, 440 (5th Cir. 2011) (holding that

12   "use of 'the people' in both the Second and Fourth Amendment" did not "mandate[]

13   a holding that the two amendments cover exactly the same groups of people").

14   Again, Plaintiffs do not dispute that legislatures may impose at least *some* age

15   limits on access to firearms.  (*See* Defs. Mem. at 4 n.4; *accord Rene E.*, 583 F.3d at

16   15.)  They do not argue that pre-schoolers have a right to purchase guns, or identify

17   any authority for the proposition that the Second Amendment right vests at birth.[8]

18        Moreover, Plaintiffs' contention that the First and Fourth Amendments

19   "applied to minors at the Founding as they do today" (Pls. Mem. at 17), "rests on a

20   dubious understanding of the First Amendment rights of minors in the era of the

21   Second Amendment."  Saul Cornell, *"Infants" and Arms Bearing in the Era of the*

22   *Second Amendment: Making Sense of the Historical Record*, 40 Yale L. & Pol'y

23   Rev., 1, 6 (2021).  "[T]he argument that minors enjoy broad rights claims, although

24

_____

25        [8] The two cases addressing age limits on which Plaintiffs rely for their
     argument regarding "the people" fail to acknowledge this crucial difference in
26   scope between the Second Amendment and the First and Fourth Amendments, and
     thus cannot support interpreting the Second Amendment right to apply to *all*
27   Americans regardless of age.  (*See* Pls. Mem. at 12 [citing *Brown v. Bureau of*
     *Alcohol, Tobacco, Firearms and Explosives*, No. 1:22-CV-80, --- F. Supp. 3d ---,
     2023 WL 8361745 (N.D. W. Va. Dec. 1, 2023); *Firearms Pol'y Coal., Inc. v.*
28   *McCraw*, 623 F. Supp. 3d 740, 749 (N.D. Tex. 2022) (*McCraw*)].)

true in modern law, was simply not true in the Founding era."  (Cornell Rpt. ¶ 53.)

Nor can Plaintiffs establish that 18-20-year-olds were originally understood to be among "the people" by pointing to the absence of an express age restriction in the Second Amendment.  Plaintiffs argue that the Framers included age limitations in the Constitution anywhere they intended an age limit to apply, so the absence of an express age limit in the Second Amendment must mean that the Framers intended the right to extend to all ages.  (Pls. Mem. at 10.)  In so arguing, Plaintiffs point to the minimum age qualifications for legislators and the President set forth in Articles I and II.  (*Id.*)  Plaintiffs ignore Article I, Section 2, which states that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States."  Like the Second Amendment, Section 2 has no express age limit.  But the Founders did not thus intend for toddlers to acquire the right to vote for their congressional representatives; instead, until passage of the Twenty-Sixth Amendment, "the Constitution left the determination of voting eligibility," including age, "up to individual states."  (Brewer Rpt. ¶ 47.)

Accordingly, the absence of an express age limit in a constitutional provision addressed to "the people" is not an accurate indicator of whether that provision's rights belong to persons of all ages.

### 4.  Mandatory Militia Service Did Not Imply an Individual Right to Keep and Bear Arms for Individuals Under 21

Plaintiffs ask the Court to "presum[e]" an individual right for 18-20-year-olds to keep, bear, and acquire arms outside the context of militia service based on the existence of militia laws pressing individuals under the age of 21 into compulsory service and requiring them to bring arms to muster.  (Pls. Mem. at 22-23.)  The Court has previously rejected Plaintiffs' attempt to read a Second Amendment right into mandatory militia duties, and it should do so again.  (Order at 18.)

*First*, Plaintiffs continue to improperly conflate the imposition of compulsive militia *duty* with an independent *right* to keep, bear, or acquire firearms.  Militia

laws "did not create or assert a *right* against government regulation" of the right to arms. (Cornell Rpt. ¶ 84.) Rather, "[m]ilitia statutes gave governments broad authority to compel individuals to engage in specified actions or face punishment," and "[t]hus, Plaintiffs' claim that militia laws offer strong proof of the existence of a right possessed by [persons under the age of 21] to keep and bear arms rests almost entirely on an ahistorical and anachronistic misreading of these documents." (*Id.*; *accord, e.g., id.* ¶¶ 72-96; Spitzer Rpt. ¶¶ 14-15; Rivas Rpt. ¶¶ 13, 54-64.)[9] [10]

*Second*, the Founders understood the right to bear arms as "an individual right unconnected to militia service." *Heller*, 554 U.S. at 611. The militia-related purpose in the Amendment's prefatory clause does not limit—or expand—the scope of the right enunciated in its operative clause. *See id.* at 578.

Plaintiffs attempt to find an independent right for 18-20-year-olds by referencing Thomas Cooley's 1880 treatise, which states "that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America*, 271 (1880). Plaintiffs posit that 18-20-year-olds required to serve in the militia therefore must have had an individual right to acquire arms. (Pls. Mem. at 12.)

The cited excerpt, however, stands *only* for the proposition that the Second Amendment "secures an individual right unconnected with militia service," rather than a collective right. *Heller*, 554 U.S. at 616-17. Just three years later, Cooley

---

[9] And, of course, government mandates to engage in specified conduct do not create an individual right to engage in that same conduct. For example, citizens may be compelled to serve on a jury, but "[a]n individual juror does not have a right to sit on any particular petit jury." *Powers v. Ohio*, 499 U.S. 400, 409 (1991).

[10] Review of militia statutes from the colonies, Founding Era, and beyond makes clear that service was indeed compulsory: "members of the militia were subject to military discipline and punishment . . . including corporal punishment such as whipping." (Cornell Rpt. ¶ 83; Walsh & Cornell, *supra* note 7 (manuscript at 132) [Supp. Grabarsky Decl., Ex. 2, at 057-58].) Fines and other punishments were imposed for failure to appear at muster or to appear properly armed, or for misuse of weapons. (*See* Cornell Rpt. ¶ 83; Brewer Rpt. ¶¶ 10-20.) Delaware's 1776 law even "levied a fine on any 'Masters, Guardians, and Parents' who 'restrained' militia-eligible minors from enrolling." (Cornell Rpt. ¶ 87.)

9

confirmed "[t]hat the State may prohibit the sale of arms to minors."  Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883) (citing *State v. Callicutt*, 69 Tenn. 714 (1878) [Tennessee Supreme Court rejected argument that state law prohibiting sales of firearms to minors under 21 violated the Constitution because they were subject to military duty]).  Read together, Cooley's two treatises distill the principle that the Second Amendment granted "the people" an individual right to keep and bear arms outside militia service, but individuals under 21 were not among those "people" with unfettered rights, even if subject to militia duty.

*Third*, Plaintiffs' militia law argument relies on the faulty premise that "at the Founding and shortly thereafter, all states required 18-to-20-year-old adults to acquire and possess their own firearms to serve in the militia."  (Pls. Mem. at 23.)  There are two incurable problems with this contention:  (1) There was no universal age for militia service, and (2) militia laws frequently excused those under 21 from supplying their own arms, or mandated that parents, guardians, or masters provide them for the minors under their care.  Plaintiffs do not provide analysis of any individual militia laws in their brief.[11]

---

[11] Rather than examine any militia statutes or weapons laws themselves in their brief, Plaintiffs rely heavily on blanket cites to law review articles written by David Kopel and Joseph Greenlee—who were not designated as experts—purporting to address the Second Amendment rights of "young adults."  (Pls. Mem. at 16, 23, citing Pl. 731-770; Pl. 771-871.)  But Professor Cornell explains that the views of Kopel and Greenlee "are premised on [an] anachronistic understanding of the legal status of infants in Anglo-American law" and "confusion about the legal relationship between rights and duties," leading them to make "ahistorical claims" about the Second Amendment and 18-20-year-olds.  (Cornell Rpt. ¶ 46 n.50.)

More generally, Plaintiffs' Memorandum appears to rely on citation to hundreds of pages of law review and unpublished articles penned by Kopel, Greenlee, and other historians and legal scholars that Plaintiffs did not designate as experts.  (*See* Pls.' Appx., Exs. N, P-R, AG-AH, AM-AN.)  Plaintiffs should not be permitted to rely on this expert scholarship and evidence on summary judgment.  They were given the opportunity to designate experts following the Ninth Circuit's remand of this matter, and chose not to do so.  (Defs. Mem. at 6.)

Also, Plaintiffs' motion asks the Court to consider previously-filed preliminary injunction exhibits, including several declarations from individuals whom Plaintiffs identified as would-be experts in their supplemental initial disclosures.  (*See* ECF No. 136 [stating intention to rely upon ECF Nos. 21-11 through 21-19]); Supp. Grabarsky Decl., Ex. 4 at 198-202.)  The Court should decline this prejudicial request.  (*See* Defs. Objs. at 2-5; Fed. R. Civ. P. 37(c)(1).)

*No uniform age for militia service.*  Throughout the colonial and Founding Eras, and through the end of the nineteenth century, the lower age limit set for mandatory participation in the states' militias varied.  (Brewer Rpt. ¶ 21.)  The federal militia act set the default lower age for militia participation generally at 18, but provided the states with authority to set different limits.  Act of May 8, 1792, 1 Stat. 271, §§ I, II.  Professor Cornell explains that "States were at liberty to expand or contract the legal definitions of the militia to further their goals of public defense."  (Cornell Rpt. ¶ 73.)  Defendants' experts conducted extensive analyses of the militia laws from the Founding and beyond, and concluded that while the age was often set at 18, it also dipped in some States to 15 or 16 in times of need, and was often raised to exempt individuals under the age of 21 in peace times.  (Rivas Rpt. ¶¶ 54-64; Brewer Rpt. 21-36; Cornell Rpt. 72-74.)  Delaware and Pennsylvania quickly adopted provisions exempting individuals under the age of 21 from participating in militia duty except in times of emergency or rebellion.  (*See* Brewer Rpt. ¶¶ 24 [Delaware], 33 [Pennsylvania].)

*Individuals Under 21 Were Not Required to Supply Their Own Arms.*  Professor Holly Brewer reviewed the militia laws, including their amendments and variations, for the first thirteen States of the republic, and found that, "without exception," the Founding-Era militia laws of these States recognized minors' incapacity to purchase arms for themselves.  (Brewer Rpt. ¶ 46.)  Although all of the militia laws included provisions mandating that militia members bring arms for militia service, every single one of the original 13 States included a provision exempting under-21 militia members from providing their own arms, providing alternative means for firearms to be procured for the under-21 member by the State, or exempting the under-21 member from punishment for failure to appear with the appropriate arms at muster.  (*Id.* ¶¶ 21-36.)  Parents, guardians, or masters were directed to purchase or provide the requisite firearms for their under-21 charges, and were explicitly designated as the parties who would bear liability for paying

11

penalties if their under-21 charge failed to appear with the required arms.  (*Id.*; *see also* Cornell Rpt. ¶ 85-96.)  At least one of the Founding-era militia statutes mandated that masters or guardians maintain the weapons for their under-21 charges while they were not at muster[.]"  (Brewer Rpt. ¶ 34 [South Carolina].)

These militia laws, and those enacted or amended later in American history, make clear that legislators did not expect individuals under the age of 21 to "*acquire* and possess their *own* firearms to serve in the militia."  (Pls. Mem. at 23 [emphasis added].)  Rather, such individuals were commanded to report to muster with firearms they would use under supervised militia training and service, but those weapons were generally expected to be provided to them by parents, guardians, or masters.  (Cornell Rpt. ¶ 91 & Table A.)

*Finally*, aside from militia statutes that do not support their argument, Plaintiffs have identified *no* legal decisions, historical legal commentary, or any other historical source from the eighteenth or nineteenth centuries establishing that 18-20-year-olds would have been understood to be among "the people" accorded rights to acquire firearms outside the context of mandatory militia service.  (Pls. Mem. at 22-23.)  In light of this failure, judgment in Defendants' favor is required.

### B.   Plaintiffs Fail to Establish That Their Proposed Course of Conduct Falls Within the Second Amendment's Scope

Plaintiffs' motion for summary judgment fails because their articulation of their proposed conduct—desire to "purchase and possess[] firearms for self-defense and all other lawful purposes" (Pls. Mem. at 1)—is too sweeping.  *Cf. McRorey v. Garland*, No. 23-10837, --- F.4th ---, 2024 WL 1825398, at *4 (5th Cir. Apr. 26, 2024) (proposed conduct in 18-20-year-olds' challenge to expanded background checks was purchasing firearm *without a background check*).  As Defendants have explained, Section 27510 imposes *no* restrictions on *possession* by 18-20-year-olds, and they remain free to acquire and use all types of otherwise-lawful firearms through one of Section 27510's express exemptions or through non-dealer

acquisition avenues.  (*See supra*, § I.)  The Court need not resolve the long-open question of the precise scope of any right to purchase firearms, *see Teixeira v. County of Alameda*, 873 F.3d 670, 679-80 (9th Cir. 2017) (en banc), because the Second Amendment does not protect Plaintiffs' appropriately circumscribed proposed course of conduct:  18-20-year-olds acquiring *any particular weapon* from *any particular source* without the imposition of *any conditions* of sale or transfer.  (Defs. Mem. at 8, 10-13.)

At the very least, judgment in Defendants' favor is warranted at this stage of the analysis with respect to the hunting license exemption.  Where, as here, a permit-to-purchase regulation tracks the kinds of objective shall-issue licensing regimes that *Bruen* sanctioned, the Court may uphold it at the textual stage and need not proceed to assess historical analogues.  *See Or. Firearms Fed'n v. Kotek*, --- F.3d ---, No. 2:22-CV-01815-IM, 2023 WL 4541027, at *46-49 (D. Or. July 14, 2023) (*Kotek*) (upholding at textual stage a permit-to-purchase regulation imposing a background check, mental health check, and firearms training course).

The hunting license exemption and its associated hunter education course requirement are conditions and qualifications on commercial arms transactions akin to the narrow, objective, shall-issue public-carry licensing regimes that *Bruen* sanctioned as passing constitutional muster so long as they are not "put toward abusive ends."  *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge" if the regime is abusive "in practice"); Defs. Mem. at 11-13.  Like the sanctioned shall-issue regimes, the hunting license exemption does not "prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right," and the hunter education course's firearms training requirement is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Bruen*, 597 U.S. at 38 n.9.

The Fifth Circuit recently confirmed that courts need not engage in the stage-

13

two historical analysis when assessing presumptively lawful pre-purchase conditions imposed on commercial transactions involving 18-20-year-olds, absent abusive conditions. *See McRorey*, 2024 WL 1825398, at *3-5. That court rejected a challenge to expanded pre-purchase background checks for 18-20-year-olds. *Id.* at *4-5. It explained that although "[t]he right to 'keep and bear' can *implicate* the right to purchase," "on its face 'keep and bear' does not *include* purchase—let alone without background check." *Id.* (emphasis added). Thus, the plaintiffs' desire to purchase firearms without undergoing the expanded background check did not fall within the "plain text" of the Second Amendment, and the condition was presumptively lawful. *Id.* The court held that because "*Bruen* requires an historical showing by the government" only "'[w]hen the Second Amendment's *plain text* covers an individual's conduct,'" the court was not required to proceed to the historical analysis unless the plaintiffs could rebut the condition's presumptive lawfulness in an as-applied challenge. *Id.* (quoting 597 U.S. at 24 (emphasis added)). They failed to do so. *Id.* at *5-6.[12]

Here, Plaintiffs' proposed course of conduct with respect to the hunting license exemption is purchasing firearms without "pass[ing] a firearms safety course," a condition sanctioned by the Supreme Court as presumptively lawful. *Bruen*, 597 U.S. at 38 n.9. That conduct does not fall within the right to "keep and bear" arms articulated in the Second Amendment's plain text. *McRorey*, 2024 WL 1825398, at *4. Because Plaintiffs bring no as-applied challenge and have made no showing that they (or any individuals aged 18-20) have been subject to any abusive conditions in taking a hunter education course or purchasing a hunting license (*see* Defs. Mem. at 13), summary judgment may be granted in Defendants' favor as to the hunting license exemption without proceeding to step two. *McRorey*, 2024 WL

---

[12] Notably, in finding unconstitutional a Texas law prohibiting 18-20-year-olds from procuring public carry permits, a district court recognized that under *Bruen*, a state could "require 18-to-20-year-olds to satisfy additional objective criteria when compared to those above[] 21." *McCraw*, 623 F. Supp. 3d at 756 n.9.

14

1825398, at *5; *Kotek*, 2023 WL 4541027, at *46-49.

**III. SECTION 27510'S AGE LIMIT PROVISIONS ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARM REGULATION**

Even if the Court determines that 18-20-year-olds must be considered among "the people" to whom the Second Amendment right extends, and that Plaintiffs' proposed course of conduct falls within the plain text of the Second Amendment, the Court should still deny their motion.  Defendants set forth an extensive record establishing that governments have traditionally exercised broad discretion to regulate access to weapons for individuals under the age of 21 in order to protect the public safety and in light of the particular dangers of the time.  (Defs. Mem. at 13-25.)  Thus, Section 27510's challenged age limitations are "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.

As concealable weapons such as pistols, dirks, daggers, and other arms became more widely available in the early and mid-nineteenth century following the Jacksonian Revolution, interpersonal violence rose, and "states began passing laws to deal with the negative consequences of these weapons," including restrictions on sales, loans, and public carry by the general public.  (Cornell Rpt. ¶¶ 109-116; Defs. Mem. at 15.)  Restrictions on access and use by individuals under the age of 21 swiftly followed—and mirrored—these broader restrictions on the general population.  (Cornell Rpt. ¶¶ 109-116.)  Defendants and their experts identified 27 of these state statutes, spanning from 1856 through the end of the nineteenth century; all imposing restrictions on the ability of 18-20-year-olds to purchase, receive, borrow, use, or even possess certain firearms.  (Defs. Mem. 17-19.)  Like Section 27510, these statutes also often included exemptions for purchase or receipt with parental consent, for the purchase of less dangerous firearms, or for the purchase of firearms specifically for hunting, rendering them comparable in scope and burden.  (*See id.*; ECF No. 133, Table A.)

In addition to these state statutes, Defendants also identified many city and

local ordinances imposing similar age limits on sale, transfer, carry, and use, dating from the eighteenth century through the end of the nineteenth century, (ECF No. 133, Table A), as well as dozens of college and university regulations dating back to colonial times restricting the possession, carry, and use of firearms on college campuses and in surrounding neighborhoods (*id.*, Table B).  Together, these categories of statutes and regulations provide a clear view of the historic scope of age limitations regulations, and show that Section 27510 is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also* Defs. Mem. 17-19.)  They are further supported by hundreds of laws similar in scope to the nineteenth century age limits laws Defendants identified; these prohibit the sale, loan, possession, or public carry of concealable firearms and small knives—by the general population or categories of persons deemed untrustworthy, dangerous, or irresponsible.  (Defs. Mem. at 17 n.11.)  They include the eighteenth- and early nineteenth-century predecessors to the nineteenth-century age limits laws. (*Id.*; *see also* ECF No. 133, Table D.)  And Defendants identified other relevant statutes from the eighteenth and nineteenth centuries that provide critical context for the legal status of minors during the eighteenth and nineteenth centuries.  (ECF No. 133, Table C.)  Finally, Defendants disclosed expert reports from leading historians, social scientists, and a neuroscientist to aid the Court's analysis.

Plaintiffs' sole evidentiary offering to rebut Defendants' showing is the set of militia statutes that Defendants have shown fail to support Plaintiffs' claim that 18-20-year-olds are entitled to unfettered Second Amendment rights.  *Supra*, § II.A.4.

### A.   A "More Nuanced" Analogical Approach Is Warranted

Plaintiffs argue that because "firearms and general societal public safety interests existed when the Second Amendment was ratified," and "'teenagers have been, well, teenagers'" "'[s]ince time immemorial,'" the Court need not take the "more nuanced" analogical approach to the historical inquiry here.  (Pls. Mem. at 16, 17.)  Plaintiffs' "argument, however, is divorced from both reality and the law."

16

1    *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (rejecting argument

2    that modern illegal drug trade was similar to historical smuggling).[13]

3         "The Founding era did not have a modern-style gun violence problem to

4    address," and "the structure of early American society meant that minors were

5    seldom allowed access to guns outside of some supervised context." (Cornell Rpt.

6    ¶ 100.) This case involves *both* dramatic technological change *and* unprecedented

7    societal concerns for public safety. (Defs. Mem. at 14-15.) Courts routinely apply

8    the more nuanced analogical approach in cases where, as here, the law is aimed at

9    addressing mass shootings or another "largely modern crime," or where the

10   technology at issue is, like the semiautomatic centerfire rifles at issue in this case,

11   highly advanced. *See, e.g.*, *Alaniz*, 69 F.4th 1129; *accord* Defs. Mem. at 14-16.

12   Plaintiffs offer *no* evidence that could rebut Defendants' showing on this point.

13   Thus, although Defendants' proffered analogues are directly relevant and could

14   survive the direct analysis, applying the more nuanced approach is justified.

15        **B.   Plaintiffs Incorrectly Narrow the Historical Inquiry to Only the**
          **Founding Era**
16
         Plaintiffs incorrectly attempt to limit the relevant timeframe for the Court's
17
     historical analysis to 1791, arguing that *Bruen* commands that Defendants offer
18
     "appropriate historical analogues from the relevant time period, i.e., the Founding
19
     era (1791)." (Pls. Mem. at 13.) Contrary to Plaintiffs' contention (*id.* at 14-15),
20
     *Bruen* expressly left open whether courts should primarily look to 1791 (when the
21
     Second Amendment was ratified) or 1868 (when the Fourteenth Amendment was
22
     ratified) to find the public understanding of the right to bear arms. *See Bruen*, 597
23
     U.S. at 37-38. Both *Bruen* and *Heller* liberally surveyed nineteenth century laws,
24

---

25   [13] Plaintiffs focus their motion for summary judgment largely around
     analyzing expert declarations and evidence that Defendants filed in March 2023 in
26   connection with their opposition to Plaintiffs' motion for preliminary injunction.
     (*See* Pls. Appx., Exs. G-J.) However, Defendants submitted with their motion for
27   summary judgment substantially revised expert reports, with additional expert
     evidence and analysis. All of these items were disclosed to Plaintiffs in discovery
     and available for purposes of their current motion. Thus, all of Plaintiffs' analysis
28   directed to Defendants' experts and evidence is directed to the wrong record.

1    treatises, and other sources in conducting their historical analyses.  *See id.* at 30, 50-

2    64; *Heller*, 554 U.S. at 577-78, 581, 593, 601, 602-603, 608, 610–619.  And the

3    Ninth Circuit has twice noted the relevance of nineteenth century laws.  *See Alaniz*,

4    69 F.4th at 1129; *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  *Alaniz*, like

5    *Bruen*, recognized that the historical tradition at issue "began in the 1700s" and

6    "persisted through the Second Founding," i.e., Reconstruction. 69 F.4th at 1129 n.2.

7         Because this is a challenge to a state statute, nineteenth century regulations

8    bear particular importance.  As noted in *Bruen*, the Second Amendment was made

9    applicable to the states not in 1791, but in 1868, with the ratification of the

10   Fourteenth Amendment.  597 U.S. at 37-38; *see also Ezell v. City of Chicago*, 651

11   F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-

12   government action is challenged, the focus of the original-meaning inquiry is

13   carried forward in time; the Second Amendment's scope as a limitation on the

14   States depends on how the right was understood *when the Fourteenth Amendment*

15   *was ratified*." (emphasis added)).  Thus, "the prevailing understanding of the right

16   to bear arms in 1868 and 1791 are *both* focal points of our analysis."  *Antonyuk v.*

17   *Chiumento*, 89 F.4th 271, 304 (2d Cir. 2023) (emphasis added).[14]

18        **C.   Plaintiffs Improperly Demand a Historical Twin**

19        Plaintiffs iterate a laundry list of categories of laws they believe the Court

20   must disregard entirely in conducting its historical analysis, including:  all militia

21   laws; Reconstruction-Era laws with no historical twin in the Founding Era; any

22   laws that were repealed for any reason, even if not for constitutional infirmity; all

23   twentieth century laws; any laws that do not involve regulations of long guns; all

24   laws that permitted sales or transfers with parental permission, or for hunting;

25   ────────────

26   [14] A California district court recently concluded that "evidence shortly before
     or after 1868 is the most probative evidence of the Second Amendment's meaning"
27   in a case challenging a state statute.  *Rupp*, 2024 WL 1142061, at *31 ("As such, a
     challenged statute is 'consistent with this Nation's historical tradition of regulating
28   firearms' if the government has identified a practice that has been established since
     Reconstruction—even if [it] was not widespread at the time of the Founding.").

college and university regulations; and all laws that do not impose an age-based restriction on sales to "legal adults."  Plaintiffs are wrong on all counts.

*First*, under the more nuanced analogical approach, Defendants need not identify "distinctly similar" analogues; a broader range of analogues may be considered relevantly similar.  *Alaniz*, 69 F.4th at 1129-30.

*Second*, the Ninth Circuit has expressly rejected the kind of "divide-and-conquer approach" Plaintiffs take to analyzing the historical record.  *Perez-Garcia*, 96 F.4th at 1191 (rejecting appellant's arguments that loyalty oath statutes, affray statutes, and surety statutes were unlike challenged pre-trial release disarmament in various ways).  "In applying the Second Amendment, we do not isolate each historical precursor and ask if it differs from the challenged regulation in some way.  We emphasize again: *Bruen* does not require the Government to identify a 'historical twin' or an 18th century 'dead ringer' for the [challenged] firearm condition."  *Id.* (quoting *Bruen*, 597 U.S. at 30 (emphasis omitted)).  Instead, courts must "examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation (such as 'dangerous and unusual weapons' or 'sensitive places'), and whether the historical precedent and the modern regulation are 'relevantly similar,'" such that they "'evince[ ] a comparable tradition of regulation.'"  *Id.* (quoting *Bruen*, 597 U.S. at 27, 29).  Section 27510's age limits are amply supported by the overall historical record presented with Defendants' Motion.  Nonetheless, Defendants address several points below.

### 1.   Historical Analogues from the Nineteenth Century Are Relevantly Similar

Plaintiffs claim that Defendants' historical analogues are inapposite because "no evidence exists of any age-based laws prohibiting purchase, acquisition, sale or transfer from before, at the Founding, or in the Early Republic."  (Pls. Mem. at 17.)  Relatedly, Plaintiffs argue that all age-related laws from the Reconstruction Era are wholly *irrelevant* if there were no similar laws in existence in 1791.  (Pls. Mem. at

18 ["Reconstruction era law references are insufficient to contradict the plain text and lack of any regulation during the Founding era."].)  This is wrong, and would render meaningless the use of post-1791 laws in the historical analysis.[15]

The Court may focus its historical analysis on laws around *both* 1791 *and* 1868.  *Antonyuk*, 89 F.4th at 304.  And courts and legal historians caution that

> the absence of a distinctly similar historical regulation in the presented record . . . can only prove so much.  Legislatures . . . have not generally legislated to their constitutional limits. . . .  [I]t is not necessarily the case that, if no positive legislation from a particular place is in the record, it must be because the legislators there deemed such a regulation inconsistent with the right to bear arms. . . .  [L]awmakers are not moved to forbid behavior that is governed by custom, universal practice, or private warning.

*Antonyuk*, 89 F.4th at 301 & n.10 (citing Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 153 (2023)); *see also Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 369 (3d Cir. 2016) (en banc) (A "paucity of eighteenth century gun control laws might have reflected a lack of political demand rather than constitutional limitations."). This conclusion accords with *Bruen*'s guidance that, where "the historical record yields relatively few" analogues from the eighteenth and nineteenth centuries, but there are also "no disputes regarding the lawfulness of such prohibitions," the Court may "assume it settled" that the restriction is lawful.  *Bruen*, 597 U.S. at 30; *Antonyuk*, 89 F.4th at 304 ("depending on the historical context, comparable historical laws need not proliferate to justify a modern prohibition").

Here, Defendants offered 27 nineteenth century state laws setting the lower age limit for firearms sales, transfers, possession, or carry at 21.  (*See* Defs. Mem. at 18; ECF No. 133, Table A **[2-6, 9, 11-14, 16, 18-20, 22-23, 25, 29, 35, 36, 38,**

---

[15] Plaintiffs' citation to *Bruen* for this is misleading.  When the Supreme Court observed that "to the extent later history contradicts what the text says, the text controls," *Bruen*, 597 U.S. at 36, it was acknowledging that it had, in *Heller*, recognized that "evidence through the end of the nineteenth century represented a critical tool of constitutional interpretation." *Id.* (quoting *Heller*, 554 U.S. at 605).

20

**41, 44-46, 48, 50]**.)  Alabama's law passed in 1856, more than a decade before the Fourteenth Amendment's ratification; Tennessee followed with two more in 1856 and 1858; and Kentucky followed in 1859.  The remaining 24 state laws proliferated from 1875-1897.  (*See* ECF No. 133, Table A **[2-6, 9, 11-14, 16, 18-20, 22-23, 25, 29, 35, 36, 38, 41, 44-46, 48, 50]**.)  The Court is not required to discount or disregard statutes enacted after 1868; statutes passed "in close proximity" to 1791 and 1868 also carry weight.  *Antonyuk*, 89 F.4th at 304.  And, as previously noted, in the sole constitutional challenge to one of these laws, the Tennessee Supreme Court upheld the law.  *See State v. Callicutt*, 69 Tenn. 714 (upholding 1856 Tenn. Pub. Acts ch. 81 p. 92 § 2, ECF No. 133, Table A **[3]**).

Defendants also submitted numerous city ordinances passed from the eighteenth century through 1895, imposing various age restrictions.  (*See* ECF No. 133, Table A.)  Although Plaintiffs contend that the earliest of these—New York in 1793 and 1803, and South Carolina in 1817—are too dissimilar because they prohibit firing weapons in cities, these laws remain relevant because, in accordance with the patriarchal structure of the time, they require parents to pay associated penalties for their children's deeds.  (*Id.*, **[80-82]**.)  These state and local authorities are ample analogous support for the notion that Section 27510's age limits are part of an enduring American tradition of firearm regulation.  (Defs. Mem. at 17-19.)

"The smaller number of earlier [age] restrictions [in the early nineteenth century] was not attributable to a different public understanding of legal rights for minors [under age 21] in the eighteenth century," but "[r]ather, the rise in laws restricting minors' access to weapons was a result of the spread of mass produced, cheap firearms in urban areas in the latter part of the nineteenth century—including to minors—resulting in an array of legal enactments to address the problem, including anti-concealed carry weapons laws."  Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers L. Rev. 101, 109-10 (2024) [Supp. Grabarsky Decl., Ex. 1, at 010-11].

Plaintiffs also argue that the Court must exclude *all* "laws that have been overturned," and identify three state and local laws in which legislators originally set 21 as a lower age limit, and then later lowered the age limit to 18. (Pls. Mem. at 15, 19 n.4.) While "state regulations that were 'rejected on constitutional grounds' can 'provide some probative evidence of [a similar modern regulation's] unconstitutionality'" under *Bruen*, "[t]he Second Amendment gives states space to experiment" by varying regulation according to their needs. *Hanson v. D.C.*, 671 F. Supp. 3d 1, 25 (D.D.C. 2023) (quoting *Bruen*, 597 U.S. at 27). Plaintiffs here do not offer any evidence that those laws were changed on the basis of constitutional infirmity rather than political need. (Pls. Mem. at 19 n.4.) Thus, the Court may consider these relevant analogues. And, in any case, many more regulations setting the age limit at 21 proliferated in the same period. (*See* ECF No. 133, Table A.)

Finally, Plaintiffs contend that these laws are not persuasive because they did not prohibit "legal adults" from possessing arms. (*See* Pls. Mem. at 1, 15-16 [demanding analogue regulating "young adults"]; 17-18, 23.) But this contention proves Defendants' argument; 18-20-year-olds were considered infants without independent legal capacity in the relevant historical periods. *See supra*, § II.A.

### 2. Historical Analogues with Exemptions for Hunting Arms or Parental Consent Are Relevantly Similar

Plaintiffs claim that *all* of the historical analogues that Defendant identified that impose age restrictions in the mid- and late-nineteenth century must be rejected because they generally leave the 18-20-year-olds free to purchase shotguns, fowling pieces, hunting rifles, or other long guns, or provide for the purchase, use, loan, or receipt of a firearm from a parent or guardian, or with permission of a parent or guardian. (Pls. Mem. at 18; Appx. Pl.0033-0040.) But these exemptions are *precisely* what make these laws relevantly similar here. (Defs. Mem. at 17-19.) Like Section 27510, these laws impose a comparable burden by restricting the firearms that were considered the most dangerous in the hands of 18-20-year-olds at

the time (then, concealable arms such as pistols, revolvers, and bowie knives, *see* Rivas Rpt. ¶¶ 33-40, while leaving open avenues for 18-20-year-olds to purchase, receive, or use long guns, or the prohibited concealable weapons with parental or guardian supervision (*see id.*, ¶ 42; ECF No. 133, Table A **[2-6, 9, 11-14, 16, 18-20, 22-23, 25, 29, 35, 36, 38, 41, 44-46, 48, 50]**.)  And although most of these laws restricted the concealable arms considered most dangerous at the time, while the challenged limits here regard long guns, courts often consider regulations of a firearm type distinct from the modern-day firearm as historical analogues, so long as the arms were appropriately subject to an analysis of comparable burdens and justifications.  *See generally Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) (examining historical laws regarding trapguns, slingshots, and other weapons in assessing historical analogues for modern assault weapons, as well as various modes of regulation like taxing and permitting).

### 3. Historical Analogues Need Not Include Training or a License as a Prerequisite to Sales To Be Relevantly Similar

Plaintiffs claim that Defendants must identify a historical analogue imposing a training requirement as a prerequisite to sale to support the constitutionality of the hunting license exemption.  (Pls. Mem. at 23-25.)[16]  But the Court need not analyze *any* historical analogues with respect to the hunting license exemption, as Plaintiffs failed at the textual stage to carry their burden to show that their desire to buy a firearm without taking a hunter education course falls within the text of the Second Amendment.  Thus the hunting license exemption falls outside the ambit of the Second Amendment, and the inquiry is over.  *See supra*, § II.B.

*Even if* the Court determines that the hunting license exemption does *not* fall outside the scope of the Second Amendment, Defendants need not show a "dead ringer."  Defendants provided relevant analogues restricting access to firearms for

---

[16] Plaintiffs ask the court to reject the backdrop of commercial regulations this Court already sanctioned as providing "additional relevant historic support for the regulation of commercial firearms sales enacted in Section 27510."  (Order at 19.)  But these laws are offered as part of the overarching historical tradition.

18-20-year-olds, along with relevant historical context.  (*See* Defs. Mem. at 17-19.)
The provisions for parental or guardian supervision in those analogues also ensure
some measure of the supervision contemplated by the hunter education course.

Plaintiffs claim that their "militia contentions are controlling" for purposes of
determining whether 18-20-year-olds were understood to be among "the people"
who have unfettered Second Amendment rights, but demand that the Court ignore
any aspects of those same militia laws evidencing training requirements for
purposes of analyzing the historical record.  (Pls. Mem. at 22-23.)  Militia laws
provide relevant historical context showing that people aged 18-20, and other
enrolled minors, received training, discipline, and supervision as part of their
mandatory militia service.  (*See, e.g.*, Brewer Rpt., ¶¶ 28, 42.)  These, too, provide a
measure of training and supervision contemplated by the hunter education course.

In addition, Plaintiffs are wrong in claiming that the record is devoid of
relevantly similar analogues involving prerequisites to firearms access for those
under the age of 21.  Defendants identified multiple laws that, while not imposing a
training course as a prerequisite to acquisition, nonetheless prohibited people under
the age of 21 from purchasing or carrying weapons of the types considered
especially dangerous in the hands of minors at the time without a license.  A 1925
West Virginia statute followed the earlier established tradition by imposing a permit
requirement for carry of concealed weapons, setting the lower age limit for such
permits at 21, and requiring that the applicant show that they were "of good moral
character" and "temperate habits" **[75]**.  Similarly, in 1933, the then-territory of
Hawa'ai imposed a permit-to-purchase requirement setting 21 as the lower age limit
for permits to acquire rifles, pistols, revolvers, and ammunition, and 16 for the
acquisition of shotguns **[79]**.  These permit-to-purchase and permit-to-carry laws,
which impose conditions far less restrictive than many earlier counterparts that
prohibited possession or purchase of these weapons altogether, are a natural
twentieth-century outgrowth of the mid-nineteenth century and Reconstruction-Era

age-limits laws Defendants previously discussed, and relevantly similar in both burden and justification. *See Antonyuk*, 89 F.4th at 323 (noting that "the growth of permitting schemes—as opposed to prohibitory laws enforced in the courts—reflected the developing philosophy of proactive local government").[17]

### 4.    College and University Regulations Are Relevant

Plaintiffs attempt to minimize the importance of college and university firearm regulations to the historical analysis by referencing the size of student populations, arguing that municipal and state policies might not have reflected age limitations simultaneously with these regulations, and arguing that the regulations do not include express age limitations. (Pls. Mem. at 20-22.) But the regulations are relevant to show that Founding-Era and Reconstruction-Era policymakers and legislators considered 18-20-year-olds (who would have comprised the bulk of the student bodies), to be subject to *in loco parentis* and thus the proper subjects of firearms regulations both on and off campus, and to underscore the notion that throughout the Founding Era and nineteenth century, "access to . . . weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers." (Cornell Rpt. ¶ 71; *accord* Defs. Mem. at 19-20.)[18]

### CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' motion, grant Defendants' motion, and enter judgment in Defendants' favor.

---

[17] Contrary to Plaintiffs' argument (Pls. Mem. at 15), these twentieth-century laws may be considered as analogues confirming earlier practice because they do not *contradict* laws from the earlier historical tradition. *See Bruen*, 597 U.S. at 36; *Antonyuk*, 89 F.4th at 319 n.32 ("when laws which otherwise might be too recent when considered in isolation nonetheless reflect previously settled practices and assumptions, they remain probative as to the existence of an American tradition of regulation"); *Rupp*, 2024 WL 1142061, at *28-30.

[18] If the Court enters judgment holding that Section 27510 violates the Second Amendment, Defendants respectfully request that the Court stay enforcement of any such judgment pending appeal. All four factors courts consider in evaluating a request to stay pending appeal weigh in favor of Defendants' request. *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009).

1

2   Dated:  April 29, 2024                    Respectfully submitted,

3                                            ROB BONTA
                                             Attorney General of California
4                                            ANYA BINSACCA
                                             Supervising Deputy Attorney General
5                                            TODD GRABARSKY
                                             STEPHANIE ALBRECHT
6                                            CAROLYN DOWNS
                                             Deputy Attorneys General
7
                                             /s/ Jennifer E. Rosenberg
8                                            JENNIFER E. ROSENBERG
                                             Deputy Attorney General
9                                            *Attorneys for Defendants Rob Bonta,*
                                             *in his official capacity as Attorney*
10                                           *General of the State of California,*
                                             *and Allison Mendoza, in her official*
11                                           *capacity as Director of the*
                                             *Department of Justice Bureau of*
12                                           *Firearms*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (3:19-cv-01226-L-AHG)