Rob Bonta
Attorney General of California
Anya Binsacca
Supervising Deputy Attorney General
Stephanie Albrecht
Deputy Attorney General
Todd Grabarsky
Deputy Attorney General
Carolyn Downs
Deputy Attorney General
Jennifer E. Rosenberg
Deputy Attorney General
State Bar No. 275496
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6617
  Fax:  (916) 731-2124
  E-mail:  Jennifer.Rosenberg@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSE CHAVEZ**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California**, *et al.*,<br><br>Defendants. | 3:19-cv-01226-L-AHG<br><br>**SUPPLEMENTAL DECLARATION OF DEPUTY ATTORNEY GENERAL TODD GRABARSKY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:      The Honorable M. James Lorenz<br>Action Filed:     July 1, 2019 |

1

I, Todd Grabarsky, hereby declare as follows:

1.   I am a Deputy Attorney General with the California Department of Justice and serve as counsel in this action for Defendants Attorney General Rob Bonta, in his official capacity, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms.   I make this declaration in support of Defendants' Motion for Summary Judgment.  I have personal, first-hand knowledge of the matters set forth below and, if called as a witness, I could and would testify competently thereto.

2.   Attached hereto to this declaration are true and correct copies of the following exhibits:

| Exhibit No. | Description | Page Nos. |
|---|---|---|
| 1 | Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 Rutgers L. Rev. 101 (2024) | 1-26 |
| 2 | Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 Minn. L. Rev. __ (forthcoming June 2024) | 25-100 |
| 3 | Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Cal. L. Rev. __ (forthcoming 2025) | 101-189 |
| 4 | Plaintiffs' Supplemental Initial Disclosures, dated and served August 18, 2023 | 190-216 |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on April 29, 2024, in Los Angeles, California.

_____
Todd Grabarsky

2

# Exhibit 1

Supp. Grabarsky Decl.  001


# HISTORICAL WEAPONS RESTRICTIONS ON MINORS

### *Robert J. Spitzer\**

### ABSTRACT

*Since the Supreme Court's ruling in 2022 that recast the basis for judging the constitutionality of contemporary gun laws according to the existence of historical analogs, all manner of laws have been subject to court challenge, including those that restrict gun access to those under the age of twenty-one. To date, federal courts have split on this question. Given this new, history-based standard for judging the constitutionality of current weapons laws, this Article examines the historical record pertaining to how the age of majority was defined in our past and how that pertains to the history of laws that restricted minors' access to firearms and other weapons. This Article offers the most extensive assessment of state laws and local ordinances from the eighteenth and nineteenth centuries to be found to date. In addition, it includes a new and extensive excavation of a wide range of college and university codes in the eighteenth and nineteenth centuries that limited or barred students from having weapons during that time period, the nature and extent to which has not been identified or reported before. All of this information supports the conclusion that the broadly accepted age of majority during this time period was twenty-one.*

### TABLE OF CONTENTS

I.   INTRODUCTION ............................................................... 102
II.  HISTORICAL RESTRICTIONS ON MINORS' ACCESS TO WEAPONS.... 103
III. HISTORICAL WEAPONS RESTRICTIONS ON COLLEGE CAMPUSES .. 112
IV.  CONCLUSION ................................................................. 119

\*   Distinguished Service Professor of Political Science Emeritus, the State University of New York at Cortland; Adjunct Professor, the College of William and Mary School of Law; Ph.D., Cornell University. Spitzer is the author of six books on gun policy, including THE GUN DILEMMA: HOW HISTORY IS AGAINST EXPANDED GUN RIGHTS (2023) and THE POLITICS OF GUN CONTROL (9th ed. 2024). The assistance of Saul Cornell, Neal Devins, and Cody Watson is gratefully acknowledged.

Supp. Grabarsky Decl.  002

102            *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

## I. INTRODUCTION

The Supreme Court's 2022 ruling in *New York State Rifle & Pistol Association, Inc. v. Bruen*[1] redefined, recast, and scrambled the definition of gun rights under the Second Amendment's right to bear arms. In the ruling, the high court set out at least two important, if freighted, principles: that the Second Amendment now protected a right of citizens to carry firearms in public for self-protection; and that the constitutionality of modern gun laws would now be evaluated based on whether "the regulation is consistent with the Nation's historical tradition."[2] In so doing, the Court has spurred challenges to all manner of gun laws, sometimes yielding contradictory outcomes involving similar issues. Such has been the case with challenges to state laws that restrict weapons access to those between the ages of eighteen and twenty-one; challenges to these laws have yielded at least five federal court rulings to date, with three rulings upholding a right of those between eighteen and twenty to have access to guns,[3] and two other cases denying that right by upholding the existing laws.[4]

In this Article, I examine the historical record pertaining to how the age of majority was defined in our past and how that pertains to the history of laws that restricted minors' access to firearms and other weapons. This examination offers the most extensive assessment of state laws and local ordinances from the eighteenth and nineteenth centuries to be found to date. In addition, it includes a new and extensive excavation of a wide range of college and university codes in the eighteenth and nineteenth centuries that limited or barred students from having weapons during that time period, the extent of which has not been identified or reported before. All of this information supports the conclusion that the broadly accepted age of majority during this time period was twenty-one. Given the Supreme Court's newly established history-based yardstick for determining the constitutionality of contemporary gun laws, this evidence lends important weight to setting twenty-one as the appropriate age of majority for gun possession and use under most circumstances. This analysis takes on greater importance

---

1. 597 U.S. 1 (2022).

2. *Id.* at 17.

3. *See* Firearms Pol'y Coal., Inc. v. McCraw, 623 F. Supp. 3d 740, 745 (N.D. Tex. 2022); Fraser v. ATF, No. 3:22-CV-410, 2023 WL 3355339, at *23 (E.D. Va. May 10, 2023); *Fraser*, No. 3:22-CV-410, 2023 WL 5617899, at *1–2 (E.D. Va. Aug. 30, 2023); Worth v. Harrington, No. 21-CV-1348, 2023 WL 2745673, at *1 (D. Minn. 2023).

4. Reese v. ATF, 647 F. Supp. 3d 508, 525 (W.D. La. 2022); NRA v. Bondi, 61 F.4th 1317, 1320 (11th Cir. 2023).

2024]          *WEAPONS RESTRICTIONS ON MINORS*          103

because young adults are more likely to be perpetrators of violent crime.[5] For example, while those between the ages of eighteen and twenty compose less than four percent of the population, they are responsible for more than fifteen percent of manslaughter arrests and homicides.[6] A U.S. Department of Justice study spanning from 1980 to 2008 reported that those between the ages of eighteen and twenty-four consistently had the highest rate of homicide.[7] In 2019, according to FBI data, the age that committed the largest number of homicides that year was nineteen, followed by those age eighteen.[8] Beyond that, society has traditionally assumed a greater obligation to protect and guide its young.

### I. HISTORICAL RESTRICTIONS ON MINORS' ACCESS TO WEAPONS

From the colonial era through the nineteenth century, and up until 1971, the generally recognized age of majority in America was twenty-one. As Vivian Hamilton notes in her study of the definition of adulthood in the United States,

> The immediate historical origins of the U.S. age of majority lie in the English common law tradition. The American colonies, then the United States, adopted age twenty-one as the near universal age of majority. The U.S. age of majority remained unchanged from the country's founding well into the twentieth century.[9]

Similarly, *Black's Law Dictionary* notes that "infancy" (the traditional term "infants" applied to what are now labeled minors) is defined as "the state of a person who is under the age of legal majority,— at common law, twenty-one years."[10] As the constitutional scholar James Kent noted in his classic *Commentaries*,

---

5.   U.S. DEP'T OF JUST., TRENDS IN YOUTH ARRESTS FOR VIOLENT CRIMES (2022), https://ojjdp.ojp.gov/publications/trends-in-youth-arrests.pdf.

6.   *Crime In the United States 2019*, U.S. DEP'T OF JUST., https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38#:~:text=Arrests%2C%20by%20Age%2C%202019%20In%202019%2C%2093.0%20percent,88.9%20percent%20of%20per-sons%20arrested%20for%20property%20crimes (last visited Mar. 5, 2024); *Age and Sex Composition In the United States: 2021*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/2021/demo/age-and-sex/2021-age-sex-composition.html (last visited Mar. 5, 2024).

7.   U.S. DEP'T OF JUST., HOMICIDE TRENDS IN THE UNITED STATES, 1980–2008, at 1, 4 (2011), https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf.

8.   *See* U.S. DEP'T OF JUST., *supra* note 6.

9.   Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55, 64 (2016).

10.   *Infancy*, BLACK'S LAW DICTIONARY (6th ed. 1991). *Merriam Webster's Dictionary of Law* defines "infant" as "a person who is not of the age of majority." MERRIAM-WEBSTER'S DICTIONARY OF LAW (1st ed. 1996).

**Supp. Grabarsky Decl.  004**

104      *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

> The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years. The age of twenty-one is the period of majority for both sexes . . . . The age of twenty-one is probably the period of absolute majority throughout the United States . . . .[11]

Concerns over the prospect of minors obtaining ready access to firearms were often expressed in the nineteenth century, especially in the latter half of that century.[12] Voicing a typical sentiment of the time, the Supreme Court of Tennessee said this in an 1878 decision: "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions."[13] At the time, the legal age for purchasing or owning a firearm in Tennessee was twenty-one.[14]

My survey of old weapons laws in America as they relate to minors (i.e., those who have not reached the age of majority) reveals that they were numerous and prolific, dating from the 1700s through the early 1900s.[15] At least forty-six states enacted laws to keep guns and other dangerous weapons (usually including fighting knives, types of clubs, and various explosives, sometimes including ammunition) out of the hands of minors, though the age limits set in these laws encompassed some variation.[16]

At least seven states enacted thirteen laws pertaining to minors and weapons before 1861. The earliest law, enacted in New York City in 1763, said that,

> [I]f any Children, Youth, Apprentices, Servants, or other Persons, do fire and discharge any Gun, Pistol, Leaden-Gun, Rockets, Crackers, Squibs, or other Fire-Works, at any Mark, or at Random, against any Fence, Pales or other Place in any Street, Lane or Alley, or within any Orchard, Garden or other Inclosure

---

11. 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 233 (John M. Gould ed., 14th ed. 1896).

12. PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS *FROM* COLONIAL MILITIAS *TO* CONCEALED CARRY 156, 404–05 (2018).

13. State v. Callicutt, 69 Tenn. 714, 716–17 (1878).

14. NRA v. Bondi, 61 F.4th 1317, 1326 & n.13 (11th Cir. 2023) (citing Warwick v. Cooper, 37 Tenn. (5 Sneed) 659, 660 (Tenn. 1858)).

15. My analysis is based on and drawn from the compendium of old weapons laws found at the Duke Center for Firearms Law Repository of Historical Gun Laws. *Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu /repository/search-the-repository/ (last visited Mar. 6, 2024).

16. *See* Appendix A (on file with author).

**Supp. Grabarsky Decl.  005**

2024]        *WEAPONS RESTRICTIONS ON MINORS*          105

[sic], or in any Place where Persons frequent to walk; such Person so offending, shall forfeit for every such Offense, the Sum of Forty Shillings.[17]

In 1803, the city enacted a provision to hold parents accountable for any unlawful firearm discharge by a minor.[18] A similar measure was enacted in 1859.[19]

Other early laws and ordinances pertaining to minors and weapons were enacted in Delaware (1812), South Carolina (1817), Connecticut (1835), Kentucky (1853, 1859, 1860), Alabama (1856), and Tennessee (1856, 1858). The Delaware state law was enacted to prevent firearms firing "within the towns and villages, and other public places" of the state, and extended its prohibition to any "child or children" that broke the law, with the parents bearing the penalty for violation.[20] The South Carolina law prohibited the firing of firearms in Columbia, noting that if such illegal firing were committed "by minors or other disorderly persons, who have no ostensible property," the guns in question could be seized.[21] The Connecticut law held parents liable for violations by "minors and apprentices" for firing any gun or "crackers, or other fire works" within the city of New London.[22] The three Kentucky laws applied to two cities. The first penalized selling gunpowder to those under fifteen without parental consent and also to "free colored persons."[23] The second and third applied the prohibition to pistols, fighting knives (including Bowie knives), certain clubs, "or other [concealed] deadly weapon" to minors and also to any "slave, or free negro."[24] The Alabama law imposed a fine on

---

17.  N.Y.C., N.Y., Ordinances § VI (1763).

18.  N.Y.C., N.Y., Ordinances ch. 23, § 1 (1803) (preventing the firing of guns in the City of New York).

19.  N.Y.C., N.Y., Ordinances ch. 13, § 6 (1859) (concerning the firing of fire-arms, cannons, and fire-work).

20.  195 DEL. LAWS 522 § 2 (1812).

21.  COLUMBIA, S.C., Ordinances No. 41 (1823) (prohibiting the firing of guns in Columbia).

22.  NEW LONDON, CONN., Ordinances ch. 26, § 2 (1835) (prohibiting the firing of guns and pistols in New London and making parents and guardians liable for breaches by minors and apprentices).

23.  LOUISVILLE, KY., Ordinances No. 68 (1853) (prohibiting the sale of gunpowder to minors under fifteen and to African-Americans). As discussed below, minors were often grouped together with African-Americans in laws that limited their ability to obtain or possess weapons. Though racist and abhorrent, these laws show that, historically, minors are treated differently than persons afforded full rights under the law.

24.  1859 Ky. Acts 245 § 23 (amending an earlier act to consolidate several acts concerning the town of Harrodsburg); 1860 Ky. Acts 245 ch. 33, § 23 (amending an earlier act to consolidate several acts concerning the town of Harrodsburg).

**Supp. Grabarsky Decl.  006**

106          *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

anyone who sold, gave, or lent a pistol or fighting knife to a minor.[25] The two Tennessee state laws penalized anyone who gave to minors any "pistol, bowie-knife, dirk, Arkansas tooth-pick, [or] hunter's knife."[26] The early laws applying to cities and towns both reflected and presaged the effort to keep dangerous weapons out of the hands of minors in populated areas, for reasons discussed below.

During and following the Civil War, restrictions on minors' possession and use of weapons proliferated. From 1861 to 1880, twelve states enacted fifteen laws.[27] From 1881 to 1900, thirty-one states and the District of Columbia enacted forty-nine laws.[28] From 1855 to 1900, at least nineteen states and the District of Columbia adopted laws that set twenty-one as the age of maturity.[29] From 1901 to 1933, twenty-four states enacted thirty-five laws (note that state totals here exceed forty-six because some states enacted multiple laws across these time periods).[30] The contents of these state laws establish four important principles: that the laws went to great lengths to keep guns (mostly handguns, but sometimes any guns) and other weapons out of the hands of minors; that the definition of who constituted a minor varied during this time and according to the specific type of weapons restriction; that the age of maturity set in weapons laws was most commonly twenty-one; and that the category of minors was a class not entitled to anything like gun rights.

While the specific regulatory mechanisms across the states varied some, they generally encompassed provisions to criminalize the act of transmitting guns (whether through sale, gift, trade, or the like) and usually other weapons (primarily fighting knives and clubs) to minors—whether by private individuals or commercial dealers. Some of the laws stipulated that those under the given age could have weapons in their possession with parental consent or supervision.[31] Some of the provisions also extended to barring minors' possession or ignition of gunpowder and firework-type explosives, including percussion caps and the like.[32] The inferior legal status of minors is punctuated by the fact that some of these

---

25.   1856 Ala. Acts 17 § 1 (amending the criminal law).
26.   1856 Tenn. Pub. Acts 92 ch. 81, §§ 2–3 (restricting the sale, loan, or bequest of weapons to minors); TENN. CODE § 4864 (1858) (restricting the sale of liquors and weapons to minors and slaves). The laws excepted guns for hunting. *Id.*
27.   *See* Appendix A, *supra* note 16.
28.   *Id.*
29.   *See id.* For example, in 1859, Kentucky enacted a law setting twenty-one as the relevant age limit. NRA v. Bondi, 61 F.4th 1317, 1326 (11th Cir. 2023).
30.   *See* Appendix A, *supra* note 16.
31.   *See id.*
32.   *See id.*

2024]        *WEAPONS RESTRICTIONS ON MINORS*              107

laws also included other categories of people who were viewed as not entitled to full rights, including African-Americans (enslaved and free before the Civil War), servants, those of "unsound mind," those who were intoxicated, convicts, and drug addicts.[33] Some of these restrictions—most notably those applying to African-Americans—are abhorrent in the modern context. But it would be a mistake to ignore them. Rather, the fact that minors were often included as a similar prohibited category of person underscores the fact that minors were treated in the same category as others with more limited legal rights.

In terms of age limits, while they ranged from a low of twelve to a high of twenty-one, it is clear that twenty-one was by far the most commonly set age of majority.[34] Of the 107 laws counted in Table 1 that set a numerical age limit (not including the fifteen laws that did not give a numerical age in the laws' text or for which no known case law provided for one), forty-five of them (42%) set the age of majority at twenty-one. When the laws concerning twenty-one-year-olds are broken down by decades, four of them (9%) came before 1861; 18% of them were enacted from 1861–1880; 49% of them were enacted in the period from 1881–1900; and 24% during the period from 1901–1933.

The next most common was age sixteen (21%), followed by age eighteen (13%). The lower age limits tended to have other qualifiers, like the age at which children could have a gun or go hunting but subject to parental supervision.[35] Listed below are the respective ages of majority that appear in those laws for which the age was stated or could be discerned.[36] Given that American law regarding the legal status of children was in flux in the nineteenth century,[37] as were the circumstances giving rise to guns and minors laws, there is in fact a surprising degree of agreement about the ages as described here. This is especially notable given that the nation during this time transitioned from an overwhelmingly rural nation (where children working on a farm, for example, was an accepted practice) to an industrial nation by the end of the nineteenth century (where the notion of children working in factories and mines, for example, was increasingly abhorrent to society).[38]

---

33.    *See id.*
34.    *See infra* Table 1.
35.    *See* Appendix A, *supra* note 16.
36.    Note that a few laws list multiple ages for different types of restrictions within the same law.
37.    *See supra* notes 31–36.
38.    *See supra* notes 31–37 and accompanying text.

108        *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

TABLE 1

WEAPONS LAWS RESTRICTIONS FOR MINORS BY AGE LIMIT*

| Age | 21 | 20 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | Unknown |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Laws | 45 | 1 | 14 | 1 | 23 | 11 | 7 | 1 | 4 | 15 |

***Source:** Appendix A. Laws that did not designate a numerical age in their text or that could not be ascertained are in the column "Unknown."*

As noted, the age set also varied depending on the nature of the restriction (higher age limits on the age for carrying concealable weapons, for example, or lower age limits for those allowed to hunt or have dangerous, but less lethal, "toy guns").[39] What was not in flux, however, was the principle that minors, however defined, were not eligible to exercise anything like adult rights, including any right to have a gun or other dangerous weapon or substance (absent in loco parentis) in the nineteenth century.

The rise of weapons laws pertaining to minors during the course of the nineteenth century is most readily explainable by understanding the profound changes in American state and society during this time period. At the start of the nineteenth century, over ninety percent of the population in the United States was engaged in agriculture.[40] The typical American lived and worked on subsistence family farms. Under those circumstances, children mostly lived at home, under the care of their parents, and participated in farm work from an early age. Children had no access to what we would now call "disposable income," much less anything resembling a "right" to obtain firearms on their own. Indeed, at the start of the 1800s, the economy was "based primarily on small-scale farming and local commerce."[41] By the end of the 1800s, however, the nation had "matured into a far-flung capitalist marketplace entwined with world markets" that "generated changes in every other area of American life, from politics to the legal system, from the family to social values."[42] The once primarily rural society "became [by the end of the 1800s] a highly structured, increasingly centralized, urban-industrial

---

39. Catie Carberry, *The Origin of Toy Guns in America*, DUKE CTR. FOR FIREARMS L. (Jul. 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/.

40. NAT'L AGRIC. STAT. SERV., U.S. DEP'T OF AGRIC., THE STORY OF U.S. AGRICULTURAL ESTIMATES 1 (Apr. 1969), https://www.nass.usda.gov/About_NASS/pdf/The%20Story %20of%20U.S.%20Agricultural%20Estimates.pdf.

41. 1 GEORGE BROWN TINDALL & DAVID E. SHI, AMERICA: A NARRATIVE HISTORY 444 (6th ed. 2004).

42. *Id.* at 444–45.

2024]        *WEAPONS RESTRICTIONS ON MINORS*              109

society buffeted by the imperatives of mass production, mass consumption, and time-clock efficiency."[43] With the rise of urbanization and industrialization that characterized the industrial revolution came a concomitant rise in—and ruthless exploitation of—child labor outside of the home, especially in the industrial and manufacturing sectors, that ultimately led to the proliferation of child labor laws, minimum wage laws, and compulsory education requirements, among many other changes.[44] Urbanization also led to "an increased number of youth on the streets" who in turn "became involved in juvenile crime."[45] Stated differently, "[r]apid urbanization disrupted families, resulting in overcrowding and an increase in crime, including crimes committed by children."[46]

In the light of this history, it is little wonder that relatively few minors weapons laws existed in the eighteenth century, since minors mostly lived with their parents in circumstances where minors did not possess the means, ability, inclination, or right to obtain firearms on their own. When massive societal changes altered these circumstances, it is no surprise that weapons laws concerning minors proliferated, especially in urban areas first, and then more generally in the latter half of the nineteenth century.[47] The smaller number of earlier restrictions was not attributable to a different public understanding of legal rights for minors in the eighteenth century (as noted earlier, the accepted age of majority, even in the eighteenth century, was twenty-one).[48] Rather, the rise in laws restricting minors' access to weapons was a result of the spread of mass produced, cheap firearms in urban areas in the latter part of the nineteenth century— including to minors—resulting in an array of legal

---

43.  2 GEORGE BROWN TINDALL & DAVID E. SHI, AMERICA: A NARRATIVE HISTORY 802 (6th ed. 2004).

44.  *Id.* at 822–24, 974–76; *see also* Michael Schuman, *History of Child Labor in the United States*, U.S. BUREAU OF LAB. STAT. (Jan. 2017), https://www.bls.gov/opub /mlr/2017/article/history-of-child-labor-in-the-united-states-part-1.htm.

45.  Lyle Therese A. Hilotin-Lee, *History of the Juvenile Justice System*, FINDLAW (Aug. 28, 2023), https://www.findlaw.com/criminal/juvenile-justice/development-of-the-juvenile-justice-system.html.

46.  Michele Deitch, *Historical Perspective*, NAT'L INST. OF CORR., https://info.nicic.gov /dtg/node/9 (last visited Mar. 6, 2024).

47.  *See supra* pp. 104–06.

48.  Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, YALE L. & POL'Y REV., https://ylpr.yale.edu /inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record#:~:text=Professor%20Cornell's%20Remark%20offers%20a,into%20an%20originalis t%20legal%20framework (last visited Feb. 5, 2024). As Jacob D. Charles noted, the absence of evidence—historical silence on a question—does not imply any sort of historical understanding that the government lacked power to act. Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 DUKE L. J. 67, 74 (2023).

110          *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

enactments to address the problem, including anti-concealed carry weapons laws.[49] As is true of other firearms and weapons laws, these social problems led to the vast majority of states adopting an array of laws to protect minors, including measures to keep guns and other weapons from children throughout the 1800s.[50] These measures also functioned to protect society from minors' consequent misdeeds.[51] That power was (and is) extensively exercised.

One final, related point merits attention. The fact that the age for militia service in the late 1700s and 1800s was typically defined as beginning at age eighteen is used as a basis for arguing that eighteen-to-twenty-year-olds should have the same right to buy and own guns in the present era.[52] For example, the Uniform Militia Act of 1792 defined militia service as applicable to those between the ages of eighteen and forty-five.[53]

But the notion that eighteen-to-twenty-year-olds could be compelled to enter military or militia service as somehow also inferring either a contemporaneous or modern civilian right of eighteen-to-twenty-year-olds to buy and own guns conflates two very different ideas. First, militia and military service are obligations or duties, not rights.[54] An obligation is, quite simply, something that one *must* do under law, as in to submit to military service under circumstances of a military draft, for example. An obligation is, in other words, "[t]hat which a person is bound to do or forbear; any duty imposed by law."[55] A right, on the other hand, is something that one *may* do by one's own judgment, or "powers of free action."[56] One does not implicate the other. Even that portion of the 1792 Militia Act that required militia-eligible men to keep and maintain "a good musket or firelock" did so as one of the requirements attendant to military service.[57] In addition, militia/military service is entirely different from civilian activities, rights, and actions. Military service

---

49.   Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 63–67 (2017); *see, e.g.*, LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA 133–86 (1975); ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL 105–18 (2001).

50.   *See supra* pp. 104–06.

51.   *See supra* pp. 104–06.

52.   *See* David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. UNIV. L.J. 119, 154–55 (2018).

53.   Militia Act of 1792, ch. 33, 1 Stat. 271.

54.   Cornell, *supra* note 48.

55.   *Obligation*, BLACK'S LAW DICTIONARY (6th ed. 1991).

56.   *Right*, BLACK'S LAW DICTIONARY (6th ed. 1991).

57.   Militia Act of 1792, ch. 33, 1 Stat. 271.

2024]        *WEAPONS RESTRICTIONS ON MINORS*            111

occurs through a rigorous, closely supervised, and coordinated system of hierarchical rank, order, and discipline, especially with respect to firearms in a military context, even when that involved the ill-trained, poorly disciplined, and haphazard American militias of the late eighteenth and nineteenth centuries.[58] Further, it is well understood that members of the military are not necessarily entitled to the same rights (such as free speech) as civilians.[59]

And finally, the militia implementation laws of the thirteen states enacted in the 1790s further support the idea that militia service by eighteen-to-twenty-year olds did not confer a right to obtain or own firearms. After passage of the Uniform Militia Act of 1792 by, each state enacted its own militia law in conformity with the federal law, with the states including more specific and detailed provisions. These state militia laws exempted those under twenty-one from the requirement in the 1792 federal law that recruits obtain their own firearms. Instead, the burden for arming militia members who were below the age of twenty-one fell to the recruits' parents, masters (employers), or guardians.[60] In instances where those under twenty-one came from families or circumstances without the means to purchase the necessary weapons, government monies could be used to purchase muskets, though the firearms remained the property of the government that purchased them.[61]

---

58.  ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 38–39, 45–48 (8th ed. 2021).

59.  Elizabeth Beaumont, *Rights of Military Personnel*, FREE SPEECH CTR., https://firstamendment.mtsu.edu/article/rights-of-military-personnel/ (Sep. 19, 2023). Members of the military are governed under the Uniform Code of Military Justice. *Id.*

60.  *See, e.g.*, ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 298–99 (Hartford, Hudson & Goodwin 1796); ROBERT & GEORGE WATKINS, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 461–62 (Philadelphia, R. Aitkin 1800); WILLIAM KILTY, THE LAWS OF MARYLAND (Annapolis, Frederick Green 1800); THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 340 (Worcester, Isaiah Thomas 1789); THE LAWS OF THE STATE OF NEW HAMPSHIRE 422 (Portsmouth, John Melcher 1797); WILLIAM PATTERSON, LAWS OF THE STATE OF NEW JERSEY, REVISED AND PUBLISHED UNDER THE AUTHORITY OF THE LEGISLATURE 440 (New Brunswick, Abraham Blauvelt 1800); THE LAWS OF THE STATE OF NEW YORK 447 (New York, Thomas Greenleaf 1798) (providing New York's Militia Act of 1793); JAMES IREDELL & FRANCOIS XAVIER MARTIN, PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA 159 (New Bern, Martin & Ogden 1804); 14 JAMES T. MITCHELL & HENRY FLANDERS, THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 456 (Harrisburg, Harrisburg Publishing Co. 1909); PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS 69 (Newport, H & O Farnsworth 1798); BENJAMIN ELLIOTT & MARTIN STROBEL, THE MILITIA SYSTEM OF SOUTH CAROLINA, BEING A DIGEST OF THE ACTS OF CONGRESS CONCERNING THE MILITIA, LIKEWISE OF THE MILITIA LAWS OF THIS STATE 23 (Charleston, A.E. Miller 1835); 12 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 12 (Richmond, George Cochran 1823).

61.  *See, e.g.*, Hening, *supra* note 60.

112          *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

## II. HISTORICAL WEAPONS RESTRICTIONS ON COLLEGE CAMPUSES

One other category of laws and rules bears on the larger idea that minors below the age of twenty-one were not accorded anything akin to "gun rights" in history. This category pertains to the legal status of college students. As historian Saul Cornell noted: "College was one of the very few circumstances where minors lived outside of their parents' or a guardian's direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of in loco parentis."[62] Admittedly, college education in the modern era is far more widespread and democratized. As of 2022, over thirty-seven percent of Americans have at least a four year college degree.[63] In 1870, the newly created Federal Department of Education (then a sub-cabinet department) reported that 9,000 college degrees had been awarded as of that year.[64] Also in 1870, about 63,000 students were enrolled in institutions of higher learning.[65] Yet the fact that few Americans attended college in the eighteenth and nineteenth centuries compared to the present era does not undercut the significance of college rules restricting students' access to firearms and other weapons. As discussed below, public universities overseen by state legislatures in at least a dozen states enacted weapons restrictions. Further, these rules, discussed below, applied regardless of the size of the student bodies and were based on the universally understood in loco parentis powers exercised by colleges and universities over their students. The numerous rules governing private campuses are not public law, to be sure, but they do provide a different source of information confirming that those under twenty-one were not entitled to anything resembling gun rights. Indeed, college rules from this early period are a microcosm of societal attitudes

---

62.   Cornell, *supra* note 48; *see also* Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135, 1136 (1991); STEVEN J. NOVAK, THE RIGHTS OF YOUTH: AMERICAN COLLEGES AND STUDENT REVOLT, 1798–1815, at 103–05 (1977). Even during this period, a college education was generally four years in length, and attracted students in their late teens.

63.   Tyler Talbott, *The Percentage of Americans with College Degrees in 2023*, COLL. TRANSITIONS (Aug. 12, 2023) https://www.collegetransitions.com/blog/percentage-of-americans-with-college-degrees/.

64.   OFF. OF EDUC. RSCH. & IMPROVEMENT, U.S. DEP'T OF EDUC., 120 YEARS OF AMERICAN EDUCATION: A STATISTICAL PORTRAIT 5 (Thomas D. Snyder ed., 1993).

65.   Clair Kluskens, *Census Fun Fact #6 - The Evolving Enumeration of College Students, 1850-1950*, HISTORYHUB (Jul. 4, 2021), https://historyhub.history.gov/genealogy/census-records/b/census-blog/posts/census-fun-fact-6—-the-evolving-enumeration-of-college-students-1850-1950. The U.S. population in 1870 was about 38 million. *POP Culture: 1870*, U.S. CENSUS BUREAU, https://www.census.gov/history/www/through_the_decades/fast_facts/1870_fast_facts.html (last visited Mar. 6, 2024).

**Supp. Grabarsky Decl. 013**

2024]        *WEAPONS RESTRICTIONS ON MINORS*        113

concerning the rights (or lack of rights) pertaining to young people and for that reason alone are highly instructive.

Some have argued that colleges' control over their students during this time, including weapons restrictions, was not based on students' age, but rather was "based on their status as students living together in dormitories."[66] This, however, is incorrect for two reasons.

First, these rules often applied to students whether they lived on campus or off campus.[67] That is, they were codes that applied uniformly to *all* students enrolled in these institutions. For example, an 1810 regulation for Georgia public colleges and universities said, "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[68] In fact, these codes typically regulated or proscribed a range of student behaviors extending far beyond firearms restrictions both on campus and off, providing further evidence of colleges' plenary in loco parentis authority over students.

Second, experts on early American higher education make perfectly clear that college faculty and administrators functioned in the manner of, and with authority comparable to, parents. This is the very definition of in loco parentis: to act "[i]n the place of a parent; instead of a parent; charged . . . with a parent's rights, duties, and responsibilities."[69]

For example, one study of American college life in the 1700s and 1800s noted that "[t]eachers assumed the position of parents."[70] Another confirmed that as early as the mid-1700s, "[c]olonial [college] faculties had assumed without question their authority over students"[71] This translated into a college campus system where faculty and administrators exercised,

---

66.   Rocky Mountain Gun Owners v. Polis, No. 23-CV-01077, 2023 WL 5017253, at *16 (D. Colo. Aug. 7, 2023).

67.   *See, e.g.*, WALTER C. BRONSON, THE HISTORY OF BROWN UNIVERSITY, 1714–1914, at 183 (Boston, D.B. Updike ed. 1914); LAWS AND REGULATIONS OF THE COLLEGE OF WILLIAM AND MARY 19 (Richmond, Thomas White ed. 1830); LAWS AND REGULATIONS OF OBERLIN COLLEGE 11 (Oberlin, Shankland & Harmon 11th ed. 1859). Students often sought or needed housing off campus, even in the 1700s and early 1800s. *See* DAVID F. ALLMENDINGER, PAUPERS AND SCHOLARS: THE TRANSFORMATION OF STUDENT LIFE IN NINETEENTH-CENTURY NEW ENGLAND 82–90, 98–99 (1975).

68.   *The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842*, at 86, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/laws/the-minutes-of-the-senatus-academicus-of-the-state-of-georgia-1799-1842-at-86-1810/ (last visited Mar. 6, 2024).

69.   *In loco parentis*, BLACK'S LAW DICTIONARY (6th ed. 1991).

70.   ALLMENDINGER, *supra* note 67, at 114.

71.   David F. Allmendinger, *The Dangers of Ante-Bellum Student Life*, 7 J. SOC. HIST. 75, 75 (1973).

114          *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

> [A]n intimate, "parental" system of ordering the lives of students. "Parental" government was more than a metaphor. . . . The "parental" system extended over students an intimate supervision of residence, diet, company-keeping and manners. More rigorous in its substitution of faculty for family than modern conceptions of in loco parentis . . . ."[72]

Another analysis of college life makes the same point:

> During the colonial period and the early years of the Republic, higher education was conducted . . . in an environment that mirrored the families students left behind . . . [t]he dominant legal philosophy courts used to describe this familial relationship was the doctrine of *in loco parentis*. College authorities stood in the place of parents to the students entrusted to their care."[73]

And the age range of college students in the late 1700s and 1800s generally coincided with the age range of college students today: roughly eighteen to twenty-two.[74] My excavation and examination of laws and campus rules pertaining to college students and dangerous weapons uncovered a considerable series of them—far more than have been unearthed up until now.[75] These codes extend to both public and private colleges and universities. The difficulty in unearthing and identifying these old college codes was complicated by the fact that relatively little attention has been given to this subject, that there is no central repository of such college policies to my knowledge, and many of these measures have been found in old reprints of campus policies which have been subject to far less modern examination and digitization as compared

---

72.   *Id*. at 79–80.

73.   *See* Jackson, *supra* note 62, at 1135–36 (footnotes omitted). Moreover, as Jackson further notes, the fundamentals of this system persisted: Even when college life changed "[i]n the late nineteenth and early twentieth centuries . . . the traditional legal interpretation of the student-university relationship remained relatively constant as courts continued to defer to almost every expression of institutional authority." *Id*. at 1136.

74.   ALLMENDINGER, *supra* note 71, at 131–38. Allmendinger studied twelve New England colleges from 1751 to 1860, and compiled data on the ages of those graduating from those institutions. *Id*. While the age of graduation included a scattering of students who graduated younger than eighteen and older than twenty-eight, the most common age of students at graduation was consistently from ages twenty to twenty-two. *Id*.; *see also* JOSEPH F. KETT, RITES OF PASSAGE: ADOLESCENCE IN AMERICA 1790 TO THE PRESENT 51–52, 55 (1977). Then and now, colleges included a few younger students and those older than twenty-two who for various reasons sought out a college education at a later age. *Id*.

75.   A full list, including excerpted provisions, is available from the Author.

2024]        *WEAPONS RESTRICTIONS ON MINORS*              115

with old state laws.[76] In all, I tallied at least twelve state university systems (many applying to multiple campuses) and nearly fifty private colleges that imposed firearms restrictions. In no instance did I uncover a campus student discipline policy that did not include an anti-firearm restriction.

In 1655, nineteen years after the founding of the institution, Harvard College enacted a campus policy saying, in part, that "noe students shall be suffered to have [a g]un in his or theire chambers or studies, or keepeing for theire use any where else in the town."[77] Yale College enacted a similar measure in 1745 and 1795.[78]

Among public universities subject to state laws, the state university systems of North Carolina (1799, 1838),[79] University of South Carolina (1807),[80] University of Georgia (1810),[81] Ohio University (1814),[82] University of Virginia (1824),[83] University of Delaware (1828),[84] College

---

76. An extremely helpful source to track down old college student codes of conduct was DONALD G. TEWKSBURY, THE FOUNDING OF AMERICAN COLLEGES AND UNIVERSITIES BEFORE THE CIVIL WAR (1969). Especially helpful was Tewksbury's bibliography of "Historical References" pertaining to the origins of American colleges and universities founded before the Civil War that often included the names of sources which I could then track down, and which often included original college codes and his list of "Permanent Colleges and Universities Founded Before the Civil War."

77. A COPY OF THE LAWS OF HARVARD COLLEGE 8, 10 (Cambridge, J. Wilson & Son 1655) (including a section titled "Thirdly concerneing penall lawes"); *see also* LAWS OF HARVARD COLLEGE ch. 6, § 1, no. 2 (Cambridge, Univ. Press 1824).

78. FRANKLIN BOWDITCH DEXTER, BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE: May 1745–May 1763, at 8 (New York, H. Holt 1745); THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, Oct. 6, 1795, ch. VIII, at 26 (New Haven, Thomas Green & Son ed. 1800).

79. UNIVERSITY OF NORTH CAROLINA, LAWS OF THE UNIVERSITY OF NORTH-CAROLINA; ESTABLISHED BY THE BOARD OF TRUSTEES AT THEIR SESSION IN DECEMBER, 1799 (Raleigh, J. Gales 1800); ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH CAROLINA, LAWS FOR THE GOVERNMENT OF THE UNIVERSITY, ch.V, §13, at 15 (Raleigh, Office of the Raleigh Register 1838).

80. EDWIN L. GREEN, A HISTORY OF THE UNIVERSITY OF SOUTH CAROLINA 220 (1916).

81. *The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842*, at 86, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/laws/the-minutes-of-the-senatus-academicus-of-the-state-of-georgia-1799-1842-at-86-1810/ (last visited Mar. 6, 2024).

82. THOMAS N. HOOVER, THE HISTORY OF OHIO UNIVERSITY 57 (1954); *see also Ohio University Rules for Students*, OHIO HIST. COLLECTION, https://ohiomemory.org/digital /collection/p267401coll36/id/16772 (last visited Mar. 6, 2024).

83. UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES 4–5 (Oct. 1824).

84. *The University of Delaware – Chapter 2, University Archives and Records Management*, UNIV. OF DEL., https://sites.udel.edu/uarm/the-university-of-delaware-chapter-2/ (last visited Mar. 6, 2024).

116      *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

of William and Mary (Va., 1830),[85] Miami University of Ohio (1843),[86] University of Iowa (1848),[87] the College of New Jersey/Rutgers College/Drew University (1853, 1854, 1871),[88] the University of Kentucky (1865, 1890-1891),[89] Purdue University (Indiana, 1874),[90] the University of Mississippi (1878, 1880, 1892),[91] and the University of Vermont (1885),[92] all adopted strict measures against having, keeping, firing, and/or carrying weapons on campus—sometimes extending to student housing and off-campus student behavior. Note that some of these encompass state university systems covering multiple campuses.[93]

Similar measures existed on private campuses. In addition to Harvard and Yale, other private campuses included: Union College (N.Y., 1802),[94] Brown University (R.I.; 1803, 1865),[95] Middlebury College (Vt., 1803, 1839),[96] Hampden-Sidney College (Va., 1805),[97] Hamilton College

---

85. LAWS AND REGULATIONS OF THE COLLEGE OF WILLIAM AND MARY 19 (Richmond, Thomas White ed. 1830).

86. THE LAWS OF MIAMI UNIVERSITY FOR THE GOVERNMENT OF THE FACULTY AND STUDENTS, 1843, at 15 (J.M. Christy ed. 1843), https://digital.lib.miamioh.edu/digital /collection/univdocs/id/3116/rec/3.

87. MERLE CURTI & VERNON CARSTENSEN, THE UNIVERSITY OF WISCONSIN: A HISTORY, 1848–1925, at 196 (1949).

88. REVISION OF THE STATUTES OF NEW JERSEY: PUBLISHED UNDER THE AUTHORITY OF THE LEGISLATURE BY VIRTUE OF AN ACT APPROVED APRIL 4, 1871, at 236–37, 282–83 (Trenton, John L. Murphy ed. 1877).

89. JAMES F. HOPKINS, THE UNIVERSITY OF KENTUCKY: ORIGINS AND EARLY YEARS 167 (1951); KENTUCKY UNIVERSITY, CATALOGUE OF KENTUCKY UNIVERSITY 23 (Lexington, Ky. Univ. 1890).

90. ROBERT W. TOPPING, A CENTURY AND BEYOND: THE HISTORY OF PURDUE UNIVERSITY 86 (1988).

91. 1878 Miss. Laws 176 ch. 46, § 4 (An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes); JOSIAH A. PATTERSON CAMPBELL, THE REVISED CODE OF THE STATUTE LAWS OF THE STATE OF MISSISSIPPI: WITH REFERENCES TO DECISIONS OF THE HIGH COURT OF ERRORS AND APPEALS, AND OF THE SUPREME COURT, APPLICABLE TO THE STATUTES 776–777 (Jackson, J.L. Power ed. 1880); THE ANNOTATED CODE OF THE GENERAL STATUTE LAWS OF THE STATE OF MISSISSIPPI 327, § 1030 (R.H. Thompson ed. 1892).

92. LAWS OF THE UNIVERSITY OF VERMONT, ch. 4, § 4234, ch. 6, §§ 4, 9 (Burlington, 1885).

93. *See, e.g., supra* note 79.

94. WAYNE SOMERS, ENCYCLOPEDIA OF UNION COLLEGE HISTORY 533 (2003).

95. WALTER C. BRONSON, THE HISTORY OF BROWN UNIVERSITY, 1714–1914, at 182–83 (1914); LAWS OF BROWN UNIVERSITY § 5, no. 4 (Providence, 1865).

96. THE LAWS OF MIDDLEBURY-COLLEGE 16 (Middlebury, Huntington & Fitch 1804); THE LAWS OF MIDDLEBURY COLLEGE ch. 7, §§ 1, 11 (Middlebury, 1839).

97. JOHN L. BRINKLEY, ON THIS HILL: A NARRATIVE HISTORY OF HAMPDEN-SYDNEY COLLEGE, 1774–1994, at 65 (1994).

2024]  *WEAPONS RESTRICTIONS ON MINORS*   117

(N.Y., 1813),[98] Bowdoin College (Me., 1817),[99] Princeton University (N.J. 1819),[100] Columbian College (now George Washington University, D.C., 1824),[101] University of Cambridge (Mass., 1825),[102] Furman University (S.C., 1826),[103] Trinity College (Ct., 1826),[104] McKendree College (Il., 1828),[105] Centenary College of Louisiana (1830),[106] Dickinson College (Pa., 1830),[107] Mississippi Presbytery and Oakland College (Miss., 1831),[108] Colby College (Me., 1832),[109] Allegheny College (Pa., 1834),[110] Wake Forest University (N.C., 1834),[111] Lafayette College (Pa., 1837),[112] LaGrange College (Ala., 1837),[113] University School of Nashville (Tenn., 1837),[114] Georgetown University (Washington, D.C., 1839),[115] Randolph-Macon College (Va., 1839),[116] Kemper College (Mo., 1840),[117] Davidson

---

98. HAMILTON COLLEGE, DOCUMENTARY HISTORY OF HAMILTON COLLEGE 151 (1922) (including "The Laws of Hamilton College, 1813, Chapter VIII, Of Crimes and Misdemeanors, § XII").

99. ERNST CHRISTIAN HELMREICH, RELIGION AT BOWDOIN COLLEGE: A HISTORY 39 (1981).

100. At the time, Princeton was known as the College of New Jersey. LAWS OF THE COLLEGE OF NEW JERSEY, ch. 17, § 9, ch. 19, § 10 (Trenton, George Sherman 1819).

101. LAWS OF THE COLUMBIAN COLLEGE IN THE DISTRICT OF COLUMBIA, ch. 5, § 2, no. 10 (Washington, D.C., 1824).

102. STATUTES AND LAWS OF THE UNIVERSITY IN CAMBRIDGE, ch. 7, § 76, no. 3, (Cambridge, Univ. Press 1825).

103. W.J. MCGLOTHLIN, BAPTIST BEGINNINGS IN EDUCATION: A HISTORY OF FURMAN UNIVERSITY 115 (1926).

104. LAWS OF WASHINGTON COLLEGE 10 (1826) (renamed Trinity College in 1845).

105. CENTENNIAL HISTORY OF MCKENDREE COLLEGE 1928, at 238 (1928).

106. WILLIAM HAMILTON NELSON, A BURNING TORCH AND A FLAMING FIRE: THE STORY OF CENTENARY COLLEGE OF LOUISIANA 81 (1931).

107. THE STATUTES OF DICKINSON COLLEGE, AS REVISED AND ADOPTED BY THE BOARD OF TRUSTEES, APRIL 16, 1830, at 22–23 (Carlisle, Geo. Fleming 1830).

108. CONSTITUTION & LAWS OF THE INSTITUTION OF LEARNING UNDER THE CARE OF THE MISSISSIPPI PRESBYTERY, OAKLAND COLLEGE (MISS.) 10 (1831).

109. LAWS OF WATERVILLE COLLEGE, MAINE 11 (Glazier, Masters & Co. 1832) (renamed Colby College).

110. ERNEST ASHTON SMITH, ALLEGHENY—A CENTURY OF EDUCATION, 1815–1915, at 401 (1916).

111. GEORGE WASHINGTON PASCHAL, HISTORY OF WAKE FOREST COLLEGE 136 (1935).

112. DAVID B. SKILLMAN, THE BIOGRAPHY OF A COLLEGE: BEING THE HISTORY OF THE FIRST CENTURY OF THE LIFE OF LAFAYETTE COLLEGE 130 (1932).

113. *Circular Letter of the Faculty of La Grange College*, N. ALABAMIAN, May 5, 1837, https://www.newspapers.com/image/308403735/?terms=%22the%20faculty%22&match=1.

114. W.M. ALCOTT, AMERICAN ANNALS OF EDUCATION AND INSTRUCTION FOR THE YEAR 1837, at 185 (Boston, Otis, Broaders & Co. 1837).

115. 1 ROBERT E. CURRAN, A HISTORY OF GEORGETOWN UNIVERSITY 195 (2010).

116. JAMES EDWARD SCANLON, RANDOLPH-MACON COLLEGE: A SOUTHERN HISTORY 1825–1967, at 63-64 (1983).

117. THE LAWS OF KEMPER COLLEGE, NEAR ST. LOUIS, MISSOURI 9 (St. Louis, Churchill & Harris 1840).

118        *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

College (N.C., 1845-46),[118] Denison University (Ohio, 1847),[119] Emory University (Ga., 1847),[120] Dartmouth College (N.H., 1849),[121] Beloit College (Wisc. 1850),[122] Illinois College (1850),[123] Gettysburg College (Pa., 1852),[124] Tufts University (Mass., 1852),[125] Westminster College (Mo., 1852),[126] Franklin and Marshall College (Pa., 1853),[127] Amherst College (Mass., 1855),[128] LaGrange Synodical College (Tenn., 1859),[129] Oberlin College (Ohio, 1859),[130] Albion College and Wesleyan Seminary (Mich., 1860),[131] McKenzie College (Tex., 1860),[132] Centre College (Ky., 1861),[133] Grinnell College (Iowa, 1865),[134] Howard College (Ala., 1870),[135]Vanderbilt University (Tenn., 1874),[136] and Williams College (Mass., 1878).[137]

These many examples strongly indicate that policies restricting students' access to weapons were common, if not ubiquitous, on campuses during this time. I reach this conclusion because in every instance where I was able to obtain an actual code of student conduct for campuses in the 1700s and 1800s, the codes included provisions restricting guns and

---

118.  CORNE CORNELIA REBEKAH SHAW, DAVIDSON COLLEGE 300 (1923) (referring to Appendix IX, Old Rules).

119.  FRANCIS W. SHEPHERDSON, DENISON UNIVERSITY: 1831–1931 A CENTENNIAL HISTORY 55 (1931).

120.  HENRY M. BULLOCK, A HISTORY OF EMORY UNIVERSITY 134 (1972).

121.  LAWS OF DARTMOUTH COLLEGE 11 (Hanover, Dartmouth Press 1849).

122.  LAWS OF BELOIT COLLEGE, ch. 4, § 2 (1850).

123.  TRANSACTIONS OF THE ILLINOIS STATE HISTORICAL SOCIETY FOR THE YEAR 1906, at 245 (1906) (including the Laws of Illinois College, 1850).

124.  1 CHARLES H. GLATFELTER, A SALUTARY INFLUENCE: GETTYSBURG COLLEGE, 1832–1985, at 153 (1987).

125.  RUSSELL E. MILLER, LIGHT ON THE HILL: A HISTORY OF TUFTS COLLEGE 1852–1952, at 397 (1986).

126.  M.M. FISHER, HISTORY OF WESTMINSTER COLLEGE, 1851–1903, at 85 (1903).

127.  JOSEPH HENRY DUBBS, HISTORY OF FRANKLIN AND MARSHALL COLLEGE 229 (1903).

128.  THE LAWS AND REGULATIONS OF AMHERST COLLEGE, ch. 9, § 7 (Amherst, William Faxon 1855).

129.  CODE OF LAWS FOR THE GOVERNMENT OF LA GRANGE SYNODICAL COLLEGE, ch. 10, §§ 2–9 (1859).

130.  OBERLIN COLLEGE, LAWS AND REGULATIONS OF OBERLIN COLLEGE 11 (11th ed. 1859).

131.  EIGHTEENTH ANNUAL CATALOGUE OF THE OFFICERS AND STUDENTS OF THE ALBION FEMALE COLLEGE, AND WESLEYAN SEMINARY (1860–1861), at 32 (1860).

132.  Frederick Eby, *Laws of McKenzie College*, EDU. IN TEX. (Apr. 25, 1918).

133.  LAWS OF THE CENTRE COLLEGE OF KENTUCKY, LOCATED AT DANVILLE 5 (Frankfort, A.G. Hodges & Co. 1861).

134.  JOHN SCHOLTE NOLLEN, GRINNELL COLLEGE 72 (1953).

135.  Mitchell B. Garrett, *Sixty Years of Howard College*, 1842–1902, 85 HOW. COLL. BULL. 81 (1927).

136.  EDWIN MIMS, HISTORY OF VANDERBILT UNIVERSITY 126 (1946).

137.  LAWS OF WILLIAMS COLLEGE, AUTHORIZED BY THE TRUSTEES AT THEIR MEETING IN JULY, 1878, at 13 (North Adams, James T. Robinson & Son 1878).

2024]        *WEAPONS RESTRICTIONS ON MINORS*              119

other weapons. I found no instance of a student code of conduct from this period lacking a no-guns provision. Finally, the law and policy regulations pertaining to the college campuses listed here do not include an entire other category of statutes from the time that barred the carrying or possession of firearms and other weapons in schools and educational institutions more generally.[138] This compilation of college student discipline codes restricting firearms lends strong additional support to the idea that weapons restrictions were commonly understood to apply to those under the age of twenty-one, and that minors had nothing resembling a "right" to obtain or have firearms.

### III. CONCLUSION

State and local restrictions that were designed to keep guns and other dangerous weapons out of the hands of minors were ubiquitous in the nineteenth century. By far the most common age set in legislation for adulthood, and therefore for full ability to access weapons, was twenty-one. The relative paucity of such regulations pertaining to minors before the time examined here was not based on any belief that those below the age of twenty-one were somehow adults with full rights. Historians note that minors in the eighteenth century decidedly did not have such full rights.[139] The right to vote, for example, was generally set at twenty-one by the time of the Revolutionary period and thereafter in the United States.[140] The critical change leading to a proliferation of age-based restrictions on gun purchase and ownership that occurred in the mid-to-late nineteenth century was a general consequence of profound societal shifts from overwhelmingly agrarian life—where children generally lived and worked at home and therefore under direct parental control—to urban, industrialized life—where children increasingly worked and lived outside of the home in population centers. As noted here, the fact that at least forty-six states enacted age-based restrictions (most commonly set for those below the age of twenty-one) on weapons ownership or use by minors during the time period examined here reflects a societal understanding that concerns about safety and judgment when minors

---

138.  *E.g.*, 1870 Tex. Laws 63, ch. 46, § 1 (regulating the right to keep and bear arms); 1883 Mo. Laws 76, § (amending § 1274, art. 2, ch. 24 of the revised statutes of Missouri); Act of Mar. 18, 1889, 13 Ariz. Sess. Laws 30, §§ 1–9.

139.  Cornell, *supra* note 48; Hamilton, *supra* note 9.

140.  John Adams noted as much in the 1770s. JOSEPH J. ELLIS, THE CAUSE: THE AMERICAN REVOLUTION AND ITS DISCONTENTS, 1773–1783, at 69 (2021). The minimum voting age of twenty-one was not reduced until Georgia became the first state to do so in 1943. F.M. BREWER, THE VOTING AGE (1944), https://library.cqpress.com/cqresearcher/document.php?id=cqresrre1944090900.

120          *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

had access to dangerous weapons were no less significant at that time than in the present day.

2024]      *WEAPONS RESTRICTIONS ON MINORS*        121

APPENDIX A
TABLE OF STATE LAWS RESTRICTING WEAPONS TO MINORS

| STATE | YEAR* | OTHERS BARRED IN SAME LAW |
|---|---|---|
| Alabama | 1855/1856 (minors 21#); 1866 (under 18); 1876 (under 18) | |
| Alaska | | |
| Arizona | 1901 (under 14) | Indians (1901) |
| Arkansas | | |
| California | 1896 (18) | |
| Colorado | | |
| Connecticut | 1835 (minors); 1871 (minors); 1881 (16) | |
| Delaware | 1812 (child); 1881 (minors 21); 1881 (21); 1911 (21); 1918 (no hunt under 15); 1919 (21) | Intoxicated (1911, 1919) |
| District of Columbia | 1892 (under 21); 1932 (under 18) | No drug addicts, unsound mind, convicts (1932) |
| Florida | 1881 (under 16) | Unsound mind (1881) |
| Georgia | 1876 (minors 21); 1920 (21) | |
| Hawaii | 1927 (minors); 1933 (under 20; no shotguns under 16) | |
| Idaho | 1909 (under 16) | Intoxicated (1909) |
| Illinois | 1873 (minors); 1881 (minors 21); 1914 (21); 1917 (21) | |
| Indiana | 1875 (under 21); | |

122        *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

|  |  |  |
|---|---|---|
|  | 1881 (under 21); 1905 (under 21) 1925 (under 21) 1929 (sentence enhanced if commit weapon crime over 16) |  |
| Iowa | 1884 (minors 21); 1887 (21); 1897 (21) |  |
| Kansas | 1883 (minors 21); 1887 (21) | Unsound mind (1887) |
| Kentucky | 1853 (under 15); 1859 (minors 21); 1860 (21) | Free colored, enslaved persons (1853, 1859) |
| Louisiana | 1890 (under 21); 1893 under 18) |  |
| Maine | 1892 (under 16) |  |
| Maryland | 1882 (under 21); 1904 (under 15); 1908 (under 21) |  |
| Massachusetts | 1882 (under 16); 1884 (under 16); 1909 (under 15); 1922 (under 15) | Unnaturalized or foreign born (1922) |
| Michigan | 1883 (under 13) |  |
| Minnesota | 1885 (under 18), 1888 (under 18) |  |
| Mississippi | 1878 (minors 21, parents under 16); 1880 (minors 21, parents under 16) | Intoxicated (1878, 1880) |
| Missouri | 1883 (minors 21); 1887 (no ammo under 16); 1917 (21) | Intoxicated (1883, 1917) |
| Montana |  |  |
| Nebraska | 1895 (minors) |  |
| Nevada | 1881 (under 21) |  |

2024]        *WEAPONS RESTRICTIONS ON MINORS*            123

| | | |
|---|---|---|
| New Hampshire | 1883 (minors) | |
| New Jersey | 1882 (under 15); 1885 (under 15); 1903 (under 15); 1914 (no hunt under 14); | |
| New Mexico | | |
| New York | 1763 (no children, youth); 1803 (minors); 1859 (minors); 1884 (under 18); 1885 (under 18); 1885 (under 18); 1900 (under 18; no spring/air gun under 16; no toy pistol under 16); 1911 (under 16); 1911 (under 16) | Apprentices, Servants (1763); apprentices, servants, slaves (1803) |
| North Carolina | 1893 (minors 21); 1913 (under 12) | |
| North Dakota | 1923 (under 18) | |
| Ohio | 1883 (under 14); 1913 (no toy gun under 16; no gun under 17) | |
| Oklahoma | 1890 (minors); 1891 (minors) | Intoxicated (1890) |
| Oregon | 1868 (rt. to have guns over 16); 1903 (under 14); 1917 (under 21) | |
| Pennsylvania | 1881 (under 16); 1883 (under 16) | |
| Rhode Island | 1883 (under 15); 1883 (under 15) | |
| South Carolina | 1817 (minors); 1923 (minors; no parents to child under 12) | Disorderly persons, those w/o property |

124        *RUTGERS UNIVERSITY LAW REVIEW* [Vol. 76:101

| | | |
|---|---|---|
| South Dakota | 1903 (under 15) | |
| Tennessee | 1856 (no minors except hunting, defense); 1858 (under 21); 1863 (21); 1867 (no minors 21 exc. hunting) | |
| Texas | 1897 (minors 21) | |
| Utah | 1905 (under 14) | |
| Vermont | 1912 (under 16) | |
| Virginia | 1869 (under 16); 1903 (under 12) | |
| Washington State | 1883 (under 16); 1909 (under 14) | |
| West Virginia | 1882 (under 21); 1891 (21); 1925 (under 18 lesser penalty; "over 21" to get license) | Intoxicated (1925) |
| Wisconsin | 1882 (minors 21); 1883 (21) | Intoxicated (1883) |
| Wyoming | 1890 (no concealed weapon under 21; no cartridges under 16) | |
| TOTAL STATES | 46 | 15 |
| TOTAL LAWS | 104 | |

*Source: https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search The designation "minors" after years of law means the laws restrict weapons from this category without specifying an age. Years with numbers following them are ages defined in the laws as age of majority.

#The designations "minors 21" refer to laws that say only "minors" without listing an age, but where state court rulings define minors as those under twenty-one. *See* NRA v. Bondi, 61 F.4th 1317 (11th Cir. 2023).

# Exhibit 2

Supp. Grabarsky Decl.  026

Age Restrictions and the Right to Keep and Bear Arms 17911868.docx (Do Not Delete)    4/26/2024 8:26 AM

Article

# Age Restrictions and the Right to Keep and Bear Arms, 1791–1868

## Megan Walsh[†] and Saul Cornell[††]

*The disproportional misuse of firearms by eighteen-to-twenty-year-olds has long been a problem in America. The concerns are not novel. Nor are legislative responses to this problem a recent development in American law. These limitations are deeply rooted in American legal history.*

*While minimum age gun laws routinely survived constitutional challenges before the Supreme Court's decision in* New York State Rifle & Pistol Ass'n v. Bruen, *the majority of courts applying* Bruen *have struck down firearms restrictions based on age.* Bruen *fundamentally altered the way courts evaluate the constitutionality of firearms regulations, requiring them to judge modern gun laws based on history, text, and tradition. As* Bruen *requires, courts have turned to history to adjudicate these challenges. Unfortunately, many courts have discounted the relevant history and tradition.*

*At the time of the Founding, individuals under the age of twenty-one were viewed as lacking sufficient judgment to make responsible decisions. These individuals, categorized as "infants" at the time, were unquestionably not full members of the political community. Their ability to contract was limited, which prevented them from obtaining arms without the assistance of parents or guardians. Although those under the age of twenty-one*

† Megan Walsh is a Visiting Assistant Clinical Professor of Law and the Director of the Gun Violence Prevention Clinic at the University of Minnesota Law School.

†† Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University.

The Authors thank Joseph Blocher, Jacob Charles, Mark Frassetto, and Eric Ruben for insightful and helpful comments, and Ted Mathiowetz for excellent research support. Copyright © 2024 by Megan Walsh and Saul Cornell.

101

102          *MINNESOTA LAW REVIEW*          [108:pppp

*served in the militia, statutes mandating militia service do not demonstrate a right to keep and bear arms outside of militia service. Instead, these statutes demonstrate the government's power over eighteen-to-twenty-year-olds, and represent the obligation of minors to serve, not an independent right to possess firearms.*

*The nation's tradition of regulating firearms based on age expanded after the Founding. By the time of the adoption of the Fourteenth Amendment, such regulations were commonplace and widely viewed as a core exercise of state and local police power. Bruen's directive that modern-day firearms regulation must be guided by history supports limits on minors' access to deadly weapons.*

*Anglo-American law has always countenanced restrictions based on age, and recent developments in neuroscience have vindicated historical wisdom on this matter. Brain development of eighteen-to-twenty-year-olds is incomplete, a fact that limits their ability to evaluate risk and heightens their inclination to make reckless decisions. Indeed, while our understanding of the place of women and minorities in society and the political community has rightfully transformed since the time of the Founding, the view of teenagers' limited capacity to make responsible decisions has not changed, but, instead, has been bolstered by scientific development. Applying Bruen's analytical framework to these facts leads to the conclusion that modern-day firearm regulations based on age are justified by history, text, and tradition.*

**Supp. Grabarsky Decl.  028**

2024]         *AGE RESTRICTIONS AND ARMS*         103

TABLE OF CONTENTS

Introduction .................................................................... 104
I.  The Limited Rights of Eighteen-to-Twenty-Year-Olds at the
      Time of the Founding ..................................................... 114
      A.  Common Law Limits on Minors' Legal Autonomy 115
      B.  Patriarchy and Limits on Minors' Rights at the
          Founding.............................................................. 119
      C.  Patriarchal Governance of Minors in the Founding
          Era: The Case of Colleges....................................... 122
      D.  The Role of Minors in the Militia at the Founding 127
      E.  Social Change, Legal Change, and the Development
          of New Weapon Regulations over the Course of the
          Nineteenth Century................................................ 140
II.  The Historical Context of Minors' Rights in Today's Second
      Amendment................................................................. 150
      A.  Limits on Eighteen-to-Twenty-Year-Olds Span the
          Long Arc of American History ............................... 151
      B.  The Centrality of the Common Law to *Bruen*'s
          Method................................................................. 157
III.  *Bruen*'s Second Step: The Historical Tradition of
      Regulating Minors ....................................................... 160
Conclusion...................................................................... 172

**Supp. Grabarsky Decl.  029**

104              *MINNESOTA LAW REVIEW*              [108:pppp

## INTRODUCTION

Age-based firearms restrictions are prevalent across the country.[1] These policies are evidence of a strong consensus among the American people that restrictions on eighteen-to-twenty-year-olds' access to, and public carry of, certain firearms promote safety and the public interest. Federal law makes it unlawful for anyone under the age of eighteen to possess handguns or to transfer a handgun to anyone under the age of eighteen,[2] and prohibits eighteen-to-twenty-year-olds from purchasing handguns from federal firearm licensed dealers (FFLs).[3] Many states prohibit eighteen-to-twenty-year-olds from purchasing or possessing certain firearms, such as handguns or assault weapons, and from carrying firearms in public.[4] These laws are not derived from novel insights about the dangers associated with allowing minors unfettered access to guns. These types of limits are deeply rooted in American legal history.

---

1.  *See, e.g.*, DEL. CODE ANN. tit. 11, § 1448(a)(5) (2023) (effective June 30, 2025) (banning the sale of firearms to anyone under the age of twenty-one); FLA. STAT. § 790.065(13) (2023) (banning the sale of firearms to eighteen-to-twenty-year-olds); MD. CODE ANN., PUB. SAFETY § 5-133(d)(1) (LexisNexis 2023) (prohibiting possession of a "regulated firearm" to those under the age of twenty-one); MASS. GEN. LAWS ch. 140, § 131(d)(iv) (2023) (prohibiting permits to carry from being issued to those under the age of twenty-one at the time of application); MICH. COMP. LAWS § 28.422 (2024) (prohibiting the sale of pistols to individuals under twenty-one years old); MINN. STAT. § 624.714, subdiv. 2(b)(2) (2023) (requiring applicants for a permit to carry to be "at least [twenty-one] years old"); N.J. STAT. ANN. § 2C:58-6.1(b) (West 2023) (restricting handgun ownership for those under twenty-one); N.Y. PENAL LAW § 400.00(1)(a) (McKinney 2024) (allowing permits to carry for those who are "twenty-one years of age or older," among other conditions); OR. REV. STAT. § 166.291(1)(b) (2023) (allowing sheriffs to issue permits to carry only to those over the age of twenty-one); VT. STAT. ANN. tit. 13, § 4020(a) (2023) (prohibiting sales of firearms to those under twenty-one years of age); WASH. REV. CODE § 9.41.240(1) (2023) (restricting ownership of a pistol or semiautomatic assault rifles to those over the age of twenty-one); *see also Minimum Age to Purchase & Possess*, GIFFORDS L. CTR., https://giffords.org/lawcenter/gun-laws/policy-areas/who-can-have-a-gun/minimum-age [https://perma.cc/N5Z9-EEKC] (summarizing federal and state laws regulating firearms on the basis of age).

2.  18 U.S.C. § 922(x)(1).

3.  *Id.* § 922(b)(1).

4.  *See, e.g.*, statutes cited *supra* note 1 (providing examples of state statutes that regulate the sale of firearms by age).

Age-based firearms laws exist for good reason: statistics show that eighteen-to-twenty-year-olds are at high risk of misusing firearms for both homicide and suicide. Youth suicide has reached an apex in recent years, and the firearm suicide rate among eighteen-to-twenty-year-olds increased fifty-one percent over the last decade, which is faster than the rates of older adults.[5] One study found that state laws raising the minimum legal age to purchase firearms to twenty-one years were associated with a nine percent decline in rates of firearm suicides among the eighteen-to-twenty-year-old age group.[6] Similar patterns arise in data on homicides. Across the United States, eighteen-to-twenty-year-olds commit homicide at disproportionately higher rates than *any* other age group—at triple the rate of those twenty-one and older.[7]

But neither evidence of the dangers associated with misuse of firearms by eighteen-to-twenty-year-olds, nor the consensus among the majority of states that age-based firearms restrictions are sound public policy, are central considerations under the Supreme Court's test for Second Amendment challenges after *New York State Rifle & Pistol Ass'n v. Bruen*, which fundamentally

---

5. *The Rise of Firearm Suicide Among Young Americans*, EVERYTOWN FOR GUN SAFETY (June 2, 2022), https://everytownresearch.org/report/the-rise-of-firearm-suicide-among-young-americans [https://perma.cc/UEC2-QL3W] (compiling data from 2011 to 2020 that demonstrates that "the firearm suicide rate among young people has increased faster than among any other age group").

6. Daniel W. Webster et al., *Association Between Youth-Focused Firearm Laws and Youth Suicides*, 292 J. AM. MED. ASS'N 594, 598 (2004).

7. *Eighteen to 20-Year-Olds Commit Gun Homicides at Triple the Rate of People 21 Years and Older*, EVERYTOWN FOR GUN SAFETY (Mar. 1, 2022), https://everytownresearch.org/stat/eighteen-to-20-year-olds-commit-gun-homicides-at-a-rate-triple-the-rate-of-those-21-and-years-older [https://perma.cc/XVS4-FPWQ]; Katherine A. Vittes et al., *Reconsidering the Adequacy of Current Conditions on Legal Firearm Ownership*, *in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 65, 70 (Daniel W. Webster & Jon S. Vernick eds., 2013) ("Young people between the ages of 18 and 20 have some of the highest rates of homicide offending, and age-specific homicide offending rates rise sharply in the late teens and peak at age 20."); Michael Dreyfuss et al., *Teens Impulsively React Rather than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time." (footnotes omitted)).

106          *MINNESOTA LAW REVIEW*          [108:pppp

changed the way courts examine the constitutionality of gun regulations under the Second Amendment.[8] Under *Bruen*, courts examine the Second Amendment's plain text and the historical record to evaluate whether a firearms regulation violates the Second Amendment right to keep and bear arms.[9] As one court applying *Bruen* to an age limit challenge stated, "*Bruen* makes clear that today's policy considerations play no role in an analytical framework that begins and ends more than two hundred years ago."[10]

Instead, under *Bruen*, courts determine whether the challenged law burdens the right protected by the plain text of the Second Amendment.[11] When it does, the court advances to the second step and evaluates whether "the regulation is consistent with the Nation's historical tradition of firearm regulation."[12] Lower courts have interpreted *Bruen* to direct them to consider "who" has Second Amendment rights as part of the first step of *Bruen*'s test.[13] Specifically, courts look to whether the individual who is regulated by the challenged statute is part of "the people" covered by the Amendment.[14]

Neither *Bruen* nor *District of Columbia v. Heller*,[15] a preceding case invalidating a District of Columbia law banning handgun possession, comprehensively answered the question of "who" is protected by the Second Amendment.[16] When referring to "the

---

8.   591 U.S. 1, 70 (2022).

9.   *Id.* at 17.

10.   Worth v. Harrington, 666 F. Supp. 3d 902, 926 (D. Minn. 2023).

11.   *Bruen*, 591 U.S. at 24.

12.   *Bruen*, 591 U.S. at 1; *see also* United States v. Sitladeen, 64 F.4th 978, 987 (8th Cir. 2023) (ending the constitutional analysis at step one, after holding that illegal immigrants are not part of "the people" entitled to Second Amendment protection).

13.   *See, e.g.*, Range v. Att'y Gen., 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (noting the threshold question of the plain text analysis is whether defendant is "one of 'the people' who have Second Amendment rights"); *Sitladeen*, 64 F.4th at 987 (providing that a court must examine whether the people whose conduct is burdened by a firearm regulation are part of "the people" with Second Amendment rights as part of the step one "plain text" analysis).

14.   *See, e.g.*, *Range*, 69 F.4th at 101; *Sitladeen*, 64 F.4th at 987.

15.   District of Columbia v. Heller, 554 U.S. 570 (2007).

16.   *See Bruen*, 591 U.S. at 72 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm . . . ."); *see also* Jacob D. Charles, *Time and Tradition in Second Amendment Law*, 51 FORDHAM URB.

people," *Heller* explained that "the term unambiguously refers to all members of the political community, not an unspecified sub-set."[17] Yet *Heller*'s description of "the people" was hardly unambiguous. The majority opinion contextualized the Second Amendment right by stating that it applies to "law abiding, responsible citizens," which is not coextensive with the nation's political community.[18] While some parties bringing Second Amendment challenges under *Bruen* claim that this language is dicta and should not be interpreted to narrow the scope of "the people,"[19] *Bruen* itself used the phrase "law-abiding" over a dozen times when describing the scope of the Second Amendment right, including in its opening sentence.[20] Elsewhere in the opinion, *Heller* referred to people who have Second Amendment rights as "all Americans,"[21] "citizens,"[22] and those who are part of the "national community," citing a Fourth Amendment opinion, *United States v. Verdugo-Urquidez*.[23] Justice Scalia has noted that texts must be read reasonably, not literally.[24]

Given the varying terms the Court has used to describe who is entitled to exercise Second Amendment rights, unsurprisingly, the lower courts have reached opposing results when applying *Bruen* to determine "who" has a Second Amendment right. Several federal courts have held that certain groups do not

L.J. 259, 271 (2023) ("Based in part on the mixed messages *Heller* sent about who can exercise the right to keep and bear arms, courts have yet to work out an adequate theory of when government can constitutionally disarm someone.").

17.   *Heller*, 554 U.S. at 580.

18.   *Id.* at 635. The Supreme Court carried through the phrase "law-abiding, responsible citizens" in *Bruen*. *See Bruen*, 591 U.S. at 2–3 ("The Second Amendment 'is the very product of an interest balancing by the people,' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." (quoting *Heller*, 554 U.S. at 635)).

19.   *See, e.g.*, Supplemental Brief of Appellant at 7–9, *Sitladeen*, 64 F.4th 978 (No. 22-1010).

20.   *Bruen*, 591 U.S. at 8–9; *e.g.*, Brief for the United States at 12, United States v. Rahimi, 143 S. Ct. 2688 (2023) (mem.) (No. 22-915).

21.   *Heller*, 554 U.S. at 581.

22.   *Id.* at 584.

23.   *Id.* at 580 (citing United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990)).

24.   *See* Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION 3, 23 (Amy Gutmann ed., 1997) ("A text . . . should be construed reasonably, to contain all that it fairly means.").

Supp. Grabarsky Decl.  033

108          *MINNESOTA LAW REVIEW*          [108:pppp

possess Second Amendment rights categorically, including fel-
ons and illegal immigrants, but other courts take the approach
that the Second Amendment applies to "all Americans," then an-
alyze historical analogues to determine whether the government
is permitted to restrict their exercise of the right.[25]

History provides insight into "who" had Second Amendment
rights at the Founding; the phrase "the people" excluded a vari-
ety of individuals and groups. In addition to constitutional out-
siders such as slaves or the members of the "Indian" nations,[26]
such exclusions applied to groups who were deemed to be dan-
gerous, such as individuals disarmed for failing to sign loyalty
oaths and those judged to be mentally unfit.[27]

Minors, meaning those under the age of twenty-one, or "in-
fants," in the language used at the time of the Founding,[28] occu-
pied a status somewhere between full members of the polity and
those categorically excluded from the full benefits of citizen-
ship.[29] Those under the age of twenty-one did not have independ-
ent political rights; they did not vote or serve on juries, and the

25.  *Compare* United States v. Sitladeen, 64 F.4th 978, 987 (8th Cir. 2023)
(holding that illegal immigrants are not part of "the people" who have any Sec-
ond Amendment protection), *with* Range v. Att'y Gen., 69 F.4th 96, 111 (3d Cir.
2023) (Ambro, J., concurring) (noting that felons are included in "the people"
with Second Amendment rights, despite *Heller*'s identification of felon prohibi-
tors as "presumptively lawful"), *and* Rocky Mountain Gun Owners v. Polis, No.
23-cv-01077-PAB, 2023 WL 5017253, at *11 (D. Colo. Aug. 7, 2023) (assuming
that "the people" includes every American).

26.  The terms used to describe the tribal populations of North America fol-
lows the usage recommended by legal historian Gregory Ablavsky, who uses
"the term 'Indian' as a term of art for individuals either historically labeled as
'Indians' by Anglo-Americans or, in the present, legally defined as 'Indian' by
the federal government." Gregory Ablavsky, *"With the Indian Tribes": Race, Cit-
izenship, and Original Constitutional Meanings*, 70 STAN. L. REV. 1025, 1028
n.1 (2018). By contrast, "the term 'Native' to describe the indigenous peoples of
North America and their descendants" is best applied to these peoples in all
other contexts. *Id.*

27.  *See, e.g.*, United States v. Jackson, 69 F.4th 495, 502–03 (8th Cir. 2023)
(summarizing historical firearms prohibitions on Native Americans, and groups
deemed to be dangerous, including individuals disarmed for declining to take a
loyalty oath and Catholics).

28.  For a good discussion of the way Founding-era law treated minors as
not fully autonomous legal actors, see 1 ZEPHANIAH SWIFT, A SYSTEM OF THE
LAWS OF THE STATE OF CONNECTICUT: IN SIX BOOKS 212–18 (1795).

29.  For a discussion of the concept of constitutional outsiders and Found-
ing-era law, see GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC:

law limited their ability to assert rights in court.[30] Their ability to enter contracts was severely restricted, and contractual obligations undertook by minors were not enforceable against them.[31] Their place in society was subsumed into their role as part of a family unit in which they were subservient to the head of household.[32] Accordingly, minors were not considered independent adults in the legal or political realm, the economy, or in the social or familial structure. These limits existed because the prevailing legal understanding was that those under the age of twenty-one were not able to make mature, reasonable decisions, and thus required an adult to care for them.[33]

---

DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780S–1830S, at 60–65 (2019). On the disarmament of Loyalists, see Amanda L. Tyler, Rahimi, *Second Amendment Originalism, and the Disarming of Loyalists During the American Revolution*, LAWFARE (Nov. 30, 2023) https://www.lawfaremedia.org/article/rahimi-second-amendment-originalism-and-the-disarming-of-loyalists-during-the-american-revolution [https://perma.cc/M9M2-KDUC]. Tyler correctly notes that Loyalists were not placed outside of the polity, but they were deprived of some rights. *Id.* On the marginal legal status of minors in the Founding era and its relationship to those judged to be mentally unfit, see *infra* text accompanying notes 68–70.

30.  *See generally* HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY 230–87 (2005) (discussing the formation of legal rights for children in American history).

31.  *Id.* at 239.

32.  Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, YALE L. & POL'Y REV.: INTER ALIA, at pt. II (Oct. 26, 2021) [hereinafter Cornell, *Infants*], https://yalelawandpolicy.org/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record [https://perma.cc/K2RL-7AM9].

33.  *See, e.g.*, T.E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22, 22 (1960) ("In the eyes of the common law, all persons were esteemed infants until they attained [twenty-one years of age] . . . ."); Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55, 66 (2016) (explaining that the "legal age of majority" reflects society's perception that an individual has reached the level of maturity required to function as an adult); Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750–1820*, 47 WM. & MARY Q. 235, 236 (1990) (describing how, in the eighteenth century, "patriarchal household heads [spoke] for their dependents in dealings with the larger world," and that the "civic status of household dependents [was] an indirect or secondary one" where "the community reaches them primarily through the actions and voices of the heads"); BREWER, *supra* note 30, at 132 ("In placing so much weight on reason and holding that children do not have it, the political writers of the eighteenth century developed new categories of those who could exercise the rights and obligations of subjects and citizens, definitions that increasingly rested on age (and higher age) as opposed to property and that began

110        *MINNESOTA LAW REVIEW*        [108:pppp

Given the common law understanding of minors' capacity and the legal limits placed on minors at the time of the Founding, the Second Amendment was not understood to apply to those below the age of legal majority.[34] Although it is true that minors served in the militia during the Founding era and after,[35] participation in the militia exchanged one form of patriarchy for another. Minors in the militia were subject to adult supervision and were placed under the full force of military discipline.[36] Moreover, the obligation to serve in the militia is not evidence that minors had a right to keep or bear arms outside of the militia. Treating obligations and rights as synonymous is a serious logical and legal error.[37]

Courts that reviewed challenges to firearm laws limiting eighteen-to-twenty-year-olds' legal access to firearms have had difficulty grappling with the Founding era's understanding of minors' legal status. Pre-*Bruen* cases turned to history from the time of the Founding to evaluate the constitutionality of age-limit laws, but did not expressly answer the question of whether minors are part of "the people" who have Second Amendment rights.[38] In upholding federal regulations prohibiting FFLs from

to coalesce around one age in particular by the late eighteenth century: twenty-one.").

34.   Cornell, *Infants*, *supra* note 32, at pt. II.

35.   *See* United States v. Bainbridge, 24 F. Cas. 946 (C.C.D. Mass. 1816) (No. 14,497) (discussing a case of a twenty-year-old serving in the United States Navy during 1815). In his opinion, Justice Joseph Story underscored the indisputable fact that the legislature had plenary authority to define the legal age of majority: "Can there be a doubt, that the state legislature can, by a new statute, declare a minor to be of full age, and capable of acting for himself at fourteen, instead of twenty-one years of age?" *Id.* at 950.

36.   *See* 1 FRIEDRICH WILHEIM VON STEUBEN, REGULATIONS FOR THE ORDER AND DISCIPLINE OF THE TROOPS OF THE UNITED STATES 128–54 (1779) (discussing the structure and supervision required of both officers and soldiers serving in the United States military in 1779).

37.   *See* Joseph Blocher, *Rights To and Not To*, 100 CALIF. L. REV. 761, 777 n.59, 773–91 (2012) (addressing the relationship between duties and rights in the context of choice rights, option rights, and protection rights, and citing *Singer v. United States*, 380 U.S. 24, 34–35 (1965), as an example of how "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right").

38.   *See, e.g.*, Nat'l Rifle Ass'n of Am. v. Swearingen, 545 F. Supp. 3d 1247, 1258 (N.D. Fla. 2021) (analyzing laws about the age of militia eligibility, but not considering whether minors were among "the people"). Courts rejected the vast majority of Second Amendment challenges to age-limit laws under *Heller*. *See*

2024]          *AGE RESTRICTIONS AND ARMS*          111

selling handguns to persons under twenty-one, the Fifth Circuit, in a 2012 opinion, referenced that the "age of minority at common law was 21," and cited scholarship suggesting that the government could prohibit "infants" from possessing firearms, like other groups who were deemed dangerous or non-law-abiding, such as felons and "those of unsound mind."[39] Although the Fifth Circuit noted that "considerable evidence" suggested that "the conduct at issue falls outside of the Second Amendment's protection," the court stopped short of holding so explicitly, "in an abundance of caution."[40]

---

Nat'l Rifle Ass'n of Am. v. McCraw, 719 F.3d 338, 350 (5th Cir. 2013) (upholding Texas's statutory scheme that prevented eighteen-to-twenty-year-olds from lawfully carrying handguns in public); Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 188 (5th Cir. 2012) (upholding the constitutionality of 18 U.S.C. § 922(b)(1) and (c)(1), which prohibit FFLs from selling handguns to persons under twenty-one); United States v. Rene E., 583 F.3d 8, 9 (1st Cir. 2009) (upholding the constitutionality of 18 U.S.C. § 922(x), the federal ban on juvenile possession of handguns). *But see* Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407 (4th Cir. 2021) (striking down 18 U.S.C. § 922(b)(1) and (c)(1)), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

39.   *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 201 (citing BLACK'S LAW DICTIONARY 847 (9th ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years, and at that period . . . he or she is said to attain majority.")). A noted exception to the pre-*Bruen* cases upholding firearm age limit laws is *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, which relied primarily on militia statutes "requir[ing] those 18 and older to join the militia and bring their own arms" in finding that eighteen-year-olds are entitled to Second Amendment rights. 5 F.4th at 421, *vacated as moot*, 14 F.4th 322 (4th Cir. 2021). For a rejoinder to this conclusion, see Cornell, *Infants*, *supra* note 32, at pt. I, and *infra* Part I.D (demonstrating the flawed logic in courts using the fact that minors were required to serve in the militia as evidence that minors were also entitled to Second Amendment protection for privately purchased arms).

40.   *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 203–04 (upholding the law pursuant to the interest-balancing test that courts used to evaluate Second Amendment challenges after *Heller* and prior to *Bruen*). The relevance of virtue as a qualification for arms bearing has been controversial. In part this confusion is a result of conflating the concept of civic virtue with private virtue. The former concept has proven difficult to translate into a modern idiom. For a discussion of the relevance of Founding-era ideas regarding civic virtue, as opposed to private virtue, for interpreting the Second Amendment after *Heller*, see Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L.J. 25, 33 (2023) [hereinafter Cornell, *Constitutional Mischiefs*].

112          *MINNESOTA LAW REVIEW*          [108:pppp

Similarly, the First Circuit upheld the federal ban on juvenile handgun possession in 2009 and cited an 1878 opinion from the Supreme Court of Tennessee stating,

> [W]e do not deem it necessary to do more than say that we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions.[41]

The First Circuit further relied on late nineteenth- and early twentieth-century cases addressing criminal and civil claims related to transferring deadly weapons, including handguns, to juveniles and concluded that "from at least the Civil War period . . . regulating juvenile access to handguns was permissible on public safety grounds and did not offend constitutional guarantees of the right to keep and bear arms."[42] Although the First Circuit did not explicitly address whether eighteen-to-twenty-year-olds were part of "the people," it suggested that "the right to keep arms in the founding period did not extend to juveniles."[43]

Despite *Bruen*'s mandate that courts must reconstruct history and tradition to evaluate the scope of the Second Amendment right,[44] courts addressing age-limit firearms regulations post-*Bruen* have largely ignored the societal and legal framework in which Founding era legislatures acted.[45] Courts addressing firearm regulations involving age limits have either simply

---

41. *Rene E.*, 583 F.3d at 13–16 (quoting State v. Callicutt, 69 Tenn. 714, 716–17 (1878)). The *Rene E.* court relied on late nineteenth- and early twentieth-century cases to uphold the federal ban on juvenile handgun possession. *See id.* at 14 (first citing *Callicutt*, 69 Tenn. at 716–17 (suggesting that a regulation criminalizing the sale of a pistol to a juvenile did not violate the Second Amendment and was wise public policy); then citing Coleman v. State, 32 Ala. 581, 582 (1858) (citing an act that "makes it a misdemeanor to sell, or give, or lend, to any male minor, a pistol"); and then citing Tankersly v. Commonwealth, 9 S.W. 702, 702 (Ky. 1888) (referencing criminal indictment for "selling a deadly weapon to a minor")).

42. *Id.* at 15.

43. *Id.* at 16.

44. *See* N.Y. State Rifle & Pistol Ass'n v. Bruen, 591 U.S. 1, 17 (2022) ("To justify its regulation, the government . . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.").

45. *See, e.g.*, Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 145–47 (E.D. Va. 2023) (finding 18 U.S.C. § 922(a)(5) unconstitutional); Worth v. Harrington, 666 F. Supp. 3d 902, 926–27 (D. Minn.

2024]          *AGE RESTRICTIONS AND ARMS*          113

held that eighteen-to-twenty-year-olds are part of "the people" whose conduct is entitled to Second Amendment protection, or assumed that they are part of "the people," and focused on the second-step historical analysis.[46] Both of these approaches ignore key features of the historical background of the Second Amendment. Minors were not full members of the American political community at the time of the Founding or the adoption of the Fourteenth Amendment.[47]

This Article provides the missing historical context necessary to understand the limited nature of the rights of eighteen-to-twenty-year-olds at the time the Second Amendment was adopted. Under *Bruen*'s test, investing eighteen-to-twenty-year-olds today with rights they did not possess at the Founding is not consistent with originalism. A genuinely originalist analysis not only precludes such an approach, but it also underscores that decisions about minors and guns have always been something that legislatures, not courts, decided. While eighteen-to-twenty-year-olds in modern America do have expanded rights in many realms beyond what they possessed in the Founding era, these developments are properly the function of legislatures to decide, not judges.

Applying *Bruen*'s method correctly requires incorporating the historical limitations on minors' rights at the time of the Founding into courts' analysis of modern-day age-limit laws. This historical context is relevant at both steps of the *Bruen* test. First, courts should understand what this historical context tells us about whether eighteen-to-twenty-year-olds were part of "the

---

2023) (finding MINN. STAT. § 624.714, subdiv. 22 unconstitutional); Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 647 F. Supp. 3d 508, 525 (W.D. La. 2022) (upholding the constitutionality of 18 U.S.C. § 922(b)(1)).

46.  *See* Jones v. Bonta, No. 19-CV-1226-L-AHG, 2023 WL 8530834, at *5 (S.D. Cal. Dec. 8, 2023) (finding *Bruen*'s first prong met where government agreed for purposes of a preliminary injunction motion that "18-20-year-olds are part of the 'people' protected by the Second Amendment"); Firearms Pol'y Coal., Inc. v. McCraw, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022) ("[L]aw-abiding 18-to-20-year-olds are a part of 'the people' referenced in the Second Amendment."); Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1324 (11th Cir. 2023) (acknowledging that "it's not clear whether 18-to-20-year-olds 'are part of "the people" whom the Second Amendment protects,'" but conducting second-step analysis, as defendant did not contest that 18-to-20-year-olds were part of "the people" with Second Amendment rights), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) (mem.).

47.  *See infra* Parts I.A, I.B, I.E.

114 *MINNESOTA LAW REVIEW* [108:pppp

people" at the Founding, and how that affects whether they are part of "the people" with Second Amendment rights today. It also affects the second step of the *Bruen* test, which requires courts to look to the historical record to determine the scope of permissible regulation, including the constitutionality of age-limit laws.

Part I of this Article describes the relevant legal background for assessing the scope of minors' rights at the Founding, including the right to keep and bear arms. In addition to canvassing regulations, one must understand the role of the common law, societal norms, and the economic realities of gun ownership. Moreover, a survey of firearms regulations in place at state and private colleges in the Founding era, one of the few situations in which minors lived outside of traditional family units, underscores the fact the Founding generation did not support minors' untrammeled access to guns outside of situations in which they were closely supervised by adults. Part II evaluates how Founding era views of the limited autonomy of minors rested on assumptions about those below the legal age of majority that continue to shape the rights of minors. In contrast to other groups who had limited rights at the Founding, but have since gained equal rights in modern America, such as women and Black Americans, minors continue to be viewed as citizens whose autonomy is limited because of the unique nature of their status. Part III addresses step two of the *Bruen* test and shows how extensive regulation of minors' access to firearms is deeply rooted in American law.

*Bruen* requires courts to determine the scope of today's Second Amendment right by analyzing the scope of the right as it was understood at the Founding and at the time of the Fourteenth Amendment. A rigorous application of *Bruen*'s method compels one conclusion: restrictions on the right to keep and bear arms for those under the age of twenty-one are among the most long-standing restrictions in the Anglo-American legal tradition.

## I. THE LIMITED RIGHTS OF EIGHTEEN-TO-TWENTY-YEAR-OLDS AT THE TIME OF THE FOUNDING

Eighteen-to-twenty-year-olds at the Founding operated in a much different societal and legal structure than today, one that meaningfully limited their ability to act autonomously. This Part explores the legal context and the socio-economic forces shaping the law. In addition to common law and statutory limits on the

2024]        *AGE RESTRICTIONS AND ARMS*        115

rights of minors, the patriarchal structure of society and market forces profoundly limited the autonomy of eighteen-to-twenty-year-olds, particularly regarding the acquisition and ownership of firearms.

A.  COMMON LAW LIMITS ON MINORS' LEGAL AUTONOMY

The first step in evaluating the status of Second Amendment rights for those aged eighteen to twenty and other minors in the Founding era is to consider the common law treatment of the legal capacities and rights of persons under the age of legal majority at that time. American law, particularly the law governing the family, derived from English common law. A central principle inherited from this common law tradition was the legal distinction between adults and "minors," or "infants" as minors were often known; there was no legal category of "young adult" under English common law or the American law of domestic relations.[48] Persons aged eighteen to twenty were considered "minors" under the law in the Founding era.[49]

Although little known today, Thomas Rutherforth was well known to the Founding generation and cited by the Supreme Court in a number of important cases in the decades following the adoption of the Second Amendment.[50] When writing on the age of majority, Rutherforth expressed that the "civil legislator of any community is at liberty to fix that period of life, as the age of discretion, at which experience and observation have shown the judgment of those, who live in the same climate with himself,

---

48.  Cornell, *Infants*, *supra* note 32 (describing that the problem with modern courts using the term "young adult" was that "there was no legal category of young adult in the Founding Era," that "[i]ndividuals below the age of majority were 'infants' in the eyes of the law," and that "[t]he principle inherited from the common law tradition was unambiguous on this point").

49.  SWIFT, *supra* note 28, at 213 ("Persons within the age of twenty-one, are, in the language of the law denominated infants . . . .").

50.  R.H. Helmholz, *Judicial Review and the Law of Nature*, 39 OHIO N.U. L. REV. 417, 418 n.13 (2013) (first citing Scott v. Sandford, 60 U.S. (19 How.) 393 (1857) (enslaved party), *superseded by constitutional amendment*, U.S. CONST. amend XIV; then citing Van Rensselaer v. Kearney, 52 U.S. (11 How.) 297 (1850); then citing Livingston v. Moore, 32 U.S. 469 (7 Pet.) (1833); then citing Comegys v. Vasse, 26 U.S. (1 Pet.) 193 (1828); then citing L'Invincible, 14 U.S. 238 (1 Wheat.) (1816); then citing Ware v. Hylton, 3 U.S. 199 (3 Dall.) (1796); and then citing United States v. Lawrence, 3 U.S. 42 (3 Dall.) (1795)).

116               *MINNESOTA LAW REVIEW*               [108:pppp

to be usually ripe."[51] Rutherforth continued by stating that these "principles" led "the civil laws of [England] [to] have long determined twenty-one years to be the age of consent."[52] This legal fact did not change until the latter half of the twentieth century.[53]

Under common law, and under later statutory revisions of the common law, minors enjoyed few rights that could be asserted in court; the law subsumed the legal identity of minors almost entirely within their parents, guardians, or masters, with a few well-defined exceptions.[54] Under English common law, individuals under the legal age of majority, twenty-one, were subsumed under the authority of their parents (usually their fathers) or guardians.[55] The power of fathers or guardians under this system of patriarchy exceeded the power of the monarch over his subjects. For example, for minors there was no right of petition or other rights enjoyed by English subjects and later by American citizens.[56] Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment. There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).[57]

---

51.  T. RUTHERFORTH, INSTITUTES OF NATURAL LAW; BEING THE SUBSTANCE OF A COURSE OF LECTURES ON GROTIUS'S DE JURE BELLI ET PACIS, bk. II, ch. VI, § XIV, at 388 (2d Am. ed., William & Joseph Neal 1832) (1754–56).

52.  *Id.*

53.  *See* Hamilton, *supra* note 33, at 63–65 (discussing the historical progression of the age of majority in the United States).

54.  SWIFT, *supra* note 28, at 212–18.

55.  *Id.* at 212.

56.  *See generally* Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142, 142–53 (1986) (discussing the right of citizens in colonial America to petition the court).

57.  *See* John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449, 449–51 (2008) (discussing the forms of child protection from the colonial period through 1875); ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT 69–87 (First Illinois ed. 2004) (1987) (discussing the first criminal prosecution of child abuse in the United States in 1874 and the subsequent social reckoning afterwards).

2024]          *AGE RESTRICTIONS AND ARMS*          117

In the 1790s, minors were not part of the political community, nor did they exercise other traditional civic duties.[58] In fact, eighteen-to-twenty-year-olds were expressly excluded from the political community as they had no right to vote: voting was restricted to those over the age of twenty-one.[59] Moreover, minors were not able to serve on juries.[60] Across the board, American legal history relevant to Second Amendment analysis, infants' or minors' legal status was significantly constrained under law and would not have included the ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision.[61]

Furthermore, minors could not enter into contracts, except for necessaries, such as food, clothes, lodging, and occasionally education.[62] Zephaniah Swift, an esteemed Connecticut jurist in the Founding era and author of one of the first legal treatises published after the adoption of the Second Amendment, captured the central legal fact governing persons below the age of majority at the time of the Founding: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech, minors."[63] Swift noted, "[b]y the common law, a minor can bind himself by his contract for necessaries, for

58.   *See* BREWER, *supra* note 30, at 231–87 ( discussing the history and scope of children's "legal abilities"); ALEXANDER KEYSSAR, THE RIGHT TO VOTE: THE CONTESTED HISTORY OF DEMOCRACY IN THE UNITED STATES 8 (rev. ed. 2009) (explaining that the commonly-held view at the time was that "[t]he interests of the propertyless, like . . . children, could be represented effectively by wise, fair-minded, wealthy white men").

59.   *See* BREWER, *supra* note 30, at 43 ("[A]ll states settled on the age of twenty-one as appropriate for voting privileges . . . ."); KEYSSAR, *supra* note 58, at 8 (describing how "[o]nly men with property . . . were deemed to be sufficiently attached to the community and sufficiently affected by its laws to have earned the privilege of voting," and excluding the "propertyless," women, and children from voting).

60.   *See* BREWER, *supra* note 30, at 248 n.30 (explaining that "those under twenty-one should not be jurors" for a civil jury trial for land disputes).

61.   Brief of Amici Curiae Historian Holly Brewer in Support of Appellant and in Support of Reversal at 16–23, Worth v. Jacobson, No. 23-2248 (8th Cir. July 25, 2023) [hereinafter Brewer Amici Curiae] (providing guidance on the historical conception of infants' legal status).

62.   *Id.* at 18 (providing exceptions "for his good teaching and instruction, whereby he may profit himself afterwards").

63.   SWIFT, *supra* note 28, at 213.

118                *MINNESOTA LAW REVIEW*                [108:pppp

diet, apparel, education, and lodging," but little else.[64] Further-more, the law did not recognize a minor's contract if a minor under-took an obligation that the minor did not honor or repay.[65] Similarly, a minor could not collect a debt owed to himself or herself, and had to act through a guardian to collect a debt.[66] Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[67]

The reason for the limits on minors' rights through the Founding era was because minors were deemed mentally imma-ture and unable to self-govern responsibly. Legal author James Kent stated in his influential *Commentaries on American Law*, "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in con-templation of law, until the infant has attained the age of twenty-one years."[68] This view meant that limits on a minor's legal autonomy were distinct from other groups that were ex-cluded from full legal rights because of their status as constitu-tional outsiders.

John Bouvier, author of the first American law dictionary, shared the views of Swift and Kent, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age of twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights . . . ."[69] Bouvier's statement captures the wide-spread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full array of rights under American law.[70]

---

64. *Id.* at 216.

65. *See id.* at 215–16 (noting that a merchant who contracts with a minor "knowing him to be a minor" is delivering the goods as a gift).

66. *Id.* at 216–17.

67. *See* BREWER, *supra* note 30, at 260–62 (describing the different types of historical supervision children were subjected to).

68. 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 232 (3d ed. 1836).

69. 1 JOHN BOUVIER, INSTITUTES OF AMERICAN LAW 148 (1858).

70. Bouvier's dictionary was praised by Joseph Story and Chancellor Kent. *See A Law Dictionary, Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union; with References to the Civil*

2024]        *AGE RESTRICTIONS AND ARMS*        119

In this historical context, treating infants as autonomous legal actors capable of having the right to keep, bear, and acquire arms independent of militia service is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.

B.  PATRIARCHY AND LIMITS ON MINORS' RIGHTS AT THE FOUNDING[71]

An exclusive focus on militia laws by scholars and courts, without due attention to context, has resulted in a type of legal myopia, obscuring, not elucidating the legal realities of the Founding.[72] The social history of the Founding era, particularly the way economic and social realities shaped family formation in this period, underscores the conclusion that minors had no Second Amendment rights at the Founding. Johns Hopkins historian Toby Ditz summarizes the centrality of the legal concept of patriarchy to family law and governance in the Founding era,

> [H]istorians have begun to use the concept "household patriarchy" to describe community organization in the eighteenth century, especially in New England. Household patriarchy refers to both internal and external aspects of domestic organization. It describes authority relations in which heads, and not others within households, have the formal right to make final decisions about internal matters. Patriarchal household heads speak for their dependents in dealings with the larger world. The civic status of household dependents is an indirect or secondary one; the community reaches them primarily through the actions and voices of the heads.[73]

In many respects, the situation of minors under twenty-one resembled that of married women under coverture. Under the doctrine of coverture, a married woman ceased to exist as a legal entity, and her entire legal persona was subsumed within her

---

*and Other Systems of Foreign Law. To Which Is Added, Kelham's Dictionary of the Norman and Old French Language. By John Bouvier*, 93 N. AM. REV. 71, 74 (1861).

71.  The absorption of the common law in America and the development of different variants of common law in the colonies and states have generated a rich scholarly literature. For a useful overview, see Lauren Benton & Kathryn Walker, *Law for the Empire:* The Common Law in Colonial America *and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

72.  *See supra* notes 45–47 and accompanying text (discussing how post-*Bruen* courts have impermissibly ignored the societal and legal framework in which Founding-era legislatures acted).

73.  Ditz, *supra* note 33, at 236.

120            *MINNESOTA LAW REVIEW*            [108:pppp

husband's authority.[74] Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover*, she performs every thing; and is therefore called in our law-french a *feme-covert* . . . .[75]

So too the legal existence of minors was subsumed under their parent or guardian's authority.[76]

Although minors were allowed to act independently before the age of twenty-one in some specific circumstances, these examples should also be understood in the context of the way patriarchal society functioned in the eighteenth-century Anglo-American world. For example, the *Worth* and *Hirschfeld* courts noted that minors were permitted to be married at twelve (for women), to choose a guardian at fourteen (for women), or to take an oath at twelve.[77] The courts took these examples to mean that the age of majority was not strictly understood to be twenty-one, and that the Founding society may have understood twenty-year-olds to be minors in some circumstances, and adults in others. Although at first glance these examples may seem to support the view that minors acted autonomously, interpreting these laws historically demonstrates that these exceptions only highlight the influence of patriarchy. As a practical matter, the effect of the minors' seemingly autonomous actions did not facilitate their independence. Instead, it integrated them more fully into patriarchal households: as wives subservient to a husband, as a child subservient to a guardian, or as a peacekeeper or militia

---

74.  1 WILLIAM BLACKSTONE, COMMENTARIES *442.

75.  *Id.*

76.  *See* Mark Anthony Frassetto, *Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY 195, 209 (Joseph Blocher et al. eds., 2023) (noting that women and "men who had not yet established their own households," i.e., minors, "would have been considered wards of their fathers"). In contrast to wives, subsequent legal change has not bestowed full rights on minors. *See* discussion *infra* Part II.A (discussing the legal limits imposed upon eighteen-to-twenty-year-olds throughout U.S. history).

77.  Worth v. Harrington, 666 F. Supp. 3d 902, 916 (D. Minn. 2023); Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407, 435 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

2024]          *AGE RESTRICTIONS AND ARMS*          121

member under adult male authority. Thus, these exceptions only confirm Kent's view that minors lacked the ability to care for themselves. Legal authority over their lives rested with other decision-makers.[78]

The social and economic forces supporting patriarchy further eroded the legal autonomy of minors, placing significant hurdles in the effort to establish their own independent households. The laws governing settlement and residency for Massachusetts are revealing in this regard: they imposed an age requirement of twenty-one, as well as a variety of different wealth requirements, to establish residency in the commonwealth.[79] Moreover, acquiring the necessary economic resources to establish independence was increasingly difficult during the era of the American Revolution and Second Amendment.[80] Indeed, most adult men in Concord, the town virtually synonymous with the Minuteman ideal of a well-regulated militia, were forced by economic necessity to postpone establishing their own independent households until their mid-twenties.[81] This decision was necessitated by the difficulty of acquiring enough land to establish an independent farmstead.[82] Indeed, every aspect of an eighteen-to-twenty-year-old's life during the relevant period would have been shaped by his or her role as legally subservient to a parent, guardian, or the state.

---

78.  *See* KENT, *supra* note 68, at 232 (explaining how infants are under the protection of a guardian because they cannot "take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years").

79.  Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-Century Massachusetts*, 62 PUBL'NS COLONIAL SOC'Y MASS.: L. COLONIAL MASS. 1630–1800, at 153, 189 (1984). Persons residing outside of a properly governed household, i.e., a home headed by a white male patriarch, could be banished from early New England towns in a process known as "warning out." *Id.* at 176–81.

80.  ROBERT A. GROSS, THE MINUTEMEN AND THEIR WORLD 76 (1976) ("A silent struggle between the generations was under way . . . . The slipping authority of the fathers reflected an inescapable dilemma in Concord's agricultural life: there were simply too many sons and not enough productive land for all.").

81.  *See id.* at 78 ("Most young men had to wait to marry until their fathers willingly released control of land and enabled them to sustain households of their own.").

82.  *See* Mary Babson Fuhrer, *The Revolutionary Worlds of Lexington and Concord Compared*, 85 NEW ENG. Q. 78, 85–91 (2012) (discussing economic trends affecting younger generations' independence).

122          *MINNESOTA LAW REVIEW*          [108:pppp

### C.  PATRIARCHAL GOVERNANCE OF MINORS IN THE FOUNDING ERA: THE CASE OF COLLEGES

Founding era colleges were one of the few places where minors resided outside of a traditional home. The tight regulation of arms in colleges also offer one of the strongest examples of the Founder generation's belief that minors could not be trusted with guns when not supervised by adults.[83] Minors attending college were governed by a restrictive rule of in loco parentis.[84] The regulations enacted by colleges prohibiting guns on campus illustrate the view that the Founders opposed unfettered access to guns by minors. Harvard's campus rules adopted in the era of the American Revolution prohibiting guns on campus are illustrative:

> XVI No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls, Yard or near the College, he shall be fined not exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence.[85]

Although Harvard was a private entity, its role in early Massachusetts society straddled the public and private spheres.[86]

---

83.  Cornell, *Infants*, *supra* note 32, at pt. II (describing how during the Revolutionary era "[m]inors attending college traded strict parental authority for an equally restrictive rule of *in loco parentis*"). For an extensive collection of historical weapons restrictions by colleges, see Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 RUTGERS U. L. REV.: COMMENTARIES 101, 112–18 (2024).

84.  Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135, 1146 (1991) ("The court [in explaining the doctrine] held that college authorities stand *in loco parentis* when the physical, moral, and mental welfare of the pupils is concerned. Any rule or regulation for the betterment of their pupils in these areas was deemed permissible." (footnotes omitted)). The case described by Jackson, *Gott v. Berea Coll.*, 161 S.W. 204 (Ky. 1913), "often is cited as the clearest expression of [in loco parentis] in this country." Jackson, *supra*, at 1146.

85.  *The Laws of Harvard College [1767]*, 31 PUBL'NS COLONIAL SOC'Y MASS.: HARV. COLL. RECS. PART 3, at 347, 358 (1935).

86.  Thus, the Massachusetts Constitution of 1780 instructed "legislatures and magistrates . . . to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge." MASS. CONST. ch. V, § 2 (1780), https://www.nhinet.org/ccs/docs/ma-1780.htm [https://perma

2024]        *AGE RESTRICTIONS AND ARMS*        123

Other colleges in the Founding era adopted similar restrictions as Harvard. Yale College prohibited students from possessing any guns or gun powder.[87] The nation's first public universities also adopted similar prohibitions. The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus.[88] The rule was emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[89]

A similar law governed students at the University of North Carolina, another public university founded in the same period.[90] The university prohibition was total: "No Student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane . . . ."[91] College regulations from this era further demonstrate the fact that norms governing American society in the era of the Second Amendment's ratification opposed the view that unsupervised minors were to be trusted with free access to firearms.

The University of Virginia's exceedingly strict laws on this point are illustrative of this general societal attitude.[92] The actions of the university are of particular relevance because of the

.cc/VAF3-NVNJ]. Harvard students and faculty were exempted from militia obligations but during the American Revolution Harvard College did create a militia company. Conrad Edick Wright, *Creating a Fellowship of Educated Men: Forming Gentleman at Pre-Revolutionary Harvard*, in YARDS AND GATES: GENDER IN HARVARD AND RADCLIFFE HISTORY 17, 29–30 (Laurel Thatcher Ulrich ed., 2004) (highlighting undergraduate clubs at Harvard in the early 1770s and describing the "Martimercurian Company, an undergraduate militia with more than 60 members" that wore uniforms, drilled in public, and carried "muskets supplied by the province").

87. THE LAWS OF YALE-COLLEGE IN NEW-HAVEN IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS ch. VIII, § XIV, at 26 (1795).

88. Univ. of Ga., *The Minutes of the Senate Academicus* 1799 – 1842, DIGIT. LIBR. OF GA. (Nov. 4, 1976), https://dlg.galileo.usg.edu/data/guan/ua0148/pdfs/guan_ua0148_ua0148-002-004-001.pdf [https://perma.cc/Y56Y-NPGA].

89. *Id.*

90. UNIV. OF N.C., ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

91. *Id.*

92. *See* Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes (October 4–5, 1824)*, ENCYCLOPEDIA VA. 6–7 (Dec. 7, 2020), https://

124              *MINNESOTA LAW REVIEW*              [108:pppp

role that Thomas Jefferson and James Madison played in the governance of the university in its earliest days.[93] The laws enacted regarding weapons are worth quoting in detail: "No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon . . . ."[94]

Despite Jefferson's ardent defense of an expansive vision of the right to keep and bear arms as a matter of constitutional law, even he took a dim view of allowing guns at the University of Virginia.[95] Similarly, James Madison, the drafter of the Second Amendment, was also opposed to permissive policies when the issue was minors and guns.[96]

The fact that many American educational institutions banned firearms is also consistent with the patriarchal systems in which minors lived in the 1700s and 1800s.[97] College regulations from the era of the Second Amendment only underscore this understanding, a view that pervaded early American law and society.[98]

---

encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors -minutes-october-4-5-1824 [https://perma.cc/5PHC-4R9C] (prohibiting various behaviors including the keeping or use of firearms within the university).

93.   Jefferson and his good friend James Madison, the primary architect of the Second Amendment, attended the meeting in which this policy was adopted. *Id.* at 1.

94.   *Id.* at 6–7.

95.   *See id.* (noting Jefferson's attendance at the meeting where University of Virginia restricted firearms on campus).

96.   *See id.* (noting Madison's attendance at the meeting where University of Virginia restricted firearms on campus); *cf.* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 500 (2004) (noting Madison's distinction "between bearing a gun for personal use and bearing arms for the common defense").

97.   *See* discussion *supra* Part I.B (illustrating how the patriarchal system of this time period limited the rights of minors as their legal existence was in effect subsumed under their parent or guardian's authority).

98.   The district court in *Worth* refused to agree that collegiate regulations from the era of the Second Amendment "demonstrate a relevantly similar historical tradition of restrictions on 18-to-20-year-olds possessing or carrying firearms." Worth v. Harrington, 666 F. Supp. 3d 902, 921 (D. Minn. 2023). It stated, "none of these proposed analogues appears to be the product of a legislative body elected by founding-era voters." *Id.* The restrictions noted above were found in private institutions chartered by the state and public institutions. The *Worth* court's requirement that only actions expressly enacted by legislatures count

2024]         *AGE RESTRICTIONS AND ARMS*         125

These university provisions are relevant historical evidence even though they were not "the product of a legislative body elected by founding-era voters."[99] First, these policies illuminate broadly shared culture and legal values essential to identifying the original meaning of the scope of permissible firearms regulation. Ignoring them fails to apply *Bruen*'s mandate that the scope of the Second Amendment is understood through analyzing "historical tradition," which is not limited solely to codified statutes and ordinances.[100] *Bruen* stated that "examination of a variety of legal and other sources to determine *the public under-*

---

both misreads *Bruen* and ignores the fact that most regulation in this period occurred by common law means. *See, e.g.*, WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 19–50 (1996) (explaining the nineteenth-century vision of the police power in a common law system). Indeed, all statutes were read in the context of the common law as it had been absorbed after the American Revolution. *See* 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (1822) ("The common law is to be regarded in the construction of statutes, and three things are to be considered. The old law, the mischief, and the remedy: that is, how the common law stood at the time of the making of the act; what the mischief was for which the common law did not provide: and what remedy the statute had provided to cure the mischief: and the business of the judges is so to construe the act as to suppress the mischief and advance the remedy." (footnote omitted)). Thus, the *Worth* court's approach is itself inconsistent with Founding-era interpretive practices and hence inconsistent with *Bruen*, which provides that the Constitution's "meaning is fixed according to the understandings of those who ratified it" and directs courts to look to the "public understanding" of the right at the time of ratification. *See* N.Y. State Rifle & Pistol Ass'n v. Bruen, 591 U.S. 1, 28, 37–38 (2022). For a summary of the relationship between common law and statutory construction in the Founding era, see *id.*

99.  *Compare Worth*, 666 F. Supp. 3d at 921 (finding that collegiate regulations are not relevant historical evidence in part because they were not "the product of a legislative body elected by founding-era voters"), *with* Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1326–27 (2023) (noting that "[p]ublic universities have long prohibited students from possessing firearms on their campuses," and holding these "traditional firearm regulations" are passed for the same "why" as Florida's law prohibiting eighteen-to-twenty-year-olds from purchasing firearms), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) (mem.).

100.  *See Bruen*, 591 U.S. at 17 ("Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); District of Columbia v. Heller, 554 U.S. 570, 578, 583, 593–95, 600–05, 615–16, 626 (2008) (citing, by way of example, legal commentators, case law, legislative discussion of proposed constitutional amendments, and state constitutions).

126            *MINNESOTA LAW REVIEW*            [108:pppp

standing of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation."[101] Tools that *Bruen* lists as relevant in *Heller*'s analysis evaluating the scope of the right include "founding-era legal scholars [who] interpreted the Second Amendment in published writings"; "19th-century cases that interpreted the Second Amendment"; the "discussion of the Second Amendment in Congress and in public discourse" after the Civil War; and writing from post–Civil War commentators.[102] Thus, courts have recognized the importance of historical evidence other than historical laws passed by legislative bodies in evaluating the text of the Second Amendment since *Heller*.[103] The court in *Jones v. Bonta* stated expressly that these university policies "demonstrate the general understanding during the historically relevant era that firearm regulation of 18-20-year-olds was well-established on numerous fronts and consistent with municipal and state regulation in the first half of the nineteenth century."[104] Moreover, these university institutions were chartered by the state and were given broad police powers by the state.[105] The universities thus operated as extensions of the state. Had the state not had such power, it would not have been able to delegate this authority to colleges.[106]

Courts have accepted private rules and regulations as relevant historical analogues pursuant to *Bruen*, and it makes sense to do so here, where university regulations represent one of the

---

101.   *Bruen*, 591 U.S. at 20 (quoting *Heller*, 554 U.S. at 605).

102.   *Bruen*, 591 U.S. at 21 (quoting *Heller*, 554 U.S. at 605, 610, 614, 616–19).

103.   *See Heller*, 554 U.S. at 578, 583, 593–95, 600–05, 615–16, 626 (examining a wide variety of historical sources as evidence in order to interpret the text of the Second Amendment).

104.   Jones v. Bonta, No. 19-cv-1226-L-AHG, 2023 WL 8530834, at *10 (S.D. Cal. Dec. 8, 2023).

105.   *See* Joshua Hochman, Note, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676, 1709–11 (2024) (describing gun regulations at quasi-private–quasi-public schools).

106.   *See id.* (treating collegiate firearms restrictions as delegated legislative authority).

few times that minors lived outside of their familial unit.[107] Furthermore, they represent the view of the scope of the Second Amendment right held by influential figures in the Founding era, including Thomas Jefferson and James Madison.[108]

The fact that these bans were also adopted by several public universities only underscores their relevance. These restrictions provide historical insight into what state-affiliated entities understood to be lawful firearm regulations of minors in the Founding era. Accordingly, the rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms. Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers.

## D. The Role of Minors in the Militia at the Founding

Plaintiffs in age-limit challenges primarily rely on Founding-era laws that required eighteen-to-twenty-year-olds to serve in the militia as evidence that minors are entitled to Second Amendment protection for privately purchased arms.[109] The logic of this claim is flawed: militia duties mandated by Founding law are evidence of obligations, not rights. In the Anglo-American legal tradition, rights are the correlatives of duties, they are not synonyms.[110] The characterization of rights "as absolute shields and trumps protecting individuals from society

---

107. *See, e.g.*, Frey v. Nigrelli, 661 F. Supp. 3d 176, 203–06 (S.D.N.Y. 2023) (relying on restrictions from private rail carriers as historical analogues because there was no government-run rail carrier at the Founding).

108. *See supra* notes 92–96 and accompanying text.

109. *See, e.g.*, Worth v. Harrington, 666 F. Supp. 3d 902, 914–15 (D. Minn. 2023) (discussing early militia laws as support for the argument that eighteen-to-twenty-year-olds should enjoy Second Amendment protections); Firearms Pol'y Coal., Inc. v. McCraw, 623 F. Supp. 3d 740, 751 (N.D. Tex. 2022) ("[B]ecause 18-to-20-year-olds were (and are) a part of the militia, the Second Amendment must protect their right to keep and bear arms.").

110. *See* Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 YALE L.J. 16, 30–33 (1913) (describing rights in terms of the correlative duties they impose on others). There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. *See* J. Raz, *Legal Rights*, 4 OXFORD J.

**Supp. Grabarsky Decl.  053**

128          *MINNESOTA LAW REVIEW*          [108:pppp

and government," a frame that is often used today to characterize Second Amendment rights, is in conflict with the understanding of rights at the time of the Founding, at which time rights were "secondary to (indeed derived from) the larger social obligations of man."[111] The "dominant early American legal discourse . . . took duties, not rights, seriously,"[112] and it would follow that Founding-era thinkers would have interpreted militia statutes as establishing duties, not investing individuals rights.

An illustrative example that clarifies the distinction between rights and duties is provided by the role of the jury. Individuals have a duty to participate in jury service, but do not have a right to be chosen to serve on a jury. Or, even more relevant here, modern draft laws do not create a right to serve in the United States military. Even in the context of historical militia service, individuals mustered into militia service were not guaranteed to carry a weapon: minors might have been tasked with carrying a flag, fife, or drum.[113] The notion that these minors had a right to carry a gun outside the context of the militia illustrates the flaws of treating obligations as evidence of a right. Imposing a legal obligation on individuals to participate in militia service does not establish a constitutional right to keep, bear, or acquire firearms for those under the age of twenty-one.

Militia laws, considered in the proper historical context, gave governments broad power over minors, underscoring minors' inability to act independently outside of the context of adult supervision. These laws did not erect a barrier against government intrusion into the most private sphere of American life—the home. In fact, militia statutes achieved the opposite goal: they gave government sweeping powers over Americans and their guns.[114] Weapons were subject to government inspection,

---

LEGAL STUD. 1 (1984); Leif Wenar, *Rights*, STAN. ENCYCLOPEDIA PHIL. (Feb. 24, 2020), https://plato.stanford.edu/entries/rights [https://perma.cc/V32G-ERUT].

    111.  NOVAK, *supra* note 98, at 34.

    112.  *Id.*

    113.  *Fifes and Drums*, COLONIAL WILLIAMSBURG, https://www.colonialwilliamsburg.org/explore/fifes-and-drums [https://perma.cc/2V2G-WW2E] ("During the American Revolution, one fifer and one drummer were deployed as a regular component of a company of 75 officers and men. Two boys, generally aged between 10 and 18, marched along with each company.").

    114.  *See* Cornell & DeDino, *supra* note 96, at 487, 496, 505, 509 (analyzing several "intrusive" militia regulations).

including home inspection.[115] Indeed, although militia weapons were privately owned, they were among the most heavily regulated forms of private property in early American law.[116] The historical record demonstrates that infants were typically only entrusted with firearms when under the supervision of a parent or a guardian, or when serving in militias or other community-based peace keeping activities such as the "hue and cry."[117]

The acquisition of required arms for militia service also depended on adults. Minors did not arm themselves for militia service; they depended on parents and guardians to outfit them with the necessary arms, and, in some instances, depended on local government or the state to provide arms.[118] Arms were pro-

---

115.  *See* Act of Oct. 10, 1799, § 4, 1799 Conn. Acts 511, 511–12 (Reg. Sess.) ("That the Fines and Penalties incurred for Non-appearance and deficiencies of Arms, Ammunition and Accoutrements shall in future be as follows, viz. Each non-commissioned Officer, Drummer, Fifer or Trumpeter who shall neglect to appear at the Time and Place appointed for regimental or battalion Exercise or Review, being legally warned thereto shall forfeit and pay a Fine of *Three Dollars* for each Days neglect, and for each Days neglect to appear at the Time and Place appointed for company Exercise or Inspection, being legally warned thereto, shall forfeit and pay a Fine of *One Dollar* and *Fifty Cents*, and each Private belonging to any Company of Militia, shall for Non-appearance on Days of regimental or battalion Exercise or Review, being thereto legally warned, forfeit and pay a Fine of *Two Dollars* for each Day's neglect, and for Non-appearance at Time and Place for company Exercise or Inspection he shall forfeit and pay a Fine of *One Dollar* for each Day's neglect; and for deficiencies of Arms, Ammunition and Accoutrements, required by Law, each non-commissioned Officer and Private shall forfeit and pay for each Day of Review or Exercise that he shall be deficient, the following Fines, viz. For a Gun or pair of Pistols, each *Seventy-five Cents*; for Sword, Bayonet or Cartridge Box, each *Fifty Cents*; and for each of the other Articles required by law, *Twenty-five Cents*.").

116.  *See* Cornell & DeDino, *supra* note 96, at 508–10 (describing extensive regulations of New York and Massachusetts militias).

117.  Cornell, *Infants*, *supra* note 32, at pt. II; Brewer Amici Curiae, *supra* note 61, at 8 ("The state militia laws demonstrate that 18-to-20-year-olds were not thought to hold political rights such as the right to bear arms afforded to 'the people.' Instead, the presence of these laws and the language therein demonstrates that the underlying assumption was that 18-to-20-year-olds did not possess weapons and were under the supervision and authority of others—thus the need for laws explicitly granting 18-20-year-olds the right to bear arms *in the militia*.").

118.  ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 307–08 (1796) (setting fines if militia member does not show up with weapons, but providing that, for a man under twenty-one years of age, it is the responsibility

130          *MINNESOTA LAW REVIEW*          [108:pppp

vided to minors to allow them to comply with their militia obligations mandated by early American militia statutes. The fact that these laws provided mechanisms by which eighteen-to-twenty-year-olds would be supplied weapons to meet a militia obligation reflect that minors did not have the legal capacity or financial resources to purchase or own weapons themselves.[119]

Moreover, early American militia statutes reflected the persistent problem states and the federal government faced in properly arming the militia. Although Americans were better armed than their British ancestors, most households did not have a military quality musket at the time of the Second Amendment.[120] In contrast to modern Americans, most gun-owning households had only a single weapon, and typically that gun was better suited to life on a farm, not the rigors of eighteenth-century ground warfare.[121]

---

of the "Parent, Master or Guardian" to supply the weapons and to bear the costs of any fines for his failure to appear or to perform his duty); 2 LAWS OF THE STATE OF DELAWARE, FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1135 (1797) (exempting men under twenty-one from having to supply their own weapons); 2 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION, IN THE YEAR 1780, TO THE END OF THE YEAR 1800, at 172–94 (1801) (exempting young men from supplying their own "arms and equipment" and providing for parents, masters, or guardians, to provide such weapons, or for the town to step in if the parent could not afford weapons); THE LAWS OF THE STATE OF NEW-HAMPSHIRE, THE CONSTITUTION OF THE STATE OF NEW-HAMPSHIRE, AND THE CONSTITUTION OF THE UNITED STATES, WITH ITS PROPOSED AMENDMENTS 422 (1797) (providing that minors unable to arm themselves will be provided weaponry by the town); PUBLIC LAWS OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS 69 (1798) (dictating that the town will pay for the "arming and equipping" of minors unable to equip themselves); *see* Brewer Amici Curiae, *supra* note 61, at 12–13 (explaining how eighteen-to-twenty-year-olds historically were not responsible for arming themselves for militia service).

119.   *See* Brewer Amici Curiae, *supra* note 61, at 12–13 (arguing that provision of weapons to minors and minors' exemption from certain militia penalties placed them outside the political community); *see also* laws cited *supra* note 118 (providing examples of several statutory mechanisms).

120.   Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 54, 62–63 (Jennifer Tucker et al. eds., 2019).

121.   *Id.*

Americans' reluctance to purchase the guns government required them to have for service in the militia meant that all guns were not created equal in the eyes of the law. Government policy was designed to force militia members to acquire the type of weapons the government deemed essential for a well-regulated militia.[122] Failure to acquire the officially proscribed type of weaponry could result in fines.[123] A 1794 Rhode Island statute adopted a few years after the Second Amendment was ratified is illustrative of the punishments that could be meted out:

> That every non-commissioned Officer or Private who shall neglect to appear at the regimental Rendezvous, shall forfeit the Sum of *Six Shillings* and for every Day he shall neglect to appear at the Company Parade, he shall forfeit *Four Shillings and Sixpence*. And if he shall not be armed and equipped according to other said Act of Congress, when so appearing, without sufficient Excuse, he shall, for appearing without a Gun, forfeit *One Shilling and Sixpence*; without a Bayonet and Belt, *Sixpence*; without a Cartouch-Box and Cartridges, *Sixpence* . . . .[124]

Once they had mustered, members of the militia were subject to military discipline and punishment.[125] Militia statutes prescribed penalties and punishments for failing to report to muster properly armed and for misuse of weapons once an individual appeared at muster.[126] Indeed, eighteenth-century military discipline was exceedingly harsh, including corporal punishment

---

122.  *Id.*

123.  *E.g.*, Act of Apr. 14, 1778, ch. 22, § 46, 1778 N.J. Laws 42, 53 (imposing a twenty-shilling fine for failure to bring weaponry when called to training or service). For a sampling of other Founding-era militia statutes, see Act of Mar. 13, 1779, ch. 33, 1779 N.Y. Laws 136 (raising a thousand men to defend the state); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia, and; encouraging military skill for state defense); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson County).

124.  Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21–22.

125.  *See Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820) (upholding state and federal government jurisdiction over militia punishment); Act of Dec. 20, 1791, 1791 S.C. Acts 16 (amending and putting into force an earlier act calling for the organization and discipline of militia); *see also* Cornell & DeDino, *supra* note 96, at 508–10 (noting the requirement for militiamen to appear at muster with certain equipment).

126.  *See, e.g.*, § 10, 1794 R.I. Pub. Laws at 21–22 ("And if he shall not be armed and equipped according to the said Act of Congress, when so appearing, without sufficient Excuse, he shall, for appearing without a Gun, forfeit *One Shilling and Sixpence* . . . ."); Act of Dec. 28, 1792, 1792 N.H. Laws 436, 443 (providing that any private who "shall unnecessarily neglect to appear

132          *MINNESOTA LAW REVIEW*          [108:pppp

such as whipping.[127] Tennessee's enforcement mechanism involved the institution of the court martial:

> [T]he commissioned and staff officers of the infantry are hereby required to meet at the place of holding their battalion musters at eleven o'clock on the day preceding said muster, armed with a rifle, musket, or shot gun and dressed in the uniform prescribed by law, for the purpose of being trained as at regimental drills, and the commanding or senior officer present shall call, or cause the roll to be called, and make a return of all delinquents to the next regimental or battalion court martial.
>
> . . . That Regimental courts martial shall have power to fine delinquents, field or staff officers, and it shall be the duty of the commanding or senior officer present at any regimental, battalion or drill muster, to make a return of all such delinquents to the next regimental or battalion court martial, and they shall have discretionary power to assess fines or not as they may think proper on delinquents.[128]

The fact that punishment was incorporated into historical militia laws to compel service members to meet their *obligations* is hard to reconcile with the idea that these laws offer evidence of a *right* that might be asserted against government.[129] In short, minors required to serve in the militia had no choice about the types of weapons needed to meet their legal obligations, a fact that further undermines the claim that minors enjoyed a right to bear arms against government interference.

Furthermore, within the context of militia discipline, minors who failed to meet their militia obligations to acquire the correct armaments were not held personally responsible.[130] Parents, guardians, or, at times, the local government were responsible

---

equipped, [at muster] as the law directs" shall "pay a fine of nine shillings"); Act of Oct. 10, 1799, § 4, 1799 Conn. Pub. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

127.   *See* Act of Apr. 10, 1812, ch. 55, § 6, Pub. L. No. 12-55, 2 Stat. 705, 707 (1812) (prohibiting whipping, which was a common form of punishment used by the military in the eighteenth century).

128.   Act of Nov. 16, 1821, ch. 55, §§ 2–3, 1821 Tenn. Pub. Acts 63, 63.

129.   Brewer Amici Curiae, *supra* note 61, at 14 ("[T]he punitive components of the laws further demonstrate that these laws were imposing an obligation—not creating or codifying a preexisting right—for 18-to-20-year-olds to bear arms . . . .").

130.   *E.g.*, ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA, *supra* note 118, at 308 (assigning the "Parent, Master or Guardian" of minors to supply the weapons and to bear the costs of any fines for a minor's failure to appear or to perform his duty).

2024]          *AGE RESTRICTIONS AND ARMS*          133

in the event a minor appeared without sufficient weaponry.[131] For example, New Hampshire's 1792 militia law was explicit that parents and guardians were responsible if minors under their care failed to acquire the necessary weapons for militia participation; the parent or guardian suffered the penalties:

> That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements. . . . [and] That parents, masters and guardians shall be liable for the neglect . . . of such persons as are under their care . . . .[132]

And even when such obligations were not expressly included by statute, the common law definition of infants meant that any legal proceeding that would attempt to prosecute minors for such a failure would have to proceed against the legally responsible adult in charge of the minor's household.[133] Connecticut's militia law, adopted in October, 1792, described in considerable detail what weapons were required by statute to meet the obligation to participate, and it also listed the penalties and punishments for failing to appear at muster properly armed and accoutered.[134]

Appearing at muster without proper armaments rendered one "delinquent" and a fine was levied against him if he is "upwards of twenty-one Years of Age."[135] For those not legally adults, this responsibility fell on the "Parent, Master or Guardian" to supply the weapons and to bear the costs of any fines for his failure to appear or to perform his duty.[136] The Connecticut militia statute unambiguously stated that the ultimate legal responsibility for acquiring armaments needed by minors serving in the militia rested with parents, guardians, or masters, not the infants under their charge.[137]

---

131.  *Id.*; 1792 N.H. Laws at 447; Act of Mar. 6, 1810, ch. CVII, § 28, 1810 Mass. Acts 151, 176.

132.  1792 N.H. Laws at 447; *see also* § 28, 1810 Mass. Acts at 176 (subjecting parents, masters, or guardians of a minor to the same penalties as of age militia members for failure to provide the required arms and equipment).

133.  SWIFT, *supra* note 28, at 213, 217.

134.  ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA, *supra* note 118, at 299, 307 (describing the precise weaponry and equipment each citizen enrolled in the militia must acquire and dictating a fine of "*One Dollar* and *Fifty Cents,* for each Day" he appears without being properly "armed and equipped").

135.  *Id.* at 308.

136.  *Id.*

137.  *Id.*

134            *MINNESOTA LAW REVIEW*            [108:pppp

Delaware's militia law of 1792 also exempted young men under the age of twenty-one from having to supply their own weapons.[138] These laws further demonstrate that minors were not full participants in the "political community" at the time of the Founding, as they were not full citizens independently held by the law to be legally responsible for failing to arm.[139]

Imposing mandatory militia service was a policy choice made by states and the federal government; it does not represent a fixed constitutional principle in American law. This fact is clear from the drafting history of the Second Amendment. The Second Amendment's original language defined the militia as "composed of the body of the people."[140] As the debates of the First Congress make clear, Congress chose to omit this language so that it would retain plenary authority to decide the composition of the militia and alter it to meet the demands of the nation's defense requirements.[141] There was no constitutional requirement for any subset of the population to serve in the militia.[142] And these statutory requirements were adjusted over time to the changing needs of the individual states and the federal government.[143] The claim that minors have an inherent right to bear arms would essentially rewrite the plain text of the Second Amendment and contravene its original meaning, reinserting language that Congress deliberately excised from the text. Such an approach is antithetical to the originalist methodology required in Second Amendment cases.

It is not surprising that the debate over the composition of the militia was influenced by public concern over the economic

---

138. Act of Jun. 18, 1793, ch. XXXVI, § 2, II Del. Laws 1134, 1135 (1793).

139. *See* Brewer Amici Curiae, *supra* note 61, at 6–15 (discussing how, contextually, the Second Amendment's reference to "the people" was not inclusive of eighteen-to-twenty-year-olds).

140. For an account of the Second Amendment's drafting history, see Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 CHI.-KENT L. REV. 103, 124–32, 158–59 (2000).

141. SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 60–65 (2006) [hereinafter CORNELL, A WELL-REGULATED MILITIA].

142. *See id.* at 65, 67.

143. *Id.* at 67; *see also* Cornell & DeDino, *supra* note 96, at 487, 496, 508–10 (highlighting the variation in state and federal statutes regarding militia service).

2024]          *AGE RESTRICTIONS AND ARMS*          135

burden that participation in the militia placed on American families.[144] This concern was voiced forcefully during the debate over the first militia act in Congress. Thomas Fitzsimons, a Federalist representative from Pennsylvania, expressed his concern that militia service was a burdensome tax on Americans, and that it would prove to be an undue burden for most families.[145] During this debate, Congress seriously considered abandoning the idea of a broadly inclusive militia in favor of a smaller, more select, better trained, and better equipped force, but ultimately this proposal failed.[146] Instead, Congress settled on a compromise: the first federal militia act carried forward a broadly inclusive idea of a militia, but it did not take the necessary action to properly arm and equip the militia.[147]

The imposition of an obligation, enforced by a range of punishments, was necessitated by the economic realities facing American families in the eighteenth century. The labor of sons

144.  *See* 2 ANNALS OF CONG. 1804 (1790) ("[House Representative] observed, the clause which enacts that every man in the United States shall 'provide himself' with military accoutrements would be found impracticable, as it must be well known that there are many persons who are so poor that it is impossible they should comply with the law.").

145.  *Id.* at 1806 ("[S]ubjecting the whole body of the people to be drawn out four or five times a year [for militia service] was a great and unnecessary tax on the community; that it could not conduce either to the acquisition of military knowledge, or the advancement of morals.").

146.  *See id.* at 1805 (recording a suggestion from one representative that "[a] much smaller number would, in his opinion, answer all the purposes of a militia"); *cf.* H. Richard Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403, 471–72 (2000) (describing how George Washington was in favor of a small, highly trained, professional militia).

147.  *See* Uviller & Merkel, *supra* note 146, at 516 ("[T]he Act provided that citizens, for whom militia service was required, furnish their own standard arms and equipment.").

136          *MINNESOTA LAW REVIEW*          [108:pppp

was vital to the survival and prosperity of families.[148] Rural communities needed this labor on farms.[149] Apprentices were essential to artisan modes of production.[150] Given the strong economic pressures on small farm owners and artisans in a pre-industrial society to maximize this source of labor, market forces could easily have led families to oppose allowing sons to join the militia voluntarily.[151] Thus, at the time of the Second Amendment's enactment, these legal and social facts meant that it was necessary for the states to enact laws requiring able-bodied minors under twenty-one to participate or face penalties. Without such laws, it is likely that few minors would have been enrolled in the militia because of the opposition of those who needed their labor, i.e., parents, guardians, and masters. The individual states and federal government had the power to, and did, coerce individuals to participate in the militia, even if such participation posed an economic hardship to individuals, their families, or legal guardians.[152] And the states flexed that power by threatening punishment: Delaware's 1782 militia law, for example, expressly recognized this problem and included a provision that levied a fine on any "Parent, Guardian, or Master" if their militia eligible minor failed to enroll.[153]

The fact that the composition of the militia was shaped by policy choices, not a constitutional mandate, meant that if a state felt it was necessary to exclude minors because of the economic burden it placed on families it could redefine the population of those eligible as needed. Similarly, if military necessities led legislatures to the conclusion that younger Americans were

---

148.   GROSS, *supra* note 80, at 78 ("Next to the land itself, a farmer's children were his basic resource. From sunup to sundown, throughout the year, and with only a few weeks off for winter school, his sons were with him on the farm, tilling his crops, building his income, easing his toil.").

149.   *Id.*

150.   *See id.* at 70 (listing "artisans, laborers, and teen-age apprentices" in the Concord militia); BRUCE LAURIE, ARTISANS INTO WORKERS: LABOR IN NINETEENTH-CENTURY AMERICA 18–21 (1989).

151.   *See* GROSS, *supra* note 80, at 78 (describing how the labor of sons was vital to their family's livelihood, and noting that it was "[n]o wonder, then, that farmers were reluctant to let their labor force go").

152.   *See* 2 ANNALS OF CONG. 1804–10 (1790) (debating the impact of militia act provisions on citizens).

153.   Act of Feb. 5, 1782, § 9, Del. Laws 1, 4 (Jan. Adjourned Sess. 1782).

**Supp. Grabarsky Decl.  062**

2024]         *AGE RESTRICTIONS AND ARMS*         137

no longer viewed as effective soldiers, there was nothing to pre-vent a legislature from implementing changes that excluded them from participation.[154] Thus, New Jersey changed the legal definition of the militia in 1829: "[F]rom and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace."[155] Kansas excluded minors by framing its constitutional provision on the militia as follows: "The Militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[156] Ohio also set the minimum age to serve at twenty-one.[157]

Indeed, the ages of individuals required to serve in the mili-tia fluctuated, depending on the need for soldiers, and whether the country was in a time of war or peace. "In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one."[158] Moreover, the Fed-eral Militia Act of 1792 set the minimum age for service at eight-een, but allowed states to set their own minimum ages in their own statutes.[159] The varying minimum ages of militia service members demonstrate that there is no direct correlation between militia age and the Second Amendment right vesting at eight-een. Moreover, the federal militia statute would not permit states to override its age minimum if the federal government viewed the age of those who served in the militia to correspond to the time the Second Amendment right vests.

When individuals below the age of legal majority served in the militia, or participated in community-based efforts to keep the peace, these public safety duties were undertaken in a su-pervised setting under the authority of parents, guardians, or

---

154.   *See* Rakove, *supra* note 140, at 159 (discussing the legislative authority of government to regulate the form of the militia).

155.   Act of Nov. 6, 1829, § 1, 1829 N.J. Laws 3, 3. By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of sat-ire and ridicule. *See* David Tatham, *David Claypoole Johnston's* Militia Muster, AM. ART J., Spring 1987, at 4, 7–8 (discussing the circumstances surrounding the militia's ridicule in the 1820s).

156.   KAN. CONST. of 1859, art. VIII, § 1.

157.   Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53.

158.   Nat'l Rifle Ass'n of Am. v. Swearingen, 545 F. Supp. 3d 1247, 1258 (N.D. Fla. 2021).

159.   Act of May 8, 1792, Pub. L. No. 2-33, §§ 1–2, 1 Stat. 271, 271–72 (1792).

138        *MINNESOTA LAW REVIEW*        [108:pppp

other adults authorized under the color of law.[160] Further, the circumstances under which an infant could participate in community forms of keeping the peace were defined by the patriarchal structure of local communities and the peacekeeping mechanism instantiated by law.[161] As Princeton historian Laura Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept was based in a long-standing, highly gendered construction of government authority, which subordinated everyone to a sovereign body, just as all individual dependents were subordinated to specific male heads of household.[162]

The involvement of minors in community-based law enforcement also was, as Professor Edwards notes, embedded in the patriarchal structure of local communities.[163] A minor acting on their own accord would not have had the legal authority to engage in peace keeping activities without supervision.[164]

A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, captured the dominant view of the era when it described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[165] The author of this popular legal guide, John Fauchereaud Grimké, was among the state's most

---

160.   The Statute of Winchester, adopted in 1285 in the Reign of Edward I, required male members of the community between fifteen and sixty to join the "hue and cry" and participate in community law enforcement. 1 STATUTES OF THE REALM 96, 97–98. Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue and cry," was the only means to deal with most forms of ordinary crime. LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 29 (1993).

161.   *See* Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-Revolutionary United States*, 1 U.C. IRVINE L. REV. 565, 571 (2011) ("Keeping the peace meant keeping everyone—from the lowest to the highest—in their appropriate places, as defined in specific local contexts. Those contexts, while different in their own ways, were defined by stark, entrenched inequalities. . . . To the extent that individuals figured in the logic of the peace, it was through hierarchical family and community relationships that connected them to the social order and made them part of the peace.").

162.   *Id.* at 570.

163.   *See id.* at 572 ("[T]he peace folded everyone into its jurisdiction. Even those without rights—wives, children, and slaves, all of whom were legally subordinated to their household heads . . . had direct access to this arena of law.").

164.   *Id.*

165.   JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF PEACE 117 (1788).

2024]          *AGE RESTRICTIONS AND ARMS*          139

distinguished and influential jurists.[166] The fact that he included infants—who were old enough to participate in the militia, but under the age of majority—in the same category as madmen and idiots, whom the law considered to be incapable of asserting their legal will independently,[167] illustrates that the Founding era did not treat those under twenty-one as having a robust, freestanding right to keep, bear, and freely acquire arms. Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social realities of domestic life at the Founding.[168]

In sum, militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted. Such laws are not evidence of rights but instead represent the government's coercive authority to force minors to participate in the militia. These laws embodied policy choices made by legislatures to ensure that the militia was properly staffed and equipped. These laws do not provide evidence that minors had an independent, constitutional right to keep and bear arms outside of the militia context.[169]

---

166.  *See* Eli A. Poliakoff, *Grimké, John Faucheraud*, S.C. ENCYCLOPEDIA (May 17, 2016), https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud [https://perma.cc/4U9Z-GUDU] (detailing Grimké's professional history and involvement with the city of Charleston's legal community).

167.  On the disabilities of minors under early American law, see discussion *supra* Parts I.A–B.

168.  For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical modern understanding of rights, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS., no. 1, 2020, at 31.

169.  Several courts that have addressed age limits post-*Bruen* have agreed. *See, e.g.*, Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1331–32 (11th Cir. 2023) ("Congress imposed upon 18-to-20-year-olds a specific obligation to serve in the militia but did not give them all the rights associated with full citizenship . . . . So we can't infer from the fact that 18-to-20-year-olds had a specific obligation that they had a specific right."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) (mem.); Rocky Mountain Gun Owners v. Polis, No. 23-cv-01077-PAB, 2023 WL 5017253, at *17 (D. Colo. Aug. 7, 2023) ("The Court agrees with the Governor that service by 18-to-20-year-olds in militias does not prove that such persons had an unfettered right to possess firearms outside of militias.").

140            *MINNESOTA LAW REVIEW*            [108:pppp

E.  SOCIAL CHANGE, LEGAL CHANGE, AND THE DEVELOPMENT OF
    NEW WEAPON REGULATIONS OVER THE COURSE OF THE
    NINETEENTH CENTURY

The proliferation of guns in the decades after the adoption of the Second Amendment and the first state constitutional arms bearing provisions produced an expansion of regulation to address a range of problems that did not exist in 1791.[170] The primary focus of Founding-era firearms policy was to get Americans to purchase the types of guns needed for the militia at a time when most Americans desired guns necessary for life in agrarian society, typically fowling pieces and light hunting muskets.[171] Moreover, at the time of the Second Amendment, handguns were owned by a tiny fraction of the population.[172] Given these facts there was little need to enact modern-style gun regulations aimed at restricting access to weapons. There were limited gun

Courts that have relied on the militia statutes as evidence of an individual Second Amendment right have not acknowledged that many militia statutes required parents, guardians, or the state to supply the weapons that minors would use in the militia. *See, e.g.*, Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 143 (E.D. Va. 2023) (finding "a broad . . . consensus that 18 was the age of majority for membership in the militia, membership which required its members to supply their own arms"); Worth v. Harrington, 666 F. Supp. 3d 902, 915 (D. Minn. 2023) ("Founding-era militia laws requiring service in the militia by 18–20-year-olds who are responsible for supplying their own weapons is consistent with a contemporary understanding that this age group was not excluded from the class of persons who had the right to keep and bear arms."); Firearms Pol'y Coal., Inc. v. McCraw, 623 F. Supp. 3d 740, 750 (N.D. Tex. 2022) (noting the 1792 Militia Act "required militia members to arm themselves rather than rely on the Government to provide arms" in holding that participation in militia supported an individual Second Amendment right, and citing *United States v. Miller*, 307 U.S. 174, 179 (1934), for the finding that militia presupposed firearm possession). *See generally* notes 130–39 (listing historical laws in which minors were not held personally responsible for failure to bring their own weapons for militia service).

170.   For recent historical research demonstrating the Founding generation did not face an urban gun violence problem, see Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT, *supra* note 120, at 113, 116–17.

171.   Sweeney, *supra* note 120, at 62; Roth, *supra* note 170, at 116 (noting that in the colonial and revolutionary period "few households owned pistols, but most owned muskets or fowling pieces, used for hunting, warfare, [and] vermin control").

172.   Sweeney, *supra* note 120, at 61 tbl.3.5.

homicides in urban areas in 1791, and family and household homicides were largely not perpetrated by firearms.[173] The misuse of firearms was complicated by the necessity to acquire a high level of skill to load and shoot a muzzle loading musket, fowling piece, or pistol.[174] Technological change and economic transformation in the early decades of the nineteenth century changed both the calculus of self-defense, making guns, including handguns, more available, easier to use, and more prone to misuse.[175] These changes forced governments to deal with gun violence as a significant societal problem for the first time in American history.[176] Among the new problems governments confronted related to these technological and economic changes was the easier access and potential abuse of firearms by minors.

---

173.  *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 153–54 (2023) ("[D]uring the colonial period, the urban areas were relatively free of the consistent use of firearms." (quoting LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA 48 (1975)); Roth, *supra* note 170, at 117 (noting that family and household homicides were committed with "weapons close at hand" at the time of the Founding, which meant "whips, sticks, hoes, shovels, axes, knives, feet, or fists" instead of guns, and that while gun homicide occurred in nonrural areas in the colonial period, urban gun violence was uncommon).

174.  RANDOLPH ROTH, AMERICAN HOMICIDE 56 (2009) ("Muskets had their limits as murder weapons. They were inaccurate with slugs, impossible to conceal, and difficult to load.").

175.  Saul Cornell, *Limits on Armed Travel Under Anglo-American Law: Change and Continuity over the Constitutional* Longue Durée*, 1688–1868, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT, *supra* note 120, at 72, 79 ("Economic and technological changes during [the Jacksonian period] were also profound, particularly regarding firearms. The expanding market revolution made variety of new good available to ordinary consumers, everything from wooden clocks to cheap and reliable handguns. The latter development lay at the heart of an even more profound change in the legal meaning of arms in American life.").

176.  *See id.* (describing how the new proliferation of concealable and dependable handguns in nineteenth-century America created a new practice of Americans carrying handguns in public and how, "[i]n response to this new practice and widespread perception that it encouraged more violence, the first wave of modern-style American gun-control laws were enacted" for reasons of public safety). For an overview of recent historical scholarship demonstrating the profound changes in gun culture and regulation resulting from technological and economic developments in the decades after the adoption of the Second Amendment, see Cornell, *Constitutional Mischiefs*, *supra* note 40, at 37–44. On regional gun cultures and the slave South's propensity for violence, see Eric M.

142          *MINNESOTA LAW REVIEW*          [108:pppp

Several states and localities enacted laws limiting minors' access to firearms in the antebellum era. Pre–Civil War laws from Alabama, Tennessee, and Kentucky expressly limited minors' access to firearms. In 1856, twelve years before the ratification of the Fourteenth Amendment, Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever named called, or air gun or pistol."[177] Similarly, in 1858, Tennessee enacted a law prohibiting the selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, or hunter's knife," with exceptions for hunting and traveling.[178] An 1859 Kentucky law prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon . . . to any minor."[179] All of these laws responded to new problems posed by the proliferation of firearms and other deadly weapons that were more easily concealed and carried. No similar problem existed during the Founding era because weapons in that period were more cumbersome to use, less reliable, and harder to conceal.[180] These types of arms posed a new and unprecedented threat to public safety because they could be more easily carried and used by minors for illegal purposes. Nor is it surprising that the South, the region with the highest rates of armed violence, led the way in enacting a variety of new laws to deal with unprecedented problems,[181] including the increased threat to public safety posed by minors and weapons.

Local governments also responded in turn to these changes. An 1803 law from New York City also held parents liable for the

Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121 (2015).

177.   Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Laws 17, 17.

178.   Act of Feb. 26, ch. 81, §§ 2–3, 1856 Tenn. Pub. Acts 92, 92.

179.   Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245.

180.   ROTH, *supra* note 174, at 56.

181.   *See, e.g.*, H.V. REDFIELD, HOMICIDE, NORTH AND SOUTH 68 (Ohio State Univ. Press 2000) (1880) ("[I]n the single State of Texas, with a population of about one-twelfth the aggregate in [Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, Pennsylvania, Michigan, and Minnesota], there are more homicides in a year than in all these States combined."); FREDERICK LAW OLMSTED, A JOURNEY THROUGH TEXAS: OR, A SADDLE-TRIP ON THE SOUTHWESTERN FRONTIER 158 (Univ. of Tex. Press 1978) (1857) (describing the frequency of gun violence in San Antonio).

unlawful discharge of firearms by minors.[182] Columbia, South Carolina, enacted a law in 1817 providing for weapons, including firearms, to be seized from minors within city limits.[183] In 1857, the city of Louisville, Kentucky, passed an ordinance stating that "[n]o person shall retail gunpowder to minors" but included an exception for those who had "authority from his parent or guardian."[184]

These antebellum trends intensified in the years following the Civil War. The number of restrictions on minors' access to firearms increased dramatically during this period. After surveying hundreds of gun laws in the nineteenth century, political scientist Robert Spitzer concluded that "[n]umerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s."[185] In fact, he concluded that in the period between 1868 and 1899 restrictions on minors' access and use of arms were more common than limits on felons.[186]

While language in *Bruen* suggests that laws enacted during and after the time of the Fourteenth Amendment's ratification are less relevant than Founding-era laws,[187] laws from after the Civil War are especially relevant when analyzing state laws.[188]

---

182.   New York, N.Y., To Prevent the Firing of Guns in the City of New-York, § 1 (Apr. 18, 1803), https://firearmslaw.duke.edu/laws/edward-livingston-laws -and-ordinances-ordained-and-established-by-the-mayor-aldermen-and -commonalty-of-the-city-of-new-york-in-common-council-convened-for-the -good-rule-and-government-of-the-inh [https://perma.cc/P33A-Y8C6].

183.   Columbia, S.C., For Prohibiting the Firing of Guns in the Town of Columbia (Apr. 23, 1817), https://firearmslaw.duke.edu/laws/ordinances-of-the -town-of-columbia-s-c-passed-since-the-incorporation-of-said-town-to-which -are-prefixed-the-acts-of-the-general-assembly-for-incorporating-the-said -town-and-others-in-relati [https://perma.cc/8996-N68X].

184.   Louisville, Ky., An Ordinance as to Retailing Gun Powder (Oct. 17, 1853).

185.   Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS., no. 2, 2017, at 55, 76.

186.   *See id.* at 60 tbl.1 (comparing the number of gun laws by category).

187.   N.Y. State Rifle & Pistol Ass'n v. Bruen, 591 U.S. 1, 35 (2022) ("[W]e must also guard against giving postenactment history more weight than it can rightly bear.").

188.   *See* Brief of Everytown for Gun Safety as Amicus Curiae in Support of Appellant and Reversal at 13–18, Worth v. Jacobson, No. 23-2248 (8th Cir. July 20, 2023) (citing multiple court decisions; oral argument from Paul Clement, who argued on behalf of Bruen; and multiple originalist, conservative legal

144          *MINNESOTA LAW REVIEW*          [108:pppp

As stated in *Bruen*, states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second."[189] Thus, when courts are analyzing state gun restrictions, it is appropriate to consider laws at the time of the Fourteenth Amendment's passage, as those laws governed the scope of the right as understood when the states ratified it.[190]

The changing circumstances states and localities faced after the Civil War, most importantly changes in gun technology, gun commerce, and gun culture, led to an increase in gun crime and gun injury. As the table below shows, states and localities responded by passing a range of new gun laws. These new laws responded to novel problems, but the legal justifications for them were identical to those employed by antebellum legislatures and courts: the state's ample police powers.[191]

---

scholars who endorse the view that "applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law" is appropriate).

189.   *Bruen*, 591 U.S. at 37.

190.   *See Bruen*, 591 U.S. at 28–29 (tying the interpretation of the Amendment to the public understanding at the time of ratification); *see also* Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1323 (11th Cir. 2023) (stating that where "the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms . . . differ[s] from the 1789 understanding[,] . . . the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) (mem.); Gould v. Morgan, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").

191.   On the role of antebellum police power jurisprudence in shaping the contours of early American firearms law, see Cornell, *Constitutional Mischiefs*, *supra* note 40, at 32–35.

2024]            *AGE RESTRICTIONS AND ARMS*            145

Table 1

States with Firearms Laws Limiting Minors Enacted
Between 1851−1890

| State | Year | Provision |
|-------|------|-----------|
| Alabama | 1856 | Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Laws 17, 17 (making it unlawful to sell, give, or lend an air gun or pistol to a male minor). |
| Tennessee | 1856 | Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Pub. Acts 92, 92 (making it unlawful to sell, loan, or give to any minor a pistol). |
| Kentucky | 1860 | Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 (making it unlawful for anyone other than a parent or guardian to sell, give, or loan any pistol or other deadly weapon which can be conceal carried to a minor). |
| Indiana | 1875 | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 (making it unlawful to sell, barter, or give a pistol or other deadly weapon to any person under twenty-one). |
| Georgia | 1876 | Act of Feb. 17, 1876, no. 128, § 1, 1876 Ga. Laws 112, 112 (making it unlawful to sell, give, lend, or furnish any pistol or other deadly weapons to a minor). |
| Mississippi | 1878 | Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175, 175 (making it unlawful to sell a pistol or other similarly deadly weapon to a minor). |
| Delaware | 1881 | Act of Apr. 8, 1881, ch. 548, § 1, 16 pt. 2 Del. Laws 716, 716 (1881) (making it unlawful to sell a deadly weapon to a minor). |

146             *MINNESOTA LAW REVIEW*             [108:pppp

| | | |
|---|---|---|
| Florida | 1881 | Act of Feb. 4, 1881, ch. 3285, §§ 1–2, 1881 Fla. Laws 87, 87 (making it unlawful to sell, hire, barter, lend, or give a pistol or other arm or weapon, with certain exceptions, to minors under sixteen). |
| Illinois | 1881 | Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73, 73 (making it unlawful for any person other than a parent, guardian, or employer to sell, give, loan, hire, or barter a pistol, revolver, or other deadly weapon to a minor). |
| Pennsylvania | 1881 | Act of June 10, 1881, no. 124, § 1, 1881 Pa. Laws 111, 111–12 (making it unlawful to sell a revolver, pistol, or other deadly weapon, to a person under sixteen). |
| Maryland | 1882 | Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656 (making it unlawful to sell, barter, or give away any firearm or other deadly weapons, with some exceptions, to a minor under the age of twenty-one). |
| West Virginia | 1882 | Act of Mar. 24, 1882, ch. 135, § 7, 1882 W. Va. Acts 421, 421–22 (making it unlawful to furnish a revolver, pistol, or other dangerous and deadly weapon, to a person under twenty-one). |
| Kansas | 1883 | Act of Mar. 1, 1883, ch. 105, §§ 1–2, 1883 Kan. Sess. Laws 159, 159 (making it unlawful to furnish a pistol, revolver, toy pistol, or other dangerous weapon to a minor, and making it unlawful for any minor to possess such weapons). |
| Missouri | 1883 | Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76, 76 (making it unlawful to sell, deliver, loan, or barter a firearm or other deadly weapon to a minor without their parent's or guardian's consent). |

| | | |
|---|---|---|
| Wisconsin | 1883 | Act of Apr. 3, 1883, ch. 329, §§ 1–2, 1883 Wis. Sess. Laws 290, 290 (making it unlawful for any person to sell, loan, or give a pistol or revolver to a minor, and making it unlawful for any minor to go armed with any pistol or revolver). |
| Iowa | 1884 | Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86 (making it unlawful to sell, present, or give any pistol, revolver, or toy pistol to a minor). |
| Nevada | 1885 | Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51, 51 (making it unlawful for any person under twenty-one to wear or carry any concealed pistol or other dangerous or deadly weapon). |

Post–Civil War legal authorities recognized that improvements in gun technology and changes in society posed new challenges to government's efforts to preserve the peace. In particular, the proliferation of small pistols, some expressly marketed to young people, prompted a backlash as legislators responded to increasing levels of gun violence among minors.[192] The rising levels of gun violence, including accidents, in the post–Civil War era drew notice by jurists, journalists, and physicians.[193] Indeed, one prominent medical expert noted that an entire class of firearms injuries were specific to boys whose behavior with guns was reckless and whose access to smaller firearms made injuries

---

192.   *See* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 68–70, 78 (2021) [hereinafter Cornell, *Right to Regulate*] (discussing the rising level of gun violence in the Reconstruction Era and the bevy of new laws, including laws aimed at limiting the access of weapons to minors, passed by legislators in response). For a good illustration of this concern in regard to minors, see J.N. Hall, *Accidents with Firearms*, 23 OUTING, Oct. 1893–Mar. 1894, at 89, 89–90.

193.   For an examination of the proliferation of journalistic accounts of gun violence in the post–Civil War era, see Jennifer Carlson & Jessica Cobb, *From Play to Peril: A Historical Examination of Media Coverage of Accidental Shootings Involving Children*, 98 SOC. SCI. Q. 397, 403–04 (2017).

148          *MINNESOTA LAW REVIEW*          [108:pppp

more likely.[194] The development of smaller weapons specifically targeted at minors exacerbated a problem that had emerged in the antebellum era, prompting widespread calls for more regulation.[195]

Although the problems society faced were new, the legal tools used by governments to legislate were not. As had been true during the antebellum era, states and localities turned to their ample police powers to justify new laws and regulations. Lewis Hochheimer, one of the leading authorities on domestic law and respected commentator on legal matters, addressed these developments in his influential writing on the police power.[196] Fortunately, the problem of guns and minors was easily addressed using the police power framework that antebellum jurists had developed to address these questions.[197] The regulation of firearms was an area of the law in which the police power was at its

---

194.   J.N. Hall, *Accidental Gun Shot Wounds: A Medico-Legal Study*, MED. REC., Sept. 19, 1896, at 408, 411 ("Perhaps the most prolific cause of accidental shootings is to be found in the habit of pointing a weapon at another in fun, under the impression that it is not loaded. . . . Children learn to shoot toy pistols and are permitted to fire them at one another with impunity. Then, obtaining a revolver in some manner, they use it in similar fashion. . . . Sheer foolhardiness is responsible for an enormous number of accidents.").

195.   *See Firearms*, IOWA STATE BD. OF HEALTH, MONTHLY BULLETIN, June 1891, at 75, 75–76 (noting that, in reference to revolvers especially, "[t]he practice of carrying concealed weapons seems on the increase, and is indulged in too often by mere boys and generally without the slightest excuse," and calling for "vigorous enforcement of the law prohibiting the carrying of firearms . . . especially the law prohibiting the sale of firearms to children").

196.   *See New Books and Editions: Hochheimer on Custody of Infants,* 36 ALB. L.J. 380, 380 (1887) (celebrating Hochheimer's new book, *The Law Relating to the Custody of Infants*).

197.   *See* Lewis Hochheimer, *The Police Power*, 44 CENT. L.J. 158, 158, 161 (1897). Hochheimer defined the police power as "the inherent and plenary power of a State or government to prescribe regulations to preserve and promote the public safety, health and morals, and to prohibit all things hurtful to the comfort and welfare of society." *Id.* at 158. He noted that "[t]he constitutionality of statutes as to the care and protection of minors has been universally upheld," and that States may utilize their police power in regard to minors for purposes of care and "moral training." *See id.* at 161.

greatest reach.[198] Interestingly, Hochheimer noted that "infants," those below the age of legal majority,[199] were not entirely beyond the protection of the Bill of Rights,[200] but Hochheimer was quick to point out that the need to protect those below the age of majority meant that some types of firearms regulations that were impermissible if applied to adults were perfectly legal when regulating infants.[201] In this instance, the broad power to

198.  *See* LEWIS HOCHHEIMER, A MANUAL OF CRIMINAL LAW AS ESTAB-LISHED IN THE STATE OF MARYLAND 146–47 (1889) ("The carrying or wearing of dangerous or deadly weapons concealed upon or about the person and the carrying or wearing of such weapons openly, with the intent or purpose of injuring any person, are statutory offenses. Such statutes have frequently been held not to conflict with the constitutional right of the people of the United States to keep and to bear arms." (footnotes removed)); ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 246–47 (1904) (detailing the permissibility of laws that restrained adults from selling deadly weapons to minors and commenting that "[t]he constitutionality of legislation for the protection of children or minors is rarely questioned; and the legislature is conceded a wide discretion in creating restraints"); Glenn v. State, 10 Ga. App. 128, 72 S.E. 927, 928 (1911) ("The police power of the state makes a special charge of minors. It gathers them under its ample and protective wing 'even as a hen gathereth her brood.' Minors, as to their property rights, are the wards of chancery. Minors, as to their protection from vicious conduct or habits, are the wards of the police power of the state. The truth of the latter part of this statement is proved by the numerous statutes in the Code restricting the exercise by adults of rights in so far as the exercise of these rights relate to minors.").

199.  LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS 1 (3d ed. 1899).

200.  *See id.* at 2 ("The only limitations upon the governmental power are those resulting from the obligation towards the infant himself, not to infringe upon those constitutional guaranties and safeguards which are enacted for the security and protection of the person and property of all citizens. Thus, the constitutional requirement, that no person shall be deprived of life, liberty or property without due process of the law operates as a limitation upon the general powers of the courts over the estates of infants as well as a prohibition of any legislation . . . .").

201.  *See id.* at 3–4 (describing how governments' exercise of duty and power to protect and care for infants includes "[s]pecific regulations and prohibitions, designed for the protection of their morals and health and the security of their persons, such as those relating to the sale of . . . dangerous weapons," i.e., firearms). A Reconstruction era review of Hochheimer's book on infants praised the work for its exhaustive treatment of the subject, noting that it offered a "convenient and comprehensive summary" of the rights, remedies, and procedures available to infants, parents, guardians, and courts in this area of the law. *New Books and Editions: Hochheimer on Custody of Infants*, *supra* note 196, at 380. A brief review in the *Harvard Law Review* also praised the book for its "careful exposition of a small but important topic in the law." *Reviews*, 13 HARV. L. REV.

150           *MINNESOTA LAW REVIEW*           [108:pppp

protect the welfare of minors gave government extraordinary latitude in regulating their conduct.[202] Hochheimer's comments echoed other commentators from the period who saw firearms regulation as the *locus classicus* of state police power authority.[203]

## II.  THE HISTORICAL CONTEXT OF MINORS' RIGHTS IN TODAY'S SECOND AMENDMENT

The question at issue for courts is how the historical status of eighteen-to-twenty-year-olds as minors affects the modern-day Second Amendment right. *Bruen*'s approach compels courts to recognize and incorporate the historical limitations on minors' autonomy into any analysis of modern age-limit firearm regulations—either at *Bruen*'s first step, as minors were not part of "the people" with Second Amendment rights at the Founding, or at the second step, as evidence that government has historically limited minors' ability to keep and bear arms as part of a long historical tradition of arms regulation.[204] As *Bruen* and *Heller* tell us, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[205] The historical tradition and context in which minors operated at the Founding must factor into any analysis of the constitutionality of modern-day age-limit regulations. *Bruen*'s focus solely on history, tradition, and the plain text of the Second Amendment

---

416, 420 (1900) (book review) (giving a positive review to Lewis Hochheimer's book, *The Law Relating to the Custody of Infants*).

202.  *See* HOCHHEIMER, *supra* note 199, at 2–4 (describing the scope of the government's police power over infants).

203.  For an exploration of the broad legal consensus on the scope of police power regulation of arms during the era of the Fourteenth Amendment, see Cornell, *Right to Regulate*, *supra* note 192. For a discussion of the regulation of gun access by infants during this period, see *supra* notes 185–97 and accompanying text.

204.  *See* N.Y. State Rifle & Pistol Ass'n v. Bruen, 591 U.S. 1, 24 (2022); *see also, e.g.*, United States v. Sitladeen, 64 F.4th 978, 985 (8th Cir. 2023) (interpreting *Bruen* to require a two-part test).

205.  *Bruen*, 591 U.S. at 34 (quoting District of Columbia v. Heller, 554 U.S. 570, 634–35 (2007)).

Supp. Grabarsky Decl.  076

2024] *AGE RESTRICTIONS AND ARMS* 151

mandate such an analysis.[206] Courts have nonetheless been reluctant to start from the position that minors are not part of the people with Second Amendment rights.[207] The historical tradition of limiting minors' autonomy in multiple areas of the law, including firearms regulation, provides ample evidence that government can limit eighteen-to-twenty-year-olds' access to firearms and their ability to carry firearms legally in public today.

A. LIMITS ON EIGHTEEN-TO-TWENTY-YEAR-OLDS SPAN THE LONG ARC OF AMERICAN HISTORY

Several courts addressing firearm age limits have reasonably expressed concerns about defining "the people" whom the Second Amendment protects today as the political community that existed at the Founding era.[208] Societal norms about inclusion and democracy have changed dramatically over the past two centuries.[209] As the *Fraser* court noted, "[i]t is no secret" that the

---

206. *See, e.g.*, United States v. Collette, 630 F. Supp. 3d 841, 848–51 (W.D. Tex. 2022) (noting the nation's "longstanding" tradition of exercising its right to exclude those who committed crimes and violence from "the people").

207. *See, e.g.*, Firearms Pol'y Coal., Inc. v. McCraw, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022) (concluding that law-abiding eighteen-to-twenty-year-olds are part of the "the people"); Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1324 (11th Cir. 2023) (proceeding to *Bruen*'s second-step analysis without deciding whether eighteen-to-twenty-year-olds are part of "the people"), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) (mem.).

208. *E.g.*, Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 132–34 (E.D. Va. 2023); Transcript of Oral Argument at 57, Worth v. Harrington, 666 F. Supp. 3d 902 (D. Minn. 2023) (No. 21-cv-1348) ("If I endorse your idea that 'the people' excluded people who were not full participants in civic life, then whether I say it out loud or not, I am implicitly saying that the Bill of Rights only applies to certain people. And I am saying that 'the people' doesn't include people under 21, and whatever analysis I use to reach that conclusion, it's hard to figure out how I don't also find that it doesn't apply to women, which can't be.").

209. *See, e.g.*, Reva B. Siegel, *How "History and Tradition" Perpetuates Inequality:* Dobbs *on Abortion's Nineteenth-Century Criminalization*, 60 HOUS. L. REV. 901, 909 (2023) ("Only recently have women taken seats on the Supreme Court and begun to play a role in the articulation of our fundamental law. Yet women are asked to accept a Constitution that was written and interpreted for centuries by men *only* as a Constitution that speaks for men and women *both*. What does it mean when the Supreme Court endorses originalist and history-and-traditions methods that amplify this bias, by centering the Constitution's meaning around lawmaking from which women were excluded[?]" (footnote omitted)).

152          *MINNESOTA LAW REVIEW*          [108:pppp

voting population at the time of the Founding was limited to white male property owners.[210] Certainly, limiting voting rights—or other constitutional rights—to the subset of the citizenry that accounted for the voting population at the Founding would not be constitutional today.[211] But the historical understanding of minors and the rights they held at the time of the Founding is nonetheless relevant to evaluating the scope of the modern-day Second Amendment right as it applies to eighteen-to-twenty-year-olds because society continues to recognize the special status of minors under law.[212]

---

210. *Fraser*, 672 F. Supp. 3d at 133.

211. Courts have relied on historical guideposts that would no longer be acceptable or constitutional today in other areas of Second Amendment jurisprudence, including as historical analogues for *Bruen*'s second step. *See, e.g.*, United States v. Jackson, 69 F.4th 495, 502–03 (8th Cir. 2023) (noting how "[i]n colonial America, legislatures prohibited Native Americans," religious minorities such as Catholics, and people who refused to declare an oath of loyalty, "from owning firearms," and stating that "[w]hile some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms"); *see also* Kanter v. Barr, 919 F.3d 437, 458 & n.7 (7th Cir. 2019) (Barrett, J., dissenting) (considering historical laws categorically prohibiting firearms on the basis of race, notwithstanding that "[i]t should go without saying that such race-based exclusions would be unconstitutional today"). *But see* Range v. Att'y Gen., 69 F.4th 96, 105 (3d Cir. 2023) (rejecting Founding-era laws that "disarmed groups [contemporary governments] distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks" as not analogous because the defendant in that case is not part of a similar group today). While historical laws that derive from racist or discriminatory motives do not justify modern laws driven by similar animus, ignoring these Founding-era laws entirely distorts the relevant history. As one court has recently noted, a failure to understand those laws in context presents a distorted "picture" that is "incomplete or misleading." Baird v. Bonta, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959, at *25 (E.D. Cal. Dec. 29, 2023).

212. *Cf.* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in* New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, *supra* note 76, (manuscript at 12), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696 [https://perma.cc/7VCL-V8WS] (arguing that gun regulations "at the Founding (or in the mid 1800s for state and local laws), even those whose specific targets are no longer relevant, desirable or even constitutional" are relevant to evaluating the scope of the government's power to regulate guns under the Second Amendment); Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30 (2023) (arguing for an approach that relies on abstracting general principles of historical laws with now-unconstitutional goals, while condemning the reasons for their adoption).

2024]        *AGE RESTRICTIONS AND ARMS*        153

Limits on the rights of minors are grounded in long standing views that their ability to evaluate risk and make responsible decisions is compromised. The law has always countenanced some restrictions based on age for this reason. Age is not a suspect class under the Fourteenth Amendment, unlike gender or race, and the U.S. Supreme Court has expressly held that "a State may rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests."[213] Laws that assign different rights or privileges on the basis of age, in contrast to insidious distinctions based on race, gender, or other suspect classifications, are tied to legitimate interests of the state and are now grounded in hard scientific evidence. Age restrictions do not target "discrete and insular minorit[ies]."[214] Nor do they represent the kind of invidious discrimination associated with laws targeting persons based on such suspect categories as race, religion, national origin, and alienage.[215] Also, unlike legislation targeting suspect classifications, all individuals who reach the age of an average life span have experience with being a teenager.[216] In short, age-based restrictions do not pose the same type of equal protection concerns that arise in the context of other features of established Fourteenth Amendment law.[217]

Importantly, while society long ago repudiated discriminatory laws based on race, religion, gender, or status, society's view of teenagers has not shifted in the same way. As the *Fraser* court

---

213. *See* Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000). "States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Id.* at 83. The Court then compared the higher scrutiny that applies to discrimination on the basis of gender or race. *Id.*

214. *Id.* at 83 ("Old age also does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it." (citing Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313–14 (1976)); *see also* United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) (referencing the merit of applying heightened scrutiny when analyzing legislation targeting "discrete and insular minorities").

215. *Cf.* Ortwein v. Schwab, 410 U.S. 656, 660 (1973) (contrasting discrimination against the poor with suspect categories of "race, nationality, [and] alienage").

216. *Kimel*, 528 U.S. at 83.

217. *See id.* ("[A]ge is not a suspect classification under the Equal Protection Clause.").

154 *MINNESOTA LAW REVIEW* [108:pppp

noted, "[s]ince time immemorial, teenagers have been, well, teenagers."[218] Put another way, the Founding era's concerns about teenagers' ability to make mature decisions has not shifted. Modern laws and policies limiting the rights of those under the age of twenty-one exist now for the same reason that similar restrictions have been in place for centuries: individuals under the age of majority are limited in their capacity to act responsibly in the eyes of the law.[219] Minors today, as was true in the Founding era, do not have capacity to make fully informed mature decisions.[220] Although the Founding era's views of appropriate limits on minors were not based on evidence drawn from modern neuroscience or psychology, the law recognized that such persons were not fully developed as adults until they reached the legal age of majority.[221]

---

218.  Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 145 (E.D. Va. 2023).

219.  By way of example, the legislative history for the federal law that prohibits those under twenty-one from purchasing handguns noted concerns about handguns that had been sold by FFLs to "emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(6), 82 Stat. 197, 225–26 (1968).

220.  The underdeveloped capacity of the brains of eighteen-to-twenty-year-olds recently led the Massachusetts Supreme Judicial Court to hold that sentencing eighteen-to-twenty-year-olds to life in prison without the possibility of parole was unconstitutional cruel and unusual punishment. Commonwealth v. Mattis, 224 N.E.3d 410, 415 (Mass. 2024). The trial judge made four core findings of fact following an evidentiary hearing, including that eighteen-to-twenty-year-olds

> (1) have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains.

*Id.* at 421 (footnote omitted). The court concluded that "[t]he driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults." *Id.* (citing Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 DEV. REV. 78, 82–84, 85–89 (2008)). If the mental maturity of eighteen-to-twenty-year-olds is different enough that the Constitution prohibits them from being sentenced in the same way as older adults, it should follow that governments can lawfully determine that this age group's access to and carry of firearms poses sufficient risk that limitations are necessary.

221.  *See supra* text accompanying notes 68–70.

Moreover, today we have a greater understanding than existed in the Founding era of *why* eighteen-to-twenty-year-olds do not have the capacity to make fully mature decisions, due to our greater understanding of the development of brain physiology and chemistry.[222] Modern scientific discovery has identified that the brains of young adults do not finish developing until they are approximately twenty-five years old, or even later.[223] Specifically, the prefrontal cortex, which controls impulse control and judgment, continues to develop into one's mid-twenties.[224] Comparatively, the limbic system, which controls emotions of pleasure, fear, and anger, develops well before the prefrontal cortex, which can cause impulsive emotions and desires to overcome rational thinking.[225] The effect is that members of this age group typically have more difficulty exercising self-control and effectively weighing risk, leading to greater impulsivity, including a heightened reaction to perceived threats.[226] The modern scien-

---

222.  *See generally* Jay N. Giedd et al., *Brain Development During Childhood and Adolescence: A Longitudinal MRI Study*, 2 NATURE NEUROSCIENCE 861 (1999) (analyzing gray and white matter brain development in people between the ages of four and twenty-one), https://www.nature.com/articles/nn1099_861.pdf [https://perma.cc/J65F-WPE2]. In this important pediatric neuroimaging study, Giedd and his team "examined magnetic resonance brain imaging data of typically developing children and adolescents . . . . [and] found steady increases in the overall volume of white matter with increasing age (individuals in the study were 4–21 years old)." Praveen Kambam & Christopher Thompson, *The Development of Decision-Making Capacities in Children and Adolescents: Psychological and Neurological Perspectives and Their Implications for Juvenile Defendants*, 27 BEHAV. SCIS. & L. 173, 179 (2009). Changes in white matter volume, along with a host of other changes and developments in the brain "during adolescence and early adulthood[,] reinforce[] the notion that adolescence is likely a time of significant risk for engaging in potentially problematic, even criminal, behavior and, to some extent, begin[] to provide an etiology/explanation for these behaviors." *Id.* at 187.

223.  Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453 (2013). *See generally* B.J. Casey et al., *The Adolescent Brain*, 1124 ANNALS N.Y. ACAD. SCIS. 111 (2008) (offering a modern understanding of childhood brain development and its effect on adolescent behavior).

224.  Arain et al., *supra* note 223, at 453.

225.  *Id.*

226.  Dreyfuss et al., *supra* note 7, at 226 (finding that adolescents—particularly males—were more likely to react impulsively to threat cues than their

156          *MINNESOTA LAW REVIEW*          [108:pppp

tific understanding of eighteen-to-twenty-year-olds' brain devel-opment provides evidence for why states routinely choose to limit this group's access to specific firearms and lawful ability to carry in public. Thus, while an evolved societal understanding of race and gender has discredited the foundation for laws discrim-inating against women and racial minorities,[227] the evolution of our modern understanding of brain development only reinforces why limits on minors are both necessary and appropriate.

Modern laws reflect a broad scientific and social consensus that eighteen-to-twenty-year-olds lack the maturity to make fully informed decisions in many areas—the same understand-ing that prevailed at the Founding. For these reasons, both laws and market forces have limited what minors are permitted to do. Individuals between eighteen and twenty years of age are pre-vented from lawfully using alcohol or tobacco,[228] and they cannot rent a car in a majority of states.[229] Several states do not permit eighteen-year-olds to adopt a child.[230]

The most important counter example, the change in the le-gal age for voting, occurred in 1971, when concerns about the

---

older and younger peers); *see* Laurence Steinberg et al., *Age Differences in Sen-sation Seeking and Impulsivity as Indexed by Behavior and Self-Report: Evi-dence for a Dual Systems Model*, 44 DEVELOPMENTAL PSYCH. 1764, 1764 (2008) (finding that adolescents are vulnerable to risk taking because of a combination of higher inclination to seek excitement and immature capacities for self-con-trol).

227.   *See, e.g.*, Kirchberg v. Feenstra, 450 U.S. 455, 456 (1981) (striking down a statute giving a husband the unilateral right to dispose of joint property with-out his spouse's consent as unconstitutional gender-based discrimination); Al-len v. Milligan, 599 U.S. 1, 24 (2023) (striking down voting maps that diluted voting power based on race as unconstitutional discrimination).

228.   21 U.S.C. § 387f(d)(5) (prohibiting those under twenty-one from pur-chasing tobacco products); 23 U.S.C. § 158(a)(1)(A) (setting the national legal age to drink alcohol at twenty-one).

229.   *See* Christopher Elliott, *Car Rental Age Restrictions Can Be Compli-cated. Here's What to Know.*, WASH. POST (Jan. 18, 2023), https://www .washingtonpost.com/travel/tips/car-rental-age-restrictions [https://perma.cc/ SHV3-Q7FT] ("There are no upper age limits in the United States, but car rental companies may restrict rentals to young drivers. For example, Enterprise and its brands (including Alamo and National) don't allow retail rentals to an-yone under 21 in the United States and Canada, except in New York and Mich-igan, where state laws set the minimum at 18. Avis and Budget are the same.").

230.   COLO. REV. STAT. § 19-5-202(1) (2024); DEL. CODE ANN. tit. 13, § 903(3) (2023); OKLA. STAT. tit. 10, § 7503-1.1 (2023).

2024]        *AGE RESTRICTIONS AND ARMS*        157

draft during the Vietnam War put political pressure on government to allow those drafted to be able to vote.[231] Prior to this change, the history of voting supports the long-standing view that minors have not been entrusted with the full rights of citizens. "Since the nation's founding, a voting age of twenty-one . . . had been a remarkable constant in state laws governing the franchise" due to a "traditional consensus that twenty-one was the age of political maturity."[232] The voting age has been eighteen for a fraction of American history and is a recent innovation in American law. If Americans wish to expand gun rights by setting aside the long-standing view that easy access to guns by minors poses unacceptable risks to public safety, the proper approach would be do so by statute. Legislatures have instead done the opposite, and consistently restrict eighteen-to-twenty-year-olds' access to firearms.[233] *Bruen*'s directive that courts must turn to history to define the scope of Second Amendment rights prevents courts from overruling these legislative choices, which are ably supported by history from the Founding and Reconstruction eras.[234]

## B. The Centrality of the Common Law to *Bruen*'s Method

Courts should not discount the common law when interpreting early American statutes and Founding era law more generally. *Bruen* correctly noted that some aspects of the common law were not absorbed into early American law,[235] but it is beyond dispute that the common law and common law modes of legal analysis remained vital in the period in which the Second Amendment was adopted. In contrast to most modern lawyers,

---

231.   U.S. Const. amend. XXVI, § 1; *see also* Eric S. Fish, *The Twenty-Sixth Amendment Enforcement Power*, 121 Yale L.J. 1168, 1219 (2012) (discussing the impact the Vietnam War had on the passage of the Twenty-Sixth Amendment).

232.   Keyssar, *supra* note 58, at 225.

233.   *See* statutes cited *supra* note 1 (providing a non-exhaustive list of modern laws restricting minors' access to firearms).

234.   *See infra* Part III (detailing *Bruen's* second step historical tradition requirement and discussing some courts' misapplication of history and tradition in age-limit cases).

235.   N.Y. State Rifle & Pistol Ass'n v. Bruen, 591 U.S. 1, 39 (2022). On the absorption of the common law in America, see generally Kunal M. Parker, Common Law, History, and Democracy in America, 1790–1900: Legal Thought Before Modernism (2011).

158 *MINNESOTA LAW REVIEW* [108:pppp

the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.[236] Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[237] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[238]

Some lower courts have misapplied *Bruen*, failing to distinguish between those aspects of the common law vital to understanding early American law and those aspects of the common law that were rejected by early American courts and legislatures.[239] *Bruen* does not stand for the proposition that common

---

236. *See* William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393, 426 (1968) (noting that courts in post-revolutionary America applied common law in their decisions).

237. *See id.* ("The post-Revolutionary evidence makes it nigh conclusive that Chief Justice Daniel Horsmanden spoke not only for New York but of colonial America when he said in 1765 that the courts applied the common law 'in the main.'"); MD. CONST. of 1776, Declaration of Rights, art. III ("[T]he inhabitants of Maryland are entitled to the common law of England, and the trial by Jury, according that law, and to the benefit of such of the English statutes, as existed at the time of their first emigration, and which, by experience, have been found applicable to their local and other circumstances . . . ."). For a discussion of the relationship between colonial legal origins and the constitution of empires, see generally Benton & Walker, *supra* note 71.

238. 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 29–30 (James T. Mitchell & Henry Flanders eds., 1903) (adopting and adapting some provisions from English common law); FRANCOIS-XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (1792) (adopting English common law of firearms regulation); Commonwealth v. Leach, 1 Mass. 59, 60–61 (1804) ("[G]enerally speaking . . . the *English statutes* which were in force at the time of the emigration of our ancestors from that country, are common law *here*. The statutes of *Ed.* III. have been adopted and practised upon *here*, and are, therefore, to be considered as part of our common law.").

239. *See* Saul Cornell, *Cherry-Picked History and Ideology-Driven Outcomes: Bruen's Originalist Distortions*, SCOTUSBLOG (June 27, 2022), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions [https://perma.cc/S2HD-K3JW] (describing the selective interpretation of historical evidence to support gun-rights claims while dismissing or ignoring counterevidence).

Supp. Grabarsky Decl.  084

2024]              *AGE RESTRICTIONS AND ARMS*              159

law can never be used to provide insight into the historical understanding of the Constitution at the time of its adoption, it stands for the proposition that one must approach the absorption of the common law with some degree of historical sophistication.[240]

Relying on the common law is, in fact, necessary to understand the interpretive rules and background assumptions of laws governing the interpretation of early American statutes.[241] Early American judges and legislators were schooled in common law modes of interpretation. The distinguished Connecticut jurist Zephaniah Swift summarized these common law-based rules of construction in an influential early constitutional text.[242] Three of the paramount rules used to make sense of statutes were linked to the common law tradition:

> [I]t is impracticable to make statutes so plain and explicit that no doubt can be entertained respecting their meaning, certain rules of construction have been adopted.

---

240.   *See Bruen*, 591 U.S. at 38, 43–44, 46–47, 59 (referencing and relying on the common law and historical statutes codifying the common law and noting that the government can rely on "an American tradition" to justify a modern-day law).

241.   *See* Munroe Smith, *State Statute and Common Law*, 2 POL. SCI. Q. 105, 105–06 (1887) ("The law of the American colonies, like the rest of their civilization, was English; and the development of American law, however modified by new conditions and alien grafts, has been and is a growth from English roots. The English law which the colonists brought with them and by which they lived—avowedly, in most cases; actually, where they did not avow it—was case law, *i.e.*, judge-made law. . . . The United States emerged from the war of independence with this body of English judge-made law as the basis of their legal development."). The Supreme Court has extensively relied on the common law for examples of the nation's historical tradition when evaluating the scope of other constitutional rights. S*ee, e.g.*, Tyler v. Hennepin County, 598 U.S. 631, 639–42 (2023) (analyzing common law to interpret a Fifth Amendment takings claim); Washington v. Glucksberg, 521 U.S. 702, 712 (1997) (relying on the Anglo-American common law tradition in deciding that individuals do not have a fundamental liberty interest in receiving assisted suicide under the Due Process Clause of the Fourteenth Amendment); Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (looking to protections against unreasonable searches and seizure permitted by common law in evaluating scope of Fourth Amendment right). In *Dobbs v. Jackson Women's Health Organization*, decided the day after *Bruen*, the Court significantly relied on "eminent common-law authorities" and noted expressly that "American law followed the common law until a wave of statutory restrictions in the 1800s expanded criminal liability for abortions." 597 U.S. 215, 217, 242–43 (2022).

242.   SWIFT, *supra* note 98, at 11.

160          *MINNESOTA LAW REVIEW*          [108:pppp

1. The intention of the makers of the statute is to be pursued in the construction of it, and may be collected from the cause or necessity of making it, as well as from other circumstances.

2. The common law is to be regarded in the construction of statutes, and three things are to be considered. The old law, the mischief, and the remedy: that is, how the common law stood at the time of the making of the act; what the mischief was for which the common law did not provide: and what remedy the statute had provided to cure the mischief: and the business of the judges is so to construe the act as to suppress the mischief and advance the remedy.

3. When a statute makes use of a word, the meaning of which is known to the common law, the word shall be understood in the same sense.[243]

Thus, taking text, history, and tradition seriously means reckoning with the common law, including its key concepts and modes of statutory construction. When these laws are applied to early law, the claim that minors were fully included among the people who enjoyed Second Amendment rights is no longer tenable.

### III. *BRUEN*'S SECOND STEP: THE HISTORICAL TRADITION OF REGULATING MINORS

The common law, public understanding of minors' place in society from the time of the Founding, and laws enacted prior to the Civil War are vital to analyzing modern age-limit regulations within the *Bruen* framework. Yet it is also necessary to consider laws responding to developments in firearms technology and production in the century between the adoption of the Second Amendment and the Fourteenth, which altered how guns were used and significantly changed gun violence in Reconstruction America.

At the second step of the *Bruen* test, the government must identify regulatory analogues to demonstrate that the modern regulation is consistent with this nation's historical tradition.[244] The court then determines whether the challenged regulation is similar enough to the government's proposed historical analogues to justify the modern law, with particular emphasis on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that

---

243.   *Id.* (footnotes omitted).
244.   *Bruen*, 597 U.S. at 24.

2024]          *AGE RESTRICTIONS AND ARMS*          161

burden is comparably justified."[245] *Bruen* directs courts to look at "how and why the regulations burden a law-abiding citizen's right to armed self-defense" as meaningful metrics for this analogical reasoning.[246]

The state and municipal laws that regulated minors' access to firearms discussed herein[247] are consistent with society's continued understanding at the Founding that parents, guardians, and other adults were responsible for keeping those under the age of twenty-one safe. Minors' access to firearms was mediated through the patriarchal structure of the family and comparable institutions governed by the principle of in loco parentis.[248] In the context of the militia, minors were also supervised and subject to the harsh rules of military discipline and punishment.[249] As described above, minors did not typically purchase weapons directly themselves because of their limited ability to make contracts.[250]

Some of the courts addressing age limits post-*Bruen* have rejected pre–Civil War era laws governing parents or other adults as sufficiently similar historical analogues for modern age-limit laws, without taking this historical context into account. As one court noted, "[t]hese laws are not properly characterized as 'restrictions on the use of firearms by minors.'"[251] Today's age-limit laws respond to the fact that eighteen-to-twenty-

---

245.  *Id.* at 29.

246.  *Id.* For analysis of how *Bruen*'s metrics of "how" and "why" are insufficient to resolve Second Amendment challenges, see Blocher & Ruben, *supra* note 173, at 109–13.

247.  *See supra* Part I.E.

248.  *See supra* Parts I.B–I.C.

249.  *See supra* notes 125–34 and accompanying text.

250.  *See* Brewer Amici Curiae, *supra* note 61, at 20 ("By the late eighteenth century, it was an established rule that young people under the age of 21 could not make contracts except for necessaries. While the exact scope of those 'necessaries' was slightly flexible and debatable, Amicus has never encountered a situation where a firearm was considered a necessary. Thus, at the time of the founding, people under the age of 21 could only enter into contracts for food, clothes, lodging, and occasionally education . . . ."); *see also* Brewer, *supra* note 30, at 230–87 (providing a comprehensive overview of minors' abilities to form contracts from the sixteenth to the nineteenth century).

251.  Rocky Mountain Gun Owners v. Polis, No. 23-cv-01077-PAB, 2023 WL 5017253, at *18 (D. Colo. Aug. 7, 2023) (quoting The Governor's Response to Plaintiff's Motion for Preliminary Injunction at 17, *Rocky Mountain Gun Owners*, 2023 WL 5017253 (23-cv-01077)); *see also* Worth v. Harrington, 666 F. Supp.

162          *MINNESOTA LAW REVIEW*          [108:pppp

year-olds today access firearms differently than they did at the time of the Founding, including through direct purchases.[252] Direct regulation of minors is more effective and appropriate now than it was at the Founding. Yet both these historical and modern laws have the same "why": concerns about public safety resulting from minors' impulsivity and their improper usage of firearms.[253] As the court in *Jones v. Bonta* explained, "The foregoing are examples of historical regulations which limited the ability of 18-20-year-olds to purchase, acquire and possess certain weapons in common use to ensure public safety due to the immaturity of individuals under the age of 21."[254] Both sets of laws also have the same "how": limiting minors' access to weapons by regulating the main mechanism minors use to obtain weapons.

The lack of direct regulation of minors at the Founding is also explained by firearms technology at the time. At the time of the ratification of the Second Amendment, about ninety percent of the guns owned by Americans were long guns.[255] Flintlocks and muzzle-loading weapons took too long to load and were too inaccurate to make them effective instruments of anti-social violence or criminal activity.[256] Given these facts, gun violence was not a serious problem that prompted governments to limit minors' access to guns. Government arms policy at the time of the Second Amendment was driven by an alternative problem: too

3d 902, 925 (D. Minn. 2023) ("Several of the Reconstruction-era laws pointed to by the Commissioner prohibited sales of firearms to minors, but did not place restrictions on minors receiving them from parents or even employers. . . . These restrictions do not burden the Second Amendment right in a manner distinctly similar to the age requirement [of] Minnesota's permit-to-carry law." (footnote omitted)).

252.   Daniel W. Webster et al., *How Delinquent Youths Acquire Guns: Initial Versus Most Recent Gun Acquisitions*, 79 J. URB. HEALTH 60, 60–68 (2002) (describing a study that demonstrated that youth obtained guns primarily through "purchases, gifts, and by finding them").

253.   *See generally supra* note 246 and accompanying text (discussing *Bruen*'s "why" and "how" metrics).

254.   Jones v. Bonta, No. 19-cv-1226-L-AHG, 2023 WL 8530834, at *8 (S.D. Cal. Dec. 8, 2023).

255.   *See* Sweeney, *supra* note 120, at 61 tbl.3.5 (collecting firearm data on probate inventories of colonial male decedents).

256.   *See* Roth, *supra* note 170, at 117 (discussing the limitations of muzzle-loading firearms).

2024]     *AGE RESTRICTIONS AND ARMS*     163

few military guns in the hands of members of the militia.[257] Public policy, both at the state and federal level, aimed to encourage the ownership of military-quality weapons needed for militia service and regulation was designed to further this objective.[258] Given the problems of arming the population, governments correctly directed enforcement mechanisms at those who had the economic resources to acquire weapons: adults, not minors.

Laws from the Reconstruction era, many of which did directly regulate minors, are relevant to showing the historical tradition of restricting minors' access and use of firearms, even though they were not in place at the time the Second Amendment was ratified. There was no systemic youth gun violence problem at the time of the Second Amendment's adoption, so there was no problem with minors and gun violence to regulate.[259] Times change, and the law seeks to respond to those changes. The expansion of laws regulating minors and guns over the courts of the nineteenth century illustrates this reality.

Technological changes and economic efficiencies in the nineteenth century made weapons that were more accurate and more easily concealable widely available.[260] The market revolution of the Jacksonian period (1828–1854) transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time.[261] The impact of this

---

257.   *See* Sweeney, *supra* note 120, at 62 (discussing the difficulties faced by colonial governments who were attempting to properly arm the militia).

258.   *See* CORNELL, A WELL-REGULATED MILITIA, *supra* note 141, at 69 ("To achieve the goal of having a well-regulated militia meant that government would encourage citizens to acquire military-style firearms and attain a basic competency with them.").

259.   *See* CORNELL, A WELL-REGULATED MILITIA, *supra* note 141, at 138–40 (noting that America's first gun violence problem was during Jacksonian era and that proliferation of handguns and knives in Jacksonian era led to more interpersonal violence).

260.   *See id.* at 137–41. For an in-depth discussion of the technological differences between eighteenth- and nineteenth-century firearms, see Roth, *supra* note 170, at 117–27.

261.   *See generally* CHARLES SELLERS, THE MARKET REVOLUTION: JACK-SONIAN AMERICA, 1815–1846 (1991) (providing a comprehensive overview of the changes in American life during the Jacksonian era); MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 17–21, 272–73 (1977) (describing the transformative effect technological advances had on the arms and machine tool industry during the early eight-

164          *MINNESOTA LAW REVIEW*          [108:pppp

inter-connected set of changes in production, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common and reliable.[262] Cheap handguns became widely available for the first time in American history in the early decades of the nineteenth century.[263] In response to the perception that these guns posed a particular danger, states began passing laws to deal with the negative consequences of these weapons, including new limits on public carry.[264] As discussed above, these regulations also included regulation of minors' access to weapons.[265]

The municipal and state regulations which governed access to firearms and ammunition by those under the age of twenty-one are examples of how governments respond to the technological development of firearms and the resulting increase in interpersonal gun violence after the enactment of the Second Amendment. As Jennifer Carlson's work demonstrates, post–Civil War

---

eenth century and, in the context of armorers and the Clock Strike of 1842, describing how "the new technology helped to lighten physical labor, increase output and yield a more uniform product," while also leading to a loss in the "artistry" of many goods); Andrew J.B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526–37 (2014) (detailing the rise of United States military industry and manufacturing in the early eighteenth century, which "solved a critical problem that had beset the United States during the Revolutionary War: a ready domestic supply of arms and munitions"); Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 BUS. HIST. REV. 57, 57–83 (2018) (detailing the transformation of industrial firearms manufacturing during this period and the impact of Manifest Destiny ideology).

262.   *See* CORNELL, A WELL-REGULATED MILITIA, *supra* note 141, at 137–41; Roth, *supra* note 170, at 120–22 (describing the transformation of firearms during the Jacksonian era).

263.   *See* CORNELL, A WELL-REGULATED MILITIA, *supra* note 141, at 137–41.

264.   *See supra* Table 1 and related text. For a good example of an early public carry law, see Act of Jan. 9, 1841, ch. 7, § 4, 1840 Ala. Laws 148, 148–49 ("Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.").

265.   *See supra* Table 1 and related text.

America became alarmed at the problem of gun violence and injury.[266] Concerns over the danger guns posed to minors increased dramatically during the era of the Civil War.[267] States responded to this concern with a variety of laws, including statutes enacted in 1856,[268] 1858,[269] and 1859,[270] all of which reflect responses to technological and societal developments post-1791. Municipal laws regulating minors' access to guns also expanded dramatically in this period.[271]

While *Bruen* left open the question of the degree of influence that laws enacted during the Reconstruction era should have for *Bruen*'s second-step historical analysis,[272] courts should not undervalue the expansion of legislative regulation of minors related to firearms during Reconstruction. The technological changes in firearms during the Civil War, the resulting effect on youth gun violence during the Reconstruction era, and government's responsive regulation demonstrate why there was a significant upsurge in laws regulating minors at that time. Reconstruction era laws regulating minors are part of this nation's history and tradition and should be a part of *Bruen*'s second-step calculus.

Moreover, the laws enacted during Reconstruction to address minors and guns addressed new problems, but they were

266.   On the growing perception of the threat guns posed to minors in the post–Civil War era, see Carlson & Cobb, *supra* note 193, at 399–407.

267.   *See id.* at 403–04 (describing how in the years directly following the Civil War most public coverage of child-involved gun violence was framed as "as incidental private troubles, not systematic public concerns," but that by the 1880s "narratives that would frame child-involved shootings as more than mere accidents were taking shape").

268.   *See, e.g.*, Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Laws 17, 17 (making it unlawful to sell, give, or lend an air gun or pistol to a male minor).

269.   *See, e.g.*, Act of Feb. 26, ch. 81, §§ 2–3, 1856 Tenn. Pub. Acts 92, 92 (prohibiting people from selling, loaning, giving, or delivering pistols and like dangerous weapons to minors except under limited circumstances).

270.   *See, e.g.*, Act of Jan. 12, 1860, ch. 33, § 23, 1859 Ky. Acts 241, 245 (forbidding individuals from selling, giving, or loaning pistols and other dangerous weapons to minors).

271.   *See, e.g.*, Louisville, Ky., An Ordinance as to Retailing Gun Powder (Oct. 17, 1853) (making it unlawful to sell gunpowder to minors); *see also* Spitzer, *supra* note 185, at 59 tbl.1 (demonstrating a dramatic increase in the numbers of gun laws in states, including local and municipal laws, during Reconstruction).

272.   N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 35 (2022).

166 *MINNESOTA LAW REVIEW* [108:pppp

not a novel application of the police power. Such laws were an extension of legal conceptions grounded in Founding-era constitutionalism. These efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic, and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.[273]

*Bruen* also directed that courts may use a "more nuanced approach" in evaluating analogies when addressing "unprecedented societal concerns or dramatic technological changes" that were unforeseeable to the Framers.[274] Many courts that have followed this directive and applied a "nuanced approach" have trended toward looking at analogies at a higher level of generality.[275] Some courts dealing with age limit cases have opted not to apply the nuanced approach, instead citing *Bruen*'s language that a modern law may be unconstitutional if it addresses a "general societal problem that has persisted since the 18th century" but uses "materially different means" to address it.[276] This perspective fails to consider the rapidly changing technological shift in firearms between the Founding and the adoption of the Fourteenth Amendment.

273. Cornell, *Right to Regulate*, *supra* note 192, at 89 ("Rather than acting as a high-water mark for gun rights, Reconstruction ushered in a period of expansive regulation. Courts, legislators, and commentators during this period recognized that the robust power to regulate firearms, particularly in public, was not only constitutional, but essential to preserve ordered liberty.").

274. N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 27 (2022).

275. *See, e.g.*, Nat'l Ass'n for Gun Rights v. Lamont, No. 3:22-1118 (JBA), 2023 WL 4975979, at *27, *32 (D. Conn. Aug. 3, 2023) (upholding a prohibition on assault weapons and large capacity magazines based on "a longstanding tradition of the government exercising its power to regulate new and dangerous weapon technology" without requiring a more specific analogue); Or. Firearms Fed'n v. Kotek, No. 2:22-cv-01815-IM, 2023 WL 4541027, at *39–46 (D. Or. July 14, 2023) (considering "regulations on the use of trap guns, the storage of gun powder, the possession and carrying of blunt objects like clubs, the possession and carrying of certain fighting knives, the concealed carrying of pistols, the concealed carrying of revolvers, and the use and possession of fully-automatic and semi-automatic firearms" as historical analogues to a modern prohibition on large capacity magazines); *see also* Blocher & Ruben, *supra* note 173, at 162–67 (discussing the "potential virtues" of applying a high level of generality).

276. *See, e.g.*, Worth v. Harrington, 666 F. Supp. 3d 902, 911–12 (D. Minn. 2023) (citing *Bruen*, 597 U.S. at 26).

Moreover, although societal concerns about teenagers' ability to make sound decisions have been ever-present since the Founding, our understanding of why teenagers are prone to impulsive behavior, and do not have full capacity for evaluating risk, has improved because of developments in cognitive science.[277] Indeed, our understanding of brain development has increased exponentially since the time the Second and Fourteenth Amendments were ratified.[278] Like developments in technology and unprecedented social concerns, the Founders could not have anticipated these scientific developments or crafted laws based on their insights. This evolved understanding demonstrates why modern society may use "materially different means" to address a problem inherent in human psychology "that has persisted since the 18th Century."[279]

Furthermore, dramatic technological changes in weaponry have made teenagers' capacity to make reckless decisions have greater consequences, consequences that could not have been predicted at the time of the Founding. Developments in large capacity magazines, bump stocks, and other modern firearms technology, have significantly increased the damage that can be, and, at times, is, caused by teenagers' faulty decision-making in connection with firearms.[280] There were no mass shootings at the time of the Founding.[281] The capacity of a lone teen to inflict multiple casualties in a single event would have been unimaginable to the authors of the Second Amendment. Yet, as of June 2022, six of the nine deadliest shootings since 2018 were committed by

---

277.  *See supra* notes 218–27 and accompanying text (discussing Founding-era concerns over the decision-making ability of minors and illuminating modern-day, scientific understandings regarding the brain development of minors).

278.  *See supra* notes 220–27 and accompanying text (discussing our increased understanding of brain development in minors due to advances in science and technology); *see also* Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV. (forthcoming June 2024).

279.  *See generally Bruen*, 597 U.S. at 26–27 ("[I]f earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.").

280.  *See, e.g., Kotek*, 2023 WL 4541027, at *13, *39 ("[M]odern LCM allows an individual to fire at least four times more rapidly than the most well-trained soldier of the Founding era.").

281.  *See id.* at *13–14 ("Mass Shootings are a recent phenomenon in American history.").

168          *MINNESOTA LAW REVIEW*          [108:pppp

individuals aged twenty-one or younger.[282] Jefferson and Madison did not trust the sons of Virginia's elite to possess firearms at the University of Virginia and would not countenance unrestricted access of those under the age of twenty-one to today's weapons.[283]

The continuity in human psychology stands in marked contrast to the profound changes in firearms technology and the societal ills arising from these changes. Requiring society to limit solutions to modern gun violence by employing regulations developed at a time when there were limited gun violence problems is apiece with claims that the Second Amendment only protects muskets. Indeed, Justice Scalia noted it would be "bordering on the frivolous" to argue that the Second Amendment would not cover modern-day weapons, despite the significant development of firearms since the Founding.[284] Arguments that we cannot address modern gun violence with insights drawn from recent social science and neural science are equally risible. Addressing gun violence with the benefit of today's enhanced scientific understanding and with regulations adapted to the realities of

282.   Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, N.Y. TIMES (June 2, 2022), https://www.nytimes.com/2022/06/02/us/politics/mass-shootings-young-men-guns.html [https://perma.cc/S67B-RDKG].

283.   *See supra* notes 92–96 and accompanying text (describing how Thomas Jefferson and James Madison attended a University of Virginia board meeting where it was decided that students would not be allowed to keep or use guns); *cf. Kotek*, 2023 WL 4541027, at *14 ("During the Newtown, Connecticut mass shooting that occurred at Sandy Hook Elementary school in 2012, nine children were able to flee and two were able to hide when the shooter paused to reload magazines.").

284.   District of Columbia v. Heller, 554 U.S. 570, 582 (2007); *Bruen*, 597 U.S. at 28 (carrying through *Heller*'s holding that the Second Amendment applies to "modern instruments that facilitate armed self-defense"); *see also* Blocher & Ruben, *supra* note 173, at 53 (noting that *Heller* and *Bruen*'s conclusion that modern weapons receive Second Amendment protection "must be understood more broadly as an argument against anachronism" and "must account for other forms of change, including those regarding regulation"); Ruben, *supra* note 278, at 163 ("[A] good-faith comparison of why policymakers passed modern and historical laws requires comparing contexts, and if today's laws are informed by science, it becomes highly relevant to consider the scientific context at the time historical laws were enacted.").

modern weaponry is true to *Heller* and its progeny, which recognize that government regulation is fully consistent with the Second Amendment.

Fortunately, some courts have begun to recognize the radically different nature of today's gun violence problem from the issues that faced early American courts and legislatures. In *Oregon Firearms Federation v. Kotek*, the court found, after a bench trial, that mass shootings represent a unprecedented societal concern that did not exist at the Founding.[285] It noted that "[b]etween 1776 and 1949, or for about 70 percent of American history, there was no example of a mass shooting event that resulted in double digit fatalities."[286] It further found that the "annual incidence of high-fatality mass shootings," defined as shootings where six or more individuals died, "has increased along a linear trend line from 1990 to 2022," and noted testimony regarding "a rise in the fatalities or victims killed in recent years from mass shooting events."[287] Mass shootings have an unprecedented effect on "the capacity of health care systems," where mass shootings exceed a hospital's surge capacity and create situations where hospitals do not have sufficient resources to treat all patients.[288] The trauma associated with these events has touched the lives of millions of Americans.[289]

---

285. *See Kotek*, 2023 WL 4541027, at \*14, \*36 (finding that "based on the evidence presented at trial, Defendants and Intervenor-Defendant have shown that mass shootings using LCMs are an unprecedented societal concern rather than a general societal problem that has persisted since the eighteenth century," and that "[m]ass shootings are a recent phenomenon in American history").

286. *Id.* at \*13.

287. *Id.* at \*13, \*36.

288. *Id.* at \*37.

289. *See* Amy O'Kruk et al., *In the Last Decade, an Estimated 40 Million Americans Lived Within 1 Mile of a Mass Shooting,* CNN (last updated Oct. 26, 2023), https://www.cnn.com/interactive/2023/08/us/americans-living-near-mass-shootings-statistics-dg [https://perma.cc/2G62-AZ9B] (sharing the stories of people who lived near recent mass shootings, noting that "[c]ommunity-wide, mass shootings lead to increases in feelings of fear and lack of safety," and reporting research data that found "[a]mong children, witnessing urban violence is a risk factor for adverse outcomes, such as substance abuse, aggression, anxiety, depression and antisocial behavior"); Associated Press & Nat'l Op. Rsch. Ctr., *Americans' Experiences, Concerns, and Views Related to Gun Violence,* UNIV. CHI. HARRIS SCH. OF PUB. POL'Y (Aug. 2022), https://harris.uchicago.edu/files/uchicago_harris_ap_norc_poll_report_final.pdf [https://perma.cc/F3BX

170             *MINNESOTA LAW REVIEW*            [108:pppp

Our evolved understanding of the brain development of eighteen-to-twenty-year-olds also provides empirical evidence why this age demographic is more dangerous than other age groups when they have access to firearms.[290] The historical tradition of disarming those who are dangerous also supports age limit firearms restrictions.[291] As of this writing, the Justices are considering *United States v. Rahimi*, a challenge to the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits gun possession by persons subject to domestic violence restraining orders, as defined by 18 U.S.C. § 922(g)(8).[292] Most observers expect the Court to uphold the restriction, though it could do so in a variety of

-98A5] (detailing that one in five Americans report that either themselves, a family member, or close friend has been a victim of gun violence); Zara Abrams, *Stress of Mass Shootings Causing Cascade of Collective Traumas,* MONITOR ON PSYCH. (July 11, 2022), https://www.apa.org/monitor/2022/09/news-mass-shootings-collective-traumas [https://perma.cc/J2ZQ-UJTA] (summarizing studies that indicate millions of Americans experience behavior-altering trauma as a result of continual mass shootings).

290.   *See supra* note 7 and accompanying text (providing empirical evidence demonstrating that eighteen-to-twenty-year-olds have some of the highest homicide rates of any age group and some of the highest rates of general criminal activity).

291.   A now oft-cited quotation from her days as a Seventh Circuit Judge, U.S. Supreme Court Justice Amy Coney Barrett wrote, "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." Kanter v. Barr, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting); *see also* United States v. Jackson, 69 F.4th 495, 504 (8th Cir. 2023) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."). Indeed, scholars and practitioners who favor strong gun rights have also concluded that history shows that governments have the ability to disarm those who are dangerous. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 261–65 (2020) (recognizing that there is a historical tradition of legislators authorizing disarmament for persons they determined were potentially dangerous); Brief of Amici Curiae Professors of Second Amendment Law, the Second Amendment Law Center, and the Independence Institute in Support of Respondent and Affirmance at 4, United States v. Rahimi, 143 S. Ct. 2688 (2023) (No. 22-915) ("The original public meaning of the Second Amendment is not infringed by laws to take arms from persons proven to be dangerous to others.").

292.   United States v. Rahimi, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688 (2023) (No. 22-915).

**Supp. Grabarsky Decl.  096**

different ways, each with implications for the arguments and evidence we have laid out here.[293]

The Solicitor General argued in *Rahimi* that there is a historical tradition that supports the constitutionality of restricting access to firearms by people, or categories of people, who have a higher propensity for dangerousness than the general public.[294] Several courts have highlighted historical laws evidencing dangerousness as a basis for disarmament.[295] If that principle becomes the basis for the result in *Rahimi*, then our arguments about the historical tradition of regulating minors based on their inability to make mature, reasonable decisions is further bolstered by *Rahimi*'s conclusion that the Second Amendment permits restrictions on those whose access to firearms poses a high risk of dangerousness to self or others.

Other parts of our argument stand largely independent of *Rahimi*, which has not been fully litigated on the basis of whether Rahimi, an individual subject to a domestic violence restraining order, is among "the people."[296] Domestic violence was viewed by the Founding generation through a lens in which women had no legal identity separate from their husbands, and

---

293.    *See* Brannon P. Denning & Glenn H. Reynolds, *Trouble's* Bruen*: The Lower Courts Respond*, 108 MINN. L. REV. (forthcoming June 2024) (highlighting that the Supreme Court seemed willing to adopt a standard that would permit disarmament of those who are dangerous to themselves or others). The advocate who argued on behalf of Rahimi has said as much, stating that he predicts a majority opinion finding a "'tradition' of 'disarming the dangerous.'" J. Matthew Wright (@attorneydad), X (formerly TWITTER) (Jan. 23, 2024), https://twitter.com/
attorneydad/status/1750035530476134755 [https://perma.cc/R9VW-T47Z].

294.    Brief for the United States at 6–8, 14–15, 28, United States v. Rahimi, 143 S. Ct. 2688 (2023) (No. 22-915).

295.    *See* sources cited *supra* note 291.

296.    *See* Brief for the United States, *supra* note 294, at 36 ("The Fifth Circuit emphasized that the Second Amendment guarantees the right of 'the people' to keep and bear arms and that Rahimi, 'while hardly a model citizen, is nonetheless among "the people  ."'" Rahimi similarly argues that the Amendment secures 'an unqualified right belonging to all of "the people,"' and that Congress has no power to make 'judgment[s] about who should be trusted with firearms.' That is incorrect." (citations omitted) (quoting briefs)); Reply Brief for the Petitioner at 8–9, United States v. Rahimi, 143 S. Ct. 2688 (2023) (No. 22-915) (arguing that reading "the people" as "all Americans" is a historically erroneous interpretation).

172          *MINNESOTA LAW REVIEW*          [108:pppp

husbands had the right to "physically chastise" their wives.[297] In contrast, those between the ages of eighteen and twenty were identified as potentially more dangerous, and less responsible, than the general public, both at the Founding and today.[298] The state and municipal laws that regulated minors' access to firearms discussed herein[299] are consistent with society's continued understanding that parents, guardians, and other adults were responsible for keeping those under the age of twenty-one safe.

In sum, the common law, the public understanding of minors' role in society at and after the time of the Founding, and historical laws addressing minors' access to firearms provide ample historical support that modern age-limit laws are part of this nation's history and tradition. The Supreme Court's incoming decision in *United States v. Rahimi* may further bolster the constitutionality of age limit-based restrictions on firearms.

CONCLUSION

Courts addressing age-limit firearm regulations post-*Bruen* have erred in discounting the historical context of minors' limited legal rights during the Founding. The history catalogued above demonstrates that minors were not treated as independent and autonomous actors capable of engaging in commerce or acting independently of their head of household in most circumstances. For most of the pre–Civil War period in American history, minors only had legal access to arms when under the control and authority of a parent or guardian, when assisting sheriffs, justices of the peace, or constables to preserve the peace, or when performing militia duties supervised by militia officers. The practical realities of acquiring firearms in early America further limited the opportunities of minors to acquire them without parental consent. The laws and historical context demonstrate that those under twenty-one have never had a constitutional right to keep, bear, or acquire firearms.

---

297.   Kelly Roskam et al., *The Case for Domestic Violence Protective Order Firearm Prohibitions Under* Bruen, 51 FORDHAM URB. L.J. 221, 245 (2023).

298.   For Founding-era views on the responsibility and dangerousness of eighteen-to-twenty-year-olds, see *supra* notes 28–37, 68–70 and accompanying text. For a modern understanding, see *supra* notes 222–27, 291 and accompanying text.

299.   *See supra* Table 1 and related text.

2024]        *AGE RESTRICTIONS AND ARMS*        173

While it is incontrovertible that governments chose to require males who were under twenty-one to serve in the militia in the 1700s and 1800s, the militia laws from these time periods do not contradict the conclusion that minors had no Second Amendment rights at or after the time of the Founding. Rather, these laws demonstrate that governments have imposed a constitutional duty and obligation upon minors when the nation required more bodies to contribute to public defense. Moreover, the argument that service in the militia established a Second Amendment right for those under twenty-one would have to mean that the right applies equally to those under the age of eighteen, a position that even courts that have struck down age-limit laws have been unwilling to hold.[300]

Minors called to serve were not required to purchase firearms to use in service; firearms for minors were often provided by parents or guardians, or, in some instances, the state or local government. Punishments meted for a minor's failure to provide his own weapons also fell on his parents or guardians. The militia laws relied upon by plaintiffs in age-limit cases do not demonstrate that any right to bear arms existed for minors outside of militia service, they demonstrate that minors were obligated to serve in the militia. Creating a right out of an obligation is contrary to the understanding of rights and duties at the Founding and modern law that treats rights and obligations as correlates.[301] Lower courts that have failed to recognize this fact have simply misconstrued one of the most basic features of our legal tradition.

The Reconstruction era also ushered in a wave of new laws expressly regulating minors and guns.[302] Technological changes

---

300.   *See* Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 136 n.18 (E.D. Va. 2023) ("This, of course, does not mean that the Second Amendment applies to individuals under the age of 18 who have not yet attained full admittance into the political community."); Worth v. Harrington, 666 F. Supp. 3d 902, 915 (D. Minn. 2023) ("No court has read the Second Amendment to cover those under the age of 18, and this case does not raise that issue."); *see also* Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407, 422 & n.13 (4th Cir. 2021) (showing a pre-*Bruen* opinion stating that Second Amendment protections do not "extend in full force to those under 18"), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

301.   *See supra* notes 109–13 and accompanying text.

302.   *See supra* Table 1 and related text; *supra* notes 264–71 and accompanying text.

174           *MINNESOTA LAW REVIEW*           [108:pppp

in firearms during the Civil War led to a proliferation of cheap and concealable firearms, which youth were able to access more readily than in previous eras.[303] Legislatures responded to these developments, and the resulting increase in gun violence, including youth gun violence, with new laws. While these Reconstruction-era laws regulating minors were enacted by legislative bodies, they were an extension of the common law principles of the police power that were at the root of limits on minors in the Founding era. Laws regulating minors and firearms in the Reconstruction era, along with the common law, show how limits on minors' access to firearms is consistent with our nation's history and tradition.

Courts which have disregarded the original understanding of minors' status under early American law have effectively rewritten the meaning of the Second Amendment to accord with modern ideas. While such an approach was common during the Warren Court era, this unconscious turn to living constitutionalism for gun rights is not consistent with *Heller* or *Bruen*.[304]

---

303. *See supra* notes 256–67 and accompanying text.

304. On the Warren Court's rights revolution and its connection to the idea of a living Constitution, see generally Morton J. Horwitz, *The Warren Court and the Pursuit of Justice*, 50 WASH. & LEE L. REV. 5 (1993).

# Exhibit 3

# The Myth of Continuity in American Gun Culture

113 CALIF. L. REV. __ (*forthcoming* 2025)

*Brian DeLay\**

### ABSTRACT

*The Supreme Court's 2022 decision in New York State Rifle & Pistol Association v. Bruen elevated history, text, and tradition as the sole criteria for assessing the constitutionality of firearms restrictions. Gun-rights advocates have responded with a wave of Second Amendment challenges, most employing a three-part argument: 1) X firearms-related issue has been around since the founding; 2) the Founders did little or nothing about it; 3) therefore we cannot do anything about it, either. Legal scholars are engaged in critical work on parts 2 and 3 of that argument. As a professional historian involved in several Second Amendment cases over the past year, I have the disciplinary expertise to offer a critique of part 1. This Article explains why the argument for continuity in American gun culture is largely a myth, and offers a case study in the role that historical research can play in Second Amendment cases in the Bruen era.*

*It begins by arguing that whereas today's gun culture is consumerist, state-phobic, and individualist, early America's gun culture was utilitarian, state-led, and collective. The Article then presents detailed critiques of the iterations of the myth of continuity being deployed to overturn laws regulating assault weapons, large-capacity magazines, and ghost guns. It demonstrates that these were nonexistent or impractical technologies in the Founding era, no more likely to attract regulatory attention than jetpacks do in our own times. Once these products finally became reliable enough consumer items to cause problems in the twentieth and twenty-first centuries, regulation quickly followed. Put into proper historical context, then, assault weapons, high-capacity magazines, and ghost guns represented "dramatic technological changes" that provoked "unprecedented societal concerns." Regulations addressing those concerns should be found constitutional under Bruen's history-centric framework.*

*Good history should help preserve some firearms laws in the Bruen era. More importantly, by forcing states to research Founding-era history in*

Electronic copy available at: https://ssrn.com/abstract=4546050

2          *The Myth of Continuity in American Gun Culture*

*order to defend firearms regulation, the decision will inevitably bring renewed scrutiny to* Heller*'s ahistorical claim that the Second Amendment was crafted to protect an individual right to armed self-defense. The Article therefore concludes by predicting that* Bruen *will ultimately destabilize the very foundation of modern Second Amendment jurisprudence.*

TABLE OF CONTENTS

**ABSTRACT** ..................................................................................................................1

**TABLE OF CONTENTS** ...............................................................................................2

**INTRODUCTION** ........................................................................................................3

**I. GUN CULTURE IN BRITISH NORTH AMERICA BEFORE THE REVOLUTION** ............12

    A. WHY WAS EARLY AMERICA SO WELL-ARMED? ............................................... 13
    B. COLONIAL MILITIAS & THE UNEVEN GEOGRAPHY OF GUN OWNERSHIP ............................. 18

**II. EARLY AMERICA'S MISSING REPEATING FIREARMS** ...........................................**21**

    A. THE ELUSIVE QUEST FOR RELIABLE REPEATING FIREARMS PRIOR TO THE NINETEENTH CENTURY ...................................................................................................................... 22
    B. REPEATING ARMS IN THE COLONIES AND EARLY UNITED STATES ........................................ 27
    C. WHY DID THE FOUNDERS NOT REGULATE REPEATING FIREARMS OR AMMUNITION CAPACITY? ...................................................................................................................... 33
    D. NINETEENTH-CENTURY BREAKTHROUGHS IN REPEATING FIREARMS .................................. 39
        *1.    Repeat-Fire Pistols* ................................................................................. *39*
        *2.    The Slow Spread of the First Viable "Large Capacity" Firearm* ............... *44*
    E. THE ARRIVAL AND REGULATION OF AUTOMATIC AND SEMI-AUTOMATIC FIREARMS .............. 46
        *1.    The Era of the Slow-load Large-capacity Firearm, 1870-1900* ............... *46*
        *2.    The Era of the Fast-load Large-capacity Firearm* ................................... *49*

**III. THE NOVELTY OF GHOST GUNS IN AMERICAN LIFE** ...........................................**55**

    A. GLOCK, IKEA-STYLE ....................................................................................... 58
    B. EUROPE'S EARLY-MODERN DOMINANCE OF GLOBAL ARMS PRODUCTION .......................... 60
        *1.    How Muskets Worked* ............................................................................ *60*
        *2.    Making Gun Barrels* .............................................................................. *61*
        *3.    Making Gun Locks* ................................................................................ *63*
        *4.    Europe's Competitive Advantage* ........................................................... *65*
    C. "GUNSMITHS," VS. "GUNSMITHS," VS. "GUNSMITHS" BEFORE THE REVOLUTION ................. 66
    D. AMERICAN GUN-MAKING IN THE REVOLUTION .............................................................. 74

**CONCLUSION** .........................................................................................................**80**

**APPENDIX** ..............................................................................................................**86**

Electronic copy available at: https://ssrn.com/abstract=4546050

*The Myth of Continuity in American Gun Culture*               3

INTRODUCTION

In 2008, for the first time, the Supreme Court declared that the Second Amendment protected an individual right to possess firearms.[1] Two years later, the Court held that states and municipalities were obliged to abide by this novel interpretation of gun rights, thanks to incorporation by the Fourteenth Amendment.[2] These rulings set the stage for New York State Rifle & Pistol Association v. Bruen, in the summer of 2022, wherein the Court declared a right to carry firearms outside the home an individually held fundamental right. What makes *Bruen* so radical and consequential is the novel framework it introduced for assessing the constitutionality of any regulation of individual conduct covered by "the Second Amendment's plain text."[3]

The decision invalidated the two-part framework for deciding Second Amendment cases which had been adopted by the federal circuit courts in the years after *Heller*. Under this framework courts first looked to the Second Amendment's history, text, and tradition to determine whether a regulation impinged on the protected right. If it did, courts then applied one of the traditional tiers of constitutional scrutiny which ask about the government's interest and how important the challenged regulation is in furthering that interest. Instead, *Bruen* insisted that lower courts begin deciding Second Amendment cases entirely based on history, text, and tradition. State and local limitations on an individual's right to keep and bear arms will now be considered constitutional only if they are consistent with "the Nation's historical tradition of firearm regulation."[4] According to Erwin Chemerinsky, the ruling "provides more protection for gun rights

---

* Associate Professor and Preston Hotchkis Chair in the History of the United States, University of California, Berkeley, Department of History. I am grateful to Joseph Blocher, Jacob D. Charles, Erwin Chemerinsky, Saul Cornell, Mark Frassetto, Thomas Laqueur, Jack Rakove, Eric Ruben, Kevin Sweeney, and Jennifer Tucker for generous and insightful feedback on drafts. Daimeon Shanks has been an invaluable research assistant and interlocutor during my work on this essay.
[1] District of Columbia v. Heller, 554 U.S. 570 (2008).
[2] McDonald v. City of Chicago, 561 U.S. 742 (2010).
[3] N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 8 (2022).
[4] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

4          *The Myth of Continuity in American Gun Culture*

than virtually any other in the Constitution."[5] In no other branch of constitutional law has history become so central or so contested as in Second Amendment litigation.[6]

*Bruen* has encouraged opponents of firearm regulation to pay even closer attention to early America. They like what they do not see. The ruling makes historical evidence—or more to the point, the absence of historical evidence—dispositive. Laws restricting conceal-carry permits to those who can demonstrate "good cause?"[7] Laws requiring buyers be at least twenty-one before purchasing handguns?[8] Laws disarming felons[9] or persons under restraining orders for domestic violence?[10] They are hard to find in early America. And according to the most pro-gun-rights interpretation of *Bruen*'s standard, if Americans had no such regulations in 1791, when the Second Amendment was ratified, or, maybe, in 1868, when the Fourteenth Amendment was ratified, then we cannot have them, either. "We are going to defeat virtually every gun control on the books," exulted the executive director of a prominent gun-rights organization in March 2023, when asked by the *New York Times* about the implication of *Bruen* to his organization's judicial agenda.[11]

---

[5]  Erwin Chemerinsky, *Supreme Court Gun Ruling Puts Countless Firearms Regulations in Jeopardy*, ABA JOURNAL (June 29, 2022, 10:10 AM), https://www.abajournal.com/columns/article/chemerinsky-supreme-court-gun-ruling-puts-countless-firearms-regulations-in-jeopardy#:~:text=For%20the%20first%20time%20in,to%20those%20who%20show%20cause.

[6]  *See* Jacob D. Charles, *The Dead Hand of a Silent Past: Bruen, Gun Rights, and the Shackles of History*, 73 DUKE L.J. 67, 69-75 (2023).

[7]  *See, e.g.*, California Dep't of Justice, *Legal Alert: U.S. Supreme Court's Decision in New York State Rifle & Pistol Association v. Bruen, No 20-843* (June 24, 2022), *available at* https://oag.ca.gov/system/files/media/legal-alert-oag-2022-02.pdf.

[8]  *See, e.g.*, John Corey Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives, No. 3:22-cv-410 (E.D. Va. May 10, 2023), *available at* https://storage.courtlistener.com/recap/gov.uscourts.vaed.524643/gov.uscourts.vaed.524643.47.0_1.pdf.

[9]  *See, e.g.*, United States v. Quiroz, No. 22-CR-00104, 2022 U.S. Dist. LEXIS 168329 (W.D. Tex., Sept. 29, 2022).

[10]  U.S. v. Rahimi, No. 21-11001 (5th Cir., March 2, 2023), *available at* https://www.ca5.uscourts.gov/opinions/pub/21/21-11001-CR2.pdf.

[11]  Shawn Hubler, *In the Gun Law Fights of 2023, a Need for Experts on the Weapons of 1791*, N.Y. TIMES (Mar. 14, 2023) (quoting Sam Paredes of Gun Owners of California), *available at* https://www.nytimes.com/2023/03/14/us/gun-law-1791-supreme-court.html. For more coverage of *Bruen*, history, and historians, see Jacob Gershman, *Why America's Gun Laws Are in Chaos*, WALL ST. J. (Aug. 1, 2023), available at

Electronic copy available at: https://ssrn.com/abstract=4546050

*The Myth of Continuity in American Gun Culture*          5

While such predictions might seem premature, *Bruen* undeniably heralds a new era of gun law. An analysis completed seven and a half years after *Heller* found that during that interval, Second Amendment civil challenges prevailed fifteen percent of the time.[12] In the *Bruen* era, civil challenges are succeeding at more than twice that rate. A recent study identifies eighty-one Second-Amendment civil claims adjudicated in the twelve months after the decision was announced.[13] Forty percent of them prevailed.[14] The nation has embarked on a momentous reconsideration of gun regulations, with the distant past as the primary field of contention.

The *Bruen* opinion reassured judges that they are not expected to engage in historical research themselves; rather, they are "entitled to decide a case based on the historical record compiled by the parties."[15] Offices of Attorneys General across the country, scrambling to defend established or new laws, are consequently turning to professional historians with expertise in eighteenth- and nineteenth-century firearms. This is not a crowded field. In a recent *New York Times* article on the situation, the influential legal historian Saul Cornell quipped that its members could convene "in an English phone booth."[16]

I am one of the historians in that metaphorical booth, and the phone has been ringing. While I have been studying the history of firearms in the eighteenth and nineteenth century for more than a decade, before *Bruen* I had never been approached by any party to a Second Amendment case. Since *Bruen*, I have been recruited as an expert witness by authorities defending firearms regulations in Washington D.C., Oregon, Illinois, Washington State, California, New Jersey, Colorado, and Delaware.[17]

---

https://www.wsj.com/articles/why-the-nations-gun-laws-are-in-chaos-587ded3f?mod=hp_lead_pos1

[12] Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After Heller*, 67 DUKE L.J. 1433, 1478 (2018).

[13] Charles, *supra* note 6, table 2, at 126.

[14] *Id.* Charles' survey of cases stopped at June 22, 2023. By way of comparison, he identified 294 Second Amendment criminal claims in the first year after Bruen, and those only succeeded 3.74% of the time.

[15] N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 17 n.6 (2022).

[16] Hubler, *supra* note 11.

[17] In the District of Columbia: Hanson et al., v. District of Columbia, Case No. 22-cv-02256 (D.D.C.); in Oregon: Joseph Arnold et al., v. Tina Kotek, et al., No. 22CV41008 (Harney Cnty. Cir. Ct.). In the Federal District Court of Oregon: Oregon Firearms Federation et al. v. Tina Kotek et. al., 2:22-cv-01815-IM (D. Ore.) (lead case); Mark Fitz,

Electronic copy available at: https://ssrn.com/abstract=4546050

6          *The Myth of Continuity in American Gun Culture*

In examining the arguments made by plaintiffs and their expert witnesses in these cases, all involving limits on magazine capacity, assault weapons, or ghost guns, what has most stood out to me is their strained insistence on historic continuity. No one who seriously studies guns in eighteenth century American life can fail to appreciate the profound differences between then and now. Yet opponents of firearm regulation intone a myth of continuity in American gun culture.

The myth takes various forms, depending on the regulation that needs overturning. Arguing against limitations on high-capacity magazines and assault weapons, for example, plaintiffs and their allies have rummaged through a shared compendium of exotic guns, many literally drawn from a 1955 book entitled *Firearms Curiosa*, in search of evidence for the antiquity of repeating firearms.[18] Thus equipped, they advance a three-part argument. First, that "magazines capable of holding more than 10 rounds predate the Second Amendment and were known to and embraced by the Founders."[19] Second, that "no regulations from around the time of the adoption of the Second or 14th Amendments limited the ammunition capacity of a firearm."[20] And third, given *Bruen*'s insistence that "*only* historical tradition can remove a firearm from the Second Amendment's protective scope,"[21] such regulations are unconstitutional today.

---

et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01859-IM (D. Ore.) (trailing case); Katerina B. Eyre, et al., v. Ellen F. Rosenblum et al., 3:22-cv-01862-IM (D. Ore.) (trailing case); and Daniel Azzopardi, et al., v. Ellen F. Rosenblum, et al., 3:22-cv-01869-IM (D. Ore.) (trailing case). In Illinois: Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill.); Langley v. Kelly, Case No. 23-cv-192-NJR (S.D. Ill.); Barnett v. Raoul, 23-cv-209-RJD (S.D. Ill.); Federal Firearms Licensees of Illinois v. Pritzker, 23-cv-215-NJR (S.D. Ill.); Herrera v. Raoul, 23-cv-532 (N.D. Ill.); and Kenneally v. Raoul, et al., 23-cv-50039 (N.D. Ill.). In California: William Wiese, et al., v. Rob Bonta, et al., 2:17-cv-00903-WBA-KJN (E.D. Cal.). In Washington State: Gabriella Sullivan, et al., v. Bob Ferguson, et al., (W.D. Wash.), 3:22-cv-05403. In New Jersey: Association Of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Platkin et al., 3:18-cv-10507; Cheeseman et al. v. Platkin et al., 1:22-cv-04360; Ellman et al. v. Platkin et al., 3:22-cv-04397. In Colorado: Rocky Mountain Gun Owners et al., v. the Town of Superior et al., (D. Colo.), 22-cv-2680. In Delaware: John Rigby et al. v. Kathy Jennings et al. 1:21-cv-01523-MN.

[18] Lewis Winant, Firearms Curiosa (1955).

[19] Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgement at 15, Wiese et al., v. Bonta et al., No. 2:17-cv-00903-WBS-KJN (E.D. Ca. Mar. 31, 2023).

[20] Complaint for Declaratory and Injunctive Relief and damages at 20, Hanson et al., v. District of Columbia, Civil Action No. 22-cv-2256 (D.D.C. Apr. 20, 2023).

[21] Complaint for Declaratory and Injunctive Relief at 4, Harrel v. Raoul, Case No. 23-

Electronic copy available at: https://ssrn.com/abstract=4546050

*The Myth of Continuity in American Gun Culture*          7

The myth of continuity is highly adaptable, and the same basic argumentative framework is now being deployed for other gun-rights causes.[22] At its most general, the myth maintains that America has a stable gun culture dating back to the colonial era. Then and now, it asserts, Americans wanted and used guns for similar reasons. The myth acknowledges that firearms have evolved. But it insists that guns in the late eighteenth century were sufficiently analogous to guns in our own time to have provoked similar societal concerns. As two pioneers of this narrative put it in a 2007 law review article, "it is certainly true that firearms technology has advanced since 1791—*but not as much as some would like to think.*"[23]

What has really changed, the myth's purveyors argue, is not so much the guns, the reasons Americans have them, what their owners do with them, or the resulting social consequences. What has really changed is law. Modern policymakers have broken with tradition by seeking to regulate weapons that the founders, in their wisdom, opted not to. Regulation is the great discontinuity, in other words, and it must be overturned.

\*\*\*

The myth of continuity's perniciousness – or its promise, depending on your viewpoint – comes from the way it confidently projects our modern experience with guns and gun violence back onto the late eighteenth century. That projection has helped remake Second Amendment jurisprudence over the past fifteen years, most consequentially with *Heller* and its ahistorical premise that pistols played a similar role in crime and self-defense in 1791 as they did in 2008. *Bruen*'s framework ensures that the myth of continuity will figure even more prominently into regulatory battles going forward. That is true not only because of the primacy that the decision affords history, but also because of how it directs courts to approach regulatory silence.

The ruling distinguishes between policy challenges it presumes will or

---

cv-141-SPM (S.D. Ill. Jan. 17, 2023). Harrel et. al., v. Raoul et. al., No. 3:23-cv-00141-SPM (S.D. Ill.) (Emphasis in original).

[22] See for example the historical arguments in Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35 (2023).

[23] Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008). Emphasis in original.

Electronic copy available at: https://ssrn.com/abstract=4546050

8          *The Myth of Continuity in American Gun Culture*

will not be "fairly straightforward."[24] In the first category are those involving regulations that address "a general societal problem that has persisted since the 18th century."[25] In such cases, the absence of "distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[26] Historic regulation through "materially different means," or regulation later rejected on constitutional grounds, could also be evidence that contemporary restrictions are unconstitutional.[27] In other words, a "straightforward" case under Bruen's framework is one featuring an enduring societal problem involving firearms. If the activity in question went unregulated by the Founders, it is presumed to be constitutionally immune from regulation today.

Cases expected to be something other than straightforward are those involving "unprecedented societal concerns or dramatic technological changes."[28] Such cases "may require a more nuanced approach," necessitating analogical reasoning to determine "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[29] Referencing Cass Sunstein's influential essay "On Analogical Reasoning,"[30] Justice Thomas's opinion explained that this "commonplace task for any lawyer or judge" simply requires determining whether a modern and a historic regulation are "relevantly similar."[31]

Given that the second, more nuanced approach opens more avenues for defending regulation, much depends on whether courts can be convinced that a firearms-related problem has "persisted since the late 18th century." Opponents of gun regulations therefore have more incentive than ever to argue for continuity in American gun culture. What is usually at stake in such arguments is the vital question of *why* there might be regulatory silences in the historic record.  After all, legislation responds to felt needs. Historical context is essential to fully understanding those needs. States

---

[24] N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 17 (2022).

[25] *Id.*

[26] *Id.*

[27] *Id.* at 17–18.

[28] *Id.* at 18.

[29] *Id.* at 18–20. *See also* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99 (2023).

[30] Cass R. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741 (1993).

[31] *Bruen*, 597 U.S. at 19–20.

Electronic copy available at: https://ssrn.com/abstract=4546050

defending firearms laws in the *Bruen* era will often need to provide that context to rebut the myth of continuity put forward by plaintiffs and their allies.

By way of illustration, consider a technology that remains unregulated today: personal jetpacks.  Jetpacks have intrigued militaries and the public for more than a hundred years.  That interest has generated competition in research and development.  Most of us know, however, that jetpacks remain an expensive and experimental curiosity in our own times because of stubborn technological, safety, and practical challenges, including cost.  But imagine a scenario where a jurist 232 years in the future is presented with a shrewdly curated version of this context.  Confronted only with documentary evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest (any number of movies and television shows could serve as exhibits), that future jurist might be persuaded that the absence of regulation reflected an ideological disposition against regulating jetpacks. Of course, a simpler and more accurate explanation would be that jetpacks remained too rare to attract regulatory attention in 2024.[32]

Repeating firearms were the jetpacks of the founding era. They were intriguing, expensive, and dangerous curiosities that attracted interest and even paying crowds. But they produced no social consequences and therefore attracted no regulatory attention. Explaining *why* repeating firearms were the jetpacks of the founding era, however, requires a type of historical analysis more typical of history journals than law reviews. It requires answers to practical questions about historic technologies and their social, military, and regulatory consequences. For instance: how well did repeating firearms work in the eighteenth and nineteenth centuries? Were they reliable, effective, or safe to shoot? How many were made? How widely did they circulate? What were they used for? More concretely, if high-capacity weapons were actually "well-known to and embraced by the founders," why, then, did the founders fight their revolution without them? Indeed, why did the United States military rely overwhelmingly on single-shot firearms in every war it fought between the ratification of the Second

---

[32] Anthony Quinn, *The Fall and Rise of Jetpacks*, ROYAL AERONAUTICAL SOCIETY (Aug 16, 2022), https://www.aerosociety.com/news/the-fall-and-rise-of-jetpacks/#.

Electronic copy available at: https://ssrn.com/abstract=4546050

10          *The Myth of Continuity in American Gun Culture*

and Fourteenth Amendments?

Large-capacity magazine and other class-of-arms cases invite an unusually detailed historical analysis, because of their focus on technological change. But *Bruen*'s framework is making historical analysis imperative in most topics in Second Amendment litigation. Numerous gun regulations now face the same basic, three-pronged attack: (1) X firearms-related issue has been around since at least the founding; (2) the Founders did very little about it; (3) therefore we cannot do anything about it now. In the year since *Bruen*, legal scholars have been doing vital work on points (2) and (3). For example, Joseph Blocher and Eric Ruben have argued persuasively that *Bruen*'s "originalism-by-analogy" framework lacks the standards of relevant similarity, consistent levels of analogical generality, and institutional humility necessary to guide principled or even coherent Second Amendment decisions.[33] Jacob Charles[34] and Albert W. Alschuler[35] have offered powerful critiques of the decision's equation of legislative silence with constitutional protection. Darrell A. H. Miller and Blocher have demonstrated that the Bruen majority failed to be sufficiently transparent or rigorous when it dismissed relevant historical laws as outliers.[36] And Blocher and Reva Siegel have excavated a centuries-long record of sensitive-place regulations to argue that history offers ample support for certain firearms safety laws, even under Bruen's framework.[37]

Legal scholars are less well-positioned to respond to the first prong of the attack: the claim that guns and gun problems in the late eighteenth century were fundamentally similar to those in our own times. This Article offers a critique of that claim. My contribution as a professional historian involved in several recent cases is to explain and debunk the myth of continuity in American gun culture, the central historical conceit underlying gun-rights legal activism in the *Bruen* era.

***

[33] Blocher & Ruben, *supra* note 29.

[34] Charles, *supra* note 6.

[35] Albert W. Alschuler, *Twilight-Zone Originalism: The Supreme Court's Peculiar Reasoning in New York State Pistol & Rifle Association v. Bruen*, 32 WM. & MARY BILL RTS. J. __, 19 n.73 (forthcoming 2023).

[36] Darrell A. H. Miller & Joseph Blocher, *Manufacturing Outliers*, 2022 SUPREME COURT REVIEW 2 (2022).

[37] Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 NYU L. REV 6 (2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

The Article has three parts. Part I offers a wide-angle consideration of some of the most significant discontinuities between American gun culture in the late eighteenth century and in our own times. It explains that while early America was an unusually well-armed society by the standards of the day, the main reasons why it was so-well armed – slavery, settler colonialism, and inter-imperial warfare – differ profoundly from the explanations for our own superabundance of firearms. Whereas today's gun culture is consumerist, state-phobic, and individualist, I argue that early America's gun culture was utilitarian, state-led, and collective. One can discern these hallmarks in the uneven geography and shifting chronology of firearms ownership in the seventeenth and eighteenth centuries.

The Article then narrows its focus to consider two unusually elaborate iterations of the myth of continuity. The first concerns the history of repeating arms, a technology at the heart of current legal battles over high-capacity magazines and assault weapons. Contrary to the claims of prominent gun-rights activists and plaintiffs in recent cases, Part II demonstrates that repeating firearms were flawed curios before the nineteenth century. They were much too unusual and irrelevant to have attracted regulatory attention from the founding generation, notwithstanding a robust tradition of firearms regulation. Part II goes on to explain the technological advances that made repeating firearms commercially viable by the mid-nineteenth century, but demonstrates that "large-capacity firearms" (with magazines holding more than ten rounds) were still vanishingly rare when the Fourteenth Amendment was ratified. Indeed, it was not until the turn of the twentieth century that weapons similar to those at the heart of our current regulatory debates – semi-automatic firearms with detachable magazines – began to enter the US consumer market. Once the social consequences of automatic- and semi-automatic guns began to be felt, states across the country moved to regulate them.

The continuity argument for repeating firearms deployed in current court cases draws upon decades of gun-activist scholarship. Part III evaluates a newer application of the myth of continuity being applied to the fight over "ghost guns": firearms assembled by amateurs either from commercially available kits or by using 3D-printers. These activists oppose regulations requiring federal serial numbers on these arms. To challenge the constitutionality of such regulations, they have developed a narrative about "The American Tradition of Self-Made Arms," to quote a recent law review

Electronic copy available at: https://ssrn.com/abstract=4546050

article on the topic. Part III explains the history behind firearms production in early America, explaining why firearms were so hard to produce, why the overwhelming majority came from Europe, and why there was no significant tradition of self-made arms in our nation's history.

Finally, the conclusion reflects on the role that historical research is likely to play in the unfolding battle over firearms regulation. In the short- and medium-term, good history should help preserve some firearms laws. The long-term consequences could be more significant. By forcing states and localities to research history in order to defend every challenged firearms regulation, the decision will inevitably bring renewed scrutiny to *Heller*'s claim that the Second Amendment was crafted to protect an individual right to armed self-defense—rather than to protect the viability of state militias. That claim seemed weak to most professional historians in 2008 and has been revealed to be weaker still in the years since. I believe it will come to look even less defensible under the brightening glare of the renewed historical inquiry required by *Bruen*. The Article therefore concludes by arguing that the decision will ultimately undermine the very basis of modern Second Amendment jurisprudence.

## I. GUN CULTURE IN BRITISH NORTH AMERICA BEFORE THE REVOLUTION

In at least one important regard, the continuity argument rings true. Like residents of the United States today, (white) British North Americans owned a lot of guns. Compared to most colonists elsewhere around the hemisphere, and compared to their counterparts in Great Britain, white residents of the thirteen colonies were remarkably well-armed.[38] However, contrary to some overheated rhetoric, they were not "the greatest weapon-using people of that epoch in the world."[39] They were not even the greatest weapon-using people east of the Mississippi in the eighteenth century. That

---

[38] For gun ownership in Britain, see Priya Satia, *Who Had Guns in Eighteenth-Century Britain?*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019); *see also* Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 61 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019).

[39] For "the greatest," see Greenlee, *supra* note 22 at 46 (quoting CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 9 (1910)).

Electronic copy available at: https://ssrn.com/abstract=4546050

distinction almost certainly belonged to eastern North America's Indigenous polities, which, while obviously still vulnerable to the much larger settler population, had remarkably high per-capita rates of gun ownership. In most Native societies east of the Mississippi, nearly every able-bodied man was a trained warrior and a commercial hunter who owned several trade muskets over the course of a lifetime.[40]

Still, by the standards of the day, British North Americans were unusually well-armed. Careful samples of probate inventories from 1774 suggest that on average about half of all white households possessed a firearm.[41] That certainly did not mean that "the gun was more abundant than the tool,"[42] but it did mean that the gun was (considerably) more abundant than the bible.[43] All told, the thirteen colonies might have had as many as 150,000-200,000 firearms on hand by the eve of the Revolution, enough (at the upper end) to arm around a third of adult white men.

The relative abundance of firearms is an important continuity with our own times. But once we inquire into why early Americans had so many guns, and how those motivations shaped patterns of gun ownership over time, the gulf between then and now comes into view.

## A.  Why Was Early America so Well-Armed?

Why were British North Americans so well-armed compared to contemporaries? For reasons distinct to the times. Whereas our present-day gun culture is consumerist, state-phobic, and individualist, gun culture in eighteenth century British North America was utilitarian, state-led, and collective.

Consider some of the features of contemporary gun culture. One of the most prominent is the gun's association with rural America and with hunting. Here the continuity with the eighteenth century seems strong. In an era where rural farming families comprised around 95% of the colonial population, firearms were useful and sometimes indispensable tools for everyday life.[44] They were required for fowling or hunting big game, and

---

[40] For Indigenous ownership, see DAVID J. SILVERMAN, THUNDERSTICKS: FIREARMS AND THE VIOLENT TRANSFORMATION OF NATIVE AMERICA (2016).

[41] James Lindgren & Justin L. Heather, *Counting Guns in Early America*, 43 WM. & MARY L. REV. 1777, 1780–81 (2002).

[42] Greenlee, *supa*, note 22, at 46 (quoting CHARLES WINTHROP SAWYER, FIREARMS IN AMERICAN HISTORY 9 (1910)).

[43] Lindgren & Heather, *supra* note 41, at 1800.

[44] For rural vs. urban in the 1790 census, see United States Bureau of the Census & Social Science Research Council, *Historical Statistics of the United States: Colonial Times to 1957*, 14 (1975).

Electronic copy available at: https://ssrn.com/abstract=4546050

14          *The Myth of Continuity in American Gun Culture*

handy for keeping pests from crops and homes. Guns are obviously put to similar uses in the United States today, but only by a small proportion of the population (14% now live in rural areas, and a mere 4% hunt).[45]

Another conspicuous feature of our contemporary gun culture is the degree to which arms are prized and heavily-marketed consumer goods.[46] For a small minority of wealthy colonial buyers, finely-made arms could be valued and pleasing material possessions, objects to take care of and even pass down to inheritors.[47] But the extreme rarity in the eighteenth century of the large firearm collections so important to the flourishing of today's industry is another metric of discontinuity. A landmark 2016 study from researchers at Harvard and Northeastern University found that today's so-called "super-owners," the three percent of Americans who for reasons of collecting or prepping or both own the most guns, possess roughly half of all privately held firearms in the country.[48]

Contrast that with the colonial era. Historian Kevin Sweeney's painstaking work in probate records from British North America has revealed that only 4.4% of male probate inventories contained more than three arms, and that only 1.4% contained more than five.[49] Rather than aficionados or preppers, most of the tiny number of early American "super-owners" had entirely practical, utilitarian reasons to maintain private arsenals. More than two-thirds of those in Sweeney's sample who owned six or more guns were southern slaveholders.[50] All ten of the probate inventories containing ten guns or more belonged to South Carolinian

---

[45] For the 2021 rural population, see Elizabeth A. Dobis et al., *Rural America at a Glance: 2021 Edition*, USDA ECONOMIC RESEARCH SERVICE 2 (Nov. 2021). For hunting today, see Andrew Moore, *Decline in Hunting Threatens Conservation Funding*, NC STATE COLLEGE OF NATURAL RESOURCES NEWS (Jan. 27, 2021), *available at* https://cnr.ncsu.edu/news/2021/01/decline-in-hunting-threatens-conservation-funding/.

[46] For recent accounts of the business of marketing and selling firearms in the United States, see RYAN BUSSE, GUNFIGHT: MY BATTLE AGAINST THE INDUSTRY THAT RADICALIZED AMERICA (2021); and JENNIFER CARLSON, MERCHANTS OF THE RIGHT: GUN SELLERS AND THE CRISIS OF AMERICAN DEMOCRACY (2023).

[47] MICHAEL LENZ, "ARMS ARE NECESSARY": GUN CULTURE IN EIGHTEENTH-CENTURY AMERICAN POLITICS AND SOCIETY 138-40 (2010).

[48] Lois Beckett, *The Gun Numbers: Just 3% of American Adults Own a Collective 133m Firearms*, THE GUARDIAN (Nov. 15, 2017), *available at* https://www.theguardian.com/us-news/2017/nov/15/the-gun-numbers-just-3-of-american-adults-own-a-collective-133m-firearms.

[49] Kevin M. Sweeney, *An Eighteenth-Century Gun Culture Shaped by Restraints*, Sept. 6, 2023, Duke Center for Firearms Law Second Thoughts Blog, https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints

[50] See Kevin M. Sweeney's declaration at 12 in Nguyen et al., v. Bonta, 3:20-cv-02470-WQH-BGS (S.D. Cal.).

Electronic copy available at: https://ssrn.com/abstract=4546050

planters who ran vast slave labor enterprises, averaging ninety-five enslaved laborers each.[51] Americans of the late eighteenth century would have found today's hyper-commercialized and ideologically charged culture of consuming guns deeply alien.

Over the past generation a concern with self-defense has become central to contemporary gun culture, a shift the firearms industry has skillfully encouraged through its advertising campaigns.[52] This increasing focus on self-defense is also at the heart of recent Second Amendment jurisprudence as defined in *Heller*, *McDonald*, and *Bruen*. But crime and self-defense, in the sense of attacks on or protection against other members of one's own society, are weak explanations for colonial gun ownership. Prior to the widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century, firearms were awkward tools either for perpetrating or resisting crimes of passion.  They were notoriously inaccurate at range, liable to misfire, and had to be muzzle-loaded with gunpowder and ball before every shot, either by pouring ammunition direct into the barrel or packing in a pre-made paper cartridge loaded with powder and ball.[53] That took time and focus.  Moreover, such guns were seldom kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly.[54]

Partly for these reasons, firearms usually played a relatively small role in murders between white people in North America before the era of the Civil War. Randolph Roth, the nation's foremost scholar of the history of homicide in North America, has argued that rates of gun violence rose and fell in step with political instability and shifts in faith in government, justice, and social hierarchy.[55] When the overall homicide rate was low, guns were used in only 10-15% of homicides. During periods of political instability before the Civil War, firearms could be used in as many as 30-40% of all homicides.[56] But even those unusual circumstances look different from our own times. In 2020 nearly 80% of all homicides in the

---

[51] *Id.* at 12.

[52] The sociologist David Yamane has done important work documenting this shift in U.S. gun culture. *See e.g.*, David Yamane, Paul Yamane, and Sebastian L. Ivory, *Targeted Advertising: Documenting the Emergence of Gun Culture 2.0 in* Guns *Magazine: 1955–2019*, 6 PALGRAVE COMMUNICATIONS 1 (2020).

[53] Randolph Roth, *Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History*, *in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 116–17 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019)

[54] *Id.* at 117.

[55] *Id.* at 116.

[56] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

16          *The Myth of Continuity in American Gun Culture*

United States involved a firearm.[57] In sum, neither consumerism nor fear of crime are adequate explanations for British North America's unusually high rates of firearm ownership.

That given, what *are* compelling explanations? Freedom from restrictive laws provides a partial answer. Gun ownership among wealthy colonists seems to have been twice as common as it was among their peers in mid-eighteenth-century England, while the poorest white colonists were more than eighteen times more likely to own a gun than their English counterparts.[58] Whereas England criminalized hunting and gun ownership for all but the relatively wealthy,[59] colonists in British North America faced no such barriers.[60] Even so, that fact cannot explain the great variability in gun ownership across time and space in early America. To explain that, we need to center slavery, settler colonialism, and inter-imperial warfare.

In the first instance, firearms were necessary for the two systematic forms of violent predation that preoccupied generations of European colonists: dispossessing Native People of their land and terrorizing and enslaving people of African descent (amounting to nearly a fifth of the population in the thirteen colonies in 1775).[61] As those ten rich South Carolinian enslavers understood very well, neither project could have been sustained without a weapons gap. Some modern activists, writers, and jurists seeking a continuous American gun culture have ennobled these imperatives by gathering them under the banner of self-defense.[62] During

---

[57] For homicide and arms technology, see generally *id.* Roth's chapter draws upon his magisterial book *American Homicide.* RANDOLPH ROLF, AMERICAN HOMICIDE (2009). For 2020 homicides, see John Gramlich, *What the Data Says about Gun Deaths in the U.S.*, PEW RESEARCH CENTER (Feb. 3, 2022), *available at* https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/.

[58] Sweeney, *supra* note 38, at 60.

[59] LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 46–73, 156–70 (2016).

[60] Sweeney, *supra* note 38, at 59-60.

[61] ALAN TAYLOR, AMERICAN REVOLUTIONS: A CONTINENTAL HISTORY: 1750-1804 3 (2016).

[62] As Clayton E. Cramer puts it, "traditionally, historians assumed that guns were always part of our culture, a consequence of a nation formed from a 'howling wilderness,' a necessity in a place where hunting for food and defense against dangerous animals, and sometimes hostile Indians, was needed." See CLAYTON E. CRAMER, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE viii (2018). Justice Alito writes in his concurring opinion in *Bruen* that "in 1791, when the Second Amendment was adopted, there were no police departments, and many families lived along on isolated farms or on the frontiers. If these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection. Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to

Electronic copy available at: https://ssrn.com/abstract=4546050

oral arguments in *Heller*, for example, Justice Anthony Kennedy asked whether the second clause in the Second Amendment "had nothing to do with the concern of the remote settler to defend himself and his family against hostile Indian tribes and outlaws, wolves and bears and grizzlies and things                    like                    that?"[63] It is true that colonists terrorizing and exploiting enslaved people and settlers encroaching on Native land (often in violation of British law) had reason to fear their victims, and, therefore, reason to be armed.[64] But such colonists needed guns not so much for self-defense as for collective-*offense*: so that they and their white neighbors could safely take what they wanted from Black and Indigenous people.

Many colonists also needed to be well-armed on account of imperial rivals on the continent. Warfare between western Europe's great powers provoked warfare in Americas repeatedly during the colonial era. Given the vastness of imperial claims, the vulnerability of scattered frontier settlements, and the relatively small size of imperial armies, colonists inevitably found themselves recruited into formal or informal military service in ways that very few Americans today can relate to.[65] Conflict between Spain, France, and Britain also magnified the risks of slavery and settler colonialism, as European powers sought advantage by arming and otherwise empowering their enemies' enemies.[66] That happened during King Williams' War (1689-1697), Queen Anne's War (1702-1713), King George's War (1744-1748), and, especially, during the Seven Years' War (1754-1763). More than 100,000 men from the British colonies served alongside British regular forces in North America in these conflicts, which required periodic weapons shipments from the metropole.[67]

Other colonists in the Americas obviously consumed guns, too. They consumed guns for hunting and dealing with pests, for the predations of

---

protect themselves." N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 9 (2022) (Alito, J., concurring).

[63] Transcript of oral arguments in *D.C. v. Heller*, March 18, 2008, p. 8.

[64] For an overview of settler encroachment on Native land in the decade before the Revolution, see ALAN TAYLOR, AMERICAN REVOLUTIONS: A CONTINENTAL HISTORY, 1750-1804 55-90 (2016).

[65] As of 2018, 7% of the adult population in the United States were veterans. See Jonathan Vespa, *Those Who Served: America's Veterans from World War II to the War on Terror*, REPORT OF THE U.S. CENSUS BUREAU (June 2, 2020), *available at* https://www.census.gov/library/publications/2020/demo/acs-43.html.

[66] For a case-study of this phenomenon, see ALAN TAYLOR, THE INTERNAL ENEMY: SLAVERY AND WAR IN VIRGINIA, 1772-1832 (2013).

[67] *See* GEORGE D. MOLLER, AMERICAN MILITARY SHOULDER ARMS, VOLUME I: COLONIAL AND REVOLUTIONARY WAR ARMS 9–12, (2011) (appendix I provides the tally of 107,000 colonists serving in these years).

Electronic copy available at: https://ssrn.com/abstract=4546050

slavery and settler colonialism, and for coping with inter-imperial war. But it seems nowhere else in the hemisphere did these imperatives reinforce each other as strongly or as often as in eastern North America.[68] Partly for that reason, nowhere else was the state so energetic in its attempts to arm such a large percentage of its colonial population. Today, we associate state regulation of firearms with various kinds of limitations on private ownership. In the colonial era, state regulations were more likely to encourage and even mandate private gun ownership rather than to restrict it.

### B.  Colonial Militias & the Uneven Geography of Gun Ownership

The most consequential firearm regulations concerned militias, the formal, compulsory, selective, state-sanctioned organizations through which colonists undertook most martial activities.[69] Colonial authorities passed hundreds of militia laws before the Revolution, laws mandating how these armed bodies were to be constituted, mobilized, equipped, led, and disciplined.[70] Research in probate records makes it clear that government exerted a powerful influence on the geography of gun ownership in the British colonies, and that it did so primarily through the mechanism of militia laws. Gun ownership was highest in those colonies where governments energetically encouraged and supported militia service. These were places where slavery, settler colonialism, and/or nearby imperial rivals provoked security concerns. In such places, colonial authorities mandated gun ownership and, in times of heightened anxiety, took steps to equip militiamen who lacked their own arms.[71]

---

[68] French Canada, where settlers likewise engaged in warfare with Native People, contented with imperial rivals, and (to a lesser extent) practiced slavery, seems to be the exception that proves the rule. Census records indicate arms ownership by about two-thirds of the male population of New France in the eighteenth century. See Jay Cassel, *The Militia Legend: Canadians at war, 1665-1760*, IN CANADIAN MILITARY HISTORY SINCE THE SEVENTEENTH CENTURY 61 (YVES TREMBLY, ED., 2001).

[69] For a critique of how the majority in *Heller* mischaracterized these bodies as unorganized "citizens' militias" whose primary purpose was to be a "safeguard against tyranny," see Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER 311 (Saul Cornell & Nathan Kozuskanich eds., 2013).

[70] Several hundred of these laws were anthologized by the Selective Service System in the mid-twentieth century. *See* MILITARY OBLIGATION: THE AMERICAN TRADITION; A COMPILATION OF THE ENACTMENTS OF COMPULSION FROM THE EARLIEST SETTLEMENTS OF THE ORIGINAL THIRTEEN COLONIES IN 1607 THROUGH THE ARTICLES OF CONFEDERATION 1789 (ARTHUR VOLLMER ED., 1947).

[71] The association between militia organization and changes in firearm possession over time and place is a dominant theme in Sweeney's work. *See* Sweeney, *supra* note 38;

Electronic copy available at: https://ssrn.com/abstract=4546050

In mid-seventeenth-century New England, for example, with its violently expanding settler frontier and robust militia tradition, nearly 70% of male probate inventories included a firearm.[72] Ownership was nearly as high in the Chesapeake. In late-seventeenth-century Virginia, where anxious authorities restricted militia service to property owners but took an active role in arming them, firearms likewise appear in 70% of male probate inventories.[73] Vulnerable South Carolina, which not only had an enslaved majority but shared frontiers with the mighty Creek and Cherokee nations to the West and (prior to the establishment of Georgia) with rival Spanish Florida to the South, was even better armed by the mid-eighteenth century.[74] There, colonial and imperial officials cooperated to ensure white colonists possessed firearms, and even armed enslaved men for militia service in wartime.[75]

In contrast, mid-Atlantic colonies with weak or nonexistent militia traditions usually had far lower rates of gun ownership. Dutch and English New Yorkers, accustomed to relying on professional military and Native allies, owned fewer firearms than their counterparts north or south. There, firearms appear in just over half of late seventeenth-century inventories, and in barely more than a third by the mid-eighteenth century.[76] In Pennsylvania, New Jersey, and Delaware, with few enslaved laborers, no nearby imperial rivals, and, until the mid-eighteenth century, relatively peaceful relations with Indigenous neighbors, pacifist Quaker proprietors repressed militias during most of the colonial era. As a result, here again only around a third of Pennsylvania's probate inventories contained firearms before independence.[77]

In other words, the uneven geography of gun ownership in British North America can help us understand *why* colonists had guns, in addition to *who* had them and *where*. Colonial British North America had a robust gun culture, but it was very different from the one that prevails today. The

---

Sweeney, *supra* note 69.

[72] See table 3.6 in Sweeney, *supra* note 38 at 61.

[73] *Id.*

[74] *Id.*

[75] For South Carolina's arming, see DE WITT BAILEY, SMALL ARMS OF THE BRITISH FORCES IN AMERICA: 1664-1815 110–12 (2009). For arming South Carolina's enslaved, see John W. Shy, *A New Look at Colonial Militia*, 20 WM. & MARY Q. 181 (1963); PETER MICHAEL VOELZ, SLAVE AND SOLDIER: THE MILITARY IMPACT OF BLACKS IN THE COLONIAL AMERICAS 358 (1993); Maria Alessandra Bollettino, *Slavery, War, and Britain's Atlantic Empire: Black Soldiers, Sailors, and Rebels in the Seven Years' War* 41–50 (2009) (unpublished Ph.D. Dissertation, University of Texas, Austin).

[76] See table 3.6 in Sweeney, *supra* note 38, at 61.

[77] Sweeney, *supra* note 69, at 321–23.

Electronic copy available at: https://ssrn.com/abstract=4546050

20        *The Myth of Continuity in American Gun Culture*

shifting and uneven geography of ownership reveals a utilitarian and collective gun culture powerfully and actively shaped by the state. Encouraged and assisted by the metropole and by colonial governments, British North Americans armed themselves for the purpose of responding to collective opportunities and collective threats.

When the imperatives and dangers associated with those opportunities and threats relaxed, gun ownership seems to have declined. Massachusetts militiamen were well-armed in the decades before Metacom's (King Philip's) War (1675-78) devastated southern New England's Indigenous polities. By the 1740s, however, the colony's militias struggled to arm themselves for the crisis of King George's War.[78] Relying on Indigenous allies and armed enslaved men from South Carolina, North Carolina defeated the formidable Tuscarora between 1711 and 1715, relieving the colony of the most proximate threat to its settler colonial program. Militia service declined in North Carolina over the following decades, to the point that by the mid-eighteenth century it was described as "not near half-armed and those [arms] they have very bad."[79]

The state played an enormous role in these shifting patterns of gun ownership, not only through militia regimes specific to individual colonies but through the primary fount of firepower, the imperial metropole. To a greater degree than in previous inter-imperial conflicts, the Seven Years' War came to turn on events in North America. British war planners needed to recruit tens of thousands of colonists but found that most of them were either unwilling or unable to muster into service with an appropriate firearm. Consequently, Britain shipped more than 66,000 guns to the colonies between 1756-1763.[80] That sudden infusion of firepower might have represented a fifty percent increase in the number of guns available in British North America. While thousands of these arms remained in colonial storehouses or crown arsenals after 1763, the majority apparently stayed with the colonists who mustered out of service.[81]

Contra the myth of continuity, in summary, gun culture in the late colonial era was profoundly different from American gun culture in the

---

[78] *Id.* at 328–29.

[79] *Id.* at 334–35.

[80] De Witt Bailey, the main expert on the topic, found that the British Ordnance Department sent colonial authorities in British North America 10,000 muskets in 1756 and another 12,000 in 1758. During the war, merchants operating under government license shipped another 7610 firearms to colonial governments, and 36,592 "for the planters" – that is, for private buyers. Presumably most of these buyers were likewise motivated by the war. Bailey's figures exclude weapons shipped for the Indian trade. *See* Bailey, *supra* note 75, at 119–24, 236–38.

[81] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

twenty-first century. This historic gun culture was utilitarian, rather than consumerist; state-led, rather than state-phobic; and collective, rather than individualist. By building contemporary Second Amendment jurisprudence around the totem of armed private self-defense, the Supreme Court has projected twenty-first century anxieties and preoccupations onto the late eighteenth century. The public, its lawmakers, and its courts are left to navigate the consequences. That makes it even more urgent that we pay close attention to those arenas of firearms policy where gun rights activists want to take the myth of continuity now.

## II. Early America's Missing Repeating Firearms

The myth of continuity has been richly elaborated in regulatory battles over repeating firearms. Over the past generation, localities, states, and the federal government have passed laws restricting legal access to detachable magazines beyond a certain size (usually ten or fifteen rounds), as well as "assault weapon" laws prohibiting specific types of firearms. The two kinds of laws often go together and are closely related, insofar as most state restrictions define assault weapons partly through reference to ammunition capacity.[82]

In response to these regulatory efforts, gun-rights advocates David B. Kopel and Clayton Cramer developed a detailed narrative about the antiquity of repeating weapons. They offered an early iteration in 1995, in a co-authored *Temple Law Review* article.[83] In the years since, Kopel in particular has reiterated and elaborated on it in more public-facing venues,[84] as well as other law review articles[85] and in amici curiae briefs in state courts,[86] circuit courts,[87] and the U.S. Supreme Court.[88] The continuity

---

[82] *See e.g.*, Cal. Penal Code § 30515(a)(2)

[83] David B. Kopel, Clayton E. Cramer, and Scott G. Hattrup, *A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts: Emerging Issues in State Constitutional Law*, 68 Temp. L. Rev. 1177, 1197–1204 (1995).

[84] *See e.g.*, David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Washington Post: Volokh Conspiracy Blog (May 29, 2014), *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.

[85] The most complete and sophisticated version of the argument—frequently cited in current litigation—is David B. Kopel, *The History of Firearms Magazines and Magazine Prohibitions*, 88 Alb. L. Rev. 849 (2015). *See also* Cramer & Olson, *supra* note 23, at 716–22.

[86] *See, e.g.*, Brief of Cato Institute, Firearms Policy Coalition, Firearms Policy Foundation, and Independence Institute as Amici Curiae, Vermont v. Misch, 2021 VT 10, No. 172-2-19, *available at* https://www.davekopel.org/Briefs/States/2019-266-Cato-

Electronic copy available at: https://ssrn.com/abstract=4546050

22          *The Myth of Continuity in American Gun Culture*

narrative that he has done more than anyone to develop is now the basic historical framework used by most plaintiffs and expert witnesses trying to overturn restrictions on high-capacity magazines and assault weapons.

Part of the reason that this narrative has enjoyed so much success is that most of its specific fact claims are correct. It is indeed the case that repeat fire is an old idea in gun-making. Inventive gunsmiths began trying to design reliable, effective firearms capable of shooting multiple rounds without reloading as early as the sixteenth century. Evidence for their efforts can be found in personal and public archives, in patent records, and occasionally in actual weapons preserved in museums and private collections today.

What pushes this continuity narrative into myth is not so much its constituent fact claims as the misleading conclusions that it derives from them. In fact, early repeating weapons were flawed, experimental curiosities prior to the founding of the United States. They were both dangerous (to the shooter) and highly unusual. Most of these weapons never advanced beyond proof of concept. Only a small minority of repeating firearm inventions ever moved past the design or prototype stage, and none achieved commercial significance or military relevance prior to 1791. This centuries-long history of inventive failure has a context, one essential to evaluating arguments about the historic regulation of firearms—or lack thereof.

### A. The Elusive Quest for Reliable Repeating Firearms Prior to the Nineteenth Century

Europeans began engaging with gunpowder and its potential military applications in the thirteenth century.[89]  By then, European states had long been in competition with one another for military and economic advantage.

---

Amicus.pdf. (last visited July 31, 2023).

[87] *See, e.g.*, Brief of S.P. Fjestad and The Center for Constitutional Jurisprudence as Amici Curiae, Shew, et al. v. Malloy, et al., 994 F. Supp. 2d 234 (D. Conn. 2014), *available at* https://www.davekopel.org/Briefs/Shew-History-Brief.pdf. (last visited July 31, 2023).

[88] *See, e.g.*, Brief of Cato Institute, National Sheriffs' Association, Second Amendment Foundation, and Independence Institute as Amici Curiae, Kolbe v. Hogan, No. 17-127 (petition for writ of certiorari in respect of Koble v. Hogan, 849 F.3d 114 (2017), *available at* https://www.cato.org/sites/cato.org/files/wp-content/uploads/kolbe_cert-stage.pdf. (last visited July 31, 2023).

[89] For an insightful account of the emergence of gunpowder technologies in China and their transmission to Europe, see KENNETH WARREN CHASE, FIREARMS: A GLOBAL HISTORY TO 1700 (2003).

Electronic copy available at: https://ssrn.com/abstract=4546050

As the design and efficacy of artillery, bombs, and handheld firearms improved, and as these improvements forced leaders to reconsider venerable military traditions, states began spending more and more on their militaries. Intensifying competition between sovereigns created powerful incentives for craftspeople and inventors to improve on existing military technology.[90]

Sovereign competition fueled innovation.  Three of the most important innovations in the seventeenth and eighteenth centuries were: (a) gradual improvements in gunpowder corning, a process that made powder burn more evenly and enabled producers to better modulate its power; (b) the substitution of the cumbersome matchlock ignition system for the more reliable flintlock system in the late seventeenth century; and (c) the development of the socket bayonet (also in the late seventeenth century), which, for the first time, enabled infantry to act both as musketeers and pikemen.[91]   All three advances had significant consequences for the development and use of firearms around the world.   Still, most improvements to firearms technology were incremental during the Renaissance and early modern era.  Meaningful breakthroughs were very rare.

Repeat fire was probably the most coveted but elusive of the gun-making world's aspirations. Safe and reliable increased rate of fire would have been an invaluable force multiplier for militaries. States would have paid handsomely to acquire such a comparative advantage, and that prospect helped incentivize centuries of experimentation.  Four basic solutions had come into view as early as the sixteenth century. Each attracted generations of talented gunsmiths, and each had distinct virtues and limitations.

The first solution, the so-called superposed load or stacked charge method, fired multiple rounds loaded into a single barrel. This was probably the earliest method for achieving repeat fire, and it appeared in two basic versions. One functioned like a roman candle.[92] The other also employed a barrel loaded with multiple rounds but allowed the shooter more control over the pace of firing. This was achieved either with multiple locks or a sliding lock that would enable the user to fire the load in two or more

---

[90] Geoffrey Parker, The Military Revolution: Military Innovation and the Rise of the West, 1500-1800 (2d ed. 1996).

[91] These and other developments are lucidly described in Bert S. Hall, Weapons and Warfare in Renaissance Europe: Gunpowder, Technology, and Tactics (1997).

[92] The earliest examples probably date to the late 1300s. See D.R. Baxter, Superimposed Load Firearms, 1360-1860 1-8 (1966). For discussion of some particularly ingenious superposed load designs, see M. L. Brown, Firearms in Colonial America: The Impact on History and Technology: 1492-1792 104–6 (1980).

Electronic copy available at: https://ssrn.com/abstract=4546050

24          *The Myth of Continuity in American Gun Culture*

different bursts.[93]

A second solution achieved repeat fire with a revolving breech – usually some type of bored cylinder on an axis at the rear of the barrel. One innovative design along these lines emerged in Germany in the early sixteenth century.[94]   A third approach employed multiple barrels.  A seventeenth-century Scot built a gun with a single, fixed breech and fifty barrels arrayed around an axis, for instance.[95]   Finally, a fourth design incorporated an internal magazine housing enough powder and (sometimes) balls for multiple shots.  Most such arms employed a rotating breechblock to cycle a single powder charge and (sometimes) a single ball into the chamber, before closing the chamber for firing.[96]

Master gunsmiths made exquisite varieties of repeating arms from the sixteenth through the eighteenth centuries, at high cost.  Designs with rotating breeches or multiple barrels seldom exceeded a ten-round capacity, but early magazine or superposed firearms could.  Regardless of type, gunmakers often decorated multi-fire weapons lavishly, and sold or gifted them to a tiny stratum of elite consumers across Europe.[97] But most of these weapons remained gorgeous curiosities, usually more suited to admire than to shoot.  Writing about early magazine arms, W. W. Greener, one of the nineteenth century's preeminent authorities on firearms, remarked that "the peculiar complication of the various mechanisms, and the general inutility of the weapons themselves, render a detailed description of little value to the inventor or the general reader; but the connoisseur will find several varieties in the Paris Museum."[98] Prized more than used, early repeating firearms survive at far, far higher rates than do the era's ordinary, single-shot firearms that did actual work in the world.  While produced in very small quantities annually, therefore, they accumulated over the centuries of production so that today the world's museums and collectors possess many

---

[93] WINANT, *supra* note 18, at 166-93.

[94] BROWN, *supra* note 92, at 50.

[95] *Id*. at 100.

[96] Of early magazine repeaters, a respected authority says "as all were basically impractical and many quite hazardous to use they were produced in extremely limited quantities and hence all are considered great collector's prizes." NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 691 (9th ed. 2007).

[97] For example, the seventeenth-century English diarist Samuel Pepys saw and was impressed by a magazine arm in 1663. This weapon belonged to Sir Edward Montagu, the Earl of Sandwich, one of the most prominent men in England at the time. He used the gun to impress friends and clients, like Pepys. See Pepys' diary entry for Friday, March 4, 1663/64, *available at* https://www.pepysdiary.com/diary/1664/03/#fn1-1664-03-04  (last visited July 31, 2023).

[98] W. W. GREENER, THE GUN AND ITS DEVELOPMENT 81 (9th ed. 1910).

Electronic copy available at: https://ssrn.com/abstract=4546050

intriguing specimens.[99]

Most rotating breech mechanisms were complex and exceedingly difficult to make well prior to the mid-nineteenth century when moving parts could be built with machine precision. Long-guns festooned with several barrels were too heavy and cumbersome to be practical handheld weapons. Early magazine guns demanded an even higher level of craftsmanship in order to create a perfect seal between the rotating breechblock and the stored powder, lest the combustion in the chamber ignite the magazine. The best, like those made by the Florentine Michele Lorenzoni in the late seventeenth and early eighteenth centuries, minimized these dangers through slow, precise craftsmanship.[100] But early magazine guns could be perilous even in the hands of expert gunmakers. Lorenzoni's countryman, the famed gunmaker Bartolomeo Girardoni, reportedly lost his left hand in a magazine explosion.[101]

As for muskets with superposed loads, they were mechanically simpler than the alternatives. But roman-candle style bursts of fire had limited utility on the battlefield and no utility off it. Worse, like all but the best-made magazine arms, superposed load systems were notoriously perilous to the shooter on account of having so much explosive gunpowder packed into a single firearm. If the sequencing between rounds was off, the barrel could explode like a tubular grenade in the shooter's hands. That is why one expert on these curious weapons declared that "the dread of misfires was reason enough for the lack of sustained enthusiasm for any of the superposed load guns.[102]

Notwithstanding often brilliant work, no repeating firearm design functioned well enough to become militarily and commercially significant before the nineteenth century. These ideas were simply too far ahead of their times. As Greener explained, "the advantages of the repeating principle thus appear to have been observed at an early date, and the inventive genius of the gun-maker would have been equal to producing weapons of the desired type if only the skill and tools of the workman had allowed of a perfect mechanically fitting joint being obtained."[103]

To illustrate the point, consider the gun patented by English lawyer James Puckle in 1718. The Puckle Gun has become a fixture in the myth of

---

[99] For example, see the engraved, walnut, steel, and silver repeating flintlock pistol signed by gunmaker Michele Lorenzoni now in the Metropolitan Museum in New York City. *Repeating Flintlock Pistol*, METMUSEUM.ORG, https://www.metmuseum.org/art/collection/search/788263 (last visited July 31, 2023).

[100] BROWN, *supra* note 92, at 144-45.

[101] For Girardoni's accident, see ELDON G. WOLFF, AIR GUNS 27 (1968).

[102] WINANT, *supra* note 18, at 178.

[103] GREENER, *supra* note 98, at 80.

Electronic copy available at: https://ssrn.com/abstract=4546050

26          *The Myth of Continuity in American Gun Culture*

continuity, invoked frequently in contemporary challenges to assault weapons bans and magazine restrictions.[104] But on closer inspection it exemplifies both just how strange and flawed most examples of early modern repeat-fire weapons really were. Elaborating on what by the early eighteenth century were established rotating breech designs, Puckle devised a clever multi-fire, flintlock ignition gun.  It consisted of a long barrel mounted to a tripod, and a set of removable, rotating breeches.[105]  These breeches had different purposes.   One was designed for shooting "grenadoes," by which Puckle apparently meant shrapnel; one fired standard round balls; and one fired shots cast in the shape of ice-cubes.[106] Puckle intended the balls to be used on Christians, and the cubes to be used against Muslim Turks.[107]  Needless to say, this was a design that privileged mystical   sectarian   posturing   over   battlefield   effectiveness   (and aerodynamism).

The bulky gun required at least two men to carry and position, making it more like light artillery than a handheld firearm.[108] Sometimes misleadingly billed as an early machine-gun, Puckle's exotic firearm was not self-loading – the user had to reposition the breech with a hand crank and then tighten it in-between each round.[109]   Compared to actual machine guns, it had a glacial rate of fire.   Once it had discharged its seven cube-loads, for example, the breech had to be removed; each chamber had to be re-loaded with powder, wadding, and shot; the breech had to be carefully re-attached to the gun; and the touchhole of each chamber had to be re-primed as it came into position prior to each shot. Under serene conditions, a practiced operator would theoretically have been able to fire all seven cube-shots in a chamber in under a minute. But given that an average soldier fired two or three shots a minute from a smoothbore musket, the Puckle Gun hardly represented a sea-change in firearms technology.[110]

---

[104] *See, e.g.*, Duncan v. Becerra, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted, opinion vacated,* 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom.* Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022).

[105] CHARLES FFOULKES, ARMS AND ARMAMENT: AN HISTORICAL SURVEY OF THE WEAPONS OF THE BRITISH ARMY 83 (1945).

[106] *Id*. at 84.

[107] *Id*.

[108] *Id*. at 85.

[109] *Id*. at 83–84.

[110] For average rate of musket fire, see HEW STRACHEN, EUROPEAN ARMIES AND THE CONDUCT OF WAR 17 (1983). Players of the popular video game *Assassins Creed: Rogue* have been introduced to a Puckle Gun more wondrous than even its inventor imagined. *See, e.g.*, MrDiggity, *AC® Rogue Remastered: These Puckle Guns are SLIGHTLY*

Electronic copy available at: https://ssrn.com/abstract=4546050

Even that modest assessment assumes that it worked.  Charles Ffoulkes, the researcher who re-discovered the Puckle Gun in 1936, had his doubts. Like all rotating breech designs made before the Industrial Revolution, the breech of the Puckle Gun could not be fully gas-proof.  In fact, Ffoulkes found the design even more faulty than others with rotating breeches, because the closeness of the chambers heightened the risk of a chain-fire (one charge prematurely igniting the others).[111]  The British military seems to have shared Ffoulkes' skepticism.  The inventor formed a company to raise investment around his gun, but it never got off the ground.  Fear not, my friends, this terrible machine," quipped one wry contemporary, "they're only wounded who have shares therein."[112]

To be fair to James Puckle, the fundamental material and technological hurdles were beyond anyone's solving in the eighteenth century.  To be durable, reliable, affordable, and safe enough to achieve popularity, the experimental designs required metallurgical techniques and a level of machine precision unknown until well into the nineteenth century.  Not until the advent of these and other breakthroughs (including the adoption of percussion-cap ignition in the 1830s and metallic cartridges in the 1850s) could repeating firearms become practical weapons of mass production, widespread military adoption, and commercial viability.[113]

Neither hustling arms inventors looking to make a fortune nor military and political leaders hunting for battlefield advantage knew that, of course. Hope sprung eternal, on both sides.  That is why numerous historic designs for repeating firearms exist, despite the technical and material limitations that prevented any of them from achieving commercial or military relevance.

## B.  Repeating Arms in the Colonies and Early United States

Advances in repeating firearm technology arose in Europe prior to the nineteenth century, and few of these rare weapons left Europe.  Very occasionally, however, repeating firearms appear in the documentary record of early America. Two English gunsmiths, trained in the rarified tradition of

---

*Overpowered     for     Boarding*, YOUTUBE     (June     29,     2020), https://www.youtube.com/watch?v=PyMFowUics8.

[111] FFOULKES, *supra* note 105, at 83-84.

[112] W. Y. CARMAN, A HISTORY OF FIREARMS: FROM EARLIEST TIMES TO 1914 80 (1955); Winant, *supra* note 18, AT 221.

[113] For a summary of the basic technological hurdles and how they were finally overcome in the nineteenth century, see JOSEPH BRADLEY, GUNS FOR THE TSAR: AMERICAN TECHNOLOGY AND THE SMALL ARMS INDUSTRY IN NINETEENTH-CENTURY RUSSIA 12–19 (1990).

Electronic copy available at: https://ssrn.com/abstract=4546050

making repeating firearms, emigrated to Boston in the early eighteenth century. One seems to have brought a magazine firearm with him to Massachusetts and, decades later, advertised it for sale in old age.[114] The other made a repeating firearm, probably a superposed load design, that Boston's authorities demonstrated to impress Indigenous dignitaries in the early 1720s.[115] A 1736 estate sale in South Carolina included "a six times repeating Gun."[116]

Gun rights activists have been particularly keen to find examples from the founding era, in hopes of substantiating their oft-repeated claim that "firearms capable of firing multiple rounds without reloading were well known to the founding generation."[117] The two examples that they most frequently invoke are a repeater associated with Joseph Belton and a Girardoni air rifle.[118] Put into proper context, these two guns make it clear that the founding generation could only have thought of repeating firearms as flawed curios.

Philadelphian Joseph Belton saw an opportunity for military contracts

---

[114] David S. Weaver & Brian Godwin, *"John Cookson, Gunmaker,"* 19:1 ARMS & ARMOUR 43 (January 2, 2022). Cookson's advertisement appeared in the *Boston Gazette*, April 12, 1756.

[115] For John Pim's London roots, see BROWN, *supra* note 92, at 255, 257. Brown also describes an ingenious .52 caliber snaphaunce revolver inscribed with Pim's name. At least one other expert doubts the authenticity of that inscription. See Baxter, *supra* note 92, at 153. Baxter also thinks Pim is the same person that, as a boy named "Pym," was apprenticed to a London gunmaker in 1679 (at 153).

[116] Kevin Sweeney, "In Search of Repeating Firearms in Eighteenth Century America," *Second Thoughts Blog*, July 26, 2023, https://firearmslaw.duke.edu/2023/07/in-search-of-repeating-firearms-in-eighteenth-century-america

[117] Amended Complaint of July 1, 2022 (Dkt.# 42), Sullivat et al., v. Ferguson, No. 3:22-cv-05403-DGE (W.D. Wash. Oct. 18, 2022), available at https://storage.courtlistener.com/recap/gov.uscourts.wawd.310742/gov.uscourts.wawd.310742.42.0.pdf.

[118] A brief search on Westlaw brings back two judicial opinions and twelve briefs, mostly from amici curiae, that reference the Belton rifle as an example of a functional repeating firearm. *See, e.g.*, Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey, 974 F.3d 237, 255 (3d Cir. 2020*), cert. granted, judgment vacated sub nom.* Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck, 213 L. Ed. 2d 1108, 142 S. Ct. 2894 (2022); Brief of Second Amendment Foundation and Millennial Policy Center as Amici Curiae, Rocky Mountain Gun Owners v. Hickenlooper, 2018 WL 11269710 (Colo.), at 20. A similar search on Westlaw brings back three judicial opinions and thirty-five briefs, mostly from amici curiae, that reference the Girardoni (sometimes spelled "Girandoni") air rifle as an example of a functional repeating firearm. *See, e.g.*, Duncan v. Bonta, 19 F.4th 1087 (9th Cir. 2021), cert. granted, judgment vacated, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), and vacated and remanded, 49 F.4th 1228 (9th Cir. 2022); Brief of National African American Gun Association, Inc. as Amicus Curiae, Worman v. Healey, 2018 WL 7049897 (U.S.), at 11 n. 8.

Electronic copy available at: https://ssrn.com/abstract=4546050

with the outbreak of the American Revolution.  In 1775 he pitched an idea for a submersible with cannons that he claimed would sink British ships. Benjamin Franklin recommended Belton and his submersible idea to George Washington, but still the proposal went nowhere.[119]   In 1777, Belton tried another approach.  He informed the Continental Congress that he had "discover'd an improvement, in the use of Small Armes… which I have kept as yet a secret."  Surviving correspondence makes it clear that Belton was pitching a superposed load design. Intrigued, Congress placed an order for 100 of these "new improved" guns.  Congress cancelled the order a few days after extending it, however, and refused to ever reconsider notwithstanding Belton's increasingly desperate appeals.[120]

Congress's failure to adopt Belton's weapon is an obvious problem for those arguing that the weapon represented a meaningful breakthrough in firearms technology. Why would insurgents risking their lives and fortunes scorn a major advance in weaponry? Proponents of the myth of continuity attempt to get around this problem by explaining that Belton was charging prices "which the Continental Congress could not afford."[121] It is true that Belton requested £1000 from each state, a significant sum at the time (though hastily reduced to £500 the moment Congress balked).[122]  But the Continental Congress issued about £44.5 *million* in currency during the Revolutionary War.[123]  It clearly had the wherewithal to hire Belton if it had

---

[119] *See* Letter from Benjamin Franklin to Silas Deane (Aug. 27, 1775), and editors' footnote No. 2, *available at* https://founders.archives.gov/?q=joseph%20belton&s=1111311111%20&sa=&r=1&sr= (last visited Jan. 25, 2023); Letter from Benjamin Franklin to George Washington (July 22, 1776), and editors' footnote No. 1, *available at* https://founders. archives.gov/?q=joseph%20belton&s=1111311111&sa=&r=3&sr= (last visited Jan. 27, 2023); Letter from George Washington to Benjamin Franklin (July 30, 1776), *available at* https://founders.archives.gov/?q=joseph%20belton&s=1111311111&sa=&r=4&sr=    (last visited Jan. 27, 2023).

[120] The relevant correspondence has been digitized and transcribed on Wikisource. *Correspondence between John Belton and the Continental Congress (1777)*, WIKISOURCE.ORG, *available at* https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited Jan. 27, 2023).

[121] *See, e.g.*, David B. Kopel & Joseph Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS __, 38 (forthcoming 2024).

[122] *See* Letter from Joseph Belton to Congress (May 7, 1777), *available at* https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited Feb. 4, 2023). When Congress refused, Belton cut his price in half, to no avail. *See* Letter from Joseph Belton to John Hancock (May 8, 1777), *available at* https://en.wikisource.org/wiki/Correspondence_between_John_Belton_and_the_Continental_Congress (last visited Feb. 4, 2023).

[123] For wartime currency, see Stephen Mihm, *Funding the Revolution: Monetary and*

Electronic copy available at: https://ssrn.com/abstract=4546050

30       *The Myth of Continuity in American Gun Culture*

wanted to. Congress could and would have paid his price *if* it believed he and his guns would deliver a meaningful military advantage. That delegates evidently did not believe this tells us much about the quality of the arms on offer.

Given the technical challenges afflicting repeat-fire gunpowder weapons, it is little wonder that one of the only repeating weapons from the period that enjoyed even limited, experimental military use in a European army was not a true firearm, but rather an airgun. As with other categories of repeaters, airguns had been produced since at least the sixteenth century and probably earlier.[124] While most airguns were single-shot weapons, using highly compressed air as the propellant, rather than gunpowder, eliminated many of the problems that had long bedeviled the quest for repeating arms.[125] It was a relatively simple enhancement to attach a fixed tubular magazine to the side or underside of the airgun's barrel, and to feed balls into the chamber (using gravity, by tipping the barrel up), one-by-one with a lever. The shooter could then fire as many rounds as the magazine would hold before needing to reload the fixed magazine. Depending on the size and pressure of the compressed air reservoir, the shooter might be able to empty the magazine more than once before needing to refill the propellant. Air-rifles had numerous advantages over gunpowder weapons. In addition to the ease with which they were configured for multi-fire, they required no gunpowder (not always easy to obtain), and the absence of gunpowder meant that their bores required little cleaning and that shots produced no smoke and little noise.[126]

The most impressive airgun of the period was developed in Vienna by one-handed Bartolomeo Girardoni, shortly after the American Revolution. Following his gruesome accident working with magazine firearms, he decided he had enough of gunpowder weapons and transitioned to airguns. Girardoni made improvements to existing designs, most especially an elegant breechblock mechanism for chambering balls from the attached magazine.[127] Multi-shot air-rifles of his design saw limited service in the

---

*Fiscal Policy in Eighteenth-Century America*, *in* THE OXFORD HANDBOOK OF THE AMERICAN REVOLUTION 334 (Jane Kamensky & Edward G. Gray eds., 2013). MEASURINGWORTH.COM provides conversion estimates to historical currencies, but not before 1791. The £44.5 million figure is its average estimate of $200 million converted to British sterling as of 1791. *See* https://www.measuringworth.com/calculators/exchange/ (last visited July 10, 2023).

[124] WOLFF, *supra* note 101, at 4–13.
[125] *Id.* at 27–28.
[126] *Id.* at 25–30.
[127] For background on his air rifle, see the essay by Robert D. Beeman, *New Evidence on the Lewis and Clark Air Rifle – an "Assault Rifle" of 1803.*, BEEMANS.NET,

Electronic copy available at: https://ssrn.com/abstract=4546050

Austrian military between the 1790s and 1810s, a special corps of hundreds of snipers being equipped with the weapon.[128]

Nonetheless, airguns had major drawbacks that consigned them to the status of military oddities and niche consumer items, notwithstanding their significant advantages. Period technology made it difficult to achieve air pressures commensurate with black powder, so power was one concern. As an article in the *Sportsman's Cyclopedia* from 1831 put it, "for buck or deer shooting the best air gun is not sufficiently powerful; for rook shooting it is very well calculated."[129]  The weapons were time-consuming and onerous to prime. Girardoni's air-rifles had to be pumped fifteen-hundred times to fully pressurize one reservoir.[130]  Cannisters of pressurized air can explode, much like early gunpowder magazines, producing grenade-like effects.[131] The craft and expense involved in building reliable airguns greatly exceeded even the considerable skill required to build fine firearms.  Air-tight reservoirs, pumps, valve housings and valve seats had to be made with a degree of precision unknown in most manufactured goods from the era. These material and technical demands greatly increased costs.[132]  According to one of the few book-length studies of historic airguns, the high cost of these arms and their various limitations made them "a novelty used by people of wealth who had sufficient funds to go in for the unusual."[133]

For all these reasons, airguns were exceedingly rare in eighteenth-century America.  Indeed, they were so rare that owners could charge people to see them.  Two months after the Second Amendment was ratified, a museum proprietor in New York named Gardiner Baker took out ads in the city's newspapers to promote his latest acquisition: "an air gun, made by a young man, a native of Rhode-Island."[134]  According to its new owner, the gun would "do execution twenty times, without renewing the charge," suggesting that it was a single-shot weapon capable of firing twenty individually loaded rounds before needing to renew the compressed air supply.   Baker explained that he had purchased the gun "at a very

---

https://www.beemans.net/lewis-assault-rifle.htm (last visited July 31, 2023).

[128] WOLFF, *supra* note 101, at 22, 29–30.

[129] Cited in *Id.* at 22.

[130]  Austrian military snipers reportedly traveled with numerous pressurized air reservoirs, to speed recharging. *Id.* at 29–30.

[131] *Id.* at 31–32.

[132] *Id.* at 30–32.

[133]*Id.* at 31.  *See also* John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.COM (Mar. 15, 2011),  https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[134]  *To the Curious*, THE WEEKLY MUSEUM (Feb. 11, 1792) (article on file with the author).

Electronic copy available at: https://ssrn.com/abstract=4546050

considerable price, with a view eventually to make it the property of the American museum."  To recoup his investment, he announced that he would "exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence."[135]

Meriwether Lewis brought what seems to have been a Girardoni Air Rifle on his famous expedition across the continent with William Clark for a similar purpose.[136]  The Corps of Discovery seems never to have fired the gun offensively or defensively.  None of the more than twenty references to the air-rifle in the expedition's journals involve combat.[137]  Instead, like virtually every other repeating firearm from that period, this unusual weapon was a showpiece.  Lewis brought the air-rifle on the expedition precisely because it was so uncommon.  He hoped a gun that fired multiple times without powder, flash, smoke, or much noise would impress Native People.  It did.  He happily reported that it "excited great astonishment," which is itself a testament to the weapon's novelty.[138]

But Indigenous people were not the only ones fascinated with this exotic airgun.  At the very outset of the expedition near Pittsburgh, "some gentlemen" asked for a demonstration.  Lewis obliged, firing the airgun seven times.  But when one of the men took hold of the weapon, he accidentally squeezed off an eighth shot that hit a woman forty yards away, in the head.  To his great relief, Lewis found the woman's "wound by no means mortal, or even dangerous."[139]  That the gun's eighth round inflicted only a minor flesh wound at forty yards suggests it lost pressure rapidly.[140]

Airguns remained rare curiosities elsewhere in the U.S. in the early nineteenth century.  Just a few months before Lewis and Clark set out, the museum in Connecticut's State House advertised an airgun as one of its three prime attractions (the others being a wampum cloak and a sixteen-foot-long snakeskin from South America).[141]  In no sense were these weapons commonly used at the time, in crime, warfare, self-defense, or

---

[135] *Id.*

[136] For a discussion of the air gun and the expedition, see JIM GARRY, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 91–103 (2012).

[137] The journals are searchable online at HTTPS://LEWISANDCLARKJOURNALS.UNL.EDU/

[138] Journal Entry by Meriwether Lewis on April 18, 1806, JOURNALS OF THE LEWIS & CLARK EXPEDITION, https://lewisandclarkjournals.unl.edu/item/lc.jrn.1806-04-18#lc.jrn.1806-04-18.01 (last visited Feb. 4, 2023).

[139] Journal Entry by Meriwether Lewis on August 30, 1803, JOURNALS OF THE LEWIS & CLARK EXPEDITION, https://lewisandclarkjournals.unl.edu/item/lc.mult.1803-08-30kloefkorn (last visited Feb. 4, 2023).

[140] *Id.*

[141] See, for example, James Steward's advertisement for the attraction. *Museum*, THE CONNECTICUT COURANT (Apr. 27, 1803) (advertisement on file with the author).

Electronic copy available at: https://ssrn.com/abstract=4546050

anything else.

In sum, notwithstanding the great desire of states for military advantage, the great incentives that they held out for inventors who could deliver it, and the centuries of skillful effort that went into chasing those incentives, repeating firearms remained militarily and commercially irrelevant throughout the eighteenth and early nineteenth centuries. On those very rare occasions when such weapons were deployed by European militaries, they were issued to dozens or (in the case of the Girardoni rifle) hundreds of men in wars involving hundreds of thousands or even millions of combatants. Commercially, the best (and most expensive) examples of repeating firearms circulated among a paper-thin slice of Europe's political and economic elite. For almost everyone else at the time, these guns were unknown and irrelevant.

In fifteen years studying the international arms trade in the Age of Revolutions (1763-1825), I have never come across any evidence in primary sources that repeating firearms were anything other than exotic curios in this era. Few alive at the time had ever laid eyes on one. Single-shot muzzle-loading smoothbore muskets, rifles, and pistols remained the only handheld firearms that the vast majority of people ever owned, used, or encountered in the late-eighteenth and early-nineteenth centuries. That fact ought to be borne in mind when assessing the absence of laws regulating repeating firearms and ammunition capacity at the time of the Second Amendment's adoption.

## C. Why Did the Founders Not Regulate Repeating Firearms or Ammunition Capacity?

We have an incomplete understanding of the history of firearm regulation in the United States. Electronically searchable compendia of historic laws have only captured part of our legal tradition. They are particularly lacking when it comes to local ordinances, where (as today) much regulation and enforcement originated.[142] Still, even the incomplete record reveals a rich regulatory tradition in pursuit of public safety – safety as authorities at the time defined it.

Lawmakers in British North America and in the early United States passed hundreds of laws that directly or indirectly regulated firearms prior to 1791. Sometimes these concerns look familiar to our own times. For instance, states passed laws regulating the carrying[143] or brandishing[144] of

---

[142] Blocher & Ruben, *supra* note 29, at 158.

[143] *See, e.g.*, An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786), *available at* https://firearmslaw.duke.edu/laws/1786-va-laws-33-ch-21-an-act-

Electronic copy available at: https://ssrn.com/abstract=4546050

particular weapons; forbidding discharge in sensitive times[145] and places;[146] and sentence enhancements for crimes committed with arms.[147] Regulations of all these types were enacted in the decade before the ratification of the Second Amendment, and they reflect public safety concerns familiar to twenty-first century Americans.

But, as explained above, the technological limitations of muzzle-loading flintlock firearms meant that regulating gun violence between subjects (or, after independence, citizens) was not remotely as significant a policy concern in the late-eighteenth century as it is today. Instead, most of the era's firearms-relevant legislation addressed public safety concerns that are thankfully alien to our own times. The hundreds of militia laws on the books directly or indirectly follow from the imperatives of slavery, settler colonialism, and inter-imperial competition. White authorities also passed numerous laws aimed at controlling the access that Indigenous and enslaved people had to arms and ammunition.[148]

Courts have painful decisions to make about these discriminatory laws.[149] They are manifestly bigoted and hateful, and there is something not

---

forbidding-and-punishing-affrays/ (last visited June 1, 2023).

[144] *See, e.g.*, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), *available at* https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/ (last visited June 1, 2023).

[145] *See, e.g.*, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, 1784–1785 N.Y. Laws 152 (1785), *available at* https://firearmslaw.duke.edu/laws/1784-1785-n-y-laws-152-an-act-to-prevent-firing-of-guns-and-other-firearms-within-this-state-on-certain-days-therein-mentioned-ch-81/ (last visited June 1, 2023).

[146] See the 1788 Ohio Law 42, "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4, 1788–1801 Ohio Laws 42 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-42-an-act-for-suppressing-and-prohibiting-every-species-of-gaming-for-money-or-other-property-and-for-making-void-all-contracts-and-payments-made-in-furtherance-thereof-ch-13/ (last visited June 1, 2023).

[147] *See, e.g.*, the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-20-a-law-respecting-crimes-and-punishments-ch-6/ (last visited June 1, 2023).

[148] The Repository of Historic Gun Laws at the Duke Center for Firearms Law has an incomplete sampling of such "race and slavery based laws": *Search Results: Race and Slavery Based*, DUKE CTR. FOR FIREARMS LAW, https://firearmslaw.duke.edu/repository/search-results/?_sft_subjects=race-and-slavery-based (last visited June 1, 2023).

[149] The dilemma is sensitively described, with examples of differing solutions, in Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 STAN. L. REV. ONLINE (Aug., 2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

just objectionable but degrading about giving them any form of deference today. One option, then, is to simply exclude them from consideration of our nation's tradition of firearms regulation.[150] As a historian of early America, though, that strikes me as folly. Racism and white supremacy are too marbled through our history, too fundamental to explaining it, for courts to indulge the notion that we can ignore law touched by bigotry and hope to have anything coherent left afterward. Historic legislation did not target Black and Native people because gun regulation was racist. Legislation targeted Black and Native people because early American society was racist. We can be clear-eyed about the reprehensible aspects of our past generally, and the discriminatory intent of many historic firearm regulations specifically, without ignoring them. *Bruen*'s demand that authorities defending firearms laws identify historic analogues would make it even more impoverishing to cordon off swaths of an already incomplete legal record - hence the longstanding enthusiasm of gun-rights activists for this approach.[151]

Instead, we should scrutinize the whole of the known legal record for insights into how the founding generation would have understood the scope of their regulatory authority. Judge Amy Coney Barrett, before her appointment to the Supreme Court, employed just this sort of analysis when considering historic race-based gun laws during a 2019 gun-case before the 7th Circuit. While acknowledging that such laws would of course be unconstitutional today, Barrett abstracted from them the more general and historically undeniable principle that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety."[152]

---

[150] *Id.*

[151] Gun-rights advocates have long argued that the racist character of much early American gun law disqualifies it from relevance in contemporary legal battles. *See e.g.*, Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995); David Kopel & Joseph Greenlee, *The Racist Origin of Gun Control Laws*, THE HILL (Aug. 22, 2017), https://thehill.com/blogs/pundits-blog/civil-rights/347324-the-racist-origin-of-gun-control-laws/. For an illuminating consideration of the history of race-specific gun law and how it has been instrumentalized by gun-rights activists, see Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV. 1343 (2022).

[152] See Judge Coney-Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019). For thoughtful analysis of this point, see Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting 'Dangerous' Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY 131-48 (Joseph Blocher, Jacob D. Charles, & Darrell A. H. Miller eds., 2023); Charles, *supra* note 149, at 5. On June 2, 2023, an all-Republican appointed panel for the Eighth Circuit adopted this approach to reject a Second Amendment challenge to the felon-

Electronic copy available at: https://ssrn.com/abstract=4546050

Crucially, founding-era legislatures clearly believed that this authority extended to disarming white people, too. English precedents for the disarming of Catholics, insurgents, "disaffected persons," and others judged "dangerous to the peace of the kingdom" shaped practice in the colonies.[153] Seventeenth-century Massachusetts disarmed religious dissidents, for example. Maryland, Virginia, and Pennsylvania all passed laws to disarm Catholics during the Seven Years' War.[154]

The scope of the state's perceived authority to disarm came into sharp focus in the early years of the American Revolution. Patriot committees began disarming white political opponents as early as the fall of 1775. Events in the colony of New York illustrate the pattern. Patriots in Brookhaven, New York, resolved in September 1775 to disarm anyone who dared "deny the authority of the Continental or of this Congress, or the Committee of Safety, or the Committees of the respective Counties, Cities, Towns, Manors, Precincts, or Districts in this Colony."[155] At this point in the rebellion many residents of New York were either loyalists or vainly hoping to remain neutral in the spiraling conflict with Britain, so such disarmament orders theoretically applied to a vast population. In January 1776, the Continental Congress ordered several hundred-armed minutemen into Queen's County in New York to disarm loyalists.[156] George Washington ordered General Charles Lee to disarm everyone in Long Island "whose conduct, and declarations have render'd them justly suspected of Designs unfriendly to the Views of Congress."[157] General Philip Schuyler disarmed "malignants" in the Hudson Valley, mostly Scotch Highlanders loyal to the king. In March of 1776, Congress concluded that nearly the entire population of Staten Island consisted of "avowed Foes" and ordered a general disarmament there.[158]

Disarmament was not confined to New York. Frustrated at the results of more targeted efforts, the Continental Congress called for a general ban of gun ownership among loyalists on March 14, 1776. It recommended to all the individual colonies that they immediately "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected

---

in-possession law. *See* United States v. Edell Jackson, No. 22-2870 (8th Cir. 2023).

[153] Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* 20, WYOMING L. REV., 257-61 (2020).

[154] *Id.* at 263–64.

[155] Thomas Verenna, *Disarming the Disaffected*, JOURNAL OF THE AMERICAN REVOLUTION (Aug. 26, 2014), https://allthingsliberty.com/2014/08/disarming-the-disaffected/.

[156] *Id.*

[157] *Id.*

[158] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies."[159]  In addition to New York, Patriot leaders ordered loyalists disarmed in Connecticut[160], North Carolina[161], Delaware[162], Georgia,[163] New Hampshire[164], New Jersey[165], South Carolina[166], Pennsylvania[167], Massachusetts[168], Maryland[169], and Virginia.[170]

There were two primary motivations for the Founding Fathers and likeminded Americans to orchestrate a nationwide disarmament campaign against white political opponents.  First, loyalists could of course use their weapons to resist the insurgency and fight for the king.  Second, patriot forces were perilously under-armed and needed whatever guns they could find.  This is the reason that George Washington argued for a broad confiscation program in at least one Pennsylvania county, targeting not only

---

[159] *See* Congressional Resolutions of Tuesday, Jan. 2, 1776, *in* UNITED STATES CONTINENTAL CONGRESS, JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, EDITED FROM THE ORIGINAL RECORDS IN THE LIBRARY OF CONGRESS, VOL. 4 205 (Worthington Chauncey Ford ed., 1904).

[160] *An Act for restraining and punishing Persons who are inimical to the Liberties of this and the rest of the United Colonies, Connecticut Assembly, Dec. 14, 1775*, *in* AMERICAN ARCHIVES: CONSISTING OF A COLLECTION OF AUTHENTICK RECORDS, STATE PAPERS, DEBATES, AND LETTERS AND OTHER NOTICES OF PUBLICK AFFAIRS, FOURTH SERIES, VOL. 4 270–72 (M. St. Claire Clarke & Peter Force eds., 1837) [hereinafter AMERICAN ARCHIVES].

[161] *Extract of a Letter from the Provincial Council of North Carolina, March 5, 1776*, *in* AMERICAN ARCHIVES, VOL. 5, *supra* note 160, at 59, 67.

[162] "General Orders for the Delaware State," *in* DELAWARE ARCHIVES: REVOLUTIONARY WAR IN THREE VOLUMES, VOL 3, at 1049 (1919). See also resolutions for Thursday, July 3, 1777, in UNITED STATES CONTINENTAL CONGRESS, *supra* note 159, VOL. 8, 529-30.

[163] "Special meeting of the Council of Safety," Jan 18, 1776, in ALLEN DANIEL CANDLER, ED., THE REVOLUTIONARY RECORDS OF THE STATE OF GEORGIA 101 (1908).

[164] OTIS GRANT HAMMOND, THE TORIES OF NEW HAMPSHIRE IN THE WAR OF THE REVOLUTION 19 (1917).

[165] *July 1, All persons who refuse to bear arms to be disarmed*, *in* AMERICAN ARCHIVES, VOL 6, *supra* note 160, at 1634.

[166] *South Carolina Congress, March 13, 1776*, *in* AMERICAN ARCHIVES, VOL 5, *supra* note 160, at 592.  South Carolina went further, ordering that if anyone previously disarmed shall arm himself again, that person would be incarcerated.

[167] *See Resolves of the Pennsylvania Assembly for April 6, 1776*, *in* AMERICAN ARCHIVES, VOL 5, *supra* note 160, at 714.

[168] *See Notes from the Massachusetts Council, May 1, 1776*, *in* AMERICAN ARCHIVES, VOL 5, *supra* note 160, at 1301.

[169] *See Notes from the Baltimore County Committee, March 8, 1776*, *in* AMERICAN ARCHIVES, VOL 5, *supra* note 160, at 1509.

[170] *Extracts from the Votes of the Assembly [VA], April 6, 1776*, *in* AMERICAN ARCHIVES, VOL 6, *supra* note 160, at 881.

Electronic copy available at: https://ssrn.com/abstract=4546050

38          *The Myth of Continuity in American Gun Culture*

those actively fighting for the crown, but also those "claimed the Right of remaining Neuter." Washington insisted that "we ought not to hesitate a Moment in taking their arms, which will be so much wanted in furnishing the new Levies."[171] There is a striking flexibility in these revolutionary-era disarmaments, in other words. They were undertaken preemptively, targeted not so much at people who had taken up arms against the newly cohering political authority but rather at people who might decide to do so in the future. And they could be undertaken both to preemptively disempower political opponents and out of a very practical imperative to arm insurgent forces.

Indeed, patriot forces were so desperate for guns early in the war that they sometimes took them from whites regardless of their political affiliation. In early 1776, Georgia dispatched men to search the homes of all "overseers and negroes" throughout the colony, and even those across the river in southern South Carolina, to seize all guns and ammunition they found, leaving behind only "one gun and thirteen cartridges for each overseer."[172]

From New Hampshire in the north to Georgia in the south, then, guns were taken away from white Americans in the name of public safety–public safety as the founding generation defined it. The emergency of the Revolution obviously made it easier for lawmakers to justify taking guns from white people, but the conviction that the state had regulatory authority to so neither began with the Revolution nor ended with it. In 1786, a tax uprising erupted in western Massachusetts. "Shay's Rebellion," as it came to be known, helped convince nationalists to convene the Constitutional Convention in 1787. That same year the uprising also moved the Massachusetts Assembly to pass a law disarming not only persons who take up arms against the state, but also those "who have given or may hereafter give them counsel, aid, comfort or support, voluntarily, with intent to encourage the opposition to the government.[173]

In sum, early America had a diverse, extensive, and sometimes deeply intrusive tradition of regulating firearms in the name of public safety. This tradition was often but certainly not always directed at racial outsiders. Why, then, do we find no period laws regulating repeating firearms or restricting the size of firearm magazines?

---

[171] George Washington to the Pennsylvania Council of Safety (Dec. 15, 1776), at https://founders.archives.gov/documents/Washington/03-07-02-0276

[172] Candler, *supra* note 163, at 92.

[173] *See* Massachusetts Act of Feb. 16, 1787, ch. VI, 1787 MASS. ACTS 555 (1787), *available at* https://firearmslaw.duke.edu/laws/act-of-feb-16-1787-ch-vi-1787-mass-acts-555/ (last visited June 1, 2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

Proponents of the myth of continuity would have us believe that this regulatory restraint emerged from ideology; that (a) the founding generation were intimately familiar with repeating firearms, including those capable of firing more than ten rounds without reloading, but (b) believed they lacked the regulatory authority to restrict them. Neither proposition is convincing. The founding generation could only have conceived of repeating arms as flawed curiosities. Like their counterparts today, lawmakers from early America focused their efforts on actual social phenomena, not the possible implications of experimental technologies. They did not spend their time scouring European publications for news about the cutting edge of firearms technology or hold lengthy debates about the social implications of weapons that few of them had ever seen, and that were not known to have ever been militarily or commercially consequential anywhere in the world.

Even if they had been aware that a Philadelphia gunmaker could fire twenty superimposed loads with a single pull of a trigger, in other words, or that a museum proprietor in New York was charging people to see a repeater that fired compressed air, lawmakers in the colonial and early national eras would have had no incentive to craft legislative solutions to these technologies for the simple reasons that these technologies had created no social problems. The simplest and most accurate explanation for the absence of regulation, therefore, is that repeating firearms were much too rare and too irrelevant to public safety to attract regulatory attention in 1791.

### D. Nineteenth-Century Breakthroughs in Repeating Firearms

Firearms technology would undergo huge changes after 1791. Advances in metallurgy, machine tooling, and mass-production associated with the Industrial Revolution enabled gifted firearms innovators and engineers to finally overcome many of the challenges that had frustrated the quest for reliable repeat fire in earlier centuries. New innovations built on one another, such that the nineteenth century became the most dynamic era in the history of firearms technology. Nonetheless, even this age of breakneck innovation had its limits. As I explain below, reliable hand-held arms with capacities greater than ten rounds remained exceedingly rare in the United States when the Fourteenth Amendment was ratified in 1868.

1. Repeat-Fire Pistols

Some American gunsmiths kept experimenting with superposed load

Electronic copy available at: https://ssrn.com/abstract=4546050

designs in the decades after the Second Amendment's ratification, to little effect.[174] But more lasting changes in firearms technology were underway. One of the most important was the development of the percussion-cap ignition system.  Around the turn of the century, European chemists developed a new class of highly explosive compounds, dubbed fulminates. Though the potential military applications of these compounds were tantalizing, early experiments demonstrated that they were much too powerful to be used in firearms or artillery as an alternative propellant to gunpowder.[175]  In 1805, Scotsman Alexander Forsyth had the insight that while fulminates could not yet be used for propulsion, in very small quantities they could be used for ignition.  Others soon improved on his idea.  By the 1810s, multiple inventors were developing "percussion caps"– small, sealed caps (usually made of copper) filled with fulminate.[176]  It was a simple matter to redesign gun locks so that instead of a vice holding a flint, hammers looked like actual hammers.  Rather than a pan filled with priming powder, the newly designed hammer would fall upon an iron nipple topped with a percussion cap.  The blow would ignite the fulminate, which would in turn ignite the main gunpowder charge inside the barrel. Percussion caps were inexpensive to mass produce, and far more reliable than flints as a source of ignition.  Over the next few decades, militaries around the world would convert their stockpiles of firearms from flintlocks to percussion locks.[177]

The advent of percussion cap ignition opened the way for reliable repeating pistols.  Relieved of cumbersome hammer-vices, flints, and priming pans filled with loose powder, arms designers saw a path to using the old ideas of multiple, rotating barrels or rotating breeches to make practical weapons for the first time.[178]  In decades prior, such designs would have still faced severe manufacturing obstacles to large-scale production because it was so difficult to make precision component parts by hand. But by the 1830s, Springfield Armory and some of its biggest contractors had become world-leaders the use of automatic milling machines to produce parts so uniform as to be interchangeable. This "American system of manufacture" as the rest of the world would soon call it, combined with other advances in metallurgy and machine tooling made it possible both to

---

[174] See Andrew Fagal, *The Promise of American Repeating Weapons, 1791-1821*, AGE OF REVOLUTIONS (Oct. 20, 2016), https://ageofrevolutions.com/2016/10/20/the-promise-of-american-repeating-weapons-1791-1821/.

[175] CARMAN, *supra* note 112, at 162, 176.

[176] *Id*. at 176–77.

[177] DANIEL R. HEADRICK, THE TOOLS OF EMPIRE: TECHNOLOGY AND EUROPEAN IMPERIALISM IN THE NINETEENTH CENTURY 85-87 (1981).

[178] HERBERT G. HOUZE, SAMUEL COLT: ARMS, ART, AND INVENTION 24 (2006)

Electronic copy available at: https://ssrn.com/abstract=4546050

build complex arms from nearly identical component parts, and to manufacture them at greater speed and less cost than ever before.[179]

By the 1830s, two types of repeating pistols were entering the market. The first type, skillfully refined and aggressively patented by the inventor Samuel Colt, featured a single barrel with a multi-chambered, rotating breech. Percussion caps were affixed to the rear of each chamber in the breech. The chamber rotated mechanically so that the cap affixed to successive chambers would assume position to receive the hammer's blow and ignite the powder inside each chamber.[180] The second type, most associated with gunmaker Ethan Allen, featured three or more barrels that rotated around an axis (either manually or mechanically), the charge for each barrel ignited by a separate percussion cap. Also referred to as "revolvers" early on, these arms eventually came to be known as "pepperboxes."[181]

Unlike repeat-fire curiosities in the eighteenth century, pepperboxes and revolvers provoked actual societal concerns. And these societal concerns generated legislation. Responding to rising public safety concerns over the increase in gun violence and the proliferation of concealable weapons (repeating pistols as well as single-shot, percussion-cap pistols, bowie knives, and other weapons), lawmakers across the country sought to regulate conceal-carry. Cornell, one of the nation's preeminent historians of gun law in early America, calls this "the first wave of modern-style American gun-control laws." More than thirty such laws were enacted around the country between the ratifications of the Second and Fourteenth Amendments.[182]

While recognizing the new firepower that repeat pistols made available to U.S. consumers, it is important to be mindful of two important limitations of pepperboxes and revolvers in this era. The first was capacity. Whether

---

[179] WILLIAM HARDY MCNEILL, THE PURSUIT OF POWER: TECHNOLOGY, ARMED FORCE, AND SOCIETY SINCE A.D. 1000 233-34 (1982). See also MERRITT ROE SMITH, HARPERS FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE 219-51(1977).

[180] HOUZE, *supra* note 178, at 37–53.

[181] For pepperboxes and revolvers, see LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST: 1803-1865 95–104, 139–52, 203–20 (1998).

[182] Saul Cornell, *Limits on Armed Travel under Anglo-American Law: Change and Continuity over the Constitutional Longue Durée, 1688-1868, in* A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATE ON THE SECOND AMENDMENT 79 (Jennifer Tucker, Barton C. Hacker, & Margaret Vining eds., 2019); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 59–60, 63–64 (2017). For the relevant laws, see Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century* (Jan. 15, 2013), at 20–24, *available at* https://ssrn.com/abstract=2200991 (last accessed July 21, 2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

the firearm had rotating chambers or rotating barrels, there were practical design limits to how many shots it could fire from a single loading. Gunmakers occasionally designed versions capable of firing more than ten rounds,[183] but these were extraordinarily unusual and made in tiny quantities. Guns with too many barrels or chambers became too heavy, clunky, and hard to manage. The vast majority of revolvers and pepperboxes produced in the nineteenth century held seven or fewer rounds. *Flayderman's Guide to Antique American Firearms and Their Values*, now in its 9th edition, is considered the gold standard reference for historic American firearms. That authoritative guide lists only three nineteenth-century revolvers with greater than ten-round capacity. All of them were made in quantities best characterized as "experimental"– probably fewer than three hundred, combined.[184]

The second important limitation from mid-nineteenth-century repeating pistols is that they took a very long time to load. To load a chamber of a cap-and-ball revolver, the shooter had to execute five distinct steps. First, fill each chamber with the appropriate measure of gunpowder; second, insert a ball; third, compact the ball into the powder charge with a ramming rod; fourth, cap the chamber with grease to avoid chain-fire (optional but highly recommended); and fifth, attach a percussion cap to each nipple at the back of the chamber. If the revolver had six chambers, it would therefore take thirty steps to fully load it. Pepperboxes had comparably laborious loading procedures. Paper cartridges containing powder and ball could be used to slightly expedite the process, but reloading could still easily take a minute and half to two minutes or more.[185]

These and other limitations of the day have been obscured by gun-rights advocates in recent cases. Consider some of the weapons that plaintiffs in one federal case invoke as examples of the wide variety of functioning, viable, large-capacity firearms supposedly available to U.S. consumers before 1868. In addition to the Jennings repeater discussed above, these include 24-shot pepperboxes, which as far as I know never existed (except

---

[183] For three examples, see Lewis Winant, Pepperbox Firearms 104, 124, 137 (1952).

[184] For example: (1) the Aaron C. Vaughn Double Barrel Revolver, made in the early 1860s and characterized as "one of the most rare and unusual of American percussion revolvers," held fourteen rounds, total production: twenty or fewer; (2) the John Walch Navy Model 12 Shot Revolver, made in 1859-1860, chambered twelve rounds (six chambers, each with a double load), total production: around 200; (3) the Charles E. Sneider two-cylinder revolver, made in the 1860s, held fourteen rounds (in two, seven-shot cylinders), "Quantity unknown; very limited. Extremely rare." FLAYDERMAN, *supra* note 96, at 374–75, 514.

[185] For a demonstration, see Blackie Thomas, *Loading the Percussion Revolver*, YOUTUBE (Feb. 26, 2016), https://www.youtube.com/watch?v=B84wI2MKZ2s.

Electronic copy available at: https://ssrn.com/abstract=4546050

perhaps as freakish showpieces); the Bennett and Haviland Rifle, one of the more unsafe firearms ever built (fewer than ten ever made; one recent profile characterizes the arm as being as "safe as juggling chainsaws"[186]); a 21-round Colt revolver, which as far as I can discover Colt never manufactured; the Walch 12-shot Navy revolver, of which only about 200 were ever made; a 15-round Hall Rifle, a revolving rifle made in experimental or showcase quantities and vanishingly rare today; "the 38-shot Porter Rifle," which was actually a *9*-shot firearm (the plaintiffs mistaking its caliber for its capacity) built around the unsafe (and, therefore, commercially doomed) turret chamber design and produced in the hundreds; the 42-shot Enoy "Ferris Wheel" pistol, a bizarre experiment, apparently never made beyond prototypes, that would have been far too heavy to hold and aim in one hand; and a 20-round belt-fed chain pistol, a patented design from 1855 that was as intriguing as it was impractical (imagine a bicycle chain hanging eight inches down from the barrel of a revolver).[187]  None of these weapons, real or imagined, did meaningful work in the world.

At mid-century, American consumers wanting reliable repeating weapons purchased cap-and-ball pepperboxes or revolvers that usually held between three and seven rounds. In terms of the damage that a single person could inflict with such a firearm (or two), however, limited shot capacity and lengthy reload times made these weapons very different from today's semi-automatic pistols with detachable, large-capacity magazines.  For comparison's sake, consider the handguns used by the mass-murderer in the Virginia Tech massacre on April 6, 2007. Using a Glock 19 and a Walther P22 and equipped with multiple magazines (of 15- and 10-round capacities, respectively) Seung-Hui Cho fired 174 shots in 9 minutes, killing 33 people and wounding 17 others before taking his own life.[188]  Would-be murderers in the mid-nineteenth century could hardly have conceived of that kind of killing power.

---

[186] John Paul Jarvis, *Bennett & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain [Video]*, GUNS.COM (Apr. 3, 2012), https://www.guns.com/news/2012/04/03/bennett-and-havilland-revolving-rifle.

[187] All examples are drawn from Eyre Plaintiffs' First Amended Complaint at 14-15, Oregon Firearms Federation et al. v. Tina Kotek et. al., 2:22-cv-01815-IM (D. Ore.), which relies on David Kopel, *Magazines over 10 Rounds Were Well-Known to the Founders*, REASON.COM (Feb. 11, 2020), https://reason.com/volokh/2020/02/11/magazines-over-10-rounds-were-well-known-to-the-founders/.

[188] *Background on Pistols Used in Virginia Tech Shooting*, VIOLENCE POL'Y CTR. (Apr. 2007), https://vpc.org/studies/vatechgunsbackgrounder.pdf.

Electronic copy available at: https://ssrn.com/abstract=4546050

44          *The Myth of Continuity in American Gun Culture*

2.   The Slow Spread of the First Viable "Large Capacity" Firearm

The technological and manufacturing advances that made repeat-fire pistols practical weapons for the first time also enabled new breakthroughs in long arms.  Innovations in breech-loading and metallic cartridges proved particularly important.  Loading a firearm muzzle-first had three main disadvantages.  It was hard to do while lying prone. Rising up to reload made one an easier target during combat.  Muzzle-loading had also made rifles impractical battlefield weapons because they took so long to load. This was because their lead balls had to be nearly as large as the diameter of the barrel bore if they were to engage the internal grooves (rifling) that gave the round its spin. Finally, muzzle-loading made repeat-fire difficult to achieve because the point of loading and exit were the same. Guns loaded at the breech solved all these problems.[189]

As with so many other innovative designs, breech-loading was a very old concept. But such weapons were exceedingly difficult to build well prior to the Industrial Revolution, mainly because it was so hard to make the breech accessible but also sufficiently sealable to contain explosive gases.  Solutions of varying quality arose to address this problem in the first half of the nineteenth century.  In the U.S. alone, inventors patented 135 breech-loading longarm designs between 1811-1860.[190]

Metallic cartridges represented another breakthrough.   Soldiers, especially, had used paper cartridges of powder and ball for generations. But such cartridges were notoriously delicate: liable to get wet and ruined, and far too fragile to use in any kind of ammunition-feeding device.  Once percussion caps came into common use, however, it took little imagination to envision a single, metal object that contained primer, powder, and ball all in one. By the 1850s, inventors began moving from concept to practical application. Within a decade, they realized that in addition to serving as a durable container for primer, powder, and ball, properly designed metallic cartridges could help overcome stubborn limitations with breech-loading, by completely sealing the breech when fired.[191]

Flawed but clever designs began to appear that combined attached or internal magazines, metallic cartridges, and mechanisms for the chambering of cartridges and ejection of spent cases.  This line of innovation culminated in 1860 with the world's first reliable firearm with a greater than ten-shot capacity – the most typical threshold in contemporary lawmaking for the designation "large capacity." It was developed by Oliver Winchester's New

---

[189] For the "breechloader revolution," see HEADRICK, *supra* note 177, at 96-104.
[190] ALEXANDER ROSE, AMERICAN RIFLE: A BIOGRAPHY 105 (2008).
[191] HEADRICK, *supra* note 177, at 98.

Electronic copy available at: https://ssrn.com/abstract=4546050

Haven Arms Company.[192]  The "Henry," named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading, lever-action rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen from an attached, tubular magazine).  Refinements to the Henry resulted in an even better gun: the Winchester Model 1866.[193]

Throughout the 1860s, none of the viable alternatives fired more than ten rounds.  Practically speaking, then, Henrys and Winchesters were the only large-capacity firearms in circulation in the years surrounding the ratification of the Fourteenth Amendment. That given, these weapons feature prominently in recent court cases. Numbers matter. Plaintiffs and their expert witnesses have been quick to argue that "magazines holding over 10 rounds were commonly possessed already in the 1860s, 130 years before attempts to strictly regulate them would come along."[194] It is true that Winchester lever-action rifles would enjoy tremendous commercial success in the late nineteenth century. Given the special importance of the 1868 to contemporary firearms litigation, however, the more relevant question is how many of these weapons were in civilian hands around the time the Fourteenth Amendment was ratified.

Company records reveal there were 74,000 Henrys and Winchester 1866s produced between 1861 and 1871.[195]  Notwithstanding the Winchester's ubiquity in Hollywood westerns and, consequently, our national imagination, the huge majority of these weapons were made to order for foreign armies and exported abroad.  The Ottoman Empire alone purchased 50,000 Model 1866s. Another 14,906 went to military purchasers in Europe, Latin America, and Japan during these years.[196]  Based on the Winchester's production figures, that would have left only 9,094 large-

---

[192] The Spencer Repeating Rifle, also introduced in 1860 and also destined for military and commercial success, was a seven-shot, lever-action rifle. *See generally* ROY M. MARCOT, SPENCER REPEATING FIREARMS (2002).

[193] HERBERT G. HOUZE, WINCHESTER REPEATING ARMS COMPANY: ITS HISTORY & DEVELOPMENT FROM 1865 TO 1981 42-46 (1994).

[194] Complaint for Declaratory and Injunctive Relief at 21–22, Harrel v. Raoul, Case No. 23-cv-141-SPM (S.D. Ill. Jan. 17, 2023) (citing Kopel, *supra* note 85, at 871).

[195] Specifically, there were approximately 11,000 Henrys from 1861 – March 1863; 3,000 rifles with King's improvements, but without company name, from April 1866 – March 1867, and 60,000 M1866s between 1866 – 1871.  *See* Letter from Tom Hall (longtime curator of the Winchester Collection) to D. C. Cronin, (May 18, 1951), Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[196] Export numbers are drawn from HOUZE, *supra* note 193, at 21 (500 to  Bavaria), 36 (1000 for the French forces in Mexico), 51 (1000 to Chile and 5000 to Japan), 59 (400 to the Swiss and 1000 to Juarez's forces in Mexico), 65 (1000 to Brazil), 71 (4406 to France and 20,000 to the Ottomans), 73 (600 to Peru), 75 (30,000 to the Ottomans).

Electronic copy available at: https://ssrn.com/abstract=4546050

46          *The Myth of Continuity in American Gun Culture*

capacity firearms for domestic consumption in the United States before 1872.  Of those, 8,500 were Henrys purchased by or issued to Union soldiers during the Civil War.[197]  These figures suggest (a) that large-capacity firearms went almost exclusively to military buyers through the early 1870s, and (b) that very few were in the hands of private persons that might have used them in ways that attracted regulatory attention.

The figures also tell us that even a few years after the ratification of the Fourteenth Amendment, large-capacity firearms constituted a tiny percentage of firearms in the United States. How tiny? Some numbers offer perspective.  In 1859, on the eve of the Civil War, the U.S. Ordnance Department counted 610,598 shoulder arms in federal arsenals.  Combined, the arsenals of individual states likely contained hundreds of thousands more.  Domestic producers made 2.5 to 3 million firearms for the Union during the war, while Union purchasing agents imported 1,165,000 European muskets and rifles.[198]  The Confederacy imported more than a quarter million firearms as well.[199]  The scale of private gun ownership is less clear, though the U.S. may have had the most heavily armed civilian population in the world after the Civil War.  If state arsenals possessed around five million firearms, we can conservatively estimate that the civilian population (more than 31 million at the time) owned at least as many again. With a very rough estimate of ten million firearms total in the U.S. during the early 1870s, then, fewer than one in a thousand would have been large capacity.

### E.  The Arrival and Regulation of Automatic and Semi-Automatic Firearms

Lever-action rifles with large capacity magazines came into common use in the United States in the generation after the Fourteenth Amendment was ratified. But even then, the firearms Americans owned were very different from the ones at the heart of our regulatory battles today.

### 1.  The Era of the Slow-load Large-capacity Firearm, 1870-1900

The late nineteenth century was an era of slow-load large-capacity

---

[197] For Henrys used in the Civil War, see PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 81 (2016).

[198] CARL L. DAVIS, ARMING THE UNION; SMALL ARMS IN THE CIVIL WAR 39, 64, 106 (1973).

[199] C.L. WEBSTER III, ENTREPÔT: GOVERNMENT IMPORTS INTO THE CONFEDERATE STATES 318–20 (2010). Webster notes total CSA imports could have reached half a million.

Electronic copy available at: https://ssrn.com/abstract=4546050

firearms. Winchester lever-action rifles and their large-capacity competitors in the last third of the nineteenth century had fixed magazines. Once a fixed magazine was empty, the shooter had to reload each round, one by one. As with Colt revolvers (which transitioned away from the laborious cap and ball system to faster-loading metallic cartridges in the 1870s, more than a decade after its competitor Smith & Wesson had done so), this round-by-round loading process put a ceiling on the damage a single shooter could inflict on a group of people. Notwithstanding the success of lever-action large-capacity firearms, that ceiling had not gotten dramatically higher since the 1830s. The magazines of most large-capacity rifles held somewhere between ten to fifteen rounds. A person armed with a pair of seven-shot revolvers could fire fourteen rounds without reloading. Except for the remarkable but expensive and short-lived Evans rifle, then, a shooter from the time with a repeating rifle had roughly the same capabilities as a shooter with two revolvers in his hands. There were trade-offs, of course. The repeating rifle often had somewhat more power and always had more range and accuracy. Pistols were concealable and easier to use in some circumstances. (Neither arm had the power, range, or accuracy of bolt-action, single-shot rifles that the U.S. and the strongest European militaries continued to favor.) [200]

In other words, the advent of Winchester repeaters and their competitors did not provoke fundamentally different social problems than those that had been accelerating in the U.S. since the proliferation of revolvers and pepperboxes earlier in the century. The changes were of degree, rather than kind. State and municipal lawmakers continued to regulate firearms in the name of public safety, as they had since the colonial era. The Duke Repository of Historical Gun Laws, an indispensable though incomplete compendium, contains 285 such regulations on carrying weapons enacted between 1865 and 1900.[201] By the turn of the century, the majority living in the nation's most populous urban areas – millions of Americans – were subject to one restrictive carry regime or another.[202] (More than 100 additional such laws would be enacted between 1900-1935.[203]) Rather than

---

[200] For the U.S. Military, see for example DAVID F. BUTLER, UNITED STATES FIREARMS: THE FIRST CENTURY, 1776-1875 152–93 (1971).

[201] https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, searching for the category "carrying weapons" between 1865-1900. Search performed Jan. 27, 2024.

[202] Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928*, 55 U.C. DAVIS L. REV. 2554, 2591–96, (2022).

[203] https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, searching for the category "carrying weapons" between 1900-1935. Search performed Jan. 27, 2024

Electronic copy available at: https://ssrn.com/abstract=4546050

48          *The Myth of Continuity in American Gun Culture*

target lever-action rifles, though, lawmakers in this regulatory era usually lumped them together with other kinds of firearms when crafting law. Rifles are invoked alongside other kinds of weapons in Montana's 1879 prohibition against dueling, for instance; in North Carolina's 1869 law against hunting on the Sabbath; in Florida's 1881 law criminalizing the sale of weapons to minors and to those with "unsound minds;" and in unlawful discharge laws in Texas (1871), Wyoming (1879), New Mexico (1886), and Rhode Island (1892).[204] Exciting new historical scholarship on nineteenth-century firearms regulation has made it increasingly clear that America has a robust tradition of regulating arms in the name of public safety.[205] But we have a great deal left to unearth about the regulatory response to increasing firearms lethality in the second half of the nineteenth century.

The era of slow-load large-capacity firearms was different from our own times. To appreciate how different, it is instructive to consider which arms among those commercially available before the twentieth century *would* have been subject to regulations currently before federal courts. It is not a long list. Most laws regulating "assault weapons" focus overwhelmingly on semi-automatic firearms, which, as I explain below, only began entering the market at the turn of the century.[206] As for today's limits on "large-capacity magazines," nearly all such laws contain an exception for "a tubular magazine that is contained in a lever-action firearm." Using *Flayderman's Guide* and excluding guns made in small quantities (fewer than 1000), I

---

[204] Frassetto, *supra* note 182, at 39 (Montana), 92 (North Carolina), 76 (Florida); 98 (Texas), 99 (Wyoming), 12 (New Mexico), 97 (Rhode Island).  For a nuanced examination of state and local firearm regulations in the second half of the nineteenth century, one attentive to regional difference and minority viewpoints, see PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 122–65 (2018).

[205] The historian Brennan Gardner Rivas is producing some of the nation's most exciting and important new scholarship on nineteenth-century firearms regulation. *See e.g.*, Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836–1900*, 121 SOUTHWESTERN HIST. Q 284 (2017); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study Symposium: The 2nd Amendment at the Supreme Court: '700 Years of History' and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2603 (2022); Brennan Gardner Rivas, *Perspective:| In the Past, Americans Confronted Gun Violence by Taking Action*, WASHINGTON POST (June 3, 2022), *available at* https://www.washingtonpost.com/outlook/2022/06/03/past-americans-confronted-gun-violence-by-taking-action/.

[206] Semi-automatic rifles and shotguns were not introduced into the market until the early twentieth century. Two successful semi-automatic pistols predate the turn of the century (the Borchardt C-93, introduced in 1893, and the Mauser C-96, introduced in 1896). But neither of these German-made guns seems to have been popular consumer items in the United States before the turn of the century).

Electronic copy available at: https://ssrn.com/abstract=4546050

cannot identify any firearm commercially available before the twentieth century that would definitely be subject to regulation under such ordinances.[207]

Slow-load large-capacity rifles seldom attracted particular regulation because, in an era when revolvers had already become so common, they did not represent a fundamental change in how a single armed individual could threaten public safety.  But automatic and semi-automatic weapons with detachable magazines, the world's first viable fast-load large-capacity firearms, did.

### 2.  The Era of the Fast-load Large-capacity Firearm

Lever-action or pump-action rifles require energy transferred from human muscle through an internal mechanism to eject a spent casing and chamber a new round.  The same is true of single-action revolvers, which require the shooter to pull back the hammer to rotate the chamber and position a new round for firing.  (Double-action revolvers transfer all this work to the trigger, which when squeezed both rotates the chamber and releases the hammer).  Automatic and semi-automatic firearms do not rely on human muscle.  Instead, their great innovation is to enlist some of the energy released by the first round to eject the spent casing and chamber the next round.

Automatic firearms (which continue to fire so long as the trigger is depressed and ammunition lasts) and semi-automatic firearms (which fire a round with each squeeze of the trigger) first started coming on the market in the 1890s. In addition to advances in machine production, materials science, and precision parts, these revolutionary weapons incorporated three specific innovations.

The first was the invention of a reliable mechanism using springs and levers to capture the recoil energy of a fired round to chamber the next round.  That discovery belongs to Hiram Maxim, creator of the famous Maxim machine gun in 1884.[208]  Maxim aimed to improve upon the French mitrailleuse (1851), the U.S. Gatling gun (1862), and the Swiss Nordenfeldt (1873). Like the Puckle gun, their distant and ineffective precursor, these heavy, multi-barreled military weapons sat atop tripods or carriages and achieved rapid fire through hand-cranked ammunition feeding devices. The bulky Maxim gun also required at least two people to carry and position.

---

[207] The lever-action Evans Rifle could *arguably* have been subject to the magazine limitations, depending on whether authorities considered its large and unusual internal magazine a "tubular" device.

[208] CARMAN, *supra* note 112, at 82–88.

Electronic copy available at: https://ssrn.com/abstract=4546050

But unlike its competitors' mechanical feeding systems, the Maxim's method of using  recoil to chamber each new round was scalable and, therefore, would have huge consequences for smaller, handheld firearms.[209]

Smokeless powder was the second innovation.  When fired, black powder leaves residue behind that fouls barrels.  This was a manageable annoyance in the era before guns could fire several times a second.  With the astonishing rates of fire made possible through Maxim's invention – up to six hundred rounds a minute[210] – fouling could be so rapid as to render an automatic fire weapon inoperable.  Serendipity intervened to solve this problem.   In the mid-1880s, right when Maxim was making his breakthrough in harnessing recoil energy, researchers in France perfected a chemical propellant (based on nitrocellulose) that was three times as powerful as black powder, gave off very little smoke, and left behind almost no residue in the barrel.[211]  Smokeless powder meant that automatic fire would be a practical technology.

Third and finally, automatic- and semi-automatic firearms required a method of feeding cartridges into the weapon.  Maxim's machine gun used belts of bullets, stored in crates or boxes.  For semi-automatic firearms designed to fire one shot at a time, it would be far more practical to have a magazine.  One option was for the weapon to have a fixed magazine: an integral component of the weapon itself, as with the tubular magazines of most lever-action rifles.  Some of the earliest semi-automatic handguns would be designed around fixed box magazines – the Mauser C96, for example (a innovative if flawed German arm introduced in 1896).[212]

Once gunmakers began turning their attention to semi-automatic arms in earnest, however, they had another, more appealing option: detachable magazines.   Like self-loading mechanisms and smokeless powder, detachable magazines achieved their initial practical use in military arms during the 1880s. The first successful firearm with a detachable magazine had been developed by James Paris Lee, to be used with military bolt-action rifles.[213]  What made detachable magazines so advantageous is that they dramatically accelerated loading.  Rather than reloading a weapon bullet-by-bullet (as with lever-action rifles or revolvers), the shooter simply

---

[209] *Id.*

[210] JULIA KELLER, MR. GATLING'S TERRIBLE MARVEL: THE GUN THAT CHANGED EVERYTHING AND THE MISUNDERSTOOD GENUIS WHO INVENTED IT 222 (2008).

[211] For the development of smokeless powder, see René Amiable, *Scientific Reasoning and the Empirical Approach at the Time of the European Invention of Smokeless Powder*, *in* GUNPOWDER, EXPLOSIVES, AND THE STATE: A TECHNOLOGICAL HISTORY 343–54 (Brenda J. Buchanan ed., 2006).

[212] JOHN WALTER, HAND GUN STORY 196–98 (2008).

[213] ROSE, *supra* note 190, at 224-25.

Electronic copy available at: https://ssrn.com/abstract=4546050

ejected the spent magazine, inserted a full magazine, and resumed firing.[214]

By the early 1890s, then, gunmakers had at their disposal a trio of potent new design features that would become characteristic of most modern automatic and semi-automatic firearms – self-loading mechanisms, smokeless powder ammunition, and detachable magazines. The first pistol to successfully combine all three elements was the Borchardt C-93. Made in Germany in 1893, the Borchardt C-93 had a detachable, 8-round magazine.[215] Competitors were quick to enter the market. John Moses Browning, arguably the most inventive and important of all U.S. gunmakers, finished his first design for a semi-automatic pistol in 1895. Slow to grasp the huge importance of these new guns, Colt declined Browning's design because the firm did not think there would be a domestic market for it. Browning tinkered some more and sold the design to Belgium's Fabrique Nationale. FN produced the gun starting in 1900, with a 7-round detachable magazine, and would go on to sell more than 700,000 of them over the next decade.[216] Colt soon realized its mistake and revived its partnership with Browning, marketing better and better versions of his semi-automatic pistols starting in 1900. These culminated with the M1911, a handgun with a 7-round detachable magazine. The most copied and influential of all modern handguns, several million M1911s have been sold in the past century. Variations of the gun are still in production today.[217]

American firms also helped lead the way in the production of semi-automatic rifles. Winchester and Remington both had models out early in the century. As with the early semi-automatic handguns, some designs had fixed magazines and others had detachable magazines. Light, fully automatic guns (so-called "sub-machine guns"), migrated from the battlefield to the U.S. civilian market. The most notorious was the Thompson submachine gun, aka the "Tommy Gun," which entered the U.S. market in the 1920s. It was a select fire weapon, meaning it could be set either to automatic or semi-automatic fire. Tommy Guns had box magazines ranging from twenty to thirty rounds, and drum magazines as large as one hundred rounds. Its high price discouraged civilian sales. But this fast-load large-capacity firearm became much sought-after by criminals and law enforcement.[218]

---

[214] Greener compared the standard service arms of nineteen countries in 1910. Only four (Turkey, Switzerland, Great Britain, and Belgium) employed arms with detachable magazines. GREENER, *supra* note 98, at 736–37.

[215] WALTER, *supra* note 212, at 127–44.

[216] *Id.*, at 220–28.

[217] FLAYDERMAN, *supra* note 96, at 118.

[218] JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 149–77 (1975).

Electronic copy available at: https://ssrn.com/abstract=4546050

Because their detachable magazines enabled shooters to load and reload all at once, rather than round by round, the new fast-load firearms empowered individual shooters to inflict far more damage on more people than had been possible with earlier technologies. So, as they had with the proliferation of single-shot and multi-fire pistols in the nineteenth century, lawmakers responded to the novel threat to public safety with legislation. Between 1925 and 1933, at least twenty-eight states passed laws against fully automatic firearms.[219] In 1934, Congress passed the first significant federal firearm law in the nation's history, regulating fully automatic firearms along with several other kinds of weapons.[220]

Despite the great variety of models produced, prior to the 1930s surprisingly few of the new firearms came with magazines that held more than ten rounds. Gun-rights proponents have characteristically suggested otherwise in recent cases, by invoking facts shorn of context in order to conjure a false picture of continuity.

Consider claims made by Ashley Hlebinsky, senior fellow and co-founder of the new Firearms Research Center at the University of Wyoming, in a recent expert witness declaration for plaintiffs in an Oregon high-capacity magazine case.[221] Hlebinsky notes that the Mauser C-96 "came in configurations as high as twenty rounds,"[222] apparently referring to the variant Model 712, which could fire in semi- or fully-automatic modes, and could indeed accept a 20-round cartridge. What is left unsaid is that this arm was introduced in the early 1930s and that Mauser shipped the vast majority of them to China. Moreover, because the Model 712 had an automatic fire mode, if any found their way to the United States they would have been regulated under the National Firearms Act.[223] Hlebinsky observes that some Luger semi-automatic pistols "had the option of thirty-two round snail drum magazines."[224] It is true that some Artillery Model Lugers were issued with snail-drum magazines to German shock troops and non-commissioned-officers, but there is no evidence these were ever marketed

---

[219] Spitzer, *supra* note 182, at 67.

[220] ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL 139 (6th ed. 2015).

[221] Declaration of Ashley Hlebinsky, Oregon Firearms Federation et al. v. Tina Kotek et. al., 2:22-cv-01815-IM (D. Ore.).

[222] *Id.* at 28.

[223] See the profile of the Mauser Model 712 "Schnellfeuer" Machine Pistol on the NRA Museum's website, NRAMUSEUM.COM, https://www.nramuseum.org/guns/the-galleries/wwii,-korea,-vietnam-and-beyond-1940-to-present/case-37-wwii-the-axis,-germany-italy/mauser-model-712-schnellfeuer-machine-pistol.aspx (last visited July 31, 2023).

[224] Hlebinsky, *supra* note 221, at 28.

Electronic copy available at: https://ssrn.com/abstract=4546050

to U.S. consumers.[225] She writes that the Model 1903, Winchester's first semi-automatic rifle made for the public, "was also fixed with a lesser-known Sabo ninety-six round detachable magazine."[226] What she neglects to mention is that this exotic, complex magazine cost twice as much as the firearm to which it was affixed and was made in tiny quantities (an expert in these arms is aware of only four in existence, and writes that "it is easy to see why it is so rare and was essentially a commercial failure").[227] Hlebinsky writes that the Winchester 1907 had box magazines that went up to twenty rounds.[228] But according to a profile of this gun in the NRA magazine *The American Rifleman*, the 1907's "standard magazines held five rounds, but ten- and even fifteen-rounders were made for law enforcement and military work."[229]   She notes Winchester developed a select-fire rifle in 1917 mounted with two, twenty-round magazines.[230] That made for a very impressive forty-shot capacity. But the most important fact about this gun is only obliquely addressed in a footnote. Winchester only produced one (1) of these firearms, a prototype made in the (doomed) hope of securing a military contract.[231]

Perhaps partly because large-capacity magazines were so unusual at this time, lawmakers worried about the implications of semi-automatic weapons for public safety do not seem to have conceived of magazines as something they could productively regulate separately from the guns themselves.  And yet many clearly thought that the magazine capacity of these firearms was one of the things that made them so dangerous.  So those states that did act regulated the arms themselves, often addressing magazine capacity in the

---

[225] See the profile of the DWM Model 1914 Artillery Luger snail drum magazine on the NRA Museum's website, NRAMUSEUM.COM, https://www.nramuseum.com/guns/the-galleries/world-war-i-and-firearms-innovation/case-34-world-war-i-the-central-powers/dwm-model-1914-artillery-luger-snail-drum-magazine.aspx (last visited July 31, 2023).

[226] Hlebinsky, *supra* note 221, at 28.

[227] See essay accompanying a recent auction of one of these rare weapons, *Lot #709: © WinchesterModel 1903 .22 Semi Automatic Rifle with Rare Sabo Model B Magazine*, MORPHY                                                    AUCTIONS, https://auctions.morphyauctions.com/LotDetail.aspx?inventoryid=446518 (last visited July 31, 2023).

[228] Hlebinsky, *supra* note 221, at 28.

[229] Dave Campbell, *A Look Back at the Winchester Model 1907 Rifle*, AMERICAN RIFLEMAN (Dec. 19, 2017), https://www.americanrifleman.org/content/a-look-back-at-the-winchester-model-1907-rifle/.

[230] Hlebinsky, *supra* note 221, at 25.

[231] *See* Ian McCollum, *Burton 1917 Light Machine Rifle*, FORGOTTENWEAPONS.COM (July 4, 2016), https://www.forgottenweapons.com/burton-1917-light-machine-rifle/.

Electronic copy available at: https://ssrn.com/abstract=4546050

54          *The Myth of Continuity in American Gun Culture*

process.[232]

Of the seven states that passed laws explicitly restricting semi-automatic weapons during the 1920s and 1930s, five of them incorporated capacity ceilings.  Different states set different limits, presumably reflecting the different circumstances and views prevailing among their constituents.[233] For Ohio the limit was eighteen.  Michigan put it at sixteen.  Rhode Island set the limit at twelve.  Virginia's limit was seven.  South Dakota forbade guns "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."  In addition to the seven states with laws explicitly regulating semi-automatic firearms, three others – South Carolina, Louisiana, and Illinois – crafted laws that leave ambiguity as to whether they only applied to automatic firearms.  But all three chose the relatively low figure of eight rounds for their ceiling, something fully automatic weapons could spit out in a single second.  That strongly suggests that they, too, had decided to respond to the novel public safety implications of semi-automatic firearms by regulating them. In so doing, they acted consistently with American history, text, and tradition.[234]

In sum, contrary to the myth of continuity, firearms technology has undergone dramatic and consequential transformations since the founding era. These transformations led to waves of regulation. Safe, reliable, affordable repeat fire weapons, the elusive goal of centuries of innovative gunsmiths, only became available to consumers starting in the 1830s with the advent of revolvers and pepperboxes. The profusion of affordable pistols (repeaters as well as single shots) fueled anxieties about crime which, in turn, led to dangerous weapons legislation across the country. Viable firearms capable of firing more than ten rounds without reloading only started making serious inroads into the U.S. consumer market after the ratification of the Fourteenth Amendment. Like revolvers and pepperboxes, these were slow-load repeating firearms. Shooters endured lengthy, vulnerable pauses while reloading round by round. It was not until the early twentieth century that fast-load repeat fire weapons became common in the U.S. market. Equipped with automatic or semi-automatic firearms with detached magazines, shooters could fire and reload much faster than ever before. This momentous rupture in firearms technology generated new anxieties over public safety and provoked new kinds of regulatory responses across the nation.

To use the language of *Bruen*'s framework, the United States has

---

[232] Spitzer, *supra* note 182, at 68–71.
[233] Data in this paragraph drawn from Table 2 in *id*. at 70–71.
[234] *Id*.

Electronic copy available at: https://ssrn.com/abstract=4546050

witnessed multiple "dramatic technological changes" in firearms, changes that have generated "unprecedented societal concerns" and led to waves of regulatory responses.[235] Technological changes provoking social concerns that lead to public safety legislation. That is the nation's tradition of firearms regulation.

## III. The Novelty of Ghost Guns in American Life

Major arms manufacturers began stamping serial numbers on firearms as early as the mid-nineteenth century. Finding industry serialization useful in investigating crime, states began incorporating these numbers into firearms law in the early twentieth century. The federal government first required serial numbers in 1958,[236] and these rules were elaborated in the landmark 1968 Gun Control Act. Still in force today, the GCA requires producers and importers of firearms to obtain Federal Firearms Licenses, and to stamp serial numbers and other markings on their guns' frames or receivers (the "primary structural component of a firearm to which fire control is attached").[237] Finished frames or receivers are treated as firearms by the GCA, and subject to this same requirement. In the years since, these regulations have become essential tools for federal, state, and local authorities investigating gun crime.[238]

The GCA contained an exemption for hobbyists who made their own firearms for personal use. Some began purchasing partially finished steel frames and receivers, which, unlike the fully finished versions, are not legally regarded as firearms or required to bear serial numbers. Most such consumers had to employ a machinist or gunsmith to finish these parts before they could be used to assemble a working firearm.[239] Over the past fifteen years or so, however, advances in polymers, small-batch parts manufacturing, compact control milling devices, and, most recently, 3D-printing and computer-aided design (CAD) files have helped firearms entrepreneurs turn the GCA's hobbyist exception into a dynamic sub-industry. Their products enable unskilled buyers to easily assemble their

---

[235] *Id.*

[236] Interstate Traffic in Firearms and Ammunition, 26 CFR 79.

[237] Codified as 18 U.S.C.§§ 921–934. For the A.T.F. definition, see https://www.federalregister.gov/documents/2021/05/21/2021-10058/definition-of-frame-or-receiver-and-identification-of-firearms (last visited July 30, 2023). On pistols this component is called a frame, and on semi-automatic rifles it is called a receiver.

[238] William J. Krouse, *Privately Made Firearms: A Growing Source of Unmarked, Untraceable 'Ghost Guns'?* Congressional Research Service Report IF11810, April 8, 2021.

[239] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

56          *The Myth of Continuity in American Gun Culture*

own guns without professional assistance and often without specialized tools.[240]

Fully functional semi-automatic pistols and rifles can now be rapidly assembled at home with kits purchased online or in stores. For instance, 80% Arms, a prominent online vendor, offers an array of unfinished frames and receivers. They sell kits that include the other parts necessary to assemble a working firearm (none of which are regulated by the GCA, so they can be sold finished). The kit for a GST-9 pistol (modeled after a Glock-19) also comes with an Allen wrench, two drill bits, a cutting tool, and a one-page, color-coded instruction sheet.[241] Customers simply place the unfinished frame in a jig that guides them as they drill three holes on each side of the polymer frame, remove four small tabs with cutting pliers, and grind out one final piece of the frame with the cutting tool.[242] They now have a finished frame, and can quickly assemble the rest of the components with the help of an array of online instructional videos.[243]

In most of the country, consumers can buy gun kits like these without passing a background check, meeting minimum age requirements, or enduring waiting periods, and then, with no specialized experience or unusual tools, quickly assemble a reliable, un-serialized firearm. Such "ghost-guns" have provoked concerns over trafficking[244] and extremist violence,[245] and alarm over the ease with which teenagers are purchasing them.[246] They are also increasingly prominent in gun crime, which presents significant challenges to law enforcement precisely because they are so difficult to trace. The number of "privately made firearms" submitted for tracing to the bureau of Alcohol, Tobacco, and Firearms increased by more

---

[240] *Id.*

[241] *GST-9: 80% Pistol Build Kit*, https://www.80percentarms.com/products/gst-9-80-pistol-build-kit/ (last visited July 31, 2023).

[242] *GST-9: 80% Lower Pistol Kit: Jig Instructions*, https://www.80percentarms.com/content/GST9%20MANUAL%20FINAL%20V2.pdf (last visited July 31, 2023).

[243] *See, e.g., Home of the GST-9 MOD1 and Everything 80%*, Odysee.com, https://odysee.com/@80PercentArms:0 (last accessed July 31, 2023).

[244] See for example, the Drug Enforcement Administration's press release *Ghost Gun and Narcotics Trafficking Ring Shut Down in NYC*, DEA.GOV (Mar. 15, 2023), https://www.dea.gov/press-releases/2023/03/15/ghost-gun-and-narcotics-trafficking-ring-shut-down-nyc.

[245] Alain Stephens, *The Feds Are Increasingly Worried about Extremists Acquiring Ghost Guns, Leaked Report Shows*, THE TRACE (Aug. 6, 2021), https://www.thetrace.org/2021/08/ghost-gun-government-report-3d-print-extremism-terrorism/.

[246] Tom Jackman & Emily Davies, *Teens Buying 'Ghost Guns' Online, with Deadly Consequences*, THE WASH. POST (July 12, 2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

than 1000% between 2017 and 2021.[247] In late 2021, the *New York Times* reported that they accounted for a quarter to half of all guns recovered at crime scenes in Los Angeles, San Diego, Oakland, and San Francisco.[248]

In response to these unprecedented societal concerns, as of July 2023 twelve states and the District of Columbia have enacted legislation to regulate the sale and manufacture of ghost guns.[249] These regulations differ in detail, but none prohibit arms assembled from the kits described above. Instead, they all insist that federal serial numbers be affixed to component parts and most require purchasers to pass background checks when buying component parts.[250]

Opponents of these efforts to hold ghost guns to some of the same regulatory standards as professionally made guns are employing the myth of continuity to challenge the laws in court. Joseph Greenlee, a lawyer and gun-rights activist with the Heartland Institute and the Firearms Policy Coalition, elaborated the thesis in a 2023 article in the *Saint Mary's Law Journal*.[251] As its title suggests, "The American Tradition of Self-Made Arms" argues that today's printers and assemblers of ghost guns are part of a venerable national tradition of "at-home arms production," one that stretches back into the colonial era.[252] Hlebinksy made similar claims before a Congressional committee on ghost guns in 2021.[253] The argument, in brief, is that (1) private citizens have been making their own arms since the founding era; (2) the founders did nothing about it; (3) therefore we can do

---

[247] U.S. Dept. of Justice, National Firearms in Commerce and Trafficking Assessment, Vol. Two: Crime Guns; Part III: Crime Guns Recovered and Traced within the United States and its Territories 5 (2022), *available at* https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-iii-crime-guns-recovered-and-traced-us/download.

[248] Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, NY Times (Nov. 14, 2021), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

[249] The states are California, Illinois, Colorado, Hawaii, Nevada, Delaware, Maryland, Connecticut, New Jersey, New York, Washington, Oregon, and Rhode Island. Virginia and Massachusetts have regulations against plastic guns undetectable by metal detectors. *Which States Regulate Ghost Guns?*, Everytown for Gun Safety, https://everytownresearch.org/rankings/law/ghost-guns-regulated/ (last visited Jan. 28, 2024).

[250] *Id.* Delaware, Hawaii, New Jersey, Oregon, and Rhode Island also prohibit 3D-printed firearms.

[251] Greenlee, *supra* note 22.

[252] *Id.* at 14.

[253] Testimony of Ashley Hlebinsky, United States Senate, Subcommittee on the Constitution, Committee on the Judiciary, Stop Gun Violence: Ghost Guns, May 11, 2021, https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf.

Electronic copy available at: https://ssrn.com/abstract=4546050

nothing about it, either. Sound familiar?

This iteration of the myth of continuity is already finding its way into legal challenges.[254] For example, Defense Distributed, a Texas-based nonprofit that helped pioneer 3D-printed guns and describes itself as the "first private defense contractor in service of the general public,"[255] recently challenged California's regulation of privately made arms. The organization's complaint cites Greenlee to argue that "the unregulated self-manufacture of firearms was common in the American colonies;"[256] that during the Revolution, "Americans manufactured their own arms and gunpowder to survive,"[257] and that the widespread tradition of gun-making "extended to pioneers, mountain men, and explorers whose need to make and repair firearms was a necessity to survive."[258]

How accurate are these claims? Are ghost guns really consistent with American tradition?

### A. *Glock, Ikea-Style*

Much like the continuity argument devised for battles over assault weapons and high-capacity magazines (from which it clearly takes inspiration), the American-tradition-of-self-made-arms-narrative tactically collapses categories and obscures historical context. Before turning to history, some categorical clarity is necessary.

The self-made-arms-narrative deploys three kinds of categorical confusion to conjure a tradition out of the historical record. First, to expand the terrain within which useful historical analogues might be located, it defines "arms-making" to include an implausibly huge range of activities. Pursuits as dissimilar as manufacturing high-quality firearms from scratch, performing minor repairs, and even filling paper cartridges with a measure of gunpowder and a lead ball all constitute "arms-making" according to this analysis.[259]

Second, the narrative conflates amateurs with professionals. No one doubts that there has long been an arms industry in the United States, or that

---

[254] See for example Greenlee's expert declaration in Roger Palmer et al., v. Stephen Sisolak et al., No. 3:21-cv-00268 (D. Nev.).

[255] *See* Defense Distributed's website: *About*, DEFENSE DISTRIBUTED, https://defdist.org/ (last visited June 16, 2023).

[256] *See* Complaint for Declaratory and Injunctive Relief at 6, Defense Distributed et al., v. Rob Bonta et al., No. 2:22-cv-06200-CAS-AGR (C.D. Cal.).

[257] *Id.* at 7.

[258] *Id.* at 8.

[259] For the equation of cartridge-making with "the convenience of at-home arms production," see Greenlee, *supra* note 22, at 50.

Electronic copy available at: https://ssrn.com/abstract=4546050

the industry has long employed professionals with specialized skills in firearms production. Ghost gun kits are not aimed at professionals. They are explicitly designed for and marketed to amateurs. On its website, for instance, 80% Arms assures customers that its AR-15 and .308 jigs make it "ridiculously easy for a non-machinist to finish their 80% lower in under one hour with no drill press required."[260] The relevant historical issue, then, concerns *amateur* arms production. Gun-rights advocates could not substantiate a longstanding tradition of "amateur-made arms," however. Hence the sleight-of-hand made possible by the phrase "self-made," which is roomy and abstract enough for them to link today's consumers of ghost-gun kits with Samuel Colt, Benjamin Tyler Henry, John Browning, and others of the nation's most accomplished professional gunsmiths.[261]

Finally, the self-*made*-arms narrative mischaracterizes what it is that consumers are actually doing with ghost-gun kits and 3D-printers. They are not making guns, but rather *assembling* them. Here gun-rights activists owe a debt to the federal government and its unfortunate adoption of the label "privately made firearm" (PMF) for the category to which guns from kits and printers belong.[262] The distinction between making and assembling bears upon the constitutional question at stake in these cases. The conceit that consumers are using kits to "make" arms is critical to the argument that these amateurs belong to a "long and storied tradition in America," as the president for the National Association of Gun Rights recently put it.[263] But what if consumers are merely availing themselves of a novel product that enables amateurs to "assemble" arms? Consider a familiar comparison. Several years ago, I purchased a dining table and a set of chairs from Ikea. Everything came disassembled and packed in boxes, along with an Allen wrench, a few other tools, and a one-page instruction sheet. It took me a few hours to assemble the pieces. My table and chairs have held up well. But no one I have had over for dinner in the years since considers me a "furniture maker." There is a proud tradition of furniture making in this country stretching back into the colonial era. No one seriously thinks I am part of that tradition.

The operative question, then, is whether there is a venerable American tradition of amateurs assembling firearms? The answer is no. Explaining

---

[260] See the tab "Ridiculously Easy" on https://www.80percentarms.com/ (last visited July 30, 2023).

[261] Greenlee, *supra* note 22, at 72-74. The overwhelming majority of examples Greenlee offers in his article concern professional gun-makers.

[262] *See What is a Privately Made Firearm (PMF)?*, ATF.gov, https://www.atf.gov/rules-and-regulations/qa/what-privately-made-firearm-pmf (last visited July 31, 2023).

[263] Quoted in Jackman & Davies, *supra* note 246.

Electronic copy available at: https://ssrn.com/abstract=4546050

why requires an examination of how firearms were built before the nineteenth century; where they were built, by whom, and why; and the nature of firearms production in early America.

### B. Europe's Early-Modern Dominance of Global Arms Production

Europeans manufactured and distributed the vast majority of the eighteenth-century world's firearms. While gunpowder and gunpowder weapons originated in China, Europe became the global center of firearm innovation starting in the late seventeenth century. As European gun-making became more sophisticated, specialized, and efficient, most of the rest of the world chose to import guns than try and compete through domestic manufacturing. While quality arms production persisted in the Ottoman Empire, China, and some polities of South and Southeast Asia, it often involved European advisors and usually supplemented rather than replaced imports from Europe.[264] The dominance of western European manufacturers meant that they were the ones equipping Europe's huge armies, navies, coast guards, sheriffs, and militias; supplying the continent's domestic firearms markets; arming its vast merchant marine and the huge trading companies that extracted so much wealth from the rest of the world; outfitting European allies and mercenaries in wartime; and shipping hundreds of thousands of inexpensive guns annually to Africa by mid-century, as fuel for the inferno of the Atlantic slave trade.[265]

Europeans gunmakers were also responsible for all but a tiny percentage of the firearm that anyone ever laid eyes on in the colonial Americas. To understand why so few of early America's guns were made by American gunsmiths, let alone by nonexperts, we have to understand how firearms worked and how they were manufactured.

### 1. How Muskets Worked

Firearms were the most technologically complex objects most

---

[264] As Peter Lorge puts it, Asia "became part of the European arms trading system" starting in the sixteenth century. PETER A. LORGE, THE ASIAN MILITARY REVOLUTION: FROM GUNPOWDER TO THE BOMB 17, 89–90 (2008). For production in South Asia, see PRIYA SATIA, EMPIRE OF GUNS: THE VIOLENT MAKING OF THE INDUSTRIAL REVOLUTION 176–80, 285–99 (2019); EMRYS CHEW, ARMING THE PERIPHERY: THE ARMS TRADE IN THE INDIAN OCEAN DURING THE AGE OF GLOBAL EMPIRE 28–36 (2012).

[265] For a sweeping overview of the history of arms making and power, see MCNEILL, *supra* note 179. For Africa, see J.E. Inikori, *The Import of Firearms into West Africa 1750-1807: A Quantitative Analysis*, 18 J. AFR. HIST. 339, 343–49 (1977).

Electronic copy available at: https://ssrn.com/abstract=4546050

*The Myth of Continuity in American Gun Culture*          61

people ever encountered in the eighteenth century. With a primed, loaded, and cocked musket pressed against the shoulder, a simple squeeze of the index finger unleashed a kind of magic. That squeeze initiated a series of movements inside the lock mechanism. The pulled trigger rotated small iron wedge called a sear, which held a gear called a tumbler in place. With the sear released, the tumbler rotated forward--propelled by a spring that had been tensed when the shooter first cocked the gun. The cock (or hammer), connected to the tumbler, also rotated forward, with force. Atop the cock a simple vice gripped a sharpened piece of flint, and as it rotated downward the flint skidded into a concave, serrated steel plate called a frizzen.[266]

Flint is one of nature's hardest materials; hard enough that when it hits iron or steel with enough force and at the right angle some of the metal gives way, showering off in a glowing spray of super-heated flakes. Thanks to the elegant design of the flintlock mechanism, when the cock and flint fell forward the frizzen was shoved backward on its pin, exposing a little pan full of fine, black gunpowder. That is when human energy traveling through levers and springs unleashed chemical energy. The cascading metal sparks ignited this powder, and a tongue of flame darted down from the pan through a small touchhole into the barrel of the musket, where the shooter had earlier packed in a larger charge of gunpowder. That charge ignited. Trapped by the barrel's walls and the breech-plug at the rear, the explosion traveled the only direction it could, forward. In so doing it drove before it an obstacle, the musket ball, a lead sphere that clanged and screamed down the length of the barrel, took to the air, and flew.[267]

The remarkable tool that made all this happen had four basic components: a wooden stock, a lock (ignition) mechanism made of iron and steel, an iron barrel, and a group of metal parts (usually brass) called "furniture" including a butt-plate, trigger guard, and ramrod pipe. Most carpenters could make serviceable stocks, and most blacksmiths could cast, file, and polish brass furniture. Reliable barrels and locks, however, were very difficult to produce and extraordinarily difficult to produce in quantity.

2.  Making Gun Barrels

The barrels of eighteenth-century firearms were made from wrought iron – nearly pure iron that is repeatedly heated and worked into shape with tools. Low carbon content made wrought iron softer and much more ductile than the most common alternative, cast iron (an iron alloy with a lower

---

[266] Many books offer lucid explanations of the workings of flintlock firearms. See for example BROWN, *supra* note 92, at 68-79; and CARMAN, *supra* note 112, at 100-04.
[267] *Id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

melting temperature that was used in molds). Wrought iron's relative pliability meant it could withstand the extreme pressures of repeated gunpowder explosions.[268] That is, wrought-iron gun barrels could withstand these pressures *if* they were well made. Barrel-makers from the era heated iron slabs and then laboriously hammered them into shape and welded them together around a tapered iron rod called a mandrel. The mandrel's diameter would be slightly narrower than the intended bore of the firearm. The iron wrapped around the mandrel was repeatedly heated and hammered on an anvil cut with grooves corresponding to the desired shape of the barrel. Eventually, the iron took the form of a tube with an open seam, thicker at one end so that the breech of the gun would be able to endure the shock of the charge.[269]

Great care had to be taken in closing the seam, lest the barrel burst upon firing. Once the seam had been sealed, the interior had to be bored. A steel bit affixed to a hand-turned drill was twisted into the barrel, scraping out a thin layer of iron with each pass. This difficult process would be repeated over and over, each time with a slightly larger bit, until the diameter of the bore reached the desired caliber. At this point the breech had to be closed, either by screwing in a threaded iron plug, or by heating and hammering in a plug without threads. Then the touchhole would be drilled or punched at the breech, and the rough exterior of the barrel would be ground down to a pre-determined thickness and filed smooth.[270] Untreated iron oxidizes (rusts) when exposed to air or, especially, moisture. Once begun, this process will not stop on its own; it will continue until the integrity of the iron object has been totally compromised. Barrel makers learned to treat barrels with chemicals that artificially accelerate and then arrest the oxidization process.[271] Finally, barrel loops would be braised onto the underside and a stud braised on the top, near the muzzle, to act as a sight and (for military arms) as a stop for a socket bayonet.[272]

Badly made or poorly maintained barrels could fail, laming or even killing the shooter. Henry Knox, one of George Washington's top lieutenants during the Revolution and the nation's first Secretary of War, had two fingers blown off his left hand when the breech of his fowling piece burst.[273] He got off easy. Given how one must cradle a longarm to shoot it, the explosive shards of iron from the burst barrel could just as

---

[268] ROBERT B. GORDON, AMERICAN IRON, 1607-1900 7-11 (2020).
[269] For barrels, see BROWN, *supra* note 92, at 17–20; BAILEY, *supra* note 75, at 95-97.
[270] *Id.*
[271] For barrel "browning," see GREENER, *supra* note 98, at 279-81.
[272] BAILEY, *supra* note 75, at 95.
[273] BROWN, *supra* note 92, at 299.

Electronic copy available at: https://ssrn.com/abstract=4546050

easily have gone into his eyes, chest, or throat. With the stakes of inferior craftsmanship literally a matter of life-and-death, the major arms-producing states of Europe required finished gun barrels to undergo rigorous inspection. Barrels would be "viewed" (their bore measured with a rod gauge; the muzzle diameter checked with a socket gauge; and the soundness of the braising confirmed), and then be "proved" (charged with twice the standard load of powder, fired, left to sit for forty-eight hours, and then closely examined for the tell-tale signs of rust that would betray any stress fractures).[274] In the mid-eighteenth century, fully a quarter of the musket barrels made for the French military typically failed proof. It was not easy to work slabs of iron into a quality barrel, in other words, even for craftsmen paid to do nothing else.[275]

## 3.  Making Gun Locks

It was more challenging still to make quality gunlocks. Flintlock mechanisms consisted of more than a dozen separate parts, some fixed and others moveable, all required to operate in symmetry to produce the intended effect. Engravings published in 1770 as a supplement to the *Encyclopédie*, Enlightenment France's great monument to knowledge, provide precise views of the finished lock mechanism (Fig. 1) and its constituent parts (Fig. 2), which are reproduced in the appendix to this Article. Lock makers in eighteenth-century Europe generally used hardened dies to make the larger pieces. Small, red-hot bars of iron would be pounded into dies cut in the shape of the lock-plate, cock, hammer, tumbler, bridle, sear, frizzen, and trigger. It usually took multiple firings before a component part was properly forged to shape, which made the metal brittle. Lock-makers therefore had to soften (anneal) it with controlled reheating and cooling it in powdered charcoal inside cast-iron chests.[276] Some parts required additional steps. The tumbler (see fig. 17, in Fig. 2), for example, which transmitted the main spring's energy to the hammer, featured graded notches that had to be filed with near-precision for the lock mechanism to function correctly.[277]

Once properly formed and cooled, the pieces would be knocked out of the dies and excess metal cut and filed off to ready them for assembly. Screws of various lengths and diameters had to be cut to size, to affix the

---

[274] BAILEY, *supra* note 75, at 95–97.

[275] KEN ALDER, ENGINEERING THE REVOLUTION: ARMS AND ENLIGHTENMENT IN FRANCE: 1763-1815 174 (1997).

[276] *See* SMITH, *supra* note 179, at 86–89.

[277] *Id*. at 90.

Electronic copy available at: https://ssrn.com/abstract=4546050

smaller parts to the lock plate and the lock plate to the stock. Threads for metal screws would be cut on a steel screw plate, and those for wood on a lathe.[278] The hammer and frizzen had to be hardened before these parts could endure their constant collisions without quickly wearing down. They were "case-hardened" by being heated with charcoal inside a sealed box to import carbon to their surface, creating a hard skin, or "case."[279]

The most finicky parts of a gunlock were its three delicate springs. The battery spring (Fig. 2, #21) held the frizzen in place, so that the pan cover (attached to the frizzen) kept the priming charge covered until firing. The sear spring (Fig 2, #18), smallest of the three springs, imparted tension to the trigger. The mainspring (Fig. 2, #19) the largest and most important, absorbed energy when the shooter cocked the gun and then released that energy to power the cock's descent after the trigger was pulled.[280]

While case hardening sufficed for hammers and frizzens, that was insufficient for springs. Springs had to be made from steel, otherwise they would not return to their original shape after repeatedly coming under stress. This requirement introduced still more technical difficulties into the gun-making process because quality steel was extremely challenging to produce. Steel is an alloy of iron and around 1-1.5% carbon. Though it could be made by reducing the carbon (and other impurities) from cast iron, more typically steelmakers produced it by boosting the carbon content of wrought iron. They tightly packed iron and charcoal dust in chests made of stone, sealed them fast with clay and sand, and fired the chests red-hot in a furnace for several days so that the carbon could diffuse not just into the skin but throughout the iron. Success yielded something called blister steel, on account of the surface blisters left behind from the escaping carbon monoxide gases produced in firing.[281]

But success was far from guaranteed. Overheating or inadequate seals were two of the more common missteps that could ruin the process. And even when all tasks were performed correctly, furnaces would not produce blister steel without pure iron. Though the chemistry would not be understood for decades, only iron low in phosphorus could be made into steel. Phosphorus inhibits the carbon diffusion process. Even with the right process and materials, the quality of blister steel varied considerably.[282] In

---

[278] *Id.* For gunlock making (and a deeper engagement with the ENCYCLOPÉDIE), see also BROWN, *supra* note 92, at 68–79, 200–207; BAILEY, *supra* note 75, at 95–96.

[279] For case hardening, see GORDON, *supra* note 268, at 255.

[280] For the evolution of lock designs and the critical role of springs, see BROWN, *supra* note 92, at 68–79.

[281] GORDON, *supra* note 268, at 173-76.

[282] The problem with phosphorus is a recurring topic in *id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

the mid-eighteenth century, Sheffield watchmaker Benjamin Huntsman set about trying to improve upon the mediocre steel available for his watch springs. He eventually pioneered the crucible method of purifying blister steel into something far more consistent and useful. It relied on exceptionally pure Swedish iron, and on crucibles made from Stourbridge Clay found in England's West Midlands. This unusual clay was strong enough to bear the weight and the heat of molten steel, but sufficiently free from any of the chemicals that would corrupt the carbon diffusion process. The great superiority of Huntsman's method, and the great difficulty of replicating it or its materials anywhere else, meant that steelmakers in and around Sheffield would dominate the international industry well past the mid-nineteenth century.[283]

### 4. Europe's Competitive Advantage

Given the technical and material challenges involved in making quality firearms, dominant producers were those with regular access to high-quality materials, and who could sustain economies of scale while reliably policing quality. It is unsurprising, then, that the vast majority of firearms built in the eighteenth century came from London and Birmingham, England; Liège, Belgium; Placencia, Spain; Saint-Etienne, France, and a few other European cities where the regional economies had for decades been oriented around arms production. These were the manufacturing centers that armed Europe's armies, navies, coast guards, sheriffs, and militias; that supplied its domestic firearms markets; that equipped its vast merchant marine and the huge, parasitic trading companies that extracted so much wealth from the rest of the world; that outfitted European allies and mercenaries in wartime; that shipped nearly four hundred thousand inexpensive guns annually to Africa by mid-century, as fuel for the inferno of the Atlantic slave trade; and that manufactured nearly every firearm that anyone ever laid eyes on in the colonial Americas.[284]

A visitor to Saint-Etienne, where the Manufacture Royale turned out more than a quarter million muskets in 1772 alone, likened the city to an ants' nest. "You cannot have any idea of the number of forges and their activity," he reported to his fiancée. The city and its environs choked with gloom, "perpetually shrouded in coal smoke which penetrates everywhere." The visitor marveled at Saint-Etienne's thousands of armorers,

---

[283] *Id.* at 171–84.

[284] Inikori, *supra* note 265, at 343–49. For British share of the trade, types, names, and quality, see W. A Richards, *The Import of Firearms into West Africa in the Eighteenth Century*, 21 J. AFR. HIST. 43, 53–56 (1980).

Electronic copy available at: https://ssrn.com/abstract=4546050

metalworkers, and ironmongers, with their "white eyes that stare at passers-by even as they busily continue working." It seemed as if nearly all the area's thirty-thousand inhabitants – not just men, but also women and children with their wiry forearms and soot-black faces – were heaving, sweating, and clanging away at gun-work. "These are the true dens of Vulcan."[285]

The great gun-making centers were organized in different ways. By the 1770s France had come to embrace mechanization to a far greater extent than Britain, for example. But all of Europe's major arms producers employed a complex division of labor. Rather than tens of thousands of gun-makers producing firearms from scratch, there were tens of thousands of specialists responsible for a particular component or process. More than two-dozen sub-trades went into making a musket at Saint-Etienne. Merely producing a quality barrel involved four supervisors overseeing thirteen armorers.[286] Elsewhere one would find rough-stockers and woodcarvers; barrel-forgers, barrel-borers, barrel-straighteners, and barrel-browners; lock-makers who either employed or sub-contracted out to others who specialized in forging lock-parts, or casehardening and polishing, or making steel springs, or producing pins and screws. Then there were the filers, furniture casters, sight-fitters, engravers, and, finally, the finishers whose job it was to put everything together.[287]

This complex division of labor improved quality and uniformity, as well as profitability and productive capacity. Artisans in the dozens of specializations that went into the gun trade spent perhaps a decade developing their skills with a master. Guilds gave coherence, structure, and collective influence to individual professions. The state enforced demanding regulations and quality tests, and steady contracts from great monarchs and powerful merchants nursed the entire enterprise.[288]

Nothing remotely comparable existed anywhere in colonial America. What, then, are we to make of all the *gunsmiths* in the colonies?

*C. "Gunsmiths," vs. "Gunsmiths," vs. "Gunsmiths" before the Revolution*

As of 2020, there were nearly eight million registered automobiles in

---

[285] For Saint-Etienne, see the masterful book by ALDER, *supra* note 275, at 163, 163–201.

[286] *Id.* at 176, 201.

[287] BAILEY, *supra* note 75, at 95–99.

[288] Exemplary studies of gun-making centers include DE WITT BAILEY AND DOUGLAS A. NIE, ENGLISH GUNMAKERS: THE BIRMINGHAM AND PROVINCIAL GUN TRADE IN THE 18TH AND 19TH CENTURY (1978);  CLAUDE GAIER, FOUR CENTURIES OF LIÈGE GUNMAKING (1985); ALDER, *supra* note 275.

Electronic copy available at: https://ssrn.com/abstract=4546050

the state of Florida.[289] There are no vehicle production or assembly plants in the state, so Floridians drive automobiles made in other states or countries.[290] Most Floridians have easy access to service stations and oil change shops for routine maintenance. In the event of damage or malfunction beyond the routine, Floridians turn to one of the nearly thirty thousand auto mechanics or body shops in the state for repairs.[291] Some of Florida's professional mechanics and hobbyists have the requisite skill and experience to build cars from imported parts. But thanks to the transparency of modern industrial statistics, the distinction the English language makes between auto *manufacturing*, auto *maintenance*, and auto *repair*, and the fact that there are no legal, ideological, or corporate incentives to claim that Floridians make the cars they drive, we can all agree that while the state has a lot of cars, a lot of maintenance and repair shops, and individuals with mechanical skill, the state's population nonetheless imports its millions of vehicles.

Things are quite different when it comes to guns and gunsmiths in early America. Gunsmiths are easy enough to find in the archives of individual colonies, and routinely advertised their services in colonial newspapers. For example, Henry Deabarear informed his customers in Pennsylvania that "he follows his usual business, such as gun work and spring lancet making, likewise cupping spring and teeth instruments."[292] And Thomas Tew, in his shop on Broad Street in Newport, boasted that he "cleans and repairs GUNS, and GUN-LOCK in the best and most expeditious manner."[293] In New York, Gilbert Forbes made and sold "all Sorts of GUNS, in the neatest and best Manner, on the lowest Terms."[294]

While anecdotal evidence of gunsmithing is common, assessing the role

---

[289] 7,853,979 registrations in 2021, according to Statista. *Automobile Registrations in the United States in 2021, by State*, STATISTA (Sept. 28, 2023), https://www.statista.com/statistics/196010/total-number-of-registered-automobiles-in-the-us-by-state/.

[290] *See* Anh Bui, P. Slowik, and N. Lutsey, *Power Play: Evaluating the US Position in the Global Electric Vehicle Transition*, INTERNATIONAL COUNCIL ON CLEAN TRANSPORTATION 17 (2021), *available at* https://theicct.org/wp-content/uploads/2021/12/us-position-global-ev-jun2021-1.pdf.

[291] According to IBIS World, in 2022 there were 22,265 auto mechanic businesses in Florida. See *Car Body Shops in Florida – Market Research* Report, Aug. 18, 2022, IBISWORLD, https://www.ibisworld.com/industry-statistics/number-of-businesses/auto-mechanics-in-florida-united-states (last visited Oct. 25, 2022), and 7119 auto body businesses in Florida, IBISWORLD, https://www.ibisworld.com/us/industry/florida/car-body-shops/12653/

[292] PENNSYLVANIA GAZETTE (Sept. 15, 1773).

[293] NEWPORT MERCURY (June 26, 1775).

[294] NEW YORK JOURNAL (May 25, 1775).

Electronic copy available at: https://ssrn.com/abstract=4546050

68          *The Myth of Continuity in American Gun Culture*

colonial gunsmiths played in arming British North America is a challenge. For one thing, historians disagree about the number of gunsmiths active in the colonies. Experts have advanced wildly diverging estimates, ranging from 175[295] to nearly 2000[296] working in the thirteen colonies on the eve of the Revolution.

Impoverished terminology presents an even bigger challenge. As the advertisements above suggest, a single term covered a wide range of expertise. Though this varying expertise existed across a spectrum, it clustered into three basic groups. Those able to repair firearms were called "gunsmiths." Those capable of not just repairing but also building firearms from a mix of self-made and imported parts were known as "gunsmiths." And those with the skills, tools, and materials necessary to manufacture guns entirely from components of their own making were called "gunsmiths."

You see the problem…and the opportunity. The looseness of the term is both an obstacle to genuine understanding and a helpful screen for the motivated argument that early America had a widespread tradition of self-made arms. A closer consideration of each of the three, overlapping sub-groups of gunsmiths makes it plain, though, that only a small percentage of them were in the business of making their own arms.

The first group, repairers of firearms, vastly outnumbered the rest. Given that guns were so common, so important, and so easily damaged or worn out, and given the impracticality of sending defective arms back to Europe to be fixed, artisans capable of repairing arms had a steady clientele throughout the colonies. Many things could go wrong with muskets; even more so with the relatively light and inexpensive firearms that predominated in early America.[297] Nearly any component of a firearm could need repairing or replacing after a few years of hard use or inattention. Inventories of guns stored by colonial governments frequently listed as

---

[295] Robert F. Smith, Manufacturing Independence: Industrial Innovation in the American Revolution 12 (2016).

[296] Brown, *supra* note 92, at 404–09. Brown's appendix lists the names of approximately 500 people involved in manufacturing war material for the Revolutionary War effort, though this number includes many who made musket balls, bayonets, wire brushes, etc. Brown estimates the total number of gunsmiths active during the Revolution to be less than two thousand. *Id.* at 347.

[297] The Creek leader Alexander McGillivray offered a glimpse into the expected durability of lighter firearms in 1789 when he requested "English Trading Guns which are Good and will last more than two Years in Constant Use." *See* Letter from Alexander McGillivray to William Panton, Little Tallassie (Feb. 1, 1789), *in* John Walton Caughey, McGillivray of the Creeks 215–20 (1938).

Electronic copy available at: https://ssrn.com/abstract=4546050

many as a quarter, a third, or even higher fractions out of repair.[298]

For one unusually-well documented gunsmith in eighteenth century North America, the most common work was replacing or repairing (casehardening) frizzens and hammers that had grown too soft through overuse. Missing screws also needed attending to, barrels straightened, cracked butts restoked, broken breech plugs refashioned, and springs replaced.[299] Any of these mishaps or a dozen others could render a firearm into little more than an expensive club. As one observer put regarding Indian trade guns, "the breaking a Spring or a gunlock etc. may be the means of destroying a whole Seasons Hunt and of distressing and Starving a numerous Family."[300] Late-eighteenth century gunsmith John Anderson from Williamsburg, Virginia, seems to have been typical. His account books reflect a craft business oriented almost entirely to repairs, and they contain no evidence that he made even a single firearm prior to the American Revolution.[301] Greenlee lists numerous examples of early Americans in other craft professions working part-time as "gunsmiths" for extra income.[302] The intended implication here is that the craft was not only very widespread but also relatively easy to learn. But insofar as the farmers, carpenters, cutlers, stone masons, and attorneys (yes, attorneys) he mentions moonlighted with gunsmithing, they almost certainly were dabbling in this first, largest, and least-skilled category of "gunsmith" focused on repairs.

A second, smaller cohort of gunsmiths had experience making firearms with a mix of self-made components and imported locks and/or barrels. Colonial newspapers routinely note the importation of locks[303] and barrels.[304] It is hardly surprising that colonial gunsmiths would welcome the

---

[298] *Id.* at 314–19; BAILEY, *supra* note 75, at 105–06.

[299] Kevin Paul Jones, *An Examination of Flintlock Components at Fort St. Joseph (20BE23), Niles, Michigan* 17, 29–30 (2019) (unpublished M.A. thesis, Western Michigan University).

[300] *Plan of Robert Rogers, 1767*, *in* THE PAPERS OF SIR WILLIAM JOHNSON, VOL. 13, 453 (Alexander C. Flick ed., 1921).

[301] HAROLD B GILL, THE GUNSMITH IN COLONIAL VIRGINIA 22–27, 64–68 (1974). Cited in the Expert Report and Declaration of Kevin M. Sweeney at 6 n.10, Nguyen et al., v. Bonta et al., No. 3:20-cv-02470-WQH-BGS (S.D. Cal.).

[302] Greenlee, *supra* note 22, at 66-68.

[303] During the 1750s and 1760s in the *Pennsylvania Gazette* alone, merchants advertised gunlocks on July 16, 1752; May 10, 1753; Feb. 11, 1755; Feb. 5, 1756; March 11, 1756; Jan 5, 1758; March 8, 1759; Jan. 3, 1760; Jan. 9, 1766; and July 20, 1769.

[304] Consider the following examples from a ten-year period in a single colony: NEW YORK GAZETTE (Nov. 8, 1762), NEW YORK GAZETTE (Mar. 4, 1765), NEW YORK JOURNAL (Nov. 27, 1766), NEW YORK GAZETTE OR WEEKLY POST-BOY (Oct. 24, 1768), NEW YORK GAZETTE AND WEEKLY MERCURY (Mar. 16, 1772), NEW YORK JOURNAL OR THE GENERAL ADVERTISER (June 11, 1772).

Electronic copy available at: https://ssrn.com/abstract=4546050

outsourcing of the most technically complex and consequential parts of a firearm. Most would have worked with imported locks and/or barrels because they lacked the expertise to make them, or at least make them well. Others with the requisite skill often relied on imported parts because it was more economical to do so, or because essential tools or materials were lacking. Steel for the springs in gunlocks was particularly difficult to produce in early America and only imported at great expense.[305]

Even the era's most distinctive and developed American arms-making tradition – production of the American long rifle (also known as the Kentucky-, Lancaster-, or Pennsylvania-rifle), usually relied on imported English or German locks.[306] American-rifles were prized for their well-made barrels, and specialists in that tradition were using increasingly sophisticated production methods by the second half of the eighteenth century.[307] But as for typical fowling pieces or muskets, consumers would have more confidence in the integrity of imports because, unlike those made in America, imported barrels had been manufactured under a demanding system of regulations and had almost always undergone proof.[308]

How analogous were these imported locks and barrels to the components and kits used to assemble ghost guns in our own times? Consider the distance the new eighteenth-century owner of a lock and barrel would have to travel before having a reliable firearm to shoot. A functional wooden stock would have to be made, a task requiring woodworking tools and expertise. Numerous additional parts would have to be made or purchased, including a butt-plate, side-plate, trigger, trigger guard, trigger plate, trigger pivot, escutcheon, ramrod, ramrod pipes, furniture-fastening cross-pins, and a variety of metal and wood screws.[309] There are no parts kits in early America, so all of this would have to have been made or acquired *à la carte*. One of the reasons there were no parts kits is that firearms were not yet built with interchangeable parts. Quite unlike the "incredibly precise" machine-made interchangeable parts advertised by today's ghost-gun entrepreneurs, eighteenth-century components were almost all made by hand.[310] The resulting variability in the size, shape, thickness, and quality of individual parts required significant time and skill

---

[305] On the scarcity of steel for lock-springs as a particular impediment to the colonial arms industry, see BROWN, *supra* note 92, at 243-44.

[306] *Id.* at 268.

[307] Carlton O. Wittlinger, *The Small Arms Industry of Lancaster County: 1710-1840*, 24 PENNSYLVANIA HISTORY: A JOURNAL OF MID-ATLANTIC STUDIES 121, 135–36 (1957).

[308] BROWN, *supra* note 92 at 150.

[309] BAILEY, *supra* note 75, at 95-96.

[310] See the tab "incredibly precise" at https://www.80percentarms.com/ (last visited Sept. 28, 2023).

Electronic copy available at: https://ssrn.com/abstract=4546050

on the part of the person charged with turning them into a reliable firearm. Parts often had to be filed, fitted, re-filed, and re-fitted before they could be put into harmony with one another, and particular time and care had to be taken mounting the barrel and the lock to the stock.[311] Needless to say, all of this had to be done without PDF instructions or how-to videos. This was not the work of amateurs. Gunsmiths capable of building firearms with imported locks and/or barrels were skilled professionals and were compensated as such.

Colonial Americans who made their own firearms from scratch belonged to the third and smallest cohort of gunsmiths. Unlike the European system characterized by complex division of labor, gun-makers in the colonies usually worked alone or in pairs in small shops. That meant that in addition to an unusually wide range of skills, such producers needed an unusually large collection of materials and tools. They needed iron, copper, and steel; bellows, forges, anvils, and sledges; hammers and mallets of different shapes, materials, and sizes; a remarkable array of files (one eighteenth-century gunsmith's inventory includes twenty-nine types); rasps, saws, planes, hand- and table-vices, wrenches, swedges, screwdrivers, piers, pincers, tongs, drills, chisels, gouges, screw-plates, augers, drawing knives, and sandpaper; and mortars, pestles, and the necessary components for browning chemicals, among other necessities.[312]

Mobilizing the requisite skills and equipped with these and other requisite materials and tools, it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch.[313] Anything elaborate or ornate would have taken considerably longer. Evidence from the time suggests that even those capable of building guns from scratch seldom did so. John Partridge Bull of Deerfield, Massachusetts, was one of those unusual gunsmiths who knew how to make firearms from scratch and had the materials, facilities, and tools to do so. Bull is even more unusual because he left behind a detailed account book recording the work he did over two decades as a gunsmith, 1768-1788. It reveals that he made just three new guns during those twenty years.[314]

In sum, early America had a minor, low-productivity tradition of

---

[311] BAILEY, *supra* note 75, at 96–98. *See also* Jones, *supra* note 299, at 15.

[312] For tools, see BROWN, *supra* note 92, at 244–57; JAMES B. WHISKER, THE GUNSMITH'S TRADE 180–81 (1992).

[313] SMITH, *supra* note 276, at 11.

[314] Susan McGowan, *Agreeable to His Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts* 5, 39–40, 74–75 (1988) (unpublished M.A. thesis, Trinity College). I thank Kevin Sweeney for alerting me to this source.

Electronic copy available at: https://ssrn.com/abstract=4546050

72          *The Myth of Continuity in American Gun Culture*

firearms manufacturing, one executed by a small number of experts. Sometimes these experts made firearms for their own private use. Everyone else used guns made by experts, overwhelmingly by Europeans. The vast majority of guns in the colonies came from Europe; repairs consumed the vast majority of work done by American gunsmiths; and of those firearms built in America, the vast majority featured European locks and barrels.

Still, some might concede these basic facts and still insist upon a "tradition of self-made arms" in the colonies. Maybe this was a tradition of significant latent potential, potential kept slumbering by the competitive advantage of European manufacturing. So long as Europe turned out huge quantities of quality, affordable barrels and locks, one could argue, American gunsmiths rarely had cause to make them at home – *but they could have, if need be*. That is certainly what one would expect if, as Greenlee insists, there had been a robust American tradition of self-made arms.

The trouble with this interpretation is that the colonies did sometimes find themselves under-armed at moments of crisis, and yet domestic manufacturing consistently failed them. Consider "the great arms crisis" of 1758, during the Seven Years' War.[315] General James Abercromby, tasked with organizing 20,000 colonists for a campaign into the Ohio Country, could only obtain 10,000 guns from the metropole. He spent all spring and early summer imploring, cajoling, and bullying colonial governors to secure arms for the new recruits. With varying degrees of enthusiasm and sincerity, the governors grudgingly loaned out arms from public magazines, appealed to loyal subjects to contribute to the cause, and recruited the help of Thomas Hancock and other prominent merchants. These merchants eventually managed to purchase guns from market-savvy colleagues who had placed bulk orders with English gun dealers at the start of the war in anticipation of reaping handsome profits (foresight well-rewarded).[316] What no one seems to have seriously attempted, or even to have to have imagined would be worth attempting, was mobilizing British North America's "tradition of self-made arms" to manufacture the guns the recruits required. Insofar as American gunsmiths helped solve the crisis, it was through repairs - making defective arms fit for service.[317] Delayed six weeks by the maddening search for firearms, Abercromby arrived too late at Ticonderoga and

---

[315] BAILEY, *supra* note 75, at 121.

[316] John A. Schutz, *The Disaster of Fort Ticonderoga: The Shortage of Muskets during the Mobilization of 1758*, 14 HUNTINGTON LIB. Q. 307, 307–09 (1951). *See also* BAILEY, *supra* note 75, at 121–23.

[317] Schutz, *supra* note 316, at 314.

Electronic copy available at: https://ssrn.com/abstract=4546050

suffered one of Britain's most humiliating defeats of the war.[318]

Or consider "Lord Dunmore's War" in 1774. In the fall of that year, Virginia's royal governor led militiamen from the colony's western counties in a war of conquest against the Shawnee in the Ohio Country. Settlers eagerly volunteered for militia duty, out of a mix of anxious dislike of the Shawnee, expectation of plunder, and hope of receiving land bounties.[319] Where would their guns come from? Reading Greenlee, one would conclude that these resourceful backcountry folk simply made their own guns. As for the "pioneers, mountain men, and other explorers essential to the expansion of the American empire from sea to shining sea," he tells us, "they had to know how to build and repair arms themselves to survive."[320] The frontier leaders tasked with organizing militias understood the situation better. As one local recruiter put it, "most of these men is bad off for arms and ammunition and I believe Cannot get them."[321] Facility with basic repairs was obviously a welcome skill. But a little reflection on the great difficulties involved in building firearms even in well-supplied eastern seaports ought to be enough to disabuse anyone of the notion that the average western settler had the necessary materials, facilities, tools, and skills to make a musket. Dunmore's forces won a narrow victory over Shawnees not because of a tradition of self-made arms, but because the state had provided English-made guns (and ammunition) for unarmed militiamen from the governor's palace and colonial magazine in Williamsburg.[322]

The scale and logistical challenge of Abercromby's or Dunmore's campaigns obviously paled in comparison to what the colonies would soon be facing in the Revolutionary War. Indeed, the Revolution represented the perfect natural experiment to test the proposition that early Americans nurtured a robust tradition of self-made arms. War with Britain would make it existentially necessary for insurgents to acquire many tens of thousands of additional firearms. Would "the American tradition of self-made arms" be up to the challenge?

---

[318] Schutz argues that lack of muskets was "the most important cause of the defeat." *Id.* at 307. For the defeat in context, see FRED ANDERSON, CRUCIBLE OF WAR: THE SEVEN YEARS' WAR AND THE FATE OF EMPIRE IN BRITISH NORTH AMERICA: 1754–1766 (2000).

[319] ROB HARPER, UNSETTLING THE WEST: VIOLENCE AND STATE BUILDING IN THE OHIO VALLEY 46–66 (2018).

[320] Greenlee, *supra* note 22, at 68.

[321] Letter from Michael Woods to William Preston (May 29, 1774), *in* DOCUMENTARY HISTORY OF DUNMORE'S WAR: 1774 397–98 (Reuben Gold Thwaites & Louise Phelps Kellogg eds., 1905), 397–98.

[322] For guns and ammunition sent from the mansion and magazine, see JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA 1773-1776, INCLUDING THE RECORDS OF THE COMMITTEE OF CORRESPONDENCE 223 (John Pendleton Kennedy ed., 1905).

Electronic copy available at: https://ssrn.com/abstract=4546050

### D.  American Gun-Making in the Revolution

At the end of 1774, before Lexington and Concord made war with Great Britain a reality rather than a frightening possibility, one informed skeptic asked his more pugilistic American contemporaries an urgent question: "is it possible that a people without arms, ammunition, money, or navy, should dare to brave a nation, dreaded and respected by all the powers on earth?"[323] Possible, yes. But how? How could an American insurgency arm itself against such a mighty enemy?

Greenlee's surprising answer is domestic production. "To sustain themselves against a large and well-supplied British military throughout the eight-year war," he writes, "the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of arms manufacturing."[324] Indeed, he insists that during the Revolutionary War, "Americans needed to build their own arms to survive."[325] This answer is surprising because it is at odds with what most professional historians know about the war. The evidence makes it clear that American arms makers were not remotely up to the challenge of equipping a war against Great Britain. Were it not for massive imports of firearms (and gun parts, and saltpeter, among many other things) from continental Europe, the insurgency against Great Britain would have been a spectacular failure.

Patriot leaders hoped things would be otherwise at the dawn of the rebellion, and confidently boasted that they could build their way out of their arms shortage. Benjamin Franklin wrote that with the right incentives "arms may be made as good and cheap in America as in any Part of the World."[326] John Adams claimed that his country had "many manufacturers of firearms now, whose arms are as good as any in the world."[327] John Hancock believed that the colonies' gunsmiths would "soon be able to provide" the necessary firepower.[328] And Thomas Paine informed readers of

---

[323] Extract of a Letter from Newport (Dec. 14, 1774), published in the NEW YORK GAZETTEER (Dec. 29, 1774), *in* NAVAL DOCUMENTS OF THE AMERICAN REVOLUTION, VOL. 1 20 (William Bell Clark ed., 1964).

[324] Greenlee, *supra* note 22, at 51.

[325] *Id.* at 48.

[326] Letter from Benjamin Franklin to Silas Deane (Aug. 27, 1775), *available at* https://founders.archives.gov/?q=joseph%20belton&s=1111311111%20&sa=&r=1&sr= (last visited Jan. 25, 2023)

[327] John Adams, *Novanglus III* (Feb. 6, 1775), *in* PAPERS OF JOHN ADAMS, VOL 2 243–55, 252 (Robert J Taylor et al. eds., 1977).

[328] Letter from John Hancock to George Washington (Mar. 6, 1776), *in* THE PAPERS OF

Electronic copy available at: https://ssrn.com/abstract=4546050

*Common Sense* of canon cast "at pleasure" and American small arms "equal to any in the world."[329] Richard Penn, a former lieutenant governor of Pennsylvania and the man whom the Continental Congress entrusted to deliver the "olive-branch petition" to the King in the summer of 1775, warned parliament that the colonies made small arms "in great numbers, and very complete."[330] Another correspondent from Philadelphia went even further, assuring parliament that there were gunsmiths in his province could "make one hundred thousand stand of Arms in one year."[331]

Even accounting for optimistic bravado and a degree of menacing boastfulness, American officials had ambitious, sincere hopes for domestic arms production. Provincial congresses from around the colonies passed legislation and issued appeals in hopes of recruiting gunsmiths and would-be gunsmiths to public service. Greenlee devotes several pages of his article to quoting these sources,[332] much like counterparts writing about the history of large-capacity firearms detail example after example of exotic historic weapons. But just as those authors seldom tell us about the safety, price, production numbers, or distribution of the unusual guns they highlight (that is, about context), Greenlee has almost nothing to say about the *results* of revolutionary-era appeals for domestic production of firearms.[333] The silence is understandable, because those results were deeply underwhelming.

Take Massachusetts, which budgeted nearly $100,000 to pay for domestically produced war material early in the conflict. Colonial craftsmen lacked the capacity to meet this surging demand, and much of that

---

GEORGE WASHINGTON DIGITAL EDITION (Theodore J. Crackel, ed., 2008).

[329] THOMAS PAINE, RIGHTS OF MAN, COMMON SENSE, AND OTHER POLITICAL WRITINGS 41 (Mark Philp ed., 1998).

[330] Penn's testimony is in WILLIAM COBBETT, THE PARLIAMENTARY HISTORY OF ENGLAND FROM THE EARLIEST PERIOD TO THE YEAR 1803: FROM WHICH LAST-MENTIONED EPOCH IT IS CONTINUED DOWNWARDS IN THE WORK ENTITLED "THE PARLIAMENTARY DEBATES," VOL 18 911–13 (1814).

[331] Quoted in Greenlee, *supra* note 22, at 55.

[332] *Id.* at 54-61.

[333] Greenlee claims that it is difficult to assess the scale of domestic firearms production during the war because, fearful of British retaliation, American gunsmiths did not sign their creations. *Id.* at 60. This is incorrect. In the first instance, archival evidence can tell us more about the scale of manufacturing than can examination of weapons that have survived the centuries. Second, some of the surviving guns do bear makers' signatures or insignia. Indeed, authorities sometimes required gunmakers to sign the firearms they produced under contract. *See* BROWN, *supra* note 92, at 325; NEIL LONGLEY YORK, MECHANICAL METAMORPHOSIS: TECHNOLOGICAL CHANGE IN REVOLUTIONARY AMERICA 65 (1985).

Electronic copy available at: https://ssrn.com/abstract=4546050

appropriation went unspent.[334] Authorities in Maryland likewise worked to encourage domestic arms production. They set a relatively modest goal of producing 240 a month, yet failed to achieve it.[335] New York offered a bounty of $444 to anyone willing to start a gunlock factory in the colony; that substantial bounty went unclaimed, and the colony was reduced to sending George Washington unarmed recruits.[336] Virginians had high hopes for domestic firearms production. But even after sending agents in search of gunsmiths far beyond their colony's borders, Virginians not only failed to help arm the Continental Army, they failed to secure the arms they themselves required.[337] Wealthy Pennsylvania organized the most ambitious arms-making program of the individual colonies. It spent more than other colonies, and tried to centralize production in a new, $100,000 state-run armory inspired by European methods of mass production. Yet even with their lucrative incentives and state-supported infrastructure, Pennsylvania's wartime gunsmiths only managed to produce around eighty-four muskets a month on average. Each one cost the state about twice as much as a new musket fetched on the open market.[338]

In frustration, individual colonies looked to the Continental Congress to equip their fighting men. Though it took time to cohere, Congress eventually organized a very impressive system of wartime production. State intervention was crucial, because only the government could overcome systemic obstacles inhibiting production. Even in peacetime, private manufacturers struggled to obtain working capital, master unfamiliar technical skills, source and arrange for the timely transportation of raw materials, and recruit experienced labor. Wartime mobilization, disruption, scarcity, and inflation made all these routine problems dramatically worse.[339] The Department of the Commissary General of Military Stores (DCGMS) had solutions. It provided cash advances, raw materials, transportation, and technical consulting to private manufacturers working under contract. More consequentially, the DCGMS centralized production at three main national arsenals, at Springfield Massachusetts, Carlisle Pennsylvania, and Philadelphia.[340]

State contractors and master craftsmen at these arsenals coordinated specialists in multiple trades to mass-produce necessary military supplies.

---

[334] SMITH, *supra* note 295, at 9–10.

[335] *Id.* at 10.

[336] *Id.*

[337] *Id.*

[338] *Id.* at 15, 222 n.41. For the efforts of individual colonies, see also YORK, *supra* note 333, at 65–70.

[339] *See* BROWN, *supra* note 92, at 310.

[340] SMITH, *supra* note 295, at 142–71.

Electronic copy available at: https://ssrn.com/abstract=4546050

For some vital supplies, the results were remarkable. Among other items, they made large quantities of cartridge boxes, ramrods, bayonets, and cartridge paper. They produced hundreds of wagons, ammunition carts, and iron cannon.[341] The cast tens of thousands of pieces of shot and artillery shells in a wide range of sizes.[342] And, relying overwhelmingly on imported gunpowder or domestic powder made with imported saltpeter, the mostly female labor force at the ammunition laboratory in Philadelphia produced an astonishing 4.2 million musket cartridges.[343]

What the DCGMS could not do, it became clear, was manufacture new firearms at anywhere near the scale that the war demanded. The most recent expert estimate suggests that on the eve of the Revolution there were only around 175 gunsmiths in the colonies capable of doing this work.[344] Perhaps partly for this reason, of the three arsenals only the one in Philadelphia was tasked with producing arms. Departmental procurement records from the time make it difficult to say with confidence how many new firearms the facility turned out. One expert suggests that fifteen thousand "was not out of the question" during its years of operation, which, if accurate, would be an impressive figure given the challenges of the day.[345]

But the large majority of these American-made firearms produced during the Revolution relied on European locks and barrels. War planners understood from the beginning that it would have to be so. In September 1775, for example, Congress authorized the foreign purchase and importation of ten thousand muskets and *twenty* thousand musket locks.[346] George Moller, a respected authority early American firearms history, found evidence for at least 40,000 locks imported during the Revolution, along with comparable quantities of musket barrels (including nearly 30,000 in a single shipment in May of 1777).[347] The scale of these parts imports suggest that the expert gunsmiths employed by government seldom made firearms from scratch. Indeed, after extensive research, Moller himself was "unable to establish a single instance where a continental armorer was employed in the fabrication of entirely new arms."[348]

Even while relying almost entirely on imports for the most critical

---

[341] *Id.* at 122, 193.

[342] *Id.* at 123–26, 209.

[343] *Id.* at 82–88. Government facilities made eleven million musket cartridges overall. *Id.* at 209.

[344] *Id.* at 12.

[345] *Id.* at 96.

[346] *See* resolutions of Monday, Sept. 18, 1775, in UNITED STATES CONTINENTAL CONGRESS, *supra* note 159, at 2:253-54.

[347] MOLLER, *supra* note 67, at 141–42.

[348] *Id.* at 147.

Supp. Grabarsky Decl.  178

Electronic copy available at: https://ssrn.com/abstract=4546050

components, it is doubtful whether domestic producers made even a tenth of the firearms used by American forces during the war. Around three hundred thousand Americans bore arms in the Revolution, either as Continentals or militiamen.[349] Some of them entered the service with their own firearm (the great majority of which had been made entirely in Europe or built with European locks and barrels), and some served with arms taken from the enemy.[350] But, as Greenlee briefly acknowledges,[351] most fought with arms imported from continental Europe, particularly arms from France. Moller's careful inventory records more than 150,000 muskets imported between 1776-1781, and he suspects the actual total exceeded 200,000.[352]

In other words, it was not "domestic arms production [that] maintained the colonies through the arms shortage during the war."[353] What maintained the colonies through the arms shortage during the war was a remarkable state-run engagement with the international arms trade and, especially, the patronage of European empires. Colonial gunsmiths contributed meaningfully to the war effort, primarily by repairing many thousands of arms.[354] When they did manufacture guns, they almost always relied on imported locks and barrels. As had been true throughout the colonial era, and as would be true for Haitians and Spanish Americans fighting for their own independence in the coming decades, American revolutionaries obtained their guns (and ammunition) not through a "tradition of self-made arms," but rather from government and markets.[355]

In the aftermath of the Revolution, Washington, Franklin, Knox, and other nationalists spent more than a decade urging their compatriots to invest in a domestic arms industry. As Treasury Secretary Alexander Hamilton put it while making the case in his landmark *Report on the Subject of Manufactures*, "the extreme embarrassments of the United States during the late War, from an incapacity of supplying themselves are still

---

[349] According to historian John Ferling, around 100,000 served in the Continental Army over the course of the war, and around 200,000 soldiered in colonial militias. *See* John Ferling, *Myths of the American Revolution*, 40 SMITHSONIAN MAGAZINE 48 (2010).

[350] For more on both points, see Brian DeLay, *The Arms Trade and American Revolutions*, 128:3 AM. HIST. REV. 1144-1181 (SEPT. 2023).

[351] Greenlee, *supra* note 22, at 54.

[352] MOLLER, *supra* note 67, at 195, 484–85. The 150,00 figure begins with his list of 117,661 "total known imports" from 1776-1883, adds an additional 40,000 sent for Massachusetts and subtracts a shipment of 6,266 in 1783, after the North American fighting had ended. *Id.* appendix 5, at 484–85.

[353] Greenlee, *supra* note 22, at 61.

[354] MOLLER, *supra* note 67, at 146-53.

[355] I argue that the international arms trade connected the American Revolution, the Haitian Revolution, and the Spanish-American Wars for Independence in DeLay, *supra* note 350.

Electronic copy available at: https://ssrn.com/abstract=4546050

matter of keen recollection."[356] The new federal government finally began making the necessary investments in the mid-1790s, relying both on state arsenals at Springfield, Massachusetts and Harper's Ferry Virginia and on private contractors to make firearms. These investments and state-private partnerships made the U.S. largely self-sufficient for arms in the War of 1812, and positioned it to take advantage of and contribute to the era's technological breakthroughs described above in Part II.[357] The Civil War supercharged the country's arms production, making it one of the most efficient and inventive in the world. Ever since, the U.S. arms industry has been thoroughly entangled with war-making and government contracts – even as the gun lobby has spun the ingenious illusion that the federal government is the industry's enemy rather than its indispensable historic patron.[358]

In sum, after centuries of depending upon European imports, Americans in the early republic finally managed to become largely self-sufficient in arms production. They did so through federal patronage of production at national arsenals and through federal contracts to private manufacturers. The individuals who worked at arsenals or under contract were not exponents of an "American tradition of self-made arms" or the forbears of today's amateurs with gun kits trying to evade state regulation. They were professionals or professionals-in-training, working in an industry intimately connected to the state. They were the forebears of those employed today by firms like Glock, Sig Sauer, and Smith & Wesson to make arms for the state and for the market, and who are obliged by law to stamp federal serial numbers on their products.

3D-printed guns and kits enable consumers with no skill, experience, or special tools to quickly assemble high-quality firearms. Nothing like that has ever existed before in American life. The dramatic technological changes that have given birth to this sub-industry have provoked unprecedented societal consequences. As those consequences accelerate, we are witnessing the nation's tradition of regulatory response iterate in real time. When Greenlee drafted his article about self-made arms, six states

---

[356] Alexander Hamilton's Final Version of the Report on the Subject of Manufactures (Dec. 5, 1791), available at http://founders.archives.gov/documents/Hamilton/01-10-02-0001-0007 (last visited June 20, 2023).

[357] This history is powerfully illuminated in Andrew Beardsley Fagal, *The Political Economy of War in the Early American Republic: 1774–1821* 89 (2013) (unpublished Ph.D. dissertation, State University of New York at Binghamton).

[358] Brian DeLay, *The American Public Has Power Over the Gun Business. Why Doesn't it Use It?*, The Conversation (Feb. 16, 2018), *available at* https://theconversation.com/the-american-public-has-power-over-the-gun-business-why-doesnt-it-use-it-92005.

Electronic copy available at: https://ssrn.com/abstract=4546050

regulated ghost guns.[359] Today, more than twice as many do.[360] These laws are consistent with our nation's history of firearms regulation. In no sense are the entrepreneurs who sell parts and kits or their customers part of a historic tradition of "self-made arms" that should shield their guns from the serialization requirements that for more than half a century have applied to other firearms.  As with regulating high-capacity magazines, then, treating ghost guns like any other firearm (that is, requiring serial numbers and background checks) should be found constitutional under *Bruen*'s framework.

CONCLUSION

Gun-rights activists have enjoyed breathtaking victories over the past fifteen years. *Heller* and *Bruen* have inscribed the myth of continuity deep into the heart of Second Amendment jurisprudence. Experience has convinced gun rights activists that history is favorable terrain upon which fight for its legal program, hence the post-*Bruen* euphoria about overturning "virtually every gun control on the books."[361] There is no doubt that *Bruen*'s framework makes that wild aspiration more realistic than before. By refusing to consider the public interest at stake in regulation; indulging in a very high level of abstraction when defining "arms" (e.g., a flintlock musket is analogous to an AR-15) but being intolerant of abstraction when assessing law (dismissing most historic regulations as "outliers" insufficiently similar to contemporary laws); and equating regulatory silence with constitutional protection, the Court has erected formidable new obstacles to democratically-enacted firearms regulation in the United States.[362]

Locating a path around these obstacles will be a more daunting challenge for some regulations than for others. While data from case outcomes in the first year after the decision reveal a striking number of successful challenges, they also provide a (very preliminary) sense of how uneven those successes have been. A few categories of challenges have been unanimously rejected over the past year, including those connected with the National Firearms Act, unlawful use in a crime, and sentence enhancements.[363] Other challenges have done much better. Age restrictions,

---

[359] Greenlee, *supra* note 22, at 80.

[360] Everytown for Gun Safety, *supra* note 249.

[361] Hubler, *supra* note 11.

[362] For these and other critiques of the decision, see Blocher and Ruben, *supra* note 29; Charles, *supra* note 6; Alschuler, *supra* note 35.

[363] Charles, *supra* note 6, at table 3, 53.

Electronic copy available at: https://ssrn.com/abstract=4546050

licensing and permit requirements, and sensitive place regulations have prevailed just over half of the time.[364] This inconsistent judicial record says much about the inadequacy of the ruling's framework as a guide to lower courts. *Bruen*-era decisions have been described as "wildly manipulable and unpredictable,"[365] evincing "an erratic, unprincipled jurisprudence"[366] where judges "wield their power in firearms cases far more actively than their interest-balancing predecessors ever did."[367]

At the same time, the uneven record is partly explained by the fact that reliable historical evidence is more readily available for some questions than for others. The myth of continuity is challenging to debunk for many, perhaps most issues in firearms law, because it is so difficult to make definitive arguments about things that never happened. Why did the Founders not take guns away from domestic abusers or felons? Why did they not prohibit minors from purchasing guns? Why did they not institute robust licensing and permit requirements? There are sophisticated historical arguments to be made for these and related topics.[368] But those arguments will seldom turn on questions as straightforward as "did high-capacity firearms cause societal problems in the Founding era?" or "how many Henrys and Winchesters were there in the U.S. in 1868?"

Indeed, in most cases the more elaborate the historical narrative proffered by gun-rights activists, the less likely it will be to survive contact with serious historical research. That is surely one reason why assault weapon/large capacity magazine regulations have fared less poorly than some other laws, having been upheld in more than two-thirds of cases so far in the *Bruen* era.[369] Fairing less poorly is not the same thing as faring well, of course, but the contrast with some other types of regulations is notable. There have been fewer rulings on ghost gun challenges, and states have not yet engaged professional historians to help them respond to the misleading American-tradition-of-self-made-arms narrative.[370] But ghost guns represent another area of firearm law where historical research should be an effective tool in defense of regulation.

This is not to say that claims about continuity are largely correct for some categories of cases and largely incorrect for others. The differences between the founding-era and our own times are profound and extend to

---

[364] *Id.*
[365] Blocher and Ruben, *supra* note 29, at 105.
[366] *Id.*
[367] Alschuler, *supra* note 35, at 75.
[368] See for example Blocher & Siegal, *supra* note 37.
[369] Charles, *supra* note 6, at table 3, 53.
[370] Of five adjudicated claims filed against ghost gun regulation in the past year, two have been upheld. See *id.*

Electronic copy available at: https://ssrn.com/abstract=4546050

82          *The Myth of Continuity in American Gun Culture*

almost everything to do with firearms. As a matter of historical accuracy, *discontinuity* would be a much more defensible starting assumption for courts considering firearms challenges in the *Bruen* era than continuity would be. It is just that the myth of continuity is more readily debunked in some categories of firearms cases than in others, on account of the nature of the evidentiary claims. History is not inherently favorable terrain for gun-rights legal activism, in other words – unless the myth of continuity goes unchallenged in court.

***

Historians have an important and unavoidable role to play in Second Amendment litigation in the *Bruen* era. But I sympathize with Americans who feel ambivalent about that. When I have talked with friends, colleagues, and acquaintances about working as an expert witness in recent Second Amendment cases, most are understandably puzzled, even mildly aghast to learn that historians have anything to do with the fate of firearms policy in their communities. With nearly sixty million guns sold legally in the U.S. from 2020-2022,[371] with gun suicides,[372] homicides,[373] and mass shootings[374] on the rise, and with firearms fatalities now the number one cause of death for American children,[375] they believe we urgently need an array of professionals working on solutions. Public health specialists, doctors, faith and community leaders, law enforcement, legal scholars, criminologists, and, especially, democratically elected representatives

---

[371] For sales data based on the FBI's National Criminal Instant Background Check System, see Daniel Nass & Champe Barton, *How Many Guns Did Americans Buy Last Month?*, THE TRACE (June 5, 2023), https://www.thetrace.org/2020/08/gun-sales-estimates/#:~:text=Americans%20bought%20an%20estimated%201.38,an%20analysis%20of%20FBI%20data.&text=That's%20about%20the%20same%20as,like%20mass%20shootings%20and%20elections.

[372] Gun suicide, accounting for more than half of all firearms-related deaths in the United States, increased by 10% from 2019-2021. *See* John Gramlich, *What the Data Say about Gun Deaths in the U.S.*, PEW RESEARCH CENTER (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/.

[373] Gun homicides climbed 49% between 2019 and 2021. *Id.*

[374] According to the F.B.I., there were three mass-shootings in 2000 and sixty-one in 2021. *Id.*

[375] In 2020, guns surpassed automobile accidents to become the leading cause of childhood death in America. Robert Gebeloff et al., *Childhood's Greatest Danger: The Data on Kids and Gun Violence*, NY TIMES (Dec. 14, 2022), https://www.nytimes.com/interactive/2022/12/14/magazine/gun-violence-children-data-statistics.html.

Electronic copy available at: https://ssrn.com/abstract=4546050

should all be involved in discussions over effective responses to our gun crisis. But historians?

So, as a reluctant interloper into matters of constitutional law, I offer what I consider to be an optimistic prediction. In the short- to medium-term, historical research can only help blunt *Bruen*'s most disruptive implications for public safety. Even with robust partnerships between state legal teams and professional historians, the results will likely be quite uneven across different categories of law. But over the long term, an honest reckoning with the differences between our own times and the founding era can do more than expose bogus arguments against specific firearms regulations. By forcing states to research Founding-era history to defend firearms regulation, *Bruen* will inevitably bring renewed scrutiny to *Heller*'s ahistorical claim that the Second Amendment was crafted to protect an individual right to armed self-defense.

Recall that gun culture in the founding era was one that for generations had evolved around collective threats and opportunities, most of them stemming from the enduring preoccupations of slavery, settler colonialism, and inter-imperial war. Above all, increased scrutiny of the historical record will confirm that it was a gun culture molded by the state. Throughout the colonial and early national eras, government exerted an enormous influence on who did and did not have guns, and on shifting patterns of firearms ownership over time and space. When acute collective threats and opportunities arose, whether huge (the Seven Years' War) or modest (Lord Dunmore's War), much of the public relied on the state for arms and ammunition.

Most immediately, the founding generation thought about firearms in relation to their formative experience of the American Revolution. No one who had any role in that war harbored illusions that victory came from "self-made" guns. Victory had been armed by the state. It had been armed, in the first instance, by local insurgent committees purchasing whatever they could and confiscating the arms of political opponents. It had been armed by colonial assemblies who partnered with prominent merchants to scour Caribbean markets for muskets and gunpowder. It had been armed by the Continental Congress, which oversaw a sophisticated and sprawling international program to import guns and ammunition. And, ultimately, it had been armed by the generous patronage of foreign governments.[376]

Despite itself, *Bruen* will invite the nation to use its deepening understanding of the founding generation's experience with guns to revisit their reasons for crafting the Second Amendment. After prolonged

---

[376] See DeLay, *supra* note 350.

Electronic copy available at: https://ssrn.com/abstract=4546050

84          *The Myth of Continuity in American Gun Culture*

controversy and argument, Article I, Section 8 of the Constitution had just secured to the new federal government sweeping powers over state militias. Congress was empowered to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States."[377] All political observers at the time understood state power to be a precondition to arming effective collective action. Everything about the colonial and revolutionary experience confirmed that. Indeed, the state was so essential that it could effectively disarm just by failing to arm.

That given, it is little wonder that many feared the Federal government would abuse its new authority over state militias by doing just that. The Virginian George Mason, delegate to the Constitutional Convention whose reservations prevented him from signing the finished document, gave voice to these anxieties. At his state's ratifying convention, Mason objected that the new Constitution gave national authorities "almost unlimited Authority over the militia of the several states; whereby, under Colour of regulating, they may disarm, or render useless the Militia, the more easily to govern by a standing Army…"[378] Mason's suggested remedy was "an express declaration, that the state governments might arm and discipline" their militias.[379]

As several of the nation's most distinguished early American historians argued in an amicus brief to the Court in 2008, the Second Amendment was crafted to address these and other concerns about reconciling republican liberty with the need for effective military power.[380] The language of Madison's initial draft is even clearer on this point than the ratified edit: "the right of the people to keep and bear arms shall not be infringed; a well armed and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person."[381]

Justice John Paul Stevens's dissent in *Heller* correctly identified the discontinuity between the Founders' anxieties about firearms and our own. "The Second Amendment was adopted to protect the right of the people of

---

[377] U.S. Cons. Art. I, § 8.

[378] Letter from George Mason to Thomas Jefferson (May 26, 1788), *available at* https://founders.archives.gov/?q=%20Author%3A%22Mason%2C%20George%22%20Recipient%3A%22Jefferson%2C%20Thomas%22&s=1111311111&r=6.

[379] Sweeney, *supra* note 69, at 360.

[380] Brief of Jack N. Rakove, Saul Cornell, David T. Konig, Lois G. Schwoerer et al. as Amici Curiae, District of Columbia v. Heller, 554 U.S. 570 (2008).

[381] Quoted in Sweeney, *supra* note 69 at 361. For the larger debate over arming the militia, see *id.* at 359–61.

Electronic copy available at: https://ssrn.com/abstract=4546050

each of the several States to maintain a well-regulated militia," he explained. "It was a response to concerns raised during the ratification of the Constitution that the power of Congress to disarm the state militias and create a national standing army posed an intolerable threat to the sovereignty of the several States."[382]

Of course, the *Heller* majority insisted instead on continuity, arguing that the Founders were actually a lot like gun owners in our own times. Rather than the balance of federal and state power, militias, or standing armies, what really concerned them was protecting an individual right to keep and bear arms for self-defense. Americans will have to keep living and dying with the consequences of that deadly misinterpretation for the foreseeable future. But so long as *Bruen* compels renewed historical inquiry whenever a firearms regulation is challenged, the folly of modern Second Amendment jurisprudence will only come into sharper and sharper focus. History will not be kind to the myth of continuity in American gun culture.

---

[382] *Heller*, 554 U.S. at 637 (Stevens, J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=4546050

86          *The Myth of Continuity in American Gun Culture*

APPENDIX



*Fig. 1: Views of a mid-18th-century French flintlock mechanism, lock screws, cock/hammer, frizzen/battery, muskets, false breech, pistol, and breech plug, from*

Electronic copy available at: https://ssrn.com/abstract=4546050

*The Myth of Continuity in American Gun Culture*     87

*Diderot's L'encyclopédie, ou Dictionnaire Raisonné des Sciences, des Arts et des Métiers: Recueil de Planches sur les Sciences et les Arts (Paris, 1770), vol. 1, Plate V. Note the outline of the trigger, below f. 2.*



Supp. Grabarsky Decl.  188

Electronic copy available at: https://ssrn.com/abstract=4546050

88          *The Myth of Continuity in American Gun Culture*

*Fig. 2: Trigger guard and constituent parts of a French flintlock mechanism, from multiple vantage points. From Diderot's* L'encyclopédie, ou Dictionnaire Raisonné des Sciences, des Arts et des Métiers: Recueil de Planches sur les Sciences et les Arts.

Electronic copy available at: https://ssrn.com/abstract=4546050

# Exhibit 4

John W. Dillon (Bar No. 296788)
Dillon Law Group APC
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Telephone: (760) 642-7150
Facsimile: (760) 642-7151
E-mail: jdillon@dillonlawgp.com

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE CHAVEZ, et al,<br><br>                              Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,<br><br>                              Defendants. | Case No.: 3:19-cv-01226-L-AHG<br><br>Hon. M. James Lorenz and Magistrate Judge Allison H. Goddard<br><br>**PLAINTIFFS' SUPPLEMENTAL INITIAL DISCLOSURES**<br><br>Complaint Filed: July 1, 2019<br>Third Amended Complaint Filed: March 22, 2023 |

PLAINTIFFS' SUPPLEMENTAL INITIAL DISCLOSURES (3:19-CV-01226-L-AHG)

Jose Chavez, Andrew Morris, PWGG, L.P. (d.b.a. Poway Weapons and Gear and PWG Range), North County Shooting Center, Inc., Firearms Policy Coalition, Inc., FPC Action Foundation (formerly Firearms Policy Foundation), the California Guns Rights Foundation, and Second Amendment Foundation (collectively, "Plaintiffs") hereby submits its Supplemental Initial Disclosures pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 26(e)(1).

The disclosures contained herein and the accompanying documents are based on the information and documents reasonably available to Plaintiffs at the present time. Plaintiffs' discovery and investigation is continuing. Pursuant to FRCP Rule 26(e), Plaintiffs hereby reserve the right and indicates their intention to supplement these disclosures with information and documents assembled and obtained during the course of this proceeding as required by law. Nothing herein is intended to waive any privilege or alter any substantive rights of the Plaintiffs.

## I.       INDIVIDUALS WHO MAY HAVE DISCOVERABLE INFORMATION

### a.  Individual Plaintiffs

#### i.  Jose Chavez

1. Address:

   100 Clubhouse Way
   Tracy, CA 95376

2. Telephone Number: 1 (209) 646-4110

Mr. Chavez has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Specifically, Mr. Chavez has knowledge of (i) his desire to purchase, acquire, and use firearms for self-defense and all other lawful purposes; (ii) his eligibility to purchase and own a firearms but for California Penal Code section 27510's prohibition due to his age; (iii) the lack of any applicable exceptions to Penal Code section 27510; and (iv) his denial to purchase a firearm due to his age.

### ii. Andrew Morris

1. Address:

    13718 Sagewood Drive
    Poway, CA 92064

2. Telephone Number: 1 (858) 829-8267

Mr. Morris has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration.  Specifically, Mr. Morris has knowledge of (i) his desire to purchase, acquire, and use firearms for self-defense and all other lawful purposes; (ii) his eligibility to purchase and own a firearms but for California Penal Code section 27510's prohibition due to his age; (iii) the lack of any applicable exceptions to Penal Code section 27510; and (iv) his denial to purchase a firearm due to his age.

iii. **John Phillips** (Owner of Plaintiff Poway Weapons and Gear ("PWG"))

    1. Address:

        13550 Danielson Street
        Poway, California 92064

    2. Telephone Number: 1 (858) 206-5057

Mr. Phillips has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Specifically, Mr. Phillips has knowledge of (i) the State's prohibition on his ability as a federally licensed dealer to buy, sell, transfer, or allow control or possession of any firearms to an individual under the age of 21 through Defendants' enforcement of Penal Code section 27510; (ii) the fact that PWG has had to deny numerous individuals ages 18 to 20 from purchasing firearms due to the Defendants' enforcement of said law; (iii) PWG's inability to rent PWG firearms to individuals under 21 or to rent PWG firearms to groups of individuals who have individuals under 21 within their group; and (iv) Penal Code Section 27510's general application and effect on firearms sales, transfers, firearms classes, and PWG's ability to conduct firearms training courses and hunters education courses for Young Adults.

iv. **Darin Prince** (Representative of Plaintiff North County Shooting Center ("NCSC")

    1. Address:

        1440 Descanso Ave.

San Marcos, California 92069

2. Telephone Number: 1 (760) 798-7300

Mr. Prince has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Specifically, Mr. Prince has knowledge of (i) the State's prohibition on his ability as a federally licensed dealer to buy, sell, transfer, or allow control or possession of any firearms to an individual under the age of 21 through Defendants' enforcement of Penal Code section 27510; (ii) the fact that NCSC has had to deny numerous individuals ages 18 to 20 from purchasing firearms due to the Defendants' enforcement of said law; (iii) NCSC's inability to rent NCSC firearms to individuals under 21 or to rent NCSC firearms to groups of individuals who have individuals under 21 within their group; and (iv) Penal Code Section 27510's general application and effect on firearms sales, transfers, firearms classes, and NCSC's ability to conduct firearms training courses and hunters education courses for Young Adults.

**b. Institutional/Organizational Plaintiffs**

i. **Brandon Combs** (Representative of Plaintiff Firearms Policy Coalition)

1. Address:

5550 Painted Mirage Road, Ste. 320
Las Vegas, Nevada 89149

2. Telephone Number: 1 (916) 378-5785

# Exhibit 4

Mr. Combs has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Specifically, Mr. Combs has general knowledge of (i) FPC's purpose and mission regarding Second Amendment rights; (ii) FPC's members which include individuals ages 18-to-20 years old.

    ii. **Alan Gottlieb** (Representative of Plaintiff Second Amendment Foundation)

        1. Address:

           12500 NE 10th Pl.
           Bellevue, Washington 98005

        2. Telephone Number: 1 (425) 454-7012

Mr. Gottlieb has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Specifically, Mr. Gottlieb has general knowledge of (i) SAF's purpose and mission regarding Second Amendment rights; and (ii) SAF's members which include individuals ages 18-to-20 years old.

    iii. **Gene Hoffman** (Representative of California Gun Rights Foundation)

        1. Address: 333 University Ave, Suite 200, Sacramento, California 95825

        2. Telephone Number: (800) 556-2109

Mr. Hoffman has general knowledge regarding each of Plaintiffs' allegations against Defendants. Specifically, Mr. Gottlieb has general knowledge of (i) California Gun Rights Foundations' purpose and mission regarding Second Amendment rights; and (ii) California Gun Rights Foundations' members which include individuals ages 18-to-20 years old.

iv. **Jeffrey Silvester** (Representative of FPC Action Foundation)

v. Address: 5550 Painted Mirage Road, Suite 320, Las Vegas, Nevada 89149

vi. Email: jsi@fpchq.org

Mr. Silvester has general knowledge regarding each of Plaintiffs' allegations against Defendants. Specifically, Mr. Silvester has general knowledge of (i) FPC Action Foundation's purpose and mission regarding Second Amendment rights; and (ii) FPC Action Foundation's members which include individuals ages 18-to-20 years old.

c. **Non-Party Witnesses and Declarants**

i. **Thomas Marvell.**

1. Address: Williamsburg, Virginia

2. Telephone Number: 1 (757) 229-3531

Dr. Marvell has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Dr. Marvell can provide information regarding his professional background and expertise.  Dr. Marvell has

authored or co-authored more than 30 publications concerning criminology, 11 of which pertain to gun laws. Based on Dr. Marvell's education, work experience, research background, publications, and review of the research of others, he can provide his expert opinion that there is no evidence that gun laws banning the purchase or possession of firearms based on age restrictions have the intended effect of reducing gun homicides and suicides; and that he has found no discernable crime-reduction impact as a result of such laws. Additionally, Dr. Marvell can provide his expert opinion that increasing the minimum age to purchase firearms from 18 to 21 does not have any more effect than other minimum age requirements currently in place.

### ii.  David T. Hardy.

1. Address: 8987 East Tanque Verde Road, No. 265, Tucson, AZ 85749

2. Telephone Number: 1 (520) 490-9460

Mr. Hardy has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration.  Mr. Hardy can provide information regarding his professional background and expertise. As a licensed attorney specializing in the Second and Fourteenth Amendments, as well as his numerous publications on the Second and Fourteenth Amendments, Mr. Hardy can provide his expert opinion and knowledge of historical statutes, regulations, and case law regarding the Second Amendment and age-based firearms regulations in the

United States. Based on Mr. Hardy's education, work experience, research background, publications, and review of the research of others, he can provide his expert opinion that, based on his review of Colonial and Founding Era firearms regulations, there were *no* age-based restrictions on the acquisition, purchase, transfer, or possession of firearms for 18-to-20-year-old adults ("Young Adults"). Mr. Hardy can also provide his expert opinion and knowledge on the various state militia acts throughout this nation's history. Mr. Hardy can provide his expert opinion that Young Adults possess the same protection under the Second Amendment as adults 21 and over.  Further, Mr. Hardy will be able to provide his expert opinion that, any firearm ban on Young Adults, based solely on age, significantly infringes on the core Second Amendment rights of Young Adults.

### iii.  John R. Lott.

1.  Address:

Burke, Virginia

2.  Telephone Number: 1 (484) 802-5373

Mr. Lott has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration.  Dr. Lott graduated with a bachelor's degree in economics from the University of California Los Angeles (UCLA) in 1980.  He obtained his master's degree in economics from UCLA in 1982; and his PhD in economics from UCLA in 1984.  He has held research and/or teaching positions at various higher education academic institutions, including the

University of Chicago, Yale University, the Wharton School of the University of Pennsylvania, Stanford University, and Rice University; and was the chief economist at the United States Sentencing Commission during 1988-1989.

Dr. Lott has authored numerous academic and popular publications. For example, he has authored (a) nine books, including *More Guns, Less Crime*, *The Bias Against Guns*, and *Freedomnomics;* and (b) more than 100 articles in peer-reviewed academic journals. Dr. Lott is also the founder and president of the Crime Prevention Research Center (CPRC). CPRC is a research and education organization dedicated to conducting academic quality research on the relationship between laws regulating the ownership or use of guns, crime, and public safety; educating the public on the results of such research; and supporting other organizations, projects, and initiatives that are organized and operated for similar purposes.

Specifically, Dr. Lott can provide his expert opinion regarding (i) age-based firearms laws and restrictions; (ii) sources of where criminals obtain firearms illegally; (iii) the effect of firearms bans on crime and criminal access to firearms; (iv) age distribution of mass shooters; (v) comparisons of various crime statistics; (vi) concealed carry revocation rates; and (vi) other relevant firearms and crime statistics.

### iv.  David Bogan.

    1.  Address: 41835 Camino De La Torre, Temecula, CA 92592

    2.  Telephone Number: 1 (951) 536-0171

Mr. Bogan has general knowledge regarding each of Plaintiffs' allegations against Defendants and the contents of his signed declaration. Mr. Bogan holds a California Department of Fish and Wildlife Hunter's Education Instructor Certificate (No. 004392) and is Board Member of the Hunter Education Instructors Association and the Southern California Region Liaison to the Boy Scouts of America. Mr. Bogan has provided instruction for 35 California Hunter's Education courses and instructed 638 Hunter's Education students.

Specifically, Mr. Bogan can provide his expert opinion and knowledge of the California Hunter's Education course, application process, course topics/materials, and the standards and requirements of said course. Mr. Bogan also can provide expert knowledge regarding the Firearms Safety Certificate Program, study guide, course topics, testing procedures, and minimum requirements to pass the Firearm Safety Certificate test.

## II.   DOCUMENTS IN PLAINTIFFS' POSSESSION, CUSTODY, OR CONTROL

### a.  Initial Disclosure

This initial disclosure contains the attached list of documents and their description by category and location of all documents, electronically stored information, and tangible things that Plaintiffs have in their possession, custody, or control. Attached hereto as **Attachment A** is said list.

Furthermore, Plaintiffs expect that they will locate/receive additional documents. Plaintiffs will supplement its production of documents when such documents are located/received during the course of this proceeding as required by law.

## III.    CATEGORY OF DAMAGES CLAIMED BY PLAINTIFFS

This case involves a constitutional challenge to California's Penal Code section 27510 alleging a violation of Plaintiffs' Second Amendment rights. There are no damages claimed in this action.

## IV.    INSURANCE AGREEMENTS

Plaintiffs' are not aware of any insurance agreements that could be relevant to this action.

August 18, 2023                              Respectfully submitted,

                                             Dillon Law Group APC

                                             By: ____*/s/ John W. Dillon*_____
                                                   John W. Dillon
                                                   Attorney for Plaintiffs

## ATTACHMENT A

## EXHIBITS
### to Declarations In Support of Motion for Preliminary Injunction

| <u>No.</u> | <u>Description of Exhibit</u> | <u>Page(s)</u> | <u>Location of Document</u> |
|---|---|---|---|
| 1. | David Bogan, Curriculum Vitae | Bogan Dec., Ex. No. 1, pp 0001 – 0004 | Dillon Law Group APC 2647 Gateway Road, Suite 105, No. 255 Carlsbad, CA 92009 (DLG) *Previously Filed With the court and served on Defendants |
| 2. | Hunter's Education course materials – Today's Hunter in California | Bogan Dec., Ex. No. 2, pp 0005 – 0129 | DLG *Previously Filed With the court and served on Defendants |
| 3. | Penal Code section 26845 | Bogan Dec., Ex. No. 3, pp 0130 – 0132 | DLG *Previously Filed With the court and served on Defendants |
| 4. | California Firearm Safety Certificate Study Guide, Office of the Attorney General, Department of Justice Bureau of Firearms (January 2019) | Bogan Dec., Ex. No. 4, pp 0133 – 0184 | DLG *Previously Filed With the court and served on Defendants |
| 6. | U.S. Department of Justice, Office of Justice Programs, "Bureau of Justice | Dillon Dec., Ex. | DLG |

1

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| | Statistics Special Report: Age Patterns of Victims of Serious Violent Crime" | No. 1, pp 0001 – 0030 | *Previously Filed With the court and served on Defendants |
| 7. | United States Secret Service National Threat Assessment Center: *Mass Attacks in Public Space – 2018*, Department of Homeland Security, Published July 2019 | Dillon Dec., Ex. No. 2, pp 0031 – 0051 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 8. | *School Climate and Safety*, 2015-16 Civil Rights Data Collection, Data Highlights on School Climate and Safety in Our Nation's Public Schools, U.S. Department of Education Office for Civil Rights | Dillon Dec., Ex. No. 3, pp 0052 – 0070 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 9. | *More than 228,000 students have experienced gun violence at school since Columbine*, The Washington Post's database of school shootings, The Washington Post | Dillon Dec., Ex. No. 4, pp 0071 – 0078 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 10. | *Three Decades of School Shootings: An Analysis* –Tawnell D. Hobbs, The Wall Street Journal, published April 19, 2019 | Dillon Dec., Ex. No. 5, pp 0079 - 0089 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 11. | *Everything We Know About The San Bernardino Terror Attack Investigation So Far,* Los Angeles Times, published December 14, 2015 | Dillon Dec., Ex. No. 6, pp 0090 - 0104 | DLG<br><br>*Previously Filed With the court and served on Defendants |

2

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| 12. | David T. Hardy, Curriculum Vitae | Hardy Dec., Ex. No. 1, pp 0001 – 0007 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 13. | Clayton E. Cramer *Colonial Firearm Regulation*, 16 J. on Firearms & Pub. Pol'y (2004) | Hardy Dec., Ex. No. 2, pp 0008 – 0056 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 14. | Connecticut Acts and Laws, October Session (1792) | Hardy Dec., Ex. No. 3, pp 0057 – 0070 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 15. | An Act for Establishing the Militia In This State, Delaware (1793) | Hardy Dec., Ex. No. 4, pp 0071 – 0085 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 16. | An Act to Revise and Amend the Militia Law of This State, and to Adapt the Same to the Act of Congress of the United States, Passed the Eighth Day of May, One Thousand Seven Hundred and Ninety-Two, Entitled An Act More Effectually to Provide for the National Defence by Establishing and Uniform Militia Throughout the United States, as | Hardy Dec., Ex. No. 5, pp 0086 – 0106 | DLG<br><br>*Previously Filed With the court and served on Defendants |

3

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| | contained in Digest of the Laws of Georgia, 460 (1792) | | |
| 17. | Ch. LIII, An Act to Regulate and Discipline the Militia of This State, Laws of Maryland (1793) | Hardy Dec., Ex. No. 6, pp 0107 – 0115 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 18. | Ch. 1, An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts, and for Repealing All Laws Heretofore Made for That Purpose; excepting an Act Entitled, An Act for Establishing Rules and Articles for Governing the Troops Stationed in Forts and Garrisons, Within This Commonwealth, and Also the Militia, When Called Into Actual Service, Massachusetts Acts and Laws, May Session (1793) | Hardy Dec., Ex. No. 7, pp 0116 – 0137 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 19. | An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose, New Hampshire, 441 (1792) | Hardy Dec., Ex. No. 8, pp  0138 - 0149 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 20. | Ch. CCCCXIII, An Act for Organizing and Training the Militia of This State, Sec. 4, Acts of the General Assembly of the State of New Jersey (1792) | Hardy Dec., Ex. No. 9, pp 0150 – 0155 | DLG<br><br>*Previously Filed With the court and served on Defendants |

4

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| 21. | Ch. 45, An Act to Organize the Militia of This State. Laws of New York (1793) | Hardy Dec., Ex. No. 10, pp 0156 – 0168 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 22. | Ch. XXII, An Act for Establishing a Militia in This State, Laws of North Carolina — 1786 | Hardy Dec., Ex. No. 11, pp 0169 – 0171 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 23. | Ch. MDCXCVI, An Act for Regulating the Militia of the Commonwealth of Pennsylvania, Statutes at Large of Pennsylvania, 454-481 (1793) | Hardy Dec., Ex. No. 12, pp 0172 – 0204 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 24. | An Act to Organize the Militia Throughout the State of South Carolina, in Conformity with the Act of Congress, Statutes at Large of South Carolina, Vol. 8 (1794-1837) | Hardy Dec., Ex. No. 13, pp 0205 – 0326 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 25. | Ch. CXLVI, An Act for Regulating the Militia of this Commonwealth, Virginia (1792) | Hardy Dec., Ex. No. 14, pp 0327 – 0335 | DLG<br><br>*Previously Filed With the court and served on Defendants |
| 26. | Uniform Militia Act, 1 Stat. 271-72 (1792) | Hardy Dec., Ex. No. 15, pp 0336 – 0340 | DLG<br><br>*Previously Filed With the court and |

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| | | | served on Defendants |
| 27. | David B. Kopel & Joseph G.S. Greenlee *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People (2018)* | Hardy Dec., Ex. No. 16, pp 0341 – 0379 | DLG *Previously Filed With the court and served on Defendants |
| 28. | Kopel, David B. and Joseph Greenlee *The Second Amendment Rights of Young Adults* (2019) | Hardy Dec., Ex. No. 17, pp 0380 – 0480 | DLG *Previously Filed With the court and served on Defendants |
| 29. | *1 Journals of the AM. Congress From 1774-1788* | Hardy Dec., Ex. No. 18, pp 0481 – 0496 | DLG *Previously Filed With the court and served on Defendants |
| 30. | 1 David Ramsey, *The History of the American Revolution* 181 (Liberty Fund 1990) (1789) | Hardy Dec., Ex. No 19, pp 0497 – 0752 | DLG *Previously Filed With the court and served on Defendants |
| 31. | 3 Am. Archives 4th Ser. (Clark & Force) 621 (1840) | Hardy Dec., Ex. No. 20, pp 0753 – 0756 | DLG *Previously Filed With the court and served on Defendants |

6

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| 32. | Thomas Jefferson, *Writings 760* (Merrill D. Peterson, ed., 1984) | Hardy Dec., Ex. No. 21, pp 0757 – 0760 | DLG <br><br>*Previously Filed With the court and served on Defendants |
| 33. | Tench Coxe, *A Pennsylvanian, No. 3*, *Pennsylvania Gazette*, Feb. 20, 1788 | Hardy Dec., Ex. No. 22, pp 0761 – 0764 | DLG <br><br>*Previously Filed With the court and served on Defendants |
| 34. | David B. Kopel, *The Posse Comitatius and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 763, (2015) | Hardy Dec., Ex. No. 23, pp 0765 - 0856 | DLG <br><br>*Previously Filed With the court and served on Defendants |
| 35. | John R. Lott Curriculum Vitae | Lott Dec., Ex. No. 1, pp 0001 - 0124 | DLG <br><br>*Previously Filed With the court and served on Defendants |
| 36. | Mariel Alper and Lauren Glaze "Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016" U.S. Department of Justice, Office of Justice Programs, (2019) | Lott Dec., Ex. No. 2, pp 0125 - 0145 | DLG <br><br>*Previously Filed With the court and served on Defendants |
| 37. | Associated Press "Mexico sets 1st half murder record, up 5.3%" ( 2019); FBI Uniform Crime Report for 2017 | Lott Dec., Ex. No. 3, pp 0146 - 0151 | DLG <br><br>*Previously Filed With the court and |

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| | | | served on Defendants |
| 38. | Margaret K. Formica, et al. "Can Mass Shootings be Stopped? To Address the Problem, We Must Better Understand the Phenomenon" (2018) | Lott Dec., Ex. No. 4, pp 0152 - 0168 | DLG  *Previously Filed With the court and served on Defendants |
| 39. | John R. Lott, Jr. and John E Whitley Abortion and Crime: Unwanted children and out-of-wedlock births (2006); FBI, Uniform Crime Report Crime in the United States (2017) | Lott Dec., Ex. No. 5, pp 0169 - 0191 | DLG  *Previously Filed With the court and served on Defendants |
| 40. | SB 1100's Legislative History Senate Committee on Public Safety Bill No. 1100 (2018) | Lott Dec., Ex. No. 6, pp 0192 - 0199 | DLG  *Previously Filed With the court and served on Defendants |
| 41. | 2018 Texas Department of Public Safety, Regulatory Services Division, Handgun Licensing Program, Demographic Information by Age, Licenses: Issued, Revoked, and Suspended | Lott Dec., Ex. No. 7, pp 0200 - 0203 | DLG  *Previously Filed With the court and served on Defendants |
| 42. | FBI, Uniform Crime Report Crime in the United States (2017)Table 2 | Lott Dec., Ex. No. 8, pp 0204 - 0205 | DLG  *Previously Filed With the court and served on Defendants |
| 43. | Thomas Marvell Curriculum Vitae | Marvell Dec., Ex. No. 1, pp 0001 - 0004 | DLG  *Previously Filed With the court and |

8

| No. | Description of Exhibit | Page(s) | Location of Document |
|---|---|---|---|
| | | | served on Defendants |
| 44. | Kleck, Gary *"Regulating guns among young adults,"* American Journal of Criminal Justice (2019) | Marvell Dec., Ex. No. 2, pp 0005 - 0021 | DLG *Previously Filed With the court and served on Defendants |
| 45. | Kleck, Gary, et al. "Does Gun Control Reduce Violent Crime?" *Criminal Justice Review* (2016) | Marvell Dec., Ex. No. 3, pp 0022 - 0048 | DLG *Previously Filed With the court and served on Defendants |
| 46. | Gius, Mark "The impact of minimum age and child access prevention laws on firearms related youth suicides and unintentional deaths," *Social Science Journal* (2015) | Marvell Dec., Ex. No. 4, pp 0049 - 0057 | DLG *Previously Filed With the court and served on Defendants |
| 47. | Rodríguez et al. "Gun control and suicide: impact of state firearm regulations in the United States," 1995-2004. *Health Policy* (2011) | Marvell Dec., Ex. No. 5, pp 0058 - 0067 | DLG *Previously Filed With the court and served on Defendants |
| 48. | Rosengart et al. "An evaluation of state firearms regulations and homicide and suicide death rates," *Injury Prevention* (2005) | Marvell Dec., Ex. No. 6, pp 0068 - 0075 | DLG *Previously Filed With the court and served on Defendants |
| 49. | Webster et al. "Association between youth- | Marvell Dec., Ex. | DLG |

| <u>No.</u> | <u>Description of Exhibit</u> | <u>Page(s)</u> | <u>Location of Document</u> |
|---|---|---|---|
|  | focused firearm laws and youth suicides," *Journal of the American Medical Association* (2004) | No. 7, pp 0076 - 0085 | *Previously Filed With the court and served on Defendants |
| 50. | Marvell, Thomas "The impact of banning juvenile gun possession," *Journal of Law and Economics* (2001) | Marvell Dec., Ex. No. 8, pp 0086 - 0109 | DLG  *Previously Filed With the court and served on Defendants |
| 51. | Kleck, Gary et al. "The impact of gun control and gun ownership levels on violence rates," *Journal of Quantitative Criminology* (1993) | Marvell Dec., Ex. No. 9, pp 0110 - 0150 | DLG  *Previously Filed With the court and served on Defendants |
| 52. | Morral, et al. *The Science of Gun Policy:A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* (2018) | Marvell Dec., Ex. No. 10, pp 0151 - 0329 | DLG  *Previously Filed With the court and served on Defendants |
| 53. | Luca et al. "*The Impact of Mass Shootings on Gun Policy*," Working Paper (2019) | Marvell Dec., Ex. No. 11, pp 0330 - 0389 | DLG  *Previously Filed With the court and served on Defendants |

10

## DECLARATION OF SERVICE BY ELECTRONIC MAIL

**Case Name:**      Jose Chavez, et al. v. Rob Bonta, et al.
**Case No.:**        3:19-cv-01226-L-AHG

      I, John W. Dillon, am a member of the California State Bar. I am over the age of 18 years of age and counsel for Plaintiffs in this matter. On August 18, 2023, I served the documents listed below by transmitting a true copy via electronic mail addressed as follows:

Jennifer Rosenberg
Office of the Attorney General                     E-mail Address:
300 South Spring Street, Suite 1702       Jennifer.Rosenberg@doj.ca.gov
Los Angeles, CA 90013-1230

1. PLAINTIFF FIREARMS POLICY COALITION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS
2. PLAINTIFF FIREARMS POLICY COALITION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES
3. PLAINTIFF FIREARMS POLICY COALITION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
4. PLAINTIFF FPC ACTION FOUNDATION'S (FORMERLY FIREARMS POLICY FOUNDATION) SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS
5. PLAINTIFF FPC ACTION FOUNDATION'S (FORMERLY FIREARMS POLICY FOUNDATION) SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES
6. PLAINTIFF FPC ACTION FOUNDATION'S (FORMERLY FIREARMS POLICY FOUNDATION) SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
7. PLAINTIFF CALIFORNIA GUN RIGHTS FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS
8. PLAINTIFF CALIFORNIA GUN RIGHTS FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES

9.  PLAINTIFF CALIFORNIA GUN RIGHTS FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
10. PLAINTIFF SECOND AMENDMENT FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS
11. PLAINTIFF SECOND AMENDMENT FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF INTERROGATORIES
12. PLAINTIFF SECOND AMENDMENT FOUNDATION'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS
13. PLAINTIFFS SUPPLEMENTAL INITIAL DISCLOSURES
14. PROOF OF SERVICE

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on August 18, 2023, in Carlsbad, California.

_____

John W. Dillon