John W. Dillon (SBN 296788)
jdillon@dillonlawgp.com
**DILLON LAW GROUP APC**
2647 Gateway Road
Suite 105, No. 255
Carlsbad, California 92009
Phone: (760) 642-7150
Fax: (760) 642-7151

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE CHAVEZ, et al.,<br><br>            Plaintiffs,<br><br>vs.<br><br>ROB BONTA, in his official capacity as Attorney General of California, et al.,<br><br>            Defendants. | Case No. 3:19-cv-01226-L-AHG<br><br>**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY** |

## Introduction and Summary

Plaintiffs Jose Chavez, *et al.* ("Plaintiffs") submit the following additional legal authority to support their claims for relief: *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 23-30033, 2025 WL 340799 (5th Cir. Jan. 30, 2025). The Fifth Circuit's published Slip Opinion ("Slip Op.") is attached hereto as **Exhibit A**.

In *Reese*, the Fifth Circuit issued a pivotal opinion reversing the district court's judgment granting Defendants' motion to dismiss, and holding that: (1) the Second Amendment's right to keep and bear arms covers the right to purchase arms; (2) persons 18-to-20-years old were part of "the people" for Second Amendment purposes, and therefore, the plain text of the Second Amendment presumptively protected their right to keep and bear arms; and (3) there was no historical analogue to statutes prohibiting Federal Firearm Licensees (FFLs) from selling handguns to 18-to-20-year-old adults, and thus the subject statutes and their attendant regulations violated the Second Amendment's right of "the people" to keep and bear arms. In so holding, the Fifth Circuit also abrogated *National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ("*NRA I*"), a case relied upon by Defendants and this Court in this case. Plaintiffs rely on *Reese* as persuasive authority for the propositions addressed below.

*Reese* addressed a Second Amendment challenge to the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), which together prohibit FFLs from selling handguns to 18-to-21-year-old adults, which challenge closely parallels the legal issues presented in this case. In finding the federal law unconstitutional under the Second Amendment, the Fifth Circuit applied the legal framework established by the Supreme Court in *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), and affirmed in *United States v. Rahimi*, 602 U.S. 680 (2024), which require courts to first determine whether the Second Amendment's plain text covers the conduct at issue, and if so, whether the challenged law or regulation is consistent with the Nation's historical tradition of

firearms regulation. *Reese*, 2025 WL 340799 at *1. The district court assumed the plain text of the Second Amendment covered the purchase of firearms by 18-to-20-year-olds, but found that the law was consistent with historical traditions, relying heavily on *NRA I*. *Id*., at *2. The Fifth Circuit abrogated *NRA I* due to the two recent "clarifying Supreme Court opinions on the methodology by which we construe gun regulations under the Second Amendment." *Id*. at *1. Considering the controlling authority of *Bruen* and *Rahimi*, the Fifth Circuit concluded "[w]e are now compelled to focus intently on the evidence of firearm access and ownership by eighteen-to-twenty-year-olds near and at the founding, and we conclude that (1) *NRA I* is incompatible with the *Bruen* and *Rahimi* decisions of the Supreme Court, and (2) these provisions are inconsistent with the Second Amendment." *Id.,* at *1. The *Reese* decision also addresses key arguments that have been relied on by the parties in this case.

### **Purchasing Firearms Falls Under the Second Amendment's Plain Text**

In *Reese,* the government denied that the plain text of the Second Amendment "establish[es] a right" to purchase firearms "at any time from any source." It emphasized that the challenged federal law only limited the sale of handguns by a "particular type of seller" (FFLs) to a "particular class of buyers (under-21-year-olds)." The Court rejected these arguments, reasoning:

> "But the right to "keep and bear arms" surely implies the right to purchase them. *See Luis v. United States*, 578 U.S. 5, 26, 136 S. Ct. 1083, 1097, 194 L.Ed.2d 256 (2016) (Thomas, J., concurring) ("Constitutional rights ... implicitly protect those closely related acts necessary to their exercise."); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) (When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.").
>
> Further, the contention that sales to young adults are not covered by the Second Amendment simply because of the Act's targeted application is fundamentally inconsistent with the *Bruen/Rahimi* framework. The

threshold textual question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment "covers" the conduct (commercial purchases) to begin with. Because constitutional rights impliedly protect corollary acts necessary to their exercise, we hold that it does. To suggest otherwise proposes a world where citizens' constitutional right to "keep and bear arms" excludes the most prevalent, accessible, and safe market used to exercise the right. The baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether."

*Reese,* at *4-5.

Notably, the Fifth Circuit reached this conclusion, acknowledging that there was no outright ban in the statute on owning, possessing, carrying, gifting, and/or using handguns, or "buying handguns in the unlicensed, private market." *Id*., at *3. The simple act of prohibiting the *purchase/sale* of handguns to 18-to-20-year-olds was a violation of the Plaintiffs' Second Amendment rights. That there were other means in which 18-to-20-year-olds could acquire handguns (*e.g.,* buying handguns in the unlicensed, private market or receiving handguns as gifts) was immaterial to the constitutional question before the Fifth Circuit. *Id*., at *5 ("The threshold textual question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment "covers" the conduct (commercial purchases) to begin with. Because constitutional rights impliedly protect corollary acts necessary to their exercise, we hold that it does").

### 18-to-20-Year-Olds Are a Part of "The People"

As in this case, the government in *Reese* also asserted that 18-to-20-year-olds are not "'part of 'the people'" whom the Second Amendment protects. *Id*., at *5. The Fifth Circuit stated that this argument is "based largely on the common law's recognition of 21 years as the date of legal maturity at the time of the founding, and the fact that legislatures have long established minimum age requirements for various activities." *Id*., at *5. The Fifth Circuit then rejected the government's argument, stating "there are no age or maturity restrictions in the plain text of the [Second] Amendment, as there are

in other constitutional provisions." *Id*. According to the Fifth Circuit, this "suggests that the Second Amendment lacks a minimum age requirement." *Id.* (citing Scalia & Garner, *supra*, at 93–100 (discussing the "'omitted-case canon—the principle that what a text does not provide is unprovided'")), and adding that:

> "[I]n the unamended Constitution and Bill of Rights, the phrase 'right of the people' appears in the First Amendment's Assembly-and-Petition Clause, the Fourth Amendment's Search-and-Seizure Clause, and the Ninth Amendment. *Heller*, 554 U.S. at 579, .... All of these references confer 'individual rights' and undoubtedly protect eighteen-to-twenty-year-olds as much as twenty-one-year-olds. In fact, with modifications, the rights they confer extend to younger minors. *See, e.g., Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 95 S. Ct. 2268, 2274, 45 L.Ed.2d 125 (1975) ('[M]inors are entitled to a significant measure of First Amendment protection.'); *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S. Ct. 733, 740, 83 L.Ed.2d 720 (1985) (school-age children are protected by the Fourth Amendment, with greater permissible intrusions in the school context).

*Id*.

As Defendants in this case have argued, the government in *Reese* also asserted that because 18–20-year-olds did not enjoy the full range of civil and political rights, including the right to vote during the founding era, they are not part of "the people" for Second Amendment purposes. *Id*. at *6. The Fifth Circuit rightly rejected the argument stating, "[w]hile it may be true that eighteen-to-twenty-year-olds could not then serve on juries, firearm restrictions are notably absent from the government's list of founding-era age-limited civil and political rights. Nor does the government provide any evidence suggesting that eighteen-to-twenty-year-olds historically lacked the right to self-defense, the "central component" of the Second Amendment." *Id*. (internal citations omitted). The Fifth Circuit further clarified that limiting the individual right to keep and bear arms based on the fact that 18-to-20-year-olds were unable to exercise their "civic right" to vote "does not mean they were deprived of the individual right to self-defense." *Id*., at *6.

> "[T]he contention that 'the people' covered by the Second Amendment is limited to those who enjoyed civic or voting rights at the founding does

not withstand common-sense scrutiny. In most cases, early colonial governments conditioned eligibility to vote on various criteria, including variations of the 'forty-shilling freehold' requirement (footnote omitted). Shortly after the Constitution was ratified in 1788, states began to reassess this "landed" requirement (footnote omitted), but often maintained race and gender-based voter qualifications footnote omitted). In 1870, nearly eighty years after the ratification of the Bill of Rights, the Fifteenth Amendment extended voting rights to all Americans, regardless of race; and it was not until 1920 that the Nineteenth Amendment guaranteed women the right to vote. Finally, the Twenty-Sixth Amendment lowered the voting age for all Americans from twenty-one to eighteen in 1971.

*Thus, to say that 'the people' covered by the Second Amendment is limited to those who were a part of the 'political community' at the founding would imply excluding 'law-abiding, adult citizens' based on property ownership, race, or gender*. See *Bruen*, 597 U.S. at 31–32, 142 S. Ct. at 2134 ('It is undisputed that petitioners ...—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects.') (citing *Heller*, 554 U.S. at 580, 128 S. Ct. at 2790). Just as defining 'arms' as 'only those arms in existence in the 18th century' 'border[s] on the frivolous,' likewise, attempting to limit 'the people' to individuals who were part of the 'political community' at ratification is ludicrous. *See Heller*, 554 U.S. at 582, 128 S. Ct. at 2791. 'Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'"

*Id.*, at *6-7 (emphasis added).

Further, the Fifth Circuit acknowledged that "the history of firearm use, particularly in connection with militia service, contradicts the premise that eighteen-to-twenty-year-olds are not covered by the plain text of the Second Amendment." *Id*., at *7. According to the Fifth Circuit, the "1792 Militia Act, in turn, shows that eighteen-to-twenty-year-olds, not only served in that militia, but were required to serve…." and thus, "eighteen-to-twenty-year-olds … must be covered by the plain text of the Second Amendment, as they were compulsorily enrolled in the regiments that the Amendment was written to protect." *Id*., at *8. "The Supreme Court recognized in *Heller* and repeated in *Bruen* that the Second Amendment 'belongs to *all* Americans'…While the core of the right is rooted in self-defense and unconnected with the militia, the text of

the Amendment's prefatory clause considered along with the overwhelming evidence of their militia service at the founding indicates that eighteen-to-twenty-year-olds were indeed part of 'the people' for Second Amendment purposes." *Id.*, at *9 citations omitted).

### Historical Tradition of Arms Regulations

Because the Fifth Circuit held that the Second Amendment's plain text covers the conduct at issue, it held that the Constitution presumptively protects the conduct. *Id.*, at *9. Therefore, "[a]ccording to *Bruen*, the next question is whether restricting eighteen-to-twenty-year-olds from purchasing handguns from FFLs is 'consistent with this Nation's historical tradition of firearm regulation.'" *Id.* "The government bears the burden of proof." *Id.*

### Firearm Regulations at the Founding

In considering founding era arms regulations, the government in *Reese* relied on firearms restrictions that were implemented at universities and colleges. *Id.*, at *10. The Fifth Circuit rejected the assertion that these school policies and rules provided analogous justification for the present handgun ban. According to the Fifth Circuit, these policies were "too different in both the 'how' and the 'why' to establish a compelling historical analogue for contemporary restrictions. *Id*. "The resolutions applied to *all* enrolled students regardless of age." *Id*. "Moreover, universities had heightened authority over student conduct *in loco parentis*. Actions taken *in loco parentis* say little about the general scope of Constitutional rights and protections." *Id*. The Fifth Circuit also stated that these "university resolutions" imposed a "markedly different burden" on students:

> "The current handgun ban prohibits law-abiding, adult citizens from buying handguns from FFLs on account of their age, whereas the university resolutions simply disarmed students while on school grounds. Not only are these resolutions inapt in scope and purpose, but we are mindful of the Supreme Court's caution against construing too broadly the

> category of "sensitive places such as schools and government buildings," as it would "eviscerate the general right to publicly carry arms for self-defense.

*Id.*

The Fifth Circuit also addressed the same government argument advanced in this case. Specifically, the Fifth Circuit considered the argument that the challenged law evidences a legislatures' "broader authority to restrict arms-bearing by 'categories of persons' that 'present a special danger of misuse.'" *Id.,* at *11. The Fifth Circuit correctly rejected this notion, stating that such an argument "misquotes *Rahimi*" which explicitly stated those laws "appl[y] *only* once a court has found that *the defendant* 'represents a credible threat to the physical safety' of another." *Id.* The Fifth Circuit further explained:

> "The government's contention is meritless. The domestic violence gun ban in *Rahimi* was held 'relevantly similar' to a historic tradition of 'restrict[ing] gun use to mitigate demonstrated threats of physical violence' through surety and going armed laws. The under-twenty-one handgun purchase ban, however, requires no 'judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon.' *Rahimi* expressly rejected the contention that, under its historical analysis, '[Petitioner] may be disarmed simply because he is not 'responsible.'"

*Id.*

After thoroughly considering and rejecting all the government's arguments, the Fifth Circuit held "[t]he government's proposed founding-era analogues do not meet its burden to establish a historical tradition of firearm restrictions imposed on eighteen-to-twenty-year-old Americans. *Id.*, at *12.

### Reconstruction-Era and Late 19th Century Arms Regulations

The Fifth Circuit acknowledged that "[t]wenty-two jurisdictions, including nineteen states, the District of Columbia, and two municipalities, passed laws between 1856 and 1897 that limited the Second Amendment rights of eighteen-to-twenty-year-

olds in some way." *Id*., at *12. However, the court noted "[t]he limitation of these late 19th century analogues is not in the "how" or the "why" of regulation, but rather that the laws were passed too late in time to outweigh the tradition of pervasively acceptable firearm ownership by eighteen-to-twenty-year-olds at "the crucial period of our nation's history." *Id*. The Fifth Circuit explained:

> "*Bruen* cautioned that 'when it comes to interpreting the Constitution, not all history is created equal.' 597 U.S. at 34, 142 S. Ct. at 2136. Rather, 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.' *Heller*, 554 U.S. at 634–35, 128 S. Ct. at 2821; *see Bruen*, 597 U.S. at 34, 142 S. Ct. at 2136. As Justice Barrett explained in her concurrence in *Rahimi*, 'for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function.' *Rahimi*, 602 U.S. at 737–38, 144 S. Ct. at 1924 (Barrett, J., concurring); *see Bruen*, 597 U.S. at 36, 142 S. Ct. at 2137 (quoting *Heller*, 554 U.S. at 614, 128 S. Ct. at 2810) ('[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'); *United States v. Connelly*, 117 F.4th 269, 281-82 (5th Cir. 2024).
>
> To be sure, *Heller* and *Bruen* both considered 19th century sources in their analysis—to confirm and reinforce earlier historical evidence contemporaneous with the Constitution's ratification. *See Bruen*, 597 U.S. at 37, 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 587 U.S. 678, 702, 139 S. Ct. 1960, 1976, 204 L.Ed.2d 322 (2019)) (stating that, in *Heller*, '[t]he 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established.'). While acknowledging the 'ongoing scholarly debate' regarding the most relevant period of history for issues arising under the Fourteenth Amendment, the Court clarified that 'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'"

*Id*., at *13.

The Fifth Circuit's decision in *Reese* is directly on point and persuasive authority as to the precise legal issues before this Court. In the words of the Fifth Circuit:

"Ultimately, the text of the Second Amendment includes eighteen-to-twenty-year-old individuals among 'the people' whose right to keep and bear arms is protected. The federal government has presented scant evidence that eighteen-to-twenty-year-olds' firearm rights during the founding-era were restricted in a similar manner to the contemporary federal handgun purchase ban, and its 19th century evidence 'cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.'"

*Id.*, at *13 (citations omitted).

## Conclusion

The *Reese* decision abrogated *NRA I*, and for good reason. It also invalidated the challenged law banning 18-to-20-year-olds from purchasing a handgun under the *Heller/Bruen/Rahimi* legal framework. In the process, the Fifth Circuit rejected virtually all the same arguments advanced by the government in this case. Plaintiffs urge this Court to consider and apply *Reese* and issue a ruling in favor of Plaintiffs' Second Amendment rights.

February 12, 2025                                    **DILLON LAW GROUP APC**

/s/ John W. Dillon
John W. Dillon

Attorneys for Plaintiffs