**EXHIBIT A**

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 30, 2025

Lyle W. Cayce
Clerk

————————

No. 23-30033

————————

CALEB REESE; FIREARMS POLICY COALITION, INCORPORATED; SECOND AMENDMENT FOUNDATION; LOUISIANA SHOOTING ASSOCIATION; EMILY NAQUIN,

*Plaintiffs—Appellants*,

*versus*

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES; STEVEN DETTELBACH, *Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*; JAMES R. MCHENRY III, *Acting U.S. Attorney General*,

*Defendants—Appellees*.

————————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:20-CV-1438

————————————————————

Before ELROD, *Chief Judge*, JONES, and BARKSDALE, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

This is a second challenge in our court to the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), which together prohibit Federal Firearms Licensees from selling handguns to eighteen-to-twenty-year-old adults. In *National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,

No. 23-30033

700 F.3d 185 (5th Cir. 2012) ("*NRA I*"), this court upheld those provisions. But that decision, which was criticized at the time, *see National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 341 (5th Cir. 2013) ("*NRA II*") (Jones, J., dissenting from denial of rehearing en banc), preceded two recent clarifying Supreme Court opinions on the methodology by which we construe gun regulations under the Second Amendment. We are now compelled to focus intently on the evidence of firearm access and ownership by eighteen-to-twenty-year-olds near and at the founding, and we conclude that (1) *NRA I* is incompatible with the *Bruen* and *Rahimi* decisions of the Supreme Court, and (2) these provisions are inconsistent with the Second Amendment. Accordingly, we REVERSE the district court's contrary judgment and REMAND for further proceedings consistent with this opinion.

## I. Background

### A. Procedural History

Appellants filed suit in the district court against the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), its Director, and the Attorney General of the United States, challenging the constitutionality of 18 U.S.C. §§ 922(b)(1) and (c)(1), and their attendant regulations, including 27 C.F.R. §§ 478.99(b), 478.124(a), and 478.96(b). These provisions, in effect, prohibit Federal Firearms Licensees ("FFLs") from selling or delivering handguns to adults under the age of twenty-one. *Id.* Appellants contend that the federal laws unconstitutionally infringe on their right to keep and bear

No. 23-30033

arms under the Second Amendment and deny them equal protection under the Due Process Clause of the Fifth Amendment.[1]

Appellants are individuals between the ages of eighteen and twenty-one and three nonprofit organizations, filing on behalf of their members who are unable to buy handguns from FFLs and FFLs who are, in turn, prohibited from selling them handguns. Because the federal laws ban purchases by adults of a certain age, Appellants recently added additional named Plaintiffs who are currently over eighteen and under twenty-one.

In 2021, the government moved to dismiss or for summary judgment, contending that Appellants lacked Article III standing and failed to state a claim upon which relief could be granted. Appellants filed a cross-motion for summary judgment. The district court found that Appellants had standing, but granted the government's motion to dismiss under Rule 12(b)(6).

In so doing, the district court purported to adopt the framework established by the Supreme Court in *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022). The court considered first "whether the Second Amendment's plain text protects the ability of 18 to 20-year-olds to directly purchase handguns from FFLs," and, if so, "whether the challenged restrictions are consistent with the Nation's historical tradition of firearm regulation." *See id.* at 24, 142 S. Ct. at 2129–30. "Out of an abundance of caution," the court assumed that the Second Amendment's plain text covered the purchase of firearms by eighteen-to-twenty-year-olds. Proceeding to *Bruen*'s historical prong, the court found that the prohibition is consistent with this Nation's historical tradition of

---

[1] Appellants also sought as-applied relief with respect to women under the age of twenty-one. The district court did not rule on that question. Given our conclusion on the facial unconstitutionality of these statutes and regulations, we do not address this issue.

firearms regulation. The court relied considerably on this court's analysis in *NRA I*, which upheld the same laws challenged here under intermediate means-ends scrutiny. The court acknowledged, however, that means-ends scrutiny was rejected by *Bruen*, 597 U.S. 1, 142 S. Ct. 2111. Appellants timely appealed.

After oral argument, this appeal was abated pending the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. 680, 144 S. Ct. 1889 (2024). There, the Supreme Court largely reinforced and refined the *Bruen* analysis and ultimately upheld 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a domestic violence restraining order from possessing firearms. *Id.* at 692, 144 S. Ct. at 1898. After supplemental briefing and another round of oral argument, we now return to the constitutionality of §§ 922(b)(1), (c)(1) and their attendant regulations.

### B. Statutory Framework

Congress enacted the Omnibus Crime Control and Safe Streets Act ("Act") in 1968, and, *inter alia*, prohibited FFLs from selling certain firearms to certain purchasers based on the purchaser's age. Pub. L. No. 90-351, tit. IV, § 922(b)(1), 82 Stat. 197 (1968). The first challenged provision states:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver [] any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm, or ammunition is other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age[.]

18 U.S.C. § 922(b)(1). Additionally, § 922(c)(1) prohibits FFLs from selling such a firearm to "a person who does not appear in person at the licensee's

No. 23-30033

business premises," absent a sworn statement that they are "twenty-one years or more of age[.]" 18 U.S.C. § 922(c)(1).

ATF implemented regulations prohibiting the sale of firearms "other than a shotgun or rifle" to adults under twenty-one. 27 C.F.R. § 478.99(b), for instance, states in part:

> A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver . . . [any] firearm, or ammunition, . . . other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the importer, manufacturer, dealer, or collector knows or has reasonable cause to believe is less than 21 years of age[.]

As a result, eighteen-to-twenty-year-olds "may not purchase handguns from FFLs." *NRA I*, 700 F.3d at 190. The Act and regulations do nothing to prohibit eighteen-to-twenty-year-olds from owning, possessing, or carrying handguns, nor does it prohibit them from buying handguns in the unlicensed, private market or receiving handguns as gifts.

Appellants allege that this "handgun ban" is inconsistent with our Nation's history of firearm regulation and thus unconstitutionally infringes on their Second Amendment right to keep and bear arms.

## C. The Second Amendment

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *District of Columbia v. Heller* and *McDonald v. City of Chicago*, the Supreme Court held that the Amendment, in conjunction with the Fourteenth, "protect[s] an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17, 142 S. Ct. at 2125; *Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008); *McDonald*, 561 U.S. 742, 767–68, 130 S. Ct. 3020, 3036 (2010).

Subsequently, *Bruen* clarified the framework for determining when a given statute or regulation unconstitutionally infringes on that right. *Bruen*, 597 U.S. at 24, 142 S. Ct. at 2129–30. First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

"Why and how the regulation burdens the right are central to this inquiry" in "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26–31, 142 S. Ct. at 2131–34). Neither *Bruen* nor *Rahimi* contemplates "a law trapped in amber," where the government must show a "historical twin." *Id.* at 691–692, 144 S. Ct. at 1897–98 (quoting *Bruen*, 597 U.S. at 30, 142 S. Ct. at 2111). If a challenged regulation "does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 692, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30, 142 S. Ct. at 2133). At the same time, a law may unconstitutionally infringe on the right when it goes "beyond what was done at the founding," "[e]ven when [it] regulates arms-bearing for a permissible reason." *Id.*

In *Bruen*, the Court considered the constitutionality of New York's licensing regime for carrying handguns in public. 597 U.S. at 8–11, 142 S. Ct. at 2122. Following up on a 1905 law, New York's "Sullivan Law" criminalized the possession of handguns, either concealed or otherwise, without a government-issued license, which could be issued if the applicant demonstrated "good moral character" and "proper cause." *Id.* (quoting 1913 N.Y. Laws ch. 608, § 1, p. 1629; citing 1911 N.Y. Laws ch. 195, § 1, p. 443). At the time *Bruen* was decided, the regulatory scheme had evolved to criminalize the possession of "any firearm without a license, whether inside

No. 23-30033

or outside the home." *Id.* at 11–12, 142 S. Ct. at 2122 (internal quotations omitted). What made New York's licensing regime relatively unique was its "may issue" framework, which gave state authorities discretion in issuing licenses even where the applicant had demonstrated the requisite criteria. *Id.* at 13–14, 142 S. Ct. at 2123–24.

The Court considered it "undisputed" that the plaintiffs in *Bruen*, both "law-abiding, adult citizens," were a part of "the people" protected by the Amendment, and that "handguns are weapons in 'common use' today for self-defense." *Id.* at 31–32, 142 S. Ct. at 2134 (citing *Heller*, 554 U.S. at 580, 627, 128 S. Ct. at 2790–91, 2817). Because the plain text of the Amendment covered the conduct at issue, the government bore the burden of justifying the regulation under our Nation's regulatory tradition. Turning to that tradition, the "historical record . . . [did] not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 38, 142 S. Ct. at 2138. While there were a "handful of late-19th-century" examples of such prohibitions, there was "little evidence of an early American practice of regulating public carry by the general public." *Id.* at 38, 46, 142 S. Ct. at 2138, 2142. Further, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 38, 46, 66, 142 S. Ct. at 2138, 2142, 2154 (citing *Heller*, 554 U.S. at 614, 128 S. Ct. at 2810). After a thorough discussion of firearm regulation stretching from medieval England to the early 20th century, the Court concluded that the government had "not met [its] burden to identify an American tradition justifying [New York's] proper-cause requirement." Accordingly, the licensing statute violated the Second Amendment as incorporated by the Fourteenth. *Id.* at 34, 70–71, 142 S. Ct. at 2135–36, 2156.

Two years later, in *Rahimi*, the Court applied the *Bruen* two-part framework and upheld a challenge to the federal law that prohibits individuals

No. 23-30033

subject to a domestic violence restraining order from possessing firearms. 602 U.S. at 684–686, 144 S. Ct. at 1894; 18 U.S.C. § 922(g)(8). The Court analogized the provision to surety laws and "going armed" laws around the time of the founding. *Rahimi*, 602 U.S. at 693–699, 144 S. Ct. at 1899–1901. Surety laws, a form of "preventive justice," "authorized magistrates to require individuals suspected of future misbehavior to post a bond" (which would be forfeited on any breaking of the peace), providing a "mechanism for preventing violence before it occurred." *Id.* at 695, 144 S. Ct. at 1899–1900. "Going armed" laws prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land," and were punishable, *inter alia*, by "forfeiture of . . . arms." *Id.* at 697, 144 S. Ct. at 1901 (alterations in original) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 149 (10th ed. 1787)). "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698, 144 S. Ct. at 1901. Consequently, § 922(g)(8) was consistent with the principles that underlie our regulatory tradition and passed constitutional muster.

## II. Analysis

With this background, we review the constitutional questions *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003). Addressing the first question under *Bruen*, the government contends that "the Second Amendment's plain text" does not cover the conduct that §§ 922(b)(1) and (c)(1) prohibit. *Bruen*, 597 U.S. at 24, 142 S. Ct. at 2130. The government argues that a limited ban on the purchase of handguns from FFLs is not an infringement on the Second Amendment rights, and in any event eighteen-to-twenty-year-olds are not among "the people" protected by the right. We reject these points, then move to *Bruen*'s second inquiry: whether the

government met its burden to demonstrate historical analogues supporting the challenged regulations.

## A. Purchasing Firearms

Contrary to the district court's assumption, the government denies that the plain text of the Second Amendment "establish[es] a right" to purchase firearms "at any time from any source." It emphasizes that § 922(b)(1) only limits the sale of handguns by a "particular type of seller" (FFLs) to a "particular class of buyers (under-21-year-olds)." Of course, the words "purchase," "sale," or similar terms describing a transaction do not appear in the Second Amendment. But the right to "keep and bear arms" surely implies the right to purchase them. *See Luis v. United States*, 578 U.S. 5, 26, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise."); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) (When "a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.").

Further, the contention that sales to young adults are not covered by the Second Amendment simply because of the Act's targeted application is fundamentally inconsistent with the *Bruen/Rahimi* framework. The threshold textual question is not whether the laws and regulations impose reasonable or historically grounded limitations, but whether the Second Amendment "covers" the conduct (commercial purchases) to begin with. Because constitutional rights impliedly protect corollary acts necessary to their exercise, we hold that it does. To suggest otherwise proposes a world

No. 23-30033

where citizens' constitutional right to "keep and bear arms" excludes the most prevalent, accessible, and safe market used to exercise the right. The baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether.[2]

### B. "The People"

The government next asserts that eighteen-to-twenty-year-olds are not "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at 31–32, 142 S. Ct. at 2134. This argument is based largely on the common law's recognition of 21 years as the date of legal maturity at the time of the founding, and the fact that legislatures have long established minimum age requirements for various activities.

---

[2] In *Rocky Mountain Gun Owners v. Polis*, the court upheld a Colorado state firearms purchase ban on 18- to 20-year old adults as a "presumptively lawful regulatory measure" not characterized by "abuse" and therefore outside Second Amendment protection. 121 F.4th 96, 112–128 (10th Cir. 2024). The court excluded this ban from the *Bruen* analysis allegedly based on *Heller*'s statement that regulations on commercial firearms sales are "presumptively lawful." In our view, as pointed out above, the court committed a category error in its analysis that a complete ban of the most common way for a young adult to secure a firearm is not an abridgement of the Second Amendment right and therefore subject to *Bruen*'s test.

Nor is this court's decision in *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), to the contrary. *McRorey* upheld expanded federal background checks for firearms purchases by 18- to 20-year olds. Although this court stated that the "keep and bear" language does not include "purchase," it also observed that the right to "keep and bear" can "implicate the right to purchase" and noted that is the reason "the Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping." *Id.* at 838 (citing *Bruen,* 597 U.S. at 38 n.9, 142 S. Ct. at 2138). The case before us is more than a "functional prohibition," it is an outright ban. We fail to see how a purchase ban unknown at the time of the founding can evade *Bruen* analysis. *See also United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) (applying *Bruen* to federal law disarming convicted felons).

No. 23-30033

The operative clause of the Second Amendment states that "the right of *the people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). There are no age or maturity restrictions in the plain text of the Amendment, as there are in other constitutional provisions. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 (members of the House of Representatives must be at least 25 years old). This suggests that the Second Amendment lacks a minimum age requirement. *See, e.g.*, Scalia & Garner, *supra*, at 93–100 (discussing the "omitted-case canon—the principle that what a text does not provide is unprovided").

Moreover, in the unamended Constitution and Bill of Rights, the phrase "right of the people" appears in the First Amendment's Assembly-and-Petition Clause, the Fourth Amendment's Search-and-Seizure Clause, and the Ninth Amendment. *Heller*, 554 U.S. at 579, 128 S. Ct. at 2790. All of these references confer "individual rights" and undoubtedly protect eighteen-to-twenty-year-olds as much as twenty-one-year-olds. In fact, with modifications, the rights they confer extend to younger minors. *See, e.g.*, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212, 95 S. Ct. 2268, 2274 (1975) ("[M]inors are entitled to a significant measure of First Amendment protection."); *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S. Ct. 733, 740 (1985) (school-age children are protected by the Fourth Amendment, with greater permissible intrusions in the school context).

Elsewhere in the Constitution, "the people" refers to all Americans collectively. *See* U.S. Const. pmbl.; *id.* art. I, § 2; *id.* amend. X. But as *Heller* explained, these provisions "deal with the exercise or reservation of powers, not rights. Nowhere else in the Constitution does 'a right' attributed to 'the people' refer to anything other than an individual right." 554 U.S. at 579–80, 128 S. Ct. at 2790. From another angle, "in all six other provisions of the Constitution that mention 'the people', the term unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at

580, 128 S. Ct. at 2790–91. In sum, "the people" is a term of art that refers to a "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S. Ct. 1056, 1061 (1990). On examining the constitutional text, *Heller* "start[ed] therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581, 128 S. Ct. at 2791.

Seizing on *Heller*'s reference to a "political community," the government asserts that, because eighteen-to-twenty-year-olds did not "enjoy the full range of civil and political rights" in the founding-era, they are not a part of "the people" for Second Amendment purposes. *Id.* at 580, 128 S. Ct. at 2790; *see, e.g.*, 1 John Bouvier, *Institutes of American Law* 148 (new ed. 1858) ("The rule that a man attains his majority at the age of twenty-one years accomplished, is perhaps universal in the United States."); 1 Blackstone, *supra*, at 463 ("[F]ull age in male or female is twenty-one years . . ."). While it may be true that eighteen-to-twenty-year-olds could not then serve on juries, firearm restrictions are notably absent from the government's list of founding-era age-limited civil and political rights. *See* Albert W. Aschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 877 n.52 (1994). Nor does the government provide any evidence suggesting that eighteen-to-twenty-year-olds historically lacked the right to self-defense, the "central component" of the Second Amendment. *Heller*, 554 U.S. at 599, 128 S. Ct. at 2801 (emphasis omitted).

Still, the government emphasizes that the right to vote "from the founding to the Twenty-Sixth Amendment" was typically reserved for citizens over twenty-one. Thus, because voting is a "hallmark of membership in the polity," eighteen-to-twenty-year-olds were originally, and

now remain, excluded from the "political community" described in *Heller*. This argument is incompatible with Second Amendment precedent, nonsensical when considered against the backdrop of American suffrage, and contradicted by the history of firearm use at the founding.

First, *Heller* unambiguously holds that "the Second Amendment confer[s] an *individual* right to keep and bear arms" (as opposed to a right conditioned on service in the militia). 554 U.S. at 595, 600, 128 S. Ct. at 2799, 2802 (emphasis added). And in contrast to "civic rights" that presuppose virtue limitations, the right to keep and bear arms is an "individual right" rooted in the right to self-defense. *See Kanter v. Barr*, 919 F.3d 437, 462–63 (7th Cir. 2019) (Barrett, J., dissenting); *Heller*, 554 U.S. at 595, 128 S. Ct. at 2799. The fact that eighteen-to-twenty-year-olds were minors unable to vote (or exercise other civic rights) does not mean they were deprived of the individual right to self-defense. *See NRA I*, 700 F.3d at 204 n.17 ("The terms 'majority' and 'minority' lack content without reference to the right at issue."), *abrogated by Bruen*, 597 U.S. 1, 142 S. Ct. 2111.

Second, the contention that "the people" covered by the Second Amendment is limited to those who enjoyed civic or voting rights at the founding does not withstand common-sense scrutiny. In most cases, early colonial governments conditioned eligibility to vote on various criteria, including variations of the "forty-shilling freehold" requirement.[3] Shortly after the Constitution was ratified in 1788, states began to reassess this "landed" requirement,[4] but often maintained race and gender-based voter

---

[3] New York, for example, amended its voting laws in 1701 to exclude anyone who was not in "possession [of] an Estate of freehold." Hayley N. Lawrence, *The Untold History of Women's Suffrage: Voting Rights Pre-Ratification*, 52 INT'L SOC'Y BARRISTERS Q., 1, 8 (2020).

[4] *See, e.g.*, Laura E. Free, *Suffrage Reconstructed: Gender, Race, and Voting Rights in the Civil War Era* 3 (2015). By 1840, only three states retained a property qualification, and

No. 23-30033

qualifications.[5] In 1870, nearly eighty years after the ratification of the Bill of Rights, the Fifteenth Amendment extended voting rights to all Americans, regardless of race; and it was not until 1920 that the Nineteenth Amendment guaranteed women the right to vote. Finally, the Twenty-Sixth Amendment lowered the voting age for all Americans from twenty-one to eighteen in 1971.

Thus, to say that "the people" covered by the Second Amendment is limited to those who were a part of the "political community" *at the founding* would imply excluding "law-abiding, adult citizens" based on property ownership, race, or gender. *See Bruen*, 597 U.S. at 31–32, 142 S. Ct. at 2134 ("It is undisputed that petitioners . . .—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects.") (citing *Heller*, 554 U.S. at 580, 128 S. Ct. at 2790). Just as defining "arms" as "only those arms in existence in the 18th century" "border[s] on the frivolous," likewise, attempting to limit "the people" to individuals who were part of the "political community" at ratification is ludicrous. *See Heller*, 554 U.S. at 582, 128 S. Ct. at 2791. "Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28, 142 S. Ct. at 2132.

Finally, the history of firearm use, particularly in connection with militia service, contradicts the premise that eighteen-to-twenty-year-olds are not covered by the plain text of the Second Amendment. The Second

---

the practice finally ended nation-wide with North Carolina in 1856. Stanley Engerman & Kenneth Sokoloff, *The Evolution of Suffrage Institutions in the New World*, Nat'l Bureau of Econ. Rsch. 18 (2001).

[5] Delaware, for example, amended its constitution in 1831 to limit the right to "free white male citizen[s]" that were over the age of twenty-one, and was followed shortly thereafter by Tennessee in 1843. Lawrence, *supra*, at 15.

Amendment's prefatory clause states that "[a] well regulated Militia, being necessary to the security of a free State . . . ." U.S. CONST. amend. II. While *Heller* recognized that the "central component" of the right to keep and bear arms is self-defense, the "prefatory clause announces the *purpose* for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599, 128 S. Ct at 2801 (emphasis omitted and added); *see also Bruen*, 597 U.S. at 18, 142 S. Ct. at 2126. The Framers knew all too well the dangers a disarmed and defenseless public could face under monarchical control. *See Heller*, 554 U.S. at 592–95, 128 S. Ct. at 2797–99.

At the founding, "the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range." *Id*. at 580, 595–97, 128 S. Ct. at 2791, 2799–800 (citing *United States v. Miller*, 307 U.S. 174, 179, 59 S. Ct. 816, 818 (1939) ("the Militia comprised all males physically capable of acting in concert for the common defense"); The Federalist No. 46, pp. 329, 334 (B. Wright ed. 1961) (J. Madison) ("near half a million of citizens with arms in their hands"); Letter to Destutt de Tracy (Jan. 26, 1811), in *The Portable Thomas Jefferson* 520, 524 (M. Peterson ed. 1975) ("the militia of the State, that is to say, of every man in it able to bear arms")). Under Article I, Congress has the power to "call[] forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions[.]" U.S. CONST. art. I, § 8, cl. 15. When called, militiamen were "expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Miller*, 307 U.S. at 179, 59 S. Ct. at 818.

The Second Congress consequently enacted the Militia Act of 1792, which stated, in part:

> That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except

as is herein excepted) shall severally and respectively be enrolled in the militia . . . . And it shall at all time hereafter be the duty of every such captain or commanding officer of a company to enroll every such citizen, as aforesaid, and also those who shall, from time to time, arrive at the age of eighteen years . . . . That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, . . . [and] a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock; . . . or with a good rifle, . . . [and] twenty balls suited to the bore of his rifle . . . .

Act of May 8, 1792, 1 Stat. 271, 271. After *Heller*, there is no doubt that "the militia" was "a subset of 'the people'" protected by its operative clause. *See Heller*, 554 U.S. at 580, 128 S. Ct. at 2790–91. The 1792 Militia Act, in turn, shows that eighteen-to-twenty-year-olds not only served in that militia, but were required to serve. Act of May 8, 1792, 1 Stat. 271, 271. Eighteen-to-twenty-year-olds therefore must be covered by the plain text of the Second Amendment, as they were compulsorily enrolled in the regiments that the Amendment was written to protect.

In response, the government points to four instances in which states set the minimum age for militia service above eighteen. One is from the colonial era, while the rest were codified between 1829 and 1868.[6] Colonial Virginia exempted men under twenty-one from militia service from 1738 to 1757, but adopted the minimum age of eighteen in response to a need for

---

[6] The government points to New Jersey's 1829 "Act to exempt minors from Militia Duty in time of peace," the 1860 Code of the State of Georgia, and the 1868 North Carolina Constitution as examples of states raising the minimum militia age to twenty-one. An Act to exempt minors from Militia Duty in time of peace (1829), *reprinted in A Compilation of the Public Laws of the State of New-Jersey, Passed Since the Revision in the Year 1820* 266 (Josiah Harrison ed., 1833); *The Code of the State of Georgia*, pt. 1, tit. 11, chs. 1, 2, §§ 981, 1027, at 189, 199 (Richard H. Clark et al. eds., 1861); N.C. CONST. of 1868, art. XII, § 1.

No. 23-30033

additional forces during the French & Indian War. David B. Kopel & Joseph G. S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533, 579 (2019) ("*Rights of Young Adults*"). Apart from this example, colonial legislatures consistently set the minimum militia age at eighteen, and in some cases even lower.[7] *Id.* at 533; *see Miller*, 307 U.S. at 180–81, 59 S. Ct. at 819 (discussing Massachusetts and New York laws from 1784 and 1786, respectively, that required able-bodied men from sixteen to forty-five to enroll in the militia, and "provide himself, at his own Expense, with a good Musket").

One brief pre-ratification aberration and a handful of post-ratification examples do not outweigh the consistent approach of all states—including Virginia—where the minimum age of eighteen prevailed at or immediately after ratification of the Second Amendment. *See NRA II*, 714 F.3d at 340–41 n.8 (Jones, J., dissenting from denial of rehearing en banc). The founding-era laws are far more probative of what "the people" meant when the Second Amendment was ratified, as "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35, 128 S. Ct. at 2821.

Reliance on the Militia Act does not, of course, constrain the Second Amendment to founding-era militiamen. *Heller* expressly rejected that argument. *Id.* at 577, 128 S. Ct. at 2789. But the prefatory clause, in establishing the Amendment's purpose, describes those who, at a minimum, must have been covered by it. In other words, the Framers wanted to ensure that individuals eligible for militia service to defend "themselves, if

---

[7] After returning to a minimum age of eighteen in 1757, Virginia briefly lowered the minimum age for militia service to sixteen during the Revolutionary War. Shortly thereafter, Virginia brought the minimum age back to eighteen in 1784, where it remained through ratification of the Second Amendment. *Id.* at 582–83.

No. 23-30033

necessary, and . . . their country" could not be disarmed. *Id.* at 613, 128 S. Ct. at 2809 (quoting *State v. Chandler*, 5 La. Ann. 489, 490 (1850)).

Finally, the government argues that mere participation in the militia was not enough to establish Second Amendment protections because (1) black men served in the militia but were otherwise barred from possessing arms; and (2) Virginia, by law, disarmed men who refused to take a loyalty oath while still requiring them to enroll in the militia, albeit without firearms.[8] The treatment of blacks is hardly probative as to eighteen-to-twenty-year-olds because race-based classifications would apply regardless of age. *See McDonald*, 561 U.S. at 770–78, 130 S. Ct. at 3038–42 (discussing race, ratification of the Fourteenth Amendment, and the right to keep and bear arms). Similarly, although Virginia (and presumably other states) disarmed men who refused to swear loyalty to the United States during the Revolution, this exception does not show that eighteen-to-twenty-year-olds, as a class, were excluded from the right to keep and bear arms. *See NRA II*, 714 F.3d at 343 (Jones, J., dissenting from denial of rehearing en banc). In some respects, "Loyalty Tests" contradict the government's position. Virginia required men over sixteen years old to swear an oath of allegiance lest they "be *dis*armed".[9] This language implies that Virginia expected that potential dissidents as young as sixteen may be armed; and young men of sixteen were "considered to have rights even if they were being restricted equally with other suspect class members." *NRA II*, 714 F.3d at 343 (Jones, J., dissenting from denial of rehearing en banc). Finally, this Virginia law was a wartime

---

[8] An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiance to the Same, and for Other Purposes ("Virginia Loyalty Act") (1777), *printed in Printed Ephemera Collection*, Library of Congress, Portfolio 178, Folder 27.

[9] Virginia Loyalty Act (emphasis added).

measure, not unlike the "military dictates" that *Bruen* cautions should be discounted when assessing the "Constitution's usual application during times of peace." *Bruen*, 597 U.S. at 63 n.26, 142 S. Ct. at 2152.

The Supreme Court recognized in *Heller* and repeated in *Bruen* that the Second Amendment "belongs to *all* Americans" (subject, of course, to "reasonable, well-defined restrictions"). *Heller*, 554 U.S. at 581, 128 S. Ct. at 2791 (emphasis added); *Bruen*, 597 U.S. at 31–32, 70, 142 S. Ct. at 2134, 2156. While the core of the right is rooted in self-defense and unconnected with the militia, the text of the Amendment's prefatory clause considered along with the overwhelming evidence of their militia service at the founding indicates that eighteen-to-twenty-year-olds were indeed part of "the people" for Second Amendment purposes. *See Worth v. Jacobson*, 108 F.4th 677, 689–92 (8th Cir. 2024) (holding the same); *Lara v. Commissioner*, No. 21-1832, 2025 WL 86539, at *5–7 (3d Cir. Jan. 13, 2025).

## C. Tradition of Firearms Regulation

Because the "Second Amendment's plain text covers [the] conduct" at issue, "the Constitution presumptively protects [the] conduct." *Bruen*, 597 U.S. at 24, 142 S. Ct. at 2129–30. According to *Bruen*, the next question is whether restricting eighteen-to-twenty-year-olds from purchasing handguns from FFLs is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 142 S. Ct. at 2126. The government bears the burden of proof. *Id.*

The Supreme Court reiterated in *Rahimi* that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26–31, 142 S. Ct. at 2131–34). Courts must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at

29, 142 S. Ct. at 2132); *see Lara*, 2025 WL 86539, at *1. Central to this analogical inquiry are "[*w*]*hy* and *how* the regulation burdens the right," *Rahimi*, 602 U.S. at 692, 144 S. Ct. at 1898 (emphasis added), or, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified . . . ." *Bruen*, 597 U.S. at 29, 142 S. Ct. at 2133. For "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi*, 602 U.S. at 692, 144 S. Ct. at 1898.

As discussed above, the 1792 Militia Act, passed shortly after the Second Amendment was ratified, required eighteen-year-olds to enroll in the militia, and militia members were required to furnish their own weapons. *See supra* Section II.B. Of course, "[t]he right to keep and bear arms was not coextensive with militia service," however, "[g]un ownership was necessary for militia service; militia service wasn't necessary for gun ownership." *NRA II*, 714 F.3d at 342 (Jones, J., dissenting from denial of rehearing en banc). Certainly, eighteen-year-olds "must have been allowed to 'keep' firearms for personal use," and "were within the 'core' rights-holders at the founding . . . ." *Id.* at 339. To satisfy its burden that banning eighteen-to-twenty-year-olds from purchasing handguns is consistent with our Nation's historical tradition of firearm regulation, the government must overcome this clear and germane evidence that eighteen-to-twenty-year-olds enjoyed the same Second Amendment rights as their twenty-one-year-old peers at the founding.

The government's theory inverts historical analysis by relying principally on mid-to-late-19th century statutes (most enacted after Reconstruction) that restricted firearm ownership based on age. Then the government works backward to assert that these laws are consistent with founding-era analogues focusing on the minority status and general

No. 23-30033

"irresponsibility" of eighteen-to-twenty-year-olds. The government thus confects a longstanding tradition of firearm restrictions imposed on individuals under twenty-one.

We look at the historical evidence chronologically and fail to see the unbroken tradition or validity of the analogues that the government deploys.

### 1. Firearm Regulation at the Founding

The government presents a handful of regulations and practices from near the founding that asserted parental or supervisory authority over arms-bearing by eighteen-to-twenty-year-olds.

First, resolutions passed in 1810 and 1824, respectively, prohibited firearm possession by public university students at the Universities of Georgia and Virginia.[10] These resolutions, however, are too different in both the "how" and the "why" to establish a compelling historical analogue for contemporary restrictions. The resolutions applied to *all* enrolled students regardless of age. Moreover, universities had heightened authority over student conduct *in loco parentis*. Actions taken *in loco parentis* say little about the general scope of Constitutional rights and protections. *See, e.g.*, *Morse v. Frederick*, 551 U.S. 393, 416, 127 S. Ct. 2618, 2633 (2007) (Thomas, J., concurring) ("The doctrine of *in loco parentis* limited the ability of schools to set rules and control their classrooms in almost no way. It merely limited the imposition of excessive physical punishment.").

Further, the "principle" behind the resolutions was to effectuate student discipline and academic rigor, not to disarm all minors. *See Rahimi*, 602 U.S. at 692, 144 S. Ct. at 1898 ("The law must comport with the

---

[10] *See* University of Georgia Libraries, The Minutes of the Senatus Academicus 1799–1842, 73 (Nov. 4, 1976); University of Virginia Board of Visitors Minutes, Encyc. Va. (1824).

No. 23-30033

*principles* underlying the Second Amendment . . . .") (emphasis added). These resolutions also imposed a markedly different burden on students. *See Bruen*, 597 U.S. at 29, 142 S. Ct. at 2133. The current handgun ban prohibits law-abiding, adult citizens from buying handguns from FFLs on account of their age, whereas the university resolutions simply disarmed students while on school grounds. Not only are these resolutions inapt in scope and purpose, but we are mindful of the Supreme Court's caution against construing too broadly the category of "sensitive places such as schools and government buildings," as it would "eviscerate the general right to publicly carry arms for self-defense." *See Bruen*, 597 U.S. at 30–31, 142 S. Ct. at 2133–34.

Second, the government points to Pennsylvania's 1755 Militia Act, which permitted individuals under twenty-one to enroll in the militia only with the prior consent of their parents.[11] Similarly, six state laws enacted between 1810 and 1826 required parents to furnish firearms for young men's militia duty. The Pennsylvania act is not relevant, as the legislature passed a militia statute in 1777 that set an unqualified enrollment age of eighteen, which remained through ratification of the Second Amendment.[12] Further, requirements that parents furnish firearms for their sons' militia service do not mean that the military-age young men lacked the right to keep and bear (or obtain) such arms themselves. They just as readily imply that eighteen-to-twenty-year-olds were *expected* to keep and bear arms, even if provided by parents.

---

[11] *See* 5 James T. Mitchell & Henry Flanders, *The Statutes at Large of Pennsylvania from 1682 to 1801* 200 (1898).

[12] *See* 9 James T. Mitchell and Henry Flanders, *The Statutes at Large of Pennsylvania from 1682 to 1801* 77 (1903).

Finally, the government cites an 1810 South Carolina treatise discussing the eligibility criteria for constables. At the time, justices of the peace appointed constables who could select "any particular private person" for appointment in "any case of emergency."[13] Although "infants," *i.e.*, legal minors under the age of 21, were categorically excluded from serving as constables, so also were justices of the peace, lawyers, attorneys, physicians, the poor, the sick, and the elderly.[14] Obviously, limiting firearm access did not run parallel to constabulary duty. In any case, exempting "minors" from serving as constables hardly qualifies as "relevantly similar" to curtailing (or in some cases practically prohibiting, for those who lack access to gifts or secondary markets) their ability to acquire a handgun. *See Bruen*, 597 U.S. at 29, 142 S. Ct. at 2132–33.

In supplemental briefing after the Supreme Court's decision in *Rahimi*, the government makes passing mention that 28 U.S.C. §§ 922(b)(1) and (c)(1) evidence legislatures' broader authority to restrict arms-bearing by "categories of persons" that "present a special danger of misuse." *Rahimi*, 602 U.S. at 698, 144 S. Ct. at 1901. But this misquotes *Rahimi*, which added that those laws "appl[y] *only* once a court has found that *the defendant* 'represents a credible threat to the physical safety' of another." *Id.* at 699, 144 S. Ct. at 1901 (citing 28 U.S.C. § 922(g)(8)(C)(i)) (emphasis added). The government's contention is meritless. The domestic violence gun ban in *Rahimi* was held "relevantly similar" to a historic tradition of "restrict[ing] gun use to mitigate demonstrated threats of physical violence" through surety and going armed laws. *Id.* at 698, 144 S. Ct. at 1901. The under-twenty-one handgun purchase ban, however, requires no "judicial

---

[13] John Fauchereaud Grimke, *The South Carolina Justice of Peace* 118 (3d ed. 1810).

[14] *Id.* at 117.

determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 699, 144 S. Ct. at 1902. *Rahimi* expressly rejected the contention that, under its historical analysis, "[Petitioner] may be disarmed simply because he is not 'responsible.'" *Id.* at 701, 144 S. Ct. at 1903.

As William Rawle explained in his influential 1829 treatise, "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace."[15] Rawle "clearly differentiated between the people's right to bear arms and their service in a militia: 'In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens.'" *Heller*, 554 U.S. at 607, 128 S. Ct. at 2806 (quoting W. Rawle, *A View of the Constitution of the United States of America* 140 (1825)). Taken together, Rawle's writings demonstrate that eighteen-to-twenty-year-olds, who were required to enroll in the militia, should be "permitted and accustomed to bear arms," *id.*, "burdened only if another could make out a specific showing of reasonable cause to fear an injury, or breach of the peace." *Bruen*, 597 U.S. at 56, 142 S. Ct. at 2148 (internal quotations omitted); *see* Kopel & Greenlee, *Rights of Young People*, *supra*, at 135–36.

Moreover, contrary to the government's recitation of concerns expressed in the colonial and founding eras about the "irresponsibility" of those under twenty-one, these young individuals were expected to keep the peace rather than disturb it. In addition to serving in the militia, eighteen-to-

---

[15] David B. Kopel & Joseph G.S. Greenlee, History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People, 43 S. Ill. U. L.J. 119, 135 (2018) ("Rights of Young People") (quoting William Rawle, A View of the Constitution of the United States of America 125–26 (William S. Hein & Co. 2003) (2d ed. 1829)).

twenty-year-olds could be obliged to join the *posse comitatus*, for which the minimum age was often fifteen or sixteen, and bring "such arms or weapons as they have or can provide". *See* Kopel & Greenlee, *Rights of Young Adults*, *supra*, at 534, n.235. Before the emergence of standing police forces, the *posse comitatus* was made up of civilians who accompanied sheriffs or other officials in pursuit of fugitives. Gautham Rao, *The Federal Posse Comitatus Doctrine: Slavery, Compulsion, and Statecraft in the Mid-Nineteenth-Century America*, 26 L. & HIST. REV. 1, 10 (2008). In early colonial America, the *posse* was "transformed . . . from an instrument of royal prerogative to an institution of local self-governance" that "all but precipitated the American Revolution." *Id.* at 10. Citizens could be called to "execute arrests, level public nuisances, and keep the peace;" they faced fines or imprisonment if they refused. *Id.* at 2. Instead of refusing to arm young Americans for fear of their irresponsibility, founding-era regulations required them to *be* armed to secure public safety.[16]

The government's proposed founding-era analogues do not meet its burden to establish a historical tradition of firearm restrictions imposed on eighteen-to-twenty-year-old Americans.

### 2. Reconstruction-era and late-19th Century

The government also contends that 19th century statutes show that eighteen-to-twenty-year-olds' access to handguns has been controlled for "most of American history."

---

[16] This is not to suggest that 15- or 16-year-olds have Second Amendment rights by virtue of the possibility of *posse comitatus* duty. That issue is not before us, and this evidence on its own would be insufficient to establish any such rights. In contrast, the evidence supporting the rights and duties of 18-year-olds and older individuals is wide-reaching and compelling.

No. 23-30033

Twenty-two jurisdictions, including nineteen states, the District of Columbia, and two municipalities, passed laws between 1856 and 1897 that limited the Second Amendment rights of eighteen-to-twenty-year-olds in some way.[17]  One of the states prohibited only *concealed* carry of handguns and other weapons and is less immediately relevant in "how" it burdened the right.  *See* 1885 Nev. Stat. 51, ch. 51, § 1 ("Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword . . . concealed upon his person, shall be deemed guilty of a misdemeanor . . . .").    Another comes from Kansas, where the state Supreme Court demonstrated a "fundamental misunderstanding of the right to bear arms, as expressed in *Heller*" around the time of its enactment. *Bruen*, 597 U.S. at 68, 142 S. Ct. at 2155 (discussing *Salina v. Blaksley*, 72 Kan. 230 (1905)).    These proposed analogues are less probative in establishing a historical tradition of similar regulations.

The remaining 19th century laws, however, appear to be "relevantly similar" to the current handgun purchase ban, insofar as they purported to restrict firearm access by those under twenty-one-years-old to prevent misuse.[18]  *See Rahimi*, 602 U.S. at 692, 144 S. Ct. at 1898 (quoting *Bruen*, 597

─────────────────────

[17] 1856 Ala. Acts 17, No. 26, § 1; 16 Del. Laws 716 (1881); 27 Stat. 116–17 (1892) (District of Columbia); 1876 Ga. Laws 112, No. CXXVIII (O. No. 63), § 1; 1881 Ill. Laws 73, § 2; 1875 Ind. Laws 59, ch. XL, § 1; 1884 Iowa Acts 86, ch. 78, § 1; 1883 Kan. Sess. Laws 159, ch. CV, §§ 1, 2; 1859 Ky. Acts 245, § 23; 1890 La. Acts 39, No. 46, § 1; 1882 Md. Laws 656, ch. 242, § 2; 1878 Miss. Laws 175, ch. 66, §§ 1–2; Mo. Rev. Stat. § 1274 (1879); 1885 Nev. Stat. 51, ch. 51, § 1; 1893 N.C. Sess. Laws 468–69, ch. 514; 1856 Tenn. Pub. Acts 92, ch. 81, §2; 1897 Tex. Gen. Laws 221–22, ch. 155, § 1; 1882 W. Va. Acts 421–22, ch. 135, § 1; 1883 Wis. Sess. Laws 290, ch. 329, §§ 1–2; 1890 Wyo. Sess. Laws 140, § 97. The municipal authority comes from Chicago, Illinois (1872-1873) and Lincoln, Nebraska (1895).

[18] There are, of course, some peripheral differences.  Alabama, for example, prohibited only sales to *male* minors, and the majority of laws cited also prohibited the

26

No. 23-30033

U.S. at 29, 142 S. Ct. at 2132). Proceeding past the bounds of founding-era analogues, however, is risky under *Bruen*, and courts must "guard against giving [such] postenactment history more weight than it can rightly bear." *Bruen*, 597 U.S. at 35, 142 S. Ct. at 2136. The limitation of these late 19th century analogues is not in the "how" or the "why" of regulation, but rather that the laws were passed too late in time to outweigh the tradition of pervasively acceptable firearm ownership by eighteen-to-twenty-year-olds at "the crucial period of our nation's history." *NRA II*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc).

*Bruen* cautioned that "when it comes to interpreting the Constitution, not all history is created equal." 597 U.S. at 34, 142 S. Ct. at 2136. Rather, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35, 128 S. Ct. at 2821; *see Bruen*, 597 U.S. at 34, 142 S. Ct. at 2136. As Justice Barrett explained in her concurrence in *Rahimi*, "for an originalist, the history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law. History (or tradition) that long postdates ratification does not serve that function." *Rahimi*, 602 U.S. at 737–38, 144 S. Ct. at 1924 (Barrett, J., concurring); *see Bruen*, 597 U.S. at 36, 142 S. Ct. at 2137 (quoting *Heller*, 554 U.S. at 614, 128 S. Ct. at 2810) ("[B]ecause post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as

---

provision of bowie-knives, dirks, and the like depending on the age of the recipient. Ala. Acts 17, No. 26, § 1; *see, e.g.,* 1890 Wyo. Sess. Laws 140, § 97.

earlier sources.'"); *United States v. Connelly*, 117 F.4th 269, 281–82 (5th Cir. 2024).

To be sure, *Heller* and *Bruen* both considered 19th century sources in their analysis—to confirm and reinforce earlier historical evidence contemporaneous with the Constitution's ratification. *See Bruen*, 597 U.S. at 37, 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 587 U.S. 678, 702, 139 S. Ct. 1960, 1976 (2019)) (stating that, in *Heller*, "[t]he 19th-century evidence was 'treated as mere confirmation of what the Court thought had already been established.'"). While acknowledging the "ongoing scholarly debate" regarding the most relevant period of history for issues arising under the Fourteenth Amendment, the Court clarified that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36, 38, 142 S. Ct. at 2137–38 (citations omitted) (emphasis in original). "[T]he scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37, 142 S. Ct. at 2137–38 (citing *Crawford v. Washington*, 541 U.S. 36, 42–50, 124 S. Ct. 1354 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–69, 128 S. Ct. 1598 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–25, 131 S. Ct. 2343 (2011) (First Amendment)).

## III. Conclusion

Ultimately, the text of the Second Amendment includes eighteen-to-twenty-year-old individuals among "the people" whose right to keep and bear arms is protected. The federal government has presented scant evidence that eighteen-to-twenty-year-olds' firearm rights during the founding-era were restricted in a similar manner to the contemporary federal handgun purchase ban, and its 19th century evidence "cannot provide much

No. 23-30033

insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66, 142 S. Ct. at 2154 (citing *Heller*, 554 U.S. at 614, 128 S. Ct. at 2810). In sum, 18 U.S.C. §§ 992(b)(1), (c)(1) and their attendant regulations are unconstitutional in light of our Nation's historic tradition of firearm regulation.

We REVERSE the district court's judgment and REMAND for further proceedings consistent with this opinion.