ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JENNIFER E. ROSENBERG
CAROLYN DOWNS
TODD GRABARSKY
Deputy Attorneys General
MICHAEL S. COHEN
Deputy Attorney General
State Bar No. 339846
  1300 I Street, Suite 124
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6090
  Fax: (916) 324-8835
  E-mail: Michael.Cohen@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOSE CHAVEZ, *et al.*,** | 3:19-cv-01226-L-AHG |
| Plaintiffs, | **NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, *et al.*,** | Judge: Hon. M. James Lorenz |
| | Action Filed: July 1, 2019 |
| Defendants. | |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms, submit this notice of supplemental authority in support of Defendants' pending motion for summary judgment and in opposition to Plaintiffs' pending motion for summary judgment.  In *National Rifle Association, et al. v. Commissioner, Florida Department of Law Enforcement*, No. 21-12314 (11th Cir. Mar. 14, 2025), the Eleventh Circuit upheld a Florida law that prohibits individuals under the age of 21 from purchasing firearms, with limited exceptions.  A true and correct copy of the opinion accompanies this notice as Exhibit A.

Dated:  March 20, 2025                    Respectfully submitted,

                                         ROB BONTA
                                         Attorney General of California
                                         MARK R. BECKINGTON
                                         Supervising Deputy Attorney General

                                         */s/ Michael S. Cohen*

                                         MICHAEL S. COHEN
                                         Deputy Attorney General
                                         *Attorneys for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Department of Justice Bureau of Firearms*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2025, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated:  March 20, 2025                    */s/ Michael S. Cohen*

MICHAEL S. COHEN

# EXHIBIT A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12314

_____

NATIONAL RIFLE ASSOCIATION,
RADFORD FANT,

Plaintiffs-Appellants.

*versus*

PAM BONDI,
In her official capacity as Attorney General of Florida, et al.,

Defendants,

COMMISSIONER, FLORIDA DEPARTMENT
OF LAW ENFORCEMENT,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:18-cv-00137-MW-MAF

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, BRASHER, ABUDU, and WILSON, Circuit Judges.[*]

WILLIAM PRYOR, Chief Judge, delivered the opinion of the Court, in which JORDAN, ROSENBAUM, JILL PRYOR, NEWSOM, GRANT, ABUDU, and WILSON, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a concurring opinion in which JORDAN, Circuit Judge, joined as to Parts I and II, and in which ABUDU, Circuit Judge, joined as to Part III.

NEWSOM, Circuit Judge, filed a concurring opinion.

WILSON, Circuit Judge, filed a concurring opinion.

BRANCH, Circuit Judge, filed a dissenting opinion in which LAGOA, Circuit Judge, joined.

_____

[*] WILSON, Circuit Judge, elected to continue in the decision of this appeal, which was reheard en banc while he was in regular active service. 28 U.S.C. § 46(c). KIDD, Circuit Judge, who joined the Court after oral argument, did not participate in the decision of this appeal.

LAGOA, Circuit Judge, filed a dissenting opinion in which BRANCH, Circuit Judge, joined.

BRASHER, Circuit Judge, filed a dissenting opinion in which BRANCH, LUCK, and LAGOA, Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a state law that prohibits the purchase of firearms by minors violates the Second and Fourteenth Amendments as applied to individuals between the ages of 18 and 21. After the Florida Legislature enacted this prohibition in response to the massacre at Marjory Stoneman Douglas High School, the National Rifle Association and an individual member sued the Commissioner of the Florida Department of Law Enforcement. The district court granted summary judgment for the Commissioner. We affirm because the Florida law is consistent with our historical tradition of firearm regulation.

## I. BACKGROUND

On February 11, 2017, Nikolas Cruz entered Sunrise Tactical Supply in Coral Springs, Florida. *See* MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY COMMISSION, INITIAL REPORT 262–64 (2019). Cruz turned 18 years old five months earlier and could legally purchase a firearm in the State of Florida. *Id.* at 231, 262. At Sunrise Tactical, Cruz lawfully purchased a Smith & Wesson M&P 15 semiautomatic rifle with a sling and bipod attached. *Id.* at 262–64.

A year later, on Valentine's Day, Cruz arrived in an Uber at Marjory Stoneman Douglas High School in Parkland, Florida, at 2:19 p.m. carrying the rifle. *Id.* at 24, 57. Two minutes later, he walked into a school building, entered a stairwell, and paused to load his rifle and don a vest that held extra magazines of ammunition. *Id.* at 25. When a student encountered Cruz in the stairwell as he prepared for the attack, Cruz said, "you better get out of here, something bad is about to happen." *Id.*

Seconds later, Cruz left the stairwell and opened fire in the first-floor hallway. *Id.* Gina Montalto sat in the alcove of a classroom, and Luke Hoyer and Martin Duque stood outside the door. *Id.* Cruz fatally shot all three. Cruz then shot and wounded another student who was in the hall. *Id.*

Next, Cruz aimed his rifle at a student-filled classroom. *Id.* He fired two series of shots into the room. *Id.* These shots killed Alyssa Alhadeff, Alaina Petty, and Alex Schachter and wounded five others. *Id.* at 25–26. In the next student-filled classroom that Cruz approached, he fatally shot Nicholas Dworet and Helena Ramsay and wounded four others. *Id.* at 26.

Campus monitor Chris Hixon burst into the hallway and ran toward Cruz; Cruz turned and shot him too. *Id.* at 27. Hixon fell to the ground wounded and crawled behind a nearby wall. *Id.* Cruz turned the rifle toward yet another classroom and fired again. *Id.* at 28. These shots killed Carmen Schentrup and wounded three others. *Id.* Cruz then ran through the hallway, passed Hixon lying

wounded on the ground, and shot him again and killed him. *Id.* at 28, 65.

Next, Cruz entered the stairwell. *Id.* at 28. There, he encountered campus monitor Aaron Feis. *Id.* Cruz shot and killed him before he continued to the second floor. *Id.* at 28–29. He entered the hallway with his rifle raised to fire but found the hallway empty. *Id.* at 29. As he moved through the hall, he muttered, "no one is here." *Id.*

Meanwhile, on the third floor, panic ensued when the fire alarm blared. *Id.* at 27. Students rushed for the stairwell but reversed course when they heard the gunshots below. *Id.* As Cruz stalked up the stairwell, one third-floor teacher frantically tried to locate his keys so he could let students back into his classroom. *Id.* at 31. When Cruz entered the third-floor hallway, about 20 people were still outside classrooms. *Id.* He opened fire on them. *Id.* Scott Beigel and another teacher were holding doors open for students when Cruz shot them and killed Beigel. *Id.* Unable to access his classroom, the teacher searching for his keys hid with several students in the alcove of his classroom before he darted to another alcove to try a different classroom door, which was also locked. *Id.* at 31–32. He then directed the students to flee with him to the stairwell. *Id.* at 32. As they ran, Cruz opened fire on them. *Id.* Jaime Guttenberg and Peter Wang were fatally shot within feet of reaching the stairwell. *Id.* at 31–32. Cruz then turned his attention to Meadow Pollack, who was on the ground wounded, and Cara Loughran, who remained in the alcove, and fatally shot them. *Id.*

at 31–33. He then entered the alcove to the men's restroom and fatally shot Joaquin Oliver too. *Id.* at 31, 33. Three others were wounded during Cruz's third-floor attack. *Id.* at 31.

Five minutes and 32 seconds after Cruz fired the first shots, he fired the final shot. *Id.* at 25, 33. After shooting students and teachers on the third floor, he shot at the exterior windows of a room on that floor in a last-ditch effort to establish a sniper position to target fleeing students outside the building. *Id.* at 33. He then entered the stairwell, placed his rifle, vest, and 180 live rounds on the ground and ran down the stairs. *Id.* at 34. He left the building and ran with fleeing students to blend in. *Id.* at 34, 125. He walked to a nearby McDonald's and sat down at a table occupied by a man. *Id.* at 35. Unbeknownst to the man, Cruz had shot and seriously injured his sister in a first-floor classroom less than an hour before. *Id.* at 28, 35–36. Cruz was arrested a short time later. *Id.* at 36–37. He killed 17 individuals and wounded 17 others during his massacre. *Id.* at 7.

Less than a month later, Florida enacted the Marjory Stoneman Douglas High School Public Safety Act to "address the crisis of gun violence, including but not limited to, gun violence on school campuses." 2018 Fla. Laws 10. The law states that a "person younger than 21 years of age may not purchase a firearm." FLA. STAT. § 790.065(13). It also prohibits a "licensed importer, licensed manufacturer, or licensed dealer" from "ma[king] or facilitat[ing]" the "sale or transfer of a firearm to a person younger than 21 years of age." *Id.* A violation of the Florida law is a third-degree felony

punishable by up to five years of imprisonment and a fine up to $5,000. *Id.* §§ 790.065(13), 775.082(3)(e), 775.083(1)(c). The Florida law contains exceptions permitting the purchase of a rifle or shotgun by peace officers, correctional officers, or military personnel under the age of 21. *Id.* § 790.065(13).

The National Rifle Association sued the Commissioner of the Florida Department of Law Enforcement for declaratory and injunctive relief and alleged that the Florida law violates the Second and Fourteenth Amendments. Radford Fant, who was between the ages of 18 and 21 at the time, later joined as an individual plaintiff. Although the Association and Fant purported to make a facial challenge to the Florida law, they alleged that it is unconstitutional only to the extent that it prohibits individuals between the ages of 18 and 21 from purchasing firearms. Colton Campbell, who is between the ages of 18 and 21, has since been substituted for Fant as the individual plaintiff.

The parties cross-moved for summary judgment, and the district court granted judgment for the Commissioner. The district court ruled that the Florida law does not violate the right to keep and bear arms of individuals between 18 and 21 years of age.

This appeal followed. During its pendency, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). The Supreme Court held that a firearm regulation is constitutional if it "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. We vacated a panel opinion that affirmed the district court after the *Bruen* decision to rehear

this appeal en banc. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317 (11th Cir. 2023), *vacated, reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023). And we stayed briefing until the Supreme Court later decided, in *United States v. Rahimi*, that a federal law forbidding persons subject to domestic-violence restraining orders from possessing firearms, 18 U.S.C. § 922(g)(8)(C)(i), was constitutional because it was consistent with our historical tradition of regulating firearms. 144 S. Ct. 1889, 1898, 1903 (2024).

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment. *Thai Meditation Ass'n of Ala. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Summary judgment is proper where, construing all facts in the non-movant's favor, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*

## III. DISCUSSION

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The Amendment secures a preexisting right held by "the people" that is "exercised individually and belongs to all Americans." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The "'central component' of the Second Amendment" is the right to "self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599). The Amendment guarantees Americans the right to "have weapons" and to carry them "outside of an organized militia." *Heller*, 554 U.S. at 582, 584 (internal quotation marks

omitted). This guarantee extends to "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*. at 582.

"Like most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. Since the Founding, American law has regulated arms-bearing conduct in many ways: from prohibitions on "gun use by drunken New Year's Eve revelers" to bans on "'dangerous and unusual weapons'" to restrictions on concealed carry. *Rahimi*, 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 627).

Although the Association and Campbell purport to make a facial challenge to the Florida law, their challenge is to the law as applied only to individuals between the ages of 18 and 21. A facial challenge requires a plaintiff to "'establish that no set of circumstances exists under which the [law] would be valid,' or . . . show[] that the law lacks a 'plainly legitimate sweep.'" *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (alteration rejected) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The Association and Campbell do not challenge the Florida law in that way. They argue that the law is unconstitutional because it bars individuals between the ages of 18 and 21 from purchasing firearms—not because it prohibits all minors from purchasing firearms.

When a person challenges a law regulating arms-bearing conduct, courts must examine the "'historical tradition of firearm regulation'" in our nation to "delineate the contours of the right." *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 142 S. Ct. at 2126). A regulation is lawful if it "fits within" and "is consistent with the principles that underpin" that tradition. *Id.* at 1897–98. This inquiry turns on "[w]hy and how" the regulation burdens the right to keep and bear arms. *Id.* at 1898. If it addresses the same problem as historical restrictions, it shares a "why" with those restrictions. *Id.* A shared "why" is a "strong indicator" that a modern regulation "fall[s] within a permissible category of regulations." *Id.* And, if a regulation shares a "why" with historical restrictions, it is lawful if it is "'similar'" to those restrictions in "how" it burdens the right. *Id.* (quoting *Bruen*, 142 S. Ct. at 2132). The burden to establish the lawfulness of a regulation lies with the government. *Id.* at 1897.

Although a regulation "may not be compatible with the right if it" restricts the right "to an extent beyond what was done at the founding," the regulation need "not precisely match its historical precursors" either. *Id.* at 1898. A modern law could "'pass constitutional muster'" if it is "'analogous enough'" to those precursors to "comport with the principles underlying the Second Amendment," even if it is not a "'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2133). To require that a modern law perfectly match a law from the Founding era erroneously "assumes that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring). The Constitution

does not impose a "'use it or lose it' view of legislative authority."
*Id.*

To determine whether the Florida law is consistent with our regulatory tradition, we must first decide *what* tradition is relevant to that inquiry. For purposes of this appeal, the Founding era is the primary period against which we compare the Florida law. The Supreme Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137. That is, "incorporated Bill of Rights protections," like the Second Amendment, "'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *McDonald*, 561 U.S. at 765 (quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)).

The Supreme Court has "generally assumed that the scope" of those rights "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137. But the Court did not definitively decide in *Bruen* the period of history against which we should compare firearm regulations. It acknowledged the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. But it declined to decide the proper historical period because the "public understanding of the

right to keep and bear arms in both 1791 and 1868 was, for all rele-
vant purposes, the same with respect to public carry." *Id.*

    The Supreme Court relied heavily on sources from the
Founding era to interpret the Second Amendment in *Heller*. To in-
terpret the phrase "to keep and bear arms," the Court used diction-
aries from the Founding era, "written documents of the founding
period," and "state constitutional provisions written in the 18th
century or the first two decades of the [nineteenth century]." *Heller*,
554 U.S. at 581–92. To determine the meaning of the Second
Amendment's operative clause, the Court also "look[ed]" to the
"historical background of the Second Amendment" because "it has
always been widely understood that the Second Amendment . . .
codified a *pre-existing* right." *Id.* at 592. That historical background
spanned over 100 years, from before the Glorious Revolution to
the first decade of the nineteenth century. *Id.* at 592–95. The Court
also considered the debate over whether the right to keep and bear
arms "needed to be codified in the Constitution." *Id.* at 598. And it
again considered "analogous arms-bearing rights in state constitu-
tions that preceded and immediately followed adoption of the Sec-
ond Amendment." *Id.* at 600–01.

    The Supreme Court has warned against the overuse of his-
tory from Reconstruction. Although the Supreme Court looked to
sources from Reconstruction in *Heller*, it cautioned that because
those sources come "75 years after the ratification of the Second
Amendment, they do not provide as much insight into its original
meaning as earlier sources." *Id.* at 614. And, in *Bruen*, the Court

explained that "when it comes to interpreting the Constitution, not all history is created equal" because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35). The Second Amendment was ratified, and its meaning fixed, in 1791.

Our conclusion that we first look to the Founding understanding finds additional support in the Supreme Court's repeated interpretations of other amendments based on their public meaning at the Founding. For example, in *Crawford v. Washington*, the Court explained that the "founding generation's" understanding of the "right to confront one's accusers" derived from the "common law." 541 U.S. 36, 43 (2004). *Crawford* canvassed English legal history, colonial practice, state law contemporary to the ratification of the Sixth Amendment, ratification debates, and early state practice to ascertain the scope of the right. *Id.* at 42–50. Likewise, in *Virginia v. Moore*, the Court explained that it "look[s] to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve." 553 U.S. 164, 168 (2008). And, in *Nevada Commission on Ethics v. Carrigan*, the Court considered legislative enactments, treatises, and conflict-of-interest rules contemporaneous to the ratification of the First Amendment to determine whether legislative recusal rules violate the First Amendment. 564 U.S. 117, 122–25 (2011). These precedents reflect the preeminence of Founding-era sources to the meaning of the Bill of Rights. Because the Supreme Court relies on sources from the

Founding era to interpret the Bill of Rights, including the Second Amendment, we do too.

Nevertheless, postratification history of a "'regular course of practice' can 'liquidate [and] settle the meaning of disputed or indeterminate 'terms [and] phrases' in the Constitution." *Bruen*, 142 S. Ct. at 2136 (quoting *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020)). To be sure, *Bruen* did not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). And "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137 (majority opinion). For example, in the context of the First Amendment, the Supreme Court declined to rely on a practice of over 30 states from the "second half of the 19th century" yet relied on other evidence from that era. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020). The Court explained that it saw "no inconsistency in recognizing that such evidence may *reinforce* an early practice but cannot *create* one." *Id.* at 2259 (emphasis added). So we may look to historical practice from the mid-to-late nineteenth century at least to confirm the Founding-era understanding of the Second Amendment. But we need not and do not decide in this appeal how to address a conflict between the Founding-era and Reconstruction-era understandings of the right because the law of both eras restricted the purchase of firearms by minors. *Cf. Bruen*, 142 S. Ct. at 2138 (declining to address this issue because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry").

At the Founding, a person was an "infant[]" or a "minor[]" in the eyes of the law until age 21. 1 ZEPHANIAH SWIFT, A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795); *accord* 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *463 (George Sharswood ed., 1893) ("[F]ull age in male or female is twenty-one years," and an individual "till that time is an infant, and so styled in law."); SAMUEL JOHNSON, *I'nfant. n.s.*, A DICTIONARY OF THE ENGLISH LANGUAGE (1773), https://perma.cc/Q4JZ-DRGE ("*Infants*" were "young person[s] to the age of one and twenty."). And the colonies "adopted age twenty-one as the near universal age of majority." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TUL. L. REV. 55, 64 (2016). The "age of majority at twenty-one was early established at common law" and evolved "from the system of judicial combat and knight service, the age of knighthood being increased . . . to the completion of twenty years." T. E. James, *The Age of Majority*, 4 AM. J. LEGAL HIST. 22, 30 (1960). English law set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals. *See* 1 BLACKSTONE, *supra*, at *453. The English view was that a child does not "arriv[e] at years of discretion" until that age. *Id.* When a child turned 21 years of age, "the law . . . established" that "the empire of the father, or other guardian," should "give[] place to the empire of reason." *Id.*

The Founders' generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights. Gouverneur Morris warned that these individuals "want prudence" and "have no will of their own." 4 THE WRITINGS OF

James Madison 119 (Gaillard Hunt ed., 1903) (Constitutional Convention, August 7, 1787). Thomas Jefferson considered "infants" akin to "maniacs," "drunkards," and others who "cannot take care of themselves." Letter from Thomas Jefferson to Samuel Smith (May 3, 1823), https://perma.cc/YD6X-H6PN. And, with respect to voting, John Adams explained that these individuals were not "fit to be trusted by the [p]ublic" because of their lack of "[j]udgment" and "[w]ill." Letter from John Adams to James Sullivan (May 26, 1776), https://perma.cc/HW9M-7YL2.

Because of their lack of reason, infants were subject to the "power" of their parents until they reached age 21. 1 Blackstone, *supra*, at *452–53; 1 Swift, *supra*, at 213. Parents "ha[d] the benefit" and "receive[d] the profits" of their children's labor. 1 Blackstone, *supra*, at *453. Minors could not sue to vindicate their rights without joining their guardians or some other "next friend" who was not their guardian. *Id.* at *464. Parents controlled children's access to information, including books. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 831–32 (2011) (Thomas, J., dissenting). Nor could they enlist in the military without parental consent. Act of March 16, 1802, 2 Stat. 132, 135 ("[N]o person under the age of twenty-one years shall be enlisted by any officer, or held in the service of the United States, without the consent of his parent."). Families in New England were arranged so that the "[p]atriarchal household heads sp[oke] for their dependents in dealings with the larger world." Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750–1820*, 47 Wm. & Mary Q. 235, 236 (1990). Dependent minors "lacked the formal capacity to

participate in public life and [were] subject to the authority of household heads." *Id.* at 237.

Among the many legal disabilities that "secure[d] [minors] from hurting themselves by their own improvident acts," 1 BLACKSTONE, *supra*, at *464, minors generally lacked the capacity to contract, *id.* at *465, and to purchase goods on account, WILLIAM MACPHERSON, TREATISE ON THE LAW RELATING TO INFANTS 303 (1843). All "contracts with infants, except for necessaries, [were] either void or voidable" because "infants . . . are supposed to want judgment and discretion in their contracts and transactions with others." 1 SAMUEL COMYN, A TREATISE OF THE LAW RELATIVE TO CONTRACTS AND AGREEMENTS NOT UNDER SEAL 148 (1809). As a "general rule," contracts for the purchase of "personal property" involving minors were "voidable." 1 SWIFT, *supra*, at 215. By the early nineteenth century, voidability was applied so "broadly" that "it became *almost impossible* for children to form *any* contracts." HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY 271 (2005) (emphasis added). But a minor could "bind himself by his contract for necessaries, for diet[,] apparel, education, and lodging." 1 SWIFT, *supra*, at 216; *accord* BREWER, *supra*, at 271; 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 256 (William Kent ed., 8th ed. 1854). Yet, an infant who "live[d] with his father or guardian" who adequately cared for him, could not "bind himself *even for necessaries*." 2 KENT, *supra*, at 256–57 (emphasis added).

18                    Opinion of the Court                    21-12314

The inability to contract impeded minors from acquiring firearms during the Founding era. In that era, "contracts were more important for the basic transactions of society" than today. BREWER, *supra*, at 271. The purchase of goods, including firearms, required the ability to contract because people often bought goods on credit. *See, e.g.*, *Wills v. Brown*, 3 N.J.L. 548, 548 (N.J. Sup. Ct. 1809) (dispute over a "running blacksmith account"); *Christie v. Woods*, 2 Yeates 213, 215 (Pa. 1797) (dispute over "goods [that] were sold on six months' credit"); *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. (1 McCord) 572, 572 (1822) (dispute over goods, including "powder and pistols," purchased on credit); MACPHERSON, *supra*, at 316 (discussing disputes over clothing and jewelry bought on credit). And because voidability threatened sellers with a "high risk" that they could not recover goods sold if they contracted with infants, "infants [were] effectively unable to form contracts." BREWER, *supra*, at 271. Importantly, "liquor, pistols, powder, saddles, bridles, [and] whips" were *not* necessaries. *Ott's Adm'r*, 12 S.C.L. (1 McCord) at 572; *see also* 1 SWIFT, *supra*, at 216 (necessaries were "diet[,] apparel, education, and lodging"); BREWER, *supra*, at 266 (necessaries were food, clothing, education, and medicine); 2 KENT, *supra*, at 256 (same). Minors also lacked disposable income to otherwise purchase firearms because they either worked for their parents for no wages, Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 RUTGERS U.L. REV.: COMMENTARIES 101, 108 (2024), or any wages earned belonged to their parents, 1 BLACKSTONE, *supra*, at *453.

We draw two lessons from the legal treatment of minors at the Founding. First, minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor. Second, minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society.

State militia laws from the Founding era confirm this understanding. Because of the legal incapacity of individuals under the age of 21, states enacted laws at the Founding to address minors' inability to purchase firearms required for their militia service. The Second Congress passed the Militia Act to enroll "able-bodied" men between the ages of 18 and 45 in the militia. Act of May 8, 1792, 1 Stat. 271, 271. The Act provided that "every citizen so enrolled . . . shall . . . provide himself with a good musket or firelock." *Id.* But members of Congress recognized that individuals between the ages of 18 and 21 would need their parents to provide them weapons to comply with the Act. Representative John Vining "asked by what means minors were to provide themselves with the requisite articles" for militia service. 2 JOSEPH GALES, THE DEBATES AND PROCEEDINGS IN THE CONGRESS OF THE UNITED STATES 1854–55 (1834). And Representative Jeremiah Wadsworth responded that "as to minors, their parents or guardians would prefer furnishing them with arms themselves, to depending on the United States" to furnish them with arms. *Id.* at 1856.

States addressed the problem of providing minors the firearms necessary for militia service in different ways. Pennsylvania

and Delaware exempted minors from the firearm requirement entirely. 14 JAMES T. MITCHELL & HENRY FLANDERS, THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 456 (1909) ("[Y]oung men under the age of twenty-one . . . shall be exempted from furnishing the necessary arms, ammunition and accoutrements.") (Statutes of 1793); 2 LAWS OF THE STATE OF DELAWARE 1135–36 (New Castle, Samuel Adams & John Adams 1797) (same) (Statutes of 1793). New Hampshire, Massachusetts, Vermont, North Carolina, Louisiana, Maine, and Missouri required parents of minors to acquire firearms for their militia service. THE LAWS OF THE STATE OF NEW HAMPSHIRE 421–22 (Portsmouth, John Melcher 1797) (Act of 1792); 2 THE PERPETUAL LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 181 (Boston, I. Thomas & E. T. Andrews 1801) (Statutes of 1793); 2 THE LAWS OF THE STATE OF VERMONT 131–32 (Randolph, Sereno Wright 1808) (Act of 1797); 2 FRANCOIS-XAVIER MARTIN, THE PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA 159 (Newbern, Martin & Ogden 1804) (Act of 1800); ACTS PASSED AT THE FIRST SESSION OF THE LEGISLATIVE COUNCIL OF THE TERRITORY OF ORLEANS 284–86 (New Orleans, James M. Bradford 1805) (Act of 1805); AN ACT TO ORGANIZE, GOVERN, AND DISCIPLINE THE MILITIA, OF THE STATE OF MAINE 21, 37 (Portland, Todd & Smith 1824) (Act of 1821); 2 LAWS OF THE STATE OF MISSOURI 533, 554, 571, 574 (St. Louis, E. Charless 1825) (Act of 1825). And Virginia, Connecticut, New York, Rhode Island, Maryland, New Jersey, Ohio, Mississippi, Kentucky, Georgia, Indiana, and Illinois implicitly required parents to supply minors with firearms because those states held parents liable for

minors' fines related to militia service, including the failure to obtain a firearm. 9 WILLIAM WALTER HENING, THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 270–71 (Richmond, J. & G. Cochran Printers 1821) (Act of 1777); ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 307–08, 312 (Hartford, Hudson & Goodwin 1796) (Act of 1792); 3 LAWS OF THE STATE OF NEW YORK 58, 63–64 (New York, Thomas Greenleaf 1797) (Act of 1793); THE PUBLIC LAWS OF THE STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS 436–38 (Providence, Carter & Wilkinson 1798) (Act of 1798); 2 WILLIAM KILTY, THE LAWS OF MARYLAND ch. LIII, §§ I, XV, XIX (Annapolis, Frederick Green 1800) (Supplement of 1798); WILLIAM PATERSON, LAWS OF THE STATE OF NEW JERSEY 438–40 (New Brunswick, Abraham Blauvelt 1800) (Act of 1799); 2 ACTS OF THE STATE OF OHIO: SECOND SESSION OF THE GENERAL ASSEMBLY 31–32, 35 (Chillicothe, N. Willis, reprinted by The Laning Co. 1901) (Statutes of 1803); HARRY TOULMIN, THE STATUTES OF THE MISSISSIPPI TERRITORY 80 (Natchez, Samuel Terrell 1807) (Statutes of 1807); 2 LAWS OF KENTUCKY 401, 405 (Lexington, John Bradford 1807) (Statutes of 1807); OLIVER H. PRINCE, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 330–31 (Milledgeville, Grantland & Orme 1822) (Act of 1807); AN ACT REGULATING THE MILITIA, OF THE STATE OF INDIANA 19–20 (Corydon, Carpenter & Douglass 1824) (Act of 1824); LAWS PASSED BY THE FOURTH GENERAL ASSEMBLY OF THE STATE OF ILLINOIS, AT THEIR SECOND SESSION 23 (Vandalia, Robert Blackwell 1826) (Act of 1826).

During the Founding era, minors generally lacked unrestricted access to firearms. By 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population, CENSUS FOR 1820, at 18 (Washington, Gales & Seaton 1821)—had enacted laws that placed the onus on parents to provide minors with firearms for militia service. These laws reflected that, at common law, minors could not purchase weapons for themselves. *Cf. Timbs v. Indiana*, 139 S. Ct. 682, 688 (2019) ("In 1787, the constitutions of eight States—accounting for 70% of the U.S. population—forbade excessive fines." And by 1868, "the constitutions of 35 of the 37 States—accounting for over 90% of the U.S. population—expressly prohibited excessive fines.").

University regulations from the Founding era also confirm that minors needed parental consent to access firearms. At the Founding, "[c]ollege authorities stood in the place of parents to the students entrusted to their care." Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 VAND. L. REV. 1135, 1135–36 (1991). Acting *in loco parentis*, universities could impose "[a]ny rule or regulation for the betterment of" their students' "physical, moral, and mental welfare." *Id.* at 1146; *accord* 1 BLACKSTONE, *supra*, at *453 (A father could "delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge . . . as may be necessary to answer the purposes for which he is employed."). And universities "were permitted to deny students the autonomy

and rights enjoyed by others in order to preserve institutional harmony." Jackson, *supra*, at 1147.

Exercising this parental authority, universities commonly restricted firearm access both on and off campus. *See generally* Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 MINN. L. REV. 3049, 3069–75 (2024); Spitzer, *supra*, at 112–19 (collecting dozens of public and private university codes and concluding that "policies restricting students' access to weapons were common, if not ubiquitous" in the 1700s and 1800s). For example, in 1795, Yale College prohibited students from "keep[ing] any kind of fire-arms, or gun-powder." THE LAWS OF YALE-COLLEGE, IN NEW HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795, at 26 (New Haven, Thomas Green & Son 1800). In 1810, the University of Georgia prohibited students from possessing firearms off campus. *See The Minutes of the Senatus Academicus 1799–1842*, UNIV. OF GA. LIBRS. 86 (Nov. 4, 1976), https://perma.cc/EW28-VU83 (prohibiting students from possessing "any gun" or "other offensive weapon in College" or "out of the college in any case whatsoever"). Later, the University of Virginia prohibited students from keeping "weapons or arms of any kind, or gunpowder" on school grounds. *University of Virginia Board of Visitors Minutes,* ENCYCLOPEDIA VA. 6–7 (Oct. 5, 1824), https://perma.cc/F32R-AWK9. And students at the University of North Carolina could not "keep . . . fire arms, or gunpowder" nor "carry, keep, or own at the College . . . any deadly weapon" nor "use fire arms without permission from the President." ACTS OF THE GENERAL ASSEMBLY AND

ORDINANCES OF THE TRUSTEES FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (Raleigh, The Raleigh Register 1838).

Mid-to-late-nineteenth-century laws consistent with these principles further establish that our law historically precluded the purchase of firearms by individuals under the age of 21. In the second half of the nineteenth century, 20 jurisdictions enacted laws that restricted access to arms for minors. Most of those laws prohibited all methods of providing arms to individuals under the age of 21. And only a few of these laws allowed parents to provide arms to their children.

Alabama, Tennessee, Kentucky, Indiana, Missouri, Illinois, Maryland, West Virginia, Wisconsin, Iowa, Louisiana, Wyoming, the District of Columbia, North Carolina, and Texas prohibited selling, loaning, or giving dangerous weapons, including pistols, to individuals under the age of 21. 1855–56 Ala. Laws 17; TENN. CODE § 4864 (1858), *reprinted in* THE CODE OF TENNESSEE ENACTED BY THE GENERAL ASSEMBLY OF 1857–'8, at 871 (Nashville, E. G. Eastman & Co. 1858); 1860 Ky. Acts 245; 1875 Ind. Acts 59; MO. REV. STAT. § 1274 (1879), *reprinted in* 1 THE REVISED STATUTES OF THE STATE OF MISSOURI 1879, at 224 (Jefferson, Carter & Regan 1879); 1881 Ill. Laws 73; 1882 Md. Laws 656; 1882 W. Va. Acts 421; 1883 Wis. Sess. Laws 290 (vol. 1); 1884 Iowa Acts 86; 1890 La. Acts 39; 1890 Wyo. Terr. Sess. Laws 140; J. A. VAN ORSDEL & FENIMORE CHATTERTON, REVISED STATUTES OF WYOMING IN FORCE DECEMBER 1, 1899, at 1253 (Laramie, Chaplin, Spafford & Mathison 1899) (codifying the

territorial law); 27 Stat. 116–17 (1892); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22; *see also Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing a "minor under the age of twenty-one years"); *Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660–61 (1858) (referring to 21 as the age of majority); *Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666, 671 (1857) (referring to 21 as the age of majority); MO. REV. STAT. § 2559, *supra*, (setting the age of majority at 21 for males and 18 for females); 64 ILL. COMP. STAT. § 1 (1881) (setting the age of majority at 21 for males and 18 for females); *Hepp v. Huefner*, 20 N.W. 923, 924 (Wis. 1884) (referring to 21 as the age of majority); *In re Mells*, 20 N.W. 486, 486 (Iowa 1884) (referring to 21 as the age of majority); *State v. Kittelle*, 15 S.E. 103, 103 (N.C. 1892) (referring to 21 as the age of majority); 1 JOHN SAYLES & HENRY SAYLES, SAYLES' ANNOTATED CIVIL STATUTES OF THE STATE OF TEXAS 1009 (St. Louis, The Gilbert Book Co. 1898) (setting the age of majority at 21 for males and unmarried females). But, of those jurisdictions, only four excepted parents or guardians from their prohibitions on providing arms to individuals under the age of 21. 1860 Ky. Acts 245; MO. REV. STAT. § 1274 (1879), *supra*; 1897 Tex. Gen. Laws 221–22; 1881 Ill. Laws 73 (employers, too).

Five other jurisdictions regulated access to arms for individuals under the age of 21 in slightly different ways. Mississippi prohibited the sale of deadly weapons including pistols to individuals under the age of 21 but did not prohibit other ways of providing arms to those individuals. 1878 Miss. Laws 175; *see also Acker v. Trueland*, 56 Miss. 30, 34 (1878) (referring to 21 as the age of majority). Similarly, Delaware prohibited the sale of "deadly weapon[s]

26                    Opinion of the Court                    21-12314

. . . other than an ordinary pocket knife" to minors. 16 Del. Laws
716 (1881); *see also* REVISED STATUTES OF THE STATE OF DELAWARE
OF EIGHTEEN HUNDRED AND FIFTY-TWO 484–85 (Wilmington,
James & Webb 1874) (setting the age of majority at 21 for males
and 18 for females). Georgia prohibited "sell[ing], giv[ing]
lend[ing], or furnish[ing]" a pistol to a minor unless "circumstances
justif[ied]" the use of the weapon to "defend[] life, limb or prop-
erty." 1876 Ga. Laws 112. Nevada and Kansas went further. Nevada
prohibited individuals under the age of 21 from "wear[ing] or
carry[ing] . . . dangerous or deadly weapons[]," including pistols.
1885 Nev. Stat. 51. And Kansas prohibited their "possession" of pis-
tols and "other dangerous weapon[s]." 1883 Kan. Sess. Laws 159;
*see also Burgett v. Barrick*, 25 Kan. 526, 527–29 (1881) (referring to 21
as the age of majority).

     The law of the Founding era, which restricted the purchase
of firearms by minors, continued into the nineteenth century in the
form of statutory prohibitions. By the end of the nineteenth cen-
tury, at least 19 states and the District of Columbia—representing
roughly 55 percent of the population of states admitted to the Un-
ion, CENSUS OFF., DEP'T OF THE INTERIOR, TWELFTH CENSUS OF THE
U.S. TAKEN IN THE YEAR 1900, CENSUS REPORTS, VOL. I:
POPULATION 2 (1901) (1890 population data)—restricted the pur-
chase or use of certain firearms by minors. When the common-law
regime became less effective at restricting minors' access to fire-
arms, statutes increasingly did the work.

These mid-to-late-nineteenth-century laws also carried the threat of criminal penalties. Alabama, Kentucky, Indiana, Mississippi, Illinois, Maryland, Kansas, and Wyoming imposed only fines for violations of their statutes. 1855–56 Ala. Laws 17; 1860 Ky. Acts 245; 1875 Ind. Acts 59; 1878 Miss. Laws 175; 1881 Ill. Laws 73; 1882 Md. Laws 656; 1883 Kan. Sess. Laws 159; 1890 Wyo. Terr. Sess. Laws 140. But Tennessee, Georgia, Missouri, Delaware, West Virginia, Wisconsin, Iowa, Nevada, Louisiana, the District of Columbia, North Carolina, and Texas threatened violators with imprisonment. TENN. CODE § 4864 (1858), *supra*; 1876 Ga. Laws 112; THE CODE OF THE STATE OF GEORGIA 782 (R. H. Clark, et al. eds., 2d ed. 1873); MO. REV. STAT. § 1274 (1879), *supra*; 16 Del. Laws 716 (1881); 1882 W. Va. Acts 421; 1883 Wis. Sess. Laws 290 (vol. 1); 1884 Iowa Acts 86; 1885 Nev. Stat. 51; 1890 La. Acts 39; 27 Stat. 116–17 (1892); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22.

The age of the majority "remained unchanged" in the United States "from the country's founding well into the twentieth century." Hamilton, *supra*, at 64. When World War II necessitated lowering the conscription age to 18, states lowered the age of majority too. *Id*. And, in 1971, the ratification of the Twenty-Sixth Amendment guaranteed the right to vote to individuals at the age of 18. But for much of the first two centuries of our nation, our law limited the rights of individuals under the age of 21, including their purchase of firearms.

From this history emerges a straightforward conclusion: the Florida law is consistent with our regulatory tradition in why and

how it burdens the right of minors to keep and bear arms. *See Rahimi*, 144 S. Ct. at 1898. Because minors have yet to reach the age of reason, the Florida law prohibits them from purchasing firearms, yet it allows them to receive firearms from their parents or another responsible adult.

The Florida law has the same "why" as the Founding-era limitations: individuals under the age of 21 have not reached the age of reason and lack the judgment and discretion to purchase firearms responsibly. To reduce the likelihood that another individual like Nikolas Cruz would lawfully purchase a firearm and use it to inflict grievous harm on himself or others, the Florida law restricts the purchase of firearms by individuals under the age of 21. *See* FLA. STAT. § 790.065(13). Likewise, our legal system "imposed age limits on all manner of activities that required judgment and reason" at the Founding. *Brown*, 564 U.S. at 834 (Thomas, J., dissenting). But when an individual reaches the age of reason and the need to protect him and the public from his immaturity and impulsivity dissipates, the Florida law permits him to purchase firearms. *See* FLA. STAT. § 790.065(13).

The Florida law is also consistent with our regulatory tradition in "how" it burdens the right. Founding-era law precluded individuals under the age of 21 from purchasing arms because they lacked cash and the capacity to contract. Access to arms was a matter of parental consent. When Founding-era laws required minors to carry arms for militia service, states required their parents to provide the arms. And universities, standing in for students' parents,

imposed significant restrictions on both firearm access and use. Consistent with these Founding-era limitations, states in the nineteenth century expressly prohibited the sale of arms to minors with some exceptions for parents to provide firearms to their children. The Florida law burdens the right no more than these historical restrictions because it prohibits purchase but preserves access to firearms with parental consent.

Notably, the Florida law is less restrictive than the law at the Founding in some ways. The militia laws did not empower any individuals under the age of 21 to purchase arms. But the Florida law contains exceptions permitting the purchase of a rifle or shotgun by peace officers, correctional officers, or military personnel. FLA. STAT. § 790.065(13). This exception is *more generous* than the Founding-era militia laws because it empowers minors to purchase firearms when needed for public service.

The Florida law fits comfortably within postratification tradition too. Indeed, many postratification laws went further than the Florida law does. Fifteen jurisdictions prohibited *providing* pistols and other dangerous weapons under any circumstances to individuals under the age 21, not just selling them. Only six jurisdictions permitted parents to provide arms to their children regardless of circumstances—a step back from the parental consent of the Founding era. And Nevada and Kansas prohibited *possession* by individuals under the age of 21. That the Florida law is less restrictive than many of these postratification laws further confirms that it fits within our regulatory tradition.

To be sure, the common-law regime of the Founding era differs from our modern regime of statutory regulation. But Supreme Court precedents do not require a modern law to "precisely match its historical precursors." *Rahimi*, 144 S. Ct. at 1898. Those "precedents were not meant to suggest a law trapped in amber." *Id.* at 1897. And we do not "assume[] that founding-era legislatures maximally exercised their power to regulate" or that the Second Amendment imposes a "'use it or lose it' view of legislative authority." *Id.* at 1925 (Barrett, J., concurring). That kind of assumption is especially unwarranted here where the limitations on the legal rights of minors were so pervasive that states had no need to enact restrictions that prohibited their purchase of firearms. Instead, the inability to contract and the lack of a right to their own wages precluded minors from purchasing *any goods* on their own, except for necessaries when their parents would not provide them. *See* BREWER, *supra*, at 271; 2 KENT, *supra*, at 256–57; 1 BLACKSTONE, *supra*, at *466.

The question is whether the modern law is "'analogous enough,'" and the Florida law is. *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 142 S. Ct. at 2133). Like the Founding-era legal regime, the Florida law prevents purchases by minors. The difference between the Florida law and the Founding-era regime is that the law at the Founding was *more restrictive* than the Florida law because it prevented the purchase of many goods besides firearms. The Florida law does not violate the Second and Fourteenth Amendments because it restricts the rights of minors less than the Founding-era law did.

Although the Founding era lacked express prohibitions on the purchase of firearms, the postratification period did not. The laws from the mid-to-late nineteenth century make explicit what was implicit at the Founding: laws may regulate the purchase of firearms by minors. To that end, 18 jurisdictions expressly prohibited the sale of certain arms to individuals under the age of 21 and attached criminal penalties to those prohibitions.

The ways in which postratification laws are less restrictive than the Florida law do not undermine our conclusion either. Many of these laws arguably target only abnormally dangerous weapons instead of all weapons. *See, e.g.*, TENN. CODE § 4864 (1858), *supra* ("pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in travelling"); *see also* Brasher Dissenting Op. at 30 ("[T]hese laws reflect a tradition of regulating specific weapons that were considered unusually dangerous because they could so easily be concealed."). And some of these laws permitted women to purchase arms at 18 years of age instead of 21. *E.g.*, 1881 Ill. Laws 73; 64 ILL. COMP. STAT. § 1 (1881). Even if we accept that the Florida law is more restrictive than the postratification laws in these ways, that fact does not make the Florida law inconsistent with our regulatory tradition. At the Founding, the law precluded the purchase of any kind of firearm by a minor, whether male or female. So, to the extent that the Florida law is more restrictive than postratification laws, it does not matter because the Florida law is nevertheless consistent with the law of the Founding.

Judge Brasher's dissenting opinion offers tales of Founder/President youths shooting guns, Brasher Dissenting Op. at 12–13 (recounting how Thomas Jefferson and John Adams and eldest son John Quincy Adams used firearms as children for hunting and sport), to imply that it would violate the Second and Fourteenth Amendments to restrict the purchase of firearms by minors of *any* age, *see id.* at 3 ("[T]he majority has read an age limit into the Second Amendment and that amendment alone."); *id.* at 12 ("[T]here are no Founding-era laws disarming anyone based on age."); *id.* at 14 ("[F]ederal legislation simply required all national select militia members to arrive armed for duty; there were no specific provisions about minors."); *id.* at 16 ("[T]here were no Founding-era laws prohibiting young adults from purchasing any firearm at all."); *id.* at 27 ("There were no age-based limitations on [the] right to keep and bear arms either before, during, or immediately after the adoption of the Bill of Rights."). Judge Branch's dissenting opinion also implies that any age restriction is unconstitutional. *See* Branch Dissenting Op. at 3 ("[T]he majority's lone Founding-era analogue . . . a contract-law doctrine . . . incidentally reached contracts for firearms because it reached contracts by minors for *any* non-necessity."). But that position defies our legal tradition, which "imposed age limits on all manner of activities that required judgment and reason." *Brown*, 564 U.S. at 834 (Thomas, J., dissenting).

Perhaps because that position is so difficult to defend, Judge Brasher's dissent frames the Florida law as one that supposedly targets "adults" between the ages of 18 and 21 even though the Florida law, by its terms, covers all individuals under the age of 21. *See, e.g.,*

Brasher Dissenting Op. at 1 (describing the Florida law as a prohi-
bition on "adult citizens between the ages of eighteen to twenty-
one from purchasing any kind of firearm"). The dissent then sug-
gests that its modern "adults" are individuals who possess some un-
specified set of legal rights. *See id.* at 20 (noting that individuals over
the age of 18 "can [now] be held to long term contracts" in Florida
and that their parents lack an "obligation to protect them, provide
for them, or ensure their safety"). And it concludes that Florida can-
not bar these "adults" from purchasing firearms today regardless of
their status at the Founding. Campbell and the Association take a
similar approach: Although they concede that Florida may restrict
the purchase of firearms by minors, they argue that Florida's regu-
latory authority is somehow tied to the age of majority that it cur-
rently uses for most other rights.

The dissent's attempt to avoid the weight of legal history by
labeling individuals between the ages of 18 and 21 as "adults" is un-
availing. The dissent fails to define its category of "adults" for fed-
eral constitutional purposes; it discounts the key fact that, at the
Founding and until the late twentieth century, the age of majority
was 21. Instead of reviewing the legal analogues for regulating the
rights of individuals under the age of 21 as minors, the dissent treats
contemporary "adults" as the so-called "analogues" of the adults of
the Founding era. *Id.* at 31 ("Not to belabor the point, but eighteen-
to twenty-one-year-olds in Florida today are analogous to adults,
not minors, at the time these statutes were enacted."). The dissent
fails to explain which, or how many, modern rights push an indi-
vidual across the threshold from minor to adult under the Second

Amendment. Taken to its logical end, the dissent's position would mean that the federal right to keep and bear arms turns on a sliding scale defined by contemporary state law that varies from jurisdiction to jurisdiction. The federal right could even mean something entirely different in Florida next week depending on the public policy choices of its legislature.

That Florida has lowered the age of majority for some rights does not mean that it has less power to restrict the rights of minors than it did at the Founding. Although 21 was the near-universal age of majority at the Founding, Hamilton, *supra*, at 64, Florida, in recent decades, has lowered the age of majority for many rights to 18, *see* FLA. STAT. § 743.07. But not all states have lowered the age of majority like Florida. *See, e.g.*, MISS. CODE § 1-3-27 (establishing 21 years as the age of majority except with respect to the capacity to enter contracts that affect personal or real property); ALA. CODE § 26-1-1(a) (establishing 19 years as the age of majority). And even modern Florida laws bar individuals under the age of 21 from purchasing alcohol and tobacco. *See* FLA. STAT. § 562.11(1)(a) (alcohol); *id*. § 569.101(1) (tobacco). Judge Brasher's dissent would have us hold that the Second Amendment turns on an evolving standard of adulthood that is divorced from the text of the Amendment and from our regulatory tradition. We decline to do so. *See* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 54 (Boston, Little, Brown, & Co. 1868) ("A principal share of the benefit expected from written constitutions

would be lost if the rules they established were so flexible as to bend to circumstances or be modified by public opinion.").

In a real sense, Judge Brasher's dissent erroneously reviews the Florida law under an equal-protection standard masquerading as an analysis under the Second Amendment. It asserts that the Florida law cannot stand because the principle that minors were subject to the power of their parents at the Founding does not adequately support application of the law to individuals between the ages of 18 and 21 today. Brasher Dissenting Op. at 21 (asserting that "Florida cannot enforce its ban based on a historical justification that does not exist in the present day"). In effect, the dissent applies heightened scrutiny and asks whether the Florida law is sufficiently tailored to the dissent's chosen justification. But settled law makes clear that we ordinarily review age classifications under the Equal Protection Clause for rational basis, and the Florida law easily satisfies that standard. *See Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991) (Because "age is not a suspect classification under the Equal Protection Clause," a state "need therefore assert only a rational basis for its age classification."). Although the dissent contends that age classifications that involve fundamental rights receive strict scrutiny, Brasher Dissenting Op. at 22, the Supreme Court has "recognized that even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults,'" *Ginsberg v. New York*, 390 U.S. 629, 638 (1968) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944)). Indeed, the Supreme Court has described the right to vote as "fundamental," *Harper v. Va. State Bd. of Elections*,

383 U.S. 663, 670 (1966), yet it has held that Congress could not use its enforcement power under Section 5 of the Fourteenth Amendment to require states to lower the voting age from 21 to 18, *Oregon v. Mitchell*, 400 U.S. 112, 130 (1970). After all, Section 2 of the Fourteenth Amendment itself uses 21 years as an age classification for that right. U.S. CONST. amend. XIV, § 2 (reducing the "basis of representation" of any state that "denie[s]" the "right to vote" to "any of the male inhabitants of such State, being twenty-one years of age").

Florida did not lose its constitutional authority to regulate minors' access to firearms when it in recent decades bestowed on individuals between the ages of 18 and 21 greater rights than they would have enjoyed at the Founding. Indeed, that Florida distinguishes between the purchase of a firearm and other rights is consistent with the Founding-era legal regime, which also distinguished between when individuals under the age of 21 could exercise rights based on need and maturity. For example, individuals under the age of 21 could enter valid contracts to purchase necessaries if their parents did not provide those necessaries. 2 KENT, *supra*, at 256–57. The law also treated marriage contracts differently than other contracts. *See* 1 BLACKSTONE, *supra*, at *433, 436. Boys could validly marry at the age of 14, and girls could at the age of 12—the "years of discretion" for marriage. *Id.* at *436. These Founding-era exceptions for the exercise of rights based on need or judgments about maturity are no different from Florida's contemporary judgment that only individuals with a greater degree of maturity should be able to purchase firearms. And that judgment is

one reserved for legislatures whose role it is to formulate policy about legal adulthood—not courts. To this point, our dissenting colleagues offer no response.

Nor does the fact that some states required minors to serve in the militia establish that they had a right to unfettered firearm access. Judge Brasher's dissent mistakes the duty of some minors to serve in the militia for a right to purchase firearms. *See* Brasher Dissenting Op. at 13–16. Although minors between the ages of 18 and 21 could serve in the militia, there was no national requirement that they do so. Instead, Congress permitted, but did not require, states to mandate militia service for minors between 18 and 21 years of age. 1 Stat. at 271–72. And, consistent with that authority, New Jersey, Ohio, and Kansas exempted minors from service in the militia in the nineteenth century. ACTS OF THE FIFTY-FOURTH GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY 3 (Trenton, Joseph Justice 1829) (excluding minors under the age of 21 from the militia); ACTS OF A GENERAL NATURE, PASSED BY THE FORTY SECOND GENERAL ASSEMBLY OF THE STATE OF OHIO 53 (Columbus, Samuel Medary 1844) (same); KAN. CONST. of 1859, art. VIII, § 1 (same). Contrary to the dissent, the militia laws establish no national "expectation of gun ownership" by minors. Brasher Dissenting Op. at 14. They establish only that many state legislatures determined that minors could be required to bear arms provided by their parents and to use those arms under the command and supervision of militia officers.

We also reject, as contrary to Supreme Court precedent, Judge Branch's dissenting opinion that we must rely only on firearm-specific regulations from the Founding era and cannot consider the common law of contracts that governed minors. *See* Branch Dissenting Op. at 3. Reliance on the common-law regime of contracts is appropriate because the Florida law prohibits the *sale* of firearms—a kind of contract. And it adheres to Supreme Court precedent because, in *Rahimi*, the Supreme Court relied on principles "[w]ell entrenched in the common law" that were not limited to firearms. 144 S. Ct. at 1900. Specifically, the Supreme Court relied on surety laws, which generally required that an individual pledge to keep the peace and "could be invoked to prevent all forms of violence." *Id.* As the *Rahimi* Court explained, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98.

Nor does it make any sense for Judge Branch's dissenting opinion to suggest that our citation of a decision *refusing* to enforce a creditor's purported contract with a minor, *Ott's Adm'r*, 12 S.C.L. (1 McCord) at 572, somehow proves that minors regularly purchased firearms in the Founding era, *see* Branch Dissenting Op. at 7. Judge Branch's dissent cites *no* firearm-sales contract with a minor enforced by *any* court, and it points to *no* evidence that minors in *any* state regularly purchased firearms.

It bears repeating that it is unclear whether our dissenting colleagues accept that *any* age restriction for the sale of firearms is constitutional. If they do not, their position would require

enjoining the enforcement of numerous federal and state laws, including a federal law that prohibits licensed sellers from selling "any firearm or ammunition" to an individual under the age of 18. *See* 18 U.S.C. § 922(b)(1). But if our dissenting colleagues accept that some age restrictions are constitutional—and they do not say that they do—it is unclear what aspects of the Founding-era legal regime they believe would support that position. Would the common-law regime of contracts be relevantly similar for limiting sales of firearms to *any* minors? Or would a firearm-specific regulation from that era be necessary? Would the common-law regime that enshrined parental control be relevantly similar? Or would the legislatures of that era have had to exercise that control? And if the aspects of the common-law regime that we have invoked are relevantly similar for upholding modern laws that prohibit sales of firearms to minors under the age of 18 years, what principle of constitutional law do our dissenting colleagues believe empowers the federal judiciary to override the judgment of the Florida legislature to draw the line at 21 years, the same line that prevailed during the Founding era and throughout most of American history? Keep in mind that Congress too has drawn the same line of 21 years for sales of firearms that are not "a shotgun or rifle." *Id.* On these questions, our dissenting colleagues exercise a right to remain silent. *See* Branch Dissenting Op. at 1 n.1 ("I express no opinion on any restrictions placed upon Americans under 18 years of age.").

The recent contrary decision of our sister circuit—which ignored how the common-law regime restricted minors' access to firearms—also fails to persuade us. *Reese v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 127 F.4th 583, 586 (5th Cir. 2025) (holding unconstitutional a federal law, 18 U.S.C. § 922(b)(1), (c)(1), that prohibits licensees from selling handguns to minors between the ages of 18 and 21). Our sister circuit considered state militia laws and university regulations without reference to the common law at the Founding. *See id.* at 596–99. But even mid-nineteenth century jurists described "the unwritten law" as the "basis of our jurisprudence." *Commonwealth v. Chapman*, 54 Mass. (13 Met.) 68, 69 (1847). The common law "furnishe[d] the rules by which public and private rights [we]re established and secured, the social relations of all persons regulated, their rights, duties, and obligations determined, and all violations of duty redressed and punished." *Id.* From those jurists' perspective, without the common law, "the written law, embracing the constitution and statute laws, would constitute but a lame, partial, and impracticable system." *Id.*; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 3 (2012) ("Ours is a common-law tradition . . . . Statutes were a comparatively infrequent source of English law through the mid-19th century."). Indeed, in the Founding era, "crimes were often defined by the common law rather than by statute." STUART BANNER, THE DECLINE OF NATURAL LAW 50 (2021). And after the American Revolution, the states quickly "passed 'reception statutes' to adopt English common law as judicial precedent." BRYAN A. GARNER, ET AL., THE LAW OF JUDICIAL PRECEDENT 738 (2016); *see generally* Ford W. Hall, *The Common Law: An Account of Its Reception in the United States*, 4 VAND. L. REV. 791, 798–800 (1951); *see also* ANTHONY J. BELLIA JR. & BRADFORD R.

CLARK, THE LAW OF NATIONS AND THE UNITED STATES
CONSTITUTION 10 (2017) ("Each state adopted the common law of
England and, by extension, key parts of the law of nations.").

The written laws of the Founding era must be understood
in the light of that predominant common-law regime. *See* William
Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99
NOTRE DAME L. REV. 1467, 1468–70 (2024) ("The constitutionaliza-
tion of a preexisting right means that . . . the Constitution's refer-
ence to a legal right must be understood by learning the historical
customary law that defined and governed the right before its codi-
fication."); J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. (forth-
coming 2025) (manuscript at 32–33), https://perma.cc/C592
-T8GA ("[T]he more reasonable reading is that *Bruen* does not, in
fact, limit the category of historical evidence to regulations. *Bruen*
is an originalist methodology . . . . In other contexts, the Court has
rightly looked to many different sources to determine the original
meaning of the Constitution."); *see generally* Stewart Jay, *Origins of
Federal Common Law: Part Two*, 133 U. PA. L. REV. 1231 (1985); An-
thony J. Bellia Jr. & Bradford R. Clark, *General Law in Federal Court*,
54 WM. & MARY L. REV. 655 (2013); Caleb Nelson, *The Persistence of
General Law*, 106 COLUM. L. REV. 503 (2006); William Baude, et al.,
*General Law and the Fourteenth Amendment*, 76 STAN. L. REV. 1185
(2024). That common-law regime restricted minors' ability to pur-
chase firearms. The state statutes that obligated parents to provide
firearms for minors' militia service confirm that minors had limited
access, and the many university regulations that restricted firearm
possession by students confirm that minors' access was a matter of

parental consent. Because the Fifth Circuit failed to consider the background common-law regime, it misapprehended the import of these written laws. *See Reese*, 127 F.4th at 597 (The "requirements that parents furnish firearms for their sons' militia service do not mean that the military-age young men lacked the right to keep and bear (or obtain) such arms themselves."); *id.* at 596 ("Actions taken *in loco parentis* say little about the general scope of Constitutional rights and protections.").

Nor are we persuaded that two other considerations present in *Rahimi* command a different conclusion. First, although the Supreme Court acknowledged in *Rahimi* that section 922(g)(8)(C)(i) did not apply to an entire class of "persons thought by a legislature to present a special danger of misuse," it did so because the Founding-era comparators, surety and going-armed laws, did not apply to entire classes either. 144 S. Ct. at 1901–02. Section 922(g)(8)(C)(i) "presumes, like the surety laws before it, that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* at 1902. Unlike the surety and going-armed laws, the rule that minors had not "arriv[ed] at years of discretion" and lacked legal capacity applied during the Founding era to all individuals under the age of 21. 1 BLACKSTONE, *supra*, at *452–53. So, it does not matter that the Florida law applies to a class of individuals because the Founding-era comparators did too.

Second, the lack of criminal penalties at the Founding is not dispositive, especially in the light of the criminal penalties that

emerged during the nineteenth century. *Rahimi* considered the penalty that attaches to a firearm regulation as a "relevant," but not necessary, "aspect of the burden." 144 S. Ct. at 1902. Violations of the Florida law carry the possibility of imprisonment of up to five years and a fine of up to $5,000. FLA. STAT. §§ 790.065(13), 775.082(3)(e), 775.083(1)(c). The law at the Founding did not impose criminal penalties on individuals under the age of 21 who purchased firearms. But postratification laws, which prohibited the purchase of firearms by individuals under the age of 21 consistent with Founding-era limitations, did threaten violators with fines and imprisonment. *E.g.*, TENN. CODE § 4864 (1858), *supra*. And the law at the Founding was not toothless either. Voidability threatened sellers with a "high risk" that they could not recover goods sold if they contracted with infants. BREWER, *supra*, at 271. As a criminal penalty might discourage an individual in Florida from purchasing a firearm, voidability so discouraged sellers such that "infants [were] effectively unable to form contracts." *Id*. Although there was no risk of imprisonment until the nineteenth century, other incentives nevertheless discouraged the sale of firearms to individuals under the age of 21. The burden on the right is not so different as to compel the conclusion that this "relevant aspect" deserves dispositive weight.

Finally, we assume, but do not decide, that individuals under the age of 21 are part of "the people" protected by the Second Amendment. Some have argued that we need not look beyond the text of the Second Amendment to determine whether laws like the Florida law are constitutional because these individuals are not part

of "the people" protected by the Amendment. *See, e.g.*, *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 447 (3d Cir. 2025) (Restrepo, J., dissenting) ("The public in 1791 did not understand those under 21 to be part of 'the people' protected by the Second Amendment."); *see also Bruen*, 142 S. Ct. at 2129–30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."); *cf. Brown*, 564 U.S. at 821 (Thomas, J., dissenting) ("The practices and beliefs of the founding generation establish that 'the freedom of speech,' as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors' parents or guardians."). But others have pointed to the Supreme Court's statement that "the people" includes "all members of the political community," *Heller*, 554 U.S. at 580, to argue that these individuals are part of "the people" protected by the Amendment and that "the people" protected by the Second Amendment are the same as "the people" protected by the First and Fourth Amendments, *see, e.g.*, *Lara*, 125 F.4th at 435–38 (majority opinion); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (The text of the Constitution "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, . . . refers to a class of persons who are part of a national community."). Those amendments protect individuals under the age of 21. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) (unreasonable searches and seizures). Because the parties assume that minors are among "the people" protected by the Second

Amendment and the Florida law is consistent with our regulatory tradition in any event, we assume that the Second Amendment protects individuals under the age of 21.

The Florida law that prohibits minors from purchasing firearms does not violate the Second and Fourteenth Amendments because it is consistent with our historical tradition of firearm regulation. From the Founding to the late-nineteenth century, our law limited the purchase of firearms by minors in different ways. The Florida law also limits the purchase of firearms by minors. And it does so for the same reason: to stop immature and impulsive individuals, like Nikolas Cruz, from harming themselves and others with deadly weapons. Those similarities are sufficient to confirm the constitutionality of the Florida law.

## IV. CONCLUSION

The judgment in favor of the Commissioner is **AFFIRMED**.

Rosenbaum, Circuit Judge, joined by Jordan, Circuit Judge, as to Parts I and II, and by Abudu, Circuit Judge, as to Part III, Concurring:

I join in the Majority Opinion's excellent explanation of why the Marjory Stoneman Douglas High School Public Safety Act, *see* Fla. Stat. § 790.065(13), "is consistent with this Nation's historical tradition of firearm regulation," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). I write separately to add three thoughts.

First, in concluding Florida's law is constitutional under the Second Amendment, I agree with the Majority Opinion that here, we need not rely heavily on the Reconstruction Era laws that barred the sale of some firearms to those under 21 ("Under-21s"). That's so because the Founding Era perceived the problem that Under-21s "lacked the reason and judgment necessary to be trusted with legal rights." Maj. Op. at 15. So its common law imposed "relevantly similar," *Bruen*, 597 U.S. at 29, restrictions on Under-21s' right to keep and bear arms to the Florida law's. But I write separately to show that we could rely heavily on the Reconstruction Era laws because they represent the states' response to a new and different problem—an unprecedented kind of Under-21 firearm violence—that began to arise during the nineteenth century. And they are also "relevantly similar" to Florida's law.

Second, modern medical science bolsters the Majority Opinion's conclusion that Florida's law limits Under-21s' ability to buy firearms for the same reasons the common law did during the

Founding Era.  As I've noted, the Majority Opinion explains that the common law presumed that Under-21s "lacked the reason and judgment necessary to be trusted with legal rights."  Maj. Op. at 15. Modern medicine confirms our Founders' hunch.  As it turns out, the common-law principle is based on the manifestation of what we now know to be scientific fact.  The prefrontal cortex, the part of the brain responsible for exercising judgment and moderating behavior in social situations, is one of the last regions of the brain to mature—and it doesn't hit that point until around the age of 25. So Florida adhered to "this Nation's historical tradition of firearm regulation" when it enacted a law designed to moderate the risk Under-21s' limited reasoning and decisionmaking ability may pose to themselves and the public at large.

Third, I agree with the Majority Opinion's decision to leave for another day whether Founding Era or Reconstruction Era evidence controls *Bruen*'s historical inquiry, Maj. Op. at 14, if a conflict arises between the two or the Founding Era is silent on the issue.  I write separately to emphasize that good reasons favor that decision.  For starters, it's not necessary to resolve the question because no conflict exists here between Founding Era and Reconstruction Era history.  Second, many constitutional scholars and courts have weighed in on the side of Reconstruction Era history in a conflict or Founding Era silence.  And for good reason.  Among others, the Constitution's meaning is fixed to the understanding of those who ratified it, so we interpret the Constitution's provisions, including those guaranteeing our rights, at the time the people adopted them.  *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

And when we speak of the incorporation of the Second Amendment right against the states, that occurred in 1868 when Americans adopted the Fourteenth Amendment. *See Bruen*, 597 U.S. at 37–38. Finally, modern Second Amendment jurisprudence is still in its infancy. So allowing more time for courts and scholars to weigh in on the question will help us reach the best understanding.

I discuss each of my three points in more detail below.

**I.    The states' response to a new problem—an unprecedented kind of Under-21 firearm violence—that began to arise during the nineteenth century because of unprecedented societal and technological change is "relevantly similar" to Florida's law.**

The Majority Opinion explains why both Founding Era and nineteenth-century laws are relevantly similar to Florida's law and why they show that Florida's law is constitutional. In this Part, I write to add a few thoughts on the nineteenth-century history.

Before diving into that history, though, I pause to review some principles that govern our historical inquiry. The Supreme Court has recognized that times change, and with them, so do technology and societal problems. *See Bruen*, 597 U.S. at 27; *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024). As a result, "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27. Yet the Second Amendment was "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs."

4                    Rosenbaum, J., Concurring                    21-12314

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819) (emphasis omitted).

      In reconciling the Second Amendment with modern society's problems and technology, the Court has explained that the Second Amendment is not "a law trapped in amber." *Rahimi*, 602 U.S. at 691. Indeed, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691–92. So our inquiry asks whether the modern law is "relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 692 (cleaned up). That question requires us to consider "[w]hy and how the regulation burdens the right" to keep and bear arms. *Id.* "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.*

      But sometimes new problems arise, and legislatures must address "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27; *see Bianchi v. Brown*, 111 F.4th 438, 464 (4th Cir. 2024) (en banc) ("These are not our forebears' arms, and these are not our forebears' calamities. We thus take the instruction of *Bruen* to engage in a 'more nuanced approach' to address these 'unprecedented societal concerns.'" (quoting *Bruen*, 597 U.S. at 27)).

When that happens, a challenged law often will not simply be "an updated model of a historical counterpart." *Rahimi*, 602 U.S. at 739 (Barrett, J., concurring).  But it may well still be constitutional.

The question is whether "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition," *id.* at 692 (Roberts, C.J., majority) (emphasis added), not whether the challenged regulation has a historical "twin" or "cousin," *id.* at 739 (Barrett, J., concurring).  And to answer that question, we must view the principles underlying our regulatory tradition through the correct lens, adjusting the focus to "just the right level of generality" so that we are continuing to respect the Second Amendment, *see id.* at 740, while not "trap[ping] [the law] in amber," *id.* at 691 (Roberts, C.J., majority).  Put differently, we must ask ourselves whether we are "endorsing outliers that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

*Bruen* suggests that analogical reasoning—comparing the "why" and the "how" of historic laws to the challenged law—is one way to resolve the questions our historical inquiry poses.  Still, the Court explained that it didn't conduct an "exhaustive survey of the features that render regulations" consistent with our Nation's tradition of firearm regulation.  *Id.* at 29.  Other factors also help us assess whether a historic law can serve as a "relevantly similar" analogue for a law that addresses "circumstances beyond those the

6                    ROSENBAUM, J., Concurring                21-12314

Founders specifically anticipated." *Id.* at 28–29.  I mention two below.

First, if the "proliferation of" analogues to a challenged law "coincides with the" new changes or technological developments, that may suggest that the modern law can pass constitutional muster. *Antonyuk v. James*, 120 F.4th 941, 1022 (2d Cir. 2024).  Today's laws, though they may in some ways regulate arms-bearing behavior "to an extent beyond what was done at the founding," *Rahimi*, 602 U.S. at 692, or through "different means," *Bruen*, 597 U.S. at 26, need only impose a "comparable burden" that is "comparably justified" by new societal problems and technological advancements, *id.* at 29.  *See, e.g.*, *Bianchi*, 111 F.4th at 464 ("[L]egislatures, since the time of our founding, have responded to the most urgent and visible threats posed by excessively harmful arms with responsive and proportional legislation.").

After all, "founding-era legislatures" generally did not "maximally exercise[] their power to regulate," and the Constitution does not "adopt[] a 'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring).  So when governments enact a new solution to solve a new problem, that law may still "fit[] neatly within" our regulatory tradition despite differences from its historical predecessors.  *Id.* at 698 (Roberts, C.J., majority); *see, e.g.*, *United States v. Diaz*, 116 F.4th 458, 471 & n.5 (5th Cir. 2024) (relying on one historical analogue to supply the "why" and on another to separately supply the "how").

Second, if a proposed historical analogue has been "reasonably consistent and longstanding," that favors the conclusion that the modern law accords with a tradition of firearm regulation. *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring); *see Heller*, 554 U.S. at 626 (confirming "nothing in our opinion should be taken to cast doubt on longstanding prohibitions"); *Bruen*, 597 U.S. at 30 (explaining laws are more likely constitutional where there are "no disputes regarding the lawfulness of such prohibitions").

We generally don't "repeat[]" unconstitutional acts and allow them "to crystallize into a regular practice." *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring) (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 472–73 (1915)); *accord McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *The Pocket Veto Case*, 279 U.S. 655, 688–90 (1929); *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002); *NLRB v. Noel Canning*, 573 U.S. 513, 525–26 (2014); *cf. Washington v. Glucksberg*, 521 U.S. 702, 710, 723–24 (1997) (finding no fundamental right where longstanding laws regulate that purported right); *Kerry v. Din*, 576 U.S. 86, 95 (2015) (plurality opinion) (same); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239–41 (2022) (same); *Dep't of State v. Munoz*, 602 U.S. 899, 911–12 (2024) (same). So regular or longstanding practices can imply constitutionality.

And we view that implication of constitutionality as even stronger if a particular practice has gone unchallenged (or survived challenges) in jurisdictions that enforce "analogous arms-bearing rights" through "interpretation[s] of . . . state constitutional provisions adopted by . . . state courts." *See Heller*, 554 U.S. at 585 &

nn.8–9, 600–05, 610–14 (identifying jurisdictions that secure the same preexisting right as does the Second Amendment).  Presumably, lawyers over the past two centuries would have sought to vindicate their clients' constitutional rights.  That they didn't (or failed in doing so) is highly probative of the conclusion that a similar, modern regulation does not violate those rights.  *Cf. Bruen*, 597 U.S. at 27 ("[I]f . . . proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.").

To be clear, I'm not suggesting that "freewheeling reliance on historical practice," "unmoored from [the] original meaning" of the Second and Fourteenth Amendments, may establish modern regulations' constitutionality.  *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) (cleaned up).  "[T]he use of postenactment history," of course, "requires some justification other than originalism simpliciter."† *Id.*

---

† Still, I do not imply that post-ratification history—or "tradition"—has the limited use (or even the "irrelevan[ce]") that Judge Newsom suggests it does.  Newsom Conc. Op. at 1 (citation and emphasis omitted).  Given the length of this opinion and the varied subjects it addresses already, I will leave for another day a fuller explanation of why I disagree.  But for now, it suffices to note two points.  First, our Framers intended post-ratification history, even some history from long after the Founding, to play an important role in constitutional interpretation.  Liquidating constitutional indeterminacies is a prime example.  *See* THE FEDERALIST NO. 37 (James Madison) ("All new laws . . . are considered as more or less obscure and equivocal, until their meaning be liquidated and ascertained by a series of particular discussions and adjudications."); *see generally* William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1 (2019)

But consistent and longstanding practices may "reinforce our understanding of the Constitution's original meaning," including "the scope of the pre-existing right that the people enshrined in our fundamental law." *Id.* at 738–39 (citation omitted). And they may do so "even when that practice began after the founding era." *Noel Canning*, 573 U.S. at 525.

For instance, if Founding Era practice plausibly supports two interpretations of the Second Amendment's scope—one that suggests a modern law's constitutionality and one that does not—a well-established, post-Founding practice may confirm which of the two controls. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 238 (D.C. Cir. 2024) (relying on post-Reconstruction and early-twentieth century practice to define the "relevant historical tradition" as "the regulation of weapons that are particularly capable of unprecedented lethality and not, as the dissent would have [had] it, upon the regulation of Bowie knives specifically"); *cf. Antonyuk*, 120 F.4th at 1022 (concluding public parks are sensitive places because the late-nineteenth century "municipal tradition of regulating

---

(describing the historical basis for constitutional liquidation and explaining "[p]rivileging early practice through liquidation is tempting but wrong"); *see also* Stephen E. Sachs, *Originalism as A Theory of Legal Change*, 38 Harv. J.L. & Pub. Pol'y 817, 855–57 (2015) (explaining constitutional liquidation is not inconsistent with originalism—and may be affirmatively originalist—because it may reflect an "actual Founding-era legal rule"). And second, as I've explained, we have long considered (in fact, one might say it's a tradition to consider) "tradition" in constitutional analysis. *See Rahimi*, 602 U.S. at 726–29 & n.5 (Kavanaugh, J., concurring) (collecting cases spanning more than two centuries).

firearms in urban public parks" was "apparently accepted without any constitutional objection by anyone").

Here, the nineteenth-century history calls for us to employ both these tools.

First, in that century, a problem that didn't and couldn't have existed during the Founding Era arose for the first time: an unprecedented kind of lethal, gun-related violence that Under-21s largely inflicted. The new violence became possible because of revolutionary advances in firearms technology. And the urbanization and industrialization of the United States in the Antebellum, Civil War, and Reconstruction periods enabled Under-21s to buy these newly disruptive firearms for the first time. This perfect storm caused the common-law concern that Under-21s lack the necessary reason and judgment to buy arms to manifest in a way far more dangerous than our "Founders specifically anticipated." *Bruen*, 597 U.S. at 28.

To put a finer point on it, this new problem was a more focused manifestation of Under-21s' less-than-fully-developed reasoning ability that served as the basis for the common-law restrictions during the Founding Era. And it demanded more focused solutions—laws that specifically addressed the problem of Under-21 gun violence. In other words, a narrower "why" required a more targeted "how."

So states across the country responded to this hurricane of violence by enacting statutory restrictions on Under-21s' purchases of certain arms to restore the Founding Era status quo. And

(second,) those statutory restrictions stood the test of time for more than 150 years.

This Part explains why we can rely on those nineteenth-century laws in our analysis, and it shows that they are "relevantly similar" to Florida's law. Section A traces the societal and technological roots of the emerging nineteenth-century problem of lethal gun violence perpetrated by Under-21s. Section B recounts the states' response to this new problem and explains that the states' laws have withstood the test of time for more than 150 years. And Section C shows that Florida's law is "relevantly similar" to these nineteenth-century precursors, so it, too, survives Second Amendment scrutiny.

A. *Dramatic technological and sociological changes created a new problem of lethal firearm violence perpetrated by Under-21s in the nineteenth century.*

At the Founding, firearms seldom contributed to homicides. To the contrary, "interpersonal violence among colonists and early Americans rarely resulted in death." *Bianchi*, 111 F.4th at 464 (citing Randolph Roth, *Why Guns Are and Aren't the Problem*, in A RIGHT TO BEAR ARMS? THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 116 (Jennifer Tucker et al. eds., 2019)).

Firearms were simply impractical for the task. Americans owned muskets and fowling pieces, which were prone to misfiring, needed to be reloaded after each shot, and required substantial acumen and experience to effectively employ in combat. Roth, *Why*

12                    ROSENBAUM, J., Concurring                    21-12314

*Guns Are and Aren't the Problem*, *supra*, at 116–17; Joseph Blocher &
Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudica-
tion*, 133 YALE L.J. 99, 153 (2023); *see also Bianchi*, 111 F.4th at 464.
Founding Americans also couldn't store their firearms pre-loaded
because the gunpowder of the time absorbed moisture, which cor-
roded the gun's metal and firing mechanisms.  Roth, *Why Guns Are
and Aren't the Problem*, *supra*, at 117; *see* Blocher & Rubin, *supra*, at
153 ("Guns thus generally were not kept or carried loaded in
1791 . . . ."); *see also Bianchi*, 111 F.4th at 464.

So Americans didn't carry guns that they could readily use
in a fight.  *Bianchi*, 111 F.4th at 464; *see Tennessee v. Garner*, 471 U.S.
1, 14 (1985) ("[C]ommon-law rule[s] developed at a time when
weapons were rudimentary.  Deadly force could be inflicted almost
solely in a hand-to-hand struggle . . . .").  In fact, "[w]ell into the
1800s, even after pistols became more common, some still consid-
ered knives to be more dangerous."  Blocher & Ruben, *supra*, at
154; *see Cockrum v. State*, 24 Tex. 394, 402 (1859) ("The gun or pistol
may miss its aim, and when discharged, its dangerous character is
lost, or diminished at least. . . . The bowie-knife differs from these
in its device and design; it is the instrument of almost certain
death.").

Not only were guns impractical as impromptu combat
weapons during the Founding Era, but Under-21s couldn't buy fire-
arms, anyway.  As the Majority Opinion explains, "the limitations
on" Under-21s' "legal rights . . . were so pervasive" that they created
a practical bar on Under-21s' ability to buy guns.  Maj. Op. at 29.

Case 3:19-cv-01226-L-AHG   Document 158   Filed 03/20/25   PageID.18703   Page 62
USCA11 Case: 21-12314   Document: 139-1   Date Filed: 03/14/2025   Page: 58 of 169

21-12314            Rosenbaum, J., Concurring            13

Under-21s had no cash because most worked for their parents, and for those who didn't, any wages they might have earned belonged to their parents. *See* 1 William Blackstone, Commentaries on the Laws of England *453 (William Carey Jones ed., 1915). And Under-21s also couldn't buy firearms because they couldn't contract or use credit to purchase goods. *See* Maj. Op. at 16–18. Indeed, sellers viewed Under-21s as too high-risk to sell to. *See id.*

Plus, even if Under-21s could somehow get their hands on firearms, their parents could simply dispossess their children of them. After all, at the Founding, parents enjoyed "total parental control over children's lives." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 830 (2011) (Thomas, J., dissenting). Parents could even excuse their children from both militia and military service. *See* 25 Annals of Cong. 172 (1812) (Joseph Gales ed., 1834) (remarks of Rep. Josiah Quincy III) ("The obligation to serve in the militia, is always subject to the paramount duty to the master and the parent."); Frances M. Clarke & Rebecca Jo Plant, *No Minor Matter: Underage Soldiers, Parents, and the Nationalization of Habeas Corpus in Civil War America*, 35 L. & Hist. Rev. 881, 892–95 (2017) (explaining parents' widespread use of the writ of habeas corpus to recall their children from military service was "rooted in common law traditions that imbued parents with substantial authority over their children until they reached the age of majority").

14                    ROSENBAUM, J., Concurring                    21-12314

In short, the common-law "practically prohibit[ed],"‡ *Reese
v. BAFTE*, 127 F.4th 583, 597 (5th Cir. 2025), Under-21s from

---

‡ The Dissents, and our colleagues from the Fifth Circuit, first err here. As the
Dissents put it, "there is no evidence that legal barriers . . . were the primary
impediment to eighteen-year-olds arming themselves." Brasher Diss. Op. at
23; *see also* Branch Diss. Op. at 3 n.2, 7 (suggesting "minors did buy goods on
credit, including firearms"). Our colleagues in the Fifth Circuit also suggest
they aren't aware of Founding Era laws that "curtail[ed]" or "practically pro-
hibit[ed]" Under-21s from purchasing firearms. *See Reese*, 127 F.4th at 597. But
unlike here, the parties before our sister circuit did not present the court with
evidence of the common law's "practical prohibit[ions]," *see id.*, on Under-21s'
purchases of firearms. So the Fifth Circuit was apparently unaware of the ev-
idence on that point. The Dissents, in contrast, reach their erroneous conclu-
sion by ignoring the collection of common-law restrictions that worked to-
gether to, as a practical matter, prevent Under-21s from purchasing or bearing
arms without the permission of their parents or some other guardian *in loco
parentis*, like a militia officer or college administrator. Instead, they pluck one
legal rule—the voidability of Under-21s' contractual obligations—from the
network of the common-law regime, considering it essentially in isolation.
*Compare* Brasher Diss. Op. at 16–21 (discussing only contracting capacity), *and*
Branch Diss. Op. at 3–6 (suggesting the majority relies on "contract-law doc-
trine" and "inferred economic effects" resulting from "contract-law doctrine"),
*with* Maj. Op. at 15–18 (discussing common-law parental rights and contrac-
tual rules that, in practical effect, meant Under-21s "generally could not pur-
chase firearms"). But the Majority Opinion and this concurrence are chock
full of evidence that Under-21s could not purchase firearms at the Founding
and that the Founding generation accounted for that fact in its legislation. *See,
e.g.*, Maj. Op. at 18–22 (recounting legislative debates about laws requiring par-
ents to procure weapons for militia-aged children because the common-law
regime prevented Under-21s from purchasing firearms themselves); *infra* Part
I.A (explaining states enacted statutory restrictions on Under-21s' access to
firearms to fill gaps in the eroding common-law regulatory regime). So on the
Dissents' and the Fifth Circuit's own standard, the Founding Era history sup-
ports Florida's law.

purchasing firearms, so Under-21s didn't pose a public-safety risk at the Founding. But in the nineteenth century, societal developments and technological advancements upset that status quo: Gun technology and manufacturing improved drastically, the United States urbanized and industrialized, and we underwent the Civil War. Because of these circumstances, Under-21s gained the personal and economic freedom to buy the new, widely available, and lethal weapons.

To start with technology, by the 1810s, multiple inventors had begun developing "percussion caps"—small, sealed caps (usually made of copper) filled with fulminate, a detonating chemical. Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 CALIF. L. REV. (forthcoming 2025) (manuscript at 66). So firearm owners no longer had to fill a gun's pan with priming powder because gunsmiths could create an ignition system that would strike the precision cap and light the fulminate within, igniting the gunpowder that would discharge the bullet. *Id.* at 66–67; *see also Bianchi*, 111 F.4th at 465.

As a result, more effective pistols appeared in commerce. DeLay, *supra*, at 67. By the 1830s, repeating pistols entered the market, spearheaded by Samuel Colt's and Ethan Allen's designs. *Id.* at 68; *see also Bianchi*, 111 F.4th at 465. And by 1866, gunsmiths developed the modern centerfire metallic cartridge. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 267 (2024). These bullets were more stable and reliable than their predecessors. And they benefitted from

more improvements in 1884, when a new type of gunpowder enabled firearms to shoot "further and with a flatter trajectory than ever before." *Id.*

At the same time, the United States rapidly industrialized and urbanized. In the period immediately after the Revolution, the United States was an agrarian society; "urban areas simply did not exist in 1791 as we understand them today." Blocher & Ruben, *supra*, at 154.

The whole country consisted of only four million Americans, and New York, our largest city at that time, had just 33,000 people. *Id.* Americans were mostly "isolated farmers" who "produced just enough food, livestock, and clothing for their own family's needs." GEORGE B. TINDALL & DAVID E. SHI, AMERICA: A NARRATIVE HISTORY 353 (10th ed. 2016). Families typically lived together on a farm, with children providing their parents much-needed labor throughout their youth. Steven Ruggles, *Multigenerational Families in Nineteenth-Century America*, 18 CONTINUITY & CHANGE 139, 160–62 (2003).

The War of 1812 spurred the beginning of dramatic changes. It forced the United States to become more self-reliant and to enlarge its manufacturing capabilities. TINDALL & SHI, *supra*, at 341. So the country began to shift from an "agricultural republic" to a "commercial" and "industrial" nation. *Id.* at 341–42. New jobs in mills, factories, stores, and banks attracted Americans to cities, and they left their farms. *Id.* at 352. In the 1830s and 1840s, northern states rapidly urbanized. Jeffrey G. Williamson,

*Antebellum Urbanization in the American Northeast*, 25 J. ECON. HIST.
592, 598–99, 602 (1965).  In fact, "by 1860 most of the cities in the
Northeast and many in the Midwest fully qualified as industrial-ur-
ban complexes," *id.* at 604—a substantial shift in American de-
mographics from the Founding and Antebellum periods.

     To put the overall change in perspective, only about five per-
cent of the United States's population lived in cities in 1790.  David
R. Goldfield, *The Stages of American Urbanization*, 5 OAH MAG.
HIST. 25, 27 (1990).  But for each of the decades between 1820 and
1870, our nation's urban population grew at three times the rate of
our national population.  *Id.*  So by 1870, more than a quarter of
the American population lived in cities.  *Id.*  As a result, by halfway
through the 1800s, a "market-based economy" had replaced the
farm economy, and Americans had access to cash income, which
they could use to buy goods.  TINDALL & SHI, *supra*, at 352–53 (em-
phasis omitted).

     Firearms were among those goods.  PATRICK J. CHARLES,
ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL
MILITIAS TO CONCEALED CARRY 141 (2019).  Shops started stockpil-
ing and selling arms.  *Id.* at 404 n.211.  And "Americans scrambled
to buy them."  Roth, WHY GUNS ARE AND AREN'T THE PROBLEM,
*supra*, at 121.

     Against a background of industrialization, huge population
increases, and a race to urbanize, "the rapid proliferation of mass-
produced single-shot and repeating pistols unsurprisingly led to in-
creases in armed crime."  DeLay, *supra*, at 68.  And by the 1850s,

"gun violence" became "a significant societal problem for the first time in American history."  Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 MINN. L. REV. 3049, 3088 (2024); *see Bianchi*, 111 F.4th at 465 (first citing RANDOLPH ROTH, AMERICAN HOMICIDE SUPPLEMENTAL VOLUME: WEAPONS FIGURES Figures 25, 29, 34, 38 (2009); and then citing Roth, *Why Guns Are and Aren't the Problem*, *supra*, at 122).

Homicide statistics show when this problem arose.  At the Founding and into the nineteenth century, homicide rates fell as Americans understood "the long-term consequences of the Revolution."  RANDOLPH ROTH, AMERICAN HOMICIDE 180 (2009).  By the 1820s, homicide rates in the North hit historic lows—the lowest rates in our history.  *Id*.  So too in the mountain South.  *Id*. at 180–81.  And in the Midwest, the homicide rates bottomed out by the 1830s.  *Id*. at 180.

But as the nineteenth century progressed through the Antebellum period and into Reconstruction, interpersonal violence surged.  The wave started in the South, before sprawling northward, eastward, and westward.  *Bianchi*, 111 F.4th at 465 (citing ROTH, AMERICAN HOMICIDE, *supra*, at 180, 199–201, 299–302, 337).

And for the first time, Under-21s began to regularly perpetrate gun violence, too.  Industrialization and "the loss of fathers and older brothers" in the Civil War resulted in less family "control" over Under-21s.  Loren Walker, *Juvenile Violence, 1861-1865 (Civil War Era)*, *in* ENCYCLOPEDIA OF JUVENILE VIOLENCE 148, 148 (Laura L. Finley ed., 2007).  And because, during the industrial

revolution, children were more economically valuable to their families by laboring in mills and factories, Under-21s' families often removed them from farm life and took them to cities to work. William S. Bailey, *Flawed Justice: Limitation of Parental Remedies for the Loss of Consortium of Adult Children*, 27 SEATTLE U. L. REV. 941, 946 (2004).

In turn, "[o]ver the course of the early nineteenth century," courts "gradually abandoned th[e] set of legal rules" that "prevented minors from making contracts" or "work[ing] for wages." James D. Schmidt, *"Restless Movements Characteristic of Childhood": The Legal Construction of Child Labor in Nineteenth-Century Massachusetts*, 23 L. & HIST. REV. 315, 317–18 (2005) (identifying three periods of legal developments in Massachusetts: 1830s, 1840s, and 1850s–1910s). Industrialization, mass production of guns, and the erosion of the common-law regime that effectively banned Under-21s from buying firearms meant that Under-21s could now purchase cheap, widely available guns.

Urbanization also exposed many Under-21s to crime and poverty. New York City, for instance, "saw an enormous increase in the number of juvenile gangsters." HERBERT ASBURY, THE GANGS OF NEW YORK: AN INFORMAL HISTORY OF THE UNDERWORLD 238 (Capricorn Books 1970) (1928). Overall, juvenile crime exploded, and the number of juvenile reformatories increased from one in 1825 to forty-five by 1885. Walker, *supra*, at 148.

Americans noticed this problem in real time. Citizens complained "that it was 'common' practice among the more violently

inclined to 'arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves,' which resulted in the 'stabbing shooting & murdering so many of our citizens.'" *Bianchi*, 111 F.4th at 466 (quoting Roth, American Homicide, *supra*, at 218–19). And they thought Under-21s were among the "more violently inclined" who should not possess these new, lethal firearms.

Editorials and news reports decrying Under-21s' access to firearms littered publications in the post-Civil War United States. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 & nn.1–5, 1329–30 (11th Cir.) (collecting newspapers and editorials), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023); *cf. Heller*, 554 U.S. at 615 (relying on "an editorial" to conclude that a "view" was "widely held"). "[B]oth lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors." Charles, *supra*, at 156; *see id.* at 404–05 (collecting legislative history, newspapers, and other primary materials). They thought these restrictions would slow and prevent Under-21s from inflicting firearm-related casualties. *Id.* at 156.

Because of this perfect storm of dramatic societal and technological changes, between the middle and end of the nineteenth century, Americans faced a public-safety crisis "beyond [anything] the Founders specifically anticipated." *Bruen*, 597 U.S. at 28. And they responded with statutes restricting the sale of firearms to Under-21s in jurisdictions where more than half the United States population lived. Maj. Op. at 26.

B. *Statutory prohibitions on the sale of firearms to Under-21s*
*have survived all constitutional challenges from Reconstruction*
*to this decade.*

Those criminal, statutory prohibitions on the sale of fire-
arms to Under-21s survived, to my knowledge, any constitutional
scrutiny for the first 166 years after Alabama enacted the first such
state-wide statute in 1855.  *See* Maj. Op. at 23–27 (collecting stat-
utes); *Hirschfeld v. BAFTE*, 5 F.4th 407, 438 & n.51, 453 (4th Cir.)
(first-ever appellate opinion declaring unconstitutional a restriction
on the sale of certain firearms to Under-21s), *vacated as moot*, 14
F.4th 322 (4th Cir. 2021).  That "longstanding" practice is highly
"probative" of the Second Amendment's meaning and its scope.
*Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

Take the first three states to enact bans on Under-21s' pur-
chase of certain firearms: Alabama, Tennessee, and Kentucky.
1855–56 Ala. Laws 17; Tenn. Code § 4864 (1858), *reprinted in* THE
CODE OF TENNESSEE ENACTED BY THE GENERAL ASSEMBLY OF 1857–
'8 871 (Nashville, E. G. Eastman & Co. 1858); 1860 Ky. Acts 245; *see
also Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing a "minor
under the age of twenty-one years"); *Warwick v. Cooper*, 37 Tenn. (5
Sneed) 659, 660–61 (1858) (referring to 21 as the age of majority);
*Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666, 671 (1857) (same).  These
three states made it illegal to "sell," "give," or "loan" certain fire-
arms—including handguns, the "quintessential self-defense
weapon," *Heller*, 554 U.S. at 629—to Under-21s even before the Civil
War and Reconstruction.  They did so because the violence that

22 ROSENBAUM, J., Concurring 21-12314

advancements in firearm lethality wrought hit the South first in the Antebellum period. *See* ROTH, AMERICAN HOMICIDE, *supra*, at 180, 199–202, 219.

All three statutes either went unchallenged or survived constitutional scrutiny. And that's so even though each state court interpreted its state constitution's right to keep and bear arms in lockstep with what the Supreme Court has said is the original meaning of the Second Amendment. *See Heller*, 554 U.S. at 602–03, 608–09, 612–13 (approving of the rights enshrined in the constitutions of Alabama, Tennessee, and Kentucky).

Alabama's Constitution, for example, "adopted" a "Second Amendment analogue" that "used the . . . individualistic phrasing that each citizen has the 'right to bear arms in defence of himself and the State.'" *Heller*, 554 U.S. at 602 (quoting ALA. CONST. of 1819, art. I, § 23). Its supreme court then clarified that any "statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *State v. Reid*, 1 Ala. 612, 616–17 (1840).

Still, against that backdrop, Alabama made it illegal to "sell or give or lend, to any male minor, a[n] . . . air gun or pistol." 1855 Ala. Laws 17; *see Saltonstall*, 28 Ala. at 172 (describing "a minor under the age of twenty-one years"). And no one successfully challenged the law. In fact, the Alabama Supreme Court upheld a conviction under it. *Coleman v. State*, 32 Ala. 581, 582–83 (1858).

21-12314               ROSENBAUM, J., Concurring                  23

The same thing happened in Tennessee.  The Tennessee Su-
preme Court interpreted the State's Second Amendment analogue
to secure a right "to be exercised and enjoyed by the citizen as such,
and not by him as a soldier, or in defense solely of his political
rights."  *Heller*, 554 U.S. at 608 (quoting *Andrews v. State*, 50 Tenn.
165, 183–84 (1871)); *see id.* at 613–14 ("'[T]he Tennessee Supreme
Court had treated the state constitutional provision as conferring a
right 'to all the free citizens of the State to keep and bear arms for
their defence.'" (quoting *Simpson v. State*, 13 Tenn. 356, 360 (1833))).
As the Tennessee Supreme Court put it, "every man has a right to
own and keep" weapons such as "pocket pistols, or revolvers" for
defense.  *Page v. State*, 50 Tenn. 198, 198 (1871).

Yet despite *Page*'s recognition of "every man['s] . . . right to
own and keep" "pocket pistols, or revolvers," *id.*, the state prohib-
ited selling, loaning, giving, or delivering "to any minor a pistol . . .
or like dangerous weapon, except a gun for hunting or weapon for
defence in traveling," Tenn. Code § 4864 (1858), *supra*; *see Warwick*,
37 Tenn. (5 Sneed) at 660–61 (1858) (referring to 21 as the age of
majority).  And when a challenge to that law made it to the Ten-
nessee Supreme Court, the tribunal rejected the challenge, even cit-
ing *Page v. State* in the process.  *State v. Callicutt*, 69 Tenn. 714, 716–
17 (1878).  The court concluded "the acts to prevent the sale, gift,
or loan of a pistol or other like dangerous weapon to a minor" are
"not only constitutional as tending to prevent crime but wise and
salutary in all its provisions."  *Id.*

As for Kentucky, its state constitution also "referred to the right of the people to 'bear arms in defence of themselves and the State.'" *Heller*, 554 U.S. at 584–85 & n.8, 602 (citing KY. CONST. of 1792, art. XII, § 23). The Kentucky Supreme Court interpreted the provision generously, suggesting almost any regulation of the right to keep and bear arms would violate the State's constitution: "[W]hatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. . . . [A]ll which diminish or impair it as it existed when the constitution was formed, are void." *Bliss v. Commonwealth*, 12 Ky. 90, 91–92, 93 (1822) (declaring unconstitutional a concealed-carry restriction).

That expansive interpretation of the right to keep and bear arms was an outlier in that it over-secured the right as the Second Amendment embodied it. Other states recognized that fact. *See Commonwealth v. Murphy*, 166 Mass. 171, 172–73 (1896) (explaining *Bliss* "has not been generally approved"). Yet it appears that no one challenged Kentucky's law making it unlawful for anyone, "other than the guardian," to "sell, give, or loan any pistol . . . slung-shot, cold, cane-gun, or other deadly weapon . . . to any minor." 1859 Ky. Acts 245, § 32; *see Newland*, 57 Ky. (18 B. Mon.) at 671 (1857) (referring to twenty-one as the age of majority). And in one instance, Kentucky's highest appellate court dismissed for want of jurisdiction an appeal from a prison sentence based on a conviction under the statute. *Tankersly v. Commonwealth*, 9 S.W. 702, 702–03 (Ky. 1888).

Even after Americans ratified the Fourteenth Amendment to secure from state interference the right to keep and bear arms, challenges to restrictions on Under-21s' ability to buy firearms found no solid footing.  To be sure, the Supreme Court may have limited federal enforcement of the right by declaring that the Second Amendment applied only against the federal government.  *See United States v. Cruikshank*, 92 U.S. 542, 553 (1876); *Presser v. Illinois*, 116 U.S. 252, 265 (1886); *Miller v. Texas*, 153 U.S. 535, 538 (1894).  But it did so precisely because, under its interpretation of the Privileges or Immunities Clause, the right the Second Amendment secured was a pre-existing one, not "in any manner dependent upon" the Constitution "for its existence." *Cruikshank*, 92 U.S. at 553.  It was a right that "[m]ost if not all of the States have adopted," *United States v. Miller*, 307 U.S. 174, 182 (1939), and protected through state constitutions and courts, *see Heller*, 554 U.S. at 585 & nn.8–9, 600–05, 610–14; *see also, e.g., Bliss*, 12 Ky. at 91–92; *Reid*, 1 Ala. at 616; *Nunn v. State*, 1 Ga. 243, 251 (1846); *Page*, 50 Tenn. at 198; *People v. Zerillo*, 219 Mich. 635, 642 (1922).

Yet despite the right to bear arms's force and the states' protection of it, jurisdictions around the country—representing over half the population—followed the leads of Alabama, Tennessee, and Kentucky and enacted their own, similar restrictions.  *See* Maj. Op. at 23–27 (collecting examples).  Simply put, state courts across the country that had applied their states' Second Amendment analogue in lockstep with *Heller*'s understanding of its pre-existing right found no constitutional concern when their governments

enacted and enforced statutory prohibitions on the sale of firearms to Under-21s.

So it's unsurprising that Thomas Cooley's "massively popular . . . Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, easily confirmed those laws did not offend the right to keep and bear arms. *See* THOMAS M. COOLEY, TREATISE ON CONSTITUTIONAL LIMITATIONS 739 & n.4 (5th ed. 1883) ("[T]he State may prohibit the sale of arms to minors" as "a just restrain of an injurious use of property, which the legislature have authority to impose." (citation omitted)). And his treatise noted no conflict between *Callicut*, which upheld Tennessee's law barring the sale of pistols to Under-21s, and other cases, such as *Bliss*, which held unconstitutional on Second Amendment grounds other gun-control laws. *See id.* at 428 & nn.3–4, 739 & n.4. In short, it's clear that the ability to limit Under-21s' access to firearms inhered in this Nation's tradition of firearm regulation.

No court concluded otherwise in roughly the century-and-a-half after Reconstruction. To the contrary, jurisdictions across the United States continued the tradition of limiting firearm sales to Under-21s. And courts routinely upheld and enforced criminal prohibitions. *See, e.g.*, *Biffer v. City of Chicago*, 278 Ill. 562, 565–66, 570–71 (1917) (monetary penalties); *State v. Quail*, 28 Del. 310, 310 (1914) (monetary penalties and imprisonment); *United States v. Rene E.*, 583 F.3d 8, 20 (1st Cir. 2009) (same); *Nat'l Rifle Ass'n of Am. v. BAFTE*, 700 F.3d 185, 211 (5th Cir. 2012) (same), *abrogated by Diaz*, 116 F.4th at 465; *see also State v. Allen*, 94 Ind. 441, 443 (1884)

(monetary penalties); *Tankersly*, 9 S.W. at 702–03 (monetary penalties and imprisonment); *cf. Glenn v. State*, 72 S.E. 927, 928–29 (Ga. App. 1911) (upholding conviction under statute banning plaintiff who was under 18 from possessing firearms).

Beyond criminal punishments, courts also allowed victims of firearm violence to pursue negligence actions against merchants who sold firearms to Under-21s. *See, e.g., Hoosier v. Lander*, 17 Cal. Rptr. 2d 518, 522 (Ct. App. 1993) (statute applied to and plaintiff was under 21); *Coker v. Wal-Mart Stores, Inc.*, 642 So. 2d 774, 778 (Fla. Dist. Ct. App. 1994) (same); *cf. Poland v. Earhart*, 30 N.W. 637, 637–38 (Iowa 1886) (statute applied to Under-21s; plaintiff was under 18); *Bernard v. Smith*, 90 A. 657, 658–59 (R.I. 1914) (statute applied to and plaintiff was under 15); *Spires v. Goldberg*, 106 S.E. 585, 586–88 (Ga. App. 1921) (statute applied to Under-21s; plaintiff was under 18); *McMillen v. Steele*, 275 Pa. 584, 586 (1923) (statute applied to and plaintiff was under 16); *Neff Lumber Co. v. First Nat. Bank*, 122 Ohio St. 302, 305, 307–09 (1930) (statute applied to and plaintiff was under 17); *Driesse v. Verblaauw*, 153 A. 388, 388, 390 (N.J. Sup. Ct. 1931) (statute applied to and plaintiff was under 16); *Tamiami Gun Shop v. Klein*, 116 So. 2d 421, 422–24 (Fla. 1959) (ordinance applied to Under-21s; plaintiff was under 18); *Crown v. Raymond*, 159 Ariz. 87, 90 (Ct. App. 1988) (statute applied to Under-21s; plaintiff was under 18).

These actions, of course, could not have occurred had states interpreted their pre-existing right to keep and bear arms to protect the sale of firearms to Under-21s. *Cf. N.Y. Times Co. v. Sullivan*, 376

U.S. 254, 277 (1964) (explaining the First Amendment limits the bounds of state torts); *Wampler v. Higgins*, 93 Ohio St. 3d 111, 132 (2001) (concluding the Ohio Constitution limits state-law defamation actions).

And well into the twentieth century, Congress passed the Gun Control Act of 1968 ("1968 Act"). The new law "sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Chief among its restrictions were those on the "transfer[] [of] handguns," along with certain other firearms, with some exceptions, "to any person under 21." *Printz v. United States*, 521 U.S. 898, 902 (1997) (citing 18 U.S.C. § 922(b)).

The legislative history explained the rationale. The Senate Report highlighted, "In contributing to our ever-increasing crime rates, juveniles account for some 49 percent of the arrests for serious crimes in the United States and minors account for 64 percent of the total arrests in this category." S. REP. NO. 90–1097, at 77 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2165. So the 1968 Act included restrictions on the sale of firearms to Under-21s as part of its "attempt to take major steps to prevent firearm abuses."§ *Busic v. United States*, 446 U.S. 398, 404 n.9 (1980).

─────────────────

§ And tellingly, Congress imposed these limitations, even though, at the same time, it "conducted extensive hearings on" "proposals to lower the voting age to 18." *Oregon v. Mitchell*, 400 U.S. 112, 278–79 & n.47 (1970) (Brennan, J., concurring in part and dissenting in part). Indeed, federal legislators considered

21-12314            ROSENBAUM, J., Concurring                29

And the 1968 Act too survived without courts expressing
constitutional concern for more than the next five-and-a-half dec-
ades. *See, e.g.*, *Rene E.*, 583 F.3d at 20 (upholding the restriction as
to Under-21s); *BAFTE*, 700 F.3d at 211 (same); *see also Heller*, 554 U.S.
at 626–27 & n.26 (considering some of the Gun Control Act's re-
strictions "on the possession of firearms" as "longstanding prohibi-
tions" that are "presumptively lawful regulatory measures"). Based
on my review of the history, until 2021, not one federal appellate
court or state court of final review held unconstitutional a limita-
tion on the sale of certain firearms to Under-21s. *Cf. Hirschfeld*, 5

---

proposals to lower the voting age as early as 1942. *Id.* at 278–79. And the next
year, Georgia lowered its minimum voting age, followed later by Kentucky,
Alaska, and Hawaii. *Id.* at 245 & n.28. As for the series of hearings leading to
the Voting Rights Act of 1970 and the Twenty-Sixth Amendment, those began
in 1968. *See id.* at 278–79. That Congress and the States ratified the Twenty-
Sixth Amendment around the same time that Congress enacted the Gun Con-
trol Act of 1968 defies any suggestion that Congress meant through the
Twenty-Sixth Amendment to make age-based restrictions on the sale of guns
to Under-21s unconstitutional. And most courts that have addressed whether
the Twenty-Sixth Amendment changed the age of majority have concluded it
didn't. *See, e.g.*, *United States v. Duncan*, 456 F.2d 1401, 1404–05 (9th Cir.) (hold-
ing the Twenty-Sixth Amendment did not make federal law setting the mini-
mum age for jury service at twenty-one unconstitutional), *vacated on other
grounds*, 409 U.S. 814 (1972); *United States v. Guzman*, 468 F.2d 1245, 1248 (2d
Cir. 1972) (same); *United States v. Shaver*, 506 F.2d 699, 701 (4th Cir. 1974) (re-
jecting the argument that Congress "impliedly . . . redefined the term 'minor-
ity'" through the Twenty-Sixth Amendment). Plus, "[o]ur Constitution per-
mits States to draw lines on the basis of age when they have a rational basis
for doing so at a class-based level, even if it 'is probably not true' that those
reasons are valid in the majority of cases." *Kimel v. Fla. Bd. of Regents*, 528 U.S.
62, 86 (2000).

F.4th at 438 (before being vacated as moot, holding unconstitutional the federal law limiting the sale of handguns and handgun ammunition to Under-21s).

That consistent, longstanding, and uninterrupted tradition of prohibiting the sale of firearms to Under-21s through criminal statutes, beginning in 1855 with Alabama's law and running through at least 2021, provides evidence of the constitutionality of laws like Florida's that prohibit the sale of firearms to Under-21s.

Judge Brasher's Dissent says it doubts this body of history—what it calls a "slow trickle of . . . laws"—establishes an "enduring" and "representative" regulatory tradition.  Brasher Diss. Op. at 28 (quoting *Bruen*, 597 U.S. at 27, 30, 67).  I disagree.

There is no reasonable dispute over whether the nineteenth-century regulatory tradition is "enduring"; by any definition, it is. Indeed, the Reconstruction Era laws have gone virtually unchallenged since 1855, and they are rooted in the common law.

Similarly, it's objectively wrong to suggest a regime that governed the majority of the nineteenth-century population and the entire twentieth-century population is not "representative" of our legal traditions.  That's not just "representative"; it's overwhelming.  After all, courts have concluded far lower proportions of the population were "representative."  *See*, *e.g.*, *Antonyuk*, 120 F.4th at 1022–23 (concluding a representative tradition existed where "15.3 percent of the Nation's population," comprising "37.7% of the urban population living" in the United States, prohibited firearms in

public parks). And the nineteenth-century regime bears no resemblance to the unrepresentative tradition that *Bruen* rejected. There, only "about two-thirds of 1% of the population" adopted the proffered analogues—quite literally, an exponential difference of tens of millions of people from the pervasiveness of the nineteenth-century regulatory regime. *See Bruen*, 597 U.S. at 67.

Our consistent, longstanding, and uninterrupted tradition of prohibiting the sale of firearms to Under-21s through criminal statutes, beginning in 1855 with Alabama's law and running through at least 2021, provides evidence of the constitutionality of laws like Florida's that prohibit the sale of firearms to Under-21s.

### C. Florida's law fits comfortably within this Nation's tradition of firearm regulations.

The historical evidence makes this an easy case. Florida's law is not an "outlier[] that our ancestors would never have accepted." *Bruen*, 597 U.S. at 30 (citation omitted).

As the Majority Opinion explains, the common law's impediments to Under-21s' ability to buy guns during the Founding Era are "relevantly similar" to the Florida law's statutory prohibition on the sale of firearms to Under-21s. Starting with the "why," our Founders worried that Under-21s lacked sufficient reasoning and decisionmaking ability to responsibly purchase and possess guns without supervision. And Florida passed its law for the same reason. Turning to the "how," the Founding Era's common law had the practical effect of precluding Under-21s from purchasing

firearms. Instead, Under-21s were entirely reliant on their parents to obtain guns. Florida's law also makes it illegal for Under-21s to buy guns, but parents can choose to provide their children with them if they wish to do so.

Moving into the nineteenth century, "unprecedented societal concerns" and "dramatic technological changes" required our Nation to address for the first time the new problem of Under-21s' perpetration of lethal firearm violence. *Id.* at 27. The states responded to this new type of firearm violence by barring Under-21s from purchasing pistols and other dangerous weapons. Again, both the "how" and the "why" of these nineteenth-century state laws are "relevantly similar" to those of Florida's law.

Starting again with the "why," both nineteenth-century legislatures and Florida tried to curb a rise in deadly firearm violence that Under-21s were inflicting. Our Founders had a general concern about Under-21s' underdeveloped decisionmaking abilities. But the technological advancements and societal changes during the Antebellum, Civil War, and Reconstruction periods allowed any underdeveloped reasoning abilities of Under-21s our Founders worried about to create a true public-safety crisis.

Florida's law responds to the same crisis: advancements in weaponry have enabled Under-21s to commit mass murder on a greater scale than ever before. So turning to the "how," both nineteenth-century legislatures and Florida enacted criminal, statutory prohibitions on the sale of firearms to Under-21s. Yet unlike some Under-21s in the Reconstruction Era, Floridians under the age of

21-12314            Rosenbaum, J., Concurring            33

21 may still possess firearms, receive them from parents, and use them.  In fact, Under-21s today may even own firearms, as long as they obtain them legally.  It's therefore unsurprising that the Fifth Circuit agrees that most of these nineteenth-century laws "appear to be 'relevantly similar' to the [federal government's] current handgun purchase ban," which, just like Florida's law, "restrict[s] firearm access by those under twenty-one-years-old to prevent misuse."  *Reese*, 127 F.4th at 599; *see also id.* (noting that these laws are relevantly similar in the "'how' and 'why'").

        To be sure, some differences exist among Florida's law, the laws of the nineteenth century, and the common law at the Founding.** But none of those differences place Florida's law outside our

---

** Judge Brasher's Dissent notes that the Reconstruction Era statutes generally focused on pistols, rather than rifles, shotguns, or other long guns, which Florida now prevents the sale of to Under-21s.  Brasher Diss. Op. at 28.  Based on this, the Brasher Dissent mistakenly concludes states tried to regulate only "dangerous and unusual weapons," not Under-21s.  *See id.* at 30 (quoting *Heller*, 554 U.S. at 627).  *But see* 4 Blackstone, *supra*, at *149 (describing traditional limitations on the use of "dangerous *or* unusual weapons" (emphasis added)).  The Brasher Dissent is doubly wrong; both sets of laws "restrict firearm access by those under twenty-one-years-old to prevent misuse."  *Reese*, 127 F.4th at 599.  For starters, even *Reese* recognizes that the differences between the nineteenth-century laws and laws prohibiting federal firearms licensees from selling handguns to Under-21s are "peripheral."  *Id.* at 599 n.18.  No wonder.  Pistols are the "quintessential self-defense weapon."  *Heller*, 554 U.S. at 629.  Plus, the Brasher Dissent's conclusion ignores the central theme among the Reconstruction Era Under-21 laws: these laws barred the sale of specific weapons to Under-21s precisely because they were so common (and Under-21s so often abused them).  *See* Roth, *Why Guns Are and Aren't the Problem*, *supra*, at 121

Nation's tradition of firearm regulation.  Rather, the principle that underpins the past two-and-a-half centuries of gun laws—up through and including Florida's law—is this: governments may use their police powers to prevent Under-21s from purchasing guns.  *Cf. Shelley v. Kraemer*, 334 U.S. 1, 17–18, 21 (1948) (explaining both "state law" and "state courts . . . enforcing a substantive common-law rule" are "exertions of state police power").

And two more details confirm that rule defines the "principle[] underlying the Second Amendment," *Rahimi*, 602 U.S. at 692, at "just the right level of generality," *id.* at 740 (Barrett, J., concurring): (1) the new nineteenth-century problem of Under-21s' lethal gun violence, which arose from dramatic societal and

---

(explaining "Americans scrambled to buy" the improved pistols of the late-Antebellum and Civil-War period); *Bondi*, 61 F.4th at 1319 & nn.1–5, 1329–30 (describing Under-21s' use of such firearms); CHARLES, *supra*, at 156, 404–05 (same); *see also Bianchi*, 111 F.4th at 465.  The Brasher Dissent also asserts the same restrictions often applied to those who were at least 21 in the same ways.  But to support this proposition, the Brasher Dissent cites only a Georgia law that *did not restrict* those who were at least 21 from possessing and carrying pistols, as long as they did so "in an open manner."  Brasher Diss. Op. at 31 (quoting Ga. Code § 4413 (1861)).  So when we consider historical context, we can't reasonably conclude the Reconstruction Era laws show a tradition of regulating only dangerous and unusual weapons and that those laws do so without respect to age.  In fact, drawing that conclusion could transform the Second Amendment into a "regulatory straightjacket."  *Bruen*, 597 U.S. at 30.  Today, (semiautomatic) rifles are among the weapons that Under-21s have misused to endanger the public safety.  *See* Maj. Op. at 3 (explaining Cruz purchased a semiautomatic rifle).  To say Florida can't regulate Under-21s' access to those weapons because Under-21s most abused pistols in the mid-nineteenth century would erroneously insist on a historical "twin."

technological changes, and (2) the longevity of the states' responding to that problem.

First, states enacted explicit prohibitions on the sale of firearms to Under-21s as a direct response to the technological advancements in firearm lethality and the societal changes that eroded the common-law system of firearm regulations. Defining the "controlling principle" at any more specific level of generality would have required Reconstruction Era legislatures (and now Florida), who faced new problems, "to follow late-18th-century policy choices" made in response to late-18th-century problems. *Rahimi*, 602 U.S. at 739 (Barrett, J., concurring). And that would give us a "law trapped in amber," *id.* (citation omitted), not one "intended to endure for ages to come, and . . . to be adapted to the various crises of human affairs," *McCulloch*, 17 U.S. (4 Wheat.) at 415 (emphasis omitted). Put another way, the nineteenth-century regulations imposed a "comparable burden" on the right to keep and bear arms that was "comparably justified" by new societal problems and technological advancements.[††] *Bruen*, 597 U.S. at 29.

---

[††] Judge Branch's Dissent argues that *Bruen* requires a historical tradition of firearm-specific regulations and that general common-law proscriptions don't count. Branch Diss. Op. at 3 & n.2. The Branch Dissent proves too much. General legal principles include firearm-specific applications. So when the common law made it effectively impossible for Under-21s to purchase any type of good that wasn't a "necessary," the common law made it effectively impossible for Under-21s to purchase firearms (because firearms weren't "necessaries"). And it's no answer to say, as the Branch Dissent does, that Under-21s lacked the ability to purchase firearms *and* other goods. If it were, a

36                    Rosenbaum, J., Concurring                    21-12314

        And second, these laws prohibiting the sale of firearms to
Under-21s have gone unchallenged for almost the entirety of
American history. That they weren't challenged or ruled unconsti-
tutional for so long, even despite a vibrant Second Amendment ju-
risprudence, *see, e.g.*, *Bliss*, 12 Ky. at 91–92; *Reid*, 1 Ala. at 616; *Nunn*,
1 Ga. at 251; *Page*, 50 Tenn. at 198, suggests the "controlling princi-
ple" is at the level of generality I describe. *See* Keith E. Whitting-
ton, *Originalism: A Critical Introduction*, 82 Fordham L. Rev. 375,
385–86 (2013) (explaining a consensus about the validity of certain
laws helps clarify which plausible interpretation of the Constitu-
tion controls); *Antonyuk*, 120 F.4th at 1022–24 (concluding an un-
challenged, post-Founding practice of regulating firearms in public

---

present-day Florida law forbidding Under-21s from purchasing any goods (in-
cluding firearms) would not warrant Second Amendment scrutiny because it's
not a firearm-specific regulation. That's obviously wrong. And *Bruen* con-
firms the error: we focus on "whether modern and historical regulations im-
pose a *comparable burden* on the right of armed self-defense." 597 U.S. at 29
(emphasis added). Here, they do. Both the common law and Florida's law
prevent Under-21s from purchasing firearms. That the common law "practi-
cally prohibit[ed]" them from doing so through a series of indirect legal rules,
*Reese*, 127 F.4th at 597, while Florida's law does so through a direct, statutory
prohibition does not change the fact that the burden is the same. And it's the
burden, not the formalities of the legal scheme that imposes it, that matters.
*See, e.g.*, *Shelley*, 334 U.S. at 17–18, 21; *United States v. Classic*, 313 U.S. 299, 313
(1941) (considering "the practical operation of the primary law"); *Terry v. Ad-
ams*, 345 U.S. 461, 469–70 (1953) (opinion of Black, J.) ("The effect of the whole
procedure . . . is to do precisely that which the Fifteenth Amendment for-
bids."). After all, "a government official cannot do indirectly what she is
barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190
(2024).

parks confirmed public parks fell within the longstanding tradition of regulating firearm use in sensitive places).

When we define the "controlling principle" that way, it includes both our Founding Era practices and the consistent, longstanding nineteenth-century regulations. This over-arching time-honored tradition, stemming from the Founding Era through modern times, reinforces our understanding of the Second Amendment's original meaning, *Bruen*, 597 U.S. at 35–37; *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring); *id.* at 738 (Barrett, J., concurring)—that governments may use their police powers to bar the sale of firearms to Under-21s.

For these reasons, our history compels the conclusion that the Marjory Stoneman Douglas High School Public Safety Act comports with the preexisting limits on the preexisting right that the Second Amendment enshrined.

38                    ROSENBAUM, J., Concurring                    21-12314

## II.    Modern science supports the common-law presumption that individuals under the age of 21 lacked sufficient reason and decisionmaking ability to engage in risky or potentially dangerous activities.

To determine whether a "challenged regulation is consistent with the principles that underpin our regulatory tradition," we ask whether the regulation and its historical analogues share the same "why"—that is, whether the Founders and the later legislature that enacted the law at issue created those restrictions on the right to keep and bear arms "for similar reasons." *Rahimi*, 602 U.S. at 692. As I've mentioned (a few times by now), the Majority Opinion explains that the Founding Era's "why" for the original impediments to Under-21s' ability to buy guns was that Era's belief that Under-21s "lacked the reason and judgment necessary to be trusted with legal rights." Maj. Op. at 15.

Modern medical research confirms that the Founders were on to something.‡‡  As it turns out, biology objectively establishes what generations of Americans have noticed the effects of since the republic began:  Before the age of 25, a person's brain hasn't fully developed, and the area responsible for impulse control, delayed

---

‡‡ This is not an indictment of those under 21.  Many wonderful, clear-thinking individuals who haven't yet turned 21 walk this earth, and some have begun leading us into the years to come.  But as I explain in this Part, the brains of even the most restrained and logical Under-21s still haven't experienced complete brain maturity.  And no matter how mature an Under-21 may be, it's a biological fact that they will be more so upon full brain development.

gratification, and reasoned decisionmaking—especially under
stress—is not what it will be once development finishes.

I divide this Part into two sections. Section A summarizes
the thinking at the Founding about Under-21s' reasoning and deci-
sionmaking abilities. And Section B explains how modern science
bears those thoughts out and shows the biological basis for the be-
havior Florida invoked as the "why" underlying its law barring the
sale of firearms to Under-21s.[§§]

   A. *The common law restricted Under-21s' rights, including their
      access to firearms, because it presumed their decisionmaking
      abilities had not fully developed.*

To recap, at the Founding, "the law imposed age limits on
all manner of activities that required judgment and reason." *Ent.
Merchants Ass'n*, 564 U.S. at 834 (Thomas, J., dissenting). As the
Majority Opinion meticulously recounts, *see* Maj. Op. at 14–18, the
Founding Generation believed that individuals didn't accumulate
the intellectual ability to make sound decisions before reaching a

---

[§§] To be clear, I don't suggest that our analysis of the Founding Era's "why"
can rely on the medical evidence in the absence of some connection to our
Nation's history and tradition of firearm regulation. But the medical evidence
is helpful in understanding that there's a biological basis for why Under-21s'
behavior since before the Founding has raised concerns about their deci-
sionmaking and impulse-control abilities. And for that reason, to the extent
that modern-day laws rely on the medical evidence for their "why," it's worth
recognizing that such a modern "why," as a practical matter, is just the scien-
tific version of the Founding Era "why." That is, both "whys" are effectively
the same.

40                    ROSENBAUM, J., Concurring                21-12314

certain age.*** And to that generation, all those who hadn't yet attained that age were treated as "infants."

Professor Cooley explained that the Founding Generation considered "[t]he infant of tender years [a]s wanting in competency, but . . . daily acquiring it," until the "fixed" time "at which he shall conclusively be presumed to possess what is requisite." COOLEY, *supra*, at 41. And as the Majority Opinion highlights, Gouverneur Morris, a signer of the Constitution and drafter of the Preamble, cautioned that so-called "infants" "want prudence" and "have no will of their own." Maj. Op. at 15 (quoting 4 THE WRITINGS OF JAMES MADISON 119 (Gaillard Hunt ed., 1903) (Constitutional Convention, August 7, 1787)).

The Founding Era thought the "fixed" age when "infants" acquire sufficient "competency" was at least 21. *See, e.g.,* 1 BLACKSTONE, *supra*, at *464 ("So that full age in male or female, is twenty one years, . . . who till that time is an infant, and so styled in law."); 2 JAMES Kent, COMMENTARIES ON AMERICAN LAW *233 (O. W. Holmes, Jr. ed., 12th ed. 1873) ("T[he] necessity of guardians

---

*** Appellants argue that 21 years as a demarcation line between "infants" and adults originally arose because that was the age when a knight became physically able to bear the weight of armor. That may be so. But apart from a point-of-interest pitstop, it's irrelevant to our Second Amendment analysis. No matter why those in medieval times may have settled on the age of 21, the historical record is clear that the Founding Generation severely limited the rights of Under-21s—including, as a practical matter, their gun rights—because it believed Under-21s lacked reasoned, decisionmaking ability. And that's the "why" that Florida's law tracks.

results from the inability of infants to take care of themselves; and this inability continues, in contemplation of law, until the infant has attained the age of twenty-one years."); JOHN LOCKE, TWO TREATISES OF GOVERNMENT 324–28 (Peter Laslett ed., Cambridge 1960) (observing that the rights of Under-21s could be restricted because they had not achieved a "state of Reason"). As a result, Under-21s effectively could not contract, buy goods on account, or even earn their own money—all because the Founding Generation did not think they enjoyed enough reasoning ability to handle those responsibilities properly.

In fact, in some cases, our Founders thought the "fixed" age even higher. The Constitution provides the clearest example. Its original iteration mentions age only three times: when it sets the minimum age requirements for congressional representatives, senators, and the President. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2; *id.* art. I, § 3, cl. 3; *id.* art. II, § 1, cl. 5. To serve in the House of Representatives, a citizen must "have attained to the Age of twenty five Years." *Id.* art. I, § 2, cl. 2. That's the lowest age requirement of the three, and the Framers started at 25 in part because they thought younger candidates would not have the requisite decisionmaking ability to represent constituents in Congress.

Nicholas Collin, who was "a noted political writer," *United States v. Williams*, 113 F.4th 637, 655 (6th Cir. 2024), explained, "[a]t the age of 25 the heat and hurricanes of youth are over," and "a considerable stock of moral knowledge must also have been acquired" so that any "youthful errors . . . will probably be reclaimed

42                    ROSENBAUM, J., Concurring                    21-12314

by maturing reason."††† Foreign Spectator, PHILADELPHIA INDEPENDENT GAZETTEER (Sep. 22, 1787), *reprinted in* 32 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 185, 187 (John P. Kaminski et al., 2019). And another commentor recounted that the Constitution set the minimum age for representatives at twenty-five "in order to provide, as far as possible for wisdom, as well as integrity in this government." CHARLESTON CITY GAZETTE (Apr. 2, 1788), *reprinted in* 27 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 235, 240 (John P. Kaminski et al. eds. 1976).

These examples show that, based on their everyday experiences growing up and later dealing with younger Americans, the Founding Generation perceived age 21—and sometimes even older ages—to define the point at which individuals gain enough knowledge, experience, and maturity to make better choices.

B. *Modern medical science confirms our Founders' conclusion that individuals under the age of 21 have not fully developed their reasoning and decisionmaking abilities.*

What we now know to be scientific fact explains what the Founding Generation perceived. Humans' brains generally don't fully develop until the age of 25.

---

††† The *Philadelphia Independent Gazetteer* was a prominent newspaper, and the Supreme Court has relied on the commentaries it published to understand the Founding public's thoughts about the Constitution. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 364–365 & n.2 (1995) (Thomas, J., concurring in the judgment); *Heller*, 554 U.S. at 600 n.17, 604.

The past few decades have brought "[s]ignificant progress . . . in understanding the brain's regional morphology[‡‡‡] and function during adolescence."  Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 449 (2013).  It is now "well established that the brain undergoes a 'rewiring' process" that's not complete until about the age of 25.  *Id.* at 451.

To understand how this process occurs, we must know some basic information about how the brain functions.

I begin with neurons.  Neurons are nerve cells that make up the brain.  Joan Stiles & Terry L. Jernigan, *The Basics of Brain Development*, 20 NEUROPSYCH. REV. 327, 329 (2010).  They gather and transmit electrochemical signals in the body and within the brain to tell the body and brain what to do.  *Id.*  Nerve cells are not physically connected to one another.  Rather, a small gap exists between them.  That small gap is called a synapse, and, using neurotransmitters, nerve cells send and receive electrochemical signals over the synaptical gap.  *See id.* at 329, 338; Thomas C. Südhof, *Towards an Understanding of Synapse Formation*, 100 NEURON 276, 277 (2018).

A neuron transmits the signals over a longer part of the neuron called the axon, which "act[s] a little like [a] telephone wire[]."

---

‡‡‡ In this context, "morphology" refers to the structure of the brain.  *See Morphology*, OXFORD ENGLISH DICTIONARY, https://perma.cc/9P7M-9VEH (last visited Dec. 2, 2024) ("Shape, form, external structure or arrangement, esp. as an object of study or classification. Also: a particular shape, form, or external structure, esp. of (a part of) an organism, landform, etc.").

Styles & Jerigan, *supra*, at 329–30.  The axon, in turn, receives protection from a layer called a myelin sheath, which covers the axon like "insulation on a telephone wire." *Id*. at 330.  The myelin sheath allows the electrochemical signals to travel quickly and efficiently between neurons, maintaining the signal's strength as the signal travels. *Id.*

    But humans are not born with all their neurons.  And adults do not have all the neurons they had when they were children.  Rather, brains develop in a recurring cycle: neuron growth followed pruning and myelination.  Arain et al., *supra*, at 452.  After a brain develops neurons, it must prune some of them.  *Id.*; Styles & Jerigan, *supra*, at 328.  Pruning eliminates excess production of neurons and brain matter created during human growth periods.  The brain determines which neurons to prune based on lived experiences.  *Id.* at 328, 338.  Put simply, the brain removes unused neurons so that it can operate economically.  Also, when new neurons develop, they don't come with their myelin sheath, the insulation that facilitates signal transmission.  The myelin sheath grows separately.  The process by which neurons gain their myelin sheath, called myelination, also happens in the brain after neuron growth.  *See* Arain et al., *supra*, at 452.

    If you've hung in there so far, we must next consider how the recurring process of brain growth, pruning, and myelination during humans' first 25 years of life affects their reasoning ability, impulse control, and maturity.  The first major phase of brain growth, pruning, and myelination happens during infancy and

"preschool."  Stiles & Jernigan, *supra*, at 328.  By age 6, human brains reach 90 percent of their adult volume.  *Id.*  But structural changes in brain matter continue throughout childhood and adolescence.  *Id.*

The second period of neuron growth happens just before puberty.  Arian et al., *supra*, at 452.  That surge is similar to the one in infancy.  The brain's grey matter thickens, neurons grow, and the brain begins to rewire itself.  *Id.*  That rewiring occurs when puberty begins and can last until about age 24 years, and it is especially prevalent in the prefrontal cortex.  *Id.*  The prefrontal cortex is responsible for, among other things, planning, decisionmaking, and problem solving.  *Id.* at 453.  So the process of pruning and myelination in the adolescent period "allows for multitasking, enhanced ability to solve problems, and the capability to process complex information."  *Id.* at 452.  It also affects individuals' ability to "exercise good judgment" when they face "difficult life situations."  *Id.* at 453.

But the prefrontal cortex is one of the last parts of the brain to mature, and it does not complete that process until near the age of 25.  *Id.* at 451–53.  So those under that age can struggle with functions the prefrontal cortex controls.  Those functions include decisionmaking in stressful or emotional situations, *id.* at 454–54, impulse control and delayed gratification, *id.* at 455–56, and moderating the influence of societal pressures, such as those on social media, *id.* at 456.  *Accord* WHITE PAPER PROJECT TEAM, CTR. LAW, BRAIN & BEHAVIOR, WHITE PAPER ON THE SCIENCE OF LATE

ADOLESCENCE 12–13 (2022) [hereinafter WHITE PAPER ON THE SCIENCE OF LATE ADOLESCENCE] ("Research findings demonstrate that individuals ages 20–30 have more disrupted working memory during periods of emotional stimulation, suggesting that emotional contexts can compromise their cognition . . . .").

And even within the under-25 universe, the prefrontal cortex functions of 18-to-21-year-olds are materially less developed than those of 22-to-25-year-olds. In one study, for instance, researchers exposed age groupings of those under 25 to "threat states" in which participants anticipated the possibility of hearing an "aversive sound." *Id.* at 14. In response, 18-to-21-year-olds showed patterns of brain activity that were "more similar" to those of 13-to-17-year-olds than they were to those of 22-to-25-year-olds. *Id.*

Similarly, studies have shown that "adolescents are more likely to prioritize immediate rewards over long-term outcomes." *Id.* at 15. That may explain why those between the ages of 14 and 21 "are more likely to engage in . . . dangerous behavior resulting in unintentional injuries." *Id.* at 1, 15. By contrast, when making decisions, "[o]lder individuals (ages 25–31)" are "more likely to simultaneously activate both the striatum and prefrontal cortex," resulting in "a decreased tendency to prefer immediate rewards." *Id.* at 16. In other words, as the prefrontal cortex develops, people act "with reduced impulsivity" and make more "future-oriented" decisions. *Id.*

In sum, the biological evidence shows that "the adolescent brain is structurally and functionally vulnerable to environmental stress" and "risky behavior" in a way that the fully developed brain wouldn't be. Arian et al., *supra*, at 458; *see BAFTE*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over.").

Besides the biological evidence, the sociological evidence reveals the devastating consequences that the lesser maturity of Under-21s' brain development can wreak.

For instance, those under 25 are far more likely than other age groups to commit suicide. Indeed, suicide accounts for a higher percentage of deaths for 18-to-24-year-olds than for any other age group. *WISQARS Fatal and Nonfatal Injury Infographics*, CTRS. DISEASE CONTROL & PREVENTION, https://perma.cc/G2FQ-QEXM. The problem is so severe when it comes to 18-to-20-year-olds that from 2001 to 2022, suicide was the third-most-common cause of death among that group (behind unintentional injury and homicide). *WISQARS Leading Causes of Death Visualization Tool*, CTRS. DISEASE CONTROL & PREVENTION, https://perma.cc/F46Z-4KG5.

And the impulse-control problems Under-21s experience because their prefrontal cortexes have not yet fully developed only add to this tragic statistic. Close to 25 percent of near-lethal suicide-attempt survivors aged 13-to-34 reported that fewer than five minutes passed between their decisions to attempt suicide and

their suicide attempts.  Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 (SUPP.) SUICIDE & LIFE-THREAT. BEHAV. 49, 50–52 (2001); *accord* Eberhard A. Deisenhammer et al., *The Duration of the Suicidal Process: How Much Time Is Left for Intervention Between Consideration and Accomplishment of a Suicide Attempt?*, 70 J. CLINICAL PSYCHIATRY 19, 20 (2009) (47.6 percent of suicide survivors recount that fewer than ten minutes had passed between their decision to attempt suicide and their attempt).

    That statistic takes on added urgency when it comes to firearms.  The American Public Health Association has described firearm access as "a key risk factor for suicide."  *Reducing Suicides by Firearms*, AM. PUB. HEALTH ASSOC. (Nov. 13, 2018), https://perma.cc/97BN-U5LH.  To give a sense of the breadth of the problem, those with access to firearms are more than two to ten times more likely to commit suicide than those without access to them.  Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989, 990 (2008).  For 16-to-21-year-olds, in 2021, a whopping more than half of the 2,735 suicide deaths among that age group involved firearms.  *The Effects of Minimum Age Requirements,* RAND CORP. (July 16, 2024), https://perma.cc/MDJ6-FQ3H.  Put simply, the ability to buy a firearm may mean the difference between life and death for struggling Under-21s who are prone to making life-altering or -ending decisions because of a developmental predisposition towards short-term thinking.

And the risks Under-21s' access to firearms create don't end with Under-21s themselves. As the Marjory Stoneman Douglas mass shooting tragically exemplifies, those under the age of 21 are responsible for some of the most deadly mass shootings in United States history.§§§ Not only that, but "[f]irearm homicides and violent crimes disproportionately involve individuals under age 21 . . . ." Rand Corp., *supra*. In fact, although those between the ages of 12 and 24 comprise only 17 percent of the population, in 2020, they accounted for about 44 percent of the firearm homicides for which the age of the shooter was known. *Id.*

The numbers are even worse for 18-to-21-year-olds specifically. In Florida in 2020, 18-to-20-year-olds were perpetrators of fatal shootings "at three times the rate of 16-year-olds," "nearly twice the rate of people in their 20s," and "about three times the

---

§§§ *See, e.g.*, Mark Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Monterey Park and Uvalde*, Business Insider (Jan. 23, 2023), https://perma.cc/T86A-24ZX; James Barron, *Nation Reels After Gunman Massacres 20 Children at School in Connecticut*, N.Y. Times (Dec. 14, 2012), https://perma.cc/R4YS-VUTR; Sharifa Jackson & Corey Davis, *2 Arrested, 2 More Wanted in Connection with Mass Shooting at SEPTA Bus Stop that Injured 8 Teens*, 6 ABC News (Mar. 11, 2024), https://perma.cc/YZ2S-ZBBP; Isabel Rosales et al., *6 People Face Murder Charges for the Sweet 16 Party Massacre that Left 4 Dead and 32 Injured*, CNN (Apr. 21, 2023), https://perma.cc/79BY-9KVP; Elise Hammond et al., *The Latest on Mass Shooting in Farmington, New Mexico*, CNN (May 17, 2023), https://perma.cc/KC77-VN24; Assoc. Press, *Gunman Who Killed 2 After High School Graduation Targeted Graduate, Police Say*, PBS News (June 7, 2023), https://perma.cc/7L2S-RQ92; Jenna Fisher et al., *Teen and Woman Killed in Shooting at St. Louis High School*, N.Y. Times (Oct. 24, 2022), https://perma.cc/9V34-FW2S.

rate of a person in their 30s."  Samantha Putterman, *What Does the Data Show on Deadly Shootings by 18- to 20-Year-Olds?*, TAMPA BAY TIMES (Feb. 7, 2024), https://perma.cc/7MP9-MNGA (cleaned up).  And a survey of convicted gun offenders in 13 states found that 17 percent of the offenders—nearly a fifth—would have been prohibited from obtaining firearms when they committed their crimes if the minimum legal age in that state had been 21 years.  Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJ. PREVENTION 26, 29 (2013).  Those figures are "consistent with the historical pattern of gun homicides" over the past several decades.  *See* U.S. DEP'T OF JUST. & U.S. DEP'T OF THE TREASURY, GUN CRIME IN THE AGE GROUP 18-20 2 (1999) ("In 1997, . . . [o]f all gun homicides where an offender was identified, 24 percent were committed by 18 to 20 year olds.").

In short, modern medicine and social science confirm our Founders' intuition that Under-21s don't enjoy full "reason and decisionmaking ability."  *Ent. Merchants Ass'n*, 564 U.S. at 826 (Thomas, J., dissenting).  In other words, what the Founders observed and experienced, science validates.  So the reasons a state may choose to limit Under-21s' access to firearms—their lesser reasoning ability and impulse control—are not only "similar" to those of the Founding generation, *Rahimi*, 602 U.S. at 692, they are the same.  Only now we can prove the scientific basis for what the Founders saw and lived.

**III.    We don't need to decide now whether the Reconstruction Era is the proper period against which we should**

**assess our Nation's tradition of firearm regulation in the case of silence or a conflict with the Founding Era, but when the time comes to make that decision, there are good reasons to rely on the right to keep and bear arms as Americans understood it during Reconstruction.**

I agree with the Majority Opinion that we "need not and do not decide in this appeal how to address a conflict between the Founding-era and Reconstruction-era understandings of the right" to keep and bear arms because "the law of both eras restricted the purchase of firearms by" Under-21s.  Maj. Op. at 14; *accord Bruen*, 597 U.S. at 38; *Rahimi*, 602 U.S. at 692 n.1.  But to the extent that the Majority Opinion can be understood to suggest that the Founding Era history would trump Reconstruction Era sources where the two conflict or in the case of historical silence during the Founding Era, I write to emphasize that at least four good reasons exist not to choose the preeminent historical period now.

First, we don't need to identify which historical period prevails here because both historical periods give us the same answer: that Florida's law comports with our nation's tradition of firearm regulation.  Second, the quality and quantity of authorities that stack up on the side of Reconstruction Era history is substantial, and we should fully and deeply consider them.  Third, the Supreme Court has explained that, generally, the Constitution's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28.  So when it comes to rights that the Fourteenth Amendment incorporated against the States, it's the

understandings of those who ratified the Fourteenth Amendment
that would seem to matter.  And fourth, jurisprudence on individ-
uals' fundamental Second Amendment rights is still in its relative
infancy (indeed, if we start with *Heller*, it's an Under-21).  Allowing
time for the law to develop and percolate through the courts until
a conflict actually arises will allow us to reach a well-thought-out
answer to this important constitutional question.  I explain my
thinking more below.

First, as the Majority Opinion explains, no conflict between
the Founding Era and Reconstruction Era histories requires recon-
ciliation here.  Maj. Op. at 13–14.  We should wait until one does
before resolving the conflict question because context might better
crystallize the benefits and disadvantages of each approach.  *See
Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47 (1936)
(Brandeis, J., concurring) (explaining courts do "not anticipate a
question of constitutional law in advance of the necessity of decid-
ing it" and do "not formulate a rule of constitutional law broader
than is required by the precise facts to which it is to be applied."
(cleaned up)).

Second, several of our sister circuits, as well as many well-
known academics, believe that Americans' understanding of the
right to keep and bear arms when they ratified the Fourteenth
Amendment ought to inform our historical inquiry.  Indeed, many
have suggested Reconstruction Era evidence should control in si-
lence or a conflict.  *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702
(7th Cir. 2011) (Sykes, C.J.); AKHIL REED AMAR, THE BILL OF RIGHTS:

CREATION AND RECONSTRUCTION 223 (1998) ("[W]hen we 'apply'
the Bill of Rights to the states today, we must first and foremost
reflect on the meaning and spirit of the amendment of 1866, not
the Bill of 1789."); Steven G. Calabresi & Sarah E. Agudo, *Individual
Rights Under State Constitutions When the Fourteenth Amendment was
Ratified in 1868: What Rights are Deeply Rooted in History and Tradi-
tion?*, 87 TEX. L. REV. 7, 115–16 (2004); Josh Blackman & Ilya
Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the
Constitution in 2020, and Properly Extending the Right to Keep and Bear
Arms to the States*, 8 GEO J.L. & PUB. POL'Y 1, 52–55 (2010). And
other courts have held, at a minimum, that Reconstruction Era ev-
idence provides a "fertile ground" for ascertaining our Nation's tra-
dition of firearm regulation. *Antonyuk*, 120 F.4th at 973–74; *Wolford
v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024).

The quantity and quality of this authority supporting the no-
tion that the Fourteenth Amendment understanding should gov-
ern ought to give us pause before jumping too hastily to the con-
clusion that the Founding Era history (or lack thereof) necessarily
controls in all circumstances. So we should answer the question
only when it is squarely presented and we must resolve it. And
even then, we should carefully study the arguments these authori-
ties have raised for considering Reconstruction Era history before
determining which period governs.

Third, the Constitution's "meaning is fixed according to the
understandings of those who ratified it," *Bruen*, 597 U.S. at 28, be-
cause the consent of those who voted for the Constitution is what
give it—and us, as Article III courts exercising the judicial power

that the Constitution authorizes—legitimacy.  *See, e.g.*, Whitting-
ton, *supra*, at 381; Antonin Scalia, *Originalism: The Lesser Evil*, 57 U.
CINN. L. REV. 849, 854, 862–84 (1989); *see also Heller*, 554 U.S. at 635
(referring to the Second Amendment as the "very *product* of an in-
terest balancing by the people").  That's the reason "constitutional
rights are enshrined with the scope they were understood to have
when the people adopted them." *Bruen*, 597 U.S. at 34 (cleaned up).

And here, in a challenge against state action, it is the Four-
teenth Amendment that binds states.  *See McDonald v. City of Chi-
cago*, 561 U.S. 742, 767 (2010) (plurality opinion).  So if we are going
to construe the Second Amendment as the Fourteenth Amend-
ment's ratifiers understood they were incorporating it, we should
enforce Americans' understanding of the right to keep and bear
arms in 1868.[****]  After all, it would be odd, to say the least, for the

---

[****] Of course, the Supreme Court has said that the "individual rights enu-
merated in the Bill of Rights and made applicable against the states through
the Fourteenth Amendment have the same scope as against the Federal Gov-
ernment." *Bruen*, 597 U.S. at 37.  So deciding that Fourteenth Amendment
thinking should triumph over Founding Era thinking in the case of a conflict
would require one of two resolutions: either (1) both the federal and individual
rights would have to be construed according to the Fourteenth Amendment
understanding of the Second Amendment right, *cf.* Newsom Conc. Op. at 2
n.1 (rejecting that contention), or (2) the Supreme Court would have to recon-
sider its position that the Second Amendment right necessarily has the same
scope as an individual right and against the federal government.  But these are
resolutions scholars and courts are considering.  *See Bruen*, 597 U.S. at 37–38.
On the one hand, "later amendments often contain a powerful, albeit unwrit-
ten, gravitational pull that invites reinterpretation of earlier amendments so

Reconstruction Era states to have made the Second Amendment
(or any other amendment) applicable to themselves if they under-
stood that they were imposing on themselves constructions of the
first eight amendments that they disagreed with.

And fourth, modern Second Amendment jurisprudence is in
its infancy. The Supreme Court only recognized an individual
right to keep and bear arms in 2008. *Heller*, 554 U.S. at 635–36. It
only held that the Fourteenth Amendment incorporates that right
against the states in 2010. *McDonald*, 561 U.S. at 791. And it only
announced the historical inquiry for reviewing a firearm regulation
about three years ago, after concluding the circuit courts

_____

that the Constitution as a whole coheres as a sensible system of rules and prin-
ciples." AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 408 (2012).
The Reconstruction Amendments, coming out of what some have labeled
"the Second Founding," do just that. *See, e.g.*, ERIC FONER, THE SECOND
FOUNDING xix (2019) ("The Civil War and the Reconstruction period that fol-
lowed form the pivotal era of American history."). And on the other hand,
historical evidence suggests the right to keep and bear arms served different
purposes and, thus, had different meanings when our predecessors ratified it
in the Second and Fourteenth Amendments, respectively. *See* AKHIL REED
AMAR, AMERICA'S CONSTITUTION: A BIOGRAPHY 390 (2005). In the future, the
Supreme Court (and we) will have to decide which of those readings is correct.
*See, e.g.*, Akhil Reed Amar, *Intratextualism*, 112 HARV. L. REV. 747, 766–71
(1999) (distinguishing between instances where intratextualism ought to re-
quire similar restrictions against both the state and federal government and
where our Founders intended the Constitution to impose different limitations
upon our federal and state governments). Still, both make clear the error in
relying on Founding Era history to interpret our fundamental rights, especially
those we enforce against the states through the Fourteenth Amendment.

improperly fashioned a means-end test for scrutinizing firearm regulations. *Bruen*, 597 U.S. at 18–19.

So the law is unsettled, and courts across the country are trying to figure out just how to faithfully apply the right to keep and bear arms. *See Rahimi*, 602 U.S. at 691 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases."); *id.* at 741 (Jackson, J., concurring) ("Today's effort to clear up misunderstandings is a tacit admission that lower courts are struggling." (cleaned up)). Allowing more of our sister circuits, and potentially the Supreme Court, to contribute to Second Amendment jurisprudence before we tackle whether the Founding Era or Reconstruction Era history governs in a conflict or silence in the Founding Era will aid in our careful consideration of the issue when a case requires that we resolve it.

For all these reasons, the Majority Opinion appropriately chooses to wait to decide whether Founding Era history should trump Reconstruction Era sources where the two conflict or in historical silence during the Founding Era.

## IV.    Conclusion

Today, the Majority Opinion correctly concludes that the Marjory Stoneman Douglas High School Public Safety Act does not violate the Second and Fourteenth Amendments. Since the Founding, Americans have restricted the sale of firearms to Under-21s, whether through common-law limitations on commercial rights or, once those limitations faded away, direct criminal prohibitions. And since the Founding, Americans have limited Under-21s' ability

21-12314                 ROSENBAUM, J., Concurring                 57

to buy firearms to abate the risk their still-developing decisionmak-
ing ability may pose to public safety.  Though our Founders im-
posed these limitations based on their observations and lived expe-
riences, medical science now confirms Under-21s' not-yet-fully-de-
veloped reasoning abilities.  So I join the Majority Opinion and con-
clude that Florida's ban on the sale of firearms to Under-21s com-
ports with this Nation's history and tradition of firearms regula-
tions.

Newsom, Circuit Judge, concurring:

I concur in the Court's judgment and join its opinion in full. I write separately to highlight an important methodological issue that, I'll confess, has become something of a hobby horse of mine: the uses and misuses of post-ratification history in originalist decisionmaking.

I've been a vocal and persistent critic of courts' reliance on post-ratification history—sometimes euphemistically called "tradition"—to interpret constitutional provisions. *See* Kevin C. Newsom, *The Road to Tradition or Perdition? An Originalist Critique of Traditionalism in Constitutional Interpretation*, 47 Harv. J.L. & Pub. Pol'y 745, 746–55 (2024). In short, I regard "latter-day-but-still-kind-of-old-ish understandings" as having arisen too late in the day to inform a proper originalist analysis. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1051 n.2 (11th Cir. 2022) (Newsom, J., concurring). The reason: "We originalists say that any particular constitutional provision should be interpreted in accordance with its common, ordinary meaning *at the time it was adopted and ratified*. If we really mean that, then by definition, it seems to me, evidence that significantly *post*-dates that provision's adoption isn't just second-best—it's positively *irrelevant*." Newsom, *supra*, at 754. Simply put, we have what Justice Barrett has aptly called a "timing problem." *Samia v. United States*, 599 U.S. 635, 655 (2023) (Barrett, J., concurring in part and concurring in the judgment).

In its decision today, the Court properly focuses on sources from the Founding era to conclude that Florida's law doesn't

2                         NEWSOM, J., Concurring                         21-12314

infringe the Second Amendment as it was understood by ordinary Americans at that time.  *See* Majority Op. at 10–13.  The Court, though, also cites a number of state laws restricting minors' access to firearms that date from the mid-to-late nineteenth century—"to confirm," it says, "the Founding-era understanding of the Second Amendment."  *Id.* at 14.  Let me briefly explain why I think the Court is right (or at least not wrong) to do so, and why this case presents one of the exceedingly rare circumstances in which post-ratification evidence is fair game.††††

---

†††† Lurking beneath every Second Amendment case is (I think) an exceedingly knotty meta-issue:  Which historical period informs the originalist inquiry—the Founding or Reconstruction?  "Strictly speaking, [a state] is bound to re-spect the right to keep and bear arms because of the Fourteenth Amendment, not the Second."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 37 (2022).  The Second Amendment was ratified in 1791; the Fourteenth in 1868.  Of course, if 1868 is the proper guidepost, then some nineteenth-century sources aren't *post*-ratification but rather *pre*-ratification evidence.  At least for now, I agree with the majority's decision to bracket the Founding-vs.-Recon-struction issue.  *See* Majority Op. at 14; *accord, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 692 n.1 (2024).  It's an important question, though—one to which I hope scholars of all stripes will devote serious and sustained attention.

I'll say that as a matter of existing *doctrine*, it seems to me clear enough that Founding-era (rather than Reconstruction-era) understandings must gov-ern.  *See, e.g.*, *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011) (First Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008) (Fourth Amendment); *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amend-ment).  That's because, rightly or wrongly, the Supreme Court has held "that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."  *Bruen*, 597 U.S. at 37; *see also Ramos v. Louisiana*,

Let's start with the basics.  Originalism is a *text*-focused enterprise.  Accordingly, "the focus of *any* proper originalist inquiry is the document itself: the duly adopted and ratified text is the only thing that counts as law."  Newsom, *supra*, at 748.  In some cases, the Constitution's language is so "strikingly clean" that there's little need for a deep historical dive.  Akhil Reed Amar, *America's Constitution*, at xi (2005); *see also United States v. Rahimi*, 602 U.S. 680, 715–16 (2024) (Kavanaugh, J., concurring).  There's not much use, for instance, in parsing the ratification debates in order to confirm that Senators in fact serve six-year terms or that the President must actually be at least 35 years old.  *See* U.S. Const. art. I, § 3, cl. 1; *id.* art. II, § 1, cl. 5.

Oftentimes, though—as in this case—the Constitution's meaning doesn't leap off the page, fully formed.  In such circumstances, those (like me) who think that our interpretive lodestar is

---

590 U.S. 83, 95 (2020) ("[T]his Court's precedents, both then and now, prevent the Court from applying the Sixth Amendment to the States in some mutated and diminished form under the Fourteenth Amendment.").  That "no-daylight" rule, I think, essentially compels the conclusion that when the Founding- and Reconstruction-era sources point in different directions, the former has to prevail.  A contrary view would permit Reconstruction-era evidence to guide the meaning of the Second Amendment as it applies not only to the states but also to the federal government.  And that would defy the Fourteenth Amendment's plain text, which by its terms binds only the "States."  *See* U.S. Const. amend. XIV, § 1.  *But cf. Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (applying the principles underlying the Fourteenth Amendment's Equal Protection Clause to the federal government).  So at least for now, I think we're obliged to treat the Founding—not Reconstruction—as our presumptive yardstick.

"the common, ordinary meaning of th[e] text at the time of its adoption and ratification . . . can and should look to history." Newsom, *supra*, at 748. But—and it's an important "but"—we should consult history not "for its own sake" but, rather, "only because—and to the extent that—it actually illuminates the original public meaning of the adopted and ratified text." *Id.* To that end, we should "investigate how contemporary speakers of American English used the key terms and phrases in the years leading up to the critical juncture"—examining, for instance, "[f]raming-era dictionaries, judicial decisions, legal treatises, political pamphlets, popular books, [and] newspaper articles." *Id.* The important point for present purposes is "that in order to inform the meaning of the words on the page—the duly adopted and ratified constitutional text—the historical sources that we consult must of necessity *predate or exist contemporaneously with* the text itself." *Id.* (emphasis added); *accord, e.g.*, *Rahimi*, 602 U.S. at 737–38 (Barrett, J., concurring) ("[T]he history that matters most is the history surrounding the ratification of the text; that backdrop illuminates the meaning of the enacted law.").

By definition, then, later-breaking evidence—post-ratification evidence—"cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 66 (2022). That much, I think, is uncontroversial—at least among originalists: If the post-ratification history is at odds with the Founding-era history, the former has to give way.

21-12314                NEWSOM, J., Concurring                5

But what if the post-ratification history is *consistent* with the Founding-era history?  In that circumstance, might it be relevant to "confirm" or "reinforce" what the Founding-era sources indicate? *See* Majority Op. at 14; Rosenbaum Concurring Op. at 9.  Yes, but to my mind, only in a very particular sense.  The way I see it, latter-day evidence isn't relevant as a matter of course—"tradition is not an end in itself."  *Vidal v. Elster*, 602 U.S. 286, 323 (2024) (Barrett, J., concurring in part).  Post-ratification history is *not* just one part of a seamless Founding-to-present narrative, the entirety of which a court can tap in an effort to illuminate the Constitution's original meaning.‡‡‡‡  Rather, post-ratification history has only derivative value; it becomes relevant only if—and to the extent that—the Founding-era evidence *makes* it so.

I needn't attempt here to catalog the ways in which post-ratification history might be made relevant (although I suspect they are few and far between).  I'll simply note that I think this case exemplifies one of them.  At least in the circumstances here, the post-ratification history helps us avoid mistaking the *absence* of a precisely analogous Founding-era regulation for the *existence* of a substantive constitutional right.  *See Rahimi*, 602 U.S. at 739–40

---

‡‡‡‡ In this respect, Judge Rosenbaum and I may view post-ratification history's role a little differently.  *See* Rosenbaum Concurring Op. at 30 ("Th[e] consistent, longstanding, and uninterrupted tradition of prohibiting the sale of firearms to Under-21s through criminal statutes, beginning in 1855 with Alabama's law and running through at least 2021, provides evidence of the constitutionality of laws like Florida's that prohibit the sale of firearms to Under-21s.").

(Barrett, J., concurring) (stating that it would be wrong to "assume[] that . . . founding-era legislatures maximally exercised their power to regulate"). Here's how that cashes out in this case: As the majority opinion persuasively explains, pursuant to a fairly robust common-law regime that existed at the Founding, minors "generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor." Majority Op. at 18. That regime is sufficiently analogous to Florida's law—with regard to both "how" and "why" it regulates. *Id.* at 27–28. And importantly, the common law's general, far-reaching restrictions on minors' purchasing power made it unnecessary for Founding-era legislatures to more pointedly prohibit minors from buying firearms, in particular. *See id.* at 29–30. Tellingly, though, when those common-law restrictions waned in the nineteenth century, the states filled the void by enacting a flurry of outright bans, thereby—and this is the key point—"mak[ing] explicit what was implicit at the Founding: laws may regulate the purchase of firearms by minors." *Id.* at 30. The (limited) relevance of the post-ratification history thus comes into proper focus: It prevents us from falling into the "use it or lose it" trap. *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). While the Founding-era sources (and a dose of logic) could do that job on their own, the post-ratification history further dispels the fallacy.

\* \* \*

Post-ratification history has no particular value of its own—at least to an originalist analysis. It enters the stage only if the

21-12314                NEWSOM, J., Concurring                      7

Founding-era evidence calls for it.  This, to my mind, is one of those
rare cases.

21-12314                Wilson, J., Concurring                1

Wilson, Circuit Judge, concurring:

Today, the majority faithfully applies *United States v. Rahimi*, using "a historical inquiry calibrated to reveal something useful and transferable to the present day." 602 U.S. 680, 702 (2024) (Sotomayor, J., concurring). The law, history, and common sense all point to the same conclusion: Florida's law preventing its citizens under twenty-one from purchasing firearms is consistent with our nation's tradition of allowing states to impose age-based restrictions on the purchase of firearms.

I write separately as a Florida judge who is puzzled by some of my dissenting colleagues' inconsistent treatment of school safety issues. Just two years ago, they insisted "when school authorities have prudently assessed and addressed an issue that affects student welfare, we should pay attention." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 802 (11th Cir. 2022) (en banc). Based solely on the school district's conclusory references to student "safety" and "privacy," the *Adams* majority embraced the "important governmental objective in protecting students' privacy interests in school bathrooms." *See id.* at 797, 805.

But many of my colleagues who stressed the importance of protecting Florida schoolchildren when using school bathrooms looked the other way when Florida passed a law "to comprehensively address the crisis of gun violence, including but not limited to, gun violence on school campuses." 2018 Fla. Laws. 10.

Despite *Rahimi*'s guidance, the dissenters continue to demand a "historical twin." 602 U.S. at 701. In doing so, they find

convenient justifications to reject the trove of historical and scientific evidence presented by the State of Florida and "pick their friends out of history's crowd." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 112, (2022) (Breyer, J., dissenting). Apparently, "the privacy afforded by [biological] sex-separated bathrooms is widely recognized throughout American history and jurisprudence," *Adams*, 57 F.4th at 805, but the state's longstanding ability to set age restrictions on the purchase of firearms is not.

I believe I am not alone when I say I am more concerned about high school seniors purchasing assault rifles than I am about which bathroom they use. I "remain troubled by *Bruen*'s myopic focus on history and tradition, which fails to give full consideration to the real and present stakes of the problems facing our society today." *Rahimi*, 602 U.S. at 706 (Sotomayor, J., concurring). And I believe the conflicting viewpoints in these two cases exemplify this problem.

## I.

On February 14, 2018, a nineteen-year-old gunman walked into Marjory Stoneman Douglas High School in Parkland, Florida. He used a legally purchased AR-15 semiautomatic rifle to open fire into four classrooms—killing fourteen students and three staff members, and seriously wounding many others.

Less than a month after the deadliest high school shooting in our country's history, Florida lawmakers approved the first gun

control measures to pass in the state in more than twenty years.§§§§
The Florida legislature enacted the Marjory Stoneman Douglas
High School Public Safety Act with bipartisan support after "thou-
sands of students marched on the state capitol in Tallahassee to de-
mand change."***** Hundreds of Parkland students, parents, and
teachers met with Florida lawmakers, shared their experiences, and
advocated for stronger gun laws.††††† Marjory Stoneman Douglas
High Sch. Pub. Safety Comm'n, *Initial Report* 7 (2019). In the words
of one survivor, "the students at my school felt one shared experi-
ence—our politicians abandoned us by failing to keep guns out of
schools."‡‡‡‡‡

     Among other safety measures, the Marjory Stoneman
Douglas Public Safety Act (the Act) raised the minimum age for
firearm purchases from 18 to 21. Fla. Stat. § 790.065(13). The 19-
year-old Parkland shooter began legally buying firearms, including

---

§§§§ *See* James Call, *Florida Lawmakers Send Gun-Control Bill to Governor, Includes
Plan to Arm Teachers*, USA Today (Mar. 8, 2018), https://perma.cc/8R33-
MNC4.

***** Michael Scherer, *Florida Legislature Backs New Gun Restrictions After Park-
land School Shooting*, Wash. Post (Mar. 7, 2018 9:38 PM),
https://perma.cc/T65E-4YGQ; Dave Cullen, *"The News Forgets. Very Quickly":
Inside the Marjory Stoneman Douglas Students' Incredible Race to Make History*,
Vanity Fair (Mar. 7, 2018), https://perma.cc/HE2W-G976.

††††† Jessica Contrera, *'I Would Rather Not Be Alone.' Behind Their Anger, Florida
Students Are Still Teens Struggling with Trauma*, Wash. Post (Feb. 20, 2018),
https://perma.cc/XDN3-C8UT.

‡‡‡‡‡ Cameron Kasky, Opinion, *Parkland student: My generation won't stand for
this*, CNN (Feb. 20, 2018), https://perma.cc/2Y2H-89TS.

the assault rifle used during the shooting, on or around his eight-eenth birthday, and he had collected at least seven rifles at the time of the shooting. S. Rules Comm., Bill Analysis and Fiscal Impact Statement S.B. 7026, at 4 (Fla. 2018). In doing so, the Florida Legis-lature relied on data that suggests people under the age of 21 who buy firearms are more dangerous to their fellow Floridians than those who are over the age of 21. *Id.*

The gun violence epidemic in America has only gotten worse since the Act was passed. Since 2020, firearms have been the leading cause of death in the United States for children and adoles-cents. U.S. Surgeon General, Advisory, *Firearm Violence: A Public Health Crisis in America* 4 (2024). More than half of 14 to 17-year-olds in the United States report that they are worried about a shoot-ing happening at their school and a school near them. *Id.* at 15.

## II.

"Imagine the sense of loss that afflicts not only the moment, but the lifetimes of those families and friends affected. And then imagine that you mobilize and lobby your representatives to pass preventative legislation, only to be told by a court that your Con-stitution renders you powerless to save others from your family's fate." *Bianchi v. Brown*, 111 F.4th 438, 472 (4th Cir. 2024). Today, the majority's opinion honors the efforts of the Parkland commu-nity and the will of Florida's constituents. And does so in a way that is faithful to *Bruen* and *Rahimi*.

With no place in its analysis for the overwhelming data of the dangers that unregulated gun access pose to Florida's present

day young adults, the pleas of Florida's high school students, or the will of its constituents,§§§§§ the dissent champions an application of *Bruen* and *Rahimi* that would uphold this law based in part on anecdotes about Thomas Jefferson and John Adams' proclivity for hunting as schoolboys.

Of course, part of this meandering search for historical evidence is a product of how we must analyze Second Amendment cases. Prior to *Bruen*, circuits analyzing Second Amendment issues considered *both* historical practice and contemporary data. *See, e.g.*, *Horsley v. Trame*, 808 F.3d 1126, 1134 (7th Cir. 2015); *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives (BATFE)*, 700 F.3d 185, 200–03, 208–10 (5th Cir. 2012). But now, "courts evaluating a Second Amendment challenge must consider history *to the exclusion of all else*." *Rahimi*, 602 U.S. at 744 (Jackson, J., concurring).

The problems with *"Bruen's* game of historical Where's Waldo" have been well documented. *United States v. Love*, 647 F. Supp. 3d 664, 670 (N.D. Ind. 2022); *see also, e.g.*, *Rahimi*, 602 U.S. at 742 n.1 (Jackson, J., concurring). Just "canvassing the universe of historical records and gauging the sufficiency of such evidence is an exceedingly difficult task." *Rahimi*, 602 U.S. at 744–45 (Jackson, J., concurring); *see also Bruen*, 597 U.S. at 107 (Breyer, J., dissenting) (noting courts are "staffed by lawyers, not historians"). And

---

§§§§§ Though, the dissent *does* express concerns for the welfare of a fictional "20-year-old single mother living on her own," despite *Rahimi* referring to this very "hypothetical scenario" as "slaying a straw man" in facial Second Amendment challenges. 602 U.S. at 701.

"disputed history provides treacherous ground on which to build decisions written by judges who are not expert at history." *McDonald v. City of Chicago*, 561 U.S. 742, 914 (2010) (Breyer, J., dissenting).

Yet supporters of "history-and-tradition" tests insist "[h]istory is far less subjective than policy. And reliance on history is more consistent with the properly neutral judicial role than an approach where judges subtly (or not so subtly) impose their own policy views on the American people." *Rahimi*, 602 U.S. at 718 (Kavanaugh, J., concurring). Its proponents argue that history "intrudes less upon the democratic process because the rights it acknowledges are those established by a constitutional history formed by democratic decisions." *McDonald*, 561 U.S. at 805 (Scalia, J., concurring).

True, it is "comforting to believe that a search for 'tradition' involves nothing more idiosyncratic or complicated than poring through dusty volumes on American history." *Michael H. v. Gerald D.*, 491 U.S. 110, 137 (1989) (Brennan, J., dissenting). But "all history is summary." Laurence H. Tribe & Michael C. Dorf, *Levels of Generality in the Definition of Rights*, 57 U. Chi. L. Rev. 1057, 1087 (1990). Reasonable people can, and do, disagree about the content and relevance of particular traditions. *See, e.g.*, *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring).

History is an "especially inadequate tool when it comes to modern cases presenting modern problems" a useful tool to "make it nearly impossible to sustain common-sense regulations necessary to our Nation's safety and security." *Bruen*, 597 U.S. at 112–13

(Breyer, J., dissenting). Recognizing these limitations, the concurring Justices in *Rahimi* encouraged us to seek "a principle, not a mold." 602 U.S. at 740 (Barrett, J., concurring). In other words, our historical inquiry should be "calibrated to reveal something useful and transferable to the present day." *Id.* at 1904 (Sotomayor, J., concurring).

### III.

We do not—because we cannot—analyze equal protection claims like *Adams* using an analysis based purely in history and tradition. Our nation's "history and tradition" of discrimination is what led to the ratification of the Equal Protection Clause in the first place. States cannot point to our nation's long history of segregating schools or banning interracial marriage to justify twenty-first century laws barring such marriages or segregating schools. T. Cary Franklin, *History and Tradition's Equality Problem*, 133 Yale L.J. Forum 946, 966 (2024).

But even *Adams* illuminates how selective history unmoored from present-day data can be wielded to achieve judges' preferred outcomes. There, a transgender male student used the boys' restrooms at his high school for several weeks without any complaint from other boys. He was later consigned to the single-stall facilities, experiencing humiliation, embarrassment, isolation, and physical harm from this discriminatory treatment. Adams sued, arguing that his assignment to the gender-neutral bathrooms, and not to the boys' bathrooms, violated the promise of the Fourteenth Amendment's Equal Protection Clause. *Adams*, 57 F.4th at 798. His

8                    WILSON, J., concurring                    21-12314

claim failed. According to the majority, the School Board's un-
founded assertion that the bathroom policy addresses concerns
about the privacy, safety, and welfare of students was enough to
survive intermediate scrutiny. *Id.* at 797.

      The majority criticized the district court that upheld Adams'
constitutional challenge for "misconstruing the privacy interests at
issue, minimizing the factual and practical realities of how the sex-
separated bathrooms operate, and discounting the parties' stipula-
tion that students and parents objected to any bathroom policy that
would commingle the sexes out of privacy concerns, among oth-
ers." 57 F.4th at 806.

      Yet none of these "factual and practical realities" included
any evidence about actual privacy or safety issues. The majority
opinion declared "without any basis" that a person's "biological
sex" is comprised solely of chromosomal structure and birth-as-
signed sex. *See id.* at 832 (Jill Pryor. J., dissenting). In doing so, it
disregarded "unchallenged findings of fact that reflect medical sci-
ence" and oversimplified "the role of gender identity in determin-
ing a person's biological sex." *Id.* at 844. The school districts did not
present evidence about privacy or safety issues in their own
schools, nor did they present any evidence that such harms were
more likely to be caused by transgender students. Nor could they,
because no such data exists.******

---

****** Policies that prevent students from using bathrooms or locker rooms con-
sistent with their gender identity create more safety risks for students. Gabriel

The majority turned to history instead, specifically, the "long tradition in this country of separating sexes in some, but not all, circumstances." *Id.* at 801. It claimed, "the privacy afforded by sex-separated bathrooms has been widely recognized throughout American history and jurisprudence." *Id.* at 805. It pointed to the fact that "sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding." *Id.* Without any evidence, case law, or explanation of how the bathroom policy furthers student safety, history and the school's "conclusory and passing references to 'student safety'" were enough to override the Constitution's promise of equal protection. *Id.* at 853 (Jill Pryor, J., dissenting).

## IV.

Rather than being used to apply Founding-era principles to modern problems, the history-and-tradition test, when applied as rigidly as the dissent advocates, forces us to apply Founding-era solutions to modern problems, and protect our students' bathroom privacy more rigorously than their safety from firearms. The leading cause of death among children in this country is not their classmates using the "wrong" bathrooms. What the reasoning of the majority in *Adams* and the dissenters here have in common is allowing historical practices to unmoor them from present-day realities.

---

R. Murchison et al., *School Restroom/Locker Rooms Restrictions and Sexual Assault Risk Among Transgender Youth*, Pediatrics, June 2019.

10                          WILSON, J., concurring                          21-12314

When thousands of Florida students, teachers, and parents who survived a terrible tragedy have pleaded for commonsense firearm reform, we should pay attention. The Second Amendment "does not require courts to turn their backs to democratic cries—to pile hopelessness on top of grief." *Brown*, 111 F.4th at 472. If we are to make law based on "history and tradition," we should do so in a way that explicitly recognizes present-day realities—not one that is more concerned with the Founding Fathers as schoolboys than contemporary Florida schoolchildren. Because the majority opinion strikes the appropriate balance between historical analogues and present-day realities, I respectfully concur.

21-12314                BRANCH, J., Dissenting                1

BRANCH, Circuit Judge, joined by LAGOA, Circuit Judge, dissenting:

Judge Brasher convincingly explains why Florida Statute § 790.065(13), which prohibits anyone under 21 years old from purchasing firearms, violates the Second Amendment rights of all 18- to 20-year-old Floridians.[††††††] I join his dissent in full. I write separately to emphasize two simple, but in my view fatal, flaws in the majority's methodology.

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court explained the "standard for applying the Second Amendment." 597 U.S. 1, 24 (2022).

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id.* (quotation omitted). Then, in *United States v. Rahimi*, the Court reiterated that we must "examine our 'historical tradition of

---

[††††††] The majority reads my opinion to "impl[y] that any age restriction [on firearm purchases] is unconstitutional." To be clear, I would merely hold that in this case, the Commissioner failed to demonstrate that prohibiting 18-to-20-year-olds from purchasing firearms comports with this Nation's history and tradition of firearm regulation. I express no opinion on any restrictions placed upon Americans under 18 years of age.

firearm regulation' to help delineate the contours of" the Second Amendment right.  602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 17).   This approach to constitutional interpretation is colloquially called a "history and tradition" test.  *See, e.g.*, Randy E. Barnett & Lawrence B. Solum, *Originalism After* Dobbs*,* Bruen*, and* Kennedy*: The Role of History and Tradition*, 118 Nw. U. L. Rev. 433, 435 (2023) ("*New York State Rifle & Pistol Ass'n v. Bruen* articulated a history and tradition test for the validity of laws regulating the right to bear arms recognized by the Second Amendment." (footnote omitted)).

The Supreme Court has also shown us how to apply its history-and-tradition test to Second Amendment challenges.  In *Bruen*, the Court canvassed "a variety of historical sources from the late 1200s to the early 1900s" to determine if New York's licensing regime comported with this Nation's history and tradition of firearm regulation.  597 U.S. at 34.  Importantly, in so doing, the Court principally reviewed direct, primary sources—statutes, cases, and treatises from the relevant historical eras that concerned disarmament of particular individuals (or disarmament for particular conduct)—before concluding that the New York licensing regime violated the Second and Fourteenth Amendments.  *See id.* at 39–71.  The Court repeated this methodology in *Rahimi* by reviewing direct, primary historical sources to determine the constitutionality of 18 U.S.C. § 922(g)(8). *See* 602 U.S. at 693–700.  In upholding section 922(g)(8), the Court principally relied on historical analogues that (1) "[i]mportantly . . . targeted the misuse of firearms" by requiring armed individuals to

post a bond, *id.* at 696, and (2) disarmed persons who went armed to "menace" others, *id.* at 697. In sum, *Bruen*'s history-and-tradition approach requires us to examine contemporaneous historical sources of firearm regulation to determine if a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Today, however, the majority breaks from the Supreme Court's command first by declining to review our Nation's "historical tradition of *firearm regulation*" from the Founding Era. *Rahimi*, 602 U.S. at 691 (emphasis added) (quoting *Bruen*, 597 U.S. at 17). The Supreme Court has not instructed us to consider an untethered "historical tradition"—the tradition must be of firearm regulation. *Id.* But the Commissioner and the majority's lone Founding-era analogue is not a firearm regulation at all; it is a contract-law doctrine. That doctrine incidentally reached contracts for firearms because it reached contracts by minors for *any* non-necessity. Such a broadly applicable doctrine is a far cry from the historical regulations that the Court has considered as proper analogues. *See id.* at 693–700. Put simply, the Commissioner and the majority's analogue is not an "American gun law[]" as the Supreme Court has instructed us to consider. *Id.* at 693. I find no support for the use of such broad "history and tradition" as the majority employs.######

---

###### In response to this point, the majority contends that it need not only rely on firearms-specific regulations and cites the surety laws that the Supreme

But second, even if we could look at "history and tradition" as broadly defined as the majority does, the majority's Founding-era analogue faces another problem: it is not "history and tradition" at all. Instead, the Commissioner and the majority's Founding-era analogue is just inferred economic effects. To be sure, the majority cites Founding-era rules, cases, and treatises to establish that at the Founding, those under 21 years old could void their contracts for non-necessary goods. And contracts, as the majority explains, form the basis of extending credit. From these facts, the majority

---

Court relied on in *Rahimi*. But the majority's position contradicts *Rahimi* itself, because the Court noted that, "[i]mportantly for this case, the surety laws *also targeted the misuse of firearms*." 602 U.S. at 696 (emphasis added). The Court found a sufficient nexus between those surety laws and 18 U.S.C. § 922(g)(8) because each of those laws preemptively sought to curb gun violence by individuals known to be dangerous. *See id*. at 698 ("Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). By contrast, in this case, the nexus between Fla. Stat. § 790.065(13) and the voidability of minors' contracts for non-necessary goods is merely—and wholly—incidental.

Judge Rosenbaum repeats the majority's reasoning on this point and contends that the majority properly relies on "general common-law proscriptions" because "[g]eneral legal principles include firearm-specific applications." But Judge Rosenbaum's analysis turns on her and the majority's assertion that the common law actually "made it effectively impossible for Under-21s to purchase firearms" and other non-necessary goods. As I explain below, history shows that the Commissioner's cited contract-law doctrine posed little barrier at all to minors purchasing non-necessary goods, including firearms, on credit. Thus, there is little connection between the Commissioner's purported historical analogue and "American gun laws" considered by the Supreme Court. *Rahimi*, 602 U.S. at 693.

concludes that minors at the Founding generally could not purchase firearms.

The problem is that the majority's historical sources do not directly support the majority's conclusion.  Contract law has long recognized a difference between forming a contract and that same contract later being declared unenforceable.  *See, e.g.*, *Shelby v. Smith's Heirs*, 9 Ky. (2 A.K. Marsh.) 504, 512 (1820) ("Chancery will enforce contracts that are fair and certain, and it will often rescind them for mistake and fraud; but it will never make new contracts, or new model and add to those already made by the parties."); *Cochran v. Cummings*, 4 U.S. (4 Dall.) 250, 250 (Pa. 1802) (declaring an already-formed contract "fraudulent and void" because the contract was procured through "a gross misrepresentation of facts, relating to the subject of [the] contract").  The majority's cited sources reveal only that after a credit contract was formed, the minor could, if he or she so chose, avoid his or her obligations.  *See* 2 James Kent, *Commentaries on American Law* 191–93 (1827).  None of the majority's Founding-era historical sources demonstrates that minors could not, as a legal matter, *form* contracts.  By extension, none of the majority's Founding-era historical sources demonstrates that minors could not, as a legal matter, buy goods on credit.

Because the majority's sources only discuss the *ex post facto* effects of this voidability rule (*i.e.*, that minors' contracts could be declared unenforceable), these sources are merely indirect evidence that, *ex ante*, minors may have had practical difficulties

purchasing non-necessary goods on credit in the first place. But this *ex ante* effect depended entirely on a merchant's ability to tolerate risk. It may be true, as the majority asserts, that in the face of minors' ability to void contracts, merchants refused to extend minors credit wholesale. But on that point, the Commissioner and the majority cite no *direct*, historical supporting evidence.

Instead, to move from the majority's indirect evidence of the effects of the voidability rule to the majority's conclusion that minors could not purchase non-necessary goods on credit, the majority simply declares it to be so. In support, the majority cites one modern historian who agrees that "it became almost impossible [in the early 19th century] for children to form any contracts," and "infants [were] effectively unable to form contracts." That historian, however, also fails to cite any direct evidence that minors could not *form* contracts. *See* Holly Brewer, *By Birth or Consent: Children, Law, and the Anglo-American Revolution in Authority* 271 (2005). Instead, like the majority, the historian simply infers the *ex ante* economic effects of the voidability of minors' contracts for non-necessities. *See id.* at 270–71. Thus, the majority's key Founding-era analogue for *Bruen* purposes is nothing more than the majority's economic inference from indirect evidence accompanied by hollow citations.

If the majority had faithfully applied *Bruen*'s history-and-tradition test as applied in *Rahimi*, the majority would have found direct, contemporaneous historical evidence that minors at the Founding could and did purchase goods, including firearms, on

credit.  For example, the Massachusetts Supreme Judicial Court recognized that although "[t]he common law renders void any promise made by an infant, the consideration of which is not for necessaries," merchants "will nevertheless give credit to them, and minister to their pleasures and dissipation, relying upon the honor of ingenuous young men to discharge debts so incurred."  *Soper v. President & Fellows of Harv. Coll.*, 18 Mass. (1 Pick.) 177, 183 (1822). The "only remedy" for this evasion of "the wholesome intention of the common law," according to the court, was for the legislature to pass statutes affirmatively prohibiting the extension of credit to minors.  *Id.* at 183–84.  Indeed, in *Saunders Glover & Co. v. Ott's Administrator*, a case that the majority cites, the minor-defendant purchased a pistol and powder on credit, and the court determined that the merchant-plaintiff could not collect payment from the minor-defendant on the voided account.  12 S.C.L. (1 McCord) 572, 572 (1822).  Thus, the majority's inferred economic effects failed to materialize.

    This historical evidence dooms the majority's conclusion that Founding-era contract law is sufficiently analogous to Fla. Stat. § 790.065(13) to render the latter constitutional because these sources demonstrate that minors did buy goods on credit, including firearms.  Put simply, a criminal prohibition on purchasing firearms cannot be justified by a civil doctrine that, evidently, posed little barrier to purchasing anything at all.  To conclude otherwise is to give Florida the "regulatory blank check" that the Supreme Court has rejected.  *Bruen*, 597 U.S. at 30. Moreover, this evidence of minors purchasing goods on credit

8                    BRANCH, J., Dissenting                    21-12314

rebuts the majority's insistence that Founding-era legislatures had "no need to enact restrictions that prohibited [minors'] purchase of firearms." Where the majority sees "no need," Massachusetts's highest court saw great need, deeming legislation "perhaps the only remedy" to merchants and minors' credit contracts. *Soper*, 18 Mass. (1 Pick.) at 183–84. The fact that the majority cites no such legislation "is relevant evidence that [Fla. Stat. § 790.065(13)] is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

Once this analogue fails, the Commissioner's case fails. I agree with the majority and with Judge Brasher that our historical focus should be on the Founding Era. But this contracts doctrine is the Commissioner's lone Founding-era analogue. The remainder of the majority's Founding-era discussion is of laws and rules that merely "confirm" a conclusion the majority has already drawn. Indeed, Judge Brasher shows how these early militia laws and university rules cannot, by themselves, be historical analogues for Fla. Stat. § 790.065(13). Thus, the Commissioner's case, and the majority's reasoning, hinge entirely upon this lone contract-law doctrine as Fla. Stat. § 790.065(13)'s constitutional analogy. Because that analogy fails, as I have explained, we should reverse the district court.

In this case, the Commissioner bore the burden of demonstrating that Fla. Stat. § 790.065(13) comports with this Nation's history and tradition of firearm regulation. *See Bruen*, 597 U.S. at 24. Yet the Commissioner fails to cite any direct, primary historical sources that would suffice to demonstrate the

21-12314                    BRANCH, J., Dissenting                    9

constitutionality of Fla. Stat. § 790.065(13).  *See Rahimi*, 602 U.S. at
693–700 (canvassing relevant historical sources).  Nevertheless, the
majority finds in the Commissioner's favor based on economic
inferences from indirect evidence of the effects of a contract-law
doctrine.  Because I believe *Bruen* and *Rahimi* require more than
that, I respectfully dissent.

21-12314                    LAGOA, J., Dissenting                    1

LAGOA, Circuit Judge, joined by BRANCH, Circuit Judge, dissenting:

On a near-categorical basis, Florida prohibits ordinary, law-abiding adults between the ages of eighteen and twenty-one from purchasing firearms and imposes criminal sanctions on both the buyer and seller.  Fla. Stat. § 790.065(13).  Judge Brasher's dissent explains why Florida's law violates the Second Amendment—in particular, why Florida's ban and criminalization of gun purchases is at odds with our Nation's history and tradition of firearm regulation, as defined by the framework laid out in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. 680 (2024).  In responding to the majority's historical analysis, Judge Brasher shows that the record of historical statutes compiled by the Commissioner of Florida's Department of Law Enforcement does not establish a Founding-era tradition of outlawing all firearm purchases by eighteen- to twenty-one-year-olds.  In a separate dissent, Judge Branch demonstrates how the majority's analysis—which relies on the common law principle that certain contracts entered into by people under the age of twenty-one are voidable—may have made it more difficult for a person under twenty-one to purchase a product (including a gun) or for a seller to enforce a sales contract against that person, but does not evidence a historical tradition of firearm regulation.  I agree with and join in these well-reasoned dissents.

I write separately to respond to Judge Wilson's concurrence.  In his concurrence, Judge Wilson attempts to draw connections

21-12314                    Lagoa, J., Dissenting                    2

between the Court's *en banc* decision in *Adams by & through Kasper v. School Board of St. Johns County*, 57 F.4th 791 (11th Cir. 2022) and today's dissents.  In *Adams*, the Court concluded that separating the use of male and female bathrooms in the public schools based on a student's biological sex violated neither the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, nor Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et. seq.*  Judge Wilson appears puzzled that an analysis of our Nation's historical treatment of firearm regulation and our historical and judicial treatment of policies separating bathrooms based on sex might yield different judicial outcomes.  The answer to that conundrum, according to his concurrence, is that today's dissenters care more about "which bathroom [students] use" than "their safety from firearms."

*First*, I address the obvious analytical flaws in Judge Wilson's concurrence.  The right of individual, law-abiding adults to keep and bear arms is an expressly guaranteed constitutional right.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 597 U.S. at 31–32.  The desire of minor students to use a public-school bathroom assigned to the opposite sex is not.§§§§§§  Because individual rights guaranteed under

---

§§§§§§ As we recognized in *Adams*, courts including this one "have long found a [constitutional] privacy interest in shielding one's body from the opposite sex in a variety of legal contexts."  57 F.4th at 805; *see, e.g.*, *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (joining other circuits "in recognizing a prisoner's constitutional right to bodily privacy because most people have 'a

the Second Amendment are "fundamental," *McDonald*, 561 U.S. at 768, we treat them differently from other rights—precisely because they are foundational to our "system of ordered liberty." *Id.* at 778.

Moreover, § 790.065(13) regulates the conduct of adults,******* while *Adams* dealt with minors, whose constitutional rights "cannot be equated to those of adults" because of "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979) (plurality opinion). Thus, the Supreme Court "long has recognized that the

---

special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating'" (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981))); *cf. Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) (accepting that "the law tolerates same-sex restrooms or same-sex dressing rooms . . . to accommodate privacy needs"); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (same).

******* The majority opinion emphasizes that twenty-one was considered the age of majority around the time of the Founding. But, under Florida law, the age of adulthood is eighteen. *See* Fla. Stat. § 743.07(1). Additionally, the Supreme Court has held that the "age of [eighteen] is the point where society draws the line for many purposes between childhood and adulthood," including "the line for death eligibility." *Roper v. Simmons*, 543 U.S. 551, 574 (2005); *see also Graham v. Florida*, 560 U.S. 48, 74–75 (2010) (holding that the "Eighth Amendment forbids the sentence of life without parole" for offenders under the age of eighteen who did not commit homicide); *Miller v. Alabama*, 567 U.S. 460, 465 (2012) (drawing the constitutional line at eighteen for all mandatory sentences of life without parole). Given that adulthood begins at eighteen under Florida law and Supreme Court precedent, § 790.065(13) regulates the conduct of adults.

21-12314                 LAGOA, J., Dissenting                 4

State has somewhat broader authority to regulate the activities of children than of adults," *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976), and has applied this principle in a variety of cases involving minors' rights.  *See, e.g.*, *Prince v. Massachusetts*, 321 U.S. 158, 167–68 (1944) (upholding restriction on children's right to sell religious literature on the street even where an "identical" restriction, "applicable to adults or all persons generally, would be invalid"); *Ginsberg v. New York*, 390 U.S. 629, 637 (1968) (upholding prohibition on pornography sales to minors and concluding that it was constitutionally permissible for New York to "accord minors . . . a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see").

         Additionally, *Adams* arose in the K-12 public-school context, where a minor's rights must be further balanced against the school's interest in exercising its "custodial and tutelary obligations." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995); *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) ("[T]he constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings."); *Bd. of Educ. v. Earls*, 536 U.S. 822, 830 (2002) ("A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety.").  In *Adams*, this Court recognized that public schools operate *in loco parentis* to children and have special and weighty responsibility over them, which is why we held that "when school authorities have

Case 3:19-cv-01226-L-AHG    Document 158    Filed 03/20/25    PageID.18778    Page
USCA11 Case: 21-12314    Document: 137 of 173    Date Filed: 03/14/2025    Page: 133 of 169

21-12314                 LAGOA, J., Dissenting                              5

prudently assessed and addressed an issue that affects student welfare, we should pay attention." 57 F.4th at 802.

But even outside of public schools, the "power of the state to control the conduct of children reaches beyond the scope of its authority over adults." *Prince*, 321 U.S. at 170. And that does not even begin to address the lack of any doctrinal or factual connection between the issues involved here and those in *Adams*. Analogizing guns to bathrooms is legally and historically incoherent.

*Second*, the concurrence is simply the expression of one judge's policy preferences. Judge Wilson asks the reader to consider "the pleas of Florida's high school children" for "stronger gun laws," claims to know that his dissenting colleagues care more about "protecting Florida schoolchildren when using school bathrooms" than from "the crisis of gun violence . . . on school campuses," and states that he is "more concerned about high school seniors purchasing assault rifles than [he is] about which bathroom they use." All of this might make for an impassioned floor speech by an elected member of Florida's legislature in support of Florida's law, but, as the Supreme Court has admonished repeatedly, "we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Day-Brite Lighting, Inc. v. State of Missouri*, 342 U.S. 421, 423 (1952).

Judges adjudicate the issues brought before them by the parties. Here, the majority opinion and the dissents grapple with the relevant historical record and the application of Supreme Court

precedents to that record, and they thoughtfully explain why they reach different results from it. And that is not an infrequent occurrence on appellate courts, where we often disagree with our colleagues' analysis—sometimes strongly. But while the cut-and-thrust of *legal* disagreements may be sharp, they presume that a colleague means what he says when explaining his reasoning. The majority and dissents in this case are good examples of that dynamic.

Judge Wilson's concurrence offers a different approach, one that values judicial "will" over "judgment." *See The Federalist No. 78*, at 465 (A. Hamilton) (Clinton Rossiter ed., 1961). So, it is somewhat ironic that his concurrence implies that the dissenters here and the *Adams* majority have cherrypicked the historical record to achieve their presumed preferred policy outcomes. The dissenting opinions here, which I join in full, faithfully follow the Supreme Court's two-step framework laid out in *Bruen* and *Rahimi*, beginning with the presumptive constitutionality of conduct covered by the plain text of the Second Amendment, and ending with the determination that Florida's blanket prohibition is inconsistent with the Nation's history and tradition of firearm regulation. *See Bruen*, 597 U.S. at 17. Likewise in *Adams*, this Court straightforwardly applied intermediate scrutiny to a governmental policy that classified on the basis of sex and engaged in a statutory analysis using the plain and ordinary meaning of "sex" in 1972, when Title IX was passed. 57 F.4th at 803–15. Far from imposing any policy views on the American people, *see Rahimi*, 602 U.S. at 718 (Kavanaugh, J., concurring), *Adams* noted that "[w]hether Title IX should be

21-12314                    LAGOA, J., Dissenting                    7

amended to equate 'gender identity' and 'transgender status' with 'sex' should be left to Congress—not the courts." 57 F.4th at 817.

By contrast, Judge Wilson's suggestion that we should be "more concerned" about some issues than others is far more likely to be wielded to achieve judges' preferred outcomes. But it is not "for courts to judge the wisdom, fairness, or logic of legislative choices," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), or to compare policies and announce which ones are beneficial and which ones are dangerous. Nor is it a judge's job to decide which of society's ills are more important than others and, on that basis, which are more deserving of our attention and protection. Our system of separation of powers assigns those responsibilities to Congress and the various state legislatures.

This Court's job is to follow the law; that is exactly what the dissenting opinions have done, although they reach a different result from the majority opinion and from Judge Wilson's preferred policy outcome. For the reasons stated above, and for all the additional reasons laid out in Judge Brasher's and Judge Branch's dissenting opinions, I respectfully dissent.

21-12314                BRASHER, J., Dissenting                1

BRASHER, Circuit Judge, joined by BRANCH, LUCK, and LAGOA, Circuit Judges, dissenting:

This appeal asks whether the Second Amendment to the United States Constitution allows Florida to blanketly prohibit ordinary, law-abiding adult citizens between the ages of eighteen to twenty-one from purchasing any kind of firearm for self-defense. The majority opinion answers "yes." The majority opinion does so because it concludes that Florida's ban is analogous to Founding-era laws that gave legal minors a defense to the enforcement of some contracts and required parents to provide guns to their militia-going children. But there is only the most superficial and insignificant similarity between these historical and modern policies. Whatever one thinks of the majority opinion's analogical reasoning, it is not the "text, history, and tradition" framework announced in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and applied in *United States v. Rahimi*, 602 U.S. 680 (2024).

Under the Supreme Court's Second Amendment jurisprudence, we must first ask whether the prohibited conduct is encompassed by the text. In this case, we must decide whether citizens between the ages of eighteen and twenty-one are part of the "people" who have the right to keep and bear arms. And we must decide whether the right to keep and bear arms extends to the purchase of firearms. Neither the Commissioner of Florida's Department of Law Enforcement nor the majority opinion disputes that this first step is met in favor of the plaintiffs. Therefore, a presumption arises that Florida's ban is unconstitutional. *See Bruen*, 597 U.S. at 24.

2                    BRASHER, J., Dissenting                    21-12314

We next must ask whether the Commissioner can over-come that presumption of unconstitutionality by establishing that the challenged ban is consistent with our Nation's history and tra-dition of firearm regulation. This is where the majority opinion loses its bearings. Simply put, there is nothing in our Nation's his-torical tradition of firearm regulation that resembles Florida's com-plete prohibition on an adult's ability to purchase a firearm based only on that adult's age. Nothing in the Founding-era legal land-scape is analogous to the challenged law. To the extent the history says anything about age and firearms, it says that the states and fed-eral government expected all men over the age of eighteen to be armed. It was not until the middle of the nineteenth century that the first age-based regulation of the purchase of firearms was en-acted. Forty more years passed and still fewer than half the states in the country had enacted similar laws. And, even then, those laws applied only to those people who lacked the rights and responsibil-ities of adulthood and restricted only the purchase of specific weap-ons considered unusually dangerous.

In the absence of historical precedent, the Second Amend-ment does not allow for a categorical ban on the ability of law-abid-ing adults to purchase a firearm for self-defense. The majority opin-ion's contrary conclusion is hard to understand as anything other than a declaration that Second Amendment rights—alone among all our constitutional rights—start at the age of twenty-one. This conclusion splits with at least three sister circuits. *See Reese v. BAFTE,* 127 F.4th 583 (5th Cir. 2025); *Lara v. Comm'r, Pa. State Police*, 125 F.4th 428 (3d Cir. 2025); *Worth v. Jacobson*, 108 F.4th 677, 688–

21-12314          BRASHER, J., Dissenting          3

92 (8th Cir. 2024). And it is inconsistent with Supreme Court precedent. The Supreme Court has warned us that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). But the majority has read an age limit into the Second Amendment and that amendment alone.

To be clear, the Second Amendment allows policymakers to address important societal issues and respond to current events in ways that respect ordinary, law-abiding citizens' rights. As the majority opinion recounts, the Florida Legislature in 2018 enacted a suite of reforms after the infamous school shooting at Marjory Stoneman Douglas High School. Those reforms were directed at protecting school campuses and disarming the dangerous and mentally ill. The key elements of that regulatory framework are not at issue in this case. No one in this case questions the constitutionality of laws that impose background checks, regulate unreasonably dangerous weapons, spend money on school safety, or disarm the violent or mentally ill. Unlike the purchase ban, none of those laws purport to disarm an entire class of law-abiding, nonviolent, mentally competent adult citizens.

Florida's purchase ban, however, sweeps in all ordinary, law-abiding adults between eighteen and twenty-one in the entire state. And the law flatly prohibits the purchase of every firearm, even those indisputably in common use for lawful purposes, such as hunting and self-defense. A law "broadly restrict[ing] arms use

by the public generally" will never find an adequate analogue in our Nation's tradition of firearm regulation. *See Rahimi*, 602 U.S. at 698. Because Florida's ban is inconsistent with our historical tradition of firearm regulation and is therefore unconstitutional, I respectfully dissent.

## I.

Florida law prohibits individuals from possessing or using firearms if they are violent, mentally ill, or otherwise unfit to operate a firearm. For instance, a firearm generally may not be possessed or used under Florida law by (1) any individual who has ever been convicted of a felony, Fla. Stat. § 790.23(1)(a); (2) anyone who is subject to an injunction against committing acts of domestic violence, *id*. § 790.233; (3) minors under the age of eighteen, unless engaged in certain activities or supervised by an adult, *id*. § 790.22(3); or (4) individuals who have been adjudicated mentally defective or are committed to a mental institution, *id*. § 790.064.

In 2018, in response to a shooting at Marjory Stoneman Douglas High School, Florida adopted a package of measures to address violence committed on school campuses by the mentally ill. *See* 2018 Fla. Sess. Law Serv. Ch. 2018–3, § 2. The Legislature announced its purpose as "providing law enforcement and the courts with the tools to enhance public safety by temporarily restricting firearm possession by a person who is undergoing a mental health crisis and when there is evidence of a threat of violence, and by promoting school safety and enhanced coordination between education and law enforcement entities at the state and local

level." *Id.* To that end, the law provided grants for school safety programs, created school safety offices and officer positions, and expanded background checks, among similar measures. *Id.* §§ 3–5, 8, 10, 12, 14.

The centerpiece of that legislation was a "red flag" law that "requires courts to proactively remove firearms from individuals (upon petitions filed by law enforcement agencies) who pose a significant danger to themselves or others." *Davis v. Gilchrist Cnty. Sheriff's Off.*, 280 So. 3d 524, 528 (Fla. Dist. Ct. App. 2019). The Florida courts routinely enforce that "red flag" law. *See id.*

One small piece of that legislation affects people who are not violent, incompetent, or mentally ill: it prohibits eighteen- to twenty-one-year-old adults from purchasing any firearm from any source. Specifically, it provides that "[a] person younger than 21 years of age may not purchase a firearm," with narrow exceptions for certain occupations. *See* 2018 Fla. Sess. Law Serv. Ch. 2018–3, § 11 (codified as Fla. Stat. § 790.065(13)). If someone under twenty-one does purchase a gun, he or she faces up to five years' imprisonment and $5,000 in fines. *Id.* If the person selling the firearm is "a licensed importer, licensed manufacturer, or licensed dealer," then the same punishments apply to the seller as well. *Id.*

Unlike other provisions in Florida law, this purchase restriction disarms a class of law-abiding, nonviolent, mentally competent adults. In Florida, the age of adulthood is eighteen. *See* Fla. Stat. § 743.07(1). *See also Farmer v. State*, 268 So. 3d 1009, 1011 (Fla. Dist. Ct. App. 2019) ("[i]t is well established that eighteen is the

6                          BRASHER, J., Dissenting                    21-12314

dividing line between adult privileges and responsibilities and the
privileges and responsibilities of children"). An eighteen-year-old in
Florida is emancipated from the care and custody of his or her par-
ents, and they in turn are no longer responsible for his or her care
and support. *See Neville v. Neville*, 34 So. 3d 779, 780 (Fla. Dist. Ct.
App. 2010) ("a parent is not legally bound to support his or her chil-
dren beyond the age of 18, unless the parent agrees to do so in a
binding contract, or unless one of the exceptions to [this rule] ap-
plies"). Eighteen-year-olds are subject to different and higher crim-
inal penalties than children. *See Jones v. State*, 286 So. 3d 294, 296
(Fla. Dist. Ct. App. 2019) (explaining that "appellant was an adult
when he was sentenced and had thus aged out of the juvenile jus-
tice system"). And, at that age, a person may be sued and held liable
for breach of contract. *See* Fla. Stat. § 743.07(1).

  Not only does this purchase restriction disarm a class of law-
abiding, mentally competent adults, it also disproportionately dis-
arms adults who, in the words of the district court, "actually need
firearms to defend themselves." Because Florida allows young
adults to possess and use guns if they can get them, the people most
affected by the purchase restriction are adults who want to legally
obtain a firearm but lack the connections to get one for free. As the
district court explained, these adults "are likely independent" and
"likely to have families and children of their own." For example,
the restriction on purchase means that a "20-year-old single mother
living on her own [will] be unable to obtain a firearm for self-de-
fense," but an eighteen-year-old high schooler who lives with his

21-12314              Brasher, J., Dissenting                    7

parents can still lawfully get a firearm from them or an older sibling.

The National Rifle Association and an individual young adult sued the Commissioner of Florida's Department of Law Enforcement, who enforces the purchasing ban. The complaint alleged that Florida's law violates the Second and Fourteenth Amendments by "ban[ning] law-abiding, responsible, 18-to-21-year-old adult citizens from purchasing any firearm from any source." *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (holding that the Second Amendment protects an individual right to keep and bear arms); *McDonald*, 561 U.S. 742 at 791 (holding that the Fourteenth Amendment makes the Second Amendment applicable to the states).

Both sides moved for summary judgment. The district court ruled for the defendants. *See Nat'l Rifle Ass'n of Am. v. Swearingen*, 545 F. Supp. 3d 1247 (N.D. Fla. 2021). A panel of this Court affirmed. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1332 (11th Cir. 2023). And a majority of the active judges on this Court voted to rehear the appeal en banc. *See* 72 F.4th 1346 (11th Cir. 2023).

## II.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. The plaintiffs

8                    BRASHER, J., Dissenting                    21-12314

contend that Florida's blanket prohibition on firearm purchases by persons below the age of twenty-one violates the Second Amendment rights of "law-abiding, responsible, 18-to-21-year-old adult citizens." The plaintiffs are correct. Applying *Bruen's* two-step framework, as further refined by the Supreme Court's recent decision in *United States v. Rahimi*, Florida's law is unconstitutional as applied to eighteen- to twenty-one-year-old adults.

### A.

*Bruen's* first step asks whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17, 24. There are several critical textual components at play here: "the right," "the people," and "keep and bear arms." It is the plaintiff's burden at this first step to establish that he is a member of "the people" and that his conduct involves "keep[ing] and bear[ing] arms." *See id.* at 17, 24, 31–33. If the plaintiff checks those boxes, a presumption arises that the plaintiff's conduct is protected by the "right" codified in the Constitution. *Id.*

The Commissioner does not dispute that ordinary, law-abiding citizens ages eighteen to twenty-one are part of "the people." I agree. For starters, the Supreme Court essentially said as much in *Heller*. There, the Supreme Court said "'the people' . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). In other words, the text presumptively covers "all Americans." *Bruen*,

597 U.S. at 70. That definition obviously includes law-abiding citizens over the age of eighteen who have all the rights and responsibilities of adulthood.

Moreover, "the people" is a term of art used throughout the Constitution. *See Worth*, 108 F.4th at 688–90; *United States v. Williams*, 113 F.4th 637, 649 (6th Cir. 2024). Other Bill of Rights provisions that refer to "the people" have been held to protect eighteen- to twenty-one-year-olds. *See, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *New Jersey v. T.L.O.*, 469 U.S. 325, 344 (1985) (unreasonable searches and seizures). And the absence of any age restriction in the Second Amendment stands in contrast to the many express age limitations in the Constitution's text. *See, e.g.*, U.S. Const. art. I, § 2, cl. 2 (25 or older to hold office in the House of Representatives). Accordingly, we can safely say that the Second Amendment protects the "right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms." *Nunn v. Georgia*, 1 Ga. 243, 251 (1846) (cited as "particularly instructive" in *Bruen*, 597 U.S. at 54).

Just as the Commissioner does not dispute that "people" includes adults over the age of eighteen, the Commissioner also does not contest that the ability to purchase a firearm implicates the ability to "keep and bear" one. True, the challenged law does not facially prohibit or regulate the Second Amendment right, as articulated in *Heller*, "to possess and carry weapons in case of confrontation." 554 U.S. at 592. But the "the Second Amendment [also] protects ancillary rights necessary to the realization of the core right to

10                BRASHER, J., Dissenting                21-12314

possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873
F.3d 670, 677 (9th Cir. 2017) (en banc) (firearm purchasing re-
strictions); *see also Jackson v. City & County of San Francisco*, 746 F.3d
953, 967-68 (9th Cir. 2014) (ammunition purchasing restrictions);
*Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (gun range
ban). So the fact that Florida law generally allows those ages eight-
een to twenty-one to possess a firearm—if they can somehow get
one—is not dispositive. The challenged law here makes it so that a
young adult in Florida can lawfully possess a firearm only if he
knows someone willing to give it to him for free. Otherwise, the
law completely prevents that person from exercising his or her Sec-
ond Amendment rights.

Because the plaintiffs have carried their burden under
*Bruen*'s first step, Florida's law is presumptively unconstitutional.

## B.

To overcome the presumption of unconstitutionality,
*Bruen*'s second step requires the Commissioner "to show that [Flor-
ida's ban] is consistent with this Nation's historical tradition of fire-
arm regulation." 597 U.S. at 34. The government's burden is to "af-
firmatively prove," based on "historical evidence," that an "endur-
ing," "representative," and "comparable tradition of regulation"
justifies the challenged law. *Id.* at 19, 24, 27, 30, 69. The historical
analysis means that the challenged "law must comport with the
principles underlying the Second Amendment, but it need not be a
'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692 (quoting
*Bruen*, 597 U.S. at 30). The most important part of the inquiry is

that the modern law and the "enduring" historical analogue are "relevantly similar" in both the "how and why" the laws burden protected conduct. *Bruen*, 597 U.S. at 29; *see also Rahimi*, 602 U.S. at 692 ("Why and how the regulation burdens the right are central to this inquiry.").

The Commissioner flunks this test. The Commissioner has presented no analogous Founding-era regulation that precluded young adults from purchasing firearms. The record of historical statutes the Commissioner did compile, which does not begin until the 1850s, does not establish a tradition of outlawing all firearms purchases by eighteen- to twenty-one-year-olds. These statutes were passed many years after the Founding, and they are meaningfully dissimilar from Florida's ban in ways that undermine the "how and why" analogy.

1.

I will start with the Founding era, which should be the focus in our analysis. As a matter of doctrine, this focus is most consistent with the Supreme Court's caselaw. The Founding-era understanding of the Bill of Rights controls for every other amendment. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008) (Fourth Amendment); *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011) (First Amendment). And the Supreme Court has given every indication that the Founding era controls for the Second Amendment as well. *See Rahimi*, 602 U.S. at 692 ("if laws at the founding regulated firearm use to address particular problems, that

will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations"); *Bruen*, 597 U.S. at 37 (assuming "that the scope of the [Second Amendment's] protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791"). Moreover, as a matter of constitutional theory, "the history that matters most is the history surrounding the ratification of the text" because it "illuminates the meaning of the enacted law." *Rahimi*, 602 U.S. 680, 737–38 (Barrett, J., concurring); *see also Williams*, 113 F.4th at 650.

I will first discuss the way Founding-era laws addressed arms-bearing by persons between eighteen and twenty-one. Next, I will address the Commissioner's argument that Florida's ban is comparable to the voidability of contracts when undertaken with a legal minor.

a.

We know that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). But there are no Founding-era laws disarming anyone based on age.

Florida's law bans young adults from purchasing, among other things, rifles and shotguns used for hunting. Fla. Stat. § 790.065(13). At the Founding, such a law would have been unimaginable. Youthful proficiency with firearms was part of the fabric of the American identity. At age ten, Thomas Jefferson would go

21-12314                 BRASHER, J., Dissenting                          13

"into the wilderness alone with nothing but his firearm, to learn self-reliance." David B. Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 531 (2019) (hereinafter "*Young Adults*"). Years later, Jefferson advised his fifteen-year-old nephew to keep a gun as a "constant companion" during walks because skill in firearms "gives boldness, enterprise and independence to the mind." *Id.* at 532 (quotation omitted). As a schoolboy, John Adams kept a gun by the door so that he could go hunting as soon as his school lessons concluded. *Id.* And in the following generation, his son John Quincy practiced military maneuvers in the yard with a musket longer than he was tall. *Id.* These men became Founders and Presidents, but they exemplify the mentality of everyday Americans during the birth of our Nation. *See id.* at 530–32 (collecting anecdotes and concluding that "[o]rdinary people were just as determined to teach the young how to use arms").

     A well-armed American populace was about more than hunting, however—it was the official public safety policy of the day. Militia enrollment statutes obligated able-bodied men to keep certain arms and some minimum amount of ammunition in the home. Of particular relevance here, an extensive catalogue of colonial and state militia statutes establishes that eighteen- to twenty-one-year-olds were universally required to have access to firearms. *See id.* at 533–89. "Of the more than 250 militia statutes passed by the colonies and fledgling states, only one did not require militia service by eighteen-to-twenty-year-olds." George Mocsary, *Treating Young Adults as Citizens*, 27 Tex. Rev. L. & Pol. 607, 624 (2023).

And the one outlier was relatively short-lived. *See* Kopel & Green-lee, *Young Adults*, at 533.

Eventually, in the 1792 Uniform Militia Act, Congress set the federal age cutoff for militia service at eighteen years old, and most states followed suit. *Id. See generally Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 433 (4th Cir.), as amended (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (examining historical state laws and concluding that "every state required enrollment at least by age 18 during the decades around ratification, which is the critical time for determining the historical meaning of the Second Amendment"). For their part, state statutes at the time required parents to provide arms for any minor called to serve in a state select militia. *See* Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868*, 108 Minn. L. Rev. 3049, 3077–81, 3119 & nn.118–19 (2024) (hereinafter "*Age Restrictions*"); Kopel & Greenlee, *Young Adults*, at 506 n.56. But the federal legislation simply required all national select militia members to arrive armed for duty; there were no specific provisions about minors. *See* Patrick J. Charles, *The 1792 National Militia Act, The Second Amendment, and Individual Militia Rights: A Legal and Historical Perspective*, 9 Geo. J. L. & Pub. Pol'y 323, 332 (2011).

The expectation of gun ownership by those between the ages of eighteen and twenty-one was important not only for repelling foreign invaders but also for keeping the domestic peace. A regular police force is a modern development. At the Founding, sheriffs or magistrates responsible for seeing that laws were

21-12314          BRASHER, J., Dissenting          15

enforced carried out their duties by relying on the people. Different law enforcement functions were given different names, and today they are often discussed jointly under the *posse comitatus* umbrella, but they all required abled-bodied males, including those between eighteen and twenty-one, to come to the sheriff's aid bearing their own arms. *See* Kopel & Greenlee, *Young Adults*, at 533–35; Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 273 n.53 (1983) ("[B]y guaranteeing the arms of the individual, the amendment was simultaneously guaranteeing arms to . . . the *posse comitatus* . . . .").

The majority opinion strains to minimize the historical fact that, at the time of the Founding, young adults between eighteen and twenty-one were members of the militia who were legally obligated to acquire a firearm. Maj. Op. at 36. The majority opinion can't dispute that, just a few months after the Second Amendment was ratified, Congress passed the Militia Act of 1792 which required males beginning at "the age of eighteen years" to "be enrolled in the militia" and for each one to "provide himself with a good musket or firelock . . . or with a good rifle." Act of May 8, 1782, 1 Stat. 271. Instead, the majority opinion argues that the "duty" of young adults to "serve in the militia" does not suggest a corresponding "right to purchase firearms." Maj. Op. at 36. But, as a matter of both formal logic and common sense, a legal *obligation* to acquire a private firearm necessarily presupposes the legal *ability* to acquire one. "[T]he very survival of the militia depended on men who would bring their commonplace, private arms with them to muster." *Parker v. District of Columbia*, 478 F.3d 370, 394 (D.C. Cir. 2007)

16                    BRASHER, J., Dissenting                    21-12314

(affirmed by *Heller*, 554 U.S. 570). "That young adults had to serve in the militia indicates that founding-era lawmakers believed those youth could, and indeed should, keep and bear arms." *Lara*, 125 F.4th at 444. *See also Heller*, 554 U.S. at 601-602 (relying on similar "colonial statutes [that] required individual arms bearing for public-safety reasons" as evidence that the Second Amendment codified an "individual right to bear arms").

Like any other right, the right to bear arms is not unlimited. But the constant through all these regulations, from long before the Founding and enduring long afterward, is that the public expected those between the ages of eighteen and twenty-one to have access to firearms. "The meaning of the [Second Amendment] undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose." *Heller*, 554 U.S. at 617 (quoting Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880)). Unsurprisingly, then, there were no Founding-era laws prohibiting young adults from purchasing any firearm at all, much less anything like the total, criminal ban in Fla Stat. § 790.065(13).

b.

Because nothing like Florida's ban has existed in our history, the Commissioner's appeal to the Founding era begins and ends with the recognition (which no one disputes) that twenty-one, not eighteen, was often the legal age of contracting capacity at the time of the Founding. *See* Maj. Op. at 14–22. That means, for example,

that those between the ages of eighteen and twenty-one could void most contracts at the time of Founding. That is, a minor could enter a long-term contract or a contract to pay on credit, but the minor could later repudiate that contract under certain circumstances. *See* 2 James Kent, *Commentaries on American Law* 191 (1827) (noting that contracts with minors were "voidable only, and not absolutely void"). Florida still has the same policy today for the benefit of anyone under the age of eighteen. *See, e.g., Dilallo By & Through Dilallo v. Riding Safely, Inc.*, 687 So. 2d 353, 357 (Fla. Dist. Ct. App. 1997).

It is hard to see how the existence of this contract defense establishes a "comparable tradition of regulation" of "arms-bearing" with a "relevantly similar" "how and why" to Florida's ban on purchasing firearms. *Bruen*, 597 U.S. at 19, 20, 24, 27, 29, 30, 69. The Commissioner concedes that young adults at the Founding could purchase guns with money up front; the very thing they are prohibited from doing by Florida's ban. He concedes that they could even purchase guns on credit as long as the seller was willing to bear the risk that the contract might be voided, and the gun returned. And a contract for military service, which at the Founding required a firearm, could be enforced against someone under twenty-one-years-old, even if it was entered into against the will of his parents. *See United States v. Blakeney*, 44 Va. 405, 418 (1847) (per Baldwin, J.) (enforcing contract because "at the age of eighteen, a man is capable intellectually and physically of bearing arms"). *See also id.* at 441 (per Brooke, J.) ("I myself received a commission as first lieutenant in Col. Harrison's regiment of artillery, before I was

seventeen years of age, whilst I was at school; and served three years, to the end of the [Revolutionary] war.").

Moreover, the age of contracting doesn't reflect the Founding generation's views on the contours of the right to keep and bear arms, which is the right at issue here. The common law established no hard-and-fast age of legal capacity—the age depended on the activity. *See* 1 William Blackstone, *Commentaries* 453–54; *see also id.* at 453 (noting the "different capacities which [individuals] assume at different ages"). So a male could take an oath at age 12, be capitally punished in a criminal case at age 14, and serve as an executor at age 17. *Id.* at 453–54. A female could consent to marriage at age 12, choose a guardian at age 14, and serve as an executrix at age 17. *Id.* at 453. For that reason, the Founders' views on the generic capabilities of "infants" at the time of the Founding say very little about who they expected to keep and bear arms. For example, the letter from John Adams and the speech from Gouverneur Morris cited in the majority opinion make the case that some people shouldn't *vote*; they have nothing to do with arms-bearing. *See* Maj. Op. at 15. "The fact that eighteen-to-twenty-year-olds were minors unable to vote (or exercise other civic rights) does not mean they were deprived of the individual right to self-defense." *Reese*, 127 F.4th at 592.

But the biggest problem with the Commissioner's analogy is the mismatch in "how" the regulation operates, or in its "burden." In *Rahimi*, the Court explained how to assess whether a challenged law and a historical comparator have a similar "burden" or

21-12314          Brasher, J., Dissenting                    19

"how." There, the Court held that a modern prohibition on the possession of firearms by domestic abusers was comparable in "burden" with surety laws. Both laws "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." 602 U.S. at 699. They both imposed a restriction of "limited duration." *Id.* And "the penalty—another relevant aspect of the burden" was the same because they both "provided for imprisonment." *Id.*

Here, by contrast, there is no comparison at all. Historically, people under the age of twenty-one had the right to void certain contracts if sued to perform. Legal minors under the age of eighteen in Florida still have that option today. But these transactions were not prohibited—either criminally or civilly. And the enforceability of contracts was a matter for the civil courts and private suits, not criminal law. Florida's ban, on the other hand, prevents young adults from purchasing firearms by criminalizing the transaction—making it a felony punishable by prison. Florida's restriction is broader—it prohibits purchases outright. And the penalty is harsher—it comes with the threat of criminal prosecution and imprisonment. The contract voidability defense protected minors from unscrupulous counterparties; Florida's law threatens to put eighteen-to-twenty-one-year-olds in jail for five years. The upshot is that Florida's ban is not comparable to these contracting rules: "[e]ven when a law regulates arms-bearing for a permissible reason . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id.* at 692.

The mismatch between the burdens is enough to doom any comparison between the ban and contracting capacity, but let's also consider whether Florida's ban is "comparably justified." *Bruen*, 597 U.S. at 29. The justification for Florida's ban is evident from the face of the legislation that enacted it—it is about protecting the public from acts of violence. *See* 2018 Fla. Sess. Law Serv. Ch. 2018–3, § 2. That justification—preventing firearm violence—has no comparison in the voidability-of-contract regime on which the Commissioner relies. "The right of an infant to avoid his contract is one conferred by law for *his protection* against his own improvidence and the designs of others." *Putnal v. Walker*, 55 So. 844, 845 (Fla. 1911) (emphasis added). The justification is not that a minor might use the fruits of a contract to harm someone; the justification is that the minor should have the option to change his or her mind about going through with the commercial transaction.

The majority opinion says that these Founding-era capacity-to-contract laws—which, again, still exist today as applied to those under the age of eighteen—were justified because "minors were subject to the power of their parents and depend[ent] on their parents' consent to exercise rights and deal with others in society." Maj. Op. at 18. That principle doesn't provide a comparable justification *for Florida's ban*. Florida has removed the "[t]he disability of nonage" for anyone "18 years of age or older," which is why they can be held to long term contracts. Fla. Stat. § 743.07. That also means that eighteen- to twenty-one-year-olds in Florida are *not* subject to the power of their parents or dependent on their parents' consent for anything. Unlike legal minors, their parents have *no*

obligation to protect them, provide for them, or ensure their safety. *See Carter v. Carter*, 511 So. 2d 404, 406 (Fla. Dist. Ct. App. 1987) ("In short, as the law stands in Florida today, a parent has no legal obligation to support a child who has attained his majority unless that child is statutorily dependent."). Florida cannot enforce its ban based on a historical justification that does not exist in the present day. *See Bruen*, 597 U.S. at 47 ("[E]ven if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

Eighteen- to twenty-one-year-olds in Florida today—in other words, adults—are analogous to legal adults at the time of the Founding, not legal minors. The Constitution's protections are not limited to those persons who are older than the most common age of majority in the 1700s. That reasoning is akin to "applying the protections of the [Second Amendment] right only to muskets and sabers" to the exclusion of modern weapons. *Rahimi*, 602 U.S. at 692. Like any other constitutional amendment, the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28. *Cf. Kyllo v. United States*, 533 U.S. 27, 40 (2001) ("[W]e must take the long view, from the original meaning of the Fourth Amendment forward."). Even if the Founders did not anticipate that eighteen-year-olds would lose the right to the care and protection of their parents and be treated as adults under the law, the Founders adopted a Second

Amendment that applies across changes in law, society, and technology. *Bruen*, 597 U.S. at 28.

The majority opinion criticizes the preceding paragraphs as applying an equal-protection analysis and proposes that, had the plaintiffs brought a claim under the Equal Protection Clause, it would be reviewed for "rational basis." Maj. Op. at 35. The majority opinion is wrong in both respects. First, under *Bruen*, we must evaluate a law's justifications and its burdens to assess whether those justifications and burdens are comparable to an alleged historical tradition, which is what this section does. An equal protection analysis would assess the *importance* of the law's justification—compelling, rational, etc.—and focus on how closely the law is tailored to meet it, which this dissenting opinion does not do. *Compare Hirschfeld*, 5 F.4th at 440-52 (applying means-ends scrutiny to similar age-based firearm prohibition). Second, although age classifications are usually subject to rational basis scrutiny, as the majority opinion says, the majority opinion ignores that this case involves a classification about who may exercise *a fundamental right*. *See McDonald*, 561 U.S. at 778 ("the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty"). And, under the Equal Protection Clause, "if the law impinges on a fundamental right, it is subject to strict scrutiny," even if it would otherwise be subject to rational basis review. *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305–06 (11th Cir. 2009). *See, e.g.*, *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312–13 (1976) (mandatory retirement age classification was

subject to rational basis review under Equal Protection Clause because right to government employment is not fundamental).

Finally, the majority opinion says the existence of laws that specifically required parents to provide firearms for their militia-aged children suggest that those children could not purchase firearms themselves. But there is no evidence that legal barriers (as opposed to financial ones) were the primary impediment to eighteen-year-olds arming themselves. "[E]ven though there were founding-era militia laws that required parents or guardians to supply arms to their minor sons, nothing in those statutes says that 18-to-20-year-olds could not purchase or otherwise acquire their own guns." *Lara*, 125 F.4th at 445. And there is a more important point that the majority opinion overlooks: those laws *required* parents to arm otherwise unarmed eighteen- to twenty-one-year-olds. To the extent those laws reflect a Founding-era policy on age and firearms, they reflect the policy that eighteen- to twenty-one-year-olds *should be armed*. The "how and why" of that policy is as far as can be from the "how and why" of Florida's prohibition on young adults arming themselves.

Although I don't doubt that state legislatures may set age qualifications as a general matter, this case involves a fundamental right guaranteed by the text of the Constitution that does not depend on legislative grace. Because (as the majority opinion assumes and the Commissioner concedes) eighteen-to-twenty-one-year-old citizens are part of the "people" who have the right to bear arms, Florida's law is unconstitutional unless the Commissioner can

identify an analogous historical tradition of regulation that has a comparable "why" (or justification) and a comparable "how" (or burden). To meet that test based on Founding era history, the Commissioner needs to establish that a historical contract defense for legal minors is "relevantly similar" to a criminal law that prohibits legal adults from purchasing any firearm for self-defense. *Bruen*, 597 U.S. at 29; *see also Rahimi*, 602 U.S. at 692. I see nothing more than a superficial similarity between the justifications and burdens of these two very different legal regimes.

### 2.

Left without any Founding-era analogues against which to assess Fla. Stat. § 790.065(13), the Commissioner looks forward in time. First, the Commissioner notes that, starting in the 1850s, states began to restrict legal minors from purchasing certain types of firearms. Second, the Commissioner notes that public universities have historically prohibited possession of firearms by students—a class of persons that usually includes some eighteen- to twenty-one-year-olds.

There are three important considerations that make these historical analogues insufficient, I believe, to satisfy the *Bruen/Rahimi* test. Indeed, the Commissioner's historical record confirms only that our national tradition of firearm regulation has never contemplated blanket bans on firearm purchases by all persons between the ages of eighteen and twenty-one. Put another way, regardless of their place in history, none of the

Commissioner's statutes or campus regulations is a "proper analogue" for Fla. Stat. § 790.065(13).

a.

For starters, the history of state prohibitions is far too late and too sporadic to meaningfully inform our understanding of the text of the Second Amendment. The Second Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. The Framers did not originate the right to keep and bear arms, and the right is not "in any manner dependent upon [the Constitution] for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875). Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Bruen*, 597 U.S. at 34 (emphasis omitted) (quoting *Heller*, 554 U.S. at 634–35), the point of *Bruen*'s historical inquiry is to "delineate the contours" of the preexisting right to keep and bear arms. *Rahimi*, 602 U.S. at 691. In other words, historical research is a means to the end of ascertaining "the understandings of those who ratified" the Constitution. *Bruen*, 597 U.S. at 28; *see also Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring). Because we are trying to understand the scope of a preexisting right codified by the Second Amendment, post-ratification resources "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Bruen,* 597 at 36 (quoting *Heller*, 554 U.S. at 614); *see also Rahimi*, 602 U.S. at 737–38 (Barrett, J., concurring).

States first began to restrict the transfer of certain weapons to minors a generation after the Founding. Not until the 1850s did

26                    BRASHER, J., Dissenting                    21-12314

three statutes restrict eighteen- to twenty-one-year-olds' ability to
purchase firearms. *See* 1855 Ala. Laws 17; Tenn. Code § 4864 (1858);
1859 Ky. Acts 245, § 32. Those three laws were a blip on the radar
until the middle of the 1870s, when four more states enacted simi-
lar laws. *See* 1875 Ind. Acts 59; 1876 Ga. Laws 112; 1878 Miss. Laws
175; Mo. Rev. Stat § 1274 (1879). The trend only began to pick up
steam in the 1880s, when eight more states enacted such laws. *See*
1881 Ill. Laws 73; 16 Del. Laws 716 (1881); 1882 Md. Laws 656; 1882
W. Va. Acts 421; 1883 Kan. Sess. Laws 159; 1883 Wis. Sess. Laws
290 (vol. 1); 1884 Iowa Acts 86; Nev. Rev. Stat. § 4864 (1885). Three
more states, the Wyoming Territory, and the District of Columbia
joined the ranks to round out the nineteenth century. *See* 1890 La.
Acts 39; 1893 N.C. Sess. Laws 468; 1897 Tex. Gen. Laws 221–22;
1890 Wyo. Terr. Sess. Laws 140; 27 Stat. 116–17 (1892). *But see*
*Bruen*, 597 U.S. at 68 (questioning the interpretive worth of territo-
rial laws because they "were rarely subject to judicial scrutiny" and
"the basis of their perceived legality" is unknown).

    Because of this timing, these nineteenth-century statutes
could help the Commissioner's argument only if the tradition they
reflected was robust enough to provide "confirmation" that the
Founding-era public would have approved a ban on gun purchases
by those under the age of twenty-one. *Bruen*, 597 at 37 (quoting
*Gamble v. United States*, 587 U.S. 678, 702 (2019)). That is, if the
Founding-era record were "elusive or inconclusive" on that point,
we might consider whether these statutes could "liquidate" the
meaning of the Second Amendment by establishing a national his-
torical tradition of age-based purchasing bans similar to Florida's.

*Rahimi*, 602 U.S. at 723-24, 738 (Kavanaugh, J., concurring); *see also Bruen* 597 U.S. at 35–36.

But no one can say the Founding-era history is "elusive or inclusive" on this point. The Founding generation viewed eighteen- to twenty-one-year-olds as capable of using firearms in a responsible manner. *Lara*, 125 F.4th at 442-44. They were—expressly—part of the militia referred in the Second Amendment's text. "Instead of refusing to arm young Americans for fear of their irresponsibility, founding-era regulations required them to *be* armed to secure public safety." *Reese*, 127 F.4th at 598. There were no age-based limitations on their right to keep and bear arms either before, during, or immediately after the adoption of the Bill of Rights. "[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 597 U.S. at 66; *see also Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020) (holding that practices that "arose in the second half of the 19th century" cannot alone define "an early American tradition").

I also cannot say these state statutes reflect the kind of "'universal and long-established' tradition of prohibiting certain conduct" that establishes the constitutionality of that prohibition. *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 377 (1995) (Scalia, J., dissenting)). All told, over a century after the Second Amendment was ratified, only nineteen out of forty-five states (plus the District of Columbia) had implemented any form of age-based

28                    BRASHER, J., Dissenting                21-12314

firearms regulation. *See Reese*, 127 F.4th at 599-600. The slow trickle of these nineteenth-century laws is hardly an "enduring," "representative," and "comparable tradition of regulation" that justifies the challenged law. *Bruen*, 597 U.S. at 27, 30, 67; *see also id.* at 19, 24, 69.

b.

These post-ratification state statutes also fail the *Bruen*/*Rahimi* test because they do not impose comparable burdens on the right with comparable justifications. *See id.* at 66 (discounting certain nineteenth-century contrary laws because of "several serious flaws even beyond their temporal distance from the founding").

First, all but two of these statutes plainly regulate the purchase of specific easily concealed weapons;[†††††††] they do not affect the purchase of ordinary firearms in use at the time, such as rifles or shotguns. Some statutes specifically exempted normal, everyday weapons from the prohibition. *See* Tenn. Code § 4864 (does not apply to "a gun for hunting or weapon for defence in traveling"); 1882 Md. Laws 656 (excepted "shot gun[s], fowling pieces and rifles"). Others contained an exhaustive list of regulated weapons and, therefore, allowed the purchase of rifles, shotguns, and the

---

[†††††††] *See* Mo. Rev. Stat. § 1274 ("any deadly or dangerous weapon"); 16 Del. Laws 716 ("a deadly weapon . . . other than an ordinary pocket knife"). It is an open question whether all firearms were understood to be considered "deadly" or "dangerous" weapons or whether those terms applied to a subset of weapons that are easily concealed.

21-12314                  BRASHER, J., Dissenting                  29

like.‡‡‡‡‡‡ *See Worth*, 108 F.4th at 697–98 (noting that many statutes from this era, including some cited by the Commissioner here, "prohibited only *concealed* carry" or "prohibited only the kinds of weapons that could be easily concealed"). Still others identify specific concealable weapons before concluding with a catchall such as "or other deadly weapon."§§§§§§§ And basic principles of statutory

---

‡‡‡‡‡‡‡ *See* 1855 Ala. Laws 17 ("bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol"); 1876 Ga. Laws 112 ("pistol, dirk, bowie knife or sword cane"); 1883 Wis. Sess. Laws 290 (vol. 1) ("any pistol or revolver"); 1884 Iowa Acts 86 ("any pistol, revolver or toy pistol"); 1893 N.C. Sess. Laws 468 ("any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot"); 1897 Tex Gen. Laws 221–22 ("any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense").

§§§§§§§ *See* Tenn. Code § 4864 (1858) ("pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon"); 1859 Ky. Acts 245, § 32 ("pistol, dirk, bowie-knife, brass-knucks, slung-shot, cold, cane-gun, or other deadly weapon"); 1875 Ind. Acts 59 ("pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon"); 1878 Miss. Laws 175 ("bowie knife, pistol, brass knuckles, slung shot, or other deadly weapon of like kind or description"); 1881 Ill. Laws 73 ("pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character"); 1882 W. Va. Acts 421 ("any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character"); 1883 Kan. Sess. Laws 159 ("any pistol, revolver or toy pistol . . . or any dirk, bowie-knife, brass knuckles, slung shot, or other dangers weapon[]"); 1890 La. Acts 39 ("pistol, dirk, bowie-knife or any other dangerous weapon"); 1890 Wyo. Terr. Sess. Laws 140 ("any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon"); 27 Stat. 116–17 ("any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks,

interpretation require reading those catchalls in light of the enumerated lists they follow. *See Parman v. Lemmon*, 244 P. 227, 233 (Kan. 1925) ("[I]f the Legislature of 1883 had intended to include shotguns in the prohibited list of dangerous weapons, it would have specifically mentioned them."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199–213 (2012) (discussing the *ejusdem generis* canon). Two of the statutes in this last group even propose that reading in the text. *See* 1890 La. Acts 39 ("any other dangerous weapon, *which may be carried concealed*" (emphasis added)); 1890 Wyo. Terr. Sess. Laws 140 ("or other deadly weapon *that can be worn or carried concealed upon or about the person*" (emphasis added)).

The upshot is that, unlike Florida's ban, which prohibits the purchase of any and all firearms, these laws reflect a tradition of regulating specific weapons that were considered unusually dangerous because they could so easily be concealed. The Second Amendment protects only "the sorts of weapons . . . 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). And one regulation with historical pedigree is the prohibition of "dangerous and unusual weapons." *Id.* at 626–28. That policy—prohibiting access to especially dangerous weapons—is the aim and effect of these statutes. And some of

---

blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles"); *see also* Nev. Rev. Stat. § 4864 (regulating not the purchasing of any weapon but instead the "wear[ing] or carry[ing of] any pistol, sword in case, slung shot, or other dangerous or deadly weapon").

the same states that restricted minors from purchasing these weapons also restricted adults from possessing them. *See, e.g.*, Ga. Code § 4413 (1861) (prohibiting "[a]ny person" from "having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, [or] bowie-knife"). If these statutes were enough to justify Florida's ban on all gun purchases by young adults, the pedigree of "dangerous and unusual weapons" restrictions would justify a ban on firearm purchases for everyone. But there is a world of difference between the "burden" of a law like Florida's ban, which completely abolishes one's freedom to acquire a firearm to hunt or defend oneself, and these historical laws, which merely regulated the *kind* of gun that a person could purchase.

Second, these late 1800s statutes limited their proscriptions to legal minors and do not differentiate one adult from another. Each nineteenth-century statute cited by the Commissioner regulated minors as a class. Most of the statutes made that explicit. *E.g.*, 1876 Ga. Laws 112 (making it unlawful "to sell, give, lend or furnish any minor or minors any pistol"). Florida's law here, however, affects the gun-purchasing rights of adults.

Not to belabor the point, but eighteen- to twenty-one-year-olds in Florida today are analogous to adults, not minors, at the time these statutes were enacted. Unlike minors, eighteen- to twenty-one-year-olds in Florida today must protect, shelter, and defend themselves. Because they are adults, neither the state nor their parents owe them any special duty of protection or defense.

32                    BRASHER, J., Dissenting                    21-12314

It is one thing for a state to restrict a twenty-year-old's freedom to defend himself when the state also imposes a legal duty of care and protection on the twenty-year-old's parents; it is another thing entirely to prevent a twenty-year-old from acquiring the means to defend himself when there is no one else to defend him. The burdens as between these two policies are not analogous.

c.

Lastly, the campus codes are uniquely poor analogues. They were limited in geographical reach and carried far less meaningful punishments than the fines and imprisonment imposed by Florida's ban. They are "too different in both the 'how' and the 'why' to establish a compelling historical analogue for contemporary restrictions." *Reese*, 127 F.4th at 596.

There is no doubt that public colleges and universities have historically prohibited possession of firearms by students. *See* Univ. of Ga. Lib., *The Minutes of the Senatus Academicus 1799–1842* (Nov. 4, 1976), https://perma.cc/VVT2-KFDB (providing an August 9, 1810 resolution prohibiting student possession of "any gun, pistol," or "other offensive weapon in College or elsewhere"); Univ. of Va. Bd. of Visitors, *University of Virginia Board of Visitors Minutes (October 4-5, 1824)* 6–7, Encyclopedia Va. (Dec. 7, 2020), https://perma.cc/5GVE-K2DS (forbidding the possession or use of "weapons or arms of any kind, or gunpowder" on the grounds); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838), https://perma.cc/WW7L-KH5T (prohibiting

possession of "fire arms, or gunpowder"). Some of these students were likely between eighteen and twenty-one, but others were presumably younger and some older.

The campus codes are not useful *Bruen* analogues. The point of analogizing to historical statutes, judicial decisions, and commentary is to see what the people responsible for ratifying, interpreting, and enforcing the Second Amendment thought it meant. But when these campus codes were written, nobody understood the Constitution to govern a college's campus rules. Not until 1961 did a court enforce students' constitutional rights against a public university. *See generally Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961). In the decades just before that decision, courts would apply a form of contract law and review university action, if at all, only for reasonableness. David M. Rabban, *Judicial Review of the University-Student Relationship: Expulsion and Governance*, 26 Stan. L. Rev. 95, 97–98 (1973). And when the campus codes invoked here were implemented, colleges were said to stand *in loco parentis*: In the eyes of the law, the student's parents had given "the discretionary privileged authority of parents to university authorities." *Id.* at 97 n.15; *see also Worth*, 108 F.4th at 695–96. Colleges, imbued with this "strict authority and control," imposed a "vast array of rules and restrictions" as *parents*, not *governments*. Brian Jackson, *The Lingering Legacy of In Loco Parentis: An Historical Survey and Proposal for Reform*, 44 Vand. L. Rev. 1135, 1139–40 (1991). A campus code says no more about the Constitution than does a particular parent's house rules.

34                    BRASHER, J., Dissenting                    21-12314

Even taken at face value, these campus codes are unlike Fla. Stat. § 790.065(13). Most campus codes applied only to school grounds, making them more like "sensitive places" regulations than precursors for a universal ban on all firearms purchases by an entire class of individuals. *See Bruen*, 597 U.S. at 30–31 (explaining historical pedigree and purpose of sensitive-places laws). And even when campus codes could be enforced based on off-campus conduct, the punishments were nominal financial penalties, suspensions, or expulsions, not the years of imprisonment contemplated by Florida's ban. *See* Walsh & Cornell, *Age Restrictions*, at 3070; *see also Rahimi*, 602 U.S. at 699 (observing that a regulation's penalty is "another relevant aspect of the burden").

### III.

The Second Amendment does not allow for a categorical ban on the ability of law-abiding adults ages eighteen to twenty-one to purchase a firearm for self-defense. Because Supreme Court caselaw establishes that Florida's ban is unconstitutional as applied to adults between the ages of eighteen and twenty-one, I respectfully dissent.